

U.S. Department of the Interior
Bureau of Land Management
Colorado State Office



# Glenwood Springs Resource Area

## Oil & Gas Leasing & Development

# Record of Decision and Resource Management Plan Amendment

March, 1999

BLM_0007119



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7076

IN REPLY REFER TO:

1610/1792

March 24, 1999

Dear Reader:

Enclosed is a copy of the Record of Decision (ROD) for an Amendment to the oil and gas decisions contained in the Resource Management Plan (RMP) for the Glenwood Springs Resource Area (GSRA). The decisions described in the Plan Amendment are those analyzed in the "Glenwood Springs Resource Area Oil and Gas Leasing and Development Final Supplemental Environmental Impact Statement (SEIS)," published January 1999. The document is a supplement to the "Colorado Oil and Gas Leasing and Development Final Environmental Impact Statement (FEIS)," published in January, 1991.

The SEIS was primarily prepared to address increasing levels of oil and gas development in the western portion of the Glenwood Springs Resource Area. While the SEIS was being prepared, management of the 56,000 acre Naval Oil Shale Reserve (NOSR) was transferred from the Department of Energy to the Department of Interior. The legislation effecting this transfer further mandated that certain oil and gas reserves of the NOSR be offered for lease by November 18, 1998. Because of the physical proximity of the affected NOSR lands and the western portion of the GSRA, the decision was made to incorporate portions of the NOSR into the SEIS.

The approved plan amendment includes the entire GSRA, although the analysis in the SEIS focused on the area with increasing levels of oil and gas development in the western portion of the Resource Area. The remainder of the GSRA has experienced very little oil and gas development in the last 10 years and little future development is anticipated.

We are pleased to provide this copy for your reference and appreciate your cooperation and participation during the planning process. If you have any questions or desire more information, please contact the Glenwood Springs Resource Area office at 970-947-2800.

Sincerely,

Ann J. Morgan   Acting
State Director

# Record of Decision

BLM_0007121

The purpose of this Record of Decision (ROD) is to document both the completion of the environmental review and the approval of the amendment of the oil and gas decisions of the Glenwood Springs Resource Area (GSRA), Resource Management Plan (RMP).

## Decision

The decisions identified in Chapter 2 of the attached Glenwood Springs Resource Area, Resource Management Plan Amendment (Plan Amendment) are approved. These decisions are analyzed and described in the Preferred Alternative of the "Glenwood Springs Resource Area Oil and Gas Leasing and Development Final Supplemental Environmental Impact Statement (SEIS)," published January, 1999. The decisions contained in the ROD supersede the decisions made for the GSRA in the Record of Decision for the "Colorado Oil and Gas Leasing and Development Final Environmental Impact Statement (FEIS)," published in January 1991. They also supersede the oil and gas decisions in the GSRA Resource Management Plan (RMP), dated January, 1984. This Plan Amendment was prepared under the regulations for implementing the Federal Land Policy and Management Act (FLPMA) of 1976 (43 CFR 1600). An environmental impact statement (EIS) was prepared for this Plan Amendment in compliance with the National Environmental Policy Act (NEPA) of 1969. The decisions contained in this Plan Amendment are the same as those analyzed in the Preferred Alternative of the Final SEIS published by the BLM in January 1999. Minor corrections and editorial changes are shown in the *"Errata"* sheet (Appendix C) at the end of this document.

The decisions contained in this document will be implemented in the form of lease stipulations [No Surface Occupancy (NSO) stipulations, Timing Limitation (TL) stipulations, and Controlled Surface Use stipulations (CSU)] and Lease Notices (LN) placed on new leases. These stipulations and notices are identified in Appendix B of the attached Resource Management Plan Amendment.

In addition, Conditions of Approval (COA) are developed by the BLM on a case-by-case basis to address site-specific issues. Any mitigation measure which is consistent with lease rights, or accepted on a voluntary basis, and the guidance set forth in this plan and subsequent amendments is available to the Authorized Officer (AO) for use as a COA. Appendix D of the FEIS contains a full listing of potential COAs in use in 1991. Appendix D of the SEIS includes a list of COAs developed since then. Other COAs which are consistent with lease rights granted and the general guidance in the RMP amendment will be developed to mitigate site specific issues identified during analysis of field development proposals.

Although the lease stipulations and COAs were developed to apply to oil and gas leasing and development, it is intended that the same or similar measures will be applied to other public land uses in order to maintain or achieve the same resource conditions and to assure equitable treatment to all public lands users. Additional administrative measures may be needed to determine how to best apply comparable measures to other uses.

Approximately 160 acres of NOSR 1 located in Lots 1-4 Section 8 and Lots 1-4 Section 9, T. 6 S., R. 95 W., will be available for leasing at this time because the parcel is part of a communitization agreement initiated by the Department of Energy and is considered a portion of the NOSR to be leased by November 18, 1998. A Resource and Mineral Estate Protection NSO stipulation, with no exceptions, will be attached to the parcel to prevent impacts to surface resources while providing protection of the U.S. Government's mineral interest as defined by existing contract obligations. This will ensure no adverse environmental impacts occur as a result of leasing this parcel and no additional environmental analysis beyond that already in the SEIS is necessary.

## Alternatives

Three alternatives were initially analyzed in the development of this Plan Amendment: Continuation of Current Management Alternative,

BLM_0007122

a Maximum Protection Alternative, and a Proposed Action. As a result of the comments received on the Draft SEIS, a Preferred Alternative was developed. All of these alternatives are further described and analyzed in both the Draft and Final SEIS.

## Mitigation

The Plan Amendment has been designed to avoid or minimize environmental impacts as much as possible. Specific mitigation measures are described as lease stipulations and lease notices in Appendix B of this document and Appendix D of the SEIS.

## Evaluation and Monitoring

This amended plan will be evaluated on an on-going basis to determine the effectiveness of the mitigation measures in achieving the desired levels of resource protection while facilitating the development of natural gas reserves. This evaluation will occur primarily in the context of the environmental assessments (EA) to be prepared for an Application for Permit to Drill (APD). The primary purpose of the evaluation is to determine: if actions are consistent with the Plan Amendment; whether original assumptions are still valid; whether environmental effects and impacts to mineral resources are correctly predicted; and whether mitigation·measures are reasonable and satisfactory in achieving the desired levels of resource protection. Ultimately, evaluation will determine whether there is sufficient cause to warrant further change to the Resource Management Plan.

In addition, monitoring will be conducted as necessary for specific resources to determine the effectiveness of the mitigation measure in achieving the desired levels of resource protection.

## Public Involvement

The views and opinions of the public were sought throughout the development of the Plan Amendment. Numerous formal and informal meetings were held with the public, county commissioners, and various interest groups. A 90 day public review period was held to receive comments on the Draft SEIS. Because of numerous requests, the Draft SEIS review period was extended to allow more time for review and comment.

A 30 day public protest period was held in conjunction with a 60-day Governor's consistency review after the Final SEIS was published in January, 1999.

## Protests

During the protest period, the BLM Director received protests from the following individuals and groups:

- Colorado Environmental Coalition (CEC)
- The Grand Valley Citizens' Alliance (GVCA) and Western Colorado Congress (WCC)
- Barrett Resources, Inc.
- Ralph Irwin
- Ronald Cloninger

The CEC protested that BLM failed to consider emerging issues and new information in preparing the alternatives and that BLM did not consider an appropriate range of alternatives, including a "no leasing" alternative.

GVCA and WCC protested that BLM did not select the Maximum Protection Alternative, that BLM needs to improve methods to measure reclamation success; that the analysis of environmental effects discounts the attributes of various land forms and resultant habitat and species diversity; that BLM should control spacing of wells and consider directional drilling; that BLM's analysis of impacts associated with impacts on existing leases was inadequate; that BLM did not adequately address pollution prevention; that the BLM estimate of the number of wells was too

BLM_0007123

low; that wells should be located no less than 1000 feet from residences and that BLM failed to discuss unitization.

Barrett Resources, Inc. protested that some of the lease stipulations and lease notices were inappropriate because; exceptions were missing or not broad enough; the stipulations or notice indicate an imbalance in BLM's management goals; implementation of the measure would inappropriately restrict oil and gas development; implementation of the measure would be open-ended in terms of cost and delay; that the FEIS did not support the need for the measure; or that the measure was based on an inappropriate management goal.

Ralph Irwin protested that BLM should select the Maximum Protection Alternative and should not allow more than four wells per square mile.

Ronald Cloninger protested that the SEIS failed to discuss measures that will be utilized to control dust during the life of the well.

After careful review of the protests, the Director of BLM concluded that the Colorado State Director followed applicable planning procedures, laws, regulations, and policies, and considered relevant resource values and public input. Accordingly, the issues raised did not warrant changes to the proposed Plan Amendment.

## Consistency

The plan amendment is consistent with plans, programs, and policies of the local and state governments and of other federal agencies.

## Public Availability of the Plan

Copies of the Plan Amendment are available from the BLM offices in Glenwood Springs, Grand Junction, and Lakewood, Colorado.

BLM_0007124

U. S. Department of Interior
Bureau of Land Management

## GLENWOOD SPRINGS RESOURCE AREA

## OIL & GAS LEASING & DEVELOPMENT

## RESOURCE MANAGEMENT PLAN AMENDMENT

## AND

## SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

# RECORD OF DECISION

Approved by:

*Mario Gonzalez*
Mario Gonzalez
Acting COLORADO STATE DIRECTOR
Bureau of Land Management

March 24, 1999

BLM_0007125

# Resource Management Plan Amendment

BLM_0007126

Glenwood Springs Resource Area
Resource Management Plan Amendment

## Oil and Gas Element

# TABLE OF CONTENTS

**CHAPTER 1   INTRODUCTION**
Purpose and Need ................................................................................................................ 1
Description of the Area......................................................................................................... 1
Valid Existing Rights............................................................................................................ 2


**CHAPTER 2   RESOURCE MANAGEMENT DECISIONS**
Objectives ............................................................................................................................ 3
Decisions .............................................................................................................................. 3


**CHAPTER 3  PLAN IMPLEMENTATION, MONITORING AND MAINTENANCE**
Implementation .................................................................................................................... 5
Monitoring ............................................................................................................................ 5
Maintenance.......................................................................................................................... 5
Amendments and Revision ................................................................................................... 5


**APPENDICES**
A      Resource Management Decision Lease Stipulations ........................................... 7
B      Management of Lease Development ................................................................... 16
C      Errata ................................................................................................................. 18

BLM_0007127

# Chapter 1: Introduction

## Purpose and Need

In November 1991, the Bureau of Land Management (BLM) amended the oil and gas portion of the Resource Management Plan (RMP) for the Glenwood Springs Resource Area (GSRA), as described in the FEIS of January, 1991. When the 1991 FEIS was being prepared, only limited oil and gas development had occurred in the GSRA. In the previous 30 years, about 50 wells had been drilled on federal mineral estate. The Reasonable Foreseeable Development (RFD) scenario used in the FEIS forecast 90 wells for the entire GSRA, which seemed a likely level of development for the next 20 years. However, soon after completion of the FEIS, the level of development activity began to increase in portions of the western part of the GSRA (referred to as Region 4). Although 72 wells had been anticipated in that area over a 20 year period, that number was reached in only eight years. This higher-than-expected rate of development raised questions about the impact analysis in the FEIS and its continued validity.

The FEIS (page 1-6) stated that when the number of wells identified in its RFD scenario had been authorized, BLM would prepare an environmental analysis to determine if the impacts identified in the FEIS had been exceeded. BLM concluded that development was concentrated in a relatively small area along the Interstate 70 corridor from Silt to Parachute in a pattern that was denser than implied in the FEIS. Additionally, as many as 25 wells per year had been approved on public land in recent years, and such rates were expected to continue into the future. This exceeded the rate analyzed in the FEIS. Therefore, a decision was made to complete a new evaluation of the impacts of oil and gas leasing and development in the GSRA and the SEIS process to supplement the 1991 EIS was initiated.

The purpose of the Supplemental EIS (SEIS) and this Plan Amendment is to: 1) comply with the FEIS mandate for a review of environmental effects when the number of wells exceeded the RFD; 2) provide public disclosure of the impacts of a level of development greater than originally anticipated; 3) provide an improved information base for managing gas development impacts; 4) prepare a set of management objectives or standard operating procedures that could be used to manage future oil and gas development; and 5) review and modify the lease stipulations that could be applied to future leases and thereby amend the RMP for the GSRA (the Plan Amendment).

While the SEIS was being prepared, Congress passed Public Law 105-85, the Department of Defense Authorization Act of 1998 (included in Appendix C of the Draft SEIS). Section 3404 of the Act called for the transfer of all 56,000 acres of the Naval Oil Shale Reserves (NOSR) near Rifle, Colorado from the Department of Energy (DOE) to the Department of the Interior (DOI), to be managed by the BLM, and mandated that the oil and gas reserves of the developed portion of the NOSR be offered for lease by November 18, 1998. Because of the area's proximity and a physical nature similar to surrounding BLM land, the GSRA decided to include the developed portion of the NOSR (the NOSR Production Area) in the SEIS and Plan Amendment. The RMP amendment and environmental analysis for the remainder of the 56,000 acre NOSR, that part north of the NOSR Production Area, will be done as soon as practicable. This RMP amendment makes no oil and gas leasing decisions for this area of approximately 44,000 acres (about 38,000 in the GSRA, the remainder in the White River Resource Area).

## Description of the Area

Like the 1991 Plan Amendment, this Plan Amendment addresses the entire GSRA (568,000 acres of public land from Edwards to DeBeque and from Aspen to Toponas). This includes a portion of the 56,000 acre Naval Oil Shale Reserve as described above. Maps depicting the GSRA are available in the SEIS.

BLM_0007128

Lands acquired by BLM in the GSRA since the FEIS, including about 4,200 acres near King Mountain in Routt County and the Haff Ranch southeast of Glenwood Springs in Garfield County are included in this Plan Amendment.

## Valid Existing Rights

The Plan Amendment does not repeal valid existing rights on public lands. Valid existing rights take precedence over the actions in this plan. As an example, a lease issued prior to this plan having no timing limitation stipulation may not be restricted by decision in this plan unless the lessee agrees voluntarily or the restriction is determined to be compatible with the lease terms issued. Valid existing rights may be held by other federal agencies or by private individuals or companies.

BLM_0007129

# Chapter 2: Resource Management Decisions

## Objectives

The overall objective for this Plan Amendment is the same as the objective in the 1991 RMP amendment: to facilitate orderly, economic, and environmentally sound exploration and development of oil and gas resources using balanced multiple-use management. BLM is not proposing changes to the major decisions in the FEIS, namely that: 1) the entire federal mineral estate in the GSRA, except the Wilderness Study Areas (WSAs), would be open for oil and gas leasing and development; 2) BLM would apply lease stipulations and lease notices as appropriate to all new leases; and 3) BLM will develop appropriate Conditions of Approval (COAs) for all Applications for Permit to Drill (APDs) for leases issued prior to the RMP Amendment, provided the COAs are consistent with lease rights granted. Maps depicting the areas affected by lease stipulations are available in the SEIS.

## Decisions

- All oil and gas leases will be subject to the standard terms and conditions of an oil and gas lease (see Appendix D of the Draft SEIS for a description of standard lease terms).

- Conditions of Approval (COA) will be applied to individual permits to drill and subsequent field operations at the time of actual lease development. Any mitigation measure which is consistent with lease rights, or accepted on a voluntary basis, and the guidance set forth in this plan and subsequent amendments is available to the Authorized Officer (AO) for use as a COA. Appendix D of the FEIS contains a full listing of potential COAs in use in 1991. Appendix D of the Final SEIS includes a list of COAs developed since then. Other COAs which are consistent with lease rights granted and the general guidance in the

Plan Amendment will be developed to mitigate site specific issues identified during analysis of field development proposals.

- Approximately 27,760 acres of BLM-administered mineral estate within the Glenwood Springs Resource Area are closed to oil and gas leasing (the WSAs).

- Special management areas, including surface coal mines, riparian and wetland zones, major river corridors, State wildlife areas, fish hatcheries, domestic watershed areas, debris flow hazard zones, steep slope areas, Areas of Critical Environmental Concern, Special Recreation Management Areas, Recreation Management Area, Interstate 70 viewshed and the Anvil Points Cave Area will be protected with No Surface Occupancy (NSO) stipulations on oil and gas leases. Exceptions to the NSO requirement are available at the discretion of the AO for many of these areas.

- Important wildlife habitat areas including grouse leks, raptor nest sites, Bald Eagle roost or nest sites, Peregrine Falcon nest complexes, Mexican Spotted Owl roost or nest sites, wildlife seclusion areas, and Threatened or Endangered species habitat will also be protected with No Surface Occupancy stipulations. Timing limitations will additionally be used to avoid development activities during periods critical to many wildlife species.

- Controlled Surface Use stipulations will be used for underground coal mines, riparian and wetland zones, BLM sensitive species habitat, areas with erosive soils or steep slopes, areas in Visual Resource Management Class II, and in the Sharrard Park Paleontological Area.

- Lease Notices notifying oil and gas lessees of special inventory requirements or reporting requirements will be utilized for Class I and II Paleontological Areas, biological inventory areas, annual reclamation progress reporting, and emergency communication plans. Lease Notices will also be utilized to inform oil and

BLM_0007130

gas lessees of operational concerns in wildlife areas, residential areas, in the Anvil Points Landfill, areas near the Rulison Project, and in sensitive viewsheds.

Appendix A of this document includes a listing of lease stipulations and identifies those situations where exceptions are available. Lease stipulation exceptions may be utilized for those lease stipulations where the option is identified as available, and the criteria for its use can be satisfied. Appendix B of this document describes the process utilized to manage lease development.

Further details of these decisions are provided in the Final SEIS.

BLM_0007131

# Chapter 3:  Plan Implementation, Monitoring and Maintenance

## Implementation

This amendment will be implemented upon approval by the State Director.  The new leasing stipulations and lease notices will be attached to oil and gas leases beginning with the first sale after plan implementation ( i.e., ROD signing).

## Evaluation and Monitoring

This plan will be evaluated on an on-going basis to determine the effectiveness of the mitigation measures in achieving the desired levels of resource protection while facilitating the development of natural gas reserves, as described in the Plan Amendment.  This evaluation will occur primarily in the context of the environmental assessments (EA) to be prepared for an Application for Permit to Drill (APD).  The primary purpose of the evaluation is to determine: if actions are consistent with the Plan Amendment; whether original assumptions are still valid; whether environmental effects and impacts to mineral resources are correctly predicted; and whether mitigation measures are reasonable and satisfactory in achieving the desired levels of resource protection.  Ultimately, evaluation will determine whether there is sufficient cause to warrant changes to the Plan Amendment.

In addition, monitoring will be conducted as necessary for specific resources to determine the effectiveness of the mitigation measure in achieving the desired levels of resource protection.

## Maintenance

Minor changes may be made to the plan without additional public involvement.  This category of plan change is called "plan maintenance." Definitions and procedures for plan maintenance are contained in the BLM planning regulations. Examples of plan maintenance include updating inventories of resources protected, so long as the new inventory does not change the need for, or level of, protection required by the plan.

One example of maintenance might be the expansion of acreage covered by a wildlife stipulation based on a new inventory.  That kind of maintenance would only be done when the Authorized Officer determined that no new leasing restriction was required to protect the additional acreage and that the imposition of the restriction on the addition would not impact oil and gas development more than predicted in the RMP.

## Amendments and Revisions

The Plan Amendment may be amended or revised if major changes are necessary.  Monitoring and evaluation findings, new data, new or revised policy, or a proposed action resulting in a change in scope, terms, or conditions of the plan, would warrant an amendment or revision. An amendment will be analyzed either in an environmental assessment or environmental impact statement. The public and other agencies will be included in the amendment and revision process.

An example of a decision requiring a Plan Amendment would be to convert a No Surface Occupancy stipulation to a Timing Limitation stipulation of four months.  To make such a decision the Authorized Officer would have to evaluate the impacts resulting from oil and gas development during certain times of the year in an area where the RMP originally analyzed the impacts of no development at all.

Note that this decision is different than one an AO might make on a one-time basis to exempt a particular operation from a No Surface Occupancy stipulation based on criteria analyzed in the RMP (See the discussion of waiver, exception, and modification of leasing stipulation on page 2-4 of the Final SEIS).

BLM_0007132

# Appendix A:  Resource Management Decision Lease Stipulations

## No Surface Occupancy Stipulations (NSO)

**1.  Surface Coal Mines.**  NSO within the area of an approved surface coal mine for the conservation of natural resources.  This stipulation may be waived without a plan amendment if the lessee agrees that any well approved for drilling will be plugged below the coal when the crest of the highwall approaches within 500 feet of the well, and that the well will be re-entered or redrilled after completion of mining operations through the well location.  A suspension of operations and production will be considered when the well is plugged and a new well is to be drilled after mining operations move through the location.

**2.  Riparian and Wetland Zones.**  To maintain the proper function of riparian zones, activities associated with oil and gas exploration and development, including roads, transmission lines and storage facilities, are restricted to an area beyond the outer edge of the riparian vegetation.

Exception: a) An exception may be granted if the Authorized Officer (AO) determines that the activity will cause no loss of riparian vegetation, or that the vegetation lost can be replaced within three to five years with vegetation of like species and age class; b) Within the riparian vegetation, an exception is permitted for stream crossings, if an area analysis indicates that no suitable alternative is available.

**3.  Major River Corridors.**  NSO within one-half mile of either side of the high water mark (bank-full stage) of six major rivers: Colorado, Roaring Fork, Crystal, Frying Pan, Eagle and Piney. These riverine and adjacent areas provide: a) special status fish and wildlife species habitat; b) important riparian values; c) water quality/filtering values; d) waterfowl and shorebird production values; e) valuable amphibian habitat;  f) high scenic and recreation values.  Included in this area are public lands near the Eagle and Colorado Rivers designated as Special Recreation Management Areas (SRMAs) in which BLM provides facilities to enhance recreation opportunities and maintain the recreational setting.

*Note:* The area north of I-70 in the NOSR Production Area is not included in this stipulation.

Exception:  The distance from the river may be reduced after the AO has considered the habitat values and the species present, the topographical and vegetative characteristics of the area, and the type and amount of surface disturbance proposed.  For the Eagle and Colorado Rivers, additional exception criteria include measures to mitigate impacts on recreation: a) screening operations from scenic views; b) reducing drill rig and other equipment noise to an acceptable level; c) protecting the recreating public from operations; and d) restoring disturbed areas to a condition substantially unnoticeable to the casual observer.

**4.  Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas.**  Protection of wildlife habitat values for which these areas were acquired by the state, including crucial big game and upland game winter habitat, and concentration areas and riparian values.

Exception criteria include special mitigative measures developed in consultation with the Colorado Division of Wildlife.

**5.  Rifle Falls and Glenwood Springs Fish Hatcheries.**  NSO within a two mile radius of the hatcheries for the protection of the quality and quantity of surface water and underground aquifers supplying the Rifle Falls and Glenwood Springs Fish Hatcheries.

Exception criteria include special mitigative measures developed in consultation with the Colorado Division of Wildlife.

BLM_0007133

**6.   Grouse** (includes sage grouse, Columbian sharp-tailed, lesser and greater prairie chicken). NSO within one-quarter mile radius of a lek site (courtship area).

Exception:   The NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation screening to the lek site.

**7. Raptors** (includes golden eagle and osprey; all accipiters; falcons, except kestrel; buteos; and owls).  Raptors that are listed and protected by the Endangered Species Act are addressed separately.  NSO within one-eighth mile radius of a nest site.

Exception:   The NSO area may be altered depending on the active status of the nest site or the geographical relationship to the nest site of topographic barriers and vegetation screening.

**8.   Bald Eagle.**   NSO within one-quarter mile radius of the roost or nest site.

Exception:  For roost sites, the NSO applies to the essential features of the winter roost site complex.  After Section 7 consultation with the U.S. Fish and Wildlife Service, the NSO area may be altered, depending on the active status of the roost or the geographical relationship of topographic barriers and vegetation screening to the roost site.

**9.  Peregrine Falcon.**  NSO within one-quarter mile radius of cliff nesting complex.
Exception:  After Section 7 consultation with the US Fish and Wildlife Service, exceptions may be permitted.

**10.   Mexican Spotted Owl.**  NSO within one-quarter mile radius of a roost or nest site.

Exception:  After Section 7 consultation with the US Fish and Wildlife Service, exceptions may be permitted.
**11.   Wildlife Seclusion Areas.**  NSO within fourteen seclusion areas that provide high wildlife value: The Roan Cliffs, Cottonwood Gulch, and Webster Hill/Yellowslide Gulch (all in the NOSR Production Area); Hayes Gulch; Riley and Starkey Gulch; Riley Gulch; Crawford Gulch; Magpie Gulch; Paradise Creek; Coal Ridge; Lower Garfield; Jackson Gulch; Bald Mountain; and Battlement Mesa.

Exceptions may be granted based on approval by the AO of a mitigation plan that suitably addresses the wildlife seclusion values at risk. These areas provide several unique qualities, such as an optimum mix of quality forage, cover and water; proximity to natural migration corridors; birthing areas; topographic features which moderate severe winter conditions; and seclusion from human intrusion.

**12.   Threatened or Endangered Species.**  NSO on habitat areas for those species listed by the federal or state government as endangered or threatened, and for federal proposed or candidate species.  Habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species.

Exception: Surface occupancy may be authorized, pending Section 7 consultation with the U.S. Fish and Wildlife Service on federal Threatened or Endangered Species or with the Colorado Division of Wildlife for state listed species.  The AO will consider the type and amount of surface disturbance, plant frequency and density, relative abundance of habitat, species and location, topography, and other related factors.

**13.   Domestic Watershed Areas.**  Protection of municipal watersheds providing domestic water for the communities of Rifle and New Castle.

Exception:  Activity may be permitted if the AO determines, in consultation with the communities of Rifle and New Castle, that the applicant's proposal would produce only a negligible decrease in water quality.

**14. Debris Flow Hazard Zones.**  NSO for the protection of the Glenwood Springs debris flow zones.

BLM_0007134

Exception: Activity may be permitted by the AO in consultation with the City of Glenwood Springs and Garfield County, provided that the applicant's proposal will produce only a negligible increase in the risk of debris flow.

**15. Steep Slopes.** To maintain site stability and site productivity, no surface disturbance for oil and gas facilities will be authorized on slopes greater than 50 percent. This NSO does not apply to pipelines.

Exception: In the event the lessee demonstrates that operations can be conducted without causing unacceptable impacts and that less restrictive measures will protect the public interest, an exception may be approved by the AO. A request for an exception must include an engineering and reclamation plan which provides a high level of certainty that such operations can be conducted consistent with the objectives of the GSRA Reclamation Policy. All elements of the Erosive Soils and Steep Slope CSU would apply. In addition, the operator must provide sufficient on-site analysis of soil types, vegetation types, aspect, depth to bedrock, nature of subsurface materials and potential for below ground seeps or springs. The lessee must also provide an evaluation of past practices on similar terrain and be able to demonstrate success under similar conditions. Previous success under similar conditions would be a critical element in the AO's determination.

**16. Special Recreation Management Areas (SRMAs).** For the protection of the recreational setting, recreation opportunities and recreation facilities provided within the SRMAs, the Class I VRM values in the Areas of Critical Environmental Concern (ACECs) and cave resources in the Deep Creek Cave Area, no surface occupancy will be permitted within the following areas:

- Deep Creek ACEC/SRMA
- Deep Creek Cave Area (Includes no subsurface occupancy for 5,000 feet below the surface)

- Bull Gulch ACEC/SRMA
- Thompson Creek ACEC/SRMA
- Hack Lake SRMA
- Rifle Mountain Park

Exceptions: No exceptions are permitted.

**17. Recreation Management Areas.** For the protection of non-motorized recreation opportunities, no surface occupancy will be authorized within the following areas:

- King Mountain Area
- Siloam Springs Area
- Castle Peak Area
- Bull Gulch Area (The portion of the Bull Gulch WSA not within the Bull Gulch SRMA.)
- Sunlight Peak Area
- Fisher Creek Area (Haff Ranch)

No exceptions are permitted in any of the above areas.

- King Creek Area (840 acres on the north side of King Mountain)
- Pisgah Mountain Area

Exceptions: For the Pisgah Mountain Area, oil and gas drilling and maintenance operations on designated BLM Roads 8530, 8536 and 8585 will be permitted, since these roads are open to motorized public use. For the King Creek Area, use of the two roads previously authorized for motorized use by adjacent landowners be permitted. These exceptions are available provided wellpads and associated facilities could be located within 100 yards of the designated (Pisgah Mountain Area) or previously authorized (King Creek Area) roads. Certain timing restrictions consistent with current travel management regulations for the affected areas will also be necessary so that operations would not substantially affect the non-motorized recreation values in the area.
*Note:* Non-motorized recreation opportunities are those experiences where the visitor can generally expect to see fewer people, largely due to the fact that access is more difficult or challenging, and

---

BLM_0007135

enjoy a mostly natural setting with a higher degree of solitude and tranquillity. BLM's overall management goal for the identified areas is to maintain the non-motorized recreation opportunities. Non-motorized recreation opportunities are not exclusive of other uses; however, when other uses with the potential to conflict with these opportunities are being considered, the impact to the non-motorized recreation opportunities will be evaluated.

Multiple use consistent with the GSRA RMP will be accommodated to the extent that such use has minimal impact on the non-motorized recreation opportunities.

**18. Interstate 70 Viewshed.** NSO on slopes over 30 percent with high visual sensitivity in the Interstate 70 viewshed. Lands with high visual sensitivity are those lands within 5 miles of the Interstate, of moderate to high visual exposure, where details of vegetation and landform are readily discernible and changes in visual contrast can be easily noticed by the casual observer on the Interstate.

Exceptions would be granted if protective measures can be designed to accomplish VRM Class II objectives, namely that the overall landscape character would be retained Such measures would be designed to blend the disturbance in with the natural landscape. BLM acknowledges that activities on private lands alter the landscape character and affect the visual quality of the overall landscape. Such modifications to the overall landscape character will be considered when evaluating mitigation proposals.

**19. Anvil Points Cave Area.** For the protection of the scientific and wildlife values provided by these caves and to avoid the difficulties inherent in drilling such locations, no surface occupancy will be permitted in the area encompassing the cave openings, subsurface features and the watersheds immediately above the caves.

Exceptions: No exceptions are identified.

## Timing Limitation Stipulations (TL)

**1. Big Game Winter Habitat** (includes mule deer, elk, pronghorn antelope and bighorn sheep). Protection of winter habitat which includes severe big game winter range and other high value winter habitat as mapped by the CDOW.

- Big Game Winter Habitat - December 1 to April 30.

Exception: Under mild winter conditions, the last 60 days of the seasonal limitation period may be suspended after consultation with the CDOW. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the winter range during the winter months. This limitation may apply to work requiring a Sundry Notice pending environmental analysis of any operational or production aspects.

**2. Big Game Birthing Areas.**
- Elk Calving - April 16 to June 30
- Pronghorn Antelope Fawning - May 1 to July 15
- Rocky Mountain Bighorn Sheep Lambing - May 1 to July 15
- Desert Bighorn Sheep Lambing - March 16 to May 30

Exception for Big Game Birthing Areas: When it is determined through a site-specific environmental analysis that actions would not interfere with critical habitat function nor compromise animal condition within the project vicinity, the restriction may be altered or removed.

**3. Grouse** crucial winter habitat and nesting habitat (includes sage grouse, Columbian sharp-tailed grouse, and lesser and greater prairie chickens). Sage grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters in height and a mean

---

BLM_0007136

canopy cover between fifteen and 40 percent within a two mile radius of an active lek.

- Sage grouse crucial winter habitat - December 16 to March 15.
- Sage grouse nesting habitat - March 1 to June 30.

No exceptions are permitted for winter habitat. Exceptions: During years when the lek is inactive and it is determined that there is no nesting activity occurring by May 15, the seasonal limitation may be suspended.

**4. Greater Sandhill Crane** nesting and staging areas - March 1 to October 16.

No exceptions identified.

**5. White Pelican** nesting and feeding habitat areas - March 16 to September 30.

No exceptions identified.

**6. Raptor** nesting and fledgling habitat (includes the golden eagle and all accipiters; falcons, except the kestrel; all buteos; and owls). Raptors that are listed and protected by the Endangered Species Act are addressed separately.   A one-quarter mile buffer zone around the nest site from February 1 to August 15.

**7. Ferruginous Hawk** nesting and fledgling habitat. A one-mile buffer zone from February 1 to August 15 to avoid nest abandonment.

**8. Osprey** nesting and fledgling habitat. A one-half mile buffer zone from April 1 to August 31 to avoid nest abandonment.

Exception for raptor, ferruginous hawk and osprey (6, 7 and 8 above) nesting and fledgling habitat: During years when a nest site is unoccupied by May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest.

**9. Mexican Spotted Owl** nesting and fledgling

habitat - February 1 to July 31.

The average Mexican spotted owl territory is estimated to encompass approximately 2,000 acres. Within this area, Primary Activity Centers (PACs) are defined around nesting, feeding, and roosting areas within the territory.    These PACs   are mapped as a one-half mile radius (600 acre) area around nests, roosts and the center of feeding areas, and are not considered to be overlapping. With multiple sightings of the Mexican spotted owl, but with no confirmed nest or roost sites, a PAC is defined as the area where habitat is used the most.

Exceptions may be identified after formal Section 7 consultation with the U.S. Fish and Wildlife Service.

**10. Bald Eagle Nest Site.** A one-half mile buffer zone around the nest site is required to prevent disruption of nesting from December 15 to June 15.

Exceptions may be identified after formal Section 7 consultation with the U.S. Fish and Wildlife Service. The limitation may be suspended in years when the nest site is unoccupied by May 15 or once the young have fledged and dispersed from the nest.

**11. Bald Eagle Winter Roost Site.** A one-half mile buffer area around the roost site is required from November 16 to April 15 to avoid relocation to less suitable areas.

Exceptions may be identified after formal Section 7 consultation with the U.S. Fish and Wildlife Service. If there is partial or complete visual screening of the area of activity, the roost site buffer may be reduced to one-quarter mile.

**12. Peregrine Falcon.** A one-half mile buffer area around the cliff nesting complex from March 16 to July 31 to prevent abandonment and desertion of established territories.

Exceptions may be identified after formal Section 7 consultation with the U.S. Fish and Wildlife

BLM_0007137

Service. The limitation may be suspended in years when the nest site is unoccupied by May 15, or once the young have fledged and dispersed from the nest.

### 13. Waterfowl and Shorebird Nesting Areas.

This stipulation protects nesting ducks from April 15 to July 15 in a one-quarter mile buffer around the nesting and production areas of the following reservoirs: Fravert Watchable Wildlife Area, Consolidated Reservoir and the King Mountain Reservoirs - Grimes-Brooks, Nobel and Upper and Lower King Mountain.

Exceptions may be permitted after consultation with the CDOW if nesting waterfowl and shorebirds are not present at the reservoirs, or if operations can be located in such a manner as to minimize disturbance to nesting waterfowl and shorebirds.

## Controlled Surface Use (CSU) Stipulations

### 1. Underground Coal Mines. Within the area of federally leased coal lands, oil and gas operations will be relocated outside the area to be mined or located to accommodate room and pillar mining operations. This stipulation may be waived without a plan amendment if the lessee agrees that the drilling of a well will be subject to the following conditions:

- the well must be plugged when the mine approaches within 500 feet of the well bore;
- the well must be plugged in accordance with Mine Safety and Health Administration (formerly Mine Enforcement and Safety Administration) Informational Report 1052; and
- the operator will provide an accurate location of where the casing intercepts the coal by providing a directional and deviational survey of the well to the coal operator; *or*
- relocate well into a permanent pillar or more than 500 feet outside the area to be mined. A suspension of operations and production will

be considered when the well is plugged and a new well is to be drilled after mining operations move through the location.

### 2. Riparian and Wetland Zones. Within 500 feet of the outer edge of the riparian or wetland vegetation, activities associated with oil and gas exploration and development, including roads, pipelines and wellpads, may require special design, construction, and implementation measures, including relocation of operations beyond 200 meters, in order to protect the values and functions of the riparian and wetland zones. Such measures will be based on the nature, extent and value of the riparian or wetland area. In general, the areas immediately adjacent to the riparian vegetation are most important to the function of the riparian zone and will be avoided.

### 3. BLM Sensitive Species. For those species listed as sensitive by BLM and for significant natural plant communities, special design, construction and implementation measures, including relocation of operations by more than 200 meters, may be required. For plants, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or communities. For animals, habitat areas are areas that are important during some portion of the lifecycle, such as nesting and production areas or communal roost areas.

### 4. Erosive Soils and Slopes Greater Than 30 Percent. Special design, construction, operation and reclamation measures will be required to limit the amount of surface disturbance, to reduce erosion potential, to maintain site stability and productivity, and to insure successful reclamation in identified areas of highly erosive soils and of slopes greater than 30 percent. Highly erosive soils are soils in the "severe" and "very severe" erosion classes based on NRCS Erosion Condition mapping. Areas identified in the RMP as Erosion Hazard Areas and Water Quality Management Areas are also included in this stipulation. Implementation may include relocation of operations beyond 200 meters.

The surface use plan of the APD submitted for

BLM_0007138

wells on erosive soils or slopes greater than 30 percent must include specific measures to comply with the GSRA Reclamation Policy, such as stabilizing the site to prevent settling, land sliding, slumping, and highwall degradation, and controlling erosion to protect the site and adjacent areas from accelerated erosion and sedimentation and siltation of nearby water sources.

Specific performance objectives for the plan include:

- Limitation of total disturbance to 3.0 acres for the wellpad;
- Limitation of the interim *in use* area to 0.5 acres; and
- maximizing the area of interim reclamation that is shaped to a grade of 3:1 or less; any planned highwall must be demonstrated to be safe and stable and include enhanced reclamation and erosion prevention measures as needed.

The operator must also provide an evaluation of the site's reclamation potential based on problematic characteristics of the site (slope, aspect, vegetation, depth of soils, soil salinity and alkali content) and a comparison of the site with comparable sites already constructed. When the proposed site is comparable to sites where reclamation has not been successful, the operator will be required to make adjustments to reclamation techniques. Special measures might include: locating production facilities off-site; building roads to higher standards, including surfacing; constructing sediment catchments; reclaiming the reserve pit immediately after use; and applying fertilizers, mulches, soil additives and geotextile fabrics. The AO will evaluate plans submitted by the operator and approve a design and any special measures that best accomplish the performance objectives, achieving a reasonable balance of site stability and revegetation potential, and minimizing overall disturbance.

**5. Visual Resource Management (VRM) Class II.** Within VRM Class II areas, relocation of operations by more than 200 meters may be required to protect visual values. Protection may include special design requirements and other measures to retain the overall landscape character. Such measures would be designed to blend the disturbance in with the natural landscape so that it does not attract attention from key observation points. BLM acknowledges that activities on private lands may alter the landscape character and such modifications will be considered when evaluating mitigation proposals relative to the visual quality of the overall landscape.

**6. Sharrard Park Paleontological Area.** Special survey, design, construction and reclamation measures may be required, including relocation of operations beyond 200 meters, in the identified portions of Wasatch outcrops within the Sharrard Park area. The operator will provide a survey of the paleontological resources in the proposed areas of disturbance (plus a 200 foot buffer around that disturbance), performed by a BLM-permitted paleontologist. The operator will implement mitigation measures approved by the AO, instruct all on-site personnel to be aware of the potential for fossils, notify the AO if any fossils are found, and leave in place any vertebrate fossils.

## Lease Notices (LN)

**1. Class I and II Paleontological Areas.** An inventory shall be conducted by an accredited paleontologist approved by the AO prior to surface-disturbing activities in these areas.

**2. Biological Inventories.** In areas of known or suspected habitat of special status species, or habitat of other species of interest, such as raptor nests or elk calving areas, or significant natural plant communities, a biological inventory will be required prior to approval of operations. The inventory would be used to prepare mitigating measures to reduce the impacts of surface disturbance on the affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads, wellpads, pipelines, and other facilities, and fencing operations or habitat.

Given the high potential for sensitive species to

BLM_0007139

occur in the NOSR Production Area, it is likely that a biological inventory will be required for most proposed locations in that area prior to development activities.

### 3. Annual Reports of Reclamation Progress.
All lessees in the GSRA are required to report to the AO annually on the ongoing progress of reclamation at locations developed on the lease.

### 4. Emergency Communications Plan.
The operator is required to prepare and maintain a current emergency communications plan. The plan shall be provided to the BLM, Colorado State Patrol, the affected county and communities, and the general public.

The plan shall contain information sufficient to describe the potential for emergency incidents related to oil and gas development which pose an immediate danger to human health and safety and would normally require immediate actions by the operator to remove the threat, such as for hazardous materials spills; actions to be taken by the operator in the event of such an incident; and a communications plan to inform appropriate authorities and potentially affected citizens.

### 5. Wildlife and Wildlife Habitat.
Within high value or crucial big game winter range, the operator is required to implement specific measures to reduce impacts of oil and gas operations on wildlife and wildlife habitat. Such measures shall be developed in concert with BLM during the preparation of the EA. They may include completion of habitat improvement projects designed to replace habitat lost through construction activities; reduction of human disturbance in important habitat areas during critical times of the year by installing gates and closing roads; using telemetry to collect well data; and accessing well site locations during the times of the day when wildlife is not likely to be present in the area.

It is recognized that other measures may be appropriate and that not all measures would be appropriate for all areas. As such, this notice is best implemented through site-specific planning

addressing several years activity in an area. Measures to reduce impacts would generally be considered when well density exceeds four wells per 640 acres, or when road density exceeds three miles of road per 640 acres.

BLM's overall goals are to: a) reduce direct impacts (physical loss of habitat) by minimizing the disturbance on lands where revegetation is not possible, such as roads, production facilities, working portions of the wellpads, exposed rock outcrops, highwalls, etc., and by offsetting the loss of productive wildlife areas during interim reclamation; and b) reduce indirect habitat impacts (reduced habitat availability for big game and other species from disturbances caused by increased human activities) in big game winter range and in other high value wildlife areas (refer to Draft SEIS, Appendix G), by managing human activities to minimize disturbance during critical times of the year.

### 6. Working in Wildlife Habitat.
The operator is required to establish a set of reasonable operating procedures for employees and contractors working in important wildlife habitats. Such procedures would be designed to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures might address items such as working in bear country, controlling dogs, and understanding and abiding by hunting and firearm regulations.

### 7. Working in Residential Areas.
The operator drilling on federal mineral estate is required to consider the impact of operations on nearby communities and residences and will be expected to reasonably adjust operating procedures to accommodate local residential concerns. For example, the operator will be expected to try to work out reasonable compromises on issues such as noise, dust, and traffic. The operator will be expected to address such issues when raised during public comment periods associated with preparation of environmental assessments or when complaints are reported to the operator, BLM or the COGCC.

---

BLM_0007140

**8. Anvil Points Landfill.** Any operations within the Anvil Points landfill area owned by Garfield County shall be consistent with the terms and conditions established in EA-CO-078-5-31.

**9. Project Rulison Monitoring.** Any wells located within three miles of Project Rulison will be subject to oversight measures established by the Colorado Oil and Gas Conservation Commission (COGCC). Any such wells would also be reviewed by the Department of Energy (DOE) for consideration if such wells should be incorporated into DOE's regular monitoring program.

**10. Sensitive Viewsheds.** Special design and construction measures may be required in order to minimize the visual impacts of drilling activities within five miles of all communities or population centers throughout the GSRA, major BLM or county roads, and state or federal highways. The overall goal of these measures would be to blend the disturbance with the natural landscape as much as possible. At a minimum, operations should be designed to insure that the disturbance does not dominate the natural landscape character (VRM Class III objective). BLM acknowledges that activities on private lands may alter the landscape character, and such alterations will be considered when evaluating mitigation proposals relative to the visual quality of the overall landscape.

BLM_0007141

# Appendix B:  Management of Lease Development

In order to maximize BLM's ability to achieve the mitigation measures described in this Plan Amendment, BLM may implement the following procedures during processing of APD's and other authorizations for leasehold development.

**1.     Geographic Area Proposal (GAP).**  In areas being actively developed, the operator must submit a Geographic Area Proposal (GAP) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  The GAP will be used to plan development of federal leases within the area, to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access and resource concerns.  This requirement for a GAP may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed wellpads, or for individual wells proposed along existing roads.

**2. Inventories.**  The operator may be required to conduct biological, cultural, paleontological or other inventories, as appropriate, for an area identified by the BLM at the time of the GAP analysis.

**3. Cumulative Impacts.** The cumulative impacts of oil and gas development are discussed in the Final SEIS.  Future EAs for APDs will not repeat this analysis.  However, the GAP environmental assessment will evaluate the effects of all past oil and gas development as well as planned actions within the geographic area, to determine the need for appropriate mitigation.

**4. Mitigation Planning.**  BLM will review the Plan Amendment to identify which mitigation measures are applicable to the area under consideration and will work with the operator to jointly develop a mitigation plan that incorporates those measures.  Stipulations will be implemented for the GAP as far as they are consistent with lease rights.  In those cases where mitigation measures might be inconsistent with lease rights, BLM will seek voluntary compliance from the operator or develop alternative mitigation measures to accomplish the objectives of the Plan Amendment in so far as possible.  (Chapter 2 of the Final SEIS includes a detailed description of the ways in which stipulations are applied both to new and to existing leases.)  As appropriate, BLM will apply the COAs listed in the Appendix D of the Final SEIS or develop new COAs to accomplish reasonable mitigation to offset the impacts described in the EA consistent with the goals established in the Plan.

**5.   Impacts on wildlife habitat.**  BLM will require reasonable mitigation of the impacts on wildlife habitat that are attributable to both past and proposed oil and gas development within the GAP area.   Such mitigation will generally be considered when well densities on critical winter wildlife habitats in high value wildlife areas (refer to Draft SEIS, Appendix G) exceed four wells per 640 acres or when road densities exceed three miles of road per 640 acres.  It is not BLM's intent that oil and gas operators be held accountable for mitigation of habitat impacts due to residential, agricultural or other commercial land uses, including those impacts associated with the Federal and State Highways and County Roads.

BLM's overall goal is to reduce direct impacts on wildlife habitat by minimizing the amount of land on which revegetation is not possible, such as roads, production facilities, working portions of wellpads, exposed rock outcrops, highwalls, etc.  In consideration of the amount and type of habitat made unavailable due to oil and gas operations, BLM will develop appropriate mitigation for such habitat losses.

Indirect habitat impacts (reduced habitat availability for big game and other species from disturbances caused by increased human activities) in big game winter range in high value wildlife areas will be mitigated by managing human

---

BLM_0007142

activities to minimize disturbance during critical time periods, using such measures as road closures, hourly restrictions for well operations, and use of radio telemetry to monitor individual wells. Additionally, each operator will be expected to adopt a *code of conduct* for field employees such that they can perform their duties in the manner most compatible with wildlife use in the same area.

BLM_0007143

# Appendix C: Errata

The following errata refer to corrections of material in the Final SEIS:

**Page 1-7, Map 1-3, *Region 4: Location of the Naval Oil Shale Reserves*.** The map incorrectly displays the northeastern boundary of the NOSR Production Area. The following legal description refers to additional lands that should have been shown on the map. These lands were included in the analysis in the Final SEIS.

> Township 6 South, Range 94, west,
> 6th P.M.
> Section 3: NWSW, S2S2, NESE:
> Section 10: NWNE, NW.

**Page 2-10, Section 2.4.2, *No Surface Occupancy Stipulations*.** The last phrase of the description of NSO 19, Anvil Points Cave Area, should read *subsurface features and the watersheds immediately above the caves*, removing the reference to the *two defined* caves.

**Page 2-18, Table 2.5-1, *Comparison of the Alternatives*.** In the description of NSO 17, the parenthetical description of the King Creek Area should read *840 acres on the north side of King Mountain* changing the acreage figure from 640 acres to 840 acres.

BLM_0007144

# UNITED STATES DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
### WASHINGTON, D.C. 20240

### August 24, 2000

In Reply Refer To:
1690, 3595, 3720, 3823, 8142, 8120, 9430
(WO 210, 250, 320, 360, 880, HR 240) P

EMS TRANSMISSION 08/29/2000
Instruction Memorandum No. 2000-182
Expires: 09/30/2001

**To:** AFOs

**From:** Director

**Subject:** Mitigating and Remediating Physical Safety Hazards at Abandoned Mine Land Sites

**Program Areas:** Abandoned Mine Land Management; Planning: Land Use - Recreation; Cultural Resources: Management; Solid Minerals: Protection against Mining Hazard; Safety and Health for Field Operations; Budget Administration; Law Enforcement Management

**Purpose:** This Instruction Memorandum (IM) establishes policy, priorities, and plans to support the elimination or reduction of physical hazard and safety risks at abandoned mine lands (AML's). The BLM presently does not receive appropriated funds specifically for AML physical safety hazard cleanups. State and Field Offices use funds from "benefitting programs" to enable many AML physical safety hazard cleanups to be funded. State and Field Offices have also partnered with State government agencies, and the mining industry, to clean up these kinds of sites, often with the BLM covering the costs of related environmental damage from its Clean Water Action Plan AML cleanup funding.

Enhanced concerns about public safety dictate taking a more unified approach in targeting which AML physical safety hazard sites to clean up. While the BLM's ideal, long-term goal, is to work toward eventually identifying and addressing such hazards at every known AML site on the public lands, the Bureau does not have the resources to do so. This makes it even more essential to establish priorities, especially for the short-term years. Accordingly, the purpose of this IM is to establish policies and procedures governing the Bureau's AML cleanup actions related to physical safety hazards sites.

Effective immediately, the BLM will set as its highest AML physical safety action priority the cleaning up of those AML sites situated at locations: (a) where a death or injury has occurred and the site has not already been addressed; or (b) situated on or in immediate proximity to developed recreation sites and areas with high visitor use. When those sites are finished, focus will shift to other sites where formal risk assessment indicates a risk level of HIGH or EXTREMELY HIGH. This IM also requires potential impacts from physical safety risks at AML's to be factored into

BLM_0007145

future recreation management area designations, land use planning assessments, and all other applicable use authorizations.

**Background**: Each year, dozens of children and adults are injured or killed from accidents that occur at active and inactive underground mines, sinkholes, pits and quarries. Nationally, in 1999 alone, 17 people died in non-mining accidents on mine property, according to the U.S. Department of Labor's Mine Safety and Health Administration. Three additional fatalities have occurred as of March 2000.

In addition to fatalities, serious injuries related to AML safety hazards also continue to occur. Most of these hazards comprise adits and other mine openings, often hundreds of feet deep. Leftover storage buildings, mill structures, equipment, debris, piles of tailings and waste rock, oil and chemical storage drums are typically found at AML sites. Vertical shafts and openings may be partially covered by vegetation to the point where a person may not even see the hole in the ground before stepping into it. People who enter mine openings may not become aware of deadly gases and lack of oxygen until it is too late to escape.

The potential for injuries and deaths to continue to occur each year increases as western population sprawl and recreational use of public lands increase, bringing the public into contact with heretofore isolated AML sites. Moreover, when injuries occur on BLM-managed lands, liability risks can ensue against the United States. Persons who become injured while visiting AML sites on public lands can attempt to recover from the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 2671 *et seq*. With certain exceptions, the FTCA provides that the United States will be liable for death, personal injury, or property damage caused by the negligent or wrongful act or omission by the United States. Recently, the BLM was involved in a tort claim settlement resulting from an accident that occurred when two individuals were injured after entering an abandoned mine in proximity to a BLM recreation site. The settlement cost the United States an amount well into the hundreds of thousands of dollars. At this particular site, the BLM had placed a sign reading "Day Use Only - No Overnight Camping" in the general area where the AML site was located. Plaintiffs argued that the sign posting could have created an invitation for public use and a corresponding expectation that the area was safe for use.

To enhance public safty on BLM lands, the BLM is initiating proactive risk management actions aimed at reducing the potential for fatalities and injuries associated with AML sites to occur especially at high visitation area. If carried out effectively, a concurrent reduction in potential liability can also result. The liability of the United States is generally determined by the law of the State where the injury occurred. Because State law generally defines the duty owed to a member of the public, the exact allegation of negligence can vary from claim to claim, but the three most common allegations of negligence in cases involving hazardous land conditions are: (1) failing to guard against the hazard; (2) failing to warn against the hazard; and (3) failing to give adequate warning against the danger. Attachment 1, "Mitigation and Remedial Actions," discusses these allegations of negligence in more detail. Even without further survey efforts, the BLM's Abandoned Mine Land Inventory System (AMLIS) presently has more than 8,600 site records, and the inventory continues to grow as newly-identified sites are found during normal field work. Even the present inventory of known sites in need of cleanup is far more than the Bureau can respond to given limited fiscal resources.

BLM_0007146

Presently, State and Field Offices have been finding ways to address AML physical safety hazards chiefly through use of funds from the programs associated with the hazard. The recent tort claim experience now necessitates the need to establish priorities. National guidance is now being issued to guide the State and Field Offices on setting priorities for these cleanups in order to ensure consistency in priority throughout the Bureau. This IM establishes policies by which the BLM can assess its resource needs and begin to address the above three criteria. In determining appropriate mitigation and remedial measures, Field Offices may consider the design and construction standards used by their counterpart State or Tribal AML reclamation agency as useful guidelines.

**Policy/Action:**

*Site priorities.* State and Field Offices should focus their physical safety hazard AML cleanup projects at AML sites which:

- are either in, or eligible for listing in, AMLIS; and
- a death or injury is known to have occurred at the site; or
- are situated on or in immediate proximity to developed recreation sites and areas with high visitor use.

After this group of sites is addressed, additional priorities will be set for the remaining cleanups. However, as long as a State Office is able to address the above short-term goals, it may address other AML sites beginning with those sites where formal risk assessment indicates a risk level of HIGH or EXTREMELY HIGH if adequate resources are available.

All AML sites on BLM-managed lands that are cleaned up by BLM, States, or other partners, should be entered and reported in AMLIS so that the system can be used to report program accomplishments and estimate the remaining workload.

*Scoping Report.* Each State Office is to submit to the WO, a report that contains a list of developed recreation sites and areas with high visitor use which are determined to have an AML site posing one or more significant physical safety hazards. Use of the Facilities Inventory Maintenance Management System (FIMMS) may be of assistance in identifying relationships between RMIS and AMLIS records. In the event the data in these systems is not sufficient enough to prepare estimates, then additional field surveying will be needed.

The information compiled from the State Offices is intended to assist BLM management in providing a firm basis for future funding requests.

For each AML site, the report should list the on-the-ground physical safety hazards to be mitigated or remediated, and a lump-sum cost estimate for completing the proposed action. The data to be collected are the data fields prescribed by BLM's AML Inventory Checklist. If the BLM SO has entered into an agreement with its State AML counterpart to gather AML data for the State, then the data collected should also encompass any additional State data elements. State and Field Offices should take necessary steps to ensure that the quality of the data gathered and entered into AMLIS is complete and of high quality. Use of GIS equipment is strongly encouraged. In order to assist the State Offices, AMLIS is being modified to enable the requested data to be entered and reported electronically, and data fields enabling a link to the RMIS are

BLM_0007147

being added to AMLIS. WO-360 will notify State Office AML Coordinators when the system will be available for data entry.

*Identifying Developed Sites and Areas With High Visitor Use, Using RMIS/FIMMS data.*
Developed sites should be included in both the Recreation Management Information System (RMIS) and Facilities Inventory Maintenance Management System (FIMMS). At a minimum all of these locations must be reviewed to determine if AML's occur in the "immediate proximity" to the developed site. In doing so, you should not necessarily limit your review to just the physical limit of the developed site, but should consider where visitors would most likely walk to and include this area as part of the developed site review.

Areas with High Visitor Use will need to be identified on a local basis and could include dry lake beds, sand dunes, high use roads, frequently used special event areas, open Off-Highway Vehicle (OHV) areas, etc. Furthermore, the use may be high or low depending on season, day of the week, weather or any number of other factors. An area such as a mine site may receive high use in an otherwise low use area simply because it attracts recreational users who are out exploring roads. While most of these areas will probably be within an area identified in RMIS as either a Special Recreation Management Area (SRMA), Back Country Byway (BCBWY) or some other designation, not all areas of high use will be included in these areas and not all lands within many SRMAs or BCBWYs are subject to high use. It would be inappropriate to identify all of an area if the concentration of use takes place in only a small part of it (i.e. "immediate proximity"). Here also the type of use and the terrain in which it occurs will largely control the area of effect which needs to be reviewed. Motorized users can access a far greater geographic area than can users on foot.

Where use is authorized under a Special Recreation Permit, such as for an OHV race event, this would not by itself create a high use visitor area in an otherwise low or dispersed use area. However, consideration should be given to including a stipulation in the permit for identification and marking of AML's by the permit holder if there could be a safety issue.

*Management Information System (MIS).* Each State Office is to provide to the WO a listing of AML sites which fall under the scope of this IM planned for mitigation or remediation during FY 2001. State Offices are to then enter into MIS the associated summary figures for performance monitoring and reporting purposes. MIS data entry and reporting details will be transmitted separately.

*On-the-ground mitigation and remediation.* Consistent with available budget resources and other programmatic concerns, BLM field personnel should consider and implement appropriate mitigation or remedial actions to either guard against or warn of conditions deemed to present significant physical safety hazards at locations covered by this IM when the associated AML sites are judged to be easily accessible. Examples could include those located on main visitation pathways and adjacent areas when there is reason to believe visitation is occurring or has occurred in the past. Field personnel also should factor budget resources and other programmatic concerns into their decisions as to which sites to address and how best to respond to specific on-the-ground safety hazards. Considerable guidance concerning various mitigation and remediation techniques is available from BLM and other government agencies. As an initial source of information, State and Field personnel can refer to the information posted on the BLM's national

BLM_0007148

AML program webpage (currently at www.blm.gov/narsc/aml), and can contact WO-360 for further guidance.

*NEPA requirements.* Field staffs need to take appropriate steps to fulfill all requirements of the National Environmental Policy Act in support of their actions.

*Future planning.* Field personnel should also address the impacts of AML's posing potential physical safety hazards that are situated within or in the immediate proximity of any areas that are proposed for recreational development. Such AML hazards should be, to the extent practicable, mitigated or remediated on-the-ground during site development.

**Timeframe:** This policy is effective upon issuance. Scoping reports are requested by December 15. In the event an extension is needed due to competing priorities or resource needs, please contact WO-360 for revised time schedule. Mitigation and remediation plans need to be submitted to the WO before monies are obligated in FY 2001, and summary planning targets are to be entered into the MIS in accordance with MIS guidance for FY 2001.

**Budget Impact:** While the BLM continues to request appropriated funds for purposes of AML physical safety hazard cleanups, Field Offices can use funds from other related program budget subactivities that are available for BLM operations in order to address immediate needs (i.e., applying the "benefitting budget subactivity" concept). For future recreation site developments,

Field Offices should include mitigation or remedial measures deemed appropriate into the project's development schedule and budget.

**Manual/Handbook Sections Affected:** None.

**Coordination**: This IM has been coordinated among the following WO groups: Planning, Assessment and Community Support (WO-210), Cultural Heritage, Wilderness and Special Areas (WO-240), Recreation (WO-250), Solid Minerals (WO-320), Protection and Response (WO-360), Law Enforcement (WO-370), and Budget (WO-880). It has also been coordinated with the National Human Resources Management Center's Safety Group (HR-240).

**Contacts**: Hal Hallett, Recreation Group (WO- 250), (202) 452-7794; George Stone, Protection and Response Group (WO-360), (202) 452-5087.

Signed by:                          Authenticated by:
Nina Hatfield                       Barbara J. Brown
Deputy Director                     Policy & Records Group, WO-560

1 Attachment
  1- Mtigation and Remedial Actions (2 pp)

BLM_0007149

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

**MANUAL TRANSMITTAL SHEET**

Release
1-1666

Date
11/22/00

Subject

### 1601 - LAND USE PLANNING

1.  <u>Explanation of Material Transmitted</u>: This release is the foundation Manual Section for program-specific Manuals and Handbooks in the 1600 planning series, which collectively constitute the guidance for land use planning. Planning objectives, authorities, responsibilities, and policy considerations are set forth and the general features of the Bureau planning system and resource management planning process are described.

2.  <u>Reports Required</u>: None.

3.  <u>Material Superseded</u>: Rel Nos. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362; 1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472; 1-1528; 1-1366; 1-1367

4.  <u>Filing Instructions</u>: File as directed below.

| REMOVE: | INSERT: |
|---|---|
| 1601; 1602 | 1601 |
| 1611; 1612 | (Total: 12 Sheets) |
| 1614; 1615 | |
| 1616; 1617 | |
| 1618; 1619 | |
| 1620; 1621 | |
| 1622; 1623 | |
| 1624; 1625 | |
| H-1625-1 | |
| 1631; 1632 | |

Henri R. Bisson
Assistant Director
Renewable Resources and Planning

☆ U.S. GOVERNMENT PRINTING OFFICE: 1987-181-423/64180

BLM_0007150

TC-1

# 1601 - LAND USE PLANNING

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
    A.  Planning Approach
    B.  Planning Base
    C.  Collaborative and Multijurisdictional Approaches to Planning
    D.  Planning Scale
    E.  Decision-making Levels and Procedures
    F.  Implementation Actions Subsequent to Land Use Plan Decisions
    G.  Valid Existing Rights

.07  File and Records Maintenance
.08  Glossary

BLM MANUAL                                                          Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;      11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007151

TC-2

**1601 - LAND USE PLANNING**

This page left blank

BLM MANUAL                                                          Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;        11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007152

.01

# 1601 - LAND USE PLANNING

## .01  Purpose.

A.  The purpose of this Manual is to provide further guidance to Bureau of Land Management (BLM) personnel on the requirements of Sec. 201 and 202 of the Federal Land Policy and Management Act (FLPMA), the BLM's Planning Regulations (43 CFR 1600), and the National Environmental Policy Act (NEPA).  Nothing in this Manual section and supporting Handbooks may supersede the legal and regulatory mandates cited in the authorities section of this Manual.

B.  The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM.  Planning is critical to ensuring a coordinated, consistent approach to managing these lands.  This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans.  Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements.

C.  To the extent possible, this guidance integrates land use planning requirements with requirements under NEPA.  This guidance is a further interpretation BLM's Planning Regulations (43 CFR 1600) based on field practice and experiences gained since the planning regulations were completed in 1983.  This Manual and Handbook must be used in conjunction with the planning regulations.

## .02  Objectives.  These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 *et seq.*) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber; and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values.  Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use.  The BLM will encourage collaboration and public participation throughout the planning process.  To accomplish the above, the BLM will:

A.  Provide on a continuing basis an inventory of all public lands and their resource and other values.  This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values (FLPMA, Sec. 201 (a)).

B.  Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.

BLM_0007153

.02C

## 1601 - LAND USE PLANNING

C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law (FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).

D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.

E. Provide to the public a documented record of land allocations and permissible resource uses and constraints.

F. Provide a framework to guide subsequent implementation decisions.

.03 **Authority**. The following is a list of major legal authorities relevant to the BLM land use planning process; it is not an inclusive list of all BLM authorities.

A. The Federal Land Policy and Management Act of 1976 (FLPMA), as amended, 43 U.S.C. 1701 *et seq*., provides the authority for the BLM land use planning.

1. Sec. 102 (a) (7) and (8) sets forth the policy of the United States concerning the management of the public lands.

2. Sec. 201 requires the Secretary of the Interior to prepare and maintain an inventory of the public lands and their resource and other values, giving priority to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

3. Sec. 202 (a) requires the Secretary, with public involvement, to develop, maintain, and when appropriate, revise land use plans that provide by tracts or areas for the use of the public lands.

BLM MANUAL                                                          Rel. 1-1666
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;        11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007154

.03D

## 1601 - LAND USE PLANNING

4. Sec. 202(c)(1-9) requires that, in developing land use plans, the BLM shall use and observe the principles of multiple use and sustained yield; use a systematic interdisciplinary approach; give priority to the designation and protection of areas of critical environmental concern; rely, to the extent it is available, on the inventory of the public lands; consider present and potential uses of the public lands; consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values; weigh long-term benefits to the public against short-term benefits; provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; and consider the policies of approved State and tribal land resource management programs, developing land use plans that are consistent with State and local plans to the maximum extent possible consistent with Federal law and the purposes of this Act.

5. Sec. 202 (d) provides that all public lands, regardless of classification, are subject to inclusion in land use plans, and that the Secretary may modify or terminate classifications consistent with land use plans.

6. Sec. 202 (f) and Sec. 309 (e) provide that Federal, State, and local governments and the public be given adequate notice and an opportunity to comment on the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for the management of the public lands.

7. Sec. 302 (a) requires the Secretary to manage BLM lands under the principles of multiple use and sustained yield, in accordance with available land use plans developed under Sec. 202 of FLPMA. There is one exception: where a tract of the BLM lands has been dedicated to specific uses according to other provisions of law, it shall be managed in accordance with such laws.

8. Sec. 302 (b) recognizes the entry and development rights of mining claimants, while directing the Secretary to prevent unnecessary or undue degradation of the public lands.

B. The National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. 4321 et seq., requires the consideration and public availability of information regarding the environmental impacts of major Federal actions significantly affecting the quality of the human environment. This includes the consideration of alternatives and mitigation of impacts.

C. The Clean Air Act of 1990, as amended, 42 U.S.C. 7418, requires Federal agencies to comply with all Federal, State and local requirements regarding the control and abatement of air pollution. This includes abiding by the requirements of State Implementation Plans.

D. The Clean Water Act of 1987, as amended, 33 U.S.C. 1251, establishes objectives to restore and maintain the chemical, physical, and biological integrity of the Nation's water.

BLM_0007155

.03D

<div align="center">**1601 - LAND USE PLANNING**</div>

E. The <u>Federal Water Pollution Control Act</u>, 33 U.S.C. 1323, requires Federal land managers to comply with all Federal, State, and local requirements, administrative authorities, process, and sanctions regarding the control and abatement of water pollution in the same manner and to the same extent as any nongovernmental entity.

F. The <u>Colorado River Basin Salinity Control Act</u>, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

G. The <u>Safe Drinking Water Act</u>, 42 U.S.C. 201, is designed to make the Nation's waters "drinkable" as well as "swimmable."  Amendments in 1996 establish a direct connection between safe drinking water and watershed protection and management.

H. The <u>Endangered Species Act (ESA) of 1973, as amended</u>, 16 U.S.C. 1531 *et seq.*:

1. Provides a means whereby the ecosystems upon which endangered and threatened species depend may be conserved and provides a program for the conservation of such endangered and threatened species (Sec. 1531 (b), Purposes).

2. Requires all Federal agencies to seek to conserve endangered and threatened species and utilize applicable authorities in furtherance of the purposes of the Endangered Species Act (Sec. 1531 (c) (1), Policy).

3. Requires all Federal agencies to avoid jeopardizing the continued existence of any species that is listed or proposed for listing as threatened or endangered or destroying or adversely modifying its designated or proposed critical habitat (Sec. 1536 (a), Interagency Cooperation).

4. Requires all Federal agencies to consult (or confer) in accordance with Sec. 7 of the ESA with the Secretary of the Interior, through the Fish and Wildlife Service and/or the National Marine Fisheries Service, to ensure that any Federal action (including land use plans) or activity is not likely to jeopardize the continued existence of any species listed or proposed to be listed under the provisions of the ESA, or result in the destruction or adverse modification of designated or proposed critical habitat (Sec. 1536 (a), Interagency Cooperation, and 50 CFR 402).

I. The <u>Wild and Scenic Rivers Act, as amended</u>, 16 U.S.C. 1271 *et seq.*, requires Federal land management agencies to identify potential river systems and then study them for potential designation as wild, scenic, or recreational rivers.

BLM MANUAL                                                        Rel. 1-1666
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;      11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007156

.03J

## 1601 - LAND USE PLANNING

J.  The <u>Wilderness Act, as amended</u>, 16 U.S.C. 1131 *et seq.*, authorizes the President to make recommendations to the Congress for Federal lands to be set aside for preservation as wilderness.

K.  The <u>Alaska National Interest Lands Conservation Act</u>, (ANICLA), 16 U.S.C. 3101, et.seq., provides for the special designation of certain public lands in Alaska and conservation of their fish and wildlife values.

L.  The <u>Antiquities Act of 1906</u>, 16 U.S.C. 431-433, protects cultural resources on Federal lands and authorizes the President to designate National Monuments on Federal lands.

M.  The <u>National Historic Preservation Act (NHPA), as amended</u>, 16 U.S.C. 470, expands protection of historic and archaeological properties to include those of national, State, and local significance and directs Federal agencies to consider the effects of proposed actions on properties eligible for or included in the National Register of Historic Places.  It also directs the pro-active management of historic resources.

N.  The <u>American Indian Religious Freedom Act of 1978</u>, 42 U.S.C. 1996, establishes a national policy to protect and preserve the right of American Indians to exercise traditional Indian religious beliefs or practices.

O.  The <u>Recreation and Public Purposes Act of 1926, as amended</u>, 43 U.S.C. 869 *et seq.*, authorizes the Secretary of the Interior to lease or convey BLM lands for recreational and public purposes under specified conditions.

P.  The <u>Federal Coal Leasing Amendments Act of 1976</u>, 30 U.S.C. 201 (a) (3) (A) (i), requires that coal leases be issued in conformance with a comprehensive land use plan.

Q.  The <u>Surface Mining Control and Reclamation Act of 1977</u>, 30 U.S.C. 1201 *et seq.*, requires application of unsuitability criteria prior to coal leasing and also to proposed mining operations for minerals or mineral materials other than coal.

R.  The <u>Mineral Leasing Act of 1920, as amended</u>, 30 U.S.C. 181 *et seq.,* authorizes the development and conservation of oil and gas resources.

S.  The <u>Onshore Oil and Gas Leasing Reform Act of 1987</u>, 30 U.S.C. 181 *et seq.*, provides that a study be conducted by the National Academy of Sciences and the Comptroller General that results in recommendations for improvements which may be necessary to ensure the following are adequately addressed in Federal land use plans:

   1.  Potential oil and gas resources are identified;

BLM_0007157

.03S2

### 1601 - LAND USE PLANNING

2. The social, economic, and environmental consequences of exploration for and development of oil and gas resources are determined; and

3. Any stipulations to be applied to oil and gas leases are clearly identified.

T. The General Mining Law of 1872, as amended, 30 U.S.C. 21 *et seq.*, allows the location, use, and patenting of mining claims on sites on public domain lands of the United States.

U. The Mining and Mineral Policy Act of 1970, 30 U.S.C. 21a, establishes a policy of fostering the orderly development of economically stable mining and minerals industries and studying methods for reclamation and the disposal of waste.

V. The Taylor Grazing Act of 1934, 43 U.S.C. 315, authorizes the Secretary of the Interior "to establish grazing districts, or additions thereto and/or to modify the boundaries thereof of vacant, unappropriated and unreserved lands from any part of the public domain . . . which in his opinion are chiefly valuable for grazing and raising forage crops[.] . . ." The Act also provides for the classification of lands for particular uses.

W. The Public Rangelands Improvement Act of 1978, 43 U.S.C. 1901, provides that the public rangelands be managed so that they become as productive as feasible in accordance with management objectives and the land use planning process established pursuant to 43 U.S.C. 1712.

X. The Wild and Free-Roaming Horse and Burro Act, as amended, 16 USC 1331-1340, provides that wild horses and burros shall be considered comparably with other resource values in formulating land use plans, and that management activities shall be undertaken with the goal of maintaining free-roaming behavior.

Y. Executive Orders 11644 (1972) and 11989 (1997) establish policies and procedures to ensure that off-road vehicle use shall be controlled so as to protect public lands.

Z. Executive Order 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations), 49 *Fed. Reg.* 7629 (1994), requires that each Federal agency consider the impacts of its programs on minority and low-income populations.

AA. Executive Order 13007 (Indian Sacred Sites), 61 *Fed. Reg.* 26771 (1996), requires Federal agencies to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions to:

1. Accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners; and
2. Avoid adversely affecting the physical integrity of such sacred sites.

BLM MANUAL        Rel. 1-1666
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;    11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007158

.03AA2

## 1601 - LAND USE PLANNING

BB.  Executive Order 13084 (Consultation and Coordination with Indian Tribal Governments) provides, in part, that each Federal agency shall establish regular and meaningful consultation and collaboration with Indian tribal governments in developing regulatory practices on Federal matters that significantly or uniquely affect their communities.

CC.  Executive Order 13112 (Invasive Species) provides that no Federal agency shall authorize, fund, or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species unless, pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk or harm will be taken in conjunction with the actions.

DD.  Secretarial Order 3175 (incorporated into the Departmental Manual at 512 DM 2) requires that if Department of the Interior (DOI) agency actions might impact Indian trust resources, the agency must explicitly address those potential impacts in planning and decision documents, as well as consult with the tribal government whose trust resources are potentially affected by the Federal action.

EE.  Secretarial Order 3206 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act) requires DOI agencies to consult with Indian tribes when agency actions to protect a listed species, as a result of compliance with ESA, affect or may affect Indian lands, tribal trust resources, or the exercise of American Indian tribal rights.

FF.  Secretarial Order 3215 (Principles for the Discharge of the Secretary's Trust Responsibility) guides DOI officials by defining the relatively limited nature and extent of Indian trust assets, and by setting out the principles that govern the Trustee's fulfillment of the trust responsibility with respect to Indian trust assets.

.04  **Responsibility**.

A.  Director, Bureau of Land Management, is responsible for:

1.  Establishing national strategies, goals and objectives for land use plans consistent with the Federal Land Policy and Management Act (FLPMA) and the BLM Strategic Plan, as required under the Government Performance and Results Act of 1993.

2.  Providing national-level policy guidance and direction for land use planning at several scales, as well as providing for land use plan evaluations.

3.  Resolving protests to proposed land use plans and amendments.

BLM_0007159

.04A3

## 1601 - LAND USE PLANNING

B. <u>State Directors</u> are responsible for:

1. Providing policy guidance and direction reflecting national strategic goals for regional, sub-basin, and local land use planning, where appropriate, and for RMPs, subsequent implementation plans, and project-level plans within their States.

2. Approving boundaries for assessments and for land use plans, revisions and amendments.

3. Approving land use plans, revisions, and amendments.

4. Assisting with plan evaluations at the intervals specified in each land use plan, and either approving evaluations or concurring with Field and District Manager approvals of plan evaluations.

C. <u>Field Managers and District Managers</u> are responsible for:

1. Preparing and implementing plans, including RMPs, implementation plans, and project-level plans.

2. Ensuring that all activities on public lands conform to approved land use plan decisions.

3. Approving implementation decisions.

4. Monitoring and evaluating land use plans in accordance with the intervals and standards established in their land use plans, as well as at other times as appropriate; approving plan evaluations for those evaluations initiated at the field level.

.05 **References**.

A. 2 U.S.C. 1534 - State, Local and Tribal Government Input

B. 5 U.S.C. 552 - Public Information; Agency Rules, Opinions, Orders, Records, and Proceedings

C. 16 U.S.C. 1001 *et seq*. - Watershed Protection and Flood Prevention

D. 16 U.S.C. 1601 *et seq*. - Forest and Rangeland Renewable Resources Planning
E. 42 U.S.C. 4332 - Cooperation of Agencies

F. Executive Order 12088 - Federal Compliance with Pollution Control Standards

BLM MANUAL
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

Rel. 1-1666
11/22/00

BLM_0007160

.05E

## 1601 - LAND USE PLANNING

G. 36 CFR 800 - Protection of Historic and Cultural Properties

H. 40 CFR 1500 - Council on Environmental Quality

I. 43 CFR 4 - Department Hearings and Appeals Procedures

J. 43 CFR 1600 - Planning, Programming, Budgeting

K. 43 CFR 2200 - Exchanges: General Procedures

L. 43 CFR 2300 - Land Withdrawals

M. 43 CFR 2400 - Land Classification

N. 43 CFR 2520 - Desert Land Entries

O. 43 CFR 2530 - Indian Allotments

P. 43 CFR 2610 - Carey Act Grants

Q. 43 CFR 2620 - State Grants

R. 43 CFR 2710 - Sales: Federal Land Policy and Management Act

S. 43 CFR 2740 - Recreation and Public Purposes Act

T. 43 CFR 2800 -Rights-of-way, Principles and Procedures

U. 43 CFR 2910 - Leases

V. 43 CFR 2920 - Leases, Permits, and Easements

W.   43 CFR 3100 - Oil and Gas Leasing

X. 43 CFR 3160 - Onshore Oil and Gas Operations

Y. 43 CFR 3420 - Competitive Leasing

Z.   43 CFR 3461 - Federal Lands Review: Unsuitability For Mining

AA.   43 CFR 3809 - Surface Management

BLM MANUAL                                                    Rel. 1-1666
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;   11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

.05Z

## 1601 - LAND USE PLANNING

BB.   43 CFR 4100 - Grazing Administration

CC.   43 CFR 4180 - Rangeland Health

DD.   43 CFR 4740 - Wild Horses and Burros: Motor Vehicles and Aircraft

EE.   43 CFR 5003 - Effect of Decisions

FF.     43 CFR 8340 - Off-Road Vehicles

GG.   43 CFR 8342 - Off-Road Vehicles: Designation Procedures

HH.   43 CFR 8364 - Visitor Services: Closure and Restriction Orders

II.   50 CFR 402 - Interagency Coordination--Endangered Species Act of 1973, as amended

JJ.   Departmental Manual 512 DM 2 - Departmental Responsibilities for Indian Trust Resources

KK.   Departmental Manual 516 DM - NEPA Manual

LL.   BLM Handbook H-1790-1 - NEPA Handbook

MM.   BLM Manual 6840 - Special Status Species Management

NN.   BLM Manual 8120 - Native American Consultation

OO.   BLM Manual 8160 - Native American Coordination and Consultation

PP.   BLM Handbook H-8160-1 - General Procedural Guidance for Native American Consultation

QQ.   BLM Manual 8300 - Recreation Management

RR.   BLM Handbook H-8160-1 - General Procedural Guidance for Native American Consultation

SS.     BLM Handbook H-8410-1 - Visual Resources Inventory

TT.   BLM Handbook H-9211-1 - Fire Management Activity Planning

UU.   BLM Handbook H-9214-1 - Prescribed Fire Management Handbook

BLM MANUAL                                                                Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;        11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007162

.05SS

## 1601 - LAND USE PLANNING

.06 **Policy**.

A. <u>Planning Approach</u>.

1. The BLM will use a collaborative approach, where possible and as appropriate, when preparing or amending land use plans.  Land use planning will be completed in accordance with applicable laws, regulations, and guidance, and will support BLM's mission and goals as outlined in BLM's Strategic Plan.  Planning decisions will also be developed in concert with sustainable development concepts.  These concepts include a vision of economic prosperity, a healthy environment, and a just and equitable society.  These sustainable development concepts are consistent with the mission and goals outlined in BLM's Strategic Plan.

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.  Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

B. <u>Planning Base</u>.

1. The BLM has developed a comprehensive set of land use planning decisions that are described in MFPs, RMPs, and other equivalent plans.  Equivalent plans include:

a. Plans prepared by other agencies and adopted by the BLM (43 CFR 1610.5-7).

b. Planning analyses prepared by the BLM for BLM-managed areas that are outside current RMP or MFP planning boundaries.

BLM MANUAL                                                              Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;        11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007163

.06B2

## 1601 - LAND USE PLANNING

2.  This planning base covers nearly all of the public land managed by the BLM.  The planning base will evolve as BLM prepares new RMPs, amendments, and revisions:

   a.  In response to evaluations of consistency with current laws, regulations, and policies.

   b.  Upon determining that implementing a plan's decisions is not achieving the desired resource conditions.

   c.  When new science, data, or information indicates a need to change previous decisions.

   d.  Upon determining that current plans do not provide adequate management direction.

   e.  When new proposals or actions not evaluated in previous land use plans are put forth.

3.  As funding permits, the BLM will prepare new RMPs for BLM-managed areas where none currently exist.  Such areas include those currently covered by MFPs, areas covered by a planning analysis, newly acquired areas placed under BLM management, and areas for which the BLM has not yet completed any planning (e.g., portions of Alaska).  The BLM will use the procedures outlined in this Manual and Handbook to prepare separate RMPs for National Monuments, National Conservation Areas, or other areas that warrant an RMP.

   C.  Collaborative and Multijurisdictional Approaches to Planning.

1.  The BLM will use collaborative and multijurisdictional approaches, where possible and as appropriate, to provide additional opportunities for identifying and resolving issues relating to the use of BLM-managed Federal lands.  Collaboration is a cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing federal and other lands.  Collaboration can be used to encourage the development of shared landscape goals and objectives and to garner the support needed for implementation.

BLM MANUAL
Supersedes Rel. 1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

Rel. 1-1666
11/22/00

BLM_0007164

.06C2

# 1601 - LAND USE PLANNING

2.  While the ultimate responsibility regarding land use plan decisions on BLM-administered lands rests with the BLM official, managers have discovered that when people, communities, and government work together toward a common objective, there is significant improvement in the stewardship of BLM's lands.  A collaborative approach to planning means that the BLM must strive to work together with Federal, tribal, State, and local governments and other interested parties from the earliest stages and throughout the planning process to address common needs and goals within the planning area.  This approach is effective whether the BLM is planning solely for BLM lands, or as a partner in multijurisdictional planning efforts in which there are multiple public and nonpublic land ownerships and jurisdictions.

D.  Planning Scale.  Planning and regional assessments may be done at multiple scales to ensure that decisions properly address issues, trends, and concerns.  For instance, assessment and planning regional issues, while not required, could set the context for RMPs or multi-jurisdictional plans and subsequent implementation plans.  Multiple scales of planning decisions, from regional to site-specific, provide a comprehensive land use planning base for resource management within the context of FLPMA.  Assessment and planning at different geographic scales allow the public to better focus on the level where its interests lie and allow the agency to make decisions at a scale most appropriate for the issues at hand and the level of information available.

E.  Decision-making Levels and Procedures.

1.  Procedures for making decisions vary, depending on whether the decisions are land use plan decisions or implementation decisions, as well as the level of impacts of the decisions.  The BLM shall make land use plan decisions using the NEPA process in conjunction with the planning requirements at 43 CFR 1600.  Proposed land use plan decisions can be protested under 43 CFR 1610.5-2.

2.  The BLM will normally make implementation decisions in implementation plans, or as stand-alone decisions, using program-specific requirements and applicable NEPA procedures.  These decisions are generally appealable to the Interior Board of Land Appeals (IBLA) through the Office of Hearings and Appeals (OHA) under 43 CFR 4, or to other authorities specific to resource programs.  Handbook H-1601-1, Sections III and IV, provide additional details on procedural requirements for both land use plan decisions and implementation decisions.  Handbook H-1601-1, Appendix F, provides additional details on protest and appeal provisions.

F.  Implementation Actions Subsequent to Land Use Plan Decisions.  The BLM will implement land use plans contingent upon available funding for authorizing and managing uses.  If appropriated funds are not sufficient to complete actions required prior to authorizing specific uses (e.g., the completion of required clearances, consultation, and environmental analysis), it is acceptable for applicants to pay for these costs to help facilitate the authorization process.

G.  Valid Existing Rights.  All decisions made in land use plans, and subsequent

BLM MANUAL                                                             Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;      11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

.06G

## 1601 - LAND USE PLANNING

implementation decisions, will be subject to valid existing rights. This includes, but is not limited to, valid existing rights associated with oil and gas leases, mineral leases, mining claims, and lands and realty actions (e.g., rights-of-way, easements, leases, etc.).

The BLM has the discretion, subject to the agreement of holders of valid existing rights, to modify proposed actions to reduce the effect of actions on resource values and uses. These modifications may be necessary to maintain the choice of alternatives being considered during land use plan development and implementation, and may include appropriate stipulations, relocations, redesigns, or delay of proposed actions.

.07 **File and Records Maintenance**. [Reserved]

BLM MANUAL                                                                    Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;   11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007166

## 1601 - LAND USE PLANNING

.08 **Glossary**.

Following are definitions for terms and descriptions for acronyms used in this Manual and Handbook H-1601-1.  Also see definitions for terms used in Section 103 of FLPMA and the planning regulations at 43 CFR 1601.0-5.  This glossary does not supersede these definitions or those in other laws or regulations.

**Terms**

-A-

Activity Plan:  see "Implementation Plan."

Alternative Dispute Resolution:  any process used to prevent, manage, or resolve conflicts using procedures other than traditional courtroom litigation or formal agency adjudication.

Amendment:  the process for considering or making changes in the terms, conditions, and decisions of approved RMPs or MFPs using the prescribed provisions for resource management planning appropriate to the proposed action or circumstances.  Usually only one or two issues are considered that involve only a portion of the planning area.

Assessment:  the act of evaluating and interpreting data and information for a defined purpose.

-B-

Best Management Practices (BMP):  a suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes.  Best management practices are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory.  They may be updated or modified without a plan amendment if they are not mandatory.

-C-

Categorical Exclusion (CX):  a category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an EIS is required (40 CFR 1508.4).

Closed:  generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.  For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to OHV use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders.

Collaboration :  a cooperative process in which interested parties, often with widely varied

BLM MANUAL                                                                    Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;          11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007167

Case No. 1:20-cv-02484-MSK   Document 28-1   filed 04/27/21   USDC Colorado   pg 50 of 422

## 1601 - LAND USE PLANNING

interests, work together to seek solutions with broad support for managing public and other lands.  This may or may not involve an agency as a cooperating agency.

Collaborative Partnerships and Collaborative Stewardship:  refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

Conformance:  means that a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

Conservation Agreement:  a formal signed agreement between the U.S. Fish and Wildlife Service or National Marine Fisheries Service and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species.  CA's can be developed at a State, regional, or national level and generally include multiple agencies at both the State and Federal level, as well as tribes.  Depending on the types of commitments the BLM makes in a CA and the level of signatory authority, plan revisions or amendments may be required prior to signing the CA, or subsequently in order to implement the CA.

Conservation Strategy:  a strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats.  Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

Consistency:  means that the proposed land use plan does not conflict with officially approved plans, programs, and policies of tribes, other Federal agencies, and State, and local governments to the extent practical within Federal law, regulation, and policy.

Cooperating Agency:  assists the lead Federal agency in developing an EA or EIS.  The Council on Environmental Quality regulations implementing NEPA define a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6).  Any tribe or Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

-D-

Director (BLM Director):  the national Director of the BLM.

Documentation of Land Use Plan Conformance and National Environmental Policy Act (NEPA) Adequacy (DNA):  a worksheet for determining and documenting that a new, site-specific

BLM MANUAL
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362; 1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472; 1-1528; 1-1366; 1-1367

Rel. 1-1666
11/22/00

BLM_0007168

Glossary, Page 3

## 1601 - LAND USE PLANNING

proposed action both conforms to the existing land use plan(s) and is adequately analyzed in existing NEPA documents. The signed conclusion in the worksheet is an interim step in BLM's internal analysis process and is not an appealable decision.

-E-

Evaluation (Plan Evaluation): the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented.

-G-

Geographic Information System: a computer system capable of storing, analyzing, and displaying data and describing places on the earth's surface.

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

-I-

Implementation Decisions: decisions that take action to implement land use plan decisions. They are generally appealable to IBLA under 43 CFR 4.40.

Implementation Plan: a site-specific plan written to implement decisions made in a land use plan. An implementation plans usually selects and applies best management practices to meet land use plan objectives. Implementation plans are synonymous with "activity" plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans.

Indian tribe (or tribe): any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status (listed periodically in the *Federal Register*).

-L-

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan: a set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation

BLM MANUAL                                                    Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;          11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007169

## 1601 - LAND USE PLANNING

of land-use-plan-level decisions developed through the planning process outlined in
43 CFR 1600, regardless of the scale at which the decisions were developed.

Land Use Plan Decision:  establishes desired outcomes and actions needed to achieve them.
Decisions are reached using the planning process in 43 CFR 1600.  When they are presented
to the public as proposed decisions, they can be protested to the BLM Director.  They are not
appealable to IBLA.

Land Use Planning Base:  the entire body of land use plan decisions resulting from RMPs, MFPs,
planning analyses, the adoption of other agency plans, or any other type of plan where land-
use-plan-level decisions are reached.

-M-

Management Decision:  a decision made by the BLM to manage public lands.  Management
decisions include both land use plan decisions and implementation decisions.

Monitoring (Plan Monitoring):  the process of tracking the implementation of land use plan
decisions.

Multijurisdictional Planning:  collaborative planning in which the purpose is to address land use
planning issues for an area, such as an entire watershed or other landscape unit, in which there
is a mix of public and/or private land ownerships and adjoining or overlapping tribal, State,
local government, or other Federal agency authorities.

-O-

Objective:  a description of a desired condition for a resource.  Objectives can be quantified and
measured and, where possible, have established time frames for achievement.

Open:  generally denotes that an area is available for a particular use or uses.  Refer to specific
program definitions found in law, regulations, or policy guidance for application to individual
programs.  For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates
to OHV use.

-P-

Permitted Use:  the forage allocated by, or under the guidance of, an applicable land use plan for
livestock grazing in an allotment under a permit or lease; expressed in Animal Unit Months
(AUMs) (43 CFR 4100.0-5).

Planning Analysis:  a process using appropriate resource data and NEPA analysis to provide a
basis for decisions in areas not yet covered by an RMP.

BLM_0007170

Glossary, Page 5

# 1601 - LAND USE PLANNING

<u>Planning Criteria</u>:  the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning.  Planning criteria streamline and simplify the resource management planning actions.

<u>Provincial Advisory Council</u> (PAC):  see Resource Advisory Council.

<u>Public Land</u>:  land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

-R-

<u>Resource Advisory Council</u> (RAC):  a council established by the Secretary of the Interior to provide advice or recommendations to BLM management.  In some states, Provincial Advisory Councils (PACs) are functional equivalents of RACs.

<u>Resource Use Level</u>:  the level of use allowed within an area.  It is based on the desired outcomes and land use allocations in the land use plan.  Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan.  Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

<u>Revision</u>:  the process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

-S-

<u>Scale</u>:  refers to the geographic area and data resolution under examination in an assessment or planning effort.

<u>Social science</u>:  the study of society and of individual relationships in and to society, generally including one or more of the academic disciplines of sociology, economics, political science, geography, history, anthropology, and psychology.

<u>Standard</u>:  a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards).

<u>State Implementation Plan</u> (SIP):  a strategic document, prepared by a State (or other authorized air quality regulatory agency) and approved by the U.S. Environmental Protection Agency, that throughly describes how requirements of the Clean Air Act will be implemented (including standards to be achieved, control measures to be applied, enforcement actions in

BLM MANUAL                                         Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;    11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

BLM_0007171

**1601 - LAND USE PLANNING**

case of violation, etc.).

Special status species:  includes proposed species, listed species, and candidate species under the ESA; State-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840 - Special Status Species Policy).

Strategic Plan (BLM Strategic Plan):  a plan that establishes the overall direction for the BLM. This plan is guided by the requirements of the Government Performance and Results Act of 1993, covers a 5-year period, and is updated every 3 years.  It is consistent with FLPMA and other laws affecting the public lands.

-T-

Total Maximum Daily Load (TMDL):  an estimate of the total quantity of pollutants (from all sources:  point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

Tribe:  see Indian tribe.

BLM MANUAL
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362; 1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472; 1-1528; 1-1366; 1-1367

Rel. 1-1666
11/22/00

BLM_0007172

# 1601 - LAND USE PLANNING

**Acronyms**

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| ADR | Alternative Dispute Resolution |
| AUM | Animal Unit Month |
| | |
| BLM | Bureau of Land Management |
| | |
| CA | |
| Conservation Agreement | |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CS | |
| Conservation Strategy | |
| CX | Categorical Exclusion |
| | |
| DM | Departmental Manual |
| DNA | Documentation of Land Use Plan Conformance and National Environmental Policy Act (NEPA) Adequacy |
| DOI | Department of the Interior |
| DR | |
| Decision Record (for an EA) | |
| | |
| EA | |
| Environmental Assessment | |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| | |
| FACA | Federal Advisory Committee Act |
| FWS | Fish and Wildlife Service |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| | |
| GIS | Geographic Information System |
| IBLA | Interior Board of Land Appeals |
| | |
| LAC | Limits of Acceptable Change |
| LUP | Land use plan |
| | |
| MFP | Management Framework Plan |
| MOU | Memorandum of Understanding |

BLM MANUAL                                                                                     Rel. 1-1666
Supersedes Rel.  1-1357; 1-1358; 1-1359; 1-1466; 1-1360; 1-1361; 1-1362;      11/22/00
1-1363; 1-1364; 1-1365; 1-1467; 1-1468; 1-1469; 1-1470; 1-1471; 1-1472;
1-1528; 1-1366; 1-1367

## 1601 - LAND USE PLANNING

| | |
|---|---|
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| NEPA | |
| National Environmental Policy Act | |
| NMFS | |
| National Marine Fisheries Service | |

| | |
|---|---|
| OHV | Off-Highway Vehicle (also refers to Off-Road Vehicles) |
| PAC | Provincial Advisory Council |

| | |
|---|---|
| RAC | Resource Advisory Council |
| RMP | Resource Management Plan |
| ROD | Record of Decision (for an EIS) |
| ROS | Recreation Opportunity Spectrum |

| | |
|---|---|
| T&E | Threatened and Endangered |
| TMDL | Total Maximum Daily Load |

| | |
|---|---|
| U.S.C. | United States Code |

| | |
|---|---|
| VRM | Visual Resource Management |

BLM_0007174

| UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT | Release 3-314 |
|---|---|
| MANUAL TRANSMITTAL SHEET | Date    2/22/2002 |

**Subject**

### 3600 - MINERAL MATERIALS DISPOSAL

1. Explanation of Material Transmitted: This release revises Manual Section 3600 - Mineral Materials Disposal in its entirety. The revised Manual incorporates changes in policies resulting from the revision of regulations in 43 CFR 3600. Guidelines for processing disposals and all of the appendices have been deleted in an effort to eliminate technical instructions more appropriately found in handbooks.

2. Reports Required: None.

3. Materials Superseded: The Manual material superseded by this release is listed under "REMOVE" below. No other directives are superseded.

4. Filing Instructions: File as directed below.

| REMOVE | Insert |
|---|---|
| All of 3600 (Rel. 3-80 and 3-213) (Total 23 sheets) | 3600 (Total 6 Sheets) |

Assistant Director
Minerals, Realty & Resource Protection

Case No. 1:20-cv-02484-MSK   Document 28-1   filed 04/27/21   USDC Colorado   pg 58 of 422

3600 - MINERAL MATERIAL DISPOSAL

## Table of Contents

.01  Purpose

.02  Objectives

.03  Authority

.04  Responsibility

.05  References

.06  Policy

.07  File and Record Maintenance

.1  Limitations

    A. Disposal Prohibited

    B. Disposal Restricted

.2  Unauthorized Use

BLM_0007176

.01

## 3600 - MINERAL MATERIAL DISPOSAL

.01  <u>Purpose</u>.  This manual section provides the policies, procedures, and references for processing the disposal, exploration, development, and mining of mineral materials, and reclamation of lands disturbed by such activities.

.02  <u>Objectives</u>.  To assure that mineral material disposal are processed within prescribed Departmental procedures and judicial case laws on the matter.

.03  <u>Authority</u>.

    A.  <u>Laws</u>.

       1.  <u>The Materials Act of July 31, 1947</u> (61 Stat. 681, 30 U.S.C. 601 et seq.) as principally amended by:

         a. <u>The Act of July 23, 1955</u>, Public Law 167 (69 Stat. 367, 30 U.S.C. 601) and

         b. <u>The Act of September 28, 1962</u> (76 Stat. 652, 30 U.S.C. 601).

       2. <u>The Federal Land Policy and Management Act of 1976</u> (31 U.S.C. 1732 and 1734).

       3. <u>The Independent Offices Appropriations Act of 1952</u> (31 U.S.C. 9701).

       4.  <u>The Federal Highway Act of 1958</u> (23 U.S.C. 107(d) and 317).

       5.  <u>Stock-Raising Homestead Act of 1916</u> (43 U.S.C. 299, as amended; (39 Stat. 865; 107 Stat 60)).

       6.  <u>Taylor Grazing Act of 1934</u> (48 Stat. 1272, as amended; 43 U.S.C. 315g).

.03A7

### 3600 - MINERAL MATERIAL DISPOSAL

7.   <u>Small Tract Act of 1938</u>, (52 Stat. 609), as amended by the Act of June 8, 1954 (68 Stat. 239; 43 U.S.C. 682a).

8.   <u>Alaska Native Allotment Act of 1906</u>, (43 U.S.C. 270-273, 34 Stat. 197, as amended by 70 Stat. 954).

9.   <u>Alaska Native Claims Settlement Act of 1971</u>, (43 U.S.C. 1601).

10. <u>Reclamation Project Act of August 4, 1939</u>. (43 U.S.C. 387).

B.   <u>Regulations</u>.

1.   43 CFR 3600 - Mineral Materials Disposal

2.   43 CFR 3710 - Public Law 167; Act of July 23, 1955

3.   43 CFR 3814 - Disposal of Reserved Minerals Under the Stockraising Homestead Act.

4.   43 CFR 1810 - Public Administrative Procedures

5.   43 CFR 9230 - Trespass

C.   <u>Case Law</u>.

1. <u>Watt v. Western Nuclear, Inc.</u>, 103 S.Ct 2218 (June 6, 1983).

2. <u>United States v. Coleman</u>, 390 S.Ct 599 (April 22, 1968)

3. <u>McClarty v. Secretary of the Interior</u>, 408 F.2d 907, 908 (9th Cir. 1969)

BLM_0007178

.04

3600 - MINERAL MATERIAL DISPOSAL

.04  <u>Responsibility</u>.

A.  <u>The Director and Deputy Director</u> are responsible for establishing overall policy and guidance for the management of mineral resources administered by the Bureau of Land Management (BLM). This responsibility is exercised through the Assistant Director, Minerals, Realty and Resource Protection.

B.  <u>State Directors</u>, or designated Authorized Officers are responsible for the management of mineral materials administered by the BLM, within their respective areas of jurisdiction.

.05  <u>References</u>. See BLM Handbook H-3600-1

.06  <u>Policy</u>.  It is BLM policy to dispose of mineral materials, provided adequate measures are taken to protect the environment and that damage to public health and safety is minimized.  Since disposal of mineral materials is discretionary, no disposals will be made if it is determined by the Authorized Officer that the total damage to public lands and resources would exceed the expected public benefits derived from any proposed disposal.

.07  <u>File and Record Maintenance</u>. Refer to GRS/BLM Combined Records Schedule.

BLM MANUAL                                    Rel. 3-314
Supersedes Rel. 3-80 and 3-213                2/22/02

BLM_0007179

.1

## 3600 - MINERAL MATERIAL DISPOSAL

.1   <u>Limitations</u>.

  A.   <u>Disposal Prohibited</u>.  The BLM will not dispose of mineral materials if any of the following conditions exist:

  1.   The lands are included in National Parks, National Monuments, National Forests, National Wilderness Areas, or Indian Lands.

  2.   There are conflicting non-mineral applications or entries pending which involve title to the mineral estate, such as sales or exchanges.

  3.   Disposal would be in conflict with the current BLM land use plan.

  4.   Disposal is otherwise prohibited by law.

  B.   <u>Disposal Restricted</u>.

  1.   Withdrawn Lands.  Disposals may be made from lands withdrawn on behalf of another Federal department or agency (other than Interior), State or local government agency, if the other  department or agency consents to the disposal.  (See 43 CFR 3601.13.)

  2.   Restricted Lands.

  a. Disposal of mineral material from powersite lands, administered by the Federal Energy Regulatory Commission (FERC), is allowed under a July 20, 1966, memorandum of understanding between the BLM and FERC.

BLM MANUAL         Rel. 3-314
Supersedes Rel. 3-80 and 3-213    2/22/02

BLM_0007180

.1B2b

### 3600 - MINERAL MATERIAL DISPOSAL

b. Disposals from lands withdrawn or acquired on behalf of the Bureau of Reclamation are allowed pursuant to a March 25, 1983, memorandum of understanding between BLM and the Bureau of Reclamation.

3. Stockraising Homestead Act (SRHA) Lands. Disposal of mineral materials from SRHA lands may be made by the BLM, provided conditions found in Section 9 of the 1916 Act and in 43 CFR 3814 are met.

4. Acquired Lands. Material disposals may be made from acquired lands managed by BLM under the same procedures and authorities as disposals from public lands, unless otherwise prohibited by terms of the conveyance document. For disposals from Section 8, Taylor Grazing Act acquisitions, each conveyance document must be reviewed to determine the extent of the mineral reservation and any additional provisions governing the disposition of minerals.

5. Small Tract. Disposal of mineral materials from Small Tract lands (lands patented under the Small Tract Act of 1938) may be made by the BLM under the same procedures and authorities as disposals from public lands, unless otherwise prohibited by terms of the conveyance document. Each Small Tract conveyance document involved in the disposal must be reviewed to determine the extent of the mineral reservation and any additional provisions governing the disposition of minerals.

BLM_0007181

.1B6

## 3600 - MINERAL MATERIAL DISPOSAL


6.    Alaska.  BLM may not dispose of mineral materials from lands included in a native allotment either before or after a certificate of allotment under the Alaska Native Allotment Act of May 17, 1906, has been issued.  Disposal from lands selected, but not conveyed, under the Alaska Native Claims Settlement Act (ANCSA) may be made only under provisions of 43 CFR 2650.1 and special procedures provided by the Secretary. Disposals may not be made from lands selected by, but not yet conveyed to, the State of Alaska. In addition all disposals must be made in accordance with Chapter II of BLM Manual Handbook H-3600-1.


7.    Jurisdictional Boundaries.  Material disposals, that which by nature of the mining unit necessitate overlaps between Forest Service and BLM jurisdictional boundaries may be accomplished by a specific memorandum of understanding.

8. Lands Encumbered with Unpatented Mining Claims. BLM will not dispose of mineral materials from unpatented mining claim if such a disposal would endanger or materially interfere with the mining, processing, or exploration and reasonably incident activities.

The BLM will not dispose of mineral materials from a pre-July 23, 1955,unpatented mining claim without making a determination that it has a right to dispose of mineral material from the claim.

Chapter X of BLM Manual Handbook H-3600-1 provides guidance for disposal from unpatented mining claims.

BLM_0007182

.2

3600 - MINERAL MATERIAL DISPOSAL

.2  <u>Unauthorized Use</u>.  Except when authorized by sale, permit, or other authorized use under the laws and regulations of the Department of Interior, the extraction, severance, or removal of mineral materials from public lands under the jurisdiction of the Department of the Interior is unauthorized use.  Procedures for reporting and processing unauthorized use cases must conform to BLM Manual 9230, 9235, and BLM Manual Handbook H-9235-1. Procedures for collection of damages can be found in BLM Manual 9235 and BLM Manual Handbook H-9235-1.

BLM_0007183

Case No. 1:20-cv-02484-MSK   Document 28-1   filed 04/27/21   USDC Colorado   pg 66 of 422

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

**MANUAL TRANSMITTAL SHEET**

Release

8–72

Date

12/03/04

Subject

## 8100 – THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES  (PUBLIC)

1. <u>Explanation of Material Transmitted</u>.  This release completely revises BLM Manual
Section 8100.

2. <u>Reports Required</u>:  None.

3. <u>Materials Superseded</u>:  Manual pages superseded by this release are listed under REMOVE
below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below:

| <u>REMOVE</u> | <u>INSERT</u> |
|---|---|
| All of 8100 (Rel. 8-38) | 8100 |

(Total: 72 Sheets)

BLM_0007184

TC-1

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance
.08  Responsibility for Non-Federal Cultural Resources
.09  Program Relationships

.1  National Programmatic Agreement Regulates BLM's Compliance with NHPA
    .11  Historic Preservation is Integrated into Multiple-Use Management under FLPMA
    .12  Authority to Implement the Programmatic Agreement is Provisional
    .13  BLM Standards Required under the National Programmatic Agreement
    .14  Thresholds for Council Participation

.2  Personnel Qualifications and Administrative Requirements
    .21  Personnel Must Meet Permit Standards
    .22  Alternate Documentation Allowed for Official Duties
    .23  BLM Personnel
    .24  Non-BLM Personnel

.3  Preparing and Distributing Annual Reports
    .31  Data Compilation
    .32  Report Content
    .33  Report Distribution

Glossary of Terms

Appendices
1.  Antiquities Act of 1906
2.  Historic Sites Act
3.  Reservoir Salvage Act
4.  Archeological and Historic Preservation Act
5.  National Historic Preservation Act
6.  Executive Order 11593
7.  American Indian Religious Freedom Act
8.  Archaeological Resources Protection Act
9.  Native American Graves Protection and Repatriation Act
10.  National Trails System Act (Excerpts)
11.  Executive Order 13007
12.  Executive Order 13287
13.  National Programmatic Agreement
14.  Preservation Board Charter
15.  Advisory Council Letter of May 24,1999 TC-2

TC-2

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

Manual Sections in the 8100 Series
8100 - The Foundations for Managing Cultural Resources
8110 - Identifying and Evaluating Cultural Resources
8120 – Tribal Consultation Under Cultural Resource Authorities
8130 - Planning for Uses of Cultural Resources
8140 - Protecting Cultural Resources
8150 - Permitting Uses of Cultural Resources
8160 - Preserving Museum Collections [Reserved]
8170 - Interpreting Cultural Resources for the Public

BLM_0007186

.01

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.01  Purpose. This Manual Section is intended as a reference source to provide BLM managers with basic information and general summary guidance for managing cultural resources. More detailed information, policy direction, and operating procedures are found in the subsidiary Manual Sections and Handbooks in this series (see .05). The purpose of the Manual series is to establish a uniform BLM process for meeting the spirit and requirements of the cultural resource authorities  (see .03) in a dynamic multiple use environment.

.02  Objectives.  Managing cultural resources in BLM is viewed as an integrated system of identifying and evaluating cultural resources, deciding on their appropriate uses, and administering them accordingly, both on public lands and on other lands where BLM decisions could affect cultural resources. The objectives of this integrated management system are to:

A.  Respond in a legally sufficient and professional manner to (1) the legal authorities concerning historic preservation and cultural resource protection, and (2) the principles of multiple use.

B.  Recognize the potential public and scientific uses of, and the values attributed to, cultural resources on the public lands, and manage the lands and cultural resources so that these uses and values are appropriately protected.

C.  Contribute to land use planning and the multiple use management of the public lands in ways that make optimum use of the thousands of years of land use history inherent in cultural resource information, and that safeguard opportunities for achieving appropriate uses of cultural resources.

D.  Protect and preserve in place representative examples of the full array of cultural resources on public lands for the benefit of scientific and public use by present and future generations.

E.  Ensure that proposed land uses avoid inadvertent damage to Federal and non-Federal cultural resources.

F.  Further the goals of the Department's and the BLM's Strategic Plan and the Government Performance and Results Act.

BLM_0007187

.03

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.03  Authority.

A.  "An Act for the Preservation of American Antiquities," also known as the Antiquities Act of 1906  (P.L. 59-209; 34 Stat. 225; 16 U.S.C. 432, 433), is chronologically and philosophically the basic legislation for the protection and preservation of cultural properties (archaeological and historic, without regard to minimum age) on Federal lands. It provides for permits to authorize scholarly use of properties, for misdemeanor-level penalties to control unauthorized use, and for presidential designation of outstanding properties as national monuments for long-term preservation. The act is implemented by uniform regulations at 43 CFR Part 3. Both broader in scope than and superseded in part by the Archaeological Resources Protection Act (see .O3J), it remains a fully active statutory authority. (See Appendix 1.)

B.  Recreation and Public Purposes Act of 1926 (P.L. 69-386; 44 Stat. 741; 43 U.S.C. 869) authorizes the lease or sale of historic properties under certain conditions. (See 43 CFR Subpart 2741 and BLM Manual Section 2740.)

C.  Historic Sites Act of 1935 (P.L. 74-292; 49 Stat. 666; 16 U.S.C. 461) declares national policy to identify and preserve "historic sites, buildings, objects and antiquities" of national significance, authorizing the National Historic Landmarks program of the National Park Service and providing a foundation for the later National Register of Historic Places (see .O3E). Regulations implementing the Landmarks program are at 36 CFR Part 65. (See Appendix 2.)

D.  Reservoir Salvage Act of 1960, as amended by Archeological and Historic Preservation Act of 1974 (P.L. 86-523; 74 Stat. 220, 221; 16 U.S.C. 469; P.L. 93-291; 88 Stat. 174; 16 U.S.C. 469) provides for the preservation of historical and archaeological data that might otherwise be lost as the result of a Federal construction project or a federally licensed or assisted project, activity, or program having an effect on cultural resources. Although amended and broadened after 1966, the act makes no distinction regarding National Register eligibility (see .O3E). The act provides that up to one percent of funds the Congress authorizes to be appropriated for a project may be spent to recover, preserve, and protect archaeological and historical data. Because BLM projects are rarely subject to line item authorization and appropriation, this provision generally does not apply to BLM. (See Appendices 3 and 4.)

.03E

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

E.  National Historic Preservation Act of 1966 (P.L. 89-665; 80 Stat. 915; 16 U.S.C. 470), as amended, extends the policy in the Historic Sites Act to include State and local as well as national significance, expands the National Register of Historic Places, and establishes the Advisory Council on Historic Preservation, State Historic Preservation Officers, Tribal Preservation Officers, and a preservation grants-in-aid program. Section 106 directs all Federal agencies to take into account effects of their undertakings (actions and authorizations) on properties included in or eligible for the National Register of Historic Places, and Section 110 sets inventory, nomination, protection, and preservation responsibilities for federally owned cultural properties. Section 110(c) requires each Federal agency to designate a Preservation Officer to coordinate activities under the act. Section 106 of the act is implemented by regulations of the Advisory Council on Historic Preservation, 36 CFR Part 800. (See Appendix 5.) The 10 Western BLM States and Alaska comply with Section 106 of the Act according to a national Programmatic Agreement dated March 26, 1997. (See Appendix 13.)

F.  National Environmental Policy Act of 1969 (P.L. 91-190; 83 Stat. 852; 42 U.S.C. 4321) establishes national policy for the protection and enhancement of the environment. Part of the function of the Federal Government in protecting the environment is to "preserve important historic, cultural, and natural aspects of our national heritage." Cultural resources need not be determined eligible for the National Register of Historic Places (as in the National Historic Preservation Act) to receive consideration under the National Environmental Policy Act.  The act is implemented by regulations of the Council on Environmental Quality, 40 CFR 1500-1508.  A procedural statute, the act provides for public participation in the consideration of cultural resource issues, among others, during agency decisionmaking.

G.  Executive Order 11593 ("Protection and Enhancement of the Cultural Environment," 36 F.R. 8921, May 13, 1971) directs Federal agencies to inventory cultural properties under their jurisdiction, to nominate to the National Register of Historic Places all federally owned properties that meet the criteria, to use due caution until the inventory and nomination processes are completed, and also to assure that Federal plans and programs contribute to preservation and enhancement of nonfederally owned properties. Some of the provisions of the Executive Order are also found in Section 110 of the National Historic Preservation Act. (See Appendix 6.)

H.  Federal Land Policy and Management Act of 1976 (P.L. 94-579; 90 Stat. 2743; 43 U.S.C. 1701; "FLPMA") directs the Bureau of Land Management to manage public lands on the basis of multiple use, in a manner that "recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands" and that will "protect the quality of . . . historical . . . resources, and archeological values." Cultural resources need not be determined eligible for the National Register of Historic Places (as in the National Historic Preservation Act) to receive consideration under the FLPMA. The act provides for the periodic inventory of public lands and resources, for long-range, comprehensive land use planning, for permits to regulate use of the public lands, and for the enforcement of public land laws and regulations.  FLPMA provides the broadest framework for managing cultural resources on the public lands.

BLM_0007189

.031

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)


I.  American Indian Religious Freedom Act of 1978 (P.L. 95-431; 92 Stat. 469; 42 U.S.C. 1996) resolves that it shall be the policy of the United States to protect and preserve for the American Indian, Eskimo, Aleut, and Native Hawaiian the inherent right of freedom to believe, express, and exercise their traditional religions, including but not limited to access to religious sites, use and possession of sacred objects, and freedom to worship through ceremonials and traditional rites. Federal agencies are directed to evaluate their policies and procedures to determine if changes are needed to ensure that such rights and freedoms are not disrupted by agency practices. The act, a specific expression of First Amendment guarantees of religious freedom, is not implemented by regulations. (See Appendix 7.) (Note: A U.S. Court of Appeals has determined that there is a compliance element in the American Indian Religious Freedom Act, requiring that (1) the views of Indian leaders be obtained and considered when a proposed land use might conflict with traditional Indian religious beliefs or practices, and that (2) unnecessary interference with Indian religious practices be avoided during project implementation, but specifying that (3) conflict need not necessarily bar Federal agencies from adopting proposed land uses in the public interest. Wilson v. Block, 708 F.2d 735, 747 (D.C. Cir. 1983).) An amendment in 1994 (P.L. 103-344) provided for Indians' use, possession, and transportation of peyote for traditional religious purposes.


J.  Archaeological Resources Protection Act of 1979 (P.L. 96-95; 93 Stat. 721; 16 U.S.C. 470aa et seq.) as amended (P.L. 100-555; P.L. 100-588) provides felony-level penalties, more severe than those of the Antiquities Act of 1906 (see .03A), for the unauthorized excavation, removal, damage, alteration, defacement, or the attempted unauthorized removal, damage, alteration, or defacement of any archaeological resource, more than 100 years of age, found on public lands or Indian lands. The act also prohibits the sale, purchase, exchange, transportation, receipt, or offering of any archaeological resource obtained from public lands or Indian lands in violation of any provision, rule, regulation, ordinance, or permit under the act, or under any Federal, State, or local law.  Archaeological resources need not be determined eligible for the National Register of Historic Places (as in the National Historic Preservation Act) to receive consideration under the ARPA. The act establishes definitions, permit requirements, and criminal and civil penalties, among other provisions.  The act overlaps with and partially supersedes the Antiquities Act, in its provisions for permits and penalties. It is implemented by uniform regulations and departmental regulations, both at 43 CFR Part 7. An amendment in 1988 gives Federal agencies explicit direction to establish educational programs explaining the importance of archaeology, to help members of the public understand why archaeological resources are protected from unauthorized removal or damage (See Appendix 8.)

BLM_0007190

.03K

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

K.  Native American Graves Protection and Repatriation Act of 1990 (P.L. 101-601; 104 Stat. 3048; 25 U.S.C. 3001) establishes rights of Indian tribes and Native Hawaiian organizations to claim ownership of certain "cultural items," including human remains, funerary objects, sacred objects, and objects of cultural patrimony held or controlled by Federal agencies and museums that receive Federal funds. The act requires agencies and museums to identify holdings of such remains and objects and to work with appropriate Native American groups toward their repatriation. Permits for the excavation and/or removal of "cultural items" protected by the act require Native American consultation, as do discoveries of "cultural items" made during land use activities. The Secretary of the Interior's implementing regulations are at 43 CFR Part 10. (See Appendix 9.)

L.  National Trails System Act of 1968 (P.L. 90-543; 16 U.S.C. 1241 et. seq. as amended through P.L. 107-325, December 4, 2002) established a national trails system to promote preservation of, public access to, travel within, and enjoyment of the open-air, outdoor areas, and historic resources of the nation.  The Act designated initial trail system components and established methods and standards for adding additional components. Trails are added to the system only by act of Congress. Historic Trails, trail sites, and trail segments must be evaluated against the National Register criteria at 36 CFR Part 60, whether congressionally designated or not, to determine National Register qualification (See Manual Section 8110.3; Departmental Manual 710; National Register Bulletin #30) and related NHPA Section 106 responsibilities.

M.  Executive Order 13007 ("Indian Sacred Sites," 61 F.R. 104, May 24, 1996) provides that in managing Federal lands, agencies–to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions–shall accommodate Indian religious practitioners' access to and ceremonial use of Indian sacred sites, shall avoid adversely affecting the physical integrity of such sites, and shall maintain the confidentiality of sacred sites. The responsibility to identify such sacred sites to the managing agency resides with the Indian tribe or appropriately authoritative representative of an Indian religion. The responsibility to inform tribes, where practicable and appropriate, of proposed actions or land management policies that could restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites, rests with the agency. The Order directs agencies to comply with the Executive Memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments." It explicitly does not create any new right or benefit for Indian tribes, nor any new trust responsibility for the Federal Government. (See Appendix 10.)

N.  Executive Order 13287 ("Preserve America" 68 F.R. 43, March 5, 2003) orders the Federal Government to take a leadership role in protection, enhancement, and contemporary use of historic properties owned by the Federal Government, and promote intergovernmental cooperation and partnerships for preservation and use of historic properties.  The order establishes new accountability for agencies with regard to inventories and stewardship.

.04

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.04  Responsibility.

A.  Director, through the Assistant Director, Renewable Resources and Planning, and the Manager, Cultural and Fossil Resources and Tribal Consultation Group, is responsible for:

1.  Overall direction, leadership, and coordination for the implementation and evaluation of BLM's cultural resource management procedures and initiatives.

2.  Cultural resource management guidance, information, strategies, procedures, and directives as required by other staffs and BLM offices. This is accomplished in consultation with the related Washington Office Group(s).

3.  Coordination of contacts with other Federal bureaus, agencies, and departmental offices in Washington, D.C., regarding cultural resource concerns, in consultation with the related Washington Office Group(s).

B.  State Directors, within their respective jurisdictions, are responsible for:

1.  Directing implementation of the cultural resource management program and identifying priorities for implementing program elements.

2.  Providing statewide training and technical direction for implementing program elements.

3.  Monitoring the progress and quality of work being completed at the field level.

C.  Field Office Managers are responsible for directing the implementation and maintenance of the cultural resource management program within their respective areas of authority, and for ensuring that all elements of the program are conducted in conformance with legal and professional standards. Managers are also responsible for encouraging and enabling the cultural resource staff specialists under their supervision to maintain and strengthen their professional qualifications, through training, course work, attendance at professional conferences, special details, and other means.

D.  Cultural Resource Specialists are responsible for providing professionally sound recommendations, advice, and service to managers to assist them in fulfilling their responsibilities. Specialists are also responsible for maintaining and strengthening their own professional and technical knowledge and skills, which includes staying current with professional methods and standards and legal/regulatory matters pertinent to performance of their duties. Staff specialists must inform their supervisor when a proposed work assignment exceeds their professional qualifications. (See "Professional Development" commitments in BLM's national Programmatic Agreement, items 7.a. and b., App. 13, p. 10.)

BLM_0007192

.04E

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)


E.  <u>All Field Personnel</u> are responsible for knowing and observing the prohibitions against unauthorized disturbance of cultural resources and collection of archaeological and historical artifacts; reporting all cultural resource discoveries; avoiding damage to or destruction of cultural resources; and reporting to appropriate officials any apparent violations of the laws and regulations protecting cultural resources.

F.  <u>The Bureau's Preservation Officer,</u> a senior cultural resource specialist in the Headquarters Office, is responsible for fulfilling coordination duties under the National Historic Preservation Act (see Appendix 5, Section 110(c)), and for advising the directorate on professional and technical matters relating to cultural resource management. The Preservation Officer chairs the Preservation Board (.04H).

G.  <u>Deputy Preservation Officer,</u> a senior cultural resource specialist on each State Director's staff, is responsible for advising the State Director and Field Office managers on professional and technical matters relating to cultural resource management, and for serving as an ex-officio member on the Preservation Board (.04H).

H.  <u>The Preservation Board,</u> established by the Director pursuant to the national Programmatic Agreement of March 26, 1997 (Appendix 13), oversees historic preservation activities bureauwide, coordinates with the Advisory Council on Historic Preservation and the State Historic Preservation Officers, and advises the State Directors and the Headquarters Directorate on historic preservation matters. See Appendix 14, Preservation Board Charter, and BLM Manual Section 1211.09G.

BLM_0007193

.05

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.05  References.

A.  National Programmatic Agreement of March 26, 1997 (see Appendix 13).

B.  Title 36 Code of Federal Regulations, Parts 60, 61, 63, 65, 68, 79, and 800.

C.  Title 43 Code of Federal Regulations, Parts 3 and 7.

D.  BLM Manual Section 8110 - Identifying and Evaluating Cultural Resources.

E.  BLM Manual Section 8120 – Tribal Consultation Under Cultural Resource Authorities

F.  BLM Manual Handbook H-8120-1 - Guidelines for Conducting Tribal Consultation

G.  BLM Manual Section 8130 - Planning for Uses of Cultural Resources

H.  BLM Manual Section 8140 - Protecting Cultural Resources.

I.  BLM Manual Section 8150 - Permitting Uses of Cultural Resources

J.  BLM Manual Section 8160 - Preserving Museum Collections [Reserved]

K.  BLM Manual Section 8170 - Interpreting Cultural Resources for Public Use

BLM_0007194

.06

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.06  Policy.

A.  Cultural resources are recognized as fragile, irreplaceable resources with potential public and scientific uses, representing an important and integral part of our Nation's heritage.

B.  The BLM manages cultural resources under its jurisdiction or control according to their relative importance, protecting against impairment, destruction, and inadvertent loss, and encouraging and accommodating the uses determined appropriate through planning and public participation.

C.  Apart from certain considerations derived from specific cultural resource statutes, management of cultural resources on the public lands is primarily based on FLPMA (see .O3H), and is governed by the same multiple use principles and the same planning and decisionmaking processes as are followed in managing other public land resources.

.07  File and Records Maintenance. See .22, .23C, .23D, .24A-D, .3. See also subsidiary Manual Sections in this series. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4).

.08  Responsibility for Non-Federal Cultural Resources.

A.  The BLM assures that its actions and authorizations are considered in terms of their effects on cultural resources located on non-Federal land. The extent of BLM's responsibility for identifying and protecting non-Federal cultural resources is limited by the degree to which BLM decisions determine or control the location of activities on non-Federal lands which could have effects on cultural resources. (See BLM Manual Section 8140.O6D.)

B.  The BLM conducts, or causes to be conducted, the inventory and evaluation of cultural resources on non-Federal lands within the area potentially impacted by proposed land uses, whether initiated by BLM or in response to a land use application.

C.  The BLM mitigates, or causes to be mitigated, adverse effects to non-Federal cultural properties that would result from land uses carried out by or authorized by BLM.

D.  When mitigation involves data recovery, the artifacts, samples, and collections recovered from non-Federal land remain the property of the non-Federal landowner unless donated to the Federal Government. The United States must receive complete and true copies of the investigator's original field notes, maps, records of analyses, photographs, other data, and reports when mitigation work is conducted on non-Federal land on behalf of the Federal Government. Reports resulting from work on non-Federal land should be made available to the land owner.

E.  Identification and/or mitigation of adverse effects may be required as a condition of a lease, permit, or license issued by BLM, whether Federal or non-Federal lands are involved.

BLM_0007195

.09

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.09  Program Relationships.

   A.  Relationship to Other BLM Programs.

     1.  BLM Planning System. (See BLM Manual Sections 1601 and 8130).

      a.  The management of cultural resources (including but not limited to protection, public use, and scientific use of the resources) shall be guided by and in accordance with approved BLM land use plans, principally Resource Management Plans (RMP).

      b.  Together with the other public land resources, cultural resources are considered in BLM land use plans as follows:

       (1)  Land use plans take into account the extent to which implementation of the cultural resource management objectives may affect other resource management programs and actions.

       (2)  Land use plans also take into account the extent to which other potential land and resource uses may have effects on cultural resources. The need for developing additional cultural resource information, e.g., sample inventory, is assessed relative to the potential effects, responsibility is assigned, and data acquisition tasks and schedules are established at the outset of land use planning.

       (3)  Evidence of cultural resource consideration (including, as applicable, compliance with Section 106 of the National Historic Preservation Act (NHPA) and Native American consultation in observance of the NHPA, the American Indian Religious Freedom Act, the Archaeological Resources Protection Act, and the Native American Graves Protection and Repatriation Act) is incorporated in the environmental impact statement prepared as part of the land use plan.

       (4)  Each land use plan should make full use of any cultural resource information that can provide insights into successful and failed attempts at using the land and resources in the prehistoric and historic past, whenever analogous land and resource uses are being considered in the plan.

     2.  Recreation Management Program. (See BLM Manual series 8300.)

      a.  The long-term management of some cultural properties, determined to be suited to management for public visitation and/or interpretation, may be found to fall partly within the recreation management program. Whenever cultural properties are to be developed to accommodate public visitation, interpretation, and education, recreation management expertise is an essential part of the development.

BLM_0007196

.09A2b

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

b.  Any recreational use of cultural properties must be compatible with cultural resource management objectives established through evaluation and planning, and must be closely coordinated with and draw on the technical expertise of the cultural resource staff.

c.  Restoration of cultural properties may be undertaken by BLM to meet recreation program objectives. In contrast, similar cultural resource program actions are normally limited to stabilizing and maintaining a cultural property's present condition.

d.  Onsite interpretation of cultural properties for public education may also have the objective and effect of protecting other use(s) assigned to the cultural properties. The division of funding, staffing, and roles is determined case by case, based on the balance of benefits to each program.

e.  The cultural resource staff assists the recreation staff by providing:

(1) Cultural resource inventory and evaluation data appropriate for analysis from a recreation opportunity standpoint.

(2) Any cultural resource technical expertise needed for accurate interpretation, restoration, or other recreation-related development and use of cultural properties.

3.  <u>National Landscape Conservation System (NLCS)</u>. The NLCS staff in Headquarters, State, and field offices guides the long-term management of National Monuments, National Conservation Areas, Wilderness Areas, National Rivers, National Trails, and other types of congressionally designated conservation system units. Presidential proclamations and congressional designations for many units of these systems recognize the contributions of archaeological and historic properties to their overall national importance. For such units, coordination between NLCS and cultural resource staffs is vital, especially during the development of management plans.

4.  <u>Other Land and Resource Management Programs</u>.

a.  <u>Compliance Requirements</u>. All BLM resource programs that may have an effect on cultural resources through their actions or authorizations are responsible, as benefiting activities, for funding:

(1) Cultural resource inventories and evaluations as needed to measure potential effects, including analysis and report preparation following completion of fieldwork.

(2) Documentation adequate for conducting consultations required under Section 106 of the National Historic Preservation Act and Section 3(c) of the Native American Graves Protection and Repatriation Act.

BLM_0007197

.09A4a(3)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

(3) Cultural resource protection work needed to avoid or mitigate adverse effects of land or resource use on cultural resources, including analysis and report preparation following completion of fieldwork, and curation of collections and copies of records, data, photographs, and other documents derived from the work following completion of analyses and reports.

b. <u>Paleontological Resource Management</u>. Paleontological (fossil) resource management (subject-function code 8270) is distinct from cultural resource management (subject-function code 8100, etc.). However, if fossils are found in direct association with archaeological materials, they are also considered to be archaeological resources and are protected by the Archaeological Resources Protection Act. (See Appendix 8, Section 3.)

5. <u>Management Supporting Programs</u>. The Manuals in this Manual Series frequently refer to the various BLM programs that contribute support to assist the cultural resource management program in meeting its objectives (such as planning, environmental coordination, law enforcement, engineering, cadastral survey, land and minerals operations, records, public affairs, and others). Personnel in those programs receive technical and policy guidance from their own Manuals and program directives unless otherwise noted.

B. <u>Relationship to Federal Historic Preservation Programs</u>.

1. <u>National Park Service (NPS)</u>. The National Park Service administers several programs the BLM may employ while managing cultural resources on BLM- administered lands. Consultation, joint projects, or technical assistance may be arranged with the NPS when they would promote the effectiveness or efficiency of BLM program execution or aid the NPS in its assigned roles. The BLM provides data to the NPS as requested for annual reports to the Congress under Public Laws 93-291 and 96-95 (see Appendices 4 and 8).

a. <u>National Register and Landmarks</u>. The NPS administers the National Register of Historic Places and the National Historic Landmarks program. The BLM's National Register nominations and formal requests for determinations of eligibility are submitted to the NPS for decision (36 CFR Part 60). Properties the BLM and the State Historic Preservation Officer recommend for inclusion in the National Register as nationally significant are considered by NPS for potential Landmark designation. The BLM comments on NPS proposals to designate BLM properties as Landmarks. The NPS exercises the responsibilities of the Secretary to administer these programs, but does not have any management authority over BLM properties included in these programs.

b. <u>Project Mitigation</u>. The Secretary's responsibility for coordinating activities under the Reservoir Salvage Act as amended by the Archeological and Historic Preservation Act (Public Laws 86-523 and 93-291, Appendices 3 and 4), and for preparing an annual report to the Congress on the scope and effectiveness of that program, is delegated to the NPS. It would be exceedingly rare for BLM to conduct project mitigation under this authority (see .03D) instead of under the authority of Section 106 of the National Historic Preservation Act (see .03E).

.09B1c

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

c. <u>Protection Consultation and Technical Information</u>. Executive Order 11593 authorizes the Secretary, through the NPS, to advise Federal agencies on the identification and evaluation of cultural resources, and to develop and disseminate information concerning methods and techniques of protection, restoration, and maintenance of cultural properties. The BLM may consult with NPS on these matters.  Implementation of NPS recommendations is at the BLM's discretion.

d. <u>Standards and Guidelines</u>. The National Historic Preservation Act requires the Secretary to develop various professional standards and guidelines for the preservation of cultural properties in Federal ownership or control. This function is delegated to the NPS. The BLM observes the standards and guidelines as applicable.

e. <u>Native American Graves Protection</u>. Under the Native American Graves Protection and Repatriation Act (see Appendix 9), the Secretary is responsible to promulgate implementing regulations, to establish a Review Committee to oversee implementation, to ensure that museums comply, and to grant funds to Indian tribes, Native Hawaiian organizations, and museums for carrying out the Act. The Secretary has delegated these duties to the NPS.

2. <u>Advisory Council on Historic Preservation</u>. Under the national Programmatic Agreement, the Advisory Council has an advisory-consultative role in the BLM management process and when a proposed land use might have an effect on a nationally significant cultural property or would involve interstate and/or interagency coordination. Offices not operating under the national Programmatic Agreement are required to follow the Council's Section 106 regulations at 36 CFR Part 800. In either case, after compliance obligations have been met, the authority and responsibility for decisions remain with the Field Office manager.

C. <u>Relationship to Tribal, State and Local Historic Preservation Programs</u>.

1. <u>Tribal Historic Preservation Officer</u> (THPO).

a. As authorized in Section 101(d) of the National Historic Preservation Act and subject to the Secretary's approval, Indian tribes may establish historic preservation programs to give them greater roles and responsibilities for preserving historic properties on tribal lands. Tribes with approved programs designate Tribal Historic Preservation Officers (THPO) who may assume any or all of the functions of a State Historic Preservation Officer (SHPO) with respect to tribal land. Assumed functions may include identifying and maintaining inventories of culturally significant properties, nominating properties to national and tribal registers of historic places, conducting Section 106 reviews of Federal agency projects on tribal lands, and conducting educational programs on the importance of preserving historic properties.

BLM_0007199

.09C1a(1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)


(1) For tribes with approved programs, Field Office managers consult with the THPO in lieu of the SHPO for undertakings occurring on, or affecting historic properties on, tribal lands.

(2) For other tribes, Field Office managers consult a tribally designated representative in addition to the SHPO during review of projects occurring on, or affecting historic properties on, their tribal lands.

b. In accordance with Section 101(d)(6) of the National Historic Preservation Act, Indian tribes often choose to designate the THPO as the tribal representative to assist Federal officials in identifying tribally significant, National Register-eligible properties, potentially affected by a proposed Federal undertaking on non-tribal lands. Although the same individual or office is involved, this is a role completely apart from the THPO's roles with respect to the tribe's preservation program and tribal lands.

(1) Concerning non-tribal lands, THPOs do not assume any of the SHPO's functions.

(2) Concerning non-tribal lands, Field Office managers consult with THPOs only when they have been designated as tribal representatives for purposes of Section 106, for their assistance in identifying and evaluating properties of traditional religious and cultural importance to the tribe. This does not substitute for consultation with SHPO under .09C2e.

(3) Concerning non-tribal lands, THPOs designated as tribal representatives for purposes of Section 106 are acting as tribal representatives, not as THPOs. This distinction and its implications may not always be clear. THPOs do not have management responsibility or authority for tribally significant properties on non-tribal lands.

c. The BLM national Programmatic Agreement does not apply to undertakings on tribal lands. A Field Office manager considering an undertaking on tribal lands complies with 36 CFR Part 800, or where the tribe has entered into an agreement with the Advisory Council, with the tribe's preservation regulations.

d. A tribe's establishment of a tribal preservation program and designation of a THPO often facilitates cooperative opportunities with the tribe, such as sharing information and expertise.

.09C2

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

2. <u>State Historic Preservation Officer</u> (SHPO). Field Office managers work closely with SHPOs to satisfy the working relationships set forth in the national Programmatic Agreement, and the State's BLM-SHPO Protocols developed to implement the Programmatic Agreement. The BLM cooperates with the SHPO in fulfilling functions that relate to BLM. These include:

a. Assisting in data base automation and development of GIS capability.

b. Developing and implementing a comprehensive State historic preservation plan. (See 36 CFR Part 61.)

c. Directing and conducting a continuing statewide survey of cultural properties and maintaining inventories of such properties.

d. Reviewing and commenting on all BLM National Register nominations and BLM requests for formal determinations of eligibility from the Keeper of the National Register.

e. Reviewing and commenting on documentation submitted by BLM for compliance with Section 106 of the National Historic Preservation Act.

f. It is not normally the SHPO's function to perform surveys or evaluate, nominate, or manage cultural properties on BLM-administered lands, unless arranged through agreements, contracts, or permits.

2. <u>Certified Local Governments</u>. Any affected local government with a historic preservation program that has been certified pursuant to section 101(c)(1) of the National Historic Preservation Act (see Appendix 5) may assume parts of the Section 106 consultation duties of the SHPO if the local government, the SHPO, and the Advisory Council agree.

D. <u>Relationship to Other Countries' Historic Preservation Programs</u>

1. <u>Account for Effects in Other Countries</u>. In Section 402 of the National Historic Preservation Act Amendments of 1980 (P.L. 96-515 Title IV, 16 U.S.C. Sec. 470a-2) the Congress directs Federal agencies to take into account the effects of their undertakings on significant cultural resources in other countries.

a. <u>Cross-border Linear Projects</u>. The BLM does not conduct or authorize undertakings outside the United States. However, the BLM does sometimes process applications for the U.S. portions of cross-border linear projects, such as oil and gas pipelines, that could cause or enable adverse effects on another country's significant cultural resources, effects that might not otherwise occur except for the U.S. participation.

b. <u>DOE Lead.</u> International energy projects require Presidential permits. The Department of Energy (DOE) has been assigned the lead role on such projects, including compliance responsibility for the National Historic Preservation Act (NHPA). On occasion the BLM might agree to carry out compliance activities on DOE's behalf.

BLM_0007201

.09D2

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

    2.  <u>Contact, Communication, and Coordination</u>. When carrying out the lead NHPA role for a proposed cross-border undertaking, the BLM lacks authority to require another country's significant cultural resources to be identified, or for adverse effects to them to be avoided or mitigated. Nevertheless, the Congress's purpose is clear, that Federal agencies should not be heedless of adverse effects that United States involvement might generate on significant cultural resources outside U.S. borders. The BLM will fulfill Section 402's purpose as follows:

    a.  When the BLM and Department of Energy agree that the BLM will fulfill the Federal Government's NHPA compliance responsibilities for a proposed cross-border undertaking that would potentially affect significant cultural resources outside the United States, the responsible BLM manager shall contact counterpart officials in the other country and shall facilitate communication among government agencies and proponent companies in both countries. The aim of contact and communication is to alert officials in the other country so that they may appropriately direct project-related activities and account for the project's potential effects on significant cultural resources.

    b.  The State Historic Preservation Officer and the Advisory Council on Historic Preservation must be involved in the historic preservation review for the U.S. portion of the project, according to provisions of the BLM national Programmatic Agreement and State protocols. They do not, however, have any statutory role in the consideration of effects to significant cultural resources outside the United States, and they are not to be formally involved in cross-border coordination.

BLM_0007202

.1

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.1 <u>National  Programmatic Agreement Regulates BLM's Compliance with NHPA</u>. The Programmatic Agreement (PA) executed by the BLM, the Advisory Council on Historic Preservation (Council), and the National Conference of State Historic Preservation Officers (NCSHPO) on March 26, 1997, legally replaces 36 CFR Part 800, the Council's governmentwide regulations, as the procedural basis for BLM managers to meet their responsibilities under Sections 106, 110(f), and 111(a) of the National Historic Preservation Act (NHPA)(See App. 15).

.11 <u>Historic Preservation is Integrated into Multiple-Use Management under FLPMA</u>. The parties to the PA agreed that historic preservation in BLM will be best achieved by integrating NHPA responsibilities as fully as possible into land-use planning and resource management procedures under FLPMA. Correspondingly, management of the public lands and other public land resources will benefit from early attention to the statutory authorities, executive orders and national policies concerning cultural resources.

.12 <u>Authority to Implement the Programmatic Agreement is Provisional</u>.  The PA is based on the Council's and NCSHPO's recognition that BLM is capable of assuming more historic preservation responsibility without case-by-case Council and SHPO oversight, because of strategically placed professional staff, well developed cultural resource management direction (this manual series), and its managers' commitment to preservation goals, as demonstrated by a history of good performance. The parties agreed that the BLM could implement the PA after completing actions summarized in .13. At the same time, the PA is clear that these capabilities must be maintained in order to keep the PA in effect.

.13  <u>BLM Standards Required under the National Programmatic Agreement</u>. To replace the preservation oversight usually provided by the SHPO and Council, the Director agreed to:

A.  Establish a Preservation Board to advise the BLM's line managers (the Director, State Directors and Field Office managers). (See Appendix 14 for Board composition and duties.)

B.  Update the national BLM policies and procedures (the 8100 manual series) with the advice of the Preservation Board and assisted by the Council, the NCSHPO, the SHPOs and other participating parties, to fit their larger role under the PA.

C.  Develop State Director/SHPO operating protocols, to tailor the national policies and procedures to State-specific circumstances and needs.

D.  Train all Field Office managers and their cultural heritage staffs in the operation of the national policies and procedures and the State protocols.

E.  Certify that Field Offices under a State Director's jurisdiction are appropriately qualified to employ the streamlined procedures developed pursuant to the PA.

.14

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.14 <u>Thresholds for Council Participation</u>. The parties to the PA agreed that BLM will request the Council's participation in case of the following, and other similar occasions as the Field Office manager deems appropriate:

    A.  Nonroutine interstate and/or interagency projects or programs.

    B.  Undertakings directly or adversely affecting National Historic Landmarks or National Register eligible properties of national significance.

    C.  Highly controversial undertakings, when BLM, a SHPO, an Indian tribe, a local government, or an applicant for a BLM authorization requests Council review. (In general, "highly controversial" means cases where historic preservation issues are unusually contentious and are the subject of media, congressional, and public inquiries.)

BLM_0007204

.2

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.2 Personnel Qualifications and Administrative Requirements. Only properly qualified personnel may complete the professional staff work and implement the streamlined procedures developed pursuant to the PA.

.21 Personnel Must Meet Permit Standards. Provisions of Section 4 of the Archaeological Resources Protection Act (BLM Manual Section 8100, Appendix 8) and 43 CFR Part 7 regarding qualifications, conditions, and Native American religious and cultural consideration, must be met whether individuals approved to conduct the work are permittees, government employees, government contractors, or volunteers.

.22 Alternate Documentation Allowed for Official Duties. To meet legal requirements without unnecessary duplication of administrative effort, 43 CFR 7.5(c) provides that persons carrying out official agency management duties under the Federal land manager's direction do not need to hold a permit per se. However, the Federal land manager must document that the professional qualifications standards of the regulations (43 CFR 7.8) have been met; must set appropriate conditions in writing consistent with the regulations (43 CFR 7.9); and must ensure that carrying out of any official duties that are likely to result in harm to or destruction of a known Indian tribal religious or cultural site have been the subject of notification and consultation, as appropriate, consistent with the regulations (43 CFR 7.7).

.23 BLM Personnel.

A. Specialists. Only professionally qualified specialists, trained and experienced in the appropriate discipline(s), may undertake or oversee inventories and evaluations. Only appropriately qualified specialists may make evaluation and management recommendations. Entry-grade and other junior cultural resource specialists may not be assigned independent cultural resource work beyond the level of their qualifications. Only properly qualified specialists may review and recommend approval of cultural resource work done by other specialists, technical assistants, contractors, permittees, cooperating agencies, and volunteers.

B. Technical Assistants. Adequately trained and experienced BLM cultural resource technical assistants (paraprofessionals) (see .21 and .22), under the direction of an appropriately qualified BLM cultural resource specialist, may assist in carrying out inventory tasks. "Under the direction" includes assigning, checking, approving, and accepting professional responsibility for the assistant's work. The specialist decides whether to assign a technical assistant on a project, based on the assistant's training and experience and the anticipated sensitivity of the project area. The specialist is responsible for evaluating cultural resources, recommending mitigation measures, writing final reports, and ensuring compliance with the national Programmatic Agreement and the State's BLM-SHPO Protocol in all instances where a technical assistant records cultural resources. All technical assistants' work must be approved in writing by a qualified BLM professional cultural resource specialist before it can be used as a basis for management decisions or included in cultural resource records systems or data bases. Technical assistants may not direct others participating in inventory work.

.23C

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

C. Documentation of Qualifications. Required qualifications, appropriate to the work to be performed, and qualification criteria are identified through the position description, vacancy announcement, and rating plan prepared at the time of recruitment. Documentation that the criteria are met is included in the Merit Promotion Case File (BLM Manual Section 1400-335). Qualifications upgraded through training and experience on the job may be documented through certificates of training, completed prior-year performance review forms, and other relevant documentation included in the employee's official personnel file. Field Office managers must document the professional staff capability available to them as part of satisfying the provisions of the national Programmatic Agreement, and must maintain sufficient professional staff capability to operate under the Agreement.

D. Documentation of Assignments. Supervisors are responsible for ensuring that the level of work assigned and performed is appropriate to an employee's qualifications. It is the employee's ethical responsibility to inform the supervisor when an assignment would go beyond the employee's qualifications. Field Office managers must ensure that staff assignments are appropriately matched to staff members' professional qualifications in order to operate under the national Programmatic Agreement.

.24  Non-BLM Personnel. Inventory and evaluation tasks performed by non-BLM personnel must be overseen and accepted by an appropriately qualified BLM cultural resource specialist, whose recommendations must be approved by the responsible manager.

BLM_0007206

.24A

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

   A. Contractors. BLM may obtain professional services for inventories and/or evaluations through contracts with appropriately qualified non-Federal sources. Potential contractors' minimum required qualifications are specified in the request for proposals (see BLM Manual Handbook 1510-1, Ch. VIII). Assessment of offerors' qualifications is performed by the Technical Proposal Evaluation Committee and Contracting Officer, and documented in the procurement record. Appropriate conditions are specified in the contract. Notification of Indian tribes, if necessary, is the responsibility of the program office originating the procurement, and should precede the procurement. Any notification and any subsequent consultation should be documented in both the procurement record and the related job file.

   B. Third-Party Consultants. Land use applicants often obtain the services of professionally qualified cultural resource consultants to conduct inventory and/or evaluation tasks to expedite BLM processing of their land use applications. Permit provisions in BLM Manual Section 8150 govern consultants proposing to conduct inventory and/or evaluation tasks on public lands. Permittees' qualifications to do specific work or evaluate specific resources are documented in the permit file. Terms and conditions are incorporated in the permit. Any required BLM notification of Indian tribes and subsequent BLM consultation is documented in the permit file.

   C. Cooperators. Qualifications, conditions, and any required notifications relating to work done cooperatively by another agency or a partner is documented in the same general manner as for contractors or third-party consultants, as appropriate, in the cooperative agreement file. (See BLM Manual Sections 1510 and 1780.)

   D. Volunteers. Appropriately trained volunteers may assist in conducting inventories. Professionally qualified volunteers may conduct inventory work in the manner of a contractor or third-party consultant, under the direction of a qualified BLM cultural resource specialist, at the discretion of the responsible manager and with the concurrence of the cultural resource specialist. Less qualified volunteers may be used under the direct supervision of a qualified BLM cultural resource specialist, as appropriate. Volunteers' qualifications shall be reviewed and documented. The appropriate assignment of volunteers shall be documented in individual volunteer services agreements (Form 1114-4, BLM Manual Section 1114).

BLM_0007207

.3

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

.3  Preparing and Distributing Annual Reports. The BLM cooperates with the National Park Service in meeting the Secretary's requirements to report annually to the Congress under the Archeological and Historic Preservation Act (Appendix 4) and the Archaeological Resources Protection Act (Appendix 8). In addition, the national PA (see Appendix 13, item 9.a.) obligates each State Director to prepare an annual report in consultation with the appropriate SHPO(s), outlining the preservation activities conducted under the PA in the preceding year.  Annual cultural resource data is also integrated into the Public Land Statistics, Chief Financial Officers/Stewardship Assets, and "Public Rewards from Public Lands" reports.

.31  Data Compilation. Field Offices should record pertinent data continually, as the data are being generated, and should automate the recording process so that data fields can be tabulated with minimum effort at any time. To the extent possible, compilation of PA-related data into the State Director's report format should be timed to coincide with compilation of the Secretary's annual report data.

.32  Report Content. Annual reports should include the following information.

A. Secretary's Report.

1. Tabular data on cultural resource inventories, recorded properties, National Register evaluations, cultural resource overviews and data reviews, unanticipated discoveries, data recovery projects, and archaeological permitting.

2. Narratives on agency highlights, including accomplishments in public outreach, heritage education, collections management, and data automation.

3. Listing of Outlaw Treachery (LOOT) forms that describe law enforcement prosecutions and convictions of archaeological crimes.

B. Programmatic Agreement Report.

1. Statistical information on resource inventories, recorded properties, National Register listings and evaluations, resource overviews, properties physically and administratively protected, mitigation and data recovery, and cultural resource use permits.

2. Progress in implementing the national Programmatic Agreement including working with State Historic Preservation Officers to automate existing cultural resource site data, synthesize existing cultural resource inventory information and complete historic context documents.

3. Public benefits projects resulting from cost savings realized through implementation of the national PA.

BLM_0007208

.32C

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

C. Public Land Statistics Report.

1. Statistical information on resource inventories, recorded properties, and cultural resource use permits.

D. Chief Financial Officer/Stewardship Assets Report.

1. Statistical information on resource inventories, recorded properties, cultural resource use permits, curatorial facilities holding BLM museum objects

2. Narratives on agency highlights, including accomplishments in public outreach, heritage education, collections management, and data automation.

3. Progress in implementing the national Programmatic Agreement including working with State Historic Preservation Officers to automate existing cultural resource site data, synthesize existing cultural resource inventory information and complete historic context documents.

E. Public Rewards from Public Lands. Statistical information on resource inventories and recorded properties by State.

.33  Report Distribution.

A. Secretary's Report. The Director will annually submit a compilation of the preceding fiscal year's cultural resource accomplishments, including numerical and narrative information and highlights, to the National Park Service for incorporation into the Secretary's Report to Congress. The NPS will be responsible for distribution of this report, including dissemination to BLM field office specialists.

B. Programmatic Agreement Report. Each State Director will provide copies to the appropriate SHPO(s), the Council, the Preservation Board, and interested parties who have made themselves known to the State Director, and will make copies available to the public on request.

Glossary, Page 1

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Glossary of Terms

-A-

adverse effect:  alteration of the characteristics of a cultural property that may qualify it for the National Register, thereby reducing or eliminating the resource's use potential, diminishing its integrity, or disqualifying it from Register eligibility. Determination of adverse effect to cultural properties is guided by criteria in the Advisory Council's regulations, 36 CFR Part 800.

Advisory Council:  the Advisory Council on Historic Preservation as established by Title II of the National Historic Preservation Act. (See Appendix 5.) The Advisory Council is an independent executive agency that reports to and advises the President and the Congress on historic preservation matters. Headquartered in Washington, D.C., the Advisory Council also has a staff office in Denver, Colorado.

"archaeological resource":  a term with legal definition and application (see Appendix 8, Section 3) which means any material remains of human life or activities that are at least 100 years of age, and that are of archaeological interest, as further defined at 43 CFR 7.3. (See "archaeology.")

archaeology:  the subfield of anthropology engaged in recovering, analyzing, interpreting, and explaining evidence of the human prehistoric and historic past; the time-depth arm of anthropology. Archaeology as a scholarly endeavor is not limited in the scope of its subject matter by legal or regulatory provisions such as the minimum age assigned to archaeological resources (for enforcement purposes) by the Archaeological Resources Protection Act. (See "archaeological resource.") (Note on spelling: In BLM, retention of the second 'a' in 'archaeology' is preferred except when quoting material that originally used the alternate spelling.)

artifact:  literally, human made, not natural; any object that shows evidence of human manufacture, modification, or use. In common usage, normally refers to portable prehistoric items such as implements made of stone, bone, pottery, or other durable material. Compare 43 CFR 7.3.

avoidance:  preventing a potential adverse effect from occurring by the partial or complete redesign or relocation of a proposed land use.

-C-

clearance:  a word best avoided; it has no legal meaning in the context of section 106 or other compliance, and its use tends to suggest expectations that may be overly simplified or inappropriate to required actions.

BLM_0007210

Glossary, Page 2

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

compliance:  adherence to specific provisions of any law, executive order, regulation, authorization, agreement, or similar legal instrument. In cultural resource management, most commonly used to mean documented observance of the regulated procedural requirements of Section 106 of the National Historic Preservation Act, or, for BLM, documented observance of the national Programmatic Agreement and State Director/SHPO protocols.

Council:  (See "Advisory Council.")

cultural:  of or pertaining to culture, the regularized, patterned, learned behavior shared by members of an interacting social group and passed from generation to generation, comprising the group's technology, economy, religion, arts, social organization, and more. A group's partly subconscious consensus on how things are done. Aspects of culture vary among contemporary groups and change through time. Culture may be viewed as a complex set of instrumental behaviors interposed between a group and its natural and social environment, and may be said to constitute the group's adaptation to its environment.

cultural resource or cultural property:  a definite location of human activity, occupation, or use identifiable through field inventory (survey), historical documentation, or oral evidence. The term includes archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and may include definite locations (sites or places) of traditional cultural or religious importance to specified social and/or cultural groups. (Cf. "traditional cultural property"; see "definite location".) Cultural resources are concrete, material places and things that are located, classified, ranked, and managed through the system of identifying, protecting, and utilizing for public benefit described in this Manual series. They may be but are not necessarily eligible for the National Register (See "historic property" or "historic resource".)

cultural resource inventory classes:  (See BLM Manual Section 8110.21.)

1. class I - existing information inventory:  a study of published and unpublished documents, records, files, registers, and other sources, resulting in analysis and synthesis of all reasonably available data. Class I inventories encompass prehistoric, historic, and ethnological/sociological elements, and are in large part chronicles of past land uses. They may have major relevance to current land use decisions.

2. class II - probabilistic field survey:  a statistically based sample survey designed to help characterize the probable density, diversity, and distribution of archaeological properties in a large area by interpreting the results of surveying limited and discontinuous portions of the target area. (Cf. "reconnaissance survey".)

3. class III - intensive field survey:  a continuous, intensive survey of an entire target area, aimed at locating and recording all archaeological properties that have surface indications, by walking close-interval parallel transects until the area has been thoroughly examined. Class III methods vary geographically, conforming to the prevailing standards for the region involved.

BLM_0007211

Glossary, Page 3

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

cultural resource management:  in a strict sense, the management of cultural resources begins when the responsible manager's cultural resource protection and use decisions are implemented. Less precisely, cultural resource management is often considered to include the inventory, evaluation, and planning steps that precede the manager's decisions and their implementation. The BLM's cultural resource management program includes all the program elements that contribute to management. Cultural resource management in BLM may be characterized as the process by which a Field Office manager (1) becomes informed of the nature of the cultural resources known and expected to occur within his or her area of administrative responsibility, (2) assesses their various use potentials, (3) assigns uses, thereby accepting a commitment to safeguard those uses, (4) takes planned steps to protect or realize assigned uses, and (5) authorizes appropriate uses.

cultural resource management manuals:  the 8100 Manual series, covering the various aspects of BLM's cultural resource management program.

cultural resource manager:  any line manager (Field Office manager, State Director, Director) whose  responsibilities and decisionmaking authority include cultural resource management.

cultural resource specialist:  a professionally qualified anthropologist, archaeologist, architectural historian, historian, historical architect, or similar professional who serves in a staff or advisory capacity and provides professional recommendations and services to assist managers in meeting their cultural resource management responsibilities (see .2).

-D-

decision:  an authorized manager's exercise of choice within the limits of discretionary authority. This is in contrast to mere fulfillment of ministerial functions with prescribed conclusions determined by findings of fact, such as approving a mineral patent application upon making a finding that the requirements of law and regulation have been met.

definite location:  having discernible, mappable, more or less exact limits or boundaries, on a scale that can be established by a survey crew using conventional sensing and recording equipment, by an informant's direct on-the-ground indication, or by precise placement in a documentary source (see "cultural resource or cultural property").

-E-

effect:  any change in the characteristics that contribute to the use(s) determined appropriate for a cultural resource, or to the qualities that qualify a cultural property for the National Register. Determination of effect to cultural properties is guided by criteria in the regulations of the Advisory Council, 36 CFR Part 800.

BLM_0007212

Glossary, Page 4

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

evaluation:

1. with regard to BLM planning:  the process of determining the public and scientific use potential of cultural resources through (a) the analysis of cultural resource inventory data, (b) the application of professional judgment to identify characteristics contributing to possible uses, and (c) the recommendation of appropriate uses. (For definitions of use categories, see BLM Manual Section 8110.4.)

2. with regard to the National Register of Historic Places:  the application of the National Register eligibility criteria, 36 CFR 60.4. (See BLM Manual Section 8110.3.)

excavation:  the controlled, scientific recovery of subsurface materials and information from an archaeological property, through professionally applied archaeological techniques. (See also "recovery of cultural resource data.")

-H-

historical archaeology:  the branch of archaeology that investigates cultural properties dating to the historic period by combining archaeological methods and documentary research.

"historic context":  "an organizing structure for interpreting history that groups information about historic properties that share a common theme, common geographical area, and a common time period.  The development of historic contexts is a foundation for decisions about the planning, identification, evaluation, registration, and treatment of historic properties, based upon comparative historic significance" (quoted from National Register Bulletin No. 15, Glossary).

"historic preservation":  "includes identification, evaluation, recordation, documentation, curation, acquisition, protection, management, rehabilitation, restoration, stabilization, maintenance, reconstruction, or any combination of the foregoing activities" (quoted from National Historic Preservation Act, Section 301; Appendix 5) in relation to properties significant in American history, architecture, archaeology, or culture.

"historic property" or "historic resource":  "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register. The term includes, for purposes of these regulations, artifacts, records, and remains that are related to and located within such properties. The term 'eligible for inclusion in the National Register' includes both properties formally determined as such by the Secretary of the Interior and all other properties that meet National Register listing criteria" (quoted from 36 CFR 800.2(e); compare National Historic Preservation Act, Section 301, Appendix 5). (See also "cultural resource - cultural property." "Cultural property" is an analogous BLM term not limited by National Register status.)

BLM_0007213

Glossary, Page 5

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

-I-

identification:  the general term for the component of BLM's cultural resource management program that includes locating, recording, and determining the legal, scientific, public, and conservation values of cultural resources, i.e., giving cultural resources a management identity. (See "inventory" and "evaluation.")

Indian tribe or tribe: as defined in Section 301 of the National Historic Preservation Act, "an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation or Village Corporation, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act [43 U.S.C. 1602], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." (See Appendix 5.)

important:  with regard to cultural resources, determined to be worthy of long-term management because of identified public, tribal, or scientific value, as established through inventory, consultation, evaluation and planning.

inadvertent:  inattentive, unmindful; literally, not turning (one's attention) to. (Note that NAGPRA, .03K, uses this word in a way that is not consistent with standard definitions, to mean something similar to unintended, unexpected, or unplanned.)

inventory:  a term used to refer to both a record of cultural resources known to occur within a defined geographic area, and the methods used in developing the record. Depending on intended applications for the data, inventories may be based on (a) compilation and synthesis of previously recorded cultural resource data from archival, library, and other indirect sources; (b) systematic examinations of the land surface and natural exposures of the subsurface (survey) for indications of past human activity as represented by artificial modifications of the land and/or the presence of artifacts; and (c) the use of interviews and related means of locating and describing previously unrecorded or incompletely documented cultural resources, including those that may not be identifiable through physical examination. (See "cultural resource inventory classes.")

-M-

mitigation:  lessening the severity of a potential adverse effect by application of appropriate protection measures, such as the recovery of archaeological data from sites, or other means. (Note on usage: One mitigates adverse effects or impacts, i.e., lessens them. One does not mitigate cultural resources.)

BLM_0007214

Glossary, Page 6

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

-N-

National Register:  the National Register of Historic Places, expanded and maintained by the Secretary of the Interior, as authorized by section 2(b) of the Historic Sites Act and section 101(a)(1)(A) of the National Historic Preservation Act. The National Register lists cultural properties found to qualify for inclusion because of their local, State, or national significance. Eligibility criteria and nomination procedures are found in 36 CFR Part 60. The Secretary's administrative responsibility for the National Register is delegated to the National Park Service.

-P-

professionally qualified:  cultural resource staff specialists are deemed minimally professionally qualified when found to meet Office of Personnel Management (OPM) degree requirements and other qualification standards for their occupation series (GS-193 archaeologist, GS-170 historian, etc.). Additional training and supervised experience beyond the minimum qualifications are necessary for most full-performance field positions. Staff archaeologists carrying out official agency duties that for nonemployees would require a permit must meet the same professional qualifications as required of permittees in ARPA and 43 CFR Part 7 (see BLM Manual Sections 8100.21 and 8150.12B2). It is incumbent on managers and their staff specialists to assess training and experience needs on a regular basis, in order to ensure that specialists can carry out all preservation assignments effectively (see .04C, .04D, and .21).

programmatic agreement:  an agreement among the responsible agency official, the Advisory Council, the appropriate State Historic Preservation Officer(s) or the National Conference of SHPOs, and others as invited, establishing alternative agency procedures to substitute for the governmentwide procedures in 36 CFR Part 800 for complying with Section 106 of the National Historic Preservation Act (see "Section 106"). The BLM's national Programmatic Agreement, which applies to all BLM activities below specified thresholds, provides regulatory relief in most instances from the requirement for case-by-case review by SHPOs and the Advisory Council, in exchange for managers' maintenance of appropriate staff capability and observance of internal BLM standards as set out in the 8100 Manual series. (See Appendices 13 and 14.)

proposed land use:  any use of lands or resources, BLM-administered or not, that requires a BLM manager's formal approval, whether proposed by BLM or by an outside applicant. When a decision to approve a proposed land use might affect cultural properties eligible for the National Register, the term is synonymous with "undertaking" as used in the National Historic Preservation Act (see "undertaking") and is subject to compliance with Section 106 of the Act.

BLM_0007215

Glossary, Page 7

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

protection measures:

1. physical protection measure:  any physical means, such as stabilization of elements of a cultural property or its immediate environment, placement of physical barriers, or similar measures, employed to arrest, slow the rate of, or divert the source of natural or human-caused deterioration to a cultural property.

2. administrative protection measure:  any nonphysical means, such as withdrawal, closure, or other measures, employed to limit conflicting use of, or access to, an area containing or importantly pertaining to a cultural resource undergoing or threatened by deterioration.

-R-

reconnaissance survey:  field survey that is less systematic, less intensive, or otherwise does not fully meet inventory standards (see "cultural resource inventory classes - class II and class III"). Reconnaissance surveys may be useful for checking class I inventory or class II survey conclusions, or for developing recommendations about further survey needs in previously unsurveyed areas. Other terms sometimes applied to similar kinds of survey include "judgmental," "intuitive," "opportunistic," and "purposive."

recovery of cultural resource data:  the professional application of archaeological techniques of controlled observation, collection, excavation and/or removal of physical remains, including analysis, interpretation, explanation, and preservation of recovered remains and associated records in an appropriate curatorial facility, used as a means of protection. Data recovery may sometimes employ professional collection of data such as oral histories, genealogies, folklore, and related information to portray the social significance of the affected resources.

resource:  in this context, something useful held in reserve until needed.

-S-

salvage  (See "recovery of cultural resource data".)

Secretary:  the Secretary of the Interior.

Section 106:  the section of the National Historic Preservation Act (see Appendix 5) that requires Federal agency officials (1) to take into account the effects of their undertakings on properties eligible for or included in the National Register of Historic Places, and (2) to afford the Advisory Council a reasonable opportunity to comment on the undertaking. 36 CFR Part 800 implements section 106. The BLM complies with Section 106 and 36 CFR 800 by following its national Programmatic Agreement (Appendix 12), BLM/SHPO protocols established pursuant to the national Programmatic Agreement, and BLM Manuals in this 8100 series.

Glossary, Page 8

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

Section 110:  the section of the National Historic Preservation Act (see Appendix 5) that requires Federal agency officials to preserve historic properties owned or controlled by the agency, including, among other things, (1) identifying, evaluating and nominating properties to the National Register, (2) managing and maintaining such properties in ways consistent with their preservation value, (3) consulting with Indian tribes and Federal, State and local agencies, and (4) carrying out agency programs and projects, including those conducted under permit or other authorization, in accordance with the purposes of the Act.

"significance" or "significant":  terms with legal/regulatory application (see National Historic Preservation Act, Section 101(a), Appendix 5; and 36 CFR Part 60), which mean that a property meets the National Register eligibility criteria. This is the only technical, operational meaning. Cultural properties may be found to qualify for the National Register at local, State, or national levels of significance.

site:  the location of activities or events, often used loosely to mean the same as cultural resource. In archaeological jargon, the basic meaning of site is a place where archaeological evidence occurs, with precise meanings varying considerably from region to region and among recording institutions within regions. Section 4(c) of the Archaeological Resources Protection Act (see Appendix 8) uses "site" in the term "religious or cultural site" in its common dictionary sense, i.e., as a location, not as a synonym for "archaeological resource." If the Congress had meant "archaeological resource" in Section 4(c), the drafters either would have used that defined term or would have defined "site" to mean the same as "archaeological resource." According to the Glossary of National Register Terms in National Register Bulletin No. 16A, site means "location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself possesses historic, cultural, or archeological value regardless of any existing structure."

split estate:  real property for which ownership is split; the surface estate is owned by one entity and the mineral estate is held by another.

survey:  the application of professional methods and techniques for field inventory, used to locate and identify cultural properties. (See "cultural resource inventory classes - class II and class III," and "reconnaissance survey.")

BLM_0007217

Glossary, Page 9

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)


-T-

tradition: longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses. Traditions are shared generally within a social and/or cultural group and span generations.

traditional: conforming to tradition.

traditional cultural property: a property that derives significance from traditional values associated with it by a social and/or cultural group such as an Indian tribe or local community. See "cultural resource or cultural property" and "definite location." A traditional cultural property may qualify for the National Register if it meets the criteria and criteria exceptions at 36 CFR 60.4. See National Register Bulletin 38.

traditional value: a social and/or cultural group's traditional systems of religious belief, cultural practice, or social interaction, not closely identified with definite locations. Another group's shared values are abstract, nonmaterial, ascribed ideas that one cannot know about without being told. Traditional values are taken into account through public participation during planning and environmental analysis or through tribal consultation, as applicable. Traditional values may imbue a place with historic significance (see "traditional cultural property").

treasure or treasure trove:  generally taken to mean precious metals in coin, plate, or bullion, loose gem stones, or other monetarily valuable materials. The term and a presumption of associated legal rights derive from English common law. For BLM's policy negating salvors' presumed appropriation rights over Government property, see BLM Manual Section 8140.4.

tribal land: as defined in Section 301 of the National Historic Preservation Act (see Appendix 5): "(A) all lands within the exterior boundaries of any Indian reservation; and (B) all dependent Indian communities." The BLM very rarely has any involvement with tribal land in the context of compliance with the NHPA.

Tribal Historic Preservation Officer (THPO): a term adopted in practice to indicate the "tribal preservation official" authorized in Section 101(d)(2) of the National Historic Preservation Act (NHPA; see Appendix 5) : "the tribe designates a tribal preservation official to administer the tribal historic preservation program, through appointment by the tribe's chief governing authority or as a tribal ordinance may otherwise provide". A THPO may assume some or all duties of the State Historic Preservation Officer concerning tribal land, in accord with the Secretary's approval of the tribe's historic preservation program. While a THPO's authority does not extend to nontribal lands, a THPO is sometimes designated to represent the tribe in consultation relative to NHPA Section 101(d)(6). See Manual Section 8120.08 and Handbook H-8120-1.

tribe: (See "Indian tribe or tribe".)

BLM_0007218

Glossary, Page 10

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

-U-

"undertaking":  a term with legal definition and application i.e., "actions carried out by or on behalf of the agency; those carried out with Federal financial assistance; those requiring a Federal permit, license, or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a federal agency." (See National Historic Preservation Act, Section 106 and Section 301(7), Appendix 5; 36 CFR Part 800). However, Section 106 does not apply to actions subject to State or local regulation only. The vast majority of land use authorizations approved by BLM, as well as BLM-funded projects, are undertakings for purposes of Section 106 of the NHPA.  (See also "decision" and "proposed land use.")

use categories: within the framework of these manuals, this term refers to six BLM categories (scientific use, conservation for future use, traditional use, public use, experimental use, discharged from management) employed by Field Office managers to  connect identified cultural resources with decisions about their protection and utilization (see BLM Manual Section 8110.42). All cultural resources have uses, to which they can often be assigned even before they have been individually identified. Use allocations allow Field Office managers to know in advance how to respond to potential conflicts between cultural resources and proposed land uses. A cultural property may be allocated to more than one use category. Although some scientific and experimental uses result in physical alteration of resources, use does not imply consumptive use. Managed use of cultural resources can be fully compatible with long-range preservation, and also the means by which preservation is achieved.

Appendix 1
(.03A)

8100 - CULTURAL RESOURCE MANAGEMENT - (Public)

**Antiquities Act of 1906**

[Public–No. 209]

**An Act For the preservation of American Antiquities**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who shall appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity, situated on lands owned or controlled by the Government of the United States, without the permission of the Secretary of the Department of the Government having jurisdiction over the lands on which said antiquities are situated, shall, upon conviction, be fined in a sum of not more than five hundred dollars or be imprisoned for a period of not more than ninety days, or shall suffer both fine and imprisonment, in the discretion of the court.

SEC. 2. That the President of the United States is hereby authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with proper care and management of the objects to be protected: *Provided,* That when such objects are situated upon a tract covered by a bona fide unperfected claim or held in private ownership, the tract, or so much thereof as may be necessary for the proper care and management of the object, may be relinquished to the Government, and the Secretary of the Interior is hereby authorized to accept the relinquishment of such tracts in behalf of the Government of the United States.

SEC. 3. That permits for the examination of ruins, the excavation of archaeological sites, and the gathering of objects of antiquity upon the lands under their respective jurisdictions may be granted by the Secretaries of the Interior, Agriculture, and War to institutions which they may deem properly qualified to conduct such examination, excavation, or gathering, subject to such rules and regulation as they may prescribe: *Provided,* That the examinations, excavations, and gatherings are undertaken for the benefit of reputable museums, universities, colleges, or other recognized scientific or educational institutions, with a view to increasing the knowledge of such objects, and that the gatherings shall be made for permanent preservation in public museums.

SEC. 4. That the Secretaries of the Departments aforesaid shall make and publish from time to time uniform rules and regulations for the purpose of carrying out the provisions of this Act.

Approved, June 8, 1906

BLM_0007220

Appendix 2, page 1

(.03C)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

## Historic Sites Act of 1935

[PUBLIC–No. 292–74TH CONGRESS]

[S. 2073]

**AN ACT**

**To provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it is hereby declared that it is a national policy to preserve for public use historic sites, buildings and objects of national significance for the inspiration and benefit of the people of the United States.

SEC. 2. The Secretary or the Interior (hereinafter referred to as the Secretary), through the National Park Service, for the purposes of effectuating the policy expressed in section 1 hereof, shall have the following powers and perform the following duties and functions:

(a) Secure, collate, and preserve drawings, plans, photographs, and other data of historic and archaeologic sites, buildings, and objects.

(b) Make a survey of historic and archaeologic sites, buildings, and objects for the purpose of determining which possess exceptional value as commemorating or illustrating the history of the United States.

(c) Make necessary investigations and researches in the United States relating to particular sites, buildings, or objects to obtain true and accurate historical and archaeological facts and information concerning the same.

(d) For the purpose of this Act, acquire in the name of the United States by gift, purchase, or otherwise any property, personal or real, or any interest or estate therein, title to any real property to be satisfactory to the Secretary: *Provided,* That no such property which is owned by any religious or educational institution, or which is owned or administered for the benefit of the public men be so acquired without the consent of the owner: *Provided further,* That no such property shall be acquired or contract or agreement for the acquisition thereof made which will obligate the general fund of the Treasury for the payment of such property, unless or until Congress has appropriated money which is available for that purpose.

(e) Contract and make cooperative agreements with States, municipal subdivisions, corporations, associations, or individuals, with proper bond where deemed advisable, to protect, preserve, maintain, or operate any historic or archaeologic building, site, object, or property used in connection therewith for public use, regardless as to whether the title thereto is in the United States: *Provided,* That no contract or cooperative agreement shall be made or entered into which will obligate the general fund of the Treasury unless or until Congress has appropriated money for such purpose.

(f) Restore, reconstruct, rehabilitate, preserve, and maintain historic or prehistoric sites, buildings, objects, and properties of national historical or archaeological significance and where deemed desirable establish and maintain museums in connection therewith.

BLM_0007221

Appendix 2, page 2
(.03C)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Historic Sites Act of 1935**

(g) Erect and maintain tablets to mark or commemorate historic or prehistoric places and events of national historical or archaeological significance.

(h) Operate and manage historic and archaeologic sites, buildings, and properties acquired under the provisions of this Act together with lands and subordinate buildings for the benefit of the public, such authority to include the power to charge reasonable visitation fees and grant concessions, leases, or permits for the use of land, building space, roads, or trails when necessary or desirable either to accommodate the public or to facilitate administration: *Provided,* That such concessions, leases, or permits, shall be let at competitive bidding, to the person making the highest and best bid.

(i) When the Secretary determines that it would be administratively burdensome to restore reconstruct, operate, or maintain any particular historic or archaeologic site, building, or property donated to the United States through the National Park Service, he may cause the same to be done by organizing a corporation for that purpose under the laws of the District of Columbia or any State.

(j) develop an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archaeologic sites, buildings, and properties of national significance. Reasonable charges may be made for the dissemination of any such facts or information.

(k) Perform any and all acts, and. make such rules and regulations not inconsistent with this Act as may be necessary and proper to carry out the provisions thereof. Any person violating any of the regulations authorized by this Act shall be punished by a fine of not more than $500 and be adjudged to pay all cost of the proceedings.

SEC. 3. A general advisory board to be known as the "Advisory Board on National Parks, Historic Sites, Buildings, and Monuments " is hereby established, to be composed  of not to exceed eleven persons, citizens of the United States, to include representatives competent in the fields of history, archaeology, architecture, and human geography, who shall be appointed by the Secretary and serve at his pleasure. The members of such board shall receive no salary but may be paid expenses incidental to travel when engaged in their duties as such members.

It shall be the duty of such board to advise on any matters relating to national parks and to the administration of this Act submitted to it for consideration by the Secretary. It may also recommend policies to the Secretary from time to time pertaining to national parks and to the restoration, reconstruction. conservation. and general administration of historic and archaeologic sites, buildings, and properties.

SEC. 4. The Secretary, in administering this Act, is authorized to cooperate with and may seek and accept the assistance of any Federal, State, or municipal department or agency, or any educational or scientific institution, or any patriotic association, or any individual.

(b) When deemed necessary, technical advisory committees may be established to act in an advisory capacity in connection with the restoration or reconstruction of any historic or prehistoric building or structure.

BLM_0007222

Appendix 2, page 3
(.03C)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Historic Sites Act of 1935

(c) Such professional and technical assistance may be employed without regard to the civil-service laws, and such service may be established as may be required to accomplish the purposes of this Act and for which money may be appropriated by Congress or made available by gifts for such purpose.

SEC. 5. Nothing in this Act shall be held to deprive any State, or political subdivision thereof, of its civil and criminal jurisdiction in and over lands acquired by the United States under this Act.

SEC. 6. There is authorized to be appropriated for carrying out the purposes of this Act such sums as the Congress may from time to time determine.

SEC. 7. The provisions of this Act shall control if any of them are in conflict with any other Act or Acts relating to the same subject matter.

Approved, August 21, 1935.

BLM_0007223

Appendix 3, page 1
(.03D)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Reservoir Salvage Act

**Public Law 86-523**

June 27, 1960           **AN ACT**
[S. 1185]

To provide for the preservation of historical and archeological data (including relics and specimens) which might otherwise be lost as the result of the construction of a dam.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it is the purpose of this Act to further the policy set forth in the Act entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes", approved August 21, 1935 (16 U.S.C. 461-467), by specifically providing for the preservation of historical and archeological data (including relics and specimens) which might otherwise be irreparably lost or destroyed as the result of flooding, the building of access roads, the erection of workmen's communities, the relocation of railroads and highways, and other alterations of the terrain caused by the construction of a dam by any agency of the United States, or by any private person or corporation holding a license issued b any such agency.

SEC. 2. (a) Before any agency of the United States shall undertake the construction of a dam, or issue a license to any private individual or corporation for the construction of a dam, it shall give written notice to the Secretary of the Interior setting forth the site of the proposed dam and the approximate area to be flooded and otherwise changed if such construction is undertaken: *Provided,* That with respect to any floodwater retarding dam which provides less than five thousand acre-feet of detention capacity and with respect to any other type of dam which creates a reservoir of less than forty surface acres the provisions of this section shall apply only when the constructing agency, in its preliminary surveys, finds, or is presented with evidence that historical or archeological materials exist or may be present in the proposed reservoir area.

(b) Upon receipt of any notice, as provided in subsection (a), the Secretary of the Interior (hereinafter referred to as the "Secretary"), shall cause a survey to be made of the area proposed to be flooded to ascertain whether such area contains historical and archeological data (including relics and specimens) which should be preserved in the public interest. Any such survey shall be conducted as expeditiously as possible. If, as a result of any such survey, the Secretary shall determine (1) that such data exists in such area, (2) that such data has exceptional historical or archeological significance, and should be collected and preserved in the public interest, and (3) that it is feasible to collect. and preserve such data, he shall cause the necessary work to be performed in such area to collect and preserve such data. All such work, shall be performed as expeditiously its possible.

(c) The Secretary shall keep the instigating agency notified at all times of the progress of any survey made under this Act, or of any work undertaken as a result of such survey, in order that there will be as little disruption or delay as possible in the carrying out of the functions of such agency.

BLM_0007224

Appendix 3, page 2
(.03D)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Reservoir Salvage Act**

(d) A survey similar to that provided for by section (b) of this section and the work required to be performed as a result thereof shall so far as practicable also be undertaken in connection with any dam the construction of which has been heretofore authorized by any agency of the United States, or by any private person or corporation holding a license issued by any such agency.

(e) The Secretary shall consult with any interested Federal and State agencies, educational and scientific organizations, and private institutions and qualified individuals, with a view to determining the ownership of and the most appropriate repository for any relics and specimens recovered as a result of any work performed as provided for in this section.

SEC. 3. In the administration of this Act, the Secretary may–
(1) enter into contracts or make cooperative agreements with any Federal or State agency, any educational or scientific organization, or any institution, corporation, association, or qualified individual; and
(2) procure the temporary or intermittent services of experts or consultants or organizations thereof as provided in section 15 of the Act of August 2, 1946 (5 U.S.C. 55a) ; and
(3) accept and utilize funds made available for salvage archeological purposes by any private person or corporations holding a license issued by an agency of the United States for the construction of a dam or other type of water or power control project.

SEC. 4. There are hereby authorized to be appropriated such sums as may be necessary to carry out the purposes of this Act.

Approved June 27, 1960.

BLM_0007225

Appendix 4, page 1
(.03D)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archeological and Historic Preservation Act**

## Public Law 93-291

May 24, 1974                 AN ACT
[S. 514]        To amend the Act of June 27, 1960 (74 Stat. 220), relating to the preservation
of historical and archeological data.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act entitled "An Act to provide for the preservation of historical and archeological data (including relics and specimens) which might otherwise be lost as the result of the construction of a dam", approved June 27, 1960 (74 Stat .220; 16 U.S.C. 469), is amended as follows:

(1) In section 1, after "result of" insert "(1)" and delete "agency." and insert "agency or (2) any alteration of the terrain caused as a result of any Federal construction project or federally licensed activity or program."

(2) In section 2, change "SEC. 2. (a) ", to "SEC. 2."; after "Secretary of the Interior" insert " (hereafter referred to as the Secretary)", and delete all of subsection (b).

(3) Add the following new sections:

"SEC. 3. (a) Whenever any Federal agency finds, or is notified, in writing, by an appropriate historical or archeological authority, that its activities in connection with any Federal construction project or federally licensed project, activity, or program may cause irreparable loss or destruction of significant scientific, prehistorical, historical, or archeological data, such agency shall notify the Secretary, in writing, and shall provide the Secretary with appropriate information concerning the project, program, or activity. Such agency may request the Secretary to undertake the recovery, protection, and preservation of such data (including preliminary survey, or other investigation as needed, and analysis and publication of the reports resulting from such investigation), or it may, with funds appropriated for such project, program, or activity, undertake such activities. Copies of reports of any investigations made pursuant to this section shall be submitted to the Secretary, who shall make them available to the public for inspection and review.

"(b) Whenever any Federal agency provides financial assistance by loan, grant, or otherwise to any private person, association, or public entity, the Secretary, if he determines that significant scientific, prehistorical, historical, or archeological data might be irrevocably lost or destroyed, may with funds appropriated expressly for this purpose conduct, with the consent of all persons, associations, or public entities having a legal interest, in the property involved, a survey of the affected site and undertake the recovery, protection, and preservation of such data (including analysis and publication). The Secretary shall, unless otherwise mutually agreed to in writing, compensate any person, association, or public entity damaged as a result of delays in construction or as a result of the temporary loss of the use of private or any nonfederally owned lands.

"Sec. 4. (a) The Secretary, upon notification, in writing, by any Federal or State agency or appropriate historical or archeological authority that scientific, prehistorical, historical, or archeological data is being or may be irrevocably lost or destroyed by any Federal or federally assisted or licensed project, activity, or program, shall, if he determines that such data is significant and is being or may be irrevocably lost or destroyed and after reasonable notice to the agency responsible for funding or licensing such project, activity, or program, conduct or cause to be conducted a survey and other investigation of the areas which are or may be affected and recover and preserve such data (including analysis and publication) which, in his opinion, are not being, but should be, recovered and preserved in the public interest'.

BLM_0007226

Appendix 4, page 2
(.03D)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archeological and Historic Preservation Act**

" (b) No survey or recovery work shall be required pursuant to this section which in the determination of the head of the responsible agency would impede Federal or federally assisted or licensed projects or activities undertaken in connection with any emergency, including projects or activities undertaken in anticipation of, or as a result of, a natural disaster.

"(c) The Secretary shall initiate the survey or recovery  effort within sixty days after notification to him pursuant to Subsection (a) of this section or within such time as may be agreed upon with the head of the agency responsible for funding or licensing the project, activity, or program in all other cases.

"(d) The Secretary shall, unless otherwise mutually agreed to in writing, compensate any person, association, or public entity damaged as a result of the temporary loss of the use of private or nonfederally owned land."

(4) In Section 2. change "SEC. 2. (c)" to "SEC. 5. (a)" and change "instigating agency" to "agency responsible for funding or licensing the project" and delete "agency." and insert "agency and the survey and recovery programs shall terminate at a time mutually agreed upon by the Secretary and the head of such agency unless extended by mutual agreement.".

(5) Delete subsection 2(d).

(6) In section 2, change "SEC. 2. (e) " to "SEC. 5. (b)".

(7) In section 5, add the following new subsection:

" (c) The Secretary shall coordinate all Federal survey and recovery activities authorized under this Act and shall submit an annual report at the end of each fiscal year to the Interior and Insular Affairs committees of the United States Congress indicating the scope and effectiveness of the program, the specific projects surveyed and the results produced, and the costs incurred by the Federal Government as a result thereof." .

(8) Redesignate "Sec. 3." as "Sec. 6." and change paragraphs (2) and (3) to read as follows:

"(2) obtain the services of experts and consultants or organizations thereof in accordance with section 3109 of title 5, United States Code; and

"(3) accept and utilize funds made available for salvage archeological purposes by any private person or corporation or transferred to him by any Federal agency.".

(9) Delete all of section 4 and insert the following:

"SEC. 7. (a) To carry out the purposes of this Act, any Federal agency responsible for a construction project may assist the Secretary and/or it may transfer to him such funds as maybe agreed upon, but not more than 1 per centum of the total amount authorized to be appropriated for such project, except that the 1 per centum limitation of this section shall not apply in the event that the project involves 50,000 or less: *Provided,* That the costs of such survey, recovery, analysis, and publication shall be considered nonreimbursable project costs.

"(b) For the purposes of subsection 3 (b), there are authorized to be appropriated such sums as may be necessary, but not more than $500,000 in fiscal year 1974; $1,000,000 in fiscal year 1975; $1,500,000 in fiscal year 1976; $1,500,000 in fiscal year 1977; and $1,500,000 in fiscal year 1978.

"(c) For the purposes of subsection 4(a), there are authorized to be appropriated not more than $2,000,000 in fiscal year 1974; $2,000,000 in fiscal year 1975; $3,000,000 in fiscal year 1976; $3,000,000 in fiscal year 1977; and $3,000,000 in fiscal year 1978.".

Approved May 24, 1974.

BLM_0007227

Appendix 5, Page 1
(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

## THE NATIONAL HISTORIC PRESERVATION ACT[1]
### As Amended through 1992

**AN ACT** to Establish a Program for the Preservation of Additional Historic Properties throughout the Nation, and for Other Purposes, Approved October 15, 1966 (Public Law 89-665; 80 Stat. 915; 16 U.S.C. 470) as amended by (Public Law 91-243, Public Law 93-54, Public Law 94-422, Public Law 94-458, Public Law 96-199, Public Law 96-244, Public Law 96-515, Public Law 98-483, Public Law 99-514, Public Law 100-127, and Public Law 102-575).

**Section 1** *(16 U.S.C. 470)*

*Short title*

(a) This Act may be cited as the "National Historic Preservation Act."

*Purpose of the Act*

(b) The Congress finds and declares that–

(1) the spirit and direction of the Nation are founded upon and reflected in its historic heritage;

(2) the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people;

(3) historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency;

(4) the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, esthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans;

(5) in the face of ever-increasing extensions of urban centers, highways, and residential, commercial, and industrial developments, the present governmental and nongovernmental historic preservation programs and activities are inadequate to ensure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation;

(6) the increased knowledge of our historic resources, the establishment of better means of identifying and administering them, and the encouragement of their preservation will improve the planning and execution of Federal and federally assisted projects and will assist economic growth and development; and

(7) although the major burdens of historic preservation have been borne and major efforts initiated by private agencies and individuals, and both should continue to play a vital role, it is nevertheless necessary and appropriate for the Federal Government to accelerate its historic preservation programs and activities, to give maximum encouragement to agencies and individuals undertaking preservation by private means, and to assist State and local governments and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities.

BLM_0007228

Appendix 5, Page 2
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**Section 2** *(16 U.S.C. 470-1)*

#### *Declaration of policy of Federal Government*

It shall be the policy of the Federal Government, in cooperation with other nations and in partnership with the States, local governments, Indian tribes, and private organization and individuals to--

(1) use measures, including financial and technical assistance, to foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations;

(2) provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations and in the administration of the national preservation program in partnership with States, Indian tribes, Native Hawaiians, and local governments;

(3) administer federally owned, administered, or controlled prehistoric and historic resources in a spirit of stewardship for the inspiration and benefit of present and future generations;

(4) contribute to the preservation of nonfederally owned prehistoric and historic resources and give maximum encouragement to organization and individuals undertaking preservation by private means;

(5) encourage the public and private preservation and utilization of all usable elements of the Nation's historic build environment; and

(6) assist State and local governments, Indian tribes and Native Hawaiian organizations and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities.

### TITLE I

**Section 101** *(16 U.S.C. 470a)*

#### *National Register of Historic Places, expansion and maintenance*

(a)(1)(A) The Secretary of the Interior is authorized to expand and maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture.

#### *National Historic Landmarks, designation*

(B) Properties meeting the criteria for National Historic Landmarks established pursuant to paragraph (2) shall be designated as "National Historic Landmarks" and included on the National Register, subject to the requirements of paragraph (6). All historic properties included on the National Register on the date of enactment of the National Historic Preservation Act Amendments of 1980 shall be deemed to be included on the National Register as of their initial listing for purposes of this Act. All historic properties listed in the Federal Register of February 6, 1979, as "National Historic Landmarks" or thereafter prior to the effective date of this Act are declared by Congress to be National Historic Landmarks of national historic significance as of their initial listing as such in the Federal Register for purposes of this Act and the Act of August 21, 1935 (49 Stat. 666); except that in cases of National Historic Landmark districts for which no boundaries have been established, boundaries must first be published in the Federal Register and submitted to the Committee on Energy and Natural Resources of the United States Senate and to the Committee on Interior and Insular Affairs of the United States House of Representatives.

BLM_0007229

Appendix 5, Page 3
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

(2) The Secretary in consultation with national historical and archeological associations, shall establish or revise criteria for properties to be included on the National Register and criteria for National Historic Landmarks, and shall also promulgate or revise regulations as may be necessary for–

(A) nominating properties for inclusion in, and removal from, the National Register and the recommendation of properties by certified local governments;

(B) designating properties as National Historic Landmarks and removing such designation;

(C) considering appeals from such recommendations, nomination, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate);

(D) nominating historic properties for inclusion in the World Heritage List in accordance with the terms of the Convention concerning the Protection of the World Cultural and Natural Heritage;

(E) making determinations of eligibility of properties for inclusion on the National Register; and

(F) notifying the owner of a property, and any appropriate local governments, and the general public when the property is being considered for inclusion on the National Register, for designation as a National Historic Landmark or for nomination to the World Heritage List.

(3) Subject to the requirements of paragraph (6), any State which is carrying out a program approved under subsection (b), shall nominate to the Secretary properties which meet the criteria promulgated under subsection (a) for inclusion on the National Register. Subject to paragraph (6), any property nominated under this paragraph or under section 110(a)(2) shall be included on the National Register on the date forty-five days after receipt by the Secretary of the nomination and the necessary documentation, unless the Secretary disapproves such nomination within such forty-five day period or unless an appeal is filed under paragraph (5).

(4) Subject to the requirements of paragraph (6) the Secretary may accept a nomination directly from any person or local government for inclusion of a property on the National Register only if such property is located in a State where there is no program approved under subsection (b). The Secretary may include on the National Register any property for which such a nomination is made if he determines that such property is eligible in accordance with the regulations promulgated under paragraph (2). Such determinations shall be made within ninety days from the date of nomination unless the nomination is appealed under paragraph (5).

(5) Any person or local government may appeal to the Secretary a nomination of any historic property for inclusion on the National Register and may appeal to the Secretary the failure or refusal of a nominating authority to nominate a property in accordance with this subsection.

(6) The Secretary shall promulgate regulations requiring that before any property or district may be included on the National register or designated as a National Historic Landmark, the owner or owners of such property, or a majority of the owners of the properties within the district in the case of a historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property or district for such inclusion or designation. If the owner or owners of any privately owned property, or a majority of the owners of such properties within the district in the case of a historic district, object to such inclusion or designation, such property shall not be included on the National Register or designated as a National Historic Landmark until such objection is withdrawn. The Secretary shall review the nomination of the property or district

BLM_0007230

Appendix 5, Page 4
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

where any such objection has been made and shall determine whether or not the property or district is eligible for such inclusion or designation, and if the Secretary determines that such property or district is eligible for such inclusion or designation, he shall inform the Advisory Council on Historic Preservation, the appropriate State Historic Preservation Officer, the appropriate chief elected local official and the owner or owners of such property, of his determination. The regulations under this paragraph shall include provisions to carry out the purposes of this paragraph in the case of multiple ownership of a single property.

### *Regulations for curation, documentation, and local government certification*

**(7)** The Secretary shall promulgate, or revise, regulations--

**(A)** ensuring that significant prehistoric and historic artifacts, and associated records, subject to section 110 of this Act, the Act of June 27, 1960 (16 U.S.C. 469c), and the Archeological Resources Protection Act of 1979 (16 U.S.C. 470aa and following) are deposited in an institution with adequate long-term curatorial capabilities;

**(B)** establishing a uniform process and standards for documenting historic properties by public agencies and private parties for purposes of incorporation into, or complementing, the national historic architectural and engineering records within the Library of Congress; and

**(C)** certifying local governments, in accordance with subsection (c)(1) and for the allocation of funds pursuant to section 103(c) of this Act.

**(8)** The Secretary shall, at least once every 4 years, in consultation with the Council and with State Historic Preservation Officers, review significant threats to properties included in, or eligible for inclusion on, the National Register, in order to--

**(A)** determine the kinds of properties that may be threatened;

**(B)** ascertain the causes of the threats; and

**(C)** develop and submit to the President and Congress recommendations for appropriate action.

### *State Historic Preservation Programs*

**(b)(1)** The Secretary, in consultation with the National Conference of State Historic Preservation Officers and the National Trust for Historic Preservation, shall promulgate or revise regulations for State Historic Preservation Programs. Such regulations shall provide that a State program submitted to the Secretary under this section shall be approved by the Secretary if he determines that the program--

**(A)** provides for the designation and appointment by the Governor of a "State Historic Preservation Officer" to administer such program in accordance with paragraph (3) and for the employment or appointment by such officer of such professionally qualified staff as may be necessary for such purposes;

**(B)** provides for an adequate and qualified State historic preservation review board designated by the State Historic Preservation Officer unless otherwise provided for by State law; and

**(C)** provides for adequate public participation in the State Historic Preservation Program, including the process of recommending properties for nomination to the National Register.

**(2)(A)** Periodically, but not less than every 4 years after the approval of any State program under this subsection, the Secretary, in consultation with the Council on the appropriate provisions of this Act, and in cooperation with the State Historic Preservation

BLM_0007231

Appendix 5, Page 5
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

Officer, shall evaluate the program to determine whether it is consistent with this Act.

**(B)** If, at any time, the Secretary determines that a major aspect of a State program is not consistent with this Act, the Secretary shall disapprove the program and suspend in whole or in part any contracts or cooperative agreements with the State and the State Historic Preservation Officer under this Act, until the program is consistent with this Act, unless the Secretary determines that the program will be made consistent with this Act within a reasonable period of time.

**(C)** The Secretary, in consultation with State Historic Preservation Officers, shall establish oversight methods to ensure State program consistency and quality without imposing undue review burdens on State Historic Preservation Officers.

**(D)** At the discretion of the Secretary, a State system of fiscal audit and management may be substituted for comparable Federal systems so long as the State system--

> **(i)** establishes and maintains substantially similar accountability standards; and
> **(ii)** provides for independent professional peer review.

The Secretary may also conduct periodic fiscal audits of State programs approved under this section as needed and shall ensure that such programs meet applicable accountability standards.

### *SHPO responsibilities*

**(3)** It shall be the responsibility of the State Historic Preservation Officer to administer the State Historic Preservation Program and to–

**(A)** in cooperation with Federal and State agencies, local governments, and private organizations and individuals, direct and conduct a comprehensive statewide survey of historic properties and maintain inventories of such properties;

**(B)** identify and nominate eligible properties to the National Register and otherwise administer applications for listing historic properties on the National Register;

**(C)** prepare and implement a comprehensive statewide historic preservation plan;

**(D)** administer the State program of Federal assistance for historic preservation within the State;

**(E)** advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

**(F)** cooperate with the Secretary, the Advisory Council on Historic Preservation, and other Federal and State agencies, local governments, and organizations and individuals to ensure that historic properties are taken into consideration at all levels of planning and development;

**(G)** provide public information, education and training, and technical assistance in historic preservation;

**(H)** cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to subsection (c);

**(I)** consult with the appropriate Federal agencies in accordance with this Act on--

> **(i)** Federal undertakings that may affect historical properties; and
> **(ii)** the content and sufficiency of any plans developed to protect, manage, or to reduce or mitigate harm to such properties; and

**(J)** advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance.

BLM_0007232

Appendix 5, Page 6
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**(4)** Any State may carry out all or any part of its responsibilities under this subsection by contract or cooperative agreement with any qualified nonprofit organization or educational institution.

**(5)** Any State historic preservation program in effect under prior authority of law may be treated as an approved program for purposes of this subsection until the earlier of--

**(A)** the date on which the Secretary approves a program submitted by the State under this subsection, or

**(B)** three years after the date of the enactment of the National Historic Preservation Act Amendments of 1992.

**(6)(A)** Subject to subparagraphs (c) and (d), the Secretary may enter into contracts or cooperative agreements with a State Historic Preservation Officer for any State authorizing such Officer to assist the Secretary in carrying out one or more of the following responsibilities within that State–

**(i)** Identification and preservation of historic properties.

**(ii)** Determination of the eligibility of properties for listing on the National Register.

**(iii)** Preparation of nominations for inclusion on the National Register.

**(v)** Evaluation of eligibility for Federal preservation incentives.

Nothing in this paragraph shall be construed to provide that any State Historic Preservation Officer or any other person other than the Secretary shall have the authority to maintain the National Register for properties in any State.

**(B)** The Secretary may enter into a contract or cooperative agreement under subparagraph (a) only if–

**(i)** the State Historic Preservation Officer has requested the additional responsibility;

**(ii)** the Secretary has approved the State historic preservation program pursuant to section 101(b)(1) and (2);

**(iii)** the State Historic Preservation Officer agrees to carry out the additional responsibility in a timely and efficient manner acceptable to the Secretary and the Secretary determines that such Officer is fully capable of carrying out such responsibility in such manner;

**(iv)** the State Historic Preservation Officer agrees to permit the Secretary to review and revise, as appropriate in the discretion of the Secretary, decisions made by the Officer pursuant to such contract or cooperative agreement; and

**(v)** the Secretary and the State Historic Preservation Officer agree on the terms of additional financial assistance to the State, if there is to be any, for the costs of carrying out such responsibility.

**(C)** For each significant program area under the Secretary's authority, the Secretary shall establish specific conditions and criteria essential for the assumption by State Historic Preservation Officers of the Secretary's duties in each such program.

**(D)** Nothing in this subsection shall have the effect of diminishing the preservation programs and activities of the National Park Service.

## *Certification of local governments*

**(c)(1)** Any State program approved under this section shall provide a mechanism for the certification by the State Historic Preservation Officer of local governments to carry out the purposes of this Act and provide for the transfer, in accordance with section 103(c), of a portion of the grants received by the States under this Act, to such local governments. Any local government shall be certified to participate under the provisions of this section if the

BLM_0007233

Appendix 5, Page 7
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

applicable State Historic Preservation Officer, and the Secretary, certifies that the local government–

    **(A)** enforces appropriate State or local legislation for the designation and protection of historic properties;

    **(B)** has established an adequate and qualified historic preservation review commission by State or local legislation;

    **(C)** maintains a system for the survey and inventory of historic properties that furthers the purposes of subsection (b);

    **(D)** provides for adequate public participation in the local historic preservation program, including the process of recommending properties for nomination to the National Register; and

    **(E)** satisfactorily performs the responsibilities delegated to it under this Act.

Where there is no approved State program, a local government may be certified by the Secretary if he determines that such local government meets the requirements of subparagraphs (a) through (e); and in any such case the Secretary may make grants-in-aid to the local government for purposes of this section.

    **(2)(A)** Before a property within the jurisdiction of the certified local government may be considered by the State to be nominated to the Secretary for inclusion on the National Register, the State Historic Preservation Officer shall notify the owner, the applicable chief local elected official, and the local historic preservation commission. The commission, after reasonable opportunity for public comment, shall prepare a report as to whether or not such property, in its opinion, meets the criteria of the National Register. Within sixty days of notice from the State Historic Preservation Officer, the chief local elected official shall transmit the report of the commission and his recommendation to the State Historic Preservation Officer. Except as provided in subparagraph (B), after receipt of such report and recommendation, or if no such report and recommendation are received within sixty days, the State shall make the nomination pursuant to section 101(a). The State may expedite such process with the concurrence of the certified local government.

    **(B)** If both the commission and the chief local elected official recommend that a property not be nominated to the National Register, the State Historic Preservation Officer shall take no further action, unless within thirty days of the receipt of such recommendation by the State Historic Preservation Officer an appeal is filed with the State. If such an appeal is filed, the State shall follow the procedures for making a nomination pursuant to section 101(a). Any report and recommendations made under this section shall be included with any nomination submitted by the State to the Secretary.

    **(3)** Any local government certified under this section or which is making efforts to become so certified shall be eligible for funds under the provisions of section 103(c) of this Act, and shall carry out any responsibilities delegated to it in accordance with such terms and conditions as the Secretary deems necessary or advisable.

    **(4)** For the purposes of this section the term–

    **(A)** "designation" means the identification and registration of properties for protection that meet criteria established by the State or the locality for significant historic and prehistoric resources within the jurisdiction of a local government; and

    **(B)** "protection" means a local review process under State or local law for proposed demolition of, changes to, or other action that may affect historic properties designated pursuant to subsection (c).

BLM_0007234

Appendix 5, Page 8
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

### *Program for assistance to Indian tribes*

 **(d)(1)(A)** The Secretary shall establish a program and promulgate regulations to assist Indian tribes in preserving their particular historic properties. The Secretary shall foster communication and cooperation between Indian tribes and State Historic Preservation Officers in the administration of the national historic preservation program to ensure that all types of historic properties and all public interests in such properties are given due consideration, and to encourage coordination among Indian tribes, State Historic Preservation Officers, and Federal agencies in historic preservation planning and in the identification, evaluation, protection, and interpretation of historic properties.

 **(B)** The program under subparagraph (a) shall be developed in such a manner as to ensure that tribal values are taken into account to the extent feasible. The Secretary may waive or modify requirements of this section to conform to the cultural setting of tribal heritage preservation goals and objectives. The tribal programs implemented by specific tribal organizations may vary in scope, as determined by each tribe's chief governing authority.

 **(C)** The Secretary shall consult with Indian tribes, other Federal agencies, State Historic Preservation Officers, and other interested parties and initiate the program under subparagraph (a) by not later than October 1, 1994.

### *Tribal assumption of State Historic Preservation Officer functions*

 **(2)** A tribe may assume all or any part of the functions of a State Historic Preservation Officer in accordance with subsections (b)(2) and (b)(3), with respect to tribal lands, as such responsibilities may be modified for tribal programs through regulations issued by the Secretary if–

 **(A)** the tribe's chief governing authority so requests;

 **(B)** the tribe designates a tribal preservation official to administer the tribal historic preservation program, through appointment by the tribe's chief governing authority or as a tribal ordinance may otherwise provide;

 **(C)** the tribal preservation official provides the Secretary with a plan describing how the functions the tribal preservation official proposes to assume will be carried out;

 **(D)** the Secretary determines, after consultation with the tribe, the appropriate State Historic Preservation Officer, the Council (if the tribe proposes to assume the functions of the State Historic Preservation Officer with respect to review of undertakings under section 106), and other tribes, if any, whose tribal or aboriginal lands may be affected by conduct of the tribal preservation program–

 **(i)** that the tribal preservation program is fully capable of carrying out the functions specified in the plan provided under subparagraph (c);

 **(ii)** that the plan defines the remaining responsibilities of the Secretary and the State Historic Preservation Officer;

 **(iii)** that the plan provides, with respect to properties neither owned by a member of the tribe nor held in trust by the Secretary for the benefit of the tribe, at the request of the owner thereof, the State Historic Preservation Officer, in addition to the tribal preservation official, may exercise the historic preservation responsibilities in accordance with subsections (b)(2) and (b)(3); and

 **(E)** based on satisfaction of the conditions stated in subparagraphs (a), (b), (c), and (d), the Secretary approves the plan.

BLM_0007235

Appendix 5, Page 9
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**(3)** In consultation with interested Indian tribes, other Native American organizations and affected State Historic Preservation Officers, the Secretary shall establish and implement procedures for carrying out section 103(a) with respect to tribal programs that assume responsibilities under paragraph (2).

**(4)** At the request of a tribe whose preservation program has been approved to assume functions and responsibilities pursuant to paragraph (2), the Secretary shall enter into contracts or cooperative agreements with such tribe permitting the assumption by the tribe of any part of the responsibilities referred to in subsection (b)(6) on tribal land, if--

**(A)** the Secretary and the tribe agree on additional financial assistance, if any, to the tribe for the costs of carrying out such authorities;

**(B)** the Secretary finds that the tribal historic preservation program has been demonstrated to be sufficient to carry out the contract or cooperative agreement and this Act; and

**(C)** the contract or cooperative agreement specifies the continuing responsibilities of the Secretary or of the appropriate State Historic Preservation Officers and provides for appropriate participation by–

**(i)** the tribe's traditional cultural authorities;

**(ii)** representatives of other tribes whose traditional lands are under the jurisdiction of the tribe assuming responsibilities; and

**(iii)** the interested public.

### *Review of undertakings under tribal preservation regulations instead of section 106*

**(5)** The Council may enter into an agreement with an Indian tribe to permit undertakings on tribal land to be reviewed under tribal historic preservation regulations in place of review under regulations promulgated by the Council to govern compliance with section 106, if the Council, after consultation with the tribe and appropriate State Historic Preservation Officers, determines that the tribal preservation regulations will afford historic properties consideration equivalent to those afforded by the Council's regulations.

### *Traditional religious and cultural properties potentially eligible*

**(6)(A)** Properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register.

### *Section 106 review and religious and cultural properties*

**(B)** In carrying out its responsibilities under section 106, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to properties described in subparagraph (A).

**(C)** In carrying out his or her responsibilities under subsection (b)(3), the State Historic Preservation Officer for the State of Hawaii shall--

**(i)** consult with Native Hawaiian organizations in assessing the cultural significance of any property in determining whether to nominate such property to the National Register;

**(ii)** consult with Native Hawaiian organizations in developing the cultural component of a preservation program or plan for such property; and

**(iii)** enter into a memorandum of understanding or agreement with Native Hawaiian organizations for the assessment of the cultural significance of a property in determining whether to nominate such property to the National Register and to carry out the cultural component of such preservation program or plan.

BLM_0007236

Appendix 5, Page 10
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

*Grants to States*

(e)(1) The Secretary shall administer a program of matching grants to the States for the purposes of carrying out this Act.

(2) The Secretary shall administer a program of matching grants-in-aid to the National Trust for Historic Preservation in the United States, chartered by Act of Congress approved October 26, 1949 (63 Stat. 947), for the purposes of carrying out the responsibilities of the National Trust.

(3)(A) In addition to the programs under paragraphs (1) and (2), the Secretary shall administer a program of direct grants for the preservation of properties included on the National Register. Funds to support such program annually shall not exceed 10 per centum of the amount appropriated annually for the fund established under section 108. These grants may be made by the Secretary, in consultation with the appropriate State Historic Preservation Officer--

(i) for the preservation of National Historic Landmarks which are threatened with demolition or impairment and for the preservation of historic properties of World Heritage significance;

(ii) for demonstration projects which will provide information concerning professional methods and techniques having application to historic properties;

(iii) for the training and development of skilled labor in trades and crafts, and in analysis and curation, relating to historic preservation; and,

(iv) to assist persons or small businesses within any historic district included in the National Register to remain within the district.

(B) The Secretary may also, in consultation with the appropriate State Historic Preservation Officer, make grants or loans or both under this section to Indian tribes and to nonprofit organizations representing ethnic or minority groups for the preservation of their cultural heritage.

(C) Grants may be made under subparagraph (a)(i) and (iv) only to the extent that the project cannot be carried out in as effective a manner through the use of an insured loan under section 104.

(4) Grants may be made under this subsection for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant. Nothing in this paragraph shall be construed to authorize the use of any funds made available under this section for the acquisition of any property referred to in the preceding sentence.

(5) The Secretary shall administer a program of direct grants to Indian tribes and Native Hawaiian organizations for the purpose of carrying out this Act as it pertains to Indian tribes and Native Hawaiian organizations. Matching fund requirements may be modified. Federal funds available to a tribe or Native Hawaiian organization may be used as matching funds for the purposes of the tribe's or organization's conducting its responsibilities pursuant to this section.

(6)(A) As a part of the program of matching grant assistance from the Historic Preservation Fund to States, the Secretary shall administer a program of direct grants to the Federated States of Micronesia, the Republic of the Marshall Islands, the Trust Territory of the Pacific Islands, and upon termination of the Trusteeship Agreement for the Trust Territory of the Pacific Islands, the Republic of Palau (referred to as the Micronesian States) in furtherance of the Compact of Free Association between the United States and the

BLM_0007237

Appendix 5, Page 11
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

Federated States of Micronesia and the Marshall Islands, approved by the Compact of Free Association Act of 1985 (48 U.S.C. 1681 note), the Trusteeship Agreement for the Trust Territory of the Pacific Islands, and the Compact of Free Association between the United States and Palau, approved by the Joint Resolution entitled `Joint Resolution to approve the "Compact of Free Association" between the United States and Government of Palau, and for other purposes' (48 U.S.C. 1681 note). The goal of the program shall be to establish historic and cultural preservation programs that meet the unique needs of each Micronesian State so that at the termination of the compacts the programs shall be firmly established. The Secretary may waive or modify the requirements of this section to conform to the cultural setting of those nations.

**(B)** The amounts to be made available to the Micronesian States shall be allocated by the Secretary on the basis of needs as determined by the Secretary. Matching funds may be waived or modified.

**(f)** No part of any grant made under this section may be used to compensate any person intervening in any proceeding under this Act. **(g)** In consultation with the Advisory Council on Historic Preservation, the Secretary shall promulgate guidelines for Federal agency responsibilities under section 110 of this title.

**(h)** Within one year after the date of enactment of the National Historic Preservation Act Amendments of 1980, the Secretary shall establish, in consultation with the Secretaries of Agriculture and Defense, the Smithsonian Institution, and the Administrator of the General Services Administration, professional standards for the preservation of historic properties in Federal ownership or control.

**(i)** The Secretary shall develop and make available to Federal agencies, State and local governments, private organizations and individuals, and other nations and international organizations pursuant to the World Heritage Convention, training in, and information concerning professional methods and techniques for the preservation of historic properties and for the administration of the historic preservation program at the Federal, State, and local level. The Secretary shall also develop mechanisms to provide information concerning historic preservation to the general public including students.

**(j)(1)** The Secretary shall, in consultation with the Council and other appropriate Federal, tribal, Native Hawaiian, and non-Federal organizations, develop and implement a comprehensive preservation education and training program.

(2) The education and training program described in paragraph (1) shall include--

**(A)** new standards and increased preservation training opportunities for Federal workers involved in preservation-related functions;

**(B)** increased preservation training opportunities for other Federal, State, tribal and local government workers, and students;

**(C)** technical or financial assistance, or both, to historically black colleges and universities, to tribal colleges, and to colleges with a high enrollment of Native Americans or Native Hawaiians, to establish preservation training and degree programs;

**(D)** coordination of the following activities, where appropriate, with the National Center for Preservation Technology and Training–

**(i)** distribution of information on preservation technologies;

**(ii)** provision of training and skill development in trades, crafts, and disciplines related to historic preservation in Federal training and development programs; and

**(iii)** support for research, analysis, conservation, curation, interpretation, and display related to preservation.

BLM_0007238

Appendix 5, Page 12
(.03E)
## 8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**Section 102** *(16 U.S.C. 470b)*

**(a)** No grant may be made under this Act–
**(1)** unless application therefore is submitted to the Secretary in accordance with regulations and procedures prescribed by him;
**(2)** unless the application is in accordance with the comprehensive statewide historic preservation plan which has been approved by the Secretary after considering its relationship to the comprehensive statewide outdoor recreation plan prepared pursuant to the Land and Water Conservation Fund Act of 1965 (78 Stat. 897);
**(3)** for more than 60 percent of the aggregate costs of carrying out projects and programs under the administrative control of the State Historic Preservation Officer as specified in section 101(b)(3) in any one fiscal year;
**(4)** unless the grantee has agreed to make such reports, in such form and containing such information as the Secretary may from time to time require;
**(5)** unless the grantee has agreed to assume, after completion of the project, the total cost of the continued maintenance, repair, and administration of the property in a manner satisfactory to the Secretary; and
**(6)** until the grantee has complied with such further terms and conditions as the Secretary may deem necessary or advisable.
Except as permitted by other law, the State share of the costs referred to in paragraph (3) shall be contributed by non-Federal sources. Notwithstanding any other provision of law, no grant made pursuant to this Act shall be treated as taxable income for purposes of the Internal Revenue Code 1954.
**(b)** The Secretary may in his discretion waive the requirements of subsection (a), paragraphs (2) and **(5)** of this section for any grant under this Act to the National Trust for Historic Preservation in the United States.
**(c)** No State shall be permitted to utilize the value of real property obtained before the date of approval of this Act in meeting the remaining cost of a project for which a grant is made under this Act.
**(d)** The Secretary shall make funding available to individual States and the National Trust for Historic Preservation as soon as practicable after execution of a grant agreement. For purposes of administration, grants to individual States and the National Trust each shall be considered to be one grant and shall be administered by the National Park Service as such.
**(e)** The total administrative costs, direct and indirect, charged for carrying out State projects and programs may not exceed 25 percent of the aggregate costs except in the case of grants under section 101(e)(6).

**Section 103** *(16 U.S.C. 470c)*

**(a)** The amounts appropriated and made available for grants to the States for the purposes of this Act shall be apportioned among the States by the Secretary on the basis of needs as determined by him.
**(b)** The amounts appropriated and made available for grants to the States for projects and programs under this Act for each fiscal year shall be apportioned among the States as the Secretary determines to be appropriate. The Secretary shall notify each State of its apportionment under this subsection within thirty days following the date of enactment of legislation appropriating funds under this Act. Any amount of any apportionment that has not been paid or obligated by the Secretary during the fiscal year in which such notification is given and for two fiscal years thereafter, shall be reapportioned by the Secretary in accordance with this subsection. The Secretary shall analyze and revise as necessary the

BLM_0007239

Appendix 5, Page 13
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

method of apportionment. Such method and any revision thereof shall be published by the Secretary in the Federal Register.

(c) A minimum of 10 per centum of the annual apportionment distributed by the Secretary to each State for the purposes of carrying out this Act shall be transferred by the State, pursuant to the requirements of this Act, to local governments which are certified under section 101(c) for historic preservation projects or programs of such local governments. In any year in which the total annual apportionment to the States exceeds $65,000,000, one half of the excess shall also be transferred by the States to local governments certified pursuant to section 101(c).

(d) The Secretary shall establish guidelines for the use and distribution of funds under subsection (c) to ensure that no local government receives a disproportionate share of the funds available, and may include a maximum or minimum limitation on the amount of funds distributed to any single local government. The guidelines shall not limit the ability of any State to distribute more than 10 per centum of its annual apportionment under subsection (c), nor shall the Secretary require any State to exceed the 10 per centum minimum distribution to local governments.

**Section 104** *(16 U.S.C. 470d)*

(a) The Secretary shall establish and maintain a program by which he may, upon application of a private lender, insure loans (including loans made in accordance with a mortgage) made by such lender to finance any project for the preservation of a property included on the National Register.

(b) A loan may be insured under this section only if–

(1) the loan is made by a private lender approved by the Secretary as financially sound and able to service the loan properly;

(2) the amount of the loan, and interest rate charged with respect to the loan, do not exceed such amount, and such a rate, as is established by the Secretary, by rule;

(3) the Secretary has consulted the appropriate State Historic Preservation Officer concerning the preservation of the historic property;

(4) the Secretary has determined that the loan is adequately secured and there is reasonable assurance of repayment;

(5) the repayment period of the loan does not exceed the lesser of forty years or the expected life of the asset financed;

(6) the amount insured with respect to such loan does not exceed 90 per centum of the loss sustained by the lender with respect to the loan; and

(7) the loan, the borrower, and the historic property to be preserved meet other terms and conditions as may be prescribed by the Secretary, by rule, especially terms and conditions relating to the nature and quality of the preservation work. The Secretary shall consult with the Secretary of the Treasury regarding the interest rate of loans insured under this section.

(c) The aggregate unpaid principal balance of loans insured under this section and outstanding at any one time may not exceed the amount which has been covered into the Historic Preservation Fund pursuant to section 108 and subsection (g) and (i) of this section, as in effect on the date of the enactment of the Act but which has not been appropriated for any purpose. (d) Any contract of insurance executed by the Secretary under this section may be assignable, shall be an obligation supported by the full faith and credit of the United States, and shall be incontestable except for fraud or misrepresentation of which the holder had actual knowledge at the time it became a holder.

BLM_0007240

Appendix 5, Page 14
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

(e) The Secretary shall specify, by rule and in each contract entered into under this section, the conditions and method of payment to a private lender as a result of losses incurred by the lender on any loan insured under this section.

(f) In entering into any contract to insure a loan under this section, the Secretary shall take steps to assure adequate protection of the financial interests of the Federal Government. The Secretary may–

(1) in connection with any foreclosure proceeding, obtain, on behalf of the Federal Government, the property securing a loan insured under this title; and

(2) operate or lease such property for such period as may be necessary to protect the interest of the Federal Government and to carry out subsection (g).

(g)(1) In any case in which a historic property is obtained pursuant to subsection (f), the Secretary shall attempt to convey such property to any governmental or nongovernmental entity under such conditions as will ensure the property's continued preservation and use; except that if, after a reasonable time, the Secretary, in consultation with the Advisory Council on Historic Preservation, determines that there is no feasible and prudent means to convey such property and to ensure its continued preservation and use, then the Secretary may convey the property at the fair market value of its interest in such property to any entity without restriction.

(2) Any funds obtained by the Secretary in connection with the conveyance of any property pursuant to paragraph (1) shall be covered into the historic preservation fund, in addition to the amounts covered into such fund pursuant to section 108 and subsection (i) of this section, and shall remain available in such fund until appropriated by the Congress to carry out the purposes of this Act.

(h) The Secretary may assess appropriate and reasonable fees in connection with insuring loans under this section. Any such fees shall be covered into the Historic Preservation Fund, in addition to the amounts covered into such fund pursuant to section 108 and subsection (g) of this section, and shall remain available in such fund until appropriated by the Congress to carry out the purposes of this Act.

(i) Notwithstanding any other provision of law, any loan insured under this section shall be treated as non-Federal funds for the purposes of satisfying any requirement of any other provision of law under which Federal funds to be used for any project or activity are conditioned upon the use of non-Federal funds by the recipient for payment of any portion of the costs of such project or activity.

(j) Effective after the fiscal year 1981 there are authorized to be appropriated, such sums as may be necessary to cover payments incurred pursuant to subsection (e).

(k) No debt obligation which is made or committed to be made, or which is insured or committed to be insured, by the Secretary under this section shall be eligible for purchase by, or commitment to purchase by, or sale or issuance to, the Federal Financing Bank.

### Section 105 *(16 U.S.C. 470e)*

The beneficiary of assistance under this Act shall keep such records as the Secretary shall prescribe, including records which fully disclose the disposition by the beneficiary of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

BLM_0007241

Appendix 5, Page 15
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

**Section 106** *(16 U.S.C. 470f)*

### *Advisory Council on Historic Preservation, comment on Federal undertakings*

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.

**Section 107** *(16 U.S.C. 470g)*

Nothing in this Act shall be construed to be applicable to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds.

**Section 108** *(16 U.S.C. 470h)*

To carry out the provisions of this Act, there is hereby established the Historic Preservation Fund (hereafter referred to as the "fund") in the Treasury of the United States. There shall be covered into such fund $24,400,000 for fiscal year 1977, $100,000,000 for fiscal year 1978, $100,000,000 for fiscal year 1979, $150,000,000 for fiscal year 1980, $150,000,000 for fiscal year 1981, and $150,000,000 for each of fiscal years 1982 through 1997, from revenues due and payable to the United States under the Outer Continental Shelf Lands Act (67 Stat. 462, 469) as amended (43 U.S.C. 338) and/or under the Act of June 4, 1920 (41 Stat. 813) as amended (30 U.S.C. 191), notwithstanding any provision of law that such proceeds shall be credited to miscellaneous receipts of the Treasury. Such moneys shall be used only to carry our the purposes of this Act and shall be available for expenditure only when appropriated by the Congress. Any moneys not appropriated shall remain available in the fund until appropriated for said purposes: Provided, that appropriations made pursuant to this paragraph may be made without fiscal year limitation.

**Section 109** *(16 U.S.C. 470h-1)*

 **(a)** In furtherance of the purposes of sections of this Act, the Secretary may accept the donation of funds which may be expended by him for projects to acquire, restore, preserve, or recover data from any district, building, structure, site, or object which is listed on the National Register of Historic Places established pursuant to section 101 of this Act, so long as the project is owned by a State, any unit of local government, or any nonprofit entity.

**(b)** In expending said funds, the Secretary shall give due consideration to the following factors: the national significance of the project; its historical value to the community; the imminence of its destruction or loss; and the expressed intentions of the donor. Funds expended under this subsection shall be made available without regard to the matching requirements established by section 102 of this Act, but the recipient of such funds shall be permitted to utilize them to match any grants from the Historic Preservation Fund established by section 108 of this Act.

 **(c)** The Secretary is hereby authorized to transfer unobligated funds previously donated to the Secretary for purposes of the National Park Service, with the consent of the donor, and any funds so transferred shall be used or expended in accordance with the provisions of this Act.

BLM_0007242

Appendix 5, Page 16
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**Section 110** *(16 U.S.C. 470h-2)*

### *Agency responsibility to preserve historic properties within its jurisdiction*

(a)(1) The heads of all Federal agencies shall assume responsibility for the preservation of historic properties which are owned or controlled by such agency. Prior to acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities, each Federal agency shall use, to the maximum extent feasible, historic properties available to the agency. Each agency shall undertake, consistent with the preservation of such properties and the mission of the agency and the professional standards established pursuant to section 101(g), any preservation, as may be necessary to carry out this section.

### *Agency preservation program, establishment*

(2) Each Federal agency shall establish (unless exempted pursuant to section 214), in consultation with the Secretary, a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties. Such program shall ensure--

(A) that historic properties under the jurisdiction or control of the agency, are identified, evaluated, and nominated to the National Register;

(B) that such properties under the jurisdiction or control of the agency as are listed in or may be eligible for the National Register are managed and maintained in a way that considers the preservation of their historic, archaeological, architectural, and cultural values in compliance with section 106 and gives special consideration to the preservation of such values in the case of properties designated as having National significance;

### *Agency responsibility to consider nonagency historic properties*

(C) that the preservation of properties not under the jurisdiction or control of the agency, but subject to be potentially affected by agency actions are given full consideration in planning;

(D) that the agency's preservation-related activities are carried out in consultation with other Federal, State, and local agencies, Indian tribes, Native Hawaiian organizations carrying out historic preservation planning activities, and with the private sector; and

(E) that the agency's procedures for compliance with section 106--

(i) are consistent with regulations issued by the Council pursuant to section 211;

(ii) provide a process for the identification and evaluation of historic properties for listing in the National Register and the development and implementation of agreements, in consultation with State Historic Preservation Officers, local governments, Indian tribes, Native Hawaiian organizations, and the interested public, as appropriate, regarding the means by which adverse effects on such properties will be considered; and

(iii) provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3002(c)). (b) Each Federal agency shall initiate measures to assure that where, as a result of Federal action or assistance carried out by such agency, a historic property is to be substantially altered or demolished, timely steps are taken to make or have made appropriate records, and that such records then be deposited, in accordance with section 101(a), in the Library of Congress or with such other appropriate agency as may be designated by the Secretary, for future use and reference.

BLM_0007243

Appendix 5, Page 17

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

#### *Agency designation of Preservation Officer*

(c) The head of each Federal agency shall, unless exempted under section 214, designate a qualified official to be known as the agency's "preservation officer" who shall be responsible for coordinating that agency's activities under this Act. Each Preservation Officer may, in order to be considered qualified, satisfactorily complete an appropriate training program established by the Secretary under section 101(h).

(d) Consistent with the agency's mission and mandates, all Federal agencies shall carry out agency programs and projects (including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required) in accordance with the purposes of this Act and, give consideration to programs and projects which will further the purposes of this Act.

(e) The Secretary shall review and approve the plans of transferees of surplus federally owned historic properties not later than ninety days after his receipt of such plans to ensure that the prehistorical, historical, architectural, or culturally significant values will be preserved or enhanced.

#### *Minimizing harm to National Historic Landmarks: comment opportunity*

(f) Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

#### *Preservation costs borne by sponsors of undertakings*

(g) Each Federal agency may include the costs of preservation activities of such agency under this Act as eligible project costs in all undertakings of such agency or assisted by such agency. The eligible project costs may also include amounts paid by a Federal agency to any State to be used in carrying out such preservation responsibilities of the Federal agency under this Act, and reasonable costs may be charged to Federal licensees and permittees as a condition to the issuance of such license or permit.

(h) The Secretary shall establish an annual preservation awards program under which he may make monetary awards in amounts not to exceed $1,000 and provide citations for special achievement to officers and employees of Federal, State, and certified local governments in recognition of their outstanding contributions to the preservation of historic resources. Such program may include the issuance of annual awards by the president of the United States to any citizen of the United States recommended for such award by the Secretary.

(i) Nothing in this Act shall be construed to require the preparation of an environmental impact statement where such a statement would not otherwise be required under the National Environmental Policy Act of 1969, and nothing in this Act shall be construed to provide any exemption from any requirement respecting the preparation of such a statement under such Act.

(j) The Secretary shall promulgate regulations under which the requirements of this section may be waived in whole or in part in the event of a major natural disaster or an imminent threat to the national security.

BLM_0007244

Appendix 5, Page 18

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**(k)** Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee permit, license, or other assistance to an applicant who, with intent to avoid the requirements of section 106, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant.

**(l)** With respect to any undertaking subject to section 106 which adversely affects any property included in or eligible for inclusion in the National Register, and for which a Federal agency has not entered into an agreement with the Council, the head of such agency shall document any decision made pursuant to section 106. The head of such agency may not delegate his or her responsibilities pursuant to such section. Where a section 106 memorandum of agreement has been executed with respect to an undertaking, such memorandum shall govern the undertaking and all of its parts.

**Section 111** *(16 U.S.C. 470h-3)*

**(a)** Notwithstanding any other provision of law, any Federal agency, after consultation with the Council, shall, to the extent practicable, establish and implement alternatives for historic properties, including adaptive use, that are not needed for current or projected agency purposes, and may lease a historic property owned by the agency to any person or organization, or exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property.

**(b)** The proceeds of any lease under subsection (a) may, notwithstanding any other provision of law, be retained by the agency entering into such lease and used to defray the costs of administration, maintenance, repair, and related expenses incurred by the agency with respect to such property or other properties which are on the National Register which are owned by, or are under the jurisdiction or control of, such agency. Any surplus proceeds from such leases shall be deposited into the Treasury of the United States at the end of the second fiscal year following the fiscal year in which such proceeds were received.

**(c)** The head of any Federal agency having responsibility for the management of any historic property may, after consultation with the Advisory Council on Historic Preservation, enter into contracts for the management of such property. Any such contract shall contain such terms and conditions as the head of such agency deems necessary or appropriate to protect the interests of the United States and insure adequate preservation of historic property.

**Section 112** *(16 U.S.C. 470h-4)*

**(a) In general.** Each Federal agency that is responsible for the protection of historic resources, including archaeological resources pursuant to this Act or any other law shall ensure each of the following–

**(1)(A)** All actions taken by employees or contractors of such agency shall meet professional standards under regulations developed by the Secretary in consultation with the Council, other affected agencies, and the appropriate professional societies of the disciplines involved, specifically archaeology, architecture, conservation, history, landscape architecture, and planning.

Appendix 5, Page 19
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

### Professional standards

(B) Agency personnel or contractors responsible for historic resources shall meet qualification standards established by the Office of Personnel Management in consultation with the Secretary and appropriate professional societies of the disciplines involved. The Office of Personnel Management shall revise qualification standards within 2 years after the date of enactment of this Act for the disciplines involved, specifically archaeology, architecture, conservation, curation, history, landscape architecture, and planning. Such standards shall consider the particular skills and expertise needed for the preservation of historic resources and shall be equivalent requirements for the disciplines involved.

### Permanent records of research, surveys, and excavations

(2) Records and other data, including data produced by historical research and archaeological surveys and excavations are permanently maintained in appropriate data bases and made available to potential users pursuant to such regulations as the Secretary shall promulgate.

(b) Guidelines.  In order to promote the preservation of historic resources on properties eligible for listing in the National register, the Secretary shall, in consultation with the Council, promulgate guidelines to ensure that Federal, State, and tribal historic preservation programs subject to this Act include plans to–

(1) provide information to the owners of properties containing historic (including architectural, curatorial, and archaeological) resources with demonstrated or likely research significance, about the need for protection of such resources, and the available means of protection;

(2) encourage owners to preserve such resources intact and in place and offer the owners of such resources information on the tax and grant assistance available for the donation of the resources or of a preservation easement of the resources;

(3) encourage the protection of Native American cultural items (within the meaning of section 2(3) and (9) of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 (3) and (9)) and of properties of religious or cultural importance to Indian tribes, Native Hawaiians, or other Native American groups; and

(4) encourage owners who are undertaking archaeological excavations to--

(A) conduct excavations and analyses that meet standards for federally-sponsored excavations established by the Secretary;

(B) donate or lend artifacts of research significance to an appropriate research institution;

(C) allow access to artifacts for research purposes; and

(D) prior to excavating or disposing of a Native American cultural item in which an Indian tribe or Native Hawaiian organization may have an interest under section 3(a)(2)(B) or (C) of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3002(a)(2)(B) and (C)), given [sic] notice to and consult with such Indian tribe or Native Hawaiian organization.

## Section 113 (16 U.S.C. 470h-5)

(a) Study. In order to help control illegal interstate and international traffic in antiquities, including archaeological, curatorial, and architectural objects, and historical documents of all kinds, the Secretary shall study and report on the suitability and feasibility of alternatives for controlling illegal interstate and international traffic in antiquities.

BLM_0007246

Appendix 5, Page 20

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**(b) Consultation.** In conducting the study described in subsection (a) the Secretary shall consult with the Council and other Federal agencies that conduct, cause to be conducted, or permit archaeological surveys or excavations or that have responsibilities for other kinds of antiquities and with State Historic Preservation Officers, archaeological, architectural, historical, conservation, and curatorial organizations, Indian tribes, Native Hawaiian organizations, and other Native American organizations, international organizations and other interested persons.

**(c) Report.** Not later than 18 months after the date of enactment of this section, the Secretary shall submit to Congress a report detailing the Secretary's findings and recommendations from the study described in subsection (a).

**(d) Authorization.** There are authorized to be appropriated not more than $500,000 for the study described in subsection (a), such sums to remain available until expended.

## TITLE II

**Section 201** *(16 U.S.C. 470i)*

### *Advisory Council on Historic Preservation membership*

**(a)** There is established as an independent agency of the United States Government an Advisory Council on Historic Preservation which shall be composed of the following members:

**(1)** a Chairman appointed by the President selected from the general public;

**(2)** the Secretary of the Interior;

**(3)** the Architect of the Capitol;

**(4)** the Secretary of Agriculture and the heads of four other agencies of the United States (other than the Department of the Interior), the activities of which affect historic preservation, appointed by the President;

**(5)** one Governor appointed by the President;

**(6)** one mayor appointed by the President;

**(7)** the President of the National Conference of State Historic Preservation Officers;

**(8)** the Chairman of the National Trust for Historic Preservation;

**(9)** four experts in the field of historic preservation appointed by the President from the disciplines of architecture, history, archaeology, and other appropriate disciplines;

**(10)** three at-large members from the general public, appointed by the President; and

**(11)** one member of an Indian tribe or Native Hawaiian organization who represents the interests of the tribe or organization of which he or she is a member, appointed by the President.

**(b)** Each member of the Council specified in paragraphs (2) through (8) (other than (5) and (6)) may designate another officer of his department, agency, or organization to serve on the Council in his stead, except that, in the case of paragraphs (2) and (4), no such officer other than an Assistant Secretary or an officer having major department-wide or agency-wide responsibilities may be so designated.

**(c)** Each member of the Council appointed under paragraph (1), and under paragraphs (9) and (10) of subsection (a) shall serve for a term of four years from the expiration of his predecessor's term; except that the members first appointed under that paragraph shall serve for terms of one to four years, as designated by the President at the time of appointment, in such manner as to ensure that the terms of not more than two of them will expire in any one year. The members appointed under paragraphs (5) and (6) shall serve for the term of their

BLM_0007247

Appendix 5, Page 21

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

elected office but not in excess of four years. An appointed member whose term has expired shall serve until that member's successor has been appointed.

(d) A vacancy in the Council shall not affect its powers, but shall be filled not later than sixty days after such vacancy commences, in the same manner as the original appointment (and for the balance of any unexpired terms). The members of the Advisory Council on Historic Preservation appointed by the President under this Act as in effect on the day before the enactment of the National Historic Preservation Act Amendments of 1980 shall remain in office until all members of the Council, as specified in this section, have been appointed. The members first appointed under this section shall be appointed not later than one hundred and eighty days after the enactment of the National Historic Preservation Act Amendments of 1980.

(e) The President shall designate a Vice Chairman, from the members appointed under paragraphs (5), (6), (9), or (10). The Vice Chairman may act in place of the Chairman during the absence or disability of the Chairman or when the office is vacant.

(f) Nine members of the Council shall constitute a quorum.

**Section 202** *(16 U.S.C. 470j)*

(a) The Council shall–

(1) advise the President and the Congress on matters relating to historic preservation, recommend measures to coordinate activities of Federal, State, and local agencies and private institutions and individuals relating to historic preservation; and advise on the dissemination of information pertaining to such activities;

(2) encourage, in cooperation with the National Trust for Historic Preservation and appropriate private agencies, public interest and participation in historic preservation;

(3) recommend the conduct of studies in such areas as the adequacy of legislative and administrative statutes and regulations pertaining to historic preservation activities of State and local governments and the effects of tax policies at all levels of government on historic preservation;

(4) advise as to guidelines for the assistance of State and local governments in drafting legislation relating to historic preservation;

(5) encourage, in cooperation with appropriate public and private agencies and institutions, training and education in the field of historic preservation;

(6) review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this Act; and,

(7) inform and educate Federal agencies, State and local governments, Indian tribes, other nations and international organizations and private groups and individuals as to the Council's authorized activities.

(b) The Council shall submit annually a comprehensive report of its activities and the results of its studies to the President and the Congress and shall from time to time submit such additional and special reports as it deems advisable. Each report shall propose such legislative enactments and other actions as, in the judgment of the Council, are necessary and appropriate to carry out its recommendations and shall provide the Council's assessment of current and emerging problems in the field of historic preservation and an evaluation of the effectiveness of the programs of Federal agencies, State and local governments, and the private sector in carrying out the purposes of this Act.

BLM_0007248

Appendix 5, Page 22
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

### Section 203 *(16 U.S.C. 470k)*

The Council is authorized to secure directly from any department, bureau, agency, board, commission, office, independent establishment or instrumentality of the executive branch of the Federal Government information, suggestions, estimates, and statistics for the purpose of this title; and each such department or instrumentality is authorized to furnish such information, suggestions, estimates, and statistics to the extent permitted by law and within available funds.

### Section 204 *(16 U.S.C. 470l)*

The members of the Council specified in paragraphs (2), (3), and (4) of section 201(a) shall serve without additional compensation. The other members of the Council shall receive $100 per diem when engaged in the performances of the duties of the Council. All members of the Council shall receive reimbursement for necessary traveling and subsistence expenses incurred by them in the performance of the duties of the Council.

### Section 205 *(16 U.S.C. 470m)*

(a) There shall be an Executive Director of the Council who shall be appointed in the competitive service by the Chairman with the concurrence of the Council. The Executive Director shall report directly to the Council and perform such functions and duties as the Council may prescribe.

(b) The Council shall have a General Counsel, who shall be appointed by the Executive Director. The General Counsel shall report directly to the Executive Director and serve as the Council's legal advisor. The Executive Director shall appoint such other attorneys as may be necessary to assist the General Counsel, represent the Council in courts of law whenever appropriate, including enforcement of agreements with Federal agencies to which the Council is a party, assist the Department of Justice in handling litigation concerning the Council in courts of law, and perform such other legal duties and functions as the Executive Director and the Council may direct.

(c) The Executive Director of the Council may appoint and fix the compensation of such officers and employees in the competitive service as are necessary to perform the functions of the Council at rates not to exceed that now or hereafter prescribed for the highest rate for grade 15 of the General Schedule under section 5332 of Title 5, United States Code: Provided, however, That the Executive Director, with the concurrence of the Chairman, may appoint and fix the compensation of not to exceed five employees in the competitive service at rates not to exceed that now or hereafter prescribed for the highest rate of grade 17 of the General Schedule under section 5332 of Title 5, United States Code.

(d) The Executive Director shall have power to appoint and fix the compensation of such additional personnel as may be necessary to carry out its duties, without regard to the provisions of the civil service laws and the Classification Act of 1949.

(e) The Executive Director of the Council is authorized to procure expert and consultant services in accordance with the provisions of section 3109 of Title 5, United States Code.

(f) Financial and administrative services (including those related to budgeting, accounting, financial reporting, personnel and procurement) shall be provided the Council by the Department of the Interior, for which payments shall be made in advance, or by reimbursement, from funds of the Council in such amounts as may be agreed upon the Chairman of the Council and the Secretary of the Interior; Provided, That the regulations of the Department of the Interior for the collection of indebtedness of personnel resulting from

BLM_0007249

Appendix 5, Page 23
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

erroneous payments (5 U.S.C. 46(e)) shall apply to the collection of erroneous payments made to or on behalf of a Council employee, and regulations of said Secretary for the administrative control of funds (31 U.S.C. 665(g)) shall apply to appropriations of the Council: And provided further, That the Council shall not be required to prescribe such regulations.

 (g) The members of the Council specified in paragraphs (2) through (4) of Section 201(a) shall provide the Council, with or without reimbursement as may be agreed upon by the Chairman and the members, with such funds, personnel, facilities, and services under their jurisdiction and control as may be needed by the Council to carry out its duties, to the extent that such funds, personnel, facilities, and services are requested by the Council and are otherwise available for that purpose. To the extent of available appropriations, the Council may obtain, by purchase, rental, donation, or otherwise, such additional property, facilities, and services as may be needed to carry out its duties and may also receive donations of moneys for such purpose, and the Executive Director is authorized, in his discretion, to accept, hold, use, expend, and administer the same for the purposes of this Act.

**Section 206** *(16 U.S.C. 470n)*

 (a) The participation of the United States as a member of the International Centre for the Study of the Preservation and Restoration of Cultural Property is hereby authorized.

 (b) The Council shall recommend to the Secretary of State, after consultation with the Smithsonian Institution and other public and private organizations concerned with the technical problems of preservation, the members of the official delegation which will participate in the activities of the Centre on behalf of the United States. The Secretary of State shall appoint the members of the official delegation from the persons recommended to him by the Council.

 (c) For the purposes of this section there is authorized to be appropriated an amount equal to the assessment for United States membership in the Centre for fiscal years 1979, 1980, 1981, and 1982: Provided, that no appropriation is authorized and no payment shall be made to the Centre in excess of 25 per centum of the total annual assessment of such organization. Authorization for payment of such assessment shall begin in fiscal year 1981, but shall include earlier costs.

**Section 207** *(16 U.S.C. 470o)*

So much of the personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, held, used, programmed, or available or to be made available by the Department of the Interior in connection with the functions of the Council, as the Director of the Office of Management and Budget shall determine, shall be transferred from the Department to the Council within 60 days of the effective date of this Act.

**Section 208** *(16 U.S.C. 470p)*

Any employee in the competitive service of the United States transferred to the Council under the provisions of this section shall retain all rights, benefits, and privileges pertaining thereto held prior to such transfer.

BLM_0007250

Appendix 5, Page 24
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**Section 209** *(16 U.S.C. 470q)*

The Council is exempt from the provisions of the Federal Advisory Committee Act (86 Stat. 770), and the provisions of the Administrative Procedure Act (80 Stat. 381) shall govern the operations of the Council.

**Section 210** *(16 U.S.C. 470r)*

No officer or agency of the United States shall have any authority to require the Council to submit its legislative recommendations, or testimony, or comments on legislation to any officer or agency of the United States for approval, comments, or review, prior to the submission of such recommendations, testimony, or comments to the Congress. In instances in which the Council voluntarily seeks to obtain the comments or review of any officer or agency of the United States, the Council shall include a description of such actions in its legislative recommendations, testimony, or comments on legislation which it transmits to the Congress.

**Section 211** *(16 U.S.C. 470s)*

### *Council regulations to govern section 106*

The Council is authorized to promulgate such rules and regulations as it deems necessary to govern the implementation of section 106 of this Act in its entirety. The Council shall, by regulation, establish such procedures as may be necessary to provide for participation by local governments in proceedings and other actions taken by the Council with respect to undertakings referred to in section 106 which affect such local governments.

**Section 212** *(16 U.S.C. 470t)*

 **(a)** The Council shall submit its budget annually as a related agency of the Department of the Interior. There are authorized to be appropriated for purposes of this title not to exceed $5,000,000 for each of the fiscal years 1993 through 1996. **(b)** Whenever the Council submits any budget estimate or request to the President or the Office of Management and Budget, it shall concurrently transmit copies of that estimate or request to the House and Senate Appropriations Committees and the House Committee on Interior and Insular Affairs and the Senate committee on Energy and Natural Resources.

**Section 213** *(16 U.S.C. 470u)*

To assist the Council in discharging its responsibilities under this Act, the Secretary at the request of the Chairman, shall provide a report to the Council detailing the significance of any historic property, describing the effects of any proposed undertaking on the affected property, and recommending measures to avoid, minimize, or mitigate adverse effects.

**Section 214** *(16 U.S.C. 470v)*

The Council, with the concurrence of the Secretary, shall promulgate regulations or guidelines, as appropriate, under which Federal programs or undertakings may be exempted from any or all of the requirements of this Act when such exemption is determined to be consistent with the purposes of this Act, taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic properties.

## TITLE III

**Section 301** *(16 U.S.C. 470w)*

BLM_0007251

Appendix 5, Page 25
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

*Definitions*

As used in this Act, the term–

 **(1) "Agency"** means agency as such term is defined in section 551 of Title 5, United States Code.

 **(2) "State"** means any State of the United States, the District of Columbia, the commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and, upon termination of the Trusteeship Agreement for the Trust Territory of the Pacific Islands, the Republic of Palau.

 **(3) "Local government"** means a city, county, parish, township, municipality, or borough, or any other general purpose political subdivision of any State.

 **(4) "Indian tribe"** or **"tribe"** means an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation or Village Corporation, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602) , which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

 **(5) "Historic property"** or **"historic resource"** means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion on the National Register, including artifacts, records, and material remains related to such a property or resource.

 **(6) "National Register"** or **"Register"** means the National Register of Historic Places established under section 101.

 **(7) "Undertaking"** means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including–

    **(A)** those carried out by or on behalf of the agency;

    **(B)** those carried out with Federal financial assistance;

    **(C)** those requiring a Federal permit, license, or approval; and

    **(D)** those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

 **(8) "Preservation"** or **"historic preservation"** includes identification, evaluation, recordation, documentation, curation, acquisition, protection, management, rehabilitation, restoration, stabilization, maintenance, research, interpretation, conservation, and education and training regarding the foregoing activities or any combination of the foregoing activities.

 **(9) "Cultural park"** means a definable area which is distinguished by historic resources and land related to such resources and which constitutes an interpretive, educational, and recreational resource for the public at large.

 **(10) "Historic conservation district"** means an area which contains–

    **(A)** historic properties,

    **(B)** buildings having similar or related architectural characteristics,

    **(C)** cultural cohesiveness, or

    **(D)** any combination of the foregoing.

 **(11) "Secretary"** means the Secretary of the Interior acting through the Director of the National Park Service except where otherwise specified.

 **(12) "State Historic Preservation Review Board"** means a board, council, commission, or other similar collegial body established as provided in section 101(b)(1)(B)–

BLM_0007252

Appendix 5, Page 26
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**(A)** the members of which are appointed by the State Historic Preservation Officer (unless otherwise provided for by State law)

**(B)** a majority of the members of which are professionals qualified in the following and related disciplines: history, prehistoric and historic archeology, architectural history, architecture, folklore, cultural anthropology, curation, conservation, and landscape architecture; and

**(C)** which has the authority to–

    **(i)** review National Register nominations and appeals from nominations;

    **(ii)** review appropriate documentation submitted in conjunction with the Historic Preservation Fund;

    **(iii)** provide general advice and guidance to the State Historic Preservation Officer, and

    **(iv)** perform such other duties as may be appropriate.

**(13) "Historic preservation review commission"** means a board, council, commission, or other similar collegial body which is established by State or local legislation as provided in section 101(c)(1)(B), and the members of which are appointed, unless otherwise provided by State or local legislation, by the chief elected official of the jurisdiction concerned from among–

**(A)** professionals in the disciplines of architecture, history, architectural history, planning, prehistoric and historic archaeology, folklore, cultural anthropology, curation, conservation, and landscape architecture or related disciplines, to the extent such professionals are available in the community concerned, and

**(B)** such other persons as have demonstrated special interest, experience, or knowledge in history, architecture, or related disciplines and as will provide for an adequate and qualified commission.

**(14) "Tribal lands"** means–

**(A)** all lands within the exterior boundaries of any Indian reservation; and

**(B)** all dependent Indian communities.

**(15) "Certified local government"** means a local government whose local historic preservation program has been certified pursuant to section 101(c).

**(16) "Council"** means the Advisory Council on Historic Preservation established by section 201.

**(17) "Native Hawaiian"** means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

**(18) "Native Hawaiian organization"** means any organization which–

**(A)** serves and represents the interests of Native Hawaiians;

**(B)** has as a primary and stated purpose the provision of services to Native Hawaiians; and

**(C)** has demonstrated expertise in aspects of historic preservation that are culturally significant to Native Hawaiians.

The term includes, but is not limited to, the Office of Hawaiian Affairs of the State of Hawaii and Hui Malama I Na Kapuna O Hawai'i Nei, an organization incorporated under the laws of the State of Hawaii.

### Section 302 *(16 U.S.C. 470w-1)*

Where appropriate, each Federal agency is authorized to expend funds appropriated for its authorized programs for the purposes of activities carried out pursuant to this Act, except to the extent appropriations legislation expressly provides otherwise.

BLM_0007253

Appendix 5, Page 27

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**Section 303** *(16 U.S.C. 470w-2)*

(a) The Secretary is authorized to accept donations and bequests of money and personal property for the purposes of this Act and shall hold, use, expend, and administer the same for such purposes.

(b) The Secretary is authorized to accept gifts or donations of less than fee interests in any historic property where the acceptance of such interests will facilitate the conservation or preservation of such properties. Nothing in this section or in any provision of this Act shall be construed to affect or impair any other authority of the Secretary under other provision of law to accept or acquire any property for conservation or preservation or for any other purpose.

**Section 304** *(16 U.S.C. 470w-3)*

### Freedom of Information Act exemption

(a) **Authority to withhold from disclosure.** The head of a Federal agency or other public official receiving grant assistance pursuant to this Act, after consultation with the Secretary, shall withhold from disclosure to the public, information about the location, character, or ownership of a historic resource if the Secretary and the agency determine that disclosure may–

   (1) cause a significant invasion of privacy;

   (2) risk harm to the historic resource; or

   (3) impede the use of a traditional religious site by practitioners.

(b) **Access determination.** When the head of a Federal agency or other public official has determined that information should be withheld from the public pursuant to subsection (a), the Secretary, in consultation with such Federal agency head or official, shall determine who may have access to the information for the purpose of carrying out this Act.

(c) **Consultation with Council.** When the information in question has been developed in the course of an agency's compliance with Section 106 or 110(f), the Secretary shall consult with the Council in reaching determinations under subsections (a) and (b).

**Section 305** *(16 U.S.C. 470w-4)*

In any civil action brought in any United States district court by any interested person to enforce the provisions of this Act, if such person substantially prevails in such action, the court may award attorneys' fees, expert witness fees, and other costs of participating in such action, as the court deems reasonable.

**Section 306** *(16 U.S.C. 470w-5)*

(a) In order to provide a national center to commemorate and encourage the building arts and to preserve and maintain a nationally significant building which exemplifies the great achievements of the building arts in the United States, the Secretary and the Administrator of the General Services Administration are authorized and directed to enter into a cooperative agreement with the Committee for a National Museum of the Building Arts, Incorporated, a nonprofit corporation organized and existing under the laws of the District of Columbia, or its successor, for the operation of a National Museum for the Building Arts in the Federal Building located in the block bounded by Fourth Street, Fifth Street, F Street, and G Street, Northwest in Washington, District of Columbia. Such museum shall--

   (1) collect and disseminate information concerning the building arts, including the establishment of a national reference center for current and historic documents, publications, and research relating to the building arts;

BLM_0007254

Appendix 5, Page 28
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

(2) foster educational programs relating to the history, practice and contribution to society of the building arts, including promotion of imaginative educational approaches to enhance understanding and appreciation of all facets of the building arts;

(3) publicly display temporary and permanent exhibits illustrating, interpreting and demonstrating the building arts;

(4) sponsor or conduct research and study into the history of the building arts and their role in shaping our civilization; and

(5) encourage contributions to the building arts.

(b) The cooperative agreement referred to in subsection (a) shall include provisions which–

(1) make the site available to the Committee referred to in subsection (a) without charge;

(2) provide, subject to available appropriations, such maintenance, security, information, janitorial and other services as may be necessary to assure the preservation and operation of the site; and

(3) prescribe reasonable terms and conditions by which the Committee can fulfill its responsibilities under this Act.

(c) The Secretary is authorized and directed to provide matching grants-in-aid to the Committee referred to in subsection (a) for its programs related to historic preservation. The Committee shall match such grants-in-aid in a manner and with such funds and services as shall be satisfactory to the Secretary, except that no more than $500,000 may be provided to the Committee in any one fiscal year.

(d) The renovation of the site shall be carried out by the Administrator with the advice of the Secretary. Such renovation shall, as far as practicable–

(1) be commenced immediately,

(2) preserve, enhance, and restore the distinctive and historically authentic architectural character of the site consistent with the needs of a national museum of the building arts and other compatible use, and

(3) retain the availability of the central court of the building, or portions thereof, for appropriate public activities.

(e) The Committee shall submit an annual report to the Secretary and the Administrator concerning its activities under this section and shall provide the Secretary and the Administrator with such other information as the Secretary may, from time to time, deem necessary or advisable.

(f) For purposes of this section, the term " building arts" includes, but shall not be limited to, all practical and scholarly aspects of prehistoric, historic, and contemporary architecture, archeology, construction, building technology and skills, landscape architecture, preservation and conservation, building and construction, engineering, urban and community design and renewal, city and regional planning, and related professions, skills, trades and crafts.

### Section 307 *(16 U.S.C. 470w-6)*

(a) At least thirty days prior to publishing in the Federal Register any proposed regulation required by this Act, the Secretary shall transmit a copy of the regulation to the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the Senate. The Secretary also shall transmit to such committees a copy of any final regulation prior to its publication in the Federal Register. Except as provided in subsection (b) of this section, no final regulation of the Secretary shall become effective prior to the expiration of thirty calendar days after it is published in the Federal Register during which either or both Houses of Congress are in session.

Appendix 5, Page 29
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

**(b)** In the case of an emergency, a final regulation of the Secretary may become effective without regard to the last sentence of subsection **(a)** if the Secretary notified in writing the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate setting forth the reasons why it is necessary to make the regulation effective prior to the expiration of the thirty-day period.

 **(c)** Except as provided in subsection **(b)**, the regulation shall not become effective if, within ninety calendar days of continuous session of Congress after the date of promulgation, both Houses of Congress adopt a concurrent resolution, the matter after the resolving clause of which is as follows: "That Congress disapproves the regulation promulgated by the Secretary dealing with the matter of_____, which regulation was transmitted to Congress on_____," the blank spaces therein being appropriately filled.

 **(d)** If at the end of sixty calendar days of continuous session of Congress after the date of promulgation of a regulation, no committee of either House of Congress has reported or been discharged from further consideration of a concurrent resolution disapproving the regulation, and neither House has adopted such a resolution, the regulation may go into effect immediately. If, within such sixty calendar days, such a committee has reported or been discharged from further consideration of such a resolution, the regulation may go into effect not sooner than ninety calendar days of continuous session of Congress after its promulgation unless disapproved as provided for.

 **(e)** For the purposes of this section–
    **(1)** continuity of session is broken only by an adjournment sine die; and
    **(2)** the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of sixty and ninety calendar days of continuous session of Congress.

 **(f)** Congressional inaction on or rejection of a resolution of disapproval shall not be deemed an expression of approval of such regulation.

**TITLE IV**

**Section 401**

The Congress finds and declares that, given the complexity of technical problems encountered in preserving historic properties and the lack of adequate distribution of technical information to preserve such properties, a national initiative to coordinate and promote research, distribute information, and provide training about preservation skills and technologies would be beneficial.

**Section 402**

For the purposes of this title–
 **(1)** The term "Board" means the National Preservation Technology and Training Board established pursuant to section 404.
 **(2)** The term "Center" means the National Center for Preservation Technology and Training established pursuant to section 403.
 **(3)** The term "Secretary" means the Secretary of the Interior.

## Section 403

 **(a) Establishment.** There is hereby established within the Department of the Interior a National Center for Preservation Technology and Training. The Center shall be located at Northwestern State University of Louisiana in Nachitoches, Louisiana.

BLM_0007256

Appendix 5, Page 30
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**(b) Purposes.** The purposes of the Center shall be to–

    **(1)** develop and distribute preservation and conservation skills and technologies for the identification, evaluation, conservation, and interpretation of prehistoric and historic resources;

    **(2)** develop and facilitate training for Federal, State and local resource preservation professionals, cultural resource managers, maintenance personnel, and others working in the preservation field;

    **(3)** take steps to apply preservation technology benefits from ongoing research by other agencies and institutions;

    **(4)** facilitate the transfer of preservation technology among Federal agencies, State and local governments, universities, international organizations, and the private sector; and

    **(5)** cooperate with related international organizations including, but not limited to the International Council on Monuments and Sites, the International center for the Study of Preservation and Restoration of Cultural Property, and the International Council on Museums.

**(c) Programs.** Such purposes shall be carried out through research, professional training, technical assistance, and programs for public awareness, and through a program of grants established under section 405.

**(d) Executive Director.** The Center shall be headed by an Executive Director with demonstrated expertise in historic preservation appointed by the Secretary with advice of the Board.

**(e) Assistance from Secretary.** The Secretary shall provide the Center assistance in obtaining such personnel, equipment, and facilities as may be needed by the Center to carry out its activities.

### Section 404

**(a) Establishment.** There is established a Preservation Technology and Training Board.

**(b) Duties.** The Board shall–

    **(1)** provide leadership, policy advice, and professional oversight to the Center;

    **(2)** advise the Secretary on priorities and the allocation of grants among the activities of the Center; and

    **(3)** submit an annual report to the President and the Congress.

**(c) Membership.** The Board shall be comprised of–

    **(1)** The Secretary, or the Secretary's designee;

    **(2)** 6 members appointed by the Secretary who shall represent appropriate Federal, State, and local agencies, State and local historic preservation commissions, and other public and international organizations, and

    **(3)** 6 members appointed by the Secretary on the basis of outstanding professional qualifications who represent major organizations in the fields of archeology, architecture, conservation, curation, engineering, history, historic preservation, landscape architecture, planning, or preservation education.

### Section 405

**(a) In general.** The Secretary, in consultation with the Board, shall provide preservation technology and training grants to eligible applicants with a demonstrated institutional capability and commitment to the purposes of the Center, in order to ensure an effective and efficient system of research, information distribution and skills training in all the related historic preservation fields.

BLM_0007257

Appendix 5, Page 31
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## National Historic Preservation Act

**(b) Grant requirements.**

**(1)** Grants provided under this section shall be allocated in such a fashion to reflect the diversity of the historic preservation fields and shall be geographically distributed.

**(2)** No grant recipient may receive more than 10 percent of the grants allocated under this section within any year. **(3)** The total administrative costs, direct and indirect, charged for carrying out grants under this section may not exceed 25 percent of the aggregate costs.

**(c) Eligible applicants.** Eligible applicants may include Federal and non☐Federal laboratories,

accredited museums, universities, non☐profit organizations; offices, units, and Cooperative Park Study Units of the National Park System, State Historic Preservation Offices, tribal preservation offices, and Native Hawaiian organizations.

**(d) Standards.** All such grants shall be awarded in accordance with accepted professional standards and methods, including peer review of projects.

**(e) Authorization of appropriations.** There is authorized to be appropriated to carry out this section such sums as may be necessary.

## Section 406

**(a) Acceptance of grants and transfers.** The Center may accept–

**(1)** grants and donations from private individuals, groups, organizations, corporations, foundations, and other entities; and

**(2)** transfers of funds from other Federal agencies.

**(b)** Contracts and cooperative agreements. Subject to appropriations, the Center may enter into contracts and cooperative agreements with Federal, State, local, and tribal governments, Native Hawaiian organizations, educational institutions, and other public entities to carry out the Center's responsibilities under this title.

**(c) Authorization of appropriations.** There are authorized to be appropriated such sums as may be necessary for the establishment, operation, and maintenance of the Center. Funds for the Center shall be in addition to existing National Park Service programs, centers, and offices.

## Section 407

In order to improve the use of existing National Park Service resources, the Secretary shall fully utilize and further develop the National Park Service preservation (including conservation) centers and regional offices. The Secretary shall improve the coordination of such centers and offices within the National Park Service, and shall, where appropriate, coordinate their activities with the Center and with other appropriate parties.

## APPENDIX I

National Historic Preservation Act Amendments of 1980, Public Law 96☐515, December 12,1980, 94 Stat. 3000

This appendix contains related legislative provisions enacted in the National Historic Preservation Act Amendments of 1980 but that are not part of the National Historic Preservation Act.

**Section 208** *(16 U.S.C. 469c  2)*

Notwithstanding section 7(a) of the Act of June 27, 1960 (16 U.S.C. 469c) or any other provision of law to the contrary–

**(1)** identification, surveys, and evaluation carried out with respect to historic properties within project areas may be treated for purposes of any law or rule of law as planning costs of the project and not as costs of mitigation;

BLM_0007258

Appendix 5, Page 32
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

(2) reasonable costs for identification, surveys, evaluation, and data recovery carried out with respect to historic properties within project areas may be charged to Federal licensees and permittees as a condition to the issuance of such license or permit; and

(3) Federal agencies, with the concurrence of the Secretary and after notification of the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate, are authorized to waive, in appropriate cases, the 1 per centum limitation contained in section 7(a) of such Act.

## Section 401 *(16 U.S.C. 470a  1)*

(a) The Secretary of the Interior shall direct and coordinate United States participation in the Convention Concerning the Protection of the World Cultural and Natural Heritage, approved by the Senate on October 26, 1973, in cooperation with the Secretary of State, the Smithsonian Institution, and the Advisory Council on Historic Preservation. Whenever possible, expenditures incurred in carrying out activities in cooperation with other nations and international organizations shall be paid for in such excess currency of the country or area where the expense is incurred as may be available to the United States.

(b) The Secretary of the Interior shall periodically nominate properties he determines are of international significance to the World Heritage Committee on behalf of the United States. No property may be so nominated unless it has previously been determined to be of national significance. Each such nomination shall include evidence of such legal protections as may be necessary to ensure preservation of the property and its environment (including restrictive covenants, easements, or other forms of protection). Before making any such nomination, the Secretary shall notify the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate.

(c) No non☐Federal property may be nominated by the Secretary of the Interior to the World Heritage Committee for inclusion on the World Heritage List unless the owner of the property concurs in writing to such nomination.

## Section 402 *(16 U.S.C. 470a  2)*

Prior to the approval of any Federal undertaking outside the United States which may directly and adversely affect a property which is on the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over such undertaking shall take into account the effect of the undertaking on such property for purposes of avoiding or mitigating any adverse effects.

## Section 502 *(16 U.S.C. 470a note)*

The Secretary, in cooperation with the American Folklife Center of the Library of Congress shall, within two years after the date of the enactment of this act, submit a report to the President and the Congress on preserving and conserving the intangible elements of our cultural her itage such as arts, skills, folklife, and folkways. The report shall take into account the view of other public and private organizations, as appropriate. This report shall include recommendations for legislative and administrative actions by the Federal Government in order to preserve, conserve, and encourage the continuation of the diverse traditional prehistoric, historic, ethnic, and folk cultural traditions that underlie and are a living expression of our American heritage.

BLM_0007259

Appendix 5, Page 33
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**Section 503** *(16 U.S.C. 470j note)*

#### Council's report to the President and Congress: tax laws

The Advisory Council on Historic Preservation, in cooperation with the Secretary and the Secretary of the Treasury, shall submit a report to the President and the Congress on Federal tax laws relating to historic preservation or affecting in any manner historic preservation. Such report shall include recommendations respecting amendments to such laws which would further the purposes of this Act. Such report shall be submitted within one year after the date of enactment of this Act.

**Section 504** *(16 U.S.C. 470h note)*

The Secretary shall submit a report directly to the President and the Congress on or before June 1, 1986, reviewing the operation of the Historic Preservation Fund and the national historic preservation program since the enactment of this Act and recommending appropriate funding levels, the time period for the reauthorization for appropriations from the fund, and other appropriate legislative action to be undertaken upon the expiration of the current fund authorization.

**Section 505** *(40 U.S.C. 874 note)*

The Pennsylvania Avenue Development Corporation shall review the development plan for those parts of the development area which are not under development or committed for development as of the date of the enactment of this Act, to identify means by which the historic values of such parts of the development area may be preserved and enhanced to the maximum extent feasible. The foregoing review shall not be limited by the applicable provisions of the development plan in effect at the time of the review; nor shall the review require any actions by the Corporation during the course of the review or during its consideration by the Congress. Within one year of the date of this act the Corporation shall submit to the appropriate committees of Congress a report containing the findings of the review required under this section, together with the Corporation's recommendations for any legislative measures or funding necessary to carry out the purposes of this section. The report shall also include a description of those activities which the Corporation proposes to undertake to carry out the purposes of this section and the financial implications of carrying out those activities.

**Section 506** *(16 U.S.C. 470a note)*

The Secretary shall undertake a comprehensive study and formulate recommendations for a coordinated system of cultural parks and historic conservation districts that provide for the preservation, interpretation, development, and use by public and private entities of the prehistoric, historic, architectural, cultural, and recreational resources found in definable urban areas throughout the Nation. The study shall propose alternatives concerning the management and funding of such system by public and private entities and by various levels of government. The Secretary shall submit a report of his study and recommendations to the President and the Congress within two years after the enactment of this Act.

**Section 507** *(16 U.S.C. 470a note)*

The Secretary, in cooperation with the Secretary of the Treasury, the Administrator of the United States Fire Administration, and the Administrator of the Federal Insurance Administration, shall submit a report to the President and the Congress on fire in historic properties. Such report shall include a review of Federal laws to determine any relationship between these laws and arson or fire by "suspicious origin", and to make recommendations

BLM_0007260

Appendix 5, Page 34

(.03E)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**National Historic Preservation Act**

respecting amendments to such laws should a correlation be found to exist. Such report shall include the feasibility and necessity of establishing or developing protective measures at the Federal, State, or local level for the prevention, detection, and control of arson or fire by "suspicious origin" in historic properties. Such report shall also include recommendations regarding the Federal role in assisting the States and local governments with protecting historic properties from damage by fire. Such report shall be submitted within eighteen months after the date of enactment of this Act.

**APPENDIX II**

National Historic Preservation Act Amendments of 1992, Public Law 102□575, October 30, 1992, 106 Stat. 4753

This appendix contains related legislative provisions enacted in the National Historic Preservation Act Amendments of 1992 but that are not part of the National Historic Preservation Act.

**Section 4021** *(16 U.S.C. 470a note)*

The Secretary of the Interior, in consultation with the Advisory Council, shall seek to ensure that historic properties preserved under the National Historic Preservation Act fully reflect the historical experience of this nation.

**Section 4023** *(16 U.S.C. 470a note)*

Section 6 of the Act entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes" (16 U.S.C. 461□467) is amended to read as follows:

"**Sec. 6.** Requirement for specific authorization for projects under the Historic Sites, Buildings, and Antiquities Act.

"**(a) In general.** Except as provided in subsection (b), notwithstanding any other provision of law, no funds appropriated or otherwise made available to the Secretary of the Interior to carry out section 2(e) or 2(f) may be obligated or expended after the date of enactment of this section–

"**(1)** unless the appropriation of such funds has been specifically authorized by law enacted on or after the date of enactment of this section; or

"**(2)** in excess of the amount prescribed by law enacted on or after such date.

"**(b) Savings provision.** Nothing in this section shall prohibit or limit the expenditure of or obligation of any funds appropriated prior to January 1, 1993.

"**(c) Authorization of appropriations.** Except as provided by subsection (a), there is authorized to be appropriated for carrying out the purposes of this Act such sums as the Congress may from time to time determine."

**Section 4025** *(16 U.S.C. 470a note)*

(a) **Report.** Not later than one year after the date of enactment of this Act, the Secretary of the Interior shall prepare and submit to the Congress a report on the manner in which pr operties are listed or determined to be eligible for listing on the National Register, including but not limited to, the appropriateness of the criteria used in determining such eligibility, and the effect, if any, of such listing or finding of eligibility.

(b) **Preparation.** In preparing the report, the Secretary shall consult with, and consider the views and comments of other Federal agencies, as well as interested individuals and public and private organizations, and shall include representative comments received as an appendix to the report.

BLM_0007261

Appendix 5, Page 35
(.03E)
8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

### National Historic Preservation Act

**ENDNOTES**

[1]The wording of the "National Historic Preservation Act Amendments of 1992" is as passed in Title XL of HR429.

HR429 also contains an amendment to An Act to Establish the Martin Luther King, Jr. National Historic Site in the State of Georgia, Public Law 96□428; 94 Stat. 1839, which has not been reprinted.

BLM_0007262

Appendix 6, Page 1

(.03G)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Executive Order 11593

# Title 3–The President

## EXECUTIVE ORDER 11593

### Protection and Enhancement of the Cultural Environment

By virtue of the authority vested in me as President of the United States and in furtherance of the purposes and policies of the National Environmental Policy Act of 1969 (83 Stat. 852, 42 U.S.C. 4321 et seq.), the National Historic Preservation Act of 1966 (80 Stat. 915, 16 U.S.C. 470 et seq.), the Historic Sites Act of 1935 (49 Stat. 666, 16 U.S.C. 461 et seq.), and the Antiquities Act of 1906 (34 Stat. 225, 16 U.S.C. 431 et seq.), it is ordered as follows:

SECTION 1. *Policy.* The Federal Government shall provide leadership in preserving, restoring and maintaining the historic and cultural environment of the Nation. Agencies of the executive branch of the Government (hereinafter referred to as "Federal agencies") shall (1) administer the cultural properties under their control in a spirit of stewardship and trusteeship for future generations, (2) initiate measures necessary to direct their policies, plans and programs in such a way that federally owned sites, structures, and objects of historical, architectural or archaeological significance are preserved, restored and maintained for the inspiration and benefit of the people, and (3), in consultation with the Advisory Council on Historic Preservation (16 U.S.C. 470i), institute procedures to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned sites, structures and objects of historical, architectural or archaeological significance.

SEC. 2. *Responsibilities of Federal agencies.* Consonant with the provisions of the acts cited in the first paragraph of this order, the heads of Federal agencies shall:

(a) no later than July 1, 1973, with the advice of the Secretary of the Interior, and in cooperation with the liaison officer for historic preservation for the State or territory involved, locate, inventory, and nominate to the Secretary of the Interior all sites, buildings, districts, and objects under their jurisdiction or control that appear to qualify for listing on the National Register of Historic Places.

(b) exercise caution during the interim period until inventories and evaluations required by subsection (a) are completed to assure that any federally owned property that might qualify for nomination is not inadvertently transferred, sold, demolished or substantially altered. The agency head shall refer any questionable actions to the Secretary of the Interior for an opinion respecting the property's eligibility for inclusion on the National Register of Historic Places. The Secretary shall consult with the liaison officer for historic preservation for the State or territory involved in arriving at his opinion. Where, after a reasonable period in which to review and evaluate the

BLM_0007263

Appendix 6, Page 2
(.03G)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Executive Order 11593**

property, the Secretary determines that the property is likely to meet the criteria prescribed for listing on the National Register of Historic Places, the Federal agency head shall reconsider the proposal in light of national environmental and preservation policy. Where, after such reconsideration, the Federal agency head proposes to transfer, sell, demolish or substantially alter the property he shall not act with respect to the property until the Advisory Council on Historic Preservation shall have been provided an opportunity to comment on the proposal.

(c) initiate measures to assure that where as a result of Federal action or assistance a property listed on the National Register of Historic Places is to be substantially altered or demolished, timely steps be taken to make or have made records, including measured drawings, photographs and maps, of the property, and that copy of such records then be deposited in the Library of Congress as part of the Historic American Buildings Survey or Historic American Engineering Record for future use and reference. Agencies may call on the Department of the Interior for advice and technical assistance in the completion of the above records.

(d) initiate measures and procedures to provide for the maintenance, through preservation, rehabilitation, or restoration, of federally owned and registered sites at professional standards prescribed by the Secretary of the Interior.

(e) submit procedures required pursuant to subsection (d) to the Secretary of the Interior and to the Advisory Council on Historic Preservation no later than January 1, 1972, and annually thereafter, for review and comment.

(f) cooperate with purchasers and transferees of a property listed on the National Register of Historic Places in the development of viable plans to use such property in a manner compatible with preservation objectives and which does not result in an unreasonable economic burden to public or private interests.

SEC. 3. *Responsibilities of the Secretary of the Interior.* The Secretary of the Interior shall:

(a) encourage State and local historic preservation officials to evaluate and survey federally owned historic properties and, where appropriate, to nominate such properties for listing on the National Register of Historic Places.

(b) develop criteria and procedures to be applied by Federal agencies in the reviews and nominations required by section 2(a). Such criteria and procedures shall be developed in consultation with the affected agencies.

(c) expedite action upon nominations to the National Register of Historic Places concerning federally owned properties proposed for sale, transfer, demolition or substantial alteration.

BLM_0007264

Appendix 6, Page 3
(.03G)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Executive Order 11593**

(d) encourage State and Territorial liaison officers for historic pres-
ervation to furnish information upon request to Federal agencies regarding
their properties which have been evaluated with respect to historic,
architectural or archaeological significance and which as a result of such
evaluations have not been found suitable for listing on the National Register of
Historic Places.

(e) develop and make available to Federal agencies and State and local
governments information concerning professional methods and techniques for
preserving, improving, restoring and maintaining historic properties.

(f) advise Federal agencies in the evaluation, identification, preservation,
improvement, restoration and maintenance of historic properties.

(g) review and evaluate the plans of transferees of surplus Federal
properties transferred for historic monument purposes to assure that the
historic character of such properties is preserved in rehabilitation, restoration,
improvement, maintenance and repair of such properties.

(h) review and comment upon Federal agency procedures submitted
pursuant to section 2(e) of this order.

/s/ Richard Nixon

THE WHITE HOUSE,
    *May 13, 1971.*

BLM_0007265

Appendix 7, Page 1
(.03I)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**American Indian Religious Freedom Act**

**PUBLIC LAW 95-341–AUG. 11, 1978**                                   **92 STAT. 469**

Public Law 95-341
95th Congress

## Joint Resolution

Aug. 11, 1978

American Indian Religious Freedom                    [S.J. Res. 102]

Whereas the freedom of religion for all people is an inherent right, fundamental to the democratic structure of the United States and is guaranteed by the First Amendment of the United States Constitution;

Whereas the United States has traditionally rejected the concept of a government denying individuals the right to practice their religion and, as a result, has benefited from a rich variety of religious heritages in this country;

Whereas the religious practices of the American Indian (as well as Native Alaskan and Hawaiian) are an integral part of their culture, tradition and heritage, such practices forming the basis of Indian identity and value systems:

Whereas the traditional American Indian religions, as an integral part of Indian life, are indispensable and irreplaceable;

Whereas the lack of a clear, comprehensive. and consistent Federal policy has often resulted in the abridgment of religious freedom for traditional American Indians;

Whereas such religious infringements result from the lack of knowledge or the insensitive and inflexible enforcement, of Federal policies and regulations premised on a variety of laws;

Whereas such laws were designed for such worthwhile purposes as conservation and preservation of natural species and resources but were never intended to relate to Indian religious practices and, therefore, were passed without consideration of their effect on traditional American Indian religions;

Whereas such laws and policies often deny American Indians access to sacred sites required in their religions, including cemeteries;

Whereas such laws at times prohibit the use and possession of sacred objects necessary to the exercise of religious rites and ceremonies;

Whereas traditional American Indian ceremonies have been intruded upon, interfered with, and in a few instances banned: Now, therefore, be it *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That henceforth it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

BLM_0007266

Appendix 7, Page 2
(.03I)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**American Indian Religious Freedom Act**

SEC. 2. The President shall direct the various Federal departments, agencies, and other instrumentalities responsible for administering relevant laws to evaluate their policies and procedures in consultation with native traditional religious leaders in order to determine appropriate changes necessary to protect and preserve Native American religious cultural rights and practices. Twelve months after approval report of this resolution, the President shall report back to the Congress the results of his evaluation, including any changes which were made in administrative policies and procedures, and any recommendations he may have for legislative action.

Approved August 11, 1978.

LEGISLATIVE HISTORY:
HOUSE REPORT No. 95-1308 accompanying H.J. Res. 738 (Comm. on Interior and
    Insular Affairs).
SENATE REPORT No. 95-709 (Comm. on Indian Affairs).
CONGRESSIONAL RECORD, Vol. 124 (1978):
    Apr. 3, considered and passed Senate.
    July 18, H.J. Res. 738 considered and passed House; proceedings vacated and
        S.J. Res. 102, amended, passed in lieu.
    July 27, Senate concurred in House amendment.

BLM_0007267

Appendix 7, Page 3

(.03I)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**American Indian Religious Freedom Act**

PUBLIC LAW 103-344–Oct 6, 1994                                    108 Stat. 3124
103rd Congress

## American Indian Religious Freedom Act Amendments of 1994

*An Act*

To amend the American Indian Religious Freedom Act to provide for the traditional
use of peyote by Indians for religious purposes, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "American Indian Religious Freedom Act
Amendments of 1994".

SEC. 2. TRADITIONAL INDIAN RELIGIOUS USE OF THE PEYOTE SACRAMENT.

The Act of August 11, 1978 (42 U.S.C. 1996), commonly referred to as the
"American Indian Religious Freedom Act", is amended by adding at the end
thereof the following new section:

SEC. 3. (a) The Congress finds and declares that

(1) for many Indian people, the traditional ceremonial use of the peyote
cactus as a religious sacrament has for centuries been integral to a way of life,
and significant in perpetuating Indian tribes and cultures;

(2) since 1965, this ceremonial use of peyote by Indians has been protected
by Federal regulation;

(3) while at least 28 States have enacted laws which are similar to, or are in
conformance with, the Federal regulation which protects the ceremonial use of
peyote by Indian religious practitioners, 22 States have not done so, and this
lack of uniformity has created hardship for Indian people who participate in
such religious ceremonies;

(4) the Supreme Court of the United States, in the case of Employment
Division v. Smith, 494 U.S. 872 (1990), held that the First Amendment does
not protect Indian practitioners who use peyote in Indian religious ceremonies,
and also raised uncertainty whether this religious practice would be protected
under the compelling State interest standard; and

(5) the lack of adequate and clear legal protection for the religious use of
peyote by Indians may serve to stigmatize and marginalize Indian tribes and
cultures, and increase the risk that they will be exposed to discriminatory
treatment.

BLM_0007268

Appendix 7, Page 4

(.03I)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## American Indian Religious Freedom Act

(b)(1) Notwithstanding any other provision of law, the use, possession, or transportation of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State. No Indian shall be penalized or discriminated against on the basis of such use, possession or transportation, including, but not limited to, denial of otherwise applicable benefits under public assistance programs.

(2) This section does not prohibit such reasonable regulation and registration by the Drug Enforcement Administration of those persons who cultivate, harvest, or distribute peyote as may be consistent with the purposes of this Act.

(3) This section does not prohibit application of the provisions of section 481.111(a) of Vernon's Texas Health and Safety Code Annotated, in effect on the date of enactment of this section, insofar as those provisions pertain to the cultivation, harvest, and distribution of peyote.

(4) Nothing in this section shall prohibit any Federal department or agency, in carrying out its statutory responsibilities and functions, from promulgating regulations establishing reasonable limitations on the use or ingestion of peyote prior to or during the performance of duties by sworn law enforcement officers or personnel directly involved in public transportation or any other safety-sensitive positions where the performance of such duties may be adversely affected by such use or ingestion. Such regulations shall be adopted only after consultation with representatives of traditional Indian religions for which the sacramental use of peyote is integral to their practice. Any regulation promulgated pursuant to this section shall be subject to the balancing test set forth in section 3 of the Religious Freedom Restoration Act (Public Law 103-141; 42 U.S.C. 2000bb1).

(5) This section shall not be construed as requiring prison authorities to permit, nor shall it be construed to prohibit prison authorities from permitting, access to peyote by Indians while incarcerated within Federal or State prison facilities.

(6) Subject to the provisions of the Religious Freedom Restoration Act (Public Law 103-141; 42 U.S.C. 2000bb1), this section shall not be construed to prohibit States from enacting or enforcing reasonable traffic safety laws or regulations.

(7) Subject to the provisions of the Religious Freedom Restoration Act (Public Law 103-141; 42 U.S.C. 2000bb1), this section does not prohibit the Secretary of Defense from promulgating regulations establishing reasonable limitations on the use, possession, transportation, or distribution of peyote to promote military readiness, safety, or compliance with international law or laws of other countries. Such regulations shall be adopted only after consultation with representatives of traditional Indian religions for which the sacramental use of peyote is integral to their practice.

BLM_0007269

Appendix 7, Page 5
(.031)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**American Indian Religious Freedom Act**

(c) For purposes of this section—

(1) the term "Indian" means a member of an Indian tribe;

(2) the term "Indian tribe" means any tribe, band, nation, pueblo, or other organized group or community of Indians, including any Alaska Native village (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians;

(3) the term "Indian religion" means any religion --

(A) which is practiced by Indians, and

(B) the origin and interpretation of which is from within a traditional Indian culture or community; and

(4) the term "State" means any State of the United States, and any political subdivision thereof.

(d) Nothing in this section shall be construed as abrogating, diminishing, or otherwise affecting—

(1) the inherent rights of any Indian tribe;

(2) the rights, express or implicit, of any Indian tribe which exist under treaties, Executive orders, and laws of the United States;

(3) the inherent right of Indians to practice their religions; and

(4) the right of Indians to practice their religions under any Federal or State law.

Approved October 6, 1994

H.R.4230

BLM_0007270

Appendix 8, page 1
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

PUBLIC LAW 96-95–OCT. 31, 1979          93 STAT. 721

To protect archaeological resources on public lands and Indian lands, and for other purposes.

<div align="right">Oct. 31, 1979<br>[H.R. 1825]</div>

*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,*

SHORT TITLE

SECTION 1. This Act may be cited as the "Archaeological Resources Protection Act of 1979".

FINDINGS AND PURPOSE

SEC. 2. (a) The Congress finds that–
(1) archaeological resources on public lands and Indian lands are an accessible and irreplaceable part of the Nation's heritage;
(2) these resources are increasingly endangered because of their commercial attractiveness;
(3) existing Federal laws do not provide adequate protection to prevent the loss and destruction of these archaeological resources and sites resulting from uncontrolled excavations and pillage; and
(4) there is a wealth of archaeological information which has been legally obtained by private individuals for noncommercial purposes and which could voluntarily be made available to professional archaeologists and institutions.
(b) The purpose of this Act is to secure, for the present and future benefit of the American people, the protection of archaeological resources and sites which are on public lands and Indian lands, and to foster increased cooperation and exchange of information between governmental authorities, the professional archaeological community, and private individuals having collections of archaeological resources and data which were obtained before the date of the enactment of this Act.

DEFINITIONS

SEC. 3. As used in this Act–
(1) The term "archaeological resource" means any material remains of past human life or activities which are of archaeological interest, as determined under uniform regulations promulgated pursuant to this Act. Such regulations containing such determination shall include, but not be limited to: pottery, basketry, bottles, weapons, weapon projectiles, tools, structures or portions of structures, pit houses, rock paintings, rock carvings, intaglios, graves, human skeletal materials, or any portion or piece of any of the foregoing items. Nonfossilized and fossilized paleontological specimens, or any portion or piece thereof, shall not be considered archaeological resources, under the regulations under this paragraph, unless found in an archaeological context. No item shall be treated as an archaeological resource under regulations under this paragraph unless such item is at least 100 years of age.

BLM_0007271

Appendix 8, page 2
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Archaeological Resources Protection Act

(2) The term "Federal land manager" means, with respect to any public lands, the Secretary of the department, or the head of any other agency or instrumentality of the United States, having primary management authority over such lands. In the case of any public lands or Indian lands with respect to which no department, agency, or instrumentality has primary management authority, such term means the Secretary of the Interior. If the Secretary of the Interior consents, the responsibilities (in whole or in part) under this Act of the Secretary of any department (other than the Department of the Interior) or the head of any other agency or instrumentality may be delegated to the Secretary of the Interior with respect to any land managed by such other Secretary or agency head, and in any such case, the term "Federal land manager" means the Secretary of the Interior.

(3) The term "Public lands" means

(A) lands which are owned and administered by the United States as part of–

(i) the national park system,

(ii) the national wildlife refuge system, or

(iii) the national forest system; and

(B) all other lands the fee title to which is held by the United States, other than lands on the Outer Continental Shelf and lands which are under the jurisdiction of the Smithsonian Institution;

(4) The term "Indian lands" means lands of Indian tribes, or Indian individuals, which are either held in trust by the United States or subject to a restriction against alienation imposed by the United States, except for any subsurface interests in lands not owned or controlled by an Indian tribe or an Indian individual.

(5) The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (85 Stat. 688).

(6) The term "Person" means an individual, corporation, partnership, trust, institution, association, or any other private entity or any officer, employee, agent, department, or instrumentality of the United States, of any Indian tribe, or of any State or political subdivision thereof.

(7) The term "State" means any of the fifty States, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.

## EXCAVATION AND REMOVAL

SEC. 4. (a) Any person may apply to the Federal land manager for a permit to excavate or remove any archaeological resource located on public lands or Indian lands and to carry out activities associated with such excavation or removal. The application shall be required, under uniform regulations under this Act, to contain such information as the Federal land manager deems necessary, including information concerning the time, scope, and location and specific purpose of the proposed work.

(b) A permit may be issued pursuant to an application under subsection (a) if the Federal land manager determines, pursuant to uniform regulations under this Act, that

(1) the applicant is qualified, to carry out the permitted activity,

(2) the activity is undertaken for the purpose of furthering archaeological knowledge in the public interest,

BLM_0007272

Appendix 8, page 3
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

(3) the archaeological resources which are excavated or removed from public lands will remain the property of the United States, and such resources and copies of associated archaeological records and data will be preserved by a suitable university, museum, or other scientific or educational institution, and

(4) the activity pursuant to such permit is not inconsistent with any management plan applicable to the public lands concerned.

(c) If a permit issued under this section may result in harm to, or destruction of, any religious or cultural site, as determined by the Federal land manager, before issuing such permit, the Federal land manager shall notify any Indian tribe which may consider the site as having religious or cultural importance. Such notice shall not be deemed a disclosure to the public for purposes of section 9.

(d) Any permit under this section shall contain such terms and conditions, pursuant to uniform regulations promulgated under this Act, as the Federal land manager concerned deems necessary to carry out the purposes of this Act.

(e) Each permit under this section shall identify the individual who shall be responsible for carrying out the terms and conditions of the permit and for otherwise complying with this Act and other law applicable to the permitted activity.

(f) Any permit issued under this section may be suspended by the Federal land manager upon his determination that the permittee has violated any provision of subsection (a), (b), or (c) of section 6. Any such permit may be revoked by such Federal land manager upon assessment of a civil penalty under section 7 against the permittee or upon the permittee's conviction under section 6.

(g)(1) No permit shall be required under this section or under the Act of June 8, 1906 (16 U.S.C. 431), for the excavation or removal by any Indian tribe or member thereof of any archaeological resource located on Indian lands of such Indian tribe, except that in the absence of tribal law regulating the excavation or removal of archaeological resources on Indian lands, an individual tribal member shall be required to obtain a permit under this section.

(2) In the case of any permits for the excavation or removal of any archaeological resource located on Indian lands, the permit may be granted only after obtaining the consent of the Indian or Indian tribe owning or having jurisdiction over such lands. The permit shall include such terms and conditions as may be requested by such Indian or Indian tribe.

(h)(1) No permit or other permission shall be required under the Act of June 8, 1906 (16 U.S.C. 431-433), for any activity for which a permit is issued under this section.

(2) Any permit issued under the Act of June 8,1906, shall remain in effect according to its terms and conditions following the enactment of this Act. No permit under this Act shall be required to carry out any activity under a permit issued under the Act of June 8, 1906, before the date of the enactment of this Act which remains in effect as provided in this paragraph, and nothing in this Act shall modify or affect any such permit.

(i) Issuance of a permit in accordance with this section and applicable regulations shall not require compliance with section 106 of the Act of October 15, 1966 (80 Stat. 917, 16 U.S.C. 470f).

(j) Upon the written request of the Governor of any State, the Federal land manager shall issue a permit, subject to the provisions of subsections (b)(3), (b)(4), (c), (e), (f), (g), (h), and (i) of this section for the purpose of conducting archaeological research, excavation, removal, and curation, on behalf of the State or its educational institutions, to such Governor or to such designee as the Governor deems qualified to carry out the intent of this Act.

BLM_0007273

Appendix 8, page 4

(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Archaeological Resources Protection Act

### CUSTODY OF RESOURCES

SEC. 5. The Secretary of the Interior may promulgate regulations providing for–

(1) the exchange, where appropriate, between suitable universities, museums, or other scientific or educational institutions, of archaeological resources removed from public lands and Indian lands pursuant to this Act, and

(2) the ultimate disposition of such resources and other resources removed pursuant to the Act of June 27, 1960 (16 U.S.C. 469-469c) or the Act of June 8, 1906 (16 U.S.C. 431-433).

Any exchange or ultimate disposition under such regulation of archaeological resources excavated or removed from Indian lands shall be subject to the consent of the Indian or Indian tribe which owns or has jurisdiction over such lands. Following promulgation of regulations under this section, notwithstanding any other provision of law, such regulations shall govern the disposition of archaeological resources removed from public lands and Indian lands pursuant to this Act.

### PROHIBITED ACTS AND CRIMINAL PENALTIES

SEC. 6. (a) No person may excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under section 4, a permit referred to in section 4(h)(2), or the exemption contained in section 4(g)(1).

(b) No person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange any archaeological resource if such resource was excavated or removed from public lands or Indian lands in violation of

(1) the prohibition contained in subsection (a), or

(2) any provision, rule, regulation, ordinance, or permit in effect under any other provision of Federal law.

(c) No person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange, in interstate or foreign commerce, any archaeological resource excavated, removed, sold, purchased, exchanged, transported, or received in violation of any provision, rule, regulation, ordinance, or permit in effect under State or local law.

(d) Any person who knowingly violates, or counsels, procures, solicits, or employs any other person to violate, any prohibition contained in subsection (a), (b), or (c) of this section shall, upon conviction, be fined not more than $10,000 or imprisoned not more than one year, or both: *Provided, however,* That if the commercial or archaeological value of the archaeological resources involved and the cost of restoration and repair of such resources exceeds the sum of $5,000, such person shall be fined not more than $20,000 or imprisoned not more than two years, or both. In the case of a second or subsequent such violation upon conviction such person shall be fined not more than $100,000, or imprisoned not more than five years, or both.

(e) The prohibitions contained in this section shall take effect on the date of the enactment of this Act.

Appendix 8, page 5
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Archaeological Resources Protection Act

(f) Nothing in subsection (b)(1) of this section shall be deemed applicable to any person with respect to an archaeological resource which was in the lawful possession of such person prior to the date of the enactment of this Act.

(g) Nothing in subsection (d) of this section shall be deemed applicable to any person with respect to the removal of arrowheads located on the surface of the ground.

CIVIL PENALTIES

SEC. 7. (a)(1) Any person who violates any prohibition contained in an applicable regulation or permit issued under this Act may be assessed a civil penalty by the Federal land manager concerned. No penalty may be assessed under this subsection unless such person is given notice and opportunity for a hearing with respect to such violation. Each violation shall be a separate offense. Any such civil penalty may be remitted or mitigated by the Federal land manager concerned.

(2) The amount of such penalty shall be determined under regulations promulgated pursuant to this Act, taking into account, in addition to other factors–

(A) the archaeological or commercial value of the archaeological resource involved, and

(B) the cost or restoration and repair of the resource and the archaeological site involved. Such regulations shall provide that, in the case of a second or subsequent violation by any person, the amount of such civil penalty may be double the amount which would have been assessed if such violation were the first violation by such person. The amount of any penalty assessed under this subsection for any violation shall not exceed an amount equal to double the cost of restoration or repair of resources and archaeological sites damaged and double the fair market value of resources destroyed or not recovered.

(3) No penalty shall be assessed under this section for the removal of arrowheads located on the surface of the ground.

(b)(1) Any person aggrieved by an order assessing a civil penalty under subsection (a) may file a petition for judicial review of such order with the United States District Court for the District of Columbia or for any other district in which such person resides or transacts business. Such a petition may only be filed within the 30-day period beginning on the date the order making such assessment was issued. The court shall hear such action on the record made before the Federal land manager and shall sustain his action if it is supported by substantial evidence on the record considered as a whole.

(2) If any person fails to pay an assessment of a civil penalty–

(A) after the order making the assessment has become a final order and such person has not filed a petition for judicial review of the order in accordance with paragraph (1), or

(B) after a court in an action brought under paragraph (1) has entered a final judgment upholding the assessment of a civil penalty,

the Federal land managers may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found, resides, or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. In such action, the validity and amount of such penalty shall not be subject to review.

(c) Hearings held during proceedings for the assessment of civil penalties authorized by subsection (a) shall be conducted in accordance with section 554 of title 5 of the United States Code. The Federal land manager may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer

BLM_0007275

Appendix 8, page 6
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

oaths. Witnesses summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person pursuant to this paragraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Federal land manager or to appear and produce documents before the Federal land manager, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

REWARDS; FORFEITURE

SEC. 8. (a) Upon the certification of the Federal land manager concerned, the Secretary of the Treasury is directed to pay, from penalties and fines collected under sections 6 and 7 an amount equal to one-half of such penalty or fine, but, not to exceed $500, to any person who furnishes information which leads to the finding of a civil violation, or the conviction of criminal violation, with respect to which such penalty or fine was paid. If several persons provided such information, such amount shall be divided among such persons. No officer or employee of the United States or of any State or local government who furnishes information or renders service in the performance of his official duties shall be eligible for payment under this subsection.

(b) All archaeological resources with respect to which a violation of subsection (a), (b), or (c) of section 6 occurred and which are in the possession of any person, and all vehicles and equipment of any person which were used in connection with such violation, may be (in the discretion of the court or administrative law judge, as the case may be) subject to forfeiture to the United States upon

(1) such person's conviction of such violation under section 6,

(2) assessment of a civil penalty against such person under section 7 with respect to such violation, or

(3) a determination by any court that such archaeological resources, vehicles, or equipment were involved in such violation.

(c) In cases in which a violation of the prohibition contained in subsection (a), (b), or (c) of section 6 involve archaeological resources excavated or removed from Indian lands, the Federal land manager or the court, as the case may be, shall provide for the payment to the Indian or Indian tribe involved of all penalties collected pursuant to section 7 and for the transfer to such Indian or Indian tribe of all items forfeited under this section.

CONFIDENTIALITY

SEC. 9. (a) Information concerning the nature and location of any archaeological resource for which the excavation or removal requires a permit or other permission under this Act or under any other provision of Federal law may not be made available to the public under subchapter II of chapter 5 of title 5 of the United States Code or under any other provision of law unless the Federal land manager concerned determines that such disclosure would–

(1) further the purposes of this Act or the Act of June 27, 1960 (16 U.S.C. 469-469c), and

BLM_0007276

Appendix 8, page 7

(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

(2) not create a risk of harm to such resources or to the site at which such resources are located.

(b) Notwithstanding the provisions of subsection (a), upon the written request of the Governor of any State, which request shall state–

(1) the specific site or area for which information is sought,

(2) the purpose for which such information is sought,

(3) a commitment by the Governor to adequately protect the confidentiality of such information to protect the resource from commercial exploitation,

the Federal land manager concerned shall provide to the Governor information concerning the nature and location of archaeological resources within the State of the requesting Governor.

## REGULATIONS; INTERGOVERNMENTAL COORDINATION

SEC. 10. (a) The Secretaries of the Interior, Agriculture and Defense and the Chairman of the Board of the Tennessee Valley Authority after consultation with other Federal land managers, Indian tribes, representatives of concerned State agencies, and after public notice and hearing, shall promulgate such uniform rules and regulations as may be

appropriate to carry out the purposes of this Act. Such rules and regulations may be promulgated only after consideration of the provisions of the American Indian Religious Freedom Act (92 Stat. 469; 42 U.S.C. 1996). Each uniform rule or regulation promulgated under this Act shall be submitted on the same calendar day to the Committee on Energy and Natural Resources of the United States Senate and to the Committee on Interior and Insular Affairs of the United States House of Representatives, and no such uniform rule or regulation may take effect before the expiration of a period of ninety calendar days following the date of its submission to such Committees.

(b) Each Federal land manager shall promulgate such rules and regulations, consistent with the uniform rules and regulations under subsection (a), as may be appropriate for the carrying out of his functions and authorities under this Act.

## COOPERATION WITH PRIVATE INDIVIDUALS

SEC. 11. The Secretary of the Interior shall take such action as may be necessary, consistent with the purposes of this Act, to foster and improve the communication, cooperation, and exchange of information between

(1) private individuals having collections of archaeological resources and data which were obtained before the date of the enactment of this Act, and

(2) Federal authorities responsible for the protection of archaeological resources on the public lands and Indian lands and professional archaeologists and associations of professional archaeologists.

In carrying out this section, the Secretary shall, to the extent practicable and consistent with the provisions of this Act, make efforts to expand the archaeological data base for the archaeological resources of the United States through increased cooperation between private individuals referred to in paragraph (1) and professional archaeologists and archaeological organizations.

BLM_0007277

Appendix 8, page 8

(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

SAVINGS PROVISIONS

SEC. 12. (a) Nothing in this Act shall be construed to repeal, modify, or impose additional restrictions on the activities permitted under existing laws and authorities relating to mining, mineral leasing, reclamation, and other multiple uses of the public lands.

(b) Nothing in this Act applies to, or requires a permit for, the collection for private purposes of any rock, coin, bullet, or mineral which is not an archaeological resource, as determined under uniform regulations promulgated under section 3(1).

(c) Nothing in this Act shall be construed to affect an land other than public land or Indian land or to affect the lawful recovery, collection, or sale of archaeological resources from land other than public land or Indian land.

REPORT

SEC. 13. As part of the annual report required to be submitted to the specified committees of the Congress pursuant to section 5(c) of the Act of June 27, 1960 (74 Stat. 220; 16 U.S.C. 469-469a), the Secretary of the Interior shall comprehensively report as a separate component on the activities carried out under the provisions of this Act, and he shall make such recommendations as he deems appropriate as to changes or improvements needed in the provisions of this Act. Such report shall include a brief summary of the actions undertaken by the Secretary under section 11 of this Act, relating to cooperation with private individuals.

Approved October 31, 1979.

LEGISLATIVE HISTORY:
HOUSE REPORT No. 96-311 (Comm. on Interior and Insular Affairs).
SENATE REPORT No. 96-179 accompanying S. 490 (Comm. on Energy and Natural Resources).
CONGRESSIONAL RECORD, Vol. 125 (1979):
    July 9, considered and passed House.
    July 30, considered and passed Senate, amended, in lieu of S. 490.
    Oct. 12, House agreed to Senate amendments with an amendment.
    Oct. 17, Senate concurred in House amendment.

BLM_0007278

Appendix 8, page 9
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Archaeological Resources Protection Act**

PUBLIC LAW 100-555–OCT. 28, 1988

An Act

To improve the protection and management of archeological resources on Federal land.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Archaeological Resources Protection Act of 1979 (Public Law 96-95; 16 U.S.C. 470ii) be amended to add the following new section after section 13:

"SEC. 14. The Secretaries of the Interior, Agriculture, and Defense and the Chairman of the Board of the Tennessee Valley Authority shall–

"(a) develop plans for surveying lands under their control to determine the nature and extent of archaeological resources on those lands;

"(b) prepare a schedule for surveying lands that are likely to contain the most scientifically valuable archaeological resources; and

"(c) develop documents for the reporting of suspected violations of this Act and establish when and how those documents are to be completed by officers, employees, and agents of their respective agencies.".

*Speaker of the House of Representatives.*

*Vice President of the United States and President of the Senate.*

S. 1985

BLM_0007279

—

Appendix 8, page 10
(.03J)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Archaeological Resources Protection Act

PUBLIC LAW 100–588–NOV. 3, 1988

| | |
|---|---|
| To amend the Archaeological Resources Protection Act of 1979 to strengthen the enforcement provisions of that Act, and for other purposes. | Nov. 3, 1988 [H.R. 4068] |

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. AMENDMENTS TO ARCHAEOLOGICAL RESOURCES PROTECTION ACT OF 1979.

(a) Section 3(3) of such Act is amended by striking out the semi-colon at the end thereof and substituting a period.

(b) Section 6(a) of such Act is amended by inserting after "deface" the following: ", or attempt to excavate, remove, damage, or otherwise alter or deface".

(c) Section 6(d) of such Act is amended by striking "$5,000" and inserting in lieu thereof "$500".

(d) Section 10 of such Act is amended by adding the following new subsection at the end thereof:

"(c) Each Federal land manager shall establish a program to increase public awareness of the significance of the archaeological resources located on public lands and Indian lands and the need to protect such resources. Each such land manager shall submit an annual report to the Committee on Interior and Insular Affairs of the United States House of Representatives and to the Committee on Energy and Natural Resources of the United States Senate regarding the actions taken under such program.".

Approved November 3, 1988.

LEGISLATIVE HISTORY–H.R. 4068 (S. 1985):
HOUSE REPORTS: No. 100-791, Pt. 1 (Comm. on Interior and Insular Affairs).
SENATE REPORTS: No. 100-566 (Comm. on Energy and Natural Resources) and No. 100-569 accompanying S. 1985 (Comm. on Energy and Natural Resources).
CONGRESSIONAL RECORD, Vol. 134 (1988):
    July 26, considered and passed House.
    Oct. 14, considered and passed Senate, amended.
    Oct. 19, House concurred in Senate amendment.

BLM_0007280

Appendix 9, page 1

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

Public Law 101-601
101st Congress

### An Act

<u>Nov. 16, 1990</u>
[H.R. 5237]        To provide for the protection of Native American graves, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Native American Graves Protection and Repatriation Act".

SEC. 2. DEFINITIONS.

For purposes of this Act, the term–

(1) "burial site" means any natural or prepared physical location, whether originally below, on, or above the surface of the earth, into which as a part of the death rite or ceremony of a culture, individual human remains are deposited.

(2) "cultural affiliation" means that there is a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group.

(3) "cultural items" means human remains and–

(A) "associated funerary objects" which shall mean objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, and both the human remains and associated funerary objects are presently in the possession or control of a federal agency or museum, except that other items exclusively made for burial purposes or to contain human remains shall be considered as associated funerary objects.

(B) "unassociated funerary objects" which shall mean objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, where the remains are not in the possession or control of the Federal agency or museum and the objects can be identified by a preponderance of the evidence as related to specific individuals or families or to known human remains or, by a preponderance of the evidence, as having been removed from a specific burial site of an individual culturally affiliated with a particular Indian tribe,

(C) "sacred objects" which shall mean specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents, and

(D) "cultural patrimony" which shall mean an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed

BLM_0007281

Appendix 9, page 2
(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group.

(4) "Federal agency" means any department, agency, or instrumentality of the United States and shall include, except as may be inconsistent with the provisions of P.L. 101-185, the Smithsonian Institution.

(5) "Federal lands" means any land other than tribal lands which are controlled or owned by the United States.

(6) "Hui Malama I Na Kupuna O Hawai'i Nei" means the nonprofit, Native Hawaiian organization incorporated under the laws of the State of Hawaii by that name on April 17, 1989, for the purpose of providing guidance and expertise in decisions dealing with Native Hawaiian cultural issues, particularly burial issues.

(7) "Indian tribe" means any tribe, band, nation, or other organized Indian group or community of Indians, including any Alaska Native village (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(8) "museum" means any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items. Such term does not include the Smithsonian Institution or any other Federal agency.

(9) "Native American" means of, or relating to, a tribe, people, or culture that is indigenous to the United States.

(10) "Native Hawaiian" means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

(11) "Native Hawaiian organization" means any organization which–

(A) serves and represents the interests of Native Hawaiians,

(B) has a primary and stated purpose the provision of services to Native Hawaiians, and

(C) has expertise in Native Hawaiian Affairs, and

shall include the Office of Hawaiian Affairs and Hui Malama I Na Kupuna O Hawai'i Nei.

(12) "Office of Hawaiian Affairs" means the Office of Hawaiian Affairs established by the constitution of the State of Hawaii.

(13) "right of possession" means possession obtained with the voluntary consent of an individual or group that had authority of alienation. The original acquisition of an unassociated Native American funerary object, sacred object, or object of cultural patrimony from an Indian tribe or Native Hawaiian organization with the voluntary consent of an individual or group with authority to alienate such object is deemed to give right of possession of that object, unless the phrase so defined would, as applied in section 7(c), result in a Fifth Amendment taking by the United States as determined by the United States Claims Court pursuant to 28 U.S.C. 1491 in which event the "right of possession" shall be as provided under otherwise applicable property law. The original acquisition of Native American

BLM_0007282

Appendix 9, page 3
(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

human remains and associated funerary objects which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin or the official governing body of the appropriate culturally affiliated Indian tribe or Native Hawaiian organization is deemed to give right of possession to those remains.

(14) "Secretary" means the Secretary of the Interior.

(15) "tribal land" means–

(A) all lands within the exterior boundaries of any Indian reservation;

(B) all dependent Indian communities;

(C) any lands administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act, 1920, and section 4 of Public Law 86-3.

## SEC. 3. OWNERSHIP.

(a) NATIVE AMERICAN HUMAN REMAINS AND OBJECTS.–The ownership or control of Native American cultural items which are excavated or discovered on Federal or tribal lands after the date of enactment of this Act shall be (with priority given in the order listed)–

(l) in the case of Native American human remains and associated funerary objects, in the lineal descendants of the Native American; or

(2) in any case in which such lineal descendants cannot be ascertained, and in the case of unassociated funerary objects, sacred objects, and objects of cultural patrimony–

(A) in the Indian tribe or Native Hawaiian organization on whose tribal land such objects or remains were discovered;

(B) in the Indian tribe or Native Hawaiian organization which has the closest cultural affiliation with such remains or objects and which, upon notice, states a claim for such remains or objects; or

(C) if the cultural affiliation of the objects cannot be reasonably ascertained and if the objects were discovered on Federal land that is recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims as the aboriginal land of some Indian tribe–

(1) in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered, if upon notice, such tribe states a claim for such remains or objects, or

(2) if it can be shown by a preponderance of the evidence that a different tribe has a stronger cultural relationship with the remains or objects than the tribe or organization specified in paragraph (l), in the Indian tribe that has the strongest demonstrated relationship, if upon notice, such tribe states a claim for such remains or objects.

(b) UNCLAIMED NATIVE AMERICAN HUMAN REMAINS AND OBJECTS.–Native American cultural items not claimed under subsection (a) shall be disposed of in accordance with regulations promulgated by the Secretary in consultation with the review committee established under section 8, Native American groups, representatives of museums and the scientific community.

(c) INTENTIONAL EXCAVATION AND REMOVAL OF NATIVE AMERICAN HUMAN REMAINS AND OBJECTS.–The intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study,

BLM_0007283

Appendix 9, page 4
(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Native American Graves Protection and Repatriation Act**

or removal of such items is permitted only if–
    (1) such items are excavated or removed pursuant to a permit issued under section 4 of the Archaeological Resources Protection Act of 1979 (93 Stat. 721; 16 U.S.C. 470aa et seq.) which shall be consistent with this Act;
    (2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe or Native Hawaiian organization;
    (3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b); and
    (4) proof of consultation or consent under paragraph (2) is shown.
    (d) INADVERTENT DISCOVERY OF NATIVE AMERICAN REMAINS AND OBJECTS.–(1) Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after the date of enactment of this Act shall notify, in writing, the Secretary of the Department, or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe or Native Hawaiian organization with respect to tribal lands, if known or readily ascertainable, and, in the case of lands that have been selected by an Alaska Native Corporation or group organized pursuant to the Alaska Native Claims Settlement Act of 1971, the appropriate corporation or group. If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming such activity, and provide notice under this subsection. Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe or Native Hawaiian organization that notification has been received, the activity may resume after 30 days of such certification.
    (2) The disposition of and control over any cultural items excavated or removed under this subsection shall be determined as provided for in this section.
    (3) If the Secretary of the Interior consents, the responsibilities (in whole or in part) under paragraphs (1) and (2) of the Secretary of any department (other than the Department of the Interior) or the head of any other agency or instrumentality may be delegated to the Secretary with respect to any land managed by such other Secretary or agency head.
    (e) RELINQUISHMENT.–Nothing in this section shall prevent the governing body of an Indian tribe or Native Hawaiian organization from expressly relinquishing control over any Native American human remains, or title to or control over any funerary object, or sacred object.

SEC. 4. ILLEGAL TRAFFICKING.

    (a) ILLEGAL TRAFFICKING.–Chapter 53 of title 18, United States Code, is amended by adding at the end thereof the following new section:

BLM_0007284

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

"**§ 1170. Illegal Trafficking in Native American Human Remains and Cultural Items**

"(a) Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit, the human remains of a Native American without the right of possession to those remains as provided in the Native American Graves Protection and Repatriation Act shall be fined in accordance with this title, or imprisoned not more than 12 months, or both, and in the case of a second or subsequent violation, be fined in accordance with this title, or imprisoned not more than 5 years, or both.

"(b) Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit any Native American cultural items obtained in violation of the Native American Graves Protection and Repatriation Act shall be fined in accordance with this title, imprisoned not more than one year, or both, and in the case of a second or subsequent violation, be fined in accordance with this title, imprisoned not more than 5 years, or both."

(b) TABLE OF CONTENTS.–The table of contents for chapter 53 of title 18, United States Code, is amended by adding at the end thereof the following new item:

"1170. Illegal Trafficking in Native American Human Remains and Cultural Items.".

SEC. 5. INVENTORY FOR HUMAN REMAINS AND ASSOCIATED FUNERARY OBJECTS.

(a) IN GENERAL.–Each Federal agency and each museum which has possession or control over holdings or collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.

(b) REQUIREMENTS.–(1) The inventories and identifications required under subsection (a) shall be–

(A) completed in consultation with tribal government and Native Hawaiian organization officials and traditional religious leaders;

(B) completed by not later than the date that is 5 years after the date of enactment of this Act, and

(C) made available both during the time they are being conducted and afterward to a review committee established under section 8.

(2) Upon request by an Indian tribe or Native Hawaiian organization which receives or should have received notice, a museum or Federal agency shall supply additional available documentation to supplement the information required by subsection (a) of this section. The term "documentation" means a summary of existing museum or Federal agency records, including inventories or catalogues, relevant studies, or other pertinent data for the limited purpose of determining the geographical origin, cultural affiliation, and basic facts surrounding acquisition and accession of Native American human remains and associated funerary objects subject to this section. Such term does not mean, and this Act shall not be construed to be an authorization for, the initiation of

BLM_0007285

Appendix 9, page 6

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Native American Graves Protection and Repatriation Act**

new scientific studies of such remains and associated funerary objects or other means of acquiring or preserving additional scientific information from such remains and objects.

(c) EXTENSION OF TIME FOR INVENTORY.–Any museum which has made a good faith effort to carry out an inventory and identification under this section, but which has been unable to complete the process, may appeal to the Secretary for an extension of the time requirements set forth in subsection (b)(1)(B). The Secretary may extend such time requirements for any such museum upon a finding of good faith effort. An indication of good faith shall include the development of a plan to carry out the inventory and identification process.

(d) NOTIFICATION.–(1) If the cultural affiliation of any particular Native American human remains or associated funerary objects is determined pursuant to this section, the Federal agency or museum concerned shall, not later than 6 months after the completion of the inventory, notify the affected Indian tribes or Native Hawaiian organizations.

(2) The notice required by paragraph (1) shall include information–

(A) which identifies each Native American human remains or associated funerary objects and the circumstances surrounding its acquisition;

(B) which lists the human remains or associated funerary objects that are clearly identifiable as to tribal origin; and

(C) which lists the Native American human remains and associated funerary objects that are not clearly identifiable as being culturally affiliated with that Indian tribe or Native Hawaiian organization, but which, given the totality of circumstances surrounding acquisition of the remains or objects, are determined by a reasonable belief to be remains or objects culturally affiliated with the Indian tribe or Native Hawaiian organization.

(3) A copy of each notice provided under paragraph (1) shall be sent to the Secretary who shall publish each notice in the Federal Register.

(e) INVENTORY.–For the purposes of this section, the term "inventory" means a simple itemized list that summarizes the information called for by this section.

SEC. 6. SUMMARY FOR UNASSOCIATED FUNERARY OBJECTS, SACRED OBJECTS, AND CULTURAL PATRIMONY.

(a) IN GENERAL.–Each Federal agency or museum which has possession or control over holdings or collections of Native American unassociated funerary objects, sacred objects, or objects of cultural patrimony shall provide a written summary of such objects based upon available information held by such agency or museum. The summary shall describe the scope of the collection, kinds of objects included, reference to geographical location, means and period of acquisition and cultural affiliation, where readily ascertainable.

(b) REQUIREMENTS.–(1) The summary required under subsection (a) shall be–

(A) in lieu of an object-by-object inventory;

(B) followed by consultation with tribal government and Native Hawaiian organization officials and traditional religious leaders; and

(C) completed by not later than the date that is 3 years after the date of enactment of this Act.

BLM_0007286

Appendix 9, page 7

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

(2) Upon request, Indian tribes and Native Hawaiian organizations shall have access to records, catalogues, relevant studies or other pertinent data for the limited purposes of determining the geographic origin, cultural affiliation, and basic facts surrounding acquisition and accession of Native American objects subject to this section. Such information shall be provided in a reasonable manner to be agreed upon by all parties.

SEC. 7. REPATRIATION.

(a) REPATRIATION OF NATIVE AMERICAN HUMAN REMAINS AND OBJECTS POSSESSED OR CONTROLLED BY FEDERAL AGENCIES AND MUSEUMS.–(1) If, pursuant to section 5, the cultural affiliation of Native American human remains and associated funerary objects with a particular Indian tribe or Native Hawaiian organization is established, then the Federal agency or museum, upon the request of a known lineal descendant of the Native American or of the tribe or organization and pursuant to subsections (b) and (e) of this section, shall expeditiously return such remains and associated funerary objects.

(2) If, pursuant to section 6, the cultural affiliation with a particular Indian tribe or Native Hawaiian organization is shown with respect to unassociated funerary objects, sacred objects or objects of cultural patrimony, then the Federal agency or museum, upon the request of the Indian tribe or Native Hawaiian organization and pursuant to subsections (b), (c) and (e) of this section, shall expeditiously return such objects.

(3) The return of cultural items covered by this Act shall be in consultation with the requesting lineal descendant or tribe or organization to determine the place and manner of delivery of such items.

(4) Where cultural affiliation of Native American human remains and funerary objects has not been established in an inventory prepared pursuant to section 5, or the summary pursuant to section 6, or where Native American human remains and funerary objects are not included upon any such inventory, then, upon request and pursuant to subsections (b) and (e) and, in the case of unassociated funerary objects, subsection (c), such Native American human remains and funerary objects shall be expeditiously returned where the requesting Indian tribe or Native Hawaiian organization can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion.

(5) Upon request and pursuant to subsections (b), (c) and (e), sacred objects and objects of cultural patrimony shall be expeditiously returned where–

(A) the requesting party is the direct lineal descendant of an individual who owned the sacred object;

(B) the requesting Indian tribe or Native Hawaiian organization can show that the object was owned or controlled by a member thereof, provided that in the case where a sacred object was owned by a member thereof, there are no identifiable tribe or organization; or

(C) the requesting Indian tribe or Native Hawaiian organization can show that the sacred object was owned or controlled by a member thereof, provided that in the case where a sacred object was owned by a member thereof, there are no

BLM_0007287

Appendix 9, page 8

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

identifiable lineal descendants of said member or the lineal descendants, upon notice, have failed to make a claim for the object under this Act.

(b) SCIENTIFIC STUDY.–If the lineal descendant, Indian tribe, or Native Hawaiian organization requests the return of culturally affiliated Native American cultural items, the Federal agency or museum shall expeditiously return such items unless such items are indispensable for completion of a specific scientific study, the outcome of which would be of major benefit to the United States. Such items shall be returned by no later than 90 days after the date on which the scientific study is completed.

(c) STANDARD OF REPATRIATION.–If a known lineal descendant or an Indian tribe or Native Hawaiian organization requests the return of Native American unassociated funerary objects, sacred objects or objects of cultural patrimony pursuant to this Act and presents evidence which, if standing alone before the introduction of evidence to the contrary, would support a finding that the Federal agency or museum did not have the right of possession, then such agency or museum shall return such objects unless it can overcome such inference and prove that it has a right of possession to the objects.

(d) SHARING OF INFORMATION BY FEDERAL AGENCIES AND MUSEUMS.–Any Federal agency or museum shall share what information it does possess regarding the object in question with the known lineal descendant, Indian tribe, or Native Hawaiian organization to assist in making a claim under this section.

(e) COMPETING CLAIMS.–Where there are multiple requests for repatriation of any cultural item and, after complying with the requirements of this Act, the Federal agency or museum cannot clearly determine which requesting party is the most appropriate claimant, the agency or museum may retain such item until the requesting parties agree upon its disposition or the dispute is otherwise resolved pursuant to the provisions of this Act or by a court of competent jurisdiction.

(f) MUSEUM OBLIGATION.–Any museum which repatriates any item in good faith pursuant to this Act shall not be liable for claims by an aggrieved party or for claims of breach of fiduciary duty, public trust, or violations of state law that are inconsistent with the provisions of this Act.

SEC. 8 REVIEW COMMITTEE.

(a) ESTABLISHMENT.–Within 120 days after the date of enactment of this Act, the Secretary shall establish a committee to monitor and review the implementation of the inventory and identification process and repatriation activities required under sections 5, 6 and 7.

(b) MEMBERSHIP.–(1) The Committee established under subsection (a) shall be composed of 7 members,

(A) 3 of whom shall be appointed by the Secretary from nominations submitted by Indian tribes, Native Hawaiian organizations, and traditional Native American religious leaders with at least 2 of such persons being traditional Indian religious leaders;

(B) 3 of whom shall be appointed by the Secretary from nominations submitted by national museum organizations and scientific organizations; and

Appendix 9, page 9

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

(C) 1 who shall be appointed by the Secretary from a list of persons developed and consented to by all of the members appointed pursuant to subparagraphs (A) and (B).

(2) The Secretary may not appoint Federal officers or employees to the committee.

(3) In the event vacancies shall occur, such vacancies shall be filled by the Secretary in the same manner as the original appointment within 90 days of the occurrence of such vacancy.

(4) Members of the committee established under subsection (a) shall serve without pay, but shall be reimbursed at a rate equal to the daily rate for GS-18 of the General Schedule for each day (including travel time) for which the member is actually engaged in committee business. Each member shall receive travel expenses, including per diem in lieu of subsistence, in accordance with sections 5702 and 5703 of title 5, United States Code.

(c) Responsibilities.–The committee established under subsection (a) shall be responsible for–

(1) designating one of the members of the committee as chairman;

(2) monitoring the inventory and identification process conducted under sections 5 and 6 to ensure a fair, objective consideration and assessment of all available relevant information and evidence;

(3) reviewing upon the request of any affected party and finding relating to

(A) the identity or cultural affiliation of cultural items, or

(B) the return of such items;

(4) facilitating the resolution of any disputes among Indian tribes, Native Hawaiian organizations, or lineal descendants and Federal agencies or museums relating to the return of such items including convening the parties to the dispute if deemed desirable;

(5) compiling an inventory of culturally unidentifiable human remains that are in the possession or control of each Federal agency and museum and recommending specific actions for developing a process for disposition of such remains;

(6) consulting with Indian tribes and Native Hawaiian organizations and museums on matters within the scope of the work of the committee affecting such tribes or organizations;

(7) consulting with the Secretary in the development of regulations to carry out this Act;

(8) performing such other related functions as the Secretary may assign to the committee; and

(9) making recommendations, if appropriate, regarding future care of cultural items which are to be repatriated.

(d) Any records and findings made by the review committee pursuant to this Act relating to the identity or cultural affiliation of any cultural items and the return of such items may be admissible in any action brought under section 15 of this Act.

(e) RECOMMENDATIONS AND REPORT.– The committee shall make the recommendations under paragraph (c)(5) in consultation with Indian tribes and Native Hawaiian organizations and appropriate scientific and museum groups.

(f) ACCESS.–The Secretary shall ensure that the committee established under

BLM_0007289

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

subsection (a) and the members of the committee have reasonable access to Native American cultural items under review and to associated scientific and historical documents.

(g) DUTIES OF SECRETARY.–The Secretary shall–

(1) establish such rules and regulations for the committee as may be necessary, and

(2) provide reasonable administrative and staff support necessary for the deliberations of the committee.

(h) ANNUAL REPORT.–The committee established under subsection (a) shall submit an annual report to the Congress on the progress made, and any barriers encountered, in implementing this section during the previous year.

(i) TERMINATION.–The committee established under subsection (a) shall terminate at the end of the 120-day period beginning on the day the Secretary certifies, in a report submitted to Congress, that the work of the committee has been completed.

SEC. 9. PENALTY.

(a) PENALTY.–Any museum that fails to comply with the requirements of this Act may be assessed a civil penalty by the Secretary of the Interior pursuant to procedures established by the Secretary through regulation. A penalty assessed under this subsection shall be determined on the record after opportunity for an agency hearing. Each violation shall be a separate offense.

(b) AMOUNT OF PENALTY.–The amount of a penalty assessed under subsection (a) shall be determined under regulations promulgated pursuant to this Act, taking into account, in addition to other factors–

(1) the archeological, historical or commercial value of the item involved;

(2) the damages suffered, both economic and non-economic, by an aggrieved party;

(3) the number of violations that have occurred.

(c) ACTIONS TO RECOVER PENALTIES.–If any museum fails to pay an assessment of a civil penalty pursuant to a final order of the Secretary that has been issued under subsection (a) and not appealed or after a final judgment has been rendered on an appeal of such order, the Attorney General may institute a civil action in an appropriate district court of the United States to collect the penalty. In such action, the validity and amount of such penalty shall not be subject to review.

(d) SUBPOENAS.–In hearings held pursuant to subsection (a), subpoenas may be issued for the attendance and testimony of witnesses and the production of relevant papers, books and documents. Witnesses so summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States.

SEC. 10. GRANTS.

(a) INDIAN TRIBES AND NATIVE HAWAIIAN ORGANIZATIONS.–The Secretary is authorized to make grants to Indian tribes and Native Hawaiian organizations for the purpose of assisting such tribes and organizations in the repatriation of Native American cultural items.

BLM_0007290

Appendix 9, page 11

(.03K)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Native American Graves Protection and Repatriation Act

(b) MUSEUMS.–The Secretary is authorized to make grants to museums for the purpose of assisting the museums in conducting the inventories and identification required under sections 5 and 6.

SEC. 11. SAVINGS PROVISIONS.

Nothing in this Act shall be construed to–
  (1) limit the authority of any Federal agency or museum to–
      (A) return or repatriate Native American cultural items to Indian tribes, Native Hawaiian organizations, or individuals, and
      (B) enter into any other agreement with the consent of the culturally affiliated tribe or organization as to the disposition of, or control over, items covered by this Act;
  (2) delay actions on repatriation requests that are pending on the date of enactment of this Act;
  (3) deny or otherwise affect access to any court;
  (4) limit any procedural or substantive right which may otherwise be secured to individuals or Indian tribes or Native Hawaiian organizations; or
  (5) limit the application of any State or Federal la w pertaining to theft or stolen property.

SEC. 12. SPECIAL RELATIONSHIP BETWEEN THE FEDERAL GOVERNMENT AND INDIAN TRIBES.

This Act reflects the unique relationship between the Federal government and Indian tribes and Native Hawaiian organizations and should not be construed to establish a precedent with respect to any other individual, organization or foreign government.

SEC. 13. REGULATIONS.

The Secretary shall promulgate regulations to carry out this Act within 12 months of enactment.

SEC. 14. AUTHORIZATION OF APPROPRIATIONS.

There is authorized to be appropriated such sums as may be necessary to carry out this Act.

SEC. 15. ENFORCEMENT.

The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this Act and shall have the authority to issue such orders as may be necessary to enforce the provisions of this Act.

Approved November 16, 1990.

BLM_0007291

Appendix 10, page 1
(.03M)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Excerpts from**

**THE NATIONAL TRAILS SYSTEM ACT**
**(P.L. 90-543, as amended through P.L. 107-325, December 4, 2002)**
**(also found in *United States Code*, Volume 16, Sections 1241-1251)**

SEC. 3. [16USC1242]

(a)  The national system of trails shall be composed of the following:

\* \* \*

(3)  National historic trails, established as provided in section 5 of this Act, which will be extended trails which follow as closely as possible and practicable the original trails or routes of travel of national historic significance. Designation of such trails or routes shall be continuous, but the established or developed trail, and the acquisition thereof, need not be continuous onsite. National historic trails shall have as their purpose the identification and protection of the historic route and its historic remnants and artifacts for public use and enjoyment. Only those selected land and water based components of a historic trail which are on federally owned lands and which meet the national historic trail criteria established in this Act are included as Federal protection components of a national historic trail. The appropriate Secretary may certify other lands as protected segments of an historic trail upon application from State or local governmental agencies or private interests involved if such segments meet the national historic trail criteria established in this Act and such criteria supplementary thereto as the appropriate Secretary may prescribe, and are administered by such agencies or interests without expense to the United States.

\* \* \*

SEC. 5. [16USC1244]

(b)  The Secretary \* \* \* shall make such additional studies as are herein or may hereafter be authorized by the Congress for the purpose of determining the feasibility and desirability of designating other trails as national scenic or national historic trails. \* \* \*

(11)  To qualify for designation as a national historic trail, a trail must meet all three of the following criteria:

(A)  It must be a trail or route established by historic use and must be historically significant as a result of that use. The route need not currently exist as a discernible trail to qualify, but its location must be sufficiently known to permit evaluation of public recreation and historical interest potential. A designated trail should generally accurately follow the historic route, but may deviate somewhat on occasion of necessity to avoid difficult routing through subsequent development, or to provide some route variations offering a more pleasurable recreational experience. Such deviations shall be so noted on site. Trail segments no longer possible to travel by trail due to subsequent development as motorized transportation routes may be designated and marked onsite as segments which link to the historic trail.

Appendix 10, page 2

(.03M)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Excerpts from

## THE NATIONAL TRAILS SYSTEM ACT

(B)  It must be of national significance with respect to any of several broad facets of American history, such as trade and commerce, exploration, migration and settlement, or military campaigns. To qualify as nationally significant, historic use of the trail must have had a far reaching effect on broad patterns of American culture. Trails significant in the history of native Americans may be included.

(C)  It must have significant potential for public recreational use or historical interest based on historic interpretation and appreciation. The potential for such use is generally greater along roadless segments developed as historic trails and at historic sites associated with the trail. The presence of recreation potential not related to historic appreciation is not sufficient justification for designation under this category.

*  *  *

(f) Within two complete fiscal years of the date of enactment of legislation designating a national historic trail or the Continental Divide National Scenic Trail or the North Country National Scenic Trail as part of the system, the responsible Secretary shall, after full consultation with affected Federal land managing agencies, the Governors of the affected States, and the relevant Advisory Council established pursuant to section 5(d) of this Act, submit to the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the Senate, a comprehensive plan for the management, and use of the trail, including but not limited to, the following items:

(1) specific objectives and practices to be observed in the management of the trail, including the identification of all significant natural, historical, and cultural resources to be preserved, details of any anticipated cooperative agreements to be consummated with State and local government agencies or private interests, and for national scenic or national historic trails an identified carrying capacity of the trail and a plan for its implementation;
(2) the process to be followed by the appropriate Secretary to implement the marking requirements established in section 7(c) of this Act;
(3) a protection plan for any high potential historic sites or high potential route segments *  *  *.

*  *  *

### DEFINITIONS

SEC. 12. [16USC1251] As used in this Act:

(I) The term "high potential historic sites" means those historic sites related to the route, or sites in close proximity thereto, which provide opportunity to interpret the historic significance of the trail during the period of its major use. Criteria for consideration as high potential sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion.

BLM_0007293

Appendix 11, page 1
(.03M)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Executive Order 13007

## Presidential Documents

**Executive Order 13007 of May 24, 1996**

## Indian Sacred Sites

By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered:

**Section 1.** *Accommodation of Sacred Sites.* (a) In managing Federal lands, each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites. Where appropriate, agencies shall maintain the confidentiality of sacred sites.

(b) For purposes of this order:

(i) "Federal lands" means any land or interests in land owned by the United States, including leasehold interests held by the United States, except Indian trust lands;

(ii) "Indian tribe" means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to Public Law No. 103-454, 108 Stat. 4791, and "Indian" refers to a member of such an Indian tribe; and

(iii) "Sacred site" means any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

**Sec. 2.** *Procedures.* (a) Each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, as appropriate, promptly implement procedures for the purposes of carrying out the provisions of section 1 of this order, including, where practicable and appropriate, procedures to ensure reasonable notice is provided of proposed actions or land management policies that may restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites. In all actions pursuant to this section, agencies shall comply with the Executive memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments."

Appendix 11, page 2
(.03M)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Executive Order 13007**

(b) Within 1 year of the effective date of this order, the head of each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall report to the President, through the Assistant to the President for Domestic Policy, on the implementation of this order. Such reports shall address, among other things, (i) any changes necessary to accommodate access to and ceremonial use of Indian sacred sites; (ii) any changes necessary to avoid adversely affecting the physical integrity of Indian sacred sites; and (iii) procedures implemented or proposed to facilitate consultation with appropriate Indian tribes and religious leaders and the expeditious resolution of disputes relating to agency action on Federal lands that may adversely affect access to, ceremonial use of, or the physical integrity of sacred sites.

**Sec. 3.** Nothing in this order shall be construed to require a taking of vested property interests. Nor shall this order be construed to impair enforceable rights to use of Federal lands that have been granted to third parties through final agency action. For purposes of this order, "agency action" has the same meaning as in the Administrative Procedure Act (5 U.S.C. 551(13)).

**Sec. 4.** This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by any party against the United States, its agencies, officers, or any person.

/s/ William J. Clinton

THE WHITE HOUSE,
*May 24, 1996.*

Source: Federal Register May 29, 1996 (Volume 61, Number 104) Pages 26771 - 26772

BLM_0007295

Appendix 12, page 1
(.03N)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Executive Order 13287**

## Presidential Documents

**Executive Order 13287 of March 3, 2003**

**Preserve America**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the National Historic Preservation Act (16 U.S.C. 470 *et se*q.) (NHPA) and the National Environmental Policy Act (42 U.S.C. 4321 *et se*q.), it is hereby ordered:

**Section 1.** *Statement of Policy.* It is the policy of the Federal Government to provide leadership in preserving America's heritage by actively advancing the protection, enhancement, and contemporary use of the historic properties owned by the Federal Government, and by promoting intergovernmental cooperation and partnerships for the preservation and use of historic properties. The Federal Government shall recognize and manage the historic properties in its ownership as assets that can support department and agency missions while contributing to the vitality and economic well-being of the Nation's communities and fostering a broader appreciation for the development of the United States and its underlying values. Where consistent with executive branch department and agency missions, governing law, applicable preservation standards, and where appropriate, executive branch departments and agencies ("agency" or "agencies") shall advance this policy through the protection and continued use of the historic properties owned by the Federal Government, and by pursuing partnerships with State and local Governments, Indian tribes, and the private sector to promote the preservation of the unique cultural heritage of communities and of the Nation and to realize the economic benefit that these properties can provide. Agencies shall maximize efforts to integrate the policies, procedures, and practices of the NHPA and this order into their program activities in order to efficiently and effectively advance historic preservation objectives in the pursuit of their missions.

**Sec. 2.** *Building Preservation Partnerships.* When carrying out its mission activities, each agency, where consistent with its mission and governing authorities, and where appropriate, shall seek partnerships with State and local governments, Indian tribes, and the private sector to promote local economic development and vitality through the use of historic properties in a manner that contributes to the long-term preservation and productive use of those properties. Each agency shall examine its policies, procedures, and capabilities to ensure that its actions encourage, support, and foster public-private initiatives and investment in the use, reuse, and rehabilitation of historic properties, to the extent such support is not inconsistent with other provisions of law, the Secretary of the Interior's Standards for Archeology and Historic Preservation, and essential national department and agency mission requirements.

BLM_0007296

Appendix 12, page 2
(.03N)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Executive Order 13287

**Sec. 3.** *Improving Federal Agency Planning and Accountability.* (a) Accurate information on the state of Federally owned historic properties is essential to achieving the goals of this order and to promoting community economic development through local partnerships. Each agency with real property management responsibilities shall prepare an assessment of the current status of its inventory of historic properties required by section 110(a)(2) of the NHPA (16 U.S.C. 470h–2(a)(2)), the general condition and management needs of such properties, and the steps underway or planned to meet those management needs. The assessment shall also include an evaluation of the suitability of the agency's types of historic properties to contribute to community economic development initiatives, including heritage tourism, taking into account agency mission needs, public access considerations, and the long-term preservation of the historic properties. No later than September 30, 2004, each covered agency shall complete a report of the assessment and make it available to the Chairman of the Advisory Council on Historic Preservation (Council) and the Secretary of the Interior (Secretary).

(b) No later than September 30, 2004, each agency with real property management responsibilities shall review its regulations, management policies, and operating procedures for compliance with sections 110 and 111 of the NHPA (16 U.S.C. 470h–2 & 470–3) and make the results of its review available to the Council and the Secretary. If the agency determines that its regulations, management policies, and operating procedures are not in compliance with those authorities, the agency shall make amendments or revisions to bring them into compliance.

(c) Each agency with real property management responsibilities shall, by September 30, 2005, and every third year thereafter, prepare a report on its progress in identifying, protecting, and using historic properties in its ownership and make the report available to the Council and the Secretary. The Council shall incorporate this data into a report on the state of the Federal Government's historic properties and their contribution to local economic development and submit this report to the President by February 15, 2006, and every third year thereafter.

(d) Agencies may use existing information gathering and reporting systems to fulfill the assessment and reporting requirements of subsections 3(a)–(c) of this order. To assist agencies, the Council, in consultation with the Secretary, shall, by September 30, 2003, prepare advisory guidelines for agencies to use at their discretion.

(e) No later than June 30, 2003, the head of each agency shall designate a senior policy level official to have policy oversight responsibility for the agency's historic preservation program and notify the Council and the Secretary of the designation. This senior official shall be an assistant secretary, deputy assistant secretary, or the equivalent, as appropriate to the agency organization. This official, or a subordinate employee reporting directly to the official, shall serve as the agency's Federal Preservation Officer in accordance with section 110(c) of the NHPA. The senior official shall ensure that the Federal Preservation Officer is qualified consistent with guidelines established by the Secretary for that position and has access to adequate expertise and support to carry out the duties of the position.

BLM_0007297

Appendix 12, page 3
(.03N)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## Executive Order 13287

**Sec. 4.** *Improving Federal Stewardship of Historic Properties.* (a) Each agency shall ensure that the management of historic properties in its ownership is conducted in a manner that promotes the long-term preservation and use of those properties as Federal assets and, where consistent with agency missions, governing law, and the nature of the properties, contributes to the local community and its economy.

(b) Where consistent with agency missions and the Secretary of the Interior's Standards for Archeology and Historic Preservation, and where appropriate, agencies shall cooperate with communities to increase opportunities for public benefit from, and access to, Federally owned historic properties.

(c) The Council is directed to use its existing authority to encourage and accept donations of money, equipment, and other resources from public and private parties to assist other agencies in the preservation of historic properties in Federal ownership to fulfill the goals of the NHPA and this order. (d) The National Park Service, working with the Council and in consultation with other agencies, shall make available existing materials and information for education, training, and awareness of historic property stewardship to ensure that all Federal personnel have access to information and can develop the skills necessary to continue the productive use of Federally owned historic properties while meeting their stewardship responsibilities.

(d) The National Park Service, working with the Council and in consultation with other agencies, shall make available existing materials and information for education, training, and awareness of historic property stewardship to ensure that all Federal personnel have access to information and can develop the skills necessary to continue the productive use of Federally owned historic properties while meeting their stewardship responsibilities.

(e) The Council, in consultation with the National Park Service and other agencies, shall encourage and recognize exceptional achievement by such agencies in meeting the goals of the NHPA and this order. By March 31, 2004, the Council shall submit to the President and the heads of agencies recommendations to further stimulate initiative, creativity, and efficiency in the Federal stewardship of historic properties.

**Sec. 5.** *Promoting Preservation Through Heritage Tourism.* (a) To the extent permitted by law and within existing resources, the Secretary of Commerce, working with the Council and other agencies, shall assist States, Indian tribes, and local communities in promoting the use of historic properties for heritage tourism and related economic development in a manner that contributes to the long-term preservation and productive use of those properties. Such assistance shall include efforts to strengthen and improve heritage tourism activities throughout the country as they relate to Federally owned historic properties and significant natural assets on Federal lands.

(b) Where consistent with agency missions and governing law, and where appropriate, agencies shall use historic properties in their ownership in conjunction with State, tribal, and local tourism programs to foster viable economic

BLM_0007298

Appendix 12, page 4
(.03N)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Executive Order 13287**

partnerships, including, but not limited to, cooperation and coordination with tourism officials and others with interests in the properties.

**Sec. 6.** *National and Homeland Security Considerations.*

Nothing in this order shall be construed to require any agency to take any action or disclose any information that would conflict with or compromise national and homeland security goals, policies, programs, or activities.

**Sec. 7.** *Definitions.* For the purposes of this order, the term ''historic property'' means any prehistoric or historic district, site, building, structure, and object included on or eligible for inclusion on the National Register of Historic Places in accordance with section 301(5) of the NHPA (16 U.S.C. 470w(5)).

The term ''heritage tourism'' means the business and practice of attracting and accommodating visitors to a place or area based especially on the unique or special aspects of that locale's history, landscape (including trail systems), and culture. The terms ''Federally owned'' and ''in Federal ownership,'' and similar terms, as used in this order, do not include properties acquired by agencies as a result of foreclosure or similar actions and that are held for a period of less than 5 years.

**Sec. 8.** *Judicial Review.* This order is intended only to improve the internal management of the Federal Government and it is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

/s/ George W. Bush

THE WHITE HOUSE,
*March 3, 2003.*

Source: Federal Register March 3, 2003 (Volume 68, Number 43) Pages 10635 - 10638

BLM_0007299

Appendix 13, page 1

(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**PROGRAMMATIC AGREEMENT**
**AMONG**
**THE BUREAU OF LAND MANAGEMENT,**
**THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, AND**
**THE NATIONAL CONFERENCE OF STATE HISTORIC PRESERVATION OFFICERS**
**REGARDING**
**THE MANNER IN WHICH BLM WILL MEET ITS RESPONSIBILITIES**
**UNDER THE NATIONAL HISTORIC PRESERVATION ACT**

*Preamble*

**Bureau of Land Management.** The Bureau of Land Management (BLM), consistent with its authorities and responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), is charged with managing public lands principally located in the States of Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, and Wyoming in a manner that will "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values," and "that will provide for outdoor recreation and human occupancy and use."

The BLM also has specific responsibilities and authorities to consider, plan for, protect, and enhance historic properties and other cultural properties which may be affected by its actions in those and other States, including its approval for Federal mineral resource exploration and extraction, under the National Environmental Policy Act, the National Historic Preservation Act of 1966 (NHPA), the Archaeological Resources Protection Act, the Native American Graves Protection and Repatriation Act, the Historic Sites Act of 1935, the Antiquities Act, the American Indian Religious Freedom Act, the Religious Freedom Restoration Act, Executive Order 13007 ("Sacred Sites"), and related authorities.

In carrying out its responsibilities, the BLM has developed policies and procedures through its directives system (BLM Manual Sections 8100-8160) to help guide the BLM's planning and decision making as it affects historic properties and other cultural properties, and has assembled a cadre of cultural heritage specialists to advise the BLM's managers and to implement cultural heritage policies consistent with these statutory authorities.

**State Historic Preservation Officers.** State Historic Preservation Officers (SHPOs), as represented by the National Conference of State Historic Preservation Officers (NCSHPO), have responsibilities under State law as well as under Section 101(b)(3) of the National Historic Preservation Act that include to "advise and assist as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities," and to "consult with the appropriate Federal agencies in accordance with [NHPA] on Federal undertakings that may affect historic properties, and the content and sufficiency of any plans developed to protect, manage, or to reduce or mitigate harm to such properties."

BLM Manual                                                                          Rel. 8-72
Supersedes Rel. 8-38, 8-51                                                          12/03/04

BLM_0007300

Appendix 13, page 2
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

2

In certain cases others may be authorized to act in the SHPO's place. Where the Secretary has approved an Indian tribe's preservation program pursuant to Section 101(d)(2) of the NHPA, a Tribal Preservation Officer may perform some SHPO functions with respect to tribal lands. A local historic preservation commission acting through the chief local elected official may fulfill some SHPO-delegated functions, where the Secretary has certified the local government pursuant to Section 101(c)(1) of the NHPA, and its actions apply to lands in its jurisdiction. Pursuant to the regulations implementing Section 106 of the NHPA [36 CFR 800.1(c)], the Council may at times act in lieu of the SHPO.

**Advisory Council on Historic Preservation**. The Advisory Council on Historic Preservation (Council) has the responsibility to administer the process implementing Sections 106, 110(f), and 111(a) of the National Historic Preservation Act, to comment with regard to Federal undertakings subject to review under Sections 106, 110(f) and 111(a) in accordance with its implementing regulations (36 CFR Part 800), and to "review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under [NHPA]" under Section 202(a)(6) of the NHPA.

The above-named parties now wish to ensure that the BLM will organize its programs to operate efficiently, effectively, according to the spirit and intent of the NHPA, and in a manner consistent with 36 CFR Part 800; and that the BLM will integrate its historic preservation planning and management decisions with other policy and program requirements to the maximum extent. The BLM, the SHPOs, and the Council desire and intend to streamline and simplify procedural requirements, to reduce unnecessary paperwork, and to emphasize the common goal of planning for and managing historic properties under the BLM's jurisdiction and control in the public interest.

*Basis for Agreement*

Proceeding from these responsibilities, goals, and objectives, the parties acknowledge the following basis for agreement:

WHEREAS the BLM's management of lands and mineral resources may affect cultural properties, many of which are historic properties as defined by the National Historic Preservation Act and are therefore subject to Sections 106, 110(f), and 111(a) of the NHPA; and

WHEREAS, among other things, the BLM's program established in response to Section 110(a)(2) and related authorities provides a systematic basis for identifying, evaluating, and nominating to the National Register historic properties under the bureau's jurisdiction or control; for managing and maintaining properties listed in or eligible for the National Register in a way that considers the preservation of their archaeological, historical, architectural, and cultural values and the avoidance of adverse effects in light of the views of

Appendix 13, page 3
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

3

local communities, Indian tribes, interested persons, and the general public; and that gives special consideration to the preservation of such values in the case of properties designated as having National significance; and

WHEREAS the BLM's program is also intended to ensure that the bureau's preservation-related activities are carried out in consultation with other Federal, State, and local agencies, Indian tribes, and the private sector; and

WHEREAS the BLM's program also has as its purpose to ensure that the bureau's procedures for compliance with Section 106 are consistent with regulations issued by the Council pursuant to Section 211 of the NHPA (36 CFR Part 800, "Protection of Historic Properties"), and provide a process for the identification and evaluation of historic properties for listing in the National Register and the development and implementation of agreements, in consultation with State Historic Preservation Officers, local governments, Indian tribes, and the interested public, as appropriate, regarding the means by which adverse effects on such properties will be considered; and

WHEREAS the BLM's program also intends to ensure that its Section 106 procedures recognize the historic and traditional interests of Indian tribes and other Native American groups in lands and resources potentially affected by BLM decisions, affording tribes and other groups adequate participation in the decisionmaking process in accordance with Sections 101(d)(6), 110(a)(2)(D), and 110(a)(2)(E)(ii) of the NHPA, and provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with Section 3(c) of the Native American Graves Protection and Repatriation Act, in accordance with Section 110(a)(2)(E)(iii) of the NHPA; and

WHEREAS this agreement will not apply to tribal lands, but rather, a proposed BLM undertaking on tribal lands will require consultation among the BLM, the Tribal Preservation Officer, and the Council; or among BLM, tribal officials (where no Tribal Preservation Program exists) the SHPO, and the Council; and such consultation will be outside the compass of this agreement and will follow 36 CFR Part 800 or the Indian tribe's alternative to 36 CFR Part 800; and

WHEREAS the BLM's program, the elements of which were defined in the BLM Manual between 1988 and 1994, does not incorporate some recent changes in legal, regulatory, and Executive Order authorities and recent changes in the nature and direction of historic preservation relationships, rendering the program directives in need of updating, and this need is recognized by the BLM, the Council, and the NCSHPO as an opportunity to work jointly and cooperatively among themselves and with other parties, as appropriate, to enhance the BLM's historic preservation program; and

WHEREAS the States, particularly those containing a high percentage of public land under the BLM's jurisdiction and control, have a strong incentive in forming a cooperative relationship with the BLM to facilitate and promote activities of mutual interest, including

BLM_0007302

Appendix 13, page 4
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

4

direction and conduct of a comprehensive statewide survey and inventory of historic properties, identification and nomination of eligible properties to the National Register of Historic Places, preparation and implementation of comprehensive historic preservation plans, and development and dissemination of public information, education and training, and technical assistance in historic preservation, and

WHEREAS the parties intend that efficiencies in the Section 106 process, realized through this agreement, will enable BLM, SHPO, and Council staffs to devote a larger percentage of their time and energies to proactive work, including analysis and synthesis of data accumulated through decades of Section 106 compliance; historic property identification where information is needed, not just in reaction to proposed undertakings; long-term preservation planning; purposeful National Register nomination; planning- and priority-based historic resource protection; creative public education and interpretation; more efficient BLM, SHPO, and Council coordination, including program monitoring and dispute resolution; and other activities that will contribute to readily recognizable public benefits and to an expanded view of the Section 106 context, and

WHEREAS the BLM has consulted with the Advisory Council on Historic Preservation (Council) and the National Conference of State Historic Preservation Officers (NCSHPO) regarding ways to ensure that BLM's planning and management shall be more fully integrated and consistent with the above authorities, requirements, and objectives;

NOW, THEREFORE, the BLM, the Council, and the NCSHPO mutually agree that the BLM, after completing the actions summarized in 1. below, will meet its responsibilities under Section 106, 110(f), and 111(a) through the implementation of the mechanisms agreed to in this agreement rather than by following the procedure set forth in the Council's regulations (36 CFR Part 800), and the BLM will integrate the manner in which it meets its historic preservation responsibilities as fully as possible with its other responsibilities for land-use planning and resource management under FLPMA, other statutory authorities, and executive orders and policies.

## *Components Of Agreement*

### 1. Applicability

The Council's regulations (36 CFR Part 800) and existing State programmatic agreements will continue to apply to BLM undertakings under a State Director's jurisdiction until the Director and State Directors, with the advice of the Preservation Board, assisted by the Council, the NCSHPO, the SHPOS, and other participating parties, as appropriate, have updated and revised national BLM policies and procedures; developed State-specific BLM/SHPO operating protocols; and trained all field managers and their cultural heritage staffs in the operation of the policies, procedures, and protocols. Field offices under a State Director's jurisdiction

BLM_0007303

Appendix 13, page 5
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)


5

(including those under the jurisdiction of the Eastern States Director) will not begin to employ the streamlined procedures developed pursuant to this agreement until the Director has certified that the State Director's organization is appropriately qualified to do so.


## 2. Establishment of Preservation Board

a. The BLM's Director will establish a Preservation Board to advise the Director, Assistant Directors, State Directors, and field-office managers in the development and implementation of BLM's policies and procedures for historic properties. Authority, responsibilities, and operating procedures for the Preservation Board will be specified in the BLM Manual.

b. The Preservation Board will be chaired by the BLM's Preservation Officer designated under Section 110(c) of the NHPA, and will include a professionally qualified Deputy Preservation Officer from each State Office. The field management organization will be represented by at least three line managers (i.e., officials who are authorized by the Director's or State Directors' delegation to make land-use decisions).

c. The Preservation Board will perform primary staff work and make recommendations to the Director and State Directors concerning policies and procedures (3. below); bureauwide program consistency (3. below); training (6. below); certification and decertification of field offices (8. below); monitoring of field offices' historic preservation programs (9. below); and responses to public inquiries (9. below).

d. In addition, the Preservation Board will confer regularly with the Council and NCSHPO and involve them in its activities, as appropriate, including the development of the items listed in 2.c. The Preservation Board will also confer regularly with individual SHPOs and such other parties as have identified themselves to the Board as interested parties, including Tribal Preservation Officers, local governments, and preservation associations, to promote consistency with State, regional, and national practice, to identify recurrent problems or concerns, and to create opportunities in general to advance the purposes of this agreement.

e. The BLM will provide assistance, where feasible and appropriate, with reasonable and prudent expenses of the Council related to its activities pursuant to 2.c. and 2.d. above.


## 3. Revision of "Cultural Resource Management" Procedures

a. Within 6 months from the date of its establishment under 2. above, the Preservation Board will provide notice to Indian tribes and the public and, in accordance with 2.c. above, will begin to review, update, revise, adapt, and augment the various relevant sections of its Manual (8100 Series). These are:

Appendix 13, page 6
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

6

8100 - "Cultural Resource Management";
8110 - "Cultural Resource Identification";
8111 - "Cultural Resource Inventory and Evaluation";
8130 - "Cultural Resource Planning";
8131 - "Cultural Resource Management Plans";
8132 - "Cultural Resource Project Plans";
8140 - "Cultural Resource Protection";
8141 - "Physical and Administrative Protection";
8142 - "Recovery of Cultural Resource Data";
8143 - "Avoidance and/or Mitigation of Adverse Effects to Cultural Properties";
8150 - "Cultural Resource Utilization";
8151 - "Cultural Resource Use Permits";
8160 - "Native American Coordination and Consultation"; and
H-8160-1 - "General Procedural Guidance for Native American Consultation."

b. Manuals will be revised in consultation with the Council, NCSHPO, and the SHPOs, and will consider the views of other interested parties who have identified themselves in response to 2.d. (above).

c. Procedures will be revised to be consistent with the purposes of (1) this agreement, (2) the principles and standards contained in the Council's regulations, "Protection of Historic Properties" (36 CFR Part 800); (3) the Secretary of the Interior's *Standards and Guidelines for Archeology and Historic Preservation* regarding identification, evaluation, registration, and treatment, (4) the Office of Personnel Management's classification and qualification standards as revised under Section 112 of the NHPA, and (5) other applicable standards and guidelines, and will include time frames and other administrative details for actions referred to in this agreement.

d. The BLM will ensure adequate public participation and consultation with parties outside the BLM when revising policy and procedures under 3.a. The BLM's procedures for implementing the National Environmental Policy Act (NEPA) will be used as appropriate for ensuring adequate public participation in the BLM's historic preservation decision making. Provisions of Section 110 of the NHPA and the Council's regulations will be the basis for tailoring the NEPA procedures to historic preservation needs. Mechanisms for continuing public involvement in BLM's historic preservation process will be incorporated in BLM/SHPO protocols under 5. below.

e. The BLM will provide Indian tribes and other Native American groups with appropriate opportunities for involvement. Consultation with tribes pursuant to Sections 101(d)(6) and 110(a)(2)(E) of the NHPA will follow government-to-government conventions. Procedures to ensure timely and adequate Native American participation will follow the direction in Sections 101(d)(6) and 110(a)(2)(E) of the NHPA, and BLM Manual Section 8160 and Manual Handbook H-8160-1, as revised pursuant to a. and b. above. Revisions to the 8160 Manual Section and Manual Handbook will treat the cited NHPA direction as the

BLM_0007305

Appendix 13, page 7
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

7

minimum standard for Indian tribes' and other Native American groups' opportunities to be involved. Provisions for Native American participation in BLM's procedures for historic property identification, evaluation, and consideration of adverse effects will be incorporated in BLM/SHPO protocols under 5. below. For Indian tribes with historic preservation programs approved by the Secretary under Section 101(d)(2) of the NHPA, Tribal Preservation Officers will be involved in place of SHPOs when tribal land would be affected. Such involvement will occur under the Council's and/or the Tribe's procedures in all cases, not under this programmatic agreement.

f. It will be the Preservation Board's duty in accordance with 3.b. above to ensure that the policies and procedures, as revised pursuant to this section, are being followed appropriately by field offices. Where problems with implementation are found, it will be the Preservation Board's duty to move promptly toward effecting correction of the problems. This responsibility of the Preservation Board, among others, will be spelled out in the BLM Manual under 2.a. above.

**4. Thresholds for Council Review**

a. The BLM procedures will identify circumstances calling for the Council's review.

b. At a minimum, the BLM will request the Council's review in the following classes of undertakings:

(1) nonroutine interstate and/or interagency projects or programs;

(2) undertakings directly and adversely affecting National Historic Landmarks or National Register eligible properties of national significance;

(3) highly controversial undertakings, when Council review is requested by the BLM, an SHPO, an Indian tribe, a local government, or an applicant for a BLM authorization.

**5. Cooperation and Enhanced Communication**

a. Immediately following execution of this agreement, the BLM will offer each affected SHPO and the Council (and others who have identified concerns under 2.d. above) the following information, and will provide or update as needed:

– a reference copy of the existing BLM Manual Sections and Manual Handbooks related to "Cultural Resource Management;"

BLM_0007306

Appendix 13, page 8
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

8

– a copy of any Handbook, Manual Supplement, or other standard procedure for "Cultural Resource Management" used by the BLM within an individual State Office's jurisdiction
– a list of Preservation Board members;
– a list of BLM cultural heritage personnel within each State Office's jurisdiction;
– a map of the State showing BLM field office boundaries and responsibilities;
– the best available map of the State showing tribal lands, ceded lands, and ancestral use areas; and
– a brief summary of land holdings, major ongoing development projects or permitted uses, proposed major undertakings such as land exchanges or withdrawals, and particularly significant historic properties on BLM lands within each State Office's jurisdiction.

b. Within 6 months after revised policies and procedures become available, each State Director will meet with each pertinent SHPO to develop a protocol specifying how they will operate and interact under this agreement. Where a State Director has few interactions with an SHPO due to minimal public land holdings, protocols need not be pursued and historic preservation consideration will continue to be carried out under the procedures of 36 CFR Part 800. Adoption of protocols, as formalized by the State Director's and SHPO's signatures, will be a prerequisite for the certification described in 8. The Preservation Board and the Council will be kept informed of the progress of protocol development, and will receive an information copy of any signed BLM/SHPO protocol. The SHPO and State Director may ask the NCSHPO, the Preservation Board, and the Council to assist at any stage in developing protocols.

At a minimum, protocols will address the following:

– the manner in which the State Director will ensure the SHPO's involvement in the BLM State management process;
– data sharing, including information resource management development and support
– data synthesis, including geographical and/or topical priorities for reducing the backlog of unsynthesized site location and report information, and data quality improvement;
– public education and community involvement in preservation;
– preservation planning;
– cooperative stewardship;
– agreement as to types of undertakings and classes of affected properties that will trigger case-by-case review (case-by-case review will be limited to undertakings that BLM finds will affect historic properties; the parties to this agreement agree that such case-by-case review will be minimized);
– BLM/SHPO approaches to undertakings involving classes of, or individual examples of, historic properties for which the present BLM staff lacks specialized capabilities;
– provisions for resolving disagreements and amending or terminating the protocol; and
– relationship of the protocol to 36 CFR Part 800.

BLM_0007307

Appendix 13, page 9
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

9

c. As agreed under the protocol, but at least annually, the BLM will regularly send to the SHPO copies of forms and reports pertaining to historic properties, in a format appropriate to the SHPO's established recording systems, and consistent with the confidentiality provisions of Section 304 of the NHPA, so that information can be shared to the maximum extent and contribute to State inventories and comprehensive plans as well as to BLM land use and resource management planning.

d. The State Director, with the assistance of the Preservation Board, will seek, as appropriate, the SHPO's active participation in the BLM's land-use planning and associated resource management activities so that historic preservation considerations can have a greater influence on large scale decisions and the cumulative effects of the more routine decisions, before key BLM commitments have been made and protection options have been limited. Where SHPO participation will be extensive, State Directors may provide funding, if available.

e. Relevant streamlining provisions of BLM Statewide programmatic agreements currently in force in Arizona, California, Colorado, Nevada, New Mexico, and Wyoming (and other programmatic agreements and/or formalized working arrangements between BLM and SHPOs in any State, relative to identifying undertakings, identifying properties, evaluating properties, determining effects, and protecting historic properties) may be incorporated in BLM/SHPO protocols as appropriate and as consistent with 5.b. above, after which the State Directors will notify the SHPO and Council that the Statewide agreements may be suspended for so long as this agreement remains in effect. Project and special purpose programmatic agreements will function normally according to their terms.

f. When potentially relevant to the purposes and terms of this agreement, the BLM will forward to the Council information concerning the following, early enough to allow for timely briefing and consultation at the Council's election:

– major policy initiatives;
– prospects for regulations;
– proposals for organizational change potentially affecting relationships addressed in this agreement;
– the Administration's budget proposals for BLM historic preservation activities;
– training schedules; and
– long-range planning and regional planning schedules.

**6. Training Program**

In cooperation with the Council and the NCSHPO, and with the active participation of individual SHPOs, the Preservation Board will develop and implement a training program to (a) instruct BLM line managers and cultural heritage program personnel on the policies underlying and embodied in this agreement, as well as specific measures that must be met

BLM_0007308

Appendix 13, page 10
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

10

prior to its implementation, and (b) enhance skills and knowledge of other BLM personnel involved with "Cultural Resource Management" activities, including land use planning and resource management staffs. Training sessions will be open to Indian tribes, cultural resource consultants, and other parties who may be involved in the implementation of this agreement. The BLM may, where feasible and appropriate, reimburse the Council for assistance in developing training programs.

## 7. Professional Development

a. The Preservation Board, in consultation with the supervising line manager and cultural heritage specialist, will document each specialist's individual attainments as a preservation professional, consistent with OPM guidance and Section 112 of the NHPA and giving full value to on-the-job experience. Documentation will include any recommended limitations on the nature and extent of authorized functions. Where a field office manager's immediate staff does not possess the necessary qualifications to perform specialized preservation functions (e.g., historical architecture), the documentation will identify available sources of specialized expertise from outside the immediate staff, such as from other BLM offices, the SHPO, other Federal agencies, or non-governmental sources.

b. The Preservation Board, the supervising line manager, and the cultural heritage specialist will assess the manager's needs for special skills not presently available on the immediate staff, and the specialist's opportunities for professional development and career enhancement through training, details, part-time graduate education, and other means.

## 8. State Office Certification and Decertification

a. The Preservation Board, in consultation with the appropriate SHPO and the Council, will certify each BLM State Office to operate under this agreement upon determining that (1) managers and specialists have completed the training referred to in 7. above, (2) professional capability to carry out these policies and procedures is available through each field office's immediate staff or through other means, (3) each supervising line manager within the State has assigned and delimited cultural heritage specialists' duties, and (4) the State Director and the SHPO have signed a protocol outlining BLM/SHPO interaction in accordance with 5. above.

b. The Preservation Board may choose to review a field office's certification status. The field office's manager, the State Director, the Council, or the SHPO may request that the Preservation Board initiate a review, in which case the Preservation Board will respond as quickly as possible. If a field office is found not to have maintained the basis for its certification (e.g. the professional capability needed to carry out these policies and procedures is no longer available, or the office is not in conformance with the BLM/SHPO protocol, the procedures developed under 3. above, or this agreement) and the office's manager has not

BLM_0007309

Appendix 13, page 11
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

11

voluntarily suspended participation under this agreement, the Preservation Board will recommend that the State Director decertify the field office. If a suspended or decertified field office is found to have restored the basis for certification, the Preservation Board will recommend that the State Director recertify the office.

     c. A State Director may ask the Director to review the Preservation Board's decertification recommendation, in which case the Director will request the Council's participation in the review.

     d. The Preservation Board will notify the appropriate SHPO(s) and the Council if the status of a certified office changes.

     e. When a field office is suspended or decertified, the responsible manager will follow the procedures of 36 CFR Part 800 to comply with Section 106.

**9. Accountability Measures**

     a. Each State Director will prepare an annual report in consultation with the appropriate SHPO(s), outlining the preservation activities conducted under this agreement. The annual report's content will be specified in the revised Manual. The report will be provided to the Council and made available to the public.

     b. Once each year, the Council, in consultation with the BLM, SHPOS, and interested parties, and with assistance from the BLM, may select a certified State or States, or field offices within a State, for a detailed field review limited to the implementation of this agreement. Selecting parties may consider including other legitimate affected parties as participants in the review, as appropriate. The Preservation Officer and the appropriate Deputy Preservation Officer(s) and SHPO(s) will participate in the review. Findings and recommendations based on this field review will be provided to the Director, the State Director, and the Preservation Board for appropriate action.

     c. The Preservation Officer and Deputy Preservation Officers will prepare responses to public inquiries for the Director's or a State Director's signature. This applies only to inquiries about the BLM's exercise of its authorities and responsibilities under this agreement, such as the identification, evaluation, and protection of resources, and not to general inquiries. Preparing responses will include establishing the facts of the situation and, where needed, recommending that the Director or State Director prescribe corrections or revisions in a practice or procedure.

     d. Each meeting of the Preservation Board will be documented by a report. The Preservation Board will provide a copy of each report to the Council, the NCSHPO, and participating SHPOs.

BLM_0007310

Appendix 13, page 12
(.05A)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

12

## 10. Reviewing and Changing the Agreement

a. The parties to this agreement may agree to revise or amend it at any time. Changes that would affect the opportunity for public participation or Native American consultation will be subject to notice and consultation, consistent with 3.e. above.

b. Should any party to this agreement object to any matter related to its implementation, the parties will meet to resolve the objection.

c. Any party to this agreement may terminate it by providing 90 days notice to the other parties, provided that the parties will meet during the period prior to termination to seek agreement on amendments or other actions that would avoid termination. In the event of termination, the BLM will comply with 36 CFR Part 800, including any relevant suspended State programmatic agreements (see 5.e. above).

d. Not later than the third quarter of FY 1999, and every two years thereafter, the parties to this agreement will meet to review its implementation.

### *Affirmation*

The signatures below represent the affirmation of the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers that successful execution of the components of this agreement will satisfy the BLM's obligations under Sections 106, 110(f), and 111(a) of the National Historic Preservation Act.

/s/ Sylvia V. Baca                                            3/26/97
_____     _____
Director, Bureau of Land Management                Date

/s/ Cathryn B. Slater                                         March 26, 1997
_____     _____
Chairman, Advisory Council on Historic Preservation     Date

/s/ Judith E. Bittner                                          Mar 26, 1997
_____     _____
President, National Conference of State Historic      Date
    Preservation Officers

Appendix 14, page 1
(.04H)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**BUREAU OF LAND MANAGEMENT**

**CHARTER FOR THE
PRESERVATION BOARD**

The Preservation Board is established to assist the Directorate, the State Directors, and Field Office managers in meeting their responsibilities under the National Historic Preservation Act. The Board serves in a professional staff function, assuring that Bureauwide quality standards are observed and maintained, and recommending adjustments in policy, procedures, and practice when needed. The Board coordinates with the Advisory Council on Historic Preservation (Council), the National Conference of State Historic Preservation Officers (NCSHPO), and individual State Historic Preservation Officers (SHPO), and responds to inquiries from the public, according to provisions of the National Programmatic Agreement, dated March 26, 1997, executed by the Director, the Chairman of the Council, and the President of the National Conference of SHPO's.

This Charter will be reviewed during the third quarter 1999, in conjunction with the scheduled review of the National Programmatic Agreement's implementation, and afterward will continue to be reviewed on the same schedule as reviews of the National Programmatic Agreement.

**I. Membership**

    A. Ex officio members:

        1. The BLM's Preservation Officer, designated under Section 110(c) of the National Historic Preservation Act (Chair)
        2. A professionally qualified Deputy Preservation Officer representing each State Director (State Office Cultural Heritage Program Lead)

    B. Rotating-term members, recommended by the Board and appointed by the Director:

        1. An Associate State Director (two-year term)
        2. Two Field Office managers (two-year term)
        3. A Field Office Cultural Heritage staff specialist (one-year term)
        4. Additional line or staff manager(s) as appropriate (two-year term)

**II. Roles**

    The Preservation Board's roles are:

        To perform primary staff work and make recommendations to the Director and State Directors concerning –
        – historic preservation policy and procedures
        – bureauwide program consistency
        – training

BLM_0007312

Appendix 14, page 2
(.04H)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

- certification and decertification of Field Offices
- monitoring of Field Offices' historic preservation activities, and
- responses to public inquiries;

To confer regularly with the NCSHPO and the Council and with parties who have identified themselves to the Board as interested parties, including SHPO's, Tribal Preservation Officers (TPO's), trade and professional associations, and authorized users of the public lands –
- to promote consistency with State, regional, and national historic preservation practice, and
- to identify recurrent problems or concerns.

### III. Scope and Responsibilities

The scope of the Preservation Board's staff and advisory functions is consistent with the scope of responsibilities that come to the Director (as "head of [a] Federal agency") under the National Historic Preservation Act, whether those responsibilities are met at Field Office, State, inter-State, or Bureauwide levels. Where they bear on the BLM's capability to meet the Director's legal responsibilities, funding, staffing, and other budgetary aspects of program management may be included in the Board's advisory scope.

A. Bureauwide Historic Preservation Policy and Procedures

The Preservation Board will review and make recommendations to the Directorate on Manual Sections, Manual Handbooks, and temporary directives addressing historic preservation.

B. Bureauwide Historic Preservation Practice

The Preservation Board will monitor Field Office performance under Bureauwide historic preservation policy and procedures and State-level protocols developed with SHPO's, and will recommend adjustments where needed to correct problems.

### IV. Board Support and Ad-hoc Board Assignments

The Preservation Board may call on the host office for space, normally available equipment, and clerical or other staff support needed to facilitate its meetings. The Cultural Heritage, Wilderness, Special Areas and Paleontology Group in the Washington Office will maintain file copies of Board reports and recommendations.

The Preservation Board may identify special ad-hoc advisors or advisory teams to provide technical support, subject to assignment by the responsible manager(s).

BLM_0007313

Appendix 14, page 3
(.04H)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**V. Meetings**

The Preservation Board will meet at least twice each year. Schedules and locations will be determined by the Board. Other meetings involving all Board members or a representative special committee may be held as needed to examine special issues. The Board will develop procedures for conducting its meetings. Each meeting of the Board or a Board committee will be documented by a report, a copy of which will be provided to the NCSHPO and Council for their information.

Recommended by:

/s/ John G. Douglas                                    9/18/97
_____        _____
Preservation Officer                                    Date

Reviewed and
concurred in by:

/s/ Marilyn W. Nickels                                 9/18/97
_____        _____
Group Manager, Cultural Heritage, Wilderness,   Date
     Special Areas and Paleontology

for

/s/ Tom Walker                                          9/18/97
_____        _____
Assistant Director, Renewable Resources         Date
     and Planning

Approved by:

/s/ Pat Shea                                            10/1/97
_____        _____
Director                                                Date

BLM_0007314

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

## BUREAU OF LAND MANAGEMENT

### CHARTER FOR THE
### PRESERVATION BOARD

# REVISION

The following changes revise the Preservation Board charter of October 1, 1997.

**From Section I,  Membership, remove the existing paragraph B:**

    B.  Rotating-term members, recommended by the Board and appointed by the Director:

        1.  An Associate State Director (two-year term)
        2.  Two Field Office managers (two-year term)
        3.  A Field Office Cultural Heritage staff specialist (one-year term)
        4.  Additional line or staff manager(s) as appropriate (two-year term)

**and replace with a new paragraph B:**

    B.  Rotating-term members with overlapping terms of 2 years each, recommended by the Board and appointed by the Director:

        1.  Four line managers representing the tiers of the Field organization
        2.  Two Field Office cultural heritage staff specialists

Recommended:

| | |
|---|---|
| /s/ John G Douglas | 11/15/99 |
| Preservation Officer on behalf of the Preservation Board | Date |

Approved:

| | |
|---|---|
| /s/ Tom Fry | 12/1/99 |
| Director | Date |

BLM_0007315

Appendix 15, page 1
(.1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Council Letter With Transition Questions and Answers**

---

**Advisory
Council On
Historic
Preservation**

The Old Post Office Building
1100 Pennsylvania Avenue, NW, #809
Washington, DC 20004

---

May 24, 1999

Dear Preservation Partner:

The Council is pleased to convey a copy of the revised 36 CFR Part 800, "Protection of Historic Properties." Published in the *Federal Register* May 18, 1999, at 64 F.R. 27043-27084, they go into effect June 17, 1999. The document also includes the Council's "Recommended Approach for Recovery of Significant Information From Archaeological Sites" (pp. 27085-27087).

The new regulations significantly modify the Section 106 review process, introducing new streamlining while incorporating changes mandated by the 1992 amendments to NHPA. They give greater deference to decisions made by Federal agencies and SHPOs; focus Council actions on larger issues such as monitoring Federal preservation program trends and overall performance; define and strengthen the roles of Indian tribes and other Native Americans; recognize the role of applicants; and encourage early compliance.

The rule also encourages Federal agencies to integrate Section 106 review with reviews required under the National Environmental Policy Act and other laws. Specific provisions now allow agencies to use information and analyses prepared for one law to meet the requirements of another. Revisions and refinements throughout the regulations cumulatively improve the operation of the Section 106 review process.

In addition to the rule itself, the materials in this package include an overview of significant changes, a flow chart of the new process, procedural Q&As, and information about transitional briefings. Additional materials will be posted on our Web site www.achp.gov as they become available.

Thank you for your support throughout the process of regulatory revision. With your help, we now have a more effective and efficient Section 106 review process.

Sincerely,

John M. Fowler
Executive Director

Enclosures

---

BLM Manual
Supersedes Rel. 8-38, 8-51

Rel. 8-72
12/03/04

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

**Transition Questions and Answers**

**Revised Section 106 Regulations**
Effective June 17, 1999

**ACHP** **106**

Major Changes

Full Text of the Revised Regulations

Regs Flow Chart

Flow Chart Explanatory Material

Archeology Guidance

Transition Questions and Answers

Briefings Schedule

## Making the Transition to the Council's Revised Regulations: Questions and Answers

### Introduction

**1. Are existing Memoranda of Agreement and Programmatic Agreements still valid?**

**2. What interpretation applies to provisions of MOAs/PAs executed before the effective date of the new regulations that refer to the former regulations by section numbers?**

**3. How are existing MOAs/PAs to be interpreted that do not specifically refer to a section of the former regulations but refer instead to the Council's regulations in a general manner?**

**4. Under what regulations must cases in progress be handled?**

**5. How are MOAs prepared under the former regulations to be executed when they are received by the Council after the new regulations go into effect?**

**6. If it is decided that the former regulations are to be used for one purpose under an MOA/PA, is use of the revised regulations precluded for another purpose in the same MOA/PA?**

**7. To what address must case materials be sent?**

**Summary**

## Introduction

The Advisory Council on Historic Preservation has revised the regulations that implement Section 106 of the National Historic Preservation Act. Published in the *Federal Register* (64 FR 27043-27084) on May 18, 1999, the revised regulations go into effect June 17, 1999. This briefing sheet addresses questions that are expected to arise during the transition from the former regulations to the revised ones.

The revisions are the culmination of careful Council review of the Section 106 process, which was last amended in 1986. This review reaffirmed the basic tenets of the Section 106 process, while

BLM_0007317

Appendix 15, page 3

(.1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Transition Questions and Answers**

introducing new flexibility and options for agencies to meet their legal obligations. The process continues to focus on constructive resolution of potential conflicts between a Federal undertaking and historic properties through consultation and agreement among the agency, the State or Tribal Historic Preservation Officer (SHPO/THPO), and the Council.

## 1. Are existing Memoranda of Agreement and Programmatic Agreements still valid?

Yes. Memoranda of Agreement (MOAs) and Programmatic Agreements (PAs) executed under the former regulations are still valid. The revised regulations contain changes to the process by which agreements will be developed and executed after June 17, 1999.

## 2. What interpretation applies to provisions in Memoranda of Agreement and Programmatic Agreements executed before the effective date of the new regulations that refer to the former regulations by section numbers?

When the parties to existing MOAs and PAs entered into those agreements, the former regulations were in place. By referring to sections of those regulations, the signatories expressed their intent to be bound by the terms of the regulations existing at the time the agreements were executed.

Unless a particular MOA or PA expressly states that the most current version of the regulations is to apply, each MOA or PA must be interpreted under the version of the regulations that was current at the time the agreement was executed. If an MOA or PA states that the most current version of the regulations is to govern the agreement's terms, then the revised regulations should be used. Few, if any, agreements contain such a provision.

Under both the former and the revised regulations and under most MOAs and PAs, signatories are entitled to seek amendment to the agreement. Thus, if a signatory is unhappy with a reference to a section of the former regulations or its interpretation, that party would be free to seek amendment to bring the MOA or the PA under the revised regulations.

However, except in a highly unusual situation, it is anticipated that amendments will be pursuant to the revised regulations. In addition, all the signatories to the original document must agree to the amendment.

BLM_0007318

Appendix 15, page 4

(.1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Transition Questions and Answers**

### 3. How are existing MOAs and PAs to be interpreted that do not specifically refer to a section of the former regulations but refer instead to the Council's regulations in a general manner?

By including in the Memoranda of Agreement a general reference to the Council's regulations rather than a specific reference, the parties agreed to a general process and not to specific steps as might be contained in a particular section or subsection of the former regulations.

This sort of general reference is often seen in stipulations in MOAs that require the agency to seek the comments of the Council under 36 CFR Part 800 if the provisions of the MOA cannot be met. Although it could be shown that the parties intended the processes contained in the former regulations to apply, it is more reasonable to assume that the most current process is applicable. Therefore, new consultation required by such general references, including that occurring in the context of an MOA, should be conducted under the revised regulations.

Again, parties may seek amendment of MOAs or PAs to clarify any ambiguities.

### 4. Under what regulations must cases in progress be handled?

Even if an agency has initiated the Section 106 process prior to June 17, 1999, the revised regulations should be applied unless circumstances strongly warrant completing the process under the former regulations. This approach should not cause delay in completing the Section 106 process.

Generally, regarding cases in progress when the revised regulations go into effect, it will be assumed that the revised regulations apply unless the consulting parties agree to the contrary. The parties should consider the following factors in deciding which regulations to use to complete the process:

- How long ago did the agency initiate the process? If the process was initiated so long ago that the agency might have reasonably expected that the former regulations would apply, it might make sense to continue to apply those regulations.
- How far into the process is the case? If a case has been nearly completed under the former regulations, it might be

BLM_0007319

Appendix 15, page 5

(.1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES – (Public)

**Transition Questions and Answers**

more expedient to complete the process under the former regulations. If the process has only begun, the revised regulations should be applied.

- Will continued application of the former regulations create any delay, expense, or hardship? If so, it is more reasonable to apply the revised regulations.
- Will continuing to use the former regulations deprive any party (e.g. THPO, other tribes, applicants, local governments) or the public of an opportunity to participate? If so, the revised regulations should apply.

If the Agency Official, SHPO, and Council cannot agree, then the revised regulations should apply.

**5. How are Memoranda of Agreement prepared under the former regulations to be executed when they are received by the Council after June 17, 1999?**

When agreements that have been prepared under the former regulations come to the Council for consideration and signature, the Council will assume that the revised regulations apply to its own actions with regard to those agreements. The Council will treat them as MOAs under §800.6(b)(2) of the revised regulations, requiring the Council's signature.

Although the appropriate documentation required by the revised regulations should be submitted, the Council will apply the documentation requirements flexibly when, in its estimation, circumstances so warrant.

**6. If it is decided that the former regulations are to be used for one purpose under an MOA or a PA, is use of the revised regulations precluded for another purpose in the same MOA or PA?**

Although it is preferable to apply only one set of regulations to any given MOA or PA, there may be circumstances in which it would be more reasonable to apply both the former and the revised regulations for different purposes. For example, when an existing MOA or PA refers to a specific section of the former regulations and it is clear that the parties intended the particular terms of that section to apply, then the specified section of the former regulations may be used.

BLM_0007320

Appendix 15, page 6

(.1)

8100 - THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES - (Public)

**Transition Questions and Answers**

The same MOA or PA may also require the parties to seek Council comment when the terms of the agreement cannot be met. For this second reference, the revised regulations would apply. (See answer to question #3.)

## 7. To what address must case materials be sent?

All case materials developed under the regulations should be sent to the Director, Office of Planning and Review. Materials for cases originating in localities east of the Mississippi River, as well as in Minnesota, Iowa, and Missouri, should be sent to ACHP, 1100 Pennsylvania Ave., NW, Suite 809, Washington, DC 20004. Materials for cases originating west of the Mississippi River (exclusive of Minnesota, Iowa, and Missouri) should be sent to ACHP, 12136 W. Bayaud Ave., Suite 330, Lakewood, CO 80228.

## Summary

Specific references to sections of the former regulations in existing agreements should be interpreted under the version of the regulations that existed at the time the agreement was executed, unless the MOA or PA contains a provision to the contrary or the signatories agree that the MOA or PA should be interpreted under the revised regulations. General references to the Council's regulations in existing MOAs or PAs should be interpreted as references to the revised regulations unless the MOA clearly indicates otherwise.

Cases in progress generally should follow the revised regulations. However, the consulting parties, who began consultation before the effective date of the new regulations, and having considered all pertinent factors, may agree to complete the process under the former regulations. Such agreement should be in writing and should state the reasons for the decision.

The Council staff is available to answer any questions and provide guidance on application of the regulations in specific circumstances. For questions related to the regulations, call (202) 606-8508, or e-mail regs@achp.gov.

Source: http://www.achp.gov/regsq&a.html. Transmitted with App. 15, page 1, May 24, 1999.

BLM_0007321

# Bureau of Land Management

# National Sage-Grouse Habitat Conservation Strategy

## U.S. Department of the Interior

## November 2004

BLM_0007322

# Bureau of Land Management

# National Sage-Grouse Habitat Conservation Strategy

## Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 3 |
| II. | Purpose | 4 |
| III. | Other Sage-Grouse Related Programs, Initiatives and Efforts | 5 |
| IV. | Overview of Sage-Grouse; Population and Life History and Threats to Sage-Grouse Habitat | 6 |
| V. | Guiding Principles | 7 |
| VI. | Vision, Goals, Strategies and Actions | 9 |
| VII. | Progress Reporting | 16 |
| VIII. | Authorities and Responsibilities | 16 |
| IX. | Literature Relevant to the BLM Sage-Grouse Habitat Conservation Strategy | 20 |

2

BLM_0007323

## I. Introduction

BLM developed this National Sage-grouse Habitat Conservation Strategy (National Sage-grouse Strategy) to guide future actions for conserving sage-grouse and associated sagebrush habitats and to enhance BLM's ongoing conservation efforts. The National Sage-grouse Strategy provides a framework for future conservation efforts by setting out broad goals and specific actions to meet the goals. For each action that BLM will take, the National Sage-grouse Strategy explains what the action is, when the action will be taken and who will be the responsible official or office for completing the action. Integral to the National Sage-grouse Strategy are various guidance documents that will help BLM ensure that it successfully incorporates sage-grouse conservation measures into all of its ongoing programs and activities, including land use planning, grazing and mineral leasing, and other programs.

BLM designed this National Sage-grouse Strategy around four main goals. Associated with each goal are specific strategies and actions that BLM will undertake to meet the goal. The four goals are:

1) Improve the effectiveness of the management framework for addressing conservation needs of sage-grouse on lands administered by the BLM.

2) Increase understanding of resource conditions in order to prioritize habitat maintenance and restoration.

3) Expand partnerships, available research and information that support effective management of sage-grouse habitat.

4) Ensure leadership and resources are adequate to continue ongoing conservation efforts and implement national and state-level sage-grouse habitat conservation strategies and/or plans.

BLM is not a newcomer to sage-grouse conservation. As the land manager of almost half of the remaining sagebrush habitat, BLM plays a key role in conserving sage-grouse and sagebrush habitat. BLM has been taking actions for years on its own and as an active partner in state and local led efforts that have benefited the species and associated habitats. For example, in July 2000, BLM signed a Memorandum of Understanding (MOU) with the Western Association of Fish and Wildlife Agencies (WAFWA), the U.S. Forest Service (FS), and the U.S. Fish and Wildlife Service (FWS) that provided for state and local cooperation to coordinate planning, habitat and population mapping, and evaluation and restoration of sage-grouse populations. However, conservation of sage-grouse habitat is complex. Effective conservation strategies must occur at a variety of scales, with a variety of partners (state, local and tribal governments), and be integrated into the daily activities of the BLM land management mission. Conservation of sage-grouse requires national level policy, national and local program commitment, and local and regional knowledge and support.

Sections I through IV contain background information about sage-grouse population and life history, habitat requirements, and threats or risks potentially affecting the species. The information comes from a large body of published scientific literature, which is provided in Section IX. Sections V through VII detail the guiding principles, goals, strategies, and actions that provide the fundamental themes and guidance for preparing and implementing national and

3

state-level strategies.  Additional information on progress reporting and a list of major authorities used by the BLM in carrying out conservation efforts are provided in Sections VIII-IX.

## II. Purpose

The purpose of this comprehensive National Sage-grouse Strategy is to set goals and objectives, assemble guidance and resource materials, and provide a comprehensive management direction for the BLM's contributions to the on-going multi-state sage-grouse conservation effort in cooperation with the WAFWA.

The Federal Land Policy and Management Act (1976) (FLPMA) provides the basic authority for BLM's multiple use management of all resources on the public lands.  One of the BLM's many responsibilities under FLPMA is to manage public lands for the benefit of wildlife species and the ecosystems upon which they depend.  However, habitat management is one of many provisions of the multiple-use mandate outlined in FLPMA.  Because conserving sagebrush habitats involves managing many other public land uses, this National Sage-grouse Strategy includes guidance and existing regulations for a variety of BLM-administered programs.  FLPMA gave BLM the legal authority and mandate to manage and regulate the uses on the public lands "so that their various resource values are utilized in a combination that will best meet the present and future needs of the American people" (Section 103 (c)).  Consistency and coordination in identifying and addressing threats to sage-grouse and sagebrush habitat in context of the multitude of programs that BLM manages is required.  Addressing these threats throughout the range of the sage-grouse is critical to achieving the mandate of FLPMA and threat reduction, mitigation, and elimination to sage-grouse and sagebrush habitats.

In July 2000, WAFWA, FS, FWS and BLM signed an MOU that provides for Federal, state and local cooperation to coordinate planning, habitat and population mapping, and evaluation and restoration of sage-grouse populations.  In July 2002, WAFWA agreed to develop a Conservation Assessment (CA) for sage-grouse and sage-grouse habitat to be completed in two distinct phases.  Phase 1 is a range-wide assessment of sage-grouse populations and habitat status, trends and threats across eleven Western states.  It was completed in June 2004.  Phase 2, a range-wide implementation plan, will outline specific actions for the conservation of sage-grouse and sage-grouse habitats.  Phase 2 is scheduled for completion in mid to late 2005.

As an active partner in Federal, state and local sage-grouse conservation planning efforts and as the primary Federal manager of sage-grouse habitat, the BLM is in a key position to contribute to sage-grouse habitat conservation from the range-wide geographic scale to the local level.  This National Sage-grouse Strategy will strengthen Federal, state and local efforts by addressing habitat needs and trends on the BLM–managed lands and by ensuring that sage-grouse habitat needs are addressed in BLM land use plans and through actions carried out at the site specific level.  Implementation of BLM's National Sage-grouse Strategy and the state-level Sage-grouse Habitat Conservation Strategies will complement and expand the ongoing efforts to conserve sagebrush ecosystems on public lands administered by the BLM for the benefit of sage-grouse and other wildlife species.

4

BLM_0007325

### III. Other Sage-Grouse Related Programs, Initiatives and Efforts

BLM program actions described in this National Sage-grouse Strategy focus on achieving coordinated conservation efforts on BLM-administered public land and are consistent with and support the following on-going efforts:

1) Conservation Planning Framework Team:  The 2000 MOU between BLM, FWS, FS and WAFWA established a Conservation Planning Framework Team consisting of four (4) representatives from WAFWA member agencies (U.S. only) and one (1) each from BLM, FS, and FWS.  The Team is responsible for developing the range-wide conservation planning framework, making recommendations and providing guidance to working groups on the contents of state and local conservation plans.

2) Nevada Ad Hoc Working Group:   In 1999, the BLM, FS, FWS, and the Nevada Department of Wildlife formed an ad hoc working group to coordinate the development of planning tools and other resources to facilitate conservation of species of concern throughout the sagebrush biome.

   The working group adopted a regional, multi-scale approach to conservation and restoration in the sagebrush biome in an attempt to manage overall efforts more effectively.  Prototype processes and projects of regional importance are being developed or planned for the Great Basin, Columbia Plateau, Wyoming Basin, Northern Great Plains, and the Utah/Colorado Plateau.  This approach will provide better information about sage-grouse and sagebrush habitats and improve conservation planning by prioritizing areas where conservation activities are most likely to be successful using existing and projected resources.

3) SageMap:  Regional Science Based Assessments:  As a result of the ad-hoc working group's efforts, in 2002 the BLM, in cooperation with the FS, Pacific Northwest Research Station, and the U.S. Geological Survey (USGS), Biological Resources Division, Snake River Field Station (SRFS), developed science-based procedures that use existing information to conduct regional sagebrush habitat assessments for species of concern.  The procedures are made available to the public through the USGS SageMap website and were used to develop the prototype Great Basin assessment.  Information from that assessment is being used in support of sage-grouse conservation planning and the Great Basin Restoration Initiative (GBRI).  These procedures are also being used to conduct or support prototype assessments in the Wyoming Basin.

4) SageMap Query and Data Analysis Modeling:  The SageMap project, conducted by SRFS, is identifying and collecting spatial data layers needed to research and manage sage-grouse and shrubsteppe systems. The data sets, which can be queried, viewed, and downloaded from an FTP site, are important for understanding and managing shrubsteppe lands and associated wildlife.  SageMap was created to share and disseminate information on sagebrush management, especially among resource managers and researchers interested in available literature and data from research within the sagebrush biome.  SageMap contains over 3,000 data sets and currently is the most comprehensive source of spatial data related to sagebrush and associated studies in North America.

5) Great Basin Restoration Initiative:  The GBRI was initiated by BLM in response to widespread habitat losses in the Great Basin from wildfires and other causes.  Concern over the loss of habitats for sage-grouse and other sagebrush-dependent species was a significant and important factor in how GBRI evolved.

5

BLM_0007326

6) Plant Conservation Alliance:  The Plant Conservation Alliance (PCA) is a public/private partnership among 10 Federal agencies and more than 200 non-Federal cooperators.  In accord with Congressional direction, the PCA (through BLM) is leading an interagency native-plant material-development program for use in restoration and rehabilitation efforts on Federal lands.  Funds have been provided for development of appropriate native plant materials within sagebrush ecosystems.  This is critical to the development of seed sources for restoring native plant communities within sagebrush ecosystems.

7) Supportive BLM Programs:  Numerous BLM programs, plans or initiatives provide additional guidance and resources to conserve and/or restore sagebrush and sage-grouse habitats as described in this National Sage-grouse Strategy.  These include:

   - Department of the Interior (DOI) and BLM Strategic Plans
   - 95 BLM Land Use Plans covering the current occupied range of sage-grouse
   - Healthy Forests Initiative
   - BLM Special Status Species – Manual 6840
   - BLM 1601 Handbook Appendix C – *Land Use Planning, Special Status Species*
   - National Fire Plan – 10-year Implementation Plan
   - BLM Standards for Rangeland Health Handbook (H-4180-1)

**IV. Overview of Sage-Grouse; Population and Life History and Threats to Sage-Grouse Habitat**

Sage-grouse historically inhabited much of the sagebrush-dominated ecosystems of North America.  Today, sage-grouse population abundance and extent have declined throughout most of their historical range.  Population dynamics of sage-grouse are marked by strong cyclic behavior; however, in the last 30 years, the peak in the cycle of bird numbers has declined. Adult survival is high but is offset by low juvenile survival, resulting in low productivity.  Habitat requirements for sage-grouse vary greatly depending on the season and life-history stage.  Key habitat components include adequate canopy cover of tall grasses and medium height shrubs for nesting, abundant forbs and insects for brood rearing, and availability of herbaceous riparian species for late growing-season foraging.

No single factor can be identified as the cause of declines in sage-grouse populations.  Since settlement of the West began, numerous activities have adversely affected the number of birds and the amount, distribution, and quality of sagebrush habitats.  Historically, sagebrush-dominated vegetation was one of the most widespread habitats in the country.  However, the majority of sagebrush ecosystems were lost or altered in some way by human activities and naturally occurring events.  Some examples are large-scale conversions to cultivated croplands or pastures, altered fire frequencies resulting in conifer invasion at higher elevations and annual grass invasion at lower elevations, livestock grazing, herbicide use, mineral and energy development, and recreational activities related to urban growth and increased human populations.  In many cases, the extent and significance of these effects or how sage-grouse populations will respond over time to cumulative effects caused by historical uses coupled with new activities is still unknown.  Currently, the risk to sage-grouse comes from multiple sources across multiple scales.  Thus, the BLM National Sage-grouse Strategy is comprehensive in its approach and address the risk to sage-grouse and habitat at appropriate scales.

A more detailed treatment of life history, threats and risks to sage-grouse is contained in the *Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats* (Connelly, et al.

6

BLM_0007327

2004) produced by WAFWA and available at http://sagemap.wr.usgs.gov/.

## V. Guiding Principles

The National Sage-grouse Strategy is the framework for conserving and managing sage-grouse habitats on lands administered by the BLM.  In addition, this National Sage-grouse Strategy serves as the umbrella for BLM state-level strategies, which have been or are being developed in cooperation with state wildlife agencies and partners.

The following principles are the foundation of the National Sage-grouse Strategy.

- Cooperative Integrated Approach: The BLM recognizes the states' role in sage-grouse conservation planning as described in the 2000 MOU.  The BLM National Sage-grouse Strategy complements state-led sage-grouse conservation planning efforts and provides consistent guidance for integration of range-wide, state and local-level conservation actions into existing BLM programs.  This cooperation and coordination will ensure appropriate actions are identified at the appropriate scale for conserving sage-grouse and sagebrush habitat.

- BLM's Roles as the Key Federal Sagebrush Habitat Manager: Approximately half of the remaining sage-grouse habitat is under BLM jurisdiction and management; therefore, BLM land plays a significant role in the conservation of sage-grouse and other sagebrush-dependent wildlife species.

- Best Available Science: The BLM will use the best available science and other relevant information to develop conservation efforts for sage-grouse and sagebrush habitats.

- Comprehensive Strategy:  Planned actions carried out under this National Sage-grouse Strategy will be fully consistent with laws, regulations, and policies.

- Interdisciplinary Integrated Approach:  The use of interdisciplinary teams and specific analysis at the local and regional levels are key to the success of sage-grouse and sagebrush conservation.

- National Goals, Local Solutions:  This National Sage-grouse Strategy contains clearly defined goals and measurable tasks.  BLM land use plans will be an essential component in implementing local solutions and sage-grouse and sagebrush conservation.  These plans will use science and information at the local and state level with input from agency partners, scientists and other planning participants to develop appropriate solutions at the appropriate scale.

- Strategic Implementation:  Development and implementation of this National Sage-grouse Strategy is consistent with, and supports implementation of the Department of the Interior (DOI) Strategic Plans Resource Protection mission under the pillars of partnerships and management.

- Land Use Plan Based:  BLM land use plans and associated implementation plans are the principal mechanisms for making decisions and conducting on the ground actions to conserve and restore sage-grouse habitats for lands administered by the BLM.  Land use plans will be updated and amended when and where appropriate, to adequately

7

address sage-grouse and sagebrush conservation needs through full public participation.

- Rangeland Health Program Based:  BLM Standards for Rangeland Health are the primary tool for evaluating the condition of sage-grouse and sagebrush habitats.  BLM Resource Advisory Councils (RACs) will be consulted as additional program guidelines are developed.

- Cooperative Conservation:  Communication, cooperation, and consultation among state and Federal agencies, tribes, stakeholders, BLM RAC's within states, and the conservation community are essential for achieving successful conservation results. Partnerships both inside and outside the BLM will be fostered at every opportunity and every organizational level.

- Supportive to Current Initiatives:  The BLM will capitalize on existing national or regional initiatives, such as the GBRI, Seeds of Success, Partnership Against Weeds, and the Plant Conservation Alliance, that benefit sage-grouse and sagebrush habitat.

- Open Collaborative Approach:  The BLM will collaborate and share, as appropriate and authorized all information that is pertinent and useful in conserving sage-grouse and sage-grouse habitat.

- Adaptive:  The Bureau is committed to sage-grouse and sagebrush conservation and will continue to adjust and adapt our National Sage-grouse Strategy as new information, science and monitoring results evaluate effectiveness over time.

- Implementation Commitment:  Successful implementation of this National Sage-grouse Strategy requires a long-term commitment from BLM managers and staff across all programs and at every level of the organization.

BLM_0007329

## VI. Vision, Goals, Strategies, and Actions

**Vision:  Manage BLM-administered public land to maintain, enhance and restore
sagebrush habitats while ensuring multiple use and sustained yield goals of FLPMA.**

The following table identifies the Goals, Strategies, Actions, Responsible Party, and Deadline
for each Action.

**Goal 1:  Set forth the management framework for addressing conservation of sage-
grouse on lands administered by the BLM.**

**Strategy 1.1:   Provide needed coordinated policies and program direction at the
National and the BLM State and Field Office levels.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 1.1.1  Issue direction on completion of state-level strategies and BLM plans. | Director, WO-230 (Lead), WO-210 (Co-lead) | November 2004 |
| 1.1.2  Complete BLM coordination on State agency led strategies and/or plans. | State Directors | Ongoing, with final state submissions July 2005. |
| 1.1.3  Issue off-site habitat mitigation policy.  Identify limitations and opportunities for funding and implementation across programs. | WO-300 (Lead); WO-200 (Co-lead) | March 2005 |
| 1.1.4  Develop a resource guide to enhance partnership involvement in sage-grouse conservation efforts. | Director, WO-200, WO-300, WO-800 | October 2004, Completed |
| 1.1.5  Revise or develop fire management plans for each state to include sage-grouse habitat management guidance. | State Directors | October 2004 |
| 1.1.6  Report to the Director on progress towards implementation of this strategy. | WO-200 (Lead) (National Sage-grouse Strategy) State Directors (State-level strategies) | September 1, 2005, 2006, 2007 |

**Strategy 1.2:  Establish and maintain a data base to describe and track
conservation efforts in sagebrush habitats.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 1.2.1  Gather initial information on conservation effort from all states with current sage-grouse populations. | WO-200 (Lead), WO-300, WO-880 | July 2004, Completed |
| 1.2.2  Support the information gathered with a data base that allows assemblage across state lines and queries. | WO-200 (Lead), WO-300, WO-880, NSTC | July 2004, Completed |
| 1.2.3  Expand the data base to include sagebrush habitat in states without current sage-grouse populations. | WO-880 (Lead), WO-200, WO-300 | December 2005 |

9

BLM_0007330

**Strategy 1.3:  Provide guidance to ensure integration of sage-grouse habitat conservation measures for actions provided through the management in land use planning process.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 1.3.1  Issue guidance to ensure land use plans and plan amendments adequately address sage-grouse habitat conservation needs. | Director, WO-200 (Lead) | October 2004, Completed |
| 1.3.2  Develop standard terminology for sage-grouse habitats (e.g., stronghold areas, breeding, etc.) for consistent future use. | WO-200 (Lead), NSTC | January 2005 |
| 1.3.3  Complete preparation of Southeast Oregon RMP case history for applying multi-scale information. | WO-230 (Lead), DSDs, NSTC | March 2005 |
| 1.3.4  Develop a process and schedule to update deficient land use plans to address sage-grouse needs. | State Directors, WO-210 | April 2005 |
| 1.3.5  Develop process for use of broad-, mid- and fine-scale  assessments in land use planning efforts and incorporate into planning guidance. | WO-200 (Lead), NSTC | October 2005 |

**Strategy 1.4:  Issue mandatory guidance on management of sagebrush habitat for sage-grouse conservation.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 1.4.1  Develop and issue "Guidance for the Management of Sagebrush Plant Communities for Sage-Grouse Conservation." National guidance must be adaptable to local variability provided sage-grouse conservation goals are maintained or enhanced by the local adaptations. | Director, WO-230 (lead) | October 2004, Completed |
| 1.4.2  Develop additional management guidance as needed, to address specific future conservation needs. | WO-200 (Lead) and Fire | Ongoing |
| 1.4.3  Develop and issue livestock grazing BMPs to restore, maintain or enhance the quality of sage-grouse and sagebrush habitat. | WO-220 (Lead), WO-200 | December 2004 |
| 1.4.4  Develop and issue BMPs for oil and gas development. | WO-300 (Lead), WO-200 | June 2004, Completed, WO-2004-194 |

10

BLM_0007331

**Goal 2:  Enhance knowledge of resource conditions and priorities in order to support habitat maintenance and restoration efforts.**

**Strategy 2.1:  Complete and maintain eco-regional assessments of sagebrush and sage-grouse habitats across the sagebrush biome.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 2.1.1  Develop national spatial data sets for multi-scale assessments. | WO-200 (Lead),WO-300, State Directors, NSTC | September 2006 |
| 2.1.2  Complete ecoregional assessments of the Wyoming Basin, Northern Great Plains, Colorado Plateau, and complete habitat connectivity analysis. | NSTC (Lead), WO-230,  State Directors | September 2006

November 2006 for connectivity analysis |
| 2.1.3  Update ecoregional assessments for the Columbia Basin and Great Basin. | WO-230 (Lead), State Directors | September 2008 |
| 2.1.4  Complete state-level mapping of sage-grouse/sagebrush habitats and disturbance regimes. | State Directors (Lead), NSTC | May 2004, Completed |
| 2.1.5  Participate in preparation of the WAFWA range-wide sage-grouse conservation assessment phase I and phase II. | WO-230 (Lead), State Directors | June 2004, phase I completed

Phase II, 2005 |

**Strategy 2.2:  Provide a consistent and scientifically based approach for collection and use of monitoring data for sagebrush habitats, sage-grouse and other components of the sagebrush community.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 2.2.1  Develop, cooperatively with our partners, appropriate monitoring strategies and protocols at the appropriate scale for sage-grouse habitat in conjunction with the development of the range-wide conservation action plan. | WO-200 (Lead) | August 2005 |
| 2.2.2  Develop, cooperatively with our partners, a sage-grouse habitat assessment methodology in conjunction with development of the range-wide conservation action plan. | WO-200 | November 2005 |

11

| Actions | Responsibilities | Deadline |
| --- | --- | --- |
| 2.2.3  Incorporate the sage-grouse habitat assessment framework into the land health assessment process for evaluating indicators of healthy rangelands. | WO-200 | December 2006 |
| 2.2.4  In conjunction with the development of the range-wide conservation action plan, issue guidance for collecting fine-scale monitoring and assessment information and incorporating requirements into implementation projects and plans. | WO-200 (Lead), NSTC | April 2005 |

**Strategy 2.3:  Identify, prioritize and facilitate needed research to develop relevant information for sage-grouse and sagebrush habitat conservation in coordination with WAFWA.**

| Actions | Responsibilities | Deadline |
| --- | --- | --- |
| 2.3.1  In cooperation with partners, establish an national interagency, interdisciplinary technical team to:<br>• receive research questions from local and regional managers and working groups;<br>• sort  priority information needs and identify sources of research information (e.g. West Nile virus); and<br>• serve as clearinghouse for research funding proposals. | WO-200 | July 2005 |

12

**Goal 3:  Expand partnerships, available research, and information that support effective management of sage-grouse and sagebrush habitats.**

**Strategy 3.1:  Maintain, develop and expand partnerships to promote cooperation and support for all activities associated with sage-grouse and sagebrush conservation.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 3.1.1  Participate in the local, regional and national  conservation efforts established under the agreement with Western Association of Fish and Wildlife Agencies. | State Directors; WO-200 | Ongoing |
| 3.1.2  Expand partnerships at all levels to support development and implementation of the National Sage-grouse Strategy. | Director, State Directors, Field Managers | Ongoing |
| 3.1.3  Maintain and expand state and local partnerships to implement the tasks outlined in the cooperatively developed  state-level strategies and/or plans. | State Directors, Field Managers | Ongoing |

**Strategy 3.2:  Effectively communicate throughout BLM and with current and prospective partners on steps BLM will take to conserve sage-grouse and sage-grouse and sagebrush habitats.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 3.2.1  Complete a communications plan for the National Sage-grouse Strategy, including internal and external audiences. | WO-610 (Lead), WO-200, WO-300, WO-880 | August 2004, Completed and Ongoing |
| 3.2.2  Complete a communications plan for state-level sage-grouse strategies/plans, including internal and external audiences Ensure that the BLM National, State and Field Office communication strategies support the comprehensive National Sage-grouse Strategy and ensure each level of the BLM organization knows how their strategies implement goals and enhance sage-grouse and sagebrush conservation goals. | State Directors (Lead), Public Affairs, Field Managers | December 2004 |

13

**Strategy 3.3:  Facilitate the collection, transfer and sharing of information among all BLM partners and cooperators, as well as BLM program personnel.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 3.3.1  Continuously improve interagency data and mapping efforts such as SageMap | WO-200 (lead) | Ongoing |
| 3.3.2  Improve  web-based tools available to support sagebrush conservation efforts (e.g. links to literature, project and studies maps, decision support models) | WO-200 (lead) | 2005; Ongoing |
| 3.3.3  Develop and distribute publications that support field-level conservation efforts | WO-200 (lead) | Ongoing; 2005 and beyond |
| 3.3.4  Develop minimum standards for data collection, data dictionary  and reporting at state, regional and national levels that are compatible with data developed by state agencies and other partners | WO-200 (Lead), WO-880 | December 2006 |
| 3.3.5  Provide training to ensure Bureau-wide understanding of sage-grouse habitat requirements and Best Management Practices (BMPs) across all disciplines | WO-230 (Lead), NTC | December 2005 |
| 3.3.6  Host a biennial workshop with partners to share understanding and knowledge of sagebrush ecology and management, including use of BMPs | WO-200 | Biennial |
| 3.3.7  Identify cooperative funding and/or other mechanisms for data collection, reporting and dissemination related to sagebrush and sage-grouse habitats | WO-200 | November 2004 |
| 3.3.8  Enhance and accelerate, through partnerships, technical and scientific support to the field for sagebrush conservation efforts | WO-200/WO-170 | June 2005 |

14

BLM_0007335

**Goal 4:  Ensure leadership and resources are adequate to implement national and state-level sage-grouse and sagebrush habitat conservation strategies and/or plans.**

**Strategy 4.1:  Develop BLM state-level strategies and/or plans for sage-grouse and sagebrush conservation on BLM-administered public lands.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 4.1.1 Establish BLM state-level interdisciplinary teams to prepare strategies. | State Directors (Lead), Field Managers | Ongoing; November 2004 |
| 4.1.2 Consult with States, RACs, Councils, tribes, other agencies, stakeholders, and interested publics in preparation of draft BLM state-level strategy/plan. | State Directors (Lead), Field Managers | Ongoing; annual meetings |
| 4.1.3 Incorporate sage-grouse/sagebrush conservation measures into all applicable land use plans. | State Directors (Lead), Field Managers | Ongoing, as scheduled per Action 1.3.4 |

**Strategy 4.2:  Formulate budgets necessary to support continued implementation of the National Sage-grouse Strategy.**

| Actions | Responsibilities | Deadline |
|---|---|---|
| 4.2.1 Prioritize needs for sage-grouse and sagebrush conservation in Strategic Budget Plan (FY+2). | Director, State Directors, Field Committee and the Budget Strategy Team | Ongoing; annual |
| 4.2.2 Include priority needs for sage-grouse and sagebrush conservation in Budget Justifications (FY+1). | State Directors, Field Managers, WO-200, WO-300, WO-800 (Lead) | Ongoing; annual |
| 4.2.3 Prioritize needs for sage-grouse and sagebrush conservation in Annual Work Plan. | State Directors, Field Managers, WO-200, WO-300, WO-800 (Lead) | Ongoing; annual |
| 4.2.4 Give priority to sage-grouse and sagebrush conservation in CCS, CCI and NFWF funding proposals. | State Directors, Field Managers, WO-200 | Ongoing; annual |

15

BLM_0007336

## VII. Progress Reporting

Implementation of the actions outlined in this BLM National Sage-grouse Strategy and the cooperative state agency led sage-grouse habitat conservation strategies will be monitored and progress reported to the Director annually. The effectiveness of implementing actions outlined in both the national and state strategies will require an assessment process that includes 'before and after' project evaluation of habitat conditions. This assessment process is currently being developed (see Action 2.2.2). The assessment process will be incorporated into BLM's land health assessment process for evaluating indicators of healthy rangelands.

## VIII. Authorities and Responsibilities

The BLM has broad authority to manage the public lands. BLM management of the public lands is guided by Federal laws, regulations, policies and handbooks. Collectively, these frame BLM's "regulatory mechanisms" for sage-grouse conservation as discussed in Section 4 of the Endangered Species Act. Many of these authorities have a bearing on sage-grouse conservation, but only the most relevant ones are discussed below.

### 1) Laws

Several major Federal laws provide the authority and framework for this National Sage-grouse Strategy:

#### Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 *et seq.*), as amended

This is the primary Federal law governing most land uses on BLM-administered lands. It directs BLM to develop and maintain land use plans based on inventories of these lands and the resources they support. Among other things, this Act gave fish and wildlife resources equal standing with the other traditional public uses of BLM-administered lands. Section 102(a)(8) states: "The Congress declares that it is the policy of the United States that the public lands be managed in a manner that will....provide food and habitat for fish and wildlife...."

#### National Environmental Policy Act (NEPA), 1969, Title II (42 U.S.C. 4321 *et seq.*), as amended

NEPA requires that land-management planning be conducted in the public arena, using an interdisciplinary process for evaluating and disclosing resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to explore alternatives; consider impacts, including cumulative impacts; mitigate impacts; and decide appropriate public land uses.

#### Public Rangelands Improvement Act 1978, Title II (43 U.S.C. 1901 *et seq.*), as amended

The Public Rangelands Improvement Act provides that "[e]xcept where the land use planning process required pursuant to Section 202 of [FLPMA] determines otherwise or the Secretary determines, and sets forth his reasons for this determination, that grazing uses should be discontinued (either temporarily or permanently) on certain lands, the

16

goal of ...management shall be to improve the range conditions of the public rangelands so that they become as productive as feasible in accordance with the rangeland management objectives established through the land use planning process, and consistent with the values and objectives listed in sections 2(a) and (b)(2) of this Act."

### Sikes Act of 1974, Title II (16 U.S.C. 670 *et seq.*), as amended

This Act directs the Secretaries of Interior and Agriculture to, in cooperation with the State agencies, develop plans to "... develop, maintain, and coordinate programs for the conservation and rehabilitation of wildlife, fish and game. Such conservation and rehabilitation programs shall include, but not be limited to, specific habitat improvement projects, and related activities and adequate protection for species considered threatened or endangered."

### Wild Horse and Burro Act of 1971 (16 U.S.C. 1331), as amended

The Wild Horse and Burro Act gives BLM statutory authority for management of wild horses and burros and responsibility to provide for a thriving ecological balance on public rangelands. At 43 CFR 4700.0-6 is the policy of the BLM that: "Wild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat."

## 2) Regulations

Once a law is enacted, the administering Federal agency promulgates rules and regulations, as appropriate, to guide implementation. These regulations set the framework for national policy and can in some instances provide implementation direction. Regulations are a very important "regulatory mechanism" for administering land uses on public lands. For the BLM, there are several sets of regulations associated with implementing FLPMA and other laws. Most of the regulations that may affect BLM guidance on sage-grouse management are found in 43 CFR, although some, such as the Council on Environmental Quality regulations, are found in other portions of the CFR.

### 43 CFR Subpart C, Minerals Management 3000 Series,

The Minerals Management regulations contain regulatory authority for BLM operations, enforcement and reclamation of mineral actions on public lands.

### 43 CFR Subpart 4120, Grazing Management

The Grazing Management regulations contain the regulatory authority for grazing administration, use authorizations, permit terms, and conditions for achieving resource-condition objectives. Subparts 4140-4170 outline prohibited acts, enforcement, and penalties. Subpart 4180 is an example of how regulations provide direction for sage-grouse conservation. Within the scope of these grazing regulations, are included specific direction to the BLM State Directors to develop standards that among other things would address:

(43 CFR 4180.2(d)):

17

(4) Habitat for endangered, threatened, proposed, candidate, or special status species; and (5) Habitat quality for native plant and animal populations and communities.

In addition, Subpart 4180.2(e) requires development of guidelines to address:

(9) Restoring, maintaining or enhancing habitats of Federal proposed, Federal candidate, and other special status species to promote their conservation.

### 43 CFR 4180, Fundamentals of Rangeland Health

The Fundamentals of Rangeland Health require the BLM to develop, in consultation with Resource Advisory Councils, rangeland health standards. The Fundamentals of Rangeland Health combine the basic precepts of physical function and biological health with elements of law relating to water quality and plant and animal populations and communities to provide the basis for the standards for land health.

## 3) BLM National Policy Guidance

National policy guidance further defines or clarifies how laws and regulations will be administered. This direction comes either in the form of a policy statement or as manuals or handbooks. National policy establishes what basic policy is to be achieved. BLM State and local policies can provide more specific guidance on how the national policy objectives are to be accomplished. BLM State and local field offices have discretion to adapt national policy to local situations, but do not have authority to override national policy for local situations.

Policies are particularly useful in avoiding conflicts with laws and regulations. Federal agency policies concerning sensitive species are a good example. The ESA only applies to proposed and listed species and designated or proposed critical habitat, but it is in the interest of the Federal government, consistent with other laws such as FLPMA, to conserve sensitive species with the intent to avoid a need to list. There are no regulations associated with FLPMA that specifically address fish and wildlife management or, more specifically, conservation of sensitive species at risk of being listed in the future. Agency policy provides this direction for sensitive species conservation and fills this regulatory gap. Two main sets of policy guidance currently provide direction for sage-grouse conservation efforts.

### BLM Special Status Species Management – Manual 6840

Policy guidance for sage-grouse habitat conservation is summarized in this manual. It provides national-level policy direction, consistent with appropriate laws, for the conservation of special-status species of animals and plants and the ecosystems on which they depend. *Conservation* in this National Sage-grouse Strategy, and consistent with 6840 policy, means the use of all methods and procedures necessary to improve the condition of special status species and their habitats to a point where their special status recognition is no longer warranted.

BLM_0007339

**Land Use Planning Handbook - H-1601-1**

All program actions (allocations, authorizations, objectives, standards, conditions and implementation priorities) taken on the public land are guided by land use plans. These plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 *et seq.*) under the principles of multiple use and sustained yield. The BLM Land Use Planning Handbook provides more detailed direction for land use planning consistent with planning regulations found in 43 CFR 1600.

The Handbook states that, as required by FLPMA, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use by encouraging collaboration and public participation throughout the planning process. In addition, the public lands must be managed in a manner that recognizes the nation's need for domestic sources of minerals, food, timber, and fiber from the public lands.

Land use plans are the primary mechanisms for guiding BLM program activities. Land use plans guide management actions on public lands in the planning area. Land use plan decisions establish goals and objectives for resource management,; measures needed to achieve these desired future conditions, and the parameters for using BLM-administered public land. These plans identify lands that are open or available for certain uses, including any applicable restrictions, and lands that are closed to certain uses.

19

BLM_0007340

## IX.  Literature Relevant to the BLM Sage-Grouse Habitat Conservation Strategy

Anonymous.  1997.  Gunnison sage grouse conservation plan. Gunnison Basin, Colorado. Bureau of Land Management, Gunnison, Colorado.  108 p.

Apa, A. D.  1998.  Habitat use and movements of sympatric sage and Columbian sharp-tailed grouse in southeastern Idaho.  Ph.D. dissertation, Univ. of Idaho, Moscow.

Asher, J. 1994. Crushing the wilderness spirit: Alien plant invasions. Unpublished report on file with: U.S. Department of the Interior, Bureau of Land Management, Oregon State Office, P.O. Box 2965, Portland, Oregon 97201.

Autenrieth, R. E.  1981.  Sage grouse management in Idaho Wildlife Bulletin Number 9.  Idaho Department of Fish and Game.  Boise.  239 p.

Baker, H.G. 1986. Patterns of plant invasion in North America.  Mooney, H.A. and J.A. Drake, editors, Ecology of biological invasions of North America and Hawaii. Springer-Verlag, New York. 44-57.

Barnett, J. F., and J. A. Crawford.  1994.  Pre-laying nutrition of sage grouse hens in Oregon. Journal of Range Management.  47:114-118.

Barney, M.A., and N. C. Frischknecht.  1974.  Vegetation changes following fire in the pinyon-juniper type of west-central Utah.  Journal of Range Management 27:91-96.

Bay, K. G.   1989.  Writing rules of progress - A look at oil and gas development in the midwest. Proceedings of the 43rd Midwest Fish and Wildlife Conference.  Wichita, KS.  8 p.

Bazzaz, F.A. 1986. Life history of colonizing plants: Some demographic, genetic, and physiological features.  H.A. and J.A. Drake, editors, Ecology of biological invasions of North America and Hawaii. Springer-Verlag, New York. 96-110.

Beck, J. L., and D. L. Mitchell.  2000.  Influences of livestock grazing on sage grouse habitat. Wildlife Society Bulletin 28:993-1002.

Beck, T. D. I.  1977.  Sage grouse flock characteristics and habitat selection during winter. Journal of Wildlife Management 41:18-26.

Beck, T. D. I.  1975.  Attributes of a wintering population of sage grouse, North Park, Colorado. M.S. thesis.  Colorado State University, Fort Collins.  49 p.

Bergerud, A. T.  1988.  Population ecology of North American grouse.  A.T. Bergerud and M. W. Gratson, eds.  *Adaptive strategies and population ecology of northern grouse.* University of Minnesota Press, Minneapolis.  578-648.

Berry, J. D., and R. L. Eng.  1985.  Interseasonal movements and fidelity to seasonal use areas by female sage grouse.  Journal of Wildlife Management 49:237-240.

Blus, L. J., C. S. Staley, C. J. Henny, G. W. Pendleton, T. H. Craig, E. H. Craig, and D. K. Halford. 1989.  Effects of organophosphorus insecticides on sage grouse in southeastern Idaho.  Journal of Wildlife Management 53:1139-1146.

Braun, C. E.  1986.  Changes in sage grouse lek counts with advent of surface coal mining. Proceedings of Issues and Technology in the Management of Impacted Western Wildlife.  Thorne Ecological Institute. 2:227-231.

Braun, C. E.  1987.  Current issues in sage-grouse management.  Proceedings, Western Association of Fish and Wildlife Agencies.  67:134-144.

Braun, C. E.  1998.  Sage grouse declines in western North America:  what are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies.  78:139-156.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge.  2002.  Oil and Gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage-grouse.  Transactions of the North American Wildlife and Natural Resources Conference: in press.

20

Call, M. W., and C. Maser.  1985.  Wildlife habitats in managed rangelandsBthe Great Basin of southeastern Oregon.  Sage Grouse (*Centrocercus urophasianus*).  U. S. Forest Service, General Technical Report PNW-GTR-187.  31 p.

Coggins, K. A.  1998.  Sage grouse habitat use during the breeding season on Hart Mountain National Antelope Refuge. M.S. thesis, Oregon State University, Corvallis.  61 p.

Connelly, J. W., Jr.  1982.  An ecological study of sage grouse in southeastern Idaho.  Ph.D. dissertation, Washington State University, Pullman.  84 p.

Connelly, J. W., and L. J. Blus.  1991.  Effects of pesticides on upland game: a review of herbicides and organophosphate and carbamate insecticides.  M. Marsh, editor.  Proceedings, Pesticides in Natural Systems - how can their effects be monitored?  U. S. Environmental Protection Agency, Seattle, Washington.  92-97.

Connelly, J. W., and C. E. Braun.  1997. Long-term changes in sage grouse *Centrocercus urophasianus* populations in western North America. Wildlife Biology 3:123-128.

Connelly, J. W., and O. D. Markham.  1983.  Movements and radionuclide concentrations of sage grouse in southeastern Idaho.  Journal of Wildlife Management 47:169-177.

Connelly, J. W., W. J. Arthur, and O. D. Markham.  1981.  Sage grouse leks on recently disturbed sites.  Journal of Range Management 52:153-154.

Connelly, J. W., H. W. Browers, and R. J. Gates.  1988.  Seasonal movements of sage grouse in southeastern Idaho.  Journal of Wildlife Management 52:116-122.

Connelly, J. W., W. L. Wakkinen, A. D. Apa, and K. P. Reese. 1991.  Sage grouse use of nest sites in southeastern Idaho.  Journal of Wildlife Management 55:521-524.

Connelly, J. W., R. A. Fischer, A. D. Apa, K. P. Reese, and W. L.  Wakkinen.  1993.  Renesting of sage grouse in southeastern Idaho.  Condor 95:1041-1043.

Connelly, J. W., K. P. Reese, W. L. Wakkinen, M. D. Robertson, and R. A. Fischer.  1994.  Sage grouse ecology report. Idaho Department of Fish and Game Job Completion Report.  W-160-R-19.  Subproject 9.  91 p.

Connelly, J. W., M. A. Schroeder, A. R. Sands, C. E. Braun. 2000.  Guidelines for management of sage grouse populations and habitats. Wildlife Society Bulletin 28(4): 967-985.

Connelly, J. W. , S. T. Knick, M. A. Schroeder, and S. J. Stiver.  2004.  Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats.  Western Association of Fish and Wildlife Agencies.  Unpublished Report.  Cheyenne, Wyoming.

Cottam, W. P. and G. Stewart.  1940.  Plant succession as a result of grazing and of meadow desiccation by erosion since settlement in 1892.  Journal of Forestry 38: 613-626.

Dalke, P. D., D. B. Pyrah, D. C. Stanton, J. E. Crawford, and E. F. Schlatterer.  1963.  Ecology, productivity, and management of sage grouse in Idaho.  Journal of Wildlife Management 27:810-841.

Delong, A. K., J. A. Crawford, and D. C. Delong, Jr.  1995.  Relationships between vegetational structure and predation of artificial sage grouse nests.  Journal of Wildlife Management 59:88-92.

DePuit, E. J., and J. G. Coenenberg. 1979. Methods for establishment of native plant communities on top soiled coal strip-mine spoils in the northern Great Plains.  Reclamation Review 2:75-83.

Drut, M. S., W. H. Pyle, and J. A. Crawford.  1994.  Diets and food selection of sage grouse chicks in Oregon.  Journal of Range Management 47:90-93.Drut, M. S., W. H. Pyle, and J. A. Crawford. 1994.  Diets and food selection of sage grouse chicks in Oregon.  Journal of Range Management 47:90-93.

Eddleman, L. E. 1987.  Establishment of western juniper in central Oregon.  R. L. Everett, compiler.  ProceedingsBpinyon-juniper conference 1986, U.S. Forest Service General Technical Report INT-GTR-215.  Intermountain Research Station, Ogden, Utah.  255-259.

BLM_0007342

Edelmann, F. B., M. J. Ulliman, M. J. Wisdom, K. P. Reese, and J. W. Connelly.  1998.  Assessing habitat quality using population fitness parameters: a remote sensing/GIS-based habitat-explicit population model for sage grouse (*Centrocercus urophasianus*).  Technical Report 25.  Idaho Forest, Wildlife and Range Experiment Station, Moscow.

Edminster, F. C.  1954.  American game birds of field and forest.  Charles Scribner's Sons, New York, New York, USA.

Ellis, K. L. 1987.  Effects of a new transmission line on breeding male sage grouse at a lek in northwestern Utah.  Abstract *in* J. Roberson, editor.  Transactions of the 15th Sage Grouse Committee.  Western Association of Fish and Wildlife Agencies, July 1987, Midway, Utah.  28-30.

Eng, R. L.  1963.  Observations on the breeding biology of male sage grouse.  Journal of Wildlife Management 27:841-846.

Eng, R. L., and P. Schladweiler.  1972.  Sage grouse winter movements and habitat use in central Montana.  Journal of Wildlife Management 36:141-146.

Enyeart, G.  1956.  Responses of sage grouse to grass reseeding in the Pines area, Garfield County, Utah.  M.S. thesis, Utah State Agricultural College, Logan. 55 p.

Fischer, R. A.  1994.  The effects of prescribed fire on the ecology of migratory sage grouse in southeastern Idaho.

Fischer, R. A., A. D. Apa, W. L. Wakkinen, K. P. Reese, and J. W. Connelly.  1993.  Nesting-area fidelity of sage-grouse in southeastern Idaho.  Condor 95: 1038-1041.

Fischer, R. A., K. P. Reese, and J. W. Connelly.  1996*a*.  An investigation on fire effects within xeric sage grouse brood habitat.  Journal of Range Management 49:194-198.

Fischer, R. A., K. P. Reese, and J. W. Connelly.  1996*b*.  Influence of vegetal moisture content and nest fate on timing of female sage grouse migration.  Condor 98:868-872.

Fischer, R. A., K. P. Reese, and J. W. Connelly.  1997.  Effects of prescribed fire on movements of female sage grouse from breeding to summer ranges.  Wilson Bulletin 109:82-91.

Gates, R. J.  1983.  Sage grouse, lagomorph, and pronghorn use of a sagebrush grassland burn site on the Idaho National Engineering Laboratory.  M. S. thesis, Montana State University, Bozeman.  135 p.

Gates, R. J.  1985.  Observations of the formation of a sage grouse lek.  Wilson Bulletin 97:219-221.

Gill, R. B.  1965.  Distribution and abundance of a population of sage grouse in North Park, Colorado. M. S. thesis, Colorado State University, Fort Collins.  187 p.

Gray, G. M.  1967.  An ecological study of sage grouse broods with reference to nesting movements, food habits and sagebrush strip spraying in the Medicine Lodge drainage, Clark County, Idaho.  M.S. thesis, University of Idaho, Moscow.  200 p.

Gregg, M. A.  1991.  Use and selection of nesting habitat by sage grouse in Oregon.  M.S. thesis, Oregon State University, Corvallis.  46 p.

Gregg, M. A., J. A. Crawford, M. S. Drut, and A. K. DeLong.  1994.  Vegetational cover and predation of sage grouse nests in Oregon.  Journal of Wildlife Management 58:162-166.

Hanf, J. M., P. A. Schmidt, and E. B. Groshens.  1994.  Sage grouse in the high desert of central Oregon:  results of a study, 1988-1993.  U. S. Department of Interior, Bureau of Land Management Series P-SG-01, Prineville, OR.  56 p.

Heath, B. J., R. Straw, S. H. Anderson, and J. Lawson.  1998.  Sage grouse productivity, survival, and seasonal habitat among 3 ranches with different livestock grazing, predator control, and harvest management practices.  Completion Report.  Wyoming Game and Fish Department.  66 p.

Higby, L. W.  1969.  A summary of the Longs Creek sagebrush control project.  Proceedings Biennial Western States Sage Grouse Workshop.  6:164-168.

BLM_0007343

Hill, E. F., R. G. Heath, J. W. Spann, and J. D. Williams. 1975. Lethal dietary toxicities of environmental pollutants to birds. U. S. Fish and Wildlife Service Special Scientific Report No. 191. Washington, D.C. 61 p.

Holloran, M. J. 1999. Sage grouse (*Centrocercus urophasianus*) seasonal habitat use near Casper, Wyoming. M.S. thesis, University of Wyoming, Laramie. 130 p.

Hupp, J. W. and C. E. Braun. 1989. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management 53:823-829.

Johnson, G. D. and M. S. Boyce. 1990. Feeding trials with insects in the diet of sage grouse chicks. Journal of Wildlife Management 54(1) 89-91.

Johnson, G. D., and M. S. Boyce. 1991. Survival, growth, and reproduction of captive-reared sage grouse. Wildlife Society Bulletin 19:88-93.

Keister, G. P., and M. J. Willis. 1986. Habitat selection and success of sage grouse hens while nesting and brooding. Oregon Department of Fish and Wildlife, Progress Report W-87-R-2, Subproject 285, Portland.

Klebenow, D. A. 1969. Sage grouse nesting and brood habitat in Idaho. Journal of Wildlife Management 33:649-661.

Klebenow, D. A. and G. M. Gray. 1968. Food habitats of juvenile sage grouse. Journal of Range Management 21:80-83.

Klebenow, D. A. 1982. Livestock grazing interactions with sage grouse. J. M. Peek and P. D. Dalke, editors. Wildlife-livestock relationships symposium: Proceedings 10. University of Idaho, College of Forestry, Wildlife, and Range. Moscow. 113-123.

Klebenow, D. A. 1985. Habitat management for sage grouse in Nevada. World Pheasant Association Journal 21:80-83.

Lyon, A. G. 2000. The potential effects of natural gas development on sage grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. M. S. thesis, University of Wyoming, Laramie. 120 p.

Mack, R. N. and J. N. Thompson 1982. Evolution in steppe with few large, hoofed mammals. American Naturalist 119:757-773.

Mack, R.N. 1986. Alien plant invasion into the Intermountain West: A case history. Mooney, H.A. and J.A. Drake, editors, Ecology of biological invasions of North America and Hawaii. Springer-Verlag, New York. 191-213

Martin, N. S. 1970. Sagebrush control related to habitat and sage grouse occurrence. Journal of Wildlife Management 34:313-320.

Miller, R.F., and J.A. Rose. 1995. Historic expansion of *Juniperus occidentalis* (western juniper) in southeastern Oregon. Great Basin Naturalist 55:37-45.

Oakleaf, R. J. 1971. The relationship of sage grouse to upland meadows in Nevada. Nevada Department of Fish and Game and the Renewable Resources Center, University of Nevada, Reno. W-48-2. 64 p.

Patterson, R. L. 1952. The sage grouse in Wyoming. Sage Books, Inc. Denver, CO. 341 p.

Pellant, M. 1990. The cheatgrass-wildfire cycle--are there any solutions? In: McArthur, E. Durant; Romney, Evan M.; Smith, Stanley D; Tueller, Paul T. , comps. Proceedings -- symposium on cheatgrass invasion, shrub die-off, and other aspects of shrub biology and management: 1989 April 5-7; Las Vegas, NV. Gen. Tech. Rep. INT-276. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station: 11-17.

Pellant, M. 1996. Use of indicators to qualitatively assess rangeland health. *Rangelands in a Sustainable Biosphere.* (Ed. N.E. West),.Proc. 5th International Rangeland Congress. Society for Range Management. Denver, CO. 434-435

23

Pellant, M., and S. B. Monsen.  1993. Rehabilitation on public rangelands in Idaho, USA: a change in emphasis from grass monocultures. Proceedings of the International Grassland Congress   17:778-779.

Petersen, B. E.  1980.  Breeding and nesting ecology of female sage grouse in North Park, Colorado. M.S. thesis, Colorado State University, Fort Collins, CO.  86 p.

Peterson, J. G.  1970.  The food habits and summer distribution of juvenile sage grouse in central Montana. Journal of Wildlife Management 34:147-155.

Quigley, T.M., and S.J. Arbelbide, technical editors. 1997. Volume II of: An assessment of ecosystem components in the interior Columbia Basin and portions of the Klamath and Great Basins. General Technical Report PNW-GTR-405. U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station, Portland, OR.

Rasmussen, D. I., and L. A. Griner.  1938.  Life history and management studies of sage grouse in Utah, with special reference to nesting and feeding habitats.  Transactions of the North American Wildlife Conference 3:852-864.

Redente, E. F., T. B. Doerr, C. E. Grygiel, and M. E. Biondini. 1984. Vegetation establishment and succession on disturbed soils in northwest Colorado.  Reclamation and Revegetation Research 3:153-165.

Remington, T. E., and C. E. Braun.  1985.  Sage grouse food selection in winter, North Park, Colorado.  Journal of Wildlife Management 49:1055-1061.

Robertson, M. D.  1991.  Winter ecology of migratory sage grouse and associated effects of Prescribed fire in southeastern Idaho.  M.S. thesis, University of Idaho, Moscow, ID.  88 p.

Rowland, M. M., M. J. Wisdom.  2002.  Research problem analysis for greater sage-grouse in Oregon.  Final report.  Oregon Department of Fish and Wildlife; U.S. Department of Interior, Bureau of Land Management, Oregon/Washington State Office: and U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station.  75 p.

Savage, D. E.  1969.  Relation of sage grouse to upland meadows in Nevada.  Nevada Fish and Game Commission Job Completion Report, Project W-39-R-9.  Job 12.  Reno. 101 p.

Schroeder, M. A.  1997.  Unusually high reproductive effort by sage grouse in a fragmented habitat in north-central Washington.  Condor 99:933-941.

Schroeder, M. A., J. R. Young and C. E. Braun.  1999. Sage Grouse (*Centrocercus urophasianus*).  *In* The Birds of North America, No. 425 (A. Poole and F. Gill, eds.).  The Birds of North America, Inc., Philadelphia, PA.

Schuman, G. E., F. Rauzi, and D.T. Booth. 1982. Production and competition of crested wheatgrass-native grass mixtures.  Agronomy Journal 74:23-26.

Skoog, F. E., F. T. Cowan, and K. Messenger.  1965.  Ultra-low-volume aerial spraying of dieldrin and malathion for rangeland grasshopper control.  Journal of Economic Entomology 66:1267-1268.

Sveum, C. M., J. A. Crawford, and W. D. Edge.  1998.  Use and selection of brood-rearing habitat by sage grouse in south central Washington.  Great Basin Naturalist 58:344-351.

Swenson, J. E.  1986.  Differential survival by sex in juvenile sage grouse and gray partridge.  Ornis Scandinavica 17:14-17.

Swenson, J. E., C. A. Simmons, and C. D. Eustace.  1987.  Decrease of sage grouse *Centrocercus urophasianus* after ploughing of sagebrush steppe.  Biological Conservation 41:125-132.

Thurow, T. L., and C. A. Taylor.  1999.  The role of drought in range management. Journal of Range Management 52:413-419.

Trueblood, R. W.  1954.  The effect of grass reseeding in sagebrush lands on sage grouse populations.  M.S. thesis, Utah State Agricultural College, Logan, UT.

24

Tyser, R.W., and C.H. Key. 1988. Spotted knapweed in natural area fescue grasslands: An ecological assessment. Northwest Science 62:151-160.

USDI, U.S. Fish and Wildlife Service. 2004.  Connelly, J. C., S. T. Knick, M. A. Schroeder and S. J. Stiver. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats.

USDI, Bureau of Land Management. 2003.  Fish, Wildlife, Botany and Special Status Species Program Evaluation: Final Report on Evaluation Findings and Recommendations for Action Plan Development.  March 31, 2003.  52 p.

USDI and USDA 1995. Federal wildland fire management policy and program review. 45 p. Valentine, J. F.  1990.  Grazing management.  Academic Press, Incorporated.  San Diego, CA.  553 p.

Wakkinen, W. L.  1990.  Nest site characteristics and spring-summer movements of migratory sage grouse in southeastern Idaho.  M. S. thesis, University of Idaho, Moscow.  57 p.

Wakkinen, W. L., K. P. Reese, and J. W. Connelly.  1992.  Sage grouse nest locations in relation to leks.  Journal of Wildlife Management 56:381-383.

Wallestad, R. O. 1971.  Summer movements and habitat use by sage grouse broods in central Montana.  Journal of Wildlife Management 35:129-136.

Wallestad, R. O.  1975.  Life history and habitat requirements of sage grouse in central Montana. Montana Fish and Game Department Technical Bulletin.  66 p.

Wallestad, R. O., and D. B. Pyrah. 1974.  M Wallestad, R. O., and D. B. Pyrah.  1974.  Movement and nesting of sage grouse hens in central Montana.  Journal of Wildlife Management 38:630-633.

Wallestad, R. O., and P. Schladweiller. 1974.  Breeding season movements and habitat selection of male sage grouse.  Journal of Wildlife Management 38:634-637.

Wallestad, R. O., J. G. Peterson, and R. L. Eng.  1975.  Foods of adult sage grouse in central Montana.  Journal of Wildlife Management 39:628-630.

Wambolt, C. L., A. J. Harp, B. L. Welch, N. Shaw, J. W. Connelly, K. P. Reese, C. E. Braun, D., A. Klebenow, E. D. McArthur, J. G. Thompson, L. A. Torell, and J. A. Tanaka.  2002. Conservation of greater sage-grouse on pubic lands in the western U.S.: implications of recovery and management policies.  Policy Analysis Center for Western Public Lands, Policy Paper SG-02-02.  Caldwell, Idaho.  41 p.

West, N. E.  1999.  Managing for biodiversity of rangelands.  W. W. Collins and C. O. Qualset, editors.  Biodiversity in agroecosystems.  CRC, Boco Raton, Florida.  101-126.

Whisenant, S. G. 1990.  Changing fire frequencies of Idaho's Snake River plains: ecological and management implications.  E. D. McArther, E. M. Romney, S. D. Smith, and P. T. Tueller. (Comps.) Proc.- Symposium on cheatgrass invasion, shrub die off, and other aspects of shrub biology and management.  April 5-7, 1989.  Las Vegas, NV.  Gen. Tech. Rep. INT-276.  U.U. Dep. Of  Agr., For. Service, Intermountain Res. Stat. Ogden, UT.  4-10.

Wisdom, M. J., R. S. Holthausen, B. C. Wales, D. C. Lee, C. D. Hargis, V. A. Saab, W. J. Hann, T. D. Rich, M. M. Rowland, W. J. Murphy, and M. R. Eames.  2000. Source habitats for terrestrial vertebrates of focus in the interior Columbia Basin: Broad-scale trends and management implications.  General Technical Report PNW-GTR-485.  U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station, Portland, OR.

Willis, M. J., G. P. Keister, Jr. 1984.  Sage grouse ecology (research plan - 1984).  Unpublished file report.  Oregon Department of Fish and Wildlife, Wildlife Research, Portland.

Wright, H.A., L.F. Neuenschwander, and C.M. Britton. 1979. The role and use of fire in sagebrush-grass and pinyon-juniper plant communities: A state-of-the-art review. General Technical Report INT-GTR-58. U.S. Department of Agriculture, Forest Service, Intermountain Research Station, Ogden, UT.

Zablan, M. A.  1993.  Evaluation of sage grouse banding program in North Park, Colorado. M.S. thesis, Colorado State University, Fort Collins, CO.  59 p.

BLM_0007346

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

**Release**
8-73

**Date**
12/03/04

Subject

## 8110 – IDENTIFYING AND EVALUATING CULTURAL RESOURCES   (PUBLIC)

1. <u>Explanation of Material Transmitted</u>.  This release completely revises BLM Manual Section 8110 and 8111.

2. <u>Reports Required</u>:  None

3. <u>Materials Superseded</u>:  Manual pages superseded by this release are listed under REMOVE below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below:

| REMOVE | INSERT |
|---|---|
| All of 8110 (Rel. 8-38) | 8110 |
| All of 8111 (Rel. 8-53) | |

(Total: 24 sheets)

TC-1

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES - (Public)

## Table of Contents

.01  Purpose
.02  Objective
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Determining Identification Needs
    .11  Elements of Identification
        A. Inventory
        B. Evaluation
        C. Documentation
    .12  Information Needs
    .13  Planning
    .14  Land Use Authorizations
    .15  Environmental Documentation
    .16  SHPO Views

.2  Gathering Cultural Resource Information
    .21  Kinds of Inventory
        A. Class I - Existing Information Inventory
        B. Class II - Probabilistic Field Survey
        C. Class III - Intensive Field Survey
    .22  Other Information-Gathering Techniques
        A. Reconnaissance Survey
        B. Subsurface Probing
        C. Test Excavation
        D. Locating Properties of Traditional Cultural Importance
        E. Predictive Modeling
    .23  Survey Requirements and Exceptions

.3  Evaluating Legal Significance
    .31  Legal Standards
        A. Accountability for Effects on Significant Properties
        B. The Nature of Significance
        C. A Uniform System of Significance Measurement
    .32  Determining National Register of Historic Places Eligibility
        A. Specialist Applies the National Register Criteria
        B. Specialist Applies SHPO Information
        C. Specialist Makes Staff Recommendation
        D. Legal Implications of Recommendation

BLM_0007348

TC-2

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

    E. The National Register Criteria
    F. Criteria Exceptions
    G.  National Register of Historic Places Registration
  .33  Nationally Significant Properties
    A. National Historic Landmarks
    B. Nationally Significant National Register Properties
    C. Other Historical Designations
    D. Identification and Consultation

.4  <u>Categorizing According to Uses</u>
  .41  Allocation to Use Categories
  .42  Use Categories
    A. Scientific Use
    B. Conservation for Future Use
    C. Traditional Use
    D. Public use
    E. Experimental Use
    F. Discharged from Management
  .43  Relationship between Evaluation and Allocation
  .44  Consultation with Outside Parties
    A. Consultation with SHPO
    B. Consultation with Tribes

.5  <u>Documentation and Maintenance of Data, Records, and Maps</u>
  .51  Cultural Resource Inventory Records
    A. Cultural Resource Record Forms
    B. Survey Record
    C. Maps and Photographs
  .52  Maintenance of Inventory and Evaluation Data
    A. Paper Files
    B. Digital Data and Automated Files
  .53  Master Maps
  .54  Inventory Reports
  .55  Confidentiality
  .56  Archival Standards
  .57  Collections
  .58  Inventory Updating

BLM_0007349

TC-3

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.6  <u>External Review</u>
    .61  SHPO Review
    .62  Tribal Review
    .63  Peer Review

<u>Appendices</u>
    1. List of Selected National Register Bulletins
    2. Recording Cultural Resource Locations Using Global Position System (GPS) Technology

BLM_0007350

.01

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.01  Purpose. This Manual Section provides general direction for identifying, evaluating, categorizing, and allocating to uses all the cultural resources that occur on public lands within a Field Office manager's jurisdiction.

.02  Objectives. The objectives of the identification component of the cultural resource management program are to ensure that BLM Field Office managers accomplish the following:

A. Locate and record cultural resources on lands they administer and in areas affected by undertakings they authorize.

B. Establish the resources' National Register significance and their scientific, cultural, public, traditional, and conservation values as the basis for managing the resources and the surrounding land area over the long term.

C. Prepare to enter into land use planning with sound qualitative, quantitative, and geographical information about known and anticipated cultural resources, and with definite goals for their short- and long-term management.

D. Maintain permanent, up-to-date records through cooperation with the State Historic Preservation Officer, and encourage their use for appropriate educational, research, and other learning purposes.

.03  Authority. (See BLM Manual Section 8100.03.)

.04  Responsibility. (See BLM Manual Section 8100.04.)

.05  References. (See also BLM Manual Section 8100.05)

A. National Programmatic Agreement of March 26, 1997, among the Director, BLM, the Chairman, Advisory Council on Historic Preservation, and the President, National Conference of State Historic Preservation Officers (see BLM Manual Section 8100, Appendix 13).

B. "Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation," published by the National Park Service at 48 FR 44716, September 29, 1983.

C. "Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act," published by the National Park Service at 63 FR 20496, April 24, 1998.

BLM_0007351

.05D

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

D. "Treatment of Archeological Properties: A Handbook," available from the Advisory Council on Historic Preservation. See also 45 FR 78808, November 26, 1980.

E. National Register Bulletin series, published by the National Park Service (see Appendix 1 for selected list).

F. Glossary of Terms, BLM Manual Section 8100.

.06  Policy.

The BLM's Field Office managers, with the assistance and advice of professionally qualified cultural resource staff, shall:

A. Incorporate cultural resource considerations into all aspects of planning and decision making.

B. Complete appropriate levels of cultural resource inventory, evaluation, and documentation, at the appropriate stage in planning, for all lands potentially affected by BLM decisions, regardless of ownership.

C. Consider the character, importance, potential uses, and appropriate management of cultural resources when inventorying, evaluating, and documenting them.

D. Inventory cultural resources that are potentially affected by Section 106 undertakings, by the methods and at a level commensurate with the nature of the proposed undertaking and its likely effects on the protection and management of the cultural resources (see additional guidance in 8110.23 and 8140.2).

E. Ensure that only professionally qualified archaeologists, historians, anthropologists, architectural historians, or other specialists as appropriate to the nature of the resources, locate, evaluate, document, or collect cultural resources (see Glossary of Terms, BLM Manual Section 8100: "professionally qualified;" and Section 8100.03).

F. Record all cultural resource locations using Global Positioning System (GPS) technology, at a level of accuracy within a mean error of 12.5 meters or less at a 95 percent confidence level. (See Appendix 2.)

G. Allocate cultural resources on public land to the appropriate use categories and manage them in a manner that ensures, protects, or contributes to their assigned uses.

H. Cooperate in sharing cultural resource data with State Historic Preservation Offices (SHPO) according to the State's BLM-SHPO Protocol established pursuant to the national Programmatic Agreement, ensuring that records and data bases will be permanently maintained, properly secured, and kept current and readily available to meet agency information needs.

BLM_0007352

.06I

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

I. Withhold sensitive information from public disclosure when disclosure would threaten the resources (see National Historic Preservation Act, Section 304, BLM Manual Section 8100, Appendix 5; and Archaeological Resources Protection Act, Section 9, BLM Manual Section 8100, Appendix 8).

J. Provide Federal, tribal, State, and local agencies, qualified professionals, and the public with access to cultural resource information when access would further the BLM's objectives, consistent with the National Historic Preservation Act and the Archaeological Resources Protection Act, and would not result in harm to the resources.

.07  File and Records Maintenance. See .11C, .32C, .5, .51-.57. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4).

BLM_0007353

.1

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.1  Determining Identification Needs. The timely and adequate professional identification of cultural resources on public lands and in areas affected by BLM's undertakings is essential to making informed resource management and land use decisions.

.11  Elements of Identification. Inventory, evaluation, and documentation are the three main elements of identification. Each has a critical role to play in enabling the long-term management and use of cultural resources.

A.  Inventory is meant to ensure that the nature and distribution of cultural resources on BLM-administered lands (and in areas affected by BLM undertakings) are identified by professional cultural resource staff and made known to the responsible Field Office manager.

B.  Evaluation is meant to ensure that the significance and use potential of the cultural resources are analyzed and recommended by professional cultural resource staff and approved by the responsible Field Office manager, after appropriate consultation with the State Historic Preservation Officer and tribal officials.

C.  Documentation is meant to record adequately the resources' location, geographical settings, physical characteristics, and scientific, historical, architectural, traditional, educational, interpretive, and conservation values. Documentation is not done as a separate step but occurs throughout the identification process. Qualified professionals prepare documentation in the course of inventorying and evaluating cultural resources. The BLM works in cooperation with State Historic Preservation Offices to ensure that this documentation is maintained in permanent and secure paper and digital files and databases in a manner that fulfills data sharing requirements of the national Programmatic Agreement and data sharing agreements and programs that exist for individual states.

.12  Information Needs. During the earliest feasible stage of land use planning or environmental review, the Field Office manager, assisted by professional staff, will determine the information needed to locate and evaluate cultural resources potentially affected by the plan or undertaking. After this determination, the Field Office manager will also seek information from relevant Indian tribes and interested persons to identify historic and traditional cultural properties and potential effects on them. Where possible, information needs can be determined on a large-scale programmatic basis.

A.  During planning, the Field Office manager, assisted by professional staff, shall complete cultural resource inventory, evaluation, and use allocations for public lands potentially affected by planning decisions as an integral component of regional plans, local interdisciplinary plans, or project plans.

B.  In issuing land use authorizations, the Field Office manager shall ensure that areas where proposed land uses are being considered in response to a land use application or a BLM proposal are inventoried to identify potentially affected cultural resources at a level commensurate with the nature of the proposed undertaking and its likely effects on cultural resources.

BLM_0007354

.13

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.13 <u>Environmental Documentation</u>. When an environmental assessment or environmental impact statement is being prepared for a proposed land use that might affect cultural resources, preparers must have access to sufficient inventory data, and professional expertise, to allow them to give meaningful consideration to cultural resources known or projected to occur in the potential impact area.

.14 <u>SHPO Views</u>. The Field Office manager shall consider the views of the appropriate SHPO(s), obtained programmatically or on a case basis as appropriate, before making decisions about cultural resource inventory needs, evaluations, and treatment options relating to a planning effort or proposed land use. Where the BLM national Programmatic Agreement is active, SHPO views shall be obtained according to the State's BLM-SHPO Protocol.

BLM_0007355

.2

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES - (Public)

.2  Gathering Cultural Resource Information. Given that inventory, evaluation, and documentation are the three main elements of cultural resource identification, inventory – a representation of the cultural resource content of a geographical locale – is the most fundamental element.

.21  Kinds of Inventory. The BLM cultural resource inventory system is composed of three kinds of inventory: class I - existing information inventory; class II - probabilistic field survey; and class III - intensive field survey (see .21A-C). Each is designed to provide specific kinds of cultural resource information for various planning and resource management needs. The most frequently employed method of inventory is class III survey carried out for specific projects to enable BLM to comply with Section 106 of the National Historic Preservation Act (NHPA) before making decisions about proposed land and resource uses. In those cases, unless specifically prohibited in regulations, the cost of inventories shall be the responsibility of the land-use applicant or the benefiting BLM activity, as authorized in Section 110(g) of NHPA.

A. Class I - Existing Information Inventory.

1.  A class I inventory is most useful for gaining a comprehensive view of all the known archaeological, historic, cultural and traditional places within a large area, such as the area to be covered by a land-use plan or an EIS.  A class I inventory is a professionally prepared study that includes a compilation and analysis of all reasonably available cultural resource data and literature, and a management-focused, interpretive, narrative overview, and synthesis of the data. The overview also defines regional research questions and treatment options. Existing cultural resource data are obtained from published and unpublished documents, BLM cultural resource inventory records, institutional site files, State and national registers, interviews, and other information sources. Class I inventories, which should have prehistoric, historic, and ethnological elements, are in large part chronicles of past land uses, and as such they should be relevant to current land use decisions. General information about sacred sites and other places of traditional cultural or religious importance to Native Americans or other cultural groups (including "traditional cultural properties" as discussed in National Register Bulletin No. 38) should as much as possible be included in the inventory. Class I inventories are periodically updated, in both the compilation and the synthesis, to incorporate new data from class II and class III inventories, histories, oral testimony, and other sources. They can be used to develop regional research designs for resource evaluation. Maintaining current class I inventories in Geographic Information System (GIS) compatible format is of critical importance for making cultural resources information readily available for research, planning, management and compliance activities.

a.  Purpose. The purpose of a class I inventory is to provide cultural resource specialists and managers with an informed basis for understanding the study area in terms of:

(1) The range of variety, the apparent extent, and the probable importance of each of the various kinds of cultural resources presently known to exist within the study area, including how and by whom they may be considered important.

BLM_0007356

.21A1a(2)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

(2) The natural settings where the various known kinds of cultural resources might be expected to occur or not to occur within the study area, based on present information.

(3) The potential for and probable consequences of conflict between the known kinds of cultural resources and the various types of land and resource uses that are likely to be proposed in the study area.

(4) The need for new cultural resource survey to improve the state of knowledge, especially where there are substantial data gaps because previous survey has been limited and/or biased, and the data gaps coincide with areas of potential land use.

(5) The human uses of the land and resources through time, as evidenced in the prehistoric and historic record, and the ways that this knowledge of successful and unsuccessful past adaptations might apply to decisionmaking for current land use proposals.

b. Not a mere "records check". A class I inventory is a detailed study consisting of all the elements described in .21A3 and A4. In contrast, a "literature review," "existing data review," "file search," or "records check" is generally the brief first step before initiating a field survey. Ideally, completing an existing data review means consulting the part II documentation of a completed, up-to-date class I inventory (see .21A4) and/or the SHPO's automated database. Sometimes it means checking relatively undeveloped BLM and SHPO survey and site records to learn whether any survey has been conducted and any cultural properties have been recorded nearby. This level of review is not to be confused with a full class I inventory and should not be called a class I inventory.

2. Regional Overview. Part I of a class I inventory is a narrative overview consisting of the following 10 elements.

a. Abstract. The abstract is a brief summary of the overview, up to 250 words in length, that highlights the major points and findings of the study. Because it may be used for various general reference systems, such as the National Technical Information System, the abstract should be sufficiently informative that a reader unfamiliar with the study area can determine the kind of information the document contains. It is basically a highly condensed version of the management summary (see next paragraph).

b. Management Summary. The management summary or "executive summary" should be limited to approximately 2500 words. It gives a brief account of the major points of the complete class I inventory, including both the overview and the data compilation. It summarizes what is known about human land use experiences in the study area from the earliest prehistoric occupation to the immediate past, provides concise statements about the study area's cultural resource data base, and discusses the relative importance of the area's known and projected cultural resources. The five points in .21A1 are specifically addressed and may form the basis for the summary's organization. The management summary should allow the reader to be familiar with the class I inventory results without reading the entire document. It and the abstract should be prepared last.

BLM_0007357

.21A2c

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

   c. <u>Study Area Orientation</u>. The study area is identified, together with the reasons and goals for the study, the underlying assumptions, and theoretical and methodological approaches to the study. Problems encountered in undertaking the work and steps taken to resolve them may be identified. The personnel involved in the study and the role of each person should be identified, as should procedures used for data collection and review, field work (if any), and report preparation.

   d. <u>Environmental Factors</u>. Past and present environmental factors important for understanding the study area's prehistoric and historic human use and occupation, as well as factors affecting preservation, are discussed. Factors are those that describe the geographic system of the study area:

     (1) Surface geology.
     (2) Climate.
     (3) Topography.
     (4) Soils.
     (5) Flora and fauna
     (6) The effects of human activity.
     (7) The effects of time.

The factors are treated in terms of a dynamic, interactive system, and single-factor analyses are avoided.

   e. <u>Prior Cultural Resource Investigations and Research</u>.

   (1) <u>Summary of Past and Current Work</u>. Important past and ongoing archaeological, historical, and ethnological/sociological investigations in the study area are briefly described. This should be limited to those that have contributed substantially to knowledge about the cultural resources of the study area. Investigations are assessed in terms of their strengths and weaknesses relative to the goals of the study. The general character of data and materials collected from the study area as part of the prior work are briefly discussed, including information on their nature, extent, and location.

   (2) <u>Survey Coverage</u>. Locations where cultural resource surveys have been conducted are identified, and surveys are assessed quantitatively and qualitatively.

BLM_0007358

.21A2e(3)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

(3) Present Research Emphases. The problem orientation and objectives of current cultural resource research pertaining to the study area are discussed. Management orientations and objectives should also be included as applicable. Regional or problem-specific research designs or strategies presently planned or being implemented within the area are discussed. If none exists, specific research designs, strategies, or orientations from surrounding areas, that may be pertinent to the study of cultural resources within the study area, should be discussed and evaluated for possible applicability.

f. Cultural Resource Narrative. This constitutes a major portion of the cultural resource overview, providing the descriptive data from which the synthesis is drawn. Depending on the data, it may be convenient to treat prehistoric, historic, and contemporary cultures separately, but it may also be useful to minimize these boundaries when they would detract from a clear view of continual, changing land use through time. Topics below may be organized differently as appropriate.

(1) Prehistory.

(a) Culture Sequence. The reconstructed prehistoric chronology of the study area is described, including summary discussion of the archaeologically defined cultures, the basis for their definition, and the field basis for their recognition.

(b) Prehistoric Lifeways. Technological, settlement, economic, social, religious, and political systems thought to represent the various cultures described in (1) are discussed. Ethnographic analogy and inferences may be used, but should be so identified.

(2) History.

(a) Historic Lifeways. The lifeways of the historic groups known to have lived in or used the area, however temporarily, and including ethnic and/or religious groups as appropriate, are discussed chronologically. The discussion should extend the preceding discussion of prehistoric lifeways and should address the same topics. Historical material culture and the tangible evidence remaining or expected in the study area should be described.

(b) Historic Context. The study area is also discussed in terms of its historical place within the broad pattern of westward movement, settlement, and land use. Historic context provides a basis for targeting future inventory and for evaluating historic period cultural resources.

BLM_0007359

.21A2f(3)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

(3) <u>Contemporary Culture</u>. The populations currently occupying and/or using the study area and their lifeways are discussed, including rural members of the dominant culture. Topically, this discussion should be a further extension of discussions of the study area's Prehistory and History, paragraphs .21A2f (1) and (2). In addition, any locations that contemporary peoples are known to recognize as important to their traditional lifeways are identified, including identification of sources of information.

(4) <u>Cultural Chronology Summary</u>. An outline of the cultural chronology may be used to summarize the major prehistoric, historic, and recent land uses and events occurring within or affecting the study area. A summary of variations in kinds and locations of associated cultural properties should be included.

g. <u>Cultural Resource Synthesis</u>. This is a concise but comprehensive synthesis of all available cultural resource data, depicting human use and occupation of the study area from earliest prehistoric time to the present. A synthesis is more than a summary of the database. It organizes diverse and incomplete information in terms of cultural process and deals specifically, but not exclusively, with changes in settlement patterns and settlement systems; changes in land use technology; changes in land tenure; changes in the nature and effects of the cultural systems operating within the study area over time; and other topics needed to provide a coherent view of dynamic human use and occupation of the area, including factors affecting preservation of archaeological evidence. It is basically a land use theory that strives to account for all significant human use of the study area. This is the most creative and most important part of a class I inventory.

h. <u>Management Classification</u>. All cultural resources known and anticipated to occur in the study area are broadly classified and grouped according to their similarities. The classification may be based on whatever organizing criteria are appropriate to the data, as reflected in the synthesis. These criteria might include some mix of age, culture, function, location, size, public or scientific appeal, attractiveness to illegal looters, etc., but should focus as much as possible on producing groupings of resources that reflect the management implications of their similarities. The classification derives from and extends the synthesis, moving the synthesis beyond its more or less theoretical conclusions and setting the stage for its practical application. It is the first step toward evaluating resources (see .3) and assigning them to uses (see Manual Section 8130). It should establish a general classificatory framework that will facilitate evaluation without preempting the evaluation process.

BLM_0007360

.21A2i

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

i. Suggested Management Options and Research Directions. General questions and issues, relating to future archaeological, historical, and ethnological/sociological research and to future management of cultural resources in the study area, are briefly discussed. Gaps in the present data base related to these questions and issues are indicated, and future research goals and investigation needs are suggested, including well-supported, suggested priorities and strategies for new field inventory. Relevant cultural resource management options for the area are discussed, and the desirability and viability of the options are considered from public, scientific, and management points of view.

j. Bibliography and Supporting Documentation. Pertinent backup materials follow the text. This should include an evaluatively annotated bibliography of sources cited and other relevant but uncited sources, and appendices containing relevant information not suited to presentation in the body of the report. Maps and graphics may be incorporated within the text or may follow it, as appropriate.

3. Compilation of Known Cultural Resource Data. Part II of a class I inventory is the compilation of all known cultural resource information for the study area, consisting of the following elements.

a. Maps. All identified cultural properties, and any traditional values that can be usefully represented on maps, shall be mapped at a scale of 1:24,000 or the nearest equivalent, preferably using GIS technology.  Each such location is identified with a reference number. Permanent BLM numbers should not be assigned to unverified cultural properties (see .5). A separate map at a scale capable of showing the entire study area should indicate survey coverage and provide easy reference to the general locations and densities of known cultural resources. Relative sensitivity of subareas should be indicated, based on the importance and/or complexity of resources (and therefore the severity of potential land use conflicts) rather than on simple density alone.

b. Inventory Forms. Copies of cultural resource recording forms not previously on file at the appropriate BLM office, from recording or repository institutions and other sources, are duplicated to supplement the BLM and SHPO record system.

c. Report. The part II report is a brief narrative that may be included at the end of the cultural resource overview. It includes the following elements.

(1) Data Sources. Sources used, time and personnel involved, methods used, and any problems encountered in compiling the data are summarized. Possible sources that could not be used, such as data believed to exist only outside the United States, are identified.

.21A3c(2)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

(2) <u>Cultural Resource Recording Systems</u>. Recording systems in use for the area are briefly discussed, including a description of numbering conventions and locations where records are maintained. A conversion table may be included to cross-reference between recording institutions' numbers and BLM-assigned numbers.

(3) <u>Data Reliability</u>. The quality of the cultural resource data used in the compilation is assessed, including precision of cultural resource locations, definitions in use for "site" or any other term used variously or ambiguously, and other relevant observations bearing on the reliability of sources and the probable need for ground-truthing.

(4) <u>Formal Systems of Recognition</u>. All cultural resources included in or formally determined eligible for the National Register of Historic Places, found to qualify for or designated as National Historic Landmarks, included in the Historic American Buildings Survey or Historic American Engineering Record, or included in State, county, or local registers or similar lists, are identified and discussed in brief.

(5) <u>Summary Table</u>. A summary listing of all known cultural resources should include at least the following:

        (a) Reference number(s).
        (b) Location (cadastral or UTM).
        (c) Ownership.
        (d) Function/type.
        (e) Cultural affiliation/historic context.
        (f) Chronological placement.
        (g) Established uses.
        (h) Formal recognition.
        (i) Recorder.
        (j) Date recorded.

4. <u>Reason for Detailed Class I Direction</u>. To prepare for professionally acceptable on-the-ground class II and class III surveys, the BLM can rely on up-to-date method and theory literature, consultants' expertise, and the prevailing State and regional standards. However, there is no outside source for direction on how to construct a compilation and synthesis of all existing cultural resource information as preparation for multiple-use, land-use planning and day-to-day cultural resource decisionmaking. The direction above is detailed because a class I inventory is one of the most important tools a Field Office manager can have for putting useful information in plans and for guiding those day-to-day cultural resource decisions

BLM_0007362

.21B

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

B. Class II - Probabilistic Field Survey

1. A class II survey is most useful for improving cultural resource information in a large area, such as for planning or EIS purposes, where insufficient systematic identification work has been done in the past.  A class II probabilistic field survey is a statistically based sample survey, designed to aid in characterizing the probable density, diversity, and distribution of cultural properties in an area, to develop and test predictive models, and to answer certain kinds of research questions. Within individual sample units, survey aims, methods, and intensity are the same as those applied in class III survey. Class II survey may be conducted in several phases, using different sample designs, to improve statistical reliability.

2. Class II survey may be appropriate when comparing alternative locations for proposed undertakings. Class II survey is generally not appropriate for determining specific effects of a proposed land use, except when the sample distribution and sample rate have proven to be sufficient to demonstrate that the specific environmental situation(s) in the area sampled did not support human occupation or use to a degree that would make further field survey information useful or meaningful. Class II survey may be appropriate when existing information about the project area or similar environments indicates that a properly designed sample survey would adequately address the relevant research questions about past human use of the area. Class II survey is generally not appropriate where designing a sample and executing a discontinuous survey may prove more demanding and time-consuming than a continuous class III survey.

3. Class II surveys may be appropriate for testing hypotheses about presence or absence of significant prehistoric and historic archaeological and architectural properties, such as:

a.  When the regional inventory suggests a significant correlation between certain environmental variables and particular significant property types, which can be tested through sampling the study area.

b.  When comparative effects or cumulative effects assessments are needed for environmental documentation.

c.  When class I data are found to be biased or otherwise insufficient to allow for reasoned judgments during general land use planning or activity planning.

d.  When generating statistical data needed for developing and testing predictive models.

BLM_0007363

.21B4

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

4. This Manual does not discuss how to design class II surveys because the methods and theories of sampling are continually being refined. Well-qualified consultants should be retained to work with the BLM staff to develop a sample design appropriate to the particular place and the particular reasons for the data collection.

C. Class III - Intensive Field Survey. Intensive survey is most useful when it is necessary to know precisely what historic properties exist in a given area or when information sufficient for later evaluation and treatment decisions is needed on individual historic properties. Intensive survey describes the distribution of properties in an area; determines the number, location and condition of properties; determines the types of properties actually present within the area; permits classification of individual properties; and records the physical extent of specific properties.

1. Thorough Coverage. Consistent with standards in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (48 FR 44716, September 29, 1983), a BLM class III Intensive Field Survey is a professionally conducted, thorough pedestrian survey of an entire target area (except for any subareas exempted), intended to locate and record all historic properties.

2. Field Methods. While BLM class III methods may differ from State to State (and sometimes between geographical/cultural regions within a State), they conform to the prevailing professional survey standards for the State or region involved, provided that these standards meet or exceed the Secretary's Standards and Guidelines. Agreed-upon methodological guidance is generally incorporated by reference or inclusion in the BLM/SHPO protocol required by the national Programmatic Agreement. In Eastern States, where the Programmatic Agreement is not in use, methods are determined in consultation with the appropriate SHPO.

3. Complete Record. A class III survey provides managers and cultural resource specialists with a complete record of cultural properties, locatable from surface and exposed profile indications, occurring within a specified and defined target area. Because class III survey is designed to produce a total inventory of the cultural properties observable within the target area (if any), once it has been completed no further survey work should be needed in the target area. Areas with dense vegetation cover, partial snow cover, dune activity, or other surface-obscuring conditions may require further survey as these conditions change. Local conditions which might make resurvey advisable should be defined in the State's BLM-SHPO Protocol developed pursuant to the national Programmatic Agreement.

BLM_0007364

.21C4

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

4. <u>Professional Documentation Standard</u>. As specified in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation, an intensive survey report should document: (a) the kinds of properties looked for; (b) the boundaries of the area surveyed; (c) the method of survey, including an estimate of the extent of survey coverage; (d) a record of the precise location of all properties at a degree of accuracy that meets or exceeds the National Map Accuracy Standard for 1:24,000 scale maps (http://rockyweb.cr.usgs.gov/nmapsstds/nmas.html) and, after 1 Apr 2004, obtained using Global Positioning System (GPS) technology; and (e) information on the appearance, significance, integrity and boundaries of each property sufficient to permit an evaluation of its significance. Reports should also include discussion of the area's culture history, previous research in the area, and treatment recommendations. Field work must be designed and staffed appropriately to ensure that this documentation standard will be achieved.

.22   <u>Other Information-Gathering Techniques</u>

A. <u>Reconnaissance Survey</u>.

1. Standing outside the inventory classes defined in .21, a BLM reconnaissance survey is a focused or special-purpose information tool that is less systematic, less intensive, less complete, or otherwise does not meet class III inventory standards. While portions of an area investigated by reconnaissance survey may have been covered to standards, an area surveyed only by reconnaissance methods cannot be considered to be "inventoried" and may be subject to resurvey for other purposes (depending in part on the purposes and results of the reconnaissance).

2. Reconnaissance surveys may be used, among other purposes, for:

a. Checking the adequacy of previous surveys.

b. Developing recommendations about inventory needs in previously unsurveyed areas.

c. Verifying assumed conditions that would warrant a waiver of more intensive survey.

d. Locating architectural or other high-profile properties.

e. Filling special management information needs, such as locating properties associated with particular kinds of landscape features, or properties potentially damaged by wildfire, wildfire suppression, or other emergency treatments; ground-truthing remote sensing results; or spot checking the effects of a class of authorized uses on a given landscape.

BLM_0007365

.22B

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

B. Limited Subsurface Testing. Initial field survey should not require subsurface testing, e.g. shovel tests, as a standard practice. It may be useful where recent soil deposition could have covered cultural resources, where dense vegetation obscures cultural resources, or where it is difficult to determine the horizontal or vertical extent of a property from surface indications alone. It may be authorized under the authority of a survey and recordation permit, as long as (1) a qualified BLM professional cultural resource specialist determines that the work would not be likely to affect the attributes of properties that may make them eligible for the National Register, and (2) consultation with tribes, or with the SHPO pursuant to the State's BLM-SHPO Protocol, as applicable, is not necessary. Collection of cultural materials is generally not authorized through survey and recordation permits (see BLM Manual Section 8150).

C. Test Excavation. Controlled test excavation, by implication, exceeds the disturbance threshold for limited subsurface testing (.22B) and is more likely to affect attributes that may make a property eligible for the National Register. Test excavation must be limited to a scale that would not substantially alter the property's significant archaeological features, that is, those which would make it eligible for inclusion in the National Register of Historic Places. If the property would be substantially altered, the Field Office manager may need to consult with tribes, as appropriate, and with the SHPO pursuant to the State's BLM-SHPO Protocol. Test excavation as part of survey for Section 106 compliance purposes should be limited to cases where it is necessary to assist in assessing the eligibility or ineligibility of a property being evaluated. This necessity is difficult to determine in advance of field work. Except where heavy vegetation cover or aggrading surfaces are the rule, test excavation should not be authorized under the authority of a general survey and recordation permit (see BLM Manual Section 8150), but should be justified for each project and authorized with an appropriate project-specific testing or excavation permit.

D. Locating Properties of Traditional Cultural Importance. Properties of traditional cultural or religious importance to Native Americans (including "traditional cultural properties" as discussed in National Register Bulletin No. 38) can be found to meet National Register criteria and thus should be located, described, and evaluated at the same stage in the Section 106 compliance process as the field inventory for historic properties. Properties of traditional cultural or religious importance must meet one or more National Register criteria (i.e., must be historically significant) in order to be determined eligible for the National Register (see .31).

1. Specific, Definite Places. Properties of traditional cultural or religious importance are specific, definite places that figure directly and prominently in a particular group's cultural practices, beliefs, or values, when those practices, beliefs, or values (i) are widely shared within the group, (ii) have been passed down through the generations, and (iii) have served a recognized role in maintaining the group's cultural identity for at least 50 years. While an individual member of a group may attach importance to a place that does not meet this definition, e.g., a personally important place, such places should not be considered to be properties of traditional cultural or religious importance.

BLM_0007366

.22D2

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

2. Identified by Consultation, Not Field Survey. Specific properties, or categories of properties, of traditional cultural or religious importance should be known to the group that ascribes traditional value to them. Accordingly, such properties are not identified using survey methods analogous to archaeological survey. Instead, they are identified by consulting with the cultural groups known to have traditional interests in the target area. Consultation gives interested persons an opportunity to reveal to the BLM the specific locations of traditional cultural places that are known to them and that they want the BLM to consider during decision making. Consultation with Native Americans to locate properties of traditional importance is carried out in conformance with Handbook H-8120-1. Consultation to identify these types of properties should always precede field survey.

3. Inventory Reports are Generally Not a Subject for Consultation. Appropriate planning documents pertaining to the nature and location of a proposed undertaking should be shared with Indian tribes as part of consultation about the undertaking. There is no general need routinely to provide Indian tribes or other cultural groups with inventory reports and other cultural resource documentation or to consult with them about survey results, unless additional consultation is needed because a proposed undertaking would potentially affect properties of traditional cultural or religious importance, which a tribe or group identified to us in consultation preceding the survey.

E. Predictive Modeling. As discussed in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation, predictive modeling is an application of basic sampling techniques that projects or extrapolates the number, classes, distribution, and frequencies of properties. Predictive modeling can be an effective tool in land use planning, during the early stages of planning an undertaking, for targeting field survey, and for other management purposes. However, the reliability of the model must be verified; predictions should be confirmed through field testing, and the model should be redesigned and retested if necessary. Models that characterize the known density and distribution of cultural resources in relation to observable environmental variables can be useful planning tools for understanding regional settlement and land use patterns in the archaeological and historical record. Properly developed, statistically valid models can provide Field Office managers with estimates of the probability of finding cultural properties within a specific landscape. These predictions can be used to allocate scarce resources to inventory and management activities and to estimate the time and effort that may be required for compliance work, including survey, in support of proposed land uses. Models can also be useful in developing management plans and historic contexts to evaluate resources.

BLM_0007367

.23

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.23  <u>Survey Requirements and Exceptions</u>. Section 106 of NHPA requires agency officials to identify historic properties in a proposed undertaking's area of potential effect. In determining the appropriate level of identification effort, the responsible manager ("agency official") must take into account past planning, research and studies, the nature of the undertaking, the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effect. The manager must also take into account the alternatives under consideration and the views of the SHPO/THPO and any other consulting parties.

A.  <u>Survey Required</u>. In a previously unsurveyed area of potential effect, a class III (intensive) survey is generally required when a proposed undertaking would substantially disturb the land surface, transfer land out of Federal ownership, affect the integrity of historic properties, or alter the traditional use of known properties with traditional cultural or religious importance to an Indian tribe.

B.  <u>Survey Not Required</u>. Previously surveyed areas where conditions have not significantly changed should not require further survey. If resurvey is to be done in previously surveyed areas, the record must clearly state the justification. In addition, survey requirements may be waived when any of the following conditions exists:

1. Natural conditions are such, or previous natural ground disturbance has modified the surface so extensively, that the likelihood of finding evidence of cultural properties is negligible. (Examples: glaciers; avalanche areas; flood plains.)

2. Human activity within the last 50 years has changed the natural topography enough to eradicate cultural properties. (Examples: contouring a right of way to meet Federal Aid highway safety standards; leveling agricultural fields for irrigation by extensive cutting and filling.)

3. Existing survey data are sufficient to indicate that the specific environmental situation did not support human occupation or use to a degree that would make further inventory information useful or meaningful, and records documenting the location, methods, results, and reliability of the survey are at hand.

4. The type of undertaking or the geographical or environmental setting is exempted from survey in the State's BLM-SHPO Protocol developed under the national Programmatic Agreement. (Exemption of a geographical or environmental setting is generally based on an analysis of existing survey data -- using modeling or other analytical tools in combination with field testing the conclusions -- that indicates a low probability of finding significant cultural resources in such settings. See .22E above.)

BLM_0007368

.3

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.3  <u>Evaluating Legal Significance</u>.

31.  <u>Legal Standards</u>.

A. <u>Accountability for Effects on Significant Properties</u>. While Field Office managers are responsible generally for ensuring that all cultural properties on public lands in their jurisdiction are appropriately managed, Sections 106 and 110 of the National Historic Preservation Act (NHPA), and implementing regulations at 36 CFR Part 800, place specific procedural requirements on managers. Managers are required to take into account the effects that a proposed BLM undertaking (action or authorization) would have on significant cultural properties, prior to making a decision to approve or authorize the undertaking (see BLM Manual Section 8140).

B. <u>The Nature of Significance</u>. "Significance" under the NHPA is indicated by inclusion in or eligibility for the National Register of Historic Places. To comply with the NHPA, Field Office managers must ensure that appropriately qualified historic preservation specialists evaluate the significance of all cultural properties potentially affected by a proposed undertaking. Qualified specialists, guided by Regional Overviews, research designs, historic contexts, and their own professional knowledge of the resources, apply the National Register criteria for evaluation (see .32A) to determine if a cultural property is eligible for listing in the National Register of Historic Places. The specialist then provides the Field Office manager with appropriate recommendations concerning eligibility.

C. <u>A Uniform System of Significance Measurement</u>. The same criteria and integrity standards are applied to all cultural properties, whether archaeological, historical, architectural, or traditional. In order to be listed in or found eligible for listing in the National Register, a property must have integrity and must meet one or more of the four criteria. No type of property is automatically eligible for listing in the National Register.

.32  <u>Determining National Register of Historic Places Eligibility</u>

A. <u>Specialist Applies the National Register Criteria</u>. In determining the National Register eligibility of a cultural property, an appropriately qualified cultural resource specialist must apply each of the four National Register of Historic Places criteria for evaluation (36 CFR Part 60.4; see .32E). If a cultural property has integrity, meets one or more criteria, and is not ruled out by a criterion exception, the specialist should recommend to the responsible manager that it be considered to be an eligible "historic property" as defined in the National Historic Preservation Act and related regulations. The National Park Service's National Register Bulletins provide guidance on applying the evaluation criteria and assessing integrity (see Appendix 1).

.32B

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

B. Specialist Applies SHPO Information. Each State Historic Preservation Office maintains information relevant for evaluating the legal significance of cultural resources in the State. The qualified specialist applying the National Register criteria is expected to be well-versed in this information and to use it appropriately when considering eligibility. Relevant SHPO information includes a comprehensive inventory of cultural resources, copies of all National Register documentation for the properties in the State, and the statewide historic preservation plan, which identifies themes or contexts important in that State's history and prehistory.

C. Specialist Makes Staff Recommendation. As needed for Section 106 compliance or management planning, the appropriately qualified specialist recommends whether cultural properties should be considered to be eligible for the National Register. A positive or negative recommendation about a property's eligibility is a professional judgment based on careful consideration of information concerning the integrity of the cultural property and the reasons why the property is thought to be, or not to be, significant. All staff recommendations about eligibility must be documented. Field Office managers use this information in decision making about potential undertakings and management strategies that might affect the cultural property.

D. Legal Implications of Recommendation. Further compliance requirements under Section 106 of the NHPA are triggered only when a National Register-listed or -eligible property is present in the area of potential effects. Where no eligible properties are involved, Section 106 does not have further requirements.

1. Where Programmatic Agreement is Not Active. In Field Offices where the national Programmatic Agreement is not in effect, eligibility determinations must be made between the Field Office manager and the SHPO, following the consensus procedures in 36 CFR 800 or the procedures in 36 CFR 63 for a formal Determination of Eligibility through the Keeper of the National Register.

2. Where Programmatic Agreement is Active. Under the national Programmatic Agreement and the States' BLM-SHPO Protocols implementing it, SHPOs' direct involvement in determining eligibility should be limited to exceptional properties and to those for which the BLM Field Office lacks the appropriate expertise (e.g., historic architecture). Otherwise, full responsibility for eligibility judgments, negative and positive, rests with the responsible Field Office managers and their professional staffs. Improperly made or inadequately documented eligibility determinations, if subjected to appeal or injunction proceedings, would at a minimum result in extended delays to the land use authorization process. If a Field Office manager and his or her professional staff are uncertain about a property's eligibility, or if a Field Office manager disagrees with a staff recommendation, the manager shall consult with the SHPO to resolve the eligibility question. If the Field Office manager and SHPO are then unable to agree about the property's eligibility, they shall apply the formal determination of eligibility procedure (36 CFR Part 63).

BLM_0007370

.32E

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

E. <u>The National Register Criteria</u>. A district, site, building, structure, object, traditional cultural property, historic landscape, or discrete group of thematically related properties, that represents America's history, architecture, archaeology, engineering, or culture may be eligible for the National Register. To be judged eligible, a property must possess integrity of location, design, setting, materials, workmanship, feeling, and association, and must meet at least one of the following criteria:

1. Property is associated with an event or events that have made a significant contribution to the broad patterns of America's history. (Corresponds to 36 CFR 60.4 criterion "a".)

2. Property is associated with the lives of persons significant in our past. (Corresponds to 36 CFR 60.4 criterion "b".)

3. Property embodies the distinctive characteristics of a type, period, or method of construction, or represents the work of a master, or possesses high artistic value, or represents a significant and distinguishable entity whose components may lack individual distinction. (Corresponds to 36 CFR 60.4 criterion "c".)

4. Property has yielded or may be likely to yield information important in prehistory or history. (Corresponds to 36 CFR 60.4 criterion "d".)

F. <u>Religious and Other Properties Excluded</u>. In general, properties used for religious purposes, cemeteries, graves, birthplaces, moved structures, reconstructed buildings, commemorative properties, and properties that are less than 50 years old are excluded from National Register eligibility. See 36 CFR 60.4, "Criteria considerations," for more details and an explanation of the specific factors that may counteract the general exclusions.

1. <u>Native American Religious Places, Cemeteries, and Graves</u>. Properties used for traditional religious purposes by Native Americans may be found eligible for the National Register. The eligibility exclusion pertaining to religious properties is not intended to exclude traditional cultural properties merely because they have religious uses, as traditional cultures often do not distinguish between what is secular and what is sacred. As with all traditional cultural properties, properties used for traditional religious purposes must have multi-generation time depth and conform to the meaning of traditional (see "tradition" and "traditional" definitions, BLM Manual 8120 Glossary) and satisfy one or more National Register criteria to be found eligible. Native American graves ("burials") and cemeteries, the criteria exclusions notwithstanding, may also be found eligible as traditional cultural properties.

2. <u>Ethnohistoric Documentation</u>. A traditional cultural property important for the religious or funerary values ascribed to it may be found to be eligible, but only if its importance has been ethnohistorically documented and the property can be clearly defined (see National Register Bulletin No. 15, "Criteria Consideration A: Religious Properties").

BLM_0007371

.32G

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

G.  National Register of Historic Places Registration

1.  National Register Nominations.  Districts, sites, buildings, structures, objects, traditional cultural properties, historic landscapes, and discrete groups of thematically-related multiple properties on public lands may be nominated for listing in the National Register. Appropriately qualified cultural resource professionals prepare nomination Form No. 10306, with continuation sheets (where necessary) form No. 10300A, and accompanying maps and photographs that adequately document the property.  (See 36 CFR Part 60 and National Register Bulletins 15, 16A, and 16B.)

2.  Nomination Submission and Review Process.

a.  Field Offices prepare nominations and forward to the State Director for review and submission to the SHPO.

b.  State Directors submit nominations to the SHPO for review and comment regarding the adequacy of the nomination, the significance of the property and its eligibility for the National Register.  Concurrently, the chief elected local officials of the county or equivalent government unit and municipal political jurisdiction in which the property is located are notified and given 45 days in which to comment.  The SHPO signs the form with an eligibility recommendation.

c.  After receiving the SHPO-signed nomination, the State Director submits the nomination to the Preservation Officer (WO-240) with any comments from the SHPO and chief local official, and requests the Preservation Officer approve the nomination and forward it to the Keeper of the National Register.

d.  The Preservation Officer reviews the nomination form.

(1) If the Preservation Officer finds that the nomination is technically and professionally correct and sufficient and that the property meets the National Register criteria, the Preservation Officer signs and submits the nomination form to the Keeper of the National Register indicating whether the property appears to qualify for the Register at the national, State, or local level of significance.

(2) If the Preservation Officer finds that the nomination is not technically and professionally correct and sufficient, or that the property does not meet the eligibility criteria, the Preservation Officer will contact the State Office for clarification. If changes are needed, the Preservation Officer will return the nomination to the State Office.

BLM_0007372

.32G2e

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

e.  The National Register provides notice in the Federal Register that the nominated property is being considered for listing in the National Register.  Nominations will be included in the National Register within 45 days of receipt by the Keeper unless the Keeper disapproves such nomination or an appeal is filed.  Nominations that are technically or professionally inadequate will be returned for correction and resubmission.  When a property does not appear to meet the National Register criteria for evaluation, the nomination will be returned with an explanation as to why the property does not meet the National Register criteria for evaluation.

.33  Nationally Significant Properties. The national Programmatic Agreement obligates the BLM to consult with the Advisory Council when an undertaking would involve a National Historic Landmark or a National Register-eligible property of national significance. The implications of national-level eligibility were not fully explored at the time the Agreement was negotiated. The procedural complexities are described in .33A through C, and the policy resolution is set out in .33D2.

A.  National Historic Landmarks.

1.  Higher Standards of Evaluation. National Historic Landmarks are this Nation's only officially recognized, nationally significant historic properties that are designated after a criteria-led, professional evaluation process (compare .33C). The Secretary of the Interior designates Landmarks on the basis of recommendations from the National Park System Advisory Board, a committee of scholars and other citizens, under the authority of the Historic Sites Act of 1935. The National Park Service staffs the program and maintains the National Historic Landmarks inventory. The National Historic Landmark criteria (36 CFR Part 65.4; National Register Bulletin No. 16, Appendix V), while similar to the National Register criteria, set substantially higher thresholds for evaluating significance. (Because evaluation according to the National Historic Landmark criteria is the prerogative of the National Park System Advisory Board, there is no need for Field Office staffs to apply the Landmark criteria when evaluating cultural properties.)

2.  Protection and Preservation. Landmarks enjoy a higher threshold for protection: Section 110(f) of the National Historic Preservation Act requires Federal agencies to minimize harm to National Historic Landmarks to the maximum extent possible. The National Park Service monitors the preservation of National Historic Landmarks (36 CFR 65.70) and reports to the Congress on its findings (Section 8, National Park Systems General Authorities Act of 1970, as amended), especially focusing on threats to Landmarks.

BLM_0007373

.33B

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

B. Nationally Significant National Register Properties.

1. Recommendations and Referrals. Based on the recommendation of the State Historic Preservation Officer and/or the agency Preservation Officer, the National Register staff will review the significance level of a property being nominated to the National Register, and may or may not concur that the property appears to be of national significance. If the National Register staff does concur, the nomination is referred to the National Historic Landmarks staff for consideration.

2. National Significance is Determined through Landmark Evaluation. The NPS would not be able to justify separate, competing National Register and National Landmark systems for evaluating national significance. Consequently, the system of objective criteria, professional staffing, and board review established for the National Historic Landmarks program--which preceded the National Register by three decades--prevails as the only official process by which a historic property may be evaluated for national significance. Note that neither the National Historic Preservation Act nor the Historic Sites Act recognizes the concept of "eligible National Historic Landmarks," and there is no process in place to make such determinations.

3. Status Information. The annual report compiled by the Washington Office Cultural and Fossil Resources and Tribal Consultation Group is the most accurate source of information about BLM's Register and Landmark properties. In addition, the National Register of Historic Places maintains an inventory of properties referred for Landmark consideration (among other information) in its National Register Information Systems (NRIS) database and property files. The NRIS may be accessed online at the National Park Service's World Wide Web site.

C. Other Historical Designations.

1. Congressional and Presidential Designations. The Congress, through legislation, and the President, through Executive proclamation, sometimes designates places that are distinguished for their historical importance. For example, the Congress may designate components of the National Historic Trails system, and the President may proclaim National Monuments, a large percentage of which are archaeological or historical in nature. Such areas are managed according to the particular requirements in the legislation or proclamation that designated them.

a. National Register and Landmark Status not Automatic. Unless they had already been included in the National Register or designated as National Historic Landmarks, there may be no direct connection between special congressional and presidential designations and the application of the National Historic Preservation Act or Historic Sites Act. Consequently, significance relative to the National Register of Historic Places will need to be established separately.

BLM_0007374

.33C1b

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

    b. <u>Evaluation Follows the Normal Process</u>. Where a proposed undertaking would potentially affect a specially designated place such as a National Monument or a National Historic Trail, the first step is to determine if it is listed in the National Historic Landmark inventory or the National Register.

    (1) If the monument or trail is listed in either inventory, then the cultural resource specialist must determine if the portion of the property to be affected is a contributing part of the property. This is determined by applying the National Register criteria for evaluation and assessing integrity to that portion of the property. If the area or features (such as historic wagon ruts) appear to be contributing and the monument or the trail is a National Historic Landmark or listed in the National Register of Historic Places at the national level of significance, then the SHPO and the Advisory Council should be consulted in accordance with the national Programmatic Agreement.

    (2) If the monument or trail is not a National Historic Landmark or listed in the National Register of Historic Places, but the portion that would be affected appears to be eligible in its own right or to contribute to an eligible historic property, then the area or feature should be considered eligible for the National Register and treated as such. If it is neither eligible in its own right nor contributing, then the portion that would be affected should not be considered a historic property as defined by the National Historic Preservation Act.

    2. <u>State, Local, and Tribal Designations</u>. Properties designated as historically or culturally significant by non-Federal entities, such as State and local governments and Indian tribes, do not automatically accrue National Register eligibility or status as a result of such designations. Similar to the process in paragraph 1.b., where a proposed undertaking would potentially affect a specially designated place such as a State historic register property or a community commemorative site, the first step is to determine if it is listed in or eligible for the National Register.

    3. <u>United Nations Designations</u>. The World Heritage List was established under terms of The Convention Concerning the Protection of the World Cultural and Natural Heritage adopted in November 1972 at the 17th General Conference of UNESCO. The Convention states that a World Heritage Committee "will establish, keep up-to-date and publish" a World Heritage List of cultural and natural properties, submitted by the States Parties and considered to be of outstanding universal value. The BLM manages several Chacoan Outlier sites, associated with the Chaco Culture National Historic Park and listed on the World Heritage List.

BLM_0007375

.33D

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

    D. Identification and Consultation.

       1. Designated Properties. Designated National Historic Landmarks and National Register properties determined to be nationally significant through the listing process must be identified at the earliest stages of project or undertaking planning. As specified in the national Programmatic Agreement, if they would be directly and adversely affected by the undertaking, then the BLM will consult with the SHPO and the Council.

       2. Undesignated Properties. For purposes of the national Programmatic Agreement, if the SHPO and the State Director, with the advice of the Deputy Preservation Officer, concur that an undesignated property should be listed as nationally significant, the property will be regarded as if nationally significant and, if it would be directly and adversely affected by an undertaking, subject to consultation with the SHPO and the Council.

BLM_0007376

.4

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.4  <u>Categorizing According to Uses</u>. Categorizing cultural resources according to their potential uses is the culmination of the identification process and the bridge to protection and utilization decisions. Use categories establish what needs to be protected, and when or how use should be authorized. All cultural resources have uses, but not all should be used in the same way. Cultural resources can be allocated to the various recognized use categories even before they are individually identified. The clear advantage in doing this is that it allows Field Office managers to know in advance how to respond to conflicts that arise between specific cultural resources and other land uses. Relative to the national Programmatic Agreement, categorizing resources to uses provides a mechanism for the Field Office manager and the SHPO to confer and concur on how to handle most routine cases of conflict in advance, enabling the Field Office manager to put decisions into effect in the most appropriate and most timely manner.

.41  <u>Allocations to Use Categories</u>.

A. Field Office managers shall allocate to appropriate use categories all cultural properties known and projected to occur in a plan area. Allocations are made in land use plans (RMP), and may be applied both to individual properties and to classes of similar properties. Appropriately qualified staff professionals recommend suitable uses for each cultural property or class of properties, considering the properties' characteristics, condition, setting, location, and accessibility, and especially their perceived values and potential uses. A cultural property may be allocated to more than one use category or it may pass from one category to another (e.g., from Scientific Use to Public Use, as when an archaeological property becomes appropriate for in-place interpretation and conservation for future scientific use, upon completion of scientific investigation). During the compliance process for proposed land uses, allocations allow Field Office managers to analyze needs and develop appropriate mitigation and treatment options. Allocations should be consistent with historic context documents and State Historic Preservation Plans.

B. Allocations shall be reevaluated and revised, as appropriate, when circumstances change or new data become available. Conditions and/or criteria for revising allocations must be included in the RMP, or else revisions may require a plan amendment.

C. A Field Office more than 1 year from an RMP start may assign cultural resources to use categories through an implementation plan (e.g., integrated or interdisciplinary plan, coordinated resource management plan, or landscape management plan) that implements any commitment in an existing land use plan to manage cultural resources appropriately (even if only a commitment to comply with the National Historic Preservation Act; see next to last sentence in .41A). Assignments made in implementation plans do not become full allocation decisions until incorporated in an approved RMP.

BLM_0007377

.42

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.42  Use Categories

A. Scientific Use. This category applies to any cultural property determined to be available for consideration as the subject of scientific or historical study at the present time, using currently available research techniques. Study includes methods that would result in the property's physical alteration or destruction. This category applies almost entirely to prehistoric and historic archaeological properties, where the method of use is generally archaeological excavation, controlled surface collection, and/or controlled recordation (data recovery). Recommendations to allocate individual properties to this use must be based on documentation of the kinds of data the property is thought to contain and the data's importance for pursuing specified research topics. Properties in this category need not be conserved in the face of a research or data recovery (mitigation) proposal that would make adequate and appropriate use of the property's research importance.

B. Conservation for Future Use. This category is reserved for any unusual cultural property which, because of scarcity, a research potential that surpasses the current state of the art, singular historic importance, cultural importance, architectural interest, or comparable reasons, is not currently available for consideration as the subject of scientific or historical study that would result in its physical alteration. A cultural property included in this category is deemed worthy of segregation from all other land or resource uses, including cultural resource uses, that would threaten the maintenance of its present condition or setting, as pertinent, and will remain in this use category until specified provisions are met in the future.

C. Traditional Use. This category is to be applied to any cultural resource known to be perceived by a specified social and/or cultural group as important in maintaining the cultural identity, heritage, or well being of the group. Cultural properties assigned to this category are to be managed in ways that recognize the importance ascribed to them and seek to accommodate their continuing traditional use.

D. Public use. This category may be applied to any cultural property found to be appropriate for use as an interpretive exhibit in place, or for related educational and recreational uses by members of the general public. The category may also be applied to buildings suitable for continued use or adaptive use, for example as staff housing or administrative facilities at a visitor contact or interpretive site, or as shelter along a cross-country ski trail.

BLM_0007378

.42E

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

E. <u>Experimental Use</u>. This category may be applied to a cultural property judged well-suited for controlled experimental study, to be conducted by BLM or others concerned with the techniques of managing cultural properties, which would result in the property's alteration, possibly including loss of integrity and destruction of physical elements. Committing cultural properties or the data they contain to loss must be justified in terms of specific information that would be gained and how it would aid in the management of other cultural properties. Experimental study should aim toward understanding the kinds and rates of natural or human-caused deterioration, testing the effectiveness of protection measures, or developing new research or interpretation methods and similar kinds of practical management information. It should not be applied to cultural properties with strong research potential, traditional cultural importance, or good public use potential, if it would significantly diminish those uses.

F. <u>Discharged from Management</u>. This category is assigned to cultural properties that have no remaining identifiable use. Most often these are prehistoric and historic archaeological properties, such as small surface scatters of artifacts or debris, whose limited research potential is effectively exhausted as soon as they have been documented. Also, more complex archaeological properties that have had their salient information collected and preserved through mitigation or research may be discharged from management, as should cultural properties destroyed by any natural event or human activity. Properties discharged from management remain in the inventory, but they are removed from further management attention and do not constrain other land uses. Particular classes of unrecorded cultural properties may be named and described in advance as dischargeable upon documentation, but specific cultural properties must be inspected in the field and recorded before they may be discharged from management.

BLM_0007379

.43

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.43  <u>Relationship between Evaluation and Allocation</u>. Cultural properties are evaluated with reference to National Register criteria for the purpose of assessing their historical values and their public significance. Such evaluations should be carefully considered when cultural properties are allocated to use categories and decisions are made regarding the appropriateness of National Register nomination and/or long-term preservation. Although preservation and nomination priorities must be weighed on a case-by-case basis, the following table can serve as a general guide to illustrate the relationship between National Register evaluation and allocation to use categories.

| Cultural Resource Use Category | National Register Eligibility | Preservation/National Register Nomination |
|---|---|---|
| Scientific Use | Usually eligible | Long-term preservation not critical; medium National Register nomination priority. |
| Conservation for Future Use | Always eligible | Long-term preservation is required; highest nomination priority. |
| Traditional Use | May be eligible | Long-term preservation is desirable; nomination priority is determined in consultation with the appropriate cultural group(s). |
| Public Use | Usually eligible | Long-term preservation is desirable; high nomination priority. |
| Experimental Use | May be eligible | Long-term preservation not anticipated; low nomination priority. |
| Discharged from Management | Not eligible | Long-term preservation and management are not considerations; nomination is inappropriate. |

TABLE 8110-1. Relationship Among Use Categories, National Register Eligibility, and Preservation/National Register Nomination

BLM_0007380

.44

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.44  Consultation with Outside Parties

A. Consultation with SHPO. In accordance with the national Programmatic Agreement and the State's BLM-SHPO protocol, the Field Office manager should invite the SHPO to participate in developing or revising regional, local and project plans, with regard to cultural property evaluations, allocations to use categories (or revisions to such allocations), identification of objectives, and development of management actions. If evaluations and allocations are jointly agreed to, a major portion of future Section 106 consultation requirements will have been satisfied in advance of specific land use proposals. Evaluations and allocations should be consistent with research and preservation priorities identified in the SHPO's State Historic Preservation Plan and should consider assessments of significance in any historic contexts that have been developed.

B. Consultation with Tribes. Consultation with American Indian tribes and Alaska Native tribes during the inventory and evaluation information-gathering steps is essential for planning purposes and for subsequent compliance with FLPMA, AIRFA, NHPA, ARPA, NAGPRA, and Executive Order 13007. Involving tribal governments closely at this level of resource identification will greatly facilitate coordination and consultation at later stages of planning and project development. (See Manual Section 8100.08C1, Manual Section 8120 and Manual Handbook H-8120-1.)

BLM_0007381

.5

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.5  Documentation and Maintenance of Data, Records, and Maps

.51  Cultural Resource Inventory Records. The BLM cultural resource inventory record system documents cultural properties discovered as a result of field surveys, and traditional cultural properties identified through interviews connected with class III inventories, ethnographic studies, oral testimony, or other sources of reliable information. Such inventories cannot be considered to be complete until the appropriate records (cultural resource record forms, survey records, project reports, maps and photographs) have been developed and sent to the SHPO as specified in BLM/SHPO Protocols developed under the national Programmatic Agreement.  The reliability of data on individual cultural properties obtained from non-BLM sources, particularly older data, shall be ascertained before being incorporated fully as part of the system ("recorded").  All inventory information shall be provided to the SHPO promptly in fulfillment of BLM's data sharing commitments.

A.  Cultural Resource Record Forms. The basic documentation of adequately recorded cultural properties and traditional cultural properties, as applicable, shall be done with forms and formats acceptable to the appropriate state data repositories in a manner that fulfills the data sharing requirements of the national Programmatic Agreement and data sharing agreements and programs that exist for individual states, and be filed as a permanent part of the Field Office filing system.

B.  Survey Record. The results of the inventory for each area surveyed must be recorded and the record made a permanent part of the Field Office filing system. These records shall include the nature and intensity of the inventory, both positive and negative results, and appropriate cultural resource record forms, survey notes, project reports, a catalog of curated materials, maps and photographs. Survey records shall be done with forms and formats acceptable to the appropriate state data repositories in a manner that fulfills the data sharing requirements of the national Programmatic Agreement and data sharing agreements and programs that exist for individual states.

C.  Maps and Photographs. All recorded cultural properties, any traditional cultural concerns that may be represented on maps, and all class II or class III survey units are plotted on scaled maps, preferably using GIS technology, which become a part of the cultural resource inventory record. Photographs and negatives are maintained in proper files, preferably separate from the record forms and cross-keyed to the cultural resource survey record.

.52

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.52  Maintenance of Inventory and Evaluation Data.

A. Paper Files. Each Field Office maintains permanent, up-to-date cultural resource inventory and evaluation records files. At a minimum, the records files include all cultural resource inventory and cultural resource evaluation records prepared for cultural resources and areas inventoried within the relevant administrative unit.

B. Digital Data and Automated Files. Each State Director shall cooperate with the SHPO in developing and supporting automated systems for maintaining and utilizing inventory records, and shall ensure that the systems are sufficiently compatible to fulfill the data sharing aims of the national Programmatic Agreement and data sharing agreements and programs that exist for individual states, and also to support the development of BLM GIS based planning and analysis capabilities.

.53  Master Maps. Each Field Office will maintain a master set of maps showing all areas surveyed within the administrative unit, the locations of all recorded cultural properties, and any traditional values that can be usefully represented on maps, preferably using GIS technology. Plotted cultural resources are identified by an appropriate reference number acceptable to the appropriate State data repositories in a manner that fulfills the data sharing requirements of the national Programmatic Agreement and data sharing agreements and programs that exist for individual states.

.54  Inventory Reports. Each Field Office will maintain a permanent file of all cultural resource inventory reports completed within the administrative unit.

.55  Confidentiality. Cultural resource inventory and evaluation records, maps, and reports may be withheld from disclosure to the public as necessary to protect the resource (see Manual Section 8100 Appendix 5, Sec. 304, and Appendix 8, Sec. 9). Each Field Office shall develop procedures related to internal and external GIS data handling and security.

.56  Archival Standards. Maintenance of permanent records files, maps, electronic media, and especially photographs, negatives, and slides, should follow archival standards to the extent practical. While it may not be practical to eliminate all possible sources of deterioration, such as fire, humidity, light, and chemical changes, care should be taken not to introduce sources of deterioration when there is a choice.   Paper archives should be maintained in an environment conducive to preservation, i.e. temperature and humidity are within acceptable ranges, containers are of an appropriate size and shape, and chemically compatible (folders and sleeves are acid free), and damage from air pollution, light and biological infestations (insects and rodents) is effectively prevented.  Digital GIS data records shall be backed up using standard best practice procedures within the computer industry.

BLM_0007383

.57

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.57  <u>Collections</u>. Artifacts, samples, collections, and copies of records, data, photographs, reports, and other documents resulting from inventory must be housed in an appropriate curatorial facility. Field Office files should maintain a record of artifacts, samples, and collections (which remain the property of the United States), where they are located, and any pertinent curatorial agreement.

.58  <u>Inventory Updating</u>. Field Office managers are responsible for ensuring that class I inventories and associated GIS data layers, including survey areas, cultural resource locations and requirements and strategies of unsurveyed areas, are updated often enough to remain fully useful for multiple use decision making.

BLM_0007384

.6

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

.6  <u>External Review</u>.

.61  <u>SHPO Review</u>. SHPO review of inventory findings and evaluation recommendations will be determined in each State according to the provisions of the national Programmatic Agreement and State's BLM-SHPO Protocol. As partners in Field Offices' certification procedures under the national Programmatic Agreement, SHPOs will also be interested in verifying that personnel doing inventory and evaluation work are appropriately professionally qualified (see Manual Section 8100.1 and 2).

.62  <u>Tribal Review</u>. Inventory findings and evaluation recommendations resulting from consultation with American Indian tribes and Alaska Native tribes under .44 should be communicated to the tribes, so that they can know how their information was employed and what recommended safeguards will be carried into planning.

.63  <u>Peer Review</u>. Field Office managers responsible for cultural resource inventories and evaluations should seek professional peer review as appropriate to ensure quality products. Peer review is especially desirable during historic context or research design development, or other planning and inventory efforts that form the primary substantive and theoretical basis for evaluation and planning. It is also appropriate for planning, implementing, and reporting major inventory or data recovery projects. State and/or regional professional cultural resource associations, universities, and SHPOs are good sources for identifying possible reviewers.

BLM_0007385

Appendix 1
(.05E; .32A)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

| List of Selected National Register Bulletins | |
| --- | --- |
| Number | Title |
| 15 | How to Apply the National Register Criteria for Evaluation |
| 16A | How to Complete the National Register Registration Form |
| 16B | How to Complete the National Register Multiple Property Documentation Form |
| 18 | How to Evaluate and Nominate Designed Historic Landscapes |
| 30 | Guidelines for Evaluating and Documenting Rural Historic Landscapes |
| 32 | Guidelines for Evaluating and Documenting Properties Associated with Significant Persons |
| 36 | Guidelines for Evaluating and Registering Historical Archeological Sites and Districts (Note: also applicable to evaluating and registering prehistoric archaeological sites and districts) |
| 38 | Guidelines for Evaluating and Documenting Traditional Cultural Properties |
| 39 | Researching a Historic Property |
| 41 | Guidelines for Evaluating and Registering Cemeteries and Burial Places |
| 42 | Guidelines for Identifying, Evaluating and Registering Historic Mining Properties |
| Available from the National Register of Historic Places, National Park Service, 1849 C Street, N.W., Washington, D.C. 20240 | |

BLM_0007386

Appendix 2, Page 1
(.06F; .21C4)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

## Recording Cultural Resource Locations
## Using Global Position System (GPS) Technology

**Purpose and Objective.** This guidance describes minimum requirements for recording BLM cultural resource locations using GPS technology. The BLM has required the use of GPS to record all cultural resource locations since April 1, 2004.

The GPS has become a major tool both for traditional mapping applications and for Geographic Information System (GIS). The main objective of this guidance is to improve the overall reliability of site location information recorded by cultural resource specialists, including cooperators, contractors, and permittees; and to support the standardization and expansion of GIS applications for cultural resource management.

**Accuracy Standard.** The accuracy standard for cultural resource location data shall be a mean error of +/-12.5 meters or less, at a 95 percent confidence level. This mean error requirement is consistent with the National Map Accuracy Standard for 1:24,000 scale quadrangles and Federal Geographic Data Committee (FGDC) reporting requirements.  This degree of accuracy can be achieved with a variety of contemporary GPS equipment. Appropriate equipment is defined as GPS technology that meets the accuracy standard.

**Field Observation Standards – GPS.**  Cultural resources shall be located by reporting a minimum of one GPS-observed coordinate taken in the approximate estimated visible center (centroid) of the resource. The centroid need not be perfectly central to a site, but it must lie in the site's approximate center for map-plotting purposes. Multiple coordinates shall be used to define the approximate centerline of a linear resource (e.g., trail), if field judgment suggests that a single centroid is insufficient to record its location.  More points, lines or polygons may be taken for other mapping purposes, including recording project area boundaries, site datums or markers, or internal attributes. Applicability of this standard for recording isolated finds shall be a State-level decision.

**Field Observation Standards – UTM.** In addition, cultural resource locations shall be reported using the Universal Transverse Mercator (UTM) coordinate system, North American Datum 1983 (NAD83). This is the same standard used for the National Register of Historic Places. A State Historic Preservation Office may also request that locations be reported in a State-specific coordinate system. Consequently, it is important that all reported coordinates clearly identify the coordinate system used.

**Alternative Field Observation Methods.** In situations where GPS observations are not practical or possible due to geography, vegetation, satellite availability, or the presence of hazardous materials, the recorder should locate the resource using GPS offset equipment and capabilities, map coordinates, or a combination of GPS and other techniques.  Such non-GPS methods must be described in the site or project area record.

BLM_0007387

Appendix 2, Page 2
(.06F; .21C4)

8110 - IDENTIFYING AND EVALUATING CULTURAL RESOURCES – (Public)

**Recording Standard:** The location observations shall be reported on the appropriate part of a resource recording form, in the narrative description of the resource, or both, and shall include the following information:

- The UTM coordinates with the UTM zone. For all coordinates, the datum reference must be reported.
- The coordinate system for observations should be recorded in an obvious way (e.g. "UTM Zone 10 NAD83 centroid coordinate: N4986000 E302000 meters")
- The probable error must also be recorded in narrative, if the error terms for a given coordinate are known (e.g., "GPS observations were differentially processed to an average error of less than 5m root mean standard deviation [RMS]").
- Receiver type, correction status, length of observation and number of observation points, position dilution of precision (PDOP), and horizontal error estimates must be recorded with the location whenever GPS equipment and software provides such information.
- Discrepancies between GPS locations and USGS quadrangle locations should be noted on the site record. Because GPS locations are mathematically precise coordinates, a point plotted from GPS may appear to be in an incorrect location on a USGS quadrangle.

**Standards may be exceeded.** These are minimum standards and should not be used to lessen any applicable State or Federal standard or reduce site location accuracy from conventional mapping methods. There may be situations where more accurate location information is desirable or required. For instance, State Offices may apply more stringent standards for intra-site mapping, excavation unit and datum locations. In all instances, the most accurate and capable equipment available shall be used to meet the needs of the types of data that are being recorded, even if it exceeds the accuracy standards in this guidance. Appropriate GPS experts within Washington Office, National Centers, State and Field Offices should be consulted as needed.

IM 2004-227, Bureau of Land Management's Biomass Utilization Strategy    file:///Z:/Shared/e-Library/1 Agencies/BLM/IMs/IBs/IMs/2004/im2004-2...

Case No. 1:20-cv-02484-MSK  Document 28-1  filed 04/27/21  USDC Colorado  pg 271 of 422

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240


August 16, 2004


EMS TRANSMISSION 08/16/2004
Instruction Memorandum No. 2004-227
Expires: 09/30/2005

To:        SD's and CD's

From:      Assistant Director, Renewable Resources and Planning
           Director, Office of Fire and Aviation

Subject:    Bureau of Land Management's Biomass Utilization Strategy

**Program Areas:** Forests and Woodlands Management, Fuels Management.

**Purposes:** This Instruction Memorandum (IM) will establish the Bureau of Land Management's (BLM) Biomass Utilization Strategy. The strategy is a framework to implement the biomass portions of the National Fire Plan, National Energy Policy, DOI Strategic Plan, commitments made by the Secretary of the Interior at the Bioenergy and Wood Products Conference (January 2004) and the Memorandum of Understanding (MOU) for Woody Biomass Utilization for Restoration and Fuels Treatments on Forests, Woodlands and Rangelands.

**Policy/Action:** The BLM will implement a strategy for increasing the utilization of biomass from BLM lands consistent with the National Fire Plan (NFP) and using the tools of the Healthy Forests Initiative, including the new authorities for stewardship contracting projects and the Healthy Forests Restoration Act (HFRA). Short-term efforts will focus on developing tools, and expertise that can be implemented by December 31, 2004. Longer-term efforts will initially focus on items that can be implemented by October 1, 2005. However, making significant progress in biomass utilization issue will take much longer and must be a coordinated effort by all Bureau staff and offices, the Department and our partners. The majority of the tasks associated with this strategy are assigned to the Forests and Woodlands Group (WO270) and the Office of Fire and Aviation (FA600). This strategy is a working document, and will be modified as conditions change and new opportunities arise.

**Background:** The announcement by Secretary Norton at the Denver Biomass Conference charged the Department and the agencies with development of a coordinated biomass implementation strategy. With this announcement and under the umbrella of the NFP, the new authority for stewardship contracting and the recent passage of the HFRA, BLM was charged to develop a biomass utilization strategy. Additional guidance used to develop this strategy includes:

BLM_0007389

1. MOU/Woody Biomass Utilization, DOA, DOE and DOI, June 2003.
2. Biomass Energy Opportunities on Public Lands, Office of Wildland Fire Coordination Office, 2003.
3. Cooperative Agreement for the purpose of promotion of woody biomass utilization, BLM and National Association of Conservation Districts, June 2004.
4. Program Evaluation of the Public Domain Forest Management Program, May 5, 2003.
5. BLM State Forestry Action Plans 2003.
6. IB No. OF&A 2002-058, Biomass Utilization.
7. IM No. OF&A 2002-032, Utilization of By-Products Produced by Hazardous Fuels Reduction Activities.

**Impact on Budget:** In the short run, this strategy will require participation of State and National BLM Staff. In the long run, implementing this strategy is expected to reduce the cost of forest health and hazardous fuel reduction treatments.

**Coordination:** This IM was coordinated with the Office of Fire and Aviation, Planning and Resources (FA-600); and Forests and Woodlands Management (WO-270).

BLM_0007390

**Contact:** Additional information is available by contacting Scott Lieurance, BLM's Biomass Coordinator at (202) 452-0316, Laura Ceperley at (202) 452-5029, or Roy Johnson at (208) 387-5163.

Signed by:                                Authenticated by:
Edward Shepard                            Barbara J. Brown
Assistant Director                        Policy & Records Group, WO-560
Renewable Resources and Planning

Signed by:
Larry Hamilton
Director
Office of Fire and Aviation

5 Attachments
  1- BLM's Biomass Utilization Strategy (7 pp)
  2- Woody Biomass Utilization Memo and MOU (9 pp)
  3- Biomass Energy Opportunities on Public Lands (10 pp)
  4- IB No. OF&A 2002-058 (2 pp)
  5- IM No. OF&A 2002-032 (6 pp)

BLM_0007391



# BLM's Biomass Utilization Strategy



**July**

**2004**

BLM_0007392

# BLM's Biomass Utilization Strategy
# July 2004

***Purpose -*** The BLM will implement a strategy for increasing the utilization of biomass from BLM lands consistent with the National Fire Plan and using the tools of the Healthy Forests Initiative, including the new authorities for stewardship contracting projects and the Healthy Forests Restoration Act.  The purpose of this strategy is to assist in implementation the goals of the National Fire Plan, and the National Energy Policy, the DOI Strategic Plan and the commitments made by the Secretary of the Interior at the Bioenergy and Wood Products Conference held in January 2004.

***Strategy -*** Short-term efforts will focus on developing tools, increasing field office expertise and increases in acres treated with biomass utilized.  These actions can be implemented by December 31, 2004.  Longer-term efforts will build on the short term efforts and expand to working with partners and looking at barriers to biomass utilization.  These actions can be implemented by October 1, 2005.  **This strategy is a working document**, and will be modified as conditions change and new opportunities arise.  This strategy fulfills some of the commitments of the National Energy Policy, Task 45.

***Background -***

## A.  National Fire Plan
### 1. Ten-Year Comprehensive Strategy (August 2001)



Goal 4:  Promote Community Assistance Guiding Principles:

Biomass Utilization – Employ all appropriate means to stimulate industries that will utilize small-diameter, woody materials resulting from hazardous fuel reduction activities, such as for biomass electric power, pulp and paper-making and composite structural building materials.

Actions:  Promote markets for traditionally underutilized wood as a value-added outlet for by-products of hazardous fuel reduction and ecosystem restoration efforts.

### 2.   10 Year Comprehensive Strategy;  Implementation Plan (May 2002)
One requirement of reducing threat of wildland fire is "active forest and rangeland management, including thinning that produces commercial or pre-commercial products, biomass removal and utilization, prescribed fire and other fuels reduction tools to simultaneously meet long-term ecological, economic and community objectives."  (pg 6 of Strategy)

An implementation outcome is "communities at risk have increased capacity to prevent losses from wildland fire and the potential to see economic opportunities resulting from treatments and services" (pg 15 of Strategy).

**Performance Measure E.**  Percent of acres treated to reduce hazardous fuels by mechanical means with by-products utilized.

**Implementation Tasks.**  Create an internet-based information system to provide technical assistance and identify programs that improve and increase utilization of by-products from hazardous fuel treatments and ecosystem restoration activities.

Develop an improved technical assistance program to promote commercial uses for small – diameter materials.

### B.  National Energy Policy (Task # 45, Increase Biomass Utilization):

Develop strategies to encourage use of biomass from public lands.  Develop an incentive program to encourage use of biomass as renewable energy.  Find opportunities to utilize funding from other sources within the National Fire Plan (due 12.30.05)



Develop new procedures to offer the option of removal of small diameter woody by-products (biomass) in commercial and procurement contracts.  (10.1.04)

Develop a short term strategy to increase the knowledge, new tools and expertise needed to increase the availability of biomass for market (10.0.04)

Develop a long term strategy for marketing, infrastructure development and biomass supply (12.30.05)

### C.  DOI Strategic Plan:
DOI Strategic Goal:  2.0:  Resource use
End outcome goal:  2.4:  Manage or Influence Resource Use to Enhance Public Benefit, Promote Responsible Use, and Ensure Optimal Value – Forest and Woodland Products
End outcome measure:  2.4.02: Volume of wood products offered consistent with applicable management plans, PD lands.
2.4.04:  Volume of wood products offered consistent with applicable management plans, O&C lands
2.4.05:  Responsible use:  Percent of permitted acres maintained at appropriate land conditions and water quality standards.

### D.  Commitments made by the Secretary of the Interior
Bioenergy and Wood Products Conference, Denver, Colorado (January 2004):

1.  By October 1, 2004, the DOI and the Forest Service will publish in the Federal Register new procedures for commercial and procurement contracts, when appropriate, that will offer the option of removal of small diameter woody by-products to be used for bio-energy.
2.  The DOI will work with the National Association of Conservation Districts to develop regional workshops on biomass utilization and fuel reduction in support of the National Fire Plan.
3.  The DOI will develop web-based information tools to increase understanding of the social, environmental and economic benefits of biomass thinning for forest restoration and catastrophic fire risk reduction.

**E.  Existing Policies and IM/IB**:

1.  MOU – Woody Biomass Utilization, USDA, DOE, DOI (June 2003).
2.  Biomass Energy Opportunities on Public Lands, Office of Wildland Fire Coordination (2003).
3.  Program Evaluation of the Public Domain Forest Management Program (May 5, 2003).
4.  BLM State forestry action plans (2002).
5.  IB No. OF&A 2002-058, Biomass Utilization (September 9, 2003).
6.  IM No. OF&A 2002-032, Utilization of By-Products produced by Hazardous Fuels Reduction Activities (July 17, 2002).

 

**Biomass Energy Opportunities on Public Lands**

BLM_0007395

## BLM's  Biomass Utilization Strategy
### July 2004

| | National Lead | Comple-tion Date | Status/Comments |
|---|---|---|---|
| **1.0 Short-term Goal:  Increase the utilization of biomass from treatments on BLM lands, where opportunities exist.** | | | |
| **1.1.  Develop tools** | | | |
| 1.  Action:  Develop a comprehensive **definition** of biomass, such as "small diameter woody material that can be used to generate a commercial product." | WO270 | Oct-04 | Start with existing definitions, broad enough to include forage. |
| 2.  Action:  Develop contract specifications for **appraising** biomass by finalizing Wood Fiber Utilization Contracting Procedures. | WO270 | Dec-04 | |
| 3.  Action:  Develop guidelines for estimating biomass **volume.** | WO270 | Dec-04 | |
| 4.  Action:  Develop guidelines for **tracking** biomass accomplishments, building on DOI strategic plan, and biomass definition. | WO270 | Dec-04 | Start with 10-year Plan performance measure E. |
| 5.  Action:  Increase the number of **fuels IDIQ** task orders that include a biomass component , by modifying existing "salvage" clause, and developing a new template. | WO270, FA600, NBC | Oct-04 | |
| 6.  Action:  Assist developing **DOI clauses** for biomass removal in all appropriate commercial sales and service contracts (resulting in the contractor buying the material for at least the minimum market value). | OR State Office, WO270 | Oct-04 | |
| **1.2.  Build expertise within the BLM, and networks with other agencies and organizations.** | | | |
| 1.  Action:  Identify  **demonstration projects** in several States for 2005 BLM funding priorities.  Criteria will include business and community infrastructure, BLM staff expertise, and resource potential.  Advertise lessons learned. | WO270, FA600 | Oct-04 | Coordinate with other DOI agencies and OWFC. |
| 2.  Action: Continue filling **new forester/forestry technician** positions in key field office, implementing the BLM State Action Plans, and national office. (in addition to 4 positions filled in 2004.) | WO270, FA600 | Done for 2004 | Coordinate with hiring of fuels specialists. |
| 3.  Action:  **Train BLM staff** in use of biomass guidance and "tools" (stewardship contracts/agreements, biomass clauses, etc). | WO270, FA600, NTC | ongoing | |
| 4.  Action:  **Train key partners,** governments, tribes, contractors, etc in use of "tools"  (stewardship contracts/agreements, biomass clauses, etc) so that they can participate/compete in contracts/agreements. | WO270, FA600 | ongoing | Build on MOU with NACD. Coordinate with BIA and FS. |
| 5.  Action: Facilitate **technology transfer with key partners**, governments, tribes, contractors, etc by participating in DOI/USDA website (under HFI), conferences, developing key BLM staff, participating in technology centers. | WO270, FA600 | ongoing | Build on MOU with NACD. Coordinate with BIA and FS. Have Biomass on HFI website by August 1. |

## BLM's  Biomass Utilization Strategy
### July 2004

| | National Lead | Completion Date | Status/Comments |
|---|---|---|---|
| **1.3.  Increase percent of  acres treated with biomass utilized** | | | |
| 1.  Action:  Increase the **number of 2005 fuels and stewardship projects** that include a biomass component. | WO270, FA600 | Done for 2004 | |
| 2.  Action:  Increase **funding available** for biomass projects in 2005, including fuels and community assistance, CCS/CCI, stewardship receipts,  MLR. | WO270, FA600 | Dec-04 | |
| 3.  Action:  Develop **incentives for increasing biomass products** in areas where opportunities currently exists. | WO270, FA600 | Dec-04 | Consider transportation bid items. |
| 4.  Action:  **Identify barriers in existing land use plans** which impede effective biomass utilization. | WO270, WO210 | Dec-04 | |
| **2.0  Long-term Goal:  Increase the utilization of biomass from treatments on BLM lands nation-wide, as appropriate, including in developing markets areas.** | | | |
| **2.1.  Develop tools** | | | |
| 1.  Action:  Develop **CXs** for limited timber harvest. | WO 270 | Jan-05 | |
| 2.  Action:  Develop **evaluation criteria** for awarding contracts in "best value" solicitations, where contractors utilize biomass. | WO 270 | Jan-05 | |
| 3.  Action:  Develop **timber sale provisions** to reduce slash disposal deposits when the purchases utilizes biomass. | WO 270 | Jan-05 | |
| 4.  Action:  Develop budget proposals for grants and base funding. | WO270, FA600 | Jan-05 | |
| **2.2.  Build expertise within the BLM, and networks with other agencies and organizations.** | | | |
| 1.  Action: Connect key partners with **grants available for DOI, USDA, EPA** et | WO270 | ongoing | Coordinate with NACD. |
| 2.  Action: Continue filling **new forester/forestry technician** positions in key field office, implementing the BLM State Action Plans. | WO270, FA600 | ongoing | |
| 3.  Action: Actively engage the USDA Forest Service in implementation of **Title II of HFRA** -- grants for research of biomass use, rural revitalization through forestry and biomass commercial utililization. | WO270 | Jan-05 | |
| 4.  Action: Actively engage the USGS in implementation of **Title IV of HFRA** (applied research assessment of federal lands that are at risk of infestation). | WO270 | Oct-05 | |

BLM_0007397

## BLM's  Biomass Utilization Strategy
### July 2004

| | National Lead | Completion Date | Status/Comments |
|---|---|---|---|
| 5.  Action:  **Train BLM staff** in use of biomass guidance and "tools" (stewardship contracts/agreements, biomass clauses, etc). | WO270, FA600, NTC | ongoing | |
| 6.  Action:  **Train key partners,** governments, tribes, contractors, etc in use of "tools"  (stewardship contracts/agreements, biomass clauses, etc) so that they can participate/compete in contracts/agreements. | WO270, FA600 | ongoing | Build on MOU with NACD. Coordinate with BIA and FS. |
| 7.  Action: Facilitate **technology transfer with key partners**, governments, tribes, contractors, etc by participating in DOI/USDA website (under HFI), conferences, developing key BLM staff, participating in technology centers. | WO270, FA600 | ongoing | Build on MOU with NACD. Coordinate with BIA and FS. Have Biomass on HFI website by August 1. |

### 2.3.  Increase percent of acres treated with biomass utilized.

| | National Lead | Completion Date | Status/Comments |
|---|---|---|---|
| 1.  Action: Promote **landscape planning across ownerships**, estimating long term supply from BLM lands and incorporating concepts from community assistance planning. | WO270 | Oct-05 | Investigate CROP and other models, five year vegetation management schedules. |
| 2.  Action: Where appropriate, incorporate biomass  in land use plans, including **removing barriers** that exclude commercial product removal in appropriate areas (i.e., such as direction in RMP that disallow commercial vegetative treatments). | WO270 | ongoing | Consider regional, state or national plan amendments. |
| 3.  Action:  Increase the number of **stewardship contracts** and agreements that include a biomass component. | WO270 | Oct-05 | |
| 4.  Action:  Implement **DOI clauses (currently being developed)** for biomass removal in all appropriate commercial sales and service contracts (resulting in the contractor buying the material for at least the minimum market value). | WO270 | Oct-05 | |
| 5.  Action: Report by State, biomass performance measures, and incorporate into 2006 budget allocations. | WO270, FA600 | Oct-05 | |



# United States Department of the Interior

OFFICE OF THE ASSISTANT SECRETARY
POLICY, MANAGEMENT AND BUDGET
Washington, DC 20240



**APR 0 8 2004**

Memorandum

To:       Assistant Secretaries
          Solicitor
          Bureau Directors

From:     P. Lynn Scarlett

Subject:  Implementation of the Policy Principles for Woody Biomass Utilization

On June 18, 2003 Secretary Gale A. Norton signed the *Memorandum of Understanding On Policy Principles for Woody Biomass Utilization for Restoration and Fuel Treatments On Forests, Woodlands, and Rangelands among the Department of the Interior, the Department of Energy and the Department of Agriculture* (MOU). This letter transmits that document for immediate implementation of the Department of the Interior Bureaus and Offices.

The President recently signed the Healthy Forests Restoration Act (P.L. 108-148), or HFRA, which gives the Department of the Interior new tools and increased opportunities to address forest, woodland and rangeland health and protect communities and resources from catastrophic wildfires. Title II of the HFRA provides new authorities to encourage commercial biomass utilization. Additionally, the National Energy Policy and the National Fire Plan 10 Year Comprehensive Strategy –Implementation Plan led by the Western Governors, and the August 2002 White House Report *In Response to the National Energy Policy Recommendations to Increase Renewable Energy Production on Federal Lands*, signed by Secretary Abraham and Secretary Norton, all call for utilization of woody biomass to meet the nation's energy needs and supporting local communities.

The message from the President, the Congress and the States is clear: we should utilize the woody biomass by-products from restoration and fuels treatment projects wherever ecologically and economically appropriate and in accordance with the law.

It is now time for the Department of the Interior, and our partners at DOE and USDA, to act. Until such time as we can revise the Departmental Manual, I am directing the Bureaus to begin implementation of the policy principles in the Woody Biomass MOU.

The eight policy principles of the MOU are:

> **1) Include local communities, interested parties, and the general public in the formulation and consideration of woody biomass utilization strategies.**

2) Promote public understanding of the quantity and quality of woody biomass that may be made available from federal lands and neighboring Tribal, State, and private forests, woodlands, and rangelands nationwide.

3) Promote public understanding that woody biomass utilization may be an effective tool for restoration and fuels treatment projects.

4) Develop and apply the best scientific knowledge pertaining to woody biomass utilization and forest management practices for reducing hazardous fuels and improving forest health.

5) Encourage the sustainable development and stabilization of woody biomass utilization markets.

6) Support Indian Tribes, as appropriate, in the development and establishment of woody biomass utilization within Tribal communities as a means of creating jobs, establishing infrastructure, and supporting new economic opportunities.

7) Explore opportunities to provide a reliable, sustainable supply of woody biomass.

8) Develop and apply meaningful measures of successful outcomes in woody biomass utilization.

For further information about this letter, the MOU or the biomass policy, please contact John Stewart, Office of Wildland Fire Coordination, at (202) 606-0504.

Attachment: Woody Biomass MOU, June 13, 2003

BLM_0007400

# Memorandum of Understanding
## On Policy Principles For

## Woody Biomass Utilization for Restoration and Fuel Treatments
## On Forests, Woodlands, and Rangelands

## United States Department of Agriculture
## And
## United States Department of Energy
## And
## United States Department of the Interior

**THIS MEMORANDUM OF UNDERSTANDING (MOU)** is hereby entered into by and among the United States Department of Agriculture, the United States Department of Energy, and the United States Department of the Interior.

*Preamble:  The Secretaries support the utilization of woody biomass by-products from restoration and fuels treatment projects wherever ecologically and economically appropriate and in accordance with the law.*

## A.  PURPOSE:

The purpose of this MOU is to demonstrate a commitment to develop and apply consistent and complementary policies and procedures across three Federal departments to encourage utilization of woody biomass by-products that result from forest, woodland, and rangeland restoration and fuel treatments when ecologically, economically, and legally appropriate, and consistent with locally developed land management plans, by:

- Communicating to our employees and partners that the harvest and utilization of woody biomass by-products can be an effective restoration and hazardous fuel reduction tool that delivers economic and environmental benefits and efficiencies;
- Promoting consideration of woody biomass utilization from restoration and fuels treatment instead of burning or other on-site disposal methods; and
- Encouraging development of new mechanisms that increase the benefits and efficiencies of woody biomass utilization.

This MOU is intended to maximize the coordination and effectiveness of the Departments of the Interior (DOI), Agriculture (USDA), and Energy (DOE) in furthering the purposes set forth in this MOU.

BLM_0007401

**B. STATEMENT OF MUTUAL INTERESTS:**

**Background:** Today between 100 and 200 million acres of America's Federal lands are at risk of catastrophic wildfires in large part due to significant changes in forest and woodland structure that have occurred in the last century. Widespread wildfire suppression and past forest, woodland, and rangeland management activities have contributed to these changes. Innovative, large scale management is needed to restore at-risk ecosystems to healthy and resilient conditions.

In 2002, 7.2 million acres of Federal lands burned, nearly double the ten-year average. This followed the devastating 2000 wildfire season, during which over 8.4 million acres burned and which prompted development of the National Fire Plan. President Bush has focused attention on this issue in his Healthy Forests Initiative.

The President's Healthy Forests Initiative, the National Fire Plan and the joint Federal-State 10-year Comprehensive Strategy Implementation Plan all call for biomass and wood fiber utilization as an integral component of restoring our Nation's precious forests, woodlands, and rangelands. Biomass utilization can also meet a key objective of the National Energy Policy by contributing to diversification of the Nation's energy supply. Further, the August 20, 2002, *White House Report In Response to the National Energy Policy Recommendations to Increase Renewable Energy Production on Federal Lands* includes a Proposed Action (3.3) to "Establish a Biomass Initiative at the Department of the Interior." The Report was prepared by DOE and DOI but includes a number of actions by, and related to, USDA biomass utilization efforts. Coordination between DOI, USDA, and DOE is important to the success of these initiatives, as is working cooperatively with States, Tribes, private landowners, Non-Governmental Organizations, and other interested parties and potential partners.

In this MOU, *restoration* refers to those management actions that seek to restore forest, woodland, and/or rangeland health, including such things as thinning and other stocking control actions, species conversion, invasive species management, insect and disease management, and soil and water conservation actions. In this MOU, *fuels treatment* and *hazardous fuel reduction* are synonymous terms and refer to management actions that seek to reduce the rate of spread, intensity, resistance to control, and crowning potential of wildfires by reducing available fuel; examples include thinning, chipping, crushing, piling, burning, and actions that reduce or remove live and dead woody fuels. In this MOU, *woody biomass* is defined as the trees and woody plants, including limbs, tops, needles, leaves, and other woody parts, grown in a forest, woodland, or rangeland environment, that are the by-products of restoration and hazardous fuel reduction treatments. In this MOU, *woody biomass utilization* is defined as the harvest, sale, offer, trade, and/or utilization of woody biomass to produce the full range of wood products, including timber, engineered lumber, paper and pulp, furniture and value-added commodities, and bio-energy and/or bio-based products such as plastics, ethanol, and diesel.

**Need for this MOU:** USDA is responsible for the management of 192 million acres of National Forest System lands and for assisting in the management of 430 million acres of State and private forest lands. DOI is responsible for the management of 507 million acres of surface lands, of which approximately 120 million acres are forest and woodlands. DOE provides significant technical expertise in biomass energy and linkages to the renewable energy industry.

BLM_0007402

In addition, public assistance and grants programs administered by these three departments have positive benefits in capacity-building for woody biomass utilization in local communities, industries, and on private lands.  Energy is a key market for low-value woody biomass, and DOE and USDA fund, support, and/or conduct a major share of the research concerning biomass energy alternatives.

Within the Federal family, these three departments profoundly affect whether and how woody biomass utilization is employed as a tool for forest, woodland, and rangeland restoration and fuels treatment. The development and implementation of consistent and complementary policies and procedures can help maximize Federal efficiency and effectiveness of woody biomass utilization.

Woody biomass utilization can help reduce or offset the cost and increase the quality of the restoration or hazardous fuel reduction treatments. Woody biomass utilization can also have additional value in that it may result in more diverse forest ecosystems, characterized by native flora and fauna, healthy watersheds, better air quality, improved scenic qualities, more fire-resilient landscapes, and reduced wildfire threats to communities, and may provide an alternative waste management strategy.

## C. <u>POLICY PRINCIPLES</u>

DOI, DOE and USDA will use their statutory authorities to support the Principles listed below, as appropriate:

**1) Include local communities, interested parties, and the general public in the formulation and consideration of woody biomass utilization strategies.**

*Examples:*

- Communications that further the understanding that the implementation of the President's Healthy Forests Initiative and National Fire Plan go beyond Federal boundaries and affect local communities.
- Collaborative partnerships and public involvement programs and projects that provide value and enhance the economics, successes, and opportunities of utilizing woody biomass.
- Efforts to share knowledge and technology with community leaders, business owners, and private forest landowners.

BLM_0007403

**2) Promote public understanding of the quantity and quality of woody biomass that may be made available from Federal lands and neighboring Tribal, State, and private forests, woodlands, and rangelands nationwide.**

*Examples:*

- Inventory and analyze known geographic, transportation, and land use designation parameters.
- Evaluate woody biomass utilization capability in communities near restoration and hazardous fuel reduction areas on Federal lands.
- Verify fire condition classes of Federal forests and woodlands.
- Inventory and classify woody material by condition classes.
- Assist non-Federal partners with assessments of biomass quantity and availability on non-Federal lands.

**3) Promote public understanding that woody biomass utilization may be an effective tool for restoration and fuels treatment projects.**

*Examples:*

- Encourage science-based analysis at the appropriate land use planning level for decisions whether to make woody biomass available for utilization.
- Emphasize local efforts directed at woody biomass availability and utilization.
- Encourage market analysis or forest products appraisal to determine whether woody biomass utilization should have preference over disposal through chipping, crushing, burning, and/or other on-site disposal methods.
- Explore landscape-level analysis and fine-scale resolution of forests, woodlands, and rangelands to support management, restoration, and hazardous fuel reduction treatments.
- Encourage strategies for economic development in local and rural communities for value-added wood products and woody biomass utilization.

**4) Develop and apply the best scientific knowledge pertaining to woody biomass utilization and forest management practices for reducing hazardous fuels and improving forest health.**

*Examples:*

- Continue to expand knowledge of bio-based products and bio-energy from wood fiber using the Biomass Research and Development Act of 2000, the Farm Security and Rural Investment Act of 2002, and other applicable authorities.
- Strengthen research and development capacity for woody biomass products and energy research, and sustainable forest harvesting and processing systems for small diameter material.
- Assist States and private non-industrial landowners in using short-rotation cropping systems and developing low-value product markets.
- Map woody biomass utilization capacity.

BLM_0007404

**5) Encourage the sustainable development and stabilization of woody biomass utilization markets.**

*Examples:*

- Promote renewable energy marketing strategies to stimulate investments in woody biomass utilization.
- Support efforts to allow retail electric power customers an option to pay an appropriate premium to purchase electricity generated from woody biomass resulting from restoration or hazardous fuels treatments.
- Encourage the production and marketing of electric energy generated from woody biomass resulting from restoration or hazardous fuels treatment.
- Inform the public of available Federal financial assistance to encourage the utilization of woody biomass from restoration and hazardous fuels treatments.
- Explore biomass transportation cost subsidies from the forest to point of use, where doing so saves or avoids higher costs of treatments or fire-fighting in the future.
- Promote new utilization technologies and technology transfer, research, and development of bio-ethanol and other bio-based products.

**6) Support Indian Tribes, as appropriate, in the development and establishment of woody biomass utilization within Tribal communities as a means of creating jobs, establishing infrastructure, and supporting new economic opportunities.**

*Examples:*

- Encourage the use of guaranteed or insured loans under the Indian Financing Act, 25 USC §1451 et seq., to the extent permissible under existing law, including a possible set-aside for pilot projects that support development of woody biomass generation utilizing hazardous fuels and by-products of forest health treatments.
- Use the Buy Indian Act, 25 USC §47, to the extent permissible by law, in the purchase or procurement of woody biomass products resulting from Indian labor or industry.
- Provide technical and policy assistance to Tribal governments for the establishment of woody biomass programs.
- Assess extent of woody biomass fuels on Indian lands.

**7) Explore opportunities to provide a reliable, sustainable supply of woody biomass.**

*Examples:*

- Investigate the feasibility of long-term or renewable contracts for removal of woody biomass from Federal lands.
- Explore expanded use of contracting authorities and mechanisms for hazardous fuel reduction or restoration treatments on public lands.
- Expedite, as appropriate, environmental analysis and review for priority restoration and hazardous fuel reduction sites in Federal forests, woodlands, and rangelands.

BLM_0007405

**8) Develop and apply meaningful measures of successful outcomes in woody biomass utilization**.

*Examples:*

- Social, economic, and environmental sustainability measures.
- Measures of unit-cost reductions in hazardous fuel treatment and forest health treatment through offset by woody biomass utilization.
- Performance or workload measures to track targets and accomplishments in the offer and sale of woody biomass from Federal lands.

**D. <u>IT IS MUTUALLY UNDERSTOOD BY ALL PARTIES THAT:</u>**

**1) <u>AUTHORITIES</u>**.  These Principles will be implemented under the relevant authorities of the three Departments that are parties to this MOU.

**2) <u>TERMINATION</u>**.  Any of the three Departments may terminate its participation in and agreement to this MOU, in whole or in part, at any time.

**3) <u>PARTICIPATION IN SIMILAR ACTIVITIES</u>**. This MOU in no way restricts the three Departments from participating in similar activities with other public or private agencies, organizations, and individuals.

**4) <u>PRINCIPAL CONTACTS</u>**. The principal contacts for this agreement are:

| | | |
|---|---|---|
| John Sebelius | John Stewart | John Ferrell |
| USDA Forest Service | USDOI | USDOE |
| Research and Development | Wildland Fire Coordination | Office of Energy Efficiency |
| P.O. Box 96090 | Room 3060, Main Interior Bldg | and Renewable Energy |
| Washington, DC 20090 | Washington, DC 20240 | 1000 Independence Ave, SW |
| | | Washington, DC 20585-0121 |

**5) <u>NON-FUND OBLIGATION DOCUMENT</u>.**  This MOU is neither a fiscal nor a funds obligation document.  Nothing in this MOU authorizes or is intended to obligate the parties to expend, exchange, or reimburse funds, services, or supplies, or transfer or receive anything of value.  If it is necessary to expend, exchange, or reimburse funds for any supplies or services, it will be accomplished under a separate contract or agreement approved by an authorized individual, and such expenditures are subject to the availability of appropriations.

**6) <u>NO RIGHT OF ACTION</u>**.  This MOU is strictly for internal management purposes for the Federal Government.  It is not legally enforceable and shall not be construed to create any legal obligation on the part of the signatory Secretaries or their respective Departments.  This agreement shall not be construed to provide a private right or cause for action by any person or entity.

BLM_0007406

**7) MODIFICATION**. The Principles in this MOU are subject to relevant law, as it may be amended from time to time.  Additionally, the parties may modify this MOU at any time by a written amendment executed by all parties.

**8) COMPLETION DATE**. This MOU is executed and made effective as of the last date shown below and shall expire ten years after such date.

THE PARTIES HERETO have executed this MOU.


      /s/  Gale A. Norton            June 18, 2003
Gale A. Norton                               Date
Secretary of the Interior


      /s/  Spencer Abraham         June 17, 2003
Spencer Abraham                          Date
Secretary of Energy


      /s/  Ann M. Veneman          June 16, 2003
Ann M. Veneman                          Date
Secretary of Agriculture

BLM_0007407





## Biomass Energy Opportunities on Public Lands

**Summary of Key Points:**

- New bio-energy plants are unlikely in areas of significant Federal ownership, without a <u>reliable</u> source of raw material to meet the needs of investors.

- Existing BLM timber sale contracts (with completed NEPA analysis) could provide twenty-five times more acres for biomass utilization than current levels. An active forest management and restoration program could provide a potential energy supply of 438 Gigawatt hours.

- Reducing hazardous fuels under the National Fire Plan provides the greatest immediate opportunity to expand biomass production on public lands. Potential energy supply: 219 Gigawatt hours.

- There is a need for a coherent, inter-Departmental strategy to define a successful federal role in renewable energy.

- Forest and woodland inventory should be completed in order to support resource allocation decisions and help determine sustainable supplies of raw material.

- The budget for the Public Domain Forest Management and the Oregon & California Forest Management budgets have declined over 60% (inflation adjusted) since 1981, severely hindering the ability to develop forest and fuels management projects with biomass opportunities.

- An effective biomass strategy on public lands will require a larger cadre of professional foresters and other resource professionals with a clear understanding of current ecosystem science and vegetation management technologies, as well as knowledge and skills to plan, write, coordinate, facilitate and monitor a timely NEPA and ESA process.

- Changes in policy and contracting procedures will help private contractors and the forest products industry determine appropriate products and markets, and yield greater biomass opportunities.

BLM_0007408

# Biomass Energy Opportunities on Public Lands

**Availability of Supply**

The American Bioenergy Association puts it simply: "biomass is stored solar energy". Therefore wherever vegetation is available, there is a potential supply. Biomass for energy typically includes fuel crops, such as hybrid poplars and switchgrass, agricultural residues such as corn stover, rice straw, wheat straw or other agricultural by-products, municipal solid wastes, and forest residues. For the purposes of this discussion, however, biomass refers primarily to small trees or limbs, tops and other forest residues and woody plants. Similarly, "bioenergy" refers to a broad suite of biomass uses, including combustion for electricity, biomass gasification, conversion to ethanol and bio-diesel production.

There is an important difference between biomass inventory and its availability. While hundreds of millions of tons of biomass may be growing in private and public forests, only a small fraction is actually available. This analysis uses a conservative assumption, based on practical experience, that 50% of all treatment areas have economic, topographic or environmental constraints that make biomass harvest impractical.

There is an immediate opportunity for at least a 25-fold increase in acres available for biomass utilization from existing Bureau of Land Management (BLM) timber sales and fuels reduction projects. The BLM conducts forest products sales on over 10,000 acres per year. Only 2% (217 acres) of these treatments utilized biomass as part of a fuels reduction strategy in Fiscal Year 2001. Removing biomass will reduce hazardous fuels generated by the commercial harvesting operation. Not only does this result in lower hazardous fuels conditions for public lands, and reduce the risks to prescribed or natural fires, it can also reduce or offset the brush disposal costs to timber purchasers.

At the current rate of treatment it will take over 500 years to treat the estimated 12 million acres of forest and woodland restoration needs in Public Domain lands managed by the BLM. Obviously this treatment level is far below the potential and far below the desired level for ecological restoration. If the BLM were to initiate an active 30 year forest and woodland restoration program, the agency would need to treat 150,000 acres a year. A combined program of forest management and forest restoration treatments would mean a 360-fold increase in biomass harvest over current production levels (80,000 acres vs. 217 acres per year).

Table 1 – Forest Management and Restoration Opportunities for Biomass Production

| Type | Total Acres | Annual Acres Available | Acres Suitable* |
|---|---|---|---|
| Existing Contracts | 10,000 | N/A | 5,000 |
| Forest Management | 10,000 | 10,000 | 5,000 |
| Forest Restoration | 12,000,000 | 150,000 | 75,000 |
| Totals | 12,020,000 | 160,000 | 80,000 |

* assumes 50% of the acres available are suitable for biomass production.

At a crude, estimated conversion rate of 8,000 Bone Dry Tons (BDT) to one megawatt year, and five BDT per acre, this represents a potential energy source of 50 Megawatt years, or 438 Gigawatt hours. NREL conversion factors indicate this would replace approximately 200,000 tons of coal.

**Opportunities**

In June 2001, Secretary Norton told the House Committee on Resources:

*" ...Utilization of biomass for energy production is consistent with a National Energy Policy objective to increase America's use of renewable and alternative energy sources. Biomass utilization is also consistent with the goals and objectives of the National Fire Plan to reduce accumulations of woody material that create a fire hazard, threatening communities and forests and rangelands...."*

By far the greatest opportunity for producing biomass on public lands is by reducing hazardous fuels under the National Fire Plan.   To a high degree, the woody fuels which are typically used in bioenergy are the same materials which contribute to the rapid spread of wildfires or are ladder fuels which allow for damaging crown fires.

The Bureau of Land Management has estimated that there are some 110 to 130 million acres of lands at high risk and another 85 to 105 million acres at moderate risk to catastrophic damage by wildfire.  The Department of Agriculture has estimated 73 million acres of forested USDA Forest Service lands are at moderate to high risk of catastrophic wildfire (Report to the President, September 9, 2000).  Biomass production using the types of equipment available today is economically and technically feasible on only a small portion of theses lands.  Other constraints include the types of fuels to be treated (mostly in shrub and grasslands), access to markets, conflicting land use allocations, and environmental concerns.

Table 2 – Fuels Treatment Opportunities for Biomass Production

| Public Agency | Acres at moderate to high risk of catastrophic wildfire | Fuels treatment acres planned in FY2002 | Acres potentially available for biomass* |
|---|---|---|---|
| BLM | 28,000,000 | 125,000     WUI 275,000 landscape | 40,000 |
| BIA | 21,000,000 | 176,000 | 17,000 |
| NPS | 3,000,000 | 196,000 | 17,000 |
| USFWS | 800,000 | 326,000 | 5,000 |
| USFS | 73,000,000 | 1,350,000 | 675,000 |

* assumes 50% of the acres available are suitable for biomass production.

At a crude, estimated conversion rate of 8,000 Bone Dry Tons (BDT) to one megawatt year, and five BDT per acre, the BLM portion of this represents a potential energy source of 25 Megawatt years, or 219 Gigawatt hours.  NREL conversion factors equate this to approximately 100,000 tons of coal.

Specific Examples of BLM Opportunities:

- The Alturas and Eagle Lake Field Offices in northeastern California have experience in biomass projects on forested lands and are now proposing a juniper restoration project.  This proposal, if successful, has outstanding possibilities throughout the 37 million acres of BLM's woodlands. Northeastern California has an active biomass industry, with well-established infrastructure, so the probability of success is very high.

- The Montana State Director has identified a pro-active forest restoration program which, if funded, could provide a 900% increase in restoration treatments.  Proposed as a long-term (over 60 years) restoration program, this is the type of commitment which will attract investments in biomass infrastructure.

- The Ely District in eastern Nevada has committed to produce over 50-100,000 tons per year of pinyon-juniper biomass products as part of their Eastern Nevada Landscape Restoration Coalition (Coalition) project. The Coalition involves 75 federal, State, and local governments, private foundations and environmental groups, and local community and industry leaders. Designed to restore and improve habitat for sage grouse and Rocky Mountain elk, the project will treat over 18,000 acres of woodlands in FY 2002.

## External Opportunities

Twelve States have Renewable Portfolio Standards which require a certain percentage of the State energy portfolio must come from renewable energy. In the West, for example, Nevada requires 5% renewables by 2003 and 15% renewables by 2015. New Mexico and Arizona have less ambitious programs, at 5% and 1.1% respectively. California had a similar program several years ago which encouraged the development of a biomass industry and infrastructure, and is expected to have a new program in place within a year.

Several States and the U.S. Congress have looked at price supports for renewable energy. One proposal would give grants to companies which remove hazardous fuels under the National Fire Plan as biomass feedstock. Tax credits and energy surcharges have also been explored. These types of supports should be encouraged, as they go a long way towards reducing private investor risks and encouraging biomass supplies.

## Communication Barriers

Perception

Land managers are generally unaware of the full range of tools available to solve ecological restoration and forest or woodland health problems. Often times there is a failure to recognize new or different approaches. For example, many managers think that it costs less to treat an acre of forest by prescribed fire compared to mechanical removal of small trees. This is frequently untrue, especially when considering the risks of escaped fire to adjacent communities and critical habitat areas and the uncertainty of protecting valuable resources and large trees. For example, biomass operations on the Eagle Lake Ranger District of the Lassen National Forest yielded a gross average return to the government of $146.65/acre (ten year average from 30 sales, range of $5.88 to $647.59 per acre) on a total of 15,732 acres of treatments . The costs of similar treatments, using a series of prescribed burns in a forested environment range from $100 to $400/acre. Thus the net difference between mechanical treatment over prescribed fire is $146 + $100 to $400 (savings by not burning) = $246 to $546/acre. This doesn't include the social values of reduced smoke pollution and the aesthetics of unburned small or large trees.

There is a common perception that forestry activities are damaging to the environment. However, soil disturbance, because of the type of equipment used and small size trees with wide weight distribution area, is minimal. Biomass harvesting typically uses medium-sized mechanical shears with a grapple to hold the tree. The operator then cuts or shears the tree and carries the tree and lays it in a bundle. By controlling the direction of fall, there is minimal damage to desired residual trees. Therefore, compared to prescribed burning, research indicates a greater level of precision of application can be achieved through the biomass operation. Mechanical harvest also provides an opportunity to save specific trees or groups of vegetation for wildlife cover. The results of these biomass treatments, seen in Figure 1, are

BLM_0007411

similar to the treatment objectives of a series of prescribed fire.

Supply

Because of the controversial nature of "traditional" forestry practices, many public land managers have avoided an active forest or woodland management program. Even restoration work involving only the cutting of small trees has had little support by land managers. Members of most environmental organizations resist any forestry work – even ecological restoration – if it involves a commercial venture. The environmental community refers to this as a "perverse incentive" to cut trees. The reasons for these feelings are many, but generally stem from a lack of trust or understanding of the professional forestry.



**Figure 1**: This eastside pine stand was biomass thinned to improve goshawk habitat one month prior to photo. Note the dense, unthinned stand in background. Photo courtesy of Eagle Lake R.D., Lassen National Forest

For biomass opportunities to expand, there is a need for a focused outreach and education program on the costs and benefits of biomass utilization targeted toward agency managers, environmental organizations, and the general public.

Technical Knowledge

Most people, even professional foresters and field technicians in forest and woodland management, are unaware of the potential benefits and the wide range of field conditions where biomass harvesting is both practical and economical. Even seasoned forest managers are reluctant to utilize this valuable tool in reducing hazardous fuels or conducting commercial thinnings. Forest managers need information on equipment limitations, contract requirements and contract administration, markets and economies for the wide spectrum of forest products (often called "multi-products") which contribute to the long-term success of a healthy biomass products industry.

**Outreach**

For a biomass program to be successful on public lands an outreach and education program needs to be conducted with a target audience of agency managers, environmental organizations, and the general public. The objective would be to provide information on the state-of-the-art technology which is available to utilize small diameter wood by-products and the many benefits which biomass thinning can provide.

**Administrative Barriers**

Inventory

Most of the BLM forest and woodlands have not had an activity or Plan level inventory for over 25 years. Another important barrier is that there is no consistent method for inventory of woodland resources which play a major role in the biomass picture. The lack of credible, consistent data is acknowledged both inside and outside the agency.

Without this basic inventory data, it is difficult to make an accurate calculation of the sustainable supply of biomass feedstock. Based on the extraordinary mortality occurring throughout the Public Domain, it is obvious that much work needs to be done to reverse the overstocked forest conditions. There is credible evidence to support immediate restoration efforts. However, in order to support resource allocation decisions, a comprehensive inventory should start immediately.

There is an opportunity to explore the use of the Forest Inventory and Analysis (FIA) data from the USDA Forest Service. The FIA data is multi-agency in scope, relatively inexpensive, and at relatively minor costs can be adapted to provide the type of information necessary to address questions of biomass feedstock locations and quantities on BLM managed lands. The FIA data protocols are currently being revised to include measures of smaller trees and will also provide estimates of biomass in bone dry tons. BLM should support, both in staffing and budgeting, this important program.

NEPA/ESA

Compliance with National Environmental Policy Act (NEPA) and Endangered Species Act (ESA) requirements have often slowed the ability to offer forest and woodland management or restoration projects. These requirements lead to better informed decisions, and are simply "process" issues and not "barriers". Much of the delays are due to inadequate staffing by both BLM and the consultation agencies: the U.S. Fish and Wildlife Service and the National Marine Fisheries Service. Interagency efforts are currently underway to expedite these consultation procedures.

There is also a critical shortage in skills to plan, write and coordinate NEPA and ESA compliance. This leads to poor quality documents, increased vulnerability to appeals and litigation, and considerable re-work. Failure to utilize public scoping through local Resource Advisory or Fire Safe Councils may mean missed opportunities to use Categorical Exclusions, or Environmental Assessments rather than a lengthy Environmental Impact Statement. The end result is a low return on investment. This process can be so complex that it discourages attempting even simple projects such as biomass thinning.

Budget

The budget for BLM's Public Domain Forest Management Program has declined almost 64% (inflation adjusted) since 1981, and over 37% in real dollars (please see Figure #2). A similar pattern is found in the budget for the O&C Forest Management program, which has declined over 60% (inflation adjusted) since 1981, and over 31% in real dollars. This decline in funding has lead to a skeletal program that funds approximately 50 Foresters to manage 48 million acres of forest land. There is virtually no discretionary funding available to do project work within the base PD Forest Management Program.

Specific forest health projects in the BLM are currently being funded by the Forest Ecosystem Health and Recovery Fund (FEHRF), a permanent operating fund authorized by Congress in 1993. The FEHRF, which currently has a balance of approximately $4.5 million, meets only about one-third of the forest restoration project funding needs identified in Fiscal Year 2002. However, since the Public Domain Forest Management budget covers the base funding for forestry personnel, this has a direct effect on the ability of the BLM to respond to new salvage, fuel hazard reduction and/or forest health situations which provide biomass opportunities.

BLM_0007413



**Figure 2**: BLM Public Domain Forest Management Budget

<u>Staffing</u>

The number of professional foresters (460 series) employed by the BLM has declined by 44% from 1991 to 1999 (please see Figure #3). During this same time the Foresters job, both in the woods and in the office, has become far more complex. Federal land management agencies have made a fundamental shift in forest management practices in the last ten to fifteen years. Over the last decade, the BLM Public Domain Forest Management Program has shifted from a timber production emphasis that extensively used clear-cutting to extract timber resources, to emphasizing forest health and restoration practices. This emphasis on actively restoring forest health will also provide excellent opportunities for biomass feedstock



**Figure 3**: BLM Forester Worforce

BLM_0007414

Many of BLM's current Foresters were hired in the mid-1970's during the big staffing push to meet the needs of NEPA and the Federal Land Policy and Management Act (FLPMA) for interdisciplinary approaches to natural resource management. As such, these employees are now in their mid- to late-careers. It is estimated that over 75% of BLM's foresters will be eligible for retirement within the next seven years. There are three primary concerns resulting from this demographic dilemma: BLM's ability to make science-based management decisions for management of forested lands, the loss of corporate knowledge, and BLM's ability to develop highly skilled employees.

The first concern is that without a workforce that is knowledgeable of forest dynamics and forest health issues that are in the forefront of forest resource management throughout the western U.S., and without the skills to design, analyze and implement restoration actions to improve forest health, BLM will not be capable of meeting it's forest stewardship responsibilities.

The second concern is that the loss of BLM's "experienced", or senior employees, who have in-depth knowledge of the resources, constituents and processes/practices which have been acquired and refined over many years of practical work experience, will jeopardize BLM's ability to effectively train and mentor new Foresters.

Finally, most of the key positions in a field office take many years of experience to develop the necessary skills to perform their job effectively. For example, in Timber Sale Administration it takes many years of field work to become proficient in sale administration skills, layout, marking and cruising and contract preparation for biomass thinning projects. There are numerous other examples in critical skill areas such as silviculture and planning.

**Figure 4**: An ecological research treatment at Blacks Mountain Experimental Forest. Note the high diversity of the forest.

Besides needing to hire new Foresters, BLM needs to improve the skills and keep current with technological advances for existing employees. Specifically, BLM needs training in contract administration, vegetation ecology and silvics, ecosystem management, and technical advances in GIS, GPS and inventory. BLM also needs proficiency in project planning and design which integrates aquatic conservation strategies, ecosystem management and RMP decisions.

**Market Barriers**

<u>Research</u>

Bioenergy research has suffered from a lack of attention and under-funding. As a result, new and creative technologies have not been fully explored. For example, biogasification – the process of converting biomass into syngas for use in advanced technologies or for chemical conversion to liquid

fuel – has tremendous potential as a clean fuel source.  This technology has only been applied in a few places in the U.S., but is used throughout Western Europe.

Large-scale bio-ethanol plants require tens of millions of dollars of investment and need long-term fuel supplies guaranteed.  Studies for market and supply feasibility are lacking.  Industry has been hesitant in developing this promising, but potentially risky field.  There are numerous other potential markets for woody biomass.  Development research that bridges the gap between the possible and the actual is badly needed.

<u>Supply</u>
Aside from the issues of economic feasibility and equipment operability discussed earlier, the most significant market barrier to increasing biomass production from Federal lands is the uncertainty of biomass supplies.  While there are tens of millions of acres in need of biomass thinning or fuel hazard reduction, until recently there has not been a long-term strategic plan (the National Fire Plan) to address this forest and woodland health issue.  There has not been a corresponding effort to develop a strategic plan for biomass marketing and utilization.

Private sector investors are reluctant to invest in a bio-energy plant in areas where the Federal government is the principal supplier of raw material.  Principally as a result of changing legal and institutional interpretations of environmental laws or regulations, and appeals and litigation, federal supplies have been erratic at best.  Industry representatives have indicated that the rule thumb for private investors is to reduce federal supply estimates by 60% to compensate for these fluctuations.  Considering the need for a long-term (20+ years) investment in infrastructure, new bio-energy plants are unlikely in areas of significant federal ownership, unless a dependable source of raw material can be guaranteed.  The problem of attracting industry to these in areas is magnified when there is a weak support infrastructure (trucking and logging operators, road and/or rail systems) and/or an inadequate variety of forest product manufacturers.  In many areas of the West this forest-based industrial infrastructure is already gone.

<u>Contracting Restrictions</u>
There is a general distrust of single unit pricing, a method of selling all forest products at one single rate, by federal Contracting Officers .  Many feel that they will get a higher return by pricing sawlog material at one rate and biomass material at another.  This discourages "multi-product" sales, in which the Purchaser determines how, and in what form, the products are marketed and removed.  Often times a Purchaser will desire to change utilization specifications based on current conditions: small sawlogs (trees less than 18 inches in diameter) are usually processed for studs or low grade lumber; trees from 6 to 14 inches in diameter, are often utilized for "clean chips" for pulp and paper-making, or may be made into veneer lumber for plywood or manufactured lumber products.  The residual tops, limbs, bark and trees less than 8 inches, are then utilized as "biomass".  In this example, without single unit pricing, trees over a certain utilization standard (say 10 inch minimum for saw logs) must be removed in a specified form (sawlog). This discourages competition, reduces bid values, and increases contract inspection costs to ensure the contract utilization standards are followed.  Under single unit pricing, economic and market conditions determine the most cost effective product mix, not the government Contracting Officer.

Federal managers have moved to "tree measurement" or "lump sum" sales, where forest product quantities are determined prior to sale.  The risk of an inaccurate quantity is borne by the Purchaser.

BLM_0007416

Historically, many sales were sold with estimated volumes, which cost less to prepare because the statistical standards were lower. Forest products were then "scaled" and the Purchaser was billed for the actual quantity removed. The process used for scaling was often expensive and required increased sale administration costs to ensure that the contract utilization standards were followed. With sales based on weight, unit costs for scaling are significantly reduced for both the government and the Purchaser. When weight scaling is combined with single unit pricing, government contract administration costs and the risk of poor utilization are virtually eliminated. The risk of timber theft in transportation is also reduced, allowing the sale administrator to spend more time in the woods, where they should be focusing. Purchasers also bid higher values due to lower scaling costs and less risk in determining the final amount of wood products to be removed.

<u>Stewardship Contracts</u>
The USDA Forest Service has been given special, temporary authority to use a variety of innovative authorities such as "goods for services" contracts and local retention of receipts to do forest restoration work which has limited commercial value. The focus of the work is usually forest thinning, fuel hazard reduction and watershed improvement. Under "goods for services" some small trees and biomass are removed and "traded" against the value of the services provided. This stewardship authority could be invaluable in situations where there are limited commercial products, as is the case with many biomass thinning projects. The BLM does not have this authority, however, it would be a useful tool for forest and woodland restoration.

The USDA Forest Service is also using service contracts with embedded timber sales under their existing contract authorities. Funds received under the sale are kept separate from those used to pay for the services and are transferred directly to the U.S. Treasury. This avoids the appearance that the agency is re-directing appropriations. BLM needs the authority to pursue a variety of contracting avenues to avoid the concern about funding "augmentation" (per Comptroller General decision).

**Contacts and References**
The following individuals provided advice or comments on the preparation of this paper:
Tad Mason, TSS Consultants
Mark Nechodom, USDA Forest Service, PSW Experiment Station
Larry Swann, USDA Forest Service, Winema National Forest
Mike Haske, BLM, Deputy Group Manager, Fish, Wildlife and Forests Group (WO-230)
Rick Tholen, BLM, Forest Health Program Manager, Fish, Wildlife and Forests Group (WO-230)
John Sebelius, USDA Forest Service (on detail to White House Energy Streamlining Task Force)
Al Vazquez, Bob Andrews, Rod Vineyard, Don Dockery, USDA Forest Service, Eagle Lake RD
Mike Kossey, USDA, Rural Utility Service
Bill Von Sagan, USDA Forest Service



Reference materials used in this paper:
* National Renewable Energy Lab publications

* Barriers to biomass production on National Forests (draft report by Mark Necodom and Tad Mason)

* Forest Biomass for Energy, Safety and Forest Health (draft report by USFS)

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
Office of Fire and Aviation
3833 South Development Avenue
Boise, Idaho 83705

September 9, 2002

In Reply To:
9210 (FA-630) P

EMS Transmission 09/09/02
Information Bulletin No. OF&A 2002-058

To:          All Field Offices

From:        Director, Office of Fire and Aviation

Subject:     Biomass Utilization

The 10-Year Comprehensive Strategy for Reducing Wildland Fire Risks to communities
and the environment identifies four specific goals. Two of those goals, reducing
hazardous fuels and restoring fire-adapted ecosystems, can use mechanical fuels
treatments as one method to achieve those results. Reducing the fuel loads is only one
step in the fuels management process. Utilization of the biomass generated by
mechanical fuels reduction projects is just as important.

The problem is that conventional uses of wood products, building materials and
dimensional lumber are not economically viable options with the small diameter material
generated by most fuel reduction projects. For a long-term fuels management program to
be successful, it is vital that new and creative uses for small diameter trees and brush be
identified and supported.

We need to move beyond thinking in terms of fuels projects and the tons of fuel
removed. Every area in which the BLM is involved, forestry, range, wildlife,
watersheds, fire management, energy, minerals, threatened and endangered species, need
to evaluate the raw materials and products developed from mechanical fuels management
projects. For this reason, I am now requiring that all fuels treatment projects identify the
amount of biomass that will be produced and describe how the material will be utilized.

We need to involve our partners and local stakeholders in this exploration. Collaborating
with companies and individuals will allow us to draw on the best each has to offer.

BLM_0007418

2

Providing equipment such as brush hogs, chippers, portable mills, etc., for contractor use during project work will attract micro and small business participation that in turn will expand local area capabilities and capacity.

This work will lead to new outreach efforts and new partnerships. These contacts can often provide the foundation for success on other resource management issues. The use of partnerships and outside contractors will be the key to solving these problems. A long-term fuels management program will rely heavily on the use of contractors. In order for these contractors to survive, they will need a steady supply of raw materials and diverse markets for their products. The critical element is the establishment of markets for either the raw biomass, or the value added products derived from fuels projects. Ultimately, commercial utilization of these materials on some scale will be the desired goal.

The information included in the attachments are just some of the current biomass utilization efforts. Offices at all levels are encouraged to look beyond these examples and develop local, innovative uses for the materials generated by fuels projects. By working cooperatively at all levels, especially with the states and local communities, we can identify uses, develop the infrastructure, and create the markets necessary to finish the fuels management loop.

Signed by:                              Authenticated by:
Larry E. Hamilton                       Pat Lewis
Director, Office of Fire and Aviation   Supervisory Mgmt. Asst., Office Services

2 - Attachments
    Brain Storm (3 pps.)
    Mechanical Fuels Treatment (6 pps.)

Distribution:
Anne Jeffery, FA-101,WO
Jay Thietten, FA-101,WO
Group Manager, Planning and Resources
Group Manager, Support Services
Group Manager, Fire Operations
Group Manager, Aviation
Cyndie Hogg, NARTC

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
Office of Fire and Aviation
3833 S. Development Ave.
Boise, Idaho 83705-5354

July 17, 2002

In Reply Refer To:
9210 (FA-630) P

EMS Transmission 07/19/02
Instruction Memorandum No. OF&A 2002-032
Expires: 09/30/2003

To:            State Directors

From:          Director, Office of Fire and Aviation

Subject:       Utilization of By-Products Produced by Hazard Fuels Reduction Activities
               DD: Sept. 30, 2002

**Program Area:** Fire Management/Hazard Fuels Reduction

**Purpose:** This Instruction Memorandum (IM) requests each State Director to report any hazard fuels treatment with by-products utilized. It also requests each State to identify any potential by-product utilization methods being used, or with potential for use, within their state.

**Policy/Action:** Adding a performance measure to the Workplan for the Fire Management Program.

**Timeframe:** Due date is September 30, 2002.

**Budget Impact:** None

**Background:** Most of our mechanical fuels reduction treatments leave vegetative material on the ground in the form of slash, small diameter wood or chips. In many instances, this residual material can be made available for other uses. This is by-product utilization. The following performance measure is identified in the Comprehensive Strategy Implementation Plan under Goal 4 (Promote Community Assistance):

> *e.) Percent of acres treated to reduce hazardous fuels by mechanical means with by-products utilized.*

We have been asked to report any hazard fuels treatment with by-products utilized as outlined by this performance measure. The output for this performance measure will be captured in the BLM Workplan for the Fire Management Program as Workload Activity 1.c.:

*1.c. - % of total acres treated to reduce hazardous fuels by mechanical means with by-product utilization.* Acres treated in this workload activity need to be captured and reported by September 30, 2002.

This workload measure is also being added as a reportable field in NFPORS.

Also, states are encouraged to look for additional opportunities to increase the utilization of by-products produced as a result of hazard fuels reduction activities. There may be many opportunities to make these by-products available for other uses which could provide additional benefits to local communities.

Typically, by-product utilization has consisted of allowing the public to gather firewood, harvest cedar fence posts or cut Christmas trees in treatment areas. Work has been done to explore value-added opportunities in forested areas, however, there may be opportunities to develop value-added opportunities from treatments we conduct in woodlands and shrub lands. Some examples include:

Co-generation - burning biomass waste with coal to produce electricity.

Make small diameter woodland products available to the public for the manufacturing of furniture (either rustic wood furniture or some form of laminate product).

Promote the use of woodland/shrubland by-products for the production of ethanol.

Recover and provide woodland/shrubland chips as mulch or decorative bark.

Make by-products available for heat generation purposes (this is currently occurring in Alaska).

Attached is a list of projects that are occurring in various states (Attachment 1).

I would like a listing of any potential by-product utilization opportunities within your state that, with further research and development, could increase our ability to make biomass available for the benefit of local communities. This information should be provided to Carl Gossard by September 30, 2002. A list of websites that discuss biomass utilization and may give you ideas for potential uses of biomass is attached (Attachment 2).

The information you provide will be shared across the Bureau and with our land management partners. It will certainly generate new methods in which we can provide opportunities for communities to derive benefits in conjunction with making their communities more fire resistant.

**Manual/Handbook Sections Affected:** None
**Coordination:** RP 220 Rangeland, Soils, Water and Air Group.

**Contact:** If you have any technical questions concerning this IM contact Carl Gossard at (208) 387-5419.

BLM_0007421

Signed by:                              Authenticated by:
Wilhemina Sorensen                      Pat Lewis
Acting Director                         Supervisory Mgmt. Asst.
Office of Fire and Aviation             Office Services


2 Attachments
    1 - Examples of Biomass Utilization and Sustainable Livestock Grazing Practices Involving
    BLM Lands
    2 - Biomass Websites


Distribution:
Anne Jeffery, FA-101,WO
Jay Thietten, FA-101,WO
WO-560
BLM AD's
BC Library
Group Manager, Planning and Resources
Group Manager, Support Services
Group Manager, Fire Operations
Group Manager, Aviation
Cyndie Hogg, NARTC

BLM_0007422

**Examples of Biomass Utilization and
Sustainable Livestock Grazing Practices
Involving BLM Lands**

| BLM Field Office | Project Name | Project Description | Acres (if known) |
|---|---|---|---|
| Arizona Strip, AZ | Mt. Trumbull | Stand density reduction resulting in biomass utilized for cogeneration plants and firewood utilization | Unknown |
| Salt Lake, UT | Terra Fuel Break | Fuel break constructed near community of Terra; resulting juniper trees made available to public as firewood. | Unknown |
| Roswell, NM | Lincoln Village Fuels Reduction | Unwanted, expanding juniper trees were cut and made available for public firewood gathering. Posts were utilized in fence construction. | Unknown |
| Roswell, NM | Mount Nebo Fuels Reduction | Pinon-juniper stands thinned to improve ecological conditions. Resulting woody material made available to public as firewood. | Unknown |
| Miles City, MT | Shepherd AH-Nei Fuels Reduction | Ponderosa pine stands thinning to improve ecological conditions. Resulting woody material made available to public as firewood. | Unknown |
| Surprise Valley, CA | Newland Fuels Reduction | Dense juniper stands mechanically harvested and made available for firewood and posts | 250 |
| Alturas, CA | Muck Valley Fuels Reduction | Feller-bunchers used to shear and gather thinned trees. Materials were chipped and sold to a co-generation plant. | 150 |

BLM_0007423

| BLM Field Office | Project Name | Project Description | Acres (if known) |
|---|---|---|---|
| Alturas, CA | McCabe Fuels Reduction | Juniper removal; downed trees made available to public firewood gathering. | 300 |
| Prineville, OR | Upper and Little Deschutes Fuels Treatments | Demonstration site for The Nature Conservancy's Fire Learning Network, to involve restoration in juniper and conifer forests through mechanical thinning | Future biomass utilization of unmerchantable material |
| Lakeview, OR | Long Canyon Fuels Reduction | Juniper trees mechanically sheared, and made available for firewood gathering. | 100 |
| Klamath Falls, OR | Gerber Fuels Reduction | Juniper trees mechanically sheared, and made available for firewood gathering. | 800 |

BLM_0007424

Attachment # 2
Page 1 of 1

## BIOMASS WEBSITES

National Renewable Energy Laboratory - Http://www.nrel.gov

Bioenergy Information Network - http://bioenergy.ornl.gov

Renewable Energy Policy Project - www.repp.org  Click on Biomass -or- click on Job Creation and Renewable energy.

Ethanol - http://www.ethanol.org

BLM_0007425

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

**MANUAL TRANSMITTAL SHEET**

Release
8-76

Date
12/03/04

Subject

## 8130 – PLANNING FOR USES OF CULTURAL RESOURCES   (PUBLIC)

1. <u>Explanation of Material Transmitted</u>.  This release completely revises BLM Manual Section 8130 AND 8131.

2. <u>Reports Required</u>:  None

3. <u>Materials Superseded</u>:  Manual pages superseded by this release are listed under REMOVE below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below:

|          REMOVE          |          INSERT          |
|--------------------------|--------------------------|
| <div align="center">REMOVE</div> | <div align="center">INSERT</div> |

<div align="center">

REMOVE         INSERT

</div>

All of 8130 (Rel. 8-41; 8-54)      8130
All of 8131 (Rel. 8-42; 8-55)
All of 8132 (Rel. 8-43; 8-56)      (Total: 12 sheets)

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

Table of Contents

.01  Purpose
.02  Objective
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Principles and Standards for Cultural Resource Planning
    .11  Planning Requirements
    .12  Information Needed for Decision Making
        A.  Data Needs
        B.  Data Sources
        C.  Data Analysis
        D.  Data Display
    .13  Management Direction in Land Use Plans
        A.  Prioritizing Research Needs
        B.  Clarifying Purposes of Long-Term Conservation
        C.  Anticipating Traditional Uses
        D.  Considering Educational and Recreational Needs
        E.  Targeting Experimental Study
        F.  Effects on Other Resources
        G.  Protection Needs
        H.  Data Needs
        I.  Contributions to the Management of Other Resources
    .14  Factors to Consider in Decision Making
        A.  Relative Importance and Sensitivity
        B.  Feasibility
        C.  Necessity
        D.  Balance
        E.  Sensitive Information
    .15  Consultation with Other Parties
        A.  Consultation with Indian Tribes
        B.  Consultation with State and Local Governments

.2  Incorporating Cultural Resource Content in Resource Management Plans (RMP))
    .21  New RMPs, RMP Revisions, and RMP Amendments
        A.  Budgeting for Identification Costs

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

B.  Identification
    1.  Data source
    2.  Existing class I overviews
    3.  "Landscape" scale overviews
    4.  Outreach
    5.  Consultation
    6.  Minimum data standards
C.  Goals
    1.   Preserve and protect significant cultural resources
    2.   Seek to reduce imminent threats and potential conflicts
D.  Allocations in Support of Goals
E.  Management Actions in Support of Goals
    1.  Preserve and Protect
    2.  Reduce Threats
F.  Monitoring and Evaluating Effectiveness of Management Actions
.22  Maintaining, Amending, and Revising Cultural Resource Content in Recent RMPs
.23  Previous-Generation Land-Use Plans
    A.  Plans Scheduled for Amendment or Revision in the Near Future
    B.  Plans Not Scheduled for Amendment or Revision in the Near Future

.3  Incorporating Cultural Resource Content in Local Land Use Plans

.4  Incorporating Cultural Resource Content in Project Plans
    .41  Other Subactivities' Plans
    .42  Cultural Resource Project Plans (CRPPs)
    .43  Compliance and Consultation for CRPPs
        A.  NEPA Compliance
        B.  Native American Consultation
        C.  SHPO Consultation
    .45  CRPP Approval Process
    .46  Implementing the CRPPs
        A.  Annual Work Plan Process (PTA/AWP)
        B.  Performance Review
        C.  Reporting Accomplishments
    .47  Evaluating CRPP Effectiveness
        A.  Review
        B.  Revisions

Text Figures

FIG. 1.  Cultural resource use categories and corresponding desired future conditions
FIG. 2.  Management actions needed to realize use allocations

BLM Manual                                   Rel. 8-76
Supersedes Rel. 8-41, 8-42, 8-43, 8-54, 8-55, 8-56        12/03/04

BLM_0007428

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.01 <u>Purpose</u>. The purpose of this Manual Section is to clarify the level of cultural resource information and the kinds of long-term management decisions needed in land use plans that pertain to cultural resources, as outlined in Manual Section 1601, "Land Use Planning," Manual Handbook H-1601-1, "Land Use Planning Handbook," and Manual Section 8110, "Identifying Cultural Resources;" and to provide instruction on preparation of other property-, resource- and project-specific plans that pertain to management of cultural resources.

.02 <u>Objective</u>. The objective of the planning component of the cultural resource management program is to establish parameters for planning decisions with the potential to affect management of cultural resources in a Field Office manager's jurisdiction. The BLM goal is development of land use plans that (a) set priorities for preserving and protecting significant cultural resources and ensuring that they will be available for appropriate uses by present and future generations; (b) identify priority geographic areas for new field inventory, based upon the probability of unrecorded significant resources; and (c) identify and resolve use allocation conflicts with the potential to adversely affect cultural resources.

.03 <u>Authority</u> (See BLM Manual Section 8100.03.)

   A. <u>Federal Land Policy and Management Act of 1976</u> (P.L. 94-579; 90 Stat. 2743; 43 U.S.C. 1701; "FLPMA") states that the Secretary shall prepare and maintain on a continuing basis a current inventory of all public lands and their resource and other values; and with public involvement, develop, maintain, and when appropriate, revise land use plans using the principles of multiple use and sustained yield; and that public lands be managed in a manner that protects the quality of scientific, scenic, historical, and archeological values.

   B. <u>National Historic Preservation Act of 1966</u> (P.L. 89-665; 80 Stat. 915; 16 U.S.C. 470), as amended by P.L. 96-515, December 12, 1980, directs in Section 110 (among other things) that (1) each Federal agency shall establish a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and the protection of historic properties; (2) such properties under the jurisdiction or control of the agency as are listed or may be eligible for the National Register are managed and maintained in a way that considers the preservation of their historic, archaeological, architectural, and cultural values; (3) historic properties not under control of the agency, but subject to be potentially affected by agency actions are given full consideration in planning; (4) the agency's preservation related activities are carried out in consultation with other Federal, State, and local agencies and Indian tribes carrying out historic preservation planning activities, and with the private sector; and (5) prior to approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark.

   C. <u>National Trails System Act</u> (P.L. 90-543) (16 U.S.C. 1241 et. seq.) as amended through P.L. 107-325, December 4, 2002, states that within two fiscal years of the date of enactment of legislation designating a national or historic trial, as part of the system, the responsible Secretary shall submit a comprehensive plan for the management and use of the trail including all significant historical and cultural resources preserved and a protection plan for any high potential historic sites or high potential route segments.

BLM_0007429

.04

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.04  Responsibility (See BLM Manual Section 8100.04.)

.05  References (See also BLM Manual Section 8100.05.)

A.  BLM Manual Section 1601, "Land Use Planning."

B.  BLM Manual Handbook H-1601-1, "Land Use Planning Handbook."

C.  BLM Manual Section 8110, identifying and Evaluating Cultural Resources

.06  Policy. State Directors and Field Office managers and their staffs shall ensure that:

A.  New and revised land use and project plans shall incorporate current information on cultural resources inventory, information needs, use allocations, protection issues, and special management concerns, including plans for historic trails, National Monuments and other specially-designated areas, at the appropriate scale and level of detail.

B.  New and revised land use and project plans shall give full consideration to cultural resources and resolve use conflicts between cultural and other resources, in such a way as to identify and seek to avoid potential adverse impacts to cultural resources in establishing land use allocations and management goals and practices that support multiple use and sustainable yield.

C.  The development, implementation and revision of plans with the potential to affect cultural resources shall include appropriate opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public, including consideration of related cultural resource planning and management programs.

D.  Plans that include implementation authorizations and associated National Environmental Policy Act (NEPA) documents shall incorporate effect determinations and consideration of No Effect alternatives, so that approvals may appropriately take into account the effects on cultural resources, as required by Section 106 of the National Historic Preservation Act.

E.  Plans shall be maintained, supplemented, amended or revised as necessary to incorporate results of ongoing cultural resource inventory and consultation.

.07  File and Records Maintenance. See .14E, .15A3, .43A3, .44C, .47A1. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4).

BLM Manual                                                      Rel. 8-76
Supersedes Rel. 8-41, 8-42, 8-43, 8-54, 8-55, 8-56              12/03/04

BLM_0007430

.1

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.1  Principles and Standards for Cultural Resource Planning

.11  Planning Requirements. Besides the inventory and planning requirements in the Federal Land Policy and Management Act (FLPMA), which apply to all resource management programs, the BLM is required to consider the short- and long-term management of cultural resources under Sections 106 and 110 of the National Historic Preservation Preservation Act (NHPA; see BLM Manual Section 8100, App. 5); Section 14 of the Archaeological Resources Protection Act (ARPA; see BLM Manual Section 8100, App. 8); the National Trails System Act (see BLM Manual Section 8100, App. 10) (16 U.S.C. 1241 et. seq.) and the BLM's national Programmatic Agreement with the Advisory Council on Historic Preservation and the National Conference of State Historic Preservation Officers (PA; see Manual Section 8100.03M and Appendix 13).

.12  Information Needed for Decision Making in Land Use Plans.

A.  Data Needs. The following cultural resource related data may be required when preparing or revising regional or local plans.

1.  Estimated density, diversity and distribution of cultural properties in the plan area. The population of cultural properties in the plan area should be classified and described in quantitative and qualitative terms, preferably according to subunits of the plan area defined from the cultural resource data.

2.  Present condition of the known cultural properties in the plan area.

3.  Existing and potential uses of the cultural properties in the plan area.

4.  Existing and reasonably foreseeable threats to the cultural properties in the plan area.

5.  Traditional values ascribed to places and resources by Native Americans or other cultural groups.

6.  Results of previous management actions to prevent the loss or destruction of cultural properties in the plan area.

7.  Tribal, State, or local planning goals related to cultural resources in the planning area.

8.  Existing cultural resource related commitments and agreements, e.g., Memoranda of Agreement, Programmatic Agreements, or Protocols with the State Historic Preservation Officer or Memoranda of Understanding with Indian tribes.

BLM_0007431

.12B

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

B. <u>Data Sources</u>. Decision making in regional or local plans should be preceded by at least the data compilation phase of an initial or updated class I Existing Information Inventory. Depending on the adequacy of existing inventory data relative to the issues to be addressed in decision making, a class II survey may also be needed in selected portions of the plan area. Some decision making may not require additional cultural resource data, depending on the land use issues to be addressed and the potential effects on, or constraints imposed by, cultural resources. Tribal, State, and local cultural resource planning documents should be consulted, as appropriate.

C. <u>Data Analysis</u>. Cultural property use evaluations should be completed during preplanning or early in the decision making process. For each kind of cultural property, considered individually or in collective groupings, a context should be prepared that includes a description of the resource(s) being evaluated, principal contributing characteristics, possible uses, and recommended management objectives. Use evaluations should include National Register eligibility assessments by the type of use and/or the kind of property (see Manual Section 8110.43 and Table 8110-1).

D. <u>Data Display</u>. A geographic information system (GIS) provides essential tools to bring cultural resources and other data together at various scales and formats for spatial analysis and display of results.

.13 <u>Management Direction in Land Use Plans</u>. Field Office managers develop objectives in regional and local plans to provide management direction consistent with the allocations described in Manual Section 8110.4 and to identify management actions necessary to achieve the objectives. Objectives should address at least the following:

A. <u>Prioritizing Research Needs</u>. Assess information gaps and needs for studying particular kinds of cultural properties through research projects, by BLM or others, or through data recovery as a means of mitigating adverse effects. Outline in general the major research questions that need to be addressed in the plan area consistent with research priorities identified in historic context documents, State Historic Preservation Plans, land use plans, class I Existing Information Inventories, and other BLM studies. Identify known properties or kinds of properties that could appropriately be committed to the purpose of fulfilling information needs as opportunities arise.

B. <u>Clarifying Purposes of Long-Term Conservation</u>. Address the need to hold specific, exceptional cultural properties available for future use by prohibiting any use, including scientific study, that would threaten their condition. Objectives or management actions should define conditions under which such properties may be released from the constraints of long-term conservation and used for some other purpose.

BLM_0007432

.13B1

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

1.  If a cultural property's importance lies in its outstanding research potential, include in its description the kinds of data the property apparently contains, its apparent value for the pursuit of specified research topics, and the exact, technical reasons for prohibiting scientific study at this time. Specify, as clearly as possible, precisely what methodological, technological, or other conditions need to be met before the property will be released from its conservation status and made available for research, i.e., what has to happen before scientific study would be allowed? Why would we not accept a good research proposal right now? How will we be able to determine in the future if the release conditions have been met?

2.  If a cultural property is important for historical or architectural reasons and is not suitable for study that might result in its physical alteration, including stabilization-related study, describe the precise reasons for withholding it from such study.

3.  If a property is to be conserved for the future and also managed for a compatible use (either traditional use or public use), include long-term protection safeguards in local interdisciplinary plans and subsequent project plans. If interpretation is the intended end use of a property, and steps will be taken within a reasonable time to accommodate that use, then allocate the property to interpretation in addition to long-term conservation.

C.  Anticipating Traditional Uses. Address needs of Native Americans and other cultural groups for access to and unhampered use of places of traditional cultural or religious importance, including collection of natural resources for traditional purposes.

D.  Considering Educational and Recreational Needs. Consider opportunities and public demand for places to visit and learn from cultural properties. Management actions should include the general steps that may be necessary before recreational or educational activities can be accommodated at properties allocated to those uses, such as interpretive development, "hardening" sites to withstand increased visitation, data recovery, and preparation of field school agreements.

E.  Targeting Experimental Study. Identify technical questions and opportunities to address them through experimental use of cultural properties that lend themselves to the purpose. Identifying management actions should include identifying any administrative or on-the-ground steps that will be necessary before experimental use can begin, such as limiting land uses to focus the experiment, recording baseline data, establishing controls, notifying the public, etc.

F.  Effects on Other Resources. Special cultural resource considerations that may affect the location, timing, method of development or use of other resources in the planning area, should be addressed in objectives or management actions pertaining to the resources involved.

G.  Protection Needs. Address means for monitoring, reducing or removing threats, specifying the kind and level of protection measures (including law enforcement), data recovery, or other mitigation actions needed where deterioration is ongoing or reasonably expected.

BLM_0007433

.13H

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

H.  Data Needs. Consider needs and priorities for gathering additional information such as sample inventory in areas where inventory data are inadequate, test excavations of archaeological properties where difficulties in interpreting surface data make management allocations tentative, condition assessments, or ethnographic studies where little or no information is currently available.

I.  Contributions to Management of Other Resources. Identify opportunities to use cultural resource data to improve management of other resources. For example, using ethnohistorical data to show how past land uses have affected present-day plant communities; using archaeological data to indicate past species distributions; using cultural resources to date slope or fluvial processes; and using tree-ring data to reflect cycles of precipitation and stream flow.

.14  Factors to Consider in Decision Making. The following factors should be considered in making cultural resource use allocation decisions in regional or local plans.

A.  Relative Importance and Sensitivity. In establishing management objectives, the relative importance and sensitivity of known and anticipated cultural properties should be considered, not simply their geographic distribution and density. Simple density is not necessarily a measure of the importance of cultural properties or the magnitude of potential conflicts. For example, a large cluster of dots on a map could represent a group of small archaeological manifestations determined to have very little scientific importance and no public value, at small risk from other resource or land uses. Alternatively, an isolated dot could represent a unique archaeological property of overriding importance and high vulnerability to competing uses.

B.  Feasibility. Cultural resources should be included under a management objective only if there is a reasonable potential of achieving the objective. For example, a rare and important archaeological property should not be proposed for long-term conservation if its deterioration is proceeding at a pace or due to causes that cannot reasonably be arrested.

C.  Necessity. Management decisions should be made on the basis of their need, not just their feasibility. For example, while many cultural properties are capable of being interpreted to the public, in some areas there is virtually no need or desirability for interpretive development.

D.  Balance. Cultural properties are not divided among the several management categories in any set proportion. In most plan areas, the majority of cultural properties will be prehistoric and historic archaeological properties managed for scientific use. Objectives pertaining to other management categories may be scarcely represented or not represented at all in a given plan area.

BLM_0007434

.14E

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

E.  Sensitive Information. In any documentation of decision-making that is made available to the public, cultural resource discussions should be generalized so as not to disclose sensitive locational information. Precise information concerning the nature and location of archaeological resources (43 CFR 7.3) and cultural properties eligible for the National Register of Historic Places (36 CFR 60.4) may be withheld from the public as necessary for their protection (ARPA Section 9, 43 CFR 7.18; and NHPA Section 304).

.15  Consultation with Other Parties

A.  Consultation with Indian Tribes. Tribal consultation during preparation of RMPs/EISs, RMP amendments, and Interdisciplinary Plans is needed to meet the BLM's responsibilities under FLPMA, NEPA, AIRFA, NAGPRA, and Executive Order 13007. The BLM must inform tribal officials of opportunities to comment on and to participate in development of BLM land use plans, specifically requesting their views, asking them which individuals, such as traditional leaders, should be contacted, if any, and making an effort to pursue those contacts. Consultation responsibilities during land use planning can be met as follows:

1.  Subjects of Consultation. Communication with the tribe should at a minimum provide a description (and map) of the planning effort, invite the tribe to participate in scoping, and request the tribe's comments on:

a.  Any issues or concerns the tribe might have regarding BLM's management of the planning area.

b.  Whether there are any places of traditional religious or cultural importance to the tribe within the planning area, or needs for access to these places, that should be considered in BLM's planning effort.

c.  Whether there are any individuals, such as traditional cultural leaders, who should also be contacted. If the Field Office is already aware of such individuals, the letter should state that the BLM will be contacting them as well.

2.  Use of Information Obtained. The Field Office manager must consider comments provided by the Native Americans consulted in making decisions on the plan, and must notify consulted persons of the relevant final plan decisions.

3.  Documentation. All consultation efforts should be carefully documented. If acceptable to tribal officials, a memorandum of understanding endorsed by the Field Office manager and the appropriate tribal official is the best possible method of documentation.

BLM_0007435

.15A4

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

4. <u>Sufficiency of Consultation</u>. The Field Office manager should extend an invitation to the chief governing authority of each tribe potentially concerned about or affected by a plan, seeking the tribe's participation and comments. This should minimally involve contact by a telephone call. If the tribe chooses not to participate or provide comments, the Field Office manager's efforts will be considered sufficient. If tribal officials request it, the Field Office manager should meet with them or other tribal members in person. If the Field Office already knows of individuals, such as traditional leaders, who might wish to know about BLM planning issues, the Field Office manager should inform tribal officials that the BLM anticipates contacting the individuals directly, before actually doing so. These few steps are the minimum level of effort sufficient to meet tribal consultation requirements on land use plans.

B. <u>Consultation with State and Local Governments</u>

1. <u>Consultation with SHPO</u>. The BLM/SHPO protocol, implementing the national Programmatic Agreement in each State (see Manual Section 8140, Appendix 1 or Manual Section 8100, Appendix 13), establishes each State's procedures and standards for involving SHPO in the development of land use plans. Early SHPO involvement is a vital element for effectively incorporating historic preservation and cultural resource management in land use decisions.

2. <u>Consultation with County and Municipal Governments</u>. Certified Local Governments and other local governments that have expressed an interest in historic preservation and cultural resource management decision making should be involved in land use plans. An MOU is an appropriate means for defining involvement and establishing the standard of sufficiency for consultation with local governments.

BLM_0007436

.2

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.2  Incorporating Cultural Resource Content in Resource Management Plans (RMP)

   .21  New RMPs, RMP revisions, and RMP amendments. The provisions in subsection .1 of this Manual Section apply to all pending RMPs, RMP revisions, and RMP amendments. All new and updated RMPs will identify the nature and importance of cultural resources in the RMP area; establish goals for their management; make cultural resource use allocation decisions in support of the objectives; and choose management actions and prescriptions that will contribute to achieving those decisions.

      A.  Budgeting for Identification Costs. Field Offices developing preparation plans and budget requests for RMPs must target sufficient land use planning funds from subactivity 1610 for the assembly, analysis, synthesis, and evaluation of available cultural resource information.

      B.  Identification. The scope and scale of cultural resource identification is much more general and less intensive for land use planning than for processing specific land use proposals. Instead of new, on-the-ground inventory, the appropriate identification level for land use planning is a class I Existing Information Inventory; i.e., (1) a compilation and analysis of reasonably available cultural resource data and literature, and (2) a management-oriented synthesis of the resulting information. (See Manual Section 8110.21A)  However, if land use decisions are more specific in terms of impacts, they may require a more detailed level of identification of the scope and nature of cultural resources during land use planning.

         1.  Data source. The State Historic Preservation Office (SHPO) database is the primary data source for Existing Information Inventory. In addition to locating and characterizing the distribution of all surveyed areas and recorded cultural resources, qualitatively and quantitatively, class I inventory should interpret the potential cultural resource contents and densities of unsurveyed areas. Data and data interpretations, including projected cultural resource distributions in the unsurveyed areas, should be presented in Geographical Information System (GIS) format.

         2.  Existing Class I Overviews. Most field offices already have older class I inventories that can be updated, singly or in combination, to meet RMP needs (see Attachment 1). Most existing class I inventories were completed a decade or more ago for "planning units" under an earlier planning strategy. Some were prepared at a larger "resource area" scale, which may or may not correspond to current field office area boundaries. Many are outdated and therefore reflect less-reliable and less-complete information than is available now.

BLM_0007437

.21C3

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

3. "Landscape" scale inventories. For current planning purposes, some overviews warrant development at the "landscape" scale, focusing less on administrative boundaries and more on the continuity of geographic and cultural similarities and influences. For example, basing an overview on a linear cultural-geographical feature such as an historic trail, or a natural physiographic unit such as a watershed, might be a better way to organize cultural resource data for planning than field office or other arbitrary boundaries would be. A single landscape-level inventory may contribute to the cultural resource information needs for more than one RMP.

4. Outreach. Groups and individuals with historical, scientific, Native American, interpretive, and similar kinds of information and interests should be invited to participate in identification of the cultural resources in the RMP area, especially including evaluation of the resources' use potential. Participation of these groups and individuals is supposed to be recommended in preparation plans. Where this was not done and plan preparation is already underway, their participation should be requested as soon as possible.

5. Consultation. Consultation at the outset of planning with Indian tribes and the SHPO is required by law, regulations, and implementing agreements, and is a vital part of identification and management. Involving tribal governments and SHPOs closely at this level of resource consideration will greatly facilitate coordination and consultation at later stages of planning and project development. (See Manual Section 8120 and Manual Handbook H-8120-1.)

6. Minimum data standards. Each State should develop standards on how to acquire and display data, compatible with the Federal Geographic Data Committee report <http://colby.uwyo.edu/fgdcdocs/fgdcreport.pdf>, National Map Accuracy Standard <http://rockyweb.cr.usgs.gov/nmapstds/nmas.html>, SHPO data standards, final National Interagency Trail Data Standards, and any additional internal State BLM standards that apply.

C. Goals. A particular RMP may include numerous cultural resource goals. All will include at least the following two goals. (Pertinent legal authorities are shown in parentheses.)

1. Preserve and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations. (FLPMA Sec. 103(c), 201(a), 202(c); NHPA Sec. 110(a); ARPA Sec. 14(a).)

2. Seek to reduce imminent threats and resolve potential conflicts, from natural or human-caused deterioration, or from other resource uses (FLPMA Sec 103(c), NHPA Sec. 106; 110(a)(2);

BLM_0007438

.21D

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

    D.  <u>Allocations in Support of Goals</u>.  Allocate all cultural properties in the RMP area, whether already recorded or projected to occur on the basis of existing-data synthesis, to one or more of the following uses according to their nature and relative preservation value (see Appendix 2). These use allocations pertain to cultural resources, not to areas of land.

| Use Category * | Desired Future Condition |
|---|---|
| a. Scientific Use | Preserved until research potential is realized |
| b. Conservation for Future Use | Preserved until conditions for use are met |
| c. Traditional Use | Long-term preservation |
| d. Public Use | Long-term preservation, on-site interpretation |
| e. Experimental Use | Protected until used |
| f. Discharged from Management | No use after recordation; not preserved |
| * The majority of the cultural properties in a given geographic area will fall into categories a and f. The less-common properties in categories b-e are likely to be associated with particular settings that can be delineated geographically in the planning process. As the plan is developed, properties in categories b-d will require the most attention to balance their proactive uses with other land and resource uses. | |

**FIG. 1. Cultural resource use categories and corresponding desired future conditions.**

    E.  <u>Management Actions in Support of Goals</u>.

    1.  <u>Goal 1 – Preserve and Protect</u>.

      a.  Maintain current cultural resources inventory information in GIS format, including identification of priority geographic areas for future inventory, based upon the probability of unrecorded significant resources (ARPA Sec. 14(a); NHPA Sec. 106, 110).  State Offices, Field Office Managers and staff shall support BLM and SHPO efforts to complete and maintain automated cultural resource databases and GIS capability, and continually refine strategies for appropriate consideration of cultural resources in unsurveyed areas, including categorizing geographic areas on the basis of sensitivity and as high/medium/low priority for future cultural resource inventory.

BLM_0007439

.21E1b

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

b.  Incorporate the following management actions in planning documents to realize use potentials allocated to cultural properties:

| Use | Management Actions |
|---|---|
| Scientific Use | Permit appropriate research, including data recovery |
| Conservation for Future Use | Propose protection measures/ designations* |
| Traditional Use | Consult with tribes; determine limitations |
| Public Use | Determine limitations, permitted uses* |
| Experimental Use | Determine nature of experiment(s) |
| Discharged from Management | Remove protective measures |
| * Managers may impose safeguards against incompatible land and resource uses through withdrawals, stipulations on leases and permits, design requirements, and similar measures which are developed and recommended by an appropriately staffed interdisciplinary team. | |

FIG. 2. Management actions needed to realize use allocations.

2.  Goal 2 – Reduce Threats.  Seek to reduce imminent threats and resolve potential conflicts, from natural or human-caused deterioration, or from other resource uses.

a.  State Offices must ensure that all authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act, consistent with and subject to the objectives established in the RMP for the proactive use of cultural properties in the public interest.  All sections of the RMP that address the development of lands and resources will contain standard language stating that managers must not approve proposed activities until compliance with Section 106 of the National Historic Preservation Act has been completed and documented, including, where applicable, consultation with the SHPO and federally recognized Indian Tribes.

BLM_0007440

.21E2b

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

b.  In resolving conflicts between cultural resource use allocations and competing land use allocations, where the competing land use has potential to adversely affect cultural resources, managers shall consider all prudent and feasible alternatives to avoid adverse effects on the cultural resources or their uses. Where such alternatives would require undue cost or would be incompatible with competing goals, managers shall seek to balance goals, considering the magnitude of the harm to the cultural resource or its use, the significance of the resource or its use, the effect of mitigation activities on the competing use allocation, and public sensitivities.

F.  <u>Monitoring and Evaluating Effectiveness of Management Actions</u>. Field Office Managers shall ensure that plans include a schedule and standards to monitor and evaluate plans to determine whether management actions and protective measures are working satisfactorily.

.22  <u>Maintaining, Amending, and Revising Cultural Resource Content in Recent RMPs</u>. New circumstances may call for changes in the cultural resource content in RMPs prepared according to the above standards. Examples are new cultural resource data of significance to the plan, substantial change in related plans of other Federal agencies, State and local governments and Indian tribes, or changed legal requirements. Maintenance of RMP decisions and supporting components, to reflect minor changes in data, can be done without formal public involvement or preparation of an environmental assessment. Changes in an approved plan's cultural resource use decisions would require an amendment. Where the entire plan or major portions of the plan would be affected, a plan revision would be required.

.23  <u>Previous-Generation Land-Use Plans</u>. Plans prepared before recent authorities such as NAGPRA, the 1992 NHPA amendments, and E.O. 13007 existed, before current planning guidance was in place, or before the national Programmatic Agreement was approved, may not have specific resource management goals and management actions, and may have relied on public participation and consultation guidance which, while adequate at the time, differs from current standards. These plans will need to be updated to current standards as soon as practicable.

A.  <u>Plans Scheduled for Amendment or Revision in the Near Future</u>. Field Office managers shall provide for developing cultural resource data before scheduled planning starts. As detailed in Manual Handbook H-1601-1, Manual Section 8110, and this Manual Section every new, revised, and amended RMP is required to incorporate sufficient information to identify the nature and importance of all cultural resources known or expected to be present in the RMP area; definite goals for their management; land use allocation decisions in support of the goals; and management actions and prescriptions that will contribute to achieving the allocation decisions.

BLM_0007441

.23B

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.    B.  <u>Plans Not Scheduled for Amendment or Revision in the Near Future</u>. Even where plans will not be formally updated for some time, interim working documents may be developed to guide cultural resource-related decisions as appropriate. Field Office managers should seek opportunities to assign staff and/or cooperators to begin developing information and recommendations within available time and funds: assembling and organizing existing cultural resource information; acquiring new information, where needed, through reconnaissance-level field work and consultation; identifying potential management goals for the cultural resources and considering the management tools that would help to achieve them; and recording the information and recommendations to be easily retrievable by general geographical location

.

BLM_0007442

.3

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.3  Incorporating Cultural Resource Content in Local Land Use Plans

A. Consideration of cultural resources in local land use plans, e.g. interdisciplinary resource (activity level) plans, shall meet RMP standards on types and levels of cultural resource information, at a scale and level of detail appropriate to the size and complexity of the area and subject matter.

B. Consideration of cultural resources in special resource plans shall meet any supplemental guidance, as for instance the National Trails System Act.

C. Local land use plans shall seek to provide resolution between alternative uses for known cultural resources and also identify and provide strategies for resolving any conflicts between cultural resource protection and any competing management actions.

BLM_0007443

.4

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.4  Incorporating Cultural Resource Content in Project Plans.

.41  Other Subactivities' Project Plans.

A.  Recreation Management.  Interpretive or related recreational development and use of cultural properties, allocated to and being protected for public use, may require preparation of a recreation project plan.  This maybe done in lieu of preparing a CRPP, provided the recreation project plan includes the appropriate CRPP elements. Once the necessary recreation plan has been implemented, it may be appropriate to transfer long-term management responsibility to the recreation management program.

B.  Wilderness Management.  Wilderness management plans may have sections addressing management of cultural resources.  When the cultural resource management elements of CRPPs are included in these plans, they may be substituted for CRPPs.

C.  Other Special Management Areas.  Areas of Critical Environmental Concern (ACECs) or other areas of special management attention may appropriately address cultural resources in lieu of preparing CRPPs.

.42  Cultural Resource Project Plans. Cultural Resource Project Plans (CRPP) are detailed design plans for implementing decisions made in regional or local land use plans. Cultural resource project plans include precise estimates of workforce, time/scheduling, equipment and supply needs for specific management or information gathering actions. They should be sufficiently detailed to serve as contract specifications, as needed, and to provide a direct link between planning and budgeting. Jobs that are based on completed project plans shall receive priority consideration during annual work plan preparation.  They cover:

A. Protection projects for individual cultural properties or for classes of cultural properties requiring similar measures within a manageable spatial unit.

B. Information projects such as inventory or test excavations where needed to provide a basis for refining evaluations and allocations to use categories.

C. Interpretation projects in which cultural properties are developed for public visitation.

.43  Developing CRPPs. Appropriately qualified culture resource specialists develop project plans in close consultation with engineering, recreation, and staff personnel as appropriate. Project plans are prepared according to the schedule in the local land use plan. Project plans are also developed for protection projects such as stabilization or emergency protection for threatened cultural resources before a local land use plan has been prepared.

A.  Required Narrative Components. Project plans should not duplicate information in regional or local land use plans.

BLM_0007444

.43A1

## 8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

1. <u>Introduction</u>. Provide a brief introduction to orient the reader, referencing the regional or local land use plan being implemented and including: objectives of the CRPP; a summary of the cultural resources and/or resource types involved; the uses to be protected or implemented; a summary of the relevant land use plan decisions/strategies; a concise statement of the management problem or opportunity being addressed by the CRPP; and a brief description of the relevant geographical and physical characteristics considered from a logistical or engineering perspective.

2. <u>Planned Actions</u>. Describe specific information gathering, protection, and other management actions, by order of implementation or by calendar dates for initiation and completion. Identify dependent actions as such; that is, if step Y cannot proceed until step X is completed, state this. Protection actions to be considered include installation of physical protection devices, stabilization, partial data recovery, and law enforcement surveillance. Protection supporting actions include withdrawals and closures, execution of cooperative agreements, and cadastral survey. Information gathering actions include new inventory where protection may be needed, new documentary research, test excavations for refining evaluations and management allocations, and similar data-oriented actions. Identify subactivities that will be involved, and provide cost and scheduling details for prescribed actions in narrative, tabular, and graphic form (such as sketches, maps, photos, time lines, etc.) as appropriate.

3. <u>Appendices</u>.

    a. <u>Graphics</u>. Include maps, overlays, or similar attachments integral to the plan in an appendix. Date and initial all maps and overlays, and clearly identify any cultural resources affected by the plan.

    b. <u>Supporting Data</u>. Include detailed information and documentation needed for the permanent project record in an appendix (e.g., forms, data summaries, evaluation summaries, and related records not already included in the regional or local land use plan). Also, reference or summarize any relevant State or local cultural resource plans and professional reports within the project area.

    c. <u>Specific Location Information</u>. Delete legal descriptions and maps from CRPPs before they are made available for public review or inspection if there is sufficient reason to expect that disclosure of location would lead to a cultural property's unauthorized disturbance (see National Historic Preservation Act, Section 304; and Archaeological Resources Protection Act, Section 9).

B. <u>Implementation Schedule and Cost Estimate</u>.  Prepare a detailed implementation schedule for the planned actions, including specific work requirements and cost estimates on a year-by-year-basis. Give careful consideration to monitoring and maintenance needs; do not plan term management on a single-year basis. The CRPP must also include a description of the methods to be used in monitoring, measuring and reporting CRPP progress and accomplishment of objectives, and in identifying needs and methods for changes in the implementation process.

BLM_0007445

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.44 <u>Compliance and Consultation for CRPPs</u>.

A. <u>NEPA Compliance</u>. Compliance with the National Environmental Policy Act is guided by BLM Manual Section 1790 and Handbook H-1790-1. Environmental review is required for every CRPP. Each existing germane NEPA document is identified and reviewed to determine if it can be used to satisfy NEPA requirements for the CRPP, or if a new document is needed. This must in all cases include examination of the environmental impact statement/environmental assessment for the regional land use plan and local plan, if any, under which the CRPP is being prepared. Environmental analysis (usually resulting in an environmental assessment tiered to the existing environmental documents) is completed as necessary to fully disclose projected impacts of the actions covered by the CRPP. Documentation of the results of the review and any subsequent environmental analysis is conducted as specified in H-1790-1.

B. <u>Native American Consultation</u>.

1. <u>Native American Participation</u>. If any tribe or Indian individual attributes religious or cultural importance to a cultural property involved in the project plan, and if the proposed management action was not considered as part of the tribal coordination or public participation for the regional or local plan EIS/EA or during ARPA notification (see .44B2), provide the tribe or individual an opportunity to participate prior to plan approval, during preparation of the CRPP EA. The need for, and extent of, Native American consultation should be determined in accordance with Handbook H-8120-1.

2. <u>ARPA Notification</u>. If work under the project plan would require an excavation permit or its equivalent under the ARPA and could harm or destroy a site that has been identified by an Indian tribe as being of religious or cultural importance, notify the tribe after CRPP actions have been determined (see 43 CFR 10.3 7.7, BLM Manual Section 8150.13), during plan development. Complete consultation requested by the Indian tribe, prior to plan approval.

3. <u>NAGPRA Consultation</u>. If work under the project plan includes the intentional excavation of Native American human remains, funerary objects, sacred objects or objects of cultural patrimony, consult with the lineal descendant(s) and affiliated tribe(s) during plan development to determine views with regard to the excavation. If excavation is still planned after considering the results this consultation, incorporate into the plan appropriate treatment and disposition measures 43 CFR 10.3). Complete consultation prior to plan approval.

C. <u>SHPO Consultation</u>. As appropriate to the actions covered by a CRPP, consult with the SHPO in accordance with the national Programmatic Agreement and BLM/SHPO Protocol prior to plan approval, and prior to implementing any action that may have an effect on cultural properties eligible for or included in the National Register. Document this consultation in the plan.

BLM_0007446

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

.45 <u>CRPP Approval Process</u>. After involved staff specialists have indicated their participation by signature and date, the appropriate Field Office manager approves the plan or plan revision by signing and dating the approval sheet.

.46 <u>Implementing CRPPs</u>

   A. <u>Annual Work Plan Process (PTA/AWP)</u>. The implementation schedule and cost information provide direct input to the development of the PTA/AWP. Include in the PTA/AWP submission both the level of implementation that can be funded within the proposed cost target and also the specific actions that will require additional funding for full implementation. The approved AWP sets the rate of CRPP implementation based on statewide assessment of protection or information needs and other program priorities.

   B. <u>Performance Review</u>. When the implementation or maintenance of a CRPP is funded in the AWP, the CRPP provides specific details for developing specific performance measures to be included in the annual performance reviews for responsible managers and staff specialists.

   C. <u>Reporting Accomplishments</u>

      1. <u>Performance Indicators</u>. Report individual projects or actions that implement the plan each fiscal year through the performance indicator feedback requested in the AWP.

      2. <u>Annual Report</u>. Report plan completion and implementation among annual report data requested by the Director early in the following fiscal year.

.47 <u>Evaluating CRPP Effectiveness</u>

   A. <u>Review</u>

      1. Where CRPPs pertain to long-term protection and use of resources, conduct on-the-ground monitoring, studies, and/or analyses on a regular basis to measure CRPP effectiveness. Unless more frequent review is indicated by the nature of conditions that prompted plan preparation, review the effectiveness of CRPP implementation at least annually. Document reviews and findings as an addendum to the plan.

      2. Where CRPPs pertain to information gathering projects, incorporate results in Class 1 inventories and evaluation records within one year of project completion, and evaluate the project's effectiveness at correcting the deficiency that prompted the project.

BLM_0007447

.47B

8130 - PLANNING FOR USES OF CULTURAL RESOURCES – (Public)

B.  Revisions. Ensure that any major plan revision incorporates the same analysis, coordination, and compliance as required for the original CRPP, and that revisions are approved in the manner of an original CRPP.

1. Revise protection CRPPs as necessary, based on annual review or other indication that changes need to be made. A revision is indicated when the condition of the resources has continued to deteriorate at an unacceptable rate, or when other objectives of the plan are not being met.

2. Revise information-gathering CRPPs as needed. For example, revise to design a subsequent phase of class II survey when review indicates that intended results were not adequately attained, or when a predictive model developed on project data now requires new data for testing its usefulness.

3. Revise public-interpretation CRPPs when deteriorating resource or facility conditions, visitor surveys, or other public response indicate that objectives are not being met.

BLM_0007448

# Gunnison Gorge National Conservation Area

# APPROVED
# RESOURCE MANAGEMENT PLAN AND
# RECORD OF DECISION



**Gunnison Gorge National Conservation Area**
**Delta and Montrose Counties, Colorado**

**November 2004**



Bureau of Land Management
Gunnison Gorge NCA Office
2465 South Townsend Avenue
Montrose, Colorado 81401



## US Department of the Interior, Bureau of Land Management

BLM_0007449

**Mission Statement**

It is the mission of the Bureau of Land Management (BLM) to sustain the
health, diversity, and productivity of the public lands for the use and
enjoyment of present and future generations.

**Gunnison Gorge National Conservation Area Mission Statement**

The BLM will manage the NCA to protect its resources in accordance with
the designating legislation, the Federal Land Policy and Management Act of
1976, the Wilderness Act of 1964, as amended, and other applicable
provisions of law. The BLM will incorporate multiple uses to the extent
that important resources are protected and the combination of uses takes
into account the long-term needs of future generations for renewable and
nonrenewable resources. The purpose of the planning effort is to establish
an integrated guiding plan for future site-specific analysis and decisions that
maintains or improves existing conditions to meet or exceed Colorado
BLM Land Health Standards."

BLM_0007450

 

**United States Department of the Interior**

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2505 South Townsend Avenue
Montrose, Colorado 81401

In Reply Refer to:
CO-154-1610

Dear Reader:                                                                                  November 12, 2004

Enclosed for your review are the Record of Decision and Approved Resource Management Plan (RMP) for the Gunnison Gorge National Conservation Area (NCA), which contains the Gunnison Gorge Wilderness. The Proposed RMP/Final Environmental Impact Statement (EIS) (PRMP), published in January 2004, was a refinement of the Preferred Alternative (Alternative D) from the Draft RMP/EIS (DRMP) published in March 2003. The DRMP was available for a 90-day comment period between March and June 2003, and the PRMP was subject to protest during a 30-day period in January and February 2004, in accordance with 43 Code of Federal Regulations (CFR) Part 1610.5.2. In addition, the Governor of Colorado was provided a 60-day review period to determine that the proposed plan conformed to existing state policy and plans. The attached RMP is essentially the same as the PRMP.

Thirty-two protest letters were received on the PRMP. Twenty-nine of the protests were determined to represent valid protests. After consideration of all points raised in the 32 letters, the BLM Director concluded that the NCA planning team and decision-makers, including the Colorado State Director, followed all applicable laws, regulations, policies, and pertinent process and resource considerations in developing the proposed plan. All protesting parties and those submitting comments received a response from the BLM Director.

The RMP contains both proposed Land Use Planning decisions and Implementation decisions. Land Use Planning decisions were subject to protest during a 30-day period following publication of the PRMP (discussed above). No further administrative remedies are available for Land Use Planning decisions. The attached Record of Decision serves as the final decision for Land Use Planning decisions contained in the attached RMP and becomes effective the day the Notice of Availability of the RMP is published in the *Federal Register*. Please note that some Land Use Planning decisions will require the preparation of detailed, project-level National Environmental Policy Act analyses prior to on-the-ground implementation.

Table 2-2 of Chapter 2 of the RMP identifies both Land Use Planning and Implementation decisions. Implementation decisions are subject to appeal to the Interior Board of Land Appeals during the 30-day period following the publication of the Notice of Availability of the RMP in the *Federal Register*, or until December 12, 2004. This appeal period also will be announced via local news releases, advertisements, newsletter mailings, and other means.

Any party adversely affected by an Implementation decision in Table 2-2 of the RMP may appeal within 30 days of the effective date of the Record of Decision or in accordance with the provisions of 43 CFR 4.4. The appeal must include a statement of reasons or the person(s) appealing must file a separate statement of reasons within 30 days of filing the appeal. The appeal must state if a stay of the decision is being requested in accordance with 43 CFR 4.21 and must be filed with the Field Manager at the following address: Gunnison Gorge NCA, C/o Uncompahgre Field Office, 2465 South Townsend Avenue, Montrose, Colorado 81401.

A copy of the appeal, statement of reasons, and all other supporting documents must be sent to: Regional Solicitor, Rocky Mountain Region, US Department of the Interior, 755 Parfet Street, Suite 151, Lakewood, Colorado 80215.

BLM_0007451

If the statement of reasons is filed separately, it must be sent to: Interior Board of Land Appeal, Office of Hearings and Appeals, 4015 Wilson Blvd., Arlington, Virginia 22203.

It is suggested that any appeal be sent certified US mail, return receipt requested.

Should you wish to file a motion for stay pending the outcome of an appeal of these implementation decisions, you must show sufficient justification based on the following standards under 43 CFR 4.21:

1)      The relative harm to the parties if the stay is granted or denied.

2)      The likelihood of the appellant's success on the merits.

3)      The likelihood of immediate or irreparable harm if the stay is not granted.

4)      Whether the public interest favors granting the stay.

As noted above, the motion for stay must be filed in the office of the authorized officer.

The RMP, PRMP, and DRMP are available on the project Web site, www.gunnison-gorge-eis.com.  A limited number of paper and CD-ROM copies of the documents are available from the Gunnison Gorge NCA, C/o Uncompahgre Field Office, 2465 South Townsend Avenue, Montrose, Colorado 81401; phone (970) 240-5337.

**Freedom of Information Act Considerations/Confidentiality**

Public comments submitted for this planning review, including names and street addresses of respondents, will be available for public review at the Gunnison Gorge NCA, Uncompahgre Field Office, in Montrose, Colorado, during regular business hours (7:45 a.m. to 4:30 p.m.), Monday through Friday, except holidays. Comments, including names and addresses of respondents, will be retained on file in the same office as part of the public record for this planning effort.  Individual respondents may request confidentiality.  If you wish to withhold your name or address from public inspection or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comment.  Such requests will be honored to the extent allowed by law.  All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

We greatly appreciate your valuable assistance, input, and help in this planning effort, and look forward to your continued participation as the plan is implemented.  For additional information or clarification regarding the attached document or the planning process, please contact Bill Bottomly at (970) 240-5337 (email bill_bottomly@co.blm.gov) or Karen Tucker, NCA Manager, at (970) 240-5309 (email karen_tucker@co.blm.gov).

Sincerely yours,

*Barbara Sharrow*

Barbara Sharrow, Manager
Uncompahgre Field Office

BLM_0007452

# TABLE OF CONTENTS

Section                                                                                          Page

List of Acronyms ..................................................................................................................... v

## RECORD OF DECISION

Introduction ............................................................................................................. R-2
Land Use Plan Decisions ......................................................................................... R-1
Implementation Decisions ....................................................................................... R-3
 Appeal Procedures for Implementation Decisions ........................................... R-3
Overview of the Alternatives .................................................................................. R-4
 Alternatives Considered but Not Analyzed in Detail ....................................... R-4
 Alternatives Analyzed in Detail ....................................................................... R-5
 Environmentally Preferable Alternative ........................................................... R-7
Rationale for the Decision ...................................................................................... R-7
Mitigation Measures ............................................................................................... R-8
Plan Monitoring ...................................................................................................... R-8
Public Involvement .................................................................................................. R-8
 Scoping ......................................................................................................... R-8
 Focus Group .................................................................................................. R-9
 Newsletter ..................................................................................................... R-9
 Public Review and Comment on the DRMP ................................................... R-10
 Distribution and Availability of the PRMP ...................................................... R-10
 Consultation with US Fish and Wildlife Service .............................................. R-11
 Native American Tribal Coordination ............................................................. R-11
 Public Participation in RMP Implementation .................................................. R-11
Managers' Recommendation .................................................................................. R-12
State Director Approval ......................................................................................... R-13

## APPROVED RESOURCE MANAGEMENT PLAN

1. Introduction ....................................................................................................... 1-1
 1.1 Location ............................................................................................... 1-1
 1.2 Purpose of and Need for the Resource Management Plan .................... 1-2
 1.3 Planning Process .................................................................................. 1-5
  1.3.1 Planning Themes and Issues ................................................... 1-5
  1.3.2 Planning Criteria ..................................................................... 1-7
 1.4 Vision and Mission Statement .............................................................. 1-9
 1.5 Goals and Objectives of the Resource Management Plan ..................... 1-9
 1.6 Wild and Scenic Rivers Study Report .................................................. 1-11
2. Approved Decisions ........................................................................................... 2-1
 2.1 Introduction ........................................................................................ 2-1
 2.2 Recreation Management in the Gunnison Gorge Wilderness ................. 2-1
 2.3 Benefits-based Recreation Management in the Planning Area ............... 2-2
 2.4 Management Units ............................................................................... 2-3
 2.5 Approved Decisions ............................................................................. 2-4
3. Resource Management Plan Implementation and Modification .............................. 3-1
 3.1 Introduction ........................................................................................ 3-1
 3.2 Requirements for further Environmental Analysis ................................. 3-1
 3.3 Adaptive Management ......................................................................... 3-2
 3.4 Monitoring .......................................................................................... 3-2

BLM_0007453

# TABLE OF CONTENTS *(continued)*

Section        Page

     3.5    Resource Management Plan Modification ....................................................... 3-3

           3.5.1    Plan Maintenance ................................................................................ 3-3

           3.5.2    Plan Amendments ............................................................................... 3-3

           3.5.3    Plan Revision ...................................................................................... 3-4

4.   List of Preparers .............................................................................................. 4-1

5.   References ........................................................................................................ 5-1

GLOSSARY ................................................................................................... GLOSSARY-1

INDEX ............................................................................................................... INDEX-1

## APPENDICES

| | |
|---|---|
| A | Legislation |
| B | BLM *Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado* |
| C | Public Land Tracts Available or Unavailable for Disposal and Private Land Tracts Prioritized for Acquisition |
| D | Area of Critical Environmental Concern Locations |
| E | Oil and Gas Stipulations |
| F | Distribution of RMP/ROD |
| G | Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado – Goals, Objectives and Management Measures |
| H | Data Management |
| I | Final Wild and Scenic Rivers Study Report |

BLM_0007454

# LIST OF FIGURES

| Figure | Page |
|---|---|

| | | |
|---|---|---|
| 1-1 | Project Location | 1-3 |
| 2-1 | Management Units | 2-5 |
| 2-2 | Recommended Utility ROW Corridors | 2-105 |
| 2-3 | OHV Designations | 2-107 |
| 2-4 | Designated Routes in Limited Areas | 2-109 |
| 2-5 | Visual Resource Management | 2-111 |
| 2-6 | Special Management Features | 2-113 |
| 2-7 | Recreation Management Zones | 2-115 |
| 3-1 | Adaptive Management Strategy | 3-3 |
| C-1 | Private Land Acquisition Areas by Priority | C-5 |
| D-1 | Gunnison Sage Grouse ACEC | D-3 |
| D-2 | Fairview ACEC/RNA | D-5 |
| D-3 | Native Plant Community ACEC | D-7 |
| E-1 | Oil and Gas Leasing Stipulations UB-1 and GGNCA-13 | E-11 |
| E-2 | Oil and Gas Leasing Stipulations UB-2, GGNCA-1, GGNCA-10, and GGNCA-11 | E-13 |
| E-3 | Oil and Gas Leasing Stipulations UB-3, UB-4, and UB-6 | E-15 |
| E-4 | Oil and Gas Leasing Stipulation GGNCA-8 | E-17 |
| E-5 | Oil and Gas Leasing Stipulation GGNCA-12 | E-19 |
| I-1 | Wild and Scenic Rivers Eligibility Process Flow Chart | I-3 |
| I-2 | Planning Area Rivers Considered in Wild and Scenic Rivers Inventory Process | I-11 |
| I-3 | Planning Area River Segments Proposed as Eligible for Further Study | I-13 |
| I-4 | Gunnison River (Entire Wilderness to Transmission Line South of North Fork) | I-15 |
| I-5 | Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company Diversion) | I-19 |
| I-6 | Smith Fork Creek | I-23 |
| I-7 | Red Canyon Creek | I-25 |

BLM_0007455

# LIST OF TABLES

Table                                                                                          Page

1-1     BLM Planning Process ..................................................................................................... 1-6
2-1     Management Unit Acres and Values.............................................................................. 2-3
2-2.0   Decisions and Management Objectives Common to All Planning Area Public Lands .................. 2-8
2-2.1   Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire
       Management Unit ........................................................................................................ 2-30
2-2.1a  Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions.... 2-36
2-2.2   Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to
       Entire Management Unit.............................................................................................. 2-49
2-2.2a  Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management
       Zone Decisions ........................................................................................................... 2-56
2-2.3   Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to
       Entire Management Unit.............................................................................................. 2-64
2-2.3a  Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management
       Zone Decisions ........................................................................................................... 2-70
2-2.4   Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire
       Management Unit ........................................................................................................ 2-79
2-2.4a  Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone
       Decisions ................................................................................................................... 2-84
2-2.5   Management Unit 5 (Native Plant Community ACEC/ONA) Decisions Applicable to
       Entire Management Unit.............................................................................................. 2-87
2-2.5a  Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management
       Zone Decisions ........................................................................................................... 2-89
2-2.6   Management Unit 6 Decisions Applicable to Entire Management Unit...................................... 2-92
2-2.6a  Management Unit 6 Recreation Management Zone Decisions.................................................. 2-96
2-3     Recommended Utility ROW Corridors on Public Lands ........................................................ 2-103
2-4     Birds of Conservation Concern for the Southern Rockies and Colorado Plateau....................... 2-104
4-1     RMP Preparers............................................................................................................ 4-1
E-1    Summary of Oil and Gas Stipulations Applicable to Federal Oil and Gas Estate.......................... E-9
F-1    Persons and Agencies Sent Copies of the Record of Decision/Resource Management Plan .......... F-2
H-1   Integration of GIS Data ................................................................................................ H-2
I-2-1   Classification Criteria for Wild, Scenic, and Recreational River Areas ........................................ I-47
I-3-1   Interim Protection for Candidate Wild and Scenic Rivers......................................................... I-49
I-4-1   River Segments from Initial Identification Efforts ................................................................... I-52

BLM_0007456

## LIST OF ACRONYMS

| Acronym or Abbreviation | Full Phrase |
|---|---|
| 2003 Act | Black Canyon of the Gunnison Boundary Revision Act of 2003 (Public Law 108-78, November 4, 2003) |
| ACEC | Area of Critical Environmental Concern |
| Act | Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (Public Law 106-76, October 21, 1999) |
| APD | application for permit to drill |
| APHIS | Animal and Plant Health Inspection Service (US Department of Agriculture) |
| ATV | all-terrain vehicle |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| CDOW | Colorado Division of Wildlife |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| CNHP | Colorado Natural Heritage Program |
| CO- | Colorado Highway |
| COA | conditions of approval |
| CSUS | controlled surface use stipulation |
| DRMP | Gunnison Gorge NCA Draft Resource Management Plan and Environmental Impact Statement |
| EIS | environmental impact statement |
| FLPMA | Federal Land Policy and Management Act |
| GIS | Geographic Information System |
| Gorge | Gunnison Gorge |
| Gunnison Forks | confluence of the Gunnison River and North Fork of the Gunnison River |
| IBA | Important Bird Area |
| kV | kilovolt |
| MBTA | Migratory Bird Treaty Act |
| MOU | Memorandum of Understanding |
| MU | management unit |
| National Park | Black Canyon of the Gunnison National Park |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |

BLM_0007457

## LIST OF ACRONYMS *(continued)*

| Acronym or Abbreviation | Full Phrase |
|---|---|
| NHPA | National Historic Preservation Act |
| NLCS | National Landscape Conservation System |
| North Fork | North Fork of the Gunnison River |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |
| | |
| OHV | off-highway vehicle |
| ONA | Outstanding Natural Area |
| | |
| Park Service | United States Department of the Interior, National Park Service |
| PL | Public Law |
| planning area | Gunnison Gorge National Conservation Area planning area |
| Pleasure Park | Gunnison River Pleasure Park (at Gunnison Forks) |
| PRMP | Gunnison Gorge NCA Proposed Resource Management Plan and Final Environmental Impact Statement |
| | |
| RAMP | Final Recreation Management Plan for the Gunnison Gorge Recreation Lands, Colorado |
| RAMP Addition | Addition to the Recreation Area Management Plan for the Gunnison Gorge Recreation Lands, Colorado |
| RMP | resource management plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | right-of-way |
| | |
| SRMA | Special Recreation Management Area |
| SRUP | Special Recreation Use Permit |
| | |
| TLS | timing limitation stipulation |
| Tri-State | Tri-State Generation and Transmission Association |
| | |
| US | United States |
| US- | United States Highway |
| USC | United States Code |
| US Forest Service | United States Department of Agriculture, Forest Service |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| USGS | United States Geological Survey |
| | |
| VRM | Visual Resource Management |
| | |
| Wilderness | Gunnison Gorge Wilderness |
| WSR Act | Wild and Scenic Rivers Act |

BLM_0007458

# RECORD OF DECISION

### INTRODUCTION

The Gunnison Gorge National Conservation Area (NCA) planning area (planning area) totals about 196,000 acres in southwestern Colorado and is adjacent to the cities of Montrose and Olathe in Montrose County, and near the cities of Delta, Hotchkiss, and Crawford in Delta County (Figure 1-1). The planning area encompasses 95,781 acres of federal lands managed by the US Department of the Interior, Bureau of Land Management (BLM), 99,743 acres of private land, and 666 acres at Sweitzer Lake State Park. Within the planning area, the NCA encompasses 62,844 acres of BLM-managed lands and 2,225 acres of private lands. The interior 17,784 acres of the NCA, encompassing the Gunnison Gorge, is the Gunnison Gorge Wilderness (Wilderness). The Wilderness contains about 14 miles of the Gunnison River, and the NCA contains an additional eight miles of the Gunnison River downstream of the Wilderness boundary.

My decision is to approve the attached Gunnison Gorge NCA Resource Management Plan (RMP). This Record of Decision (ROD) will provide the overall resource management direction of BLM-administered lands in the planning area. The existing RMP for the Uncompahgre Field Office (BLM 1989) is hereby amended by this ROD to reflect and incorporate the decisions in this RMP for the affected lands. In addition to land use planning decisions, this ROD covers a variety of management actions that are considered implementation decisions. Therefore, this decision identifies which are land use planning decisions, which were protestable under the land use planning regulations (43 Code of Federal Regulations [CFR] 1610) and those actions that are implementation decisions and are currently appealable under the Department of the Interior's appeal regulations (43 CFR 4).

### LAND USE PLAN DECISIONS

The attached Gunnison Gorge NCA RMP is hereby approved. The RMP was prepared by the BLM in accordance with the Federal Land Policy and Management Act of 1976 (FLMPA) (43 US Code 1701 *et seq.*) and its implementing regulations (43 CFR 1600). An environmental impact statement (EIS) was prepared for the RMP in accordance with

BLM_0007459

the National Environmental Policy Act of 1969 (NEPA). The EIS assessed the possible environmental and social effects of implementing the RMP. The RMP is identical to the Proposed RMP/Final EIS (PRMP) published in January 2004 (BLM 2004), which was a refinement of the Preferred Alternative (Alternative D) from the Draft RMP/EIS (DRMP) published in March 2003 (BLM 2003c). Specific management decisions for BLM-administered lands in the planning area are provided in the RMP attached to this document.

All decisions, including land use plan decisions, are identified in Chapter 2 of the attached RMP. Land use plan decisions include:

- Goals, objectives, standards, and guidelines that define desired outcomes or future conditions;
- Land use allocations such as withdrawals and special management area designations;
- Visual resource management (VRM) classifications;
- Land tenure; and
- Allowable uses and restrictions including specific off-highway vehicle (OHV) areas, mining restrictions, areas allotted to and excluded from livestock grazing, areas open or closed to firewood cutting or other vegetative product removal, and areas closed to commercial timber harvest or having no allowable sale quantity.

Land use planning decisions can be distinguished from implementation decisions in that, although land use plan decisions are themselves final and effective upon adoption, the decisions normally require additional decision steps (such as permit approvals) before management or other activities having on-the-ground impacts can be carried out.

A 30-day protest period was provided on the land use plan decisions in the PRMP in accordance with 43 CFR Part 1610.5-2. Thirty-two protest letters were received. All but three of the protests were determined to represent valid protests. These three letters were considered comments, not protests. After consideration of all points raised in these protests, the BLM Director concluded that the NCA planning team and decision-makers, including the Colorado State Director, followed all applicable laws, regulations, policies, and pertinent process and resource considerations in developing the proposed plan. The resolutions to the protests resulted in minor editing and clarification of the RMP/ROD, and did not result in the necessity for re-analysis or re-publication of the PRMP/FEIS for additional public review and protest. One clarification was made in Appendix E of the RMP to explain the nature of additional NEPA documentation that will be completed, if necessary, prior to excepting, waiving, or modifying oil and gas lease stipulations. A second clarification explained that BLM interim management requirements for suitable wild and scenic river segments will apply until Congress acts on the suitability findings in the ROD, rather than for three years only, as stated in the PRMP/FEIS. All protesting parties and those submitting comments received a response from the BLM Director. This ROD serves as the final decision for the land use plan decisions described

above and becomes effective on the date it is signed. No further administrative remedies are available for these land use plan decisions (see the attached RMP).

**IMPLEMENTATION DECISIONS**

Implementation decisions are management actions to implement land use plans. Implementation decisions generally constitute BLM's final approval allowing on-the-ground actions to proceed. For the most part, unlike land use plan decisions, implementation decisions are not subject to protest under the planning regulations. Instead, implementation decisions are subject to various administrative remedies, primarily appeals to the Interior Board of Land Appeals in the Office of Hearings and Appeals. These types of decisions are based on site-specific planning and NEPA analyses and are subject to the administrative remedies set forth in the regulations that apply to each resource management program of the BLM.  Decisions to construct, build, or install site-specific projects are subject to administrative remedies at the time such decisions are made, primarily appeals to the Interior Board of Land Appeals (IBLA) in the Office of Hearings and Appeals. Over time and as funding and staff are available, the BLM intends to implement specific project-level decisions described in Chapter 2 of the attached RMP. These "implementation decisions" are different than the previously described land use planning decisions. Some implementation decisions in the RMP will require the preparation of appropriate, detailed, project plans and site-specific NEPA analyses prior to implementation, which will include the appropriate level of public involvement, public scoping, consultation and collaboration with other agencies and partners, friends groups, and complying with all applicable regulations, policies, guidance, and laws. Some implementation decisions do not require any additional environmental documentation, such as decisions to map, survey, inventory, monitor, collect information, conduct research, and prepare project specific or implementation level plans. These are typically administrative actions and not surface disturbing actions and are addressed to a sufficient level of detail in the RMP/EIS process to be implemented over time without further NEPA analysis. Other decisions have been addressed to a sufficient level of detail in the RMP/EIS process to be implemented over time without further NEPA analysis. Implementation decisions and Land Use Plan decisions are shown in Chapter 2 of the attached RMP. The opportunity to appeal Implementation decisions is being provided at this time, as described below.

**Appeal Procedures for Implementation Decisions**

Any party adversely affected by an implementation decision in Chapter 2 of the attached RMP may appeal within 30 days of receipt of this decision in accordance with the provisions of 43 CFR 4.4. The appeal must include a statement of reasons or the person(s) appealing must file a separate statement of reasons within 30 days of filing the appeal. The appeal must state if a stay of the decision is being requested in accordance with 43 CFR 4.21 and must be filed with the Field Manager at the following address:

> Gunnison Gorge NCA
> C/o Uncompahgre Field Office
> 2465 S. Townsend Street
> Montrose, CO 81401

BLM_0007461

A copy of the appeal, statement of reasons, and all other supporting documents should be sent to:

> Regional Solicitor
> Rocky Mountain Region, US Department of the Interior
> 755 Parfet Street, Suite 151
> Lakewood, CO 80215

If the statement of reasons is filed separately, it must be sent to:

> Interior Board of Land Appeals
> Office of Hearings and Appeals
> 4015 Wilson Blvd.
> Arlington, VA 22203

It is suggested that any appeal be sent certified US mail, return receipt requested.

### Request for Stay

Should you wish to file a motion for stay pending the outcome of an appeal of these implementation decisions, you must show sufficient justification based on the following standards under 43 CFR 4.21:

1) The relative harm to the parties if the stay is granted or denied.
2) The likelihood of the appellant's success on the merits.
3) The likelihood of immediate or irreparable harm if the stay is not granted.
4) Whether the public interest favors granting the stay.

As noted above, the motion for stay must be filed in the office of the authorized officer.

## OVERVIEW OF THE ALTERNATIVES

### Alternatives Considered but Not Analyzed in Detail

The BLM worked with citizens, government agencies, and organizations to discuss management alternatives. Four alternatives were dismissed because they do not meet the purpose and need for action:

### Maximize Resource Protection by Eliminating All Human Use on Planning Area Public Lands

This alternative would have substantially restricted or eliminated all or most human use, including OHVs, rafting, livestock grazing, and hiking, within the NCA, Wilderness, and other planning area public lands. The FLPMA mandates that BLM lands provide multiple use opportunities. The *Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999* (Public Law 106-76) (Act) requires that certain values, including exceptional multiple-use opportunities and recreational resources, must be protected by the management plan. Some alternatives considered in the DRMP, as well as the PRMP, restrict or eliminate some human uses in some planning area locations. This alternative, however, would substantially restrict or

BLM_0007462

eliminate all or most human use. The BLM does not believe this is feasible because the impact analysis does not compel the BLM to restrict or eliminate all or most human uses in certain locations. As such, this alternative was dismissed from further consideration.

### Remove NCA and Wilderness Designations

This alternative would have removed the NCA designation provided by the Act, and the area would have remained public lands with no national designation. This alternative is not feasible or prudent because the Congressional Act designating the NCA and Wilderness cannot be revoked unless by another act of Congress, which is not likely in the foreseeable future. As such, this alternative was dismissed from further consideration.

### Allow Unregulated Recreation

This alternative would have allowed unencumbered, unregulated recreation in the NCA, Wilderness, and remaining public lands in the planning area. The Act states that the NCA and Wilderness shall be managed to protect their natural, cultural, scenic, wilderness, and recreational resources. Allowing unregulated recreation would mean that users could travel anywhere on planning area public lands via automobile, OHV, mountain bike, foot, or horseback. In addition, private and commercial users would be allowed unregulated access to and use of the Gunnison River in the Wilderness and downstream. Such use would lead to increased user days and more user conflicts throughout the NCA and Wilderness, which would lead to additional impacts on the natural, cultural, scenic, wilderness, and recreational resources for which the NCA and Wilderness were designated. As such, these resources would not be protected as required by the Act. Therefore, this alternative was dismissed from further consideration.

### Partial Implementation of the RMP

A number of alternatives were developed that would only focuses on a few issues or otherwise result in partial implementation of the RMP. Preparation and full implementation of the RMP is a BLM requirement. As such, these alternatives were dismissed as infeasible, impracticable, or precluded by legal insufficiency.

### Alternatives Analyzed in Detail

Four alternatives are analyzed in detail in the DRMP (BLM 2003c). General management themes for each alternative analyzed in detail are described below.

### Alternative A

The objectives of Alternative A, continuation of current management (or "no action" alternative), was to continue implementing the direction and actions contained in existing guidance, laws, plans, and policies that are currently in effect, in compliance with the legislative Act designating the NCA and Wilderness (Appendix A), while meeting land health standards. Current levels of motorized and non-motorized uses and activities would have continued with some restrictions applied. More routes would have been designated for motorized and mechanized (e.g., mountain bicycle) use.

BLM_0007463

Noncommercial (private) and commercial recreation use on the Gunnison River would have continued, with no limitations on numbers of private boater launches. The Wilderness would have been managed for the same degree of solitude opportunities that are currently possible. Current levels, methods, and mix of multiple use resource management of planning area public lands would have continued. Existing guidance, laws, plans, policies, and management would have been amended only as necessary to comply with the Act.

### Alternative B

The objectives of Alternative B were to resolve issues and concerns on planning area public lands with a focus on conserving natural values and improving and enhancing land health conditions where possible. Lands would have been managed overall for a primitive non-motorized and motorized setting. Human uses would have had greater restrictions and would have been managed for less-impacting results. Non-motorized opportunities would have been emphasized with more comprehensive restrictions and conditions on motorized activities. Open, cross-country, off-route motorized and mechanized (e.g., mountain bicycle) areas would have been more restricted and smaller. Group sizes for commercial Gunnison River activities in the Wilderness and beyond would have been reduced. Noncommercial (private) Gunnison River recreation would have been managed by implementing a limiting permit and allocation system. The Wilderness would have been managed to enhance and increase opportunities for solitude.

### Alternative C

The objectives for Alternative C were to resolve issues and concerns on planning area public lands to provide a greater diversity of uses, additional developed facilities (such as roads and trails), and fewer restrictions outside the Wilderness, while meeting land health standards everywhere. Lands would have been managed for motorized and non-motorized settings. Economic return and community stability would have been an important consideration when actions are implemented. Overall, restrictions on people's activities would have been lessened. Open, cross-country, off-route motorized and mechanized (e.g., mountain bicycle) use opportunities would have been maximized with allocations of large open areas. Whitewater boating and Gold Medal trout fishing would have been emphasized in the Wilderness. Group sizes for commercial Gunnison River activities in the Wilderness would have been increased. The Wilderness would have been managed for maximum use, and commercial and private river recreation opportunities would have been limited only if necessary to maintain group encounter numbers.

### Alternative D

Alternative D was and is the BLM's preferred alternative. Parts of some management units from Alternatives A, B, and C were incorporated into Alternative D. In some cases, management unit boundaries were modified to make management more effective. The objectives of Alternative D are to maximize diversity of multiple uses, including human activities and opportunities, while meeting or exceeding land health standards. Areas will be prioritized for land health standard improvement or enhancement. Lands will be managed for non-motorized and motorized activities in a variety of settings.

Areas for open, cross-country, off-route motorized and mechanized (e.g., mountain bicycle) activities will be allocated. A moderate amount of control will be exercised on motorized vehicular activities, and additional control will be exercised in some areas. Some human uses will be limited in some areas to recognize natural and other values. In the Wilderness and beyond, commercial and noncommercial (private) Gunnison River recreation will be analyzed to determine needed changes to meet Wilderness criteria and human satisfaction levels.

**Environmentally Preferable Alternative**

Environmental preference is judged using the criteria in the NEPA and Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 CFR 1500-1508). The CEQ defines the environmentally preferred alternative as that which will promote the national environmental policy as expressed in Section 101 of the NEPA. This section lists six broad policy goals for all federal plans, programs, and policies:

1) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

2) Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

3) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

4) Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

5) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

6) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Based on these criteria, identifying the most environmentally preferable alternative involves balancing current and potential resource use with resource protection. Alternative B in the DRMP (BLM 2003c) was considered to be the environmentally preferred alternative based on these criteria, as well as the alternative's established objectives.

**RATIONALE FOR THE DECISION**

The PRMP was developed based on environmental impacts of the alternatives analyzed in the DRMP (BLM 2003c); issues raised throughout the planning process; how each alternative resolves existing conflicts on planning area public lands; public input and scoping throughout the process; and laws, regulations, and BLM Manuals and other guidance. Aspects of DRMP Alternatives A, B, and C are included in Alternative D and the PRMP. The PRMP was developed by the Gunnison Gorge NCA staff and Manager, the Uncompahgre Field Office Manager, and interdisciplinary team members and represents the mix and variety of actions that, in the opinion of the preparers, best resolve the issues and management concerns that drove preparation of the RMP/EIS.

All actions in the attached RMP comply with current applicable state and federal regulations, standards, and policies. In certain instances, laws, regulations, or policies will require some management actions to receive overriding priority in conflict resolution, such as protection of threatened and endangered species or historical or archaeological resources.

## MITIGATION MEASURES

The attached RMP decisions include any mitigation measures necessary to minimize impacts.

## PLAN MONITORING

The BLM planning regulations (43 CFR 1610.4-9) require monitoring of RMPs on a continual basis with formal evaluations conducted at periodic intervals. The attached RMP decisions incorporate monitoring measures for a variety of resources. Revisions or amendments to the RMP may be necessary to accommodate changes in resource needs, policies, or regulations. A detailed, decision-specific implementation and funding schedule will be completed following approval of the RMP. It will contain detailed implementation and monitoring plans, including all monitoring recommended in the attached RMP, and schedules necessary to implement RMP decisions. It is anticipated that several follow-on strategies or activity plans will be prepared during implementation of the RMP.

## PUBLIC INVOLVEMENT

The BLM implemented an extensive public collaboration program for this planning effort. The BLM distributed newsletters, hosted public open houses, and facilitated a public collaboration focus group. The BLM also collaborated with parties after the public comment period on the DRMP (BLM 2003c) to help resolve issues dealing with wild and scenic river recommendations, rights-of-way utility corridors, and OHV use.

### Scoping

Public involvement is an integral component of BLM's resource management planning process. The planning process officially started on August 18, 2000, with the publication of a notice of intent in the *Federal Register*, which notified the public of the BLM's intent to develop a management plan. The notice of intent also formally initiated the scoping process, or solicitation of public comments. In November 2001, a project-specific Web site (www.gunnison-gorge-eis.com) was launched to serve as a clearinghouse of project information. The Web site provides background information about the project, a public meeting calendar, and copies of public information documents, and is updated regularly with current information. A link was also available for Web site visitors to submit comments. A directed mailing of the project newsletter and newspaper advertisements, a press release, and a television spot also were issued to notify the public of the project, to announce the three public open houses, to request public comments, and to provide contact information.

Open houses were held in three western Colorado locations in the vicinity of the project planning area during February 2002. They provided the public the opportunity to

BLM_0007466

receive information, ask questions, and provide input. In addition to BLM representatives, a total of 66 people attended the open houses. The close of the official scoping period was March 8, 2002. A total of 81 written submissions were received from different entities and affiliations. Many of the submissions contained multiple comments on different topics. A total of 1,243 individual comments were made in the 81 written submissions received. A scoping report was published in March 2002 and posted on the project Web site. Information received through written scoping comments was evaluated, verified, and incorporated into the RMP/EIS as appropriate.

## Focus Group

A citizen/agency focus group was developed to assist BLM in the planning process. The BLM Southwest Resource Advisory Council officially sanctioned the focus group as is subcommittee. The focus group has provided extensive and important input to the RMP/EIS process. The focus group members provided data and information for those resources and uses that they represent, assisted in identifying issues to be addressed in the planning process, assisted in formulating alternatives, and reviewed and provided input on the preliminary draft alternatives. A total of 12 meetings were held with the focus group, and a total of 296 people attended the meetings. For each geographical visitor use zones in the NCA, three focus group meetings were held. During the first meeting, the focus group was presented an overview of the existing conditions and management in a particular geographic zone. The group then broke into smaller groups to voice issues and opportunities group members think are present in each zone. The second meeting consisted of an outdoor field trip to each zone. Maps were brought into the field, and the group discussed what was present on the ground. The third meeting consisted of meeting indoors again and collaboratively developing alternative management ideas for the RMP. In addition to the 12 focus group meetings, an additional four collaborative citizen/agency meetings were held.

All individuals who had attended any of the above 12 focus group meetings were provided an opportunity to comment on the preliminary draft alternatives in December 2002, which were posted on the project Web site and available for review at the BLM's Gunnison Gorge NCA Office. A total of 193 focus group members were contacted. A total of almost 50 written submissions were received on the preliminary draft alternatives, either in letter or electronic mail format, which helped BLM refine the alternatives before publishing the DRMP.

## Newsletter

Five editions of the project newsletter, *News from the Gorge*, have been published to date:

1) The January 2002 issue kicked off public scoping; it was mailed to 650 contacts on the project distribution list.

2) The April 2002 issue provided public scoping results; it was mailed to over 1,000 contacts on the distribution list.

3) The January 2003 issue described the alternatives being analyzed in the DRMP; it was mailed to over 1,000 contacts on the distribution list.

BLM_0007467

4) The March 2003 issue announced the availability of the DRMP; it was mailed to over 1,000 contacts on the distribution list.

5) The January 2004 issue announced the availability of the PRMP and summarized comments submitted on the DRMP; it was mailed to over 1,500 contacts on the distribution list.

6) The November 2004 issue announced the availability of the RMP and ROD; it was mailed to over 1,500 contacts on the distribution list.

## Public Review and Comment on the DRMP

The DRMP (BLM 2003c) was published on March 14, 2003. A notice of availability (NOA) was published in the *Federal Register* on that date, which notified the public of the availability of the DRMP. The NOA also solicited written public comments during the 90-calendar-day review period. The DRMP was available on the project Web site and at seven local public libraries. Three newspaper advertisements and a press release were issued to notify the public of the DRMP availability, to announce the three open houses, and to request public comments.

Copies of the DRMP were distributed to 266 parties, including elected officials, regulatory agencies, focus group members, and other members of the public. Approximately an additional 900 parties were notified of the availability of the DRMP via a directed mailing of the project newsletter. Eighty-nine additional parties received copies of the DRMP by request to the BLM. Most of these recipients were the same parties who had received a CD-ROM and were requesting a paper copy of the document. Therefore, in total, 282 parties received copies of the DRMP.

Open houses were held in the towns of Delta, Hotchkiss, and Montrose, Colorado, during the 90-day public review period of the DRMP. A total of 66 people attended the open houses.

The comment period closed on June 16, 2003. A total of 642 written submissions were received by the deadline. A total of 1,348 individual comments were made in the 642 submissions. All information received through these comments has been evaluated, verified, and incorporated into the PRMP, as appropriate.

About 23 percent of submissions (150 submissions) were unique in that they were not associated with a standardized form letter or postcard. A total of 492 (77 percent) of the 642 total submissions included two different "form" letters, which are letters identical or very similar in content. Some of these submissions included additional comments supplementing those in the standardized text.

## Distribution and Availability of the PRMP

An NOA was published in the *Federal Register* to notify the public of the availability of the PRMP. Newspaper advertisements and a press release also were issued. The PRMP was available via the project Web site and at seven local public libraries. All recipients of the DRMP, and all parties who submitted written comments on the DRMP (some of

BLM_0007468

whom are the same parties), were mailed the project newsletter announcing the availability of the PRMP. The newsletter was mailed to approximately an additional 900 contacts on the distribution list. In total, approximately 1,700 parties received notification of the PRMP availability. All focus group members and all parties who submitted non-form letter written comments on the DRMP were mailed copies of the PRMP.

A 30-day protest period was provided on the PRMP in accordance with 43 CFR 1610.5-2. See the "Land Use Plan Decisions" section above for information on these protests.

## Consultation with US Fish and Wildlife Service

In conformance with the Interagency Programmatic Section 7 Consultation Memorandum of Agreement (October 2000), the BLM initiated consultation with US Fish and Wildlife Service (USFWS) in June 2001 to request a list of species either federally listed or proposed for listing that may occur in the planning area. The BLM received USFWS response in July 2001. The BLM updated this list with USFWS' concurrence in March 2002 and again in October/November 2002. Species known to occur in the planning area were addressed in the planning process. In compliance with Section 7 requirements of the Endangered Species Act, the BLM prepared a biological assessment for the implementation of the RMP. It was submitted to USFWS in draft form in July 2003, USFWS comments were received in August 2003, and the revised and final biological assessment was submitted to USFWS in January 2004. The BLM received USFWS' concurrence with the biological assessment, which completes the informal Section 7 consultation process, on March 11, 2004.

## Native American Tribal Coordination

Federal law and regulation require coordination with federally recognized Native American tribes that may be interested in the planning area. Uncompahgre Field Office staff have coordinated with three Native American tribes via meetings, phone calls, e-mail messages, letters, and directed mailings of two project newsletters. Uncompahgre Field Office staff also have made presentations to Tribal councils and have escorted Tribal officials on planning area field visits. Three Native American tribes were notified of the DRMP and PRMP availability. No comments were received from Tribal officials on the DRMP or PRMP.

## Public Participation in RMP Implementation

The implementation and funding schedule to be completed following approval of the RMP will contain opportunities for public involvement in implementing RMP decisions.

## MANAGERS' RECOMMENDATION

Having considered a full range of alternatives, associated impacts, and public impact, I recommend adoption of the Gunnison Gorge National Conservation Area Resource Management Plan. The existing RMP for the Uncompahgre Field Office (BLM 1989) is hereby amended to reflect and incorporate the decisions in this RMP for the affected lands.


_Barbara Sharrow_          10/27/04

Barbara Sharrow                    Date
Field Manager
Uncompahgre Field Office
US Bureau of Land Management


_Karen D Tucker_  10/27/04

Karen Tucker                    Date
Manager
Gunnison Gorge National Conservation Area
US Bureau of Land Management

BLM_0007470

## STATE DIRECTOR APPROVAL

I approve the attached Gunnison Gorge National Conservation Area Resource Management Plan, as recommended. This document meets the requirements for a Record of decision provided in 40 CFR 1505.2 and for a resource management plan as described in 40 CFR 1610.0-5(k).

_Ron Wenker_        11/5/04

Ron Wenker                   Date
Director
Colorado State Office
US Bureau of Land Management

BLM_0007471

*This page intentionally left blank.*

BLM_0007472

# TABLE OF CONTENTS

Chapter                                                                                                    Page

LIST OF ACRONYMS ........................................................................................................................ v

1. INTRODUCTION ................................................................................................................ 1-1
    1.1   Location ................................................................................................................ 1-1
    1.2   Purpose of and Need for the Resource Management Plan ....................................... 1-2
    1.3   Planning Process .................................................................................................. 1-5
        1.3.1   Planning Themes and Issues ...................................................................... 1-5
        1.3.2   Planning Criteria ...................................................................................... 1-7
    1.4   Vision and Mission Statement ................................................................................ 1-9
    1.5   Goals and Objectives of the Resource Management Plan ........................................ 1-9
    1.6   Wild and Scenic Rivers Study Report ..................................................................... 1-11

2. APPROVED DECISIONS .................................................................................................... 2-1
    2.1   Introduction ......................................................................................................... 2-1
    2.2   Recreation Management in the Gunnison Gorge Wilderness .................................... 2-1
    2.3   Benefits-based Recreation Management in the Planning Area ................................... 2-2
    2.4   Management Units ................................................................................................ 2-3
    2.5   Approved Decisions .............................................................................................. 2-4

3. RESOURCE MANAGEMENT PLAN IMPLEMENTATION AND MODIFICATION ....................... 3-1
    3.1   Introduction ......................................................................................................... 3-1
    3.2   Requirements for further Environmental Analysis .................................................... 3-1
    3.3   Adaptive Management ........................................................................................... 3-2
    3.4   Monitoring ............................................................................................................ 3-2
    3.5   Resource Management Plan Modification ................................................................ 3-3
        3.5.1   Plan Maintenance ...................................................................................... 3-3
        3.5.2   Plan Amendments ..................................................................................... 3-3
        3.5.3   Plan Revision ........................................................................................... 3-4

4. LIST OF PREPARERS ......................................................................................................... 4-1

5. REFERENCES ................................................................................................................... 5-1

    GLOSSARY ........................................................................................................... Glossary-1

    INDEX ...................................................................................................................... Index-1

BLM_0007473

# TABLE OF CONTENTS *(CONTINUED)*

Chapter          Page

**APPENDICES**

| | | |
|---|---|---|
| A | Legislation | |
| B | BLM *Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado* | |
| C | Public Land Tracts Available or Unavailable for Disposal and Private Land Tracts Prioritized for Acquisition | |
| D | Area of Critical Environmental Concern Locations | |
| E | Oil and Gas Stipulations | |
| F | Distribution of RMP/ROD | |
| G | Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado – Goals, Objectives and Management Measures | |
| H | Data Management | |
| I | Final Wild and Scenic Rivers Study Report | |

# LIST OF FIGURES

Figure          Page

| | | |
|---|---|---|
| 1-1 | Project Location | 1-3 |
| 2-1 | Management Units | 2-5 |
| 2-2 | Recommended Utility ROW Corridors | 2-105 |
| 2-3 | OHV Designations | 2-107 |
| 2-4 | Designated Routes in Limited Areas | 2-109 |
| 2-5 | Visual Resource Management | 2-111 |
| 2-6 | Special Management Features | 2-113 |
| 2-7 | Recreation Management Zones | 2-115 |
| 3-1 | Adaptive Management Strategy | 3-3 |

BLM_0007474

# LIST OF TABLES

| Table | | Page |
|---|---|---|
| 1-1 | BLM Planning Process | 1-6 |
| 2-1 | Management Unit Acres and Values | 2-3 |
| 2-2.0 | Decisions and Management Objectives Common to All Planning Area Public Lands | 2-8 |
| 2-2.1 | Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit | 2-30 |
| 2-2.1a | Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions | 2-36 |
| 2-2.2 | Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit | 2-49 |
| 2-2.2a | Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions | 2-56 |
| 2-2.3 | Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit | 2-64 |
| 2-2.3a | Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions | 2-70 |
| 2-2.4 | Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit | 2-79 |
| 2-2.4a | Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone Decisions | 2-84 |
| 2-2.5 | Management Unit 5 (Native Plant Community ACEC/ONA) Decisions Applicable to Entire Management Unit | 2-87 |
| 2-2.5a | Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management Zone Decisions | 2-89 |
| 2-2.6 | Management Unit 6 Decisions Applicable to Entire Management Unit | 2-92 |
| 2-2.6a | Management Unit 6 Recreation Management Zone Decisions | 2-96 |
| 2-3 | Recommended Utility ROW Corridors on Public Lands | 2-103 |
| 2-4 | Birds of Conservation Concern for the Southern Rockies and Colorado Plateau | 2-104 |
| 4-1 | RMP Preparers | 4-1 |

BLM_0007475



*This page intentionally left blank.*

BLM_0007476

## LIST OF ACRONYMS

| Acronym or Abbreviation | Full Phrase |
|---|---|
| 2003 Act | Black Canyon of the Gunnison Boundary Revision Act of 2003 (Public Law 108-78, November 4, 2003) |
| ACEC | Area of Critical Environmental Concern |
| Act | Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (Public Law 106-76, October 21, 1999) |
| APD | application for permit to drill |
| APHIS | Animal and Plant Health Inspection Service (US Department of Agriculture) |
| ATV | all-terrain vehicle |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| CDOW | Colorado Division of Wildlife |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| CNHP | Colorado Natural Heritage Program |
| CO- | Colorado Highway |
| COA | conditions of approval |
| CSUS | controlled surface use stipulation |
| DRMP | Gunnison Gorge NCA Draft Resource Management Plan and Environmental Impact Statement |
| EIS | environmental impact statement |
| FLPMA | Federal Land Policy and Management Act |
| GIS | Geographic Information System |
| Gorge | Gunnison Gorge |
| Gunnison Forks | confluence of the Gunnison River and North Fork of the Gunnison River |
| IBA | Important Bird Area |
| kV | kilovolt |
| MBTA | Migratory Bird Treaty Act |
| MOU | Memorandum of Understanding |
| MU | management unit |
| National Park | Black Canyon of the Gunnison National Park |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |

BLM_0007477

# LIST OF ACRONYMS (continued)

| Acronym or Abbreviation | Full Phrase |
|---|---|
| NHPA | National Historic Preservation Act |
| NLCS | National Landscape Conservation System |
| North Fork | North Fork of the Gunnison River |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |
| OHV | off-highway vehicle |
| ONA | Outstanding Natural Area |
| Park Service | United States Department of the Interior, National Park Service |
| PL | Public Law |
| planning area | Gunnison Gorge National Conservation Area planning area |
| Pleasure Park | Gunnison River Pleasure Park (at Gunnison Forks) |
| PRMP | Gunnison Gorge NCA Proposed Resource Management Plan and Final Environmental Impact Statement |
| RAMP | Final Recreation Management Plan for the Gunnison Gorge Recreation Lands, Colorado |
| RAMP Addition | Addition to the Recreation Area Management Plan for the Gunnison Gorge Recreation Lands, Colorado |
| RMP | resource management plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | right-of-way |
| SRMA | Special Recreation Management Area |
| SRUP | Special Recreation Use Permit |
| TLS | timing limitation stipulation |
| Tri-State | Tri-State Generation and Transmission Association |
| US | United States |
| US- | United States Highway |
| USC | United States Code |
| US Forest Service | United States Department of Agriculture, Forest Service |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| USGS | United States Geological Survey |
| VRM | Visual Resource Management |
| Wilderness | Gunnison Gorge Wilderness |
| WSR Act | Wild and Scenic Rivers Act |

BLM_0007478

# CHAPTER 1
# INTRODUCTION

This Resource Management Plan (RMP) was prepared using United States (US) Department of the Interior, Bureau of Land Management (BLM) planning regulations and guidance issued under the authority of the Federal Land Policy and Management Act of 1976 (43 US Code [USC] 1701 *et seq.*) (FLPMA).

## 1.1   LOCATION

The Gunnison Gorge National Conservation Area (NCA) planning area (planning area) considered in this document totals about 196,000 acres in southwestern Colorado and is adjacent to the cities of Montrose and Olathe in Montrose County, and near the cities of Delta, Hotchkiss, and Crawford in Delta County (Figure 1-1). The planning area encompasses 95,781 acres of federal BLM-managed land, 99,743 acres of private land, and 666 acres at Sweitzer Lake State Park. The Black Canyon of the Gunnison National Park (National Park) is adjacent to but not within the planning area. Within the planning area, the NCA encompasses 62,844 acres of BLM-managed lands and 2,225 acres of private lands. The interior 17,784 acres of the NCA, encompassing the Gunnison Gorge (Gorge), is the Gunnison Gorge Wilderness (Wilderness). The Wilderness contains about 14 miles of the Gunnison River downstream of the National Park, and the NCA contains an additional eight miles of the Gunnison River downstream of the Wilderness boundary.

The remaining BLM-managed lands are adjacent to and outside the boundary of the NCA and include public lands in the Peach Valley and Flat Top area on the NCA's west and south boarder, and public lands on the east side of the Gunnison River in the Red Canyon and Fruitland Mesa areas.

Management measures outlined in the RMP apply only to BLM-managed land and water in the planning area; no measures have been developed for private or state lands. Given that private and state lands are interspersed with the BLM-managed lands, they are included because they could influence or be affected by management actions in this RMP.

BLM_0007479

## 1.2    PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

The RMP is being prepared to provide the BLM, Uncompahgre Field Office, with a comprehensive framework for managing the NCA, Wilderness, and other BLM-managed lands in the planning area. The purpose of the RMP is to develop a public, detailed document that defines management polices and actions on these lands. The RMP:

- Specifies where and under what circumstances particular activities will be allowed on public lands in the planning area;

- Updates the decisions and existing management policies for public lands in the NCA and the resource allocations affecting the NCA;

- Incorporates available new data;

- Resolves issues identified during public scoping;

- Integrates or modifies uses of public land that have occurred since the Uncompahgre Basin Resource Area RMP (BLM 1989) and other associated management/activity plans were completed;

- Provides public land management measures in accordance with the FLPMA and BLM's Land Use Planning Handbook, H-1601-1; and

- Analyzes stream segments in the NCA and planning area and considers their eligibility and suitability for inclusion in the National Wild and Scenic Rivers System (NWSRS), according to the US Department of the Interior and US Department of Agriculture *Final Revised Guidelines for Eligibility, Classification, and Management of River Areas* (Federal Register 1982), as amended, and current BLM guidelines and regulations.

The RMP is needed for the following two reasons:

(1) To comply with the Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (Public Law [PL] 106-76, October 21, 1999) (Act) and the Black Canyon of the Gunnison Boundary Revision Act of 2003 (PL 108-78, November 2003) (2003 Act) (Appendix A). The Act created the Gunnison Gorge NCA and Wilderness "to protect the resources within the Conservation Area" and requires that the BLM "develop a comprehensive plan for the long-range protection and management of the Conservation Area" within four years of designation. The 2003 Act expanded the boundary of the NCA to incorporate additional public lands.

(2) To comply with national and state BLM National Landscape Conservation System (NLCS) policy, all NCAs are required to have a stand-alone RMP that consolidates all land use plans and implementation or activity plans relevant to the planning area (BLM Instruction Bulletin No. 2001-022, February 22, 2002).

BLM_0007480



Roads and Trails
Rivers
County Boundaries
NPS and Other Non-BLM-Managed Federal Lands
Gunnison Gorge Wilderness
Gunnison Gorge NCA
Other BLM Lands
NPS Administrative Boundary
Planning Area
Private Land
Montrose County Landfill

The Gunnison Gorge NCA planning area covers approximately 96,000 acres of public land in Delta and Montrose counties, Colorado.

Source: BLM 2002k.

Tetra Tech, Inc.

**Project Location**
Gunnison Gorge NCA Planning Area, Colorado

**Figure 1-1**

1-3

BLM_0007481

Case No. 1:20-cv-02484-MSK   Document 28-1   filed 04/27/21   USDC Colorado   pg 364 of 422

*This page intentionally left blank.*

BLM_0007482

The existing RMP for the Uncompahgre Field Office (BLM 1989) will be amended to reflect and incorporate the decisions in this RMP for the affected lands. This RMP is a stand-alone land use plan for all BLM-managed lands in the NCA, Wilderness, and planning area.

A Record of Decision (ROD) and this Approved RMP were published following a 30-day protest period for the Proposed RMP/Final Environmental Impact Statement (EIS) (PRMP) (BLM 2004) and after the Governor's consistency review. This final, approved RMP provides guidance for the BLM's land use planning and resource management actions in the planning area over the next 15 to 20 years.

## 1.3   PLANNING PROCESS

The BLM follows a nine-step planning process, which is provided in Table 1-1, including critical timeframes for this RMP.

### 1.3.1   Planning Themes and Issues

A planning issue is defined as a matter of controversy, dispute, or general concern over resource management activities, the environment, or land uses. While planning issues drove the RMP, many other basic environmental and management issues are also addressed to provide comprehensive management guidance for all resources and to satisfy legal requirements.

The following six issue themes and sub-categories were developed to help guide the planning process. Throughout the process, the planning team referred to the list below to help focus on the most important questions to resolve during the planning process, at meetings, and during alternative formulation internally and with the focus group that was formed. In essence, each alternative, and the RMP, was charged to resolve these issues and concerns.

1. Preservation of Natural and Wilderness Resources of NCA and Wilderness

   - General

   - Terrestrial Wildlife

   - Vegetation

   - Riparian and Water Resources

   - Cultural Resources

   - Woodland Resources

   - Fire Management

BLM_0007483

**Table 1-1**
**BLM Planning Process**

| BLM Planning Process Step | Description | Timeframe |
|---|---|---|
| Step 1 – Planning Issues Identification | Issues and concerns are identified through a scoping process that includes the public, Indian tribes, other federal agencies, and state and local governments. | Completed March 2002 (see Section 1.3.1) |
| Step 2 – Planning Criteria Development | Planning criteria are created to ensure decisions are made to address the issues pertinent to the planning effort. Planning criteria are derived from a variety of sources including applicable laws and regulations, existing management plans, coordination of other agencies programs, and the results of public and agency scoping. The planning criteria may be updated and changed as planning proceeds. | Completed May 2002 (see Section 1.3.2) |
| Step 3 – Data and Information Collection | Data and information for the resources in the planning area are collected based on the planning criteria. | Completed September 2002 |
| Step 4 – Management Situation Analysis | The current management of resources in the planning area is assessed. | Completed September 2002 |
| Step 5 – Alternatives Formulation | A range of reasonable management alternatives that address issues identified during scoping is developed. | Completed December 2002 |
| Step 6 – Alternatives Assessment | The effects of each alternative are estimated. | Completed January 2003 |
| Step 7 – Preferred Alternative Selection | The alternative that best resolves planning issues is identified as the preferred alternative. | Completed January 2003 |
| Step 8 – Resource Management Plan Selection | First, a Draft RMP/EIS (DRMP) is issued and is made available to the public for a review period of 90 calendar days. After comments to the draft document have been received and analyzed, it is modified as necessary, and the Proposed RMP/Final EIS is published and made available for public review for 30 calendar days. A ROD is signed to approve the RMP. | DRMP: March to June 2003<br><br>PRMP: January 2004<br><br>ROD: November 2004 |
| Step 9 – Implementation and Monitoring | Management measures outlined in the approved plan are implemented on the ground, and future monitoring is conducted to test their effectiveness. Changes are made as necessary to achieve desired results. See Chapter 3 for detail. | Ongoing |

2. Management of People's Activities and Uses

- Private and Commercial Recreation Use
- Hunting
- Off-Highway Vehicle (OHV) Management
- Motorized River Craft
- Livestock Grazing Management
- Mineral Management and Valid Existing Rights

BLM_0007484

- Fuel Wood and Post Cutting

- Utility Corridors, Rights-of-Way, and Withdrawals

- Land Tenure

3. Integration of NCA Management with Other Agency and Community Plans

- Fisheries Management (Colorado Division of Wildlife [CDOW])

- Gunnison River Water Issues

- Emergency Services (Delta County Sheriff, Montrose County Sheriff, and US Department of the Interior, National Park Service [Park Service])

- Tourism Management

4. Facilities and Infrastructure Needed to Provide Visitor Services and Administration

5. Management of Transportation and Access

6. Consideration of Private Property in the Planning Area

### 1.3.2  Planning Criteria

Planning criteria identify the legal, policy, and regulatory constraints that direct or limit BLM's ability to resolve issues. They also help guide the development of alternatives. Planning criteria are based on standards prescribed by applicable law and regulations, agency guidance, analysis of information pertinent to the planning area, the result of coordination with the public, government agencies, and Native American tribes, and professional judgment.

Draft planning criteria were completed following the open houses held in February 2002. BLM solicited public comment on the draft criteria between April 19 and May 20, 2002. No comments were received, so the criteria became proposed criteria. They have since been finalized and are as follows:

- The RMP will be completed in compliance with FLPMA and all other applicable laws. It will meet the requirements of the Act (PL 106-76), designating the NCA to protect the NCA's natural resources and outstanding recreation opportunities.

- The personnel involved with the RMP process will work cooperatively with the State of Colorado, tribal governments, county and municipal governments, other federal agencies, and all other interested groups, agencies, and individuals. Public participation will be encouraged throughout the process.

- The RMP will establish the guidance that the BLM will rely on in managing the resources and values in the NCA and planning area.

- The planning process will include an EIS that will comply with standards of the National Environmental Policy Act of 1969 (NEPA).

BLM_0007485

- The RMP will emphasize the protection and enhancement of the NCA's biodiversity while at the same time providing the public with opportunities for compatible recreation activities.

- The Gunnison Gorge Wilderness is a pilot site for the National Fee Pilot Demonstration Program. Since 1988, user fees have been charged for all commercial and private walk-in and boating use in the area. Fees will continue to be charged under the authority of the Fee Demo Program.

- Under the RMP, valid existing rights within the NCA will be recognized, and how valid existing rights are verified will be reviewed. The RMP will also include an outline of the process the BLM will use to address applications or notices filed on existing claims or other land use authorizations after the completion of the RMP.

- The lifestyles and concerns of area residents, including the activities of grazing and hunting, will be recognized in the RMP.

- The RMP will address boundary adjustments to the NCA. The NCA legislation states that the Secretary of the Department of the Interior may make revisions to the boundary of the NCA following acquisition of land necessary to accomplish the purposes for which the NCA was designated.

- Any lands within the NCA's administrative boundary that are acquired by the BLM to accomplish purposes for which the NCA was designated will be managed consistent with the RMP, subject to any constraints associated with the acquisition.

- The RMP will recognize the State of Colorado's responsibility to manage wildlife on BLM-managed lands in Colorado. BLM, in accordance with the NCA legislation, will consult with the CDOW before establishing no-hunting zones or periods to protect public safety, administration, or public use and enjoyment.

- The RMP will address transportation and access and will identify where better access is warranted, where access should remain as is, and where decreased access is appropriate to protect NCA resources and to manage visitation.

- The management of livestock grazing is regulated by laws and regulations other than the NCA legislation. The RMP will incorporate the Colorado Rangeland Health Standards and Guidelines for livestock grazing management. The RMP will outline a strategy for ensuring proper grazing practices are followed within the NCA.

- The RMP will incorporate the Colorado BLM Guidelines for Recreation Management. It will outline a strategy for ensuring that proper recreation management practices are followed within the NCA.

- The planning process will involve Native American tribal governments and will provide strategies for protecting recognized traditional uses.

BLM_0007486

- Decisions in the RMP will strive to be compatible with the existing plans and policies of adjacent local, state, and federal agencies as long as the decisions are in conformance with the NCA legislation, other laws and regulations, and applicable other legal or regulatory guidance.

## 1.4   VISION AND MISSION STATEMENT

The following mission statement was prepared early in the planning process by the citizen/agency focus group, in collaboration with the BLM, to provide an underlying vision for managing the NCA and associated planning area:

"The BLM will manage the NCA to protect the resources in accordance with the designating legislation, FLPMA, the Wilderness Act of 1964, as amended, and other applicable provisions of law. The BLM will incorporate multiple uses to the extent that important resources are protected and the combination of uses takes into account the long-term needs of future generations for renewable and nonrenewable resources. The purpose of the planning effort is to establish an integrated guiding plan for future site-specific analysis and decisions that maintains or improves existing conditions to meet or exceed Colorado BLM Land Health Standards."

## 1.5   GOALS AND OBJECTIVES OF THE RESOURCE MANAGEMENT PLAN

The Act provides overall guidance, management objectives, and legal mandates that must be incorporated into the RMP. Key provisions or objectives in the Act that are important to the general management of the NCA and Wilderness state the following:

- The NCA shall be managed by the BLM to protect the resources in accordance with the legislation, the FLPMA; and other applicable provisions of law. The Act specifically refers to the area's "exceptional multiple use opportunities" and "natural, cultural, scenic, wilderness, and recreational resources" and mandates their protection.

- Subject to valid existing rights, all NCA lands are withdrawn from all forms of entry, appropriation, or disposal under the public land laws; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing.

- Hunting and fishing is permitted within the NCA in accordance with applicable federal and state laws, with the exception that the BLM, in conjunction with CDOW), may designate no hunting zones for reasons concerning public safety, administration, or public use and enjoyment.

- In addition to the use of motorized vehicles on established roadways, the use of motorized vehicles in the NCA shall be allowed to the extent that use is compatible with OHV designations as described in the management plan in effect on the date of the Act's enactment. (This refers to the OHV designation areas depicted in the 1985 Final Recreation Management Plan for the Gunnison Gorge Recreation Lands Colorado [RAMP] [BLM 1985], Addition to the Recreation Area Management Plan for the Gunnison

BLM_0007487

Gorge Recreation Lands, Colorado [RAMP Addition] [BLM 1988a], and Uncompahgre Basin RMP [BLM 1989a]. The Act recognizes that recreational and other uses of motorized vehicles are some of many multiple uses occurring on public lands in the NCA.)

- Boundary revisions may be made to the boundary of the NCA following acquisition of land necessary to accomplish the purpose for with the NCA was designated.

In regard to the RMP, the Act specifies that the management plan do the following:

- Describe the appropriate uses and management of the NCA in accordance with the Act.

- Incorporate appropriate decisions contained in any management plan or activity for the area completed prior to the enactment date.

- Incorporate appropriate wildlife habitat management plans or other plans prepared for lands within or adjacent to the NCA.

- Be prepared in close consultation with appropriate federal, state, county, and local agencies.

- May use information developed prior to the date of the enactment of this Act in studies of the land within or adjacent to the NCA.

- Be transmitted to the Committee on Energy and Natural Resources of the Senate, the Committee on Resources of the House of Representatives not later than 4 years after the date of enactment (October 21, 2003).

In regard to the Gunnison Gorge Wilderness within the NCA, the Act states the following:

- Subject to valid existing rights, the Wilderness shall be administered by the BLM in accordance with the Wilderness Act (16 USC 1131 *et seq.*).

- The jurisdiction or responsibilities of the State of Colorado with respect to wildlife and fish on the public lands within the Area will not be affected by the Act.

- No expressed or implied reservation of water for any purpose was created by the Act, and water rights in existence prior to the enactment date are not affected by the Act.

- Any new water right determined necessary for purposes of the Act must be established under the procedures and substantive requirements of Colorado law.

- The approximate 300-acre parcel in the southern portion of the former Gunnison Gorge Wilderness Study Area is released from section 603 of FLPMA and is no longer subject to management under "wilderness suitability" requirements set forth under section 603(c) of that Act. The

BLM_0007488

Act also incorporates this parcel into the non-wilderness portion of the NCA.

Additional management goals for the Gunnison Gorge Wilderness from the BLM Wilderness Policy are as follows:

- To provide for the long-term protection and preservation of the area's wilderness character under a principle of nondegradation. The area's natural condition, opportunities for solitude, opportunities for primitive and unconfined types of recreation, and any ecological, geological or other features of scientific, educational, scenic, or historical value present will be managed so that they will remain unimpaired.

- To manage the area for the use and enjoyment of visitors in a manner that will leave the area unimpaired for future use and enjoyment as wilderness. The wilderness resources will be dominant in all management decisions where a choice must be made between preservation of the wilderness character and visitor use.

- To manage the area using the minimum tool, equipment, or structure necessary to successfully, safely, and economically accomplish the objectives. The chosen tool, equipment, or structure should be the one that least degrades wilderness values temporarily or permanently. Management will seek to preserve spontaneity of use and as much freedom from regulation as possible.

- To manage nonconforming but acceptable uses permitted by the Wilderness Act and subsequent laws in a manner that will prevent unnecessary or undue degradation of the area's wilderness character. Nonconforming uses are the exception rather than the rule; therefore, emphasis is placed on wilderness character.

## 1.6    WILD AND SCENIC RIVERS STUDY REPORT

The Revised Final Wild and Scenic Rivers Study Report for the planning area is included as Appendix I. The report makes final the BLM's examination of planning area river segments as they relate to Wild and Scenic Rivers Act (WSR Act) eligibility, classification, and suitability criteria for planning area river segments' potential inclusion in the NWSRS.

In reviewing planning area streams to determine which, if any, should be considered in the inventory processing accordance with the WSR Act, 26 river segments were initially considered. Of these, four river or stream segments were determined eligible and suitable for inclusion in the NWSRS. The 16-mile segment of the Gunnison River (including the entire portion of the river within the Wilderness and downstream to the transmission line located south of the North Fork of the Gunnison River [North Fork]) is suitable as a wild and scenic river under the Wild classification. Similarly, the 6-mile segment of the Gunnison River from the transmission line to the Relief Ditch diversion is suitable under the Recreational classification. The 4.2-mile segment of Red Canyon

BLM_0007489

and the 2-mile segment of Smith Fork Creek on BLM-managed lands are suitable under the Scenic classification.

Neither the end product of the BLM planning process nor the Revised Final Wild and Scenic Rivers Study Report (Appendix I) means that any stream segment studied is, or will be, automatically designated into the NWSRS. There are only two methods by which potential stream or river segments are included into the NWSRS: Congress can designate these segments into the NWSRS, or such designation can occur by a state Governor's recommendations that is confirmed by the Secretary of the US Department of the Interior. Congress will ultimately choose the legislative language if any of the segments in the PRMP and Revised Final Wild and Scenic Rivers Study Report (Appendix I) comes before them. Water-protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed.

BLM_0007490

# CHAPTER 2
# APPROVED DECISIONS

## 2.1   INTRODUCTION

This chapter describes the decisions approved by the ROD for the Gunnison Gorge NCA RMP.  This chapter consists of Land Use Planning decisions, Implementation decisions, and administrative actions that will be taken over the life of the RMP.  See pages R-1 and R-2 in the ROD and Section 2.5 in this chapter for more information on Land Use Planning and Implementation decision types.  Other than the format used, this chapter is nearly identical to the PRMP (BLM 2004), which was essentially the Agency Preferred Alternative, Alternative D, from the DRMP (BLM 2003c), with changes reflecting public comment, collaboration during the preparation of this RMP, and BLM's internal comments and analysis of the entire DRMP and PRMP.

The objective of the RMP decisions in Section 2.5 is to maximize diversity of multiple uses, including human activities and opportunities, while meeting or exceeding land health standards.  Areas of public land in the planning area will be prioritized for land health standard improvement or enhancement. Lands will be managed for non-motorized and motorized activities in a variety of settings. Areas for open, cross-country, off-route motorized and mechanized (e.g., mountain bicycle) activities will be allocated. A moderate and adequate amount of control will be exercised on motorized vehicular activities, and additional control will be exercised in some areas. Some human uses will be limited in some areas to recognize natural and other values. In the Wilderness and beyond, commercial and noncommercial (private) Gunnison River recreation will be analyzed to determine needed changes to meet Wilderness criteria and human satisfaction levels.

## 2.2   RECREATION MANAGEMENT IN THE GUNNISON GORGE WILDERNESS

The RMP recommends that current management be continued in the Gunnison Gorge Wilderness, which is Management Unit 1, until completion of a collaborative process that will more-thoroughly resolves issues of commercial and noncommercial recreation use, primarily boating, in the Wilderness. Such a collaborative process will involve the pubic, including those individuals, agencies, groups, and organizations that participated

BLM_0007491

in the planning process. Based on the amount of information available and public comment received on the DRMP (BLM 2003c), the BLM believes this approach to be the best method of resolving issues discussed during the more than seven-month collaboration process in 2002 and 2003. This approach will permit the necessary extensive analysis of resource information, visitor use data on hand (and to be gathered), and visitor survey results. The approach will also permit the necessary depth of consideration that could be given to the questions of how, when, and where to manage future commercial and noncommercial uses in the Wilderness to determine if changes in current management will be truly necessary to maintain and enhance Wilderness values. As part of the future collaborative process, a monitoring system will be developed to measure indicators such as customer satisfaction, resource conditions, and campsite conditions, among others, in order to determine when additional changes will be needed to achieve Wilderness management objectives. This depth of analysis and these outputs and outcomes can best direct continual improvement in management. See the decisions in Tables 2-2.1 and 2-2.1a for more specific information.

## 2.3    BENEFITS-BASED RECREATION MANAGEMENT IN THE PLANNING AREA

Public lands in the planning area, NCA, Wilderness, and beyond encompass a wide variety of settings that provide a great diversity of benefits to users and inhabitants of the area. Users include recreationists and traditional users (such as ranchers). Users can derive monetary benefit from their activities and nonmonetary value, such as solitude, wildlife viewing, and resource protection. The benefits-based recreation component of this RMP goes beyond the traditional approach of managing each component of the ecosystem separately. It recognizes that each component of the ecosystem has some effect on human and nonhuman elements.

Benefits as defined in this RMP are changes that are viewed to be advantageous, or improvements in psychological or physiological condition of individuals, groups, society, or another entity such as an endangered species; the prevention of worse conditions; and realization of desired and satisfying on-site psychological experiences. The objectives of management unit prescriptions are thus designed to deliver benefits for the major components addressed in this RMP, including, but not limited to, the recreation experience, vegetation, soil, water, air, wildlife, and cultural resources.

Public lands in the planning area will be managed to deliver benefits by providing opportunities for visitors to engage in a variety of activities in a variety of physical, social, and managerial settings. A range of opportunities, experiences, and beneficial outcomes will be provided in their appropriate settings with the goal of optimizing net benefits to visitors and affected residents, their communities, and the environment. Recreation decisions in this RMP are more detailed and specific as a result of integrating the benefits-based process. Recreation decisions specific to each management unit are shown in a separate, different tabular format than other decisions, in order to display the recreation management actions the BLM will implement to achieve desired future conditions and provide targeted established benefits, values, settings, and experiences.

### 2.4  MANAGEMENT UNITS

The planning area has been divided into six management units based on a particular geographic area's public land resources, uses, and values and relative to the goals and objectives of the RMP (see Section 1.5). Management unit prescriptions are derived from the Preferred Alternative (Alternative D) of the DRMP (BLM 2003c) and the PRMP (BLM 2004), with changes made as a result of public comment and internal review. The size, number, and configuration of the management units in this RMP are identical to those in the PRMP. Table 2-1 lists the acres in each management unit. Figure 2-1 depicts management unit boundaries, land ownership, and other features in the planning area.

**Table 2-1**
**Management Unit Acres and Values**

| Management Unit | Acres of Public Land | Percentage of Planning Area[1] | Important Values, Resources, or Land Uses |
|---|---|---|---|
| 1 | 17,784 | 19 | Protect Wilderness (Gunnison Gorge Wilderness) |
| 2 | 9,754 | 10 | Enhance natural, scenic, and recreational values (Flat Top-Peach Valley OHV Recreation Area) |
| 3 | 13,502 | 14 | Protect and enhance riparian and recreation resources (Gunnison and North Fork Rivers Special Recreation Management Area [SRMA]) |
| 4 | 22,200 | 23 | Protect Gunnison sage-grouse *(Centrocercus minimus)*, elk *(Cervus elaphus)*, and mule deer *(Odocoileus hemionus)* winter concentration (Gunnison Sage-Grouse Area of Critical Environmental Concern [ACEC]/Important Bird Area [IBA]) |
| 5 | 3,785 | 4 | Protect native plants (Native Plant Community ACEC/Outstanding Natural Area [ONA]) |
| 6 | 28,755 | 30 | Provide for multiple use under common management |

[1] This value is the percentage of public land (surface estate) in the planning area that is located in each management unit.
Source: BLM 2002k.

Although each management unit will be managed under the multiple-use concept, in some cases the most outstanding resources, resource uses, or values in a unit will be given significant consideration to protect those specific qualities. Thus, the decisions for management unit prescriptions may place constraints on some resources, uses, or values within a unit. In most cases, these other resources will be managed to the extent that such management will be compatible with the more significant resources, uses, or values in a unit. In addition, future proposals will be evaluated in the context of each management unit prescription. Planning area public lands where no particular resource, use, or value is outstanding comprise Management Unit 6. Any differences in acres in the RMP/ROD, the PRMP, and the Preferred Alternative (Alternative D) in the DRMP are the result of the peculiarities of the Geographic Information System (GIS) system used.

BLM_0007493

## 2.5   APPROVED DECISIONS

Table 2-2 contains the decisions in this approved RMP and is comprised of the following sub-tables:

Table 2-2.0   Decisions and Management Objectives Common to All Planning Area Public Lands

Table 2-2.1   Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit

Table 2-2.1a   Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions

Table 2-2.2   Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit

Table 2-2.2a   Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions

Table 2-2.3   Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit

Table 2-2.3a   Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions

Table 2-2.4   Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit

Table 2-2.4a   Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone Decisions

Table 2-2.5   Management Unit 5 (Native Plant Community ACEC/ONA) Decisions Applicable to Entire Management Unit

Table 2-2.5a   Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management Zone Decisions

Table 2-2.6   Management Unit 6 Decisions Applicable to Entire Management Unit

Table 2-2.6a   Management Unit 6 Recreation Management Zone Decisions

All sub-tables associated with Table 2-2 consist of Land Use Planning decisions, Implementation decisions, and administrative actions that will be taken over the life of the RMP. The Land Use Planning and Implementation decision types are differentiated in Table 2-2 sub-tables to clearly identify the two decision types. These include decisions that were subject to protest (land use planning decisions) following publication of the PRMP, and decisions that are subject to possible appeal (implementation decisions) to the Interior Board of Land Appeals during the 30-day period following *Federal Register* publication of the Notice of Availability of this RMP/ROD.  Refer to the ROD for more information regarding the protest and appeal processes.

BLM_0007494



The RMP designates different management units on public lands in the planning area.

**RMP Management Units**

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

**Figure 2-1**

2-5

*This page intentionally left blank.*

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007496

The decisions in the Table 2-2 sub-tables have been edited slightly since the PRMP (BLM 2004) to remove duplication and ambiguity and to place decisions in the proper management unit. Some decisions have been combined to clarify the full intent of the decision. No decisions in the PRMP have been changed regarding the end result of their implementation.

If not specifically mentioned, and unless modified within the specific management unit prescriptions in Table 2-2, resources/resource uses and programs on planning area public lands will be managed according to the decisions in Table 2-2.0 (Decisions and Management Objectives Common to All Planning Area Public Lands). However, decisions in the six management unit prescriptions do, in some instances, modify the Decisions and Management Objectives Common to All Planning Area Public Lands.

BLM_0007497

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands**
(If not specifically mentioned, and unless modified within the following management unit decisions,
resources/resource uses and programs on public lands will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| General | GEN-C-1 | Public lands will be managed in accordance with the *Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado* (BLM 1997d) (Appendix B). All areas not meeting land health standards will be improved and will be prioritized for improvement based on each area's improvement potential. Pilot restoration projects will be developed in areas where there is potential and it is feasible to protect them. | |
| | GEN-C-2 | Using available research and resource information BLM, will identify areas suitable for restoration, set priorities for restoration efforts, and pursue funding to complete restoration projects.  BLM will collaboratively partner with private landowners and others to accomplish the goals and objectives of this plan. | |
| | GEN-C-3 | The BLM will continue to coordinate where appropriate and as needed with the Park Service, CDOW, and other agencies. | |
| | GEN-C-4 | Where applicable, projects will incorporate accessibility, energy efficiency/conservation, security, and seismic design. Projects will utilize, wherever possible, construction, landscaping, and transportation products and other items that are made with recovered materials and designated in the US Environmental Protection Agency's Comprehensive Procurement Guideline. | |
| Lands, Rights-of-Way, and Withdrawals | LAND-C-1 | Lands will be acquired on an as-needed, willing-buyer/willing-seller basis to implement management objectives and will be done in accordance with FLMPA and BLM criteria. Nonfederal lands in the NCA and Fruitland Mesa area that are necessary to facilitate recreation, wildlife, and livestock values will be acquired. See Appendix C for a list of areas or tracts where acquisition of private lands will be a priority. | |
| | LAND-C-2 | Per the Plan Amendments to the ROD and Uncompahgre Basin RMP (BLM 2002a), BLM will consider 14 tracts of public land (approximately 987 acres) for disposal through sale or exchange, not including lands in the NCA, Wilderness, and the Fairview ACEC/Research Natural Area (RNA).  Lands being considered for disposal will be examined for the presence of new information, values, or features that would possibly render the disposal of specific tracts invalid.  Prior to disposal, resources within identified tracts will be managed according to the management prescription for the management unit in which they are located. All laws will be complied with on these lands, including the Endangered Species Act and those applicable to cultural and historical resources.  Minimal funds, if any, will be spent on improvements on these lands. Federal mineral estate will be conveyed with surface estate where it would be in the public interest. | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007498

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals *(continued)* | LAND-C-3 | BLM will retain in federal ownership the remaining public lands managed by BLM (Category II lands), but these lands will be considered for disposal on a case-by-case basis through disposal means other than public sale, such as exchanges. | |
| | LAND-C-4 | In the NCA and Wilderness, the following will be prohibited: all forms of entry, appropriation, or disposal under the public land laws. | |
| | LAND-C-5 | Public lands in the planning area will be available or unavailable for disposal per Appendix C. Special management areas will be unavailable for disposal. | |
| | LAND-C-6 | Several right-of-way (ROW) corridors, generally one-half mile in width, will be designated on public lands in the planning area and NCA. Table 2-3 (see end of this chapter) describes these designated corridors, and Figure 2-2 (see end of this chapter) shows the general location of each. The BLM will encourage future applicants proposing new or upgraded linear utility and other projects to locate facilities within these ROW corridors. See the description of affected management units for additional information and management regarding these recommended corridors. BLM will encourage use of potential, recommended, or designated ROW corridors and ROW Use Areas to the extent possible. However, depending on site-specific needs, actual locations may vary. Use of these areas and variances to these locations will be considered, provided such locations and uses are consistent with the prescriptions for the affected management unit(s) and the objectives for ROW corridors and ROW Use Areas. | |
| | LAND-C-7 | BLM will work with user groups and private landowners in the planning area to resolve vehicular and other trespass situations involving use and occupancy occurring on public lands. | |
| | LAND-C-8 | Approximately five acres of public lands on Green Mountain and ten acres on Flat Top Mesa will be designated as low-power communication sites (Figures 2-1 and 2-2). A detailed site and landscaping plan will be developed before authorizing any additional uses at the Green Mountain and Flat Top Communication Sites, and visual impacts of existing uses will be mitigated where possible. Fencing will be required at all sites for security. Construction, materials, or structures on the sites will not create strong visual contrasts as seen from the National Park, NCA, or Wilderness areas. Future applicants will collaborate with BLM and Park Service to develop the proposed action during the application process and to mitigate the visual impacts. Each future additional application for use will be accompanied by a simulation visual analysis and visual impact determination as seen from to-be-selected critical viewing points, in order to assess the actual visual impacts of the proposal and alternatives. All future uses at the Green Mountain and Flat Top Communication Sites will not interfere with the uses currently authorized at the time new applications are received. | |

BLM_0007499

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*

(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals *(continued)* | LAND-C-9 | On public lands in the planning area outside the Wilderness, the BLM will cooperate with the US Department of the Interior, Bureau of Reclamation (BOR) to acknowledge and document the agency's existing facilities and access needs for maintenance and operation of these facilities under the appropriate authority, e.g., withdrawals and ROWs. BLM will request adequate information to process for the appropriate documentation, analysis, and authorizations for the facilities.  See decisions in Management Unit 6 regarding public lands withdrawn to BOR and OHV uses. | |
| | LAND-C-10 | On public lands in the planning area outside the Wilderness, the BLM will acknowledge and document the Uncompahgre Valley Water Users Association and BOR's existing facilities and access needs for maintenance and operation of these facilities on public lands, under the appropriate authority, such as withdrawals and ROWs, when the BLM receives adequate mapping and other information to process the appropriate authorizations for the facilities.<br><br>The BLM will recommend changes to the BOR in any existing withdrawals that are deemed not necessary for the purposes of the existing facilities. | |
| | LAND-C-11 | The BOR has recommended the full revocation of its Fruitland Mesa Project Withdrawals; BLM action on that recommendation is pending. If the BOR withdrawal were revoked, the public lands will be managed according to the prescriptions in the management unit in which the withdrawal is located. | |
| | LAND-C-12 | The BLM will recommend that the planning area be closed to development of water power and storage reservoir sites. The recommendation will not restrict any proposals from being considered on public lands for linear ROWs associated with water pipelines or other purposes, unless precluded by some other law, regulation, or policy. | |
| | LAND-C-13 | On public lands withdrawn to the BOR, BLM will undertake no management activities that would preclude or adversely affect use of the land for BOR purposes (Sections 5A and 5B) (BLM and BOR 1983). | |
| | LAND-C-14 | Newly acquired or administered lands or interests in lands will be managed for their highest potential or for the purposes for which they are acquired. For example, lands acquired within "Special Management Areas" with Congressional designations or RMP allocation/direction will be managed in conformance with guidelines for those areas. If lands with unique or fragile resource values are acquired, it may be appropriate to protect those values until the next plan revision. | |

BLM_0007500

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | Land Use Planning Decision | | Implementation-level Decision |
|---|---|---|---|
| **Lands, Rights-of-Way, and Withdrawals** *(continued)* | **LAND-C-14** *(continued)* | Lands acquired with no identified special values or management goals will be managed in the same manner as surrounding or comparable BLM-administered lands. This implies recreation management, project applications and implementation, livestock grazing, fuelwood management, management of the mineral estate, standard operating procedures and pre-committed mitigation measures. | |
| **Access and Transportation** | **TRAN-C-1** | Road improvements such as culverts and bridges will be implemented as necessary to reduce erosion and proliferation of roads. | |
| | | Roads will be maintained as necessary to protect resources. | |
| | **TRAN-C-2** | Easements and necessary access will be secured on an as-needed, willing-buyer/willing-seller basis for improved administration, user access, and safety, and to implement management objectives. | |
| | | Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands. These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management. | |
| | **TRAN-C-3** | Access will be available for all land use authorization holders and those authorized to have vehicular access according to the conditions and terms of the applicable permit or authorization. | |
| | **TRAN-C-4** | Designated routes will be further refined with the assistance of a BLM/citizen work group | **TRAN-C-5**<br><br>Unless otherwise noted in the RMP, motorized and non-motorized, mechanical vehicular travel and use will be allowed only on the designated routes shown on Figure 2-4 (see end of this chapter). The routes shown are preliminary and may not be all-inclusive. |
| **Geology, Soils, and Water Resources** | **GEO-C-1** | US Geological Survey (USGS) research will be conducted in the Mancos shale soils that comprise the western edge and southern portions of the planning area to determine the level of impacts from multiple uses in the area. The USGS and other research will concentrate on sediment, Selenium, and salinity production and off-site impacts on water quality. It will also address user impacts in relation to these and determine ways to manage or mitigate impacts. | |
| | | Adaptive management from research results will be applied. | |

BLM_0007501

**Table 2-2.0**

**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*

(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Geology, Soils, and Water Resources *(continued)* | GEO-C-2 | Areas of highly erosive or fragile soils, including biological soil crusts, will be protected. | |
| | | Soils will be managed to minimize accelerated erosion, salinity and selenium yields, compaction, and contamination. | |
| | | Actions will be employed to minimize soil erosion and water quality deterioration and will be required in all plans for surface-disturbing activities. | |
| | GEO-C-3 | Soil and water resources will, in association with land health analyses, continue to be monitored to define problem areas, develop management strategies, and determine effectiveness of solutions. | |
| | | Vegetation treatments designed and managed to increase plant basal cover, thereby reducing erosion, could be implemented on soils that exhibit accelerated erosion rates. | |
| | GEO-C-4 | In cooperation with the USGS and others, BLM will develop a list of best management practices that will, along with other guidelines, serve as tools for managing water and soil resources in the NCA and planning area. The following will be used as references and resources, at a minimum: "Best Management Practices for Agriculture and Silviculture" (November 1988), "Best Management Practices for Urban and Construction Runoff" (March 1993, Water Quality Control Division in coordination with the Colorado Nonpoint Source Task Force), and "Best Management Practices for Agriculture in the Uncompahgre Valley" (produced in July 1996 by the Uncompahgre Valley Best Management Practices Decision Committee, published by Shavano Soil Conservation District/Colorado State University Cooperative Extension). | |
| Minerals and Energy Resources | MIN-C-1 | All federal mineral estate in the NCA and Wilderness will continue to be withdrawn from all forms of mineral entry, location, entry, and patent under the mining laws. In addition, certain lands outside the NCA boundary are likewise withdrawn and will not be available for these mineral activities. | |
| | MIN-C-2 | Disposal of saleable mineral material on federal mineral estate will not be permitted in the NCA and Wilderness. | |
| | MIN-C-3 | Disposal of mineral materials from specific areas outside the NCA and Wilderness will be permitted unless prohibited in a management unit prescription. | |
| | | Disposal of mineral materials where not prohibited will be discretionary with the authorizing official and will be determined on a case-by-case basis. | |
| | | Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal. | |

BLM_0007502

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** (continued)
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Minerals and Energy Resources** (continued) | **MIN-C-4** | Federal mineral estate in areas outside the NCA and Wilderness not under withdrawal will be open to entry and location under the general mining laws, including recreational panning. | |
| | **MIN-C-5** | Plans of operation will be required for proposed locatable mineral activity authorized by BLM's surface management regulations on the following lands:  1) lands closed to OHV travel and 2) lands within designated ACECs.<br><br>BLM will conduct validity examinations on all mining claims located within the NCA or on any lands withdrawn from mineral entry. | |
| | **MIN-C-6** | Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions. Split-estate lands are private or other non-federal surface estate overlying federal mineral estate.<br><br>Other special stipulations and conditions for leasing of federal mineral estate, such as no surface occupancy (NSO) stipulation and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply. See Appendix E for the special stipulations that will be applied to oil and gas leases on federal mineral estate in the planning area for certain resources, features, or values that could be found on public lands during examinations or exploration of public land prior to leasing. | |
| | **MIN-C-7** | Additional conditions consistent with lease terms will be considered when BLM processes and develops mitigation for operational field applications.  Operational field applications and activities include Applications for Permit to Drill (APDs), Sundry Notices, applications for ROWs, and Notices of Intent (NOIs) for geophysical operations.<br><br>Additional environmental documentation will be required if a request for an exception, waiver, or modification to a lease stipulation is made by an oil and gas lessee, if the request has not been analyzed and addressed already, for example while processing an APD.   See Appendix E for special stipulations and conditions for leasing on both federal surface and split-estate lands, and for an explanation of how stipulations assigned to split-estate lands will be applied, reviewed, waived, modified, or excepted, based on verification of surface and mineral estate resource information by BLM during review of APDs. | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007503

Table 2-2.0
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Minerals and Energy Resources *(continued)* | MIN-C-7 *(continued)* | The most reasonable foreseeable level of oil, gas, and geothermal development in the planning area will involve a maximum of one to ten APDs during the life of the plan, with an estimated total of from 10 to 30 acres of surface disturbance. See Appendix E for a description of typical oil and gas development and operation standards and procedures. | |
| | MIN-C-8 | If applications for coalbed methane development were received within the planning area, an analysis of potential impacts on Gunnison sage-grouse from West Nile Virus will be conducted. | |
| Water Resources | WTR-C-1 | If the historical flow regime the Gunnison River through the Gorge changes significantly, BLM could amend the management measures outlined in this plan to accommodate different peak flows, shoulder flows, and base flows. (The BLM recognizes that the historical flow regime of the Gunnison River through the Gorge could change as a result of the water right application filed January 17, 2001, for Black Canyon of the Gunnison National Park, located upstream of the Gunnison Gorge Wilderness). | |
| | WTR-C-2 | All areas not meeting land health standards, including areas in Elephant Skin Wash impacted by livestock grazing, OHV, and other surface-disturbing activities, will be reclaimed where necessary to meet land health standards. | |
| | WTR-C-3 | Water source developments in fair, poor, or abandoned condition will be maintained, improved, or reclaimed. Stream improvements to benefit fisheries and other aquatic/riparian values will be allowed outside the Wilderness. Actions, including best management practices, will be employed to reduce soil erosion and water quality deterioration and will be required in all plans involving surface disturbance. A primary objective of studies and management will be to limit sediment, salinity, and selenium production related to user impacts, primarily targeted at improving off-site water quality. | |
| | WTR-C-4 | BLM will inventory water sources that have not yet been adjudicated and will seek to acquire water rights for livestock use, wildlife watering, wildlife forage and cover, and recreation use on those sources under procedural and substantive provisions of Colorado water law. (The BLM currently holds state-based water rights on a majority of point water sources within the NCA and Wilderness, including springs, livestock tanks, and reservoirs). | |
| | WTR-C-5 | Gunnison Forks Spring and Caliente Spring water sources within the planning area will be re-inventoried (flow rates in the original inventory were very low) to determine if they are suitable for water rights filing. | |
| | WTR-C-6 | BLM will identify future water needs to accommodate landscape rehabilitation projects, including the need for water-supply wells and sanitation stations. | |

BLM_0007504

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** (continued)
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Water Resources (continued) | WTR-C-7 | All livestock tanks on BLM's list of planning area water sources will be examined to ensure livestock tank permits have been filed on them. | |
| | WTR-C-8 | The BLM will not recommend any river or stream segment for NWSRS designation in the RMP or the Revised Final Wild and Scenic Rivers Study Report (Appendix I). The BLM does not hold any water rights for flows in the Gunnison River or other streams in the NCA.<br><br>The BLM does not believe that assertion of a federal water right is necessary to maintain the wild and scenic river values in and along any of the river and stream segments found eligible and suitable for inclusion in the NWSRS in the Draft, Final, and Revised Final Wild and Scenic Rivers Study Reports (BLM 2003c, BLM 2004, and Appendix I, respectively). The BLM is neither requesting nor recommending such a right in the Revised Final Wild and Scenic Rivers Study Report (Appendix I). | |
| | WTR-C-9 | Wild and scenic river values will be maintained by land use restrictions implemented through BLM land use designations and the existing 300-cubic feet per second (cfs) instream flow water right held by the Colorado Water Conservation Board as minimum flow. | |
| | WTR-C-10 | In cooperation with the USGS and others, BLM will develop a list of best management practices that will, along with other guidelines, serve as tools for managing water and soil resources in the NCA. | |
| Climate and Air Quality | AIR-C-1 | Activities and projects on BLM-managed lands will comply with applicable local, state, and federal air quality regulations, including National Ambient Air Quality Standards. | |
| | AIR-C-2 | Mitigation to minimize air quality degradation will be incorporated into project proposals as appropriate. | |
| | AIR-C-3 | Specific measures related to air quality management will be developed and implemented. | |
| | AIR-C-4 | OHV and vehicular travel on dirt roads will be managed to minimize air pollution from dust and exhaust. | |
| | AIR-C-5 | Fires, both controlled burns and fire use, will be managed to minimize smoke impacts. | |
| Vegetation | VEG-C-1 | Public lands will be managed in accordance with Interpreting Indicators of Rangeland Health (Pellant et al. 2000). | |
| | VEG-C-2 | Current vegetation studies will be continued, and new studies will be initiated. | |
| | VEG-C-3 | Monitoring and studies will be carried out to help achieve sustainable populations of native plant species, with healthy native plant communities dominating the landscape. | |

BLM_0007505

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Vegetation** *(continued)* | **VEG-C-4** | Vegetation will be managed to promote sustainable populations of native plant species, with healthy native plant communities dominating the landscape. | |
| | **VEG-C-5** | Activities that damage the vegetation resource will be managed to minimize and mitigate for vegetation destruction. BLM measures to minimize and mitigate could include changes in the season or duration of the activity, changes in the location of the activity, elimination of the activity from the problem area, etc. | |
| | **VEG-C-6** | Vegetation planting and weed control will take place on all areas identified in the Gunnison Gorge Land Health Assessment (BLM 2001a) as needing restoration, and restoration will occur until an acceptable native plant community occupies the site. | |
| | **VEG-C-7** | Weed-control measures will be implemented throughout the NCA to minimize infestation of noxious and undesirable nonnative species. Infestations of noxious weeds and other nonnative species will be controlled using direct control and preventative measures. | |
| | **VEG-C-8** | Plant community improvement projects will take place to restore native perennial grasses and forbs to communities where these have been depleted far below average levels. | |
| | **VEG-C-9** | Native plant communities will be restored on disturbed areas. | |
| | **VEG-C-10** | Closed roads, trails, areas subjected to surface-disturbing activities, and ways will be rehabilitated, reclaimed, or revegetated with genetically appropriate native species when feasible. In instances when native species are not available or not suitable to meet the immediate needs of the site, nonpersistent nonnative species may be used. | |
| | **VEG-C-11** | Management measures will be implemented to ensure riparian areas meet land health standards. | |
| | **VEG-C-12** | BLM will develop partnerships with the Park Service, Tamarisk Coalition, and other partners where possible. | |
| | **VEG-C-13** | Wilderness user fees will continue to be used to help fund saltcedar (tamarisk) *(Tamarix parviflora* and *Tamarix ramosissima)* control and other resource-protection projects in the Gunnison River corridor. | |
| | **VEG-C-14** | Only uses that are compatible with maintaining the desired plant communities will be allowed to occur within these areas. | |
| | **VEG-C-15** | The BLM will work with USGS, other federal and state agencies, universities, and others to identify, or develop, the best restoration techniques for damaged federal lands. | |

BLM_0007506

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*

(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Vegetation** *(continued)* | **VEG-C-16** | BLM will manage lands to ensure that viable populations of native plant species present and existing within the planning area are maintained. High priority will be placed on understanding plant species habitat requirements and their population status. | |
| | **VEG-C-17** | BLM will continue to manage habitat for special status species, including listed species, BLM sensitive species, rare endemic species, and other species of special concern. | |
| | **VEG-C-18** | Pursuant to BLM's Partners in Weeds strategy, BLM will conduct integrated weed management with counties, private landowners, and other agencies to meet land health standards. | |
| | **VEG-C-19** | All hay, processed grains, and pellets brought onto public lands by all livestock users, including equestrians, outfitters, and livestock operators and ranchers, will be required to be certified weed-free. | |
| | **VEG-C-20** | Severely degraded sites will be restored. | |
| | **VEG-C-21** | BLM will manage lands to ensure that viable populations of all plant species are maintained within the NCA. | |
| | **VEG-C-22** | User-related activities that negatively impact plant populations will be managed to minimize or mitigate these impacts. | |
| | **VEG-C-23** | Threats to native vegetation will be minimized, including those from weeds and activities that directly damage vegetation. | |
| | **VEG-C-24** | Weed-control measures will be implemented in the Mancos shale soils that comprise the western edge and southern portions of the planning area. | **VEG-C-25** Vegetation treatments will be avoided. |
| | **VEG-C-26** | BLM will actively engage in scientific study to determine improved management techniques for native vegetation, for application in the NCA and beyond. | |
| | **VEG-C-27** | BLM will research the connection between river flows and riparian vegetation and weeds in the riparian zone. | |
| | **VEG-C-28** | Brushbeating will be excluded, except if it would be used for the purpose of restoring or rejuvenating the plant communities that have been damaged by past management. | |
| | **VEG-C-29** | Seeding mixes that will result in meeting the *Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado* (BLM 1997d) (Appendix B) will be followed. | |
| **Forestry** | **FOR-C-1** | All public lands in the planning area will be closed to commercial forestry activities. | |
| | **FOR-C-2** | Fuelwood collection or cutting will be allowed only if all other management unit objectives will continue to be met and, upon completion of fuelwood collection, existing ground conditions will not hinder proposed treatments. | |

BLM_0007507

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Forestry *(continued)* | FOR-C-3 | In areas on the east side of the Gorge that receive vegetation treatments, prescribed burns, or other techniques, fuelwood collection could be allowed as a means to accomplish a resource objective, priority, clean up, or to remove fuel from the ground and to facilitate the purposes of the treatment, if appropriate. | |
| Wildlife, Fish and Aquatic Life | WFA-C-1 | Public lands will be managed in accordance with existing guidance, laws, regulations, and policies, including the following: CDOW-BLM Memorandum of Understanding (MOU) Providing for Bighorn Sheep Management in Gunnison Gorge (BLM and CDOW 1985); national and state memorandums of agreement with US Department of Agriculture, Animal and Plant Health Inspection Service (APHIS) and CDOW resources regarding animal damage control; the Migratory Bird Treaty Act, as amended (MBTA) (16 USC 703-711); and the Gunnison Forks Habitat Management Plan (BLM 1981). | |
| | WFA-C-2 | The Habitat Partnership Program between the CDOW, BLM, US Department of Agriculture, Forest Service (US Forest Service), and private grazing permittees/landowners will continue. | |
| | WFA-C-3 | The BLM will address animal damage control per the MOU with the APHIS program. Areas where there are safety issues and areas where US Department of Agriculture should not be conducting animal damage control will be identified. | |
| | WFA-C-4 | The BLM will investigate feasibility of reintroduction of native wildlife species and will work with CDOW to restore native species. Steps will be taken to collect data regarding reintroduction. The BLM will partner with agencies, academia, and others to study options. BLM will encourage CDOW to reintroduce species where data supports it. BLM will get involved in local plans where compatible with this objective. Habitat for all native species will be managed to help support viable populations of each species in the region. | |
| | WFA-C-5 | The BLM will continue to work with CDOW to manage and maintain a bighorn sheep herd within the Gorge. In the event that the existing population of Rocky Mountain bighorn sheep *(Ovis canadensis canadensis)* is determined to be expired, BLM will work with CDOW to determine the feasibility of introducing desert bighorn sheep *(Ovis canadensis* spp.) (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands. Current guidelines (BLM 1998f) for the management of bighorn sheep habitat suggest that at least nine miles of separation are needed between occupied bighorn sheep habitat and domestic sheep. Within the NCA, that situation is not attainable because of the presence of domestic sheep on private lands surrounding the NCA). | |

BLM_0007508

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Wildlife, Fish and Aquatic Life *(continued)* | WFA-C-6 | Wildlife forage allocations will remain at current levels until studies determine adjustments are needed to achieve management objectives. | |
| | WFA-C-7 | Additional forage allocations will favor wildlife consumption over livestock grazing. | |
| | WFA-C-8 | Existing wildlife facilities will be maintained, and vegetation management to improve habitat will continue where needed. | |
| | WFA-C-9 | Riparian zones and aquatic habitats will be inventoried and monitored. | |
| | WFA-C-10 | Wildlife habitat monitoring studies will be established and/or maintained on all crucial winter ranges. | |
| | WFA-C-11 | A pending Draft MOU between BLM, US Department of Interior, Fish and Wildlife Service (USFWS), and the US Forest Service will further define agency responsibilities under the MBTA. The MOU will also place the highest priority on Birds of Conservation Concern published by USFWS in 2002. Table 2-4 (see end of this chapter) highlights those Birds of Conservation Concern that apply to the planning area. Currently there is little data available to BLM on the status of these species and other migratory bird species within the planning area.<br><br>The BLM's responsibilities under the MBTA are to avoid actions that result in incidental take (pursue, hunt, shoot, wound, kill, trap) of migratory species. | |
| | WFA-C-12 | BLM, in partnership with the Colorado Bird Observatory, will continue to participate in monitoring efforts to obtain better data on the status of Birds of Conservation Concern. | |
| Special Status Species and Habitat | SSS-C-1 | BLM will continue to manage special status species and habitat, including listed species, BLM sensitive species, rare endemic species, and other species of special concern. | |
| | SSS-C-2 | Policy and guidance for the management of special status species on BLM Managed lands is provided through BLM Manual 6840 – Special Status Species Management. | |
| | SSS-C-3 | BLM will consult with USFWS under Section 7 of the Endangered Species Act, as amended, on all proposed activities that may affect federally listed or proposed threatened and endangered species. | |
| | SSS-C-4 | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat areas in the planning area. See management unit decisions for more detail on species to include. | |

BLM_0007509

Table 2-2.0
Decisions and Management Objectives Common to All Planning Area Public Lands *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Special Status Species and Habitat *(continued)* | SSS-C-5 | Supplemental releases and/or reintroduction of threatened or endangered species, candidate, or BLM sensitive species could be authorized following preparation of a release or reintroduction plan and environmental analysis, in addition to consultation with USFWS, CDOW, and other affected parties. | |
| | SSS-C-6 | Threatened or endangered species will continue to be inventoried and monitored to provide information for future management. | |
| | SSS-C-7 | A rare plant survey for the northern portion of the Mancos Shale area west of the Gorge will be completed, including information collection regarding conflicts with OHVs and other permitted surface uses. | |
| | SSS-C-8 | The BLM will complete rare plant inventories for the marine shales within the planning area. | |
| | SSS-C-9 | Priorities for monitoring special status species and habitat, will be established and, at a minimum, species with the highest priority will have active monitoring programs. | |
| | SSS-C-10 | Heightened efforts to protect special status species will be undertaken in the planning area, including increased monitoring of populations and identification of opportunities to expand habitat and populations, accompanied by education and outreach. | |
| | SSS-C-11 | At known populations of Clay-loving wild buckwheat *(Eriogonum pelinophilum)*, BLM will 1) monitor known population sites, 2) work with USFWS to complete genetic studies on the species, 3) conduct minimum viable population modeling, 4) study the feasibility of population augmentation, and 5) in concert with USFWS, investigate the potential to designate critical habitat for this species on high-quality public land sites (USFWS 1988). | |
| | SSS-C-12 | BLM will consult and pursue a working partnership with USFWS and will encourage research on the habitat requirements of Clay-loving wild buckwheat, and, if feasible, propose a pilot restoration project for this species into suitable unoccupied habitat | |
| | SSS-C-13 | BLM will evaluate non-vehicular activities on sandstone pediment areas (mesa tops), including within Peach Valley lands, to see if there are other human activities limiting the establishment of more viable populations of Uinta Basin hookless cactus *(Sclerocactus glaucus)* in the NCA. | |
| | SSS-C-14 | In the Peach Valley Lands, motorized and non-motorized vehicle use will be confined to designated roads on the sandstone pediment areas (mesa tops). | |
| | SSS-C-15 | The BLM will ensure that all existing recovery plans are utilized to develop measures designed to protect special status species and their habitat. | |

BLM_0007510

Table 2-2.0
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Special Status Species and Habitat** *(continued)* | SSS-C-16 | If large or particularly unique occurrences or populations of sensitive plants are found, the sites will be protected as needed and required through such actions as fencing or closure to OHV use, mineral entry, mineral material disposal, or other activities that are not compatible with maintenance of rare plant populations. | |
| | SSS-C-17 | BLM will take special management actions to promote and protect special status species. Special status species include listed species, proposed species, candidate species, state listed species and sensitive species. Actions could include, but will not be limited to modification of existing uses or practices to eliminate or mitigate the negative impact, or closing areas to certain types of use. | |
| | SSS-C-18 | BLM will remove OHV traffic, concentrated livestock use, such as domestic sheep bed grounds, or other impacting uses from known population sites of Clay-loving wild buckwheat or other special status species. | |
| | SSS-C-19 | Measures to protect threatened or endangered species and associated habitat will be required in all plans for surface-disturbing activities. | |
| **Rangeland** | RANG-C-1 | Forage for livestock will not be permanently allocated on newly acquired lands. Cattle will not be permitted to use forage on these newly acquired lands. | |
| | RANG-C-2 | On newly acquired lands in the planning area BLM will prepare, with input from permittees, a grazing allotment and grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands. Not authorizing new permanent allocations of forage for domestic sheep grazing within occupied bighorn sheep habitat or associated nine mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats ([BLM 1998f]). | |
| | RANG-C-3 | All grazing leases/permits will be reviewed. All leases/permits will be reissued/renewed after developing terms and conditions to meet land health standards where they are not met. | |

BLM_0007511

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Rangeland *(continued)* | RANG-C-4 | Grazing will be managed to meet land health standards. (Some management unit prescriptions modify current grazing to reduce conflicts among various resource management goals and soils, water, and riparian area management.) | |
| | RANG-C-5 | Suitable public lands will be available for livestock grazing use. | |
| | RANG-C-6 | Livestock grazing will be authorized and managed with the goal of improving the conditions of forage and rangeland resources. | |
| | RANG-C-7 | Livestock grazing will be managed at current forage allocation levels for the Uncompahgre Field Office until studies and/or monitoring indicates adjustments are needed. | |
| | RANG-C-8 | Livestock grazing permits in Mancos shale soils that comprise the western edge and southern portions of the planning area will be evaluated to ensure that compatible livestock management objectives, projects, and mitigating measures are incorporated before being implemented. | |
| | RANG-C-9 | Opportunities will be sought to improve allotment configuration, infrastructure, and size for increased range management flexibility. | |
| | RANG-C-10 | Grazing allotments that become unallocated will be considered for: 1) using occasionally as a grazing bank to alleviate grazing pressure on other allotments in the region; or 2) adding to an existing, contiguous allotment to increase grazing flexibility if vegetation in the allotment or the region is degraded, otherwise, they may become reallocated. | |
| Cultural Resources | CUL-C-1 | Cultural resources will be managed according to existing legislation, regulations, executive orders, and BLM policy. | |
| | CUL-C-2 | Measures to protect and manage cultural resources will be required in all land use activity plans, including those associated with recreation management and OHV activities. Measures will be designed in conjunction with appropriate consulting parties as defined by the National Programmatic Agreement, Colorado State Protocols, and the relevant sections of the BLM Manual (8100 series) addressing cultural resource management. | |
| | CUL-C-3 | BLM will continue to comply with Section 106 of the National Historic Preservation Act (NHPA) for all authorizations for land and resource use.  Compliance inventories for Section 106 of the NHPA will be conducted prior to all surface-disturbing or other activities that could affect cultural resources.   Proposed activities will not be approved until compliance with Section 106 of the NHPA has been completed and documented. | |
| | CUL-C-4 | Class I inventory data will be consulted and Class III surveys will be conducted, if warranted. | |
| | CUL-C-5 | Cultural resources identified or discovered will be evaluated according to the Secretary of the Interior's standards and the BLM 8100 Manual. | |

BLM_0007512

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Cultural Resources** *(continued)* | CUL-C-6 | Impacts to National Register of Historic Places (NRHP)-eligible cultural resources will be mitigated as they are identified. Preservation of resources in place will be the preferred management of cultural resources discovered during project implementation or construction. | |
| | CUL-C-7 | Resource condition will be monitored during implementation of projects on the ground. | |
| | CUL-C-8 | The discovery of NRHP-eligible cultural resources or areas of traditional importance to federally-recognized tribes during planning, inventory, or research for a project, or during implementation of surface disturbing activities will require appropriate consultation and mitigation in order to provide the proper level of management and protection for the cultural resources. Mitigation possibilities will include an array of options that could include, but will not be limited to, relocation of the project to another location, possible excavation of the resources following proper procedures and regulations, or in extenuating and unusual circumstances, preventing the installation of a project. Avoidance of impacts to eligible cultural resources through project redesign or relocation is often the preferred mitigation. | |
| | CUL-C-9 | The following Section 110 preservation management measures will be implemented to identify high priority areas for cultural inventory and protect at-risk resources:<br>• Inventories will be conducted to determine archaeological site density, diversity, and distribution;<br>• Cultural resources will be inventoried, stabilized, and interpreted, where appropriate;<br>• High-priority areas and cultural resources in the planning area may be identified later that will require Section 110 preservation management measures; and<br>• Areas will be closed where necessary to protect cultural resources from natural or human-caused deterioration or potential conflict with other resource uses. | |
| | CUL-C-10 | All cultural properties in the planning area, including cultural landscapes, will be allocated to the following uses according to their nature and relative preservation value:<br>a) Scientific use – preserved until research potential is realized;<br>b) Conservation for future use – preserved until conditions for use are met;<br>c) Traditional use – long-term preservation;<br>d) Public use – long-term preservation, on-site interpretation;<br>e) Experimental use – protected until used; or<br>f) Discharged from management – no use after recordation; not preserved.<br>The majority of the cultural properties in a given geographic area will fall into categories a and f. The less-common properties in categories b, c, d, and e are likely to be associated with particular settings that can be delineated geographically. Properties in categories b, c, and d will require the most attention to balance their proactive uses with other land and resource uses. | |

BLM_0007513

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Paleontological Resources | PAL-C-1 | Prior to any surface-disturbing activity, inventories will be completed in appropriate BLM Condition 1 areas, and, for larger projects, in some Condition 2 areas containing the potential for the occurrence of paleontological resources. | |
| | PAL-C-2 | Measures to scientifically collect or other wise protect and interpret, where appropriate, known or discovered fossil values will be implemented. | |
| | PAL-C-3 | Areas will be closed where necessary to protect paleontological resources. | |
| | PAL-C-4 | No surface-disturbing activities will be allowed in any area where potential for paleontological values exists until inventories are conducted and appropriate measures developed to protect any significant fossils. | |
| | PAL-C-5 | Paleontological resources will be managed in accordance with FLPMA and through policy outlined in BLM 8270 Manual and Handbook for the Management of Paleontological Resources. | |
| | PAL-C-6 | Paleontological resources will be inventoried in potentially fossiliferous areas prior to surface-disturbing activities, and appropriate protective measures will be developed, if necessary. | |
| Recreation | *see Table 2-2.6a* | Recreation management decisions are shown in Table 2-2.6a at the end of this chapter for Decisions and Management Objectives Common to All Planning Area Public Lands. See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones MU6-1 and MU6-2. | |
| | REC-C-1 | Recreation will be managed for targeted recreational activities, experiences, and beneficial outcomes and corresponding recreation settings within each management unit, as well as the management actions necessary to deliver those recreation opportunities within their prescribed settings.<br><br>Benefits-based management will guide management measures such that implementing actions will strive to improve conditions to individuals, groups, society, and/or the environment.<br><br>Public lands in the planning area will be managed to deliver benefits by providing opportunities for visitors to engage in a variety of activities in a variety of physical, social, and managerial settings. A range of opportunities (i.e., activities, experiences, and beneficial outcomes) will be provided in their appropriate settings with the goal of optimizing net benefit attainment. | |
| | REC-C-2 | Competitive OHV events will not be authorized within the boundary of the NCA. | |

BLM_0007514

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Recreation *(continued)* | REC-C-3 | See Figure 2-3 (at the end of this chapter) for a map of all OHV designations in the planning area. The OHV designations in the planning area will include 2,579 acres in the open category, where cross-country, off-route motorized and non-motorized, mechanical vehicular travel will be permitted; 51,727 acres of lands where motorized and non-motorized mechanized use will be limited to designated routes year round; 22,200 acres of public lands where motorized and non-motorized mechanized travel will generally be limited to designated routes from May 1 to November 14 annually, and for the remainder of the year, these lands will be closed to these uses; and 19,274 acres of public lands closed to motorized and mechanized use yearlong, including the Gunnison Gorge Wilderness. | **REC-C-4** Unless otherwise mentioned in management unit prescriptions, motorized and non-motorized, mechanical vehicular traffic will be limited to the designated routes and trails on Figure 2-4 (see end of this chapter). The designated routes shown on Figure 2-4 are preliminary and may not be all-inclusive. |
| | | | **REC-C-5** Designated routes will be further fine-tuned and refined in a collaborative process with the assistance and input of a BLM/citizen work group. Until routes are refined, all motorized and mechanical travel in limited areas on public lands will be limited to the designated routes shown on Figure 2-4 (see end of this chapter). Figure 2-4 depicts 246 miles of routes and trails that will be available for these uses in these "limited" areas. |
| | REC-C-6 | In the Mancos shale soils that comprise the western edge and southern portions of the planning area, signing or other means to direct traffic will be installed where needed to meet management goals. | |
| | REC-C-7 | Throughout the Mancos shale area, motorized and non-motorized mechanical OHV use may be restricted or prohibited in certain areas as necessary to meet site-specific management objectives for improving users experiences, reducing conflicts, addressing safety concerns, conducting research and monitoring efforts, and/or providing resource protection in sensitive areas, as part of the adaptive management process. | |
| | REC-C-8 | In the Mancos shale soils that comprise the western edge and southern portions of the planning area, opportunities for non-motorized users will be provided and will be managed in a manner to reduce user conflicts between motorized and non-motorized users. | |

BLM_0007515

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Recreation *(continued)* | REC-C-9 | BLM, with assistance and input from the public and other agencies, will manage levels of acceptable use in areas where cross-country, off-route motorized and non-motorized mechanical OHV use will be permitted, using indicators and parameters such as land health, noise, dust, user conflicts, and safety. | |
| | REC-C-10 | At BLM's discretion, target shooting on public lands may be authorized on public lands in the planning area only in those portions of Management Units 2, 4, and 6 located outside the NCA boundary. See the recreation-specific decisions for these management units below. Target shooting will not be authorized on public lands in the remainder of the planning area in order to provide a safe environment for all users in the planning area, and to protect resources, health, and property. Authorization would occur according to BLM and other applicable regulations. Special operating procedures and local BLM regulations will be established and posted. Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be complied with. If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. | |
| | REC-C-11 | BLM will work with user groups and private landowners in the planning area to resolve vehicular and other trespass situations involving use and occupancy occurring on public lands. | |
| | REC-C-12 | Wilderness user fees will continue to be collected. | |
| Visual Resources | VIS-C-1 | Visual resource management (VRM) objectives will be established for public lands in the planning area as shown on Figure 2-5 (see end of this chapter). All activities proposed on public lands will be planned and implemented to meet VRM objectives. | |
| | VIS-C-2 | The BLM will recommend to Delta County that housing developments on private lands within view of the Gunnison River between the North Fork and Austin have visual setbacks or visual screening. | |
| Special Management Areas | SMA-C-1 | The 161-acre existing Fairview ACEC/RNA/Colorado State Natural Area in Management Unit 6 will be retained and will be managed for the protection and management of Clay-loving wild buckwheat and Adobe penstemon. | |
| | SMA-C-2 | The BLM will continue to work with the Uncompahgre Valley Water Users Association, users, and Montrose County to locate potential designated routes through the Fairview ACEC/RNA and to acknowledge and develop additional designated routes in the ACEC such that plant populations will not be impacted. | |
| | SMA-C-3 | Public lands in Management Unit 4 (22,200 acres) will be designated and managed as the Gunnison Sage-Grouse ACEC/IBA. Management and protection of the Gunnison sage-grouse and its habitat will be emphasized in this management unit. | |

BLM_0007516

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Special Management Areas *(continued)* | SMA-C-4 | This RMP adopts and incorporates the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998), as part of the management objectives and direction for Management Unit 4. | |
| | SMA-C-5 | Public lands in Management Unit 5 (3,785 acres) will be designated and managed as the Native Plant Community ACEC/ONA. Management and long-term preservation of the Winterfat Shrub Steppe, Juniper-Grass Savanna, and Pinyon-Juniper Woodland native communities will be emphasized in this management unit. | |
| Fire Management | FIRE-C-1 | The current management direction, including that found in the Uncompahgre Field Office Fire Management Plan (BLM 2002m), which tiers from the Wildland and Prescribed Fire Management Policy, August 1998 (Park Service et al. 1998), will continue to be implemented. | |
| | FIRE-C-2 | Any fire that occurs in a fire use category area before a prescribed burn plan is approved, that is not within the limits of the prescription, or that threatens life or property will be suppressed as a conditional suppression area fire. | |
| | FIRE-C-3 | BLM will coordinate with and participate in fire management planning with local landowners, other agencies, and governments. | |
| | FIRE-C-4 | In all management units in the planning area, prescribed and planned ignitions will continue to be allowed as a management tool to meet management objectives, such as to increase forage for wildlife and livestock grazing. Prior to any ignitions, an environmental analysis, burn plan, and burning permit will be prepared or obtained. | |
| Hazardous Materials | HAZ-C-1 | Hazardous materials contamination on public lands will be prevented, and risks associated with hazardous materials on public lands will be reduced. | |
| Law Enforcement, Patrols, and Public Safety | LAW-C-1 | Law enforcement activities will be conducted by authorized personnel on a priority-order basis as needed. | |
| | LAW-C-2 | The BLM will continue to implement current management direction, including conducting drug operations once annually, which consists of the BLM and Army National Guard flying over the NCA searching for drug crops and methamphetamine labs. | |
| | LAW-C-3 | Information and education regarding BLM resource management and regulations will be disseminated during BLM rangers' contact with visitors. | |

BLM_0007517

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Wild and Scenic River Study Segments | *see MU 1 and MU 3* | See the decisions in Management Units 1 and 3 below for wild and scenic river study segment decisions. | |
| Education and Interpretation | **EDU-C-1** | An aggressive interpretation/environmental education effort will be implemented to educate users about the natural values and the potential impacts on these values from inappropriate uses in the NCA. The two objectives of this program will be to protect NCA resources by educating users and to convey an appreciation of the specific environment within the NCA to users, as well as an understanding of broader environmental issues such as clean water, biodiversity, etc. | |
| | **EDU-C-2** | Educational tools will be implemented to educate users about shared recreational use to reduce user conflicts. BLM will educate users about responsible OHV play and travel on designated routes and regulations regarding resource damage. | |
| | **EDU-C-3** | Trail and road maps will be developed showing designated routes for motorized and mechanical vehicular travel. | |
| | **EDU-C-4** | The BLM will implement Colorado Interagency Sign Standards to provide clear direction to educate people about legitimate motorized and mechanical vehicular travel locations. Gunnison Gorge NCA signs and informational materials will include appropriate NLCS identity logos and messaging. | |
| | **EDU-C-5** | Education and research will be emphasized. | |
| | **EDU-C-6** | BLM will partner with schools to develop outdoor classrooms and curriculum packages for teachers, for example. Increased user education will be provided. | |
| | **EDU-C-7** | BLM will expand the public education program of "Leave No Trace," "Tread Lightly," and other recreation ethics and land stewardship. | |
| | **EDU-C-8** | BLM will partner with other agencies, such as the Park Service, to develop best management practices and education/interpretative materials. | |
| | **EDU-C-9** | BLM will develop ways to educate the public about what sensitive species are and how to avoid them. | |

BLM_0007518

**Table 2-2.0**
**Decisions and Management Objectives Common to All Planning Area Public Lands** *(continued)*
(If not specifically mentioned, and unless modified within the following management unit decisions, resources/resource uses and programs will be managed according to decisions in this section.)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Education and Interpretation** *(continued)* | **EDU-C-10** | BLM will encourage a volunteer "friends" group, patrols, and/or citizen work groups for the NCA and Wilderness. The mission will include but not be limited to working on trails and other facilities, monitoring and improving resource conditions, monitoring visitor satisfaction levels, educating users in pre-trip information and during trips, and providing feedback to BLM on general activities in the area. The friends groups will help volunteer patrol within areas where motorized or mechanical OHV use is concentrated. | |
| | **EDU-C-11** | The BLM will coordinate with local tourism providers regarding the accurate marketing of planning area public lands. | |

BLM_0007519

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit**

**Management Unit 1 Land Ownership: 17,784 acres of public surface; 19% of planning area public lands**

*In Management Unit 1, the Gunnison Gorge Wilderness, management and protection of the wilderness, scenic, cultural, and recreational values will be emphasized. . This unit contains 17,784 acres and is located in the approximate center of the NCA within the double canyon of the Gunnison Gorge. It includes 14 miles of the Gunnison River, extending from the northwestern boundary of the Black Canyon of the Gunnison National Park north to a point approximately one mile downstream from the confluence of Smith Fork Creek and the main stem of the Gunnison River. The unit's values include scenic, geological, paleontological, scientific, educational, and recreational resources. It also offers a wild and pristine backcountry experience. The Wilderness is managed according to the Wilderness Act of 1964, as amended. Specific management measures will include the following:*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) |
|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-1-1 | The Wilderness is a ROW exclusion area. |
| | LAND-1-2 | The entire federal mineral estate in the unit is withdrawn from mineral entry, location, and patent under the mining laws, and the oil and gas estate is withdrawn from leasing. |
| | LAND-1-3 | Mineral material disposal is not permitted, nor is disposal of federal surface estate under the public land laws. |
| Access and Transportation | TRAN-1-1 | To reduce the chance of human-caused ignition in the relict tree stands on Buttermilk Ridge, continuing growth of the existing "stump road" will be discouraged. |
| | TRAN-1-2 | The BLM will consider relocating the Ute Road completely on public lands to better manage the access. |
| | TRAN-1-3 | BLM will coordinate and work with local OHV groups, Western Colorado Congress and other organizations and volunteers to survey roads and trails (using records and ground visits) to identify user-created routes. |
| Geology and Topography | GEO-1-1 | The 1,300-acre Chukar Canyon abutting the National Park boundary will be managed as the Ute Indian Fault Zone and Geologic Area. The Chukar Trail will form the approximate center of the area, and the area's boundaries will extend to the Dakota sandstone rims of the canyon. Figure 2-6 (see end of this chapter) depicts the location and size of this area. |
| | GEO-1-2 | The Wilderness boundary and the boundary of the Ute Indian Fault Zone and Geologic Area will be posted on the Chukar Trail and on the nearby OHV trail. |
| | GEO-1-3 | Interpretation of the Ute Indian Fault Zone and Geologic Area will be provided at the Chukar Trailhead via bulletin board messages and brochures. |
| | GEO-1-4 | Use of the nearby OHV trail will be monitored and the trail maintained and signed to prevent accidental or unintentional OHV use in the area and Wilderness. |
| Vegetation | VEG-1-1 | Along the Gunnison River in the Gunnison Forks to Austin section, restoration projects will be implemented to protect aquatic areas and remove invasive weeds. |
| Wildlife, Fish, and Aquatic Life | WFA-1-1 | BLM will enter into a MOU with the CDOW to continue the use of motorized equipment in the Wilderness by the CDOW for fisheries management. The MOU will specify how and when these actions will be authorized and will be based on a minimum-tool analysis that will limit motorized use to the minimum necessary. |

BLM_0007520

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) |
|---|---|---|
| **Wildlife, Fish, and Aquatic Life** *(continued)* | **WFA-1-2** | BLM will continue to work with CDOW to manage the Gold Medal trout (brown trout *[Salmo trutta]* and rainbow trout *[Oncorhynchus mykiss]*) fishery. |
| **Special Status Species** | **SSS-1-1** | BLM will continue to work with CDOW to manage river otter *(Lutra canadensis)* (state-listed endangered) and wintering bald eagle *(Haliaeetus leucocephalus)* (federally listed threatened) concentrations in the inner Gorge. |
| | **SSS-1-2** | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat in the unit, specifically for aquatic areas for the inner Gorge. |
| **Rangeland** | **RANG-1-1** | Livestock grazing in the Gunnison River riparian corridor will be managed to ensure healthy functioning riparian systems and few or no conflicts with recreationists, especially during recreation high-use period (May 15 through September 30). Techniques to accomplish this could include changes of season, fencing, livestock movement, or other methods.<br><br>Livestock grazing in the Wilderness will be managed to protect wilderness values. |
| **Cultural Resources** | **CUL-1-1** | Normally, study or management must not include any excavation, stabilization, or interpretation activities. |
| | **CUL-1-2** | Salvage, rehabilitation, stabilization, reconstruction, and restoration work on archaeological and historic site; excavation; and intensive inventories will be permitted on a case-by-case basis where the project would not degrade the overall Wilderness character of the area and such activity is needed to preserve the particular resource. BLM State Director approval will be required for all such projects as part of this permitting process. In most instances, cultural resources would be subject to the forces of nature in the same manner as other Wilderness resources. |
| | **CUL-1-3** | The following Section 110 preservation management measures will be implemented in the unit to identify high-priority areas for cultural inventory and protect at-risk resources:<br>• Howell village – appropriate protection measures including stabilization will be identified for the long-term preservation and management of the site; and<br>• The Ute, Red Canyon, and Chukar Trails – appropriate protection measures will be identified for the long-term preservation and management of the trails in consultation with federally-recognized tribes and other interested parties. |
| | **CUL-1-4** | The Howell Village site, located approximately north of the Ute Trail's halfway point between its beginning and end in the west-central portion of the Gunnison Gorge Wilderness, will be recommended for listing on the NRHP to give site recognition and to make the site eligible for stabilization funding to reduce weathering and neglect effects. Figure 2-6 (see end of this chapter) depicts the location of the site. |
| | **CUL-1-5** | The Howell Village site will be stabilized and preserved, monitored annually, and interpreted. The recommendation will resolve the concerns of the threats of natural deterioration and vandalism. Natural deterioration is the result of weathering and long-term neglect. |

BLM_0007521

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) | |
|---|---|---|
| **Cultural Resources** *(continued)* | CUL-1-6 | Management and long-term preservation of the Howell Village historic site will be emphasized in this management unit. Increased use of the nearby Ute Trail results in increased risk of vandalism by way of artifacts that are destroyed or removed from the Howell Village site. |
| | CUL-1-7 | Interpretation of the Howell Village site will be provided at the appropriate levels and locations, in compliance with Wilderness regulations, to help visitors better understand the history of the site and the Gunnison Gorge, and to recognize the importance of preserving the site. |
| | CUL-1-8 | The Ute, Red Canyon, and Chukar Trails will be inventoried, field verified, and evaluated for listing on the NRHP. |
| | CUL-1-9 | Five-hundred-foot buffers on both sides of the Ute, Red Canyon, and Chukar Trails will be recognized and delineated for management and long-term preservation of these prehistoric and historic trails. The Ute and Chukar Trails are located on the west side of the Gunnison River in the Wilderness and provide the major foot and horse access into the Wilderness. The actual location of the Red Canyon Trail is uncertain. Figure 2-6 (see end of this chapter) depicts the locations of these trails. |
| | CUL-1-10 | Research will be conducted to determine the eligibility of the Ute, Red Canyon, and Chukar Trails for listing as a National Historic District. The cultural landscape will be evaluated as part of the trail research to determine the appropriate buffer needed to protect the trail from direct and indirect impacts. These recommendations will help resolve the concerns in this management unit of the increased trail use because of designation of the Gunnison Gorge Wilderness, which results in increased direct and indirect impacts on these sites. Also, natural erosion plays a role in ever-increasing loss of information that these sites could provide. |
| | CUL-1-11 | Interpretation of the Ute, Red Canyon, and Chukar Trails be researched and designed by BLM in coordination with the local residents knowledgeable about the trails' history and with Native American groups. |
| | CUL-1-12 | Interpretation of the Ute, Red Canyon, and Chukar Trails will be implemented in a manner compatible and appropriate for the settings and in compliance with Wilderness regulations. |
| **Paleontological Resources** | PAL-1-1 | In the Wilderness, only limited collecting of highly scientific fossils and related specimens will be allowed. |
| | PAL-1-2 | Overall, information will continue to be gathered on paleontological resources. This could include recordation of new localities, monitoring of some known localities, and continued permitting for scientific fossils and related specimens |
| | PAL-1-3 | Study or management will not entail excavation, stabilization, or interpretation.  Exceptions may be granted by the BLM State Director for significant paleontological or cultural resources where the project will not degrade the overall Wilderness character of the area and such activity is needed to preserve the particular resource. Paleontological resources will be subject to the forces of nature in the same manner as other Wilderness resources. |
| **Recreation** | *see Table 2-2.1a* | Recreation management decisions are shown in Table 2-2.1a below for Management Unit 1.  See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones MU1-1 through MU1-4. |

BLM_0007522

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) |
|---|---|---|
| Recreation *(continued)* | REC-1-1 | As outlined in Table 2-2.1a, BLM's Wilderness recreation management objective, or desired future condition, will be to continue to provide challenging wilderness experiences in a primitive and uncrowded physical and managerial setting that preserves wilderness values of solitude, naturalness, and outstanding opportunities for primitive and unconfined recreation. |
| | REC-1-2 | Recreation use levels will be managed to protect the Wilderness and provide equal opportunity to all users to derive great satisfaction and benefits from their experience. |
| | REC-1-3 | Overall social encounters in the Wilderness river corridor will be managed to remain very low during the off-season period (October through April) and low during the majority of the river season (May through September). There will be some periods, such as the June stone fly hatch, holidays, and busy summer weekends, when encounters with other groups (both floating and on-shore) will be more frequent and choices for camping, fishing spots, and the like will be limited because of higher demand. Visitors will be able to make informed decisions about which Wilderness recreation opportunities and use periods meet their desires and thus have their expectations met. |
| | REC-1-4 | During the scoping period, BLM received numerous comments that favored continuation of Wilderness management under current management described in the 1985 RAMP (BLM 1985) and 1988 RAMP Addition (BLM 1988a). The RMP will continue the management actions and decisions from the two current plans that will best achieve the desired future condition stated above. |
| | | As a starting point, BLM will continue to manage and regulate all recreation use under provisions in the existing RAMP and RAMP Addition. BLM will also collaboratively prepare and implement an activity-level Wilderness Recreation Strategy that will: 1) provide additional direction in areas where existing plans lack specific management direction to meet the desired future condition; and 2) make changes in management that address problems identified by BLM and the public.  BLM will call upon the focus group consisting of individual who participate in providing input into this RMP to assist in preparing the strategy. A primary objective of the Wilderness Recreation Strategy will be to balance private and commercial numbers at levels that provide a higher level of satisfaction for users while ensuring preservation of Wilderness qualities and resource conditions. |
| | | In the Wilderness Recreation Strategy, access to the Wilderness for recreation will be managed equitably using existing management methods, such as user fees charged for all users and a designated campsite system that provides a balance of boater and walk-in visitor campsites. New management actions, including changes in the existing commercial permit and allocation systems and new allocations for private uses, will be implemented when and where necessary. Specific indicators and/or triggers for implementation of these actions will be identified in the Wilderness Recreation Strategy, as will specific measures for monitoring those indicators. |
| | | The collaboratively developed Wilderness Recreation Strategy will: 1) Analyze all commercial and private Wilderness use statistics and past and future user surveys, along with user input, to identify baselines, trends, and problems with specific uses and/or periods of use. 2) Develop long-term assessment and monitoring methods for visitor satisfaction levels and resources to provide adaptive management direction. |

BLM_0007523

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) | |
|---|---|---|
| Recreation *(continued)* | REC-1-4 *(continued)* | 3) Use existing and establish new resource indicators where necessary to determine when and where new visitor allocations are needed. Wilderness indicators include, but are not limited to: 1) resource damage (e.g., campsite proliferation; social trails proliferation; human waste problems; vandalism to historical, archaeological, paleontological sites; and destruction of biological soil crusts); 2) conflicts with threatened and endangered plant or animal species; 3) number of social encounters; and 4) visitor satisfaction levels as reported in regular visitor surveys and other public feedback methods. |

<br>

4) Establish a public process for determining and implementing new use allocations where necessary.
5) Make the existing commercial allocation system more effective and efficient in meeting Wilderness management objectives by implementing changes in:
   a. Current season of permitted use;
   b. Methods for allocating existing launches, including those currently unallocated (pool launches), and the timely release of unused allocated launches so that other outfitters may use them;
   c. Maximum number of launches and training trips allocated to one-year and multi-year outfitters under the current system; and
   d. Compliance requirements and compliance-assessment methods.
   6) Make existing commercial permit authorization more effective and efficient in meeting Wilderness management objectives by considering methods and developing criteria to:
   e. Make changes in existing permit operating plans and/or stipulations;
   f. Determine how many commercial permits are needed to provide Wilderness visitor services that meet desired resource conditions and visitor satisfaction levels, and make changes to number of permits as needed;
   g. Upgrade one-year permits to multi-year, transferable permits (criteria could include, but would not be limited to, safety records, business history, compliance with other state and/or federal permits and requirements, and past compliance with the RAMP's minimum-use requirements);
   h. Select new permittees (criteria could include, but will not be limited to, safety records, business history, compliance with other state and/or federal permits and requirements, ability to meet demand not presently being met by existing permittees, and ability to provide services outside of high-use periods);
   i. Transfer existing permits to existing or new outfitters; and
   j. Equitably and effectively deal with non-compliance issues.

The Wilderness Recreation Strategy will provide a range of thresholds that, upon monitoring, could result in an increase or decrease in the level of noncommercial boating permitted within the Gorge, depending on the indicators monitored. Limits on launches per day, season of use, group size, and campsite availability could be tools for regulating use. The design will include method(s) of assessing and monitoring visitor satisfaction levels and resources over time. Implementation will provide adaptive management direction such that changes could be made so as to continue meeting wilderness values and management goals.

BLM_0007524

**Table 2-2.1**
**Management Unit 1 (Gunnison Gorge Wilderness) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 1) |
|---|---|---|
| Recreation *(continued)* | REC-1-5 | Until the Wilderness Recreation Strategy is complete, all other noncommercial activities and uses in the Gorge will be managed according to current management. |
| | REC-1-6 | Until the Wilderness Recreation Strategy is complete, BLM will continue to manage all noncommercial recreation boating use in the Wilderness according to the applicable portions of the RAMP and RAMP Addition. |
| | REC-1-7 | Until the Wilderness Recreation Strategy is complete, all private users will be required to have a non-limiting, educational permit that informs them of the likelihood and nature of future use allocations that will affect them. |
| | REC-1-8 | Private permits will not be required until the collaborative Wilderness Recreation Strategy is completed (see above). The strategy will indicate if, when, where, why, and to what extent permits may be needed. |
| | REC-1-9 | BLM will consider a system to limit uses other than boating in the Gunnison Gorge if indicators show these other uses are a contributing factor to resource degradation. |
| Fire Management | FIRE-1-1 | Fuels treatments, including mechanical treatment or prescribed fire, will be encouraged in younger vegetation near the relict tree stands on Buttermilk Ridge to protect the stands from catastrophic (crown) fire. |
| | FIRE-1-2 | All fire will be suppressed in the relict tree stands on Buttermilk Ridge. |
| | FIRE-1-3 | Fuels or other vegetative treatments will not be allowed within the relict tree stands on Buttermilk Ridge. |
| Law Enforcement, Patrols, and Public Safety | LAW-1-1 | Law enforcement presence will be increased. |
| | LAW-1-2 | In cooperation with user groups, friends groups, and other volunteers, BLM will conduct regular trail patrols, cleanups, and necessary maintenance. |
| Wild and Scenic River Study Segments | WSR-1-1 | No segment or portion of any stream in the unit will be recommended for designation or inclusion into the NWSRS in this RMP or the Revised Final Wild and Scenic Rivers Study Report (Appendix I). |
| | WSR-1-2 | Under WSR Act criteria, BLM has determined that the 16-mile segment of the Gunnison River (including the entire portion of the river within designated Wilderness and downstream to the transmission line located upstream and south of the North Fork of Gunnison River) in Management Unit 1 will be suitable under the Wild classification. |
| | WSR-1-3 | BLM has determined that the 4.2-mile segment of Red Canyon and the 2.0-mile segment of Smith Fork Creek on BLM-managed lands will be suitable under the Scenic classification in Management Unit 1. |
| | WSR-1-4 | Implementing interim management measures for suitable wild and scenic river segments will begin with implementing the RMP and ROD, and will continue for the life of this plan or until Congress takes action. See Table I-3-1 (Appendix I) for interim management of wild and scenic river values in these segments. |

BLM_0007525

**Table 2-2.1a**
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions**

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone MU1-1:  Inner Gorge Inner river canyon extending downstream of Chukar boat launch area up to the northern Wilderness boundary (approximately 5,500 acres).**<br><br>*Does not include the Chukar Trail or boat launch, Smith Fork Day Use Area, or Ute Park.*<br><br>**Activities:**<br>Day and multi-day Gold Medal trout walk-wade and float-boat fishing, whitewater rafting and kayaking, camping, hiking, picnicking, scenery and wildlife viewing. | *Physical Setting:*  Primitive, non-motorized and non-mechanized, remote, unmodified natural environment.<br><br>*Number Social Encounters:*<br><br>*Off Season (October – April):*  Very little or no contact with other boaters or fishing groups; (0-3 groups per day) and no other groups visible from your campsite); average group size seen is 2-4 people.<br><br>*Primary River Season (May-September):*  Little contact with other boater or fishing groups (see 4-6 groups per day) during mid-week with no other groups visible from your campsite; low to contact (7-10 groups on weekends) with 1-2 groups visible from your campsite; average group size seen is 6-8 people.<br><br>*Stone Fly Hatch, July 4, Memorial and Labor Day weekends:*  Moderate contact with others boater and fisher groups on shore (see 11-15 groups per day); average group size seen is 5-7 people. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in day-use and overnight Gold Medal (i.e., restrictive) trout fishing, kayaking, rafting, camping, and scenery and wildlife viewing.<br><br>**Experiences:**<br>• Enjoying risk-taking adventure.<br>• Feeling good about solitude, being isolated, and independent.<br>• Experiencing nature in a pristine setting.<br><br>**Benefits:**<br><br>Individual:<br>• Closer relationship with the natural world.<br>• Strengthened relationships with family and friends.<br>• Restored mind from unwanted stress.<br>• Greater appreciation of our parklands and their management challenges. | **Travel Management:**<br><br>REC-1-10 ✔  Public lands in this zone will be closed to motorized and non-motorized, mechanized vehicular use.<br><br>**Camping:**<br><br>REC-1-11 ✔  Will be allowed in campsites designated for hikers or boaters only. No dispersed camping will be allowed.<br><br>REC-1-12 ✔  Visitors will be required to sign-in at Ute, Duncan or Bobcat trailheads or Chukar River register and reserve a campsite.<br><br>REC-1-13 ✔  Human waste disposal systems (porta-potties, wag-bags, etc.) will be required for overnight boating, hiking, and equestrian groups.<br><br>REC-1-14 ✔  BLM will continue to require all users to pay Wilderness user fees for day use and camping.<br><br>**Campfires:**<br><br>REC-1-15 ✔  No open fires.<br><br>REC-1-16 ✔  Stoves and/or charcoal in fire pans only.<br><br>REC-1-17 ✔  No firewood collecting.<br><br>**Maximum Group Size:  REC-1-18 ✔**  12 people.<br>**Allowed Number of Boat Launches Per Day:**<br><br>REC-1-19 ✔  *Commercial*  2 per day<br><br>REC-1-20 ✔  *Private:*  Target of 4 per day<br><br>**Competitive Events:  REC-1-21 ✔**  Competitive events will not be permitted in the zone or management unit.<br><br>**Target Shooting:  REC-1-22 ✔**  Will not be permitted in the zone or management unit.<br><br>**Hunting:  REC-1-23 ✔**  Will be allowed in accordance with state regulations. |

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** (continued)

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-1:  Inner Gorge** Inner river canyon extending downstream of Chukar boat launch area up to the northern Wilderness boundary.<br><br>*(continued)* | *Managerial Setting*: 1-2 river patrols per week during primary season, increased patrols and visitor contacts during high use periods; a few subtle visitor controls in river corridor (designated campsite markers, 2-3 primitive toilets); no developed facilities.<br><br>Small tamarisk/weed control areas are evident but tend to fit in with natural landscape in most areas. | Household and Community:<br>■ Greater community involvement in recreation and other land-use decisions.<br>■ Enlarged sense of community dependence on public lands.<br><br>Economic:<br>■ Local job opportunities.<br><br>Environmental:<br>■ Greater community ownership and stewardship of recreation and natural resources.<br>■ Reduced spread of invasive species such as plants, insects, and aquatic organisms.<br>■ Conservation of inner gorge ecosystem.<br>■ Greater protection of fish, wildlife, and plant habitat from impacts.<br>■ Preservation of spectacular gorge scenery for future generations. | <ins>Commercial and Private Permits:</ins><br><br>*Existing Commercial Permits:*<br><br>**REC-1-24** ✔  BLM will continue to permit 3 walk-wade fishing and 10 rafting/ float-fishing outfitters according to applicable sections of the RAMP until the Wilderness Recreation Strategy is implemented.<br><br>**REC-1-25** ✔  Continue to permit one additional walk-wade/float-fishing operator downstream of the Smith Fork confluence according to applicable sections of the RAMP until the Wilderness Recreation Strategy is implemented.<br><br>**REC-1-26** ✔  Changes to existing permits and allocation system will be developed and implemented according to the Wilderness Recreation Strategy.<br><br>**REC-1-27** ✔  The existing SRUP for authorizing motorized boat use from Pleasure Park (at Gunnison Forks) to Smith Fork Creek on the Gunnison River in Delta County, Colorado, will be allowed to continue  for the life tenure of the permittee, Mr. LeRoy Jagodinski, or until the permit is relinquished or terminated by BLM.  The existing SRUP will be amended to incorporate stipulations permitting this subject motorized use only at certain times of the day, and to specify that only the current operator/permit holder, Mr. Jagodinski, and his employees, will be allowed to operate motorized boats within the Wilderness boundary under the permit. If the permit held by Mr. Jagodinski is transferred to another person, corporation, organization, or entity by BLM, the terms, stipulations,  and conditions of operation for the new permittee will be determined at that time; however, motorized boat use will not be permitted to continue within the Wilderness.<br><br>*New Commercial Permits:* **REC-1-28** ✔  New Wilderness permits will be issued if the Wilderness Recreation Strategy indicates a need for additional commercial services to meet management objectives.<br><br>*Private Permits:* **REC-1-29** ✔  BLM will continue to not require private boater or other recreation permits until a collaborative process for determining when, where, and to what extent permits are needed is developed and completed as part of the Wilderness Recreation Strategy.<br><br>**REC-1-30** ✔  In the interim, BLM will require all private users to have a nonlimiting, educational permit that informs them of the likelihood and nature of future use allocations that will affect them. |

BLM_0007527

2.  Approved Decisions

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)** **Recreation Management Zone  MU1-1:  Inner Gorge** Inner river canyon extending downstream of Chukar boat launch area up to the northern Wilderness boundary. *(continued)* | | | **Facilities and Signs:** *Existing:* REC-1-31 ✔ 17 primitive campsites. REC-1-32 ✔ Designated campsite markers that delineate 5 hiker, 10 boater, and 2 overflow (hiker or boater) sites. REC-1-33 ✔ Inner canyon segments of Duncan and Bobcat primitive access trails. REC-1-34 ✔ 1 pit toilet (Duncan) for hiker use only. *New:* REC-1-35 Relocation of pit toilets when needed; removal and rehabilitation of old site. REC-1-36 Possible relocation and/or addition of a few  (2-3) designated campsites if determined necessary to meet desired conditions.  Sites could be relocated or added to accommodate use from areas closed temporarily or permanently for restoration and/or weed control measures. **Trail or Road Construction:  REC-1-37** ✔ None **Trail or Road Maintenance:** REC-1-38 Trail maintenance will be conducted as needed to protect resources. REC-1-39  In addition to the continued use of chemicals and hand tools, chainsaws and other motorized equipment (minimum tool) will be used for removal of large stands of tamarisk in the area from Smith Fork Creek downstream to the Wilderness boundary. This maintenance will be accomplished within funding capabilities and will be implemented where appropriate. **Visual Resource Management:  REC-1-40** ✔ VRM Class I. **Recreation Opportunity Spectrum (ROS):  REC-1-41** ✔ ROS Unit I (primitive). |

BLM_0007528

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-2: Smith Fork Day Use Area and Ute Park (Cowboy Camp to BLM backcountry ranger site) (approximately 100 acres).**<br><br>**Activities:**<br>Day and multi-day Gold Medal trout walk-wade and float-boat fishing, camping, hiking, scenery, wildlife, and cultural resource viewing, nature study, photography. | *Physical Setting:* Backcountry; semi-primitive non-motorized; largely unmodified natural environment with evidence of man (past and present) subtly noticeable but not drawing attention when hiking or floating through the area with the exception of the seasonal BLM ranger station at Ute Park.<br><br>*Off Season (October – April):* Little contact with other boater, hiker, or fishing groups (0-3 groups per day) and no other groups visible from your campsite); average group size seen is 2-4 people.<br><br>*Primary River Season (May-September):* Little to low contact with other boater, hiker, or fisher groups  (see 4-10) groups per day) during mid-week, and moderate contact (see 11-15 groups on weekends) with 2-3 groups visible from your campsite; average group size seen is 6-8 people.<br><br>*Stone Fly Hatch, July 4, Memorial and Labor Day weekends:* Moderate to high contact with other boater, hiker, or fishing groups (see 15-20 groups per day); with 4-6 groups visible from your campsite; average group size seen is 5-7 people. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in picnicking, camping, Gold Medal (i.e., restrictive) trout fishing, kayaking, and rafting:<br><br>**Experiences:**<br>▪ Enjoying the total aesthetic environment Relishing group affiliation and togetherness.<br><br>▪ Having others nearby who could help you if needed.<br><br>**Benefits:**<br><br>Individual:<br>▪ Strengthened relationships with family and friends.<br>▪ Greater access for people having different skills to enjoy the same place.<br>▪ Increased acceptance of others who are different.<br>▪ Increased appreciation of the area's cultural history. | **Travel Management:** **REC-1-42** ✔ Public lands in this zone will be closed to motorized and non-motorized, mechanical use.<br><br>**Camping:**<br>**REC-1-43** ✔ No camping will be allowed at Smith Fork Day Use Area<br><br>**REC-1-44** ✔ Will be allowed in Ute Park in campsites designated for hikers or boaters. No dispersed camping will be allowed.<br><br>**REC-1-45** ✔ Human waste disposal systems (porta-potties, wag-bags, etc.) will be required for all camping parties.<br><br>**REC-1-46** ✔ All users will be required to pay Wilderness user fees for day use and camping.<br><br>**Stay Limit:** **REC-1-47** ✔ 3 days;<br><br>**REC-1-48** ✔ Boaters will be allowed to spend only one night in designated boater sites;<br><br>**REC-1-49** ✔ No layover night camping permitted.<br><br>**REC-1-50** ✔ Hikers will be permitted to stay two nights at a designated hiker camp.<br>**Campfires:**<br>**REC-1-51** ✔ No open fires will be allowed.<br><br>**REC-1-52** ✔ Stoves and/or charcoal will be allowed in fire pans only.<br><br>**REC-1-53** ✔ No firewood collecting will be allowed.<br><br>**Maximum Group Size:** **REC-1-54** ✔ 12 people.<br><br>**Competitive Events:** **REC-1-55** ✔ Competitive events will not be permitted in the zone or management unit.<br><br>**Target Shooting:** **REC-1-56** ✔ Will not be permitted in the zone or management unit.<br><br>**Hunting:** **REC-1-57** ✔ Will be allowed in accordance with state regulations. |

BLM_0007529

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-2: Smith Fork Day Use Area and Ute Park (Cowboy Camp to BLM backcountry ranger site)**<br><br>*(continued)* | *Managerial Setting*: 1-2 river patrols per week during primary season, increased patrols and visitor contacts in Ute Park campsites on weekends and during high use periods; a few visitor controls in river corridor (designated campsite markers, primitive toilet, BLM ranger station tepee and sign).<br><br>Land management practices, including tamarisk/weed control areas are evident but tend to fit in with natural landscape in most areas. | Household and Community:<br>■ Greater interaction of visitors from different cultures.<br>■ Improved group cooperation.<br><br>Economic:<br>■ Increased local tourism revenue.<br><br>Environmental:<br>■ Greater retention of distinctive natural landscape features.<br>■ Reduced spread of invasive species such as plants, insects, and aquatic organisms.<br>■ Greater protection of fish, wildlife, and plant habitat from impacts.<br>■ Greater protection of area historic structures and archeological sites. | <u>Commercial and Private Permits:</u><br><br>*Existing Commercial Permits:*<br><br>**REC-1-58** ✔  The existing SRUP authorizing  motorized boat use from Pleasure Park (at Gunnison Forks) to Smith Fork Creek on the Gunnison River in Delta County, Colorado, would be allowed to continue  for the life tenure of the permittee, Mr. LeRoy Jagodinski, or until the permit is relinquished by Mr. Jagodinski or terminated by BLM.  The existing SRUP would be amended to incorporate stipulations  permitting this subject  motorized boat use only at certain times of the day, and to specify that only the current operator/permit holder, Mr. Jagodinski, and his employees, would be allowed to operate motorized boats within the Wilderness boundary under the permit.  If the permit held by Mr. Jagodinski is transferred to another person, corporation, organization, or entity by BLM, the terms, stipulations, and conditions of operation for the new permittee will be determined at that time, however, motorized boat use would not be permitted to continue within the Wilderness<br><br>**REC-1-59** ✔  BLM will continue to permit 3 walk-wade fishing and 10 rafting/ float-fishing outfitters according to applicable sections of the RAMP until the Wilderness Recreation Strategy is implemented.<br><br>**REC-1-60** ✔  Changes to existing permits and allocation system will be developed and implemented according to the Wilderness Recreation Strategy.<br>*New Commercial Permits:*<br><br>**REC-1-61** ✔  No additional permits will be issued for motorized use.<br><br>**REC-1-62** ✔  New Wilderness permits will be issued if the Wilderness Recreation Strategy indicates a need for additional commercial services to meet management objectives.<br><br>*Private Permits:*<br><br>**REC-1-63** ✔  BLM will continue to not require private permits until a collaborative process for determining when, where, and to what extent permits are needed is developed and completed as part of the Wilderness Recreation Strategy and implement accordingly.<br><br>**REC-1-64** ✔  n the interim, BLM will require all private users to have a nonlimiting, educational permit that informs them of the likelihood and nature of future use allocations that will affect them. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007530

**Table 2-2.1a**
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)** <br><br> **Recreation Management Zone  MU1-2: Smith Fork Day Use Area and Ute Park (Cowboy Camp to BLM backcountry ranger site)** <br><br> *(continued)* | | | **Facilities and Signs:** <br><br> *Existing:* <br><br> **REC-1-65** ✔ Smith Fork Day Use Area – primitive trail up to potholes. <br><br> **REC-1-66** ✔ Ute Park – 6 primitive campsites (with designated campsite markers that delineate hiker and boater sites) and following facilities: <br> • BLM seasonal ranger station (tepee and sign) set up from May – October. <br> • 1 primitive toilet. <br> • Inner canyon portion of Ute Trail. <br> • Cultural resource protection signs. <br><br> *New:* <br> **REC-1-67** BLM will relocate and/or add a few designated campsites if determined necessary to meet desired conditions. <br><br> **REC-1-68** Sites could be relocated or added to accommodate use from areas closed temporarily or permanently for restoration and/or weed control measures or to accommodate increased camping use during periods of high use (stone fly hatch, holiday weekends). <br><br> **Trail or Road Construction/Maintenance:** <br><br> **REC-1-69** Trail maintenance will be conducted as needed to protect resources. <br><br> **REC-1-70** In addition to the continued use of chemicals and hand tools, chainsaws and other motorized equipment (minimum tool) will be used for removal of tamarisk or other noxious vegetation in this zone. This maintenance will be accomplished within funding capabilities and will be implemented where appropriate. <br><br> **Visual Resource Management: REC-1-71** ✔ VRM Class I. <br><br> **Recreation Opportunity Spectrum: REC-1-72** ✔ ROS Unit I (primitive). |

BLM_0007531

### Table 2-2.1a
### Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions<br>✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone MU1-3 Outer Wilderness Canyon Area - outer canyon above inner Gorge on east and west sides (approximately 11,000 acres).**<br><br>*Includes upper portions of Bobcat, Duncan, and Ute Trail and the Howell Village Trail on east side; Smith Fork Way on west side.*<br><br>**Activities:**<br>Hiking, backpacking, horseback riding, and nature study. | *Physical Setting:* Primitive, non-motorized, non-mechanized, unmodified natural environment.<br><br>*Off Season (October – April):* extremely little or no contact with others; (0 - 1 groups per day); average group size seen is 1-3 people.<br><br>*Primary Season (May-September):* Very little contact with other hiker or riding groups (see 0-3 groups per day) during mid-week; Little contact (see 4-6 groups) on weekends; average group size seen is 2-3 people.<br><br>*Stone Fly Hatch, July 4, Memorial and Labor Day weekends:* Little contact with other hiker or riding groups (see 4-6 groups per day) ; average group size seen is 2-3 people.<br><br>*Managerial Setting:* Few backcountry patrols; very subtle on-site visitor controls; no developed facilities.<br><br>Land management practices are essentially invisible. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in hiking, horseback riding, backpacking, and nature study.<br><br>**Experiences:**<br>■ Enjoying going exploring on my own.<br>■ Testing your endurance.<br>■ Gaining a greater sense of self-confidence.<br>■ Feeling good about solitude, being isolated, and independent.<br>■ Experiencing nature in a pristine setting.<br>■ Enhanced awareness and understanding of nature.<br><br>**Benefits:**<br>Individual:<br>■ Greater self-reliance.<br>■ Closer relationship with the natural world.<br>■ Improved physical health.<br>■ Increased appreciation of the area's cultural history. | **Travel Management:** **REC-1-73** ✔ Public lands in this Recreation Management Zone will be closed to motorized and non-motorized, mechanized vehicular use.<br><br>**Camping:**<br><br>**REC-1-74** ✔ Dispersed camping will be allowed (unless indicators exceed land health standards; if so, will restrict use to designated campsites)<br><br>**REC-1-75** ✔ Human waste disposal systems (porta-potties, wag-bags, etc.) will be required for all camping parties.<br><br>**REC-1-76** ✔ BLM will continue to require all users to pay Wilderness user fees for day use and camping.<br><br>**Stay Limit:** **REC-1-77** ✔ 3 days<br><br>**Campfires:**<br><br>**REC-1-78** ✔ No open fires will be allowed.<br><br>**REC-1-79** ✔ Stoves and/or charcoal will be allowed in fire pans only.<br><br>**REC-1-80** ✔ No firewood collecting will be allowed.<br><br>**Maximum Group Size:** **REC-1-81** ✔ 12<br><br>**REC-1-82** ✔ BLM will consider exceptions, up to a maximum of 25 people, on a case-by-case basis to accommodate groups larger than 12 for special uses ("kids-at risk" groups, school groups, research groups, etc.) appropriate for the Recreation Management Zone.<br><br>**REC-1-83** ✔ Groups with more than 12 people will require an organized group permit and will not be permitted to travel or camp outside of the Recreation Management Zone .<br><br>**Competitive Events:** **REC-1-84** ✔ Competitive events will not be permitted in the zone or management unit.<br><br>**Target Shooting:** **REC-1-85** ✔ Will not be permitted in the zone or management unit.<br><br>**Hunting:** **REC-1-86** ✔ Will be allowed in accordance with state regulations. |

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-3: Outer Wilderness Canyon Area - outer canyon above inner Gorge on east and west sides.**<br><br>*(continued)* | | <u>Environmental:</u><br>▪ Conservation of inner gorge ecosystem.<br>▪ Preservation of spectacular gorge scenery for future generations. | <u>Commercial and Private Permits:</u><br><br>***Existing Commercial Permits:***<br><br>**REC-1-87** ✔ BLM will continue to permit 1-2 big game outfitters according to applicable sections of the RAMP until the Wilderness Recreation Strategy is implemented.<br><br>**REC-1-88** ✔ Changes to existing permits and allocation system will be developed and implemented according to the Wilderness Recreation Strategy.<br><br>***New Commercial Permits:***<br><br>**REC-1-89** ✔ New commercial permits in the Wilderness  will be issued if the Wilderness Recreation Strategy indicates a need for additional commercial services to meet management objectives.<br><br>***Private Permits:***<br><br>**REC-1-90** ✔ BLM will issue organized group permits on a case-by-case basis for private groups over 12.<br><br>**REC-1-91** ✔ BLM will develop criteria and special regulations for organized private group permits in the Wilderness Recreation Strategy.<br><br>**REC-1-92** ✔ BLM will continue to not require individual private permits until a collaborative process for determining when, where, and to what extent permits are needed is developed and completed as part of the Wilderness Recreation Strategy and implement accordingly.<br><br><u>Facilities and Signs:</u><br><br>***Existing Trails:***<br><br>**REC-1-93** ✔ Outer canyon segments of 2 primitive (Bobcat and Duncan) and one developed (Ute Trail) access trails on west side (Bobcat, Duncan, and Ute Trails) and Howell Village to T-Dyke Trail (primitive)<br><br>**REC-1-94** ✔ Smith Fork Way Trail on west side (primitive road)<br><br>**REC-1-95** ✔ Historic Sidewinder (or Stemwider) Trail – primitive trail located in Buttermilk/Red Canyon area on east side.<br><br>***New:***<br>**REC-1-96** Primitive trail and directional signs will be added where needed to keep users on route and away from sensitive areas. |

BLM_0007533

2. Approved Decisions

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone MU1-3: Outer Wilderness Canyon Area - outer canyon above inner Gorge on east and west sides.**<br><br>*(continued)* | | | **Trail or Road Maintenance/Construction:**<br>**REC-1-97** BLM will convert primitive road sections of Smith Fork Way to hiking/horseback trail.<br><br>**REC-1-98** BLM will construct primitive trail segments where needed to better define Sidewinder Trail and keep users on route.<br><br>**REC-1-99** BLM will construct primitive trail segments where needed to connect East Side overlook(s) to Smith Fork Way Trail to reduce user-created routes on Wilderness rim.<br><br>**Trail or Road Maintenance:** **REC-1-100** Trail maintenance will be conducted as needed to protect resources. In addition to the continued use of chemicals and hand tools, chainsaws and other motorized equipment (minimum tool), will be used for removal of large stands of tamarisk in side canyon drainages if needed. This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management:** **REC-1-101** ✔ VRM Class I.<br><br>**Recreation Opportunity Spectrum:** **REC-1-102** ✔ ROS Unit II (semi-primitive non-motorized). |
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone MU1-4: Chukar Recreation Site - Includes Chukar Trailhead Recreation Site, Chukar Trail , boat launch and designated river campsites including Margaritaville sites within the Black Canyon of the Gunnison National Park that are managed jointly by BLM and Park Service (about 1,500 acres, including about 350 acres in the adjacent Black Canyon of the Gunnison National Park).** | *Physical Setting:*<br>• **Chukar Trailhead:** Middle country; semi-primitive motorized; modified natural environment with human use alterations dominant.<br>• **Chukar Trail:** Backcountry; semi-primitive non-motorized; largely unmodified natural environment with human use alterations noticeable on trail, at boat launch and campsite area.<br><br>*Off Season (October – April):* Little contact with others; (see 0-6 groups per day) and no other groups visible from your campsite); average group size seen is 2-4 people. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in on-trail hiking, day-use and overnight Gold Medal (i.e., restrictive) trout fishing, and camping:<br><br>**Experiences:**<br>• Enjoying having relatively easy access to pristine wilderness.<br>• Enjoying getting some needed physical exercise. | **Travel Management:**<br>**REC-1-103** Chukar Trailhead Recreation Site - Travel by motorized and non-motorized, mechanical vehicles will be permitted on Chukar Road only and within trailhead use area in this zone.<br><br>**REC-1-104** ✔ Chukar Trail, boat launch, river campsites – Will be closed to motorized and non-motorized, mechanized vehicular use.<br><br>**Camping:**<br>**REC-1-105** ✔ No dispersed camping will be allowed in Recreation Management Zone .<br><br>**REC-1-106** ✔ Vehicle camping will be permitted in developed campsites at Chukar Trailhead Recreation Site.<br><br>**REC-1-107** ✔ Camping in river corridor will be allowed only in designated hiker or boater campsites at Chukar or Margaritaville areas.<br><br>**REC-1-108** ✔ Toilets will be provided at trailhead and boat launch for hikers, campers and/or boater groups waiting to launch. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007534

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-4:  Chukar Recreation Site**<br><br>*(continued)*<br><br>**Activities:**<br>Day and overnight Gold Medal trout fishing, camping, on-trail hiking and scenery viewing. | *Primary River Season (May-September):* Low contact with others (see 7-10 groups per day) during mid-week, and moderate contact (see 11-15 groups on weekends); average group size seen is 6-8 people.<br><br>*Stone Fly Hatch, July 4, Memorial and Labor Day weekends:* Moderate to high contact with others (see 15-20 groups per day); average group size seen is 4-6 people.<br><br>*Managerial Setting:* Regular (almost daily) hike-in patrols during primary season, increased patrols and visitor contacts on weekends and during high use periods; visitor controls and facilities evident at developed trailhead and boat launch. Designated campsite markers at river campsites.<br><br>Land management practices including tamarisk/weed control areas are evident but tend to fit in with natural landscape in most areas. | **Benefits:**<br><br>Individual:<br>• Greater cultivation of personal resource stewardship ethics.<br>• Enlarged sense of personal accountability for acting responsibly. Improved understanding of our community's dependence and impact on public lands.<br><br>Household and Community:<br>• Greater awareness that this area is a special place.<br>• Enlarged sense of community dependence on public lands.<br>• Greater appreciation the challenge of sustaining environmental quality here.<br><br>Economic:<br>• Improved local economic stability.<br>• Increased local tourism revenue. | **REC-1-109** ✔  All users will be required to pay Wilderness user fees for day use and camping .<br>**REC-1-110** ✔  Dogs will be required to be leashed at all times within the National Park.<br><br>**Stay Limit:  REC-1-111** ✔  3 days; Boating groups could spend only 1 night at Margaritaville boater campsite(s).<br><br>**Campfires:**<br>**REC-1-112** ✔  No open fires will be allowed.<br>**REC-1-113** ✔  Stoves and/or charcoal in grills will be allowed in developed trailhead campsites.<br>**REC-1-114** ✔  Stoves will be allowed only in river campsites (Chukar and Margaritaville campsites)<br>**REC-1-115** ✔  No firewood collecting will be allowed.<br><br>**Maximum Group Size:  REC-1-116** ✔  12<br><br>**Competitive Events:  REC-1-117** ✔  Competitive events will not be permitted in the zone or management unit.<br><br>**Target Shooting:  REC-1-118** ✔  Will not be permitted in the zone or management unit.<br><br>**Hunting:  REC-1-119** ✔  Will be allowed in accordance with state regulations.<br><br>**Allowed Number of Boat Launches Per Day:**<br>**REC-1-120** ✔  *Commercial*:  2 per day<br>**REC-1-121** ✔  *Private:*  Target of 4 per day<br><br>**Commercial and Private Permits:**<br>*Existing Commercial Permits:*<br>**REC-1-122** ✔  BLM will continue to permit 3 walk-wade fishing , 10 rafting/ float-fishing outfitters, and one commercial horse packer according to applicable sections of the RAMP until the Wilderness Recreation Strategy is implemented. |

BLM_0007535

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**  **Recreation Management Zone  MU1-4:  Chukar Recreation Site**  *(continued)* | | Environmental:  ▪ Reduced looting and vandalism of area facilities.  ▪ Greater community stewardship of natural and man-made area features. | **REC-1-123** ✔ Changes to existing permits and allocation system will be developed and implemented according to the Wilderness Recreation Strategy.  *New Commercial Permits:*  **REC-1-124** ✔ New Wilderness permits will be issued if the Wilderness Recreation Strategy indicates a need for additional commercial services to meet management objectives. The Wilderness Recreation Strategy will provide management direction for ensuring that horse-packing services will continue to be available to the public throughout the river season.  *Private Permits:*  **REC-1-125** ✔ BLM will continue to not require private permits until a collaborative process for determining when, where, and to what extent permits are needed is developed and completed as part of the Wilderness Recreation Strategy and implement accordingly.  **REC-1-126** ✔ Until the Wilderness Recreation Strategy is developed, and implemented, BLM will require all private users (during stone fly hatch and/or other high use periods) to have a nonlimiting, educational permit in this zone that informs users of the likelihood and nature of future use allocations that will affect them.  **Facilities and Signs:**  *Existing:*  **REC-1-127** Chukar Trailhead Recreation Site – Wilderness and fee information kiosk, parking lot, composting toilet, 3 developed campsites with grills, and picnic tables.  **REC-1-128** Chukar Horse-Staging Area – 4-5 hitching posts and unloading area currently used by one permitted outfitter that provides all horse packing services for Wilderness boaters.  **REC-1-129** Chukar Trail – constructed trail with sections of gravel, wooden steps, and retaining walls.  **REC-1-130** Chukar Boat Launch – river register, universal access toilet,  **REC-1-131** Chukar and Margaritaville campsites - designated campsite markers that delineate hiker and boater sites. |

BLM_0007536

Table 2-2.1a
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 1 (Wilderness)**<br><br>**Recreation Management Zone  MU1-4:  Chukar Recreation Site**<br><br>*(continued)* | | | **New:**<br><br>**REC-1-132**  BLM will possibly relocate and/or add 1-2 designated campsites if determined necessary to meet desired conditions.  Sites could be relocated or added to accommodate use from areas closed temporarily or permanently for restoration and/or weed control measures or accommodate increased camping use during high use periods.<br><br>**REC-1-133**  Upgrades to Chukar Trailhead Recreation site will be conducted as needed to meet desired conditions, visitor satisfaction levels, and BLM construction standards for developed recreation areas.  Upgrades could include expansion of the existing 3-site campground and changes to the existing toilet structure to meet increased demand and/or visitor safety standards.<br><br>**REC-1-134**  BLM will potentially undertake new construction at horse-staging area if needed to provide continued horse-packing services for commercial and private Wilderness boaters.  Construction could include corrals and/or other permanent structures for providing horse-packing services throughout the primary use season.<br><br>**Trail or Road Construction:  REC-1-135** ✔  None<br><br>**Trail or Road Maintenance:**<br>**REC-1-136**  BLM will conduct regular trail maintenance to protect resources and maintain trail to horse and visitor use safety standards. This could include addition of gravel, wooden or stone steps, or other materials or rerouting of trail sections to improve conditions or address safety concerns.<br><br>**REC-1-137**  In addition to the continued use of chemicals and hand tools, chainsaws and other motorized equipment will be used (minimum tool), if needed, for removal of large stands of tamarisk. This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management:  REC-1-138** ✔  VRM Class I.<br><br>**Recreation Opportunity Spectrum: REC-1-139** ✔  ROS Unit I (primitive). |

BLM_0007537

**Table 2-2.1a**
**Management Unit 1 (Gunnison Gorge Wilderness) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 1 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 1:** | | | **REC-1-140** ✔ Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions. |

**REC-1-140** ✔ Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions.

**REC-1-141** ✔ Set carrying capacities for high use areas as needed based on resource protection needs and visitor satisfaction levels.

**REC-1-142** ✔ Set specific regulations for appropriate OHV "play" and travel on designated routes to enhance visitor safety and protect resources. Regulations will include temporary closures for periods when soils are too wet for travel.

**REC-1-143** ✔ Educate users about responsible OHV play and regulations regarding resource damage.

**REC-1-144** ✔ Implement low-impact use regulations for camping, campfires, sanitation, etc. as needed.

**REC-1-145** ✔ Educate users about low impact camping, "Tread Lightly," and other land use ethics.

**REC-1-146** ✔ Develop maximum group size and vehicle limits, selection criteria, and special regulations for commercial, organized group, and competitive permits based on resource conditions, etc.

**REC-1-147** ✔ Provide maps, brochures, and website information.

**REC-1-148** ✔ Continue coordinating with the Park Service to provide and improve visitor information, signing, and compliance. and annually fund the joint Park Service/BLM Visitor Guide.

**REC-1-149** ✔ Where feasible, BLM will coordinate joint funding with the Park Service for permanent and seasonal positions to increase ground presence and coordination between the agencies to improve customer service and user education.

**REC-1-150** ✔ Analyze need for additional trails, recreation facilities, resource protection measures, etc. to enhance visitor safety, protect resources; and provide diversity of trail uses (single-track, all-terrain vehicle [ATV], mountain bike, dirt bike, etc.).

**REC-1-151** ✔ BLM will assist in forming and administering a friends group to help BLM manage the Wilderness and Gunnison Gorge resources. The mission will include, but will not be limited to, working on trails and other facilities, monitoring and improving resource conditions, monitoring visitor satisfaction levels, educating users in pre-trip information and during trips, and providing feedback to BLM on general activities in the area.

**REC-1-152** ✔ Develop (cooperatively with CDOW) criteria and process for establishing no-hunting areas where needed for visitor safety.

BLM_0007538

**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit**

**Management Unit 2 Land Ownership: 9,754 acres of public surface; 10% of planning area public lands**

*This 9,754-acre management unit includes public and private lands inside and outside the NCA. The unit is located in the southwest portion of the NCA. See Figure 2-1 for the location of this unit. Flat Top, a prominent Mancos shale mesa, is a featured landmark in the southwestern-most portion of the unit. This unit contains Mancos shale soils and terrain. Providing a wide range of quality riding opportunities and benefits for motorized and non-motorized users will be the primary emphasis in this unit. About 1,600 acres of public land are outside the NCA boundary.*

*In addition to providing outstanding OHV opportunities, lands in the unit contain a number of values. The unit includes portions of Colorado Natural Heritage Program Potential Conservation Areas recognized for rare plants, as well as for good-condition examples of certain plant communities (cold desert shrublands:* Atriplex confertifolia Leymus salina, Atriplex confertifolia/Hilaria jamesii). *The unit includes several rare plants unique to Mancos shale in this region, including Clay-loving wild buckwheat, Colorado desert parsley* (Lomatium concinnum), *Montrose penstemon (Adobe beardtongue)* (Penstemon retrorsus), *Rocky Mountain thistle* (Cirsium perplexans), *Uinta Basin hookless cactus, and Good neighbor bladderpod* (Lesquerella vicina). *The soils in the Mancos shale also support several species of biological soil crusts that provide several ecological functions to the area (e.g., soil stability, reduced erosion and sediment yield, nitrogen fixation). One species of soil lichen,* Aspicilia fruticulosa, *that was collected in Peach Valley during the fall of 2002 has been documented in only one other location in the state of Colorado in Grand County north of Kremmling (Rosentreter 2002) and in very few other locations in North America.*

*The management unit supports wildlife species such as the kit fox (state-listed endangered)* (Cervus elaphus), *western burrowing owl* (Athene cunicularia), *Gunnison's prairie dog* (Cynomys gunnisoni), *chukar* (Alectoris chukar), *coyote* (Canis latrans), *red fox* (Vulpes vulpes), *mule deer, elk, northern harrier* (Cirus cyaneus), *wintering bald eagle (federally listed threatened), white tailed ground squirrel* (Ammospermophilus leucurus), *mourning dove* (Zenaida macroura), *horned lark* (Eremophila alpestris), *and a variety of other species either seasonally or year round.*

*In addition, the unit supports somewhat unique soils and geology, has scenic values, has the potential to support scientific research, has interpretive and educational values, and serves as a transition into the NCA and Wilderness.*

*Concerns in this management unit include: a potential increase in recreation use and users and associated effects of this increase both on-site and off-site, including safety. Additionally, users' access to limited areas via undesignated routes from private lands will be difficult to control.*

*This management unit will be managed as the Flat Top-Peach Valley OHV SRMA. Specific management measures will include the following:*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-2-1 | Approximately 10 acres of public lands on Flat Top Mesa will be designated as a low-power communication site (Figure 2-1). | |

BLM_0007539

**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Lands, Rights-of-Way, and Withdrawals** *(continued)* | **LAND-2-2** | A detailed site and landscaping plan will be developed for the entire Flat Top mesa, including the communication site, and lands not currently used for communication purposes, before authorizing any additional uses. The goal for the site will be to manage the lands for low-power uses and integrate recreation uses currently ongoing.<br><br>At the site:<br>1. The existing high-power FM sites will be permitted to be authorized.<br>2. No additional high-power FM uses will be authorized.<br>3. When existing high-power FM authorizations are relinquished or terminated, the uses will not be reauthorized.<br>4. All future uses and applicants will not interfere with the uses currently authorized.<br>5. Interpretive signs will be designed and installed to communicate the multiple uses of this site and surrounding area(s) and to display the prominent features seen from the site.<br>6. Visual impacts of existing uses will be mitigated over time where possible.<br>7. Each future additional application for use will be accompanied by a simulation visual analysis and visual impact determination as seen from to-be-selected critical viewing points, in order to assess the actual visual impacts of the proposal and alternatives.<br>8. Fencing will be required for security at all sites.<br>9. The current uses on the site, including public access and motorized and non-motorized vehicular use, will be maintained and considered in the site plan.<br>10. Existing tire tracks will be smoothed over to reduce the existing visual impacts. | **LAND-2-3**<br>Motorized and non-motorized, mechanical vehicular travel and use, including mountain bikes, on the Flat Top Mesa and the slopes of the mesa will be limited to the designated routes shown on Figure 2-4 (see end of this chapter).  These routes could be refined during the site planning process for the mesa top. |
| | **LAND-2-4** | A ROW corridor 0.5-mile wide and approximately one-quarter mile wide will be designated on public lands at the northern  end of Management Unit 2 along the western edge of NCA.   The corridor will contain part of the existing Tri-State Generation and Transmission Association (Tri-State) 115-kilovolt (kV) transmission line. This corridor will extend north into adjacent Management Unit 6. See Figure 2-2 and Table 2-3 (see end of this chapter) for more detail on this ROW corridor.  The BLM will encourage future applicants proposing new or upgraded linear utility and other projects to locate facilities within this ROW corridor. | |
| | **LAND-2-5** | The remainder of the unit will be open to ROWs on a case-by-case basis, but would avoid impacts on recreation facilities. | |
| | **LAND-2-6** | Mitigation will be required in all ROW applications to meet the objectives of this management unit. | |
| | **LAND-2-7** | ROWs across the existing and proposed Falcon Road entrance site or staging area will be allowed on a case-by-case basis but will avoid impacts on the recreation facilities. | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007540