**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Access and Transportation | TRAN-2-1 | Road improvements such as culverts and bridges will be implemented as necessary to reduce erosion and proliferation of roads. | |
| | TRAN-2-2 | Easements and necessary access will be secured for improved administration, user access, and safety. | |
| | TRAN-2-3 | Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands. These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management. | |
| Geology, Soils, and Water Resources | GEO-2-1 | USGS research will be conducted to determine the level of impacts from multiple uses in the area. USGS, BLM, and other research entities may be involved in research. Adaptive management from research results will be applied. | |
| | GEO-2-2 | Using research from USGS and BLM, changes will be made where needed to meet BLM land health standards. Contributions to soil erosion, salt and selenium loading, sedimentation, and dust from OHV use, livestock grazing, mountain biking, and other surface-disturbing uses will be researched and proactively addressed. Contributing uses that can be mitigated successfully will be, and use will be avoided in areas where resource impacts far outweigh benefits of the use. | |
| | GEO-2-3 | In Elephant Skin Wash (see Figure 3-4 in Chapter 3 of the DRMP [BLM 2003c]), all surface-disturbing uses (including but not limited to OHV, mountain biking, horseback riding, and livestock grazing) will be monitored. | |
| Minerals and Energy Resources | MIN-2-1 | The entire federal oil and gas estate outside the NCA boundary in the unit will be available for leasing with an NSO stipulation in the event leasing occurs, in order to prevent safety hazards and to reduce conflict with high concentrations of OHV users and others on these important recreation lands (stipulation GGNCA-10). | |
| | MIN-2-2 | Public lands in the unit outside the NCA will not be available for mineral material sales. | |
| Vegetation | VEG-2-1 | Weed-control measures will be implemented. | |
| | VEG-2-2 | Research and monitoring will be conducted to determine if uses allowed in the management unit are exacerbating the spread of undesirable plant species or causing excessive damage to native vegetation or biological soil crusts, and mitigation plans and rehabilitation projects will be implemented if needed to address these concerns. | |
| | VEG-2-3 | On those areas degraded by historic use, a series of pilot restoration projects will be carried out to determine best practices for restoring native plant communities. | |

BLM_0007541

**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Vegetation** *(continued)* | **VEG-2-4** | Successful practices will be implemented on a broader scale in other seriously degraded areas in the unit. | |
| | **VEG-2-5** | In areas in the unit with slightly degraded vegetation, measures to control the source of degradation will be taken and the vegetation will be monitored to determine if it will recover on its own. | |
| **Wildlife; Public Safety** | **WFA-2-1** | To prevent conflicts and/or safety problems with animal damage control efforts, the entire management unit will be closed to aerial gunning. | |
| **Special Status Species** | **SSS-2-1** | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat in the unit, specifically within Mancos shale areas, for Gunnison's prairie dog, Clay-loving wild buckwheat, and kit fox, a state-listed endangered species. | |
| **Rangeland** | **RANG-2-1** | Livestock grazing permits will be evaluated to ensure that compatible livestock management objectives, projects, and mitigating measures are incorporated before being implemented. | |
| | **RANG-2-2** | All areas not meeting land health standards, including areas in Elephant Skin Wash impacted by livestock grazing, OHV, and other surface-disturbing activities, will be reclaimed where necessary to meet land health standards. | |
| **Recreation** | *see Table 2-2.2a* | Recreation management decisions are shown in Table 2-2.2a below for Management Unit 2. See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones MU2-1 through MU2-3. | |
| | **REC-2-1** | OHV designations are shown on Figure 2-3 (see end of this chapter).<br><br>Approximately 2,579 acres of public land in the unit in three different locations will be open to off-route, off-trail, motorized or non-motorized, mechanical vehicular travel. | **REC-2-2**<br><br>Motorized and non-motorized mechanical vehicular travel and use on public lands in the remainder of this unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter). The routes shown are preliminary and may not be all-inclusive. |

BLM_0007542

**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Recreation** *(continued)* | | | **REC-2-3** Designated routes will be further refined with the assistance of a collaborative BLM/citizen work group. Until routes are refined, all motorized and non-motorized, mechanical vehicular travel will be limited to the designated routes shown on Figure 2-4 (see end of this chapter). |
| | **REC-2-4** | Lands designated as open to cross-country, off-route, motorized and non-motorized mechanical vehicular travel and use, and lands where existing open designations will be changed, will be monitored for compliance. | |
| | **REC-2-5** | Approximately 1,606 acres of public lands outside the NCA in the southern-most part of the unit will be open to motorized and non-motorized, mechanical vehicular travel and use near Flat Top Mesa. This area will be bounded on the north by the north rim of the east-west drainage following King Ditch and Upper King Ditch and the southern boundary of the NCA, on the west by BLM-managed lands and private land boundaries, and on the east by Bostwick Park Road. | |
| | **REC-2-6** | An existing, informal staging and unloading area within the unit near Flat Top Mesa will be re-designed, expanded, and constructed to facilitate use of the lands. Parking, access, sanitation, and informational signing will be elements of the design. Users and others will assist in the location and design of the site. | |
| | **REC-2-7** | Approximately 40 acres of public lands within the NCA boundary containing the "Lower Elephant Skin Pond Track" will also be open to cross-country, off-route, motorized and non-motorized mechanical vehicular travel and use. | |
| | **REC-2-8** | Approximately 933 acres of public land in the unit inside the NCA boundary on the north and south sides of Falcon Road in the Peach Valley area will be open to motorized and non-motorized, mechanical vehicular travel and use. This open area includes the proposed visitor entrance site at the existing Falcon Road OHV staging area, and the new OHV staging area to be relocated and constructed within this unit. | |

BLM_0007543

**Table 2-2.2**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Recreation** *(continued)* | **REC-2-9** | The existing OHV staging and unloading area on Falcon Road at the northwest corner of this unit will be relocated and constructed at a location near the existing water storage tank in this unit. The relocation and design of the new staging will be accomplished with the assistance of OHV users and others. At a minimum, the new staging area will provide parking, unloading/loading facilities, information, and sanitation facilities, and will be located near designated or existing routes or trails that could be used by motorized OHVs or non-motorized mechanical vehicles to access other lands for OHV activities. The staging area will be open to motorized and non-motorized mechanical vehicular travel and use. The existing staging area will be converted into the Falcon Road Visitor Entrance Site. | |
| | **REC-2-10** | The boundaries of the Falcon Road open area will be adjusted, mapped, marked, and identified to prevent unintentional cross-country off-route travel by motorized and non-motorized mechanical vehicles. | |
| | | | **REC-2-11** Signing or other means to direct traffic will be installed where needed in the open and limited areas to communicate off-limit areas or areas where some measure of vehicular control is needed to meet management goals. |
| | **REC-2-12** | Throughout this unit, OHV use may be restricted or prohibited in certain areas as necessary to meet site-specific management objectives for improving users experiences, reducing conflicts, addressing safety concerns, conducting research and monitoring efforts, and/or providing resource protection in sensitive areas, as part of the adaptive management process. Restricting or prohibiting OHV use could include either temporary or permanent closure or relocation of certain routes if necessary. Valid rationale for these adjustments could include, but will not be limited to, that mentioned above and for such reasons as safety, omitting duplicative, adjacent routes, or for other reasons. | |
| | **REC-2-13** | Opportunities for non-motorized users will be provided in the unit and will be managed in a manner to reduce user conflicts between motorized and non-motorized users. | |
| | **REC-2-14** | BLM, with assistance and input from the public and other agencies, will manage levels of acceptable use in open areas using parameters such as land health, noise, dust, user conflicts, and safety. Open areas will be monitored to determine when use has exceeded limits and OHV designations need to be changed. | |

Table 2-2.2
Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Decisions Applicable to Entire Management Unit *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Recreation** *(continued)* | **REC-2-15** | Grants and other appropriate non-governmental funding will continue to be sought for a variety of recreation and other purposes in this unit. | |
| | **REC-2-16** | Based on funding needs, the BLM could implement a day use fee for recreation activities within the OHV Recreation Area. | |
| | **REC-2-17** | At BLM's discretion, target shooting on public lands may be authorized on public lands in the planning area only in those portions of Management Units 2, 4, and 6 located outside the NCA boundary. See the recreation-specific decisions for these management units below. Target shooting will not be authorized on public lands in the remainder of the planning area in order to provide a safe environment for all users in the planning area, and to protect persons, health, and property. Authorization would occur according to BLM and other applicable regulations. Special operating procedures and local BLM regulations will be established and posted. Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be followed. If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. | |
| **Law Enforcement, Patrols, and Public Safety** | **LAW-2-1** | In cooperation with user groups and volunteers, BLM will conduct regular trail patrols, cleanups, and necessary maintenance. Law enforcement presence will be increased. BLM will work with the CDOW and users to determine the need to establish a no-hunting zone and target shooting restrictions in the unit to ensure public safety. Restrictions could include a no-hunting zone and target shooting closure within the entire unit. | |
| | **LAW-2-2** | The BLM will collaborate with Montrose County to reduce the amount of windblown trash on public and other lands from the county landfill (Figure 1-1). Consideration will be given to cooperative cleanup programs or alternative fencing methods, and landfill operation procedures that result in the trash being blown off the landfill property. | |
| **Education and Interpretation** | **EDU-2-1** | At Flat Top and Falcon Road staging area, brochures, maps, and other instructional information will be developed for marketing and other purposes to accurately inform potential visitors of the opportunities, experiences, allowed uses, best times and locations for certain uses, regulations, and generally what to expect in the OHV Recreation Area. Information on low impact use and natural values will also be included. Such materials will indicate that motorized use will be managed in specific ways to meet BLM resource protection objectives and provide different types of experiences for a wide range of motorized and non-motorized users. Visitor information will be available at the low power communication site to be designed on Flat Top Mesa and will be distributed via local merchants, the Internet, and other means. | |

BLM_0007545

Table 2-2.2a
Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)

Recreation Management Zone MU2-1: Falcon Road OHV Play Area (933 acres).

*Open OHV use area located within NCA's west boundary on Falcon Road near Olathe.*

Activities:
Cross-country ATV, dirt bike riding and vehicle "play." | *Physical Setting:* Front country adjacent to primary access road; and rural private lands; resource modification by OHV activities very evident; surrounded by natural-appearing environment.

*Number Social Encounters:* moderate to high degree of contact with people on roads (see 30 or more groups per day near roads and 15 or more groups away from roads.) Average group size seen is 3-5 people.

*Managerial Setting:* On-site management controls and regulations are numerous and easy to see; simple visitor information facilities are present. Increased vehicle patrols and visitor contacts.

New facilities will include NCA entrance kiosk, OHV staging area, informational, regulatory, boundary, and directional signing, fences, barricades, etc.

Facilities will be designed to be vandal-resistant, easy to maintain, and able to accommodate high degree of use.

Land management practices, such as grazing, vegetation treatments are evident but tend to fit in with natural landscape. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in play area Dirt Bike and ATV riding:

Experiences:
• Developing your skills and abilities.
• Enjoying risk-taking adventure.
• Enjoying being with friends and family.

Benefits:

Individual:
• Reduced stress.
• Increased sense of adventure.
• Greater family bonding.

Household and Community:
• Enlarged sense of community dependence on public lands.
• Greater community involvement in recreation and other land use issues.

Economic:
• Increased local tourism revenue | Travel Management:

REC-2-18 ✔ Public lands in Recreation Management Zone MU2-1 will be open to off-route, cross-country motorized and non-motorized, mechanical vehicular travel.

REC-2-19 ✔ For safety reasons in this zone, off-route, cross-country motorized and non-motorized, mechanical vehicle travel will be permitted only for ATVs, mountain bikes, and motorcycles.

REC-2-20 ✔ Passenger cars, trucks, jeeps, and other automobile use will be authorized in this zone only on Falcon Road, Chukar Road, designated parking lots, and access roads to designated parking lots.

REC-2-21 ✔ These vehicle types will be considered for use on certain other routes or areas on public lands in this zone during the collaborative route-refinement process to be conducted after ROD is effective (See Travel Management, Zone MU2-3).

REC-2-22 ✔ Based on resource protection needs, amount of use, overcrowding, safety, or other factors, certain areas or heavily used routes within this zone may be restricted to certain types of vehicles or use in order to meet land health standards, reduce safety hazards, or comply with other regulations. Use on these lands will be considered during the collaborative process for designated route refinement with the assistance and input of a BLM/citizen work group.

Camping:  REC-2-23 ✔ In designated areas only. Camping could be eliminated or otherwise restricted if monitoring shows adverse impacts to soils, water, vegetation, or other values. Until areas are designated, these areas will be for day use only.

Stay Limit:  REC-2-24 ✔ 7 days, once areas are designated.

Campfires:  REC-2-25 ✔ No open fires will be allowed;

REC-2-26 ✔ stoves and/or charcoal in grills or fire pans will be allowed.

REC-2-27 ✔ No firewood collecting will be allowed. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007546

**Table 2-2.2a**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-1:  Falcon Road OHV Play Area**<br><br>*(continued)* | Environmental:<br>▪ Improved respect for privately-owned lands.<br>▪ Greater community ownership in/stewardship of area. | | **Maximum Group Size: REC-2-28** ✔ 25 people;<br><br>**REC-2-29** ✔ Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events: REC-2-30** ✔ Motorized and non-motorized competitive events will not be authorized in this recreation management zone (933 acres).<br><br>**Target Shooting: REC-2-31** ✔ Will not be permitted in the zone or management unit.<br><br>**Hunting: REC-2-32** ✔ Will be allowed in accordance with state regulations. No-hunting zones will be established in cooperation with CDOW if determined necessary for visitor protection<br><br>**Commercial and Private Permits:**<br><br>*Existing Commercial Permits:* **REC-2-33** ✔ None<br><br>*New Commercial Permits:* **REC-2-34** ✔ BLM will allow new permits if activities would be appropriate to Recreation Management Zone .<br><br>*Private Permits:* **REC-2-35** ✔ Individual private permits will not be required.<br><br>**REC-2-36** ✔ Organized group permits will be required for private groups over 25 people.<br><br>**Facilities and Signs:**<br><br>**REC-2-37** BLM will construct a new OHV staging area/parking area west of existing Falcon Road water storage tank (NEPA completed 2004).<br><br>**REC-2-38** BLM will construct a new NCA information kiosk and parking area at site of existing Falcon Road OHV staging/parking area.<br><br>**REC-2-39** Boundary, informational, regulatory, and directional signs. Fences, rock barricades, etc., to: protect private lands; contain OHV play in open area; protect special status species, unique soils, etc; and allow success of restoration measures<br><br>**Trail Construction: REC-2-40** ✔ Open area. |

BLM_0007547

**Table 2-2.2a**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-1:  Falcon Road OHV Play Area**<br><br>*(continued)* | | | <u>Trail Maintenance:</u>  **REC-2-41**  Will be conducted as needed.<br><br>**REC-2-42**  Areas impacted by unauthorized uses will be closed, either temporarily or permanently as needed, and rehabilitated.  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br><u>Visual Resource Management</u>:  **REC-2-43** ✔  VRM Class IV.<br><br><u>Recreation Opportunity Spectrum:</u>  **REC-2-44** ✔  ROS Unit II (semi-primitive motorized). |
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-2:  Chukar Road to Elephant Skin Wash (approximately 7,000 acres, about 99 percent of which are inside NCA).**<br><br>*Limited OHV Area – Located within NCA west of Chukar Road and extending from Falcon Road OHV Play Area to Elephant Skin Wash.*<br><br>**Activities:**<br>ATV, dirt bike and mountain bike trail riding. | ***Physical Setting:*** Middle Country with small sections of rural by private land and one primitive road, motorized, largely unmodified natural-appearing surrounding.<br><br>***Number Social Encounters:*** Low contact away from roads or main trails (see 6-15 groups per day); moderate to high degree of contact with others on main trails (see more than 15 groups.)  Average group size seen is 2-4 people.<br><br>***Managerial Setting:*** Vehicle patrols and increased visitor contacts.<br><br>Facilities include trailhead kiosks trails systems, and signs.<br><br>Land management practices, such as grazing, vegetation treatments are evident but tend to fit in with natural landscape. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in Mountain Bike and Dirt Bike riding and ATV and four-wheel-drive driving on designated routes:<br><br>Experiences:<br>• Enjoying having easy access to natural landscapes.<br>• Developing your skills and abilities.<br>• Enjoying getting some needed physical exercise.<br><br>Benefits:<br><br>Individual:<br>• Reduced stress.<br>• Increased sense of adventure. | <u>Travel Management:</u>  **REC-2-45** ✔  Limited OHV area;<br>**REC-2-46**  Motorized and non-motorized mechanical vehicle use on public lands in this zone will be limited to the designated routes shown on Figure 2-4.  This use will not be permitted off-route or cross-country.<br><br><u>Camping:</u> **REC-2-47** ✔  In designated areas only.<br><br>**REC-2-48** ✔  Camping could be eliminated or otherwise restricted if monitoring shows adverse impacts to soils, water, vegetation, or other values.<br><br>**REC-2-49** ✔  Until areas are designated, this zone will be for day-use only.<br><br><u>Stay Limit:</u>  **REC-2-50** ✔  7 days, once areas are designated.<br><br><u>Campfires:</u>  **REC-2-51** ✔  No open fires will be allowed;<br>**REC-2-52** ✔  stoves and/or charcoal in grills or fire pans will be allowed.<br>**REC-2-53** ✔  No firewood collecting will be allowed.<br><br><u>Maximum Group Size:</u> **REC-2-54** ✔  25 people;<br><br>**REC-2-55** ✔  Organized group permits will be required for groups over 25 people.<br><br><u>Competitive Events:</u> **REC-2-56** ✔  Competitive events will not be permitted in the zone or management unit. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

November 2004

BLM_0007548

**Table 2-2.2a**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-2: Chukar Road to Elephant Skin Wash**<br><br>*(continued)* | <u>Household and Community</u>:<br>■ Enlarged sense of community dependence on public lands.<br>■ Greater community involvement in recreation and other land use issues.<br><br><u>Economic</u>:<br>■ Increased local tourism revenue.<br><br><u>Environmental</u>:<br>■ Improved respect for privately-owned lands.<br>■ Greater community ownership in/stewardship of area.<br>■ Increased protection of natural landscapes. | | <u>**Target Shooting**</u>: **REC-2-57** ✔ Will not be permitted in the zone or management unit.<br><br><u>**Hunting**</u>: **REC-2-58** ✔ Will be allowed in accordance with state regulations.<br><br>**REC-2-59** ✔ No-hunting zones will be established in cooperation with CDOW if determined necessary for visitor protection.<br><br><u>**Commercial and Private Permits**</u>:<br><br>*<u>Existing Commercial Permits</u>*: **REC-2-60** ✔ None<br><br>*<u>New Commercial Permits</u>*: **REC-2-61** ✔ BLM will allow new permits if activities appropriate to Recreation Management Zone.<br><br>*<u>Private Permits</u>*: **REC-2-62** ✔ Individual private permits will not be required.<br><br>**REC-2-63** ✔ Organized group permits will be required for private groups over 25 people.<br><br><u>**Facilities and Signs**</u>:<br><br>*<u>Existing</u>*: **REC-2-64** ✔ OHV designation signs.<br><br>*<u>New</u>*:<br>**REC-2-65** Trailhead kiosks for main travel routes between Falcon and Flat Top Open Areas such as Moonlight Mesa and Highway One.<br>**REC-2-66** Boundary, informational, regulatory, and directional signs.<br>**REC-2-67** Trail signs to delineate single track, ATV, and 4-wheel drive routes.<br>**REC-2-68** Fences, rock barricades, etc., to: protect private lands; contain use within Recreation Management Zone ; protect special status species, unique soils, etc.; and allow for success of restoration measures.<br><br><u>**Trail and Road Construction/Maintenance**</u>:<br>**REC-2-69** ✔ New construction will be allowed only if needed to resolve resource concerns or user conflicts.<br>**REC-2-70** Regular maintenance of designated routes will be conducted. |

BLM_0007549

Table 2-2.2a
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** (continued)

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-2:  Chukar Road to Elephant Skin Wash**<br><br>*(continued)* | | | **REC-2-71**  Areas impacted by unauthorized use will be closed, either temporarily or permanently as needed, and rehabilitated.<br><br>**REC-2-72**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management:  REC-2-73 ✔**  VRM Classes III and IV. Mancos shale soils that comprise the western edge and southern portions of the planning area will be managed per the objectives of VRM Class III.<br><br>**Recreation Opportunity Spectrum:  REC-2-74 ✔**  ROS Unit II (semi-primitive motorized). |
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-3:  Flat Top and Lower Elephant Skin OHV Play Area (1,646 acres total, including 40 acres inside NCA at Elephant Skin Wash).**<br><br>*OPEN OHV use area comprised of 1,606 acres outside NCA and 40 acres at Elephant Skin Wash inside NCA.*<br><br>**Activities:**<br>Cross-country four-wheel driving, ATV and motorcycle "play." | *Physical Setting:* Front country adjacent to primitive road and rural private lands; motorized; resource modification by OHV activities very evident; surrounded by natural-appearing environment.<br><br>*Number Social Encounters:* moderate to high degree of contact with other individuals or small groups of people (see 20 or more groups per day at developed staging area; see 10-20 groups away from staging area. Average group size seen is 4-6 people.<br><br>*Managerial Setting:* On-site management controls and regulations are numerous and easy to see; simple visitor information facilities are present. Increased vehicle patrols and visitor contacts. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in trails and play area OHV and mountain bike riding:<br><br>**Experiences:**<br>• Enjoying natural environment.<br>• Releasing some built-up mental tensions.<br>• Enjoying being with friends.<br>• Enjoying having access to close-to-home outdoor amenities.<br>• Enlarged sense of personal accountability to act responsibly. | **Travel Management:**<br><br>**REC-2-75**  To protect scenic values, motorized and non-motorized, mechanical vehicle use on public lands on Flat Top Mesa and on the slopes of Flat Top Mesa in Zone MU2-3 will be limited to the designated routes shown on Figure 2-4.<br><br>**REC-2-76 ✔**  Designated routes will be further fine tuned and refined in a collaborative process with the assistance and input of a BLM/citizen work group.<br><br>**REC-2-77 ✔**  The designated routes shown on Figure 2-4 are preliminary and may not be all-inclusive. Until routes are refined, all motorized and mechanical travel in limited areas on public lands will be limited to the designated routes shown on Figure 2-4.<br><br>**REC-2-78 ✔**  On the Remainder of public lands in Recreation Management Zone MU2-3:  These lands will be open to off-route, cross-country motorized and non-motorized, mechanical vehicular travel.  Based on resource protection needs, amount of use, overcrowding, safety, or other factors, certain areas or heavily used routes within this zone may be restricted to certain types of vehicles or use in order to meet land health standards, reduce safety hazards, or comply with other  regulations. Use on these lands will be considered during the collaborative process for designated route refinement with the assistance and input of a BLM/citizen work group.<br><br>**Camping: REC-2-79 ✔**  No camping in Lower Elephant Skin OHV open area.<br><br>**REC-2-80 ✔**  Camping in Flat Top open area outside NCA in designated areas only. Camping could be eliminated or otherwise restricted if monitoring shows adverse impacts to soils, water, vegetation, or other values. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007550

Table 2-2.2a
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** (continued)

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-3: Flat Top and Lower Elephant Skin OHV Play Area**<br><br>**(continued)** | Facilities will include OHV staging area, trailheads, trail systems, informational, regulatory, boundary, and directional signing, fences, barricades, etc.<br><br>Facilities will be designed to be vandal-resistant, easy to maintain, and able to accommodate high degree of use.<br><br>Land uses such as grazing are obvious and will include measures to protect soil and vegetation from recreation use impacts. | **Benefits:**<br><br>Individual:<br>▪ Reduced stress.<br>▪ Improved physical health.<br>▪ Increased sense of adventure.<br>▪ Strengthened personal relationships.<br><br>Household and Community:<br>▪ Enlarged sense of community dependence on public lands.<br>▪ Greater community involvement in recreation and other land use issues.<br><br>Economic:<br>▪ Improve local economic stability.<br><br>Environmental:<br>▪ Greater community ownership in/stewardship of area. | **REC-2-81 ✔** Until areas are designated, this zone will be for day-use only.<br><br>**Stay Limit: REC-2-82 ✔** 7 days.<br><br>**Campfires: REC-2-83 ✔** No open fires will be allowed;<br><br>**REC-2-84 ✔** Stoves and/or charcoal in grills or fire pans will be allowed.<br><br>**REC-2-85 ✔** No firewood collecting will be allowed.<br><br>**Maximum Group Size: REC-2-86 ✔** 35 people;<br><br>**REC-2-87 ✔** Organized group permits will be required for groups over 35 people.<br><br>**Competitive Events: REC-2-88 ✔** No competitive events will be allowed in the NCA. Outside the NCA, motorized and non-motorized competitive events may be permitted on a case-by-case basis. Maximum group size limits for participants and spectators, vehicle types and number limits, selection criteria, and special terms, conditions, and other stipulations for commercial, organized groups, and competitive permits will be developed based on individual proposals, safety, site capacity, resource conditions, user satisfaction levels, and other factors such as season and type of use. Permit issuance is discretionary with BLM and permit terms and conditions will be subject to management discretion and availability of BLM staff and other resources to administer, conduct compliance on, and monitor impacts of events.<br><br>**Target Shooting: REC-2-89 ✔** No target shooting will be allowed in the NCA.<br><br>**REC-2-90 ✔** Outside the NCA, at BLM's discretion, target shooting may be authorized only in those portions of Recreation Management Zone MU2-3, outside the NCA boundary, to provide a safe environment for all users and to protect resources, health, and property. Authorization would occur according to BLM and other applicable regulations. Special operating procedures and local BLM regulations will be established and posted. Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be obeyed. If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated.<br><br>**Hunting: REC-2-91 ✔** Will be allowed in accordance with state regulations. |

BLM_0007551

2. Approved Decisions

**Table 2-2.2a**
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-3: Flat Top and Lower Elephant Skin OHV Play Area**<br><br>*(continued)* | | | **REC-2-92** ✔ No-hunting zones will be established in cooperation with CDOW if determined necessary for visitor protection.<br><br>**Commercial and Private Permits:**<br><br>*Existing Commercial Permits*: **REC-2-93** ✔ None<br><br>*New Commercial Permits:* **REC-2-94** ✔ BLM will allow new permits if activities appropriate to zone.<br><br>*Private Permits*: **REC-2-95** ✔ Individual private permits will not be required.<br><br>**REC-2-96** ✔ Organized group permits will be required for private groups over 35 people.<br><br>**Facilities and Signs:**<br><br>**REC-2-97** Designated trail signs for Flat Top Mesa.<br><br>**REC-2-98** ✔ Design, expand, and re-construct existing informal OHV staging area on large flat area at base of Flat Top Mesa.<br><br>**REC-2-99** Boundary, informational, regulatory, and directional, signs.<br><br>**REC-2-100** Trail signs for major trail systems.<br><br>**REC-2-101** Fences, rock barricades, etc., to: protect private lands; contain OHV play; protect special status species, unique soils, etc; and allow success of restoration measures.<br><br>**Trail Construction/Maintenance:**<br><br>**REC-2-102** ✔ Open area.<br><br>**REC-2-103** Flat Top Mesa and Slopes Limited Area - no new trails will be allowed.<br><br>**REC-2-104** Some routes on Flat Top will be closed and rehabilitated to protect scenic values.<br><br>**REC-2-105** BLM will conduct regular maintenance of designated routes (Flat Top Mesa) and major trail systems in open area. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

November 2004

BLM_0007552

Table 2-2.2a
**Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 2 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 2 (Flat Top-Peach Valley OHV Recreation Area)**<br><br>**Recreation Management Zone MU2-3:  Flat Top and Lower Elephant Skin OHV Play Area**<br><br>*(continued)* | | | **REC-2-106**  Areas impacted by unauthorized use will be closed, either temporarily or permanently as needed, and rehabilitated.<br>**REC-2-107**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management:  REC-2-108** ✔  VRM Class III (Flat Top Mesa) and IV.<br><br>**Recreation Opportunity Spectrum:  REC-2-109** ✔  ROS Unit II (semi-primitive motorized). |
| **Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 2:** | | | **REC-2-110** ✔  Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions.<br>**REC-2-111** ✔  Set Recreation Management Zone carrying capacity based on desired resource condition and visitor satisfaction levels.<br>**REC-2-112** ✔  Set specific regulations for appropriate OHV "play" and travel on designated routes to enhance visitor safety and protect resources. Regulations will include temporary closures for periods when soils are too wet for travel.<br>**REC-2-113** ✔  Develop maximum group size and vehicle limits, selection criteria, and special regulations for commercial, organized group, and competitive permits based on carrying capacities, resource conditions, etc.<br>**REC-2-114** ✔  Analyze need for additional trails, recreation facilities, resource protection measures, etc. to enhance visitor safety, protect resources; and provide diversity of trail uses (single-track, ATV, mountain bike, dirt bike, etc.)<br>**REC-2-115** ✔  Develop (cooperatively with CDOW) criteria and process for establishing no-hunting areas within zones.<br>**REC-2-116** ✔  Educate visitors and users about responsible OHV play and regulations regarding resource damage. Provide maps, brochures, and website information. |

BLM_0007553

**Table 2-2.3**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit**

**Management Unit 3 Land Ownership: 13,502 acres of public surface; 14% of planning area public lands**

*Management and protection of native riparian values, balanced with recreation site development to maintain these riparian values, will be emphasized in this 13,502-acre management unit. This unit is comprised of the river and riparian portions of the Gunnison and the North Fork of the Gunnison Rivers outside the Wilderness, as well as the surrounding uplands north and south of these rivers, including the former Tri-State lands recently added to the NCA (see 2003 Act in Appendix A). Almost this entire unit is within the NCA. Specifically, this management unit is: 1) the river corridors of the North Fork of the Gunnison River from its confluence with the Gunnison River to the east boundary of the NCA; 2) the river corridor of the Gunnison River from its confluence with the North Fork south to the northern edge of the Wilderness; 3) the river corridor of the Gunnison River downstream from the confluence to the Austin bridge at the northwestern edge of the NCA; and 4) the uplands surrounding these river corridors. Figure 2-1 depicts this management unit. The width of the river corridors vary, and is the topographic high point adjacent to the rivers that includes all of the riparian vegetation along the rivers. The unit includes lands within the northernmost part of the NCA and is adjacent to the Gunnison Gorge Wilderness.*

*Values in the management unit values include riparian vegetation that contains remnants of the globally imperiled, Fremont cottonwood (Populus fremontii) riparian forest with coyote willow (Salix exigua) and skunkbrush (Rhus aromatica) understory. Other values include water quality, water diversions and structures, private and commercial recreational boating, mountain biking, OHV use, universally-accessible recreation sites, environmental education opportunities, recreation site development potential, and the Gunnison Forks Wildlife Management Area that is cooperatively managed by CDOW and BLM. In addition, the management unit supports a rapidly developing stocked, catch-and-release sport fishery with the potential to be greatly improved with habitat management.*

*The management unit supports Rocky Mountain bighorn sheep, chukar, river otter, mule deer, coyote, red fox, waterfowl, bald eagle, northern leopard frog (Rana pipiens), and potential habitat for southwestern willow flycatcher (Epidonax traillii extimus). Sandhill crane (Grus canadensis) and yellow-billed cuckoo (Coccyzus americanus) are potential beneficiaries. Rare plants include Colorado desert parsley and Uinta Basin hookless cactus.*

*This entire portion of this management unit north of the Gunnison River also includes 1,048 acres of Mancos shale soils and terrain.*

*Concerns within this unit include the current lack of official management direction for the uplands and riparian zone within the former Tri-State lands located on both sides of the Gunnison River, which were recently added to the NCA (see 2003 Act in Appendix A). The subdivision of private land near and to the northwest of the management unit is an additional concern. Disease transmission from domestic sheep to Rocky Mountain or other bighorn sheep is a concern in the unit. In addition, existing water diversions structures are damaging riparian values, weeds are invading riparian vegetation, and riparian zone livestock grazing is damaging riparian values and could cause conflicts with recreational use of the rivers. Motorized, non-motorized, and mechanical vehicular access to both sides of the Gunnison River corridor in the vicinity of the Gunnison Forks Wildlife Management Area is a concern because of the potential riparian values damage. Also, recreational use of both rivers is expected to increase, and human sanitation is a potential concern.*

*This management unit will be designated and managed as the Gunnison and North Fork Rivers SRMA. Specific management measures will include the following.*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-3-1 | Private lands suitable for development of river-related recreation facilities near Austin will be purchased on a willing seller-willing buyer basis. | |

BLM_0007554

**Table 2-2.3**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|
| **Lands, Rights-of-Way, and Withdrawals** *(continued)* | **LAND-3-2** A utility ROW corridor 0.5-mile wide will be designated on public lands along the centerline of the existing 46kV surface transmission line on the south side of Colorado Highway (CO-) 92 for utility construction only. The corridor will extend 0.25-mile on either side of the line or as otherwise appropriate where the line is adjacent and parallel to CO-92. The 46kV line will be contained within the corridor and will be permitted to be upgraded. Upgraded structures will be located on the approximate centerline location of the existing poles, and upgraded structures and facilities will meet BLM VRM objectives. A utility ROW corridor approximately 0.5-mile wide will be designated on public lands along the west boundary of the unit beginning one-half mile from the south side of the Gunnison River and extending south to the south end of the unit (Figure 2-2 at the end of this chapter). The remainder of the management unit will be a ROW avoidance area; however, exceptions could be considered or allowed on a case-by-case basis. | |
| | **LAND-3-3** The BLM will cooperate with Tri-State to match the terms and conditions of the existing 115 kV ROW C-1534, and those accompanying the easement, where possible, such that consistent operation, maintenance, and upgrading activities could be conducted on the line regardless of the location on public lands (The Tri-State 115 kV line within the unit is contained partly within BLM ROW C-1534 (100 feet wide and approximately 4.0 miles total distance), and partly within an easement (100 feet wide and approximately 1.85 miles total distance) that accompanied the BLM's acquisition of the former Tri-State lands). | |
| | **LAND-3-4** The BLM will continue working with both the Delta-Montrose Electric Association and Tri-State to map, document, and authorize needed, access routes for vehicular access for maintenance, operation, and monitoring of electrical facilities, with consideration for recommended OHV designated routes. | |
| | **LAND-3-5** Subject to valid existing rights, all federal lands within the unit between the NCA boundary and CO-92 will be recommended to be withdrawn from all forms of entry, appropriation, or disposal under the public land laws; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing. | |

BLM_0007555

Table 2-2.3
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit** (continued)

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Access and Transportation | **TRAN-3-1** | Road H-75 Drive, a Delta county road, will continue to be maintained by the county. Existing primitive roads on both sides of the Gunnison River will continue to be minimally maintained. Motorized vehicular access to the edges of the river corridors will be permitted. Routes in the river corridor and elsewhere in the unit not selected for designated motorized or non-motorized mechanical vehicular use will be reclaimed if possible. | |
| | **TRAN-3-2** | Motorized vehicular access within the river corridor will be limited to certain designated routes and parking sites in order to protect riparian vegetation. Designated routes and sites will be determined in the management plan to be prepared for this SRMA. | |
| | **TRAN-3-3** | Acquisition of public access for motorized and non-motorized vehicles will be pursued with partners and agencies to lands along the Gunnison River near Austin for fisher access and non-motorized boating. | |
| Geology and Soils | **GEO-3-1** | In the Mancos shale soils portion of this management unit (the area north of the Gunnison River), USGS research will be conducted to determine the level of impacts from multiple uses, and adaptive management from research results will be applied. | |
| Minerals and Energy Resources | **MIN-3-1** | Also refer to the Lands, Rights-of-way, and Withdrawals section. Subject to valid existing rights, the public lands in this unit will not be available for mineral material disposal, except on split estate lands. Split estate lands occur when the federal government owns and manages the mineral estate and another party owns the surface lands. All mineral material disposals on split estate lands in this area will be subject to all BLM and other applicable rules, laws, regulations, and policy. Until the withdrawal recommendation is implemented, the federal oil and gas estate on public lands in the unit outside the boundary of the NCA, between the NCA boundary and CO-92, oil and gas leases will contain seasonal stipulations on seismic and drilling activities from December 1 through April 30 on lands containing bald eagle winter concentration areas (stipulation UB-3), from March 15 through June 30 on lands containing waterfowl nesting and breeding areas (stipulation UB-6), and from March 1 through May 31 on public lands with Mancos shale soils (highly erodible soil areas) where low soil productivity will prolong or disallow revegetation (stipulation UB-1) (see Appendix E). | |
| | **MIN-3-2** | Carbon dioxide wells will continue to be capped/reclaimed. | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007556

Table 2-2.3
Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Water Resources | WTR-3-1 | Steps will be taken to develop permanent solutions for in-channel activities that degrade riparian values. These activities include annual maintenance of diversion structures via dredging in the channel and via reinforcement of rock and rip-rap structures. | |
| | WTR-3-2 | BLM will collaborate with the Relief Ditch Company to facilitate the design and implementation of a permanent structure or other permanent solutions at the site of the Relief Ditch Company's diversion. | |
| Vegetation | VEG-3-1 | Weed-control measures will be implemented. Along the Gunnison River, in the Gunnison Forks to Austin section, restoration projects will be implemented to protect aquatic areas and remove invasive weeds. BLM will develop partnerships with the Park Service, Tamarisk Coalition, and other partners where possible. | . |
| | VEG-3-2 | Severely degraded sites will be restored. | |
| | VEG-3-3 | Slightly degraded areas will be managed to control the source of degradation, thereby allowing the vegetation community to improve on its own. | |
| Special Status Species | SSS-3-1 | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat in the unit, specifically for the upland and aquatic areas for the Gunnison River above and below the Gunnison Forks. | |
| | SSS-3-2 | BLM will complete a thorough inventory of the former Tri-State lands in Management Unit 3 to determine if there is a population of Uinta Basin hookless cactus present. | |
| Rangeland | RANG-3-1 | Livestock grazing in the Gunnison River riparian corridor will be managed to ensure healthy functioning riparian systems and few or no conflicts with recreationists, especially during recreation high-use period (May 15 through September 30). Techniques to accomplish this could include changes of season, fencing, livestock movement, or other methods. | |
| | RANG-3-2 | Forage will not be allocated on newly acquired lands for cattle grazing. | |

BLM_0007557

Table 2-2.3
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Rangeland** *(continued)* | **RANG-3-3** | Forage for livestock will not be permanently allocated on newly acquired lands. On these lands, including the former Tri-State lands in the NCA in Management Unit 3, BLM will prepare, with input from permittees, a grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing. (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands. Not authorizing new permanent allocations of forage for domestic sheep grazing, within occupied bighorn sheep habitat or associated nine-mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats [BLM 1998f]). | |
| **Recreation** | **REC-3-1** | Recreation management decisions are shown in Table 2-2.3a below for Management Unit 3. See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones MU3-1 through MU3-3. | |
| | **REC-3-2** | Wilderness user fees will continue to be used to help fund tamarisk-control and other resource-protection projects in the Gunnison River corridor | **REC-3-3** The informal overlook on the hill above the Gunnison Forks will be designed and constructed for visitor enjoyment, and informational signing will be installed. |
| | | | **REC-3-4** A visitor entrance site will be designed and constructed on the Smith Mountain Road near its intersection with Tri-State Road, just east of the western boundary of the NCA. Changes to the existing landscape will be implemented as necessary to improve aesthetics at the site. Parking, informational signs, and sanitation facilities will be provided. Safe egress and ingress and ease of access will be factors to consider when locating and designing the station. |

BLM_0007558

**Table 2-2.3**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|
| Recreation *(continued)* | | **REC-3-5**<br>A visitor overlook will be designed and constructed at the point on Smith Mountain in the extreme northwestern part of the NCA. Parking and signing will be installed for visitor interpretation, enjoyment, and safety. |
| | | **REC-3-6**<br>A visitor overlook will be designed and constructed at the intersection of the Smith Mountain access road and the Black Ridge Trail adjacent to the Gunnison Gorge Wilderness. Parking, informational signs, and sanitation facilities will be provided.  Safe egress and ingress and ease of access will be factors to consider when locating and designing the overlook. Access to the Gunnison River on the west side across from Gunnison Forks will be blocked and a parking lot constructed. Walk-in day and overnight camping use will be emphasized, and camping will be limited to designated sites. |
| | **REC-3-7** Public lands on both sides of the Gunnison River upstream and south of the North Fork will be closed to motorized and mechanical vehicular use and travel within the river corridor. | **REC-3-8**<br>Motorized and mechanical vehicular travel and use on public lands in the remainder of this unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter). The routes shown are preliminary and may not be all-inclusive. Designated routes will be further refined with the assistance of a BLM/citizen work group. Until routes are refined, all motorized and mechanical travel will be limited to the designated routes shown on Figure 2-4. |
| Wild and Scenic River Study Segments | **WSR-3-1** No segment or portion of any stream in the planning area will be recommended for designation or inclusion in the NWSRS in this RMP or the Revised Final Wild and Scenic Rivers Study Report (Appendix I). | |
| | **WSR-3-2** Under WSR Act criteria, BLM has determined that the 6-mile segment of the Gunnison River from the transmission line to the Relief Ditch diversion is suitable under the Recreational classification. | |
| | **WSR-3-3** Implementing interim management measures for suitable wild and scenic river segments will begin with implementing the RMP and ROD, and will continue for the life of this plan or until Congress takes action. See Table I-3-1 (Appendix I) for interim management of wild and scenic river values. | |

BLM_0007559

**Table 2-2.3a**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions**

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-1: Main Gunnison River Corridor – river corridor and uplands located within outer canyon rim from northern Gunnison Gorge Wilderness boundary to North Fork confluence (approximately 1,500 acres).**<br><br>**Activities:**<br>Gold Medal trout fishing, flat-water boating, and wildlife viewing. | ***Physical Setting:*** Backcountry, semi-primitive non-motorized and non-mechanized, predominately unmodified natural-appearing environment<br><br>***Number Social Encounters:***<br><br>*Off Season (October – April):* Low contact with others; (see 6 -10 groups per day on weekends) and no other groups visible from your campsite; average group size seen is 2-4 people.<br><br>*Primary River Season (May-September):* Low to moderate contact with others during midweek (see 8-12 groups per day; less than 3 groups visible from your campsite. Moderate to moderately high contact with others on weekends (see 15-18 groups).<br><br>*Stone Fly Hatch, July 4, Memorial and Labor Day weekends:* Moderately high to very high contact with others boating and fishing groups on shore (18-25 groups per day); average group size seen is 5-7 people.<br><br>***Managerial Setting:*** Increased backcountry and river ranger patrols; a few subtle visitor controls (designated campsite signs), primitive trails, no developed facilities. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in day-use and overnight Gold Medal trout fishing, flat-water boating, and wildlife viewing:<br><br>**Experiences:**<br>• Enjoying the total aesthetic environment.<br>• Enjoying going exploring on my/our own.<br>• Developing your own skills and abilities.<br>• Enjoying getting some needed physical exercise.<br><br>**Benefits:**<br><br>Individual:<br>• Strengthened relationships with family and friends.<br>• Restored mind from unwanted stress.<br>• Greater access for people having different skills to enjoy the same place. | **Travel Management:**  REC-3-9 ✔  This zone will be closed to all motorized and non-motorized, mechanized uses, except for CDOW and existing jet boat permittee.<br><br>**Camping:**<br>**REC-3-10** ✔  Will be allowed in designated campsites only.<br><br>**REC-3-11** ✔  Human waste disposal systems (porta-potties, wag-bags, etc.) will be required for all camping groups<br><br>**Stay Limit:**  REC-3-12 ✔  3 days<br><br>**Campfires:**<br>**REC-3-13** ✔  No open fires will be allowed.<br><br>**REC-3-14** ✔  Stoves and/or charcoal will be allowed in fire pans only.<br><br>**REC-3-15** ✔  No firewood collecting will be allowed.<br><br>**Maximum Group Size:**  REC-3-16 ✔  12<br><br>**Competitive Events:**  REC-3-17 ✔  Competitive events will not be permitted in the zone or management unit.<br><br>**Target Shooting:**  REC-3-18 ✔  Will not be permitted in the zone or management unit.<br><br>**Hunting:**  REC-3-19 ✔  Will be allowed in accordance with state regulations. |

BLM_0007560

Table 2-2.3a
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-I: Main Gunnison River Corridor – river corridor and uplands located within outer canyon rim from northern Gunnison Gorge Wilderness boundary to North Fork confluence.**<br><br>*(continued)* | Land management practices, such as tamarisk/weed control are evident but tend to fit in with natural landscape. | Household and Community:<br>▪ Greater family bonding.<br>▪ Enlarged sense of community dependence on public lands.<br><br>Economic:<br>▪ Increased local tourism revenue.<br>▪ Improved local and regional economic stability.<br>▪ Increased local job opportunities.<br><br>Environmental:<br>▪ Reduced spread of invasive species such as plants, insects, and aquatic organisms.<br>▪ Increased protection of natural landscapes.<br>▪ Reduced negative human impacts such as litter, vegetative trampling, and unplanned trails. | **Commercial and Private Permits:**<br><br>***Existing Commercial Permits:***<br><br>**REC-3-20** ✔ The existing SRUP authorizing  motorized boat use from Pleasure Park (at Gunnison Forks) to Smith Fork Creek on the Gunnison River in Delta County, Colorado, would be allowed to continue  for the life tenure of the permittee, Mr. LeRoy Jagodinski, or until the permit is relinquished by Mr. Jagodinski or terminated by BLM.  The existing SRUP would be amended to incorporate stipulations  permitting this subject  motorized boat use only at certain times of the day, and to specify that only the current operator/permit holder, Mr. Jagodinski, and his employees, would be allowed to operate motorized boats within the Wilderness boundary under the permit.  If the permit held by Mr. Jagodinski is transferred to another person, corporation, organization, or entity by BLM, the terms, stipulations, and conditions of operation for the new permittee will be determined at that time, however, motorized boat use would not be permitted to continue within the Wilderness.<br><br>***New Commercial Permits:*** **REC-3-21** ✔ No additional permits will be issued for motorized use.  New permits for non-motorized uses will be considered after a method and system for determining permit needs, allocating use, and selecting new outfitters is implemented.<br><br>***Private Permits:*** **REC-3-22** ✔ Individual private permits will not be required.<br>**Facilities and Signs:**<br><br>***Existing:***<br><br>**REC-3-23** ✔ North Fork to Smith Fork Trail (east side).<br>**REC-3-24** ✔ Unimproved Gunnison River access road/trail (west side).<br>**REC-3-25** ✔ 2–3 primitive campsites<br>***New:***<br>**REC-3-26** Designated campsite markers<br>**REC-3-27** 2-3 additional primitive campsites. |

BLM_0007561

Table 2-2.3a
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-1: Main Gunnison River Corridor – river corridor and uplands located within outer canyon rim from northern Gunnison Gorge Wilderness boundary to North Fork confluence.**<br><br>**(continued)** | | | **Trail or Road Construction/Maintenance: REC-3-28** BLM will convert vehicle access routes to foot trails.<br>    **REC-3-29** Trail maintenance will be conducted as needed to protect resources.<br>    **REC-3-30** BLM will continue mechanized and chemical tamarisk and other weed control.<br>    **REC-3-31** This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management: REC-3-32** ✔ VRM Class II.<br><br>**Recreation Opportunity Spectrum: REC-3-33** ✔ ROS Unit III (semi-primitive motorized), except in the two-mile portion (of the greater 16-mile segment) of the Gunnison River segment preliminarily suitable for inclusion into the NWSRS, which will be ROS Unit II (semi-primitive non-motorized). |
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-2: Lower Gunnison River Corridor - main river corridor upstream of Gunnison Forks Day Use Area downstream to west NCA boundary Austin (approximately 1,500 acres, about 80 percent of which are in NCA).** | *Physical Setting:* Predominately unmodified natural-appearing environment with following areas:<br><br>*Gunnison Forks:* Front country, roaded natural area. Motorized.<br><br>*Lands adjacent to River:* Middle country and Rural (private agricultural lands), semi-primitive motorized.<br><br>*River:* Middle country; semi-primitive non-motorized. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in day-use and overnight Fishing, Flat-Water Boating, Camping and Picnicking,: | **Travel Management:**<br>**REC-3-34** Motorized and non-motorized, mechanical vehicular travel will be permitted on the designated routes shown on Figure 2-4 only.<br>**REC-3-35** ✔ Designated routes will be further fine tuned and refined in a collaborative process with the assistance and input of a BLM/citizen work group.<br>**REC-3-36** ✔ The Gunnison River will be closed to motorized river and water craft.<br>**Camping:**<br>**REC-3-37** ✔ Camping will be allowed in designated campsites or camping areas only.<br>**REC-3-38** ✔ No camping or overnight parking will be allowed in Gunnison Forks Day Use Area.<br>**REC-3-39** ✔ Porta-potties will be required for overnight boating groups in dispersed river sites.<br>**Stay Limit: REC-3-40** ✔ 7 days |

BLM_0007562

Table 2-2.3a
Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions<br>✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-2: Lower Gunnison River Corridor - main river corridor upstream of Gunnison Forks Day Use Area downstream to west NCA boundary Austin.**<br><br>*(continued)*<br><br>**Activities:**<br>Day and multi-day walk-wade and float-boat fishing, flat-water boating, camping, and picnicking, | ***Number Social Encounters:*** Low (off-season) to moderate contact with others on river; (see 15 or more groups per day); moderate to high contact with others at Gunnison Forks (see 25 or more groups per day in high use periods).<br><br>***Managerial Setting:*** Visitor controls for group size and low impact use; increased back-county and river patrols.<br><br>Facilities such as designated vehicle camping areas and river access sites will be restricted to existing impacted areas.<br><br>Facility design will be harmonious w/ the land and minimum necessary to meet management objectives and support managed activities.<br><br>Land management practices, such as grazing, tamarisk/weed control are evident but tend to fit in with natural landscape. | **Experiences:**<br>▪ Relishing group affiliation and togetherness.<br>▪ Enjoying the total aesthetic environment.<br>▪ Developing your own boating and fishing skills.<br>▪ Enjoying having access to close-to-home outdoor amenities.<br>▪ Enjoying being able to frequently participate in desired activities and settings.<br><br>**Benefits:**<br><br>Individual:<br>▪ Improved relationship with nature.<br>▪ Strengthened relationships with family and friends.<br>▪ Greater sense of adventure.<br>▪ Restored mind from unwanted stress.<br>▪ Improved physical fitness and health maintenance.<br><br>Household and Community:<br>▪ Greater family bonding.<br>▪ Enlarged sense of community dependence on public lands. | **Campfires:**<br><br>**REC-3-41** ✔  No open fires will be permitted.<br><br>**REC-3-42** ✔  Campers will be required to use stoves and/or charcoal in fire pans.<br><br>**REC-3-43** ✔  No firewood collecting will be allowed.<br><br>**Maximum Group Size: REC-3-44** ✔  25 people;<br><br>✔ **REC-3-45**  Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events: REC-3-46** ✔  Non-motorized competitive events may be permitted on a case-by-case basis in this zone on the Gunnison River. Maximum group size limits for participants and spectators, vehicle types and number limits, selection criteria, and special terms, conditions, and other stipulations for commercial, organized groups, and competitive permits will be developed based on individual proposals, safety, site capacity, resource conditions, user satisfaction levels, and other factors such as season and type of use. Permit issuance is discretionary with BLM and permit terms and conditions will be subject to management discretion and availability of BLM staff and other resources to administer, conduct compliance on, and monitor impacts of events.<br><br>**Target Shooting: REC-3-47** ✔  Will not be permitted in the zone or management unit.<br><br>**Hunting: REC-3-48** ✔  Will be allowed in accordance with state regulations.<br><br>**Commercial and Private Permits:**<br><br>***Existing Commercial Permits:* REC-3-49** ✔  BLM will continue to permit 5 walk-wade fishing outfitters; and 3 float-fishing outfitters.<br><br>**REC-3-50** ✔  BLM will continue to allow rafting/float fishing use in Recreation Management Zone by four Wilderness outfitters.<br><br>***New Commercial Permits:* REC-3-51** ✔  No permits will be issued for motorized use.<br><br>**REC-3-52** ✔  New permits for non-motorized uses will be considered after a method and system for determining permit needs, allocating use, and selecting new outfitters is implemented. |

BLM_0007563

Table 2-2.3a
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-2: Lower Gunnison River Corridor – main river corridor upstream of Gunnison Forks Day Use Area downstream to west NCA boundary Austin.**<br><br>***(continued)*** | | Economic:<br>• Increased local tourism revenue.<br>• Increased local job opportunities. | *Private Permits:* **REC-3-53** ✔ Individual private permits will not be required.<br><br>**REC-3-54** ✔ Organized group permits will be required for groups over 25.<br><br>Facilities and Signs:<br><br>*Existing:*<br><br>**REC-3-55** ✔ Gunnison Forks Day Use Area (toilets, picnic tables, signs, and unimproved boat launch area).<br><br>*New:*<br><br>**REC-3-56** Facilities will be located in heavily impacted areas (tamarisk, Russian knapweed, and placer mined areas) away from native riparian areas.<br><br>**REC-3-57** Site design will include removal of tamarisk and reseeding and planting of native species.<br><br>**REC-3-58** ✔ 1 river access/boat ramp site for non-motorized craft located in heavily impacted area on south side of river approximately halfway between Gunnison Forks and Austin. Site will include vault toilet and 4-6 vehicle campsites.<br><br>**REC-3-59** ✔ 1 river access/boat ramp site at site to be determined near Austin. Depending on location and size, site could include toilet (vault or portable) and campsites, or be managed as a day use area.<br><br>**REC-3-60** 3-5 designated, dispersed boater campsites along river corridor.<br><br>**REC-3-61** NCA information and interpretive kiosks at Gunnison Forks.<br><br>**REC-3-62** ✔ Modifications to Gunnison Forks boat ramp area as needed to increase protection of riparian area and improve public safety and river access for non-motorized activities.<br><br>**REC-3-63** Fences, rock barricades, etc., where needed to: protect private lands; delineate campsites and parking areas, protect resources, and allow success of restoration measures.<br><br>**REC-3-64** Boundary, informational, regulatory, and directional signs.<br><br>**REC-3-65** Designated campsite markers. |

BLM_0007564

Table 2-2.3a
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** (continued)

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| Management Unit 3 (Gunnison and North Fork Rivers SRMA)<br><br>Recreation Management Zone MU3-2: Lower Gunnison River Corridor - main river corridor upstream of Gunnison Forks Day Use Area downstream to west NCA boundary Austin.<br><br>*(continued)* | | | **Trail or Road Construction/Maintenance:**<br><br>**REC-3-66** ✔  BLM will conduct where needed to provide access to designated river access sites.<br>**REC-3-67**  BLM will provide regular maintenance of primary access roads.<br>**REC-3-68**  Trail maintenance will be conducted as needed to protect resources.<br>**REC-3-69**  BLM will continue mechanized and chemical tamarisk and other weed control.<br><br>**Visual Resource Management:** **REC-3-70** ✔  VRM Class II.<br><br>**Recreation Opportunity Spectrum:** **REC-3-71** ✔  ROS Unit III (semi-primitive motorized). |
| Management Unit 3 (Gunnison and North Fork Rivers SRMA)<br><br>Recreation Management Zone MU3-3: Smith Mountain/Rogers Mesa Uplands - uplands extending north and south of Recreation Management Zone MU3-2. Zone MU3-3 consists of approximately 10,500 acres, about 97 percent of which are outside NCA). | *Physical Setting:* Predominately middle country with sections of front country near access roads, motorized, largely unmodified natural- appearing environment.<br><br>*Number Social Encounters:* Low to moderate contact away from roads or developed sites (see 6-15 groups per day) ; moderate to high degree of contact with others on roads and in developed sites (see more than 15 groups per day).<br><br>*Managerial Setting:* Visitor controls for low impact use; increased vehicle patrols and visitor contacts. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in on-route four-wheel-drive driving, horseback trail riding, dispersed and developed site camping:<br><br>**Experiences:**<br>▪ Getting away from everyday responsibilities for awhile.<br>▪ Being able to enjoy nature without having to get out in it too much.<br>▪ Enjoying having easy access to natural landscapes. | **Travel Management:** **REC-3-72**  Motorized and non-motorized,  mechanical vehicle travel will be limited to designated routes only as shown on Figure 2-4.<br><br>**REC-3-73** ✔  Designated routes will be further fine tuned and refined in a collaborative process with the assistance and input of a BLM/citizen work group.<br><br>**Camping:** **REC-3-74** ✔  Camping will be allowed in designated areas and/or campgrounds only.<br><br>**Stay Limit:** **REC-3-75** ✔  7 days.<br><br>**Campfires:**<br>**REC-3-76** ✔  No open fires; bonfires, etc. will be allowed.<br>**REC-3-77** ✔  Campers will be required to use grills, stoves and/or charcoal.<br>**REC-3-78** ✔  No firewood cutting or collecting will be allowed.<br><br>**Maximum Group Size:** **REC-3-79** ✔  25 people;<br>**REC-3-80** ✔  Organized group permits will be required for groups over 25 people. |

BLM_0007565

Table 2-2.3a
Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions<br>✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 3 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU3-3:  Smith Mountain/Rogers Mesa Uplands - uplands extending north and south of Recreation Management Zone MU3- 2.**<br><br>***(continued)***<br><br>**Activities:**<br>Four-wheel driving, horseback riding, and camping. | Design of facilities will be harmonious with land and minimum necessary to meet management objectives and support managed activities.<br><br>Land management practices, such as grazing and weed control are somewhat evident but tend to fit in with natural landscape. | **Benefits:**<br><br>Individual:<br>▪ Stronger ties with my family and friends.<br>▪ Enlarged sense of personal accountability to act responsibly.<br>▪ Greater sensitivity to the outdoors.<br><br>Economic:<br>▪ Increased local tourism revenue.<br>▪ Increased local job opportunities.<br><br>Environmental:<br>▪ Reduced negative human impacts such as litter, vegetative trampling, and unplanned trails.<br>▪ Increased awareness and protection of natural landscapes. | <u>**Competitive Events:**</u> **REC-3-81** ✔ Non-motorized competitive events may be permitted on a case-by-case basis in this zone. Maximum group size limits for participants and spectators, vehicle types and number limits, selection criteria, and special terms, conditions, and other stipulations for commercial, organized groups, and competitive permits will be developed based on individual proposals, safety, site capacity, resource conditions, user satisfaction levels, and other factors such as season and type of use. Permit issuance is discretionary with BLM and permit terms and conditions will be subject to management discretion and availability of BLM staff and other resources to administer, conduct compliance on, and monitor impacts of events.<br><br><u>**Target Shooting:**</u> **REC-3-82** ✔ Will not be permitted in the zone or management unit.<br><br><u>**Hunting:**</u> **REC-3-83** ✔ Will be allowed in accordance with state regulations.<br><br><u>**Commercial and Private Permits:**</u><br><br>*<u>Existing Commercial Permits:</u>* **REC-3-84** ✔ BLM will continue to permit 1-2 big game outfitters.<br><br>*<u>New Commercial Permits:</u>* **REC-3-85** ✔ BLM will develop commercial use needs assessment for providing additional outfitted services, including but not limited to, jeep tours and horseback rides. BLM will authorize and allow new permits if proposals and activities are appropriate to Recreation Management Zone.<br><br>*<u>Private Permits:</u>* **REC-3-86** ✔ Will not be required.<br><br><u>**Facilities and Signs:**</u><br><br>*<u>Existing:</u>*<br>   **REC-3-87** ✔ OHV designation signs<br>   **REC-3-88** ✔ Black Ridge Trail System<br>   **REC-3-89** ✔ Smith Mountain Jeep Trail System |

BLM_0007566

**Table 2-2.3a**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| Management Unit 3 (Gunnison and North Fork Rivers SRMA)  Recreation Management Zone MU3-3: Smith Mountain/Rogers Mesa Uplands - uplands extending north and south of Recreation Management Zone MU3- 2.  *(continued)* | | | *New*:  **REC-3-90**  NCA entrance kiosk on county road near intersection of CO-92 and County Road 2810.  **REC-3-91**  Interpretive overlook site on hill overlooking Gunnison Forks.  **REC-3-92**  NCA entrance area at H-75 Road boundary will include information kiosk; vehicle parking, and horse and OHV staging area.  **REC-3-93**  Trailhead kiosks for: 1) Gunnison River access trail (trail is located in Recreation Management Zone  2- on west side of river south of Gunnison Forks); 2) Black Ridge Trail system; 3) Smith Mountain jeep trail system.  **REC-3-94** ✔ Small vehicle campground (10-15 sites) if needed to reduce dispersed camping impacts.  Site to be determined.  **REC-3-95**  Small interpretive overlook areas on Smith Mountain and near intersection of Smith Mountain Jeep Trail and Black Ridge Trail.  **REC-3-96**  Fences, rock barricades, etc., where needed to: protect private lands; delineate campsites and parking areas, protect resources, and allow success of restoration measures.  **REC-3-97**  Boundary, informational, regulatory, and directional signs.  **Trail or Road Construction/Maintenance**:  **REC-3-98** ✔ Will be conducted where needed to provide access to designated river access sites, camping areas, etc. and/or resolve resource concerns or user conflicts.  **REC-3-99**  BLM will provide regular maintenance of primary access roads.  **REC-3-100**  BLM will conduct trail maintenance as needed to protect resources.  **REC-3-101**  BLM will continue mechanized and chemical tamarisk and other weed control.  **REC-3-102**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.  **Visual Resource Management**: **REC-3-103** ✔ VRM Class II.  **Recreation Opportunity Spectrum: REC-3-104** ✔ ROS Unit III (semi-primitive motorized). |

BLM_0007567

**Table 2-2.3a**
**Management Unit 3 (Gunnison and North Fork Rivers SRMA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 3 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 3:** | | | **REC-3-105** ✔ Continue to manage recreation use in Recreation Management Zone 1 under applicable portions of RAMP and RAMP Addition. |
| | | | **REC-3-106** ✔ Continue to work with partners (Trout Unlimited, private landowners, etc.) to provide a public river access site in the Austin area. |
| | | | **REC-3-107** ✔ Set carrying capacity for NCA areas within Recreation Management Zones based on desired resource conditions and visitor satisfaction levels. Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions. |
| | | | **REC-3-108** ✔ If monitoring shows impacts from dispersed camping (Recreation Management Zone Mu3-3) exceed standards, restrict all camping to designated sites, areas, or, if determined necessary, a developed campground. |
| | | | **REC-3-109** ✔ Set specific regulations for appropriate travel on designated routes to enhance visitor safety and protect resources. |
| | | | **REC-3-110** ✔ Educate users about responsible travel on designated routes and regulations regarding resource damage. Include temporary closures for periods when soils are too wet for travel. |
| | | | **REC-3-111** ✔ Educate users about low impact camping, "Tread Lightly," and other land use ethics. |
| | | | **REC-3-112** ✔ Analyze need for additional trails, recreation sites, resource protection measures, etc. and implement measures as needed to meet RMP objectives. |
| | | | **REC-3-113** ✔ Develop maximum group size, vehicle, stock (horses, llamas, etc) limits, selection criteria, and special regulations for commercial and organized group permits where authorized based on carrying capacities, resource conditions, etc. |
| | | | **REC-3-114** ✔ Develop maps, brochures, and website info. |

**Table 2-2.4**
**Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit**

**Management Unit 4 Land Ownership: 22,200 acres of public surface; 23% of planning area public lands**

*Management and protection of the Gunnison sage-grouse and its habitat in the NCA will be emphasized in this 22,200-acre management unit. This management unit includes Gunnison sage-grouse range on public lands within the NCA in the Black Ridge and Fruitland Mesa areas. Although active leks are not known to occur in this management unit, Gunnison sage-grouse is known to occur on Black Ridge in the western portion of the unit. This management unit contains a population of Gunnison sage-grouse that is being managed under the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998). Gunnison sage-grouse was classified as a candidate species under the Endangered Species Act, as amended, on December 28, 2000. In 1995, to address rising concerns about the long-term status of the Gunnison sage-grouse in the Crawford area, the CDOW, the BLM, USFWS, local landowners, and interested individuals and groups formed the Crawford Sage-Grouse Partnership to address declining trends of sage-grouse numbers. In 1998, the Crawford Sage-Grouse Partnership completed a conservation plan that outlines a framework to guide a coordinated management effort to improve sage-grouse habitat and reverse the long-term downward trend (Crawford Sage-Grouse Partnership 1998). Sage-grouse numbers appear to have increased slightly since 1994 (BLM 2001a) (Figure 3-9 of Chapter 3 of the DRMP [BLM 2003c]). Range wide, both the distribution and abundance of this species is on a long-term declining trend.  The primary threat to Gunnison sage-grouse is loss of habitat, primarily sagebrush (Artemisa spp.) in close proximity to other habitat needs. These losses are due to various types of development including buildings, roads, energy exploration, and conversion of habitats to agricultural uses. Inappropriate livestock management and wetland alterations are also contributing to losses. Other important resource values in the area include livestock grazing (cattle and sheep), recreation use, and habitat for a variety of other native wildlife. Plant communities consist primarily of sagebrush grass sites with some scattered occurrences of Utah serviceberry (Amelanchier utahensis) and Gambel oak (Quercus gambelii).*

*The Gunnison Sage-Grouse Conservation Plan was developed to help maintain the viability of the local population and to secure the species' long-term status.  The Plan was developed with local stakeholders to set management guidance for Gunnison sage-grouse habitat in this area, primarily to help increase the quality of habitat and numbers of sage-grouse, in order to prevent the federal listing of the species as endangered. This RMP adopts and incorporates the Gunnison Sage-Grouse Conservation Plan as part of the management objectives and direction for this unit. Many of the plant communities in the management unit have become decadent over time, and appropriate actions are required to restore a complete compliment of seral stages and plant community composition. In addition, in December 2003, the Gunnison Sage-grouse Recovery Team plans to complete a range-wide conservation plan that will include recommendations and guidelines for activities within the sage-grouse habitat. The BLM will review this document and incorporate guidelines as appropriate.  Until this document is made available, the BLM will continue to coordinate with the partners and CDOW for projects within Gunnison sage-grouse habitat that may affect the species.*

*Public lands in this management unit will be designated and managed as the Gunnison Sage-Grouse ACEC/IBA. Rationale for this unit is provided in Appendix E of the PRMP (BLM 2004). Specific management measures will include the following:*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-4-1 | Approximately one mile of the public lands in the management unit parallel to Red Canyon Creek will be located within a recommended ROW utility corridor for future growth in the North Fork Valley area. Part of this corridor is also located in Management Unit 6. See Figure 2-2 (at the end of this chapter) for the location and Table 2-3 (see end of this chapter) for information on all recommended corridors in the planning area.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required. | |
| | LAND-4-2 | Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and Gunnison sage-grouse. | |

BLM_0007569

**Table 2-2.4**
**Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|
| **Lands, Rights-of-Way, and Withdrawals** *(continued)* | **LAND-4-3** Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated. Mitigation will be required in all applications to meet the objectives of this management unit. Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet. Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes. Mitigation will be required in all applications to meet the objectives of this management unit. Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives. | |
| **Minerals and Energy Resources** | **MIN-4-1** Federal oil and gas estate in the unit will be available for leasing subject to the following stipulations. See Appendix E for more information, including exceptions that could be applied. <ol><li>An NSO stipulation within a two-mile radius of Gunnison sage-grouse lek sites to prevent disturbance to leks and strutting/dancing grouse (stipulation GGNCA-1).</li><li>An NSO stipulation within riparian areas that contain Gunnison sage-grouse brood-rearing habitat to prevent disturbance and damage to this habitat (stipulation GGNCA-12).</li><li>A TLS within Gunnison sage-grouse winter range that will prohibit all oil and gas activities except those related to operation and maintenance of existing oil and gas production facilities, from November 15 through April 30, to prevent disturbance and stress to wintering Gunnison sage-grouse (stipulation GGNCA-8).</li><li>A TLS within crucial deer and elk winter range that will prohibit all oil and gas activities except those related to operation and maintenance of existing oil and gas production facilities, from November 15 through April 30, to prevent disturbance and stress to wintering big game and to help prevent big game from foraging on lower elevation private lands and crops (stipulation UB-4).</li><li>A controlled surface use stipulation restricting oil and gas exploration and development activities beyond 500 feet of riparian vegetation zones that contain perennial water sources and streams, sage-grouse brood rearing habitat, fisheries, and other water and vegetation quality values (stipulation GGNCA-14).</li><li>A lease notice could be imposed on federal oil and gas leases containing Gunnison sage-grouse nest sites that will prohibit surface-disturbing activities or require other special mitigation on leases from March 1 through June 30 to prevent disturbance to nesting sage-grouse (stipulation GGNCA-15).</li></ol>A plan of operation will be required in this ACEC, for locatable mineral activities that will result in surface disturbance. | |

BLM_0007570

Table 2-2.4
Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Vegetation | VEG-4-1 | In the Black Ridge area of the unit, the size, number, and types of vegetation (see Figure 3-8 in Chapter 3 of the DRMP [BLM 2003c]) will be tailored first to Gunnison sage-grouse needs, and second to big game winter range needs. | |
| | VEG-4-2 | Vegetation treatments will be managed to ensure that appropriate plant communities are present for all life functions for the Gunnison sage-grouse. | |
| | VEG-4-3 | Slightly degraded vegetation will be managed to minimize the source of degradation so that the vegetation community may recover on its own. | |
| | VEG-4-4 | In areas of severely degraded vegetation, restoration treatments will be undertaken. | |
| Forestry | FOR-4-1 | In areas that receive vegetation treatments, prescribed burns, or other techniques, fuelwood collection could be allowed as a means to accomplish a resource objective, priority, clean up, or to remove fuel from the ground and to facilitate the purposes of the treatment, if appropriate. Fuelwood collection or cutting, where authorized, will be allowed only if all other management unit objectives will continue to be met and, upon completion of fuelwood collection, existing ground conditions will not hinder proposed treatments. | |
| Wildlife, Fish, and Aquatic Life | WFA-4-1 | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for wildlife species and habitat in the unit, specifically for mule deer, elk, and other species. | |
| Special Status Species and Habitat | SSS-4-1 | This unit will be managed for enhancement of the Gunnison sage-grouse population. | |
| | SSS-4-2 | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat in the unit, specifically for the Fruitland Mesa area, including Gunnison sage-grouse and other species. | |
| | SSS-4-3 | These lands will be closed to motorized and non-motorized mechanical vehicular travel the remainder of the year to prevent disturbance to breeding sage-grouse and wintering big game. See the Recreation" section below. | SSS-4-4 Motorized and mechanical vehicular travel on public lands containing leks or potential leks will be limited seasonally to designated routes and trails. See the Recreation section below. |
| | SSS-4-5 | Livestock management, road and trails management, recreation activity management, and vegetation management will be conducted to maintain and restore Gunnison sage-grouse habitat in this area. | |

BLM_0007571

**Table 2-2.4**
**Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Special Status Species and Habitat** *(continued)* | **SSS-4-6** | Surface-disturbing activities will be restricted in special status species occupied locations and their potential habitat for their protection. | |
| **Recreation** | *see Table 2-2.4a* | Recreation management decisions are shown in Table 2-2.4a below for Management Unit 4. See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones. | |
| | **REC-4-1** | The East Side Scenic Overlook in Section 30, Township 15 South, Range 93 West, 6th Principal Meridian, Delta County, will be designed and developed to provide opportunities to view the outstanding vistas of the Gunnison Gorge Wilderness, including views of the Gunnison River at Ute Park. (Other views include the west rim of the Gorge to the west, the Gunnison River north of the Wilderness, the San Juan Mountains to the south, the West Elk Mountains to the east, and the greater Uncompahgre Valley to the west. The site is located on a cliff on the east side of the Gunnison Gorge immediately east of and outside the Wilderness. The unit is approximately one mile south of the junction of the Gunnison River and Smith Fork Creek. It is accessible by four-wheel-drive roads). The development will be unintrusive and semi-primitive in nature. Natural materials will be used at the site to mark and denote parking, and barriers such as rocks, dead trees, and limbs will be placed to prevent motorized travel beyond confined parking at the termination of the existing access road uphill of the cliff overlook site. The concern at this site is the likely increased use of the overlook and potential proliferation of user-established off-road travel via motorized vehicles, and off-route travel by foot or horseback. | **REC-4-2** Motorized travel within the confines of the East Side Scenic Overlook will be limited to the parking space identified uphill form the overlook. |
| | **REC-4-3** | Interpretation of the vistas could be installed at the cliff in a manner keeping with preserving and considering Wilderness values. | |
| | **REC-4-4** | Seasonal vehicular closures will be imposed according to the objectives for the remainder of this management unit. | |
| | **REC-4-5** | To prevent disturbance to wintering big game and to reduce impacts on strutting Gunnison sage-grouse in the spring, public lands in the unit will be closed to motorized and mechanical vehicular use and travel from November 15 through April 30 annually. If these and related human uses are determined to cause disturbance to breeding sage-grouse or wintering big game during the periods when these uses will be permitted, BLM will extend the periods of vehicular closure where and when necessary to prevent disturbance to these species or habitat. The closure extension will be for up to 31 days, depending on the circumstances warranting the extension. | **REC-4-6** From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks. The routes shown are preliminary and may not be all inclusive. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007572

**Table 2-2.4**
**Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Recreation** *(continued)* | | | **REC-4-7** Designated routes will be further refined with the assistance of a BLM/citizen work group. Until routes are refined, all motorized and mechanical travel will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) from May 1 to November 14. The seasonal limitation period could change if an extended closure period is necessary. |
| | **REC-4-8** | At BLM's discretion, target shooting on public lands may be authorized on public lands in the planning area only in those portions of Management Units 2, 4, and 6 located outside the NCA boundary.  See the recreation-specific decisions for these management units below. Target shooting will not be authorized on public lands in the remainder of the planning area in order to provide a safe environment for all users in the planning area, and to protect resources, health, and property.  Authorization will occur according to BLM and other applicable regulations.  Special operating procedures and local BLM regulations will be established and posted.  Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision.  All BLM and other federal, state, and local regulations and best management practices will be followed.  If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. | |
| **Fire Management** | **FIRE-4-1** | All fire will be suppressed in the relict tree stand on Black Ridge. | |
| | **FIRE-4-2** | Fuel treatments or reduction or other vegetative treatments will not be conducted within the stands. | |
| | **FIRE-4-3** | Fuels treatments, including mechanical treatment or prescribed fire, will be encouraged in younger vegetation near relict stands to protect the stands from catastrophic (crown) fire. | |

BLM_0007573

Table 2-2.4a
Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone Decisions

| Recreation Management Zones in Management Unit 4 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions  ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 4 (Gunnison and North Fork Rivers SRMA).**<br><br>**Recreation Management Zone MU4: Areas in Black Ridge and Fruitland Mesa Lands on east side of planning area (22,200 acres, 5,670 acres of which are inside NCA).**<br><br>Activities:<br>Wildlife viewing, four-wheel driving, scenic driving, hunting. | *Physical Setting:* Predominantly Middle country with some sections of backcountry in Black Ridge and Green Mountain areas of NCA; semi-primitive motorized, largely unmodified and natural-appearing; resource modifications evident but harmonious with surroundings.<br><br>*Number Social Encounters:* Very low contact (see 1-6 groups per day) except during big game hunting season when there is moderate to high degree of contact with others on roads and in dispersed campsites (see more than 15 groups.)<br><br>*Managerial Setting:* Vehicle patrols and increased visitor contacts during hunting season.<br><br>Land management practices, such as grazing, vegetation treatments, and wildlife protection projects are evident but tend to fit in with natural landscape.<br><br>Recreation facility design will be harmonious with the land and minimum necessary to meet management objectives and support managed activities.<br><br>Where needed, and to the extent possible, natural materials (rocks, dead trees, etc.) will be used to delineate parking areas, road closures, camping areas, etc. | **Management Objective:** Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in Wildlife viewing, four-wheel driving, scenic driving, hunting:<br><br>**Experiences:**<br>• Enjoying nature.<br>• Learning more about unique species and places.<br>• Enjoying going exploring on my own.<br><br>**Benefits:**<br><br>Individual:<br>• Enhanced awareness and understanding of nature.<br>• Greater appreciation for public land and how managers care for it. | **Travel Management:**<br><br>**REC-4-9** ✔ Limited OHV area;<br><br>**REC-4-10** ✔ The management unit will be closed to motorized and mechanical vehicular use and travel from November 15 through April 30 annually to prevent disturbance to wintering big game or breeding/strutting sage-grouse. Closure could be extended an additional 30-days if warranted by circumstances.<br><br>**REC-4-11** Motorized and mechanical vehicle travel on public lands in this management unit will be limited to the designated routes as shown on Figure 2-4 from May 1 through November 14, unless necessary to extend closure another 30 days.<br><br>**Camping: REC-4-12** ✔ Dispersed camping will be allowed.<br><br>**Stay Limit: REC-4-13** ✔ 14 days will be allowed unless special regulations (such as seasonal closures, etc.) are in effect.<br><br>**Campfires: REC-4-14** ✔ Campfires must be in fire pans.<br><br>✔ Portable stoves and grills will be permitted in dispersed camping areas.<br><br>**Maximum Group Size: REC-4-15** ✔ 25 people;<br><br>**REC-4-16** ✔ Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events: REC-4-17** ✔ Motorized and non-motorized competitive events will not be permitted in the management unit or this zone.<br><br>**Target Shooting: REC-4-18** ✔ Will not be permitted on public lands within the NCA boundary. At BLM's discretion, target shooting on public lands may be authorized on public lands in the management unit outside the NCA boundary. Target shooting will not be authorized on public lands in the remainder of the planning area in order to provide a safe environment for all users in the planning area, and to protect resources, health, and property. Authorization would will occur according to BLM and other applicable regulations. Special operating procedures and local BLM regulations will be established and posted. Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be complied with. If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. |

BLM_0007574

**Table 2-2.4a**
**Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 4 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 4 (Gunnison and North Fork Rivers SRMA)**<br><br>**Recreation Management Zone MU4**<br><br>*(continued)* | | <u>Household and Community</u>:<br>▪ Greater community involvement in recreation and other land use decisions.<br>▪ Better understanding of wildlife's contribution to my own quality of life.<br>▪ Improved understanding of our community's dependency and impact on public lands.<br><br><u>Economic</u>:<br>▪ Positive contributions to local economic stability.<br>▪ Reduced impacts of big game on private land hay fields.<br><br><u>Environmental</u>:<br>▪ Greater protection of sage-grouse habitat and critical big game winter range.<br>▪ Reduced wildlife harassment by recreation users.<br>▪ Reduced spread of invasive species (i.e., pinyon-junipers).<br>▪ Great community ownership and stewardship of natural resources. | **Hunting:** **REC-4-19** ✔ Will be allowed in accordance with state regulations.<br><br>**REC-4-20** ✔ Continue coordination with CDOW to increase visitor contacts during hunting season.<br><br>**REC-4-21** ✔ No-hunting zones will be established in NCA areas in cooperation with CDOW if determined necessary for visitor protection.<br><br><u>**Commercial and Private Permits**</u>:<br><br>*<u>Existing Commercial Permits</u>:* **REC-4-22** ✔ BLM will continue to manage 5-7 commercial permits for big game hunting in Recreation Management Zone.<br><br>*<u>New Commercial Permits</u>:* **REC-4-23** ✔ BLM will develop commercial use needs assessment for providing additional outfitted services such as jeep tours, horseback rides, etc.<br><br>**REC-4-24** ✔ BLM will allow new permits if activities appropriate to zone.<br><br>*<u>Private Permits</u>:* **REC-4-25** ✔ Individual private permits will not be required.<br>**REC-4-26** Organized group permits will be required for groups over 25 people.<br><br><u>**Facilities and Signs**</u>:<br>*<u>Existing</u>:* **REC-4-27** BLM boundary and directional signs will be installed at major road intersections.<br>*<u>New</u>:*<br>**REC-4-28** East Side Scenic Overlook (on Wilderness rim near Smith Fork Creek in Section 30, Township 15 South, Range 93 West, 6 Principal Meridian, Delta County).<br>**REC-4-29** NCA entrance signs and informational kiosks will be installed at major NCA access roads.<br>**REC-4-30** Additional boundary, informational, regulatory, and directional signs.<br>**REC-4-31** Fences, rock barricades, etc., to: protect private lands; contain use within Recreation Management Zone ; protect special status species, unique soils, etc.; and allow for success of restoration measures. |

BLM_0007575

2. Approved Decisions

Table 2-2.4a
Management Unit 4 (Gunnison Sage-Grouse ACEC/IBA) Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 4 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 4 (Gunnison and North Fork Rivers SRMA)** <br><br> **Recreation Management Zone MU4** <br><br> *(continued)* | | | <u>**Trail and Road Construction/Maintenance:**</u> <br><br> **REC-4-32** ✔  BLM will allow new road construction only if needed to resolve resource concerns or user conflicts. <br> **REC-4-33**  BLM will continue to maintain designated roads at current maintenance levels and road standards. <br> **REC-4-34**  Areas impacted by unauthorized use will be closed, either temporarily or permanently as needed, and rehabilitated. <br> **REC-4-35**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate. <br><br> <u>**Visual Resource Management:**</u> **REC-4-36** ✔  East Side Scenic Overlook – VRM Class I. Relict tree stand on Black Ridge – VRM II. Remaining areas – VRM Classes III and IV. <br><br> <u>**Recreation Opportunity Spectrum:**</u> **REC-4-37** ✔  ROS Unit III (semi-primitive motorized). |
| <u>**Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 4:**</u> | **REC-4-38** ✔ Set carrying capacity for NCA areas within zones based on desired resource conditions and visitor satisfaction levels. <br><br> **REC-4-39** ✔ Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas. <br><br> **REC-4-40** ✔ Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions. <br><br> **REC-4-41** ✔ Set specific regulations for appropriate travel on designated routes to enhance visitor safety and protect resources. Educate users about responsible travel on designated routes and regulations regarding resource damage. <br><br> **REC-4-42** ✔ Implement low-impact use regulations for camping, campfires, sanitation, etc. <br><br> **REC-4-43** ✔ Educate users about low impact camping, "Tread Lightly," and other land use ethics. <br><br> **REC-4-44** ✔ Develop maximum group size and vehicle limits, selection criteria, and special regulations for commercial, organized group, and competitive permits based on carrying capacities, resource conditions, etc. <br><br> **REC-4-45** ✔ Provide maps, brochures, and website information. <br><br> **REC-4-46** ✔ Continue coordinating with the Park Service to provide and improve visitor information, signing, and compliance and annually fund the joint Park Service/BLM Visitor Guide. Where feasible, BLM will coordinate joint funding for permanent and seasonal positions to increase ground presence and coordination between the agencies to improve customer service and user education. | | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007576

**Table 2-2.5**
**Management Unit 5 (Native Plant Community ACEC/ONA) Decisions Applicable to Entire Management Unit**

**Management Unit 5 Land Ownership: 3,785 acres of public surface; 4% of planning area public lands**

*Management and long-term preservation of the Winterfat Shrub Steppe, Juniper-Grass Savanna, and Pinyon-Juniper Woodland native communities will be emphasized in this 3,785-acre management unit. This unit is located in the north-central portion of the planning area along the western boundary of the Wilderness. This area has been identified and mapped by The Nature Conservancy for long-term preservation of the Winterfat Shrub Steppe, Juniper-Grass Savanna, and Pinyon-Juniper Woodland within the Southern Rocky Mountain Ecosystem.*

*This management unit protects occurrences of the native plant communities listed above. These communities protect not only the major plant species that define them, but also provide habitat for numerous associated plant and animal species. When The Nature Conservancy's recommended conservation areas are taken together, they should ensure protection of the biodiversity within the Southern Rocky Mountain Ecosystem, with the least amount of land conserved. The area identified in this management unit helps to fulfill this planning area's contribution to maintaining the ecosystem's biodiversity.*

*Threats to this unit's values include vegetation treatments for fuels reduction or wildlife habitat improvement and weed invasions, especially annual weeds like cheatgrass (Anisantha tectorum) that are already present and are exacerbated by livestock grazing. Open OHV designation is another threat.*

*This management unit will be managed as the Native Plant Community ACEC/ONA. Rationale for this unit is provided in Appendix E of the PRMP (BLM 2004). Specific management measures will include the following:*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 5) |
|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-5-1 | Public lands in the management unit will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet. |
| | LAND-5-2 | Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes. |
| | LAND-5-3 | Mitigation will be required in all ROW applications to meet the objectives of this management unit. Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives. |
| Access and Transportation | TRAN-5-1 | Additional road construction that will fragment the plant communities of concern will not be authorized or permitted in this unit. |
| Vegetation | VEG-5-1 | Vegetation treatments will be avoided. |
| | VEG-5-2 | Brushbeating treatments will be permitted only for the purpose of restoring or rejuvenating the plant communities that have been damaged by past management. |
| | VEG-5-3 | Seeding mixes that abide by grazing management guidelines will be followed. |
| | VEG-5-4 | BLM will use native seed unless a non-native plant species will be more capable of achieving and maintaining proper functioning condition without degrading the native plant community. |
| | VEG-5-5 | Necessary field work will be conducted to better map where the native plant communities occur. Field mapping of specific communities of interest will be conducted. |

BLM_0007577

**Table 2-2.5**
**Management Unit 5 (Native Plant Community ACEC/ONA) Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision (Note: There are no Implementation Decisions for any resources/resource uses, other than Recreation, in Management Unit 5) |
|---|---|---|
| Forestry | FOR-5-1 | This unit will be closed to fuelwood cutting except if treatment were used to restore or rejuvenate the plant communities that have been damaged by past management. |
| Special Status Species | SSS-5-1 | As appropriate to enhance management, and if information is available, habitat management objectives will be included in follow-on activity planning and management plans for special status species and habitat in the unit, including Mancos shale areas for Gunnison's prairie dog, Clay-loving wild buckwheat, and the kit fox, a state-listed endangered species. |
| | SSS-5-2 | Field work will be conducted in the unit to better map where the native plant communities occur. |
| Rangeland | RANG-5-1 | Livestock grazing will be monitored and managed to ensure concerned plant communities are not being damaged, either through consumption or through noxious weed invasions. |
| | RANG-5-2 | In the area identified by The Nature Conservancy for native plant communities (in the vicinity of Duncan and Bobcat Roads), livestock grazing will be monitored and managed to ensure concerned plant communities are not being damaged, either through consumption or through noxious weed invasions. |
| Recreation | *see Table 2-2.5a* | Recreation management decisions are shown in Table 2-2.5a below for Management Unit 5. See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones. |
| Education and Interpretation | EDU-5-1 | Interpretive actions will be used to inform the public about the importance of native plant communities in general, as well as these communities specifically. |

BLM_0007578

Table 2-2.5a
**Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management Zone Decisions**

| Recreation Management Zones in Management Unit 5 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 5 (Native Plant Community ACEC/ONA) (3,785 acres, all of which are in NCA).**<br><br>**Recreation Management Zone MU5:**<br>**Activities:**<br>On-route four-wheel driving, motorcycle and mountain bike trail riding, hiking and horseback riding. | _**Physical Setting:**_ Middle country adjacent to Wilderness rim on east side; largely unmodified and natural-appearing; resource modifications evident but harmonious with surroundings.<br><br>_**Number Social Encounters:**_ Low contact away from roads or developed sites (see 6-15 groups per day); moderate to high degree of contact with others on roads and in developed sites (see 15 –30 groups).<br><br>_**Managerial Setting:**_ Vehicle patrols and increased visitor contacts.<br><br>Facility design will be harmonious with the land and minimum necessary to meet management objectives and support managed activities.<br><br>Land management practices, such as grazing, vegetation treatments are evident but tend to fit in with natural landscape. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in on-route four-wheel driving, single-track motorcycle and mountain bike riding, hiking and horseback riding to and along the Wilderness rim:<br><br>**Experiences:**<br>• Enjoying having easy access to natural landscapes and outstanding scenery.<br>• Enjoying having readily available access through this area.<br>• Being able to enjoy the Wilderness without being in it.<br><br>**Benefits:**<br>Individual:<br>• Improved wilderness awareness and appreciation for non-Wilderness users.<br>• Greater understanding of and commitment to sustaining the area's physical/managerial diversity.<br>• Increased sensitivity to and acceptance of different recreation users. | **Travel Management:  REC-5-1** ✔  Limited OHV area;<br>Motorized and non-motorized, mechanical vehicle travel will be permitted only on the designated routes shown on Figure 2-4.<br><br>_**Black Ridge Trail (Wilderness rim)**_:<br><br>　**REC-5-2** ✔  Motorized passenger vehicles (cars and trucks) and 4-wheel ATVs on Black Ridge Trail (Wilderness rim) will be restricted to double-track road sections of trail located north of Ute Trailhead.<br><br>　**REC-5-3** ✔  Motorcycles, horses, mountain bikes, and hikers will be allowed on both double-track road and single-track portions of Black Ridge Trail (Wilderness rim) trail through entire management unit.<br><br>**Camping:  REC-5-4** ✔  Camping will be allowed in developed sites at Ute, Duncan, and Bobcat Trailheads, and at dispersed sites.  Camping could be eliminated or restricted to designated sites if monitoring shows adverse impacts to native plant communities.<br><br>**Stay Limit:  REC-5-5** ✔  7 days<br><br>**Campfires:    REC-5-6** ✔  No open fires will be permitted, no bonfire parties, etc.<br><br>**REC-5-7** ✔  Campers will be required to use grills provided at developed sites, stoves, and/or fire pans.<br><br>**Maximum Group Size:  REC-5-8** ✔  25 people;<br><br>**REC-5-9** ✔  Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events:  REC-5-10** ✔  Motorized and non-motorized competitive events will not be permitted in this management unit.<br><br>**Target Shooting:  REC-5-11** ✔  Will not be permitted in this management unit.<br><br>**Hunting:  REC-5-12** ✔  Will be allowed in accordance with state regulations.<br><br>**REC-5-13** ✔  BLM will continue coordination with CDOW to increase visitor contacts during hunting season. |

BLM_0007579

Table 2-2.5a
Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 5 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 5 (Native Plant Community ACEC/ONA)**<br><br>**Recreation Management Zone MU5**<br><br>*(continued)* | Household and Community:<br>▪ Improved cultivation of outdoor-oriented lifestyle.<br>▪ Greater understanding of the importance of recreation-tourism to our community.<br><br>Economic:<br>▪ Ability to demonstrate the social value of multiple use recreation to the local economy.<br><br>Environmental:<br>▪ Increased protection of natural landscapes<br>▪ Greater protection of area cultural resources.<br>▪ Simultaneously sustaining wilderness and motorized environments. | **REC-5-14** ✔ No-hunting zones will be established in NCA areas in cooperation with CDOW if determined necessary for visitor protection.<br><u>**Commercial and Private Permits**</u>:<br>*<u>Existing Commercial Permits</u>*: **REC-5-15** ✔ None<br>*<u>New Commercial Permits</u>*: **REC-5-16** ✔ BLM will allow new permits if activities will be appropriate to zone.<br>*<u>Private Permits</u>*: **REC-5-17** ✔ Individual private permits will not be required.<br>**REC-5-18** ✔ Organized group permits will be required for groups over 25 people.<br><u>**Facilities and Signs**</u>:<br>*<u>Existing</u>*:<br>**REC-5-19** ✔ Chukar, Bobcat, Duncan, and Ute Wilderness access roads.<br>**REC-5-20** ✔ Duncan Trailhead facilities: parking, fee and information kiosk, toilet, 1 picnic table, and visitor register.<br>**REC-5-21** ✔ Ute Trailhead facilities: parking, fee and information kiosk, toilet, 2 picnic tables, and visitor register.<br>**REC-5-22** ✔ Black Ridge Trail (multiple use trail with single track and four-wheel drive sections)<br>*<u>New</u>*:<br>**REC-5-23** Trailhead signs for Black Ridge Trail will be installed at major trail/road intersections.<br>**REC-5-24** BLM will continue maintenance of trailhead facilities to meet visitor needs and safety needs. This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br>**REC-5-25** Boundary, information, regulatory, and directional signs will be installed where needed to provide direction, protect resources, and/or designate segments of trail systems for specific uses (i.e., multiple use, non-motorized, etc.).<br>**REC-5-26** Fences, rock barricades, etc., to: protect private lands; protect native communities, special status species, unique soils, cultural resources, etc; and allow success of restoration measures.<br>**REC-5-27** BLM will continue to replace stolen and vandalized signs. |

BLM_0007580

Table 2-2.5a
**Management Unit 5 (Native Plant Community ACEC/ONA) Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 5 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| Management Unit 5 (Native Plant Community ACEC/ONA)<br><br>Recreation Management Zone MU5<br><br>*(continued)* | | | **Trail and Road Construction and Maintenance:**<br>**REC-5-28**  BLM will conduct modifications (including rerouting, pullouts, etc.) of roads and/or trails where needed to reduce impacts to native plant communities.<br><br>**REC-5-29** ✔ BLM will construct new roads as needed to reduce impacts to native plant communities.<br>**REC-5-30**  BLM will continue to maintain Bobcat, Duncan, Ute, four-wheel drive portions of Black Ridge Trail, and other designated routes at current levels and road standards.<br>**REC-5-31**  BLM will maintain single-track sections of trails to preserve riding experience and reduce off-road impacts to plant communities.<br>**REC-5-32**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br>**REC-5-33**  Areas impacted by unauthorized uses will be closed, either temporarily or permanently as needed, and rehabilitated.<br><br>**Visual Resource Management:  REC-5-34** ✔ VRM Class III<br><br>**REC-5-35** ✔ BLM will maintain visual setbacks (minimum 500 feet) adjacent to Bobcat, Duncan, and Ute access roads, trails, and developed recreation facilities.  This will include relocating existing and restricting placement of new structures or facilities (stock tanks, bed grounds, reservoirs, etc.<br><br>**Recreation Opportunity Spectrum:  REC-5-36** ✔ ROS Unit III (semi-primitive motorized). |
| **Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 5:** | **REC-5-37** ✔ Set carrying capacity for NCA areas within zones based on desired resource conditions and visitor satisfaction levels.<br><br>**REC-5-38** ✔ Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions.<br><br>**REC-5-39** ✔ Set specific regulations for appropriate travel on designated routes to enhance visitor safety and protect resources.  Educate users about responsible travel on designated routes and regulations regarding resource damage.<br><br>**REC-5-40** ✔ Implement low-impact use regulations for camping, campfires, sanitation, etc.<br><br>**REC-5-41** ✔ Educate users about low impact camping, "Tread Lightly," and other land use ethics.<br><br>**REC-5-42** ✔ Develop maximum group size and vehicle limits, selection criteria, and special regulations for commercial, organized group, and competitive permits based on carrying capacities, resource conditions, etc.<br><br>**REC-5-43** ✔ Provide maps, brochures, and website information. | | |

BLM_0007581

Table 2-2.6
Management Unit 6 Decisions Applicable to Entire Management Unit

**Management Unit 6 Land Ownership: 28,755 acres of public surface; 30% of planning area public lands**
*This 28,755-acre management unit is located throughout the planning area. Specific management measures will include the following:*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Lands, Rights-of-Way, and Withdrawals | LAND-6-1 | The 30 acres of BOR withdrawn lands within this management unit, north of Montrose, are technically closed to motorized and managed by the BOR in accordance with 43 Code of Federal Regulations (CFR) 420.2 and a 1983 Interagency Agreement between the BLM and BOR.  The lands are located within an area currently designated as open to motorized use.  In this RMP, motorized and mechanical vehicular traffic on these lands will be limited to selected, designated routes.  During the mapping and documentation process for water-related facilities and other agency withdrawn lands, BLM will pursue a supplemental agreement with BOR for management of the surface on these lands. In the interim, on public lands withdrawn for BOR project purposes, the BOR and the BLM will manage the lands in accordance with their 1983 Interagency Agreement. | |
| | LAND-6-2 | The following 0.5-mile-wide ROW corridors are recommended to be located in various locations in this Unit.  Refer to Table 2-3 and Figure 2-2 (see end of this chapter) for information and general locations. Mitigation will be required in all applications to meet the objectives of this management unit and other values that could be present.<br><br>Map Key 1, Table 2-3 (at end of this chapter)<br>Along the western edge of the NCA and planning area, including all of West Peach Valley lands. The width of the corridor varies, and the corridor contains the West Peach Valley lands.  The existing Tri-State 115 kV transmission line will be located in the southern portion of the corridor in this unit in the Candy Lane area on the western boundary of the NCA north of Falcon Road. This corridor extends into Management Units 2 and 3.<br><br>Map Key 2, Table 2-3 (at end of this chapter)<br>Along the southernmost boundary of the planning area adjacent to and parallel to US Highway (US-) 50 east of Montrose.<br><br>Map Key 3, Table 2-3 (at end of this chapter)<br>Parallel to CO-92, south of Crawford, along approximately two miles of public land. | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

November 2004

BLM_0007582

Table 2-2.6
**Management Unit 6 Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| **Lands, Rights-of-Way, and Withdrawals** *(continued)* | **LAND-6-2** *(continued)* | Map Key 4, Table 2-3 (at end of this chapter) Along the south side of Red Canyon Creek. Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required. Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk. Part of this corridor will be located in Management Unit 4. | |
| | | Map Key 5, Table 2-3 (at end of this chapter) Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon. Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required. Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk. This corridor will be located adjacent to Unit 4. | |
| | | Map Key 7, Table 2-3 (at end of this chapter) Along public lands at "Jones Draw" switchbacks on CO-347. | |
| **Minerals and Energy Resources** | **MIN-6-1** | Federal oil and gas estate in the unit will be available for leasing subject to the following stipulations. See Appendix E for more information, including for exception that could be applied. 1) A TLS within crucial deer and elk winter range that will prohibit all oil and gas activities except those related to operation and maintenance of existing oil and gas production facilities, from November 15 through April 30, to prevent disturbance and stress to wintering big game and to help prevent big game from foraging on lower elevation private lands and crops (stipulation UB-4). 2) An NSO stipulation within a two-mile radius of Gunnison sage-grouse lek sites to prevent disturbance to leks and strutting/dancing grouse (stipulation GGNCA-1). 3) An NSO stipulation to protect threatened, endangered, candidate, and sensitive plants and their potential habitat that may be discovered on public lands outside the NCA (stipulation GGNCA-11). 4) A TLS within sage-grouse winter range that will prohibit all oil and gas activities except those related to operation and maintenance of existing oil and gas production facilities from November 15 through April 30 to prevent disturbance and stress to wintering grouse (stipulation GGNCA-8). | |

BLM_0007583

**Table 2-2.6**
**Management Unit 6 Decisions Applicable to Entire Management Unit** *(continued)*

| Resource or Resource Use | Land Use Planning Decision | | Implementation-level Decision |
|---|---|---|---|
| **Minerals and Energy Resources** *(continued)* | **MIN-6-1** *(continued)* | 5) An NSO stipulation in the existing 161-acre Fairview ACEC/RNA to protect known populations of and habitat for Clay-loving wild buckwheat and Adobe penstemon (stipulation UB-2). <br> 6) An NSO stipulation within riparian areas that contain Gunnison sage-grouse brood-rearing habitat (stipulation GGNCA-12). <br> 7) A TLS from March 1 through May 31 on public lands with Mancos shale soils (highly erodible soil areas) where low soil productivity will prolong or disallow revegetation (stipulation UB-1). | |
| **Special Status Species** | **SSS-6-1** | As appropriate to enhance management, and if information is available, habitat management  objectives will be included in follow-on activity planning and management plans  for special status species and habitat in the unit, specifically within Mancos shale areas for Gunnison's prairie dog, Clay-loving wild buckwheat, and kit fox, a state-listed endangered species. | **SSS-6-2** <br><br> Populations of sensitive plant species either side of an existing irrigation canal and access road will be fenced to prevent damage or other impacts to plant specimens or habitat. |
| **Recreation** | *see Table 2-2.6a* | Recreation management decisions are shown in Table 2-2.6a below for Management Unit 6.  See Figure 2-7 (at the end of this chapter) for a map showing recreation management zones MU6-1 and MU6-2. | |
| | **REC-6-1** | Other than on a single designated route, the remainder of the Fairview ACEC/RNA will remain closed to motorized and non-motorized, mechanical vehicle use. | **REC-6-2** <br><br> Motorized and non-motorized, mechanical vehicular travel in the existing Fairview ACEC/RNA in this unit will be limited to a single, designated route used for maintenance of an irrigation canal and facilities. |

BLM_0007584

Table 2-2.6
Management Unit 6 Decisions Applicable to Entire Management Unit *(continued)*

| Resource or Resource Use | | Land Use Planning Decision | Implementation-level Decision |
|---|---|---|---|
| Recreation *(continued)* | REC-6-3 | At BLM's discretion, target shooting on public lands may be authorized on public lands in the planning area only in those portions of Management Units 2, 4, and 6 located outside the NCA boundary. See the recreation-specific decisions for these management units below. Target shooting will not be authorized on public lands in the remainder of the planning area in order to provide a safe environment for all users in the planning area, and to protect resources, health, and property.  Authorization  will occur according to BLM and other applicable regulations.  Special operating procedures and local BLM regulations will be established and posted.  Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be followed.  If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. | |
| Special Management Areas | SMA-6-1 | The 161-acre existing Fairview ACEC/RNA/Colorado State Natural Area in this unit will be maintained for the protection and management of Clay-loving wild buckwheat and Adobe penstemon. | |
| Education and Interpretation | EDU-6-1 | The BLM will collaborate with school district RE-1J to evaluate the Fairview ACEC/RNA for potential as an outdoor classroom. A collaborative strategy will be developed to cooperatively use lands for day-use educational and interpretive purposes. | |

BLM_0007585

Table 2-2.6a
Management Unit 6 Recreation Management Zone Decisions

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>**Recreation Management Zone MU6-1: West Common Lands (approximately 16,000 acres).**<br><br>*Common Management lands in West Peach Valley Lands and on the West slope of NCA.*<br><br>**Activities:**<br>Scenic driving, four-wheel driving, motorcycle and mountain bike trail riding, hiking and horseback riding. | *Physical Setting:* Middle country with small sections of Rural next to private lands, motorized, largely unmodified and natural-appearing; resource modifications evident but harmonious with surroundings<br><br>*Number Social Encounters:* Low contact away from roads or developed sites (see 6-10 groups per day); moderate degree of contact with others on roads and in developed sites (see 11-15 groups.)<br><br>*Managerial Setting:* Vehicle patrols and increased visitor contacts.<br><br>Facility design will be harmonious with the land and minimum necessary to meet management objectives and support managed activities.<br><br>Land management practices, such as grazing, vegetation treatments are evident but tend to fit in with natural landscape. | Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in on-route four-wheel-drive driving, single-track motorcycle and mountain bike riding, hiking and horseback riding to and along the Wilderness rim:<br><br>**Experiences:**<br>▪ Enjoying having easy access to natural landscapes and outstanding scenery.<br>▪ Enjoying having readily available access through this area.<br>▪ Being able to enjoy the Wilderness without being in it.<br><br>**Benefits:**<br>Individual:<br>▪ Improved wilderness awareness and appreciation for non-Wilderness users.<br>▪ Greater understanding of and commitment to sustaining the area's physical/managerial diversity.<br>▪ Increased sensitivity to and acceptance of different recreation users. | **Travel Management:** **REC-6-4** ✔ Limited OHV area;<br>**REC-6-5** Motorized and non-motorized, mechanical vehicle travel will be permitted on designated routes only as shown on Figure 2-4.<br><br>**Camping:** **REC-6-6** No camping on west side of Peach Valley and Chukar Roads to reduce impacts to Mancos shale soils and special status species. Dispersed camping will be allowed east side of Peach Valley and Chukar Roads.<br><br>**Stay Limit:**<br>**REC-6-7** Dawn to Dusk (west side of Peach Valley Road)<br>**REC-6-8** 7 days (East side of Peach Valley and Chukar Roads).<br><br>**Campfires:** **REC-6-9** No open fires will be permitted, no bonfire parties, etc.<br>**REC-6-10** Campers will be required to use grills provided at developed sites, stoves, and/or fire pans and charcoal fires.<br><br>**Maximum Group Size:** **REC-6-11** 25 people;<br><br>**REC-6-12** ✔ Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events:** **REC-6-13** ✔ Motorized and non-motorized competitive events will not be permitted on public lands in the recreation management zone inside the boundary of the NCA. Motorized and non-motorized competitive events will be permitted outside the NCA on a case-by-case basis. Maximum group size limits for participants and spectators, vehicle types and number limits, selection criteria, special terms, conditions, and other stipulations for commercial, organized groups, and competitive permits will be developed based on individual proposals, safety, site capacity, resource conditions, user satisfaction levels, and other factors such as season and type of use. Permit issuance and permit terms and conditions will be subject to management discretion and availability of BLM staff and other resources to administer, conduct compliance on, and monitor impacts of events. |

BLM_0007586

**Table 2-2.6a**
**Management Unit 6 Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions<br>✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>**Recreation Management Zone**<br>**MU6-1: West Common Lands**<br><br>*(continued)* | | **Household and Community:**<br>■ Improved cultivation of outdoor-oriented lifestyle.<br>■ Greater understanding of the importance of recreation-tourism to our community.<br><br>**Economic:**<br>■ Ability to demonstrate the social value of multiple use recreation to the local economy.<br><br>**Environmental:**<br>■ Increased awareness of the area's natural and scenic qualities.<br>■ Greater protection of area's unique adobe badlands landscapes.<br>■ Simultaneously sustaining wilderness and motorized environments.<br>■ Greater protection of sensitive plant and animal communities. | **Target Shooting: REC-6-14** ✔ Will not be permitted in this recreation management zone inside the NCA boundary.  At BLM's discretion, target shooting on public lands may be authorized on public lands in the planning area in this recreation management zone (MU6-1) located outside the NCA boundary in order to provide a safe environment for all users in the zone and management unit, and to protect resources, health, and property. Authorization would occur according to BLM and other applicable regulations.  Special operating procedures and local BLM regulations will be established and posted.  Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be complied with.  If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated.<br><br>**Hunting: REC-6-15** ✔ Will be allowed in accordance with state regulations. BLM will continue coordination with CDOW to increase visitor contacts during hunting season. No-hunting zones will be established in NCA areas in cooperation with CDOW if determined necessary for visitor protection.<br><br>**Commercial and Private Permits:**<br><br>*Existing Commercial Permits*: **REC-6-16**  None<br><br>*New Commercial Permits:* **REC-6-17** ✔ BLM will allow new permits if activities appropriate to zone.<br><br>*Private Permits*: **REC-6-18** ✔ Individual private permits will not be required.<br><br>**REC-6-19** ✔ Organized group permits will be required for groups over 25 people.<br><br>**Facilities and Signs:**<br><br>*Existing*:<br>**REC-6-20**  Lower portions of Bobcat, Duncan, and Ute Roads.<br>**REC-6-21**  Chukar Road – includes non-Wilderness and cherry-stemmed Wilderness segments.<br>**REC-6-22**  OHV designation signs.<br>**REC-6-23**  NCA portal signs on Carnation and North Peach Valley Roads.<br>**REC-6-24**  Other primitive motorized roads and trails (no facilities) including: Eagle Valley, southern portions of Black Ridge Trail (rim trail) Chukar Geologic Area (horse trail); Wave and Eagle Jeep Trails, Red Rocks Trail, Dinosaur Road, Backdown Road, and Candy Lane. |

BLM_0007587

2.  Approved Decisions

Table 2-2.6a
**Management Unit 6 Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| Management Unit 6<br><br>Recreation Management Zone MU6-1: West Common Lands<br><br>*(continued)* | | | *New:*<br>**REC-6-25**  NCA entrance kiosks at NCA boundaries on Carnation and North Peach Valley Roads.<br>**REC-6-26**  Horse trailer parking and staging area on Ute Road near Peach Valley turnoff.<br>**REC-6-27**  Trailheads (kiosks and small parking areas): Eagle Valley, Black Ridge Trail (rim Trail) Chukar Geologic Area (Horse Trail); Wave and Eagle Jeep Trails, and Red Rocks Trail.<br>**REC-6-28**  Boundary, information, regulatory, and directional signs where needed to provide direction, protect resources, and/or designate segments of trail systems for specific uses (i.e., multiple use, non-motorized, etc.).<br>**REC-6-29**  Fences, rock barricades, etc., to: protect private lands; protect special status species, unique soils, etc; and allow success of restoration measures.<br>**REC-6-30**  Informational signing will be provided on the Black Ridge Trail where it intersects access roads (Ute Road, Duncan Road, and Bobcat Road).<br><br>**Trail or Road Construction:**<br>**REC-6-31**  BLM will relocate lower portion of Ute Road to reduce conflicts with private lands.<br>**REC-6-32**  BLM will relocate segment of Red Rocks trail to keep motorized use out of National Park Wilderness.<br>**REC-6-33**  BLM will make modifications to existing trail systems, resource protection measures, etc. where necessary to better meet NCA management objectives.<br><br>**Trail and Road Maintenance:**<br>**REC-6-34**  BLM will continue to maintain Eagle Valley Trail, Black Ridge Trail, Red Rocks Trail, Chukar Geologic Area Trail (Horse Trail), at existing maintenance levels.<br>**REC-6-35**  BLM will continue to maintain Bobcat, Duncan, Ute, Chukar, Dinosaur, Backdown, Wave, Eagle, Candy Lane Roads and four-wheel drive portions of Black Ridge Trail at existing maintenance levels and road standards.<br>**REC-6-36**  BLM will continue to gravel first half of Chukar Road up to Wilderness boundary as needed to reduce rutting and erosion of Mancos shale soils.<br>**REC-6-37**  BLM will continue to maintain Wilderness cherry-stemmed portion of Chukar Road at current levels that protect resources and address visitor safety and access problems.<br>**REC-6-38**  Areas impacted by unauthorized uses will be closed, either temporarily or permanently as needed, and rehabilitated. |

BLM_0007588

2. Approved Decisions

Table 2-2.6a
Management Unit 6 Recreation Management Zone Decisions *(continued)*

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>**Recreation Management Zone MU6-1: West Common Lands**<br><br>*(continued)* | | | **REC-6-39**  This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management:**<br><br>**REC-6-40** ✔  Outside NCA – VRM Class III.<br><br>**REC-6-41** ✔  Within NCA – VRM Class II.<br><br>**REC-6-42** ✔  BLM will maintain visual setbacks (minimum 500 feet) adjacent to primary access roads, trails, and developed recreation facilities.  This includes relocating existing and restricting placement of new structures or facilities (stock tanks, bed grounds, reservoirs, etc.).<br><br>**Recreation Opportunity Spectrum:  REC-6-43** ✔  ROS Unit III (semi-primitive motorized). |
| **Management Unit 6**<br><br>**Recreation Management Zone MU6-2: East and Southwest Common Lands (approximately 13,000 acres).**<br><br>*Common Management lands located within the east side of the NCA, Fruitland Mesa, Jones Draw, and East Flat Top. Area (east of Landfill/Bostwick Park Road)*<br><br>**Activities:**<br>Hunting , hiking and horseback riding. | *Physical Setting:* Predominantly Middle country with some sections of backcountry in Black Ridge and Green Mountain areas of NCA; motorized, largely unmodified and natural-appearing; resource modifications evident but harmonious with surroundings.<br><br>*Number Social Encounters:* Little contact (2-4 groups per day) except during big game hunting season when there is moderate to high degree of contact with others on roads and in dispersed campsites (see 15-20 groups.) | Management Objective: Provide 80% of participants moderate to high (3-4 on 4-point probability scale) attainment of the following outcomes while engaged in Hunting and on-route four-wheel driving:<br><br>Experiences:<br>• Enjoying going exploring on my own.<br>• Developing your skills and abilities.<br>• Enjoying escape from crowds and people. | **Travel Management:**<br><br>**REC-6-44** ✔  Limited OHV area;<br>**REC-6-45**  Motorized and non-motorized, mechanical vehicle travel will be permitted on designated routes only as shown on Figure 2-4.<br><br>*East Flat Top Day Use Area:*<br>**REC-6-46**  Motorized and non-motorized, mechanical vehicular use  will be permitted on designated access roads only as shown on Figure 2-4.<br><br>*Fairview ACEC/RNA (existing):*<br>**REC-6-47**  Motorized and non-motorized, mechanical vehicle travel within existing Fairview ACEC/RNA will be permitted on a single, existing, designated route along a canal.  The route will be posted for this use.<br><br>**REC-6-48** ✔  Remainder of public lands in Fairview ACEC/RNA will be closed to motorized and non-motorized, mechanical vehicular use to prevent damage to special status plant species.<br><br>**REC-6-49** ✔  Designated routes in this zone will be further fine tuned and refined in a collaborative process with the assistance and input of a BLM/citizen work group. |

BLM_0007589

Table 2-2.6a
**Management Unit 6 Recreation Management Zone Decisions** (*continued*)

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>**Recreation Management Zone MU6-2: East Common Lands**<br><br>*(continued)* | *Managerial Setting:* Vehicle patrols and increased visitor contacts.<br><br>Land management practices, such as grazing, vegetation treatments are evident but tend to fit in with natural landscape.<br><br>Recreation facility design will be harmonious with the land and minimum necessary to meet management objectives and support managed activities.<br><br>Where needed, and to the extent possible, natural materials (rocks, dead trees, etc.) will be used to delineate parking areas, road closures, camping areas, etc. | **Benefits:**<br>Individual:<br>• Enjoying going exploring on my/our own.<br>• Improved understanding of our communities' dependency and impact on public lands.<br>• Greater appreciation for public land and how managers care for it.<br>Household and Community:<br>• Greater community involvement in recreation and other land use decisions.<br>Economic:<br>• Positive contributions to local economic stability.<br>Environmental:<br>• Greater retention of distinctive natural landscape features (i.e., relict trees, native plant communities, microbiotic crusts, etc.).<br>• Greater protection of critical big game winter range, sage-grouse, and kit fox habitat.<br>• Reduced wildlife harassment by recreation users.<br>• Reduced spread of invasive species (i.e., pinyon-junipers). | **Camping:** REC-6-50 ✔ Dispersed camping will be allowed except in East Flat Top and Black Ridge relict tree day use areas.<br><br>**Stay Limit:**<br>REC-6-51 ✔ Dawn to Dusk (East Flat Top Day Use Area, Black Ridge relict tree area)<br><br>REC-6-52 ✔ 14 days – other areas<br><br>**Campfires:** REC-6-53 Campers in NCA areas will be required to use grills, stoves, or charcoal in fire pans.  No campfires or firewood gathering will be allowed in East Flat Top day use area or relict tree areas.<br><br>**Maximum Group Size:** REC-6-54 ✔ 25 people;<br><br>REC-6-55 ✔ Organized group permits will be required for groups over 25 people.<br><br>**Competitive Events:** REC-6-56 ✔ Motorized and non-motorized competitive events will not be permitted on public lands in this recreation management zone within the NCA. Motorized and non-motorized competitive events will be permitted in this zone outside the NCA on a case-by-case basis. Maximum group size limits for participants and spectators, vehicle types and number limits, selection criteria, special terms, conditions, and other stipulations for commercial, organized groups, and competitive permits will be developed based on individual proposals, safety, site capacity, resource conditions, user satisfaction levels, and other factors such as season and type of use. Permit issuance and permit terms and conditions will be subject to management discretion and availability of BLM staff and other resources to administer, conduct compliance on, and monitor impacts of events.<br><br>**Target Shooting:** REC-6-57 ✔ Will not be permitted on public lands within NCA boundary , or at Jones Draw, or East Flat Top Day Use Area.<br><br>REC-6-58 ✔ Outside the NCA, or at Jones Draw, or East Flat Top Day Use Area, at BLM's discretion, target shooting may be authorized to provide a safe environment for all users and to protect resources, health, and property. Authorization would occur according to BLM and other applicable regulations. Special operating procedures and local BLM regulations will be established and posted. Patrols by law enforcement personnel will be conducted to help ensure compliance with this decision. All BLM and other federal, state, and local regulations and best management practices will be obeyed. If monitoring results indicate resource or other problems are occurring, areas selected for this activity will be closed and rehabilitated. |

BLM_0007590

Table 2-2.6a
**Management Unit 6 Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>Recreation Management Zone MU6-2:  East Common Lands<br><br>*(continued)* | | | **Hunting:  REC-6-59** ✔ Will be allowed in accordance with state regulations.<br><br>**REC-6-60** ✔ Continue coordination with CDOW to increase visitor contacts during hunting season.<br><br>**Commercial and Private Permits:**<br><br>*Existing Commercial Permits*: **REC-6-61** ✔ BLM will continue to manage commercial permits for big game hunting in zone.<br><br>*New Commercial Permits:* **REC-6-62** ✔ BLM will allow new permits if activities will be appropriate to zone.<br><br>*Private Permits*: **REC-6-63** ✔ Individual private permits will not be required.<br><br>**REC-6-64** ✔ Organized group permits will be required for groups over 25 people.<br><br>**Facilities and Signs:**<br><br>*Existing*: **REC-6-65** BLM boundary and directional at major road intersections.<br><br>*New:*<br>**REC-6-66** Jones Draw Recreation Site – BLM will improve existing pull-off and parking area, install new visitor information kiosk, and delineate 3 to 4 vehicle camping sites.<br>**REC-6-67** NCA entrance signs and informational kiosks at major NCA access roads.<br>**REC-6-68** Additional boundary, informational, regulatory, and directional signs.<br>**REC-6-69** Fences, rock barricades, etc., to: protect private lands; contain use within Zone; protect special status species, unique soils, etc.; and allow for success of restoration measures.<br>**REC-6-70** Trailhead kiosks and small parking area for new East Flat Top trails.<br><br>**Trail and Road Construction/Maintenance:**<br><br>**REC-6-71** ✔ BLM will continue coordination with Crawford State Park on development of non-motorized trail along Smith Fork Creek. BLM will allow construction of trail if determined to meet NCA management objectives.<br>**REC-6-72** BLM will connect existing routes to provide loop trails and a diversity of experiences for non-motorized users in east Flat Top area. |

BLM_0007591

Table 2-2.6a
**Management Unit 6 Recreation Management Zone Decisions** *(continued)*

| Recreation Management Zones in Management Unit 6 (Figure 2-7) | Desired Future Conditions | Benefits and Values to be Maintained | Decisions and Management Actions ✔ denotes Land Use Planning Decisions; all others are Implementation Decisions |
|---|---|---|---|
| **Management Unit 6**<br><br>**Recreation Management Zone MU6-2: East Common Lands**<br><br>*(continued)* | | | **REC-6-73** ✔ BLM will develop one main access road into East Flat Top Day Use Area. BLM will close and reclaim unneeded roads and trail segments.<br><br>**REC-6-74** ✔ BLM will allow new road construction only if needed to resolve resource concerns or user conflicts.<br>**REC-6-75** BLM will continue to maintain designated roads at current maintenance levels and road standards.<br>**REC-6-76** Areas impacted by unauthorized use will be closed, either temporarily or permanently as needed, and rehabilitated.<br>**REC-6-77** This maintenance will be accomplished within funding capabilities and will be implemented where appropriate.<br><br>**Visual Resource Management: REC-6-78** ✔ VRM Classes III and IV<br><br>**Recreation Opportunity Spectrum: REC-6-79** ✔ ROS Unit III (semi-primitive motorized).</th> |
| **Administrative and Monitoring Actions for ALL Recreation Management Zones in Management Unit 6:** | | | **REC-6-80** ✔ Set carrying capacity for NCA areas within zones based on desired resource conditions and visitor satisfaction levels.<br><br>**REC-6-81** ✔ Develop and implement methods to assess and monitor visitor satisfaction levels and resource conditions.<br><br>**REC-6-82** ✔ Set specific regulations for appropriate travel on designated routes to enhance visitor safety and protect resources. Educate users about responsible travel on designated routes and regulations regarding resource damage.<br><br>**REC-6-83** ✔ Implement low-impact use regulations for camping, campfires, sanitation, etc. as needed.<br>Educate users about low impact camping, "Tread Lightly," and other land use ethics.<br><br>**REC-6-84** ✔ Develop maximum group size and vehicle limits, selection criteria, and special regulations for commercial, organized group, and competitive permits based on carrying capacities, resource conditions, etc.<br><br>**REC-6-85** ✔ Provide maps, brochures, and website information.<br><br>**REC-6-86** ✔ Continue coordinating with the Park Service to provide and improve visitor information, signing, and compliance and annually fund the joint Park Service/BLM Visitor Guide. Where feasible, BLM will coordinate joint funding for permanent and seasonal positions to increase ground presence and coordination between the agencies to improve customer service and user education. |

BLM_0007592

**Table 2-3**
**Recommended Utility ROW Corridors on Public Lands**

| Figure 2-2 Key | Affected Management Units and General Location on Public Land | Width |
|---|---|---|
| 1 | Management Units 2, 3, and 6: Western edge of NCA and planning area, including all of West Peach Valley lands; contains part of existing Tri-State 115 kV transmission line. | Generally 0.5 mile |
| 2 | Management Unit 6: Southernmost boundary of planning area adjacent to and parallel to US-50 east of Montrose. | 0.5 mile |
| 3 | Management Unit 6: Parallel to CO-92 south of Crawford. | 0.5 mile |
| 4 | Management Units 4 and 6: Along northeast boundary of planning area and parallel to Red Canyon Creek. | Generally 0.5 mile |
| 5 | Management Unit 6: Along northeast boundary of planning area and NCA and parallel to Smith Fork Creek and canyon. | Generally 0.5 mile |
| 6 | Management Unit 3: Along the centerline of the existing Delta-Montrose Electric Association 46kV transmission line on the south side of CO-92; corridor would extend 0.25-mile either side of the line or as otherwise appropriate where the line is adjacent and parallel to CO-92. | Generally 0.5 mile |

BLM_0007593

**Table 2-4**
**Birds of Conservation Concern for the Southern Rockies and Colorado Plateau**

| Common Name | Scientific Name |
|---|---|
| Northern Harrier[1] | *Circus cyaneus* |
| Swainson's Hawk[1] | *Buteo swainsoni* |
| Ferruginous Hawk | *Buteo regalis* |
| Golden Eagle[1] | *Aquila chrysaetos* |
| Peregrine Falcon[1] | *Falco peregrinus* |
| Prairie Falcon[1] | *Falco mexicanus* |
| Gunnison Sage-Grouse[1,2] | *Centrocercus minimus* |
| Snowy Plover | *Charadrius alexandrinus* |
| Mountain Plover | *Charadrius montanus* |
| Solitary Sandpiper | *Tringa solitaria* |
| Marbled Godwit | *Limosa fedoa* |
| Wilson's Phalarope[1] | *Phalaropus tricolor* |
| Yellow-billed Cuckoo[1] | *Coccyzus americanus* |
| Flammulated Owl | *Otus flammeolus* |
| Western Burrowing Owl[1] | *Athene cunicularia* |
| Short-eared Owl | *Asio flammeus* |
| Black Swift | *Cypseloides niger* |
| Lewis's Woodpecker[1] | *Melanerpes lewis* |
| Williamson's Sapsucker | *Sphyrapicus thyroideus* |
| Gray Vireo[1] | *Vireo vicinior* |
| Pinyon Jay[1] | *Gymnorhinus cyanocephalus* |
| Bendire's Thrasher | *Toxostoma bendirei* |
| Crissal Thrasher | *Toxostoma crissale* |
| Sprague's Pipit | *Anthus spragueii* |
| Virginia 's Warbler[1] | *Vermivora virginiae* |
| Black-throated Gray Warbler[1] | *Dendroica nigrescens* |
| Grace's Warbler | *Dendroica graciae* |
| Sage Sparrow[1] | *Amphispiza belli* |
| Chestnut-collared Longspur | *Calcarius ornatus* |

Source: USFWS 2002b
[1] Species known to breed in the planning area or that have a high probability of occurrence in the habitats present in the planning area (Kingery 1998).
[2] Nonmigratory species

BLM_0007594



Several right-of-way corridors, generally one-half mile in width, are designated on public lands in the planning area and NCA.

**Utility Right-of-Way Corridors**

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

**Figure 2-2**

2-105

BLM_0007595

*This page intentionally left blank.*

BLM_0007596



The RMP designates different types of allowed off-highway vehicle uses on public lands.

**RMP OHV Use Designations**
**Gunnison Gorge NCA Planning Area, Colorado**

Legend:
- Wilderness
- NCA
- Planning area
- Flat Top - Peach Valley OHV Recreation Area
- Major Access Routes
- Open OHV use
- Limited OHV use
- Closed from 11/15 to 4/30 annually; Limited to designated routes from 5/1 to 11/14 annually
- Closed to OHV use

Tetra Tech, Inc.

**Figure 2-3**

2-107

BLM_0007597

Case No. 1:20-cv-02484-MSK   Document 28-2   filed 04/27/21   USDC Colorado   pg 58 of 334

*This page intentionally left blank.*

BLM_0007598



In limited areas, motorized and mechanized use are permitted
only on the designated routes shown, which are preliminary and may
not be all inclusive. Designated routes will be further refined with
the assistance of a BLM/citizen work group. Until routes are refined,
all motorized and mechanical travel are limited to the designated routes shown.

**RMP Designated Routes in Limited Areas**
**Gunnison Gorge NCA Planning Area, Colorado**

Legend:
— Major Access Routes
— Rivers
Wilderness
NCA
Planning area
Cities and towns
— Designated routes where motorized or mechanized use is allowed
Open OHV use
Limited OHV use
Closed from 11/15 to 4/30 annually; Limited to designated routes from 5/1 to 11/14 annually
Closed to OHV use
Flat Top -Peach Valley OHV Recreation Area

Tt Tetra Tech, Inc.

**Figure 2-4**

*This page intentionally left blank.*

BLM_0007600



The RMP manages visual resources on public lands according to the four classes in the BLM's Visual Resource Management (VRM) system.

**RMP Visual Resource Management Classes**
**Gunnison Gorge NCA Planning Area, Colorado**

Tetra Tech, Inc.

**Figure 2-5**

BLM_0007601

*This page intentionally left blank.*

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007602



**RMP Special Management Features**
**Gunnison Gorge NCA Planning Area, Colorado**



Figure 2-6

2-113

BLM_0007603

*This page intentionally left blank.*

BLM_0007604



Figure 2-7

Recreation Management Zones
Gunnison Gorge NCA Planning Area, Colorado

Smaller recreation management zones are established within each larger management unit. Each zone is managed per a management objective.

Tetra Tech, Inc.

2-115

BLM_0007605

*This page intentionally left blank.*

BLM_0007606

# CHAPTER 3
# RESOURCE MANAGEMENT PLAN IMPLEMENTATION AND MODIFICATION

## 3.1   INTRODUCTION

Implementation of the RMP begins when the Colorado BLM State Director signs the ROD. Many land use planning decisions, such as land use allocation decisions and special designations (e.g., ACECs), are implemented or become effective upon approval of the RMP. Management actions that require additional site-specific project planning will require further environmental analysis and are discussed below in Section 3.2.

A detailed, decision-specific implementation and funding schedule will be completed following approval of the RMP. It will contain detailed implementation and monitoring plans and schedules necessary to implement all decisions in the RMP.  It is anticipated that several follow-on activity plans would be prepared during implementation of the RMP.

## 3.2   REQUIREMENTS FOR FURTHER ENVIRONMENTAL ANALYSIS

During implementation of the RMP, additional documentation to comply with NEPA could be required. Land use planning decisions that are implemented upon approval of the RMP do not require any further environmental analysis or documentation. Implementation decisions that require preparation of activity plans, such as interpretive plans, communication sites, or transportation plans, for example, would require additional environmental analysis or documentation. Individual management actions requiring additional site-specific planning as funding becomes available also would require further environmental analysis and documentation. These actions would be in accordance with the decisions established in the RMP. Environmental documentation can vary from a statement of conformance with the ROD to more-complex documents that analyze several alternatives. All such documents will be prepared with the appropriate level of public input.

BLM_0007607

### 3.3 ADAPTIVE MANAGEMENT

This RMP was developed based on the ecosystem management approach. The ecosystem management approach focuses on the ecological system instead of a single species or single resource. Thus, a natural resource is not viewed as a thing or an object but as a function that a thing or an object may perform or as an operation in which it may take part within the system (Zimmerman 1951). The art of ecosystem management is managing the system to maximize the functions of resources for predetermined desired conditions. Before one can implement ecosystem management, two inherent rules must be understood. First, natural ecosystems are incredibly complex and our understanding of them is limited (Leslie et al. 1996). Second, unlike tangible objects (for example, trees), resources (for example, timber) change in response to ecological, social, and institutional events, including the following:

- Societal tastes and values;
- Knowledge;
- Technology;
- Laws and institutions; and
- The ecosystem (Salazar and Lee 1990).

Thus, the greatest hurdle to overcome in effective ecosystem management is uncertainty. To mitigate uncertainty, the BLM will use adaptive management.

Adaptive management recognizes that there is incomplete data when dealing with natural resources and that through continued research and monitoring of the effects of management practices, new information will be developed. This information can be reevaluated and incorporated into the management plan, and practices can be adjusted accordingly. Thus, adaptive management is the "process of implementing policy decisions as scientifically driven management experiments that test predictions and assumptions in management plans and that use the resulting information to improve plans" (Noss and Cooperider 1994). The adaptive management process is illustrated in Figure 3-1.

### 3.4 MONITORING

Monitoring is an essential component of the adaptive management strategy. Monitoring data is used to assess resource conditions, identify resource conflicts, determine if resource objectives are being met, and periodically refine and update desired conditions and management strategies. The BLM planning regulations (43 CFR 1610.4-9) require monitoring of RMPs on a continual basis with formal evaluations conducted at periodic intervals. The RMP decisions in Chapter 2 incorporate monitoring measures for a variety of resources. As discussed in Section 3.1, the implementation and funding schedule that will be completed following approval of the RMP will incorporate detailed monitoring plans and schedules necessary to implement RMP decisions.

BLM_0007608



**Figure 3-1: Adaptive Management Strategy**

**3.5      RESOURCE MANAGEMENT PLAN MODIFICATION**

The Gunnison Gorge NCA RMP will be kept up to date through approved plan modification procedures including plan maintenance, plan amendments, or plan revision. The appropriate type of plan modification will be determined by monitoring and comprehensive land use plan evaluation.

**3.5.1    Plan Maintenance**

RMP maintenance is the process of further refining or documenting a previously approved decision in an RMP (43 CFR 1610.5-4). The scope of resource uses or restrictions cannot be expanded, and the terms, conditions, or decisions of the approved RMP cannot be changed. Plan maintenance is a continual process to ensure the plan reflects the current status of decision implementation and knowledge of resource conditions.

**3.5.2    Plan Amendments**

RMP amendments are prepared to change one ore more of the terms, conditions, or decisions of the approved RMP (43 CFR 1610.5-5). An RMP may be amended to consider a new proposal or action that does not conform to the RMP; implement new or revised policy that changes land use planning decisions; respond to new, intensified, or changed uses on public lands; or consider new information from resource assessments, monitoring, or scientific studies that change land use planning decisions.

The RMP amendment process is essentially he same as the RMP development process. The primary difference is that the RMP amendment process may be completed through the NEPA environmental assessment process rather than through the EIS process, depending on the level of complexity.

BLM_0007609

### 3.5.3 Plan Revision

An RMP revision is the preparation of a new RMP to replace an existing one (43 CFR 1610.5-6). Revisions of the RMP may be necessary to accommodate changes in resource or user needs, policies, or regulations. RMP revisions are prepared using the same procedures and documentation as for new RMPs.

BLM_0007610

# CHAPTER 4
# LIST OF PREPARERS

This RMP/EIS has been prepared by an interdisciplinary team of resource specialists from the BLM Gunnison Gorge NCA Office, Uncompahgre Field Office, Western Slope Center, and Colorado State Office. Tetra Tech, Inc., an environmental consulting firm in Boulder, Colorado, assisted the BLM in the preparation of these documents and in the planning process. These preparers are listed in Table 4-1.

**Table 4-1**
**RMP Preparers**

| Name | Role or Resource Area | Education | Years of Experience |
|---|---|---|---|
| *BLM – Gunnison Gorge NCA Office, Uncompahgre Field Office, and Western Slope Center* | | | |
| Bill Bottomly | Project Management, Public Outreach, Alternatives, QA/QC | B.L.A. Landscape Architecture | 45 |
| Amanda Clements | Vegetation, Wildlife, Water Quality, Riparian, Soils | M.S. Range Ecology | 11 |
| Julie Coleman | Archaeology, Geology | M.A. History<br>B.A. Geology, emphasis Archaeology, Secondary Education | 10 |
| Jim Cunio | Fire Management | B.S. Forest Management | 25 |
| Steven D. Ellis | Fire Management | B.A. Biological Sciences | 27 |
| Jim Ferguson | Wildlife | B.S. Wildlife Management | 26 |
| Dan Huisjen | Fire Management, Forestry | B.S. Natural Resource Management Completed Technical Fire Management Program | 17 |
| Kurt Kubik | Rangeland | B.S. Rangeland Science Associates Degree, Agricultural Economics | 11 |
| Lynn Lewis | Geology, Minerals and Energy Resources | B.S. Geology | 25 |

BLM_0007611

**Table 4-1**
**RMP Preparers** *(continued)*

| Name | Role or Resource Area | Education | Years of Experience |
|---|---|---|---|
| ***BLM – Gunnison Gorge NCA Office, Uncompahgre Field Office, and Western Slope Center*** *(continued)* | | | |
| Dennis Murphy | Hydrology | B.S. Forestry/Watershed Science | 25 |
| Teresa Pfifer | Transportation and Access; Lands, ROWs, and Withdrawals | | 10 |
| Jim Sazama | Rangeland, Wildlife | M.S. Range Science<br>B.S. Wildlife Biology | 27 |
| Karen Tucker | NCA Manager, Public Outreach, Alternatives, Recreation, Education & Interpretation | B.S. Natural Resource Management | 20 |
| Robert Vlahos | GIS Specialist | B.S. Forest and Range Management | 30 |
| Bob Welch | Wildlife, Special Status Species | M.S. Wildlife Management<br>B.S. Wildlife Biology | 32 |
| ***BLM – Colorado State Office*** | | | |
| Harley J. Armstrong | Paleontology, Archaeology, Geology | M.B.S. Museum Studies (vertebrate paleontology and archaeology)<br>B.A. Anthropology | 25 |
| Roy Smith | Water Resources | M.S. Natural Resource Management<br>B.S. Communication and Biology | 11 |
| ***Tetra Tech, Inc.*** | | | |
| Dean Amundson *(former employee)* | Visual Resources | M.S. Environmental Policy<br>B.A. Environmental Studies | 10 |
| David Batts | Project Management, Public Outreach, Alternatives, QA/QC, Special Management Areas | M.S. Natural Resource Planning<br>B.S. International Development | 13 |
| John Bock | Fire Management, Hazardous Materials | B.S. Environmental Toxicology | 9 |
| Amy Cordle | Climate & Air Quality, Noise | B.S. Civil Engineering | 10 |
| Kevin Doyle | Climate & Air Quality, Noise, Archaeological & Cultural Resources, Paleontological Resources, Fire Management | B.A. Sociology | 17 |
| Genevieve Kaiser | GIS, Geology & Topography, Soils, Minerals & Energy Resources, Socioeconomics & Environmental Justice | M.S. Energy Management & Policy<br>B.A. Economics<br>GIS Certificate | 9 |
| Mike Manka | Vegetation; Forestry; Wildlife, Fish & Aquatic Life; Special Status Species; Rangeland; Wild & Scenic River Study | B.S. Biology, Ecology and Systematics | 10 |
| Craig Miller | Lands, ROWs & Withdrawals; Water Resources; Visual Resources; Fire Management | M.S. Wildlife Biology<br>B.S. Wildlife and Fisheries Biology | 11 |

BLM_0007612

**Table 4-1**
**RMP Preparers** *(continued)*

| Name | Role or Resource Area | Education | Years of Experience |
|------|----------------------|-----------|---------------------|
| ***Tetra Tech, Inc.*** *(continued)* | | | |
| Angie Nelson | Project Management, Public Outreach, Alternatives, Recreation, Access & Transportation, Law Enforcement & Public Safety, Education & Interpretation | B.A. Biology and English | 8 |
| Randy Varney | Technical Editor | B.A. Technical and Professional Writing | 14 |
| Tom Whitehead, RG | Geology & Topography, Soils, Water Resources | M.S. Hydrology B.S. Geology B.A. Anthropology | 15 |

BLM_0007613

Case No. 1:20-cv-02484-MSK   Document 28-2   filed 04/27/21   USDC Colorado   pg 74 of 334

*This page intentionally left blank.*

BLM_0007614

# CHAPTER 5
# REFERENCES

Anderson, K. 2002. Topographic Map with hand-drawn existing trails and routes north of Flat Top and northwest of Bostwick Park Road (Landfill Road) in the Gunnison Gorge NCA. Scale 1:30,750. Davis Service Center, Montrose, CO.

Anderson, P.A. and K. Johnson. 1998. *Elk Mountains Odyssey: The West Elk Loop Scenic and Historic Byway Guide.* Redstone Press, Carbondale, Colorado. 128 pp.

Armstrong, H. 2002. BLM, Colorado State Office, Regional Paleontologist. *Fossils in the Gunnison Gorge National Conservation Area: An Analysis of Paleontological Resources.* Unpublished report. September 2002.

Bauer, C. 2002a. Outdoor Recreation Planner, BLM, Uncompahgre Field Office. Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., May 2, 2002.

_____. 2002b. Outdoor Recreation Planner, BLM, Uncompahgre Field Office. Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., August 6, 2002.

BEA (US Bureau of Economic Analysis). 2001. Regional Accounts Data. Personal income by major source and earnings by industry. May 2001. Internet Website: http://www.bea.doc.gov/bea/regional/reis/action.cfm. Accessed on April 18, 2002.

Benson, A. 2002. *"As land valuation and home prices soar, affordable housing becoming scarce",* The Montrose Daily Press. Montrose, Colorado, Sunday, April 14, 2002.

Berger, D. 1976. An Assessment of the Raptors of the Gunnison Gorge below the Black Canyon of the Gunniosn National Monument. Milwaukee, Wisconsin. 12 pp plus attachments.

BIO/WEST, Inc. and MK Centennial. 1999. *SR-79 and SR-204 Reconstruction Project Environmental Assessment and Section 4(f) Evaluation.* BIO/WEST, Inc., Logan, Utah.

BLM_0007615

BLM (US Department of Interior, Bureau of Land Management). 1978. *Final Environmental Statement, Proposed Domestic Livestock Grazing Program for the Uncompahgre Basin Resource Area.* BLM, Colorado State Office, Montrose District, Uncompahgre Field Office, Montrose, Colorado.

_____. 1981. *Gunnison Forks Habitat Management Plan.* BLM, Montrose District and Colorado State Office, Montrose and Denver, Colorado.

_____. 1983. *Elephant Skin Wash – Salinity Control Project, Watershed Activity Plan.* BLM, Montrose District, Uncompahgre Field Office, Montrose, Colorado. August 1983.

_____. 1985. *Final Recreation Management Plan for the Gunnison Gorge Recreation Lands Colorado.* BLM, Montrose District, Uncompahgre Field Office, Montrose, Colorado. 57 pp.

_____. 1987a. *Draft Uncompahgre Basin Resource Management Plan and Environmental Impact Statement.* BLM, Colorado State Office, Montrose District, Uncompahgre Field Office, Montrose, Colorado.

_____. 1987b. *Draft Uncompahgre Basin Planning Area Wilderness Technical Supplement.* BLM, Colorado State Office, Montrose District, Uncompahgre Field Office, Montrose, Colorado.

_____. 1988a. *Addition to the Recreation Area Management Plan for the Gunnison Gorge Recreation Lands, Colorado.* BLM, Montrose District, Uncompahgre Basin Resource Area, Montrose, Colorado. 16 pp.

_____. 1988b. *Areas of Critical Environmental Concern.* BLM Manual 1613. Rel.1-1541. BLM, Washington, DC. September 29, 1988.

_____. 1989a. *Record of Decision, Uncompahgre Basin Resource Management Plan.* BLM, Montrose District, Uncompahgre Basin Resource Area, Montrose, Colorado.

_____. 1989b. *Uncompahgre Basin Wilderness Final Environmental Impact Statement.* BLM, Montrose District, Uncompahgre Basin Resource Area, Montrose, Colorado. 168 pp.

_____. 1991. *Final Environmental Impact Statement, Vegetation Treatment on BLM Lands in Thirteen Western States.* BLM, Wyoming State Office, Cheyenne, Wyoming.

_____. 1992a. *Gunnison Resource Area Proposed Resource Management Plan and Final Environmental Impact Statement.* BLM, Montrose District, Montrose, Colorado.

_____. 1992b. How to Obtain Sand, Gravel and Other Mineral Materials from BLM Administered Federal Lands. BLM-WO-GI-92-002-4140, April 1992.

_____. 1992c. Uncompahgre Basin Resource Management Plan Amendment (Fire Amendment), Decision Record, Finding of No Significant Impact (Environmental Assessment CO-030-U-92-20). BLM, Montrose District, Montrose, Colorado. October 5, 1992.

_____. 1993. *Gunnison Resource Area Record of Decision, Approved Resource Management Plan, and Rangeland Program Summary.* BLM, Montrose District, Montrose, Colorado.

BLM_0007616

_____. 1994. Uncompahgre Basin Resource Management Plan Amendment (Land Disposal Plan Amendment), Decision Record, Finding of No Significant Impact (Environmental Assessment CO-034-94-23). BLM, Montrose District, Montrose, Colorado. September 20, 1994.

_____. 1995a. BLM Edition Surface Management Status: Topographic Map, with hand-drawn Recreation Opportunity Spectrum class boundaries. Scale 1:100,000. BLM, Colorado State Office, Lakewood, CO.

_____. 1995b. *BLM Environmental Education National Strategy.* BLM, Washington Office Task Group, Washington, DC. 28 pp.

_____. 1997a. *Decision Record and Finding of No Significant Impact for Adoption of Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado.* BLM, Colorado State Office, Denver, Colorado. 186 pp.

_____. 1997b. *Ruby Canyon/Black Ridge Integrated Resource Management Plan Environmental Assessment.* BLM, Grand Junction District, Grand Junction Field Office, Grand Junction, Colorado.

_____. 1997c. *Gunnison Gorge Fee Demonstration Project: Feasibility Study and Business Plan.* Unpublished Report. BLM, Montrose District, Uncompahgre Resource Basin Area, Montrose, Colorado.

_____. 1997d. *Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado.* BLM, Colorado State Office, Denver, Colorado.

_____. 1997e. *Trail Impact Monitoring – Gunison Gorge* and *Riparian Impact Monitoriing – Gunnison Gorge.* Unpublished report. 1997.

_____. 1997f. Uncompahgre Basin Resource Management Plan Amendment (Standards and Guidelines Amendment). BLM, Montrose District, Montrose, Colorado. February 7, 1997.

_____. 1998a. *Handbook of Guidelines and Procedures for Identification, Evaluation, and Mitigation of Cultural Resources.* BLM, Colorado State Office, Denver, Colorado.

_____. 1998b. *Ruby Canyon/Black Ridge Integrated Resource Management Plan Record of Decision and Finding of No Significant Impact.* BLM, Grand Junction District, Grand Junction Field Office, Grand Junction, Colorado. 12 pp.

_____. 1998c. *Ruby Canyon/Black Ridge Integrated Resource Management Plan.* BLM, Grand Junction Field Office, Grand Junction, Colorado.

_____. 1998d. Programmatic Agreement among BLM, Advisory Council on Historic Preservation, and National Conference of State Historic Preservation Officers Regarding the Manner in which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act. Instruction Memorandum No. CO-98-037. BLM, Colorado State Office, Lakewood, Colorado.

_____. 1998e. *Prescribed Fire Management Handbook.* BLM Handbook H-9214-1. Rel. 9-349. BLM, Washington DC. January 16, 1998.

BLM_0007617

_____. 1998f.  Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats. Instruction Memorandum No. WO-98-140.  BLM, Director's Office, Washington, DC.  2 pp. Internet Website: http://www.blm.gov/nhp/efoia/id/data/98_ib/so/ib98-265.htm. Accessed on December 10, 2003.

_____. 1999.  *Emergency Fire Rehabilitation Handbook.*  BLM Handbook H-1742-1.  Rel. 1-1661.  BLM, Washington DC.  July 27, 1999.

_____. 2000a.  *Land Use Planning Handbook.*  BLM Handbook H-1601-1.  BLM.

_____. 2000b.  *Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado.*  BLM, Colorado State Office, Lakewood, Colorado.  December 11, 2000.

_____. 2000c.  *Final Colorado BLM Sensitive Species List.*  BLM, Colorado State Office, Lakewood, Colorado.  March 17, 2000.

_____. 2000d.  *Draft Environmental Impact Statement for the Jack Morrow Hills Coordinated Activity Plan.*  BLM, Rock Springs Field Office, Rock Springs, Wyoming.  June 2000.

_____. 2001a.  *Gunnison Gorge Land Health Assessment.*  BLM, Montrose District, Uncompahgre Field Office, Montrose, Colorado. 86 pp.

_____. 2001b.  *National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands.*  BLM.  49 pp.

_____. 2001c.  Fire Occurrence in the Planning Area 1994-2000.  Unpublished data.  BLM, Montrose District, Uncompahgre Field Office, Montrose, Colorado.

_____. 2001d.  Gunnison Gorge WSA/Wilderness Carrying Capacity Monitoring 1989-2001.  Unpublished data. BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2001e.  Gunnison Gorge WSA/Wilderness Commercial Allocation System 1988-2001.  Unpublished data. BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2001f.  Gunnison Gorge WSA Private and Commercial Use Breakdown (Adjustments for Nonregistrants and Lost Data), 1992-1999.  Unpublished data.  BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2001g.  Gunnison Gorge WSA Private and Commercial Visitor Day Totals 1991-1999.  Unpublished data. BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2001h.  *Interim Management Policy for Bureau of Land Management National Monuments and National Conservation Areas.*  Instruction Memorandum No. 2002-008.  BLM, Director's Office, Washington, DC.  6 pp.

_____. 2001i. Recreational Non-Motorized Placer Operations in the Uncompahgre Field Office. Internet Website: http://www.co.blm.gov/ubra/recplacer.htm. Accessed on April 28, 2002.

BLM_0007618

_____.   2001j.   Gunnison Gorge NCA Wilderness Visitation Totals 2000-2001.   Unpublished data.   BLM, Uncompahgre Field Office, Montrose, Colorado.

_____.   2001k.   *National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands.*   BLM, Washington, DC.   48 pp.

_____.   2001l.   *Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management.*   BLM Manual 8351.   Internet Website:   http://www.blm.gov/nhp/efoia/wo/manual/8351.html.   Accessed on December 22, 2001.

_____.   2001m.   Gunnison Gorge NCA Planning Area River Map (nca_str.jpg).   Scale undefined.   Additional river names later added by Tetra Tech, Inc.   BLM, Uncompahgre Field Office, Montrose, CO.

_____.   2002a.   *Plan Amendments to the Record of Decision and Uncompahgre Basin Resource Management Plan.*   BLM, Montrose District, Uncompahgre Field Office, Montrose, Colorado.

_____.   2002b.   *BLM's Role and Responsibilities Under the Endangered Species Act Training Video Workbook.*   National Training Center Course number 1730-40.   BLM, National Training Center.

_____.   2002c.   Visual Resource Management:   VRM System.   Internet Website:   http://www.blm.gov/nstc/VRM/vrmsys.html.   Accessed on April 23, 2002.

_____.   2002d.   *Visual Resource Management.*   BLM Manual 8400.   Internet Website:   http://www.blm.gov/nstc/VRM/8400.html.   Accessed on April 23, 2002.

_____.   2002e.   Visual Resource Management (VRM) Policy Restatement – Information Bulletin No. 98-135.   May 22, 1998.   Internet Website: http://www.blm.gov/nstc/VRM/98135.html.   Accessed on April 23, 2002.

_____.   2002f.   Visual Resource Management (VRM) Policy Restatement – Information Memorandum No. 98-164.   September 8, 1998.   Internet Website: http://www.blm.gov/nstc/VRM/98164.html.   Accessed on April 23, 2002.

_____.   2002g.   Planning Area River Miles.   Unpublished Data.   BLM, Uncompahgre Field Office, Montrose, Colorado.

_____.   2002h.   *Draft Environmental Impact Statement for a Proposed Recreation Area Management Plan and Amendment to the California Desert Conservation Area Plan: Imperial Sand Dunes Recreation Area.*   BLM, El Centro Field Office, El Centro, California.

_____.   2002i.   Weed Management in Colorado: BLM National List of Invasive Weed Species of Concern.   Internet Website: http://www.co.blm.gov/botany/invasiweed.htm.   Accessed on May 6, 2002.

_____.   2002j.   Bureau of Land Management's Weed Website.   Internet Website: http://www-a.blm.gov/weeds.   Accessed on May 6, 2002 and October 25, 2002.

BLM_0007619

_____. 2002k. Geographic Information System. Unpublished Data. BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2002l. Memorandum to A. Pfister, Assistant Colorado Field Supervisor, US Fish and Wildlife Service, Western Colorado Office, Grand Junction, Colorado regarding species list update for the Gunnison Gorge NCA RMP. BLM, Uncompahgre Field Office, Montrose, Colorado. March 4, 2002. USFWS signature of concurrence dated March 29, 2002.

_____. 2002m. *Uncompahgre Field Office Fire Management Plan*. BLM, Uncompahgre Field Office, Montrose, Colorado. Revised May 2002.

_____. 2002n. PowerPoint Presentation for March 26, 2002 Water Issues Meeting. Unpublished Data. BLM, Uncompahgre Field Office, Montrose, Colorado.

_____. 2002o. Manual H-8410-1 – Visual Resource Inventory. Internet Website: http://www.blm.gov/nstc/VRM/8410.html. Accessed on September 18, 2002.

_____. 2002p. *Draft Wild and Scenic Rivers Eligibility Report*. BLM, Dillon Field Office, Dillon, Montana. March 2002.

_____. 2002q. Instruction Memorandum No. 2002-196. BLM, Washington Office, Washington, DC. June 25, 2002.

_____. 2002r. Memorandum to A. Pfister, Assistant Colorado Field Supervisor, US Fish and Wildlife Service, Western Colorado Office, Grand Junction, Colorado regarding species list update for the Gunnison Gorge NCA RMP. BLM, Uncompahgre Field Office, Montrose, Colorado. October 24, 2002. USFWS signature of concurrence dated November 19, 2002.

_____. 2002s. Gunnison Gorge NCA and Wilderness Slide Show (WaterIssuesMeeting3-16-02.ppt). Unpublished data. BLM, Uncompahgre Field Office, Montrose, CO. March 26, 2002.

_____. 2002t. Gunnison Gorge Wilderness Slide Show (UpdatedWildernessRiverShow6-5.ppt). Unpublished data. BLM, Uncompahgre Field Office, Montrose, CO. June 7, 2002.

_____. 2003a. Partners Against Weeds – An Action Plan for the BLM. Internet Website: http://www-a.blm.gov/education/weed/paws/. Accessed on February 3, 2003.

_____. 2003b. Karen Tucker, NCA Manager, BLM, Gunnison Gorge NCA Office. Personal communication via email with Angie Nelson of Tetra Tech, Inc., February 12, 2003.

_____. 2003c. *Draft Resource Manamgenet Plan and Environmental Impact Statement, Volumes 1 and 2*. BLM, Uncompahgre Field Office, Montrose, Colorado, and Tetra Tech, Inc., Boulder, Colorado. March 2003.

_____. 2004. *Proposed Resource Manamgenet Plan and Final Environmental Impact Statement*. BLM, Uncompahgre Field Office, Montrose, Colorado, and Tetra Tech, Inc., Boulder, Colorado. January 2004.

BLM_0007620

_____. Undated a.  Gunnison Gorge…A Multiple Use Challenge.

_____. Undated b. 1999 Big Game Hunting by Field Office, Uncompahgre Field Office.

_____. Undated c. 1999 Small Game Hunting by Field Office, Uncompahgre Field Office.

_____. Undated d.  Fossils on America's Public Lands.  Brochure.

BLM and BOR (US Department of Interior, Bureau of Land Management, and US Department of the Interior, Bureau of Reclamation).  1983.  Interagency Agreement between the Bureau of Reclamation and The Bureau of Land Management. March 1983.

BLM and CDOW (US Department of Interior, Bureau of Land Management and Colorado Division of Wildlife). 1985.  Memorandum of Understanding Providing for Bighorn Sheep Management in Gunnison Gorge, Montrose and Delta Counties, Colroado.  BLM, Montrose District, and State of Colorado, Department of Natural Resources, Division of Wildlife, Southwest Region.  Signed August 1985.

CDOW (Colorado Division of Wildlife).  2002.  Fishing Colorado's Hot Spots.  Internet Website: http://wildlife.state.co.us/fishing/hotspots.asp.  Accessed on April 26, 2002.

_____.  2003.  Wildlife Commission Downlists River Otter from Endangered to Threatened Status. Internet Website: http://dnr.state.co.us/news/press.asp?pressid=2450.  Accessed on October 29, 2003.

CDPHE (Colorado Department of Public Health and Environment).  2002a.  Water Quality Control Division: Determination of TMDL Inapplicability, May 1, 2002.  Internet Website: http://www.cdphe.state.co.us/wq/Assessment/TMDL/pdf/Delisting_Rationales/un04fc.pdf.  Accessed on December 20, 2002.

_____.  2002b.  Colorado Noise Statute: June 2001.  Internet Website: http://www.cdphe.state.co.us/ic/ecac/NoiseStatute.html.  Accessed on May 1, 2002.

Center for Business and Economic Forecasting, Inc.  2001a.  Tourism Jobs Gain Ground in Colorado, 1999 Estimates of State and County Tourism Jobs. Colorado Department of Local Affairs, Demography Section: April 27, 2001.

_____. 2001b.  1999 Tourism Matrix, Region 10.

Chapman, H.  2002.  Soil Scientist, US Department of Agriculture, Natural Resources Conservation Service, Montrose County Service Center.  Personal communication via telephone and facsimile with Angie Nelson of Tetra Tech, Inc., September 12, 2002.

City of Delta. 1997. *City of Delta Comprehensive Plan.*  City of Delta, Community Development Department.

City of Montrose.  1998. *City of Montrose, Colorado Comprehensive Plan.*  Prepared for City of Montrose, Colorado by BRW.

BLM_0007621

Clemens, C.  2002a.  *"School enrollment swells by more than 24 percent"*, The Montrose Daily Press.  Montrose, Colorado, Sunday, April 14, 2002.

_____.  2002b.  *"Conversion of ag land accelerates"*, The Montrose Daily Press. Montrose, Colorado, Sunday, April 14, 2002.

_____.  2002c.  *"Family farms fast becoming a memory"*, The Montrose Daily Press.  Montrose, Colorado, Sunday, April 14, 2002.

Clements, A.  2002a.  Ecologist, BLM, Uncompahgre Field Office.  Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., May 23, 2002.

_____.  2002b.  Ecologist, BLM, Uncompahgre Field Office.  Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., November 20, 2002.

Coleman, J.  2001.  Archaeologist, BLM, Uncompahgre Field Office.  Personal communication with Angie Nelson of Tetra Tech, Inc., October 24, 2001.

_____.  2002a.  Archaeologist, BLM, Uncompahgre Field Office.  Personal communication via telephone with Angie Nelson of Tetra Tech, Inc., December 13, 2002.

_____.  2002b.  Archaeologist, BLM, Uncompahgre Field Office.  Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., December 27, 2002.

Colorado Air Quality Control Commission (Colorado Department of Public Health and Environment, Air Quality Control Commission).  1995. *An Evaluation of Federal Land Manager Activities That May Impact Air Quality Related Values in Class I Areas in Colorado*, November 21, 1995.   Internet Website: http://apcd.state.co.us/documents/flmvis.pdf.  Accessed on January 8, 2002.

_____.  2002a.  Colorado Air Pollution and Prevention Control Act.   Internet Website: http://www.cdphe.state.co.us/op/airact.pdf.  Accessed on April 30, 2002.

_____.  2000b.  .  *Issue Paper: Colorado's Regional Haze SIP Development Process*.  April 18, 2002. Internet Website: http://www.cdphe.state.co.us/ap/rhwhitepaperindex.html.  Accessed on January 8, 2002.

Colorado Department of Agriculture, Division of Plant Industry.  2002.  Rules Pertaining to the Colorado Noxious Weed Act.  Internet Website: http://www.ag.state.co.us/DPI/rules/noxious.html.  Accessed on May 6, 2002.

Colorado Department of Local Affairs.  2000a.  1990-2000 Racial Component Change, Colorado Counties – 2000.  Internet Website: http://www.dola.state.co.us/demog/CensusData/Race/RaceCompPer.xls.  Accessed on April 29, 2002.

_____.  2000b.  2000 Population by Race & Hispanic Origin, Colorado Municipalities. Internet Website: http://www.dola.state.co.us/demog/CensusData/Race/MUNITOT.xls. Accessed on April 29, 2002.

BLM_0007622

_____. 2000c. 2000 Population by Race & Hispanic Origin, Colorado Municipalities - Percentage of Total. Internet Website: http://www.dola.state.co.us/demog/CensusData/Race/MUNITPER.xls. Accessed on April 29, 2002.

_____. 2000d. 2000 Population by Race and Hispanic Origin, Colorado Counties - Total Population. Internet Website: http://www.dola.state.co.us/demog/CensusData/Race/CORaceDom.xls. Accessed on April 29, 2002.

_____. 2001a. Colorado County Profile Output. Internet Website: http://www.dola.state.co.us/demog/muleout.cfm. Updated December 5, 2001. Accessed on April 21, 2002.

_____. 2001b. Colorado Employment by Economic Sector. Internet Website: http://www.dola.state.co.us/demog/Empgcod2.cfm. Accessed on April 18, 2002.

_____. 2001c. Delta County and Montrose County Labor Force and Total Employment - Both Employed Persons and Jobs Filled. Internet Website: http://www.dola.state.co.us/demog/employ2.cfm. Updated December 5, 2001. Accessed on April 18, 2002.

_____. 2002a. Preliminary Population Projections for Colorado Counties, 1990-2025. Internet Website: http://www.dola.state.co.us/demog/Projections/Counties.xls. Accessed on April 26, 2002.

_____. 2002b. Regional and County Projections, Labor Force, Employment, and Personal Income. Internet Website: http://www.dola.state.co.us/demog/cbef/CBEFLFOut.cfm. Accessed on April 26, 2002.

Colorado Legislative Council. 2003. Colorado Economic Chronicle, February 7, 2002. Internet Website: http://www.state.co.us/gov_dir/leg_dir/lcs/chronicle/2002/Feb02/02-02Chronicle.html. Accessed on January 7, 2003.

Conner, C.E. and B.J. Davenport. 2001. *Class I Cultural Resource Inventory for the Gunnison Gorge NCA and Wilderness Area Administered by the Uncompahgre Field Office, Bureau of Land Management, Order No. CCp010045.* GRI Project No. 2128. Grand River Institute, Grand Junction, Colorado. 10 pp. plus appendix.

Coray, K.E. 1999. *BLM Recreational Use Customer Survey Results.* Human Management Services, Inc., Arlington, Virginia. 64 pp.

Cornelisse, P. and R. Sell. 2003. Biologists, BLM, Colorado State Office. Comments made to Gunnison Gorge NCA Draft RMP/EIS (March 2003). May 16, 2003.

Crawford Sage-Grouse Partnership. 1998. Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado. July 22, 1998.

Crimmins, T. 1999. Colorado OHV User Survey: Summary of Results. Completed for the State of Colorado and Colorado OHV Coalition under contact with Colorado State Parks OHV Program. Coeur d'Alene, Idaho. 16 pp.

BLM_0007623

Cronk, Q. and J. Fuller. 1995. Plant Invaders: The threat to natural ecosystems. Chapman and Hall, New York.

Dalaker, J. and B.D. Proctor. 2000. U.S. Census Bureau, Current Population Reports, Series P60-210, *Poverty in the United States: 1999*, GPO, Washington, DC, 2000. US Census Bureau (US Census). 2001. Census 2000 Demographic Profiles for Colorado Counties and Places, 4/1/2000. Releases May 22, 2001, Table prepared June 26, 2001.

Davis, S. 2002. Soil, Water, Air, Forests, Fire Rehabilitation, Salinity, Science Coordination, BLM, Colorado State Office. Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., May 23, 2002.

Dawson, C. 2002. Botanist, BLM, Colorado State Office. Personal communication via electronic mail with Sherri Thompson of BLM, Colorado State Office (forwarded to Angie Nelson of Tetra Tech, Inc.), October 2, 2002.

Delta County. 1996. *Delta County Master Plan*. Final Draft. Delta County, Colorado. 12 pp.

Delta County. 1998. *Delta County Noxious Weed List, March 1998*. Delta County Board of County Commissioners Resolution No. 98-R-010.

Dunne, T. and L.B. Leopold. 1978. *Water in Environmental Planning*. W.H. Freeman and Company, San Francisco.

EPA (US Environmental Protection Agency). 1974. *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety*. EPA/ONAC 550/9-74-004. March 1974.

_____. 1997. Visibility Trends *National Air Quality and Emission Trends Report*. Internet Website: http://www.epa.gov/oar/aqtmd97/chapter6.pdf. Accessed on January 8, 2003.

_____. 2002a. The Green Book: Currently Designated Nonattainment Areas for All Criteria Pollutants Listed by State, County, then Pollutant, as of January 15, 2002. Internet Website: http://www.epa.gov/oar/oaqps/greenbk/ancl.html#Colorado. Accessed on April 30, 2002.

_____. 2002b. *Environmental Impacts of Newly Regulated Nonroad Engines*. Frequently Asked Questions EPA420-F-02-33. Internet Website: http://www.epa.gov/otaq/recveh.htm. Accessed on January 8, 2003.

_____. 2002c. *Emission Standards for New Nonroad Engines*. Regulatory Announcement EPA420-F-02-37. Internet Website: http://www.epa.gov/otaq/recveh.htm. Accessed on January 8, 2003.

Federal Register. 1982. National Wild and Scenic Rivers System; Final Revised Guidelines for Eligibility, Classification, and Management of River Areas. Section 1(3), Vol. 47, No. 173, page 39461. September 7, 1982.

FEMA (Federal Emergency Management Agency). 1984. FIRM: Flood Insurance Rate Map, Montrose County, Colorado (Unincorporated Areas). Panel 75 of 575. Community Panel Number 080124 0075B. Approximate scale 1:24,000. FEMA, Washington, DC.

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007624

_____. 2002. The FEMA Flood Map Store. Internet Website: http://web1.msc.fema.gov/MSC/. Accessed on October 21, 2002.

Ferguson, J. 2002. Letter to K. Tucker, NCA Manager, BLM, Gunnison Gorge NCA, Montrose, Colorado regarding OHV Conflicts with Clay Loving Wild Buckwheat. BLM, Uncompahgre Field Office, Montrose, Colorado. May 29, 2002.

George, G. 2001. Law Enforcement Officer, BLM, Uncompahgre Field Office. Personal communication with Genevieve Kaiser of Tetra Tech, Inc., October 23, 2001.

GPO (US Government Printing Office). 2001. Gunnison Gorge National Conservation Area and Wilderness: Visitor Guide. Bull. No. 2001-674-993. GPO, Washington, DC.

High Country News. 2003. *"Coalbed methane boom: A High Country News Special Report"*, High Country News. Paonia, Colorado. Internet Website: http://www.hcn.org/specialcollections/coalbedmethane.jsp. Accessed on January 8, 2003.

House Ear Institute. 2002. *Noise-induced Hearing Loss Fact Sheet.* Internet Website: http://www.hei.org/news/factshts/nihlfact.htm. Accessed on September 11, 2002.

Huisjen, D. 2001. Fire Ecologist, BLM, Uncompahgre Field Office. Personal communication with Genevieve Kaiser of Tetra Tech, Inc., October 23, 2001.

_____. 2002. Fire Ecologist, BLM, Uncompahgre Field Office. Personal communication with Craig Miller of Tetra Tech, Inc., May 7, 2002.

Hurshman, T. 2001. Realty Specialist, BLM, Uncompahgre Field Office. Personal communication with Genevieve Kaiser of Tetra Tech, Inc., October 24, 2001.

_____. 2002. Realty Specialist, BLM, Uncompahgre Field Office. Personal communication via email with Angie Nelson of Tetra Tech, Inc., June 27, 2002.

Ireland, T. 2002. Biologist, US Fish and Wildlife Service, Grand Junction Field Office. Personal communication with Mike Manka of Tetra Tech, Inc., September 17, 2002.

Johnson, G. 2002a. *"Montrose Grows Nearly 40 Percent in 1990s"*, The Montrose Daily Press. Montrose, Colorado, Sunday, April 14, 2002.

_____. 2002b. *"Hispanic population hopes to build on progress of the 1990s"*, The Montrose Daily Press. Montrose, Colorado, Sunday, April 14, 2002.

Johnston, S. 2002. School Resource Officer, Montrose City Police Department. Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., December 16, 2002.

Kingery, H.E. Editor. 1998. Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership and Colorado Division of Wildlife. Denver, Colorado. 636 pp.

BLM_0007625

Knopf, R.C., K.L. Andereck, R.J. Virden, and J. Fletcher.  2002.  *Final Report of the Gunnison Gorge National Conservation Area Visitor Study.*  Arizona State University, Phoenix, Arizona.  November 2002.

Levad, R. and K. Potter.  2002.  An Inventory of Burrowing Owls *(Speyotyto cunicularia hypugaea)* in Western Colorado.  BLM, Grand Junction, Colorado.

Leslie, M., G.K. Meffe, J.L. Hardesty, and D.L. Adams. 1996. *Conserving Biodiversity on Military Lands: A Handbook for Natural Resource Managers.* The Nature Conservancy, Arlington, Virginia.

Lewis, L.  2002.  Geologist, BLM, Uncompahgre Field Office.  Personal communication with Genevieve Kaiser of Tetra Tech, Inc., May 7, 2002.

Lopez, M.  2002a.  *"City enjoys a decade of skyrocketing retail sales",* The Montrose Daily Press.  Montrose, Colorado, Sunday, April 14, 2002.

_____.  2002b. *"The southern migration of Montrose business",* The Montrose Daily Press. Montrose, Colorado, Sunday, April 14, 2002.

_____.  2002c.  *"Higher education vital to maintaining local economy",* The Montrose Daily Press.  Montrose, Colorado, Sunday, April 14, 2002.

Lyon, P. and M. Denslow.  2001.  Gunnison Gorge National Conservation Area Survey of Impacts on Rare Plants. Prepared for BLM, Montrose, Colorado, by Colorado Natural Heritage Program, Fort Collins, Colrado.

Montrose County.  2002a.  Should We Be Concerned with Noxious Weeds?  Internet Website: http://www.co.montrose.co.us/Weeds.html. Accessed on May 6, 2002.

Montrose County.  2002b.  *Montrose County Master Plan.*  Adopted October 25, 2001.  Prepared for Montrose County, Colorado, Land Use Department, by Belloffet-Entranco.  Internet Website: http://www.co.montrose.co.us/LUD_masterplan.htm.  Accessed on September 25, 2002.

Motorcycle Industry Council.  2001 *Stationary Sound Test Manual for Off-Highway Motorcyles and All-Terrain Vehicles.* Motorcycle Industry Council.  Irvine, California.

MSME/Wallaby Enterprises (Mountain States Mineral Enterprises, Inc., and Wallaby Enterprises, Inc.).  1983.  Phase 1: Geological, Energy, and Minerals (GEM) Resource Assessment for Region 4, Colorado Plateau, Gunnison Gorge Area, GEM Resource Area (GRA) 5.  May 1983.

Murphy, D.  2003.  Hydrologist, BLM, Uncompahgre Field Office.  Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., October 31, 2003.

National Geographic Society (National Geographic Society/ Trails Illustrated).  2000.  Topographic Map: Black Canyon of the Gunnison National Park, Colorado, USA.  Scale 1:28,000.  Evergreen, CO.  Copyright 1995, Revised 2000.

BLM_0007626

NCES (National Center for Education Statistics, Global Education Locator). 2001. *Information on Public Schools and School Districts in the United States 1998-1999*. Internet Website: http://nces.ed.gov/ccdweb/school/. Accessed on April 21, 2002.

NDIS (Colorado Natural Diversity Information Source). 2002a. Delta County Species Level Occurrence and Abundance. Internet Website: http://ndis.nrel.colostate.edu/ndis/countyab/species/taxon/dt_oc_ab.html. Last updated May 16, 2000. Accessed on May 2, 2002.

_____. 2002b. Montrose County Species Level Occurrence and Abundance. Internet Website: http://ndis.nrel.colostate.edu/ndis/countyab/species/taxon/mr_oc_ab.html. Last updated May 16, 2000. Accessed on May 2, 2002.

Noss, R.F., and A.Y. Cooperider. 1994. *Saving Nature's Legacy: Protecting and Restoring Biodiversity*. Island Press, Washington, DC.

Park Service (US Department of Interior, National Park Service). 1979. *Final Environmental Impact Statement. Wild and Scenic River Study – Gunnison River*. NPS in cooperation with the Colorado Department of Natural Resources.

_____. 1990. *Resource/Boundary Evaluation for Lands Adjacent to Black Canyon of the Gunnison National Monument*. NPS, Rocky Mountain Regional Office. 76 pp.

_____. 1996. *General Management Plan, Black Canyon of the Gunnison National Monument, Curecanti National Recreation Area*. NPS, Black Canyon of the Gunnison National Monument, Curecanti National Recreation Area, Rocky Mountain System Support Office. 172 pp.

_____. 2001. Strategic Plan for Black Canyon of the Gunnison National Park October 1, 2001 – September 30, 2005. NPS, Black Canyon of the Gunnison National Park. 14 pp.

_____. undated. Resource Topics for Parklands, Criteria for Parklands. GPO brochure 1990-262-100/00214.

Park Service (US Department of Interior, National Park Service), US Department of Agriculture, National Forest Service, US Department of the Interior, Bureau of Indian Affairs, US Department of the Interior, Fish and Wildlife Service, and US Department of the Interior, Bureau of Land Management. 1998. *Wildland and Prescribed Fire management Policy, Implementation Procedures Reference Guide, August 1998*.

Pellant, M., P. Shaver, D.A. Pyke, and J.E. Herrick. 2000. *Interpreting Indicators of Rangeland Health*. Version 3. Technical Reference 1734-6. BLM, National Science and Technology Center, Information and Communications Group, Denver, Colorado. 118 pp.

Pfifer, T. 2002. Realty Specialist, BLM, Uncompahgre Field Office. Personal communication via email with Angie Nelson of Tetra Tech, Inc., May 22, 2002.

Reynolds, Robert E. 1988. *Paleontologic Resource Overview and Management Plan for Edwards Air Force Base, California*. San Bernardino County Museum.

BLM_0007627

Ring, R.  2002.  *"Backlash: Local governments tackle an in-your-face rush on coalbed methane"*, High Country News. Paonia, Colorado, Monday, September 2, 2002.  Internet Website: http://www.hcn.org/servlets/hcn.Article?article_id=11371.  Accessed on January 8, 2003.

Roberts, D.  2003.  Management Assistant, National Park Service, Black Canyon of the Gunnison National Park. Personal communication via electronic mail with Angie Nelson of Tetra Tech, Inc., January 8, 2003.

Rosentreter, R.  2002.  Botanist, BLM, Idaho State Office.  Personal communication via email with Jim Ferguson of BLM, Uncompahgre Field Office, October 4, 2002.

Salazar, D., and R. Lee. 1990. *Natural Resource Policy Analysis and Rational Choice Theory: A Strategy for Empirical Research*. Natural Resource Journal, Vol. 30, Spring 1990.

SCS (US Department of Agriculture, Soil Conservation Service) and CSU (Colorado State University Experiment Station).  1980.  Important Farmlands of Montrose/Ouray Counties Colorado, Uncompahgre Valley Area.  Scale 1:100,000.  SCS and CSU, Montrose, Colorado.

SCS (US Department of Agriculture, Soil Conservation Service).  1981.  Soil Survey of Paonia Area, Colorado. Parts of Delta, Gunnison, and Montrose Counties.

_____.  1982.  Soil Survey of Ridgway Area, Colorado; Interim Report.  Unpublished.  US Department of Agriculture, SCS.

Shavano Soil Conservation District.  1996.  Best Management Practices for Agriculture in the Uncompahgre Valley.  Produced by the Uncompahgre Valley BMP Decision Committee. Published in cooperation with Colorado State University Cooperative Extension.

Smith, R.  2002.  Water Rights Specialist, BLM, Colorado State Office, Branch of Natural Resources, Division of Resource Services.  Personal communication via email with Bill Bottomly of BLM, Uncompahgre Field Office, October 31, 2002.

_____.  2002.  *"More of the public uses public lands"*, The Montrose Daily Press.  Montrose, Colorado, Sunday, April 14, 2002.

Tetra Tech, Inc.  2002.  *Gunnison Gorge National Conservation Area RMP and EIS Scoping Report, Gunnison Gorge NCA, Montrose and Delta Counties, Colorado.*  Prepared for the BLM, Montrose, Colorado.  March 2002.

US Census (US Census Bureau). 1990a.  General Housing Characteristics: 1990, 1990 Summary Tape File 1 (STF 1) - 100-Percent data.  Internet Website: http://factfinder.census.gov/servlet/GCTTable?_ts=37484642590. Accessed on April 21, 2002.

_____.  1990b.  Persons of Hispanic Origin, 1990 Summary Tape File 1 (STF 1) - 100-Percent data. Internet Website: http://factfinder.census.gov/servlet/DTTable?_ts=37554012464 and http://factfinder.census.gov/servlet/DTTable?_ts=37554472473. Accessed on April 22, 2002.

BLM_0007628

_____.   1990c.   Persons, 1990 Summary Tape File 1 (STF 1) - 100-Percent data. Internet Website: http://factfinder.census.gov/servlet/DTTable?_ts=38152454514. Accessed on April 17, 2002.

_____.   1990d.   Poverty Status in 1989 by Age, 1990 Summary Tape File 3 (STF 3) - Sample data. Internet Website: http://factfinder.census.gov/servlet/DTTable?_ts=37642995179. Accessed on April 23, 2002.

_____.   1990e.   Race, 1990 Summary Tape File 1 (STF 1) – 100-Percent data. Internet Website: http://factfinder.census.gov/servlet/DTTable?_ts=37553758694. Accessed on April 22, 2002.

_____.   2000a.   Occupied Housing Characteristics: 2000, Census 2000 Summary File 1 (SF 1) 100-Percent Data. Internet Website: http://factfinder.census.gov/servlet/GCTTable?_ts=37485477740. Accessed on April 21, 2002.

_____.   2000b.   Profile of General Demographic Characteristics: 2000. Internet Website: http://factfinder.census.gov/servlet/QTTable?_ts=38151832049. Accessed on April 15, 2002.

_____.   2000c.   Total Population.   Internet Website: http://factfinder.census.gov/servlet/DTTable?_ts=38152223263. Accessed on April 18, 2002.

_____.   2001.   1998 State and County Small Area Income and Poverty Estimates. Internet Website: http://www.census.gov/housing/saipe/estmod98/est98_CO.dat. Accessed on April 23, 2002.

US Department of Energy.   2002.   Office of Energy Efficiency and Renewable Energy, National Center for Photovoltaics, Renewable Resource Data Center.  Internet Website: http://rredc.nrel.gov.  Accessed on November 10, 2002.

USFWS (US Department of the Interior, Fish and Wildlife Service).  1988.  Clay-loving Wild-buckwheat Recovery Plan. U.S. Fish and Wildlife Service, Denver, Colorado.

_____.   2002a.   National Wetlands Inventory – Wetland Maps Database Search Form. Internet Website: http://www.nwi.fws.gov/cgi-bin/nwi/run-phtml.cgi/search_form.phtml.  Accessed on November 21, 2002.

_____.   2002b.   Birds of Conservation Concern 2002.  USFWS, Division of Migratory Bird Management, Arlington, Virginia.  99 pp.

Water Quality Control Division.  1988.  Best Management Practices for Agriculture and Silviculture.  Prepared in coodination with the Colorado Nonpoint Source Task Force.

_____.   1993.   Best Management Practices Handbook Appendix to Colorado Nonpoint Source Management Program. Prepared to fulfill the requirements of Section 319 of the Clean Water Act.  Prepared in coodination with the Colorado Nonpoint Source Task Force.

Wemex.  1994.  *Off-Highway Motorcycle and ATV Trails Guidelines for Design, Construction, Maintenance, and User Satisfaction.* Second Edition.  American Motorcyclist Association.  Pinckerton, Ohio.

BLM_0007629

Westbrooks, R. 1998. Invasive plants, changing the landscape of America: Fact book. Federal Interagency Committee for the Management of Noxious and Exotic Weeds (FICMNEW), Washington, DC.

Western Utility Group. 1986. Western Regional Corridor Study 1986. Prepared by Michael Clayton and Associates. Washington, DC.

Western Utility Group. 1992. Western Regional Corridor Study. Prepared by Michael Clayton and Associates. Washington, DC.

Wilderness Society. 2000. *The Wilderness Act Handbook*. Fourth Ed. The Wilderness Society, Washington, DC. 84 pp.

WRCC (Western Regional Climate Center). 2002a. Period of Record General Climate Summary – Precipitation (Montrose 2, Colorado, Station 055722). Internet Website: http://www.wrcc.dri.edu/cgi-bin/cliMAIN.pl?comont. Accessed on April 30, 2002.

_____. 2002b. Period of Record General Climate Summary – Precipitation (Paonia 1 SW, Colorado, Station 056306). Internet Website: http://www.wrcc.dri.edu/cgi-bin/cliGCStP.pl?copaon. Accessed on April 30, 2002.

_____. 2002c. Period of Record General Climate Summary – Temperature (Montrose 2, Colorado, Station 055722). Internet Website: http://www.wrcc.dri.edu/cgi-bin/cliGCStT.pl?comont. Accessed on April 30, 2002.

Zimmerman, E. 1951. *World Resources and Industries: A Functional Appraisal of Agriculture and Industrial Materials*.

BLM_0007630

# GLOSSARY

**ACTIVITY PLAN.** A document that describes management objectives, actions, and projects to implement decisions of the RMP or other planning documents. Usually prepared for one or more resources in a specific area.

**ADAPTIVE MANAGEMENT.** A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

**AIR QUALITY CLASSES.** Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act, which limits the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be insignificant; and Class III applies to areas where industrial deterioration would generally be insignificant.

**ALLOTMENT.** An area of land where one or more operators graze their livestock. It generally consists of public lands but may include parcels of private or state-owned lands. The number of livestock and period of use are stipulated for each allotment.

**ALLOTMENT CATEGORIZATION.** As an aid in prioritizing grazing allotments for grazing management .system development, all allotments have been tentatively placed into one of three categories: (1) Maintain or "M"; (2) Improve or "I", and (3) Custodial or "C". Allotments within each category do not have to meet all the criteria to be managed according to the category objectives. Category criteria are:

- **"M" (Maintain) Category Criteria.** Present range condition is satisfactory; allotments have moderate or high resource production potential (or trend is moving in that direction); no serious resource-use conflicts/controversy exist; opportunities may exist for positive economic return from public investments; and present management appears satisfactory.

BLM_0007631

- **"I" (Improve) Category Criteria.** Present range condition is unsatisfactory; allotments have moderate to high resource production potential and are producing at low to moderate levels; serious resource-use conflicts/controversy exist; opportunities exist for positive economic return from public investments; and present management appears unsatisfactory.

- **"C" (Custodial) Category Criteria.** Present range condition is not a factor; allotment have low resource production potential and are producing near their potential, limited resource-use conflicts/controversy may exist; opportunities for positive economic return on public investments do not exist or are constrained by technological or economic factors; and present management appears satisfactory or is the only logical practice under existing resource conditions.

**ALLOTMENT MANAGEMENT PLAN (AMP).** A concisely written program of livestock grazing management, including supportive measures if required, designed to attain specific, multiple-use management goals in a grazing allotment.

**ALLOWABLE CUT.** The amount of timber, which can be harvested on an annual or decadal basis consistent with the principle of sustained yield. The allowable cut includes all planned timber harvest volumes exclusive of such products as Christmas trees, branches, and cones.

**ALLUVIAL SOIL.** A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**ALLUVIUM.** Clay, silt, sand, gravel, or other rock materials transported by moving water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in rivers, floodplains, lakes, and shores, and in fans at the base of mountain slopes.

**AMBIENT AIR QUALITY.** The state of the atmosphere at ground level as defined by the range of measured and/or predicted ambient concentrations of all significant pollutants for all averaging periods of interest.

**AMBIENT NOISE.** The all-encompassing noise level associated with a given environment, being a composite of sounds from all sources.

**ANIMAL UNIT MONTH (AUM).** The amount of forage necessary to sustain one cow or its equivalent for a period of one month.

**AQUATIC.** Living or growing in or on the water.

**AREA OF CRITICAL ENVIRONMENTAL CONCERN (ACEC).** An area established through the planning process as provided in FLPMA where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or

BLM_0007632

scenic values; or to fish and wildlife resources or other natural systems or processes; or to protect life and afford safety from natural hazards.

**ATTAINMENT AREA.** A geographic area in which levels of a criteria air pollutant meet the health-based National Ambient Air Quality Standard for that specific pollutant.

**ATTENUATION.** The reduction of sound intensity and energy as a function of distance traveled.

**BIG GAME.** Larger species of wildlife that are hunted, such as elk, deer, bighorn sheep, and pronghorn antelope.

**BIODIVERSITY (BIOLOGICAL DIVERSITY).** The variety of life and its processes, and the interrelationships within and among various levels of ecological organization. Conservation, protection, and restoration of biological species and genetic diversity are needed to sustain the health of existing biological systems. Federal resource management agencies must examine the implications of management actions and development decisions on regional and local biodiversity.

**BIOLOGICAL OPINION.** A document prepared by US Fish and Wildlife Service stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

**CANDIDATE SPECIES.** Any species not yet officially listed but which are undergoing a status review or are proposed for listing according to *Federal Register* notices published by the Secretary of the Interior of the Secretary of Commerce.

**CATEGORY I TRACTS.** Public land tracts that meet one or more of the disposal criteria through public sale as set forth in Section 203 of FLPMA.

**CRITERIA POLLUTANT.** US Environmental Protection Agency uses six "criteria pollutants" as indicators of air quality, and has established for each of them a maximum concentration above which adverse effects on human health may occur. These threshold concentrations are called National Ambient Air Quality Standards (NAAQS). The criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, particulate matter and lead.

**COMMON MANAGEMENT.** Public lands within the planning area where no particular resource, use, or value is outstanding, and where multiple-use management would be minimal, which are considered a general resource management unit for a particular alternative.

**CRUCIAL GUNNISON SAGE-GROUSE WINTERING RANGE.** "Crucial" pertains to important winter cover habitat as defined by Colorado Division of Wildlife based on habitat conditions and usage. "Crucial Gunnison sage-grouse wintering range" is delineated in Appendix E, Figure E-4.

BLM_0007633

**CRUCIAL WINTER RANGE.** A BLM definition that applies to elk and mule deer comprised of areas defined by Colorado Division of Wildlife as "winter concentration areas" and "severe winter range:"

- **Winter Concentration Area:** That part of winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter range in the average five winters out of ten.

- **Severe Winter Range:** That part of the overall range where 90 percent of the individuals are located when the annual snow pack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.

**CUBIC FEET PER SECOND (CFS).** As a rate of stream flow, a cubic foot of water passing a referenced section in 1 second of time. One cfs flowing for 24 hours will yield 1.983 acre-feet of water.

**CULTURAL RESOURCES.** Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**CULTURAL RESOURCES INVENTORY.** An inventory to assess the potential presence of cultural resources. There are three classes of surveys:

- **Class I.** An existing data survey. This is an inventory of a study area to (1) provide a narrative overview of cultural resources by using existing information, and (2) compile existing cultural resources site record data on which to base the development of the BLM's site record system.

- **Class II.** A sampling field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites within a portion of an area so that an estimate can be made of the cultural resources for the entire area.

- **Class III.** An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

**CUMULATIVE EFFECTS.** The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**DIVERSITY.** The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**EASEMENT.** Right afforded 'a person or agency to make limited use of another's real property for access or other purposes.

**ELIGIBLE RIVER SEGMENT.** A section of a river that qualifies for inclusion into the National Wild and Scenic River System through determination that it is free-flowing and with its adjacent land area possessing at least one river-related value considered to be outstandingly remarkable.

**ENDANGERED SPECIES.** Any species that is in danger of extinction throughout all or a significant portion of its range.

**ENVIRONMENTAL ASSESSMENT (EA).** A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**ENVIRONMENTAL IMPACT STATEMENT (EIS).** A formal public document prepared to analyze the impacts on the environment of a proposed project or action and released for comment and review. An EIS must meet the requirements of NEPA, CEQ guidelines, and directives of the agency responsible for the 'proposed project or action.

**EXISTING ROUTES.** The roads, trails, or ways that are used by motorized vehicles (jeeps, ATVs, motorized dirt bikes, etc.), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 (FLPMA).** Public Law 94-579 signed by the President on October 21, 1976. Establishes public land policy for management of lands administered by the Bureau of Land Management. FLPMA specifies several 'key directions for the Bureau, 'notably (1) management be on the basis of multiple-use and sustained yield, (2) land use plans be prepared to guide management actions, (3) public lands be managed for the protection, development, and enhancement of resources, (4) public lands be retained in federal ownership, and (5) public participation be utilized in reaching management decisions.

**FORAGE.** All browse-and herbaceous foods that are available to grazing animals.

**GRAZING PREFERENCE.** The total number of animal unit months of livestock use on public lands apportioned and attached to base property owned or controlled by a permittee. Some of the total grazing preference may have been suspended in past administrative actions. That portion of the grazing preference that is not suspended is the active grazing preference.

**GRAZING SYSTEM.** Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation.

BLM_0007635

**HABITAT.** A specific set of physical conditions that surround a single species, a group of species, or a large community. In wildlife management, the major components of habitat are considered to be food, water, cover, and living space.

**HABITAT MANAGEMENT PLAN (HMP).** A 'written and approved activity plan for a geographical area which identifies habitat management activities to be implemented in achieving specific objectives of planning decisions.

**HAZARDOUS MATERIAL.** A substance, pollutant, or contaminant that, due to its quantity, concentration, or physical or chemical characteristics, poses a potential hazard to human health and safety or to the environment if released into the workplace or the environment.

**IMPACT.** The effect, influence, alteration, or imprint caused by an action.

**IMPAIRMENT.** The degree to which a distance of clear visibility is degraded by man-made pollutants.

**IMPLEMENTATION DECISION.** Actions to implement land use plans. Implementation decisions are based on site-specific planning and NEPA analyses and are subject to the administrative remedies set forth in the regulations that apply to each resource management program of the BLM. These administrative remedies for final implementation decisions usually take the form of appeals to the Office of Hearings and Appeals, though for certain proposed or non-final implementation decisions, including those affecting timber sales, oil and gas lease sales, land exchanges, and proposed grazing decisions, the regulations provide for an internal agency review (usually a protest to the Authorized Officer) that must be completed before the final implementation decision can be appealed to the Office of Hearings and Appeals. This type of protest to the Authorized Officer should not be confused with the protest of land use planning decisions to the BLM Director.

**INVERTEBRATE.** An animal lacking a backbone or spinal column.

**LAND TREATMENT.** All methods of artificial range improvement arid soil stabilization such as reseeding, brush control (chemical and mechanical), pitting, furrowing, water spreading, etc.

**LAND USE PLANNING DECISION.** Consist of desired outcomes (goals, standards, and objectives) and the allowable uses (including allocations, levels of use, and restrictions on use) and management actions necessary to achieve those outcomes. Land use planning decisions provide management direction at a broad scale and guide future actions. When land use planning decisions are presented in the Proposed RMP, the public has an opportunity to protest those decisions to the BLM Director prior to their approval, as set forth in the planning regulations (43 CFR 1610.5-2). The Office of Hearings and Appeals does not have jurisdiction to review land use planning decisions.

BLM_0007636

Thus, after the protests to land use planning decisions have been resolved, there are no further administrative remedies within the Department of Interior.

**LEASEABLE MINERALS.** Those minerals or materials designated as leaseable under the Mineral Leasing Act of 1920. They include coal, phosphate, asphalt, sulphur, potassium and sodium minerals, and oil and gas.  Geothermal resources are also, leaseable under the Geothermal Steam Act of 1970.

**LEK.** Areas used by Gunnison sage grouse during the mating season where males display to attract receptive females. These sites are characterized by low vegetation with sparse shrubs often surrounded by big sagebrush communities. Strutting grounds or leks are considered to be the center of Gunnison sage grouse activities.

**LENTIC.** Pertaining to standing water such as lakes and ponds.

**LITHIC SITE.** An archaeological site containing debris left from the manufacture, use, or maintenance of flaked stone tools.

**LOCATABLE MINERALS.** Minerals or materials subject to claim and development under the Mining Law of 1872, as amended. Generally includes metallic minerals such as gold and silver, and other materials not subject to lease or sale (some bentonites, limestone, talc, some xeolites, etc.). Whether or not a particular mineral deposit is locatable depends on such factors as quality, quantity, mineability, demand, and marketability. *

**LONG-TERM EFFECT.** The effect could occur for an extended period after implementation of the alternative. The effect could last several years or more.

**MANAGEMENT SITUATION ANALYSIS (MSA).** An unpublished companion document to the RMP that provides the background documentation for the development of alternatives. The MSA consists of the Physical Profile, Existing Management Situation, and Capability Analysis.  Data from the MSA for this RMP is summarized in the Affected Environment chapter and the No Action Alternative.

**MECHANIZED USES.** Equipment that is mechanized, including but not limited to mountain bikes, wheelbarrows, and game carts.

**MINERAL ENTRY.** Claiming public lands (administered by the BLM) under the Mining Law of 1872 for the purpose of exploiting minerals. May also refer to mineral exploration and development under the mineral leasing laws and the Material Sale Act of 1947.

**MINERAL MATERIALS.** Common varieties of sand, building stone, gravel, clay, moss rock, etc., obtainable under the Minerals Act of 1947, as amended.

**MINING LAW OF 1872.** Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the "General Mining Laws" or "Mining Laws."

BLM_0007637

**MITIGATION.** Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation.

**MOTORIZED VEHICLES OR USES.** Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (ATVs, such as four-wheelers and three-wheelers), and trail motorcycles or dirt bikes.

**MULTIPLE-USE.** Management of the various surface and subsurface resources so that they are jointly utilized in the manner that will best meet the present and future needs of the public, without permanent impairment of the productivity of the land or the quality of the environment.

**NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**NATIONAL REGISTER OF HISTORIC PLACES (NRHP).** A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

**NATURALNESS.** Refers to an area that "generally appears to have been affected primarily by the forces of nature, with, the imprint of man's work substantially unnoticeable" (Set 2[c] of the Wilderness Act of 1964).

**OFF-HIGHWAY VEHICLE (OHV).** A general term referring to any motorized vehicle capable of operating on roads, trails, or designed areas that are not maintained. These include motorcycles, ATVs, dune buggies, and four-wheel-drive vehicles.

**OFF-ROAD VEHICLE DESIGNATIONS.** Public lands designated for off-highway vehicle use. Lands in the planning area are designated as open, limited, or closed for OHV use.

- **Open.** Designated areas and trails where off-road vehicles may be operated (subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343). For the purposes of the Gunnison Gorge NCA RMP/EIS, an "open area" is defined as an area where all types of motorized vehicles (jeeps, ATVs, motorized dirt bikes, etc.) and mechanized uses (mountain bikes, wheelbarrows, game carts) are allowed to travel freely at all times, anywhere in the area, on roads or cross country, subject to the operating regulations and vehicle standards set forth in 43 CFR, subparts 8341 and 8342.

- **Limited.** Designated areas and trails where the use of off-road vehicles is subject to restrictions such as limiting the number or types of vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are

BLM_0007638

signed for use. Combinations of restrictions, such as limiting use to certain types of vehicles during certain times of the year, are possible. For the purposes of the Gunnison Gorge NCA RMP/EIS, a "limited area" is an area where motorized and mechanized travel is restricted to designated routes, unless otherwise noted. Off-road, cross-country travel is prohibited in limited areas. Some existing routes may be closed in limited areas.

- **Closed.** Designated areas and trails where the use of off-road vehicles is permanently or temporarily prohibited. Emergency use of vehicles is allowed. For the purposes of the Gunnison Gorge NCA RMP/EIS, A "closed area" is where motorized and mechanized use is prohibited in all locations at all times.

**OUTSTANDING NATURAL AREA (ONA).** An area established to preserve scenic values and natural wonders. The preservation of these resources in their natural condition is the primary management objective.

**OVERSTORY.** That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

**PALEONTOLOGICAL RESOURCES.** The physical remains or other physical evidence of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for correlating and dating rock strata and for understanding past environments, environmental change, and the evolution of life

**PASSENGER VEHICLE.** Two-wheel-drive, low-clearance vehicles.

**PATENT.** A grant made to an individual or group conveying fee simple title to selected public lands.

**PATENTED CLAIM.** A claim on which title has passed from the federal government to the mining claimant under the Mining Law of 1872.

**PLANNING AREA.** The geographical area for which land use and resource management plans are developed and maintained.

**PRESCRIBED FIRE (PRESCRIBED BURNING).** Application of fuel to natural fuels under specific conditions of weather, fuel moisture, soil moisture, smoke, and other conditions intended to produce the intensity of heat and rate of spread required to accomplish certain objectives of wildlife habitat or livestock grazing management, and/or hazard reduction.

**PRIMITIVE AND UNCONFINED RECREATION.** Non-motorized and undeveloped types of outdoor recreation.

**PUBLIC LAND.** Any land and interest in land (outside of Alaska) owned by the United States and administered by the Secretary of the Interior through the BLM.

BLM_0007639

**RAPTOR.** Bird of prey with sharp talons and strongly curved beaks, e.g. hawks, owls, vultures, eagles.

**RECLAIM.** To rescue from an undesirable state, or to make available for human use by changing natural conditions. Regarding vegetation, this could include chainings, roller chop, controlled burns, and other projects with the intent of converting existing plant communities to a different type to increase livestock forage, to control the spread of wildfire, or to reduce erosion.

**RECREATION OPPORTUNITY SPECTRUM (ROS).** A land delineation system commonly used by federal land management agencies to address the need for a range of recreational opportunities within the planning area.

**REHABILITATE.** To restore to a former condition.

**RELINQUISHMENT.** A voluntary request from an agency or department of the government to end or terminate an existing withdrawal of public lands to that agency. Relinquishment is accomplished through the revocation process.

**REPORTABLE QUANTITY.** The quantity of a hazardous material or substance that is considered reportable under CERCLA. Reportable quantities are 1 pound or greater, or an amount as established and listed at 40 CFR 302.4 or under section 111 of the Clean Water Act.

**RESEARCH NATURAL AREA (RNA).** A land management status which reserves the area for uses that are compatible with the resource of interest and research for which the area was designated.

**RESOURCE AREA.** A geographic portion of a BLM District that is the smallest administrative subdivision in the BLM.

**RESOURCE MANAGEMENT PLAN (RMP).** A land use plan that establishes land use allocations, multiple-use guidelines, and management objectives for a given planning area. The RMP planning system has been used by the BLM since about 1980.

**RESTORE.** To bring back to a former condition.

**REVEGETATE.** To provide barren or denuded land with vegetative cover.

**REVOCATION.** Generally, an action that cancels a previous official act; specifically, an action that cancels a withdrawal. Revocation is usually done in conjunction with restoration, which opens the public lands. It need not necessarily open the lands to application/entry.

BLM_0007640

**RIPARIAN.** Situated on or pertaining to the bank of a river, stream, or other body of water. Normally describes plants of all types that grow rooted in the, water table or sub-irrigation zone of streams, ponds, and springs.

**RIPARIAN/AQUATIC SYSTEM.** Interacting system between aquatic and terrestrial situations. Identified by a stream channel and distinctive vegetation that requires or tolerates free or unbound water.

**RIPARIAN ZONE.** An area one-quarter mile wide encompassing riparian and adjacent vegetation.

**ROADS.** Vehicle routes that have been improved and maintained by mechanical means to ensure relatively regular and continuous use. (A way maintained strictly by the passage of vehicles does not constitute a road.)

**ROADLESS.** Refers to the absence of roads that have been constructed and maintained by mechanical means to ensure regular and continuous use.

**ROUTES.** A combination of roads, trails, or ways that are used by motorized vehicles (jeeps, ATVs, motorized dirt bikes, etc.), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders).

**RUTTING.** The result on routes and trails that occurs when the ground is too soft to support the weight of a vehicle and rider. This usually occurs when the ground is wet and soft. Ruts collect rainwater and runoff, keeping the trail wet. Ruts channel water, leading to trail erosion.

**SALINITY.** Refers to the solids such as sodium chloride (table salt) and alkali metals that are dissolved in water.

**SCOPING PROCESS.** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**SHORT-TERM EFFECT.** The effect occurs only during or immediately after implementation of the alternative.

**SOLITUDE.** The state of being alone or remote from habitations; isolation. A lonely or secluded place. Factors contributing to opportunities for solitude may include size, natural screening, topographic relief, vistas, physiographic variety, and the ability of the user to find a secluded spot.

**SPECIAL RECREATION MANAGEMENT AREA (SRMA).** An area that possesses outstanding outdoor recreation resources or where recreation use causes significant user conflicts, visitor safety problems, or resource damage. SRMAs are established to direct recreation funding and personnel to lands where a commitment has been made to

provide a specific recreation activity or experience and public benefit opportunities. This includes a long-term commitment to managing the physical, social, and managerial settings to sustain these activities, experiences, and benefit opportunities.

**SPLIT ESTATE.** Split estate lands occur when the federal government owns and manages the mineral estate and another party owns the surface lands.

**SUITABLE RIVER.** A river segment found, through administrative study by an appropriate agency, to meet the criteria for designation as a component of the National Wild and Scenic Rivers system, specified in Section 4(a) of the Wild and Scenic Rivers Act.

**SUPPLEMENTAL VALUES.** Resources associated with wilderness that contributes to the quality of wilderness areas.

**SUSTAINED YIELD.** The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

**SWITCHBACKS.** Zig-zags on a trail up or down a hill that are designed to lessen the trail's slope and to minimize erosion.

**TERRESTRIAL.** Living or growing in or on the land

**THREATENED SPECIES.** Any species or significant population of that species likely to become endangered within the foreseeable future throughout all or a significant portion of its range. Usually includes only those species that have been recognized and listed as threatened by federal and state governments, but may include species categorized as rare, very rare, or depleted

**TIMBER.** Standing trees, downed trees, or logs which are capable of being measured in board feet.

**TOTAL DISSOLVED SOLIDS (TDS).** Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**TRADITIONAL CULTURAL PROPERTIES.** A cultural property that is eligible for inclusion in the National Register of Historic Places because of its association with a living community's cultural practices or beliefs that (a) are rooted in that community's history and (b) are important in maintaining the community's continuing cultural identity.

**TRAIL BRAIDING.** Several paths in close proximity that avoid the same obstacle.

**TRESPASS.** Any unauthorized use of public land.

BLM_0007642

**UNDERSTORY.** That portion of a plant community growing underneath the taller plants on the site.

**UNIQUE PLANT ASSOCIATIONS.** Plant communities which (1) occur only in Colorado, (2) are common elsewhere but are represented by only a few occurrences in Colorado, (3) could easily be eliminated from Colorado, or (4) are considered to be in their natural state.

**UTILITY CORRIDOR.** Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**VALID EXISTING RIGHTS.** Legal interests that attach to a land or mineral estate that cannot be divested from the estate until that interest expires or is relinquished.

**VEGETATION MANIPULATION.** Planned alteration of Vegetation communities through use of prescribed fire, plowing, herbicide spraying, or other means to gain desired changes in forage availability, wildlife cover, etc.

**VEGETATION TYPE.** A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

**VERTEBRATE.** An animal having a backbone or spinal column.

**VISIT DAY.** A visit day represents one person using the Wilderness for all or part of one day. For example, if one person spent one night camping on public lands, it is counted as two visit days.

**VISUAL RESOURCES.** The visible physical features on a landscape, (topography, water, vegetation, animals, structure-s, and other features) that comprise die scenery of the area.

**VISUAL RESOURCE MANAGEMENT (VRM).** The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives.

BLM_0007643

**VISUAL RESOURCE MANAGEMENT CLASSES.** VRM classes identify the degree of acceptable visual change within a characteristic landscape. A classification is assigned to public lands based on the guidelines established for scenic quality, visual sensitivity, and visibility.

- **VRM Class I.** This classification preserves the existing characteristic landscape and allows for natural ecological changes only. Includes Congressionally authorized areas (wilderness) and areas approved through the RMP where landscape modification activities should be restricted.

- **VRM Class II.** This classification retains the existing characteristic landscape. The level of change in any of the basic landscape elements due to management activities should be low and not evident.

- **VRM Class III.** This classification partially retains the existing characteristic landscape. The level of change in any of the basic landscape elements due to management activities may be moderate and -evident.

- **VRM Class IV.** This classification provides for major modifications of the characteristic landscape. The level of change in the basic landscape elements due to management activities can be high. Such activities may dominate the landscape and be the major focus of viewer attention.

- **VRM Class V.** This classification applies to areas where the characteristic landscape has been so disturbed that rehabilitation is needed. Generally considered an interim short-term classification until rehabilitation or enhancement is completed.

**VISUAL SENSITIVITY.** Visual sensitivity levels are a measure of public concern for scenic quality and existing or proposed visual change.

**WALK-IN USE, WALK-IN ACCESS.** Walk-in users include non-boaters such as anglers, hikers, and horseback riders, and access the Gunnison River in the Wilderness via the Chukar, Bobcat, Duncan, or Ute Trails.

**WATER POWER AND STORAGE RESERVOIR SITES.** Areas set aside for potential development of large reservoirs for power development or irrigation.

**WATERSHED.** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**WILDERNESS.** An area formally designated by Congress as a part of the National Wilderness Preservation System.

**WILDERNESS CHARACTERISTICS.** Identified by Congress in the Wilderness Act of 1964, namely, size, naturalness, outstanding opportunities for solitude or a primitive and unconfined type of recreation, and supplemental values such as geological, archaeological, historical, ecological, scenic, or other features.

BLM_0007644

Glossary

**WINTER RANGE.** A Colorado Division of Wildlife definition that applies to elk and mule deer. That part of the overall range where 90 percent of the individuals are located during the average five winters out of ten from the first heavy snowfall to spring green-up, or during a site-specific period of winter.

**WITHDRAWAL.** An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

**WILDFIRE.** Any wildland fire that requires a suppression response. A prescribed burn may be declared a wildfire if part of it escapes from the control line or if weather conditions deteriorate and become unacceptable, as described in the burning plan.

**WOODLANDS.** Plant communities in which trees, often small and characteristically short-bowled relative to their depths of crown, are present but form only an open canopy, the intervening areas being occupied by lower vegetation, commonly grass. Woodland forests contain major and minor forest products (or any wood fiber) that have, or may have, merchantability.

BLM_0007645

*This page intentionally left blank.*

BLM_0007646

# A

access, 1-7, 2-11, 2-30, 2-51, 2-66, 2-69, 2-87, 4-2, 4-3, Glossary-14, H-3, H-4, H-5

acquisition, 1-8, 1-10, 2-8, 2-65, 2-66, C-1, C-4, C-5, C-7, I-7, I-28, I-31, I-32, I-33, I-35, I-37, I-38, I-50

adaptive management, 2-11, 2-51, 3-2, Glossary-1

allotment, Glossary-1, Glossary-2

Allotment Management Plan (AMP), Glossary-2

all-terrain vehicle (ATV), 2-48, 2-56, 2-58, 2-59, 2-60, 2-63, 5-15, Glossary-8

Animal and Plant Health Inspection Service (APHIS), 2-18

Animal Unit Month (AUM), Glossary-2

application for permit to drill (APD), 2-13, E-2, E-3, E-4, E-6, E-7

Area of Critical Environmental Concern (ACEC), 2-3, 2-4, 2-8, 2-26, 2-27, 2-79, 2-80, 2-81, 2-82, 2-83, 2-84, 2-85, 2-86, 2-87, 2-88, 2-89, 2-90, 2-91, Glossary-3, C-1, D-1, D-2, D-3, D-7, H-7, H-8

Austin, 2-26, 2-30, 2-64, 2-66, 2-67, 2-72, 2-73, 2-74, 2-75, 2-78, F-5, F-9

# B

Bald eagle, E-9

benefits-based management, 2-24

Best Management Practices, 2-12, 5-14, 5-15, B-5

biodiversity, 5-12, 5-13, Glossary-3

biological diversity, B-5

Black Canyon of the Gunnison Boundary Revision Act of 2003 (2003 Act), 1-2, 2-64, A-1

Black Canyon of the Gunnison National Park (National Park), R-4, 1-1, 1-2, 1-7, 2-9, 2-14, 2-30, 2-44, 2-45, 2-99, 5-12, 5-13, 5-14, Glossary-8, A-1, C-2, C-4, F-2, H-5, H-11, I-2, I-10, I-17, I-18, I-27, I-39, I-54

Black Ridge, 2-69, 2-76, 2-77, 2-79, 2-80, 2-81, 2-83, 2-84, 2-86, 2-89, 2-90, 2-91, 2-98, 2-99, 2-100, 2-101, 5-3, D-1, H-4, H-5, H-7

boating, 2-45, 2-72

# C

camping, 2-36, 2-39, 2-42, 2-44, 2-56, 2-58, 2-60, 2-70, 2-72, 2-75, 2-84, 2-89, 2-97, 2-101

campsite, 2-2, 2-33, 2-34, 2-36, 2-37, 2-38, 2-39, 2-40, 2-41, 2-44, 2-45, 2-46, 2-70, 2-71, 2-74, I-27

Candidate, Glossary-3, E-10, I-5, I-49, I-50

Category I lands, C-1

Chukar Trail, 2-30, 2-31, 2-32, 2-36, 2-44, 2-46, 2-47, H-10, I-27

Clay-loving wild buckwheat, 2-20, 2-21, 2-26, 2-49, 2-52, 2-88, 2-95, 2-96, D-2

Coal Bank Gulch, I-9, I-54

Colorado Division of Wildlife (CDOW), 1-7, 1-8, 1-9, 2-8, 2-18, 2-20, 2-30, 2-31, 2-48, 2-55, 2-57, 2-59, 2-62, 2-63, 2-64, 2-70, 2-79, 2-85, 2-89, 2-90, 2-98, 2-102, 5-7, 5-11, Glossary-4, Glossary-15

Colorado Natural Heritage Program (CNHP), 2-49, 5-12, D-2, F-4, H-14, I-17

competitive events, 2-36, 2-39, 2-42, 2-45, 2-58, 2-70

consultation, R-3, R-11

coordination, R-11, 5-10

cultural resources, 2-22, 2-23, Glossary-4, H-9

# D

Delta, R-1, R-10, 1-1, 1-7, 2-26, 2-37, 2-40, 2-65, 2-66, 2-71, 2-82, 2-85, 2-105, 5-7, 5-9, 5-10, 5-13, 5-14, F-6, F-8, F-9, F-10, F-11, F-12, H-2, H-10, H-12, H-13, I-29, I-30, I-53

BLM_0007647

Draft Resource Management Plan and
Environmental Impact Statement (DRMP),
R-2, R-4, R-5, R-7, R-8, R-9, R-10, R-11, 1-6,
2-1, 2-2, 2-3, 2-51, 2-79, 2-81, D-1, E-1,
F-1, H-2, H-3, I-1, I-6, I-28, I-29, I-32, I-34,
I-37

# E

Elephant Skin Wash, 2-14, 2-51, 2-52, 2-58, 2-59,
2-60, 5-2, H-11

Endangered Species Act, R-11, 2-8, 2-19, 2-79,
5-5, E-2, E-3

energy, 1-10, 2-12, 2-13, 2-14, 2-51, 2-66, 2-80,
2-94, 2-95, 4-1, 4-2, 5-12, 5-15, F-3, F-4,
F-6

# F

Fairview ACEC/RNA, 2-26, 2-95, 2-96, 2-100,
D-1, D-2, D-5, E-9, E-10

Federal Land Policy and Management Act of 1976
(FLPMA), R-1, R-4, 1-1, 1-2, 1-7, 1-9, 1-10,
2-24, Glossary-3, Glossary-5, C-1, C-4, D-1,
I-5

fish, R-11, 2-18, 2-19, 2-30, 2-31, 2-81, 4-2, 5-6,
5-11, 5-13, 5-15, Glossary-3, F-3, F-7, I-45

fishing, 2-72, 5-7

forestry, 2-17, 2-18, 2-81, 2-88, 4-1, 4-2, F-4

fossils, 5-1, 5-7

Fremont, 2-64, I-53

Fruitland Mesa, 1-1, 2-8, 2-10, 2-79, 2-81, 2-84,
2-100, D-1

fuelwood, 2-11, 2-17, 2-18, 2-81, 2-88

# G

Geographic Information System (GIS), 2-3, 4-2,
5-6, H-1, H-2, H-3, I-9

grazing, R-2, R-4, 1-8, 2-11, 2-14, 2-18, 2-19,
2-21, 2-22, 2-27, 2-31, 2-51, 2-52, 2-56,
2-58, 2-61, 2-64, 2-67, 2-68, 2-73, 2-76,
2-79, 2-84, 2-87, 2-88, 2-89, 2-97, 2-101,
Glossary-1, Glossary-2, Glossary-5,
Glossary-6, Glossary-9, B-2, B-4, H-14, I-7,
I-47

group size, R-6

Gunnison Forks, 2-14, 2-18, 2-30, 2-37, 2-40,
2-64, 2-67, 2-68, 2-69, 2-71, 2-72, 2-73,
2-74, 2-75, 2-77, 5-2, I-18, I-39

Gunnison Gorge, R-2, R-3, R-4, R-7, R-9, R-12,
R-13, 1-1, 1-2, 1-8, 1-9, 1-10, 1-11, 2-1,
2-3, 2-4, 2-14, 2-16, 2-18, 2-25, 2-28, 2-30,
2-31, 2-32, 2-33, 2-34, 2-35, 2-36, 2-37,
2-38, 2-39, 2-40, 2-41, 2-42, 2-43, 2-44,
2-45, 2-46, 2-47, 2-48, 2-64, 2-69, 2-70,
2-71, 2-72, 2-82, 3-3, 4-1, 4-2, 5-1, 5-2,
5-3, 5-4, 5-5, 5-6, 5-7, 5-9, 5-11, 5-12,
5-14, Glossary-8, Glossary-9, A-1, D-1, D-2,
E-1, H-1, H-2, H-3, H-4, H-5, H-6, H-7,
H-8, H-11, I-1, I-8, I-10, I-17, I-18, I-21,
I-22, I-29, I-39

Gunnison River, R-1, R-5, R-6, R-7, 1-1, 1-7, 1-11,
2-1, 2-14, 2-15, 2-16, 2-26, 2-30, 2-31,
2-32, 2-35, 2-37, 2-40, 2-64, 2-65, 2-66,
2-67, 2-68, 2-69, 2-70, 2-71, 2-72, 2-73,
2-74, 2-75, 2-77, 2-82, 5-13, Glossary-14,
C-2, C-3, C-4, D-1, F-6, H-5, H-6, H-7, H-9,
H-11, H-14, H-15, I-2, I-7, I-8, I-9, I-10,
I-15, I-18, I-19, I-21, I-22, I-30, I-31, I-34,
I-36, I-39, I-40, I-52, I-53, I-54

Gunnison River Pleasure Park (Pleasure Park),
2-37, 2-40, 2-71, F-6, I-18, I-30, I-31, I-39,
I-52, I-53

Gunnison sage-grouse, 2-3, 2-14, 2-26, 2-79,
2-80, 2-81, 2-82, 2-94, 2-95, Glossary-4,
D-2, E-9, E-22, E-23, E-24, H-13

# H

Habitat Partnership Program, 2-18

hazardous materials, 2-27

hiking, 2-42

horse, 2-46, 2-99

horseback riding, 2-42, 2-51, 2-76, 2-89, 2-97,
2-101

BLM_0007648

Howell Village, 2-31, 2-32, 2-42, 2-43, H-9

hunting, 1-9, 2-100, 5-7

# I

Important Bird Area (IBA), 2-3, 2-4, 2-26, 2-79, 2-80, 2-81, 2-82, 2-83, 2-84, 2-85, 2-86, D-1, H-7

# J

Jones Draw, 2-94, 2-100, 2-101, 2-102, C-7, H-11, I-9, I-54

# L

Land Health Assessment, 2-16, 5-4, H-11

Lime Kiln Gulch, I-9, I-53

limited OHV area, 2-58, 2-84, 2-89, 2-97, 2-100

livestock, R-2, R-4, 1-8, 2-8, 2-11, 2-14, 2-15, 2-17, 2-19, 2-21, 2-22, 2-27, 2-31, 2-51, 2-52, 2-64, 2-67, 2-68, 2-79, 2-87, 2-88, Glossary-1, Glossary-2, Glossary-5, Glossary-9, Glossary-10, B-4, B-5, I-47

Loutsenhizer Arroyo, I-9, I-53

# M

Mancos shale, 2-11, 2-17, 2-22, 2-25, 2-49, 2-52, 2-60, 2-64, 2-66, 2-88, 2-95, 2-97, 2-99, E-9

Migratory Bird Treaty Act (MBTA), 2-18, 2-19

minerals, 2-12, 2-13, 2-14, 2-51, 2-66, 2-80, 2-94, 2-95, 4-1, 4-2, 5-12, Glossary-7

mining, Glossary-7, Glossary-8, Glossary-9, I-50

mitigation, R-8, 2-15, 2-23, 2-50, 2-80, 2-87, 2-93, 5-3, 8, I-31

monitoring, R-8, 1-6, 2-15, 2-48, 2-63, 2-78, 2-86, 2-91, 2-103, 3-2, 5-3, 5-4

Montrose, R-1, R-3, R-10, 1-1, 1-7, 2-26, 2-49, 2-55, 2-65, 2-93, 2-105, 5-1, 5-2, 5-3, 5-4, 5-5, 5-6, 5-7, 5-8, 5-9, 5-10, 5-11, 5-12, 5-13, 5-14, 5-16, C-7, D-2, F-2, F-4, F-5, F-6, F-7, F-8, F-9, F-10, F-11, F-12, F-13, F-14, H-1, H-2, H-10, H-12, H-13

motorized, 1-6, 2-50, 2-52, 2-57, 2-58, 2-64, 2-66, 2-69, 2-72, 2-75, 2-81, 2-82, 2-84, 2-89, 2-95, 2-97, 2-100, 2-101, 5-4, 5-5, Glossary-8

# N

National Environmental Policy Act of 1969 (NEPA), R-2, R-7, 1-7, 2-57, 3-1, 3-3, Glossary-5, Glossary-6, Glossary-8, E-3, E-5, E-6, E-7, I-5

National Historic Preservation Act (NHPA), 2-22, 5-3

National Landscape Conservation System (NLCS), 1-2, 2-28

National Register of Historic Places (NRHP), 2-23, 2-31, 2-32, Glossary-8, Glossary-12, I-45

National Wild and Scenic Rivers System (NWSRS), 1-2, 1-11, 1-12, 2-15, 2-35, 2-69, 2-72, 5-10, I-1, I-2, I-5, I-6, I-8, I-22, I-27, I-28, I-29, I-30, I-31, I-32, I-33, I-34, I-35, I-36, I-37, I-38, I-39, I-40, I-41, I-43, I-48, I-50

noise, 4-2, 5-7, 5-10, 5-11, Glossary-2

# O

off-highway vehicle (OHV), R-2, R-5, R-8, E-9, 1-6, 1-9, 2-3, 2-4, 2-10, 2-13, 2-14, 2-15, 2-21, 2-22, 2-24, 2-25, 2-26, 2-28, 2-29, 2-30, 2-48, 2-49, 2-50, 2-51, 2-52, 2-53, 2-54, 2-55, 2-56, 2-57, 2-58, 2-59, 2-60, 2-61, 2-62, 2-63, 2-64, 2-65, 2-76, 2-77, 2-87, 2-98, 2-109, 5-9, 5-11, Glossary-8, H-6, H-7, H-8, H-9, H-15, I-53

Olathe, 1-1, 2-56, F-5, F-6, F-7, F-10, F-11, H-2

Outstanding Natural Area (ONA), 2-3, 2-4, 2-27, 2-87, 2-88, 2-89, 2-90, 2-91, Glossary-9, D-2, H-7, H-8

BLM_0007649

# P

paleontological resources, 2-24, 2-32, 4-2, 5-1, Glossary-9

Parvin Gulch, I-9, I-54

Peach Valley, 1-1, 2-3, 2-4, 2-20, 2-49, 2-50, 2-51, 2-52, 2-53, 2-54, 2-55, 2-56, 2-57, 2-58, 2-59, 2-60, 2-61, 2-62, 2-63, 2-93, 2-97, 2-98, 2-99, C-4, E-9, H-11, H-14, I-9, I-53

Peach Valley Canal, H-11, H-14, I-9, I-53

planning criteria, 1-6, 1-7

plants, 5-12, B-2, B-3

Poison Spring Gulch, I-10, I-54

Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP), R-2, R-4, R-7, R-10, R-11, 1-5, 1-6, 1-12, 2-1, 2-3, 2-4, 2-7, 2-79, 2-87, D-1, F-1, H-2, H-3, H-16, I-1, I-28, I-31, I-32, I-35, I-37, I-40

public involvement, R-8

public scoping, R-3, R-9, 1-2

# R

RAMP (Final Recreation Management Plan for the Gunnison Gorge Recreation Lands, Colorado), 1-9, 2-33, 2-34, 2-35, 2-37, 2-40, 2-43, 2-46, 2-78

RAMP Addition (Addition to the Recreation Area Management Plan for the Gunnison Gorge Recreation Lands, Colorado), 1-10, 2-33, 2-35, 2-78, 5-2

rangeland, 1-8, 2-15, 2-21, 2-22, 2-31, 2-52, 2-67, 2-68, 2-88, 4-1, 4-2, 5-2, 5-13

Record of Decision (ROD), R-1, R-2, R-10, 1-5, 1-6, 2-1, 2-3, 2-4, 2-8, 2-35, 2-56, 2-69, 3-1, 5-2, 5-3, 5-5, E-1, F-1, F-2, F-3, F-4, F-5, F-6, F-7, F-8, F-9, F-10, F-11, F-12, F-13, F-14

recreation, R-5, 1-6, 1-8, 1-9, 2-1, 2-2, 2-3, 2-4, 2-24, 2-25, 2-26, 2-30, 2-31, 2-32, 2-33, 2-34, 2-35, 2-36, 2-37, 2-38, 2-39, 2-40, 2-41, 2-42, 2-43, 2-44, 2-45, 2-46, 2-46, 2-47, 2-48, 2-49, 2-50, 2-51, 2-52, 2-53, 2-54, 2-55, 2-56, 2-57, 2-58, 2-59, 2-60, 2-61, 2-62, 2-63, 2-68, 2-69, 2-70, 2-71, 2-72, 2-73, 2-74, 2-75, 2-76, 2-77, 2-78, 2-81, 2-82, 2-83, 2-84, 2-85, 2-86, 2-87, 2-88, 2-89, 2-90, 2-91, 2-95, 2-96, 2-97, 2-98, 2-99, 2-100, 2-101, 2-102, 2-103, 2-117, 4-2, 4-3, 5-1, 5-2, 5-3, 5-4, 5-5, 5-13, Glossary-10, C-3, C-4, E-9, F-5, H-14, H-16

Recreation Opportunity Spectrum (ROS), 2-38, 2-41, 2-44, 2-47, 2-58, 2-60, 2-63, 2-72, 2-75, 2-77, 2-86, 2-91, 2-100, 2-103, 5-3, Glossary-10

Red Canyon Creek, 2-79, 2-94, 2-105, H-5, H-13, H-14, H-15, I-8, I-25

Red Canyon Trail, 2-32

Red Rock Canyon, H-11, H-14, I-9, I-54

Relief Ditch Company, 2-67, I-9, I-18, I-19, I-30, I-31, I-33, I-39, I-40, I-52

research, 2-8, 2-32, 2-51, 5-14, Glossary-10, C-1

Research Natural Area (RNA), 2-8, Glossary-10, C-1, D-2, H-6, H-8

riparian, 1-5, 2-19, 4-1, 5-3, Glossary-11, B-2

roads, 2-11, 2-51, 2-88, 2-97, 2-98, 2-99, Glossary-11, H-3, 48

right-of-way (ROW), 2-9, 2-30, 2-50, 2-65, 2-79, 2-80, 2-87, 2-93, 2-105, 2-107, H-16

# S

salinity, 5-2, 5-10, Glossary-11

scoping, R-8, 5-14, Glossary-11

Selenium, 2-11, F-6

Smith Fork, 1-12, 2-30, 2-35, 2-36, 2-37, 2-38, 2-39, 2-40, 2-41, 2-42, 2-43, 2-44, 2-71, 2-82, 2-85, 2-94, 2-102, 2-105, C-3, H-12, H-13, H-14, H-15, I-2, I-8, I-9, I-10, I-21, I-23, I-29, I-34, I-35, I-39, I-40, I-52

socioeconomics, 4-2

soil, 2-12, 5-7, 5-10, 5-14, Glossary-2, E-8, H-11

Special Recreation Management Area (SRMA), 2-3, 2-4, 2-49, 2-64, 2-65, 2-66, 2-67, 2-68, 2-69, 2-70, 2-71, 2-72, 2-73, 2-74, 2-75, 2-76, 2-77, 2-78, 2-84, 2-85, 2-86, Glossary-12, H-7, H-8, H-9

special status species, 2-21, E-9

special recreation use permit (SRUP), 2-37, 2-40, 2-71

# T

target shooting, 2-26, 2-55, 2-83, 2-84, 2-96

Traditional Cultural Properties, Glossary-12

trails, 2-32, 2-43, 2-99, 2-99, 5-12, 5-15, H-3

trespass, Glossary-13

# U

Uncompahgre Field Office Fire Management Plan, 2-27, 5-6

US Department of the Interior, Bureau of Reclamation (BOR), 2-10, 2-93, 5-7, C-3

US Department of the Interior, Fish and Wildlife Service (USFWS), R-11, 2-19, 2-20, 2-79, 2-106, 5-6, 5-15

US Department of the Interior, National Park Service (Park Service), 1-7, 2-8, 2-9, 2-16, 2-27, 2-28, 2-44, 2-48, 2-67, 2-86, 2-103, 5-13, I-2, I-17, I-28, I-29, I-39, I-54

US Geological Survey (USGS), 2-11, 2-12, 2-15, 2-16, 2-51, 2-66

Ute Trail, 2-31, 2-32, 2-41, 2-42, 2-43, 2-89, 2-90, 14, H-6, I-17

# V

Visual Resource Management (VRM), R-2, 2-26, 2-38, 2-41, 2-44, 2-47, 2-58, 2-60, 2-63, 2-5, 2-72, 2-75, 2-77, 2-86, 2-91, 2-100, 2-103, 2-113, 5-5, 5-6, Glossary-13, Glossary-14, H-16

# W

water quality, B-2

watershed, 4-1, 5-2, Glossary-14

weed, 2-16, 2-17, 2-51, 2-67, 5-5, 5-8, 5-10

West Peach Valley, 2-93, 2-97, 2-105

wetlands, 5-15

Wild and Scenic Rivers, 1-11, 1-12, 2-15, 2-35, 2-69, 5-5, 5-6, Glossary-12, I-1, I-2, I-3, I-5, I-7, I-8, I-11, I-28, I-32, I-34, I-37, I-48, I-49, I-50

Wild and Scenic Rivers Act (WSR Act), 1-11, 1-12, 2-35, 2-69, Glossary-12, I-1, I-2, I-5, I-6, I-7, I-8, I-10, I-28, I-29, I-32, I-35, I-36, I-37, I-38, I-48, I-49, I-50

Wilderness, R-1, R-4, R-5, R-6, R-7, 1-1, 1-2, 1-5, 1-8, 1-9, 1-10, 1-11, 2-1, 2-2, 2-3, 2-4, 2-8, 2-9, 2-10, 2-12, 2-13, 2-14, 2-16, 2-25, 2-26, 2-29, 2-30, 2-31, 2-32, 2-33, 2-34, 2-35, 2-36, 2-37, 2-38, 2-39, 2-40, 2-41, 2-42, 2-43, 2-44, 2-45, 2-46, 2-46, 2-47, 2-48, 2-49, 2-64, 2-68, 2-69, 2-70, 2-71, 2-72, 2-73, 2-82, 2-85, 2-87, 2-89, 2-90, 2-97, 2-98, 2-99, 5-2, 5-4, 5-5, 5-6, 5-9, 5-11, 5-16, Glossary-8, Glossary-13, Glossary-14, A-1, C-1, C-4, D-1, E-1, E-22, F-8, F-9, H-3, H-5, H-7, H-8, I-9, I-10, I-15, I-17, I-18, I-21, I-22, I-27, I-28, I-29, I-34, I-35, I-36, I-37, I-38, I-39, I-40, I-41, I-52

wildfire, Glossary-15

wildlife habitat, 2-19

withdrawals, 1-7, 2-8, 2-9, 2-10, 2-11, 2-30, 2-49, 2-50, 2-64, 2-65, 2-66, 2-79, 2-80, 2-87, 2-93, 2-94, 4-2, Glossary-15

*This page intentionally left blank.*

BLM_0007652

# TABLE OF CONTENTS

Appendix                                                                                                    Page

A.    LEGISLATION ............................................................................................................A-1

B.    BLM STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING
      MANAGEMENT IN COLORADO .........................................................................................B-1

      B.1    Standards for Public Land Health............................................................B-1
             B.1.1    Standard 1 .............................................................................B-1
             B.1.2    Standard 2 .............................................................................B-2
             B.1.3    Standard 3 .............................................................................B-2
             B.1.4    Standard 4 .............................................................................B-3
             B.1.5    Standard 5 .............................................................................B-3
      B.2    Guidelines for Livestock Grazing Management .........................................B-4

C.    PUBLIC LAND TRACTS AVAILABLE OR UNAVAILABLE FOR DISPOSAL AND PRIVATE LAND TRACTS
      PRIORITIZED FOR ACQUISITION .......................................................................................C-1

      C.1    Land Disposal ......................................................................................C-1
             C.1.1    Planning Area Public Land Tracts Not Available for Disposal ...........C-1
             C.1.2    Public Land Tracts Not Available for Disposal outside Planning Area ...C-2
             C.1.3    Remaining Public Lands ...........................................................C-4
      C.2    Priority Private Land Acquisition Tracts .................................................C-4

D.    AREA OF CRITICAL ENVIRONMENTAL CONCERN LOCATIONS.............................................. D-1

      D.1    Introduction ....................................................................................... D-1
             D.1.1    Gunnison Sage-Grouse ACEC/IBA ............................................. D-1
             D.1.2    Fairview ACEC/RNA (Existing Designation) ................................. D-2
             D.1.3    Native Plant Community ACEC/ONA........................................... D-2

E.    OIL AND GAS STIPULATIONS........................................................................................... E-1

      E.1    Introduction ....................................................................................... E-1
      E.2    Oil and Gas Leasing Process ................................................................. E-1
             E.2.1    Standard Lease Terms ............................................................. E-2
             E.2.2    Leasing with Surface Stipulations.............................................. E-2
             E.2.3    Application of Surface Stipulations............................................. E-8
      E.3    Summary of Oil and Gas Lease Stipulations............................................ E-8
      E.4    Stipulations ....................................................................................... E-8
             E.4.1    Uncompahgre Basin RMP #UB-1: Highly Erodible and/or Saline Soil Areas ...... E-8
             E.4.2    Uncompahgre Basin RMP #UB-2: Threatened, Endangered, Candidate, and
                      Sensitive Plant Areas ............................................................. E-10
             E.4.3    Uncompahgre Basin RMP #UB-3: Bald Eagle Winter Concentration Areas ...... E-10
             E.4.4    Uncompahgre Basin RMP #UB-4: Crucial Deer and Elk Winter Ranges........... E-10
             E.4.5    Uncompahgre Basin RMP #UB-6: Waterfowl Habitat...................... E-21
             E.4.6    GGNCA-1 (Colorado BLM Exhibit CO-02) .................................... E-21
             E.4.7    GGNCA-8 ............................................................................. E-21
             E.4.8    GGNCA-10............................................................................ E-22
             E.4.9    GGNCA-11............................................................................ E-22
             E.4.10   GGNCA-12............................................................................ E-23
             E.4.11   GGNCA-13 (Colorado BLM Exhibit CO-27) .................................. E-23
             E.4.12   GGNCA-14............................................................................ E-24
             E.4.13   GGNCA-15 (Colorado BLM Exhibit CO-30) .................................. E-24

BLM_0007653

# TABLE OF CONTENTS *(continued)*

Appendix                                                Page

**F.**    DISTRIBUTION OF RMP/ROD .......................................................................................... F-1

**G.**    GUNNISON SAGE-GROUSE CONSERVATION PLAN, CRAWFORD AREA, COLORADO –
GOALS, OBJECTIVES, AND MANAGEMENT MEASURES ........................................................ G-1

**H.**    DATA MANAGEMENT ................................................................................................... H-1

**I.**    REVISED FINAL WILD AND SCENIC RIVERS STUDY REPORT ................................................. I-1

    I.1     Introduction ................................................................................................... I-1
    I.2     Wild and Scenic River Study Process ............................................................ I-2
          I.2.1    Inventory Phase ................................................................................ I-2
          I.2.2    Suitability Study Phase .................................................................... I-6
    I.3     Relationship of Wild and Scenic Rivers Act to Private Lands ........................... I-7
    I.4     Relationship of Wild and Scenic Rivers Act to Water Rights ........................... I-7
    I.5     Gunnison Gorge NCA Wild and Scenic Rivers Study Report ......................... I-8
          I.5.1    Identification of Eligible Segments ................................................. I-8
          I.5.2    Eligibility Determination and Tentative Classification ..................... I-10
          I.5.3    Suitability Determinations .............................................................. I-22
          I.5.4    Suitability Determination Summary ................................................. I-38
          I.5.5    Interim Management ....................................................................... I-40
    I.6     Next Steps ...................................................................................................... I-41
    Attachment I-1 (to Appendix I) – Eligibility Criteria ................................................. I-43
    Attachment I-2 (to Appendix I) – Classification Criteria for Wild, Scenic, and Recreational
        River Areas ...................................................................................................... I-47
    Attachment I-3 (to Appendix I) – Interim Protection for Candidate Wild and Scenic Rivers ......... I-49
    Attachment I-4 (to Appendix I) – River Segments from Initial Identification Efforts ..................... I-51
    Attachment I-5 (to Appendix I) – BLM Scenic Quality Field Inventory Forms ............................. I-55

BLM_0007654

# LIST OF FIGURES

Figure                                                                                                          Page

C-1     Private Land Acquisition Areas by Priority ................................................................. C-5
D-1     Gunnison Sage Grouse ACEC................................................................................... D-3
D-2     Fairview ACEC/RNA................................................................................................ D-5
D-3     Native Plant Community ACEC ................................................................................ D-7
E-1     Oil and Gas Leasing Stipulations UB-1 and GGNCA-13 ........................................... E-11
E-2     Oil and Gas Leasing Stipulations UB-2, GGNCA-1, GGNCA-10, and GGNCA-11..................... E-13
E-3     Oil and Gas Leasing Stipulations UB-3, UB-4, and UB-6 ........................................... E-15
E-4     Oil and Gas Leasing Stipulation GGNCA-8 .............................................................. E-17
E-5     Oil and Gas Leasing Stipulation GGNCA-12 ............................................................ E-19
I-1     Wild and Scenic Rivers Eligibility Process Flow Chart................................................. I-3
I-2     Planning Area Rivers Considered in Wild and Scenic Rivers Inventory Process........................... I-11
I-3     Planning Area River Segments Proposed as Eligible for Further Study ......................... I-13
I-4     Gunnison River (Entire Wilderness to Transmission Line South of North Fork)........................... I-15
I-5     Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company
        Diversion) ............................................................................................................. I-19
I-6     Smith Fork Creek.................................................................................................... I-23
I-7     Red Canyon Creek .................................................................................................. I-25

# LIST OF TABLES

Table                                                                                                           Page

E-1     Summary of Oil and Gas Stipulations Applicable to Federal Oil and Gas Estate........................... E-9
F-1     Persons and Agencies Sent Copies of the Record of Decision/Resource Management Plan .......... F-2
H-1     Integration of GIS Data .......................................................................................... H-2
I-2-1   Classification Criteria for Wild, Scenic, and Recreational River Areas ......................... I-47
I-3-1   Interim Protection for Candidate Wild and Scenic Rivers........................................... I-49
I-4-1   River Segments from Initial Identification Efforts ...................................................... I-52



*This page intentionally left blank.*

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007656

# APPENDIX A
# LEGISLATION

The following is the *Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999* (Act) and the *Black Canyon of the Gunnison Boundary Revision Act of 2003* (2003 Act). The Act designated the Gunnison Gorge National Conservation Area (NCA) and Wilderness, and the 2003 Act changed the boundary of the NCA and added 7,100 acres of public lands to the NCA.

BLM_0007657

*This page intentionally left blank.*

BLM_0007658

PUBLIC LAW 106–76—OCT. 21, 1999

BLACK CANYON OF THE GUNNISON
NATIONAL PARK AND GUNNISON GORGE
NATIONAL CONSERVATION AREA ACT
OF 1999

BLM_0007659

113 STAT. 1126        PUBLIC LAW 106–76—OCT. 21, 1999

Public Law 106–76
106th Congress

An Act

Oct. 21, 1999
[S. 323]

To redesignate the Black Canyon of the Gunnison National Monument as a national park and establish the Gunnison Gorge National Conservation Area, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999. Colorado. 16 USC 410fff note. 16 USC 410fff.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999".

**SEC. 2. FINDINGS.**

Congress finds that—

(1) Black Canyon of the Gunnison National Monument was established for the preservation of its spectacular gorges and additional features of scenic, scientific, and educational interest;

(2) the Black Canyon of the Gunnison and adjacent upland include a variety of unique ecological, geological, scenic, historical, and wildlife components enhanced by the serenity and rural western setting of the area;

(3) the Black Canyon of the Gunnison and adjacent land provide extensive opportunities for educational and recreational activities, and are publicly used for hiking, camping, and fishing, and for wilderness value, including solitude;

(4) adjacent public land downstream of the Black Canyon of the Gunnison National Monument has wilderness value and offers unique geological, paleontological, scientific, educational, and recreational resources;

(5) public land adjacent to the Black Canyon of the Gunnison National Monument contributes to the protection of the wildlife, viewshed, and scenic qualities of the Black Canyon;

(6) some private land adjacent to the Black Canyon of the Gunnison National Monument has exceptional natural and scenic value that would be threatened by future development pressures;

(7) the benefits of designating public and private land surrounding the national monument as a national park include greater long-term protection of the resources and expanded visitor use opportunities; and

(8) land in and adjacent to the Black Canyon of the Gunnison Gorge is—

(A) recognized for offering exceptional multiple use opportunities;

BLM_0007660

PUBLIC LAW 106–76—OCT. 21, 1999        113 STAT. 1127

(B) recognized for offering natural, cultural, scenic, wilderness, and recreational resources; and

(C) worthy of additional protection as a national conservation area, and with respect to the Gunnison Gorge itself, as a component of the national wilderness system.

**SEC. 3. DEFINITIONS.**

16 USC 410fff–1.

In this Act:

(1) CONSERVATION AREA.—The term "Conservation Area" means the Gunnison Gorge National Conservation Area, consisting of approximately 57,725 acres surrounding the Gunnison Gorge as depicted on the Map.

(2) MAP.—The term "Map" means the map entitled "Black Canyon of the Gunnison National Park and Gunnison Gorge NCA—1/22/99". The map shall be on file and available for public inspection in the offices of the Department of the Interior.

(3) PARK.—The term "Park" means the Black Canyon of the Gunnison National Park established under section 4 and depicted on the Map.

(4) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

**SEC. 4. ESTABLISHMENT OF BLACK CANYON OF THE GUNNISON NATIONAL PARK.**

16 USC 410fff–2.

(a) ESTABLISHMENT.—There is hereby established the Black Canyon of the Gunnison National Park in the State of Colorado as generally depicted on the map identified in section 3. The Black Canyon of the Gunnison National Monument is hereby abolished as such, the lands and interests therein are incorporated within and made part of the new Black Canyon of the Gunnison National Park, and any funds available for purposes of the monument shall be available for purposes of the park.

(b) ADMINISTRATION.—Upon enactment of this title, the Secretary shall transfer the lands under the jurisdiction of the Bureau of Land Management which are identified on the map for inclusion in the park to the administrative jurisdiction of the National Park Service. The Secretary shall administer the park in accordance with this Act and laws generally applicable to units of the National Park System, including the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916 (16 U.S.C. 1, 2–4), and the Act entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, approved August 21, 1935 (16 U.S.C. 461 et seq.).

(c) MAPS AND LEGAL DESCRIPTION.—As soon as practicable after the date of the enactment of this Act, the Secretary shall file maps and a legal description of the park with the Committee on Energy and Natural Resources of the United States Senate and the Committee on Resources of the United States House of Representatives. Such maps and legal description shall have the same force and effect as if included in this Act, except that the Secretary may correct clerical and typographical errors in such legal description and maps. The maps and legal description shall be on file and available for public inspection in the appropriate offices of the National Park Service.

(d) WITHDRAWAL.—Subject to valid existing rights, all Federal lands within the park are hereby withdrawn from all forms of entry, appropriation, or disposal under the public land laws; from

BLM_0007661

113 STAT. 1128        PUBLIC LAW 106–76—OCT. 21, 1999

location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing, and all amendments thereto.

(e) GRAZING.—(1)(A) Consistent with the requirements of this subsection, including the limitation in paragraph (3), the Secretary shall allow the grazing of livestock within the park to continue where authorized under permits or leases in existence as of the date of the enactment of this Act. Grazing shall be at no more than the current level, and subject to applicable laws and National Park Service regulations.

(B) Nothing in this subsection shall be construed as extending grazing privileges for any party or their assignee in any area of the park where, prior to the date of the enactment of this Act, such use was scheduled to expire according to the terms of a settlement by the United States Claims Court affecting property incorporated into the boundary of the Black Canyon of the Gunnison National Monument.

(C) Nothing in this subsection shall prohibit the Secretary from accepting the voluntary termination of leases or permits for grazing within the park.

(2) Within areas of the park designated as wilderness, the grazing of livestock, where authorized under permits in existence as of the date of the enactment of this Act, shall be permitted to continue subject to such reasonable regulations, policies, and practices as the Secretary deems necessary, consistent with this Act, the Wilderness Act, and other applicable laws and National Park Service regulations.

(3) With respect to the grazing permits and leases referenced in this subsection, the Secretary shall allow grazing to continue, subject to periodic renewal—

(A) with respect to a permit or lease issued to an individual, for the lifetime of the individual who was the holder of the permit or lease on the date of the enactment of this Act; and

(B) with respect to a permit or lease issued to a partnership, corporation, or other legal entity, for a period which shall terminate on the same date that the last permit or lease held under subparagraph (A) terminates, unless the partnership, corporation, or legal entity dissolves or terminates before such time, in which case the permit or lease shall terminate with the partnership, corporation, or legal entity.

16 USC 410 fff–3.   **SEC. 5. ACQUISITION OF PROPERTY AND MINOR BOUNDARY ADJUSTMENTS.**

(a) ADDITIONAL ACQUISITIONS.—

(1) IN GENERAL.—The Secretary may acquire land or interests in land depicted on the Map as proposed additions.

(2) METHOD OF ACQUISITION.—

(A) IN GENERAL.—Land or interests in land may be acquired by—

(i) donation;

(ii) transfer;

(iii) purchase with donated or appropriated funds; or

(iv) exchange.

(B) CONSENT.—No land or interest in land may be acquired without the consent of the owner of the land.

BLM_0007662

PUBLIC LAW 106–76—OCT. 21, 1999          113 STAT. 1129

(b) BOUNDARY REVISION.—After acquiring land for the Park, the Secretary shall—

(1) revise the boundary of the Park to include newly-acquired land within the boundary; and

(2) administer newly-acquired land subject to applicable laws (including regulations).

(c) BOUNDARY SURVEY.—As soon as practicable and subject to the availability of funds the Secretary shall complete an official boundary survey of the Park.

(d) HUNTING ON PRIVATELY OWNED LANDS.—

(1) IN GENERAL.—The Secretary may permit hunting on privately owned land added to the Park under this Act, subject to limitations, conditions, or regulations that may be prescribed by the Secretary.

(2) TERMINATION OF AUTHORITY.—On the date that the Secretary acquires fee ownership of any privately owned land added to the Park under this Act, the authority under paragraph (1) shall terminate with respect to the privately owned land acquired.

**SEC. 6. EXPANSION OF THE BLACK CANYON OF THE GUNNISON WILDERNESS.**

16 USC 410fff–4, 1132 note.

(a) EXPANSION OF BLACK CANYON OF THE GUNNISON WILDERNESS.—The Black Canyon of the Gunnison Wilderness, as established by subsection (b) of the first section of Public Law 94–567 (90 Stat. 2692), is expanded to include the parcel of land depicted on the Map as "Tract A" and consisting of approximately 4,419 acres.

(b) ADMINISTRATION.—The Black Canyon of the Gunnison Wilderness shall be administered as a component of the Park.

**SEC. 7. ESTABLISHMENT OF THE GUNNISON GORGE NATIONAL CONSERVATION AREA.**

16 USC 410fff–5.

(a) IN GENERAL.—There is established the Gunnison Gorge National Conservation Area, consisting of approximately 57,725 acres as generally depicted on the Map.

(b) MANAGEMENT OF CONSERVATION AREA.—The Secretary, acting through the Director of the Bureau of Land Management, shall manage the Conservation Area to protect the resources of the Conservation Area in accordance with—

(1) this Act;

(2) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.); and

(3) other applicable provisions of law.

(c) WITHDRAWAL.—Subject to valid existing rights, all Federal lands within the Conservation Area are hereby withdrawn from all forms of entry, appropriation or disposal under the public land laws; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing, and all amendments thereto.

(d) HUNTING, TRAPPING, AND FISHING.—

(1) IN GENERAL.—The Secretary shall permit hunting, trapping, and fishing within the Conservation Area in accordance with applicable laws (including regulations) of the United States and the State of Colorado.

(2) EXCEPTION.—The Secretary, after consultation with the Colorado Division of Wildlife, may issue regulations designating

BLM_0007663

113 STAT. 1130          PUBLIC LAW 106–76—OCT. 21, 1999

zones where and establishing periods when no hunting or trap-
ping shall be permitted for reasons concerning—

   (A) public safety;
   (B) administration; or
   (C) public use and enjoyment.

   (e) USE OF MOTORIZED VEHICLES.—In addition to the use of
motorized vehicles on established roadways, the use of motorized
vehicles in the Conservation Area shall be allowed to the extent
the use is compatible with off-highway vehicle designations as
described in the management plan in effect on the date of the
enactment of this Act.

   (f) CONSERVATION AREA MANAGEMENT PLAN.—

<div style="margin-left:2em">Deadline.</div>

   (1) IN GENERAL.—Not later than 4 years after the date
of the enactment of this Act, the Secretary shall—
      (A) develop a comprehensive plan for the long-range
   protection and management of the Conservation Area; and
      (B) transmit the plan to—
         (i) the Committee on Energy and Natural
      Resources of the Senate; and
         (ii) the Committee on Resources of the House of
      Representatives.
   (2) CONTENTS OF PLAN.—The plan—
      (A) shall describe the appropriate uses and manage-
   ment of the Conservation Area in accordance with this
   Act;
      (B) may incorporate appropriate decisions contained
   in any management or activity plan for the area completed
   prior to the date of the enactment of this Act;
      (C) may incorporate appropriate wildlife habitat
   management plans or other plans prepared for the land
   within or adjacent to the Conservation Area prior to the
   date of the enactment of this Act;
      (D) shall be prepared in close consultation with appro-
   priate Federal, State, county, and local agencies; and
      (E) may use information developed prior to the date
   of the enactment of this Act in studies of the land within
   or adjacent to the Conservation Area.

   (g) BOUNDARY REVISIONS.—The Secretary may make revisions
to the boundary of the Conservation Area following acquisition
of land necessary to accomplish the purposes for which the Con-
servation Area was designated.

16 USC 410fff–6,
1132 note.

**SEC. 8. DESIGNATION OF WILDERNESS WITHIN THE CONSERVATION
      AREA.**

   (a) GUNNISON GORGE WILDERNESS.—
   (1) IN GENERAL.—Within the Conservation Area, there is
designated as wilderness, and as a component of the National
Wilderness Preservation System, the Gunnison Gorge Wilder-
ness, consisting of approximately 17,700 acres, as generally
depicted on the Map.
   (2) ADMINISTRATION.—
      (A) WILDERNESS STUDY AREA EXEMPTION.—The
   approximately 300-acre portion of the wilderness
   area depicted on the Map for release from section 603
   of the Federal Land Policy and Management Act of 1976
   (43 U.S.C. 1782) shall not be subject to section 603(c)
   of that Act.

BLM_0007664

PUBLIC LAW 106–76—OCT. 21, 1999          113 STAT. 1131

(B) INCORPORATION INTO NATIONAL CONSERVATION AREA.—The portion of the wilderness study area described in subparagraph (A) shall be incorporated into the Conservation Area.

(b) ADMINISTRATION.—Subject to valid rights in existence on the date of the enactment of this Act, the wilderness areas designated under this Act shall be administered by the Secretary in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.) except that any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this Act and any reference to the Secretary of Agriculture shall be deemed to be a reference to the Secretary of the Interior.

(c) STATE RESPONSIBILITY.—As provided in section 4(d)(7) of the Wilderness Act (16 U.S.C. 1133(d)(7)), nothing in this Act or in the Wilderness Act shall affect the jurisdiction or responsibilities of the State of Colorado with respect to wildlife and fish on the public land located in that State.

(d) MAPS AND LEGAL DESCRIPTIONS.—As soon as practicable after the date of the enactment of this section, the Secretary of the Interior shall file a map and a legal description of the Gunnison Gorge Wilderness with the Committee on Energy and Natural Resources of the United States Senate and the Committee on Resources of the United States House of Representatives. This map and description shall have the same force and effect as if included in this Act. The Secretary of the Interior may correct clerical and typographical errors in the map and legal description. The map and legal description shall be on file and available in the office of the Director of the Bureau of Land Management (BLM).

**SEC. 9. WITHDRAWAL.**          16 USC 410ffff–7.

Subject to valid existing rights, the Federal lands identified on the Map as "BLM Withdrawal (Tract B)" (comprising approximately 1,154 acres) are hereby withdrawn from all forms of entry, appropriation or disposal under the public land laws; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing, and all amendments thereto.

**SEC. 10. WATER RIGHTS.**          16 USC 410ffff–8.

(a) EFFECT ON WATER RIGHTS.—Nothing in this Act shall—
(1) constitute an express or implied reservation of water for any purpose; or
(2) affect any water rights in existence prior to the date of the enactment of this Act, including any water rights held by the United States.

(b) ADDITIONAL WATER RIGHTS.—Any new water right that the Secretary determines is necessary for the purposes of this Act shall be established in accordance with the procedural and substantive requirements of the laws of the State of Colorado.

**SEC. 11. STUDY OF LANDS WITHIN AND ADJACENT TO CURECANTI NATIONAL RECREATION AREA.**          16 USC 410ffff–9.

(a) IN GENERAL.—Not later than 3 years after the date of          Deadline.
the enactment of this Act, the Secretary, acting through the Director of the National Park Service, shall conduct a study concerning land protection and open space within and adjacent to the area administered as the Curecanti National Recreation Area.

BLM_0007665

113 STAT. 1132      PUBLIC LAW 106–76—OCT. 21, 1999

(b) PURPOSE OF STUDY.—The study required to be completed under subsection (a) shall—

(1) assess the natural, cultural, recreational and scenic resource value and character of the land within and surrounding the Curecanti National Recreation Area (including open vistas, wildlife habitat, and other public benefits);

(2) identify practicable alternatives that protect the resource value and character of the land within and surrounding the Curecanti National Recreation Area;

(3) recommend a variety of economically feasible and viable tools to achieve the purposes described in paragraphs (1) and (2); and

(4) estimate the costs of implementing the approaches recommended by the study.

Deadline.

(c) SUBMISSION OF REPORT.—Not later than 3 years from the date of the enactment of this Act, the Secretary shall submit a report to Congress that—

(1) contains the findings of the study required by subsection (a);

(2) makes recommendations to Congress with respect to the findings of the study required by subsection (a); and

(3) makes recommendations to Congress regarding action that may be taken with respect to the land described in the report.

(d) ACQUISITION OF ADDITIONAL LAND AND INTERESTS IN LAND.—

(1) IN GENERAL.—Prior to the completion of the study required by subsection (a), the Secretary may acquire certain private land or interests in land as depicted on the Map entitled "Proposed Additions to the Curecanti National Recreation Area", dated 01/25/99, totaling approximately 1,065 acres and entitled "Hall and Fitti properties".

(2) METHOD OF ACQUISITION.—

(A) IN GENERAL.—Land or an interest in land under paragraph (1) may be acquired by—

(i) donation;

(ii) purchase with donated or appropriated funds; or

(iii) exchange.

(B) CONSENT.—No land or interest in land may be acquired without the consent of the owner of the land.

(C) BOUNDARY REVISIONS FOLLOWING ACQUISITION.—Following the acquisition of land under paragraph (1), the Secretary shall—

(i) revise the boundary of the Curecanti National Recreation Area to include newly-acquired land; and

(ii) administer newly-acquired land according to applicable laws (including regulations).

BLM_0007666

PUBLIC LAW 106–76—OCT. 21, 1999          113 STAT. 1133

**SEC. 12. AUTHORIZATION OF APPROPRIATIONS.**

There are authorized to be appropriated such sums as are necessary to carry out this Act.

16 USC 410fff–10.

Approved October 21, 1999.

LEGISLATIVE HISTORY—S. 323:

HOUSE REPORTS: No. 106–307 (Comm. on Resources).
SENATE REPORTS: No. 106–69 (Comm. on Energy and Natural Resources).
CONGRESSIONAL RECORD, Vol. 145 (1999):
    July 1, considered and passed Senate.
    Sept. 27, considered and passed House, amended.
    Oct. 1, Senate concurred in House amendment.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 35 (1999):
    Oct. 21, Presidential statement.

○

BLM_0007667

Appendix A.  *Black Canyon of the Gunnison National Park and Gunnison Gorge NCA Act of 1999*

*This page intentionally left blank.*

BLM_0007668

S. 677

# One Hundred Eighth Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Tuesday,
the seventh day of January, two thousand and three*

## An Act

To revise the boundary of the Black Canyon of the Gunnison National Park and
Gunnison Gorge National Conservation Area in the State of Colorado, and for
other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Black Canyon of the Gunnison
Boundary Revision Act of 2003".

**SEC. 2. BLACK CANYON OF THE GUNNISON NATIONAL PARK
BOUNDARY REVISION.**

(a) BOUNDARY REVISION.—Section 4(a) of the Black Canyon
of the Gunnison National Park and Gunnison Gorge National Con-
servation Area Act of 1999 (16 U.S.C. 410fff–2(a)) is amended—

(1) by striking "There" and inserting "(1) There"; and

(2) by adding at the end the following:

"(2) The boundary of the Park is revised to include the
addition of approximately 2,530 acres, as generally depicted
on the map entitled 'Black Canyon of the Gunnison National
Park and Gunnison Gorge NCA Boundary Modifications' and
dated April 2, 2003.".

(b) TRANSFER OF ADMINISTRATIVE JURISDICTION.—On the date
of enactment of this Act, the Secretary shall transfer the land
under the jurisdiction of the Bureau of Land Management identified
as "Tract C" on the map described in subsection (a)(2) to the
administrative jurisdiction of the National Park Service for inclusion
in the Black Canyon of the Gunnison National Park.

(c) CONFORMING AMENDMENT.—Section 5(a)(1) of the Black
Canyon of the Gunnison National Park and Gunnison Gorge
National Conservation Area Act of 1999 (16 U.S.C. 410fff–3(a)(1))
is amended by striking "Map" and inserting "Map or the map
described in section 4(a)(2)".

S. 677—2

## SEC. 3. GUNNISON GORGE NATIONAL CONSERVATION AREA BOUNDARY REVISION.

Section 7(a) of the Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 (16 U.S.C. 410fff–5(a)) is amended—

(1) by striking "There" and inserting "(1) There"; and

(2) by adding at the end the following:

"(2) The boundary of the Conservation Area is revised to include the addition of approximately 7,100 acres, as generally depicted on the map entitled 'Black Canyon of the Gunnison National Park and Gunnison Gorge NCA Boundary Modifications', and dated April 2, 2003.".

## SEC. 4. GRAZING PRIVILEGES.

(a) TRANSFER OF PRIVILEGES.—Section 4(e)(1) of the Black Canyon of the Gunnison National Park and Gunnison Gorge National Area Act of 1999 (16 U.S.C. 410fff–2(e)(1)) is amended by adding at the end the following:

"(D) If land within the Park on which the grazing of livestock is authorized under permits or leases under subparagraph (A) is exchanged for private land under section 5(a), the Secretary shall transfer any grazing privileges to the land acquired in the exchange.".

(b) PRIVILEGES OF CERTAIN PARTNERSHIPS.—Section 4(e)(3) of the Black Canyon of the Gunnison National Park and Gunnison Gorge National Area Act of 1999 (16 U.S.C. 410fff–2(e)(3)) is amended—

(1) by striking "and" at the end of subparagraph (A);

(2) by redesignating subparagraph (B) as subparagraph (D);

(3) by inserting after subparagraph (A) the following:

"(B) with respect to the permit or lease issued to LeValley Ranch Ltd., for the lifetime of the last surviving limited partner as of October 21, 1999;

"(C) with respect to the permit or lease issued to Sanburg Herefords, L.L.P., for the lifetime of the last surviving general partner as of October 21, 1999; and"; and

(4) in subparagraph (D) (as redesignated by paragraph (2))—

(A) by striking "partnership, corporation, or" each place it appears and inserting "corporation or"; and

(B) by striking "subparagraph (A)" and inserting "subparagraphs (A), (B), or (C)".

S. 677—3

**SEC. 5. ACCESS TO WATER DELIVERY FACILITIES.**

The Commissioner of Reclamation shall retain administrative jurisdiction over the Crystal Dam Access Road and land, facilities, and roads of the Bureau of Reclamation in the East Portal area, including the Gunnison Tunnel, and the Crystal Dam area, as depicted on the map entitled "Black Canyon of the Gunnison National Park and Gunnison Gorge NCA Boundary Modifications", and dated April 2, 2003, for the maintenance, repair, construction, replacement, and operation of any facilities relating to the delivery of water and power under the jurisdiction of the Bureau of Reclamation.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*

BLM_0007671

*This page intentionally left blank.*

BLM_0007672

# APPENDIX B
# BLM STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT IN COLORADO

### B.1 STANDARDS FOR PUBLIC LAND HEALTH

Standards describe conditions needed to sustain public land health, and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

#### B.1.1 Standard 1

Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, landform, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

***Indicators***

- Expression of rills, soil pedestals is minimal.

- Evidence of actively eroding gullies (incised channels) is minimal.

- Canopy and ground cover are appropriate.

- There is litter accumulating in place and is not sorted by normal overland water flow.

- There is appropriate organic matter in soil.

- There is diversity of plant species with a variety of root depths.

- Upland swales have vegetation cover or density greater than that of adjacent uplands.

- There are vigorous, desirable plants.

BLM_0007673

### B.1.2    Standard 2

Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

#### *Indicators*

- Vegetation is dominated by an appropriate mix of native or desirable introduced species.

- Vigorous, desirable plants are present.

- There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.

- Stream bank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high stream flow events.

- Plant species present indicate maintenance of riparian moisture characteristics.

- Stream is in balance with the water and sediment being supplied by the watershed (e.g., no headcutting, no excessive erosion or deposition).

- Vegetation and free water indicate high water tables.

- Vegetation colonizes point bars with a range of age classes and successional stages.

- An active floodplain is present.

- Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.

- Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.

- Woody debris contributes to the character of the stream channel morphology.

### B.1.3    Standard 3

Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

BLM_0007674

***Indicators***

- Noxious weeds and undesirable species are minimal in the overall plant community.

- Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.

- Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.

- Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.

- Photosynthetic activity is evident throughout the growing season.

- Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.

- Appropriate plant litter accumulates and is evenly distributed across the landscape.

- Landscapes composed of several plant communities that may be in a variety of successional stages and patterns.

## B.1.4    Standard 4

Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the United States (US) Department of Interior, Bureau of Land Management (BLM), and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

***Indicators***

- All the indicators associated with the plant and animal communities standard apply.

- There are stable and increasing populations of endemic and protected species in suitable habitat.

- Suitable habitat is available for recovery of endemic and protected species.

## B.1.5    Standard 5

The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

BLM_0007675

### Indicators

- Appropriate populations of macroinvertebrates, vertebrates, and algae are present.

- Surface and ground waters only contain substances (e.g. sediment, scum, floating debris, odor, heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

## B.2    GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT

Guidelines are the management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Currently, the only guidelines for BLM Colorado that have been developed in concert with the Resource Advisory Councils are livestock grazing management guidelines.

1) Grazing management practices promote plant health by providing for one or more of the following:

- periodic rest or deferment from grazing during critical growth periods;

- adequate recovery and regrowth periods; and

- opportunity for seed dissemination and seedling establishment.

2) Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3) Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4) Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity. Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious weeds on the site, and composition of non-natives in the seed mix.

5) Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts on other resources or uses of riparian/wetland and upland sites.

BLM_0007676

6)   Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

7)   Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8)   Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

BLM_0007677

*This page intentionally left blank.*

BLM_0007678

# APPENDIX C
# PUBLIC LAND TRACTS AVAILABLE OR UNAVAILABLE FOR DISPOSAL AND PRIVATE LAND TRACTS PRIORITIZED FOR ACQUISITION

## C.1    LAND DISPOSAL

Category I tracts are tracts of public land that meet one or more of the disposal criteria through public sale as set forth in Section 203 of the Federal Land Policy and Management Act of 1976 (FLPMA).   Category I lands are primarily those lands currently identified as potential disposal tracts in the Uncompahgre Basin Resource Management Plan (RMP) (BLM 1989a).

In the NCA (various management units) and Wilderness (Management Unit 1), the following will be prohibited: all forms of entry, appropriation, or disposal under the public land laws. Fairview Area of Critical Environmental Concern (ACEC)/Research Natural Area (RNA) (within Management Unit 6) will continue to be unavailable for disposal under the public land laws.

### C.1.1    Planning Area Public Land Tracts Not Available for Disposal

There are 509.74 acres of planning area public lands not available for disposal.

The tracts of public land described below are within the planning area and were identified as Category I disposal tracts in the Uncompahgre Basin RMP Land Disposal Plan Amendment (BLM 1994). The tracts will not be available for disposal for the reasons provided. The number preceding each tract's legal description is the same number for the tract that is identified in the Uncompahgre Basin RMP Land Disposal Plan Amendment (BLM 1994).

#### *Tract Numbers 36 and 37 (229.74 acres)*

These two tracts are 160 acres and 69.74 acres in size, respectively. The tracts will not be available for disposal under the RMP because disposal of the tracts could result in mixed

BLM_0007679

Case No. 1:20-cv-02484-MSK   Document 28-2   filed 04/27/21   USDC Colorado   pg 140 of 334

Appendix C.  Public Land Tracts Available or Unavailable for Disposal and
Private Land Tracts Prioritized for Acquisition

land uses and other management complexities. The tracts are located within the planning area near the confluence of the Gunnison River and the North Fork of the Gunnison River. The tracts are adjacent to the banks of the Gunnison River and are within the NCA boundary. At the time of the Uncompahgre Basin RMP Land Disposal Plan Amendment (BLM 1994), the NCA did not exist, and the tracts were surrounded by private lands.  Most of the private lands surrounding these tracts are now public lands, and disposal will be counter to BLM management on these lands. The lands are being considered by Congress for addition to the NCA boundary.

**Tract 36:**  Township 14 South, Range 94 West, Section 36: W½SW¼, NE¼SW¼, NW¼SE¼. 160-acre isolated parcel.

**Tract 37:**  Township 15 South, Range 94 West, Section 1: Lots 22, 28, 29. 69.94-acre isolated parcel.

### Tract Number 87 (280 acres)

The tract contains 280 acres with vegetation and slopes surrounded by private lands in the Bostwick Park area south of the National Park.  The land contains mostly dense pinyon-juniper vegetation.  The tract would provide a large enough area of wildlife cover within the private lands to serve as potentially crucial habitat for deer, elk, and other wildlife species.  The tract would also serve as potential open space in the event of residential or other development in this area of Bostwick Park, which is undergoing gradual land use changes from agricultural open space to developed real estate.

**Tract 87:**   Township 49 N., Range 8 West, Section 11: E½NW¼, NE¼SW¼, W½SE¼; Section 14: N½NE¼. 280-acre isolated parcel.

## C.1.2   Public Land Tracts Not Available for Disposal outside Planning Area

There are 243.70 acres of public land tracts not available for disposal outside but near the NCA and planning area. The tracts were identified as Category I disposal tracts in the Uncompahgre Basin RMP Land Disposal Plan Amendment (BLM 1994). The tracts will not be available for disposal under the Approved RMP; rationale is provided below. The number preceding each tract's legal description is the same number for the tract that is identified in the 1994 Uncompahgre Basin RMP Amendment.

### Tract Number 28 (37.33 acres)

Tract 28 is located adjacent to the NCA boundary and contains the confluence of Big Gulch with the North Fork of the Gunnison River.  Important riparian and watershed values exist on the tract.  The tract could be important to the management of watershed and downstream river resources within the NCA.

**Tract 28:**  Township 14 South, Range 93 West, Section 31: Lot 8.  37.33-acre isolated parcel.

BLM_0007680

### Tract Numbers 24 and 29 (206.37 acres)

These are two isolated tracts outside the planning area along the south rim of Smith Fork Creek, an important tributary of the Gunnison River. The tracts provide riparian values and potential watershed protection for Smith Fork Creek and waters downstream. The tracts also offer opportunity for future trail planning for a possible link from the NCA to Crawford State Recreation Area. Tract 24 contains primarily sagebrush, grasses, and forbs. Tract 29 contains dense pinyon-juniper vegetation mixed with sagebrush and upland grasses and forbs. Both tracts also provide important wildlife cover. The tracts provide excellent viewing points for foreground, middle ground, and background views of the NCA and planning area lands.

**Tract 24:** Township 15 South, Range 92 West, Section 31: Lot 5. 41.82-acre isolated parcel.

**Tract 29:** Township 15 South, Range 93 West, Section 25: Lots 5, 6, 7, and 8. 164.55-acre isolated parcel.

### Planning Area Public Land Tracts Available for Disposal outside NCA

There are 233.75 acres of public land in eight tracts inside the planning area but outside the NCA that are available for disposal. The eight tracts were identified as Category I tracts suitable and available for disposal in the Uncompahgre Basin RMP Land Disposal Plan Amendment (BLM 1994). These tracts will continue to be suitable and available for disposal under the RMP. Tracts 47 and 50 are isolated parcels of public land that are identified for disposal but are currently withdrawn to the US Department of Interior, Bureau of Reclamation (BOR). These parcels may be disposed of if these withdrawals are revoked or they could be transferred to the BOR. However, the tracts are not available for disposal without concurrence of and coordination with the BOR.

**Tract 38:** Township 15 South, Range 94 West, Section 19: NE¼SE¼. 40-acre isolated parcel.

**Tract 39:** Township 15 South, Range 94 West, Section 32: W½NW¼. 80-acre isolated parcel.

**Tract 47:** Township 15 South, Range 95 West, Section 13: NE¼NE¼SE¼. 10-acre isolated parcel.

**Tract 48:** Township 15 South, Range 95 West, Section 13: SW¼SE¼. 40-acre isolated parcel.

**Tract 49:** Township 15 South, Range 95 West, Section 33: N½NW¼NE¼NE¼SE¼, N½NW¼NE¼SE¼. 6.25-acre isolated parcel.

**Tract 50:** Township 15 South, Range 95 West, Section 36: SE¼SE¼NE¼SW¼, NE¼NE¼SE¼SW¼, SW¼SW¼NW¼SE¼, NW¼NW¼SW¼SE¼. 10-acre isolated parcel.

BLM_0007681

**Tract 64:**  Township 50 N., Range 6 West, Section 19: SE¼NE¼. 40-acre isolated parcel.

**Tract 112:**  Township 50 N., Range 9 West, Section 7: E½E½NE¼SW¼NW¼, E½SE¼SW¼NW¼. 7.5-acre isolated parcel.

### C.1.3    Remaining Public Lands

The remaining planning area public lands outside the NCA, excluding lands between the Gunnison River and Colorado Highway (CO-) 92, will continue to be classified as Category II lands.  These lands do not meet FLPMA Section 203 sale criteria, and, as such, will not be considered for disposal by sale.  These lands could, however, be considered for disposal on a case-by-case basis through exchange, boundary adjustments, state indemnity selection, Recreation and Public Purposes Act (68 Statute 173; 43 US Code [USC] 869 *et. seq.*) applications, or other appropriate statute or authority, if the disposal would serve the public interest.

### C.2    PRIORITY PRIVATE LAND ACQUISITION TRACTS

Areas within or adjacent to the planning area, NCA, or Wilderness that BLM will consider for private land tract acquisition under a willing-seller/willing-buyer basis, through a variety of means, are listed below. Figure C-1 depicts these tracts. These areas are listed in priority of importance for acquisition if opportunities are presented. The BLM will also consider opportunities for acquisition of private lands in areas not listed here.

1)   Private lands adjacent to the Wilderness within the NCA, including Red Canyon area, lands adjacent to southernmost Wilderness boundary near the southwestern boundary of the Black Canyon of the Gunnison National Park (National Park), and lands adjacent to and downstream from the northernmost boundary of the Wilderness near the Gunnison River. These lands are of interest to the BLM for enhanced Wilderness management and protection.

2)   All other private lands within the NCA boundary, including lands between CO-92 and the Wilderness boundary, lands adjacent to the western NCA boundary along Peach Valley Road, and the tract adjacent to the western boundary of the NCA northeast of the intersection of Holly Road and Loutsenhizer Canal.  These lands are of interest to the BLM for enhanced management of NCA lands and riparian and watershed management and protection.

3)   Private lands located between the existing NCA boundary and CO-92 that are also adjacent to or in close proximity to public lands.  These lands are of interest to the BLM for enhanced management of public lands, public recreation access to the Gunnison River or other areas, and watershed protection.

4)   Private lands located outside the NCA boundary surrounded by public lands southwest of the Chukar Road. These lands are of interest to the BLM for enhanced recreation, riparian, and watershed management.

BLM_0007682



BLM considers private land tracts for acquisition
under a willing-seller/willing-buyer basis. These areas
are listed in priority of importance for acquisition if opportunities
are presented. The BLM also considers opportunities for
acquisition of private lands in other areas not shown.

*Private Land Acquisition Areas By Priority*
**Gunnison Gorge NCA Planning Area, Colorado**



 **Tetra Tech, Inc.**

**Figure C-1**

C-5

BLM_0007683

Appendix C.  Public Land Tracts Available or Unavailable for Disposal and
Private Land Tracts Prioritized for Acquisition

*This page intentionally left blank.*

BLM_0007684

Case No. 1:20-cv-02484-MSK   Document 28-2   filed 04/27/21   USDC Colorado   pg 145 of 334

Appendix C.  Public Land Tracts Available or Unavailable for Disposal and
Private Land Tracts Prioritized for Acquisition

5)   Private lands west of Jones Draw Lands that are adjacent to public lands.  These
lands are of interest to the BLM for enhanced recreation management and public
access.

6)   Private lands either side of Landfill-Bostwick Road adjacent to public lands
(excluding lands containing the Montrose County Landfill) and private lands located
south of Flat Top and north of Lincoln Road that are adjacent to public lands.
These lands are of interest to the BLM for enhanced public lands management and
recreation management.

7)   Private lands located adjacent to the NCA boundary, or within or adjacent to the
planning area boundary, that will enhance public land resource management or
provide better or necessary public access to other public lands. These lands will be
considered for acquisition through a variety of means, including either purchase or
exchange.

Appendix C.  Public Land Tracts Available or Unavailable for Disposal and
Private Land Tracts Prioritized for Acquisition

*This page intentionally left blank.*

BLM_0007686

# APPENDIX D
# AREA OF CRITICAL ENVIRONMENTAL CONCERN LOCATIONS

**D.1     INTRODUCTION**

ACECs are defined in FLPMA Sec. 103 (43 USC 1702[a]) and in 43 Code of Federal Regulations (CFR) 1601.0-5(a) as "areas within the public lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards".

As part of the land use planning process for the Gunnison Gorge NCA RMP/Environmental Impact Statement (EIS), a BLM interdisciplinary team reviewed ten areas nominated by BLM, the public, and other agencies. The nominated areas were analyzed to determine if they contained values that met the relevance and importance criteria for consideration as potential ACECs. This analysis was documented in the Draft RMP (DRMP) (BLM 2003c) and Proposed RMP (PRMP) (BLM 2004) as Appendix E, *Importance and Relevancy Criteria and Findings for Areas of Critical Environmental Concern Considerations.*

Six of the ten areas analyzed met the relevance and importance criteria: Gunnison Sage-Grouse, Fairview ACEC/RNA, Mancos Shale, Relict Tree, Gunnison and North Fork of the Gunnison River Corridors, and Native Plant Community. The following two areas, as well as one existing ACEC, were included in the Agency Preferred Alternative (Alternative D) in the DRMP (BLM 2003c) and were carried forward into the PRMP (BLM 2004) and this Approved RMP.

**D.1.1     Gunnison Sage-Grouse ACEC/IBA**

This ACEC/Important Bird Area (IBA) corresponds to Management Unit 4 (Figure 2-1 of the RMP). The 22,000-acre ACEC is located on the east side of the Gunnison River in uplands and extends from the Wilderness boundary on Black Ridge to Poison Springs Hill on Fruitland Mesa (Figure D-1). These lands contain a population of Gunnison

BLM_0007687

sage-grouse, a candidate species for potential federal listing, that is being managed under the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998). The species has been declining throughout its range, and the conservation plan was designed in collaboration with partners in the North Fork Valley and local, state, and federal agency representatives to help assure the long-term viability of the species in this area. This area includes 100 percent of the occupied Gunnison sage-grouse habitat in the planning area. The area also includes a Colorado Natural Heritage Program potential conservation area that was designated primarily for Gunnison sage-grouse and spotted bat foraging habitat.  The spotted bat is a BLM Colorado and United States Department of Agriculture, Forest Service (US Forest Service) sensitive wildlife species.

### D.1.2  Fairview ACEC/RNA (Existing Designation)

This ACEC/RNA is located within Management Unit 6 (Figure 2-1 of the RMP). The 161-acre area within the planning area boundary (Figure D-2) is one of two land areas contained in this existing designated ACEC/RNA.  The lands are not within the NCA. This area inside the planning area is surrounded on most of three sides by private lands. The value for which the area was designated was populations of Clay-loving wild buckwheat and Montrose penstemon. The site also includes some saline wetlands and communities of mat saltbrush with black sagebrush fingers. Some research on Clay-loving wild buckwheat has been completed in this ACEC.

### D.1.3  Native Plant Community ACEC/ONA

This ACEC/Outstanding Natural Area (ONA) corresponds to Management Unit 5 (Figure 2-1 of the RMP). This relatively unfragmented area (4,577 acres) is located on the uplands in the NCA on the west side of the Gunnison Gorge (Figure D-3).  The area has been identified and mapped by The Nature Conservancy for long-term protection of Winterfat Shrub Steppe, Juniper-Grass Savanna, and Pinyon-Juniper Woodland communities within the Southern Rocky Mountain Ecosystem.  These communities protect not only the major plant species that define them, but also provide habitat for numerous associated plant and animal species.  These areas help ensure protection of the biodiversity within the Southern Rocky Mountain Ecosystem, within a relatively small area.  The area will help protect, manage, and contribute to maintaining the biodiversity of the region's ecosystems.

BLM_0007688



This 22,000-acre ACEC contains all of the occupied Gunnison sage-grouse
(*Centrocercus minimus*) habitat in the planning area.

*Gunnison Sage-Grouse ACEC/IBA*
**Gunnison Gorge NCA Planning Area, Colorado**



| | |
|---|---|
| —— Major Roads | Other BLM Lands in the Planning Area |
| —— Rivers | Planning Area |
| Gunnison Sage-Grouse ACEC/IBA | NPS and Other Non-BLM-Managed Federal Lands |
| Wilderness | NPS Administrative Boundary |
| NCA | Cities and Towns |

**Tetra Tech, Inc.**

**Figure D-1**

BLM_0007689

*This page intentionally left blank.*

BLM_0007690



This existing 161-acre ACEC contains populations of Clay-loving wild buckwheat *(Eriogonum pelinophilum)* and Adobe penstemon (Montrose penstemon, Adobe beardtongue) *(Penstemon retrorus).*

*Fairview ACEC/RNA*
**Gunnison Gorge NCA Planning Area, Colorado**



| | |
|---|---|
| —— Major Roads | Other BLM Lands in the Planning Area |
| —— Rivers | Planning Area |
| Fairview ACEC/RNA | NPS and Other Non-BLM-Managed Federal Lands |
| Wilderness | NPS Administrative Boundary |
| NCA | Cities and Towns |

**Tetra Tech, Inc.**

**Figure D-2**

BLM_0007691

*This page intentionally left blank.*

BLM_0007692



This 4,577-acre ACEC contains Winterfat Shrub Steppe,
Juniper-Grass Savanna, and Pinyon-Juniper Woodland
communities within the Southern Rocky Mountain Ecosystem

*Native Plant Community ACEC/ONA*
**Gunnison Gorge NCA Planning Area, Colorado**

| | |
|---|---|
| Major Roads | Other BLM Lands in the Planning Area |
| Rivers | Planning Area |
| Native Plant Community ACEC/ONA | NPS and Other Non-BLM-Managed Federal Lands |
| Wilderness | NPS Administrative Boundary |
| NCA | Cities and Towns |

**Tetra Tech, Inc.**

**Figure D-3**

D-7

BLM_0007693

*This page intentionally left blank.*

BLM_0007694

# APPENDIX E
# OIL AND GAS STIPULATIONS

**E.1    INTRODUCTION**

This appendix contains stipulations that will be added to future oil and gas leases on both federal surface and split-estate lands in the planning area. Table E-1 in this appendix lists, by Management Unit in the RMP, the stipulations that will be applied to lands available for leasing with three different stipulation types, and the conditions under which the stipulation could be exempted, modified, or waived. The DRMP (BLM 2003c) contained stipulations proposed for Alternatives B, C, and D, and this appendix contains the stipulations that will be applicable to this RMP.

The 1999 Act designating the NCA and Wilderness and the 2003 NCA boundary revision act (see Appendix A) withdrew all federal lands within the NCA and Wilderness from disposition under all laws relating to mineral and geothermal leasing and all amendments thereto. This clause in the Act excluded future oil and gas and geothermal leasing within the boundary of the NCA and Wilderness. As a result, the stipulations in this appendix are applicable to federal oil and gas estate, including split estate, within the planning area outside the NCA boundary that will be available for oil and gas leasing under the RMP.

Precise wording of these stipulations could be adjusted at the time of any future leasing within the planning area to reflect future legislation, court decisions, or policy changes; however, the protection standards in these stipulations will be maintained. Any change to the protection content of the stipulation will require an amendment to the Gunnison Gorge NCA RMP/Record of Decision (ROD).

**E.2    OIL AND GAS LEASING PROCESS**

The information below contains the typical oil and gas leasing process that will be applied if oil and gas leases were authorized.

As explained in Chapter 2 of the RMP, certain BLM lands in the planning area will be unavailable for leasing and development because of withdrawals. All the lands within

BLM_0007695

the boundary of the NCA, and approximately 1,154 acres outside the NCA adjacent to CO-347, are withdrawn from oil and gas leasing.  The remaining lands in the planning area will be available for leasing subject to lease terms authorized by BLM Standard Lease Form 3100-11 and stipulations described in this appendix.

## E.2.1   Standard Lease Terms

All oil and gas leases are issued on BLM Standard Lease Form 3100-11.  This form contains standard lease terms that are applicable to all leases.  This form gives the Field Manager authority to modify operations (exploration, development, production, and maintenance) at the time they are proposed.  A modification of operations under standard lease terms is considered a mitigation measure rather than a stipulation.

The modification is developed after rather than before issuance of the lease.  This mitigation is attached to operational approvals for Applications for Permits to Drill (APD) and sundry notices as conditions of approval (COA).

Under Section 6 of the standard lease terms, the Field Manager has authority to modify operations consistent with lease rights. This is done to minimize adverse impacts on other resource values, land uses, or land users.  Under the standard lease terms, the BLM may require modification to the site design and location, and specify interim and final reclamation measures.  The Field Manager also has the authority under Section 6 to deny operations that would adversely affect resources protected by law such as cultural resources or threatened and endangered plants and animal species.

To be consistent with lease rights under standard lease terms, operations may not be denied unless operations would adversely affect resources protected by law, i.e., cultural resources or threatened and endangered plant and animal species or habitat.  In addition, the Field Manager cannot require operations to be: 1) moved off the leasehold; 2) moved by more than 200 meters; or 3) delayed for longer than 60 days in any lease year.

Operations proposed on lands with standard lease terms will be subject to the 200-meter/60-day thresholds, interim and final reclamation measures listed in this appendix, and applicable laws such as the Endangered Species Act.

## E.2.2   Leasing with Surface Stipulations

The following information pertaining to lease stipulations is taken from the booklet, *Uniform Format for Oil and Gas Lease Stipulations*, prepared by the Rocky Mountain Regional Coordinating Committee in March 1989. These guidelines were developed by the BLM and the US Forest Service.

Stipulations are conditions, promises, or demands that are to be made part of oil and gas leases when the environmental and planning record demonstrates the necessity for the stipulations. Stipulations, as such, are neither standard nor special, but rather a necessary modification of the terms of the lease. Lands that need protection above and beyond that authorized under standard lease terms are leased with surface stipulations. Lands

BLM_0007696

identified as available for leasing with surface stipulations are leased with the least restrictive surface stipulation needed to achieve other resource protection goals. In contrast to mitigation applied under standard lease terms, surface stipulations are placed on leases at the time they are issued.  Surface stipulations may require operations to be: 1) moved off the leasehold; 2) moved farther than 200 meters; or 3) delayed longer than 60 days.  Surface stipulations could result in denial of operations within the terms of the lease contract.  Lands leased with surface stipulations are also subject to the mitigation authorized under Section 6 of BLM Standard Lease Form 3100-11.  This includes applicable laws such as the Endangered Species Act.  In order to accommodate the variety of resources encountered on federal lands, these stipulations are categorized as to how the stipulation modifies the lease rights, not by the resource(s) to be protected. What, why, and how this mitigation/protection is to be accomplished is determined by the land management agency through land management planning and analysis under the National Environmental Policy Act of 1969 (NEPA).  Three types surface stipulations are applied to leases in the planning area: 1) No Surface Occupancy (NSO) stipulations; 2) Timing Limitation Stipulations (TLS); and 3) Controlled Surface Use Stipulations (CSUS), or Limited Surface Use stipulations.  Of these stipulations, the NSO stipulation is the most restrictive.

Resource information for split estate lands has not been verified by the BLM. Verification will occur during review of the APD. On-site inspection and consultation with the surface owner and operator may reveal that the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level or that the resources of concern are not present. Upon either of these determinations by the Authorized Office, the stipulations can be waived, modified, or excepted without public notice other than that provided for the APD. If, after on-site inspection and consultation with the private surface landowner, it were determined by the Authorized Officer that conditions necessary to avoid impacts on private resources will adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided, in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

### Implementation

If, upon weighing the relative resource values, uses, and/or users, it is determined that conflict with oil and gas operations exist that cannot be adequately managed under the BLM Standard Lease Terms (SLTs), a lease stipulation is necessary. Land use/management plans serve as the primary vehicle for determining the necessity for lease stipulations (BLM Manual 1624). Documentation of the necessity for a stipulation is disclosed in planning documents or through site-specific analysis. Land management plans and/or NEPA documents also establish the guidelines by which future waivers, exceptions, or modifications may be granted. Substantial modification or waiver subsequent to lease issuance is subject to public review for at least a 30-day period in accordance with Section 5102.f of the Federal Onshore Oil and Gas Leasing Reform Act of 1987. Stipulations may be necessary if the authority to control the activity on the

BLM_0007697

lease does not already exist under laws, regulations, or orders. The necessity for individual lease stipulations is documented in the lease-file record with reference to the appropriate land management plan or other leasing analysis document. The necessity for exceptions, waivers, or modifications also will be documented in the lease-file record through reference to the appropriate plan or other analysis.  Additional environmental documentation will be required if a request for an exception, waiver, or modification to a lease stipulation is made by an oil and gas lessee, if the request has not been analyzed and addressed already, for example while processing an APD.

### Definitions

#### Conditions of Approval (COA)
Conditions or provisions (requirements) under which an APD or a sundry Notice is approved.

#### Controlled Surface Use (CSU) or Limited Surface Use (LSU)
Use and occupancy is allowed (unless restricted by another stipulation), but identified resource values require special operational constraints that may modify the lease rights. This stipulation is used for operating guidance, not as a substitute for the NSO or timing stipulations. This stipulation  could require special management practices to protect sensitive resources, such as prohibiting  surface disturbance on steep slopes.

#### Exception
Case-by-case exemption from a lease stipulation. The stipulation continues to apply to all other sites within the leasehold to which the restrictive criteria apply.

#### Information Notice or Lease Notice
Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. This notice also addresses special items the lessee should consider when planning operations, but does not impose new or additional restrictions. These notices may be attached to all leases regardless of the leasing subcategory.  The leasing notice does not impose any restrictions other than those applicable under existing law, lease terms, regulations, or operational orders. These notices attached to leases should not be confused with Notices to Lessees (43 CFR 3160.0-5).

#### Modification
Fundamental change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Therefore, a modification may include an exemption from or alteration to a stipulated requirement. Depending on the specific modification, the stipulation may or may not apply to all other sites within the leasehold to which the restrictive criteria apply.

#### No Surface Occupancy (NSO)
Use or occupancy of the land surface for fluid mineral exploration or development is prohibited  to  protect  identified  resource  values.  The  NSO  stipulation  includes

stipulations that may have been worded as "No Surface Use/Occupancy," "No Surface Disturbance," "Conditional NSO," and "Surface Disturbance or Surface Occupancy Restriction (by location)."

_Notice to Lessees_
The Notice to Lessees is a written notice issued by the BLM authorized officer. Notices to Lessees implement regulations and operating orders, and serve as instructions on specific item(s) of importance within a state, district, or area.

_Stipulation_
A provision that modifies standard lease rights and is attached to and made a part of the lease.

_Timing Limitation (Seasonal Restriction)_
Prohibits surface use during specified time periods to protect identified resource values. This stipulation does not apply to the operation and maintenance of production facilities unless the findings of analysis demonstrate the continued need for such mitigation and that less stringent, project-specific mitigation measures will be in sufficient.

_Waiver_
Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Stipulation Guidance**

_No Surface Occupancy (NSO) Stipulation Guidance_
The NSO stipulation is intended for use only when other stipulations are determined insufficient to adequately protect the public interest. An NSO stipulation prohibits the lessee from occupying all or a portion of the surface of the lease tract year-round. The NSO stipulation can require relocation of proposed operations by more than 200 meters. The land management plan/NEPA document prepared for leasing must show that less restrictive stipulations were considered and determined by the authorized officer to be insufficient (i.e., show why the NSO stipulation is needed). The planning/NEPA record must also show that consideration was given to a no-lease alternative when applying an NSO stipulation. An NSO stipulation is not needed if the desired protection will not require relocation of proposed operations by more than 200 meters (43 CFR 3101.1-2).

The Field Manager or authorized office can make exceptions, modifications, or waivers to the NSO stipulation under the conditions specified in the applicable NSO stipulation. Land management plans and/or NEPA documents should identify the specific conditions for providing waivers, exceptions, or modifications to lease stipulations. Requests for waivers, exceptions, or modifications to oil and gas lease stipulations must be supported by appropriate environmental analysis and documentation, and subject to the same test used to initially justify the imposition of this stipulation. Language may be added to the NSO stipulation form to provide the lessee with information or

BLM_0007699

circumstances under which waivers, exceptions, or modifications will be considered. A waiver, exception, or modification may be approved if the record shows that circumstances or relative resource values have changed or that the lessee can demonstrate that operations can be conducted without causing unacceptable impacts, and that less restrictive stipulations will protect the public interest.  Additional environmental documentation will be required if a request for an exception, waiver, or modification to a lease stipulation is made by an oil and gas lessee, if the request has not been analyzed and addressed already, for example while processing an APD.  Waivers, exceptions or modifications can only be granted by the authorized officer. If the waiver, exception, or modification is inconsistent with the land management planning document, that document must be amended or the change disallowed.  If the authorized officer determines, prior to lease issuance, that a stipulation involves an issue of major concern, modification or waiver of the stipulation will be subject to public review (43 CFR 3101.1-4).

*Timing Limitation Stipulation (TLS) Guidance*
The TLS (often called seasonal restrictions) prohibits fluid mineral exploration and development activities for time periods less than yearlong. When using this stipulation, assure that date(s) and location(s) are as specific as possible. A limitation involves the prohibition of activities described in the stipulation for periods of more than 60 days (43 CFR 3101.1-2). A TLS prohibits exploration and development activities during specified times of year on all or portions of the lease tract.  The TLS can require the lessee to suspend operations for more than 60 days during one year.

The land management plan/NEPA document prepared for leasing must show that less restrictive stipulations were considered to be insufficient. The environmental effects of exploration, development, and production activities may differ markedly from each other in scope and intensity.

If the effects of reasonably foreseeable production activities necessitate timing limitation requirements, this need should be clearly documented in the record. The record also should show that less stringent, project-specific mitigation may be insufficient. In such cases the stipulation language should be modified on a case-by-case basis to clearly document that the timing limitation applies to all stages of activity.

Land management plans and/or NEPA documents should identify the specific conditions for providing waivers, exceptions, or modifications to lease stipulations. Requests for waivers, exceptions, or modifications of an oil and gas leasing stipulation, such as continuing drilling operations into a restricted time period, must be supported with appropriate environmental analysis and documentation, and will be subject to the same test used to initially justify the imposition of this stipulation. Language may be added to the stipulation form to provide the lessee with information or circumstances under which a waiver, exception, or modification will be considered. The need for one-time, case-by-case exceptions of a timing limitation stipulation may arise from complications or emergencies during the drilling program. The need for timely review and decision making is great in such cases. For this reason, it is desirable that land

BLM_0007700

management plans/NEPA documents clarify what review procedures and other requirements, if any, will apply in such cases.

A waiver, exception, or modification may be approved if the record shows that circumstances or relative resource values have changed or that the lessee can demonstrate that operations can be conducted without causing unacceptable impacts, and that less restrictive stipulations will protect the public interest. Waivers, exceptions or modifications can only be granted by the authorized officer. Additional environmental documentation will be required if a request for an exception, waiver, or modification to a lease stipulation is made by an oil and gas lessee, if the request has not been analyzed and addressed already, for example while processing an APD.  If the waiver, exception or modification is inconsistent with the land management planning document, and that document does not disclose the conditions under which such changes will be allowed, the plan or NEPA document must be amended as necessary, or the change disallowed.  If the authorized officer determines, prior to lease issuance, that a stipulation involves an issue of major concern, modification or waiver of the stipulation will be subject to public review (e.g., 43 CFR 3101.1-4). The land management plan also may identify other cases when a public review is required for waiver, exception, or modification.

### _Controlled Surface Use Stipulation (CSUS) or Limited Surface Use Stipulation (LSUS) Guidance_

This stipulation category places requirements on a lease that could include standards that exceed the mitigation available under the lease terms.  These stipulations cannot result in restrictions such as would be applied with a NSO or timing stipulation. A CSUS can require special management practices to protect sensitive resources.

The Field Manager or authorized office can make exceptions, modifications, or waivers to the stipulations under the conditions specified in the applicable stipulation.  Land management plans and/or NEPA documents should identify the specific conditions for providing waivers, exceptions, or modifications to these stipulations. Requests for waivers, exceptions, or modifications to oil and gas lease stipulations must be supported by appropriate environmental analysis and documentation, and subject to the same test used to initially justify the imposition of this stipulation. Language may be added to the stipulation form to provide the lessee with information or circumstances under which waivers, exceptions, or modifications will be considered. A waiver, exception, or modification may be approved if the record shows that circumstances or relative resource values have changed or that the lessee can demonstrate that operations can be conducted without causing unacceptable impacts, and that less restrictive stipulations will protect the public interest.  Additional environmental documentation will be required if a request for an exception, waiver, or modification to a lease stipulation is made by an oil and gas lessee, if the request has not been analyzed and addressed already, for instance during the processing of an application for permission to drill. Waivers, exceptions or modifications can only be granted by the authorized officer. If the waiver, exception, or modification is inconsistent with the land management planning document, that document must be amended or the change disallowed.  If the

BLM_0007701

authorized officer determines, prior to lease issuance, that a stipulation involves an issue of major concern, modification or waiver of the stipulation will be subject to public review (43 CFR 3101.1-4).

### E.2.3    Application of Surface Stipulations

Stipulations are applied to oil and gas leases by legal description on the basis of standard quarter-quarter sections (40 acres) or lots.  Any quarter-quarter section or lot needing protection on at least one half the subdivision has the appropriate stipulation appended to the lease document for the entire subdivision.  A quarter-quarter section or lot needing protection on one half or less of the subdivision does not have a stipulation appended to the document for that subdivision.  That small a parcel can be avoided through standard lease terms.

### E.3    SUMMARY OF OIL AND GAS LEASE STIPULATIONS

Table E-1 summarizes the stipulations recommended in the RMP, and Figures E-1 through E-5 depict where the stipulations will be effective.

### E.4    STIPULATIONS

Based on the analysis in the RMP, this appendix lists the stipulations that could be applied to surface disturbing activities or other oil and gas related activities associated with leasing federal oil and gas estate.

### E.4.1    Uncompahgre Basin RMP #UB-1: Highly Erodible and/or Saline Soil Areas

Timing Limitation Stipulation: No surface use is allowed March 1 through May 30.  This stipulation does not apply to operation and maintenance of production facilities.

#### Stipulation

To protect watersheds from salinity infusions and to protect highly erodible soil areas where low soil productivity will prolong or disallow revegetation, all development activities (exploration, drilling, etc.) will be allowed only from June 1 through February 28.  Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description to be appended to lease).

#### Reasons for Exceptions

This stipulation may be waived, excepted, or modified by the Authorized Officer. If the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on salinity and highly erodible soil areas. The stipulation will not be waived, excepted, or modified if it is determined that the activity would cause accelerated erosion that would result in excessive amounts of salinity being contributed to the Colorado River. Variances could be allowed if soils are not saturated during the typical high soil moisture period when these soils are most susceptible to damage (March 1 through May 31), or if impacts could be mitigated, or if site specific conditions do not warrant the stipulation (small amount of disturbance, short duration of operations, etc.).

BLM_0007702

Table E-1
Summary of Oil and Gas Stipulations Applicable to Federal Oil and Gas Estate[1]

| Type of Stipulation[2]; Time Period | Stipulation Number | Description of Resource or Value that Stipulation is Intended to Protect | Surface Acres Potentially Affected | Management Unit Potentially Affected | Figure |
|---|---|---|---|---|---|
| TLS March 1 – May 31 | UB-1 | Mancos shale soils (highly erodible and/or saline soil areas) | 90 | Management Unit 3 | Figure E-1 |
| | | | 8,162 | Management Unit 6 | Figure E-1 |
| | | | 237 | Management Unit 4 | Figure E-1 |
| NSO Year-round | UB-2 | Special status species plants within Fairview ACEC/RNA | 161 | Management Unit 6 | Figure E-2 |
| TLS December 1 – April 30 | UB-3 | Bald eagle winter concentration areas | 166 | Management Unit 3 | Figure E-3 |
| TLS November 15 – April 30 | UB-4 | Crucial deer and elk ranges | 5,433 | Management Unit 4 | Figure E-3 |
| | | | 1,898 | Management Unit 6 | Figure E-3 |
| TLS March 5 – June 30 | UB-6 | Waterfowl breeding and nesting habitat | 166 | Management Unit 3 | Not applicable |
| NSO Year-round | GGNCA-1 | Gunnison sage-grouse leks and strutting/dancing sites | 670 | Management Unit 4 | Figure E-2 |
| TLS November 15 – April 30 | GGNCA-8 | Gunnison sage-grouse winter range | 16,410 | Management Unit 4 | Figure E-4 |
| | | | 405 | Management Unit 6 | Figure E-4 |
| NSO Year-round | GGNCA-10 | Recreation lands in Flat Top-Peach Valley OHV Recreation Area | 1,778 | Management Unit 2 | Figure E-2 |
| NSO Year-round | GGNCA-11 | Threatened, endangered, candidate, and sensitive species, exclusive of Fairview ACEC/RNA | 41 | Management Unit 6 | Figure E-2 |
| | | | 59 | Management Unit 2 | Figure E-2 |
| NSO Year-round | GGNCA -12 | Gunnison sage-grouse brood-rearing habitat: riparian and water sources | 16,529 | Management Unit 4 | Figure E-5 |
| | | | 2,155 | Management Unit 6 | Figure E-5 |
| | | | 94 | Management Unit 3 | Figure E-5 |
| Controlled Surface Use | GGNCA-13 | Mancos shale soils on slopes greater than 40 percent | 90 | Management Unit 3 | Figure E-1 |
| | | | 8,162 | Management Unit 6 | Figure E-1 |
| | | | 237 | Management Unit 4 | Figure E-1 |

[1] Public lands in the NCA are closed to oil and gas leasing.
[2] TLS = Timing Limitation Stipulation;  NSO = No Surface Occupancy

BLM_0007703

### E.4.2   Uncompahgre Basin RMP #UB-2: Threatened, Endangered, Candidate, and Sensitive Plant Areas

NSO Stipulation.

**Stipulation**

To protect the threatened, endangered, candidate, and sensitive plants and their potential habitat within the Fairview ACEC/RNA, NSO will be permitted in these areas. Exceptions to this restriction may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description to be appended to lease).

**Reasons for Exceptions**

This stipulation maybe waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on threatened, endangered, candidate, and sensitive plants and their potential habitats within these areas.

### E.4.3   Uncompahgre Basin RMP #UB-3: Bald Eagle Winter Concentration Areas

TLS: No surface use is allowed December 1 through April 30.  This stipulation does not apply to operation and maintenance of production facilities.

**Stipulation**

To protect bald eagles from activities that would cause abandonment of winter concentration areas, all development activities (exploration, drilling, etc.) will only be allowed in these areas from May 1 through November 30. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description to be appended to lease).

**Reasons for Exceptions**

This stipulation maybe waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on wintering bald eagles.

### E.4.4   Uncompahgre Basin RMP #UB-4: Crucial Deer and Elk Winter Ranges

TLS: No surface use is allowed November 15 through April 30.  This stipulation does not apply to operation and maintenance of production facilities.

**Stipulation**

To protect crucial deer and elk winter ranges from activities that would cause these species to abandon areas of crucial winter forage and cover for less suitable ranges, all development activities (exploration, drilling, etc.) will not be authorized from November 15 to April 30. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description to be appended to lease).

BLM_0007704



**Oil and Gas Leasing Stipulations UB-1 and GGNCA-13**

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

**Figure E-1**

E-11

*This page intentionally left blank.*

BLM_0007706



Oil and Gas Leasing Stipulations UB-2, GGNCA-1, GGNCA-10, and GGNCA-11

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

Figure E-2

E-13

*This page intentionally left blank.*

BLM_0007708



**Oil and Gas Leasing Stipulations UB-3, UB-4, and UB-6**

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

**Figure E-3**

E-15

*This page intentionally left blank.*

BLM_0007710



**Oil and Gas Leasing Stipulation GGNCA-8**

Gunnison Gorge NCA Planning Area, Colorado

**Figure E-4**

E-17

*This page intentionally left blank.*

BLM_0007712



Oil and Gas Leasing Stipulation GGNCA-12

Gunnison Gorge NCA Planning Area, Colorado

Tetra Tech, Inc.

Figure E-5

E-19

*This page intentionally left blank.*

BLM_0007714

*Reasons for Exceptions*

This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on deer and elk utilization of crucial winter ranges. Variances could be allowed if these crucial ranges are not being utilized due to mild winter conditions or temporary changes in winter range utilization, or if impacts could be mitigated, or if site-specific conditions do not warrant the stipulation (small amount of disturbance, short duration of operations, etc.).

### E.4.5   Uncompahgre Basin RMP #UB-6: Waterfowl Habitat

TLS: No surface use is allowed March 15 through June 30.  This stipulation does not apply to operation and maintenance of production facilities.

*Stipulation*

To protect waterfowl from activities that would alter breeding behavior, increase the incidence of nest abandonment, and decrease breeding success, all development activities (exploration, drilling, etc.) will only be allowed in waterfowl habitats from July 1 through March 14. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

*Reasons for Exceptions*

This stipulation maybe waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on breeding and nesting waterfowl. Variances could be allowed if these breeding habitats are not being utilized, or if impacts could be mitigated, or if site-specific conditions do not warrant the stipulation (few individuals affected, short duration of operations, etc.).

### E.4.6   GGNCA-1 (Colorado BLM Exhibit CO-02)

NSO stipulation.

*Stipulation Purpose*

To protect grouse strutting/dancing grounds (including sage and mountain sharp-tailed grouse and lesser and greater prairie chickens) within a two-mile (three-kilometer) radius from the site. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.

*Reasons for Exceptions*

An exception may be granted depending on current usage of the site or on the geographical relationship to topographic barriers and vegetation screening.

### E.4.7   GGNCA-8

TLS: No surface use is allowed December 16 through March 15.  This stipulation does not apply to operation and maintenance of production facilities.

BLM_0007715

*Stipulation Purpose*

Protecting crucial Gunnison sage-grouse wintering range from activities that would cause these species to abandon areas of crucial winter cover habitat and forage for less suitable ranges.

*Reasons for Exceptions*

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the crucial winter range is: 1) not being utilized and is expected to remain in such a condition because of a temporary change in climate and/or habitat; or 2) impacts can be mitigated to avoid the abandonment of crucial winter cover and forage.

This stipulation may be waived by the Authorized Officer only upon a determination that crucial winter range does not exist within the lease. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.

### E.4.8    GGNCA-10

NSO stipulation.

*Stipulation Purpose*

To prevent disturbance to important recreations lands outside the NCA and Wilderness from resource damage and to prevent safety hazards and associated risks to the public. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes

*Reasons for Exceptions*

An exception may be granted depending on current usage.

### E.4.9    GGNCA-11

NSO stipulation.

*Stipulation Purpose*

To protect the threatened, endangered, candidate, and sensitive plants and their potential habitat that may be discovered on public lands outside the NCA, NSO will be permitted in these areas.

*Reasons for Exceptions*

Exceptions to this restriction may be authorized in writing by the BLM's Authorized Officer. This stipulation may be waived, excepted, or modified by the Authorized Officer is the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on threatened, endangered, candidate, and sensitive plants and their potential habitats within these areas.

BLM_0007716

### E.4.10  GGNCA-12

NSO stipulation.

***Stipulation Purpose***

To protect Gunnison sage-grouse brood rearing habitat in certain riparian areas from activities that would remove this habitat and force Gunnison sage-grouse into less suitable areas.

***Reasons for Exceptions***

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorizing Officer that the Gunnison sage-grouse brood-rearing habitat is (1) not being utilized and is expected to remain in such a condition because of a temporary change in climate and/or habitat, and (2) operations can be conducted in such a manner as to avoid altering the vegetation, topography, and Gunnison sage-grouse escape cover.

This stipulation may be waived by the Authorized Officer only upon a determination that Gunnison sage-grouse no longer use these riparian zones as brood-rearing habitat.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.

### E.4.11  GGNCA-13 (Colorado BLM Exhibit CO-27)

LSUS or CSUS: Surface occupancy or use is subject to special operating constraints.

***Stipulation Purpose***

To protect soils on surfaces greater than 40 percent slope.  Prior to surface disturbance of steep slopes (greater than 40 percent), an engineering/reclamation plan must be approved by the Authorized Officer.  Such plans must demonstrate how the following will be accomplished:

    a.   Site productivity will be restored.

    b.   Surface runoff will be adequately controlled.

    c.   Off-site areas will be protected from accelerated erosion such as drilling, gullying, piping, and mass wasting.

    d.   Surface-disturbing activities will not be conducted during extended wet periods.

    e.   Construction will not be allowed when soils are frozen.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.

BLM_0007717

### E.4.12  GGNCA-14

CSUS: Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond 500 feet of the riparian vegetation zone on the lands described below (for clarification, the 500-foot restriction starts at the point between riparian vegetation and upland vegetation).

***Stipulation Purpose***

To protect perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important Gunnison sage-grouse brood-rearing habitat, and fish use, water quality, and other related resource values. This stipulation will not be applied when the Authorized Officer determines that relocation up to 200 meters can be applied to protect the riparian system during well siting.

***Reasons for Exceptions***

This stipulation may be excepted subject to an on-site impact analysis with consideration given to degree of slope, soils, importance to the amount and type of wildlife.

### E.4.13  GGNCA-15 (Colorado BLM Exhibit CO-30)

Information Notice or Lease Notice: A potential closure period from March 1 through June 30, and special mitigation measures to protect nesting Gunnison sage-grouse from surface-disturbing activities.

Information Notice or Lease Notice: The lessee is hereby notified of potential closure period (March 1 through June 30) and special mitigation to protect nesting Gunnison sage-grouse from surface-disturbing activities.  Gunnison sage-grouse nesting habitat is described as sagebrush stands with plants between 30 and 100 centimeters in height and 15 to 40 percent mean canopy cover.

BLM_0007718

# APPENDIX F
# DISTRIBUTION OF ROD/RMP

Table F-1 lists those parties who received copies of this ROD/RMP. In November 2004, paper or electronic (CD-ROM) copies of the ROD/RMP were distributed to a total of 321 parties, including elected officials, regulatory agencies, parties who protested the PRMP, focus group members, and other members of the public (Table F-1). Of this, the focus group distribution included mailing CD-ROMs of the ROD/RMP to all focus group members.

The same parties that were initially sent the DRMP (BLM 2003c), as well as those parties initially sent copies of the PRMP (BLM 2004), also were sent copies of the ROD/RMP. In addition, all 642 parties who submitted written comments on the DRMP (some of whom received PRMP and ROD/RMP copies), were sent notification of the availability of the ROD/RMP via a directed mailing of the project newsletter. In addition, approximately an additional 900 parties were notified of the availability of the ROD/RMP via a directed mailing of the project newsletter. In total, approximately 1,700 parties were mailed notification of the ROD/RMP availability.

Six local libraries also were provided paper copies of the RMP/ROD. This availability was announced in the newsletter.

BLM_0007719

Table F-1
Persons and Agencies Sent Copies of the Record of Decision/Resource Management Plan

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Federal Agencies* | | | | | |
| 1. | Bureau of Land Management | Sering | John | Law Enforcement Ranger | Moab | UT |
| 2. | Department of Commerce | | | Reviewer of Other Agency Resource Plans | Washington | DC |
| 3. | Department of Energy | | | Reviewer of Other Agency Resource Plans | Washington | DC |
| 4. | Department of Transportation | Hausler | Terry | | Lakewood | CO |
| 5. | National Park Service | Bockus | Dangoule | Ecologist | Montrose | CO |
| 6. | National Park Service | Hoogland | Jake | | Washington | DC |
| 7. | National Park Service | Roehrs | Peter | Black Canyon District Ranger | Montrose | CO |
| 8. | National Park Service, Intermountain Support Office | Heywood | Jeff | | Denver | CO |
| 9. | U.S. Department of the Interior | | | Director, Bureau of Land Management (WO-210) | Washington | DC |
| 10. | U.S. Department of the Interior | | | Director, Office of Environmental Policy and Compliance | Washington | DC |
| 11. | U.S. Department of the Interior | | | Office of Environmental Policy and Compliance | Denver | CO |
| 12. | US Army Corps of Engineers | | | Reviewer of Other Agency Resource Plans | Sacramento | CA |
| 13. | US Bureau of Indian Affairs | Sutherland | Don | | Washington | DC |
| 14. | US Bureau of Land Management | MacDonald | Carol | | Washington | DC |
| 15. | US Bureau of Reclamation | Whittington | Brenda | | Washington | DC |
| 16. | US Environmental Protection Agency | Cody | Cynthia | | Denver | CO |
| 17. | US Fish and Wildlife Service | Peterson | Don | | Arlington | VA |
| 18. | US Geological Survey | Burton | Jim | | Reston | VA |
| 19. | US Geological Survey | Riley | Trish | | Reston | VA |
| 20. | USFWS | Young-Dubovsky | Connie | NEPA Coordinator, Region 6 | Denver | CO |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007720

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | ***State Agencies*** | | | | | |
| 21. | Colorado Department of Natural Resources | Coven | Dale | | Montrose | CO |
| 22. | Colorado Department of Natural Resources | Hebein | Sherman | | Montrose | CO |
| 23. | Colorado Department of Natural Resources | Homan | Doug | | Hotchkiss | CO |
| 24. | Colorado Department of Natural Resources | Jones | Paul | | Gunnison | CO |
| 25. | Colorado Department of Natural Resources | Kuharich | Rod | Director | Denver | CO |
| 26. | Colorado Natural Heritage Program | Lyon | Peggy | | Ridgway | CO |
| 27. | Colorado Department of Natural Resources, Division of Wildlife, Durango Service Center | Spezze; Jones | Tom; Paul | Regional Manager | Durango | CO |
| 28. | Western Area Power Administration, CRSP-MC Office | Collins | Shane | Ms. Mary Simbala | Salt Lake City | UT |
| 29. | Bureau of Land Management, Anasazi Heritage Center | Kendall | Steve | Canyons of the Ancients National Monument Planner | Dolores | CO |
| 30. | Bureau of Reclamation, Western Colorado Area Office | Schroeder | Alan | and Kathleen Ozga | Grand Junction | CO |
| | ***Local Agencies and Elected Officials*** | | | | | |
| 31. | C/o Senator Ben Nighthorse Campbell | Aggelar | Katie | | Durango | CO |
| 32. | City of Montrose | Jensen | Kerwin | | Montrose | CO |
| 33. | Colorado Counties, Inc. | | | Director | Aurora | CO |
| 34. | Colorado State Representative, District 58 | Rose | Ray | | Denver | CO |
| 35. | Colorado State Senator, District 5 | Entz | Lewis | | Denver | CO |
| 36. | Colorado State Senator, District 5 | Entz | Lewis | | Denver | CO |
| 37. | Colorado State Senator, District 6 | Isgar | Jim | | Denver | CO |
| 38. | Governor of Colorado | Owens | Bill | Governor of Colorado | Denver | CO |
| 39. | Montrose County | Hale | Betsy | Chair, District One Commissioner | Montrose | CO |
| 40. | Montrose County | Ubell | David | District Two Commissioner | Olathe | CO |
| 41. | Olathe Town Government | Larum | Chris | Council Member | Olathe | CO |
| 42. | Olathe Town Government | Novotny | George | Olathe Town Council Member Manager | Olathe | CO |

BLM_0007721

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Local Agencies and Elected Officials (continued)* | | | | | |
| 43. | Town of Olathe | Blair | Wayne | Mayor | Olathe | CO |
| 44. | Town of Olathe | Sale | Bill | Director of Operations | Olathe | CO |
| 45. | | Henry | Shane | Assistant Director for Energy, Land, and Forestry | Denver | CO |
| 46. | | McInnis | Scott | Attn: Kelly Watson | Grand Junction | CO |
| 47. | | Rossman | George | C/o Senator Ben Nighthorse Campbell | Grand Junction | CO |
| | *Colleges and Universities* | | | | | |
| 48. | Arizona State University | Knopf | Richard | | Phoenix | AZ |
| 49. | Colorado State University Cooperative Extension | LeValley | Robbie | | Hotchkiss | CO |
| 50. | Western State College | Young | Jessica | Associate Professor of Biology | Gunnison | CO |
| | *Organizations and Businesses* | | | | | |
| 51. | Adrift Adventures | Tierney | Pat | | Jensen | UT |
| 52. | Adventure Travel Business | Mallett | Jerry | | Salida | CO |
| 53. | ALS Inc. and Town of Olathe | Shriver | Al | | Olathe | CO |
| 54. | American White Water Association, River Runners for Wilderness | Johnson | Jo | | Boulder | CO |
| 55. | Arkansas River Tours/OLTS | Medrick and Bob Hamel | Rick | | Cotopaxi | CO |
| 56. | Bear Dance River Ranch | Wells | Thomas | | Montrose | CO |
| 57. | Black Canyon Anglers | Dudginski | Rick | | Austin | CO |
| 58. | Black Canyon Audobon Society | Day | Bill | | Hotchkiss | CO |
| 59. | Black Canyon Lease | Linman | William and Lila F. | | Crawford | CO |
| 60. | Black Canyon of the Gunnison National Park | Roberts | Dave | | Montrose | CO |
| 61. | Black Canyon Ranch Properties, LLC | Kugler | Bruce | | Denver | CO |
| 62. | Carnivore Restoration Program | Edward | Rob | Director | Boulder | CO |
| 63. | Center for Native Ecosystems | Smith | Jacob | Executive Director | Denver | CO |
| 64. | Center for Native Ecosystems | Smith | Jacob | Executive Director | Paonia | CO |

BLM_0007722

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Organizations and Businesses (continued)* | | | | | |
| 65. | Colorado Mountain Club | Schmaltz | Charlie | | Montrose | CO |
| 66. | Colorado Mountain Club | Smith | Vera | Conservation Director | Golden | CO |
| 67. | Colorado Mountain Club | White | Bob | | Montrose | CO |
| 68. | Colorado Off Highway Vehicle Coalition (COHVCO) | | | | Denver | CO |
| 69. | Colorado Off-Highway Vehicle Coalition | Wight | D. Andrew | Attorney for the Colorado Off-Highway Vehicle Coalition | Denver | CO |
| 70. | Colorado Plateau Mountain Bike Trail Association (COPMOBA) | Files | Ralph | | Montrose | CO |
| 71. | Colorado Plateau Mountain Bike Trail Association (COPMOBA) | Harris | Bill | | Grand Junction | CO |
| 72. | Colorado River Energy Distributors Association (CREDA) | James | Leslie | Executive Director | Tempe | AZ |
| 73. | Colorado River Water Conservation District | Kanzer, P.E. | David A. | Water Resources Engineer | Glenwood Springs | CO |
| 74. | Delta County Independent | Borchardt | Bob | | Delta | CO |
| 75. | Davis Service Center - Motorcycle Shop | Nance | Jamie | | Montrose | CO |
| 76. | Delta-Montrose Electric Association | Davenport | Kent | Engineering Manager | Montrose | CO |
| 77. | Denham Ranch | Denham | Larry | | Olathe | CO |
| 78. | Dragonfly Anglers | Cesario | Roger | | Crested Butte | CO |
| 79. | Dvorak Expeditions | Dvorak | Bill | | Nathrop | CO |
| 80. | Echo Canyon River Expeditions | Nienas | Andy | | Canyon City | CO |
| 81. | Forest Guardians | Oliva | Jon-Paul | Conservation Biologist | Santa Fe | CO |
| 82. | Friends of the Earth | Sykes | Kristen | Interior Department Watchdog | Washington | DC |
| 83. | G&C Agri. Services | Davis | Gary G. | | Montrose | CO |
| 84. | Grand Valley Anglers | Knackendoffel | Dick | | Grand Junction | CO |
| 85. | Grand Valley Anglers | Knapp | Cliff | President | Grand Junction | CO |
| 86. | Gunnison Basin Selenium Task Force | See | Randy | Coordinator | Montrose | CO |

BLM_0007723

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Organizations and Businesses (continued)* | | | | | |
| 87. | Gunnison River Expeditions | Hotze | Hank | | Montrose | CO |
| 88. | Gunnison River Pleasure Park | Jagodinski | Leroy and Carline | | Lazear | CO |
| 89. | Hargar Roofing | Hargar | Brian | | Montrose | CO |
| 90. | High Country Citizens Alliance | Shea | Sandy | | Crested Butte | CO |
| 91. | High Country Citizens' Alliance | McDermott | Wendy | Outreach Director | Crested Butte | CO |
| 92. | Hotchkiss National Fish Hatchery | | | Manager/Superintendent | Hotchkiss | CO |
| 93. | Hotchkiss Public Library | | | | Hotchkiss | CO |
| 94. | Hotchkiss Ranches | Farmer | Brian | | Hotchkiss | CO |
| 95. | International Facilitation Group, Inc. | Mautner | Bill | President | Newburg | OR |
| 96. | J & Ray Outfitters | Franks | Larry, Erin & Ronald | | Montrose | CO |
| 97. | Matt Owens Fly Company | Owens | Matt | | Cedaredge | CO |
| 98. | Montrose Daily Press | Smyth, Eric Drummond & Mary Ann Lopez | Russell | | Montrose | CO |
| 99. | Montrose Walkers | Schultz | Dick | | Montrose | CO |
| 100. | MotoX | Curtis | Dan & DJ | | Montrose | CO |
| 101. | National Trust for Historic Preservation | Smith | Michael | Public Lands Counsel | Washington | DC |
| 102. | National Wildlife Federation | Carlson | Cathy | and Marc Smith | Boulder | CO |
| 103. | North Fork River Improvement Association | Crane | Jeff | Director | Hotchkiss | CO |
| 104. | North Fork River Improvement Association (NFRIA) | Bounty | Shawn | | Paonia | CO |
| 105. | Peregrine River Outfitters | Klema | Tom | | Durango | CO |
| 106. | Private Boaters Coalition and Pikes Peak River Runners | King | Christina | | Woodland Park | CO |
| 107. | Ridgway Independent Guide Service LLC | Patterson & Bill Sheppard | Tim | | Ridgway | CO |
| 108. | River Rats | Harris & Mike Haas | Bob | | Snowmass | CO |
| 109. | Rock Rods 4-WD Club | McPherson | Trevor | | Montrose | CO |
| 110. | Rock'n Wheelers | Hatton | Mark | | Delta | CO |
| 111. | Sanburg Herefords, LLP | Sanburg | Kurt & Elloise | | Montrose | CO |
| 112. | Scenic Mesa Ranch | Miller | Terry | | Hotchkiss | CO |

BLM_0007724

Table F-1
Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Organizations and Businesses (continued)* | | | | | |
| 113. | Scenic Mesa Ranch, LLC | Littlefield | Julia | | Hotchkiss | CO |
| 114. | Sierra Club | Robison | Deb | and Melinda Pierce | Boulder | CO |
| 115. | Telluride Co | Bush | Mark | | Telluride | CO |
| 116. | Telluride Real Estate Corporation | Hilbert | Steve | Managing Director | Telluride | CO |
| 117. | The Nature Conservancy | Gann | David | | Montrose | CO |
| 118. | The Wilderness Society | Harmon | Tara | Public Lands Assistant | Denver | CO |
| 119. | The Wilderness Society | Hunt | Fran | Elano Richmond, Wendy Vanasselt | Washington | DC |
| 120. | The Wilderness Society | Jones | Suzanne | Assistant Regional Director | Denver | CO |
| 121. | To-Hell-U-Riders Cycles and Sleds, LLC | Schaeffer | Susan | and Paul Russell | Telluride | CO |
| 122. | Tri-State Generation & Transmission Association, Inc. | Murray | Mark | Permitting and Land Rights Manager | Denver | CO |
| 123. | Trout Unlimited | Evans | Joel | | Montrose | CO |
| 124. | Trout Unlimited | Oglesby | Pat & Carol | | Grand Junction | CO |
| 125. | Trout Unlimited | Trammell | John | | Grand Junction | CO |
| 126. | Trout Unlimited | Walker | Chuck | | Grand Junction | CO |
| 127. | Uncompahgre Valley Association (WCC) | Hahn J & Christine L Jarus | Jeffery P | | OLATHE | CO |
| 128. | Uncompahgre Valley Trail Riders | Johnson | Roy | | Montrose | CO |
| 129. | Uncompahgre Valley Trail Riders | Morris | Robert & Claudia | | Montrose | CO |
| 130. | Uncompahgre Valley Water Users Association | Catlin | Marc | Manager | Montrose | CO |
| 131. | US Public Interest Research Group | Sittenfeld | Tiernan | Conservation Advocate | Washington | DC |
| 132. | UVA | Jentsch | Robert and Shirley | | Montrose | CO |
| 133. | Western Colorado Congress | Baker | Susan | Director | Montrose | CO |
| 134. | Western Colorado Congress | Ballantyne | Marv | | Montrose | CO |
| 135. | Western Colorado Congress | Patterson | Bill | | Montrose | CO |
| 136. | Western Colorado Congress | Sura | Matt | Public Lands Organizer | Grand Junction | CO |
| 137. | Western Colorado Congress | Welch | Margie | | Montrose | CO |

BLM_0007725

Table F-1
Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan *(continued)*

| Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|
| *Organizations and Businesses (continued)* | | | | | |
| 138.  Western Slope 4 Wheelers | Faison | Scott | Secretary & Newsletter Editor | Montrose | CO |
| 139.  Western Slope Environmental Resource Council | Puckett | Jeremy | Assistant Director | Paonia | CO |
| 140.  Western Slope Environmental Resource Council | Robinsong | Andrea | | Hotchkiss | CO |
| 141.  Wilderness Aware Rafting | Griener | Joe | | Buena Vista | CO |
| 142.  Wildlife Management Institute | Carpenter | Len | | Ft. Collins | CO |
| *Individuals* | | | | | |
| 143. | | Teri | | Montrose | CO |
| 144. | Allard | Wayne | Attn: Derek Wagner | Grand Junction | CO |
| 145. | Allen | Larry | | Hotchkiss | CO |
| 146. | Allen | Paul | | Hotchkiss | CO |
| 147. | Allen | Ross | | Hotchkiss | CO |
| 148. | Anderson | Bryan | | Eckert | CO |
| 149. | Anderson | Chris & Jordan | | Montrose | CO |
| 150. | Anderson | Kevin | | Montrose | CO |
| 151. | Austin | Casey | | Montrose | CO |
| 152. | Ayer | James and Justin | | Crawford | CO |
| 153. | Baldus | John | | Montrose | CO |
| 154. | Bellgardt | Allen | | Montrose | CO |
| 155. | Bennett | Scott | | Telluride | CO |
| 156. | Bol | Alan | | | |
| 157. | Boyle | Steve | | Montrose | CO |
| 158. | Brunton | Rick | | Montrose | CO |
| 159. | Brush | Carole | | Boulder | CO |
| 160. | Buchheim | Ernie | | Cedaredge | CO |
| 161. | Buhler | Tim | | Golden | CO |
| 162. | Bush | Terry | | Montrose | CO |

BLM_0007726

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Individuals (continued)* | | | | | |
| 163. | | Campbell | Ben Nighthorse | | Washington | DC |
| 164. | | Campbell | Bob | | Glenwood Springs | CO |
| 165. | | Campbell | Craig and Brad | | Montrose | CO |
| 166. | | Chandler-Reed | Susan | | Montrose | CO |
| 167. | | Chase | Myron | | Montrose | CO |
| 168. | | Christensen | Steve | | Price | UT |
| 169. | | Clark | Jim | | Montrose | CO |
| 170. | | Clark III | Ralph E. | | Gunnison | CO |
| 171. | | Collins | Justin | | Montrose | CO |
| 172. | | Colvin | Ted | | | |
| 173. | | Connelly | Brett | | Montrose | CO |
| 174. | | Cook | Lillian | | Montrose | CO |
| 175. | | Coolidge | Joanna | | | |
| 176. | | Costoyo | Mindy | | Gunnison | CO |
| 177. | | Cotten | Larry L. | Ms. Faye Robinson | Monte Vista | CO |
| 178. | | Cotten | Shirley and Orval | | Crawford | CO |
| 179. | | Cottone | Glenn | | Breckenridge | CO |
| 180. | | Cussins | Michael | | Lakewood | CO |
| 181. | | Darlington | Darryll | | Dolores | CO |
| 182. | | Day | Cheryl | | Hotchkiss | CO |
| 183. | | Deines | Rob | | Montrose | CO |
| 184. | | DeShazer | Vincent C | | Westminster | CO |
| 185. | | Dickerson | Jon & Emarae Garcia | | Montrose | CO |
| 186. | | Discoe | Jimmy and Shonnie | | Ridgway | CO |
| 187. | | Dodge | Bob | | Olathe | CO |
| 188. | | Dourlet | John | | Telluride | CO |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007727

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Individuals (continued)* | | | | | |
| 189. | | Durall | Jeannie & Adrian Appelhans | | Montrose | CO |
| 190. | | Edwards | Skip | | Crawford | CO |
| 191. | | Etchart | Ernie | | Montrose | CO |
| 192. | | Fakiri | Sue | | Montrose | CO |
| 193. | | Felix | Deven | | Montrose | CO |
| 194. | | Foltz | Tim | | Delta | CO |
| 195. | | Furimsky | Ben | | Crested Butte | CO |
| 196. | | Gallegos | Dave | | Montrose | CO |
| 197. | | Gates | Bo | | Montrose | CO |
| 198. | | Goffin | Gene | | Crawford | CO |
| 199. | | Green | Robert | | Ridgway | CO |
| 200. | | Gumpper | Andy | | | |
| 201. | | Hamilton | Joey | | Montrose | CO |
| 202. | | Harding | Richard | | Olathe | CO |
| 203. | | Harper | Paula | | Hotchkiss | CO |
| 204. | | Hasto | Craig | | Montrose | CO |
| 205. | | Hawkins | Bud, Cindy & Clarance Jr. | | Delta | CO |
| 206. | | Hawks | John | | Olathe | CO |
| 207. | | Hawks | Randy | | Olathe | CO |
| 208. | | Heneghan | Jim and Adele | | Olathe | CO |
| 209. | | Henry | Gig, Annette, and Max | | Ridgway | CO |
| 210. | | Hibbard | Heath, Cristal, and Sue | | Montrose | CO |
| 211. | | Hines | Todd & Cynthia | | Olathe | CO |
| 212. | | Horgan | Chris | | Livingston | TX |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007728

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|
| ***Individuals*** *(continued)* | | | | | |
| 213. | Jackson | Elliot | | Paonia | CO |
| 214. | Jensen | Elaine & Jon & Tyler | | Montrose | CO |
| 215. | Johnson | Chelsey | | Ridgway | CO |
| 216. | Johnson | Phil | | Paonia | CO |
| 217. | Johnson | Tom | | Ridgway | CO |
| 218. | Johnston | Scott | | Montrose | CO |
| 219. | Joss | Bruce | | | |
| 220. | Jury | Darrel | | Gunnison | CO |
| 221. | Kauffman | Barbara | | Mt. Crested Butte | CO |
| 222. | Kenneth | Scott | | Ridgway | CO |
| 223. | Kinser | Jack and Mildred | | Crawford | CO |
| 224. | Kintz | Dan | | | |
| 225. | Klaseen | Charles | | Crawford | CO |
| 226. | Krch | Eric | | Montrose | CO |
| 227. | Lannan | John and Kelly | | Ridgway | CO |
| 228. | Laursen | David K. | | Montrose | CO |
| 229. | Leach | Tom | | Hotchkiss | CO |
| 230. | Leonard | Ralph E. | | Montrose | CO |
| 231. | Leonard | Randy | | Montrose | CO |
| 232. | Loesch and Scott Hawkins | Sara | | Montrose | CO |
| 233. | MacNulty | Joy | | Paonia | CO |
| 234. | Mader | Thomas | | Anchorage | AK |
| 235. | Maness | Peter | | Montrose | CO |
| 236. | Marchbanks | Tim | | Montrose | CO |
| 237. | Marshall | Fred H | | Montrose | CO |
| 238. | Maskie | John | | Montrose | CO |

BLM_0007729

## Table F-1
## Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Individuals (continued)* | | | | | |
| 239. | | Maurus | John K. | | Winnetka | IL |
| 240. | | McGowan | Jeff | | Montrose | CO |
| 241. | | McInnis | Scott | | Washington | DC |
| 242. | | McKinnon | Rodney | | Montrose | CO |
| 243. | | McLeod | Tom | | Delta | CO |
| 244. | | McPeak | Mike | | Montrose | CO |
| 245. | | Meeks | Mary | | Bailey | CO |
| 246. | | Miller | Gary | | Colorado Springs | CO |
| 247. | | Miller | Steve | | Santa Fe | NM |
| 248. | | Moore | Claire | | Paonia | CO |
| 249. | | Moore | John | | Crawford | CO |
| 250. | | Morrison | Robyn | | Paonia | CO |
| 251. | | Mortimer | Chris | | Ridgway | CO |
| 252. | | Nash | Rod | | Crested Butte | CO |
| 253. | | Nichols | Shawn | | Montrose | CO |
| 254. | | Nicholson | Bob | | Montrose | CO |
| 255. | | Nicolas | August G. & Sherry Lynn | Claudette Nicolas | Montrose | CO |
| 256. | | Nicolas | Paul & Shane | | Montrose | CO |
| 257. | | Noble | Homer | | Denver | CO |
| 258. | | Nordlund | James M. | | Stockton | KS |
| 259. | | Norton | Patrick | | Montrose | CO |
| 260. | | Paigen | Mark | | Paonia | CO |
| 261. | | Patterson | Steve | | Telluride | CO |
| 262. | | Patterson III | James | | Hotchkiss | CO |
| 263. | | Perpar | John | | Montrose | CO |
| 264. | | Phillips | Jeff | | Montrose | CO |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

November 2004

BLM_0007730

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Individuals (continued)* | | | | | |
| 265. | | Pipher | Luce | | Crawford | CO |
| 266. | | Pipkin | Marilyn and Dave | | Cedaridge | CO |
| 267. | | Pipkin | Patricia | | | |
| 268. | | Polson | Duane E. and Patricia | | Crawford | CO |
| 269. | | Potter | Maurice | | Montrose | CO |
| 270. | | Rajca | Jack | | Ridgway | CO |
| 271. | | Rattan | Lanham | | Montrose | CO |
| 272. | | Ray | Joan | | Boulder | CO |
| 273. | | Rhoten | Troy & Bryan & Eric & Troy | | Montrose | CO |
| 274. | | Rives | Jenny and David | | | |
| 275. | | Robey | Tom | | Santa Fe | NM |
| 276. | | Rodenburg | Mark | | Denver | CO |
| 277. | | Rotherham | Will | | Montrose | CO |
| 278. | | Sanderson | Patrick | | Albuqueque | NM |
| 279. | | Sanderson | Steven | | Albuquerque | NM |
| 280. | | Scheid | Heide & Scott & Nancy | | Montrose | CO |
| 281. | | Scherben | Joseph IV | | Montrose | CO |
| 282. | | Scherben | Kalena & Joseph & Andrea | | Montrose | CO |
| 283. | | Schiele | Adrienne | | | |
| 284. | | Schlosser | Mark | | Montrose | CO |
| 285. | | Schmitt | Ed | | Colorado Springs | CO |
| 286. | | Sexton | Rick | | Granite | CO |
| 287. | | Sherratt | Heidi | | Crested Butte | CO |
| 288. | | Simpson | Robert | | Montrose | CO |
| 289. | | Souther | Sarah | | | |

BLM_0007731

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| | Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|---|
| | *Individuals (continued)* | | | | | |
| 290. | | Spaulding | Kim and Jake | | Telluride | CO |
| 291. | | Spruill | John | | Montrose | CO |
| 292. | | Staehle | Alan | | Ouray | CO |
| 293. | | Starr | Frank | | Ridgway | CO |
| 294. | | Stith | Greg | | Montrose | CO |
| 295. | | Strickland | Rob | Guide | Gunnison | CO |
| 296. | | Summers | Steven | | Montrose | CO |
| 297. | | Sutton II | William W. | | Delta | CO |
| 298. | | Swancara | Frank & Barb | | Montrose | CO |
| 299. | | Taylor | Shane | | Montrose | CO |
| 300. | | Terry | Noalani | | Montrose | CO |
| 301. | | Tickner | Paul | | Montrose | CO |
| 302. | | Ulrich | Kurt | | Crawford | CO |
| 303. | | Valentine | Sue | | Cedaredge | CO |
| 304. | | Walker | Mitch and Kathy | | Montrose | CO |
| 305. | | Waller | Clyde | | Montrose | CO |
| 306. | | Walsh | Pete | | Grand Junction | CO |
| 307. | | Walton | Ron | | Montrose | CO |
| 308. | | Warren | Breton & Ivan & Robin | | Montrose | CO |
| 309. | | Webb | Basil | | | |
| 310. | | Welby | Daniel | | Montrose | CO |
| 311. | | White | Jake & Josh | | Montrose | CO |
| 312. | | Wilkes | Debra | | Montrose | CO |
| 313. | | Wilkes | Jesse | | Montrose | CO |
| 314. | | Wilkes | Robert | | Montrose | CO |
| 315. | | Williams | Joe and Ruby | | Montrose | CO |

BLM_0007732

**Table F-1**
**Persons and Agencies Sent Copies of the Record of Decision/Approved Resource Management Plan** *(continued)*

| Affiliation | Last Name | First Name(s) | Title | City | State |
|---|---|---|---|---|---|
| *Individuals (continued)* | | | | | |
| 316. | Wise | Thomas & Connie | | Montrose | CO |
| 317. | Wooddell | Larry | | Telluride | CO |
| 318. | Yanda | James | | | |
| 319. | Young | John | | Paonia | CO |
| 320. | Zaffos | Joshua | | Paonia | CO |
| 321. | Zeman | Howard & Mari | | Montrose | CO |

BLM_0007733

*This page intentionally left blank.*

BLM_0007734

# APPENDIX G
# GUNNISON SAGE-GROUSE CONSERVATION PLAN, CRAWFORD AREA, COLORADO – GOALS, OBJECTIVES, AND MANAGEMENT MEASURES

As part of the RMP, and as stated in Chapter 2, management goals and objectives that will be adopted from the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado include:  maintain or increase sage-grouse numbers and distribution in the Crawford area while maintaining current uses and a healthy landscape; maintain and/or improve the quality of sage-grouse habitat; reduce fragmentation by preventing, minimizing, and mitigating past, present, and future loss of sage-grouse habitat; and identify and manage physical disturbances to reduce adverse effects on sage-grouse (Crawford Sage-Grouse Partnership 1998). In addition, specific management actions outlined in the Gunnison Sage-Grouse Conservation Plan are adopted as part of this RMP.

Below is a reproduction of the management goals, objectives and specific management measures described in the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado.

BLM_0007735

*This page intentionally left blank.*

BLM_0007736

# GUNNISON SAGE GROUSE

# CONSERVATION PLAN

# CRAWFORD AREA - COLORADO



**July 22, 1998**

BLM_0007737

stalus is exlensive.

## V.   CONSERVATION STRATEGY

### A.   CRAWFORD AREA GOALS AND OBJECTIVES

To more clearly guide management efforts of the Partnership in securing the long term status of the Gunnison sage grouse, and meeting the needs of the other resources and involved groups and individuals, the following goals and objectives were developed.

**Overall Goal:**  Maintain or increase sage grouse numbers and distribution in the Crawford area while maintaining current uses and a healthy landscape.

**Sage Grouse Population Goal:**  Maintain a sage grouse population size in the Crawford area that is in balance with the carrying capacity of the habitat, striving for a desired minimum of 225 birds and an optimum of at least 480 birds; increase the minimum number of birds over time to at least 225 ± in 2001 (3 years), 350 ± in 2005 (7 years), and 480 ± total birds in 2010 (12 years).

Page 6

BLM_0007738

The present (1996-97) size of the breeding population of Gunnison sage grouse in the Crawford area is between 129 and 228 birds based on 41-45 males counted on 3 active leks. Thus, the minimum goal desired, 225 birds, may be higher than the present estimated population.

To obtain the minimum spring population goal of 225 birds, it would be necessary to have at least 4 active leks with an average of 14 males/lek (present numbers) for a total male population of 56 that is counted (4 x 14). If this number represents 75% of the cocks in the population and all active lek areas are known and counted, the male population should be 75 (56 ÷ 0.75) with 150 hens for a total population of 225 sage grouse (75 males + 150 hens). An optimal population would translate to 160 males (120 ÷ 75%) and 320 hens for a spring population size of about 480 sage grouse. With proper habitat management, this goal should be achievable. Three-year averages of counts of males on leks will be used to assess population trend (1994-95-96, 1995-96-97, 1996-97-98, etc.). Further, as new information is obtained, changes in these goals may be necessary.

**Sage Grouse Habitat Goal:**   Maintain on suitable sites across the Crawford landscape relative large, contiguous stands of sagebrush with a variety of vegetative conditions interspersed throughout, in the desired arrangement with good connectivity to provide the quantity and quality of sage grouse habitat to support at least the desired optimum population level by 2010.

Populations are basically products of the environment, or habitat in which they are found. Thus, habitat quality is an indicator of how well habitat meets the needs of sage grouse. Also, the health of the natural system in which populations exist, and its ability to function in a dynamic manner through time largely determines its capability for long-term sustainability. Time, space, a focus on the natural processes and their ability to function, and the relationship with surrounding communities are of primary importance and concern in achieving the habitat goal of this plan.

## B.   GENERAL CONSERVATION OBJECTIVES

Using these goals as a target, the Crawford Partnership identified three dominant themes or categories; habitat quality, habitat loss/fragmentation, and physical disturbance to the population, for which general conservation objectives were developed. Specific objectives were developed for habitat quality. These objectives were developed largely based on the issues and/or factors identified as in some way contributing to the static or declining population size of sage grouse or affecting the quantity or quality of sage grouse habitat in the Crawford area.

The purpose of these objectives is to guide the selection of conservation actions. These objectives are also useful to explain the overall thrust of the conservation strategy. These objectives are:

**Habitat Quality:**  Maintain and/or improve the quality of sage grouse habitat,

**Description:**  Habitat quality is an indication of how well habitat meets the needs of sage grouse. Habitat in poor condition is of lower quality than habitat which is in good condition because higher quality habitat provides more of the essential components such as food, water, cover, etc. Generally, the group of factors that affect habitat quality and/or fragmentation (discussed in the following section) are considered to be the most important to sage grouse recovery.

## Specific Objectives: (Habitat Vegetation)

Leks:

      **Habitat Function:** Used for display and mating, require good acoustics and visibility for display activity, and for predator detection.
      **Location:**      Within at least 300 yards to 1/2 mile of nesting habitat. Within 200 yards of escape

BLM_0007739

cover (large expanses of sagebrush). Typically in broad valleys or benches, broad ridges or mesas. At least 200 yards from trees or other potential raptor perches.

| | |
|---|---|
| Size: | 1-5 acres. |
| Shape: | Irregular, but usually circular or short and linear. |
| Time of use: | Mid March to early June. |
| Composition: | Perennial grass cover > 20%. |
| | Total sage cover < 10%. |
| | Total forb cover > 10%. |
| Structure: | No trees or deciduous shrubs > 3 feet tall. |
| | Grass and forb height 5-10 inches. |
| | Sage up to 15 inches. |

## Near Lek Areas:

**Habitat Function:** Provides escape cover for displaying males, visiting females, resting birds.

| | |
|---|---|
| Location: | Within 200 yards of lek. |
| Size: | > 1 acre up to 40-60 acres. |
| Shape: | Irregular, if linear, then > 200 yards in width, if patches, then > 200 yards in diameter. |
| Composition: | Perennial grass cover > 20%. |
| | Total shrub cover (sage + mountain shrubs) 20-30%. |
| | Total forb cover > 10%. |
| Structure: | Sagebrush and other shrubs > 15 inches tall. |
| | No potential raptor perches. |

## Nesting/Early Brood Rearing Areas:

**Habitat Function:** Provides good hiding and nesting cover and high levels of insects and succulent forbs to meet brood rearing nutritional requirements.

| | |
|---|---|
| Location: | Within 3 miles of a lek. |
| Size: | Overall nesting area > 10 acres made up of 1/4-1 acre patches of sage ranging from dense to sparse. |
| Shape: | Need high level of interspersion within heavier sagebrush areas. |
| Time of use: | April through July. |
| Composition: | Patchy: **foraging areas:** |
| | Total sage cover < 20%. |
| | Total forb cover > 15%. |
| | Total grass cover > 25%. |
| | **hiding areas:** |
| | Total sage cover > 25%. |
| | Total forb cover > 10% |
| | Total grass cover > 20%. |
| Structure: | Sagebrush > 18 inches tall. |
| | Abundant standing herbaceous material. |
| | Herbaceous average height > 8 inches. |

## Late Brood Rearing Areas:

**Habitat Function:** Provides moisture and high levels of succulent forbs and insects, hiding cover. Typically edges of hay meadows, riparian areas, ponds, seeps, drainage bottoms.

| | |
|---|---|
| Location: | Near stands of live sagebrush or other deciduous shrubs close enough for escape. Less than 1/2 mile from early brood rearing areas, often north slopes. |
| Size: | > 100 yards, usually around 200 yards wide. |
| Shape: | Irregular, frequently linear, high interspersion of stand and cover types. |
| Composition: | Sagebrush < 20%. |

Page 8

BLM_0007740

> Total shrub cover < 25%.
> Perennial Grass cover > 25%.
> Perennial forb cover > 15%.

**Structure:** herbaceous vegetation >10 inches tall.

**Fall and Winter Habitat:**

**Habitat Function:** Provides thermal and hiding cover, abundant supply of taller sagebrush (15-25 inches).

**Location:** Usually broad basins, ridges, and north to northwest facing slopes.

**Size:** Extensive stands of sage, usually in patches larger than 100-2200 acres.

**Shape:** Interspersion of shorter stands of sage (ridges) with taller stands (swales, valley bottoms).

**Composition:** Total sage cover > 20% (25-30% preferable).
Total Forb Cover > 10%.
Perennial grass cover > 15%.

**Structure:** Tall sage 15-25 inches.
Shorter sage > 10 inches.

**Habitat loss/fragmentation:** Reduce fragmentation by preventing, minimizing, and mitigating past, present and future loss of sage grouse habitat,

**Description:** Loss of sage grouse habitat refers to areas that once provided habitat, but no longer does because that habitat no longer exists or is not available. It should be thought of as a permanent loss in the area. Another example of habitat loss occurs when a subdivision occupies an area that once was a sagebrush community.

Fragmentation refers to the distribution or location of habitat in terms of its physical position or connectiveness.

**Physical disturbance to the population:** Identify and manage physical disturbances to reduce adverse effects to sage grouse.

**Description:** This refers to the physical disturbance to sage grouse, the birds themselves. Physical disturbance can result in sage grouse death or exert stress particularly if disturbance occurs during biologically critical periods or times. Narratives of these issues can be found in Appendix A. (Issue Descriptions)

## VI.   CONSERVATION ACTIONS AND IMPLEMENTATION

The backbone of the Crawford sage grouse Conservation Plan is its goals and objectives which together establish a framework for developing conservation actions.  Conservation Actions are designed to be consistent with the plan's goals and also to meet one or more of the objectives.  These actions also address issues that affect sage grouse, and/or their habitat.  Due to the interrelationship of the habitat components, resource values, and issues, many actions may apply to more than one objective.  However, to avoid duplication, these actions have been listed in table 2 (page 12) where the link is most direct.  Any additional actions identified at a later date will be analyzed by the Partnership for the application and design to ensure the appropriateness and compliance with the goals and objectives set forth in this plan.

Plan implementation will be priority-based starting with those actions the Partnership believes to be most effective at accomplishing their goals.  This group recognizes the need to be opportunistic in carrying out specific conservation actions as situations present themselves.  For example, a particular conservation action might be implemented sooner than scheduled, if funding became available, or a group or individual came forward to help with completing a task.

Some actions have already begun, or are ongoing.  Other actions would need to be done continually throughout the plan.  These are normally a matter of policy or require small changes in the way resources are managed and land use activities take place.  Sometimes a land use has to be proposed or initiated by a third party before the conservation action can be applied.

The adoption of these Conservation Actions will be the responsibility of the Partnership.  Specific steps or tasks needed to carry out a conservation action will be developed as the implementation proceeds.   Cost estimates, including those for monitoring and evaluation will be identified.  Every effort to leverage money and resources will be made.  Many actions, such as vegetation treatments are costly, and will be dependent upon seeking cooperative funding from many partners, and possibly outside sources, such as grants.

Because plan accomplishment will require a lengthy period to complete, it is important to track progress at meeting our goals.  At least yearly, the Crawford Partnership will convene a meeting to examine accomplishments and keep the plan on track.  As actions are completed they will  become part of the yearly

BLM_0007742

progress report. Signatory parties to this Plan will provide reports of their accomplishments to BLM by January 15 of each year for inclusion in the Partnership's annual progress report. A consolidated report will then be prepared and disseminated to Partnership members prior to the yearly or spring planning meeting. The public will be invited to attend the annual meeting and copies of the progress report made available to those interested.

An important part of the yearly progress report and meeting will be to discuss and document any exceptions or deviations to planned accomplishments. Inadequate funding may preclude the completion of an action in a given period. In this instance, an adjustment to the implementation sequence would be needed. What is important is to show continual progress at accomplishing the goals in the plan.

Based on the data available the BLM and CDOW will schedule a public meeting each year, or as needed, to discuss progress and future planning, and to disseminate results of the previous year's efforts or to adjust the Conservation Plan as needed.

## VII.   MONITORING AND EVALUATION

Monitoring data will be gathered and used to evaluate progress in meeting the goal and objectives of this plan. Monitoring will be coordinated to insure that data collected will provide the needed information to assess the on-the-ground management actions and to measure progress in resolving resource problems and conflicts. This coordination will include appropriate consultation and cooperation with rangeland users, general public, landowners, academia, private organizations and local, State, and Federal agencies. Direct involvement by interested parties in the collection of data and in the subsequent evaluations based on these data will add to the credibility of monitoring results.

It is important that all monitoring information be easily accessed by those interested. Monitoring the response of the Gunnison sage grouse population to conservation actions will be measured by total number of active leks, and the total number of males counted. The number of active leks and total males will reflect winter survival as well as chick production in the previous year. Changes in habitat quality which result from the implementation of planned actions will be monitored using techniques applicable to the specific project or action. Three year averages of lek counts will be used to assess sage grouse population trend (1994,95,96; 1995,96, 97; 1996,97,98, etc.).

Evaluations may be conducted anytime during the implementation of this plan. The goal of evaluation is to determine whether progress is occurring, and if progress is not occurring, to identify adjustments.

It is the intent of the Partnership to frequently communicate with other Gunnison Sage Grouse Work Groups to seek and exchange information as progress is made on implementing the Conservation Actions. Also, participation by private landowners in this Conservation Plan will be strictly on a volunteer basis.

BLM_0007743

**Table 1.  Crawford area Gunnison sage grouse Conservation Actions (listed in no particular order & with examples of how to accomplish), and Implementation Schedule (when & who).**

| CONSERVATION ACTIONS | | IMPLEMENTATION SCHEDULE | |
|---|---|---|---|
| **Action** | **Examples of How to Accomplish** | **When** | **Who** |
| **A.  Information & Education** | | | |
| 1. Provide to the public, landowners, and others information that describes sage grouse habitat needs and conditions, and identifies sage grouse population levels. Identify concerns and opportunities to improve conditions for sage grouse in this area. | a. Maps, newspaper articles, radio & TV spots, displays, etc.<br>b. Public contacts (e.g., individuals, County Commissioners, local schools, Tri-River Conservency ), meetings, field trips, & make available copies of Conservation Plan.<br>**c. Videos (sage grouse & habitat, treatments, etc.) in Coop with other sage grouse groups.**<br>d. Brochures (e.g., Living with sage grouse in your backyard - control of dogs, etc.).<br>e. Coordination/communications with; the public, other sage grouse groups, HPP, Black Canyon Audubon, etc.<br>f. Information sign at Black Canyon Road and C77 Road. | a. Ongoing opportunistically.<br>b. Ongoing opportunistically.<br><br>**c. 1998-99 (completed).**<br><br>d. As planned and when funding is available .<br>e. Ongoing opportunistically.<br><br>f. 1999-2000. | a. The Partnership.<br>b. The Partnership.<br><br>c. DOW Lead, BLM, NRCS, Public.<br>d. The Partnership.<br><br>e. The Partnership.<br><br>f. BLM/DOW/NRCS. |
| 2. Work with interested parties, landowners and others to create a better understanding of sage grouse needs, including the value and importance of sage grouse and sage grouse habitat, and provide a basis for sharing of ideas and reaching agreement on ways to improve sage grouse habitat and increase populations. | a. Meetings with interested landowners, government/regulatory entities (e.g., Counties, and livestock Associations).<br>b. Maintain a current mailing list of interested citizens, and State, Local, and Federal Agencies.<br>c. Develop management plans, cooperative agreements, etc.<br>d. Distribute information about importance of sage grouse; availability of incentive programs, Best Management Practices, effects of certain land uses on grouse.<br>e. Coord. Management of sage grouse with other wildlife species and resource agencies.<br>f. Continue to work with other groups, e.g., Habitat Partnership Program.<br>g. Communicate with other sage grouse groups.<br>h. provide monitoring information and training to landowners.<br>i. Present programs at local schools. | a. Ongoing opportunistically.<br><br>b. Ongoing.<br><br>c. Ongoing opportunistically.<br>d. Ongoing opportunistically .<br><br><br>e. Ongoing opportunistically .<br><br>f. Ongoing opportunistically .<br><br>g. Ongoing, annually.<br>h. Ongoing opportunistically.<br>i. Ongoing opportunistically. | a. The Partnership.<br><br>b. The Partnership.<br><br>c. The Partnership.<br>d. DOW, BLM, NRCS, FWS, landowners.<br><br>e. The Partnership.<br><br>f. The Partnership.<br><br>g. The Partnership.<br>h. The Partnership.<br>i. The Partnership. |

BLM_0007744

| CONSERVATION ACTIONS | | IMPLEMENTATION SCHEDULE | |
|---|---|---|---|
| Action | Examples of How to Accomplish | When | Who |
| **B. Monitoring** | | | |
| 1. Identify and evaluate sage grouse habitat, limiting factors and activities that have the potential to impact sage grouse or their habitat.  Identify and evaluate critical sage grouse habitats. | a. Habitat mapping and condition monitoring.<br>b. Assess and track land-use changes, e.g., developments, roads, etc.<br>c. On-site visits with landowners, Holistic Resource Mgmt. groups, Livestock and Wool growers groups to discuss and assess habitat conditions and monitoring needs.<br>d. Joint-interagency/landowner evaluation, information sharing.<br>e. Provide monitoring training to landowners.<br>f. Big game impact data. | a. Ongoing, annually.<br>b. Update 3-5 years.<br>c. As needed/requested/ opportunistically.<br>d. As needed/requested/ opportunistically.<br>e. As needed/requested/ opportunistically.<br>f. Ongoing, annually. | a. BLM, DOW, NRCS, landowners, Extension.<br>b. BLM, DOW, NRCS, FWS, County.<br>c. The Partnership.<br><br>d. The Partnership.<br>e. BLM, DOW, NRCS, Extension.<br>f. DOW, BLM. |
| 2. Continue to gather or initiate the collection of basic resource data to better understand and document conditions for sage grouse, including response to applied conservation measures. | a. Sage grouse population monitoring/census, e.g. lek counts.<br>b. Design and carry out monitoring for applied measures, e.g., treatments.<br>c. Continue to identify changes in the sage grouse populations size (use 3 yr. average of lek counts). | a. Annually, March-May.<br>b. Annually, as needed.<br>c. Annually. | a. DOW, others, Black Canyon Audubon.<br>b. BLM, NRCS, Extension, landowners.<br>c. DOW. |
| **C.  Avoiding or mitigating permanent loss of habitat** | | | |
| 1. Develop and encourage incentives for landowners to avoid or mitigate loss of sage grouse habitat. | a. Land exchanges.<br>b. Conservation Easements with 3-Rivers Trust, Valley Land Conservancy, CCA, RMEF, etc.<br>c. Transferrable development rights.<br>d. Payment for non use of sage grouse habitat.<br>e. Application of specific land use practices that benefit grouse, e.g., water development, grazing plans.<br>f. Develop recommendations for managing sagebrush community as a whole, considering all uses. | a. Ongoing opportunistically.<br>b. Ongoing opportunistically.<br>c. Ongoing opportunistically .<br>d. Ongoing opportunistically .<br>e. Ongoing opportunistically .<br>f. Ongoing opportunistically . | a. BLM/Private landowners.<br>b. Private landowners.<br>c. The Partnership, Counties, landowners, developers.<br>d. DOW, NRCS (WIP, EQUIP), FWS.<br>e. DOW, HPP, BLM, NRCS, Pvt., Extension.<br>f. DOW, HPP, BLM, NRCS, Pvt., FWS, Extension. |

Page 13

BLM_0007745

| CONSERVATION ACTIONS | | IMPLEMENTATION SCHEDULE | |
|---|---|---|---|
| **Action** | **Examples of How to Accomplish** | **When** | **Who** |
| 2. Enhance existing and restore former sage grouse habitat to offset loss of habitat elsewhere. | a. Vegetation treatments, e.g., brush beat, burn, reclaim. seed.<br><br>b. Mitigating effects of human population growth and development. | a. Ongoing opportunistically .<br><br>b. Ongoing opportunistically . | a. BLM, DOW, NRCS, Extension, landowners.<br>b. The Partnership, County Planners. |
| 3. Prevent loss and fragmentation of habitat from construction of roads, utilities. | a. Relocate or modify new utility lines, roads, developments, etc. in key grouse habitat. | a. Ongoing opportunistically. | a. BLM, DOW, FWS, Counties, landowners. |
| **D.  Restoring or improving quality of grouse habitat and populations** | | | |
| 1. Enhance existing riparian areas, or create or enhance small wet areas to benefit sage grouse nesting and brood rearing habitat. | a. Design and implement livestock grazing management practices to benefit riparian areas.<br><br>b. Modify or adapt pipelines/springs to create small wet areas.<br><br><br>c. Enhance and protect existing natural wet areas. | a. Ongoing opportunistically .<br><br>b. Ongoing opportunistically .<br><br><br>c. Ongoing opportunistically. | a. BLM on Public lands, NRCS assist landowners on private lands.<br>b. BLM on Public lands, NRCS assist landowners on private lands.<br>c. BLM, FWS, landowners. |
| 2. Eliminate or modify situations that cause predation. | a. Modify power lines and wood fence posts (to remove raptor perches) in critical sage grouse areas.<br>b. Cut pinyon-juniper trees near leks and elsewhere within potential sage grouse habitat to remove raptor perches, and to maintain the sagebrush habitat.<br><br>c. Sale of Christmas trees in key sage grouse areas. | a. Ongoing opportunistically .<br><br>b. 1998, ongoing.<br><br><br><br>c. 1998, ongoing. | a. DOW, BLM, Power Counties, pvt. landowners, FWS.<br>b. BLM (contracts, Delta Honor Crew), landowners, NRCS,& DOW, & FWS (incentives to landowners).<br>c. BLM, landowners. |
| 3. Implement local guidelines and use Best Management Practices to guide land uses to increase sage grouse populations and improve sage grouse habitat quantity and quality. | a. Implement Livestock grazing practices that benefit sage grouse habitat quality, and avoid physical disturbance to grouse during critical times, i.e., breeding and nesting.<br>b. Restore and rehabilitate riparian areas.<br>c. Proper land treatment design and construction that reduce impacts to sage grouse (e.g., how and where to plan projects).<br>d. Land development options.<br>e. Construction standards (placement, timing, rehab.,techniques). | a. Ongoing opportunistically.<br><br><br>b. Ongoing opportunistically.<br>c. Ongoing opportunistically.<br><br>d. Ongoing opportunistically.<br>e. Ongoing opportunistically. | a. BLM-permittee's, NRCS/Ext.-landowners.<br>b. BLM, FWS, landowners.<br>c. The Partnership.<br><br>d. The Partnership.<br>e. The Partnership. |

BLM_0007746

| CONSERVATION ACTIONS | | IMPLEMENTATION SCHEDULE | |
|---|---|---|---|
| **Action** | **Examples of How to Accomplish** | **When** | **Who** |
| 4. Improve sage grouse habitat quality, and improve vegetation cover, especially forbs and grasses in sage grouse areas. | a. Develop and use sound grazing management practices.<br>b. Plant and/or re-seed with a high proportion of forbs.<br><br>c. Design vegetation treatments in sage grouse areas to be compatible with sage grouse needs.<br>d. Improve ground cover in sage grouse areas.<br><br>e. Manage big game population and habitat to minimize or avoid conflicts on grouse habitats, and to encourage moving them off grouse habitat, i.e., to the extent possible develop the highest quality big game habitat outside the sage grouse prime habitat.<br>f. Integrate weed management with grouse needs.<br><br>g. Vegetation treatments to improve vegetative age class diversity, improve the grass and forb component (may or may not need to seed), and reclaim any disturbed areas.<br>h. Road closures, e.g., C-77 road at second cattle guard after 3rd season, and at Black Canyon road Dec. 15. | a. 1998, ongoing opportunistically.<br>b. 1998, ongoing opportunistically.<br><br>c. 1998, ongoing opportunistically.<br><br>d. 1998, ongoing opportunistically.<br><br>e. 1998, ongoing opportunistically.<br><br><br><br><br>f. 1998, ongoing opportunistically.<br><br>g. 1998, ongoing opportunistically.<br><br><br>h. 1998, ongoing opportunistically. | a. BLM, Private.<br>b. BLM, HPP, NRCS, DOW, FWS, Private.<br>c. BLM, HPP, RMEF, NRCS, DOW, FWS, Private.<br>d. BLM, HPP, RMEF, NRCS, DOW, FWS, Private.<br>e. BLM, DOW, Private.<br><br><br><br><br>f. BLM, County Weed Boards, Private.<br>g. BLM, Private.<br><br><br>h. BLM, Park Service, County Roads. |
| 5. Increase opportunities for improving over-winter survival, escape cover near leks, nesting cover, and expanding the range or use areas of sage grouse, e.g. use of new lek sites and areas. | a. Improve quality of sagebrush dominated habitats by using grazing management and vegetation treatment, e.g., mechanical treatment, fertilization.<br>b. Avoid treatment projects that remove large stands of sagebrush in critical areas.<br>c. Attempt to expand existing sage grouse use areas/range by using calls to entice males during the breeding season to use new lek sites close to or adjacent to existing lek sites. | a. 1998, ongoing opportunistically.<br><br>b. Ongoing opportunistically.<br><br>c. 1999 (start). | a. BLM, HPP, DOW, NRCS, FWS.<br><br>b. BLM, HPP, FWS, Private.<br><br>c. DOW. |
| **E.  Reducing Physical Disturbance to Sage Grouse** | | | |
| 1. Mitigate or reduce conflicts with sage grouse during critical biological periods and on critical habitats. | a. Noise or physical disturbance ordinances or restrictions during critical periods near leks, e.g. manage on-road travel and OHV use in key grouse areas to avoid disturbance during critical times.<br>b. Delay or modify construction start up dates or hours.<br>c. Control or limit pets.<br>d. Coordinate grazing management to avoid conflicts on leks. | a. 1998, ongoing opportunistically.<br><br>b. 1998, ongoing opportunistically.<br>c. 1998, ongoing opportunistically.<br>d. 1998, ongoing opportunistically. | a. BLM, NPS, FWS, County.<br><br>b. BLM, FWS, Counties, DOW.<br>c. DOW, FWS, Counties.<br>d. BLM, FWS, Private. |

Page 15

BLM_0007747

| CONSERVATION ACTIONS | | IMPLEMENTATION SCHEDULE | |
|---|---|---|---|
| **Action** | **Examples of How to Accomplish** | **When** | **Who** |
| **F. Improving community support and participation** | | | |
| 1. incorporate economic, social and cultural values into conservation practices. | a. Seek understanding, information sharing and maintaining communication.<br>b. Adopt principle of voluntary compliance and participation.<br>c. Involve landowners and local communities in all aspects of sage grouse conservation. | a. 1998, ongoing opportunistically.<br><br>b. 1998, ongoing opportunistically.<br>c. 1998, ongoing opportunistically. | a. The Partnership.<br><br>b. The Partnership.<br>c. The Partnership. |
| 2. Maintain local control. | a. Maintain Sage Grouse Partnership (must include landowners, local residents) to serve as advisory body.<br>b. Continually seek public input and involvement.<br>c. Annual (or as needed) hold a Partnership meeting to discuss progress and future needs, and plan a yearly schedule of events and conservation action implementation. | a. 1998, ongoing opportunistically.<br><br>b. 1998, ongoing opportunistically.<br>c. 1998, ongoing opportunistically. | a. The Partnership.<br><br>b. The Partnership.<br>c. The Partnership. |
| 3. Develop, improve, and encourage credibility and success. | a. Seek outside scientific review of projects.<br>b. Involve college and/or universities.<br>c. Adapt and change as we go.<br>d. Annually the Partnership will prepare and disseminate to the members and others a progress report. | a. 1998, ongoing opportunistically.<br>b. 1998, ongoing opportunistically.<br>c. 1998, ongoing opportunistically.<br>d. 1998, Annually. | a. The Partnership.<br>b. The Partnership.<br>c. The Partnership.<br>d. The Partnership. |

Page 16

BLM_0007748

# APPENDIX H
# DATA MANAGEMENT

Table H-1 lists the GIS files used in this planning effort. Some data were used to develop figures in the Draft, Proposed, and Approved RMP and associated EISs, while others were used to aid in alternative development or impact analyses. Data and metadata are available at the BLM's Gunnison Gorge NCA office in Montrose, Colorado.

BLM_0007749

Table H-1
Integration of GIS Data

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| WestSlope.shp | City of Delta boundary | 1-1 | 1-1 | 1-1 | | |
| Pueblo.shp | City of Pueblo boundary | 1-1 | 1-1 | 1-1 | | |
| MontroseOlathe.shp | Boundaries for the cities of Montrose and Olathe | 1-1 | 1-1 | 1-1 | | |
| GrandJunction.shp | City of Grand Junction boundary | 1-1 | 1-1 | 1-1 | | |
| FortCollins.shp | City of Fort Collins boundary | 1-1 | 1-1 | 1-1 | | |
| Durango.shp | City of Durango boundary | 1-1 | 1-1 | 1-1 | | |
| Denver.shp | City of Denver boundary | 1-1 | 1-1 | 1-1 | | |
| CoSpgs.shp | City of Colorado Springs boundary | 1-1 | 1-1 | 1-1 | | |
| BLMPlanArea.shp | BLM-owned lands within the Gunnison Gorge NCA planning area | 1-1, 2-1, 2-3, 2-6, 2-8, 3-1, 3-6, 3-7, 3-8, 3-12, B-4, B-5, B-6, B-7 | 1-1, 4-1, B-4, B-5, B-6, B-7 | 1-1, 2-1, I-4, I-5, I-6, I-7 | Alternatives B, C, D | Impacts on all resources under all alternatives |
| MainRoutes1.shp | Major regional access roads to the Gunnison Gorge NCA planning area | 1-1 | 1-1 | 1-1 | | |
| COcountiesUSGS.shp | Colorado county boundaries | 1-1, | 1-1, | 1-1, | | |

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| plan_bdy.shp | Gunnison Gorge NCA planning area boundary | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 3-1, 3-2, 3-3, 3-4, 3-6, 3-7, 3-8, 3-10, 3-11, 3-12, 3-18, B-2, B-3, D-1, D-2, D-3, D-4 | 1-1, 3-4, 4-1, 4-3, 4-4, 4-6, B-2, B-3 | 1-1, 2-1, 2-3, 2-4, 2-6, I-2, I-3 | Alternatives B, C, D | Impacts on all resources under all alternatives |
| tristate_rd.shp | Tri-State Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| Gorgeaccess.shp | Major access routes into the Gunnison Gorge NCA planning area from the surrounding cities and towns | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| rim_trail.shp | Rim Trail | 1-1, 2-1, 2-3, 2-6, 2-8 | 1-1, 4-1 | 1-1, 2-1 | Alternatives A, B, C, D | |
| gorge_trails.shp | Trails within the Gunnison Gorge Wilderness | 1-1, 2-1, 2-3, 2-6, 2-8 | 1-1, 4-1 | 1-1, 2-1 | Alternatives A, B, C, D | |
| OverlookAccessRds.shp | Access roads leading to the East Side overlook | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| CR6400CR6450.shp | County Roads 6400 and 6450 | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| cr6400.shp | County Road 6400 | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| CR6350FlatTopRd.shp | Flat Top Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| cr6200.shp | County Road 6200 | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| CR2200.shp | County Road 2200 | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| col_hwy arc | Major roads surrounding the Gunnison Gorge NCA planning area | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 3-1, 3-2, 3-3, 3-4, 3-7, 3-8, 3-10, 3-11, 3-12, 3-18, B-2, B-3, B-5, D-1, D-2, D-3, D-4 | 1-1, 3-4, 4-1, 4-3, 4-6, B-2, B-3, B-5 | 1-1, 2-1, 2-3, 2-6, I-2, I-3, I-5 | | |
| CarnationRoad.shp | Carnation Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| CandyLane.shp | Candy Lane | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| BostwickParkRd2.shp | Bostwick Park Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| BlackCanyonRoad.shp | Black Canyon Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| BigTreesAccessRds.shp | Access roads to the Black Ridge and Buttermilk relict tree stands | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |

BLM_0007752

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| BigTreesAccess.shp | Access roads to the Black Ridge and Buttermilk relict tree stands | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| A75Road.shp | A75 Road | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9 | 1-1, 4-1, 4-3, 4-6 | 1-1, 2-1, 2-3, 2-6 | | |
| RedCanyonCreek.shp | Red Canyon Creek | 1-1, 2-1, 2-3, 2-5, 2-6, 2-8, 3-1 | 1-1, 4-1, 4-6 | 1-1, 2-1, 2-6 | Alternatives B, C, D special management areas | Wild and scenic river recommendations |
| B-12.shp | Gunnison River segment in the planning area | 1-1, 2-1, 2-3, 2-5, 2-6, 2-8, 3-1 | 1-1, 4-1, 4-6 | 1-1, 2-1, 2-6 | | Wild and scenic river recommendations |
| B-13.shp | Gunnison River segment in the planning area | 1-1, 2-1, 2-3, 2-5, 2-6, 2-8, 3-1 | 1-1, 4-1, 4-6 | 1-1, 2-1, 2-6 | | Wild and scenic river recommendations |
| B-14.shp | Gunnison River segment in the planning area | 1-1, 2-1, 2-3, 2-5, 2-6, 2-8, 3-1 | 1-1, 4-1, 4-6 | 1-1, 2-1, 2-6 | | Wild and scenic river recommendations |
| NorthFork.shp | North Fork Creek | 1-1, 2-1, 2-3, 2-5, 2-6, 2-8, 3-1 | 1-1, 4-1, 4-6 | 1-1, 2-1, 2-6 | | |
| Region10Counties.shp | Counties within Region 10 | 1-1 | 1-1 | 1-1 | | |
| gg_nps.shp | Black Canyon of the Gunnison National Park boundary | 1-1, 3-12 | 1-1 | 1-1 | | |
| ggnca_wild.shp | Gunnison Gorge Wilderness boundary | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 3-1, 3-4, 3-6, 3-7, 3-8, 3-10, 3-11, 3-12, 3-18, B-2, B-3, B-4, B-5, B-6, B-7, D-1, D-2, D-3, D-4 | 1-1, 3-4, 4-1, 4-3, 4-4, 4-6, B-2, B-3, B-4, B-5, B-6, B-7 | 1-1, 2-1, 2-3, 2-4, 2-6, I-2, I-3, I-4, I-5, I-6, I-7 | | Impacts on all resources under all alternatives |

BLM_0007753

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| blmnca.shp | BLM-owned lands within the Gunnison Gorge NCA boundary | 1-1, B-2, B-3, B-4, B-5, B-6, B-7 | 1-1, B-2, B-3, B-4, B-5, B-6, B-7 | 1-1, I-2, I-3, I-4, I-5, I-6, I-7 | | |
| UteTrailCorrect.shp | Updated location of the Ute Trail | 2-1, 2-3, 2-5, 2-6 | 4-6 | 2-6 | Alternatives A, B, C | |
| mar_nca.shp | Gunnison Gorge NCA boundary outline | 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, 2-8, 2-9, 3-1, 3-4, 3-6, 3-7, 3-8, 3-10, 3-11, 3-12, 3-18, D-1, D-2, D-3, D-4 | 3-4, 4-1, 4-3, 4-4, 4-6 | 2-1, 2-3, 2-4, 2-6 | | Impacts on all resources under all alternatives |
| blmoldrmpzones8.shp | Old RMP management zones on public lands within the planning area | 2-1 | | | Alternative A | |
| gg_towns.shp | Cities and towns surrounding the Gunnison River segment in the planning area | 2-1, 2-3, 2-6, 2-8, 3-1, 3-4, 3-10, 3-12, B-2, B-3, D-1, D-2, D-3, D-4 | 3-4, 4-1, 4-4, B-2, B-3 | 2-1, 2-4, I-2, I-3 | | |
| FairviewRNA.shp | Fairview RNA | 2-2, 2-3, 2-4, 2-6, 2-7, 2-8, 2-9, D-1, D-2, D-3, D-4 | 4-1, 4-3, 4-4 | 2-1, 2-3, 2-4 | Alternatives A, B, C, D | Impacts on all resources under Alternatives A, B, C, and D OHV designations |
| AltAOHVltdTrails.shp | Areas where OHV use currently (Alternative A) is limited to existing routes year round | 2-2, D-1 | | | | Impacts on all resources under Alternative A OHV designations |

BLM_0007754

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| Blmplanohvltd.shp | Areas where OHV use currently (Alternative A) is limited to designated routes and seasonal restrictions | 2-2, D-1 | | | | Impacts on all resources under Alternative A OHV designations |
| CommonManagement.shp | BLM-owned lands outside the Gunnison Gorge Wilderness | 2-2, 2-3, 2-4, 2-6, 2-7, 2-8, 2-9, D-2, D-3, D-4 | 4-1, 4-3, 4-4 | 2-1, 2-3, 2-4 | Alternatives B, C, D | |
| Communication.shp | Communications site locations | 2-3, 2-6, 2-8 | 4-1 | 2-1 | | |
| FalconRdEntrance.shp | Falcon Road entrance to the NCA | 2-3 | | | | |
| gunnisonnfkacec6.shp | Management Unit B-8, Gunnison and North Fork Rivers ACEC | 2-3 | | | Alternative B | Impacts on all resources under Alternatives B |
| gunnisonsrma8.shp | Management Unit B-9, Gunnison River SRMA | 2-3 | | | Alternative B | Impacts on all resources under Alternative B |
| blk rdge big trees2.shp | Management Unit B-7, Black Ridge Relict Tree ACEC/ONA | 2-3, 2-4, 2-7, 2-9, D-2, D-3, D-4 | 4-3, 4-4 | 2-3, 2-4 | Alternative B | Impacts on all resources under Alternatives B, C, and D OHV designations |
| bt_milk big trees2.shp | Management Unit B-7, Buttermilk Relict Tree ACEC/ONA | 2-3, 2-4, 2-7, 2-9, D-2, D-3, D-4 | 4-3, 4-4 | 2-3, 2-4 | Alternative B | Impacts on all resources under Alternatives B, C, and D OHV designations |

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| ncasagegrouseacec5.shp | Management Unit B-1, D-4, Gunnison Sage Grouse ACEC/IBA | 2-3, 2-4, 2-8, 2-9, D-2, D-4 | 4-1, 4-3, 4-4 | 2-1, 2-3, 2-4 | Alternatives B, D | Impacts on all resources under Alternatives B and D OHV designations |
| mancosohvopen2.shp | Management Unit B-3, Flat Top SRMA | 2-3 | | | Alternative B | |
| Nativeplantonacalc.shp | Management Unit B-2, D-5, Native Plant Community ACEC/ONA | 2-3, 2-8 | 4-1 | 2-1 | Alternatives B, D | |
| mancosshalerna10.shp | Management Unit B-6, Mancos Shale ACEC/RNA | 2-3 | | | Alternative B | |
| BLMB-50Road.shp | B50 Road area closed to OHV use under Alternative B | 2-4, D-2 | | | | Impacts on all resources under Alternative B OHV designations |
| bostwickohvclosed3.shp | Bostwick Park area closed to OHV use under Alternative B | 2-4, D-2 | | | | Impacts on all resources under Alternative B OHV designations |
| mancosohvopen2.shp | Flat Top area open to OHV use under Alternative B | 2-4, D-2 | | | | Impacts on all resources under Alternative B OHV designations |
| EastSideOverlook.shp | Location of East Side Overlook site | 2-5, 2-6 | 4-6 | 2-6 | | |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007756

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| Allcamps.shp | Location of all designated camp sites within the Gunnison Gorge Wilderness | 2-6 | | | | |
| Gunnisonriversrma.shp | Management Unit C-1, Gunnison and North Fork Rivers SRMA | 2-6 | | | Alternative C | Impacts on all resources under Alternative C |
| flattopohvopen6.shp | Management Unit C-3, Flat Top OHV NRA | 2-6, 2-7, D-3 | | | Alternative C | Impacts on all resources under Alternative C OHV designations |
| ncasagegrouseacecd3.shp | Alternative C seasonally closed or limited OHV area | 2-7, D-3 | | | | Impacts on all resources under Alternative C OHV designations |
| SCentralOHVopen.shp | Area open to OHV use under Alternative C | 2-7, D-3 | | | | Impacts on all resources under Alternative C OHV designations |
| flattopohvnra14.shp | Management Unit D-2, Flat Top OHV NRA | 2-8 | 4-1 | 2-1 | Alternative D | Impacts on all resources under Alternative D |
| gunnisonriversrma2.shp | Management Unit D-3, Gunnison River SRMA | 2-8 | 4-1 | 2-1 | Alternative D | Impacts on all resources under Alternative D |
| gunnisonnfkclosedohv3.shp | Area around the junction of the Gunnison River and North Fork Creek closed to OHV use under Alternative D | 2-9, D-4 | 4-3, 4-4 | 2-3, 2-4 | | Impacts on all resources under Alterative D OHV designations |

BLM_0007757

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| planohvopend4.shp | Areas open to OHV use under Alternative D | 2-9, D-4 | 4-3, 4-4 | 2-3, 2-4 | | Impacts on all resources under Alterative D OHV designations |
| HowellVillage.shp | Location of Howell Village | 2-5 | 4-6 | 2-6 | | Cultural resources impacts |
| redcanyonckacec3.shp | Red Canyon (Alternatives B and D) | 2-5 | 4-6 | 2-6 | Alternatives B, D | |
| UteGeolArea.shp | BLM Lands Ute Indian Fault Zone & Geologic Area (Alternatives B, C, and D) | 2-5 | 4-6 | 2-6 | Alternatives B, C, D | Impacts on geology |
| ChukarTrail.shp | Chukar Trail | 2-5 | 4-6 | 2-6 | Alternatives B, D | |
| mtco_roads arc | Montrose County roads | 3-1, D-1, D-2, D-3, D-4 | 4-4 | 2-4 | | |
| delco_roads arc | Delta County roads | 3-1 D-1, D-2, D-3, D-4 | 4-4 | 2-4 | | |
| rds_gps.shp | GPS road locations within the planning area | 3-1 | | | | |
| rds_digit2.shp | Road locations within the planning area, digitized from existing maps | 3-1 | | | | |
| gg_fault.shp | Geologic faults | 3-2 | | | | Impacts on geology |
| gg_fault500.shp | Geologic faults at 1:500,000 | 3-2 | | | | Impacts on geology |
| gg_fold.shp | Geologic folds | 3-2 | | | | Impacts on geology |
| gg_fold500.shp | Geologic folds at 1:500,000 | 3-2 | | | | Impacts on geology |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007758

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| PlanGeol.shp | Geologic formations underlying the planning area | 3-2 | | | | Impacts on geology |
| NorthFkPt.shp | Portion of North Fork Creek | 3-3 | | | | Wild and scenic river recommendations |
| ggnca_gunnison_river.shp | Gunnison River, extending through the Black Canyon of the Gunnison National Park to the north of State Route 92 | 3-3, 3-10, 3-12 | | | | |
| GorgeAllotment | Gunnison Gorge allotment from the Land Health Assessment (BLM 2001a) | 3-3 | | | | |
| SoilStd1.shp | BLM lands within the planning area evaluated according to the Land Health Assessment's Soil Standard | 3-3 | | | | Soils impacts |
| elephantskinwash2.shp | Elephant Skin Wash | 3-4 | 3-4 | | | |
| SpringGulch.shp | Spring Gulch | 3-4 | 3-4 | | | |
| SulphurGulch.shp | Sulphur Gulch | 3-4 | 3-4 | | | |
| JonesDraw.shp | Jones Draw | 3-4 | 3-4 | | | |
| WildScenicInv1.shp | Some of the streams in the Wild and Scenic River study | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river recommendations |
| Loutsenhizer.shp | Loutsenhizer Canal | 3-4 | 3-4 | | | |
| RedRockCanyon.shp | Red Rock Canyon | 3-4 | 3-4 | | | |
| PeachValleyCanal.shp | Peach Valley Canal | 3-4 | 3-4 | | | |
| IronCreek.shp | Iron Creek | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |

BLM_0007759

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| GrizzlyGulch.shp | Grizzly Gulch | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| DryCurrantCreeks.shp | Dry Currant Creek | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| DiamondJoeGl2.shp | Portion of Diamond Joe Gulch | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| DiamondJoeGl1.shp | Portion of Diamond Joe Gulch | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| CedarRunCk.shp | Cedar Run Creek | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| CedarCreek.shp | Cedar Creek | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| BuckCanyon.shp | Buck Canyon Creek | 3-4, B-2 | 3-4, B-2 | I-2 | | Wild and scenic river study |
| UncompahgreR.shp | Uncompahgre River | 3-4 | 3-4 | | | |
| SmithFork.shp | Smith Fork Creek | 2-1, 2-3, 2-5, 2-6, 2-8, 3-1, 3-4, B-2 | 3-4, 4-1, 4-6, B-2 | 2-1, 2-6, I-2 | | Wild and scenic river recommendations |
| urveg | Infrared Landsat image of vegetation types within the western portion of the planning area | 3-6 | | | | Impacts on vegetation |
| ugveg | Infrared Landsat image of vegetation types within the eastern portion of the planning area | 3-6 | | | | Impacts on vegetation |
| Deltadeerwca.shp | Deer winter concentration areas in Delta County | 3-7 | | | | Impacts on mule deer critical winter range |
| Montdeerwca.shp | Deer winter concentration areas in Montrose County | 3-7 | | | | Impacts on mule deer critical winter range |

BLM_0007760

**Table H-1**
**Integration of GIS Data** *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| Deltadeerswr.shp | Deer severe winter range in Delta County | 3-7 | | | | Impacts on mule deer critical winter range |
| Montdeerswr.shp | Deer severe winter range in Montrose County | 3-7 | | | | Impacts on mule deer critical winter range |
| deltaelkwca.shp | Elk winter concentration areas in Delta County | 3-7 | | | | Impacts on elk critical winter range |
| Montelkwca.shp | Elk winter concentration areas in Montrose County | 3-7 | | | | Impacts on elk critical winter range |
| Deltaelkswr,shp | Elk severe winter range in Delta County | 3-7 | | | | Impacts on elk critical winter range |
| Montelkswr.shp | Elk severe winter range in Montrose County | 3-7 | | | | Impacts on elk critical winter range |
| ufo_sglek.shp | Gunnison sage-grouse leks | 3-8 | | | Alternatives B, D | Impacts on threatened and endangered species |
| mar_sgna.shp | Gunnison sage-grouse nesting areas | 3-8 | | | Alternatives B, D | Impacts on threatened and endangered species |
| mar_sgov.shp | Gunnison sage-grouse range | 3-8 | | | Alternatives B, D | Impacts on threatened and endangered species |

BLM_0007761

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| ggnca_other_rivers.shp | North Fork Creek, Smith Fork Creek, Red Canyon Creek, and other perennial streams within the planning area | 3-10, 3-12 | | | | |
| PlanPCAS.shp | CNHP's Potential Conservation Areas (PCAs) within the planning area boundary | 3-10 | | | Alternative B | |
| PlanAreaGraze | Grazing allotments within the planning area boundary | 3-11 | | | | Impacts on ranchers and grazing |
| ROSdigitized | Recreation opportunity spectrum classifications, hand-digitized based on existing BLM mapping (BLM 1995a) | 3-13 | | | | |
| BLMfireplanzones | Fire management zones within the planning area (BLM 2002k) | 3-18 | | | | Impacts on fire management |
| PeachValleyPlan | Peach Valley Canal within the planning area | B-2 | B-2 | I-2 | | Wild and scenic river study |
| RedRockCanyonPlan | Red Rock Canyon Creek within the planning area | B-2 | B-2 | I-2 | | Wild and scenic river study |
| BuckCanyonPlan | Buck Canyon Creek within the planning area | B-2 | B-2 | I-2 | | Wild and scenic river study |
| GunnsionRWSinvPlan | Portion of the Gunnison River in the Wild and Scenic River Inventory | B-2 | B-2 | I-2 | | Wild and scenic river study |
| RedCanyonCkWild | Red Canyon Creek in the Wild and Scenic River Inventory | B-2, B-3, B-7 | B-2, B-3, B-7 | I-2, I-3, I-7 | | Wild and scenic river study |
| SmithForkWild | Smith Fork Creek in the Wild and Scenic River Inventory | B-2, B-3, B-6 | B-2, B-3, B-6 | I-2, I-3, I-7 | | Wild and scenic river study |
| CedarCreekPlan | Portion of Cedar Creek within the planning area | B-2 | B-2 | I-2 | | Wild and scenic river study |

BLM_0007762

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| GrizzGulchPlanArea | Portion of Grizzly Gulch within the planning area | B-2 | B-2 | I-2 | | Wild and scenic river study |
| GunnisonRScenic | Portion of the Gunnison River in the Wild and Scenic River Inventory considered eligible for further study | B-3, B-4, B-5, B-6, B-7 | B-3, B-4, B-5, B-6, B-7 | I-3, I-4, I-5, I-6, I-7 | | Wild and scenic river study |
| buffer1320gunnisonrscenic7 | 0.25- mile buffer around the wild and scenic eligible sections of the Gunnison River | B-4, B-5 | B-4, B-5 | I-4, I-5 | | Wild and scenic river study |
| buffer1320smithforkwild2 | 0.25- mile buffer around the wild and scenic eligible sections of Smith Fork Creek | B-6 | B-6 | I-6 | | Wild and scenic river study |
| redcanyonckwildpvt | 0.25- mile buffer around the wild and scenic eligible sections of Red Canyon Creek | B-7 | B-7 | I-7 | | Wild and scenic river study |
| Altaexistinggps.shp | Existing OHV routes in limited areas, plotted from GPS | D-1 | | | | Impacts on recreation under Alternative A |
| Altaexistingdigit.shp | Existing OHV routes in limited areas, digitized from existing mapping | D-1 | | | | Impacts on recreation under Alternative A |
| Designatedaltb.shp | Designated routes where motorized or mechanized travel is allowed in areas of limited OHV use under Alternative B | D-2 | | | | Impacts on recreation under Alternative B |
| Designatedaltc2.shp | Designated routes where motorized or mechanized travel is allowed in areas of limited OHV use under Alternative C | D-3 | | | | Impacts on recreation under Alternative C |
| Designatedaltd3.shp | Designated routes where motorized or mechanized travel is allowed in areas of limited OHV use under Alternative D | D-4 | 4-4 | 2-4 | | Impacts on recreation under Alternative D |

BLM_0007763

Table H-1
Integration of GIS Data *(continued)*

| File Name | Description of Data | DRMP/EIS Figures Developed with Data | PRMP/FEIS Figures Developed with Data | Approved RMP Figures Developed with Data | DRMP/EIS Alternatives Developed with Data | DRMP/EIS Impact Analysis Conducted with Data |
|---|---|---|---|---|---|---|
| blm_new_nca_bdynad27.shp | New NCA boundary | | 1-1, 4-1, 4-2, 4-3, 4-4, 4-5, 4-6, 4-7, B-1, B-2, B-3, B-4, B-5, B-6, B-7, D-1, F-1, F-2, F-3, F-4, F-5 | 1-1, 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7, I-1, I-2, I-3, I-4, I-5, I-6, I-7, C-1, E-1, E-2, E-3, E-4, E-5 | | PRMP impacts on a variety of resources |
| MU1-1 through MU6-2 | Recreation management zone boundaries | | 4-7 | 2-7 | | PRMP impacts on recreation resources |
| Vrm_classes_merge | VRM class boundaries | | 4-5 | 2-5 | | PRMP impacts on visual resources |
| Mancos_mu, og_bewco, of_crucial, og_sagegrouse, og_teo, og_wsi, og_str | Oil and gas leasing stipulations | | F-1, F-2, F-3, F-4, F-5 | E-1, E-2, E-3, E-4, E-5 | | PRMP impacts on a variety of resources |
| Row1aclip, row2, row3, row4, row5, row6, row7 (TT created) | Utility ROW corridors | | 4-2 | 2-2 | | PRMP impacts on a variety of resources |
| Bcbdy2 | NPS Administrative Boundary | | 4-1, 4-2, 4-3, 4-4, 4-5, 4-6, 4-7 | 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7 | | |

BLM_0007764

# APPENDIX I
# REVISED FINAL WILD & SCENIC RIVERS STUDY REPORT

## I.1    INTRODUCTION

Congress enacted the Wild and Scenic Rivers Act of 1968 (Public Law 90-542, as amended; 16 US Code 1271-1287) to provide a national policy for preserving and protecting selected rivers and river segments in their free-flowing condition for the benefit and enjoyment of present and future generations. Section 5(d)(1) of the Wild and Scenic Rivers Act (WSR Act) directs federal agencies to consider potential wild and scenic rivers in their land and water planning processes ("*In all planning for the use and development of water and related land resources, consideration shall be given by all federal agencies involved to potential national wild, scenic and recreational river areas*"). To fulfill this requirement, whenever the Bureau of Land Management (BLM) undertakes a land use planning effort (e.g., a resource management plan [RMP]), it conducts an analysis of river and stream segments that might be eligible for inclusion into the National Wild and Scenic Rivers System (NWSRS). The WSR Act provides criteria that must be considered during the analysis. The eligibility process is depicted in Figure I-1. The inventory is conducted during the data-gathering stage of RMP development, and the study phase is done during the formulation of the DRMP and PRMP.

This report is a record of the wild and scenic river study that is being conducted concurrently with the Gunnison Gorge National Conservation Area (NCA) RMP and Environmental Impact Statement (EIS). This report documents BLM's examination of the river segments as they relate to the WSR Act eligibility, classification, and suitability criteria. This report has been revised since the March 2003 Draft Wild and Scenic Rivers Study Report with changes reflecting public comment on the DRMP (BLM 2003c), collaboration during the preparation of the PRMP (BLM 2004), and BLM's internal comments and analysis of entire DRMP and PRMP. The environmental analysis of impacts from eligibility and suitability results for wild and scenic river designation or nondesignation within the BLM's preferred alternative are discussed in Chapter 5 of the PRMP (BLM 2004).

BLM_0007765

A previous wild and scenic river study was conducted for the Gunnison River from the upstream boundary of the Black Canyon of the Gunnison National Park (National Park) downstream to the confluence with Smith Fork Creek. This study was completed in 1979 by the National Park Service (Park Service). The Park Service identified a 26-mile segment of the Gunnison River as eligible for designation as "Wild" under the Wild and Scenic Rivers Act. The proposed "Wild" segment identified is located on Park Service and BLM lands and runs from the upstream boundary of the National Park to approximately one mile downstream of the confluence with Smith Fork Creek. Congress took no action to designate this segment.

The Park Service conducted a *Resource/Boundary Evaluation for Lands Adjacent to Black Canyon of the Gunnison National Monument* in 1990 that referred to the 1979 study. The 1990 evaluation reiterated the Wild recommendation for the Gunnison River from the northern boundary of the Black Canyon of the Gunnison National Monument (now National Park) to near the confluence with Smith Fork Creek (an approximately 13-mile stretch).

Legislation was introduced in 1986 and again in 1991 to designate a portion of the Gunnison River as Wild. Both legislation attempts failed in subcommittee.

## I.2    WILD AND SCENIC RIVER STUDY PROCESS

The wild and scenic river study process is comprised of two main components: the inventory phase and the study phase. The inventory phase includes identifying eligible river and stream segments, assigning tentative classification (Wild, Scenic, or Recreational), and describing protective management for the eligible segments. The study phase includes determining the suitability of eligible segments for inclusion in the National Wild and Scenic Rivers System (NWSRS) and describing interim management measures.

### I.2.1    Inventory Phase

#### *Identification of Eligible River Segments*

The purpose of the inventory is to identify eligible rivers and river segments in the planning area and to assign them a tentative classification. The agency conducting the inventory is directed to consider a wide variety of internal and external sources to identify potentially eligible rivers. The goal is to avoid overlooking river segments that have potential for inclusion in the NWSRS.

#### *Eligibility Determination*

The BLM applies standard criteria to identified river segments to determine eligibility. To be eligible, a river segment must be free-flowing and possess at least one river-related value considered outstandingly remarkable. The specific criteria for free-flowing and outstandingly remarkable values are listed in Attachment I-1 to this appendix.

BLM_0007766



The BLM inventories and evaluates rivers when it develops a RMP. The inventory is conducted during the data gathering stage of RMP development, and the study phase is done during the formulation of the Draft and Proposed RMP.

*Wild and Scenic Rivers Eligibility Process Flow Chart*

Tetra Tech, Inc.

**Figure I-1**

BLM_0007767

*This page intentionally left blank.*

BLM_0007768

### Tentative Classification

Once rivers are considered eligible as a result of applying the free-flowing and outstandingly remarkable criteria, river segments are assigned a tentative classification. The criteria for classification are defined in Section 2(b) of the WSR Act. Classification categories are Wild, Scenic, or Recreational, and are based on the type and degree of human development and access associated with the river and adjacent lands at the time of the inventory.

The classification does not reflect the types of values present along a river segment. The specific classification criteria are described in Attachment I-2 to this appendix. The classification assigned during the inventory phase is tentative. Final classification is a Congressional legislative determination along with designation of a river segment as part of the NWSRS.

### Protective Management of Eligible Rivers

Rivers or river segments determined eligible must be managed to protect the free flow, outstandingly remarkable values, and tentative classification. This protective management is in place until a river or river segment is determined suitable or unsuitable. Management guidelines to protect candidate are detailed in Attachment I-3 to this appendix, *Interim Protection for Candidate Wild and Scenic Rivers.*

During the interim phase, any proposed action that could adversely impact or be inconsistent with wild and scenic river values will require management decisions based on NEPA analysis and Section 202 of FLPMA, as follows:

- Any proposed action that may be inconsistent with or adversely impact identified wild and scenic river values will require a site-specific environmental assessment (EA), opportunity for public involvement, and at least a 30-day public comment period. The decision notice record for the EA (involving these types of actions) will be conducted and signed at the field office level. However, prior to signature a copy of supporting documentation will be forwarded to the applicable State Director for review and concurrence.

- If the EA determined that the proposal could have a major action significantly affecting the environment, a separate EIS apart from the BLM RMP/EIS will be required.

- Should the EA or EIS determine that the action as proposed, or with appropriate mitigation or an acceptable alternative, will not have irreversible or irretrievable adverse impacts and will maintain or enhance identified wild and scenic river values, such action may be approved.

- If the EA or EIS determines that the action as proposed will have irreversible or irretrievable adverse impacts to identified wild and scenic river values, the decision on the action will be held temporarily in suspension until wild and scenic river evaluations are address and resolved through the BLM planning process.

### I.2.2   Suitability Study Phase

The purpose of the study phase is to determine whether eligible river segments are suitable or unsuitable for inclusion in the NWSRS per the criteria of the WSR Act. The suitability evaluation does not result in actual designation, but only a suitability determination for designation. BLM does not recommend any stream segments for designation into the NWSRS, and no stream segment studied is or will be automatically designated as part of the NWSRS. Only Congress can designate a wild and scenic river. In some instances, the Secretary of the Interior may designate a wild and scenic river when the governor of a state, under certain conditions, petitions for a river to be designated. Congress will ultimately choose the legislative language if any suitable segments are presented to them. Water-protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed. Rivers found unsuitable will be dropped from further consideration and managed according to the objectives outlined in the RMP.

The suitability evaluation is completed as the DRMP is prepared. Impacts that would occur from designation and non-designation of the eligible river segments are then analyzed in the EIS associated with the RMP. Public review and comment on suitability determinations included in the DRMP is considered before the BLM makes final suitability determinations.

#### *Suitability Determination*

The following eight factors, identified in BLM Manual Section 8351 (BLM 2001l), are applied to each eligible river segment when completing the suitability study:

1.   Characteristics that do or do not make the river a worthy addition to the NWSRS;

2.   The status of land and mineral ownership, use in the area, and associated or incompatible uses;

3.   Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area is not designated;

4.   Federal, state, tribal, local, public, or other interest in designation or non-designation of the river;

5.   Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated;

6.   Ability of the agency to manage and protect the river area or segment as a wild and scenic river, or other means to protect the identified values other than wild and scenic river designation;

7.   Historical or existing rights which could be adversely affected with designation; and

8.   Other.

BLM_0007770

### Interim Management of Suitable Segments

BLM guidance requires that interim management be developed and followed to protect the free-flowing nature, outstandingly remarkable values, and recommended classification of suitable segments until Congressional action regarding designation is taken.  Guidelines for management are included in the management unit prescriptions for Management Units 1 and 3 in the RMP and in Table I-3-1, Attachment I-3, Appendix I.

## I.3    RELATIONSHIP OF WILD AND SCENIC RIVERS ACT TO PRIVATE LANDS

The basic objective of wild and scenic river designation is to maintain the existing condition of the river.  If a land use or development clearly threatens the outstandingly remarkable value that resulted in designation of the river, efforts would be made to remove the threat through local zoning, land exchanges, purchases from willing sellers, and other actions except condemnation.  Agriculture and grazing activities occurring at the time of designation would generally not be affected.

Under the WSR Act, designation neither gives nor implies government control of private lands within the river corridor.  Although Congress (or the Secretary of the Interior for 2(a)(ii) rivers) could include private lands (inholdings) within the boundaries of the designated river area, management restrictions will apply only to public lands.  The federal government has no authority to regulate or zone private lands under the Act; however, administering agencies may highlight the need for amendments to local zoning (where state and local zoning occurs).  People living with a river corridor will be able to use their property as they had before designation.

Land use controls on private lands are a matter of state and local zoning.  Although the WSR Act includes provisions encouraging protection of river values through state and federal land use planning, these provisions are not binding on local governments.

The federal government is responsible for ensuring that management of designated rivers meets the intent of the WSR Act.  In the absence of local or state river protection provisions, the federal government could ensure protection through acquisition of private lands or interests in lands.

The WSR Act specifically prohibits federal use of condemnation in the fee title purchase of lands if 50 percent or more of the land within the boundary is already in public ownership.  The BLM manages about 90 percent (6,966 acres) of the surface estate in the four river segments proposed.  As a result, acquisition through federal use of condemnation is prohibited under the WSR Act for these segments.  However, the WSR Act does provide the federal gvernment with authority to purchase scenic, conservation, or access easements through condemnation proceedings; this measure of last resort would be used only as necessary to remove a threat to the river.

## I.4    RELATIONSHIP OF WILD AND SCENIC RIVERS ACT TO WATER RIGHTS

The BLM does not hold any water rights for flows in the Gunnison River or other streams in the NCA. The BLM is not recommending any river or stream segment for

BLM_0007771

designation into the NWSRS. The BLM does not believe that assertion of a federal water right is necessary to maintain the outstandingly remarkable values in or along any of the river segments found eligible and suitable for inclusion in the NWSRS in this report. The BLM is neither requesting nor recommending such a right.

The US Congress will ultimately choose the legislative language if any segment found suitable in this report comes before them for possible designation. Because of the complexity of existing and pending water rights and other water agreements on the Gunnison River, the BLM cannot make a determination of future river flows in meeting the intent of the WSR Act for the Gunnison River. Additionally, water protection strategies and measures to meet the purposes of the WSR Act will be the responsibility of Congress in any legislation proposed for designation of any suitable segment under the WSR Act. Therefore, BLM is not requesting a federal reserved water right to meet the requirements of the WSR Act. Congress has the authority through the WSR Act to designate a segment with specific language that instructs agencies to protect the outstandingly remarkable values with methods other than a federal reserved water right.

If Congress chooses to designate any suitable segment into the NWSRS, and if a federal reserved water right is included with the designation, it would only carry a priority date equal to that of the designation date and would be junior to all senior water rights located upstream. Private, senior water rights are located upstream of several of the stream segments analyzed in the planning area, specifically the Gunnison River, Smith Fork Creek, and Red Canyon Creek. If a federal reserved water right were included with designation of any stream segment into the system, any requested change in senior water rights located upstream would be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. Potential effects on water rights as a result of Congressional designation are discussed in the suitability determinations for each segment.

## I.5 GUNNISON GORGE NCA WILD AND SCENIC RIVERS STUDY REPORT

Various resource personnel from the BLM's Uncompahgre Field Office and Gunnison Gorge NCA Office were consulted to conduct the wild and scenic rivers inventory in support of the Gunnison Gorge NCA RMP currently underway. The team was comprised of BLM staff specialists in wildlife biology, outdoor recreation, rangeland management, archeology, fisheries, and geology. In addition to BLM specialists, wild and scenic river eligibility was discussed during several public focus group meetings.

### I.5.1 Identification of Eligible Segments

The BLM resource team considered all river segments in the RMP's approximate 196,000-acre planning area that might meet the criteria of free flowing and exhibit the potential for any outstandingly remarkable values. This comprehensive approach was used to ensure all possible candidates were considered during the wild and scenic rivers review. As part of the initial screening process, the Gunnison River was divided into three segments to address the characteristic changes that occur within the planning area.

BLM_0007772

In order to avoid overlooking potentially eligible river segments, a combination of sources were used.  These sources include the Nationwide Rivers Inventory and the BLM's existing Geographic Information System (GIS) rivers and streams layer.  The existing GIS layer (BLM 2002k) was created by the BLM and is a comprehensive list of potentially free-flowing water bodies within the planning area.

Initial screening and identification efforts resulted in a list of 26 rivers for further consideration in the inventory process.  These rivers or river segments include those listed below, which are depicted on Figure I-2:

1.  Gunnison River (entire Wilderness to transmission line located south of North Fork);

2.  Gunnison River (from transmission line located south of North Fork to Relief Ditch Company diversion);

3.  Gunnison River (from Relief Ditch Company diversion to edge of planning area);

4.  Smith Fork Creek;

5.  North Fork of the Gunnison River;

6.  Cedar Creek;

7.  Grizzly Gulch;

8.  Peach Valley Canal;

9.  Sulphur Gulch;

10. Loutsenhizer Arroyo;

11. Iron Creek;

12. Long Gulch;

13. Lime Kiln Gulch;

14. Lawheed Gulch;

15. Currant Creek;

16. Dry Creek;

17. Red Rock Canyon;

18. Jones Draw;

19. Parvin Gulch;

20. Coal Bank Gulch;

21. Son-of-a-Gun Gulch;

22. Diamond Joe Gulch;

23. Buck Canyon;

BLM_0007773

      24.  Poison Spring Gulch;

      25.  Spring Gulch; and

      26.  Red Canyon.

Additional review focused on whether these 26 segments met free-flowing criteria and contained any outstandingly remarkable values as defined in the WSR Act.  Members of the BLM resource team conducted this review for each of their areas of expertise, using their knowledge of the area and consulting available inventory information.  This information was considered against the outstandingly remarkable values criteria provided in Attachment I-1.  Details of their findings are provided in Attachment I-4.

### I.5.2    Eligibility Determination and Tentative Classification

The BLM resource team prepared and reviewed documentation of the values considered outstandingly remarkable for each of the 26 river segments.  As a result of this evaluation, four river segments are proposed as eligible for further study.  These four river segments are depicted on Figure I-3.  The following provides a description of outstandingly remarkable values for each candidate river segment, as well as the tentative classification.  Scenic quality field inventory forms are included as Attachment I-5 to this appendix.

***Segment 1:  Gunnison River (Entire Wilderness to Transmission Line South of North Fork)***

Length within Planning Area: 16.0 miles (see Figure I-4)

Tentative Classification: Wild

Proposed Boundary:  Approximate 0.5-mile corridor centered on of the river (Figure I-4)

The majority of this reach of the Gunnison River is located within the Gunnison Gorge.  A short distance downstream from Smith Fork Creek, the scenery changes from the black rock canyon walls to a wider canyon lined with sandstone walls.  The upstream extent of the reach is the Black Canyon of the Gunnison National Park boundary.  The downstream extent of the reach is the transmission line that crosses the Gunnison River approximately one mile upstream of the confluence with the North Fork.  Although the flows for this segment are controlled by impoundments upstream, this segment qualifies as free flowing.  The boundary for this designation would likely be the lower canyon rim.

BLM_0007774



Initial screening and identification effors resulted in a list of 26 planning area streams for further consideration in the wild and scenic rivers inventory process.

***Planning Area Streams Considered in Wild and Scenic Rivers Inventory Process***

**Gunnison Gorge NCA Planning Area, Colorado**

| | |
|---|---|
| Cities and towns | |
| Wilderness | |
| NCA | |
| Planning area | |

Stream segments considered

Stream segments outside planning area

Major roads

**Tetra Tech, Inc.**

**Figure I-2**

BLM_0007775

*This page intentionally left blank.*

BLM_0007776



Values considered outstandingly remarkable for each of the 26 river segments considered were evaluated, and as a result, four river segments are proposed as eligible for further study.

*Planning Area River Segments*
*Proposed as Eligible for Further Study*

**Gunnison Gorge NCA Planning Area, Colorado**

— Wild and Scenic River eligible segments
— Segment delimiters
— Major roads
▭ Planning area
▪ Cities and towns
▪ Wilderness
▪ NCA

**Tetra Tech, Inc.**

**Figure I-3**

BLM_0007777

*This page intentionally left blank.*

BLM_0007778



Transmission Line

The suitable Wild and Scenic River
designation boundary is an approximate
0.5-mile corridor, centered on the Gunnison River.

*Segment 1: Gunnison River (Entire Wilderness to Transmission Line South of North Fork, 16 Miles)*

**Gunnison Gorge NCA Planning Area, Colorado**



Gunnison River

Wild and Scenic River Segment Boundary

Private Land

Wilderness

NCA

Other BLM Lands

**Tetra Tech, Inc.**

**Figure I-4**

I-15

*This page intentionally left blank.*

BLM_0007780

The outstandingly remarkable values for this segment are described as follows:

- **Cultural and Historic** – There are stone and timber remnants from a historic cabin located along the river in Ute Park.  The exact origin of the cabin is unknown.  The cabin and some mining and related sites meet the criteria of having exceptional human interest.  These sites serve as illustrations of historic land use for mining, cattle driving, or early recreation.  They represent a unique and hardy human spirit willing to "tough it out" in an isolated and difficult area.  The Ute Trail meets the criteria of being rare and unusual and having exceptional human interest because it is the only crossing point of the Gunnison Gorge/Canyon.  The trail has likely been used for hundreds of years by Native Americans and later by cattlemen.  The trail demonstrates native people's mobility in their seasonal rounds, and how they were able to use a wide variety of habitats and resources.  Wickiups identified in the vicinity of Red Canyon substantiate use of the area by the Ute Indians.

- **Ecological** – There is a population of Great Basin wild rye (*Elymus cinereus*) located at the upstream end of the Ute Park area. This population has been identified as an excellent isolated resource value of high significance. Although populations of Great Basin wild rye are fairly common in Rio Blanco County, Colorado, this is the only known occurrence within the one-million-acre Uncompahgre Field Office resource area.  In addition, the Colorado Natural Heritage Program (CNHP) has identified the Ute Trail area as having high-quality vegetative communities and recommends the site to be designated as a CNHP conservation area.  Species known to occur in the Ute Trail area include Wetherill's milkvetch (*Astragalus wetherillii*) and large-flowered breadroot (*Pediomelum megalanthum*).  The area's box elder (*Acer negundo*)/sandbar willows (*Salix exigua*) association is not described in any of the Natureserve literature; as such, its significance has not been determined.

- **Scenic** – Scenic values found in the gorge are inextricably interwoven with the geologic and physiographic features of the area (Park Service 1979).  The river segment provides an excellent opportunity to observe the extremely scenic geologic transition from the towering black walls of the Black Canyon of the Gunnison National Park, to the beautiful and very colorful and dramatic double-canyon system found in the Gunnison Gorge Wilderness.  The area is rated "A" for visual quality as defined in the BLM Visual Resource Inventory Handbook, H-8410-1 (BLM 2002o).  As the river winds through the canyon, the viewer is presented with a multitude of images and settings ranging from dark towering walls covered with spider webs and swallow nests that convey an atmosphere of grandeur and solemnity, to sweeping panoramas of colorful canyons against clear, vibrant blue skies that convey a spirit of wilderness as open and free.

- **Geological** – This river segment provides an excellent opportunity to observe the geologic transition area of the river corridor.  According to

BLM_0007781

Wallace Hansen, noted geologist with the US Geological Survey, there is nowhere in the world where the Precambrian rock is better exposed for viewing than in the walls and canyon floor of the Gunnison Gorge. The Gorge contains outstanding examples of faulting, pegmatite dyke formations, and geologic "unconformities," as well as many other interesting geologic features. Its geology, a continuation of the National Park's geology, provides additional features not found in the National Park, including the outer canyon composed of sedimentary layers.

- **Recreational –** In addition to the excellent recreational opportunities for hiking, camping, and solitude provided by the river segment's designation as a Wilderness, the river provides outstanding opportunities for whitewater boaters, float anglers, and walk-in anglers, who can access the area via four wilderness trails. Visitors travel long distances and are willing to hike themselves and their boats and gear down into the canyon to the water's edge, as the area is accessible only by non-motorized, non-mechanized trail. The river corridor provides commercial usage for whitewater rafting companies and licensed fishing guides. The river contains a Gold Medal trout fishery. From a regional standpoint, the limited access and Wilderness designation provides a unique opportunity to visitors.

- **Wildlife –** There is significant habitat for regionally important populations of river otter (*Lutra canadensis*), mule deer (*Odocoileus hemionus*), elk (*Cervus elaphus*), wintering bald eagle (*Haliaeetus leucocephalus*), ferruginous hawk (*Buteo regalis*), and osprey (*Pandion haliaetus*).

### Segment 2:  Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company Diversion)

Length within Planning Area: 6.0 miles (see Figure I-5)

Tentative Classification:  Recreational

Proposed Boundary:  Approximate 0.5-mile corridor centered on of the river (Figure I-5)

This segment is generally flat water bordered by red sandstone canyon walls. The width of the valley varies in this section. There is some shoreline development including the BLM's day-use area at the Gunnison Forks, the Gunnison River Pleasure Park, a small house and fenced area, and a dirt road that runs parallel to the river for the entire segment. There are also two features located downstream of the North Fork confluence. One is near the private property on river left (the south side) across from Sulphur Gulch and downstream of the Pleasure Park. The other is on river right (the north side) at Sulphur Gulch downstream of the Pleasure Park. These features, although small and practically unnoticeable, initially appear to be small diversions. However, further investigation showed these to be side channels, not diversions. Their presence does not affect any outstandingly remarkable values.

BLM_0007782



The suitable Wild and Scenic River designation boundary is an approximate 0.5-mile corridor, centered on the Gunnison River.

***Segment 2: Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company Diversion, 6 Miles)***

**Gunnison Gorge NCA Planning Area, Colorado**

Gunnison River

Wild and Scenic River Segment Boundary

Private Land

Wilderness

NCA

Other BLM Lands

**Tetra Tech, Inc.**

**Figure I-5**

BLM_0007783

*This page intentionally left blank.*

BLM_0007784

The outstandingly remarkable values for this segment are described as follows:

- **Scenic –** Interesting geology and outstanding vistas of the Uncompahgre Plateau, West Elk Wilderness, Grand Mesa, and the Ragged Mountains add interest and 360-degree viewing enjoyment.  The area is rated "A" for visual quality as defined in the BLM Visual Resource Inventory Handbook, H-8410-1 (BLM 2002o).

- **Recreational –** This segment provides an excellent opportunity for family boating.  The relatively flat water allows for canoeing, kayaking, and rafting through a relatively secluded area.  In addition, this segment is noted for its excellent year-round trout fishery that is supported by high-quality water.  There is currently a road parallel to the river for the entire segment length.  This road provides recreation for off-highway vehicle users and access for anglers and boaters.  It is visible from the river corridor in many places and is located within the proposed 0.5-mile-wide segment boundary.

### Segment 3:  Smith Fork Creek

Length within Planning Area: 2.0 miles (see Figure I-6)

Tentative Classification:  Scenic

Proposed Boundary:  Approximate 0.5-mile corridor centered on of the river (Figure I-6)

The segment of the Smith Fork Creek under consideration is from the confluence with the Gunnison River upstream to the Gunnison Gorge Wilderness boundary.  Smith Fork Creek is deeply entrenched in a canyon.  From the river itself, views are limited to the sharp canyon walls.  There is a road along the rim on the shelf between the upper and lower canyon, but this road is not visible from the river.

The outstandingly remarkable values for this segment are described as follows:

**Scenic –** The twisted and jagged geology of the Smith Fork Canyon is outstanding and remarkably scenic.  The intense, black rock of the river corridor, combined with extremely steep black canyon walls, evoke a sense of complete isolation and a sense of awe.  As Smith Fork Creek twists its way through the gnarled canyon, it drops over huge jagged boulders and falls into myriads of cascading waterfalls into calmer pools of green water that reflect the overhanging walls.  The area is rated "A" for visual quality as defined in the BLM Visual Resource Inventory Handbook, H-8410-1 (BLM 2002o).

- **Recreational –** This area contains cascading waterfalls and pools that attract thousands of visitors that stop at Smith Fork Creek as part of Gunnison River rafting trips.  This provides a unique opportunity for boaters to stop and enjoy the deep pools and warmer water of Smith Fork Creek.

BLM_0007785

***Segment 4:  Red Canyon***

Length within Planning Area: 4.2 miles (see Figure I-7)

Tentative Classification: Scenic

Proposed Boundary: Approximate 0.5-mile corridor centered on the river (Figure I-7)

The segment of the Red Canyon being evaluated includes three smaller segments.  The first segment is approximately 1.5 miles stretching from the confluence with the Gunnison River to where Red Canyon enters private land.  The segment along private land is approximately 0.25-mile in length.  Red Canyon then returns to BLM land for approximately 1.5 miles.

The outstandingly remarkable values for this segment are described as follows:

- **Scenic –** The lower Red Canyon sections provide a narrow darkness and starkness made awe inspiring by the steep canyon walls and lack of vegetation.  In addition, there is a dramatic waterfall at the confluence with the Gunnison River adding to its scenic value.  The area is rated "A" for visual quality as defined in the BLM Visual Resource Inventory Handbook, H-8410-1 (BLM 2002o).

- **Cultural –** The Ute trail continues from the west side of the Gunnison Gorge across the river and east through Red Canyon.  As part of the Ute trail, it meets the criteria of being rare and unusual and having exceptional human interest because it is the only crossing point of the Gorge/Canyon. The trail has likely been used for hundreds of years by Native Americans and later by cattlemen.  The trail demonstrates native people's mobility in their seasonal rounds, and how they were able to use a wide variety of habitats and resources.  Wickiups identified in the vicinity of Red Canyon substantiate use of the area by the Ute Indians.

### I.5.3    Suitability Determinations

This section contains a discussion of eight suitability factors in relationship to each of the four segments determined to be eligible.  These factors were described in Section I.2.2, Suitability Determination.

***Segment 1:  Gunnison River (Entire Wilderness to Transmission Line South of North Fork)***

1.    Characteristics that do or do not make the river a worthy addition to the NWSRS:

The outstandingly remarkable values that qualify this river segment as eligible for inclusion in the NWSRS are cultural and historic, ecological, scenic, geological, recreational, and wildlife, as described in Section I.4.2.  The free-flowing river is crucial to maintaining the recreational, wildlife, scenic, and ecological outstandingly remarkable values.   The cultural and historic and geological outstandingly remarkable values are the result of the historic flows and uses of the river segment; interpretation of these values is dependent upon the river.

BLM_0007786



The suitable Wild and Scenic River designation boundary is an approximate 0.5-mile corridor, centered on Smith Fork Creek.

**Segment 3: Smith Fork Creek (2 Miles)**
**Gunnison Gorge NCA Planning Area, Colorado**



Rivers
Wild and Scenic River Segment Boundary
Private Land
Wilderness
NCA

**Tetra Tech, Inc.**

**Figure I-6**

I-23

*This page intentionally left blank.*

BLM_0007788



The suitable Wild and Scenic River designation boundary is an approximate 0.5-mile corridor, centered on Red Canyon Creek.

**Segment 4: Red Canyon Creek (4.2 Miles)**
**Gunnison Gorge NCA Planning Area, Colorado**



Rivers
Wild and Scenic River Segment Boundary
Private Land
Wilderness
NCA

**Tetra Tech, Inc.**

**Figure I-7**

I-25

BLM_0007789

*This page intentionally left blank.*

BLM_0007790

Classification criteria pertaining to shoreline development of a Wild river require essentially primitive shoreline development and little or no evidence of human activity (see Attachment I-2). Shoreline development in this segment includes 26 primitive campsite locations and three pit toilets. Use of the campsites is temporary and does not result in permanent developments along the river. Two of the permanent pit toilets are small, single-person toilets. One pit toilet is located at the bottom of the Chukar Trail and is completely enclosed. These three toilets are the only permanent developments along the river segment and serve to protect the scenic and ecological values of the river. Another shoreline development is a small diversion immediately upstream of the transmission line that directs water downstream to the Angel private property tract on river left (south side of river). The feature is nearly indistinguishable and does not affect any outstandingly remarkable values.

The flows in this segment are controlled by the dams located upstream of the National Park. Although this has the potential to interfere with the free-flowing nature of the river, the dams are currently operated in a manner generally such that adequate flows and the outstandingly remarkable values are maintained. Future water rights and agreements would have the potential to change the river flows.

2.   The status of land and mineral ownership, use in the area, and associated or incompatible uses:

This segment contains 3,901 acres, of which 3,795 is federal land managed by the BLM. A small portion of private land (106 acres) is located within the boundary outside of the river channel (Figure I-4). The majority of the federal land is located within the Wilderness (3,644 acres) and the remaining 151 acres is within the NCA. BLM management policies for the Wilderness protect the majority of the outstandingly remarkable values from impacts. Additionally, the small segment outside the Wilderness is within the NCA and is also managed for the protection of the outstandingly remarkable values. Overall, there are no incompatible land uses or mineral ownerships within this segment.

3.   Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area is not designated:

The Wilderness designation for the majority of the area and NCA management for the remainder of the area restricts potential uses that might impact a Wild river designation. The only potential use that would be curtailed as a result of designation would be an expansion of the existing transmission line right-of-way that marks the downstream end of the segment. Any expansion of this right-of-way would have to occur to the north outside of the designated segment. This would not result in any major impacts to transmission capabilities.

4.   Federal, state, tribal, local, public, or other interest in designation or non-designation of the river:

This segment's tentative classification is Wild. Designation of this segment, or any other segment, into the NWSRS as a Wild river would permanently prohibit the construction of water impoundment projects in this segment. However, Congress will ultimately choose the legislative language if any segment found suitable comes before them for possible designation.  During the March 14 through June 16, 2003, public comment period on the DRMP and the Draft Wild and Scenic Rivers Study Report (BLM 2003c), 389 written comments were received supporting the wild and scenic river suitability findings and recommendations in the Agency Preferred Alternative, Alternative D. The Colorado Water Conservation Board, the Colorado River Water Conservation District, and the Uncompahgre Valley Water User's Association submitted written objections to these determinations and recommendations in this segment because of the relationship between the Wild and Scenic Rivers Act and a federal reserved water right or perceived implications to future water development.  A summary analysis of the comments received is in Chapter 6 of the PRMP (BLM 2004). All comments received are reprinted and responded to in Chapter 6.  Local public and governmental interest in designation or nondesignation of this segment has occurred on several occasions since the 1979 Park Service study report found most of this same segment suitable for designation. The Secretary of Interior recommended to Congress the upstream 14 miles of the segment for designation following the 1979 study report.

5.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated:

Designation as a Wild river segment would not require the acquisition of any property.  All of the lands are federal lands managed by the BLM as a Wilderness and NCA.  No additional costs are anticipated from the management of the area as a Wild river segment.

6.  Ability of the agency to manage and protect the river area or segment as a wild and scenic river, or other means to protect the identified values other than wild and scenic river designation:

Because of the current designation of the majority of the area as Wilderness, it would be relatively simple for the BLM to incorporate considerations to maintain or protect values into current management.   Within the Wilderness, management would not change, with the exception of reviewing future proposals for compliance with the WSR Act.  In the small portion located outside the Wilderness, some additional attention would be needed to ensure protection of Wild river values. Overall, the BLM would be able to manage and protect the river area with minimal effort.

7.  Historical or existing rights which could be adversely affected with designation:

In this segment, the Colorado Water Conservation Board holds an instream flow right for 300 cubic feet per second (year-round) that was decreed in 1992. This water right would not be affected by NWSRS designation with a federal reserved right because it is a senior right. In addition, the Colorado Water Conservation

BLM_0007792

Board's water right would help maintain the segment's outstandingly remarkable values by maintaining the instream flow.

Also in Segment 1, the City of Delta, Colorado, has a conditional water right for the Smith Fork Hydroelectric Project. The location of the right is within the Gunnison Gorge Wilderness at Smith Fork Creek. (See Chapter 1, Section 1.13, of the DRMP [BLM 2003c] for more information on this right.) The conditional right pre-dates the 1979 Park Service wild and scenic river study report that recommended the segment for inclusion in the NWSRS. This water right would be affected by designation. However, if the City ever chose to exercise the subject right, the construction of any project within the segment associated with the water right could be affected, depending on the designation language chosen by Congress.

Private, senior water rights are located upstream of this segment. If a federal reserved water right were included with designation of any stream segment in the NWSRS, any requested change in senior water rights located upstream would be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. If Congress designates a segment with a federal reserved water right included, and if owners of these upstream senior water rights seek to change their water rights, then these proposed changes could be affected. The effect would depend on the actual change proposed, the language in the designation legislation, and the potential impacts on outstandingly remarkable values in the segment. The federal agency holding the reserved right may be able to object if the changes could potentially affect the outstandingly remarkable values in the segment. In addition, major reservoirs with federal government involvement and operations are located upstream of this segment.  Proposals or changes involving the federal government that would result in potential effects on wild and scenic river values in any designated segment would also be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. If determinations show an effect, the proposals could be objected, depending on the language in the designation act.

Congress is the only entity, in most cases, that designates river or stream segments as part of the NWSRS. Congress could designate a segment without a federal reserved water right. This report does not recommend segments for designation in the NWSRS. This report documents BLM determinations of eligibility, tentative classification, and suitability for inclusion in the NWSRS. BLM is not requesting a federal reserved water right in this report or the RMP, as water protection strategies and measures to meet the purposes of the WSR Act will ultimately be the responsibility of Congress.

BLM_0007793

8.   Other:

No other major issues or concerns have been identified in the land use planning process regarding suitability of this segment.

### Segment 2:  Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company Diversion)

1.   Characteristics that do or do not make the river a worthy addition to the NWSRS:

The outstandingly remarkable values that qualify this river segment as eligible for inclusion in the NWSRS are scenic and recreational, as described in Section I.4.2. The free-flowing river is crucial to maintaining these values.

Although the segment contains outstanding scenic values, there are a few intrusions visible from the river.  The upstream end of the segment is bounded by a transmission line that crosses the river and is visible for approximately one mile downstream.  A dirt road runs parallel to the river on the western shore (river right) for the entire length of the segment.  The BLM would close this road if the segment were designated to protect the scenic values.  Use of this road by existing private property owners would be allowed.  Along this road there are several turnouts that have been used as campsites and river-access points.  Additionally, there is an old water wheel in the river near the south bank just upstream of the Relief Ditch Company diversion dam that marks the downstream boundary of this river segment.  The water wheel may be of historic interest; the diversion that once supplied water to the wheel is no longer maintained.

There are two developments within the river corridor along this segment.  The first is the Gunnison River Pleasure Park located at the confluence with the North Fork. The Gunnison River Pleasure Park contains several buildings, including a store and camping facilities, and is frequently used as a boat take-out point.  The Gunnison River Pleasure Park is located on private land and is accessible by a paved road from Colorado Highway 92.   Immediately upstream of and adjacent to the Gunnison River Pleasure Park is a BLM Day-Use Area along the Gunnison River and the North Fork River that is also visible from the river segment. Approximately 0.5-mile downstream of the confluence with the North Fork, there is a small house and fenced yard adjacent to the river on the southern shore (river left).

There are three features located downstream of the North Fork confluence.  One is near the private property on river left (the south side) across from Sulphur Gulch and downstream of the Pleasure Park.  The other is on river right (the north side) at Sulphur Gulch downstream of the Pleasure Park.  These features, although small and practically unnoticeable, initially appear to be small diversions.  However, further investigation showed these to be side channels, not diversions.  Their presence does not affect any outstandingly remarkable values.  The third feature is a small diversion for the North Delta Ditch Company on river right (the north side) that appears to be a small side channel a short distance upstream from the Relief

BLM_0007794

Ditch Company diversion.  The presence of the diversion does not affect any outstandingly remarkable values.  The riparian vegetation along this segment is heavily infested with nonnative saltcedar (tamarisk) (*Tamarix parviflora* and *Tamarix ramosissima*).  The scenic value of saltcedar is subjective based on the observer's knowledge and opinion of native riparian vegetation.

2.  The status of land and mineral ownership, use in the area, and associated or incompatible uses:

This segment contains 1,776 acres, of which 1,388 acres are federal land managed by the BLM.  All the federal lands are included in the NCA (including the former Tri-State Lands that were acquired by the BLM in January 2000 and added to the NCA in November 2003).

Mineral, oil, gas, and geothermal leasing activities are not allowed on lands within the NCA.  As a result, none of land within the NCA would be affected by designation.  The management of the remaining former Tri-State lands not within the NCA would be determined by the selected alternative in the RMP.  Currently, however, there are no general management restrictions regarding mineral, oil, gas, and geothermal leasing in this area.

Approximately 363 acres of land occur within two developed private land parcels.  The Gunnison River Pleasure Park parcel is located at the confluence with the North Fork, and another private parcel is located on the south shore downstream of the confluence.  The BLM has no plans to pursue acquisition of these properties and, as a result, would have no jurisdiction over management of these parcels.  The BLM would consider acquisition under a willing seller/willing buyer basis if opportunities were presented.  The BLM does not anticipate significant changes to the existing condition of these properties.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area is not designated:

If designated, the BLM would limit the construction and maintenance of any proposed diversion structures.  If designated, the BLM would not allow mineral, oil, gas, or geothermal leasing activities to occur within the segment's boundary.  These actions may occur regardless of designation.

The RMP would develop access, camping facilities, and a boat launch within this segment.  The potential impacts from these actions on wild and scenic river values are evaluated in Chapter 5 of the PRMP (BLM 2004).  Mitigation measures would be implemented to ensure the wild and scenic river values would not be adversely affected by proposed actions.

BLM_0007795

4.  Federal, state, tribal, local, public, or other interest in designation or non-designation of the river:

This segment's tentative classification is Recreational. Designation of segment 2, or any other segment, into the NWSRS would permanently prohibit the construction of water impoundment projects in the segment. However, Congress will ultimately choose the legislative language if any segment found suitable comes before them for possible designation.  During the March 14 through June 16, 2003, public comment period on the DRMP and Draft Wild and Scenic Rivers Study Report (BLM 2003c), 389 written comments were received supporting the wild and scenic river suitability findings and recommendations in the Agency Preferred Alternative, Alternative D. The Colorado Water Conservation Board and the Colorado River Water Conservation District submitted written objections to these determinations and recommendations in this segment because of the relationship between the WSR Act and a federal reserved water right or perceived implications to future water development.  A summary analysis of the comments received is in Chapter 6 of the PRMP (BLM 2004). All comments received are reprinted and responded to in Chapter 6.  Designation would preserve the outstandingly remarkable values for public benefit, which are predominantly realized by recreational users of the segment.  Designation would not affect the private landowners' ability to manage their property.

5.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated:

The BLM would not actively pursue the acquisition of private parcels within the designated boundary.  The BLM would consider acquisition under a willing seller/willing buyer basis if opportunities were presented.  The study segment could be managed without acquiring private lands.  The cost of administering the area would be minimal because it is already predominantly BLM-managed lands.  There may be a small increase in effort necessary for activities such as closure and restoration of the existing road and general clean up.

6.  Ability of the agency to manage and protect the river area or segment as a wild and scenic river, or other means to protect the identified values other than wild and scenic river designation:

Because the majority of the property in this segment is federal land managed by BLM, it would not be difficult for BLM to manage this segment for the protection of the outstandingly remarkable values.  In addition, the construction of additional facilities along this segment is being evaluated to determine potential impacts on the outstandingly remarkable values for this segment.  Overall, the BLM could manage this segment for the protection of its values without designation; however, the management direction to do so is not currently in place.  The RMP includes management for protection of these values.

BLM_0007796

7.   Historical or existing rights which could be adversely affected with designation:

There is a water right and structure at the downstream terminus of this segment held by the Relief Ditch Company for an existing cross-channel earthen and rock diversion.   Historical or existing rights held or owned by the company and the structure would not be affected by the suitability finding or designation as part of the NWSRS.   The actual impoundment or diversion structure would not be within the segment.   The existing Relief Ditch Company diversion would continue to be operated at current levels.   Land purchases, exchanges, or easement acquisitions within the segment would be carried out only with willing sellers.

Private, senior water rights are located upstream of this segment. If a federal reserved water right were included with designation of any stream segment in the NWSRS, any requested change in senior water rights located upstream would be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected.   If Congress designates a segment with a federal reserved water right included, and if owners of these upstream senior water rights seek to change their water rights, then these proposed changes could be affected. The effect would depend on the actual change proposed, the language in the designation legislation, and the potential impacts on outstandingly remarkable values in the segment.   The federal agency holding the reserved right may be able to object if the changes could potentially affect the outstandingly remarkable values in the segment. In addition, major reservoirs with federal government involvement and operations are located upstream of this segment.   Proposals or changes involving the federal government that would result in potential effects on wild and scenic river values in any designated segment would also be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. If determinations show an effect, the proposals could be objected to, depending on the language in the designation act.

Congress is the only entity, in most cases, that designates river or stream segments as part of the NWSRS. Congress could also designate a segment without a federal reserved water right.   This report does not recommend segments for designation in the NWSRS.   This report documents BLM determinations of eligibility, tentative classification, and suitability for inclusion in the NWSRS.   BLM is not requesting a federal reserved water right in this report or RMP, as water protection strategies and measures to meet the purposes of the WSR Rivers Act will ultimately be the responsibility of Congress.

8.   Other:

No other major issues or concerns regarding suitability of this segment have been identified in the land use planning process.

***Segment 3:  Smith Fork Creek***

1.  Characteristics that do or do not make the river a worthy addition to the NWSRS:

    Smith Fork Creek contains scenic and recreational outstandingly remarkable values, as described in Section I.4.2, that make the segment a worthy addition to the NWSRS.  The waterfalls and pools are an integral part of these values.

    Flows in Smith Fork Creek vary significantly throughout the year.  During low-flow periods, the river segment contains very little flowing water, which diminishes the scenic and recreational values created by the waterfalls and deep pools.

2.  The status of land and mineral ownership, use in the area, and associated or incompatible uses:

    The entire length of the Smith Fork Creek segment being considered is on BLM-managed federal land in the Wilderness.  This provides significant protection for resource values within the area.  The proposed 0.5-mile designation corridor extends beyond the river and onto privately owned land.  As such, the proposed 0.5-mile corridor includes 564 acres of federal land and 98 acres of private property.  Immediately upstream of the proposed segment, Smith Fork Creek flows through a privately owned valley.  The valley contains several habitable structures and a large working ranch.  The majority of the valley is irrigated with water from Smith Fork Creek.  As a result, the water quality of Smith Fork Creek could be adversely affected by runoff and return flows from irrigation practices.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area is not designated:

    The Smith Fork Creek segment occurs in an isolated canyon accessible only by boat from the Gunnison River or through private property upstream of the segment.  There are no roads extending into the proposed segment, and the canyon's topography is not conducive to development.  As a result, there are no foreseeable potential uses of this segment that would be affected by designation.

4.  Federal, state, tribal, local, public, or other interest in designation or non-designation of the river:

    This segment's tentative classification is Scenic.  Designation of segment 3, or any other segment, into the NWSRS would permanently prohibit the construction of water impoundment projects in the segment.  However, Congress will ultimately choose the legislative language if any segment found suitable comes before them for possible designation.  During the March 14 through June 16, 2003, public comment period on the DRMP and Draft Wild and Scenic Rivers Study Report (BLM 2003c), 389 written comments were received supporting the wild and scenic river suitability findings and recommendations in the Agency Preferred Alternative, Alternative D.  The Colorado Water Conservation Board and the Colorado River Water Conservation District submitted written objections to these determinations and

BLM_0007798

recommendations in this segment because of the relationship between the Wild and Scenic Rivers Act and a federal reserved water right or perceived implications to future water development.  A summary analysis of the comments received is in Chapter 6 of the PRMP (BLM 2004). All comments received are reprinted and responded to in Chapter 6.

5.  Designation would preserve the outstandingly remarkable values for public benefit, which are predominantly realized by recreational users of the segment.  Designation would not affect private landowners' ability to manage their property. Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated:

The BLM would not actively pursue the acquisition of the private lands within the proposed boundary.   The BLM would consider acquisition under a willing seller/willing buyer basis if opportunities were presented.   However, it may be easier to manage the segment for the protection of identified values if the proposed boundary were adjusted to exclude the private parcels.   However, these private lands have been included to provide a buffer to the portion of the segment on federal lands.

Administration of this segment would be relatively simple and would not require costs in addition to current Wilderness management costs.   The amount of recreational use in this area is minimal and would not require active management.

6.  Ability of the agency to manage and protect the river area or segment as a wild and scenic river, or other means to protect the identified values other than wild and scenic river designation:

The Smith Fork Creek segment is currently managed as Wilderness by the BLM. Designation as a Scenic river would not significantly change management of the area.   As a result, the BLM would be able to maintain identified values through current management practices.

7.  Historical or existing rights which could be adversely affected with designation:

Upstream or downstream of this segment, administration and operation of water rights by private landowners would not be affected by the suitability findings in this report.  Private, senior water rights are located upstream of this segment. If a federal reserved water right were included with designation of any stream segment in the NWSRS, any requested change in senior water rights located upstream would be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected.  If Congress designates a segment with a federal reserved water right included, and if owners of these upstream senior water rights seek to change their water rights, then these proposed changes could be affected. The effect would depend on the actual change proposed, the language in the designation legislation, and the potential impacts on outstandingly remarkable values in the segment.  The federal agency holding the reserved right may be able to object if the changes could potentially affect the outstandingly remarkable values in

BLM_0007799

the segment.  Proposals or changes involving the federal government that would result in potential effects on wild and scenic river values in any designated segment would also be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. If determinations show an effect, the proposals could be objected, depending on the language in the designation act.

8.  Congress is the only entity, in most cases, that designates river or stream segments as part of the NWSRS. Congress could also designate a segment without a federal reserved water right.  This report does not recommend segments for designation in the NWSRS.  This report documents BLM determinations of eligibility, tentative classification, and suitability for inclusion in the NWSRS.  BLM is not requesting a federal reserved water right in this report or the RMP, as water protection strategies and measures to meet the purposes of the WSR Act will ultimately be the responsibility of Congress. Other:

No other major issues or concerns regarding suitability of this segment have been identified in the land use planning process.

### Segment 4:  Red Canyon

1.  Characteristics that do or do not make the river a worthy addition to the NWSRS:

The scenic and cultural outstandingly remarkable values described in Section I.4.2 make this segment a worthy addition to the NWSRS.  The cultural outstandingly remarkable values are based on the Ute trail and are not river dependent, but rather are the result of topography.  The outstandingly remarkable scenic values are a function of the river and, in particular, the dramatic waterfall at its confluence with the Gunnison River.

The Red Canyon segment is an ephemeral segment with substantial flows during the spring, but generally it lacks water during the late summer and fall seasons.

2.  The status of land and mineral ownership, use in the area, and associated or incompatible uses:

The majority (3.8 miles) of the Red Canyon segment being considered (4.2 miles) is on BLM-managed federal land in the Wilderness.  A portion of the proposed 0.5-mile designation corridor also extends beyond the river and onto privately owned land.  The proposed boundary for the Red Canyon segment contains 1,367 acres, 1,194 acres (87 percent) of which occur on federal land.  Private land accounts for 173 acres of the proposed designated area, most of which occurs in the middle of the 4.2-mile segment.  Land use on the private segment is not managed by the BLM.

3.  Reasonably foreseeable potential uses of the land and related waters that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS, and values that would be foreclosed or diminished if the area is not designated:

BLM_0007800

There are no foreseeable potential uses of the land and related waters that would be affected by designation of the segment.

4.  Federal, state, tribal, local, public, or other interest in designation or non-designation of the river:

This segment's tentative classification is Scenic. Designation of segment 4, or any other segment, into the NWSRS would permanently prohibit the construction of water impoundment projects in this segment.  However, Congress will ultimately choose the legislative language if any segment found suitable comes before them for possible designation.  During the March 14 through June 16, 2003, public comment period on the DRMP and Draft Wild and Scenic Rivers Study Report (BLM 2003c), 389 written comments were received supporting the wild and scenic river suitability findings and recommendations in the Agency Preferred Alternative, Alternative D. The Colorado Water Conservation Board and the Colorado River Water Conservation District submitted written objections to these determinations and recommendations in this segment because of the relationship between the WSR Act and a federal reserved water right or perceived implications to future water development.  A summary analysis of the comments received is in Chapter 6 of the PRMP (BLM 2004).  All comments received are reprinted and responded to in Chapter 6.

The BLM has interest in enhancing and maintaining protection of the identified values in this segment.  Existing uses on the 178 acres of private land in this segment would not be affected.  Acquisition of any private land in this segment would occur only on a willing seller-willing buyer basis.

5.  Estimated cost of acquiring necessary lands, interests in lands, and administering the area if designated:

The BLM would not actively pursue or consider the acquisition of the private land parcel unless it became available from a willing seller.  The BLM does not anticipate this happening in the foreseeable future.

The federal land is currently managed as Wilderness by the BLM.  As a result, administration of this segment as a Scenic river would be relatively simple.  The majority of the protective measures required for administrating a Scenic river are already in place as a result of the Wilderness designation.

BLM_0007801

6.  Ability of the agency to manage and protect the river area or segment as a wild and scenic river, or other means to protect the identified values other than wild and scenic river designation.

Because of the current designation as Wilderness, it would be relatively simple for the BLM to manage this segment as Scenic.

7.  Historical or existing rights which could be adversely affected with designation:

Existing private property rights would not be affected.  Land purchases, exchanges, or easement acquisitions would be carried out only with willing sellers.

Private, senior water rights are located upstream of this segment. If a federal reserved water right were included with designation of any stream segment in the NWSRS, any requested change in senior water rights located upstream would be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected.  If Congress designates a segment with a federal reserved water right included, and if owners of these upstream senior water rights seek to change their water rights, then these proposed changes could be affected. The effect would depend on the actual change proposed, the language in the designation legislation, and the potential impacts on outstandingly remarkable values in the segment.  The federal agency holding the reserved right may be able to object if the changes could potentially affect the outstandingly remarkable values in the segment. In addition, major reservoirs with federal government involvement and operations are located upstream of this segment.  Proposals or changes involving the federal government that would result in potential effects on wild and scenic river values in any designated segment would also be analyzed to determine if the outstandingly remarkable values for which the stream was designated would be affected. If determinations show an effect, the proposals could be objected to, depending on the language in the designation act.

Congress is the only entity, in most cases, that designates river or stream segments as part of the NWSRS. Congress could also designate a segment without a federal reserved water right.  This report does not recommend segments for designation in the NWSRS.  This report documents BLM determinations of eligibility, tentative classification, and suitability for inclusion in the NWSRS.  BLM is not requesting a federal reserved water right in this report or RMP, as water protection strategies and measures to meet the purposes of the WSR Act will ultimately be the responsibility of Congress.

8.  Other:

No other major issues or concerns regarding suitability of this segment have been identified in the land use planning process.

## I.5.4  Suitability Determination Summary

All four of the eligible segments were determined to be suitable for inclusion in the NWSRS.  Below is a brief summary for each of the four segments.  The BLM does not

BLM_0007802

believe that assertion of a federal water right is necessary to maintain the outstandingly remarkable values in and along these river segments.

### Segment 1:   Gunnison River (Entire Wilderness to Transmission Line South of North Fork)

This segment contains outstandingly remarkable cultural and historical, ecological, scenic, geological, recreational, and wildlife values.  Scenic values found in the Gorge are inextricably interwoven with the geologic and physiographic features of the area (Park Service 1979).  The river segment provides an excellent opportunity to observe the extremely scenic geologic transition from the towering black walls of the Black Canyon of the Gunnison National Park, to the beautiful and very colorful and dramatic double-canyon system found in the Gunnison Gorge Wilderness.  Although flows are controlled by dams upstream of the segment, the river maintains a free-flowing nature throughout the entire 16 miles.  The segment meets classification criteria as Wild because the only access to the river is by trail, and there is minimal development along the shores, which maintains the primitive nature of this segment.  The only development consists of three pit toilets that facilitate the recreational uses of this segment while minimizing environmental impacts.  Designation of this segment would result in minimal changes to existing management but would provide an additional layer of protection for this river segment.  As a result, this segment has been determined suitable for designation as a Wild river within the NWSRS.

### Segment 2:   Gunnison River (From Transmission Line South of North Fork to Relief Ditch Company Diversion)

This segment contains outstandingly remarkable scenic and recreational values.  This segment is generally flat water bordered by red sandstone canyon walls.  There is some shoreline development visible from the river channel including the BLM's day-use area at the Gunnison Forks, the Gunnison River Pleasure Park, a small house and fenced area, and a dirt road parallel to the river for the entire segment.  These developments are considered minor and consistent with the segments classification as a Recreational river.  Management my BLM would include measures such as closing the dirt road that runs parallel to the river to ensure protection of scenic values, although use of this road by existing private property owners would continue to be allowed.  As a result, this segment is determined suitable for designation as a Recreational river in the NWSRS.

### Segment 3:  Smith Fork Creek

This segment contains outstandingly remarkable scenic and recreational values.  Smith Fork Creek is deeply entrenched in a canyon.  From the river itself, views are limited to the sharp canyon walls.  The segment contains waterfalls and deep pools providing scenic and recreational opportunities for visitors.  Although flow varies greatly in this segment and water quality and quantity may be the result of land use upstream on private parcels, the BLM does not consider these to adversely impact the outstandingly remarkable values or free-flowing nature of this segment.  Management of this segment by the BLM would involve minimal effort, as many of the protective measures have been implemented as a result of the area's Wilderness designation.  This segment is determined suitable for designation as a Scenic river in the NWSRS.

BLM_0007803

### Segment 4:  Red Canyon

This segment contains outstandingly remarkable scenic and recreational values.  The lower Red Canyon sections provide a narrow darkness and starkness made awe inspiring by the steep canyon walls and lack of vegetation.  In addition, there is a dramatic waterfall at the confluence with the Gunnison River adding to its scenic value. Although this segment is ephemeral (i.e., it does not flow year-round), this is typical of many rivers and streams in the region and consistent with the natural function of this segment.  Management of this segment by the BLM would involve minimal effort, as many of the protective measures have been implemented as a result of the area's Wilderness designation.  This segment is determined suitable for designation as a Scenic river in the NWSRS.

### I.5.5   Interim Management

Interim protection for suitable river segments is described in Table I-3-1 in Attachment I-3 of this appendix.

### Segment 1:   Gunnison River (Entire Wilderness to Transmission Line South of North Fork)

The majority of this segment (3,642 acres, or 97 percent) is located on federal land either within the Wilderness or the NCA.  The 106 acres of private land within the segment comprise a small portion.  Current BLM management of this area is sufficient to protect the free-flowing nature and outstandingly remarkable values that make this segment suitable for designation as a Wild river in the NWSRS.

### Segment 2:   Gunnison River (From Transmission Line south of North Fork to Relief Ditch Company Diversion)

The portions of this segment that occur on federal land within the NCA would be adequately protected under current NCA management policies.  Potential impacts on wild and scenic river values associated with the proposed construction of a boat launch and camping facilities are addressed in Chapter 5 of the PRMP (BLM 2004).  Interim management measures would ensure these proposed projects do not adversely affect the outstandingly remarkable values of this segment.

### Segment 3:  Smith Fork Creek

The majority of this segment is located on federal land inside the Wilderness.  Current BLM management of the area would be sufficient to protect the free-flowing nature and outstandingly remarkable values that make this segment suitable for designation as a Scenic river in the NWSRS.  BLM could provide limited assistance to encourage private landowner participation in the protection and management of river resources.

### Segment 4:  Red Canyon

The majority of this segment is located on federal land inside the Wilderness.  Current BLM management of the area would be sufficient to protect the free-flowing nature and outstandingly remarkable values that make this segment suitable for designation as a Scenic river in the NWSRS.  BLM could provide limited assistance to encourage private landowner participation in the protection and management of river resources.

BLM_0007804

**I.6**    **NEXT STEPS**

Congressional legislative action is required for actual designation and final classification of suitable river segments.

BLM_0007805

*This page intentionally left blank.*

BLM_0007806

# ATTACHMENT I-1 (TO APPENDIX I)
# ELIGIBILITY CRITERIA

### I-1.1   INTRODUCTION

For the purpose of classification, a river area may be divided into segments. For example, changes in river character such as the presence of dams and reservoirs, significant changes in types or amounts of development, significant changes in physiographic character, tributaries, or features, and/or significant changes in land status should be considered in identifying river segments for evaluation. Management strategies necessary to administer the entire river area should also be taken into account. As such, excessive segmentation should be avoided. Each segment, considered as a whole, needs to conform to either the "Wild," "Scenic," or "Recreational" classification. There are no specific requirements for segment length. Congress has designated a segment as short as four miles. A river segment is of sufficient length if a specific outstandingly remarkable value(s) can be protected (a factor in the suitability determination, not eligibility determination) should the segment be designated. An entire stream could be one segment.

Each identified river segment in the RMP planning area must be evaluated to determine whether or not it is eligible for inclusion in the NWSRS. To be eligible, a river segment must be "free-flowing" and must possess at least one "outstandingly remarkable" value. Free-flowing means "existing or flowing in a natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the water." Please note:

- A river below a dam or impoundment can still be eligible;

- A river need not be navigable by water craft in order to be eligible; and

- There are no specific requirements concerning the flow of an eligible river segment. Flows are sufficient if they sustain or complement the outstandingly remarkable values for which the segment would be designated. As such, intermittent and ephemeral streams can be eligible.

BLM_0007807

### I-1.2   OUTSTANDINGLY REMARKABLE VALUES

The determination of whether a river area contains "outstandingly remarkable" values is a professional judgement and needs to be documented in the study report.  In order to be considered as outstandingly remarkable, a river-related value must be a unique, rare, or exemplary feature that is significant at a comparative regional or national scale.  While the spectrum of resources that may be considered is broad, all values should be directly river-related. That is, they should:

- Be located in the river or on its immediate shorelands (for the purposes of this study, the preliminary boundary is 0.25-mile on either side of the river);

- Contribute substantially to the functioning of the river ecosystem; and/or

- Owe their location or existence to the presence of the river.

The following are general guidelines for the outstandingly remarkable values for which river segments can be eligible.  Only one such value is needed for eligibility.

#### Scenic

The landscape elements of landform, vegetation, water, color, and related factors result in notable or exemplary visual features and/or attractions. When analyzing scenic values, additional factors –  such as seasonal variations in vegetation, scale of cultural modifications, and the length of time negative intrusions are viewed – may be considered. Scenery and visual attractions may be highly diverse over the majority of the river or river segment.

#### Recreational

Recreational opportunities are, or have the potential to be, popular enough to attract visitors from throughout or beyond the region of comparison or are unique or rare within the region. Visitors are willing to travel long distances to use the river resources for recreational purposes. River-related opportunities could include, but are not limited to, sightseeing, wildlife observation, camping, photography, hiking, fishing and boating.

- Interpretive opportunities may be exceptional and attract, or have the potential to attract, visitors from outside the region of comparison.

- The river may provide, or have the potential to provide, settings for national or regional usage or competitive events.

#### Geological

The river, or the area within the river corridor, contains one or more example of a geologic feature, process or phenomenon that is unique or rare within the region of comparison. The feature(s) may be in an unusually active stage of development, represent a textbook example, and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, or other geologic structures).

BLM_0007808

### Fish

Fish values may be judged on the relative merits of either fish populations or habitat, or a combination of these river-related conditions:

    a. *Populations.* The river is nationally or regionally one of the top producers of resident, indigenous, and/or anadromous fish species. Of particular significance may be the presence of wild or unique stocks, or populations of State, federally listed, or candidate threatened and endangered species.

    b. *Habitat.* The river provides exceptionally high quality habitat for fish species indigenous to the region. Of particular significance is habitat for State, federally listed, or candidate threatened and endangered species.

### Wildlife

Wildlife values may be judged on the relative merits of either wildlife populations or habitat, or a combination of these conditions:

    a. *Populations.* The river or area within the river corridor contains nationally or regionally important populations of resident or indigenous wildlife species dependent on the river environment. Of particular significance may be species considered to be unique or populations of State, federally listed, or candidate threatened and endangered species.

    b. *Habitat.* The river or area within the river corridor provides exceptionally high quality habitat for wildlife of national or regional significance, or may provide unique habitat or a critical link in habitat conditions for State, federally listed, or candidate threatened and endangered species. Contiguous habitat conditions are such that the biological needs of the species are met.

### Cultural

The river or area within the river corridor contains a site(s) where there is evidence of occupation or use by Native Americans. Sites must be rare, have unusual characteristics, or exceptional human-interest value(s). Sites may have national or regional importance for interpreting prehistory; may be rare; may represent an area where culture or cultural period was first identified and described; may have been used concurrently by two or more cultural groups; or may have been used by cultural groups for rare or sacred purposes.

### Historic

The river or area within the river corridor contains a site(s) or feature(s) associated with a significant event, an important person, or a cultural activity of the past that was rare, or unusual in the region. A historic site(s) and/or feature(s) in most cases is 50 years old or older. Sites or features listed in, or eligible for inclusion in, the National Register of Historic Places, may be of particular significance.

BLM_0007809

*Other Similar Values*

While no specific evaluation guidelines have been developed for the other similar values category, additional values deemed relevant to the eligibility of the river segment should be considered in a manner consistent with the foregoing guidance, including, but not limited to, hydrologic, ecologic/biologic diversity, paleontologic, botanic, and scientific study opportunities.

BLM_0007810

# ATTACHMENT I-2 (TO APPENDIX I) CLASSIFICATION CRITERIA FOR WILD, SCENIC, AND RECREATIONAL RIVER AREAS

### Table I-2-1
### Classification Criteria for Wild, Scenic, and Recreational River Areas

| Attribute | Wild | Scenic | Recreational |
|---|---|---|---|
| Water Resources Development (impoundments, diversions, etc.) | Free of impoundment | Free of impoundment | Some existing impoundment or diversion.<br>The existence of low dams, diversions, rip-rap, or other modifications of the waterway is acceptable, provided the waterway remains generally natural and riverine in appearance. |
| Shoreline Development | Essentially primitive. Little or no evidence of human activity.<br>The presence of a few inconspicuous structures, particularly those of historic or cultural value, is acceptable.<br>A limited amount of domestic livestock grazing or hay production is acceptable.<br>Little or no evidence of past timber harvest. No ongoing timber harvest. | Largely primitive and undeveloped. No substantial evidence of human activity.<br>The presence of small communities or dispersed dwellings or farm structures is acceptable.<br>The presence of grazing, hay production, or row crops is acceptable.<br>Evidence of past or ongoing timber harvest is acceptable, provided the forest appears natural from the riverbank. | Some development. Substantial evidence of human activity.<br>The presence of extensive residential development and a few commercial structures is acceptable.<br>Lands may have been developed for the full range of agricultural and forestry uses.<br>May show evidence of past and ongoing timber harvest. |

BLM_0007811

**Table I-2-1**
**Classification Criteria for Wild, Scenic, and Recreational River Areas** *(continued)*

| Attribute | Wild | Scenic | Recreational |
|---|---|---|---|
| Accessibility | Generally inaccessible except by trail. No roads, railroads, or other provision for vehicular travel within the river area. A few existing roads leading to the boundary of the river area is acceptable. | Accessible in places by road. Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable. | Readily accessible by road or railroad. The existence of parallel roads or railroads on one or both banks, as well as bridge crossings and other river access points, including fords, is acceptable. |
| Water Quality | Meets or exceeds federal criteria or federally approved state standards for aesthetics, for propagation of fish and wildlife normally adapted to the habitat of the river, and for primary contact recreation (swimming), except where exceeded by natural conditions. | No criteria prescribed by the Wild and Scenic Rivers Act. The Federal Water Pollution Control Act Amendments of 1972 have made it a national goal that all waters of the US be made fishable and swimmable. Therefore, rivers will not be precluded from scenic or recreational classification because of poor water quality at the time of their study, provided a water quality improvement plan exists or is being developed in compliance with applicable federal and state laws. | |

Source: Federal Register. National Wild and Scenic Rivers System; Final Revised Guidelines for Eligibility, Classification, and Management of River Areas.  Section 1(3), Vol. 47, No. 173, page 39461. September 7, 1982.

BLM_0007812

# ATTACHMENT I-3 (TO APPENDIX I)
# INTERIM PROTECTION FOR CANDIDATE WILD AND SCENIC RIVERS

BLM guidance requires that interim management be developed and followed to protect the free-flowing nature, outstandingly remarkable values, and recommended classification of suitable segments until Congressional action regarding designation is taken. Table I-3-1 includes this interim protection.

**Table I-3-1**
**Interim Protection for Candidate Wild and Scenic Rivers**

| Wild and Scenic Rivers Act, Section 5(d)(1)[1] | | |
|---|---|---|
| **Issue/Action** | **Eligible[2]** | **Suitable** |
| Study Boundary | Minimum of 0.25-mile from ordinary high-water mark | Minimum of 0.25-mile from ordinary high-water mark |
| | Boundary may include adjacent areas needed to protect identified values | Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification | Section 2(b): 3 classes: Wild, scenic, recreational defined by statute | Section 2(b): 3 classes: Wild, scenic, recreational defined by statute |
| | Criteria for classification described in Interagency Guidelines | Criteria for classification described in Interagency Guidelines |
| | Manage at preliminary classification | Manage at preliminary classification |
| Study Report Review Procedures | | Notice of study report/Draft EA[3] published in Federal Register |
| | | Comments/response from federal, state, and local agencies, and the public included in the study report/Final EA[4] transmitted to the President and Congress |

BLM_0007813

**Table I-3-1**
**Interim Protection for Candidate Wild and Scenic Rivers** *(continued)*

| Wild and Scenic Rivers Act, Section 5(d)(I)[1] | | |
|---|---|---|
| **Issue/Action** | **Eligible[2]** | **Suitable** |
| Private Land<br>* Administration<br>*Acquisition | Affect private land uses through voluntary partnership with state/local governments and landowners | Affect private land uses through voluntary partnership with state/local governments and landowners |
| | No regulatory authority | No regulatory authority |
| | No ability to acquire interest in land under the Act's authority prior to designation | No ability to acquire interest in land under the Act's authority prior to designation |
| | | Typically an evaluation of the adequacy of local zoning and land use controls is a component of suitability determination5 |
| Water Resources Project | River's free-flowing condition protected to the extent of other agency authorities; not protected under the Act | River's free-flowing condition protected to the extent of other agency authorities; not protected under the Act |
| Land Disposition | Agency discretion to retain lands within river corridor in federal ownership | Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | Protect free flow, water quality, and outstandingly remarkable values through other agency authorities | Protect free flow, water quality, and outstandingly remarkable values through other agency authorities |
| Actions of Other Agencies | Affect actions of other agencies through voluntary partnership | Affect actions of other agencies through voluntary partnership |
| Protect Outstandingly Remarkable Values | No regulatory authority conferred by the Act; agency protects through other authorities | No regulatory authority conferred by the Act; agency protects through other authorities |
| | Section 11(b) 1:<br>Limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources[6] | Section 11(b) 1:<br>Limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources[6] |

[1] Agency-identified study rivers as directed by Section 5(d)(1) of the Act.
[2] A number of sources are available for identifying rivers under Section 5(d)(1). Under a Presidential Directive issued in 1979, each federal agency, as part of its normal planning and environmental review processes, is required to avoid or mitigate adverse effects on rivers in the National Rivers Inventory.
[3] Draft Environmental Assessment
[4] Final Environmental Assessment
[5] For an agency-identified study river that includes private lands there is often the need to evaluate existing state and local land use controls and, if necessary, assess the willingness of state and local government to protect river values.
[6] Section 11(b)1 authorizes the Secretary of the Interior and secretary of Agriculture, or the head of any other federal agency, to provide for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." This authority "applies within or outside a federally administered area and applies to rivers which are components of the National Wild and Scenic Rivers System and to other rivers." The recipients of federal assistance include states or their political subdivisions, landowners, private organizations, or individuals. Some examples of assistance under this section include, but are not limited to, riparian restoration, riparian fencing to protect water quality and riparian vegetation, of vegetative screening to enhance scenery/recreation experience.

BLM_0007814

# ATTACHMENT I-4 (TO APPENDIX I)
# RIVER SEGMENTS FROM INITIAL IDENTIFICATION EFFORTS

Table I-4-1 lists the planning area river and stream segments considered during initial identification efforts for the wild and scenic rivers study process.

BLM_0007815

## Table I-4-1
## River Segments from Initial Identification Efforts

| River Name | River Type | Segment Length | Resource Team Comments | Potential Outstandingly Remarkable Values | Determination (Eligible or Not Eligible) |
|---|---|---|---|---|---|
| Gunnison River (entire Wilderness to transmission line south of North Fork) | Perennial | approx. 16.0 miles | The majority of this reach is located within the steep canyon walls.  This section contains excellent scenic, recreational, cultural, and geological values.<br>The 1979 Wild and Scenic Study determined the majority of this segment to be eligible for Scenic designation. | Scenic, Recreational, Geology, Cultural | Eligible |
| Gunnison River (from transmission line south of North Fork to Relief Ditch Company diversion | Perennial | approx. 6.0 miles | This segment consists of relatively flat water bordered by red sandstone canyon walls.  There are great vistas of the Grand Mesa, the West Elk Mountains, and rugged wilderness areas.<br>The area also provides recreational opportunities such as family boating, and fishing.<br>The area contains some development including the Pleasure Park and a ranch house located downstream of the North Fork.  A gravel road runs parallel to the river this entire segment; however, BLM is considering closing it. | Scenic, Recreational | Eligible |
| Gunnison River (from Relief Ditch Company diversion to edge of planning area) | Perennial | approx. 3.2 miles | This segment consists of relatively flat water with colorful sandstone cliffs.<br>Although this segment is beautiful, containing scenic and recreational values, there are a number of rip-rapped areas that compromise its free-flowing qualifications.<br>Other detractions include an old carbon dioxide well, an irrigation ditch running parallel, and old road, several buildings and powerlines. | None | Not Eligible |
| Smith Fork Creek | Perennial | 3.0 miles | The segment being considered is from the confluence with the Gunnison River upstream approximately 3 miles.  However, the upstream 2 miles of this segment is located on private land.  The private land contains a number of buildings, roads, and bridges and is actively farmed.<br>The one mile long segment located within the Wilderness boundary is a deeply entrenched canyon containing outstanding scenic and recreational values.<br>The lower portion of Smith Fork Creek currently has poor water quality with high temperatures and levels of dissolved solids presenting problems for aquatic life. | Scenic, Recreational | Eligible - only the one mile segment located within the Wilderness |

BLM_0007816

## Table I-4-1
### River Segments from Initial Identification Efforts *(continued)*

| River Name | River Type | Segment Length | Resource Team Comments | Potential Outstandingly Remarkable Values | Determination (Eligible or Not Eligible) |
|---|---|---|---|---|---|
| North Fork | Perennial | 1.2 miles | This short segment contains a narrowleaf cottonwood, skunk bullrush, and Fremont's cottonwood riparian forest.<br>The surrounding area contains several buildings (Pleasure Park), a picnic area, a paved road and barbed wire fence visible from the river.<br>There are too many intrusions to consider the ecological values outstandingly remarkable. | None | Not Eligible |
| Cedar Creek | Perennial | 6.3 miles | No outstandingly remarkable values | None | Not Eligible |
| Grizzly Gulch | Intermittent | 1.0 mile | No outstandingly remarkable values | None | Not Eligible |
| Peach Valley Canal | Intermittent | 17.6 miles | Irrigation ditch - does not qualify as free-flowing | None | Not Eligible |
| Sulphur Gulch | Intermittent | 1.1 miles | This is a relatively short segment that runs between Highway 92 and the Gunnison River.  At Highway 92 it is little more than a shallow, wide depression.  Only for the last 0.25-mile is it steeply incised.<br>Segment contains a population of the federally listed Delta lomatium and Uinta Basin hookless cactus.<br>Lack of water during summer.<br>OHV trails and trash piles along upper canyon rim | Ecological | Not Eligible |
| Loutsenhizer Arroyo | Intermittent | 16.8 miles | No outstandingly remarkable values | None | Not Eligible |
| Iron Creek | Intermittent | 4.7 miles | No outstandingly remarkable values | None | Not Eligible |
| Long Gulch | Ephemeral | 3.3 miles | No outstandingly remarkable values | None | Not Eligible |
| Lime Kiln Gulch | Ephemeral | 3.0 miles | No outstandingly remarkable values | None | Not Eligible |
| Lawheed Gulch | Ephemeral | 2.6 miles | A relatively short segment between Highway 92 and the Gunnison River.  There is a gravel road that runs along side the gulch.  Powerlines cross the actively grazed area.  Much of this segment is ditch like with no outstandingly remarkable values.<br>The area contains a cattail marsh, greasewood/sea blight community, and populations of federally listed endangered clay-loving wild buckwheat. | Ecological | Not Eligible |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007817

**Table I-4-1**
**River Segments from Initial Identification Efforts** *(continued)*

| River Name | River Type | Segment Length | Resource Team Comments | Potential Outstandingly Remarkable Values | Determination (Eligible or Not Eligible) |
|---|---|---|---|---|---|
| Currant Creek | Ephemeral | 0.8 mile | No outstandingly remarkable values | None | Not Eligible |
| Dry Creek | Ephemeral | 0.4 mile | No outstandingly remarkable values | None | Not Eligible |
| Red Rock Canyon | Ephemeral | 4.3 miles | Although this segment is within the planning area, none if it is managed by BLM. Approximately 2 miles is located within the Black Canyon of the Gunnison National Park and the remainder is located within private land. The Park Service may consider this segment during their planning process. | Not assessed due to lack of BLM authority. | Not Eligible as part of the BLM planning process. |
| Jones Draw | Ephemeral | 4.2 miles | No outstandingly remarkable values | None | Not Eligible |
| Parvin Gulch | Ephemeral | 4.3 miles | No outstandingly remarkable values | None | Not Eligible |
| Coal Bank Gulch | Ephemeral | 3.4 miles | No outstandingly remarkable values | None | Not Eligible |
| Son-of-a-Gun Gulch | Ephemeral | 4.1 miles | No outstandingly remarkable values | None | Not Eligible |
| Diamond Joe Gulch | Ephemeral | 0.7 mile | No outstandingly remarkable values | None | Not Eligible |
| Buck Canyon | Ephemeral | 3.0 miles | No outstandingly remarkable values | None | Not Eligible |
| Poison Spring Gulch | Ephemeral | 6.5 miles | No outstandingly remarkable values | None | Not Eligible |
| Spring Gulch | Ephemeral | 1.3 miles | No outstandingly remarkable values | None | Not eligible |
| Red Canyon | Ephemeral | 13.3 miles | Red Canyon includes a mix of private and BLM land. Over the course of the 13.3 miles the river transitions from a steep walled canyon near the confluence with the Gunnison River to a meandering stream in a wide bottomed valley. | Scenic, Cultural, and Geology | Eligible - only 3 miles from confluence with Gunnison River upstream. |

Gunnison Gorge National Conservation Area
Approved Resource Management Plan

BLM_0007818

# ATTACHMENT I-5 (TO APPENDIX I)
# BLM SCENIC QUALITY FIELD INVENTORY FORMS

The following are the scenic quality field inventory forms completed by the BLM resource team for each of the four river segments proposed for further evaluation.

BLM_0007819

*This page intentionally left blank.*

BLM_0007820

Form 8400-1
(September 1985)

**UNITED STATES**

**DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

**SCENIC QUALITY FIELD INVENTORY**

| | |
|---|---|
| **Date** September 16, 2002 | |
| **District**  Montrose Field Office | |
| **Resource Area**  Gunnison River NCA Planning Area | |
| **Scenic Quality rating unit** Gunnison River upstream segment Park to transmission line | |

| 1. Evaluators (Names) | Karen Tucker (NCA Manager), Jim Sazama (Grazing Specialist), Dennis Murphy (Water Resource Specialist), Mike Manka (Aquatic Ecologist) |
|---|---|

### 2. LANDSCAPE CHARACTER (Feature)

| | a. LANDFORM / WATER | b. VEGETATION | c. STRUCTURE (General) |
|---|---|---|---|
| **FORM** | Steep narrow inner canyon of dark rock, exposed faults, multi-layerd outer canyon.  Meandering river with contoured flats of gravel and sand.  Upland terraces above flat verticle walls. | Dramatic changes from areas of no vegetation to terraces, to upland meadows, and vegetated slopes | Double canyon with a meandering river. |
| **LINE** | Vertical walls (400-1000' high; 1/8 - 1/2 mile wide) jagged ridge lines, upward thrusting pegmatite dykes, folds and drapes.  Horizontally oriented (1000 - 2000' high; 2 miles wide. | Sparse to no vegetation in some areas.  Meandering and linear riparian areas.  Upland twisted pinyon-juniper woodlands. | Sharply vertical inner canyon dramatically tiered outer canyon. |
| **COLOR** | Imposing dark inner canyon interspersed with contrasting brightly colored bands (dykes) of pink. Brightly colored outer canyon composed of tan, buff, salmon, red, grey, pink, and white sandstones. | Bright green riparian vegetation contrasted by muted green pinyon-juniper woodlands and green meadows.  Oasis like. | Multi-colored and contrasting. |
| **TEXTURE** | Smooth inner canyon walls contrasted by jagged pegmatite dykes; Multi-textured coarse-featured outer canyon. | Smooth and flowing grasses contrasted by stark coarse-textured shrubs and trees. | Uneven with dramatic changes and contrasts. |

### 3. Narrative

Scenic values found in the Gorge are inextricably interwoved with the geologic and physiographic features of the area (Gunnison River Final EIS WSR 1979).  This river segment provides an excellent opportunity to operve the extremely scenic geologic transition from the towering black walls of the Black Canyon National Park, to the beautiful and very colorful and dramatic double canyon system found in the Gorge Wilderness.  The Gorge's geology, a continuation fo the Black Canyon National Park's, exhibits many of the outstanding scenic features found in the Park, including the towering and imposing dark narrow inner walls which are streaked and stained by the elements and intruded by brightly colored pink and white pegmatite dykes which thrust dramatically upward.  According to Wallace Hansen, noted geologist with the USGS, there is no where in the world where the Precambrian rock is better exposed to viewing than in the walls and canyon floor of the Gunnison Gorge.  The gorge however offers more in terms of its many and varied geologic formations and phenomena.  According to a 2002 (continued on next page)

### 4. SCORE

| | High | Medium | Low | Explanation or Rationale |
|---|---|---|---|---|
| a. Landform | 5 | | | array of landscapes |
| b. Vegetation | 4 | | | Oasis-like appearance |
| c. Water | 5 | | | Exceptional color and clarity |
| d. Color | 5 | | | Excellent contrasts |
| e. Adjacent Scenery | 5 | | | Variety of views |
| f. Scarcity | | 3 | | (See Next Page) |
| g. Cultural Modification | | 0 | | Very few, mostly unnoticeable |
| **TOTALS** | 24 | 3 | 0 | = 27 total |

SCENIC QUALITY
CLASSIFICATION

 **_X_**  A - 19 or more

 **___** B - 12-18

 **___** C - 11 or less

BLM_0007821

Form 8400-1
(September 1985)

# INSTRUCTIONS

Following are the instructions for completing the form.  The numbers correspond with the item numbers on the form

1. Evaluators.  List the names of the persons involved in the rating.
2. Landscape Character.  Briefly describe the major features and elements in the landscape.  Refer to
    illustrations 4, 5, 6, and 7 fo the BLM Handbook 1-8431-1 for guidelines on the terminology to be used
    to describe the elements.
3. Narrative.  Briefly describe the general character of the landscape as it relates to the immediate
    surroundings and to similar landscape features within the physiographic province.
4. Scores.  Rate the scenic qualtiy using the criteria and guidelines in the BLM Handbock 1-8410-1
    Section 11.  Record the scores by circling the appropriate numbers.  If the rating more appropriately
    falls between the listed numbers, write in the desired number and circle it.  For example, if the desired
    number for "color" falls between 3 and 5, write in the number and circle it.  Explain any unusual
    factcrs affecting a rating under the "explanation and rationale" column.  If more space is needed,
    continue the explanation on this page.  After the ratings are completed total the scores and check the
    appropriate classification line.

---

**3. Narrative continued:**  USGS survey, the Gorge contains outstanding examples of faulting, colorful, pegmatite dyke formations, and geologic "unconformities, as well as many other interesting and scenic geologic features which can be easily viewed by visitors from the river.  More importantly, the Gorge provides additional scenic features not found in the Park including the beautiful outer canyon composed of brightly colored, multi textured sedimentary layers of red, buff, salmon, pink, grey and white.  This multi-colored formation offers the viewer a striking and visually pleasing contrast to the weathered dark surfaces of the precambrian rocks in the inner gorge.  As the river winds through the canyon, the viewer is presented with a multitude of images and settings ranging from dark, towering walls covered with spider webs and swallow nests which convey an atmosphere of grandeur and solemnity to sweeping panoramas of colorful canyons against clear, vibrant blue skies that convey a spirit of wilderness as open and free.

The area is famous for its beautiful, free-flowing water in this segment.  The waters are a clear green that allows visitors to see to the bottom of deep pools.  A recently published Gorge guide book states: "There is an intrinsic beauty about the flow of the water in the Gunnison Gorge… that is hypnotizing… the river bends over a rock in midstream, goes white at the rapids, deepens to a color like night sky… Just for the sheer artistry of its water, there is no more beautiful river in the West than Colorado's Gunnison."

Riparian vegetation in the Gorge is typical of other rivers in the southwest, but it contrasts with the adjacent pinyon-juniper and exposed rock, creating an oasis-like appearance (Gunnison River Final EIS WAS 1979).

**Score:  f. Scarcity:** There are between 2-5 other stretches similar in Colorado, but they are much shorter and less spectacular.  Relatively unique double canyon system.

BLM_0007822

Form 8400-1
(September 1985)

**UNITED STATES**

**DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

## SCENIC QUALITY FIELD INVENTORY

**Date**  September 17, 2002

**District**  Montrose Field Office

**Resource Area**  Gunnison River NCA Planning Area

**Scenic Quality rating unit**  Gunnison river from transmission line to Diversion

**1. Evaluators (Names)**   Karen Tucker (NCA Manager), Jim Sazama (Grazing Specialist), Dennis Murphy (Water Resource Specialist), Mike Manka (Aquatic Ecologist)

| 2. LANDSCAPE CHARACTER (Feature) | | |
|---|---|---|
| **a. LANDFORM / WATER** | **b. VEGETATION** | **c. STRUCTURE (General)** |
| **FORM** Broad river valley transitions back into meandering canyon | Simple forms and patterns | Oval, elongated and linear |
| **LINE** Meandering river, vertical walls, sloping canyons | Irregular, indistinct | Rounded, horizontal |
| **COLOR** Deep green, clear waters surrounded by colorful walls of buff, red, greys, and pinks | Vibrant green in riparian areas, yellows and muted greens in uplands | Multi-colored layers |
| **TEXTURE** Smooth walls to coarse outcrops | Smooth to uneven, random | Uneven |

**3. Narrative**

The Gunnison River water in this stretch is remarkable fof its beautiful color and clarity allowing viewers to see down through deep pools to the bottom of the river. The river at times is impacted by lower quality water flowing from the North Fork, but the impact is generally short in duration and recovers quickly back to its excellent condition.  This stretch is noted for its excellent year-round trout fishery which is supported by high quality water.

Interesting geology and outstanding vistas of the Uncompahgre Plateau, West Elk Wilderness, Grand Mesa, and the Ragged Mountains, add interest and 360 degree viewing enjoyment.  Outstanding views of surrounding snow-capped peaks (fall, winter, spring) and fall colors on Grand Mesa.

There are minimal visual intrusions including a few buildings and a gravel road which is seen only intermittently.  Non-native vegetation is visible but does not unduly detract.

This river stretch is augmented all sommer long from Gunnison Gorge flows and thus provides river environment in a desert area.

| 4. SCORE | | | | | |
|---|---|---|---|---|---|
| | **High** | **Medium** | **Low** | **Explanation or Rationale** | **SCENIC QUALITY CLASSIFICATION** |
| **a. Landform** | | 3 | | broad valley to canyon landscape | |
| **b. Vegetation** | | | 1 | predominantly non-native | |
| **c. Water** | 5 | | | Exceptional color and clarity | _X__ A - 19 or more |
| **d. Color** | | 3 | | (See next page) | |
| **e. Adjacent Scenery** | 5 | | | Outstanding views | ___ B - 12-18 |
| **f. Scarcity** | 4 | | | relatively rare in Colorado | |
| **g. Cultural Modification** | | | (-2) | few buildings, road not significant | ___ C - 11 or less |
| **TOTALS** | 14 + | 6 + | (-1) | = 19 Total | |

(Instructions on reverse)

BLM_0007823

Form 8400-1
(September 1985)

**INSTRUCTIONS**

Following are the instructions for completing the form.  The numbers correspond with the item numbers on the form

1. Evaluators.  List the names of the persons involved in the rating.
2. Landscape Character.  Briefly describe the major features and elements in the landscape.  Refer to
     illustrations 4, 5, 6, and 7 fo the BLM Handbook 1-8431-1 for guidelines on the terminology to be used
     to describe the elements.
3. Narrative.  Briefly describe the general character of the landscape as it relates to the immediate
     surroundings and to similar landscape features within the physiographic province.
4. Scores.  Rate the scenic qualtiy using the criteria and guidelines in the BLM Handbock 1-8410-1
     Section 11.  Record the scores by circling the appropriate numbers.  If the rating more appropriately
     falls between the listed numbers, write in the desired number and circle it.  For example, if the desired
     number for "color" falls between 3 and 5, write in the number and circle it.  Explain any unusual
     factcrs affecting a rating under the "explanation and rationale" column.  If more space is needed,
     continue the explanation on this page.  After the ratings are completed total the scores and check the
     appropriate classification line.

**Score :  d. Color** - Sandstone walls streaked with reds, greys, whites, goot fall colors

BLM_0007824

Form 8400-1
(September 1985)

**UNITED STATES**

**DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

## SCENIC QUALITY FIELD INVENTORY

| | |
|---|---|
| **Date**  September 17, 2002 | |
| **District**  Montrose Field Office | |
| **Resource Area**  Gunnison River NCA Planning Area | |
| **Scenic Quality rating unit**  Smith Fork | |

| 1. Evaluators (Names) | Karen Tucker (NCA Manager), Jim Sazama (Grazing Specialist), Dennis Murphy (Water Resource Specialist), Mike Manka (Aquatic Ecologist) |
|---|---|

### 2. LANDSCAPE CHARACTER (Feature)

| | a. LANDFORM / WATER | b. VEGETATION | c. STRUCTURE (General) |
|---|---|---|---|
| **FORM** | Deeply cut, entrenched, and incised narrow canyon | Dramatic changes from areas of no vegetation to steep sparsely vegetated slopes | Mostly linear |
| **LINE** | Very steep vertical walls, jagged ridge lines, twisting canyon with abrupt drops and turns.  Line broken by walls and abrupt vertical drops of the river over rocks and steeply dropping terrain | (See next page) | Sharply vertical and twisting canyon |
| **COLOR** | Imposing black and grey rocks in steep canyon with impressive shadows and light effects. | Muted greens and yellows in upland areas.  Little or no vegetation in steep portions | Dark grays, black |
| **TEXTURE** | Jagged and coarse | Sparse, uneven, random | Uneven |

### 3. Narrative

The twisted and jagged geology of the Smith Fork canyon is outstanding and remarkably scenic.  The intense twisting and jagged black rock of the river corridor combined with extremely steep black walls evoke a sense of complete isolation and a sense of awe  The rugged course winds its way through the boulders and falls forming its channel.  The steep adjacent canyon walls have a dramatic visual impact as does the view of the Gunnison Gorge.  As the Smith Fork twists its way through the gnarled canyon, it drops over huge jagged boulders and falls into myriads of cascading waterfalls into calming pools of green water that reflect the overhanging walls.  The canyon's orientation allows for wonderful shadow effects.

While it is difficult to see out from the steep canyon in many places, the viewer at times is treated to views of the adjacent Gunnison Gorge wilderness with its outstanding geology and beautiful green water.  These views are exceptionsl the closer one gets to the Gunnison River confluence.  Although there are some roads in the area, none are visible from this reach.

### 4. SCORE

| | High | Medium | Low | Explanation or Rationale |
|---|---|---|---|---|
| a. Landform | 5 | | | Outstanding geology, and canyon |
| b. Vegetation | | 3 | | Contrasts black rock |
| c. Water | | 3 | | (See next page) |
| d. Color | | 3 | | impressive black precambrian rock |
| e. Adjacent Scenery | | 3 | | colorful and impressive views |
| f. Scarcity | | 3 | | Unusual setting of pools in desert |
| g. Cultural Modification | | 0 | | very few, unnoticeable |
| **TOTALS** | 5 + | 15 + | 0 | = 20 total |

**SCENIC QUALITY CLASSIFICATION**

_X__ **A - 19 or more**

___ **B - 12-18**

___ **C - 11 or less**

(Instructions on reverse)

BLM_0007825

Form 8400-1
(September 1985)

## INSTRUCTIONS

Following are the instructions for completing the form.  The numbers correspond with the item numbers on the form

1. Evaluators.  List the names of the persons involved in the rating.
2. Landscape Character.  Briefly describe the major features and elements in the landscape.  Refer to
    illustrations 4, 5, 6, and 7 fo the BLM Handbook 1-8431-1 for guidelines on the terminology to be used
    to describe the elements.
3. Narrative.  Briefly describe the general character of the landscape as it relates to the immediate
    surroundings and to similar landscape features within the physiographic province.
4. Scores.  Rate the scenic qualtiy using the criteria and guidelines in the BLM Handbock 1-8410-1
    Section 11.  Record the scores by circling the appropriate numbers.  If the rating more appropriately
    falls between the listed numbers, write in the desired number and circle it.  For example, if the desired
    number for "color" falls between 3 and 5, write in the number and circle it.  Explain any unusual
    factcrs affecting a rating under the "explanation and rationale" column.  If more space is needed,
    continue the explanation on this page.  After the ratings are completed total the scores and check the
    appropriate classification line.

## 2. Landscape

b. Vegetation - Line - Sparse to no vegetation in some places where walls drop directly into river.  Sharp transition into upland with twisted pinyon-juniper woodlands dissected with low growing spiky shrubs.

## 4. Score

c. Water - Some water quality concerns, but segment meets State criteria.  Water twisting through jagged rocks and dropping abruptly into cascading waterfalls into pools is extremely impressive and scenic.

(Instructions on reverse)

2 of 2

BLM_0007826

Form 8400-1
(September 1985)

**UNITED STATES**

**DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

**SCENIC QUALITY FIELD INVENTORY**

**Date** September 17, 2002

**District** Montrose Field Office

**Resource Area** Gunnison River NCA Planning Area

**Scenic Quality rating unit** Red Canyon

**1. Evaluators (Names)** Karen Tucker (NCA Manager), Jim Sazama (Grazing Specialist), Dennis Murphy (Water Resource Specialist), Mike Manka (Aquatic Ecologist)

### 2. LANDSCAPE CHARACTER (Feature)

| | a. LANDFORM / WATER | b. VEGETATION | c. STRUCTURE (General) |
|---|---|---|---|
| **FORM** | Open canyon transitions into deeply cut, entrenched and incised narrow canyon with dramatic waterfall drop near Gunnison River confluence | Dramatic changes from upland pinyon-juniper woodlands to steep canyon with little vegetation | Mostly linear |
| **LINE** | Very steep verticle walls, horizontal cliff formations around Ute Fault zone | (See next page) | Sharply vertical and twisting canyon near confluence. Linear above. |
| **COLOR** | Imposing black and grey rocks intersected with brightly colored pink/white pegmatite dykes. Upper canyon multi-colored sandstones (tan, red, salmon and grey) | Muted greens and yellows in upland areas. Little or no vegetation in steep portions. | Dark grays, black near confluence. Reddish above. |
| **TEXTURE** | Jagged and coarse near confluence, smoother textures above in sandstone areas | Sparse, uneven, random | Uneven |

### 3. Narrative

The twisted and jagged geology of the lower Red Canyon segments which are carved through ancient Precambrian rock are in marked visual contrast to those of the upper segments which flow through sedimentary rocks of brightly colored red/salmon/tan/white sandstones. The picturesque quality of the brightly colored sandstone strata in the upper portions of this section is greatly enhanced by the colorful riparian and upland shrub and woodland vegetation, whereas the narrow darkness and starkness of the steep lower canyon is made even more awe-inspiring by its lack of vegetation. An extremely dramatic waterfall at the confluence adds significantly to the scenery.

### 4. SCORE

| | High | Medium | Low | Explanation or Rationale |
|---|---|---|---|---|
| a. Landform | 4 | | | dramatic waterfall canyon |
| b. Vegetation | | 2 | | colorful upland, much contrast |
| c. Water | | 3 | | (See next page) |
| d. Color | 4 | | | (See next page) |
| e. Adjacent Scenery | 5 | | | Very impressive views |
| f. Scarcity | | 2 | | Unusual setting in desert environ. |
| g. Cultural Modification | | 0 | | Very few, unnoticeable |
| **TOTALS** | 13 + | 7 + | 0 | = 20 total |

SCENIC QUALITY CLASSIFICATION

_X__ A - 19 or more

___ B - 12-18

___ C - 11 or less

(Instructions on reverse)

1 of 2

BLM_0007827

Form 8400-1
(September 1985)

## INSTRUCTIONS

Following are the instructions for completing the form.  The numbers correspond with the item numbers on the form

1. Evaluators.  List the names of the persons involved in the rating.
2. Landscape Character.  Briefly describe the major features and elements in the landscape.  Refer to
    illustrations 4, 5, 6, and 7 fo the BLM Handbook 1-8431-1 for guidelines on the terminology to be used
    to describe the elements.
3. Narrative.  Briefly describe the general character of the landscape as it relates to the immediate
    surroundings and to similar landscape features within the physiographic province.
4. Scores.  Rate the scenic qualtiy using the criteria and guidelines in the BLM Handbock 1-8410-1
    Section 11.  Record the scores by circling the appropriate numbers.  If the rating more appropriately
    falls between the listed numbers, write in the desired number and circle it.  For example, if the desired
    number for "color" falls between 3 and 5, write in the number and circle it.  Explain any unusual
    factcrs affecting a rating under the "explanation and rationale" column.  If more space is needed,
    continue the explanation on this page.  After the ratings are completed total the scores and check the
    appropriate classification line.

**2. Landscape**

   b. Vegetation - Line - Sparse to no vegetation in some places where walls drop directly into river.  Sharp transition into
   upland with twisted pinyon-juniper woodlands dissected with low growing spiky shrubs.

**4. Score**

   c. Water - water twisting though jagged rocks and dropping abruptly in a waterfall at confluence is extremely impressive
   and scenic.  Downside - waterflow is low due to upstream irrication uses in summer.
   d. Color - Very impressive display of black Precambrian rock and brightly colored sedimentary layers.  Reddish colors
   dominate upper sections (hence the name).

(Instructions on reverse)                                                                                          2 of 2

BLM_0007828

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

Release
8-77

Date
12/03/04

Subject

8140 – PROTECTING CULTURAL RESOURCES   (PUBLIC)

1. Explanation of Material Transmitted. This release completely revises BLM Manual
Section 8140, 8141, 8142 and 8143.

2. Reports Required: None

3. Materials Superseded: Manual pages superseded by this release are listed under REMOVE
below. No other directives are superseded.

4. Filing Instructions: File as directed below:

      REMOVE                INSERT

All of 8140 (Rel. 8-44)      8140
All of 8141 (Rel. 8-45)
All of 8142 (Rel. 8-46)
All of 8143 (Rel. 8-47; 8-57)

(Total: 22 sheets)

TC-1

8140 - PROTECTING CULTURAL RESOURCES – (Public)

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance
.08  Roles in the Section 106 Review Process

.1   Physical and Administrative Conservation Measures
     .11 Physical Conservation Measures
          A.  Indirect Measures
               1.  Signing
               2.  Fencing/Gating
               3.  Patrol/Surveillance
               4.  Erosion Control (off-site)
               5.   Fire Control (off-site)
          B.  Direct Measures
               1.  Stabilization
               2.  Erosion Control (on-site)
               3.  Fire Control (on-site)
               4.  Detailed Recording
               5.  Relocation
               6.  Adaptive Reuse of Structures
               7.  Archaeological Data Recovery Techniques
     .12  Administrative Conservation Measures
          A.  Withdrawal
          B.  Closure to Public Access and Off Highway Vehicles
          C.  Special Designations
          D.  Land Acquisition
          E.  Recreation and Public Purposes Act
          F.  Easements
          G.  Public Information and Education

TC-2

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.2  Considering Effects of Proposed Land Use
   .21  Determining If Cultural Properties May Be Affected
   .22  Assessing Effects on Listed or Eligible Properties
     A. No Effect Found
     B. Effect Found
       1. Effect is Not Adverse
       2. Effect is Adverse
   .23  Case Review Under the Programmatic Agreement
   .24  Determining Appropriate Treatment
     A. Considerations for Physical Conservation
     B. Considerations for Administrative Conservation
   .25  Scope of Treatment
   .26  Data Recovery
   .27  Data Recovery Reports
   .28  Previously Undiscovered Properties
     A. Discovery Plan Developed
     B. Discovery Plan Not Developed
   .29  Treatment Plan Review

.3  Preventing Loss and Destruction from Illegal Activities
   .31  Prohibited Acts
     A.  Archaeological Resources
     B.  Native American Human Remains and Cultural Items
     C.  Cultural Resource Use Permit
     D.  Other Federal and State Regulations and Statutes
   .32  Prevention by Physical and Administrative Protection
   .33  Detection Measures and Procedures
   .34  Investigation and Examination
   .35  Criminal Penalties
   .36  Civil Penalties
   .37  Rewards

.4  Treasure Hunting on Public Lands
   .41  Metal Detector Use
   .42  "Treasure Trove" Contracts

BLM_0007831

TC-3

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.5  Coordinating With Outside Parties
    .51  Consulting Native Americans
       A. Consultation on Land Use Actions
       B. Standard of Sufficiency
    .52  Consulting Other Groups and Individuals

Appendix
1. National Programmatic Agreement of March 26, 1997
2. Programmatic Agreement Authority
3. Criteria of Effect and Adverse Effect

BLM_0007832

.01

## 8140 - PROTECTING CULTURAL RESOURCES – (Public)

.01  Purpose. This Manual Section provides general guidance for protecting cultural resources from natural or human-caused deterioration; for making decisions about recovering significant cultural resource data when it is impossible or impractical to maintain cultural resources in a nondeteriorating condition; for protecting cultural resources from inadvertent adverse effects associated with BLM land use decisions, pursuant to the National Historic Preservation Act, the National Environmental Policy Act, Executive Order 11593, and the national Programmatic Agreement; and for controlling unauthorized uses of cultural resources.

.02  Objectives. The protection component of the cultural resource management program is aimed toward protecting the significance of cultural resources by ensuring that they are managed in a manner suited to the characteristics, attributes, and uses that contribute to their public importance; toward giving adequate consideration to the effects of BLM land use decisions on cultural properties; toward meeting legal and regulatory obligations through a system of compliance fitted to BLM's management systems; and toward ensuring that cultural resources on public land are safeguarded from improper use and responsibly maintained in the public interest.

.03  Authority. (See BLM Manual Section 8100.03.)

.04  Responsibility. (See BLM Manual Section 8100.04.)

.05  References.

A. National Programmatic Agreement of March 26, 1997 (see Appendix 1).

B. "Protection of Historic and Cultural Properties," 36 CFR Part 800.

C. "Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation," published by the National Park Service at 48 FR 44716, September 29, 1983.

D. "Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act" published by the National Park Service at 63 FR 20496, April 24, 1998.

E. "Treatment of Archeological Properties: A Handbook," available from the Advisory Council on Historic Preservation. See also 45 FR 78808, November 26, 1980.

F. "The Secretary of the Interior's Standards for the Treatment of Historic Properties," 36 CFR Part 68.  These standards for preservation, rehabilitation, restoration, and reconstruction are regulatory only in regard to grant-in-aid development projects assisted through the National Historic Preservation Fund.

G. Glossary of Terms, BLM Manual Section 8100.

.06

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.06  Policy.

A. The Field Office manager ensures that his or her land use decisions will not have an inadvertent adverse effect on the qualities that qualify cultural properties for the National Register or on the use(s) determined appropriate through the BLM evaluation process (see BLM Manual Section 8110). The Field Office manager protects cultural properties by the means and to the degree necessary to safeguard the appropriate use(s) and/or the qualities that qualify the properties for the National Register.

B. To determine whether proposed land use decisions would have effects on National Register-listed or eligible properties and to take effects into account, the Field Office manager consults with the SHPO and the Advisory Council on Historic Preservation (Council) according to the procedures set out in the national Programmatic Agreement and the State's BLM-SHPO Protocol implementing the Agreement, or according to 36 CFR 800, as applicable.

C. The Field Office manager's first choice shall be to avoid National Register listed and eligible properties that would otherwise be affected by a proposed land use, if it is reasonable and feasible to do so. In part, reasonableness is a measure of proportion and prudence. For example, avoidance would not represent reasonable balance and should not be chosen if the redesign or relocation efforts that would be incurred by the BLM or an authorized land user would be out of proportion to the cultural property's evaluated significance, data potential, or preservation value.

D. The BLM's responsibility for inventory, evaluation, and protection of cultural properties on lands outside BLM administrative jurisdiction is limited according to the degree to which the Field Office manager's decisions determine or control the location of surface-disturbing activities on those lands.

1. Where the location of potential surface disturbance is dependent on, integrally related to, or directly associated with a BLM decision, so that the BLM decision would foreclose alternatives for locating surface-disturbing activities beyond the boundaries of the public lands, the Field Office manager shall take into account potential effects to cultural properties on lands clearly affected by the decision.

2. Where alternative locations for potential surface disturbance are left open by a BLM decision, the Field Office manager shall take into account only those potential effects to cultural properties off the public lands that are reasonably attributable to his or her decision.

BLM_0007834

.06D3

8140 - PROTECTING CULTURAL RESOURCES – (Public)

3. Where BLM has been assigned to act as lead agency in the environmental review of a proposed land use that would affect lands under other jurisdiction or ownership, BLM's accountability may be determined to extend to the entire project, and the Field Office manager's responsibility may be found not to be limited as described in .06D through .06D2.

4. Where BLM-administered public lands are involved in a proposed land use for which the environmental review lead rests with another Federal agency, the BLM Field Office manager is responsible for decisions about assessing effects and treating effects to properties on the public lands.

E. Whenever possible, the Field Office manager shall integrate the actions necessary to carry out the provisions of this Manual Section with the environmental reviews and analyses conducted to fulfill the requirements for the National Environmental Policy Act (see BLM Manual Handbook H-1790-1).

F. The Field Office manager selects the methods and extent of physical and administrative protection, and the techniques and completeness of data recovery, to fit the characteristics that define affected cultural properties' appropriate uses and the qualities that qualify them for the National Register.

G. The Field Office manager may elect to apply data recovery (such as excavation and/or removal or detailed recordation, and including curation of recovered materials and related documents) to cultural properties undergoing or threatened with deterioration, where he or she determines that protection by physical or administrative protection measures is not appropriate. The Field Office manager makes data recovery decisions in consultation with the SHPO, as set forth in the State's BLM-SHPO Protocol or according to 36 CFR 800, as applicable. The Field Office manager's data recovery decisions may also be subject to Native American notification pursuant to Section 4(c) of the Archaeological Resources Protection Act and 43 CFR 7.7 (see BLM Manual Section 8150.13).

H. It is generally not appropriate to their jobs or logistically possible for BLM cultural resource specialists to carry out data recovery operations. Properly qualified specialists (see BLM Manual Section 8110.2) may conduct minor data recovery projects only when adequate time and support are provided for conducting field work, analyzing recovered materials, and preparing a full report, and when appropriate arrangements are made for permanent and proper curation of all artifacts, samples, collections, and copies of records, data, photographs, reports, and other documents resulting from the work (see 43 CFR 7.8(a)(7)).

BLM_0007835

.06I

8140 - PROTECTING CULTURAL RESOURCES – (Public)

I. Field Office managers shall ensure that federally owned artifacts, samples, collections, and copies of records, data, photographs, reports, and other documents resulting from data recovery operations or other cultural resource work ("museum property"; see 410 DM) are housed in an appropriate curatorial facility. Normal BLM office space is not an appropriate curatorial facility. Collections may be temporarily housed in BLM offices for reference or exhibit purposes after they have been processed and recorded by a cooperating curatorial facility and are borrowed under a loan agreement for a definite, limited time, provided that storage conditions in the BLM office, including security, are deemed adequate (see BLM Manual Section 8160.1). Otherwise, collections of museum property should not be in a BLM office.

J. Field Office managers shall treat Native American human remains recovered from public lands in strict accordance with the requirements of the Native American Graves Protection and Repatriation Act and 43 CFR Part 10 (see BLM Manual Section 8160, "Preserving Collections of Cultural Resources").

.07  File and Records Maintenance. See .51A4. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4).

.08  Roles in the Section 106 Review Process. Although roles and responsibilities in 36 CFR Part 800 change somewhat under the national Programmatic Agreement, the primary participants in Section 106 compliance continue to be the responsible Field Office manager (the "Agency Official"), the SHPO, and the Council. The SHPO's and Council's roles are adequately defined in 36 CFR Part 800. The Field Office manager's role relative to prospective land users and their cultural resource consultants is further defined below.

A. Compliance with Section 106 is a Federal agency responsibility that cannot be delegated or transferred to a non-Federal party.

B. In the terminology of 36 CFR Part 800, the Field Office manager who is authorized to make a land use decision that could affect properties included in or eligible for the National Register is the "Agency Official" responsible for initiating and carrying out the Section 106 review and consultation.

C. The responsible Field Office manager may invite land use applicants and their cultural resource consultants to participate in the Section 106 review process, as appropriate.

1. Land use applicants and their cultural resource consultants may not take BLM's place or represent BLM in consultations with the SHPO or Council without the responsible Field Office manager's explicit and specific authorization.

BLM_0007836

.08C2

8140 - PROTECTING CULTURAL RESOURCES – (Public)

2. A cultural resource consultant's ideas about how project inventory should be done, or opinions about eligibility or effect, or suggested treatment of adverse effects must not be discussed with the SHPO or Council as if they were BLM's proposals, unless the responsible Field Office manager has concurred and has authorized the consultant to speak on BLM's behalf.

3. A cultural resource consultant's documents prepared for BLM to use for Section 106 compliance (e.g., survey reports including recommendations) must not be distributed directly to the SHPO or Council without BLM review and evidence of the responsible manager's approval. A consultant's documents should be used as support for BLM's conclusions, not as BLM's conclusions.

4. The responsible Field Office manager should sign a cover letter to the SHPO and/or Council, abstracting the pertinent points in a consultant's document and relating them to the specific steps of the Section 106 process, whether under 36 CFR Part 800 or under the State's BLM-SHPO Protocol.

5. State Directors should advise the SHPO and Council not to treat consultants' products as Section 106 documents unless they are accompanied by a BLM cover letter requesting Section 106 review.

6. For purposes of paragraphs .08C1-5, State agencies conducting Section 106 compliance work on BLM-administered lands, such as State highway departments acting on behalf of the Federal Highway Administration, have the same role as third-party consultants unless a formal agreement with BLM gives the State agency a larger role.

.1

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.1 <u>Physical and Administrative Conservation Measures</u>.  Field Office managers employ the following physical and administration conservation measures as management tools to protect historic properties as required by the National Historic Preservation Act, related Secretary of Interior Standards and Guidelines, and Executive Order 13287.

.11 <u>Physical Conservation Measures</u>.   Physical conservation measures may be applied directly to the cultural property, as in stabilization, or indirectly to the general area, such as in signing, fencing or patrolling.

A. <u>Indirect Methods</u>. These methods refer to physical conservation measures that do not modify the resource. For this reason, they are often preferable to direct methods.

1. <u>Signing</u>. Under conditions of active or potential vandalism, cultural properties should be adequately signed, identifying the protection afforded by law. Signs should be placed so as not to intrude upon the property or to draw unwanted attention to it. Interpretive signs may also be appropriate for some properties and may protect them by promoting conservation ethics.

2. <u>Fencing/Gating</u>.  Fences, barriers, and gates of various materials can be used alone or in combination with other methods to restrict access. The selection of designs and materials must avoid unwarranted intrusion on the property. Maintenance and safety requirements must also be considered in the design.

3. <u>Patrol/Surveillance</u>. Patrol and surveillance are determined by and scheduled according to the nature of the resource, degree of threat present, and the uses appropriate for the cultural resources involved. Irregularly scheduled patrols are among the best means of deterring looting, vandalism and other unauthorized uses. Besides staking out a site, surveillance can be accomplished through detection systems; however, installation of surveillance equipment should not impair or compromise the integrity of the cultural resources.

4. <u>Erosion Control (off-site)</u>. Cultural resources are frequently threatened by various types of erosion. Flooding, seepage, major runoff areas, movement of soils by wind action, and other potential erosion problems can be monitored and controlled. Erosion control performed off-site can generally be accomplished at lower cost, with less disturbance to the resource, than on-site erosion control. Recontouring to improve drainage, construction of catch basins, diversion or check dams, revegetation, windbreaks, and other protection measures can reduce erosion.

5. <u>Fire Control (off-site)</u>. An active fire protection program for cultural resources should include pre-suppression, suppression, and post-suppression activities. Periodic inspections may be undertaken to determine potential fire hazards. Pre-suppression measures include fire retardant treatments, reduction of fuel, construction of fuel breaks, and site-specific fire action plans. When implementing fire control measures, care should be taken to preserve the cultural resource's visual and environmental setting. Post-suppression analysis should consider physical conservation measures needed to restore the setting and rehabilitate the cultural resource damaged by fire and suppression activities.

.11B

8140 - PROTECTING CULTURAL RESOURCES – (Public)

B. Direct Methods. These methods refer to physical conservation measures that modify the resource.

1. Stabilization. Structural and material stabilization techniques introduce chemical, mechanical, or structural elements to retard the deterioration of a variety of cultural resources. For example, chemical measures include the application of polymers to protect rock art; structural measures include the replacement of mortar; mechanical measures include the jacking of floors. Detailed specifications for stabilization work should include individual fieldwork tasks required, specific locations requiring stabilization, methods and materials used, and types of expertise required. Maps, scale drawings and photos should be used liberally to illustrate work requirements. All stabilization work must be accurately and adequately documented to provide a clear "before and after" record of the property.

2. Erosion Control (on-site). When erosion control is necessary within the physical boundaries of a cultural property, the effects of the control measures on resource values should be carefully limited. Standard engineering construction practices must be modified to allow the proper recovery and recording of information that would be disturbed by the implementation of the erosion control measures. Examples of on-site erosion control measures include recontouring the site surface to promote better drainage, and backfilling illegally excavated areas.

3. Fire Control (on-site). Effective on-site fire control is limited primarily to preventive measures. For example, wooden structures can be treated with fire retardant, trash and litter can be reduced, and in areas of public use, restrictions can be placed on campfires in the immediate vicinity of cultural resources. Fire arrest equipment can be provided inside structures for visitor safety and protection of the resource. Fire suppression handlines and bulldozer lines should be located to protect cultural properties.

4. Detailed Recording. The intent of detailed recording is to document those aspects of a cultural property that contribute to historical or scientific studies without substantially modifying the resource. This non-destructive technique may include the use of detailed mapping using surveying equipment, photogrammetry, aerial and standard photography, use of electronic equipment such as magnetometers or metal detectors, and narrative descriptions.

5. Relocation. Some cultural resources can be relocated with minimal impact to their inherent significance. This alternative is largely limited to structures and to some forms of rock art, such as boulders containing petroglyphs. Relocation of structures usually is expensive and requires special skills and equipment. Efforts to relocate properties should be carefully planned after full consideration of alternative conservation methods.

BLM_0007839

.11B6

8140 - PROTECTING CULTURAL RESOURCES – (Public)

6. <u>Adaptive Reuse of Structures</u>. The adaptive reuse of historic structures should be considered before selecting some more potentially destructive methods (such as relocation). After rehabilitating a structure consistent with its historic character, it may be usable in its original location.

7. <u>Archaeological Data Recovery Techniques</u>. Archaeological data recovery includes those techniques that maximize controlled collection and/or excavation of cultural materials and data analysis. Excavation should be attempted only when other protection alternatives are not adequate or feasible to protect the scientific information contained in the property. Appropriate data recovery techniques are based on a formal research design carried out by qualified, trained specialists. Resulting collections and records should be curated at a qualified repository within the geographic region.

12. <u>Administrative Conservation Measures</u>

A. <u>Withdrawal</u>. Protective withdrawal of lands (see 43 CFR 2300-2370; BLM Manual Section 2321.6) means withholding an area from settlement, sale, location or entry under the general land laws and mining laws. Withdrawals usually do not cover discretionary actions such as those taken under the mineral leasing laws or the Recreation and Public Purposes Act. Administrative withdrawal allows transfer of jurisdiction to other Federal agencies.

B. <u>Closure to Public Access and Off-Highway Vehicles</u>. Areas may be temporarily closed to public use and travel (43 CFR 8364 and 8340) to facilitate special cultural uses or to protect scientific studies. Public lands may also be designated as indefinitely limited or closed to the use of off-highway vehicles.

C. <u>Special Designations</u>. Individual cultural properties or districts may be nominated to and listed on the National Register of Historic Places to recognize and reinforce their special management status (36 CFR 60 and 65; BLM Manual Section 1613). Limited protection through national recognition is also afforded when a property is listed as a National Historic Landmark. Areas of Critical Environmental Concern (ACEC) may also be designated to address special management needs for cultural resources.

D. <u>Land Acquisition</u>. State-owned or privately owned portions of Federal cultural properties or adjacent State or private lands may be acquired through exchange, purchase or deed to maintain site integrity or to provide buffer areas (43 CFR 2200).

E. <u>Recreation and Public Purposes Act</u>. This Act allows transfer of land to State or local government agencies or other entities (such as historical societies, conservation groups) under a conditional lease or patent (43 CFR 2740). This tool can be used to allow other entities to protect and develop cultural properties for public use when it is impractical or infeasible for BLM to do so.

BLM_0007840

.12F

8140 - PROTECTING CULTURAL RESOURCES – (Public)


F. Easements. Easements are authorizations for non-possessory, non-exclusive use of lands. BLM may acquire an easement to ensure administrative access to a cultural property (such as for patrolling) or to install physical conservation measures (such as fences or dikes) on non-Federal lands to protect BLM-administered cultural properties (BLM Manual Section 2130).


G. Public Information and Education (See BLM Manual Section 8170). Efforts to inform and educate the public about local cultural resource significance and conservation ethics may help decrease vandalism and ensure compliance with use restrictions.

.2

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.2  Considering Effects of Proposed Actions. As required by the National Historic Preservation Act Section 106 process and the BLM national Programmatic Agreement (Appendix 1), the field Office manager, with the assistance of qualified professional staff, identifies, evaluates, and assesses effects of proposed actions on cultural properties as follows:

.21  Determining If Cultural Properties May Be Affected. Prior to initiating or authorizing a proposed action that meets the definition of undertaking in Section 301(7) of the National Historic Preservation Act, as amended, the responsible Field Office manager shall:

A. Determine the undertaking's area of potential effects, i.e., the geographic area or areas within which an undertaking may cause changes in the character or use of historic properties, if any such properties exist.

B. Review existing information on cultural properties potentially affected by the action, including any data concerning the likelihood that unidentified cultural properties exist in the area of potential effects.

C. Seek information in accordance with BLM land use planning and environmental review processes from Indian tribes and other parties likely to have knowledge of or concerns with cultural properties in the area.

D. Determine the need for further actions, such as field surveys and predictive modeling, to identify cultural properties (see BLM Manual Section 8110.2).

E. Make a reasonable and good faith effort to identify cultural properties that may be affected by the undertaking, consider their most appropriate use(s), and evaluate the eligibility of these properties for the National Register of Historic Places (see BLM Manual Section  8110.3).

F. Determine if a cultural property meets one or more eligibility criteria specified in 36 CFR 60.4 (see also BLM Manual Section 8110.32), applied according to the State's BLM-SHPO Protocol.

1.  If the Field Office manager determines, consistent with the State's BLM-SHPO Protocol, that a cultural property meets one or more eligibility criteria, the property shall be considered eligible for the National Register for purposes of complying with Section 106 of the National Historic Preservation Act and the national Programmatic Agreement (Appendix 1).

2.  If the Field Office manager determines, consistent with the State's BLM SHPO Protocol, that a cultural property does not meet the eligibility criteria, the property shall be considered not eligible for the National Register and therefore not subject to compliance with Section 106 and the national Programmatic Agreement.

G. Provide documentation to the State Historic Preservation Officer (SHPO), if the Field Office manager determines that no National Register listed or eligible cultural properties exist in the undertaking's area of potential effects, according to the reporting schedule specified in the State's BLM-SHPO protocol.

BLM Manual                                                                                                    Rel. 8-77
Supersedes Rel. 8-44, 8-45, 8-46, 8-47, 8-57                                         12/03/04

.22

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.22  Assessing Effects on Listed or Eligible Properties. The Field Office manager, upon determining that National Register listed or eligible cultural properties may be affected by an undertaking, shall apply the Criteria of Effect in Appendix 3 to the cultural properties, giving consideration to the views, if any, of any persons who have contributed to identification of the properties.

A.  No Effect Found. If no effect is found to those characteristics of the property that qualify it for the National Register, document this finding and proceed with the undertaking. Provide the documentation of "no effect" to the SHPO in accordance with the reporting schedule specified in that State's Protocol.

B.  Effect Found. If an effect is found to those characteristics of the property that qualify it for the National Register, apply the Criteria of Adverse Effect in 36 CFR 800, to determine whether the effect of the undertaking should be considered adverse (see Appendix 3).

1.  Effect is Not Adverse. If the effect is found not to be adverse or the property is of value only for its potential contribution to archaeological, historical, or architectural research, and such value can be substantially preserved through the conduct of appropriate research, document this finding, provide for any data recovery, rehabilitation, or other protective actions necessary to meet the "not adverse" conditions in 36 CFR 800.9c, and proceed with the undertaking.

2.  Effect is Adverse. If the effect is found to be adverse, document this finding. If the Field Office manager decides to proceed with the undertaking, he or she shall make a reasonable and good faith effort to avoid or reduce adverse effects to the most reasonable and fitting extent, considering the nature of the effects and the characteristics and qualities that lend the property its significance.  Consultation with the SHPO and/or Advisory Council on Historic Preservation may be necessary on undertakings involving adverse effects as specified in the national Programmatic Agreement and the State's BLM-SHPO Protocol, as applicable. If not, provide documentation of the finding to the SHPO in accordance with the reporting schedule specified in the Protocol.

.23  Case Review Under the Programmatic Agreement. When a proposed agency decision or action meets thresholds for case review specified in the national Programmatic Agreement (see Appendix 1) or the State's BLM-SHPO Protocol, the Field Office manager shall consult with the SHPO to determine the following, as appropriate:

A.  Actions necessary to identify cultural properties.

B.  National Register eligibility of cultural properties affected by the undertaking.

C.  Effects the undertaking would have on National Register-listed or -eligible cultural properties.

D.  Methods for avoiding or reducing adverse effects.

BLM Manual                                                                 Rel. 8-77
Supersedes Rel. 8-44, 8-45, 8-46, 8-47, 8-57                12/03/04

BLM_0007843

.24 Determining Appropriate Treatment. If a proposed action or an existing land use has the potential for affecting the characteristics which contribute to the uses(s) determined appropriate for a cultural property, or the qualities which qualify a property for the National Register, the Field Office manager, with the assistance of qualified professional staff, shall ensure that appropriate conservation measures are carried out. The preferred strategy for treating potential adverse effects on listed or eligible properties is avoidance. If avoidance is imprudent or infeasible, a range of alternative physical and administrative conservation measures should be considered. Physical conservation measures include data recovery, stabilization, monitoring, protective barriers and signs, relocation, and adaptive reuse. Administrative conservation measures include withdrawing lands from under the general land laws and mining laws, transfer of jurisdiction to other federal agencies, closure to public access and off-highway vehicles, Area of Critical Environmental Concern designation, land and easement acquisition, leasing or transferring lands to State or local governments under the Recreation and Public Purposes Act, and efforts to inform and educate the public. Commonly used physical and administrative conservation measures are discussed in 8140.1.

A. Considerations for Physical Conservation

1. Physical conservation measures that maintain cultural resource integrity are usually preferable to relocation and data recovery techniques.

2. Where physical measures are intended to conserve scientific data in place, the measures and methods should be carefully selected to fit the nature of the property and the data being protected, to be reasonably reversible, and directly and indirectly to disturb the least practical amount of the data.

3. The cost and feasibility of long-term maintenance should be considered in project planning, and the effectiveness of implemented conservation measures should be routinely monitored.

4. When cultural properties that are scientifically significant cannot be preserved in place, the loss of research potential can sometimes be reduced through various data recovery techniques. Data recovery plans should define study topics and discuss data collection priorities related to the uses(s) and/or significant qualities of specific cultural properties or types of cultural properties. The proposed work, including field methods and analysis techniques, should be justified in terms of research objectives. Proposals must provide for the proper conservation and curation of any materials collected (see BLM Manual Section 8130.2).

.24B

8140 - PROTECTING CULTURAL RESOURCES – (Public)

B. Considerations for Administrative Conservation

1. Implementation of administrative conservation measures often requires considerable lead-time and support from other resource specialists.

2. The physical environment should be protected from incompatible visual and structural intrusions by consideration of an appropriate buffer area. The immediate setting of the property should be managed in a manner consistent with the protection objectives.

3. Periodic review of administrative conservation measures is needed to evaluate their effectiveness.

.25  Scope of Treatment. Treatment will be commensurate with the nature, significance of the cultural resources involved and the extent of possible impacts. Treatment will be cost-effective and realistic and will consider project requirements and limitations. Treatment recommendations must be BLM-approved or BLM-formulated.

.26  Data Recovery. If treatment includes data recovery, data recovery plans should be prepared.  For archaeological properties, these should be consistent with the *Secretary of the Interior's Standards and Guidelines for Archeological Documentation* (48 FR 44734-37), and take into account the Advisory Council on Historic Preservation's *Treatment of Archeological Properties*. For historic buildings and structures, these should be consistent with the *Secretary of the Interior's Standards and Guidelines for Architectural and Engineering Documenation* (48 FR 44730-34.  Data recovery plans should include, at a minimum, the following:

A. The property, properties, or portions of properties where data recovery will be carried out.

B. Any property, properties, or portions of properties that will be destroyed or altered without data recovery.

C. The research questions to be addressed through data recovery, with an explanation of their relevance and importance.

D. The field and laboratory analysis methods to be used with an explanation of their relevance to the research questions.

E. The methods to be used in data management and dissemination of data, including a schedule.

F. The proposed disposition of recovered materials and records.

G. A proposed schedule for the submission of progress reports.

BLM_0007845

.26H

8140 - PROTECTING CULTURAL RESOURCES – (Public)

H. Proposed methods by which Indian tribes and local governments will be kept informed of the work and afforded the opportunity to comment, as appropriate.

I. The methods to be used for evaluating and treating cultural properties that may be discovered during construction of the project.

.27  Data Recovery Reports. The results of data recovery efforts shall be documented in a report meeting prevailing professional standards. Reports should include:

A. Brief summary of the project background and scientific context of work conducted.

B. Description of fieldwork, analysis techniques, and results.

C. Interpretation of data and conclusions.

D. Suggestions for future evaluation and treatment of similar cultural properties.

E. Recommendations for future research directions.

F. Appendices, as appropriate, on special studies or analyses, site maps, charts, drawings, profiles, photographs, and other graphics, plus certification of the curation of recovered materials.

.28  Previously Undiscovered Properties. The Field Office manager, during the identification efforts described in .21A, should consider the likelihood that cultural properties will be discovered during implementation of an undertaking. If discovery is likely, a plan should be developed for the treatment of such properties, including consultation requirements and compliance with other laws, such as the Native American Graves Protection and Repatriation Act and applicable state laws, in the case of inadvertent discovery of human remains, prior to initiating or authorizing the undertaking.

A. Discovery Plan Developed. If a discovery plan has been developed, the Field Office manager can meet the requirements of Section 106 and the national Programmatic Agreement, and any other applicable laws by following the plan when cultural properties are discovered during implementation of an undertaking. The Field Office manager shall take prudent and feasible steps to ensure that the undertaking does not harm the property until treatment is completed in accordance with the discovery plan.

BLM Manual
Supersedes Rel. 8-44, 8-45, 8-46, 8-47, 8-57

Rel. 8-77
12/03/04

BLM_0007846

.28B

8140 - PROTECTING CULTURAL RESOURCES – (Public)

B. <u>Discovery Plan Not Developed</u>. If a discovery plan has not been developed prior to implementing an undertaking, the Field Office manager shall make reasonable efforts to avoid or minimize harm to a discovered property until (1) the property has been assessed in terms of National Register eligibility and appropriate use(s), and (2) treatment measures have been carried out consistent with any treatment plan developed for the undertaking as a whole.  In the absence of a treatment plan for the undertaking, measures will be carried out consistent with the Field Office's professional assessment of the property's research, traditional use, interpretation, or conservation significance and compliance requirements under any other laws that apply (see Manual Section 8140.28).

.29   <u>Treatment Plan Review</u>. Where a BLM Field Office is operating under the national Programmatic Agreement, the SHPO and Council will normally not be asked to review routine treatment plans for BLM undertakings. Circumstances under which case-by-case review will occur are described in the PA and the State's BLM-SHPO Protocol.

BLM_0007847

.3

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.3  Preventing Loss and Destruction From Illegal Activities.

.31  Prohibited Acts. Unauthorized use includes but is not limited to the following:

A. Archaeological Resources. Any act prohibited under the Archaeological Resources Protection Act (ARPA; 16 U.S.C. 470ee), as implemented by regulations pursuant thereto and set out in 43 CFR Part 7. These acts, or the attempt to commit them, include excavation, removal, and damaging or otherwise altering or defacing archaeological resources, as defined, on public lands, as defined, unless such activity is pursuant to the terms of a permit issued under the provisions of ARPA or its implementing regulations; and the sale purchase, exchange, transport, or receipt of any illegally removed archaeological resource.

B. Native American Human Remains and Cultural Items. Any act prohibited under the Native American Graves Protection and Repatriation Act (NAGPRA; 25 U.S.C. 3002(c)) and/or in violation of 43 CFR Part 10, including the excavation, removal, possession, sale, purchase, use for profit, or transport for sale or profit of human remains or cultural items of Native American origin without the right of possession to those remains or cultural items as provided in NAGPRA.

C. Cultural Resource Use Permit. Any activity by the holder of a BLM cultural resource use permit, issued under the authority of ARPA, the Antiquities Act, and/or FLPMA (see BLM Manual Section 8130), which was conducted without written authorization or is contrary to or in excess of written authorization.

D. Other Federal and State Regulations and Statutes. Any activity in violation of Federal or State law or regulation that affects cultural properties on public lands including the theft of artifactural materials from a federally owned cultural property. For example, ARPA excludes from its criminal penalties the removal of arrowheads located on the surface of the ground (16 U.S.C. 470ee(g)); however, arrowheads are an archaeological resource by definition, i.e., weapon projectiles (16 U.S.C. 470bb(1)). Although the removal of arrowheads on the ground surface are not subject to ARPA penalties, such removal of an arrowhead, which is an archaeological resource, is prohibited by 43 CFR 8365.1-5(a)(1), and is a violation of FLPMA (43 U.S.C. 1733(a)) and the Antiquities Act (16 U.S.C. 432, 433) and subject to the criminal penalties provided by those acts.

.32

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.32  Prevention by Physical and Administrative Protection. Physical and administrative
protection measures (see 8140.1) may be employed to prevent unauthorized uses of cultural
properties. Physical protection measures may include signing, fencing/gating, patrol/surveillance,
erosion control, fire control, stabilization, recordation, relocation, and archaeological data
recovery. Administrative protection measures may include withdrawal, closure to public access
and off-road-vehicles, special designations, land acquisitions, transfer, easements, public
information and education programs, supplementary rules (43 CFR 8365.1-6), injunctions, and
other appropriate court orders.

.33  Detection Measures and Procedures. Unauthorized use can be detected during routine
fieldwork or as a result of specifically designed patrols.  Detection measures can include
inspection of cultural properties to document changes in site condition due to vandalism and to
observe and note other types of unauthorized uses. These inspections should be systematic and
repetitive to maximize detection capability. Coordination with law enforcement will increase
efficiency of detection measures and procedures.

.34  Investigation and Examination. The scene of a suspected unauthorized use of cultural
resources should be immediately secured, to the extent possible, and access thereto limited to the
responding law enforcement personnel with jurisdiction, preferably BLM law enforcement
personnel. The scene should not be altered in any way until examined by the appropriate law
enforcement personnel. Evidence collection procedures should be observed and technical
personnel shall follow the instructions of law enforcement personnel during onsite collection of
physical evidence. The investigation and examination should additionally result in an assessment
of the damage resulting from an unauthorized use and a treatment plan to protect and prevent any
additional deterioration to the damaged portions of the site.

.35  Criminal Prosecutions.

A.  Criminal Penalties. "Prohibited Acts and Criminal Penalties" are set out in ARPA, at
16 U.S.C. 470ee. The statute includes numerous criminal acts including excavating, removing,
transporting, selling, trafficking over State lines when obtained in violation of State or local law,
and many other acts. Penalties for knowing violation are also set out. Criminal acts and penalties
for a knowing violation of NAGPRA are set out in 18 U.S.C. 1170. All criminal prosecutions
under these laws should be handled in conjunction with BLM law enforcement personnel.

BLM_0007849

.35A1

8140 - PROTECTING CULTURAL RESOURCES – (Public)

1.  Penalties under ARPA.

     a.  If the commercial or archaeological value of archaeological resources and cost of restoration and repair does not exceed $500.00, a convicted individual shall be fined not more than $10,000.00 or imprisoned not more than 1 year, or both.

     b.  If the commercial value or archaeological value of archaeological resources and cost of restoration and repair exceed $ 500.00, a convicted person shall be fined not more than $20,000.00 or imprisoned not more than 2 years, or both.

     c.  Upon additional convictions, such person shall be fined not more than $100,000.00 or imprisoned not more than 5 years, or both.

2.  Penalties under NAGPRA.

     a.  A person convicted of illegal trafficking of Native American human remains shall be fined in accordance with title 18 U.S.C. (see 18 U.S.C. 3571), or imprisoned not more than 12 months, or both, and in the case of a second or subsequent violation, be fined in accordance with title 18 U.S.C. (see 18 U.S.C. 3571), or imprisoned not more than 5 years, or both.

     b.  If convicted of illegal trafficking of Native American cultural items such person shall be fined in accordance with title 18 U.S.C. (see 18 U.S.C. 3571), or imprisoned not more than one year, or both, and in the case of a second or subsequent violation, be fined in accordance with title 18 U.S.C. (see 18 U.S.C. 3571), imprisoned not more than 5 years, or both.

3.  Penalties under other Federal Statutes.  Determination of penalties under other statutes shall be made in accordance with regulations promulgated under those Acts.

.36 Civil Proceedings.

A.  Determination of Civil Penalties.  The assessment of penalties and damage claims against individuals under the Archaeological Resources Protection Act shall be guided by provisions in the Act and its implementing regulations, 43 CFR Part 7.

     1.  Under 43 CFR 7.15 the Federal land manager may assess a civil penalty against any person who has violated any prohibition contained in 43 CFR 7.4 or who has violated any term or condition included in a permit issued in accordance with ARPA and 43 CFR Part 7.

BLM_0007850

.36A1b

8140 - PROTECTING CULTURAL RESOURCES – (Public)

2.  Before civil penalties are assessed the Federal land manager should ensure that such assessments do not interfere or jeopardize any criminal investigation or prosecution. In the event that a criminal investigation is initiated, no civil penalties may be issued without the consent of the Special Agent-in-Charge.

3.  The amount of civil penalties shall take into account the archaeological or commercial value of the resource, the cost of restoration and repair of the resource, and whether the case represents a second or subsequent conviction by an individual subject to the penalty.

B.  <u>Violations under other Statutes</u>. The measure of damages and reimbursements shall be made in accordance with regulations promulgated under those Acts.

.37  <u>Rewards</u>

A.  <u>Provision for Awards</u>. As provided by the Archaeological Resources Protection Act (16 U.S.C. 470gg) and 43 CFR 7.17(b), the Federal land manager may certify to the Secretary of the Treasury that a person is eligible to receive an amount equal to one-half the penalty assessed under either the criminal or civil provisions of the Act, but not to exceed $500.00, for furnishing information leading to the finding of a civil violation, or the conviction of criminal violation under the Act.

BLM_0007851

.4

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.4  Treasure Hunting on Public Lands

 .41  Metal Detector Use. Metal detectors may be used on public lands. They must be used, however, for lawful purposes. Any act with a metal detector that violates the proscriptions of ARPA or any other law is prosecutable thereunder.

 .42  "Treasure Trove" Contracts. The BLM does not honor requests for contracts to recover abandoned historic property ("treasure trove"). There are no exceptions. The General Services Administration administers a salvage-authorizing program loosely based on an 1870 abandoned property statute, 40 U.S.C. 310, through which salvors contract to turn over a portion of their finds to the Government. None of the cases that have ever come to BLM has resulted in a contract. Alleged materials that are the subject of such discussions, if they were to exist (none has ever been verified), would generally be archaeological resources legally unsuitable for conversion to private property.

.5

8140 - PROTECTING CULTURAL RESOURCES – (Public)

.5  Coordinating With Outside Parties

.51  Consulting Native Americans. Within the framework of a government-to-government dialogue, and consistent with BLM Manual Section 8120, Manual Handbook H-8120-1, and Manual Section 8130.15A) the Field Office manager will determine how consultation with Native Americans should proceed when considering protection for cultural properties.

A.  Consultation on Land Use Actions. When considering a specific land use action, efforts to meet the consultation requirements of NHPA, NAGPRA, ARPA, AIRFA and NEPA should be coordinated as much as possible and may be met through a single consultation process. The Field Office manager can meet the BLM's consultation responsibilities under these laws as follows:

1. Review what is known from previous consultations about Native Americans' concerns pertaining to the area affected by the proposed action, including review of any agreements with Indian tribes about when they should be consulted concerning particular areas or particular kinds of undertaking.

2. As appropriate, based on information reviewed in .51A1, consult with the chief governing authority of any tribe potentially concerned by the proposed action. This should be done at the earliest opportunity after receiving a land use application or at the earliest stages of project planning and should provide as much information as possible regarding the location and nature of the proposal. The BLM should invite the tribe's comments on the proposed action, including:

a. Concerns the tribe might have with the proposed action in general, and how to resolve any issues that might affect the tribe.

b. How to resolve adverse effects on cultural properties identified in the cultural resource inventory.

c. Whether there are places of traditional religious or cultural importance that were not identified in the cultural resource inventory, and if so, how to resolve adverse effects on them.

d. How to treat human remains and "cultural items" as defined in NAGPRA (if excavation of these remains and items is anticipated).

e. Whether there are any traditional cultural leaders or religious practitioners who should also be contacted. If the Field Office is aware of such leaders or practitioners, or if the tribe has cultural resource representatives who are designated to act as liaison with Federal agencies, the letter should state that the BLM will be contacting those individuals, as well.

3. Complete a cultural resource inventory of the area affected by the proposed action, if needed. Results of the inventory may be shared with the tribe if requested during the consultation.

BLM Manual                                                            Rel. 8-77
Supersedes Rel. 8-44, 8-45, 8-46, 8-47, 8-57                          12/03/04

BLM_0007853

.51B4

8140 - PROTECTING CULTURAL RESOURCES – (Public)

4. Document consultation efforts carefully. Comments gathered as a result of these efforts must be considered in making decisions on the proposed action, in developing treatment plans for cultural properties, and in complying with Section 106 of the NHPA in accordance with the national Programmatic Agreement. The comment period allowed for tribes should conform to existing protocols. In the absence of established protocols, tribes should be given at least 30 days to comment after being informed of a proposed action. Persons consulted should be notified of BLM's final decision.

5. Consult with tribes during the project planning stage, before conducting a cultural resource field inventory. This is particularly important when the project area is likely to change as a result of tribal concerns or public comment. A tribe may request separate consultation after the field survey is completed, to discuss the cultural resources located by the survey. The Field Office manager and the tribe may wish to establish mutually agreed upon criteria for when it is appropriate not to consult, such as for minor or routine land use actions or for actions in certain areas, in oral or written agreements, as appropriate.

B. Standard of Sufficiency. The required level of effort is the same for consulting on proposed land use actions as for consulting on land use plans (see Manual Section 8130.23 C.5). However, while all land use plans will require consultation with Indian tribes, some proposed land use actions might not. Consultation is necessary whenever the Field Office manager determines, in conformance with existing agreed-upon arrangements with the tribe, that the nature and/or the location of a proposed land use could have effects that are subject to consultation.

.52  Consulting Other Groups and Individuals. The Field Office manager may consult the Advisory Council on Historic Preservation, State and local governments and interested private organizations and individuals when determining strategies for protecting cultural resources, as appropriate and consistent with the national Programmatic Agreement's thresholds for Council participation, State BLM-SHPO Protocols developed pursuant to the Programmatic Agreement, and any existing MOUs with local governments or organizations.

A. Interested Groups and Individuals May Identify Themselves. National, regional, State, or local organizations or individuals interested in participating in historic preservation decision making may identify themselves to the Field Office manager.

B. Groups' and Individuals' Interests Should be Accommodated Appropriately. The Field Office manager should document when and under what circumstances groups and individuals wish to be notified and given an opportunity to participate in the decision making process. Documentation may be achieved by a letter, a memorandum of understanding, or other appropriate means.

Appendix 1, page 1

8140 - PROTECTING CULTURAL RESOURCES – (Public)


PROGRAMMATIC AGREEMENT
AMONG
THE BUREAU OF LAND MANAGEMENT,
THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, AND
THE NATIONAL CONFERENCE OF STATE HISTORIC PRESERVATION OFFICERS
REGARDING
THE MANNER IN WHICH BLM WILL MEET ITS RESPONSIBILITIES
UNDER THE NATIONAL HISTORIC PRESERVATION ACT


*Preamble*

**Bureau of Land Management.** The Bureau of Land Management (BLM), consistent with its authorities and responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), is charged with managing public lands principally located in the States of Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, and Wyoming in a manner that will "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values," and "that will provide for outdoor recreation and human occupancy and use."

The BLM also has specific responsibilities and authorities to consider, plan for, protect, and enhance historic properties and other cultural properties which may be affected by its actions in those and other States, including its approval for Federal mineral resource exploration and extraction, under the National Environmental Policy Act, the National Historic Preservation Act of 1966 (NHPA), the Archaeological Resources Protection Act, the Native American Graves Protection and Repatriation Act, the Historic Sites Act of 1935, the Antiquities Act, the American Indian Religious Freedom Act, the Religious Freedom Restoration Act, Executive Order 13007 ("Sacred Sites"), and related authorities.

In carrying out its responsibilities, the BLM has developed policies and procedures through its directives system (BLM Manual Sections 8100-8160) to help guide the BLM's planning and decision making as it affects historic properties and other cultural properties, and has assembled a cadre of cultural heritage specialists to advise the BLM's managers and to implement cultural heritage policies consistent with these statutory authorities.


**State Historic Preservation Officers.** State Historic Preservation Officers (SHPOs), as represented by the National Conference of State Historic Preservation Officers (NCSHPO), have responsibilities under State law as well as under Section 101(b)(3) of the National Historic Preservation Act that include to "advise and assist as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities," and to "consult with the appropriate Federal agencies in accordance with [NHPA] on Federal undertakings that may affect historic properties, and the content and sufficiency of any plans developed to protect, manage, or to reduce or mitigate harm to such properties."

Appendix 1, page 2

8140 - PROTECTING CULTURAL RESOURCES – (Public)

2

In certain cases others may be authorized to act in the SHPO's place. Where the Secretary has approved an Indian tribe's preservation program pursuant to Section 101(d)(2) of the NHPA, a Tribal Preservation Officer may perform some SHPO functions with respect to tribal lands. A local historic preservation commission acting through the chief local elected official may fulfill some SHPO-delegated functions, where the Secretary has certified the local government pursuant to Section 101(c)(1) of the NHPA, and its actions apply to lands in its jurisdiction. Pursuant to the regulations implementing Section 106 of the NHPA [36 CFR 800.1(c)], the Council may at times act in lieu of the SHPO.

**Advisory Council on Historic Preservation**. The Advisory Council on Historic Preservation (Council) has the responsibility to administer the process implementing Sections 106, 110(f), and 111(a) of the National Historic Preservation Act, to comment with regard to Federal undertakings subject to review under Sections 106, 110(f) and 111(a) in accordance with its implementing regulations (36 CFR Part 800), and to "review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under [NHPA]" under Section 202(a)(6) of the NHPA.

The above-named parties now wish to ensure that the BLM will organize its programs to operate efficiently, effectively, according to the spirit and intent of the NHPA, and in a manner consistent with 36 CFR Part 800; and that the BLM will integrate its historic preservation planning and management decisions with other policy and program requirements to the maximum extent. The BLM, the SHPOs, and the Council desire and intend to streamline and simplify procedural requirements, to reduce unnecessary paperwork, and to emphasize the common goal of planning for and managing historic properties under the BLM's jurisdiction and control in the public interest.

*Basis for Agreement*

Proceeding from these responsibilities, goals, and objectives, the parties acknowledge the following basis for agreement:

WHEREAS the BLM's management of lands and mineral resources may affect cultural properties, many of which are historic properties as defined by the National Historic Preservation Act and are therefore subject to Sections 106, 110(f), and 111(a) of the NHPA; and

WHEREAS, among other things, the BLM's program established in response to Section 110(a)(2) and related authorities provides a systematic basis for identifying, evaluating, and nominating to the National Register historic properties under the bureau's jurisdiction or control; for managing and maintaining properties listed in or eligible for the National Register in a way that considers the preservation of their archaeological, historical, architectural, and cultural values and the avoidance of adverse effects in light of the views of

BLM_0007856

Appendix 1, page 3

8140 - PROTECTING CULTURAL RESOURCES – (Public)

3

local communities, Indian tribes, interested persons, and the general public; and that gives special consideration to the preservation of such values in the case of properties designated as having National significance; and

WHEREAS the BLM's program is also intended to ensure that the bureau's preservation-related activities are carried out in consultation with other Federal, State, and local agencies, Indian tribes, and the private sector; and

WHEREAS the BLM's program also has as its purpose to ensure that the bureau's procedures for compliance with Section 106 are consistent with regulations issued by the Council pursuant to Section 211 of the NHPA (36 CFR Part 800, "Protection of Historic Properties"), and provide a process for the identification and evaluation of historic properties for listing in the National Register and the development and implementation of agreements, in consultation with State Historic Preservation Officers, local governments, Indian tribes, and the interested public, as appropriate, regarding the means by which adverse effects on such properties will be considered; and

WHEREAS the BLM's program also intends to ensure that its Section 106 procedures recognize the historic and traditional interests of Indian tribes and other Native American groups in lands and resources potentially affected by BLM decisions, affording tribes and other groups adequate participation in the decisionmaking process in accordance with Sections 101(d)(6), 110(a)(2)(D), and 110(a)(2)(E)(ii) of the NHPA, and provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with Section 3(c) of the Native American Graves Protection and Repatriation Act, in accordance with Section 110(a)(2)(E)(iii) of the NHPA; and

WHEREAS this agreement will not apply to tribal lands, but rather, a proposed BLM undertaking on tribal lands will require consultation among the BLM, the Tribal Preservation Officer, and the Council; or among BLM, tribal officials (where no Tribal Preservation Program exists) the SHPO, and the Council; and such consultation will be outside the compass of this agreement and will follow 36 CFR Part 800 or the Indian tribe's alternative to 36 CFR Part 800; and

WHEREAS the BLM's program, the elements of which were defined in the BLM Manual between 1988 and 1994, does not incorporate some recent changes in legal, regulatory, and Executive Order authorities and recent changes in the nature and direction of historic preservation relationships, rendering the program directives in need of updating, and this need is recognized by the BLM, the Council, and the NCSHPO as an opportunity to work jointly and cooperatively among themselves and with other parties, as appropriate, to enhance the BLM's historic preservation program; and

WHEREAS the States, particularly those containing a high percentage of public land under the BLM's jurisdiction and control, have a strong incentive in forming a cooperative relationship with the BLM to facilitate and promote activities of mutual interest, including

BLM_0007857

Appendix 1, page 4

8140 - PROTECTING CULTURAL RESOURCES – (Public)

4

direction and conduct of a comprehensive statewide survey and inventory of historic properties, identification and nomination of eligible properties to the National Register of Historic Places, preparation and implementation of comprehensive historic preservation plans, and development and dissemination of public information, education and training, and technical assistance in historic preservation, and

WHEREAS the parties intend that efficiencies in the Section 106 process, realized through this agreement, will enable BLM, SHPO, and Council staffs to devote a larger percentage of their time and energies to proactive work, including analysis and synthesis of data accumulated through decades of Section 106 compliance; historic property identification where information is needed, not just in reaction to proposed undertakings; long-term preservation planning; purposeful National Register nomination; planning- and priority-based historic resource protection; creative public education and interpretation; more efficient BLM, SHPO, and Council coordination, including program monitoring and dispute resolution; and other activities that will contribute to readily recognizable public benefits and to an expanded view of the Section 106 context, and

WHEREAS the BLM has consulted with the Advisory Council on Historic Preservation (Council) and the National Conference of State Historic Preservation Officers (NCSHPO) regarding ways to ensure that BLM's planning and management shall be more fully integrated and consistent with the above authorities, requirements, and objectives;

NOW, THEREFORE, the BLM, the Council, and the NCSHPO mutually agree that the BLM, after completing the actions summarized in 1. below, will meet its responsibilities under Section 106, 110(f), and 111(a) through the implementation of the mechanisms agreed to in this agreement rather than by following the procedure set forth in the Council's regulations (36 CFR Part 800), and the BLM will integrate the manner in which it meets its historic preservation responsibilities as fully as possible with its other responsibilities for land-use planning and resource management under FLPMA, other statutory authorities, and executive orders and policies.

### *Components Of Agreement*

**1. Applicability**

The Council's regulations (36 CFR Part 800) and existing State programmatic agreements will continue to apply to BLM undertakings under a State Director's jurisdiction until the Director and State Directors, with the advice of the Preservation Board, assisted by the Council, the NCSHPO, the SHPOS, and other participating parties, as appropriate, have updated and revised national BLM policies and procedures; developed State-specific BLM/SHPO operating protocols; and trained all field managers and their cultural heritage staffs in the operation of the policies, procedures, and protocols. Field offices under a State Director's jurisdiction

Appendix 1, page 5

8140 - PROTECTING CULTURAL RESOURCES – (Public)

5

(including those under the jurisdiction of the Eastern States Director) will not begin to employ the streamlined procedures developed pursuant to this agreement until the Director has certified that the State Director's organization is appropriately qualified to do so.

**2. Establishment of Preservation Board**

a. The BLM's Director will establish a Preservation Board to advise the Director, Assistant Directors, State Directors, and field-office managers in the development and implementation of BLM's policies and procedures for historic properties. Authority, responsibilities, and operating procedures for the Preservation Board will be specified in the BLM Manual.

b. The Preservation Board will be chaired by the BLM's Preservation Officer designated under Section 110(c) of the NHPA, and will include a professionally qualified Deputy Preservation Officer from each State Office. The field management organization will be represented by at least three line managers (i.e., officials who are authorized by the Director's or State Directors' delegation to make land-use decisions).

c. The Preservation Board will perform primary staff work and make recommendations to the Director and State Directors concerning policies and procedures (3. below); bureauwide program consistency (3. below); training (6. below); certification and decertification of field offices (8. below); monitoring of field offices' historic preservation programs (9. below); and responses to public inquiries (9. below).

d. In addition, the Preservation Board will confer regularly with the Council and NCSHPO and involve them in its activities, as appropriate, including the development of the items listed in 2.c. The Preservation Board will also confer regularly with individual SHPOs and such other parties as have identified themselves to the Board as interested parties, including Tribal Preservation Officers, local governments, and preservation associations, to promote consistency with State, regional, and national practice, to identify recurrent problems or concerns, and to create opportunities in general to advance the purposes of this agreement.

e. The BLM will provide assistance, where feasible and appropriate, with reasonable and prudent expenses of the Council related to its activities pursuant to 2.c. and 2.d. above.

**3. Revision of "Cultural Resource Management" Procedures**

a. Within 6 months from the date of its establishment under 2. above, the Preservation Board will provide notice to Indian tribes and the public and, in accordance with 2.c. above, will begin to review, update, revise, adapt, and augment the various relevant sections of its Manual (8100 Series). These are:

Appendix 1, page 6

8140 - PROTECTING CULTURAL RESOURCES – (Public)

6

8100 - "Cultural Resource Management";
8110 - "Cultural Resource Identification";
8111 - "Cultural Resource Inventory and Evaluation";
8130 - "Cultural Resource Planning";
8131 - "Cultural Resource Management Plans";
8132 - "Cultural Resource Project Plans";
8140 - "Cultural Resource Protection";
8141 - "Physical and Administrative Protection";
8142 - "Recovery of Cultural Resource Data";
8143 - "Avoidance and/or Mitigation of Adverse Effects to Cultural Properties";
8150 - "Cultural Resource Utilization";
8151 - "Native American Use Permits";
8160 - "Native American Coordination and Consultation"; and
H-8160-1 - "General Procedural Guidance for Native American Consultation."

b. Manuals will be revised in consultation with the Council, NCSHPO, and the SHPOs, and will consider the views of other interested parties who have identified themselves in response to 2.d. (above).

c. Procedures will be revised to be consistent with the purposes of (1) this agreement, (2) the principles and standards contained in the Council's regulations, "Protection of Historic Properties" (36 CFR Part 800); (3) the Secretary of the Interior's *Standards and Guidelines for Archeology and Historic Preservation* regarding identification, evaluation, registration, and treatment, (4) the Office of Personnel Management's classification and qualification standards as revised under Section 112 of the NHPA, and (5) other applicable standards and guidelines, and will include time frames and other administrative details for actions referred to in this agreement.

d. The BLM will ensure adequate public participation and consultation with parties outside the BLM when revising policy and procedures under 3.a. The BLM's procedures for implementing the National Environmental Policy Act (NEPA) will be used as appropriate for ensuring adequate public participation in the BLM's historic preservation decision making. Provisions of Section 110 of the NHPA and the Council's regulations will be the basis for tailoring the NEPA procedures to historic preservation needs. Mechanisms for continuing public involvement in BLM's historic preservation process will be incorporated in BLM/SHPO protocols under 5. below.

e. The BLM will provide Indian tribes and other Native American groups with appropriate opportunities for involvement. Consultation with tribes pursuant to Sections 101(d)(6) and 110(a)(2)(E) of the NHPA will follow government-to-government conventions. Procedures to ensure timely and adequate Native American participation will follow the direction in Sections 101(d)(6) and 110(a)(2)(E) of the NHPA, and BLM Manual Section 8160 and Manual Handbook H-8160-1, as revised pursuant to a. and b. above. Revisions to the 8160 Manual Section and Manual Handbook will treat the cited NHPA direction as the

Appendix 1, page 7

8140 - PROTECTING CULTURAL RESOURCES – (Public)

7

minimum standard for Indian tribes' and other Native American groups' opportunities to be involved. Provisions for Native American participation in BLM's procedures for historic property identification, evaluation, and consideration of adverse effects will be incorporated in BLM/SHPO protocols under 5. below. For Indian tribes with historic preservation programs approved by the Secretary under Section 101(d)(2) of the NHPA, Tribal Preservation Officers will be involved in place of SHPOs when tribal land would be affected. Such involvement will occur under the Council's and/or the Tribe's procedures in all cases, not under this programmatic agreement.

f. It will be the Preservation Board's duty in accordance with 3.b. above to ensure that the policies and procedures, as revised pursuant to this section, are being followed appropriately by field offices. Where problems with implementation are found, it will be the Preservation Board's duty to move promptly toward effecting correction of the problems. This responsibility of the Preservation Board, among others, will be spelled out in the BLM Manual under 2.a. above.

**4. Thresholds for Council Review**

a. The BLM procedures will identify circumstances calling for the Council's review.

b. At a minimum, the BLM will request the Council's review in the following classes of undertakings:

(1) nonroutine interstate and/or interagency projects or programs;

(2) undertakings directly and adversely affecting National Historic Landmarks or National Register eligible properties of national significance;

(3) highly controversial undertakings, when Council review is requested by the BLM, an SHPO, an Indian tribe, a local government, or an applicant for a BLM authorization.

**5. Cooperation and Enhanced Communication**

a. Immediately following execution of this agreement, the BLM will offer each affected SHPO and the Council (and others who have identified concerns under 2.d. above) the following information, and will provide or update as needed:

-- a reference copy of the existing BLM Manual Sections and Manual Handbooks related to "Cultural Resource Management;

BLM_0007861

Appendix 1, page 8

8140 - PROTECTING CULTURAL RESOURCES – (Public)

8

-- a copy of any Handbook, Manual Supplement, or other standard procedure for "Cultural Resource Management" used by the BLM within an individual State Office's jurisdiction
-- a list of Preservation Board members;
-- a list of BLM cultural heritage personnel within each State Office's jurisdiction;
-- a map of the State showing BLM field office boundaries and responsibilities;
-- the best available map of the State showing tribal lands, ceded lands, and ancestral use areas; and
-- a brief summary of land holdings, major ongoing development projects or permitted uses, proposed major undertakings such as land exchanges or withdrawals, and particularly significant historic properties on BLM lands within each State Office's jurisdiction.

b. Within 6 months after revised policies and procedures become available, each State Director will meet with each pertinent SHPO to develop a protocol specifying how they will operate and interact under this agreement. Where a State Director has few interactions with an SHPO due to minimal public land holdings, protocols need not be pursued and historic preservation consideration will continue to be carried out under the procedures of 36 CFR Part 800. Adoption of protocols, as formalized by the State Director's and SHPO's signatures, will be a prerequisite for the certification described in 8. The Preservation Board and the Council will be kept informed of the progress of protocol development, and will receive an information copy of any signed BLM/SHPO protocol. The SHPO and State Director may ask the NCSHPO, the Preservation Board, and the Council to assist at any stage in developing protocols.

At a minimum, protocols will address the following:

-- the manner in which the State Director will ensure the SHPO's involvement in the BLM State management process;
-- data sharing, including information resource management development and support
-- data synthesis, including geographical and/or topical priorities for reducing the backlog of unsynthesized site location and report information, and data quality improvement;
-- public education and community involvement in preservation;
-- preservation planning;
-- cooperative stewardship;
-- agreement as to types of undertakings and classes of affected properties that will trigger case-by-case review (case-by-case review will be limited to undertakings that BLM finds will affect historic properties; the parties to this agreement agree that such case-by-case review will be minimized);
-- BLM/SHPO approaches to undertakings involving classes of, or individual examples of, historic properties for which the present BLM staff lacks specialized capabilities;
-- provisions for resolving disagreements and amending or terminating the protocol; and
-- relationship of the protocol to 36 CFR Part 800.

BLM_0007862

Appendix 1, page 9

8140 - PROTECTING CULTURAL RESOURCES – (Public)

9

c. As agreed under the protocol, but at least annually, the BLM will regularly send to the SHPO copies of
forms and reports pertaining to historic properties, in a format appropriate to the SHPO's established recording
systems, and consistent with the confidentiality provisions of Section 304 of the NHPA, so that information can be
shared to the maximum extent and contribute to State inventories and comprehensive plans as well as to BLM land
use and resource management planning.

d. The State Director, with the assistance of the Preservation Board, will seek, as appropriate, the SHPO's
active participation in the BLM's land-use planning and associated resource management activities so that historic
preservation considerations can have a greater influence on large scale decisions and the cumulative effects of the
more routine decisions, before key BLM commitments have been made and protection options have been limited.
Where SHPO participation will be extensive, State Directors may provide funding, if available.

e. Relevant streamlining provisions of BLM Statewide programmatic agreements currently in force in
Arizona, California, Colorado, Nevada, New Mexico, and Wyoming (and other programmatic agreements and/or
formalized working arrangements between BLM and SHPOs in any State, relative to identifying undertakings,
identifying properties, evaluating properties, determining effects, and protecting historic properties) may be
incorporated in BLM/SHPO protocols as appropriate and as consistent with 5.b. above, after which the State
Directors will notify the SHPO and Council that the Statewide agreements may be suspended for so long as this
agreement remains in effect. Project and special purpose programmatic agreements will function normally according
to their terms.

f. When potentially relevant to the purposes and terms of this agreement, the BLM will forward to the
Council information concerning the following, early enough to allow for timely briefing and consultation at the
Council's election:

-- major policy initiatives;
-- prospects for regulations;
-- proposals for organizational change potentially affecting relationships addressed in this agreement;
-- the Administration's budget proposals for BLM historic preservation activities;
-- training schedules; and
-- long-range planning and regional planning schedules.

**6. Training Program**

In cooperation with the Council and the NCSHPO, and with the active participation of individual SHPOs, the
Preservation Board will develop and implement a training program to (a) instruct BLM line managers and cultural
heritage program personnel on the policies underlying and embodied in this agreement, as well as specific measures
that must be met

Appendix 1, page 10

8140 - PROTECTING CULTURAL RESOURCES – (Public)

10

prior to its implementation, and (b) enhance skills and knowledge of other BLM personnel involved with "Cultural Resource Management" activities, including land use planning and resource management staffs. Training sessions will be open to Indian tribes, cultural resource consultants, and other parties who may be involved in the implementation of this agreement. The BLM may, where feasible and appropriate, reimburse the Council for assistance in developing training programs.

**7. Professional Development**

a. The Preservation Board, in consultation with the supervising line manager and cultural heritage specialist, will document each specialist's individual attainments as a preservation professional, consistent with OPM guidance and Section 112 of the NHPA and giving full value to on-the-job experience. Documentation will include any recommended limitations on the nature and extent of authorized functions. Where a field office manager's immediate staff does not possess the necessary qualifications to perform specialized preservation functions (e.g., historical architecture), the documentation will identify available sources of specialized expertise from outside the immediate staff, such as from other BLM offices, the SHPO, other Federal agencies, or non-governmental sources.

b. The Preservation Board, the supervising line manager, and the cultural heritage specialist will assess the manager's needs for special skills not presently available on the immediate staff, and the specialist's opportunities for professional development and career enhancement through training, details, part-time graduate education, and other means.

**8. State Office Certification and Decertification**

a. The Preservation Board, in consultation with the appropriate SHPO and the Council, will certify each BLM State Office to operate under this agreement upon determining that (1) managers and specialists have completed the training referred to in 7. above, (2) professional capability to carry out these policies and procedures is available through each field office's immediate staff or through other means, (3) each supervising line manager within the State has assigned and delimited cultural heritage specialists' duties, and (4) the State Director and the SHPO have signed a protocol outlining BLM/SHPO interaction in accordance with 5. above.

b. The Preservation Board may choose to review a field office's certification status. The field office's manager, the State Director, the Council, or the SHPO may request that the Preservation Board initiate a review, in which case the Preservation Board will respond as quickly as possible. If a field office is found not to have maintained the basis for its certification (e.g. the professional capability needed to carry out these policies and procedures is no longer available, or the office is not in conformance with the BLM/SHPO protocol, the procedures developed under 3. above, or this agreement) and the office's manager has not

BLM Manual                                                                                      Rel. 8-77
Supersedes Rel. 8-44, 8-45, 8-46, 8-47, 8-57                                      12/03/04

Appendix 1, page 11

8140 - PROTECTING CULTURAL RESOURCES – (Public)

11

voluntarily suspended participation under this agreement, the Preservation Board will recommend that the State Director decertify the field office. If a suspended or decertified field office is found to have restored the basis for certification, the Preservation Board will recommend that the State Director recertify the office.

c. A State Director may ask the Director to review the Preservation Board's decertification recommendation, in which case the Director will request the Council's participation in the review.

d. The Preservation Board will notify the appropriate SHPO(s) and the Council if the status of a certified office changes.

e. When a field office is suspended or decertified, the responsible manager will follow the procedures of 36 CFR Part 800 to comply with Section 106.

**9. Accountability Measures**

a. Each State Director will prepare an annual report in consultation with the appropriate SHPO(s), outlining the preservation activities conducted under this agreement. The annual report's content will be specified in the revised Manual. The report will be provided to the Council and made available to the public.

b. Once each year, the Council, in consultation with the BLM, SHPOS, and interested parties, and with assistance from the BLM, may select a certified State or States, or field offices within a State, for a detailed field review limited to the implementation of this agreement. Selecting parties may consider including other legitimate affected parties as participants in the review, as appropriate. The Preservation Officer and the appropriate Deputy Preservation Officer(s) and SHPO(s) will participate in the review. Findings and recommendations based on this field review will be provided to the Director, the State Director, and the Preservation Board for appropriate action.

c. The Preservation Officer and Deputy Preservation Officers will prepare responses to public inquiries for the Director's or a State Director's signature. This applies only to inquiries about the BLM's exercise of its authorities and responsibilities under this agreement, such as the identification, evaluation, and protection of resources, and not to general inquiries. Preparing responses will include establishing the facts of the situation and, where needed, recommending that the Director or State Director prescribe corrections or revisions in a practice or procedure.

d. Each meeting of the Preservation Board will be documented by a report. The Preservation Board will provide a copy of each report to the Council, the NCSHPO, and participating SHPOs.

BLM_0007865

Appendix 1, page 12

8140 - PROTECTING CULTURAL RESOURCES – (Public)

12

**10. Reviewing and Changing the Agreement**

a. The parties to this agreement may agree to revise or amend it at any time. Changes that would affect the opportunity for public participation or Native American consultation will be subject to notice and consultation, consistent with 3.e. above.

b. Should any party to this agreement object to any matter related to its implementation, the parties will meet to resolve the objection.

c. Any party to this agreement may terminate it by providing 90 days notice to the other parties, provided that the parties will meet during the period prior to termination to seek agreement on amendments or other actions that would avoid termination. In the event of termination, the BLM will comply with 36 CFR Part 800, including any relevant suspended State programmatic agreements (see 5.e. above).

d. Not later than the third quarter of FY 1999, and every two years thereafter, the parties to this agreement will meet to review its implementation.

*Affirmation*

The signatures below represent the affirmation of the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers that successful execution of the components of this agreement will satisfy the BLM's obligations under Sections 106, 110(f), and 111(a) of the National Historic Preservation Act.

/s/ Sylvia V. Baca                                          3/26/97

_____          _____          _____
Director, Bureau of Land Management          Date

/s/ Cathryn B. Slater                                       March 26, 1997

_____          _____          _____
Chairman, Advisory Council on Historic Preservation          Date

/s/ Judith E. Bittner                                       Mar 26, 1997

_____          _____          _____
President, National Conference of State Historic          Date
   Preservation Officers

BLM_0007866

Appendix 2, page 1

8140 - PROTECTING CULTURAL RESOURCES – (Public)

# Programmatic Agreement Authority

*The material quoted below is from the version of "Protection of Historic and Cultural Properties," 36 CFR Part 800, that was published September 2, 1986 (51 FR 31118). These were the regulations in effect at the time the national Programmatic Agreement (Appendix 1) was executed in March 1997.  References to 36 CFR 800 in the national Programmatic Agreement are to the 1986 version of the regulations. The quoted provisions authorize Programmatic Agreements and specify that an approved Programmatic Agreement satisfies the Agency's section 106 responsibilities for all individual undertakings carried out in accordance with the agreement until it expires or is terminated. That is to say, an approved Programmatic Agreement has equivalent legal effect to, and stands in the place of, the Advisory Council's regulations.*

**Section 800.13 Programmatic Agreements**

(a) **Application.** An Agency Official may elect to fulfill an agency's section 106 responsibilities for a particular program, a large or complex project, or a class of undertakings that would otherwise require numerous individual requests for comments through a Programmatic Agreement. Programmatic Agreements are appropriate for programs or projects:

(1) When effects on historic properties are similar and repetitive or are multi-State or national in scope;

(2) When effects on historic properties cannot be fully determined prior to approval;

(3) When non-Federal parties are delegated major decision making responsibilities;

(4) That involve development of regional or land-management plans; or

(5) That involve routine management activities at Federal installations.

(b) **Consultation process.** The Council and the Agency Official shall consult to develop a Programmatic Agreement. When a particular State is affected, the appropriate State Historic Preservation Officer shall be a consulting party. When the agreement involves issues national in scope, the President of the National Conference of State Historic Preservation Officers or a designated representative shall be invited to be a consulting party by the Council. The Council and the Agency Official may agree to invite other Federal agencies or others to be consulting parties or to participate, as appropriate.

(c) **Public involvement.** The Council, with the assistance of the Agency Official, shall arrange for public notice and involvement appropriate to the subject matter and the scope of the program. Views from affected units of State and local government, Indian tribes, industries, and organizations will be invited.

Appendix 2, page 2

8140 - PROTECTING CULTURAL RESOURCES – (Public)

(d) **Execution of the Programmatic Agreement.** After consideration of any comments received and reaching final agreement, the Council and the Agency Official shall execute the agreement. Other consulting parties may sign the Programmatic Agreement as appropriate.

(e) **Effect of the Programmatic Agreement.** An approved Programmatic Agreement satisfies the Agency's section 106 responsibilities for all individual undertakings carried out in accordance with the agreement until it expires or is terminated.

(f) **Notice.** The Council shall publish notice of an approved Programmatic Agreement in the Federal Register and make copies readily available to the public.

(g) **Failure to carry out a Programmatic Agreement.** If the terms of a Programmatic Agreement are not carried out or if such an agreement is terminated, the Agency Official shall comply with Sections 800.4 through 800.6 with regard to individual undertakings covered by the agreement.

BLM_0007868

Appendix 3, page 1

8140 - PROTECTING CULTURAL RESOURCES – (Public)

# Criteria of Effect and Adverse Effect

*The criteria below are quoted from the September 2, 1986 (51 FR 31118) version of 36 CFR Part 800, "Protection of Historic and Cultural Properties." These were the regulations in effect when the national Programmatic Agreement (Appendix 1) was executed in March 1997. Accordingly, wherever 36 CFR 800 is referred to in the Programmatic Agreement, the reference is to the 1986 version of the regulations. The 1986 criteria are in no way less protective of significant cultural properties than the current version. Achieving an effect that is "not adverse" through the application of avoidance or mitigation measures is functionally equivalent to "resolution of effect" in the current regulations.*

**Section 800.9 Criteria of effect and adverse effect**

(a) An undertaking has an effect on a historic property when the undertaking may alter characteristics of the property that may qualify the property for inclusion in the National Register. For the purpose of determining effect, alteration to features of a property's location, setting, or use may be relevant depending on a property's significant characteristics and should be considered.

(b) An undertaking is considered to have an adverse effect when the effect on a historic property may diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Adverse effects on historic properties include, but are not limited to:

(1) Physical destruction, damage, or alteration of all or part of the property;

(2) Isolation of the property from or alteration of the character of the property's setting when that character contributes to the property's qualification for the National Register;

(3) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting;

(4) Neglect of a property resulting in its deterioration or destruction; and

(5) Transfer, lease, or sale of the property.

(c) Effects of an undertaking that would otherwise be found to be adverse may be considered as being not adverse for the purpose of these regulations:

(1) When the historic property is of value only for its potential contribution to archeological, historical, or architectural research, and when such value can be substantially preserved through the conduct of appropriate research, and such research is conducted in accordance with applicable professional standards and guidelines;

(2) When the undertaking is limited to the rehabilitation of buildings and structures and is conducted in a manner that preserves the historical and architectural value of affected historic property through conformance with the Secretary's ``Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings", or

(3) When the undertaking is limited to the transfer, lease, or sale of a historic property, and adequate restrictions or conditions are included to ensure preservation of the property's significant historic features.

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

Release

8–78

Date

12/03/04

Subject

## 8150 – PERMITTING USES OF CULTURAL RESOURCES (PUBLIC)

1. <u>Explanation of Material Transmitted</u>. This release completely revises BLM Manual Section 8150 AND 8151.

2. <u>Reports Required</u>: None

3. <u>Materials Superseded</u>: Manual pages superseded by this release are listed under REMOVE below. No other directives are superseded.

4. <u>Filing Instructions</u>: File as directed below:

| REMOVE | INSERT |
|---|---|
| All of 8150 (Rel. 8-48)<br>All of 8151 (Rel. 8-49) | 8150 |

(Total: 22 Sheets)

TC-1

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Authorizing Scientific Uses of Cultural Resources
   .11  Limitations of Permits
     A. To Whom Permits May Be Issued
     B. To Whom Permits May Not Be Issued
       1. Federal Agencies
       2. BLM Employees and Agents
       3. Federal Employees Acting as Consultants
     C. Limits of Applicability
       1. Public Lands
       2. Non-Federal Lands
       3. Ethnographic Work
     D. Uses Authorized
       1. Survey and Recordation
       2. Limited Testing and/or Collection
       3. Excavation and/or Removal
       4. A Combination of Activities
     E. Curation Agreements are Required Regardless of the Use Authorized
   .12  Processing Applications for Permits
     A. Application Receipt and Initial Processing
     B. Application Review and Evaluation
       1. Completeness
       2. Qualifications of Applicant
       3. Qualifications of Proposed Curatorial Facility
       4. Certification by Curatorial Facility
       5. Purpose of Proposed Work
       6. Conformity with Management Constraints
       7. Indian Tribal Religious or Cultural Concerns
       8. Evaluation and Recommendation
       9. Decision
     C. Permit Issuance or Denial
     D. Information About Permits and Permittees
     E. Fieldwork Authorizations

BLM_0007871

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.13 Notifying Indian Tribes
   A. Permit Notification Requirement and Content
     1. When Notification Is Required
     2. When Notification Is Not Required
     3. Content of Notification

.2 <u>Coordinating with Other Agencies and Offices</u>
   .21.  Coordination With Other Federal Agencies
     A. Exchange of Information
     B. Consistency of Requirements
     C. Performance of Permittees
   .22  Coordination Within BLM
     A. Consistency of Criteria and Requirements
     B. Permit Issuance Lead
     C. Interstate Effect of Suspension or Revocation
   .23  Status of Permits and Performance

.3 <u>Administering Permits</u>
   .31  Monitoring and Documenting Performance
     A. Monitoring and Review
     B. Documentation
   .32  Modifying, Renewing, and Extending Permits
     A. Modification
      1. Initiated by Permittee
      2. Initiated by State Director
     B. Renewal
     C. Extension
     D. Decision and Documentation
   .33  Suspending and Revoking Permits
     A. Suspension for Cause
     B. Revocation for Cause
     C. Effect of Suspension or Revocation for Cause
      1. Effect on Organization
      2. Effect on Individual
     D. State Director's Warning
     E. Suspension for Management Purposes
     F. Revocation for Management Purposes
     G. Notice of Suspension
     H. Notice of Revocation
     I. Documentation

BLM_0007872

TC-3

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.34 Responding to Disputes and Appeals
  A. Disputes
    1. Request for Review
    2. Request for Conference
    3. Review at Higher Organizational Level
    4. Record of Review
  B. Appeals
    1. Initiated by Disputant
    2. Initiated by Other Affected Person
  C. Departmental Review of Professional Issues
.35  Maintaining an Automated Permit Status File

.4  Reporting Results and Protecting Products of Permitted Cultural Resource Work
  .41  Reports
    A  Preliminary Report
    B.  Interim Report
    C.  Final Report
  .42  Management of Collections
    A.  Responsibility of Permittee
      1.   Catalog of Artifacts
      2.   Confirmation of Delivery
    B.  Responsibility of Curatorial Facility

.5  Assessing the Results of Permitted Cultural Resource Work
  .51  Assessing Project Results
  .52  Assessing Cumulative Results
  .53  Public Dissemination of Results

Illustrations
1. Required Permit Content (.12B8a)
2. Land Use and Resource Protection Conditions (.12B8a)
3. Relationships Among BLM, Permittees, and Land Use Applicants (.33I2)

Glossary of Terms

BLM_0007873

.01

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.01  <u>Purpose</u>. The purpose of this Manual Section is to provide specific procedural direction on authorizing the use of cultural resources on public land, and on administering permits and the products resulting from permitted work.

.02  <u>Objectives</u>. Objectives of the program's utilization component are to facilitate appropriate scientific use of cultural properties on public lands; to ensure that collections of archaeological materials removed from public lands and records relating to them are maintained in qualified public repositories as United States property and are used for appropriate research or educational purposes; and to ensure that tangible public benefits follow from permitted uses of public land cultural resources.

.03  <u>Authority</u>.

    A. (See BLM Manual Section 8100.03A, H, I, and J.)

    B. <u>Title 43 Code of Federal Regulations</u>, Parts 3, 4, 7, and 2920.

    C. Departmental Manual, 519 DM 2 and 411 DM

    D. <u>Title 36 Code of Federal Regulations</u>, Part 79

.04  <u>Responsibility</u>. (See also BLM Manual Section 8100.04.)

    A. <u>State Directors,</u> through or with the assistance of the appropriate Deputy State Director(s) or his or her delegate within the State Office, as assigned, are responsible for receiving permit applications; for preparing permanent files; for conducting technical and management reviews to ensure that all qualifying requirements are met; for issuing or denying, modifying, suspending, and revoking permits; for establishing consultation relationships with potentially affected Indian tribes; and for maintaining complete and current files. Authority to issue, deny, modify, suspend, or revoke permits, and to issue warnings to permittees, may be delegated to an appropriate official within the State Office, at the State Director's discretion. Staffing of the necessary administrative work may be assigned as appropriate, but decision authority remains with the State Director or his or her immediate delegate in the State Office.

    B. <u>Field Office managers</u>, through or with the assistance of their delegates, as assigned, are responsible for conducting technical and management reviews of permit applications as requested by the State Director; for making recommendations concerning permit issuance, denial, modification, warning, suspension, and revocation; for receiving requests to authorize field work proposed under the authority of a permit; for issuing or denying such fieldwork authorizations; for notifying and consulting with affected Indian tribes; and for monitoring work conducted under permits and fieldwork authorizations.

BLM_0007874