.04C

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

C. <u>Cultural Resource Specialists</u> on State Office or Field Office staffs are responsible, within the limits of their professional qualifications, for providing and documenting technical reviews and recommendations; for developing and recommending permit terms and conditions; for monitoring and documenting permittees' technical performance and compliance with permit terms and conditions; for overseeing and documenting the maintenance of collections in BLM and public repositories; and for promoting the beneficial use of cultural resources and information derived from them.

.05  <u>References</u> (See BLM Manual Section 8100.05.)

.06  <u>Policy</u>.

A. The BLM encourages appropriate scientific use of cultural resources on public land and authorizes such use, consistent with the controlling laws and regulations and the established objectives for the resources' long-term management.

B.  Responsible Field Office managers monitor activities under permits to ensure that permittees observe agreed-upon conditions of authorized cultural resource use.

C. As much as possible the BLM ensures that approved activities that change the integrity of cultural resources are prudent in the effects they cause, and generous in the public benefits they contribute.

D. The BLM ensures that archaeological materials removed from public lands are properly housed in approved curatorial facilities and maintained to Federal standards as U.S. property.

E. As appropriate, the BLM promotes the use of U.S. collections for educational and research purposes.

F. Each activity conducted under a permit must be assessed in writing for its contribution to cultural resource knowledge, for its implications for cultural resource planning decisions and protection priorities, and for its importance to the public.

.07  <u>File and Records Maintenance</u>. See .12A, .12B1, .12B8, .12B9, .12C, .12E2, .12E3c-d, .13, .23, .31B, .32B2, .32D, .33D4, .33I, .34A3c, .35. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4, Item 14).

BLM_0007875

.1

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.1  <u>Authorizing Scientific Uses of Cultural Resources</u>

   .11  <u>Limitations of Permits</u>

      A.  <u>To Whom Permits May Be Issued</u>. State Directors may issue permits to appropriately qualified non-Federal applicants, provided that work proposed would further knowledge in the public interest, would not conflict with other legitimate or protected uses of the public lands and resources, and would not be inconsistent with any approved management plan, objective, or established policy applicable to the public lands or resources concerned.

      B.  <u>To Whom Permits May Not Be Issued</u>.

        1. <u>Federal Agencies</u>. State Directors may not issue permits to other Federal agencies. Officially proposed cultural resource work, which would be conducted on the public lands by appropriately qualified Federal employees from another agency and which would otherwise require a permit, may be authorized by a written agreement. Approval is subject to exactly the same review process and considerations as are specified in this Manual Section for a permit. Where the written agreement is not job specific, other Federal agencies are required to obtain a Fieldwork Authorization from the appropriate Field Office manager prior to beginning fieldwork. An employee of another Federal agency, proposing to do off-duty personal research that would require a permit, is subject to the regular permit application process.

        2. <u>BLM Employees and Agents</u>. State Directors may not issue permits as such to BLM employees or cultural resource consultants under contract to BLM, who are carrying out official agency duties associated with the management of cultural resources on public lands. BLM employees and contractors must meet qualifications provisions in .12B2b and limiting provisions in .11B3 of this Manual Section. This must be documented through the means appropriate to employment and assignment of duties, or procurement of services (see BLM Manual Sections 1400-335, 1400-90, 1510, and 8100.2). A BLM employee, proposing to do off-duty personal research that would require a permit, is subject to the regular permit application process.

        3. <u>Federal Employees Acting as Consultants</u>. State Directors may not issue a permit to any Federal employee whose intent is to provide off-duty consultation services directly or indirectly to a BLM land use applicant. Field Office managers may not issue a fieldwork authorization for such consultation services to a Federal employee who holds a cultural resource use permit for off-duty personal research as allowed in paragraphs .11B1 and 2.

BLM_0007876

.11C

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

C. Applicability of Permits

1. Public Lands. Permit requirements described in this Manual Section pertain only where BLM administers the surface. Cultural resource consultants may not be required to hold BLM permits to conduct work on non-Federal surface overlying Federal subsurface (split estate), even though BLM is requiring the work prior to authorizing development of subsurface minerals. (Buried cultural resources are legally recognized as part of the surface estate.)

2. Non-Federal Lands. Although permits are not issued for consultants working on non-Federal surface under BLM requirements, BLM is responsible for the quality of work done to satisfy historic preservation requirements and should review both the project proponent's proposed choice of consultant and the adequacy of the work proposed and advise the proponent about adequacy of the qualifications and/or the work through official correspondence. The BLM must accept a consultant's work product, even if indirectly, before completing the historic preservation review process and approving the proponent's land use application.

3. Ethnographic Work. Ethnographic work pertaining to public lands does not require a cultural resource use permit. However, when ethnographic work is being done on behalf of the BLM to enable the BLM to comply with a legal requirement, the qualifications of the ethnographer and proposed methodology should be reviewed, to ensure that they meet the Secretary of the Interior's professional qualification Standards, and approved in writing by the State Office prior to the initiation of field studies.

D. Uses Authorized. The following activities are subject to permitting under the procedures below.

1. Survey and Recordation may be authorized for applicants who propose to identify, evaluate, record, or conduct similar non-impacting studies of cultural properties that will not include excavation and/or removal of material remains or other significant disturbance of cultural properties. As agreed in advance and specifically limited in the permit conditions, such permits may authorize collection of isolated archaeological materials, not in association with cultural properties, and limited subsurface testing (e.g. shovel testing), as described in BLM Manual Section 8110.22B. Survey and Recordation permits may be issued on a multiple-Field Office or Statewide basis, for extended periods of time, to facilitate Section 106 compliance inventories and surveys. As appropriate, this type of permit may also be used to authorize nonimpacting research projects.

BLM_0007877

.11D2

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

2. <u>Limited Testing and/or Collection</u> may be authorized for applicants who propose to do small-scale testing and/or systematic collection and removal of material remains during field identification, evaluation, and recording activities, so that the significance or research potential of a cultural property may be better understood but not substantially diminished. Work proposed under Limited Testing and/or Collection permits may be used to determine future mitigation strategies. This category of permit does not normally require notification under .13 since the work proposed is unlikely to cause harm to or destruction of sites having religious or cultural importance. These are project-specific permits.

3. <u>Excavation and/or Removal</u> may be authorized for applicants who propose to excavate and/or remove material remains at a greater scale than the limited testing described in .11D2, with the result that the significance and/or future research potential of a cultural property or properties may be substantially altered. This category of permit includes major testing programs designed to answer research questions and to guide future data recovery efforts. Ordinarily, this type of permit will require notification and consultation with Indian Tribes pursuant to the Archaeological Resources Protection Act (ARPA) and the Native American Graves Protection Act (NAGPRA) because of the substantial likelihood that the work authorized could result in harm to or destruction of sites having religious or cultural importance to Indian Tribes or disturb cultural items subject to NAGPRA. These are project-specific permits.

4. <u>A Combination of Activities</u> described in .11D1 through 3 may be authorized in a single permit, as appropriate to the extent and nature of work proposed in the application. A permit may be modified, under provisions of .32, to authorize additional activities, project areas, and/or cultural properties that were not specified in the permit at the time of issuance.

E. <u>Curation Agreements are Required Regardless of the Use Authorized</u>. The permittee will be required to deposit copies of records, data, photographs, and other documents, and collections as applicable, with an approved curatorial facility.

.12  <u>Processing Applications for Permits</u>. Any person (see Glossary) may apply for a cultural resource use permit by submitting an approved application form and required supporting documentation (see .12B2 through .12B5), in person or by mail, to the address designated by the State Director responsible for administering the public lands where the proposed work would occur.

A. <u>Application Receipt and Initial Processing</u>. Applications are officially received, assigned a case identifier number, and assembled in a permanent record folder by the appropriate staff, as determined under .04.

BLM_0007878

.12B

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

B. Application Review and Evaluation.

1. Completeness. An appropriately qualified specialist shall examine each application upon receipt to determine if the filing is regular and completely fills all information requirements.

a. Information Lacking. Applications that are missing necessary information or required documentation in support of an information item may be withheld from further review until the needed information or documentation is provided. The applicant shall be informed as quickly as possible what is needed for review. For this purpose, documented telephone contact is preferable to written notification.

b. Unmet Criteria. Any application that fails to meet minimum qualifying criteria specified in .12B2 through .12B5, either upon initial receipt or through failure to respond adequately to a request for missing information, may be recommended for rejection without further review, by following the permit denial procedure in .12B8, .12B9, and .12C. An exception is that the criteria pertaining to organizational qualifications, principal investigator's qualifications, crew chiefs' qualifications, and purpose of proposed work shall not be applied to an application filed by the Governor for a permit on behalf of the State (16 U.S.C. 470cc(j)).

2. Qualifications of Applicant. Applications shall be reviewed by an appropriately qualified cultural resource specialist to determine whether or not applicants are adequately qualified for work proposed, except that among criteria in .12B, only the requirement to name a project administrator qualified to obligate the applicant organization shall apply to an application filed by the Governor for a permit on behalf of the State (16 U.S.C. 470cc(j)). Applicants may be disqualified on the basis of failure to meet qualifying criteria, which may include documented history of inadequate performance under a previous permit (e.g., revocation for cause). Similarly, individuals named in applications may be excluded from a permit or have their intended roles changed for insufficient qualifications or documented inadequate performance under a previous permit (see .33C).

a. Organizational Qualifications. Applications must show the applicant's organizational capability to accomplish work of the type and scope proposed. An organizational resume or summary of organizational experience should be submitted to provide the following minimum information:

(1) Statement of applicant's organizational ability to accomplish work, including:

(a) Location(s) of facilities and equipment.

(b) Description of facilities and equipment.

(c) Organizational structure and staffing.

BLM_0007879

.12B2a(1)(d)

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

(d) Specification of which and to what extent facilities, equipment, and staff listed would be involved in the proposed work.

(2) Statement of applicant's organizational history in completing type of work proposed, including:

(a) Similar past projects.

(b) Past Government contracts.

(c) Selected bibliography of project or contract reports and/or publications resulting from (a) and (b).

(d) Federal permits held in the last 3 years, effective dates of permits currently in force, and applications pending or planned (information on current permits and applications is important for interagency or intrabureau coordination under .2).

(3) Other pertinent organizational experience, such as research and special studies.

(4) If the applicant is a newly formed entity, any information that might take the place of information about similar past projects and past Government contracts should be provided. In such cases, individual capabilities of personnel will carry greater weight in evaluation of organizational qualifications. Lack of an organizational history should not be the principal factor in a recommendation for permit denial.

b. Individual Qualifications.

(1) Permit Administrator. Applications must show the name of the individual proposed to be responsible for carrying out the conditions of the permit and otherwise complying with legal requirements applicable to the permitted activity. This individual must be legally empowered to obligate the applicant organization and must sign the application and other official correspondence such as permit amendments. Unless this individual is also named under 12B2b(2) or (3), this individual need not be professionally qualified as a field investigator.

BLM_0007880

.12B2b(2)

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

(2) <u>Principal Investigator</u>. Applications must include the name of any individual(s) proposed to be responsible for planning, supervising, and overseeing field projects, including responsibility for the professional quality of evaluations and recommendations. Principal investigators shall have primary accountability for technical completeness and competence of work conducted under the permit. They shall be responsible for development of work plans and/or research designs, for performance of crew chiefs, for selection standards and limitations on work assignments of crew members, for analysis and interpretation of field data, for integration of fieldwork results into comparative regional perspectives, and for preparation of reports. For each such individual, information must be included with the application to demonstrate that the individual has achieved the following:

(a) Adequate professional instruction. This may be obtained in either of the following two ways:

(i) Formal education resulting in a graduate degree in the appropriate discipline.

(ii) Formal education resulting in a bachelor's degree in the appropriate discipline for the permitted activity plus at least 24 months of professionally supervised experience including similar duties as proposed in the application.

(b) Competence in theory and methods, and in recording, collecting, handling, analyzing, evaluating, and reporting cultural property data, relative to the type and scope of work proposed.

(c) Ability to plan, equip, staff, organize, and supervise activity of the type and scope proposed.

(d) Ability to carry research to completion, as evidenced by timely completion of theses, research reports, and similar documents.

(e) Completion of at least 16 months of professional cultural resource management experience including similar duties as proposed in the application. This experience must include at least 4 months of experience with comparable cultural resources in similar cultural contexts and environmental settings. The State Director may reduce the 4-month geographical experience requirement, as appropriate, if the proposed work is a narrow technical study independent of culture or location, such as research focused on a particular aspect of lithic technology. If equivalency is claimed under .12B2b(2)(a)(ii), the 16 months of experience required in this paragraph is to be included in, not in addition to, the required 24 months.

BLM_0007881

.12B2b(3)

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

(3) <u>Crew Chief</u>. Applications must include the name of any individual(s) proposed to be responsible for carrying out field projects. Crew chiefs shall be responsible for the technical quality of field work, for the direct on-the-ground supervision of all aspects of field work and data gathering, for proposing resource evaluations and recommendations for further treatment, and for preparing field records and descriptive reports. For each such individual, information must be included with the application to demonstrate that the individual has achieved the following:

(a) Adequate professional instruction, obtained in either of the following two ways:

(i) Formal education resulting in a baccalaureate degree in appropriate discipline (anthropology/archaeology, history, architecture) and at least 12 months of pertinent professionally supervised experience, with increasing responsibility leading to duties similar to those proposed in the application.

(ii) Equivalent training and experience, including at least 30 months of professionally supervised experience including increasing responsibilities leading up to responsibilities equivalent to those proposed in the application.

(b) Competence in recording, collecting, handling, analyzing, evaluating, and reporting cultural property data, relative to the type and scope of work proposed.

(c) Demonstrated ability to supervise activity of the type and scope proposed.

(d) Completion of at least 4 months of professional cultural resource management experience with comparable cultural resources in similar cultural contexts and environmental settings. This may be part of the experience required in .12B2b(3)(a)(i) and (ii).

(4) Individual qualifications can be documented by information such as the following, with greater weight being given to field experience that corresponds to work proposed in the application:

(a) Survey and excavation reports of cultural resource management or Section 106 (or other compliance) projects that the individual carried out or supervised.

(b) National Register documentation based on the individual's field work, resulting in property listings or determinations of eligibility.

BLM_0007882

.12B2b(4)(d)

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

(d) Publications including articles in professional journals, monographs, books, or chapters in edited books, related to the preservation of cultural properties.

(c) Materials such as presentations, booklets, brochures, lesson plans, or videos that interpret the results of the individual's cultural resource investigations for the general public;

(e) Presentations at regional, national, or international professional conferences related to the preservation of cultural properties.

(f) Professional service on boards or committees of regional, national, or international professional organizations concerned with the preservation of cultural properties.

(g) Awards, research grants, research fellowships, or invitations to teaching posts.

(5) The same individual may be proposed to perform any combination of permit administrator, principal investigator, and crew chief duties, provided that evidence is submitted to show that all pertinent qualifications are met for those positions.

BLM_0007883

.12B3

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

3. <u>Qualifications of Proposed Curatorial Facility</u>. To the maximum extent possible, proposed curatorial facilities should meet the 36 CFR Part 79 standards. State Directors shall determine that those facilities proposed to house collections and/or copies of records, data, photographs, and other documents derived from the permitted work satisfy the following minimum considerations, as applicable:

a. <u>Physical Considerations</u>:

(1) Adequate security.

(2) Adequate protection for the types of materials expected to be housed, such as climate control for perishable material remains, if applicable.

(3) Adequate protection for records, data, photographs, and other documents.

(4) Adequate records/accessioning/retrieval systems, including full capability to account for materials.

(5) Adequate provisions for scholarly access and study.

(6) Maintenance of physical plant insurance.

b. <u>Administrative Considerations</u>:

(1) Provision for permanent preservation, including transfer to a Federal or federally approved location in the event the facility should cease to exist.

(2) Adequate staffing.

(3) Proximity to the region/culture area where work is proposed, preferably location in the same State within which work is proposed.

(4) Provision for granting qualified scholars reasonable access to records and collections for research purposes.

4. <u>Certification by Curatorial Facility</u>. Each application must include written certification, signed by a properly authorized official of the proposed curatorial facility, of willingness to accept any collections, as applicable, and records, data, photographs, and other documents generated during the proposed term of the permit, and to assume permanent curatorial responsibility and accountability for such materials on behalf of the United States Government.

BLM_0007884

.12B5

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

5. <u>Purpose of Proposed Work</u>.

a. <u>Public Interest</u>. Applications must show that the work proposed would further knowledge of cultural properties in the public interest. Work that conforms to the use of a cultural property determined appropriate through evaluation and planning, and work that has been agreed to through the section 106 consultation process (including the application of a BLM-SHPO protocol), are considered to be in the public interest. Applications for excavation, research, or field school projects must include documentation that sets forth a methodological/theoretical framework appropriate to work proposed, and that proposes a schedule for timely and professional reporting of completed work.

b. <u>Definite Need</u>. Because of the considerable staff time it takes to review applications, prepare permits for approval, and monitor status, State Directors or their delegates should counsel prospective applicants not to apply for speculative permits. Permits must not be viewed or used as a Federal certification of consultants' credentials, a license to practice, or a precondition for consultants to compete for jobs. Applicants who are denied a speculative permit should be informed in writing (see .12B8) that an application for definite work will be processed promptly, and that denial under these circumstances does not reflect negatively on qualifications or performance. Land use applicants who will be requested to provide cultural resource information or services in support of their applications should be informed of the exact need, and asked to have their preferred consultant apply for a cultural resource use permit, as soon as the need is determined.

6. <u>Conformity with Management Constraints</u>. All applications must be reviewed for compatibility of proposed work with any approved management plan or established policy, objectives, or requirements applicable to the management of the public lands and resources involved.

a. Proposed work may be modified through limitations or conditions, or applications may be denied, if the application proposes work incompatible with:

(1) Cultural resource management commitments established through evaluation and planning. For example, if an applicant proposes to train university field school students in excavation techniques in a cultural property that has been allocated to long-term conservation because of scarcity and overriding scientific importance, a similar property that has been allocated to the research category should be substituted (after consultation with the applicant), or the application should be denied. (See BLM Manual Section 8110.)

BLM_0007885

.12B6A(2)

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

(2) Multiple use resource protection requirements pertaining to time of year, type of activity, type of equipment employed, access, personal safety, fire safety, or other management restrictions. For example, if an applicant proposes to do testing in a bighorn sheep lambing area during lambing season, or to use motorized equipment in a wilderness study area, the proposed timing or method of use should be changed through conditions (after consultation with the applicant) or the application should be denied.

(3) Other authorized uses of lands or resources exclusive in nature.

b. When the application is of a general nature, at a scope above the level of specific projects, so that potential conflicts cannot be identified, this review step may be limited or deferred until a request for fieldwork authorization is submitted pursuant to .12D.

7. Indian Tribal Religious or Cultural Concerns. All applications for Limited Testing and/or Collection permits and Excavation and/or Removal permits must be reviewed for potential harmful or destructive effects on locations of religious or cultural importance to Indian tribes. (See ARPA Section 4(c) and 43 CFR 7.7(a). See also Manual Handbook H-8120-1.) In addition, applications for Survey and Recordation permits may be so reviewed if there are reasons to think, because of an area's previously identified sensitivity, that even such nonimpacting use should be made known to Indian tribes. If it is determined that the potential exists for harm to or destruction of sites of religious or cultural concern to Indian tribes as a result of permit authorization, the notification procedures in .13 must be followed prior to making a decision to approve the application. Indian tribal religious or cultural concerns may be the basis for modification of the proposed work through limitations or terms and conditions, or for denial of the application.

8. Evaluation and Recommendation. Upon completing the review, the cultural resource specialist shall prepare a recommendation for permit issuance or denial. The basis for the recommendation, documented in writing, shall become a part of the permanent file.

a. Recommending Permit Conditions and Permit Term. When recommending that the State Director approve a permit, the cultural resource specialist shall prepare a brief written summary of review findings, complete an approved permit form with the standard conditions (Illustrations 1), and attach any special conditions determined appropriate to the work and recommended for approval (e.g., Illustration 2). The specialist's recommendation for the permit's term (duration) shall be indicated by the expiration date entered on the form.

(1) For permits that would cover a series of jobs over an extended period of time, the permit term reflects the confidence BLM has in the organization's ability to complete work and meet permit conditions. Three years is normal for survey permits issued to firms that have demonstrated a history of acceptable performance.

(2) New firms or firms that have experienced performance problems may be issued permits of shorter duration, such as one year, or held to a separate permit for each job.

BLM_0007886

Illustration 1, Page 1 of 2
.12B8a
8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)
**Illustration 1**

**Required Permit Content**

All cultural resource use permits must include completed information fields for:

1. Permit number
2. Name of permittee
3. Permittee's mailing address, telephone number, and email address
4. Nature of authorized cultural resource work
5. Location of authorized cultural resource work
   a. Description of Public Lands involved
   b. Identification of specific cultural resource(s) involved (if applicable)
6. Authorized beginning date
7. Expiration Date
8. Name of individual(s) authorized to plan and supervise field work and approve reports, evaluations, and recommendations
9. Name of individual responsible for carrying out terms and conditions of permit
10. Name of approved curatorial facility where collections and records shall be deposited upon completion of authorized cultural resource work
11. Signature of State Director or authorized official and date signed

All cultural resource use permits must include the following administrative conditions:

1. This permit is subject to all applicable provisions of pertinent regulations (43 CFR 2920; 43 CFR 3; 43 CFR 7), and policies and procedures (BLM Manual Section 8150), which are made a part hereof.
2. This permit may not be assigned.
3. Permittee shall immediately request that the State Director make a modification to accommodate any change in an essential condition of the permit (1, 2, 5, 6, 9, 10, 11 above), and shall without delay notify the State Director of any other changes affecting the permit or regarding information submitted as part of the application for the permit. Failure to do so may result in permit suspension or revocation or criminal charges.
4. This permit is issued for the term specified in 6 and 7 above. It is subject to suspension or revocation, for management purposes or for cause, at the discretion of the State Director, upon written notice.
5. Permittee may request permit extension, in writing, at any time prior to expiration of the term of the permit, specifying a limited, definite amount of time required to complete permitted work.
6. Any correspondence about this permit or work conducted under its authority must cite the permit number. Any publication of results of work conducted under the authority of this permit must cite the Bureau of Land Management and the permit number.
7. Special conditions attached to this permit are made a part hereof.
8. Permittee shall contact the affected Field Office manager prior to beginning any field work under the authority of this permit by submitting a fieldwork authorization request except when a specific fieldwork authorization is included with the permit.
9. Permittee's initiation of work or other activities under the authority of this permit signifies the permittee's acceptance of the terms and conditions of the permit.

(cont'd. next page)

BLM_0007887

Illustration 1, Page 2 of 2
.12B8a
8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

## Illustration 1 (continued)

## Required Permit Content

Administrative conditions continued

10. Permittee may request a review, in writing to the official concerned, of any disputed decision regarding inclusion of specific terms and conditions in this permit or any fieldwork authorization, denial of a fieldwork authorization request, or modification, suspension, or revocation of this permit, setting out reasons for believing that the decision should be reconsidered.

11. Permittee shall not be released from requirements of this permit until all outstanding obligations have been satisfied, whether or not the term of the permit has expired. Permittee may be subject to civil penalties for violation of any term or condition of this permit.

12. Permittee shall use State Director-approved GPS technology to record all location data for field work authorized in this permit.

13. Permittee shall submit a preliminary report to the authorized officer within 10 days of completion of any episode of field work, setting out what was done, how it was done, by whom, specifically where, and with what results, including maps, GPS data, an approved site form for each newly recorded cultural property, a BLM evaluation form for each cultural property examined, and the permittee's professional recommendations, as results require. Depending on the scope, duration, and nature of the work, the authorized officer may require progress reports, during or after the fieldwork period or both.

14. Permittee shall submit a final report to each the authorized officer and the State Director not later than 180 days after completion of field work. Where a fieldwork episode involved only minor work and/or minor findings, a final report may be submitted in place of the preliminary report.

15. Permittee shall deposit all artifacts, samples and collections, as applicable, and copies of all records, data, photographs, and other documents, resulting from work conducted under this permit, with the curatorial facility named in item 11, above, not later than 90 days after the date the final report is submitted to the State Director. Not later than 180 days after the final report is submitted, permittee shall provide the State Director with a catalog and evaluation of all materials deposited with the curatorial facility, including the facility's accession and/or catalog numbers.

BLM_0007888

Illustration 2
.12B8a
8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

## Illustration 2

## Land Use and Resource Protection Conditions

Following are additional conditions the State Director may add to the permit if applicable (conditions pertaining to excavation, for example, would not be applicable in a permit that does not authorize excavation). The State Director may add any pertinent State-specific conditions. The Field Office manager may adjust or add conditions to fieldwork authorizations as appropriate to the location, time of year, or work to be conducted. Such adjusted and added conditions become a fully enforceable part of the permit.

1.  Permittee shall observe all Federal, State, and local laws and regulations applicable to the public lands and resources, whether or not stipulated in the permit conditions.

2.  Permittee shall allow the State Director and authorized officer or their representatives full access to the work area specified in this permit at any time the permittee is in the field, for purposes of examining the work area and any recovered materials and related records.

3.  Permittee shall cease work upon discovering any human remains and associated funerary objects, and shall immediately notify the authorized officer. Work in the vicinity of the discovery may not resume until the authorized officer has given permission.

4.  Permittee shall backfill all subsurface test exposures and excavation units as soon as possible after recording the results, and shall restore them as closely as reasonable to the original contour.

5.  Permittee shall take precautions to protect livestock, wildlife, the public, or other users of the public lands from accidental injury in any excavation unit.

6.  Permittee shall not conduct any flint knapping or lithic replication experiments at any archaeological site, aboriginal quarry source, or non-site location that might be mistaken for an archaeological site as a result of such experiments.

7.  Permittee shall perform the field work authorized in this permit in a way that does not impede or interfere with other legitimate uses of the public lands, except when the authorized officer specifically provides otherwise.

8.  Permittee shall restrict vehicular activity to existing roads and trails unless the authorized officer provides otherwise.

9.  Permittee shall keep disturbance to the minimum area consistent with the nature and purpose of the field work.

10. Permittee shall not cut or otherwise damage living trees unless the authorized officer gives permission.

11. Permittee shall take precaution at all times to prevent wildfire. Permittee shall be held responsible for suppression costs for any fires on public lands caused by the permittee's negligence. Permittee may not burn debris without the authorized officer's specific permission.

12. Permittee shall not disturb resource management facilities within the permit area, such as fences, reservoirs, and other improvements, without the authorized officer's approval. Where disturbance is necessary, permittee shall return the facility to its prior condition, as determined by the authorized officer.

13. Permittee shall remove temporary stakes and/or flagging, which the permittee has installed, upon completion of field work. Permittee shall clean all camp and work areas before leaving the permit area.

14. Permittee shall take precautions to prevent littering or pollution on public lands, waterways, and adjoining properties. Refuse shall be carried out and deposited in approved disposal areas.

BLM Manual                                                          Rel. 8-78
Supersedes Rel. 8-48, 8-49                                          12/03/04

BLM_0007889

.12B8b

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

b. <u>Preparation of Denial Letter</u>. For any recommendation to deny a permit application, the cultural resource specialist shall prepare a letter to the applicant, setting out in detail the reasons for denial.

9. <u>Decision</u>. The file, including the staff recommendation and documentation and the completed permit form or denial letter, shall be transmitted to the appropriate official for decision (see .04). Once the permit or the denial letter has been signed, that information shall be returned to the permanent file.

C. <u>Permit Issuance or Denial</u>.

1. <u>Final Processing</u>. Upon receiving the file, the responsible staff shall check the file for completeness.

2. <u>Distribution</u>. The responsible staff shall distribute the decision document and copies as follows:

a. Original signed permit, including standard and special conditions, or original signed letter of denial to applicant/permittee.

b. Copy to the permanent file.

c. Copy to each Field Office affected.

d. Copy to any curatorial facility identified under .12B4.

3. <u>Additional Material to Permittees</u>. With each original permit, include in the mailing to the permittee information about requesting fieldwork authorization, together with any procedural instructions and materials (inventory forms, etc.) that will aid the permittee in meeting conditions of the permit.

D. <u>Information About Permits and Permittees</u>.

1. <u>Confidentiality</u>. The State Director may withhold information about the location and nature of permitted work if disclosing it would compromise the protection of archaeological resources and/or National Register properties.

2. <u>Public Information</u>. The State Director and Field Office manager may on request provide the names of individuals and firms holding cultural resource use permits, but must not represent the information as identifying the only consultants who are qualified to conduct cultural resource studies. Land use applicants who are being required to provide inventory and evaluation data in support of their land use applications should be encouraged to select a qualified consultant and to request that the consultant apply for the appropriate permit. (See .12B5b) Permittee lists should not be used to limit competition in any way.

BLM_0007890

.12E

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

E. Fieldwork Authorizations.

1. All permits require fieldwork authorizations, which may take the form of written documentation (including email or fax), a record of pre-field checks of office records, or documented oral authorizations by telephone. Project-specific permits (see .11D2 and 3) often include at issuance the only fieldwork authorization that they will require. However, if field work will be discontinuous, project-specific permits will need additional authorization prior to each episode of field work. The primary purpose of fieldwork authorizations is to determine whether areas have been previously surveyed, whether there are conflicts with other resources, or other factors (such as safety issues) that could affect timing and scope of the proposed fieldwork. For any recommendation to postpone fieldwork, the cultural resource specialist shall prepare a letter to the permittee, setting out in detail the reasons for delay and when work may begin. Fieldwork authorizations should not routinely be used to apply additional special conditions to the permit beyond what was attached at original issuance, nor should the fieldwork authorization process be used as a second level of review of proposed personnel.

2. Field Office managers are responsible for authorizing specific field work conducted under a cultural resource use permit. Field Offices shall maintain a file for each permit affecting them, documenting to the file all fieldwork authorized under the permit, and shall forward originals or copies of documentation, as appropriate, to the permanent file.

3. Written Authorization Procedures. Because fieldwork authorizations may be given as the product of in-office pre-field records checks, as telephone authorizations, as email or fax exchanges, or as more formal written documentation, the applicability of the procedural guidance in paragraphs .12E3a-d will vary from State to State, being most applicable to States that employ more formal fieldwork authorization procedures. States electing optional methods must document contacts and authorizations as part of the permit record. Permittees should also be advised to document contacts and authorizations for their own records.

a. Pre-work Contact. Except for project-specific permits that authorize work to begin immediately upon issuance, each permit shall require that the permittee contact the Field Office manager prior to beginning any work under authority of the permit. The permittee should make such contact by submitting a request for fieldwork authorization, in person or by mail, to the Field Office manager responsible for the administration of lands involved in the proposed field work (except when waived under paragraph .12E3b(1)). When proposed field work would consist of numerous instances of essentially similar tasks carried out in the same Field Office (e.g., oil and gas drill pad surveys), the Field Office manager may elect to limit pre-work contacts to initial and periodic (e.g., monthly or quarterly) submissions of fieldwork authorization requests, updated at the initiation of each new fieldwork episode by documented telephone contacts.

BLM_0007891

.12E3b

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

b. <u>Review</u>. An appropriately qualified cultural resource specialist shall review proposed field work in consultation with the Field Office manager(s) with management responsibility for the location(s) specified. A cultural resource specialist who does not have appropriate professional qualifications to review the work proposed by the permittee may not be assigned to do the review.

(1) <u>Site or Project-Specific Permits</u>. When a permit is sufficiently specific to project location field work is proposed to begin immediately upon issuance of the permit, and the affected Field Office manager has approved the permit application, further review may be waived and a fieldwork authorization issued as part of the permit.

(2) <u>General Authorization Permits</u>. When permits are at a scope of generalization above the level of specific projects, so that pre-issuance review was limited or deferred, such review must be completed prior to approving a request for fieldwork authorization.

(3) <u>Additional Permit Conditions</u>. The cultural resource specialist in consultation with the Field Office manager may develop and recommend necessary and appropriate conditions that were not previously included in the permit. Additional conditions in fieldwork authorizations should ordinarily be limited to protecting other resources (e.g., restricting activity in specific areas during elk calving season) or ensuring public safety (e.g., alerting the permittee to extreme fire hazard and specifying necessary precautions). They may not substantially alter the scope of the permit. Simple instructions to the permittee that can be conveyed in a cover letter should not be added to the permit as conditions. Any conditions added in fieldwork authorizations have the same force and effect as conditions in the original permit. Special resource protection or safety considerations may be adequate reason to deny a request for fieldwork authorization or to delay its approval until the special circumstances have changed. Both as a courtesy and as a possible source of unconsidered alternatives, the permittee should be consulted before a decision is made to deny or delay a fieldwork authorization.

(4) <u>Evaluation and Recommendation</u>. Upon completing the review, the cultural resource specialist shall prepare a recommendation for approval, including any additional conditions considered necessary, or for denial. The basis for the recommendation must be adequately documented in writing.

(5) <u>Preparation of Authorization Form</u>. For any recommendation for approval, the cultural resource specialist shall prepare a fieldwork authorization, attaching any additional conditions recommended.

(6) <u>Preparation of Denial Letter</u>. For any recommendation to deny a request for fieldwork authorization, the cultural resource specialist shall prepare a letter to the permittee, setting out in detail the reasons for denial.

BLM_0007892

.12E3c

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

      c. <u>Decision</u>. A staff recommendation for approval or denial will be submitted to the Field Office manager for decision. Once the fieldwork authorization or denial letter has been signed, the temporary file shall be returned to the Field Office records section for further action.

      d. <u>Issuance</u>. Upon receiving the temporary file, the Field Office records section shall distribute the decision document and copies as follows: Original signed fieldwork authorization, including additional conditions, if any, or original signed letter of denial to permittee; copy to issuing office for inclusion in the permanent file; copy to each Field Office manager affected.

    .13 <u>Notifying Indian Tribes</u>. The State Director or Field Office managers, as appropriate, are responsible for notifying and consulting with Indian tribes when work proposed in an application for a permit might have a harmful or destructive effect on sites or areas that have tribal religious or cultural importance in accordance with ARPA and NAGPRA (see "site of religious or cultural importance" and "cultural item," Glossary of Terms). In general, only permits for major testing programs and excavation and/or removal are expected to be subject to consultation requirements (see .12B7 and .13). As defined in ARPA, the term "Indian tribe" includes Alaska Native Villages and Native Corporations defined in or established by the Alaska Native Claims Settlement Act. Except as noted below, the specific notification or consultation procedures and processes contained in BLM Manual Section 8120 and the associated Manual Handbook H-8120-1 shall be followed when dealing with Indian tribes on permitting issues. File information pertaining to the nature and location of sites or areas that are of concern to Indian tribes or groups for religious or cultural reasons, shall be protected from public disclosure to the extent allowed by statute. Sites or areas that are or coincide with archaeological resources as defined in ARPA and 43 CFR 7.3, or that are or coincide in location with a cultural property eligible for or included in the National Register of Historic Places, shall be protected from disclosure under a Freedom of Information Act request (16 U.S.C. 470w-3; 16 U.S.C. 470hh).

    A. <u>Permit Notification Requirement and Content</u>. (See 43 CFR 7.7(a).)

      1. <u>When Notification Is Required</u>. Upon receiving an application for an Excavation and/or Removal permit that could, if approved, result in harm to or destruction of already identified sites or areas of Indian tribal religious or cultural concern, the Field Office manager shall notify Indian tribe(s) known to have the concerns. Notification shall be by mail, return receipt requested.

      2. <u>When Notification Is Not Required</u>. Notification shall not be required when one or more of the following conditions applies:

      a. The proposed activity will not result in surface disturbance.

BLM_0007893

.13A2b

## 8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

b. Diligent attempts to identify Indian tribes with aboriginal or historic ties have had a negative conclusion.

c. Information obtained pursuant to this subsection indicates that notification is not necessary under the circumstances of the proposed work.

d. Information has been withheld by the Indian tribe or group, and the Field Office manager has informed the tribe or group in writing that the absence of information will preclude notification.

e. The tribe has already been consulted about the proposed archaeological work pursuant to Section 106 of the National Historic Preservation Act, the national Programmatic Agreement, and the State's BLM-SHPO Protocol, sufficient to satisfy the requirement of 43 CFR 7.7.

3. Content of Notification. Any notification shall include, at a minimum, the following information:

a. Location and nature of proposed work.

b. Identification of anticipated harmful or destructive effects, to specific known sites or areas of religious or cultural importance, that the Field Office manager has determined might result from the proposed work.

c. Statement that any request for consultation with the Field Office manager must be received within 30 days from date of receipt of the notification (beginning as of the date of delivery shown on the return receipt).

d. Citation of ARPA Section 4(c) 43 CFR 7.7(a) as the basis for notification, and citation of NAGPRA Section 3(c) if the work involves intentional excavation of human remains and/or associated funerary objects.

BLM_0007894

.2

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.2 <u>Coordinating with Other Agencies and Offices</u>.

.21 <u>Coordination With Other Federal Agencies</u>. For permit applications filed under the authority of ARPA that involve the jurisdictions of more than one Federal land manager, State Directors or appropriate Field Office managers are required to coordinate the review and evaluation of applications and the issuance of permits (see 43 CFR 7.8(b)).

A. <u>Exchange Information</u>. If needed, each State Director or Field Office manager shall seek to develop an agreement, such as a memorandum of understanding, with counterpart office heads for other Federal agencies that have permit issuance responsibility on lands proximate or contiguous to lands under the State Director's or Field Office manager's administrative jurisdiction. The agreement should provide for exchange of information pertaining to permit applications that affect lands under more than one jurisdiction. Similar agreements may also be developed with State agencies as appropriate.

B. <u>Consistency of Requirements</u>. State Directors or Field Office managers should notify office heads of other agencies when a permit application indicates that the other agency's lands are involved, that a permit for similar work on the other agency's lands is in force, or that a comparable application is pending in the other agency. When work would be essentially similar on the lands of more than one agency, proposed terms and conditions should be compared so that improved interagency consistency of requirements may be achieved.

C. <u>Performance of Permittees</u>. Information pertaining to permit reviews, warnings, suspensions, and revocations should be provided to office heads of other agencies when appropriate.

.22 <u>Coordination Within BLM</u>.

A. <u>Consistency Criteria and Requirements</u>. When an applicant is applying to more than one BLM State for a permit for the same or essentially similar work, the authorized officers should coordinate the review of applications and shall ensure, when possible, consistency of decisionmaking criteria and selection of terms and conditions.

B. <u>Permit Issuance Lead</u>. Two or more State Directors may agree that one will assume a lead role and issue a single permit with terms and conditions appropriate to each participating State. Fieldwork authorizations shall remain individual and specific to each affected Field Office.

BLM_0007895

.22C

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

C. Interstate Effect of Suspension or Revocation. If a State Director suspends or revokes a permit for cause, documentation about the decision shall be transmitted to all other States where the permittee holds an active permit. Other BLM States administering active permits held by the permittee in question shall review the circumstances and decide whether their active permits should also be suspended or revoked. If the State Director deems it necessary, the active permit may be suspended immediately, pending completion of the review.

.23 Status of Permits and Performance. Information relating to applications, permits, and performance of permittees should be maintained in current status in an automated permit status file, which should be of a format that can be shared electronically. Other BLM States in which a permittee also holds a permit should be notified in any case of a suspension or revocation for cause (see .33).

BLM_0007896

.3

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.3  Administering Permits

.31  Monitoring and Documenting Performance.

A. Monitoring and Review. Field Office managers shall be responsible for monitoring the permittee's performance at various intervals throughout the life of the permit. Monitoring, adequate to ensure compliance, shall be conducted when the permittee is in the field. Performance is reviewed with direct regard to conditions in the permit as well as applicable standards and guidelines. Monitoring is intended to verify the permittee's adherence to administrative conditions as well as adherence to technical and resource protection conditions. Administrative conditions include, among others, conducting the survey at the times agreed to and having the required personnel present during field work. Performance monitoring should be carried out often enough that developing problems can be recognized and brought to the permittee's attention at a time when they may still be easily corrected, without requiring a formal State Director's warning (see .33D). For any permit issued for a period greater than one year, the permittee's performance under the permit shall be reviewed at least annually. State Directors should establish the monitoring standards appropriate for their States. In addition to fieldwork monitoring, Field Office managers should verify the timely deposit of records and collections, as applicable, with approved curatorial facilities at least annually.

B. Documentation. Findings from any performance monitoring or annual review shall be entered into the permanent file and may be noted in an automated status file, as appropriate. The responsible manager should inform the permittee in writing of the results of performance monitoring, review, and verification.

.32  Modifying, Renewing, and Extending Permits.

A. Modification.

1. Initiated by Permittee. The permittee may request permit modification, in writing, at any time. The permittee must request a permit modification whenever a change in any essential condition of the permit is anticipated. Any change in an essential condition that is not accommodated by a modification shall make the permit invalid and shall be cause for suspension. Essential conditions include individuals named in the permit, type, scope, or location of work, location and facilities of permittee or curatorial facility, and any other conditions pertaining to the permittee's eligibility for the permit. A change of permit duration may not be accommodated by modification (see Renewal and Extension below).

2. Initiated by State Director. The State Director may modify a permit at any time when essential management considerations have changed but do not require that the permit be suspended or revoked. The State Director may modify a permit to remove an individual from a responsible position, such as crew chief, when monitoring has shown that the individual is incapable of performing adequately in the position, and suspension or revocation of the permit is otherwise not necessary.

BLM_0007897

.32A3

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

3. <u>Written Notice</u>. The State Director shall provide written notice of a permit modification to the permittee, in person or by mail (return receipt requested), setting out in full the reasons for the modification. Whenever possible, oral notice should precede written notice.

B. <u>Renewal</u>.

1. A permittee holding a permit for Survey and Recordation may request that the State Director renew it. The renewal request may be made up to 3 months prior to the expiration of the term of the permit or, provided no field work has been conducted after the permit expired, within a reasonable period of time after expiration. The permittee should submit an updated application form, showing any changes in essential conditions (see .32) since the original application. If such changes have been already been accommodated by modification, the State Director may allow the permittee to attest to this in a letter request in lieu of an application form. The State Director may renew a permit, provided that the permit is not suspended for cause and the permittee has no outstanding, significant performance problems. The State Director may modify and renew a permit at the same time.

2. A renewed permit should be given a new number so that case files do not become unwieldy, either in size or in complexity. This can be as simple a change as adding an ending-year suffix. In the event of a dispute or appeal, reviewing officials should not have to work with an excessively large case file containing years-old, superseded information. Cultural resource permit files should follow the same basic case recordation standards as serialized lands and minerals case files, for similar reasons.

C. <u>Extension</u>. A permittee holding a permit for Limited Testing and/or Collection or for Excavation and/or Removal may request that the State Director extend the permit. The request should be made a reasonable period of time before the permit's term expires. Because these are project-specific permits, there should not be a need for numerous extensions. The State Director may extend a permit, provided that any changes in an essential condition (see .32A) have been accommodated by modification, the permit is not suspended for cause, and the permittee has no outstanding, significant performance problems. The State Director may modify and extend a permit at the same time. An extended permit may retain the same number.

D. <u>Decision and Documentation</u>. Decisions on permit modification, renewal, and extension shall be based on a review process comparable to the review in .12B. Any modification, renewal, or extension shall be documented in the permanent file and noted in an automated status file.

BLM_0007898

.33

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.33  Suspending and Revoking Permits.

A. Suspension for Cause.

1. The State Director may suspend a permit for infringements of permit conditions that are of a serious or irresponsible nature. For example, acts of commission or omission or misrepresentation warrant suspension when they are directly or indirectly detrimental to cultural or natural resources or public safety. Also, suspension is appropriate when the permittee has failed to meet a condition of the permit, such as failure to request a modification to accommodate change in an essential condition and failure to meet special resource protection conditions added as part of a fieldwork authorization or as a permit modification (initiated by the State Director). When a permittee's actions warrant suspension, prompt suspension is the appropriate BLM response; the State Director should not instead allow a problem permit to run to term and then deny a request for its renewal.

2. The State Director shall suspend a permit when the permittee has been formally charged with a violation of any prohibition in 16 U.S.C. 470ee or 43 CFR 7.4.

3. Because not all permit conditions are of equal weight, good judgment must be exercised in determining whether a permit should be suspended. Lesser performance problems that warrant an action of record should be handled by a State Director's warning (see .33D).

4. A suspended permit may be reinstated.

B. Revocation for Cause.

1. The State Director shall revoke a permit upon the permittee's conviction under 16 U.S.C. 470ee, or the assessment of a civil penalty under 16 U.S.C. 470ff and 43 CFR 7.

2. The State Director may revoke a permit upon the permittee's failure after a reasonable time to correct the situation that led to suspension for cause.

3. The State Director shall revoke a permit upon determining that information presented as fact in an application, a fieldwork authorization request, or a report was knowingly falsified.

4. A revoked permit may not be reinstated.

BLM_0007899

.33C

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

C. Effects of Suspension or Revocation for Cause

1. Effect on Organization. The permittee, usually an organization rather than an individual, is the entity most clearly affected by a suspension or revocation for cause. Before considering a reinstatement request or a reapplication, the State Director will require a firm whose permit is suspended or revoked for cause to demonstrate that the cause has been corrected. The State Director may bar a firm, whose permit is revoked for cause, from consideration for a permit to work on BLM-administered lands for a period of years.

2. Effect on Individual. For supervisory personnel who committed or allowed the deficient performance that led to the organization's suspension or revocation for cause, that person will no longer be eligible to work under a cultural resource use permit in a supervisory capacity for that or any other organization. Upon demonstration that the causes for unsatisfactory performance problems have been resolved (e.g., by demonstrating additional training or experience), the State Director may consider reinstating the individual in a supervisory capacity.

D. State Director's Warning. The State Director may notify a permittee in writing when the permittee's performance under a permit is marginal and approaching cause for suspension. State Director's warnings are optional, discretionary, BLM administrative courtesies that are not procedurally required by law, regulation, or policy.

1. The State Director's warning notice should describe the problem in sufficient detail that the permittee can clearly understand the cause for the warning; should set forth what action is needed on the part of the permittee to correct the problem; and should set a time limit within which the permittee will be expected to remedy the problem.

2. The State Director's warning notice should point out that continuation of the problem without remedy is likely to result in permit suspension for cause.

3. When a performance problem is of a relatively minor nature, such as inadvertent omissions or incorrect procedures in the completion of forms or the preparation of reports, the State Director's or Field Office manager's staff should alert the permittee more informally, such as by a telephone call or other direct personal contact.

4. Written State Director's warnings become a part of the permanent permit file and could influence future permit decisions, including the outcome of disputes and appeals. Because of their gravity and their potential relationship to permit suspension, they may be issued only by the State Director.

5. Warnings below the State Director level are not authorized in the BLM cultural resource use permit system.

BLM_0007900

.33E

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

    E. Suspension for Management Purposes. The State Director may suspend a permit when management conditions that were not in effect at the time the permit was issued require that the permitted work be temporarily stopped. Protection of other resources, safety, or similar considerations might be cause for suspension for management purposes.

    F. Revocation for Management Purposes. The State Director may revoke a permit if reasons warranting suspension for management purposes are expected to continue indefinitely.

    G. Notice of Suspension. The State Director shall serve the permittee with written notice of suspension, in person or by mail (return receipt requested), setting out in full the reasons for the suspension. Suspension notices must inform the permittee clearly why the suspension has been imposed, what action the permittee must take and the time within which the permittee must act, as applicable, and potential legal consequences to the permittee if work under the suspended permit is continued.

    H. Notice of Revocation. The State Director shall serve the permittee with written notice of revocation, in person or by mail (return receipt requested), setting out in full the reasons for the revocation and notifying the revokee that any continuation of work without a permit may be a violation of criminal law. Information on disputes and appeals must be included with any notice of revocation (see .34).

    I. Documentation.

    1. Any warning, suspension, or revocation shall be documented and entered in the permanent file. The permittee's performance record shall not be affected by suspension or revocation for management purposes, and the permittee shall be so informed. Warning, suspension, or revocation should be noted in an automated status file.

    2. In the case of a State Director's warning, which does not take a permit out of operation, communication should be limited to BLM and the permittee. It is inappropriate for the State Director, or any official delegated to act in his or her stead (see .04), to send copies of warning letters and related correspondence to a permittee's client or sponsor. See Illustration 1.

    3. In the case of suspension or revocation for cause, other agencies and BLM offices should be notified directly of the action. It is the permittee's or revokee's responsibility, not the BLM's, to notify any client or sponsor whose work will not be completed as scheduled.

BLM_0007901

Illustration 3
(.3312)
8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

**Illustration 3**

Mutually Exclusive Relationships Among the BLM, Cultural Resource Permittees, and Land Use Applicants.



**Mutually Exclusive Relationships Among the BLM, Cultural Resource Permittees, and Land Use Applicants**

$   **A-B**  The BLM has a direct A-B relationship with the permittee through the cultural resource permit process. This relationship is shaped by the laws, regulations, policies, and procedures that control such permits. BLM is not concerned about who employs permittees, but rather that they have appropriate staff and infrastructure to do the kind of work they are permitted to do, and that an approved curatorial facility agrees to receive the resulting records and collections (if any).

$   **A-C**  The BLM has a direct A-C relationship with the land-use applicant, responsive to the laws and regulations that govern the particular land use. As a part of application reviews, BLM usually asks the land-use applicant to obtain the cultural resource data that BLM will need to comply with Sec. 106 of the National Historic Preservation Act, by hiring a qualified consultant of C's choosing. (Optionally, BLM could hire a consultant and bill the applicant. However, applicants have always preferred to make their own market choices.)

$   **B-C**  The B-C consultant-client relationship is purely a business relationship between the two private parties. It does not involve BLM at all. If B qualifies for a permit, C may contract to use B – or any other qualified consultant – to obtain the cultural resource data that BLM needs to process C's land-use application.

BLM_0007902

.34

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.34  Responding to Disputes and Appeals.

A. Disputes. In accordance with 43 CFR 7.36(a) and (b), any applicant, permittee, or revokee ("disputant") may question the decision of the authorized officer (i.e., State Director or Field Office manager, as applicable) with respect to the denial of a permit application or a request for fieldwork authorization, the inclusion of specific terms and conditions in a permit, or the modification, suspension, or revocation of a permit.

1. Request for Review. The disputant may file a written request to the authorized officer for review of the authorized officer's decision, setting out reasons for believing that the decision should be reconsidered. The authorized officer may modify the original decision in light of information presented, or may sustain the original decision, in either case providing the disputant with written explanation.

2. Request for Conference. Either the disputant or the authorized officer may request a conference to discuss the original decision and its basis. The authorized officer may modify the original decision in light of information presented, or may sustain the original decision, in either case providing the disputant with a written explanation.

3. Review at Higher Organizational Level. The purpose of the disputes process is to resolve differences of understanding as quickly as possible and at the lowest organizational level possible. It is incumbent on the reviewing official to seek a reasonable resolution and to avoid passing a case upward. However, in some circumstances, higher level review is necessary.

a. The disputant, if unsatisfied with the outcome of a review or conference addressing the authorized officer's decision, may request, in writing to the authorized officer, that the decision be reviewed at the next higher organizational level. The disputant's written request should set out the procedural or substantive basis for thinking that the authorized officer's decision is in error. The authorized officer's decision shall stand during the course of any higher level review.

b. Decisions of a Field Office manager may be reviewed by the State Director, and those of a State Director may be reviewed by the Director. The Director may request that the Departmental Consulting Archeologist participate in the Director's review.

c. Upon receiving a request for higher level review, the authorized officer shall transmit the request and the pertinent file(s) to the reviewing official, i.e., the State Director or Director, as appropriate.

d. The reviewing official shall inform the disputant by mail (copy to the authorized officer) of the estimated time required for the review.

BLM_0007903

.34A3e

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

e. If the reviewing official determines that the authorized officer's decision is procedurally and substantively correct and should stand unchanged, the reviewing official shall notify the disputant by mail (return receipt requested).

f. If the reviewing official determines that the authorized officer's decision is procedurally or substantively flawed, the reviewing official shall consult with the authorized officer, establish a course for correcting the decision, and notify the disputant by mail (return receipt requested).

g. Upon concluding the review, the reviewing official shall return the pertinent file(s) to the authorized officer (i.e., the State Director will return a temporary file to the Field Office manager; the Director will return any file(s) reviewed to the State Director).

h. The authorized officer shall immediately take any corrective actions determined under .34A3f.

4. Record of Review. Record of any reexamination of an authorized officer's decision shall be included in the permanent file.

B. Appeals.

1. Initiated by Disputant. In accordance with 43 CFR 7.36(c) and 43 CFR 7.11, after the dispute opportunities in .34A have been exhausted, the disputant may file a formal appeal with the Interior Board of Land Appeals by following the procedures in 43 CFR Part 4, Subpart E. When the authorized officer finds that suspension of the decision in accordance with 43 CFR 4.21(a) would cause harmful effects to cultural resources, the authorized officer shall apply to the Board for a determination that the decision being appealed, or pertinent parts of the decision, shall stand in full force and effect during the appeal period in the public interest.

2. Initiated by Other Affected Person. Any other affected person wishing to appeal a decision connected with a permit may file a formal appeal with the Interior Board of Land Appeals by following the procedures in 43 CFR Part 4, Subpart E. As necessary, the authorized officer shall apply to the Board for a determination that the decision being appealed shall stand during the appeal period.

C. Departmental Review of Professional Issues. In accordance with 43 CFR 7.36(d), any affected person may request the Departmental Consulting Archeologist's review of any professional issues involved in a BLM permitting decision, such as qualifications, research design, or other professional archaeological matters. The Departmental Consulting Archeologist's final professional recommendation will be made to the Director. The Director shall consider the recommendation, but shall retain the decisionmaking authority.

BLM_0007904

.35

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.35  <u>Maintaining an Automated Permit Status File</u>. Information on applications, permit issuance, modification, extension, warning, suspension, revocation, or other actions should be entered in an automated permit status file to provide an easily retrieved summary of essential permit information within the State.

BLM_0007905

.4

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.4  Reporting Results and Protecting Products of Permitted Cultural Resource Work

.41  Reports.

A. Preliminary Report. The permittee shall submit two copies of a preliminary report to the authorized officer within 10 days of completion of any episode of field work, setting out what was done, how it was done, by whom, specifically where, and with what results, including maps, precise and accurate locational data, an approved site form for each newly recorded cultural property, a BLM evaluation form for each cultural property examined, and the permittee's professional recommendations, as results require.

B. Interim Report. Depending on the scope, duration, and nature of the work, the authorized officer may require progress reports, during or after the fieldwork period or both.

C. Final Report. The permittee shall submit two copies of a final report to each the authorized officer and the State Director not later than 180 days after completion of field work. Where a fieldwork episode involved only minor work and/or minor findings, a final report may be submitted in place of the preliminary report.

.42  Management of Collections.

A. Responsibility of Permittee. The permittee shall deposit all artifacts, samples and collections, as applicable, and copies of all records, data, photographs, and other documents, resulting from work conducted under this permit, with the curatorial facility named in the permit, not later than 90 days after the date the final report is submitted to the State Director.

1. Catalog of Artifacts. Not later than 180 days after the final report is submitted, permittee shall provide the State Director with a catalog and evaluation of all materials deposited with the curatorial facility, including the facility's accession and/or catalog numbers.

2. Confirmation of Delivery. The permittee shall provide the State Director with a Confirmation of Museum Collections Deposition Statement (Illustration 4), signed by an authorized curatorial facility official, confirming the date of deposition, type, number and condition of the collected museum objects deposited at the facility. The curatorial facility's own collections receiving form may be substituted if it includes all of the information required in Illustration 4. Collections from each project must be listed separately.

B. Responsibility of Curatorial Facility. Any curatorial agreement between the permittee and the approved curatorial facility must specify that the facility shall manage collections and associated records as United States property in a manner consistent with 36 CFR Part 79, and that the repository will assist the permittee in reporting to the BLM State Director about collections deposited with the facility, including confirmation of receipt, a brief description of the objects received, and the facility's accession and/or catalog numbers for such collections.

BLM_0007906

.5

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)

.5  <u>Assessing the Results of Permitted Cultural Resource Work</u>

   .51 <u>Assessing Project Results</u>. Following a project, such as a data-recovery excavation, or a set of small but related projects, such as well-pad surveys in a particular well field, the permittee shall be instructed to prepare an assessment as part of the final report. The assessment is intended to give BLM managers a frank, after-the-fact appraisal of what the permitted use of publicly owned cultural resources has returned for the public good. The assessment should describe:

   a. What was done, where, and for what purpose.

   b. What was found, including whether and how finds add to the current body of knowledge.

   c. How the finds fit, or do not fit, land use plans and cultural resource use decisions, including future field inventory priorities.

   d. Whether and why the work was important to the public and worthy of the sponsor's financial support.

   e. What resulting changes should occur in the cultural resource knowledge base, cultural resource management plans, and cultural resource protection priorities.

   .52 <u>Assessing Cumulative Results</u>. Where work is permitted generally instead of by individual projects, such as in survey and recordation permits, permittees shall be instructed to prepare at least an annual assessment, as described in .51a-e, due on the permit anniversary, or more frequently as the results of field work merit.

   .53 <u>Public Dissemination of Results</u>. The State Director and Field Office manager shall use appropriate means to make the information in permittee's assessments available to the public.

Glossary Page 1

8150 - PERMITTING USES OF CULTURAL RESOURCES – (Public)


Glossary of Terms

[Note: The following terms are defined as they apply to this Manual Section. Other definitions may be found in BLM Manual Section 8100.]

- C -

cultural resource:  any cultural property, including records and physical remains related to such property.

cultural resource use permit:  a land use authorization that the State Director issues to a qualified applicant, pursuant to this Manual Section, for the purpose of carrying out various identification and/or data recovery operations on cultural properties that are located on lands where BLM administers the surface. Such permits are issued partly under the authority of Section 302(b) of FLPMA and the procedures in BLM Manual Section 2920, but in contrast to other "2920 permits," cultural resource use permits are nonexclusive, noncompetitive, minimum impact permits, and are not subject to Notice of Realty Action, filing fees, or cost reimbursement.

- P -

person: "any individual, corporation, partnership, trust, institution,  association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the United States, or of any Indian tribe, or of any State or political subdivision thereof" (quoted from 43 CFR 7.3(g)). Although any "person" may apply for a permit, applicants and permittees are generally firms or organizations rather than individuals (see .06B, .06C, and .12B2a).

- S -

site of religious or cultural importance: any location identified by an Indian tribe as having such importance. Note that the word "site" as used in Section 4(c) of the Archaeological Resources Protection Act has a broad, general meaning and is not synonymous with "archaeological resource," although an archaeological resource could be, or could coincide in location with, a site* of religious or cultural importance. (See BLM Handbook H-8120-1.)

_____

* A standard rule of legal construction is that any word not defined in the statute is to be understood according to its ordinary dictionary definition. In ARPA, "archaeological resource" is the defined term of art. "Site" is not defined. If the Congress had meant for "site of religious or cultural importance" to mean "archaeological resource of religious or cultural importance," the drafters either would have used that wording or they would have defined "site" to mean the same as "archaeological resource." Since neither of those things occurred, "site" means place or location.

BLM_0007908

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

Release
8-79

Date
12/03/04

Subject

## 8170 – INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC (PUBLIC)

1. <u>Explanation of Material Transmitted</u>.  This is a new Manual Section.

2. <u>Reports Required</u>:  None

3. <u>Materials Superseded</u>:  No Manual pages are superseded by the addition of this section.
No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below:

<u>REMOVE</u>                    <u>INSERT</u>

(None)                         8170

(Total: 6 sheets)

TC-1

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

Table of Contents

.01  Purpose
.02  Objective
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Public Interpretation and Education.
    .11  Program Relationships
      A. Adventures in the Past
      B. National Programmatic Agreement
      C. Heritage Education
      D. Recreation Program
      E. Relationship to Use Allocation
    .12 Kinds of Benefits
      A. Direct, Indirect, and Multiple Benefits
      B. Benefit Categories
        1. Information Benefits
        2. Applied Benefits
        3. Sociocultural Benefits
        4. Economic Benefits
        5. Recreational and Inspirational Benefits
        6. Educational Benefits
        7. Intra- and Intergovernmental Benefits

Glossary of Terms

.01

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

.01 <u>Purpose</u>. This Manual Section provides general direction for public outreach and interpretation related to cultural resources including use of volunteers, museum collections, heritage tourism, and heritage education.

.02 <u>Objective</u>. The objectives of the public outreach component of the cultural resource management program are to ensure that BLM Field Office managers--

A. Respond in a legally sufficient and professional manner to the statutory authorities concerning public outreach involving interpretation and education related to cultural resource values.

B. Recognize the potential public uses of cultural resources on the public lands, and manage the lands and cultural resources so that these uses and values are not diminished, but rather are maintained and enhanced.

C. Understand the essential roles that public communication and heritage education play in historic preservation.

D. Acknowledge the responsibility to communicate to the public, both local and universal, about the significance and importance of cultural resources.

E. Protect and preserve in place, and improve access where appropriate, to cultural resources on public lands for the benefit of public use by present and future generations.

F. Enhance and expand interpretation, information, and education about cultural resources through establishment of partnerships, including local communities, and use of volunteers.

G. Establish a variety of heritage education programs that promote the public stewardship of cultural resources.

H. Recognize cultural resources as assets with economic as well as intrinsic value.

I. Make appropriate use of BLM museum collections housed in public and private curatorial facilities to inspire public perceptions of diverse cultural values and foster an appreciation and understanding of our Nation's rich heritage.

.03

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

.03 <u>Authority</u>

A. <u>National Historic Preservation Act of 1966</u> (P.L. 89-665; 80 Stat. 915; 16 U.S.C. 470), as amended, states that it is "the policy of the Federal Government, in cooperation with other nations and in partnership with the States, local governments, Indian tribes, and private organizations and individuals to … administer federally owned … prehistoric and historic resources in a spirit of stewardship for the inspiration and benefit of present and future generations." It further provides that "The Secretary shall ... develop and implement a comprehensive preservation education and training program," including increased training opportunities for students.

B. <u>Archaeological Resources Protection Act of 1979</u> (P.L. 96-95; 93 Stat. 721; 16 U.S.C. 47Oaa <u>et seq.</u>) as amended (P.L. 100-555; P.L. 100-588) provides that, "Each Federal land manager shall establish a program to increase public awareness of the significance of the archaeological resources located on public lands and … the need to protect such resources."

C. <u>Executive Order 13287: Preserve America</u> (March 3, 2003) provides that, "When carrying out its mission, each agency . . . shall seek partnerships with State and local governments, Indian tribes, and the private sector to promote local economic development and vitality through the use of historic properties in a manner that contributes to the long-term preservation and productive use of those properties."

.04 <u>Responsibility</u>  (See BLM Manual Section 8100.04)

.05 <u>References</u>  (See BLM Manual Section 8100.05)

BLM_0007912

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

.06 Policy. The BLM's Field Office managers, with the assistance and advice of professionally qualified cultural resource staff, shall--

A. Treat cultural resources as fragile, irreplaceable resources with potential public and scientific uses, representing an important and integral part of our Nation's heritage.

B. Ensure a high quality public visitor experience and enjoyment of cultural resources on the public lands through interpretation programs that are factually accurate, interesting, and appealing.

C. Foster private-public initiatives and investment in the use, reuse, and rehabilitation of cultural resources.

D. Promote community economic development through State and local governments, Indian tribes and private sector partnerships in heritage tourism.

E. Foster an awareness among students and adults of the fragility and importance of cultural resources through heritage education programs.

F. Involve representatives of the local communities and Indian tribes in the formulation of the basic interpretive approach at a site, particularly when the interpretive presentation involves a description of a living local community or Indian tribe and/or its archaeological, historical, cultural, artistic, and ethnic heritage.

G. Develop sustainable and durable heritage tourism opportunities that minimize the negative effects of tourism and, at the same time, maximize the benefits for local communities, States, Indian tribes, and "gateway" communities.

H. Incorporate site-appropriate design principles, for such things as preservation projects, kiosks, walking paths, and information signs, that are sensitive to the character of the site and its surrounding, and that do not endanger the site's long-term preservation.

I. Ensure that BLM cultural specialists, as well as outside scholars and permittees, working on public lands fulfill their responsibility to communicate the significance and meaning of cultural resources to the general public.

J. Maximize efforts to integrate the National Historic Preservation Act and Executive Order 13287 into their program activities.

.07 File and Records Maintenance. Filing requirements are found in the GRS/BLM Combined Records Schedule (Schedule 4).

BLM_0007913

.1

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

.1 <u>Public Interpretation and Education</u>.

  .11 <u>Program Relationships</u>.

    A.  <u>Adventures in the Past</u>.  Adventures in the Past is the BLM's "umbrella" program for promoting public education and awareness, and for encouraging public participation in the protection of its cultural resources.  Adventures in the Past has as its goals increasing public appreciation and knowledge of cultural resources, promoting public stewardship of cultural resources, and reducing the threat to these resources.  These goals have their basis in law and Executive Order.  (See BLM Manual Section 8100.03.)

    B.  <u>National Programmatic Agreement</u>.  A major purpose of the BLM's national Programmatic Agreement (see BLM Manual Section 8100, Appendix 13) is to create efficiencies in the Section 106 process and to enable the BLM's cultural resource staff and the SHPO's staff to devote a larger percentage of their time and energy to proactive work, including creative public education and interpretation.

    C.  <u>Heritage Education</u>.  BLM's Heritage Education Program includes two primary elements, Project Archaeology and History Mysteries, as well as occasional outreach pieces targeted toward other audiences.  Project Archaeology is a collaborative effort between BLM and The Watercourse, an educational non-profit group located at Montana State University.  Aimed at teachers and youth leaders, Project Archaeology emphasizes stewardship of cultural resources.  Tied to educational standards, it supports the existing elementary and secondary school curriculum by using examples from archaeology and history to facilitate the teaching of history, social studies, science, math, art, and higher order thinking skills, such as problem solving, synthesis, and evaluation.  Project Archaeology is delivered through local teacher workshops; local information is provided by the state student handbook series, *Discovering Archaeology*.  State and regional partners organize Project Archaeology locally and provide newsletters, and additional learning and teaching opportunities.

History Mysteries seek to stimulate in young people an interest in and appreciation of stories associated with public lands and to foster their commitment to good stewardship of public lands in the United States by exploring unsolved mysteries and lingering questions of broader historical significance regarding the development of the American West.  Components include a newspaper, educational trading cards, and a related web page for children and teachers.  Other elements of the Heritage Education Program include a series of articles published in the magazine of the National Science Teachers Association, which often draw on Adventures themes; and the BLM cultural web page.  Additionally, occasional brochures focusing on a topic, like the effect of fire on cultural resources, are targeted toward adult audiences.

BLM_0007914

.11D

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

D.  Recreation Management.  The cultural resource management program and the recreation management program often share in designing and operating interpretive sites.  See BLM Manual Section 8100.08A2.

E.  Relationship to Use Allocation.  Field Office managers are expected to allocate all cultural properties in a plan area to one or more use categories, including scientific use, conservation for future use, traditional use, public use, and experimental use (see BLM Manual Section 8110.4).  In an important sense these use categories are public-benefit categories. Cultural resources are expected to be utilized in ways that reflect the use(s) to which they were assigned during the planning process.  Thus, if a cultural property has been allocated to scientific use, it is reasonable to assume that public benefit is realized when this property is scientifically investigated.  Similarly, if a property is identified as having interpretive (public use) potential, it can be assumed that an important public benefit is being realized when the property is made accessible and its place in time, culture, and the ecosystem is explained.

.12  Kinds of Benefits.

A.  Direct, Indirect, and Multiple Benefits.  Benefits from the use of cultural resources may derive directly from the actual places on the public lands, and also indirectly from the information--documents, records, and museum collections--that results when these places are recorded or scientifically investigated.  In developing public awareness and outreach efforts, Field Offices should consider giving priority to those that achieve the broadest array of public benefits.  In some instances, however, attaining a single public benefit, such as traditional use by a specific sociocultural group, may outweigh projects with multiple benefits.

B.  Public Benefit Categories.

1.  Information Benefits.  Information benefits include the increase in knowledge about past and contemporary cultures as a result of formal archaeological, anthropological, or historical study.  Such knowledge may relate to the adaptation and adjustment of cultures to their environments, cultural evolution, the development of political or religious belief systems, the evolution and functioning of complex systems, or other research topics validated by current research paradigms within the fields of archaeology, anthropology, and history.  This is the broadest category of public benefits derived from the systematic study of cultural resources. With interpretation, the knowledge gained is often of equal academic and lay interest.

BLM_0007915

.12B2

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

2. <u>Applied Benefits</u>.  Knowledge derived from the study of cultural resources can have application to contemporary issues.  For example, the study of past settlements may provide information useful for making decisions about vegetative treatments, zoning policies, the siting of developments, or appropriate land uses.  Paleoenvironmental data may provide clues on the role of prehistoric and historic peoples in environmental change, informing contemporary discussions on the subject.  Analyses of archaeological data may also yield management benefits.  For example, pollen studies may reveal the mix of forbs, trees, and shrubs in a past environment that a Field Office wants to restore for a specific region.  Similarly, faunal remains from archaeological sites may indicate suitable habitat for endangered species or former distribution of such species, information useful for reintroducing plants or animals into their former habitats.

3. <u>Sociocultural Benefits</u>.  Sociocultural benefits may accrue to the general public and to specific cultural groups as a result of studying or interpreting cultural resources representative of the groups' culture and history.  Benefits may include improved recognition of the richness and complexity of a minority group's culture and history, an increase in intercultural tolerance, greater appreciation for multicultural perspectives, and increased economic opportunities.  For example, interpreting cultural resources related to a group's ancestral or historical roots may foster acknowledgment in the society at large of the group's contributions to the regional culture, and enhance the group's sense of well-being.

4. <u>Economic Benefits</u>.  Economic benefits are the tangible fiscal or economic gains enjoyed by communities as a result of cultural resources, primarily as a result of heritage tourism.  Heritage tourism represents a very significant segment of State and local economies in the West, and its significance is expected to grow in the years ahead, according to marketing studies conducted by the tourism industry.  Revival of Native American artistic traditions inspired by prehistoric archaeological motifs on prehistoric pottery or rock art, translated into an invigorated market for Native American art and craft items, is another example of an economic benefit and an improved standard of living.

5. <u>Recreational and Inspirational Benefits</u>.  Outdoor enthusiasts such as horseback riders, mountain bikers, hikers, and photographers use cultural resources as a focus for their personal recreation.  For many of these recreationists, the benefits they derive are an increased sense of place and an increased connectedness to, and appreciation for, their historical roots.  Others gain inspiration through museum exhibits and heritage presentations.  As with any recreation and tourism attraction there are associated economic benefits.

BLM_0007916

.12B6

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

      6.  <u>Educational Benefits</u>.  Heritage education benefits people of all ages through their increased knowledge about cultures past and present and special heritage places on public lands. Increasingly, cultural resource materials are being used to improve student reading, writing, mathematics, reasoning, and higher order thinking skills through the development of lesson plans, hands-on activities and multi-media products.  Project Archaeology and History Mysteries are a major commitment by the BLM to improve the education of America's youth while exposing them to a conservation message regarding cultural resources.  These programs demonstrate that the Nation's educational system can benefit by utilizing the material culture, scientific resources, and environmental data associated with archaeological sites.  Local offices and visitor centers provide educational programming and loan kits for the benefit of people of all ages.  Heritage education programs serve to inspire and stimulate the public across a broad spectrum of subject areas while improving knowledge and respect for other cultures.

      7.  <u>Intra- and Intergovernmental Benefits</u>.  Improvements in relations with other units of the Federal Government, with State and local governments, with Indian tribal governments, and internationally can result from shared programs of cultural resource study, conservation, and interpretation.  Local benefits also accrue through good public relations or economic benefits resulting from effective public outreach projects with local user groups, museums, Indian tribes, or other interested parties.

Glossary, Page 1

8170 - INTERPRETING CULTURAL RESOURCES FOR THE PUBLIC – (Public)

### Glossary of Terms

-C-

cultural tourism or heritage tourism:  means the business and practice of attracting and accommodating visitors to a place or area based especially on the unique or special aspects of that locale's history, landscape (including trail systems), and culture.

-H-

heritage education:  is the formal and informal method and theory about presenting the cultural heritage, particularly the physical past, to the public in order to enhance people's understanding of the past.  Specifically, for BLM, it involves formal programs and presentations about the broad context of cultural heritage associated with public lands.

-P-

public interpretation:  is the arrangement of information about a particular archaeological or historic site into a meaningful sequence, narrative, or presentation.  Public interpretation should strive to contextualize the significance of the site for the visitor, not merely provide disconnected statistics, dates, or technical terms.  Its communication medium can range from a text panel, to live guides, to a virtual reality application, although in every case it provides information about the site that would be unavailable through visual inspection alone.

Form 1221-2
(June 1969)



| | | |
|---|---|---|
| **UNITED STATES** **DEPARTMENT OF THE INTERIOR** **BUREAU OF LAND MANAGEMENT** MANUAL TRANSMITTAL SHEET | Release 1-1693 | |
| | Date 03/11/05 | |

Subject

H-1601-1   LAND USE PLANNING HANDBOOK

1.   Explanation of Material Transmitted: This Handbook provides specific guidance for preparing, amending, revising, maintaining, implementing, monitoring, and evaluating BLM land use plans. It provides further guidance related to the objectives, authorities, responsibilities, and policy considerations outlined in Manual Section 1610, Land Use Planning.

This guidance applies to all new planning starts and to other plans (such as plans in progress or completed plans) depending on the stage they are in (from this point forward, not retroactively).

2.   Reports Required: None.

3.   Material Superseded: Handbook H-1601-1, Release Number 1-1667, dated November 22, 2000 and Release Number 1-1675, dated August 22, 2002.

4.   Filing Instructions: File as directed below.

REMOVE:

All of Rel. 1-1667 and 1-1675

(Total: 61 sheets)

INSERT:

All of H-1601-1

(Total: 82 sheets)

Ed Shepard
Assistant Director
Renewable Resources and Planning

H-1601-1 – LAND USE PLANNING HANDBOOK – (Public)



**United States
Department of the Interior
Bureau of Land Management**



# Land Use Planning Handbook



**BLM Handbook H-1601-1**

BLM_0007920

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Table of Contents

I.   Introduction ........................................................................................................1
   A.  The Purpose of This Handbook and the Need for Planning Guidance ...........................1
   B.  The Basic Planning Process ............................................................2
   C.  Forms of Public and Intergovernmental Involvement.................................................2
   D.  Collaborative Planning.............................................................................4
   E.  Coordination and Cooperation with Other Federal Agencies
   and State and Local Governments ...........................................................5
   F.  Government-to-Government Coordination with Indian Tribes.......................................9
II.  Land Use Plan Decisions........................................................................................11
   A.  Introduction.....................................................................................11
   B.  Types of Land Use Plan Decisions ..................................................................12
   C.  Geographic Areas...............................................................................14
   D.  Scale of Planning ..............................................................................14
   E.  Multijurisdictional Planning..............................................................15
   F.  Establishing Management Direction for Lands that May
   Come Under the BLM Jurisdiction in the Future. ...............................................15
III. Land Use Planning Process and Products ...............................................................16
   A.  Planning for Environmental Impact Statement-level Efforts.........................................16
   B.  Planning for Environmental Assessment-level Efforts ...............................................25
IV. Implementation ...................................................................................................29
   A.  Implementing Land Use Plans ...............................................................29
   B.  Defining Implementation Decisions..............................................................29
   C.  Making Implementation Decisions ...........................................................30
   D.  Making Land Use Plan and Implementation Decisions
   in the Same Planning Effort...................................................................30
   E.  Developing Strategies to Facilitate Implementation of Land Use Plans........................31
V.  Monitoring, Evaluation, and Adaptive Management................................................32
   A.  Monitoring .....................................................................................32
   B.  Evaluation.......................................................................................33
   C.  Adaptive Management ........................................................................36
VI. Determining if New Decisions are Required ...........................................................37
   A.  Specific Regulatory Requirements for Considering New
   Information or Circumstances...................................................................37
   B.  Considering New Proposals, Circumstances, or Information .......................................37
   C.  Deciding Whether Changes in Decisions or the Supporting
   NEPA Analyses are Warranted..............................................................38
   D.  Documenting the Determination to Modify, or
   Not to Modify, Decisions or NEPA Analysis........................................................41
   E.  Evaluating New Proposals.....................................................................41
   F.  Plan Conformance .............................................................................42
   G.  Plan Conformance and Ongoing NEPA Activities...............................................42
   H.  Determining When to Update Land Use Plan Decisions
   Through Maintenance Actions....................................................................44

BLM_0007921

TC - 2
H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

VII. Amending and Revising Decisions .................................................................................44
   A.  Changing Land Use Plan Decisions .........................................................................44
   B.  Determining When it is Necessary to Amend Plans and
   How it is Accomplished...............................................................................................45
   C.  Determining When it is Necessary to Revise an RMP or Replace an MFP....................46
   D.  Changing Implementation Decisions...........................................................................46
   E.  Status of Existing Decisions During the Amendment or Revision Process....................47
   F.  Coordinating Simultaneous Planning/NEPA Processes ..................................................47

Glossary of Terms and Acronyms ....................................................................Glossary - 1
   Terms ...................................................................................................Glossary - 1
   Acronyms .............................................................................................Glossary - 9

Appendix A:  Guide to Collaborative Planning................................................Appendix A, page 1
   I.  Principles ...............................................................................Appendix A, page 1
   II.  Practices ...............................................................................Appendix A, page 2
   III.  Benefits ...............................................................................Appendix A, page 3
   IV.  Tools .................................................................................Appendix A, page 3

Appendix B:  Federal Advisory Committee Act Considerations........................Appendix B, page 1
   I.  Purpose .................................................................................Appendix B, page 1
   II.  Implementing FACA...............................................................Appendix B, page 1
     A.  Avoiding Violations...........................................................Appendix B, page 1
     B.  Determining if FACA Applies ............................................Appendix B, page 2
     C.  FACA Requirements ..........................................................Appendix B, page 2

Appendix C:  Program-Specific and Resource-Specific Decision Guidance ......Appendix C, page 1
   I.  Natural, Biological, and Cultural Resources .............................Appendix C, page 2
     A.  Air .....................................................................................Appendix C, page 2
     B.  Soil and Water..................................................................Appendix C, page 2
     C.  Vegetation .........................................................................Appendix C, page 3
     D.  Special Status Species ......................................................Appendix C, page 4
     E.  Fish and Wildlife..............................................................Appendix C, page 6
     F.  Wild Horses and Burros....................................................Appendix C, page 7
     G.  Cultural Resources............................................................Appendix C, page 8
     H.  Paleontology......................................................................Appendix C, page 10
     I.  Visual Resources ...............................................................Appendix C, page 11
     J.  Wildland Fire Management.................................................Appendix C, page 11
     K.  Wilderness Characteristics.................................................Appendix C, page 12
     L.  Cave and Karst Resources .................................................Appendix C, page 13
   II.  Resource Uses .....................................................................Appendix C, page 13
     A.  Forestry .............................................................................Appendix C, page 13
     B.  Livestock Grazing.............................................................Appendix C, page 14
     C.  Recreation and Visitor Services.........................................Appendix C, page 15
     D.  Comprehensive Trails and Travel Management .................Appendix C, page 17
     E.  Lands and Realty ...............................................................Appendix C, page 20

BLM_0007922

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

F.  Coal.................................................................................................Appendix C, page 21
G.  Oil Shale.……………………………………………………………Appendix C, page 23
H.  Fluid Minerals: Oil and Gas, Tar Sands, and
Geothermal Resources.……………………………………………Appendix C, page 23
I.  Locatable Minerals .………………………………………………  Appendix C, page 24
J.  Mineral Materials .………………………………………………...Appendix C, page 25
K. Non-energy Leasable Minerals .........................................................Appendix C, page 26
III. Special Designations.........................................................................Appendix C, page 27
A.  Congressional Designations...................................................Appendix C, page 27
B.  Administrative Designations..................................................Appendix C, page 27
IV. Support.............................................................................................Appendix C, page 28
A.  Cadastral...............................................................................Appendix C, page 29
B.  Interpretation and Environmental Education ..........................Appendix C, page 29
C.  Transportation Facilities.……………………………………....Appendix C, page 30

Appendix D:  Social Science Considerations in Land Use
Planning Decisions...................................................................................Appendix D, page 1
I.  Using Social Science in Land Use Planning ............................................Appendix D, page 1
II.  Incorporating Socio-economic Information.............................................Appendix D, page 2
A.  The Planning Process.............................................................Appendix D, page 2
B.  Objectives of the Analysis......................................................Appendix D, page 2
C.  The Scope of Analysis............................................................Appendix D, page 4
D.  Deliverables in Contracting ...................................................Appendix D, page 8
E.  Analytic Guidelines...............................................................Appendix D, page 8
III.  Public Involvement ..............................................................................Appendix D, page 10
A.  Integrating Social Science into Public Involvement ..........................Appendix D, page 10
B.  Economic Strategies Workshop ..............................................Appendix D, page 10
IV.  Environmental Justice Requirements .....................................................Appendix D, page 11
A.  BLM's Environmental Justice Principles ...........................................Appendix D, page 11
B.  Incorporating Environmental Justice Efforts in the
RMP/EIS Process...................................................................Appendix D, page 12
C.  Documentation and Analysis ..................................................Appendix D, page 13
V.  Data Management ..................................................................................Appendix D, page 13
A.  Types of Data .......................................................................Appendix D, page 13
B.  Data Quality and Analytic Soundness......................................Appendix D, page 13
C.  Paperwork Reduction Act Requirements for
New Data Collection...............................................................Appendix D, page 14
VI.  Data Sources .......................................................................................Appendix D, page 14
A.  Use of the Economic Profile System .......................................Appendix D, page 14
B.  References ............................................................................Appendix D, page 15
C.  Environmental Justice References ...........................................Appendix D, page 17
VII.  Further Guidance ...............................................................................Appendix D, page 17

Appendix E:  Summary of Protest and Appeal Provisions...................................Appendix E, page 1
I.  Land Use Plan Protests..........................................................................Appendix E, page 1
A.  Washington Office Initial Evaluation of Protests .............................Appendix E, page 1

BLM_0007923

TC - 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    B.  State Office Evaluation and Determination ........................................Appendix E, page 4
    C.  Washington Office Final Review........................................................Appendix E, page 6
    D.  Receiving, Managing, and Responding to Electronic Mail
    and Faxed Protests ...............................................................................Appendix E, page 12
    E.  State Director's Protest Analysis.........................................................Appendix E, page 13
  II. Governor's Consistency Review Appeal Process ....................................Appendix E, page 14
  III.  Administrative Remedies of Implementation Decisions ......................Appendix E, page 14

Appendix F:  Standard Formats for Land Use Plan Documents.........................Appendix F, page 1
    Appendix F-1:  Recommended Format for Preparation Plans.....................Appendix F, page 1
    Appendix F-2:  Recommended Format for Scoping Reports .......................Appendix F, page 4
    Appendix F-3:  Annotated Outline of the Analysis of the
    Management Situation .................................................................................Appendix F, page 6
    Appendix F-4:  Annotated Outline for a Draft and
    Final RMP (Amendment)/EIS ....................................................................Appendix F, page 14
    Appendix F-5:  Annotated Outline for Record of Decision
    (ROD)/Approved RMP (Amendment) .........................................................Appendix F, page 20
    Appendix F-6:  Recommended Administrative Record File
    Plan for Land Use Planning Projects ...........................................................Appendix F, page 24

Appendix G:  Managing and Applying Data and Information ...........................Appendix G, page 1
    I.  Metadata Standards and Requirements...................................................Appendix G, page 1
    II.  Identifying Data Needs for a Land Use Plan.........................................Appendix G, page 1
    III.  Data Sources ......................................................................................Appendix G, page 2
    IV.  Managing Data During Land Use Plan Development ...........................Appendix G, page 2
    V.  Integrating Data Application and Display ..............................................Appendix G, page 3

BLM_0007924

1

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## I. Introduction

## A.  The Purpose of This Handbook and the Need for Planning Guidance

This Handbook provides supplemental guidance to the Bureau of Land Management (BLM) employees for implementing the BLM land use planning requirements established by Sections 201 and 202 of the Federal Land Policy and Management Act of 1976 (FLPMA, 43 U.S.C. 1711-1712) and the regulations in 43 Code of Federal Regulations (CFR) 1600.  Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.  Land use plans include both resource management plans (RMPs) and management framework plans (MFPs).

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield.  As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use; and that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands by encouraging collaboration and public participation throughout the planning process.  Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

This Handbook provides guidance for preparing, revising, amending, and maintaining land use plans.  This Handbook also provides guidance for developing subsequent implementation (activity-level and project-specific) plans and decisions.  It builds on field experience gained in implementing the 1983 planning regulations (43 CFR 1600), subsequent BLM Manual guidance, and the 2000 Handbook.  This guidance does not, however, change or revise the planning regulations in 43 CFR 1600, which take precedence over this Handbook.  Definitions for terms used in this Handbook are found in the glossary and in the BLM planning regulations in 43 CFR 1601.0-5.

Any interpretation of the guidance contained in this Handbook is subservient to the legal and regulatory mandates contained in FLPMA, 43 CFR 1600, the National Environmental Policy Act of 1969 (NEPA, 42 U.S.C. 4321 et seq.), the Council on Environmental Quality (CEQ) regulations at 40 CFR 1500-1508, and other applicable Federal laws and regulations.  This planning guidance:

    1.  Encourages planning on a variety of scales, including both local and regional, in partnership with other landowners and agencies;

    2.  encourages active public participation throughout the planning process and facilitates multijurisdictional planning;

BLM_0007925

3.  clarifies the relationship between land use plans and implementation plans (implementation plans include both activity-level and project-specific plans);

4.  provides procedural requirements for completing land use plans and implementation plans;

5.  clarifies the relationships between land use and implementation planning and NEPA requirements;

6.  addresses new requirements and approaches for managing public lands or resources; and

7.  addresses the consideration of new information and circumstances, e.g., new listings of threatened and endangered species, and new requirements and standards for the protection of air and water quality, etc.

## B.  The Basic Planning Process

The BLM will use an ongoing planning process to ensure that land use plans and implementation decisions remain consistent with applicable laws, regulations, orders, and policies.  This process will involve public participation, assessment, decision-making, implementation, plan monitoring, and evaluation, as well as adjustment through maintenance, amendment, and revision.  This process allows for continuous adjustments to respond to new issues and changed circumstances. The BLM will make decisions using the best information available.  These decisions may be modified as the BLM acquires new information and knowledge of new circumstances relevant to land and resource values, uses, and environmental concerns.  Modifying land use plans through maintenance and amendment on a regular basis should reduce the need for major revisions of land use plans.

## C.  Forms of Public and Intergovernmental Involvement

Planning is inherently a public process.  The BLM uses a number of involvement methods to work with members of the public, interest groups, and governmental entities.

- *Public involvement* entails "The opportunity for participation by affected citizens in rule making, decision making, and planning with respect to the public lands, including public meetings or hearings . . . or advisory mechanisms, or other such procedures as may be necessary to provide public comment in a particular instance" (FLPMA, Section 103(d)). Several laws and Executive orders set forth public involvement requirements, including maintaining public participation records.  The BLM planning regulations (43 CFR 1601-1610) and the CEQ regulations (40 CFR 1500-1508) both provide for specific points of public involvement in the environmental analysis, land use planning, and implementation decision-making processes to address local, regional, and national interests.  The NEPA requirements associated with planning have been incorporated into the planning regulations.

BLM_0007926

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

- *Coordination*, as required by FLPMA (Section 202(c)(9)), involves on-going communication between BLM managers and state, local, and Tribal governments to ensure that the BLM considers pertinent provisions of non-BLM plans in managing public lands; seeks to resolve inconsistencies between such plans; and provides ample opportunities for state, local, and Tribal government representatives to comment in the development of BLM's RMPs (43 CFR 1610.3-1). The CEQ regulations implementing NEPA further require timely coordination by Federal agencies in dealing with interagency issues (see 40 CFR 1501.6), and in avoiding duplication with Tribal, state, county, and local procedures (see 40 CFR 1506.2). See Sections I(E)(1), Coordination under FLPMA; and I(F), Government-to-Government Coordination with Indian Tribes.

- *Cooperation* goes beyond the coordination requirement of FLPMA. It is the process by which another governmental entity (Federal, state, local, or Tribal) works with the BLM to develop a land use plan and NEPA analysis, as defined by the lead and cooperating agency provisions of the CEQ's NEPA regulations (40 CFR 1501.5 and 1501.6). Normally the BLM serves as the lead agency, though in some cases other governmental entities serve with the BLM as joint leads. Cooperating agency and related roles should be formalized through an agreement. See Section I(E)(2), Cooperating agency status under NEPA.

- *Consultation* involves a formal effort to obtain the advice or opinion of another agency regarding an aspect of land use management for which that agency has particular expertise or responsibility, as required by statute or regulation. For example, the Endangered Species Act requires the BLM to consult with the U.S. Fish and Wildlife Service (USFWS) or National Oceanic and Atmospheric Administration (NOAA)-Fisheries regarding land use actions that may affect listed species and designated critical habitat (see 50 CFR 402.14).

- *Collaboration* is a process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration mandates methods, not outcomes; and does not imply that parties will achieve consensus. Depending on local circumstances and the judgment of the Field Manager, varying levels of collaboration may be used in specific involvement processes. See Section I(D), Collaborative Planning.

Section 309 of FLPMA (43 U.S.C. 1739) requires that resource advisory councils (RACs) or their functional equivalent be involved in the land use planning process. RACs, which are advisory groups chartered under the Federal Advisory Committee Act (FACA) (86 Stat. 770, 5 U.S.C.A., Appendix 2), may advise the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources within a jurisdictional area. In addition, Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Environmental Justice), February 11, 1994, requires the BLM to find ways to communicate with the public that are germane to community-specific needs in areas with low income or minority populations or Tribes.

Comments or protests submitted to the BLM for use in its planning efforts, including names and home addresses of individual(s) submitting the comments, are subject to disclosure under the

BLM_0007927

4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Freedom of Information Act (FOIA, 5 U.S.C. 552); however, names and home addresses of individuals may be protected from disclosure under exemption 6 of FOIA.  In order to protect names and home addresses from public review or disclosure, the individual(s) submitting comments must request that their names and addresses be held in confidence.  Offices must place the following or a similar statement in all notices requesting public input or announcing protest opportunities, including public meeting "sign-in" sheets, notices in newspapers, on the Internet, in *Federal Register* Notices of Intent and Notices of Availability, and in "Dear Interested Party" letters in the planning/NEPA documents:

> FREEDOM OF INFORMATION ACT CONSIDERATIONS:  Public comments submitted for this planning review, including names and street addresses of respondents, will be available for public review at the XYZ Field Office during regular business hours (x:xx a.m. to x:xx p.m.), Monday through Friday, except holidays.  Individual respondents may request confidentiality.  If you wish to withhold your name or address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your comments.  Such requests will be honored to the extent allowed by law.  All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

## D.  Collaborative Planning

Collaboration as a general term describes a wide range of external and internal working relationships.  Early identification of the most appropriate, efficient, and productive type of working relationships is desirable to achieve meaningful results in land use planning initiatives.

While the ultimate responsibility regarding land use plan decisions on BLM-administered lands rests with BLM officials, it is recognized that individuals, communities, and governments working together toward commonly understood objectives yields a significant improvement in the stewardship of public lands.  Benefits of building collaborative partnerships include improving communication, developing a greater understanding of different perspectives, and finding solutions to issues and problems.

A collaborative approach to planning entails BLM working with Tribal, state, and local governments; Federal agencies; and other interested parties; from the earliest stages and continuing throughout the planning process, to address common needs and goals within the planning area.  At the same time, BLM should consider existing plans of Tribal, state, and local governments and other Federal agencies.  The BLM official must identify the decision space (i.e., regulations, policies, and local, regional and national interests) within which the BLM must operate, but the community or group working with the BLM may help focus the planning effort.

Although the initial stages of developing an open and inclusive process are time consuming, the potential returns from relationship building, cost savings, and durability of decisions more than compensate for this effort.  To provide for effective public participation in any collaborative planning process, it is important to communicate effectively with the public and invite participation in all aspects of the planning effort.  Outreach to distant interests is also important.  An effective outreach strategy will inform distant publics as well as local residents.  Appendix A of this Handbook provides additional guidelines on collaborative processes.  Also see Executive Order 13352 (Facilitation of Cooperative Conservation).

BLM_0007928

The strategies associated with BLM's national Alternative Dispute Resolution (ADR)/Collaborative Action Program are valuable resources for providing support to collaborative planning processes. The principal objective of the Program is to foster or strengthen ADR-based collaborative engagement with communities and other stakeholders, focusing primarily on helping to ensure successful outcomes on the ground through ADR-based collaboration.

Although the primary emphasis is on prevention of conflicts or disputes in the planning process through early engagement and convening to ensure up-front communication and consultation, the ADR/Collaborative Action Program's initiatives also address more formal conflicts or disputes that may arise during the planning process, as well as those associated with protests and litigation. The Program's goal is to prevent, resolve, or mitigate adverse impacts to the Bureau before a protest or judicial action is filed wherever possible and to address all the parties' interests.

In using the collaboration and ADR processes, it is important to be aware of the situations where FACA does or does not apply so that an informed decision can be made to either avoid conflict with FACA, to utilize the resources of a RAC, or pursue a FACA charter for any advisory groups (see Appendix B). Failure to review collaborative planning efforts and the requirements of FACA could result in land use plans being overturned if challenged in court. The Congress passed FACA in 1972 to reduce narrow, special-interest group influence on decision makers, to foster equal access for the public to the decision-making process, and to control costs by preventing the establishment of unnecessary advisory committees.

## E.  Coordination and Cooperation with Other Federal Agencies and State and Local Governments

FLPMA and NEPA provide BLM managers with complementary directives regarding coordination and cooperation with other agencies and governments. FLPMA emphasizes the need to insure coordination and consistency with the plans and policies of other relevant jurisdictions. NEPA provides for what is essentially a cooperative relationship between a lead agency (here, normally BLM) and cooperating agencies in the NEPA process.

(Consultation requirements for specific resources and programs are outlined in Appendix C, under the Notices, Consultations, and Hearings subsections.)

1.  Coordination under FLPMA

Section 202(c)(9) of FLPMA, as paraphrased, requires the BLM to provide for involvement of other Federal agencies and state and local government officials in developing land use decisions for public lands, including early public notice of proposed decisions that may have a significant effect on lands other than BLM-administered Federal lands (for coordination with Indian Tribes, see Section F following this section). Note that FACA does not apply to meetings with other governmental entities. Coordination must start as early in the land use planning process as is practical and must continue throughout the planning effort. This process of early coordination and involvement by other Federal agencies and state and local governments is often, but not

BLM_0007929

6

always, formalized through various memoranda of understanding (MOUs) between the State Director and the state or regional heads of other Federal agencies, between the State Director and the Governor, or between BLM Field Managers and local municipalities, communities, counties, or burroughs. The intent of a MOU is to establish points of contact and protocols for coordination between BLM and its partners. Regardless of whether an MOU is used as a tool for consistency, the principles of collaborative planning must be used in coordinating with these entities. The BLM can also seek involvement and coordination from associations of elected officials.

Section 202(c)(9) of FLPMA also requires, to the extent practical, that BLM keep itself informed of other Federal agency and state and local land use plans, assure that consideration is given to those plans that are germane to the development of BLM land use plan decisions, and assist in resolving inconsistencies between Federal and non-Federal plans. The key is ongoing, long-term relationships where information is continually shared and updated.

Many municipalities, communities, and counties have established community advisory boards, county commissions, planning boards, public land use advisory committees, or other similar planning and advisory groups. In some cases a state may have a Federal lands or policy liaison. These organizations and officials should be actively engaged from the beginning of the planning effort. The BLM may invite other Federal agencies and state and local governments to be involved as formal cooperating agencies. In planning efforts led by another agency or government entity, the BLM can be a cooperating agency.

Involving state and local government in developing land use decisions may require the BLM to be "at the table" with the various land use boards of the state or local government. In principle, coordination with and involvement of other Federal agencies and state and local government goes far beyond merely providing briefings on the status of any planning effort. In practice, however, staffing and resource constraints by other agencies and local governments may limit their involvement. BLM's plans shall be consistent with other Federal agency, state, and local plans to the maximum extent consistent with Federal law and FLPMA provisions. All BLM land use plans or plan amendments and revisions must undergo a 60-day Governor's consistency review prior to final approval. BLM's procedures for the Governor's consistency review are found in the planning regulations in 43 CFR 1610.3-2(e).

When other Federal agencies and state and local governments initiate planning efforts that may affect or be affected by BLM's management decisions, the BLM should collaborate in such planning efforts to the extent possible.

2. Cooperating agency status under NEPA

Cooperating agency status provides a formal framework for governmental units—local, state, Tribal, or Federal—to engage in active collaboration with a lead Federal agency to implement the requirements of NEPA. This guidance supplements CEQ regulations on cooperating agency status.

BLM_0007930

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

In principle, a cooperating agency shares the responsibility with the lead agency for organizing the planning process. Within the constraints of time and resources, cooperating agency staff should be encouraged to participate fully with BLM staff as members of the plan/EIS team. Responsibilities of a cooperating agency may include:

- Formal involvement in scoping and sharing the responsibility for defining and framing the issues to be examined in the NEPA process;

- developing information and analysis for which the agency has particular expertise;

- contributing staff to enhance the interdisciplinary team's capabilities; and

- bearing the costs of its own participation.

When properly conducted, the lead agency/cooperating agency relationship provides mutual benefits. From the BLM's perspective the goals of the cooperating agency relationship include:

- Gaining early and consistent involvement of key governmental partners;

- incorporating local knowledge of economic, social, and political conditions;

- addressing intergovernmental issues;

- avoiding duplication of effort;

- enhancing the local credibility of the review process; and

- building relationships of trust and collaboration for long-term mutual gain.

a. Criteria for cooperating agency status. The CEQ defines cooperating agency in regulations implementing NEPA, particularly at 40 CFR 1501.6 and 1508.5. CEQ regulations specify that a Federal agency, state agency, local government, or Tribal government may qualify as a cooperating agency because of ". . . jurisdiction by law or special expertise."

   1) Jurisdiction by law means ". . . agency authority to approve, veto, or finance all or part of the proposal." (40 CFR 1508.15)

   2) Special expertise means ". . . statutory responsibility, agency mission, or related program experience." (40 CFR 1508.26)

BLM has interpreted the definition of special expertise broadly. For example, county or Tribal governments potentially affected by a BLM planning effort would qualify on this basis through their knowledge of local social, economic, and political conditions.

Cooperating agency status is at the request of the lead Federal agency. Another Federal agency having "jurisdiction by law" in the matters subject to the NEPA process must serve as a

BLM_0007931

8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

cooperating agency when so requested.  A Federal agency qualifying through "special expertise," or a state, local, or Tribal government qualifying under either criterion may accept or decline a request to serve as a cooperating agency (40 CFR 1501.6, 1508.5).

Whether or not a federally-recognized Tribe enters into a cooperating agency relationship, its fundamental connection to the BLM is based on Tribal sovereignty, manifested through the government-to-government relationship.

b.  <u>Responsibilities of BLM managers</u>.  Before BLM begins the scoping process to develop, revise, or amend (EIS-level amendments only) an RMP, the State Director or Field Manager will invite qualifying Federal agencies and state, local, and Tribal governments to participate as cooperating agencies.  State Directors and Field Managers will consider any requests from other Federal agencies and state, local, and Tribal governments for cooperating agency status.  Field Managers who deny such requests will inform the State Director of the denial.  The State Director will determine if the denial is appropriate.

c.  <u>Role of cooperating agencies in the RMP/EIS process</u>.  It is BLM policy to encourage the involvement of cooperating agencies throughout the planning/EIS process, although practical limitations in cooperating agencies' time, resources, and expertise may make full involvement impractical.  Field Managers should encourage the collaboration of cooperating agencies in identifying issues, developing planning criteria, collecting inventory data, analyzing data for the analysis of the management situation, formulating alternatives, and estimating the effects of alternatives.  Field Managers should also collaborate with cooperating agencies in evaluating the alternatives and developing a preferred alternative.  Notwithstanding such collaborative efforts, the designation of a preferred alternative and the final decision remains the exclusive responsibility of the BLM.

Roles and responsibilities of each party should be formalized and clearly described in a MOU. The key elements of a cooperating agency MOU are outlined below.

*Introduction:*

- Describes the planning/EIS effort, and the major statutory and regulatory requirements it fulfills
- Identifies the government entities assuming cooperating agency status through the MOU, and their qualifications as defined at 40 CFR 1508.15 and 1508.26: jurisdiction, special expertise, or jurisdiction and special expertise

*Purpose (describes what will be accomplished by the MOU):*

*Authorities:*

- Identifies the principal statutory authorities for the BLM to enter into the MOU
- Identifies the principal statutory authorities for the cooperating agencies to enter into the MOU

BLM_0007932

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Roles and responsibilities:*

- The roles of each party in the planning process, including contractors if applicable
- Particular interests and areas of expertise of the cooperating agencies relative to the plan
- Procedures for information sharing and confidentiality
- How the cooperating agencies' comments, recommendations, and data will be used in the planning process
- Resource commitments
- Anticipated schedule
- How final decisions will be adopted by the cooperating agencies (as applicable)
- Any other expectations of the parties

*Agency representatives (usually enumerated in an attachment):*

*Administration of the MOU:*

- How disagreements will be resolved
- How the MOU may be modified or terminated
- Acknowledgement that the authority and responsibilities of the parties under their respective jurisdictions are not altered by the MOU

## F. **Government-to-Government Coordination with Indian Tribes**

The BLM will provide government officials of federally-recognized Tribes with opportunities to comment on and to participate in the development of land use plans.  The BLM will consider comments, notify consulted Tribes of final decisions, and inform them of how their comments were addressed in those decisions.  At a minimum, officials of federally-recognized Tribal governments must be offered the same level of involvement as state and county officials.  It is recommended that coordination take place as early as possible and before official notifications are made.  Land use plans and coordination activities must address the following:

1. Consistency with Tribal plans

Section 202(c)(9) of FLPMA requires the BLM to coordinate plan preparation for public lands with plans for lands controlled by Indian Tribes, so that the BLM's plans are consistent with Tribes' plans for managing Tribal resources to the extent possible, consistent with Federal law. This coordination allows the BLM and Tribes to develop management prescriptions for a larger land base than either agency can address by itself.

BLM_0007933

10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2. Protection of treaty rights

Land use plans must address the protection of treaty rights assured to Indian Tribes concerning Tribal uses of public lands and resources (such treaty rights in the West are generally limited to Northwestern Tribes who were subject to the Stevens Treaties of the 1850s).

3. Observance of specific planning coordination authorities

In addition to the FLPMA consistency provisions discussed above, the land use planning process, where applicable, must comply with the following statutes and Executive orders:

a. Section 101(d)(6) of the National Historic Preservation Act. This act requires the BLM to consult with Indian Tribes when historic properties of traditional religious or cultural importance to a Tribe would be affected by BLM decision-making.

b. The American Indian Religious Freedom Act. This act requires the BLM to protect and preserve the freedom of American Indians and Alaska Natives in exercising their traditional religions, including access to sites and the freedom to worship through ceremonials and traditional rites.

c. Executive Order 13007 (Indian Sacred Sites). This requires the BLM to accommodate access to and use of sacred sites and to avoid adversely affecting the physical integrity of sacred sites to the extent practicable, permitted by law, and not inconsistent with essential agency functions. The BLM must ensure reasonable notice is provided to Tribes, through government-to-government relations, of proposed actions or land management policies that may restrict future access to or ceremonial uses of, or adversely affect the physical integrity of, sacred sites, including proposed land disposals.

d. Executive Order 12898 (Environmental Justice). This requires the BLM to take into account the relevant CEQ guidelines and Department of the Interior policies and goals (see Appendix D, Table D-4).

In some cases, Native American or Tribal interests are represented by certain advocacy groups that have a "quasi-governmental" authority or interest, but that are not federally recognized. There is no statutory, fiduciary trust, or government-to-government relationship with these groups that requires consultation. These groups are consulted by BLM on the same level as any other nongovernmental organization or advocacy group using the principles of collaboration.

See BLM Manual 8120 and BLM Handbook H-8120-1 for specific guidance on Native American consultation. See Departmental Manual 512 DM 2 (Departmental Responsibilities for Indian Trust Resources).

Land use plans and their accompanying EISs must identify potential effects on Indian trust resources, trust assets, or Tribal health and safety. Any effect must be explicitly identified and documented in the land use plan, including appropriate mitigation where possible.

BLM_0007934

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## II. Land Use Plan Decisions

## A. <u>Introduction</u>

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions.  These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses).  Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

   1.  Use and observe the principles of multiple use and sustained yield;

   2.  use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;

   3.  give priority to designating and protecting areas of critical environmental concern (ACECs);

   4.  rely, to the extent available, on an inventory of public lands, their resources, and other values;

   5.  consider present and potential uses of public lands;

   6.  consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;

   7.  weigh long-term benefits to the public against short-term benefits;

   8.  provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and

   9.  to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs.  The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands.  Land use plans must be consistent with state and local plans to the maximum extent consistent with Federal law.  Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Where there are competing resource uses and values in the same area, Section 103(c) of FLPMA (43 U.S.C. 1702(c)) requires that the BLM manage the public lands and their various resource values so that they are utilized in the combination that will best meet multiple use and sustained yield mandates.

BLM_0007935

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Land use plan decisions are made according to the procedures in the BLM's planning regulations in 43 CFR 1600 and the implementing regulations for NEPA in 40 CFR 1500-1508.  Before land use plan decisions are finalized and selected, they must be presented to the public as proposed decisions and can be protested to the BLM Director under 43 CFR 1610.5-2 (see Appendix E).

## B.  Types of Land Use Plan Decisions

Land use plan decisions for public lands fall into two categories:  desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.

### 1.  Desired outcomes

Land use plans must identify desired outcomes expressed in terms of specific goals and objectives.  Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs.  Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions).  Definitions and examples of goals and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable.  Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions.  These Land Health Standards must be expressed as goals in the land use plan.  Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources.  A sample goal for a Land Health Standard is:  "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential."  A sample goal from the Strategic Plan is:  "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water."  These goals, or modifications thereof, could be used in a land use plan.

*Objectives* identify specific desired outcomes for resources.  Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate).  A sample objective is:  "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species."  When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

BLM_0007936

13

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

The land use plan must set the stage for identifying site-specific resource use levels. Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.

b. Management actions. Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System).

While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

BLM_0007937

Appendix C provides additional program-specific guidance for developing land use plan decisions.

## C. Geographic Areas

A variety of different geographic areas are associated with planning:

*Planning Area.* The geographic area within which the BLM will make decisions during a planning effort. A planning area boundary includes all lands regardless of jurisdiction; however the BLM will only make decisions on lands that fall under the BLM's jurisdiction (including subsurface minerals). Unless the State Director determines otherwise, the planning area for a RMP is the geographic area associated with a particular field office (43 CFR 1610.1(b)). State Directors may also establish regional planning areas that encompass several field offices and/or states, as necessary.

*Decision Area.* The lands within a planning area for which the BLM has authority to make land use and management decisions. In general, the BLM has jurisdiction over all BLM-administered lands (surface and subsurface) and over the subsurface minerals only in areas of split estate (areas where the BLM administers Federal subsurface minerals, but the surface is owned by a non-Federal entity, such as State Trust Land or private land).

*Analysis Area.* Any lands, regardless of jurisdiction, for which the BLM synthesizes, analyzes, and interprets data and information that relates to planning for BLM-administered lands. Analyses that extend beyond the planning area boundary allow management decisions to be made within the context of overall resource conditions and trends within the surrounding area, considering local, state, other Federal, and Tribal plans. Examples of such information include the relative significance of BLM lands for a certain resource (such as a threatened or endangered species), or the anticipated impacts to resources (such as air quality, socio-economics) based on activities on BLM-administered lands. The analysis areas can be any size, can vary according to resource, and can be located anywhere within, around, partially outside, or completely outside the planning or decision areas.

## D. Scales of Planning

Planning and decision making may vary geographically (regional versus site-specific) or temporally (short-term versus long-term), providing a comprehensive basis for implementing resource management actions.

Planning at multiple scales may be necessary to resolve issues for a geographic area that is different from the planning area for the RMP. For example, if broad-scale (regional) analysis identifies issues such as invasive weeds that cross BLM field office boundaries or other jurisdictional boundaries, desired outcomes and management actions in a planning area may be described and addressed in the context of the broader landscape.

Information presented at multiple scales also helps the BLM to understand priority resource issues, tailor decisions to specific needs and circumstances, and analyze cumulative impacts.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

When establishing goals and objectives and making management decisions, it is also important to consider temporal scales.  Some natural processes affected by decisions may occur over very long timeframes.  For example, complete restoration of a degraded habitat may take much longer than the typical time span of a land use plan.

## E.  **Multijurisdictional Planning**

Within a planning area, the BLM surface lands and subsurface mineral estate interests are often intermingled with non-Federal mineral estate, or with lands that are managed by or under the jurisdiction of Tribal, state, or local governments or other Federal agencies.  As an outgrowth of these landownership patterns and responsibilities, other governmental entities and BLM have increasingly sought to coordinate their decisions and plans.

Multijurisdictional planning assists land use planning efforts where there is a mix of landownership and government authorities and there are opportunities to develop complementary decisions across jurisdictional boundaries.  Planning can be accomplished for subbasins, entire watersheds, or other landscape units.  A multijurisdictional plan may include both land use and implementation decisions that are germane to each jurisdiction involved in the planning effort.  However, the BLM still retains authority for decisions affecting the public lands it administers.  The BLM office leading or participating in a multijurisdictional plan must assure conformance with the BLM's planning regulations, as well as all other applicable laws and regulations for the BLM-administered lands.  This can be accomplished by completing the notification, public review, and procedural requirements of 43 CFR 1600 and 40 CFR 1500-1508 as part of the multijurisdictional planning effort.  Where BLM becomes a cooperating agency for implementation actions in conformance with the existing land use plan, the lead agency's planning process may be followed provided that NEPA requirements are met.

In cases where the BLM-administered lands make up a small part of the planning area for a multijurisdictional planning effort, it may be desirable for other jurisdictional interests to lead the planning effort.  The BLM may act as a cooperating agency's facilitator, convener, leader, or participant, as appropriate, to encourage positive relationships and to develop a mutual understanding of resource conditions and multiple-use management options.  In some cases, law may define the lead role.  In most cases, planning procedures of Tribal, state, or local governments and other Federal agencies will differ from those of the BLM.  Therefore, successful multijurisdictional planning efforts are normally guided by MOUs, which clearly delineate lines of authority and roles and responsibilities for all participants, including the BLM.

## F.  **Establishing Management Direction for Lands That May Come Under the BLM Jurisdiction in the Future**

If it is foreseeable that the BLM will acquire management responsibility for certain parcels of land through purchase, exchange, withdrawal revocation, administrative transfers, or some other means, then the BLM can establish management direction for these lands, contingent on their acquisition, in conjunction with planning efforts on adjacent or similar BLM-administered lands.

BLM_0007939

16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

If acquired lands are surrounded by or adjacent to BLM lands, the BLM can extend applicable land use plan decisions, through plan maintenance (see 43 CFR 1610.5-4), to these lands after they are acquired without completing a plan amendment, as long as there are no unresolved management issues associated with the newly acquired lands.  In some cases, regulatory requirements may dictate a plan amendment be completed, such as when establishing or modifying boundaries of ACECs.

## III. Land Use Planning Process and Products

Planning requirements vary depending on the type of planning efforts and the level of environmental analysis needed.  There are three types of planning efforts:

> 1.  *New plans.*  A set of decisions for an area previously managed by an entity other than the BLM, or for an area previously managed by the BLM under a MFP (the land use plan predecessor to the present-day RMP).

> 2.  *Plan revisions.*  A complete or near-complete rewrite of an existing RMP.

> 3.  *Plan amendments.*  A modification of one or more parts (e.g., decisions about livestock grazing) of an existing RMP.

The level of environmental analysis differs by the type of planning effort, as shown in Table III-1.

**Table III-1.—*Planning efforts and required NEPA analysis***

| Type of planning effort | Type of associated NEPA document required |
|---|---|
| New plans | • EIS |
| Plan revisions | • EIS |
| Plan amendments | • EIS or EA/FONSI:  Depends on the scope of the planning effort and on the anticipated impacts. |

## A.  Planning for Environmental Impact Statement-level Efforts

Figure 1 shows required planning steps for EIS-level planning efforts, followed by a description of each step.

BLM_0007940

17

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



**Figure 1.—***EIS-level planning efforts:  Required steps for new plans, revisions, and amendments*

BLM_0007941

18
H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1. <u>Prepare to plan</u>

The preparation plan is more than merely a vehicle to secure planning funds.  A properly prepared preparation plan provides the foundation for the entire planning process by identifying the preliminary issues to be addressed, the skills needed to address them, a preliminary budget that can be used for the cost estimate, preliminary planning criteria, and data and metadata available and needed.  If the plan is to be contracted, the preparation plan also forms the basis for the statement of work.  Offices should use a full interdisciplinary team to develop a realistic preparation plan.  If the plan is to be contracted, include the procurement staff on the interdisciplinary team.

It is important that the preparation plans use the principles of project management and address the findings in the existing plan evaluation. A comprehensive preparation plan provides management direction, oversight, structure, cost estimate, and focus for the planning process.

Preparation plans should be as brief and concise as possible.

**PRODUCT:  PREPARATION PLAN**—Appendix F-1 (Recommended Format for Preparation Plans) contains a more detailed outline and discussion of specific components for a preparation plan.

2. <u>Issue a notice of intent to prepare the RMP (amendment)/EIS and start scoping</u>

At the earliest opportunity, the BLM should notify the public, Indian Tribes, other Federal agencies, and state and local governments about its intent to engage in land use planning for a given area.  BLM managers should take whatever measures they feel necessary to ensure all interested parties are notified of upcoming planning actions.  At a minimum, however, the BLM must distribute two types of notices.

a. *Publish a notice of intent (NOI) in the* Federal Register.  The BLM must publish a NOI in the *Federal Register* prior to scoping to announce its decision to prepare an EIS (and associated planning document) (40 CFR 1501.7).  The NOI should identify preliminary issues and planning criteria (see the following Conduct Scoping section).

b. *Distribute scoping notices.*  Simultaneously with the *Federal Register* NOI, the BLM should submit a scoping notice to Federal agencies, state agencies, the heads of county boards, other local government units, and Tribal chairmen or Alaska Native leaders and any other entities/individuals who have requested such notice or the Field Manager has reason to believe would be concerned with the planning effort (43 CFR 1610.3-1(d)).  BLM should request the current status of government entities' officially approved or adopted resource-related plans, and the policies and programs contained therein.

Publication of the NOI in the *Federal Register* formally initiates the plan development, revision, or amendment process and begins the scoping process.  Information discussions with cooperators (or potential cooperators), RACs, Tribes and other groups may occur before formal scoping begins.

BLM_0007942

3.  Conduct scoping

Scoping is a requirement of both the NEPA regulations (40 CFR 1501.7) and the BLM planning regulations (43 CFR 1610.2 and 43 CFR 1610.4-1).  The land use planning process is issue-driven.  Scoping is a collaborative public involvement process to identify planning issues to be addressed in the planning process.  Planning issues are disputes or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices.  Issues include resource use, development, and protection opportunities for consideration in the preparation of the RMP.  These issues may stem from new information or changed circumstances, and the need to reassess the appropriate mix of allowable uses.  Planning issues are addressed in and provide major focus for the development of alternatives (see Section III(A)(5), Formulate alternatives).

Scoping also involves the introduction of preliminary planning criteria to the public for comment.  Planning criteria guide development of the plan by helping define the decision space (or the "sideboards" that define the scope of the planning effort); they are generally based upon applicable laws, Director and State Director guidance, and the results of public and governmental participation (43 CFR 1610.4-2).  Examples of planning criteria include but are not limited to the following:

a.  The plan will be completed in compliance with FLPMA, NEPA, and all other relevant Federal law, Executive orders, and management policies of the BLM;

b.  where existing planning decisions are still valid, those decisions may remain unchanged and be incorporated into the new RMP (or amendment);

c.  the plans will recognize valid existing rights; and

d.  Native American Tribal consultations will be conducted in accordance with policy and Tribal concerns will be given due consideration.  The planning process will include the consideration of any impacts on Indian trust assets.

**PRODUCT:  SCOPING REPORT**—The BLM must document the results of scoping (43 CFR 1610.2(d)).  Field offices must either write a scoping report to capture public input in one document (recommended), or include the results of scoping in the Analysis of the Management Situation (AMS) (see following Section III(A)(4)).  The documentation must summarize the individual comments received during the formal scoping period of the planning process.  It must also describe the issues and management concerns from public scoping meetings, internal scoping meetings, and those included in the preparation plan.  See Appendix F-2 (Recommended Format for Scoping Reports).

4.  Analyze the management situation

The BLM must analyze available inventory data and other information to characterize the resource area profile, portray the existing management situation, and identify management opportunities to respond to identified issues.  This analysis provides, consistent with multiple use

BLM_0007943

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection (43 CFR 1610.4-4).

The analysis should (as briefly and concisely as possible) describe the current conditions and trends of the resources and the uses/activities in the planning area to provide information for the affected environment, provide the basis for the no action/present management alternative, and to create a framework from which to resolve the planning issues through the development of alternatives. The analysis should describe the status, or present characteristics and condition of the public land; the status of physical and biological processes that affect ecosystem function; the condition of individual components such as soil, water, vegetation, and wildlife habitat; and the relative value and scarcity of the resources. The analysis should also address social and economic conditions that influence how people, communities, and economies interact with the ecosystem. Appendix D provides additional detail on addressing social science and economic considerations in the land use planning process in the context of the larger landscape.

**PRODUCT: ANALYSIS OF THE MANAGEMENT SITUATION**—Field offices should produce a report called the *analysis of the management situation* (AMS). Field offices are encouraged to make a summary of the AMS findings (or the entire report) available to the public. Parts of the AMS should easily translate into the introduction chapter, the no action and action alternatives, and the affected environment chapter of the EIS.

Formulation of the AMS can begin as soon as the planning project is approved. Documentation supporting the AMS should be maintained in the field office for public review. The AMS document can be made available to the public during or after scoping. The scoping report can also be included in a published summary of the AMS if desired. See Appendix F-3 (Annotated Outline of the Analysis of the Management Situation) for additional guidance.

5. Formulate alternatives

Considering a reasonable range of alternatives helps the BLM and its partners understand the various ways of addressing the planning issues and different scenarios for management of the resources and uses in the planning area. Development of alternatives should draw on the management opportunities identified in the AMS. Each alternative includes desired outcomes (goals and objectives), and the allowable uses and actions anticipated to achieve those outcomes. It is important to keep in mind the following about alternative formulation:

a. The BLM must consider all reasonable alternatives, including the no action alternative (the continuation of present levels or systems of resource use). Some alternatives, including the no action alternative, may be developed for detailed study, while others are considered but not analyzed in detail. Both types of alternatives are described in the RMP/EIS. Rationale should be briefly described to document why certain alternatives were not studied in detail (43 CFR 1610.4-5). An example may be that one alternative is a reasonable variation of an existing alternative analyzed in detail.

b. Reasonable alternatives analyzed in detail meet the purpose and need of the project and can be feasibly carried out based on estimated cost, logistics, technology, and social,

BLM_0007944

and environmental factors.  An alternative may be considered reasonable even if it is outside the legal jurisdiction of the BLM because it may serve as the basis for modifying congressional approval in light of the analysis (40 CFR 1502.14(c); Forty Questions No. 2(b)).

c.  Each fully-developed alternative represents a different land use plan that addresses and/or resolves the identified planning issues in different ways.

d.  Each alternative will include a different suite of potential planning decisions to address the issues.  Some potential planning decisions may be common to multiple, or all alternatives.

e.  Goals typically pertain to all alternatives (will not vary by alternative).  Objectives, allowable uses, and management actions may (1) be consistent across alternatives, and/or (2) vary by alternative.  A plan could include some objectives that vary by alternative, and other objectives that are consistent across alternatives.

f.  Goals typically apply to the entire planning area.  Objectives, allowable uses, and management actions may (1) apply to the planning area as a whole, and/or (2) be specific to certain geographic areas, such as those listed below:

    1.  Landscape-level systems (such as ecosystems and watersheds);

    2.  specific resources (such as threatened and endangered species and cultural sites);

    3.  areas (such as allotments and special management units); and

    4.  areas needing restoration or maintenance in order to meet land health standards.

g.  All components of an individual alternative must be complementary.  Desired outcomes, allowable uses, and management actions can (and probably will) conflict from one alternative to the next.  However, they must not conflict within any one alternative.  For example, an alternative should not allow all lands open to oil and gas leasing while having all lands designated as Visual Resource Management Class I or II.

h.  When identifying allowable uses in alternatives, consider resource development potential, levels of use, and restrictions to best achieve the identified goals and objectives (see Analysis of the Management Situation above).  These uses and restrictions are based on resource protection needs and social and economic factors, and represent the most appropriate mix of uses and protections for the resources in the planning area.  Different protection and restoration measures and the availability of areas for certain uses, levels of uses, and restrictions are presented in alternatives.

BLM_0007945

22

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

i. In developing alternatives, the BLM must consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values (43 U.S.C. 1712(c)(6)).

j. Alternatives should be developed in an open, collaborative manner, to the extent possible.

6. <u>Analyze the effects of alternatives</u>

The BLM must estimate and describe the physical, biological, economic, and social effects of implementing each alternative considered in detail, including the no action alternative (43 CFR 1610.4-6). This analysis should provide adequate information to evaluate the direct, indirect, and cumulative impacts of each alternative in order to determine the best mix of potential planning decisions to achieve the identified goals and objectives (the analysis should also specifically address the attainment, or non-attainment, of Land Health Standards expressed as goals). The assumptions and timeframes used for analysis purposes (such as reasonably foreseeable development scenarios) should be documented. The effects are described in the draft RMP (amendment)/draft EIS (see Section 8).

7. <u>Select a preferred alternative</u>

By evaluating the alternatives in the EIS, the BLM must determine which combination of potential planning decisions contained in the alternatives best meets multiple use and sustained yield mandates of Section 103(c) of FLPMA (43 U.S.C. 1702(c)). If any one alternative contains the desired combination of potential planning decisions, then that alternative should be identified as the preferred alternative. If the combination of potential planning decisions is drawn from different alternatives, then those potential planning decisions should be compiled into a new alternative (identified as the preferred alternative) and the impacts analyzed accordingly.

The preferred alternative should:

a. Meet statutory requirements;

b. represent the best combination of decisions to achieve the goals and policies of the BLM as reflected through the DOI's Strategic Plan and State Director guidance; and

c. best respond to the purpose and need and best resolve the issues pertinent to the planning effort.

These and other agreed-to selection criteria should be used in selecting the preferred alternative. Development of criteria and evaluation of alternatives should include the involvement of RACs, cooperators, and interested members of the public to the extent practical. The final decision to select a preferred alternative, however, remains the exclusive responsibility of the BLM.

BLM_0007946

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The Field Manager recommends the preferred alternative to the State Director.  The State Director approves the selection of the preferred alternative along with the other alternatives under consideration.

   8.  Prepare a draft RMP (amendment) and draft EIS

**PRODUCT:  DRAFT RMP (AMENDMENT)/DRAFT EIS**—This document describes the purpose and need for the plan, the affected environment, the alternatives for managing public lands within the planning area (including the preferred alternative), the environmental impacts of those alternatives, and the consultation and coordination in which the BLM engaged in developing the plan.  See Appendix F-4 (Annotated Outline for a Draft and Final RMP [Amendment]/EIS).

   9.  Publish a notice of availability and provide a public comment period

The BLM must provide at least 90 days for the public to comment on the draft RMP (amendment) and draft EIS.  This public comment period officially starts with the Environmental Protection Agency's (EPA's) publication of a NOA for the document in the *Federal Register* (43 CFR 1610.2(e)).  The BLM also publishes a NOA in the *Federal Register* to provide information not contained in the EPA's NOA about the project, comment period, contact information, and other supplemental information.  The BLM may also announce the start of the comment period (and the dates, times, and locations of public meetings) through other mechanisms, such as press releases, planning bulletins or newsletters, direct mailings and e-mailings, and Internet postings.

Public comments may be submitted in a variety of forms, including written, electronic, and oral.  The BLM must assess and consider all comments received (similar or "like" comments may be grouped for analysis).  The BLM responds to public comments by one of the following ways (40 CFR 1503.4):

   a.  Modifying alternatives, including the proposed plan;

   b.  developing and evaluating alternatives not previously given serious consideration;

   c.  supplementing, improving, or modifying analysis;

   d.  making factual corrections; and

   e.  explaining why comments do not warrant further response, citing the sources, authorities, or reasons that support the agency's position, and, if appropriate, indicate those circumstances that would trigger reappraisal or further response.

Although the BLM is not required to write to individual commenters to explain how their comments were addressed, it is required to respond to substantive comments and include the response in the proposed RMP (amendment) and final EIS.  Nonsubstantive comments are those that include opinions, assertions, and unsubstantiated claims.  Substantive comments are those

BLM_0007947

24

that reveal new information, missing information, or flawed analysis that would substantially change conclusions.

> 10. Prepare a proposed RMP (amendment) and final EIS

**PRODUCT:  PROPOSED RMP (AMENDMENT)/FINAL EIS**—The proposed RMP (amendment) and final EIS builds on the draft RMP (amendment) and draft EIS to include appropriate responses to public comments received on the draft RMP (amendment) and draft EIS as well as a description (either verbatim or summary) of the comments received.  It also corrects errors in the draft RMP/EIS identified through the public comment process and internal BLM review.  The proposed RMP and final EIS may also contain modification to the alternatives and the accompanying impact analysis contained in the draft RMP/EIS.  However, substantial changes to the proposed action, or significant new information/circumstances collected during the comment period would require supplements to either the draft or final EIS (40 CFR 1502.9(c)).  The proposed RMP (amendment)/final EIS should clearly show the changes from the draft RMP (amendment)/draft EIS.  The proposed RMP/final EIS should also display land use plan and implementation decisions (and clearly distinguish between the two types of decisions).  One way of doing this is in the Dear Reader Letter.  See Appendix F-4 (Annotated Outline for a Draft and Final RMP [Amendment]/EIS).

> 11. Publish a notice of availability, provide a protest period, and resolve protests

Issuance of the proposed RMP (amendment)/EIS officially occurs with the EPA's publication of a NOA for the document in the *Federal Register*.  The BLM publishes a NOA as well, which contains information about the project, protest period and filing instructions, contact information, and other supplemental information not contained in the EPA's NOA.

Individuals and entities have 30 days from the publication of EPA's NOA of the document to file a protest with the BLM Director.  The protest period cannot be extended.  The BLM must resolve any protests on a proposed RMP (amendment)/final EIS before issuing a record of decision (ROD).  A ROD may be issued on any portion of the proposed RMP not protested, in coordination with the Washington Office.  See Appendix E (Summary of Protest and Appeal Provisions).

> 12. Provide a Governor's consistency review period

In addition to a 30-day protest period, the BLM must also provide a 60-day review period to the Governor of the state in which the RMP (amendment) is being proposed to ensure consistency with state and local plans, policies, and programs.  The protest period and the Governor's review period should occur simultaneously in order to save time.  Sending a print-ready copy to the Governor at the same time the document goes to the printer will allow both periods to end at about the same time.  BLM state offices can potentially negotiate a shorter review period with the Governor.

Any responses from a Governor on consistency must be resolved before the BLM issues a ROD. If the Governor does not respond within the review period, the BLM can assume that the

BLM_0007948

proposed land use plan (amendment) decisions are consistent (43 CFR 1610.3-2(e)). If the Governor recommends changes in the proposed plan (amendment) that were not raised during the public participation process, the State Director shall provide the public with an opportunity to comment on the recommendations (43 CFR 1610.3-2(e)). This public comment opportunity will be offered for 30 days and may coincide with the 30-day comment period for the notice of significant change (see Section III(A)(13) below). If the State Director does not accept the Governor's recommendations, the Governor has 30 days to appeal in writing to the BLM Director (43 CFR 1610.3-2(e)).

13. <u>Determine need for a notice of significant change and provide a comment period if necessary</u>

The protest letters and comments from the Governor could result in the need to significantly modify the proposed RMP (amendment)/final EIS. For planning purposes, "significant" is the equivalent of "substantial" as used in 40 CFR 1502.9(c). If the change is significant, the BLM must announce the intended changes to the public and provide a 30-day comment period. Without this step, the public would not have an opportunity to understand and respond to the potential change (43 CFR 1610.5-1(b) and 40 CFR 1505.2). The BLM must then respond to the comments as described in previous Section III(A)(9).

Should the BLM issue a notice of significant change, it may also be necessary to issue a supplemental proposed RMP (amendment)/ final EIS (see 40 CFR 1502.9(c)(1-4)).

14. <u>Prepare a record of decision and approved RMP (amendment)</u>

**PRODUCT:  RECORD OF DECISION /APPROVED RMP (AMENDMENT)**—The ROD /approved RMP (amendment) serves as a more concise and useful tool to land managers and stakeholders than a cumbersome EIS. It is typically the proposed RMP (amendment) as modified in response to protests, the Governor's consistency review, or other considerations. It describes the goals, objectives, and management actions for fulfilling the management direction developed within the land use planning process.

An RMP (amendment) is officially approved when the State Director signs a ROD adopting the RMP (amendment). The ROD should precede or coincide with the adoption of the RMP (40 CFR 1506.1(a)). The ROD, which provides the rationale for the decision (this should parallel the rational for the preferred alternative, using the same criteria), should be published and released in the same document with and reference the approved RMP (amendment). See Appendix F-5 (Annotated Outline for a Record of Decision/Approved RMP (Amendment)).

15. <u>Implement, monitor, and evaluate plan decisions</u>

See Sections IV and V of this Handbook.

**B. <u>Planning for Environmental Assessment-level Efforts</u>**

BLM_0007949

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The BLM completes environmental assessment (EA)-level planning efforts mainly for certain types of plan amendments.  In general, there are fewer planning steps involved in EA-level planning.  The number of steps and extent of work involved with each step varies with the complexity of identified planning issues.  Figure 2 shows the required and optional steps associated with EA-level planning.  Steps are required unless noted as optional (designated by *italics*).

> 1.  Prepare to plan (optional)

It is highly recommended that field offices engage in preplanning activities, though they are not required.  Field offices should complete preplanning steps necessary to help ensure efficient and effective planning efforts.  For example, field offices could write preparation plans similar to those required for EIS-level planning efforts (see Section III(A)(1), Prepare to Plan and Appendix F-1).

> 2.  Issue a notice of intent (NOI) to prepare the RMP amendment and review planning criteria

The BLM must publish an NOI in the *Federal Register* to initiate the start of the planning effort (43 CFR 1610.2 (c)).  The BLM can include the draft planning criteria in the NOI to solicit public review of the criteria.  Alternatively, the BLM can make the planning criteria available to the public at a later date if desired (see following Section III(A)(3), Conduct Scoping).  Note, however, that public review of planning criteria is required at some point, whether at the time of the NOI or at a later date.

> 3.  Conduct scoping

Field offices must engage in an appropriate level of scoping activities.  At a minimum, the BLM must offer a 30-day public comment period on issues and planning criteria.  Depending on the local situation and planning issues, the BLM can also conduct a more involved scoping effort and include a series of public meetings, for example.

The BLM must document the results of scoping either in a scoping report, the draft plan amendment and EA or the proposed amendment/EA (if a draft plan amendment and EA is not prepared).

> 4.  Analyze the management situation (optional)

The BLM is not required to analyze the management situation or produce a report that describes it.  However, prior to formulating alternatives, the BLM should understand current conditions and trends of the resources and the uses/activities that will relate to potential decisions in the plan amendment.  It is highly recommended that the BLM begin the process of gathering existing data, and supplementing data as needed, early in the plan amendment process.  This information will create a solid base for analysis to support amending planning decisions.  This could be accomplished by reference to and/or augmenting the existing AMS.

BLM_0007950

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



**Figure 2.—***EA-level planning efforts:  Required and optional planning steps*

BLM_0007951

28

<p style="text-align: center;">H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)</p>

### 5. Formulate alternatives

The BLM must formulate appropriate alternatives for EA-level planning efforts.  The process is similar to that for EIS-level amendments.

### 6. Analyze the effects of alternatives

The BLM must also analyze the effects of alternatives.

### 7. Prepare a draft RMP amendment and EA/FONSI (optional)

The BLM must prepare a draft RMP amendment and EA/finding of no significant impact (FONSI) when it is determined that a public review and comment period are appropriate (for example, when proposed ACEC designations are being considered per 43 CFR 1610.7-2(b) or to meet NEPA requirements under certain limited circumstances per 40 CFR 1501.4(e)(2). Otherwise, a draft plan amendment is not required, and the BLM can simply go from analyzing the effects of alternatives (step 6) to preparing a proposed RMP amendment/EA/FONSI (step 9). The FONSI should be unsigned.

### 8. Provide a public comment period (optional)

If the BLM prepares a draft RMP amendment and EA/FONSI, it must offer a minimum 30-day public comment period.  The BLM must offer a 60-day comment period for potential decisions regarding ACEC designation.

### 9. Prepare a proposed RMP amendment/EA/FONSI

The BLM must prepare a proposed RMP amendment/EA/FONSI for all EA-level planning efforts.  The proposed RMP amendment/EA/FONSI is typically arranged in an EIS format (with chapters).  The FONSI should be signed (if a FONSI cannot be signed, an EIS should be initiated).

### 10. Provide a protest period and resolve protests

Like EIS-level planning efforts, EA-level efforts require a 30-day protest period.  The protest period cannot be extended.  Since a NOA is not published in the *Federal Register* for EA-level amendment, field offices are encouraged to widely notify the public (including publication of legal notices in local newspapers) to announce the protest period.  The BLM must resolve these protests before issuing a decision record/RMP amendment.  A decision record may be issued on any portion of the proposed RMP amendment not protested, in coordination with the Washington Office.

### 11. Provide a Governor's consistency review period

Like EIS-level planning efforts, EA-level efforts require a 60-day Governor's consistency review period.

BLM_0007952

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

12. Issue a notice of significant change and provide a 30-day public comment period (if necessary)

This step is identical to that for EIS-level efforts.

13. Prepare a decision record/RMP amendment

The BLM issues the decision record/RMP amendment after it resolves all protests and any potential consistency issues received from the Governor's office. The decision record should precede (or coincide with) the RMP amendment (40 CFR 1506.1).

14. Implement, monitor and evaluate plan decisions

See Sections IV and V of this Handbook.

## IV. Implementation

### A. Implementing Land Use Plans

When an approved land use plan or land use plan amendment decision document (i.e., ROD or decision record) is signed, most of the land use plan decisions in the plan are effective immediately and require no additional planning or NEPA analysis. See Appendix C for a listing of program-specific land use plan decisions.

Some programs have specific requirements that must be taken in order to make certain decisions effective. An example of a land use plan decision that requires an additional action for implementation would be a recommendation to withdraw lands from entry under the mining laws. Formal action requiring Secretarial-level review and decision making would follow if the BLM planning process results in a withdrawal recommendation and the applicable regulations in 43 CFR 2300 are followed.

Upon approval of the land use plan, subsequent implementation decisions are put into effect by developing implementation (activity-level or project-specific) plans. An activity-level plan typically describes multiple projects in detail that will lead to on-the-ground action. These plans traditionally focused on single resource programs (habitat management plans, allotment management plans, recreation management plans, etc.). However, activity-level plans are increasingly interdisciplinary and are focused on multiple resource program areas to reflect the shift to a more watershed-based or landscape-based approach to management. These types of plans are sometimes referred to as "integrated or interdisciplinary plans," "coordinated resource management plans," "landscape management plans," or "ecosystem management plans." A project-specific plan is typically prepared for an individual project or several related projects.

### B. Defining Implementation Decisions

Implementation decisions generally constitute BLM's final approval allowing on-the-ground actions to proceed. These types of decisions require appropriate site-specific planning and

30

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

NEPA analysis. Unlike land use plan decisions, implementation decisions are not subject to protest under the planning regulations. Instead, implementation decisions are subject to various administrative remedies, particularly appeals to the Office of Hearing and Appeals (Interior Board of Land Appeals). Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by the specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP. The proposed plan /final EIS should display land use plan and implementation decisions (and clearly distinguish between the two types of decisions). One way of doing this is in the Dear Reader Letter. See Appendix C for a listing of program-specific implementation decisions.

## C.  Making Implementation Decisions

Implementation decisions are made with the appropriate level of NEPA analysis along with any procedural and regulatory requirements for individual programs. See 40 CFR 1500-1508, the BLM NEPA Handbook (H-1790-1), and 516 DM 1-7 for detailed descriptions of NEPA procedures. An EA, EIS, or EIS supplement must be prepared for subsequent implementation planning unless the decisions and actions contained in the implementation plan are:

   1.  Identified as exceptions to the BLM NEPA requirements (e.g., actions specifically exempted from NEPA by Congress);

   2.  categorically excluded (refer to Departmental Manual 516 DM 2, Appendix 1; and 516 DM 6, Appendix 5.4, for a current listing (May 19, 1992) of categorical exclusions); and

   3.  fully covered by a previously prepared EA or EIS that does not need to be updated as documented by a documentation of land use plan conformance and NEPA adequacy (DNA).

## D.  Making Land Use Plan and Implementation Decisions in the Same Planning Effort

The BLM may use a single land use planning/NEPA process to make both land use plan and implementation decisions, provided both types of decisions are adequately addressed with the appropriate level of NEPA analysis. This may be appropriate in RMPs or plan amendments covering relatively small geographic areas or where there are a number of activity-level projects such as timber sales being addressed simultaneously with land use planning efforts. When describing the protest procedures for proposed RMPs, the BLM must make clear which decisions are land use plan decisions and thus protestable under the planning regulations and which decisions are implementation decisions that are not protestable. At the decision-making stage, the BLM can separate the two categories of decisions into two decision documents, one adopting the RMP (or amendment) and the other approving the implementation decisions; or the BLM may use a single decision document that adopts the RMP (or amendment) and approves the implementation actions. If a single decision document is used, the BLM must clearly distinguish the land use plan decisions from the implementation decisions and describe the administrative remedies for both.

BLM_0007954

When considering land use plan and implementation decisions in the same land use planning/NEPA process, the implementation decisions are usually approved at the same time or after the decision to approve the RMP (or amendment).  An exception may occur when some/all of the implementation decisions are in conformance with decisions in the current RMP.  In this case, the BLM may issue a ROD/decision record on the implementation decisions that are consistent with the current plan prior to approving the ROD/decision record on the new RMP (or amendment).  This situation may occur when there is a need to approve high priority implementation decisions before the protests to the proposed RMP (or amendment) are resolved.

Making implementation decisions as part of the land use planning process and analyzing them concurrently with land use plan decisions does not change their administrative remedies or the timing of those remedies.  See Appendix E (Summary of Protest and Appeal Provisions).

## E.  Developing Strategies to Facilitate Implementation of Land Use Plans

A documented, well-organized thought process is essential to the successful implementation of land use plans.  An implementation strategy lists prioritized decisions that (1) will help achieve the desired outcomes of one or more land use plans and (2) can be implemented given existing or anticipated resources.  Developing implementation strategies enables the BLM to prioritize the preparation of implementation decisions.

There are no procedural or approval requirements for an implementation strategy. Implementation strategies may be developed in conjunction with developing land use plan decisions, but strategies are not land use plan decisions and are not subject to protest or appeal. As a rule, they should not be included in the RMP.   A well thought-out implementation strategy should prioritize each decision for funding and implementation.  The strategy should also be interdisciplinary (not program by program).  Developing an implementation strategy creates an important opportunity for continued collaboration with the public, Tribes, state and local governments, and other Federal agencies.

Described below is a suggested collaborative four-step method for developing an implementation strategy with partners involved in developing the land use plan:

   1. *Develop framework to portray the work.*  Identify specific projects to (a) achieve desired natural resource conditions, (b) achieve desired heritage and cultural resource conditions, (c) address anticipated demands for recreation, (d) address anticipated demands for forage and forest products, (e) address anticipated demand for direct community services, and (f) address demand for energy and minerals.

   2. *Identify priorities for the next 3 to 5 years.*  Using the framework in step 1, and considering current budget capabilities, identify priorities within each workload (a. through f. in step 1) and priorities across workloads.  Factors that influence decision priorities are:

BLM_0007955

32

a.  Statutory mandates, including, but not limited to, compliance with the Clean Air and Clean Water Acts, the Endangered Species Act, the National Historic Preservation Act, the Taylor Grazing Act, and FLPMA;

b.  goals listed in the DOI's Strategic Plan and Annual Performance Plan;

c.  present risks to resources, with resources at high risk ranking above resources without known or substantial risks;

d.  likelihood of success, with management actions using proven techniques possibly ranking higher than management actions using experimental techniques;

e.  cost-effectiveness of management actions; there is no requirement to develop a cost/benefit analysis, but management actions that have a high likelihood of improving resource conditions for relatively small expenditures of time and money should receive relatively higher priority;

f.  willingness and availability of cooperators to meet similar resource objectives for adjacent non-Federal lands and resources; this would include opportunities to cooperate on a watershed basis and to leverage limited resources;

g.  willingness and availability of partners interested in helping accomplish priority management actions needed to meet desired outcomes;

h.  budgetary and staff resources required to implement the decisions; and

i.  socioeconomic analysis of the local community.

3. *Develop a 3 to 5 year budget.*  Identify specific tasks to accomplish each project and associated funding needs, including labor and operations costs.  Identify potential funding sources including base, flexible, and contributions.

4. *Develop an outreach strategy.*  Identify a strategy for both internal and external communications needed to support implementation.  This could be in the form of annual plan updates and website development, etc.

## V.  Monitoring, Evaluation, and Adaptive Management

The regulations in 43 CFR 1610.4-9 require that land use plans establish intervals and standards for monitoring and evaluations, based on the sensitivity of the resource decisions involved.

## A.  <u>Monitoring</u>

Land use plan monitoring is the process of (1) tracking the implementation of land use planning decisions (implementation monitoring) and (2) collecting data/information necessary to evaluate the effectiveness of land use planning decisions (effectiveness monitoring).  In Appendix C, each

BLM_0007956

resource program identifies desired land use plan decisions.  BLM field offices must determine what management actions are needed to implement those decisions.  Sometimes actions occur just once, e.g., the development of an implementation plan; or actions occur on a fairly regular basis, e.g., steps taken to repair a damaged watershed.  Monitoring is the process of following up on these management actions and documenting BLM's progress toward full implementation of the land use plan and the achievement of desired outcomes.  Field offices are encouraged to involve Tribes, state and local governments, and the public if they express an interest in participating in this process.

Implementation monitoring is the process of tracking and documenting the implementation (or the progress toward implementation) of land use plan decisions. This should be done at least annually and should be documented in the form of a tracking log or report.  The report must be available for public review (one way to accomplish this is an annual planning update which can be sent to those who participated in the planning process or have expressed an interest in receiving the report).  The report should describe management actions proposed or undertaken to implement land use plan decisions and can form the basis for annual budget documents.  In subsequent years, reports should document which management actions were completed and what further actions are needed to continue implementing land use plan decisions.

Effectiveness monitoring is the process of collecting data and information in order to determine whether or not desired outcomes (expressed as goals and objectives in the land use plan) are being met (or progress is being made toward meeting them) as the allowable uses and management actions are being implemented.  A monitoring strategy must be developed as part of the land use plan that identifies indicators of change, acceptable thresholds, methodologies, protocols, and timeframes that will be used to evaluate and determine whether or not desired outcomes are being achieved.

The monitoring process should collect information in the most cost-effective manner and may involve sampling or remote sensing.  Monitoring could be so costly as to be prohibitive if it is not carefully and reasonably designed.  Therefore, it is not necessary or desirable to monitor every management action or direction.  Unnecessary detail and unacceptable costs can be avoided by focusing on key monitoring questions and proper sampling methods.  The level and intensity of monitoring will vary, depending on the sensitivity of the resource or area and the scope of the proposed management activity.

**B.  Evaluation**

Evaluation is the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented.   Land use plans are evaluated to determine if: (1) decisions remain relevant to current issues, (2) decisions are effective in achieving (or making progress toward achieving) desired outcomes, (3) any decisions need to be revised, (4) any decisions need to be dropped from further consideration, and (5) any areas require new decisions.

BLM_0007957

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

In making these determinations, the evaluation should consider whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, and whether there is new data of significance to the plan.

The plan should be periodically evaluated (at a minimum every 5 years) as documented in an evaluation schedule. Plan evaluations should also be completed prior to any plan revisions and for major plan amendments. Special or unscheduled evaluations may also be required to review unexpected management actions or significant changes in the related plans of Indian Tribes, other Federal agencies, and state and local governments, or to evaluate legislation or litigation that has the potential to trigger an RMP amendment or revision.

Evaluations may identify resource needs and means for correcting deficiencies and addressing issues through plan maintenance, amendments, or new starts. They should also identify where new and emerging resource issues and other values have surfaced. Evaluations may also identify new and innovative practices that improve effectiveness and efficiency so that other offices may benefit.

    1.  <u>Process for completing land use plan evaluations</u>

The following section outlines the recommended process for completing land use plan evaluations.

    a.  State offices, with input from the field, identify reasons for evaluating the RMP.

    b.  Where appropriate, state and field offices identify land use plans that can be grouped/batched in a geographic region or planning area to look at issues that cut across boundaries (state and field offices). Each plan should have its own evaluation documentation as well as a combined (grouped/batched) evaluation for all RMPs identified in the geographical region or planning area.

    c.  State and field offices identify what the evaluation is to measure. In some cases, the RMP/ROD may have identified both monitoring and evaluation measures, units, and programs, and may even have specified the monitoring/evaluation questions to be answered.

The state office may develop and send questionnaires to field offices (specific to the state and field offices) to focus the evaluation, along with instructions for completing it. Evaluations must be tailored to individual land use plans; however, a comprehensive evaluation must address the following questions:

    1.  Are management actions outlined in the plan being implemented?

    2.  Does the plan establish desired outcomes (i.e., goals and objectives)?
    3.  Are the allocations, constraints, or mitigation measures effective in achieving (or making progress towards achieving) the desired outcomes? This

BLM_0007958

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

determination is often made based on information obtained from resource assessments.

4.  Have there been significant changes in the related plans of Indian Tribes, state or local governments, or other Federal agencies?

5.  Are there new data or analyses that significantly affect the planning decisions or the validity of the NEPA analysis?

6.  Are there unmet needs or new opportunities that can best be met through a plan amendment or revision, or will current management practices be sufficient? For example, are there outstanding requests for ACEC designations to protect resource values?  *Note:  ACECs must be designated through the land use planning process.*

7.  Are new inventories warranted pursuant to the BLM's duty to maintain inventories on a continuous basis (FLPMA, Section 201)?

8.  Are there new legal or policy mandates as a result of new statutes, proclamations, Executive orders, or court orders not addressed in the plan?

d.  The state and field office establish/identify an interdisciplinary team that will complete the evaluation(s).  If available, the team should include specialists from state and field offices as well as adjoining state(s), and representatives from Washington Office, and Tribes, other Federal agencies, state and local governments, and the public. The interdisciplinary team should represent the major resources/programs present in the land use plan evaluation area and should be encouraged to incorporate other (technical procedures) evaluations or analyses that address and provide useful information on the same resources.

e.  The evaluation team should review both published and unpublished documents that implement or support the RMP decisions and NEPA analysis (e.g., AMS, area-wide mineral reports, socio-economic studies/analyses, reasonably foreseeable development scenarios, ACEC reports, documents incorporated by reference/adoption, and other studies [wild and scenic river, threatened and endangered species, water, etc.]).  The evaluation reports should also cite examples of implementation plans (at the activity level) that incorporate new information, address new issues, and provide either more detailed decisions or additional protective management direction.  These may include formal decision-making documents as well as watershed-level analyses and other landscape units or plans.

f.  The evaluation team should review NEPA compliance and procedural conformance records within the land use plan evaluation (e.g., documentation of land use plan conformance and NEPA adequacy, which typically relies on the RMP and associated NEPA documents [categorical exclusions]).

BLM_0007959

36

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

g.  The State Director should approve or concur with all evaluations.

2.  Evaluation report

An evaluation report documenting the findings of the evaluation must be prepared.  Following State Director approval or concurrence, the report will be made available to the public.  The following report format is recommended.  If appropriate, use charts, diagrams, and matrixes to display or summarize information.

a. Introduction

b. Purpose

c. Method and Scope

d. Results and Findings

1.  Document conclusions regarding achievement of desired outcomes as well as any individual program or resource management issues associated with plan implementation

2.  Identify decisions to be carried forward (i.e., no change needed), decisions needing to be modified, decisions needing to be dropped, and new decisions needed

e.  Recommendations, including any resource- or program-specific management actions needed and other follow-up opportunities for the BLM field and state offices or interagency consideration

f. Approval/Concurrence

Also see Section VI for more information on determining when new decisions are required.

## C.  Adaptive Management

The Office of Environmental Policy and Compliance (OEPC) issued ESM03-6 providing initial guidance to all Department of the Interior agencies on implementing adaptive management practices in NEPA compliance.  While this guidance does not provide specifics on the process and procedures for integrating adaptive management into the NEPA and land use planning process, it does formally define adaptive management as:

. . . a system of management practices based on clearly identified outcomes, monitoring to determine if management actions are meeting outcomes, and, if not, facilitating management changes that will best ensure that outcomes are met or to re-evaluate the outcomes.

BLM_0007960

The BLM has initiated an effort to develop policies and procedures to integrate adaptive management into the NEPA and land use planning processes.  When those policies and procedures are developed, they will be incorporated into this section of the Handbook.

## VI.  Determining if New Decisions are Required

### A.  Specific Regulatory Requirements for Considering New Information or Circumstances

New information, updated analyses, or new resource use or protection proposals may require amending or revising land use plans and updating implementation decisions.  The primary requirements for considering new information are as follows:

1.  The BLM planning regulations require evaluating whether there is new data of significance to the land use plan (see 43 CFR 1610.4-9) and whether plan amendments (see 43 CFR 1610.5-5) or revisions (see 43 CFR 1610.5-6) are required;

2.  the CEQ regulations (40 CFR 1502.9(c)) require the BLM to prepare supplements to draft or final EISs if the agency makes substantial changes in the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts; and

3.  joint agency Endangered Species Act regulations (see 50 CFR 402.16 (b)) require consultation to be reinitiated if new information reveals that decisions may affect listed species or critical habitat in a way or to an extent not previously considered, including exceeding the incidental take for a particular action.

### B.  Considering New Proposals, Circumstances, or Information

New data or information can include, but is not limited to:

1.  Changes in status, new listings or new critical habitat designations for endangered, threatened, and other special status or sensitive species (see Appendix C, Section (I)(G));

2.  changes in intensity of use or impact levels for a particular resource (e.g., increased recreation use as a result of urban expansion);

3.  changes in social and economic conditions resulting from urban expansion or broad conservation efforts (e.g., open space management);

4.  public comment or staff assessments indicating that new information or changed circumstances warrant a reconsideration of the appropriate mix of uses on particular tracts of public lands;

5.  a biological opinion issued by the USFWS or NOAA-Fisheries on actions in the planning area;

BLM_0007961

38

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

6. information from Tribes, elected county officials, state agencies, or other Federal agencies on significant changes in their related plans or resource conditions that are critical to the BLM land use plans and/or subordinate implementation plans;

7. new state listings of water-quality-limited streams (Clean Water Act, Section 303(d)), total maximum daily load (TMDL) developments, or non-attainment area designations (Clean Air Act) that may lead to the identification of new management practices that would require additional NEPA compliance and could require new land use plan decisions;

8. new geochemical, geologic, or geophysical data;

9. new cultural resource data;

10 environmental disturbances that significantly change natural conditions (e.g., wildfires, floods, or noxious weed infestations);

11. monitoring data and resource assessments associated with implementing resource management actions designed to achieve resource objectives and Land Health Standards;

12. Land use plan evaluations that weigh and interpret information gathered through resource monitoring;

13. determinations as to whether mitigation measures outlined in the plan are effective;

14. new national policy or a change in legal duties resulting from laws, regulations, Executive orders, or the BLM directives. An example would be congressional designation of a river segment under the Wild and Scenic Rivers Act that mandates a protection and enhancement standard that, in turn, may affect resource management objectives, conditions, or uses (e.g., livestock grazing, timber sales, or other proposed projects) outlined in the land use plan; and

15. information from the public or others regarding conditions or uses of resources on public lands.

## C. **Deciding Whether Changes in Decisions or the Supporting NEPA Analyses are Warranted**

The determination whether to amend or revise an RMP based on new proposals, circumstances, or information depends on (1) the nature of new proposals, (2) the significance of the new information or circumstances, (3) specific wording of the existing land use plan decisions, including any provisions for flexibility, and (4) the level and detail of the NEPA analysis. A "yes" answer to any of the following questions suggests the need to revisit existing decisions and/or the NEPA analysis:

BLM_0007962

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1.  Does the new information or circumstance provide for interpretations not known or considered at the time existing decisions were made that could significantly affect ongoing actions?  For example:  Current land use plan decisions may require that all wildland fires be suppressed to limit the fire to the smallest acreage possible and make no provision for wildland fire use.  This conflicts with new Secretarial policy guidance that wildland fire, as a critical natural process, must be reintroduced into fire-dependent ecosystems;

2.  Are the decisions in the current land use plan no longer valid, based on significant new information or changed circumstances?  If decisions are not valid, the decisions need to be vacated, replaced, or changed through plan amendment or revision.  Examples of situations that may require new or changed land use plan decisions include, but are not limited to, the following:

> a.  Monitoring information may show the need to discontinue managing a herd in an existing herd management area because it is not practical to preserve or maintain a thriving ecological balance with the multiple use relationships in that area; conversely, new herd management areas could be established if an analysis of monitoring data shows that a viable herd could be established and meet the requirements for maintaining a thriving ecological balance;

> b.  the inability to achieve Land Health Standards under any level or management of livestock use may affect the decision identifying that allotment as being available for livestock use;

> c.  consultations resulting in new requirements or actions that are not in conformance with the existing land use plan to protect threatened or endangered species or critical habitats may require new land use plan decisions, including new or supplemental NEPA analysis;

> d.  new requirements or actions that affect land use allocations or areawide constraints or restrictions established at the land use plan level would require amendment of land use plan decisions;

> e.  current scientific knowledge, as reflected in scientific literature, could highlight a need to change plan decisions; and

> f.  public comment or a staff assessment supporting a different mix of uses on the lands that will better promote the long-term health and sustainability of the lands and their resources could require an amendment.

3.  Are implementation decisions no longer valid, based on new information or changed circumstances?  Site-specific resource-use levels or management actions normally do not require a land use plan amendment if the land use plan decisions provide broad direction for these uses and actions; however, they may require appropriate NEPA analysis.  For example:

BLM_0007963

40

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a. The level of livestock use permitted in an allotment may normally be modified based on allotment-specific resource assessment, condition, and trend-monitoring data.

b. Resource use levels or management practices, such as permitted livestock use or pre-commercial forest thinning, may normally be modified or eliminated on a site-specific or project-level basis to satisfy the needs of threatened or endangered species or their critical habitat, as detailed in biological opinions or approved recovery plans. Elimination of livestock grazing on an entire allotment is a management decision that should be thoroughly analyzed through the plan amendment process and not through a maintenance action.

4. Are the effects of proposed or ongoing actions substantially different from those projected in the existing NEPA analyses associated with the existing RMP? If "yes," conduct a new or supplemental NEPA analysis to the extent necessary to address the differences and document the findings. Determine whether the new NEPA analysis should be conducted as part of a RMP plan amendment.

a. Consider direct and indirect effects and their significance.

b. Consider cumulative effects and whether the new information or circumstances identify or produce incremental impacts added to those resulting from other past, present, and reasonably foreseeable future management actions. Does the additional effect, in the context of the ongoing action, require further mitigation or new RMP decisions?

For example, upon receipt of a proposal to develop an oil and gas field, the BLM would evaluate the proposal for conformance with the RMP. If the proposal is consistent with the reasonably foreseeable development analyzed in the RMP/EIS and the proposal is consistent with the RMP decisions, changes to the RMP/EIS are probably not necessary. In this instance, the BLM would work with the lease holders to obtain appropriate site-specific information, then prepare an activity-level EA or EIS to approve some or all of the wells in the field and set the stage for subsequent application for permit to drill approvals.

If the proposal exceeds the reasonably foreseeable development analyzed in the current RMP/EIS, a new reasonably foreseeable development scenario and NEPA analysis supplementing the RMP/EIS would be warranted. If the proposal exceeds *and* is substantially different from the reasonably foreseeable development analyzed in the RMP/EIS, *and* the new NEPA analysis could reasonably be expected to result in changes to RMP decisions, a plan amendment may also be warranted. When it is not certain whether the project proposal and resulting NEPA analysis will result in the need to amend the RMP, considerable time and cost savings will be achieved by beginning the process as a plan amendment (issuing a NOI). If it is later determined that a plan amendment is not warranted, the amendment may be cancelled and the supplemental NEPA analysis continued.

BLM_0007964

The supplemental EIS/RMP amendment could also address site-specific review for some or all of the proposed wells and related facilities so that decisions on the field development could be made sequentially with the decisions regarding the proposed RMP amendment.  Where site-specific development proposals are known, such a planning/NEPA effort would promote efficient NEPA analysis and result in both plan-level and implementation-level decisions in the same document, thus reducing the need for additional NEPA analysis.

5.  In light of new information or circumstances, are there now inconsistencies between the ongoing action and the resource-related plans of Indian Tribes, state and local governments, or other Federal agencies that render earlier consistency findings invalid? Changes in land use plan decisions through amendment or revision must be accompanied by new consistency determinations.

Further NEPA analysis may be conducted to help determine whether decisions are still valid.  It is possible to conduct additional NEPA analysis and reach a conclusion that no change is needed in decisions, but the decisions cannot be changed without additional NEPA analysis.

## D.  Documenting the Determination to Modify, or Not to Modify, Decisions or NEPA Analysis

It is important to document decisions to modify or not modify the land use plan or NEPA analysis when these decisions are reached as part of the formal land use plan evaluation process (Section V).  In reviewing new information or circumstances that are controversial or of interest to the public, it is also important to provide all interested parties with written documentation of the BLM's determination.

In response to an outside application or internal proposal, a decision not to change land use decisions will be documented in the case file and/or in the response to the applicant.  Case file documentation of decisions to not amend must be signed and dated by the Field Manager and State Director.  If the decision not to amend the plan was made through a NEPA analysis, then that decision can be documented in the Plan Conformance section of the NEPA document.  If the decision is to change decisions or revisit the NEPA analysis, the rationale to modify, revise, or further evaluate decisions or NEPA analysis may be documented in a NOI prepared during scoping activities or in the planning or NEPA document.  Also see Section VII(B).

## E.  Evaluating New Proposals

New proposals can stem from specific BLM implementation actions, such as a proposal to prepare a livestock grazing allotment management plan, or from non-BLM-initiated proposals, such as a rights-of-way request for a new powerline.
A new proposal should provide enough detail to allow the BLM to determine whether it conforms to existing land use plan decisions and to facilitate screening for adequate NEPA compliance (See Figure 3).  The NEPA Handbook (H-1790-1) describes the screening process in more detail.

BLM_0007965

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## F.  Plan Conformance

The term "plan conformance," as defined in the BLM planning regulations, means either that the plan specifically identifies a resource management action or (if not) the action is consistent with the terms, conditions, and decisions of the approved plan (43 CFR 1601.0-5(b)).  Key considerations in making and documenting conformance determinations include the following:

> 1.  Do land use plan decisions allow, conditionally allow, or preclude the action?
>
> 2.  Do land use plan decisions call for a new decision to accommodate the action?
>
> 3.  If the plan does not specifically mention the action, how clearly consistent is the action with plan objectives, terms, conditions, and decisions?

## G.  Plan Conformance and Ongoing NEPA Activities

After the RMP is approved, any authorizations and management actions approved based on an activity-level or project-specific EIS (or EA) must be specifically provided for in the RMP or be consistent with the terms, conditions, and decisions in the approved RMP.  A land use plan amendment may be necessary to consider monitoring and evaluation findings, substantive new data, new or revised policy, changes in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the approved RMP.  If the BLM determines that a plan amendment may be necessary, preparation of the EIS (or EA) and the analysis necessary for the amendment may occur simultaneously (43 CFR 1610.5).

In those instances when activity-level or project-specific EISs (or EAs) are being used to analyze an action that may not conform to the current land use plan, the BLM has several options:  adjust the actions or condition the authorization to conform to the plan or achieve consistency with the terms, conditions, and decisions in the approved RMP; or prepare the EIS (or EA) as a RMP amendment, as described in Section VII.

BLM_0007966

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

---

### Key for Evaluating New Proposals

*This key poses the six critical screening questions (1 through 6 below) for any proposal or action (see BLM NEPA Handbook [H-1790-1] for additional detail).*

1. If the proposal or action conforms to existing land use plans, **go to 2.**
1. If the proposal or action does not, **go to 1a.**

    1a. If proposal or action warrants further consideration, **then amend plan[1] or modify proposal to conform.**
    1a. If proposal or action does not, **then deny action.**

2. If proposal or action is an exception from BLM/NEPA requirements, **then no additional NEPA analysis is necessary.**
2. If not, **then go to 3.**

3. If proposal or action normally requires an EIS, **go to 3a.**
3. If not, **go to 4.**

    3a. If impacts are expected to be significant, **go to 8.**
    3a. If not, **go to 7.**

4. If proposal or category of action is listed as a Categorical Exclusion, **go to 4a.**
4. If not, **go to 5.**

    4a. If any of the 10 exceptions apply, **go to 7.**
    4a. If none apply, **then the proposal or action is Categorically Excluded.**

5. If existing analysis and documentation is sufficient, **then Document NEPA Adequacy.**
5. If insufficient, **then go to 6.**

6. If environmental impacts are expected to be significant, **go to 8.**
6. If insignificant, **go to 7.**

7. Complete EA; if no significant impacts are identified, **then issue FONSI.**
7. Complete EA; if significant impacts are identified, **go to 8.**

8. **Proposal or action requires an EIS.**

---
[1] This may also be accomplished through a new plan, plan revision, or planning analysis.

**Figure 3—***Key for evaluating new proposals (an overview)*

BLM_0007967

44

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## H.  Determining When to Update Land Use Plan Decisions Through Maintenance Actions

The BLM regulation in 43 CFR 1610.5-4 provides that land use plan decisions and supporting components can be maintained to reflect minor changes in data.  Maintenance is limited to further refining, documenting, or clarifying  a previously approved decision incorporated in the plan.  Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved plan.

Plan maintenance is not considered a plan amendment and does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions.  Maintenance actions must be documented in the plan or supporting components (i.e., recorded so that the change and Field Manager concurrence are evident).   Examples of maintenance actions include:

  1.  Correcting minor data, typographical, mapping, or tabular data errors in the planning records after a plan or plan amendment has been completed;

  2.  refining the boundary of an archaeological district based on new inventory data;

  3.  applying an existing oil and gas lease stipulation to a new area prior to the lease sale based on new inventory data (e.g., apply an existing protective stipulation for sage-grouse to a newly discovered sage-grouse lek);

  4.  refining the known habitat of a special status species addressed in the plan based on new information;

  5.  modifying or waiving the lease stipulation language in the RMP consistent with the criteria outlined in the land use plan; and

  6.  refining or adjusting the boundary of a fire management unit (FMU) or other equivalent fire-related polygon through interagency coordination based on updated fire regime condition class inventory, fire occurrence, monitoring data, and/or demographic changes.

Plan maintenance must occur continuously so that the RMP and its supporting records reflect the current status of decision implementation and knowledge of resource conditions.

## VII. Amending and Revising Decisions

## A.  Changing Land Use Plan Decisions

Land use plan decisions are changed through either a plan amendment or a plan revision.  The process for conducting plan amendments is basically the same as the land use planning process used in creating RMPs.  The primary difference is that circumstances may allow for completing a plan amendment through the EA process, rather than through the EIS or supplemental EIS process.  The process for preparing plan revisions is the same as for preparing new RMPs, and an

BLM_0007968

45

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

EIS is always required.  Refer to Section III for an overview of the EIS-level and EA-level planning processes.

## B.  Determining When it is Necessary to Amend Plans and How it is Accomplished

Plan amendments (see 43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan.  These decisions may include those relating to desired outcomes; measures to achieve desired outcomes, including resource restrictions; or land tenure decisions.  Plan amendments are most often prompted by the need to:

    1.  Consider a proposal or action that does not conform to the plan;

    2.  implement new or revised policy that changes land use plan decisions, such as an approved conservation agreement between the BLM and the USFWS;

    3.  respond to new, intensified, or changed uses on public land; and

    4.  consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

The BLM regulations in 43 CFR 1600 and the NEPA process detailed in the CEQ regulations in 40 CFR 1500 guide preparation of plan amendments.  The process is tailored to the anticipated level of public interest and potential for significant impacts.  In simple, routine cases, it is possible to complete the amendment process in less than 6 months.  See Section III for procedures for preparing land use plan decisions.

Plans needing amendment may be grouped geographically or by type of decision in the same amendment process.  Similarly, one amendment process may amend the same or related decisions in more than one land use plan.  The amendment process may also be used to update plans adopted from another agency.

In reaching a decision to amend a land use plan, the BLM must not only consider the resource, but also other workload priorities, budgetary constraints, and staff capabilities.  In situations where available budgets allow and staff capabilities are restricted, consider contracting for all or portions of the plan amendment's NEPA analysis, including baseline data acquisition.  If the manager decides not to amend, then nonconforming actions cannot be taken.  Any proposal requiring an activity-level or project-specific and programmatic EIS that could result in new or modified RMP decisions, or the need to amend the current RMP prior to implementation, should be prepared as a RMP amendment whenever feasible.

Activity-level or project-specific EISs that address significant new information or circumstances not considered in the EIS for the current land use plan should be prepared as supplements to the EIS for the RMP whenever feasible.  In most cases, if a supplement to the RMP/EIS is necessary, the BLM should also consider whether or not a simultaneous plan amendment is necessary.

BLM_0007969

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Where a proposal is not in conformance with the land use plan, the Field Manager may deny the proposal without further review. The decision to deny is subject to appeal to IBLA.

An applicant may request that BLM amend the land use plan to allow an otherwise non-conforming proposal. If the Field Manager determines that the request is warranted, a plan amendment is initiated. If not warranted, the Field Manager submits to the State Director a recommendation to deny, along with appropriate supporting documentation. Denial of a request to amend the plan is a plan level decision made by the State Director and is protestable to the BLM director under 43 CFR 1610.5-2(a) (*Carrasco, 90 IBLA 39 (1985)*).

The State Director may terminate an ongoing plan amendment at any point if the Field Manager provides documentation that the amendment is no longer necessary or appropriate. This is also a protestable decision under 43 CFR 1610.5-2(a).

In either case, whether an appealable or protestable action is taken, the Field Manager should provide public notice of the action and the applicable protest or appeal procedures through news release, letter to mailing list, or other appropriate means. No *Federal Register* notice is required.

## C. **Determining When it is Necessary to Revise an RMP or Replace an MFP**

RMP revisions (see 43 CFR 1610.5-6) involve preparation of a new RMP to replace an existing one. RMP revisions are necessary if monitoring and evaluation findings, new data, new or revised policy, or changes in circumstances indicate that decisions for an entire plan or a major portion of the plan no longer serve as a useful guide for resource management. Plan revisions are prepared using the same procedures and documentation as for new plans.

As funding and capability permit, all MFPs will be replaced by RMPs. The priority for replacing MFPs will be guided by the extent to which those plans fail to meet the statutory requirements for land use planning in FLPMA (see Section II(A)), and the need to modify decisions to meet resource management needs.

## D. **Changing Implementation Decisions**

Implementation decisions are changed through an interdisciplinary NEPA process in conjunction with the BLM resource program-specific guidance.

Any NEPA analysis that will be used to approve on-the-ground actions in conformance with the current RMP should include the appropriate level of site-specific information to facilitate approval of as many of the implementation actions as possible and reduce the need for additional NEPA analysis.

During an on-going RMP revision, it is possible to amend the current RMP to implement an action analyzed in an activity-level or project-specific EA or EIS. The BLM must carefully consider the implications of the information and analysis being prepared for either document. At a minimum, the documents must be carefully coordinated to ensure consistent utilization of available information and analysis.

BLM_0007970

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## E.  Status of Existing Decisions During the Amendment or Revision Process

Existing land use plans decisions remain in effect during an amendment or revision until the amendment or revision is completed and approved.  The decisions of existing land use plans do not change.  For example, if current land use plans have designated lands open for a particular use, they remain open for that use.  Land use plan decisions may be changed only through the amendment or revision process.

During the amendment or revision process, the BLM should review all proposed implementation actions through the NEPA process to determine whether approval of a proposed action would harm resource values so as to limit the choice of reasonable alternative actions relative to the land use plan decisions being reexamined.  Even though the current land use plan may allow an action, the BLM manager has the discretion to defer or modify proposed implementation-level actions and require appropriate conditions of approval, stipulations, relocations, or redesigns to reduce the effect of the action on the values being considered through the amendment or revision process.  The appropriate modification to the proposed action is subject to valid existing rights and program-specific regulations.  A decision to temporarily defer an action could be made where a different land use or allocation is currently being considered in the preferred alternative of a draft or proposed RMP revision or amendment.  These decisions would be specific to individual projects or activities and must not lead to an area-wide moratorium on certain activities during the planning process.

## F.  Coordinating Simultaneous Planning/NEPA Processes

When preparing an activity-level or project-specific EIS (or EA) during an on-going RMP revision (with its accompanying EIS), there may be opportunities to consolidate some components of the NEPA process, such as the cumulative effects analysis, and public involvement activities, such as public meetings and mailings, to reduce overall costs and simplify the overlapping processes for the public.  Depending on the timing of the two decisions (one for the activity-level or project-specific EIS or EA and one for the on-going RMP revision), and the conformance of the management actions to be approved in the EIS or EA, the BLM may chose to amend the RMP in order to implement the proposed actions being analyzed in the EIS or EA prior to completing the on-going RMP revision.  In such cases, the BLM must consider the effect of amending the RMP on the on-going RMP revision process.  Depending on the nature of the new land use plan decisions, the alternatives to be considered in the on-going RMP revisions process, such as the no action alternative, may need to be modified.  Any land use plan decision changed during the on-going RMP revision process could also have a "ripple" effect on many elements of the analysis being prepared for the on-going RMP, such as the purpose and need, affected environment, and environmental effects section.

BLM_0007971

Case No. 1:20-cv-02484-MSK   Document 28-3   filed 04/27/21   USDC Colorado   pg 98 of 363

## Glossary of Terms and Acronyms

Following are the acronyms and definitions for terms used in this Handbook.  Also see definitions for terms used in Section 103 of FLPMA and the planning regulations at 43 CFR 1601.0-5.  This glossary does not supersede these definitions or those in other laws or regulations.

### Terms

**Activity plan** ~ a type of implementation plan (see *Implementation plan*); an activity plan usually describes multiple projects and applies best management practices to meet land use plan objectives.  Examples of activity plans include interdisciplinary management plans, habitat management plans, recreation area management plans, and allotment management plans.

**Alternative dispute resolution** ~ any process used to prevent, manage, or resolve conflicts using procedures other than traditional courtroom litigation or formal agency adjudication.

**Amendment** ~ the process for considering or making changes in the terms, conditions, and decisions of approved RMPs or MFPs.  Usually only one or two issues are considered that involve only a portion of the planning area.

**Assessment** ~ the act of evaluating and interpreting data and information for a defined purpose.

**Beneficial outcomes** ~ also referenced as "Recreation Benefits"; improved conditions, maintenance of desired conditions, prevention of worse conditions, and the realization of desired experiences.

**Best management practices (BMPs)** ~ a suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes.  BMPs are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory.  They may be updated or modified without a plan amendment if they are not mandatory.

**Broadscale data** ~ broadscale data sets are intended to support state, multi-state, or regional information needs.  Such data could be used for bioregional assessments and conservation strategies, and typically employ a map scale of 1:250,000.

**Categorical exclusion (CX)** ~ a category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an EIS is required (40 CFR 1508.4).

**Closed** ~ generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.  For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to off-highway vehicle use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders.

BLM_0007972

H-1601-1 — LAND USE PLANNING HANDBOOK

**Collaboration** ~ a cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands.

**Collaborative partnerships** ~ refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

**Community recreation-tourism market** ~ a community or communities dependent on public lands recreation and/or related tourism use, growth, and/or development. Major investments in facilities and visitor assistance are authorized within SRMAs where BLM's strategy is to target demonstrated community recreation-tourism market demand. Here, recreation management actions are geared toward meeting primary recreation-tourism market demand for specific activity, experience, and benefit opportunities. These opportunities are produced through maintenance of prescribed natural resource and/or community setting character and by structuring and implementing management, marketing, monitoring, and administrative actions accordingly.

**Conformance** ~ means that a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation agreement** ~ a formal signed agreement between the USFWS or NOAA-Fisheries and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats to, or otherwise improve the status of a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and Federal level, as well as Tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required prior to signing the conservation agreement, or subsequently in order to implement the conservation agreement.

**Conservation strategy** ~ a strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the USFWS or NOAA-Fisheries to be Federal candidates under the Endangered Species Act.

**Consistency** ~ means that the proposed land use plan does not conflict with officially approved plans, programs, and policies of Tribes, other Federal agencies, and state and local governments (to the extent practical with Federal law, regulation, and policy).

**Cooperating agency** ~ assists the lead Federal agency in developing an EA or EIS. The CEQ regulations implementing NEPA define a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any Federal, state, local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

BLM_0007973

Case No. 1:20-cv-02484-MSK   Document 28-3   filed 04/27/21   USDC Colorado   pg 100 of 363

**Designated roads and trails** ~ specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-long.

**Desired outcomes** ~ a type of land use plan decision expressed as a goal or objective.

**Destination recreation-tourism market** ~ national or regional recreation-tourism visitors and other constituents who value public lands as recreation-tourism destinations. Major investments in facilities and visitor assistance are authorized within SRMAs where BLM's strategy is to target demonstrated destination recreation-tourism market demand. Here, recreation management actions are geared toward meeting primary recreation-tourism market demand for specific activity, experience, and benefit opportunities. These opportunities are produced through maintenance of prescribed natural resource setting character and by structuring and implementing management, marketing, monitoring, and administrative actions accordingly.

**Director (BLM Director)** ~ the national Director of the BLM.

**Documentation of Land Use Plan conformance and NEPA adequacy (DNA)** ~ a worksheet for determining and documenting that a new, site-specific proposed action both conforms to the existing land use plan(s) and is adequately analyzed in existing NEPA documents. The signed conclusion in the worksheet is an interim step in BLM's internal analysis process and is not an appealable decision.

**Environmental Justice** ~ the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Fair treatment means that no group of people, including racial, ethnic, or socio-economic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of Federal, state, local, and Tribal programs and policies (see Executive Order 12898).

**Evaluation (plan evaluation)** ~ the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented.

**Explicit recreation management objective** ~ specifically targeted recreation activity, experience, and benefit opportunities (i.e., recreation opportunity outputs) and their attainment (i.e., recreation outcomes).

**Extensive recreation management area (ERMA)** ~ a public lands unit identified in land use plans containing all acreage not identified as a SRMA. Recreation management actions within an ERMA are limited to only those of a custodial nature.

**Fine-scale data** ~ fine-scale data sets support local information needs and represent the highest thematic detail and spatial accuracy. Data at this scale are intended for project-specific planning, monitoring, and evaluation, and would be typically represented at the 1:24,000 map scale.

BLM_0007974

H-1601-1 — LAND USE PLANNING HANDBOOK

**Geographic information system** ~ a system of computer hardware, software, data, people and applications that capture, store, edit, analyze, and graphically display a potentially wide array of geospatial information.

**Goal** ~ a broad statement of a desired outcome; usually not quantifiable and may not have established timeframes for achievement.

**Guidelines** ~ actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

**Implementation decisions** ~ decisions that take action to implement land use plan decisions; generally appealable to IBLA under 43 CFR 4.410.

**Implementation plan** – an area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans (they are types of implementation plans).

**Indian Tribe (or Tribe)** ~ any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing Tribal status (listed periodically in the *Federal Register*).

**Land use allocation** ~ the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan** ~ a set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and MFPs.

**Land Use Plan boundary** ~ a BLM land use plan boundary is defined as the geographic extent of a RMP or MFP.

**Land Use Plan decision** ~ establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

**Limited** ~ generally denotes that an area or roads and trails are available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines the specific meaning of "limited" as it relates to off-highway vehicle use.

BLM_0007975

Case No. 1:20-cv-02484-MSK   Document 28-3   filed 04/27/21   USDC Colorado   pg 102 of 363

**Management decision** ~ a decision made by the BLM to manage public lands.  Management decisions include both land use plan decisions and implementation decisions.

**Midscale data** ~ midscale data sets support information needs at scales between the local and state/regional.  Such a level is usually represented at the 1:100,000 scale.  Typical usage includes land use planning, rangeland monitoring, and assessment.

**Monitoring (plan monitoring)** ~ the process of tracking the implementation of land use plan decisions and collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions.

**Multijurisdictional planning** ~ collaborative planning in which the purpose is to address land use planning issues for an area, such as an entire watershed or other landscape unit, in which there is a mix of public and/or private land ownerships and adjoining or overlapping Tribal, state, local government, or other Federal agency authorities.

**Objective** ~ a description of a desired outcome for a resource.  Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway vehicle (off-road vehicle)** ~ any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding:  (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open** ~ generally denotes that an area is available for a particular use or uses.  Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.  For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates to off-highway vehicle use.

**Planning analysis** ~ a process using appropriate resource data and NEPA analysis to provide a basis for decisions in areas not yet covered by an RMP.

**Planning criteria** ~ the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning.  Planning criteria streamline and simplify the resource management planning actions.

**Project plan** ~ a type of implementation plan (see *Implementation plan*).  A project plan typically addresses individual projects or several related projects.  Examples of project plans include prescribed burn plans, trail plans, and recreation site plans.

**Public land** ~ land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired

BLM_0007976

ownership, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

**Recreation experiences** ~ psychological outcomes realized either by recreation-tourism participants as a direct result of their onsite leisure engagements and recreation-tourism activity participation or by non-participating community residents as a result of their interaction with visitors and guests within their community and/or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation management zones (RMZ)** ~ subunits within a SRMA managed for distinctly different recreation products. Recreation products are comprised of recreation opportunities, the natural resource and community settings within which they occur, and the administrative and service environment created by all affecting recreation-tourism providers, within which recreation participation occurs.

**Recreation niche** ~ the place or position within the strategically targeted recreation-tourism market for each SRMA that is most suitable (i.e., capable of producing certain specific kinds of recreation opportunities) and appropriate (i.e., most responsive to identified visitor or resident customers), given available supply and current demand, for the production of specific recreation opportunities and the sustainable maintenance of accompanying natural resource and/or community setting character.

**Recreation opportunities** ~ favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation opportunity spectrum (ROS)** ~ one of the existing tools for classifying recreation environments (existing and desired) along a continuum ranging from primitive, low-use, and inconspicuous administration to urban, high-use, and a highly visible administrative presence. This continuum recognizes variation among various components of any landscape's physical, social and administrative attributes; and resulting descriptions (of existing conditions) and prescriptions (of desired future conditions) define recreation setting character.

**Recreation setting character conditions** ~ the distinguishing recreational qualities of any landscape, objectively defined along a continuum ranging from primitive to urban landscapes, expressed in terms of the nature of the component parts of its physical, social and administrative attributes. These recreational qualities can be both classified and mapped. This classification and mapping process should be based on variation that either exists (i.e., setting descriptions) or is desired (i.e., setting prescriptions) among component parts of the various physical, social, and administrative attributes of any landscape. The recreation opportunity spectrum is one of the existing tools for doing this.

**Recreation settings** ~ the collective, distinguishing attributes of landscapes that influence, and sometimes actually determine, what kinds of recreation opportunities are produced.

BLM_0007977

**Recreation-tourism market** ~ recreation-tourism visitors, affected community residents, affecting local governments and private sector businesses, or other constituents and the communities or other places where these customers originate (local, regional, national, or international).  Based on analysis of supply and demand, land use plans strategically identify primary recreation-tourism markets for each SRMA—destination, community, or undeveloped.

**Resource advisory council (RAC)** ~ a council established by the Secretary of the Interior to provide advice or recommendations to BLM management.  In some states, provincial advisory councils (PACs) are functional equivalents of RACs.

**Resource use level** ~ the level of use allowed within an area, based on the desired outcomes and land use allocations in the land use plan.  Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan.  Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

**Revision** ~ the process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Scale** ~ refers to the geographic area and data resolution under examination in an assessment or planning effort.

**Setting character** ~ the condition of any recreation system, objectively defined along a continuum ranging from primitive to urban in terms of variation of its component physical, social, and administrative attributes.

**Social science** ~ the study of society and of individual relationships in and to society, generally including one or more of the academic disciplines of sociology, economics, political science, geography, history, anthropology, and psychology.

**Special recreation management area (SRMA)** ~ a public lands unit identified in land use plans to direct recreation funding and personnel to fulfill commitments made to provide specific, structured recreation opportunities (i.e., activity, experience, and benefit opportunities).  Both land use plan decisions and subsequent implementing actions for recreation in each SRMA are geared to a strategically identified primary market—destination, community, or undeveloped.

**Special status species** ~ includes proposed species, listed species, and candidate species under the Endangered Species Act; state-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840, Special Status Species Policy).

**Standard** ~ a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., Land Health Standards).  To be expressed as a desired outcome (goal).

**State implementation plan (SIP)** ~ a strategic document, prepared by a state (or other authorized air quality regulatory agency) and approved by the EPA, that thoroughly describes

BLM_0007978

how requirements of the Clean Air Act will be implemented (including standards to be achieved, control measures to be applied, enforcement actions in case of violation, etc.).

**Strategic plan (DOI strategic plan)** ~ a plan that establishes the overall direction for all DOI Bureaus, including the BLM. This plan is guided by the requirements of the Government Performance and Results Act of 1993, covers a 5-year period, and is updated every 3 years. It is consistent with FLPMA and other laws affecting the public lands.

**Total maximum daily load (TMDL)** ~ an estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Travel management areas** ~ polygons or delineated areas where a rational approach has been taken to classify areas open, closed, or limited, and have identified and/or designated network of roads, trails, ways, and other routes that provide for public access and travel across the planning area. All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations.

**Tribe** ~ see Indian Tribe.

**Undeveloped recreation-tourism market** ~ national, regional, and/or local recreation-tourism visitors, communities, or other constituents who value public lands for the distinctive kinds of dispersed recreation produced by the vast size and largely open, undeveloped character of their recreation settings. Major investments in facilities are excluded within SRMAs where BLM's strategy is to target demonstrated undeveloped recreation-tourism market demand. Here, recreation management actions are geared toward meeting primary recreation-tourism market demand to sustain distinctive recreation setting characteristics; however, major investments in visitor services are authorized both to sustain those distinctive setting characteristics and to maintain visitor freedom to choose where to go and what to do—all in response to demonstrated demand for undeveloped recreation.

**Visual resource management classes** ~ categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. There are four classes. Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

**Watershed approach** – a framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed. The framework considers both ground and surface water flow within a hydrologically defined geographical area.

BLM_0007979

H-1601-1 — LAND USE PLANNING HANDBOOK

## Acronyms

| | |
|---|---|
| **ACEC** | area of critical environmental concern |
| **ADR** | alternative dispute resolution |
| **AML** | appropriate management level |
| **AMS** | analysis of the management situation |
| **APD** | application for permit to drill |
| **AUM** | animal unit month |
| | |
| **BLM** | Bureau of Land Management |
| **BMP** | best management practice |
| | |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **CX** | categorical exclusion |
| | |
| **DM** | Departmental Manual |
| **DNA** | documentation of land use plan conformance and NEPA adequacy |
| **DOI** | Department of the Interior |
| **DR** | decision record (for an EA) |
| | |
| **EA** | environmental assessment |
| **EFH** | essential fish habitat |
| **EIS** | environmental impact statement |
| **EPA** | Environmental Protection Agency |
| **EPS** | Economic Profile System |
| **EPSC** | Economic Profile System for Communities |
| **ERMA** | extensive recreation management area |
| **ESA** | Endangered Species Act |
| | |
| **FACA** | Federal Advisory Committee Act |
| **FLPMA** | Federal Land Policy and Management Act |
| **FLTFA** | Federal Land Transaction Facilitation Act |
| **FOIA** | Freedom of Information Act |
| **FONSI** | finding of no significant impact |
| | |
| **GIS** | geographic information system |
| **GSA** | Government Services Agency |
| | |
| **HA** | herd area |
| **HMA** | herd management area |
| | |
| **IBLA** | Interior Board of Land Appeals |
| **IDT** | interdisciplinary team |
| | |
| **LAC** | limits of acceptable change |

BLM_0007980

Case No. 1:20-cv-02484-MSK   Document 28-3   filed 04/27/21   USDC Colorado   pg 107 of 363

| | |
|---|---|
| **MFP** | management framework plan |
| **MOA** | memorandum of agreement |
| **MOU** | memorandum of understanding |
| | |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NLCS** | National Landscape Conservation System |
| **NMFS** | National Marine Fisheries Service |
| **NOA** | notice of availability |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **NOI** | notice of intent |
| | |
| **OEPC** | Office of Environmental Policy and Compliance |
| **OEPR** | Office of Environmental Policy Review |
| **OHV** | off-highway vehicle (also refers to off-road vehicles) |
| **OMB** | Office of Management and Budget |
| | |
| **PAC** | provincial advisory council |
| **PILT** | payments-in-lieu-of-taxes |
| **PSQ** | probable sale quantity |
| | |
| **RAC** | resource advisory council |
| **RMP** | resource management plan |
| **RMZ** | recreation management zone |
| **ROD** | record of decision (for an EIS) |
| **ROS** | recreation opportunity spectrum |
| **ROW** | right-of-way |
| | |
| **SHPO** | State Historic Preservation Office |
| **SRMA** | special recreation management area |
| | |
| **T&E** | threatened and endangered |
| **TMDL** | total maximum daily load |
| | |
| **U.S.C.** | United States Code |
| **USDA** | U.S. Department of Agriculture |
| **USFWS** | U.S. Fish and Wildlife Service |
| | |
| **VRM** | visual resource management |
| | |
| **WO** | Washington Office |

BLM_0007981

H-1601-1 — LAND USE PLANNING HANDBOOK

**Appendix A:  Guide to Collaborative Planning**

## I. Principles

Collaboration implies that Tribal, state, and local governments, other Federal agencies, and the public will be involved well before the planning process is officially initiated, rather than only at specific points stipulated by regulation and policy.  The first-hand experience of BLM Field Managers and staff has resulted in the following suggested guidelines for collaboration.

A.  *Recognize Tribal, state, and local governments' role in the planning process.*  FLPMA, Section 202(c)(9), as paraphrased, requires meaningful participation by local officials and consistency, to the extent practicable, with officially approved plans of Tribal, state, and local governments so long as the plans are consistent with Federal laws and regulations.  Early involvement will help ensure that the BLM develops land use decisions that are supported by and conform to other jurisdictions in the area to the maximum extent possible.

B.  *Be inclusive and explicitly acknowledge the interests of distant groups, individuals, industry, corporations, and other agencies.*  An effective collaborative process for public land planning assures that local, regional, and national interests are integrated.  Distant interests are sought out and encouraged.  Effective outreach is the best way to get beyond the barriers to successful participation.  Ensure multiple options for participation.

C.  *Clearly cite the authority of collaborative groups, including that of the BLM, and ensure accountability.*  Participants must understand the roles of all parties in the planning effort.  If the planning effort includes other participants with jurisdictional responsibilities or decision-making authority, the responsibilities of each must be clearly identified.  Decisions made by each jurisdiction must be within their own authorities.  The BLM retains decision-making authority for all decisions on BLM lands.  The BLM does not need to be the lead agency for agency personnel to participate in collaborative efforts.

D.  *Use collaboration to enhance and complement standard public involvement requirements.*  Individuals or groups that were unable or chose not to participate in a collaborative process are still entitled to full input through legally required public review and comment processes.

E.  *Recognize that collaborative processes may not be effective everywhere.*  The BLM manager retains the authority to manage the planning process and may choose to move forward with traditional planning processes if collaborative efforts are ineffective or become unacceptably lengthy.

BLM_0007982

Appendix A, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK

## II. Practices

A. *Face-to-face or one-on-one communication provides the best means of building trust and good working relationships.* Be sure to ask yourself and others questions such as the following:

1. Who else should I talk to? Who else should be involved? Whom do I need to approach to ensure the best contacts are made? How can the BLM assure sufficiently diverse participation to adequately reflect local, regional, and national interests?

2. What formal and informal opportunities for communication could be used to relay the BLM's message?

B. *On a local level, postings on local bulletin boards and face-to-face communication may best serve community needs when presented in both English and local languages, depending on the unique characteristics of each community.* Consider the following questions:

1. How does this community receive and send information? Would the use of Internet technology, such as websites and e-mail, be effective?

2. Are there community meetings where information and ideas are exchanged?

Although this approach may seem time consuming at first, it is eventually very effective in communicating efficiently with a large number of people, motivating people to implement the agreed upon strategy, building trust, and encouraging broad-based participation. It may seem daunting in urban settings, but the same approach can be effective once the above questions are answered. This approach provides the BLM with a technique to more effectively engage the public in the decision-making process, which normally leads to increased support for the decisions ultimately reached. This approach also provides an early alert to emerging issues, giving a BLM manager more time and flexibility to resolve issues up front. As issues are resolved dynamically, conflict diminishes. These methods can be used in advance of, and are complementary to, a standard communications plan that defines what communications products are needed, who is responsible for producing them, and when specific products must be delivered.

BLM offices should maintain mailing lists of individuals and organizations that request involvement in specific activities or areas, such as rangeland developments or ACECs. NOIs and NOAs for planning/NEPA processes, along with other materials should be provided as requested. Offices should also maintain a listing of planned or ongoing planning/NEPA processes, make these lists available to the public, and encourage public participation throughout the decision-making process.

BLM_0007983

H-1601-1 — LAND USE PLANNING HANDBOOK

## III. Benefits

Benefits of collaboration include the following:

A. *Better decisions are made.*  Concerns are heard and addressed, information and technical knowledge are shared, mutual goals and actions to achieve these goals are agreed upon, and plans are easier to implement as a result.  Solutions tend to be more long-term and hold up to legal scrutiny.  Through collaboration with different landowners and jurisdictions, BLM can more effectively plan for the protection and use of the resources it administers.

B. *Resources are leveraged more effectively.*  There are a variety of cost-share arrangements and grants available for collaborative and partnership initiatives that can help implement on-the-ground projects.

C. *Relationships are improved.*  Collaboration encourages people to continue to talk despite differences and changing circumstances, thus improving the ability to resolve conflict and build trust among participants.

## IV. Tools

It is highly recommended that training on collaborative skills be completed before undertaking initiatives to work with private citizens and groups.  The BLM National Training Center offers a series of courses, "The Partnership Series," which can be taught in BLM locations to mixed public-private audiences rather than at the National Training Center.  Visit their website at www.ntc.blm.gov/partner for more information.

Innovative partnerships and assistance agreements are very helpful to launching collaborative efforts.  The BLM Washington Office's Planning, Assessment, and Community Support Group (WO-210) can provide more information.

The BLM and the Sonoran Institute have prepared "A Desktop Reference Guide to Collaborative, Community-Based Planning" which is available at BLM state and field offices. This guide provides suggestions and examples for collaborative planning.

Also see Executive Order 13352 (Facilitation of Cooperative Conservation).

BLM_0007984

H-1601-1 — LAND USE PLANNING HANDBOOK

## Appendix B:  Federal Advisory Committee Act Considerations

### I.  Purpose

The Federal Advisory Committee Act (FACA), 5 U.S.C.A. App. 2 (86 Stat. 770, as amended), was enacted on October 6, 1972, to reduce narrow special-interest group influence on decision-makers, to foster equal access to the decision-making process for the general public, and to control costs by preventing the establishment of unnecessary advisory committees.  The FACA applies whenever a statute or an agency official establishes or utilizes a committee, board, commission or similar group for the purpose of obtaining advice or recommendations on issues or policies within the agency official's responsibility.

The BLM's managers and staff must understand the provisions of FACA both when they are gathering public input for decision-making processes and when they are working in collaborative efforts, including Alternative Dispute Resolution, to ensure BLM's collaborative efforts comply with FACA.  In essence, any time a group will be consulted or will be providing recommendations to a BLM official, the BLM should verify whether FACA applies and, if so, ensure that the FACA requirements are followed.  If the BLM fails to comply with FACA, it will leave its decisions and products open to challenge in court.

### II.  Implementing FACA

#### A.  **Avoiding Violations**

To avoid violating the FACA, BLM managers should:

> 1.  Consider whether FACA applies to any current or proposed collaborative or group activity.  FACA will apply if a group is established or utilized by the BLM for the purpose of obtaining advice.  In reaching decisions whether FACA will apply, managers should refer to the General Services Administration's (GSA) regulations at 41 CFR 102-3 and consult with the Office of the Solicitor.  Further information about when FACA applies, including the FACA regulations, can be found at www.policyworks.gov/org/main/mc/linkit.htm or in the Committee Management Secretariat section of the GSA website.

>> a.  If FACA applies, establishing a committee requires consultation with GSA, filing a charter, publishing a notice in the *Federal Register*, and opening meetings of the group to the public.  Also see 43 CFR 1784 (Advisory Committees).

>> b.  Existing groups are covered by FACA if they are "utilized" by a Federal agency.  A group is "utilized" whenever a Federal agency exercises actual management or control over its operation.

> 2.  For those groups covered by FACA, verify that its requirements are followed, including the filing of an appropriate charter, balancing the membership, informing the public of its meetings (time, place, purpose, etc.) through *Federal Register* publication,

BLM_0007985

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and opening the meetings to the public.  Consult with FACA experts to ensure compliance with its procedures.  Also see 43 CFR 1784 (Advisory Committees).

Collaborative groups that are not initiated by the BLM can avoid application of FACA and can continue to have active BLM participation by maintaining their independence from BLM actual management or control.

## B.  Determining if FACA Applies

Figure 4 outlines the basic requirements to determine if the provisions of FACA apply.  If there is any doubt, the BLM field office should consult its Solicitor.   The field office must determine whether FACA applies to a particular collaborative effort, and if it does, whether it would be beneficial to pursue the effort by chartering the group under FACA or making it a subgroup of a RAC (see 43 CFR 1784.6-2).  Answers to the following questions can be helpful in determining whether FACA does or does not apply:

1.  Does the group include individuals who are not employees of Tribal, state, or local governments or other Federal agencies?

2.  Does the group have a formal organizational structure?

3.  How was the group or meeting initiated?  Specifically, was the group established by the BLM?

4.  Is the group subject to agency actual management or control?

5.  What is the function of the group?  Is it providing consensus advice or recommendations as a group to the agency?

FACA will not apply to any meeting of more than one individual initiated by the President or Federal official(s) to obtain the advice of individual attendees, provided that the Federal official does not exercise actual management or control over the group.  FACA does not apply to meetings held exclusively between Federal officials and Tribal, state, and local elected officials, or their designated employees, where such meetings are solely for the purpose of exchanging views, information, or advice relating to the management or implementation of Federal intergovernmental programs (see Unfunded Mandates Reform Act, 2 U.S.C. 1534).

## C.  FACA Requirements

If a group is subject to FACA, there are a number of requirements that must be in place in order to proceed.  Subcommittees of established FACA committees may, under some circumstances, be subject to these requirements as well.  Specific requirements include:

1.  A charter describing the committee's function, duration, members, duties, frequency of meetings, and costs.

BLM_0007986

H-1601-1 — LAND USE PLANNING HANDBOOK

2.  A designated Federal employee to attend all meetings and to approve meeting agendas.

3.  Notices of meetings that are published in the *Federal Register* and other appropriate venues.

4.  Meetings that are open to the public, with detailed minutes prepared for public review.

Further explanation is provided in the BLM's Natural Resource Alternative Dispute Resolution Initiative Strategic Plan and Tool Kit, September 11, 1997, available at BLM state offices.

BLM_0007987

Appendix B, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



Figure 4.—*Federal Advisory Committee Act (FACA) flow chart:  Does FACA apply?*

BLM_0007988

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix C:  Program/Resource-Specific Decision Guidance

This appendix provides three categories of planning information for BLM program areas:  (1) *Land Use Plan Decisions*, (2) *Implementation Decisions*, and (3) *Notices, Consultations, and Hearings.*  Each program/resource heading contains resource-specific guidance for each category.  The guidance presented for each resource should be addressed in conjunction with the guidance presented for other resources to maintain an integrated, interdisciplinary approach to planning.

**1.  *Land Use Plan Decisions.***  These broad-scale decisions guide future land management actions and subsequent site-specific implementation decisions.  Land use plan decisions fall into two categories:  desired outcomes (goals and objectives), and allowable uses and actions to achieve outcomes.  Proposed land use plan decisions are protestable to the BLM Director but are not reviewable by the Office of Hearings and Appeals.

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

I.  *Natural, Biological, and Cultural Resources:*  Decisions identified must be made during the land use planning process if the resource exists in the planning area.

II.  *Resource Uses:*  Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use.  If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.

III.  *Special Designations:*  Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation.  Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.

IV.  *Support:*  Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

**2.  *Implementation Decisions.***  Implementation decisions generally constitute the BLM's final approval allowing on-the-ground actions to proceed.  These types of decisions require site-specific planning and NEPA analysis.  They may be incorporated into implementation plans (activity  or project plans) or may exist as stand-alone decisions.  Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP *(High Desert Multiple Use Coalition, Inc. et al. Keith Collins, 142 IBLA 285 (1998)).*

BLM_0007989

Appendix C, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**3.** ***Notices, Consultations, and Hearings.*** This section identifies resource-specific requirements and suggestions for notices, consultations, and hearings when developing Land use plan decisions that are in addition to those identified in Section III of this Handbook. *Note:* Some laws or regulations, such as the Endangered Species Act, National Historic Preservation Act, and Clean Air Act, have notice, consultation, or hearing requirements that apply to most resource programs, resource uses, or activities. These requirements are identified in the primary program narrative but are not repeated for each resource program, resource use, or activity that may be affected.

## I.  Natural, Biological, and Cultural Resources

## A.  <u>Air</u>

***Land Use Plan Decisions.*** Identify desired outcomes and areawide criteria or restrictions, in cooperation with the appropriate air quality regulatory agency, that apply to direct or authorized emission-generating activities, including the Clean Air Act's requirements for compliance with:

1. Applicable National Ambient Air Quality Standards (Section 109);
2. State Implementation Plans (Section 110);
3. Control of Pollution from Federal Facilities (Section 118);
4. Prevention of Significant Deterioration, including visibility impacts to mandatory Federal Class I Areas (Section 160 et seq.); and
5. Conformity Analyses and Determinations (Section 176(c)).

***Implementation Decisions.*** Identify site-specific emission control strategies, processes, and actions to achieve desired air quality conditions from direct or authorized emission-generating activities.

***Notices, Consultations, and Hearings.*** Consult, coordinate, and comply with applicable Tribal, Federal, state, and local air quality regulations, as required by the Clean Air Act, Executive Order 12088, and Tribal, Federal or state implementation plans. Each field office should work closely with counties or states on the development or amendment of state implementation plans.

## B.  <u>Soil and Water</u>

***Land Use Plan Decisions.*** Identify desired outcomes (including standards or goals under the Clean Water Act). Identify watersheds or specific soils that may need special protection from the standpoint of human health concerns, ecosystem health, or other public uses. For riparian areas, identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics. Identify areawide use restrictions or other protective measures to meet Tribal, state, and local water quality requirements. Identify measures, including filing for water rights under applicable state or Federal permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems.

BLM_0007990

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Implementation Decisions.*** Identify site-specific management opportunities and priorities by using a watershed approach and watershed assessment information. Identify the site-specific or basin-specific soil, riparian, or nonpoint-source best management practices and rehabilitation techniques needed to meet Tribal, state, and local water quality requirements.

***Notices, Consultations, and Hearings.*** Consult and coordinate with other Federal, state, and local agencies, as directed by the Watershed Protection and Flood Prevention Act (16 U.S.C. 1001-1009), and the Clean Water Act (33 U.S.C. 1251) (see BLM Manual 7000). Collaborate with local watershed groups when developing activity plans.

## C. <u>Vegetation</u>

***Land Use Plan Decisions.*** Identify desired outcomes for vegetative resources, including the desired mix of vegetative types, structural stages, and landscape and riparian functions; and provide for native plant, fish, and wildlife habitats and livestock forage. Desired outcomes (goals and objectives) may be established at multiple scales. Identify areas of ecological importance and designate priority plant species and habitats, including special status species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age. Identify the actions and areawide use restrictions needed to achieve desired vegetative conditions.

Reference materials for establishing desired outcomes for vegetative resources include:

1. National Range and Pasture Handbook (1997): Natural Resource Conservation Service (USDA- NRCS) Methodology of Vegetation Inventory, Monitoring, Analysis and Management of Grazing Lands.

2. Interpreting Indicators of Rangeland Health: BLM Technical Reference 1734-6.

3. Ecological Site Inventory: BLM Technical Reference 1734-7.

4. Rangeland Health Standards: H-4180-1.

5. Website examples of ecological site descriptions (use Internet Explorer):

- http://esis.sc.egov.usda.gov
- http://www.nm.nrcs.usda.gov/technical/fotg/section-2/ESD.html
- http://www.mt.nrcs.usda.gov/technical/ecs/range/ecolsites/

In areas where Healthy Forests Restoration Act authorities are to be used, identify old growth forest stands or describe a process for identifying old growth forest stands in the land use plan based on the structure and composition characteristic of the forest type. Provide management direction to maintain, or contribute toward the restoration of, the structure and composition of old growth forest stands in areas where these authorities will be used. This management direction should consider the pre-fire exclusion old growth conditions characteristic of the forest

BLM_0007991

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

type, taking into account the contribution of the stand to landscape fire adaptation and watershed health, and retaining the large trees contributing to old growth structure.

***Implementation Decisions.***  Identify site-specific vegetation management practices such as allotment grazing systems, vegetation treatments, or manipulation methods (including fuels treatments) to achieve desired plant communities, as well as integrated vegetation management techniques to rehabilitate weed infestations or otherwise control noxious and invasive weeds.

Identify old-growth stands and management practices to achieve old-growth management direction where applicable.  Identify old-growth stands and management practices to achieve old-growth management direction where applicable.

***Notices, Consultations, and Hearings.***  Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction of adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840).  Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

## D.  Special Status Species

***Land Use Plan Decisions.***  Identify desired outcomes, strategies, restoration opportunities, use restrictions, and management actions to conserve and recover special status species.  Desired outcomes may incorporate goals and objectives from recovery plans and conservation strategies or identify ecologically important areas or scarce, limited habitats.  Goals and objectives may be species or habitat specific and can be established at multiple scales (i.e., fine, mid, and broad) to fully understand the context of the larger landscape.

Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all special status species, land use planning strategies, desired outcomes, and decisions should result in a reasonable conservation strategy for these species.  Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans.  This may include identifying stipulations or criteria that would be applied to implementation actions.  Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

***Implementation Decisions.***  Identify the programmatic and site-specific actions needed to implement planning decisions for conserving and recovering special status species.  These decisions may be identified in implementation plans for habitat management areas, ACECs, and grazing allotments, etc.

BLM_0007992

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Notices, Consultations, and Hearings.***  Consultation with the USFWS or NOAA-Fisheries is required by the Endangered Species Act for actions that may affect listed species and designated critical habitat, and conferencing is needed if actions are likely to jeopardize the continued existence of a proposed species, or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Manual Section 6840).  Depending on state-specific agreements or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

1. *Interagency Agreements on Consultation.*  The BLM has entered into a variety of Memoranda of Agreement and Memoranda of Understanding regarding consultation on agency actions to help streamline and bring greater efficiency to the consultation process.  A key element of these includes utilizing early involvement of regulatory agency personnel in the planning process.  Including representatives from these agencies on the planning team during development of alternatives could improve the BLM's ability to address and discuss the effects of management direction on listed and proposed species and their critical habitats.  For additional direction and guidance, consult the most current versions of these Memoranda.

2. *Initial Effects Determination.*  During preparation of draft land use plan decisions and associated NEPA analysis, the BLM makes an initial determination of effects to listed or proposed species.  If the BLM makes a determination of "no effect" on the preferred alternative, informal consultation is not required.

3. *Informal Consultation.*  Informal consultation should be initiated on the preferred alternative with the USFWS or the NOAA-Fisheries if the initial BLM determination is "not likely to adversely affect" listed species or designated critical habitat.  ."Not likely to adversely affect" determinations are reached when effects of the action are insignificant, discountable, or completely beneficial.  **Beneficial effects** are contemporaneous positive effects without any long-term adverse effects to the species.  **Insignificant effects** relate to the size of the impact and cannot be meaningfully measured.  **Discountable effects** are those that have an extremely low probability of occurring.

Informal consultation is concluded if the Services concur with the BLM determination.  This concurrence must be documented in the planning record by a written letter of concurrence from the USFWS or NOAA-Fisheries.  If the Services do not concur with the BLM determination, formal consultation must be initiated.

3. *Formal Consultation.*  Formal consultation is required when proposed management direction and resource allocations in the preferred alternative are determined to be "likely to adversely affect" to listed species or designated critical habitat.  The Endangered Species Act and 50 CFR 402.16 outline criteria for re-initiating consultation when there has been significant change since the original consultation was completed.  Based on these criteria, consultation on land use plan and implementation decisions must be re-initiated for any of the following reasons:

BLM_0007993

a)  New information shows that the plan decisions may affect listed or proposed species or critical habitat in a way or to an extent not previously considered;

b)  land use plan and/or implementation decisions are modified in a way that may cause adverse effects to the listed or proposed species or critical habitat that were not considered in the biological opinion;

c)  implementation of existing land use plan decisions could affect a newly listed species or newly designated critical habitat; or

d)  the amount or extent of incidental take is exceeded.

4.  *Conferencing.*  The BLM will conference with the Services on any action which is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat.  The conference is designed to assist the Federal agency and any applicant in identifying and resolving potential conflicts at an early stage in the planning process.  Conferencing includes informal discussions concerning an action that is likely to jeopardize the continued existence of the proposed species or results in the destruction or adverse modification of the proposed critical habitat at issue.

5.  *Consultation under Endangered Species Act with Indian Tribes.*  Department of the Interior's Secretarial Order 3206, American Indian Tribal Rights; Federal-Tribal Trust Responsibilities; and the Endangered Species Act; requires Interior agencies to consult with Indian Tribes when agency actions to protect a listed species, as a result of compliance with Endangered Species Act, affect or may affect Indian lands, Tribal trust resources, or the exercise of American Indian Tribal rights.  Consultation under this Order should be closely coordinated with regional or field offices of the USFWS and/or NOAA-Fisheries for game and non-game species.

## E.  **Fish and Wildlife**

***Land Use Plan Decisions.***  Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age.  Identify desired outcomes using BLM strategic plans, state agency strategic plans, and other similar sources.

Describe desired habitat conditions and/or population for major habitat types that support a wide variety of game, non-game, and migratory bird species; acknowledging the states' roles in managing fish and wildlife, working in close coordination with state wildlife agencies, and drawing on state comprehensive wildlife conservation strategies.  Identify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships.  (Also see previous Section D, Special Status Species.)  Identify essential fish habitat (EFH) for federally managed fish species (Oregon, Washington, California and Idaho only).

BLM_0007994

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Implementation Decisions.***  In coordination with state wildlife agencies, identify site-specific actions, such as riparian fencing, guzzler placement, fuels management, etc., needed to manage ecosystems for all species and habitat for special status species.  Identify specific measures to conserve and enhance EFH.

***Notices, Consultations, and Hearings.***  Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries, for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840).  Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.  Consult with the NOAA-Fisheries on any action authorized, funded, or undertaken that may impact EFH (through existing environmental review processes in accordance with NEPA).  Comply with Executive Order 13186 for the conservation of migratory birds.

## F.  Wild Horses and Burros

***Land Use Plan Decisions.***  Identify the following (see 43 CFR 4700):

1.  *Herd Areas.*  Herd areas (HAs) are limited to areas of the public lands identified as being habitat used by wild horses and burros at the time of the passage of the Wild Horse and Burro Act, as amended (16 U.S.C. 1331-1340).  HA boundaries may only be changed when it is determined that (1) areas once listed as HAs are later found to be used only by privately-owned horses or burros, or (2) the HA boundary does not correctly portray where wild horses and burros were found in 1971.

2.  *Herd Management Area Designation.*  Herd management areas (HMAs) are established only in HAs, within which wild horses and/or burros can be managed for the long term.  For HMAs, identify the following:

   a)  Initial and estimated herd size that could be managed while still preserving and maintaining a thriving natural ecological balance and multiple-use relationships for that area.
   b)  Guidelines and criteria for adjusting herd size.

3.  *Herd Areas Not Designated as Herd Management Areas.*  Where appropriate, the land use plan may include decisions removing horses from all or part of a HA.  Examples include intermingled and unfenced lands within HAs where private landowners do not want to make them available for wild horse or burro use; or essential habitat components are not available for wild horse or burro use within a HA.

4.  *Wild Horse and Burro Ranges.*  An HMA may be considered for designation as a wild horse or burro range when there is a significant public value present, such as unique characteristics in a herd or an outstanding opportunity for public viewing.

BLM_0007995

*5. Areawide Restrictions Needed to Achieve Objectives.* For example, if domestic horses in HMAs are not compatible with wild horse management policies, then, domestic horse grazing must not be permitted in HMAs or adjacent to HMAs if domestic and wild horses are likely to intermingle.

***Implementation Decisions.*** Identify and set objectives for herd composition, animal characteristics, and habitat development needs. Establish appropriate management levels (AMLs) based on monitoring and evaluations, including the population range within which the herd size will be allowed to fluctuate. *(Commission for the Preservation of Wild Horses, et al., 139 IBLA 24 (1997).)*

***Notices, Consultations, and Hearings.*** The Wild and Free-Roaming Horses and Burros Act, as amended (16 U.S.C. 1331-1340) requires BLM to consult with Federal and state wildlife agencies and all other affected interests during land use and implementation planning for the management of wild horses and burros.

Public hearings are required when anticipated management activities involve the use of helicopters to capture, or the use of motor vehicles to transport, wild horses and burros. Hearings are held in the state where the activities are proposed and are normally conducted on an annual basis (see 43 CFR 4740).

## G. Cultural Resources

***Land Use Plan Decisions.*** Identify special cultural resource restrictions that may affect the location, timing, or method of development or use of other resources in the planning area. Identify site-specific use restrictions from cultural resources currently being actively managed. Identify area wide criteria for recognizing potential cultural resource conflicts, such as geographic characteristics of sacred sites, historic properties, or cultural landscapes (springs, ridges, peaks, caves, and rock shelters, for example). Consider these restrictions and criteria in all proposed land and resource use decisions. Identify measures to pro-actively manage, protect, and use cultural resources, including traditional cultural properties.

The scope and scale of cultural resource identification are much more general and less intensive for land use planning than for processing site-specific use proposals. Instead of new, on-the-ground inventory, the appropriate identification level for land use planning is a regional overview: (1) a compilation and analysis of reasonably available cultural resource data and literature, (2) a management-oriented synthesis of the resulting information that includes priorities and a strategy for accomplishing needed inventory (see Manual Section 8110.) If land use decisions, however, are more specific in terms of impacts, they may require a more detailed level of identification of the scope and nature of cultural resources during land use planning.

RMPs will include at least the following two goals:

1. Identify, preserve, and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103

BLM_0007996

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

(c), 201(a) and (c); National Historic Preservation Act, Section 110(a); Archaeological Resources Protection Act, Section 14(a)).

2.   Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA Sec. 103(c), NHPA 106, 110 (a) (2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.

All cultural properties in the RMP area, whether already recorded or projected to occur on the basis of existing-data synthesis, including cultural landscapes, will be allocated to the uses listed in Table C-1 according to their nature and relative preservation value.  These use allocations pertain to cultural resources, not to areas of land.

**Table C-1.—Cultural use allocations and desired outcomes**

| Use allocation [1] | Desired outcomes |
|---|---|
| a. Scientific use | Preserved until research potential is realized |
| b. Conservation for future use | Preserved until conditions for use are met |
| c. Traditional use | Long-term preservation |
| d. Public use | Long-term preservation, on-site interpretation |
| e. Experimental use | Protected until used |
| f. Discharged from management | No use after recordation; not preserved |

[1] The majority of the cultural properties in a given geographic area will fall into categories (a) and (f).  The less-common properties in categories (b)–(e) are likely to be associated with particular settings that can be delineated geographically in the planning process.  As the plan is developed, properties in categories b–d will require the most attention to balance their proactive uses with other land and resource uses.

***Implementation Decisions.***  Identify site-specific information needs, impacted resources, protection measures and opportunities to use cultural properties for scientific, educational, recreational, and traditional purposes.  Evaluate whether intended uses would result in changes to cultural properties' significance or preservation value, and if so, how resource condition should be monitored, measured, and maintained at an acceptable level.

1.   Cultural properties allocated to uses are subject to the management actions listed in Table C-2 to realize their use potential.

**Table C-2.—Cultural use allocations and management actions**

| Use allocation | Management |
|---|---|
| a. Scientific use | Permit appropriate research, including date recovery |
| b. Conservation for future use | Propose protective measures/designations [1] |
| c. Traditional use | Consult with Tribes; determine limitations [1] |
| d. Public use | Determine permitted use [1] |
| e. Experimental use | Determine nature of experiment |
| f. Discharged from management | Remove protective measures |

[1] Safeguards against incompatible land and resource uses may be imposed through withdrawals, stipulations on leases and permits, design requirements, and similar measures which are developed and recommended by an appropriately staffed interdisciplinary team.

BLM_0007997

Appendix C, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  Categorize geographic area as high/medium/low priority for future inventory of cultural properties.

3.  All authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act, consistent with and subject to the objective established in the RMP for the proactive use of cultural properties in the public interest (NHPA Sec. 106, 101(d)(6), 110(a)(2)(E); national BLM-ACHP-NCSHPO Programmatic Agreement of March 1997).

***Notices, Consultations, and Hearings.***

1.  Consistent with the national Programmatic Agreement and individual state BLM-SHPO protocols, invite the State Historic Preservation Officer (SHPO) to participate from the outset of planning in order to reduce the potential for cultural resource conflicts with other resource uses as plans are implemented.

2.  For states not operating under a BLM-SHPO protocol, such as Eastern states, consult with the SHPO before plan approval concerning any actions that may be directly implemented upon plan approval and could affect a cultural property listed in or eligible for the National Register of Historic Places (see 36 CFR 800).

3.  Formal consultations under Section 106 of the National Historic Preservation Act usually take place during implementation planning; however, consult with the SHPO during land use planning regarding cultural resource evaluation recommendations (36 CFR 800.4(c)).

4.  Consult Tribal leaders and traditional religious practitioners under the American Indian Religious Freedom Act about any management objectives and actions that might affect Native American religious practices, including access to sacred sites.  Consult Tribal leaders under the National Historic Preservation Act about any management objectives or actions that might affect properties of traditional cultural importance.

## H.  Paleontology

***Land Use Plan Decisions.***  Identify criteria or use restrictions to ensure that (a) areas containing, or that are likely to contain, vertebrate or noteworthy occurrences of invertebrate or plant fossils are identified and evaluated prior to authorizing surface-disturbing activities; (b) management recommendations are developed to promote the scientific, educational, and recreational uses of fossils; and (c) threats to paleontological resources are identified and mitigated as appropriate.

***Implementation Decisions.***  Identify appropriate protection measures and scientific, educational, and recreational use opportunities for paleontological localities.

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

BLM_0007998

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## I.  Visual Resources

***Land Use Plan Decisions.***  Manage visual resource values in accordance with visual resource management (VRM) objectives (management classes).  Designate VRM management classes for all areas of BLM land, based on an inventory of visual resources and management considerations for other land uses.  VRM management classes may differ from VRM inventory classes, based on management priorities for land uses (see BLM Handbook H-8410-1 for a description of VRM classes).

***Implementation Decisions.***  Manage resource uses and management activities consistent with the VRM objectives established in the land use plan.  Design all BLM resource uses, management activities, and other implementation decisions to meet VRM objectives established in the land use plan.  Utilize visual resource design techniques and best management practices to mitigate the potential for short- and long-term impacts.  Contrast ratings are required for all major projects proposed on public lands that fall within VRM Class I, II, and III areas which have high sensitivity levels (see Handbook H-8341-1 for contrast-rating procedures).

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## J.  Wildland Fire Management

***Land Use Plan Decisions.***  Fire management strategies must recognize the role of wildland fire as an essential ecological process and natural change agent.  Fire management strategies must result in minimum suppression costs, considering firefighter and public safety, benefits, and values to be protected; consistent with resource objectives.  Fire management decisions (goals and objectives, and allowable uses and management actions) must reflect that the protection of human life is the single, overriding priority.  Other priorities (protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources) are based on the values to be protected, human health and safety, and the costs of protection.

Consistent with these principles, identify landscape-level fire management goals and objectives, which would be achieved through allowable uses and management actions.  Use fire regime/condition class methodology to identify desired wildland fire conditions.  Wildland fire management goals and objectives must be closely coordinated with vegetation management goals and objectives.

Identify allowable uses and management actions to achieve the fire management goals and objectives, and support the goals and objectives for vegetation, wildlife, and other resources.

As part of identifying allowable uses, identify the geographic areas that are suitable for wildland fire use, provided conditions are appropriate.  Also, identify the geographic areas where wildland fire use is not appropriate due to social, economic, political, or resource constraints (e.g., wildland urban interface areas); and where suppression action would be taken.

BLM_0007999

Appendix C, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

As part of identifying management actions to achieve goals and objectives, identify the types of fuels management or vegetation management treatments (e.g., mechanical, biological, and chemical treatments and prescribed fire) that would be implemented.

Allowable uses and management actions include the identification of restrictions on fire management practices (including both wildfire suppression and fuels management) needed to protect natural or cultural resource values. Restrictions may be structured to allow flexibility to apply restrictions on a seasonal or annual basis, based on resource conditions, weather factors, and operational capability.

Establish landscape-scale fire management priorities or provide criteria that will guide more site-specific priorities at the fire management plan level.

***Implementation Decisions.*** Identify site-specific fire management practices and fuels treatment actions needed to meet the broad-scale land use plan goals and objectives (such as wildland fire use, prescribed fire, mechanical thinning, biological, and chemical treatments) including their location, size, and specific layout and project design features, as well as any measures needed to protect sensitive resources.

For additional guidance, see the DOI and BLM Fire Management Manuals and Handbooks.

***Notices, Consultations, and Hearings.***

> 1. Consult, coordinate, and comply with Tribes, Federal agencies, and state and local governments regarding smoke management where required by the Clean Air Act, Executive Order 12088 (Federal Compliance with Pollution Control Standards), and State Implementation Plans.

> 2. Consult and coordinate with adjacent Tribes, Federal agencies, and state and local governments to establish protection and fuels management priorities.

## K. Wilderness Characteristics

***Land Use Plan Decisions.*** Identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics.

***Implementation Decisions.*** Identify site-specific protection measures to insure protection of wilderness characteristics.

***Notices, Consultations, and Hearings.*** No additional specific requirements exist.

BLM_0008000

## L.  Cave and Karst Resources

***Land Use Plan Decisions.***  Identify significant caves as mandated by the Federal Cave Resources Protection Act of 1988.  Criteria for identification of significant caves is set forth in 43 CFR 37.11(c).  If it is determined that a cave meets these criteria, it must be designated as significant as set forth in 43 CFR 37.11(f).

For each designated significant cave, consider whether or not an administrative designation (e.g., ACEC) is needed to provide adequate protection for significant cave resources (see III. Special Designations).  Regardless, it is vital that both management objectives and setting prescriptions be set for each designated significant cave.  Management objectives should be outcome-based (i.e., not facility- or project-based).  Setting prescriptions should specify conditions needed to facilitate achievement of the management objectives.

***Implementation Decisions.***  Address four basic but broad types of cave and karst resource management actions for all significant caves:

     1.  Management (resources, visitors and facilities);

     2.  marketing (outreach, information and education, promotion, interpretation, and environmental education);

     3.  monitoring (social, environmental and administrative indicators and standards); and

     4.  administration (regulatory, permit/fee/fiscal, data management, and customer liaison).

All BLM implementing actions must be conditioned by the specific management objectives and accompanying setting prescriptions incorporated within land use plan decisions for each significant cave.

***Notices, Consultations, and Hearings.***  Certain actions involving impacts to cave and karst resources may require consultation and coordination with other Federal, state and local government agencies, and nongovernmental organizations or individuals as mandated by Section 4 of the Federal Cave Resources Protection Act; Section 106 of the National Historic Preservation Act; Section 7 of the Endangered Species Act; and Section 8 of the Public Rangeland Improvement Act.

## II.  Resource Uses

## A.  Forestry

***Land Use Plan Decisions.***  Identify characteristics (indicators) to describe healthy forest conditions (i.e., desired outcomes) for forest/woodland types found within the planning area (also see I(C), Vegetation).  Identify the suite of possible management actions (including appropriate harvest, reforestation, and forest development methods), and associated best management practices, that can be applied to meet desired outcomes.

BLM_0008001

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Identify areas that are available and have the capacity for planned, sustained-yield timber harvest or special forest product harvest.  A probable sale quantity (PSQ) should be determined, if possible, for those areas determined to be available for harvest.  The PSQ is the allowable harvest level that can be maintained without decline over the long term if the schedule of harvests and regeneration are followed.  PSQ recognizes a level of uncertainty in meeting the determined level; this uncertainty is typically based on other environmental factors that preclude harvesting at a particular time (for example, because of watershed or habitat concerns).  A PSQ is not a commitment to offer for sale a specific level of timber volume every year.

***Implementation Decisions.***  Identify individual timber or special forest product sale locations and schedules; site-specific intensive management practices, locations, and schedules; and restrictions associated with forestry activities.  Identify individual forest health treatment activities by location and schedule *(Headwaters, Inc., 116 IBLA 129 (1990))*.

***Notices, Consultations, and Hearings.***  There are no additional specific requirements.

## B.  Livestock Grazing

***Land Use Plan Decisions.***  Identify lands available or not available for livestock grazing (see 43 CFR 4130.2(a)), considering the following factors:

1.  Other uses for the land;
2.  terrain characteristics;
3.  soil, vegetation, and watershed characteristics;
4.  the presence of undesirable vegetation, including significant invasive weed infestations; and
5.  the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Decisions identifying lands available, or not available, for livestock grazing may be revisited through the amendment or revision process if the grazing preference or permit on those lands has been voluntarily relinquished, or if there are outstanding requests to voluntarily relinquish the grazing preference or permit.  If an evaluation of Land Health Standards identifies an allotment or group of allotments where Land Health Standards cannot be achieved under any level or management of livestock use, then decisions identifying those areas as available for livestock grazing need to be revisited.

For lands available for livestock grazing, identify on an areawide basis both the amount of existing forage available for livestock (expressed in animal unit months) and the future anticipated amount of forage available for livestock with full implementation of the land use plan while maintaining a thriving natural ecological balance and multiple-use relationships.  The land use plan needs to describe how these public lands will be managed to become as productive as feasible for livestock grazing, including a description of possible grazing management practices such as grazing systems, range improvements (including land treatments), changes in seasons of use and/or stocking rates.  In addition, identify guidelines and criteria for future allotment-

BLM_0008002

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

specific adjustments in the amount of forage available for livestock, season of use, or other grazing management practices *(Joel Stamatakis, Steve Stamatakis; 98 IBLA 4 (1987)).*

***Implementation Decisions.***  For areas available for grazing, identify allotment-specific (for one or several allotments) grazing management practices and livestock forage amounts based on monitoring and assessment information, as well as constraints and needs related to other resources.  Grazing management practices and levels of livestock grazing use must achieve the desired outcomes outlined in the land use plan, including rangeland health standards (or comprehensive Land Health Standards), or must result in significant progress toward fulfilling rangeland health standards; they must also conform to the guidelines required under 43 CFR 4180.2(b).

***Notices, Consultations, and Hearings.***  Conduct appropriate consultation, cooperation, and coordination actions as required under 43 CFR 4130.2(b).  Copies of proposed decisions on grazing use are sent to interested members of the public in accordance with 43 CFR 4160.1.

## C.  Recreation and Visitor Services

***Land Use Plan Decisions.***  Identify special recreation management areas (SRMAs).

Each SRMA has a distinct, primary recreation-tourism market as well as a corresponding and distinguishing recreation management strategy.  For each SRMA selected, determine whether that primary market-based strategy will be to manage for a *destination* recreation-tourism market, a *community* recreation-tourism market, or an *undeveloped* recreation-tourism market, and state that determination in the land use plan.  Then describe the market that corresponds to that specific recreation management strategy (who they are and where they are located).  Divide recreation areas that have more than one distinct, primary recreation market into separate SRMAs.

For each SRMA identified, delineate discrete recreation management zone (RMZ) boundaries.  Each RMZ has four defining characteristics - it:  (1) serves a different recreation niche within the primary recreation market; (2) produces a different set of recreation opportunities and facilitates the attainment of different experience and benefit outcomes (to individuals, households and communities, economies, and the environment); (3) has distinctive recreation setting character; and (4) requires a different set of recreation provider actions to meet the strategically-targeted primary recreation market demand.  To address these four variables within each RMZ, make the following land-use allocation decisions:

    1.  Identify the corresponding recreation niche to be served;

    2.  write explicit recreation management objectives for the specific recreation opportunities to be produced and the outcomes to be attained (activities, experiences, and benefits);

    3.  prescribe recreation setting character conditions required to produce recreation opportunities and facilitate the attainment of both recreation experiences and beneficial

BLM_0008003

Appendix C, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

outcomes, as targeted above (the recreation opportunity spectrum is one of the existing tools for both describing existing setting character and prescribing desired setting character); and

4.  briefly describe an activity planning framework that addresses recreation management, marketing, monitoring, and administrative support actions (e.g., visitor services, permits and fees, recreation concessions, and appropriate use restrictions) necessary to achieve explicitly-stated recreation management objectives and setting prescriptions (see Implementation Decisions subsection below).

Visual resource management classes need to be correlated with the recreation management objectives and setting prescriptions that have been set for each RMZ delineated.

Anything not delineated as an SRMA is an extensive recreation management area (ERMA). Management within all ERMAs is restricted to custodial actions only.  Therefore, actions within ERMAs are generally implemented directly from land use plan decisions and do not require activity-level planning.  Land use plan decisions must, therefore, include recreation management objectives for all ERMAs.  Consider addressing visitor health and safety, user conflict and resource protection issues in particular through these recreation management objectives. However, land use plan decisions for ERMAs need to also identify implementing recreation management, marketing, monitoring, and administrative support actions of the kinds listed for SRMAs under Implementation Decisions below (because no follow-up implementation decisions at the activity plan level are required for ERMAs)  *Note: If recreation demand (i.e., from an undeveloped recreation-tourism market) requires maintenance of setting character and/or production of associated activity, experience, and benefit opportunities/outcomes, the area should be identified and managed as an SRMA, rather than being custodially managed as an ERMA.*

Recognition of singularly dominant activity-based recreation demand of and by itself (e.g., heavy off-highway vehicle use, river rafting, etc.), however great, generally constitutes insufficient rationale for the identification of an SRMA and the subsequent expenditure of major recreation program investments in facilities and/or visitor assistance.  This does not mean that the expenditure of substantial custodial funding is unwarranted when circumstances require it, but such expenditures should be geared to take care of the land and its associated recreation-tourism use and not to provide structured recreation opportunities which characterize SRMAs.

Identification, but not formal designation, of both SRMAs and ERMAs is required (see Manual Section 8300).

***Implementation Decisions.***  For all SRMAs, address four basic but broad types of recreation actions:

1.  Recreation management (of resources, visitors, and facilities [i.e., developed recreation sites, roads and trails, recreation concessions, etc.]);

BLM_0008004

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  recreation marketing (including outreach, information and education, promotion, interpretation, environmental education; and other visitor services);

3.  recreation monitoring (including social, environmental, and administrative indicators and standards); and

4.  recreation administration (regulatory; permits and fees, including use restrictions where necessary and appropriate; recreation concessions; fiscal; data management; and customer liaison).

All BLM implementing actions for SRMAs must be conditioned by both the identified primary recreation market strategy and the specific RMZ land use allocation objectives and accompanying setting prescriptions incorporated within land use plan decisions.  Since the BLM is not the sole-source provider of public lands recreation, be sure to address any actions of other key recreation-tourism providers within local service communities (i.e., local governments and private recreation-tourism businesses).  The BLM cannot dictate to its local government and private business providers.  Yet, without their collaborative engagement as managing partners in plan design and implementation, recreation opportunities targeted by land use plan management objectives cannot be produced over the long run, nor can prescribed recreation settings be sustained.

To the greatest extent possible, and appropriate to the setting prescriptions for the area involved, all new construction and modifications to recreation facilities, outdoor developed areas, and any related programs and activities will be accessible to people with disabilities in accordance with the Architectural Barriers Act of 1968 and Section 504 of the Rehabilitation Act of 1973, as amended, and in conformance with relevant building standards, accessible outdoor program guidance, and program regulations.

*Notices, Consultations, and Hearings.*  No additional specific requirements exist.

D.  **Comprehensive Trails and Travel Management**

*Land Use Plan Decisions.*  Delineate travel management areas and designate off-highway vehicle management areas.

1.  *Delineating Travel Management Areas.*  Comprehensive travel management planning should address all resource use aspects (such as recreational, traditional, casual, agricultural, commercial, and educational) and accompanying modes and conditions of travel on the public lands, not just motorized or off-highway vehicle activities.  In the RMP, travel management areas (polygons) should be delineated.  Identify acceptable modes of access and travel for each travel management area (including over-land, over-water, over-snow and fly-in access [remote airstrips and float planes]).   In developing these areas, consider the following:

a.  Consistency with all resource program goals and objectives;
b.  primary travelers;

BLM_0008005

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

c. objectives for allowing travel in the area;
d. setting characteristics that are to be maintained (including recreation opportunity system and VRM settings); and
e. primary means of travel allowed to accomplish the objectives and to maintain the setting characteristics.

2. *Designation of Off-Highway Vehicle Management Areas.* All public lands are required to have off-highway vehicle area designations (see 43 CFR 8342.1). Areas must be classified as *open, limited,* or *closed* to motorized travel activities. Criteria for open, limited, and closed area designations are established in 43 CFR 8340.0-5(f), (g) and (h), respectively.

For areas classified as limited consider a full range of possibilities, including travel that will be limited to types or modes of travel, such as foot, equestrian, bicycle, motorized, etc.; limited to existing roads and trails; limited to time or season of use; limited to certain types of vehicles (OHVs, motorcycles, all-terrain vehicles, high clearance, etc.); limited to licensed or permitted vehicles or users; limited to BLM administrative use only; or other types of limitations. In addition, provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation (see 43 CFR 8340.0-5(a)(1-5).

At a minimum, the travel management area designation for wilderness study areas (WSAs) must be limited to ways and trails existing at the time the area became a WSA. *Open* areas within WSAs are appropriate only for sand dune or snow areas designated as such prior to October 21, 1976. Existing roads, ways and trails must be fully documented and mapped. This applies to both motorized and mechanized transport (see Interim Management Policy and Guidelines for Lands Under Wilderness Review H-8550-1(I.)(B.)(11) for mechanized transport). In addition, future designations may be made for a WSA if it is released from study.

Except as otherwise provided by law (e.g., the Alaska National Interest Lands Conservation Act), congressionally designated wilderness areas are statutorily closed to motorized and mechanized use. These areas should be shown in the land use plans along with the acreage affected.

Existing laws, proclamations, regulations or Executive orders may limit the use of the open area designation or impose additional requirements relating to travel management in specific circumstances.

For RMP provisions related to national scenic, historic and national recreation trails, national back country byways, or other byway designations (see Appendix C, III. Special Designations).

***Implementation Decisions.*** Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical. If it is

BLM_0008006

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network.  Possible reasons for not completing the final network might be size or complexity of the area, controversy, incomplete data, or other constraints.

If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:

    1)  Produce a map of a preliminary road and trail network;

    2)  define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;

    3)  outline additional data needs, and a strategy to collect needed information;

    4)  provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;

    5)  provide a schedule to complete the area or sub-area road and trail selection process; and

    6)  identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

At the implementation phase of the plan, establish a process to identify specific areas, roads and/or trails that will be available for public use, and specify limitations placed on use.  Products from this process will include:

    1)  A map of roads and trails for all travel modes.

    2)  Definitions and additional limitations for specific roads and trails (defined in 43 CFR 8340.0-5(g)).

    3)  Criteria to select or reject specific roads and trails in the final travel management network, add new roads or trails and to specify limitations.

    4)  Guidelines for management, monitoring, and maintenance of the system.

BLM_0008007

5)  Indicators to guide future plan maintenance, amendments, or revisions related to travel management network.

6)  Needed easements and rights-of-ways (to be issued to the BLM or others) to maintain the existing road and trail network providing public land access.

In addition, travel management networks should be reviewed periodically to ensure that current resource and travel management objectives are being met (see 43 CFR 8342.3).

*Notices, Consultations, and Hearings.*  No additional specific requirements exist.

## E.  Lands and Realty

*Land Use Plan Decisions.*  Identify the following consistent with the goals and objectives for natural resources within the planning area:

1.  Lands for retention (43 CFR 2400), proposed disposal, or acquisition (based on acquisition criteria identified in the land use plan; FLPMA Section 205(b)) *(Oregon Natural Resources Council, 78 IBLA 124 (1983)).*  Lands are to be retained in Federal ownership, unless it is determined that disposal of a particular parcel will serve the national interest (FLPMA Section 102(a)(1)).  Land use plans should avoid prescribing the method of disposal, acquisition, or property interest to be acquired.

2.  Lands or interest in lands that are available for disposal under a variety of disposal authorities, provided they meet the criteria outlined in FLPMA (Sales, Section 203, 43 U.S.C. 1713(a); Exchanges, Section 206, 43 U.S.C. 1716(a); and Reservation and Conveyance of Minerals, Section 209, 43 U.S.C. 1719(a)) or other statutes and regulations.  Lands available for disposal must be identified by parcel or by specific areas (on a map or by legal description).

3.  Lands available for disposal under the Federal Land Transaction Facilitation Act of 2000 (FLTFA).  The FLTFA amended FLPMA to allow retention by the BLM of receipts received from sale of land or interests in land under Section 203 of FLPMA or conveyance of mineral interest under Section 209(b) of FLPMA provided a land use plan was completed prior to July 25, 2000.  The FLTFA currently does not apply to lands identified for disposal after July 25, 2000.  In Nevada, the FLTFA does not apply to lands eligible for sale under the Southern Nevada Public Land Management Act, Santini-Burton Act, Mesquite Lands Act, or Lincoln County Land Act.

4.  Proposed withdrawal areas including existing withdrawals to be continued, modified, or revoked (including how the lands would be managed if the withdrawal were relinquished and an opening order issued) (see 43 CFR 2300).

5.  Land Classifications under Section 7 of the Taylor Grazing Act of 1934, as amended (43 U.S.C. 315f).  The procedures applicable to Section 7 outlined in 43 CFR 2400 must be followed.  The following actions require classification:  Recreation and Public

BLM_0008008

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Purposes Act sales (see 43 CFR 2740) and leases (see 43 CFR 2912); agricultural entries (see 43 CFR 2520, 2530, 2610); and state grants (see 43 CFR 2620). To the extent that the land use planning procedures pursuant to 43 CFR 1600 differ from applicable classification procedures under 43 CFR 2400, the latter procedures shall be followed and applied. The analysis that supports classification decisions is normally the same analysis utilized in the land use planning/NEPA process to make decisions concerning the disposal or retention of public lands. For any classification decision made through the land use plan, initiate the classification decision requirements (i.e., proposed and initial decisions required under 43 CFR 2400) at the time the decision document is issued for the land use plan.

6. Where and under what circumstances authorizations for use, occupancy, and development (such as major leases and land use permits) may be granted (see 43 CFR 2740, 2912, 2911, and 2920, respectively).

7. Existing and potential right-of-way corridors (potential corridors include existing right-of-way routes with the potential for at least one additional facility and thus can be considered a corridor if not already designated) to minimize adverse environmental impacts and the proliferation of separate right-of-ways (see 43 CFR 2806).

8. Existing and potential development areas for renewable energy projects (e.g., wind and solar), communication sites, and other uses.

9. Right-of-way avoidance or exclusion areas (areas to be avoided but may be available for location of right-of-ways with special stipulations and areas which are not available for location of right-of-ways under any conditions).

10. Terms and conditions that may apply to right-of-way corridors or development areas, including best management practices to minimize environmental impacts and limitations on other uses which would be necessary to maintain the corridor and right-of-way values.

***Implementation Decisions.*** Identify exchange agreements, land sale plans, approvals of leases and permits, and all subsequent phases of case processing. Identify issuance of site-specific right-of-way grants and authorizations. Identify authorization notices for those actions that require classification or other notices, including sales, exchanges, state selections, Recreation and Public Purposes Act sales and leases, agricultural entries, and other land disposal actions.

***Notices, Consultations, and Hearings.*** Consult with parties to Interagency Agreements or MOUs relating to corridor identification or use. The Western Utility Group must be consulted when developing decisions affecting utility use. Consult with Indian Tribes and state and local governments having an interest in or jurisdiction over lands proposed for disposal or acquisition.

## F. Coal

***Land Use Plan Decisions.*** The land use plan is the chief process by which public land is reviewed to assess whether there are areas suitable for leasing or unsuitable for all or certain

BLM_0008009

Appendix C, page 22

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

types of coal mining operations under Section 522(b) of the Surface Mining Control and Reclamation Act. Identify the following consistent with the goals and objectives for natural resources within the planning area:

1. Unleased coal lands that are acceptable for further consideration for coal leasing and development and those that are not (see 43 CFR 3461).

2. Areas unsuitable for surface mining of coal (43 CFR 1610.7-1) under the criteria set forth in 43 CFR 3461.5.

3. For acceptable lands, areas suitable for development by all mining methods or by only certain stipulated mining methods, such as surface or underground mining (see 43 CFR 3461).

4. Any special conditions that must be met during more detailed planning, lease sale, or post-lease activities, including measures required to protect other resource values (see 43 CFR 3461).

5. An estimate of the amount of coal recoverable by either surface or underground mining operations or both (43 CFR 3420.1-4(d)). Only those areas that have development potential may be identified as acceptable for further consideration for leasing.

6. Areas that have development potential for coal leasing according to the screening process outlined in 43 CFR 3420.1-4(e)(1–4).

7. Areas to be withdrawn from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique and that are not included in the unsuitability criteria discussed in 43 CFR 3461.5.

***Implementation Decisions.*** Offer leases with appropriate conditions and stipulations, process lease exchanges, process preference right lease applications, and delineate coal tracts for disposal.

***Notices, Consultations, and Hearings.***

1. Prior to or as part of the initiation or update of a land use plan or land use analysis, a *call for coal and other resource information* shall be made to formally solicit indications of interest and information on coal resource development potential and on other resources which may be affected by coal development for land in the planning unit. Industry, state, and local governments and the general public may submit information on lands that should be considered for coal leasing, including statements describing why the lands should be considered for leasing (43 CFR 3420.1-2).

BLM_0008010

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The Call for Coal and other Resource Information may be combined with the notice of intent to conduct land use planning published in accordance with 43 CFR 1601.3(g) or with the issue identification process in accordance with 43 CFR 1600.

2.  Publish in the *Federal Register* a notice under 43 CFR 3461.2-1(a)(2), providing for a minimum 30-day comment period on the results of the application of unsuitability criteria, exemptions, and exceptions.

3.  Consult as required under 43 CFR 3461.5 for unsuitability criteria 7 through 11, criteria 13 through 15, and criterion 17.

4.  Consult qualified surface owners as required under 43 CFR 3420.1-4(e)(4) and 1610.2(j) to determine their preference for or against surface mining.  If a significant number of qualified surface owners in an area do not support surface mining, BLM can consider only underground mining unless one of the exceptions in 43 CFR 3420.1-4(e)(4)(ii) or (iii) applies.

5.  Consult Indian Tribes, other Federal agencies, and states as required under 43 CFR 3420.1-6 and 3420.1-7.

6.  Hold a public hearing as required under 43 CFR 1610.2(k) and 43 CFR 3420.1-5 if requested.

## G.  Oil Shale

Refer to the Fluid Minerals section (Appendix C, Section II.H below) for applicable decision guidance, making decisions that consider the unique development aspects of oil shale, from underground mining to in-situ production techniques.

## H.  Fluid Minerals:  Oil and Gas, Tar Sands, and Geothermal Resources

*Land Use Plan Decisions.*  Identify the following consistent with the goals and objectives for natural resources within the planning area (refer to H-1624-1):

1.  Areas open to leasing, subject to existing laws, regulations, and formal orders; and the terms and conditions of the standard lease form.

2.  Areas open to leasing, subject to moderate constraints such as seasonal and controlled surface use restrictions. (These are areas where it has been determined that moderately restrictive lease stipulations may be required to mitigate impacts to other land uses or resource values.)

3.  Areas open to leasing, subject to major constraints such as no-surface-occupancy stipulations on an area more than 40 acres in size or more than 0.25 mile in width. (These are areas where it has been determined that highly restrictive lease stipulations are required to mitigate impacts to other lands or resource values.  This category also

Appendix C, page 24

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

includes areas where overlapping moderate constraints would severely limit development of fluid mineral resources.)

4.  Areas closed to leasing.  (These are areas where it has been determined that other land uses or resource values cannot be adequately protected with even the most restrictive lease stipulations; appropriate protection can be ensured only by closing the lands to leasing.)  Identify whether such closures are discretionary or nondiscretionary; and if discretionary, the rationale.

5.  Resource condition objectives that have been established and specific lease stipulations and general/typical conditions of approval and best management practices that will be employed to accomplish these objectives in areas open to leasing.

6.  For each lease stipulation, the circumstances for granting an exception, waiver, or modification.  Identify the general documentation requirements and any public notification associated with granting exceptions, waivers, or modifications.

7.  Whether the leasing and development decisions also apply to geophysical exploration.

8.  Whether constraints identified in the land use plan for new leases also apply to areas currently under lease.

9.  Long-term resource condition objectives for areas currently under development to guide reclamation activities prior to abandonment.

A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval.  When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

***Implementation Decisions.***  Offer leases with appropriate stipulations.  Address site-specific actions such as geophysical exploration, approval or disapproval of applications for permit to drill (APDs) with attached restrictions or conditions of approval, well siting, tank battery placement, and pipeline routing.

***Notices, Consultations, and Hearings.***  Public notice shall be given 45 days before offering lands for lease and 30 days before approving APDs or substantially modifying the terms of any lease (43 CFR 3101.1-4).

## I.  Locatable Minerals

***Land Use Plan Decisions.***  For lands that are open to the location of lode, placer, and mill claims, the claimant has statutory authority under the mining laws to ingress, egress and development of those claims.  This authority means that those areas open to mineral entry for the purposes of exploration or development of locatable minerals cannot be unreasonably restricted.

BLM_0008012

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Identify the following consistent with the goals and objectives of locatable mineral exploration and development in concert with the protection of natural resources within the planning area.

1.  Areas recommended for closure to the mining laws for locatable exploration or development (that must be petitioned for withdrawal).

2.  Any terms, conditions, or other special considerations needed to protect other resource values while conducting activities under the operation of the mining laws.

***Implementation Decisions.***

1.  Process notices and plans of operations according to the 43 CFR 3809 regulations.

2.  Manage the use and occupancy on public lands for the development of locatable mineral deposits to that which is reasonably incident to prospecting, mining or processing operations under the mining laws (43 CFR 3715).

3.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to locatable minerals.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## J.  <u>Mineral Materials</u>

***Land Use Plan Decisions.***  Identify the following consistent with the goals and objectives for the exploration, development, and disposal of mineral materials in concert with the protection of natural resources within the planning area.

1.  Areas open or closed to mineral material disposal.

2.  Any terms, conditions, or other special considerations needed to protect resource values while operating under the mineral materials regulations.

***Implementation Decisions.***

1.  Establish common use areas and community pits and process and approve disposal of mineral materials through prospecting permits, free use permits, and competitive and noncompetitive permits and sales.

BLM_0008013

Appendix C, page 26

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to mineral materials.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## K.  <u>Non-energy Leasables</u>

***Land Use Plan Decisions.***  Applies to minerals leased under the mineral leasing acts and to hardrock minerals leasable under Reorganization Plan No. 3 of 1946.  Identify the following consistent with the goals and objectives for exploration, development, and disposal of non-energy leasables in concert with the protection of natural resources within the planning area.

1.  Areas open or closed to non-energy leasing and development.

2.  Any area wide terms, conditions, or other special considerations needed to protect other resource values while exploring or developing minerals under the non-energy leasable regulations.

***Implementation Decisions.***

1.  Issue mineral use authorizations for prospecting permits, exploration licenses, preference right lease, competitive leases, lease modifications, and use permits.

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to non-energy leasables.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

BLM_0008014

## III. Special Designations

## A. __Congressional Designations__

***Land Use Plan Decisions.*** Develop stand-alone RMP/EIS-level plans for all national monuments and congressionally designated national conservation areas, national recreation areas, cooperative management and protection areas, outstanding natural areas, and forest reserves (in accordance with the establishing statute or Presidential proclamation).

For designated national scenic and historic trails:

> 1. Identify goals, objectives and measures to achieve them, as well as allowable uses and surface restrictions to avoid potential adverse affects. Land use plans must also reference, incorporate, or be amended with provisions from applicable comprehensive management plans required by the National Trails System Act.

> 2. Establish VRM designations; identify SRMAs, recreation management zones, and off-highway vehicle designations; identify trail-related lands for retention, acquisition, withdrawals, avoidance, and exclusion areas; identify appropriate special leasing conditions, terms, constraints, or stipulations; designate trail segments as ACECs; and identify interpretive measures.

> 3. Concentrate on high potential sites and segments along national historic trails, national register eligible segments, and the primitive character and connection of national scenic trail segments. Consider the historic context and/or current and future landscape condition along the trails.

***Implementation Decisions.*** Develop site-specific implementation actions and plans for congressionally designated areas.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

## B. __Administrative Designations__

***Land Use Plan Decisions.*** Consistent with the goals and objectives for the planning area, make the following determinations:

> 1. Manage WSAs under the interim management policy (H-8550-1) until they are designated wilderness or released by Congress. Identify management direction for WSAs should they be released from wilderness consideration by Congress.

> 2. Assess all eligible river segments and determine which are suitable or non-suitable per Section 5(d)(1) of the Wild and Scenic Rivers Act of 1968, as amended (see BLM Manual 8351).

BLM_0008015

Appendix C, page 28

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  Designate ACECs and identify goals, standards, and objectives for each area, as well as general management practices and uses, including necessary constraints and mitigation measures (also see BLM Manual 1613).  This direction should be specific enough to minimize the need for subsequent ACEC management plans.  ACECs must meet the relevance and importance criteria in 43 CFR 1610.7-2(a) and must require special management (43 CFR 1601.0-5(a)) to:

> a)  Protect the area and prevent irreparable damage to resources or natural systems.

> b)  Protect life and promote safety in areas where natural hazards exist.

4.  Designate research natural areas and outstanding natural areas as types of ACECs using the ACEC designation process.

5.  Designate BLM Scenic or Back Country Byways.  Detailed procedural guidance for nomination and designation of BLM byways, as well as other byway designations occurring on BLM lands (such as All American Roads, National Scenic Byways, State Scenic Byways, Forest Scenic Byways, and similar) can be found in Handbook 8357-1: Byways, 12/17/93.

6.  Designate national recreation trails, watchable wildlife viewing sites, wild horse and burro ranges, or other BLM administrative designations.

Subject to valid existing rights, avoid approval of proposed actions that could degrade the values of potential special designations.  Proposed actions will be reviewed on a case-by-case basis and impacts to an area's values will be assessed.  The standard for this review is the protection of the area's resources and values so that the area will not be disqualified from designation.  Subject to valid existing rights, proposed actions that can not meet this standard should be postponed, relocated, mitigated, or denied until the planning for the area is completed.

***Implementation Decisions.***  Develop site-specific management actions and constraints.  Evaluate and issue permits for scientific, educational, or recreational activities, and develop project plans for trails, interpretive exhibits, resource rehabilitation, and other site-specific activities.  Protective management provisions must be followed to enhance or protect identified resource values and/or characteristics.

***Notices, Consultations, and Hearings.***  Publish a *Federal Register* notice providing a 60-day comment period on proposed ACEC recommendations and resource use limitations (see 43 CFR 1610.7-2(b)).

## IV.  Support

The planning regulations at 43 CFR 1601.0-5(k)(6) provide that land use plans may identify support needs.  These are based on individual planning situations.

BLM_0008016

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A. Cadastral

***Land Use Plan Decisions.***  Identify planning boundaries so the geographic extent of land use decisions is clearly understood.  The plan may identify areas where additional cadastral survey work is needed to locate and mark boundaries on the ground, including those areas identified for disposal.  The plan may also identify the need to complete more detailed boundary management plans.

***Implementation Decisions.***  If necessary, develop a boundary management plan for locating and marking priority areas.  Identify areas needing immediate trespass resolution.

***Notices, Consultations, and Hearings.***  No additional specific requirements.

## B. Interpretation and Environmental Education

***Land Use Plan Decisions.***  Identify management goals and/or objectives for interpretation and environmental education, and describe the significant resources or areas that will be made available for interpretation/environmental education.  For units of the NLCS, significant resource or area descriptions should be based on the designation or proclamation language establishing each area.

***Implementation Decisions.***  Determine what management actions are necessary to achieve identified interpretive and environmental education goals and/or objectives.  Address the techniques to be used, and the partners and volunteers needed, to implement these management actions.  The following factors should be considered for relevant activity-level interpretive and environmental education plans:

1. Key stories unique to the area;

2. primary messages or themes;

3. educational goals which support management objectives;

4. primary recreation opportunities;

5. distinctive recreation setting character;

6. key resource as well as recreation-tourism attractions; and

7. administrative services and controls.

The key interpretive stories and educational themes are best identified by collaborating with: 1) community groups; 2) service providers and other interested partners; and 3) other federal, state, and local government agencies.  These key stories and themes are often about unique historical, biological, geological, or other resource and human values found within the planning area.  The interpretive and educational themes relate to the primary values of the areas and/or their

BLM_0008017

Appendix C, page 30

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

associated resources.  LUP management goals should be incorporated into primary interpretive messages where appropriate.

***Notices, Consultations, and Hearings.***  No additional specific requirements.

## C.  Transportation Facilities

***Land Use Plan Decisions.***  Identify land areas available or suitable for transportation facilities. Identify types of transportation facilities that are appropriate for the planning area.  Identify limitations, if any, on the types or locations of facilities for specified areas.

Identify the area(s) having in-place transportation facilities that should be removed.  Identify road repair, road rehabilitation, road construction, and maintenance standards appropriate to specific areas.  Identify limitations, if any, on road repair, road rehabilitation, road construction, and maintenance actions.  Identify limitations, if any, on road density (i.e., miles/section) for specific areas.

Also refer to Appendix C(II)(D), Comprehensive Trails and Travel Management.

***Implementation Decisions.***  Develop a map or other type of specification document that displays and describes the intended use of the individual geographic units within the planning area.  In conjunction with the process of identifying a road network (see Appendix C, Section II.D, (Comprehensive Trails and Travel Management)), develop a transportation plan outlining specific road types and designations such as Federal, state, county, and Tribal roads, BLM administered/maintained roads, and BLM public roads.  Identify roads in congressionally designated conservation units, Presidential conservation designations, and administrative conservation designations such as back country byways.

***Notices, Consultations, and Hearings.***  No additional specific requirements.

BLM_0008018

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix D:  Social Science Considerations in Land Use Planning Decisions

## I.  Using Social Science in Land Use Planning

Appendix D provides guidance on integrating social science information into the planning process.  Any information gathered in support of a planning effort must be considered in the context of BLM's legal mandates.

The BLM is required to manage the public lands on the basis of multiple use and sustained yield and to meet the needs of present and future generations.  As the human population continues to increase and social values evolve, resource conflicts are likely to increase.  More importantly, the American public is increasingly aware of the importance of the public lands to its well-being and is demanding a larger voice in resource management decisions.  Given these realities, the planning process can represent a constant balancing of competing needs, interests, and values.  The effective use of social science can be critical to understanding and reconciling these differing perspectives.

Social science information in land use planning can include the economic, political, cultural, and social structure of communities, regions, and the Nation as a whole; social values, beliefs, and attitudes; how people interact with the landscape; and sense-of-place issues.  The social sciences integrate a wide variety of disciplines, generally including economics, sociology, demography, anthropology, archaeology, political science, geography, history, and landscape architecture.  Though the information appropriate to a given analysis depends upon the specific issues being assessed, the social science information usually important for resource planning decisions can be grouped in the following categories:

- Demography and Social Indicators
- Social Organization and Institutions
- Attitudes and Values
- Human Geography
- Economic Value
- Employment, Income, and Subsistence
- Public Finance and Government Services
- Environmental Justice

By statute, regulation, and Executive order the BLM must utilize social science in the preparation of informed, sustainable land use planning decisions. Section 202(c)(2) of FLPMA requires BLM to integrate physical, biological, economic, and other sciences in developing land-use plans (43 USC 1712(c)(2)). FLPMA regulations 43 CFR 1610.4-3 and 1610.4-6 also require BLM to analyze social, economic, and institutional information. Section 102(2)(A) of NEPA requires Federal agencies to "insure the integrated use of the natural and social sciences . . . in planning and decision making" (42 USC 4332(2)(A)).  Federal agencies are also required to "identify and address . . . disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States" in accordance with Executive Order 12898 on Environmental Justice.

BLM_0008019

Appendix D, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## II.  Incorporating Socio-economic Information

### A.  The Planning Process

To be effective, social scientific data and methods should be integrated into the entire planning process, from preparing the pre-plan to implementation and monitoring.  The main social science activities for the various planning steps are outlined in Table D-1.

**Table D-1.—**_Social science activities in land use planning_

| Planning steps | Social science activities |
|---|---|
| Steps 1 & 2—Identify Issues and Develop Planning Criteria | • Identify publics and strategies to reach them<br>• Identify social and economic issues<br>• Identify social and economic planning criteria |
| Step 3—Inventory Data | • Identify inventory methods<br>• Collect necessary social and economic data |
| Steps 4—Analyze Management Situation | • Conduct social and economic assessment, including existing conditions and trends and the impacts of continuing current management<br>• Document assessment methods in an appendix or technical supplement |
| Step 5—Formulate Alternatives | • Identify social and economic opportunities and constraints to help formulate alternatives |
| Step 6—Estimate Effects of Alternatives | • Identify analysis methods<br>• Analyze the social and economic effects of the alternatives<br>• Document impact analysis methods in an appendix or technical supplement<br>• Assess mitigation opportunities to enhance alternatives' positive effects and minimize their negative effects |
| Steps 7 & 8—Identify Preferred Alternative and Finalize Plan | • Identify potential social and economic factors to help select the preferred alternative |
| Step 9—Monitor and Evaluate | • Track social and economic indicators |

### B.  Objectives of the Analysis

Beyond contributing to the public involvement strategy (see Appendix D, Section III), socio-economic input to BLM's resource management planning has three main elements: baseline assessment, impact analysis, and mitigation.

1.  Baseline assessment

Characterize existing conditions and trends in local communities and the wider region that may affect and be affected by land use planning decisions. This baseline assessment should be

BLM_0008020

included or summarized and referenced in the Affected Environment section of the EIS.  In particular, the baseline assessment should:

> a)  Review and summarize the relevant published and unpublished literature on the history, economy, and social system(s) of the study area;

> b)  characterize the economic structure and activity of communities and groups within the study area that are affected by the management of BLM lands; and

> c)  characterize the social structure, activities, and values of such communities and groups.

When preparing RMP amendments for activity- or implementation-level projects, the social science and economic portions of the Affected Environment chapter may be referenced to the original RMP or reduced in complexity, based on the actual issues associated with the proposed actions.

> 2.  Impact analysis

In the Environmental Consequences section of the EIS, characterize impacts to existing conditions and trends from each of the alternatives under consideration, including the no action alternative, relative to the baseline assessment. Impacts include direct, indirect, and cumulative effects for all resources that make up the human environment.  In particular, impact analyses should:

> a)  Analyze the positive and negative economic effects of each alternative developed within the RMP on those communities and groups;

> b)  analyze the positive and negative social effects of each alternative developed within the RMP on those communities and groups; and

> c)  in fulfillment of Environmental Justice requirements, identify any disproportionate negative effect on low-income or minority populations associated with one or more proposed alternatives (see Appendix D, Section IV).

> 3.  Mitigation measures

As appropriate, identify measures that may reduce or avoid potential adverse economic or social effects of the alternatives, and maximize their positive effects.  Determination of the preferred alternative as expressed in the RMP ROD should reflect this analysis.  Note that the preferred alternative is not required to be the alternative with the least cumulative adverse impacts or that provides full mitigation to all social and economic impacts.

BLM_0008021

Appendix D, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## C. **The Scope of Analysis**

There is no standard scope of work for socio-economic analysis because the key topics and methods are shaped in part by the social context and potential resource allocation decisions of a given resource management plan.  The social and economic assessment (affected environment) and impact analysis (environmental consequences) should assist the reader to understand the human context of the planning effort, and in particular to identify the potential effects, constraints, and opportunities associated with planning alternatives.  Table D-2 presents 27 topics of socio-economic information.  We suggest ranking topics as follows:

---

**1 ~ Basic**:  topic should be addressed (example:  population trends)

**2 ~ Optional**:  address if warranted by context and issues

**3 ~ Not currently indicated**:  address if indicated by new information

---

In Table D-2 some topics considered basic to all socio-economic analyses are assigned a priority of **1**.  Field office staff responsible for directing the socio-economic aspect of a resource management plan can use the list of topics to define an appropriate scope of work, identifying which topics should be included in the analysis by ranking as **1** (basic), **2** (optional), or **3** (not currently indicated).

These topics are available as a stand alone <u>Checklist for Socio-Economic Analysis</u>, available on the BLM social science website (see Appendix D, Section VII).  For each topic the checklist also includes a field for "plan-specific guidance" to provide BLM staff or contractors with more precise direction as to which groups, issues, and activities should receive particular attention.  Note also that the required Economic Strategies Workshop (see Appendix D, Section III[B]) provides an excellent opportunity to discuss with interested government leaders and the public what topics should be emphasized in the socio-economic analysis.

BLM_0008022

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table D–2.**—*Topics for socio-economic analysis*

|  | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
| **Demography and Social Indicators** | *Population* | Potential demand on BLM lands and resources | Population trends; migration, distribution by age and gender | 1 |
|  | *Inequality* | Differences in visibility and influence; identify vulnerable populations (Environmental Justice) | Income distribution; percent of households in poverty | 1 |
|  | *Social difference* | Barriers to public involvement; different user needs and values; identify distinctive populations (Environmental Justice) | Ethnicity; languages spoken in household; Tribal affiliation | |
|  | *Social indicators* | Can indicate community strengths and weaknesses that may have implications for planning issues | Crime rates, divorce rates, unemployment, education, length of residence | |
| **Social Organization and Institutions** | *Government* | Potential cooperating agencies; contacts for plan coordination (identified in pre-plan) | Municipal and county governments in/near planning area; special districts; Tribal governments | 1 |
|  | *Non-govern-mental institutions* | Potential partners for plan implementation; sources of economic and social resilience | Chamber of Commerce; church groups; ethnic advocacy organizations | |
|  | *Communities of place* | Local and regional population centers relative to planning area effects may differ by community | Gateway communities; natural resource-dependent communities | 1 |
|  | *Social groups and networks* | Opportunities for informal contacts in seeking public comment and communicating plans and proposals | Networks linking ranchers or retirees | |
|  | *Occupational and interest groups* | Provide range of perspectives on potential land use decisions, effects may differ by distinct group | Wilderness advocates; oil and gas producers, Cattleman's Association | 1 |
| **Attitudes and Meanings** | *Attitudes and beliefs regarding local environment and its use* | Local understandings may shape acceptability of proposed land use decisions **[formal techniques:  surveys, interviews, focus groups]** [1] | Survey to clarify local understanding of effects of coal bed methane technology on ground-water conditions | |

BLM_0008023

Appendix D, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

| | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
| | *Significance of proposed land management actions for various publics* | While public attitudes are elicited in scoping, formal data collection can identify important differences between groups, providing further information to help identify impacts and mitigation strategies **[formal techniques: surveys, interviews, focus groups]** [1] | Interviews to assess social impacts of prescribed burning | |
| | *Quality of life* | Can indicate community perceptions that may have implications for planning issues | Perceived access to community resources; satisfaction with community conditions, such as opportunities for employment | |
| **Human Geography** | *Distribution of communities, roads, and resources* | Clarify geo-spatial context; can predict potential conflicts and impacts over proposed land use allocations | Wildland-urban interface, recreational demand from nearby cities | 1 |
| | *Land ownership and access* | Can predict potential conflicts and impacts over proposed land use allocations | Split estate ownership of sub-surface minerals | |
| | *Culturally and socially significant places and areas* | Identify constraints on site-specific activities, help to identify mitigation (may be developed in cultural resource analysis) **[formal techniques: surveys, interviews, focus groups]** [1] | Locally valued buildings, sites, and landscapes; sense of place; traditional religious/cultural use areas | |
| **Economic Value** | *Interrelation-ships among producing sectors* | Regional economic sectors and their interrelation as a context for BLM management decisions (when allocation decisions are of sufficient scale to have macroeconomic effects, consider national–level economic interrelationships) | Annual purchase and sales by economic sector (transaction matrix) | 1 |
| | *Non-market values of resources and activities* | Consider the significance of the non-market values associated with resources managed or impacts by BLM when formulating the management alternatives | Estimate the value of open space, improved riparian areas, improved wildlife habitat | |

BLM_0008024

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

|  | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
|  | *Dependence on BLM lands and resources* | Understand and quantify the potential local and regional impacts of land use decisions | Value of BLM timber sales, visitor-day expenditures, grazing and mining to the local economy |  |
| **Employment, Income, and Subsistence** | *Employment* | Quantify the anticipated employment impacts by sector to determine the population changes and the associated demand on the infrastructure in the study area | Temporary jobs from oil and gas development versus service jobs created by increased recreational opportunities | **1** |
|  | *Personal income* | Forecasting the anticipated change in income, occurring as a result of the BLM alternatives | Non-labor income (dividends, transfer payments) | **1** |
|  | *Economic diversity and resilience* | Ability of stakeholder communities to respond to external change | Level of dependence on single economic sector |  |
|  | *Regional economic organization* | Identify amount and geographic distribution of new indirect and induced employment resulting from additional local investment | New local jobs resulting from proposed increase in oil and gas production on public lands |  |
|  | *Subsistence activities* | Non-market production from BLM lands for local use | Amount and value of subsistence hunting by local residents |  |
| **Public Finance and Government Services** | *Government revenues and expenditures* | Fiscal capacity and resilience under change | Change in tax revenues and county PILT receipts |  |
|  | *Public infrastructure and services* | Community services may be impacted by resource or recreational development of public lands | Expenditures on schools, roads, social services |  |
| **Environmental Justice** | *Characterize Environmental Justice populations in planning area* | See Demography and Social Indicators:  inequality, social difference | Much of the commercial harvesting of non-timber forest products in Pacific Northwest is organized through ethnic networks | **1** |
|  | *Assess potential for disproportionate impacts to Environmental Justice populations* | Identify whether Environmental Justice issues require further modification of alternatives, or further mitigation of impacts | Oil and gas development in areas where American Indian populations collect medicinal plants | **1** |

[1] Primary (new) data collection methods may be subject to requirements of the Paperwork Reduction Act.  See Planning Handbook, Appendix D, Section V(C).  Secondary data may also be available.

BLM_0008025

Appendix D, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## D.  Deliverables in Contracting

It is recommended the field offices contracting for socio-economic analyses in resource management plans require the following deliverables.

1.  Baseline social and economic assessments, for inclusion in the AMS document.

2.  Abbreviated baseline social and economic assessments, for inclusion in the Affected Environment chapter of the plan/EIS.

3.  Proposed impact analysis strategy, describing the social and economic variables, the key data sources, and the analytic methods proposed.  These should be based on requirements provided by the contracting officer's representative, issues identified in the pre-plan, information obtained through scoping and other public involvement, guidance from cooperating agencies, and the social and economic baseline assessments.

4.  Social and economic impact analyses, for inclusion in the Environmental Consequences chapter of the plan/EIS.

5.  Analysis of Environmental Justice compliance.

6.  A brief methodological statement, presented as an appendix to the plan/EIS, summarizing the significant analytic assumptions and methods utilized in preparing the statement of social and economic impacts.

## E.  Analytic Guidelines

Social science information provided for resource management plans should be consistent with the following guidelines.

1.  *Scale and level of effort.*  The scope of analysis and level of effort should be commensurate with the importance of the particular resource issues.  In other words, focus data collection and analysis on those issues and sectors that are important for the agency's decision-making or important for the publics, as identified through scoping and other formal and informal forms of public involvement.

For example, a regional programmatic plan would likely provide a broad characterization of communities within and near the planning region as well as an examination of national-scale public land priorities.  A single RMP would likely focus on a much smaller area and include a more detailed analysis for each community.  At the implementation plan level, the analysis would focus on more site-specific information, such as the groups, networks, or individuals affected by the decision under consideration.

2.  *Assessment area.*  The assessment (study) area for economic and social analysis may be larger than the designated planning area (for example, because of a major retail center outside but near the planning area).  Depending on the issues, the boundaries of the social

BLM_0008026

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and economic study areas may not be identical. The analysis may also require describing populations that do not reside primarily in the assessment area, such as recreational users coming from metropolitan areas.

3. *Schedule*. Information should be gathered early enough to be included throughout the discussion and decision-making phases of the planning effort.

Note that the economic analysis (and indirectly, the social analysis) is dependent on sound output projections for each significant resource, over each alternative to be evaluated. For example, the economic analysis of recreation-related impacts (changes in assessment area payroll and employment) cannot be done until the recreation specialists have determined the changes in visitor days, by alternative. The economic analysis of mineral development cannot be done until the geologists have developed an analysis of the changes in mineral availability and production, by alternative.

4. *Dimensions of impact analysis*. Impact analyses must make clear how the social and economic effects of each management alternative—both positive and negative—are distributed among the communities and groups in the assessment area, and among other relevant populations (for example, recreational users who live outside the study area). Potential impacts have multiple aspects relevant to decision-making; a well-crafted impact analysis should describe the aspects listed in Table D-3.

Table D-3.—*Dimensions of impact analysis relevant to decision-making*

| Aspect | Describe |
|---|---|
| Space | ▪ Impacts across multiple geographic scales: individual, household, community, region, and where appropriate, national society. |
| Time | ▪ Impacts across multiples time scales: short-term versus long-term. |
| Social identity | ▪ Who would be affected, and in what ways. If different groups or publics (for example, distinguished by income, ethnicity, gender, or occupation) will be unequally affected, describe and explain why. Where low income, minority, or Tribal populations would be disproportionately affected, ensure that this is documented in the Environmental Justice assessment (see Section IV). |
| Magnitude | ▪ The magnitude and significance of projected impacts. |
| Probability | ▪ The likelihood of a projected impact occurring. |
| Causation | ▪ The direct, indirect, and cumulative projected impacts. |
| Acceptability | ▪ The anticipated desirability or acceptability of projected impacts. |

5. *Analysis of no-action alternative*. For the Environmental Consequences section of the EIS, characterize impacts to existing economic conditions and trends from each of the alternatives under consideration, relative to the no action alternative. While the no action alternative assumes no new actions within the RMP's scope of decisions, it should

BLM_0008027

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

include other changes reasonably anticipated to affect the study area within the planning timeframe.

6. *Non-market value*. The analysis of economic impacts for each plan alternative should consider not merely anticipated expenditures (market transactions), but where feasible, the anticipated consumer surplus generated by the proposed activity, as determined by estimates of willingness-to-pay (non-market values). To estimate non-market values for activities proposed under a plan alternative, it is often more practical to utilize *benefit transfer* methods than to undertake new research within the study area, by applying soundly derived non-market values established for comparable sites and activities.

## III. Public Involvement

### A. Integrating Social Science Into Public Involvement

Development of the social and economic analysis should take place as part of a larger collaborative dialogue between BLM and the public. Staff or contractors responsible for social science contributions to the RMP should integrate information from public involvement processes with technical data collection and analysis. Moreover, social and economic analysis can provide information about affected groups that can improve plans for public involvement.

To the extent feasible, BLM's public involvement process should seek not only attitudes and values relevant to planning issues and alternatives, but also suggestions regarding sources of data and methods of analysis. Involving local publics in discussions of appropriate data and methods early in a planning process increases the likelihood that the resulting analysis of effects will be considered credible and useful. State and field offices are encouraged to engage potential and existing partners in the collection, preparation, and analysis of social and economic data leading to the formulation of alternatives, their anticipated impacts, and potential mitigation.

Partners include other Federal agencies and state, Tribal, county, and municipal governments. Information-sharing with partners is crucial to the formulation of cumulative social and economic impacts from alternatives that span jurisdictional/regional boundaries. Consider cooperating agency status where appropriate and look for opportunities to combine analysis with partners' planning processes. Other participants, such as universities, communities, religious institutions, industry representatives, and non-governmental organizations may also share vital information not obtainable through standard data sources.

### B. Economic Strategies Workshop

The public involvement effort on all new RMPs, RMP revisions, and RMP amendments accompanied by EISs must include at least one economic strategies workshop. Such workshops provide an opportunity for local government officials, community leaders, and other citizens to discuss regional economic conditions, trends, and strategies with BLM managers and staff. Such workshops must meet three objectives:

BLM_0008028

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1. Imparting skills on analyzing local and regional economic and social conditions and trends;

2. assisting community members to identify desired economic and social conditions; and

3. collaborating with BLM staff to identify opportunities to advance local economic and social goals through planning and policy decisions within the authority of BLM, its cooperating agencies, or other partners.

Field Managers are welcome to select appropriate workshops from qualified vendors, or to work with State Office or Washington Office social science staff to design a workshop appropriate to their situations. The cost of such workshops should be included in the RMP planning budget and indicated in the pre-plan. For sources of further information on such workshops, see Section VI, Further Guidance.

## IV. Environmental Justice Requirements

Environmental Justice involves the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Fair treatment means that no group of people, including racial, ethnic, or socio-economic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of Federal, state, local, and Tribal programs and policies.

Executive Order 12898, issued in 1994, requires that ". . . each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

## A. BLM's Environmental Justice Principles

1. The BLM will determine if its proposed actions will adversely and disproportionally impact minority populations, low-income communities, and Tribes (reference Executive Order No. 12898, Environmental Justice) and consider aggregate, cumulative, and synergistic effects, including results of actions taken by other parties. While Environmental Justice analysis is specifically concerned with disproportionate effects on the three populations, the social and economic analysis produced in accord with NEPA considers all potential social and economic effects, positive and negative, on any distinct group.

2. The BLM will promote and provide opportunities for full involvement of minority populations, low-income communities, and Tribes in BLM decisions that affect their lives, livelihoods, and health.

BLM_0008029

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  The BLM will incorporate Environmental Justice considerations in land use planning alternatives to adequately respond to Environmental Justice issues and problems facing minority populations, low-income communities, and Tribes living near public lands, working with, and/or using public land resources.

4.  Where disproportionately high adverse impacts are anticipated, the BLM will work with local community groups/associations, governments, and Tribal leaders to determine if land disposition and/or acquisition policies affect real estate values and real income of minority and low income communities, and Tribes.

5.  The BLM State and Field Offices will continue to make Environmental Justice a mandatory critical element for consideration in all land use planning and NEPA documents.

**B.  Incorporating Environmental Justice Efforts in the RMP/EIS Process**

1.  Consult with other Federal agencies, Tribal leaders, states and local governments, community groups/associations, churches, etc., to identify minority and low-income communities, and reservations, including migrant and/or seasonal workers.  Work with the above groups to determine any potential disproportionately high and adverse impacts posed by the proposed action. With the cooperation of the partners, affected minority populations, low-income communities, and Tribes, adopt and implement creative measures to eliminate, minimize, and/or correct identified Environmental Justice impacts.

2.  Through collaboration, identify potential planning areas where proposed action(s) could have disproportionately high and adverse impacts on the health of minority populations, low-income communities and Tribes or their surrounding environment, and document findings and recommended solutions.

3.  Share appropriate information about potential high and adverse impacts with minority populations, and/or low-income communities, and/or Tribes through workshops, informal meetings, or other forums and solicit feedback and recommendations.

4.  Publish NOIs and NOAs announcing scoping/issue identification meetings in the local media (newspaper, radio, or television) of identified minority and low-income communities and Tribes informing them of such meetings.

5.  Develop mailing lists of identified minority populations, low-income communities, and Tribes. Become knowledgeable of the geographic areas of proposed actions and the people that live there (minority and low-income including those in transitory status).

6.  When appropriate, schedule scoping/issue identification meetings in minority and low-income communities or on Tribal reservations; and

7.  Consider the need to translate to other languages planning and NEPA documents mailed/circulated to identified minority populations, low-income communities, and

BLM_0008030

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Tribes.  Consider also the need to have an interpreter present at all scheduled meetings if there are potential language problems.

## C. Documentation and Analysis

1.  Pre-plans should identify known low-income, minority, and Tribal populations within the assessment area, and should indicate what measures will be taken to encourage their participation in the planning process.

2.  Data and analyses needed to ensure Environmental Justice compliance should be incorporated in work plans for social and economic impact analyses.

3.  Environmental Justice considerations should be documented by the RMP/EIS social and economic analyses in (a) the Analysis of the Management Situation, (b) the Affected Environment chapter, and (c) the Impact Analysis (Environmental Consequences) chapter.  An explanation of how any Environmental Justice issues have been considered and, where possible, mitigated should be included in the description and rationale for the preferred alternative.

## V.  Data Management

## A.  Types of Data

The type of data to be collected and analyzed should be appropriate to the planning scale and the issues identified through the scoping process.

There are numerous sources of data available at the national, state, and local levels from government, university, and private sources.  Utilize BLM sources as well as other governmental agencies that routinely collect and report economic and social data.  Much of the government data is easily available online.  Locally and regionally produced reports on social and economic conditions that are produced on a one-time basis (such as county or community planning documents and university extension studies) may also be useful.

Use existing data to the extent possible:  planning documents and environmental impact statements do not routinely require primary data collection.  Nonetheless, collecting primary data may be necessary, particularly for social impact assessment, using techniques such as surveys, focus groups, or key informant interviews.  Any plan to include primary data collection should be justified in terms of gaps in available data or special circumstances.

## B.  Data Quality and Analytic Soundness

Social and economic analyses should be performed in a manner consistent with professionally recognized approaches, methods, and techniques.  In addition, the Information Quality Act (Public Law 106-554, §515) requires Federal agencies to ensure that influential information, such as that used in the preparation of resource management plans, be characterized by reproducibility and transparency.

BLM_0008031

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

BLM recognizes that influential information should be subject to a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties, to an acceptable degree of precision. It is important that analytic results have a high degree of transparency regarding (1) the source of the data used, (2) the various assumptions employed, (3) the analytic methods applied, and (4) the statistical procedures employed. It is also important that the degree of rigor with which each of these factors is presented and discussed be scaled as appropriate, and that all factors are presented and discussed. (See BLM's "Information Quality Guidelines," available at: http://www.blm.gov/nhp/efoia/data_quality/.)

Data sources and methods of analysis must be clearly and briefly described in the text of the RMP/EIS and described in more detail in a technical supplement or RMP appendix.

## C. **Paperwork Reduction Act Requirements for New Data Collection**

RMP/EIS teams must ensure that any new (primary) data collection complies with the requirements of the Paperwork Reduction Act of 1995 (Public Law 104-13).

If answers to identical questions are to be collected from 10 or more members of the public—for example, through a survey questionnaire—the Paperwork Reduction Act requires Office of Management and Budget (OMB) approval for the study. Note that for purposes of the Act, "public" also applies to state, local, and Tribal government employees, though not to employees of the Federal government. OMB review is normally a lengthy process, which must be initiated through the BLM Washington Office. Unless the proposed data collection can be processed by expedited review under the terms of an existing generic OMB authorization (such as that for Customer Satisfaction Surveys), approval is likely to be time consuming.

## VI. Data Sources

## A. **Use of the Economic Profile System**

Developed by the Sonoran Institute under an agreement with the BLM, the Economic Profile System (EPS) and its companion, EPSC (for Community), produce standardized economic and demographic profiles for a selected region, county, or community in any of the 50 states. EPS and EPSC simplify the socio-economic research required for land use planning by gathering and presenting, in a variety of useful formats, data from multiple Federal databases. These information tools were created to improve planning and more efficiently accomplish the time-consuming task of gathering important social and economic data. EPSC uses the Decennial Census to provide in-depth community-level profiles. EPS draws upon a variety of governmental databases to produce thorough and multi-faceted profiles of economic and demographic changes over the past 30 years.

Field offices are encouraged to use EPS and EPSC as tools for characterizing economic and social baseline conditions. EPS and EPSC profiles can be provided in an appendix to the AMS or RMP/EIS, while selected figures and tables can easily be incorporated in the main RMP/EIS text. Where a plan or NEPA analysis will be prepared by contractors, planning leads are encouraged to have contractors utilize EPS in plan preparation, and to seek commensurate cost

BLM_0008032

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

savings in contracted work.  Note that EPS and EPSC are not impact models:  they cannot be used to quantify the economic impacts of a proposed activity or planning alternative.

For further information on EPS and EPSC, see Section VI, Further Guidance.

## B. References

The following references are provided as potential sources for social and economic information.  Data and information from these and other sources must be used within the context of the laws governing BLM's management of the public lands.

*The Federal Interagency Council on Statistical Policy.*  Fedstats Website: http://www.fedstats.gov/.  This website provides access to a wide variety of data produced by over 70 Federal agencies for public use.  It provides access to statistics for demographics, economics, natural resources, the environment, energy, health, education, and many other areas.  Much of this data is available at the county, state, and/or regional level.

*U.S. Department of Agriculture, Forest Service.*  The USDA Forest Service's course 1900-03, *Social Impact Analysis: Principles and Procedures,* includes a helpful student manual.  This source is available through Ecosystem Management Coordination (EMC), USDA Forest Service, but is not available online.  [Yates Bldg. 3CEN, 201 14th Street, SW, Washington DC 20250; 202-205-0895]

The Human Dimensions website contains much useful information about human dimensions analysis and includes sites from which economic and demographic data can be downloaded.  Source:  http://www.fs.fed.us/emc/nris/hd/ or http://fsweb.nris.fs.fed.us/hd/software/hdmodule/index.shtml

*U.S. Department of Commerce, Bureau of the Census.*  Census data includes the economic characteristics of cities, towns, counties, and states, as well as a wide variety of social and demographic information such as population, age, and migration rates.  The Census Bureau also presents information on county governments including financial characteristics [Website:  http://www.census.gov].

*U.S. Department of Commerce, Bureau of Economic Analysis.*  Includes data for states, counties, and economic regions for such factors as personal income and employment by industry, gross state product, and more  [Website:  http://www.bea.doc.gov/].

*U.S. Department of Labor, Bureau of Labor Statistics.*  This Federal agency collects and reports data on the labor market, including labor trends, detailed information on employment by industry, and unemployment rates.  It also reports price indices such as the consumer price index and the producer price index [Website:  http://www.stats.bls.gov].

*U.S. Department of the Interior, BLM.*  The BLM collects data on a wide variety of commercial uses of public lands.  This data is useful for putting public land uses in the context of overall use in a planning area.  Examples of the data collected include grazing use, mining, timber product sales, coal, oil and gas leases, recreation, rights of way, and payments-in-lieu-of-

BLM_0008033

Appendix D, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

taxes (PILT).  To obtain this data, contact resource specialists for those uses or refer to BLM's annual Public Land Statistics publication [Website: http://www.blm.gov/publications/].

*The Interorganizational Committee on Principles and Guidelines for Social Impact Assessment*: Principles and guidelines for social impact assessment in the USA. *Impact Assessment and Project Appraisal* 21(3), September 2003.  This document provides a clear model, as well as principles and steps for social impact assessment. [http://www.iaia.org/Members/Publications/Guidelines_Principles/US%20principles%20fin al%20IAPA%20version.pdf]

*Local sources of data.*  There are many local government agencies and organizations that collect data that can be useful in land use planning.  Such sources of data include state and local employment departments, city and county governments (e.g., building departments, departments of motor vehicles, or county tax assessors), local and state Chambers of Commerce, local and state economic development commissions, etc.

*Resource-specific sources of data.*  There are many state and Federal agencies that collect and report data on specific industries, such as agriculture (farming and ranching), mining, forestry, and recreation.  For agricultural data, the *USDA Economic Research Service* (Website:  http://www.ers.usda.gov/ http://www.econ.ag.gov) and the *National Agricultural Statistics Service* (Website:  http://www.usda.gov/nass/) are two good sources of information.  The *Economic Research Service* also conducts studies on rural conditions and trends.

The following text citations are provided as examples of possible sources for field offices:

Branch, K., et al.  1984.  *Guide to Social Assessment: A Framework for Assessing Social Change.*  Westview Press, Boulder, CO.

Rabel J. Burge, R.J., et al.  2004.  *The Concepts, Process and Methods of Social Impact Assessment.*  Social Ecology Press, Middleton, 2004.

Goldman, L.R., *ed.*  2000.  *Social Impact Analysis:  An Applied Anthropology Manual.*  Berg Publishing, New York, NY.

Rosenberger, R.S., Loomis, J.B.  2000.  Benefit Transfer of Outdoor Recreation Use Values:  A Technical Document Supporting the Forest Service Strategic Plan.  USDA-Forest Service, Rocky Mountain Research Station General Technical Report RMRS-GTR-72, Fort Collins, CO.

BLM_0008034

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## C.  Environmental Justice References

**Table D-4.—Web-based Environmental Justice sources**

| | |
|---|---|
| The CEQ has prepared detailed guidance on complying with Environmental Justice objectives in the NEPA process: | "Environmental Justice:  Guidance Under the National Environmental Policy Act, 1997," available at:<br>**http://ceq.eh.doe.gov/nepa/regs/ej/justice.pdf** |
| The Interagency Working Group on Environmental Justice, organized by EPA, has useful guidance and other resources: | **http://www.epa.gov/compliance/environmentaljustice/interagency/index.html.** |
| For assistance in identifying Tribal, minority, and low-income populations within a planning area: | "Environmental Justice Geographic Assessment Tool," available at:<br>**http://www.epa.gov/enviro/ej/** |
| The Department of the Interior's Office of Environmental Policy and Compliance has information on Environmental Justice policy and projects: | **http://www.doi.gov/oepc/justice.html** |

## VII.  Further Guidance

For further information on the topics in Appendix D, contact your state office social science staff, or social science staff at the Planning, Assessment, and Community Support Group, Washington Office (WO-210).  Effective use of other agencies' plans and reports, including, but not limited to local government, state agencies, and community development organizations is strongly encouraged.

A website to provide social science guidance, tools, and information resources is under development.

BLM_0008035

BLM_0008036

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix E: Summary of Protest and Appeal Provisions

The BLM must distinguish between land use plan and implementation decisions in all proposed RMP documents (new RMPs, revisions, or amendments) and related decisions (records of decision [ROD] and decision records [DR]), and clearly describe for the public the administrative remedies for each type of decision.  The Dear Reader Letter or the Executive Summary could be used to communicate this information to the public.

## I.  Land Use Plan Protests

The protest procedures in 43 CFR 1610.5-2 provide the public an administrative review of the State Director's proposed land use plan decisions.  The BLM Director determines through this process whether the State Director followed established procedure, considered relevant information in reaching proposed decisions, and whether the proposed decisions are consistent with BLM policy, regulation, and statute.

The Director has delegated signing of response letters to protests to the Assistant Director, Renewable Resources and Planning (AD-200).  Acting in support of the Director, the Group Manager for Planning, Assessment, and Community Support (WO-210) is responsible for the oversight of the entire process once a protest is filed through final resolution.  Each protest is considered in close coordination with the involved State Director and affected Washington Office groups, other Washington Office policy officials, and as appropriate, the Office of the Solicitor.  The WO-210 Group Manager makes recommendations to the Assistant Director for final resolution of the protest.

It will be the BLM's goal to resolve all protests within 90 days.  If it is not possible to resolve and respond to the protest(s) within 90 days, the WO-210 Group Manager should send a letter acknowledging receipt of the protest to the originating party, indicating that a more detailed response will follow.  Refer to Figure 5 for a summary of the protest process.

## A.  <u>Washington Office Initial Evaluation of Protests</u>

When possible, all actions in this section will be completed within 5 business days of receipt of the protest letters:

1.  ***The Protest Coordinator will establish a case file for each protest received.***  Each protest will be consecutively serialized using the following coding: **PP-SO-PN-FY-#**

    a)  "PP" means Plan Protest,
    b)  "SO" means the responsible State Office,
    c)  "PN" means a plan name identifier of up to several letters,
    d)  "FY" means the last two digits of the fiscal year,
    e)  "#" is a sequential number assigned as the filings are received.

BLM_0008037

## Protest Process Flow Chart

**WO-210 Protest Coordinator**

1) Establishes case file for each protest.
2) Determines if protests are timely filed.
3) Determines whether protests are "complete".
4) Sends copies of timely-filed and "complete" protests to responsible state and field office.

**State Office and Field Office [1]**

1) Determine "standing" for each protest.
2) Determine whether issues have been raised previously in the planning process.
3) Determine whether issues are germane to the planning process.

*[1] These steps occur in coordination/interaction with WO-210.*

**WO-210 Liaison**

1) Reviews state office initial determination of issues.
2) Works with state office/field office to finalize list of issues and comments.

**State Office Prepares and Provides WO-210**

1) Detailed issue analysis.
2) Draft protest response (decision letters).

**WO-210 State Liaison Conducts Final Review**

1) Drafts protest response letter(s) based on field/state office input and independent evaluation of the planning process (whether to uphold, remand plan, or uphold/remand in part).
2) Circulates draft letter(s) for Washington Office surnaming.
3) Works with protest coordinator to prepare final protest response letter(s).

**Assistant Director (AD-200)**

1) Signs letter(s) dismissing all protests, **or**
2) Remands protest(s) to State Director to correct flaws in proposed plan decisions and/or underlying NEPA documentation. [2]

*[2] ROD may be approved by the State Director covering just those parts of the plan that are upheld in the protest review process; remanded decisions are reevaluated and/or subject to further NEPA analysis and subsequent protest process and separate ROD.*

**Figure 5.—*Protest process flow chart***

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**2.  *The Protest Coordinator will check to ensure that each protest was filed within the protest period (see 43 CFR 1610.5-2(a)(1)).***  Plan protests are deemed timely if the postmark is not later than the last day of the protest period (see Receiving, Managing, and Responding to Electronic Mail and Faxed Protests at the end of this section).  Normally, BLM does not need to actually receive a protest by the end of the protest period—the protest letter must only be postmarked by that date.  In certain instances, the BLM may require that protests be received by the end of the protest period.  This requirement may only occur if the public is widely and officially notified (at a minimum, in the *Federal Register* notice and Dear Reader Letter).  In all cases, the protest period shall be 30 days and always end on a business day.  If the 30th day falls on a Saturday or Sunday, the protest period shall end the following Monday.  The protest period may not be extended for any reason.  Due to security screening delays, some protests may arrive in Washington, D.C., 3 weeks after the protest period ends, or later.

The following strict standards will determine timeliness:

> a)  If the originator filed a protest after the protest period, the Washington Office will dismiss it and respond to the originator in writing.

> b)  If the originator filed a protest timely, proceed to the next steps.

> c)  The publication of the EPA's *Federal Register* NOA starts the protest period for EIS-level plans and amendments. The initiation of the protest period for EA-level plan amendments is the publication of the notice of the amendment's effective date (generally, this notice would be included in the Dear Reader Letter for the amendment).

**3.  *The Protest Coordinator will examine each protest to see if it is complete (see 43 CFR 1610.5-2(a)(2)(i)-(v)).***  The term "complete" means that the following five protest components are submitted in the protest filing:

> a)  The name, mailing address, telephone number, and interest of the person filing the protest;

> b)  a statement of the issue or issues being protested;

> c)  a statement of the part or parts of the plan or amendment being protested;

> d)  a copy of all documents addressing the issue or issues that were submitted during the planning process by the protesting party or an indication of the date the issue or issues were discussed for the record; and

> e)  a concise statement explaining why the State Director's decision is believed to be wrong.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The BLM will not dismiss a protest solely because the protest omits some of the documentation required by item (3) above.  If BLM is uncertain about standing (see B.1.a below) and the missing materials are necessary for BLM to make this determination, BLM shall request, in writing, the protesting party to provide the missing materials to the protest coordinator.  Requested materials must be postmarked no later than 10 days after BLM's request for these materials is received by the protesting party (return receipt verified).  If following BLM's request for missing materials, the protest does not meet the five protest components and if standing cannot be determined by this additional step, the protesting party will be denied standing.  Case-by-case consideration will be given to appropriate actions for incomplete submissions.  Minor omissions will not be used as a reason to dismiss a protest.

The requirements for filing a protest in accordance with the regulations apply to each protesting party.  Merely attaching or referencing another protesting party's protest is not sufficient to qualify as a valid protest.

4. ***The Protest Coordinator will forward a copy of protest letters meeting the above five components to the responsible state and field office(s) for further evaluation and a detailed analysis.***  Protests that meet the requirements noted above will be forwarded to the affected state as soon as practicable rather than waiting until the end of the protest period.  Washington Office liaisons should also ensure that copies of the protests are distributed to all affected Washington Office program staffs.

## B.  State Office Evaluation and Determination

1.  The State Director and field office(s) will use the following criteria to determine the validity of the protest as documented on the "State Director's Protest Analysis" form at the end of this section:

a.  Does the protesting party have standing?  The protesting party must have an interest which is or may be adversely affected and must have participated in the planning process by:

1.  Sending written comments;
2.  making oral comments (at a hearing or meeting);
3.  attending a public meeting;
4.  calling the BLM field office; and/or
5.  discussing the project with BLM employees in the field.

The administrative record should be checked for appropriate documentation of the protesting party's participation in order for BLM to substantiate the protesting party's standing.  The responsible field office manager will review the planning records to make this determination.  If the record does not support the protester's allegations of participation, the field office shall attempt to verify the alleged participation with the protesting party, giving the protester the benefit of doubt if there is a dispute.  If the determination is made that no participation has occurred,

BLM_0008040

no further review of the protest is required. The AD-200 will issue a written decision that dismisses the protest for lack of standing. Even though the protest is dismissed, the AD may address any comments that were raised.

Individual members of an organization do not obtain standing solely because their organization has participated in the planning process. To file a protest as an individual, the individual has to meet the requirements for standing (they must have participated in the planning process). Conversely, an organization does not obtain standing solely because one of its members has standing (an officer or official representative of the organization must have participated in the planning process on behalf of the organization in order for the organization to have standing).

b. Have the issues been raised before in the planning process? Issues raised on protest must have been previously raised for the record in the planning process. The issue does not need to have been raised specifically by the protesting party. If some of the issues were previously raised, the State Director's analysis will indicate which issues were raised previously and which are newly introduced. If the responsible state/field office determines that one or more issues have not been raised before, those issues will be treated as comments.

c. Are the issues raised germane to the planning process? An issue is not germane to the planning process if it is beyond the scope of a particular planning effort, or if it involves a matter normally addressed in plan implementation. Issues that are not germane to the planning process will not be considered as protest issues but treated as comments.

If the answers to the questions in a., b., and c. above are all *yes*, the State Director should continue the analysis starting with Step 2 below. If the answers to one or more of the questions is *no*, the State Director should complete a draft response and forward the document to the appropriate WO-210 state liaison who will complete a response that dismisses the protest wholly or in part.

2. A detailed analysis will be prepared for each issue or comment raised (see Section E, State Director's Protest Analysis) in a protest letter. The following factors must be addressed in the State Director's analysis:

   a) Facts considered;
   b) procedures followed;
   c) authorities cited;
   d) references from applicable documents; and
   e) applicable BLM policies.

When citing published data from the planning record, the document, date of publication, and page number(s) must be part of the analysis used in the response to the protest issue.

BLM_0008041

Appendix E, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

When citing material from unpublished BLM records, sufficient information must be included to show that the material existed and was relevant during the planning process.

3. The State Director will document the detailed analysis of each protest using the format in the State Director's Protest Analysis. The preparation of preliminary draft responses will expedite the protest resolution process. Other pertinent information that would help resolve the protest should also be included. Completed packages will be sent to the Group Manager, WO-210, no later than 60 days after the protest is received in the state office.

4. The State Director, in consultation with the Washington Office, may determine that discussion and negotiation with protesting parties are appropriate if these discussions may lead to resolution of one or more issues. When these discussions result in resolution of protest issues, advise the protesting party to give the Director a written notice withdrawing the protest. The protesting party may decline to withdraw the protest, but may be willing to accept a clarification or minor change to the proposed plan that effectively resolves the contested issues. This type of change must not trigger a "notice of significant change" required by 43 CFR 1610.5-1(b). For large numbers of protests or complex protests, the Washington Office may send a team to work with the state office and field office in analyzing issues and preparing draft responses.

C. **Washington Office Final Review**

1. WO-210 state liaisons, in coordination with the respective state/field office, will evaluate each protest for content. 43 CFR 1610.5-2(a)(2)(v) requires that protests include a "concise statement explaining why the State Director's decision is believed to be wrong." Statements that merely reflect disagreement, express opinions, or make demands or allegations without the support of this concise statement will be addressed as comments and will not cause a change in the plan being protested.

2. The Group Manager, WO-210, will prepare a draft response and decision on each protest. Decisions should have standard organization and phraseology. The decision will:

  a) Incorporate the results of the Washington Office and State Office evaluations;

  b) incorporate the State Office and WO-210 analyses of the protest points; and

  c) provide a clear statement of the action taken on the protest (dismissed, denied, returned to the State Director for further consideration, or upheld in total or in part).

The bases for upholding protests include:

  a) Approval of the proposed plan or amendment would be contrary to the Director's policy guidance;

BLM_0008042

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

b)  significant aspects of the proposed plan or amendment are based upon invalid or incomplete information; or

c)  the proposed plan or amendment does not comply with applicable laws, regulations, policies, and planning procedures.

Protests upheld on any of the three bases above will be returned, in whole or in part, to the State Director for:

a)  Clarification;
b)  further planning or consideration; or,
c)  change, in whole or in part, of the proposed management decisions.

3.  As the protest responses are drafted, WO-210 will coordinate with other Washington Office program staffs.  Program offices are consulted when a protest involves one or more of the following:

a)  Precedent-setting departures from the existing resource management practices;
b)  failure to comply with national policy guidance and legal requirements;
c)  a major change in the use of resources in the area covered by the plan; and/or
d)  subject areas or matters where special expertise is required.

4.  The WO-210 state liaison will forward the draft proposed response(s) for surnaming to the appropriate Assistant Directors.  The following strategy will be used for expediting the surnaming process:

a)  Use of staff from appropriate groups and directorates to prepare draft protest responses.

b)  WO-210 will provide "heads up" to AD-200 when draft protest responses are ready for surnaming.

c)  AD-200 will provide "heads up" at staff meetings to alert Group Managers of the availability of draft protest responses.

d)  WO-210 will provide briefings for Group Managers as needed (including Group Managers from other Directorates as needed) 2 to 3 days prior to obtaining necessary surnames.  Requested changes should be substantive rather than editorial.

e)  WO-210 will conduct "working briefings" with the AD-200, Deputy Director, Chief of Staff, etc. (including Departmental staff as necessary), early in the process as possible and prior to approval of protest responses.

5.  A formal surnaming package should be prepared for each protest response.  The format and content of the folder should include the following:

BLM_0008043

Appendix E, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a) Cover sheet prepared for surnaming by the following individuals:

    1) Protest Coordinator
    2) Author (generally the WO-210 state liaison)
    3) Deputy Group Manager (DGM)
    4) Group Manager (at the discretion of the DGM or author)
    5) Washington Office Group Managers who have an interest in the EIS, plan, or issues raised in a protest
    6) Deputy Assistant Director (DAD)
    7) Assistant Director (AD) at the discretion of the DAD
    8) Director (at the discretion of the AD)
    9) Others at the discretion of the author

b) The letter of protest.

c) A Summary Brief (one or two pages) in the following format:

    1) Background concerning the plan (or plan amendment) and the NEPA document (EA, EIS)—including what kinds of documents were prepared, when were they completed, etc.;

    2) date the protest period closed;

    3) requirements statement as to whether all of the NEPA, FLPMA, regulatory, and policy requirements were followed by the BLM State/Field Office;

    4) position of constituents or other sensitivities—factual, political, litigation, etc;

    5) summary of the major issues in the protest and responses to issues;

    6) recommended decision or if you are recommending remand (return) in whole or part, why and what are the circumstances;

    7) state/field office collaboration, who you worked with in the state/field office and whether they reviewed the draft letter; and

    8) Washington Office coordination, who you worked with in the Washington Office (make sure they are on the surnaming sheet).

*Note: for large numbers of protests, the above information may be arranged in a tabular format rather than preparing individual summary briefs for each protest.*

d) Response letter.

BLM_0008044

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

These are typical responses to protests where the State Director's proposed decision is being upheld. Protests where the State Director's proposed decision is being returned in whole or in part, or the boilerplate paragraphs below do not fit the protest, will require a different response.

1) Standard Paragraphs

Each letter of response should contain the following paragraphs:

*Paragraph 1*: "The Bureau of Land Management (BLM) has carefully reviewed and considered your letter dated [insert date], regarding the [insert name of plan]. As the Assistant Director for Renewable Resources and Planning, I am responsible to the BLM Director for reviewing and resolving all protests of BLM land use plans. The purpose of this letter is to inform you of the results of my review."

*Paragraph 2*: *For protests that are determined to be invalid because the protesting party does not have standing:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because you have not participated in the planning process or you do not have an interest that is or may be adversely affected. Therefore, I am dismissing the protest." (*Optional:* Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For protests that are determined to be invalid because they were filed after the protest period:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because your letter was not filed by the required date. The regulations at 43 CFR 1610.5-2 do not allow for an extension of the protest period for any reason. Therefore, I am dismissing the protest." (*Optional:* Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For protests that are determined to be invalid because they were filed electronically or by fax and not followed with an original letter:*

"As outlined in the Dear Reader letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because your letter was filed electronically (or by fax) and you did not provide the original

BLM_0008045

Appendix E, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

letter by the close of the protest period.  Therefore, I am dismissing the protest."  (*Optional:*  Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For all protests that contain only issues:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you meet these requirements.  Your protest issue(s) is (are) addressed below."

*For protests that contain both issues and comments*:

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you meet these requirements, in part, and therefore portions of your protest letter are considered a valid protest.  I have determined that your letter also contained a comment(s) which is (are) not considered a valid protest issue(s) because . . . " (*Explain why:*  "the comment(s) represent opinions or observations not substantiated with a concise statement of why the State Director's proposed decision is believed to be wrong, contains issues not previously raised in the planning process, or the issues you raised are not germane to the planning process", etc.).  "The issue(s) and comment(s) are addressed below."

*For protests that contain only comments:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you do not meet these requirements because . . ." (*see above*).  "Therefore, your protest is not valid and is hereby dismissed." (*Optional:*  Even though your protest is being dismissed, your letter contained a comment(s).  That (those) comment(s) is (are) addressed below.)

2)  Issues Identified by the Protesting Party

In the response letters, issues should be addressed within separate paragraphs for the issue and response, in the same order as in the submitted protest letter.  Issues should be quoted wherever possible.  Where issues cannot reasonably be quoted (e.g., they are long, rambling or contain material not pertinent to the issues), they should be clearly summarized.  It is sufficient to have some issues summarized and others quoted.  The statement of the issue must capture all pertinent points addressed in the response.  If comments are addressed (optional), they

BLM_0008046

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

should be addressed at the end of the response letter.  Use the following format for addressing issues and comments:

*Issue/Comment #:*

*Response:*

Protest response letters should clearly document whether BLM followed the correct procedures in arriving at the proposed decision(s).  Authors should identify any regulatory basis for responding to a protesting party's assertion.  Do not argue or be defensive in the response.  BLM's response to each issue should cite page numbers, where possible, in the NEPA document that specifically relate to the issue or comment and not rely solely on what was said in meetings or derived from notes, files, or phone calls.  Focus on what was in writing or in the formal planning process.

3)  Comments

If comments are addressed (optional) they are addressed in the same manner as protest issues.  The response letter must clearly identify why comments are not treated as protest issues, either in the opening paragraphs of the letter or the response to the comment.  If comments that are part of a valid protest are not addressed, they should be responded to separately by the state or field office.

Letters addressed to the protest coordinator stating "this is not a letter of protest" should be forwarded to the respective state office.  A letter should be sent to the sender from WO-210, informing the sender that BLM has forwarded the letter to the respective state office for consideration as a comment.

4)  Standard Paragraphs after the Issues

*Decision*:  *For protests in which the State Director's proposed decision is being upheld (protests in which the decision is being returned, in whole or in part, will require a different response):*

"After careful review of your protest letter, I conclude that the BLM [insert state] State Director and the [insert field office] field office manager followed the applicable planning procedures, laws, regulations, and policies and considered all relevant resource information and public input in developing the [insert name of plan] proposed RMP/amendment/final EIS.  There is no basis for changing the Proposed RMP/amendment as a result of your protest."

BLM_0008047

Appendix E, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

"This decision is the final decision of the Department of the Interior on your protest letter (43 CFR 1610.5-2(b)).  The Interior Board of Land Appeals (IBLA) does not hear appeals from a decision by the Director of the BLM on protests concerning RMPs.  Any party to a case who is adversely affected by a decision of a BLM official to implement some portion of an RMP may appeal such action to the IBLA at the time the action is implemented."

"Thank you for your participation (if the protest is being dismissed for lack of standing, substitute "interest" for "participation") in the development of the [insert name of plan] proposed RMP/amendment/final EIS, and for your interest in the public lands.  Land use plans are designed to balance the public demands for various land uses while ensuring appropriate levels of resource protection.  While there may be times when BLM cannot meet the needs of all those interested in the public lands, BLM strives to address all public input in a conscientious manner.  I encourage you to remain actively (for protests being dismissed for lack of standing, substitute "become" for "remain actively") involved in BLM's resource management activities and to provide information and input during the implementation of the plan.  If you have any questions, or wish to further discuss any issues regarding the plan, please call [insert name], field office manager, [insert phone number]."

When the revised draft response is surnamed, the WO-210 state liaison and the Protest Coordinator will finalize each protest response and prepare a letter for signature by the Assistant Director (AD), WO-200.

Once the AD has signed the protest response, the Protest Coordinator will send it to the protesting party by certified mail, return receipt requested.  A copy will also be sent to the appropriate State Director and Field Manager(s).  The State Director may sign the land use plan decision document only after all protest response letters have been signed and mailed, and any other requirements for approval have been met.

Portions of the proposed plan not under protest or remanded for reconsideration may be approved and implemented.  In such cases, the state office should consult with the Washington Office for further direction.

If the proposed decision and its supporting analysis are returned in whole or in part to the State Director, WO-210 will negotiate the necessary follow-up with the affected state and field office.

## D.  Receiving, Managing, and Responding to Electronic Mail and Faxed Protests

All protest letters sent to BLM via facsimile (fax) or electronic mail (e-mail) will be considered invalid protests unless a properly filed protest is also submitted.  BLM will refer to such correspondence as "comments" and respond accordingly.  If the protesting party also provides

BLM_0008048

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

the original signed copy of the protest postmarked by the close of the protest period, then the fax and/or e-mail correspondence will be considered an advance copy of the protest.  Advance copies of protests provide BLM an indication of the number of protests that will come in after the close of the protest period.

The planning regulations (43 CFR 1610.5-2) require that all protests must be in writing. "Electronic signatures" for certain types of correspondence are now recognized where systems have been established and mechanisms are in place to enable the affected parties to verify the authenticity of the electronic signature.  Such systems and mechanisms are not in place for BLM protest procedures.  Consequently, BLM requires protests be sent to the protest coordinator via regular mail or other delivery service.

New standard language regarding e-mail and fax protests to include in the Agency's *Federal Register* NOA and in the Dear Reader Letter is provided below:

"E-mail and faxed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular mail or other delivery service postmarked by the close of the protest period.   Under these conditions, BLM will consider the e-mail or faxed protest as an advance copy and it will receive full consideration.  If you wish to provide BLM with such advance notification, please direct faxed protests to the attention of the BLM protest coordinator at [insert phone number], and e-mails to [insert e-mail address]."

## E.  <u>State Director's Protest Analysis</u>

When citing published data from the planning record, the state/field office must provide the document, date of publication, and page number(s).

*State Office Analysis For Protest Number*:

   1)  <u>Plan Name</u>:

   2)  <u>Closing Date for Protest</u>:

   3)  <u>Name of Individual or Organization</u>:

   4)  <u>State Office Evaluation Results</u>:

        a.  After review of all planning records, the protesting party has standing through participation in some phase of the planning process (check one)?
Yes [  ] No [  ] (The protesting party must also show an interest that is or may be adversely affected.)

        b.  Have the issues raised in the protest been raised before by the protesting party or another party in some phase of the planning process (check one)?
Yes [  ] No [  ] (Indicate from the identified list of issues those not raised during the planning process with an X.)

BLM_0008049

Appendix E, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    c. Are the issues raised in the protest germane to the planning effort (check one)? Yes [ ] No [ ] (Indicate with an X from the list of identified issues those that are not germane and why.)

   5. List of Issues Raised:

   6. State Office Detailed Analysis of Identified Issues:

   7. State Office Detailed Analysis of Identified Comments:

   8. State Office Recommendations or Opportunities for Resolution:

## II. Governor's Consistency Review Appeal Process

The planning regulations in 43 CFR 1610.3-2(e) allow a state Governor an opportunity to appeal to the BLM Director if the BLM State Director does not accept the Governor's recommendations on plan consistency.

Prior to approval of a proposed plan, revision, or amendment, the BLM State Director will submit the proposed plan, revision, or amendment to the Governor(s) of the state(s) involved and identify any known inconsistencies with approved state or local plans, policies, or programs. The Governor has 60 days to identify inconsistencies and to provide written recommendations to the BLM State Director. If the BLM State Director does not accept a Governor's recommendations, the BLM State Director must notify the Governor in writing; the Governor then has 30 days from receipt of the State Director's letter in which to submit a written appeal to the BLM Director.

The BLM Director will accept the Governor's recommendations if the Director determines that the recommendations provide for a reasonable balance between the national interest and the state's interest. The Director must communicate to the Governor in writing and publish in the *Federal Register* the reasons for accepting or rejecting the Governor's recommendations.

## III. Administrative Remedies of Implementation Decisions

Implementation decisions are subject to the administrative remedies set forth in the regulations that apply to each resource management program of the BLM. These administrative remedies for final implementation decisions usually take the form of appeals to the Office of Hearings and Appeals, though for certain proposed or non-final implementation decisions, including those affecting timber sales, oil and gas lease sales, land exchanges, and proposed grazing decisions, the regulations provide for an internal agency review (usually a protest to the authorized officer) which must be completed before the final implementation decision can be appealed to the Office of Hearings and Appeals (OHA). This type of protest to the authorized officer should not be confused with the protest of land use plan decisions to the BLM Director (there is no OHA review of land use planning decisions).

BLM_0008050

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix F:  Standard Formats for Land Use Plan Documents

### *Appendix F-1:  Recommended Format for Preparation Plans*

Preparation plans should contain the following information and discrete sections.

## A.  Introduction and Background

## B.  Anticipated Planning Issues and Management Concerns

Issues are identified by BLM staff and managers based on their knowledge of the planning area and its users.  Planning issues may be based on:

1)  Contacts or correspondence with users, adjoining districts or field offices, and interested public (including other agencies).

2)  Ongoing consultation, advisory council meetings, interagency and intergovernmental coordination, and informal sessions with users and interested public.  Preplanning does not involve public notices or public participation activities since they are specifically provided for in the RMP and NEPA processes and key preplanning results are publicly reviewed during scoping.

3)  Staff and management knowledge of resource uses, users, conditions, needs, and trends.

Management concerns are generally of a program-specific nature, and while they may not be externally generated or controversial, deserve the appropriate level of consideration in the planning process.

## C.  Preliminary Planning Criteria

Planning criteria are the constraints or ground rules that guide and direct the development of the plan.  They ensure that plans are tailored to the identified issues and ensure that unnecessary data collection and analyses are avoided.  They focus on the decisions to be made in the plan and achieve the following:

1)  Provide an early, tentative basis for inventory and data collection needs.

2)  Enable the manager and staff to develop a preliminary planning base map delineating geographic analysis units.

3)  Stimulate the development of planning criteria during public participation.

BLM_0008051

Appendix F, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## D.  **Data and GIS Needs, Including Data Inventory**

Managers of planning efforts are encouraged to use existing data compiled by other Federal agencies; state, local, and Tribal governments; and private organizations, if applicable, to address assessment questions.  Data compiled by other agencies which are used in BLM land use plans should be consistent across administrative boundaries and landscapes, where available.  Regardless of its source, sufficient metadata (data about data) should be provided to clearly determine the quality of the data, along with any limitations associated with its use.  To define the information required to support each individual planning effort, each preparation plan should:

> 1)  Create a list of currently available data (list by theme, data elements, and explain how that data will support the plan in dealing with anticipated issues and planning requirements).

> 2)  Identify the anticipated data gaps in available data required to deal with the anticipated issues, as well as the planning and analysis requirements.

> 3)  Create a realistic data inventory and collection strategy (including work months, personnel involved, costs and timeframes involved) for acquiring critically needed data and information.

See Appendix G for more information on managing data and information throughout the planning process.

## E.  **Participants in the Process**

> 1)  Describe and list roles, responsibilities, and authorities.

> 2)  Provide team lists (including management team, core team, interdisciplinary, and support teams).

## F.  **Process for the Plan**

> 1)  General steps and format.

> 2)  Alternative formulation:  Identify preliminary plan alternative themes that focus on resolving anticipated issues and reflect the preliminary planning criteria.

> 3)  Internal review of the plan.

> 4)  Form of input from the interdisciplinary team and reviewers.

## G.  **Plan Preparation Schedule**

The schedule provides estimated timeframes for the completion of the required plan components.  It identifies:

BLM MANUAL                                                                                   Rel. 1-1693
Supersedes Rel. 1-1667                                                                03/11/05

BLM_0008052

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1)  All planning actions (43 CFR 1610.4) and support actions expected to be done either consecutively or concurrently.

2)  Target completion dates for each action.

3)  Time periods needed for preparation and award of contracts, if any, and preparation costs required for use in the budget process.

## H.  Public Participation Plan

The public participation plan is to be prepared as a part of the preparation plan.  Every effort should be made to assure meaningful public involvement throughout the planning process.  This includes:

1)  Goals and objectives of public participation.

2)  A description of the public known to be interested or affected and any contributions they may make or information they may need during the planning process and the involvement techniques most appropriate (including involvement of cooperating agencies).

3)  Target dates and other pertinent details for public participation activities, notices, and availability of printed information.

4)  Provisions for updating the plan, as necessary, during plan preparation.

5)  A description of how the results of public participation activities will be summarized, analyzed, documented, and used by the line manager in making decisions in the plan.

6)  Internet technology that will be used to provide information to the public and/or solicit comments.

## I.  Budget

The budget includes all costs associated with development of the plan including, data needs collection, contracting costs, BLM staff work months, *Federal Register* notices, vehicle, travel, and support costs.  It should address the level of program sources funding provided by the field or state office, as well as increased funding needs.

BLM_0008053

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## *Appendix F-2: Recommended Format for Scoping Reports*

The following is a suggested format for field offices to prepare scoping reports to achieve a common and consistent approach that meets minimum requirements.  It is recognized that some situations (for example scoping reports dealing with an unusually large number of comments) may require additional content and detail.  Documents should be as brief, concise, and user-friendly as possible.   Authority for the scoping report can be found at 43 CFR 1610.2(d).

### A.  **Cover Letter**

Optional; signed by field office manager.

### B.  **Introduction**

    a) Overview/purpose and need for the plan (tie to planning evaluation)
    b) Brief description of the planning area (including a map)
    c) Brief description of the scoping process (NOI history, meetings, contacts, etc.)
    d) Cooperating agencies/invitees
    e) Collaboration and consultation with Tribes

### C.  **Issue Summary**

    a) Summary of public comments
    b) Issues identified during scoping
    c) Anticipated decisions to be made
    d) Issues raised that will not be addressed (including rationale)
    e) Valid existing management to be carried forward
    f) Special designations, including nominations

### D.  **Draft Planning Criteria**

Include if not previously published in initial notice; otherwise incorporate by reference.

### E.  **Data Summary/Data Gaps**

Include if not previously published in initial notice; otherwise incorporate by reference.

    a)  Refer to more detailed lists in preparation plan or elsewhere (state that these are available upon request)

    b)  Identify any relevant data provided or identified as available during scoping

    c)  List data gaps identified during scoping

BLM_0008054

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**F.  <u>Summary of Future Steps in the Planning Process</u>**

Identify planning process timelines and opportunities for public participation (including webpage address and key contact address and information, etc.)

Appendix F, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Appendix F-3:  Annotated Outline of the Analysis of the Management Situation*

The analysis of the management situation (AMS) should describe the current conditions and trends of the resources and the uses/activities in the planning area in sufficient detail to create a framework from which to resolve the planning issues through the development of alternatives. This analysis should be short, concise, and focused on the issues relevant to resource management in the area.  It should not be an exhaustive review of everything known about the area.

## CHAPTER 1.  INTRODUCTION

### A.  Purpose of Analysis of the Management Situation

Describe the role of the AMS in the planning process.

### B.  General Description of Planning Area, Geographic Scope, and Resources/Programs

### C.  Key Findings

Summary of the most important conclusions drawn from the AMS.

## CHAPTER 2.  AREA PROFILE

This chapter describes the existing condition of the resources, resource uses, and other features of the planning area (i.e., area profile).  It should provide a context for resources and uses by incorporating information compiled at multiple levels to describe the large-scale ecoregions associated with the planning area.  The information will become the basis for the Affected Environment chapter of the RMP/EIS.  Table F-1 shows the components of the area profile (not necessarily all-inclusive).

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table F-1.—***Area profile*

| Resources | Resource uses | Special designations | Social and economic |
|---|---|---|---|
| <ul><li>Air quality</li><li>Geology</li><li>Soil resources</li><li>Water resources (surface and groundwater)</li><li>Vegetative communities [1]</li><li>Fish and wildlife</li><li>Special status species</li><li>Wild horse and burros</li><li>Wildland fire ecology and management</li><li>Cultural resources</li><li>Paleontological resources</li><li>Visual resources</li><li>Wilderness characteristics</li><li>Cave and karst resources</li></ul> | <ul><li>Facilities</li><li>Forestry and woodland products</li><li>Livestock grazing</li><li>Minerals (leasable, locatable, salable)</li><li>Recreation</li><li>Renewable energy</li><li>Transportation and access</li><li>Utility corridors and communication sites</li><li>Land tenure</li><li>Land use authorizations</li><li>Withdrawals</li></ul> | <ul><li>Areas of critical environmental concern</li><li>Back country byways</li><li>National recreation areas</li><li>National trails</li><li>Wild and scenic rivers</li><li>Wilderness</li><li>Wilderness study areas</li></ul> | <ul><li>Tribal interests</li><li>Public safety (abandoned mines, debris flows, and hazardous materials)</li><li>Social and economic conditions</li></ul> |
| [1] Vegetative communities can be identified at a variety of scales and include forests, woodlands, rangelands, riparian areas, and wetlands. | | | |

## A.  Resources

The Resources section should have both an introduction common to all resources and a section specific to each resource.  The information presented in the introduction should help the planning team relate the resources in the planning area to the regional setting, and define the current condition and key features of those resources.  It should also help the team highlight potential management opportunities in Chapter 4 of the AMS by addressing the regional importance and function of resources within the planning area.

1.  Regional Context:

Different agencies and organizations have compiled geospatial datasets for large-scale ecoregions such as the Wyoming Basin and the Colorado Plateau.  Ecoregions of this scale range in size from 3.5 million acres to 88 million acres (averaging 23 million acres).  Most planning areas will fall into one or two ecoregions, depending on the scale at which they were developed. Planning boundaries may overlap ecoregional boundaries, so it is important for planning areas to coordinate in collecting and sharing information.

These large-scale geospatial datasets provide broad-level biological information that complements local planning efforts by identifying dominant patterns on the landscape and threats to resources.  Other existing fine and midscale data (e.g., state and Heritage programs, BLM-led assessments such as Land Health Assessments, Recovery Plans, and Conservation Strategies) used in combination with broad scale information can provide a complete picture of current conditions and key features of the resources (definitions for broad, mid, and fine scale data are provided in the Glossary).  For example, BLM-led Land Health Assessments contain information on upland, riparian, and stream channel condition that can be used to refine ecoregion conditions from larger datasets.  Use multiscale information to complete Table F-2.

BLM_0008057

Appendix F, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table F-2.—*Ecoregion/Planning Area Information***

| Information about the ecoregion | Information about the planning area as it relates to the ecoregion |
|---|---|
| Size and general geographic location. | • Orientation of the planning area within the ecoregion.<br>• Percent of the ecoregion that (1) all lands in the planning area cover and (2) BLM lands in the planning area cover. |
| Overall ecoregion condition (past versus present) and major issues affecting function and resource trends (i.e., fire suppression, habitat fragmentation, and invasive species). | • The overall condition of the BLM lands relative to the condition of the ecoregion.<br>• Information relative to how current land use allocations and management BLM lands might be contributing to or helping to alleviate the major ecological issues of the ecoregion. |
| Features of the ecoregion that are unique or are particularly important to ecological condition (e.g., large blocks of grasslands or sagebrush). | • The extent to which the planning area or portions within it may be ecologically important to maintaining ecosystem function. [1] |
| [1] This information may not be available depending on the source of ecoregion information used. | |

2.  Resource-specific information

The AMS should include resource-specific information organized by the following five factors:

*a.  Indicators.*  Identify factors that describe resource condition such as ambient pollutant level, visibility, and fire regime condition class.  Indicators should be quantitative whenever possible.  There are many potential sources for indicators, including Standards for Rangeland Health.

*b.  Current Condition.*  Describe the location, extent, and current condition of the resource in the planning area.  Condition can be determined by comparing the value of indicator(s) to an established standard (current plan goal or objective) and/or benchmark. Relate the condition assessment to Land Health Standards as appropriate.  The scale of the analysis may extend beyond the immediate planning area boundary and encompass a logical landscape (the analysis area). For instance, the analysis can occur at different levels such as by watershed, geographic area, or region.

*c.  Trends.*  Describe the degree and direction of change between the present and some point in the past.  Explain whether the trend is moving toward or away from the current desired condition based on the indicators.  Also describe the drivers or agents of change. Note that for some resources, a desired condition has not been established or there will not be enough information to describe trends.  When describing trends, note whether the trend is based on quantitative or qualitative information.  For example, the trend for ambient pollutant levels most likely can be described from a quantitative standpoint; that is, based on changes in levels of criteria pollutants over time as recorded in published data.  For other resources where data are not available, a qualitative approach would be used.

*d.  Forecast.*  Predict changes in the condition of resources given current management. Describe the drivers or agents of the anticipated change.

BLM_0008058

*e. Key features.*  Describe the geographic location, distribution, areas or types of resource features that should guide land use allocation or management decisions.  For example, certain areas may be particularly important to special status species habitat, or some soil types may be better able to support certain land uses than others.

## B.  Resource Uses

For each resource use, describe the following:

1)  Current level (including potential) and locations of use (map each use).

2)  Forecast, or the anticipated demand for use (levels and locations)—the reasonable foreseeable development.

3)  Key features, or the areas of high potential for the use (these areas do not necessarily have to be currently managed for the use).

## C.  Special Designations

Identify the location of existing special designations such as ACECs, wilderness areas, wilderness study areas, wild and scenic rivers, and other applicable designations.  Also identify areas meeting the relevance and importance criteria to be considered as potential ACECs or potentially eligible river segments, etc.

## D.  Social and Economic Features

Listed below are the topics to describe for each of the social and economic features.

- Tribal interests—Identify the Tribes with interests in the planning area.  Describe features not otherwise described in the cultural resources section, such as treaty-based subsistence uses, traditional use areas, and rights of access.

- Public safety (abandoned mines, debris flows, and hazardous materials)—Identify areas where public safety is an issue.

- Social and economic conditions—See Appendix D.

## CHAPTER 3.  CURRENT MANAGEMENT DIRECTION

This chapter describes current management direction based on existing land use plans and amendments by program (and later becomes the basis for the no action alternative). Provide a list of management decisions and their sources for each resource or resource use. Identify management decisions from all applicable BLM plans (RMPs, MFPs, and amendments for planning-level decisions). Note that some resources will not have any management decisions established.

BLM_0008059

Appendix F, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A. Relevant Plans and Amendments

The list of management decisions should be drawn from all applicable BLM plans (RMPs and amendments). List all plans and amendments that influence current management. This list can be displayed in a table such as the one below:

Table F-3.—*Sample format for list of relevant plans and amendments*

| Document title | Year | Other relevant information | Admininstrative record document number |
|---|---|---|---|
|  |  |  |  |

## B. Management Decisions

Describe all management decisions that will become the no action alternative in the draft RMP. Table F-4 is a recommended format.

Table F-4.—*Current management for resources, resource uses, and social and economic features*

| Current management decision | Planning decision number | Decision source | Status |
|---|---|---|---|
| Insert decision title and/or description. | Insert decision number or other identifier if known. | Insert source document for the decision, such as: Lower Gila South RMP | Insert the status of the decision: whether it was completed and when, progress if not completed, etc. |

To the extent possible, document decisions by logical management units or zones. Special management areas (special designations) would be included in this manner. Types of special management areas include ACECs, back country byways, national recreation areas, national trails, wild and scenic rivers, wilderness, and wilderness study areas.

## CHAPTER 4.  MANAGEMENT OPPORTUNITIES

Identifying management opportunities is a process of considering changes in management to respond to (a) information gathered in the area profile (Chapter 2) and (b) issues and concerns elevated through scoping. It serves as a starting point for alternative formulation by providing a list of possible management opportunities for later sorting and refining into a framework of compatible alternatives. Consult Appendix C as a guide to the program-specific land use plan decisions that should be made as part of the planning process when identifying management opportunities.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A.  Analyze the Ability of Current Management Direction to Achieve Desired Conditions and Address Resource Demands

Based on the current condition and trends of the resources and the current and trends of demands on those resources, analyze the ability of current management direction to achieve desired conditions and address resources and demands for use of the resources.  Discuss field office(s) capability in terms of staff, annual budget, summary of workload ranked by subactivity and/or program elements.

While discussing the management adequacy of each decision, also discuss options for changing the management if the decision does not adequately respond to current issues, changes in circumstances, new information, etc.

Fill out Table F-5 for each resource, resource use, special management area and social and economic feature.  Notice that the table is similar to Table G-4 in Chapter 3(B), which describes the management decisions.

**Table F-5.—*Adequacy of current management direction and options for change***

| Planning decision | Is decision responsive to current issues? | Remarks (rationale) | Options for change |
|---|---|---|---|
| Insert decision title and/or description. | (Y/N) | Describe why the decision is/is not adequate. | Insert options for changing management. As appropriate, include decisions from other jurisdictions that warrant consideration. |

## B.  Identify Areas of Relative Ecological Importance to Guide Land Uses and Management

Identifying areas of relative ecological importance enables planners to understand tradeoffs when establishing land use allocations and management requirements.  Regional knowledge, gained through broad scale assessments, can highlight the importance of an area in the context of the larger ecoregion. This information is fundamental to developing a range of alternatives and analyzing the effects of the alternatives in the RMP/EIS, and to managing for "the health, diversity, and productivity of the public lands."

Understanding relative ecological importance should guide land use allocations and management approaches, rather than preclude uses. For example, this information should feed into alternative development by helping to identify opportunities for maintenance and/or restoration of habitats. Note that relative ecological importance may change over time with new information and changes in land uses and condition.

When assembling information on relative ecological importance, focus on dominant patterns across the ecoregion, and on habitat extent, habitat condition, species connectivity requirements

BLM_0008061

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and overall plant and animal species diversity within the planning area.  There are many ways to assemble this information.  One way is to create maps using information and datasets collected for both the ecoregion or for the preparation of the area profile and AMS.  This approach is described in Figure G-1, and can be applied using a geographic information system (GIS) or transparencies.

## CHAPTER 5.  CONSISTENCY/COORDINATION WITH OTHER PLANS

Identify plans in areas surrounding the planning area and discuss the implications for the planning area from these plans.  Identify resources that are in common, dependent, or interdependent.

1) County/city plans
2) State Comprehensive Wildlife Conservation Strategies and State lands plans
3) Other Federal agency plans (including fire planning units)

Identify significant opportunities for enhancing coordination or gaining expertise through cooperating agency relationships.

## CHAPTER 6.  SPECIFIC MANDATES AND AUTHORITY

All resource specialists should provide a description of laws, regulations, and policy applicable to their resources.  Information on Federal, state, local, as well as BLM policy should be included.

## CHAPTER 7.  SCOPING REPORT OR SUMMARY OF SCOPING REPORT

## CHAPTER 8.  LIST OF PREPARERS

Provide the following information for each person working on the project:  name, responsibility, qualifications, and participation.

## CHAPTER 9.  GLOSSARY

## CHAPTER 10.  REFERENCES

Provide references for each resource section according to the format noted in the project work plan.  All references should be included and complete reference information should be submitted with each resource section.

BLM_0008062

Appendix F, page 13

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Figure F-1.—***One potential method for identifying areas of relative ecological importance*



BLM_0008063

Appendix F, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

### *Appendix F-4: Annotated Outline for a Draft and Final RMP (Amendment)/EIS*

The following outline applies to draft and full text final EISs.  If minor changes consisting of technical, editorial, or nonsubstantive factual corrections are made in the draft EIS in response to comments, then an abbreviated final EIS may be prepared.  An abbreviated final EIS only contains substantive comments received on the draft, responses to those comments, and an errata section with specific modifications and corrections to the draft EIS in response to comments (see 40 CFR 1503.4).

Contractor logos should not be placed anywhere in the documents (although it is recommended that the role of the contractor be acknowledged in the list of preparers in Chapter 5).

1. **Abstract** *(Inside front cover)*

2. **Cover sheet** *or title page*

3. **Dear Reader Letter** *(include privacy statement)*

4. **Protest procedures** *(final EIS)*

5. **Table of contents**

6. **Summary** *(approximately 15 pages)*

*(Optional Reader's Guide to help explain chapter format and contents)*

7. **Chapter 1.  Introduction** *(approximately 5–10 pages)*

    A.  Purpose and Need for the Plan

    B.  Planning Area and Map

    C.  Scoping/Issues

        1.  Issues Addressed
           a.  *Issues used to develop alternatives* [1]
           b.  *Issues addressed in other parts of the EIS*

        2.  Issues Considered but Not Further Analyzed
           a.  *Issues beyond the scope of the plan*
           b.  *Issues addressed through administrative or policy action*

    D.  Planning Criteria/Legislative Constraints

    E.  Planning Process

---

[1] Italics here show optional categories for issues.

BLM_0008064

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    1. <u>Relationship to BLM Policies, Plans, and Programs</u>

    2. <u>Collaboration</u>
        a. Intergovernmental, inter-agency, and Tribal relationships
        b. Other stakeholder relationships

F. <u>Related Plans</u>: *Discuss consideration of state, local, and Tribal land use plans that "are germane in the development of land use plans for public lands."* [2]

G. <u>Policy</u>: *Discuss policies and decisions that existed prior to the plan being written that are outside the scope of the plan but may influence the decisions, constrain the alternatives, or are needed to understand management of the area. Examples include: proclamations, legislative designations, and court settlements.*

H. <u>Overall Vision</u>: [3] *Identify the overall vision for management of the planning area. This vision should reflect the goals that are common to all alternatives. This can serve to help integrate programs.*

## 8. <u>Chapter 2. Alternatives</u> [4]

A. <u>General Description of each Alternative</u>: *Highlight the characteristics that distinguish each alternative. Rather than naming alternatives, number or letter each alternative and briefly describe the theme of each alternative.*

B. <u>Management Common to All Alternatives</u>: *Primarily goals for resource conditions and resource uses.*

C. <u>No-Action Alternative</u>: *Description of existing management direction including current decisions from relevant plans and reasonable, foreseeable, management scenarios.*

D. <u>Action Alternatives</u>: [5] *Detailed description of each of the alternatives, by alternative, needed to display a reasonable range of options to meet the stated Purpose and Need and address issues. Each alternative description should address the issues or programmatic areas. The decisions in the alternatives should follow the format for land use plan "Management Decisions" provided in Appendix F-5.*

---

[2] Federal Land Policy and Management Act, Section 202(c)(9).
[3] Optional.
[4] There has been some discussion of reversing the order of the Alternatives and Affected Environment chapters of the EIS. However, the Office of Environmental Policy and Compliance in the Department of the Interior has issued guidance stating that we must follow the recommended format in the CEQ regulations (40 CFR 1502.10) or obtain approval from OEPC to deviate from it.
[5] At the draft stage in the preparation of an EIS, the preferred alternative is identified in Chapter 2 of the draft EIS. At the final EIS stage, the proposed plan is presented with the alternatives. The proposed plan should be in a clearly delineated section to make it easily identifiable and may also be pulled out as a separate document.

Appendix F, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   E.  <u>Alternatives Considered but Not Analyzed in Detail</u>

   F.  <u>Comparison of Alternatives</u> *(table)*

   G.  <u>Comparison of Impacts</u> *(table)*

**9.  Chapter 3.  Affected Environment** *(keep as short and concise as possible):  Limit discussion to what is needed to understand issues and environmental consequences and provide context for the Goals and Objectives.  This chapter may also be formatted in the same way as the Area Profile section of the Analysis of the Management Situation (See Appendix F-3).*

   A.  <u>Resources</u>:  *Physical, biological, and cultural resources (current conditions and trends).  This is not necessarily a comprehensive list.*

       1.  <u>Air Quality</u>
       2.  <u>Geology</u>
       3.  <u>Soil Resources</u>
       4.  <u>Water Resources</u>
       5.  <u>Vegetative Communities</u>
          a.  <u>Forests and Woodlands</u>
          b.  <u>Rangelands</u>
          c.  <u>Riparian and Wetlands</u>
       6.  <u>Fish and Wildlife</u>
       7.  <u>Special Status Species</u>
       8.  <u>Wild Horses and Burros</u>
       9.  <u>Wildland Fire Ecology and Management</u>
       10.  <u>Cultural Resources</u>
       11.  <u>Paleontological Resources</u>
       12.  <u>Visual Resources</u>
       13.  <u>Wilderness Characteristics</u>
       14  <u>Cave and Karst Resources</u>

   B.  <u>Resource Uses</u>:  *Resource uses (current conditions and trends).  This is not necessarily a comprehensive list.*

       1.  <u>Facilities</u>
       2.  <u>Forestry and Woodland Products</u>
       3.  <u>Livestock Grazing</u>
       4.  <u>Minerals</u>
          a.  Leasable Minerals (e.g. oil, gas, and geothermal)
          b.  Locatable Minerals (e.g. gold and silver)
          c.  Salable Minerals (e.g. sand and gravel)
       5.  <u>Recreation</u>
       6.  <u>Renewable Energy</u>
       7.  <u>Transportation and Access</u>
       8.  <u>Utility Corridors and Communication Sites</u>

BLM_0008066

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

     9.  Land Tenure
    10.  Land Use Authorizations
    11.  Withdrawals

  C.  Special Designations

     1.  Areas of Critical Environmental Concern
     2.  Back Country Byways
     3.  National Recreation Areas
     4.  National Trails
     5.  Wild and Scenic Rivers
     6.  Wilderness
     7.  Wilderness Study Areas

  D.  Social and Economic

     1.  Tribal Interests
     2.  Public Safety
       a.  Abandoned Mines
       b.  Debris Flows
       c.  Hazardous Materials
     3.  Social and Economic Conditions (including Environmental Justice and other considerations)

**10.  Chapter 4.  Environmental Consequences**.  *Document sufficient analysis to support all conclusions.  This chapter may also be formatted in the same way as the Area Profile section of the Analysis of the Management Situation (See Appendix F-3.)*

  A.  Introduction

     1.  Analytical assumptions (reasonably foreseeable development scenarios for oil and gas, anticipated levels of vegetation treatment, etc.)
     2.  Types of effects to be addressed (direct, indirect, and cumulative)
     3.  Summarize critical elements that are addressed, not affected, or not present
     4.  Incomplete or unavailable information

For program areas, include discussions as outlined in 40 CFR 1502.16 for the alternatives by program area listed below.

  B.  Resources:  *Physical and biological resources addressed in alphabetical order.  This is not necessarily a comprehensive list.*

     1.  Air Quality
     2.  Cave and Karst Resources
     3.  Cultural Resources
     4.  Fish and Wildlife

BLM_0008067

Appendix F, page 18

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    5.  <u>Geology</u>
    6.  <u>Paleontological Resources</u>
    7.  <u>Soil Resources</u>
    8.  <u>Special Status Species</u>
    9.  <u>Vegetative Communities</u>
        a.  <u>Forests and Woodlands</u>
        b.  <u>Rangelands</u>
        c.  <u>Riparian and Wetlands</u>
  10.  <u>Visual Resources</u>
  11.  <u>Water Resources</u>
  12.  <u>Wild Horses and Burros</u>
  13.  <u>Wilderness Characteristics</u>
  14.  <u>Wildland Fire Ecology and Management</u>

C.  <u>Resource Uses</u>:  *Resource uses addressed in alphabetical order.  This is not necessarily a comprehensive list.*

    1.  <u>Facilities</u>
    2.  <u>Forestry and Woodland Products</u>
    3.  <u>Land Tenure</u>
    4.  <u>Land Use Authorizations</u>
    5.  <u>Livestock Grazing</u>
    6.  <u>Minerals</u>
        a.  Leasable Minerals (e.g. oil, gas, and geothermal)
        b.  Locatable Minerals (e.g. gold and silver)
        c.  Salable Minerals (e.g. sand and gravel)
    7.  <u>Recreation</u>
    8.  <u>Renewable Energy</u>
    9.  <u>Transportation and Access</u>
  10.  <u>Utility Corridors and Communication Sites</u>
  11.  <u>Withdrawals</u>

D.  <u>Special Designations</u>

    1.  <u>Areas of Critical Environmental Concern</u>
    2.  <u>Back Country Byways</u>
    3.  <u>National Recreation Areas</u>
    4.  <u>National Trails</u>
    5.  <u>Wild and Scenic Rivers</u>
    6.  <u>Wilderness</u>
    7.  <u>Wilderness Study Areas</u>

E.  <u>Social and Economic</u>

    1.  <u>Tribal Interests</u>
    2.  <u>Public Safety</u>

BLM_0008068

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    a.  Abandoned Mines
    b.  Debris Flows
    c.  Hazardous Materials

    3.  Social and Economic Conditions (including Environmental Justice and other considerations)

**11.  Chapter 5.  Consultation and Coordination**

    A.  Description of specific actions taken to consult and coordinate with:

        1.  Tribes
        2.  Intergovernmental (State, Local, County, and City)
        3.  Federal Agency
        4.  Interest Groups
        5.  National Mailing List

    B.  Describe additional collaboration

    C.  Responses to comments by issue area (FEIS only)

    D.  List of Preparers

**12.  Appendices**

**13.  Glossary**

**14.  References**

**15.  Index**

**16.  Abbreviations/Acronyms** (inside back cover):  *Placement can also occur with the Reader's Guide, Summary, or in the Glossary.*

BLM_0008069

Appendix F, page 20

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Appendix F-5: Annotated Outline for Record of Decision (ROD)/Approved RMP (Amendment)***

At the end of the protest period on the final EIS and proposed plan and after protests are resolved, the ROD[6] is issued.  The ROD must be published in the same document with and reference the land use plan (proposed plan from the final EIS as modified in response to protests or other considerations between the final EIS and issuance of the ROD). The ROD/RMP serves as a more concise and useful tool to land managers and stakeholders than a cumbersome EIS. Separation of the approved RMP from the final EIS and attaching it to the ROD clarifies the different roles served by a plan and the supporting NEPA analysis.  Additionally a stand-alone ROD/RMP will improve internal agency and partner understanding of the plan and improve our long-term ability to implement the plan.

## I.  Record of Decision (ROD)

**A.  Introductory Material:** *(on a cover sheet or at the top of the first page)*

   1) Title
   2) Preparing office and office location
   3) Cooperating agencies (if any)
   4) Signature and title of responsible official and concurring officials (if any) [7]
   5) Date of signature(s)

**B.  Summary:** *(if ROD exceeds 10 pages)*

**C.  Decision:** *The primary decision is to approve the attached land use plan.* [8]

**D.  Alternatives:** *Briefly discuss the alternative or alternatives that were considered to be "environmentally preferable."*[9]

**E.  Management Considerations:** *Provide the rationale for the decision.*

**F.  Mitigation Measures:** *In addition to identifying approved mitigation measures, state whether all practicable means to avoid or minimize environmental harm from the alternative*

---

[6] The format for the ROD can be found in the NEPA handbook (H-1790-1), Chapter V, pages V-22 to V-23.
[7] Signatures and date of signatures can occur at end of ROD.
[8] Example:  "The decision is hereby made to approve the attached plan as the resource management plan (Plan) for [insert title].  This Plan was prepared under the regulations implementing the Federal Land Policy and Management Act of 1976 (43 CFR 1600).  An environmental impact statement was prepared for this Plan in compliance with the National Environmental Policy Act (NEPA) of 1969.  The Plan is nearly identical to the one set forth in the [insert title] Proposed Resource Management Plan and Final Environmental Impact Statement published [insert here].  Specific management decisions for public lands under the jurisdiction of the [insert here] Field Office are presented in Chapter [insert] of the plan.  Major decisions include:  [insert here].
[9] See 40 CFR 1505.2(b).

BLM_0008070

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*selected have been adopted, and if not, why.  Summarize any monitoring and enforcement program being adopted for mitigation measures.*[10]

**G.  Plan Monitoring:**

**H.  Public Involvement:** *Briefly describe public participation in planning process.*

**II.  Approved Resource Management Plan**

**A.  Introduction.** [11]

    1.  Purpose and Need for the Plan

    2.  Planning Area and Map

    3.  Scoping/Issues

        a.  Issues Addressed
           i)  Issues used to develop alternatives [12]
           ii)  Issues addressed in other parts of the EIS

        b.  Issues Considered but Not Further Analyzed
           i)  Issues beyond the scope of the plan
           ii)  Issues addressed through administrative or policy action

    4.  Planning Criteria/Legislative Constraints

    5.  Planning Process

        a.  Relationship to BLM Policies, Plans, and Programs
        b.  Collaboration
           i)  Intergovernmental, inter-agency, and Tribal relationships
           ii)  Other stakeholder relationships

    6.  Related Plans: *Discuss consideration of state, local, and Tribal land use plans that "are germane in the development of land use plans for public lands."* [13]

    7.  Policy: *Discuss policies and decisions that existed prior to the plan being written that are outside the scope of the plan but may influence the decisions, constrain the alternatives, or are needed to understand management of the area.  Examples include: proclamations, legislative designations, and court settlements.*

---

[10] See 40 CFR 1505.2(c).
[11] This introduction section is optional material for the land use plan document.
[12] Italics here show optional categories for issues.
[13] Federal Land Policy and Management Act, Section 202(c)(9).

BLM_0008071

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

8.  Overall Vision: [14] *Identify the overall vision for management of the planning area. This vision should reflect the goals that are common to all alternatives.  This can serve to help integrate programs.*

**B.  Management Decisions.** [15] *List management decisions by issue or programmatic area, making clear how decisions in one issue or programmatic area may affect others.*

1.  Goals: [16] *Identify goals for resource conditions, resource uses, and other goals as appropriate.*

2.  Objectives: [17] *Identify objectives with their rationale (include associated goal[s]). Reference which goals are advanced by the objective.*

3.  Management Actions: *Make these adaptive as appropriate and practical.  Relate each decision to all goals and objectives impacted.  This section should address special designations and land tenure decisions.*

a.  *Allowable uses*:  This should include allowable uses, restricted uses, and prohibited uses.  Incorporate maps where appropriate.

b.  *Actions*:  Management measures that will guide future and day-to-day activities.  Project design features, stipulations, best management practices, standard operating procedures, and guidelines should be included in this section as well.

c.  *Implementation decisions*:  Include any implementation decisions (see appropriate guidance for distinction) related to particular land use planning decisions.

4.  Monitoring (and adaptive management if applicable): *Describe plans for monitoring to assess progress toward meeting goals and objectives.  If appropriate, discuss plans of action if monitoring indicates actions are not meeting goals and objectives or if actions are no longer needed.*

**C.  Public Involvement.**  *Describe how the public and partners can be involved in implementation.*

**D.  Management Plan Implementation.**  *To the extent practical and appropriate, identify priorities and costs of the management program.  Costs should be estimated at a scale that is*

---

[14] Optional.

[15] The format of this section is designed to (a) clarify the distinction between goals, objectives, and management actions; (b) move toward (or demonstrate) objectives and management decisions that will work toward meeting multiple goals; (c) demonstrate the connectivity between programs; and (d) reduce conflicts internal to the document.

[16] Goals are broad statements of desired outcomes; and usually not quantifiable.

[17] Objectives are specific desired conditions; usually quantifiable and measurable and may have timeframes for achievement.

BLM_0008072

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*useful for budgeting (thousands of dollars and whole work months).  It may be useful to identify priorities into two groups: one time projects and ongoing tasks.*

**E.  Plan Evaluation/Adaptive Management.**  *Identify a tentative schedule for land use plan evaluations and the management actions that could be taken after an evaluation.*

**F.  Appendices**

BLM_0008073

Appendix F, page 24

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Appendix F-6:  Recommended Administrative Record File Plan*
*for Land Use Planning Projects*

*For draft EISs, final EISs, and records of decision (ROD)*

A.  **General Information**

    1)  *Federal Register* Notices
    2)  Issues, Concerns, Opportunities
    3)  Planning Criteria
    4)  Interdisciplinary Team (IDT) Membership
    5)  Project Schedules
    6)  Preparation Plan

B.  **Public Information and Involvement**

    1)  Public Involvement Plans
    2)  Public Information Documents, Letters, Notices
    3)  Mailing Lists
    4)  News Reports and Clippings
    5)  General Correspondence
    6)  Meetings/Workshops
    7)  Public Comments:  *Scoping*
    8)  Public Comments:  *prior to draft EIS*
    9)  Public Comments:  *draft EIS*
    10)  Protests and Final EIS Comment Letters Received
    11)  Protest Responses
    12)  Governor's Consistency Review Comments/Response (if any)

C.  **External Communications**

    1)  Other Federal Agencies
    2)  Cooperating Agencies
    3)  Tribes
    4)  State Agencies
    5)  Local Agencies
    6)  Elected Officials
    7)  Organizations
    8)  Individuals
    9)  Freedom of Information Act (FOIA) Requests and Responses (FOIA officer is responsible for maintaining these files)

D.  **Internal Communications**

    1)  Project Management Correspondence
    2)  IDT Correspondence

BLM_0008074

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   3)  IDT Meeting Agendas and Notes
   4)  FOIA Exempt Documents
   5)  Quality Assurance Determination

**E.  <u>Materials (Background/Supporting) Used to Develop Planning Documents (Draft EIS, Final EIS, ROD)</u>**

   1)  Introduction
   2)  Alternatives
   3)  Affected Environment
   4)  Environmental Consequences
   5)  Appendices

**F.  <u>Data Used in Support of Planning Decisions</u>**

   1)  Planning Data
   2)  Data Standards
   3)  Metadata

**G.  <u>References</u>**

**H.  <u>Planning Documents</u>**

   1)  Scoping Report
   2)  Analysis of the Management Situation
   3)  Draft EIS
   4)  Final EIS
   5)  ROD/Approved RMP

BLM_0008075

BLM_0008076

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix G:  Managing and Applying Data and Information

A successful land use planning effort always employs rigorous standards for maintaining, managing, and applying data and derived information.  Standardized, accurate, and reliable data and information are critical to the development of plan assessments, alternatives, impact analyses, and planning decisions. All data used in supporting planning decisions are considered corporate data.  Corporate data are those data and applications that are exchanged across administrative units, shared with the public, used repetitively through time, and applied in decision-making.

The data and resultant information for a land use plan must be carefully managed, documented, and applied to withstand public, scientific, and legal scrutiny, and at the same time, facilitate the efficient development and operation of the Bureau's mapping and data management systems such as GIS.  For these reasons, the corporate data used in plans require a high level of consistency, standardization, and established quality control procedures.

## I.  Metadata Standards and Requirements

Metadata is the term used to describe the content, quality, condition, and other characteristics of data.  By Executive order, geospatial data used by the Bureau must be:  (1) accompanied by metadata in the format set forth by the Federal Geographic Data Committee and (2) be accessible to all interested parties.  The BLM also requires that non-spatial planning data must be accompanied by Federal Geographic Data Committee-compliant metadata.

In developing a plan, a distinction must be made between new data and existing data.  New data includes both raw data and derived information or products such as new GIS themes, or applying new analyses or modeling methods.  New data may be collected by BLM or contractors, or it may be acquired from external sources.  For additional information on metadata requirements, metadata fields, and standards, refer to the BLM Data Administration Handbook (H-1283) and the BLM Intranet through the IRM Data Management website. The site contains information on project contacts and assistance, frequently asked questions, guidelines and directives, a data standards reference library, data quality, and a data management toolkit.

## II.  Identifying Data Needs for a Land Use Plan

Data collection and management are significant costs when developing a land use plan.  Data needs are collectively determined by planning criteria, management concerns, and issues.  It is important to start identifying data needs at the inception of a planning project through the development of the preparation plan.  The BLM planning project manager must identify existing data and information sources, and determine what additional data must be collected.  A table of information should be prepared by the planning project manager and planning team which describes the specific data required to answer planning questions associated with the plan, along with the availability and status of the data.  The table will reveal data deficiencies and identify strategies to obtain missing or incomplete data or information.

BLM_0008077

Appendix G, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## III. Data Sources

Managers of planning efforts are encouraged to use existing data compiled by Tribes, Federal, state, and local government agencies, and other entities where appropriate to fulfill planning data needs. Data partnerships are also encouraged to reduce costs and to achieve data standardization across jurisdictional boundaries.

Regardless of the sources used, all metadata should be documented to identify the quality of the data, along with its limitations for application. When data or information is extracted from an outside source, the development and maintenance of the material is the responsibility of the outside entity. However, the data or information that is actually used by BLM in a plan must be treated as BLM corporate data. Project planners and planning teams also should always judiciously validate all data sources for accuracy, reliability, and limitations. At the very least, outside data and information sources will usually require reformatting, which should be taken into account in terms of project costs and time.

## IV. Managing Data During Land Use Plan Development

Planning data should be stored and maintained for easy access to planning team members and to ensure that the team is using the same data and information. At a minimum, data should be updated and archived at the stages of the management situation analysis, issuance of the draft plan or amendment, issuance of the proposed plan, and the final product approved through the ROD. Throughout the duration of a planning project, it is also important for the project planner, planning team, and GIS-data management staff to routinely check on the quality, consistency, and accuracy of the data that is being managed, analyzed, and displayed.

With the increased emphasis on collaborative planning, there is an additional need to make data available to interested publics, both during and upon completion of a plan or plan amendment. Under the Bureau-wide e-Planning Initiative, continued efforts will help bring the BLM land use planning process into an electronic business climate, reduce planning costs, and allow better public access to decision making. In the interim, access to planning data may be made available through BLM's state websites or through distribution by CDs or hard copies of a planning document.

Although individual land use plans will have their own specific data requirements, some base mapping themes are common to all planning efforts. For example, the Public Land Survey System landnet, land status, and administrative/jurisdictional boundaries are base themes needed to define the geographic extent of a given planning area. Other themes such as topography, transportation, vegetation, soils, hydrography, and cultural features are also common to most analyses.

Maintaining high-quality geospatial data supports the planning process as well as a variety of other needs. With regular updating and maintenance, the same geospatial data that supports the development of plans can be instrumental for plan implementation, monitoring, and periodic assessments.

BLM_0008078

Case No. 1:20-cv-02484-MSK   Document 28-3   filed 04/27/21   USDC Colorado   pg 205 of 363

## V.  Integrating Data Application and Display

The availability of appropriate analytical models and tools to apply and display data is important. Quality data that is inappropriately applied has the same disastrous effect as using poor or erroneous data.  A geographic information system (GIS) provides the essential tools to bring data together at various scales and formats for spatial analysis and display, usually through maps and accompanying charts and tables. Spatial models, such as those used to predict erosion loss or to determine areas suitable or unsuitable for various uses, also allow data to be applied in addressing planning and management issues.

At the beginning of a land use planning project, it is important for the project planner to work with the GIS support staff, and identify and agree on how data and information will be integrated into the development of different displays.  This includes, for example, determining the desired sets of map products that will be used in a hard copy version of a plan, public exhibits, website postings, press releases, and public notices. This avoids unnecessary production costs by planning ahead, identifies potential data-display technical problems at the inception of a project, and streamlines and ensures the development of standardized data sets and the display of data.

BLM_0008079

# RECORD OF DECISION

## Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments

### DECEMBER 2005

**U.S. Department of the Interior
Bureau of Land Management
Washington, D.C.**

Tom Lonnie
Assistant Director, Minerals, Realty and Resource Protection

DEC 1 5 2005
Date

Ed Shepard
Assistant Director, Renewable Resources and Planning

DEC 1 5 20
Date

BLM_0008080

*1*

# RECORD OF DECISION

## Implementation of a Wind Energy Development Program
## and Associated Land Use Plan Amendments

## 1 INTRODUCTION

The U.S. Department of the Interior (DOI), Bureau of Land Management (BLM), is responsible for the development of wind energy resources on BLM-administered public lands. Currently, about 500 megawatts (MW) of installed wind capacity occurs under right-of-way (ROW) authorizations administered by the BLM in accordance with the requirements of the Federal Land Policy and Management Act of 1976 (FLPMA).

This document records the decision that the BLM reached to implement a comprehensive Wind Energy Development Program in 11 western states, excluding Alaska, and to amend 52 BLM land use plans to adopt the new program. The elements of the Wind Energy Development Program and the associated land use plan amendments were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States* (BLM 2005a). This Programmatic Environmental Impact Statement (PEIS) was prepared in accordance with the National Environmental Policy Act of 1969 (NEPA) and the FLPMA. The U.S. Department of Energy (DOE) cooperated in the preparation of the PEIS in support of the BLM's proposed action.

The BLM prepared a Programmatic Biological Assessment (BA) evaluating the potential effects of wind energy development that could occur on BLM-administered public lands as a result of the proposed land use plan amendments (BLM 2005b). Specifically, the Programmatic BA considered the potential effects to federally listed threatened and endangered species and candidate species, and to their critical habitats, that have the potential to be present at locations where wind energy projects may be developed within the planning areas affected by the proposed land use plan amendments. The BLM submitted the Programmatic BA to the U.S. Fish and Wildlife Service (USFWS) on July 27, 2005, for formal consultation. The USFWS issued a Biological Opinion (BO) on November 30, 2005, (USFWS 2005). For each of the nine species listed as likely to be adversely affected in the Programmatic BA, the USFWS concluded that the program is not likely to jeopardize the species or destroy or adversely modify any federally listed threatened and endangered species critical habitat. The USFWS further recommended that the BLM coordinate with the appropriate USFWS field office prior to planning the construction of any site-specific wind energy project to obtain the most current information on the distribution of listed species in the site-specific area.

## 2 DECISION

The decision is hereby made to implement a comprehensive Wind Energy Development Program to administer the development of wind energy resources on BLM-administered public

*2*

lands in 11 western states:  Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.  The decision establishes policies and best management practices (BMPs) for the administration of wind energy development activities and establishes minimum requirements for mitigation measures.  The policies and BMPs were evaluated in the Final Wind Energy PEIS (BLM 2005a) and are included in Attachment A.  With the decision to implement the Wind Energy Development Program, the BLM Interim Wind Energy Policy (BLM 2002) will be replaced by a new policy that incorporates the programmatic policies and BMPs evaluated in the PEIS. Elements of the Interim Policy addressing applications, authorizations, competitive interests, and due diligence will not be changed by the new program requirements.

In addition, this decision amends 52 BLM land use plans in 9 of the states in the study area: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.  The land use plan amendments, identified in Attachment B, include the adoption of the Wind Energy Development Program policies and BMPs and, in a few instances, the identification of specific areas where wind energy development will be excluded.

## 3  ALTERNATIVES, INCLUDING THE PROPOSED ACTION

The Final Wind Energy PEIS (BLM 2005a) analyzed three alternatives.  It analyzed the potential impacts associated with the BLM's proposed action to implement a Wind Energy Development Program.  It also assessed potential impacts associated with two alternatives to the proposed action, which present different management options for wind energy development on BLM-administered public lands.  The alternatives were defined as follows:

- *Proposed action: implement a Wind Energy Development Program.* Under this alternative, the BLM proposed to implement a comprehensive program to address issues associated with wind energy development on BLM-administered public lands under a maximum potential development scenario (MPDS).  The program will establish policies and BMPs to address the administration of wind energy development activities and identify minimum requirements for mitigation measures.  These programmatic policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands.  Site-specific concerns, and the development of additional mitigation measures, will be addressed in project-level reviews, including NEPA analyses, as required.  To the extent appropriate, future project-specific analyses will tier from the analyses conducted in the PEIS and the decisions in this Record of Decision (ROD) to allow project-specific analyses to focus just on the critical, site-specific issues of concern.  In addition, under this alternative, a number of BLM land use plans will be amended to address wind energy development, including adoption of the programmatic policies and BMPs and identification of exclusion areas.

- *No action alternative.*  Under this alternative, the BLM would continue administering wind energy development ROW authorizations in accordance

3

with the terms and conditions of the Interim Wind Energy Development
Policy (BLM 2002). Analysis and review of wind energy development,
including NEPA analyses and development of required mitigation measures,
would be conducted on a project-by-project basis. Individual land use plan
amendments would occur on a plan-by-plan basis without the benefit of the
overarching, comprehensive analysis provided by the PEIS.

- *Limited wind energy development alternative*. Under this alternative,
  additional wind energy development on BLM-administered public lands
  would occur only in areas where it currently exists, is under review, or was
  approved for development prior to publication of this ROD . For the purposes of
  establishing an upper bound on the potential impacts of this alternative, it was
  assumed that all proposed wind energy projects on BLM-administered public
  lands under review during preparation of the PEIS would be approved for
  development by the time this ROD was published. Future expansion of wind
  energy development would be allowed at existing project areas; however, no
  additional BLM-administered public lands would be made available for
  development. Under these restrictions, development would be limited to
  locations where development currently exists: Palm Springs, California;
  Ridgecrest, California; and Arlington, Wyoming; and locations where it is
  currently being reviewed: the Table Mountain Wind Generating Facility,
  Nevada; Cotterel Mountain Wind Farm Project, Idaho; and Walker Ridge,
  California.

Potential adverse impacts to natural and cultural resources could occur during each phase
of wind energy development (i.e., site monitoring and testing, construction, operation, and
decommissioning) if effective mitigation measures are not implemented. The nature and
magnitude of these impacts would vary by phase and would be determined by the project
location and size. Potential direct impacts would include use of geologic and water resources;
creation or increase of geologic hazards or soil erosion; water quality degradation; localized
generation of airborne dust; generation of noise; alteration or degradation of wildlife habitat or
sensitive or unique habitat; interference with resident or migratory fish or wildlife species,
including protected species; alteration or degradation of plant communities, including the
occurrence of invasive vegetation; land use changes; alteration of visual resources; release of
hazardous materials or wastes; increased traffic; increased human health and safety hazards; and
destruction or loss of paleontological or cultural resources. More limited, potential indirect
impacts also could occur to cultural and ecological resources.

Effective mitigation measures can be implemented to address many of the direct and
indirect adverse impacts that could occur. For some resources, minimum requirements can be
established that would effectively mitigate impacts at all potential development sites. For other
resources, however, such as ecological and visual resources, mitigation will be better defined at
the project level to address site-specific concerns.

BLM_0008083

*4*

The potential impacts of wind energy development on local and regional economies will be largely beneficial, depending upon the size of the project and the resultant wind power capacity.

The proposed action and its alternatives present options for the management of wind energy development on BLM-administered public lands. The proposed action, implementing the Wind Energy Development Program, was determined through the Final Wind Energy PEIS (BLM 2005a) to be the "environmentally preferable" alternative because it will establish a comprehensive set of policies and BMPs. The policies will identify specific lands on which wind energy development will not be allowed; establish requirements for public involvement, consultation with other federal and state agencies, and government-to-government consultation; define the need for project-level environmental review; establish requirements for the scope and content of the site-specific project Plan of Development (POD); and incorporate adaptive management strategies. The BMPs will establish environmentally sound and economically feasible mechanisms to protect and enhance natural and cultural resources. They identify the issues and concerns that must be addressed by project-specific plans, programs, and stipulations during each phase of development. Mitigation measures protecting these resources will be required to be incorporated into project PODs; this will include incorporation of specific programmatic BMPs as well as the incorporation of additional mitigation measures contained in other, existing and relevant BLM guidance, or developed to address site-specific or species-specific concerns. The no action and limited development alternatives do not provide the same level of assurance that comprehensive mitigation measures will be implemented across the 11 states.

In addition, in terms of facilitating wind energy development, implementation of the proposed action is expected to minimize some of the delays that currently occur for wind energy development projects, ensure consistency in the ROW application and authorization process, and reduce costs. These benefits will be realized as a result of the emphasis on site-specific concerns during the project-level environmental analyses, the amendment of numerous land use plans to address wind energy development, and the opportunity to tier future NEPA analyses from the Final Wind Energy PEIS (BLM 2005a) and decisions in this ROD. The no action and limited development alternatives do not provide these benefits in terms of facilitating wind energy development.

## 4  MANAGEMENT CONSIDERATIONS

On May 18, 2001, the President issued Executive Order (E.O.) 13212, "Actions to Expedite Energy-Related Projects," which established a policy that federal agencies should take appropriate actions, to the extent consistent with applicable law, to expedite projects to increase the production, transmission, or conservation of energy. In that same month, the President's National Energy Policy Development Group (NEPDG) recommended to the President, as part of the National Energy Policy, that the Departments of the Interior, Energy, Agriculture, and Defense work together to increase renewable energy production (NEPDG 2001). In July 2001, the Departments created an interagency task force to address the issues associated with increasing renewable energy production on federal lands (DOE and DOI 2002). The task force

BLM_0008084

5

developed a Memorandum of Understanding (MOU) among the U.S. Department of Energy (DOE), U.S. Department of the Interior (DOI), U.S. Department of Agriculture (USDA), U.S. Environmental Protection Agency (EPA), Council on Environmental Quality (CEQ), and the members of the Western Governors' Association to establish a framework for cooperation between western states and the federal government to address energy problems facing the West and to facilitate renewable energy production.

To address increased interest in wind energy development and to implement the National Energy Policy recommendation to increase renewable energy production, the BLM undertook efforts to evaluate wind energy potential on public lands and establish a wind energy policy. In 2002, the BLM issued an Interim Wind Energy Development Policy (BLM 2002) that establishes requirements for processing applications for wind energy site testing and monitoring and commercial wind energy development projects. To further support wind energy development on public lands and also to minimize potential environmental and sociocultural impacts, the BLM decided to build on the interim policy and establish a comprehensive Wind Energy Development Program. The BLM initiated preparation of the PEIS in October 2003 and published the PEIS in June 2005. On August 8, 2005, the President signed into law the Energy Policy Act of 2005 (P.L. 109-58). Section 211 of the Act states, "It is the sense of the Congress that the Secretary of the Interior should, before the end of the 10-year period beginning on the date of enactment of this Act, seek to have approved non-hydropower renewable energy projects located on the public lands with a generation capacity of at least 10,000 megawatts of electricity."

The Wind Energy Development Program and the amendment of multiple land use plans to adopt the program will effectively support the directives of E.O. 13212, the recommendations of the National Energy Policy, and congressional direction provided in the Energy Policy Act of 2005 regarding renewable energy development on public lands. On the basis of the impact analyses presented in the Final Wind Energy PEIS (BLM 2005a), it appears that the proposed action will present the best approach for managing wind energy development on BLM-administered public lands. The Wind Energy Development Program is likely to result in the greatest amount of wind energy development over the next 20 years, at the lowest potential cost to industry. Simultaneously, the proposed action will provide the most comprehensive approach for ensuring that potential adverse impacts are minimized to the greatest extent possible. And, finally, the proposed action is likely to provide the greatest economic benefits to local communities and the region as a whole.

## 5  MITIGATION AND MONITORING

A primary purpose of the Wind Energy Development Program is the establishment of policies and BMPs to ensure that potential adverse impacts associated with the development of wind energy resources on BLM-administered public lands are minimized to the greatest extent possible. The policies and BMPs, included in Attachment A, address all identified issues associated with the administration of wind energy development and mitigation of potential impacts; these issues are either addressed directly in the policies and BMPs, or through requirements that they will be addressed as needed during site-specific reviews.

6

The program will establish specific monitoring requirements that must be met throughout all phases of development. The requirement for the BLM and operators of wind energy projects on BLM-administered public lands to adopt adaptive management strategies will further ensure that potential environmental impacts will be kept to a minimum. This includes requirements for periodic review and revision of programmatic policies and BMPs; comprehensive site monitoring programs, including metrics for measuring impacts; and protocols for incorporating monitoring observations and new mitigation measures into standard operating procedures and project-specific stipulations.

The amendment of 52 BLM land use plans to adopt the program ensures that the program will have a maximum effect. Additional land use plan amendments and revisions are expected to follow the issuance of this ROD in those remaining areas with potentially developable wind energy resources through ongoing and future land use planning efforts.

## 6  PUBLIC INVOLVEMENT

The "Notice of Intent to Prepare a Programmatic Environmental Impact Statement (EIS) to Evaluate Wind Energy Development on Western Public Lands Administered by the BLM" (the NOI) was published in Volume 68, page 201, of the *Federal Register* (68 FR 201) on October 17, 2003. This initiated the public scoping period, which lasted from October 17 to December 19, 2003. During that period, the BLM invited the public and interested groups to provide information and guidance on the scope of the PEIS and alternatives to the proposed action, suggest issues that should be examined, and express their concerns and opinions on resources in the western United States that wind energy development might impact. Public scoping meetings were held in Sacramento, California; Salt Lake City, Utah; Cheyenne, Wyoming; Las Vegas, Nevada; and Boise, Idaho.

An estimated 5,000 people participated in the scoping process by attending public meetings, providing comments, requesting information, or visiting the Wind Energy Development PEIS Web site (http://windeis.anl.gov). All comments received equal consideration in developing the alternatives and analytical issues evaluated in the PEIS. The results of the scoping process were documented in a report issued in January 2004 (BLM 2004) that summarizes and categorizes the major themes, issues, and concerns of the written and verbal comments. The scoping summary report and copies of the individual letters, facsimiles, and comments received electronically during scoping are available on the Wind Energy Development PEIS Web site.

In addition to public scoping, government-to-government consultation was initiated with all Tribal entities with a potential interest in wind energy development on BLM-administered public lands.

The Notice of Availability (NOA) of the Draft PEIS was published on September 10, 2004, (69 FR 175). This began a 90-day public comment period on the Draft PEIS, which lasted from September 10 to December 10, 2004. During this period, the BLM invited the public and interested groups to comment on the content of the Draft PEIS.

The Draft PEIS was posted in its entirety on the Wind Energy Development PEIS Web site. Printed copies of the document and CDs containing the electronic files comprising the document were mailed upon request. More than 120 people and organizations participated in the public comment process by providing Internet-based comments or postal letters. Approximately 718 individual comments were received. The BLM reviewed all comments and made changes to the PEIS, as appropriate. Responses to comments are provided in Volume 3 of the Final Wind Energy PEIS (BLM 2005a). The 30-day public protest period resulted in no protests.

In addition, on June 24, 2005, the BLM initiated a 90-day Governors Consistency Review of the PEIS in accordance with BLM planning regulations. The results of the review were favorable in that none of the Governors objected to the proposed plan amendments.

# 7  REFERENCES

BLM 2002, "Instruction Memorandum No. 2003-020, Interim Wind Energy Development Policy," issued by the Director of the BLM, Washington, D.C., Oct. 16.

BLM, 2004, *Summary Report of Scoping Comments Received on the BLM Wind Energy Development Programmatic Environmental Impact Statement*, prepared by Argonne National Laboratory, Argonne, Ill., for the BLM, Lands and Realty Group, Washington, D.C., Jan.

BLM, 2005a, *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States*, prepared by Argonne National Laboratory for BLM, Washington, D.C., June.

BLM, 2005b, *Programmatic Biological Assessment for the BLM's Proposed Land Use Plan Amendments to Adopt the Proposed Wind Energy Development Program*, BLM, Washington, D.C., July.

DOE and DOI (U.S. Department of Energy and U.S. Department of the Interior), 2002, *White House Report in Response to the National Energy Policy Recommendations to Increase Renewable Energy Production on Federal Lands*, Washington, D.C., Aug.

NEPDG (National Energy Policy Development Group), 2001, *National Energy Policy, Reliable, Affordable, and Environmentally Sound Energy for America's Future*, Washington, D.C., May.

USFWS (U.S. Fish and Wildlife Service), 2005, *Biological Opinion for BLM Wind Energy Program*, Washington, D.C.,Nov.

BLM_0008087

BLM_0008088

*A-1*

**ATTACHMENT A**

**BLM WIND ENERGY DEVELOPMENT PROGRAM**
**POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)**

BLM_0008089

*A-2*

## ATTACHMENT A

## BLM WIND ENERGY DEVELOPMENT PROGRAM
## POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)

The BLM's Wind Energy Development Program will establish a number of policies and BMPs, provided below, regarding the development of wind energy resources on BLM-administered public lands. The policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands. The policies address the administration of wind energy development activities, and the BMPs identify required mitigation measures that would need to be incorporated into project-specific Plans of Development (PODs) and right-of-way (ROW) authorization stipulations. Additional mitigation measures will be applied to individual projects, in the form of stipulations in the ROW authorization as appropriate, to address site-specific and species-specific issues.

These policies and BMPs were formulated through preparation of the Final Wind Energy PEIS (BLM 2005). The PEIS included detailed, comprehensive analysis of the potential impacts of wind energy development and relevant mitigation measures; reviews of existing, relevant mitigation guidance; and reviews of comments received during scoping and public review of the Draft PEIS.

### A.1  Policies

- The BLM will not issue ROW authorizations for wind energy development on lands on which wind energy development is incompatible with specific resource values. Lands that will be excluded from wind energy site monitoring and testing and development include designated areas that are part of the National Landscape Conservation System (NLCS) (e.g., Wilderness Areas, Wilderness Study Areas, National Monuments, NCAs,[1] Wild and Scenic Rivers, and National Historic and Scenic Trails) and Areas of Critical Environmental Concern (ACECs).[2] Additional areas of land may be excluded from wind energy development on the basis of findings of resource impacts that cannot be mitigated and/or conflict with existing and planned multiple-use activities or land use plans.

- To the extent possible, wind energy projects shall be developed in a manner that will not prevent other land uses, including minerals extraction, livestock grazing, recreational use, and other ROW uses.

---

[1] Wind energy development is permitted in one NCA, the California Desert Conservation Area (CDCA), in accordance with the provisions of the *California Desert Conservation Area Plan 1980, as Amended* (BLM 1999).

[2] Although the MPDS developed for this PEIS (Section 2.2.1 and Appendix B) did not exclude all of these lands at the screening level, they will be excluded from wind energy development.

*A-3*

- Entities seeking to develop a wind energy project on BLM-administered lands shall consult with appropriate federal, state, and local agencies regarding specific projects as early in the planning process as appropriate to ensure that all potential construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- The BLM will initiate government-to-government consultation with Indian Tribal governments whose interests might be directly and substantially affected by activities on BLM-administered lands as early in the planning process as appropriate to ensure that construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- Entities seeking to develop a wind energy project on BLM-administered lands, in conjunction with BLM Washington Office (WO) and Field Office (FO) staff, shall consult with the U.S. Department of Defense (DoD) regarding the location of wind power projects and turbine siting as early in the planning process as appropriate. This consultation shall occur concurrently at both the installation/field level and the Pentagon/BLM WO level. An interagency protocol agreement is being developed to establish a consultation process and to identify the scope of issues for consultation. Lands withdrawn for military purposes are under the administrative jurisdiction of the DoD or a military service and are not available for issuance of wind energy authorizations by the BLM.

- The BLM will consult with the U.S. Fish and Wildlife Service (USFWS) as required by Section 7 of the Endangered Species Act of 1973 (ESA). The specific consultation requirements will be determined on a project-by-project basis.

- The BLM will consult with the State Historic Preservation Office (SHPO) as required by Section 106 of the National Historic Preservation Act of 1966 (NHPA). The specific consultation requirements will be determined on a project-by-project basis. If programmatic Section 106 consultations have been conducted and are adequate to cover a proposed project, additional consultation may not be needed.

- Existing land use plans will be amended, as appropriate, to (1) adopt provisions of the BLM's Wind Energy Development Program, (2) identify land considered to be available for wind energy development, and (3) identify land that will not be available for wind energy development.

- The level of environmental analysis to be required under NEPA for individual wind power projects will be determined at the FO level. For many projects, it may be determined that a tiered environmental assessment (EA) is appropriate in lieu of an EIS. To the extent that the PEIS addresses anticipated issues and

*A-4*

concerns associated with an individual project, including potential cumulative impacts, the BLM will tier off of the decisions embedded in the PEIS and limit the scope of additional project-specific NEPA analyses.  The site-specific NEPA analyses will include analyses of project site configuration and micrositing considerations, monitoring program requirements, and appropriate mitigation measures.  In particular, the mitigation measures discussed in Chapter 5 of the PEIS may be consulted in determining site-specific requirements.  Public involvement will be incorporated into all wind energy development projects to ensure that all concerns and issues are identified and adequately addressed.  In general, the scope of the NEPA analyses will be limited to the proposed action on BLM-administered public lands; however, if access to proposed development on adjacent non-BLM-administered lands is entirely dependent on obtaining ROW access across BLM-administered public lands and there are no alternatives to that access, the NEPA analysis for the proposed ROW may need to assess the environmental effects from that proposed development.  The BLM's analyses of ROW access projects may tier off of the PEIS to the extent that the proposed project falls within the scope of the PEIS analyses.

- Site-specific environmental analyses will tier from the PEIS and identify and assess any cumulative impacts that are beyond the scope of the cumulative impacts addressed in the PEIS.

- The Categorical Exclusion (CX) applicable to the issuance of short-term ROWs or land use authorizations may be applicable to some site monitoring and testing activities.  The relevant CX, established for the BLM in the DOI Departmental Manual 516, Chapter 11, Sec. 11.5, E(19) (DOI 2004), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition."

- The BLM will require financial bonds for all wind energy development projects on BLM-administered public lands to ensure compliance with the terms and conditions of the rights-of-way authorization and the requirements of applicable regulatory requirements, including reclamation costs.  The amount of the required bond will be determined during the rights-of-way authorization process on the basis of site-specific and project-specific factors.  The BLM may also require financial bonds for site monitoring and testing authorizations.

- Entities seeking to develop a wind energy project on BLM-administered public lands shall develop a project-specific Plan of Development (POD) that incorporates all BMPs and, as appropriate, the requirements of other existing and relevant BLM mitigation guidance, including the BLM's interim off-site mitigation guidance (BLM 2005a).  Additional mitigation measures will be

BLM_0008092

*A-5*

incorporated into the POD and into the ROW authorization as project stipulations, as needed, to address site-specific and species-specific issues. The POD will include a site plan showing the locations of turbines, roads, power lines, other infrastructure, and other areas of short- and long-term disturbance.

- The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.

- The BLM will consider the visual resource values of the public lands involved in proposed wind energy development projects, consistent with BLM Visual Resource Management (VRM) policies and guidance. The BLM will work with the ROW applicant to incorporate visual design considerations into the planning and design of the project to minimize potential visual impacts of the proposal and to meet the VRM objectives of the area.

- Operators of wind power facilities on BLM-administered public lands shall consult with the BLM and other appropriate federal, state, and local agencies regarding any planned upgrades or changes to the wind facility design or operation. Proposed changes of this nature may require additional environmental analysis and/or revision of the POD.

- The BLM's Wind Energy Development Program will incorporate adaptive management strategies to ensure that potential adverse impacts of wind energy development are avoided (if possible), minimized, or mitigated to acceptable levels. The programmatic policies and BMPs will be updated and revised as new data regarding the impacts of wind power projects become available. At the project-level, operators will be required to develop monitoring programs to evaluate the environmental conditions at the site through all phases of development, to establish metrics against which monitoring observations can be measured, to identify potential mitigation measures, and to establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and project-specific stipulations.

## A.2  Best Management Practices (BMPs)

The BMPs will be adopted as required elements of project-specific PODs and/or as ROW authorization stipulations. They are categorized by development activity: site monitoring and testing, development of the POD, construction, operation, and decommissioning. The BMPs for development of the POD identify required elements of the POD needed to address potential impacts associated with subsequent phases of development.

*A-6*

**A.2.1  Site Monitoring and Testing**

- The area disturbed by installation of meteorological towers (i.e., footprint) shall be kept to a minimum.

- Existing roads shall be used to the maximum extent feasible.  If new roads are necessary, they shall be designed and constructed to the appropriate standard.

- Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present.  Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.

- Meteorological towers installed for site monitoring and testing shall be inspected periodically for structural integrity.

**A.2.2  Plan of Development Preparation**

***General***

- The BLM and operators shall contact appropriate agencies, property owners, and other stakeholders early in the planning process to identify potentially sensitive land uses and issues, rules that govern wind energy development locally, and land use concerns specific to the region.

- Available information describing the environmental and sociocultural conditions in the vicinity of the proposed project shall be collected and reviewed as needed to predict potential impacts of the project.

- The Federal Aviation Administration (FAA)-required notice of proposed construction shall be made as early as possible to identify any air safety measures that would be required.

- To plan for efficient use of the land, necessary infrastructure requirements shall be consolidated wherever possible, and current transmission and market access shall be evaluated carefully.

- The project shall be planned to utilize existing roads and utility corridors to the maximum extent feasible, and to minimize the number and length/size of new roads, lay-down areas, and borrow areas.

- A monitoring program shall be developed to ensure that environmental conditions are monitored during the construction, operation, and

*A-7*

decommissioning phases.  The monitoring program requirements, including adaptive management strategies, shall be established at the project level to ensure that potential adverse impacts of wind energy development are mitigated.  The monitoring program shall identify the monitoring requirements for each environmental resource present at the site, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and BMPs.

- "Good housekeeping" procedures shall be developed to ensure that during operation the site will be kept clean of debris, garbage, fugitive trash or waste, and graffiti; to prohibit scrap heaps and dumps; and to minimize storage yards.

### *Wildlife and Other Ecological Resources*

- Operators shall review existing information on species and habitats in the vicinity of the project area to identify potential concerns.

- Operators shall conduct surveys for federal and/or state-protected species and other species of concern (including special status plant and animal species) within the project area and design the project to avoid (if possible), minimize, or mitigate impacts to these resources.

- Operators shall identify important, sensitive, or unique habitats in the vicinity of the project and design the project to avoid (if possible), minimize, or mitigate impacts to these habitats (e.g., locate the turbines, roads, and ancillary facilities in the least environmentally sensitive areas; i.e., away from riparian habitats, streams, wetlands, drainages, or critical wildlife habitats).

- The BLM will prohibit the disturbance of any population of federal listed plant species.

- Operators shall evaluate avian and bat use of the project area and design the project to minimize or mitigate the potential for bird and bat strikes (e.g., development shall not occur in riparian habitats and wetlands). Scientifically rigorous avian and bat use surveys shall be conducted; the amount and extent of ecological baseline data required shall be determined on a project basis.

- Turbines shall be configured to avoid landscape features known to attract raptors, if site studies show that placing turbines there would pose a significant risk to raptors.

*A-8*

- Operators shall determine the presence of bat colonies and avoid placing turbines near known bat hibernation, breeding, and maternity/nursery colonies; in known migration corridors; or in known flight paths between colonies and feeding areas.

- Operators shall determine the presence of active raptor nests (i.e., raptor nests used during the breeding season). Measures to reduce raptor use at a project site (e.g., minimize road cuts, maintain either no vegetation or nonattractive plant species around the turbines) shall be considered.

- A habitat restoration plan shall be developed to avoid (if possible), minimize, or mitigate negative impacts on vulnerable wildlife while maintaining or enhancing habitat values for other species. The plan shall identify revegetation, soil stabilization, and erosion reduction measures that shall be implemented to ensure that all temporary use areas are restored. The plan shall require that restoration occur as soon as possible after completion of activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- Procedures shall be developed to mitigate potential impacts to special status species. Such measures could include avoidance, relocation of project facilities or lay-down areas, and/or relocation of biota.

- Facilities shall be designed to discourage their use as perching or nesting substrates by birds. For example, power lines and poles shall be configured to minimize raptor electrocutions and discourage raptor and raven nesting and perching.

### Visual Resources

- The public shall be involved and informed about the visual site design elements of the proposed wind energy facilities. Possible approaches include conducting public forums for disseminating information, offering organized tours of operating wind developments, and using computer simulation and visualization techniques in public presentations.

- Turbine arrays and turbine design shall be integrated with the surrounding landscape. Design elements to be addressed include visual uniformity, use of tubular towers, proportion and color of turbines, nonreflective paints, and prohibition of commercial messages on turbines.

- Other site design elements shall be integrated with the surrounding landscape. Elements to address include minimizing the profile of the ancillary structures, burial of cables, prohibition of commercial symbols, and lighting. Regarding

BLM_0008096

*A-9*

lighting, efforts shall be made to minimize the need for and amount of lighting on ancillary structures.

### Roads

- An access road siting and management plan shall be prepared incorporating existing BLM standards regarding road design, construction, and maintenance such as those described in the BLM 9113 Manual (BLM 1985) and the *Surface Operating Standards for Oil and Gas Exploration and Development* (RMRCC 1989) (i.e., the Gold Book).

### Ground Transportation

- A transportation plan shall be developed, particularly for the transport of turbine components, main assembly cranes, and other large pieces of equipment. The plan shall consider specific object sizes, weights, origin, destination, and unique handling requirements and shall evaluate alternative transportation approaches. In addition, the process to be used to comply with unique state requirements and to obtain all necessary permits shall be clearly identified.

- A traffic management plan shall be prepared for the site access roads to ensure that no hazards would result from the increased truck traffic and that traffic flow would not be adversely impacted. This plan shall incorporate measures such as informational signs, flaggers when equipment may result in blocked throughways, and traffic cones to identify any necessary changes in temporary lane configuration.

### Noise

- Proponents of a wind energy development project shall take measurements to assess the existing background noise levels at a given site and compare them with the anticipated noise levels associated with the proposed project.

### Noxious Weeds and Pesticides

- Operators shall develop a plan for control of noxious weeds and invasive species, which could occur as a result of new surface disturbance activities at the site. The plan shall address monitoring, education of personnel on weed identification, the manner in which weeds spread, and methods for treating infestations. The use of certified weed-free mulching shall be required. If trucks and construction equipment are arriving from locations with known

*A-10*

invasive vegetation problems, a controlled inspection and cleaning area shall be established to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

- If pesticides are used on the site, an integrated pest management plan shall be developed to ensure that applications would be conducted within the framework of BLM and DOI policies and entail only the use of EPA-registered pesticides. Pesticide use shall be limited to nonpersistent, immobile pesticides and shall only be applied in accordance with label and application permit directions and stipulations for terrestrial and aquatic applications.

## Cultural/Historic Resources

- The BLM will consult with Indian Tribal governments early in the planning process to identify issues regarding the proposed wind energy development, including issues related to the presence of cultural properties, access rights, disruption to traditional cultural practices, and impacts to visual resources important to the Tribe(s).

- The presence of archaeological sites and historic properties in the area of potential effect shall be determined on the basis of a records search of recorded sites and properties in the area and/or, depending on the extent and reliability of existing information, an archaeological survey. Archaeological sites and historic properties present in the area of potential effect shall be reviewed to determine whether they meet the criteria of eligibility for listing on the *National Register of Historic Places* (NRHP).

- When any rights-of-way application includes remnants of a National Historic Trail, is located within the viewshed of a National Historic Trail's designated centerline, or includes or is within the viewshed of a trail eligible for listing on the NRHP, the operator shall evaluate the potential visual impacts to the trail associated with the proposed project and identify appropriate mitigation measures for inclusion as stipulations in the POD.

- If cultural resources are present at the site, or if areas with a high potential to contain cultural material have been identified, a cultural resources management plan (CRMP) shall be developed. This plan shall address mitigation activities to be taken for cultural resources found at the site. Avoidance of the area is always the preferred mitigation option. Other mitigation options include archaeological survey and excavation (as warranted) and monitoring. If an area exhibits a high potential, but no artifacts were observed during an archaeological survey, monitoring by a qualified archaeologist could be required during all excavation and

*A-11*

earthmoving in the high-potential area. A report shall be prepared documenting these activities. The CRMP also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of artifacts and destruction of property on public land.

### Paleontological Resources

- Operators shall determine whether paleontological resources exist in a project area on the basis of the sedimentary context of the area, a records search for past paleontological finds in the area, and/or, depending on the extent of existing information, a paleontological survey.

- If paleontological resources are present at the site, or if areas with a high potential to contain paleontological material have been identified, a paleontological resources management plan shall be developed. This plan shall include a mitigation plan for collection of the fossils; mitigation could include avoidance, removal of fossils, or monitoring. If an area exhibits a high potential but no fossils were observed during survey, monitoring by a qualified paleontologist could be required during all excavation and earthmoving in the sensitive area. A report shall be prepared documenting these activities. The paleontological resources management plan also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

### Hazardous Materials and Waste Management

- Operators shall develop a hazardous materials management plan addressing storage, use, transportation, and disposal of each hazardous material anticipated to be used at the site. The plan shall identify all hazardous materials that would be used, stored, or transported at the site. It shall establish inspection procedures, storage requirements, storage quantity limits, inventory control, nonhazardous product substitutes, and disposition of excess materials. The plan shall also identify requirements for notices to federal and local emergency response authorities and include emergency response plans.

- Operators shall develop a waste management plan identifying the waste streams that are expected to be generated at the site and addressing hazardous waste determination procedures, waste storage locations, waste-specific management and disposal requirements, inspection procedures, and waste

A-12

minimization procedures.  This plan shall address all solid and liquid wastes that may be generated at the site.

- Operators shall develop a spill prevention and response plan identifying where hazardous materials and wastes are stored on site, spill prevention measures to be implemented, training requirements, appropriate spill response actions for each material or waste, the locations of spill response kits on site, a procedure for ensuring that the spill response kits are adequately stocked at all times, and procedures for making timely notifications to authorities.

### Storm Water

- Operators shall develop a storm water management plan for the site to ensure compliance with applicable regulations and prevent off-site migration of contaminated storm water or increased soil erosion.

### Human Health and Safety

- A safety assessment shall be conducted to describe potential safety issues and the means that would be taken to mitigate them, including issues such as site access, construction, safe work practices, security, heavy equipment transportation, traffic management, emergency procedures, and fire control.

- A health and safety program shall be developed to protect both workers and the general public during construction, operation, and decommissioning of a wind energy project.  Regarding occupational health and safety, the program shall identify all applicable federal and state occupational safety standards; establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; Occupational Safety and Health Administration [OSHA] standard practices for safe use of explosives and blasting agents; and measures for reducing occupational electric and magnetic fields [EMF] exposures); establish fire safety evacuation procedures; and define safety performance standards (e.g., electrical system standards and lightning protection standards).  The program shall include a training program to identify hazard training requirements for workers for each task and establish procedures for providing required training to all workers.  Documentation of training and a mechanism for reporting serious accidents to appropriate agencies shall be established.

- Regarding public health and safety, the health and safety program shall establish a safety zone or setback for wind turbine generators from residences and occupied buildings, roads, rights-of-ways, and other public access areas that is sufficient to prevent accidents resulting from the operation of wind turbine generators.  It shall identify requirements for temporary fencing

*A-13*

around staging areas, storage yards, and excavations during construction or decommissioning activities. It shall also identify measures to be taken during the operation phase to limit public access to hazardous facilities (e.g., permanent fencing would be installed only around electrical substations, and turbine tower access doors would be locked).

- Operators shall consult with local planning authorities regarding increased traffic during the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) shall be identified and addressed in the traffic management plan.

- If operation of the wind turbines is expected to cause significant adverse impacts to nearby residences and occupied buildings from shadow flicker, low-frequency sound, or EMF, site-specific recommendations for addressing these concerns shall be incorporated into the project design (e.g., establishing a sufficient setback from turbines).

- The project shall be planned to minimize electromagnetic interference (EMI) (e.g., impacts to radar, microwave, television, and radio transmissions) and comply with Federal Communications Commission [FCC] regulations. Signal strength studies shall be conducted when proposed locations have the potential to impact transmissions. Potential interference with public safety communication systems (e.g., radio traffic related to emergency activities) shall be avoided.

- The project shall be planned to comply with FAA regulations, including lighting regulations, and to avoid potential safety issues associated with proximity to airports, military bases or training areas, or landing strips.

- Operators shall develop a fire management strategy to implement measures to minimize the potential for a human-caused fire.

## A.2.3 Construction

### General

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the construction phase, as appropriate.

- The area disturbed by construction and operation of a wind energy development project (i.e., footprint) shall be kept to a minimum.

BLM_0008101

*A-14*

- The number and size/length of roads, temporary fences, lay-down areas, and borrow areas shall be minimized.

- Topsoil from all excavations and construction activities shall be salvaged and reapplied during reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native grasses, forbs, and shrubs.  Reclamation activities shall be undertaken as early as possible on disturbed areas.

- All electrical collector lines shall be buried in a manner that minimizes additional surface disturbance (e.g., along roads or other paths of surface disturbance).  Overhead lines may be used in cases where burial of lines would result in further habitat disturbance.

- Operators shall identify unstable slopes and local factors that can induce slope instability (such as groundwater conditions, precipitation, earthquake activities, slope angles, and the dip angles of geologic strata).  Operators also shall avoid creating excessive slopes during excavation and blasting operations.  Special construction techniques shall be used where applicable in areas of steep slopes, erodible soil, and stream channel crossings.

- Erosion controls that comply with county, state, and federal standards shall be applied.  Practices such as jute netting, silt fences, and check dams shall be applied near disturbed areas.

### Wildlife

- Guy wires on permanent meteorological towers shall be avoided, however, may be necessary on temporary meteorological towers installed during site monitoring and testing.

- In accordance with the habitat restoration plan, restoration shall be undertaken as soon as possible after completion of construction activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- All construction employees shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons.  In addition, pets shall not be permitted on site during construction.

*A-15*

**Visual Resources**

- Operators shall reduce visual impacts during construction by minimizing areas of surface disturbance, controlling erosion, using dust suppression techniques, and restoring exposed soils as closely as possible to their original contour and vegetation.

**Roads**

- Existing roads shall be used, but only if in safe and environmentally sound locations. If new roads are necessary, they shall be designed and constructed to the appropriate standard and be no higher than necessary to accommodate their intended functions (e.g., traffic volume and weight of vehicles). Excessive grades on roads, road embankments, ditches, and drainages shall be avoided, especially in areas with erodible soils. Special construction techniques shall be used, where applicable. Abandoned roads and roads that are no longer needed shall be recontoured and revegetated.

- Access roads and on-site roads shall be surfaced with aggregate materials, wherever appropriate.

- Access roads shall be located to follow natural contours and minimize side hill cuts.

- Roads shall be located away from drainage bottoms and avoid wetlands, if practicable.

- Roads shall be designed so that changes to surface water runoff are avoided and erosion is not initiated.

- Access roads shall be located to minimize stream crossings. All structures crossing streams shall be located and constructed so that they do not decrease channel stability or increase water velocity. Operators shall obtain all applicable federal and state permits.

- Existing drainage systems shall not be altered, especially in sensitive areas such as erodible soils or steep slopes. Potential soil erosion shall be controlled at culvert outlets with appropriate structures. Catch basins, roadway ditches, and culverts shall be cleaned and maintained regularly.

**Ground Transportation**

- Project personnel and contractors shall be instructed and required to adhere to speed limits commensurate with road types, traffic volumes, vehicle types,

*A-16*

and site-specific conditions, to ensure safe and efficient traffic flow and to reduce wildlife collisions and disturbance and airborne dust.

- Traffic shall be restricted to the roads developed for the project. Use of other unimproved roads shall be restricted to emergency situations.

- Signs shall be placed along construction roads to identify speed limits, travel restrictions, and other standard traffic control information. To minimize impacts on local commuters, consideration shall be given to limiting construction vehicles traveling on public roadways during the morning and late afternoon commute time.

### Air Emissions

- Dust abatement techniques shall be used on unpaved, unvegetated surfaces to minimize airborne dust.

- Speed limits (e.g., 25 mph [40 km/h]) shall be posted and enforced to reduce airborne fugitive dust.

- Construction materials and stockpiled soils shall be covered if they are a source of fugitive dust.

- Dust abatement techniques shall be used before and during surface clearing, excavation, or blasting activities.

### Excavation and Blasting Activities

- Operators shall gain a clear understanding of the local hydrogeology. Areas of groundwater discharge and recharge and their potential relationships with surface water bodies shall be identified.

- Operators shall avoid creating hydrologic conduits between two aquifers during foundation excavation and other activities.

- Foundations and trenches shall be backfilled with originally excavated material as much as possible. Excess excavation materials shall be disposed of only in approved areas or, if suitable, stockpiled for use in reclamation activities.

- Borrow material shall be obtained only from authorized and permitted sites. Existing sites shall be used in preference to new sites.

*A-17*

- Explosives shall be used only within specified times and at specified distances from sensitive wildlife or streams and lakes, as established by the BLM or other federal and state agencies.

### *Noise*

- Noisy construction activities (including blasting) shall be limited to the least noise-sensitive times of day (i.e., daytime only between 7 a.m. and 10 p.m.) and weekdays.

- All equipment shall have sound-control devices no less effective than those provided on the original equipment. All construction equipment used shall be adequately muffled and maintained.

- All stationary construction equipment (i.e., compressors and generators) shall be located as far as practicable from nearby residences.

- If blasting or other noisy activities are required during the construction period, nearby residents shall be notified in advance.

### *Cultural and Paleontological Resources*

- Unexpected discovery of cultural or paleontological resources during construction shall be brought to the attention of the responsible BLM authorized officer immediately. Work shall be halted in the vicinity of the find to avoid further disturbance to the resources while they are being evaluated and appropriate mitigation measures are being developed.

### *Hazardous Materials and Waste Management*

- Secondary containment shall be provided for all on-site hazardous materials and waste storage, including fuel. In particular, fuel storage (for construction vehicles and equipment) shall be a temporary activity occurring only for as long as is needed to support construction activities.

- Wastes shall be properly containerized and removed periodically for disposal at appropriate off-site permitted disposal facilities.

- In the event of an accidental release to the environment, the operator shall document the event, including a root cause analysis, appropriate corrective actions taken, and a characterization of the resulting environmental or health and safety impacts. Documentation of the event shall be provided to the BLM authorized officer and other federal and state agencies, as required.

BLM_0008105

*A-18*

- Any wastewater generated in association with temporary, portable sanitary facilities shall be periodically removed by a licensed hauler and introduced into an existing municipal sewage treatment facility. Temporary, portable sanitary facilities provided for construction crews shall be adequate to support expected on-site personnel and shall be removed at completion of construction activities.

### Public Health and Safety

- Temporary fencing shall be installed around staging areas, storage yards, and excavations during construction to limit public access.

## A.2.4 Operation

### General

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the operational phase, as appropriate. These control and mitigation measures shall be reviewed and revised, as needed, to address changing conditions or requirements at the site, throughout the operational phase. This adaptive management approach would help ensure that impacts from operations are kept to a minimum.

- Inoperative turbines shall be repaired, replaced, or removed in a timely manner. Requirements to do so shall be incorporated into the due diligence provisions of the rights-of-way authorization. Operators will be required to demonstrate due diligence in the repair, replacement, or removal of turbines; failure to do so could result in termination of the rights-of-way authorization.

### Wildlife

- Employees, contractors, and site visitors shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, any pets shall be controlled to avoid harassment and disturbance of wildlife.

- Observations of potential wildlife problems, including wildlife mortality, shall be reported to the BLM authorized officer immediately.

BLM_0008106

### Ground Transportation

- Ongoing ground transportation planning shall be conducted to evaluate road use, minimize traffic volume, and ensure that roads are maintained adequately to minimize associated impacts.

### Monitoring Program

- Site monitoring protocols defined in the POD shall be implemented. These will incorporate monitoring program observations and additional mitigation measures into standard operating procedures and BMPs to minimize future environmental impacts.

- Results of monitoring program efforts shall be provided to the BLM authorized officer.

### Public Health and Safety

- Permanent fencing shall be installed and maintained around electrical substations, and turbine tower access doors shall be locked to limit public access.

- In the event an installed wind energy development project results in EMI, the operator shall work with the owner of the impacted communications system to resolve the problem. Additional warning information may also need to be conveyed to aircraft with onboard radar systems so that echoes from wind turbines can be quickly recognized.

## A.2.5  Decommissioning

### General

- Prior to the termination of the rights-of-way authorization, a decommissioning plan shall be developed and approved by the BLM. The decommissioning plan shall include a site reclamation plan and monitoring program.

- All management plans, BMPs, and stipulations developed for the construction phase shall be applied to similar activities during the decommissioning phase.

- All turbines and ancillary structures shall be removed from the site.

*A-20*

- Topsoil from all decommissioning activities shall be salvaged and reapplied during final reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native shrubs, grasses, and forbs.

- The vegetation cover, composition, and diversity shall be restored to values commensurate with the ecological setting.

BLM_0008108

BLM_0008109

*B-1*

**ATTACHMENT B**

**BLM LAND USE PLAN AMENDMENTS TO ADOPT THE
WIND ENERGY DEVELOPMENT PROGRAM**

BLM_0008110

*B-2*

## ATTACHMENT B

## BLM LAND USE PLAN AMENDMENTS TO ADOPT THE WIND ENERGY DEVELOPMENT PROGRAM

The Final Wind PEIS (BLM 2005) evaluated all BLM land use plans within the 11-state study area.  The decision has been made to amend 52 land use plans in 9 of those states: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The amendments include (1) adoption of the Wind Energy Development Program policies and best management practices (BMPs), and (2) identification of specific areas where wind energy development will not be allowed.

Some plans within the 11-state study area were excluded from amendment in this Record of Decision (ROD) for a variety of reasons, including (1) if developable wind resources are not present in the planning area, (2) if the plan was previously amended or revised to adequately address wind energy development, (3) if the plan currently is being amended or revised in a separate National Environmental Policy Act of 1969 (NEPA) review and that amendment or revision will address wind energy development, or (4) if some other reason(s) exist(s) to exclude the plan from amendment under the PEIS (e.g., a plan revision is scheduled in the foreseeable future).

None of the land use plans in Arizona or California are included for amendment in this ROD.  Ongoing and upcoming land use plan amendments being conducted will address wind energy development in these states for areas where developable wind resources are present.

Table B-1 provides information describing the amendment change for each land use plan that is amended in this ROD.  The rationale for the change also is provided.

**TABLE B-1  Changes and Rationales for Land Use Plan Amendments**[a]

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Colorado* | | |
| Royal Gorge RMP, Royal Gorge Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| San Luis RMP, includes La Jara, Saguache, and Del Norte Field Offices and the San Luis Valley Public Lands Center | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in the planning area. |
| *Idaho* | | |
| Cascade RMP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Challis RMP, Challis Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |

*B-3*

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Jarbidge RMP, Jarbidge Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Kuna MFP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Lemhi RMP, Salmon Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Owyhee RMP, Owyhee Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Twin Falls MFP, Burley Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

BLM_0008113

TABLE B-1  (Cont.)

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Montana*<br>Billings RMP, Billings Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted with restrictions as indicated in the PEIS. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area.  The Billings RMP is scheduled for revision in 2007; however, Billings also has an active wind testing and monitoring permit (MTM92391) with an effective date of September 28, 2003. If this potential project goes to full field development, it is doubtful that the RMP revision would be completed in time to address wind energy development on public lands.  The current RMP does not address wind energy development. |
| Garnet RMP, Missoula Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | RMP MA 9 will be identified as an exclusion area where wind energy and its associated development will be prohibited. | Wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| | RMP MAs 1, 4, 10, and 11 will be identified as avoidance areas where wind energy and its associated development will be discouraged. | These areas contain important riparian areas; threatened and endangered species habitat; big game winter range; and/or recreation, and historic and cultural sites where wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| Headwaters RMP, Butte Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Judith-Valley-Phillips RMP, Lewistown Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*B-5*

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Judith-Valley-Phillips RMP, Malta Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | Wind energy development will be excluded from large reservoirs/waterfowl complexes. | Development will be restricted within 2 mi (3 km) of these sites because of the potential for bird/tower strikes. |
| | Wind energy development will be excluded from Montana Air National Guard Training sites. | This area is in S. Phillips County and within the Hays Military Operations Area.  Wind energy development would conflict with training missions. |
| | Wind energy development will be excluded from developed recreation sites. | Development within viewsheds will be restricted within 1 mi (2 km) unless topography can screen the project. |
| | Wind energy development will be excluded from backcountry byways. | Development should not be seen within the viewshed of the byway. |
| West Hi Line RMP, Lewiston FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *New Mexico* | | |
| Carlsbad RMP, Carlsbad FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate in some areas for wind energy development activities in this planning area. |
| | Wind energy development will be restricted in those areas along the face of the Guadalupe Mountains located in the western portion of the planning area and grassland areas in the northwestern portion of the planning area. | This area provides critical habitat for Kuenzlers cactus and Aplamado falcon.  Wind energy development in this area would be inconsistent with the BLM's management decisions and objectives for the critical habitat. |

B-6

BLM_0008115

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Carlsbad RMP, Carlsbad FO (Cont.) | Wind energy development will be restricted in those areas within the viewshed of Carlsbad Caverns National Park. | Carlsbad Caverns National Park receives heavy tourist traffic throughout the year.  Because of the significance of the park, wind energy development in the viewshed for the park would be inconsistent with the BLM's management decisions and objectives as well as those of the National Park Service. |
| | Wind energy development will be restricted in those areas that are within known cave/karst areas within the planning area. | Much of the known cave/karst areas have been designated as "high wind resource levels"; however, wind energy development in this area would have to be restricted because of the numerous cave/karst features in the area. |
| | Wind energy development will be restricted in those areas that are within the Guadalupe National Backcountry Byway and the Guadalupe Escarpment Scenic Area. | Any wind development in these areas would have a negative impact on the VRM ratings for these areas, which would be inconsistent with current BLM management decisions and objectives. |
| | Wind energy development will be restricted in designated Special Management Areas. | Wind development in these areas would be inconsistent with BLM management decisions and objectives. |
| Mimbres RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Roswell RMP, Roswell FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| White Sands RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

BLM_0008116

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Nevada* | | |
| Elko RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Las Vegas RMP, Las Vegas FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paradise-Denio MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Shoshone-Eureka RMP, Battle Mountain FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Sonoma-Gerlach MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Tonopah RMP, Battle Mountain FO, Tonopah Field Station | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Wells RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*B-8*

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Oregon* | | |
| Andrews/Steens RMP, Andrews/Steens FO | Wind energy development will be restricted from ROW, realty use, and renewable energy avoidance and exclusion zones as identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNAs, and ONAs) that were identified as avoidance and exclusion areas in the RMP.  Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/ exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| Brothers/LaPine RMP, Deschutes and Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Coos Bay RMP, Coos Bay FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Eugene RMP, Eugene FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| John Day RMP, Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Medford RMP, Medford FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Salem RMP, Salem FO | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusions zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*B-9*

BLM_0008118

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Southeast Oregon RMP, Malheur and Jordan Resource Areas | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Three Rivers RMP, Three Rivers FO's | It will be clarified that wind energy development is allowable on a case-by-case basis in areas outside rights-of--way and land use authorization avoidance and exclusion zones. | The RMP does not contain any explicit discussion on wind energy development, although the plan designates avoidance and exclusion areas for rights-of-way and land use authorizations. |
| | Wind energy development will be restricted from rights-of-way and land use authorization avoidance and exclusion zones identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNA, and ONAs) that were identified as avoidance and exclusion areas in the RMP. Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Two Rivers RMP, Deschutes and Central Oregon Field Offices | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Upper Deschutes RMP, Deschutes FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

BLM_0008119

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Utah* | | |
| Cedar-Beaver-Garfield-Antimony RMP, Cedar City FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Escalante MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paria MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Pinyon MFP, Cedar City FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Randolph MFP, Salt Lake FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| St. George RMP, St. George FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Vermillion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Zion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*B-11*

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Washington* | | |
| Spokane RMP, Wenatchee and Border Field Offices | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Wyoming* | | |
| Buffalo RMP, Buffalo FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Cody RMP, Cody FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Grass Creek RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Green River RMP, Rock Springs FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Lander RMP, Lander FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Newcastle RMP, Newcastle FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*B-12*

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Washakie RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

[a]  Abbreviations: ACEC = Area of Critical Environmental Concern; BMP = best management practice; CMPA = (Steens Mountain) Cooperative Management and Protection Area; MA = management area; MFP = Management Framework Plan; ONA = Outstanding National Area; RMP = Resource Management Plan; RNA = Research Natural Area; ROW = right-of-way; VRM = Visual Resource Management; WSA = Wilderness Study Area.

[b]  The Andrews/Steens RMP is currently being revised; upon completion, it will replace the Andrews MFP and revise part of the Three Rivers RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the Record of Decision (ROD) is issued.

[c]  The Upper Deschutes RMP is currently being revised; upon completion, it will replace a portion of the Brothers/LaPine RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the ROD is issued.

*B-13*

U.S. DEPARTMENT OF THE INTERIOR  **BUREAU (**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

August 24, 2006

In Reply Refer To:
1601/2800/2880 (WO 350) P
Ref. IM 2006-067

EMS TRANSMISSION 08/29/2006
Instruction Memorandum No. 2006-216
Expires: 09/30/07

**To:**          All Field Officials

**From:**        Director

**Subject:**     Wind Energy Development Policy

**Program Area:**    Right-of-Way Management, Wind Energy Land Use Plan Amendments, Wind Energy

**Purpose:**  This Instruction Memorandum (IM) provides guidance on implementing the Record of Decision for the Programmatic E
on Wind Energy Development and guidance on processing right-of-way applications for wind energy projects on public lands adm
Management (BLM).

**Policy/Action:**  The BLM initiated the preparation of a Programmatic Environmental Impact Statement (EIS) in October 2003 to a
development of wind energy resources on public lands. The Programmatic EIS also addressed the establishment of policies and be
(BMPs) as mitigation measures for potential environmental impacts and addressed the amendment of individual BLM land use pla
*Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States* was rele
publication of a Notice of Availability in the Federal Register. The 30-day public comment period on the Notice was completed wit
EIS. The 60-day Governor's consistency review required by the BLM land use planning regulations was completed on August 24, 2
Biological Assessment to the Fish and Wildlife Service (FWS) on July 28, 2005, to initiate the formal Section 7 consultation proces
FWS issued a Biological Opinion and non-jeopardy decision on November 30, 2005. A Record of Decision (ROD) was signed on De
the BMPs and land use plan amendments identified in the Programmatic EIS. A Notice of Availability of the ROD was published in
11, 2006.

Information on the Programmatic EIS, the Biological Opinion, and the ROD are posted on the web at www.windeis.anl.gov. A cop
IM as Attachment 1.

This IM replaces the Interim Wind Energy Development Policy (IM 2003-020), issued October 16, 2002, and implements the ROD
2005. Issuance of the IM ensures consistency in the processing of right-of-way applications and the management of authorizatior
on public land. The IM addresses the amendment of land use plans to address wind energy development and the potential to tier
Environmental Policy Act (NEPA) analyses to the Programmatic EIS.

Policies included in the ROD identify specific lands on which wind energy development would not be allowed; establish requiremer
consultation with other Federal and state agencies, and government‑to‑government consultation; define the need for project‑
establish requirements for the scope and content of the project-level Plan of Development (POD); and incorporate adaptive mana
establish environmentally sound and economically feasible mechanisms to protect and enhance natural and cultural resources. Th
concerns that must be addressed by project-specific plans, during each phase of project development.  Mitigation measures prote
required to be incorporated into project-level PODs. These mitigation measures would include the programmatic BMPs, as well as
mitigation measures contained in other existing and relevant BLM guidance, or developed to address site-specific or species‑spe

**Inventory and Planning:**  It is the BLM general policy, consistent with the National Energy Policy of 2001 and the Energy Policy
development of wind energy in acceptable areas. Wind energy site testing and monitoring activities are usually in conformance wi
by existing land use plans without a need for a land use plan amendment. Existing land use plans identify wilderness and wildern
Environmental Concern (ACEC), visual resource management areas, national scenic or historic trails, National Landscape Conserv
habitat areas, and other special management areas where land use restrictions apply to a variety of uses, including wind energy s
monitoring. Commercial wind energy development activities in some cases, however, may not be in conformance with existing lar
appropriate to amend the land use plan as a concurrent action with the same analysis for the wind energy development proposal.
for wind energy site testing and monitoring or for wind energy development projects will, however, be processed in a timely mann

The BLM Land Use Planning Handbook (H-1601-1) requires that existing and potential development areas for renewable energy p
be addressed in land use planning efforts (see Appendix C, Section E, Lands and Realty, of the Handbook). The Record of Decisio
use plans in Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. These land use plan ame

BLM_0008123

Attachment B of the ROD. The following actions are necessary at the Field Office level to document and acknowledge these amen

1)    Add a copy of the Programmatic EIS and the ROD to the official Field Office records. These documents are the supporting d amendment.

2)    Announce the plan amendment through a periodic planning publication (Annual Program Summary, Planning Update, or Qu other appropriate public outreach materials. This announcement is a courtesy announcement only. The decision to amend the pla protest or appeal is offered because there is no new decision.

Field Offices with existing land use plans that were not amended by the ROD, may amend their plans at anytime by following the 1610.5-5. Field Offices may tier to, or incorporate analysis from, the Programmatic EIS as appropriate under Chapter III of the Bl when considering a proposed plan amendment and prepare a separate decision document amending the existing plan. In most ca action would be considered using an Environmental Assessment level plan amendment process to adopt the policies and BMPs of ROD. This is a new decision and is subject to protest. In other areas where land use plans will be revised in the future, the land u address wind resource potential, public concerns, and opportunities for wind energy development within the land use planning are Use Planning Handbook (Appendix C). Field Offices are encouraged to incorporate wind energy resource development potential in facilitate the processing of future wind energy applications. The land use plan revision process would address the environmental a associated with commercial wind energy. This would provide an opportunity to potentially reduce the amount of additional enviro documentation required to process a specific application in the future.

The Department of Energy's National Renewable Energy Laboratory (NREL) assisted the BLM in the preparation of the Programm inventory assessment of wind energy resources on public lands in the Western States. The objective of this collaborative effort wa planning efforts. Appendix B of the Programmatic EIS includes a set of wind resource potential maps for each BLM Field Office in addition, GIS-based assessment and analysis information is also available from the Department of Energy internet site at www.ee /windpoweringamerica. Information on wind energy resources is also available at www.energyatlas.org. Field Offices are encourag the inventory base for addressing wind energy resource development opportunities and to assess the effects of other resource us

**Applications:**  All wind energy and wind energy related facilities will be applied for under Title V of the Federal Land Policy and M Title 43, Part 2800 of the Code of Federal Regulations (CFR). The regulations cited in this IM refer to the recent right-of-way regu the Federal Register on April 22, 2005, and became effective on June 21, 2005.

Wind energy site testing and monitoring will not be authorized by a land use permit under the 43 CFR 2920 regulations. Existing previously been issued will, however, be recognized for the term of the existing permit.

Applications for a wind energy right-of-way grant may be submitted for one of the following three (3) types of wind energy proje

1) a site-specific wind energy site testing and monitoring right-of-way grant for individual meteorological towers and instrumenta limited to 3 years;

2) a wind energy site testing and monitoring right-of-way grant for a larger site testing and monitoring project area, with a term consistent with 43 CFR 2807.22 and the provisions of this IM beyond the initial term of the grant; and

3) a long-term commercial wind energy development right-of-way grant with a term that is not limited by the regulations, but us years.

Applications for any of the above types of projects will be submitted using Standard Form 299 (SF-299), Application for Transport Facilities on Federal Land, consistent with the requirements of 43 CFR 2804.12. The BLM Authorized Officer should encourage win preapplication meetings (43 CFR 2804.10) with the BLM to assist in the preparation and processing of applications, identify poten identify any environmental or cultural resource studies that may be needed, assess public interest and concerns, identify other au general recreation and public uses in the area, discuss potential alternative site locations, and discuss potential financial obligatio willing to assume. Early public notification and involvement of local communities and other interests is also important in increasin avoiding potential conflicts, especially in areas where other uses exist on the public lands.

All wind energy right-of-way applications and authorizations are subject to appropriate cost recovery fees (processing and monito by 43 CFR 2804.14, 43 CFR 2805.16, and 43 CFR 2806.10. The policy guidance on rental fees contained in this IM is based on co existing wind energy right-of-way authorizations on Federal and non-Federal lands and was developed in consultation with BLM st expertise. Wind energy right-of-way authorizations are considered non-linear right-of-way grants and, therefore, are not subject 2806.23 regarding multi-year rental payments. However, by policy, the holder of a wind energy site testing and monitoring right- advance the required rental fee for the entire term of the grant.

Right-of-way applications for wind energy site testing and monitoring or for wind energy development projects should be identifie workload and will be processed in as timely a manner as possible. The processing timeframes for right-of-way applications as req followed for all wind energy applications.

Site testing and monitoring right-of-way applications will usually be minor cost recovery category actions and should be processe consistent with the requirements of 43 CFR 2804.25. The regulations require that the Authorized Officer notify the right-of-way ap will take longer than 60 days, the reasons for the delay, and an estimate of the timeframe for processing the application. Additio timeframes for right-of-way applications is provided by Instruction Memorandum No. 2006-067, dated January 10, 2006. The BLN

BLM_0008124

Lands, Realty and Cadastral Survey (WO-350) will also assign a right-of-way Project Manager, if requested by the State Director, any major wind energy development right-of-way application.

A bond will be required, by policy established in the ROD, for all commercial wind energy development projects to ensure complia conditions of the right-of-way authorization and the requirements of applicable regulatory requirements. The amount of the bond reclamation and administrative costs to the BLM. Bonds in the amount of $2,500 per wind turbine, considering salvage values of t generally been required for wind energy development projects on public lands. However, the amount of the required bond will be of-way authorization process on the basis of site-specific and project-specific factors. A bond for site testing and monitoring autho discretionary by the Authorized Officer (43 CFR 2805.12(g)).

**Authorizations:**
**1) Right-of-Way Grant for Site-Specific Wind Energy Testing and Monitoring Facilities:** A site-specific right-of-way grant authorize individual meteorological towers and instrumentation facilities. The area authorized for these facilities shall be the minir and maintenance of the temporary facility. The term of a site-specific right-of-way grant will be limited to 3 years, plus the additic grant to expire on December 31 of the final year of the authorization, consistent with the provisions of 43 CFR 2805.11(b)(2).
A site-specific right-of-way grant will not be extended or renewed beyond this term. A new right-of-way application would be requ holder of the site-specific right-of-way grant wishes to continue monitoring at the site. Numerous site-specific right-of-way grants and monitoring may be issued to various right-of-way holders in the same area and do not establish any exclusive or preferential energy development. In addition, the BLM retains the right to authorize other compatible uses of the public lands in the area.

Rental: The rental fee for a site-specific right-of-way grant for wind energy site testing and monitoring will be a minimum of $50 tower or instrumentation facility location and includes no additional rental fee for the acreage of each site location. Some BLM Fie site-location rental fees for temporary facilities on the public lands that can be used for wind energy site testing and monitoring fa fees will exceed the minimum $50 per year fee. The rental fee for a site testing and monitoring right-of-way grant is paid annuall year basis consistent with the regulations (43 CFR 2806.12). However, by policy, the holder of a site-specific right-of-way grant n rental fee for the entire term of the grant.

**2) Right-of-Way Grant for a Wind Energy Site Testing and Monitoring Project Area:** A right-of-way grant (Form 2800-14 renewal beyond the 3-year term (43 CFR 2807.22) will be used to authorize wind energy site testing and monitoring facilities for site testing and monitoring right-of-way grant retains an interest in the site testing and monitoring project area, but will be requir of-way application (43 CFR 2807.20) and POD to the BLM for review, analysis, and separate approval for any future wind energy retained by the holder of the site testing and monitoring right-of-way grant is only an interest to preclude other wind energy right 3-year term of the grant. The lands within the grant area will not be available for other wind energy right-of-way applications. Th monitoring right-of-way grant for a project area establishes no right to development and is required to submit a separate right-of development to the BLM for analysis, review, and decision. The BLM retains the right to authorize other compatible uses of the pu the site testing and monitoring right-of-way grant for a project area will be defined by aliquot land descriptions and be configure of land that may support a possible right-of-way application for a wind energy development project in the future.

The site testing and monitoring right-of-way grant for the site testing and monitoring project area is issued for an initial term of 3 that will allow the grant to expire on December 31 of the final year of the authorization, consistent with the provisions of 43 CFR extended or renewed (43 CFR 2807.22) for a term not to exceed an additional 3 years to allow for continued site testing and mor right‐of‐way application and POD is submitted for a wind energy development project prior to the end of the initial term of th submittal of a POD with the right-of-way application for the wind energy development project is consistent with the provisions of the site testing and monitoring right-of-way grant is required to submit, prior to the end of the initial term of the grant, a separat development to retain the interest in the site testing and monitoring project area. (See the Due Diligence section of this IM regarc site testing and monitoring right-of-way grant).

Site testing and monitoring facilities (meteorological towers) are not required to be placed on every parcel of public land involved assess the wind resource development potential of a project area. In some cases, an applicant may propose to place meteorologic state, or other land ownership with no meteorological towers on public land. The BLM has limited experience in evaluating the nur meteorological towers that may be needed to adequately assess the wind resources of a project area on public lands. The Depart Denver is available to assist the BLM Field Offices in evaluating the applicant's proposal for the siting of meteorological towers if r can request NREL assistance to evaluate the applicant's proposal to determine if the meteorological tower placement is such that resources on public land can be sufficiently evaluated for future wind energy development. In order for NREL to evaluate the prop to submit the following information: a topographic map of the area showing the boundary of the proposed project area, land own height of the meteorological towers, and access roads. The BLM Division of Lands, Realty and Cadastral Survey (WO-350) can pr NREL for these evaluations if requested.

If the evaluation determines that the meteorological tower placement on adjacent non-Federal land is capable of characterizing th then a NEPA document will need to be prepared describing the Federal action as the issuance of a right-of-way grant with limited the evaluation concludes that the proposal cannot adequately assess the wind patterns on public lands or the project area propos wind testing techniques, then the applicant should be notified of this finding and given the opportunity to amend the proposal. If the application to meet the recommendations provided by NREL, the BLM Authorized Officer can reject the application.

In cases where a right-of-way grant is issued for a site testing and monitoring project area and no meteorological towers are insta Diligence section of this IM would still require the proponent to install the meteorological towers on the non-Federal land within 12 n authorization. The holder shall provide the BLM with good cause as to the nature of any delay. The purpose of the Due Diligence preclude land speculators from obtaining a right-of-way grant for a project area with valuable wind energy resources, with the po development of wind energy on public lands.

BLM_0008125

Rental: The rental fee for a site testing and monitoring right-of-way grant for a site testing and monitoring project area will be ba
acreage of the project area included in the right-of-way grant. The rental fee for the total public land acreage of the grant will be
per year, whichever is the greater. This rental fee is based on comparable fees on non-Federal lands. There is no additional fee fo
meteorological tower or instrumentation facility located within the site testing and monitoring project area. This rental fee is base
area for site testing and monitoring and the value of the option held by the holder that precludes other wind energy right-of-way
term of the grant, comparable to similar option payments on private lands. The rental fee for a site testing and monitoring right-c
advance, on a calendar year basis consistent with the regulations (43 CFR 2806.12). However, by policy, the holder of a site testi
grant may pay in advance the required rental fee for the entire term of the grant.

Each site testing and monitoring authorization will contain appropriate BMPs and may contain appropriate site specific stipulations
road construction and maintenance, vegetation removal, and number and location of wind monitoring sites. A bond is discretionar
will usually not be required for a site testing and monitoring authorization. If a bond is required, the amount of the reclamation be
reclamation and administrative costs to the BLM.

The wind inventory data collected and held by the right-of-way grant holder is proprietary information and will be protected by th
withheld under the Freedom of Information Act to the extent allowed by Federal law. However, sufficient detailed wind data will b
BLM, at the time a separate right-of-way application for development is submitted, to support the environmental analysis and rev
development. This data becomes public information to the extent allowed by Federal law and will be used for analysis and decisio
the processing of the right-of-way application for a wind energy development project. Biological and cultural resource studies and
of-way grant holder will also be required to be provided to the BLM and becomes public information to the extent allowed by Fede

Site testing and monitoring authorizations may be assigned consistent with the provisions of the regulations (43 CFR 2807.21). H
approved by the BLM Authorized Officer and the qualifications of all assignees must comply with the Due Diligence section of this
regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)). A partial assignment of a site testing and monitoring authorizatio
action would hinder the BLM management of the authorization or the associated public lands.

**3) Right–of–Way Grant for Commercial Wind Energy Development Facilities:** A right-of-way grant (Form 2800-14) will be
held by the holder of the grant, on the public lands related to a commercial wind energy development project. This authorization
facilities, as well as the on-site access roads, electrical and distribution facilities, and other support facilities authorized by the wir
of-way grant. Other off-site facilities, such as electrical transmission and additional access roads may require a separate linear rig
lands involved in the wind energy development right-of-way grant will be defined by aliquot legal land descriptions and be configur
land involved, while still allowing an adequate distance between turbine positions and reasonable right-of-way boundaries. In the
zoning and management issues, no turbine shall be positioned closer than five (5) rotor-diameters from the center of the wind tu
boundary in the dominant upwind or downwind direction to avoid potential wind turbulence interference issues with adjacent wind
be demonstrated that site conditions, such as topography, natural features, or other conditions such as offsets of turbine location
distance. Further, for safety reasons, no turbine shall be positioned closer than 1.5 times the total height of the wind turbine to th
cases where the applicant holds a long-term lease right on adjacent Federal or non-Federal lands for wind energy development or
landowner provides a setback waiver, these minimum setbacks may be eliminated, allowing turbines to be placed closer to the rig

The right-of-way holder should also be encouraged, through terms and conditions of the right-of-way authorization, to work with
acceptance and awareness of the benefits of wind energy development by providing information and public points of access near
appropriate. These measures could include on-site interpretive resources, and photo locations. The BLM and right-of-way holder c
on the responsible use of renewable resources and the multiple resource uses of the public lands.

The term of the grant is not limited by the regulations, but the terms of most existing grants for major wind energy development
costs and useful life of wind energy facilities and are generally in the range of 30 to 35 years. The grant may be renewed for addi
provisions of the regulations (43 CFR 2807.22). The BLM also retains the right to authorize other compatible uses of the public lar
grant during the term of the grant.

Rental: The rental fee for a commercial wind energy development right-of-way grant on public land is established at $2,365 per
anticipated installed capacity of the wind energy project on public land based on the approved POD, a capacity factor of 30 percer
average purchase price of $0.03 per kilowatt hour. The rental fee is a fixed annual Bureauwide rent based on the following formu

Annual rent = (Anticipated total installed capacity in kilowatts as identified in the approved POD) x (8760 hours per year) x (30 p
percent royalty) x ($0.03 average price per kilowatt hour)

Example for one megawatt (1,000 kW) of anticipated total installed capacity on public land:

Annual rent = (1,000 kW) x (8760 hours) x (0.30 capacity) x (0.03 royalty) x ($0.03 per kWh) or $2,365 per megawatt of anticip
public land.

The annual rental fee will be phased in as follows:
First year - 25 percent of the total rental fee or $591 per megawatt;
Second year - 50 percent of the total rental fee or $1,182 per megawatt;
Third year -100 percent of the total rental fee or $2,365 per megawatt.

The full annual rental fee will apply at any time prior to 3 years, upon the start of commercial operations of the project. The renta
advance, on a calendar year basis consistent with the regulations (43 CFR 2806.12). The BLM will discourage the use of a separat

BLM_0008126

additional one time payment for each turbine installation), a production rental fee, or other fees, as part of the wind energy renta
of-way authorizations issued for off-site facilities to support the wind energy project, such as electrical transmission lines, will be
of-way rental provisions of 43 CFR 2806.20.

All wind energy right-of-way holders are subject to rent in accordance with this IM, unless they are specifically exempt from rent
holders or facilities may be exempt from rent pursuant to the Rural Electrification Act of 1936, as amended (43 CFR 2806.14(d)).

The right-of-way grant may be assigned consistent with the provisions of the regulations (43 CFR 2807.21). However, all assignm
the BLM Authorized Officer and the qualifications of all assignees must comply with the Due Diligence section of this IM, and the r
(43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)). A partial assignment of the grant shall not be approved if such action would I
the grant or the associated public lands.

All final decisions issued by the Authorized Officer in connection with the authorization of any of the above described wind energy
43 CFR part 4 (43 CFR 2801.10). It should also be noted that right-of-way grants are issued as full force and effect decisions (43
remain effective during any appeal period, unless stayed by the Interior Board of Land Appeals.

**Competitive Interest:** The right-of-way regulations (43 CFR 2804.23(c)) provide authority for identifying public lands under co
wind energy authorizations. However, the BLM will only initiate a competitive process if a land use planning decision
area for competitive wind energy leasing. The Programmatic EIS and associated ROD did not identify any competitive wind energy
use plans; therefore, any competitive leasing areas would need to be identified through a separate local land use planning proces
wind energy development right-of-way applications will, therefore, be processed on a first come basis. The BLM will encourage ap
interest in a common area to establish a partnership or cooperative agreement, if possible, which establishes compatible use of th
applicants. If the applicants choose not to form a partnership or cooperative agreement, the BLM will generally proceed ahead wit
submitted the first complete application and provided the processing cost recovery fees required by 43 CFR 2804.14.

**Due Diligence:** There are some concerns regarding the potential for land speculators to obtain right-of-way grants and control v
areas, with the potential to negatively impact development of wind energy on public lands. These concerns can be mitigated by ap
qualification requirements of the regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)) and requiring certain due diligence
authorization for site testing and monitoring or wind energy development.

The regulations clearly provide authority to require the application to include information on the applicant's technical capability to
maintain the wind energy facilities (43 CFR 2804.12(a)(5)). This technical capability can be demonstrated by international or dom
energy projects or other types of electric energy related projects on either Federal or non-Federal lands. The applicant should pro
availability of sufficient capitalization to carry out development, including the preliminary study phase of the project, as well as th
activities. Actual development or ownership of similar sized wind energy facilities or other types of electric energy related facilities
the applicant would generally constitute evidence of financial capability. However, applicants in bankruptcy or other related financ
to meet the due diligence provisions of the right-of-way authorization. The regulations provide the authority to deny the applicatic
demonstrate adequate technical ability to construct, operate, and maintain the wind energy facilities (43 CFR 2804.26(a)(5)).

Due diligence is encouraged by the limited 3-year term of the site testing and monitoring right-of-way authorization. The site test
grant for a site testing and monitoring project area can only be extended or renewed if a separate right-of-way application and PC
energy development project prior to the end of the initial term of the grant. In addition, the site testing and monitoring authorizat
development authorization shall include a due diligence requirement for installation of facilities consistent with an approved POD.
requirements will need to be included in the terms and conditions of either the site testing and monitoring authorization or the wi
authorization. If monitoring facilities, under a site testing and monitoring right-of-way authorization, have not been installed with
date of the authorization or consistent with the timeframe of the approved POD, the holder shall provide the BLM good cause as t
anticipated date of installation of facilities, and evidence of progress toward site monitoring activities. If construction of wind ener
energy development authorization, has not commenced within 2 years after the effective date of the grant or consistent with the
the right-of-way holder shall provide the BLM good cause as to the nature of any delay, the anticipated date of construction, and
commencement of construction. Failure of the holder to comply with the due diligence terms and conditions of either the site test
or the wind energy development authorization provides the Authorized Officer the authority to terminate the authorization (43 CF
provisions outlined in this IM also mitigate to some extent the concerns regarding due diligence.

**Environmental Review:** The Programmatic EIS addressed a range of alternatives, including the proposed action which would im
development program with establishment of a set of policies and BMPs for wind energy development on the public lands. The prop
"environmentally preferable" alternative and was carried forward into the ROD. The policies and BMPs are included in Attachment
to all wind energy activities on BLM-administered public lands. The BMPs establish environmentally sound and economically feasib
enhance natural and cultural resources. They identify the issues and concerns that need to be addressed by project-specific plans
these resources will be required to be incorporated into the project POD. These mitigation measures will include the specific progr
additional mitigation measures contained in other existing and relevant BLM guidance or stipulations developed to address site-sp
concerns through project-level analysis.

To the extent that the Programmatic EIS addresses anticipated issues and concerns associated with an individual wind energy pro
cumulative impacts, the BLM will by policy tier off of the analysis in the Programmatic EIS and limit the scope of additional projec
site-specific NEPA analyses will include analysis of project site configuration and micrositing considerations, monitoring program r
site-specific stipulations. In addition, off-site compensatory mitigation may be appropriate to consider for some projects consister
Memorandum No. 2005-069, dated February 1, 2005 .

**1) Site Testing and Monitoring Applications:** The scope of the environmental analysis required for either a site-specific wind

BLM_0008127

monitoring right-of-way application or a project area site testing and monitoring application includes direct, indirect, and cumulat
testing and monitoring related facilities.  The site testing and monitoring right-of-way authorization is for a limited term (3 years)
wind monitoring towers with instruments attached to measure various meteorological parameters, such as wind speed, wind direc
various heights above the ground. The footprint for each monitoring tower is small and the need for site clearances should be limi
surface disturbance and associated areas of potential effect.

The environmental review should not address wind energy development facilities, as the installation of wind turbines are not prop
monitoring. The reasonably foreseeable development discussions in the environmental analysis for a site testing and monitoring r
focus on anticipated installation of additional wind monitoring facilities during the term of the right-of-way grant. Typically only a
site testing and monitoring authorizations ever lead to actual wind energy development projects. Therefore, the reasonably forese
should not focus on uncertain future development scenarios. However, the cumulative impacts of other wind energy site testing a
reasonably foreseeable activities that potentially impact the same environmental resources in the area are required to be address
analysis.

The use of a Categorical Exclusion (CX) for the issuance of short-term right-of-way authorizations may be applicable to some site
locations.  The relevant CX, established for the BLM in Departmental Manual 516, Chapter 11, Sec. 11.5, E(19) (DOI 2004), enco
(3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where
rehabilitation to restore the land to its natural or original condition."

The holder of a site testing and monitoring right-of-way grant for a site testing and monitoring project area is limited in term to 3
required to submit a separate right‐of‐way application for any wind energy development project. The right-of-way regulations
the application be submitted and processed consistent with the provisions of 43 CFR Subpart 2804 as a separate and distinct appl
testing and monitoring right-of-way grant has established no right to development and is required to submit a separate applicatio
review, and decision.  The proposed wind energy development project will be evaluated upon the submittal of an actual applicatio
*Alliance to Protect Nantucket Sound, Inc. v. United States Department of the Army*, 288 F. Supp. 2d 64, 80 (D. Mass. 2003), *aff*
supports the proposition that an authorization to collect wind data and an authorization to develop a wind energy development pr
actions," as that term is defined at 40 CFR 1508.25. The court there held that the Army's authorization of a data tower in Nantuc
automatically trigger the authorization for a wind energy project; that information from the data tower was not required for the w
used if available and relevant; and that the data tower's utility does not depend on the ultimate authorization of the wind energy
reached in *Blue Ocean Preservation Society v. Secretary of Energy*, 754 F. Supp. 1450 (D. Hawaii 1991), so it is advisable to cons
complex cases.

**2) Commercial Wind Energy Development Application:**  The scope of the NEPA analysis and the compliance requirements w
the National Historic Preservation Act, and other laws for a wind energy development right-of-way application will be broader than
application, as the installation of wind turbines, access roads, and electrical transmission facilities will be addressed in the analysi
wind energy facilities are typically smaller than other types of energy production facilities. The level of site clearances should be li
surface disturbances and associated areas of potential effect, including the access roads to wind turbine locations and the electric
support facilities. The wind energy development facilities, however, may extend over a large geographic area and have a broad ar
impact from these facilities may, therefore, extend beyond the small footprint of the individual wind turbine locations and it may l
setbacks from important natural resource areas.

The reasonably foreseeable development discussion in the environmental analysis for a wind energy development project should t
installation of additional wind turbines and increased production and electrical transmission from the project area. In addition, the
wind energy projects and any other reasonably foreseeable projects that potentially impact the same environmental resources in
addressed in the environmental analysis. Project-specific environmental analyses for wind energy development tiered to the analy
Programmatic EIS allow the project-specific analyses to focus just on the critical, site-specific issues of concern. An Environmenta
be sufficient, but an EIS may be required if significant public controversy or a determination of significant adverse impacts is mad
combine the required environmental review process for a wind energy development project with applicable State or local environr
facility siting. This would both streamline the process and be consistent with Departmental policy on intergovernmental cooperati

**LR 2000 Data Entry:**  Commodity code (974) was established to identify wind energy related right-of-way authorizations and to
2000.

**Timeframe:** Effective immediately upon receipt. This policy does not apply to wind energy site testing and monitoring authorizati
development projects authorized prior to the effective date of this IM. Pending applications, however, will be processed consistent
IM. Existing wind energy right-of-way authorizations may be amended at the request of the holder to include the provisions of thi
opportunity for the holder of an existing right-of-way grant for site testing and monitoring to submit an amended right-of-way ap
review, analysis, and separate approval for a future wind energy development project consistent with the provisions of this IM. Ar
wind energy right-of-way grant that includes an adjustment of rental provisions consistent with this IM will be effective at the nex
amendment. There will be no refund or credits applied for previous rental payments.

**Background:** As part of an overall strategy to develop a diverse portfolio of domestic energy supplies for our future, the Nationa
Energy Policy Act of 2005 (Public Law 109-58, August 8, 2005) encourage the development of renewable energy resources, inclu

The United States has significant potential for wind energy development, especially on Federal lands in the West. The Federal win
State‐level tax credits and other incentives, including renewable energy portfolio standards in several states, have generated a
wind energy projects on BLM-administered public lands. Project proposals on public land will create a workload that demands a co
priority to the timely and consistent processing of right-of-way applications for wind energy site testing and monitoring activities .
development.

BLM_0008128

**Budget Impact:** The application of this policy will have some impact on budget. However, wind energy right-of-way applications provisions of the regulations and most applications for a long-term commercial wind energy development right-of-way will probab reasonable costs (43 CFR 2804.14(b)). In addition, the BLM monitoring activities are also subject to the cost recovery provisions impacts should be clarified through the streamlined procedures identified by this IM and by the priority established for processing applications. There is also a positive impact through the implementation of consistent procedures in the processing of wind ener applications.

**Manual/Handbook Sections Affected:** This Instruction Memorandum and policy affect BLM Right-of-Way Management Manual and BLM Land Use Planning Handbook H-1601-1.

**Coordination:** This IM incorporates the policies and BMPs established by the Programmatic EIS and associated ROD. Preparation provided an opportunity for public comment and input on the proposed BLM wind energy program, policies and BMPs, and land us use plan amendment process also included a 60-day Governor's consistency review as required by the BLM land use planning reg Section 7 consultation process with the FWS. The ROD signed on December 15, 2005 was jointly signed by the Assistant Director, Protection (AD-300), and the Assistant Director, Renewable Resources and Planning (AD-200). The BLM State Offices were provid IM and provide input prior to finalization.

**Contacts:** Any questions concerning the content of this IM should be directed to the BLM Division of Lands, Realty and Cadastral contact for wind energy right-of-way questions include Rick Stamm at 202-452-5185 or Scott Powers at 406-896-5319.

Signed by:                                Authenticated by:
Lawrence E. Benna                      Robert M. Williams
Acting, Director                          Division of IRM Governance,WO-560

1 Attachment
   1 – Record of Decision (42 pp)

Last updated: 10-21-2009

BLM_0008129

# RECORD OF DECISION

## Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments

## DECEMBER 2005

**U.S. Department of the Interior
Bureau of Land Management
Washington, D.C.**

| | |
|---|---|
| /s/  Thomas Lonnie | December 15, 2005 |
| Tom Lonnie | Date |
| Assistant Director, Minerals, Realty and Resource Protection | |

| | |
|---|---|
| /s/  Edward Shepard | December 15, 2005 |
| Ed Shepard | Date |
| Assistant Director, Renewable Resources and Planning | |

Attachment 1-1

BLM_0008130

# RECORD OF DECISION

## Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments

## 1 INTRODUCTION

The U.S. Department of the Interior (DOI), Bureau of Land Management (BLM), is responsible for the development of wind energy resources on BLM-administered public lands. Currently, about 500 megawatts (MW) of installed wind capacity occurs under right-of-way (ROW) authorizations administered by the BLM in accordance with the requirements of the Federal Land Policy and Management Act of 1976 (FLPMA).

This document records the decision that the BLM reached to implement a comprehensive Wind Energy Development Program in 11 western states, excluding Alaska, and to amend 52 BLM land use plans to adopt the new program. The elements of the Wind Energy Development Program and the associated land use plan amendments were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States* (BLM 2005a). This Programmatic Environmental Impact Statement (PEIS) was prepared in accordance with the National Environmental Policy Act of 1969 (NEPA) and the FLPMA. The U.S. Department of Energy (DOE) cooperated in the preparation of the PEIS in support of the BLM's proposed action.

The BLM prepared a Programmatic Biological Assessment (BA) evaluating the potential effects of wind energy development that could occur on BLM-administered public lands as a result of the proposed land use plan amendments (BLM 2005b). Specifically, the Programmatic BA considered the potential effects to federally listed threatened and endangered species and candidate species, and to their critical habitats, that have the potential to be present at locations where wind energy projects may be developed within the planning areas affected by the proposed land use plan amendments. The BLM submitted the Programmatic BA to the U.S. Fish and Wildlife Service (USFWS) on July 27, 2005, for formal consultation. The USFWS issued a Biological Opinion (BO) on November 30, 2005, (USFWS 2005). For each of the nine species listed as likely to be adversely affected in the Programmatic BA, the USFWS concluded that the program is not likely to jeopardize the species or destroy or adversely modify any federally listed threatened and endangered species critical habitat. The USFWS further recommended that the BLM coordinate with the appropriate USFWS field office prior to planning the construction of any site-specific wind energy project to obtain the most current information on the distribution of listed species in the site-specific area.

## 2 DECISION

The decision is hereby made to implement a comprehensive Wind Energy Development Program to administer the development of wind energy resources on BLM-administered public lands in 11 western states: Arizona, California, Colorado, Idaho, Montana, Nevada,

Attachment 1-2

New Mexico, Oregon, Utah, Washington, and Wyoming. The decision establishes policies and best management practices (BMPs) for the administration of wind energy development activities and establishes minimum requirements for mitigation measures. The policies and BMPs were evaluated in the Final Wind Energy PEIS (BLM 2005a) and are included in Attachment A. With the decision to implement the Wind Energy Development Program, the BLM Interim Wind Energy Policy (BLM 2002) will be replaced by a new policy that incorporates the programmatic policies and BMPs evaluated in the PEIS. Elements of the Interim Policy addressing applications, authorizations, competitive interests, and due diligence will not be changed by the new program requirements.

In addition, this decision amends 52 BLM land use plans in 9 of the states in the study area: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The land use plan amendments, identified in Attachment B, include the adoption of the Wind Energy Development Program policies and BMPs and, in a few instances, the identification of specific areas where wind energy development will be excluded.

# 3  ALTERNATIVES, INCLUDING THE PROPOSED ACTION

The Final Wind Energy PEIS (BLM 2005a) analyzed three alternatives. It analyzed the potential impacts associated with the BLM's proposed action to implement a Wind Energy Development Program. It also assessed potential impacts associated with two alternatives to the proposed action, which present different management options for wind energy development on BLM-administered public lands. The alternatives were defined as follows:

- *Proposed action: implement a Wind Energy Development Program.* Under this alternative, the BLM proposed to implement a comprehensive program to address issues associated with wind energy development on BLM-administered public lands under a maximum potential development scenario (MPDS). The program will establish policies and BMPs to address the administration of wind energy development activities and identify minimum requirements for mitigation measures. These programmatic policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands. Site-specific concerns, and the development of additional mitigation measures, will be addressed in project-level reviews, including NEPA analyses, as required. To the extent appropriate, future project-specific analyses will tier from the analyses conducted in the PEIS and the decisions in this Record of Decision (ROD) to allow project-specific analyses to focus just on the critical, site-specific issues of concern. In addition, under this alternative, a number of BLM land use plans will be amended to address wind energy development, including adoption of the programmatic policies and BMPs and identification of exclusion areas.

- *No action alternative.* Under this alternative, the BLM would continue administering wind energy development ROW authorizations in accordance with the terms and conditions of the Interim Wind Energy Development Policy (BLM 2002). Analysis and review of wind energy development,

Attachment 1-3

BLM_0008132

including NEPA analyses and development of required mitigation measures, would be conducted on a project-by-project basis. Individual land use plan amendments would occur on a plan-by-plan basis without the benefit of the overarching, comprehensive analysis provided by the PEIS.

- *Limited wind energy development alternative.* Under this alternative, additional wind energy development on BLM-administered public lands would occur only in areas where it currently exists, is under review, or was approved for development prior publication of this ROD . For the purposes of establishing an upper bound on the potential impacts of this alternative, it was assumed that all proposed wind energy projects on BLM-administered public lands under review during preparation of the PEIS would be approved for development by the time this ROD was published. Future expansion of wind energy development would be allowed at existing project areas; however, no additional BLM-administered public lands would be made available for development. Under these restrictions, development would be limited to locations where development currently exists: Palm Springs, California; Ridgecrest, California; and Arlington, Wyoming; and locations where it is currently being reviewed: the Table Mountain Wind Generating Facility, Nevada; Cotterel Mountain Wind Farm Project, Idaho; and Walker Ridge, California.

Potential adverse impacts to natural and cultural resources could occur during each phase of wind energy development (i.e., site monitoring and testing, construction, operation, and decommissioning) if effective mitigation measures are not implemented. The nature and magnitude of these impacts would vary by phase and would be determined by the project location and size. Potential direct impacts would include use of geologic and water resources; creation or increase of geologic hazards or soil erosion; water quality degradation; localized generation of airborne dust; generation of noise; alteration or degradation of wildlife habitat or sensitive or unique habitat; interference with resident or migratory fish or wildlife species, including protected species; alteration or degradation of plant communities, including the occurrence of invasive vegetation; land use changes; alteration of visual resources; release of hazardous materials or wastes; increased traffic; increased human health and safety hazards; and destruction or loss of paleontological or cultural resources. More limited, potential indirect impacts also could occur to cultural and ecological resources.

Effective mitigation measures can be implemented to address many of the direct and indirect adverse impacts that could occur. For some resources, minimum requirements can be established that would effectively mitigate impacts at all potential development sites. For other resources, however, such as ecological and visual resources, mitigation will be better defined at the project level to address site-specific concerns.

The potential impacts of wind energy development on local and regional economies will be largely beneficial, depending upon the size of the project and the resultant wind power capacity.

Attachment 1-4

BLM_0008133

The proposed action and its alternatives present options for the management of wind energy development on BLM-administered public lands. The proposed action, implementing the Wind Energy Development Program, was determined through the Final Wind Energy PEIS (BLM 2005a) to be the "environmentally preferable" alternative because it will establish a comprehensive set of policies and BMPs. The policies will identify specific lands on which wind energy development will not be allowed; establish requirements for public involvement, consultation with other federal and state agencies, and government-to-government consultation; define the need for project-level environmental review; establish requirements for the scope and content of the site-specific project Plan of Development (POD); and incorporate adaptive management strategies. The BMPs will establish environmentally sound and economically feasible mechanisms to protect and enhance natural and cultural resources. They identify the issues and concerns that must be addressed by project-specific plans, programs, and stipulations during each phase of development. Mitigation measures protecting these resources will be required to be incorporated into project PODs; this will include incorporation of specific programmatic BMPs as well as the incorporation of additional mitigation measures contained in other, existing and relevant BLM guidance, or developed to address site-specific or species-specific concerns. The no action and limited development alternatives do not provide the same level of assurance that comprehensive mitigation measures will be implemented across the 11 states.

In addition, in terms of facilitating wind energy development, implementation of the proposed action is expected to minimize some of the delays that currently occur for wind energy development projects, ensure consistency in the ROW application and authorization process, and reduce costs. These benefits will be realized as a result of the emphasis on site-specific concerns during the project-level environmental analyses, the amendment of numerous land use plans to address wind energy development, and the opportunity to tier future NEPA analyses from the Final Wind Energy PEIS (BLM 2005a) and decisions in this ROD. The no action and limited development alternatives do not provide these benefits in terms of facilitating wind energy development.

## 4  MANAGEMENT CONSIDERATIONS

On May 18, 2001, the President issued Executive Order (E.O.) 13212, "Actions to Expedite Energy-Related Projects," which established a policy that federal agencies should take appropriate actions, to the extent consistent with applicable law, to expedite projects to increase the production, transmission, or conservation of energy. In that same month, the President's National Energy Policy Development Group (NEPDG) recommended to the President, as part of the National Energy Policy, that the Departments of the Interior, Energy, Agriculture, and Defense work together to increase renewable energy production (NEPDG 2001). In July 2001, the Departments created an interagency task force to address the issues associated with increasing renewable energy production on federal lands (DOE and DOI 2002). The task force developed a Memorandum of Understanding (MOU) among the U.S. Department of Energy (DOE), U.S. Department of the Interior (DOI), U.S. Department of Agriculture (USDA), U.S. Environmental Protection Agency (EPA), Council on Environmental Quality (CEQ), and the members of the Western Governors' Association to establish a framework for cooperation

Attachment 1-5

between western states and the federal government to address energy problems facing the West and to facilitate renewable energy production.

To address increased interest in wind energy development and to implement the National Energy Policy recommendation to increase renewable energy production, the BLM undertook efforts to evaluate wind energy potential on public lands and establish a wind energy policy. In 2002, the BLM issued an Interim Wind Energy Development Policy (BLM 2002) that establishes requirements for processing applications for wind energy site testing and monitoring and commercial wind energy development projects. To further support wind energy development on public lands and also to minimize potential environmental and sociocultural impacts, the BLM decided to build on the interim policy and establish a comprehensive Wind Energy Development Program. The BLM initiated preparation of the PEIS in October 2003 and published the PEIS in June 2005. On August 8, 2005, the President signed into law the Energy Policy Act of 2005 (P.L. 109-58). Section 211 of the Act states, "It is the sense of the Congress that the Secretary of the Interior should, before the end of the 10-year period beginning on the date of enactment of this Act, seek to have approved non-hydropower renewable energy projects located on the public lands with a generation capacity of at least 10,000 megawatts of electricity."

The Wind Energy Development Program and the amendment of multiple land use plans to adopt the program will effectively support the directives of E.O. 13212, the recommendations of the National Energy Policy, and congressional direction provided in the Energy Policy Act of 2005 regarding renewable energy development on public lands. On the basis of the impact analyses presented in the Final Wind Energy PEIS (BLM 2005a), it appears that the proposed action will present the best approach for managing wind energy development on BLM-administered public lands. The Wind Energy Development Program is likely to result in the greatest amount of wind energy development over the next 20 years, at the lowest potential cost to industry. Simultaneously, the proposed action will provide the most comprehensive approach for ensuring that potential adverse impacts are minimized to the greatest extent possible. And, finally, the proposed action is likely to provide the greatest economic benefits to local communities and the region as a whole.

## 5  MITIGATION AND MONITORING

A primary purpose of the Wind Energy Development Program is the establishment of policies and BMPs to ensure that potential adverse impacts associated with the development of wind energy resources on BLM-administered public lands are minimized to the greatest extent possible. The policies and BMPs, included in Attachment A, address all identified issues associated with the administration of wind energy development and mitigation of potential impacts; these issues are either addressed directly in the policies and BMPs, or through requirements that they will be addressed as needed during site-specific reviews.

The program will establish specific monitoring requirements that must be met throughout all phases of development. The requirement for the BLM and operators of wind energy projects on BLM-administered public lands to adopt adaptive management strategies will further ensure

Attachment 1-6

that potential environmental impacts will be kept to a minimum. This includes requirements for periodic review and revision of programmatic policies and BMPs; comprehensive site monitoring programs, including metrics for measuring impacts; and protocols for incorporating monitoring observations and new mitigation measures into standard operating procedures and project-specific stipulations.

The amendment of 52 BLM land use plans to adopt the program ensures that the program will have a maximum effect. Additional land use plan amendments and revisions are expected to follow the issuance of this ROD in those remaining areas with potentially developable wind energy resources through ongoing and future land use planning efforts.

# 6  PUBLIC INVOLVEMENT

The "Notice of Intent to Prepare a Programmatic Environmental Impact Statement (EIS) to Evaluate Wind Energy Development on Western Public Lands Administered by the BLM" (the NOI) was published in Volume 68, page 201, of the *Federal Register* (68 FR 201) on October 17, 2003. This initiated the public scoping period, which lasted from October 17 to December 19, 2003. During that period, the BLM invited the public and interested groups to provide information and guidance on the scope of the PEIS and alternatives to the proposed action, suggest issues that should be examined, and express their concerns and opinions on resources in the western United States that wind energy development might impact. Public scoping meetings were held in Sacramento, California; Salt Lake City, Utah; Cheyenne, Wyoming; Las Vegas, Nevada; and Boise, Idaho.

An estimated 5,000 people participated in the scoping process by attending public meetings, providing comments, requesting information, or visiting the Wind Energy Development PEIS Web site (http://windeis.anl.gov). All comments received equal consideration in developing the alternatives and analytical issues evaluated in the PEIS. The results of the scoping process were documented in a report issued in January 2004 (BLM 2004) that summarizes and categorizes the major themes, issues, and concerns of the written and verbal comments. The scoping summary report and copies of the individual letters, facsimiles, and comments received electronically during scoping are available on the Wind Energy Development PEIS Web site.

In addition to public scoping, government-to-government consultation was initiated with all Tribal entities with a potential interest in wind energy development on BLM public lands.

The Notice of Availability (NOA) of the Draft PEIS was published on September 10, 2004, (69 FR 175). This began a 90-day public comment period on the Draft PEIS, which lasted from September 10 to December 10, 2004. During this period, the BLM invited the public and interested groups to comment on the content of the Draft PEIS.

The Draft PEIS was posted in its entirety on the Wind Energy Development PEIS Web site. Printed copies of the document and CDs containing the electronic files comprising the document were mailed upon request. More than 120 people and organizations participated in the public comment process by providing Internet-based comments or postal letters. Approximately

Attachment 1-7

718 individual comments were received.  The BLM reviewed all comments and made changes to the PEIS, as appropriate. Responses to comments are provided in Volume 3 of the Final Wind Energy PEIS (BLM 2005a).  The 30-day public protest period resulted in no protests.

In addition, on June 24, 2005, the BLM initiated a 90-day Governors Consistency Review of the PEIS in accordance with BLM planning regulations.  The results of the review were favorable in that none of the Governors objected to the proposed plan amendments.

# 7  REFERENCES

BLM 2002, "Instruction Memorandum No. 2003-020, Interim Wind Energy Development Policy," issued by the Director of the BLM, Washington, D.C., Oct. 16.

BLM, 2004, *Summary Report of Scoping Comments Received on the BLM Wind Energy Development Programmatic Environmental Impact Statement*, prepared by Argonne National Laboratory, Argonne, Ill., for the BLM, Lands and Realty Group, Washington, D.C., Jan.

BLM, 2005a, *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States*, prepared by Argonne National Laboratory for BLM, Washington, D.C., June.

BLM, 2005b, *Programmatic Biological Assessment for the BLM's Proposed Land Use Plan Amendments to Adopt the Proposed Wind Energy Development Program*, BLM, Washington, D.C., July.

DOE and DOI (U.S. Department of Energy and U.S. Department of the Interior), 2002, *White House Report in Response to the National Energy Policy Recommendations to Increase Renewable Energy Production on Federal Lands*, Washington, D.C., Aug.

NEPDG (National Energy Policy Development Group), 2001, *National Energy Policy, Reliable, Affordable, and Environmentally Sound Energy for America's Future*, Washington, D.C., May.

USFWS (U.S. Fish and Wildlife Service), 2005, *Biological Opinion for BLM Wind Energy Program,* Washington, D.C.,Nov.

BLM_0008137

**ATTACHMENT A**

**BLM WIND ENERGY DEVELOPMENT PROGRAM
POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)**

Attachment 1-9

BLM_0008138

## ATTACHMENT A

## BLM WIND ENERGY DEVELOPMENT PROGRAM
## POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)

The BLM's Wind Energy Development Program will establish a number of policies and BMPs, provided below, regarding the development of wind energy resources on BLM-administered public lands. The policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands. The policies address the administration of wind energy development activities, and the BMPs identify required mitigation measures that would need to be incorporated into project-specific Plans of Development (PODs) and right-of-way (ROW) authorization stipulations. Additional mitigation measures will be applied to individual projects, in the form of stipulations in the ROW authorization as appropriate, to address site-specific and species-specific issues.

These policies and BMPs were formulated through preparation of the Final Wind Energy PEIS (BLM 2005). The PEIS included detailed, comprehensive analysis of the potential impacts of wind energy development and relevant mitigation measures; reviews of existing, relevant mitigation guidance; and reviews of comments received during scoping and public review of the Draft PEIS.

### A.1  Policies

- The BLM will not issue ROW authorizations for wind energy development on lands on which wind energy development is incompatible with specific resource values. Lands that will be excluded from wind energy site monitoring and testing and development include designated areas that are part of the National Landscape Conservation System (NLCS) (e.g., Wilderness Areas, Wilderness Study Areas, National Monuments, NCAs,[1] Wild and Scenic Rivers, and National Historic and Scenic Trails) and Areas of Critical Environmental Concern (ACECs).[2] Additional areas of land may be excluded from wind energy development on the basis of findings of resource impacts that cannot be mitigated and/or conflict with existing and planned multiple-use activities or land use plans.

- To the extent possible, wind energy projects shall be developed in a manner that will not prevent other land uses, including minerals extraction, livestock grazing, recreational use, and other ROW uses.

---

[1]     Wind energy development is permitted in one NCA, the California Desert Conservation Area (CDCA), in accordance with the provisions of the *California Desert Conservation Area Plan 1980, as Amended* (BLM 1999).

[2]     Although the MPDS developed for this PEIS (Section 2.2.1 and Appendix B) did not exclude all of these lands at the screening level, they will be excluded from wind energy development.

Attachment 1-10

BLM_0008139

- Entities seeking to develop a wind energy project on BLM-administered lands shall consult with appropriate federal, state, and local agencies regarding specific projects as early in the planning process as appropriate to ensure that all potential construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- The BLM will initiate government-to-government consultation with Indian Tribal governments whose interests might be directly and substantially affected by activities on BLM-administered lands as early in the planning process as appropriate to ensure that construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- Entities seeking to develop a wind energy project on BLM-administered lands, in conjunction with BLM Washington Office (WO) and Field Office (FO) staff, shall consult with the U.S. Department of Defense (DoD) regarding the location of wind power projects and turbine siting as early in the planning process as appropriate.  This consultation shall occur concurrently at both the installation/field level and the Pentagon/BLM WO level. An interagency protocol agreement is being developed to establish a consultation process and to identify the scope of issues for consultation. Lands withdrawn for military purposes are under the administrative jurisdiction of the DoD or a military service and are not available for issuance of wind energy authorizations by the BLM.

- The BLM will consult with the U.S. Fish and Wildlife Service (USFWS) as required by Section 7 of the Endangered Species Act of 1973 (ESA).  The specific consultation requirements will be determined on a project-by-project basis.

- The BLM will consult with the State Historic Preservation Office (SHPO) as required by Section 106 of the National Historic Preservation Act of 1966 (NHPA). The specific consultation requirements will be determined on a project-by-project basis.  If programmatic Section 106 consultations have been conducted and are adequate to cover a proposed project, additional consultation may not be needed.

- Existing land use plans will be amended, as appropriate, to (1) adopt provisions of the BLM's Wind Energy Development Program, (2) identify land considered to be available for wind energy development, and (3) identify land that will not be available for wind energy development.

- The level of environmental analysis to be required under NEPA for individual wind power projects will be determined at the FO level.  For many projects, it may be determined that a tiered environmental assessment (EA) is appropriate in lieu of an EIS. To the extent that the PEIS addresses anticipated issues and

Attachment 1-11

concerns associated with an individual project, including potential cumulative impacts, the BLM will tier off of the decisions embedded in the PEIS and limit the scope of additional project-specific NEPA analyses. The site-specific NEPA analyses will include analyses of project site configuration and micrositing considerations, monitoring program requirements, and appropriate mitigation measures. In particular, the mitigation measures discussed in Chapter 5 of the PEIS may be consulted in determining site-specific requirements. Public involvement will be incorporated into all wind energy development projects to ensure that all concerns and issues are identified and adequately addressed. In general, the scope of the NEPA analyses will be limited to the proposed action on BLM-administered public lands; however, if access to proposed development on adjacent non-BLM-administered lands is entirely dependent on obtaining ROW access across BLM-administered public lands and there are no alternatives to that access, the NEPA analysis for the proposed ROW may need to assess the environmental effects from that proposed development. The BLM's analyses of ROW access projects may tier off of the PEIS to the extent that the proposed project falls within the scope of the PEIS analyses.

- Site-specific environmental analyses will tier from the PEIS and identify and assess any cumulative impacts that are beyond the scope of the cumulative impacts addressed in the PEIS.

- The Categorical Exclusion (CX) applicable to the issuance of short-term ROWs or land use authorizations may be applicable to some site monitoring and testing activities. The relevant CX, established for the BLM in the DOI Departmental Manual 516, Chapter 11, Sec. 11.5, E(19) (DOI 2004), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition."

- The BLM will require financial bonds for all wind energy development projects on BLM-administered public lands to ensure compliance with the terms and conditions of the rights-of-way authorization and the requirements of applicable regulatory requirements, including reclamation costs. The amount of the required bond will be determined during the rights-of-way authorization process on the basis of site-specific and project-specific factors. The BLM may also require financial bonds for site monitoring and testing authorizations.

- Entities seeking to develop a wind energy project on BLM-administered public lands shall develop a project-specific Plan of Development (POD) that incorporates all BMPs and, as appropriate, the requirements of other existing and relevant BLM mitigation guidance, including the BLM's interim off-site mitigation guidance (BLM 2005a). Additional mitigation measures will be

Attachment 1-12

BLM_0008141

incorporated into the POD and into the ROW authorization as project stipulations, as needed, to address site-specific and species-specific issues. The POD will include a site plan showing the locations of turbines, roads, power lines, other infrastructure, and other areas of short- and long-term disturbance.

- The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.

- The BLM will consider the visual resource values of the public lands involved in proposed wind energy development projects, consistent with BLM Visual Resource Management (VRM) policies and guidance. The BLM will work with the ROW applicant to incorporate visual design considerations into the planning and design of the project to minimize potential visual impacts of the proposal and to meet the VRM objectives of the area.

- Operators of wind power facilities on BLM-administered public lands shall consult with the BLM and other appropriate federal, state, and local agencies regarding any planned upgrades or changes to the wind facility design or operation. Proposed changes of this nature may require additional environmental analysis and/or revision of the POD.

- The BLM's Wind Energy Development Program will incorporate adaptive management strategies to ensure that potential adverse impacts of wind energy development are avoided (if possible), minimized, or mitigated to acceptable levels. The programmatic policies and BMPs will be updated and revised as new data regarding the impacts of wind power projects become available. At the project-level, operators will be required to develop monitoring programs to evaluate the environmental conditions at the site through all phases of development, to establish metrics against which monitoring observations can be measured, to identify potential mitigation measures, and to establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and project-specific stipulations.

## A.2  Best Management Practices (BMPs)

The BMPs will be adopted as required elements of project-specific PODs and/or as ROW authorization stipulations. They are categorized by development activity: site monitoring and testing, development of the POD, construction, operation, and decommissioning. The BMPs for development of the POD identify required elements of the POD needed to address potential impacts associated with subsequent phases of development.

Attachment 1-13

### A.2.1  Site Monitoring and Testing

- The area disturbed by installation of meteorological towers (i.e., footprint) shall be kept to a minimum.

- Existing roads shall be used to the maximum extent feasible.  If new roads are necessary, they shall be designed and constructed to the appropriate standard.

- Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present.  Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.

- Meteorological towers installed for site monitoring and testing shall be inspected periodically for structural integrity.

### A.2.2  Plan of Development Preparation

#### *General*

- The BLM and operators shall contact appropriate agencies, property owners, and other stakeholders early in the planning process to identify potentially sensitive land uses and issues, rules that govern wind energy development locally, and land use concerns specific to the region.

- Available information describing the environmental and sociocultural conditions in the vicinity of the proposed project shall be collected and reviewed as needed to predict potential impacts of the project.

- The Federal Aviation Administration (FAA)-required notice of proposed construction shall be made as early as possible to identify any air safety measures that would be required.

- To plan for efficient use of the land, necessary infrastructure requirements shall be consolidated wherever possible, and current transmission and market access shall be evaluated carefully.

- The project shall be planned to utilize existing roads and utility corridors to the maximum extent feasible, and to minimize the number and length/size of new roads, lay-down areas, and borrow areas.

- A monitoring program shall be developed to ensure that environmental conditions are monitored during the construction, operation, and

Attachment 1-14

decommissioning phases. The monitoring program requirements, including adaptive management strategies, shall be established at the project level to ensure that potential adverse impacts of wind energy development are mitigated. The monitoring program shall identify the monitoring requirements for each environmental resource present at the site, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and BMPs.

- "Good housekeeping" procedures shall be developed to ensure that during operation the site will be kept clean of debris, garbage, fugitive trash or waste, and graffiti; to prohibit scrap heaps and dumps; and to minimize storage yards.

### Wildlife and Other Ecological Resources

- Operators shall review existing information on species and habitats in the vicinity of the project area to identify potential concerns.

- Operators shall conduct surveys for federal and/or state-protected species and other species of concern (including special status plant and animal species) within the project area and design the project to avoid (if possible), minimize, or mitigate impacts to these resources.

- Operators shall identify important, sensitive, or unique habitats in the vicinity of the project and design the project to avoid (if possible), minimize, or mitigate impacts to these habitats (e.g., locate the turbines, roads, and ancillary facilities in the least environmentally sensitive areas; i.e., away from riparian habitats, streams, wetlands, drainages, or critical wildlife habitats).

- The BLM will prohibit the disturbance of any population of federal listed plant species.

- Operators shall evaluate avian and bat use of the project area and design the project to minimize or mitigate the potential for bird and bat strikes (e.g., development shall not occur in riparian habitats and wetlands). Scientifically rigorous avian and bat use surveys shall be conducted; the amount and extent of ecological baseline data required shall be determined on a project basis.

- Turbines shall be configured to avoid landscape features known to attract raptors, if site studies show that placing turbines there would pose a significant risk to raptors.

Attachment 1-15

BLM_0008144

- Operators shall determine the presence of bat colonies and avoid placing turbines near known bat hibernation, breeding, and maternity/nursery colonies; in known migration corridors; or in known flight paths between colonies and feeding areas.

- Operators shall determine the presence of active raptor nests (i.e., raptor nests used during the breeding season). Measures to reduce raptor use at a project site (e.g., minimize road cuts, maintain either no vegetation or nonattractive plant species around the turbines) shall be considered.

- A habitat restoration plan shall be developed to avoid (if possible), minimize, or mitigate negative impacts on vulnerable wildlife while maintaining or enhancing habitat values for other species. The plan shall identify revegetation, soil stabilization, and erosion reduction measures that shall be implemented to ensure that all temporary use areas are restored. The plan shall require that restoration occur as soon as possible after completion of activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- Procedures shall be developed to mitigate potential impacts to special status species. Such measures could include avoidance, relocation of project facilities or lay-down areas, and/or relocation of biota.

- Facilities shall be designed to discourage their use as perching or nesting substrates by birds. For example, power lines and poles shall be configured to minimize raptor electrocutions and discourage raptor and raven nesting and perching.

### Visual Resources

- The public shall be involved and informed about the visual site design elements of the proposed wind energy facilities. Possible approaches include conducting public forums for disseminating information, offering organized tours of operating wind developments, and using computer simulation and visualization techniques in public presentations.

- Turbine arrays and turbine design shall be integrated with the surrounding landscape. Design elements to be addressed include visual uniformity, use of tubular towers, proportion and color of turbines, nonreflective paints, and prohibition of commercial messages on turbines.

- Other site design elements shall be integrated with the surrounding landscape. Elements to address include minimizing the profile of the ancillary structures, burial of cables, prohibition of commercial symbols, and lighting. Regarding

Attachment 1-16

lighting, efforts shall be made to minimize the need for and amount of lighting on ancillary structures.

### Roads

- An access road siting and management plan shall be prepared incorporating existing BLM standards regarding road design, construction, and maintenance such as those described in the BLM 9113 Manual (BLM 1985) and the *Surface Operating Standards for Oil and Gas Exploration and Development* (RMRCC 1989) (i.e., the Gold Book).

### Ground Transportation

- A transportation plan shall be developed, particularly for the transport of turbine components, main assembly cranes, and other large pieces of equipment. The plan shall consider specific object sizes, weights, origin, destination, and unique handling requirements and shall evaluate alternative transportation approaches. In addition, the process to be used to comply with unique state requirements and to obtain all necessary permits shall be clearly identified.

- A traffic management plan shall be prepared for the site access roads to ensure that no hazards would result from the increased truck traffic and that traffic flow would not be adversely impacted. This plan shall incorporate measures such as informational signs, flaggers when equipment may result in blocked throughways, and traffic cones to identify any necessary changes in temporary lane configuration.

### Noise

- Proponents of a wind energy development project shall take measurements to assess the existing background noise levels at a given site and compare them with the anticipated noise levels associated with the proposed project.

### Noxious Weeds and Pesticides

- Operators shall develop a plan for control of noxious weeds and invasive species, which could occur as a result of new surface disturbance activities at the site. The plan shall address monitoring, education of personnel on weed identification, the manner in which weeds spread, and methods for treating infestations. The use of certified weed-free mulching shall be required. If trucks and construction equipment are arriving from locations with known

Attachment 1-17

BLM_0008146

invasive vegetation problems, a controlled inspection and cleaning area shall be established to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

- If pesticides are used on the site, an integrated pest management plan shall be developed to ensure that applications would be conducted within the framework of BLM and DOI policies and entail only the use of EPA-registered pesticides. Pesticide use shall be limited to nonpersistent, immobile pesticides and shall only be applied in accordance with label and application permit directions and stipulations for terrestrial and aquatic applications.

### *Cultural/Historic Resources*

- The BLM will consult with Indian Tribal governments early in the planning process to identify issues regarding the proposed wind energy development, including issues related to the presence of cultural properties, access rights, disruption to traditional cultural practices, and impacts to visual resources important to the Tribe(s).

- The presence of archaeological sites and historic properties in the area of potential effect shall be determined on the basis of a records search of recorded sites and properties in the area and/or, depending on the extent and reliability of existing information, an archaeological survey.  Archaeological sites and historic properties present in the area of potential effect shall be reviewed to determine whether they meet the criteria of eligibility for listing on the *National Register of Historic Places* (NRHP).

- When any rights-of-way application includes remnants of a National Historic Trail, is located within the viewshed of a National Historic Trail's designated centerline, or includes or is within the viewshed of a trail eligible for listing on the NRHP, the operator shall evaluate the potential visual impacts to the trail associated with the proposed project and identify appropriate mitigation measures for inclusion as stipulations in the POD.

- If cultural resources are present at the site, or if areas with a high potential to contain cultural material have been identified, a cultural resources management plan (CRMP) shall be developed.  This plan shall address mitigation activities to be taken for cultural resources found at the site.  Avoidance of the area is always the preferred mitigation option.  Other mitigation options include archaeological survey and excavation (as warranted) and monitoring.  If an area exhibits a high potential, but no artifacts were observed during an archaeological survey, monitoring by a qualified archaeologist could be required during all excavation and

Attachment 1-18

earthmoving in the high-potential area. A report shall be prepared documenting these activities. The CRMP also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of artifacts and destruction of property on public land.

### Paleontological Resources

- Operators shall determine whether paleontological resources exist in a project area on the basis of the sedimentary context of the area, a records search for past paleontological finds in the area, and/or, depending on the extent of existing information, a paleontological survey.

- If paleontological resources are present at the site, or if areas with a high potential to contain paleontological material have been identified, a paleontological resources management plan shall be developed. This plan shall include a mitigation plan for collection of the fossils; mitigation could include avoidance, removal of fossils, or monitoring. If an area exhibits a high potential but no fossils were observed during survey, monitoring by a qualified paleontologist could be required during all excavation and earthmoving in the sensitive area. A report shall be prepared documenting these activities. The paleontological resources management plan also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

### Hazardous Materials and Waste Management

- Operators shall develop a hazardous materials management plan addressing storage, use, transportation, and disposal of each hazardous material anticipated to be used at the site. The plan shall identify all hazardous materials that would be used, stored, or transported at the site. It shall establish inspection procedures, storage requirements, storage quantity limits, inventory control, nonhazardous product substitutes, and disposition of excess materials. The plan shall also identify requirements for notices to federal and local emergency response authorities and include emergency response plans.

- Operators shall develop a waste management plan identifying the waste streams that are expected to be generated at the site and addressing hazardous waste determination procedures, waste storage locations, waste-specific management and disposal requirements, inspection procedures, and waste

Attachment 1-19

minimization procedures.  This plan shall address all solid and liquid wastes that may be generated at the site.

- Operators shall develop a spill prevention and response plan identifying where hazardous materials and wastes are stored on site, spill prevention measures to be implemented, training requirements, appropriate spill response actions for each material or waste, the locations of spill response kits on site, a procedure for ensuring that the spill response kits are adequately stocked at all times, and procedures for making timely notifications to authorities.

### *Storm Water*

- Operators shall develop a storm water management plan for the site to ensure compliance with applicable regulations and prevent off-site migration of contaminated storm water or increased soil erosion.

### *Human Health and Safety*

- A safety assessment shall be conducted to describe potential safety issues and the means that would be taken to mitigate them, including issues such as site access, construction, safe work practices, security, heavy equipment transportation, traffic management, emergency procedures, and fire control.

- A health and safety program shall be developed to protect both workers and the general public during construction, operation, and decommissioning of a wind energy project.  Regarding occupational health and safety, the program shall identify all applicable federal and state occupational safety standards; establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; Occupational Safety and Health Administration [OSHA] standard practices for safe use of explosives and blasting agents; and measures for reducing occupational electric and magnetic fields [EMF] exposures); establish fire safety evacuation procedures; and define safety performance standards (e.g., electrical system standards and lightning protection standards).  The program shall include a training program to identify hazard training requirements for workers for each task and establish procedures for providing required training to all workers.  Documentation of training and a mechanism for reporting serious accidents to appropriate agencies shall be established.

- Regarding public health and safety, the health and safety program shall establish a safety zone or setback for wind turbine generators from residences and occupied buildings, roads, rights-of-ways, and other public access areas that is sufficient to prevent accidents resulting from the operation of wind turbine generators.  It shall identify requirements for temporary fencing

Attachment 1-20

BLM_0008149

around staging areas, storage yards, and excavations during construction or decommissioning activities. It shall also identify measures to be taken during the operation phase to limit public access to hazardous facilities (e.g., permanent fencing would be installed only around electrical substations, and turbine tower access doors would be locked).

- Operators shall consult with local planning authorities regarding increased traffic during the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) shall be identified and addressed in the traffic management plan.

- If operation of the wind turbines is expected to cause significant adverse impacts to nearby residences and occupied buildings from shadow flicker, low-frequency sound, or EMF, site-specific recommendations for addressing these concerns shall be incorporated into the project design (e.g., establishing a sufficient setback from turbines).

- The project shall be planned to minimize electromagnetic interference (EMI) (e.g., impacts to radar, microwave, television, and radio transmissions) and comply with Federal Communications Commission [FCC] regulations. Signal strength studies shall be conducted when proposed locations have the potential to impact transmissions. Potential interference with public safety communication systems (e.g., radio traffic related to emergency activities) shall be avoided.

- The project shall be planned to comply with FAA regulations, including lighting regulations, and to avoid potential safety issues associated with proximity to airports, military bases or training areas, or landing strips.

- Operators shall develop a fire management strategy to implement measures to minimize the potential for a human-caused fire.

## A.2.3  Construction

### *General*

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the construction phase, as appropriate.

- The area disturbed by construction and operation of a wind energy development project (i.e., footprint) shall be kept to a minimum.

Attachment 1-21

- The number and size/length of roads, temporary fences, lay-down areas, and borrow areas shall be minimized.

- Topsoil from all excavations and construction activities shall be salvaged and reapplied during reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native grasses, forbs, and shrubs.  Reclamation activities shall be undertaken as early as possible on disturbed areas.

- All electrical collector lines shall be buried in a manner that minimizes additional surface disturbance (e.g., along roads or other paths of surface disturbance).  Overhead lines may be used in cases where burial of lines would result in further habitat disturbance.

- Operators shall identify unstable slopes and local factors that can induce slope instability (such as groundwater conditions, precipitation, earthquake activities, slope angles, and the dip angles of geologic strata).  Operators also shall avoid creating excessive slopes during excavation and blasting operations.  Special construction techniques shall be used where applicable in areas of steep slopes, erodible soil, and stream channel crossings.

- Erosion controls that comply with county, state, and federal standards shall be applied.  Practices such as jute netting, silt fences, and check dams shall be applied near disturbed areas.

### Wildlife

- Guy wires on permanent meteorological towers shall be avoided, however, may be necessary on temporary meteorological towers installed during site monitoring and testing.

- In accordance with the habitat restoration plan, restoration shall be undertaken as soon as possible after completion of construction activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- All construction employees shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons.  In addition, pets shall not be permitted on site during construction.

Attachment 1-22

BLM_0008151

*Visual Resources*

- Operators shall reduce visual impacts during construction by minimizing areas of surface disturbance, controlling erosion, using dust suppression techniques, and restoring exposed soils as closely as possible to their original contour and vegetation.

*Roads*

- Existing roads shall be used, but only if in safe and environmentally sound locations.  If new roads are necessary, they shall be designed and constructed to the appropriate standard and be no higher than necessary to accommodate their intended functions (e.g., traffic volume and weight of vehicles). Excessive grades on roads, road embankments, ditches, and drainages shall be avoided, especially in areas with erodible soils.  Special construction techniques shall be used, where applicable.  Abandoned roads and roads that are no longer needed shall be recontoured and revegetated.

- Access roads and on-site roads shall be surfaced with aggregate materials, wherever appropriate.

- Access roads shall be located to follow natural contours and minimize side hill cuts.

- Roads shall be located away from drainage bottoms and avoid wetlands, if practicable.

- Roads shall be designed so that changes to surface water runoff are avoided and erosion is not initiated.

- Access roads shall be located to minimize stream crossings. All structures crossing streams shall be located and constructed so that they do not decrease channel stability or increase water velocity.  Operators shall obtain all applicable federal and state permits.

- Existing drainage systems shall not be altered, especially in sensitive areas such as erodible soils or steep slopes.  Potential soil erosion shall be controlled at culvert outlets with appropriate structures. Catch basins, roadway ditches, and culverts shall be cleaned and maintained regularly.

*Ground Transportation*

- Project personnel and contractors shall be instructed and required to adhere to speed limits commensurate with road types, traffic volumes, vehicle types,

Attachment 1-23

BLM_0008152

and site-specific conditions, to ensure safe and efficient traffic flow and to reduce wildlife collisions and disturbance and airborne dust.

- Traffic shall be restricted to the roads developed for the project. Use of other unimproved roads shall be restricted to emergency situations.

- Signs shall be placed along construction roads to identify speed limits, travel restrictions, and other standard traffic control information.  To minimize impacts on local commuters, consideration shall be given to limiting construction vehicles traveling on public roadways during the morning and late afternoon commute time.

### Air Emissions

- Dust abatement techniques shall be used on unpaved, unvegetated surfaces to minimize airborne dust.

- Speed limits (e.g., 25 mph [40 km/h]) shall be posted and enforced to reduce airborne fugitive dust.

- Construction materials and stockpiled soils shall be covered if they are a source of fugitive dust.

- Dust abatement techniques shall be used before and during surface clearing, excavation, or blasting activities.

### Excavation and Blasting Activities

- Operators shall gain a clear understanding of the local hydrogeology.  Areas of groundwater discharge and recharge and their potential relationships with surface water bodies shall be identified.

- Operators shall avoid creating hydrologic conduits between two aquifers during foundation excavation and other activities.

- Foundations and trenches shall be backfilled with originally excavated material as much as possible.  Excess excavation materials shall be disposed of only in approved areas or, if suitable, stockpiled for use in reclamation activities.

- Borrow material shall be obtained only from authorized and permitted sites. Existing sites shall be used in preference to new sites.

Attachment 1-24

BLM_0008153

- Explosives shall be used only within specified times and at specified distances from sensitive wildlife or streams and lakes, as established by the BLM or other federal and state agencies.

*Noise*

- Noisy construction activities (including blasting) shall be limited to the least noise-sensitive times of day (i.e., daytime only between 7 a.m. and 10 p.m.) and weekdays.

- All equipment shall have sound-control devices no less effective than those provided on the original equipment.  All construction equipment used shall be adequately muffled and maintained.

- All stationary construction equipment (i.e., compressors and generators) shall be located as far as practicable from nearby residences.

- If blasting or other noisy activities are required during the construction period, nearby residents shall be notified in advance.

*Cultural and Paleontological Resources*

- Unexpected discovery of cultural or paleontological resources during construction shall be brought to the attention of the responsible BLM authorized officer immediately.  Work shall be halted in the vicinity of the find to avoid further disturbance to the resources while they are being evaluated and appropriate mitigation measures are being developed.

*Hazardous Materials and Waste Management*

- Secondary containment shall be provided for all on-site hazardous materials and waste storage, including fuel.  In particular, fuel storage (for construction vehicles and equipment) shall be a temporary activity occurring only for as long as is needed to support construction activities.

- Wastes shall be properly containerized and removed periodically for disposal at appropriate off-site permitted disposal facilities.

- In the event of an accidental release to the environment, the operator shall document the event, including a root cause analysis, appropriate corrective actions taken, and a characterization of the resulting environmental or health and safety impacts.  Documentation of the event shall be provided to the BLM authorized officer and other federal and state agencies, as required.

Attachment 1-25

- Any wastewater generated in association with temporary, portable sanitary facilities shall be periodically removed by a licensed hauler and introduced into an existing municipal sewage treatment facility. Temporary, portable sanitary facilities provided for construction crews shall be adequate to support expected on-site personnel and shall be removed at completion of construction activities.

### Public Health and Safety

- Temporary fencing shall be installed around staging areas, storage yards, and excavations during construction to limit public access.

## A.2.4  Operation

### General

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the operational phase, as appropriate. These control and mitigation measures shall be reviewed and revised, as needed, to address changing conditions or requirements at the site, throughout the operational phase. This adaptive management approach would help ensure that impacts from operations are kept to a minimum.

- Inoperative turbines shall be repaired, replaced, or removed in a timely manner. Requirements to do so shall be incorporated into the due diligence provisions of the rights-of-way authorization. Operators will be required to demonstrate due diligence in the repair, replacement, or removal of turbines; failure to do so could result in termination of the rights-of-way authorization.

### Wildlife

- Employees, contractors, and site visitors shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, any pets shall be controlled to avoid harassment and disturbance of wildlife.

- Observations of potential wildlife problems, including wildlife mortality, shall be reported to the BLM authorized officer immediately.

BLM_0008155

### Ground Transportation

- Ongoing ground transportation planning shall be conducted to evaluate road use, minimize traffic volume, and ensure that roads are maintained adequately to minimize associated impacts.

### Monitoring Program

- Site monitoring protocols defined in the POD shall be implemented. These will incorporate monitoring program observations and additional mitigation measures into standard operating procedures and BMPs to minimize future environmental impacts.

- Results of monitoring program efforts shall be provided to the BLM authorized officer.

### Public Health and Safety

- Permanent fencing shall be installed and maintained around electrical substations, and turbine tower access doors shall be locked to limit public access.

- In the event an installed wind energy development project results in EMI, the operator shall work with the owner of the impacted communications system to resolve the problem. Additional warning information may also need to be conveyed to aircraft with onboard radar systems so that echoes from wind turbines can be quickly recognized.

## A.2.5  Decommissioning

### General

- Prior to the termination of the rights-of-way authorization, a decommissioning plan shall be developed and approved by the BLM. The decommissioning plan shall include a site reclamation plan and monitoring program.

- All management plans, BMPs, and stipulations developed for the construction phase shall be applied to similar activities during the decommissioning phase.

- All turbines and ancillary structures shall be removed from the site.

Attachment 1-27

- Topsoil from all decommissioning activities shall be salvaged and reapplied during final reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native shrubs, grasses, and forbs.

- The vegetation cover, composition, and diversity shall be restored to values commensurate with the ecological setting.

Attachment 1-28

BLM_0008157

**ATTACHMENT B**

**BLM LAND USE PLAN AMENDMENTS TO ADOPT THE
WIND ENERGY DEVELOPMENT PROGRAM**

Attachment 1-29

BLM_0008158

**ATTACHMENT B**

**BLM LAND USE PLAN AMENDMENTS TO ADOPT THE
WIND ENERGY DEVELOPMENT PROGRAM**

The Final Wind PEIS (BLM 2005) evaluated all BLM land use plans within the 11-state study area.  The decision has been made to amend 52 land use plans in 9 of those states: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The amendments include (1) adoption of the Wind Energy Development Program policies and best management practices (BMPs), and (2) identification of specific areas where wind energy development will not be allowed.

Some plans within the 11-state study area were excluded from amendment in this Record of Decision (ROD) for a variety of reasons, including (1) if developable wind resources are not present in the planning area, (2) if the plan was previously amended or revised to adequately address wind energy development, (3) if the plan currently is being amended or revised in a separate National Environmental Policy Act of 1969 (NEPA) review and that amendment or revision will address wind energy development, or (4) if some other reason(s) exist(s) to exclude the plan from amendment under the PEIS (e.g., a plan revision is scheduled in the foreseeable future).

None of the land use plans in Arizona or California are included for amendment in this ROD.  Ongoing and upcoming land use plan amendments being conducted will address wind energy development in these states for areas where developable wind resources are present.

Table B-1 provides information describing the amendment change for each land use plan that is amended in this ROD.  The rationale for the change also is provided.

Attachment 1-30

**TABLE B-1  Changes and Rationales for Land Use Plan Amendments[a]**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| **Colorado** | | |
| Royal Gorge RMP, Royal Gorge Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| San Luis RMP, includes La Jara, Saguache, and Del Norte Field Offices and the San Luis Valley Public Lands Center | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in the planning area. |
| **Idaho** | | |
| Cascade RMP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Challis RMP, Challis Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |

Attachment 1-31

BLM_0008160

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Jarbidge RMP, Jarbidge Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Kuna MFP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Lemhi RMP, Salmon Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Owyhee RMP, Owyhee Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Twin Falls MFP, Burley Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |

Attachment 1-32

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Montana* | | |
| Billings RMP, Billings Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted with restrictions as indicated in the PEIS. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area.  The Billings RMP is scheduled for revision in 2007; however, Billings also has an active wind testing and monitoring permit (MTM92391) with an effective date of September 28, 2003. If this potential project goes to full field development, it is doubtful that the RMP revision would be completed in time to address wind energy development on public lands.  The current RMP does not address wind energy development. |
| Garnet RMP, Missoula Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | RMP MA 9 will be identified as an exclusion area where wind energy and its associated development will be prohibited. | Wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| | RMP MAs 1, 4, 10, and 11 will be identified as avoidance areas where wind energy and its associated development will be discouraged. | These areas contain important riparian areas; threatened and endangered species habitat; big game winter range; and/or recreation, and historic and cultural sites where wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| Headwaters RMP, Butte Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

Attachment 1-33

BLM_0008162

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Judith-Valley-Phillips RMP, Lewistown Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Judith-Valley-Phillips RMP, Malta Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | Wind energy development will be excluded from large reservoirs/waterfowl complexes. | Development will be restricted within 2 mi (3 km) of these sites because of the potential for bird/tower strikes. |
| | Wind energy development will be excluded from Montana Air National Guard Training sites. | This area is in S. Phillips County and within the Hays Military Operations Area.  Wind energy development would conflict with training missions. |
| | Wind energy development will be excluded from developed recreation sites. | Development within viewsheds will be restricted within 1 mi (2 km) unless topography can screen the project. |
| West Hi Line RMP, Lewiston FO | Wind energy development will be excluded from backcountry byways. Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | Development should not be seen within the viewshed of the byway. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *New Mexico* Carlsbad RMP, Carlsbad FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate in some areas for wind energy development activities in this planning area. |

Attachment 1-34

BLM_0008163

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| | Wind energy development will be restricted in those areas along the face of the Guadalupe Mountains located in the western portion of the planning area and grassland areas in the northwestern portion of the planning area. | This area provides critical habitat for Kuenzlers cactus and Aplamado falcon.  Wind energy development in this area would be inconsistent with the BLM's management decisions and objectives for the critical habitat. |
| Carlsbad RMP, Carlsbad FO (Cont.) | Wind energy development will be restricted in those areas within the viewshed of Carlsbad Caverns National Park. | Carlsbad Caverns National Park receives heavy tourist traffic throughout the year.  Because of the significance of the park, wind energy development in the viewshed for the park would be inconsistent with the BLM's management decisions and objectives as well as those of the National Park Service. |
| | Wind energy development will be restricted in those areas that are within known cave/karst areas within the planning area. | Much of the known cave/karst areas have been designated as "high wind resource levels"; however, wind energy development in this area would have to be restricted because of the numerous cave/karst features in the area. |
| | Wind energy development will be restricted in those areas that are within the Guadalupe National Backcountry Byway and the Guadalupe Escarpment Scenic Area. | Any wind development in these areas would have a negative impact on the VRM ratings for these areas, which would be inconsistent with current BLM management decisions and objectives. |
| | Wind energy development will be restricted in designated Special Management Areas. | Wind development in these areas would be inconsistent with BLM management decisions and objectives. |
| Mimbres RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

Attachment 1-35

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Roswell RMP, Roswell FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| White Sands RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Nevada* | | |
| Elko RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Las Vegas RMP, Las Vegas FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paradise-Denio MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Shoshone-Eureka RMP, Battle Mountain FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Sonoma-Gerlach MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Tonopah RMP, Battle Mountain FO, Tonopah Field Station | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

Attachment 1-36

BLM_0008165

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Wells RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Oregon* | | |
| Andrews/Steens RMP, Andrews/Steens FO | Wind energy development will be restricted from ROW, realty use, and renewable energy avoidance and exclusion zones as identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNAs, and ONAs) that were identified as avoidance and exclusion areas in the RMP.  Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/ exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| Brothers/LaPine RMP, Deschutes and Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Coos Bay RMP, Coos Bay FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Eugene RMP, Eugene FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

Attachment 1-37

BLM_0008166

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| John Day RMP, Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Medford RMP, Medford FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Salem RMP, Salem FO | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusions zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Southeast Oregon RMP, Malheur and Jordan Resource Areas | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Three Rivers RMP, Three Rivers FO's | It will be clarified that wind energy development is allowable on a case-by-case basis in areas outside rights-of--way and land use authorization avoidance and exclusion zones. | The RMP does not contain any explicit discussion on wind energy development, although the plan designates avoidance and exclusion areas for rights-of-way and land use authorizations. |

Attachment 1-38

BLM_0008167

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| | Wind energy development will be restricted from rights-of-way and land use authorization avoidance and exclusion zones identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNA, and ONAs) that were identified as avoidance and exclusion areas in the RMP. Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Two Rivers RMP, Deschutes and Central Oregon Field Offices | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Upper Deschutes RMP, Deschutes FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*Utah*
Cedar-Beaver-Garfield-Antimony RMP, Cedar City FO

| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
|---|---|---|

Attachment 1-39

BLM_0008168

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Escalante MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paria MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Pinyon MFP, Cedar City FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Randolph MFP, Salt Lake FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| St. George RMP, St. George FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Vermillion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Zion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

*Washington*

Attachment 1-40

BLM_0008169

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Spokane RMP, Wenatchee and Border Field Offices | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Wyoming* | | |
| Buffalo RMP, Buffalo FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Cody RMP, Cody FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Grass Creek RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Green River RMP, Rock Springs FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Lander RMP, Lander FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Newcastle RMP, Newcastle FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Washakie RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

BLM_0008170

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|

[a]  Abbreviations: ACEC = Area of Critical Environmental Concern; BMP = best management practice; CMPA = (Steens Mountain) Cooperative Management and Protection Area; MA = management area; MFP = Management Framework Plan; ONA = Outstanding National Area; RMP = Resource Management Plan; RNA = Research Natural Area; ROW = right-of-way; VRM = Visual Resource Management; WSA = Wilderness Study Area.

[b]  The Andrews/Steens RMP is currently being revised; upon completion, it will replace the Andrews MFP and revise part of the Three Rivers RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the Record of Decision (ROD) is issued.

[c]  The Upper Deschutes RMP is currently being revised; upon completion, it will replace a portion of the Brothers/LaPine RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the ROD is issued.

Attachment 1-42

BLM_0008171

# Roads and Trails Terminology Report

### A Joint Effort by

### Division of Recreation and Visitor Services (WO-250)

### And

### Division of Engineering and Environmental Services (WO-360)

### U.S. Department of the Interior

### Bureau of Land Management

Recommended by:

_____     5/3/06
Division Chief, Division of Recreation and Visitor Services (WO-250)     Date

_____     5/3/06
Division Chief, Division of Engineering and Environmental     Date
    Services (WO-360)

Approved by:

_____     5/12/06
Assistant Director, Renewable Resources and Planning (AD-200)     Date

_____     5-30-06
Assistant Director, Minerals, Realty and Resources Protection (AD-300)     Date




# Bureau of Land Management

# Roads and Trails Terminology Report

Bureau of Land Management
U. S. Department of the Interior
Washington, DC  20240

**April 2006**

BLM_0008173

# Roads and Trails Terminology Report

**A Joint Effort by**

**National Recreation and Visitor Services Group (WO-250)**

**And**

**Protection and Response Group (WO-360)**

**U.S. Department of the Interior**

**Bureau of Land Management**

Recommended by:

_____     _____

Group Manager, National Recreation and Visitor Services (WO-250)       Date

_____     _____

Group Manager, Protection and Response (WO-360)       Date

Approved by:

_____     _____

Assistant Director, Renewable Resources and Planning (AD-200)       Date

_____     _____

Assistant Director, Minerals, Realty and Resources Protection (AD-300)   Date

BLM_0008174

Bureau of Land Management                                     Roads and Trails Terminology Report

# Table of Contents

**Overview**.................................................................................................................1

**Background**.............................................................................................................7

**Approach**................................................................................................................8
    Objective 1 - Establish Bureau Definitions and Standards for Transportation Linear Features... 12
    Objective 2 - Determine Appropriate Minimum National Data Standards and Electronic Storage
        Location for Linear Feature Data ............................................................................ 17
    Objective 3 - Develop a Strategy to Align the Inventory and Management of Transportation
        Linear Features between Resource Management Programs................................ 21

**Attachments**.......................................................................................................25
    Attachment  1 - Roads and Trails Terminology Team Charter..................................................... 26
    Attachment  2 - Roads and Trails Terminology Core Team Members......................................... 29
    Attachment  3 - Team Advisors and Guests................................................................................ 30
    Attachment  4 - List of Documents Reviewed ............................................................................ 31
    Attachment  5 - Terms, Definitions, and Maintenance Intensity Standards ................................ 33
    Attachment  6 - Action Plan – Terms, Definitions, and Maintenance Intensities......................... 38
    Attachment  7 - Proposed Minimum National Data Standards.................................................... 39
    Attachment  8 - Action Plan – National Standard for Transportation Linear Features ................. 52
    Attachment  9 - Action Plan – Standard Guidance for Land-Use Planning................................. 54
    Attachment 10 - Action Plan – Removal of Transportation Linear Features................................ 55
    Attachment 11 - Trails Data Standards Crosswalk..................................................................... 56
    Attachment 12 - "Name that Linear Feature" Photographs ........................................................ 58

# Overview

The Bureau of Land Management's (BLM) transportation system represents one of the most critical assets in the accomplishment of the BLM's mission to manage public lands.

It affords entry for public access and provides the infrastructure that supports uses ranging from recreation to commercial activity and is the primary means of access to the 261.8 million acres under BLM jurisdiction.

Requirements associated with the effective stewardship of public lands such as the Government Performance and Results Act (GPRA), Federal Accounting Standards Advisory Board (FASAB), Federal Land Policy and Management Act (FLPMA), and Off-Road Vehicle Executive Orders continue to focus expectations internally and externally on a coordinated, consistent, and cohesive approach to the management of transportation-related linear features, generically referred to as routes, on public lands.

The rationale for this effort is that the broad effect of the transportation system across the BLM's missions, strategic goals, and programs makes a consistent, organizational-wide approach, rooted in common terms and definitions, an essential part of the management of public lands.

There are several terms used in reference to roads and trails on BLM lands. For purposes of this report, the term "linear features" has been used to describe transportation system-related "features," from engineered roadways with asphalt surfaces through challenging trails accessible only to non-motorized traffic; "linear features" includes designated and non-designated assets.



The implementation of the Facility Asset Management System (FAMS) highlighted the need for a standard lexicon.

BLM_0008176

Bureau of Land Management                                    Roads and Trails Terminology Report

## Background

The Roads and Trails Terminology Team, a joint effort between the National Recreation and Visitor Services Group, WO-250 (Recreation) and Protection and Response Group, WO-360 (Engineering) within the BLM, was chartered to provide the BLM with recommendations to address four critical issues surrounding the BLM approach to management of transportation-related linear features on public lands. The team addressed organizational-wide approaches to:

1. Standard terms and definitions for the management of the BLM's transportation assets that consistently identify, categorize, and track linear features that occur on the BLM's land as well as those terms utilized to describe appropriate levels of stewardship to manage, protect, and preserve the public's assets.

2. Collection, storage, and management of data used to manage public lands and associated transportation system to include linear features identified for removal and rehabilitation as well as those designated as part of the BLM transportation system.

3. A national data dictionary for all BLM roads, trails, and related assets that provides the basis for consistency across the BLM in the management of data associated with transportation assets.

4. Aligning the various programs responsible for travel management functions in a parallel fashion through the use of consistent terminology for conducting inventories, assessments, plans, monitoring and other program functions.

## Approach

The Team's approach to address these critical issues included a combination of core team members (Attachment 2) and "advisors" (Attachment 3) that represented a cross-section of BLM programs and allowed the team to develop a comprehensive approach suited to BLM program needs. The Team determined that the four issues should be merged into three objectives by integrating the national data dictionary (issue 3) with collection, storage, and management of data used to manage public lands (issue 2).



BLM_0008177

The result provided three objectives:

- ☛ **Objective 1 -** **Establish Terms and Definitions for Transportation Linear Features**
- ☛ **Objective 2 -** **Determine Appropriate Minimum National Data Standards and Electronic Storage Location for Linear Feature Data**
- ☛ **Objective 3 -** **Develop a Strategy to Align the Inventory and Management of Transportation Linear Features between Resource Management Programs**

The team's *analysis* of issues included research into similar approaches taken by other federal, state, and local agencies as well as applicable private sector strategies. These approaches were considered by the team and reviewed with the advisor group prior to development of the findings and recommendations.

The use of consistent terminology is at the heart of many of the issues identified by the Roads & Trails Terminology Team. The Proposed Comprehensive Travel Management Terminology Hierarchy pictorially illustrated below as Figure 1 provides an organizational context for the linear features that exist on BLM land. Generally, those linear features are described in two categories: transportation system and transportation linear disturbances representing the manmade linear features that are not part of the transportation system.

BLM_0008178



Figure 1. Proposed Comprehensive Travel Management Terminology Hierarchy

***Findings and recommendations*** were developed based on the team's research, analysis, and deliberation to address the identified issues.  Findings were developed as a result of the team's efforts to understand and "quantify" the issue while the recommendations represent the culmination of the team's research and analysis to develop suggested resolutions.



## Conclusions

The Team's conclusions include nine key recommendations that address the issues identified by the Team's Charter.  The findings and recommendations are grouped

BLM_0008179

within each issue identified in the Roads and Trails Terminology Team Charter (Team Charter provided as Attachment 1).

A more detailed discussion of the Team's findings and rationale associated with the recommendations is provided in the body of the report.

In several cases, recommendations identify or incorporate additional information, including action plans and data standards which are provided as attachments to the report.

- ☞ **Objective 1 - Establish Terms and Definitions for Transportation Linear Features**

    1. <u>Recommendation</u> - Standardize the terms used for transportation assets within the BLM as "Road," "Primitive Road," and "Trail."

    2. <u>Recommendation</u> - Shift "Maintenance Levels" to "Maintenance Intensity" and simplify the standards for consistency across all linear features.

- ☞ **Objective 2 - Determine Appropriate Minimum National Data Standards and Electronic Storage Location for Linear Feature Data**

    3. <u>Recommendation</u> - Develop and formalize through published guidance the required minimum national data standard for all linear features that comprise the BLM transportation system assets.

    4. <u>Recommendation</u> - Utilize the Facility Asset Management System (FAMS) as the BLM's official database for the management of transportation system assets.

    5. <u>Recommendation</u> - Develop a Minimum National Data Standard for linear disturbances (asset) that incorporates national data requirements from Recreation and Engineering and provides a consistent set of guidance to the Field.

- ☞ **Objective 3 - Develop a Strategy to Align the Inventory and Management of Transportation Linear Features between Resource Management Programs**

    6. <u>Recommendation</u> - Recognize the Facility Asset Management System (FAMS) initial inventory as the BLM's transportation system.

    7. <u>Recommendation</u> - Implement a BLM-wide policy that requires any change in the BLM's network of designated routes to occur through the land-use planning process or through subsequent implementation or activity level plans and environmental assessments.

BLM_0008180

8. <u>Recommendation</u> - Standardize policy guidance for transportation planning to facilitate a consistent approach and process across the BLM.

9. <u>Recommendation</u> - The BLM should develop policy guidance to identify, track, monitor, prioritize, and fund the removal of unwanted transportation linear disturbances.

BLM_0008181

# Background



Access to public lands is crucial for the effective use and stewardship of those lands. The BLM's extensive transportation system provides the basis for access to the BLM's 261.8 million acres and supports all of the BLM's Strategic Goals as the "backbone" for administrative, commercial, and recreational use.

Due to the wide range of needs and uses, the BLM's routes represent a broad spectrum of linear features: from engineered roadways with asphalt surfaces through challenging trails accessible only to non-motorized traffic.

Inherent in the wide range of uses and "customers" is a varied vocabulary of terms used to describe the linear features that includes roads, trails, paths, routes and a host of derivatives of the basic terms. All of these terms have meaning and context within their respective programs but, when utilized collectively, often conflict and lead to confusion due to the use of the same term to describe very different physical features.

Development of a consistent set of terms and definitions for use across the BLM is an essential first step to comprehensive travel management. By establishing a common set of terms and definitions, the foundation is established for effective interchange of management needs and information within and across programs. Standard terms and definitions also allow the BLM to communicate efficiently and consistently with customers and stakeholders.

The Roads and Trails Terminology Team was chartered to "**establish strategic direction and consistent terminology used by the recreation, planning, National Science and Technology Center (NSTC), National Landscape Conservation System (NLCS), lands, property, and engineering groups to manage the BLM transportation system in activities such as planning, inventorying, designating, mapping, signing, monitoring, developing public information, maintaining, assessing condition, tracking and reporting data so ongoing alignment of current and future strategic comprehensive travel management and transportation objectives can be achieved."**

This report represents the results of that effort and provides analysis, findings, and recommendations that address the key issues identified within the Team's charter (provided as Attachment 1).

BLM_0008182

# Approach

The Roads and Trails Terminology Team
(see Attachment 2 for a list of team
members), a joint effort between the
National Recreation and Visitor Services
Group, WO-250 (Recreation) and
Protection and Response Group, WO-360
(Engineering) within BLM, was formed to
address critical issues surrounding the
BLM approach to management of
transportation linear features (routes,
roads, trails, paths, etc.). The issues included developing organizational-wide
approaches to:



1. Establishing standard terms and definitions for the management of the BLM's
   linear assets that consistently identify, categorize, and track linear features
   that occur on the BLM's land as well as those terms utilized to describe
   appropriate levels of stewardship to manage, protect, and preserve the
   public's assets.

2. Developing processes for collection, storage, and management of data used
   to manage public lands and associated transportation system to include linear
   features identified for removal or reclamation as well as those designated as
   part of the BLM's transportation system.

3. Establishing a national data dictionary for all BLM roads, trails, and related
   items that provides the basis for consistency across the BLM in the
   management of data associated with linear features.

4. Aligning the various programs responsible for travel management functions in
   a parallel fashion through the use of consistent terminology for conducting
   inventories, assessments, plans, monitoring and other program functions.

The Team's approach to address these objectives included a combination of core
team members and "advisors" (for a full list of advisors, see Attachment 3) that
represented the BLM's programs and allowed the team to develop a comprehensive
travel management approach suited to all the BLM's program needs. The Team,
once engaged, realized a need to combine two of these objectives as the data
dictionary component relates to the collection, storage, and management of data.
The result provided three objectives:

BLM_0008183

☞ **Objective 1 -** **Establish Terms and Definitions for Transportation Linear Features**

☞ **Objective 2 -** **Determine Appropriate Minimum National Data Standards and Electronic Storage Location for Linear Feature Data,** the integration of original objectives 2 and 3;

☞ **Objective 3 -** **Develop a Strategy to Align the Inventory and Management of Transportation Linear Features between Resource Management Programs**, formerly objective 4.

The process utilized to address the three objectives incorporated three steps:

☞ *Understanding*
☞ *Analysis*
☞ *Findings and Recommendations*

Through facilitated discussions within the core group and the advisors, each identified issue was reviewed to develop a clear ***understanding*** of the problem that included:

☞ Evaluation of the issue statement to define necessary outcomes and resolutions to achieve "success"
☞ Breadth of impact (programs impacted, relationship to non-BLM organizations, and legal or policy implications)
☞ Stakeholders

The team's ***analysis*** of each issue included research into similar approaches taken by other federal, state, and local agencies as well as applicable private sector strategies, development of recommended approaches for consideration by the team, and then "vetting" of those potential approaches within the team and the advisor group to develop the team's findings and recommendations for each established issue.

For clarity and a consistent understanding of the report's findings and recommendations, the following terms were established by the Roads and Trails Terminology Team:

☞ **Transportation Linear Features** – "Linear features" represents the broadest category of physical disturbance (planned and unplanned) on BLM land. Transportation related linear features include engineered roads and trails, as well as user-defined, non-engineered roads and trails created as a result of the public use of BLM land.  Linear features may include roads and trails identified for closure or removal as well as those that make up the BLM's defined transportation system.

☞ **Transportation System** – The "transportation system" represents the sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

BLM_0008184

☞ **Routes –** Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system are described as "routes."

☞ **Roads**, **Trails**, and **Primitive Roads** - Terms utilized to describe specific categories of transportation linear features and represent sub-sets of the BLM's transportation system.

☞ **Transportation Linear Disturbances –** Term utilized to identify man-made linear features that are not part of the BLM's transportation system. Linear disturbances may include engineered (planned) as well as unplanned single and two-track linear features that are not part of the BLM's transportation system.

The use of consistent terminology is at the heart of many of the issues identified by the Roads & Trails Terminology Team. The Proposed Comprehensive Travel Management Terminology Hierarchy pictorially illustrated below as Figure 1 provides an organizational context for the linear features that exist on BLM land. Generally, those linear features are described in two categories: transportation system and transportation linear disturbances representing the manmade linear features that are not part of the transportation system.

BLM_0008185



Figure 1. Proposed Comprehensive Travel Management Terminology Hierarchy

***Findings and recommendations*** were developed based on the team's research, analysis, and deliberation to address the identified issues.  Findings were generally developed as a result of the team's efforts to understand and "quantify" the issue, while the recommendations represent the culmination of the team's research and analysis to develop suggested resolutions.

Detailed approaches in support of several of the recommendations were also developed by the Team for issues such as minimum national data standards and recommended definitions.

Additionally, some recommendations require development of an implementation plan, policy directives, or other related follow-up actions, including proposed "Action Plans" with preliminary schedules, responsibilities, and objectives.

BLM_0008186

## *Objective 1 - Establish Bureau Definitions and Standards for Transportation Linear Features*



### Understanding

The Bureau of Land Management currently manages over 82,000 miles of road and more than 16,000 miles of trail within the Facility Asset Management System (FAMS) that combine to traverse the BLM's 261.8 million acres of land. Many other miles of transportation-related linear features exist yet are not actively managed.

A common lexicon and understanding of terms, definitions, and standards associated with the identification, description, and categorization of linear assets is essential to effective communication and management of the BLM's assets. Common terms provide a wide range of benefits, including:

- Reasonable categorization and detail in the way the BLM identifies and describes its transportation assets.
- Consistent reporting to internal and external stakeholders and customers with respect to the size, type, quantity, designation, and use of the BLM's transportation assets.
- Auditable management strategies and asset inventories

Collectively consistent standards and definitions provide the basis for clear coordination and communication in the management of the BLM's transportation assets.

### Analysis

Current definitions and standards used to define and describe the BLM's transportation assets are contained within a myriad of documents, including BLM Recreation Manuals, Land-Use Planning Manuals, Engineering Manuals, Software System Manuals, Federal Regulations, and internal policy and guidance documents. Attachment 4 provides a list of the major documents reviewed by the team as part of the effort.

Additionally, existing executive orders, laws, and statutory, regulatory, and policy guidance provides a framework within which many of the definitions and standards are required to function.

In order to clarify the current problem, the team conducted three multi-day workshop exercises (Phoenix, Sacramento, and Portland) that utilized the

BLM_0008187

personnel present (core team and advisors) to identify the types and characteristics of linear features that create the greatest challenges in consistency.

Pictures of existing BLM transportation linear features were utilized for the exercises that allowed each participant to identify and classify a common set of 20 photos (Attachment 12 includes the initial set of photos).

The results of the exercises indicated that the team was relatively consistent in classifying engineered, low-clearance vehicle linear features as "roads" and single-track linear features as "trails" but very inconsistent in classifying two-track linear features.

Further analysis by the team identified a common "disconnect" for those linear features that are not generally suited for low-clearance vehicular traffic, but which support 4x4 and high-clearance vehicle use.  The diagram below illustrates the type of transportation linear features (highlighted) that were identified as the source of confusion.



**Roads** and **Trails** are currently identified and defined in a number of BLM manuals and publications, yet none of those definitions appears to provide sufficient clarity to allow either the Team or BLM field personnel to classify transportation system linear assets consistently.

BLM_0008188

Research into common practices by other agencies as well as state and local governments identified **"primitive roads"** as a third category of routes currently utilized by a number of organizations to describe high-clearance and 4x4 routes that are not designed to an engineering standard, but are available for use and should be identified on transportation systems.  Attachment 4 contains a list of documents that includes references to similar uses within state and local governments.

An exercise was undertaken by the Team with the representative photos of BLM routes to determine whether the introduction of a third asset category identified as "primitive roads" would provide sufficient delineation and address the needs of BLM programs. The results of that effort, as well as subsequent discussions with the Roads and Trails Terminology Team Advisors, indicated strong understanding and support for the introduction of the third asset classification.

The Team then developed a set of three basic definitions that describe a **road**, **primitive road,** and **trail** for use in categorizing BLM linear features that are part of the BLM's transportation system.  Basic definitions for a **road** and **primitive road** were developed based on BLM's 9100 Engineering Manual and the definition for a **trail** developed from the Interagency Trail Data Standards (ITDS).

The proposed standard terms and definitions were then reviewed against existing documents, known business rules, and identified requirements.  Based on the review, potential issues and required actions were identified and addressed to ensure that the resulting definitions provide clear guidance and direction for the identification and classification of linear features that comprise the BLM's transportation system.

Existing maintenance levels were also reviewed in conjunction with the development of the new asset categories for linear features.  The team's evaluation of the use of Maintenance Levels within the BLM also found inconsistent understanding and application of the current standards.  In many cases, Maintenance Levels were poorly understood by field personnel and appeared largely utilized to describe the type of linear feature (e.g., Maintenance Level 2 generally described a high-clearance or 4x4 accessible road) versus the actual maintenance strategy or intensity determined by BLM management as appropriate to the route.

To address this issue, the team developed a recommendation to shift from Maintenance Levels to Maintenance Intensities and develop a consistent standard for use across all linear features.

BLM_0008189

## Conclusions and Recommendations

1. *Standard Terms for Linear Features based on three asset categories: "Road," "Primitive Road," and "Trail."*

   **Finding** - The BLM's "transportation system" includes a broad range of linear assets well beyond those currently identified as "roads" and "trails" within the BLM inventory. Current BLM definitions utilized to identify and describe the BLM's linear assets vary within and across existing guidance documents.  BLM definitions for defining, describing, and categorizing linear assets appear to provide insufficient guidance to existing personnel and allow for multiple interpretations that degrade the consistency of the BLM's inventory and reporting process.  The Team concluded that reasonable, consistent, and auditable results are only achievable by "institutionalizing" a consistent set of terms and definitions across the BLM.

   **Recommendation** - *Standardize the terms used as primary categories of transportation assets within the BLM as "Road," "Primitive Road," and "Trail."* Existing definitions for "road" and "trail" appear to provide inconsistent guidance for those linear assets that allow for motorized traffic of high-clearance vehicles but do not support low-clearance vehicles or utilize clear design standards.  Descriptions and standards for describing and classifying these assets appear to allow the greatest level of inconsistency.  Recommended definitions are:

   - **Road**:  A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.
   - **Primitive Road**: A linear route managed for use by four-wheel drive or high-clearance vehicles. Primitive roads do not normally meet any BLM road design standards.
   - **Trail**:  A linear route managed for human-powered, stock, or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

   The addition of a third major classification category (primitive roads) for linear assets is viewed by the Team as a key recommendation. Attachment 5 provides the Team's recommendations for an initial set of terms and definitions for use across all programs within the BLM when identifying, describing, or categorizing transportation assets.

BLM_0008190

2. ***Shift "Maintenance Levels" to "Maintenance Intensity" and simplify the standards for consistency across all linear features.***

   <u>**Finding**</u> – Existing Maintenance Level definitions currently address both the type of road (road geometry or construction material) and the level of use but do not provide a clear standard for the actual "maintenance level." As a result, they are utilized inconsistently across the BLM as a means to describe everything from road construction type through appropriate maintenance standards.

   <u>**Recommendation**</u> - ***Shift "Maintenance Levels" to "Maintenance Intensity" and simplify the standards for consistency across all linear features.*** The implementation of primary transportation asset categories provides an opportunity to review and enhance current standards for determining maintenance levels, managed use standards, and other descriptive information utilized to describe and report on the BLM's assets.  Attachment 5 provides the Team's recommendations for the new "Maintenance Intensity" levels.  It includes four primary "Maintenance Intensity" levels that allow for <u>removal</u>, <u>low</u>, <u>medium</u>, and <u>high</u> maintenance intensities irrespective of the type of route (road, primitive road, or trail).

A draft "Action Plan" with recommended responsibilities and outcomes to support the transition of definitions and maintenance standards is provided as Attachment 6.

BLM_0008191

## *Objective 2 - Determine Appropriate Minimum National Data Standards and Electronic Storage Location for Linear Feature Data*

### Understanding

Directions provided within Land-Use Plans are an important part of the BLM's strategic approach to stewardship of public lands. An integral component to the development, implementation, and management of the plans is an accurate knowledge of the transportation linear features identified on the BLM's 261.8 million acres. Information that describes the transportation linear features is currently collected through a myriad of efforts ranging from interpretation of aerial photography to field investigation utilizing remote sensing (Global Positioning System - GPS) equipment.

Data developed as a result of the management planning efforts is generally stored in a Geographical Information System (GIS). States and Field Offices currently use their own discretion in determining the appropriate information to collect and where the data will be stored following the planning effort.

Inconsistent standards across Field Offices and States have the potential to limit the functionality and long-term value of the data to the BLM as well as impact the interoperability between programs (e.g., Recreation and Engineering).

### Analysis

Existing references, including the "*Interagency Trail Data Standards*" and BLM Instructional Memorandum 2004-117 "Minimum National Data Standard for Roads," provide specific guidance on the format and content of linear feature data and were utilized as the baseline for the analysis.



The approach allowed the Team to focus on developing recommendations and business rules that align the location and storage of linear feature data in an approach consistent with the basic objectives and "customers" of the electronic systems (*e.g., the Facility Asset Management System (FAMS) is the BLM's electronic system for asset management.  Therefore, all asset management information should reside in FAMS*).

The issue of determining which information should reside in the Facility Asset Management System (FAMS) versus the Recreation Management Information System (RMIS) or BLM-wide geographical information systems such as the National Integrated Land System (NILS) was reviewed to identify the customer

BLM_0008192

for the information, which business functions the information supports, and key stakeholders for the information.

Linking the "customer" and "business purpose" to the potential information allowed the Team to develop a recommended approach for the storage of linear feature data and identify information that appeared to be beyond the "business purpose" of current national level electronic systems within the BLM.

## Conclusions and Recommendations

3. ***Develop and formalize through policy guidance the <u>required</u> minimum national data standard for all transportation linear features that comprise the BLM transportation system.***

   <u>**Finding**</u> - Current Standards such as the "*Interagency Trail Data Standards"* and the Bureau of Land Management IM 2004-117 "Minimum National Data Standard for Roads" provide excellent sources for an organizational-wide minimum national standard for roads, primitive roads, and trails. However, national-level guidance is not currently available for primitive roads and trails that indicates the appropriate minimum national data standards (a mandated and consistent set of linear feature data across the BLM), recommended data repository, or party responsible for maintaining all of the transportation linear feature data within the Bureau of Land Management.

   <u>**Recommendation**</u> - ***Develop and formalize through policy guidance the required minimum national data standard for all linear features that comprise the BLM transportation system.***  The required minimum national data standard should define the required <u>minimum</u> data standards that must be adhered to by all organizations within the BLM when planning, collecting, or managing linear feature data that is part of the BLM's transportation system.  The minimum national data standard would not preclude the collection of additional information if deemed necessary, but would provide a consistent set of data across the entire BLM. Attachment 7 represents the Team's recommendation for a minimum national data standard for primitive roads and trails that incorporates data from the Interagency Trails Data Standard and existing Instructional Memorandum (IM 2004-117) on roads into two consistent requirements.

BLM_0008193

4.  ***Utilize the Facility Asset Management System (FAMS) as the system for the management of all Bureau of Land Management Transportation System Assets.***

> **<u>Finding</u>** - BLM-wide information technology solutions such as the Facility Asset Management System (FAMS), Recreation Management Information System (RMIS), and National Integrated Land System (NILS) each have identified or "stated" business objectives that define their purpose and role within the Bureau of Land Management.  Those business objectives or roles also define the appropriate location for the BLM's linear feature information and should serve as the guidance for the correct storage and management location for BLM linear feature information.

> **<u>Recommendation</u>** - ***Utilize the Facility Asset Management System (FAMS) as the system for the management of all Bureau of Land Management transportation system assets.***  The term "assets" in this context represents linear features that have been formally identified (or "designated") as BLM assets versus the sum of all linear features on BLM land.  Doing so allows the BLM to utilize a single set of data and provide consistent information internally and externally as well as enhance efficiency through reduced duplication of effort and access to the same data across multiple programs.

5.  ***Develop a Minimum National Data Standard for the Collection of Transportation Linear Feature Data during Land-Use Planning and Related Efforts.***

> **<u>Finding</u>** – Discussions with the programs engaged in land-use planning indicate a single, comprehensive BLM-wide approach to the collection and management of transportation linear feature information gathered as part of land-use planning efforts is currently not available. Moreover, such a national data standard would provide a consistent means of collecting a baseline data set for all linear features identified on BLM land.

> **<u>Recommendation</u>** – ***Develop a Minimum National Data Standard for transportation linear features that incorporates national data requirements from Recreation, NLCS, and Engineering and provides a consistent set of guidance to the Field.*** Collection of information beyond the minimum national data standard is left to the discretion of the individual States and Field Offices. However, when data elements contained within the Interagency Trail Data Standards are utilized, collection of data should conform to the guidance provided in the Interagency Trail Data Standards, current edition.

A draft "Action Plan" with recommended responsibilities and outcomes to support the implementation and standardization of minimum national data

BLM_0008194

standards for all linear features included in the BLM asset inventory as well as the broad-based use of the Facility Asset Management System across the BLM is provided as Attachment 8.

BLM_0008195

## Objective 3 - Develop a Strategy to Align the Inventory and Management of Transportation Linear Features between Resource Management Programs

### Understanding

Transportation linear features on BLM Lands comprise one of the most significant issues facing the BLM and are the focus of a concentrated investment of BLM resources to adequately identify, categorize, designate, operate, and maintain.



A comprehensive "Framework" that identifies the relationships, responsibilities, and interconnectivity between the various efforts is an essential element to the immediate and long-term objectives of the BLM's planning efforts.

### Analysis

The Roads and Trails Terminology Team identified current efforts within the BLM that impact or affect the management of linear features. Some of the programs that are directly engaged in those types of activities include:

- Recreation
- Engineering
- Minerals (Energy Development)
- Lands and Realty
- Wild Horse and Burro
- Budget and Performance
- National Science and Technology Center
- National Landscape Conservation System
- Fire
- Wildlife

Defining the roles of each organization and how management decisions are communicated, incorporated, maintained, and enforced is at the crux of an articulated comprehensive "Framework" between the various activities.

The Team's findings with respect to the alignment between land-use planning and asset management highlight some of the specific issues and needs that surround the inter-relationship between land-use planning and the resource management of the BLM's transportation system.

BLM_0008196

Transportation linear features that exist on public lands are identified on a wide range of sources, from the BLM's internal databases through third-party publications, and the quantity, use, and location of those linear features may vary greatly depending on the sources. Such a range of sources complicates the effective communication of information and makes it difficult to accurately report on the BLM's inventory of roads, primitive roads, and trails.

Additionally, planning efforts associated with land and resource use represent a significant investment by the BLM in developing guidance and direction for the short- and long-term management of public lands. Given the level of investment and effort associated with completing the land-use plans, it is essential that the information and decisions they contain be preserved and implemented as part of the BLM's asset management program.

Finally, an integral part of asset management is an approach for modification, decommissioning, reclamation, or removal of transportation linear features that no longer meet the BLM's management objectives.

## Conclusions and Recommendations

6. *Recognize the Facility Asset Management System (FAMS) inventory of routes as the BLM's current transportation system.*

**Finding** - The BLM does not have a BLM-wide standard for what constitutes the current recognized transportation system. While various programs within the BLM provide data and maps that depict the BLM's transportation system, no single organization or data system is identified as the "standard" within the BLM. As a result, projections and reports of the total miles within the BLM's transportation system vary significantly depending on the source of information and cause the BLM challenges in addressing annual financial audit, Government Performance and Results Act (GPRA), and other reporting requirements.

**Recommendation** - *Recognize the Facility Asset Management System (FAMS) as the initial inventory of the BLM's transportation system.* FAMS currently contains 82,000 miles of road and 16,000 miles of trails that are utilized to report the BLM's asset inventory and deferred maintenance requirements and develop annual maintenance needs. FAMS represents the "baseline" for the BLM's current transportation system and comprises the designated roads and trails within the BLM. Formal recognition of FAMS as the baseline will provide consistency between all BLM Programs.

BLM_0008197

7. *Implement a BLM-wide policy that requires any change in the BLM's inventory of designated roads, primitive roads, and trails to occur through the land-use planning process.*

**Finding** - A BLM-wide policy that provides management controls on changes to the designated inventory of routes within the BLM's transportation system operates informally but does not exist as part of formal guidance or policy.

**Recommendation** – *Implement a BLM-wide policy that requires any change in the BLM's designated transportation system to occur through the Land-Use Planning Process.* Changes to the BLM's designated transportation system should occur as part of the formal evaluation and designation process through one of four events:

- Record of Decision (ROD) for a Resource Management Plan/Environmental Impact Statement (RMP/EIS) or an Amendment or Revision of a RMP/EIS.
- Decision Record for an Activity Plan, Plan Amendment/Environmental Assessment (EA).
- Federal Register Notice Action (under the authority of 43 CFR 8341.2, 8364.1, 8365.1-6, or 9268.3) that has a follow-up land-use planning action and associated NEPA action.
- Management decision of appropriate routes in an area that has been designated "open" to off-highway vehicle use.

The recommended approach for implementation of guidance between the land-use planning and formalized recognition and management of routes within FAMS is an Instructional Memorandum (IM) that clearly identifies the appropriate process for formal changes to the BLM's transportation system asset inventory.

8. *Develop a comprehensive travel management policy for land-use planning guidance to facilitate a consistent approach and process across the BLM.*

**Finding** - BLM guidance for transportation-related land-use planning is currently contained in a wide range of documents, from BLM manuals through planning handbooks. The lack of a single comprehensive source of guidance contributes to the difficulty in providing consistency in the process and its application within the BLM.

**Recommendation** - *Develop comprehensive travel management policy guidance on land-use planning to facilitate a consistent approach and process across the BLM.* Travel planning and management guidance currently exists in a number of locations. Develop a BLM comprehensive travel management source guide for use across

BLM_0008198

the BLM that provides consistency within the BLM and also minimizes the effort required to maintain BLM guidance.

Attachment 9 provides a draft "Action Plan" with recommended responsibilities and outcomes to support the standardization of comprehensive travel management planning guidance in a source guide.

9. ***The BLM should develop policy guidance to identify, track, monitor, prioritize, and fund the removal of unwanted transportation linear features (routes and other linear disturbances on BLM land).***

<u>**Finding**</u> - A BLM-wide approach to address transportation linear features identified as part of the land-use planning process but not designated as part of the BLM's transportation system does not currently exist. Currently, States and Field Offices address the issue with a wide range of approaches that range from abandonment through aggressive remediation.  Lack of a nationwide approach to address the need makes it extremely difficult for the BLM to even articulate the full extent of the requirement, let alone proactively resolve it.

<u>**Recommendation**</u> - ***The BLM should develop policy guidance and implement a formalized approach to identify, track, monitor, prioritize, and fund the removal of transportation linear features (routes and other linear disturbances on BLM land).***  A formalized approach to the mitigation of existing transportation linear features through decommissioning, reclamation, or modification of use is an integral part of the implementation of land-use planning efforts. Formalizing the BLM's approach to addressing these needs provides a consistent advocacy for seeking funding through internal and external funding sources, developing priorities, and monitoring the progress of the BLM's efforts to implement the land-use plans.

A draft "Action Plan" with recommended responsibilities and outcomes to support the development of a BLM-wide approach to address unwanted linear features is provided as Attachment 10.

BLM_0008199

## Attachments

Attachment 1 –     Roads and Trails Terminology Team Charter

Attachment 2 –     Roads and Trails Terminology Core Team Members

Attachment 3 –     Team Advisors and Guests

Attachment 4 –     List of Documents Reviewed

Attachment 5 –     Terms, Definitions, and Maintenance Intensity Standards

Attachment 6 –     Action Plan - Terms, Definitions, and Maintenance Intensities

Attachment 7 –     Proposed Minimum National Data Standard – Primitive Roads and Trails

Attachment 8 –     Action Plan – National Standard for Transportation Linear Features

Attachment 9 –     Action Plan – Standard Guidance for Land-Use Planning

Attachment 10 –    Action Plan – Removal of Transportation Linear Features

Attachment 11 –    Trails Data Standards Crosswalk

Attachment 12 –    "Name That Linear Feature" Photographs

BLM_0008200

**Bureau of Land Management**                              **Roads and Trails Terminology Report**

## *Attachment 1 - Roads and Trails Terminology Team Charter*

BLM_0008201

# Roads and Trails Terminology Team
# Team Charter

**Purpose**

The purpose of this Team is to establish strategic direction and consistent terminology used by the recreation, planning, National Science and Technology Center (NSTC), National Landscape Conservation System (NLCS), lands, property, and engineering programs to manage the BLM transportation system in activities such as planning, inventorying, designating, mapping, signing, monitoring, developing public information, maintaining, assessing condition, tracking and reporting data so ongoing alignment of current and future strategic comprehensive travel management and transportation objectives can be achieved.

**Objectives**

Specific objectives of this team effort are to:

(1) Establish bureau definitions for the many different types of roads, trails, and other associated terms, e.g., maintenance levels, that are used when managing these assets.

(2) Determine what information on roads and trails will be stored in the Facility Asset Management System (FAMS) as well as in other existing data management systems.

(3) Establish a national travel management data dictionary for all roads, trails and closely associated linear feature travel/transportation management terminology.

(4) Develop a strategy that aligns the various programs responsible for travel management functions in a parallel fashion through the use of consistent terminology for conducting inventories, assessments, plans, monitoring and other program functions.

**Membership**

The Recreation Group representative (WO-250) and Protection and Response Group representative (WO-360) will co-chair the team. The team will consist of a facilitator, note taker, and representatives from recreation, planning, NSTC, NLCS, lands, property, engineering, and other appropriate programs as either core members or advisors. In addition, representatives from the field and state level, Recreation Visitor Services Advisory Team, the Engineering Advisory Team as well as others will be included as appropriate. The temporary services of a contractor will be employed to assist with meeting note-taking, writing and editing drafting reports, finalizing reports, printing, and distribution of final team products.

BLM_0008202

**Schedule**

The team will convene for three one-week sessions during September, October, and November of 2004.

**Deliverables**

The final report will be submitted to the Assistant Director, Renewable Resources & Planning (AD-200), and Assistant Director, Minerals, Realty & Resources Protection (AD-300), by January 30, 2005 and will include:

- An updated list of terminology and definitions along with an interpretation for various applications.
- A coordination and integration strategy between FAMS, GIS and RMIS for roads and trails planning and management.
- A travel management data dictionary for all roads trails and associated linear travel/transportation facilities.
- A strategy to coordinate and merge the roads and trails inventory effort with condition assessments of those assets,
- A strategy to merge the inventory of roads and trails with land use plan and recreation data bases for the identification, designation and management of travel management networks.


(Approved) Group Manager, (WO-250)          9/9/04
                                            **Date**


(Approved) Group Manager (WO-360)           9-9-04
                                            **Date**

## *Attachment 2 - Roads and Trails Terminology Core Team Members*

| Name | Organization | Phone |
|---|---|---|
| Mark Goldbach | WO-250 (Co-Chair) | 202-452-5176 |
| Elliot Ng | WO-360 (Co-Chair) | 202-557-3564 |
| Gery Behr | WO-850 (Facilitator) | 303-236-0478 |
| Terry Heslin | ID- 931 | 208-378-3836 |
| Bill Gibson | AZ-931 | 602-417-9425 |
| Stuart Cox | CO-952 | 303-239-3805 |
| Dick Bergen | OR-959 | 503-808-6100 |
| Casey Matthews | UT-952 | 801-539-4199 |
| Eric Dillinger | Carter & Burgess, Inc. | 817-735-6794 |
| Ellen Crews | Carter & Burgess, Inc. | 817-735-6044 |
| Shelley Wolff | HNTB | 816-527-2482 |
|  |  |  |
|  |  |  |

BLM_0008204

## *Attachment 3 - Team Advisors and Guests*

| Advisor Name | Organization |
|---|---|
| Deb Salt | WO-172 NLCS |
| Paul Graves | ST-122 National Science and Technology Center |
| John Bell | USDA Forest Service Washington Office (Road System Operation & Maintenance Engineer) |
| Steve Anderson | CA-360 Redding Field Office |
| Dick Todd | WO-350 Lands and Realty |
| Chris Hamilton | WO-330 LRPO |
| Tina McDonald | WO-250 Recreation Division |
| Nefra Matthews | ST-122 National Science and Technology Center |
| Jim Perry | WO-310 Fluid Minerals |
| Gary Pavick | WO-172 Wilderness/NLCS |
| Scott Florence | WO-210 Planning |
| Phil Daemon Damon | ID-320 Pocatello Field Office |
| Paul Fredericks | OR-959 Oregon State Office |
| **Guest Name** | **Organization** |
| Paul Fulkerson | CA-944 California State Office |
| Miles Brown | OR-933 Oregon State Office |
| Ron Price | OR-930 Oregon State Office |
| Thomas W. Erkert | USDA FS Regional 6 Office (Group Leader, Transportation Planning Operation & Maintenance) |
| Richard Hanes | OR-933 Oregon State Office |

BLM_0008205

## Attachment 4 - List of Documents Reviewed

1.   Travel Routes. National Data Dictionary, ROADS, Infrastructure Application, Version 1.3, January, 2003.
2.   Off-Highway Vehicle (OHV) Designations
3.   UTAH BLM GIS Data Standards, January 22, 2004.
4.   UT 2004-061, Designating Off Highway Vehicle Routes in the Land Use Planning Process, 2004.
5.   US Forest Service, Glossary of Road Terms, 2004
6.   Presentation, National Integrated Land System (NILS), 2004
7.   IM-No. 1999-211, Subject – Facilities Maintenance, 9/29/99
8.   Memo from EAT roads committee to Director WO-300, Subject: Transportation and Deferred Management Maintenance, 8/20/1999.
9.   Memo from EAT roads committee to Director, WO-300, Subject:  BLM Roads and Trails System Management, 8/31/1999.
10.  BLM Roads Presentation to the DOI Conference, 2004.
11.  BLM Comprehensive Travel Management Presentation, 2004.
12.  Alamosa Colorado, Visitor Information Center Brochure, 2004.
13.  Arizona State Statute, 28-6705, "Primitive Roads Designation"
14.  US Forest Service, Sumter National Forest Camping Guide, Southern Region, 2004.
15.  Great Sand Dunes National Preserve, National Park Service Literature, 2004.
16.  Grand Canyon National Park, Wilderness Management Plan, National Park Service, 2003.
17.  Washington State Statute, RCW 36.75.300, "Primitive roads -- Classification and Designation."
18.  Pima County Arizona, Primitive Road Definition and Statute, 2004.
19.  Bureau of Reclamation, Prineville Reservoir Resource Management Plan, 2003.
20.  IB-2000-005, Subject: Road and Trail Condition Assessment, 10/20/1999.
21.  IB-2000-092, Subject Transportation Management Re-Engineering, 3/23/2000.
22.  Draft Report of Transportation System Management Re-Engineering, 10/2001
23.  FIMMS FY2002 Roads data, 11/5/2002.
24.  Draft Memorandum:  Lynn Scarlett, Assistant Secretary-Policy Management and Budget, Subject: Standard Facilities Data Requirements, 2002.
25.  FASAB.  1996. Accounting for Property Plant, and Equipment. Statement of Recommended Accounting Standards, Number 6. Amended.
26.  Governmental Performance and Results Act
27.  Bureau of Land Management Strategic Plan
28.  Bureau of Land Management, Roads Team Meeting Report #1, June 2002
29.  Bureau of Land Management, Roads Team Meeting Report #2, July 2003

BLM_0008206

30. Instruction Memorandum 2004-117, Minimum National Data Standard for BLM Roads
31. Federal Highway Administration & US Fish & Wildlife Service, Guidance on the Federal Highways Refuge Roads Program, 2000
32. King County Roads Standards, King County Washington, 2002
33. A Guide for Local Area Road Managers, Washington Department of Transportation, 1994.
34. Evaluation of Expenditures on Rural Roads in Kansas, Kansas University Transportation Center, 2002.
35. Review of Funding Needs for Pavement Preservation, City of Eugene, OR, 2001.
36. Department of Interior, National Park Service, Federal Lands Highway Program FY 2004 Overview and Budget Justifications, 2003.
37. Federal Lands Highway Program - Park Roads and Parkways Program: Service-wide Transportation Planning, Design and Construction Program, February 27, 2003.
38. Federal Lands Highway Program Park Roads and Parkways Revised Funding and Prioritization Procedures, Federal Lands Highway Program, 1998.
39. Asset Management Primer, US Department of Transportation, 1999.
40. AASHTO Pavement Management Catalogue, AASHTO, 2002.
41. Executive Order 11644, Use of Off-Road-Vehicles on the Public Lands, 1972.
42. Executive Order 11989, Off-Road-Vehicles on the Public Lands, 1977.
43. National Management Strategy for Motorized Off-Highway Vehicle on Public Lands, Department of Interior, Bureau of Land Management, 2001.
44. National Mountain Bicycling Strategic Action Plan, Department of Interior, Bureau of Land Management, November 2002.
45. Instruction Memorandum No. UT 2004-040, GIS Data Standard for Off Highway Vehicle Area Designations, February 2004
46. Interagency Trail Data Standards, Version 1.1, April 28, 2004.

BLM_0008207

## Attachment 5 - Terms, Definitions, and Maintenance Intensity Standards

### DEFINITIONS:

### TRANSPORTATION SYSTEM LINEAR FEATURES (ASSETS):

**Road:** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Primitive Road**: A linear route managed for use by four-wheel drive or high-clearance vehicles. These routes do not normally meet any BLM road design standards.

**Trail:** A linear route managed for human-powered, stock, or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

### OTHER TERMS USED IN THIS REPORT:

**Assets** – Term utilized to describe roads, primitive roads, and trails that comprise the transportation system. Also the general term utilized to describe all BLM constructed "Assets" contained within the Facility Asset Management System (FAMS).

**Closed Area –** An area where off-highway vehicle use is prohibited. Use of off-highway vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer.

**Comprehensive Travel Management** - The proactive interdisciplinary planning; on-the-ground management and administration of travel networks (both motorized and non-motorized) to ensure public access, natural resources, and regulatory needs are considered. It consists of inventory, planning, designation, implementation, education, enforcement, monitoring, easement acquisition, mapping and signing, and other measures necessary to provide access to public lands for a wide variety of uses (including uses for recreational, traditional, casual, agricultural, commercial, educational, and other purposes).

**Designated Roads and Trails –** Specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-long. (BLM Manual H-1601-1 LAND USE PLANNING HANDBOOK)

BLM_0008208

**Limited Area –** An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type but can generally be accommodated within the following categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions.

**Maintenance Intensities – Transportation System Assets -** BLM Route Maintenance Intensities provide guidance for appropriate "standards of care" to recognized routes within the BLM. Recognized Routes by definition include Roads, Primitive Roads, and Trails carried as Assets within the Bureau of Land Management Facility Asset Management System (FAMS).

Maintenance Intensities provide consistent objectives and standards for the care and maintenance of BLM routes based on identified management objectives. Maintenance Intensities are consistent with land-use planning management objectives (for example, natural, cultural, recreation setting, and visual). Maintenance Intensities provide operational guidance to field personnel on the appropriate intensity, frequency, and type of maintenance activities that should be undertaken to keep the route in acceptable condition and provide guidance for the minimum standards of care for the annual maintenance of a route.

Maintenance Intensities do not describe route geometry, route types, types of use or other physical or managerial characteristics of the route. Those items are addressed as other descriptive attributes to a route.

Maintenance Intensities provide a range of objectives and standards, from "identification for removal" through frequent and intensive maintenance.

Level 0        **Maintenance Description:** Existing routes that will no longer be maintained and no longer be declared a route. Routes identified as Level 0 are identified for removal from the Transportation System entirely.

**Maintenance Objectives**:
- No planned annual maintenance
- Meet identified environmental needs
- No preventive maintenance or planned annual maintenance activities

**Maintenance Funds**:  No annual maintenance funds

Level 1        **Maintenance Description:** Routes where minimum (low intensity) maintenance is required to protect adjacent lands and resource values. These roads may be impassable for extended periods of time.

BLM_0008209

**Maintenance Objectives**:
- Low (Minimal) maintenance intensity
- Emphasis is given to maintaining drainage and runoff patterns as needed to protect adjacent lands. Grading, brushing, or slide removal is not performed unless route bed drainage is being adversely affected, causing erosion.
- Meet identified resource management objectives
- Perform maintenance as necessary to protect adjacent lands and resource values
- No preventive maintenance
- Planned maintenance activities limited to environmental and resource protection
- Route surface and other physical features are not maintained for regular traffic

**Maintenance Funds**:  Maintenance funds provided to address environmental and resource protection requirements. No maintenance funds provided to perform preventive maintenance.

Level 2    *RESERVED FOR POSSIBLE FUTURE USE*

Level 3      **Maintenance Description:**  Routes requiring moderate maintenance due to low volume use (e.g., seasonally or year-round for commercial, recreation, or administrative access). Maintenance Intensities may not provide year-round access but are intended to generally provide resources appropriate to keep the route in use for the majority of the year.

**Maintenance Objectives**:
- Medium (Moderate) maintenance intensity
- Drainage structures will be maintained as needed. Surface maintenance will be conducted to provide a reasonable level of riding comfort at prudent speeds for the route conditions and intended use. Brushing is conducted as needed to improve sight distance when appropriate for management uses. Landslides adversely affecting drainage receive high priority for removal; otherwise, they will be removed on a scheduled basis.
- Meet identified environmental needs
- Generally maintained for year-round traffic
- Perform annual maintenance necessary to protect adjacent lands and resource values
- Perform preventive maintenance as required to generally keep the route in acceptable condition

BLM_0008210

- Planned maintenance activities should include environmental and resource protection efforts, annual route surface
- Route surface and other physical features are maintained for regular traffic

**Maintenance Funds**:  Maintenance funds provided to preserve the route in the current condition, perform planned preventive maintenance activities on a scheduled basis, and address environmental and resource protection requirements.

Level 4      *RESERVED FOR POSSIBLE FUTURE USE*

Level 5      **Maintenance Description:** Routes for high (Maximum) maintenance due to year-round needs, high volume traffic, or significant use. Also may include routes identified through management objectives as requiring high Intensities of maintenance or to be maintained open on a year-round basis.

**Maintenance Objectives**:
- High (Maximum) maintenance intensity
- The entire route will be maintained at least annually. Problems will be repaired as discovered. These routes may be closed or have limited access due to weather conditions but are generally intended for year-round use.
- Meet identified environmental needs
- Generally maintained for year-round traffic
- Perform annual maintenance necessary to protect adjacent lands and resource values
- Perform preventive maintenance as required to generally keep the route in acceptable condition
- Planned maintenance activities should include environmental and resource protection efforts, annual route surface
- Route surface and other physical features are maintained for regular traffic

**Maintenance Funds**:  Maintenance funds provided to preserve the route in the current condition, perform planned preventive maintenance activities on a scheduled basis, and address environmental and resource protection requirements.

**Off-Highway Vehicle (off-road vehicle)** - Any motorized vehicle capable of, or designated for travel on or immediately over land, water or other natural terrain, excluding: (1) any non-amphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency

BLM_0008211

purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open Area** – An area where all types of vehicle use is permitted at all times, anywhere in the area subject to the operating regulations and vehicle standards set forth in 43 CFR 8341 and 8342.

**Transportation Linear Disturbances** – Man-made linear features that are not part of the BLM's Transportation System. Linear disturbances may include engineered (planned) as well as unplanned single- and two-track linear features.

**Transportation Linear Features** – The broadest category of physical disturbance (planned and unplanned) on BLM land.  Transportation-related linear features include engineered roads and trails, as well as user-defined, non-engineered roads and trails created as a result of the public use of BLM land. May include roads and trails identified for closure or removal as well as those that make up the BLM's defined transportation system.

**Transportation Plan** – A transportation facility plan shown on forms and maps of all existing and planned access routes needed to use, protect, and administer the public lands. (Preparation of the transportation plan does not depend on RMP's; but as they are completed, the transportation plan should be revised to reflect changes.) (BLM Manual 9100 - ENGINEERING)

**Transportation System** – The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized and approved as part of the BLM's transportation system.

**Travel Management Areas** - Polygons or delineated areas where a rational approach has been taken to classify areas open, closed or limited, and have identified and/or designated a network of roads, trails, ways, and other routes that provide for public access and travel across the planning area.  All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations. (BLM Manual H-1601-1 LAND USE PLANNING HANDBOOK)

**Way** - Roadlike feature used by vehicles having four or more wheels but not declared a road by the owner and which receives no maintenance to guarantee regular and continuous use.

BLM_0008212

### Attachment 6 - Action Plan – Terms, Definitions, and Maintenance Intensities



# BUREAU OF LAND MANAGEMENT

| ACTION PLAN | |
|---|---|
| Subject: | Update Terms, Definitions, and Maintenance Levels |
| Lead: | WO-360 |
| Due Date: | |
| Reviewer: | |
| OBJECTIVE 1, RECOMMENDATION 1 | |

1. **Objective:**
   The Objective of this Action Plan is to update the Bureau of Land Management's existing guidance documents (manuals, handbooks, and related publications) so that they incorporate the new terms, definitions, and Maintenance Level (Maintenance Intensity) guidance developed by the BLM Roads and Trails Terminology Team.

2. **Action Plan Tasks:**
   - Initiate following Approval of the Roads and Trails Terminology Report
   - Assemble team to identify existing guidance documents for revision:
     - BLM' 9100 Series Engineering Manuals
     - BLM "Gold Book"
     - BLM land-use planning process and documents
     - Facility Asset Management System (FAMS) data standards
     - Facility Asset Management System (FAMS) Maintenance Level designations
     - Minimum National Data Standard – BLM Roads
     - Condition Assessment Protocols – Roads, Primitive Roads, and Trails
     - BLM Real Property and "Asset" Standards
   - Update existing documents in accordance with Roads and Trails Terminology Report
   - Update existing documents published by BLM and provided to "customers" to reflect new designations

3. **Responsible Organization(s):**
   WO-250 and WO-360 to each assign an individual as "lead" to identify and update appropriate guidance.  WO-360 responsible for Engineering and Asset Management related information, WO-250 to update land-use planning documents.

4. **Outcomes:**
   Consistent terms, definitions, and maintenance needs within the BLM as well as an "alignment" of existing terms and definitions across multiple programs within the BLM.

BLM_0008213

## *Attachment 7 - Proposed Minimum National Data Standards*

This attachment contains three tables outlining assets, data elements, and status for:

- Approved National Data Standard for Roads

- Proposed Primitive Roads Data Standard

- Proposed National Trails Data Standard

BLM_0008214

## Approved National Data Standard for Roads

### Approved National Data Standard for Roads

| Asset | Data Element | Status |
|---|---|---|
| Road | Latitude | Required |
| | Longitude | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| | Functional Class | Required |
| | Seismic Zone | Optional |
| | Congressional District | Required |
| | Locator Code | Required |
| | Easements Needed | Required |
| | Admin State | Required |
| | Geographic State | Required |
| | OR/CA Land | Required |
| | Route Number | Required |
| | Spur Number | Required |
| | Begin Route | Required |
| | Terminus | Required |
| | Year Withdrawn | Required |
| | Road Restrictions | Optional |
| | County | New in Phase II |
| | Jurisdiction | New in Phase II |
| | Master AUC | New in Phase II |
| Segment | Begin Mile | Required |
| | End Mile | Required |
| | Use Period Begin (Gone) | Optional |
| | Use Period End (Gone) | Optional |
| | Open in Jan | Optional |
| | Open in Feb | Optional |
| | Open in Mar | Optional |
| | Open in Apr | Optional |
| | Open in May | Optional |
| | Open in Jun | Optional |
| | Open in Jul | Optional |
| | Open in Aug | Optional |
| | Open in Sep | Optional |
| | Open in Oct | Optional |
| | Open in Nov | Optional |
| | Open in Dec | Optional |
| | County | Required |
| | Jurisdiction | Required |
| | Maintenance Responsibility | Required |
| | Maintenance Level | Required |
| | Condition (On Main Screen) | Required |

BLM_0008215

### Approved National Data Standard for Roads

| Asset | Data Element | Status |
|---|---|---|
| | Surface Type | Required |
| | Average Width | Required |
| | Restrictions | Optional |
| | Asset Category Code (On Main Screen) | Required |
| | Year Constructed (On Main Screen) | Optional |
| | Design Speed | Optional |
| | OR/CA Land | Required |
| | Year Withdrawn | Optional |
| | Road Restrictions | Optional |
| | Road Surface | Required |
| | Congressional District | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| | Special Designation - GTRN | New in Phase II |
| | Road Closure Reason Code - GTRN | New in Phase II |
| | Road Closure Status Code - GTRN | New in Phase II |
| | # of Lanes | New in Phase II |
| | Access Rights - GTRN | New in Phase II |
| | AUC - GTRN | New in Phase II |
| | TMO - Action Reason - GTRN | New in Phase II |
| | TMO - Action - GTRN | New in Phase II |
| | Route # - GTRN | New in Phase II |
| | TMO - Approved by - GTRN | New in Phase II |
| | TMO - Benefit - GTRN | New in Phase II |
| | TMO - Planned Year  - GTRN | New in Phase II |
| | TMO - Action Reason - GTRN | New in Phase II |
| | TMO - Action - GTRN | New in Phase II |
| Drain Dip | Mile Post | Optional |
| | Square Feet | Optional |
| | Depth | Optional |
| | Drainage Dip (Deleted) | Optional |
| Water Bar | Mile Post | Optional |
| | Square Feet | Optional |
| | Height | Optional |
| | Water Bar (Deleted) | Optional |
| Leadoff Ditch | Mile Post | Optional |
| | Location | Optional |
| | Leadoff Ditch (Deleted) | Optional |
| | Length | Optional |
| Low Water Crossing | Mile Post | Optional |
| | Square Feet | Optional |
| | Low Water Crossing Material | Optional |
| | Low Water Crossing (Deleted) | Optional |
| Ford | Mile Post | Optional |
| | Ford (Deleted) | Optional |

BLM_0008216

### Approved National Data Standard for Roads

| Asset | Data Element | Status |
|---|---|---|
| Check Dam | Mile Post | Optional |
| | Check Dam (Deleted) | Optional |
| | Location | Optional |
| Rock Spillway | Mile Post | Optional |
| | Rock Spillway | Optional |
| Cross Drain Culvert | Mile Post | Optional |
| | Diameter | Optional |
| | Cross Drain Type | Optional |
| Guardrail | Mile Post | Optional |
| | Guardrail Side | Optional |
| | Guardrail Materials | Optional |
| Sign Complex | Sign Type | Optional |
| | Sign Materials | Optional |
| | Sign ID Number | Optional |
| | Height | Optional |
| | Width | Optional |
| | Latitude | Optional |
| | Longitude | Optional |
| | Mile Post | Optional |
| | Map Datum | Not in FAMS |
| Cattleguard | Mile Post | Optional |
| | Length | Optional |
| | Cattleguard Type | Optional |
| | Width | Optional |
| Gate | Gate | Optional |
| | Count | Optional |
| | Mile Post | Optional |
| | Width | Optional |
| Culvert | Feature Crossed | Optional |
| | Federal Highway | Optional |
| | Fish Passage Provisions | Optional |
| | Fisheries | Optional |
| | Hydrologic Unit Code | Optional |
| | Inspection Damage | Optional |
| | Inspection Inventory | Optional |
| | Inspection Routine | Optional |
| | IR3 | Optional |
| | IR32 | Optional |
| | IR33 | Optional |
| | IRDA | Optional |
| | IRSA | Optional |
| | Jurisdiction | Optional |
| | Maintenance Level | Optional |
| | Maintenance Responsibility | Optional |
| | Mile Post | Optional |
| | ORALL | Optional |
| | Pipe Number | Optional |
| | PL33 | Optional |

BLM_0008217

### Approved National Data Standard for Roads

| Asset | Data Element | Status |
|---|---|---|
| | PL32 | Optional |
| | Major Culvert | Optional |
| | PL3 | Optional |
| | Storm Comments | Optional |
| | Storm Duration | Optional |
| | Storm Frequency | Optional |
| | Travel Surface | Optional |
| | Travel Way Width | Optional |
| | Comment | Optional |
| | Cover Height - Feet | Optional |
| | Cover Height - Inches | Optional |
| | Diameter or Rise - Feet | Optional |
| | Diameter or Rise - Inches | Optional |
| | Debris Control Structure | Optional |
| | End Section Inlet | Optional |
| | End Section Outlet | Optional |
| | Footing Height - Feet | Optional |
| | Footing Height - Inches | Optional |
| | Footing Length - Feet | Optional |
| | Footing Length - Inches | Optional |
| | Footing Width - Feet | Optional |
| | Footing Width - Inches | Optional |
| | Gauge | Optional |
| | Gauge Code | Optional |
| | Headwall In | Optional |
| | Headwall Out | Optional |
| | Length - Feet | Optional |
| | Length - Inches | Optional |
| | Material Shape | Optional |
| | Rise of Pipe | Optional |
| | Shape | Optional |
| | Special | Optional |
| | Span - Feet | Optional |
| | Span - Inches | Optional |
| | Waterway | Optional |

BLM_0008218

Bureau of Land Management                                    Roads and Trails Terminology Report

## *Proposed Primitive Roads Data Standard*

### Proposed Primitive Roads Data Standard

| Asset | Data Element | Status |
|---|---|---|
| Road | Latitude | Required |
| | Longitude | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| | Functional Class | Required |
| | Seismic Zone | Optional |
| | Congressional District | Required |
| | Locator Code | Required |
| | Easements Needed | Required |
| | Admin State | Required |
| | Geographic State | Required |
| | OR/CA Land | Required |
| | Route Number | Required |
| | Spur Number | Required |
| | Begin Route | Required |
| | Terminus | Required |
| | Year Withdrawn | Required |
| | Road Restrictions | Optional |
| | County | New in Phase II |
| | Jurisdiction | New in Phase II |
| | Master AUC | New in Phase II |
| Segment | Begin Mile | Required |
| | End Mile | Required |
| | Open in Jan | Optional |
| | Open in Feb | Optional |
| | Open in Mar | Optional |
| | Open in Apr | Optional |
| | Open in May | Optional |
| | Open in Jun | Optional |
| | Open in Jul | Optional |
| | Open in Aug | Optional |
| | Open in Sep | Optional |
| | Open in Oct | Optional |
| | Open in Nov | Optional |
| | Open in Dec | Optional |
| | County | Required |
| | Jurisdiction | Required |
| | Maintenance Responsibility | Required |
| | Maintenance Intensity | Required |
| | Condition (On Main Screen) | Required |
| | Surface Type | Required |
| | Average Width | Required |

BLM_0008219

|

## Proposed Primitive Roads Data Standard

| Asset | Data Element | Status |
|---|---|---|
| | Restrictions | Optional |
| | Asset Category Code (On Main Screen) | Required |
| | Year Constructed | Optional |
| | Design Speed | Optional |
| | OR/CA Land | Required |
| | Year Withdrawn | Optional |
| | Road Restrictions | Optional |
| | Road Surface | Required |
| | Congressional District | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| Drain Dip | Mile Post | Optional |
| | Square Feet | Optional |
| | Depth | Optional |
| Water Bar | Mile Post | Optional |
| | Square Feet | Optional |
| | Height | Optional |
| | Water Bar (Deleted) | Optional |
| Leadoff Ditch | Mile Post | Optional |
| | Location | Optional |
| | Leadoff Ditch (Deleted) | Optional |
| | Length | Optional |
| Low Water Crossing | Mile Post | Optional |
| | Square Feet | Optional |
| | Low Water Crossing Material | Optional |
| | Low Water Crossing (Deleted) | Optional |
| Ford | Mile Post | Optional |
| | Ford (Deleted) | Optional |
| Check Dam | Mile Post | Optional |
| | Check Dam (Deleted) | Optional |
| | Location | Optional |
| Rock Spillway | Mile Post | Optional |
| | Rock Spillway | Optional |
| Cross Drain Culvert | Mile Post | Optional |
| | Diameter | Optional |
| | Cross Drain Type | Optional |

BLM_0008220

### Proposed Primitive Roads Data Standard

| Asset | Data Element | Status |
|---|---|---|
| Guardrail | Mile Post | Optional |
| | Guardrail Side | Optional |
| | Guardrail Materials | Optional |
| | | |
| Sign Complex | Sign Type | Optional |
| | Sign Materials | Optional |
| | Sign ID Number | Optional |
| | Height | Optional |
| | Width | Optional |
| | Latitude | Optional |
| | Longitude | Optional |
| | Mile Post | Optional |
| | | |
| Cattleguard | Mile Post | Optional |
| | Length | Optional |
| | Cattleguard Type | Optional |
| | Width | Optional |
| | | |
| Gate | Gate | Optional |
| | Count | Optional |
| | Mile Post | Optional |
| | Width | Optional |
| | | |
| Culvert | Feature Crossed | Optional |
| | Federal Highway | Optional |
| | Fish Passage Provisions | Optional |
| | Fisheries | Optional |
| | Hydrologic Unit Code | Optional |
| | Inspection Damage | Optional |
| | Inspection Inventory | Optional |
| | Inspection Routine | Optional |
| | IR3 | Optional |
| | IR32 | Optional |
| | IR33 | Optional |
| | IRDA | Optional |
| | IRSA | Optional |
| | Jurisdiction | Optional |
| | Maintenance Level | Optional |
| | Maintenance Responsibility | Optional |
| | Mile Post | Optional |
| | ORALL | Optional |
| | Pipe Number | Optional |
| | PL33 | Optional |
| | PL32 | Optional |
| | Major Culvert | Optional |
| | PL3 | Optional |
| | Storm Comments | Optional |
| | Storm Duration | Optional |

BLM_0008221

### Proposed Primitive Roads Data Standard

| Asset | Data Element | Status |
|---|---|---|
| | Storm Frequency | Optional |
| | Travel Surface | Optional |
| | Travel Way Width | Optional |
| | Comment | Optional |
| | Cover Height - Feet | Optional |
| | Cover Height - Inches | Optional |
| | Diameter or Rise - Feet | Optional |
| | Diameter or Rise - Inches | Optional |
| | Debris Control Structure | Optional |
| | End Section Inlet | Optional |
| | End Section Outlet | Optional |
| | Footing Height - Feet | Optional |
| | Footing Height - Inches | Optional |
| | Footing Length - Feet | Optional |
| | Footing Length - Inches | Optional |
| | Footing Width - Feet | Optional |
| | Footing Width - Inches | Optional |
| | Gauge | Optional |
| | Gauge Code | Optional |
| | Headwall In | Optional |
| | Headwall Out | Optional |
| | Length - Feet | Optional |
| | Length - Inches | Optional |
| | Material Shape | Optional |
| | Rise of Pipe | Optional |
| | Shape | Optional |
| | Special | Optional |
| | Span - Feet | Optional |
| | Span - Inches | Optional |
| | Waterway | Optional |

BLM_0008222

## *Proposed National Trails Data Standard*

### Proposed National Trails Data Standard

| Asset | Data Element | Status |
|---|---|---|
| Trail | Latitude | Required |
| | Longitude | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| | Functional Class | Required |
| | Seismic Zone | Optional |
| | Congressional District | Required |
| | Locator Code | Required |
| | Easements Needed | Required |
| | Admin State | Required |
| | Geographic State | Required |
| | OR/CA Land | Required |
| | Rafting DOD | Optional |
| | Ski DOD | Optional |
| | Off Road DOD | Optional |
| | Route Number | Required |
| | Spur Number | Required |
| | Begin Route | Required |
| | Terminus | Required |
| | Year Withdrawn | Required |
| | Trail Restrictions | Optional |
| | County | Optional |
| | Jurisdiction | Optional |
| | Master AUC | Optional |
| | | |
| Segment | Begin Mile | Required |
| | End Mile | Required |
| | Open in Jan | Optional |
| | Open in Feb | Optional |
| | Open in Mar | Optional |
| | Open in Apr | Optional |
| | Open in May | Optional |
| | Open in Jun | Optional |
| | Open in Jul | Optional |
| | Open in Aug | Optional |
| | Open in Sep | Optional |
| | Open in Oct | Optional |
| | Open in Nov | Optional |
| | Open in Dec | Optional |
| | County | Required |
| | Jurisdiction | Required |
| | Maintenance Responsibility | Required |
| | Maintenance Intensity | Required |

BLM_0008223

**Proposed National Trails Data Standard**

| Asset | Data Element | Status |
|---|---|---|
| | Condition (On Main Screen) | Required |
| | Surface Type | Required |
| | Average Width | Required |
| | Restrictions | Optional |
| | Asset Category Code (On Main Screen) | Required |
| | Year Constructed | Optional |
| | Design Speed | Optional |
| | Year Withdrawn | Optional |
| | Trail Restrictions | Optional |
| | Trail Surface | Required |
| | Congressional District | Required |
| | Meridian | Required |
| | Township | Required |
| | Range | Required |
| | Section | Required |
| | Aliquot Part | Required |
| Drain Dip | Mile Post | Optional |
| | Size (Square Feet) | Optional |
| | Depth | Optional |
| | Drainage Dip | Optional |
| Water Bar | Mile Post | Optional |
| | Size (Square Feet) | Optional |
| | Height | Optional |
| Leadoff Ditch | Mile Post | Optional |
| | Location | Optional |
| | Size (Square Feet) | |
| Low Water Crossing | Mile Post | Optional |
| | Size (Square Feet) | Optional |
| | Low Water Crossing Material | Optional |
| Ford | Mile Post | Optional |
| Check Dam | Mile Post | Optional |
| | Check Dam | Optional |
| | Locator Code | Optional |
| Cross Drain Culvert | Mile Post | Optional |
| | Diameter | Optional |
| | Cross Drain Type | Optional |
| Tunnel | Mile Post | Optional |
| | Height | Optional |
| | Width | Optional |
| | Tunnel Materials | Optional |

BLM_0008224

**Proposed National Trails Data Standard**

| Asset | Data Element | Status |
|-------|-------------|--------|
| Guardrail | Mile Post | Optional |
| | Guardrail Side | Optional |
| | Guardrail Materials | Optional |
| Sign Complex | Sign Type | Optional |
| | Sign Materials | Optional |
| | Sign ID Number | Optional |
| | Height | Optional |
| | Width | Optional |
| | Latitude | Optional |
| | Longitude | Optional |
| | Mile Post | Optional |
| Cattle Guard | Mile Post | Optional |
| | Length | Optional |
| | Cattle Guard Type | Optional |
| | Width | Optional |
| Gate | Gate (Material) | Optional |
| | Count | Optional |
| | Mile Post | Optional |
| | Width | Optional |
| Shoulder | Mile Post Curb | Optional |
| | Length Curb | Optional |
| | Mile Post Curb & Gutter | Optional |
| | Length Curb & Gutter | Optional |
| | Mile Post Retaining Wall | Optional |
| | Length Retaining Wall | Optional |
| | Mile Post Riprap | Optional |
| | Length Riprap | Optional |
| | Mile Post Slope Protection | Optional |
| | Length Slope Protection | Optional |
| | Mile Post Sidewalk | Optional |
| | Length Sidewalk | Optional |
| Structure | Size (Lineal Feet) | Optional |
| | Structure Type | Optional |
| Handrail | Handrail Side | Optional |
| | Handrail Material | Optional |
| | Size (Lineal Feet) | Optional |
| | ADA | |
| Barrier | Mile Post | Optional |
| | Count | Optional |
| | Barrier Material | Optional |

BLM_0008225

### Proposed National Trails Data Standard

| Asset | Data Element | Status |
|-------|--------------|--------|
| Loading Ramp | Mile Post | Optional |
| | Count | Optional |
| | Material | Optional |
| Pedestrian Ramp | Mile Post | Optional |
| | Size (Square Feet) | Optional |
| | Material | Optional |

BLM_0008226

## Attachment 8 - Action Plan – National Standard for Transportation Linear Features



### BUREAU OF LAND MANAGEMENT

| ACTION PLAN | |
|---|---|
| Subject: | Minimum National Data Standard for Linear Features |
| Lead: | WO-250 |
| Due Date: | |
| Reviewer: | |
| OBJECTIVE 2 - RECOMMENDATION 5 | |

1. **Objective:**

    The Objective of this Action Plan is to create a minimum national data standard that will form the "baseline" for the collection of linear feature information across the BLM and allow for aggregation, analysis, and comparison across Field Offices, States, and the BLM.

    Currently, the BLM does not provide guidance or direction on a <u>required</u> minimum data standard for collection during the land-use planning process.  As a result, State and Field Office personnel collect a wide range of data during the linear feature inventory process based on an inconsistent set of data standards and naming conventions.

    This effort is intended to provide guidance and direction to all BLM personnel and facilitate a common "baseline" of linear feature information across the BLM.  It is not intended to preclude BLM personnel from collecting additional information beyond the minimum national standard.

2. **Action Plan Tasks:**
    - Initiate following Approval of the Roads and Trails Terminology Report
    - Assemble Team to develop "draft" minimum national data standard for linear features based on existing standards and efforts.
        - National Trails Data Standard
        - IM 2004-117, Minimum National Data Standard Roads
        - National Integrated Land System (NILS) data standards
        - UTAH BLM GIS Data Standards, January 22, 2004.
        - Recreation Information Management System (RMIS) data requirements
    - Present "draft" minimum national data standards to Recreation Visitor Services Advisory Team (RVSAT) and Engineering Advisory Team (EAT) for concurrence
    - Provide "draft" minimum national data standards to WO-250 and WO-360 for approval
    - Publish minimum national data standards for linear features

BLM_0008227

3.      **Responsible Organization(s):** WO-250 to provide leadership on the effort and coordinate with WO-360 for consistency and the ability to integrate linear feature data into FAMS in the event linear features become assets.

4.      **Outcomes:** Minimum national data standards for all BLM transportation and land-use planning efforts that provide a common baseline while preserving the field's ability to augment the standards to meet location specific requirements.

BLM_0008228

### Attachment 9 - Action Plan – Standard Guidance for Land-Use Planning

 **BUREAU OF LAND MANAGEMENT**

| ACTION PLAN | |
|---|---|
| Subject: | Standardize BLM Comprehensive Travel Management Planning Guidance in a Single Source Guide to Provide Consistency within BLM |
| Lead: | WO-250 |
| Due Date: | |
| Reviewer: | |
| OBJECTIVE 3 – RECOMMENDATION 8 | |

1.  **Objective:**
    The Objective of this Action Plan is to bring together and standardize existing transportation planning and management guidance in a single location and provide a single approach across the BLM that links to other program initiatives and requirements.

    Currently, travel planning and management guidance is contained in several guidance documents and does not provide a consistent policy and approach across the BLM. The ability for successfully implementing comprehensive travel management will enhance the BLM's consistency, allow for improved communication with stakeholders, and provide a more efficient approach to the BLM's planning efforts.

    This effort is intended to provide a common reference and single source of information for all land-use planning efforts.

2.  **Action Plan Tasks:**
    - Initiate following Approval of the Roads and Trails Terminology Report
    - Assemble team to identify existing sources of land-use planning guidance
    - Develop a single standard source guide document for all land-use planning efforts
    - Publish updated land-use planning document for BLM use

3.  **Responsible Organization(s):** The recommended approach is for WO-250 to provide leadership on the effort and coordinate with appropriate BLM programs and Divisions as necessary.

4.  **Outcomes:** The outcome of this effort is a single reference source for all BLM land-use planning that is coordinated with other programs and provides land-use planners with a consistent and efficient reference.

BLM_0008229

## Attachment 10 - Action Plan – Removal of Transportation Linear Features



# BUREAU OF LAND MANAGEMENT

| ACTION PLAN | |
|---|---|
| Subject: | Develop and Implement a Formalized Approach for Tracking and Removal of Unwanted Linear Features on BLM Land |
| Lead: | WO-360 |
| Due Date: | |
| Reviewer: | |
| OBJECTIVE 3 – RECOMMENDATION 10 | |

1. **Objective:**
   The Objective of this Action Plan is to develop and implement a formal program within BLM that identifies, tracks, and prioritizes unwanted linear features (linear disturbances and existing roads and trails identified for removal) and develops a funding mechanism to support the removal/rehabilitation process without adversely impacting existing limited resources utilized for annual and deferred maintenance.

   The BLM does not currently have a formal process or program that identifies, tracks, prioritizes, and funds the removal of unwanted linear features. Such a program is essential to the long-term asset management of BLM land and is considered essential by the Roads and Trails Terminology Team.

   This effort is intended to provide a concerted, long-term effort that provides the BLM with a consolidated means of reporting the current levels of unwanted linear features on BLM land and a means for proactively managing their removal and remediation.

2. **Action Plan Tasks:**
   - Initiate following Approval of the Roads and Trails Terminology Report
   - Develop a Team comprised of key BLM Stakeholders to formulate a recommended program for implementation within the BLM
   - Coordinate the effort with existing land-use planning, asset management, and related activities.
   - Develop a recommended BLM strategy for implementation across the BLM
   - Staff and Manage the effort on an on-going basis

3. **Responsible Organization(s):** The recommended approach is for WO-360 to provide leadership on the effort with a combined task team that includes engineering and recreation personnel and coordinate with appropriate BLM programs and Divisions as necessary.

4. **Outcomes:** The outcome of this effort is a strategic, long-term approach for the BLM to utilize in identifying, tracking, prioritizing, funding, and removing/rehabilitating unwanted linear features on a nationwide basis.

BLM_0008230

## Attachment 11 - Trails Data Standards Crosswalk

| TRAILS DATA STANDARDS | |
|---|---|
| **FAMS** | **NON-FAMS (e.g., GIS)** |
| **Basic Trail Information** | **Basic Trail Information** |
| Trail Name<br>Trail Number<br>Length<br>Trail Status<br>Trail Surface | Interagency Trail Identifier<br>Shared System |
| | |
| **Trail Admin Unit & Location** | **Trail Admin Unit & Location** |
| Agency<br>Admin Org<br>Managing Agency<br>Managing Org<br>Congressional District<br>County<br>Geolocation<br>Jurisdiction<br>State | Municipality |
| | |
| **Trail Management and Use** | **Trail Management and Use** |
| Trail Class<br>Primary Trail Maintainer | Trail System<br>Road System<br>Land Use Plan<br>Designed Use<br>Managed Use<br>Motorized Prohibited<br>Prohibited Use<br>Accessibility Status |
| | |
| **Trail Management Consideration** | **Trail Management Consideration** |
| Rights of Way | Historic Significance<br>National Trail Designation<br>Special Management Area |
| | |
| **Trail Condition and Cost** | **Trail Condition and Cost** |
| Trail Condition<br><br>Cost: Annual/Cyclic Maintenance<br><br>Cost: Last Updated | Cost: Annual/Cyclic Operations (Rec Sites only)<br>Cost: Deferred Maintenance (Imported to FAMS from condition assessments)<br>Cost: Improvement/Construction (Project data sheets, 5-year plans) |
| | |

BLM_0008231

Bureau of Land Management                                        Roads and Trails Terminology Report

| TRAILS DATA STANDARDS | |
|---|---|
| **FAMS** | **NON-FAMS (e.g., GIS)** |
| **Additional NST and/or NHT Basic Information (Attributes Recorded only to NHTS & NSTS)** | **Additional NST and/or NHT Basic Information (Attributes Recorded only to NHTS & NSTS)** |
| Visitor Center Name<br>Visitor Facility Location<br>Visitor Facility Type<br>(all three assets listed as facilities, not trails) | NHT/NST Trail Administrator<br>Visitor Facility Activities<br>Visitor Facility Contact Information<br><br>(all three tracked by RMIS) |
|  |  |
| **NHT Heritage Resource Information (Attributes only to NHT Routes or Associated Heritage Resource Sites)** | **NHT Heritage Resource Information (Attributes only to NHT Routes or Associated Heritage Resource Sites)** |
|  | Type of Route<br>Type of Site<br>NHT Auto-Tour Surface<br>NHT Certification Status<br>NHT Condition Category<br>NHT High Potential Segment<br>NHT Public Use Segment<br>NHT Potential Segment<br>NHT Public Use Site<br>NHT Site Name<br>NHT Site Number<br>NRHP Criteria<br>NRHP Property Category |
|  | 7 Oct 2004 Rev 2 |

Page 57                                                          April 2006

BLM_0008232

## Attachment 12 - "Name that Linear Feature" Photographs

BLM_0008233

**Bureau of Land Management**

**Roads and Trails Terminology Report**





April 2006

BLM_0008234

**Bureau of Land Management**

**Roads and Trails Terminology Report**





April 2006

BLM_0008235

**Bureau of Land Management**                    **Roads and Trails Terminology Report**





BLM_0008236

**Bureau of Land Management**                                    **Roads and Trails Terminology Report**





BLM_0008237