*For example, the BLM has a cooperative agreement with a State agency to fund fuel reduction projects on private or State lands.  If the cooperative agreement describes the criteria to select the projects but leaves the specifics of project selection to the State agency, then the NEPA is not triggered.  On the other hand, if the BLM is making a decision to fund or not fund a specific project on lands not administered by the BLM, then NEPA is triggered.*

### 3.3.2    Proposals Involving Mineral Estate

Where the BLM manages both surface resources and subsurface resources, any proposal to develop locatable or leaseable mineral resources triggers the NEPA.  Where the BLM does not manage both surface and subsurface resources (split estate), whether or not a proposal requires NEPA compliance depends on the specific situation.

–    Proposals where the BLM manages the subsurface resources and another Federal agency manages the surface.  The NEPA is triggered by a proposal to develop the subsurface resource. The BLM must establish a cooperating agency relationship with the other Federal agency (see section **12.1, *Cooperating Agency Status in Development of NEPA Analysis Documents*)**.

–    Proposals where the BLM manages the subsurface resources and the surface is non-Federal. On split estate lands where the reserved Federal minerals are open to leasing or location (location is the act of staking a mining claim under the General Mining Law), the NEPA is triggered by an operator or mining claimant's proposal to explore for or develop the subsurface resource.  The BLM is responsible for NEPA compliance, and you must document effects on surface and subsurface resources (40 CFR 1508.8).  An exception to this policy refers to Stock Raising Homestead Act lands and applies only when the surface owner and the mining claimant are the same party (IM 2005-114; 43 CFR 3809).

–    Proposals where the BLM manages the surface and the subsurface is non-Federal.  As with any proposal, the NEPA is triggered by a request for the BLM to authorize surface disturbance. *For example, the BLM is responsible for documenting NEPA compliance for an access road right-of-way application, regardless of the use for which the access is requested.*

BLM_0009297

# CHAPTER 4—CATEGORICAL EXCLUSIONS

General
4.1   Categorical Exclusions Established by the Energy Policy Act
4.2   Categorical Exclusions Established by the Department of the Interior or the BLM

## GENERAL

Categorical exclusions (CXs) are categories of actions that Federal agencies have determined do not have a significant effect on the quality of the human environment (individually or cumulatively) and for which, therefore, neither an EA nor an EIS is required (40 CFR 1508.4). A CX is a form of NEPA compliance, without the analysis that occurs in an EA or an EIS. It is not an exemption from the NEPA.

When using CXs, other procedural requirements may still apply: for example, tribal consultation, and consultation under the National Historic Preservation Act and the Endangered Species Act.

> You are encouraged to apply categorical exclusions, where appropriate, because they speed NEPA compliance (40 CFR 1500.5(k).

While use of a CX is not subject to protest or appeal, a decision on the action being taken may be subject to protest and appeal. Consult program-specific guidance and include applicable protest and appeal provisions with the documentation of the decision on the action.  See the NEPA Handbook Web Guide for program-specific protest and appeal information.

If there is high public interest in an action that will be categorically excluded, you may elect to involve the public (for example, through notification or scoping).  Public involvement may be valuable in determining whether extraordinary circumstances apply.  There may be program-specific guidance for public notification of the decision.  Even if there is no program-specific guidance, you may elect to provide public notification of a decision based on a CX, depending on the public interest in the action.

Though not required, you may elect to prepare an EA for proposed actions otherwise excluded when the decision-maker believes that an EA would be helpful in planning or decision-making (40 CFR 1501.3 and 516 DM 3.2(B)).  We recommend that you include in the NEPA document the rationale for completing an EA when a CX could be used.

Guidance for the use of CXs differs for some specific CXs as described below.

## 4.1  CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY ACT

Section 390 of the Energy Policy Act of 2005 established five statutory CXs that apply only to oil and gas exploration and development pursuant to the Mineral Leasing Act.  The CXs do not apply to geothermal actions.  These CXs are listed in **Appendix 2, *Using Categorical Exclusions Established by the Energy Policy Act of 2005.***

The decision-maker must include in the well file or case file a brief rationale as to why one or more Energy Act CXs apply.  No other documentation for application of Energy Act CXs is required. These CXs are different in application from the Departmental CXs and the BLM non-Energy Act CXs. Energy Policy Act CXs do not require review for extraordinary circumstances. This is because these CXs are established by statute, and their application is governed by that statute. However, other procedural requirements still apply, such as consultation under the Endangered Species Act and National Historic Preservation Act.

Issue a decision document for the proposed activity.  Apply environmental best management practices (BMPs) and other suitable mitigation measures to permit approvals in accordance with current national policy. Best Management Practices or conditions of approval can be implemented with a CX and do not require additional NEPA documentation.

Detailed guidance for using these statutory CXs is described in **Appendix 2, *Using Categorical Exclusions Established by the Energy Policy Act 2005*.**

## 4.2.  CATEGORICAL EXCLUSIONS ESTABLISHED BY THE DEPARTMENT OF THE INTERIOR OR THE BLM

This section outlines procedures for using categorical exclusions established by the Department of the Interior or the BLM in accordance with CEQ regulations (40 CFR 1508.4).

### 4.2.1    Identifying Potential Categorical Exclusions

Verify that the proposed action fits within one of the Departmental CXs (**Appendix 3, *Departmental Categorical Exclusions***) or a BLM CX (**Appendix 4, *BLM Categorical Exclusions)*.**  Both the Departmental and BLM lists of CXs need to be reviewed to determine if the proposed action falls into one of the listed categories, as the two lists are not the same.

Some proposed actions may fit within more than one CX.  In determining the appropriate CX to use, select the CX that most closely matches the objectives of the proposed action and is the most specific.

Several CXs include acreage limitations (**Appendix 3, *Departmental Categorical Exclusions*** and **Appendix 4, *BLM Categorical Exclusions)*.**  Where multiple treatments are proposed, for instance, consider the total area treated, rather than adding together overlapping acreage of different treatments.  *For example, the BLM CX for vegetation treatment (see **Appendix 4, BLM Categorical Exclusions)** includes an acreage limitation of 1000 acres for vegetation management projects other than prescribed fire.  A proposed action of invasive plant removal on 600 acres, followed by mechanical cutting on 500 overlapping acres does not exceed the 1000-acre limitation. If the mechanical cutting were proposed on 500 acres that did not overlap with the 600 acres of invasive plant removal, the proposed action would exceed the 1000-acre limitation.*

BLM_0009299

**4.2.2    Determining if an Extraordinary Circumstance Precludes Use of a Categorical Exclusion**

Extraordinary circumstances preclude the use of a Departmental or BLM CX.  Extraordinary circumstances are those circumstances for which the Department has determined that further environmental analysis is required for an action, and therefore an EA or EIS must be prepared (516 DM 2.3(A)(3)).  All categorically excluded actions must be subjected to sufficient review to determine if any of the extraordinary circumstances apply (see **Appendix 5, *Categorical Exclusions: Extraordinary Circumstances***).

If any extraordinary circumstances apply, an EA or EIS must be prepared (516 DM 2.3(A)(3)).  While there is no requirement for an interdisciplinary process or public involvement when reviewing whether extraordinary circumstances apply, the decision-maker may choose to do so.

If any of the extraordinary circumstances apply to the proposed action, determine whether the proposal can be modified to alleviate or resolve the circumstances that are considered extraordinary.  If this can be done, and if applicable, the proponent agrees to the change, then the proposed action may be modified and categorically excluded.  If the proposed action cannot be modified or the proponent refuses to accept a proposed change, prepare an EA or EIS.  If an extraordinary circumstance indicates there are significant effects, then an EIS must be prepared (516 DM 4) (see section **7.2, *Actions Requiring an EIS***).

Some actions may require considerable review to determine whether any extraordinary circumstances apply. *For example, a significant impact on a threatened or endangered species is an extraordinary circumstance* (see **Appendix 5, *Categorical Exclusions: Extraordinary Circumstances***). *It might be readily determined that an action would have some effect on a threatened or endangered species (which would not necessarily constitute an extraordinary circumstance). Determining whether that effect would be significant might require considerable review*. If there is uncertainty about whether one or more of the extraordinary circumstances apply, we recommend that you prepare an EA to determine whether an EIS is required.

If none of the extraordinary circumstances apply to the proposed action (or modified action), then it may be categorically excluded.

**4.2.3    Documentation Requirements**

**4.2.3.1    Documentation Requirements When Using Hazardous Fuels and Post-Fire Rehabilitation CXs**

Categorical exclusions for hazardous fuels and post-fire rehabilitation (see **Appendix 3, *Departmental Categorical Exclusions*, #1.12 and #1.13**) have specific documentation requirements. The OEPC requires you to prepare a specific memorandum documenting the use of these two categorical exclusions and documenting the decision to implement the proposed project (DM ESM 03-2).  The documentation must follow the template provided in **Appendix 7, *Documentation Requirements for Hazardous Fuels Actions and Post-Fire Rehabilitation Actions***.  You must include this document in the case or project file.

BLM_0009300

**4.2.3.2      Documentation Requirements When Using CXs Not Established by Statute**

For most actions that are categorically excluded, we recommend that you document which categorical exclusion applies. Documentation would often not be necessary for:

- Actions that have no environmental effect (for example, personnel actions (516 DM 2, Appendix 1 (1.1)) or routine financial transactions (516 DM 2 Appendix 1, (1.3))).
- Actions that have negligible environmental effect (for example, nondestructive data collection (516 DM 2, Appendix 1 (1.6)) or installation of routine signs and markers (516 DM 11.9 (G.2))).  The NEPA Handbook Web Guide provides additional examples and discussion.

If you document which categorical exclusion applies, you must use the form provided in **Appendix 6**, *Categorical Exclusion Documentation Format When Using Categorical Exclusions Not Established by Statute*. This form must be included in the case or project file. This form does not constitute a decision document, and you must issue a decision document that meets program specific guidance.

BLM_0009301

# CHAPTER 5—USING EXISTING ENVIRONMENTAL ANALYSES

General
5.1   Determination of NEPA Adequacy
5.2   Incorporation by Reference and Tiering
5.3   Supplementing an EIS
5.4   Adopting Another Agency's NEPA Analyses

## GENERAL

You may use existing environmental analyses to analyze effects associated with a proposed action, when doing so would build on work that has already been done, avoid redundancy, and provide a coherent and logical record of the analytical and decision-making process.

Address the following questions before using existing environmental analyses:

- Have any relevant environmental analyses related to the proposed action been prepared (for example, LUP/EIS, programmatic EIS)?

- Who prepared or cooperated in the preparation of the analyses (i.e., the BLM or another agency)?

- Do any of the existing analyses fully analyze the proposed actions, alternatives, and effects?

- Are there new circumstances or information that have arisen since the original analysis was conducted?

The answers to these questions will determine the degree to which you might rely on the existing NEPA analyses.  Use of existing analyses may range from considering them as the basis for decision-making (following a Determination of NEPA Adequacy (DNA) or adoption of another agency's NEPA analysis); using components of them (through tiering or incorporation by reference); or supplementing them with new analysis.

BLM_0009302

## 5.1   DETERMINATION OF NEPA ADEQUACY

> A **Determination of NEPA Adequacy** confirms that an action is adequately analyzed in existing NEPA document(s) and is in conformance with the land use plan.

Not all new proposed actions will require new environmental analysis.  In some instances an existing environmental analysis document may be relied upon in its entirety, and new NEPA analysis will not be necessary (516 DM 11.6).  The following are examples of some of the typical situations in which an existing environmental analysis might be relied upon in its entirety.

— *An applicant requests a special recreation permit for a 4-wheel vehicle race on an established route, which is analyzed in an EA, selected in a decision document, and implemented.  Later, another applicant requests a special recreation permit for a motorcycle race on the same route. Review the existing EA to determine if it adequately addresses this similar action and if new information and resource concerns have arisen.*

— *A proposed action for a landscape-scale timber harvest project is analyzed in an EIS and selected in a ROD.  For implementation of a subsequent individual timber sale developed consistent with the ROD, review the EIS to determine if its analysis adequately addresses the specific effects of the individual timber sale.*

You may also use the DNA to evaluate new circumstances or information prior to issuance of a decision to determine whether you need to prepare a new or supplemental analysis (see section **5.3, *Supplementing an EIS***).  For example:

> *A proposed action to construct a road is analyzed in an EIS, but a decision is delayed for several years until funding becomes available.  Before reaching a decision, review the existing EIS to determine if it is still adequate in light of new information and resource concerns that may have arisen in the intervening years.*

To determine if existing documents are adequate, identify and review each relevant environmental document, as described below.

### 5.1.1   Identifying Existing Environmental Documents

A new proposed action may rely on a single or multiple existing NEPA documents. The NEPA documents that may be relevant include:

- EISs associated with BLM Resource Management Plans.
- EISs or EAs associated with Resource Management Plan Amendments.
- EISs or EAs on BLM programmatic actions.
- EISs or EAs associated with BLM activity plans, projects, or permit approval actions.
- EISs or EAs prepared by other agencies, including those on programmatic, land use, and activity or project-specific plans or actions, with the BLM as a cooperating agency.
- EISs or EAs prepared by other agencies without the BLM as a cooperating agency.

BLM_0009303

If the existing document is an EIS or EA prepared by another agency, the BLM must adopt the EIS or EA in order to use it for NEPA compliance. Follow the procedures for adoption rather than a DNA (see section **5.4,** ***Adopting Another Agency's NEPA Analyses***).

### 5.1.2    Reviewing Existing Environmental Documents

Review existing environmental documents and answer the following questions to determine whether they adequately cover a proposed action currently under consideration:

- Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)? Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?

- Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?

- Is the existing analysis valid in light of any new information or circumstances (such as rangeland health standard assessments, recent endangered species listings, updated lists of BLM-sensitive species)? Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?

- Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?

We recommend that your answers be substantive and detailed and contain specific citations to the existing EA or EIS (see section **5.1.3,** ***Document the Review***). If you answer "yes" to all of the above questions, additional analysis will not be necessary. If you answer "no" to any of the above questions, a new EA or EIS must be prepared (516 DM 11.6). However, it may still be appropriate to tier to or incorporate by reference from the existing EA or EIS or supplement the existing EIS (provided that the Federal action has not yet been implemented).

In addition to answering the above questions, evaluate whether the public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action. In general, where the new proposed action has not already been discussed during public involvement for the existing EA or EIS, some additional public involvement for the new proposed action will be necessary. For example,

> *In the example above of a permit for a motorcycle race relying on the existing EA prepared for a 4-wheel vehicle race on the same route, provide some additional public involvement prior a decision on the permit, unless the public involvement for the EA specifically discussed the motorcycle race.*

*In the example above of a timber sale relying on the existing EIS for a landscape-scale timber harvest project, provide some additional public involvement prior a decision on the timber sale, unless the public involvement for the EIS specifically described the individual timber sale.*

*In the example above of a decision on road construction delayed after preparation of an EIS, additional public involvement may or may not be necessary depending on the new information or resource concerns that may have arisen. Evaluate whether additional public involvement would assist in determining whether the existing EIS is still adequate for the action.*

If you conclude that additional public involvement is necessary, the type of public involvement is at the discretion of the decision-maker. Public involvement may include any of the following: external scoping, public notification before or during your review of the existing EA or EIS, public meetings, or public notification or review of a completed DNA Worksheet (see section **5.1.3, *Document the Review***).

Some actions may be appropriate to implement with either a DNA or CX. When the new proposed action is clearly a feature of an action analyzed in an existing NEPA document and the existing analysis remains valid, a DNA would generally be preferable to using a CX, because a DNA would rely on a NEPA analysis to support decision making.

### 5.1.3   Document the Review

The DNA worksheet is not itself a NEPA document. The DNA worksheet documents the review to determine whether the existing NEPA documents can satisfy the NEPA requirements for the proposed action currently under consideration. The DNA worksheet can be found in **Appendix 8, *Worksheet [for] Determination of NEPA Adequacy (DNA)***.

When relying on an existing environmental analysis for a new proposed action, we recommend that you document the review using the DNA worksheet.

When evaluating new circumstances or information prior to issuance of a decision, as described in section **5.1, *Determination of NEPA Adequacy***, you may document your review using the DNA worksheet or in other documents, such as decision documentation or responses to comments. The Web Guide contains examples of completed DNA worksheets.

BLM_0009305

### 5.1.4    FONSIs, Decisions, Protests, and Appeals

If the new proposed action is a feature of the selected alternative analyzed in an existing EA, you do not need to prepare a new FONSI because the existing FONSI already made the finding that the selected alternative would have no significant effects.  However, you must prepare a new FONSI before reaching a decision if the new proposed action is:

1. essentially similar to, but not specifically a feature of, the selected alternative
2. a feature of, or essentially similar to, an alternative that was analyzed in the EA or EIS, but was not selected.

Be sure to evaluate whether the new FONSI must be made available for public review before reaching a decision (see section **8.4.2, *The Finding of No Significant Impact***).

The DNA worksheet is not a decision document.  For a new action for which a DNA has been prepared, you usually must prepare decision documentation consistent with program-specific guidance.

There may be program-specific guidance for public notification of decisions.  Even if there is no program-specific guidance, you may elect to provide public notification of a decision based on a DNA, depending on the public interest in the action and the public involvement that was provided for the existing NEPA analysis.

The signed conclusion in the DNA worksheet is an interim step in the BLM's internal review process and does not constitute an appealable decision.  The decision on the action being implemented may be subject to protest or appeal under 43 CFR Part 4 and program-specific regulations.  See the Web Guide for examples of DNA-level decisions.

## 5.2  INCORPORATION BY REFERENCE AND TIERING

Incorporation by reference and tiering provide opportunities to reduce paperwork and redundant analysis in the NEPA process.  When incorporating by reference, you refer to other available documents that cover similar issues, effects and/or resources considered in the NEPA analysis you are currently preparing.  Incorporation by reference allows you to briefly summarize the relevant portions of these other documents rather than repeat them.

Tiering is a form of incorporation by reference that refers to previous EAs or EISs. Incorporation by reference is a necessary step in tiering, but tiering is not the same as incorporation by reference.  Tiering allows you to narrow the scope of the subsequent analysis, and focus on issues that are ripe for decision-making, while incorporation by reference does not. You may only tier to EAs or EISs, whereas you may incorporate by reference from any type of document.

BLM_0009306

## 5.2.1   Incorporation by Reference

The CEQ regulations direct that:

> Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested parties within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference (40 CFR 1502.21).

Incorporation by reference is useful in preparing both EAs and EISs.  It involves two steps: citation and summarization.

1.  **Cite** the source of the incorporated material.  Give the name of the document and page numbers where the incorporated material can be found.  Make this citation as specific as possible so there is no ambiguity for the reader about what material is being incorporated. If unpublished, state where cited material is available.

2.  **Summarize** the incorporated material.  Briefly describe the content of the incorporated material and place it in the context of the NEPA document at hand.  For example, if analysis is incorporated by reference from one NEPA document into another, summarize the previous analysis, and explain what you conclude based on that previous analysis and how it relates to the action in question.  The summary of the incorporated material must be sufficient to allow the decision-maker and other readers to follow the analysis and arrive at a conclusion.

If a document incorporated by reference is central to the analysis in the EIS, circulate the document for comment as part of the draft.  For example, circulate incorporated material with the draft EIS if it provides the bulk of the analysis, or it addresses effects which are highly controversial, or if it is likely to provide a basis for the decision (see section **9.7.1, *ROD Format***).  In such instances, it may be more appropriate to attach the material as an appendix rather than incorporate it by reference.

Any material may be incorporated by reference, including non-NEPA documents, as long as the material is reasonably available for public inspection.  There are many ways to make incorporated material available for public inspection, such as mailing the material upon request or posting the material on the Internet.  At a minimum, incorporated material must be available for inspection in the applicable BLM office.  If the material is not or cannot be made reasonably available, it cannot be incorporated by reference.  For example, privileged data that are not readily available (such as some seismic data, company financial data, cultural inventories) may be referenced, but not incorporated by reference.  Instead, summarize the information as fully as possible with mention that the privileged information is not available for public review.

