## 9.4   THE FINAL EIS

Following public review of the draft EIS, the lead agency prepares a final EIS (unless a decision is made to terminate the EIS).

### 9.4.1   Abbreviated Final EIS

In deciding whether an abbreviated EIS is appropriate, consider the extent of the changes made to the EIS as a result of comments on the draft.  If you make only minor changes to the draft EIS in response to comments, then you may prepare an abbreviated final EIS.  An abbreviated final EIS only contains a cover sheet, an explanation of the abbreviated EIS, copies of substantive comments received on the draft, responses to those comments, and an *errata* section with specific modifications and corrections to the draft EIS made in response to comments (40 CFR 1503.4).  Abbreviated EISs require that the reader have access to both the draft and the final EIS. Because a draft EIS is usually required to understand changes in an abbreviated EIS, send the appropriate number of draft EISs with the abbreviated final EIS to the EPA when filing the final. See the Web Guide for examples of abbreviated EISs.

### 9.4.2   Full Text Final EIS

If you make major changes to the draft EIS, the final EIS should be a complete full text document.  The content of a full text document is substantially the same as the corresponding draft EIS except that it includes copies of substantive comments on the draft EIS, responses to those comments and changes in or additions to the text of the EIS in response to comments (40 CFR 1503.4).  A full text final EIS may incorporate by reference some of the text or appendices of the draft EIS (see section **5.2.1, *Incorporation by Reference***).

## 9.5   SUPPLEMENTS TO DRAFT AND FINAL EISs

See section **5.3, *Supplementing an EIS*,** for a discussion of when to supplement a draft or final EIS.  The standard procedural and documentation requirements for preparing an EIS described in this chapter also apply to supplementing an EIS, with the following exceptions:

- Additional scoping is optional (40 CFR 1502.9 (c)).

- We recommend that the supplemental EIS identify the EIS being supplemented on the cover page, and explain the relationship of the supplement to the prior analysis early in the text.

- We recommend that the supplemental EIS identify the changes in the proposed action or the new information or changed circumstances that require the BLM to prepare the supplement.

BLM_0009382

- The OEPC and the Office of the Solicitor must be consulted before proposing to the CEQ to prepare a final supplement without preparing an intervening draft (516 DM 4.5(B)).

You must circulate a supplement in the same manner as a draft or final EIS (40 CFR 1502.9(c)). If there is good reason to believe the interested and affected public will have a copy of the draft or final EIS, you only need to circulate the supplement. If you do not circulate the EIS being supplemented with the supplement, it must be reasonably available for public inspection (40 CFR 1506.6(f)).

## 9.6   ISSUING THE FINAL EIS

Once the final EIS is prepared, print it, file it with the EPA, and distribute it to the public. (See **Chapter 13, *Administrative Procedures*** for guidance on printing, filing, and distributing the EIS.) You must provide public notification of the availability of the final EIS, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b)). You must publish an NOA in the *Federal Register* for a final EIS prepared for a LUP or LUP amendment (*BLM Land Use Planning Handbook H-1601-1*). (See section **13.1, *Publishing Notices in the Federal Register*** for guidance on publishing notices). The State NEPA coordinator and Public Affairs Chief can provide information about the appropriate documentation to include with an NOA. The date the EPA notice appears in the *Federal Register* initiates the required minimal 30-day availability period. Although this is not a formal public comment period, you may receive comments. Also note that while you may have requested comment from agencies with jurisdiction by law or special expertise, you do not need to delay preparation and issuance of the final EIS when such agencies do not comment within the prescribed timeframe (516 DM 4.19(A)).

### 9.6.1   Comments Received Following Issue of the Final EIS

Any comments received may be addressed in the ROD. However, review any comments on the final EIS, to determine if they have merit; for example, if they identify significant new circumstances or information relevant to environmental concerns and bear upon the proposed action. If so, the decision-maker preparing the EIS must determine whether to supplement the draft or the final EIS or if minor changes can be made to the existing EIS. Refer to section **9.5, *Supplements to Draft and Final EISs***, when supplementing a draft or final EIS. Check program guidance for additional review requirements. For example, there is a 60-day Governor's consistency review requirement for LUPs (*BLM Land Use Planning Handbook H-1601-01*, pages 24-25).

## 9.7   ISSUING THE RECORD OF DECISION

A ROD is prepared to document the selected alternative and any accompanying mitigation measures. The ROD is must be signed by the decision-maker. The ROD may be integrated with any other record prepared by the BLM (40 CFR 1505.2). Examples would be findings for floodplains required by E.O.11988 and for wetlands required by E.O. 11990. No action concerning a proposal may be taken until the ROD has been issued, except under conditions specified in 40 CFR 1506.1 (see section **1.4, *The NEPA Approach***).

Except as described below, the ROD cannot be issued until the later of the following dates:
- 90 days after the publication of the EPA's notice of filing of the draft EIS.
- 30 days after publication of the EPA's notice of filing of the final EIS (40 CFR 1506.10(b)).

You must provide public notification of the availability of the ROD, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b), Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981). You must provide a copy of the ROD to those who have requested it (40 CFR 1506.6(b), Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981). We recommend that you provide a copy of the ROD to substantive commenters on the draft or final EIS and to others known to have a strong interest in the proposal(s). Generally, the funding office in Washington will specify WO or other distribution requirements. For example, a copy of the decision documents for LUPs or plan amendments must be provided to WO-210 (Planning and Science Policy). Consult program-specific guidance for additional requirements on the distribution of RODs or records which incorporate RODs.

If the decision is subject to 30-day appeal to the Interior Board of Land Appeals (IBLA), then the ROD may be issued at the same time the final EIS is filed (40 CFR 1506.10(b)). This allows both 30-day periods to run concurrently. If the ROD is issued at the same time the final EIS is filed, the EIS must identify and explain the appeal provisions. If the ROD is issued in full force and effect, then it cannot be issued until 30 days after publication of the EPA's notice of filing the final EIS (40 CFR 1506.10(b)(2)).

Consult program specific guidance for any additional requirements regarding protest and appeal procedures and preparation of RODs.

## 9.7.1   ROD Format

A suggested format which satisfies the ROD content requirements specified in 40 CFR 1505.2, is provided below. The Land Use Planning Handbook provides a recommended format for planning-related RODs. There is also an example of a ROD in the Web Guide.

Introductory Material. A cover sheet that provides introductory material may be prepared. This includes the title, project or case file identification number, preparing office and office location, cooperating agencies, signatures, date of signatures, and titles of the responsible and concurring officials.

Summary. A summary is needed only if the ROD exceeds 10 pages.

BLM_0009384

104

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

<u>Decision.</u>  Include a concise description of the approved action.  Identify all important aspects of details of the decision.  Provide a clear description of what is and what is not being approved.  Attach to the ROD stipulations and other design features that are part of the decision or incorporated by reference.  Present any committed mitigation measures and related monitoring and enforcement activities, if any, for the selected alternative (see **Chapter 10, *Monitoring***).  Indicate whether all practicable mitigation measures have been adopted.  You must identify any mitigation measures which were not selected with a brief explanation of why such measures were not adopted (40 CFR 1505.2(a)).

<u>Alternatives.</u>  Identify all of the alternatives considered.  When it is necessary to summarize the alternatives, thematic descriptions including major aspects may be helpful.  You must identify the the environmentally preferable alternative in this section (40 CFR 1505.2 (b)).  The environmentally preferred alternative best promotes the national environmental policy in Section 101 of the NEPA.  This is ordinarily the alternative that causes the least damage to the biological and physical environment and best protects, preserves and enhances the resources that are present.  (See Question 6a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).

<u>Management Considerations.</u>  Provide the rationale for the decision.  Discuss factors which were important and relevant to the decision (40 CFR 1505.2 (b)).  Explain how the alternatives respond to the purpose and need for the action.

<u>Public Involvement.</u>  Briefly describe efforts to seek public views throughout the EIS process.

## 9.8  Terminating the EIS Process

When you terminate the EIS process without completing a Record of Decision, complete your administrative record, documenting the reason or reasons for aborting the process.  Publish a notice in the *Federal Register*, referencing the relevant Notice of Intent to prepare the EIS and stating that you are terminating the EIS short of completion.  If you have already published a draft EIS, we recommend that you inform all who commented on the draft that you are ending the process and briefly explain why.

BLM_0009385

# CHAPTER 10—MONITORING

General
10.1   Purposes of and Requirements for Monitoring
10.2   Developing a Monitoring Plan or Strategy
10.3   Implementing Monitoring

## GENERAL

Monitoring can provide important information, including whether decisions were implemented as designed, their effectiveness in achieving desired outcomes and the effectiveness of mitigation measures.  Monitoring can also determine whether the impact analysis was accurate.  In certain instances, as described below, monitoring is required.

## 10.1   PURPOSES OF AND REQUIREMENTS FOR MONITORING

The level and intensity of monitoring varies according to the purpose being served.  In developing a NEPA-related monitoring program, carefully consider the following purposes of monitoring.

To Ensure Compliance with Decisions

We recommend monitoring to ensure that actions taken comply with the terms, conditions, and mitigation measures identified in the decision.  This monitoring may identify underlying reasons for non-compliance.  You must provide compliance monitoring where mitigation measures are required to reach a FONSI.

To Measure the Effectiveness or Success of Decisions and the Accuracy of Analysis

While not required by the NEPA, monitoring can be implemented to determine if the decisions are achieving intended environmental objectives, and whether predicted environmental effects were accurate.  This could include the validation of conceptual models and assumptions used in the analysis.

To Determine How to Modify Decisions if the Purpose and Need or Desired Outcomes Are Not Being Achieved.

If decisions are not meeting the purpose and need or achieving desired outcomes, monitoring may be used to identify necessary changes.

In a record of decision (ROD), a monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation (40 CFR 1505.2(c)).  The ROD must identify the monitoring and enforcement programs that have been selected and plainly indicate that they were adopted as part of the agency's decision (see Question 34c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*).  The ROD must delineate the monitoring measures in sufficient detail to constitute an enforceable commitment, or incorporate by reference the portions of the EIS that do so (see Question 34c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*).

BLM_0009386

106

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

The decision record on an EA may also impose requirements for mitigation and related monitoring and enforcement activities.  Monitoring activities which are adopted in a decision record must be implemented as specified.

In situations where there is incomplete or unavailable information relevant to reasonably foreseeable significant adverse impacts essential to a reasoned choice among alternatives, and it is not feasible to obtain that information prior to making a decision, we recommend that you establish a monitoring program to assess resources or values that may be impacted in order to determine if subsequent action needs to be taken.

We recommend that you coordinate monitoring that stems from the NEPA analysis process with other BLM monitoring activities.  The BLM Manual 1734 - Inventory and Monitoring Coordination, provides additional guidance on the BLM's inventory and monitoring programs.

## 10.2   DEVELOPING A MONITORING PLAN OR STRATEGY

Except for monitoring activities specifically addressed in the decision document, the responsible manager has discretion in scheduling monitoring activities, determining monitoring approaches or methodologies, and establishing monitoring standards.  We recommend a written monitoring plan that incorporates monitoring schedules, approaches, and standards.  Consider Bureau-wide and program specific monitoring policies and strategies in developing a monitoring plan (see BLM Manual 1734, Inventory and Monitoring Coordination).

We recommend that you consider the following factors when developing a monitoring plan.

> Coverage – We recommend that you tailor the scope of monitoring activities to meet the intended purpose of monitoring.  *For example, monitoring activities may be limited to determining if the action is implemented as planned (compliance monitoring), or they may be designed to also include determination of whether the action is meeting goals and objectives (effectiveness monitoring).*

> Frequency – The establishment of specific time frames are recommended for each monitoring activity.

> Intensity/Complexity – The intensity and complexity of monitoring activities will vary according to the issues at hand and with the purpose of the monitoring.  *For example, compliance monitoring to determine if an action is being implemented as described in the decision document may be relatively simple.  However, determining whether implementation of an action is achieving complex ecological objectives, would involve more complex monitoring techniques and analysis.*

BLM_0009387

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## 10.3  IMPLEMENTING MONITORING

It is important that managers establish priorities for implementing monitoring activities.  The following are situations or circumstances that warrant high priority for monitoring and that should be considered in determining important cases:

- A ROD adopts mitigation measures to reduce environmental impacts (monitoring required).
- Decisions authorize actions involving new or untested procedures or methods, or involve a high degree of uncertainty regarding the effects of the procedure or method.
- Effects are based on incomplete or unavailable information.
- Uncertainty exists about the interactive effects of multiple resources or uses.
- The decision may affect highly sensitive or important resource values.

---

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases (40 CFR 1505.3).

---

BLM_0009388

Case No. 1:20-cv-02484-MSK   Document 28-10   filed 04/27/21   USDC Colorado   pg 8 of 253

This page intentionally left blank.

BLM_0009389

# CHAPTER 11—AGENCY REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS

11.1   Obtaining Comments on Your EIS
11.2   Commenting on Another Federal Agency's EIS

## 11.1   OBTAINING COMMENTS ON YOUR EIS

When preparing an EIS, you must obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved (40 CFR 1503.1(a)(1)).  We recommend responding to comments from these agencies, even if the comments are untimely.  However, you do not need to delay the preparation and issuance of a final EIS when such agencies do not comment within the prescribed timeframe (516 DM 4.19(A)).

## 11.2   COMMENTING ON ANOTHER FEDERAL AGENCY'S EIS

When the BLM has jurisdiction by law or special expertise with respect to a project's environmental impacts, the BLM must comment on the EISs of other Federal agencies (40 CFR1503.2).  The BLM may be asked to review or provide comment on other environmental documents as well.  If the BLM does not have comments on an EIS where it has jurisdiction by law or special expertise, it must reply to that effect.  (Generally, if the BLM has jurisdiction by law or special expertise, the BLM will be a cooperating agency in the NEPA process.  See **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees*.**)

The OEPC coordinates review of other agencies' EISs and assigns agency responsibilities for review.  This includes setting the schedule for review and requesting extensions.

When a cooperating agency comments on a BLM document, or when the BLM is a cooperating agency, the comment must (40 CFR 1503.3):

- describe alternative methods for analyzing impacts if it criticizes methodology in the EIS.
- specify mitigation measures it finds acceptable if it criticizes the level of impact.

Guidance for reviewing and commenting on NEPA documents that are prepared by other agencies but that may affect BLM-managed resources is provided in 516 DM 7.  This chapter of the manual describes the roles and responsibilities of the Department and agencies, how different reviews are handled, and the content and process for performing such reviews.

BLM_0009390

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009391

# CHAPTER 12—COOPERATING AGENCIES, JOINT LEAD AGENCIES, AND ADVISORY COMMITTEES

General
12.1   Cooperating Agency Status in Development of NEPA Documents
12.2   Joint Lead Agencies in Development of NEPA Documents
12.3   Working with Advisory Committees and the Federal Advisory Committee Act

## GENERAL

This chapter discusses means for consulting with and obtaining the views of appropriate entities as part of the NEPA process.

## 12.1   COOPERATING AGENCY STATUS IN DEVELOPMENT OF NEPA DOCUMENTS

The CEQ regulations (40 CFR 1501.6) provide for and describe both lead and cooperating agency status, and emphasize agency cooperation early in the NEPA process.  Upon request of the lead agency, any other Federal agency which has "jurisdiction by law" shall be a cooperating agency.  Jurisdiction by law means the other agency has authority to approve, veto, or finance all or part of the proposal (40 CFR 1508.15). *For example, the Federal Communication Commission approves applications for BLM communication facilities and has NEPA procedures (47 CFR 1.1301 to 1.1319) for the preparation of environmental documents associated with such applications.  The BLM or FCC may participate as either lead or cooperating agency in the preparation of these documents.  You must contact FCC and agree on appropriate lead and cooperating agency status.*

In addition, any other Federal agency which has "special expertise" with respect to any environmental issue which will be addressed by the NEPA analysis may participate as a cooperating agency.  Special expertise means "…statutory responsibility, agency mission, or related program experience" (40 CFR 1508.26).  When the BLM is a lead agency, another agency may request that we designate it a cooperating or joint lead agency.  Any State, tribal, or local agency with jurisdiction by law or special expertise may by agreement be a cooperating agency (40 CFR 1508.5; 516 DM 2.5c).  Cooperating agency status is most commonly applied to preparation of an EIS, but may also be applied to an EA (DM ESM02-2).

> The BLM publication "A Desk Guide to Cooperating Agency Relationships" (2005) defines the lead agency–cooperating agency relationship and explores ways to create more effective government partnerships in the preparation of NEPA documents and land use plans.

Requirements for working with cooperating agencies were added to the BLM's planning regulations in 2005 (43 CFR 1601.0-5, 1610.3-1, and 1610.4).  Our Land Use Planning Handbook (H-1601-1) provides additional guidance for collaborative planning and preparation of an EIS or EA for approval, amendment, or revision of an LUP.

BLM_0009392

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**12.1.1    When Another Agency is Cooperating in Preparation of a NEPA Analysis Document with the BLM as a Lead**

You must invite eligible governmental entities (Federal, State, local, and tribal) to participate as cooperating agencies when preparing an EIS (516 DM 2.5(e)).  You must also consider any requests by eligible governmental entities to participate as a cooperating agency with respect to a particular EIS, and will either accept or deny such requests.  If such a request is denied, the BLM will inform the other agency and state in writing, within the EIS, the reasons for such denial. Throughout the preparation of an EIS, you must collaborate, to the fullest extent practicable, with all cooperating agencies, concerning those issues relating to their jurisdiction or special expertise (516 DM 2.5(f)).  Prepare a Memorandum of Understanding (MOU) with any cooperating agency, clearly defining the roles and responsibilities of each agency.

**12.1.2    When the BLM is Cooperating in Preparation of a NEPA Analysis Document With Another Agency as Lead**

Functioning as a cooperating agency in preparation of an EIS or EA provides you several advantages:

–    You may adopt the EIS without recirculating it when, after an independent review of the analysis, you conclude that your comments and suggestions have been satisfied (40 CFR 1506.3(c)).

–    You, and the lead agency, may save staff time and dollars when compared to each agency preparing its own document.

–    You can ensure that the NEPA analysis document meets all Departmental and BLM requirements or standards.

–    Expanding the scope of a NEPA analysis to consider connected and cumulative actions of all cooperating agencies into a single document improves overall interagency coordination.

–    Agencies working cooperatively help the public to participate effectively and efficiently. The public involvement in the NEPA process takes place in the larger context of multiple agencies.  Thus, the public can better understand the entire scope of a proposal, rather than being presented with a piece of it now and another piece later.  The public can participate effectively with fewer meetings to attend and letters to write.

–    You can ensure that the NEPA analysis specifically addresses the action that you must consider before making your decision.  This avoids the struggle to adapt another agency's documentation to fit our proposed action.

BLM_0009393

### 12.1.3     Deciding Whether to be a Cooperating Agency

When another Federal agency intends to prepare a NEPA analysis document, and you have a related decision to make, formally ask to be a cooperating agency as early as possible.  You must notify the OEPC of either the acceptance or rejection of a cooperating agency request (516 DM 2.5(B)).

If another agency asks you to be a cooperating agency in preparation of a NEPA document for an action in which the BLM has *jurisdiction by law*, you must be a cooperating agency (40 CFR 1501.6).

If another agency asks you to be a cooperating agency in preparation of a NEPA analysis document in which the BLM has *special expertise*, you may elect to be a cooperating agency.  In deciding, consider what resources you have to commit to the document preparation.

### 12.1.4     Procedures for Working as a Cooperating Agency

An interagency memorandum of understanding (MOU) between the BLM and the lead agency must be prepared (516 DM 2.5(G)).  It must identify a BLM contact and specify any special resource needs, data requirements, and issues that need to be addressed in the analysis.  The MOU must also identify the responsibilities of the lead and cooperating agencies (a sample MOU is in the Web Guide).

We recommend that the BLM be identified as a cooperating agency in the notice of intent (NOI) published in the *Federal Register*, and that the BLM be identified as a cooperating agency in the NEPA analysis document, preferably on the cover sheet.

After adopting the NEPA document, the BLM must issue its own decision (and FONSI for an EA) (Questions 30, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*), *CEO Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)) (see section **5.4, *Adopting Another Agency's NEPA Analysis***).  This may be done in an individual decision document or in a decision document signed by more than one agency, as long as it is clear that only the BLM decision-maker is making a decision regarding resources under BLM authority.

## 12.2  JOINT LEAD AGENCIES IN DEVELOPMENT OF NEPA DOCUMENTS

In order to eliminate duplication while satisfying NEPA and comparable State and local requirements, the CEQ regulations (40 CFR 1506.2(b)) encourage Federal agencies to be joint leads with State and local agencies.  When two agencies have approximately equal pieces of a proposal being considered and want to make this situation clear to their respective partners, they may agree to be joint lead agencies.

A Memorandum of Understanding (MOU) must be signed by both agencies, clearly defining the roles and responsibilities of each (516 DM 2.5(G)).  Only one agency must be identified as the agency responsible for filing the EIS with the EPA.

BLM_0009394

114

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

We recommend that the agencies be identified as joint lead agencies in the NOI and in the NEPA documents. We recommend that the cover sheet clearly identify the joint leads, and the logos of both agencies be displayed on the cover of the NEPA documents.

We recommend that an EIS preparation plan be developed and signed by both agencies, and identify such things as: the decisions to be made by each agency, the make up of the core team and ID team and their responsibilities, estimated budget and financial obligations of each agency, review responsibilities, and tentative schedules.

You must issue your own ROD for an EIS, and your own FONSI and decision record for an EA. (Questions 30, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*), *CEQ Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263 (July 28, 1983)*)) This applies to any Federal lead or cooperating agency, and all other cooperating agency procedures apply as well. This may be done in an individual decision document or in a decision document signed by more than one agency, as long as it is clear that only the BLM decision-maker is making a decision regarding resources under BLM authority.

## 12.3  WORKING WITH ADVISORY COMMITTEES AND THE FEDERAL ADVISORY COMMITTEE ACT

The Federal Advisory Committee Act (FACA) was enacted to reduce narrow special-interest group influence on decision-makers, to foster equal access to the decision-making process for the general public, and to control costs by preventing the establishment of unnecessary advisory committees. The FACA applies whenever a statute or an agency official establishes or uses a committee, board, commission or similar group for the purpose of obtaining advice or recommendations on issues or policies within the agency official's responsibility.

See H-1601-1, Appendix B for determining when the FACA applies, FACA requirements, and avoiding violations of the FACA. More in-depth information can also be found in the BLM FACA Guidebook, available from the BLM ADR (Alternative Dispute Resolution) and Conflict Prevention Program, in hard copy and online at www.blm.gov/adr.

BLM_0009395

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## 12.3.1   Guidance for Meeting With Groups

If participants with the BLM in a collaborative group are solely Federal, State, tribal, or local government employees operating in their official capacities, the group is exempt from the administrative requirements of the FACA.

If participants include nongovernmental members and they will meet regularly or formally, there are a number of circumstances that will require a FACA charter.

> The BLM's managers and staff must understand the provisions of the FACA both when they are gathering public input for decision-making processes and when they are working in collaborative efforts.  In essence, any time a group will be consulted or will be providing recommendations to a BLM official, the BLM should verify whether the FACA applies and, if so, ensure that the FACA requirements are followed.

–   The BLM establishes, manages, or controls the group.  A FACA charter is usually necessary if the BLM will be making decisions on or otherwise controlling group membership, sending out meeting invitations, or hosting the meeting.

–   The BLM also manages or controls the group's agenda, takes a leadership role in the group, and facilitates the meetings.  Funding the group or holding a disproportionate number of the group's meetings on BLM property may also be seen as indicators of management or control.

–   A FACA charter may be necessary if the BLM is seeking group advice or specific group recommendations to the agency from a nongovernmental group.

If the BLM wishes to have a central role in the formation and agenda of the group, consider pursuing a charter for a FACA committee.  Refer to the Office of the Solicitor for additional information.

To avoid the need for a FACA charter, publicize the meetings of the group, and open group membership to all.

> Meetings of collaborative community working groups should adhere to general open government criteria.  For example: *invite the public to meetings; publish timely notice in local forums; accept public comments; and keep records of group meeting minutes, attendance, and other documents used by the group.*  Even when meetings with other governmental agencies are exempt from the FACA, BLM employees should be aware of State "open meetings" laws or similar County ordinances.  For example, *an LUP strategy session attended by BLM representatives and a quorum of County Commissioners may need to be open to the public.*

116

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## 12.3.2   Alternatives to Chartered Groups

–   The BLM can establish a working group with solely governmental entities—other Federal, State, tribal, and local government employees working in their official capacities.

–   One of the non-Federal entities involved can take the lead in organizing and setting up the group.  The FACA only applies to Federal agencies, so if a tribal, State, county, or local agency or public interest group is willing to put the collaborative group together, control membership, and set up meetings, the BLM can participate without violating the FACA.

–   In some situations, the BLM can form a working group as a subcommittee of a preexisting Resource Advisory Committee (RAC) or other FACA-chartered advisory committee.  Make sure the working group always reports to the RAC or chartered committee and not directly to the BLM.

–   Sometimes group advice is not the desired outcome— the BLM only needs input from a variety of public stakeholders.  Or sometimes the BLM needs to educate the community about its programs and decisions.  Here, the best approach may be to hold town hall-style meetings with open public participation.  Such meetings will not violate the FACA as long as the BLM is not seeking group advice, but rather is sharing information or seeking a range of advice from individuals.

BLM_0009397

# CHAPTER 13—ADMINISTRATIVE PROCEDURES

General
13.1    Publishing Notices in the *Federal Register*
13.2    Printing EISs
13.3    Filing EISs With The EPA
13.4    Recordkeeping Procedures
13.5    Contracting NEPA Work

## GENERAL

There are a number of administrative requirements associated with NEPA analysis.  This chapter discusses how to publish the required *Federal Register* notices, print EISs, prepare the administrative record, and store environmental records.  Additionally, this chapter provides guidance on using contractors to assist with NEPA analysis or documentation.

## 13.1    PUBLISHING NOTICES IN THE *FEDERAL REGISTER*

You must publish various notices in the *Federal Register* during the course of the NEPA process:

- a notice of intent (NOI) to prepare an EIS in the *Federal Register* (40 CFR 1501.7).

- a notice of availability (NOA) for draft, final, and supplemental EISs for land use plans and land use plan amendments, and for actions with effects of national concern (*BLM Land Use Planning Handbook H-1601-1*, 40 CFR 1506.6(b)(2)).  You must file EISs with the Environmental Protection Agency (EPA), who publishes its own *Federal Register* notice (see section **9.3.1, *File with the EPA***).

- an NOA for RODs for actions with effects of national concern (40 CFR 1506.6(b)(2)).

- notices announcing NEPA-related hearings, public meetings, or the availability of EAs and FONSIs on issues of national concern (40 CFR 1506.6(b)(2)).

Offices should follow the most current guidance on review and submission of *Federal Register* notices.

### 13.1.1    Procedures for Publishing Notices in the *Federal Register*

The Office of the Federal Register (OFR) has established procedures and formats to be used when preparing a notice for publication.  Individuals should consult the latest version of the *Document Drafting Handbook* prepared by the OFR for detailed guidance on the preparation of notices for publication in the *Federal Register*.  The handbook can be found online at: http://www.archives.gov/federal-register/write/handbook/.

118

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**13.1.1.1     Publication Requirements**

A *Federal Register* notice should include the following items:

1.  <u>The billing code.</u>  The billing code is assigned by the Government Printing Office and can be obtained from the BLM's printing officer.  It must appear on each document submitted for publication.

2.  <u>Headings.</u>  Each notice should begin with headings that identify the BLM and the subject matter of the notice.  Headings for a notice should be in this format:

    - Department Name (DEPARTMENT OF THE INTERIOR).
    - Subagency Name (Bureau of Land Management).
    - Agency Docket Number (optional).
    - Subject Heading.

3.  <u>Authority citations.</u>  You must cite the authority that authorizes you to issue your notice; you are encouraged to use the shortest form possible.   This may appear in narrative form within the text or in parentheses on a separate line following the text.

4.  <u>Text.</u>  The text of the notice may be organized in any logical format, but the OFR recommends the preamble format, shown below:

    - AGENCY:
    - ACTION:
    - SUMMARY:
    - DATES:
    - ADDRESSES:
    - FOR FURTHER INFORMATION:
    - SUPPLEMENTARY INFORMATION:

5.  <u>Signature.</u>  Notices must be signed by an authorized official.  There must be three copies, each with original signatures, preferably in blue ink (this helps OFR determine that the signatures are original and not photocopies).  The signature block should not be on a page by itself.

See the illustrations provided by the *Federal Register* in **Appendix 11, *Federal Register* Illustrations**.

BLM_0009399

### 13.1.1.2    Typing and Format Requirements

(Refer to **Appendix 11, *Federal Register* Illustrations**)

–   Documents must be prepared on 8 ½″ × 11″ bond paper or photocopy.

–   Documents must be typed on one side of the paper and double-spaced.  Any quoted material, footnotes, and notes to tables may be single-spaced.

–   Documents must have one-inch margins on the top, bottom, and right side of the page.  On the left side, the margin will be one and one-half inches wide.

    All headings must be typed flush with the left margin.  Section headings must be typed out in full on a line separate from the text and underlined.  Pages of the document must be numbered consecutively, starting with the second page.

    The following items must be typed in all capital letters (see illustrations):

    (a)   FEDERAL REGISTER
    (b)   Name of Agency (but not the name of the subagency. i.e., DEPARTMENT OF THE INTERIOR, Bureau of Land Management)
    (c)   Preamble captions

–   The use of abbreviations, symbols, and style must be in accordance with guidance in the *Document Drafting Handbook* prepared by the OFR.

–   All signatures must be original and appear on a page with text.  The name and title of the individual who signs the notice must by typed directly below the signature line.  No second-party signatures will be accepted.

### 13.1.1.3    Submission Requirements

–   The *Federal Register* notice may or may not need to be submitted and reviewed by the Washington Office or the Department.  Review current policy before submitting the notices to the OFR, to ensure compliance with requirements.

–   The notice must be submitted in triplicate to the OFR.  Duplicate originals are recommended (each original is signed in ink, preferably blue, by the issuing official).  It is permissible to submit one original and two copies (each with an original signature), or it is also acceptable to submit one original and two certified copies.  Certified copies must include the name and title of the issuing official typed or stamped on the copy, a statement that reads "Certified to be a true copy of the original document," and the signature of the certifying official.

–   See the Web Guide for the current mailing addresses of the OFR.

120

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**13.1.1.4      Publication Date**

Notices are published in the *Federal Register* on the third business day after they are received by the OFR (for example, if the notice is received and accepted on a Monday, the notice will be published on Thursday).

**13.2   PRINTING EISs**

Prepare all EISs for printing in accordance with the BLM Manual Section 1551.  Work closely with your external affairs staff and your state printing specialist when preparing to print an EIS.

Send two hard copies of the final EIS and the ROD to the BLM Library at the National Science and Technology Center in Denver.

**13.3   FILING EISs WITH THE EPA**

You must file all draft, final, and supplemental EISs with the EPA (40 CFR 1506.9).  The *Federal Register* publishes a notice prepared by the EPA every Friday.  The notice lists all draft, final, and supplemental EISs received and filed with the EPA during the previous week.

Whereas the EPA only publishes notices for EISs on Fridays, the *Federal Register* publishes daily.  The BLM strives to publish the BLM notice for an EIS on the same Friday as the EPA notice publishes.  The BLM notice should not be published before the EPA notice.  For further discussion on publishing notices in the *Federal Register*, see section **13.1**, *Publishing Notices in the Federal Register*.

The filing procedures for delegated EISs are slightly different from the filing procedures for nondelegated EISs, as discussed in section **13.3.2**, *Procedures for Filing with the EPA*.

–      A delegated EIS is one for which the decision authority on the proposed action rests by delegation with a single Assistant Secretary or subordinate officer.

–      A nondelegated EIS is one for which the decision authority on the proposed action requires the approval of more than one Assistant Secretary (or bureaus under more than one Assistant Secretary), OR is an EIS reserved or elevated to the Secretary (or Office of the Secretary) by expressed interest of the Secretary, Deputy Secretary, the Chief of Staff, the Solicitor, or the Assistant Secretary for Policy, Management, and Budget, OR is of a highly controversial nature or one in which the Secretary has taken a prominent public position in a highly controversial issue, OR faces a high probability of judicial challenge to the Secretary.

The Web Guide contains a general schedule for the filing and publishing of *Federal Register* notices.

BLM_0009401

### 13.3.1    Significance of EPA Publication Dates

The date that the EPA notice appears in the *Federal Register* also serves as the official date for announcing the availability of a draft, final, or supplemental EIS, and starting the required comment and protest periods.

–    For draft EISs, this starts the public review period.

–    For final EISs, this notice initiates the 30-day period during which implementation cannot occur (see section.**9.3.1,** *File with the EPA*).

–    For land use planning actions, the EPA notice starts the 30-day protest period (40 CFR 1506.10).

### 13.3.2    Procedures for Filing with the EPA

The following procedures will ensure timely publication of the EPA notice for both delegated and nondelegated EISs.   For a nondelegated EIS, however, the OEPC approves and files the EIS with the EPA.   When you are working on a nondelegated EIS, consult with the OEPC early regarding the schedule and preparation of the EIS.

1.    Prepare a transmittal letter to the EPA.  For a draft EIS, indicate the length of the public review period.  The BLM may request a specific date for the EIS to be listed in the EPA's *Federal Register* notice (Friday publication dates only).  (For nondelegated EISs, the transmittal letter is signed by the OEPC.  Before the EIS is sent to the EPA, it must be approved and cleared to print by the OEPC).

2.    Mail or deliver to the EPA the transmittal letter and five copies of the EIS (draft, final, or supplemental) with a complete distribution list of individuals and organizations to whom the EIS is being distributed.  (Arrangements may be made with the EPA and the printer for direct distribution of the EIS to the EPA to save time).

      The distribution list does not need to include addresses, and may be either printed in the EIS or inserted in the EIS.  Send the letter, EISs, and distribution lists to the current addresses listed in the Web Guide.

      The EPA maintains a Web site with information and addresses associated with submitting EISs, see the Web Guide for this information.

3.    Ensure that the transmittal letter and required attachments are sent to the EPA in sufficient time to guarantee that *Federal Register* publication occurs on the intended date and that public review requirements are satisfied (section **9.3.2,** *Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment*).  The documents must be received by the EPA at least five business days before the date the notice will appear in the *Federal Register*.  Documents must also be received in the Office of Federal Activities before 2:30 pm to be logged as received for that business day.  (The Office of Federal Activities coordinates the EPA's review of all Federal EISs).

BLM_0009402

4.  Concurrent with the transmittal to the EPA, provide a copy of the transmittal letter, including the distribution list, and three copies of the EIS to the Office of Environmental Policy and Compliance (OEPC), 1849 C Street NW (2342-MIB), Washington, DC 20240. Contact the OEPC at 202-208-3891 to obtain the Environmental Statement control number. Immediately provide the Environmental Statement control number to the EPA.  The EPA will not prepare a notice to publish in the *Federal Register* without the Environmental Statement control number.

5.  Before or on the same day copies are transmitted to the EPA, distribute copies of the EIS to individuals or organizations included on the distribution list.  If the printer is mailing the EISs, arrange the shipping dates with the printer.

## 13.4  RECORDKEEPING PROCEDURES

### 13.4.1  Environmental Documents and Supporting Records—The Administrative Record

The administrative record is the paper trail that documents the BLM's decision-making process and the basis for the BLM's decision.  The administrative record establishes that you complied with relevant statutory, regulatory, and agency requirements, demonstrating that you followed a reasoned decision-making process.  It is imperative that the BLM maintain complete and well-organized files (indexed or searchable) of environmental documents and supporting records in its administrative record.  Such documents and records may be either hard copy or electronic. Begin compiling and organizing the administrative record as early in the NEPA process as possible.  Official file copies of BLM environmental documents and supporting records must be maintained by the originating office.  Environmental documents include:

- environmental assessments (EAs)
- findings of no significant impact (FONSIs)
- environmental impact statements (EISs)
- notices of intent (NOIs)
- Records of decision (RODs)
-

(40 CFR 1508.10, Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).

Supporting records consist of material generated or used in the preparation of environmental documents.  As a guiding principle, these records must demonstrate both the process and information used to reach the final decision.  Such records include, but are not limited to:

- mailing lists
- summaries of public meetings (including attendance lists)
- records pertaining to consultations
- documents or studies incorporated by reference
- technical reports prepared by staff
- materials submitted by applicants
- records of contractual work related to the project
- cost recovery forms and records

BLM_0009403

A more complete list of potential supporting records can be found in **Appendix 10, *Items to Include in the Administrative Record.*** The Web Guide includes a PowerPoint presentation on developing an administrative record.

Not all information in the administrative record is necessarily available to the public; information that is confidential must be marked as such.

We recommend you keep administrative records as long as you plan to rely upon that NEPA analysis.  The originating offices are to retain the official file copies of the NEPA document and its supporting record.  These documents are not to be stored indeterminately; the documents may be destroyed when superseded, obsolete, or no longer needed for administrative or reference purposes (BLM Manual 1220, Appendix 2).  At least one copy of draft, final, and supplemental EISs and RODs must be available in the lead State Office or Washington program office, as appropriate.

The lead State Office (or Washington program office, for programmatic or legislative environmental analyses) must determine where and for how long copies of environmental documents and documents incorporated by reference must be maintained.  In accordance with the National Archives Records Administration, the BLM follows a General Records Schedule for management of its records, including NEPA records.  This schedule is found in the BLM Manual 1220, Records and Information Management, Appendix 2—GRS/BLM Combined Records Schedules, which is available in the Web Guide.

In some instances, program-specific guidance identifies distribution and availability requirements.  For example, grazing operator case files are permanent records, and have their own schedule for storage in the field before being moved to the Federal Records Center, and on to the National Archives Records Administration.  The BLM records that may contain Indian fiduciary trust records are to be treated as permanent records, and you must coordinate these through BLM records administrators.

### 13.4.2    Other Environmental Records

Your office may have environmental records that do not fall under the scope of environmental documents as defined above (for example, categorical exclusion review records, or reviews done to determine adequacy of an existing NEPA document).  The originating office must also keep these environmental records in an official file, as discussed in section **13.4.1, *Environmental Documents and Supporting Records—The Administrative Record*.**

For records relating to the review of other agency environmental documents, the BLM office that actually assembles comments and prepares the response should maintain official files.  Thus, when the BLM is assigned as a lead agency for the Department in responding to other Federal agency's EISs, the State Office or Washington program office assigned to prepare the response maintains the official files (including all support material) for both the BLM and the Department. The cutoff for these files is the end of the fiscal year in which the review was completed.  The documents may be destroyed two years after this cutoff date, as long as they are not needed for any purposes (BLM Manual 1220, Appendix 2).

BLM_0009404

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## 13.5  CONTRACTING NEPA WORK

Contracting may be used for the preparation of a NEPA document or for certain portions of the analyses.  Contracting an environmental document does not eliminate the BLM's active role in the NEPA process; you must still put forth substantial efforts to develop the contract, meet frequently with the contractor, review all products, and develop necessary partnerships with counties, the state, Tribes, other Federal agencies, and other BLM offices. The contractor-developed work becomes your work: you are responsible for all content within NEPA document and the supporting materials, which must be included in the administrative record.  Additionally, decisions and findings are those of the BLM, not of the contractor, and these must reflect a review of underlying NEPA document.  As such, we recommend that you prepare the findings and decision records, not the contractor.

The CEQ provides guidance for contracting EAs and EISs at 40 CFR 1506.5(b) and (c).  The BLM may permit an applicant to prepare the EA.  An applicant may also pay a contractor to prepare an EA (this is called third-party contracting).  When an applicant or contractor prepares an EA, the BLM must independently evaluate the information submitted and its accuracy, and the environmental issues.  Though the applicant or contractor prepares the EA, the BLM is responsible for the scope and content of the EA.

The CEQ provides more specific guidance for contracting an EIS.  The BLM remains responsible for all of the content within the EIS.  Additionally, the BLM or a cooperating agency (ies) must select the cooperator, and a conflict of interest disclaimer must be included in the EIS.  The CEQ speaks directly to this requirement at 40 CFR 1506.5(c):

> It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

While the CEQ only requires this disclaimer for EISs, we recommend including such statements in your contractor-prepared EAs as well.  Additionally, when using third-party contracting, we recommend an MOU between the BLM and the applicant.   This MOU must:

- establish the roles and responsibilities of each party; and
- specify that all costs of using a contractor in the preparation of the NEPA document will be borne by the applicant.

BLM_0009405

There are two principle approaches for contracting environmental documents:  standard federal contracting procedures (competitive procurement), and third party contracting.  Procurement of contracts is subject to the Federal Acquisition Regulation (48 CFR 1.6).  Third party contracting may be used most effectively for non-Bureau energy initiatives (for example, power plants and certain rights-of-way).  The key element in both approaches is the BLM control of analytical standards used, of the products produced, and of the schedule.  Work with your procurement personnel early in the process when considering contracting.  See the NEPA Web guide for more information and suggestions on contracting.

The BLM Washington Office or your State Office may establish policy related to contracting NEPA work.  We recommend working with your State NEPA coordinators to ensure that any applicable guidance is used in this process.

BLM_0009406

126

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009407

# CHAPTER 14—ADAPTIVE MANAGEMENT

**[Chapter Reserved for Adaptive Management]**

BLM_0009408

128

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009409

# Glossary

**affect**—to bring about a change.  As a verb, affect is most commonly used in the sense "to influence" or "impact." The adjective "affected" means acted upon or influenced.

**alternatives**—other options to the proposed action by which the BLM can meet its purpose and need.  The BLM is directed by the NEPA to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources...."  (NEPA Sec 102(2)E)

**alternative arrangements**—where emergency circumstances make it necessary to take an action with significant environmental impact, the Federal agency taking the action may consult with Council on Environmental Quality about alternative arrangements to observing the provisions of their regulations to implement the NEPA.  Such arrangements must be limited to actions necessary to control the immediate impacts of the emergency.  Other actions remain subject to NEPA review (40 CFR 1506.11).

**appeal**—an opportunity, provided by the Secretary of the Interior, for a qualified person to obtain a formal review, by an independent board, of the procedures and authority followed by an Interior agency in making a decision.

**at-risk community**—In summary, a group of homes or structures for which a significant threat to human life or property exists as a result of a wildland fire.  When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "at-risk community" in the Act must be used.  See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**categorical exclusion**—a category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an EIS is required (40 CFR 1508.4).

**community wildfire protection plan**—In summary, a collaborative plan developed by State and local governments and communities, in conjunction with adjacent Federal land-management agencies, which identifies areas and priorities for hazardous fuels reduction treatments on Federal and non-Federal lands.  When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "community wildfire protection plan" in the act must be used. See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**conformance**—means that a proposed action shall be specifically provided for in a land use plan or, if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment.  The BLM policy requires that a statement of land use plan conformance be included in a NEPA compliance document.

BLM_0009410

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**connected action**—those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR 1508.25 (a)(1)).  Actions are connected if they automatically trigger other actions that may require an EIS; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification (40 CFR 1508.25 (a)(1)).  Connected actions are limited to actions that are currently proposed (ripe for decision). Actions that are not yet proposed are not connected actions, but may need to be analyzed in cumulative effects analysis if they are reasonably foreseeable.

**cooperating agency**—assists the lead Federal agency in developing an EA or an EIS.  A cooperating agency may be any agency that has special jurisdiction by law or special expertise for proposals covered by the NEPA (40 CFR 1501.6).  Any Federal, State, tribal, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**cumulative action**—proposed actions, which, when viewed with the proposed action, potentially have cumulatively significant impacts related to one or more identified issues.  Cumulative actions "should be discussed" in the same NEPA document (40 CFR 1508.25(a)(2)).

**cumulative effect**—"…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7 and 1508.25).

**decision-maker**—the BLM official who has been delegated authority to approve an action and is responsible for issuing a decision to implement a proposed action.  Synonyms include authorized official, authorized officer, responsible official, and responsible manager.

**decision record (DR)**—the BLM document associated with an EA that describes the action to be taken when the analysis supports a finding of no significant impact.

**delegated EIS**—an EIS for which the decision authority for the proposed action rests by delegation with a single Assistant Secretary or a subordinate officer.

**departmental policy**—a policy established by the U.S. Department of the Interior

**design features**—measures or procedures incorporated into the proposed action or an alternative, including measures or procedures which could reduce or avoid adverse impacts.  Because these features are built into the proposed action or an alternative, design features are not considered mitigation.

**Determination of NEPA Adequacy (DNA)**—an interim step in the BLM's internal analysis process that concludes that a proposed action is adequately analyzed in an existing NEPA document (an EIS or EA).  Where applicable, the determination also addresses conformance with an approved land use plan.

BLM_0009411

**direct effect**—". . . those effects which are caused by the action and occur at the same time and place" (40 CFR 1508.8(a).

**effect**—impact to the human environment brought about by an agent of change, or action. Effects analysis predicts the degree to which the environment will be affected by an action. The CEQ uses both the terms "effect" and "impact" in the NEPA regulations; these terms are synonymous in the NEPA context. As a noun, other synonyms include consequence, result and outcome. Effects can be both beneficial and detrimental, and may be direct, indirect, or cumulative.

**emergency action**—immediate steps or response taken by the BLM to prevent or reduce risk to public health or safety or important resources.

**externally generated proposal**—a proposal that has been developed by an individual or group external to the BLM.

**extraordinary circumstances**—those circumstances for which the Department has determined that further environmental analysis is required for an action, and therefore an EA or EIS must be prepared.

**Federal action**—a BLM proposal is a Federal action when: (1) the proposal is at a stage in development where we have a goal and are actively preparing to make a decision on one or more alternative means of accomplishing that goal (40 CFR 1508.23); (2) the proposed action and effects are subject to BLM control and responsibility (40 CFR 1508.18); (3) the action has effects that can be meaningfully evaluated (40 CFR 1508.23); and (4) effects of the proposed action are related to the natural and physical environment, and the relationship of people with that environment (40 CFR 1508.8; 40 CFR 1508.14).

**Federal Register**—the official daily publication for rules, proposed rules, and notices of Federal agencies and organizations, as well as executive orders and other presidential documents. The *Federal Register* is published by the Office of the Federal Register, National Archives and Records Administration (NARA).

**Finding of No Significant Impact (FONSI)**—a finding that explains that an action will not have a significant effect on the environment and, therefore, an EIS will not be required (40 CFR 1508.13).

**hard look**—a reasoned analysis containing quantitative or detailed qualitative information.

**human environment**—includes the natural and physical environment and the relationship of people with that environment. When economic or social effects and natural or physical environmental effects are interrelated, then the analysis must discuss all of these effects on the human environment (40 CFR 1508.14).

**implementation action**—an action that implements land use plan decisions.

BLM_0009412

**incorporation by reference**—citation and summarization in a NEPA document of material from another reasonably available document that covers similar actions, issues, effects, or resources.

**indirect effect**—effects that "…are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems" (40 CFR 1508.8(b)).

**internally generated proposal**—a proposal developed by the BLM.

**impact—see "effect"**

**issue**—a point or matter of discussion, debate, or dispute about the potential environmental effects or impacts, of an action.  Issues point to environmental effects and may drive the development of alternatives to the proposed action.

**jurisdiction by law**—means another governmental entity (Federal, State, tribal, or local agency) has authority to approve, veto, or finance all or part of a proposal (40 CFR 1508.15).  The CEQ guidance provides for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

**land use plan**—a set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of the Federal Land Policy and Management Act; an assimilation of land-use-plan level decisions developed through the planning process outlined in 43 CFR part 1600, regardless of the scale at which the decisions were developed.  The term includes both Resource Management Plans and Management Framework Plans (H-1601-1, Glossary, page 4).

**legislation**—includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations (40 CFR 1508.17).

**Legislative EIS**—an environmental impact statement prepared on proposals made by Federal agencies for legislation that significantly affects the quality of the human environment.  The term "legislation" in this context does not include proposed legislation initiated *by* Congress or Federal agency requests *to* Congress for appropriations.  Rather, it includes any bill or legislative proposal submitted *to* Congress that is developed by or has the significant cooperation and support of a Federal agency (i.e., the Federal agency is the primary proponent of the legislation).  Special rules apply to the preparation and review of legislative EISs. (40 CFR 1506.8)

**may**—you are free to decide whether or not to follow the guidance described.

**Mitigated FONSI**—a finding that explains that an action will not have significant effects because of the adoption of mitigation measures and, therefore, an EIS would not be required.

BLM_0009413

**mitigation**—measures or procedures which could reduce or avoid adverse impacts and have not been incorporated into the proposed action or an alternative.  Mitigation can be applied to reduce or avoid adverse effects to biological, physical, or socioeconomic resources.

**must**—you are required to follow the guidance described.

**nondelegated EIS**—an EIS for which the decision authority on the proposed action requires the approval of more than one Assistant Secretary (or bureaus under more than one Assistant Secretary); OR an EIS reserved or elevated to the Secretary (or Office of the Secretary) by expressed interest of the Secretary, Deputy Secretary, the Chief of Staff, the Solicitor, or the Assistant Secretary for Policy, Management, and Budget; OR an EIS of a highly controversial nature or one in which the Secretary has taken a prominent public position in a highly controversial issue; OR an EIS that faces a high probability of judicial challenge to the Secretary.

**notice of availability (NOA)**—the *Federal Register* notice that an EIS (draft or final) or record of decision is available.  Publication of a notice of filing of an EIS by the Environmental Protection Agency formally begins the public comment period.  A NOA may also be published for an EA.

**notice of intent (NOI)**—this *Federal Register* notice announces that an environmental impact statement or an EA-level land use plan amendment will be prepared.  Publication of this notice formally starts the scoping process.

**preferred alternative**—the alternative the BLM believes would reasonably accomplish the purpose and need for the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors.  This alternative may or may not be the same as the BLM's or the proponent's proposed action.

**proposal**—the stage in the development of an action when a Federal agency has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated (40 CFR 1508.23).  When the BLM receives or makes a proposal, the NEPA process begins.

**proposed action**—a proposal for the BLM to authorize, recommend, or implement an action to address a clear purpose and need.  A proposal may be generated internally or externally.

**protest**—an opportunity for a qualified party to seek an administrative review of a proposed decision in accordance with program-specific regulations.  For example, a protest may be filed with the Director of the BLM for review of a proposed resource management plan or plan amendment (43 CFR 1610.5-2),or a proposed grazing decision may be protested for review by the authorized officer (43 CFR 4160.2).

**reasonably foreseeable action**—actions for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends.

**reasoned choice** – a choice based on a hard look at how the proposed action or alternatives respond to the purpose and need.

**recommend**— unless you have a good rationale for not doing so, you must follow the guidance described.

**record of decision (ROD)**—the decision document associated with an EIS (40 CFR 1505.2).

**regulation**—an official rule. Within the Federal government, certain administrative agencies (such as the BLM) have a narrow authority to control conduct within their areas of responsibility. A rule (also called a regulation or rulemaking) is a statement you publish in the Federal Register to implement or interpret law or policy (see Administrative Procedure Act, 5 U.S.C. 551(4) ("'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…")). A rule is generally published as a proposed rule and then as a final rule. Once a rule is published in final, it is codified in the Code of Federal Regulations and remains in effect until it is modified by publication of another rule. (318 DM 1).

**residual effects**—those effects remaining after mitigation has been applied to the proposed action or an alternative.

**resource management plan**—(also known as Land Use Plan or Management Framework Plan). A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of the Federal Land Policy and Management Act of 1976, as amended, P.L. 94-579, 90 Stat. 2743; an assimilation of land use plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed.

**ripe for decision**—the circumstance existing when a contemplated action has reached the time when the facts have developed sufficiently to permit an intelligent and useful decision to be made. A Federal action is "ripe for decision" as soon as the agency receives or makes a proposal (40 CFR 1502.5).

**scope**—the extent of the analysis in a NEPA document.

**scoping (internal and external)**—the process by which the BLM solicits internal and external input on the issues and effects that will be addressed, as well as the degree to which those issues and effects will be analyzed in the NEPA document. Scoping is one form of public involvement in the NEPA process. Scoping occurs early in the NEPA process and generally extends through the development of alternatives (the public comment periods for EIS review are not scoping). Internal scoping is simply the use of BLM staff to decide what needs to be analyzed in a NEPA document. External scoping, also known as formal scoping, involves notification and opportunities for feedback from other agencies, organizations and the public.

**significance**—see "significant impact."

**significant impact**—effects of sufficient context and intensity that an environmental impact statement is required. The CEQ regulations at 40 CFR 1508.27(b) include ten considerations for evaluating intensity.

BLM_0009415

**similar action**—BLM actions which, when viewed with other reasonably foreseeable or proposed Federal actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. When it stands to improve the quality of analysis and efficiency of the NEPA process, similar actions may be analyzed in a single NEPA document. (40 CFR 1508.25)

**special expertise**—means another governmental (Federal, State, tribal, or local) agency who has statutory responsibility, agency mission, or related program experience (40 CFR 1508.26). The CEQ guidance provides for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

**substantive comment**—a comment that does one or more of the following:
questions, with reasonable basis, the accuracy of information in the EIS or EA; questions, with reasonable basis or facts, the adequacy of, methodology for, or assumptions used for the environmental analysis; presents reasonable alternatives other than those presented in the EIS or EA; or prompts the BLM to consider changes or revisions in one or more of the alternatives.

**supplementation**— the process of updating or modifying a draft or final EIS if, after circulation of a draft or final EIS but prior to implementation of the Federal action:
* you make substantial changes to the proposed action that are relevant to environmental concerns (40 CFR 1502.9(c)(1)(i));
* you add a new alternative that is outside the spectrum of alternatives already analyzed (see Question 29b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)*; or
* there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects (40 CFR 1502.9(c)(1)(ii)).

**third-party contracting**—contracting for the preparation of NEPA documents that is funded by the non-BLM proponent of an action. The BLM must still approve this analysis.

**tiering**—using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents, allowing the tiered NEPA document to narrow the range of alternatives and concentrate solely on the issues not already addressed.

**we**—as used in this Handbook, refers to the BLM.

**wildland–urban interface**—In summary, the area where structures and other human development meet or intermingle with undeveloped wildland. When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "wildland urban interface" in the Act must be used. See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**you**—when used in the Handbook, refers to BLM staff and contractors responsible for NEPA compliance.

Glossary - 136
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page was intentionally left blank.

BLM_0009417

Case No. 1:20-cv-02484-MSK   Document 28-10   filed 04/27/21   USDC Colorado   pg 37 of 253

# Acronyms

**APD**—application for permit to drill
**BLM**—U.S. Department of the Interior, Bureau of Land Management
**BMP**—best management practices
**CEQ**—Council on Environmental Quality
**CFR**—Code of Federal Regulations
**CX**—categorical exclusion
**DM**—Departmental Manual
**DNA**—Determination of NEPA Adequacy
**DR**—decision record (for an EA)
**EA**—environmental assessment
**EIS**—environmental impact statement
**E.O.**—executive order
**EPA**—Environmental Protection Agency
**ESA**—Endangered Species Act of 1973, as amended
**ESM**—Environmental Statement Memoranda
**FACA**—Federal Advisory Committee Act
**FONSI**—finding of no significant impact
**GIS**—geographic information system
**HFRA**—Healthy Forests Restoration Act of 2003
**IBLA**—Interior Board of Land Appeals
**IM**—Instruction Memorandums [or memoranda]
**MOU**—memorandum of understanding
**NEPA**—National Environmental Policy Act of 1969, as amended
**NOA**—notice of availability
**NOI**—notice of intent
**OEPC**—U.S. Department of the Interior, Office of Environmental Policy and Compliance
**P.L.**—public law
**RAC**—Resource Advisory Committee
**RFD**—reasonably foreseeable development
**RMP**—resource management plan
**ROD**—record of decision (for an EIS)
**WO**—BLM Washington Office

BLM_0009418

Appendix 2 - 138
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page was intentionally left blank.

BLM_0009419

# APPENDIX 1
# Supplemental Authorities To Be Considered

The NEPA is only one of many authorities that contain procedural requirements that pertain to treatment of elements of the environment when the BLM is considering a Federal action. The following list includes some of the other authorities that may apply to BLM actions.

| Element | Authority | Manual Section |
|---|---|---|
| Air Quality | The Clean Air Act as amended (42 USC 7401 et seq.) | 7300 |
| Cultural Resources | National Historic Preservation Act, as amended (16 USC 470) | 8100 |
| Fish Habitat | Magnuson-Stevens Act Provision: Essential Fish Habitat (EFH): Final Rule (50 CFR Part 600; 67 FR 2376, January 17, 2002). | NA |
| Forests and Rangelands | Healthy Forests Restoration Act of 2003 (P.L. 108-148) | NA |
| Migratory Birds | Migratory Bird Treaty Act of 1918, as amended (16 USC 703 et seq.) | NA |
| Native American Religious Concerns | American Indian Religious Freedom Act of 1978 (42 USC 1996) | 8100 |
| Threatened or Endangered Species | Endangered Species Act of 1983, as amended (16 USC 1531) | 6840 |
| Wastes, Hazardous or Solid | Resource Conservation and Recovery Act of 1976 (43 USC 6901 et seq.) Comprehensive Environmental Repose Compensation, and Liability Act of 1980, as amended (43 USC 9615) | 9180 9183 |
| Water Quality Drinking–Ground | Safe Drinking Water Act, as amended (43 USC 300f et seq.) Clean Water Act of 1977 (33 USC 1251 et seq.) | 7240 9184 |
| Wild and Scenic Rivers | Wild and Scenic Rivers Act, as amended (16 USC 1271) | 8014 |
| Wilderness | Federal Land Policy and Management Act of 1976 (43 USC 1701 et seq.); Wilderness Act of 1964 (16 USC 1131 et seq.) | 8500 |
| Environmental | E.O. 12898, "Environmental Justice" February 11, 1994 | NA |

BLM_0009420

Appendix 2 - 140

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

| Element | Authority | Manual Section |
|---|---|---|
| Justice Floodplains | E.O. 11988, as amended, Floodplain Management, 5/24/77 | 7260 |
| Migratory Birds | E.O. 131186, "Responsibilities of Federal Agencies to Protect Migratory Birds" January 10, 2001 | NA |
| Wetlands-Riparian Zones | E.O. 11990 Protection of Wetlands 5/24/77 | 6740 |

BLM_0009421

Case No. 1:20-cv-02484-MSK   Document 28-10   filed 04/27/21   USDC Colorado   pg 41 of 253

# APPENDIX 2
## Using Categorical Exclusions Established by the Energy Policy Act of 2005

The Energy Policy Act (P.L. 109-58) prescribes the following five categorical exclusions (CX) for activities whose purpose is for exploration or development of oil or gas:

1. *Individual surface disturbances of less than five acres so long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to the NEPA has been previously completed.*

2. *Drilling an oil and gas well at a location or well pad site at which drilling has occurred within five years prior to the date of spudding the well.*

3. *Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to the date of spudding the well.*

4. *Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within five years prior to the date of placement of the pipeline.*

5. *Maintenance of a minor activity, other than any construction or major renovation of a building or facility.*

Specific instructions for using these five CXs are identified below.

1. *Individual surface disturbances of less than five acres so long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to the NEPA has been previously completed.*

Use of this CX requires the decision-maker to do three things before applying this exclusion to any authorization. First, the decision-maker must determine that the action under consideration will disturb less than five acres on the site. If more than one action is proposed (for example, two or more wells), each activity is counted separately and each may disturb up to five acres. Similarly, the five-acre limit must be applied separately to each action requiring discrete BLM action, such as each APD, even though for processing efficiency purposes the operator submits for BLM review a large Master Development Plan addressing many wells.

Second, the decision-maker must determine that the current unreclaimed surface disturbance readily visible on the entire leasehold is not greater than 150 acres, including the proposed action. This would include disturbance from previous rights-of-way issued in support of lease development. If one or more Federal leases are committed to a BLM-approved unit or communitization agreement, the 150-acre threshold applies separately to each lease. For larger

BLM_0009422

leases, the requirement for adequate documentation would be satisfied with a copy of the most recent aerial photograph in the file with an explanation of recent disturbance that may not be shown on the aerial photos.  Maps, tally sheets, or other visual aids may be substituted for aerial photographs.

Finally, this CX includes the requirement of a site-specific NEPA document.  For the purposes of this CX, a site-specific NEPA analysis can be either an exploration and/or development EA/EIS, an EA/EIS for a specific Master Development Plan, a multi-well EA/EIS, or an individual permit approval EA/EIS.  The NEPA document must have analyzed the exploration and/or development of oil and gas (not just leasing) and the action/activity being considered must be within the boundaries of the area analyzed in the EA or EIS.  The NEPA document need not have addressed the specific permit or application being considered.

This CX may also be applied to geophysical exploration activities provided the above requirements have been met.  For example, if an oil and gas exploration and development EIS analyzes the site-specific impacts of 3D geophysical exploration within the oil and gas field, this CX may apply to subsequent 3D geophysical activities conducted within the field.

The above requirements, that is, the five acre threshold, 150 acre unreclaimed disturbance limit, and a site-specific NEPA document that addressed oil and gas development, are the only applicable factors for review pursuant to this statute, but all must be satisfied in order to use this CX.

2.  *Drilling an oil and gas well at a location or well pad site at which drilling has occurred within five years prior to the date of spudding the well.*

The well file narrative to support use of this CX must state the date when the previous well was completed or the date the site had workover operations involving a drilling rig of any type or capability; this also includes completion of any plugging operations.  A "location or well pad" is defined as a previously disturbed or constructed well pad used in support of drilling a well. "Drilling" in the context of, "Drilling has occurred within five years" refers to any drilled well including injection, water source, or any other service well.  Additional disturbance or expansion of the existing well pad is not restricted as long as it is tied to the original location or well pad. This exclusion does not extend to new well sites merely in the general vicinity of the original location or well pad.

If the operator delays in spudding the new well and the time period between the previous well completion and spudding exceed five years, the operator must suspend preparation for drilling operations until the BLM completes NEPA compliance for the proposed well and issues a new decision on the APD.  Therefore, the APD must contain a condition of approval (COA) stating that "If the well has not been spudded by *(the date the CX is no longer applicable)*, this APD will expire and the operator is to cease all operations related to preparing to drill the well."

The above requirements, that is, the drilling of a well at an existing location or well pad and the five year limitation are the only two applicable factors for review pursuant to this statute, but must both be satisfied in order to use this CX.

BLM_0009423

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

3.  *Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to the date of spudding the well.*

The proposed well must be within a developed oil and gas field. A developed field is any field in which a "confirmation well" has been completed. Normally, this is after the third well in a field. The pending APD must also be within the reasonably foreseeable development scenario (RFD) used in either a land use plan EIS or subsequent developmental EA or EIS. Finally, the new well must be spudded within five years of that previous NEPA document. This provision applies to "any environmental document" that analyzed drilling, meaning any document adopted by any Federal agency pursuant to the NEPA, regardless of whether it was adopted by the BLM. Because the 5-year period is again tied to the spudding of the pending well, the APD must contain a COA that if no well is spudded by the date the CX is no longer applicable, the APD will expire, thus requiring the operator to obtain a new APD. For example, "If the well has not been spudded by *(the date the categorical exclusion is no longer applicable)*, this APD will expire and the operator is to cease all operations related to preparing to drill the well."

Full field development EISs do not need to be prepared where the development envisioned was analyzed in the land use plan EIS. As long as the development foreseen does not exceed the number of wells and/or surface disturbance analyzed in the prior NEPA document, no additional NEPA documentation is required because of changes in the density of development.

All of the following requirements must be met to use this CX.

(1) The proposed APD is within a developed oil or gas field. A developed field is defined as any field in which a confirmation well has been completed.

(2) There is an existing NEPA document (including that supporting a land use plan) that contains a reasonably foreseeable development scenario encompassing this action.

(3) The NEPA document was finalized or supplemented within five years of spudding the well.

4.  *Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within five years prior to the date of placement of the pipeline.*

The 5-year time period is to be calculated from the date the decision was made approving the corridor, including any amendments to the corridor. The time period extends to the date placement of any portion of the new pipeline is concluded, provided that placement activities began within the 5-year period. If the operator delays in beginning to place the pipeline, and the time period between the approval of the corridor and placement exceeds five years, the authorized officer must suspend the right-of-way authorization until the BLM completes NEPA compliance for the proposed right-of-way and issues a decision. To avoid problems, the right-of-way must contain a term or condition that provides for the suspension of the authorization if placement does not begin before the last date that the CX is available, thus requiring the operator to obtain a new right-of-way.

Existing right-of-way corridors of any type can be used for new pipeline placement, such as the burial of a pipeline or pipeline conduit in an existing roadbed or along a power line right-of-way, could qualify for the exclusion.  The term "right-of-way corridor" in Section 390 is not limited to those authorized under 43 CFR 2800, but is a more generalized term that applies to any type of corridor or right-or-way (whether on or off lease) approved under any authority or vehicle of the BLM, including Sundry Notices.  Additional disturbance or width needed to properly or safely install the new pipeline may be authorized under this exclusion if it is within the approved right-of-way corridor.  Creation of a new right-of-way completely outside and not overlapping into a portion of the existing corridor is not authorized.

The above requirements, that is, the placement of a pipeline in an existing corridor of any type and placement of the pipe within five years of approval (or amendment), are the only two applicable factors for review pursuant to this statute and both must be satisfied to use this CX.

Other types of new right-of-way applications cannot be excluded from NEPA analysis under this exclusion, for example, above ground power lines, or new roads; however, existing right-of-way corridors, such as roads, may be used for new pipeline or pipeline conduit in an existing roadbed.

5.    *Maintenance of a minor activity, other than any construction or major renovation of a building or facility.*

This CX applies to maintenance of minor activities, such as maintenance of the well or wellbore, a road, wellpad, or production facility.  The exclusion does not cover construction or major renovation of a building or facility.  The addition of a compressor or a gas processing plant would therefore not be eligible for this CX.

Note:  CX numbers one through four reference prior approvals made following NEPA analysis.  Field Offices must apply the same or more effective mitigating measures considered in the parent NEPA documents to all actions approved under any CX.  Additionally, BMPs are to be applied as necessary to reduce impacts to any authorization issued, regardless of the NEPA analysis or exclusion used.

BLM_0009425

# APPENDIX 3
# Departmental Categorical Exclusions

The following actions are categorical exclusions (CXs) pursuant to 516 DM 2, Appendix 1. However, individual actions must be subjected to sufficient review to determine if any of the extraordinary circumstances listed in **Appendix 5, *Categorical Exclusions: Extraordinary Circumstances*** apply. If any of the extraordinary circumstances apply, an EA or an EIS must be prepared. In addition, see **Appendix 4, *BLM Categorical Exclusions*** for a list of BLM excludable activities.

1.1     Personnel actions and investigations and personnel services contracts.

1.2     Internal organizational changes and facility and office reductions and closings.

1.3     Routine financial transactions including such things as salaries and expenses, procurement contracts (in accordance with applicable procedures and Executive Orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

1.4     Departmental legal activities including, but not limited to, such things as arrests, investigations, patents, claims, and legal opinions. This does not include bringing judicial or administrative civil or criminal enforcement actions which are outside the scope of NEPA in accordance with 40 CFR 1508.18(a).

1.5     Reserved.

1.6     Nondestructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities.

1.7     Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).

1.8     Management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)

1.9     Legislative proposals of an administrative or technical nature (including such things as changes in authorizations for appropriations and minor boundary changes and land title transactions) or having primarily economic, social, individual, or institutional effects; and comments and reports on referrals of legislative proposals.

1.10     Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature and whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

BLM_0009426

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

1.11    Activities which are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

1.12    Hazardous fuels reduction activities using prescribed fire not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres. Such activities:  Shall be limited to areas (1) in wildland–urban interface and (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland–urban interface; Shall be identified through a collaborative framework as described in "A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan;" Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction.

1.13    Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire.  Such activities:  Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and Shall be completed within three years following a wildland fire.

BLM_0009427

# APPENDIX 4
# BLM Categorical Exclusions

The following actions are designated as categorical exclusions (CXs) pursuant to 516 DM 11.9.

Before any action described in the following list is used, the list of "extraordinary circumstances" described in **Appendix 5, Categorical Exclusions: *Extraordinary Circumstances*** must be reviewed for applicability. If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action. When no "extraordinary circumstances" apply, the following activities do not require the preparation of an EA or EIS.  In addition, see **Appendix 3, *Departmental Categorical Exclusions*** for a list of DOI-wide CXs.

The following actions are designated as categorical exclusions.  The subject headings are for organizational purposes only - any program may use any of the CXs.

**A. Fish and Wildlife**
1.  Modification of existing fences to provide improved wildlife ingress and egress.
2.  Minor modification of water developments to improve or facilitate wildlife use (e.g., modify enclosure fence, install flood valve, or reduce ramp access angle).
3.  Construction of perches, nesting platforms, islands, and similar structures for wildlife use.
4.  Temporary emergency feeding of wildlife during periods of extreme adverse weather conditions.
5.  Routine augmentations, such as fish stocking, providing no new species are introduced.
6.  Relocation of nuisance or depredating wildlife, providing the relocation does not introduce new species into the ecosystem.
7.  Installation of devices on existing facilities to protect animal life, such as raptor electrocution prevention devices.

**B.  Oil, Gas, and Geothermal Energy**
1.  Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands, where the subject lands are already in production.
2.  Approval of mineral lease adjustments and transfers, including assignments and subleases.
3.  Approval of unitization agreements, communitization agreements, drainage agreements, underground storage agreements, development contracts, or geothermal unit or participating area agreements.
4.  Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.
5.  Approval of royalty determinations, such as royalty rate reductions.
6.  Approval of Notices of Intent to conduct geophysical exploration of oil, gas, or geothermal, pursuant to 43 CFR 3150 or 3250, when no temporary or new road construction is proposed.

BLM_0009428

Appendix 4 - 148

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## C. Forestry

1. Land cultivation and silvicultural activities (excluding herbicide application) in forest tree nurseries, seed orchards, and progeny test sites.

2. Sale and removal of individual trees or small groups of trees which are dead, diseased, injured, or which constitute a safety hazard, and where access for the removal requires no more than maintenance to existing roads.

3. Seeding or reforestation of timber sales or burn areas where no chaining is done, no pesticides are used, and there is no conversion of timber type or conversion of non-forest to forest land. Specific reforestation activities covered include: seeding and seedling plantings, shading, tubing (browse protection), paper mulching, bud caps, ravel protection, application of non-toxic big game repellant, spot scalping, rodent trapping, fertilization of seed trees, fence construction around out-planting sites, and collection of pollen, scions and cones.

4. Pre-commercial thinning and brush control using small mechanical devices.

5. Disposal of small amounts of miscellaneous vegetation products outside established harvest areas, such as Christmas trees, wildings, floral products (ferns, boughs, etc.), cones, seeds, and personal use firewood.

6. Felling, bucking, and scaling sample trees to ensure accuracy of timber cruises. Such activities:
   a. Shall be limited to an average of one tree per acre or less,
   b. Shall be limited to gas-powered chainsaws or hand tools,
   c. Shall not involve any road or trail construction,
   d. Shall not include the use of ground based equipment or other manner of timber yarding, and
   e. Shall be limited to the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts and Lakeview District - Klamath Falls Resource Area in Oregon.

7. Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:
   a. Shall not include even-aged regeneration harvests or vegetation type conversions.
   b. May include incidental removal of trees for landings, skid trails, and road clearing.
   c. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
   d. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

Examples include, but are not limited to:
   a. Removing individual trees for sawlogs, specialty products, or fuelwood.

BLM_0009429

    b.  Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

8.  Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:

    a.  May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

    b.  May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    c.  Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

    d.  For this CX, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years. Examples include, but are not limited to:

        (i)  Harvesting a portion of a stand damaged by a wind or ice event.

        (ii)  Harvesting fire damaged trees.

9.  Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction. Such activities:

    a.  May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and

    b.  May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

    c.  May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    d.  Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.  Examples include, but are not limited to:

    (i)    Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations; and

    (ii)    Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

## D. Rangeland Management

1. Approval of transfers of grazing preference.
2. Placement and use of temporary (not to exceed one month) portable corrals and water troughs, providing no new road construction is needed.
3. Temporary emergency feeding of livestock or wild horses and burros during periods of extreme adverse weather conditions.
4. Removal of wild horses or burros from private lands at the request of the landowner.
5. Processing (transporting, sorting, providing veterinary care, vaccinating, testing for communicable diseases, training, gelding, marketing, maintaining, feeding, and trimming of hooves of) excess wild horses and burros.
6. Approval of the adoption of healthy, excess wild horses and burros.
7. Actions required to ensure compliance with the terms of Private Maintenance and Care agreements.
8. Issuance of title to adopted wild horses and burros.
9. Destroying old, sick, and lame wild horses and burros as an act of mercy.
10. Vegetation management activities, such as seeding, planting, invasive plant removal, installation of erosion control devices (e.g., mats/straw/chips), and mechanical treatments, such as crushing, piling, thinning, pruning, cutting, chipping, mulching, mowing, and prescribed fire when the activity is necessary for the management of vegetation on public lands.  Such activities:

    a.    Shall not exceed 4,500 acres per prescribed fire project and 1,000 acres for other vegetation management projects;

    b.    Shall not be conducted in Wilderness areas or Wilderness Study Areas;

    c.    Shall not include the use of herbicides, pesticides, biological treatments or the construction of new permanent roads or other new permanent infrastructure;

    d.    May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    e.    Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

BLM_0009431

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

11. Issuance of livestock grazing permits/leases where:
    a. The new grazing permit/lease is consistent with the use specified on the previous permit/lease, such that
        (i)      the same kind of livestock is grazed,
        (ii)     the active use previously authorized is not exceeded, and
        (iii)    grazing does not occur more than 14 days earlier or later than as specified on the previous permit/lease, and
    b. The grazing allotment(s) has been assessed and evaluated and the Responsible Official has documented in a determination that the allotment(s) is
        (i)      meeting land health standards, or
        (ii)     not meeting land health standards due to factors that do not include existing livestock grazing.

## E. Realty

1. Withdrawal extensions or modifications, which only establish a new time period and entail no changes in segregative effect or use.
2. Withdrawal revocations, terminations, extensions, or modifications; and classification terminations or modifications which do not result in lands being opened or closed to the general land laws or to the mining or mineral leasing laws.
3. Withdrawal revocations, terminations, extensions, or modifications; classification terminations or modifications; or opening actions where the land would be opened only to discretionary land laws and where subsequent discretionary actions (prior to implementation) are in conformance with and are covered by a Resource Management Plan/EIS (or plan amendment and EA or EIS).
4. Administrative conveyances from the Federal Aviation Administration (FAA) to the State of Alaska to accommodate airports on lands appropriated by the FAA prior to the enactment of the Alaska Statehood Act.
5. Actions taken in conveying mineral interest where there are no known mineral values in the land under Section 209(b) of the Federal Land Policy and Management Act of 1976 (FLPMA).
6. Resolution of class one color-of-title cases.
7. Issuance of recordable disclaimers of interest under Section 315 of FLPMA.
8. Corrections of patents and other conveyance documents under Section 316 of FLPMA and other applicable statutes.
9. Renewals and assignments of leases, permits, or rights-of-way where no additional rights are conveyed beyond those granted by the original authorizations.
10. Transfer or conversion of leases, permits, or rights-of-way from one agency to another (e.g., conversion of Forest Service permits to a BLM Title V Right-of-way).
11. Conversion of existing right-of-way grants to Title V grants or existing leases to FLPMA Section 302(b) leases where no new facilities or other changes are needed.
12. Grants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way.
13. Amendments to existing rights-of-way, such as the upgrading of existing facilities, which entail no additional disturbances outside the right-of-way boundary.
14. Grants of rights-of-way for an overhead line (no pole or tower on BLM land) crossing over a corner of public land.

BLM_0009432

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

15. Transfers of land or interest in land to or from other bureaus or federal agencies where current management will continue and future changes in management will be subject to the NEPA process.
16. Acquisition of easements for an existing road or issuance of leases, permits, or rights-of-way for the use of existing facilities, improvements, or sites for the same or similar purposes.
17. Grant of a short rights-of-way for utility service or terminal access roads to an individual residence, outbuilding, or water well.
18. Temporary placement of a pipeline above ground.
19. Issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition.
20. One-time issuance of short-term (3 years or less) rights-of-way or land use authorizations which authorize trespass action where no new use or construction is allowed, and where the proposal includes rehabilitation to restore the land to its natural or original condition.

**F. Solid Minerals**
1. Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands where the subject lands are already in production.
2. Approval of mineral lease readjustments, renewals, and transfers including assignments and subleases.
3. Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.
4. Approval of royalty determinations, such as royalty rate reductions and operations reporting procedures.
5. Determination and designation of logical mining units.
6. Findings of completeness furnished to the Office of Surface Mining Reclamation and Enforcement for Resource Recovery and Protection Plans.
7. Approval of minor modifications to or minor variances from activities described in an approved exploration plan for leasable, salable, and locatable minerals (e.g., the approved plan identifies no new surface disturbance outside the areas already identified to be disturbed).
8. Approval of minor modifications to or minor variances from activities described in an approved underground or surface mine plan for leasable minerals (e.g., change in mining sequence or timing).
9. Digging of exploratory trenches for mineral materials, except in riparian areas.
10. Disposal of mineral materials, such as sand, stone, gravel, pumice, pumicite, cinders, and clay, in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas.

BLM_0009433

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## G. Transportation

1. Incorporation of eligible roads and trails in any transportation plan when no new construction or upgrading is needed.
2. Installation of routine signs, markers, culverts, ditches, waterbars, gates, or cattleguards on/or adjacent to roads and trails identified in any land use or transportation plan, or eligible for incorporation in such plan.
3. Temporary closure of roads and trails.
4. Placement of recreational, special designation, or information signs, visitor registers, kiosks, and portable sanitation devices.

## H. Recreation Management

1. Issuance of Special Recreation Permits for day use or overnight use up to 14 consecutive nights; that impacts no more than 3 staging area acres; and/or for recreational travel along roads, trails, or in areas authorized in a land use plan. This CX cannot be used for commercial boating permits along Wild and Scenic Rivers.  This CX cannot be used for the establishment or issuance of Special Recreation Permits for "Special Area" management (43 CFR 2932.5).

## I. Emergency Stabilization

1. Planned actions in response to wildfires, floods, weather events, earthquakes, or landslips that threaten public health or safety, property, and/or natural and cultural resources, and that are necessary to repair or improve lands unlikely to recover to a management-approved condition as a result of the event.  Such activities shall be limited to:  repair and installation of essential erosion control structures; replacement or repair of existing culverts, roads, trails, fences, and minor facilities; construction of protection fences; planting, seeding, and mulching; and removal of hazard trees, rocks, soil, and other mobile debris from, on, or along roads, trails, campgrounds, and watercourses.  These activities:
   a. Shall be completed within one year following the event;
   b. Shall not include the use of herbicides or pesticides;
   c. Shall not include the construction of new roads or other new permanent infrastructure;
   d. Shall not exceed 4,200 acres; and
   e. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
   f. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract

BLM_0009434

**J. Other**
1. Maintaining land use plans in accordance with 43 CFR 1610.5-4.
2. Acquisition of existing water developments (e.g., wells and springs) on public land.
3. Conducting preliminary hazardous materials assessments and site investigations, site characterization studies and environmental monitoring.  Included are siting, construction, installation and/or operation of small monitoring devices such as wells, particulate dust counters and automatic air or water samples.
4. Use of small sites for temporary field work camps where the sites will be restored to their natural or original condition within the same work season.
5. Reserved.
6. A single trip in a one month period for data collection or observation sites.
7. Construction of snow fences for safety purposes or to accumulate snow for small water facilities.
8. Installation of minor devices to protect human life (e.g., grates across mines).
9. Construction of small protective enclosures, including those to protect reservoirs and springs and those to protect small study areas.
10. Removal of structures and materials of no historical value, such as abandoned automobiles, fences, and buildings, including those built in trespass and reclamation of the site when little or no surface disturbance is involved.
11. Actions where the BLM has concurrence or co-approval with another DOI agency and the action is categorically excluded for that DOI agency.
12. Rendering formal classification of lands as to their mineral character, waterpower, and water storage values.

BLM_0009435

# APPENDIX 5
# Categorical Exclusions:
# Extraordinary Circumstances

Before any non-Energy Act CX is used, you must conduct sufficient review to determine if any of the following extraordinary circumstances apply (516 DM 2, Appendix 2).  If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action. Part 516 of the Departmental Manual (516 DM 2, Appendix 2) states that extraordinary circumstances exist for individual actions within CXs which may:

2.1   Have significant impacts on public health or safety.

2.2   Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

2.3   Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)].

2.4   Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

2.5   Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

2.6   Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

2.7   Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office.

2.8   Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

2.9   Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

2.10   Have a disproportionately high and adverse effect on low income or minority populations (Executive Order 12898).

BLM_0009436

Appendix 5 - 156
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

2.11    Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (Executive Order 13007).

2.12    Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

BLM_0009437

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# APPENDIX 6
# Categorical Exclusion Documentation Format When Using Categorical Exclusions Not Established by Statute

**A. Background**

BLM Office: _____     Lease/Serial/Case File No.: _____

Proposed Action Title/Type: _____

Location of Proposed Action: _____

Description of Proposed Action: _____

_____

_____

_____

_____

**B. Land Use Plan Conformance**

Land Use Plan Name: _____   Date Approved/Amended:_____

The proposed action is in conformance with the applicable LUP because it is specifically provided for in the following LUP decision(s): _____

_____

_____

_____

_____   The proposed action is in conformance with the LUP, even though it is not specifically provided for, because it is clearly consistent with the following LUP decision(s) (objectives, terms, and conditions): _____

_____

_____

_____

**C: Compliance with NEPA:**

The Proposed Action is categorically excluded from further documentation under the National Environmental Policy Act (NEPA) in accordance with 516 DM 2, Appendix 1, _____ [Insert appropriate CX number and text, or a paraphrase of the text] or 516 DM 11.9, _____ [Insert appropriate CX number and text, or a paraphrase of the text].

This categorical exclusion is appropriate in this situation because there are no extraordinary circumstances potentially having effects that may significantly affect the environment.  The proposed action has been reviewed, and none of the extraordinary circumstances described in 516 DM2 apply.

BLM_0009438

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

I considered _____
_____ [Insert any pertinent
design features incorporated into the project design, or relevant situations discussed during
project design, and explain why there is no potential for significant impacts].

## D: Signature

Authorizing Official:  _____          Date: _____
                              (Signature)
Name:  _____
Title: _____

## Contact Person

For additional information concerning this CX review, contact [Insert contact name, title, office
name, mailing address, and telephone number].

**Note:**  A separate decision document must be prepared for the action covered by the CX.

BLM_0009439

# APPENDIX 7
# Documentation Requirements for Hazardous Fuels Actions and Post-Fire Rehabilitation Actions

### Decision Memorandum on Action and for Application of:
### Departmental Categorical Exclusion 1.12 (or 1.13 or both)
### Project Name

**U.S. Department of the Interior**

**Bureau Name**

*Bureau Field Station (State Office, Regional Office, etc.)*

**County, State**

**Description of the Proposed Action and the Purpose and Need for the Action**

[*Provide a description of the proposed action and the purpose and need for the action. Provide any pertinent facts such as: applicable legal land description, statutory citations, and other agency involvements.*]

**Plan Conformance**

[*State that the Proposed Action is consistent with any land and resource management plans as required by appropriate Federal, State, or local statutes having a bearing on the decision.*] [*State that the Proposed Action was designed in conformance with all bureau standards and incorporates appropriate guidelines for specific required and desired conditions relevant to project activities.*] [*insert findings for other applicable laws.*]

**Compliance with the National Environmental Policy Act**

[*State that the Proposed Action is categorically excluded from further documentation under the National Environmental Policy Act (NEPA) in accordance with 516 DM 2, Appendix 1, 1.12 (or 1.13 or both).*] [*insert reasons.*]

[*State that the application of this categorical exclusion is appropriate in this situation because there are no extraordinary circumstances potentially having effects which may significantly affect the environment.*] [*Clearly state that none of the exceptions apply. If any apply, then the categorical exclusions cannot be utilized.*] [*State that these extraordinary circumstances are contained in 516 DM 2, Appendix 2.*]

I considered [*insert any pertinent situations that were brought up during the design of the activities and explain why there is no potential for significant effects*].

BLM_0009440

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Persons and Agencies Consulted**

[*Explain how the public was made aware of this proposed activity.  Describe people and agencies consulted regarding the development of the action and steps taken based on this consultation.*]

**Decision and Rationale on Action**

I have decided to implement [*insert description of actions, including mitigation measures and reference any maps and drawings*].  These actions meet the need for action.   In addition, I have reviewed the plan conformance statement and have determined that the proposed action is in conformance with the approved land use plan and that no further environmental analysis is required.

**Implementation Date**

This project will be implemented on or after [*insert implementation date and identify any conditions related to implementation*].

_____          _____
[*Insert deciding official's name*]                                          Date
[*Insert deciding official's title*]
**Administrative Review or Appeal Opportunities**
[*State whether the decision is or is not subject to administrative appeal.  If it is subject to appeal, provide the citation of the appeal rules and provide appeal information.*]

**Contact Person**

For additional information concerning this decision, contact [Insert contact name, title, office name, mailing address, and telephone number].

BLM_0009441

# APPENDIX 8
## Worksheet
## Determination of NEPA Adequacy (DNA)
### U.S. Department of the Interior
### Bureau of Land Management

OFFICE:

TRACKING NUMBER:

CASEFILE/PROJECT NUMBER:

PROPOSED ACTION TITLE/TYPE:

LOCATION/LEGAL DESCRIPTION:

APPLICANT (if any):

**A. Description of the Proposed Action and any applicable mitigation measures**


**B. Land Use Plan (LUP) Conformance**

LUP Name\*_____     Date Approved _____

Other document _____     Date Approved _____

Other document _____     Date Approved _____

*\* List applicable LUPs (for example, resource management plans; activity, project, management, or program plans; or applicable amendments thereto)*


The proposed action is in conformance with the applicable LUP because it is specifically provided for in the following LUP decisions:


The proposed action is in conformance with the LUP, even though it is not specifically provided for, because it is clearly consistent with the following LUP decisions (objectives, terms, and conditions):

BLM_0009442

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**C.  Identify applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the proposed action.**

List by name and date all applicable NEPA documents that cover the proposed action.

List by name and date other documentation relevant to the proposed action (e.g., biological assessment, biological opinion, watershed assessment, allotment evaluation, and monitoring report).

**D.  NEPA Adequacy Criteria**

**1.  Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)?  Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?**

Documentation of answer and explanation:

**2.  Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?**

Documentation of answer and explanation:

**3.  Is the existing analysis valid in light of any new information or circumstances (such as, rangeland health standard assessment, recent endangered species listings, updated lists of BLM-sensitive species)?  Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?**

Documentation of answer and explanation:

**4.  Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?**

BLM_0009443

Documentation of answer and explanation:

**5. Are the public involvement and interagency review associated with existing NEPA document(s) adequate for the current proposed action?**

Documentation of answer and explanation:

**E. Persons/Agencies /BLM Staff Consulted**

Name                    Title                    Resource/Agency Represented

Note:  Refer to the EA/EIS for a complete list of the team members participating in the preparation of the original environmental analysis or planning documents.

**Conclusion**  (*If you found that one or more of these criteria is not met, you will not be able to check this box.*)

Based on the review documented above, I conclude that this proposal conforms to the applicable land use plan and that the NEPA documentation fully covers the proposed action and constitutes BLM's compliance with the requirements of the NEPA.

_____

Signature of Project Lead

_____

Signature of NEPA Coordinator

_____  _____

Signature of the Responsible Official:                    Date

**Note:** The signed Conclusion on this Worksheet is part of an interim step in the BLM's internal decision process and does not constitute an appealable decision. However, the lease, permit, or other authorization based on this DNA is subject to protest or appeal under 43 CFR Part 4 and the program-specific regulations.

Appendix 8 - 164
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009445

# APPENDIX 9
# Recommended EA Format

Following is a suggested, but optional, outline for an EA. Refer to **Chapter 8,** *Preparing an Environmental Assessment* for descriptions of the content for these EA sections or chapters.

## 1.  Introduction

- Identifying Information
- Purpose and Need for Action
- Scoping and Public Involvement and Issues

## 2.  Proposed Action and Alternatives

- Description of Proposed Action
- Description of Alternatives Analyzed in Detail
- Alternatives Considered but not Analyzed in Detail

## 3.  Affected Environment

## 4.  Environmental Effects

- Direct and Indirect Effects
- Cumulative Effects
- Residual Effects

## 5. Tribes, Individuals, Organizations, or Agencies Consulted

## 6. List of Preparers

BLM_0009446

Appendix 9 - 166
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009447

# APPENDIX 10
# Items to Include in the Administrative Record

The administrative record needs to demonstrate all of the factors considered and the process used in reaching a decision.  The record must also document public involvement in the process.  Be aware that some documents in the Administrative Record are subject to the Freedom of Information Act and Privacy Act (consult your FOIA Officer).  Note this on the document itself, and indicate it in the database.  (If the administrative record is used in lawsuits, protests, and so forth, and if information is not filed in the administrative record, the courts or the IBLA may consider that it did not happen.)

Administrative records may include (but are not limited to) these documents:

**General Information**

- *Federal Register* Notices
- Interdisciplinary Team or Project Team Membership
- Preparation Plans
- Contract Information (if the project is contracted)

**Public Information**

- Public Involvement Plans
- Public Information Documents (letters, notices)
- News Reports and Clippings
- General Correspondence
- Meeting and Workshop Records (attendance lists, announcements)
- Scoping Report
- BLM Responses to Comments (if not included in the environmental document)
- Protests or appeals and the BLM's responses
- Mailing Lists
- Public Comments (from all phases of the project)

**External Communications**

- Other Federal Agencies
- Cooperating Agencies
- Tribes
- State Agencies
- Local Agencies
- Elected Officials (Governor, County commissioners, city officials, and so forth)
- Organizations
- Individuals
- Freedom of Information Act (FOIA) Requests and Responses (maintained by the FOIA Officer)

BLM_0009448

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Internal Communications**

- Project Management Correspondence
- Interdisciplinary Team–Project Team Correspondence (meeting notes, agendas)
- FOIA exempt documents
- Quality Assurance Determination

**Background Material/Supporting Information**

- Data
- Data Standards
- Metadata
- References
- Analyses (of alternatives, environmental consequences)
- Appendixes
- Special Reports (ACEC Report, Reasonably Foreseeable Development Scenarios, Mineral Assessments, Wild and Scenic River Suitability Assessments)
- Biological Assessments or Opinions
- Section 106 Consultation

**Environmental Documents**

- Draft EIS
- Final EIS
- Record of Decision or Decision Record

BLM_0009449

# APPENDIX 1      1

## *Federal Register* Illustrations

These illustrations were adopted from the Office of the Federal Register's *Federal Register Document Drafting Handbook*, October 1998 Revision.

### Illustration 1:  *Federal Register* Format Requirements



BLM_0009450

Appendix 11 - 170
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Illustration 2:  Sample Notice**

7515-01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

Public Meeting With Interested Vendors for Ordering

Reproductions of Still Photographs, Aerial Film, Maps, and

Drawings

AGENCY: National Archives and Records Administration.

ACTION: Notice of meeting.

SUMMARY: The National Archives and Records Administration (NARA)

will hold a meeting to discuss the continued privatization of

reproduction services for still pictures, aerial film, maps, and

drawings. On March 6, 199x, NARA began a test phase of new

procedures for the delivery of reproduction services for records

which NARA customers request from the Still Picture Branch,

the Cartographic and Architectural Branch, and the Nixon

Presidential Materials Staff. The National Archives and

Records Administration permitted vendors to set up work

stations in College Park, MD, where the still photographs,

cartographic, and architectural records are housed and made

available. The three units referred customer requests for

reproduction of these media to the vendors, who determined fees,

collected payments, performed the copying work, and mailed the

reproductions to the customers. The purpose of this one-year

1

BLM_0009451

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Illustration 2: Sample Notice (Continued)**

trial program was to: verify the degree to which the

privatization of the reproduction order fulfillments could

improve customer service; and ascertain the extent

to which digital scanning can satisfy requirements from

NARA's customers. The program is extended for one more year,

with some changes. All vendors interested in the program,

including vendors already participating, are invited to attend

the next scheduled meeting. A follow-up meeting has also been

scheduled to answer any remaining questions from possible

vendors, and to distribute copies of the memorandum of

agreement.

DATES: The meeting will be held on Wednesday, January 24, 199x,

at 2 p.m. The follow-up meeting will be held on Thursday,

February 15, 199x, at 2 p.m.

ADDRESSES: The meetings will be held in Archives II, Lecture

Rooms D and E, located at 8601 Adelphi Road, College Park, MD.

FOR FURTHER INFORMATION CONTACT: Michael Meetings, 301-000-0000.

Dated: January 2, 199x.

*Signature*

Type name,

Title.

2

BLM_0009452

Appendix 11 - 172
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Illustration 3:  Guidance on Writing a *Federal Register* Notice**

**Capitals.** Type in all capital letters:

- The name of the agency or cabinet-level department (but not the name of the subagency) in the heading of a document.
- "FEDERAL REGISTER" in the parenthetical for dates that we are to compute.
- Preamble captions.

Example 27.

```
AGENCY:
ACTION:
SUMMARY:
DATES:
ADDRESSES:
FOR FURTHER INFORMATION CONTACT:
SUPPLEMENTARY INFORMATION:
```

**Copies.** Provide legible copies.

**Correction or adhesive tape.** Do not use correction or adhesive tape.

**Double-spacing.** Type the text of your document double-spaced.

**Headings.** Type document headings centered or flush with the left margin.

**Margins**

- One inch at the top, bottom, and right side.
- One and one-half inches on the left side.

**Page numbers.** Number the pages consecutively in one of the following places:

- Centered top.
- Centered bottom.
- Upper right-hand corner.

**Paper.** You must prepare your documents on 8½" × 11" white paper.

**Quotation marks.** Use quotation marks for names of books, journals, articles, and similar items.

**Quoted material.** Type quoted material:

- Single-spaced.
- Centered-block style.
- Without quotation marks.

**Single-sided copy.** You must type your document on one side only.

BLM_0009453

**Illustration 3:  Guidance on Writing a *Federal Register* Notice (Continued)**

### § Symbol.

Use the § symbol only for a CFR section and §§ symbol only for multiple sections. However, do not use a § symbol to begin a sentence; instead, spell out the word. Do not use the § symbol or the word "section" when the reference follows a title number and CFR as in 36 CFR 1200.1.

### Style.

Use the "U.S. Government Printing Office Style Manual" as a guide for punctuation, capitalization, spelling, compounding, and other style matters. You may obtain the GPO Style Manual from the Superintendent of Documents, Government Printing Office.

### References.

If your document relates to a previously published *Federal Register* document, you must cite the earlier document. A reference in a notice document to a previously published *Federal Register* document must identify the volume number, page number, and date of the issue in which the document appeared. (See example 28.)

Example 28. Reference to a previously published *Federal Register* document.

```
6x FR 12345, Jul. 23, 199x
```

A reference in a notice document to material contained in the CFR should identify the CFR title and part or section number. (See example 29.)

Example 29. Reference to material contained in the CFR.

```
36 CFR part 1200
36 CFR 1200.1
```

BLM_0009454

Appendix 11 - 174
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

BLM_0009455

# Programmatic Biological Assessment for BLM's Fluid Minerals Program in Western Colorado re: Water Depletions and effects on the Four Endangered Big River Fishes: Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail chub (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*)






Bonytail chub          Colorado pikeminnow          Humpback chub          Razorback sucker



## May 20, 2008

Prepared by:

_____          Date: _____
Tom Fresques,
West Slope Fisheries Biologist


Reviewed by:

_____          Date:_____
Jay Thompson,
State Fisheries and Riparian Lead

1

# I. Introduction/Background

Fluid mineral development in Colorado has increased dramatically in recent years, particularly on Colorado's western slope. Up to this point, BLM Colorado has not been accounting for water depletions associated with the retrieval of fluid minerals. However, many aspects of fluid mineral development require the use of water including the drilling of wells (drilling fluids, fracing, and completion activities), access road dust abatement, and hydrostatic pipeline testing. The U.S. Fish and Wildlife Service (Service, or USFWS) has already determined that any water depletions occurring within the Colorado River Basin may adversely affect the four Big River Fishes and their designated critical habitat. This consultation addresses water depletions associated with fluid mineral development across western Colorado.

The humpback chub and Colorado pikeminnow were listed as Endangered on March 11, 1967 (32 FR 4001 [USFWS 1967]). The bonytail chub was added to the list of endangered species on April 23, 1980 (45 FR 27710 [USFWS 1980]), and the razorback sucker was listed on October 23, 1991 (56 FR 54957 [USFWS 1991]). Critical habitat for all four species was designated simultaneously on March 21, 1994 (59 FR 13374-13400 [USFWS 1994a]).
The FWS has designated critical habitat for all of these species in Colorado. The following table summarizes where critical habitat exists within each of the 10 Field Offices located in western Colorado.

**Table 1.  Designated Critical Habitat by River/Affected Field Office in the Action Area**

| River | Field Offices | Species | Location of DCH |
|---|---|---|---|
| Colorado River | Kremmling FO, Glenwood Springs FO, Grand Junction, FO | BTC, CPM, HBC, RBS | In the river and its 100-year floodplain from the Colorado River Bridge at exit 90 north off Interstate 70 in Rifle, Colorado downstream to Lake Powell |
| Dolores River | San Juan Public Lands Center, Grand Junction FO | N/A | No portions of the Dolores River in Colorado are identified as Designated Critical Habitat for any of the 4 endangered fishes |
| Gunnison River | Gunnison FO, Uncompahgre FO, Grand Junction FO | CPM, RBS | In the river and its 100-year floodplain from the Uncompahgre River confluence in Delta, Colorado downstream to the confluence of the Colorado River |
| Green River | Little Snake FO | BTC, CPM, HBC, RBS | The Green River downstream from its confluence with the Yampa River and its 100-year floodplain |
| Yampa River | Little Snake FO, White River FO | BTC, CPM, HBC, RBS | In the river and its 100-year floodplain from the Colorado Highway 394 bridge downstream to its confluence with the Green River |
| White River | White River FO, Little Snake FO, Grand Junction FO | CPM | In the river and its 100-year floodplain from the dam on Rio Blanco Reservoir downstream to the Utah border |

BTC = Bonytail chub
CPM = Colorado pikeminnow
HBC = Humpback chub
RBS = Razorback sucker

2

Federal land management agencies must consult with the U.S. Fish and Wildlife Service on any action, which may affect listed species or designated critical habitat. Section 7(c)(1) of the Act requires a biological assessment be completed if a listed species and/or critical habitat may be present in the action area (USDI-FWS-NMFS,1998). It is optional if only proposed species or proposed critical habitat is involved (USDI-FWS-NMFS, 1998). The biological assessment ensures the agency's early involvement and increases the chance for resolution during informal consultation. One of the purposes of the biological assessment is to help make the determination of whether the proposed action is "likely to adversely affect" listed species and critical habitat (USDI-FWS-NMFS, 1998).

## II. Consultation History

To date, the Four Big River Fishes have undergone the following consultations regarding water depleting activities:

- Prior to completion of the 1994 Programmatic Biological Assessment (PBA), BLM completed several individual consultations on projects that depleted small amounts of water. The time and effort involved for both BLM and USFWS in completing these individual consultations led to the preparation and completion of the PBA in May 1994.

- In May 1994, BLM Colorado prepared a Programmatic Biological Assessment (PBA) that addressed water-depleting activities in the Colorado River Basin. In response to the PBA, the USFWS issued a Biological Opinion (BO) on June 13, 1994 (USFWS 1994b), which determined that water depletions from the Colorado River Basin would jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and result in the destruction or adverse modification of their critical habitat. The BO included reasonable and prudent alternatives developed by USFWS to allow BLM to authorize projects with resultant water depletions of less than 125 acre-feet. Projects or actions resulting in depletions of greater than 125 acre-feet per year fall outside the PBA and require individual consultation with USFWS.

  The PBA and BO were written to remain in effect until a total depletion threshold of 1,417 acre-feet of new depletions is reached. The threshold for historic depletions is 1,588 acre-feet. As of January 2008, BLM has depleted or authorized the depletion of approximately 1,354 acre-feet of new depletions under the 1994 PBA (and 1,019 acre-feet of historic depletions). The 1994 consultation did not fully account for fluid mineral activities and their associated water depletions; however these activities were not excluded from inclusion under the document. This BO was amended March 2, 2000 and September 27, 2005.

- In January 2007, the GSFO prepared a Biological Assessment (BA) for the Resource Management Plan Amendment, Roan Plateau Planning Area that among other things, addressed water-depleting activities within the planning area including those associated with fluid mineral development. In response to the BA, The USFWS issued a memo dated February 7, 2007, which concurred with BLM's determination that, among other things, water depletions from the Colorado River Basin would adversely affect the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and their critical

3

BLM_0009458

habitat.  Because the average annual depletion was less than 125 acre-feet (83.6 acre-feet/year), these depletions were addressed by the programmatic biological opinion issued to the BLM on June 13, 1994 (amended March 2, 2000 and September 27, 2005) for small water depletions authorized by BLM in Colorado (biological opinion number ES/GJ-6-CO-94-F017).

- *This Programmatic Consultation is for the Four Big River Fishes, and addresses the entire Fluid Mineral Program in western Colorado as administered by BLM Colorado. This consultation will be valid until such factors trigger the need for a reassessment. These factors include, but are not limited to, any newly proposed critical habitat, new and relevant information regarding any of the four listed fishes and/or their habitats, impacts not previously considered, major changes in the Fluid Mineral Program (e.g. new or revised RFD's if higher than anticipated) and/or its implementation.*

## III.  Species Considered & Species Evaluated
This PBA only addresses the Four Big River Fishes and specifically water depletions associated with the fluid mineral program as administered by the BLM in western Colorado.

### Table 2.  List of Species Considered

| Common Name | Scientific Name | Federal Status |
|---|---|---|
| Razorback sucker | *Xyrauchen texanus* | (Endangered - Critical Habitat) |
| Bonytail chub | *Gila elegans* | (Endangered - Critical Habitat) |
| Colorado pikeminnow | *Ptychocheilus lucius* | (Endangered - Critical Habitat) |
| Humpback chub | *Gila cypha* | (Endangered - Critical Habitat) |

Several other federally listed species occur across western Colorado.  However, these other listed species will be addressed in separate consultations in the event of any "May Effect" determination associated with fluid mineral development.

## IV.  Project Description (Proposed Action)
This programmatic biological assessment (PBA) addresses anticipated water depletions from the Upper Colorado River Basin on lands administered by the BLM across 8 administrative units/Field Offices located in western Colorado.

Across western Colorado, public lands administered by the BLM encompass 28% (7,189,639 acres) of the land area.  Other government agencies that manage land in western Colorado include the U.S. Forest Service (USFS) (for oil and gas development, the USFS approves the surface rights while BLM approves the drilling), U.S. National Park Service (NPS), U.S. Fish and Wildlife Service (Service), U.S. Bureau of Reclamation (BOR), Colorado Division of Wildlife (CDOW), and Colorado State Trust Lands.  Additional lands are held in private ownership or are located within the boundaries of the Southern Ute and Ute Mountain Indian Reservations (See Map Attachments 1 & 2).

4

The proposed action consists of ongoing and projected Fluid Mineral Development as administered by the BLM in Colorado. Projections are based on the Reasonable Foreseeable Development (RFD) scenarios of fluid mineral activity across western Colorado for the next 15 – 20 years. For purposes of analysis, we will assume that all drilling will occur within the smaller 15 year time frame to ensure the capture of possible higher annual activity levels. The assumptions used to arrive at the RFD's for each Field Office were based on current development trends, downspacing of drilling units, maturing oil & gas fields, predicted energy needs for the future, and the overall professional opinion of Field Office and State Office Geologists and Petroleum Engineers, as well as private industry professionals. This activity includes all Federal natural gas wells, oil wells, and coalbed methane natural gas wells including split estate. For the purposes of Cumulative Impact analysis, an estimate of proposed wells for non federal, non split estate activity is also included (see Table 3.).

Table 3. RFD's for each of the 8 Field Offices located in western Colorado for next 15 years

| Field Office | No. of Fed. Wells | No. of non-federal wells | Total No. of wells |
|---|---|---|---|
| San Juan Public Lands Center[b] | 700 | 234 | 934 |
| Glenwood Springs | 6400 | 8600 | 15000 |
| Grand Junction[a] | 1000 | 1200 | 2200 |
| Gunnison[a] | 10 | 5 | 15 |
| Kremmling[b] | 24 | 107 | 131 |
| Little Snake | 2122 | 909 | 3031 |
| Uncomphagre[a] | 200 | 100 | 300 |
| White River | 18475[c] | 2057 | 20532 |

[a] In lieu of an updated RFD, these estimates are based on discussions with office petroleum engineers and other professional staff, and for non-federal wells professional opinion, the COGCC website, and discussions with industry personnel.

[b] This estimate is a percentage of the full RFD to account for activity occurring only within the Dolores River Basin and not the San Juan River Basin for the San Juan Public Lands Center, and for activity only in the Colorado River Basin and not the North Platte River Basin in the Kremmling Field Office.

[c] The federal estimate of 18,475 is the mid-range of the RFD range provided by the WRFO.

Water depletions for the purpose of this analysis have been defined to include:

- Water used for access road dust abatement
- Water used for hydrostatic testing of newly constructed pipelines
- Water used to drill and complete wells (drilling and fracing fluids)

5

- Water associated with connected federal actions (e.g., BLM authorization of a pipeline, road, or utility line across public lands that is connected to the action of developing privately owned fluid mineral estate located on private lands)

The exceptions to this are historic depletions (occurring prior to January 1988). The Service addresses new and historic depletions differently under the new section 7 agreement of March 11, 1993. Historic depletions, regardless of size, do not pay a depletion fee, whereas new depletions over 100 acre-feet per year pay the fee.

### Dust Abatement
One use of freshwater is dust suppression of roadways used for oil and gas access. Because dust suppression would be required only on roadways actively used for oil and gas access, and only during certain times of the year, the exact number of miles or acres of roads that would require dust suppression in any given year is not known. Other variables affecting the amount of water needed for dust abatement include the type of road surface and local climate conditions. Information provided by an oil and gas operator in BLM's Vernal, Utah, resource area estimates an average of 0.1 acre-foot per well per year for dust abatement. This additional amount of water will be added to the per well water use for all fluid mineral development in western Colorado.

Methods to reduce depletions related to dust suppression include surface treatments such as magnesium chloride or gravel. Surface treatments would not be allowed in areas where they could adversely affect surface water quality. Other water conservation measures could include onsite treatment and reuse of imported or produced waters.

### Hydrostatic Pipeline Testing
Typically, new gas transmission pipelines are filled with water under pressure as a means of checking for leaks. According to an operator in BLM's Glenwood Springs Field Office hydrostatic testing of a pipeline is conducted sequentially in shorter segments controlled by valves. Each of the segments is about 10 percent of the total length being tested. When testing of one segment is completed, the same water is directed into the next segment for testing. Based on discussions with operators it is estimated that an average of 0.11 acre-feet of water is used per well for hydrostatic pipeline testing. This additional amount of water will be added to the per well water use for all fluid mineral development in western Colorado.

### Well Drilling (drilling, completion, and fracing)
Water use associated with well drilling and completion is the largest use of freshwater. Water use can vary greatly depending on several factors including local geology, depth of wells, time of year, and ability to re-use water. In western Colorado, the majority of drilling activity is occurring primarily in 3 geographic areas/Field Offices: White River Field Office, Glenwood Springs Field Office, and San Juan Public Lands Center. The remaining Field Offices make up a smaller amount of the overall activity and as such will be lumped in with the appropriate adjoining Field Office regarding water use estimates.

Conventional natural gas development generally requires the use of more fresh water than coalbed methane (CBM) development. CBM development while using less water for retrieval, results in more produced water. In Colorado, CBM produced water, like water produced from

6

BLM_0009461

any other type of oil or gas well, is handled as waste by COGCC Rule 907, and it remains under the jurisdiction of the COGCC. However, if CBM produced water is put to a beneficial use beyond the uses allowed under Rule 907, it is subject to DWR regulation through a permitting process and water users are subject to various controls to avoid injury to vested water rights. In general, most CBM produced water is disposed of in evaporation ponds or into Class II UIC injection wells due to the poor quality of the produced water. Where water is of sufficient quality, surface discharge for beneficial use could occur.

### *Federally Connected Actions*
Water use associated with connected federal actions (e.g., water use associated with the development of fee wells as actions connected to the authorization of a right-of-way to construct a natural gas pipeline, or utility or access road across federal lands.

It is impossible to foresee in advance how many road, utility, or pipeline rights-of-ways that would qualify as federal connected actions would be requested or authorized each year or how many connected fee wells would be completed in association with these authorizations. However, the BLM can track and tally the number of federal connected actions that result in the depletion of water on private lands associated with fluid mineral development and add in this depletion amount to the federal tally at the end of the year. It is the BLM's belief that the amount of water depletions associated with connected federal actions will be minimal and well within the threshold amount being consulted on.

## ESTIMATED AVERAGE ANNUAL WATER DEPLETION BY BLM FIELD OFFICE

### *White River Field Office (includes the Little Snake Field Office) Primarily Conventional Natural Gas Development with some Limited Coalbed Methane Activity*
Based on information from BLM's Petroleum Engineer in conjunction with discussions with various operators in the area, and on prevalent geology and current technology, it has been determined that an average of 2.41 acre-feet of Colorado River Basin water is used during the drilling of a single well in this area. This number is derived via a weighted average of 22 days to drill an individual well, and an estimated 850 barrels (42 gallons/barrel) of fresh (non-recycled) water per well per day. The primary gas fields located within the WRFO and LSFO are relatively new and have not been in place for many years. As such, sophisticated water treatment, holding, reuse, and associated transmission facilities are not in place. Thus limited water reuse is occurring in this region which accounts for the relatively high estimated water use per well figure.

The average depletion amount per well is calculated as follows: **[**(drilling and completion)=2.41 af**]** + **[**(dust abatement)=0.10 af**]** + **[**(hydrostatic pipeline testing)=0.11 af**]** = **2.62** af/well. For the White River geographic area, 2.62 acre-feet of water is used on average per well. It is recognized that individual wells may require the use of more or less water, but 2.62 acre-feet per well is has been calculated as a reasonable depletion amount per well drilled.

### *Glenwood Springs Field Office (includes the Grand Junction and Kremmling Field Offices) Primarily Conventional Natural Gas Development*
Based on information from BLM's Petroleum Engineer in conjunction with discussions with various operators in the area, and on prevalent geology and current technology, it has been

7

determined that an average of 0.56 acre-feet of Colorado River Basin water is used during the drilling of a single well in this area. This number is derived via a weighted average of 22 days to drill an individual well, and an estimated 200 barrels (42 gallons/barrel) of fresh (non-recycled) water per well per day. The primary gas fields located within the GSFO and GJFO are mature and have been in place for many years. As such, sophisticated water treatment, holding, reuse, and associated transmission facilities are in place. A significant amount of water reuse for well completion is occurring in this area which accounts for the relatively low estimated water use per well.

The average depletion amount per well is calculated as follows: **[**(drilling and completion)=0.56 af**]** + **[**(dust abatement)=0.10 af**]** + **[**(hydrostatic pipeline testing)=0.11 af**]** = **0.77** af/well. For the Glenwood Springs geographic area, 0.77 acre-feet of water is used on average per well. It is recognized that individual wells may require the use of more or less water, but 0.77 acre-feet per well is has been calculated as a reasonable depletion amount per well drilled.

### *San Juan Public Lands Center (includes the Columbine, Uncompahgre, and Gunnison Field Offices, Dolores Public Lands Center, and Pagosa Springs Public Lands Center) A Mix of both Convention and Coalbed Methane Natural Gas Development*
Based on information from BLM's Petroleum Engineer in conjunction with discussions with various operators in the area, and on prevalent geology and current technology, it has been determined that an average of 0.90 acre-feet of Colorado River Basin water is used during the drilling of a single well in this area. CBM well water use averages 0.5 ac-ft/well, while convention gas development averages 1.2 ac-ft/well. This number is derived via a weighted average of 22 days to drill an individual well, and an estimated 318 barrels (42 gallons/barrel) of fresh (non-recycled) water per well per day. The primary gas fields located within the SJPLC are mature and have been in place for many years. The existence of CBM gas development coupled with existence of water treatment, holding, reuse, and transmission infrastructure accounts for the relatively low estimated water use per well figure.

The average depletion amount per well is calculated as follows: **[**(drilling and completion)=0.90 af**]** + **[**(dust abatement)=0.10 af**]** + **[**(hydrostatic pipeline testing)=0.11 af**]** = **1.11** af/well. For the San Juan geographic area, 1.11 acre-feet of water is used on average per well. It is recognized that individual wells may require the use of more or less water, but 1.11 acre-feet per well is has been calculated as a reasonable depletion amount per well drilled.

Using the above well depletion figures by geographic area, and the information in Table 3, BLM has calculated the estimated number of wells that could be drilled in a given Field Office in any one year and the amount of fresh water used per well by Field Office. The estimated number of wells is used to calculate the average annual water depletion by Field Office (based on the number of wells drilled per year x depletion amount per well). In addition, these figures are used to calculate the average annual water deletion by River Basin. Finally, BLM will add the average annual water depletion figure for each Field Office/River Basin together to arrive at an overall average annual depletion amount associated with Fluid Mineral development in western Colorado. In addition, estimated water depletion associated with anticipated non federal wells will also be calculated to show and account for potential cumulative impacts.

8

BLM_0009463

**Glenwood Springs FO**   **6400 wells/15 years = 427 wells/year x 0.77 acre-feet/well = 329 acre-feet/year**

Non Federal   8600 wells/15 years = 573 wells/year x 0.77 acre-feet/well = 441.5 acre-feet/year

**Grand Junction FO**   **1000 wells/15 years = 67 wells/year x 0.77 acre-feet/well = 52 acre-feet/year**

Non Federal   1200 wells/15 years = 80 wells/year x 0.77 acre-feet/well = 61.6 acre-feet/year

**Gunnison FO**   **10 wells/15 years = 0.66 wells/year x 1.11 acre-feet/well = 0.74 acre-feet/year**

Non Federal   5 wells/15 years = 0.33 wells/year x 1.11 acre-feet/well = 0.37 acre-feet/year

**Kremmling FO**   **24 wells/15 years = 1.6 wells/year x 0.77 acre-feet/well = 1.25 acre-feet/year**

Non Federal   107 wells/15 years = 7.2 wells/year x 0.77 acre-feet/well = 5.5 acre-feet/year

**Little Snake FO**   **2122 wells/15 years = 141.5 wells/year x 2.62 acre-feet/well = 369 acre-feet/year**

Non Federal   909 wells/15 years = 60.6 wells/year x 2.62 acre-feet/well = 159 acre-feet/year

**San Juan Public Lands**   **700 wells/15 years = 46.7 wells/year x 1.11 acre-feet/well = 51.8 acre-feet/year**

Non Federal   234 wells/15 years = 15.6 wells/year x 1.11 acre-feet/well = 17.3 acre-feet/year

**Uncompahgre FO**   **200 wells/15 years = 13.3 wells/year x 1.11 acre-feet/well = 15 acre-feet/year**

Non Federal   100 wells/15 years = 6.7 wells/year x 1.11 acre-feet/well = 7.4 acre-feet/year

**White River FO**   **18475 wells/15 years = 1232 wells/year x 2.62 acre-feet/well = 3227 acre=feet/year**

Non Federal   2057 wells/15 years = 137 wells/year x 2.62 acre-feet/well = 359.2 acre-feet/year

FEDERAL
**Total = 4,046 acre-feet**

NON FEDERAL
**Total = 1,052 acre-feet**

9

BLM_0009464

Given the above equations, the estimated TOTAL average annual water depletion for the Fluid Mineral program is 4,046 acre-feet/year. Several factors contribute to the amount of development and exploration activity that occurs in any given year and in any given area including: price of oil and gas, commodity demand, technology improvements, level of field development, increases in pipeline capacity, and discovery of untapped resources, among others. Taking all of these factors into account, 4,046 acre-feet/year is the amount that BLM is consulting on with regard to federally administered fluid mineral activity in western Colorado.

**ESTIMATED AVERAGE ANNUAL WATER DEPLETION BY AFFECTED RIVER BASIN**

All of the water depletions analyzed in the Biological Assessment will occur within the Upper Colorado River Basin. Within the Upper Colorado River Basin, individual sub basins will be affected to varying degrees. RFD's and other fluid mineral development projections estimate the amount of activity that is expected to occur in each Field Office over the next 15 – 20 years. However, these estimates in no way dictate where activity within each Field Office will occur. In offices where only one river basin is affected (e.g., the Glenwood Springs Field Office which is located entirely within the Colorado River mainstem watershed), it is easy to discern that all activity within the FO will deplete water from the Colorado River. In Field Offices where multiple river basins exist (e.g., the Grand Junction Field Office which encompasses portions of the Colorado, Dolores, and Gunnison River basins), BLM will use the following assumptions regarding where fluid mineral development is anticipated to occur:

- Activity will continue to occur where it currently is occurring in developed and maturing gas fields
- New activity will be concentrated near existing development with the greatest well densities occurring in areas that already have numerous wells

**Colorado River Basin**

Glenwood Springs FO – 100% of the fluid mineral activity is occurring within this basin
Grand Junction FO – approximately 96% of the fluid mineral activity is occurring in the basin
Kremmling FO – 100% of the fluid mineral activity is occurring within the basin

Based on these figures, the following equations estimate the amount of water to be depleted in the Colorado River:

| | |
|---|---|
| **Glenwood Springs FO** | **6400 wells/15 years = 427 wells/year x 0.77 acre-feet/well = 329 acre-feet/year** |
| Non Federal | 8600 wells/15 years = 573 wells/year x 0.77 acre-feet/well = 440.6 acre-feet/year |
| **Grand Junction FO** | **960 wells/15 years = 64 wells/year x 0.77 acre-feet/well = 49 acre-feet/year** |
| Non Federal | 1152 wells/15 years = 76.8 wells/year x 0.77 acre-feet/well = 59 acre-feet/year |
| **Kremmling FO** | **24 wells/15 years = 1.6 wells/year x 0.77 acre-feet/well = 1.4 acre-feet/year** |
| Non Federal | 107 wells/15 years = 7.2 wells/year x 0.77 acre-feet/well = 5.5 acre-feet/year |

TOTAL FEDERAL = **379.4 acre-feet**

## Gunnison River Basin

Gunnison FO – 100% of the fluid mineral activity is occurring in the basin
Grand Junction FO – approximately 4% of the fluid mineral activity is occurring in the basin
Uncompahgre FO – approximately 85% of the fluid mineral activity is occurring in the basin

Based on these figures, the following equations estimate the amount of water to be depleted in the Gunnison River:

| | |
|---|---|
| **Grand Junction FO** | **40 wells/15 years = 2.7 wells/year x 0.77 acre-feet/well = 2.2 acre-feet/year** |
| Non Federal | 48 wells/15 years = 3.2 wells/year x 0.77 acre-feet/well = 2.4 acre-feet/year |
| **Gunnison FO** | **10 wells/15 years = 0.66 wells/year x 1.11 acre-feet/well = 0.76 acre-feet/year** |
| Non Federal | 5 wells/15 years = 0.33 wells/year x 1.11 acre-feet/well = 0.35 acre-feet/year |
| **Uncompahgre FO** | **170 wells/15 years = 11.3 wells/year x 1.11 acre-feet/well = 13 acre-feet/year** |
| Non Federal | 85 wells/15 years = 6 wells/year x 1.11 acre-feet/well = 7 acre-feet/year |

TOTAL FEDERAL = **15.9 acre-feet**

## Dolores River Basin

Uncompahgre FO – approximately 15% of the fluid mineral activity is occurring in the basin
San Juan Public Lands – approximately 30% of the fluid mineral activity is occurring in the basin
Grand Junction FO – no fluid mineral activity is currently being conducted in this basin

Based on these figures, the following equations estimate the amount of water to be depleted in the Dolores River:

| | |
|---|---|
| **Grand Junction FO** | **0 wells/15 years = 0 wells/year x 0.77 acre-feet/well = 0 acre-feet/year** |
| Non Federal | 0 wells/15 years = 0 wells/year x 0.77 acre-feet/well = 0 acre-feet/year |
| **San Juan Public Lands** | **700 wells/15 years = 46.7 wells/year x 1.11 acre-feet/well = 51.8 acre-feet/year** |
| Non Federal | 234 wells/15 years = 15.6 wells/year x 1.11 acre-feet/well = 17 acre-feet/year |
| **Uncompahgre FO** | **234 wells/15 years = 2 wells/year x 1.11 acre-feet/well = 2.4 acre-feet/year** |
| Non Federal | 15 wells/15 years = 1 wells/year x 1.11 acre-feet/well = 1.1 acre-feet/year |

**TOTAL FEDERAL = 54.2 acre-feet**

## Yampa River Basin

Little Snake FO – 100% of the fluid mineral activity is occurring in the basin

11

BLM_0009466

Based on these figures, the following equations estimate the amount of water to be depleted in the Yampa River:

| | |
|---|---|
| **Little Snake FO** | **2122 wells/15 years = 142 wells/year x 2.62 acre-feet/well = 369 acre-feet/year** |
| Non Federal | 909 wells/15 years = 61 wells/year x 2.62 acre-feet/well = 160 acre-feet/year |

**TOTAL FEDERAL = 369 acre-feet**

## White River Basin

White River FO – 100% of the fluid mineral activity is occurring in the basin

Based on these figures, the following equations estimate the amount of water to be depleted in the White River:

| | |
|---|---|
| **White River FO** | **18475 wells/15 years = 1232 wells/year x 2.62 acre-feet/well = 3227 acre-feet/year** |
| Non Federal | 2057 wells/15 years = 137 wells/year x 2.62 acre-feet/well = 359.2 acre-feet/year |

**TOTAL FEDERAL = 3,227 acre-feet**

## Green River Basin

Little Snake FO – no fluid mineral activity is currently being conducted in this basin

**TOTAL FEDERAL = 0.00 acre-feet**
FEDERAL
**GRAND TOTAL OF ALL RIVER BASINS = 4,046 acre-feet**

NON FEDERAL
**GRAND TOTAL OF ALL RIVER BASINS = 1,052 acre-feet**

## Conservation Measures:

As a means of minimizing negative effects, the following conservation measures are proposed up front as part of the proposed action:

- Water may be extracted directly out of the Colorado, Gunnison, White, Yampa, or Green River, which all have occupied and critical habitat for the four endangered Colorado River fish. The 8 western slope Field Offices/Administrative Units have committed to implement the following measures to minimize direct impacts to federally listed species from pumping water directly out of these rivers:

  1. The best method to avoid entrainment is to pump from off-channel locations (e.g., ponds, lakes, and diversion ditches), not directly connected to the mainstem rivers even during high spring flows.
  2. If the pump head must be located in the river channel where larval fish are known to occur (generally within Designated Critical Habitat), the following measures apply:
     a. do not situate the pump in a low-flow or no-flow area as these habitats tend to concentrate larval fishes. Instead place the pump into fast moving/riffle habitat;

12

BLM_0009467

  b. limit the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15); and

  c. avoid pumping, to the greatest extent possible, during the pre-dawn hours (two hours prior to sunrise) as larval fish drift studies indicate that this is a period of greatest daily activity.

3. Screen all pump intakes with ¼" or finer mesh material.

4. Report any fish impinged on any intake screens to the Fish and Wildlife Service (970.243.2778) or the Colorado Division of Wildlife:

> **Northwest Region**
> 711 Independent Ave., Grand Junction, CO 81505
> Phone: (970) 255-6100
>
> **Southwest Region**
> 415 Turner Dr., Durango, CO 81303
> Phone: (970) 375-6700

The above conservation measure will be implemented via the BLM working with the individual companies, their sub-contractors and industry representative groups directly to inform and educate on the ground personnel of the need to implement this conservation measure. In addition, the above conservation measure will be added to all Applications for Permit to Drill (APD's) as a condition of approval (COA) prior to commencement of development activity.

- As a means of offsetting the impacts associated with the proposed action, the BLM proposes to solicit a one-time contribution from an industry representative group in the form of a monetary payment to the National Fish and Wildlife Foundation on behalf of the Recovery Program in the current amount of $17.79 per acre-foot of the project's average annual depletion.

- Water depletion in the Colorado and Yampa River sub-basins has been addressed in programmatic biological opinions. These opinions require water users to sign Recovery Agreements that state the water users won't interfere with the implementation of recovery actions and the Fish and Wildlife Service will provide ESA compliance. The BLM will ensure Recovery Agreements are initiated by individual operators, or on the behalf of individual operators via industry representative groups, with the USFWS as appropriate.

# V. Description of the Species and their Habitat

## V.1 Bonytail chub

The bonytail chub *(Gila elegans)* is a large cyprinid fish endemic to the Colorado River Basin (Valdez and Clemmer 1982). Bonytail are medium-sized (less than 600 mm) fish in the minnow family. Adult bonytail are gray or olive-colored on the back with silvery sides and a white belly. The adult bonytail has an elongated body with a long, thin caudal peduncle. The head is small and compressed compared to the rest of the body. The mouth is slightly overhung by the snout and there is a smooth low hump behind the head that is not as pronounced as the hump on a

13

humpback chub.  Adults attain a maximum size of about 550 mm total length (TL; Bozek et al. 1984) and 1.1 kg in weight (Vanicek 1967). The bonytail is currently listed as "endangered" under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et. seq.*), under a final rule published on April 23, 1980 (45 FR 27710). A recovery plan was approved on September 4, 1990 (U.S. Fish and Wildlife Service 1990a). The final rule for determination of critical habitat was published on March 21, 1994 (59 FR 13374), and the final designation became effective on April 20, 1994.

"Bonytail" is the accepted common name for *Gila elegans*. The synonym "bonytail chub" was used when the species was listed in 1980 and is an often-used common name (Valdez and Clemmer 1982).  It is one of four mainstem, big-river fishes currently listed as endangered under the ESA. The native fish assemblage of the Colorado River is jeopardized by large mainstem dams, water diversions, habitat modification, and nonnative fish species, and degraded water quality (Miller 1961; Minckley and Deacon 1968).

Little is known about the specific habitat requirements of bonytail because the species was extirpated from most of its historic range prior to extensive fishery surveys. The bonytail is adapted to mainstem rivers where it has been observed in pools and eddies. Similar to other closely related *Gila* spp., bonytail in rivers probably spawn in spring over rocky substrates; spawning in reservoirs has been observed over rocky shoals and shorelines. It is hypothesized, based on available distribution data that flooded bottomland habitats are important growth and conditioning areas for bonytail, particularly as nursery habitats for young. Flow recommendations have been developed that specifically consider flow-habitat relationships within historic habitat of bonytail in the upper basin, and were designed to enhance habitat complexity and to restore and maintain ecological processes. The following is a description of observed habitat uses in various parts of the Colorado River Basin.

It has been suggested that the large fins and streamlined body of the bonytail is an adaptation to torrential flows (Miller 1946; Beckman 1963). Of five specimens captured recently in the upper basin, four were captured in deep, swift, rocky canyon regions (i.e., Yampa Canyon, Black Rocks, Cataract Canyon, and Coal Creek Rapid), but the fifth was taken in a reservoir (Lake Powell). Also, all fish taken from the lower basin since 1974 were caught in reservoirs. Specimens encountered in reservoirs are believed to inhabit their former habitats now inundated by these impoundments.  Vanicek (1967) who handled numerous bonytail detected no difference in habitat selection from roundtail chub. These fish were generally found in pools and eddies in the absence of, although occasionally adjacent to, strong current and at varying depths generally over silt and silt-boulder substrates. No quantitative data are available for the habitat of this species. Adult bonytail captured in Cataract Canyon and Desolation/Gray Canyons were sympatric with humpback chub in shoreline eddies among emergent boulders and cobble, and adjacent to swift current (Valdez 1990).

Threats to the Species
The primary threats to bonytail are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; hybridization with other native *Gila* species; and pesticides and pollutants (USFWS 2002d).  The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering.  The threats to bonytail in relation to flow regulation and habitat modification,

14

predation by nonnative fishes, and pesticides and pollutants are essentially the same threats identified for Colorado pikeminnow.  Threats to bonytail in relation to hybridization are essentially the same threats identified for humpback chub.

## V.2 Colorado pikeminnow

The Colorado pikeminnow (*Ptychocheilus lucius*) is the largest cyprinid fish endemic to the Colorado River Basin (Tyus 1991). The common name for this species was changed from Colorado squawfish by the American Fisheries Society (Nelson et al. 1998). Adults attain a maximum size of about 1.8 m total length (TL) and 36 kg in weight (Miller 1961). The Colorado pikeminnow is currently listed as "endangered" under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et. seq.*). It was first included in the List of Endangered Species issued by the Office of Endangered Species on March 11, 1967 (32 FR 4001) and was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 U.S.C. 668aa). The Colorado squawfish (pikeminnow) was included in the United States List of Endangered Native Fish and Wildlife issued on June 4, 1973 (38 FR No. 106), and it received protection as endangered under Section 4(c)(3) of the original ESA of 1973. The latest revised Colorado squawfish (pikeminnow) recovery plan was approved on August 6, 1991 (U.S. Fish and Wildlife Service 1991). The final rule for determination of critical habitat was published on March 21, 1994 (59 FR 13374), and the final designation became effective on April 20, 1994.

The Colorado pikeminnow is a member of a unique assemblage of fishes native to the Colorado River Basin, consisting of 35 species with 74% level of endemism (Miller 1959). It is one of four mainstem, big-river fishes currently listed as endangered under the ESA; others are the humpback chub (*Gila cypha),* bonytail (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*). The native fish assemblage of the Colorado River Basin is jeopardized by large mainstem dams, water diversions, habitat modification, nonnative fish species, and degraded water quality (Miller 1961; Minckley and Deacon 1991).

Colorado pikeminnow live in warm-water reaches of the Colorado River mainstem and larger tributaries, and require uninterrupted stream passage for spawning migrations and dispersal of young. The species is adapted to a hydrologic cycle characterized by large spring peaks of snowmelt runoff and low, relatively stable base flows. High spring flows create and maintain in-channel habitats, and reconnect floodplain and riverine habitats, a phenomenon described as the spring flood-pulse (Junk et al. 1989; Johnson et al. 1995). Throughout most of the year, juvenile, subadult, and adult Colorado pikeminnow utilize relatively deep, low-velocity eddies, pools, and runs that occur in nearshore areas of main river channels (Tyus and McAda 1984; Valdez and Masslich 1989; Tyus 1990, 1991; Osmundson et al. 1995;). In spring, however, Colorado pikeminnow adults utilize floodplain habitats, flooded tributary mouths, flooded side canyons, and eddies that are available only during high flows (Tyus 1990, 1991; Osmundson et al. 1995). Such environments may be particularly beneficial for Colorado pikeminnow because other riverine fishes gather in floodplain habitats to exploit food and temperature resources, and may serve as prey. Such low-velocity environments also may serve as resting areas for Colorado pikeminnow. River reaches of high habitat complexity appear to be preferred.

15

BLM_0009470

<u>Threats to the Species</u>
The primary threats to Colorado pikeminnow are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; and pesticides and pollutants (USFWS 2002a). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. These impairments are described in further detail below.

Stream flow regulation includes main stem dams that cause the following adverse effects to Colorado pikeminnow and its habitat:

1.  Block migration corridors.
2.  Changes in flow patterns reduced peak flows and increased base flows.
3.  Release cold water, making temperature regimes less than optimal.
4.  Change river habitat into lake habitat.
5.  Retain sediment that is important for forming and maintaining backwater habitats.

In the Upper Basin, 435 miles of Colorado pikeminnow habitat has been lost by reservoir inundation from Flaming Forge Reservoir on the Green River, Lake Powell on the Colorado River, and Navajo Reservoir on the San Juan River. Cold water releases from these dams have eliminated suitable habitat for native fishes, including Colorado pikeminnow, from river reaches downstream for approximately 50 miles below Flaming Gorge Dam and Navajo Dam. In addition to main stem dams, many dams and water diversion structures occur in and upstream from critical habitat that reduce flows and alter flow patterns, which adversely affect critical habitat. Diversion structures in critical habitat divert fish into canals and pipes where the fish are permanently lost to the river system. It is unknown how many endangered fish are lost in irrigation systems, but in some years, in some river reaches, majority of the river flow is diverted into unscreened canals. The high spring flows which maintain habitat diversity, flush sediments from spawning habitat, increase invertebrate food production, form gravel and cobble deposits important for spawning, and maintain backwater nursery habitats have been reduced by flow regulation of dams and by water diversions (McAda 2003; Muth et al. 2000).

Predation and competition from nonnative fishes have been clearly implicated in the population reductions or elimination of native fishes in the Colorado River Basin (Dill 1944; Osmundson and Kaeding 1989; Behnke 1980; Joseph et al. 1977; Lanigan and Berry 1979; Minckley and Deacon 1968; Meffe 1985; Propst and Bestgen 1991; Rinne 1991). Data collected by Osmundson and Kaeding (1991) indicated that during low water years nonnative minnows capable of preying on or competing with larval endangered fishes greatly increased in numbers.

More than 50 nonnative fish species were intentionally introduced in the Colorado River Basin prior to 1980 for sportfishing, forage fish, biological control and ornamental purposes (Minckley 1982; Tyus et al. 1982; Carlson and Muth 1989). Nonnative fishes compete with native fishes in several ways. The capacity of a particular area to support aquatic life is limited by physical habitat conditions. Increasing the number of species in an area usually results in a smaller population of most species. The size of each species population is controlled by the ability of each life stage to compete for space and food resources and to avoid predation. Some life stages of nonnative fishes appear to have a greater ability to compete for space and food and to avoid predation in the existing altered habitat than do some life stages of native fishes. Tyus and

16

Saunders (1996) cite numerous examples of both indirect and direct evidence of predation on razorback sucker eggs and larvae by nonnative species.

Threats from pesticides and pollutants include accidental spills of petroleum products and hazardous materials; discharge of pollutants from uranium mill tailings; and high selenium concentration in the water and food chain (USFWS 2002a). Accidental spills of hazardous material into critical habitat can cause immediate mortality when lethal toxicity levels are exceeded. Pollutants from uranium mill tailings cause high levels of ammonia that exceed water quality standards. High selenium levels may adversely affect reproduction and recruitment (Hamilton and Wiedmeyer 1990; Stephens et al. 1992; Hamilton and Waddell 1994; Hamilton et al. 1996; Stephens and Waddell 1998; Osmundson et al. 2000).

## V.3 Humpback chub

The humpback chub (*Gila cypha*) is a large cyprinid fish endemic to the Colorado River Basin (Miller 1946). Adults attain a maximum size of about 480 mm total length (TL) and 1.2 kg in weight (Valdez and Ryel 1997). The humpback chub is currently listed as "endangered" under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et. seq.*). It was first included in the List of Endangered Species issued by the Office of Endangered Species on March 11, 1967 (32 FR 4001) and was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 U.S.C. 668aa). The humpback chub was included in the United States List of Endangered Native Fish and Wildlife issued on June 4, 1973 (38 FR No. 106), and it received protection as endangered under Section 4(c)(3) of the original ESA of 1973. The latest revised humpback chub recovery plan was approved on September 19, 1990 (U.S. Fish and Wildlife Service 1990a). The final rule for determination of critical habitat was published on March 21, 1994 (59 FR 13374), and the final designation became effective on April 20, 1994.

The humpback chub is a member of a unique assemblage of fishes native to the Colorado River Basin, consisting of 35 species with 74% level of endemism (Miller 1959). It is one of four mainstem, big-river fishes currently listed as endangered under the ESA; others are the bonytail (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus lucius*; formerly Colorado squawfish; Nelson et al. 1998), and razorback sucker (*Xyrauchen texanus*). The native fish assemblage of the Colorado River Basin is jeopardized by large mainstem dams, water diversions, habitat modification, nonnative fish species, and degraded water quality (Miller 1961; Minckley and Deacon 1991).

The humpback chub evolved in seasonally warm and turbid water and is highly adapted to the unpredictable hydrologic conditions that occurred in the pristine Colorado River system. Adults require eddies and sheltered shoreline habitats maintained by high spring flows. These high spring flows maintain channel and habitat diversity, flush sediments from spawning areas, rejuvenate food production, and form gravel and cobble deposits used for spawning. Spawning occurs on the descending limb of the spring hydrograph at water temperatures typically between 16 and 22°C. Young require low-velocity shoreline habitats, including eddies and backwaters, that are more prevalent under base-flow conditions. Flow recommendations have been developed that specifically consider flow-habitat relationships in habitats occupied by humpback chub in the upper basin, and were designed to enhance habitat complexity and to restore and maintain

17

BLM_0009472

ecological processes. The following is a description of observed habitat uses in various parts of the Colorado River Basin.

Humpback chub live and complete their entire life cycle in canyon-bound reaches of the Colorado River mainstem and larger tributaries. These reaches are characterized by deep water, swift currents, and rocky substrates (Valdez et al. 1990). Subadults use shallow, sheltered shoreline habitats, whereas adults use primarily offshore habitats of greater depths (Valdez and Ryel 1995; Karp and Tyus 1990; Childs et al. 1998; Chart and Lentsch 1999). In Grand Canyon, nearly all fish smaller than 100 mm TL were captured near shore, whereas most fish larger than 100 mm TL were captured in offshore habitats (Valdez and Ryel 1995). Highest densities of subadults in the Colorado River in Grand Canyon were from shorelines with vegetation, talus, and debris fans (Converse et al. 1998). Adults were captured (88%) and radio-contacted (74%) primarily in large recirculating eddies disproportionate to their availability (21%; Valdez and Ryel 1997). Smaller percentages of adults were captured or radio contacted in runs (7% and 16%, respectively) that comprised 56% of surface area, pools (1% and 3%, respectively) that comprised 16% of surface area, and backwaters (4% and 7%, respectively) that comprised 0.1% of surface area.

Threats to the Species
The primary threats to humpback chub are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; parasitism; hybridization with other native *Gila* species; and pesticides and pollutants (USFWS 2002c). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. The threats to humpback chub in relation to flow regulation and habitat modification, predation by nonnative fishes, and pesticides and pollutants are essentially the same threats identified for Colorado pikeminnow.

The humpback chub population in the Grand Canyon is threatened by predation from nonnative trout in the Colorado River below Glen Canyon Dam. This population also is threatened by the Asian tapeworm reported in humpback chub in the Little Colorado River (USFWS 2002c). No Asian tapeworms have been reported in the Upper Basin populations.

Hybridization with roundtail chub (*Gila robusta*) and bonytail, where they occur with humpback chub, is recognized as a threat to humpback chub. A larger proportion of roundtail chub have been found in Black Rocks and Westwater Canyon during low flow years (Kaeding et al. 1990; Chart and Lentsch 2000), which increase the chances for hybridization.

## V.4 Razorback sucker
The razorback sucker *(Xyrauchen texanus)* is a large catostomid fish endemic to the Colorado River Basin (Minckley et al. 1991). Adults attain a maximum size of about 1 m total length (TL) and 5–6 kg in weight (Minckley 1973). The razorback sucker is currently listed as "endangered" under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et. seq.*), under a final rule published on October 23, 1991 (56 FR 54957). A recovery plan was approved on December 23, 1998 (U.S. Fish and Wildlife Service 1998). The final rule for determination of critical habitat was published on March 21, 1994 (59 FR 13374), and the final designation became effective on April 20, 1994.

18

BLM_0009473

The razorback sucker is a member of a unique assemblage of fishes native to the Colorado River Basin, consisting of 35 species with 74% level of endemism (Miller 1959). It is one of four mainstem, big-river fishes currently listed as endangered under the ESA; others are the humpback chub (*Gila cypha*), bonytail (*G. elegans*), and Colorado pikeminnow (*Ptychocheilus lucius*; formerly Colorado squawfish; Nelson et al. 1998). The native fish assemblage of the Colorado River is jeopardized by large mainstem dams, water diversions, degraded water quality, habitat modification, nonnative fish species, and degraded water quality (Miller 1961; Minckley and Deacon 1991).

The razorback sucker evolved in warm-water reaches of larger rivers of the Colorado River Basin from Mexico to Wyoming. Habitats required by adults in rivers include deep runs, eddies, backwaters, and flooded off-channel environments in spring; runs and pools often in shallow water associated with submerged sandbars in summer; and low-velocity runs, pools, and eddies in winter. Spring migrations of adult razorback sucker were associated with spawning in historic accounts and a variety of local and long-distance movements and habitat-use patterns have been documented. Spawning in rivers occurs over bars of cobble, gravel, and sand substrates during spring runoff at widely ranging flows and water temperatures (typically greater than 14 $^{\circ}$C). Spawning also occurs in reservoirs over rocky shoals and shorelines. Young require nursery environments with quiet, warm, shallow water such as tributary mouths, backwaters, or inundated floodplain habitats in rivers, and coves or shorelines in reservoirs. Flow recommendations have been developed that specifically consider flow-habitat relationships in habitats occupied by razorback sucker in the upper basin, and were designed to enhance habitat complexity and to restore and maintain ecological processes. The following is a description of observed uses in various parts of the Colorado River Basin.

Adult razorback sucker tend to occupy different habitats seasonally (Osmundson et al. 1995; Table A-1), and can do well in both lotic and lentic environments (Minckley et al. 1991). In rivers, they usually are captured in lower velocity currents, more rarely in turbulent canyon reaches (Tyus 1987; Lanigan and Tyus 1989; Tyus and Karp 1990; Bestgen 1990; Minckley et al. 1991). An exception may be in the San Juan River, where hatchery-reared, radio-tagged adults preferred swifter mid-channel currents during summer–autumn base-flow periods (Ryden 2000). In the upper basin, bottomlands, low-lying wetlands, and oxbow channels flooded and ephemerally connected to the main channel by high spring flows appear to be important habitats for all life stages of razorback sucker (Modde et al. 1996; Muth et al. 2000). These areas provide warmwater temperatures, low-velocity flows, and increased food availability (Tyus and Karp 1990; Modde 1997; Wydoski and Wick 1998). For example, in Old Charlie Wash, a managed wetland on the middle Green River, spring–summer water temperatures were 2–8°C higher than in the adjacent river (Modde 1996, 1997), density of benthos was 41 times greater than in other sampled habitats, and densities of zooplankton were 29 times greater than in backwaters and 157 times greater than in the main channel (Mabey and Shiozawa 1993).

19

BLM_0009474

<u>Threats to the Species</u>
The primary threats to razorback sucker are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; and pesticides and pollutants (USFWS 2002b). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. The threats to razorback sucker are essentially the same threats identified for Colorado pikeminnow.

# VI. Environmental Baseline (habitat/species conditions within the project/action area)

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation process. The action area is defined at 50 CFR 402 to mean "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action". For the purposes of this consultation, the action area has been defined to include lands administered by the BLM within the Colorado River Basin and those areas downstream or upstream that are affected by the proposed action.

A number of factors contributed historically to the decline of these species, including changes in flow regime (especially the timing and amplitude of high flows) associated with construction of dams and irrigation diversions, altered water quality (including reduced sediment load and lower temperatures associated with dams and, in specific areas, chemical pollutants), interference with migration to/from spawning grounds due to dams and other in-stream features (especially for the pikeminnow), competition or hybridization with introduced congeners (members of the same genus), predation on eggs, larvae, juvenile, and adult fish by introduced predatory game and non-game fishes.

*Colorado Pikeminnow*
The action area includes critical habitat for Colorado pikeminnow on the Gunnison River from the confluence of the Uncompahgre River to the confluence of the Colorado River, on the Colorado River from the Highway 13 bridge in Rifle, Colorado downstream to Lake Powell, in the Yampa River from the Colorado Highway 394 bridge downstream to the confluence with the Green River, in the Green River from the confluence with the Yampa River downstream, and in the White River from Rio Blanco Reservoir downstream to the Utah border. Colorado pikeminnow also have been found in the Gunnison River upstream from the confluence with the Uncompahgre River as far as the Hartland Diversion Dam (approximately 4 miles). Estimates of wild adult Colorado pikeminnow in the upper Colorado River (from Palisade, Colorado to Lake Powell) were approximately 780 fish in 2003. This population estimate includes the 15-mile reach of the Colorado River above the confluence with the Gunnison River. However, fish can freely swim into this reach from either the Gunnison River or the Colorado River below the confluence, so the upper Colorado River (including the Gunnison River) is considered one population. There are no specific population estimates for Colorado pikeminnow in the Gunnison River and no specific population estimates for this species above Palisade, Colorado on the Mainstem Colorado River. Other occupied habitat of wild Colorado pikeminnow includies: the Green River from Lodore Canyon to the confluence of the Colorado River; the Yampa River downstream of Craig, Colorado; the Little Snake River from its confluence with

20

BLM_0009475

the Yampa River upstream into Wyoming; the White River downstream of Taylor Draw Dam; the lower 89 miles of the Price River; the lower Duchesne River; the upper Colorado River from Palisade, Colorado, to Lake Powell; the lower 34 miles of the Gunnison River; and the lower mile of the Dolores River in Utah.

Major declines of this native fish first occurred in the lower basin where large dams were constructed from the 1930s through the 1960s. In the Upper Basin, the following major dams were not constructed until the 1960s: Glen Canyon Dam on the mainstem Colorado River, Flaming Gorge Dam on the Green River, Navajo Dam on the San Juan River, and the Aspinall Unit Dams on the Gunnison River. To date, some populations in the Upper Basin have managed to persist, while others have become nearly extirpated. River segments where these fish have declined more slowly than in other areas are those where the hydrologic regime most closely resembles the natural condition, such as the Yampa River, where adequate habitat for important life phases still exists, and where migration corridors are unblocked and allow connectivity among life phases.

### Razorback sucker
The action area includes critical habitat for razorback sucker on the Gunnison River from the confluence of the Uncompahgre River to the confluence of the Colorado River, on the Colorado River from the Highway 13 bridge in Rifle, Colorado downstream to Lake Powell, in the Yampa River from the Colorado Highway 394 bridge downstream to the confluence with the Green River, in the Green River from the confluence with the Yampa River downstream, and in the White River from Rio Blanco Reservoir downstream to the Utah border. Few wild razorback suckers occur in the action area; however, the population is being augmented by stocking both in the Colorado and Gunnison Rivers. In the Upper Colorado River Basin, above Glen Canyon Dam, razorback suckers are found in limited numbers in both lentic (lake-like) and riverine environments. The largest populations of razorback suckers in the Upper Basin are found in the middle Green and lower Yampa Rivers (Tyus 1987). In the Colorado River, most razorback suckers occur in the Grand Valley area near Grand Junction, Colorado; however, they are increasingly rare. Osmundson and Kaeding (1991) reported that the number of razorback sucker captures in the Grand Junction area has declined dramatically since 1974. Between 1984 and 1990, intensive collecting effort captured only 12 individuals in the Grand Valley (Osmundson and Kaeding 1991). The wild population of razorback sucker is considered extirpated from the Gunnison River (Burdick and Bonar 1997).

### Humpback chub
The action area includes critical habitat for the Humpback chub on the Colorado River from Black Rocks in Colorado downstream to the Utah border, in the Yampa River from the boundary of Dinosaur National Monument to the confluence with the Green River, and in the Green River from the confluence with the Yampa River to the Utah border. Present concentrations of humpback chub in the Upper Basin occur in canyon-bound river reaches ranging in length from 3.7 kilometers (Black Rocks) to 40.5 kilometers (Desolation and Gray Canyons). Humpback chubs are distributed throughout most of Black Rocks and Westwater Canyons (12.9 km), and in or near whitewater reaches of Cataract Canyon (20.9 kilometers), Desolation and Gray Canyons (65.2 kilometers), and Yampa Canyon (44.3 kilometers), with populations in the separate canyon reaches ranging from 400 to 5,000 adults. Distribution of humpback chubs within Whirlpool and Split Mountain Canyons is not presently known, but it is believed that numbers of humpback

21

BLM_0009476

chub in these sections of the Green River are low.  Other populations have been reported in De Beque Canyon of the Colorado River, Desolation and Gray Canyons of the Green River, and the Yampa and Whirlpool Canyons in Dinosaur National Monument (USFWS 1990b).  One individual was recently captured in the Gunnison River in a canyon-bound reach at RM 22 (Burdick 1995).

The Yampa River is the only tributary to the Green River presently known to support a reproducing humpback chub population.  Between 1986 and 1989, Karp and Tyus (1990) collected 130 humpback chubs from Yampa Canyon and indicated that a small but reproducing population was present.  Continuing captures of juveniles and adults within Dinosaur National Monument indicate that a population persists in Yampa Canyon (T. Modde, USFWS, pers. comm.).  Small numbers of humpback chub also have been reported in Cross Mountain Canyon on the Yampa River and in the Little Snake River about 10 kilometers upstream of its confluence with the Yampa River (Wick et al. 1981; Hawkins et al. 1996).

Population Dynamics
The humpback chub Recovery Goals (USFWS 2002c) provided the following preliminary population estimates for adults in the six populations:

* Black Rocks, Colorado River, Colorado - 900–1,500
* Westwater Canyon, Colorado River, Utah - 2,000–5,000
* Yampa Canyon, Yampa River, Colorado - 400–600
* Desolation/Gray Canyons,  Green River, Utah - 1,500
* Cataract Canyon, Colorado River, Utah - 500
* Grand Canyon, Colorado River and Little Colorado River, Arizona - 2,000–4,700

*Bonytail chub*
The action area includes critical habitat for Bonytail chub on the Colorado River from Black Rocks in Colorado downstream to the Utah border, in the Yampa River from the boundary of Dinosaur National Monument to the confluence with the Green River, and in the Green River from the confluence with the Yampa River to the Utah border.  Wild bonytail are extremely rare in the action area.  The last known riverine area where bonytail were common was the Green River in Dinosaur National Monument, where Vanicek (1967) and Holden and Stalnaker (1970) collected 91 specimens during 1962-1966.  From 1977 to 1983, no bonytail were collected from the Colorado or Gunnison Rivers in Colorado or Utah (Wick et al. 1979, 1981; Valdez et al. 1982a, 1982b; Miller et al. 1984).  However, in 1984, a single bonytail was collected from Black Rocks on the Colorado River (Kaeding et al. 1986).  Several suspected bonytail were captured in Cataract Canyon in 1985-1987 (Valdez 1990).  Current stocking plans for bonytail identify the middle Green River and the Yampa River in Dinosaur National Monument as the highest priority for stocking in Colorado and the plan calls for 2,665 fish to be stocked per year over the next 6 years (Nesler et al. 2003).

BLM_0009477

Bonytail are so rare that it is currently not possible to conduct population estimates. A stocking program is being implemented to reestablish populations in the upper Colorado River basin. From 1996 through 2004, 44,472 subadult bonytail were stocked in the Green and upper Colorado River Sub-basins. The Recovery Goals (USFWS 2002d) call for reestablished populations in the Green River and upper Colorado River sub-basins, each with >4,400 adults that are self-sustaining with recruitment.

# VII. Effects of Proposed Action

The Proposed Action accounts for Reasonable Foreseeable Development of fluid mineral activity across western Colorado for the next 15 years. Based on the number of federal wells anticipated, it is estimated that BLM's fluid mineral program will result in an average annual depletion of 4046 acre-feet in the Upper Colorado River Basin.

Water depletions from the Upper Colorado River Basin, along with a number of other factors, have resulted in such drastic reductions in the populations of the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker that the Service has listed these species as endangered and has implemented programs to prevent them from becoming extinct.

Adequate water flow at different life-stages is essential to these native fishes. Reduction in water quantity reduces the ability of the river to create and maintain the primary constituent elements that define critical habitats. Food supply, predation, and competition are important elements of the biological environment. Food supply is a function of nutrient supply and productivity, which could be limited by reduction of high spring flows brought about by water depletions. Predation and competition from nonnative fish species have been identified as factors in the decline of the endangered fishes. Water depletions contribute to alterations in flow regimes that favor nonnative fishes.

Particularly important are flows sufficient enough and at a reasonable frequency (mimicking the natural hydrograph) to allow for creation, maintenance and use of important micro-habitats including spawning bars and backwater habitats needed by adult and young fish. Reduced water flows can reduce spawning habitat availability and usability and dewater important backwater habitats or fail to connect river and backwater habitats, resulting in lowered habitat quality, complexity, and availability.

The potential exists for water intake structures placed on any of the occupied river reaches including the Colorado, Green, Gunnison, White, and Yampa Rivers to result in direct mortality to eggs, larvae, young-of-the-year, and juvenile life stages. Endangered larval fish are very small (<0.5 inches total length) and incapable of directed swimming from the time of hatching through the first 2-4 weeks of their life. Depending on the water year, larval fish may be present in occupied habitats from as early as April 1 to as late as August 31 (earlier in dry years; later in wet years). Young of the year endangered fish are most susceptible to entrainment from pumping water directly out of occupied river drainages.

All of the above effects can result in declines in species recruitment and overall productivity.

BLM_0009478

# VIII. Cumulative Effects

As it pertains to Section 7 Consultation, cumulative effects are defined as: *those effects of future State or private activities, not involving Federal activities that are reasonably certain to occur within the action area of the Federal action subject to consultation. [50 CFR 402.02].* Cumulative effects do not include any past or ongoing action, but "involve only future non-Federal actions". Future Federal actions requiring separate consultation (unrelated to the proposed action) are not considered in the cumulative effects section.

Declines in the abundance or range of many special status species have been attributed to various human activities on federal, state, and private lands, such as human population expansion and associated infrastructure development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation, including off-road vehicle activity; expansion of agricultural or grazing activities, including alteration or clearing of native habitats for domestic animals or crops; and introductions of non-native plant, wildlife, or fish or other aquatic species, which can alter native habitats or out-compete or prey upon native species. Many of these activities are expected to continue on state and private lands within the range of the various federally protected wildlife, fish, and plant species, and could contribute to cumulative effects to the species within the action area of the Proposed Actions. Species with small population sizes, endemic locations, or slow reproductive rates, or species that primarily occur on non-federal lands where landholders may not participate in recovery efforts, would be generally be highly susceptible to cumulative effects.

Reasonably foreseeable future activities that may affect river-related resources across western Colorado include oil and gas exploration and development, irrigation, urban development, recreational activities, and activities associated with the Upper Colorado River Endangered Fish Recovery Program. Implementation of these projects affects the environment including but not limited to water quality, water rights, socioeconomic and wildlife resources.

Cumulative effects to these fish species would include the following types of impacts:

- Changes in land use patterns that would further fragment, modify, or destroy potential spawning sites or designated critical habitat;
- Shoreline recreational activities and encroachment of human development that would remove upland or riparian/wetland vegetation and potentially degrade water quality;
- Competition with and predation by exotic fish species introduced by anglers or other sources;
- Non federal fluid mineral development. Based on projections, it is estimated that 880 wells may be drilled annually during the next 15 years with no federal mineral estate, resulting in an estimated average annual water depletion of 1,052 acre-feet of water;
- Non fluid mineral actions that deplete water including the construction of ponds, reservoirs, and municipal storage, among others. These additional water depletions will result in increased effects similar to the proposed action.

BLM_0009479

# IX. Determination of Effects/Conclusion

Upon consideration of the current status of the Big River Fishes; the environmental baseline for the action area for each species; and the direct, indirect, and cumulative impacts of the proposed action/activity, it is BLM's biological assessment that water depleted by activities associated with federally administered fluid mineral development in western Colorado: "**MAY AFFECT, LIKELY TO ADVERSELY AFFECT**" the Endangered Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub.

**Conclusion:**

The acre-foot amount being consulted on is 4,046 and was determined based on an average annual depletion amount anticipated to occur during the next 15 years across western Colorado associated with federal fluid mineral activity. The 4,046 acre-foot amount is the threshold amount we will track on a yearly basis. As long as depletions do not exceed this amount by more than 10%, this document and the consultation will remain valid. In the event the depletion amount exceeds 10% in a given year, we (BLM) will revisit this consultation via conferencing with the USFWS. Colorado BLM Field Offices will report numbers of wells drilled by river basin to the Colorado State Office who will then track numbers of wells and associated depletions by field office and river basin on a yearly basis. This information will then be submitted to the Service and used to jointly track compliance with the threshold depletion amount.

With respect to conservation measure bullet number 2 (see Project Description/Proposed Action section), the applicant (BLM) proposes offset the impacts of the proposed action by soliciting a one-time payment from an industry representative group for a one-time monetary contribution to the Recovery Program. At the time of this consultation, we have identified an average annual depletion of 4,046 acre-feet per year during the next 15 years associated with the proposed action. For Fiscal Year 2008 (October 1, 2007, to September 30, 2008), the depletion charge is $17.79 per acre-foot. Thus, based on our calculated average annual depletion, a one-time payment of **$71,978.34** will be required to cover the proposed action and help to offset projected impacts.

This amount will be provided to the Service's designated agent, the National Wildlife Foundation. The balance will be paid at the end of FY-08 by the industry representative group. Fifty percent of the funds will be used for acquisition of water rights to meet the instream flow needs of the endangered fishes (unless otherwise recommended by the Implementation Committee); the balance will be used to support other recovery activities for the Colorado River endangered fishes. The one-time payment will be made to the National Fish and Wildlife Foundation.

> Rebecca Kramer, Special Funds Coordinator
> National Fish and Wildlife Foundation
> 28 Second Street, 6th Floor
> San Francisco, California  94105

The payment will be accompanied by a cover letter that identifies the project and biological opinion that requires the payment, the amount of payment enclosed, check number, and any special conditions identified in the biological opinion relative to disbursement or use of the funds

25

(there are none in this instance).  The cover letter also shall identify the name and address of the payor, the name and address of the Federal Agency responsible for authorizing the project, and the address of the Service office issuing the biological opinion.  This information will be used by the Foundation to notify the BLM, the lead Federal Agency, and the Service that payment has been received.  The Foundation is to send notices of receipt to these entities within 5 working days of its receipt of payment.

Recovery agreements are required by the USFWS within the Colorado and Yampa River Basins. Individual operators or industry representative groups on behalf of individual operators would sign Recovery Agreements as appropriate.

26

## LITERATURE CITED

Beckman, W.C. 1963. Guide to the fishes of Colorado. Colorado State Museum Leaflet 11:1–110.

Behnke, R.J. 1980. The impacts of habitat alterations on the endangered and threatened fishes of the Upper Colorado River Basin: A discussion. Research Paper R-18: Resources for the Future. Washington, D.C., pages 182-192 *in* Energy Development in the Southwest: Problems of water, fish, and wildlife in the Upper Colorado River Basin. Vol. 2, ed. W.O. Spofford, Jr., A.L. Parker, and A.V. Kneese.

Bestgen, K.R. 1990. Status Review of the Razorback Sucker, *Xyrauchen texanus*. Larval Fish Laboratory #44. Colorado State University, Fort Collins.

Burdick, B.D. 1995. Ichthyofaunal studies of the Gunnison River, Colorado, 1992-1994. Final Report to the Recovery Program for the Endangered Fishes of the Upper Colorado River, Project Number 42. U.S. Fish and Wildlife Service, Grand Junction, Colorado.

Bozek, M.A., L.J Paulson, and J.E. Deacon. 1984. Factors affecting reproductive success of bonytail chubs and razorback suckers in Lake Mohave. Lake Mead Limnological Rec. Cent., Dept. Biol. Sci., Univ. Nevada, Las Vegas. Tech. Rept. No. 12.

Burdick, B D., and R.B. Bonar. 1997. Experimental stocking of adult razorback sucker in the upper Colorado and Gunnison Rivers. Final Report to the Recovery Program for the Endangered Fishes of the Upper Colorado River, Project Number 50. U.S. Fish and Wildlife Service, Grand Junction, Colorado.

Carlson, C.A., and R.T. Muth. 1989. The Colorado River: lifeline of the American Southwest. Pages 220-239 *in* D.P. Dodge, ed. Proceedings of the International Large River Symposium. Canadian Special Publication of Fisheries and Aquatic Sciences 106, Ottawa.

Chart, T.E., and L. Lentsch. 1999a. Flow effects on humpback chub (*Gila cypha*) in Westwater Canyon. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Chart, T.E., and L. Lentsch. 2000. Reproduction and recruitment of *Gila* spp. and Colorado pikeminnow (*Ptychocheilus lucius*) in the middle Green River; 1992 – 1996. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Childs, M.R., R.W. Clarkson, and A.T. Robinson. 1998. Resource use by larval and early juvenile native fishes in the Little Colorado River, Grand Canyon, Arizona. Transactions of the American Fisheries Society 127:620–629.

Converse, Y.K., C.P. Hawkins, and R.A. Valdez. 1998. Habitat relationships of subadult humpback chub in the Colorado River through Grand Canyon: spatial variability and implications of flow regulation. Regulated Rivers 14:267–284.

BLM_0009482

Dill, W.A.  1944.  The fishery of the lower Colorado River.  California Fish and Game 30:109-211.

Hamilton, S.J., and B. Waddell.  1994.  Selenium in eggs and milt of razorback sucker (*Xyrauchen texanus*) in the middle Green River, Utah.  Archives of Environmental Contamination and Toxicology 27:195-201.

Hamilton, S.J., and R.H. Wiedmeyer.  1990.  Bioaccumulation of a mixture of boron, molybdenum, and selenium in Chinook salmon.  Transactions of the American Fisheries Society 119:500-510.

Hamilton, S.J., K.J. Buhl, F.A. Bullard, and S.F. McDonald.  1996.  Evaluation of toxicity to larval razorback sucker of selenium-laden food organisms from Ouray NWR on the Green River, Utah.  National Biological Survey, Yankton, South Dakota.  Final Report to Recovery Implementation Program for the Endangered Fishes of the Upper Colorado River Basin, Denver, Colorado.  79 pp.

Hawkins, J.A., E.J. Wick, and D.E. Jennings.  1996.  Fish composition of the Little Snake River, Colorado, 1994.  Final Report of Colorado State University Larval Fish Laboratory to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Holden, P.B., and C.B. Stalnaker.  1970.  Systematic studies of the cyprinid genus *Gila* in the Upper Colorado River Basin.  Copeia 1970(3):409-420.

Johnson, B.L., W.B. Richardson, and T.J. Naimo.  1995.  Past, present, and future concepts in large river ecology.  BioScience 45:134-141.

Joseph, T.W., J.A. Sinning, R.J. Behnke, and P.B. Holden.  1977.  An evaluation of the status, life history, and habitat requirements of endangered and threatened fishes of the Upper Colorado River system.  U.S. Fish and Wildlife Service, Office of Biological Services, Fort Collins, Colorado, FWS/OBS 24, Part 2:183.

Junk, W.J., P.B. Bailey, and R.E. Sparks.  1989.  The flood pulse concept in river-floodplain systems.  Canadian Special Publication of Fisheries and Aquatic Sciences 106:110-127.

Kaeding, L.R., B.D. Burdick, P.A. Schrader, and W.R. Noonan.  1986.  Recent capture of a bonytail chub (*Gila elegans*) and observations on this nearly extinct cyprinid from the Colorado River.  Copeia 1986(4):1021-1023.

Kaeding, L.R., B.D. Burdick, P.A. Schrader, and C.W. McAda.  1990.  Temporal and spatial relations between the spawning of humpback chub and roundtail chub in the upper Colorado River.  Transactions of the American Fisheries Society 119:135-144.

Karp, C.A., and H.M. Tyus.  1990.  Humpback chub (*Gila cypha*) in the Yampa and Green Rivers, Dinosaur National Monument, with observations on roundtail chub (*G. robusta*) and other sympatric fishes.  Great Basin Naturalist 50:257-264.

Lanigan, S.H., and C.R. Berry, Jr.  1979.  Distribution and abundance of endemic fishes in the White River in Utah, final report.  Contract #14-16-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.  U.S. Bureau of Land Management, Salt Lake City, Utah.  84 pp.

BLM_0009483

Lanigan, S.H., and H.M. Tyus.  1989.  Population size and status of the razorback sucker in the Green River basin, Utah and Colorado.  North American Journal of Fisheries Management 9:1.

Mabey, L. W., and D. K. Shiozawa. 1993. Planktonic and benthic microcrustaceans from floodplain and river habitats of the Ouray Refuge on the Green River, Utah. Department of Zoology, Brigham Young University, Provo, Utah.

McAda, C.W.  2003.  Flow Recommendations to benefit endangered fishes in the Colorado and Gunnison Rivers.  U.S. Fish and Wildlife Service, Grand Junction, Colorado to the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Meffe, G.K.  1985.  Predation and species replacement on American southwestern fishes: a case study.  Southwestern Naturalist 30(2):173-187.

Miller, R.R.  1946.  *Gila cypha*, a remarkable new species of cyprinid fish from the Colorado River in Grand Canyon, Arizona.  Journal of the Washington Academy of Science 36:409–415.

Miller, R.R. 1959. Origin and affinities of the freshwater fish fauna of western North America. Pages 187–222 *in* C.L. Hubbs (ed.) Zoogeography. Publication 51 (1958), American Association for the Advancement of Science, Washington, D.C.

Miller, R.R.  1961.  Man and the changing fish fauna of the American Southwest.  Papers of the Michigan Academy of Science, Arts, and Letters 46:365-404.

Miller, W.H., L.R. Kaeding, H.M. Tyus, C.W. McAda, and B.D. Burdick.  1984.  Windy Gap Fishes Study.  U.S. Fish and Wildlife Service, Salt Lake City, Utah.  37 pp.

Minckley, W.L.  1973.  Fishes of Arizona.  Arizona Game and Fish Department, Phoenix.  293 pp.

Minckley, W. L.  1982.  Trophic Interrelations Among Introduced Fishes in the Lower Colorado River, Southwestern United States.  California Fish and Game 68:78-89.

Minckley, W.L., and J.E. Deacon.  1968.  Southwest fishes and the enigma of "endangered species."  Science 159:1424-1432.

Minckley, W.L., and J.E. Deacon. 1991. Battle against extinction: native fish management in the American West. The University of Arizona Press, Tucson.

Minckley, W.L., P.C. Marsh, J.E. Brooks, J.E. Johnson, and B.L. Jensen.  1991.  Management toward recovery of razorback sucker (*Xyrauchen texanus*).  *In* W.L. Minckley and J.E. Deacon, Eds.  Battle Against Extinction.  University of Arizona Press, Tucson.

Modde, T.  1996.  Juvenile razorback sucker (*Xyrauchen texanus*) in a managed wetland adjacent to the Green River.  Great Basin Naturalist 56:375-376.

Modde, T., and E.J. Wick.  1997.  Investigations of razorback sucker distribution movements and habitats used during spring in the Green River, Utah.  Final Report of U.S. Fish and Wildlife Service, Vernal, Utah, to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

29

Muth, R.T., L.W. Crist, K.E. LaGory, J.W. Hayse, K.R. Bestgen, T.P. Ryan, J.K. Lyons, and R.A. Valdez. 2000. Flow and temperature recommendations for endangered fishes in the Green River downstream of Flaming Gorge Dam. Final Report to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Nelson, J.S., E.J. Crossman, H. Espinosa-Perez, C.R. Gilbert, R.N. Lea, and J.D. Williams. 1998. Recommended changes in common fish names; pikeminnow to replace squawfish (*Ptychocheilus* spp.). Fisheries 23(9):37.

Nesler, T.P., K. Christopherson, J.M. Hudson, C.W. McAda, F. Pfeifer, and T.E. Czapla. 2003. An integrated stocking plan for razorback sucker, bonytail, and Colorado pikeminnow for the Upper Colorado River Endangered Fish Recovery Program.

Osmundson, B.C., T.W. May, and D.B. Osmundson. 2000. Selenium concentrations in the Colorado pikeminnow (*Ptychocheilus lucius*): Relationship with flows in the upper Colorado River. Arch. Environ. Contam. Toxicol. 38:479-485.

Osmundson, D.B., and L.R. Kaeding. 1989. Studies of Colorado squawfish and razorback sucker use of the "15-mile reach" of the upper Colorado River as part of conservation measures for the Green Mountain and Ruedi Reservoir water sales. Final report to U.S. Bureau of Reclamation. U.S. Fish and Wildlife Service, Grand Junction, Colorado.

Osmundson, D.B., and L.R. Kaeding. 1991. Recommendations for flows in the 15-mile reach during October-June for maintenance and enhancement of endangered fish populations in the Upper Colorado River. Final Report to the Recovery Program for the Endangered Fishes of the Upper Colorado River. U.S. Fish and Wildlife Service, Grand Junction, Colorado.

Osmundson, D.B., P. Nelson, K. Fenton, and D.W. Ryden. 1995. Relationships between flow and rare fish habitat in the 15-mile reach of the Upper Colorado River. Final Report to the Recovery Program for the Endangered Fishes of the Upper Colorado River Basin. U.S. Fish and Wildlife Service, Denver, Colorado.

Osmundson, D.B., M.E. Tucker, B.D. Burdick, W.R. Elmblad, and T.E. Chart. 1997. Non-spawning Movements of Subadult and Adult Colorado Squawfish in the Upper Colorado River. Final Report. U.S. Fish and Wildlife Service, Grand Junction, Colorado.

Propst, D.L., and K.R. Bestgen. 1991. Habitat and biology of the loach minnow, *Tiaroga cobitis*, in New Mexico. Copeia 1991(1):29-30.

Rinne, J.N. 1991. Habitat use by spikedace, *Meda fulgida* (Pisces:Cyprinidae) in southwestern streams with reference to probable habitat competition by red shiner (Pisces:Cyprinidae). Southwestern Naturalist 36(1):7-13.

Ryden, D.W. 2000. Adult fish community monitoring on the San Juan River, 1991-1997. San Juan River Recovery Implementation Program, U.S. Fish and Wildlife Service, Albuquerque, NM.

30

Stephens, D.W., B. Waddell, and J.B. Miller. 1992. Detailed study of selenium and selected elements in water, bottom sediment, and biota associated with irrigation drainage in the middle Green River Basin, Utah, 1988-90. U.S. Geological Survey Water Resources Invest. Report No. 92-4084.

Stephens, D.W., and B. Waddell. 1998. Selenium sources and effects on biota in the Green River Basin of Wyoming, Colorado, Utah, *in* Frankenberger, W.T., Jr., and Engberg. R.A., eds., Environmental chemistry of selenium: New York, Marcel Dekker, p. 183-204.

Tyus, H.M. 1987. Distribution, reproduction, and habitat use of the razorback sucker in the Green River, Utah, 1979-1986. Transactions of the American Fisheries Society 116:111-116.

Tyus, H.M. 1990. Potamodromy and reproduction of Colorado squawfish *Ptychocheilus lucius*. Transactions of the American Fisheries Society 119:1,035-1,047.

Tyus, H.M. 1991. Movement and Habitat Use of Young Colorado Squawfish in the Green River, Utah. Journal of Freshwater Ecology 6(1):43-51.

Tyus, H.M., and C.A. Karp. 1990. Spawning and movements of razorback sucker, *Xyrauchen texanus*, in the Green River basin of Colorado and Utah. Southwestern Naturalist 35:427-433.

Tyus, H.M., and C.W. McAda. 1984. Migration, movements and habitat preferences of Colorado squawfish, *Ptychocheilus lucius*, in the Green, White, and Yampa Rivers, Colorado and Utah. Southwestern Naturalist 29:289-299.

Tyus, H.M, and J.F. Saunders. 1996. Nonnative fishes in the upper Colorado River basin and a strategic plan for their control. Final Report of University of Colorado Center for Limnology to Upper Colorado River Endangered Fish Recovery Program. Denver.

Tyus, H.M., B.D. Burdick, R.A. Valdez, C.M. Haynes, T.A. Lytle, and C.R. Berry. 1982. Fishes of the Upper Colorado River Basin: Distribution, abundance and status. Pages 12-70 *in* W.H. Miller, H.M. Tyus, and C.A. Carlson, eds. Fishes of the Upper Colorado River System: Present and Future. Western Division, American Fisheries Society, Bethesda, Maryland.

U.S. Fish and Wildlife Service. 1990a. Humpback chub recovery plan, 2nd revision. Report of Colorado River Fishes Recovery Team to U.S. Fish and Wildlife Service, Region 6, Denver, Colorado.

U.S. Fish and Wildlife Service. 1990b. Humpback Chub Recovery Plan. U.S. Fish and Wildlife Service, Denver, Colorado. 43 pp.

U.S. Fish and Wildlife Service. 1991. Colorado Pikeminnow (Squawfish) recovery plan, 2nd revision. Report of Colorado River Fishes Recovery Team to U.S. Fish and Wildlife Service, Region 6, Denver, Colorado.

31

BLM_0009486

U.S. Fish and Wildlife Service. 1998. Razorback sucker recovery plan. U.S. Fish and Wildlife Service, Region 6, Denver, Colorado.

U.S. Fish and Wildlife Service. 2002a. Colorado pikeminnow (*Ptychocheilus lucius*) Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002b. Razorback sucker (*Xyrauchen texanus*) Recovery Goals: amendment and supplement to the Razorback Sucker Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002c. Humpback chub (*Gila cypha*) Recovery Goals: amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002d. Bonytail (*Gila elegans*) Recovery Goals: amendment and supplement to the Bonytail Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

Valdez, R.A. 1990. The Endangered Fish of Cataract Canyon. Final Report prepared for the United States Department of the Interior, Bureau of Reclamation, Salt Lake City, Utah. Contract No. 6-CS-40--3980, Fisheries Biology and Rafting. BIO/WEST Report No. 134-3. 94 pp. + appendices.

Valdez, R.A., and W. Masslich. 1989. Winter habitat study of endangered fish-Green River. Wintertime movement and habitat of adult Colorado squawfish and razorback suckers. Report No. 136.2. BIO/WEST, Inc., Logan, Utah. 178 pp.

Valdez, R.A., and G.H. Clemmer. 1982. Life History and prospects for recovery of the humpback and bonytail chub. Pages 109-119 *in* W.M. Miller, H.M. Tyus. and C.A. Carlson, eds. Proceedings of a Symposium on Fishes of the Upper Colorado River System: Present and Future. American Fisheries Society, Bethesda, Maryland.

Valdez, R.A., and R.J. Ryel. 1995. Life history and ecology of the humpback chub (*Gila cypha*) in the Colorado River, Grand Canyon, Arizona. Final Report to Bureau of Reclamation, Salt Lake City, Utah. Contract No. 0-CS-40-09110, Report TR-250-08, BIO/WEST, Inc., Logan, Utah.

Valdez, R.A., and R.J. Ryel. 1997. Life history and ecology of the humpback chub in the Colorado River in Grand Canyon, Arizona. Pages 3-31 *in* C. van Riper, III and E.T. Deshler (eds.). Proceedings of the Third Biennial Conference of Research on the Colorado Plateau. National Park Service Transactions and Proceedings Series 97/12.

Valdez, R.A., P.B. Holden, and T.B. Hardy. 1990. Habitat suitability index curves for humpback chub of the Upper Colorado River Basin. Rivers 1:31-42.

Valdez, R., P. Mangan, M. McInerny, and R.P. Smith. 1982a. Tributary report: fishery investigations of the Gunnison and Dolores Rivers. Pages 321-362 *in* W.H. Miller et al.,

BLM_0009487

editors.  Colorado River Fishery Project Final Report; Part Two, Field Studies.  U.S. Fish and Wildlife Service and Bureau of Reclamation, Salt Lake City, Utah.

Valdez, R.A., P.G. Mangan, R. Smith, and B. Nilson.  1982b.  Upper Colorado River fisheries investigations (Rifle, Colorado to Lake Powell, Utah).  Pages 100-279 *in* W.H. Miller, J.J. Valentine, D.L. Archer, H.M. Tyus, R.A. Valdez, and L. Kaeding, eds.  Part 2-Field investigations.  Colorado River Fishery Project.  U.S. Bureau of Reclamation, Salt Lake City, Utah.

Vanicek, C.D.  1967.  Ecological studies of native Green River fishes below Flaming Gorge Dam, 1964-1966.  Doctoral Dissertation, Utah State University.  124 pp.

Wick, E.J., T.A. Lytle, and C.M. Haynes.  1981.  Colorado squawfish and humpback chub population and habitat monitoring, 1979-1980.  Progress Report, Endangered Wildlife Investigations.  SE-3-3.  Colorado Division of Wildlife, Denver.  156 pp.

Wick, E.J., D.E. Snyder, D. Langlois, and T. Lytle.  1979.  Colorado squawfish and humpback chub population and habitat monitoring.  Federal Aid to Endangered Wildlife Job Progress Report.  SE-3-2.  Colorado Division of Wildlife, Denver.  56 pp. + appendices.

Wydoski, R.S., and E.J. Wick.  1998.  Ecological Value of Floodplain Habitats to Razorback Suckers in the Upper Colorado River Basin.  Upper Colorado River Basin Recovery Program, Denver, Colorado.

33

BLM_0009488




Record of Decision and

Resource Management Plan Amendments for

# Geothermal Leasing

## in the Western United States

December 2008



BLM_0009489

## Mission Statement

It is the mission of the Bureau of Land Management (BLM), an agency of the Department of the Interior, to manage BLM-administered lands and resources in a manner that best serves the needs of the American people. Management is based upon the principles of multiple use and sustained yield, taking into account the long-term needs of future generations for renewable and nonrenewable resources.

**BLM-WO-GI-09-003-1800**

**FES – 08-44**

BLM_0009490

## ABSTRACT

This Record of Decision (ROD) approves the US Department of the Interior, Bureau of Land Management's (BLM's) decision to facilitate geothermal leasing of the federal mineral estate in the 12 western states of Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.  This decision (1) allocates BLM lands as open to be considered for geothermal leasing or closed for geothermal leasing, and identifies those National Forest System lands that are legally open or closed to leasing; (2) develops a reasonably foreseeable development scenario that indicates a potential for 12,210 megawatts of electrical generating capacity from 244 power plants by 2025, plus additional direct uses of geothermal resources; and (3) adopts stipulations, best management practices, and procedures for geothermal leasing and development.  These actions will be implemented as BLM resource management plan amendments (Plan Amendments) for 114 land use plans; the decision does not amend any US Forest Service land use plans.  The proposed action and Plan Amendments were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States*, which was prepared jointly by the BLM and US Forest Service in accordance with the National Environmental Policy Act (NEPA) of 1969, the Federal Land Policy and Management Act of 1976, and the National Forest Management Act of 1976.  This ROD does not authorize any ground-disturbing activities or waive the environmental review and NEPA compliance requirements for subsequent geothermal exploration, drilling, utilization, and reclamation permits.

BLM_0009491

*This Page Intentionally Left Blank*

BLM_0009492

# BLM DIRECTOR RECOMMENDATION

Having considered a full range of reasonable alternatives, associated effects, and public input, I recommend adoption and implementation of the attached Resource Management Plan Amendments and Record of Decision for Geothermal Leasing in the western United States.

James L. Caswell, Director,
Bureau of Land Management

Date   12/17/08

# ASSISTANT SECRETARY APPROVAL

In consideration of the foregoing, I approve the Resource Management Plan Amendments and Programmatic Environmental Impact Statement for Geothermal Leasing in the western United States.

C. Stephen Allred
Assistant Secretary - Land and Minerals Management
Department of the Interior

Date   Dec 17, 2008

BLM_0009493

*This Page Intentionally Left Blank*

BLM_0009494



**USDA**

**United States Department of Agriculture**

Office of the Secretary
Washington, D.C. 20250

DEC 1 2 2008

Honorable C. Stephen Allred
Assistant Secretary, Land and Minerals Management
U.S. Department of the Interior
1849 C Street NW
Washington DC, 20240

Dear Mr. Secretary:

In response to Section 225, Public Law 109-58 (Energy Policy Act of 2005) the Bureau of Land Management and the Forest Service, in cooperation with the Department of Energy, jointly prepared the Programmatic Environmental Impact Statement (PEIS) for Geothermal Leasing. The PEIS provides a framework to facilitate Forest Service efforts regarding pending geothermal lease applications and future determinations for projects on National Forest System lands. The Department of Agriculture supports and adopts the "Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States."

If you have any questions about the Forest Service role in preparing or the intended use of the PEIS by the agency, please contact Tony Ferguson, Director, Minerals and Geology Management, (703) 605-4785.

Sincerely,

Mark Rey
Under Secretary

An Equal Opportunity Employer

*This Page Intentionally Left Blank*

BLM_0009496

# TABLE OF CONTENTS

Chapter                                                                                                                    Page

BLM DIRECTOR RECOMMENDATION

ASSISTANT SECRETARY APPROVAL

FOREST SERVICE LETTER OF SUPPORT

1.    Record of Decision ................................................................................................................. 1-1

    1.1    Introduction ........................................................................................................... 1-1

        1.1.1    Purpose and Need of the Federal Action............................................ 1-4

        1.1.2    Federal Actions Covered by this ROD ..................................... 1-5

    1.2    Scope of Analysis and Decisions ............................................................... 1-5

        1.2.1    Programmatic ROD............................................................................ 1-6

        1.2.2    Pending Lease Applications RODs ............................................... 1-6

    1.3    Overview of the Alternatives .................................................................... 1-7

        1.3.1    Alternative A – No Action: Continuation of Current Management..................... 1-7

        1.3.2    Alternative B – Proposed Action and Amendments................................. 1-8

        1.3.3    Alternative C – Leasing Lands near Transmission Lines .......................... 1-9

    1.4    The Decision......................................................................................................... 1-11

    1.5    What the Decision to Amend the RMPs Provides.................................................. 1-12

    1.6    Geothermal Leasing Decisions .......................................................................... 1-12

    1.7    What the Decision to Amend the RMPs Does not Provide................................. 1-13

    1.8    Notice of Modifications Made to the Preferred Alternative................................ 1-14

    1.9    Management Considerations in Selecting the Preferred Alternative ................................ 1-15

        1.9.1    Policy and Directive.......................................................................... 1-15

        1.9.2    Balanced Use and Environmental Protection .......................................... 1-16

        1.9.3    Comments and Recommendations ............................................... 1-17

BLM_0009497

Page

1.10    Consistency and Consultation Review .................................................................. 1-17

1.10.1   Governor's Consistency Review ................................................................ 1-17

1.10.2   Agency Coordination ................................................................................... 1-18

1.10.3   Government-to-Government Consultation ............................................. 1-19

1.10.4   National Historic Preservation Act — Section 106 Consultation ..................... 1-20

1.10.5   Endangered Species Act — Section 7 Compliance .................................... 1-20

1.11    Mitigation Measures ...................................................................................................... 1-26

1.12    Monitoring .......................................................................................................................... 1-26

1.13    Public Involvement ......................................................................................................... 1-27

1.13.1   Scoping .............................................................................................................. 1-27

1.13.2   Public Comments on the Draft PEIS ...................................................... 1-28

1.13.3   Release of the PEIS ...................................................................................... 1-28

1.13.4   Comments on the Final PEIS and Proposed Plan Amendments ......................... 1-28

1.13.5   Availability of the Record of Decision .................................................... 1-29

2.    Resource Management Plan Amendments ...................................................................... 2-1

2.1    Introduction ...................................................................................................................... 2-1

2.2    Land Use Allocations ...................................................................................................... 2-2

2.2.1   Closed Lands ..................................................................................................... 2-2

2.3    Stipulations and BMPs ................................................................................................... 2-4

2.3.1   Lease Stipulations ........................................................................................... 2-4

2.3.2   No Surface Occupancy Lease Stipulations ............................................. 2-5

2.3.3   Timing Limitations and Controlled Surface Use Lease Stipulations ..................... 2-6

2.3.4   Other Lease Stipulations .............................................................................. 2-7

2.4    Management Procedures for Geothermal Leasing ................................................ 2-9

2.5    Consideration of Other BLM Plans and Policies ................................................ 2-12

2.6    Plan Implementation ...................................................................................................... 2-12

3.    References ...................................................................................................................................... 3-1

# LIST OF TABLES

Table A-1.       Resource Management Plan Amendments...............................................................A-1

# LIST OF FIGURES

Figure 1.       BLM Field Office Boundaries within the Planning Area of the 11 Western States..........1-2
Figure 2.       BLM Administrative Boundaries in the Planning Area of Alaska...........................................1-3

# LIST OF APPENDICES

Appendix A – Resource Management Plan Amendments for Geothermal Leasing

Appendix B – Best Management Practices – Mitigation Measures

Appendix C – Form 3200-24: Offer to Lease and Lease for Geothermal Resources and Form 3203-1: Nomination of Lands for Competitive Geothermal Leasing

BLM_0009499

# LIST OF ACRONYMS

ACHP – Advisory Council on Historic Preservation

BLM - United States Department of the Interior, Bureau of Land Management

BMPs - Best Management Practices

CFR - Code of Federal Regulations

CRMP – Cultural Resource Management Plan

DNA - Documentation of Land Use Plan Conformance and National Environmental Policy Act (NEPA) Adequacy

DOI - Department of the Interior

EPA – Environmental Protection Agency

ESA – Endangered Species Act

FLPMA - Federal Land Policy and Management Act of 1976 (43 United States Code 1701 et seq.)

FS - United States Department of Agriculture, Forest Service

GIS - Geographic Information System

MFP - Management Framework Plan

NDAA – National Defense Authorization Act

NEPA - National Environmental Policy Act of 1969

NFMA - National Forest Management Act of 1976

NFS - National Forest System

NHPA - National Historic Preservation Act

NMFS - National Marine Fisheries Service

NRHP - National Register of Historic Places

NSO - No Surface Occupancy

OSHA - Occupational Safety and Health Administration

PEIS - Programmatic Environmental Impact Statement

RMP - Resource Management Plan

ROD - Record of Decision (for an EIS)

SHPO – State Historic Preservation Officer

US - United States

USC - United States Code

USFWS - United States Department of Interior, Fish and Wildlife Service

BLM_0009501

*This Page Intentionally Left Blank*

*Record of Decision for Geothermal Leasing in the Western US*
December 2008

BLM_0009502

# CHAPTER 1
# RECORD OF DECISION

## 1.1   INTRODUCTION

This Record of Decision (ROD) describes the United States (US) Department of the Interior (DOI), Bureau of Land Management's (BLM's) decision to allocate lands as open or closed to geothermal leasing and to adopt stipulations, best management practices (BMPs), and procedures for leasing by amending 114 land use plans in the 11 western states and Alaska (Appendix A). Figures 1 and 2 show the BLM field office boundaries of the 11 western states in the planning area and Alaska, respectively. The BLM is responsible for leasing geothermal resources on the federal mineral estate, including National Forest System (NFS) lands. A geothermal lease is for the earth's heat resource where there is federal mineral estate. The BLM currently administers approximately 480 geothermal leases that cover over 700,000 acres of the federal mineral estate (fiscal year 2007 data). Of those, 57 are producing geothermal energy—54 for electrical generation (termed indirect use), and 3 for direct use (such as for heating buildings, spas, and greenhouses).

As discussed above, the BLM is proposing to facilitate geothermal leasing of the federal mineral estate by allocating lands as open or closed to leasing, developing a reasonably foreseeable development scenario, and adopting stipulations, BMPs, and procedures for leasing. These actions are implemented as resource management plan (RMP) amendments (Plan Amendments). The proposed action and Plan Amendments were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States* (BLM 2008a). This Programmatic Environmental Impact Statement (PEIS) was prepared jointly by the BLM and United States Forest Service (FS) in accordance with the National Environmental Policy Act of 1969 (NEPA), the Federal Land Policy and Management Act of 1976 (FLPMA), and the National

BLM_0009503



SOURCE: BLM 2008

Scale: 1:12,000,000    Projections: Albers
NO WARRANTY IS MADE BY THE BLM OR FS FOR USE OF THIS DATA FOR PURPOSES NOT INTENDED BY THE BLM OR FS.

C:/EMPSi/GeothermalPEIS/Figures



*About 137 million acres of public land are within the geothermal potential area in the 11 western states and are administered by 97 field offices.*

LEGEND:

Potential Geothermal Area
BLM Field Office Boundary
BLM Public Land

*BLM Field Office Boundaries within the Planning Area of the 11 Western States*

Figure 1

I-2

*Record of Decision for Geothermal Leasing in the Western US*
December 2008

BLM_0009504



Almost six million acres of public land in Alaska have geothermal potential.

LEGEND:



Potential Geothermal Area

BLM Field Office Boundary

BLM Public Land

## BLM Administrative Boundaries in the Planning Area of Alaska

Figure 2

BLM_0009505

Forest Management Act (NFMA) of 1976. The BLM has the delegated authority to issue geothermal leases on the federal mineral estate, including that underlying lands administered by the FS.

### 1.1.1   Purpose and Need of the Federal Action

As identified in the Final PEIS, the purpose of the Federal action is threefold:

1. To complete the processing of active pending geothermal lease applications and nominations by deciding whether, and under what stipulations, to issue geothermal leases on NFS and public lands.

2. To amend BLM land use plans to allocate BLM-administered lands with geothermal resource potential as closed, open, or open with major or moderate constraints to geothermal leasing. This includes establishing a projected new level of potential geothermal development with existing planning level decisions (termed reasonably foreseeable development scenario), and identifying appropriate stipulations, best management practices, and procedures to protect other resource values and uses while providing sufficient pre-leasing analysis to enable the BLM to make future competitive geothermal leasing availability decisions.

3. To provide suitable information to the FS to facilitate its subsequent consent decision to the BLM for leasing on NFS lands, and to provide environmental analysis to assist future National Forest System land use decisions by providing possible land use allocations and stipulations for geothermal leasing.

As identified in the Final PEIS, the need for the Federal action is also threefold:

1. To issue decisions on pending lease applications in accordance with the Energy Policy Act of 2005. Specifically, Section 225 requires that the Secretary of the Interior and Secretary of Agriculture establish a program for reducing by 90 percent the backlog of geothermal lease applications that were pending as of January 1, 2005. The Energy Policy Act of 2005 mandates that action be taken by August 8, 2010.

2. To address other provisions of the Energy Policy Act of 2005 (Sections 211 and 222[d][1]); respond to other policy directives calling for clean and renewable energy (see Section 1.8 of the PEIS, Renewable Energy Policies); and to meet the increasing energy demands of the nation while reducing reliance on foreign energy imports, reducing greenhouse gas emissions, and improving national security.

3. To facilitate geothermal resource leasing in an environmentally responsible manner to help meet the increasing interest in

BLM_0009506

geothermal energy development on public and NFS lands in the western US (Energy Policy Act Section 211).

Based on the stated purpose of and need for action, two scopes of analysis were addressed in the PEIS: the programmatic analysis to facilitate leasing (Purpose and Need statements (2) and (3), which are covered by this ROD); and the site-specific analysis of the backlogged lease application areas (Purpose and Need statements (1), which are not covered by this ROD). See Section 1.2, Scope of Analysis and Decisions, for more information.

### 1.1.2  Federal Actions Covered by this ROD

This ROD incorporates the programmatic analysis of the PEIS and provides the decision to amend 114 BLM land use plans to take the following actions:

- Identify public lands that are administratively and legally closed or open to leasing, and under what conditions.

- Develop a comprehensive list of stipulations, BMPs, and procedures to serve as consistent guidance for future geothermal leasing and development on public and NFS lands.

- Provide a reasonably foreseeable development scenario for geothermal development on Federal lands.

- Amend BLM land use plans to adopt the resource allocations, reasonably foreseeable development scenario, stipulations, BMPs, and procedures.

Additionally, the ROD identifies public and NFS lands with geothermal potential as being legally open or closed to leasing (see Figures 2-5 and 2-6 in Chapter 2 of the Final PEIS). The decision does not amend any FS land use plans.

## 1.2  SCOPE OF ANALYSIS AND DECISIONS

Section 225 of the Energy Policy Act of 2005 requires that the US Department of the Interior and the FS reduce the backlog of geothermal lease applications pending as of January 1, 2005, by 90 percent (by August 8, 2010). Section 222(d) dictates that it be a priority for the BLM and the FS to ensure timely completion of actions such as amendments to land use plans necessary to process lease applications pending on August 8, 2005, and that all future forest plans and RMPs in areas of geothermal resource potential consider geothermal leasing and development. To respond to these directives and the stated need for action, the PEIS incorporated two different scopes for analysis. The first scope covered the programmatic analysis to allocate lands as open or closed for leasing and development of geothermal resources and to apply stipulations (Volume I of the PEIS). The second scope covered the site-specific analysis of 19 backlogged lease applications that are grouped and analyzed in seven distinct geographic areas

(Volume II of the PEIS).  Separate decisions will be issued for each scope, as discussed below.

### 1.2.1 Programmatic ROD

This ROD incorporates the programmatic analysis of the PEIS and amends BLM land use plans. As such, it allows the BLM to make future decisions on whether or not to issue geothermal leases in conformance with the amended land use plan on the basis of the analysis in the PEIS. It is the intent of the BLM that, upon receipt of future nominations or applications for leases, affected BLM offices would be able to conduct a Documentation of Land Use Plan Conformance and National NEPA Adequacy (DNA) evaluation to make lease sale decisions without further plan amendments or NEPA analysis, unless new information or special circumstances require additional environmental evaluation. Prior to issuing leases, the BLM and FS would conduct additional environmental reviews, as appropriate, to comply with other laws, including but not limited to the Endangered Species Act (ESA) and the National Historic Preservation Act (NHPA). In addition, prior to making a leasing decision on lands in proximity to a National Park System unit, the BLM or other surface management agency must determine if there would be any impacts to thermal or hydrological features within the unit, in accordance with the Geothermal Steam Act Amendments (30 USC Section 1026).

The FS is not proposing to amend its land use plans or allocate any lands as administratively closed; therefore, the FS does not have a decision to issue on the programmatic analysis.

### 1.2.2 Pending Lease Applications RODs

As of January 1, 2005, there were 194 pending lease applications; 130 on BLM public lands and 64 on NFS lands.  Since January 1, 2005 the BLM and FS have processed or resolved many of the lease applications.  In June 2007 there were 55 remaining pending leases. This list was vetted as part of the PEIS process which identified 34 leases as still pending.  Of those, 15 are being actively being addressed (see Table 10-2, Volume II of the Final PEIS).  The remaining 19 lease applications, grouped together in seven geographic areas, were evaluated in Volume II of the PEIS.  The BLM and FS will issue separate decisions for each of the seven areas associated with the pending lease applications. This requires execution of RODs separate from the programmatic action. The decision maker for the pending application areas will be the field office manager or forest supervisor. In some cases, one ROD will cover multiple lease applications (e.g., one decision for each of the seven geographical clusters with leasing applications). The decisions will be issued independently as issues are addressed and other compliance actions are completed (e.g., tribal consultation).

BLM_0009508

## 1.3  OVERVIEW OF THE ALTERNATIVES

The project area is defined as the 12 western states of Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The planning area is defined as the 530 million acres within the 12 western states that have the potential for geothermal resources.

The planning area includes BLM- and FS-administered surface lands with minerals under federal ownership that have geothermal potential and the subsurface federal geothermal mineral estate on other lands (termed split-estate). The BLM administers about 143 million surface acres of public land, and the FS administers about 104 million acres of NFS lands. Surface lands administered by other federal agencies, such as the National Park Service and US DOI, Fish and Wildlife Service (USFWS), and by state agencies are not assessed in this document unless their administrative boundaries overlap with BLM- or FS-administered lands. If these lands have subsurface federal geothermal mineral estate, the BLM would apply the management direction provided in the PEIS, with the surface management agency's consent, for lease nominations or applications. Lands that are not administered by the BLM or FS, or that are closed to geothermal leasing by statute, are not part of the analysis, including National Park System lands.

Leasing geothermal resources by the BLM vests with the lessee a nonexclusive right to future exploration and an exclusive right to produce and use the geothermal resources within the lease area subject to existing laws, regulations, formal orders, and the terms, conditions, and stipulations in or attached to the lease form or included as conditions of approval in permits. Lease issuance alone does not authorize any ground-disturbing activities to explore for or develop geothermal resources without site-specific approval for the intended operation. Such approval could include additional environmental reviews and permits, as appropriate.

### 1.3.1  Alternative A – No Action: Continuation of Current Management

Under this alternative, no BLM land use plans would be amended and the existing plan decisions, stipulations, and allocations would not change. Therefore, any plans that do not address geothermal leasing would not be amended, and the public and NFS lands would not be allocated as open or closed to geothermal leasing.

Processing of pending geothermal lease applications would continue; however, they would be evaluated on a case-by-case basis using analysis in the existing land use plans. Likewise, future lands nominated for leasing would be evaluated using analysis in existing land use plans. This could require additional NEPA analysis and possibly amendments to the plans.

BLM_0009509

*Rationale for Non-Selection:* Taking no action would not facilitate the leasing process and does not meet the stated purpose and need.

## 1.3.2   Alternative B – Proposed Action and Amendments

Alternative B was identified as the Proposed Action in the Draft PEIS. As a result of public comment, internal review, and agency coordination, Alternative B was clarified and slightly modified to become the preferred alternative and proposed plan amendments in the Final PEIS. With the minor adjustments and clarifications described in Section 1.8 of this ROD, Alternative B has been selected as the approved plan amendments (see Chapter 2 and Appendix A of the ROD).

Under Alternative B, 122 land use plans were originally proposed to be amended to allocate approximately 118 million acres of BLM public land as open to geothermal leasing, subject to existing laws, regulations, formal orders, stipulations attached to the lease form, and the terms and conditions of the standard lease form. Based on public comment and internal review of the Final PEIS, the proposal in Alternative B has been slightly modified. Under this ROD approving the Plan Amendments, 114 land use plans are amended to designate about 111 million acres of BLM public land as available for nominations and applications for geothermal leasing, and to adopt stipulations, BMPs, and procedures to serve as consistent guidance for future geothermal leasing and development (see Section 1.8, Notice of Modifications Made to the Preferred Alternative). Split-estate lands under the amended plans would also be available for leasing. In addition, about 79 million acres of NFS lands would remain legally open for leasing.

While these lands are allocated as open, compliance with laws and regulations could nevertheless prohibit some lands from leasing. For example, if the BLM or FS determines that subsequent exploration, development, or utilization of nominated lands would likely result in a significant adverse effect on a significant thermal feature within a unit of the National Park System, the lease would not be issued pursuant to the Geothermal Steam Act Amendments of 1988 (30 USC Section 1026[c]).

The closed BLM lands include those that are legally closed (e.g., non-discretionary closures) and those that are administratively unavailable to leasing (e.g., discretionary decision by the BLM). A comprehensive list of closed lands is provided in Chapter 2.

On the open lands, the authorized BLM officer retains the discretion as to whether a lease should be issued and may issue stipulations that impose moderate to major constraints on use of surface of any leases in order to mitigate the impacts to other land uses or resources objectives as defined in the guiding resource management plan. The specific stipulations are included in Section 2.3, Stipulations and BMPs.

BLM_0009510

***Reasonably Foreseeable Development Scenario***

*Projected Power Plant Development (Indirect Use)*

It is estimated that the 12 states in the project area have 5,540 MW of geothermal potential considered viable for commercial development by 2015, with a further 6,660 to 6,670 MW being forecast by 2025. This capacity is expected to be realized through approximately 111 additional power plants by 2015, and a further 133 power plants by 2025. Using these values, it is estimated that the average viable capacity at any particular site is 50 MW by 2025 (Western Governors' Association 2006). This projection is in addition to existing and plan capacity for the given locations.

*Direct Use*

Direct uses include agricultural uses (controlling environmental conditions for growing crops, flowers, or trees), aquacultural uses (controlling environmental conditions for raising fish or other animals), direct heating and cooling systems, public safety uses (eliminating ice and snow on sidewalks), food processing (dehydration, washing, and processing), and recreational uses (hot tubs, steam baths, and mud baths). Direct use applications are distributed across the project area, with the greatest number being in California, Idaho, Oregon, and Colorado. Quantitative estimates of the thermal energy of likely-to-be-developed direct use applications over the 2015 to 2025 timeframe are not available for the western US in the way that they are for indirect uses; however, for the US as a whole, the DOE National Renewable Energy Laboratory has developed estimates of thermal megawatts that are developable. It is estimated that by 2015, direct use applications could be developed in the amount of 1,600 thermal megawatts, and by 2025, this number is estimated to be 4,200 thermal megawatts (NREL 2006).

**Rationale for Selection:** Alternative B was selected as the proposed plan amendment based on: (1) its consistency with the requirements of the Energy Policy Act of 2005, (2) its balanced use and protection of resources, (3) the Final PEIS's analysis of potential environmental impacts, and (4) the comments and recommendations from agencies, states, stakeholders, and the public. Alternative B is structured to be consistent with the congressional mandate of the Energy Policy Act to facilitate geothermal leasing by amending land use plans to allocate geothermal resources and adopt stipulations and procedures for leasing.

### 1.3.3   Alternative C – Leasing Lands near Transmission Lines

Under Alternative C, the BLM and FS would only consider geothermal leasing of lands for commercial electrical generation if they are within a 20-mile corridor (10-mile from centerline) from existing transmission lines and lines currently under development at 60kV to 500kV. All lands within this corridor would be designated as closed or open with moderate to major constraints to leasing using the criteria outlined for Alternative B - Proposed Action. Under this

BLM_0009511

alternative, Island Park Geothermal Area would also be closed (as with Alternative B); however, the area would be expanded to include no leasing within 15 miles from the boundary of Yellowstone National Park. Given the limited transmission line grid and demand for localized power sources for remote communities, the lands available for geothermal leasing in Alaska would be the same as for Alternative B - Proposed Action. Leases for direct use would be considered for the entire planning area and would not be constrained by the location of transmission lines. Therefore, direct-use leasing would be the same as Alternative B.

Under this alternative, approximately 61 million acres of BLM-administered public land and 31 million acres of NFS lands would be open for geothermal leasing for commercial electrical generation.

Due to the limited locations of transmission lines, this alternative would increase the amount of land that would be unavailable for geothermal leasing within the planning area; specifically, about 80 million acres of public land and 75 million acres of NFS lands would be closed. Other lands outside the corridor would not be allocated by this action as either open or closed to leasing. Any geothermal lease applications or nominations would have to be evaluated on a case-by-case basis as described under the No Action Alternative and would be subject to the limitations of existing land use plans. This alternative was developed in response to written and verbal recommendations during public scoping.

***Rationale for Non-Selection:*** Alternative C was not selected for the following reasons: (1) Alternative C would allocate about 61 million acres of BLM-administered lands as open to leasing, which is about 57 million acres less than Alternative B. While it is not possible to quantify the precise corresponding reduction in producible megawatts of electrical power generation due to subsurface considerations in the location of geothermal resources, limiting development to narrow corridors of available lands would significantly reduce the ability of the BLM to meet the stated purpose and need for facilitating geothermal leasing and alternative energy development on public lands; and (2) it was determined that the proposed 15-mile buffer around Yellowstone National Park would not be the most effective or necessary means (as a matter of science and engineering) to protect the subsurface hydrogeology of the region. The BLM worked closely with the National Park Service between the Draft and Final PEIS to clarify and expand the discussion of procedures to jointly ensure the continued protection of significant thermal features on National Park System lands.

BLM_0009512

## 1.4    THE DECISION

Preparation of the Plan Amendments was done under the authority of the FLPMA and in accordance with BLM planning regulations (43 CFR Part 1600). The Plan Amendments are consistent with the requirements of the Geothermal Steam Act and the Energy Policy Act of 2005 and provide a balanced use and protection of resources. A PEIS was prepared to analyze and provide support for the approval of these Plan Amendments in compliance with NEPA.

The Plan Amendments in this ROD are identical to the Proposed Plan Amendments presented in the PEIS with the following three exceptions:

1.  Removal of the East San Diego County RMP from the list of plans for amendment. On October 2008, a ROD was signed revising this plan. The revision provided allocations and management direction for geothermal leasing and therefore does not require amendment.

2.  Addition of BMPs to address groundwater quality in response to the Environmental Protection Agency's (EPA's) comments on the Final PEIS (see ROD Appendix B).

3.  The BLM is deferring the decision to amend seven land use plans in accordance with the provisions of the National Defense Authorization Act (NDAA § 2815 [a and d], 113 Stat. 512, 852 [1999]). These plans are the Box Elder RMP, House Range Resource Area RMP, Iso-tract Management Framework Plan (MFP), Park City RMP, Pony Express RMP, Randolph RMP, and Warm Springs Resource Area RMP. The NDAA provided in § 2815(d) that the Secretary of the Interior may not proceed with any amendment of any individual resource management plan adjacent to or near the Utah Test and Training Range and Dugway Proving Grounds or beneath Military Operating Areas, Restricted Areas, and airspace that make up the Utah Test and Training Range until the Secretary of Defense submits a study to Congress evaluating the impact of any proposed changes to land management plans upon military training, testing, and operational readiness. As of the date of this ROD, the Secretary of Defense has not submitted the required study; therefore, the plans are not available for amendment. Once the report is submitted, the BLM will reevaluate the decision to amend these plans.

Based on these changes, the decision is to amend 114 BLM land use plans to adopt the allocations, reasonably foreseeable development scenario, stipulations, BMPs, and leasing procedures provided in Appendix B – Proposed Action in the PEIS and as attached in Chapter 2 and Appendix A of this ROD.

BLM_0009513

## 1.5    WHAT THE DECISION TO AMEND THE RMPs PROVIDES

The decision serves as the first step in the process to develop geothermal resources to meet the intent of the Energy Policy Act of 2005. The Plan Amendments allocate BLM-administered lands with geothermal resource potential as closed or open to geothermal leasing, establish a projected new level of potential geothermal development (termed reasonably foreseeable development scenario), and identify appropriate stipulations, best management practices, and procedures to protect other resource values and uses while providing sufficient pre-leasing analysis to enable the BLM to make future competitive geothermal leasing availability decisions.

Based on the Plan Amendments, the BLM can make decisions whether or not to issue geothermal leases in conformance with the amended land use plan on the basis of this PEIS. Following this amendment process, it is the intent of the BLM that, upon receipt of future nominations or applications for direct use, affected BLM offices would be able to conduct a DNA evaluation (Documentation of Land Use Plan Conformance and National NEPA Adequacy) to make lease sale decisions without further plan amendments or NEPA analysis, unless new information or special circumstances require additional environmental evaluation. Prior to issuing leases, the BLM and FS would conduct additional environmental reviews, as appropriate, to comply with other laws, including but not limited to the Endangered Species Act and National Historic Preservation Act.

Although the BLM expects to be able to rely upon the analysis in the PEIS, combined with DNA evaluations to document NEPA adequacy, to make lease issuance decisions in the near term, the issuance of a lease does not give the lessee the right to proceed with exploration or development (i.e., any surface-disturbing activities beyond casual use) in the absence of further site-specific permits and associated environmental review. This document does predict a general level of anticipated future geothermal development in BLM areas that have geothermal potential, but it is not intended to provide full analysis of all phases of development. There are several stages of decision making necessary to approve geothermal resource development, each with its own environmental compliance requirements, and this document covers only the land use planning and lease issuance stages.

## 1.6    GEOTHERMAL LEASING DECISIONS

The decision incorporates the following actions and is subject to existing Federal, State, and local laws and regulations, as well as established BLM policies. These actions are detailed in Chapter 2.

BLM_0009514

- Identifies about 143 million acres of BLM-administered public lands as having geothermal resources with potential for indirect or direct applications.

- Designates about 111 million acres BLM-administered public lands with geothermal potential as open to geothermal leasing subject to existing laws, regulations, formal orders, stipulations attached to the lease form, and the terms and conditions of the standard lease form. While these lands are allocated as open, compliance with laws and regulations or the exercise of BLM discretion in response to site-specific considerations could nevertheless prevent some lands from being leased.

- Establishes a reasonably foreseeable development scenario for geothermal development based on BLM planning areas.

- Adopts a comprehensive list of stipulations and procedures to serve as consistent guidance for future geothermal leasing on BLM-administered public lands, NFS lands, and other lands within the federal mineral estate.

- Provides a list of recommended BMPs that may be applied for subsequent exploration, drilling, development, and reclamation activities. Specifically, the BMPs can be incorporated, as appropriate, into the permit application by the lessee or can be included in the approved use authorization by the BLM as conditions of approval.

- Recognizes that prior to making a leasing decision on lands in proximity to a National Park System unit, the BLM or other surface management agency must determine if there would be any impacts to thermal or hydrological features within the unit, in accordance with the Geothermal Steam Act Amendments (30 USC Section 1026).

## 1.7    WHAT THE DECISION TO AMEND THE RMPs DOES NOT PROVIDE

- The Plan Amendments do not authorize the leasing of any of the 19 pending lease applications evaluated as part of the PEIS (see Volume II of the Final PEIS). Separate RODs will be issued for these lease applications.

- The Plan Amendments do not authorize any ground-disturbing activities or waive the environmental review and NEPA compliance requirements for subsequent geothermal lease issuance or exploration, drilling, utilization, and reclamation permits.

- The Plan Amendments do not contain decisions for minerals other than geothermal resources for the 114 plans indentified in Appendix A.

BLM_0009515

- The Plan Amendments do not authorize leasing on federal lands that are legally closed to geothermal leasing, including lands managed as part of the National Wildlife Refuge System (16 USC 668 [dd]) and lands within units of the National Park System.

- The Plan Amendments do not amend the plans of the FS or any other agency.

- The Plan Amendments do not affect valid existing rights.

- The decisions contained herein also will not:

  - Change the BLM's responsibility to comply with applicable laws, rules, and regulations.

  - Change BLM's obligation to conform to current or future National policy, as established by BLM itself, the Department, the President, or Congress.

  - Affect funding levels and budget allocations, which are determined annually at the national level and are beyond the control of the field office.

## 1.8    NOTICE OF MODIFICATIONS MADE TO THE PREFERRED ALTERNATIVE

After careful review of the information provided during the Governor's Consistency Review, continued internal review, and comments from the EPA, the BLM has incorporated the following modifications and clarifications to the BLM's preferred alternative:

**Modification:** Remove the Eastern San Diego County RMP from the listed plans for amendment. Rationale: The BLM issued a ROD for the Eastern San Diego RMP on October 2008. This ROD revised the previous plan that was proposed for amendment in the PEIS. The revised plan provides detailed allocations and management actions for geothermal resources; therefore, the plan does not require amendment.

**Modification:** Defer amending the following plans: Box Elder RMP, House Range Resource Area RMP, Iso-tract MFP, Park City RMP, Pony Express RMP, Randolph RMP, and Warm Springs Resource Area RMP. Rationale: On October 5, 1999, Congress enacted Section 2815 of the NDAA, which affected Utah's public lands "adjacent or near to the Utah Test and Training Range and Dugway Proving Grounds or beneath Military Operating Areas, Restricted Areas, and airspace that make up the Utah Test and Training Range." NDAA § 2815(a), 113 Stat. 512, 852 (1999). The NDAA provided in § 2815(d) that "the Secretary of Interior may not proceed with any amendment of any individual resource management plan"

BLM_0009516

until the Secretary of Defense submits a study to Congress evaluating the impact of any proposed changes to land management plans upon military training, testing, and operational readiness (NDAA § 2815[d], 113 Stat. 512, 852 [1999]). As of the date of this ROD, the Secretary of Defense has not submitted the required study; therefore, the plans are not available for amendment. Once the report is submitted, the BLM will reevaluate the decision to amend these plans.

***Modification:*** Add additional BMPs that may be applied to subsequent permits for all phases of geophysical exploration and development in order to protect surface and groundwater. Rationale: While the PEIS only evaluates the action of leasing lands, it is presumed that development could occur in the future. A comprehensive list of BMPs will facilitate future development and ensure a consistency in resource protection.

***Clarification:*** Add Valles Caldera National Preserve to the list of areas legally closed to geothermal development. Rationale: By statute, the FS is required to acquire outstanding mineral rights within the Preserve and withdraw them from mineral entry. The Preserve was noted as being closed in the Final PEIS, but the Preserve is added to the list of closed areas in the ROD to address comments from the State of New Mexico.

## 1.9     MANAGEMENT CONSIDERATIONS IN SELECTING THE PREFERRED ALTERNATIVE

The preferred alternative has been selected on the basis of the following factors: consistency with federal legal requirements, policy, and directive, the stated purpose and need (see Chapter 1 of the PEIS), a balanced use and protection of resources based on the analysis of potential environmental impacts as presented in the Final PEIS, and consideration of formal comments and recommendations from agencies and the public.

### 1.9.1   Policy and Directive

On May 18, 2001, the President signed Executive Order 13212, *Actions to Expedite Energy-Related Projects*, which states that, "the increased production and transmission of energy in a safe and environmentally sound manner is essential." Executive departments and agencies are directed to "take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy." Executive Order 13212 further states that, "For energy-related projects, agencies shall expedite their review of permits or take other actions as necessary to accelerate the completion of such projects, while maintaining safety, public health, and environmental protections. The agencies shall take such actions to the extent permitted by law and regulation and where appropriate." The BLM recognizes the importance of energy development as directed in the above Executive Order, as well as stewardship and proper management of all of the Nation's resources as a matter of positive domestic policy and national security.

BLM_0009517

The Energy Policy Act of 2005 amended the Geothermal Steam Act to encourage the leasing and development of geothermal resources on Federal lands. Specifically, Section 211 of the Energy Policy Act of 2005 provides a ten-year goal for the Secretary of the Interior to seek approval of non-hydropower renewable energy projects located on the public lands with a generation capacity of at least 10,000 megawatts of electricity, including electricity from geothermal resources. Section 223 gives the Secretary of the Interior authority to identify areas that could be leased exclusively for direct use of geothermal resources.

Section 222(d)(1) of the Energy Policy Act of 2005 states that, "It shall be a priority for the Secretary to ensure timely completion of administrative actions, including amendments to applicable forest plans and RMPs, necessary to process applications for geothermal leasing pending on the date of enactment of this subsection." This section also contains the requirement that, "All future forest plans and RMPs for areas with high geothermal resource potential shall consider geothermal leasing and development."

The Geothermal PEIS and the amendment of multiple land use plans to adopt the leasing program will effectively support the directives of Executive Order 13212 and congressional policy provided in the Energy Policy Act of 2005 regarding geothermal energy development on public lands.

In accordance with the Energy Policy Act, the BLM and FS will make geothermal leasing decisions on pending lease applications submitted prior to January 1, 2005; however, decisions to approve pending lease applications are identified under separate RODs.

### 1.9.2   Balanced Use and Environmental Protection

The BLM considered whether the Plan Amendment would improve and sustain properly functioning resource conditions, while considering the need and demand for existing or potential geothermal resources for direct and indirect use. Consideration was given to whether there was an appropriate balance of resource use to meet resource, social, and economic concerns in the planning area. The proposed leasing process and stipulations are designed to protect sensitive resources and resource uses. The amendment of the land use plans does not authorize any ground-disturbing activities, and there are no direct irreversible or irretrievable commitments of resources. Permits are required for any drilling or utilization of geothermal resources, subsequent to leasing. During the permitting process, site-specific environmental review will be carried out and the environmental consequences to specific resource values and uses within the areas and any alternative actions will be analyzed.

The BLM has considered the wealth of information on the full range of consequences resulting from geothermal leasing and potential subsequent development activities. The BLM used comparable data and the BLM's

BLM_0009518

professional experience managing development of geothermal resources to determine that the BLM had sufficient information on the nature of the effects for an allocation decision to be made. The analysis of potential impacts associated with geothermal development is described in Chapters 4 and 5 of the PEIS.

### 1.9.3   Comments and Recommendations

The BLM received approximately 500 discrete comments on the Draft PEIS. Most comments favored geothermal energy development if carried out in an environmentally responsible manner. The BLM considered the concerns expressed by the states, tribal and local governments, industry, special interest groups, and the public throughout the process. Consideration was given as to whether the BLM action would jeopardize other resources found on public lands. During this process, the BLM coordinated closely with federal agencies, including the US Geological Survey, Department of Energy, National Park Service, and EPA, in addition to tribes, the states, and others with special expertise.

In addition, all comments received during the comment period on the Draft PEIS were reviewed and considered. Modifications to the Draft PEIS were made, as appropriate, to form the Final PEIS and Plan Amendments.

Future site-specific geothermal development activities in the planning area are implementation-level decisions. Upon receipt of an application for these types of projects, the BLM would require a site-specific environmental analysis before ground-disturbing actions could be approved. Specific impacts of such actions would be analyzed at that time, along with the identification of possible mitigation measures. Site-specific environmental analysis would include the opportunity for additional public participation and coordination with county and state land and resource managers. Proposed site-specific activities would also be required to comply with other laws and regulations, including but not limited to the ESA and the NHPA.

## 1.10   CONSISTENCY AND CONSULTATION REVIEW

### 1.10.1  Governor's Consistency Review

On October 14, 2008, the BLM initiated the 60-day Governor's Consistency Review of the PEIS in accordance with FLPMA (43 USC §1712(c)(9)), which states that the Secretary of the Interior shall "coordinate the land-use inventory, planning, and management activities of or for such lands with the land-use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located." It further states that "the Secretary shall assure that consideration is given to those State, local and tribal plans that are germane in the development of land-

BLM_0009519

use plans for public lands [and] assist in resolving, to the extent practical, inconsistencies between Federal and non-federal government plans…." Thus, FLPMA does not require the BLM to adhere to or adopt the plans of other agencies or jurisdictional entities, but rather to give consideration to this plan and make an effort to resolve inconsistencies to the extent practical. In the event that State plans conflict with Federal law, however, there may be an inconsistency that cannot be resolved or reconciled. While State and Federal planning processes are required to be as integrated and consistent as practical, the Federal agency planning process is not bound by or subject to State plans, planning processes, or planning stipulations.

The State of Alaska provided a letter finding that the preferred alternative and plan amendments are consistent with state interests, plans, policies, and programs. The States of New Mexico and Utah provided comments and recommended changes to the preferred alternative and plan amendments. The BLM responded to and resolved these questions and has incorporated relevant and appropriate comments to improve the proposed plan amendments (see Section 1.8 Notice of Modifications Made to the Preferred Alternative). Based on the BLM's review, no inconsistencies concerning other State or local plans, policies, and programs have been identified.

## 1.10.2 Agency Coordination

The PEIS was prepared in close coordination with several federal agencies regarding the purpose and need for the proposed action and the scope of the analysis. The US Department of Agriculture, Forest Service served as a joint-lead federal agency to help address geothermal leasing on NFS lands. The US Department of Energy participated on the project core team and provided technical expertise on geothermal development and potential. The US Geological Survey worked closely with the core team to provide technical guidance in defining areas of geothermal development potential for electrical generation. The BLM coordinated closely with the EPA regarding air quality, noise, cultural resources, wetlands, water resources, and other natural resources (see Section 1.12 of this ROD for more information on EPA comments on the PEIS). The BLM worked closely with the National Park Service to protect resources in and around National Park System lands. Prior to making a leasing decision on lands in proximity to a National Park System unit, the BLM or other surface management agency must determine if there would be any impacts to thermal or hydrological features within the unit, in accordance with the Geothermal Steam Act Amendments (30 USC Section 1026)

The BLM solicited input from the State Historic Preservation Offices (SHPOs) and the Advisory Council on Historic Preservation (ACHP) in accordance with the NHPA. The PEIS indentifies a phased consultation process related to historic, traditional, and cultural resources.

BLM_0009520

Dialogues were initiated with key state agencies involved in the promotion, analysis, and permitting of geothermal development projects, including state geological surveys, state energy offices, and state energy regulatory bodies. The BLM will continue to cooperate with State, local, and tribal governments to promote consistency with their land use plans.

### 1.10.3  Government-to-Government Consultation

The BLM worked directly with tribal governments on a government-to-government basis. The Federal/tribal government-to-government relationship was reaffirmed by the Federal government on May 14, 1998, with Executive Order 13084, and strengthened on November 6, 2000, with Executive Order 13175 (US President 1998, 2000).

The BLM coordinates and consults with tribal governments, Native communities, and individual members of tribes whose interests might be directly and substantially affected by activities on public lands. It strives to provide the tribal entities sufficient opportunities for productive participation in BLM planning and resource management decision making. In addition, Section 106 of the NHPA requires Federal agencies to consult with Indian tribes for undertakings on tribal lands and for historic properties of significance to the tribes that may be affected by an undertaking (36 CFR 800.2 (c)(2)). BLM Manual 8120 (BLM 2004a) and Handbook H-8120-1 (BLM 2004b) provide guidance for Native American consultations.

The BLM developed a process to offer specific consultation opportunities to "directly and substantially affected" tribal governments, as required under the provisions of Executive Order 13175, and to Indian tribes as defined under 36 CFR 800.2(c)(2). Letters were mailed in September 2007 to each tribal executive official of over 400 tribes and pueblos in the western US and Alaska from the Deputy Director of the BLM and Deputy Chief of National Forest Systems of the FS (see Table 6-1 in the Final PEIS). The letters documented the PEIS process and detailed the pending lease applications that are being assessed in the PEIS, and invited tribal governments to participate in the consultation process. Seven tribes provided a response letter. One letter noted that no lease applications were in their area of interest, four letters requested consultation if any lease applications would fall in their areas of interest, and two letters requested consultation and to help participate in the PEIS process.

The Draft PEIS was sent to over 400 tribes and pueblos in the western US and Alaska. Follow-up contacts were made with the two tribes that had requested consultation on the PEIS. Of these, one tribe was not interested in direct government-to-government consultation at this time; one tribe is still considering requesting a meeting but has not provided any comments on the PEIS or plan amendments.

BLM_0009521

### 1.10.4  National Historic Preservation Act — Section 106 Consultation

As stated under agency coordination above, the BLM solicited input from the SHPOs and the ACHP in accordance with the NHPA. The PEIS identifies a phased consultation process related to historic, traditional, and cultural resources.

The BLM and FS will continue to work with the ACHP and the SHPOs in all 12 western states to address future development that may affect historic properties on public lands. Each phase of leasing and development will require an appropriate level of Section 106 analysis. Under the PEIS, the BLM is analyzing an allocation decision, the amendment of land use plans to designate certain public lands as open for application for future geothermal leasing. Geothermal development on these lands would require subsequent 106 consultation and analysis of historic resources.

### 1.10.5  Endangered Species Act — Section 7 Compliance

Section 7 of the ESA directs each Federal agency, in consultation with the Secretary of the Interior and the Secretary of Commerce, as appropriate, to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any listed threatened or endangered species or result in the destruction or adverse modification of critical habitat[1].

Under Section 7 of the ESA, those agencies that authorize, fund, or carry out a Federal action are commonly known as "action agencies." If an action agency determines that its Federal action "may affect" listed species or critical habitat, it must consult with the USFWS of the DOI or the National Marine Fisheries Service (NMFS) of the Department of Commerce (collectively known as the "Services") or both, whichever has jurisdiction over the species or habitat that may be affected[2].

If an action agency determines that the Federal action will not cause any effects on listed species or critical habitat, the action agency does not initiate consultation with the Services, and its obligations under Section 7 are complete. In order to make this determination, an action agency must consider the effects of the action at issue. Regulations implementing NEPA and the ESA each use the terms "direct effect," "indirect effect," and "cumulative effect," but the definitions of these terms are not identical under the statutes. Regulations at 40 CFR 1508.8 and 50 CFR 402.02 highlight these differences. Under NEPA, and as

---

[1]   See ESA § 7; 16 USC 1536. The standard for determining when Federal agencies must consult under the ESA is different from the standard for determining when Federal agencies must prepare an environmental impact statement under the NEPA.

[2]   See 50 CFR 402.02, 402.13-14.

BLM_0009522

demonstrated in the PEIS, an agency will examine the direct, indirect, and cumulative impacts of a proposed action. Indirect effects are those caused by the action, later in time, and reasonably foreseeable. Under the ESA, however, the effects of an action are evaluated by a stricter standard. Regulations implementing the ESA define the term "effects of an action" at 50 CFR 402.02 to include direct and indirect effects (and the effects of interrelated or interdependent activities), but limit indirect effects to those that are caused by the action, later in time, and reasonably certain to occur. In addition, ESA regulations limit the term "cumulative effects" to those effects of future state or private activities; NEPA regulations are not so limited.

The "reasonably certain to occur" standard used in the ESA regulations is more demanding than the "reasonably foreseeable" standard used in the NEPA regulations (see 40 CFR 1508.8). Thus, it is possible that a proposed action may have "no effect" under the ESA standard but will have multiple effects under NEPA. The Endangered Species Act standard has been part of interagency regulations at 50 CFR Part 402 since 1986 and is the subject of proposed rules recently promulgated by USFWS and NMFS[3].

### Agency Status under ESA Section 7

The DOI (BLM) has concluded that it is the action agency for Endangered Species Act purposes because the BLM manages Federal land where leasing and development of geothermal resources may take place. In particular, the BLM is an action agency for purposes of the land use plan amendments to allocate land as available for leasing, as analyzed in the PEIS and future lease applications that may be submitted. A separate document will contain decisions pertaining to the pending lease applications.

### "No Effect" Determination under Section 7

In complying with its duties under Section 7 of the ESA, the action agency has examined the effects on listed species and critical habitat both from allocating land as available for leasing of geothermal resources through land use plan amendments and from issuing leases. As a result of this examination, the action agency has determined that amending land use plans would not cause any effect on a listed species or on critical habitat. This determination is based on the following.

1.  Allocation Decisions Do Not Cause Effects on Species or Habitats

    The first proposed action, allocation of BLM-administered lands with geothermal resource potential as closed, open, or open with major or moderate constraints to geothermal leasing through amendment of land

---

[3]   Interagency Cooperation Under the Endangered Species Act, 73 Fed. Reg. 47868 (Aug. 15, 2008) (to be codified at 50 CFR pt. 402).

BLM_0009523

use plans, fulfills BLM's obligations under FLPMA and would not cause any impact, direct or indirect, as cognizable under the ESA, to listed species or critical habitat. The land use plan amendments identify and allocate such areas, adopt reasonable foreseeable development scenarios, and adopt a list of stipulations, best management practices, and procedures to be applied for the protection of resources.

This proposed action does not establish a precedent or create any legal right that would allow ground-disturbing activities within any of the areas allocated for geothermal leasing. Following lease issuance, when an application to conduct activities involving surface disturbance is submitted that could affect a listed species or critical habitat at a particular location within one of these areas, it would be subject to full policy and legal review at the time it is filed. This includes review and coordination under the ESA and other applicable statutes of the applicability of the stipulations, best management practices, and procedures for the protection of other resources.

Similarly, providing suitability information to facilitate the FS's subsequent consent decision to the BLM for leasing on NFS lands, to the extent this providing of information could be construed to be an action under the Endangered Species Act, is an administrative task that would not cause any impact, direct or indirect, as cognizable under the Endangered Species Act, to listed species or critical habitat.

2.   Lease Issuance Does Not Cause Effects on Species or Habitats

The decision to issue a lease is a separate and discretionary decision from the allocation decision made through land use plan amendment. With respect to the pending lease applications analyzed in Volume II, BLM has determined that the issuing of a geothermal lease similarly does not cause any effect on listed species or critical habitat under the ESA. Moreover, there is no guarantee that any particular authorization or lease will be granted, or, even if granted, as explained below, that any development will ever take place on such lease.

This second proposed action, therefore, to complete processing of active pending lease applications and nominations by deciding whether, and under what stipulations, to issue geothermal leases on NFS and public lands, is an action that, in itself, and on the condition that the stipulation addressing ESA matters is incorporated in any lease issued, would not cause any impact, direct or indirect, as cognizable under the ESA, to listed species or critical habitat. Lease rights are always limited by the requirements of other laws, as illustrated in the geothermal regulations at 43 CFR 3200.4.

BLM_0009524

As explained in Section 2.2.2 of the PEIS, in accordance with BLM Instruction Memorandum No. 2002-174, the BLM will apply the following ESA-related stipulation on any leases where threatened, endangered, or other special status species or critical habitat is known or strongly suspected:

> "The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to the lease terms or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the ESA as amended, 16 USC 1531 et seq., including completion of any required procedure for conference or consultation."

Additionally, the BLM will provide a separate notification through a lease notice to prospective lessees identifying the particular special status species that are present on the lease parcel offered. For agency-designated sensitive species (e.g., sage grouse), a lease stipulation would be imposed for those portions of high value/key/crucial species habitat where other existing measures are inadequate to meet agency management objectives.

Moreover, even without the ESA-related stipulation, lease issuance, by itself, does not afford lessees the right to engage in any ground-disturbing activity. Under the regulations applicable to geothermal development, permits, with associated environmental reviews and coordination, are required at every stage of exploration, drilling, and utilization before the applicant may proceed. Even before lease issuance, pre-leasing exploration cannot take place without approval, which may include protective "Conditions of Approval" (43 CFR 3251.10). The geothermal regulations include prohibitions such as "Do not start activities that will result in surface disturbance until we approve your drilling permit and Sundry Notice" (43 CFR 3261.14). Similar language appears in relation to the regulations that correspond to each stage of geothermal development, including the sections related to drilling (43 CFR 3261.11(b)), utilization, and site licenses: "Do not begin site investigations…" (43 CFR 3271.12(b)); "Do not start construction of pipelines…" (43 CFR 3271.13); "Do not start delivery of geothermal resources to a facility…" (43 CFR 3271.14(b)); "Do not start building or

BLM_0009525

testing your facility…" Each of these stages provides the BLM with opportunities to decide whether the next stage should be approved, denied, or approved with conditions such as protective measures. See, for example, 43 CFR 3273.12 (e). Each subpart also contains general standards and environmental requirements. See, for example, 43 CFR 3260.11 and 3272.12. Moreover, the agencies must verify that leasing on the applicant's parcel has been adequately addressed in a NEPA document.

Using the ESA stipulation above, as well as the many distinct decision points described in the geothermal development regulations, the agencies have retained the authority post-lease issuance to condition, and even to deny, the use of the leased property if required by the Endangered Species Act. Therefore, even the decision to lease does not result in any effect on listed species or critical habitat. For this reason, the agencies have made a "no effect" determination for the proposed allocation decisions in the land use plan amendments, as well as for the decision to issue leases.

It is important to note that the effects of any future development-stage activities that might occur subsequent to the issuance of a lease would be allowed only following additional site-specific compliance with the ESA and other applicable laws and are not included in the scope of this action. Thus, the effects of development-stage activities are not to be considered effects, direct or indirect, caused by the proposed action (lease issuance) at issue here. The regulations governing geothermal leasing and development provide for several decision stages prior to any ground-disturbing activities taking place and contemplate further compliance with applicable authorities during these decision stages. Therefore, both under the regulatory scheme, and as a practical matter, until BLM receives an application for a permit to drill, or other authorization, that includes specific information about particular projects (i.e., location, scale, technology, etc.), and adjudicates it, it is impossible to determine what effects on listed species or critical habitat might be "reasonably certain to occur" (see 50 CFR Part 402). It is at that time that consultation under Section 7 with NMFS or the USFWS may be appropriate and useful.

For the above reasons, the action agency has determined that amending land use plans to allocate areas as available for geothermal leasing, providing information for later FS decision making, and issuing geothermal leases would have no effect on listed threatened or endangered species or critical habitat.

The action agency reached their "no effect" determination not because listed species and critical habitat are unlikely to be present. To the contrary, Appendix H of the PEIS identifies numerous listed species that occur in the 12 western states where land use plans will be amended and leases may be issued. Areas that may eventually be leased would likely include areas occupied by listed species or within critical habitat.

BLM_0009526

The action agency considered preparing a biological assessment and initiating consultation with USFWS and NMFS under Section 7(a)(2). After discussing various approaches, the action agency determined that the administrative actions of allocating lands as available for leasing of geothermal resources and issuing leases for these resources would have no effect on listed species or critical habitat. Preparing a biological assessment before a site-specific application for permit to drill has been filed with BLM would be based largely on conjecture and speculation. There would be no way to know before such a site-specific proposal is made whether the impacts to be assessed would be from one or another specific type of geothermal plant or facility, or associated transmission line, etc., or some combination of uses. Further, without knowing the specifics of when and where a project would occur, it would be impossible to know what species, if any, would be affected by these future projects. The agency considered whether it made sense to make assumptions for the purposes of a biological assessment, but were left with no credible basis on which to make such assumptions. The agency determined that such assumptions would be speculative and not linked to the Federal action of allocating lands as available for geothermal leasing through land use plan amendments, or even issuing such leases. Any biological assessment would be a speculative assessment of effects from future site-specific projects, not of the proposed actions addressed in this PEIS as a whole.

This is not to say that there would be no Section 7 consultations (including preparation of biological assessments or biological opinions where appropriate) on future actions that may affect listed species or critical habitat. On the contrary, as explained above, the action agency fully expects that Section 7 compliance, including consultations if necessary, will be appropriate as applications for permits to drill on particular leaseholds are submitted for decision making by the BLM, with FS concurrence, as necessary. That is, if an application for a permit or other authorization is received by an action agency for lands allocated as open for leasing, further compliance with Section 7 of the Endangered Species Act would be initiated at that time.[4] This may take the form of a biological assessment by the action agency and issuance of a biological opinion by USFWS and/or NMFS; a "may affect, not likely to adversely affect" determination by the action agency with Service concurrence; or a "no effect" determination by the action agency. At such time, any biological assessment, biological opinion, concurrence, or "no effect" determination would be based on a detailed application describing the project, site, and method of construction — all features lacking at the present time.

---

[4]   Further, if a future, site-specific proposal may adversely affect essential fish habitat, the action agencies would consult with NMFS, as required by the Magnuson Stevens Fishery Conservation and Management Act, 16 USC 1855(b)(2), prior to approval.

BLM_0009527

In reaching their "no effect" determination, the action agency found no causal connection, whether direct or indirect, between the mere allocation of areas as available for geothermal leasing (through land use plan amendment), or issuance of such leases, and any effect on a listed species or critical habitat. Allocation of areas as available for leasing of geothermal resources neither guarantees that a lease within such an area will be granted, nor, even if a lease is granted (assuming that the ESA stipulation is incorporated in such lease), that an application for a permit to drill will be granted. Any effects to a listed species or critical habitat that might occur in any of the areas allocated through this planning action or lease issuance in the future are simply unknown at this time and, in any event, would be caused by the grant of a permit, or other site-specific authorization, following full policy and legal review, including compliance (and consultation if appropriate) under Section 7 of the ESA.

## 1.11   MITIGATION MEASURES

A primary purpose of the PEIS for Geothermal Leasing is the establishment of stipulations and BMPs to ensure that potential adverse impacts associated with the development of geothermal resources on BLM-administered public lands is minimized to the greatest extent possible. Geothermal resource leases are subject to the standard stipulations and lease terms. The current lease terms, which are subject to change, are found on Form 3200-24 (Appendix C). The right to explore, develop, and utilize leased geothermal resources is inherent in the lease, subject to stipulations, legal requirements, and terms and conditions on permits. Specific conditions of approval and other mitigation measures would be required during subsequent authorizations. These include timing and location of activities during the development phases (see Section 2.5 of the PEIS, Reasonably Foreseeable Development Scenario). In addition, BLM and other governmental agencies may require specific permits.

To minimize adverse impacts on resources and uses in the proposed action area, appropriate BMPs and mitigation measures would be applied to future site-specific Plans of Operation, which are required for surface-disturbing activities. The BMPs provide guidance for lessees on how to meet Section 6 of the standard lease terms. Depending on site-specific conditions and individual development plans, the BMPs provided in Appendix B and other mitigation measures may be required. Additional BMPs and mitigation measures could be identified during site-specific analyses.

## 1.12   MONITORING

Mitigation measures, including lease stipulations and conditions of approval as well as the general operation of geothermal developments, would be monitored by the lessee or the appropriate Federal agency to ensure their continued effectiveness through all phases of development. Using adaptive management strategies, where mitigation measures are determined to be ineffective at

BLM_0009528

meeting the desired resource conditions, the BLM and FS would take steps to determine the cause and require the operator to take corrective action. This information would also be used to inform future geothermal leasing and development.

## 1.13   PUBLIC INVOLVEMENT

One of the BLM's primary objectives during development of the PEIS was to understand the concerns and issues of various members of the public by providing opportunities for meaningful participation in the resource management planning process. The PEIS is the result of an extensive and collaborative process with tribal governments, federal agencies, states, stakeholders, and the public.

### 1.13.1   Scoping

To achieve this, the BLM published the Notice of Intent to prepare a PEIS to evaluate geothermal leasing in the 12 western states, including Alaska, on lands administered by the BLM and the FS in the Federal Register (72 FR 113) on June 13, 2007. The Notice of Intent initiated the public scoping process and invited public comments on the content and issues that should be addressed in the PEIS. The BLM and the FS conducted scoping from June 13, 2007 through August 13, 2007. During that period, the BLM and the FS invited the public and interested groups to provide information and guidance, suggest issues that should be examined, and express their concerns and opinions on geothermal leasing in eleven western states and Alaska on public lands administered by the BLM and the FS. Public meetings were held in ten cities in July 2007: Anchorage, Alaska; Boise, Idaho; Denver, Colorado; Missoula, Montana; Phoenix, Arizona; Portland, Oregon; Reno, Nevada; Sacramento, California; Salt Lake City, Utah; and Santa Fe, New Mexico.

Approximately 175 people attended the scoping meetings, and 101 verbal comments were identified and cataloged from these meetings. A total of 79 written comments were received in the form of comment cards submitted at the public meetings (2); letters by US Mail or by hand delivery (16); and by electronic mail (63).

The BLM and FS published a scoping report on the project Web site that summarized and categorized the major themes, issues, concerns, and comments expressed by private citizens, government agencies, private firms, and nongovernmental organizations. The BLM and FS considered the comments in developing the alternatives and analytical issues that are contained in the PEIS. Summaries of the individual letters, facsimiles, and electronic comments received during scoping are available within the scoping report (www.blm.gov/geothermal_eis).

BLM_0009529

### 1.13.2 Public Comments on the Draft PEIS

The EPA published a Notice of Availability of the Draft PEIS in the Federal Register on June 13, 2008 (73 FR 115). The Notice of Availability initiated the 90-day public comment period provided for planning actions.

The BLM Project Web site contained the Draft PEIS in its entirety for download. Copies of the document were sent to a mailing list of over 1,000 recipients. In addition, over 100 copies of the CD-ROM or hardcopies of the document were mailed in response to document requests. In preparing the Final PEIS, the BLM and FS considered all comments received or postmarked during the public comment period.

During the 90-day public comment period, the BLM and FS held 13 public meetings in the 12-western-state-project area in July 2008. Meeting locations included Albuquerque, New Mexico; Anchorage, Alaska; Boise, Idaho; Denver, Colorado; Fairbanks, Alaska; Helena, Montana; Portland, Oregon; Reno, Nevada; Sacramento, California; Salt Lake City, Utah; Seattle, Washington; and Tucson, Arizona. Over 200 people attended the public meetings.

### 1.13.3 Release of the PEIS

The EPA published the Notice of Availability of the Final PEIS in the Federal Register on October 24, 2008 (73 FR 207). As BLM continues to implement its geothermal program, it will continue to actively seek the views of the public using outreach techniques such as news releases and Web site information to offer opportunities for public participation and to inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment. The BLM will also continue to coordinate, both formally and informally, with the numerous State, Federal, tribal, and local agencies and officials interested and involved in the management of geothermal resources on public lands within the 12-state planning area.

### 1.13.4 Comments on the Final PEIS and Proposed Plan Amendments

The BLM received one comment letter on the Final PEIS from the EPA. The letter noted that the BLM had adequately addressed the EPA's comments on the Draft PEIS but expressed concern related to groundwater quantity and quality, especially where there are sole-source aquifers and protected geothermal resources. In particular, EPA felt there is a potential for the mixing of geothermal fluids from reinjection with surface or groundwater by connections through an existing underground fault system, and requested that the BLM include a process to incorporate the results from any existing groundwater flow analyses into the decision-making process before leasing potential geothermal resource areas and to complete groundwater flow analysis for site-specific projects before drilling. In addition, EPA requested that the ROD include mitigation measures to protect sole-source aquifers.

In response to EPA's concern, the ROD clarifies that drilling of temperature gradient wells and the subsequent slim-hole or full-diameter wells will be conducted to protect surface- and groundwater from contamination by drilling fluids and geothermal fluids. This is accomplished by requiring all well bores to be cased and cemented from the top of the production liner to the surface to prevent cross contamination and mixing between aquifers. Site-specific impacts on water resources, including groundwater and water quality, would be addressed as part of the environmental analysis for the permitting process. These evaluations will result in site-specific stipulations that will condition the lease for possible future permitting activities to assess and develop the geothermal resource. Subsequent periodic mechanical integrity testing of the wells, monitoring of groundwater resources, and other appropriate environmental monitoring will assure the maximum protection to water resources. Appendix B of the ROD provides BMPs to address methods to minimize water contamination. An additional clarifying BMP was added to this ROD in Appendix B, Section B.1.3 to further address EPA's concerns. Additionally, Federal, State, and local regulations ensure that operators will conduct drilling in a prudent manner.

Comments on the Final PEIS were also received from New Mexico, and inquiries were made by Utah as part of the Governor's Consistency Review process. In both cases, conversations between the BLM and the States were held and resolutions with the states were reached. These comments were discussed in Section 1.10.1 of this ROD.

## 1.13.5 Availability of the Record of Decision

Paper and electronic copies of the ROD with the Plan Amendments are available for review at any BLM State Office or Field Office. Copies are also available by request to geothermal_eis@blm.gov or by writing to Idaho State Office, 1387 South Vinnell Way, Boise, Idaho 83709, Attention: Jack Peterson.

Interested persons may also review the ROD and the Final PEIS on the Internet at www.blm.gov/geothermal_eis.

BLM_0009531

*This Page Intentionally Left Blank*

BLM_0009532

# CHAPTER 2
# RESOURCE MANAGEMENT PLAN AMENDMENTS

## 2.1   INTRODUCTION

The US Department of the Interior, Bureau of Land Management, develops land use plans to guide activities, establish management goals and approaches, and establish land use allocations within a planning area. Current land use plans are called resource management plans; in the past, such plans were called management framework plans, and some of these MFPs are still in use. Analyses conducted for Alternative B, Proposed Action in the PEIS support the amendment of specific land use plans in those field offices where geothermal resources are located.

The Plan Amendments amend 114 plans (See Appendix A) to do the following:

- Identify public lands that are administratively and legally closed or open to leasing, and under what conditions.

- Develop a comprehensive list of stipulations, BMPs, and procedures to serve as consistent guidance for future geothermal leasing and development on public and NFS lands.

- Provide a reasonably foreseeable development scenario for geothermal development on Federal lands (see Section 1.3.2 of this ROD for a description of the reasonably foreseeable development scenario).

The amendments only affect allocations and management of geothermal resources. These plans continue to outline the decisions or protocols for the management of the other resource uses or values within the appropriate planning areas.

BLM_0009533

## 2.2    LAND USE ALLOCATIONS

The allocations by land use plan and field office are provided in Table A-1 (see ROD Appendix A). In total, approximately 111 million acres[5] of BLM public land are allocated as open to geothermal leasing subject to existing laws, regulations, formal orders, stipulations attached to the lease form, and the terms and conditions of the standard lease form (see ROD Appendix C). In addition, about 79 million acres of FS lands are legally open (see Figures 2-5 and 2-6 in the Final PEIS). While these lands are allocated as open, compliance with laws and regulations could nevertheless prohibit some lands from leasing. For example, if it is determined that subsequent exploration, development, or utilization of nominated lands would likely result in a significant adverse effect on a significant thermal feature within a unit of the National Park System, the lease would not be issued pursuant to the Geothermal Steam Act Amendments of 1988 (30 USC Section 1026[c]).

### 2.2.1    Closed Lands

Areas identified as closed to leasing included non-discretionary closures based on existing laws, regulations (see 43 CFR 3201.11), and Executive Orders, and discretionary closures. Non-discretionary closures include the following lands administered by the BLM and FS:

- National Monuments.

- National Conservation Areas and similar designations with the exception of King Range National Conservation Area and Steese National Conservation Area.

- Wilderness Areas and National Wilderness Areas.

- Wilderness Study Areas.

- Lands within areas allocated for wilderness or further planning in Executive Communication 1504, Ninety-Sixth Congress (House Document 96-119), unless such lands are allocated to uses other than wilderness by a land and resource management plan or are released to uses other than wilderness by an act of Congress.

- National Recreation Areas.

- Designated Wild Rivers under the Wild and Scenic River Act.

- The Island Park Geothermal Area (includes NFS lands in Idaho and Montana).

---

[5]   The Final PEIS identified about 118 million acres of BLM public land as being open for geothermal leasing. The ROD removed or deferred making an amendment decision on eight plans, which contained about seven million acres classified as open for leasing. (see ROD section Notice of Modifications Made to the Plan Amendments).

BLM_0009534

- Withdrawn lands under Section 17(d)(1) of the Alaska Native Claims Settlement Act.[6]

- Valles Caldera National Preserve, New Mexico.

In addition, there are other lands administered by other Federal agencies that are legally closed to leasing, including lands managed as part of the National Wildlife Refuge System (16 USC 668 [dd]) and lands within units of the National Park System. Prior to making a leasing decision on lands in proximity to a National Park System unit, the BLM or FS must determine if there would be any impacts to thermal or hydrological features within the unit, in accordance with the Geothermal Steam Act Amendments (30 USC Section 1026).

In addition to non-discretionary closures, the BLM has administratively designated the following areas as unavailable for leasing:

- The California Desert Conservation Area[7].

- Areas of Critical Environmental Concern where the BLM determines that geothermal leasing and development would be incompatible with the purposes for which the Area of Critical Environmental Concern was designated, or those whose management plans expressly preclude new leasing or development for oil and gas or geothermal resources. A list of Areas of Critical Environmental Concern that are currently open and closed to fluid mineral leasing is provided in Appendix C of the PEIS.[8] No new closures are proposed.

- Other lands within BLM's National Landscape Conservation System, such as National Historic and Scenic Trails.

- National Landmarks and Research Natural Areas.

- Military reservations encompassing public lands are open for development except in instances where geothermal development

---

[6]  Section 17(d)(1) of the Alaska Native Claims Settlement Act of 1971 authorized the Secretary of the Interior to withdraw and reserve lands for study and classification. These withdrawals closed the lands to disposal and appropriation under public land laws, including mining and mineral leasing laws. The withdrawals remain in effect on about 50 million acres of public land in Alaska. The BLM makes recommendations for revocation of the withdrawals through the planning process, and the Secretary makes the final determination. The PEIS recognized that most land administered by the BLM in Alaska is withdrawn from geothermal leasing; however, these lands were included for analysis because the Secretary could revoke lands from withdrawal in the future. The PEIS did not make any recommendations on what lands are recommended for revocation from withdrawal; such determinations will be made in the appropriate BLM land use plans.

[7]  Geothermal leasing and development is allowed in designated portions of the California Desert Conservation Area in accordance with the California Desert Conservation Area Plan, 1980, as amended (BLM 1999).

[8]  Information regarding the terms of allowable uses was not available for every ACEC in the project area. For purposes of analysis in this document, where information was unavailable it was presumed the areas were closed to geothermal leasing; however, this information is available from individual Field Offices.

BLM_0009535

conflicts directly with the terms of the reservation or the mission as identified by the military.

- Areas previously closed to fluid minerals development in approved land use plans.

## 2.3   STIPULATIONS AND BMPs

The Plan Amendments adopt stipulations for geothermal leasing and BMPs that could be applied to subsequent applications for geothermal exploration, drilling, utilization, and reclamation. Lease stipulations are provided below, and BMPs are listed in the ROD Appendix B.

### 2.3.1   Lease Stipulations

This section provides the list of constraints that would be applied as appropriate by the authorized officer to any new leases for lands that are available for geothermal leasing. Lease stipulations are major or moderate constraints applied to a new geothermal lease. A lease stipulation is a condition of lease issuance that provides a level of protection for other resource values or land uses by restricting lease operations during certain times or at certain locations or by mitigating unacceptable impacts, to an extent greater than standard lease terms or conditions. A stipulation is an enforceable term of the lease contract, supersedes any inconsistent provisions of the standard lease form, and is attached to and made a part of the lease. Lease stipulations further implement the BLM's regulatory authority to protect resources or resource values.

Local land use plans take different approaches to protect resources depending on the circumstances in those planning areas. The geothermal stipulations herein have been developed to address a wide variety of landscapes, climates, and ecosystems, without disrupting the management approach of local land use plans. Where the agency determines that particular stipulations may be inappropriate for a planning area, the procedures for waivers, exception, and modifications would be followed as discussed in the Final PEIS.

The following stipulations serve as the minimal level of protection and are adopted as applicable to each plan. The authorized officer retains the discretion to issue stipulations in order to mitigate the impacts on other land uses or resource objectives as defined in the guiding resource management plan. For example, if an administrative unit has eligible wild and scenic rivers, the wild river stipulation would apply. If an existing land use plan offers more protective measures or has resource-specific commitments (e.g., a memorandum of understanding for cultural resources), those more-protective measures would apply instead.

BLM_0009536

### 2.3.2 No Surface Occupancy Lease Stipulations

No Surface Occupancy (NSO) stipulations are considered a major constraint, as they do not allow for surface development. An NSO is appropriate when the standard terms and conditions, other less restrictive lease stipulations (see below), and best management practices for permit approval are determined to be insufficient to achieve the resource protection objectives.

- Designated or proposed critical habitat for listed species under the Endangered Species Act of 1973 (as amended) if it would adversely modify the habitat. For listed or proposed species without designated habitat, NSO would be implemented to the extent necessary to avoid jeopardy.

- Within the boundary of properties designated or eligible for the National Register of Historic Places, including National Landmarks and National Register Districts and Sites, and additional lands outside the designated boundaries to the extent necessary to protect values where the setting and integrity is critical to their designation or eligibility.

- Areas with important cultural and archaeological resources, such as traditional cultural properties and Native American sacred sites, as identified through consultation.

- Water bodies, riparian areas, wetlands, playas, and 100-year floodplains.

- Developed recreational facilities, special-use permit recreation sites (e.g., ski resorts and camps), and areas with significant recreational use with which geothermal development is deemed incompatible, excluding direct use applications.

- Designated National Scenic and Recreational Rivers under the Wild and Scenic River Act.

- Segments of rivers determined to be potentially eligible for Wild and Scenic Rivers status by virtue of a Wild and Scenic River inventory, including a corridor of 0.25 mile from the high water mark on either side of the bank[9].

---

[9] A number of land use plans are currently undergoing revision, and as part of that process Wild and Scenic River inventories have been undertaken. Where a river or river segment has been found to be "eligible" for inclusion in the Wild and Scenic River system as part of one of these inventories, the BLM has the obligation to protect the lands along the eligible segment until a "suitability" determination has been made as part of the land use planning process. If the river or river segment is found to be "non-suitable," the lands along the river then would be available for other uses. If a river or river segment is determined to be suitable for inclusion in the Wild and Scenic River system, the BLM will forward that recommendation to Congress for action and will continue to protect the lands along the river.

BLM_0009537

- Designated important viewsheds, including (1) public lands designated as VRM Class I, and (2) NFS lands with a Scenery Management System integrity level of Very High.

- Slopes in excess of 40 percent and/or soils with high erosion potential.

- Areas that are defined as having special resource values for subsistence needs in Alaska.

Additional NSO stipulations could be applied in conformance with the local land use plan to address site-specific resource concerns.

### 2.3.3 Timing Limitations and Controlled Surface Use Lease Stipulations

Where standard lease terms and permit-level decisions are deemed insufficient to protect sensitive resources, but where an NSO is deemed overly restrictive, the BLM and FS would apply seasonal or time limited stipulations or controlled surface use stipulations to leases. In general, timing limitations are used to protect resources that are sensitive to disturbance during certain periods. Such stipulations are generally applicable to specific areas, seasons, and resources. They are commonly applied to wildlife activities and habitat, such as winter range for deer, elk, and moose; nesting habitat for raptors and migratory birds; and breeding areas. Buffer zones are also used to further mitigate impacts from any human activities. The size of buffers can also be specific to species and location, and can change based on findings of science or movement of species. Therefore, timing limitations would be applied by the authorizing officer as appropriate for the specific lease areas and in compliance with the unit's resource management plan. The BLM would consult with the appropriate agencies (e.g., state wildlife agencies) in establishing the periods and extent of area for timing limitations.

A controlled surface use stipulation allows the BLM to require that any future activity or development be modified or relocated from the proposed location if necessary to achieve resource protection. The project applicant will be required to submit a plan to meet the resource management objectives through special design, construction, operation, mitigation, or reclamation measures, and/or relocation. Unless the plan is approved, no surface occupancy would be allowed on the lease. The following controlled surface use stipulations would be applied by the authorizing officer as appropriate for the specific area and site conditions.

- ***Protection of riparian and wetland habitat.*** This stipulation would be applied within 500 feet of riparian or wetland vegetation to protect the values and functions of these areas. Measures required will be based on the nature, extent, and value of the area potentially affected.

BLM_0009538

- **Protection of visual resources.** This stipulation would be applied to BLM Visual Resource Management Class II areas (Visual Resource Management Class III management objectives would be met through conditions of approval applied during the permit approval process, and may be referenced in a lease notice); NFS lands with a Scenery Management System integrity level of High; and other sensitive viewsheds such as within the visual setting of National Scenic and Historic Trails or near residential areas.

- **Protection of recreational areas.** This stipulation would be applied to minimize the potential for adverse impacts to recreational values, both motorized and non-motorized, and the natural settings associated with the recreational activity.

- **Compatibility with urban interface.** This stipulation would be applied to minimize the potential for adverse impacts to residential areas, schools, or other adjacent urban land uses.

- **Protection of erosive soils and soils on slopes greater then 30 percent.** This stipulation would be applied to minimize the potential for adverse impacts to erosive soils as defined as severe or very severe erosion classes based on Natural Resources Conservation Service mapping.

- **Protection of important habitat and migration corridors.** This stipulation would be applied to protect the continuity of migration corridors and important habitat.

### 2.3.4   Other Lease Stipulations

*Protection of Geothermal Features*
Under the following situations, the BLM or FS would apply stipulations to protect the integrity of geothermal resource features, such as springs and geysers. If it is determined that geothermal operations are reasonably likely to result in a significant adverse effect to such a feature, then BLM would decline to issue the lease.

- The BLM or FS would include stipulations to protect any significant thermal features of a National Park System unit that could be adversely affected by geothermal development. These stipulations will be added, if necessary, when the lease or permit is issued, extended, renewed, or modified (43 CFR 3201.10[b]).

- Any leases that contain thermal features (e.g., springs or surface expressions) would have a stipulation requiring monitoring of the thermal features during any exploration, development, and production of the lease to ensure that there are no impacts to water quality or quantity.

BLM_0009539

### Endangered Species Act Stipulation

In accordance with BLM Instruction Memorandum No. 2002-174, the BLM will apply the following stipulation on any leases where threatened, endangered, or other special status species or critical habitat is known or strongly suspected. Additionally, the BLM will provide a separate notification through a lease notice to prospective lessees identifying the particular special status species that are present on the lease parcel offered.

> "The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 USC 1531 et seq., including completion of any required procedure for conference or consultation."

### Sensitive Species Stipulation

For agency-designated sensitive species (e.g., sage grouse), a lease stipulation (NSO, controlled surface use, or timing limitations) would be imposed for those portions of high value/key/crucial species habitat where other existing measures are inadequate to meet agency management objectives.

### Cultural Resources Stipulation

In accordance with BLM Instruction Memorandum No. 2005-003, the BLM will apply the following stipulation to protect cultural resources:

> "This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, Executive Order 13007, or other statutes and executive orders. The BLM will not approve any ground-disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated."

BLM_0009540

***Roadless Area Stipulation***

The FS manages about 51,477,000 acres of land in the planning area that is designated as inventoried roadless areas. The BLM will issue a non-discretionary restriction on any leases within NFS inventoried roadless areas. Specifically, no new road construction or reconstruction would be allowed in designated roadless areas. If future legislation or regulations change the roadless area designation, the restriction would be revised, along with any appropriate environmental review.

## 2.4   MANAGEMENT PROCEDURES FOR GEOTHERMAL LEASING

To ensure compliance with regulations and Federal laws, the following procedures would be implemented prior to any lands being included in a competitive lease sale. Stipulations listed above would also be used to help achieve resource protection in accordance with laws and regulations and the guiding land use plan. Given the scope of the leasing program, there will be leasing on FS-administered lands; therefore, the procedures include FS actions as applicable.

- The FS will be consulted and will provide a consent determination (including terms and conditions or stipulations) to the BLM prior to any parcels on NFS lands being offered for lease sale. As a condition of consent to the issuance of any lease, the FS would be consulted on the development of a surface use plan.

- The authorized officer of the BLM or FS would consult with the appropriate Native American tribal governments and Alaska Natives to identify tribal interests and traditional cultural resources or properties that may be affected by the Federal land leases and potential for geothermal energy development. Tribal interests include economic rights such as Indian trust assets and resource uses and access guaranteed by treaty rights. Traditional cultural resources or properties include areas of cultural importance to contemporary communities, such as sacred sites or resource gathering areas. There may be issues related to the presence of cultural properties, access rights, disruption to traditional cultural practices, cultural use of hot springs and water sources and impacts to visual resources important to tribes. Areas proposed for leasing may include lands where there are tribal interests and traditional cultural resources that are not currently identified. Consultations on leases should include a full disclosure of the lease as a commitment of the land that may eventually involve future development that could preclude other tribal uses. Consideration and research should be directed to determine if there are other ethnic and social groups that may have traditional uses or ties to the lands proposed for leases.

BLM_0009541

- The authorized officer of the BLM or FS would consult with the appropriate Native American Tribes, Alaska Natives, and State Historic Preservation Officers regarding historic and cultural resources per Section 106 of the National Historical Preservation Act. The presence of archaeological sites and historic properties would be determined on the basis of a records search and literature review of recorded sites and properties in the proposed lease area and a buffer around the lease area, if appropriate. The BLM or FS would assess the adequacy of the cultural resource identification and evaluation effort for the leasing stage. Additional historical, cultural or ethnographic research, consultation and/or inventories may be required to identify resources, determine effects, mitigate adverse effects and complete the Section 106 process. This PEIS addresses the Section 106 process at a programmatic level and serves as a basis for the phased consultation process. All existing memorandums of understanding and agreements regarding the identification and protection of cultural resources would remain valid.

- The authorized officer of the BLM or FS would determine if any listed or proposed threatened or endangered species or critical habitat is present on nominated lease parcels. If so, the authorized officer would comply with Section 7 of the Endangered Species Act, which may include consultation or conferencing with the US Fish and Wildlife Service and/or National Oceanic and Atmospheric Administration Fisheries. Additional compliance activities, which may include consultation, would occur during the site-specific project permitting process.

- The authorized officer of the BLM or FS would review the lands for any other sensitive resources (e.g., paleontological, BLM sensitive status species, and FS species of local concern) and provide for the necessary stipulations to protect these resources and ensure compliance with the land use plan. Assessment of the resource would include consulting with agency experts, coordinating with other appropriate agencies, and site surveys if warranted.

- During the processing of any lease nomination or application in Alaska, the authorized officer of the BLM or FS would conduct and document a site-specific analysis of the effects of the lease on subsistence uses and needs in accordance with Section 810(a) of the Alaska National Interest Lands Conservation Act.

- Prior to making a leasing decision on lands in proximity to a National Park System unit, the BLM or FS would coordinate with the National Park Service to determine if there would be any impacts to thermal or hydrological features within the unit. In accordance with the Geothermal Steam Act Amendments (30 USC

BLM_0009542

Section 1026), if it is determined based on scientific evidence that exploration, development, or utilization of the lands subject to the lease application or nomination is reasonably likely to result in a significant adverse effect on a significant thermal feature within the National Park System, the lease would not be issued. In the event that development is reasonably likely to adversely affect a significant thermal feature, the BLM would apply the appropriate stipulations to protect the park units (see Protection of Geothermal Features stipulations above).

- Prior to making leasing decisions, the BLM will assess the adequacy of existing NEPA documentation and ensure that the proposed action is in conformance with the approved land use plan (i.e., through completion of a DNA) to determine if there is new information or new circumstances that warrant further analysis. For example, additional NEPA analysis may be required in light of new information, or a potential change in management approach regarding resources identified for special management (e.g., travel management planning or areas under consideration by BLM for management for wilderness characteristics).

- The level of environmental analysis to be required under NEPA for subsequent individual exploration, development, and production permits will be determined at the Field Office and FS unit level. In certain instances, it may be determined that a tiered environmental assessment is appropriate in lieu of an environmental impact statement. To the extent that land use plans or the PEIS anticipated issues and concerns associated with individual projects, including potential cumulative impacts, the BLM and FS will tier from land use plans and/or the PEIS analysis and decisions; thereby limiting the required scope and effort of additional project-specific NEPA analysis.

- The authorized officer of the BLM or FS would collaborate with appropriate state agencies, especially in the case of geothermal energy, as the states manage and typically have regulatory authority for water quality, water rights, and wildlife.

- Applicants for geothermal development and production on public or NFS lands will develop a project-specific operations plan that incorporates the applicable mitigation and best management practices provided in ROD Appendix B and, as appropriate, the requirements of other existing and relevant BLM and FS mitigation guidance. Additional mitigation measures will be incorporated into the operations plan and into the conditions of approval or project stipulations. The operations plan will include site plans, location of facilities, wells, pipelines, transmission lines, roads, and other infrastructure.

BLM_0009543

## 2.5   CONSIDERATION OF OTHER BLM PLANS AND POLICIES

The ROD for the Plan Amendments amends the land use plans existing at the time the ROD is implemented and identifies those areas designated as open or closed for nomination and applications for geothermal leasing. The resource management plan amendments are listed in Table A-1. These plans continue to outline the decisions or protocols for the management of the other resource uses or values within the appropriate planning areas.

In the event there are inconsistencies or discrepancies between previously approved plans and these Plan Amendments, the decisions contained in the Plan Amendments for geothermal resources will be followed. The affected Field Offices will continue to tier to statewide, national, and programmatic environmental impact statements and other NEPA and planning documents, as well as to consider and apply BMPs or other management protocols contained in other planning documents after appropriate site-specific analysis.

All future resource authorizations and actions will conform to, or be consistent with, the decisions contained in these Plan Amendments. All existing operations and activities authorized under permits, contracts, cooperative agreements or other authorizations will be modified, as necessary, to conform to this plan within a reasonable timeframe. However, this plan does not impact valid existing rights on public lands. If such authorizations come up for review and can be modified, they will also be brought into conformance with the plan.

## 2.6   PLAN IMPLEMENTATION

### General Implementation Schedule

The decisions of the Plan Amendments go into effect upon signature of the ROD.

### Data Refinement

The available GIS data and maps used for the analysis in the Final PEIS are available at the project Web site (www.blm.gov/geothermal_eis).   Additional data are available at the BLM and FS geocommunicator Web site (www.geocommunicator.gov).   Data used in development of the Plan Amendments are dynamic. GIS boundary data were incomplete for some planning areas. Thus, please note that all acreages presented in the Plan Amendments (and shown in Appendix A) are estimations, even when presented to the nearest acre. The data and maps used throughout the Plan Amendments are for land use planning purposes only and will be refined as on-the-ground implementation occurs.

BLM_0009544

### Maintaining and Monitoring the Plan

Land use plan decisions and supporting information associated with the amended land use plans can be maintained to reflect minor changes in data, but maintenance is limited to refining, documenting, and/or clarifying previously approved plan decisions. Minor updates of data are considered plan maintenance, which will occur over time as the RMP is implemented. Maintenance will not result in expansion in the scope of resource uses or restrictions, or change the terms, conditions, and decisions of the approved plan.

In addition, the BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data and/or support new management techniques, best management practices, and scientific principles. Where monitoring shows land use plan actions or best management practices are not effective, modifications or adjustments may occur without amendment or revision of the plan as long as assumptions and impacts disclosed in the analysis remain valid, and broad-scale goals and objectives are not changed. Plan maintenance will be documented in supporting records.

### Changing the Plan

The Plan Amendments may be changed, should conditions warrant, through a plan amendment process. A plan amendment may become necessary if changes in circumstances or actions come under consideration that may result in a change in the scope of resource uses or a change in the terms, conditions, or decisions of the approved plan (e.g., significant new information is available, or a proposal or action comes under consideration that is not in conformance with the plan). The results of monitoring, evaluation of new data, or policy changes and changing public needs might also provide the impetus for an amendment. Generally, an amendment is issue-specific. If the plan amendments become outdated or otherwise obsolete, a further plan amendment may become necessary. Plan amendments are accomplished with public input and the appropriate level of environmental analysis and NEPA compliance.

BLM_0009545

*This Page Intentionally Left Blank*

BLM_0009546

# CHAPTER 3
# REFERENCES

BLM 2008a. *Final Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States.* Prepared by US DOI BLM, USDA Forest Service, and EMPSi. October 2008.

BLM 2004a. BLM Manual 8120. *Tribal Consultation Under Cultural Resources Authorities.*

BLM 2004b. Handbook H-8120-1. *General Procedural Guidance for Native American Consultation.*

NREL 2006. *Geothermal – The Energy Under our Feet: Geothermal Resources Estimates for the United States.* Technical Report NREL/TP-840-40665. By Bruce Green and Gerald Nix. November 2006.

Western Governors' Association 2006. Clean and Diversified Energy Initiative. Geothermal Task Force Report. January 2006. Available at: http://www.westgov.org/wga/initiatives/cdeac/geothermal.htm.

BLM_0009547

*This Page Intentionally Left Blank*

BLM_0009548

# APPENDIX A
# RESOURCE MANAGEMENT PLAN AMENDMENTS FOR GEOTHERMAL LEASING

The following table lists all the plans that are being amended by this decision. Allocations and reasonably foreseeable development scenarios for electrical generation (projected megawatts [MW]) are provided for each affected administrative unit (field office or districts). Specific allocations for each plan will be calculated and applied by the individual administrative units. Specific areas of BLM-administered lands have not been identified for electrical production in Colorado, Montana, or Wyoming; however, it is expected that up to 50 MW of capacity could occur in these states. In addition to electrical generation, all the affected administrative units have the potential for direct use of geothermal resources. In addition to allocations, the amendments adopt the stipulations and leasing procedures provided in Chapter 2 and the BMPs provided in Appendix B.

### Table A-1
### Resource Management Plan Amendments

| District or Field Office[†] | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| **Alaska** | | | | | |
| Anchorage | Ring of Fire RMP | 992,786 | --[‡] | 20 | 150 |
| | Kobuk-Seward RMP | | | | |
| Fairbanks | Central Yukon RMP | 4,867,749 | 1,444,835[‡] | -- | -- |
| | Kobuk-Seward RMP | | | | |
| **Arizona** | | | | | |
| Arizona Strip | Arizona Strip RMP | 626,291 | 328,799 | -- | -- |

BLM_0009549

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office[†] | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| Hassayampa | Lower Gila North MFP* Phoenix RMP* | 701,670 | 88,515 | -- | -- |
| Kingman | Kingman RMP | 2,219,911 | 373,299 | -- | -- |
| Lake Havasu | Lake Havasu RMP | 1,352,613 | 178,621 | -- | -- |
| Lower Sonoran | Phoenix RMP* Lower Gila South RMP* | 860,793 | 344,285 | | |
| Safford | Safford RMP | 1,270,987 | 90,893 | 20 | 50 |
| Tucson | Safford RMP Phoenix RMP* | 520,812 | 172,746 | -- | -- |
| Yuma | Lower Gila South RMP* Yuma RMP* | 1,289,013 | 186,006 | -- | -- |
| **California** | | | | | |
| Alturas | Alturas RMP Cedar Creek/Tule Mountain Integrated RMP* | 502,188 | 89,093 | 480 | 490 |
| Arcata | Arcata RMP Headwaters RMP | 83,436 | 56,341 | -- | -- |
| Bakersfield | Caliente RMP* Hollister RMP | 560,591 | 330,725 | -- | -- |
| Barstow | West Mojave RMP | 2,892,852 | 1,488,168 | -- | -- |
| Bishop | Bishop RMP | 747,823 | 284,029 | 120 | 240 |
| Eagle Lake | Eagle Lake RMP | 1,041,655 | 407,959 | 10 | 10 |
| El Centro | E. San Diego County RMP | 1,236,466 | 853,632 | 1,355 | 3,063 |
| Hollister | S. Diablo Mountain Range and Central Coast RMP | 273,622 | 29,240 | -- | -- |
| Palm Springs-S. Coast | South Coast RMP* | 1,555,386 | 1,017,252 | -- | -- |
| Redding | Redding RMP | 51,209 | 2,954 | 0 | 50 |
| Surprise | Surprise RMP | 1,430,221 | 397,653 | 30 | 60 |

BLM_0009550

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office† | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW 2015 | Projected MW 2025 |
|---|---|---|---|---|---|
| **Colorado** | | | | | |
| Columbine | San Juan/San Miguel RMP* | 63,001 | 2,795 | -- | -- |
| | Glenwood Springs RMP* | | | | |
| Delores | San Juan/San Miguel RMP* | 427,661 | 143,103 | -- | -- |
| Glenwood Springs | Glenwood Springs RMP* | 567,172 | 27,717 | -- | -- |
| Grand Junction | Grand Junction RMP* | 420,016 | 66,622 | -- | -- |
| Gunnison | Gunnison RMP | 614,233 | 164,408 | -- | -- |
| Kremmling | Kremmling RMP* | 367,370 | 13,807 | -- | -- |
| Little Snake | Little Snake RMP* | 962,205 | 4,457 | -- | -- |
| Pagosa Springs | San Juan/San Miguel RMP* | 5,777 | 699 | -- | -- |
| Royal Gorge | Northeast RMP Royal Gorge RMP | 661,011 | 73,627 | -- | -- |
| Uncompahgre | Uncompahgre Basin RMP* | 800,861 | 130,462 | -- | -- |
| | San Juan/San Miguel RMP* | | | | |
| White River | White River RMP | 884,343 | 22,415 | -- | -- |
| **Idaho** | | | | | |
| Bruneau | Bruneau MFP | 1,604,986 | 316,553 | -- | -- |
| Four Rivers | Cascade RMP* Kuna MFP* Jarbidge RMP* | 1,340,695 | 562,196 | 138 | 275 |
| Burley | Cassia RMP Twin Falls MFP Monument RMP | 849,597 | 70,471 | 263 | 425 |
| Challis | Challis RMP | 908,313 | 139,652 | -- | -- |
| Cottonwood | Chief Joseph MFP* | 90,128 | 13,963 | -- | -- |
| Jarbidge | Jarbidge RMP* | 1,565,165 | 131,547 | 113 | 225 |
| Owyhee | Owyhee RMP | 1,497,330 | 303,451 | -- | -- |

BLM_0009551

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office† | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| Pocatello | Malad MFP* Pocatello RMP* | 554,115 | 44,554 | 100 | 200 |
| Salmon | Lemhi RMP | 520,764 | 60,464 | 10 | 20 |
| Shoshone | Bennett Hills/ Timmerman Hills MFP Magic MFP Monument RMP Sun Valley MFP | 1,904,389 | 428,425 | 113 | 225 |
| Upper Snake | Big Desert MFP* Big Lost MFP* Little Lost-Birch MFP* Medicine Lodge RMP* | 1,881,331 | 237,801 | 120 | 300 |
| **Montana** | | | | | |
| Billings | Billings Resource Area RMP* | 149,410 | 6,768 | -- | -- |
| Butte | North Headwaters RMP* | 272,708 | 35,014 | -- | -- |
| Dillon | Dillon RMP | 910,199 | 165,583 | -- | -- |
| Lewistown | Judith Valley Phillips RMP* | 183,749 | 133 | -- | -- |
| Malta | West HiLine RMP* | 4,076 | 0 | -- | -- |
| Miles City | Big Dry RMP* Powder River Resource Area RMP* | 1,863,245 | 84,618 | -- | -- |
| Missoula | Garnet Resource Area RMP | 55,344 | 2,564 | -- | -- |
| **Nevada** | | | | | |
| Battle Mountain | Shoshone-Eureka RMP Tonopah RMP | 10,419,122 | 933,196 | 306 | 586 |
| Carson City | Carson City Consolidated RMP | 4,988,877 | 677,456 | 536 | 971 |
| Elko | Elko RMP Wells RMP | 7,505,351 | 536,717 | 238 | 488 |
| Las Vegas | Las Vegas RMP | 3,426,674 | 709,582 | -- | -- |

*Record of Decision for Geothermal Leasing in the Western US*
December 2008

BLM_0009552

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office[†] | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| Winnemucca | Paradise-Denio MFP* | 8,232,520 | 546,952 | 405 | 781 |
| | Sonoma-Gerlach MFP* | | | | |
| **New Mexico** | | | | | |
| Carlsbad | Carlsbad RMP | 186,375 | 0 | -- | -- |
| Farmington | Farmington RMP | 1,421,241 | 113,860 | -- | -- |
| Las Cruces | MacGregor Range RMP | 5,000,939 | 523,188 | 80 | 170 |
| | Mimbres RMP* | | | | |
| | White Sands RMP | | | | |
| Rio Puerco | Rio Puerco RMP* | 978,622 | 362,255 | -- | -- |
| Roswell | Roswell RMP | 119,750 | 0 | -- | -- |
| Soccoro | Socorro RMP* | 1,267,174 | 299,915 | -- | -- |
| Taos | Taos RMP* | 533,041 | 144,066 | -- | -- |
| **Oregon** | | | | | |
| Burns[†] | Three Rivers RMP | 3,268,606 | 1,055,056 | 0 | 50 |
| Eugene[†] | Eugene District RMP* | 0 | 0 | -- | -- |
| Medford[†] | Medford RMP* | 209,513 | 52,764 | -- | -- |
| Prineville[†] | Two Rivers RMP* | | | 295 | 1,040 |
| | Brothers/LaPine RMP* | | | | |
| | John Day RMP* | | | | |
| | John Day River MP* | | | | |
| | Lower Deschutes RMP | 1,652,041 | 295,084 | | |
| Roseburg[†] | Roseburg RMP* | 0 | 0 | -- | -- |
| Salem[†] | Salem RMP* | 138,070 | 19,008 | -- | -- |

BLM_0009553

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office[†] | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| **Utah** | | | | | |
| Cedar City | Cedar Beaver Garfield Antimony RMP | 2,102,417 | 23,739 | 160 | 370 |
| | Pinyon MFP | | | | |
| Kanab | Paria MFP* | 145,417 | 15,519 | -- | -- |
| | Vermilion MFP* | | | | |
| | Zion MFP* | | | | |
| Richfield | Mountain Valley MFP* | 400,725 | 49,649 | 20 | 50 |
| | Henry Mountain MFP* | | | | |
| | Parker Mountain MFP* | | | | |
| St. George | St. George (formerly Dixie) RMP | 468,886 | 63,378 | -- | -- |
| Vernal | Book Cliffs MFP* | 272,862 | 0 | -- | -- |
| | Diamond Mountain RMP* | | | | |
| **Washington** | | | | | |
| Spokane[†] | Spokane RMP | 251,096 | 14,415 | 50 | 600 |
| **Wyoming** | | | | | |
| Buffalo | Buffalo RMP | 571,425 | 12,301 | -- | -- |
| Casper | Platte River RMP* | 517,576 | 9,160 | -- | -- |
| Cody | Big Horn Basin RMP | 722,834 | 39,317 | -- | -- |
| | Cody RMP* | | | | |
| Kemmerer | Kemmerer RMP* | 693,806 | 83,508 | -- | -- |
| Lander | Lander RMP* | 1,201,201 | 32,423 | -- | -- |
| Newcastle | Newcastle RMP | 132,922 | 0 | -- | -- |
| Pinedale | Pinedale RMP* | 704,239 | 39,119 | -- | -- |
| | Snake River RMP | | | | |

BLM_0009554

**Table A-1**
**Resource Management Plan Amendments**

| District or Field Office[†] | Land Use Plan(s) | Acres Open | Acres Closed | Projected MW | |
|---|---|---|---|---|---|
| | | | | 2015 | 2025 |
| Rawlins | Great Divide RMP* | 2,308,513 | 72,173 | -- | -- |
| | Green River RMP* | | | | |
| Rock Springs | Green River RMP* | 3,356,775 | 338,172 | -- | -- |
| Worland | Grass Creek RMP* | 1,537,942 | 91,803 | -- | -- |
| | Waskakie RMP* | | | | |

[1]   Most of the land administered by the BLM within the planning area of Alaska is withdrawn from mineral leasing under Section 17(d)(1) of the Alaska Native Claims Settlement Act of 1971. The closed acres in this table represent the acreage that would remain closed to geothermal leasing if the Secretary of the Interior revoked the withdrawal from all public lands in the planning area.

*   Plans are under revision but the record of decision for these plans has not been signed. These field offices elect to amend their existing RMP/MFP with the decisions in this PEIS until their RMP record of decision is signed.

[†]   Oregon and Washington Districts manage RMPs in their respective states.

MP = Management Plan
MFP = Management Framework Plan
RMP = Resource Management Plan

BLM_0009555

*This Page Intentionally Left Blank*

BLM_0009556

# APPENDIX B
# BEST MANAGEMENT PRACTICES – MITIGATION MEASURES

Best Management Practices are state-of-the-art mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are applied to management actions to aid in achieving desired outcomes for safe, environmentally responsible resource development, by preventing, minimizing, or mitigating adverse impacts and reducing conflicts.

This appendix provides a list of sample BMPs that have been collected from various BLM and FS documents addressing geothermal and fluid mineral leasing and development, including resource management plans, forest plans, and environmental reports for geothermal leasing and development. The purpose of this appendix is to provide a list of recommended BMPs that would be incorporated as appropriate into the permit application by the lessee or would be included in the approved use authorization by the BLM as conditions of approval. When implementing new BMPs, offices are encouraged to work with an affected lessee early in the process, to explain how BMPs may fit into their development proposals and how BMPs can be implemented with the least economic impact to the lessee. Offices should discuss potential resource impacts with the lessee and seek the operator's recommended solutions. The office should also encourage the lessee to incorporate necessary and effective BMPs into their project proposal. BMPs not incorporated into the permit application by the lessee may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or rights-of-way stipulations.

All offices will incorporate appropriate environmental BMPs into proposed use authorizations after appropriate environmental review. Environmental BMPs to be considered in nearly all circumstances include the following:

BLM_0009557

- Interim reclamation of well locations and access roads soon after the well is put into production;

- Painting of all new facilities a color that best allows the facility to blend with the background, typically a vegetated background;

- Design and construction of all new roads to a safe and appropriate standard, "no higher than necessary" to accommodate their intended use; and

- Final reclamation recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography.

Other environmental BMPs are more suitable for consideration by an administrative unit on a case-by-case basis, (1) depending on their effectiveness, (2) the balancing of increased operating costs vs. the benefit to the public and resource values, (3) the availability of less restrictive mitigation alternatives that accomplish the same objective, and (4) other site specific factors. Examples of typical, case-by-case BMPs are identified below.

Guidelines for applying and selecting project-specific requirements include determining whether the measure would (1) ensure compliance with relevant statutory or administrative requirements, (2) minimize local impacts associated with siting and design decisions, (3) promote post construction stabilization of impacts, (4) maximize restoration of previous habitat conditions, (5) minimize cumulative impacts, or (6) promote economically feasible development of geothermal energy on BLM-administered or FS-administered land.

The following typical BMPs provide the BLM, FS, industry, and stakeholders a menu of improved practices for developing geothermal energy and minimize impacts to the biophysical and cultural landscape. The list is extensive but is not meant to be all inclusive given the constant development of improved practices, diversity of the western states, and potential for unique site-specific conditions. Local land use plans may contain other BMPs that better address such unique situations. Where the BMPs presented here are inconsistent with or incompatible with those developed under a specific land use plan, the staff will conduct an environmental review to determine the appropriate practices.

Only those individual mitigation measures reasonably necessary to ensure environmentally responsible geothermal development should be selected from the list below. Not all of the individual mitigation measures below will apply in most situations and selection of appropriated BMPs and mitigation measures should be dependent on factors such as the project size, location, site specific characteristics, and potential resource impacts. Prior to inclusion into a permit, the measures may be further modified to meet site-specific situations and agency requirements.

BLM_0009558

A menu of typical BMPs can also be found on the BLM Washington Office Fluid Minerals Web site at: www.blm.gov/bmp.

**Note:** Commenters to the Draft PEIS noted that the list of BMPs and mitigation measures appeared to be redundant, contradictory, confusing, and placed extensive emphasis on certain resources while deemphasizing others. The following list has been consolidated and updated to address those concerns. The BMPs and mitigation measures are arranged from Information Collection and Monitoring to Final Reclamation and have been further subcategorized. While many of the BMPs and mitigation measures will apply to all phases of geophysical exploration and development; to avoid duplication, the measures are listed only once.

## B.1   INFORMATION COLLECTION & MONITORING

### B.1.1   General

- Prior to geothermal exploration and development, a complete subsurface geotechnical investigation will be conducted to analyze the soil and geologic conditions. The investigation will evaluate and identify potential geologic hazards and would provide remedial grading recommendations, foundation and slab design criteria, and soil parameters for the design of geothermal power infrastructure.

- The operator will collect available information describing the environmental and socio-cultural conditions in the vicinity of the proposed project and will provide the information to the agency.

- A monitoring program will be developed by the operator to ensure that environmental conditions are monitored during the exploration and well drilling, testing, construction, and utilization and reclamation phases. The monitoring program requirements, including adaptive management strategies, will be established at the project level to ensure that potential adverse impacts of geothermal development are mitigated. The monitoring program will identify the monitoring requirements for each major environmental resource present at the site, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into ongoing activities. The operator will provide results of the monitoring program to the agency in an annual report.

- The operator will comply with the Secretary of Agriculture's rules and regulations for all use and occupancy of the NFS lands prior to approval of an exploration plan by the Secretary of Interior and for uses of all existing improvements, such as forest development roads,

BLM_0009559

within and outside the area permitted by the Secretary of Interior; and use and occupancy of the NFS lands not authorized by an exploration plan approved by the Secretary of Interior.

## B.1.2   Paleontological and Cultural Resources

- Before any specific permits are issued under leases, treatment of cultural resources will follow the procedures established by the Advisory Council on Historic Preservation for compliance with Section 106 of the National Historic Preservation Act. A pedestrian inventory will be undertaken of all portions that have not been previously surveyed or are identified by BLM as requiring inventory to identify properties that are eligible for the National Register of Historic Places (NRHP). Those sites not already evaluated for NRHP eligibility will be evaluated based on surface remains, subsurface testing, archival, and/or ethnographic sources. Subsurface testing will be kept to a minimum whenever possible if sufficient information is available to evaluate the site or if avoidance is an expected mitigation outcome. Recommendations regarding the eligibility of sites will be submitted to the BLM, and a treatment plan will be prepared to detail methods for avoidance of impacts or mitigation of effects. The BLM will make determinations of eligibility and effect and consult with SHPO as necessary based on each proposed lease application and project plans. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated. Avoidance of impacts through project design will be given priority over data recovery as the preferred mitigation measure. Avoidance measures include moving project elements away from site locations or to areas of previous impacts, restricting travel to existing roads, and maintaining barriers and signs in areas of cultural sensitivity. Any data recovery will be preceded by approval of a detailed research design, Native American Consultation, and other requirements for BLM issuance of a permit under the Archaeological Resources Protection Act (BLM 2007a).

- If cultural resources are present at the site, or if areas with a high potential to contain cultural material have been identified, a cultural resources management plan (CRMP) will be developed. This plan will address mitigation activities to be taken for cultural resources found at the site. Avoidance of the area is always the preferred mitigation option. Other mitigation options include archaeological survey and excavation (as warranted) and monitoring. If an area exhibits a high potential, but no artifacts were observed during an archaeological survey, monitoring by a qualified archaeologist could

BLM_0009560

be required during all excavation and earthmoving in the high-potential area. A report will be prepared documenting these activities. The CRMP also will (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of artifacts and destruction of property on public land (BLM 2005).

- Operators will determine whether paleontological resources exist in a project area on the basis of the sedimentary context of the area, a records search for past paleontological finds in the area, and/or, depending on the extent of existing information, a paleontological survey.

- If paleontological resources are present at the site, or if areas with a high potential to contain paleontological material have been identified, a paleontological resources management plan will be developed. This plan will include a mitigation plan for avoidance, removal of fossils, or monitoring. If an area exhibits a high potential but no fossils were observed during survey, monitoring by a qualified paleontologist may be required during excavation and earthmoving in the sensitive area. The operator will submit a report to the agency documenting these activities. The paleontological resources management plan also will (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

## B.1.3   Water Resources

- In coordination with State regulatory agencies the operator will comply with all State and Federal surface and ground water rules and regulations for all phases of geothermal exploration, development, and reclamation.

- Operators will develop a storm water management plan for the site to ensure compliance with applicable regulations and prevent off-site migration of contaminated storm water or increased soil erosion.

- Operators will gain a clear understanding of the local hydrogeology. Areas of groundwater discharge and recharge and their potential relationships with surface water bodies will be identified.

- Operators will avoid creating hydrologic conduits between discrete aquifers during foundation excavation and other activities.

BLM_0009561

- Freshwater-bearing and other usable water aquifers will be protected from contamination by assuring all well casing (excluding the liner) is required to be cemented from the casing shoe to the surface.

- Periodic testing and monitoring via observation wells will be conducted in a manner to assure maximum protection of water resources from geothermal fluids or alterations in reservoir pressure.

### B.1.4   Vegetation and Fish and Wildlife

- The operator will conduct surveys for plant and animal species that are listed or proposed for listing as threatened or endangered and their habitats in areas proposed for development where these species could potentially occur, following accepted protocols and in consultation with the USFWS or NMFS, as appropriate. Particular care should be taken to avoid disturbing listed species during surveys in any designated critical habitat. The operator will monitor activities and their effects on ESA-listed species throughout the duration of the project.

- The operator will identify important, sensitive, or unique habitat and biota in the project vicinity and site and should design the project to avoid (if possible), minimize, or mitigate potential impacts on these resources. The design and siting of the facilities will follow appropriate guidance and requirements from the BLM, FS, and other resource agencies, as available and applicable.

### B.1.5   National Scenic and Historic Trails

- When any right-of-way application includes remnants of a National Historic Trail, is located within the viewshed of a National Historic Trail's designated centerline, or includes or is within the viewshed of a trail eligible for listing on the NRHP, the operator will evaluate the potential visual impacts to the trail associated with the proposed project and identify appropriate mitigation measures for inclusion in the operation plan.

### B.1.6   Air Quality and Climate

- The operator will coordinate with the [State Air Quality Division] to develop and implement an air quality monitoring plan.

BLM_0009562

## B.2   PLANNING, LOCATION, AND DESIGN

### B.2.1   Traffic Planning

- Operators will consult with local planning authorities regarding increased traffic prior to the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) will be identified and addressed in the traffic management plan.

### B.2.2   Roads & Pads

- To plan for efficient use of the land, necessary infrastructure will be consolidated wherever possible.

- Existing roads and pad sites will be used to the maximum extent feasible, but only if located in a safe and environmentally sound location. No new roads and pad sites will be constructed without agency authorization. If new roads and pad sites have been authorized, they will be designed and constructed by the operator to the appropriate agency standard, no higher than necessary to accommodate their intended function. Roads and pad sites will be routinely maintained by the operator maintain public safety and to minimize impacts to the environment such as erosion, sedimentation, fugitive dust, loss of vegetation.

- An access road siting and management plan will be prepared incorporating existing Agency standards regarding road design, construction, and maintenance such as those described in the BLM 9113 Manual and the *Surface Operating Standards for Oil and Gas Exploration and Development* (i.e., the Gold Book, 4th Edition, 2007).

- A traffic management plan will be prepared for the site access roads to ensure that no hazards would result from the increased truck traffic and that traffic flow would not be adversely impacted. This plan will incorporate measures such as informational signs, flaggers when equipment may result in blocked throughways, and traffic cones to identify any necessary changes in temporary lane configuration.

- Where possible, access roads will be located to follow natural contours and minimize side hill cuts and fills. Excessive grades on roads, road embankments, ditches, and drainages will be avoided, especially in areas with erodible soils.

- Roads will be designed so that changes to surface water runoff are minimized and new erosion is not initiated.

BLM_0009563

- Access roads will be located to minimize stream crossings. All structures crossing streams will be located and constructed so that they do not decrease channel stability or increase water velocity. Operators will obtain all applicable federal and state water crossing permits.

- Roads will be located away from drainage bottoms and avoid wetlands, if practicable.

## B.2.3   Geotechnical Analysis

- The operator will perform a detailed geotechnical analysis prior to the construction of any structures; so they will be sited to avoid any hazards from subsidence or liquefaction (i.e., the changing of a saturated soil from a relatively stable solid state to a liquid during earthquakes or nearby blasting).

## B.2.4   Visual Mitigation

- The operator will incorporate visual design considerations into the planning and design of the project to minimize potential visual impacts of the proposal and to meet the Visual Resource Management objectives of the area and the agency.

## B.2.5   Visual Design Considerations

- Construct low-profile structures whenever possible to reduce structure visibility.

- Select and design materials and surface treatments to repeat or blend with landscape elements.

- Site projects outside of the viewsheds of publically accessible vantage points, or if this cannot be avoided, as far away as possible;

- Site projects to take advantage of both topography and vegetation as screening devices to restrict views of projects from visually sensitive areas;

- Site facilities away from and not adjacent to prominent landscape features (e.g., knobs and water features);

- Avoid placing facilities on ridgelines, summits, or other locations such that they will be silhouetted against the sky from important viewing locations;

- Collocate facilities to the extent possible to use existing and shared rights-of-way, existing and shared access and maintenance roads, and other infrastructure to reduce visual they do not bisect ridge tops or run down the center of valley bottoms.

BLM_0009564

- Site linear features (aboveground pipelines, rights-of-way, and roads) to follow natural land contours rather than straight lines (particularly up slopes) when possible. Fall-line cuts should be avoided.

- Site facilities, especially linear facilities, to take advantage of natural topographic breaks (i.e., pronounced changes in slope) to avoid siting facilities on steep side slopes.

- Where available, site linear features such as rights-of-ways and roads to follow the edges of clearings (where they will be less conspicuous) rather than passing through the centers of clearings.

- Site facilities to take advantage of existing clearings to reduce vegetation clearing and ground disturbance, where possible.

- Site linear features (e.g., trails, roads, rivers) to cross other linear features at right angles whenever possible to minimize viewing area and duration.

- Site and design structures and roads to minimize and balance cuts and fills and to preserve existing rocks, vegetation, and drainage patterns to the maximum extent possible.

- Use appropriately colored materials for structures or appropriate stains and coatings to blend with the project's backdrop. Refer to the Standard Environmental Colors chart available from the BLM.

- Use non-reflective or low-reflectivity materials, coatings, or paints whenever possible.

- Paint grouped structures the same color to reduce visual complexity and color contrast.

- Design and install efficient facility lighting so that the minimum amount of lighting required for safety and security is provided but not exceeded and so that upward light scattering (light pollution) is minimized. This may include, for example, installing shrouds to minimize light from straying off-site, properly directing light to only illuminate necessary areas, and installing motion sensors to only illuminate areas when necessary.

- Site construction staging areas and laydown areas outside of the viewsheds of publically accessible vantage points and visually sensitive areas, where possible, including siting in swales, around bends, and behind ridges and vegetative screens.

- Discuss visual impact mitigation objectives and activities with equipment operators prior to commencement of construction activities.

BLM_0009565

- Mulch or scatter slash from vegetation removal and spread it to cover fresh soil disturbances or, if not possible, bury or compost slash.

- If slash piles are necessary, stage them out of sight of sensitive viewing areas.

- Avoid installing gravel and pavement where possible to reduce color and texture contrasts with existing landscape.

- Use excess fill to fill uphill-side swales resulting from road construction in order to reduce unnatural-appearing slope interruption and to reduce fill piles.

- Avoid downslope wasting of excess fill material.

- Round road-cut slopes, vary cut and fill pitch to reduce contrasts in form and line, and vary slope to preserve specimen trees and nonhazardous rock outcroppings.

- Leave planting pockets on slopes where feasible.

- Combine methods of re-establishing native vegetation through seeding, planting of nursery stock, transplanting of local vegetation within the proposed disturbance areas and staging of construction enabling direct transplanting.

- **Revegetate with native vegetation establishing a composition consistent with the form, line, color, and texture of the surrounding undisturbed landscape."**

- Provide benches in rock cuts to accent natural strata.

- Use split-face rock blasting to minimize unnatural form and texture resulting from blasting.

- Segregate topsoil from cut and fill activities and spread it on freshly disturbed areas to reduce color contrast and to aid rapid revegetation.

- Bury utility cables in or adjacent to the road where feasible.

- Minimize signage and paint or coat reverse sides of signs and mounts to reduce color contrast with existing landscape.

- Prohibit trash burning; store trash in containers to be hauled off-site for disposal.

- Undertake interim restoration during the operating life of the project as soon as possible after disturbances. During road maintenance activities, avoid blading existing forbs and grasses in ditches and along roads.

BLM_0009566

- Randomly scarify cut slopes to reduce texture contrast with existing landscape and to aid in revegetation.

- Cover disturbed areas with stockpiled topsoil or mulch, and revegetate with a mix of native species selected for visual compatibility with existing vegetation.

- Restore rocks, brush, and natural debris whenever possible to approximate preexisting visual conditions.

### B.2.6   Air Quality and Climate

- The operator will prepare and submit to the agency an Equipment Emissions Mitigation Plan for managing diesel exhaust, An Equipment Emissions Mitigation Plan will identify actions to reduce diesel particulate, carbon monoxide, hydrocarbons, and nitrogen oxides associated with construction and drilling activities. The Equipment Emissions Mitigation Plan will require that all drilling/construction-related engines are maintained and operated as follows:

  o Are tuned to the engine manufacturer's specification in accordance with an appropriate time frame.

  o Do not idle for more than five minutes (unless, in the case of certain drilling engines, it is necessary for the operating scope).

  o Are not tampered with in order to increase engine horsepower.

  o Include particulate traps, oxidation catalysts, and other suitable control devices on all drilling/construction equipment used at the project site.

  o Use diesel fuel having a sulfur content of 15 parts per million or less, or other suitable alternative diesel fuel, unless such fuel cannot be reasonably procured in the market area.

  o Include control devices to reduce air emissions. The determination of which equipment is suitable for control devices should be made by an independent Licensed Mechanical Engineer. Equipment suitable for control devices may include drilling equipment, work over and service rigs, mud pumps, generators, compressors, graders, bulldozers, and dump trucks.

BLM_0009567

### B.2.7   Health and Safety

- Operators will develop a hazardous materials management plan addressing storage, use, transportation, and disposal of each hazardous material anticipated to be used at the site. The plan will identify all hazardous materials that would be used, stored, or transported at the site. It will establish inspection procedures, storage requirements, storage quantity limits, inventory control, nonhazardous product substitutes, and disposition of excess materials. The plan will also identify requirements for notices to federal and local emergency response authorities and include emergency response plans.

- Operators will develop a waste management plan identifying the waste streams that are expected to be generated at the site and addressing hazardous waste determination procedures, waste storage locations, waste-specific management and disposal requirements, inspection procedures, and waste minimization procedures. This plan will address all solid and liquid wastes that may be generated at the site.

- Operators will develop a spill prevention and response plan identifying where hazardous materials and wastes are stored on site, spill prevention measures to be implemented, training requirements, appropriate spill response actions for each material or waste, the locations of spill response kits on site, a procedure for ensuring that the spill response kits are adequately stocked at all times, and procedures for making timely notifications to authorities.

- A safety assessment will be conducted to describe potential safety issues and the means that would be taken to mitigate them, including issues such as site access, construction, safe work practices, security, heavy equipment transportation, traffic management, emergency procedures, and fire control.

- A health and safety program will be developed to protect both workers and the general public during construction and operation of geothermal projects.

- Regarding occupational health and safety, the program will identify all applicable federal and state occupational safety standards; establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; Occupational Safety and Health Administration standard practices for safe use of explosives and blasting agents; and measures for reducing occupational electric and magnetic fields exposures); establish fire safety evacuation procedures; and define safety performance standards (e.g., electrical system standards and lightning protection

BLM_0009568

standards). The program will include a training program to identify hazard training requirements for workers for each task and establish procedures for providing required training to all workers. Documentation of training and a mechanism for reporting serious accidents to appropriate agencies will be established.

- Regarding public health and safety, the health and safety program will establish a safety zone or setback for generators from residences and occupied buildings, roads, right-of-ways, and other public access areas that is sufficient to prevent accidents resulting from the operation of generators. It will identify requirements for temporary fencing around staging areas, storage yards, and excavations during construction or rehabilitation activities. It will also identify measures to be taken during the operation phase to limit public access to hazardous facilities (e.g., permanent fencing would be installed only around electrical substations, and facility access doors would be locked).

- Operators will consult with local planning authorities regarding increased traffic during the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) will be identified and addressed in the traffic management plan.

- Operators will develop a fire management strategy to implement measures to minimize the potential for a human-caused fire.

## B.2.8   Livestock Grazing

- The operator will coordinate with livestock operators to minimize impacts to livestock operations.

## B.2.9   Noxious Weeds and Pesticides

- Operators will develop a plan for control of noxious weeds and invasive species, which could occur as a result of new surface disturbance activities at the site. The most recent recommendations at the state and local level should be incorporated into any operating plan for the geothermal exploration and development. The plan will address monitoring, education of personnel on weed identification, the manner in which weeds spread, and methods for treating infestations. The use of certified weed-free mulching will be required. If trucks and construction equipment are arriving from locations with known invasive vegetation problems, a controlled inspection and cleaning area will be established to visually inspect construction equipment arriving at the project area and to remove

BLM_0009569

and collect seeds that may be adhering to tires and other equipment surfaces.

- If pesticides are used on the site, an integrated pest management plan will be developed to ensure that applications would be conducted within the framework of all Federal, State, and local laws and regulations and entail only the use of EPA-registered pesticides.

### B.2.10 Vegetation and Fish and Wildlife

- The operator will prepare a habitat restoration plan to avoid (if possible), minimize, or mitigate negative impacts on vulnerable wildlife while maintaining or enhancing habitat values for other species. The plan will identify revegetation, soil stabilization, and erosion reduction measures that will be implemented to ensure that all temporary use areas are restored. The plan will require that restoration occur as soon as possible after completion of activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

## B.3    CONSTRUCTION

### B.3.1   Traffic Management

- Traffic will be restricted to the roads developed for the project. Use of other unimproved roads will be restricted to emergency situations.

- Signs will be placed along roads to identify speed limits, travel restrictions, and other standard traffic control information. Signs directing vehicles to alternative park access and parking will be posted in the event construction temporarily obstructs recreational parking areas near trailheads. Whenever active work is being performed, the area will be posted with "construction ahead" signs on any adjacent access roads or trails that might be affected.

- Project personnel and contractors will be instructed and required to adhere to speed limits commensurate with road types, traffic volumes, vehicle types, and site-specific conditions, to ensure safe and efficient traffic flow and to reduce wildlife collisions and disturbance and fugitive dust.

- When practical, construction activities will be avoided during high recreational use periods.

### B.3.2   Roads & Pads

- The operator will obtain agency authorization prior to borrowing soil or rock material from agency lands.

BLM_0009570

- Road use will be restricted during the wet season if road surfacing is not adequate to prevent soil displacement, rutting, etc., and resultant stream sedimentation.

- Access roads and on-site roads will be surfaced with aggregate materials where necessary to provide a stable road surface, support anticipated traffic, reduce fugitive dust, and prevent erosion.

- Dust abatement techniques will be used before and during surface clearing, excavation, or blasting activities. Dust abatement techniques will be used on unpaved, unvegetated surfaces to minimize fugitive dust. Speed limits (e.g., 25 mph [40 kph]) will be posted and enforced to reduce fugitive dust. Construction materials and stockpiled soils will be covered if they are a source of fugitive dust.

- Culvert outlets will be rip-rapped to dissipate water energy at the outlet and reduce erosion. Catch basins, roadway ditches, and culverts will be cleaned and maintained regularly.

### B.3.3  Pipelines

- Pipelines constructed above ground due to thermal gradient induced expansion and contraction will rest on cradles above ground level, allowing small animals to pass underneath. Projects should be analyzed to ensure adequate passage for all wildlife species. The pipeline will be raised higher to allow wildlife passage where needed. Because pipeline corridors through certain habitat types can alter local predator-prey dynamics by providing predators with lines of sight and travel corridors, large projects should be analyzed to ensure there will be no significant changes to predator-prey balance.

### B.3.4  Utilities

- Underground utilities will be installed to minimize the amount of open trenches at any given time, keeping trenching and backfilling crews close together. Avoid leaving trenches open overnight. Where trenches cannot be back-filled immediately, escape ramps should be constructed at least every 100 feet.

## B.4    SPECIFIC RESOURCES

### B.4.1  Cultural and Paleontological Resources

- Unexpected discovery of cultural or paleontological resources during construction will be brought to the attention of the responsible BLM authorized officer immediately. Work will be

halted in the vicinity of the find to avoid further disturbance to the resources while they are being evaluated and appropriate mitigation measures are being developed.

## B.4.2   Noise

- The operator will take measurements to assess the existing background noise levels at a given site and compare them with the anticipated noise levels associated with the proposed project.

- Within [2] miles of existing, occupied residences, geothermal well drilling or major facility construction operations will be restricted to non-sleeping hours (7:00 am to 10:00 pm).

- All equipment will have sound-control devices no less effective than those provided on the original equipment. All construction equipment used will be adequately muffled and maintained.

- All stationary construction equipment (i.e., compressors and generators) will be located as far as practicable from nearby residences.

- If blasting or other noisy activities are required during the construction period, nearby residents will be notified by the operator at least 1 hour in advance.

- Explosives will be used only within specified times and at specified distances from sensitive wildlife or streams and lakes, as established by the federal and state agencies.

## B.4.3   Noxious Weeds and Pesticides

- The use of certified, weed-free mulch will be required when stabilizing areas of disturbed soil.

- If trucks and construction equipment are arriving from locations with known invasive vegetation problems, a controlled inspection and cleaning area will be established to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

- Fill materials and road surfacing materials that originate from areas with known invasive vegetation problems will not be used.

- Revegetation, habitat restoration and weed control activities will be initiated as soon as possible after construction activities are completed.

- Use of pesticides must be approved by the agency. Pesticide use will be limited agency approved pesticides and will only be applied in

BLM_0009572

accordance with label and application permit directions and stipulations for terrestrial and aquatic applications.

### B.4.4   Waste Management

- All refueling will occur in a designated fueling area that includes a temporary berm to limit the spread of any spill.

- Drip pans will be used during refueling to contain accidental releases.

- Drip pans will be used under fuel pump and valve mechanisms of any bulk fueling vehicles parked at the construction site.

- Any containers used to collect liquids will be enclosed or screened to prevent access to contaminants by wildlife, livestock, and migratory birds.

- Spills will be immediately addressed per the spill management plan, and soil cleanup and removal initiated as soon as feasible.

### B.4.5   Wild Horses and Burros

- The operator will ensure employees, contractors, and site visitors avoid harassment and disturbance of wild horses and burros, especially during reproductive (e.g., breeding and birthing) seasons. In addition, any pets will be controlled to avoid harassment and disturbance of wild horses and burros.

- Observations of potential problems regarding wild horses or burros, including animal mortality, will be immediately reported to the agency.

### B.4.6   Wildlife

- The operator will ensure that employees, contractors, and site visitors avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, pets will be controlled or excluded to avoid harassment and disturbance of wildlife.

- Ponds, tanks and impoundments (including but not limited to drill pits) containing liquids can present hazards to wildlife. Any liquids contaminated by substances which may be harmful due to toxicity, or fouling of the fur or feathers (detergents, oils), should be excluded from wildlife access by fencing, netting or covering at all times when not in active use. Liquids at excessive temperature should likewise be excluded. If exclusion is not feasible, such as a large pond, a hazing program based on radar or visual detection, in conjunction with formal monitoring, should be implemented. Clean

BLM_0009573

water impoundments can also present a trapping hazard if they are steep-sided or lined with smooth material. All pits, ponds and tanks should have escape ramps functional at any reasonably anticipated water level, down to almost empty. Escape ramps can take various forms depending on the configuration of the impoundment. Earthen pits may be constructed with one side sloped 3:1 or greater lined ponds can use textured material; straight-sided tanks can be fitted with expanded metal escape ladders.

## B.5   OPERATIONS/UTILIZATION

- "Good housekeeping" procedures will be developed by the operator to ensure that during all phases of exploration and operation the site will be kept clean of noxious weeds, debris, litter, garbage, fugitive trash or waste, and graffiti. Scrap heaps and dumps are prohibited. Storage yards are to be minimized to that which is absolutely necessary.

## B.6   RECLAMATION

The following objectives, performance standards, and recommended reclamation BMPs and mitigation measures are based on the standards and guidelines found in the BLM and Forest Service Gold Book, 4th Edition, updated in 2007.

[ ] Indicates site-specific values to be filled in by the authorized officer.

### B.6.1   Reclamation Objectives

- The objective of <u>interim reclamation</u> is to restore vegetative cover and a portion of the landform sufficient to maintain healthy, biologically active topsoil; control erosion; and minimize habitat, visual, and forage loss during the life of the well or facilities.

- The long-term objective of <u>final reclamation</u> is to return the land to a condition approximating that which existed prior to disturbance. This includes restoration of the landform and natural vegetative community, hydrologic systems, visual resources, and wildlife habitats. To ensure that the long-term objective will be reached through human and natural processes, actions will be taken to ensure standards are met for site stability, visual quality, hydrological functioning, and vegetative productivity.

### B.6.2   Reclamation Performance Standards

The following reclamation performance standards will be met:

BLM_0009574

*Interim Reclamation*

Includes disturbed areas that may be redisturbed during operations and will be redisturbed at final reclamation to achieve restoration of the original landform and a natural vegetative community.

- Disturbed areas not needed for active, long-term production operations or vehicle travel have been recontoured, protected from erosion, and revegetated with a self-sustaining, vigorous, diverse, native (or as otherwise approved) plant community sufficient to minimize visual impacts, provide forage, stabilize soils, and impede the invasion of noxious, invasive, and non-native weeds.

*Final Reclamation*

Includes disturbed areas where the original landform and a natural vegetative community have been restored.

- The original landform has been restored for all disturbed areas including well pads, production facilities, roads, pipelines, and utility corridors.

- General: A self-sustaining, vigorous, diverse, native (or otherwise approved) plant community is established on the site, with a density sufficient to control erosion and invasion by non-native plants and to reestablish wildlife habitat or forage production. At a minimum, the established plant community will consist of species included in the seed mix and/or desirable species occurring in the surrounding natural vegetation.

- Specific: No single species will account for more than [30]% total vegetative composition unless it is evident at higher levels in the adjacent landscape. Permanent vegetative cover will be determined successful when the basal cover of desirable perennial species is at least [80]% of the basal cover on adjacent or nearby undisturbed areas where vegetation is in a healthy condition; or [80]% of the potential basal cover as defined in the National Resource Conservation Service Ecological Site(s) for the area. Plants must be resilient as evidenced by well-developed root systems and flowers. [Shrubs, will be well established and in a "young" age class at a minimum (therefore, not comprised mainly of seedlings that may not survive until the following year).]

- In agricultural areas, irrigation systems and soil conditions are reestablished in such a way as to ensure successful cultivation and harvesting of crops.

- Erosion features are equal to or less than surrounding area and erosion control is sufficient so that water naturally infiltrates into

BLM_0009575

the soil and gullying, headcutting, slumping, and deep or excessive rills (greater than 3 inches) are not observed.

- The site is free of State- or county-listed noxious weeds, oil field debris and equipment, and contaminated soil. Invasive and non-native weeds are controlled.

### B.6.3   Reclamation Actions

- During initial well pad, production facility, road, pipeline, and utility corridor construction and prior to completion of the final well on the well pad, pre-interim reclamation stormwater management actions will be taken to ensure disturbed areas are quickly stabilized to control surface water flow and to protect both the disturbed and adjacent areas from erosion and siltation. This may involve construction and maintenance of temporary silt ponds, silt fences, berms, ditches, and mulching.

- When the last well on the pad has been completed, some portions of the well location will undergo interim reclamation and some portions of the well pad will usually undergo final reclamation. Most well locations will have limited areas of bare ground, such as a small area around production facilities or the surface of a rocked road. Other areas will have interim reclamation where workover rigs and fracturing tanks may need a level area to set up in the future. Some areas will undergo final reclamation where portions of the well pad will no longer be needed for production operations and can be recontoured to restore the original landform.

- The following minimum reclamation actions will be taken to ensure that the reclamation objectives and standards are met. It may be necessary to take additional reclamation actions beyond the minimum in order to achieve the Reclamation Standards.

### B.6.4   Reclamation - General

*Procedure:*
- The agency will be notified 24 hours prior to commencement of any reclamation operations.

*Housekeeping:*
- Immediately upon well completion, the well location and surrounding areas(s) will be cleared of, and maintained free of, all debris, materials, trash, and equipment not required for production.

- No hazardous substances, trash, or litter will be buried or placed in pits. Upon well completion, any hydrocarbons in the pit will be remediated or removed.

BLM_0009576

*Vegetation Clearing:*
- Vegetation removal and the degree of surface disturbance will be minimized wherever possible.

- *[Example of site-specific requirement*: During vegetation clearing activities, trees and woody vegetation removed from the well pad and access road will be moved aside prior to any soil disturbing activities. Care will be taken to avoid mixing soil with the trees and woody vegetation. Trees left for wood gathering will be cut [twelve inches or less from the ground], delimbed, and the trunks, six (6) inches or more in diameter will be removed and placed either by the uphill side of the access road, or moved to the end of the road, or to a road junction for easy access for wood gatherers and to reduce vehicle traffic on the well pad. Trees with a trunk diameter less than six (6) inches and woody vegetation will be used to trap sediment, slow runoff, or scattered on reclaimed areas to stabilize slopes, control erosion, and improve visual resources.]

*Topsoil Management:*
- Operations will disturb the minimum amount of surface area necessary to conduct safe and efficient operations. When possible, equipment will be stored and operated on top of vegetated ground to minimize surface disturbance.

- In areas to be heavily disturbed, the top [eight (8)] inches of soil material, will be stripped and stockpiled around the perimeter of the well location to control run-on and run-off, and to make redistribution of topsoil more efficient during interim reclamation. Stockpiled topsoil may include vegetative material. Topsoil will be clearly segregated and stored separately from subsoils.

- Earthwork for interim and final reclamation will be completed within 6 months of well completion or plugging unless a delay is approved in writing by the BLM authorized officer.

- Salvaging and spreading topsoil will not be performed when the ground or topsoil is frozen or too wet to adequately support construction equipment. If such equipment creates ruts in excess of four (4) inches deep, the soil will be deemed too wet.

- No major depressions will be left that would trap water and cause ponding.

*Seeding:*
- <u>Seedbed Preparation</u>. Initial seedbed preparation will consist of recontouring to the appropriate interim or final reclamation standard. All compacted areas to be seeded will be ripped to a minimum depth of 18 inches with a minimum furrow spacing of 2

BLM_0009577

feet, followed by recontouring the surface and then evenly spreading the stockpiled topsoil. Prior to seeding, the seedbed will be scarified and left with a rough surface.

If broadcast seeding is to be used and is delayed, final seedbed preparation will consist of contour cultivating to a depth of 4 to 6 inches within 24 hours prior to seeding, dozer tracking, or other imprinting in order to loosen up the soil and create seed germination micro-sites.

- <u>Seed Application</u>. Seeding will be conducted no more than 24 hours following completion of final seedbed preparation. A certified weed-free seed mix designed by BLM to meet reclamation standards will be used.

  No seeding will occur from [May 15 to September 15]. Fall seeding is preferred and will be conducted after [September 15] and prior to ground freezing. [Shrub species will be seeded separately and will be seeded during the winter.] Spring seeding will be conducted after the frost leaves the ground and no later than [May 15].

**Erosion Control and Mulching:**
- Mulch, silt fencing, waddles, hay bales, and other erosion control devices will be used on areas at risk of soil movement from wind and water erosion.

- Mulch will be used if necessary to control erosion, create vegetation micro-sites, and retain soil moisture and may include hay, small-grain straw, wood fiber, live mulch, cotton, jute, or synthetic netting. Mulch will be free from mold, fungi, and certified free of noxious or invasive weed seeds.

- If straw mulch is used, it will contain fibers long enough to facilitate crimping and provide the greatest cover.

**Pit Closure:**
- Reserve pits will be closed and backfilled within **sixty (60)** days of release of the rig. All reserve pits remaining open after **sixty (60)** days will require written authorization of the authorized officer. Immediately upon well completion, any hydrocarbons or trash in the pit will be removed. Pits will be allowed to dry, be pumped dry, or solidified in-situ prior to backfilling.

- Following completion activities, pit liners will be completely removed or removed down to the solids level and disposed of at an approved landfill, or treated to prevent their reemergence to the surface and interference with long-term successful revegetation. If it was necessary to line the pit with a synthetic liner, the pit will not

BLM_0009578

be trenched (cut) or filled (squeezed) while containing fluids. When dry, the pit will be backfilled with a minimum of 5 feet of soil material. In relatively flat areas the pit area will be slightly mounded above the surrounding grade to allow for settling and to promote surface drainage away from the backfilled pit.

***Management of Invasive, Noxious, and Non-Native Species:***

- All reclamation equipment will be cleaned prior to use to reduce the potential for introduction of noxious weeds or other undesirable non-native species.

- An intensive weed monitoring and control program will be implemented prior to site preparation for planting and will continue until interim or final reclamation is approved by the authorized officer.

- Monitoring will be conducted at least annually during the growing season to determine the presence of any invasive, noxious, and non-native species. Invasive, noxious, and non-native species that have been identified during monitoring will be promptly treated and controlled. A Pesticide Use Proposal will be submitted to the BLM for approval prior to the use of herbicides.

## B.6.5   Interim Reclamation Procedures - Additional

***Recontouring:***

- Interim reclamation actions will be completed no later than 6 months from when the final well on the location has been completed, weather permitting. The portions of the cleared well site not needed for active operational and safety purposes will be recontoured to the original contour if feasible, or if not feasible, to an interim contour that blends with the surrounding topography as much as possible. Sufficient semi-level area will remain for setup of a workover rig and to park equipment. In some cases, rig anchors may need to be pulled and reset after recontouring to allow for maximum interim reclamation.

- If the well is a producer, the interim cut and fill slopes prior to re-seeding will not be steeper than a 3:1 ratio, unless the adjacent native topography is steeper. Note: Constructed slopes may be much steeper during drilling, but will be recontoured to the above ratios during interim reclamation.

- Roads and well production equipment will be placed on location so as to permit maximum interim reclamation of disturbed areas. If equipment is found to interfere with the proper interim reclamation of disturbed areas, the equipment will be moved so proper recontouring and revegetation can occur.

BLM_0009579

***Application of Topsoil & Revegetation:***

- Topsoil will be evenly respread and aggressively revegetated over the entire disturbed area not needed for all-weather operations including road cuts & fills and to within a few feet of the production facilities, unless an all-weather, surfaced, access route or small "teardrop" turnaround is needed on the well pad.

- In order to inspect and operate the well or complete workover operations, it may be necessary to drive, park, and operate equipment on restored, interim vegetation within the previously disturbed area. Damage to soils and interim vegetation will be repaired and reclaimed following use. To prevent soil compaction, under some situations, such as the presence of moist, clay soils, the vegetation and topsoil will be removed prior to workover operations and restored and reclaimed following workover operations.

***Visual Resources Mitigation for Reclamation:***

- Trees, if present, and vegetation will be left along the edges of the pads whenever feasible to provide screening.

- To help mitigate the contrast of recontoured slopes, reclamation will include measures to feather cleared lines of vegetation and to save and redistribute cleared trees, debris, and rock over recontoured cut and fill slopes.

- To reduce the view of production facilities from visibility corridors and private residences, facilities will not be placed in visually exposed locations (such as ridgelines and hilltops).

- Production facilities will be clustered and placed away from cut slopes and fill slopes to allow the maximum recontouring of the cut and fill slopes.

- All long-term above ground structures will be painted [Covert Green] (from the "Standard Environmental Colors" chart) to blend with the natural color of the late summer landscape background.

## B.6.6   Final Reclamation Procedures - Additional

- Final reclamation actions will be completed within 6 months of well plugging, weather permitting.

- All disturbed areas, including roads, pipelines, pads, production facilities, and interim reclaimed areas will be recontoured to the contour existing prior to initial construction or a contour that blends indistinguishably with the surrounding landscape. Resalvaged topsoil will be respread evenly over the entire disturbed site to ensure successful revegetation. To help mitigate the contrast of

recontoured slopes, reclamation will include measures to feather cleared lines of vegetation and to save and redistribute cleared trees, woody debris, and large rocks over recontoured cut and fill slopes.

- Water breaks and terracing will only be installed when absolutely necessary to prevent erosion of fill material. Water breaks and terracing are not permanent features and will be removed and reseeded when the rest of the site is successfully revegetated and stabilized.

- If necessary to ensure timely revegetation, the pad will be fenced to BLM standards to exclude livestock grazing for the first two growing seasons or until seeded species become firmly established, whichever comes later. Fencing will meet standards found on page 18 of the BLM/FS Gold Book, 4th Edition, or will be fenced with operational electric fencing.

- Final abandonment of pipelines and flowlines will involve flushing and properly disposing of any fluids in the lines. All surface lines and any lines that are buried close to the surface that may become exposed in the foreseeable future due to water or wind erosion, soil movement, or anticipated subsequent use, must be removed. Deeply buried lines may remain in place unless otherwise directed by the authorized officer.

### B.6.7   Reclamation Monitoring and Final Abandonment Approval

- Reclaimed areas will be monitored annually. Actions will be taken to ensure that reclamation standards are met as quickly as reasonably practical.

- Reclamation monitoring will be documented in an annual reclamation report submitted to the authorized officer by [March 1]. The report will document compliance with all aspects of the reclamation objectives and standards, identify whether the reclamation objectives and standards are likely to be achieved in the near future without additional actions, and identify actions that have been or will be taken to meet the objectives and standards. The report will also include acreage figures for: Initial Disturbed Acres; Successful Interim Reclaimed Acres; Successful Final Reclaimed Acres. Annual reports will not be submitted for sites approved by the authorized officer in writing as having met interim or final reclamation standards. Monitoring and reporting continues annually until interim or final reclamation is approved. Any time 30% or more of a reclaimed area is redisturbed, monitoring will be reinitiated.

BLM_0009581

- The authorized officer will be informed when reclamation has been completed, appears to be successful, and the site is ready for final inspection.

BLM_0009582

# APPENDIX C
# Form 3200-24a: Offer to Lease and Lease for Geothermal Resources and Form 3203-1: Nomination of Lands for Competitive Geothermal Leasing

BLM_0009583

Print     Reset

Form 3200-24a
(September 2008)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**OFFER TO LEASE AND LEASE FOR GEOTHERMAL RESOURCES**
**(For New Leases Issued Under the Energy Policy Act of 2005 [August 5, 2005])**

Serial No.

The undersigned (see page 2) offers to lease all or any of the lands in item 2 that are available for lease pursuant to the Geothermal Steam Act of 1970, as amended (30 U.S.C. 1001-1025).

### READ INSTRUCTIONS BEFORE COMPLETING

| 1. Name | 1a. Street | |
|---|---|---|
| 1b. City | 1c. State | 1d. Zip Code |

2. Surface managing agency if other than BLM: _____  Unit/Project: _____

Legal description of land requested (segregate by public domain and acquired lands):  Enter T., R., Meridian, State and County

Total Acres Applied for _____

Percent U.S. interest _____

Amount remitted:   Processing Fee  $ _____     Rental Fee  $ _____     Total  $ _____

### DO NOT WRITE BELOW THIS LINE

3. Land included in lease:  Enter T., R., Meridian, State and County

Total Acres in Lease _____

Rental Retained  $ _____

In accordance with the above offer, or the previously submitted competitive bid, this lease is issued granting the exclusive right to drill for, extract, produce, remove, utilize, sell, and dispose of all the geothermal resources in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, for a primary term of 10 years and subsequent extensions thereof in accordance with 43 CFR subpart 3207. Rights granted are subject to: applicable laws; the terms, conditions, and attached stipulations of this lease; the Secretary of the Interior's regulations and formal orders in effect as of lease issuance; and, when not inconsistent with the provisions of this lease, regulations and formal orders hereafter promulgated.

Type of Lease:

☐ Competitive

☐ Noncompetitive

☐ Noncompetitive direct use (43 CFR subpart 3205)

Comments:

THE UNITED STATES OF AMERICA

BY _____

(Signing Official)

_____

(Printed Name)

_____

(Title)                              (Date)

EFFECTIVE DATE OF LEASE _____

Check if this is a converted lease  ☐

EFFECTIVE DATE OF LEASE CONVERSION _____

(Continued on page 2)

BLM_0009584

4. (a)  The undersigned certifies that:
   (1) The offeror is a citizen of the United States; an association of such citizens;  a municipality; or a corporation organized under the laws of the United States, any State or the District of Columbia; (2)  All parties holding an interest in the offer are in compliance with 43 CFR part 3200 and the authorizing Act; (3)  The offeror's chargeable interests, direct and indirect, do not exceed those allowed under the Act; and (4)  The offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.
   (b)  The undersigned agrees that signing this offer constitutes acceptance of this lease, including all terms, conditions and stipulations of which the offeror has been given notice.  The offeror further agrees that this offer cannot be withdrawn, either in whole or part, unless the withdrawal is received by the proper BLM State Office before this lease, or an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed on behalf of the United States.

This offer will be rejected and will afford the offeror no priority if it is not properly completed and executed in accordance with the regulations or if it is not accompanied by the required payments.  Title 18 U.S.C. § 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

| Duly executed this _____ day of _____, 20___. | | |
|---|---|---|
| | (Printed Name of Lessee or Attorney-in-fact) | (Signature of Lessee or Attorney-in-fact) |

## LEASE TERMS

Sec. 1. Rentals—Rentals must be paid to the proper office of the lessor in advance of each lease year. Annual rental rates per acre or fraction thereof, as applicable, are:
(a)  Noncompetitive lease (includes post-sale parcels not receiving bids, a direct use lease or a lease issued to a mining claimant): $1.00 for the first 10 years, thereafter $5.00; or
(b) Competitive lease: $2.00 for the first year; $3.00 for the second through tenth year; thereafter $5.00.
Annual rental is always due by the anniversary date of this lease (43 CFR 3211.13), regardless of whether the lease is in a unit or outside of a unit, in lease is in production or not, or royalties or direct use fees apply to the production.
Rental may only be credited toward royalty under 43 CFR 3211.15 and 30 CFR 218.303.  Rental may not be credited against direct use fees.  Failure to pay annual rental timely will result in late fees and will make the lease subject to termination in accordance with 43 CFR 3213.14.

Sec. 2. (a) Royalties—Royalties must be paid to the proper office of the lessor. Royalties are due on the last day of the month following the month of production. Royalties will be computed in accordance with applicable regulations and orders. Royalty rates for geothermal resources produced for the commercial generation of electricity but not sold in an arm's length transaction are: 1.75 percent for the first 10 years of production and 3.5 percent after the first 10 years.  The royalty rate is to be applied to the gross proceeds derived from the sale of electricity in accordance with 30 CFR part 206 subpart H.
The royalty rate for byproducts derived from geothermal resource production that are minerals specified in section 1 of the Mineral Leasing Act (MLA), as amended (30 U.S.C. 181), is 5 percent, except for sodium compounds, produced between September 29, 2006 and September 29, 2011 (Pub. L. No. 109-338, §102; note to 30 U.S.C. 362) for which the royalty rate is 2 percent.  No royalty is due on byproducts that are not specified in 30 U.S.C. § 181.  (43 CFR 3211.19.)
If this lease or a portion thereof is committed to an approved communitization or unit agreement and the agreement contains a provision for allocation of production, royalties must be paid on the production allocated to this lease.
(b) Arm's length transactions—The royalty rate for geothermal resources sold by you or your affiliate at arm's length to a purchaser is 10 percent of the gross proceeds derived from the arm's-length sale (43 CFR 3211.17, 3211.18).
(c) Advanced royalties—In the absence of a suspension, if you cease production for more than one calendar month on a lease that is subject to royalties and that has achieved commercial production, your lease will remain in effect only if you make advanced royalty payments in accordance with 43 CFR 3212.15(a) and 30 CFR 218.305.
(d) Direct use fees—Direct use fees must be paid in lieu of royalties for geothermal resources that are utilized for commercial, residential, agricultural, or other energy needs other than the commercial production or generation of electricity, but not sold in an arm's length transaction (43 CFR 3211.18; 30 CFR 206.356).
This requirement applies to any direct use of federal geothermal resources (unless the resource is exempted as described in 30 CFR 202.351(b) or the lessee is covered by paragraph (e), below) and is not limited to direct use leases.  Direct use fees are due on the last day of the month following the month of production.
(e)  If the lessee is a State, tribal, or local government covered by 43 CFR 3211.18(a)(3) and 30 CFR 206.366, check here: ☐. A lessee under this paragraph is not subject to paragraph (d), above.  In lieu of royalties, the lessee under this paragraph must pay a nominal fee of
$_____.

Sec. 3. Bonds—A bond must be filed and maintained for lease operations as required by applicable regulations.

Sec. 4. Work requirements, rate of development, unitization, and drainage—Lessee must perform work requirements in accordance with applicable regulations (43 CFR 3207.11, 3207.12), and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production and to require lessee to commit to a communitization or unit agreement, within 30 days of notice, if in the public interest.  Lessee must drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in the amount determined by lessor.  Lessor will exempt lessee from work requirements only where the lease overlies a mining claim that has an approved plan of operations and where BLM determines that the development of the geothermal resource on the lease would interfere with the mining operation (43 CFR 3207.13).

Sec. 5. Documents, evidence, and inspection—Lessee must file with the proper office of the lessor, not later than (30) days after the effective date thereof, any contract or evidence of other arrangement for the sale, use, or disposal of geothermal resources, byproducts produced, or for the sale of electricity generated using geothermal resources produced from the lease. At such times and in such form as lessor may prescribe, lessee must furnish detailed statements and all documents showing (a) amounts and quality of all geothermal resources produced and used (either for commercial production or generation of electricity, or in a direct use operation) or sold; (b) proceeds derived therefrom or from the sale of electricity generated using such resources; (c) amounts that are unavoidably lost or reinjected before use, used to generate plant parasitic electricity (as defined in 30 CFR 206.351) or electricity for lease operations, or otherwise used for lease operations related to the commercial production or generation of electricity; and (d) amounts and quality of all byproducts produced and proceeds derived from the sale or disposition thereof. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest.
In a format and manner approved by lessor, lessee must  keep a daily drilling record, a log, and complete information on well surveys and tests; keep a record of subsurface investigations; and furnish copies to lessor when required.

Lessee must keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee must maintain copies of all contracts, sales agreements, accounting records, billing records, invoices, gross proceeds and payment data regarding the sale, disposition, or use of geothermal resources, byproducts produced, and the sale of electricity generated using resources produced from the lease, and all other information relevant to determining royalties or direct use fees. All such records must be maintained in lessor's accounting offices for future audit by lessor and produced upon request by lessor or lessor's authorized representative or agent. Lessee must maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

Sec. 6. Conduct of operations—Lessee must conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee must take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with leased rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses will be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee. Prior to disturbing the surface of the leased lands, lessee must contact lessor to be apprised of procedures to be followed in modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessor may require lessee to complete minor inventories or short term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee must immediately contact lessor. Lessee must cease any operations that are likely to affect or take such species, or result in the modification, damage or destruction of such habitats or objects.

Sec. 7. Production of byproducts—If the production, use, or conversion of geothermal resources from these leased lands is susceptible of producing a valuable byproduct or byproducts, including commercially demineralized water for beneficial uses in accordance with applicable State water laws, lessor may require substantial beneficial production or use thereof by lessee.

Sec. 8. Damages to property—Lessee must pay lessor for damage to lessor's improvements, and must save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity—Lessee must maintain a safe working environment in accordance with applicable regulations and standard industry practices, and take measures necessary to protect public health and safety. Lessee reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. Lessee must comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractor may maintain segregated facilities.

Sec. 10. Transfer of lease interests and relinquishment of lease—As required by regulations, lessee must file with lessor any assignment or other transfer of an interest in this lease. Subject to the requirements of 43 CFR subpart 3213, lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which will be effective as of the date BLM receives it, subject to the continued obligation of the lessee and surety to be responsible for:  paying all accrued rentals and royalties; plugging and abandoning all wells on the relinquished land; restoring and reclaiming the surface and other resources; and complying with 43 CFR 3204.0.

Sec. 11. Delivery of premises—At such time as all or portions of this lease are returned to lessor, lessee must place all wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells or continued protection of the environment.

Sec. 12. Proceedings in case of default—If lessee fails to comply with any provisions of this lease or other applicable requirements under 43 CFR 3200.4, and the noncompliance continues for 30 days after written notice thereof, this lease will be subject to termination in accordance with the Act and 43 CFR 3213. This provision will not be construed to prevent the exercise by lessor of any other legal and equitable remedy or action, including waiver of the default. Any such remedy, waiver, or action will not prevent later termination for the same default occurring at any other time. Whenever the lessee fails to comply in a timely manner with any of the provisions of the Act, this lease, the regulations, or other applicable requirements under 43 CFR 3200.4, and immediate action is required, the lessor may enter on the leased lands and take actions deemed necessary to correct the failure at the lessee's expense.

Sec. 13. Heirs and successors-in-interest—Each obligation of this lease will extend to and be binding upon, and every benefit hereof will inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

---

(Continued on page 3)

(Form 3200-24a, page 2)

BLM_0009585

**INSTRUCTIONS**

A. General

1. Items 1 and 2 need to be completed only by parties filing for a noncompetitive lease. The BLM will complete the front of the form for other types of leases. The BLM may use the "Comments" space under Item 3 to identify when: the lessee has elected to make all lease terms subject to the Energy Policy Act of 2005 under 43 CFR 3200.7(a)(2) or 43 CFR 3200.8(b) (box labeled "converted lease" must also be checked); the lease is being issued noncompetitively to a party who holds a mining claim on the same lands as is covered by the lease under 43 CFR 3204.12; the lease is a direct use lease issued to a State, local, or tribal government (box at section 2(e) under Lease Terms must also be checked); the lease is a competitive lease with direct-use-only stipulations attached; or other special circumstances exist. A lessee who seeks to convert only the royalty rate of a lease under 43 CFR 3212.25 or who qualifies for a case-by-case royalty rate determination under 43 CFR 3211.17(b)(1)(i) should not use this form, but should instead use an addendum to the existing lease.

2. Entries must be typed or printed plainly in ink. The offeror must sign the form (Item 4) in ink.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Specific

Item 1—Enter the offeror's name and billing address.

Item 2—Indicate the agency managing the surface use of the land and the name of the unit or project of which the land is a part. The offeror may also provide other information that will assist in establishing status of the lands. The description of land must conform to 43 CFR 3203.10. Total acres applied for must not exceed that allowed by regulations (43 CFR 3203.10; 43 CFR 3206.12).

Payments: For noncompetitive leases, the amount remitted must include the processing fee for noncompetitive lease applications (43 CFR 3204.10; 43 CFR 3000.12) and the first year's rental at the rate of $1 per acre or fraction thereof. If the United States owns only a fractional interest in the geothermal resources, you must pay a prorated rental under 43 CFR 3211.11(d). The BLM will retain the processing fee even if the offer is completely rejected or withdrawn. To maintain the offeror's priority, the offeror must submit rental sufficient to cover all the land requested. If the land requested includes lots or irregular quarter-quarter sections, the exact acreage of which is not known to the offeror, rental should be submitted on the assumption that each such lot or quarter-quarter section contains 40 acres. If the offer is withdrawn or rejected in whole or in part before a lease issues, the BLM will return the rental remitted for the parts withdrawn or rejected.

     The BLM will fill in the processing fee for competitive lease applications (43 CFR 3203.17; 43 CFR 3000.12) and the first year's rental at the rate of $2 per acre or fraction thereof.

Item 3—The BLM will complete this space.

**NOTICES**

The Privacy Act of 1974 and the regulation at 43 CFR 2.48(d) provide that you are furnished with the following information in connection with information required by this geothermal lease application.
AUTHORITY: 30 U.S.C. 1000 et seq.
PRINCIPAL PURPOSE—The information is to be used to process geothermal lease applications.
ROUTINE USES: (1) The adjudication of the lessee's rights to the land or resources. (2) Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources. (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting uses or rights in public lands or resources. (4) Transfer to the appropriate Federal, State, local, or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions.

(Form 3200-24a, page 3)

BLM_0009586

Appendix C. Form 3200-24: Offer to Lease and Lease for Geothermal Resources

Form 3203-1

(September  2008)

UNITED STATES

DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

**NOMINATION OF LANDS FOR COMPETITIVE GEOTHERMAL LEASING**

## *READ INSTRUCTIONS BEFORE COMPLETING*

| 1.  Name | 1a. Street | |
|---|---|---|
| 1b. City | 1c.  State | 1d.  Zip Code |

2.   Surface managing agency if other than BLM:_____Unit/Project:_____

Legal description of land requested (segregate by public domain and acquired lands):

| T. | R. | Section | Meridian | State | County |
|---|---|---|---|---|---|
| | | | | | |

| 3.  ☐   Check if this nomination is part of a block nomination.  Include supporting information (see instructions). | 3a.  Total Acres Nominated: _____ |
|---|---|

4.   Amount Remitted (43 CFR 3203.12):   Filing Fee:  $_____  + Acres x $0.10:  $_____ = Total:  $_____

5.   Nominated lands cannot be included in a lease sale until BLM confirms that leasing conforms to the land use plan and all National Environmental Policy Act requirements have been met.

_____          _____
_____

(Printed Name of Nominator or Attorney-in-Fact)          ( Signature of Nominator or Attorney-in-Fact)          (Date)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 2)

BLM_0009587

# INSTRUCTIONS

A.     **General**

1.     Entries must be typed or printed plainly in ink.  The nominator must sign the form (item 5) in ink.

2.     This offer must be filed in the proper BLM State Office serving the nominated lands.  See regulations at 43 CFR 1821.10 for office locations.

3.     Submit only one nomination per form.

4.     If more space is needed, additional sheets must be attached to each copy of the form submitted.

5.     Two or more nominations may be requested to be sold as a block (43 CFR 3203.11).  Check the box in Item 3.  Block nominations must include information to support your request and whether the lands requested will be identified with a project or unit.

B.     **Specific**

Item 1—Enter the nominator's name and billing address.

Item 2—Indicate the agency managing the surface use of the land and, for a block nomination, the name of the unit or project of which the land is a part. The nominator may also provide other information that will assist in establishing status of the lands being nominated.  The description of land must conform to 43 CFR 3203.10.  Each nomination may not exceed 5,120 acres, unless the area to be leased includes an irregular subdivision (43 CFR 3203.10).

Payments:  Each nomination must include a filling fee that is found in the fee schedule at 43 CFR 3000.12. If the total acreage nominated contains fractional acreage, the per-acre fee must be rounded up to the next whole acre.

BLM_0009588

## NOTICE

The Privacy Act of 1974 and the regulation at 43 CFR 2.48(d) provide that you be furnished with the following information in connection with information required by this geothermal lease nomination.

AUTHORITY:  30 U.S.C. 1000 et seq.

PRINCIPAL PURPOSE—The information is to be used to process geothermal lease nominations.

ROUTINE USES:  (1)  The adjudication of the nomination for leasing of geothermal resources.  (2) Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources.  (3)  Transfer to appropriate Federal agencies when concurrence is required prior to granting uses or rights in public lands or resources.  (4)  Transfer to the appropriate Federal, State, local, or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION—If all the information is not provided, the nomination may be rejected.  See regulations at 43 CFR Part 3200.

(Form 3203-1, Page 2)

BLM_0009589

Case No. 1:20-cv-02484-MSK   Document 28-10   filed 04/27/21   USDC Colorado   pg 209 of 253

*This Page Intentionally Left Blank*

BLM_0009590

Form 3060-1                                             Serial Number: COC-70704
(July 1984)
(formerly 3980-1)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**Mineral Potential Report for Withdrawal of Three Abandoned Uranium Mines:**

Cory Lode Mine[1] [(17.8 acres)], Pup Tent Mine[2] [(1.31 acres)], Mother Bat Lode Mine[3] [(3.25 acres)]

**Lands Involved**
New Mexico Principal Meridian
Metes and bounds parcels
NW¼, NW¼, Sec. 11, T. 47 N., R. 17 W., [1];
NW¼, NW¼, Sec. 4, T. 49 N., R. 17 W., [2];
SW¼, SE¼, Sec. 15, T. 43 N., R. 18 W.,[3]

Prepared By:

MARILYN D. WEGWEISER, PhD

_____  22 Nov 2008
(Signature)                (Date)
Geologist, Little Snake Field Office, Craig, Colorado


MATTHEW W. SHUMAKER, P.Geo.

_____  19 Nov 2008
(Signature)                (Date)
Geologist, CRME 028, BLM National Training Center, Executive Secretary,
BLM Mineral Examiner Certification Panel, Phoenix, Arizona


Technical Approval:
BURRETT W.CLAY

_____  Nov. 19, 2008
(Signature)                (Date)
Supervisory Geologist, CRME 001, BLM National Training Center, Chairman,
BLM Mineral Examiner Certification Panel, Phoenix, Arizona

BLM_0009591

Table of Sections Included

| Section title | Page number |
| --- | --- |

- Summary. ............................................................ 1

- Conclusions. ....................................................... 2

- Recommendations. ............................................. 3

- Lands Involved. .................................................. 6

  - Land Status and Record Data................................. 6

- Climate and Vegetation. ..................................... 6

- Physical Features and Access; From North to South. ......... 7

- Regional Geology and Physiographic Provinces. ............... 9

- Other Resources. .............................................. 15

- History of Mining, Milling and Related Operations. ........ 16

- Geology and Mineralization of the claims. ...................... 26

- Mineral Exploration and Development. ........................... 30

- Current Mineral Potential. ................................. 31

- Field Work. ....................................................... 32

- References. ....................................................... 36

BLM_0009592

## Summary

This mineral potential report, for the purpose of a lands withdrawal as per 43 U.S.C. 4317, the Federal Land Policy and Management Act (FLPMA), Sec. 204, (12) and 43 C. F. R. 2310.3-4 (2) (b) has been prepared in response to a request of the Dolores and Uncompahgre Colorado Field Offices of the Bureau of Land Management, (BLM), and the San Juan Public Lands Center located in Dolores, Colorado (a joint BLM and Forest Service office). Examination of the three claims involved in the withdrawal took place September 7th-13th, 2008. The mineral examination was conducted by Marilyn D. Wegweiser and Matthew W. Shumaker, BLM Geologists. Additional assistance was given by John E. Burghardt, Coordinator: NPS Abandoned Mine Lands and Mining Claim Validity Programs, Kirk Navo, Wildlife Biologist, Colorado Division of Wildlife, and Kristin Philbrook, USFS, San Juan Public Lands Center.

The direct costs of the examination  are  paid by the Dolores and Uncompahgre Field Offices of the Bureau of Land Management, (BLM), and the San Juan Public Lands Center located in Dolores (joint BLM and Forest service) using in part, funds provided by the Colorado State Office 1990 (Mining Law) program. Each field office involved has provided support in the form of information and maps of the area.

All the mining claims involved in this examination were located in 2005 by members of the Colorado Bat Society as a protective measure. These mining claims, therefore, probably do not represent mineral exploration interest in the parcels. The Cory Lode Mining Claim is located in the former San Miguel Mining District, in the State of Colorado. The Pup Tent Mine is located in the former Montrose Mining District, in the State of Colorado. The Mother Bat Lode Mining Claim is located in the former Dolores Mining District, in the State of Colorado. All of the mining claims were

located and named by recent locators in effort to prevent overstaking, and are not historically named. Locations of the areas of interest for this report are indicated on Figures 1.1, 1.2, and 1.3, which immediately follow the References section of this report.  .

## Conclusions

All of the mines within the proposed withdrawal are within the Uravan Mineral belt, which has been a major producer of radium, vanadium and uranium for more than 100 years. Production continues at the time of this report, with bona-fide proposals for opening new mines and mills, and with considerable new exploration activity.

The majority of production in the Uravan Mineral Belt came from the Salt Wash Member of the Morrison Formation.  The mines that we examined as a part of this project exploited mineralized zones within that stratigraphic unit. There has been minor production from the Chinle Formation, which is several hundred feet stratigraphically beneath the Morrison Formation. We were unable to locate the Chinle Formation in the vicinity of the three mines subject to examination, but Chinle Formation is known to exist at depth in the project area.

It cannot be said that there is no mineral potential or low mineral potential within the Uravan region. However, our examination showed that the mine adits requested for withdrawal had exploited irregular fluvial zones in the Salt Wash Member of the Morrison Formation and have been mined out. We cannot rule out mineral potential in Chinle Formation, several hundred feet stratigraphically beneath the mine adits.

If uranium mineralization in the Chinle Formation were to be eventually discovered in the vicinity of the parcels under investigation, mining methods would be based on the mode of mineral occurrence. We anticipate that mineral occurrences would be similar to those within the Morrison

Formation. The most likely mining methods, based on the state of knowledge in 2008, would probably be underground methods that follow fluvial zones. Surface mining is also possible, but the depth to the mineral zones would dictate a large stripping ratio, which would be expensive.

The withdrawals as proposed would prove to be an impediment to future mining, based on difficulty of locating the withdrawn zones underground, and would produce tiny islands, pinnacles or columns of unmined land within the mined area.  We suspect that surface mining that close to a critical bat residence would disturb the bats so badly that they would not remain.

## Recommendations

Approve the proposed withdrawals subject to the following recommendations.

1. The withdrawal proponents have carefully and commendably requested the tiniest possible land parcels that would meet the habit needs. Even so, that could permit potentially disturbing activity to take place very close to the adits. The metes and bounds descriptions of each parcel would likely require an on-the-ground cadastral survey to establish and mark their locations.  Instead we recommend withdrawal of each 40 acre aliquot part that contains each mine adit.  That could eliminate the need for a cadastral survey, in that the withdrawal could be noted on the master title and other plats by aliquot part. Additionally, the larger acreage would probably improve protection of habitat.

2. Withdraw only the portions of each parcel above the top of the Wingate Sandstone.[1] Taking into account variations in surface elevations, this is approximately the upper 600 topographic feet of each withdrawn parcel. Doing so would protect the mined-out adits

---

[1] We recognize that this is an unusual recommendation for land delineation in a locatable mineral action. However, using subsurface formations as references is common in oil and gas agreements. Using the top of the Wingate Sandstone as a reference level will be easily understandable and highly useful to any person or entity that may be interested in the mineral potential of the vicinity.

needed for bat habitat, but would also permit discovery and utilization of uranium resources that may be located in the Chinle Formation, which is located far beneath the adits. This would place the withdrawals above the Wingate Sandstone, which is a rock unit makes a stable roof or "back"[2] for underground mining operations. Underground mining operations at that depth below the adits are not likely to interfere with bat usage.

---

[2] In hardrock underground mining terminology, the roof of an underground working is called the "back."

BLM_0009596

## Lands Involved

### Land Status and Record Data:

The lands involved in the Cory Lode Claim, as surveyed by the BLM, are located on public lands in Montrose County, Colorado, and are in the NW¼ NW¼, Sec. 11, T. 47 N., R. 17 W. The lands involved in the Pup Tent Mining Claim, as surveyed by the BLM, are located on public lands in Mesa County, Colorado, and are in the NW¼ NW¼, Sec. 4, T. 49 N., R. 17 W. The lands involved in the Mother Bat Lode Mining Claim are located on public lands in San Miguel , Colorado, and are in the SW¼ SE¼, Sec. 15, T. 43 N., R. 18 W.  Records in LR2000 indicate no encumbrances on the parcels. The mining claims were located in 2005 by members of the Colorado Bat Society in an effort to protect the adits from location of new mining claims. All the mining claim names were coined by the locators in 2005 and have no historical significance. This report does not investigate the advisability or legality of such protective mining claims. We anticipate that the locators will relinquish the mining claims when necessary to enable the withdrawal, if approved. The lands that the claims are located upon are surrounded by remote access public lands[3]. There is no electrical power under a 3 mile radius nearby to any of the three claims.

## Climate and Vegetation

The three parcels lie primarily within pinyon-juniper woodland vegetation. Pinyon-pine and juniper woodlands are widespread on the Colorado Plateau between about 5000 feet to 7000 feet in elevation. Colorado pinyon pine (*Pinus edulis*) is the most common pine species in this woodland type, and Utah juniper (*Juniperus osteosperma*) is the most common juniper. One-seed (*J.*

---

[3] Lands that are accessible only by foot trails, and by occasional two-track roads.

BLM_0009597

*monosperma*), Rocky Mountain (*J. scopulorum*), and alligator (*J. deppeana*) junipers can be abundant in different areas of the Plateau[4].

Annual precipitation is typically from 10 to about 15 inches in pinyon-juniper woodlands. Temperatures in the region have ranged from a maximum low of -20 Fahrenheit to a maximum high of 110 Fahrenheit.

## Physical Features and Access; from North to South

Access to the three mines will be discussed using Naturita, Colorado as the starting point. Naturita was chosen at headquarters for the field examinations due to its central location with respect to all three mines.



Mesa County

Courtesy Colorado Planning Division

Figure 2. Mesa County locality taken from Del Rio, 1960. Mesa County has an area of 3,334 square miles and has an elevation gradient of 10,000' to 4,360 feet above sea-level. (Del Rio, 1960).

The Pup Tent Mine is in Mesa County. To access the Pup Tent Mine, proceed North on Highway 141 to Dolores Canyon, turn NE (or right) on "P12 Rd", proceed on "P12 Rd" until the two-track marked "28.00 Rd" is reached. Turn NW (left) away from 28.00 Rd., and proceed up the hill on the two-track. The mine entrances are located on the NE side of the two-track. The Pup Tent Mine is inaccessible due to the bat gates being permanently welded shut at all openings to the mine.

---

[4] http://cpluhna.nau.edu/Biota/pinyon-juniper.htm

COC_70704; Bat Mine Withdrawal



Figure 3. Montrose County locality taken from Del Rio, 1960. Montrose County is located in the plateau region of southwestern Colorado. It borders on Utah. Montrose County encompasses the uranium containing region between the Pup Tent Mine, and the Cory Lode and Mother Bat Lode Mines. Montrose County has an area of 2, 240 square miles ranging in elevation from 9,600' to 5,150'above sea-level (Del Rio, 1960).

Access to the Cory Lode Mine, in Montrose County, is by leaving Naturita, Colorado and proceeding South on Highway 141 to W19 Rd., turn Southwest (left) on to W19 Rd., and proceed until you reach the mine site.



Figure 4. San Miguel County locality taken from Del Rio, 1960. San Miguel County has an area of 1,284 square miles, and an elevation ranging from 13,900' to 5,000' above sea-level. From 1946-1958, it was one of the most important producers of precious and base metals in the state (Del Rio, 1960). The Cory Lode and the Mother Bat Lode mines are in San Miguel County.

Access to the Mother Bat Lode Mine, in San Miguel County, is by heading in a southerly direction on Hwy 141. When in Disappointment Valley turn left onto county road 16R. Travel 2.3 miles and make a right when the 16R road forks. Travel another approximately 32 miles west to the second junction. At this junction, turn right and continue traveling 2.5 miles until the road intersects. At this intersection, turn left (heading S) and travel about 1.2 to 1.3 miles (veering to the right at the Y intersection). Continue on the N14 road (which heads to the west) for 1.06 miles. At this point, walk approximately .38 miles down the road on the slope toward the river to the mine. The mines are on the cliff to the left of and above you.

BLM_0009599

COC_70704; Bat Mine Withdrawal

8

## Regional Geology and Physiographic Provinces

All three claim sites lie within the Colorado Plateau Province of the United States. The Colorado Plateau Uranium Province was first formally described in 1985 (Granger and Finch, 1988) and later described with more emphasis on tectonics (Finch, 1991). The southwestern portion of the county contains part of the Uravan Mineral Belt (Figure 5).



Figure 5. Location map of western states uranium deposits, including the Salt Wash roll front ores deposited in the Uravan Mineral Belt (Guilbert and Park, 1986)

There are 310 known uranium clusters in the Colorado Plateau Uranium Province (Plate 1). The boundaries of the province are drawn on changes in regional structures that bound the Colorado Plateaus physiographic province. The northwest trending front of the Uncompahgre Uplift lies about 20 miles to the northeast (Gerlitz, et al., 1988) of the proposed land withdrawal area. These structures expose older sedimentary and Precambrian metamorphic rocks outside the stable plateau block and were in part coeval with widespread Tertiary volcanic activity. The Colorado Plateau Uranium

Province is bounded on the east by the Laramide Rocky Mountain deformational structures that contrast markedly with the flat-lying formations of the stable Colorado Plateau craton. It is bounded on the north for the most part by the Precambrian Uinta uplift. The western boundary is drawn along the thrust faults and related monoclinal folds and normal faults that define the Basin and Range province. The southern boundary with the Basin and Range is more subtle and broadly defined, especially along the Mogollon Rim (modified from Finch, 1996).

The sources of the uranium for the tabular sandstone are thought to have been various volcanic arcs to the west and south at the edge of the North American plate, which provided silicic ash for the thick fine-grained units lying above the major Triassic and Jurassic host sandstone layers (Finch, 1996). The uranium in sandstone beds were most likely precipitated by reduction between uranium-bearing ground water and underlying saline brine (Finch, 1996). Deposits of uranium and vanadium generally parallel the attitude of the enclosing rock (Wright and Everhart, 1960).

All three claims involved in this mineral potential examination occur in the Salt Wash Member of the Morrison Formation (Figures 6, 7 and 8). The Salt Wash Member of the Morrison Formation was age dated by Marvin and Dobson in 1979, to determine the ages of the source rock of the sandstone. The age indicated by the samples does not indicate the age of sandstone (Jurassic) but is a composite age inherited from source rocks for the zircon contained within the sandstone (Marvin and Dobson, 1979). Age dates were derived from three samples taken from the Slick Rock district, San Miguel Co, Colorado in Paradox basin. According to Marvin and Dobson (1979) all samples were taken from unaltered sandstone in the Salt Wash Member of Morrison Formation.  The samples were age dated by Pb-alpha method (on zircon). The first sample, taken in the vicinity of 38 deg 00 min 30 sec N, 108 deg 52 min 20 sec W, (T. 43 N., R. 18 W., Section 8) in Hamm Canyon quad, dated as 715 +/-80 m.y.; The second sample, taken in the vicinity 38 deg 03 min 10 sec N, 108 deg 54 min W (T. 44 N., R. 18 W., Section 30), Veta Mad Mine area, Horse Range Mesa quad, dated as 555 +/-60 m.y.; and

BLM_0009601

the third sample, taken in the vicinity 38 deg 04 min 05 sec N, 108 deg 55 min 40 sec W (T. 44 N., R. 19 W., Section 14), Cougar Canyon area, Horse Range Mesa quad, dated as 630 +/-70 m.y.

A composite generic stratigraphic column has been generated for the land withdrawal area, showing the vertical relationships of the most frequently seen strata (Figure 6). The current standard geologic time chart is found in Appendix 1. In ascending order, the strata in the area of the proposed withdrawals are the Chinle Formation, the Wingate Sandstone, the Kayenta Formation, the Entrada Formation, the Wanakah Formation, and the Morrison Formation (Figure 6).

The Upper Triassic Chinle Formation is exposed in a few areas in the proposed withdrawal area. Chinle is not exposed within the small parcels requested for withdrawal. The Chinle consists of interbedded orange-red siltstone, fine grained sandstone, and shale. Some green to gray-green beds occur near the top of the Chinle just below the contact with the Wingate sandstone. It forms a sharp, uncomformable contact with the overlying Wingate sandstone.

The Wingate Sandstone (Figures 6 and 7) (Upper Triassic) is a reddish-brown to grayish-orange fine grained, massive, cross-bedded sandstone that forms sheer cliffs cut by vertical joints. Some of the cliffs are as much as 300 feet high (Gerlitz, et al., 1988).

The Upper Triassic(?)[5] Kayenta Formation (Figures 7 and 8) conformably overlies the Wingate Sandstone (Figures 6, 7, and 8). It consists of predominantly red, buff and grey thin-bedded flaggy fine-to-coarse grained sandstone interbedded with siltstone and some conglomerate. It forms benches and ledges above the Wingate sandstone.

The Triassic Navajo Sandstone was not observed in the proposed land withdrawal area. It is reported to conformably overlie the Kayenta Formation, in the southern end of the Dolores Canyon Wilderness Study Area (Gerlitz, et al., 1988).

---

[5]  Unless otherwise stated in the text or in a footnote, the use of the query symbol (?) in this document indicates that final identification of the feature, usually a mineral name or portion of a geological formation, has not been precisely made.

COC_70704; Bat Mine Withdrawal

The Middle Jurassic Entrada Sandstone is composed of two units in the study area (Gerlitz, et al., 1988). The lower unit is the Dewey Bridge member and consists of nonresistant red siltstone and sandstone. The Slick Rock member is orange, buff, and white, fine-to-medium grained, massive, cross-bedded sandstone forming cliffs ranging from 110-150 ft thick. The white "top" of the Slick Rock Member forms a distinctive regional marker bed that is easily visible and identifiable (Figures 6, 7, 8, and 9).

The Middle Jurassic Wanakah Formation conformably overlies the Entrada Sandstone (Griggs and Read, 1959; Hansen, 1968) (Figures 6, 7, 8, and 9). It consists of red, gray, green, and brown sandy shale and mudstone. It is slope-forming unit interbedded with thin limestone and sandstone (Gerlitz, et al., 1988)

The Upper Jurassic Morrison Formation unconformably overlies the Wanakah Formation (Figures 6, 7, 8, and 9). It is divided in to three members that form a series of slopes and ledges. The lowermost Tidwell Member consists of reddish-brown and grey mudstone with minor gray sandstone and limestone, interfingered with minor gray sandstone and mudstone of the overlying Salt Wash Member. The fossiliferous Brushy Basin Member consists of gray, green, red, and purple bentonitic mudstone interbedded with fluvial sandstone and conglomerate.

The Morrison Formation occurs as the top of mesas and ridges in the vicinity of all three mining claims.

BLM_0009603

COC_70704; Bat Mine Withdrawal



Figure 6. A composite generic stratigraphic column for the land withdrawal area.

COC_70704; Bat Mine Withdrawal



Figure 7. View of the Kayenta Fm., Entrada sandstone, Wanakah Fm, and Morrison Fm taken from the viewpoint overlooking the Hanging Flume (See Figure 10).



Figure 8. Stratigraphy of the study region, as seen from the Dolores River Canyon, September 2008.

BLM_0009605

COC_70704; Bat Mine Withdrawal



Figure 9. Stratigraphic view of the region in the vicinity of the Cory Lode Mine. The Salt Wash Member of the Morrison Formation forms the mesa tops.


## Other Resources

Eligible historic resources, many associated with mining, have been identified within the region of the mines intended for withdrawal. One example would be the Dolores River Canyon stretch containing the Hanging Flume (Figure 9 and Appendix 3.1, Learned, 1981), a site listed with the World's Monuments Fund as one of the Top 100 most endangered sites in the world[6]. The Hanging Flume was constructed in 1889-1890 as a means of conveying water to operate a hydraulic mine for placer gold near Paradox, Colorado. The mine was not successful.

---

[6] See http://www.aia.org/aiarchitect/thisweek05/tw0715/tw0715worldmonuments.htm.

COC_70704; Bat Mine Withdrawal



Figure 10. Remaining remnants of the Hanging Flume appear embedded in the Wingate sandstone, in the upper portion of this photograph. The Hanging Flume was a late 1880's engineering marvel.

## History of Mining, Milling, and Related Operations

Uranium mining in Colorado goes back to 1871when pitchblende ore (Uraninite, the black oxide mineral of uranium ($UO_2$))[7] was taken from the dump of the Wood Mine, near Central City (Wright and Everhart, 1960). The Uravan Mineral Belt (Figure 5) is an arcuate zone of uranium-vanadium deposits in San Miguel, Montrose, and Mesa counties, Colorado, and Grand County, Utah. It was the area most productive of uranium in the United States in the early 20th century. In Colorado, the mineral belt includes the Slick Rock, Gypsum Valley, Uravan and Gateway mining districts (Fischer and Hilpert, 1952).

The first occurrence of carnotite appears to have come from Roc Creek in 1898 by Gordon Kimball, who mined 10 tons, and packed the ore 12 miles by burro to Paradox Valley (see the text of

---

[7] Strictly speaking, pitchblende is usually a $UO_3$ and $UO_2$ mineraloid of variable composition.

Appendix 3.2 for an interesting notation on packing burros). Kimball's ore assayed at 21.5% $U_3O_8$,

15% $V_2O_5$, and he received $2500.00 (in 1898 dollars) for the 10 tons.

This was the first discovery in what would become the highly productive Uravan Mining District

(Figure 5). It was not until 1899 this new mineral was named carnotite after the French mineralogist,

Adolphe Carnot. Uranium and vanadium out of a deposit at Roc Creek in Montrose County,

Colorado, was shipped to France, where M. M. C. Friedel and E. Cumenge identified the new mineral

that they named carnotite. Some of the carnotite from Roc Creek was sent to Marie and Pierre Curie

in Paris for their early investigations into the properties of uranium and radioactivity. The mineral

was mined for its vanadium, with uranium as a byproduct [8].

By 1913, half of the world's uranium had come from mines in San Miguel, Mesa, and Montrose

Counties, Colorado. Standard Chemical Company was the main producer, opening a radium mill in

1910, and moving it to Uravan in 1913 where it was known as the "Joe Junior Mill." There were at

least two  other mills in the vicinity: the National Radium Institute plant in Long park Colorado (circa

1915) and a mill located at saucer Basin (circa 1920) (Wright and Everhart, 1960).

Pitchblende was hand-picked from gold-silver ores in the Central City region during this time and

over 100,000 pounds of pitchblende was shipped from the region before 1917 (Wright and Everhart,

1960).

Although radium had been discovered in 1898, it had been derived from European pitchblende,

and the radium content of carnotite was not known. Carnotite was suspected to contain radium as

early as 1903, on the basis of the anomalously high radioactivity of carnotite ores (Fleck and

Haldane, 1909). But it was not until 1911 that the radium content of carnotite was confirmed by the

Marie Curie laboratory in Paris (Fleck and Haldane, 1913). Although no more than a trace of radium

was present in the ore, newly discovered medical applications had made radium worth $100 per

---

[8] See: http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

milligram, making the radium in the carnotite ore worth much more than the vanadium or uranium. Forstall (1913) reported that radium was worth $80/mg or $2,400,000.00/ounce, in 1913 dollars.[9] Montrose, Rio Blanco, San Miguel, Dolores, and Mesa counties, Colorado reportedly had the most easily treated carnotite ore in the world. Montrose County produced 95% of the ore produced in the state (Forstall, 1913).

Henry Ford's new Model T automobile caused the demand for vanadium to skyrocket beginning in 1909. When added to steel, vanadium makes the final product much stronger, and allows for lighter weight steel in thinner sections to meet the same specifications of much heavier steel without vanadium.

> *"The Model T is built entirely of the best materials obtainable. No car at $5000[10] has higher grade, for none better can be bought. Heat treated Ford Vanadium steel throughout; in axles, shafts, springs, gears-in fact a vanadium steel car-is one evidence of superiority. .. .. .. Nobody disputes that Vanadium steel is the finest automobile steel obtainable...We defy any man to break a Ford Vanadium steel shaft or spring or axle with any test less than 50% more rigid than would be required to put any other steel in the junk pile..."[11]*

Ford's utilization of vanadium came about literally by accident. The popular history version is that while at a race, Ford picked up a valve stem strip from a wrecked French race car, and recognized that it was made of something different and had it analyzed discovering that vanadium was the critical additive. A more prosaic version sometimes favored by historians is that Harold Wills picked up the idea from experts in the Pittsburgh steel industry who were watching the French[12]. In either case, use of vanadium in the Model T proved to make it stronger, and long lasting. At the time, few U.S. steel mills could produce vanadium steel, but that was soon to change.

---

[9]  That is roughly $49 million per ounce in 2007 dollars.

[10]  With the introduction of the 1909 Model T, Mr. Ford compared its features and quality to cars costing $5,000.

[11]  http://www.hfmgv.org/Exhibits/showroom/1908/lit.html

[12]http://books.google.com/books?id=J0y61r203cICC&pg=PA243&lpg=PA243&dq=model+t+vanadium+racing&sour cc=web&ots=Hhq7vAlORm&sig=JPc5ZCE1JU0KMAMJdngb707BVA&hl=en&sa=X&oi=book_result&resnum=1&ct= result

BLM_0009609

COC_70704; Bat Mine Withdrawal

Uranium ores in Colorado were not developed until the early 20th Century after the Curies announced the supposed beneficial uses of radium[13]. There were general guides ("rules") for finding uranium deposits during the uranium boom of the 1940s and 1950s (Wright and Everhart, 1960).

1. Most deposits occur where the Salt Wash Sandstone is more than 240 feet thick.

2. Most deposits occur where the Salt Wash Sandstone is about 50% sandstone and 50% mudstone.

3. Proportionally, there are more uranium deposits in the Uravan Belt, than in other areas.

4. More uranium bearing minerals occur in the upper salt Wash Sandstone.

5. Most occurrences are in sandstones that are 20-30 feet thick.

6. Tan, brown and gray sandstone is more likely to contain desirable mineral than red sandstone.

7. Scour and fill bedding is favorable for mineral deposition. This is typified by abrupt small-scale cross-bedding; thin, discontinuous mudstone layers; petrified wood; and conglomerate consisting of mudstone, pebbles and cobbles.

8. Greenish-grey mudstone frequently occurs immediately below mineral bearing sandstone. Sometimes this greenish-grey mudstone is less than 1-foot thick.

9. Abundant fossilized wood is favorable for mineral deposition. These are informally known as "hot logs."

Once carnotite was known to contain radium, prospectors rushed to the Colorado Plateau of southwest Colorado and adjacent southeast Utah, and found carnotite-bearing sandstones of the Jurassic Morrison Formation in Mesa, Montrose, and San Miguel counties in Colorado (see Figures 2, 3, and 4). The carnotite was at first shipped to Europe for processing, but by 1913, the Standard Chemical Company had built a radium processing plant in Montrose County that had become the world's largest supplier of radium.

---

[13] See:  http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

The U.S. Bureau of Mines reports the production of uranium in Mesa County (Figure 2) for 1956 at 561,754 pounds of $U_3O_8$ from 88,597 tons of ore produced from 106 operations, with an average grade of 0.32% $U_3O_8$.  During 1957 these figures were 704,784 pounds of $U_3O_8$ from 122,028 tons of ore produced from 109 operations, with an average grade of 0.29% $U_3O_8$. The county was a leading producer of vanadium-bearing uranium ores from 1946-1958 (Del Rio, 1960).  The Pup Tent Mine is within Mesa County.

From 1946-1958 Montrose County (Figure 3) led the state in Uranium ore production – for example in 1957 it accounted for 57% of Colorado's total output, and represented 97% of the value of the County's total mineral production. Between 1946-1958 Montrose County had a total precious and base metal production with a value of approximately $550,000 in 1960 US-dollars (Del Rio, 1960).  The Cory Lode Mine is within Montrose County.

San Miguel County (Figure 4) was the third ranking producer of uranium ores in Colorado from 1955-1958, with a total of 1,921,486 pounds of $U_3O_8$ being produced from a total of 69-140 operations, with a total dollar value for the time range of $8,002,449.00 in 1960 U.S. dollars. The Mother Bat Lode Mine is within San Miguel County.

Pure elemental uranium is a slightly radioactive metal, silvery white in color and dense (almost as dense as gold). Elemental uranium metal does not occur in nature because it readily combines with oxygen to form several uranium oxide minerals and compounds. The most significant property of uranium is that it is the "parent" element in a radioactive decay series that eventually leads to formation of a particular isotope of lead. Radioactive decay means that certain elements, such as uranium, will over a specific period of time, give off atomic particles—electrons, protons and neutrons—leading to changes in the atomic weight and number of the parent element. This decay is a natural constant in that half of a given amount of uranium- 238 ($^{238}$U—the 238 superscript refers to

the atomic weight of the atom)[14] will decay to lead in about 4.5 billion years. It does not decay directly to lead but passes through several daughter elements including thorium, radium, radon (a gas), and bismuth on its path to a stable isotope of lead. Uranium is found in nature in three main isotopes. $^{238}$U is the most common constituting about 99.3 percent of all natural uranium; $^{235}$U constitutes about 0.7 percent of all uranium; and other isotopes such as $^{234}$U form trace amounts. $^{235}$U is important because it is readily split as part of the fission process and in the process releases substantial energy. $^{235}$U is more radioactive than $^{238}$U because of its shorter half-life, about 700 million years, and as such, the ratio of $^{238}$U to $^{235}$U has changed over geological time. In the earth's distant past, there was a higher percentage of $^{235}$U than today.

The Uravan Mineral Belt (Figure 5) of Colorado and Utah supplied about half the world's radium from 1910 to 1922, and vanadium and uranium were byproducts. Prospectors realized that the carnotite ores of southwestern Colorado were easily mineable and contained radium. In 1913, Standard Chemical Company built the Joe Junior radium processing plant and town site on the San Miguel River at what would later grow into Uravan[15].The amount of radium in the typical carnotite ores of the Uravan district is very small. It took about 200–300 tons of high grade (about 2 percent $U_3O_8$[16]) carnotite ore to produce one gram of radium. However, during this period radium was selling for $160,000 to $120,000 per gram (31 grams = about one ounce) making the mining of these ores a very profitable operation[17]. The mines were forced out of business in 1923, when rich pitchblende deposits in the Belgian Congo forced down the price of radium. Mining revived in 1935 when the

---

[14] There is apparently no world-wide standard for written expressions of an element's isotope as a subscript or as a superscript. This nomenclatural disparity applies to both naturally occurring and man -made isotopes. Some textbooks and articles in physics express the isotope's atomic weight as a leading **subscript**, such as $_{238}$U. The U.S. Department of Interior, Geological Survey (USGS) expresses the isotope's atomic weight as a leading **superscript**, such as: $^{238}$U. Because the Bureau of Land Management is an agency of the U.S. Department of the Interior, this report utilizes USGS terminology. Whichever terminology is used, subscript or superscript, $^{238}$U is read as "Uranium 238."

[15] See: http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

[16] $U_3O_8$ is the customary compound used to report uranium content in ores, even though it is not an ore mineral. Because of its bright color, U3O8 is known as "yellowcake."

[17] See: http://geosurvey.state.co.us/portals/0/rtv9n2%20LR-web.pdf

BLM_0009612

price of vanadium rose, and boomed after World War II when the government stockpiled uranium for nuclear weapons programs (Wright and Everhart, 1960).

Originally the site of the Joe Junior Mill, the company town of Uravan was established in 1936 when U. S. Vanadium Corporation moved its plant there. U. S. Vanadium Corporation expanded the Joe Junior site and named it Uravan after the combination of uranium and vanadium minerals. At one time, over 800 people lived along the tree-lined streets enjoying housing, schools, medical facilities, tennis courts, a recreation center and pool provided by the company.

Throughout the 1930s and 1940s, production of vanadium brought some prosperity to Uravan and all of southwestern Colorado. Prior to 1937 the uranium in the carnotite ores of southwest Colorado was considered a contaminant and ended up in the mine and mill waste piles. Unites States Vanadium Company installed a uranium recovery circuit in their mill in 1937 and used the uranium, just like the vanadium, as a steel hardener. Vanadium was a strategic mineral and a government-buying program encouraged continued exploration and development. Pre-1946 production of vanadium from Uravan and the surrounding districts was 636,166 tons at a weighted average grade of 1.9 percent $V_2O_5$[18] resulting in the production of 24,138, 822 pounds of $V_2O_5$ (Chenoweth, 1981). United States entry into World War II in December 1941 changed the picture in the Uravan district dramatically. The government realized that in order to win the war they needed a superior weapon. The nuclear fission process was barely understood when the government initiated the Manhattan Project, the goal of which was to develop an atomic bomb. The Manhattan Engineers District, part of the project focused on acquiring uranium, purchased all the uranium-rich waste piles from the Uravan mineral belt mines and mills and contracted with United States Vanadium Company to process the ores for uranium. Uravan became a bustling, busy place with many new workers, homes, schools and all the amenities

[18] $V_2O_5$ is the customary compound for reporting vanadium content of ores. $V_2O_5$ is known as "redcake" due to its distinctive color.

BLM_0009613

of a regular community. Most of the uranium that was acquired by the Manhattan Project came from the Shinkolobwe Mine in the Congo (approximately 4,150 tons), and to a lesser extent the Port Radium Mine in Canada (1,000 tons), and the Uravan district (850 tons) (Amundsen, 2002). World War II ended with the dropping of two atomic bombs produced by the Manhattan Project on Hiroshima and Nagasaki, Japan in August 1945. Production of uranium at Uravan then ceased for a short while. In 1947, the newly created Atomic Energy Commission (AEC) contracted with United States Vanadium Company, which was bought by Union Carbide Nuclear Corporation in 1955 (Fig.8) to produce uranium for the Cold War effort.

In the 1970s the Uravan district began a new expansion to serve the growing needs of the nuclear power industry. However, the declining demand for nuclear power, the low prices for uranium and the increasing supply from Canada, Australia, and other countries spelled the eventual decline of the long-lived town of Uravan and the surrounding mines and mills of the Uravan mineral belt. Since 1983, Umetco Minerals Corporation has been involved in a 15 year, $70 million reclamation project. Tailings above the mill site have been stabilized and covered and process wastes from the evaporative ponds have been removed. A groundwater cleanup program is also underway[19].

Because of the end of the Cold War and the release of uranium from weapons stockpiles, the recession of the 1980s, and other factors, the price of uranium slipped from its high of $40 per pound in the late 1970s to prices below $10 per pound for most of the 1980s and 1990s. As uranium stockpiles dwindled and worldwide economies improved, the demand for uranium increased and, of course, the price began to climb somewhat dramatically in 2000. The worldwide demand for uranium is 180 million pounds per year to feed 435 nuclear reactors; however, worldwide mine production in 2005 was only 110 million pounds. Demand for uranium will likely increase as China plans to build

---

[19] See: http://www.uravan.com/index.htm.

COC_70704; Bat Mine Withdrawal

27 new reactors in the next 15 years and India plans to build 17 in the next 7 years. With rising uranium and vanadium prices, Cotter Corporation reopened four uranium mines in the Uravan district in 2003 and 2004. Cotter closed the mines abruptly in November 2005 citing increased costs making these operations unprofitable at this time. The Cotter mines produced 394,236 pounds of uranium oxide and 1,746,251 pounds of vanadium oxide from 2003 through 2005. In July 2006, International Uranium Corp. announced that they plan on reopening four uranium mines in the Uravan district. Three of those mines will be in Colorado; the other will be in Utah[20].

A new uranium processing mill is planned for private land at Pinon Ridge, near Naturita. Energy Fuels Corporation plans to mill up to 1,000 tons per day of uranium and vanadium ores derived from company-owned and other mines in the Uravan area. Planning for the Pinon Ridge mill began in 2007. Energy Fuels anticipates submitting its mill license application in April, 2009, and projects approval in 2010. Once the mill license is approved, construction is projected to begin in late 2010, with actual production operations in 2011. , (Dion, 2008, and Kral, 2008).

Vanadium processing mills sprang up during the pre-world War II period of interest, and a list of those mills is shown in Figure 11, wherein the word "Present" is meant to indicate 1960. Trucks took ore from mines of the surrounding area, rich in uranium and vanadium, to the processing plant at Uravan. Between 1936 and 1984 the plant milled 42 million pounds of vanadium. The mildly radioactive tailings (byproducts of the extraction) were deposited in huge piles above the canyon next to the plant. The total production from the United States Vanadium Company mill at Uravan to late 1945 was 1,782,000 pounds of $U_3O_8$ (Goodknight and others, 2005). The AEC ended its uranium contract in December 1970. From 1947 to 1970, the mill at Uravan produced 23.9 million pounds of $U_3O_8$ (commonly referred to as "yellowcake") and 9.7 million pounds of $V_2O_5$ for the AEC. An

---

[20] Modified from http://en.wikipedia.org/wiki/Uranium_mining_in_Colorado and from http://www.uravan.com/index.htm.

BLM_0009615

additional 123.4 million pounds of $V_2O_5$ was sold on the open market to the steel industry. In 1976, the mill was expanded to process 1,300 tons per day. In 1984, the Uravan mill was closed and the town was abandoned. Cleanup activities commenced and continued through the spring of 2006. Approximately 84 million pounds of uranium oxide and 220 million pounds of vanadium oxide were produced from the Uravan district from 1936 to 1984. Cotter Corporation opened four mines in the Uravan District between 2003-2004, transporting the ore from these mines to their mill in Cañon City for processing.



| Approximate Date of Operation | Location | Company |
|---|---|---|
| 1922-Present | Rifle, Garfield Co., Colo. | United States Vanadium Corp. |
| 1930-1932 | Dry Valley, San Juan Co., Utah | International Vanadium Corp. |
| 1935-1943 | Slick Rock, San Miguel Co. | North Continent Mines, Inc. |
| 1937-1944 | Blanding, San Juan Co., Utah | Blanding Mines Co. |
| 1939-1945 | Gateway, Mesa Co. | Gateway Alloys |
| 1940 | Loma, Mesa Co. | |
| 1940-1957 | Naturita, Montrose Co. | Vanadium Corp. of America |
| 1942-1945 | Durango, La Plata Co. | U. S. Vanadium Corp. for Metals Reserve Corp. |
| 1949-Present | Same Plant | Vanadium Corp. of America |
| 1942-1946 | Monticello, San Juan Co., Utah | Vanadium Corp. of America for Metals Reserve Corp. |
| 1949-Present | Same Plant | Atomic Energy Commission |
| 1951-Present | Grand Junction, Mesa Co. | Climax Uranium Co. |
| 1958-Present | Gunnison, Gunnison Co. | Gunnison Mining Co. |
| 1958-Present | Maybell, Moffat Co. | Union Carbide Nuclear |
| 1958-Present | Canon City, Fremont Co. | Cotter Corporation |

Colorado's uranium resources to date have been largely developed in six major districts:

1. The Uravan district, Mesa, Montrose, and San Miguel Counties;
2. The Front Range district, Boulder, Clear Creek, Gilpin, Jefferson, and Larimer Counties;
3. The Maybell district, Moffat County;
4. The Cochetopa district, Saguache County;
5. The Marshall Pass district, Chaffee, Gunnison and Saguache Counties; and
6. The Tallahassee district, Fremont County.

Figure 11. A list of uranium mills in Colorado, circa 1960 (Wright and Everhart, 1960).

There are three patented vanadium claims located within a two-mile radius of the Cory Lode Mining Claim. Those three patented claims have two (2) BLM serial numbers: COCOAA 02124, patented in 1887 and COCOAA-020096, patented in 1895. In addition, three (3) mineral surveys exist for the patented claims: MS 20473; MS 20468, and MS 20848. We did not locate these patented claims on the ground.

COC_70704; Bat Mine Withdrawal

### Geology and Mineralization of Claims

Colorado Plateau uranium-vanadium deposits of economic value are mostly found in Triassic-Jurassic period rocks of the Shinarump Conglomerate, Chinle Formation, Entrada Sandstone, Todolito Limestone, and Morrison Formation. Principal ore minerals after pitchblende[21] and coffinite are carnotite, $[K(UO_2)_2(VO_4)_2*3H_2O]$ and tyumunite $[Ca(UO_2)(VO_4)_2*8H_2O]$, gummite (a mineraloid mixture of hydrous oxides of U, Th, and Pb), and a variety of orange, yellow, blue, and black vanadium oxides such as montroseite $(VO(OH))$. Associated minerals include minor amounts of pyrite, marcasite, galena, sphalerite, chalcopyrite, bornite, chalcocite, covellite, and other sulfide minerals. Minor amounts of native selenium and the molybdenum oxide ilsemannite $(Mo_3O_8*nH_2O?)$[22] is also common (Guilbert and Park, 1986). A list of minerals that are associated with vanadium, uraninite and pitchblende can be found in Appendix 2.

Most of the structural features in the Uravan district are related to five salt-cored anticlines trending to the northwest along the Colorado-Utah line. Four of these anticlines are in Colorado; in the Sinbad Valley, the Paradox Valley (Figure 12), the Gypsum Valley, and the Dolores Anticline (Wright and Everhart, 1960). The Dolores Anticline is the only one that has not been unroofed by erosion.

---

[21] Pitchblende and uraninite are terms often used synonymously to describe a black colored mineral with chemical formula of UO2. However, pitchblende is more properly applied to a non-crystalline mixture of uraninite that contains numerous impurities, such as lead and thorium oxides.

[22] In this case, the question mark, known as a query mark, indicates that the proportion of molecular water, or $H_2O$, is variable.

BLM_0009617



Figure 12. A cross-section of the Paradox Valley Salt Anticline, taken from Wright and Everhart, 1960.

BLM_0009618

Faulting occurs frequently as high angle normal faults due to collapse of the roof & limbs of the salt anticlines. Faults and joints in the mines in the Uravan District are primarily post-ore deposition in age. Offsets make following a deposit difficult, as the uranium is deposited as pods.

Within the uranium province, most of the clusters on Plate 1 are tabular sandstone deposits impregnated with uranium and vanadium, hosted in Upper Paleozoic and Mesozoic fluvial sedimentary rocks.

There is no apparent relationship between the distribution of uranium and regional geologic structure, except insofar as tectonic history has controlled sedimentation, geomorphology, and igneous activity, and insofar as the ore deposits lie within the uplifted tectonically positive regions between structural basins. The margins of the deposits are generally gradational. The deposit normally forms a single main layer but can split, and lenses may be present, sometimes making mining at several layers necessary (Wright and Everhart, 1960).  Generally, mines followed a single level plan (Figure 13). Some deposits were elongate in a common direction normal to the trend of the Uravan belt (Wright and Everhart, 1960).  Deposit size ranges from a few tons to in excess of 100,000 tons. Typically the deposit consists of lenses and pods separated by mineralized rock or waste. In roll-front deposits, the deposit cuts sharply across bedding planes. Rolls are narrow and elongate and the long axis is generally parallel to the direction of sediment deposition prior to lithification. The three abandoned mines that we examined used only adit level entry and adit level operations.



Figure 13. Generalized Salt Wash uranium mine design from Wright and Everhart, 1960.

There are four generally agreed upon hypotheses for the origin and source locales of the uranium: (1) the ores are syngenetic and were deposited with the sediments or as an early digenetic event; (2) the uranium and vanadium were leached from overlying or interlayered tuffs and volcanic rocks; (3) groundwaters leached the metals from enclosing sands or nearby granitic sources, forming deposits where the proper eH-pH conditions prevailed (Figure 14) or where the groundwater circulation was channeled (Figure 15); (4) the ores are products of ascending hydrothermal fluids derived from underlying magma (Guilbert and Park, 1986).  Due to the regional geology and the evident mode of deposition, the uranium and vanadium that at occurred[23] at the three mines covered by this mineral report were deposited as adsorptions on older carbonaceous materials from channeled groundwater circulation (Figure 15).  The carbonaceous materials[24] were syngenetic with the fluvial environment at the time the host formations were originally laid down.

---

[23]  Our field examination showed that the uranium resources have been mined out at these three locations covered by this report.
[24]  This would primarily include fallen trees and other plant material.

BLM_0009620

COC_70704; Bat Mine Withdrawal



Figure 14. Eh-pH diagram of the U-O$_2$-CO$_2$-H$_2$O system at 25 degrees C and pCO$_2$=10$^{-2}$ atm. Uraninite solution boundaries are drawn at 10$^{-6}$$M$ (0.24 ppm) dissolved uranium species. "H & G" denotes the boundary of the uraninite stability field. The shading separates the U$^{+6}$ ion dominance and solubility (above) from U$^{+4}$ dominance and Uraninite (UO$_2$) precipitation (below). The carbonate complex ions are important transport media in roll-front deposits (Guilbert and Park, 1986).

## Mineral Exploration and Development

Minerals historically discovered and mined from the Dolores, Montrose, and San Miguel Counties are found in Appendix 2 and are compiled from Eckel, 1961.

There is no active mining within or near the boundaries of the mine adits requested for withdrawal. About four miles southwest of the Mother Bat Lode, we found slightly weathered wooden stakes indicative of a proposed exploration drilling program. We did not see any indication of drilling. The mining claims involved in the drilling are held by Homeland Uranium, Inc., C/O Prince, Yates, and Geldzahler, Salt Lake City Utah.

COC_70704; Bat Mine Withdrawal

## Current Mineral Potential

Sandstone-hosted uranium deposits are abundant in the Uravan Mineral Belt, where they occur most commonly in the Salt Wash Member of the Upper Jurassic Morrison Formation (Figure 15). The potential for uranium mineral to be found in the Uravan Mineral Belt remains high (H/B, Appendix 4). Gray mudstone units are consistently associated with ore-bearing sandstone in the Salt Wash Member of the Morrison Formation (Gerlitz, et al., 1988). Previous uranium and vanadium mining did not remove completely all potential resources in the area therefore the potential for new economically profitable mines in the region remains strong (Appendix 5). It is reasonable to expect that new exploration coupled with modern mining techniques will extract additional uranium resources from the Uravan Mineral Belt. That being said, for the case of these three mines, the Pup Tent, Cory Lode, and Mother Bat Lode Mines, the examination of the drifts in these mines shows that the mineral resource has been mined out from the workings, and considerable money and effort would need to be undertaken to explore these workings for additional economic mineral deposits.



Figure 15. An example of an adit and waste dump of an abandoned uranium mine in the salt Wash Member of the Morrison Formation, in the Uravan District.

## Field Work

Our field work to evaluate the claims in this project was limited, and consisted of a reconnaissance of each site.  We used two scintillation counters to measure the radioactivy of minerals, a THYAC III Victoreen and Dosimeter Corporation model 3007A, serial number HG-0058. The model 3007A uses an Arrow-Tech model DCA 3012 probe, with serial number PR3012-HG0058.The probe is a Geiger-Mueller counter that "detects medium and high energy x-ray and gamma radiation, as well as d igh [sic] energy beta."[25]  The sliding window permits energy discrimination. Radioactive disintegration, or decay, gives rise to spontaneous emission of alpha and beta particles and gamma rays, which is read by the scintillation counter. Detection is usually of gamma rays, and it is accomplished in most cases with a scintillometer, a photoconversion device containing a crystal of sodium iodide that emits a photon (minute packet of electromagnetic radiation) when struck by a gamma ray[26].

The scintillation counters gave readings in millirads per hour (mR/h). A millirad is a unit of radiation dose equal to 0.001 rad or 10 micrograys. A rad is a metric unit measuring radiation dose. One rad is equal to a dose of 0.01 joule of energy per kilogram of mass (J/kg), or 100 ergs of energy per gram of mass. The SI unit of radiation dose is the gray (Gy); one rad equals 0.01 gray or 1 centigray.[27] "Rad" is an acronym for "radiation absorbed dose." Per the guidance of BLM Draft Handbook 3010-1,we used normal underground equipment and procedures, including two gas monitors that monitored for explosive gases, carbon monoxide, oxygen and hydrogen sulfide. A

---

[25] This is likely a typographical error in the instrument's manual, where "high energy beta" is probably intended.
[26] http://www.britannica.com/EBchecked/topic/529024/scintillometer#tab=active~checked%2Citems~checked
&title=scintillometer%20--%20Britannica%20Online%20Encyclopedia
[27] A unit of absorbed dose of radiation (one centigray equals one rad).

COC_70704; Bat Mine Withdrawal

member of the field team was always stationed at the adit portal as a monitor to summon help in case of an underground accident. All underground entries took place without incident.

Due to the nature of the project, we did not prepare detailed geologic maps.  Our reconnaissance was intended only to determine if significant mineralization was present on, and in the near vicinity, of the mine adits proposed for withdrawal. While radiation levels within the adits were relatively low, we determined that the project did not warrant the multiple-hour exposure times required to prepare underground maps. Had our reconnaissance revealed the need to prepare extensive maps, we would likely have returned at a later date, equipped with film dosimeters for safety.

Only two of the three mines could be entered, the Cory Lode and the Mother Bat Lode. All of the mines consisted of single levels with adit entries.  Radiation readings were taken at the entrances of all three mines (Figures 16 and 17). Entry to the adit and drifts of the Mother Bat Lode was terminated after going approximately 200 meters in to the drift, due to safety concerns. Entry in to the Cory Lode Adit and drifts showed a "gopher hole" tunneling style, in which the entire hilltop was mined through following mineralized zones. Drifts were followed to the point where the drift ended, or until we arrived at another gated entrance to the mine.  We did not enter the Pup Tent Mine because both adit portals were blocked by grates that had been permanently welded shut.  Even if access had been possible, the underground workings at the Pup Tent Mine were in poor condition, and we would have declined to enter for safety reasons.

COC_70704; Bat Mine Withdrawal



Figure 16. Matt Shumaker, geologist, taking a reading with one of the hand-held Geiger Counters at one of the permanently gated adit entrances to the Pup Tent Mine.



Figure 17. Matt Shumaker, geologist, gathering a reading using the Dosimeter Corporation model 3007A, serial number HG-0058 near one of the adits to the Pup Tent Mine.

COC_70704; Bat Mine Withdrawal

Rock strata near entrances to the Pup Tent Mine had general residual background readings of 0.05 mR/h. Neither the Cory Lode or the Mother Bat Lode mines had continuous high readings indicating the presence of substantial mineralization left within the workings. Each of them had occasional readings of 0.2 mR/h.



Figure 18. The Dosimeter Corporation model 3007A, serial number HG-0058 giving a reading in the Cory Lode Mine of 0.1 mR/h.

The Mother Bat Lode Mine exhibited the highest readings overall, having more than one reading of 0.2 mR/h. None of the mine adits contained more than traces of mineralization, and radiation readings were consistently low except within a few inches of the traces of uranium minerals.

COC_70704; Bat Mine Withdrawal

*References*

Del Rio, S.M., 1960. Colorado Counties-Mineral resources in Del Rio, S. M. Ed., Mineral Resources of Colorado First Sequel. State of Colorado Mineral Resources Board, Denver, Colorado., p. 216; 279;

Dion, D, 2008, Mill May Wrest River Water, The Norwood Post, V. 14, No. 16, p. 1.

Eckel, E. B., 1961. Minerals of Colorado: A 100 year record. U.S. Geological Survey Bulletin 1114, 394 pgs with plate.

Finch, W. I., 1991. Maps showing distribution of uranium deposits in the Colorado Plateau uranium province—A cluster analysis: U.S. Geological Survey Miscellaneous Field Studies Map MF–2080, scale 1:2,500,000.

Finch, W. I., 1996. Uranium provinces of North America – their definition, distribution, and models: U.S. Geological Survey Bulletin 214, 24 p.

Fischer, R. P., and Hilpert, L.S., 1952. Geology of the Uravan Mineral Belt, US Geological Survey, Bulletin 988-A.

Flannery, J.M., 1914. Radium plant of the Standard Chemical Company, in Thirteenth Biennial Report of the Bureau of Mines of the State of Colorado, for the Years 1913 and 1914, p.113-116.

Fleck, H. and Haldane, W. G., 1909. Preliminary report on the radioactivity of the carnotite of southwest Colorado, Quarterly of the Colorado School of Mines, Oct. 1909, v.4, n.3, p.1.

Forstall, A. W., 1913. Carnotite a supply of radium, in Twelfth Biennial Report of the Bureau of Mines of the State of Colorado, for the Years 1911 and 1912, pp. 47-53.

Gerlitz, C. N., Barton, H. N., Kulik, D. M., and Martin, C. M., 1988. Mineral resources of the Dolores River Canyon Wilderness Study Area, Montrose and San Miguel Counties, Colorado. U. S. Geological Survey Bulletin 171519 p., 1 plate.

Guilbert, J. M. and Park, C. F., Jr (1986) The Geology of Ore Deposits, W. H. Freeman, pp 910-934.

Granger, H.C., and Finch, W.I., 1988. The Colorado Plateau Uranium Province, U.S.A., *in* Recognition of Uranium Provinces, Proceedings of a Technical Committee Meeting on Recognition of Uranium Provinces, London, England, 18–20 September, 1985: Vienna, Austria, International Atomic Energy Agency, p. 157–193.

Griggs, R.L., and Read, C.B., 1959, Revisions in stratigraphic nomenclature in Tucumcari-Sabinoso area, northeastern New Mexico: American Association of Petroleum Geologists Bulletin, v. 43, no. 8, p. 2003-2007. [Available online, with subscription, from AAPG archives: http://www.aapg.org/datasystems or http://search.datapages.com]

BLM_0009627

COC_70704; Bat Mine Withdrawal

Hansen, W.R., 1968, Geologic map of the Black Ridge quadrangle, Delta and Montrose Counties, Colorado: U.S. Geological Survey Geologic Quadrangle Map, GQ-747, 1 sheet, scale 1:24,000 [http://ngmdb.usgs.gov/Prodesc/proddesc_2054.htm]

Keller, J. and others, 2006. *Colorado*, Mining Engineering, May 2006, p.76.

Learned, E.A., 1981. The Hanging Flume of Dolores River Canyon, Montrose County, Colorado. New Mexico Geological Society Guidebook, 32nd Western Field Conference, Western Slope, Colorado, p. 337.

Kral, S., 2008, Energy Fuels Prepared to Ride Uranium's Resurgence, Mining Engineering, 2008, v. 60, No. 10, pp 24 – 26.

Ludwig, K.R., and Simmons, K.R., 1992, U-Pb dating of uranium deposits in collapse    reccias pipes of the Grand Canyon region: Economic Geology, v. 87, p. 1747–1765.

Martin, C. M.,1987. Mineral investigation of the Dolores River Canyon (CO-030-290) Wilderness Study Area and a part of the Sewemup Mesa (CO-070-176) Wilderness Study Area, Mesa, Montrose, and San Miguel Counties, Colorado. MLA 47-87; US-DOI/Bureau of Mines, 47 p., 1 plate.

Marvin, R.F., and Dobson, S.W., 1979, Radiometric ages; compilation "B", U.S. Geological Survey: Isochron/West, no. 26, p. 3-32.

Wright, R.J., and Everhart, D.L., 1960. Uranium, in Mineral Resources of Colorado First Sequel, State of Colorado Mineral Resources Board, p.330-331.


Figures:

Figures 1.1, 1.2, 1.3. Regional maps of the mine locations. Each location is indicated by text.  The red box on each map indicates the quarter quarter section (40 acres) that contains the adit portal, and is recommended for withdrawal.

Figure 2. Mesa County locality within Colorado, taken from Del Rio, 1960.

Figure 3. Montrose County locality within Colorado, taken from Del Rio, 1960.

Figure 4. San Miguel County locality within Colorado, taken from Del Rio, 1960.

Figure 5. Location map of western states uranium deposits, including the Salt Wash roll front ores deposited in the Uravan Mineral Belt (Guilbert and Park, 1986)

Figure 6. Generic stratigraphic column for the land withdrawal area.

Figure 7. View of the Kayenta Fm., Entrada sandstone, Wanakah Fm, and Morrison Fm taken from the viewpoint overlooking the Hanging Flume (Figure 9).

BLM_0009628

COC_70704; Bat Mine Withdrawal

Figure 8. Stratigraphy of the study region, as seen from the Dolores River Canyon, September 2008.

Figure 9. Stratigraphic view of the region in the vicinity of the Cory Lode Mine. The Salt Wash Member of the Morrison Formation forms the mesa tops.

Figure 11. A list of uranium mills in Colorado, circa 1960 (Wright and Everhart, 1960).

Figure 10. Remaining remnants of the Hanging Flume appear embedded in the Wingate sandstone, in the upper portion of this photograph. The Hanging Flume was a late 1880's engineering marvel.

Figure 12. A cross-section of the Paradox Valley Salt Anticline, taken from Wright and Everhart, 1960.

Figure 13. Generalized Salt Wash uranium mine design from Wright and Everhart, 1960. Figure 14. Eh-pH diagram of the $U$-$O_2$-$CO_2$-$H_2O$ system at 25 degrees C and $pCO_2=10^{-2}$ atm. Uraninite solution boundaries are drawn at $10^{-6}M$ (0.24 ppm) dissolved uranium species. "H & G" denotes the boundary of the uraninite stability field. The shading separates the $U^{+6}$ ion dominance and solubility (above) from $U^{+4}$ dominance and Uraninite ($UO_2$) precipitation (below). The carbonate complex ions are important transport media in roll-front deposits (Guilbert and Park, 1986).

Figure 14. Eh-pH diagram of the $U$-$O_2$-$CO_2$-$H_2O$ system at 25 degrees C and $pCO_2=10^{-2}$ atm. Uraninite solution boundaries are drawn at $10^{-6}M$ (0.24 ppm) dissolved uranium species. "H & G" denotes the boundary of the uraninite stability field. The shading separates the $U^{+6}$ ion dominance and solubility (above) from $U^{+4}$ dominance and Uraninite ($UO_2$) precipitation (below). The carbonate complex ions are important transport media in roll-front deposits (Guilbert and Park, 1986).

Figure 15. An example of an adit and waste dump of an abandoned uranium mine in the salt Wash Member of the Morrison Formation, in the Uravan District.

Figure 16. Matt Shumaker, geologist, taking a reading with one of the hand-held Geiger Counters at one of the permanently gated adit entrances to the Pup Tent Mine.

Figure 17. Matt Shumaker, geologist, gathering a reading using the Dosimeter Corporation model 3007A, serial number HG-0058 near one of the adits to the Pup Tent Mine.

Figure 18. The Dosimeter Corporation model 3007A, serial number HG-0058 giving a reading in the Cory Lode Mine of 0.1 mR/h.


Appendices

Appendix 1. Geologic time chart.

Appendix 2. List of minerals mined from the Uravan region from 1860 to 1960.

BLM_0009629

COC_70704; Bat Mine Withdrawal

Appendix 3. Learned, E.A., 1981. The Hanging Flume of Dolores River Canyon, Montrose County, Colorado. New Mexico Geological Society Guidebook, 32nd Western Field Conference, Western Slope, Colorado, p. 337. Roadside illustration as seen along Highway 141, with an interesting discussion of uranium being packed out of the mines by burros.

Appendix 4. Mineral Resource Potential matrix taken from Gerlitz, et al., 1986.

BLM_0009630

39



Figure 1.1. Location of Cory Lode. The red box indicates the quarter quarter section (40 acres) that contains the adit portal and is recommended for withdrawal.
NW¼ NW¼, Sec. 11, T. 47 N., R. 17 W.

Cory Lode

**LAND OWNERSHIP LEGEND**

| | | |
|---|---|---|
| Private Lands | Indian Lands or Reservations | BLM Wilderness Area |
| State Lands | Bureau of Land Management (BLM) | BLM Wilderness Study Area |
| City, State, County Parks | National Forest Lands (USFS) | USFS Wilderness Area |
| Other Federal Lands | National Park Service (NPS) | USFS Special Protection Area |
| National Grasslands | USFW Service, National Wildlife Refuges | Bat Mine Withdrawal Area |
| | | BLM Field Office Area |

```
0    0.25    0.5         1              1.5
                                    Miles
0  0.25  0.5    1      1.5      2      2.5
                                    Kilometers
```

Colorado

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE

Map produced by the BLM,
Uncompahgre Field Office

Land Status updated as of May 1, 2006

CAUTION:
Land ownership data is derived from less accurate data than the 1:24000 scale base map. Therefore, land ownership may not be shown for parcels smaller than 40 acres, and land ownership lines may have plotting errors due to source data.

Map created on November 12, 2008

No warranty is made by the Bureau of Land Management for the use of the data for purposes not intended by the BLM.

Figure 1.1. Location of Cory Lode.

Figure 1.2  Location of Pup Tent Mine.  The red box indicates the quarter quarter section (40 acres) that contains the adit and is recommended for withdrawal.
NW¼ NW¼, Sec. 4, T. 49 N., R. 17 W.

**LAND OWNERSHIP LEGEND**

- Private Lands
- State Lands
- City, State, County Parks
- Other Federal Lands
- National Grasslands
- Indian Lands or Reservations
- Bureau of Land Management (BLM)
- National Forest Lands (USFS)
- National Park Service (NPS)
- USFW Service, National Wildlife Refuges
- BLM Wilderness Area
- BLM Wilderness Study Area
- USFS Wilderness Area
- USFS Special Protection Area
- Bat Mine Withdrawal Area
- BLM Field Office Area

Colorado

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE

Map produced by the BLM,
Uncompahgre Field Office

Land Status updated as of May 1, 2006

CAUTION:
Land ownership data is derived from less accurate data than the 1:24000 scale base map. Therefore, land ownership may not be shown for parcels smaller than 40 acres, and land ownership lines may have plotting errors due to source data.

Map created on November 12, 2008

No warranty is made by the Bureau of Land Management for the use of the data for purposes not intended by the BLM.

Figure 1.2.  Location of Pup Tent Mine.

41



Figure 1.3. Location of the Mother Bat Lode. The red box indicates the quarter quarter (40 acres) that contains the adit portal and is recommended for withdrawal. SW¼ SE¼, Sec. 15, T. 43 N., R. 18 W.

Mother Bat Lode

**LAND OWNERSHIP LEGEND**

| | | |
|---|---|---|
| Private Lands | Indian Lands or Reservations | BLM Wilderness Area |
| State Lands | Bureau of Land Management (BLM) | BLM Wilderness Study Area |
| City, State, County Parks | National Forest Lands (USFS) | USFS Wilderness Area |
| Other Federal Lands | National Park Service (NPS) | USFS Special Protection Area |
| National Grasslands | USFW Service, National Wildlife Refuges | Bat Mine Withdrawal Area |
| | | BLM Field Office Area |

0   0.25   0.5   1   1.5
Miles

0   0.25 0.5   1   1.5   2   2.5
Kilometers

Colorado

GJFO
UFO
DFO

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE

Map produced by the BLM,
Uncompahgre Field Office

Land Status updated as of May 1, 2006

CAUTION:
Land ownership data is derived from less
accurate data than the 1:24000 scale base
map. Therefore, land ownership may not be
shown for parcels smaller than 40 acres, and
land ownership lines may have plotting errors
due to source data.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Map created on November 19, 2008

No warranty is made by the Bureau of Land Management
for the use of the data for purposes not intended by the BLM.

Figure 1.3. Location of Mother Bat Lode.

BLM_0009633



# 1999 GEOLOGIC TIME SCALE

© 1999, The Geological Society of America. Product code CTS004.  Compilers: A. R. Palmer, John  Geissman

*International ages have not been established. These are regional (Laurentian) only. Boundary Picks were based on dating techniques and fossil records as of 1999. Paleomagnetic attributions have errors, Please ignore the paleomagnetic scale.

Sources for nomenclature and ages: Primarily from Gradstein, F., and Ogg, J., 1996, *Episodes*, v. 19, nos. 1 & 2; Gradstein, F., et al., 1995, SEPM Special Pub. 54, p. 95–128; Berggren, W. A., et al., 1995, SEPM Special Pub. 54, p. 129–212;  Cambrian and basal Ordovician ages adapted from Landing, E., 1998, *Canadian Journal of Earth Sciences*, v. 35, p. 329–338; and Davidek, K., et al., 1998, *Geological Magazine*, v. 135, p. 305–309.  Cambrian age names from Palmer, A. R., 1998, *Canadian Journal of Earth Sciences*, v. 35, p. 323–328.



GEOLOGICAL SOCIETY
OF AMERICA

BLM_0009634