BLM_0009307

In addition, other material may be simply referenced in a NEPA document, without being incorporated by reference.  Without following the above procedures for incorporation by reference, such material would not be made part of the NEPA document. It may be appropriate to simply reference material when it provides additional information for the reader, but is not essential to the analysis. If such referenced material is otherwise reasonably available (such as published material including books or journal or newspaper articles), you do not need to make it available for inspection at the BLM office.  If any such material is essential to the analysis in the NEPA document, incorporate it by reference as described above.  See the Web Guide for an example of incorporation by reference.

### 5.2.2   Tiering

Tiering is using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents (40 CFR 1508.28, 40 CFR 1502.20).  This allows the tiered NEPA document to narrow the range of alternatives and concentrate solely on the issues not already addressed.  Tiering is appropriate when the analysis for the proposed action will be a more site-specific or project-specific refinement or extension of the existing NEPA document.

Before you tier to a NEPA document, evaluate the broader NEPA document to determine if it sufficiently analyzed site-specific effects and considered the current proposed action.  If so, a DNA will be more appropriate than a subsequent, tiered NEPA document (see section **5.1, Determination of NEPA Adequacy**).

When preparing a tiered NEPA document:

1.   state that it is tiered to another NEPA document;
2.   describe the NEPA document to which it is tiered; and
3.   incorporate by reference the relevant portions of the NEPA document to which it is tiered (cite and summarize, as described in section **5.2.1, Incorporation by Reference**).

You may tier to a NEPA document for a broader action when the narrower action is clearly consistent with the decision associated with the broader action.  In the tiered document, you do not need to reexamine alternatives analyzed in the broader document.  Focus the tiered document on those issues and mitigation measures specifically relevant to the narrower action but not analyzed in sufficient detail in the broader document.

Tiering can be particularly useful in the context of the cumulative impact analysis.  A programmatic EIS will often analyze the typical effects anticipated as a result of the individual actions that make up a program, as well as the total effects of the overall program.  An EA prepared in support of an individual action can be tiered to the programmatic EIS.  You may prepare an EA for an action with significant effects, whether direct, indirect or cumulative, if the EA is tiered to a broader EIS which fully analyzed those significant effects. Tiering to the programmatic EIS would allow the preparation of an EA and FONSI for the individual action, so long as the remaining effects of the individual action are not significant.  If there are new circumstances or information that would result in significant effects of an individual action not considered in the EIS, tiering to the EIS cannot provide the necessary analysis to support a FONSI for the individual action (see sections **7.1, Actions Requiring an EA**, and **8.4.2, The Finding of No Significant Impact (FONSI)**).

BLM_0009308

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

Note that in some instances, a broader EIS might fully analyze significant effects on some resources affected by the individual action, but not all resources.  The tiered EA for the individual action need not re-analyze the effects on resources fully analyzed in the broader EIS, but may instead focus on the effects of the individual action not analyzed in the broader EIS. The FONSI for such an individual action could rely on the analysis in the broader EIS as well as the tiered EA, and would explain which parts of the EIS it is relying upon.  An EIS would need to be prepared for the individual action only if there are significant effects that have not been analyzed in the broader EIS.

For example:

> *If an LUP EIS analyzed the effects of a typical individual juniper control project and the total effects of a juniper control program, an individual juniper control project implemented as part of that overall program would generally be expected to have no significant effects, beyond those already analyzed in the LUP EIS.*

In such instances, focus the EA on determining if, and how, any new circumstances or information would change the effects anticipated by the EIS. The EA in such instances may also consider mitigation of effects analyzed in the EA or already analyzed in the broader EIS, including reducing or avoiding effects that are not significant.

The following are examples of some of the typical situations in which tiering is appropriate.

–  *LUP/EIS tiered to a programmatic EIS:  tiering the analysis of a proposed grazing program in an LUP to the programmatic EIS for regulations for the fundamentals of rangeland health.  Tiering to the programmatic EIS would allow the LUP EIS to exclude alternatives that would establish grazing at levels that would not achieve the fundamentals of rangeland health.*

–  *Activity Plan NEPA document tiered to a LUP/EIS:  tiering an allotment management plan EA to the analysis in the LUP/EIS that analyzed the effects of the livestock management objectives and management actions for the area.  Tiering to the LUP EIS would allow the allotment management plan EA to exclude alternatives that would set grazing levels different than those established in the LUP EIS.*

–  *Project-specific NEPA document tiered to Activity Plan NEPA: tiering an EA for building a fence to an allotment management plan EA.  (Note that this action may sometimes be appropriate with a DNA, as described in Sec. 5.1.)  If the allotment management plan decided to use fencing, as opposed to reducing grazing levels, to exclude cows from riparian areas, tiering to the allotment management plan EA would allow the fence EA to exclude alternatives that would reduce grazing levels to reduce riparian impacts.*

–  *Project-specific NEPA document tiered to a LUP/EIS:  in the absence of an allotment management plan, tiering an EA for building a fence to the general analysis of fencing in the grazing section of the LUP/EIS. (Note that this action may sometimes be appropriate with a DNA, as described in section **5.1, Determination of NEPA Adequacy**).*

BLM_0009309

## 5.3  SUPPLEMENTING AN EIS

"Supplementation" has a particular meaning in the NEPA context. The Supreme Court has explained that supplementation of an EIS is necessary only if there remains major Federal action to occur.  (See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)).  In the case of a land use plan, implementation of the Federal action is the signing of a Record of Decision. You must prepare a supplement to a draft or final EIS if, after circulation of a draft or final EIS but prior to implementation of the Federal action:

- you make substantial changes to the proposed action that are relevant to environmental concerns (40 CFR 1502.9(c)(1)(i));
- you add a new alternative that is outside the spectrum of alternatives already analyzed (see Question 29b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)*; or
- there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects (40 CFR 1502.9(c)(1)(ii)).

A supplemental EIS must provide a basis for rational decision-making and give the public and other agencies an opportunity to review and comment on the analysis of the changes or new information (40 CFR 1502.9(c)(4)).  Supplementing is used to meet the purposes of the NEPA as efficiently as possible, avoiding redundancy in the process.

Supplementation is a process applied only to draft and final EISs, not EAs. If you make changes to the proposed action; add an alternative outside the spectrum of those already analyzed; or if new circumstances or information arise that alters the validity of an EA analysis prior to the implementation of the Federal action, prepare a new EA.

### 5.3.1   When Supplementation is Appropriate

"Substantial changes" in the proposed action may include changes in the design, location, or timing of a proposed action that are relevant to environmental concerns (i.e., the changes would result in significant effects outside of the range of effects analyzed in the draft or final EIS).

Adding a new alternative analyzed in detail requires preparation of a supplement if the new alternative is outside the spectrum of alternatives already analyzed and not a variation of an alternative already analyzed. For example:

> *Comments on a draft EIS for a transmission line right-of-way suggest an entirely new route for the right-of-way that would be a reasonable alternative.  The new route would result in effects outside the range of effects analyzed in the draft.  Prepare a supplemental draft EIS to analyze this new route.*

BLM_0009310

Describing additional alternatives that are considered but eliminated from detailed analysis does not require supplementation.

"New circumstances or information" are "significant" and trigger the need for supplementation if they are relevant to environmental concerns and bearing on the proposed action and its effects (i.e., if the new circumstances or information would result in significant effects outside the range of effects already analyzed). New circumstances or information that trigger the need for supplementation might include the listing under the Endangered Species Act of a species that was not analyzed in the EIS; development of new technology that alters significant effects; or unanticipated actions or events that result in changed circumstances, rendering the cumulative effects analysis inadequate.

### 5.3.2    When Supplementation is Not Appropriate

Supplementation is not necessary if you make changes in the proposed action that are not substantial (i.e., the effects of the changed proposed action are still within the range of effects analyzed in the draft or final EIS).

If a new alternative is added after the circulation of a draft EIS, supplementation is not necessary if the new alternative lies within the spectrum of alternatives analyzed in the draft EIS or is a minor variation of an alternative analyzed in the draft EIS. In such circumstances, the new alternative may be added in the final EIS. For example:

> *A draft EIS for an oil field development project analyzed the effects of drilling 500, 1,000, and 5,000 wells. The addition of a 3,000-well alternative could be analyzed in the final EIS without a supplemental draft EIS.*

Supplementation is not appropriate when new information or changed circumstances arise after the Federal action has been implemented. If the new information or changed circumstances impedes the use of the EIS for subsequent tiering for future decision-making, prepare a new EIS or EA and incorporate by reference relevant material from the old EIS. For example:

> *An EIS for an oil field development project is prepared and a decision issued. EAs or EISs prepared for subsequent applications of permit to drill (if they cannot be categorically excluded) are tiered to the field development EIS. New drilling technology developed after the preparation of the EIS results in significant impacts not analyzed in the field development EIS. These changed circumstances do not require that the field development EIS be supplemented. However, because the EAs or EISs for applications of permit to drill need the EIS for tiering, you may wish to prepare a new field development EIS.*

When new circumstances or information arise prior to the implementation of the Federal action, but your evaluation concludes that they would not result in significant effects outside the range of effects already analyzed, document your conclusion and the basis for it. If the new circumstances or information arise after publication of a draft EIS, document your conclusion in the final EIS. If the new circumstances or information arise after publication of the final EIS, document your conclusion in the ROD.

BLM_0009311

### 5.3.3   The Supplementation Process

Supplemental EISs will vary in scope and complexity depending upon the nature of the proposed changes or new information or circumstances.  Supplemental EISs are prepared, circulated, and filed with the same requirements as EISs, except that supplemental EISs do not require scoping (40 CFR 1502.9) (see section **9.5, *Supplements to Draft and Final EISs***).  A supplemental EIS may incorporate by reference the relevant portions of the EIS being supplemented or may circulate the entire EIS along with the supplemental EIS.

When a supplement is prepared after circulation of a draft EIS, but before preparation of a final EIS, you must prepare and circulate a draft supplemental EIS and then prepare a final EIS. When a supplement is prepared after circulation of a final EIS, you must prepare and circulate a draft supplemental EIS and then prepare and circulate a final supplemental EIS, unless alternative procedures are approved by the CEQ (40 CFR 1502.9(c)(4)).  Consult with the OEPC and the Office of the Solicitor before proposing alternative arrangements to the CEQ.

## 5.4   ADOPTING ANOTHER AGENCY'S NEPA ANALYSES

If an EIS or EA prepared by another agency is relevant to a BLM proposed action, you may prepare a new EIS or EA and incorporate by reference the applicable portions of the other agency's document (see section **5.2.1, *Incorporation by Reference***).  Or you may adopt an EIS or EA prepared by another agency, after following certain steps described below.

### 5.4.1   Adopting Another Agency's EIS

You may use another agency's EIS for BLM decision-making after adopting the EIS. "An agency may adopt a Federal draft or final [EIS] or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these [the CEQ] regulations" (40 CFR 1506.3(a)).  Adopting another agency's EIS reduces paperwork, eliminates duplication, and makes the process more efficient.  You may adopt an EIS that meets all CEQ, DOI, and BLM requirements for preparation of an EIS.  You must prepare your own ROD on adopted EISs (Question 30, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).

If the BLM is a cooperating agency in the preparation of an EIS, you may adopt it without recirculating the EIS if you conclude that your comments and suggestions have been satisfied (40 CFR 1506.3(c)).  For example:

> *The Forest Service, with the BLM as a cooperator, prepared an EIS for the Biscuit Fire Recovery Project, which addressed actions on both Forest Service and BLM-managed lands in Oregon.  The BLM adopted the EIS and prepared a separate ROD for actions on BLM-managed lands.*

BLM_0009312

32

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

If the BLM is not a cooperating agency in the preparation of an EIS, you may adopt it after recirculating the document consistent with the following requirements:

- If the BLM proposed action is substantially the same as the action covered by the other agency's EIS, you can adopt the EIS after recirculating the document as a final EIS. When recirculating the final EIS, you must identify the BLM proposed action (40 CFR 1506.3(b)).

- If the BLM adopts an EIS that is not final within the agency that prepared it, or if the action the EIS assesses is the subject of a referral or if the adequacy of the EIS is the subject of judicial action that is not final, the BLM must indicate its status in the recirculated draft and final EIS (40 CFR 1506.3(c)).

### 5.4.2    Adopting Another Agency's EA

You may use another agency's EA for a BLM FONSI and BLM decision-making after adopting the EA, consistent with the following requirements (see *CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)):

- The BLM must independently evaluate the information contained in the EA, and take full responsibility for its scope and content. You must evaluate the information contained in the EA to ensure that it adequately addresses environmental impacts of the BLM's proposed action and ensure that the EA to be adopted satisfies the BLM's own NEPA procedures. If the BLM has acted as a cooperating agency, you must ensure that any concerns which it has raised during the process of preparing the EA have been adequately addressed (*CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)). An interdisciplinary team may be useful in evaluating another agency's EA for adoption.

- If you conclude that environmental impacts are adequately addressed, you must issue your own FONSI to document your formal adoption of the EA, and your conclusions regarding the adequacy of the EA (*CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)). In certain limited circumstances, you must publish or otherwise make the FONSI available for public review for thirty days (see section **8.4.2, *The Finding of No Significant Impact***).

- You must prepare your own decision record in accordance with program-specific requirements following adoption of the EA and the issuance of the FONSI (see section **8.5, *The Decision Record***).

BLM_0009313

# CHAPTER 6—NEPA ANALYSIS

General
6.1   Outline of Analytical Steps
6.2   Purpose and Need
6.3   Scoping
6.4   Issues
6.5   Proposed Action
6.6   Alternatives Development
6.7   Affected Environment and Use of Relevant Data
6.8   Environmental Effects
6.9   Public Involvement and Responding to Comments

## GENERAL

There are a variety of ways to comply with the NEPA; the scope of your analysis and documentation will depend on your proposal and its environmental effects.  This chapter is broadly focused on NEPA analysis, not on documentation requirements. The CEQ regulations prescribe specific steps for the preparation of an EIS.  The process of preparing an EA is more flexible. This chapter describes NEPA concepts and outlines typical steps of NEPA analysis.  For detailed documentation and format requirements for EAs and EISs, see **Chapter 8,** *Preparing an Environmental Assessment* and **Chapter 9,** *Preparing an Environmental Impact Statement.*

While the NEPA process is much the same for all BLM actions, some programs have specific requirements for NEPA analysis. Become aware of and consult program-specific guidance when beginning the NEPA process.

## 6.1   OUTLINE OF ANALYTICAL STEPS

For an internally generated project (one in which the BLM is developing the proposed action), the usual analytical steps for an EA or EIS are as follows:

- Identify the purpose and need for action and describe the proposed action to the extent known.
- Develop a scoping strategy and conduct scoping.
- Identify issues requiring analysis.
- Refine the proposed action.
- Develop reasonable alternatives to the proposed action.
- Identify, gather and synthesize data.
- Analyze and disclose the impacts of each alternative.
- Identify potential mitigation measures to reduce adverse impacts.

Many of these steps are iterative; for example, developing alternatives may lead to the identification of additional issues requiring analysis.  At several points in the process, you may loop back to an earlier step to make refinements.

BLM_0009314

34
    H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

For an externally generated project (one in which a non-BLM party has developed a proposed action), the analysis steps are the same except that the first step in the process is when you accept a proposal regarding an action to be taken, and move forward into NEPA analysis.

**Figure 6.1   The NEPA Process**



# The NEPA Process

Identify the purpose and need for action and describe the proposed action to the extent known.

Scoping

This flow chart outlines the general process for NEPA compliance. Public involvement may occur throughout this process. Additionally, NEPA is iterative and you may revisit some of these steps throughout your process.

Identify issues for analysis

Refine proposed action

Develop alternatives to the proposed action

Eliminate alternatives that do not require detailed analysis

Gather data and analyze the reasonable alternatives

Describe the environmental effects of the alternatives

Identify mitigation measures

Implement and monitor

BLM_0009315

## 6.2   PURPOSE AND NEED

The CEQ regulations direct that an EIS "…shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action" (40 CFR 1502.13).  The CEQ regulations also direct that EAs "…shall include brief discussions of the need for the proposal…" (40 CFR 1508.9(b)).

The CEQ regulations do not differentiate the "purpose" of the action from the "need" for the action.  However, distinguishing the "purpose" and the "need" as two separate aspects of the purpose and need statement may help clarify why the BLM is proposing an action.  For many types of actions, the "need" for the action can be described as the underlying problem or opportunity to which the BLM is responding with the action.  The "purpose" can be described as a goal or objective that we are trying to reach.  Often, the "purpose" can be presented as the solution to the problem described in the "need" for the action.  *For example, the "need" for a culvert replacement project might describe how the existing culvert blocks fish passage; the "purpose" might be to replace the culvert with one that allows fish passage.*

Regardless of whether the "purpose" and the "need" are treated as distinct or synonymous, the purpose and need statement as a whole describes the problem or opportunity to which the BLM is responding and what the BLM hopes to accomplish by the action.

We recommend that the purpose and need statement be brief, unambiguous, and as specific as possible.  Although the purpose and need statement cannot be arbitrarily narrow, you have considerable flexibility in defining the purpose and need for action.  To the extent possible, construct the purpose and need statement to conform to existing decisions, policies, regulation, or law.  The purpose and need for the action is usually related to achieving goals and objectives of the LUP; reflect this in your purpose and need statement.

The purpose and need statement for an externally generated action must describe the BLM purpose and need, not an applicant's or external proponent's purpose and need (40 CFR 1502.13).  The applicant's purpose and need may provide useful background information, but this description must not be confused with the BLM purpose and need for action.  The BLM action triggers the NEPA analysis.  It is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision.  See the Web Guide for examples of purpose and need statements.

> The purpose and need statement should explain why the BLM is proposing action.  Note that you must describe the purpose and need for the **action**, not the purpose and need for the document.

BLM_0009316

### 6.2.1    The Role of the Purpose and Need Statement

We recommend that you draft your purpose and need statement early in the NEPA process. Including a draft purpose and need statement with scoping materials will help focus internal and external scoping comments.  Reexamine and update your purpose and need statement as appropriate throughout the NEPA process, especially when refining the proposed action and developing alternatives.

A carefully crafted purpose and need statement can be an effective tool in controlling the scope of the analysis and thereby increasing efficiencies by eliminating unnecessary analysis and reducing delays in the process.  The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action (see section **6.6.1, *Reasonable Alternatives***).  The broader the purpose and need statement, the broader the range of alternatives that must be analyzed.  The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative.  Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

*For example, in the culvert replacement example above (see section **6.2, Purpose and Need**), the scope of the analysis would be narrowed by describing a more specific "purpose" of replacing the existing culvert to allow cutthroat trout fish passage in the spring; reasonable alternatives might include analyzing various culvert sizes, or moving the culvert.  Conversely, the scope of the analysis would be broadened by describing a more general "purpose" of improving fish passage; reasonable alternatives might include culvert removal and road decommissioning.*

Examples of purpose and need statements and related decisions are found in the next section, **6.2.2, *The Decision to be Made***, and examples of combined and separated purpose and need statements can be found in the Web Guide.

### 6.2.2    The Decision to be Made

You may include in the purpose and need statement a description of your decision(s) to be made based on the NEPA analysis. Tying the purpose and need for your proposal to your decision helps establish the scope for the NEPA analysis.  A clear explanation of the decision(s) at hand is also helpful in public involvement; it helps to set expectations and explain the focus of the BLM's NEPA analysis.  In describing the BLM's decision(s) to be made, you must retain the flexibility to select among alternatives that meet the purpose and need, and are within the BLM's jurisdiction (40 CFR 1506.1(a)(2)). As with the purpose and need, the description of the decision(s) to be made may be broad or narrow.

BLM_0009317

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

For externally generated actions, the description of the decision(s) to be made helps differentiate your role in the action from the external proponent's role.  For NEPA documents prepared with cooperating agencies with jurisdiction by law, we recommend that you explicitly identify the decisions to be made by each agency (see section **12.1, *Cooperating Agency Status in Development of NEPA Documents***).

> **Jurisdiction by law** means another governmental entity (Tribal, Federal, State, or local agency) has authority to approve, veto, or finance all or part of a proposal (40 CFR 1508.15). The CEQ regulations provide for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

*Examples:*

The following examples are adapted from actual BLM actions.  These are not intended to provide a template to be copied, but as examples for general consideration.  Because the purpose and need statement controls the scope of the analysis and is directly tied to the eventual rationale for selection, it is important that the purpose and need statement be tailored to the specific action in question.

An externally generated implementation action.  *The purpose of the action is to provide the owners of private land located in Township X South, Range X West, Section X, with legal access across public land managed by the BLM.  The need for the action is established by the BLM's responsibility under FLPMA to respond to a request for a Right-of-Way Grant for legal access to private land over existing BLM roads and a short segment of new road to be constructed across public land.*
Decision to be made**:** The BLM will decide whether or not to grant the right of way, and if so, under what terms and conditions.

An internally generated implementation action.  *The purpose of the action is to modify current grazing practices on the X Allotment by adjusting timing and levels of livestock use so that progress can be made toward meeting the fundamentals of rangeland health.  The need for the action is that fundamentals of rangeland health are not being met for watersheds, riparian areas, and threatened and endangered plants in the X Allotment, based on a current assessment.  Active erosion is evident and exotic annual grasses dominate the understory.  The assessment found that current livestock grazing management practices do not meet the fundamentals of rangeland health.*
Decision to be made**:** The BLM will decide whether or not to issue a grazing permit with modifications from the current permit.

A Land Use Plan revision**,** *(Note: this example is abbreviated from the detail that would customarily be appropriate for revision of an LUP).  The purpose of the X Field Office LUP revision is to ensure that public lands are managed according to the principles of multiple use identified in FLPMA while maintaining the valid existing rights and other obligations already established.  The need for the action is that changing resource demands and technology have changed the type and level of impacts to various resources, as detailed in the LUP evaluation.  Specifically, the emergence of new exploration and extraction technologies in oil and gas*

BLM_0009318

*development may result in impacts not previously analyzed. Alternatives will address the availability of unleased lands for future oil and gas leasing; potential stipulations to be attached to new leases or leases to be reoffered if existing leases are relinquished; and mitigation measures to be considered in reviewing applications for permits to drill. This need is limited, because most oil and gas resources in the planning area have already been leased, and the LUP revision will maintain valid existing rights. The LUP evaluation also noted other changes in resource conditions and uses that could result in impacts not previously analyzed.*

Decision to be made:  The BLM will revise the LUP and identify areas available for oil and gas leasing, leasing stipulations, and mitigation measures to consider in reviewing applications for permits to drill.

## 6.3  SCOPING

Scoping is the process by which the BLM solicits internal and external input on the issues, impacts, and potential alternatives that will be addressed in an EIS or EA as well as the extent to which those issues and impacts will be analyzed in the NEPA document. Although it is not required, you may also elect to scope for issues and impacts

> "There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.  This process shall be termed scoping." (40 CFR 1501.7)

associated with actions under CX or DNA review.  Begin considering cumulative impacts during the scoping process; use scoping to begin identifying actions by others that may have a cumulative effect with the proposed action, and identifying geographic and temporal boundaries, baselines and thresholds.  Scoping also helps to begin identifying incomplete or unavailable information and evaluating whether that information is essential to a reasoned choice among alternatives.

Scoping is one form of public involvement in the NEPA process.  Scoping occurs early in the NEPA process and generally extends through the development of alternatives. (The public comment period for a DEIS or public review of an EA are not scoping).

Developing the purpose and need statement will enhance the scoping process, even if you have not yet fully developed a proposed action. A preliminary purpose and need statement will allow BLM staff, other agencies, and the public to give more focused input on issues or the proposal. Additionally, sharing what is known about the No Action alternative and the consequences of not meeting the need for action may facilitate effective scoping comments.

BLM_0009319

## 6.3.1     Internal Scoping

Internal scoping is simply the use of BLM and cooperating agency staff to help determine what needs to be analyzed in a NEPA document.  Internal scoping is an interdisciplinary process; at a minimum, use scoping to define issues, alternatives, and data needs.  Additionally, this is an opportunity to identify other actions that may be analyzed in the same NEPA document.  You may use internal scoping to:

- • formulate and refine the purpose and need.
- • identify any connected, cumulative, or similar actions associated with the proposal.
- • start preparation for cumulative effects analysis.
- • decide on the appropriate level of documentation.
- • develop a public involvement strategy.
- • decide other features of the NEPA process.

## 6.3.2     External Scoping

External scoping involves notification and opportunities for feedback from other agencies, organizations, tribes, local governments, and the public.  You do not need to conduct external scoping at the same time as internal scoping; frequently you first conduct some internal scoping to develop a preliminary range of alternatives and issues.  These alternatives and issues may then be shared during external scoping, and you will likely build upon these preliminary issues as scoping continues.

External scoping can be used to identify coordination needs with other agencies; refine issues through public, tribal and agency feedback on preliminary issues; and identify new issues and possible alternatives.  Tribal consultation centers on established government-to-government relationships, and it is important that you allow sufficient time and use the appropriate means of contacting tribes when conducting scoping.  External scoping serves to build agency credibility and promote constructive dialogue and relations with tribes, agencies, local governments and the public.

The CEQ regulations mandate external scoping for EISs, and such scoping has formal requirements (see section **9.1.3, *Scoping***).  The time-limited scoping period that follows the publication of a Notice of Intent to prepare an EIS is referred to as formal scoping.  However, you should not limit scoping for an EIS to the formal scoping period.

External scoping for EAs is optional.  See section **8.3.3, *Scoping and Issues*** for a discussion of when external scoping is appropriate for an EA.

BLM_0009320

External scoping may help identify alternatives to the proposed action, as well as refine the proposed action.  External scoping may result in refinement of issues for analysis.  Preliminary issues may be clarified and new issues identified in the external scoping process.  You will use external scoping to begin identifying past, present, and reasonably foreseeable actions by others that could have a cumulative effect together with the BLM action (see section **6.8.3.4, *Past, Present, and Reasonably Foreseeable Actions***).  External scoping can be used to identify permits, surveys, or consultations required by other agencies.  Scoping may also generate information that may be used during the permitting or consultation process.

External scoping methods include but are not limited to:  *Federal Register* notices, public meetings, field trips, direct mailing, media releases, newsletters, NEPA registers, and email notifications.  You may also seek help from other agencies, organizations, tribes, local governments, and the public in identifying interested parties that may not yet have been reached by scoping efforts.

## 6.4  ISSUES

The CEQ regulations provide many references to "issues," though the regulations do not define this term explicitly.  At 40 CFR 1501.7(a)(2), 40 CFR 1501.7(a)(3), 40 CFR 1502.1 and 1502.2(b), the CEQ explains that issues may be identified through scoping and that only significant issues must be the focus of the environmental document .  Significant issues are those related to significant or potentially significant effects (see section **7.3, *Significance***).

For the purpose of BLM NEPA analysis, an "issue" is a point of disagreement, debate, or dispute with a proposed action based on some anticipated environmental effect.  An issue is more than just a position statement, such as disagreement with grazing on public lands.  An issue:

- has a cause and effect relationship with the proposed action or alternatives;
- is within the scope of the analysis;
- has not be decided by law, regulation, or previous decision; and
- is amenable to scientific analysis rather than conjecture.

Issues point to environmental effects; as such, issues can help shape the proposal and alternatives. (For externally generated proposals, the proposed action is not developed through scoping, but other action alternatives are).  Issues may lead to the identification of design features that are incorporated into the proposed action (see section **6.5.1.1, *Design Features of the Proposed Action***) or mitigation measures (see section **6.8.4, *Mitigation and Residual Effects***).

> "Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."  (40 CFR 1500.1(b))

BLM_0009321

## 6.4.1   Identifying Issues for Analysis

Preliminary issues are frequently identified during the development of the proposed action through internal and external scoping.   Additionally, supplemental authorities that provide procedural or substantive responsibilities relevant to the NEPA process may help identify issues for analysis.  See **Appendix 1**, ***Supplemental Authorities to be Considered***, for a list of some common supplemental authorities.  There is no need to make negative declarations regarding resources described in supplemental authorities that are not relevant to your proposal at hand.

While many issues may arise during scoping, not all of the issues raised warrant analysis in an EA or EIS.  Analyze issues raised through scoping if:

- Analysis of the issue is necessary to make a reasoned choice between alternatives. That is, does it relate to how the proposed action or alternatives respond to the purpose and need? (See section **6.6, *Alternatives Development***).

- The issue is significant (an issue associated with a significant direct, indirect, or cumulative impact, or where analysis is necessary to determine the significance of impacts).

When identifying issues to be analyzed, it is helpful to ask, "Is there disagreement about the best way to use a resource, or resolve an unwanted resource condition, or potentially significant effects of a proposed action or alternative?"  If the answer is "yes," you may benefit from subjecting the issue to analysis.

> Entire resources cannot be issues by themselves, but concerns over how a resource may be affected by the proposal can be issues.

It is useful to phrase issues in the form of questions, as this can help maintain the focus of the analysis, which would need to answer the questions. For example:

*The BLM is analyzing the construction and operation of a wind farm on public lands.  "Wildlife" is not considered an issue—this is too broad for reasonable analysis, and it is not clearly related to the effects of the action.  We suggest, "What would be the effect of the alternatives on sage grouse nesting?" as a more explicit issue statement.*

[The Web Guide contains examples of issues identified for analysis.](#)

BLM_0009322

42

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

### 6.4.2   Issues Not Analyzed

You need not analyze issues associated with the proposed action that do not meet the criteria described in section **6.4.1.**, ***Identifying Issues for Analysis.***  We recommend that you document such externally generated issues along with rationale for not analyzing them in the administrative record or in the EA or EIS itself.  You have more flexibility in tracking internally generated issues.  For example, in a preliminary brainstorming session, it may not be important to record all issues raised.  However, if after careful and detailed consideration you determine not to analyze an internally-generated issue, we recommend that you document the reasons in the administrative record, or in the EA or EIS.  The detail used to explain why an issue was not analyzed is largely dependent on how the issue was presented and why you are not analyzing it.  See the Web Guide for an example of how issues not analyzed can be treated in a NEPA document.

### 6.5   PROPOSED ACTION

The CEQ regulations state that a "proposal" exists at that stage in the development of an action when an agency subject to the NEPA has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated (40 CFR 1508.23).  A "proposed action" may be described as a proposal for the BLM to authorize, recommend, or implement an action to address a clear purpose and need, and may be generated internally or externally.

When developing the proposed action, it is important to understand how it will be used in the environmental analysis.  You can use a preliminary description of the proposed action during scoping to focus public involvement.  The proposed action is one possible option to meet the purpose and need.  Alternatives are developed to consider different reasonable paths to take to accomplish the same purpose and need as the proposed action.

The level of detail used to describe a proposed action will vary by the nature and stage of the project.  For example, the level of detail available at the beginning of a project may be very limited, but details will be better defined after scoping.  The details and description of a proposed action in a programmatic analysis will be different than one in the analysis of a site-specific implementation action.  The level of detail used in describing the proposed action will influence the specificity of the analysis and the assumptions made in analyzing the environmental consequences.  The Web Guide contains example descriptions of Proposed Actions.

BLM_0009323

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## 6.5.1   Description of the Proposed Action

A detailed description of the proposed action at the outset of the analysis process is beneficial for many reasons.  Clearly described proposed actions can result in:

- more focused and meaningful public input.
- more focused and meaningful internal (BLM) participation.
- more complete identification of issues.
- development of reasonable alternatives.
- sound analysis and interpretation of effects.
- focused analysis.
- a sound and supportable decision.

Detailed descriptions of proposed actions usually include five elements:

1.  Who     "Who" is the Federal agency that is going to guide the analysis and make the decision.  Even for externally proposed projects, you will be making the decision to authorize or recommend an action.  For externally proposed projects, it is important to identify the external proponent and their role in implementing your decision.

2.  What    "What" is the specific activity or activities proposed. You must provide sufficient detail in the description of the activities so that the effects of the proposed action may be compared to the effects of the alternatives, including the No Action alternative (40 CFR 1502.14(b)).  That comparison provides the clear basis for choice by the decision-maker.

3.  How     "How" relates to the specific means by which the proposal would be implemented.  Include project design features, including construction activities, operations, and schedules.  It may also be appropriate to include maps, photographs, and figures.  Means, measures, or practices to reduce or avoid adverse environmental impacts may be included in the proposed action as design features (see section **6.5.1.1, *Design Features of the Proposed Action***).

4.  When    "When" is the timeframe in which the project will be implemented and completed.  If the proposed action has identifiable phases, describe the duration of those phases.  The timing for monitoring integral to the proposed action should also be described.

5.  Where   "Where" is the location(s) where the proposed action will be implemented and should be described as specifically as possible.  Maps at a relevant scale may be provided to support the narrative.

BLM_0009324

#### 6.5.1.1    Design Features of the Proposed Action

Design features are those specific means, measures or practices that make up the proposed action and alternatives. You may identify design features, especially those that would reduce or eliminate adverse effects after the initial formulation of alternatives, as the impact analysis is being conducted. In this situation, you may add these design features to the proposed action or alternatives. Standard operating procedures, stipulations, and best management practices are usually considered design features. For example, *if the proposed action sites a reserve pit for drilling fluids away from areas of shallow groundwater, this is a design feature, not mitigation.*

Because the formulation of alternatives and the impact analysis is often an iterative process, you might not be able to identify the means, measures or practices until the impact analysis is completed. If any means, measures, or practices are not incorporated into the proposed action or alternatives, they are considered mitigation measures (see section **6.8.4**, *Mitigation and Residual Effects*).

**Figure 6.2  Design Features and Mitigation Measures**



### 6.5.2    Defining the Scope of Analysis of the Proposed Action

After initial development of the proposed action, evaluate whether there are connected or cumulative actions that you must consider in the same NEPA document (40 CFR 1508.25). In addition, evaluate whether there are similar actions that you wish to discuss in a single NEPA document. The CEQ regulations refer only to an EIS in discussion of including connected, cumulative, and similar actions in a single EIS. For an EA, we recommend that you consider connected or cumulative actions in the same EA, and similar actions may be discussed at your discretion. Considering connected or cumulative actions in a single EA is particularly important in the evaluation of significance (see section **7.3**, *Significance*).

BLM_0009325

#### 6.5.2.1   Connected Actions

Connected actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR 1508.25 (a)(1)).  Actions are connected if they automatically trigger other actions that may require an EIS; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification (40 CFR 1508.25 (a)(i, ii, iii)).  Connected actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not connected actions, but may need to be analyzed in cumulative effects analysis if they are reasonably foreseeable.

If the connected action is also a proposed BLM action, we recommend that you include both actions as aspects of a broader "proposal" (40 CFR 1508.23), analyzed in a single NEPA document. You may either construct an integrated purpose and need statement for both the proposed action and the connected action, or you may present separate purpose and need statements for the proposed action and the connected action. Regardless of the structure of the purpose and need statement(s), you must develop alternatives and mitigation measures for both actions (40 CFR 1508.25(b)), and analyze the direct, indirect, and cumulative effects of both actions (40 CFR 1508.25(c)).

For example,
> *The BLM proposes prescribed burning to attain desired vegetation characteristics. The BLM also proposes subsequent seeding of the same site to contribute to attaining those same desired vegetation characteristics, which is a connected action. We recommend that you include the prescribed burning and seeding as aspects of a broader proposal, analyzed in a single NEPA document.*

If the connected action is an action proposed by another Federal agency, you may include both actions as aspects of a broader proposal analyzed in a single NEPA document, as described above. Evaluate whether a single NEPA document would improve the quality of analysis and efficiency of the NEPA process, and provide a stronger basis for decision-making.  Also consider the timing of the other agency action and the capabilities of the other agency to act as a cooperating agency or joint lead agency (see sections **12.1 *Cooperating Agency Status in Development of NEPA Documents*** and **12.2 *Joint Lead Agencies in Development of NEPA Documents***).

For example,
> *The BLM proposes constructing a trail to provide recreation access to BLM-managed lands from a campground the Forest Service proposes to construct on adjacent Forest Service lands. The Forest Service campground construction is a connected action. You and the Forest Service may elect to include the BLM trail construction and the Forest Service campground construction as aspects of a broader proposal, analyzed in a single NEPA document, either as joint lead agencies, or with one agency as lead and the other as cooperating.*

BLM_0009326

46
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

If you do not include the connected action with the proposed action as aspects of a broader proposal analyzed in a single NEPA document, you must, at a minimum, demonstrate that you have considered the connected action in the NEPA document for the proposed action (40 CFR 1508.25) (i.e., describe the connected action and its relationship to the proposed action, including the extent to which the connected action and its effects can be prevented or modified by BLM decision-making on the proposed action). In this case, a separate NEPA document would need to be prepared for the connected action. It may be useful to incorporate by reference portions of the NEPA document completed for the connected action, if available, into the NEPA document for the proposed action.

A non-Federal action may be a connected action with a BLM proposed action. The consideration of a non-Federal connected action is limited in your NEPA analysis, because the NEPA process is focused on agency decision making (40 CFR 1500.1(c), 40 CFR 1508.18, 40 CFR 1508.23). Therefore, you are not required to include a non-Federal connected action together with a BLM proposed action as aspects of a broader proposal, analyzed in a single NEPA document. Proposals are limited to Federal actions (40 CFR 1508.23). You would not have to develop or present the purpose and need for the non-Federal action, and you are not required to consider alternatives available to the non-Federal party for its action. If there are effects on BLM managed resources, it may be useful to develop and suggest alternatives or mitigation for those non-Federal connected actions (see **section 6.8.4, *Mitigation and Residual Effects***).

As with a Federal connected action, you must, at a minimum, demonstrate that you have considered the non-Federal connected action in the NEPA document for the proposed action (40 CFR 1508.25) (i.e., describe the connected action and its relationship to the proposed action, including the extent to which the connected action and its effects can be prevented or modified by BLM decision-making on the proposed action).

If the connected non-Federal action and its effects can be prevented by BLM decision-making, then the effects of the non-Federal action are properly considered indirect effects of the BLM action and must be analyzed as effects of the BLM action (40 CFR 1508.7, 40 CFR 1508.25(c)).

For example,
*You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry. The creation and operation of the quarry cannot proceed unless the road is constructed. The road cannot be constructed without the grant by BLM of a right-of-way. The grant of the right-of-way must be analyzed as a BLM action: the BLM can grant or deny the right-of-way request. The construction of the road and the creation and operation of the quarry are connected actions.*

*Alternatives: You must analyze the proposed action of granting the right-of-way, and consider the alternative of denying the right-of-way (the No Action alternative) and any other reasonable alternatives related to the right-of-way request. Because the construction of the road, and the creation and operation of the quarry would not be BLM actions, you do not need to consider alternatives to the road construction and creation and operation of the quarry.*

BLM_0009327

*Direct and Indirect Effects: You must analyze the direct and indirect effects of granting the right-of-way. You must also analyze the direct and indirect effects of constructing the road and creating and operating the quarry, because these effects could be prevented by a BLM decision to deny the right-of-way request, and therefore are properly considered indirect effects of the BLM right-of-way grant.*

*Cumulative Effects: You must analyze the cumulative impact of the right-of-way grant, the road construction, and quarry creation and operation, taking into account the effects in common with any other past, present, and reasonably foreseeable future actions.*

If the connected non-Federal action cannot be prevented by BLM decision-making, but its effects can be modified by BLM-decision-making, then the changes in the effects of the connected non-Federal action must be analyzed as indirect effects of the BLM proposed action. Effects of the non-Federal action that cannot be modified by BLM-decision-making may still need to be analyzed in the cumulative effects analysis for BLM action, if they have a cumulative effect together with the effects of the BLM action (see section **6.8.3 *Cumulative Effects***).

For example,

*You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry. In contrast to the example above, the creation and operation of the quarry could proceed with other, reasonably foreseeable, road access. However, conditions on the grant by BLM of a right-of-way could modify the effects of the quarry creation and operation (e.g., right-of-way conditions limiting the amount and timing of haul could alter the timing of quarry creation activities and consequent effects). The grant of the right-of-way must be analyzed as a BLM action. The effects of the road construction must be analyzed as indirect effects of the BLM right-of-way grant. The changes in the effects of the quarry creation and operation must be analyzed as indirect effects of the conditions on the BLM right-of-way grant. The unchanged effects of the quarry creation and operation would be analyzed in the cumulative effects analysis for the BLM action to the extent they would have a cumulative effect together with the effects of the BLM action.*

If the non-Federal action cannot be prevented by BLM decision-making and its effects cannot be modified by BLM decision-making, the effects of the non-Federal action may still need to be analyzed in the cumulative effects analysis for BLM action, if they have a cumulative effect together with the effects of the BLM action (see section **6.8.3 *Cumulative Effects***). While analysis of the effects of these non-Federal actions provides context for the analysis of the BLM action, their consideration in the determination of the significance of the BLM action is limited (see section 7**.3, *Significance***).

BLM_0009328

48

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

For example,

*You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry. The creation and operation of the quarry could proceed with other, reasonably foreseeable, road access. Conditions on the grant by BLM of a right-of-way would not modify the effects of the quarry creation and operation. The grant of the right-of-way must be analyzed as a BLM action. The road construction is a connected action, and its effects must be analyzed as indirect effects of the BLM right-of-way grant. However, the quarry creation and operation are not connected actions; their effects would be analyzed in the cumulative effects analysis for the BLM action to the extent they would have a cumulative effect together with the effects of the BLM action.*

### 6.5.2.2    Cumulative Actions

Cumulative actions are proposed actions which potentially have a cumulatively significant impact together with other proposed actions and "should be discussed" in the same NEPA document (40 CFR 1508.25(a)(2)).

If the cumulative action is a BLM or other Federal proposed action, you may include both actions as aspects of a broader proposal, analyzed in a single NEPA document, as described above for connected actions.

For example,

*The BLM proposes construction of a campground to enhance developed recreation opportunities. The campground construction would contribute sediment to a nearby stream. Separately, the BLM proposes a culvert replacement to remove a fish passage barrier. The culvert replacement would contribute sediment to the same stream. The culvert replacement is a cumulative action to the campground construction campground construction and culvert replacement. You may include the campground construction and culvert replacement as aspects of a broader proposal, analyzed in a single NEPA document. In this case, separate purpose and need statements for the campground construction and culvert replacement would likely be more appropriate than attempting to create a single, integrated purpose and need statement.*

If you do not include the cumulative action with the proposed action as aspects of a broader proposal analyzed in a single NEPA document, you must, at a minimum, demonstrate that you have considered the cumulative action in the NEPA document for the proposed action (40 CFR 1508.25):

- describe the cumulative action; and
- include analysis of the effects of the cumulative action in the cumulative effects analysis of the proposed action.

It may be useful to incorporate by reference portions of the NEPA document completed for the cumulative action, if available, into the NEPA document for the proposed action.

BLM_0009329

Non-Federal actions which potentially have a cumulatively significant impact together with the proposed action must be considered in the same NEPA document (40 CFR 1508.25). Identifying an action as a cumulative non-Federal action is a component of your cumulative effects analysis of the proposed action (see section **6.8.3, *Cumulative Effects***).

### 6.5.2.3   Similar Actions

Similar actions are proposed or reasonably foreseeable Federal actions that have similarities that provide a basis for evaluating their environmental consequences together with the proposed action (40 CFR 1508.25(a)(3). Similarities are not limited to type of action; such similarities include, for instance, common timing or geography. You may include similar proposed actions as aspects of a broader proposal, analyzed in a single NEPA document, as described above for connected and cumulative actions, when a single NEPA document would improve the quality of analysis and efficiency of the NEPA process, and provide a stronger basis for decision-making

If other Federal actions with a common timing or geography are interdependent with the proposed action, they would be considered as connected actions (see section **6.5.2.1, *Connected Actions***). If other Federal actions with common timing or geography would have a cumulative effect together with the proposed action, they would be considered as cumulative actions (see section **6.5.2.2, *Cumulative Actions***).

If you include similar actions as aspects of a broader proposal, analyzed in a single NEPA document, evaluate the purpose and need and the range of alternatives to ensure that they adequately address the similar actions.

## 6.6   ALTERNATIVES DEVELOPMENT

### 6.6.1   Reasonable Alternatives

The NEPA directs the BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources;…" (NEPA Sec102(2)(E)).

The range of alternatives explores alternative means of meeting the purpose and need for the action. As stated in section **6.2.1, *The Role of the Purpose and Need Statement***, the purpose and need statement helps define the range of alternatives. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. You must analyze those alternatives necessary to permit a reasoned choice (40 CFR 1502.14). For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives. When there are potentially a very large number of alternatives, you must analyze only a reasonable number to cover the full spectrum of alternatives (see Question 1b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*). When working with cooperating agencies, your range of alternatives may need to reflect the decision space and authority of other agencies, if decisions are being made by more than one agency.

In determining the alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative. "Reasonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant." (Question 2a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*).  You can only define whether an alternative is "reasonable" in reference to the purpose and need for the action.  See **Chapter 8**, *Preparing an Environmental Assessment* and **Chapter 9**, *Preparing an Environmental Impact Statement* for discussion of reasonable alternatives for an EA and EIS. For externally generated action, the range of alternatives will typically include at least denying the request (No Action); approving the request as the proponent proposed; or approving the request with changes BLM makes to the proponent's proposal.

For example,

> *An EIS for an oil field development project has a purpose and need which (in abbreviated form) is to determine whether to permit oil exploration and development within the project area consistent with existing leases and to develop practices for oil development consistent with the land use plan.  The EIS would typically analyze at least the following alternatives:*
> - *No Action, which would entail no new drilling beyond what is currently permitted;*
> - *The proponent's proposal for field development; and*
> - *The proponent's proposal with additional or different design features recommended by the BLM to reduce environmental effects. This alternative would include design features that differ from the proponent's proposal, such as alternative well locations, alternative access routes, additional timing or spacing constraints, offsite mitigation, different methods for treating produced water, horizontal well drilling, or other technologies.*

In some situations it may be appropriate for you to analyze a proposed action or alternative that may be outside the BLM's jurisdiction (Question 2b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*).  Such circumstances would be exceptional and probably limited to the broadest, most programmatic EISs that would involve multiple agencies.  For most actions, we recommend that the purpose and need statement be constructed to reflect the discretion available to the BLM, consistent with existing decisions and statutory and regulatory requirements; thus, alternatives not within BLM jurisdiction would not be "reasonable."

*Note*: Though not required, a manager may elect to analyze in detail an alternative that might otherwise be eliminated to assist in planning or decision-making. In such cases, explain in the NEPA document why you are electing to analyze the alternative in detail.

BLM_0009331

#### 6.6.1.1    Developing Alternatives Under The Healthy Forests Restoration Act

The Healthy Forests Restoration Act of 2003 (HFRA) (P.L. 108-148) contains provisions for expedited environmental analysis of projects implemented under its authority.  For authorized projects (see HFRA Section 102 to determine which projects are authorized), HFRA allows fewer alternatives to be analyzed compared with that which CEQ regulations prescribe.

For areas within the wildland–urban interface and within 1.5 miles of the boundary of an at-risk community (as defined in Section 101 of HFRA), you are not required to analyze any alternative to the proposed action, with one exception: if the at-risk community has adopted a Community Wildfire Protection Plan and the proposed action does not implement the recommendations in the plan regarding the general location and basic method of treatments, you are required to analyze the recommendations in the plan as an alternative to the proposed action.
For areas within the wildland–urban interface, but farther than 1.5 miles from the boundary of an at-risk community, you are not required to analyze more than the proposed action and one additional action alternative.

For the two previous scenarios, you are not required to present a separate section called the "No Action alternative." However, you must document the current and future state of the environment in the absence of the proposed action. This constitutes consideration of a No Action Alternative.  Document this in your purpose and need section (HFRA 104(d)).

For authorized HFRA projects in all other areas, the analysis must describe the proposed action, a No Action alternative, and an additional action alternative, if one is proposed during the scoping or collaboration process.

Additional information on HFRA can be obtained from the Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (see the Web Guide).

#### 6.6.2    No Action Alternative

The CEQ regulations direct that EISs describe the No Action alternative (40 CFR 1502.14(d)). HFRA, however, removes this regulatory requirement for actions taken under its authority (see section **6.6.1.1, *Developing Alternatives Under the HFRA***).  The No Action alternative is the only alternative that must be analyzed in an EIS that does not respond to the purpose and need for the action.

The No Action alternative provides a useful baseline for comparison of environmental effects (including cumulative effects) and demonstrates the consequences of not meeting the need for the action (see sections **8.3.4.2, *Alternatives in an EA,*** and **9.2.7.1, *Reasonable Alternatives for an EIS*** for discussion of the No Action alternative for EAs and EISs).

BLM_0009332

The description of the No Action alternative depends on the type of action proposed:

— **For land use planning actions:**  The No Action alternative is to continue to implement the management direction in the land use plan (i.e., the land use plan as written).  Any other management approach should be treated as an action alternative.  If, for example, plan evaluation identifies that implementation has not been in accordance with the management direction in the land use plan, you may consider continued non-conforming implementation as an action alternative, if it is a reasonable alternative (see section **6.1.1,** *Reasonable Alternatives*).

— **For internally generated implementation actions:**  the No Action alternative is not to take the action.

— **For externally generated proposals or applications**:  the No Action alternative is generally to reject the proposal or deny the application.  (The sole exception to this is for renewal of a grazing permit, for which the No Action alternative is to issue a new permit with the same terms and conditions as the expiring permit).  The analysis of the No Action alternative must only analyze what is reasonably foreseeable if the application is denied (see Question 3, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

The No Action alternative may constitute a benchmark at one end of the spectrum of alternatives.  Therefore, defining the No Action alternative might require reference to the action alternatives that will be analyzed.  A No Action alternative that is outside of BLM jurisdiction or contrary to law or regulation might be useful to consider as a baseline for comparison.  *For example, when revising an LUP that has been implemented and subsequently found legally inadequate, analysis of continued management under that existing LUP might provide useful comparison in the analysis of the action alternatives in the revised LUP.*  The Web Guide provides some examples of No Action alternatives.

### 6.6.3  Alternatives Considered but Eliminated From Detailed Analysis

If you consider alternatives during the EIS process but opt not to analyze them in detail, you must identify those alternatives and briefly explain why you eliminated them from detailed analysis (40 CFR 1502.14).  Explain why you eliminated an alternative proposed by the public or another agency from detailed analysis.  We recommend you do the same in an EA.  See the Web Guide for examples of "alternatives considered but eliminated from detailed analysis."

You may eliminate an action alternative from detailed analysis if:

• it is ineffective (it would not respond to the purpose and need).

• it is technically or economically infeasible (consider whether implementation of the alternative is likely given past and current practice and technology; this does not require cost-benefit analysis or speculation about an applicant's costs and profits).

• it is inconsistent with the basic policy objectives for the management of the area (such as, not in conformance with the LUP).

• its implementation is remote or speculative.

• it is substantially similar in design to an alternative that is analyzed.

• it would have substantially similar effects to an alternative that is analyzed.

BLM_0009333

## 6.7  AFFECTED ENVIRONMENT AND USE OF RELEVANT DATA

### 6.7.1  Affected Environment

The affected environment section succinctly describes the existing condition and trend of issue-related elements of the human environment that may be affected by implementing the proposed action or an alternative.  The CEQ regulations discuss "human environment" at 40 CFR 1508.14; the term broadly relates to biological, physical, social and economic elements of the environment.  We recommend that the descriptions of the specific elements be quantitative wherever possible, and of sufficient detail to serve as a baseline against which to measure the potential effects of implementing an action.  The affected environment section of the environmental analysis is defined and limited by the identified issues.

Your description of the affected environment will provide the basis for identifying and interpreting potential impacts in a concise manner.  Describe the present condition of the affected resources within the identified geographic scope and provide a baseline for the cumulative effects analysis.  Identifying past and ongoing actions that contribute to existing conditions will be helpful for the cumulative effects analysis (see section **6.8.3, *Cumulative Effects***).  Additionally, identify any regulatory thresholds and characterize what is known about stresses affecting the resources and biological or physical thresholds.  These biological or physical thresholds are often poorly understood; it may be helpful to identify as part of the analysis the threshold conditions of resources beyond which change could cause significant impacts.  This may not be possible for many resources because of incomplete or unavailable information (40 CFR 1502.22).

Your descriptions of the affected environment must be no longer than is necessary to understand the effects of the alternatives.  Data and analyses in a statement must be commensurate with the importance of the impact; with less important material, you may summarize, consolidate, or simply reference the material (40 CFR 1502.15).

### 6.7.2  Use of Relevant Data

Data and other information used to describe existing conditions and trends may be obtained from other documents and summarized and incorporated by reference or otherwise appropriately referenced.  You may also obtain data and other information from cooperating agency partners or other agencies, organizations, or individuals, as identified during scoping.

BLM_0009334

The CEQ regulations require the BLM to obtain information if it is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall cost of obtaining it is not exorbitant" (40 CFR 1502.22).  If information essential to reasoned choice is unavailable or if the costs of obtaining it are exorbitant (excessive or beyond reason), you must make a statement to this effect in the EIS or EA.  In this statement, you must discuss what effect the missing information may have on your ability to predict impacts to the particular resource.  If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, you must include within the EIS or EA:

1. a statement that such information is incomplete or unavailable;
2. a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;
3. a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and
4. the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason. (40 CFR 1502.22(b)).

## 6.8   ENVIRONMENTAL EFFECTS

### 6.8.1   Effects Analysis

#### 6.8.1.1      Defining Environmental Effects

Your EA or EIS must identify the known and predicted effects that are related to the issues (40 CFR 1500.4 (c), 40 CFR 1500.4(g), 40 CFR 1500.5(d), 40 CFR 1502.16) (*see 6.4 Issues*).  An issue differs from an effect; an issue describes an environmental problem or relation between a resource and an action, while effects analysis predicts the degree to which the resource would be affected upon implementation of an action.

> The terms "**effects**" and "**impacts**" are synonymous in the CEQ regulations (40 CFR 1508.8) and in this handbook.

Effects can be ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health.  Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial (40 CFR 1508.8).

BLM_0009335

Analyze relevant short-term and long-term effects and disclose both beneficial and detrimental effects in the NEPA analysis.  We recommend you define the duration of long term and short-term, as it can vary depending on the action and the scope of analysis.  You must consider and analyze three categories of effects for any BLM proposal and its alternatives: direct, indirect, and cumulative (40 CFR 1508.25(c)).

To help decision-makers understand how a resource will be affected, focus the discussion of effects on the context, intensity, and duration of these effects (see section *7.3, Significance*).

Your effects analysis must also identify possible conflicts between the proposed action (and each alternative) and the objectives of Federal, State, regional, local, and tribal land use plans, policies, or controls for the area concerned (40 CFR 1502.16(c)).

### 6.8.1.2    Analyzing Effects

The effects analysis must demonstrate that the BLM took a "hard look" at the impacts of the action.  The level of detail must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (40 CFR 1502.1).  See the Web Guide for recent examples of how the Interior Board of Land Appeals (IBLA) has dealt with the concept of "hard look."

> A "**hard look**" is a reasoned analysis containing quantitative or detailed qualitative information.

Use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed.

> Analytical documents to support Federal agency decision-making include EISs and EAs, but neither are considered publications of scientific research subject to peer review.  You may choose to have your NEPA analysis reviewed by members of the scientific community as part of public review of the document.  Such review may be desirable to improve the quality of the analysis or share information; this does not constitute formal peer-review.

Describe the methodology and analytical assumptions for the effects analysis as explained below:

> Methodology:  Your NEPA document must describe the analytical methodology sufficiently so that the reader can understand how the analysis was conducted and why the particular methodology was used (40 CFR 1502.24).  This explanation must include a description of any limitations inherent in the methodology.  If there is substantial dispute over models, methodology, or data, you must recognize the opposing viewpoint(s) and explain the rationale for your choice of analysis.  You may place discussions of methodology in the text or in the appendix of the document.  To the extent possible, we recommend that the analysis of impacts be quantified.

BLM_0009336

Assumptions:  We recommend that your NEPA document state the analytical assumptions, including the geographic and temporal scope of the analysis (which may vary by issue), the baseline for analysis, as well as the reasonably foreseeable future actions (see section **6.8.3, *Cumulative Effects***).  You must also explain any assumptions made when information critical to the analysis was incomplete or unavailable (40 CFR 1502.22).  See section **6.7.2, *Use of Relevant Data***, for more discussion of incomplete or unavailable information.

Analytical assumptions may include any reasonably foreseeable development (RFD) scenarios for resources, such as RFDs for oil and gas development.  A reasonably foreseeable development scenario is a baseline projection for activity for a defined area and period of time, and though commonly used in minerals development, these scenarios may be used for other resources as well.  Examples of reasonably foreseeable development scenarios can be found in the Web Guide.

Clarity of expression, logical thought processes, and rational explanations are more important than length or format in the discussion of impacts.  Following these guidelines will help the decision-maker and the public understand your analysis.

- Use objective, professional language without being overly technical.
- Avoid subjective terms such as "good," "bad," "positive," and "negative." The term "significant" has a very specific meaning in the NEPA context (see section **7.3, *Significance***).  While it is a common descriptor, do not use it in NEPA documents unless it is intended to take on the NEPA meaning.
- Avoid the use of acronyms.

## 6.8.2   Direct and Indirect Effects

EAs and EISs must analyze and describe the direct effects and indirect effects of the proposed action and the alternatives on the quality of the human environment (40 CFR 1508.8).  The value in requiring analysis of both direct and indirect effects is to make certain that no effects are overlooked.  Because it can be difficult to distinguish between direct and indirect effects, you do not have to differentiate between the terms.  When you are uncertain which effect is direct and which is indirect, it is helpful to describe the effects together.  Effects are weighted the same; you do not consider an indirect effect less important than a direct effect in the analysis.  Examples of direct and indirect effects can be found in the Web Guide.

> **Direct effects** are those effects "…which are caused by the action and occur at the same time and place" (40 CFR 1508.8(a)).
>
> **Indirect effects** are those effects "…which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems" (40 CFR 1508.8(b)).

BLM_0009337

### 6.8.3   Cumulative Effects

The purpose of cumulative effects analysis is to ensure that Federal decision-makers consider the full range of consequences of actions (the proposed action and alternatives, including the No Action alternative).  Assessing cumulative effects begins early in the NEPA process, during internal and external scoping.

> The CEQ regulations define **cumulative effects** as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

"Analyzing cumulative effects is more challenging than analyzing direct or indirect effects, primarily because of the difficulty of defining the geographic (spatial) and time (temporal) boundaries.  For example, if the boundaries are defined too broadly, the analysis becomes unwieldy; if they are defined too narrowly, significant issues may be missed, and decision-makers will be incompletely informed about the consequences of their actions" (CEQ, "Considering Cumulative Effects Under the National Environmental Policy Act").

In addition to the direction described below, the Web Guide contains a list of "Principles of cumulative effects analysis" that is useful in guiding effective cumulative effects analysis, as well as examples of cumulative effects.  The Web Guide also includes "Steps in cumulative effects analysis to be addressed in each component of environmental impact assessment" from the CEQ's "Considering Cumulative Effects Under the National Environmental Policy Act (Table 1-5)."

The following sections lay out steps in cumulative effects analysis.  This is not a required format for documentation but is a useful way to think about the process and ensure an adequate analysis.

### 6.8.3.1   Cumulative Effects Issues

Determine which of the issues identified for analysis (see section **6.4, *Issues***) may involve a cumulative effect with other past, present, or reasonably foreseeable future actions.  If the proposed action and alternatives would have no direct or indirect effects on a resource, you do not need a cumulative effects analysis on that resource.  Be aware that minor direct and indirect effects can potentially contribute to synergistic cumulative effects that may require analysis (see section **6.8.3.5 *Analyzing the Cumulative Effects***).

*For example, the BLM proposes to build a campground near private land where a private utility company proposes to build and operate a power generation structure.  The NEPA document must analyze the direct, indirect, and cumulative effects of your action of constructing a campground.  If the campground construction would affect sage grouse habitat, but have no effect on air quality, and the power generation structure would affect sage grouse habitat and air quality, your NEPA document for the campground construction must describe the cumulative effects on sage grouse habitat, but not on air quality.*

BLM_0009338

58

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

In another example, *the BLM is reviewing a proposal to develop a natural gas field that will affect air quality but not affect any sensitive plants. The State is proposing a large prescribed burn, which will affect air quality and a sensitive plant population. The NEPA document needs to discuss the cumulative effects on air quality, but not on sensitive plants.*

**6.8.3.2     Geographic Scope of the Cumulative Effects Analysis**

We recommend that you establish and describe the geographic scope for each cumulative effects issue, which will help bound the description of the affected environment (see section **6.7.1, *Affected Environment***). Describe in your EA or EIS the rationale for the geographic scope established.  The geographic scope is generally based on the natural boundaries of the resource affected, rather than jurisdictional boundaries.  The geographic scope will often be different for each cumulative effects issue.  The geographic scope of cumulative effects will often extend beyond the scope of the direct effects, but not beyond the scope of the direct and indirect effects of the proposed action and alternatives.  As noted above, if the proposed action and alternatives would have no direct or indirect effects on a resource, you do not need to analyze cumulative effects on that resource.

For example, *if a proposal affects water quality and air quality, the appropriate cumulative effects analysis areas may be the watershed and the airshed.*

**6.8.3.3     Timeframe of the Cumulative Effects Analysis**

We recommend that you establish and describe the timeframe for each cumulative effects issue—that is, define long-term and short-term, and incorporate the duration of the effects anticipated.  Long-term could be as long as the longest lasting effect.  Timeframes, like geographic scope, can vary by resource.  For example, *the timeframe for economic effects may be much shorter than the timeframe for effects on vegetation structure and composition.* Base these timeframes on the duration of the direct and indirect effects of the proposed action and alternatives, rather than the duration of the action itself.  Describe in your EA or EIS the rationale for the timeframe established.

**6.8.3.4     Past, Present, and Reasonably Foreseeable Actions**

The cumulative effects analysis considers past, present, and reasonably foreseeable future actions that would affect the resource of concern within the geographic scope and the timeframe of the analysis.  In your analysis, you must consider other BLM actions, other Federal actions, and non-Federal (including private) actions (40 CFR 1508.7).

You must consider past actions within the geographic scope to provide context for the cumulative effects analysis (40 CFR 1508.7).  Past actions can usually be described by their aggregate effect without listing or analyzing the effects of individual past actions (CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis,* June 24, 2005).  Summarize past actions adequately to describe the present conditions (see section **6.7.1, *Affected Environment***).

BLM_0009339

In some circumstances, past actions may need to be described in greater detail when they bear some relation to the proposed action. For example, past actions that are similar to the proposed action might have some bearing on what effects might be anticipated from the proposed action or alternatives. You should clearly distinguish analysis of direct and indirect effects based on information about past actions from a cumulative effects analysis of past actions. (CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis,* June 24, 2005).

You must consider present actions within the geographic scope (40 CFR 1508.7). Present actions are actions which are ongoing at the time of your analysis.

You must include reasonably foreseeable future actions within the geographic scope and the timeframe of the analysis (40 CFR 1508.7). You cannot limit reasonably foreseeable future actions to those that are approved or funded. On the other hand, you are not required to speculate about future actions. Reasonably foreseeable future actions are those for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends. Reasonably foreseeable development scenarios may be valuable sources of information to assist in the BLM's cumulative effects analysis. When considering reasonably foreseeable future actions, it may be helpful to ask such questions as:

- Is there an existing proposal, such as the submission of permit applications?
- Is there a commitment of resources, such as funding?
- If it is a Federal action, has the NEPA process begun (for example, publication of an NOI)?

Analyzing future actions, such as speculative developments, is not required but may be useful in some circumstances. Including assumptions about possible future actions may increase the longevity of the document and expand the value for subsequent tiering. For example:

> *The EIS for oil and gas leasing in the Northwest NPR-A Planning Area in Alaska included analysis of permanent road construction, even though it is not feasible at this time. By including assumptions and analysis about such possible future road construction in the EIS, new NEPA analysis might not be required if such permanent roads become feasible in the future.*

### 6.8.3.5    Analyzing the Cumulative Effects

For each cumulative effect issue, analyze the direct and indirect effects of the proposed action and alternatives together with the effects of the other actions that have a cumulative effect. Cumulative effects analysis will usually need to be addressed separately for each alternative, because each alternative will have different direct and indirect effects.

BLM_0009340

60
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

The following structure is not a required format, but may be useful in constructing the cumulative effects analysis. For each cumulative effect issue:

- Describe the existing condition (see section **6.7, *Affected Environment***). The existing condition is the combination of the natural condition and the effects of past actions. The natural condition is the naturally occurring resource condition without the effects of human actions. Detailed description of the natural condition may not be possible for some resources because of incomplete or unavailable information (40 CFR 1502.22) or may not be applicable for some resources. Describe the effects of past actions, either individually or collectively, to understand how the existing condition has been created.
- Describe the effects of other present actions.
- Describe the effects of reasonably foreseeable actions.
- Describe the effects of the proposed action and each action alternatives.
- Describe the interaction among the above effects.
- Describe the relationship of the cumulative effects to any thresholds.

See the Web Guide for an example of cumulative effects analysis.

**Figure 6.3 Cumulative Effects**
*Bars in this graph represent effects of actions.*
*This graphic most clearly represents additive cumulative effects.*



Figure 6.3

BLM_0009341

The analysis of the No Action alternative describes the cumulative effect of past, other present, and reasonably foreseeable actions, without the effect of the proposed action or action alternatives. The analysis of the proposed action will include those same effects, as well as the effects of the proposed action, and thus will demonstrate the incremental difference resulting from the proposed action.  Regardless of how you present the analysis, you must be able to describe the incremental differences in cumulative effects as a result of the effects of the proposed action and alternatives (40 CFR 1508.7).

Describe the interaction among the effects of the proposed action and these various past, present, and reasonably foreseeable actions.  This interaction may be:

- <u>additive:</u> the effects of the actions add together to make up the cumulative effect.
- <u>countervailing:</u> the effects of some actions balance or mitigate the effects of other actions.
- <u>synergistic:</u> the effects of the actions together is greater than the sum of their individual effects.

How the different effects interact may help determine how you may best describe and display the cumulative effects analysis.  It will often be helpful to describe the cause-and-effect relations for the resources affected to understand if the cumulative effect is additive, countervailing, or synergistic.

The cumulative effects analysis provides a basis for evaluating the cumulative effect relative to any regulatory, biological, socioeconomic, or physical thresholds.  Describe how the incremental effect of the proposed action and each alternative relates to any relevant thresholds.

## 6.8.4   Mitigation and Residual Effects

Mitigation includes specific means, measures or practices that would reduce or eliminate effects of the proposed action or alternatives. Mitigation measures can be applied to reduce or eliminate adverse effects to biological, physical, or socioeconomic resources. Mitigation may be used to reduce or avoid adverse impacts, whether or not they are significant in nature.  Measures or practices should only be termed mitigation measures if they have not been incorporated into the proposed action or alternatives. If mitigation measures are incorporated into the proposed action or alternatives, they are called design features, not mitigation measures (see section **6.5.1.1, *Design Features of the Proposed Action***). You must describe the mitigation

> **Mitigation** measures are those measures that could reduce or avoid adverse impacts and have not been incorporated into the proposed action or an alternative.
>
> Mitigation can include (40 CFR 1508.20):
> - Avoiding the impact altogether by not taking a certain action or parts of an action.
> - Minimizing impact by limiting the degree of magnitude of the action and its implementation
> - Rectifying the impact by repairing, rehabilitation, or restoring the affected environment.
> - Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
> - Compensating for the impact by replacing or providing substitute resources or environments."

measures that you are adopting in your decision documentation.  Monitoring is required to ensure the implementation of these measures (40 CFR 1505.2(c)) (see section **10.1, *Purposes of and Requirements for Monitoring***).

BLM_0009342

In an EIS, all "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (see Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  When presenting mitigation measures not within the BLM's jurisdiction, it is particularly beneficial to work with other agencies (see **Chapter 12, Cooperating Agencies, Joint Lead Agencies, and Advisory Committees**).

Socioeconomic impacts are usually indirect and largely fall on communities and local government institutions, by definition located outside BLM-managed lands.  While some mitigation strategies are within the BLM's control, (such as regulating the pace of mineral exploration and development to minimize rapid, disruptive social change), most mitigation strategies require action by other government entities—typically cities, counties, and State agencies.  In supporting local and State efforts to mitigate socioeconomic impacts, you "may provide information and other assistance, sanction local activities, encourage community and project proponent agreements, and cooperate with responsible officials to the fullest extent feasible" (BLM Handbook of Socio-Economic Mitigation, IV-2).

You may need to identify mitigation measures that would reduce or eliminate the effects of a non-Federal action when it is a connected action to the BLM proposed action (see section **6.8.2.1.1, Connected Non-Federal Actions**).  For such non-Federal actions, the relevant, reasonable mitigation measures are likely to include mitigation measures that would be carried out by other Federal, State or local regulatory agencies or tribes.  Identifying mitigation outside of BLM jurisdiction serves to alert the other agencies that can implement the mitigation. In describing mitigation under the authority of another government agency, you must discuss the probability of the other agency implementing the mitigation measures (see Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

For an action analyzed in an EA, mitigation can be used to reduce the effects of an action below the threshold of significance, avoiding the need to prepare an EIS (see section 7.**1, Actions Requiring an EA**).

During impact analysis, analyze the impacts of the proposed action (including design features) and with all mitigation measures (if any) applied, as well as any further impacts caused by the mitigation measures themselves.  Address the anticipated effectiveness of these mitigation measures in reducing or avoiding adverse impacts in your analysis.  Describe the residual effects of any adverse impacts that remain after mitigation measures have been applied.

## 6.9   PUBLIC INVOLVEMENT AND RESPONDING TO COMMENTS

Public involvement is an important part of the NEPA process.  The level of public involvement varies with the different types of NEPA compliance and decision-making.  Public involvement begins early in the NEPA process, with scoping, and continues throughout the preparation of the analysis and the decision.

BLM_0009343

**The public must be notified of its privacy rights.** See *IM 2007-092, April 4, 2007*. **Include the following statement in all information requesting public comment:** "Before including your address, phone number, e-mail address, or other personal identifying information in your comment, be advised that your entire comment –including your personal identifying information –may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so."

### 6.9.1    Involving and Notifying the Public

The CEQ regulations require that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" (40 CFR 1506.6(a)). There are a wide variety of ways to engage the public in the NEPA process. For EA public involvement, see sections **8.2, *Public Involvement; 8.3.3, Scoping and Issues;*** and **8.3.7, *Tribes, Individuals, Organizations, or Agencies Consulted.*** For EIS public involvement, see sections **6.3, *Scoping*** and **9.2.10.1, *Public Involvement and Scoping***.

A primary goal of public involvement is to ensure that all interested and affected parties are aware of your proposed action. Knowing your community well is the first step in determining the interested and affected parties and tribes. You may already have a core list of those interested in and potentially affected by the BLM's proposed actions; this may provide a good starting point. Work with your public affairs officer and other BLM staff, community leaders, and governmental agencies (Federal, State, and local) to help determine interested and affected parties and tribes.

Public meetings or hearings are required when there may be substantial environmental controversy concerning the environmental effects of the proposed action, a substantial interest in holding the meeting, or a request for a meeting by another agency with jurisdiction over the action (40 CFR 1506.6 (c)). You may determine that it is efficient to combine public meetings for the NEPA with hearings required by another law (an example is requirements in the Alaska National Interest Lands Conservation Act that require hearings if certain findings are made regarding the effects of a proposed action on subsistence). There are more stringent requirements for conducting the hearing and recording the proceedings. You must maintain records of public meetings and hearings including a list of attendees (as well as addresses of attendees desiring to be added to the mailing list) and notes or minutes of the proceedings. Consult 455 DM 1 for procedural requirements related to public hearings. Check individual program guidance to determine requirements for public meetings and hearings.

In many cases, people attending field trips and public meetings will be interested and/or affected parties. Make sure that you have attendance sheets that capture contact information at your field trips and meetings; these will provide you with a list of people who may want to be contacted about and involved in the NEPA process. In some cases, those affected by your proposed action may not be actively engaged in the NEPA process. In these cases, it is still important for you to reach out to those individuals, parties, or tribes, and we recommend using a variety of methods to help inform and engage those affected.

BLM_0009344

Notification methods include, but are not limited to: newsletters, Web sites or online NEPA logs, bulletin boards, newspapers, and *Federal Register* Notices. EISs have very specific notification requirements, detailed in **Chapters 9 and 13**. Also refer to **Chapters 4, 5, and 8** for more discussion of DNAs, CXs, and EAs.

The CEQ regulations explicitly discusses agency responsibility towards interested and affected parties at 40 CFR 1506.6. The CEQ regulations require that agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

In all cases the agency shall mail notice to those who have requested it on an individual action. In the case of an action with effects of national concern notice shall include publication in the Federal Register and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the 102 Monitor. An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A- 95 (Revised).
(ii) Notice to Indian tribes when effects may occur on reservations.
(iii) Following the affected State's public notice procedures for comparable actions.
(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).
(v) Notice through other local media.
(vi) Notice to potentially interested community organizations including small business associations.
(vii) Publication in newsletters that may be expected to reach potentially interested persons.
(viii) Direct mailing to owners and occupants of nearby or affected property.
(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(i) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.
(ii) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

BLM_0009345

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

## 6.9.2   Comments

The BLM has both the duty to comment on other agencies' EISs and to obtain comments on our EISs in cases of jurisdiction by law or special expertise.  For more discussion of these requirements, see **Chapter 11, *Agency Review of Environmental Impact Statements***.

Comments on the document and proposed action may be received in response to a scoping notice or in response to public review of an EA and FONSI or draft EIS.  Comments received at other times in the process may not need a formal response.  However, all substantive comments received before reaching a decision must be considered to the extent feasible (40 CFR 1503.4). Comments must be in writing (including paper or electronic format or a court reporter's transcript taken at a formal hearing), substantive, and timely, in order to merit a written response. You may receive oral comments at public meetings and workshops – it is helpful to write these down to revisit during the NEPA process.  To ensure that the true intent of the comment is captured, offer the commenter the opportunity to record his or her comment in writing. The geographic origin of a comment does not alter whether it is substantive.

The requirements for BLM responses to comments differ between EAs and EISs (see section **8.2, *Public Involvement***, and section **9.6.1, *Comments Received Following Issue of the Final EIS***). When an EA and unsigned FONSI are made available for public comment, we recommend that you respond to all substantive and timely comments.  You may respond to substantive, timely comments in the EA or in the decision record.  If a substantive and timely comment does not lead to changes in the EA or decision, you may reply directly to the commenter, and we recommend that you document the reply in either the EA or the decision record (see section **8.5.1, *Documenting the Decision*).**  When preparing a final EIS, you must respond to all substantive written comments submitted during the formal scoping period and public comment period (see section **9.4, *The Final EIS***).  You are not required to respond to comments that are not substantive or comments that are received after the close of the comment period, but you may choose to reply (516 DM 4.19(A) and (B)) (see section **6.9.2.2, *Comment Response***). However, be cautious about not responding to untimely comments from agencies with jurisdiction by law or special expertise (see section **11.1 *Obtaining Comments on Your EIS***).

## 6.9.2.1   Substantive Comments

BLM_0009346

Substantive comments do one or more of the following:

- question, with reasonable basis, the accuracy of information in the EIS or EA.
- question, with reasonable basis, the adequacy of, methodology for, or assumptions used for the environmental analysis.
- present new information relevant to the analysis.
- present reasonable alternatives other than those analyzed in the EIS or EA.
- cause changes or revisions in one or more of the alternatives.

Comments that are not considered substantive include the following.

- comments in favor of or against the proposed action or alternatives without reasoning that meet the criteria listed above (such as "we disagree with Alternative Two and believe the BLM should select Alternative Three").
- comments that only agree or disagree with BLM policy or resource decisions without justification or supporting data that meet the criteria listed above (such as "more grazing should be permitted").
- comments that don't pertain to the project area or the project (such as "the government should eliminate all dams," when the project is about a grazing permit).
- comments that take the form of vague, open-ended questions.

Examples of substantive comments can be found in the Web Guide.

### 6.9.2.2    Comment Response

The CEQ regulations at 40 CFR 1503.4 recognize several options for responding to substantive comments, including:

- modifying one or more of the alternatives as requested.
- developing and evaluating suggested alternatives.
- supplementing, improving, or modifying the analysis.
- making factual corrections.
- explaining why the comments do not warrant further agency response, citing cases, authorities, or reasons to support the BLM's position.

*Preparing to Respond to Comments*
When you anticipate receiving a large number of comments, we recommend that you develop an organized system for receiving and cataloging comments before the comments start arriving. Training (formal or informal) to ensure that staff understand their responsibilities and the system's organization may be valuable. For proposals that may have a large number of comments, we recommend that you develop a systematic way to track substantive comments and the BLM's response, such as in a searchable database. Commenters may wish to know how the BLM responded to their comments; having a well-organized means of determining this will facilitate the process.

*Responding to Substantive Comments*
You may respond to comments in several ways:

- write a letter to the commenter and record your response in the administrative record.
- present the comment and your response in the NEPA document.
- present the comment and your response in the decision document.

The CEQ recommends that responses to substantive comments should normally result in changes in the text of the NEPA document, rather than as lengthy replies to individual comments in a separate section (see Question 29a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)*. If the comments are made with respect to the BLM decision, you may respond to the comments in the decision documentation or Record of Decision rather than in the EIS or EA.
A short response to each substantive comment and a citation to the section or page where the change was made may be appropriate. Similar comments may be summarized and one response given to each group of similar comments; this approach is especially useful when a large number of comments is received.

If public comments on a draft EIS identify impacts, alternatives, or mitigation measures that were not addressed in the draft, the decision-maker responsible for preparing the EIS must determine if they warrant further consideration. If they do, the decision-maker must determine whether the new impacts, new alternatives, or new mitigation measures must be analyzed in either the final EIS or a supplemental draft EIS (see Question 29b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)* (see section **5.3, Supplementing an EIS**). Similarly, we recommend that the decision-maker responsible for preparing an EA consider whether public comments identify impacts, alternatives or mitigation measures that warrant preparation of a new EA.

Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate may or may not lead to changes in the NEPA document. When there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some instances, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the decision-maker responsible for preparing the EA or EIS does not think that a change is warranted, we recommend that your response provide the rationale for that conclusion. Thorough documentation of methodology and assumptions in the analysis may improve the reader's understanding of the BLM's analytical methods, and may reduce questions (see section **6.8.1.2, Analyzing Effects**).

*Responding to Nonsubstantive Comments*
You are not required to respond to nonsubstantive comments such as those comments merely expressing approval or disapproval of a proposal without reason. However, you may wish to acknowledge the comment, and may do so in a variety of methods, including but not limited to sending postcards, letters, or email responses.

BLM_0009348

68
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page was intentionally left blank.

# CHAPTER 7—DETERMINING WHETHER AN EA OR EIS IS APPROPRIATE

7.1   Actions Requiring an EA
7.2   Actions Requiring an EIS
7.3   Significance

## 7.1   ACTIONS REQUIRING AN EA

Actions are analyzed in an EA if the actions are not categorically excluded, not covered in an existing environmental document, and not normally subject to an EIS.  Use the EA analysis to determine if the action would have significant effects; if so, you would need to prepare an EIS. If the action would not have significant effects, prepare a Finding of No Significant Impact (FONSI) (see section **8.4.2, *The Finding of No Significant Impact (FONSI)***).  If you have already decided to prepare an EIS, you do not need to first prepare an EA (see section **7.2, *Actions Requiring an EIS***).

An EA may demonstrate that a proposed action would have effects that are significant but could be reduced or avoided through mitigation.  You may use a mitigated FONSI rather than an EIS if you are able to reasonably conclude, based on the EA analysis, that the mitigation measures would be effective in reducing effects to nonsignificance.  The FONSI must clearly identify whether the mitigation measures are needed to reduce effects to nonsignificance.  You must describe the mitigation measures you are adopting in the decision documentation, and must provide monitoring to ensure the implementation of these measures (see section **10.2, *Developing a Monitoring Plan or Strategy***).

You may prepare an EA for an action that has some significant impacts if the EA is tiered to a broader EIS which fully analyzed those significant impacts (see section **5.2.2, *Tiering***).  For such a tiered EA, you must document in the FONSI a determination that the potentially significant effects have already been analyzed, and no other effects reach significance. Only significant effects that have not been analyzed in an existing EIS will trigger the need for a new EIS.

Note: Though not required, a decision-maker may elect to prepare an EA for an action that is categorically excluded or covered by an existing environmental document to assist in planning or decision-making. In such cases, explain in the EA why you are electing to prepare an EA.

## 7.2   ACTIONS REQUIRING AN EIS

Actions whose effects are expected to be significant and are not fully covered in an existing EIS must be analyzed in a new or supplemental EIS (516 DM 11.8(A)).  You must also prepare an EIS if, after preparation of an EA, you determine that the effects of the proposed action would be significant and cannot be mitigated to a level of nonsignificance (see section **7.1, *Actions Requiring an EA***).  If you determine during preparation of an EA that the proposed action would have significant effects and cannot be mitigated to a level of nonsignificance, you do not need to complete preparation of the EA before beginning preparation of an EIS (516 DM 11.7(E)) (See section **8.4.1, *Significant Impacts – Transitioning from an EA to an EIS***).

BLM_0009350

The following actions normally require preparation of an EIS:

   (1) Approval of Resource Management Plans.
   (2) Proposals for Wild and Scenic Rivers and National Historic Scenic Trails.
   (3) Approval of regional coal lease sales in a coal production region.
   (4) Decision to issue a coal preference right lease.
   (5) Approval of applications to the BLM for major actions in the following categories:
      (a) Sites for steam-electric power plants, petroleum refineries, synfuel plants, and industrial structures
      (b) Rights-of-way for major reservoirs, canals, pipelines, transmission lines, highways and railroads
   (6) Approval of operations that would result in liberation of radioactive tracer materials or nuclear stimulation
   (7) Approval of any mining operation where the area to be mined, including any area of disturbance, over the life the mining plan is 640 acres or larger in size.

"If, for any of these actions it is anticipated that an EIS is not needed based on potential impact significance, an environmental assessment will be prepared...." (516 DM 11.8(B) and (C)).

*Note*: Though not required, a decision-maker may elect to prepare an EIS for an action that does not have significant effects to assist in planning or decision-making. In such cases, explain in the Notice of Intent and the EIS why you are electing to prepare an EIS.

## 7.3  SIGNIFICANCE

Whether an action must be analyzed in an EA or EIS depends upon a determination of the significance of the effects. "Significance" has specific meaning in the NEPA context and you must use only this meaning in NEPA documents.

> **Significance** is defined as effects of sufficient context and intensity that an environmental impact statement is required. The CEQ regulations refer to both significant effects and significant issues (for example, 40 CFR 1502.2(b)). The meaning of significance should not be interpreted differently for issues than for effects: significant issues are those issues that are related to significant or potentially significant effects.

The CEQ regulations explain in 40 CFR 1508.27:
   "'Significantly' as used in the NEPA requires considerations of both context and intensity:

   (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, for a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short-term and long-term effects are relevant.

(b) Intensity. This refers to the severity of effect. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action…." (40 CFR 1508.27).

Note that to determine the severity of effect, you must look at direct, indirect, and cumulative effects (40 CFR 1508.25(c)).

The CEQ regulations include the following ten considerations for evaluating intensity.

***Impacts that may be both beneficial and adverse*** (40 CFR 1508.27(b)(1)).  In analyzing the intensity of effects, you must consider that effects may be both beneficial and adverse. Even if the effect of an action will be beneficial on balance, significant adverse effects may exist. *For example, removal of a dam may have long-term beneficial effects on an endangered fish species. However, the process of removing the dam may have short-term adverse effects on the fish.*

The consideration of intensity must include analysis of both these beneficial and adverse effects, not just a description of the net effects. Only a significant adverse effect triggers the need to prepare an EIS.

***Public health and safety*** (40 CFR 1508.27(b)(2)).  You must consider the degree to which the action would affect public health and safety which may require, for example, evaluation of hazardous and solid wastes, air and water quality. In the context of evaluating significance, consideration of these resource effects should describe their relation to public health and safety. Economic or social effects are not intended by themselves to require preparation of an environmental impact statement (40 CFR 1508.14.).

***Unique characteristics of the geographic area*** (40 CFR 1508.27(b)(3). "Unique characteristics" are generally limited to those that have been identified through the land use planning process or other legislative, regulatory, or planning process; for example:

- prime and unique farmlands as defined by 7 CFR 657.5.
- caves designated under 43 CFR 37.
- wild and scenic rivers, both designated and suitable.
- designated wilderness areas and wilderness study areas.
- areas of critical environmental concern designated under 43 CFR 1610.7-2.

***Degree to which effects are likely to be highly controversial*** (40 CFR 1508.27(b)(4)).  You must consider the degree to which the effects are likely to be highly controversial. Controversy in this context means disagreement about the nature of the effects, not expressions of opposition to the proposed action or preference among the alternatives. There will always be some disagreement about the nature of the effects for land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly controversial. Substantial dispute within the scientific community about the effects of the proposed action would indicate that the effects are likely to be highly controversial.

BLM_0009352

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

***Degree to which effects are highly uncertain or involve unique or unknown risks*** (40 CFR 1508.27(b)(5)).  You must consider the degree to which the effects are likely to be highly uncertain or involve unique or unknown risks.  As with controversy, there will always be some uncertainty about the effects of land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly uncertain.  Similarly, there will always be some risk associated with land management actions, but the decision-maker must consider whether the risks are unique or unknown. (Refer to the Web Guide for examples of both risks that are unique or unknown, and risks that are not).

***Consideration of whether the action may establish a precedent for future actions with significant impacts*** (40 CFR 1508.27(b)(6)).  You must consider the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.  You must limit this consideration to future actions that are reasonably foreseeable, not merely possible (see section **6.8.3.4**, *Past, Present, and Reasonably Foreseeable Actions*).

***Consideration of whether the action is related to other actions with cumulatively significant impacts*** (40 CFR 1508.27(b)(7)).  You must consider whether the action is related to other actions with cumulatively significant effects (40 CFR 1508.27(b)(7).  Other actions are "related" to the action if they are connected or cumulative actions (see sections **6.5.2.1**, *Connected Actions* and **6.5.2.2**, *Cumulative Actions*).  You must analyze the effect of past, present, and reasonably foreseeable future actions, regardless of who undertakes such other actions, in the cumulative effects analysis for the proposed action. This analysis provides the context for understanding the effects of the BLM action (see section **6.8.3**, *Cumulative Effects*).  In determining the significance of the BLM action, you count only the effects of the BLM action together with the effects of connected and cumulative actions to the extent that the effects can be prevented or modified by BLM decision making (see section **6.5.2.1** *Connected Actions*).

For example:

*The BLM proposes to construct a trail to provide recreation access to BLM-managed lands from a campground the Forest Service proposes to construct on adjacent Forest Service lands.  The Forest Service campground is a connected action (see section **6.5.2.1**, **Connected Actions***). *In this example, you must count the effects of both the BLM trail construction and the Forest Service campground construction in determining significance.*

*The BLM proposes to construct a campground, which would contribute sediment to a nearby stream; the BLM proposes to replace a culvert, which would contribute sediment to the same stream.  The culvert replacement is a cumulative action (see section **6.5.2.2**, **Cumulative Actions***). *In this example, you must count the effects of both the campground construction and the culvert replacement in determining significance.*

*The BLM receives a right-of-way request for access for timber harvest on adjacent private land. The timber harvest on private land would be a connected action, because the timber harvest and the right-of-way request are interdependent parts (see section **6.5.2.1, Connected Actions**). Whether you count the effects of the timber harvest in determining the significance of the right-of-way grant would depend on whether the effects of the timber harvest could be prevented by BLM decision making (see section **6.5.2.1. Connected Actions**). In this example, that determination would likely depend on whether the private party has other reasonable access for timber harvest (see section **6.6.3, Alternatives Considered but Eliminated From Detailed Analysis** for discussion of "reasonable").*

- *If the private party has no other reasonable access (and therefore the harvest could not proceed without the right-of-way grant), the effects of the timber harvest would count towards the significance of the right-of-way grant. If the private party has no other reasonable access, the No Action alternative (i.e., denying the right-of-way request) would assume that the timber harvest would not occur. In this case, the effects of the timber harvest would be part of the incremental difference in cumulative effects between the No Action alternative (denying the right-of-way request) and the Proposed Action (granting the right-of-way).*

- *If the private party has other reasonable access, the effects of the timber harvest would not count towards the significance of the right-of-way grant. The No Action alternative would assume that the timber harvest would occur using the other reasonable access. In this case, the effects of the timber harvest would not be part of the incremental difference in cumulative effects between the No Action alternative and the Proposed Action (see section **6.8.3.5, Analyzing the Cumulative Effects**).*

***Scientific, cultural, or historical resources, including those listed in or eligible for listing in the National Register of Historic Places*** (40 CFR 1508.27(b)(8))**.** This factor represents a specific sub-set of the factor, "unique characteristics of the geographic area." Significance may arise from the loss or destruction of significant scientific, cultural, or historical resources. For resources listed in or eligible for listing in the National Register of Historic Places, significance depends on the degree to which the action would adversely affect these resources.

***Threatened or endangered species and their critical habitat*** (40 CFR 1508.27(b)(9))**.** Significance depends on the degree to which the action would adversely affect species listed under the Endangered Species Act or their designated critical habitat. A determination under the Endangered Species Act that an action would adversely affect a listed species or critical habitat does not necessarily equate to a significant effect in the NEPA context. The NEPA analysis and ESA effects determinations have different purposes and use slightly different analytical approaches (for example, regarding connected actions, reasonably foreseeable actions, and cumulative effects). Although ESA documents, such as biological assessments and biological opinions, provide useful information, you must base your evaluation of the degree to which the action would adversely affect the species or critical habitat on the analysis in the EA.

BLM_0009354

***Any effects that threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment*** (40 CFR 1508.27(b)(10))   This factor will often overlap with other factors: for example, violations of the Clean Water Act or Clean Air Act would usually involve effects that would adversely affect public health and safety.

BLM_0009355

# CHAPTER 8—PREPARING AN ENVIRONMENTAL ASSESSMENT

General
8.1  Preparing to Write an Environmental Assessment (EA)
8.2  Public Involvement
8.3  EA Format
8.4  Determination of Significance
8.5  The Decision Record
8.6  Implementation

## GENERAL

An **environmental assessment** is a tool for determining the "significance" of environmental impacts; it provides a basis for rational decision making.

The steps for performing an EA-level analysis follow the NEPA analysis steps laid out in **Chapter 6,** *NEPA Analysis*. This chapter builds on the foundation laid in Chapter 6 and provides specific direction and guidance for preparing an EA. **Chapter 8,** *Preparing an Environmental Assessment* also addresses the transition steps necessary to shift to preparation of an EIS when an EA process identifies significant effects or the likelihood of significant effects (see section **8.4.1,** *Significant Impacts – Transitioning from an EA to an EIS*).

## 8.1  PREPARING TO WRITE AN ENVIRONMENTAL ASSESSMENT (EA)

An EA is intended to be a concise public document that provides sufficient evidence and analysis for determining the significance of effects from a proposed action (40 CFR 1508.9) and that serves as a basis for reasoned choice. Based upon the EA analysis, either an EIS or a FONSI will be prepared.

The CEQ has advised agencies to keep EAs to no more than approximately 10-15 pages (Question 36a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981). Concise and well-written documents foster effective communications with the public and informed decision-making. This handbook was developed to assist in streamlining NEPA documents while retaining their informative character, and provides suggestions and tools for preparing concise EAs.

You may reduce the length of the EA by thoughtful crafting of the purpose and need for action; developing a proposed action that specifically addresses the purpose and need; and maintaining focus on the relevant issues. Consistent focus on the issues associated with the proposed action will help you identify reasonable alternatives and potential effects. Other streamlining techniques include the use of tiering and incorporation by reference (see section *5.2, Incorporation by Reference and Tiering*).

A longer EA may be appropriate when a proposal is so complex that a concise document cannot meet the goals of 40 CFR 1508.9 or when it is extremely difficult to determine whether the proposal could have significant environmental effects.  Carefully consider complex proposals and the criteria for when an EIS may be appropriate (see **Chapter 7,** ***Determining Whether an EA or an EIS is Appropriate***), rather than proceeding with a lengthy EA just to avoid the EIS process.

## 8.2  PUBLIC INVOLVEMENT

You must have some form of public involvement in the preparation of all EAs.  The CEQ regulations do not require agencies to make EAs available for public comment and review.  In certain limited circumstances, agencies are required to make FONSIs available for public review (40 CFR 1501.4(e)(2)) (see section **8.4.2,** ***The Finding of No Significant Impact (FONSI)***).  The CEQ regulations direct agencies to encourage and facilitate public involvement in the NEPA process to the fullest extent possible (40 CFR 1500.2(d), 40 CFR 1506.6).  This means that while some public involvement is required in the preparation of an EA, you have the discretion to determine how much, and what kind of involvement works best for each individual EA.  For preparation of an EA, public involvement may include any of the following: external scoping, public notification before or during preparation of an EA, public meetings, or public review and comment of the completed EA and unsigned FONSI.  The type of public involvement is at the discretion of the decision-maker.  When you need to prepare many EAs for similar projects in a short timeframe, it may be helpful to prepare a programmatic EA to cover those projects and to facilitate focused public involvement

Before and during the preparation of the EA, be very thoughtful about the level of public involvement that may be necessary with respect both to the decision to be made and the analysis of the environmental consequences of that decision.  As discussed in section **6.9,** ***Public Involvement and Responding to Comments***, consider providing for public involvement very early in the process.  It is helpful to prepare a public involvement strategy that allows you to adjust the amount and nature of public participation throughout the analysis process. In the strategy, identify the objectives for public involvement to assist in determining the need for, level and nature of that involvement.

Internal scoping, while not considered public involvement, is used to set the stage for external scoping if the decision-maker determines that it is necessary. Internal and external scoping are introduced in section **6.3,** ***Scoping*** and discussed in more detail in section **8.3.3,** ***Scoping and Issues***. Internal scoping is integral to the preparation of all environmental assessments.

In addition to public involvement in the preparation of EAs, you must notify the public of the availability of a completed EA and FONSI (40 CFR 1506.6(b)).  In addition, some FONSIs must be made available for a 30-day public review, as described in section **8.4.2,** ***The Finding of No Significant Impact (FONSI)***.  In situations that do not require public review of the FONSI, the unsigned FONSI and completed EA may be released for public review at the decision-maker's discretion.  Section **8.4.2,** ***The Finding of No Significant Impact (FONSI)*** discusses the preparation of FONSIs and provides information regarding their release for public review.

BLM_0009357

## 8.3   EA FORMAT

The CEQ regulations state that an EA must contain brief discussions of the need for the proposal, the alternatives considered, the environmental effects of the proposed action and alternatives, and a listing of agencies and persons consulted (40 CFR 1508.9 (b)).  Also, the BLM requires certain information in the EA, and there may be particular program-specific requirements for an EA. Refer to the Web Guide for a current description of program-specific requirements related to EAs.  Content and format requirements for EA-level LUP amendments can be found in the BLM's Land Use Planning Handbook H-1601-1.

We recommend that you organize an EA so that the flow of information is logical and easy to follow.  The following recommended EA format is intended to present the analytical information in a manner that both informs decision-making and enhances general reader understanding of the proposal, the analysis process, and the results.  This recommended format is provided in outline form in **Appendix 9,** *Recommended EA Format.*

### 8.3.1   Introduction

Provide the following identifying information at the beginning of an EA, or in the introduction:

- **Title, EA number, and type of project.**  Consult the appropriate State, District, or Field Office guidance regarding the assignment of EA numbers.
- **Location of proposal.**  Identify the general location of the proposed action (details of the location are in the proposed action). Use maps where appropriate to assist in identifying the specific location of the proposed action.
- **Name and location of preparing office.**
- **Identify the subject function code, lease, serial, or case file number** (where applicable).  Identify, for example, the right-of way case file number, the application for a permit to drill identifier, etc.
- **Applicant name** (where applicable).  The applicant's address may also be included.  (Note: Applicant name and address may be protected under the *Privacy Act*: refer to program-specific guidance and the exemptions under the *Freedom of Information Act,* which is referenced in the Web Guide).

The EA introduction also typically includes background information that provides context for the purpose and need statement.

### 8.3.2   Purpose and Need for Action and Decision to be Made

As discussed in section **6.2.1,** *The Role of the Purpose and Need Statement,* the purpose and need statement frames the range of alternatives.  We recommend that you develop the purpose and need statement very early in the NEPA process and include it in scoping.

We recommend including a section in the EA that describes the "Decision to be Made."  Describing the decision to be made clearly spells out the BLM's decision space and the focus of the NEPA analysis; in addition, it may serve as a vehicle for describing the nature of other decisions that will be made by other entities in order to implement the proposed action and any alternatives.  Refer to the discussion and examples in section **6.2.1,** *The Decision to be Made*.

BLM_0009358

### 8.3.3    Scoping and Issues

The topics of internal and external scoping are introduced in section **6.3, *Scoping***.  Internal scoping, as discussed, is used to formulate the purpose and need; identify connected, similar and cumulative actions associated with the proposal; begin preparations for the cumulative effects analysis; determine the appropriate level of documentation; and prepare a public participation strategy.  While external scoping for EAs is optional (40 CFR 1501.7), the benefits of external scoping for an EA are essentially the same as for an EIS, as discussed in section **6.3.2, *External Scoping***.

When evaluating the need for scoping, consider factors such as: the size or scale of the proposed action; whether the proposal is routine or unique; who might be interested or affected; and whether or not external scoping has been conducted for similar projects and what the results have been.  It is up to the decision-maker to determine the need for and level of scoping to be conducted.  We recommend that you document in the EA your rationale for determining whether or not to conduct external scoping.  If you conduct external scoping, document the scoping process, the comments received, and the issues identified and how they were addressed in the EA.  If you receive numerous comments, a summary of the comments may suffice for the EA; however, be sure to retain the comments and to document their disposition in the administrative record.  See sections **8.3.7, *Tribes, Individuals, Organizations, or Agencies Consulted***, and **8.5.1, *Documenting the Decision,*** for additional discussions regarding public involvement and managing comments.

Regardless of the level of scoping conducted, we recommend that you identify and document issues associated with the proposed action (see sections **6.3, *Scoping*** and **6.4, *Issues***).  As discussed in section **6.4.1, *Identifying Issues for Analysis***, you do not need to analyze all issues identified in the scoping process.  Analyze an issue if its analysis will help in making a reasoned choice among alternatives, or if it is, or may be, related to a potentially significant effect.  In addition, the decision-maker may elect to analyze other issues to assist in planning or decision-making.  In such cases explain in the EA why you are electing to identify the issue for analysis.

### 8.3.4    Proposed Action and Alternatives

You must describe the proposed action and alternatives considered, if any (40 CFR 1508.9(b)) (see sections **6.5, *Proposed Action*** and **6.6, *Alternative Development***).  Illustrations and maps can be used to help describe the proposed action and alternatives.  The sub-sections below provide detailed guidance for how to describe the proposed action and how to develop and describe appropriate alternatives.

### 8.3.4.1    Description of the Proposed Action

Provide a description of the proposed action (see section **6.5, *Proposed Action*** for guidance).  Generally describe the relationship between the purpose and need and the proposed action.  To identify potential connected and cumulative actions that may need to be included with the proposed action, refer to sections ***6.5.2.1, Connected Actions and 6.5.2.2, Cumulative Actions***.  Be sure to include design features specific to the proposed action (see section **6.5.1.1, *Design Features of the Proposed Action***).

BLM_0009359

## 8.3.4.2   Alternatives in an EA

EAs shall "…include brief discussions…of alternatives as required by section 102(2)(E),…" (40 CFR 1508.9(b)).  Section 102(2)(E) of the NEPA provides that agencies of the Federal Government shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

Although the regulation at 40 CFR 1508.9(b) makes no specific mention of the No Action alternative with respect to EAs, the CEQ has interpreted the regulations generally to require some consideration of a No Action alternative in an EA.  The CEQ has issued guidance stating: "you may contrast the impacts of the proposed action and alternatives with the current condition and expected future condition in the absence of the project.  This constitutes consideration of a no-action alternative as well as demonstrating the need for the project." (CEQ Memorandum to Federal NEPA Contacts: Emergency Actions and NEPA (September 8, 2005), CEQ Memorandum to Secretary of Agriculture and Secretary of Interior: Guidance for Environmental Assessments of Forest Health Projects (December 9, 2002)).  Therefore, at a minimum, your EA must include documentation of the current and future state of the environment in the absence of the proposed action.  This discussion does not need to be a separate section called "No Action Alternative," but can be part of the environmental effects section of the EA to show the change in effects brought about by the proposed action or alternatives.  Examples of how to do this can be found on the web guide.

You may analyze the No Action alternative with the same level of treatment as the proposed action and any action alternatives, if this will assist in your decision-making.  In such cases, it may be clearer to provide this analysis in a separate analysis of the No Action alternative in an environmental effects section.  Including such a separate analysis may provide a useful context for comparing environmental effects of the various alternatives, and demonstrates the consequences of not meeting the need for the action.

You must consider alternatives if there are unresolved conflicts concerning alternative uses of available resources (40 CFR 1508.9(b)).  There are no unresolved conflicts concerning alternative uses of available resources if consensus has been established about the proposed action based on input from interested parties, or there are no reasonable alternatives to the proposed action that would be substantially different in design or effects.  (However, the analysis of effects may result in new issues that require development and consideration of another alternative).

Consensus about the proposed action may be established by conducting scoping for the proposed action, but it may also be possible to establish consensus through other means of public involvement.  For example, scoping and/or public comments on a programmatic NEPA document may provide a basis for concluding that there is consensus about a subsequent specific action that is tiered to the programmatic document.  Document the basis for concluding that there is consensus about a proposed action and identify the interested parties that participated in the consensus-building process.

BLM_0009360

Many conflicts concerning alternative uses of available resources are resolved in existing land use plan (LUP) and other programmatic decisions.  Such programmatic decisions often establish "basic policy objectives for management of the area," which may ultimately limit the "reasonable" alternatives to a proposed action to implement an LUP or programmatic decision (see section **6.6.1,** *Reasonable Alternatives*).  The purpose and need statement for implementation actions may be constructed in the context of the existing LUP or programmatic decisions; thus, alternatives that are not in conformance typically will not be "reasonable." However, some proposed actions and alternatives will intentionally not be in conformance with the LUP because the intent is to amend or revise LUP direction; hence the alternatives are reasonable to analyze.

If alternatives relevant to the proposed action have been described and analyzed in a previous environmental document, it may be sufficient to incorporate by reference the description and analysis from the previous document (see section **5.2,** *Incorporation by Reference and Tiering*). In addition, you may use tiering to reduce the range of alternatives (see section **5.2,** *Incorporation by Reference and Tiering*, for further discussion of tiering).

In addition, for EAs, you need only analyze alternatives that would have a lesser effect than the proposed action.  However, be cautious in dismissing an alternative from analysis in an EA because it would have a "greater effect."  For many management actions, characterizing the overall effects of alternatives as "lesser" or "greater" will be difficult, because alternatives will often have lesser effects on some resources and greater effects on other resources when compared to the proposed action.

For projects proposed under the Healthy Forests Restoration Act of 2003 (HFRA) (P.L. 108-148), refer to specific guidance regarding analysis of alternatives in section **6.6.1,** *Reasonable Alternatives,* as it provides guidance different from that included in this section.

While analysis of alternatives is not always required in EAs, a decision-maker may choose to analyze alternatives in detail to assist in identifying trade-offs or in decision-making and planning.  In such cases, explain in the EA why you are electing to analyze the alternative in detail.

## 8.3.4.2.1     Alternatives Considered but Eliminated from Detailed Analysis

We recommend that the EA contain a description of alternatives to the proposed action that were considered but not analyzed in detail.  Include alternatives that were recommended by members of the public or agencies but dismissed from detailed analysis after preliminary investigation. Document the reasons for dismissing an alternative in the EA (see section **6.6.3,** *Alternatives Considered but Eliminated from Detailed Analysis* for additional discussion).

### 8.3.4.3    Conformance

In this section, discuss whether or not the proposed action is in conformance with the land use plan; identify directly relevant laws, regulations, policies, program guidance, and local permitting requirements that are germane to the proposed action.  An exhaustive list or discussion of all applicable laws or regulations is not appropriate.

We recommend that you also evaluate and disclose whether or not any alternatives considered are in conformance with the land use plan and as described above.  Determining "conformance" early in the process will indicate if a plan amendment is necessary to implement an alternative.

### 8.3.5    Affected Environment

We recommend that the EA contain a brief description of the environment likely to be affected by the proposed action or alternatives.  Limit the description of the affected environment to that information relevant to understanding the effect(s) of the proposed action or alternative (see sections **6.7.1**, *Affected Environment* and **6.7.2**, *Use of Relevant Data*).  You may present the affected environment description as its own section, or combined with environmental effects.

### 8.3.6    Environmental Effects

The EA must describe and provide the analysis of environmental effects of the proposed action and each alternative analyzed in detail (40 CFR 1508.9(b)).  An issue identified through internal or external scoping must be analyzed if analysis is necessary to :

- make a reasoned choice among alternatives (if any), or

- determine the significance of effects (see section **6.8**, *Environmental Effects*).

The effects analysis must address direct, indirect and cumulative effects related to each issue (see section **6.8**, *Environmental Effects*).  Tiering to a broader NEPA analysis may limit the need for analysis, especially cumulative effects analysis (see section **6.8.3**, *Cumulative Effects*).

Discussion of impacts may either be organized by alternative with impact topics as subheadings or by impact topic with alternatives as subheadings.  Generally, if impacts to a particular resource for one alternative are the same as another alternative, make reference to that section in the EA rather than repeating the information.

The EA must also identify and analyze mitigation measures, if any, which may be taken to avoid or reduce potentially significant effects (see Question 39, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).  You must describe and analyze the anticipated effectiveness of mitigation measures and any direct, indirect, and cumulative effects that remain after the application of all mitigation measures—that is, residual effects.  Although described and analyzed in the body of the EA, the mitigation measures that will be implemented are explicitly adopted in the decision record.  Refer to section **6.8.4**, *Mitigation and Residual Effects* for additional information regarding mitigation measures.

BLM_0009362

### 8.3.7    Tribes, Individuals, Organizations, or Agencies Consulted

The EA must list tribes, individuals, organizations, and agencies consulted (40 CFR 1508.9(b)). Long contact lists may be referenced or provided in an appendix to the EA.  It may be appropriate to provide brief statements regarding the purpose for the contacts and the results. You may include comments received from tribes and the public in this section, though you may also include them in the discussion of scoping and issues earlier in the EA, or describe them in the decision record (see sections **8.3.3,** *Scoping and Issues* and **8.5.1,** *Documenting the Decision*).  If large numbers of substantive comments are received, you may summarize them in the EA or decision record, but you must retain the comment letters in the administrative record. It is important that you not only evaluate and summarize the substantive comments, but be able to demonstrate that you considered them.

### 8.3.8    List of Preparers

We recommend that you provide a list of the specialists who prepared the EA and their area of expertise.

## 8.4   DETERMINATION OF SIGNIFICANCE

Based upon the analysis, provide a determination as to whether or not the selected alternative will have significant environmental effects (see section **7.3,** *Significance*).  This determination yields different results, as outlined below.

### 8.4.1    Significant Impacts -Transitioning from an EA to an EIS

If you determine that the effects of the alternative you wish to select are significant, you cannot approve the action unless it is either analyzed in an EIS or modified to avoid significant effects.

In the event that you determine an EIS is necessary, draw the EA preparations to a close (retain all documents).  You must publish in the *Federal Register* a Notice of Intent (NOI) to prepare an EIS (refer to section **13.1,** *Publishing Notices in the Federal Register*).  You may integrate the information assembled and analysis completed for the EA into the EIS and use it for scoping for the EIS.  Information related to how and when scoping was conducted for the EA, the results, and any comments received can still be very helpful.  However, the scoping for the EA does not take the place of the scoping required after publication of the NOI for the EIS unless a public notice for scoping for the EA said that preparation of an EIS was a possibility and that comments would still be considered (see Question 13, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).

When transitioning to an EIS, organize materials used for the EA so that pertinent portions may be integrated into the EIS.  As discussed above, information about the scoping process and issues, contact lists used for scoping, and comments received may be especially helpful. Discussions from the EA of the purpose and need, proposed action and alternatives may streamline the initiation of the EIS process.  Descriptions of the affected environment and the analyses of effects, including assumptions and methodologies, may also be directly incorporated into the EIS.

BLM_0009363

## 8.4.2   The Finding of No Significant Impact (FONSI)

The FONSI is a document that explains the reasons why an action will not have a significant effect on the human environment and, why, therefore, an EIS will not be required (40 CFR 1508.13). The FONSI must succinctly state the reasons for deciding that the action will have no significant environmental effects (40 CFR 1508.13, Questions 37a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981). The FONSI need only provide a basis for the conclusion that the selected alternative(s) will have no significant effect. Alternatives that are not selected but may have significant effects do not trigger the preparation of an EIS nor do they have to be described in the FONSI. We recommend that the FONSI address the relevant context and intensity factors described in section **7.3, *Significance***.

There are two situations when a FONSI is prepared:

- EA analysis shows that the action would have no significant effects.
- EA analysis shows that the action would have no significant effects beyond those already analyzed in an EIS to which the EA is tiered (see section **5.2.2, *Tiering***). You may find that your action has significant effects and still reach a FONSI, provided that those significant effects were fully analyzed in the EIS to which your EA tiered (see section **5.2.2, *Tiering***). In this case, we recommend that you state in the FONSI that there are no significant impacts beyond those analyzed in the EIS to which this EA is tiered.

The EA must be attached to the FONSI or incorporated by reference into the FONSI (40 CFR 1508.13, Question 37a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981). The FONSI must note any other relevant environmental documents related to the findings, and must be signed and dated by the decision-maker (40 CFR 1501.7(a)(5), 40 CFR 1508.13). The FONSI is not the authorizing document for the action: the decision record is the authorizing document.

Some FONSIs must be made available for a 30-day public review before the determination of whether to prepare an EIS (40 CFR 1501.4 (e)(2); also see 40 CFR 1501.4 (e)(1)). Public review is necessary if or when:

- the proposal is a borderline case, (such as when there is a reasonable argument for preparation of an EIS)
- it is an unusual case, a new kind of action, or a precedent-setting case, such as a first intrusion of even a minor development into a pristine area
- there is either scientific or public controversy over the effects of the proposal
- it involves a proposal that is similar to one that normally requires preparation of an EIS

You must also allow a period of public review of the FONSI if the proposed action is construction in a wetland or would be located in a floodplain. (Question 37b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981, citing E.O. 11990, sec. 2(b) and E.O. 11988, sec. 2(a)(4)).

BLM_0009364

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

In addition, the decision-maker may decide to release the unsigned FONSI and EA for public review and comment even if the proposal does not meet the criteria described above.  Consider the complexity of the project and issues, as well as the level of public interest, in determining the length of review and comment period.  Releasing the documents for public review and comment is typically done to allow the public, agencies and tribes the opportunity to respond to the analysis of impacts and to further long-term collaborative efforts.

If you release the EA and FONSI for public review, we recommend that you not sign the FONSI until the public review is completed and any necessary changes made to the EA.  Include a discussion of comments received on the EA and FONSI and their disposition in the decision record (see **8.5.1,** ***Documenting the Decision***).

The FONSI is signed before issuance of the decision record.  The FONSI must not be combined with the EA or decision record, although these may be attached to each other (516 DM 2.3(C)).

No format requirement exists for a FONSI; however, a suggested format and examples are provided in the Web Guide.

## 8.5   THE DECISION RECORD

Neither the EA nor the FONSI is a decision-making document.  Decisions regarding proposed actions analyzed in an EA are documented in accordance with program-specific requirements.  While the NEPA does not require a specific decision document regarding actions for which an EA has been completed, the BLM has chosen to use the "decision record" (DR) to document the decision regarding the action for which the EA was completed.  The decision cannot be implemented until the DR is signed.  Refer to section **8.3.6,** ***Environmental Effects*** and **Chapter 10,** ***Monitoring,*** for discussion of mitigation and monitoring to be included in the DR.  Check for and follow program-specific requirements on the content and format of a DR.  If there are no program-specific requirements for the DR or if they are only general, use the guidance in section **8.5.1,** ***Documenting the Decision*** to organize the content and format of the DR.

### 8.5.1   Documenting the Decision

Organize the DR using the content outline below:

1.   Identify compliance with major laws pertinent to the decision, such as the Endangered Species Act, National Historic Preservation Act, and the Clean Water Act.  Also describe conformance with the LUP, and other applicable laws, regulations, and policies.

2.   Identify the selected alternative.  Describe as precisely as possible specific features of the decision, or incorporate by reference the description of the selected action in the EA.  Identify mitigation and monitoring measures that have been selected to be implemented.  While incorporating by reference to describe the alternative and mitigation measures is encouraged, the specifics of what is being approved must be made clear.  The DR must also identify any limitations on when the decision may be implemented.

BLM_0009365

3.  Reference the FONSI indicating that the action has been analyzed in an EA and found to have no significant impacts, thus an EIS is not required.

4.  Summarize the public involvement undertaken and comments received and describe how substantive comments were considered in making the decision (see also sections **6.9.2, Comments,** and **8.3.7, Tribes, Individuals, Organizations, or Agencies Consulted**).

    Note: We recommend that you address timely comments received on the EA or FONSI during review, and that you document your responses, as described below:

    a.  Integrate comments that provide substantive new information relevant to the analysis, FONSI or decision be integrated into the EA (which becomes a "new" EA), with any changes to the FONSI reflected in a new FONSI, and the comment and its import acknowledged in the DR. If the EA and FONSI are substantively changed, the new EA and FONSI may need to be circulated for public review and comment. It is within the decision-makers' discretion to determine whether or not to circulate the new EA and FONSI for public review and comment.

    b.  Substantive comments that provide minor corrections or updates to the EA may be simply integrated into the EA and acknowledged in the DR. There typically will be no need to re-circulate the EA and FONSI for public review and comment; however, that determination is left to the discretion of the decision-maker.

    c.  If a substantive comment does not lead to changes in the EA, FONSI or DR, you may reply directly to the commenter. For this situation, we recommend that you document your reply in the administrative record.

    d.  While you are not required to respond to non-substantive comments, you may wish to acknowledge them. See section **6.9.2.2, Comment Response** for methods to acknowledge comments.

5.  Explain the rationale for the decision, explaining how the selected alternative addresses the purpose and need for action and why it was selected over other alternatives. Include all program-specific requirements.

6.  Describe protest and appeal opportunities.

7.  The decision-maker must sign and date the **DR**.

8.  You must provide notice of the signed DR, FONSI, and EA (40 CFR 1506.6(b), Question 38, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981) (see section **6.9.1, Involving and Notifying the Public**).

The Web Guide provides several examples of Decision Records and an optional format.

BLM_0009366

86

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

### 8.5.2    Terminating the EA Process

When you terminate the EA process prior to completion, complete your administrative record, documenting the reason or reasons for aborting the process.  If you have given public notice of the EA process, inform interested persons and parties that you are terminating the EA process.

### 8.6   IMPLEMENTATION

A decision may not be implemented until the FONSI and DR have been signed and all other program-specific procedural requirements have been met (such as applicable protest and appeals procedures).

Implementation of the action, including any mitigation and monitoring measures adopted in the decision record, must be in accordance with the decision described in the DR.  Program-specific guidance regarding protest and appeal provisions and timing of implementation relative to public notification can be found in the Web Guide.

**Figure 8.1   EA Process**



BLM_0009367

# CHAPTER 9—PREPARING AN ENVIRONMENTAL IMPACT STATEMENT

General
9.1     Preparing to Write an EIS
9.2     EIS Format
9.3     Issuing the Draft EIS
9.4     The Final EIS
9.5     Supplements to Draft and Final EISs
9.6     Issuing the Final EIS
9.7     Preparing and Issuing the Record of Decision
9.8     Terminating the EIS Process

**GENERAL**

The steps for performing an EIS-level analysis follow the NEPA analysis steps laid out in **Chapter 6, *NEPA Analysis*.** This chapter should be consulted as the BLM begins and works through the analytical process.

**9.1   PREPARING TO WRITE AN EIS**

**9.1.1   Develop Preparation Plan**

You must develop a preparation plan (also referred to as "prep plan") before initiating an EIS for land use plans (*BLM Land Use Planning Handbook H-1610-1,* pages 17–18, March 11, 2005). We recommend that you develop a preparation plan for other EISs.  The preparation plan facilitates coordination between participants involved in the preparation of the EIS and those with approval and oversight responsibility.  A properly prepared preparation plan provides the foundation for the entire planning process by identifying the issues to be addressed; the skills needed to address the issues; a preliminary budget that can be used for cost estimates; important legal, regulatory and policy guidance; and available and needed data and metadata.

Appendix F-1 in the *BLM Land Use Planning Handbook H-1601-1* describes in detail what goes into a preparation plan for an LUP; the contents may be tailored to fit any action effort involving an EIS.  We recommend that preparation plans contain the following information and discrete sections:
- Introduction and Background
- Anticipated Issues and Management Concerns
- Important Legal, Regulatory and Policy Guidance
- Data and GIS Needs, Including Data Inventory
- Participants in the Process
- Process for EIS Development
- Schedule
- Communications Strategy
- Budget

Links to examples of a non-LUP prep plan and an LUP or EIS prep plan can be found in the Web Guide.

BLM_0009368

#### 9.1.1.1    Develop Strategy for Public Involvement and Interagency/Intergovernmental Coordination and Consultation

The public involvement and interagency or intergovernmental coordination and consultation strategy is an integral part of the EIS process.  We recommend that it be described in the preparation plan and that it remain flexible.

We recommend that the public involvement strategy: identify tribes, individuals, organizations and other agencies known to be interested or affected by the proposed action; identify agencies with special expertise or jurisdiction by law; identify possible cooperating agencies (see **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees***); identify the role, if any, of the BLM Resource Advisory Council; identify schedules for scoping, including public meetings, and timing for electronic and postal mail notifications; identify the process for tracking and recording public involvement and include lists of contacts.  The public involvement strategy will likely be updated during the EIS process.

Public notice (see section **6.9.1**, ***Involving and Notifying the Public*** for a discussion on the various ways the public can be notified) must be provided for any EIS-related meetings or hearings (40 CFR 1506(b)) (see sections **9.3.2, *Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment; 9.4.2, Full Text Final EIS; 9.7, Issuing the Record of Decision;* and 13.1, *Publishing Notices in the Federal Register*** for additional guidance).  The BLM must also provide public notice of the availability of the draft and final EIS documents, as well as the Record of Decision (40 CFR 1506(b), Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981)).

Ensure the public involvement strategy is sensitive to language or cultural barriers.  Hold meetings in ways that accommodate cultural traditions, values and methods of communication.  Follow the requirements of the Federal Advisory Committee Act of 1972 (FACA).  See **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees*** for additional information on the FACA.

#### 9.1.2    Publish the Notice of Intent

Publishing the Notice of Intent (NOI) in the *Federal Register* begins the formal scoping process and serves as the official legal notice that the BLM, or when the BLM is the lead agency, the BLM and its cooperators, are commencing an EIS.  The NOI must include:

- A description of the purpose & need, the draft proposed action, & possible alternatives, if available.  For some BLM-initiated actions, where the proposed action has not yet been developed in detail, the reason for initiating the EIS must be clearly stated.
- A description of the agency's proposed scoping process; this should include whether, when, and where any scoping meetings will be held.  If the time and place of scoping meetings is not known, the NOI must state how the time and place will be announced.
- The name and address of the BLM contact for the proposed action and EIS (40 CFR 1508.22).
- For planning documents, also identify preliminary planning issues and planning criteria.  (See the *BLM Land Use Planning Handbook, H-1601-1*, pages 18–19, March 11, 2005).

BLM_0009369

The BLM requires that the NOI be formatted in accordance with *Federal Register* guidance on notices (see section **13.1, *Publishing Notices in the Federal Register***).  An example of an NOI can be found in the Web Guide.  Check program guidance for any additional information that must be included in the NOI.  For example, there is a specific format for a call for nominations for oil and gas leasing.  See the Web Guide for an example of an NOI that also includes a call for nominations for oil and gas.

A revised NOI may be required if there are any substantial changes to the proposed action or if substantial new circumstances or information arise that relate to the proposal or its impacts, such that the BLM would essentially be starting over with the NEPA process.  Minor changes may be addressed in the Notice of Availability (NOA) for the draft EIS.

Additional guidance on publishing notices in the *Federal Register* for EISs can be found in **Chapter 13, *Administrative Procedures***.  Contact your State office for current briefing and approval procedures for NOIs and NOAs.

### 9.1.3   Scoping

Scoping is the process required by the CEQ for EISs by which the BLM solicits input on the issues and impacts that will be addressed in a NEPA document as well as the degree to which those issues and impacts will be analyzed.  The intent of scoping is to focus the analysis on significant issues and reasonable alternatives, to eliminate extraneous discussion, and to reduce the length of the EIS.  No guidance is provided by the CEQ for the length of scoping periods. Check individual program guidance for any prescribed minimum periods.

Scoping must be conducted both internally with appropriate BLM staff, and externally with interested and affected public, agencies, tribes, and organizations (40 CFR 1501.7) (see section **6.3, *Scoping*** for more discussion of scoping).

Formal public scoping begins following publication of an NOI.  Informal internal and external scoping may occur before the formal scoping period begins. Scoping can provide valuable information in identifying issues related to cumulative effects.

The CEQ regulations at 40 CFR 1501.7 require the following in an agency's scoping process:

- Invite participation from affected Federal, State, local, and tribal organizations and interested persons.
- Determine the scope or extent of the EIS and the significant issues to be analyzed.  Scoping is valuable in identifying connected, cumlative, and similar actions.
- Eliminate those issues raised that are not related to potentially significant impacts or those that have been covered in other environmental documents.  Make assignments for preparation of the EIS between the lead and cooperating agencies.
- Identify any environmental documents being prepared that have relevance to, but are not part of, the scope of this EIS.
- Identify other environmental review and consultation requirements.
- Discuss the relationship between the timing of the preparation of the EIS and the agency's tentative planning and decision-making schedule.

BLM_0009370

90
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

In addition to publishing the NOI in the *Federal Register*, we recommend a notice announcing the beginning of the formal scoping process be published in local newspapers and be sent to interested agencies, organizations, and other stakeholders.

Prepare a scoping report that discusses the issues raised during the scoping process, the issues to be addressed in the EIS, the issues that will not be addressed in the EIS and why (see section **6.4, Issues**), a list of participants in the scoping process, and the views of those participants.  See the Web Guide for an example of a scoping report.

BLM_0009371

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Figure 9.1   The EIS Process**



## 9.2   EIS FORMAT

BLM_0009372

This section outlines a suggested format for an EIS, although the specific elements and their order should remain flexible.  For example, in some instances it may be desirable to combine chapters three and four in this outline into one chapter.  The BLM Land Use Planning Handbook provides a recommended format for planning-related EISs.

### 9.2.1    Cover Sheet

The cover sheet must not exceed one page and must include:

- a list of responsible agencies including the lead agency and any cooperating agencies.
- the title and location of the proposed action that is the subject of the statement.
- the name, address, and telephone number of the BLM contact person.
- designation of the statement as a draft, final, or supplemental.
- a one-paragraph abstract of the statement that identifies significant impacts and alternatives to the proposed action or proposal.
- the date by which comments must be received. (40 CFR 1502.11)

It is optional to include the name and title of the person responsible for preparing the EIS and the decision-maker for the action.

### 9.2.2    "Dear Reader" Letter

You may use a letter signed by the decision-maker responsible for preparing the EIS to request review and comment on the draft. You may use this letter to inform the reader of other details pertinent to the review.  For example, if you anticipate an abbreviated final EIS, the letter may suggest that the reader retain the draft for reference.  Make sure you include the privacy language discussed in section **6.9, *Public Involvement and Responding to Comments***.  Be specific about what you want the reader to focus on, but remember that the reader can decide which areas to address.  See the Web Guide for an example of a Dear Reader letter.

### 9.2.3    Summary

The EIS must contain a summary identifying the areas of controversy (including issues raised by agencies and the public), the issues to be resolved (including the choice among alternatives), and the major conclusions of the analysis. The summary normally must not exceed 15 pages, and must focus on the key points of each section  (40 CFR 1502.12).

### 9.2.4    Table of Contents

Ensure that the table of contents is sufficiently detailed to allow the reader to quickly locate major subject matter in the EIS, particularly specific impact topics and alternatives analyzed in the document.

BLM_0009373

## 9.2.5   Chapter 1—Introduction

This chapter includes the following:

- purpose and need; and we recommend you include decisions to be made (see section **6.2, *Purpose and Need***);

- the general location, including maps when appropriate;

- major authorizing laws and regulations;

- an explanation of the relationship of the proposed action to BLM policies, plans, and programs;

- the relationship to non-BLM policies, plans, and programs—including discussions of any land use planning or zoning statutes or requirements that may affect or limit the proposal. You must identify or reference any germane land use planning or zoning statutes or requirements (40 CFR 1502.16(c), 40 CFR 1506.2(d)). An exhaustive list of all applicable laws and regulations is not appropriate; and

- a list of all Federal permits, licenses, and other entitlements that must be obtained in implementing the proposal (40 CFR 1502.25(b)). It is optional to list authorizing actions by State and local entities. To the fullest extent possible, the environmental analyses for these related permits, licenses, and approvals must be integrated and performed concurrently (40 CFR 1502.25, 40 CFR 1506.2(b).

## 9.2.6   Issues

Issues may be raised by the public, other agencies, or the BLM throughout the NEPA analysis process. See section **6.4, *Issues***, for a complete discussion of issues. Include in the administrative record or the EIS supporting documentation indicating why an identified issue was not analyzed.

The section of the EIS describing the issues for analysis (and issues identified, but not analyzed) may be organized into its own chapter, as an appendix, or may be presented within other chapters of the EIS.

## 9.2.7   Chapter 2—Proposed Action and Alternatives

The EIS must describe the proposed action and alternatives (40 CFR 1502.14) (see sections **6.5, *Proposed Action*** and **6.6, *Alternatives Development***). The EIS must consider a range of reasonable alternatives, including the Proposed Action and No Action alternative, and provide a description of alternatives eliminated from further analysis (if any exist) with the rationale for elimination (40 CFR 1502.14(a)). The CEQ regulations direct that an EIS include a description of the No Action alternative (40 CFR 1502.14(d)) (see section **6.6.2, *No Action Alternative***). The No Action alternative is the only alternative that must be analyzed in an EIS that does not respond to the purpose and need for the action.

BLM_0009374

This chapter must also document:

- design features that would minimize potentially significant impacts (40 CFR 1502.14(f));
- LUP conformance (except for EISs prepared for approval, amendment, or revision of LUPs) (516 DM 11.5);
- the BLM's preferred alternative(s), if one or more exists (40 CFR 1502.14(e); and
- summary of effects (usually in a table) (40 CFR 1502.14) (see section **9.2.9, *Environmental Effects***)

### 9.2.7.1   Reasonable Alternatives for an EIS

The CEQ regulations direct that an EIS "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives that were eliminated from detailed study, briefly discuss the reasons for their having been eliminated" (40 CFR 1502.14(a): see also NEPA Sec. 102(2)(C)(iii)).

> For projects proposed under the Healthy Forests Restoration Act of 2003 (P.L. 108–148) refer to specific guidance regarding analysis of alternatives in section **6.6.1, *Reasonable Alternatives***.

The CEQ regulations also direct that an EIS "…include reasonable alternatives not within the jurisdiction of the lead agency" (40 CFR 1502.14(c)) (see section **6.6.1, *Reasonable Alternatives***).  When there are multiple agencies cooperating to develop one EIS for several agency-specific decisions, the alternatives should be developed to ensure that each agency will be able to develop its ROD from the FEIS.

### 9.2.7.2   Features Common to All Alternatives

Describe features that are common to all alternatives.  These features need only be described in detail once.  For example, identify common features in the description of the proposed action and cross-reference to that description in the discussion of each alternative to which they apply.  Another option is to describe common features under a separate heading.

Common features typically include standard operating procedures and other BLM requirements prescribed by law, regulation or policy.  This may also include a description of relevant laws, regulations, required permits, licenses, or approvals.

For a land use plan amendment or revision we recommend that you include management direction carried forward from the existing plan.

BLM_0009375

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

### 9.2.7.3      Agency Preferred Alternative

The CEQ regulations at 40 CFR 1502.14(e) direct that an EIS "…identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference." The preferred alternative may be identified in an explanatory cover letter to the draft EIS

> Note that BLM planning regulations at 43 CFR 1610.4–7 require identification of the preferred alternative in a draft EIS for a resource management plan.

or within the text.  The final EIS must identify the preferred alternative unless another law prohibits the expression of such a preference. Publication of an EIS without identifying the preferred alternative must be approved by the OEPC and the Office of the Solicitor (516 DM 4.10(b)(3)).

The identification of a preferred alternative does not constitute a commitment or decision in principle, and there is no requirement to select the preferred alternative in the ROD.  The identification of the preferred alternative may change between a draft EIS and final EIS.  Various parts of separate alternatives that are analyzed in the draft can also be "mixed and matched" to develop a complete alternative in the final as long as the reasons for doing so are explained. Selection in the ROD of an alternative other than the preferred alternative does not require preparation of a supplemental EIS if the selected alternative was analyzed in the EIS.  In any case, you must provide the rationale for selection in the ROD (40 CFR 1502(b)).

When an EIS is prepared jointly, the lead agency with responsibility for preparing the EIS and ensuring its adequacy is responsible for identifying the agency's preferred alternative (see Question 4c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  Whereas the BLM must work with cooperators and other interested parties to encourage consensus on a preferred alternative, the preferred alternative in the EIS represents the preference of the lead agency.  Cooperators and other interested parties can express their preferences through scoping and comments on the draft EIS.  The BLM will occasionally prepare an EIS with another Federal agency as "joint lead" agencies (40 CFR 1506.2(b)).  In such circumstances, the joint lead agencies must work towards reaching consensus about the preferred alternative.  If consensus cannot be reached, we recommend that each joint lead agency clearly identify their preferred alternative and explain the basis for their preference and why consensus could not be reached. (See section **12.2,** *Joint Lead Agencies in Development of NEPA Documents*).

The proposed action may be, but is not necessarily, the BLM's preferred alternative.  For internally proposed actions implementing the LUP, the proposed action will often end up as the BLM's preferred alternative.  For external proposals or applications, the proposed action may not turn out to be the BLM's preferred alternative, because the BLM will often present an alternative that would incorporate specific terms and conditions on the applicant.

## 9.2.8   Chapter 3—Affected Environment

You must provide brief description of the environment likely to be affected by the proposed action or alternatives.  Limit the description of the affected environment to that information relevant to understanding the effect(s) of the proposed action or alternative (see sections **6.7.1, *Affected Environment*** and **6.7.2, *Use of Relevant Data***).  You may present the affected environment description as its own section, or combined with environmental effects. If the EIS will be used to document compliance with any supplemental authorities, some of which are listed in **Appendix 1, *Supplemental Authorities to be Considered***, it may be necessary to provide a description of the resources of concern.

## 9.2.9   Chapter 4—Environmental Effects

The EIS must describe and provide the analysis of environmental effects of the proposed action and each alternative analyzed in detail (40 CFR 1502.16).  Describe the assumptions and assessment criteria used in analyzing impacts.  Identify any time-frames, rates of change, and other common data applied to the analysis.  Explain assumptions used when information critical to the analysis was incomplete or unavailable.  Include relevant reasonably foreseeable development scenarios for certain programmatic EISs and for cumulative effects analysis.  See section **6.8.1.2, *Analyzing Effects*** for a discussion of when methodologies must be discussed in the main text and when they may be placed in an appendix.  See section **6.7.2, *Use of Relevant Data***, for a discussion of incomplete or unavailable information.

> "The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented" (40 CFR 1502.16).

Discussion of impacts may either be organized by alternative with impact topics as subheadings or by impact topic with alternatives as subheadings.  Generally, if impacts to a particular resource for one alternative are the same as another alternative, make reference to that section in the EIS rather than repeating the information.

Based on the effects analysis in this chapter, develop a summary comparison of effects by alternative and include the summary in the section that describes the alternatives in Chapter 2. You must describe direct, indirect, and cumulative impacts of each alternative (40 CFR 1508.25(c)).  We recommend that you quantify the effects analysis as much as possible and describe effects in terms of their context, duration, and intensity.  Base the analysis of impacts on the assumption that all standard operating procedures and other standard BLM-wide requirements will be followed in implementing the proposed action and alternatives unless changes in such practices are specifically being addressed in the analysis or considered in an alternative.

BLM_0009377

You must consider long-term impacts and the effect of foreclosing future options.  Describe the relation between short-term uses of the environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources that would be involved in the proposal if it is implemented (40 CFR 1502.16).

All "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (See Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).  See section **6.8.4, *Mitigation and Residual Effects*,** for more discussion of mitigation measures including the difference between these measures and design features of the alternatives.  If mitigation measures are identified, those measures must be analyzed "even for impacts that by themselves would not be considered significant" (See Question 19a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981). Analyze and compare the effectiveness of mitigation measures proposed and the effects if the project were to proceed without mitigation.  Include an assessment of any residual direct, indirect, or cumulative effects that will remain after application of the mitigation measures.

---

Question 5b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981.*

5b. Is the analysis of the "**proposed action**" in an EIS to be treated differently from the analysis of alternatives?

A. The degree of analysis devoted to each alternative in the EIS is to be substantially similar to that devoted to the "proposed action." Section 1502.14 is titled "Alternatives including the proposed action" to reflect such comparable treatment. Section 1502.14(b) specifically requires "substantial treatment" in the EIS of each alternative including the proposed action.  This regulation does not dictate an amount of information to be provided, but rather, prescribes a level of treatment, which may in turn require varying amounts of information, to enable a reviewer to evaluate and compare alternatives**.**

---

### 9.2.10   Chapter 5 - Consultation and Coordination

Include a brief history of the public involvement (including scoping) undertaken, a list of agencies (including cooperating agencies) and organizations consulted, a list of preparers and their expertise, and a list of recipients of the EIS.  In the final EIS, include a response to comments section.

### 9.2.10.1    Public Involvement and Scoping

- Summarize the scoping process, including efforts to involve the public in preparation of the EIS.  Briefly describe the scoping meetings (when, where, how many, topics), the major issues that arose during scoping if they have not been discussed in Chapter 1, and the comments received.
- Include names of any Federal, State, or local agencies, major organizations or individuals consulted.
- Identify any unresolved environmental issues or conflicts discussed during scoping.
- Include a list of all agencies, organizations, and people to whom you will send copies.  This list may be organized alphabetically under "Federal agencies," "State and local agencies," "Indian tribes," "organizations," and "individuals."  If this list of individuals is excessively long, you may place it in the administrative record instead of the EIS, but note in the EIS that a complete list is found in the administrative record.  In the final EIS, provide an updated list of recipients, as necessary, to indicate who will be receiving the final EIS.

Although not required, you may find it to be useful to provide a discussion of the government-to-government consultation process that was followed during the EIS process.  The BLM Handbook H-8120-1 contains examples of program guidance for Native American consultation, and the BLM Manual 8120, *Tribal Consultation Under Cultural Resources*, provides detailed guidance for this consultation.  See the Web Guide for a copy of H-8120-1.

### 9.2.10.2    List of Preparers

The EIS must include a list of individuals, including names and qualifications, primarily responsible for preparing the document or significant supporting reports (40 CFR 1502.10(h) and 40 CFR 1502.17).

### 9.2.11    Other Material

- The last section of the EIS may include a bibliography, glossary, index of key words, and appendices.
- The bibliography includes a list of references cited in the EIS, including written material and personal communications.
- Define in a glossary, using plain language, any technical or other terms not understandable to an average lay reader.  Either in the glossary or in a separate list define any acronyms used in the EIS.
- You must include an alphabetically ordered index that contains enough key words from the EIS to allow the reader to find the information (see Questions 26a and 26b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).
- Appendices are for support of critical analyses in the EIS.  An appendix is not a data bank or library for total reference support, but contains only major substantiating data, essential relevant descriptions of environmental components, or other information necessary for complete use of the EIS for analytical or decision-making purposes.  You

BLM_0009379

may keep other supporting material in the administrative record and make it available if requested, instead of including it as an appendix.

## 9.3   ISSUING THE DRAFT EIS

Once approved, print the draft EIS, file it with the Environmental Protection Agency (EPA), and issue it for public review and comment.  See **Chapter 13**, ***Administrative Procedures***, for information on printing the draft EIS.

### 9.3.1   File with the EPA

File the draft EIS with the EPA in accordance with procedures identified in Chapter 13.  The EPA will then publish notice of the filing in the *Federal Register*.  The date the EPA notice appears in the *Federal Register* initiates the public review period.  Consult program-specific guidance for additional requirements regarding filing procedures.

### 9.3.2   Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment

You must provide public notification of the availability of the draft EIS, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b)).  You must publish an NOA in the *Federal Register* for a draft EIS prepared for a LUP or LUP amendment (*BLM Land Use Planning Handbook H-1601-1*).  The CEQ regulations at 40 CFR 1503.1 require that the BLM obtain comments from Federal agencies with jurisdiction by law or special expertise; and that we request comments from appropriate State and local agencies, tribes, and any agency that requests a copy of the EIS.  There are no content or format requirements for an NOA other than those associated with the preparation of notices for publication in the *Federal Register* (see section **13.1**, ***Publishing Notices in the* Federal Register**).  In addition to announcing the availability of a document and the public review period, where applicable, the NOA will generally identify the purpose and need of the action, describe the proposed action and alternatives, and indicate the dates and location of public meetings on the document.  Consult program-specific guidance for any other content requirements.  A sample notice is shown in **Appendix 11**, ***Federal Register Illustrations***.  Sample NOAs for draft and final EISs are available in the Web Guide.  Check with your State NEPA coordinator and Public Affairs Chief for information about the appropriate documentation to include with your NOA.  Public affairs will also assist with procedures for notifying appropriate members of the Congressional Delegation from your State.

The public comment period for all draft EISs must last at least 45 days (516 DM 4.26), but some programs require longer comment periods.  For example, a draft EIS for a LUP or LUP amendment must be available for a 90-day comment period (*BLM Land Use Planning Handbook H-1601-1*, page 23).  Check program guidance requirements.

A press release is usually prepared for national media, local media, or both to announce the availability of the draft and to announce any public meetings or hearings.

BLM_0009380

### 9.3.3    Distribute the Draft EIS

"Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in Sec. 1502.18(d) and unchanged statements as provided in Sec. 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.
(b) The applicant, if any.
(c) Any person, organization, or agency requesting the entire environmental impact statement.
(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period" (40 CFR 1502.19).

Distribute the draft EIS before or on the same day copies are transmitted to the EPA for filing (see section **13.3.2, *Procedures for Filing with the EPA*** for more discussion). Provide two copies to the BLM Library at the National Science and Technology Center in Denver and two copies to the BLM Planning Office in Washington, D.C. (WO-210). The standard distribution of EISs to other Interior and Federal agencies is described in the Web Guide. You must make copies available to any requesting party (40 CFR 1505.5(f)). Make sufficient copies available for review in appropriate BLM offices, including the State Office, and for distribution to those who request a copy during the review period. The use of Web sites to distribute draft and final EISs and RODs is encouraged, as is the use of compact disks or other electronic media. However, do not underestimate the number of paper copies that will be needed; there are still many people who will want a paper copy. The State NEPA coordinator can provide guidance on this process. The BLM may charge requesting parties the cost of production for a document copy in a particular format or in multiple copies.

### 9.3.4    Public Meetings and Hearings

You may hold public meetings or hearings to receive comments on the draft EIS. (See section **6.9.1, *Involving and Notifying the Public***). You must maintain records of public meetings and hearings including a list of attendees (as well as addresses of attendees desiring to be added to the mailing list) and notes or minutes of the proceedings. Consult 455 DM 1 for procedural requirements related to public hearings. Check individual program guidance to determine requirements for public meetings and hearings. See section **6.9.2, *Comments***, for a discussion of how to manage and process comments on the draft.

BLM_0009381