**Table 4.6. Emission Rates for Compressors**

| Pollutant | Emission Rate (g/sec) |
|---|---|
| Toluene | 4.23E-04 |
| Vinyl Chloride | 1.55E-05 |
| Xylene | 1.91E-04 |

An average emission rate of 1.45x10-7 g/sec hydrogen sulfide (H2S) was assumed for all glycol dehydrators (Trinity and Nicholls 2006). All H2S was assumed to convert to SO2 (ATSDR 1999) for the purposes of this assessment. Other emission estimates for glycol dehydrators are summarized in Table 4.7 and were derived from assumptions relating to glycol dehydrators in the Vernal FO (Trinity and Nicholls 2006).

**Table 4.7. Emission Rates for Glycol Dehydrators**

| Pollutant | Emission Rate (g/sec) |
|---|---|
| SO2 | 5.32E-02 |
| Benzene | 3.68E-02 |
| Ethylbenzene | 6.70E-03 |
| H2S | 1.45E-07 |
| Toluene | 5.78E-02 |
| Xylenes | 1.09E-01 |

Flaring was assumed to be required in 60% or less of the producing wells. Flared gas was assumed to be "sweet" and contain no sulfur. Flaring emissions applicable to this analysis were assumed to be primarily NOx and CO. Flaring emissions and relative percentage of wells flared were calculated using the generalized flaring emissions identified for the Vernal FO RMP (Trinity and Nicholls 2006) and are summarized in Table 4.8.

**Table 4.8. Emission Rates for Flaring**

| Pollutant | Emission Rate (g/sec) |
|---|---|
| CO | 5.32E-02 |
| NO$_x$ | 9.80E-03 |
| PM$_{10}$ | 8.90E-04 |
| PM$_{2.5}$ | 8.90E-04 |

Fugitive dust emissions were estimated using AP-42, Fifth Edition Section 13.2.2 for construction traffic on roads and Section 13.2.3 for heavy construction operations of well pads and new roads. Section 13.2.3 estimates total suspended particulates which are converted to PM10 by applying a conversion factor of 0.26 (Trinity and Nicholls 2006). Conversion from PM10 to PM2.5 is similarly achieved through a conversion factor of 0.15.

BLM_0010197

Construction activity was assumed to occur for 14 days for each well pad developed, both producing and dry. It was assumed that the control efficiency (PM10 and PM2.5) for watering was 25% on construction sites including the well pad and on new resource roads. It was assumed that watering of all exposed disturbance areas at the well pad site itself would occur as appropriate during the construction period. It was assumed that 10% of the roads would be watered. The control efficient for graveling roads was assumed to be 75%; 40% of new roads were assumed to be graveled. It was therefore assumed that 50% of new roads would receive no treatment to reduce fugitive dust. All of these assumptions were taken from the Vernal FO Air Quality Model Report and fugitive dust calculations (Trinity and Nicholls 2006). A total of 12 construction vehicles operating on-site at any one time were assumed with a total of 346 round trips (the majority of which are pick-up trucks for site visits). The average round trip distance was assumed to be 10 miles. Vehicle weights range from 8,000 lbs for a diesel pick-up truck to 85,000 lbs for diesel low-boy equipment haulers, cementer trucks, and completion rigs. It was assumed that all mobile vehicles would be working at any one time on-site. This scenario is assumed to be representative of periods of intense activity and, therefore, serves as a conservative estimate of critical conditions.

Soils in the MPA have been characterized as having low to moderate wind-erodibility. Soil moisture content of 5% and soil silt content of 5% were assumed.

In addition to construction-specific actions, some additional post-construction particulate (dust) emissions are projected to occur on a short-term basis due to loss of vegetation within the construction and staging areas. Given appropriate soil stabilization and revegetation measures, these emissions are projected to be minimal to negligible.

The contribution to the degradation of air quality from other [non-oil and gas] mineral development was considered nominal and oil and gas related activities were assumed to be the largest component of mineral related activity within the MPA. Therefore, only oil and gas related emissions were directly considered in assessing emissions.

### 4.3.1.3.2 ALTERNATIVE A

#### 4.3.1.3.2.1 Impacts of Recreation and Travel Management Decisions on Air Quality

Recreation management decisions under Alternative A would maintain existing levels of motorized vehicle use without additional constraints. Projected effects on air quality would be primarily associated with combustion byproducts from automobiles, OHVs, and other hydrocarbon-combustion based transport, and surface disturbance related to off-trail and off-road activities. Projected air quality constituents of concern specific to recreational use include particulate matter (PM10 and PM2.5), hydrocarbons and combustion by-products.

As the locations of all existing and future recreation sites within the MPA are not presently known, precise quantification of air quality impacts is not possible. As the MPA is not currently experiencing non-attainment, continued recreational use at the existing level is not projected to result in long-term, project-wide exceedances of ambient air quality standards. However, if heavy recreational use occurs in a relatively small area, local conditions may exist that contribute to short-term exceedance of air quality standards.

Impacts of recreation management decisions that limit or reduce surface and vegetation disturbance, OHV and other off-trail access and improve existing roadway and trail surfaces are

BLM_0010198

generally projected to result in negligible impacts on short-term air quality and negligible to incrementally beneficial impacts on long-term air quality. Short-term benefits to air quality would most likely not be measurable in the overall project area. Long-term benefits would include incremental site-specific reductions in windborne particulate from reduced erosion of exposed soils as vegetation/soil cohesion improves over time.

Alternative A is the least restrictive of cross country driving of all the alternatives, and therefore has the lowest associated potential benefit to air quality but is not expected to result in a substantial decrease in air quality.

### 4.3.1.3.2.2 Impacts of Mineral Development Decisions on Air Quality

Impacts of mineral development management decisions under Alternative A would maintain existing levels of use without additional constraints. Four primary BLM leasing categories for oil and gas have been identified within this assessment as outlined in Table 4.48:

- Standard Lease Terms (Standard)
- Special Conditions, or Timing Limitations and/or Controlled Surface Use (Limited)
- No Surface Occupancy (NSO)
- Closed (Lands designated as closed are not available for oil and gas development activities and therefore were not included in this analysis)

Based on the proportion of BLM lands open for leasing and the RFD (BLM 2005f), it is estimated that 451 oil and gas wells would be drilled over the life of the RMP (Table 4.9) under Alternative A, and that 226 of these would produce oil or gas. Of the producing wells, 139 are estimated to require flaring (60%). The maximum number of well pads constructed per year is assumed to be 52 (See Section 4.3.7). Alternative A would require an estimated 21 compressors and 226 glycol dehydrators. Surface disturbance associated with these wells is estimated to involve approximately 6,765 acres over the life of the RMP. Oil and gas development is anticipated to occur in all RFD areas but is projected to be least likely to occur in the Roan Cliffs RFD area, while the Book Cliffs and Greater Cisco RFD areas are projected to experience the greatest amount of development. The greatest density of new wells is projected to occur in the Greater Cisco RFD area. Additional information on disturbance specific to salable resources, other leasable resources, and geophysical exploration is available in Section 4.3.7.3.2 Impacts of Mineral Resource Development Decisions on Mineral Resource Development. Calculated numbers of wells for each RFD area in Alternative A are also listed in Table 4.9.

BLM_0010199

**Table 4.9. Average Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative A over 15 years**

| RFD Area | Predicted Oil and Gas Wells[1] | Predicted Producing Oil and Gas Wells | Producing Oil and Gas Wells Estimated to Require Flaring | Estimated Compressors Necessary[2] | Estimated Glycol Dehydrators Necessary[2] |
|---|---|---|---|---|---|
| Book Cliffs | 104 | 52 | 32 | 4 | 52 |
| Greater Cisco Area | 196 | 98 | 59 | 7 | 98 |
| Roan Cliffs | 2 | 1 | 1 | 2 | 1 |
| Salt Wash | 13 | 7 | 5 | 2 | 7 |
| Big Flat – Hatch Point | 46 | 23 | 14 | 2 | 23 |
| Lisbon Valley | 56 | 28 | 17 | 2 | 28 |
| Eastern Paradox | 34 | 17 | 11 | 2 | 17 |
| Total | 451 | 226 | 139 | 21 | 226 |

Note: Calculations based on BLM lands only, and are specific to the life of the RMP (15 years).

[1] The number of oil and natural gas wells was calculated as a cumulative total, not independently. For the purpose of analyzing impacts of minerals decisions on the total number of oil and natural gas wells, BLM lands designated as No Surface Occupancy (NSO) were not considered open for development.

[2] Necessary compressors were calculated at 0.063 per producing well (minimum of 2 per RFD area). Necessary glycol dehydrators were calculated at 1 per producing well (Trinity and Nicholls 2006).

Total emissions (tons/year) of criteria pollutants and greenhouse gases from compressors, glycol dehydrators, flaring, and fugitive dust associated with construction activities for Alternative A are summarized in Table 4.10. The base-year emission inventory for Grand and San Juan Counties are also displayed for comparison purposes. Particulate emissions increases are expected to be 10% and 9% for PM10 and PM2.5 over base-year data respectively. A 2% increase in CO, a 7% increase in NOx, and a 5% increase in Volatile Organic Compounds (VOCs) over base-year emissions is also expected. VOCs and NOx are precursors to ozone formation. No base-year TOC data are available for comparison.

**Table 4.10. Summary of Predicted Emissions and Comparison to Regional Base-year Emissions for the Moab FO Related to Expected Oil and Gas Development under Alternative A**

| Pollutant | Estimated Emissions under Alternative A (t/year) | Grand County Base-year[1] (t/year) | San Juan County Base-year[1] (t/year) | Regional Base-year[2] (t/year) | Percent change from Regional Base-year |
|---|---|---|---|---|---|
| CO | 679 | 18,107 | 9,042 | 27,149 | 2% |
| NOx | 189 | 1,611 | 1,152 | 2,764 | 7% |

BLM_0010200

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 5 of 293

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.1 Air Quality and Climate*

**Table 4.10. Summary of Predicted Emissions and Comparison to Regional Base-year Emissions for the Moab FO Related to Expected Oil and Gas Development under Alternative A**

| Pollutant | Estimated Emissions under Alternative A (t/year) | Grand County Base-year[1] (t/year) | San Juan County Base-year[1] (t/year) | Regional Base-year[2] (t/year) | Percent change from Regional Base-year |
|---|---|---|---|---|---|
| $CO_2$ | 83,271 | No data | No data | No data | No data |
| $PM_{10}$ | 245 | 851 | 1,529 | 2,380 | 10% |
| $PM_{2.5}$ | 46 | 200 | 332 | 532 | 9% |
| $SO_2$ | 0.4 | 27 | 67 | 94 | 0% |
| VOC | 1,744 | 36,803 | 1,533 | 38,337 | 5% |
| TOC | 2,767 | No data | No data | No data | No data |

[1] 2005 Emission inventory obtained from Utah Division of Air Quality. URL: http://www.airquality.utah.gov/Planning/Emission-Inventory/2005_State/05_State_List.htm
[2] Regional base-year assumed to be total emissions in Grand and San Juan County.

Emissions of hazardous air pollutants (HAPs) are summarized in Table 4.11 for Alternative A. Base-year HAPs data from the State of Utah Division of Air Quality for Grand and San Juan Counties do not include emissions from existing oil and gas development and therefore were found not be appropriate for comparison. The largest projected emissions of HAPs are for benzene (290 t/year), toluene (455 t/year), and xylenes (858 t/year). All of the HAPs listed below with the exception of H2S and naphthalene are also considered VOCs and are included as such in the criteria pollutant discussion above.

**Table 4.11. Predicted Emissions of Hazardous Air Pollutants (HAPs) for the Moab FO Related to Expected Oil and Gas Development Under Alternative A**

| Pollutant | Emissions from Compressors (t/year) | Emissions from Glycol Dehydrators (t/year) | Total Emissions (t/year) |
|---|---|---|---|
| Benzene | 0.30 | 289 | 289.4 |
| Ethylbenzene | 0.03 | 52.7 | 52.7 |
| Formaldehyde | 40.0 | 0.0 | 40.0 |
| $H_2S$ | 0.00 | <0.001 | 0.0 |
| Toluene | 0.30 | 454.4 | 454.7 |
| Xylenes | 0.10 | 858.2 | 858.4 |
| Other HAPs | 13.80 | - | 13.8 |

BLM_0010201

### 4.3.1.3.3 ALTERNATIVE B

#### 4.3.1.3.3.1 Impacts of Recreation and Travel Management Decisions on Air Quality

Under Alternative B, recreation management decisions would result in additional constraints to motorized vehicle use as compared to Alternative A.

Impacts of recreation management decisions under Alternative B are expected to be similar in nature, but more widespread than those described for Alternative A

In general, Alternative B allows no cross country driving, and is the most restrictive concerning surface-disturbing activities, and therefore has the highest potential for associated incremental benefit to air quality of all the proposed alternatives because cross country travel would be eliminated.

#### 4.3.1.3.3.2 Impacts of Mineral Development Decisions on Air Quality

Based on the proportion of BLM lands open for leasing and the RFD (BLM 2005f), it is estimated that 264 oil and gas wells would be drilled over the life of the RMP (Table 4.12) under Alternative B, a decrease of approximately 41% from Alternative A. It is assumed that 134 wells would produce oil or gas. Of the producing wells, 83 are estimated to require flaring (60%). The maximum number of well pads constructed per year is assumed to be 29 (See Section 4.3.7). Alternative B would require an estimated 16 compressors and 134 glycol dehydrators. Surface disturbance associated with these wells is estimated to involve approximately 3,960 acres over the life of the RMP. Oil and gas development is anticipated to occur in all RFD areas but is projected to be least likely to occur in the Roan Cliffs RFD Area, while the Book Cliffs and Greater Cisco RFD Areas are projected to experience the greatest amount of development, similar to Alternative A. Additional information on disturbance specific to salable resources, other leasable resources, and geophysical exploration is available in Section 4.3.7.3.2 Impacts of Mineral Resource Development Decisions on Mineral Resource Development. Calculated numbers of wells for each RFD area in Alternative B are also listed in Table 4.12.

**Table 4.12. Average Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative B over 15 years**

| RFD Area | Predicted Oil and Gas Wells[1] | Predicted Producing Oil and Gas Wells | Producing Oil and Gas Wells Estimated to Require Flaring | Estimated Compressors Necessary[2] | Estimated Glycol Dehydrators Necessary[2] |
|---|---|---|---|---|---|
| Book Cliffs | 66 | 33 | 20 | 3 | 33 |
| Greater Cisco Area | 92 | 46 | 28 | 3 | 46 |
| Roan Cliffs | 1 | 1 | 1 | 2 | 1 |
| Salt Wash | 11 | 6 | 4 | 2 | 6 |
| Big Flat – Hatch Point | 19 | 10 | 6 | 2 | 10 |

BLM_0010202

**Table 4.12. Average Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative B over 15 years**

| RFD Area | Predicted Oil and Gas Wells[1] | Predicted Producing Oil and Gas Wells | Producing Oil and Gas Wells Estimated to Require Flaring | Estimated Compressors Necessary[2] | Estimated Glycol Dehydrators Necessary[2] |
|---|---|---|---|---|---|
| Lisbon Valley | 54 | 27 | 17 | 2 | 27 |
| Eastern Paradox | 21 | 11 | 7 | 2 | 11 |
| Total | 264 | 134 | 83 | 16 | 134 |

Note: Calculations based on BLM lands only, and are specific to the life of the RMP (15 years).

[1] The number of oil and natural gas wells was calculated as a cumulative total, not independently. For the purpose of analyzing impacts of minerals decisions on the total number of oil and natural gas wells, BLM lands designated as No Surface Occupancy (NSO) were not considered open for development.

[2] Necessary compressors were calculated at 0.063 per producing well (minimum of 2 per RFD area). Necessary glycol dehydrators were calculated at 1 per producing well (Trinity and Nicholls 2006).

Total emissions (tons/year) of criteria pollutants and greenhouse gases from compressors, glycol dehydrators, flaring, and fugitive dust associated with construction activities for Alternative B are summarized in Table 4.13. Baseline base-year emission inventory for Grand and San Juan Counties are also displayed for comparison purposes. Particulate emissions increases are expected to be 6% and 5% for PM10 and PM2.5 over base-year data respectively. A 2% increase in CO, a 5% increase in NOx, and a 4% increase in Volatile Organic Compounds (VOCs) over base-year emissions are also expected. VOCs and NOx are precursors to ozone formation. No base-year TOC data is available for comparison.

**Table 4.13. Summary of Predicted Emissions and Comparison to Regional Base-year for the Moab FO Related to Expected Oil and Gas Development Under Alternative B**

| Pollutant | Estimated Emissions under Alternative A (t/year) | Grand County Base-year[1] (t/year) | San Juan County Base-year[1] (t/year) | Regional Base-year[2] (t/year) | Percent Change from Regional Base-year |
|---|---|---|---|---|---|
| CO | 475 | 18,107 | 9,042 | 27,149 | 2% |
| NOx | 136 | 1,611 | 1,152 | 2,764 | 5% |
| CO2 | 63,444 | No data | No data | No data | No data |
| PM10 | 138 | 851 | 1,529 | 2,380 | 6% |
| PM2.5 | 27 | 200 | 332 | 532 | 5% |
| SOx | 0.3 | 27 | 67 | 94 | 0% |
| VOC | 1,049 | 36,803 | 1,533 | 38,337 | 4% |
| TOC | 1,829 | No data | No data | No data | No data |

[1] 2005 Emission inventory obtained from Utah Division of Air Quality. URL: http://www.airquality.utah.gov/Planning/Emission-Inventory/2005_State/05_State_List.htm

[2] Regional base-year assumed to be total emissions in Grand and San Juan County.

BLM_0010203

Emissions of hazardous air pollutants (HAPs) are summarized in Table 4.14 for Alternative B. Base-year HAPs data from the State of Utah Division of Air Quality for Grand and San Juan Counties do not include emissions from existing oil and gas development and therefore were found not be appropriate for comparison. The largest projected emissions of HAPs are for benzene (172 t/year), toluene (270 t/year), and xylenes (509 t/year). All of the HAPs listed below with the exception of H2S and naphthalene are also considered VOCs and are included as such in the criteria pollutant discussion above.

**Table 4.14. Predicted Emissions of Hazardous Air Pollutants (HAPs) for the Moab FO Related to Expected Oil and Gas Development under Alternative B**

| Pollutant | Emissions from Compressors (t/year) | Emissions from Glycol Dehydrators (t/year) | Total Emissions (t/year) |
|---|---|---|---|
| Benzene | 0.3 | 171.4 | 172 |
| Ethylbenzene | 0.02 | 31.2 | 31.2 |
| Formaldehyde | 30.5 | 0 | 30.5 |
| $H_2S$ | 0 | <0.001 | <0.001 |
| Toluene | 0.2 | 269.4 | 270 |
| Xylenes | 0.1 | 508.9 | 509 |
| Other HAPs | 10.5 | 0 | 10.5 |

### 4.3.1.3.4 PROPOSED PLAN

#### 4.3.1.3.4.1 Impacts of Recreation and Travel Management Decisions on Air Quality

Under the Proposed Plan, recreation management decisions would result in minor additional constraints to motorized vehicle use as compared to Alternative A.

Impacts of recreation management decisions under the Proposed Plan are expected to be similar in nature but more widespread than those described for Alternative A, and less widespread than those described for Alternative B

In general the Proposed Plan is less restrictive of surface-disturbing activities, including cross country driving, than Alternative B, and more restrictive than Alternatives D or A, with the potential for a moderate associated incremental benefit to air quality, because cross country travel would be allowed only on 1,866 acres.

#### 4.3.1.3.4.2 Impacts of Mineral Development Decisions on Air Quality

Based on the proportion of BLM lands open for leasing and the RFD (BLM 2005f), it is estimated that 432 oil and gas wells would be drilled over the life of the RMP under the Proposed Plan (Table 4.15), a decrease of approximately 4% from Alternative A. It is assumed that 217 wells would produce oil or gas. Of the producing wells, 134 are estimated to require flaring (60%). The maximum number of well pads constructed per year is assumed to be 50 (See Section 4.3.7). The Proposed Plan would require an estimated 21 compressors and 217 glycol dehydrators. Surface disturbance associated with these wells is estimated to involve

BLM_0010204

approximately 6,480 acres over the life of the RMP (a decrease of approximately 4% from Alternative A). Oil and gas development is anticipated to occur in all RFD areas but is projected to be least likely to occur in the Roan Cliffs RFD Area, while the Book Cliffs and Greater Cisco RFD Areas are projected to experience the greatest amount of development, similar to Alternative A. Additional information on disturbance specific to salable resources, other leasable resources, and geophysical exploration is available in Section 4.3.7.3.2, Impacts of Mineral Resource Development Decisions on Mineral Resource Development. Calculated numbers of wells for each RFD area under the Proposed Plan are also listed in Table 4.15.

**Table 4.15. Average Predicted Oil and Gas Wells on BLM Lands within RFD Areas under the Proposed Plan over 15 years**

| RFD Area | Predicted Oil and Gas Wells[1] | Predicted Producing Oil and Gas Wells | Producing Oil and Gas Wells Estimated to Require Flaring | Estimated Compressors Necessary[2] | Estimated Glycol Dehydrators Necessary[2] |
|---|---|---|---|---|---|
| Book Cliffs | 104 | 52 | 32 | 4 | 52 |
| Greater Cisco Area | 197 | 99 | 60 | 7 | 99 |
| Roan Cliffs | 2 | 1 | 1 | 2 | 1 |
| Salt Wash | 11 | 6 | 4 | 2 | 6 |
| Big Flat – Hatch Point | 34 | 17 | 11 | 2 | 17 |
| Lisbon Valley | 56 | 28 | 17 | 2 | 28 |
| Eastern Paradox | 28 | 14 | 9 | 2 | 14 |
| **Total** | **432** | **217** | **134** | **21** | **217** |

Note: Calculations based on BLM lands only, and are specific to the life of the RMP (15 years).

[1] The number of oil and natural gas wells was calculated as a cumulative total, not independently. For the purpose of analyzing impacts of minerals decisions on the total number of oil and natural gas wells, BLM lands designated as No Surface Occupancy (NSO) were not considered open for development.

[2] Necessary compressors were calculated at 0.063 per producing well (minimum of 2 per RFD area). Necessary glycol dehydrators were calculated at 1 per producing well (Trinity and Nicholls 2006).

Total emissions (tons/year) of criteria pollutants and greenhouse gases from compressors, glycol dehydrators, flaring, and fugitive dust associated with construction activities for the Proposed Plan are summarized in Table 4.16. The base-year emission inventory for Grand and San Juan Counties are also displayed for comparison purposes. Particulate emissions increases are expected to be 10% and 8% for PM10 and PM2.5 over base-year data respectively. A 2% increase in CO, a 7% increase in NOx, and a 4% increase in volatile organic compounds (VOCs)

BLM_0010205

over base-year emissions are also expected. VOCs and NOx are precursors to ozone formation. No base-year TOC data is available for comparison.

**Table 4.16. Summary of Predicted Emissions and Comparison to Regional Base-year for the Moab FO Related to Expected Oil and Gas Development Under the Proposed Plan**

| Pollutant | Estimated Emissions under Alternative A (t/year) | Grand County Base-year[1] (t/year) | San Juan County Base-year[1] (t/year) | Regional Base-year[2] (t/year) | Percent change from Regional Base-year |
|---|---|---|---|---|---|
| CO | 669 | 18,107 | 9,042 | 27,149 | 2% |
| $NO_x$ | 187 | 1,611 | 1,152 | 2,764 | 7% |
| $CO_2$ | 83,271 | No data | No data | No data | No data |
| $PM_{10}$ | 236 | 851 | 1,529 | 2,380 | 10% |
| $PM_{2.5}$ | 45 | 200 | 332 | 532 | 8% |
| $SO_x$ | 0.4 | 27 | 67 | 94 | 0% |
| VOC | 1,678 | 36,803 | 1,533 | 38,337 | 4% |
| TOC | 2,701 | No data | No data | No data | No data |

[1] 2005 Emission inventory obtained from Utah Division of Air Quality. URL: http://www.airquality.utah.gov/Planning/Emission-Inventory/2005_State/05_State_List.htm

Emissions of hazardous air pollutants (HAPs) are summarized in Table 4.17 for the Proposed Plan. Base-year HAPs data from the State of Utah Division of Air Quality for Grand and San Juan Counties do not include emissions from existing oil and gas development and therefore were found not be appropriate for comparison. The largest projected emissions of HAPs are for benzene (278 t/year), toluene (437 t/year), and xylenes (824 t/year). All of the HAPs listed below with the exception of H2S and naphthalene are also considered VOCs and are included as such in the criteria pollutant discussion above.

**Table 4.17. Predicted Emissions of Hazardous Air Pollutants (HAPs) for the Moab FO Related to Expected Oil and Gas Development under the Proposed Plan**

| Pollutant | Emissions from Compressors (t/year) | Emissions from Glycol Dehydrators (t/year) | Total Emissions (t/year) |
|---|---|---|---|
| Benzene | 0.3 | 277.54 | 278.0 |
| Ethylbenzene | 0.0 | 50.57 | 50.6 |
| Formaldehyde | 40.0 | 0.00 | 40.0 |
| $H_2S$ | 0.0 | <0.01 | <0.01 |
| Toluene | 0.3 | 436.27 | 437.0 |
| Xylenes | 0.1 | 824.06 | 824.0 |
| Other HAPs | 13.8 | 0.00 | 13.8 |

BLM_0010206

### 4.3.1.3.5 ALTERNATIVE D

#### 4.3.1.3.5.1 Impacts of Recreation and Travel Management Decisions on Air Quality

Under Alternative D, recreation management decisions would result in minor additional constraints to motorized vehicle use as compared to Alternative A.

Impacts of recreation management decisions under Alternative D are expected to be similar in nature and area of influence to those described for the Proposed Plan.

In general Alternative D is less restrictive of surface-disturbing activities, including cross country driving, than Alternatives B or C, and more restrictive than Alternative A, with the potential for a moderate associated incremental benefit to air quality.

#### 4.3.1.3.5.2 Impacts of Mineral Development Decisions on Air Quality

Based on the proportion of BLM lands open for leasing and the RFD (BLM 2005f), it is estimated that 448 oil and gas wells would be drilled over the life of the RMP (Table 4.18), a decrease of approximately 0.7% from Alternative A. It is assumed that 225 wells would produce oil or gas. Of the producing wells, 138 are estimated to require flaring (60%). The maximum number of well pads constructed per year is assumed to be 52 (See Section 4.3.7). Alternative D would require an estimated 21 compressors and 225 glycol dehydrators. Surface disturbance associated with these wells is estimated to involve approximately 6,720 acres over the life of the RMP (a decrease of approximately 0.5% from Alternative A). Oil and gas development is anticipated to occur in all RFD areas but is projected to be least likely to occur in the Roan Cliffs RFD Area, while the Book Cliffs and Greater Cisco RFD Areas are projected to experience the greatest amount of development, similar to Alternative A. Additional information on disturbance specific to salable resources, other leasable resources, and geophysical exploration is available in Section 4.3.7.3.2, Impacts of Mineral Resource Development Decisions on Mineral Resource Development. Calculated numbers of wells for each RFD area in Alternative D are also listed in Table 4.18.

BLM_0010207

**Table 4.18. Average Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative D over 15 years**

| RFD Area | Predicted Oil and Gas Wells[1] | Predicted Producing Oil and Gas Wells | Producing Oil and Gas Wells Estimated to Require Flaring | Estimated Compressors Necessary[2] | Estimated Glycol Dehydrators Necessary[2] |
|---|---|---|---|---|---|
| Book Cliffs | 105 | 53 | 32 | 4 | 53 |
| Greater Cisco Area | 197 | 99 | 60 | 7 | 99 |
| Roan Cliffs | 2 | 1 | 1 | 2 | 1 |
| Salt Wash | 12 | 6 | 4 | 2 | 6 |
| Big Flat – Hatch Point | 44 | 22 | 14 | 2 | 22 |
| Lisbon Valley | 56 | 28 | 17 | 2 | 28 |
| Eastern Paradox | 32 | 16 | 10 | 2 | 16 |
| Total | 448 | 225 | 138 | 21 | 225 |

Note: Calculations based on BLM lands only, and are specific to the life of the RMP (15 years).

[1] The number of oil and natural gas wells was calculated as a cumulative total, not independently. For the purpose of analyzing impacts of minerals decisions on the total number of oil and natural gas wells, BLM lands designated as No Surface Occupancy (NSO) were not considered open for development.

[2] Necessary compressors were calculated at 0.063 per producing well (minimum of 2 per RFD area). Necessary glycol dehydrators were calculated at 1 per producing well (Trinity and Nicholls 2006).

Total emissions (tons/year) of criteria pollutants and greenhouse gases from compressors, glycol dehydrators, flaring, and fugitive dust associated with construction activities for Alternative D are summarized in Table 4.19. The base-year emission inventory for Grand and San Juan Counties are also displayed for comparison purposes. Particulate emissions increases are expected to be 10% and 9% for PM10 and PM2.5 over base-year data respectively. A 2% increase in CO, a 7% increase in NOx, and a 5% increase in volatile organic compounds (VOCs) over base-year emissions are also expected. VOCs and NOx are precursors to ozone formation. No base-year TOC data is available for comparison.

BLM_0010208

**Table 4.19. Summary of Predicted Emissions and Comparison to Regional Base-year for the Moab FO Related to Expected Oil and Gas Development Under Alternative D**

| Pollutant | Estimated Emissions under Alternative A (t/year) | Grand County Base-year[1] (t/year) | San Juan County Base-year[1] (t/year) | Regional Base-year[2] (t/year) | Percent change from Regional Base-year |
|---|---|---|---|---|---|
| CO | 677 | 18,107 | 9,042 | 27,149 | 2% |
| $NO_x$ | 189 | 1,611 | 1,152 | 2,764 | 7% |
| $CO_2$ | 83,271 | No data | No data | No data | No data |
| $PM_{10}$ | 245 | 851 | 1,529 | 2,380 | 10% |
| $PM_{2.5}$ | 46 | 200 | 332 | 532 | 9% |
| $SO_x$ | 0.4 | 27 | 67 | 94 | 0% |
| VOC | 1,736 | 36,803 | 1,533 | 38,337 | 5% |
| TOC | 2,780 | No data | No data | No data | No data |

[1] 2005 Emission inventory obtained from Utah Division of Air Quality. URL: http://www.airquality.utah.gov/Planning/Emission-Inventory/2005_State/05_State_List.htm
[2] Regional base-year assumed to be total emissions in Grand and San Juan County.

Emissions of hazardous air pollutants (HAPs) are summarized in Table 4.20 for Alternative D. Base-year HAPs data from the State of Utah Division of Air Quality for Grand and San Juan Counties do not include emissions from existing oil and gas development and therefore were found not be appropriate for comparison. The largest projected emissions of HAPs are for benzene (288 t/year), toluene (453 t/year), and xylenes (855 t/year). All of the HAPs listed below with the exception of H2S and naphthalene are also considered volatile organic compounds and are included as such in the criteria pollutant discussion above.

**Table 4.20. Predicted Emissions of Hazardous Air Pollutants (HAPs) for the Moab FO Related to Expected Oil and Gas Development Under Alternative D**

| Pollutant | Emissions from Compressors (t/year) | Emissions from Glycol Dehydrators (t/year) | Total Emissions (t/year) |
|---|---|---|---|
| Benzene | 0.3 | 287.8 | 288 |
| Ethylbenzene | 0.03 | 52.4 | 52.5 |
| Formaldehyde | 40 | 0 | 40 |
| $H_2S$ | 0 | <0.01 | <0.01 |
| Toluene | 0.3 | 452.4 | 453 |
| Xylenes | 0.1 | 854.4 | 855 |
| Other HAPs | 13.8 | 0 | 13.8 |

BLM_0010209

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 14 of 293

Moab PRMP/FEIS                    Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
                                  4.3.1 Air Quality and Climate

## 4.3.1.4 SUMMARY OF IMPACTS

Recreation and mineral management (oil and gas development) decisions would emit pollutants during operation (i.e., vehicle emissions, well operations, compressor engines, etc.), along with fugitive dust from public vehicle use, OHVs, construction and mineral development activities. Impacts to air quality from prescribed fire management decisions would generally be related to particulate matter (primarily PM2.5) and carbon dioxide ($CO_2$). Impacts would generally be short term and would result in long-term benefits for other resources.

With respect to oil and gas development alternatives, all of the alternatives would lead to additional emissions and impacts to air quality. These impacts were not assessed quantitatively in terms of concentrations of criteria air pollutants as the methodology employed in this analysis, an emissions inventory, precludes such analyses. However, the analysis provides for comparison to base-year emissions and a relative comparison among alternatives. The Proposed Plan would result in a 10% and 8% increase of PM10 and PM2.5 emissions over base-year data respectively. Increases in NOx and VOCs over base-year, the precursors for ozone formation, would be 7% and 4% respectively. This slight increase in emissions could affect ozone concentrations in Canyonlands National Park which are already close to the new 8-hr standard of 0.072 ppm (see Chapter 3, Section 3.2.1.1). Of all of the alternatives analyzed, Alternative B is the most protective of air quality with total emissions ranging from 24 to 44% less than Alternative A for individual pollutants. The differences in air emissions between Alternative A and the Proposed Plan are very small (Table 4.21).

**Table 4.21. Comparison Among Alternatives of Emitted Pollutants Associated with Oil and Gas Development**

|  | Alt. A | Alt B | | Proposed Plan | | Alt. D | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | Total Emissions (t/year) | Total Emissions (t/year) | Compare to Alt A | Total Emissions (t/year) | Compare to Alt A | Total Emissions (t/year) | Compare to Alt A |
| **Criteria pollutants and greenhouse gases** | | | | | | | |
| CO | 679 | 474.8 | -30% | 669 | -1% | 677 | -0.30% |
| NO$_x$ | 189 | 136.2 | -28% | 187 | -1% | 189 | -0.20% |
| CO$_2$ | 83,271 | 63,444.5 | -24% | 83,271 | 0% | 83,271 | 0.00% |
| PM$_{10}$ | 245 | 138 | -44% | 236 | -4% | 245 | 0.00% |
| PM$_{2.5}$ | 46 | 27 | -41% | 45 | -3% | 46 | -0.00001 |
| SO$_x$ | 0.4 | 0.3 | -24% | 0.4 | 0% | 0.4 | 0.00% |
| VOC | 1,744 | 1,049 | -40% | 1,678 | -4% | 1,736 | -0.40% |
| TOC | 2,767 | 1,829 | -34% | 2,701 | -2% | 2,760 | -0.30% |
| **Hazardous Air Pollutants** | | | | | | | |
| Benzene | 289 | 172 | -41% | 278 | -4% | 288 | -0.40% |
| Ethylbenzene | 53 | 31 | -41% | 51 | -4% | 52 | -0.40% |
| Formaldehyde | 40 | 30 | -24% | 40 | 0% | 40 | 0.00% |

BLM_0010210

**Table 4.21. Comparison Among Alternatives of Emitted Pollutants Associated with Oil and Gas Development**

| | Alt. A | Alt B | | Proposed Plan | | Alt. D | |
|---|---|---|---|---|---|---|---|
| | Total Emissions (t/year) | Total Emissions (t/year) | Compare to Alt A | Total Emissions (t/year) | Compare to Alt A | Total Emissions (t/year) | Compare to Alt A |
| *H2S* | 0 | 0 | -41% | 0 | -4% | 0 | -0.40% |
| *Toluene* | 454 | 269 | -41% | 436 | -4% | 452 | -0.40% |
| *Xylenes* | 856 | 508 | -41% | 822 | -4% | 853 | -0.40% |
| *Other HAPS* | 13.8 | 10.5 | -24% | 13.8 | 0% | 13.8 | 0.00% |
| **Total Hazardous Air Pollutants** | 1,707 | 1,021.2 | -40% | 1,641 | -4% | 1,699 | -0.40% |

## 4.3.2 CULTURAL RESOURCES

This section presents the impacts to cultural resources from management actions discussed in Chapter 2. Existing conditions concerning cultural resources are described in Chapter 3.

The required consultations for Section 106 of the National Historic Preservation Act are in progress and will be completed prior to signature of the ROD. The BLM has forwarded to the Utah State Historic Preservation Office a determination that, although in some cases, management actions in this plan may have a potential to affect historic properties, there would be no adverse affect to these historic properties.

Impacts to the cultural resources of the MPA could primarily result from activities associated with surface and subsurface disturbance such as development projects, recreational use/OHV travel, and fire management. However, impacts may also result from specific cultural resource management decisions and from non-surface-disturbing activities that create visual and/or auditory effects. These latter impacts would apply primarily to sites or locations deemed sacred or traditionally important by Native American tribes and used by these groups in such a manner that visual obstructions and/or noise levels impinge on that use. Impacts to cultural resources may be indirect, negligible, or non-existent from decisions related to some resource programs. In particular, management decisions for air quality, health and safety, soil and water, wildlife, and special status species are expected to have little or no direct or indirect effect on cultural resources within the MPA. Those actions, determined by the BLM IDT through best professional judgment as having little or no potential for impacts on cultural resources, will not be considered further in this analysis. All other management decisions with the potential to impact cultural resources either beneficial or adverse are discussed in subsequent sections of this chapter. Impacts to cultural resources from program decisions are considered to be long-term for the purpose of this analysis.

Because the majority of cultural resources that have been identified in the MPA consist of archaeological sites, the primary concern for impacts relates to disturbance of the artifacts, features, and architecture of sites in ways that reduce their integrity, alter their association with

BLM_0010211

traditional values, and reduce the potential to recover data. Archaeological data consist of both "objects"(in the broad sense of artifacts, architecture, features, etc.), and the horizontal and vertical relationships between these objects. Our ability to interpret and understand the past is based on recovering not only the material culture of the past in the form of artifacts, buildings, and the built environment, but the spatial relationships between different aspects of material culture. Consequently, surface and subsurface disturbances have the greatest potential for adverse impacts on cultural resources. Impacts can include elimination or reduction of the setting and physical integrity of a sacred or other site, including National Register-eligible sites, landscapes, and cultural theme areas. Other impacts may include disruption or reduction of the religious values of sites and areas, reduction in the data potential of a site, and damage to traditional collection areas or resource sites. In general, impacts on cultural resources from surface disturbance are long-term and permanent; once an archaeological site has been impacted, the effect typically cannot be reversed. However, as stated previously, short-term effects from visual or auditory impacts may occur, and can often be mitigated or accommodated.

Potential impacts to specific cultural resources from the various proposed management alternatives are difficult to quantify precisely. The management alternatives neither stipulate precise areas for surface-disturbing activities, nor are the precise locations of all cultural resources in the area known. However, it is possible to estimate impacts based on the proposed general locations of activities and the relationships of these planning areas to zones of high or low probability of containing cultural resources.

## 4.3.2.1 ANALYSIS CONSIDERATIONS

A model of cultural resource site density was developed as a means of estimating the general densities of sites at a landscape level. This model was developed by a professional BLM archaeologist using environmental variables that are known to coincide with land-use actions. The following variables were used to predict the occurrence of cultural sites in the MFO:

- Lands within 0.5 mile of a spring
- Lands within 1 mile of a river or major drainage
- Lands within 0.5 mile of intermittent streams
- Lands within 300 meters of a riparian area
- Lands classified as Piñon-Juniper from Southwest Regional Gap Analysis Project (SWREGAP) data
- Lands classified as sand dunes using SWREGAP data
- Lands within the following geologic types: Summerville Formation, Entrada sandstone, Morrison Formation, Navajo Sandstone, Alluvial and Aeolian deposits, Cedar Mountain Formation, and Wingate sandstone

If only one of the above variables was present within a given area of the MPA, the area was classified as low probability for archeological sites. If two variables were present, the area was classified as medium probability for archeological sites. If an area had three or more variables, it was classified as high probability for archeological sites. To test the model, the MFO took all known (4,259) sites in the field office area and intersected them with the probability coverage. The assumption was made that if a point intersected with a medium or high probability polygon, it was a correct classification; if the point intersected a low polygon, it was an incorrect

BLM_0010212

classification. Using a 15-meter buffer, the model correctly classified sites to 73% accuracy. That is, 3,103 of the 4,259 sites fell within the high or medium probability polygons.

While the site density prediction model used in this analysis is by no means a perfect predictor of site density, it is sufficiently accurate (73% success rate) to be utilized as a tool for analyzing potential relative involvement of cultural resource sites in management decisions. It is therefore used in analyses in the RMP as a means of gauging whether a particular alternative would involve more acres of high or medium site density land than another. The model is not used to predict numbers of sites involved in decisions, nor should it be considered a replacement for full inventory for sites prior to surface disturbance or as a substitute for the Section 106 process of the National Historic Preservation Act.

Impacts of many of the proposed management actions are assessed in the following sections with regard to how much of the action is likely to result in surface-disturbing activities within the high or medium density zones. For the purpose of analysis, it is assumed that the potential for disturbance in high and medium site density areas is proportional to the total acres of land in each site density category within the area where the disturbance would take place. For example, assume that a particular area contains 100 acres, 20 acres (20%) of which are classified by the site density model as having high site density and 80 acres (80%) of which are classified as having low site density. Assume also that a particular management decision is expected to result in a total of 50 acres of disturbance within the 100-acre area. For the purpose of the analysis of impacts to cultural resources described in this document, it would be assumed that 10 acres (20%) of that disturbance would be located in the high site density area, and 40 acres (80%) of the disturbance would be located in the low site density area. Again, while not precise, this method enables a quantifiable assessment of probable relative effect(s) of planning action alternatives.

### 4.3.2.2 IMPACTS COMMON TO ALL ALTERNATIVES, INCLUDING THE PROPOSED PLAN

Certain management decisions for cultural resources would apply to all alternatives and would impact such resources equally regardless of the alternative. Table 4.22 summarizes the anticipated impacts to cultural resources that may be anticipated under all alternatives.

**Table 4.22. Impacts Common to All Alternatives**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Compliance with all existing statutes, regulations, formal agreements, Executive Orders, and policies applicable to cultural resources, including the NHPA, NAGPRA, and existing treaties and trust agreements, would reduce opportunities for short- and long-term, adverse impacts to cultural resources. Application of avoidance measures as part of compliance with Federal laws such as the NHPA would provide for long-term beneficial impacts to cultural resource sites. |

BLM_0010213

**Table 4.22. Impacts Common to All Alternatives**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Fire Management | Protection of cultural resources was a key factor in determining fuels treatment and fire response actions included in the Moab Fire Management Plan (Moab FMP). As such, fire management in the MPA already includes measures to limit overall impacts on cultural resources. A total of 15,500 acres would be treated through prescribed fire every 10 years. Approximately 5,860 acres of those treatments would occur in high cultural resource site density areas, and 6,217 acres would occur in the medium site density areas. An additional 7,450 acres would be treated through non-fire treatments, with approximately 1,347 acres of those treatments occurring in high site density areas and 3,063 acres occurring in medium site density areas. Reducing fuel loads reduce the risks of catastrophic fires that can damage cultural resources. BLM fire management policy is to conduct cultural resource identification surveys prior to treatment for fuels reduction through non-fire treatments or prescribed fire. As such, the actual risk to cultural resources within the MPA from fire management decisions is considered low. Up to 40,000 acres every 10 years would be treated through use of wildland fire. Of this area, approximately 6,360 acres would be in high site density areas and 20,700 acres would be in medium site density areas. |
| Lands and Realty | WSAs and WAs would be exclusion zones for rights-of-way, which would afford a certain level of long-term benefit to cultural resources from reductions in ground disturbance and less human activity in the vicinity of sites. Continuation of mineral withdrawals for 78,333 acres of land would eliminate one source of potential ground disturbance and related secondary impacts to cultural resources over the short and long terms. |
| Livestock Grazing | Grazing would not be authorized on approximately 48,220 acres on several allotments in the MPA. Cultural resource sites within these allotments, regardless of site density, would experience long-term beneficial impacts as a result of reduced opportunities for trampling by livestock. |

BLM_0010214

**Table 4.22. Impacts Common to All Alternatives**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals | Approximately 353,510 acres within WSAs and Wilderness Areas would be closed to mineral leasing and development. Cultural resources within these closed areas would experience long-term beneficial impacts from reduced opportunities for both direct and indirect impacts resulting from surface disturbance and increased human presence that accompany mineral development. Outside of closed areas, application of BLM's standard policies and adherence with Federal cultural resource legislation as part of authorizing or permitting use of minerals resources includes measures for identifying cultural resources prior to development and avoidance, minimization, and/or mitigation measures to reduce potential adverse impacts to cultural resources. However, areas open to mineral development do pose some indirect, yet unquantifiable risk to cultural resources. An estimated 173 acres of high site density lands and 345 acres of medium site density lands within the MPA would be subject to potential surface disturbance over the life of the RMP for development of non-oil and gas leasable minerals, and locatable minerals. <br><br>BLM would implement the Section 106 process for all mineral development, thereby providing opportunity to avoid, minimize, or mitigate potential direct adverse impacts to cultural resources. Indirect adverse impacts to cultural resources would likely still occur from increased human activity associated with minerals development on MPA lands, which often leads to inadvertent impacts, vandalism, and looting. Mineral withdrawals would apply to 41,488 acres of high site density lands and 26,298 acres of medium site density lands. |
| Non-WSA Lands with Wilderness Characteristics | There are no actions common to all alternatives for wilderness characteristics. |
| Paleontological Resources | Paleontological program decisions have the potential for minimal, indirect impacts, both adverse and beneficial, on cultural resources. Cultural resources could indirectly benefit from pre-development paleontological surveys in that such resources could be identified as a result of fossil surveys and avoided during development. Cultural resources could experience adverse impacts as an indirect result of existing permissions to collect certain types of fossil materials from BLM lands within the MPA. Casual collectors may not distinguish between paleontological materials and cultural resources or may not recognize that permissions to collect fossil materials do not also extend to cultural artifacts. |
| Recreation | Management of recreation stresses maintenance of rangeland health, which provides limited short- and long-term benefits to cultural resources through measures reducing ground disturbance and natural resource degradation. However, without additional measures focused on cultural resources, long-term adverse impacts may occur. |

BLM_0010215

**Table 4.22. Impacts Common to All Alternatives**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Special Designations | A total of 71,460 acres in WSAs are located on lands classified as having high cultural resource site density. Another 172,334 acres are located on lands classified as having medium cultural resource site density. The same acres would be included in WSAs for all alternatives. Management of WSAs under the IMP includes restrictions on surface disturbance. These restrictions limit surface disturbance for new actions (valid existing rights and other pre-existing authorizations are recognized) to a level of disturbance that does not impair the wilderness suitability of the WSA in question. Because of these restrictions on surface-disturbing activities, cultural resources within these areas of special designation would experience long-term indirect beneficial impacts through reduced opportunities for inadvertent disturbance. There are no actions Common to All Alternatives concerning ACECs or WSRs. |
| Visual Resources | Designation of WSAs and designated wilderness as VRM Class I would reduce opportunities for direct and indirect adverse impacts to cultural resources within those areas because surface-disturbing activities are excluded, thereby resulting in potential long-term, beneficial impacts to these resources. |
| Woodlands | Woodland harvest would result in long-term beneficial impacts on traditional cultural practices of Native Americans, and potential long-term beneficial impacts to cultural resources from reductions in fuels loading and a resulting reduction in the probability of catastrophic wildfire, which can severely damage certain types of cultural resources. Woodland harvest could have potential inadvertent indirect impacts to cultural resources from the cross country driving and surface disturbance associated with woodcutting activities. |

\* high and medium site density land figures were derived from RFD impact tables with the assumption that the distribution of potential impact over the high and medium site density areas would be comparable to the ratio of high to medium density area within the combined WSAs and Was

## 4.3.2.3 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

Certain management decisions within this EIS are common to only the action alternatives (Alternatives B, D, and the Proposed Plan) and not to Alternative A. These decisions have the potential to result in impacts to cultural resources within the MPA. Table 4.23 summarizes the potential impacts to cultural resources that could occur from these common actions under Alternatives B, D, and the Proposed Plan. Fire management decisions apply to all alternatives, including Alternative A, and are discussed in Section 4.3.2.2.

BLM_0010216

**Table 4.23. Impacts Common to All Action Alternatives**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Cultural resources would experience long-term, beneficial impacts from reduced opportunities for direct and indirect disturbance associated with recreational activities, improper livestock grazing, and OHV use. Specific provisions would be implemented to minimize or mitigate ongoing conflicts between cultural resources and other authorized land uses. A focus on proactive site inventory would expand the BLM's knowledge of the cultural resources under its jurisdiction and help the agency to refine management strategies. The identification of cultural resource sensitive areas would reduce opportunities for adverse impacts to cultural resources in those areas. The development of CRMPs for seven culturally sensitive areas would better integrate the management of cultural resources in these areas with management of other resources and land uses, which should benefit cultural resources. |
| Livestock Grazing | Identification and implementation of appropriate utilization levels would help reduce grazing intensity and the attendant erosion, which can directly and indirectly adversely impact cultural resources. |
| Minerals | The application of NSO stipulations for the protection of natural resource values and recreational opportunities in the Three Rivers and Westwater Mineral Withdrawal areas would indirectly benefit cultural resources in these areas by reducing potential sources of ground disturbance and human activity. Applications of NSO stipulations in the Moab and Spanish Valleys, Castle Valley (including Mayberry Orchard), Thompson Springs, Moab Landfill, Moab Airport and Dead Horse Point State Park would provide long-term indirect benefits to cultural resources for the same reason. |
| Paleontological Resources | Impacts would be effectively the same as described for all alternatives (Table 2.1). |
| Recreation | Management of recreational activity to sustain other resource values, including cultural resources, would provide long-term benefit to cultural resources by curtailing activities that have direct and indirect adverse impacts on these resources. Allowance of dispersed camping throughout much of the MPA places cultural resources in those areas at risk for long-term adverse impacts from direct disturbance, vandalism, and looting. More concerted development and promotion of recreational trails provides opportunities to educate the public about cultural resource preservation, thereby benefiting these resources. Development of SRMAs would have similar potential for beneficial impacts as described for recreational trails. |
| Travel Management | OHV use would be restricted to designated routes, resulting in variable beneficial impacts to cultural resources. |
| Woodlands | Restrictions on fuelwood gathering in riparian areas would reduce opportunities for adverse impacts to cultural resources. Closure of areas to wood gathering and wood harvest when unacceptable impacts to sensitive resources are identified would help minimize adverse impacts to cultural resources, though mitigation of adverse impacts for previously impacted cultural sites may be necessary. |

BLM_0010217

#### 4.3.2.4 ALTERNATIVES IMPACTS

Proposed management decisions for many resource programs within the MPA vary by alternative. The potential impacts of these varying decisions are discussed in the following sections by alternative.

#### 4.3.2.4.1 ALTERNATIVE A

Impacts to cultural resources under Alternative B incorporate all of the impacts discussed in Section 4.3.2.2, Impacts Common to All Alternatives. Additional impacts to cultural resources under Alternative B, excluding special designations, are described in Table 4.25. Because special designations incorporate an array of individualized management actions, the impact of their associated decisions on cultural resources is discussed separately, following Table 4.24. There are no alternative-specific management actions for fire or paleontological resources.

**Table 4.24. Impacts to Cultural Resources Under Alternative A**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Current levels of beneficial and adverse impacts to cultural resources from authorized land uses would continue. All sites would be allocated to scientific use. |
| Lands and Realty | Designated utility corridors would encompass 3,776 acres of high site density lands and 7,930 acres of medium site density lands. This represents approximately 1.2% each of all high and medium site density lands in the MPA. |
| Livestock Grazing | Grazing would not be available on 126,907 acres of land (which is less than Alternative B, but more than Alternatives C or D). Grazing would not be available on 8% (24,329 acres) of high site density lands and 9% (55,395 acres) of medium site density lands within the MPA. Grazing would be allowed on 278,247 acres (92%) of high site density lands and 569,771 acres (92%) of medium site density lands. Cultural resources in areas available for grazing could experience minimal long-term adverse impacts from trampling and rubbing (e.g., on rock art panels) by livestock. All eligible sites would be mitigated. Cultural resources in areas not available for grazing would experience long-term benefits from reduced opportunities for direct and indirect impacts. |
| Minerals—oil and gas—Book Cliffs RFD | Approximately 79 acres of ground disturbance involving soil movement in high site density areas and 645 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.4% of all high site density lands and 0.6% of all medium site density lands in the RFD area. Standard BLM policy and the Section 106 process would be applied to all applications for disturbance, thereby reducing opportunities for direct adverse impacts related to this disturbance. Inadvertent impacts and impacts from vandalism and looting that may accompany increased human activity in developed areas may occur. |
| Minerals—oil and gas—Greater Cisco RFD | Approximately 110 acres of disturbance in high site density areas and 490 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.8% of all high site density lands and 1% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |

BLM_0010218

**Table 4.24. Impacts to Cultural Resources Under Alternative A**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals—oil and gas—Roan Cliffs RFD | Approximately 3 acres of disturbance in high site density areas and 14 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.01% of all high site density lands and 0.03% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Salt Wash RFD | Approximately 17 acres of disturbance in high site density areas and 52 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.3% of all high site density lands and 0.3% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Big Flat-Hatch Point RFD | Approximately 151 acres of disturbance in high site density areas and 203 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.2% of all high site density lands and 0.2% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Lisbon Valley RFD | Approximately 174 acres of disturbance in high site density areas and 361 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.7% of all high site density lands and 0.7% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Eastern Paradox RFD | Approximately 84 acres of disturbance in high site density areas and 163 acres in medium site density areas would occur over the life of the RMP. This represents approximately 0.07% of all high site density lands and 0.07% of all medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—geophysical | An estimated 407 acres (0.1%) of land in high site density areas within the MPA and 815 acres (0.1%) of medium site density lands would be subject to disturbance for geophysical work over the life of the RMP. Cultural resources in these areas would be available for long-term adverse impacts. Adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts occurring as a result of geophysical activities. |
| Minerals—salable (mineral materials) | A total of 1,467,768 acres is available for the disposal of salable minerals. Although adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts, the greater the area available for salable minerals disposal, the greater potential for adverse impacts because of possible inadvertent impacts. |
| Non-WSA Lands with Wilderness Characteristics | There are no specific management actions related to non-WSA lands with wilderness characteristics under Alternative A. |

BLM_0010219

**Table 4.24. Impacts to Cultural Resources Under Alternative A**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Recreation | Approximately 49,543 acres of high site density lands and 37,418 acres of medium site density land would be managed within SRMAs. This represents approximately 16% of all high site density lands and 6% of all medium site density lands in the MPA. The management and education of recreationists would generally have long-term beneficial impacts on cultural resources as direct and indirect disturbance of sites would be less likely occur either intentionally (e.g., vandalism and looting) or inadvertently. Careful monitoring by the BLM of site condition in these areas would help identify unacceptable impacts early on and allow for implementation of minimization and/or mitigation measures to address these impacts. |
| Special Designations | Although none of the eligible WSRs would be determined and managed as suitable for congressional wild and scenic designation in this alternative, they would all remain eligible and would continue to be managed to protect their outstandingly remarkable values, tentative classifications, and free-flowing nature on a case-by-case basis. This would provide a temporary benefit to cultural resources by reducing potential for direct and indirect impacts to site." |
| Travel Management | Approximately 1,049 acres (0.3%) of high site density lands and 1,844 acres (0.3%) of medium site density lands would be closed to OHV use. Approximately 208,757 acres (69%) of high site density lands and 386,579 acres (62%) of medium site density lands would be in areas where OHV use is limited to designated routes, and 92,628 acres (31%) of high site density lands and 236,593 acres (38%) of medium site density lands open to cross country OHV use. Cultural resources in areas closed to OHV use would experience long-term reductions in risks of direct and indirect adverse impacts. Cultural resources located in areas limited to OHV use on designated routes would experience variable beneficial and adverse impacts in that cultural resources in areas located off of designated routes would experience lower levels of disturbance, but cultural resources located adjacent to designated routes would likely experience more concentrated disturbance. Cultural resources located in areas open to cross country OHV use would experience current, or potentially increased, levels of adverse impacts from direct and indirect disturbances. Alternative A would have more high and medium site density lands open to cross country OHV use and less closed to OHV use than any other alternative.<br><br>Existing travel routes would remain open and available for use under current conditions. Existing levels of direct and indirect impacts, primarily adverse, to cultural resources would continue to result from inadvertent and induced impacts associated with human activity in areas containing sites. There are 148.2 miles of route identified as having possible cultural conflicts. |
| Visual Resources | Designation of 72,609 acres (24%) of high site density lands and 174,085 acres (28%) of medium site density lands as VRM Class I conditions would benefit cultural resources in those areas by limiting surface-disturbing activities and the associated human activity. |

BLM_0010220

**Table 4.24. Impacts to Cultural Resources Under Alternative A**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Woodlands | Woodland products use would be prohibited on 144,146 acres (47%) of high site density lands and 252,959 acres (40%) of medium site density lands within the MPA. Use of woodland products would be allowed on 158,768 acres (53%) of high site density lands and 372,944 acres (60%) of medium site density lands. Cultural resources in areas open to woodland products use could experience long-term adverse impacts from direct disturbance (e.g., being driven over or subject to other surface disturbance such as mixing of soils containing artifacts in work areas and loading sites) or indirect disturbance (e.g., vandalism and looting). It is important to note that not all areas open to woodland products use contain actual woodlands that would be targeted for use; therefore, the actual acres of high / medium site density lands on where wood gathering or harvest would occur is expected to be much less than the sum total of lands open for such activities. |

Special designations management decisions under Alternative A would have both direct and indirect long-term impacts on cultural resources within the MPA. Special designations include WSAs, ACECs, and WSRs. The impact to cultural resources of management actions under WSAs were discussed under Impacts Common to All Alternatives.

The Negro Bill ONA is largely within a WSA and the restrictions associated with WSA were discussed in Impacts Common to All Alternatives. No WSRs would be established under this alternative. Portions of the ONA that would be managed under WSA special designations under Alternative A include approximately 243 acres of lands with high cultural resource site density. This area would be managed with restrictions on surface disturbance to protect non-motorized recreational (i.e., hiking) opportunities and outstanding natural resources. These restrictions would provide long-term benefit to cultural resources by reducing opportunities for direct and indirect impacts to sites.

Other areas of the MPA to be designated ACECs under the action alternatives to protect relevant and important cultural values would not be designated under Alternative A. These areas would generally be managed to be consistent with the surrounding land management strategy and would, in most cases, allow for surface disturbance that could adversely impact cultural resources.

### 4.3.2.4.2 ALTERNATIVE B

Impacts to cultural resources under Alternative B incorporate all of the impacts discussed in Section 4.3.2.2, Impacts Common to All Alternatives. Additional impacts to cultural resources under Alternative B, excluding special designations, are described in Table 4.25. Because special designations incorporate an array of individualized management actions, the impact of these designations on cultural resources is discussed separately, following Table 4.25. There are no alternative-specific management actions for fire or paleontological resources.

BLM_0010221

**Table 4.25. Impacts to Cultural Resources Under Alternative B**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Priority for new inventory and assessment would encompass 50,000 acres, resulting in refined knowledge of cultural resources within the MPA and a better ability to manage these resources effectively. More sites would be targeted for restoration and nomination to the NRHP under this alternative than under any other alternative, and fewer sites would be allocated or developed for public use. Restoration of damaged sites would result in long-term benefits to the targeted sites. Public interpretation of sites has both short-term and long-term beneficial and adverse impacts to cultural resources through raising awareness of the presence of such resources in the area and educating the public about protection of cultural sites. While education may encourage visitors to be more careful around cultural sites and avoid collecting or moving artifacts, raising the awareness of sites in a given area may lead some visitors to seek out unprotected sites for the purpose of looting. |
| Lands and Realty | Designation of ACECs as avoidance areas for rights-of-way would provide long-term benefits to cultural resources in these areas by removing one potential source of ground disturbance and related indirect adverse impacts. Designated utility corridors would encompass 6,309 acres (2%) of high site density lands and 17,056 acres (3%) of medium site density lands. Cultural resources within these utility corridors would be vulnerable to adverse impacts from development of the utilities. Application of BLM standard procedures and the Section 106 process would reduce opportunities for such impacts and allow for avoidance, minimization, or mitigation of potential adverse impacts to a large degree. |
| Livestock Grazing | Grazing would be removed from or restricted in certain known high (sensitive) site density areas and would provide beneficial impacts to cultural resources from reduced opportunities for trampling, rubbing, and erosion from loss of vegetation. More such areas would exist under Alternative B (153,797 acres) than under any other alternative. Grazing would be prohibited on 29,758 acres (10%) of high site density lands and 63,524 acres (10.0%) of medium site density lands within the MPA. Grazing would be allowed on 272,818 acres (90%) of high site density lands and 561,641 acres (90%) of medium site density lands. Cultural resources in areas available for grazing could experience minimal long-term adverse impacts from trampling and rubbing (e.g., on rock art panels) by livestock. All eligible sites would be mitigated. Cultural resources in areas not available for grazing would experience long-term benefits from reduced risk for direct and indirect impacts. |
| Minerals—oil and gas—Book Cliffs RFD | Approximately 41 acres of disturbance in high site density areas and 438 acres in medium site density areas would occur over the life of the RMP. This represents 0.2% of high site density lands and 0.4% of medium site density lands in the RFD area. Standard BLM policy and the Section 106 process would be applied to all applications for disturbance, thereby reducing opportunities for direct adverse impacts related to this disturbance. Inadvertent impacts and impacts from vandalism and looting that may accompany increased human activity in developed areas may occur. |

BLM_0010222

**Table 4.25. Impacts to Cultural Resources Under Alternative B**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals—oil and gas—Greater Cisco RFD | Approximately 70 acres of disturbance in high site density areas and 253 acres in medium site density areas would occur over the life of the RMP. This represents 0.5% of high site density lands and 0.6% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Roan Cliffs RFD | Approximately 6 acres of disturbance in medium site density areas would occur over the life of the RMP. This represents 0.01% of medium site density lands in the RFD area. No high site density lands would likely be impacted. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Salt Wash RFD | Approximately 23 acres of disturbance in high site density areas and 41 acres in medium site density areas would occur over the life of the RMP. This represents 0.4% of high site density lands and 0.3% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Big Flat-Hatch Point RFD | Approximately 55 acres of disturbance in high site density areas and 76 acres in medium site density areas would occur over the life of the RMP. This represents 0.08% of high site density lands and 0.08% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Lisbon Valley RFD | Approximately 162 acres of disturbance in high site density areas and 349 acres in medium site density areas would occur over the life of the RMP. This represents 0.7% of high site density lands and 1.5% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Eastern Paradox RFD | Approximately 44 acres of disturbance in high site density areas and 100 acres in medium site density areas would occur over the life of the RMP. This represents 0.04% of high site density lands and 0.04% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—geophysical | An estimated 239 acres (0.08%) of land in high site density areas within the MPA and 477 acres (0.08%) of medium site density lands would be subject to disturbance for geophysical work over the life of the RMP. Cultural resources in these areas could be subject to long-term adverse impacts. However, adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts occurring as a result of geophysical activities. |
| Minerals—salable (mineral materials) | A total of 836,137 acres is available for the disposal of salable minerals. Although adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts, the greater the area available for salable minerals disposal, the greater the potential for adverse impacts because inadvertent damage could occur. |

BLM_0010223

**Table 4.25. Impacts to Cultural Resources Under Alternative B**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Non-WSA Lands with Wilderness Characteristics | Management of 47,784 acres (16%) of high site density lands and 83,191 acres (13%) of medium site density lands for protection of wilderness characteristics would benefit cultural resources in those areas by limiting surface-disturbing activities and the associated human activity. |
| Recreation—SRMAs | Approximately 217,994 acres of high site density lands and 391,125 acres of medium site density land would be managed within SRMAs. This represents 72% of high site density lands and 63% of medium site density lands in the MPA. By managing and educating recreationists in these areas, long-term adverse impacts on cultural resources would be reduced. Careful monitoring by the BLM of site condition in these areas would help identify unacceptable impacts early on and allow for implementation of minimization and/or mitigation measures to address these impacts. Given that Alternative B would encompass less recreational development and slightly greater restriction on camping locations and group sizes, impacts to cultural resources under this alternative would be expected to be less than under any other alternative. |
| Travel Management | Approximately 72,415 acres (24%) of high site density lands and 173,703 acres (28%) of medium site density lands would be closed to OHV use. Approximately 230,160 acres (76%) of high site density lands and 451,446 acres (72%) of medium site density lands would be where OHV use is limited to designated routes. No areas would be open to cross country OHV. Cultural resources in areas closed to OHV use would experience long-term reductions in opportunities for direct and indirect adverse impacts. Cultural resources located in areas where OHV use is limited to designated routes would experience variable beneficial and adverse impacts<br><br>Approximately 327 linear miles of existing travel routes in high site density areas and 646 miles in medium site density areas would be closed to travel. Cultural resources in these areas would experience moderate, long-term beneficial impacts from reduced opportunities for inadvertent impacts, looting, and vandalism. Existing levels of direct disturbance of cultural sites from foot and motorized traffic along travel routes would continue at current levels. Additionally, indirect impacts such as increased risk of looting and vandalism from users of travel routes would also continue to occur at levels similar to Alternative A. There are 148.2 miles of designated routes with possible cultural conflicts. In Alternative B, 46.5 miles of these routes are not identified for travel. |
| Visual Resources | Designation of 106,105 acres (35%) of high site density lands and 212,017 acres (34%) of medium site density lands for VRM Class I would benefit cultural resources in those areas by limiting surface-disturbing activities with associated reductions in human activity, reducing both direct disturbance impacts and indirect risks of vandalism and looting. |

BLM_0010224

**Table 4.25. Impacts to Cultural Resources Under Alternative B**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Woodlands | Woodland products use would be prohibited on 183,677 acres (61%) of high site density lands and 337,089 acres (54%) of medium site density lands within the MPA. Use of woodland products would be allowed on 119,237 acres (39%) of high site density lands and 288,814 acres (46%) of medium site density lands. As described under Alternative A, cultural resources in areas open to woodland products use could experience long-term adverse impacts from direct disturbance (e.g., being driven over or subject to other surface disturbance) or indirect disturbance (e.g., vandalism and looting). Not all areas open to woodland products use contain actual woodlands that would be targeted for use. As such, the actual acres of high and medium site density lands on which wood gathering or harvest would occur is expected to be less than the sum total of lands open for such activities. |

Within ACECs and WSRs, an array of management actions would be implemented that vary widely in terms of the level of surface disturbance allowed or prohibited. Since high cultural resource site density areas constitute the areas of greatest concern for potential adverse impacts to cultural resources, only those areas will be discussed relative to ACECs and WSRs.

Areas that would be managed as ACECs under Alternative B include approximately 109,809 acres of lands with high cultural resource site density in proposed ACECs and 45,113 acres of high site density lands in proposed WSRs. Within these areas, management actions include a range of measures that would benefit cultural resources by affording them direct and indirect protection from adverse impacts. These management actions include such measures as implementing NSO stipulations for leasable minerals and applying non–surface-disturbing requirements to salable minerals on approximately 45,806 acres of high site density lands (see Appendix C for a full explanation of stipulations applicable to oil and gas leasing and other surface-disturbing activities). Closing areas for leasable and salable minerals on 49,789 acres of high site density lands (where the ACEC overlaps a WSA), managing for VRM Class I (with attendant limitations on surface disturbance) on approximately 73,814 acres of high site density lands, eliminating OHV use on approximately 8,854 acres of high site density lands, restricting livestock grazing on 11,398 acres of high site density lands, and prioritizing cultural resource identification work on 67,126 acres of high site density lands would produce beneficial impacts for cultural resources. Table 4.26 lists the proposed special designations to which these stipulations apply and the acreages of high site density contained therein. If a proposed special designation area is not listed in the table, either the stipulations do not apply to the area or there are no estimated acres of high site density within the area. The stipulations noted above reduce the risk of cultural resource sites being inadvertently impacted by surface-disturbing activities.

BLM_0010225

**Table 4.26. Acres of High Site Density Lands in ACECs with Stipulations Affecting Cultural Resources, Alternative B**

| Special Designation (All ACECs) | NSO for Leasable/ Salable Minerals | Closed to Leasable/ Salable Minerals | Designated as VRM Class I | Closed to OHV Use | Unavailable / Limited Grazing | Prioritize Cultural Survey |
|---|---|---|---|---|---|---|
| Behind the Rocks | 2,288 | 0 | 5,559 | 5,559 | 271 | 7,848 |
| Bookcliffs | 2,353 | 40,033 | 40,033 | 0 | 6117 | 40,033 |
| Canyon Rims | 3,510 | 0 | 0 | 0 | 0 | 0 |
| Cisco WTPD Complex | 4,699 | 0 | 0 | 0 | 0 | 0 |
| Colorado River Corridor | 9,592 | 0 | 9,592 | 0 | 4,233 | 0 |
| Cottonwood-Diamond | 383 | 6,461 | 0 | 0 | 7,368 | 6,461 |
| Highway 279/ Shafer Basin/Long Canyon | 3,915 | 0 | 3,915 | 0 | 645 | 0 |
| Labyrinth Canyon | 5,202 | 0 | 5,202 | 0 | 0 | 0 |
| Mill Creek Canyon | 3,325 | 0 | 4,590 | 0 | 4,265 | 4,590 |
| Ten Mile Wash | 3,237 | 0 | 0 | 0 | 0 | 3,237 |
| Upper Courthouse | 4,957 | 0 | 0 | 0 | 0 | 4,957 |
| Westwater Canyon | 0 | 3,295 | 3,295 | 3,295 | 0 | 0 |
| White Wash | 717 | 0 | 0 | 0 | 5 | 0 |
| Wilson Arch | 1,628 | 0 | 1,628 | 0 | 5 | 0 |
| **Totals** | **45,806** | **49,789** | **73,814** | **8,854** | **22,904** | **67,126** |
| Percent (%) of all high density lands | 15% | 16% | 24% | 3% | 8% | 22% |

Alternative B provides for substantially greater acres of NSO stipulations in high site density areas of special designations than any other alternative. Alternative B would also provide for more acres closed to leasable and salable minerals in ACECs than any other alternative. Alternative B would designate approximately 23 times higher site density lands in ACECs as VRM Class I than the next closest alternative (Proposed Plan) and would close slightly more land in high site density areas in ACECs to OHV travel than would the Proposed Plan. Alternative B would place slightly greater restrictions on livestock grazing in certain ACECs than the Proposed Plan, thereby providing slightly greater long-term benefit to cultural resources in these areas. Alternative B would also provide for the prioritization of cultural resources identification efforts on more acres than any other alternative. Therefore, ACECs proposed in Alternative B would provide for greater protection of cultural resources than in any other alternative.

### 4.3.2.4.3 PROPOSED PLAN

Impacts to cultural resource under the Proposed Plan incorporate all of the impacts discussed in Section 4.3.2.2, Impacts Common to All Alternatives. Additional impacts to cultural resources under the Proposed Plan, excluding special designations, are described in Table 4.27. Because

BLM_0010226

special designations incorporate an array of individualized management actions, the impact of these designations on cultural resources is discussed separately, following Table 4.27. There are no alternative-specific management actions for fire or paleontological resources.

**Table 4.27. Impacts to Cultural Resources Under the Proposed Plan**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Priority for new inventory and assessment would encompass 30,000 acres, resulting in refined knowledge of cultural resources within the MPA and a better ability to manage these resources effectively. More sites would be targeted for restoration and nomination to the NRHP under this alternative than under Alternatives A and D but fewer would be nominated than under Alternative B. Slightly more sites would be allocated or developed for public use under the Proposed Plan than under Alternative B, and fewer sites would be targeted for restoration. Restoration of damaged sites would result in long-term benefits to the targeted sites. Public interpretation of sites has both short-term and long-term beneficial and adverse impacts to cultural resources through raising awareness of the presence of such resources in the area and educating the public about protection of cultural sites. |
| Lands and Realty | Designation of ACECs as avoidance areas for rights-of-way would provide long-term benefits to cultural resources in these areas by removing one potential source of ground disturbance and related indirect adverse impacts. Designated utility corridors would encompass 28,400 acres (9%) of high site density lands and 46,899 acres (8%) of medium site density lands. Cultural resources within these utility corridors would be available for adverse impacts from development of the utilities. Application of BLM standard procedures and the Section 106 process would reduce opportunities for such impacts and allow for avoidance, minimization, or mitigation of potential adverse impacts to a large degree. |
| Livestock Grazing | Grazing would not be available on 114,235 acres. Grazing would be restricted in certain known high (sensitive) site density areas and this would provide long-term beneficial impacts to cultural resources from reduced opportunities for trampling, rubbing, and erosion from loss of vegetation. Fewer such areas would exist under Alternatives A and B but more would exist under the Proposed Plan than under Alternative D. Grazing would be prohibited on 25,177 acres (8%) of high site density lands and 45,200 acres (7%) of medium site density lands within the MPA. Grazing would be allowed on 277,399 acres (92%) of high site density lands and 579,965 acres (93 %) of medium site density lands. Cultural resources in areas available for grazing could experience minimal long-term adverse impacts from trampling and rubbing (e.g., on rock art panels) by livestock. All eligible sites would be mitigated. Cultural resources in areas not available for grazing would experience long-term benefits from reduced opportunities for direct and indirect impacts. |

BLM_0010227

## Table 4.27. Impacts to Cultural Resources Under the Proposed Plan

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals—oil and gas—Book Cliffs RFD | Approximately 74 acres of disturbance in high site density areas and 641 acres in medium site density areas would occur over the life of the RMP. This represents 0.3% of high site density lands and 0.6% of medium site density lands in the RFD area. Standard BLM policy and the Section 106 process would be applied to all applications for disturbance, thereby reducing opportunities for direct adverse impacts related to this disturbance. Inadvertent impacts and impacts from vandalism and looting that may accompany increased human activity in developed areas may occur. |
| Minerals—oil and gas—Greater Cisco RFD | Approximately 114 acres of disturbance in high site density areas and 497 acres in medium site density areas would occur over the life of the RMP. This represents 0.9% of high site density lands and 1.1% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Roan Cliffs RFD | Approximately 3 acres of disturbance in high site density areas and 12 acres in medium site density areas would occur over the life of the RMP. This represents 0.01% of high site density lands and 0.03% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Salt Wash RFD | Approximately 11 acres of disturbance in high site density areas and 45 acres in medium site density areas would occur over the life of the RMP. This represents 0.2% of high site density lands and 0.3% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Big Flat-Hatch Point RFD | Approximately 94 acres of disturbance in high site density areas and 139 acres in medium site density areas would occur over the life of the RMP. This represents 0.1% of high site density lands and 0.1% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Lisbon Valley RFD | Approximately 171 acres of disturbance in high site density areas and 360 acres in medium site density areas would occur over the life of the RMP. This represents 0.7% of high site density lands and 0.7% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Eastern Paradox RFD | Approximately 60 acres of disturbance in high site density areas and 132 acres in medium site density areas would occur over the life of the RMP. This represents 0.05% of high site density lands and 0.05% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—geophysical | An estimated 352 acres (0.1%) of land in high site density areas within the MPA and 705 acres (0.1%) of medium site density lands would be subject to disturbance for geophysical work over the life of the RMP. Cultural resources in these areas could be subject to long-term adverse impacts. However, adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts occurring as a result of geophysical activities. |

BLM_0010228

**Table 4.27. Impacts to Cultural Resources Under the Proposed Plan**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals—salable (mineral materials) | A total of 1,234,717 acres is available for the disposal of salable minerals. Although adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts, the greater the area available for salable minerals disposal, the greater potential the or adverse impacts as inadvertent impacts could occur. |
| Non-WSA Lands with Wilderness Characteristics | Management of 12,773 acres (4%) of high site density lands and 20,309 acres (3%) of medium site density lands for protection of wilderness characteristics would benefit cultural resources in the Beaver Creek, Fisher Towers and Mary Jane Canyon areas by limiting surface-disturbing activities and the associated human activity. |
| Recreation—SRMAs | Approximately 160,885 acres (53%) of high site density lands and 205,578 acres (33%) of medium site density land would be managed within SRMAs. By managing and educating recreationists in these areas, long-term adverse impacts on cultural resources would be reduced. Careful monitoring by the BLM of site condition in these areas would help identify unacceptable impacts early on and allow for implementation of minimization and/or mitigation measures to address these impacts. |
| Travel Management | Approximately 69,215 acres (23%) of high site density lands and 170,608 acres (27%) of medium site density lands would be closed to OHV use. Approximately 232,875 acres (77%) of high site density lands and 453,658 acres (73%) of medium site density lands would limit OHV use to designated routes. Approximately 486 acres (0.2%) of high site density lands and 882 acres (0.1%) of medium site density lands would be open to cross country OHV use. Designated motorcycle routes would be established for approximately 19 miles on high site density lands and 26 miles on medium site density lands. Cultural resources in areas closed to OHV use would experience long-term reductions in opportunities for direct and indirect adverse impacts. As described for Alternative B, cultural resources located in areas where OHV or motorcycle use is limited to designated routes would experience variable beneficial and adverse impacts, and cultural resources located in areas open to cross country OHV use would experience current, or potentially increased, levels of adverse impacts from direct and indirect disturbances. The Proposed Plan would have more high and medium site density lands open to cross country OHV use than Alternative B but less than Alternatives A and D.

Approximately 238 linear miles of existing travel routes in high site density areas and 537 miles in medium site density areas would be closed to travel. Cultural resources in these areas would experience moderate, long-term beneficial impacts from reduced opportunities for inadvertent impacts, looting, and vandalism. As described under Alternative B, existing levels of direct disturbance of cultural sites from foot and motorized traffic along travel routes would continue at current levels. Additionally, indirect impacts such as looting and vandalism from users of travel routes would also continue to occur at levels similar to Alternative A.

There are 148.2 miles of designated routes with possible cultural |

BLM_0010229

**Table 4.27. Impacts to Cultural Resources Under the Proposed Plan**

| Resource Program | Impact on Cultural Resources |
|---|---|
| | conflicts. In the Proposed Plan, 16.6 miles of these routes are not identified for travel. |
| Visual Resources | Designation of 74,672 acres (25%) of high site density lands and 178,751 acres (29%) of medium site density lands as VRM Class I conditions would benefit cultural resources in those areas by limiting surface-disturbing activities and the associated human activity. |
| Woodlands | Woodland products use would be prohibited on 159,985 acres (53%) of high site density lands and 271,618 acres (43%) of medium site density lands within the MPA. Use of woodland products would be allowed on 143,250 acres (47%) of high site density lands and 354,439 acres (57%) of medium site density lands. As described under Alternative B, cultural resources in areas open to woodland products use could experience long-term adverse impacts from direct disturbance (e.g., being driven over or subject to other surface disturbance) or indirect disturbance (e.g., vandalism and looting). Not all areas open to woodland products use contain actual woodlands that would be targeted for use. As such, the actual acres of high and medium site density lands on which wood gathering or harvest would occur is expected to be less than the sum total of lands open for such activities. |

Within ACECs and WSRs, an array of management actions would be implemented that vary widely in terms of the level of surface disturbance allowed or prohibited. Areas that would be managed as ACECs and WSRs under the Proposed Plan include approximately 19,029 acres of lands with high cultural resource site density for ACECs and 29,364 acres of high site density lands for WSRs. Within these areas, management actions include a range of measures that would benefit cultural resources by affording them direct and indirect protection from adverse impacts. These management actions include such measures as implementing NSO stipulations for leasable minerals and applying non–surface-disturbing requirements to salable minerals on approximately 11,467 acres of high site density lands (see Appendix C for a full explanation), closing areas for leasable and salable minerals on 7,141 acres of high site density lands (where the ACEC overlaps a WSA), designating as VRM Class I (with attendant limitations on surface disturbance) on approximately 3,200 acres of high site density lands, eliminating OHV use on approximately 7,141 acres of high site density lands, restricting livestock grazing on 10,761 acres of high site density lands, and prioritizing cultural resource identification work on 5,681 acres of high site density lands. Table 4.28 lists the special designations to which these stipulations apply and the acreages of high site density contained therein. If a particular special designation is not listed in the table, either the stipulations do not apply to the area or there are no estimated acres of high site density within the area. The stipulations noted above reduce the risk of cultural resource sites being inadvertently impacted by surface-disturbing activities.

In general, the Proposed Plan would provide substantially less benefit to cultural resources and less reduction of risk of long-term adverse impacts to these resources than would Alternative B. The Proposed Plan would, however, afford greater protection and reduced risk of long-term adverse impacts when compared to Alternative A, which designates only a single ACEC, and Alternative D, which designates no ACECs.

BLM_0010230

**Table 4.28. Acres of High Site Density Lands in ACECs with Stipulations Affecting Cultural Resources, the Proposed Plan**

| Special Designation (All ACECs) | NSO for Leasable/ Salable Minerals | Closed to Leasable/ Salable Minerals | Designated as VRM I | Closed to OHV Use | Unavailable/ Limited Grazing | Prioritize Cultural Survey |
|---|---|---|---|---|---|---|
| Behind the Rocks | 2,444 | 0 | 0 | 0 | 0 | 2,444 |
| Cottonwood-Diamond | 383 | 7,141 | 0 | 7,141 | 7,524 | 0 |
| Highway 279/ Shafer Basin/Long Canyon | 3,915 | 0 | 3,200 | 0 | 0 | 0 |
| Mill Creek Canyon | 1,488 | 0 | 0 | 0 | 0 | 0 |
| Ten Mile Wash | 3,237 | 0 | 0 | 0 | 3,237 | 3,237 |
| **Totals** | **11,467** | **7,141** | **3,200** | **7,141** | **10,761** | **5,681** |
| % of all high site density lands | 4% | 2% | 1% | 2% | 3.9% | 1.9% |

### 4.3.2.4.4 ALTERNATIVE D

Impacts to cultural resources under Alternative D incorporate all of the impacts discussed under Section 4.3.2.2, Impacts Common to All Alternatives. Additional impacts to cultural resources under Alternative D are described in Table 4.29. There are no alternative-specific management actions for fire or paleontological resources, and no special designations would be implemented under this alternative.

**Table 4.29. Impacts to Cultural Resources Under Alternative D**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Cultural Resources | Priority for new inventory and assessment would encompass 20,000 acres, resulting in refined knowledge of cultural resources within the MPA and a better ability to manage these resources effectively. Fewer sites would be targeted for restoration and nomination to the NRHP under this alternative than under any other action alternative. More sites would be allocated or developed for public use than under any other alternative, and fewer sites would be targeted for restoration. Restoration of damaged sites would result in long-term benefits to the targeted sites. Public interpretation of sites has both short-term and long-term beneficial and adverse impacts to cultural resources through raising awareness of the presence of such resources in the area and educating the public about protection of cultural sites. |
| Lands and Realty | Designated utility corridors would encompass 29,983 acres (10%) of high site density lands and 51,499 acres (8%) of medium site density lands. Cultural resources within these utility corridors could be subject to adverse impacts from development of the utilities. However, application of BLM standard procedures and the Section 106 process would reduce risk of such impacts and allow for avoidance, minimization, or mitigation of potential adverse impacts to a large degree. |

BLM_0010231

**Table 4.29. Impacts to Cultural Resources Under Alternative D**

| Resource Program | Impact on Cultural Resources |
| --- | --- |
| Livestock Grazing | Grazing would not be available on 52,214 acres. Grazing would be removed from certain known high (sensitive) site density areas and provide long-term beneficial impacts to cultural resources from reduced risk of trampling, rubbing, and erosion from loss of vegetation. Fewer such areas would exist under Alternative D than under any other alternative. Grazing would be prohibited on 12,386 acres (4%) of high site density lands and 17,860 acres (3%) of medium site density lands within the MPA. Grazing would be allowed on 290,190 acres (96%) of high site density lands and 607,305 acres (97%) of medium site density lands. Cultural resources in areas available for grazing could experience minimal long-term adverse impacts from trampling and rubbing (e.g., on rock art panels) by livestock. All eligible sites would be mitigated. Cultural resources in areas not available for grazing would experience long-term benefits from reduced risk of direct and indirect impacts. |
| Minerals—oil and gas—Book Cliffs RFD | Approximately 79 acres of disturbance in high site density areas and 725 acres in medium site density areas would occur over the life of the RMP. This represents 0.4% of high site density lands and 0.6% of medium site density lands in the RFD area. Standard BLM policy and the Section 106 process would be applied to all applications for disturbance, thereby reducing risk of direct adverse impacts related to this disturbance. Inadvertent impacts and impacts from vandalism and looting that may accompany increased human activity in developed areas may occur. |
| Minerals—oil and gas—Greater Cisco RFD | Approximately 115 acres of disturbance in high site density areas and 498 acres in medium site density areas would occur over the life of the RMP. This represents 0.9% of high site density lands and 1% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Roan Cliffs RFD | Approximately 3 acres of disturbance in high site density areas and 13 acres in medium site density areas would occur over the life of the RMP. This represents 0.01% of high site density lands and 0.03% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Salt Wash RFD | Approximately 13 acres of disturbance in high site density areas and 51 acres in medium site density areas would occur over the life of the RMP. This represents 0.3% of high site density lands and 0.3% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Big Flat-Hatch Point RFD | Approximately 136 acres of disturbance in high site density areas and 197 acres in medium site density areas would occur over the life of the RMP. This represents 0.2% of high site density lands and 0.2% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—oil and gas—Lisbon Valley RFD | Approximately 171 acres of disturbance in high site density areas and 360 acres in medium site density areas would occur over the life of the RMP. This represents 0.7% of high site density lands and 0.7% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |

BLM_0010232

**Table 4.29. Impacts to Cultural Resources Under Alternative D**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Minerals—oil and gas—Eastern Paradox RFD | Approximately 77 acres of disturbance in high site density areas and 152 acres in medium site density areas would occur over the life of the RMP. This represents 0.06% of high site density lands and 0.06% of medium site density lands in the RFD area. Impacts would be similar to those described for the Book Cliffs RFD area. |
| Minerals—geophysical | An estimated 396 acres (0.1%) of land in high site density areas within the MPA and 792 acres (0.1%) of medium site density lands would be subject to disturbance for geophysical work over the life of the RMP. As described for previous alternatives, cultural resources in these areas could be subject to long-term adverse impacts. Adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts occurring as a result of geophysical activities. |
| Minerals—salable (mineral materials) | A total of 1,387,473 acres is available for the disposal of salable minerals. Although adherence to standard BLM policy and the Section 106 process of the NHPA would reduce the likelihood of adverse impacts, the greater the area available for salable minerals disposal, the greater potential for adverse impacts because inadvertent impacts could result. |
| Non-WSA Lands with Wilderness Characteristics | No areas would be managed for wilderness characteristics under Alternative D, resulting in greater adverse impacts to cultural resources in those areas because surface-disturbing activities would not be precluded. |
| Recreation—SRMAs | Approximately 74,278 acres (25%) of high site density lands and 83,056 acres (13%) of medium site density lands would be managed within SRMAs. By managing and educating recreationists in these areas, long-term adverse impacts on cultural resources would be reduced. Impacts under this alternative would be similar to those described for the Proposed Plan except that fewer restrictions on group sizes would be implemented and more dispersed camping would be allowed. Total anticipated impacts to cultural resources under Alternative D would be greater than those in Alternative B or C because fewer recreationists would be managed and fewer restrictions would be placed upon them. |
| Special Designations | No areas would be managed as ACECs or WSRs under Alternative D. |

BLM_0010233

**Table 4.29. Impacts to Cultural Resources Under Alternative D**

| Resource Program | Impact on Cultural Resources |
|---|---|
| Travel Management | Approximately 17,981 acres (6%) of high site density lands and 21,079 acres (4%) of medium site density lands would be closed to OHV use. Approximately 283,951 acres (94%) of high site density lands and 602,749 acres (96%) of medium site density lands occur where OHV use would be limited to designated routes. Approximately 643 acres (0.2%) of high site density lands and 1,321 acres (0.2%) of medium site density lands would be open to cross country OHV use. Approximately 21 miles of motorcycle routes on high site density lands and 36 miles on medium site density lands would be designated. As described in more detail under Alternative B, cultural resources in areas closed to OHV use would experience long-term reductions in risk of direct and indirect adverse impacts. Cultural resources located in areas where OHV and motorcycle use is limited to designated routes would experience variable beneficial and adverse impacts, and cultural resources located in areas open to cross country OHV use would experience current, or potentially increased, levels of adverse impacts from direct and indirect disturbances. Alternative D would have more high and medium site density lands open to cross country OHV use than Alternatives B and C but less than Alternative A. <br><br> Approximately 214 linear miles of existing travel routes in high site density areas and 494 miles in medium site density areas would be closed to travel. Cultural resources in these areas would experience moderate, long-term beneficial impacts from reduced risk of inadvertent impacts, looting, and vandalism. As described for previous alternatives, existing levels of direct disturbance of cultural sites from foot and motorized traffic along travel routes would continue at current levels. Additionally, indirect impacts such as looting and vandalism from users of travel routes would also continue to occur at levels similar to Alternative A. <br><br> There are 148.2 miles of designated routes with possible cultural conflicts. In Alternative D, 3.6 miles of these routes are not identified for travel. |
| Visual Resources | Designation of 72,703 acres (24%) of high site density lands and 174,314 acres (28%) of medium site density lands as VRM Class I would benefit cultural resources in those areas by limiting surface-disturbing activities and the associated human activity. |
| Woodlands | Woodland products use would be prohibited on 144,146 acres (48%) of high site density lands and 252,959 acres (40%) of medium site density lands within the MPA. Use of woodland products would be allowed on 158,768 acres (52%) of high site density lands and 372,944 acres (60%) of medium site density lands. As described under Alternative A, cultural resources in areas open to woodland products use could experience long-term adverse impacts from direct disturbance (e.g., being driven over or subject to other surface disturbance) or indirect disturbance (e.g., vandalism and looting). Not all areas open to woodland products use contain actual woodlands that would be targeted for use. As such, the actual acres of high and medium site density lands on which wood gathering or harvest would occur is expected to be less than the sum total of lands open for such activities. |

BLM_0010234

### 4.3.2.5 SUMMARY OF IMPACTS

In general, Alternative B provides for the most potential beneficial impact to cultural resources within the MPA of all the alternatives. This is because Alternative B would implement greater restrictions on surface-disturbing activities (and the damage these activities could advertently or inadvertently cause to cultural resources) such as mineral development, greater restrictions on recreational use and OHV travel, and more areas of special designation with their attendant management restrictions on land use such as VRM Class I, surface disturbance, and OHV travel than any other alternative. These management decisions reduce the risk of cultural resources being inadvertently impacted in an adverse way. Alternative B would also implement more management decisions focused on pro-active management of cultural resources through the development of integrated cultural-recreational management plans. Based upon these same key elements, the Proposed Plan would provide the next greatest benefit to cultural resources, followed by Alternative A. Alternative D would provide the least amount of benefit to cultural resources in the MPA of all alternatives.

## 4.3.3 FIRE MANAGEMENT

This section presents the impacts to fire management from management actions for the resources and resource uses discussed in Chapter 2. Existing conditions concerning fire management are described in Chapter 3.

The most direct and long-term impacts to fire management within the MPA would result from the decisions of the fire management program itself. As noted in Chapter 3, fire management within the MPA is the responsibility of the Moab Fire District (MFD), which encompasses the Monticello, Moab, and Price Planning Areas. The proposed decisions expected to affect fire management are: air quality, lands and realty, minerals, recreation, riparian, special designations, special status species, travel, wildlife, and woodlands.

### 4.3.3.1 IMPACTS COMMON TO ALL ALTERNATIVES

#### 4.3.3.1.1 IMPACTS OF AIR QUALITY DECISIONS ON FIRE MANAGEMENT

Under all alternatives, prescribed burns would be consistent with the State of Utah Department of Environmental Quality's (UDEQ's) permitting process and timed in conjunction with meteorological conditions so as to minimize smoke impacts. In addition, the BLM would comply with the current Smoke Management MOU between BLM, USFS, and UDAQ. This may restrict the use of prescribed fire in terms of timing and size of treatments. However, these limitations would not substantially reduce the effectiveness of long-term fire management or increase fire risk in the MPA.

#### 4.3.3.1.2 IMPACTS OF FIRE MANAGEMENT DECISIONS ON FIRE MANAGEMENT

The comprehensive Utah Land-use Plan Amendment for Fire and Fuels Management (LUP Amendment) of September 2005 (BLM 2005c) currently guides fire management in the MPA. Direction and guidance approved by the LUP Amendment is incorporated by reference into this RMP. The LUP Amendment provides fire management direction that is common to all alternatives being considered in this PRMP/EIS. Accordingly, the impacts of implementing the LUP Amendment within the MPA would also be identical for all alternatives. Readers should

BLM_0010235

note that the potential impacts of implementing the LUP Amendment across the entire MFD, including the MPA, were analyzed as part of the Environmental Assessment prepared for that document (BLM 2005c: 4-1 to 4-50).

Under all alternatives, the Moab Fire District Fire Management Plan (FMP) (BLM 2006b) will be updated and amended to meet the direction and objectives of this RMP. Under the revised FMP, fire management program decisions would focus on the goal of improving Fire Regime Condition Class (FRCC) and moving lands within the MPA toward the Desired Wildland Fire Condition (DWFC). These condition classes and desired conditions are discussed in greater detail in Chapter 3 of this Draft EIS and in the FMP (BLM 2006b: 3-27 to 3-32). The implementation goals of the FMP are to improve fire conditions, including achieving desired fuels loading, and controlling wildfire location, extent, and/or severity. Accordingly, this section quantitatively analyzes the impacts from fire management decisions based on the relative acreage of each vegetation cover type that would be treated to reduce fuels loading.

Under all alternatives, 5,000 to 10,000 acres would be treated annually across the MPA depending on budgetary and time constraints. Wildland-Urban Interface (WUI) areas, areas with fuel loading that could potentially result in the loss of ecosystem components following wildland fire, and areas that meet other management goals and objectives would be treated with prescribed fire and non-fire treatments (mechanical removal, chemical and biological treatments, manual removal, seeding). The overall impact of these treatments would be improvement in FRCC within the MPA and movement towards the DWFC for the treated areas. The majority of these treatments would likely be concentrated in the piñon-juniper vegetation type, including historical sagebrush/grassland that has been encroached upon by piñon-juniper (BLM 2005c: 2-4 to 2-6). The majority of this vegetation type is in FRCC 2 or 3, which indicates that it suffers moderate to high departure (>66% variation) from historical fire return interval and/or vegetation condition/fuel loading. The main reasons the majority of the piñon-juniper in the MPA falls within this FRCC are 1) loss of native understory of piñon-juniper stands; 2) cheatgrass invasion of disturbed piñon-juniper stands; and 3) fuel loading in uncharacteristically thick piñon-juniper stands (BLM 2006b: 3-30).

Proactive fuels loading (vegetation) treatments would be prioritized for different areas based upon the severity of possible impacts from unplanned wildland fire. The priority areas include WUI zones, areas where fuels loading could potentially result in loss of ecosystem components following wildland fire, and areas where other resource management program goals are incompatible with unplanned wildland fire. Focusing treatment on these areas would reduce fire risk in the more vulnerable or sensitive locations of the MPA.

If the MFD is able to successfully implement fuels treatments over a maximum number of desired acres in a given year, a general transition toward improved FRCC and DWFC in the MPA could eventually be realized. Landscape-level fuel treatments require a long-term commitment of resources to implement, monitor, and maintain; implementation can depend on a myriad of factors such as climate, threats or infestation from invasive species, and other variables; and, acreage goals can be altered or transformed by unexpected factors such as catastrophic wildland fire, drought, or changes in T&E habitat. In consideration of these various aspects, improved FRCC and DWFC as well as other management goals and objectives may take generations for actual accomplishments to be realized.

BLM_0010236

These treatment acreages identified in the LUP are only approximate long-term goals, but are the best available estimates for the purposes of analysis.

### 4.3.3.1.3 IMPACTS OF LANDS AND REALTY DECISIONS ON FIRE MANAGEMENT

Under all alternatives, minimum impact criteria for filming would prohibit the use of pyrotechnics and explosives, as well as limiting the numbers of people and vehicles in sensitive areas. This would provide a slight decrease in the risk of inadvertent fire starts from human causes.

### 4.3.3.1.4 IMPACTS OF RIPARIAN DECISIONS ON FIRE MANAGEMENT

Under all alternatives, integrated species management would continue to be used to accomplish riparian restoration through biological, chemical, mechanical, and manual methods (e.g., tamarisk control, willow plantings). These actions would substantially reduce the risk of wildfire in riparian areas, particularly in areas where native willow habitat has been restored.

## 4.3.3.2 ALTERNATIVES IMPACTS

### 4.3.3.2.1 IMPACTS OF MINERALS DECISIONS ON FIRE MANAGEMENT

Minerals decisions impacting fire management are largely associated with potential increased risk of human-caused fires because of mineral development. These impacts are best compared by showing relative differences in the acreage of lands open for surface-disturbing minerals development under each alternative (Table 4.30).

In general, Alternative B has the least amount of land available for surface-disturbing mineral extraction, followed by the Proposed Plan, then Alternatives D, and A respectively. Additionally, it should be noted that the actual amount of development predicted over the life of the plan is relatively low; therefore mineral development activities would likely have a relatively low impact on fire management and fire risk in comparison to other human activities such as recreational visitation.

**Table 4.30. Acreage of MPA Lands Open to Surface-disturbing Mineral Development (% of Planning Area)**

| Development | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **Leasable** | | | | |
| Open (Standard Stipulations or TL/CSU) | 1,427,949 (78%) | 1,054,111 (45%) | 1,234,267 (68%) | 1,387,473 (76%) |
| Predicted acreage of disturbance (from RFD) | 6,765 | 3,975 | 6,480 | 6,720 |
| **Locatable** | | | | |
| Open | 1,389,531 (76%) | 1,389,531 (76%) | 1,373,649 (75%) | 1,389,531 (76%) |

BLM_0010237

**Table 4.30. Acreage of MPA Lands Open to Surface-disturbing Mineral Development (% of Planning Area)**

| Development | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **Salable** | | | | |
| Open/Open Special Conditions | 1,467,768 (81%) | 836,137 (46%) | 1,234,267 (68%) | 1,387,473 (76%) |

### *4.3.3.2.2 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON FIRE MANAGEMENT*

#### 4.3.3.2.2.1 Alternatives A and D

No lands would be managed for wilderness characteristics under Alternatives A and D; there would be no impacts to travel management from these decisions.

#### 4.3.3.2.2.2 Alternative B

Under Alternative B, management of 266,485 acres (in 32 areas) of non-WSA lands with wilderness characteristics would limit the types of fuel treatments and fire management activities that could be utilized to restore natural fire regimes in fire-dependent and adapted ecosystems. This would preclude mechanical treatments or other surface-disturbing treatments that could affect wilderness characteristics. When fire must be suppressed in these areas, the ESR plan would be required to restore the area to its natural character.

#### 4.3.3.2.2.3 Proposed Plan

Under the Proposed Plan, management of 47,761 acres (in Beaver Creek, Fisher Towers, and Mary Jane Canyon) of non-WSA lands with wilderness characteristics would limit the types of fuel treatments and fire management activities that could be utilized to restore natural fire regimes in fire-dependent and adapted ecosystems. This would preclude mechanical treatments or other surface-disturbing treatments that could affect wilderness characteristics. When fire must be suppressed in these areas, the ESR plan would be required to restore the area to its natural character.

### *4.3.3.2.3 IMPACTS OF RECREATION DECISIONS ON FIRE MANAGEMENT*

Recreation decisions impacting fire management include restrictions on campfires and dispersed camping in Special Recreation Management Areas (SRMAs). Camping and campfire restrictions would decrease the risk of human-caused wildland fire starts. Table 4.31 lists the acreage of SRMAs by alternative.

**Table 4.31. SRMA Acreage by Alternative**

| | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SRMA Acreage | 141,252 | 976,173 | 658,642 | 277,471 |

BLM_0010238

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 43 of 293

*Moab PRMP/FEIS*                *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.3 Fire Management*

Alternative B requires an SRP when a group has 15 vehicles, meaning that there would be more opportunity to educate visitors on preventing wildfire. Alternative B would have less risk of human-caused wildland fire than the other alternatives, although the Proposed Plan would pose less risk than that posed by Alternative D.

### 4.3.3.2.4 IMPACTS OF SPECIAL DESIGNATION DECISIONS ON FIRE MANAGEMENT

Special designations include ACECs, Wild and Scenic Rivers (WSRs), Designated Wilderness and WSAs. Proposed management prescriptions for WSRs have negligible impact on fire management, as they do not further restrict vegetation management or woodland harvest. Additionally, fewer than 100 acres of prescribed fire and non-fire fuels treatments (each) are planned within riparian vegetation types in the MPA under the Moab FMP; therefore, proposed WSRs are unlikely to affect or be affected by potential fire management actions. Accordingly, WSR impacts on fire management are not analyzed further.

Under all alternatives, a total of approximately 353,615 acres would be within WSAs. These acreages would be closed to woodland harvest and surface-disturbing vegetation treatments. Accordingly, this acreage (approximately 19% of the MPA) would have limited access for proactive fuel reduction or manipulation of vegetation types toward DWFC. However, over the long-term, some vegetation treatments may be allowed if they are non-impairing. These would include reseeding with native species after a fire and pruning. However, stand conversion activities such as mechanical removal of piñon-juniper encroachment or Douglas fir encroachment on aspen would not be permitted under H-8550-1 (Interim Management Policy For Lands Under Wilderness Review). Fire suppression would be permitted with the understanding that it would be conducted with a minimum amount of mechanical and/or motorized resources. Limitations on woodland harvest, surface-disturbing vegetation treatments, and fire suppression techniques in WSAs would increase the fire risk in these areas under all alternatives.

Overall, designation of ACECs and the subsequent restrictions on surface disturbance in these areas would have the greatest impact on fire management activities in the MPA. Restrictions on vegetation treatments in ACECs could increase long-term fire risk due to fuel loading. Table 4.32 below summarizes the restrictions on fire and fuels treatments in the MPA.

**Table 4.32. Acreage of ACEC Restrictions on Fire Management and Fuels Treatment (acres)**

| Restriction | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| No Surface-disturbing Vegetation Treatments | 0 | 79,848 | 5,201 | 0 |

Because Alternative B designates the greatest acres of ACECs among the four alternatives, it thereby restricts the greatest amount of acreage from vegetation treatments, followed by the Proposed Plan, then Alternatives D, and A, respectively. Accordingly, Alternatives A and D

BLM_0010239

would likely result in the least amount of long-term fire risk in these areas, followed by the Proposed Plan and Alternative B, respectively.

Restrictions on dispersed camping, which would lower the risk of human-caused fire ignitions, are imposed by ACEC management in Alternative B and the Proposed Plan. Alternative B restricts dispersed camping on 115,529 acres; the Proposed Plan restricts dispersed camping on 13,902 acres. There are no ACECs proposed in Alternatives A and D, and thus no restrictions on dispersed camping. Therefore, Alternative B provides the least risk of human-caused fire ignitions.

### 4.3.3.2.5 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON FIRE MANAGEMENT

Special status species have limited distributions and suitable habitat, making relocation or re-establishment elsewhere difficult if their habitat is disturbed or altered. Thus, the protection of special status species' habitat from disturbance generally restricts options for fuels reduction and vegetative treatments where habitat is present in the MPA. Restrictions due to the presence of special status species or their habitat are often seasonal and limited to relatively small areas, such as those surrounding nests or (sage-grouse) leks. Because federally threatened and endangered species are protected under the Endangered Species Act, their management prescriptions and the resulting restrictions on fire management are generally common to all alternatives. Fire management options, including surface-disturbing vegetative treatments and the use of wildfire and prescribed burns as management tools, are generally limited in the presence or habitat of threatened and endangered species. Species present in the MPA whose recovery plans place (widely variable) limitations on such treatments include: Mexican spotted owl, southwestern willow flycatcher, bald eagle, Colorado River endangered fish (several), golden eagle, burrowing owl, ferruginous hawk, yellow-billed cuckoo, and Jones' cycladenia.

The acres of habitat with seasonal restrictions on surface-disturbing activities vary for four special status species that are not threatened or endangered: the greater sage-grouse, the Gunnison sage-grouse, the white-tailed prairie dog, and the Gunnison prairie dog. These restrictions are shown in Table 4.33, below.

**Table 4.33. Acres of Seasonal Restrictions on Surface-disturbing Activities in Sensitive Species Habitat Areas (For Decisions Not Common To All Alternatives Only)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Greater sage-grouse | 0 | 12,850 | 3,068 | 1,986 |
| Gunnison sage-grouse | 0 | 246,107 | 175,727 | 41,620 |
| White-tailed prairie dog | 0 | 284,529[*#] | 117,481[+] | 31,186[+] |
| Gunnison Prairie dog | 0 | 10,700[*] | 10,700[+] | 0 |

[*]Restrictions apply within 1300 ft of active colonies in this area
[+]Restrictions apply within 660 ft of active colonies in this area
[#]199,505 of these acres are subject to year-round restrictions as part of an ACEC.

Thus, seasonal restrictions on surface-disturbing activities due to protection for special status species vary by alternative, with Alternative B being the most restrictive for fire management actions. Restrictions on fire management would increase the long-term risk of wildfire.

BLM_0010240

### 4.3.3.2.6 IMPACTS OF TRAVEL DECISIONS ON FIRE MANAGEMENT

Motorized use in the MPA creates a limited risk of human-caused fire. This risk includes heat and sparks from motors and exhaust systems. This risk is increased substantially if travel occurs off of designated routes. The cross-country motorized travel category poses the greatest risk of inadvertent wildland fire starts, followed by travel on designated routes. Cross country travel is much more likely to bring the heat and sparks from exhaust systems in direct contact with vegetation than travel on designated routes, which are typically devoid of vegetation. Closing areas to motorized travel largely eliminates the risk of inadvertent fire starts from motorized vehicles.

All of the action alternatives would lessen the impact of human-caused fires than Alternative A due to the reduction of motorized cross-country travel under those alternatives (Table 4.34). Alternative B has the greatest acreage closed to motorized travel, followed closely by the Proposed Plan. Alternatives A and D have less area closed to motorized travel than Alternatives B or the Proposed Plan. Alternative D has the most acreage where motorized travel would be limited to designated routes (and the least amount of acreage closed to motorized travel), followed closely by Alternatives B and the Proposed Plan which have similar acreages, then by Alternative A. Thus, Alternative B provides the least amount of travel-related risk to fire management, followed closely by the Proposed Plan. Alternative D would have some additional risk and Alternative A would have substantially more risk than Alternative B and the Proposed Plan.

**Table 4.34. Travel Restrictions Impacting Fire Management and Risk (acres)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **OHV Use Categories** | | | | |
| Open to Cross-Country Travel | 678,250 | 0 | 1,866 | 3,348 |
| Limited to Existing/Designated Routes | 1,113,470 | 1,463,248 | 1,468,852 | 1,788,372 |
| Closed | 29,654 | 358,126 | 349,843 | 29,654 |
| **Miles of Designated Roads and Trails** | | | | |
| Primitive (Level D) Road | 5,033 | 2,162 | 2,527 | 2,689 |
| Motorcycle Trail | 129 | 122 | 221 | 255 |

### 4.3.3.2.7 IMPACTS OF WILDLIFE DECISIONS ON FIRE MANAGEMENT

Under all alternatives, surface-disturbing activities and vegetation alteration would be avoided during the nesting season for migratory birds (May 1 through July 30). In addition, surface-disturbing activities would be precluded in 105,636 acres of deer and/or elk summer range (within the Book Cliffs and La Sal Wildlife Management Units) between May 15 and June 30. These restrictions would limit fuels reduction treatments during these time periods.

Some management actions common to all alternatives would benefit fire management in the MPA. Dispersed camping in riparian areas would be restricted under all alternatives, which

BLM_0010241

would slightly reduce the likelihood of human-caused wildfire in these areas, as would the implementation of a limited fire suppression policy (and initiation of prescribed fires) where treatment by fire would increase vegetation productivity and increase forage for wildlife, which is also proposed under all alternatives. A prescription to increase elk forage on 4,000 acres through vegetation treatments including prescribed fire would also benefit fire management under all alternatives.

Seasonal restrictions on surface-disturbing activities specific to each alternative are shown in Table 4.35, below. These prohibitions would restrict fire management activities during specific time periods, and reduce the options available for fuels reduction, surface-disturbing vegetative treatments, and prescribed fire. In general, prohibitions on surface disturbance to protect wildlife would be most restrictive to fire management under Alternative B, followed by the Proposed Plan, then Alternatives D, and A, respectively. Alternatives that are the most restrictive to fire management carry the highest long-term risk of large or catastrophic wildfire due to increased fuel loading.

**Table 4.35. Acres of Seasonal Restrictions on Surface-disturbing Activities in Wildlife Habitat Areas (For Decisions Not Common To All Alternatives)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Pronghorn | 0 | 822,001[*] | 293,741[*] | 78,477[*] |
| Deer and/or Elk | 0 | 635,774[+] | 349,955[#] | 349,955[&] |

[*] Restrictions apply from May 1 to June 15
[+] Restrictions apply from November 1 to May 15
[#] Restrictions apply from November 15 to April 15
[&] Restrictions apply from December 1 to April 15

### 4.3.3.2.8 IMPACTS OF WOODLAND DECISIONS ON FIRE MANAGEMENT

Under all alternatives, one of the goals of woodland management decisions would be to encourage, where feasible, the harvest of forest products in areas of proposed or existing vegetation treatments to lessen the need for additional treatment or land disturbance. Where feasible, this practice would help improve FRCC and reduce the need for additional fuels treatments to reach DWFC. All alternatives would seek to use woodland harvest to assist in managing woodlands to accomplish goals outlined in the Fire Management Plan. Thus, woodland management decisions would generally be made to support fire management goals, and the impacts of woodlands management decisions would generally have beneficial impacts on fire management.

The primary means of assessing the impacts of woodland management decisions on fire management is the number of acres under each alternative that would allow or prevent woodland harvest and wood gathering, which are shown in Table 4.36, below. Alternatives that allow woodland harvest and wood gathering over larger acreages provide greater benefits to fire management goals by allowing woodland harvest to help reduce fuel loading. Alternatives A and D (equally) provide the greatest benefit to fire management, followed by the Proposed Plan and Alternative B.

BLM_0010242

**Table 4.36. Woodland Resource Decisions Impacting Fire Management and Risk (acres)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Open to Woodland Harvest and Wood Gathering | 1,243,734 | 1,071,335 | 1,212,886 | 1,243,734 |
| Closed to Woodland Harvest and Wood Gathering | 609,385 | 781,784 | 640,223 | 609,385 |

## 4.3.4 HEALTH AND SAFETY

This section discusses impacts to health and safety from management actions of other resources and resource uses.

Management actions associated with the following resources and resource uses would have negligible impacts on health and safety, regardless of the alternative chosen: air quality; cultural resources, paleontological resources; fire management; lands and realty; livestock grazing; recreation and travel management; vegetation, woodlands; riparian; soil and water; wilderness characteristics, wildlife; and special status species; special designations; visual resource management. The impacts would be negligible, and are dismissed from further analysis, because none of these resources have management prescriptions that would generate hazardous wastes, affect cleanup of toxic or hazardous waste spills, or increase or decrease the dangers of existing abandoned minelands (AML) sites and related AML water quality.

### 4.3.4.1 HAZARDOUS MATERIALS

The sources of hazardous materials are subject to the Federal and state laws described in Chapter 3. These laws and regulations are designed to safeguard human health and safety and to protect other environmental resources. Implementation of the laws and regulations would minimize the risks associated with the use, storage, and disposal of hazardous materials.

#### 4.3.4.1.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all of the alternatives, environmental conditions, as well as public health and safety, would be protected as a result of the BLM hazardous materials management practices. Authorized uses of hazardous materials would adhere to Federal and state requirements to reduce or eliminate impacts. The procedures in place within the BLM as well as state and local agencies would address accidental events and unauthorized use. These procedures would help to minimize public exposure and environmental impacts to the extent possible.

##### 4.3.4.1.1.1 Minerals

According to the Moab RFD, the projected maximum number of wells within BLM managed lands over the next 15 years is 451 with future oil and gas drilling projected at about 30 wells per year. The surface disturbance for construction of a well pad, road, and associated pipelines is estimated at 15 acres. The total projected surface disturbance for oil and gas drilling is approximately 6,772 acres. Given the small number of wells projected over the next 15 years regardless of the alternative, the overall hazardous material risk would be negligible. However,

BLM_0010243

any mineral exploration and development would cause increases in hazardous material risks in the MPA. These impacts would be adverse and long-term. The following are oil and gas related developments that would pose hazardous materials risks across all alternatives.

### 4.3.4.1.1.2 Pipelines

The installation of pipelines and supporting services for pipelines (e.g., compressor stations) would be necessary for oil and gas development. Pipelines and their associated features have the potential to leak or spill oil, gas, natural gas condensate, or other hazardous materials. The companies installing and operating pipelines in the MPA are responsible for understanding and abiding by the applicable hazardous material laws and regulations. The MFO would be responsible for inspecting and monitoring these operations to ensure that these companies are in compliance with all applicable laws and regulations.

### 4.3.4.1.1.3 Transportation

Minerals development activities would increase the instances of hazardous materials transportation. Transportation (e.g., trucking) companies are responsible for understanding and abiding by all applicable hazardous materials transportation laws and regulations.

### 4.3.4.1.1.4 Gas Flowline Leakage or Ruptures

The potential exists for gas flowline leakage or ruptures during natural gas extraction and processing. The U.S. Department of Transportation data indicate that an average of one rupture annually should be expected for every 5,000 miles of pipeline (Office of Pipeline Safety 2005). More than 50% of pipeline ruptures occur as a result of heavy equipment striking the pipeline. Such ruptures would potentially cause a fire or explosion if a spark or open flame ignited the natural gas escaping from the pipeline.

Pipeline design, materials, maintenance, and abandonment procedures are required to meet the standards set forth in U.S. Department of Transportation (DOT) regulations (49 CFR Part 192, Transportation of Natural Gas by Pipelines).

### 4.3.4.1.1.5 Well Fires and Explosions

Well fires are rare but can occur under certain conditions, and a well fire could result from a blowout during drilling activities or from a gas leak during extraction operations. Conditions that would cause gas accumulation in a confined space, and ignition by a spark would likely produce a well fire.

### 4.3.4.1.1.6 Geologic Hazards

The potential risks associated with oil and gas development include geologic hazards. These hazards include natural gas seepage, hydrogen sulfide releases, abnormally high gas pressure, seismic activity, fires, and explosions.

### 4.3.4.1.2 ALTERNATIVES IMPACTS

Due to the small amount of oil and gas wells (451) predicted over the next 15 years within the MPA and the fact that the amount of wells drilled between each alternative would vary only slightly, impacts between alternatives would also vary only slightly. However, the more acres

BLM_0010244

open to oil and gas development, the more pipelines, power lines, transportation, etc. would be needed. Therefore, the alternative with the greatest amount of acreage open for development would have a slightly higher risk of hazardous materials impacts than the alternatives with less acreage open for development. For example, impacts would be slightly higher between Alternative D versus the Proposed Plan as more acres would be open to development and thus require more oil and gas infrastructure.

Mining and exploration operations associated with other minerals such as uranium, copper, sand and gravel, are currently a minor user and producer of hazardous materials within the MPA. The potentially hazardous materials used in these operations are similar to those used by oil and gas development. As with oil and gas, the differences in potential mineral development between the alternatives are minor, with the same number of acres of surface-disturbance projected across alternatives. Therefore, the potential impacts are similar under all alternatives.

### 4.3.4.1.2.1 Alternative A

Under Alternative A, approximately 1,427,949 acres of BLM administered lands would be open for oil and gas development with standard or controlled surface use/timing lease stipulations. About 451 wells are projected under this alternative. Oil and gas development under Alternative A would pose a hazardous materials risk that results from the use, generation, storage, transportation, and/or disposal of hazardous material on 451 wells.

### 4.3.4.1.2.2 Alternative B

Under Alternative B, approximately 808,096 acres of BLM administered lands would be open for oil and gas development with standard or controlled surface use/timing lease stipulations. About 255 wells are projected under this alternative. This represents a 43% decrease in the total amount of acres available for leasing and the number of wells projected compared to Alternative A. A 43% decrease in the total number of acres open to oil and gas development and the number of wells projected would decrease the use, generation, storage, transportation, and/or disposal of hazardous materials.

### 4.3.4.1.2.3 Proposed Plan

Under the Proposed Plan, approximately 1,234,267 acres of BLM administered lands would be open for oil and gas development with standard or controlled surface use/timing lease stipulations. About 432 wells are projected under this alternative. This also represents a 14% decrease in the total amount of acres available for leasing and the number of wells projected compared to Alternative A. A 14% decrease in the total number of acres open to oil and gas development and the number of wells projected would slightly decrease the use, generation, storage, transportation, and/or disposal of hazardous materials.

### 4.3.4.1.2.4 Alternative D

Under Alternative D, approximately 1,387,473 acres of BLM administered lands would be open for oil and gas development with standard or controlled surface use/timing lease stipulations. About 449 wells are projected under this alternative. This also represents a 3% decrease in the total amount of acres available for leasing and the number of wells projected compared to Alternative A. A 3% increase in the total number of acres open to oil and gas development and

BLM_0010245

the number of wells projected would minimally decrease the use, generation, storage, transportation, and/or disposal of hazardous materials.

### 4.3.4.2 ABANDONED MINE LANDS (AML)

The MFO recognizes the need to identify and address physical safety and environmental hazards at all AML sites on public lands. Under all alternatives, abandoned mine land sites would be prioritized for remediation and closure, based on physical safety, watershed protection, and funding by other agencies. Abandoned mine lands would be considered in future recreation management area designations, land-use planning, and all applicable use authorizations.

In conformance with BLM's long-term strategies and national policies regarding AML, this RMP recognizes the need to work with our partners toward identifying and addressing physical safety and environmental hazards at all AML sites on public lands. In order to accomplish this long-term goal, criteria under the national policies would be established under all alternatives to assist in determining priorities for site and area mitigation and reclamation. See the Alternatives Matrix in Chapter 2 (Table 2.1) for AML program priorities.

### *4.3.5 LANDS AND REALTY*

This section discusses impacts to soils from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning lands and realty are described in Chapter 3.

Impacts to the lands and realty program stem from those resource decisions that limit or hinder permitting rights-of-way (ROWs) or other land-use authorizations, or affect the BLM's ability to acquire and dispose of land or make other land tenure adjustments (LTAs). Rights-of-way are issued for the placement of roads, power lines, pipelines, communications sites, wind and solar energy sites on public lands. Within the RMP, such decisions primarily result from and are affected by management actions from the minerals, special designations and wilderness characteristics, as well as lands and realty itself. In addition, the wildlife, vegetation, recreation, riparian, soils/watersheds, visual resources, special status species, and cultural resources programs collectively impact the lands and realty program through a variety of restrictions on surface-disturbing activities and availability of lands for disposal. As such, potential impacts from these program decisions will be analyzed in this chapter.

The specific program management decisions regarding the following resources and resource uses would have negligible impacts (short-term and/or long-term, as well as direct and/or indirect) on lands and realty regardless of the alternative chosen: air quality; fire management; health and safety; livestock grazing; paleontological resources; and woodlands. The impacts would be negligible because protecting air quality, reducing wildland fire risks and the health and safety risks of hazardous materials, identifying livestock utilization levels and complying with the standards and guidelines for livestock grazing, protecting fossils for scientific study and recreational collection, and permitting woodland harvesting would not alter the Moab FO's authority to designate ROWs, or to withdraw, acquire, and/or exchange lands under its administration.

BLM_0010246

## 4.3.5.1 IMPACTS COMMON TO ALL ALTERNATIVES

Wind and solar energy development would be permissible within the MPA. Authorizations for wind and solar energy uses would incorporate the best management practices contained in the Final Wind Energy Programmatic EIS (BLM 2005d: 2-10 to 2-24) and would be provided via ROW grants. Implementation of these measures would provide for the use of MPA lands for alternative energy and communications uses while meeting the individual and overall resource management goals of the RMP.

A total of 354,015 acres (within WSAs and the Black Ridge Wilderness Area) are closed to surface-disturbing activities and thus exclude the granting of new ROWs with the exception of the obligation to grant reasonable access to in held State Trust lands. They are managed as ROW exclusion areas under all alternatives. The impacts of these exclusions include precluding the placement of ROWs and facilities, limiting future access, potentially delaying or increasing the cost of energy supplies, and creating communications dead zones or potentially delaying the availability of communications services. Exclusions on the placement of ROWs could also result in ROWs being located in less desirable or less economically feasible locations. It should be noted that this is a non-discretionary decision.

ROWs would continue to be granted in certain areas under all of the management alternatives, and LTAs would also be allowed under all alternatives except in exclusion areas. Granting of ROWs generally would accommodate the placement of facilities, enhance access to facilities and lands within the MPA, and promote energy supply/transmission and communications. Granting of ROWs would also help to minimize the cost of energy and communications developments, and promote trails and recreation. LTAs would help to facilitate access to the MPA and adjoining properties, improve the BLM's management ability, reduce conflicts with adjoining landowners and surrounding communities, protect sensitive resources when lands are acquired, and accommodate surrounding communities' needs.

Impacts common to all alternatives would also occur due to visual resource management decisions, cultural resource management decisions, and special status species management decisions. Utility corridors within areas designated as VRM Class II would be managed as VRM Class III for utility projects only. Downgrading the VRM class of utility corridors would result in fewer restrictions on utility projects and potentially reduce their cost. All ROW grants would comply with applicable rules and regulations regarding cultural resources and special status species, and the presence of protected resources could alter the route of proposed ROWs. Compliance measures and the presence of protected resources are unlikely to prevent the development of specific ROWs in available areas.

## 4.3.5.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

Several lands and realty decisions would have impacts common to all of the action alternatives, or all alternatives other than Alternative A. The MFO would work cooperatively with the State of Utah and with private landowners to identify opportunities for LTAs using the criteria established for disposal and acquisition of lands. LTAs would facilitate BLM efforts to meet management goals and objectives, as set forth in this RMP. The application of minimum-impact filming criteria (Appendix B) would streamline the permit application process and encourage filming companies to use previously approved locations.

BLM_0010247

In addition, lands and realty decisions would place surface disturbance restrictions on several parcels affecting utilities and ROWs. A prohibition on surface disturbance within the Moab Canyon portion of the Hwy 191 utility corridor (for other than utility projects) would reduce surface use conflicts and maximize the efficiency of new utility projects. Allowing no surface-disturbing activities within the Three Rivers and Westwater withdrawals would restrict the granting of new rights-of-way in these areas. The impacts of these avoidance areas include restricting the placement of ROWs and facilities, limiting future access, delaying or increasing the cost of energy supplies, and creating communications dead zones or delaying the availability of communications services. Limitations on the placement of ROWs could also result in ROWs being located in less desirable or less economically feasible locations.

Finally, the existing utility corridor from Cisco to Highway 191 north of Arches National Park would be merged with the I-70 corridor under all action alternatives. Other corridors for utilities placement would be developed as part of individual action alternatives. These other utility corridors are discussed by alternative in subsequent sections of this chapter.

### 4.3.5.3 ALTERNATIVES IMPACTS

#### 4.3.5.3.1 ALTERNATIVE A

Land and realty decisions include the disposal of BLM lands, acquisition of non-Federal lands, modification of utility corridors, and designation of ROW exclusion and avoidance areas. Under Alternative A, a total of 12,415 acres of land are identified for disposal. These lands meet the BLM requirements for disposal and their transfer out of BLM ownership would be consistent with the LTA policies of the agency. Additional lands are identified for further study to determine if they meet the criteria for disposal. The disposal of 12,415 acres would have a negligible impact on the net amount of land under BLM jurisdiction in the MPA. Fewer acres of land are identified for disposal under Alternative A than under any other alternative. Disposals would help accommodate resource management needs and the needs of adjacent communities.

In addition to the 354,015 acres (within WSAs and the Black Ridge Wilderness Area) which exclude the granting of new ROWs, an additional 38,912 acres on which no surface-disturbing activities are allowed would be avoidance areas for new ROWs. Exclusion and avoidance areas impact lands and realty by restricting the placement of ROWs and facilities, limiting future access, delaying or increasing the cost of energy supplies, and creating communications dead zones or delaying the availability of communications services. Limitations on the placement of ROWs could also result in ROWs being located in less desirable or less economically feasible locations. Alternative A has the smallest area of exclusion and avoidance areas, and thus the fewest limitations on the placement of future ROWs.

Under Alternative A, utility corridors would retain their current size and location. A total of 32,502 acres would be designated as utility corridors. Alternative A would have approximately 53% of the acreage of the utility corridor delineated in Alternative B, 20% of the acreage delineated in the Proposed Plan, and 16% of the acreage of the utility corridor delineated in Alternative D. With the exception of one corridor in Alternative A that has never been used, all alternatives contain the same corridors, but vary in width. In the future, decreased width could be a limiting factor in the ability to accommodate major utilities.

BLM_0010248

A wide variety of other resource management decisions can also affect or limit the placement of ROWs and facilities on BLM lands, due to timing or controlled surface use limitations on surface-disturbing activities. Resource actions affecting the size and duration of areas limiting surface-disturbing activities would occur from , riparian, soil and water, visual resources, special status species, and wildlife management decisions. Limitations on surface-disturbing activities would preclude or hinder the placement of new ROWs, including possibly increasing their cost, limiting access to some areas of the MPA, or delaying the completion of ROWs (in the case of seasonal limitations). Alternative A has 389,605 acres where restrictions would be imposed on the development and operation of ROWs. However, with 1,038,344 acres available for ROWs with no restrictions, Alternative A is the least restrictive of surface-disturbing activities, and thus has the least impact on the construction of future ROWs.

Minerals and energy development decisions would affect the processing ROW grants (primarily roads and pipelines). A total of 451 wells are projected to be developed under Alternative A. The ROW development associated with 451 wells is similar to that projected for the Proposed Plan and Alternative D, with 449 and 451 wells, respectively. However, the ROW development associated with the 451 wells in Alternative A is 70% greater than the development associated with the 255 wells in Alternative B.

### 4.3.5.3.2 ALTERNATIVE B

Under Alternative B, a total of 14,961 acres of land are identified for disposal. The disposal of 14,961 acres would have a negligible impact on the net amount of land under BLM jurisdiction in the MPA or on the MPA's management. Slightly more acres of land would be disposed of under Alternative B than under Alternative A, and the same number as under the Proposed Plan and Alternative D. Disposals would help accommodate resource management needs and the needs of adjacent communities. No lands were targeted for acquisition under any of the alternative. Acquisitions must meet the criteria outlined in Appendix A. In general, acquisitions would benefit the lands program by improving access and/or BLM management.

A total of 671,444 acres would be within ROW exclusion areas, and closed to surface-disturbing activities under Alternative B. A non-discretionary total of 353,510 acres designated as WSAs and Wilderness contribute to this total. In addition, 266,485 acres would be excluded from ROWs in non-WSA lands with wilderness characteristics (all 32 areas), and 52,224 acres would be closed to protect watersheds in Spanish Valley and Castle Valley. These exclusion areas would have the same impacts as described under the Common to All Action alternatives.

An additional 342,931 acres would be where surface-disturbing activities are limited or are avoidance areas for new ROWs. These avoidance areas result from ACEC designation, wildlife restrictions, protection of major river corridors, scenic driving corridors, high recreation use areas, developed recreation sites, and areas with surface-use conflicts. The general nature of impacts due to excluding and avoiding ROWs is the same as described under Alternative A. However, Alternative B has the greatest area of exclusion and avoidance areas, and thus the greatest limitations on the placement of future ROWs.

Utility corridor adjustments under Alternative B would bring the total corridor area to 65,865 acres. These adjustments include the designation of two new utility corridors (the [narrow width] I-70 Utility Corridor and the Moab Canyon Utility Corridor) and the splitting of the utility corridor south of Spanish Valley into two corridors identical to the existing corridors.

BLM_0010249

Implementation of these decisions would provide more avenues for placement of utilities across MPA lands than under Alternative A, but fewer opportunities than under the Proposed Plan and Alternative D.

Limitations on surface-disturbing activities (including ROWs), would have impacts of the same nature (though not magnitude) as described under Alternative A. Alternative B has 543,751 acres with timing and controlled surface use limitation stipulations. However, with 264,344 acres available for ROWs with no restrictions, Alternative B is the most restrictive of ROWs and other land-use authorizations, and thus has the most impact on the construction of future ROWs.

Minerals and energy development decisions would effect the processing of ROW grants. A total of 255 wells are projected to be developed in the MPA under Alternative B. This would require the fewest ROWs to be granted of any of the Alternatives. Alternative B would have approximately 43% less well development than Alternatives A, D, and the Proposed Plan.

### 4.3.5.3.3 PROPOSED PLAN

Land disposal and acquisitions under the Proposed Plan would be the same as under Alternatives B and D. Thus, slightly more acres of land would be disposed of under the Proposed Plan than under Alternative A, and the same number as under Alternatives B and D. Disposals would help accommodate resource management needs and the needs of adjacent communities. Acquisitions could result in improved access and BLM management.

A total of 370,250 acres would be within ROW exclusion areas under the Proposed Plan. A non-discretionary total of 353,520 acres designated as WSAs and Wilderness contribute to this total.

An additional 217,480 acres where surface-disturbing activities are limited are avoidance areas for new ROWs. These avoidance areas result from ACEC designation, management of non-WSA lands with wilderness characteristics (47,761 acres in Beaver Creek, Fisher Towers and Mary Jane Canyon), wildlife restrictions, protection of major river corridors, high recreation use areas, developed recreation sites, and areas with surface-use conflicts. The general nature of impacts due to excluding and avoiding ROWs is the same as described under Alternative A. However, the Proposed Plan has less ROW exclusion and avoidance area than Alternative B, but more area than Alternatives A or D; it would therefore have corresponding limitations on the placement of future ROWs.

Utility corridor adjustments under the Proposed Plan would bring the total corridor area to 173,099 acres. These adjustments include the designation of two new utility corridors (the [moderate width] I-70 Utility Corridor and the Moab Canyon Utility Corridor). The two utility corridors south of Spanish Valley would be combined into a single corridor with 2 to 3 miles separating the two segments. This alternative would have approximately five times the acreage of utility corridor as Alternative A, two and a half times the acreage as Alternative B, and approximately 85% of the acreage as Alternative D. Thus, implementation of these decisions would provide more avenues for placement of utilities across MPA lands than under Alternatives A and B, but fewer opportunities than under Alternative D.

Limitations on surface-disturbing activities (including ROWs) would have impacts of the same nature (though not magnitude) as described under Alternative A. The Proposed Plan has 806,994 acres where restrictions would be imposed on development and operation of ROWs. However, with 427,273 acres available for ROWs with no restrictions, the Proposed Plan is less restrictive

BLM_0010250

on ROWs or other land-use authorizations than Alternative B but more restrictive than Alternative A or Alternative D, and would have corresponding impacts on the construction of future ROWs.

The Proposed Plan is less restrictive of surface-disturbing activities than Alternative B, but more restrictive than Alternatives A or D. The processing of ROW grants in support of 432 wells under the Proposed Plan would be similar to Alternatives A and D, and greater than under Alternative B.

### 4.3.5.3.4 ALTERNATIVE D

Land disposal and acquisitions under Alternative D would be the same as under Alternative B and the Proposed Plan. Thus, slightly more acres of land would be disposed of under Alternative D than under Alternative A, and the same number as under Alternative B and the Proposed Plan. Disposals would help accommodate resource management needs and the needs of adjacent communities. Acquisitions could result in improved access and BLM management.

In addition to the non-discretionary 354,015 acres in WSAs and designated wilderness that are exclusion areas, an additional 84,772 acres where surface-disturbing activities are limited are avoidance areas for new ROWs. These avoidance areas result from protection of major river corridors, and areas with surface-use conflicts. The general nature of impacts due to excluding and avoiding ROWs is the same as described under Alternative A. However, Alternative D has less ROW exclusion and avoidance areas than Alternative B and the Proposed Plan, but more area than Alternative A; it would therefore have corresponding limitations on the placement of future ROWs.

Utility corridor adjustments under Alternative D would bring the total corridor area to 204,168 acres. These adjustments include the designation of two new utility corridors (the [wide width] I-70 Utility Corridor and the Moab Canyon Utility Corridor). The I-70 Utility Corridor under this alternative would differ from the same corridor under the Proposed Plan in that the corridor would be twice as wide as in the Proposed Plan. As with the Proposed Plan, the two utility corridors south of Spanish Valley would be combined into a single corridor with 2 to 3 miles separating the two segments under Alternative D. Implementation of these decisions would provide the most avenues for placement of utilities across MPA lands of any of the alternatives.

Limitations on surface-disturbing activities, including ROWs, would have impacts of the same nature (though not magnitude) as described under Alternative A. Alternative D has 590,442 acres where restrictions would be imposed on the development and operation of ROWs. However, with 797,031 acres available for ROWs with no restrictions, Alternative D is less restrictive on ROWs than Alternative B and the Proposed Plan, but more restrictive than Alternative A. It would therefore have corresponding impacts on the construction of future ROWs.

In general, Alternative D is less restrictive of surface-disturbing activities than Alternative B and the Proposed Plan, but more restrictive than Alternative A.

The processing of ROW grants in support of 448 wells under Alternative D would be similar to Alternative A and the Proposed Plan, and greater than under Alternative B.

BLM_0010251

## 4.3.6 LIVESTOCK GRAZING

This section discusses impacts to livestock grazing from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning livestock grazing are described in Chapter 3. Impacts on resources and resource uses resulting from implementation of the livestock grazing program are discussed in those particular resource sections of this chapter. Impacts on livestock grazing activities are generally the result of activities that affect forage levels. Conducting vegetation treatments would likely have the greatest effect on livestock grazing, as such treatments could increase vegetation production and forage available for livestock. Activities that result in surface disturbance (e.g., mineral development, ROW construction, and recreation) or management of resources that results in limiting surface disturbance (e.g., fish and wildlife, vegetation, water resources, soil resources, and visual resources) would also impact livestock grazing by affecting forage levels. Management of fire would affect livestock grazing by either preserving or increasing available forage for livestock over the long term.

The analysis is based on the following assumptions:

- Livestock grazing will be managed in accordance with the Standards for Rangeland Health and Guidelines for Grazing Management for BLM Lands in Utah.
- Livestock grazing will occur throughout the majority of the decision area.
- In the short term, actual forage use in the decision area may increase due to improving range condition and range recovery from recent drought. Over the long-term, forage demand may continue at historic levels.

Under all alternatives, there are no measurable impacts to livestock grazing from the following resources: air quality, human health and safety, paleontology, special designations (Areas of Critical Environmental Concern, National Historic Trail, Wild and Scenic Rivers, Wilderness), visual resources, and woodlands management. Therefore, the impacts of management actions applicable to these resources will not be further analyzed.

### 4.3.6.1 IMPACTS COMMON TO ALL ALTERNATIVES

Grazing practices would be modified if a grazing allotment fails to meet any of the BLM's Utah Standards for Rangeland Health (see Appendix Q), where it is determined that livestock grazing management practices are a significant factor in this failure. Modifications could include a change in stocking rate, kind of livestock, season of use, length of season, temporary closures, or any combination of these. These modifications could mean a temporary or permanent loss of acres or AUMs available to livestock for grazing in order to repair or rehabilitate an area, and to progress towards meeting the Standards for Rangeland Health.

Data collected from rangeland monitoring studies would assist the Field Manager in the decision of whether or not to restrict livestock access to an area. These kinds of closures, although they cause a temporary loss of accessible forage, are implemented with the goal of restoring the area so that it can continue to support grazing and other resource uses.

Under all alternatives, certain allotments could undergo season-of-use changes to facilitate grazing management while maintaining rangeland health standards. Changes in season of use do not affect forage, but they do impact the timing of its availability.

BLM_0010252

Livestock grazing would not be permitted in the following areas under all alternatives (see Table 4.37): Poison Spider (Arth's Pasture Allotment), Between the Creeks Allotment, Castle Valley allotment, along the Colorado River between Hittle and to the North of Dewey Bridge, along Highway 128 from 191 to Castle Valley Road, along U.S. 191 from Moab to Highway 313, along Highway 279, Kane Spring Canyon between the open valley and the Colorado River, North Sand Flats Allotment, and South Sand Flats Allotment. The reduction in acreage available to livestock associated with these actions will be compared below. It was determined that the rationale provided and the analyses conducted under the NEPA documents and Plan Amendment which rendered these areas not available for grazing were still valid.

**Table 4.37. Acres and AUMs of Forage Not Available to Grazing under All Alternatives**

| Exclosure | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Arth's Pasture portion | Arth's Pasture | 7,634 | 425 |
| Between the Creeks | Between the Creeks | 3,960 | 221 |
| North Sand Flats | North Sand Flats | 18,246 | 798 |
| South Sand Flats | South Sand Flats | 10,209 | 592 |
| Castle Valley | Castle Valley | 6,074 | 190 |
| Along the Colorado River between Hittle and to north of Dewey Bridge | Professor Valley | 400 | 0 |
| Along Highway 128 from 191 to Castle Valley Road; along U.S. 191 from Moab to Highway 313; along Hwy. 279 | None | 1,139 | 0 |
| Kane Spring Canyon between the open valley and the Colorado River | Kane Creek Springs | 558 | 0 |
| **Total** | | **48,220** | **2,226** |

All actions would be the same as those defined in the 1985 RMP with the exceptions of laws, regulations, and policies enacted since 1985 that affect management of the resources under all alternatives. Actions common to all alternatives that would affect livestock grazing by directly decreasing or increasing acres and AUMs available to livestock are as follows:

- Wildfires would be allowed to burn according to the parameters of the Fire Management Plan unless they threaten Wildland-Urban Interface (WUI) areas, threatened, endangered, or special status species, high priority sub-basins or watersheds, cultural resources and/or cultural landscapes, or sensitive ecosystems. If an area does not have any of the above resources, it may be allowed to burn. If a wildfire occurs on rangeland, it may result in a temporary loss of acres available to livestock. BLM guidelines usually require a burned area to be closed to livestock for a minimum of one complete growing season after a fire or until adequate vegetation rehabilitation is complete (BLM 1997a).
- Any disposals, exchanges, or acquisitions of public rangelands could change acres available for livestock grazing.
- Construction of any new wind, solar or communication sites would result in a temporary loss of acres and AUMs during construction and a permanent loss where the structure is sited.

BLM_0010253

- Surface-disturbing activities due to minerals extraction could lead to temporary and long term losses of acres accessible for livestock grazing.

- Grazing would not be allowed on developed recreation sites. New recreation sites to be developed under this RMP would be excluded from grazing, in accordance with current management practices.

- Construction of new roads or cross country OHV travel could decrease acres and AUMs available for livestock.

- Since livestock grazing can have deteriorative impacts on riparian ecosystems (Armour et al. 1994), " … it may be necessary to temporarily restrict livestock use on riparian areas determined to be 'Functioning at Risk' and in a static or downward trend or 'Not Functioning'." In these cases, restrictions might be implemented to help the recovery of the site, meaning a temporary loss of acres available to livestock through seasonal restrictions, closures, and/or forage utilization limits.

- Any actions, including improper grazing, that compromise water or soil quality in sensitive areas would be avoided. Improper livestock grazing can adversely alter ecosystems by increasing soil compaction, disturbing soil, and increasing soil erosion (Belsky and Blumenthal 1997), and therefore all uses would be managed to minimize and mitigate damage to soils. Grazing would be managed to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Athena, Cisco, Cisco Mesa, Crescent Canyon, Highland, Monument Wash, and Thompson Canyon. This could lead to a decrease in acres available to livestock through seasonal restrictions or closures.

- Rangelands that have been reseeded and mechanically treated would be ungrazed for a minimum of two complete growing seasons following treatment. This could lead to a decrease in acres available to livestock through temporary closures of allotments following vegetation treatments.

- In general, when livestock grazing threatens to damage the habitats of special status species and species that are listed, or proposed for listing, or candidates for listing under the Endangered Species Act, changes would be made to grazing schedules or acreage available to livestock.

- Construction of any new range improvements to benefit wildlife, such as precipitation catchments or development of new springs, would reduce acres by the amount of rangeland surface area replaced. However, they could increase the long-term available forage for livestock.

- Any future proposal for a change in kind of livestock from cattle to sheep in Rocky Mountain or desert bighorn sheep habitat would be denied. This would have no impact in acres available to cattle.

- The noise, dust, and human presence associated with any type of construction activity could also temporarily decrease the acreages or AUMs, although the degree to which these disturbances would affect livestock would be difficult to gauge.

- If an allotment occurs in recognized Rocky Mountain or desert bighorn sheep habitat, a change in class of livestock from cattle to sheep would not be authorized. Sheep can transmit diseases such as pneumonia to native bighorn sheep, which is thought to have caused high numbers of bighorn fatalities (Foreyt and Jessup 1982; Jessup 1985). Forage and water

BLM_0010254

competition by livestock also creates stress to bighorn sheep, and all such interactions would be avoided (Desert Bighorn Council Technical Staff 1990).

## 4.3.6.2 ALTERNATIVE A

The 48,220 acres (and 2,226 AUMs) listed above under Actions Common to All Alternatives would remain not available for grazing under this alternative. Table 4.38 lists additional areas and allotments that would not be available for grazing under Alternative A.

78,612 additional acres would not be available for grazing, making a total of 126,832 acres and 4,168AUMs are not available for grazing under Alternative A (Please see Map 2-4-A-Areas Not Available for Livestock Grazing-Alternative A).

These exclusions lead to a total of 1,695,621 acres available for livestock grazing under this alternative (93.0% of total BLM lands in the MPA), and approximately 107,071 AUMs (96.2% of total current AUMs of forage available).

**Table 4.38. Acres and AUMs of Forage Not Available to Grazing under Alternative A**

| Exclosure | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Bogart | Bogart | 14,744 | 209 |
| Cottonwood | Cottonwood | 27,193 | 900 |
| Diamond | Diamond | 18,620 | 588 |
| Pear Park | Pear Park | 14,201 | 200 |
| Spring Creek | Spring Creek | 1550 | 45 |
| Beaver Creek upper drainage | Beaver Creek | 2,304 | 0 |
| **Total** | | **78,612** | **1,942** |

### 4.3.6.2.1 IMPACTS OF SOILS/WATERSHED MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Livestock grazing on portions of allotments with saline soils would be adjusted to reduce impacts on highly saline soils and reduce salinity in the Colorado River drainage. These changes could decrease the amount of acres available to livestock.

### 4.3.6.2.2 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Areas open to cross country OHV travel would result in loss of vegetation available for livestock grazing. In this alternative, 620,212 acres are open to cross country travel, possibly resulting in the destruction of forage.

### 4.3.6.2.3 IMPACTS OF VEGETATION MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Land treatments on 11 allotments (see Alternatives Matrix) would be implemented to increase available forage by 8514 AUMs to allow for increased use by livestock and wildlife (split evenly where both are present). Prescribed fire and seeding would be implemented on approximately 14,149 acres for the same purpose increasing AUMs by approximately 1,700 for livestock and wildlife. These vegetation treatments would cause a temporary reduction in the number of acres available to livestock, as it is necessary to leave treated rangelands ungrazed for a minimum of

BLM_0010255

two complete growing seasons. However, these treatments could result in an increase in available forage for livestock and future increases in acres available to livestock.

### 4.3.6.2.4 IMPACTS OF WILDLIFE MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

To improve pronghorn habitat grazing could be excluded from May 15 through June 20 or during extreme snow conditions. Changes in season of use could be made on fawning grounds to reduce disturbance to the pronghorn.

Livestock grazing in pronghorn fawning areas would be excluded from May 1 till June 30 in the Hatch Point HMP. Changes in season of use, number of livestock (27% reduction), change in livestock class from sheep to cattle, fencing, seeding, and rest/rotation would be recommended to improve pronghorn habitat. Rest/rotation would be implemented on the three pastures of the Hatch Point Allotment. These changes to grazing management could reduce acres available to livestock.

Livestock adjustment techniques would be implemented on Horsethief Point, Spring Canyon Bottom, and Ten-Mile Point allotments to improve or maintain bighorn sheep habitat. This could mean a change in the number of acres available to livestock.

### 4.3.6.3 ALTERNATIVE B

The 48,220 acres (and 2,226 AUMs) listed above under Impacts Common to All Alternatives would remain not available for grazing under this alternative. Table 4.39 lists additional areas and allotments that would be not available for grazing under Alternative B.

**Table 4.39. Acres and AUMs of Forage Not Available to Grazing under Alternative B**

| Exclosure | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Bogart | Bogart | 14,744 | 209 |
| Cottonwood | Cottonwood | 27,193 | 900 |
| Diamond | Diamond | 18,620 | 588 |
| Pear Park | Pear Park | 14,201 | 200 |
| Spring Creek | Spring Creek | 1,550 | 45 |
| Beaver Creek upper drainage | Beaver Creek | 2,309 | 0 |
| Professor Valley | Professor Valley | 18,966 | 378 |
| Ida Gulch | Ida Gulch | 3,612 | 112 |
| River | River | 386 | 7 |
| Mill Creek | Mill Creek | 3,921 | 137 |
| **Total** | | **105,502** | **2576** |

Thus, an additional 105,502 acres would be not be available for grazing in Alternative B, making a total of 153,722 acres and 4,802 AUMs not available for grazing (Map 2-4-B-Areas Not Available for Livestock Grazing-Alternative B). About 106,437 AUMs remain available for grazing under Alternative B.

BLM_0010256

For purposes of analysis, Table 4.40 shows the following areas could also be unavailable for grazing under this alternative.

These decisions (excluding the riparian acres and AUMs) lead to a total of 1,668,732 acres available for livestock grazing under this alternative (91.6% of the MPA), and 106,437 AUMs of forage (95.7% of current available forage), both measurements being similar to those under Alternative A.

**Table 4.40. Riparian Acres Not Available for Grazing and AUMs of Forage under Alternative B[1]**

| Exclusion | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Seven Mile Canyon* | Dalton Wells, Arth's Pasture, Big Flat/Ten Mile | 459 | 2 |
| Hatch Wash * | Hatch Point | 476 | 10 |
| East Coyote Wash * | Lisbon, East Coyote | 391 | 56 |
| Kane Springs | Kane Springs Canyon, Behind the Rocks | 746 | 21 |
| Hatch Wash | Hatch Point | 476 | 10 |
| Lower Gray Canyon* | Rattlesnake | 1,628 | 84 |
| Riparian areas in Mill Creek Canyon* | Mill Creek | 42 | 1 |
| Day Canyon* | Potash | 22 | 1 |
| Ten Mile Wash* | Ten Mile Point | 434 | 18 |
| **Total** | | **4,422** | **203** |

*Acreages are for BLM land only.

*Grazing permits have not been authorized previously in the Pear Park and Spring Creek allotments, and therefore, estimations for available forage in AUMs are not available.

### 4.3.6.3.1 IMPACTS OF MINERALS MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Under Alternative B, it is predicted that 426 acres of land would be disturbed annually due to minerals extraction. This is 253 fewer acres than Alternative A and, similar to Alternative A, represents a negligible decrease in the total forage available in the MPA.

### 4.3.6.3.2 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Under Alternative B, 266,485 acres in 32 areas would be managed to protect their wilderness characteristics values. Livestock developments required through Standards and Guides assessments would be required to meet VRM II objectives as well as the naturalness criteria for non-WSA lands with wilderness characteristics. This could preclude development of certain surface-disturbing rangeland projects, or require placement outside the wilderness characteristics areas.

BLM_0010257

### 4.3.6.3.3 IMPACTS OF RIPARIAN MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

The following portions of allotments could be not available for grazing (in order to further riparian management goals) under this alternative, in addition to those listed in Alternative A: Ten Mile from Dripping Springs to the Green River, Day Canyon, Mill Creek, Seven Mile Canyon, East Coyote, Cane Springs, Lower Gray Canyon, and Hatch Wash. Managed livestock grazing in all riparian areas would be allowed, although riparian areas would be managed to meet PFC.

This could reduce the numbers of acres available to livestock grazing under Alternative B by 4,422 acres and 203 AUMs as compared to Alternative A.

### 4.3.6.3.4 IMPACTS OF SOILS/WATERSHED MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Under Alternative B, some sites could undergo season-of-use changes in order to minimize impacts to saline soils.

Grazing systems and AMPs would be used to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Agate, Big Flat-Ten Mile, Cisco Mesa, Corral Wash, Crescent Canyon, Floy Creek, Harley Dome, Highlands, and San Arroyo. These new AMPs may reduce acreage available to livestock if site closures are determined to be necessary.

### 4.3.6.3.5 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Areas open to cross country OHV travel would result in loss of vegetation available for livestock grazing. In this alternative, 0 acres are open to cross country travel. This action could result in potential increases in forage.

### 4.3.6.3.6 IMPACTS OF VEGETATION MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Approximately 46,307 acres of vegetation treatments would be maintained to increase available forage. This is 20,818 acres (31%) less than Alternative A and is the same as Alternatives C and D. Vegetation treatments under this alternative would be used primarily to benefit wildlife.

The areas set aside to be treated may be unavailable for grazing temporarily, but improvements to the rangeland may result in more acres available for grazing. This would be especially likely if an area is rehabilitated to the point of meeting the Standards for Rangeland Health where previously it was not available for grazing due to failing to meet the standards. However, these treated areas would not necessarily lead to an increase in acres available for livestock. Potential changes in forage available for livestock would be analyzed at the project implementation level with site-specific NEPA.

### 4.3.6.3.7 IMPACTS OF WILDLIFE MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Spring livestock use could be limited on 188,975 acres on allotments within crucial pronghorn habitat in the Cisco Desert to encourage forb production. For purposes of analysis, this could lead to a total loss of 633 days (out of 1,691 total), or roughly a 37% decrease in livestock season of use in this area in comparison to Alternative A.

BLM_0010258

Pronghorn fawning areas in the Hatch Point HMP area could not be grazed from May 1 until June 30.

For purposes of analysis, this could lead to a total loss of 86 days (out of 605 total), or roughly a 14.2% decrease in livestock season of use in this area in comparison to Alternative A.

Livestock utilization could be adjusted to protect desert bighorn sheep lambing areas, on North River and Taylor Allotments (Dry Mesa Pasture).

For purposes of analysis, this could lead to a total loss of 137 days (out of 712 total), or roughly a 19.2% decrease in livestock season of use in this area in comparison to Alternative A.

Management of rangeland in the 458,242 acres of Rocky Mountain bighorn sheep habitat from the Green River to the Colorado border would include improving or maintaining habitat and vegetative conditions to benefit the bighorn sheep while maintaining or improving the overall ecological condition of the area. Conversion of sheep to cattle on allotments that are in the 458,242 acres of managed Rocky Mountain bighorn sheep habitat would be supported. This action would not result in overall AUM reduction, but would be a loss of opportunity for ranchers who graze domestic sheep.

### 4.3.6.4 PROPOSED PLAN

The 48,220 acres (and 2,226 AUMs) listed above under Actions Common to All Alternatives would remain not available for grazing under this alternative (see Table 4.37). Table 4.41 lists additional areas and allotments that would not be available for grazing under the Proposed Plan.

**Table 4.41. Additional Acres and AUMs of Forage Not Available to Grazing under the Proposed Plan**

| Exclosure | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Bogart | Bogart | 14,744 | 209 |
| Cottonwood | Cottonwood | 27,193 | 900 |
| Diamond | Diamond | 18,620 | 588 |
| Portions of Professor Valley, River | Professor Valley, River | 1,467 | 0 |
| Mill Creek | Mill Creek | 3,921 | 137 |
| Ida Gulch | Ida Gulch | 3,612 | 112 |
| Pear Park | Pear Park | 14,201 | 588 |
| Total | | 83,758 | 2,534 |

Thus, an additional 83,758 acres would not be available for grazing, making a total of 132,047 acres and 4,760 AUMs not available for grazing under the Proposed Plan (Map 2-4-C-Areas not available for livestock grazing under the Proposed Plan).

Table 4.42 shows the riparian areas that could be unavailable for grazing under this alternative.

These decisions (excluding the riparian acres and AUMs) lead to a total of 1,690,481 acres available for livestock grazing under this alternative (92.8% of the total MPA), and 106,479

BLM_0010259

AUMs (95.7% of current estimated forage amounts), both numbers being similar to Alternative A totals.

**Table 4.42. Acres Unavailable for Grazing and AUMs of Forage under the Proposed Plan**

| Exclusion | Allotment(s) | Acreage | AUMs |
|---|---|---|---|
| Seven Mile Canyon* | Dalton Wells, Arth's Pasture, Big Flat/ Ten Mile | 459 | 2 |
| East Coyote Wash* | East Coyote, Lisbon | 391 | 56 |
| Riparian areas in Mill Creek canyon* | Mill Creek | 42 | 1 |
| Day Canyon* | Potash | 22 | 1 |
| Ten Mile Wash, downstream from Dripping Springs* | Ten Mile Point | 434 | 18 |
| **Total** | | **1,169** | **78** |

*These areas are considered for restriction using Standards for Rangeland Health.

Management decisions would be the same as for Alternative A, with the exceptions outlined in the sections below.

#### 4.3.6.4.1 IMPACTS OF MINERALS MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Under the Proposed Plan, it is predicted that 701 acres of land would be disturbed annually due to minerals extraction. This is 22 more acres than Alternative A (3.3% increase), but still less than 1% of the total lands in the MPA.

#### 4.3.6.4.2 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Under the Proposed Plan, 47,761 acres in Beaver Creek, Fisher Towers and Mary Jane Canyon non-WSA lands with wilderness characteristics would be managed to protect their wilderness characteristics values. Livestock developments required through Standards and Guides assessments would be required to meet VRM II objectives as well as the naturalness criteria for non-WSA lands with wilderness characteristics. This could preclude development of certain surface-disturbing rangeland projects, or require placement outside the wilderness characteristics areas.

#### 4.3.6.4.3 IMPACTS OF RIPARIAN MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

The same riparian areas would be available for grazing as under Alternative B, except Lower Gray Canyon, Kane Springs and Hatch Wash, which would remain available. This is 1,169 more riparian acres (and 78 AUMs) potentially not available for grazing than under Alternative A.

#### 4.3.6.4.4 IMPACTS OF SOILS/WATERSHED MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Grazing systems would be used and AMPs would be developed to minimize impacts to saline soils in the following allotments: Agate, Athena, Big Flat – Ten Mile, Cisco, Cisco Mesa, Coal Canyon, Corral Wash, Crescent Canyon, Floy Creek, Harley Dome, Highlands, Horse Canyon,

BLM_0010260

Little Grand, Lone Cone, Monument, San Arroyo. This could result in a temporary decrease in acres available to livestock.

### 4.3.6.4.5 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Areas open to cross country OHV travel would result in loss of vegetation available for livestock grazing. In this alternative, 1,866 acres are open to cross country travel; forage could be affected on this acreage.

### 4.3.6.4.6 IMPACTS OF VEGETATION MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

The same amount of vegetation treatments would be maintained as outlined under Alternatives B and D. The treatments would be used to benefit wildlife and livestock equally.

### 4.3.6.4.7 IMPACTS WILDLIFE MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Spring grazing would be adjusted on a case-by-case basis on 188,975 acres on allotments within crucial pronghorn habitat in the Cisco Desert to encourage forb production. These allotments include Athena, Cisco, Cisco Mesa, Harley Dome, San Arroyo, and Corral Wash.

Where applicable, a rest/rotation of pasture or other grazing management systems would be developed in allotments within crucial pronghorn habitat to encourage forb production prior to fawning. Change in livestock class from sheep to cattle, fencing, seeding and rest/rotation to improve habitat would be encouraged.

To protect desert bighorn sheep lambing areas, Standards for Rangeland Health would be employed on the North River and Taylor allotments (Dry Mesa Pasture) For purposes of analysis, this leads to a total loss of 92 days (out of 712 total), or roughly a 12.9% decrease in livestock season of use in this area in comparison to Alternative A.

Management of rangeland in 310,726 acres of Rocky Mountain bighorn sheep habitat from the Green River to the Colorado border would include improving or maintaining habitat and vegetative conditions to benefit the bighorn sheep while maintaining or improving the overall ecological condition of the area. Conversion of sheep to cattle on allotments in 310,726 acres of managed Rocky Mountain bighorn sheep habitat would be supported. Once conversion occurs, reconversion (from cattle to sheep) would not be allowed. This action would not result in overall AUM reduction, but would be a loss of opportunity for ranchers who graze domestic sheep.

### 4.3.6.5 ALTERNATIVE D

The 48,220 acres (and 2,226 AUMs) listed above under Actions Common to All Alternatives would remain not available for grazing under this alternative. Table 4.43 lists additional areas and allotments that would not be available for grazing under Alternative D.

**Table 4.43. Additional Acres and AUMs of Forage Not Available to Grazing under Alternative D**

| Exclosure | Allotment(s) | Acreage | AUMs |
|-----------|-------------|---------|------|
| Mill Creek | Mill Creek | 3,921 | 137 |
| **Total** | | **3,921** | **137** |

BLM_0010261

Thus, an additional 3,921 acres would not be available for grazing, making a total of 52,141 acres and 2,363 AUMs not available for grazing under Alternative D (Map 2-4-D-Areas Not Available for Livestock Grazing - Alternative D).

These exclusions lead to a total of 1,770,314 acres available for livestock grazing under this alternative (97.1% of the MPA) and 108,876 AUMs of forage (97.9% of estimated totals in the MPA), which is the most amount acreage and AUMs of any alternative.

### 4.3.6.5.1 IMPACTS OF MINERALS MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

It is predicted that 743 acres of land would be disturbed annually due to minerals extraction under Alternative D. This is less than 1% of the MPA and is virtually identical to the total percent of lands that would be impacted under Alternative A.

### 4.3.6.5.2 IMPACTS OF SOILS/WATERSHED MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Grazing systems would be managed to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Athena, Cisco, Cisco Mesa, Crescent Canyon, Highland Monument Wash, and Thompson Canyon. This may result in temporary decreases in acres available to livestock if site closures are determined necessary.

### 4.3.6.5.3 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Areas open to cross country OHV travel would result in loss of vegetation available for livestock grazing. In this alternative, 3,064 acres are open to cross country travel and the forage on them would be subject to impacts.

### 4.3.6.5.4 IMPACTS OF VEGETATION MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

The same amount of vegetation treatments would be maintained as outlined under Alternatives B and C. Vegetation treatments would be used primarily to benefit livestock under this alternative.

### 4.3.6.5.5 IMPACTS OF WILDLIFE/FISHERIES MANAGEMENT DECISIONS ON LIVESTOCK GRAZING

Seasons of use would be adjusted to protect desert bighorn sheep lambing areas in the same areas as outlined under the Proposed Plan.

Rangeland from the Green River to the Colorado border (194,560 acres) would be managed as Rocky Mountain bighorn sheep habitat. This management would include maintaining or improving habitat and vegetative conditions to benefit bighorn sheep while maintaining or improving the ecological condition of rangelands. Any future proposal for a change in kind of livestock from cattle to sheep in Rocky Mountain bighorn sheep habitat would be denied. This action would not result in overall AUM reduction, but would be a loss of opportunity for ranchers who graze domestic sheep.

BLM_0010262

## 4.3.6.6 SUMMARY OF IMPACTS

Alternative B would have the least number of AUMs available of all the alternatives followed by Alternative A, the Proposed Plan, and Alternative D respectively. Table 4.44 summarizes grazing exclusions by AUMs and the differences by alternatives.

**Table 4.44. Total AUMs of Forage Available and Not Available to Livestock by Alternative**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| AUMs Available | 107,071 | 106,437 | 107,179 | 108,876 |
| AUMs Not Available | 4,168 | 4,802 | 4,060 | 2,363 |
| Compared to A | -- | +634 | -108 | -1805 |
| Compared to B | -634 | -- | -742 | -2,439 |
| Compared to the Proposed Plan | +108 | +742 | -- | -1,697 |
| Compared to D | +1,805 | +2,439 | +1,697 | -- |

Correspondingly Alternative B also has the fewest number of acres available for grazing followed by Alternative A, the Proposed Plan, and Alternative D, respectively. Table 4.45 summarizes grazing exclusions by acres.

**Table 4.45. Total Acreage Available and Not Available to Livestock by Alternative[1]**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Acreage Available to Grazing | 1,695,621 | 1,668,732 | 1,708,294 | 1,770,314 |
| Acreage Not Available to Grazing | 126,907 | 153,797 | 114,234 | 52,214 |

Average annual disturbance caused by minerals extraction would have the following impacts in terms of acres under each alternative (Table 4.46).

**Table 4.46. Annual Average Acres of Disturbance Due to Minerals Extraction Activities Under All Alternatives, as well as Percent of Total Planning Area**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Annual acres of disturbance | 679 | 417 | 638 | 672 |
| Percent of total planning area | <1.0% | <1.0% | <1.0% | <1.0% |

As shown, a very small percentage of the MPA would be affected by disturbance (i.e., loss of vegetation) each year. There is very little difference in yearly average acres of disturbance

---

[1] Numbers are approximate due to GIS calculation variances.

BLM_0010263

between alternatives, so there would thus be very little difference in potential impacts by alternative.

## 4.3.7 MINERALS

This section presents the environmental consequences of resource management decisions, proposed under each of the four alternatives described in Chapter 2, upon mineral resource development. Existing conditions concerning minerals are described in Chapter 3. In accordance with BLM policy and its recognition of the National Energy Policy and Conservation Act of 2000 (EPCA), as discussed in Chapters 2 and 3, mineral resource development would be allowed throughout the MPA subject to standard lease terms unless precluded by other program prescriptions, as specified in this PRMP/EIS.

Stipulations would be developed in the RMP, where necessary, to mitigate the impacts of oil and gas and other mineral activity (see Appendix C). The stipulations identified in Appendix C would apply to all surface-disturbing activities, aside from the exception, modification, and waiver situations as determined by an Authorized Officer. The area-specific restrictions on surface-disturbing activities listed in Table C.1 vary by alternative and detail limits on timing, surface use, and occupancy, as well as closures, throughout the MPA. Impacts to the mineral program from these stipulations are discussed throughout this section under the applicable impacting program.

### 4.3.7.1 RESOURCE DECISIONS THAT WOULD HAVE NEGLIGIBLE IMPACTS ON MINERAL RESOURCE DEVELOPMENT

Negligible impacts to mineral resource development would result from air quality, cultural resources, fire, health and safety, livestock grazing, travel, or woodlands management decisions. The impacts would be negligible because maintaining air quality within NAAQS thresholds through appropriate mitigation; identifying, protecting, and preserving cultural resources, and complying with section 106; reducing wildland fire risks; reducing the risks of hazardous spills, and maintaining safety around AML sites; establishing utilization levels and applying grazing standards and guidelines; designating recreational OHV access within the planning area; and permitting woodland harvesting would not reduce the opportunities for minerals leasing or for the exploration and development of mineral resources. Therefore, the impacts of management actions for these resources or programs on mineral resource development will not be analyzed further in this section.

### 4.3.7.2 ASSUMPTIONS

For this analysis, it is assumed that:

- 50% of the wells drilled would be productive,
- the remaining 50% would be abandoned and reclaimed, and
- revegetation would be successful within a scope of 10 years.

In addition, the surface-disturbance associated with geophysical exploration would be successfully reclaimed within a scope of 10 years.

Most geophysical exploration would occur in the Big Flat-Hatch Point, Lisbon Valley, and Eastern Paradox RFD areas. This exploration would beneficially impact mineral resource

BLM_0010264

development and production, in that it would refresh or increase the data available for making prudent mineral resource development decisions (BLM 2005f). This beneficial impact cannot be quantified further because it is not possible to predict the number of wells that would ultimately result from this exploration or to predict whether such data would remain useful as data-gathering technologies advance over the next 15 years.

The RFD prepared in anticipation of this RMP utilizes data on past and current development to predict future development for all lands in the MPA, both BLM lands and non-BLM lands (BLM 2005e, 2005f). The RFD is a hypothetical scenario which allows the discussion to focus the analysis on the potential impacts. For purposes of analysis, the average acreage of disturbance per well (including the well pad, roads, and pipelines) was estimated to be 15 acres. Therefore, 15 acres is assumed to be the projected, approximate disturbance per well under each alternative.

The percentage of all lands in the MPA determined to be administered by the BLM was 69.7% (Table 4.37). Assuming the RFD applies uniformly across all lands in the MPA, any calculations made, in conjunction with the disturbance per well number (15 acres) and the alternatives matrix in Chapter 2, can be used to estimate potential mineral resource development impacts (measured in number of wells and resulting acres of surface disturbance) on BLM lands for each alternative. It was assumed that the number of wells likely to be drilled under each alternative would be proportional to the acreage of land open for mineral resource development under that alternative. For example, if an alternative had 90% of BLM lands in the MPA open for development, it would be assumed that 90% of the RFD on BLM lands would be drilled under that alternative.

Table 4.47 shows the acreages of and predicted number of wells on BLM lands within the seven RFD development areas, which are to be the focus of this analysis and of future oil and gas development within the MPA.

**Table 4.47. Baseline/RFD Acreages of Lands and Average Predicted Number of Oil and Gas Wells in the Seven RFD Areas, over 15 Years**

| RFD Area | Acreage | | BLM% of Total | Wells | |
|---|---|---|---|---|---|
| | Total | BLM | | Total | BLM |
| Bigflat – Hatch Point | 470,133 | 391,395 | 83 | 60 | 50 |
| Book Cliffs | 326,070 | 255,074 | 78 | 135 | 105 |
| Eastern Paradox | 1,121,340 | 675,577 | 60 | 60 | 36 |
| Greater Cisco | 292,952 | 235,620 | 80 | 247 | 198 |
| Lisbon Valley | 153,916 | 114,494 | 74 | 75 | 56 |
| Roan Cliffs | 329,841 | 95,849 | 29 | 8 | 2 |
| Salt Wash | 65,246 | 54,526 | 84 | 15 | 13 |
| Total[1] | 2,759,498 | 1,822,535 | 69.7 | 600 | 459 |

Due to rounding, table totals may differ from the sum of the rows above.

Using the above method, similar calculations can be made regarding impacts of geophysical exploration, in conjunction with the disturbance associated with linear miles of source line within

BLM_0010265

the MPA (disturbance of 3,600 acres caused by 2,000 linear miles of source line; BLM 2005f). Table 4.48 shows the acreages for development of BLM lands throughout the MPA.

Locatable and salable mineral resource development, in conjunction with the acres of disturbance within the MPA (disturbance of 350 acres caused by locatable mineral resource development and of 390 acres caused by salable mineral resource development; BLM 2005e) will be applied uniformly across the alternatives.

Short-term and long-term impacts are discussed in the introduction to Chapter 4. Because the impact indicators for this resource are number of wells and the number of acres available for mineral resource development over the life of the RMP, short-term impacts are not distinguished from long-term impacts.

The analysis of the impacts of NSO stipulations assumes that development and production of the underlying mineral resources are administratively available by directional drilling from outside the area. The extent of directional drilling technology is currently approximately 1 mile in this region; therefore, for this RMP, 1 mile was assumed. Because the resources underlying NSO-stipulated surfaces are more difficult and costly to extract, developers are less likely to opt to develop in NSO areas if less restrictive leases are available to them. For these reasons, NSO lands experience far less development than lands with standard lease terms and special stipulations (timing limitations and controlled surface use). Since the unit of analysis in this section is acres of disturbance, and since NSO areas would not undergo surface disturbance, NSO and closed acreage has been combined in the analysis of surface disturbance. Acreage has been divided into those lands which allow surface disturbance and those lands on which surface disturbance is not allowed, and analysis performed on those two categories.

BLM_0010266

**Table 4.48. Acres of BLM Lands Available for Mineral Resource Development under Each Alternative**

| Resource | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **LEASABLE MINERAL RESOURCE DEVELOPMENT, INCLUDING OIL AND GAS** | | | | |
| Standard Lease Terms | 1,038,344 | 264,344 | 427,273 | 797,031 |
| Special Stipulations (CSU and TL) | 389,605 | 543,751 | 806,994 | 590,442 |
| **Subtotal of Open Lands** | **1,427,949** | **808,096** | **1,234,267** | **1,387,473** |
| No Surface Occupancy (NSO) Stipulations | 38,912 | 342,931 | 217,480 | 84,772 |
| Closed to Leasing* | 353,293 | 671,444 | 370,250 | 350,219 |
| **Subtotal of Closed Lands**** | **392,205** | **1,014,375** | **587,730** | **434,991** |
| **All BLM Lands** | **1,820,154** | **1,822,471** | **1,821,997** | **1,822,464** |
| **SALABLE MINERAL RESOURCE DEVELOPMENT (MINERAL MATERIAL DISPOSAL)** | | | | |
| Standard Terms/Conditions | 1,466,861 | 264,344 | 427,273 | 797,031 |
| Special Conditions (CSU and TL) | | 543,751 | 806,994 | 590,442 |
| **Subtotal of Open Lands** | **1,466,861** | **808,097** | **1,234,267** | **1,387,473** |
| NSO | | 342,931 | 217,480 | 84,772 |
| Closed | | 671,444 | 370,250 | 350,219 |
| **Subtotal of Closed Lands**** | | **1,014,375** | **587,730** | **434,991** |
| **LOCATABLE MINERAL RESOURCE DEVELOPMENT (MINERAL ENTRY)** | | | | |
| Open, Standard Terms/Conditions | 1,389,531 | 268,873 | 427,273 | 797,031 |
| Open, Special Conditions (CSU and TL) | | 1,120,658 | 962,258 | 592,500 |
| Open within WSAs, Subject to IMP | 353,510 | 353,510 | 353,510 | 353,510 |
| **Subtotal of Open Lands** | **1,743,041** | **1,743,041** | **1,743,041** | **1,743,041** |
| Withdrawn | 78,333 | 78,333 | 78,333 | 78,333 |

* More than 350,000 of these acres are closed due to WSA designation (BLM 1990, 1991c, 1995, 1999; see the IMP). WSA closures are non-discretionary and, thus, are beyond the scope of this EIS's analysis. WSA designations would continue to apply across all alternatives, including Alternative A.

** See previous paragraph. NSO and closed lands compose this subtotal.

BLM_0010267

### 4.3.7.3 ALTERNATIVE IMPACTS

#### 4.3.7.3.1 IMPACTS OF LANDS AND REALTY DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.1.1 Impacts Common to All Alternatives

Under all alternatives, approximately 78,333 acres of withdrawals from mineral entry (or 4.3% of BLM lands) would continue as follows (see Appendix C):

- Three Rivers Withdrawal (65,037 acres)
- Westwater Withdrawals (8,096 acres)
- Black Ridge Wilderness Withdrawal (5,200 acres)

These withdrawals constitute an adverse impact that would result in fewer opportunities for locatable mineral resource development on those parcels and less production and supply of locatable mineral resources (see Section 4.3.7.3.2.1).

#### 4.3.7.3.1.2 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

Under all action alternatives (i.e., excluding Alternative A), an NSO stipulation would be placed on oil and gas leasing, and other surface-disturbing activities would be precluded (see Appendix C) along the U.S. Highway 191 utility corridor within Moab Canyon and within the area of the existing withdrawals. These leasing restrictions would constitute adverse impacts compared to Alternative A. Only limited development (i.e., oil and gas production using directional drilling) would be conducted on the lands managed as NSO, which would result in a lower domestic supply of mineral resources and fewer royalties.

#### 4.3.7.3.2 IMPACTS OF MINERAL RESOURCE DEVELOPMENT DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.2.1 Impacts Common to All Alternatives

Adverse impacts to mineral resource development in the MPA result from discretionary land-use restrictions (e.g., seasonal wildlife restrictions). These restrictions would increase the cost, time, and effort devoted to production of mineral resources. In addition, non-discretionary procedures (i.e., protection of special status plant and animal species) would also increase the cost, time, and effort devoted to the production of mineral resources.

Impacts of Federal Leases on Non-BLM Lands

Under all alternatives, the BLM controls Federal lease operations on certain lands not administered by the BLM, including:

- 141,241 acres within the Manti-La Sal National Forest, Moab Ranger District, and
- 29,678 acres on split-estate lands, of which 9,617 acres (or 0.5% of all Federally leased lands) would be subject to NSO or closed to leasing.

BLM_0010268

The impacts of administering leasing operations on these non-BLM lands within the MPA—a total of 170,919 acres—would result in a net benefit for mineral resource development, particularly of oil and natural gas, over the long term. Leasing of these non-BLM lands would result in the permitting of additional wells, which in turn would result in an increase in the domestic supply of oil and natural gas and increased royalties to the Federal government and the State of Utah. However, continued oil and gas extraction would, over time, reduce the quantities of finite fossil fuel resources in the MPA. It should be noted that these lands are considered in the RFD prepared in conjunction with this PRMP/EIS.

Impacts of Mineral Leasing on Mineral Resource Development

Under all alternatives, potash solution mining exploration and development may occur on approximately 50 acres in the east-central portion of the MPA (i.e., the Big Flat – Hatch Point RFD Area).

This decision would result in beneficial impacts, taking the form of small increases in the domestic supply of potash. Furthermore, the development of potash resources in this area is not expected to conflict with the development of other mineral resources, including oil and gas (even if these developments are co-located; BLM 2005e, 2005f), due primarily to the small scale of development. Thus, the net impact of this decision would be beneficial across all alternatives.

Impacts of Salable Minerals on Mineral Resource Development

Under all alternatives, over the life of the RMP, sand and gravel resource development would continue at known deposits and could disturb approximately 360 acres in close proximity to transportation corridors and communities. Development of building stone, humate, and clay resources would also continue at existing and historical deposits and would disturb approximately 10, 17, and 7 acres, respectively, adjacent to existing and historical deposits. Therefore, a total of 394 acres are expected to be disturbed due to the development of salable minerals, which in turn would result in beneficial impacts of the types described above for potash, for similar reasons. Although development of salable mineral resources may be co-located with oil and gas and other mineral resource development, mineral material disposal operations are typically discrete sites, small enough to avoid conflicts with the development of other mineral resources. Very few adverse impacts in the form of resource conflicts between development and extraction of salable and other mineral resources would be anticipated.

Impacts of Locatable Minerals on Mineral Resource Development

Approximately 1,743,041 acres of BLM land would remain open to development of locatable mineral resources (i.e., uranium-vanadium and copper) across all alternatives, and development of these mineral resources would continue during the life of the RMP at a consistent level, regardless of the alternative implemented. The impacts of any future development of locatable resources would be analyzed through site-specific NEPA when and if the project(s) are proposed.

Approximately 300 acres (about 20 acres per year) could be disturbed for uranium-vanadium resource development over the life of the plan. This continuation of uranium-vanadium resource development would result in beneficial impacts described above for potash. Oil and gas development has some potential to co-occur with uranium-vanadium development. However, uranium-vanadium mining operations are small enough to preclude conflict or adverse impacts with oil and gas development at the planning area-wide scale (BLM 2005f).

BLM_0010269

Development of copper resources is expected to continue and expand slightly over the life of the RMP. The newly initiated Lisbon Valley Copper project—involving the Centennial, Sentinel, and GTO copper deposits—has begun copper production and is anticipated to utilize and then reclaim 1,103 acres over the life of the RMP. This multi-year copper resource development project would result in beneficial impacts, which would take the form of an increase in the domestic supply of copper. The project is, however, within an area of high development potential for oil and gas. The project's copper development operations could eliminate some opportunities for oil and gas exploration and development because oil and gas could not be developed where it would interfere with mining operations. Exploration and drilling is anticipated in the Lisbon Valley Copper area, which would amount to approximately 25–50 acres of surface disturbance over the next 10 years. In addition, along the Salt Valley anticline, drilling and potentially open-pit mining or in situ leaching facilities may cause 20 acres of surface disturbance. All of this additional copper resource development (up to approximately 70 acres) would result in beneficial and adverse impacts of the same type as those described for the Lisbon Valley Copper project, for the same reasons.

### 4.3.7.3.2.2 Alternative A

Oil and Gas Resources

Approximately 1,427,949 (or 78.5%) of BLM lands within the MPA would be open for oil and gas leasing subject to standard lease terms and conditions and special stipulations (see Appendix C) within the seven RFD development areas (see Table 4.48). Based on the proportion of BLM lands open for leasing, and on the information contained in the RFD scenario (BLM 2005f), it is estimated that 451 oil and gas wells would be drilled over the life of the RMP (Table 4.49; Map 3-16). These restrictions are discussed under the resource section imposing the stipulation or closure. See the Socioeconomic analysis in this chapter (Section 4.3.12) for the projected production and revenue of oil and gas for Alternative A.

Geophysical Exploration

Under Alternative A, approximately 1,332 linear miles of source line for geophysical exploration would be conducted over the life of the RMP for the purposes outlined in Section 4.3.7.2 and would result in approximately 2,397 acres of surface disturbance over the life of the RMP. This exploration would result in beneficial impacts to mineral resource development of the same type and quality described in Section 4.3.7.2, for the same reasons (BLM 2005f).

**Table 4.49. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative A, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Open | | | % of BLM Lands Open | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Bigflat – Hatch Point | 242,405 | 121,185 | 363,590 | 93 | 46 | 4 |
| Book Cliffs | 36,347 | 114,304 | 150,651 | 99 | 104 | 12 |
| Eastern Paradox | 428,369 | 99,088 | 527,457 | 95 | 34 | 4 |

BLM_0010270

**Table 4.49. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas under Alternative A, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Open | | | % of BLM Lands Open | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Greater Cisco | 182,272 | 33,440 | 215,712 | 99 | 196 | 24 |
| Lisbon Valley | 102,100 | 12,303 | 114,403 | 100 | 56 | 6 |
| Roan Cliffs | 6 | 3,144 | 3,150 | 100 | 2 | 1 |
| Salt Wash | 46,845 | 6,141 | 52,986 | 97 | 13 | 2 |
| **Total** | 1,038,344 | 389,605 | 1,427,949 | | 451 | 52 |

Note: Calculations based on BLM lands only.

*Oil and natural gas wells are considered together.

**Based on the RFD (BLM 2005f), Maximum per Year (MPY) reflects the maximum development that *could* occur in *any given year* over 15 years. During most years, development per year would be less than this maximum. To find the *average* development per year, take the Average over 15 years and divide it by 15, which is the number of years projected in the RFD.

Other Leasable Resources

Under Alternative A, approximately 1,427,949 acres of BLM land would be open for the leasing of potash and salt. However, the same level of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1.

Salable Resources

Under Alternative A, approximately 1,466,861 acres of BLM land would be open to development of salable minerals. Although development could occur anywhere within this acreage, the same *level* of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1. The restrictions on salable resource development are discussed under the resource sections imposing these restrictions.

### 4.3.7.3.2.3 Alternative B

Oil and Gas Resources

Approximately 808,096 acres (or 44.3%) of BLM lands within the MPA would be open for oil and gas leasing subject to standard lease terms and special stipulations (see Appendix C), within the seven RFD development areas (see Table 4.48). Based on the proportion of BLM lands open for leasing under standard lease terms and special stipulations, and on the information contained in the RFD scenario (BLM 2005f), it is estimated that 264 oil and gas wells would be drilled over the life of the RMP (Table 4.50; Map 3-16; BLM 2005f). This alternative would result in a decrease of approximately 619,853 acres (or 34.1%) of BLM lands available for development and a decrease of 187 predicted oil and gas wells (or 41.4%) compared to Alternative A. The NSO stipulations and closures for mineral resource development are discussed under the resource sections imposing the restrictions. See the Socioeconomic analysis in this chapter (Section 4.3.12) for the projected production and revenue of oil and gas for Alternative B.

BLM_0010271

**Table 4.50. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas
under Alternative B, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Open | | | % Of BLM Lands Open | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Bigflat – Hatch Point | 76,845 | 68,081 | 144,926 | 39 | 19 | 2 |
| Book Cliffs | 23,515 | 72,486 | 96,001 | 63 | 66 | 7 |
| Eastern Paradox | 80,032 | 237,603 | 317,635 | 59 | 21 | 2 |
| Greater Cisco | 47,840 | 44,879 | 92,719 | 46 | 92 | 11 |
| Lisbon Valley | 89 | 110,766 | 110,855 | 97 | 54 | 6 |
| Roan Cliffs | 0 | 1,398 | 1,398 | 37 | 1 | 0 |
| Salt Wash | 36,024 | 8,539 | 44,563 | 82 | 11 | 1 |
| **Total** | **264,345** | **543,752** | **808,097** | | **264** | **29** |

Note: Calculations based on BLM lands only.

*Oil and natural gas wells are considered together.

**Based on the RFD (BLM 2005f), MPY reflects the maximum development that *could* occur in *any given year* over 15 years.
During most years, development per year would be less than this maximum. To find the *average* development per year, take the
15 year projection and divide it by 15, which is the number of years projected in the RFD.

Geophysical Exploration

Under Alternative B, approximately 780 linear miles of source line for geophysical exploration
would be conducted over the life of the RMP for the purposes outlined in Section 4.3.7.2 and
would result in approximately 1,404 acres of surface disturbance over the life of the RMP. This
exploration would result in beneficial impacts to mineral resource development by providing
new data for making prudent mineral resource development decisions. However, less exploration
would happen under Alternative B than under Alternative A; 552 fewer miles of source line (a
decrease of 41%) would be used under Alternative B compared to Alternative A.

Other Leasable Resources

Under Alternative B, approximately 808,096 acres of BLM land would be open for the leasing of
potash and salt. The same level of development is projected for all alternatives, as mentioned in
Section 4.3.7.3.2.1.

Salable Resources

Under Alternative B, approximately 808,097 acres of BLM land would be open to development
of salable minerals (a decrease of approximately 659,671 acres, or 44.9%, compared to
Alternative A). Although development could occur anywhere within this acreage, the same *level*
of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1. The
restrictions on salable resource development are discussed under the resource sections imposing
these restrictions.

BLM_0010272

### 4.3.7.3.2.4 Proposed Plan

Oil and Gas Resources

Approximately 1,234,267 acres (or 67%) of BLM lands within the MPA would be open for oil and gas leasing subject to standard lease terms and special stipulations (see Appendix C) within the seven RFD development areas (see Table 4.48). Based on the proportion of BLM lands open for leasing under standard lease terms and special stipulations, and on the information contained in the RFD (BLM 2005f), it is estimated that 432 oil and gas wells would be drilled over the life of the RMP (Table 4.51; Map 3-16; BLM 2005f). This alternative would result in a decrease of approximately 193,682 acres (or 10%) of BLM lands available for development and a decrease of 19 oil and gas wells (or 4%) compared to Alternative A. The NSO stipulations and closures for mineral resource development are discussed under the resource sections imposing the restrictions. See the Socioeconomic analysis in this chapter (Section 4.3.12) for the projected production and revenue of oil and gas for the Proposed Plan.

**Table 4.51. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas under the Proposed Plan, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Available | | | % of BLM Lands Available | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Bigflat – Hatch Point | 114,903 | 150,323 | 265,226 | 68 | 34 | 3 |
| Book Cliffs | 37,257 | 113,105 | 150,362 | 99 | 104 | 12 |
| Eastern Paradox | 115,124 | 321,160 | 436,284 | 78 | 28 | 3 |
| Greater Cisco | 110,602 | 106,768 | 217,370 | 100 | 197 | 24 |
| Lisbon Valley | 10,444 | 103,439 | 113,883 | 100 | 56 | 6 |
| Roan Cliffs | 0 | 3,434 | 3,434 | 90 | 2 | 1 |
| Salt Wash | 38,943 | 8,765 | 47,708 | 88 | 11 | 1 |
| **Total** | **427,273** | **806,994** | **1,234,267** | | **432** | **50** |

Note: Calculations based on BLM lands only.

*Oil and natural gas wells are considered together.

**Based on the RFD (BLM 2005f), MPY reflects the maximum development that *could* occur in *any given year* over 15 years. During most years, development per year would be less than this maximum. To find the *average* development per year, take the 15 Year Average and divide it by 15, which is the number of years projected in the RFD.

Geophysical Exploration

Under the Proposed Plan, approximately 1,151 linear miles of source line for geophysical exploration would be conducted over the life of the RMP for the purposes outlined in Section 4.3.7.2 and would result in approximately 2,072 acres of surface disturbance over the life of the RMP. This exploration would result in beneficial impacts to mineral resource development by providing new data for making prudent mineral resource development decisions. However, less exploration would happen under the Proposed Plan than under Alternative A; 181 fewer miles of source line (a decrease of 14%) would be used under the Proposed Plan compared to Alternative A.

BLM_0010273

Other Leasable Resources

Under the Proposed Plan, approximately 1,234,267 acres of BLM land would be open for the leasing of potash and salt. However, the same level of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1.

Salable Resources

Under the Proposed Plan, approximately 1,234,267 acres of BLM land would be open to development of salable minerals (a decrease of approximately 193,682 acres, or 10.6%, compared to Alternative A). Although development could occur anywhere within this acreage, the same *level* of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1. The restrictions on salable resource development are discussed under the resource sections imposing these restrictions.

### 4.3.7.3.2.5 Alternative D

Oil and Gas Resources

Approximately 1,387,473 acres (or 76%) of BLM lands within the MPA would be open for oil and gas leasing subject to standard lease terms and special stipulations (see Appendix C) within the seven RFD development areas (see Table 4.48). Based on the proportion of BLM lands open for leasing under standard lease terms and special stipulations and on the information contained in the RFD (BLM 2005f), it is estimated that 448 oil and gas wells would be drilled over the life of the RMP (Table 4.52; Map 3-16; BLM 2005f). This alternative would result in a decrease of approximately 40,476 acres (or 2.8%) of BLM lands available for development and a decrease of 3 oil and gas wells (or 0.7%) compared to Alternative A. The NSO stipulations and closures for mineral resource development are discussed under the resource sections imposing the restrictions. See the Socioeconomic analysis in this chapter (Section 4.3.12) for the projected production and revenue of oil and gas for Alternative D.

Geophysical Exploration

Under Alternative D, approximately 1,294 linear miles of source line for geophysical exploration would be conducted over the life of the RMP for the purposes outlined in Section 4.3.7.2 and would result in approximately 2,329 acres of surface disturbance over the life of the RMP. This exploration would result in beneficial impacts to mineral resource development of the same type and quality described in Section 4.3.7.2, for the same reasons (BLM 2005f). However, less exploration would happen under Alternative D than under Alternative A; 38 fewer miles of source line (a decrease of 2.9%) would be used under Alternative D compared to Alternative A.

**Table 4.52. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas
under Alternative D, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Available | | | % of BLM Lands Available | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Bigflat – Hatch Point | 242,777 | 104,200 | 346,977 | 89 | 44 | 4 |
| Book Cliffs | 42,733 | 109,467 | 152,200 | 100 | 105 | 12 |
| Eastern Paradox | 241,991 | 259,192 | 501,183 | 90 | 32 | 4 |

BLM_0010274

**Table 4.52. Number of Predicted Oil and Gas Wells on BLM Lands within RFD Areas
under Alternative D, Average over 15 Years and Maximum per Year (MPY)**

| RFD Area | Acres of BLM Lands Available | | | % of BLM Lands Available | # of Predicted Wells* | |
|---|---|---|---|---|---|---|
| | Standard | Special | Total | | 15 Years | MPY** |
| Greater Cisco | 194,535 | 22,902 | 217,437 | 100 | 197 | 24 |
| Lisbon Valley | 25,261 | 88,650 | 113,911 | 100 | 56 | 6 |
| Roan Cliffs | 0 | 3,746 | 3,746 | 98 | 2 | 1 |
| Salt Wash | 49,734 | 2,285 | 52,019 | 95 | 12 | 2 |
| Total | 797,031 | 590,442 | 1,387,473 | | 448 | 52 |

Note: Calculations based on BLM lands only.

*Oil and natural gas wells are considered together.

**Based on the RFD (BLM 2005f), MPY reflects the maximum development that *could* occur in *any given year* over 15 years.
During most years, development per year would be less than this maximum. To find the *average* development per year, take the
15 year average and divide it by 15, which is the number of years projected in the RFD.

Other Leasable Resources

Under Alternative D, approximately 1,387,473 acres of BLM land would be open for the leasing
of potash and salt. However, the same level of development is projected for all alternatives, as
mentioned in Section 4.3.7.3.2.1.

Salable Resources

Under Alternative D, approximately 1,387,473 acres of BLM land would be open to
development of salable minerals (a decrease of approximately 40,476 acres, or 2.8%, compared
to Alternative A). Although development could occur anywhere within this acreage, the same
*level* of development is projected for all alternatives, as mentioned in Section 4.3.7.3.2.1. The
restrictions on salable resource development are discussed under the resource sections imposing
these restrictions.

### 4.3.7.3.3 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS MANAGEMENT DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.3.1 Alternative A

Under Alternative A, no acres of lands with wilderness characteristics are to be managed to
protect these characteristics, resulting in no additional closures of BLM lands to salable and
leasable mineral resource development. No impacts to mineral development would result in the
form of lower supply of mineral resources and fewer royalties.

#### 4.3.7.3.3.2 Alternative B

Under Alternative B, 266,485 acres of lands with wilderness characteristics (in 32 areas) would
be managed to protect these characteristics. This would result in a closure of approximately
14.6% of all BLM lands to salable and leasable mineral resource development. Closing these
areas to leasing would preclude extraction of a) oil and gas resources in any of the 32 areas, b)
coal-bed methane leasing and development in Hells Hole, Hideout Canyon, and Mexico Point,

BLM_0010275

and c) potash resources in Goldbar. An estimate of oil and gas wells foregone is 41 wells within the Bookcliffs RFD area, 8 wells within the Big Flat Hatch Point RFD area and 8 wells within Eastern Paradox RFD area over the 15 year RFD scenario. An estimate of coal-bed methane wells foregone is one 5-spot well cluster over the 15 year RFD scenario.

Development of valid existing oil and gas leases on 50,516 acres within 20 of the 32 non-WSA lands with wilderness characteristics could occur, however, additional mitigation may be required to protect wilderness characteristics values.

There would be no potential for the expansion of existing salable mineral disposal sites into the Horsethief Point, Goldbar, Behind the Rocks and Mary Jane Canyon units.

Alternative B represents the greatest adverse impacts to mineral resource development due to management of lands with wilderness characteristics.

### 4.3.7.3.3.3 Proposed Plan

Under the Proposed Plan, approximately 47,761 acres (or 2.6% of all BLM lands) in Beaver Creek, Fisher Towers and Mary Jane Canyon would be managed to protect wilderness characteristics. This would include applying a NSO stipulation for oil and gas leasing and precluding other surface-disturbing activities to lands with wilderness characteristics. This would restrict development of leasable minerals (though still allow development at greater cost) and preclude the development of salable minerals. (Certain lands within the NSO areas unreachable by directional drilling would be closed to oil and gas leasing. Due to the small amount of acreage, it is not anticipated that this would affect the RFD scenario for oil and gas development.)

There would be no potential for expansion of the two sand and gravel salable mineral disposal sites on the boundary of the Mary Jane Canyon into the non-WSA lands with wilderness characteristics.

This decision would result in impacts to mineral development, but the acreage affected would be far less than Alternative B, but more than Alternatives A and D.

### 4.3.7.3.3.4 Alternative D

Same as Alternative A.

### 4.3.7.3.4 IMPACTS OF PALEONTOLOGY DECISIONS ON MINERAL RESOURCE DEVELOPMENT

Under all alternatives (i.e., including Alternative A), lease notices, stipulations, and other requirements would be attached to permitted activities, including mineral resource development, to prevent the degradation or destruction of paleontological resources. These additional stipulations and requirements would result in an adverse impact that would take the form of additional expenditures of time, money, and effort by mineral resource developers in completing projects within the MPA.

BLM_0010276

### 4.3.7.3.5 IMPACTS OF RECREATION DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.5.1 Alternative A

The designation of SRMAs in Alternative A does not limit mineral resource development, and no other special recreation management decisions are proposed under Alternative A. Therefore, no recreation-related impacts to mineral resource development would occur under Alternative A.

#### 4.3.7.3.5.2 Alternative B

Under Alternative B, NSO stipulations would apply as follows:

- in the Goldbar/Corona Arch Hiking Focus Area (4,781 acres) of the Labyrinth Rims/ Gemini Bridges SRMA, and
- throughout the Sand Flats SRMA (6,246 acres).

These limitations on 11,027 acres would have a slight, adverse impact on mineral resource development, in the form of additional costs for individual projects associated with NSO leases in these areas, and/or in the form of less domestic supply of oil and gas and fewer royalties.

#### 4.3.7.3.5.3 Proposed Plan

Impacts under the Proposed Plan would take the same form as under Alternative B, but because the NSO stipulation would apply to 590 fewer acres under the Proposed Plan, the magnitude of the adverse impacts to minerals would be slightly reduced from Alternative B.

#### 4.3.7.3.5.4 Alternative D

There would be no adverse impacts to mineral resource development from recreation management decisions under this alternative because no restrictions on mineral development are proposed.

### 4.3.7.3.6 IMPACTS OF RIPARIAN RESOURCE DECISIONS ON MINERAL RESOURCE DEVELOPMENT

Under all action alternatives, no surface disturbance would be allowed on lands within 100-year floodplains or within 100 m of riparian areas, public water reserves, or springs. This may result in additional costs to oil and gas developers because directional drilling would be required to access mineral resources in riparian zones. In Alternative A, some select floodplains within the MPA are identified for protection; however, the acreage is less than under the action alternatives, and the additional costs to oil and gas developers because of directional drilling would be less under Alternative A.

### 4.3.7.3.7 IMPACTS OF SOIL AND WATER DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.7.1 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

Under all action alternatives, oil and gas developers would be required to follow the Guidance for Pipeline Crossings (see Appendix H), including conducting hydraulic analysis during the design phase to eliminate potential environmental degradation. This may result in adverse

BLM_0010277

impacts to oil and gas development, as it would potentially increase the up-front cost of specific development projects.

Under all action alternatives, any mineral resource development occurring in sensitive soils (see Table 2.1 in Chapter 2, Proposed Plan and Draft Alternatives, and Section 3.14.2.2 Sensitive Soils in Chapter 3, Affected Environment) would require BMPs and applicable mitigation measures to minimize impacts. Requiring a project proponent to comply with BMPs and mitigation measures would result in adverse impacts to mineral resource development, as it may increase the cost and time required to fully implement a mineral resource exploration or development project in sensitive soils.

Under all action alternatives, a controlled surface use stipulation (see Appendix C) would be applied on all slopes upwards of 30% throughout the MPA, and an additional timing limitation stipulation would be put into effect on steep slopes in the Book Cliffs RFD Area from November 1 through April 30 (i.e., 181 days, or 50% of the year). These special stipulations would have an adverse impact upon mineral resource development, though these lands would still be open to development with the restrictions specified.

### 4.3.7.3.7.2 Alternative A

Under Alternative A, surface-disturbing activities would be prohibited on approximately 313,800 acres of saline soils in Mancos Shale (or 17% of all BLM lands) from November 1 through April 30 (i.e., 181 days). This timing limitation stipulation would have an adverse impact upon mineral resource development, for the reasons stated in Section 4.3.13.5.

### 4.3.7.3.7.3 Alternative B

Under Alternative B, the Castle Valley watershed and the Mill Creek–Spanish Valley watershed would be closed to leasing to protect the aquifers. These closures would result in adverse impacts to mineral resource development, as these lands would not yield a supply of mineral resources or royalties. Of all the alternatives, Alternative B represents the greatest impacts to mineral resource development due to the closure of these two watersheds.

Under Alternative B, surface-disturbing activities would be prohibited on approximately 330,142 acres of moderately to highly saline soils in Mancos Shale (or 18.1% of all BLM lands) from December 1 through May 31 (i.e., 182 days). This timing limitation stipulation would have an adverse impact upon mineral resource development, for reasons stated in Alternative A. Impacts would be essentially of the same magnitude as Alternative A.

Under Alternative B, a minimum of 487,917 acres of BLM lands (or 60.4% of open BLM lands) with highly limited sensitive soils/slopes would be subject to surface-disturbing mineral resource development with a timing limitation or controlled surface use stipulation (see Sections 3.13, Soil and Water, and 4.3.13, Soil and Water). These particular stipulations and their attendant impacts upon mineral resource development are described in Section 4.3.7.3.7.1. Alternative B represents the smallest acreage of sensitive soils/slopes available for leasing under standard lease terms and special stipulations because much of the acreage with sensitive soils/slopes is closed or NSO due to other resource decisions.

BLM_0010278

#### 4.3.7.3.7.4 Proposed Plan

Under the Proposed Plan, the Castle Valley watershed and the Mill Creek–Spanish Valley watershed would be subject to NSO stipulations for leasing to protect the aquifers by allowing no drilling on the surface above them. These restrictions would result in adverse impacts to mineral resource development, as development of these lands would require directional drilling and the attendant increases in cost and effort. The Proposed Plan thus represents fewer impacts to mineral resource development than Alternative B (which closes these aquifers to leasing), but more than Alternatives A and D.

The same timing limitation stipulation on the same moderately to highly saline soils in Mancos Shale under Alternative B would also apply under the Proposed Plan. Impacts under the Proposed Plan would be identical to those of Alternative B.

Under the Proposed Plan, a minimum of 710,129 acres of BLM lands with sensitive soils/slopes are open to surface-disturbing mineral resource development (or 57.5% of open BLM lands) with a timing limitation or controlled surface use stipulation (see Sections 3.13, Soil and Water, and 4.3.13, Soil and Water). These particular stipulations and their attendant impacts upon mineral resource development are described in Section 4.3.7.3.7.1. The Proposed Plan represents a much larger acreage of sensitive soils/slopes open to mineral leasing under standard lease terms and special stipulations than Alternative B because less acreage with sensitive soils/slopes is closed or NSO due to other resource decisions.

#### 4.3.7.3.7.5 Alternative D

Under Alternative D, no lease stipulations would be applied to the Castle Valley watershed or the Mill Creek–Spanish Valley watershed to protect the aquifers. Therefore, no impacts to mineral resource development in these areas would result.

No timing limitation stipulations on the moderately to highly saline soils in Mancos Shale would be applied under Alternative D. Therefore, impacts to mineral resource development would be beneficial compared to Alternative A. Of all the alternatives, Alternative D has the least restrictions regarding saline soils in Mancos Shale, and is therefore the least impacting on mineral development.

Under Alternative D, a minimum of 784,782 acres of BLM lands with sensitive soils/slopes are open to surface-disturbing mineral resource development (or 56.6% of open BLM lands) with a timing limitation or controlled surface use stipulation (see Sections 3.13, Soil and Water, and 4.3.13, Soil and Water). These particular stipulations and limitations and their attendant impacts upon mineral resource development are described in Section 4.3.7.3.7.1. Alternative D is most like the Proposed Plan in acreage and proportion; therefore, the impacts to mineral resource development would be similar to the Proposed Plan.

#### 4.3.7.3.8 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.8.1 Impacts Common to All Alternatives

The MPA includes 11 Wilderness Study Areas (WSAs) and one Wilderness Area (WA), which together total 354,015 acres (or approximately 19% of BLM lands). WAs are closed to oil and

BLM_0010279

gas leasing pursuant to the Wilderness Act, and WSAs are closed to oil and gas leasing under the Interim Management Policy for Lands under Wilderness Review (BLM 1995). These areas are also closed to salable minerals. WSAs are open to the location of mining claims for locatable minerals; WAs are withdrawn from locatable minerals, and are therefore closed to development.

WSA and wilderness designations would continue to apply across all alternatives and would remain closed to leasing due to their designation. These closures are non-discretionary and, thus, are beyond the scope of this analysis.

### 4.3.7.3.8.2 Alternative A

ACECs

In Alternative A, no ACECs are designated. However, the Negro Bill Outstanding Natural Area (1,287 acres) would continue. This area is entirely within the Negro Bill WSA, and is therefore closed to leasing and mineral development. This closure is non-discretionary and thus, is beyond the scope of this analysis.

WSRs

Under Alternative A, Colorado River Segments #1, #2, and #3 and all segments of the Dolores River are eligible. This eligibility results in 16,079 acres (or 0.8% of all BLM lands) managed as NSO. Therefore, these areas would be removed from mineral resource development except for directional drilling for oil and gas, which would add expense for individual oil and gas producers.

### 4.3.7.3.8.3 Alternative B

ACECs

Management of ACECs in the MFO would result in greater restrictions on mineral resource development, replacing standard lease terms or special stipulations with NSO stipulations. Under Alternative B, 610,714 acres of BLM lands would occur in ACECs (Table 4.53), all of which are subject to an NSO stipulation or closed to leasing. Since 309,599 acres (out of 610,714 acres) are automatically closed to leasing because they are located in WSAs, the remainder—301,115 acres—would be managed with an NSO stipulation as a direct result of designation of the ACECs (see Table 4.43). Therefore, for the purposes of this analysis, implementation of Alternative B represents a restriction of 16.5% of all BLM lands (301,115 acres) due to ACEC designation. ACEC designation under Alternative B would result in an adverse impact upon mineral resource development because the resources underlying NSO-designated surfaces are more difficult and costly to extract. In addition, developers are less likely to develop in NSO areas if less restrictive leases are available to them. Alternative B is more restrictive to mineral resource development than any of the other alternatives and thus would have the greatest overall adverse impact on mineral resource development.

WSRs

Under Alternative B, all WSR segments are recommended as suitable. WSR suitability recommendations, of themselves, do not impose limitations on surface-disturbing activities, because limitations on surface disturbance would be imposed by other resource decisions, such

BLM_0010280

as wilderness, wilderness characteristics, scenery, watershed, and the Three Rivers withdrawal. These other resource decisions would protect the outstandingly remarkable values of the WSRs.

Therefore, with the exception of VRM Class, it was not necessary to impose duplicative restrictions on mineral development as a result of WSR suitability. Suitable segments tentatively classified as Wild would be designated as VRM Class I; all other segments would be designated as VRM Class II. As a result, except for VRM Class, recommendations of suitable WSR segments would not impose direct impacts to mineral resource development under Alternative B. The protections imposed by other resources are identified in Table 4.53, Acreages of Potential ACECs that are Available to Mineral Development under Alternative B.

BLM_0010281

**Table 4.53. Acreages of Potential ACECs that are Available to Mineral Resource Development under Alternative B**

| ACEC | Acres* | | | Acres in Each Lease Category | | | |
|------|-------|------------|-------------|----------|---------|------|--------|
|      | Total | Within WSA[1] | Outside WSA | Standard | Special | NSO  | Closed |
| Behind the Rocks | 17,848 | 12,983 | 4,865 | 0 | 0 | 4,865 | 12,983 |
| Bookcliffs Wildlife Area[2] | 302,449 | 247,853 | 54,596 | 0 | 0 | 28,157 | 274,292 |
| Canyon Rims[3] | 23,414 | 0 | 23,414 | 0 | 0 | 22,972 | 442 |
| Cisco White-tailed Prairie Dog Complex | 117,481 | 0 | 117,481 | 0 | 0 | 83,977 | 33,504 |
| Colorado River Corridor | 50,708 | 2,752 | 47,956 | 0 | 0 | 24,310 | 26,398 |
| Cottonwood-Diamond Watershed[4] | 35,042 | 33,218 | 1,824 | 0 | 0 | 1,824 | 33,218 |
| Hwy 279 Corridor/Shafer Basin/Long Canyon | 13,487 | 0 | 13,487 | 0 | 0 | 12,544 | 943 |
| Labyrinth Canyon | 8,529 | 0 | 8,529 | 0 | 0 | 8,529 | 0 |
| Mill Creek Canyon | 13,501 | 7,833 | 5,668 | 0 | 0 | 0 | 13,501 |
| Ten Mile Wash | 4,980 | 0 | 4,980 | 0 | 0 | 4,980 | 0 |
| Upper Courthouse | 11,529 | 0 | 11,529 | 0 | 0 | 8,480 | 3,049 |
| Westwater Canyon | 5,069 | 4,960 | 109 | 0 | 0 | 109 | 4,960 |
| White Wash | 2,988 | 0 | 2,988 | 0 | 0 | 2,988 | 0 |
| Wilson Arch | 3,689 | 0 | 3,689 | 0 | 0 | 3,689 | 0 |

1. Or with Wilderness values; always VRM I, or closed to leasing.

2. Portions of this ACEC lie within 5 WSAs.

3. Within Canyon Rims SRMA

4. Portions of this ACEC lie within 3 WSAs.

*Acreage variations may be due to GIS rounding errors

BLM_0010282

**Table 4.54. Suitable Rivers and Restrictions on Mineral Development under Alternative B**

| Suitable River | Oil and Gas Leasing Category | Resource Imposing Oil and Gas Restriction | VRM Class |
|---|---|---|---|
| Beaver Creek | NSO | Three Rivers Withdrawal to protect scenery, recreation, wildlife, riparian; non-WSA lands with wilderness characteristics. | II |
| Colorado River | NSO/Closed | Three Rivers Withdrawal to protect scenery, recreation, wildlife, riparian; WSA. | I in Westwater; otherwise II |
| Cottonwood Creek | Closed | WSA. | I |
| Dolores River | NSO | Three Rivers Withdrawal. | II |
| Green River | NSO | Three Rivers Withdrawal. | II |
| Mill Creek (South Fork) | Closed | ACEC; Moab Watershed. | I |
| Negro Bill Creek | Closed/NSO | Three Rivers Withdrawal; WSA. | I (in WSA) and II |
| North Fork Mill Creek | Closed | WSA. | I |
| Onion Creek | NSO/Closed | Three Rivers Withdrawal; wilderness characteristics. | II |
| Professor Creek | NSO/Closed | Three Rivers Withdrawal; wilderness characteristics. | II |
| Rattlesnake Creek | Closed | WSA. | I (Desolation WSA) |
| Salt Wash | NSO (Three Rivers) | Three Rivers Withdrawal. | II |
| Thompson Creek | NSO | Wilderness characteristics. | II |

### 4.3.7.3.8.4 Proposed Plan

ACECs

Under the Proposed Plan, 63,781 acres of BLM lands would occur in ACECs (Table 4.55), all of which are subject to an NSO stipulation or closed to leasing. Since 33,218 acres (out of 63,781 acres) are automatically closed to leasing because they are located in WSAs, the remainder—30,563 acres—would be managed with an NSO stipulation as a direct result of designation of the ACECs (see Table 4.55). Therefore, for the purposes of this analysis, implementation of the Proposed Plan represents a restriction of 1.7% of all BLM lands (30,563 acres) due to ACEC designation. ACEC designation under the Proposed Plan would result in less of an adverse impact upon mineral resource development than it does under Alternative B, but more than Alternatives A and D.

BLM_0010283

**Table 4.55. Acreages of Potential ACECs that are Available to Mineral Resource Development under the Proposed Plan**

| ACEC | Acres* | | | Acres in Each Lease Category | | | |
|---|---|---|---|---|---|---|---|
| | Total | Within WSA[1] | Outside WSA | Standard | Special | NSO | Closed |
| Behind the Rocks | 4,687 | 0 | 4,687 | 0 | 0 | 4,687 | 0 |
| Cottonwood-Diamond Watershed[2][3] | 35,042 | 33,218 | 1,804 | 0 | 0 | 1,804 | 33,218 |
| Hwy 279 Corridor/ Shafer Basin/Long Canyon | 13,487 | 0 | 13,487 | 0 | 0 | 13,487 | 0 |
| Mill Creek Canyon | 5,585 | 0 | 3,721 | 0 | 0 | 3,721 | 0 |
| Ten Mile Wash | 4,980 | 0 | 4,980 | 0 | 0 | 4,980 | 0 |

1. Or with Wilderness values; always VRM I, or closed to leasing.

2. Portions of this ACEC lie within 3 WSAs.

3. Same as Alternative B.

*Acreage variations may be due to GIS rounding errors.

BLM_0010284

WSRs

Impacts to mineral resource development from WSR suitability recommendations would be the same as under Alternative B, for the same reasons. Table 4.56 shows the WSR recommendations under the Proposed Plan, and the resource imposing the restriction on mineral development.

**Table 4.56. Suitable Rivers and Restrictions on Mineral Development under the Proposed Plan**

| Suitable River | Oil and Gas Leasing Category | Resource Imposing Oil and Gas Restriction | VRM Class |
|---|---|---|---|
| Colorado River | NSO/Closed | Three Rivers Withdrawal to protect scenery, recreation, wildlife, riparian; WSA. | I in Westwater; otherwise II |
| Dolores River | NSO | Three Rivers Withdrawal. | II |
| Green River | NSO | Three Rivers Withdrawal. | II |

## 4.3.7.3.8.5 Alternative D

ACECs

Under Alternative D, zero acres of BLM lands would occur in ACECs. Though management prescriptions are made for these parcels of land (e.g., leasing and VRM categories, whether to allow minerals entry, disposal, or geophysical work), none of these prescriptions is associated with an ACEC designation. Therefore, under Alternative D, special designation decisions regarding ACECs would have no impacts upon mineral development.

WSRs

Under Alternative D, none of the eligible WSR segments carried forward in this RMP would be determined suitable. Therefore, special designation decisions regarding WSRs would have no impacts upon mineral development.

### 4.3.7.3.9 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON MINERAL RESOURCE DEVELOPMENT

## 4.3.7.3.9.1 Impacts Common to All Alternatives

All alternatives require some degree of spatial or temporal limitation on surface-disturbing activities so as to protect special status species and their important habitats. In the case of mineral resource development, specific conditions of approval or lease terms are often required in order to mitigate the adverse impacts of development activities on special status species.

Standard lease terms and conditions (lease notices) have been developed in consultation with the USFWS for mineral resource development and other surface-disturbing activities. The terms and conditions consist of specific measures to protect special status species and to comply with the Endangered Species Act (see Appendix C). These measures are required by law, are non-discretionary, and are applicable under all alternatives. The impacts of these non-discretionary

measures will not be analyzed in this document, as they are outside the scope of the planning process.

### 4.3.7.3.9.2 Alternative A

Because alternative-specific decisions regarding special status species are not specified under Alternative A, only the impacts common to all alternatives (see Section 4.3.7.3.8.1) would occur.

### 4.3.7.3.9.3 Alternative B

The following timing limitation stipulations would result in impacts to mineral resource development under Alternative B:

- a 242-day timing limitation stipulation in greater sage-grouse habitat (on 12,850 acres or 0.6% of all BLM lands), and
- a 57-day timing limitation stipulation in Gunnison sage-grouse habitat (on 246,107 acres or 13.4% of all BLM lands).

In both cases, the resulting impacts would be adverse compared to Alternative A and would take the form of extra cost and effort—for surveys, for the avoidance of occupied areas, for the re-routing of roads and pipelines and the re-siting of oil and gas facilities (i.e., permanent structures), or for directional drilling—or additionally operational time, if the surface-disturbance window does not accommodate an individual project's schedule and timeline and project activities need to be postponed.

Various, year-round restrictions on surface-disturbing activities and structures would apply as follows:

- within 2 miles of greater sage-grouse active strutting grounds (10,928 acres or 0.6% of all BLM lands);
- within 6 miles of Gunnison sage-grouse leks (246,107 acres or 13.4% of all BLM lands);
- within and near white-tailed prairie dog habitat (199,505 acres or 10.8% of all BLM lands); and
- within and near Gunnison prairie dog colonies (10,700 acres or 0.7% of all BLM lands).

Adverse impacts to mineral resource development would result from these decisions and would take the form of increased expenditures of time, cost, effort, and materials associated with re-siting projects or individual facilities or conducting directional drilling.

### 4.3.7.3.9.4 Proposed Plan

The following timing limitation stipulations would result in impacts to mineral resource development under the Proposed Plan:

- a 242-day timing limitation stipulation in greater sage-grouse habitat (3,068 acres or 0.2% of all BLM lands), and
- a 57-day timing limitation stipulation in Gunnison sage-grouse habitat (175,727 acres or 9.6% of all BLM lands).

BLM_0010286

In both cases, the resulting impacts would be adverse to mineral resource development compared to Alternative A—though less so than Alternative B—and would take the form of extra cost, effort, or time, as described under Alternative B.

Various, year-round restrictions on surface-disturbing activities and structures would apply as follows:

- within 2.0 miles of greater sage-grouse active strutting grounds (3,068 acres or 0.2% of all BLM lands);
- within 2.0 miles of Gunnison sage-grouse leks (175,727 acres or 9.6% of all BLM lands);
- within and near white-tailed prairie dog habitat (117,481 acres or 6.4% of all BLM lands); and
- within and near Gunnison prairie dog colonies (10,700 acres or less than 0.6% of all BLM lands).

Adverse impacts to mineral resource development would result from these decisions—though less so than Alternative B due to lessened acreage affected—and would take the forms described under Alternative B.

### 4.3.7.3.9.5 Alternative D

The following timing limitation stipulations would result in impacts to mineral resource development under Alternative D:

- a 242-day timing limitation stipulation in greater sage-grouse habitat (1,986 acres or 0.1% of all BLM lands), and
- a 57-day timing limitation stipulation in Gunnison sage-grouse habitat (41,620 acres or 2.3% of all BLM lands).

In both cases, the resulting impacts would be adverse to mineral resource development compared to Alternative A—though less so than Alternative B and the Proposed Plan due to lessened acreage affected—and would take the form of extra cost, effort, or time, as described under Alternative B.

Year-round restrictions on surface-disturbing activities and structures would apply:

- within 0.25 miles of greater sage-grouse active strutting grounds (1,986 acres or 0.1% of all BLM lands);
- within 0.25 miles of Gunnison sage-grouse leks (41,620 acres or 2.3% of all BLM lands); and
- within and near white-tailed prairie dog habitat (41,620 acres or 1.7% of all BLM lands).

Adverse impacts to mineral resource development would result from these decisions—though less so than Alternative B and the Proposed Plan—and would take the forms described under Alternative B.

BLM_0010287

### 4.3.7.3.10 IMPACTS OF VEGETATION MANAGEMENT DECISIONS ON MINERAL RESOURCE DEVELOPMENT

Under all action alternatives, the vegetation management decision to implement the restrictions under Extreme (D3) and Exceptional (D4) drought conditions would result in adverse impacts to new mineral resource development. Under D3, no new surface-disturbing activities would be permitted in areas with sensitive soils, and under D4, no new surface-disturbing activities would be permitted at all (subject to valid existing rights; see Appendix C and Appendix M). The impacts to mineral resource development would take the form of delayed completion of individual projects and the attendant increases in cost and effort.

### 4.3.7.3.11 IMPACTS OF VISUAL RESOURCE MANAGEMENT DECISIONS ON MINERAL RESOURCE DEVELOPMENT

#### 4.3.7.3.11.1 Impacts Common to All Alternatives

Mineral resource development would be subject to the VRM class objectives of the area within which development would occur. VRM management on areas with lower scenic values (designated as VRM Class III and IV) imposes minimal restrictions on mineral resource development. Designation of an area as VRM Class I essentially closes the area to mineral resource activity. Management of areas as VRM Class II allows alteration of line, form, color and texture that characterize the existing landscape, although the resulting contrast should not attract the attention of the casual observer. Meeting VRM Class II objectives imposes additional costs on mineral resource developers. Table 4.57 quantifies the acreages of land within each VRM class.

**Table 4.57. Acreages of Each VRM Class, by Alternative**

| VRM Class | Alternative A** | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| I | 349,110 | 453,462 | 358,911 | 349,617 |
| II | 401,015 | 373,647 | 365,567 | 245,773 |
| III | 800,782 | 784,247 | 829,158 | 956,724 |
| IV | 271,356 | 210,533 | 268,133 | 269,641 |
| Totals | 1,822,263 | 1,821,887 | 1,821,768 | 1,821,755 |

* Note that these acreages include the 354,015 acres of WSAs and WAs, which are managed as VRM Class I and are non-discretionary closures. Table 4.49 and other tables discussing the impacts of mineral resource development decisions on mineral resource development exclude these areas, and thus reflect different acreages.

**In Alternative A, VRM class reflects the VRM Inventory (except for 33,037 acres of VRM Class II and 67,236 acres of VRM Class III in management in Alternative A).

#### 4.3.7.3.11.2 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

Under all action alternatives, areas managed as VRM Classes II, III, and IV would typically be available to leasing with either standard lease terms or controlled surface use stipulations (see Table 4.57). This visual resource decision would generally have a beneficial effect on mineral resource development, in that more areas would be available under standard lease terms or

controlled surface use stipulations, rather than being restricted with NSO. The beneficial impact would be that mineral exploration and development could still occur.

Under all action alternatives, direct, adverse impacts to mineral resource development resulting from VRM class I designations would include the exclusion of lands available for mineral resource development, a lower number of locations where potential wells could be drilled, a lower yield and commercial supply of oil and natural gas, and fewer royalties.

### 4.3.7.3.11.3 Alternative A

Under Alternative A, only WSAs would be designated as VRM Class I. Because the closure of WSAs to mineral resource development is non-discretionary, no impacts to mineral resources would result from visual resource management decisions under Alternative A.

### 4.3.7.3.11.4 Alternative B

Under Alternative B, approximately 453,462 acres (or 24.9% of BLM lands, including WSAs) would be designated as VRM Class I, which limits lands as either NSO or closed. In addition, 373,631 acres would be designated as VRM Class II, imposing additional costs on mineral resource developers. Adverse impacts resulting from these visual resource decisions under Alternative B would be of the same type as in Section 4.3.7.3.11.2. Alternative B proposes the greatest VRM-related limits to mineral resource development because the greatest number of acres would be designated as VRM Class I and Class II.

### 4.3.7.3.11.5 Proposed Plan

Under the Proposed Plan, approximately 359,020 acres (or 19.7% of BLM lands, including WSAs) would be designated as VRM Class I class, which limits lands as either NSO or closed. In addition, 365,567 acres would be designated as VRM Class II, imposing additional costs on mineral resource developers. Adverse impacts resulting from these visual resource decisions under the Proposed Plan would be of the same type as in Section 4.3.7.3.11.2, though less so than under Alternative B and more than under Alternative D.

### 4.3.7.3.11.6 Alternative D

Under Alternative D, approximately 349,617 acres (or 19.2% of BLM lands, including WSAs) would fall into the VRM I class, which consistently limits lands as either NSO or closed. In addition, 245,773 acres would be managed as VRM II, imposing additional costs on mineral resource developers. Adverse impacts resulting from these visual resource decisions under Alternative D would be of the same type as in Section 4.3.7.3.11.2, though less so than under Alternative B and the Proposed Plan.

### 4.3.7.3.12 IMPACTS OF WILDLIFE AND FISHERIES DECISIONS ON MINERAL RESOURCE DEVELOPMENT

### 4.3.7.3.12.1 Impacts Common to All Alternatives

All alternatives include some degree of spatial or temporal limitation on surface-disturbing activities to protect wildlife populations and their important habitats. In the case of mineral resource development, specific conditions of approval, lease terms, and/or discretionary

BLM_0010289

measures are often required in order to mitigate the adverse impacts of development activities on wildlife.

The discretionary measures include spatial and temporal limitations (hereafter referred to as controlled surface use and timing limitation stipulations, respectively), which would have an adverse impact on mineral resource development by increasing exploration costs, time, and effort. However, the degree and magnitude of such increases depend on many factors, including the options for project siting, the locale of the lease, and the drilling schedule and window.

The MFO coordinates with UDWR for the purpose of protecting wildlife species (see Appendices K, N, and O). Under all alternatives, mineral resource developers would be required to avoid surface-disturbing activities in occupied, migratory bird habitat during nesting season. Under all alternatives, these timing limitation stipulations and the associated limited drilling window only apply to up to one mile around migratory bird and raptor nests. Therefore, impacts would be adverse for operators with leases within these buffer areas, but not elsewhere. These stipulations could be waived or modified, depending on the species (see Appendix C for details). In addition, spatial buffers and timing limitation stipulations would be applied to areas around occupied raptor nest sites during their nesting seasons. This would result in planning area-wide impacts upon mineral resource development (see Appendixes N and O). Adverse impacts upon mineral resource development, in terms of extra costs, time, and effort, would result.

The *exact* impact of wildlife management decisions common to all cannot be quantified. Exact acreages of habitat to be restricted would depend on the results of field surveys associated with specific projects within the MPA. However, some general conclusions can be drawn regarding the timing limitation stipulations. The fall and winter months (i.e., September through February) generally would have the fewest timing limitation stipulations upon mineral resource development, while the spring and summer months (i.e., March through August) generally would have the most. The most restrictive months of the year would be April through July; most timing limitation stipulations would be in effect during that period. Together, these decisions would result in adverse impacts to mineral resource development at the planning area-wide level.

### 4.3.7.3.12.2 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

Under all action alternatives, a 92-day timing limitation stipulation on surface-disturbing activities in the Hatch Point bighorn sheep habitat (9,278 acres, or 0.5% of all BLM lands) and a 46-day timing limitation stipulation on surface-disturbing activities in deer and/or elk summer range (105,636 acres, or 5.8% of all BLM lands) would result in adverse impacts, in the form of delayed or slowed implementation of individual projects if the surface-disturbance limitation did not suit that project's schedule and timeline.

Under all action alternatives, the timing limitation stipulations (see Section 4.3.7.3.2.1) and the associated limited drilling window only apply to 9,278 acres of bighorn lambing and rutting areas within Hatch Point. This constitutes less than 1% of the MPA. Impacts would be adverse for operators with leases within the habitat or buffer areas, but not elsewhere. These stipulations could be waived or modified, depending on the species (see Appendix C for details).

BLM_0010290

### 4.3.7.3.12.3 Alternative A

Three wildlife management decisions would result in impacts to mineral resource development under Alternative A:

- a Category 2 stipulation in 25,431 acres of desert bighorn sheep habitat, year-round;
- a prohibition on surface disturbance in 42,500 acres of desert bighorn sheep lambing and breeding habitat; and
- a prohibition on surface disturbance in 260,769 acres of deer and/or elk winter range.

These decisions together would result in development limitations on a maximum of 328,700 possible acres (or 18.1% of BLM lands) for 90 days of the year. This would be an adverse impact to mineral resource development and would take the form of delayed or slowed implementation of individual projects in these habitats if the surface-disturbance limitation did not suit that project's schedule and timeline.

### 4.3.7.3.12.4 Alternative B

The following wildlife management decisions would result in impacts to mineral resource development under Alternative B:

- a 46-day timing limitation stipulation in pronghorn habitat (822,001 acres or 45.1% of all BLM lands);
- a 92-day timing limitation stipulation in Rocky Mountain bighorn sheep habitat (458,242 acres or 23.6% of all BLM lands);
- a 196-day timing limitation stipulation on deer and/or elk winter range (635,774 acres or 34.8% of all BLM lands); and
- a year-round, NSO stipulation in desert bighorn sheep habitat (130,419 acres or 7.1% of all BLM lands).

In all cases, the resulting impacts would be adverse compared to Alternative A and would take the form of extra cost and effort—for surveys, for the avoidance of occupied areas, for the re-routing of roads and pipelines and the re-siting of oil and gas facilities (i.e., permanent structures), or for directional drilling—or extra operational time, if the surface-disturbance window does not accommodate an individual project's schedule and timeline and project activities need to be postponed.

### 4.3.7.3.12.5 Proposed Plan

The following species management decisions would result in impacts to mineral resource development under the Proposed Plan:

- a 46-day timing limitation stipulation in pronghorn habitat (293,741 acres or 16.1% of all BLM lands);
- a 92-day timing limitation stipulation in Rocky Mountain bighorn sheep habitat (310,726 acres or 17.1% of all BLM lands);
- a 151-day timing limitation stipulation on deer and/or elk winter range (349,955 acres or 15.2% of all BLM lands); and

BLM_0010291

- a year-round, NSO stipulation in desert bighorn sheep habitat (101,897 acres or 5.6% of all BLM lands).

In all cases, the resulting impacts would be adverse to mineral resource development compared to Alternative A—though less so than Alternative B because of lesser time periods or reduced acreage—and would take the form of extra cost, effort, or time, as described under Alternative B.

### 4.3.7.3.12.6 Alternative D

The following wildlife management decisions would result in impacts to mineral resource development under Alternative D:

- a 46-day timing limitation stipulation in pronghorn habitat (78,477 acres or 4.3% of all BLM lands);
- the "recognition" of 194,560 acres, or 10.7% of all BLM lands as Rocky Mountain bighorn sheep habitat (BLM 1985a, 1986, 1993b);
- a 136-day timing limitation stipulation on deer and/or elk winter range (349,955 acres or 15.2% of all BLM lands); and
- a 137-day timing limitation stipulation in desert bighorn sheep habitat (46,319 acres or 2.5% of all BLM lands).

The resulting impacts would be adverse to mineral resource development compared to Alternative A—though less so than Alternative B and the Proposed Plan because of lesser time periods or reduced acreage—and would take the form of extra cost, effort, or time, as described under Alternative B.

### 4.3.7.4 SUMMARY OF IMPACTS

The alternatives propose varying amounts and types of restrictions on the exploration, development, and production of mineral resources. Generally, Alternative B is the most restrictive, while Alternative A is the least restrictive. Among the action alternatives, Alternative B is the least amenable, and Alternative D is the most amenable to the exploration, development and production of mineral resources.

Impacts from lands and realty, paleontological resources, riparian areas, and vegetation management actions would result only in Impacts Common to All Alternatives (including Alternative A) or Impacts Common to All Action Alternatives (excluding Alternative A). Withdrawal decisions would adversely impact 4.3% of all BLM land, other impacts resulting from lands and realty, paleontological, riparian, and vegetation decisions, while not quantifiable, generally would result in additional restrictions to mineral development.

### 4.3.8 NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

This section analyzes impacts to the 266,435 acres of non-WSA lands determined to have wilderness characteristics from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning non-WSA lands with wilderness characteristics are described in Chapter 3, Affected Environment.

Non-WSA lands with wilderness characteristics are areas having 5,000 acres, or areas less than 5,000 acres that are contiguous to designated wilderness, WSAs, or other areas administratively

BLM_0010292

endorsed for wilderness management, or, in accordance with the Wilderness' Act's language, areas "of sufficient size as to make practicable its preservation and use in an unimpaired condition." BLM used the same criteria for determining wilderness characteristics as in the 1979 wilderness inventory. The 5,000 acre value was helpful to BLM in making preliminary judgments, but it was not considered a limiting factor. These lands consist of landscapes generally in a natural or undisturbed condition. These areas also provide outstanding opportunities for solitude or primitive forms of recreation (non-motorized and non-mechanized activities in undeveloped settings). All of the alternatives would impact the values of non-WSA areas with wilderness characteristics to some degree. Generally, actions that create surface disturbance impact the natural character of these areas, and the setting for experiences of solitude and primitive recreational activities. Motorized uses in these areas detract from opportunities for both solitude and primitive forms of recreation.

Resources or uses determined not to have any impacts on non-WSA lands with wilderness characteristics include the following: Air Quality, and Health and Safety. There are no abandoned mine lands, unauthorized dumping sites, or hazardous materials spills that have been identified in non-WSA lands with wilderness characteristics; therefore, it is not an issue or resource for further analysis.

## 4.3.8.1 IMPACTS COMMON TO ALL ALTERNATIVES

There would be no impacts common to all alternatives for non-WSA lands managed to protect wilderness characteristics because no lands would be managed to maintain wilderness characteristics outside designated wilderness and WSAs in either Alternatives A or D.

## 4.3.8.2 ALTERNATIVES IMPACTS

Impacts to non-WSA lands with wilderness characteristics are analyzed based on the enhancement (beneficial impacts) or degradation (adverse impacts) of naturalness and outstanding opportunities for solitude or primitive recreation.

### 4.3.8.2.1 IMPACTS OF CULTURAL RESOURCES DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

#### 4.3.8.2.1.1 Alternative A

Alternative A would not limit visitation or camping in high-density cultural sites when archeological site integrity may be endangered. However, areas where these high-density sites are primarily located (Behind-the-Rocks, Mill Creek Canyon, and Negro Bill Canyon non-WSA lands with wilderness characteristics) are already in areas where OHV use is limited to designated routes and camping is restricted.

#### 4.3.8.2.1.2 Alternatives B, D, and the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve and maintain their wilderness characteristics. This acreage includes the entire Beaver Creek area, and portions of the Mary Jane and Fisher Towers areas. (Mary Jane was reduced to 16,499 acres in the Proposed Plan from 24,779 acres in Alternative B, and Fisher Towers was reduced to 5,540 acres in the Proposed Plan from 17,235 acres in Alternative B.) Under this management, these lands would be managed with a no surface occupancy stipulation. There

BLM_0010293

would be no other surface-disturbing activities allowed within this acreage, including no new road building or construction. Cultural resource decisions are compatible with these protections.

The cultural resource decisions under common to all action alternatives provide protection of cultural resources, including avoiding or minimizing impacts within Traditional Cultural Properties, closing areas to visitor use when it is endangering site integrity, prohibiting camping within or on archeological and historic sites, protecting and mitigating sensitive cultural sites being impacted by grazing activities, monitoring sites, inventorying new sites, ensuring compliance with the National Historic Preservation Act, implementing interim protection to newly discovered sites, mitigating impacts to sites, allocating sites to public and scientific purposes, consulting with Tribes, and others. Protection of historic and prehistoric resources in non-WSA lands with wilderness characteristics would enhance opportunities for primitive forms of recreation. Knowing more about the cultural resources of an area, interpreting the resource in an appropriate fashion, and viewing cultural resource sites in the non-WSA areas with wilderness characteristics all add to the enjoyment of these areas for primitive recreational purposes. And, protection of cultural resources adds to the character of the setting that supports these recreational opportunities.

There are no additional cultural resource decisions that would impact non-WSA lands with wilderness characteristics under these alternatives.

### 4.3.8.2.2 IMPACTS OF FIRE MANAGEMENT DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Under all alternatives, BLM would attempt to restore natural fire regimes in fire-dependent and adapted ecosystems through the use of prescribed or managed wildland fire. The MFO would base its priorities for all aspects of fire management decisions based on five categories (see Fire Management section in Chapter 2, Table 2.1, Moab RMP Description of Alternatives) to determine where fire is desired and where it is not. Further, following any wildland fire event, emergency stabilization and restoration (ESR) actions would be developed and implemented, as appropriate. Fuels treatment and management activities would be consistent with the resource goals and objectives in the RMP and may include mechanical treatments, manual treatments, prescribed fire, chemical spraying, or biological treatments and seeding.

Restoration of the use of fire to fire-dependent and adapted ecosystems would restore a more natural vegetation community (in both species and composition) and watershed conditions and wildlife populations dependent on those communities. In the short-term, a burned landscape may reduce opportunities for primitive recreation. In the long-term, however, a more natural landscape would benefit the natural character of non-WSA lands with wilderness characteristics and enhance the setting and opportunities for primitive forms of recreation, including hiking, backpacking, hunting, wildlife viewing, and nature study. This would enhance the natural conditions of these areas.

Setting fire objectives through fire management categories would identify where fire is desired on the land, leading to the same benefits to natural conditions as restoring the use of fire to fire-dependent and adapted ecosystems. When it is necessary to suppress fire in non-WSA lands with wilderness characteristics, development and implementation of the ESR plan will restore fire suppression disturbances to the land and vegetation (e.g., fire line construction), resulting in the restoration of the natural character of the non-WSA areas. Fuels treatments in non-WSA lands

BLM_0010294

with wilderness characteristics would aid in restoration of a more natural fire regime in these lands. The use of fire to accomplish this reduction would be compatible with the natural character of these areas. The use of mechanical treatments would leave an apparent imprint of human work on the land that would degrade the natural character of the non-WSA lands with wilderness characteristics.

In the short-term, fire operations (aircraft over-flights, fire line construction, etc.) would degrade the natural landscape and character of the non-WSA lands with wilderness characteristics. The noise and presence of the people, equipment, and operations would also diminish opportunities for solitude and primitive forms of recreation. In the long-term, however, surface disturbance associated with the fire treatment would be restored, with little to no net effect on naturalness. The effects of fire operations on opportunities for solitude and primitive recreation would cease, restoring those opportunities.

### 4.3.8.2.3 IMPACT OF LANDS AND REALTY MANAGEMENT DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

#### 4.3.8.2.3.1 Common to All Alternatives

Under all alternatives, the Three Rivers withdrawal would remain in place. This would protect portions along the river of the Beaver Creek, Dome Plateau, Fisher Towers, Mary Jane Canyon, Gooseneck and Labyrinth Canyon non-WSA lands with wilderness characteristics. The mineral withdrawal would continue to preserve the naturalness and opportunities for both solitude and primitive forms of recreation in each of these areas by preventing mining claims and the noise and presence of surface disturbance, people, vehicles, and equipment associated with mining.

#### 4.3.8.2.3.2 Alternative A

This alternative proposes land disposal for about 1,300 acres of public lands on the east side portion of the Behind the Rocks non-WSA lands with wilderness characteristics. Disposal of these lands would take them out of public ownership and allow for development and surface-disturbing activities out of BLM's control. The wilderness characteristics would be foregone.

All of Shafer Canyon and Gooseneck, and a portion of Goldbar (2,437 acres) and Labyrinth Canyon (12,000) non-WSA lands with wilderness characteristics would continue to be rights-of-way avoidance areas (Table 4.58). These areas are to be avoided but may be available for location of right-of-ways with special stipulations if the proposal meets the goals and objectives of other resources and uses in the land-use plan. It is expected and assumed that the avoidance areas would protect the natural character of the non-WSA lands in these areas. However, the rest of the non-WSA lands with wilderness characteristics (249,363 acres) would remain available for the placement of rights-of-way. More permanent, long term impacts would occur if the right-of-way is for an overhead power line than for a buried pipeline. However, any surface-disturbing activity and/or placement of permanent visual facilities would detract from the natural character of the area and disrupt the setting needed to support primitive forms of recreation.

BLM_0010295

**Table 4.58. Acres of Avoidance or Exclusion for Rights-of-way (ROWs) in Non-WSA Lands with Wilderness Characteristics**

| Name of Non-WSA Land with Wilderness Characteristics | Total Acres | Alternative A | Alternative B (all acres are exclusion) | PROPOSED PLAN (all acres are avoidance) | Alternative D |
|---|---|---|---|---|---|
| Arches Adjacent | 6,396 | 0 | 6,396 | 513 | 513 |
| Beaver Creek | 25,722 | 0 | 25,722 | 25,722* | 8,152 |
| Behind the Rocks | 3,643 | 0 | 3,643 | 1,582 | 55 |
| Big Triangle | 5,200 | 0 | 5,200 | 0 | 0 |
| Coal Canyon | 21,632 | 0 | 21,632 | 0 | 0 |
| Dead Horse Cliffs | 797 | 0 | 797 | 98 | 0 |
| Desolation Canyon | 10,498 | 0 | 10,498 | 985 | 244 |
| Dome Plateau | 14,207 | 0 | 14,207 | 9,580 | 6,390 |
| Fisher Towers | 17,235 | 0 | 17,235 | 8,153** | 3,312 |
| Floy Canyon | 9,983 | 0 | 9,983 | 0 | 0 |
| Flume Canyon | 3,520 | 0 | 3,520 | 730 | 0 |
| Goldbar | 6,437 | 2,437 | 6,437 | 6,064 | 543 |
| Gooseneck | 843 | 843 | 843 | 843 | 0 |
| Granite Creek | 4,528 | 0 | 4,528 | 0 | 0 |
| Harts Point | 1,465 | 0 | 1,465 | 0 | 0 |
| Hatch/Harts/Lockhart | 2,670 | 0 | 2,670 | 0 | 0 |
| Hatch Wash | 10,983 | 0 | 10,983 | 0 | 0 |
| Hells Hole | 2,538 | 0 | 2,538 | 0 | 0 |
| Hideout Canyon | 11,607 | 0 | 11,607 | 0 | 0 |
| Horsethief Point | 8,358 | 0 | 8,358 | 1,190 | 1,162 |
| Hunter Canyon | 4,465 | 0 | 4,465 | 2,855 | 310 |
| Labyrinth Canyon | 25,361 | 12,000 | 25,361 | 17,954 | 2,456 |
| Lost Spring Canyon | 11,456 | 0 | 11,456 | 0 | 0 |
| Mary Jane Canyon | 24,779 | 0 | 24,779 | 22,169*** | 976 |
| Mill Creek Canyon | 3,388 | 0 | 3,388 | 3,388 | 59 |
| Mexico Point | 12,837 | 0 | 12,837 | 0 | 0 |
| Negro Bill Canyon | 2,333 | 0 | 2,333 | 1,177 | 240 |
| Shafer Canyon | 1,842 | 1,842 | 1,842 | 1,842 | 0 |
| Spruce Canyon | 1,131 | 0 | 1,131 | 957 | 0 |
| Westwater Canyon | 3,086 | 0 | 3,086 | 84 | 0 |
| Westwater Creek | 7,188 | 0 | 7,188 | 0 | 40 |
| Yellow Bird | 357 | 0 | 357 | 0 | 0 |

BLM_0010296

**Table 4.58. Acres of Avoidance or Exclusion for Rights-of-way (ROWs) in Non-WSA Lands with Wilderness Characteristics**

| Name of Non-WSA Land with Wilderness Characteristics | Total Acres | Alternative A | Alternative B (all acres are exclusion) | PROPOSED PLAN (all acres are avoidance) | Alternative D |
|---|---|---|---|---|---|
| **Total Acres** | **266,485** | **17,122** | **266,485** | **105,886** | **24,455** |
| Total Acres Open for Rights of Way | | 249,363 | 0 | 160,599 | 242,030 |

Note: All acreage not under exclusion or avoidance remains open for ROW.
* All 27,722 acres of Beaver Creek are managed to protect, preserve and maintain their wilderness characteristics. Of these acres, 6,358 acres are exclusion.
**About 5,540 acres of the Fisher Towers area are managed to protect, preserve and maintain their wilderness characteristics.
***About 16,499 acres of the Mary Jane area are managed to protect, preserve and maintain their wilderness characteristics.

### 4.3.8.2.3.3 Alternative B

Under this alternative, all non-WSA lands with wilderness characteristics would be managed as right-of-way exclusion areas. Exclusion from future rights-of-way development for pipelines and power lines, corridor designation, or other rights-of-ways would protect the natural character in all these lands. Protection of the natural landscape would also preserve the setting needed to support primitive forms of recreation and experiences of solitude. The same protections would prevent corridor designations within any of the non-WSA lands with wilderness characteristics, thus protecting those values.

### 4.3.8.2.3.4 Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage includes the entire Beaver Creek area, and portions of Mary Jane and Fisher Towers areas. Under this management, these lands would be managed with a no surface occupancy stipulation. There would be no other surface-disturbing activities allowed within this acreage, including no new road building or construction. These areas are avoidance areas for rights of ways. There are no designated utility corridors within this acreage.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Both the Behind the Rocks and Floy Canyon non-WSA lands with wilderness characteristics would have small portions of them overlain by designated utility corridors. The Behind the Rocks non-WSA area (east side) would be partially overlain by the proposed Spanish Valley corridor. The southern-most part of Floy Canyon would be partially within the 1/2 mile width of the I-70 proposed utility corridor. Placement of future utility rights-of-ways within these portions of the corridors would diminish the wilderness characteristics by creating surface-disturbing activities (and possibly placing surface facilities) that would no longer maintain the wilderness characteristics values in the most southern portion of the Floy Canyon area.

BLM_0010297

*Moab PRMP/FEIS*

*Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

Non-WSA lands with wilderness characteristics that would remain open to rights-of-way permitting include all of 13 areas and portions of 15 areas, totaling 160,599 acres (see Table 4.58). Presently there are no proposals for rights-of-ways in these areas; however, if that opportunity arises, more permanent, long term impacts would occur if the right-of-way is for an overhead power line than for a buried pipeline. Any surface-disturbing activity and/or placement of permanent visual facilities would detract from the natural character of the area and disrupt the setting needed to support primitive forms of recreation.

There are 80,164 acres in 18 non-WSA lands with wilderness characteristics areas that would be protected, in whole or in part, from surface-disturbing activities under this alternative because they would be rights-of-way avoidance areas (see Table 4.58). Gooseneck, Mill Creek Canyon and Shafer Canyon would be completely within the avoidance areas. These areas are to be avoided but may be available for location of right-of-ways with special stipulations if the proposal meets the goals and objectives of other resources and uses in the land-use plan. It is expected and assumed that the avoidance areas would protect the natural character of the non-WSA lands in these areas.

### 4.3.8.2.3.5 Alternative D

Both the Behind the Rocks and Floy Canyon non-WSA lands with wilderness characteristics would have minor portions of them overlain by designated utility corridors. The Behind the Rocks non-WSA area (east side) would be partially overlain by the proposed Spanish Valley corridor (same as the Proposed Plan). Floy Canyon would be partially within the 1 mile width of the I-70 proposed utility corridor. Placement of future utility rights-of-way within these portions of the corridors would diminish the wilderness characteristics of these areas by causing surface-disturbing activities (and possible placing surface facilities) that would no longer maintain the wilderness characteristics values. Floy Canyon would have more potential impacts than in the Proposed Plan because the corridor width would be 1 mile on each side of I-70, providing more room for the placement of additional rights-of-way.

Non-WSA lands with wilderness characteristics that would remain open to rights-of-way permitting include all of 18 areas and portions of 14 areas, totaling 242,030 acres. Presently there are no proposals for rights-of-ways in these areas, however, if that opportunity arises, more permanent, long term impacts would occur if the right-of-way is for an overhead power line than for a buried pipeline. Any surface-disturbing activity and/or placement of permanent visual facilities would detract from the natural character of the area and disrupt the setting needed to support primitive forms of recreation.

There are 14 non-WSA lands with wilderness characteristics areas, totaling 24,455 acres that would be protected, in part, from surface-disturbing actives under this alternative because they would be rights-of-way avoidance areas (see Table 4.58). None of the areas would be completely within an avoidance area. These areas are to be avoided but may be available for location of right-of-ways with special stipulations if the proposal meets the goals and objectives of other resources and uses in the land-use plan. It is expected and assumed that the avoidance areas would protect the natural character of the non-WSA lands in these areas. Because none of the avoidance areas protect 5,000 acres of the stand alone areas, those areas could be subject to losing their wilderness characteristics if rights-of-way were developed on the non-WSA lands outside of the avoidance areas.

BLM_0010298

#### 4.3.8.2.4 IMPACTS OF LIVESTOCK GRAZING ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Livestock grazing is guided by livestock objectives set in the Standards for Rangeland Health and Guidelines for Grazing Management. Proper levels of livestock use are guided by these objectives, thus, it is not anticipated that livestock grazing would have impacts on non-WSA lands with wilderness characteristics under any alternatives because meeting these objectives would not permit degradation of the lands. When livestock use is properly managed, it would not affect the appearance of naturalness. Grazing assessments completed by MFO staff and any subsequent actions taken to remedy impending issues would enhance the natural character of non-WSA lands with wilderness characteristics. Further, improved natural condition would sustain the setting needed to support opportunities for primitive and unconfined recreation and the experience of solitude that visitors seek.

While there could be some visual evidence of livestock use in the areas (presence of livestock, feces, trampling of soil, fences, and consumption of vegetation), rangeland health and riparian conditions would be maintained through proper management under the Standards and Guides assessments, and the appearance of a natural condition of these areas would be maintained. For some visitors, the presence of livestock would be an adverse impact on the desired experience (connection with the natural world and experiences of solitude). However, this effect would be seasonal. At other times of the year, livestock would not be present, soils would recover, and vegetation would re-grow, reducing the impact on the visitor.

Under all alternatives, the Negro Bill Canyon non-WSA lands with wilderness characteristics area would remain unavailable for livestock grazing. In addition, small portions of some of the non-WSA lands with wilderness characteristics would be unavailable for grazing under the range of alternatives. When some visitors encounter an area with little or no evidence of livestock use, their experience of solitude and primitive recreation may be enhanced.

#### 4.3.8.2.5 IMPACTS OF MINERAL RESOURCES ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

#### 4.3.8.2.5.1 Oil and Gas

The mineral assumptions for analysis and the Reasonably Foreseeable Development scenarios presented in the beginning of this chapter were used in the analysis of impacts to non-WSA lands with wilderness characteristics. These RFD scenarios for oil and gas development were derived from the Mineral Potential Report for the MPA (BLM 2005e). Of the seven RFD areas identified in the MPA, non-WSA lands with wilderness characteristics fall within three of them.

The Bookcliffs RFD Area totals 151,834 acres outside of WSAs. It encompasses seven non-WSA lands with wilderness characteristics areas which total 60,453 acres, or about 39% of the RFD area (see Table 4.59). About 28,277 acres within non-WSA lands with wilderness characteristics are currently leased.

BLM_0010299

**Table 4.59. Bookcliffs RFD Area and Non-WSA Lands with Wilderness Characteristics**

| Name of Non-WSA Lands with Wilderness Characteristics | Percent of Bookcliffs RFD Area | Acres of Unit with Existing Leases and % of Total |
|---|---|---|
| Coal Canyon | 14% | 13,312 (62%) |
| Flume Canyon | 2% | 1,355 (38%) |
| Hells Hole | 2% | 1,724 (68%) |
| Hideout Canyon | 7% | 5,399 (46%) |
| Mexico Point | 8% | 6,294 (49%) |
| Spruce Canyon | 1% | 161 (14%) |
| Westwater Creek | 5% | 32 (<1%) |

The Big Flat-Hatch Point RFD Area has a total of 391,149 acres outside of WSAs. It includes 11 non-WSA lands with wilderness characteristics areas which total 66,864 acres, or about 17% of the area (see Table 4.60). About 10,127 acres within non-WSA lands with wilderness characteristics are currently leased.

**Table 4.60. Big Flat-Hatch Point RFD Area and Non-WSA Lands with Wilderness Characteristics**

| Name of Non-WSA Lands with Wilderness Characteristics | Percent of Big Flat-Hatch Point RFD Area | Acres of Unit with Existing Leases and % of Total |
|---|---|---|
| Behind the Rocks | <1% | 0 |
| Dead Horse Cliffs | <1% | 237 (30%) |
| Goldbar | 2% | 1,125 (17%) |
| Gooseneck | <1% | 0 |
| Harts Point | <1% | 0 |
| Hatch Wash | 3% | 3,006 (27%) |
| Hatch/Lockhart/Hart | <1% | 833 (31%) |
| Horsethief Point | 2% | 838 (10%) |
| Hunter Canyon | 1% | 251 (5%) |
| Labyrinth Canyon | 6% | 3,658 (14%) |
| Shafer Canyon | <1% | 179 (9%) |

The Eastern Paradox RFD Area has a total of 556,389 acres outside of WSAs. It encompasses fourteen non-WSA lands with wilderness characteristics areas which total 138,410 acres, or about 25% of the area (see Table 4.61). About 12,117 acres of non-WSA lands with wilderness characteristics are currently leased.

BLM_0010300

Moab PRMP/FEIS

Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
4.3.8 Non-WSA Lands with Wilderness Characteristics

**Table 4.61. Eastern Paradox RFD Area and Non-WSA Lands with Wilderness Characteristics**

| Name of Non-WSA Lands with Wilderness Characteristics | Percent of Eastern Paradox RFD Area | Acres of Unit with Existing Leases and % of Total |
|---|---|---|
| Arches Adjacent | 1% | 56 (<1%) |
| Beaver Creek | 5% | 0 |
| Big Triangle | <1% | 0 |
| Desolation Canyon | 2% | 0 |
| Dome Plateau | 3% | 2,364 (17%) |
| Fisher Towers | 3% | 0 |
| Floy Canyon | 2% | 8,859 (86%) |
| Granite Creek | 1% | 0 |
| Lost Spring Canyon | 2% | 771 (6%) |
| Mary Jane Canyon | 4% | 0 |
| Mill Creek Canyon | <1% | 0 |
| Negro Bill Canyon | <1% | 0 |
| Westwater Canyon | <1% | 0 |
| Yellow Bird | <1% | 67 (18%) |

Each of the three RFD areas has differing projections for oil and gas development by alternative. Table 4.62 portrays those projections. It is assumed that 15 acres would be disturbed for every well drilled.

**Table 4.62. RFD Areas with Projected Number of Wells per Year, over 15 Years**

| RFD Areas (Acres outside WSAs) | Projected Wells Per Year/over 15 Years | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Proposed Plan | Alternative D |
| Bookcliffs (151,834) | ~7 / 104 | ~4 / 64 | ~7 / 104 | ~7 / 104 |
| Big Flat – Hatch Point (391,149) | ~3 / 46 | ~1 / 19 | ~2 / 34 | ~3 / 44 |
| Eastern Paradox (556,389) | ~2 / 34 | ~1 / 21 | ~2 / 28 | ~2 / 32 |

<u>Impacts Associated with Oil and Gas Leasing/Development under All Alternatives</u>

A number of variables would determine the degree of impact to non-WSA lands with wilderness characteristics, including where surface-disturbing activities occur, land form or topography, vegetation type, sequence of development, and reclamation time. Soil types and climate would affect the time it takes to reclaim disturbances. Successful reclamation would take about 10 years.

Construction and operation of oil and gas wells and associated support facilities, including roads, surface and buried pipelines, power lines, and compressor stations would create soil and vegetation disturbance and the presence of permanent structures that would degrade the natural characteristics of non-WSA lands with wilderness characteristics. In addition to site-specific

BLM_0010301

surface disturbance, the cumulative number of wells would change the appearance of naturalness.

The noise of construction and operation of producing wells, including the presence of work crews, vehicles, and equipment, would degrade opportunities for solitude and conflict with primitive recreational opportunities in proximity to industrial development. As recreational visitors move away from the sources of development, the sights and sounds of development would diminish. However, it can be expected that sights and sounds from development would reduce opportunities for solitude and primitive and unconfined recreation up to one-half mile beyond the direct loss of natural character.

Table 4.63 displays the oil and gas leasing stipulations, by alternative, for each of the non-WSA lands with wilderness characteristics.

### Table 4.63. Non-WSA Lands with Wilderness Characteristics Leasing Stipulations By Alternative

| Name | Total Acres | Currently Leased | Stipulation | Alt. A | Alt. B | PROPOSED PLAN* | Alt. D |
|------|------|------|------|------|------|------|------|
| Arches Adjacent | 6,396 | 56 | Standard | 6,396 | 0 | 0 | 0 |
| | | | CSU/TL | 0 | 0 | 5,883 | 5,883 |
| | | | NSO | 0 | 0 | 513 | 513 |
| | | | Closed | 0 | 6,396 | 0 | 0 |
| Beaver Creek | 25,722 | 0 | Standard | 17,744 | 0 | 0 | 3,956 |
| | | | CSU/TL | 3,030 | 0 | 0 | 13,614 |
| | | | NSO | 4,948 | 0 | 22,561 | 8,152 |
| | | | Closed | | 25,722 | 2,977 | 0 |
| Behind the Rocks | 3,643 | 0 | Standard | 2,616 | 0 | 1,339 | 3,588 |
| | | | CSU/TL | 0 | 0 | 684 | 0 |
| | | | NSO | 1,019 | 0 | 1,582 | 55 |
| | | | Closed | | 3,643 | 0 | 0 |
| Big Triangle | 5,200 | 0 | Standard | 137 | 0 | 659 | 659 |
| | | | CSU/TL | 5,063 | 0 | 4,541 | 4,541 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 5,200 | 0 | 0 |
| Coal Canyon | 21,632 | 13,312 | Standard | 15,145 | 0 | 6,831 | 13,069 |
| | | | CSU/TL | 5,129 | 0 | 14,801 | 8,563 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 21,632 | 0 | 0 |
| Dead Horse Cliffs | 797 | 237 | Standard | 512 | 0 | 0 | 642 |
| | | | CSU/TL | 0 | 0 | 699 | 121 |
| | | | NSO | 250 | 0 | 98 | 34 |
| | | | Closed | 35 | 797 | 0 | 0 |

BLM_0010302

**Table 4.63. Non-WSA Lands with Wilderness Characteristics Leasing Stipulations By Alternative**

| Name | Total Acres | Currently Leased | Stipulation | Alt. A | Alt. B | PROPOSED PLAN* | Alt. D |
|------|------------|-----------------|-------------|--------|--------|----------------|--------|
| Desolation Canyon | 10,498 | 0 | Standard | 1,378 | 0 | 411 | 1,286 |
| | | | CSU/TL | 9,120 | 0 | 9,102 | 8,968 |
| | | | NSO | 0 | 0 | 985 | 250 |
| | | | Closed | 0 | 10,498 | 0 | 0 |
| Dome Plateau | 14,207 | 2,364 | Standard | 12,255 | 0 | 2,252 | 2,373 |
| | | | CSU/TL | 1,952 | 0 | 2,375 | 5,444 |
| | | | NSO | 0 | 0 | 8,267 | 6,390 |
| | | | Closed | 0 | 14,207 | 1,313 | 0 |
| Fisher Towers | 17,235 | 0 | Standard | 14,810 | 0 | 4,238 | 4,763 |
| | | | CSU/TL | 1,328 | 0 | 4,551 | 9,173 |
| | | | NSO | 1,097 | 0 | 4,528 | 3,312 |
| | | | Closed | 0 | 17,235 | 3,625 | 0 |
| Floy Canyon | 9,983 | 8,589 | Standard | 3,615 | 0 | 3,422 | 5,064 |
| | | | CSU/TL | 6,368 | 0 | 6,561 | 4,919 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 9,983 | 0 | 0 |
| Flume Canyon | 3,520 | 1,355 | Standard | 1,709 | 0 | 1,952 | 1,263 |
| | | | CSU/TL | 1,682 | 0 | 838 | 2,257 |
| | | | NSO | 129 | 0 | 730 | 0 |
| | | | Closed | 0 | 3,520 | 0 | 0 |
| Goldbar | 6,437 | 1,125 | Standard | 4,565 | 0 | 0 | 5,802 |
| | | | CSU/TL | 1,735 | 0 | 373 | 419 |
| | | | NSO | 0 | 0 | 6,064 | 543 |
| | | | Closed | 0 | 6,437 | 0 | 0 |
| Gooseneck | 843 | 0 | Standard | 275 | 0 | 0 | 530 |
| | | | CSU/TL | 530 | 0 | 0 | 313 |
| | | | NSO | 0 | 0 | 843 | 0 |
| | | | Closed | 0 | 843 | 0 | 0 |
| Granite Creek | 4,528 | 0 | Standard | 431 | 0 | 1,378 | 13 |
| | | | CSU/TL | 4,097 | 0 | 3,150 | 4,515 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 4,528 | 0 | 0 |

BLM_0010303

**Table 4.63. Non-WSA Lands with Wilderness Characteristics Leasing Stipulations By Alternative**

| Name | Total Acres | Currently Leased | Stipulation | Alt. A | Alt. B | PROPOSED PLAN* | Alt. D |
|------|-------------|------------------|-------------|--------|--------|----------------|--------|
| Harts Point (MFO) | 1,465 | 0 | Standard | 0 | 0 | 0 | 33 |
| | | | CSU/TL | 1,436 | 0 | 1,429 | 1,432 |
| | | | NSO | 29 | 0 | 36 | 0 |
| | | | Closed | 0 | 1,465 | 0 | 0 |
| Hatch Wash | 10,983 | 3,006 | Standard | 0 | 0 | 3,366 | 5,842 |
| | | | CSU/TL | 10,983 | 0 | 7,617 | 5,141 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 10,983 | 0 | 0 |
| Hatch/Lockhart/Hart | 2,670 | 833 | Standard | 0 | 0 | 0 | 114 |
| | | | CSU/TL | 2,670 | 0 | 2,670 | 2,556 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 2,670 | 0 | 0 |
| Hells Hole | 2,538 | 1,724 | Standard | 0 | 0 | 0 | 180 |
| | | | CSU/TL | 2,538 | 0 | 2,538 | 2,358 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 2,538 | 0 | 0 |
| Hideout Canyon | 11,607 | 5,399 | Standard | 0 | 0 | 0 | 0 |
| | | | CSU/TL | 11,607 | 0 | 11,607 | 11,607 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 11,607 | 0 | 0 |
| Horsethief Point | 8,358 | 838 | Standard | 7,417 | 0 | 2,326 | 6,824 |
| | | | CSU/TL | | 0 | 4,842 | 372 |
| | | | NSO | 816 | 0 | 1,190 | 1,162 |
| | | | Closed | 125 | 8,358 | 0 | 0 |
| Hunter Canyon | 4,465 | 251 | Standard | 3,092 | 0 | 0 | 4,155 |
| | | | CSU/TL | 0 | 0 | 1,610 | 0 |
| | | | NSO | 1,373 | 0 | 2,855 | 310 |
| | | | Closed | 0 | 4,465 | 0 | 0 |
| Labyrinth Canyon | 25,361 | 3,658 | Standard | 20,545 | 0 | 6,774 | 15,534 |
| | | | CSU/TL | 2,105 | 0 | 271 | 7,053 |
| | | | NSO | 2,458 | 0 | 17,954 | 2,456 |
| | | | Closed | 0 | 25,361 | 0 | 0 |

BLM_0010304

**Table 4.63. Non-WSA Lands with Wilderness Characteristics Leasing Stipulations By Alternative**

| Name | Total Acres | Currently Leased | Stipulation | Alt. A | Alt. B | PROPOSED PLAN* | Alt. D |
|------|-------------|------------------|-------------|--------|--------|----------------|--------|
| Lost Spring Canyon | 11,456 | 771 | Standard | 11,456 | 0 | 5,588 | 4,363 |
| | | | CSU/TL | 0 | 0 | 5,823 | 7,093 |
| | | | NSO | 0 | 0 | 45 | 0 |
| | | | Closed | 0 | 11,456 | 0 | 0 |
| Mary Jane Canyon | 24,779 | 0 | Standard | 21,076 | 0 | 122 | 1,995 |
| | | | CSU/TL | 3,703 | 0 | 2,457 | 21,807 |
| | | | NSO | 0 | 0 | 8,993 | 946 |
| | | | Closed | 0 | 24,779 | 13,176 | 0 |
| Mexico Point | 12,837 | 6,294 | Standard | 0 | 0 | 0 | 0 |
| | | | CSU/TL | 12,837 | 0 | 12,837 | 12,837 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 12,837 | 0 | 0 |
| Mill Creek Canyon | 3,388 | 0 | Standard | 3,051 | 0 | 0 | 192 |
| | | | CSU/TL | | 0 | 0 | 3,127 |
| | | | NSO | 337 | 0 | 3,388 | 69 |
| | | | Closed | 0 | 3,388 | 0 | 0 |
| Negro Bill Canyon | 2,333 | 0 | Standard | 2,226 | 0 | 0 | 0 |
| | | | CSU/TL | 0 | 0 | 1,156 | 2,093 |
| | | | NSO | 107 | 0 | 1,177 | 240 |
| | | | Closed | 0 | 2,333 | 0 | 0 |
| Shafer Canyon | 1,842 | 179 | Standard | 900 | 0 | 0 | 129 |
| | | | CSU/TL | 0 | 0 | 0 | 1,700 |
| | | | NSO | 942 | 0 | 1,842 | 13 |
| | | | Closed | 0 | 1,842 | 0 | 0 |
| Spruce Canyon | 1,131 | 161 | Standard | 0 | 0 | 13 | 13 |
| | | | CSU/TL | 1,131 | 0 | 161 | 1,118 |
| | | | NSO | 0 | 0 | 957 | 0 |
| | | | Closed | 0 | 1,131 | 0 | 0 |
| Westwater Canyon | 3,086 | 0 | Standard | 2,251 | 0 | 1,835 | 1,876 |
| | | | CSU/TL | 0 | 0 | 1,171 | 1,170 |
| | | | NSO | 840 | 0 | 84 | 40 |
| | | | Closed | 0 | 2,328 | 0 | 0 |
| Westwater Creek | 7,188 | 32 | Standard | 0 | 0 | 0 | 0 |
| | | | CSU/TL | 7,188 | 0 | 7,188 | 7,188 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 7,188 | 0 | 0 |

BLM_0010305

**Table 4.63. Non-WSA Lands with Wilderness Characteristics Leasing Stipulations By Alternative**

| Name | Total Acres | Currently Leased | Stipulation | Alt. A | Alt. B | PROPOSED PLAN* | Alt. D |
|---|---|---|---|---|---|---|---|
| Yellow Bird | 357 | 67 | Standard | 357 | 0 | 233 | |
| | | | CSU/TL | 0 | 0 | 124 | 357 |
| | | | NSO | 0 | 0 | 0 | 0 |
| | | | Closed | 0 | 357 | 0 | 0 |

*In the Proposed Plan, 27,722 acres of Beaver Creek are managed to protect, preserve and maintain their wilderness characteristics. Of these acres, 22,561 acres are managed with a no surface occupancy stipulation, and 2,977 acres are closed to oil and gas leasing.

In the Proposed Plan, 5,540 acres of the Fisher Towers lands with wilderness characteristics are managed to protect, preserve and maintain their wilderness characteristics. Of these acres, 1,629 are closed to oil and gas leasing, and 3,911 are open to leasing with a no surface occupancy stipulation.

In the Proposed Plan, 16,499 acres of the Mary Jane lands with wilderness characteristics are managed to protect, preserve and maintain their wilderness characteristics. Of these acres, 7,525 are closed to oil and gas leasing, and 8,910 are open to leasing with a no surface occupancy stipulation.

## Alternative A

All or parts of the 32 non-WSA lands with wilderness characteristics areas would remain open to leasing and development under standard oil and gas stipulations or under controlled surface use or timing limitation stipulations (250,853 acres). This comprises about 94% of these areas. Six percent of the non-WSA lands with wilderness characteristics (within 12 areas) would be either closed to leasing or have a no surface occupancy stipulation on the leases.

In the Book Cliffs RFD area, all seven non-WSA wilderness characteristics areas would remain open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (60,324). Only 129 acres in Flume Canyon (4%) would have a no surface occupancy stipulation applied to the lease. Based on the percentage of non-WSA lands with wilderness characteristics and the existing leases within those areas, the highest potential for leasing and/or development would be in Coal Canyon, Hideout Canyon, Mexico Point, or Hells Hole. Given that the projection for drilling for oil and gas is 7 wells/year for the whole RFD area, and that 39% of the RFD area encompasses non-WSA lands with wilderness characteristics, up to three wells per year—or up to 45 wells over a 15 year period—could be drilled within these areas. This could disturb up to 45 acres per year, or up to 675 acres over the life of the plan. Leasing and development within these non-WSA areas would cause that portion to lose their natural character and opportunities for solitude and primitive recreation due to exploration for and development of oil and gas resources. However, it is not anticipated that any of the areas would lose their wilderness characteristics in totality because of the small amount of acreage projected to be disturbed and the number of projected wells in this RFD area over the 15 year scenario.

In the Big Flat-Hatch Point RFD area, all eleven non-WSA wilderness characteristics areas would remain partially open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations. However, 1,019 acres (28%) in Behind the Rocks, 285 acres (36%) in Dead Horse Cliffs, 941 acres (11%) in Horsethief Point, 1,373 acres (31%) in Hunter Canyon, 2,458 acres (10%) in Labyrinth Canyon and 945 acres (51%) in Shafer Canyon would be under a no-surface occupancy stipulation or closed to leasing. Based on the percentage of

BLM_0010306

non-WSA lands with wilderness characteristics and the existing leases within those areas, the highest potential for leasing and/or development would be in Labyrinth Canyon, Hatch Wash, or Goldbar. Given that the projection for drilling for oil and gas is 3 wells/year for the whole RFD area, and that 17% of the RFD area encompasses non-WSA lands with wilderness characteristics, up to one well per year—or up to 15 wells over a 15 year period—could be drilled within the non-WSA areas. This could disturb up to 15 acres per year, or up to 225 acres over the life of the plan. Leasing and development within these non-WSA areas could cause that portion to lose its natural character and opportunities for solitude and primitive recreation due to exploration for and development of oil and gas resources. However, it is not anticipated that any of the areas would lose their wilderness characteristics in totality because of the small amount of acreage projected to be disturbed and the few projected wells in this RFD area over the 15 year scenario.

In the Eastern Paradox RFD area, all fourteen non-WSA wilderness characteristics areas would remain open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (133,462 acres). However, 4,948 acres in Beaver Creek (19%), 1,097 acres in Fisher Towers (6%), 337 acres in Millcreek (10%), 110 acres in Negro Bill Canyon (5%), and 840 acres in Westwater Canyon (36%), would be under a no-surface occupancy stipulation or closed to leasing). Based on the percentage of non-WSA lands with wilderness characteristics and/or the existing leases within those areas, the highest potential for leasing and/or development would be in Beaver Creek, Desolation Canyon, Dome Plateau, Floy Canyon, Fisher Towers, Mary Jane Canyon and Lost spring Canyon. Floy Canyon would have the highest probability for development based on existing leases. Given that the projection for drilling for oil and gas is two wells/year for the whole RFD area, and that 24% of the RFD area encompasses non-WSA lands with wilderness characteristics open to leasing under standard stipulation, controlled surface use, or timing stipulations, up to one well per year—or up to 15 wells over a 15 year period—could be drilled within the non-WSA areas. This could disturb up to 15 acres per year, or up to 225 acres over the life of the plan. Leasing and development within these non-WSA areas could cause that portion to lose their natural character and opportunities for solitude and primitive recreation due to exploration for and development of oil and gas resources. However, it is not anticipated that any of the areas would lose their wilderness characteristics in totality because of the small amount of acreage projected to be disturbed and the few projected wells in this RFD area over the 15 year scenario.

In summary, up to 5 wells per/year or up to 75 wells over the 15 year RFD scenario, disturbing up to 75 acres/year or 1,125 acres over the 15 year RFD scenario could occur in non-WSA lands with wilderness characteristics. Thirteen of the 32 areas have a higher potential for these wells to be drilled based on existing leases and/or percentages of non-WSA lands within the RFD area.

Alternative B

Under Alternative B, all lands within the non-WSA lands with wilderness characteristics would be closed to leasing. However, existing leases still remain in 20 of the 32 non-WSA lands with wilderness characteristics areas. Development of these leases could compromise wilderness characteristics values in these areas. Below is a breakdown of how or where that may occur based on the RFD areas and the predicted surface disturbance for oil and gas activity for this alternative. Those non-WSA lands with wilderness characteristics that are not currently leased would be fully protected under the leasing closure under this alternative. This would preserve the

BLM_0010307

naturalness of the areas and maintain the outstanding opportunities for primitive recreation and solitude.

In the Book Cliffs RFD area, all seven non-WSA wilderness characteristics areas have portions of the areas under existing leases comprising 28,277 acres. Based on the percentage of the non-WSA lands with wilderness characteristics under existing leases, the highest potential for development of those leases would be in Coal Canyon, Hideout Canyon, Mexico Point, or Hells Hole. Given that the projection for drilling for oil and gas is 4 wells/year for the whole RFD area under this alternative, and that 18% of the lands the RFD area encompasses are in non-WSA lands with wilderness characteristics that are leased, approximately one well per year—or up to 15 wells over a 15 year period—could be drilled within the non-WSA areas currently under lease. This could disturb up to 15 acres per year, or up to 225 acres over the life of the plan. The 15 year projection is on the high side, given that leases, if not developed or held in production, will expire after 10 years. Development of any leases within the non-WSA areas could cause that portion to lose their natural character and opportunities for solitude and primitive recreation due to exploration for and development of oil and gas resources. Because of the small amount of acreage projected to be disturbed and the few projected wells in this RFD area over the 15 year scenario, it is anticipated that small portions of areas could loose their wilderness characteristics in any of the three large non-WSA lands with wilderness characteristics with existing leases. Far less than 1% of any of those three areas would be at risk of loss of wilderness characteristics. However, if all of the development over the 15 year period occurs in the smaller Hells Hole area, approximately 9% of that area could lose its wilderness characteristics.

In the Big Flat RFD area, eight of the eleven non-WSA wilderness characteristics areas have portions of the areas under existing leases comprising 10,127 acres. Based on the percentage of the non-WSA lands with wilderness characteristics under existing leases, the highest potential for development of those leases could be in Labyrinth Canyon, Hatch Wash or Goldbar. Given that the projection for drilling for oil and gas is 1 well/year for the whole RFD area under this alternative, and that 3% of the lands the RFD area encompasses are in non-WSA lands with wilderness characteristics that are leased, it is not anticipated that any well would be drilled within the non-WSA lands with wilderness characteristics. Thus, all lands would maintain and protect their wilderness characteristics values in this RFD area.

In the Eastern Paradox RFD area five out of the 14 non-WSA wilderness characteristics areas have portions of the areas under existing leases comprising 12,112 acres. The rest would all be closed to leasing (126,298 acres). Based on the percentage of the non-WSA lands with wilderness characteristics under existing leases, the highest potential for development of those leases could be in Dome Plateau and Floy Canyon. Given that the projection for drilling for oil and gas is 1 well/year for the whole RFD area under this alternative, and that 2% of the lands the RFD area encompasses are in non-WSA lands with wilderness characteristics that are leased, it is not anticipated that any wells would be drilled within the non-WSA lands with wilderness characteristics. Thus, all lands would maintain and protect their wilderness characteristics values in this RFD area.

In summary, up to 1 well per/year or up to 15 wells over the 15 year RFD scenario, disturbing up to 15 acres/year or 225 acres over the 15 year RFD scenario could occur on existing leased lands in non-WSA lands with wilderness characteristics. Three non-WSA areas in the Book Cliffs RFD area have the highest potential for these wells to be drilled based on existing leases in the

BLM_0010308

non-WSA lands within the RFD area. All other non-WSA lands with wilderness characteristics
would be protected from oil and gas leasing and developments activities by closing the areas to
future leasing.

Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect,
preserve, and maintain their wilderness characteristics. This acreage includes the entire Beaver
Creek area, and portions of Mary Jane (16,499 acres) and Fisher Towers (5,540 acres) areas.
Under this management, these lands would be managed as closed, or with a no surface
occupancy stipulation. There would be no other surface-disturbing activities allowed within this
acreage, including no new road building or construction. Minerals decisions would have no
surface impacts upon the three non-WSA areas to be managed to protect, Preserve, and maintain
their wilderness characteristics as no leases would be granted that would impact these wilderness
characteristics.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

All or parts of 27 of the 31 non-WSA lands with Wilderness Characteristics areas would remain
all or partially open to leasing and development under standard oil and gas stipulations or under
controlled surface use or timing limitation stipulations (160,522 acres). This comprises about
60% of non-WSA areas. About 80,241 acres of the non-WSA lands with wilderness
characteristics spread among 20 areas would be either closed to leasing or have a no surface
occupancy stipulation on the leases. Three of those non-WSA lands with wilderness
characteristics areas would be protected, in whole, from all surface-disturbing activities:
Gooseneck, Mill Creek Canyon, and Shafer Canyon.

In the Book Cliffs RFD area, all seven non-WSA wilderness characteristics areas would remain
all or partially open to leasing under standard stipulations or under controlled surface use or
timing limitation stipulations (58,766 acres). However, a total of 1,687 acres would be under a
no-surface occupancy stipulation or closed to leasing in the following areas: 730 acres in Flume
Canyon (21%) and 957 acres in Spruce Canyon (85%). Based on the percentage of non-WSA
lands with wilderness characteristics and the existing leases within those areas, the highest
potential for leasing and/or development would be in Coal Canyon, Hideout Canyon, Mexico
Point, or Hells Hole. Because well projections under this alternative are the same as in
Alternative A, and generally the same percentage of lands in the RFD area encompass non-WSA
lands with wilderness characteristics, the same analysis portraying 3 wells in this area would be
applied.

In the Big Flat-Hatch Point RFD area, nine of the eleven non-WSA wilderness characteristics
areas would remain all or partially open to leasing under standard stipulations or under controlled
surface use or timing limitation stipulations (33,970 acres). However a total of 32,464 acres
would be under a no-surface occupancy stipulation in the following areas: 1,582 acres in Behind
the Rocks (43%), 98 acres in Dead Horse Cliffs (12%), 6,064 acres in Goldbar (94%), 842 acres
in Gooseneck (100%), 36 acres in Harts Point (2%), 1190 acres in Horsethief Point (14%), 2,855
acres in Hunter Canyon (64%), 17,954 acres in Labyrinth Canyon (71%), and 1,842 acres of
Shafer Canyon (100%). Based on the percentage of non-WSA lands with wilderness
characteristics and the existing leases within those areas, the highest potential for leasing and/or

BLM_0010309

development would be in Labyrinth Canyon, Hatch Wash, or Goldbar. Given that the projection for drilling for oil and gas is 2 wells/year for the whole RFD area under this alternative, and that less than 9% of the lands the RFD area encompasses are in non-WSA lands with wilderness characteristics (not under a no-surface occupancy stipulation), it is not anticipated that any wells would be drilled within the non-WSA lands with wilderness characteristics. Thus, all lands would maintain and protect their wilderness characteristics values in this RFD area.

In the Eastern Paradox RFD area, twelve of the fourteen non-WSA wilderness characteristics areas would remain all or partially open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (66,594 acres). However, a total of 24,055 acres would be under a no-surface occupancy stipulation or closed to leasing in the following areas: 513 acres in Arches Adjacent (9%), 985 acres in Desolation Canyon (10%), 9,580 acres in Dome Plateau (67%), 45 acres in Lost Spring Canyon (<1%), 3,388 acres in Millcreek (100%), 1,177 acres in Negro Bill Canyon (50%), and 84 acres in Westwater Canyon (4%). Based on the percentage of non-WSA lands with wilderness characteristics and/or the existing leases within those areas, the highest potential for leasing and/or development would be in Desolation Canyon, Dome Plateau, Floy Canyon, and Lost Spring Canyon. Floy Canyon would have the highest probability for development based on existing leases. Given that the projection for drilling for oil and gas is 2 wells/year for the whole RFD area under this alternative, and that less than 12% of the lands the RFD area encompasses are in non-WSA lands with wilderness characteristics (not under a no-surface occupancy stipulation or closed to leasing), it is not anticipated that any wells would be drilled within the non-WSA lands with wilderness characteristics. Thus, all lands would maintain and protect their wilderness characteristics values in this RFD area.

In summary, up to 3 wells per/year or up to 45 wells over the 15 year RFD scenario, disturbing up to 45 acres/year or 675 acres over the 15 year RFD scenario could occur in non-WSA lands with wilderness characteristics, most likely within the Book Cliffs RFD area. However, eleven of the 32 areas have a higher potential for these wells to be drilled based on existing leases and/or percentages of non-WSA lands within the RFD area.

Alternative D

All or of the 32 non-WSA lands with Wilderness Characteristics areas would remain all or partially open to leasing and development under standard oil and gas stipulations or under controlled surface use or timing limitation stipulations (242,006 acres). This comprises about 91% of non-WSA areas. Nine percent (24,479 acres) of the non-WSA lands with wilderness characteristics spread between 16 areas would be have a no surface occupancy stipulation on the leases.

In the Book Cliffs RFD area, all seven non-WSA wilderness characteristics areas would remain open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (60,453 acres). Based on the percentage of non-WSA lands with wilderness characteristics and the existing leases within those areas, the highest potential for leasing and/or development would be in Coal Canyon, Hideout Canyon, Mexico Point, or Hells Hole. Because well projections under this alternative are the same as in Alternative A, and generally the same percentage of lands in the RFD area encompass non-WSA lands with wilderness characteristics, the same analysis portraying three wells in this RFD area would be applied.

BLM_0010310

In the Big Fat-Hatch Point RFD area, all eleven non-WSA wilderness characteristics areas would remain all or partially open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (62,291 acres). However a total of 4,573 acres would be under a no-surface occupancy stipulation in the following areas: 55 acres in Behind the Rocks (2%), 34 acres in Dead Horse Cliffs (4%), 543 acres in Goldbar (9%), 1162 acres in Horsethief Point (16%), 310 acres in Hunter Canyon (7%), 2,456 acres in Labyrinth Canyon (11%), and 13 acres of Shafer Canyon (<1%). Based on the percentage of non-WSA lands with wilderness characteristics and the existing leases within those areas, the highest potential for leasing and/or development would be in Labyrinth Canyon, Hatch/Lockhart/Hart, Hatch Wash, or Goldbar. Because well projections under this alternative are the same as in Alternative A, and generally the same percentage of lands in the RFD area encompass non-WSA lands with wilderness characteristics (16%), the same analysis portraying one well in this RFD area would be applied.

In the Eastern Paradox RFD area, all fourteen non-WSA wilderness characteristics areas would remain all or partially open to leasing under standard stipulations or under controlled surface use or timing limitation stipulations (118,498 acres). However, a total of 19,912 acres would be under a no-surface occupancy stipulation or closed to leasing in the following areas: 513 acres in Arches Adjacent (9%), 8,152 acres in Beaver Creek (32%), 250 acres in Desolation Canyon (2%), 6,390 acres in Dome Plateau (45%), 3,312 acres in Fisher Towers (19%), 946 acres in Mary Jane Canyon (4%), 69 acres in Millcreek (2%), 240 acres in Negro Bill Canyon (10%), and 40 acres in Westwater Canyon (2%). Based on the percentage of non-WSA lands with wilderness characteristics and/or the existing leases within those areas, the highest potential for leasing and/or development would be in Desolation Canyon, Dome Plateau, Floy Canyon, and Lost Spring Canyon. Floy Canyon would have the highest probability for development based on existing leases. Because well projections under this alternative are the same as in Alternative A, and generally the same percentage of lands in the RFD area encompass non-WSA lands with wilderness characteristics (21%), the same analysis portraying one well in this RFD area would be applied.

In summary, like Alternative A, up to 5 wells per/year or up to 75 wells over the 15 year RFD scenario, disturbing up to 75 acres/year or 1,125 acres over the 15 year RFD scenario could occur in non-WSA lands with wilderness characteristics. Twelve of the 32 areas have a higher potential for these wells to be drilled based on existing leases and/or percentages of non-WSA lands within the RFD area.

### 4.3.8.2.5.2 Coal-bed Methane

Alternatives A, D, and the Proposed Plan

In the Book Cliffs RFD area there is potential for coal-bed methane development in Hells Hole, Hideout Canyon, and Mexico Point non-WSA lands with wilderness characteristics. Predictions of up to 225 cumulative acres of disturbance from 15 wells over the 15 year RFD scenario is anticipated for an area three times as large as the non-WSA lands together. Due to the large area of potential development for coal-bed methane in the northeastern corner of the MPA, one 5-spot well cluster, and up to 75 acres may be disturbed within these areas over the next 15 years. The impacts to wilderness characteristics from coal-bed methane leasing and development would be the same as described for oil and gas leasing and development. Leasing would be subject to the same stipulations as oil and gas leasing portrayed in on Table 4.53.

BLM_0010311

Alternative B

None of the areas would be leased for coal-bed methane under this alternative, thereby protecting the wilderness characteristics resource from that potential development.

***In summary***, Alternatives A and D would provide the most opportunities for oil and gas leasing and development to impact non-WSA lands with wilderness characteristics. In both alternatives, projections of up to five wells per year, or 75 wells over the 15 year RFD scenario could occur. This would cause surface disturbance and impact naturalness and outstanding opportunities for primitive recreation and solitude on up to 75 acres per year or up to 1,125 acres over the 15 year spread.

Under Alternative B, although all areas would be closed to leasing, projected development tied to valid existing leases could allow for up to one well a year to be developed on non-WSA lands with wilderness characteristics. This could have surface impacts on up to 15 acres a year or up to 225 acres over the 15 year RFD scenario. Statistics show that this development is most probable in the Coal Canyon, Hells Hole, Hideout Canyon, or Mexico Point areas.

The Proposed Plan would allow opportunities for up to three oil and gas wells to be developed in the non-WSA lands with wilderness characteristics areas. This could disturb up to 45 acres per year of surface disturbance, and up to 675 acres of surface disturbance over the 15 year RFD scenario.

Although oil and gas well development would cause surface-disturbing activities that may result in loss of wilderness characteristics in some areas, it is not expected under any alternative that the amount of disturbance based on well projections and the scattered nature of the wells would be substantial. Although small acreages may be lost in some of the non-WSA lands with wilderness characteristic, it is not predicted that any of the areas would lose the wilderness characteristics value in whole.

### 4.3.8.2.5.3 Potash Leasing

Alternatives A and D

Only the southernmost portion of the Goldbar non-WSA area with wilderness characteristics is intersected with a known potash leasing area. Under Alternatives A and D, this area could be leased and developed for potash. Approximately 15% of the Goldbar area would lose its wilderness characteristics if developed for potash.

Alternative B and the Proposed Plan

The 47,761 acres of non-WSA lands to be managed to protect, preserve, and maintain their wilderness characteristics (Beaver Creek – 25,722 acres, Mary Jane – 16,499 acres, and Fisher Towers—5,540 acres) would not be leased for potash under the Proposed Plan, thereby protecting the wilderness characteristics resource from that potential development.

Under these alternatives the integrity of the wilderness characteristics would be protected from surface-disturbing mining activities for potash because the area would be closed to leasing under Alternative B, and under a no-surface-occupancy stipulation under the Proposed Plan.

BLM_0010312

### 4.3.8.2.5.4 Salable Minerals

<u>Alternatives A and D</u>

Although salable mineral disposal is a discretionary decision, there is potential for expansion of existing salable mineral disposal sites that could encroach into four non-WSA areas with wilderness characteristics: Horsethief Point, Goldbar, Behind the Rocks, and Mary Jane Canyon. These areas remain available for salable mineral disposal under Alternatives A and D. There is one sand and gravel site near the northernmost boundary of Horsethief Point, one building stone site near the southernmost boundary of Goldbar, three sand and gravel sites and one building stone site on the boundary of Behind the Rocks, and two sand and gravel sites on the boundary of Mary Jane Canyon that could expand into small portions of these areas. Where surface disturbance would occur, naturalness and opportunities for primitive recreation and solitude would be foregone.

Only minimal acreage within the non-WSA areas would be affected by surface-disturbing mineral disposal activities because the existing sites area on the boundaries of these areas, and quarries or sand and gravel operations could expand in other directions as well. If the gravel pits or building rock quarries have associated support facilities, including roads and power lines, additional soil and vegetation disturbance and the presence of permanent structures would degrade the natural characteristics of non-WSA lands with wilderness characteristics. The noise of the operations of sand and gravel pits or rock quarries, including the presence of work crews, vehicles, and equipment, would degrade opportunities for solitude and conflict with primitive recreational opportunities in proximity to industrial development. As recreational visitors move away from the sources of development, the sights and sounds of development would diminish. However, it can be expected that sights and sounds from development would reduce opportunities for solitude and primitive and unconfined recreation up to 1/2 mile beyond the direct loss of natural character, depending on topography. Up to five acres in each of these areas could loose their wilderness characteristics by future expansion of the existing sites.

<u>Alternative B</u>

All non-WSA lands with wilderness characteristics would be closed to salable mineral disposal, thereby protecting the wilderness values of the four areas that contain the salable mineral sources.

The Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

The 47,761 acres of non-WSA lands to be managed to protect, preserve, and maintain their wilderness characteristics (Beaver Creek – 25,722 acres, Mary Jane – 16,499 acres, and Fisher Towers—5,540 acres) would not be available for salable mineral disposal under the Proposed Plan, thereby protecting the wilderness characteristics resource from that potential development.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Only two of the four non-WSA lands with wilderness characteristics as described in Alternative A above would be open to salable minerals: one sand and gravel site at Horsethief Point, and three sand and gravel sites and one building stone area in Behind the Rocks non-WSA areas with

BLM_0010313

wilderness characteristics. Where development would occur, the same impacts as described in alternative A would ensue.

### 4.3.8.2.5.5 Locatable Minerals

<u>All Alternatives</u>

There are eight non-WSA lands with wilderness characteristics areas that are located within moderate potential areas for uranium and vanadium: Arches Adjacent, Beaver Creek, Behind the Rocks, Goldbar, Gooseneck, Horsethief Canyon, Labyrinth Canyon, and Yellow Bird. Most of the uranium/vanadium development is expected to occur within the historic mining areas with high development potential, which are outside of the non-WSA lands with wilderness characteristics. However, if new mining development does occur within these areas, direct loss of wilderness characteristics would be unavoidable due to major surface-disturbing activities. Although Behind the Rocks non-WSA lands would be within an ACEC under Alternative B and the Proposed Plan, and thus would provide for some mitigative actions, surface disturbance from mining would still occur.

Existing mining claims currently overlay Floy Canyon, Goldbar, Dome Plateau, Beaver Creek, Hatch/Lockhart, and Hatch Wash. To date, there has been no activity associated with the claims within the non-WSA areas. New mining claims are filed continually, however, and changes could occur that would impact lands with wilderness characteristics by denuding the naturalness, and creating loss of primitive recreation activities and solitude for those areas where new mining activities may occur.

### 4.3.8.2.6 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

There are 32 areas (outside of existing wilderness study areas [WSAs]) totaling 266,485 acres, that were found to have wilderness characteristics. See Tables 3.16 and 3.17 for a list of non-WSA areas with wilderness characteristics by name and acreage.

### 4.3.8.2.6.1 Alternatives A and D

Under these alternatives, there are no specific actions prescribed to directly protect or enhance the naturalness and opportunities for solitude or primitive recreation of the non-WSA areas. Thus, numerous allocations and uses could detract from the natural character or opportunities for solitude or primitive recreation of the non-WSA areas.

### 4.3.8.2.6.2 Alternative B

Under Alternative B, all non-WSA lands with wilderness characteristics would be managed with the following prescriptions:

- Visual resource management (VRM) Class II objectives.
- Limited to Designated Road and Trails for off-highway vehicle (OHV) use.
- Closed to oil and gas leasing.
- Closed to disposal of mineral materials.
- Retain public lands in Federal ownership.

BLM_0010314

- Rights-of-way exclusion area.
- Closed to commercial and personal-use wood cutting
- Closed to new road construction.

This prescription would prevent road construction and surface disturbances that would degrade the natural character of the non-WSA areas, prevent surface disturbances and uses that would be incompatible with primitive recreation activities, and protect the setting needed to support the experience of solitude. This management prescription would protect the natural character of all of the non-WSA lands, and the opportunities for solitude or primitive recreation that exist within these areas.

### 4.3.8.2.6.3 Proposed Plan

There are 47,761 acres within Beaver Creek (25,722 acres), Fisher Towers (5,540 acres), and Mary Jane Canyon (16,499 acres) non-WSA lands with wilderness characteristics that would be managed to protect their wilderness characteristics through the following prescriptions:

- Visual resource management (VRM) Class II objectives.
- Limited to Designated Road and Trails for off-highway vehicle (OHV) use.
- Closed or No Surface Occupancy stipulation for oil and gas leasing.
- Closed to disposal of mineral materials.
- Retain public lands in Federal ownership.
- Rights-of-way avoidance area.
- Closed to commercial and personal-use wood cutting
- Closed to new road construction.

This prescription, although not as restrictive as Alternative B, would still prevent new road construction and surface disturbances that would degrade the natural character of the non-WSA areas, prevent surface disturbances and uses that would be incompatible with primitive recreation activities, and protect the setting needed to support the experience of solitude. This management prescription would protect the natural character of all of the non-WSA lands, and the opportunities for solitude or primitive recreation that exist within these areas.

For the other 218,724 acres of non-WSA lands with wilderness characteristics, there are no specific actions prescribed to directly protect or enhance the naturalness and opportunities for solitude or primitive recreation of the non-WSA areas. Thus, numerous allocations and uses could detract from the natural character or opportunities for solitude or primitive recreation of the non-WSA areas.

In summary, Alternatives A, and D prescribe no specific management prescriptions would protect the naturalness or opportunities for solitude or primitive recreation of non-WSA lands. Alternative B however, would prescribe a management scheme that would protect the naturalness and opportunities for solitude or primitive recreation of all of the non-WSA lands (266,485 acres). The Proposed Plan would manage three areas (47,761 acres) to protect their wilderness characteristics to protect naturalness and opportunities for solitude and primitive recreation in those areas.

BLM_0010315

### 4.3.8.2.7 IMPACTS OF PALEONTOLOGY DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

#### 4.3.8.2.7.1 Alternative A

Petrified wood gathering in Gooseneck, Goldbar, Dome Plateau, Mary Jane Canyon and Fisher Towers non-WSA lands with wilderness characteristics would continue to be allowed along the Colorado Riverway Special Recreation management areas, including commercial sales of this resource. This could impact the wilderness characteristics values by detracting from naturalness due to surface disturbance and affecting primitive recreational opportunities and solitude from commercial activities.

#### 4.3.8.2.7.2 Alternatives B, D, and the Proposed Plan

Petrified wood gathering and in Gooseneck, Goldbar, Dome Plateau, Mary Jane Canyon and Fisher Towers, would be prohibited within the Colorado Riverway Special Recreation Management Area to protect resources for future public enjoyment. In addition commercial sales of petrified wood would not be permitted. These decisions would maintain the wilderness characteristics of the areas. Like cultural resources, knowing more about the paleontological resources of the area, interpreting the resource in an appropriate fashion, and viewing fossil sites in the non-WSA lands with wilderness characteristics would add to the enjoyment of these areas for primitive recreational purposes. And protection of fossils adds to the character of the setting that supports these recreational opportunities.

### 4.3.8.2.8 EFFECTS OF RECREATION DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

The MFO does not prescribe specific allocation and use decisions for other resources in designated SRMAs. Each alternative designates SRMAs based on different types of recreational uses and opportunities in concert with other goals and objectives for those alternatives.

#### 4.3.8.2.8.1 Alternative A

Two designated SRMAs overlay all or portions of six non-WSA lands with wilderness characteristics. All other non-WSA lands would be managed as an Extensive Recreation Management Area (ERMA)

All of Hatch Wash, Harts Point, and Hatch/Lockhart non-WSA lands with wilderness characteristics lie within the Canyon Rims SRMA. Although the SRMA is much larger than those three areas, the primary objectives for management of these scenic and remote lands is in accordance with the MFO's Recreation Opportunity Spectrum (ROS) inventory. Both the Hatch Wash and Hatch/Lockhart areas were inventoried as semi-primitive non-motorized areas primarily for hiking and backpacking opportunities within the canyons. Harts Point non-WSA wilderness characteristics area was inventoried as a roaded natural area for the opportunity of auto touring on primary roads and visiting scenic overlooks into the Colorado River canyon and Canyonlands National Park. The SRMA opportunities would protect the natural landscape and opportunities for solitude and primitive forms of recreation in all three areas, however, motorized vehicle use of designated routes in the Harts Point area would temporarily disrupt opportunities for solitude and conflict with primitive forms of recreation.

BLM_0010316

The Colorado River SRMA envelopes a portion of the Dome Plateau and Westwater Canyon non-WSA areas for a 1/2 mile on either side of the Colorado River, and a portion of the Beaver Creek non-WSA area along the Dolores River. The purpose of this SRMA is to focus on boating and river rafting opportunities and to preserve these areas for non-motorized primitive recreation opportunities. The SRMA recreational management focus would protect the natural landscape and opportunities for solitude and primitive forms of recreation in all three areas.

None of the other 26 non-WSA lands with wilderness characteristics are within SRMAs under this alternative, therefore, there would be no recreational management objectives or focus within those areas. Because these lands are not within a managed SRMA with specific recreation objectives, they would be vulnerable to surface-disturbing uses including commercial permitting activities, special recreation permits, new road construction, and other activities that could impact the natural values and primitive recreational opportunities and solitude that currently exist in those areas.

### 4.3.8.2.8.2 Alternative B

All portions of 21 non-WSA lands with wilderness characteristics, and portions of seven others would be within eight designated SRMAs. Only four non-WSA land areas (Lost Spring, Granite Creek, Big Triangle, and Yellow Bird) would not be within a designated SRMA for focused recreation management.

The Bookcliffs SRMA includes all of Hideout Canyon, Mexico Point, Hells Hole and portions of Desolation Canyon (90%), Floy Canyon (45%), and Coal Canyon (5%). This SRMA would be managed as an undeveloped SRMA for non-mechanized recreation use, including hiking and backpacking, among others. No motorized permits would be authorized. The primitive recreation setting of this large SRMA would enhance and preserve the non-WSA lands with wilderness characteristics.

The Canyon Rims SRMA incorporates all of Hatch Wash, Harts Point, and Hatch/Lockhart non-WSA areas. A focus area for non-mechanized recreation lies in Hatch Wash, which prioritizes this area for hiking and backpacking opportunities. Designated motorized routes to scenic vistas are near the Harts Point non-WSA area. The recreational management within this SRMA would maintain and preserve the wilderness characteristics in these three non-WSA areas.

The Colorado Riverway SRMA includes all of Fisher Towers, Shafer Canyon, and portions of Dome Plateau (60%), Negro Bill (50%), and Mary Jane Canyon (90%). The main recreational emphasis in this SRMA would be to manage camping, boating, river access, trails, among others things, to protect the outstanding resource values of the area. Approximately half of the lands in Fisher Towers and 80% of the lands in Mary Jane Canyon would be non-motorized recreation focus areas. The priorities within these areas would be for hiking, climbing, and equestrian use. All of Negro Bill Canyon would be within a hiking and ecological study focus area and would be restricted to day use only. Managed recreation in these non-WSA lands with wilderness characteristics would help maintain and protect the natural character of the areas and provide for solitude and primitive recreation opportunities.

The Dolores River Canyons SRMA envelops all of the Beaver Creek non-WSA lands with wilderness characteristics. It would be managed as an undeveloped SRMA with focus on non-motorized boating, day hiking, and backpacking. Its remote setting would continue to protect and enhance wilderness characteristics values.

BLM_0010317

The Labyrinth Rims/Gemini Bridges SRMA includes all of Labyrinth Canyon, Goldbar, Horsethief, and Dead Horse Cliffs non-WSA lands with wilderness characteristics, and portions of Arches Adjacent non-WSA lands (25%). The major recreational management attention needed within this large area centers on river permitting, hiking and backpacking, camping, and motorized activities. Most of Goldbar non-WSA area would be a focus area for hiking to enjoy the scenic values of the area. Areas along the Green River (within the Labyrinth Canyon non-WSA area) would be a designated focus area for canoeing. The Labyrinth Canyon non-WSA area would also include a recreational focus area for hiking within Spring Canyon. All of these activities would help promote and maintain the wilderness characteristics values in these areas. Within the portion of Arches Adjacent non-WSA land with wilderness characteristics are two focus areas for mountain bike use. Although not a motorized use, mountain biking in those areas may detract from, and be in conflict with, solitude and a primitive recreation experience.

The Sand Flats SRMA incorporates the southern portion of Negro Bill Canyon non-WSA lands with wilderness characteristics (50%). Within this area, the Moab Slickrock Bike Trail would be closed to all motorized use which would enhance the experience of solitude. Mountain bikes would still be prevalent in the area which may detract from, and be in conflict with, a primitive recreation experience.

The South Moab SRMA incorporates all of the Mill Creek Canyon and Behind the Rocks non-WSA lands with wilderness characteristics. The recreation objective for these lands within the SRMA is to create a focus area for primitive hiking experiences. The recreational management within this SRMA would maintain and preserve the wilderness characteristics in these three non-WSA areas.

The Two Rivers SRMA includes a portion of the Westwater Canyon non-WSA lands with wilderness characteristics along the Colorado River (10%). The overall goal of this SRMA is to provide high quality opportunities for recreational boating and camping, and to protect the outstanding resource values. In the portion overlying the Westwater Canyon non-WSA area, the emphasis is for hiking and whitewater boating in a very primitive and remote setting. Managed recreation in these non-WSA lands with wilderness characteristics would preserve the natural character of the areas and provide for solitude and outstanding primitive recreation opportunities.

Those non-WSA lands with wilderness characteristics that are not within an SRMA would be managed under an ERMA for recreational objectives. Because all of the non-WSA lands with wilderness characteristics are protected by restrictive management prescriptions under this alternative, all of the wilderness characteristics values would continue to be preserved under this alternative, whether or not they are in an SRMA.

### 4.3.8.2.8.3 Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage includes the entire Beaver Creek area (25,722 acres) and portions of Mary Jane (16,499 acres) and Fisher Towers (5,540 acres) areas. Under this management, these lands would be managed with a no surface occupancy stipulation. There would be no other surface-disturbing activities allowed within this acreage, including no new road building or construction. Primitive and unconfined recreation would be emphasized. Beaver Creek is wholly contained within the Dolores River Canyons SRMA, which is an

BLM_0010318

Undeveloped SRMA. The Mary Jane and Fisher Towers' acreage within lands to be managed to protect, preserve and maintain their wilderness characteristics are wholly within the Colorado Riverway SRMA. In addition, the Mary Jane and Fisher Towers acreage is wholly within the Richardson Amphitheater Focus Area, which emphasizes hiking, climbing and equestrian use.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

All portions of 16 non-WSA lands with wilderness characteristics, and portions of five others would be within seven designated SRMAs. Ten non-WSA land areas (Floy Canyon, Coal Canyon, Hideout Canyon, Desolation Canyon, Mexico Point, Hideout Canyon, Lost Spring, Granite Creek, Big Triangle, and Yellow Bird) would not be wholly or partially within a designated SRMA for focused recreation management.

The analysis of SRMAs and their impacts on non-WSA lands with wilderness characteristics would generally be the same as in Alternative B with the following changes:

- The Bookcliffs SRMA, which includes all of Hideout Canyon, Mexico Point, Hell's Hole and portions of Desolation Canyon, Floy Canyon, and Coal Canyon, would not be designated an SRMA. It would be managed under an Extensive Recreation Management Area.
- Only about 60% of the Fisher Towers non-WSA lands with wilderness characteristics would be incorporated into the Colorado Riverway SRMA. The remaining portion of the area would be managed under an Extensive Recreation Management Area.

All of the remaining non-WSA lands with wilderness characteristics that are not within SRMAs under this alternative would be managed under an ERMA, with no specific recreational management focus within those areas. Although the Bookcliffs SRMA would not be designated under this alternative, specific management for the ERMA would be the same as for the SRMA (non-mechanized recreation, especially equestrian use, hiking, backpacking and hunting. New constructed routes would not be allowed, and commercial motorized permits would not be issued, and competitive events would not be allowed). Thus, the impacts of maintaining this area under an ERMA would be the same as for an SRMA for wilderness characteristics values.

The other lands that are not within a managed SRMA with specific recreation objectives would be vulnerable to surface-disturbing uses, including commercial permitting activities, special recreation permitting, new road construction, and other activities that could impact the natural values and primitive recreational opportunities and solitude that currently exist in those areas.

## 4.3.8.2.8.4 Alternative D

All of five and portions of five more non-WSA lands with wilderness characteristics would be within four designated SRMAs. All other non-WSA lands with wilderness characteristics would be managed under an ERMA.

The Canyon Rims SRMA and Sand Flats SRMA would remain the same as in Alternative B and C. For those non-WSA lands with wilderness characteristics that remain with SRMAs under this alternative, the impacts of their designation on non-WSA lands with wilderness characteristics would be the same as in Alternative B. The following differences from Alternative B would be in place:

BLM_0010319

- The Bookcliffs SRMA, which includes all of Hideout Canyon, Mexico Point, Hell's Hole and portions of Desolation Canyon, Floy Canyon, and Coal Canyon, would not be designated an SRMA.
- Only about 55% of the Fisher Towers non-WSA lands with wilderness characteristics would be incorporated into the Colorado Riverway SRMA.
- The Dolores River Canyons SRMA would not be designated an SRMA. A narrow portion along the Dolores River with the Beaver Creek non-WSA lands with wilderness characteristics would be incorporated into the Two River SRMA.
- The Labyrinth Rims/Gemini Bridges SRMA, which includes all of Labyrinth Canyon, Goldbar, Horsethief, and Dead Horse Cliffs non-WSA lands with wilderness characteristics, and portions of Arches Adjacent non-WSA lands would not be designated an SRMA.
- The South Moab SRMA, which incorporates all of the Mill Creek Canyon and Behind the Rocks non-WSA lands with wilderness characteristics would not be designated an SRMA.
- The Two Rivers SRMA would include the Dolores River within the Beaver Creek non-WSA lands with wilderness characteristics, as well as the portion of the Westwater Canyon non-WSA lands with wilderness characteristics along the Colorado River.

All of the remaining non-WSA lands with wilderness characteristics that are not within SRMAs under this alternative would be managed under an ERMA, with no specific recreational management focus within those areas. Although the Bookcliffs SRMA would not be designated under this alternative, specific management for the ERMA would be the same as for the SRMA (non-mechanized recreation, especially equestrian use, hiking, backpacking and hunting. New constructed routes would not be allowed, and commercial motorized permits would not be issued, and competitive events would not be allowed). Thus, the impacts of maintaining this area under an ERMA would be the same as for an SRMA for wilderness characteristics values.

For the other lands that are not within a managed SRMA with specific recreation objectives, they would be managed as an ERMA and be vulnerable to surface-disturbing uses, including special recreation permitting, commercial permitting activities, new road construction, and other activities that could impact the natural values and primitive recreational opportunities and solitude that currently exist in those areas.

### 4.3.8.2.9 IMPACTS OF RIPARIAN DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

### 4.3.8.2.9.1 Common to All Alternatives

All non-WSA lands with wilderness characteristics contain riparian ecosystems, except for the Hatch/Lockhart non-WSA area. The objective of riparian management is to manage riparian areas for properly functioning condition and to avoid or minimize loss or degradation of riparian, wetland and associated floodplains so as to preserve and enhance natural and beneficial values and provide for fish, wildlife, and special status species habitats. Decisions to implement any of these objectives would improve the natural vegetation condition of non-WSA lands with wilderness characteristics, and thus its natural values. Improved riparian and wetland condition would enhance wildlife habitat, and thus, the natural values of non-WSA lands. Further, improved wildlife habitat would lead to increases in riparian obligate wildlife species populations and opportunities for wildlife viewing. And, improved riparian and wetland

BLM_0010320

condition would improve the setting for other primitive recreational opportunities, including hiking, camping, and nature study.

### 4.3.8.2.9.2 Alternative A

Under the No Action alternative, there are no specific decisions to prevent surface-disturbing activities within 100-year floodplains or riparian areas or springs. In addition, lands with these scarce resources would also be available for disposal. Allowing surface-disturbing activities within non-WSA lands with wilderness characteristics would degrade the wilderness characteristics values, especially that of naturalness. Depending on the extent of activity in riparian areas, the primitive recreation experience could also be diminished.

### 4.3.8.2.9.3 Alternatives B, D, and the Proposed Plan

Under these action alternatives, prohibiting surface-disturbing activities within active floodplains or within 100 meters of riparian areas or springs would help restore cottonwood, willow, and other riparian species along major riparian and wetland areas.

### *4.3.8.2.10 IMPACTS OF SOILS/WATERSHED DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS*

### 4.3.8.2.10.1 Alternative A

Under the No Action Alternative, there are no specific decisions to prevent surface-disturbing activities within 100-year floodplains or riparian areas or springs, nor are there slope restrictions for surface-disturbing activities, especially associated with oil and gas development. Because there are no restrictions on OHVs or construction of new routes in the Bookcliffs area, sensitive saline soils would continue to be disturbed. This would impact the natural character of the Floy and Coal Canyons non-WSA lands with wilderness characteristics. Depending on the level of development or disturbance in these areas, solitude and primitive recreation opportunities could by foregone.

### 4.3.8.2.10.2 Common to All Action Alternatives (B, D, and the Proposed Plan)

Decisions under these alternatives would prohibit surface-disturbing activities within 100 year floodplains, or within 100 meters of natural springs. They would also limit new OHV routes from being designated in saline soil areas, which include Floy and Coal Canyons. Applying these decisions would help maintain the natural values in these areas.

### 4.3.8.2.10.3 Alternative B and the Proposed Plan

The Mill Creek–Spanish Valley watershed would be closed to surface-disturbing activities to protect the aquifer for the Moab area. Protection of the watershed would preserve and enhance the natural character and opportunities for primitive forms of recreation present in the Mill Creek non-WSA area.

BLM_0010321

### 4.3.8.2.11 IMPACTS OF SPECIAL DESIGNATION DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

For the purposes of this section of the analysis, "Special Designations" include Areas of Critical Environmental Concern (ACECs) established under each alternative, rivers recommended eligible in Alternative A and suitable for inclusion in the National Wild and Scenic Rivers System under the three action alternatives, and wilderness study areas (WSAs) being managed to protect their wilderness characteristics under each alternative.

#### 4.3.8.2.11.1 Alternative A

Under the No Action alternative there would be no ACECs designated, therefore specific decisions that may protect the wilderness characteristics in non-WSA lands with those values would not be afforded through ACEC designation.

Under this alternative, seven of the 32 non-WSA land areas intersect with eligible wild and scenic river segments, totaling 43.66 miles in those seven areas. There are 7.7 miles of Beaver Creek, 12.15 miles of the Dolores River, 2.06 miles of Onion Creek, 7.1 miles of the Green River, 12.47 miles of Professor Creek, 3.09 miles of Mill Creek, 0.08 miles of Negro Bill Creek, and 0.08 miles of Cottonwood that would be managed to preserve their wild and scenic river eligibility. Protection of river values would prevent uses and surface disturbances that would detract from the natural character of the Beaver Creek, Fisher Towers, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Spruce Canyon non-WSA lands with wilderness characteristics within the 1/2 mile river corridor (1/4 mile on each side of the river segment). The presence and noise of motor boat use along the Green River in Labyrinth Canyon non-WSA lands would reduce opportunities for solitude and conflict with primitive recreation in these river segments. The impacts would last while motorized boats were present.

Because Alternative A does not propose specific management to protect non-WSA lands with wilderness characteristics, contiguous WSAs and National Park Service lands would not have expanded opportunities for solitude and primitive forms of recreation afforded to them.

#### 4.3.8.2.11.2 Alternative B

Of the 14 ACECs that would be designated under this alternative to protect a variety of relevant and important values, 9 ACECs would overlay non-WSA lands with wilderness characteristics. Those ACECs are Behind the Rocks, Bookcliffs, Canyon Rims, Colorado River Corridor, Cottonwood-Diamond Watershed, Highway 279/Shafer Basin/Long Canyon, Labyrinth Canyon, Mill Creek Canyon, and Ten Mile Wash. The management prescriptions for these ACECs would protect naturalness and opportunities for solitude and primitive recreation in all of the non-WSA lands.

Portions of the Behind the Rocks (1,460 acres) and Hunter Canyon (2,771 acres) non-WSA lands with wilderness characteristics lie within the 17,836-acre potential Behind the Rocks ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, closed to woodcutting, limited to designated routes for OHV use, preclude vegetation treatments, and managed by VRM Class I objectives (preserve the characteristic landscape). These prescriptions would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude

BLM_0010322

and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

Portions of Coal Canyon (6,854 acres), Desolation Canyon (8,970 acres), Floy Canyon (3,921 acres), Spruce Canyon (1,120 acres), and Mexico Point (23 acres) non-WSA lands with wilderness characteristics lie within the 304,252 acre potential Bookcliffs ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, closed to woodcutting, limited to designated routes for OHV use, and managed by VRM Class II objectives (retention of the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation

Almost all of Harts Point (1,465 acres) and Hatch/Lockhart (2,027 acres) non-WSA lands with wilderness characteristics lies within the 23,400 acres potential Canyon Rims ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, closed to woodcutting, limited to designated routes for OHV use, and managed by VRM Class II objectives (retention of the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation

Portions of Dome Plateau (9,598 acres), Fisher Towers (6,466 acres), Mary Jane Canyon (17,305 acres), and Negro Bill Canyon (9 acres) non-WSA lands with wilderness characteristics lie within the 50,483 acres potential Colorado River Corridor ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, closed to woodcutting, limited to designated routes for OHV use, preclude vegetation treatments, and managed by VRM Class I objectives (preserve the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

Portion of Flume Canyon (730 acres) and Spruce Canyon (960 acres) non-WSA lands with wilderness characteristics lie within the 35,830 acres potential Cottonwood Diamond Watershed ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, closed to OHV use at end of the Class B-road system, and managed by VRM Class II objectives (retention of the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation.

Portions of Dead Horse Cliffs, (784 acres), Goldbar (35 acres), and all of Gooseneck (843 acres) and Shafer Canyon (1,842 acres) non-WSA lands with wilderness characteristics lie within the 13,500 acre potential Highway 279/Shafer Basin/Long Canyon ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, limited to designated routes for OHV use, and managed by VRM Class I objectives (preserve the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and

BLM_0010323

protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation

Portions of Labyrinth Canyon (5,204 acres) and Horsethief Point (739 acres) non-WSA lands with wilderness characteristics lie within the 8,528 acre potential Labyrinth Canyon ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, limited to designated routes for OHV use, closed to firewood cutting, and managed by VRM Class I objectives (preserve the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

Portions of Mill Creek Canyon (2,335 acres) non-WSA lands with wilderness characteristics lie within the 13,501 acre potential Mill Creek Canyon ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, limited to designated routes for OHV use, closed to firewood cutting, and managed by VRM Class I objectives (preserve the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

A small portion of Labyrinth Canyon (232) non-WSA lands with wilderness characteristics lies within the 4,908 acre potential Ten Mile Wash ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, limited to designated routes for OHV use (no routes designated), and closed to firewood cutting. This prescription would prevent surface disturbances and preclude motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation.

Under this alternative, seven of the 32 non-WSA land areas intersect with suitable wild and scenic river segments, totaling 43.66 miles in those seven areas. There are 7.7 miles of Beaver Creek, 12.15 miles of the Dolores River, 2.06 miles of Onion Creek, 7.1 miles of the Green River, 12.47 miles of Professor Creek, 3.09 miles of Mill Creek, 0.08 miles of Negro Bill Creek, and 0.08 miles of Cottonwood that would be managed for wild and scenic river designation with segment classifications of "scenic," "recreational" and "wild" (see Table 2.1). Protection of river values (until Congress acts on BLM's recommendations) would prevent uses and surface disturbances that would detract from the natural character of the Beaver Creek, Fisher Towers, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Spruce Canyon non-WSA lands with wilderness characteristics within the 1/2 mile river corridor (1/4 mile on each side of the river segment). The presence and noise of motor boat use along the Green River in Labyrinth Canyon non-WSA lands would reduce opportunities for solitude and conflict with primitive recreation in these river segments. The impacts would last while motorized boats were present.

Managing the wilderness study areas (WSAs) under BLM's Interim Management Policy to protect their wilderness values would expand opportunities for solitude and primitive forms of recreation, found in the Behind the Rocks, Coal Canyon, Desolation Canyon, Floy Canyon,

BLM_0010324

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 129 of 293

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

Flume Canyon, Lost Spring Canyon, Mill Creek Canyon, Negro Bill Canyon, Spruce Canyon, and Westwater Canyon non-WSA lands with wilderness characteristics, to larger land areas, including both the WSAs and contiguous non-WSA lands with wilderness characteristics. In addition, Yellowbird, Lost Spring Canyon, Dome Plateau, and Arches Adjacent non-WSA lands with wilderness characteristics are contiguous with Arches National Park; and Dead Horse Cliffs, Shafer Canyon, Gooseneck, and Horsethief Point non-WSA lands with wilderness characteristics are contiguous with Canyonlands National Park. Similar to the WSAs, protecting the non-WSA lands with wilderness characteristics to preserve their wilderness values would enhance and expand the opportunities for solitude and primitive recreation.

### 4.3.8.2.11.3 Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage is located within the Beaver Creek, Mary Jane and Fisher Towers areas. None of the five ACECs that would be designated under the Proposed Plan overlap these three areas. The Dolores River, which is proposed for Wild and Scenic River designation in the Proposed Plan, lies partially within the Beaver Creek area.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Of the 5 ACECs that would be designated under this alternative to protect a variety of relevant and important values, all 5 ACECs would overlay some portions of non-WSA lands with wilderness characteristics. Those ACECs are Behind the Rocks, Cottonwood Diamond Watershed, Highway 279/Shafer Basin/Long Canyon, Mill Creek Canyon, and Ten Mile Wash. The non-WSA lands and their acreages that intersect with these five ACECs are the same as in Alternative B. Management prescriptions for the non-WSA lands with wilderness characteristics within the ACECs are slightly different, however, than in the Proposed Plan. This is because VRM Class II objectives (retention of the characteristic landscape) have been applied in most areas, and the non-WSA lands would have a no surface occupancy stipulation (NSO) for oil and gas leasing. The VRM Class II objectives and the NSO stipulation would preclude surface-disturbing activities, thereby protecting naturalness and opportunities for solitude and primitive recreation in all of the non-WSA lands.

Portions of the Behind the Rocks (1,460 acres) and Hunter Canyon (2,771 acres) non-WSA lands with wilderness characteristics lie within the 5,201-acre potential Behind the Rocks ACEC. These non-WSA lands with wilderness characteristics would have a no surface occupancy (NSO) stipulation for oil and gas leasing, closed to woodcutting, limited to designated routes for OHV use, preclude vegetation treatments, and managed by VRM Class II objectives (retention of the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation

Portion of Flume Canyon (730 acres) and Spruce Canyon (960 acres) non-WSA lands with wilderness characteristics lie within the 34,027 acre potential Cottonwood-Diamond Watershed ACEC. These non-WSA lands with wilderness characteristics would be NSO for oil and gas

BLM_0010325

leasing and closed to OHV use at end of the Class B-road system. This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation.

Portions of Dead Horse Cliffs, (784 acres), Goldbar Canyon (35 acres), and all of Gooseneck (843 acres) and Shafer Canyon (1,842 acres) non-WSA lands with wilderness characteristics lie within the 13,500 acre potential Highway 279/Shafer Basin/Long Canyon ACEC. These non-WSA lands with wilderness characteristics would be closed to oil and gas leasing, limited to designated routes for OHV use, and managed by VRM Class I and II objectives (preserve and retain the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

Portions of Mill Creek Canyon (2,335 acres) non-WSA lands with wilderness characteristics lie within the 3,721 acre potential Mill Creek Canyon ACEC. These non-WSA lands with wilderness characteristics would be NSO for oil and gas leasing, limited to designated routes for OHV use, closed to firewood cutting, and managed by VRM Class II objectives (retention of the characteristic landscape). This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

A small portion of Labyrinth Canyon (232) non-WSA lands with wilderness characteristics lies within the 4,980 acre potential Ten Mile Wash ACEC. These non-WSA lands with wilderness characteristics would be NSO for oil and gas leasing, limited to designated routes for OHV use, and closed to firewood cutting. This prescription would prevent surface disturbances and limit motorized uses and protect the natural character of the non-WSA lands with wilderness characteristics and opportunities for solitude and primitive recreation. The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation.

Under this alternative, three of the 32 non-WSA land areas intersect with suitable wild and scenic river segments, totaling 16.00 miles in those three areas. There are 6.1 miles of the Dolores River, 2.8 miles of Onion Creek, and 7.1 miles of the Green River that would be managed for wild and scenic river designation with segment classifications of "scenic," "recreational" and "wild" (see Table 2.1). Protection of river values (until Congress acts on BLM's recommendations) would prevent uses and surface disturbances that would detract from the natural character of the Beaver Creek, Labyrinth Canyon, and Mary Jane Canyon non-WSA lands with wilderness characteristics within the 1/2 mile river corridor (1/4 mile from the high water mark on each river bank) of the river segment. The presence and noise of motor boat use along the Green River in Labyrinth Canyon non-WSA lands would reduce opportunities for solitude and conflict with primitive recreation in these river segments. The impacts would last while motorized boats were present.

BLM_0010326

Because the Proposed Plan does not propose specific management to protect non-WSA lands with wilderness characteristics contiguous to any WSAs or National Park Service lands, there would not be expanded opportunities for solitude and primitive forms of recreation afforded to the WSAs or National Park lands.

### 4.3.8.2.11.4 Alternative D

Under Alternative D, no ACECs would be designated; therefore, management prescriptions to protect relevant and important values would not be applied and would not afford protection of wilderness values in non-WSA lands with wilderness characteristics.

Under this alternative, no wild and scenic river segments would be found suitable. Therefore, management prescriptions to protect the suitable river segments would not be applied and would not afford protection of wilderness values in non-WSA lands with wilderness characteristics.

Because Alternative D does not propose specific management to protect non-WSA lands with wilderness characteristics, contiguous WSAs and National Park Service lands would not have expanded opportunities for solitude and primitive forms of recreation afforded to them.

In summary, Alternative B would provide the most long-term protection to the naturalness and opportunities for solitude and primitive recreation of non-WSA lands with wilderness characteristics by designating the most acres as ACEC and by recommending the longest stretches of waterways for protection in the National Wild and Scenic Rivers System, followed by the Proposed Plan. The Proposed Plan would provide some protection of the naturalness and opportunities for solitude and primitive recreation of non-WSA lands and recommend fewer river segments for protection in the National /Wild and Scenic Rivers System. Both Alternative A and D would provide the lowest level of protection, as neither one would designate ACECs or recommend suitable river segments for protection (although Alternative A does protect the eligible river segments for later study.)

### 4.3.8.2.12 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Under all alternatives, management actions would focus on maintaining, protecting, and enhancing habitats for special status species. Decisions that could help protect non-WSA lands with wilderness characteristics include avoiding construction of new roads within listed and non-listed special status plant and animal species habitats. This would help to maintain the natural character of non-WSA lands with wilderness characteristics where they intersect with special status species habitat. Another common to all alternatives decision is to implement habitat manipulations where translocations and population augmentation of special status species would occur. Depending on the methods used, this could degrade the naturalness of the non-WSA lands. During the time the habitat manipulation is being conducted, the opportunity for solitude and primitive recreation would be disrupted. Under all alternatives, a decision to implement management strategies that restore degraded riparian communities could, in the short term, affect the naturalness of the non-WSA lands with wilderness characteristics. Improvement of riparian condition, however, would also improve wildlife habitat for these species, improving wildlife viewing opportunities and the primitive recreational values of the non-WSA lands. In addition, any Recovery Plan actions that require fencing would introduce an unnatural element of human effects to the landscape, slightly degrading the natural condition of the non-WSA lands.

BLM_0010327

Restrictions on surface-disturbing activities within the 100-year floodplain of the Colorado River for endangered fish would help protect the wilderness characteristics values in the Dome Plateau, Labyrinth Canyon, Beaver Creek, and Shafer Canyon non-WSA lands with wilderness characteristics by maintaining the natural character along the river corridor. In addition, surface-disturbing restrictions in suitable *Cycladenia humilis* var. *jonesii* habitat would protect the natural character of Mary Jane Canyon and Fisher Towers non-WSA lands with wilderness characteristics.

Specific management actions for oil and gas leasing in special status species habitat under all alternatives are related to timing stipulations and/or controlled surface use stipulations. These stipulations would not protect non-WSA lands with wilderness characteristics from surface disturbance associated with oil and gas activities, impacting naturalness and opportunities for solitude and primitive recreation.

### 4.3.8.2.13 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

### 4.3.8.2.13.1 OHV Travel Management

Table 4.64 portrays all of the non-WSA lands with wilderness characteristics and displays how the OHV management would be applied under each alternative.

**Table 4.64. OHV Management in Non-WSA Lands with Wilderness Characteristics**

| OHV Acres in Non-WSA Lands with Wilderness Characteristics by Alternative | | | Alternatives | | | |
|---|---|---|---|---|---|---|
| Name | Acres | OHV Category | A | B | PROPOSED PLAN* | D |
| Arches Adjacent | 6,396 | Open | 2,500 | 0 | 0 | 0 |
| | | Limited | 3,896 | 6,396 | 6,396 | 6,396 |
| Beaver Creek | 25,722 | Open | 21,366 | 0 | 0 | 0 |
| | | Limited | 4,356 | 25,722 | 25,722 | 25,722 |
| Behind the Rocks | 3,643 | Open | 5 | 0 | 0 | 0 |
| | | Limited | 3,638 | 3,643 | 3,643 | 3,643 |
| Big Triangle | 5,200 | Open | 5,200 | 0 | 0 | 0 |
| | | Limited | 0 | 5,200 | 5,200 | 5,200 |
| Coal Canyon | 21,632 | Open | 11,099 | 0 | 0 | 0 |
| | | Limited | 10,533 | 21,632 | 21,632 | 21,632 |
| Dead Horse Cliffs | 797 | Open | 25 | 0 | 0 | 0 |
| | | Limited | 772 | 797 | 797 | 797 |
| Desolation Canyon | 10,498 | Open | 10,380 | 0 | 0 | 0 |
| | | Limited | 118 | 10,498 | 10,498 | 10,498 |
| Dome Plateau | 14,207 | Open | 7,853 | 0 | 0 | 0 |
| | | Limited | 6,354 | 14,207 | 14,207 | 14,207 |
| Fisher Towers | 17,235 | Open | 9,550 | 0 | 0 | 0 |

BLM_0010328

Moab PRMP/FEIS

Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
4.3.8 Non-WSA Lands with Wilderness Characteristics

**Table 4.64. OHV Management in Non-WSA Lands with Wilderness Characteristics**

| Name | Acres | OHV Category | A | B | PROPOSED PLAN* | D |
|---|---|---|---|---|---|---|
| **OHV Acres in Non-WSA Lands with Wilderness Characteristics by Alternative** | | | **Alternatives** | | | |
| | | Limited | 7,685 | 17,235 | 17,235 | 17,235 |
| Floy Canyon | 9,983 | Open | 8,339 | 0 | 0 | 0 |
| | | Limited | 1,644 | 9,983 | 9,983 | 9,983 |
| Flume Canyon | 3,520 | Open | 3,520 | 0 | 0 | 0 |
| | | Limited | 0 | 3,520 | 3,520 | 3,520 |
| Goldbar | 6,437 | Limited | 6,437 | 6,437 | 6,437 | 6,437 |
| Gooseneck | 843 | Limited | 843 | 843 | 843 | 843 |
| Granite Creek | 4,528 | Open | 4,528 | 0 | 0 | 0 |
| | | Limited | 0 | 4,528 | 4,528 | 4,528 |
| Harts Point (MFO) | 1,465 | Limited | 1,465 | 1,465 | 1465 | 1465 |
| Hatch Wash | 10,983 | Limited | 10,983 | 10,983 | 10,983 | 10,983 |
| Hatch/Lockhart | 2,670 | Limited | 2,670 | 2,670 | 2,670 | 2,670 |
| Hells Hole | 2,538 | Open | 2,538 | 0 | 0 | 0 |
| | | Limited | 0 | 2,538 | 2,538 | 2,538 |
| Hideout Canyon | 11,607 | Open | 11,607 | 0 | 0 | 0 |
| | | Limited | 0 | 11,607 | 11,607 | 11,607 |
| Horsethief Point | 8,358 | Limited | 8,358 | 8,358 | 8,358 | 8,358 |
| Hunter Canyon | 4,465 | Limited | 4,465 | 4,465 | 4,465 | 4,465 |
| Labyrinth Canyon | 25,361 | Open | 2,798 | 0 | 0 | 0 |
| | | Limited | 22,653 | 25,361 | 25,361 | 25,361 |
| Lost Spring Canyon | 11,456 | Open | 11,456 | 0 | 0 | 0 |
| | | Limited | 0 | 11,456 | 11,456 | 11,456 |
| Mary Jane Canyon | 24,779 | Open | 8,046 | 0 | 0 | 0 |
| | | Limited | 16,733 | 24,779 | 24,779 | 24,779 |
| Mexico Point | 12,837 | Open | 12,837 | 0 | 0 | 0 |
| | | Limited | 0 | 12,837 | 12,837 | 12,837 |
| Mill Creek Canyon | 3,388 | Open | 402 | 0 | 0 | 0 |
| | | Limited | 2,986 | 3,388 | 3,388 | 3,388 |
| Negro Bill Canyon | 2,333 | Open | 1,363 | 0 | 0 | 0 |
| | | Limited | 970 | 2,333 | 2,333 | 2,333 |
| Shafer Canyon | 1,842 | Limited | 1,842 | 1,842 | 1,842 | 1,842 |
| Spruce Canyon | 1,131 | Open | 1,131 | 0 | 0 | 0 |
| | | Limited | 0 | 1,131 | 1,131 | 1,131 |
| Westwater | 3,086 | Open | 1,479 | 0 | 0 | 0 |

BLM_0010329

**Table 4.64. OHV Management in Non-WSA Lands with Wilderness Characteristics**

| OHV Acres in Non-WSA Lands with Wilderness Characteristics by Alternative | | | Alternatives | | | |
|---|---|---|---|---|---|---|
| Name | Acres | OHV Category | A | B | PROPOSED PLAN* | D |
| Canyon | | Limited | 1,607 | 3,086 | 3,086 | 3,086 |
| Westwater Creek | 7,188 | Open | 7,173 | 0 | 0 | 0 |
| | | Limited | 15 | 7,188 | 7,188 | 7,188 |
| Yellow Bird | 357 | Open | 331 | 0 | 0 | 0 |
| | | Limited | 26 | 357 | 357 | 357 |

*All 47,761 acres of lands to be managed to protect, preserve, and maintain their wilderness characteristics (25,72 acres in Beaver Creek; 5,540 acres in Fisher Towers and 16,499 acres in Mary Jane) are to be managed with travel limited to designated routes

## Alternative A

Under present management, cross-country motorized use is allowed for game retrieval and antler collection in areas open for motorized travel. The MFO also has the discretion to authorize cross-country travel for any commercial or organized group events. These actions would continue to degrade the natural character of the non-WSA lands with wilderness characteristics by allowing new surface-disturbing activity from motorized vehicles, as well as conflict with solitude and primitive recreation experiences from the sights and sounds of vehicle travel.

Current management practices designate 145,521 acres (55%) in twenty-three of the 32 non-WSA lands with wilderness characteristics as open to cross-country travel (see Table 4.64). Cross country motorized travel in these non-WSA lands would result in surface disturbance to soils and vegetation that would alter the landscape and diminish the natural character of these non-WSA lands. Further, the presence and noise of motorized vehicles would degrade a visitor's opportunity for solitude and conflict with opportunities for primitive and unconfined recreation activities.

Under this alternative, 120,964 acres within non-WSA lands with wilderness characteristics would be limited to OHV use. In these areas, 294.8 miles of routes would be designated in the following non-WSA lands:

Arches Adjacent – 0.52 miles

Beaver Creek – 18.75 miles

Behind the Rocks – 7.17 miles

Big Triangle – 0.64 miles

Coal Canyon – 7.26 miles

Desolation Canyon – 2.9 miles

Dome Plateau – 2.11 miles

Fisher Towers – 10.98 miles

Floy Canyon – 18.19 miles

Flume Canyon – 4.5 miles

Goldbar – 13.64 miles

Gooseneck – 0.66 miles

Granite Creek – 0.35 miles

Hatch Wash – 35.59 miles

Hideout Canyon – 2.99 miles

Horsethief Point – 1.27 miles

Hunter Canyon – 4.09 miles

Labyrinth Canyon – 60.26 miles

Lost Spring Canyon – 48.44 miles

BLM_0010330

| | |
|---|---|
| Mary Jane Canyon – 33.32 miles | Westwater Canyon – 3.83 miles |
| Mexico Point – 0.19 miles | Westwater Creek – 3.37 miles |
| Mill Creek Canyon – 7.99 miles | Yellow Bird – 0.27 miles |
| Negro Bill Canyon – 5.67 miles | |

Limiting OHV use would confine soil and vegetation disturbance caused by motor vehicles to existing routes, and result in no additional change to the natural character of the non-WSA lands. The presence and noise of vehicles using these routes, however, would reduce the opportunity of visitors to find solitude in the non-WSA areas, especially in proximity to the routes. Motorized uses would conflict with primitive and unconfined recreation opportunities sought in the non-WSA areas.

Currently, there are no routes within Dead Horse Cliffs, Harts Point, Hatch/Lockhart, or Shafer Canyon, non-WSA lands with wilderness characteristics. Because no routes would be designated in these areas, surface disturbance caused by motorized travel, and the resultant impacts to the natural character of the non-WSA areas, would not be evidenced. Further, because there would be no OHV use in these areas, the opportunities for solitude or conflict with primitive forms of recreation in these areas could not be reduced. The natural character and opportunities for solitude and primitive recreation of these non-WSA areas would be unaffected by OHV travel.

While Hells Hole and Spruce Canyon non-WSA lands currently have no routes within them, they remain open to cross country OHV travel and impacts to wilderness characteristics could occur if OHV users choose to engage in cross country use.

### Common to Alternatives B, D, and the Proposed Plan

Under all of the action alternatives, vehicles must stay on designated routes. Game retrieval and antler collection must be done on foot and vehicles cannot go off designated roads for such activities. The MFO would not authorize cross-country travel for any commercial or organized group events. All motorized routes that would not be designated as open would be signed as closed. These actions would continue to preserve the natural character of the non-WSA lands with wilderness characteristics because no new surface-disturbing activity would be allowed from motorized vehicles.

### Alternative B

Under this alternative, all non-WSA lands with wilderness characteristics would be limited to designated routes. In these areas, 117.3 miles of routes would be designated in the following non-WSA lands:

| | |
|---|---|
| Beaver Creek – 5.69 miles | Granite Creek – 0.13 miles |
| Behind the Rocks – 2.33 miles | Hatch Wash – 34.57 miles |
| Coal Canyon – 2.02 miles | Hideout Canyon – 2.58 miles |
| Desolation Canyon – 2.69 miles | Hunter Canyon – 2.29 miles |
| Fisher Towers – 4.3 miles | Labyrinth Canyon – 31.38 miles |
| Flume Canyon – 0.64 miles | Lost Spring Canyon – 6.51 miles |
| Goldbar – 5.39 miles | Mary Jane Canyon – 7.15 miles |
| Gooseneck – 0.66 miles | Mill Creek Canyon – 4.1 miles |

BLM_0010331

Moab PRMP/FEIS

Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
4.3.8 Non-WSA Lands with Wilderness Characteristics

Negro Bill Canyon – 1.65 miles                      Westwater Creek – 0.32 miles

Westwater Canyon – 2.91 miles

Limiting OHV use to designated routes would confine soil and vegetation disturbance caused by motor vehicles to existing routes, and result in no additional change to the natural character of the non-WSA lands. The presence and noise of vehicles using these routes, however, would reduce the opportunity of visitors to find solitude in the non-WSA areas, especially in proximity to the routes. And, motorized uses would conflict with primitive and unconfined recreation opportunities sought in the non-WSA areas. The most notable areas where there would be a significant decrease in miles of routes would be in Labyrinth Canyon, Lost Spring Canyon, and Mary Jane Canyon. In addition, six areas that would have designated routes in Alternative A would have none in Alternative B.

There would be no routes designated in Arches Adjacent, Big Triangle, Dead Horse Cliffs, Dome Plateau, Floy Canyon, Harts Point, Hatch/Lockhart, Hells Hole, Horsethief Point, Mexico Point, Shafer Canyon, Spruce Canyon, or Yellow Bird non-WSA lands with wilderness characteristics. Because no routes would be designated in these areas, surface disturbance caused by motorized travel, and the resultant impacts to the natural character of the non-WSA areas, would not be evidenced. Further, because there would be no OHV use in these areas, the opportunities for solitude or conflict with primitive forms of recreation in these areas could not be reduced. The natural character and opportunities for solitude and primitive recreation of these non-WSA areas would be unaffected by OHV travel.

Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage is located within the Beaver Creek, Mary Jane and Fisher Towers areas. Travel is limited to designated roads within these areas. No new routes would be constructed, eliminating surface disturbance from road building activity. There are 8.36 miles of route designated within the 47,761 acres of non-WSA lands managed to protect, preserve, and maintain their wilderness characteristics. Of these miles of designated route, there are 0 miles in Fisher Towers, 0.2 miles in Mary Jane and 8.16 miles in Beaver Creek.

Thus, there would be no impacts from Travel Management decisions in Fisher Towers as no routes would be designated. Impacts from Travel Management decisions in Mary Jane would be minimized because only 0.2 miles of route have been designated and 11 miles of route have not been designated. The 8.16 miles of route remaining in Beaver Creek (reduced form 12.45 miles), minimizes the impact from Travel Management decisions to Wilderness Characteristics. Beaver Creek is a remote area and travel on the designated route would be minimal. Opportunities for solitude and primitive recreation would be preserved.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Under this alternative, and as in Alternative B, all non-WSA lands with wilderness characteristics would be limited to designated routes. In these areas, 158.54 miles of routes would be designated in the following non-WSA lands:

BLM_0010332

| | |
|---|---|
| Behind the Rocks – 5.18 miles | Hideout Canyon – 2.58 miles |
| Coal Canyon – 3.04 miles | Hunter Canyon – 3.7 miles |
| Desolation Canyon – 2.9 miles | Labyrinth Canyon – 39.18 miles |
| Fisher Towers (not managed as wilderness characteristics) – 4.3 miles | Lost Spring Canyon – 12.99 miles |
| Floy Canyon – 3.7 miles | Mary Jane Canyon (not managed as wilderness characteristics) – 10.02 miles |
| Flume Canyon – 0.64 miles | Mill Creek Canyon – 5.7 miles |
| Goldbar – 9.54 miles | Negro Bill Canyon – 1.9 miles |
| Gooseneck – 0.66 miles | Westwater Canyon – 2.91 miles |
| Granite Creek – 0.13 miles | Westwater Creek – 2.0 miles |
| Hatch Wash – 34.91 miles | |

Limiting OHV use to designated routes would confine soil and vegetation disturbance caused by motor vehicles to existing routes, and result in no additional change to the natural character of the non-WSA lands. The presence and noise of vehicles using these routes, however, would reduce the opportunity of visitors to find solitude in the non-WSA areas, especially in proximity to the routes. And, motorized uses would conflict with primitive and unconfined recreation opportunities sought in the non-WSA areas. The most notable areas where there would be a significant decrease in miles of routes would be in Labyrinth Canyon, Lost Spring Canyon, and Mary Jane Canyon. In addition, five areas that would have designated routes in Alternative A would have none in the Proposed Plan.

There would be no routes designated in Arches Adjacent, Big Triangle, Dead Horse Cliffs, Dome Plateau, Harts Point, Hatch/Lockhart, Hells Hole, Horsethief Point, Mexico Point, Shafer Canyon, Spruce Canyon, or Yellow Bird non-WSA lands with wilderness characteristics. Because no routes would be designated in these areas, surface disturbance caused by motorized travel, and the resultant impacts to the natural character of the non-WSA areas, would not be evidenced. Further, because there would be no OHV use in these areas, the opportunities for solitude or conflict with primitive forms of recreation in these areas could not be reduced. The natural character and opportunities for solitude and primitive recreation of these non-WSA areas would be unaffected by OHV travel.

<u>Alternative D</u>

Under this alternative, and as in Alternative B and the Proposed Plan, all non-WSA lands with wilderness characteristics would be limited to designated routes. In these areas, 169 miles of routes would be designated in the following non-WSA lands:

| | |
|---|---|
| Beaver Creek – 12.45 miles | Gooseneck – 0.66 miles |
| Behind the Rocks – 6.79 miles | Granite Creek – 0.13 miles |
| Coal Canyon – 3.42 miles | Hatch Wash – 35.39 miles |
| Desolation Canyon – 2.9 miles | Hideout Canyon – 2.58 miles |
| Fisher Towers – 4.3 miles | Hunter Canyon – 3.96 miles |
| Floy Canyon – 3.7 miles | Labyrinth Canyon – 40.84 miles |
| Flume Canyon – 0.64 miles | Lost Spring Canyon – 14.09 miles |
| Goldbar – 9.54 miles | Mary Jane Canyon – 11.81 miles |

BLM_0010333

Mill Creek Canyon – 7.57 miles                    Westwater Canyon – 3.71 miles

Negro Bill Canyon – 2.55 miles                    Westwater Creek – 2.0 miles

Limiting OHV use to designated routes would confine soil and vegetation disturbance caused by motor vehicles to existing routes, and result in no additional change to the natural character of the non-WSA lands. The presence and noise of vehicles using these routes, however, would reduce the opportunity of visitors to find solitude in the non-WSA areas, especially in proximity to the routes. And, motorized uses would conflict with primitive and unconfined recreation opportunities sought in the non-WSA areas. The most notable areas where there would be a significant decrease in miles of routes would be in Labyrinth Canyon, Lost Spring Canyon, and Mary Jane Canyon. In addition, five areas that would have designated routes in Alternative A would have none in Alternative D.

There would be no routes designated in Arches Adjacent, Big Triangle, Dead Horse Cliffs, Dome Plateau, Harts Point, Hatch/Lockhart, Hells Hole, Horsethief Point, Mexico Point, Shafer Canyon, Spruce Canyon, or Yellow Bird non-WSA lands with wilderness characteristics. Because no routes would be designated in these areas, surface disturbance caused by motorized travel, and the resultant impacts to the natural character of the non-WSA areas, would not be evidenced. Further, because there would be no OHV use in these areas, the opportunities for solitude or conflict with primitive forms of recreation in these areas could not be reduced. The natural character and opportunities for solitude and primitive recreation of these non-WSA areas would be unaffected by OHV travel.

In summary, Alternative A would continue to allow cross country travel in some of the non-WSA lands with wilderness characteristics and also would designate the most miles of routes within the non-WSA areas. Alternative A would manage 6 areas without designated routes. Alternative B would limit travel to designated routes and reduce the number of miles of routes in these areas by 178 miles, or over 60%, from Alternative A. In addition, Alternative B would manage 13 non WSA areas without designated routes within them. The Proposed Plan would limit travel to 158.5 miles designated routes, adding 41.2 miles of routes over Alternative B into a mix of the non-WSA lands with wilderness characteristics. The Proposed Plan would manage 12 non-WSA areas without any designated routes within them. And finally, Alternative D would limit travel to 169 miles of routes, adding nearly 52 miles of routes into the mix from Alternative B. The same areas that had no designated routes in the Proposed Plan would hold for Alternative D. The highest level of protection of wilderness characteristics values from OHV impacts would be under Alternative B, then the Proposed Plan, then D, and last of all Alternative A.

## 4.3.8.2.13.2 Mechanized Recreational Travel (Mountain Bikes)

<u>Alternative A</u>

Areas currently open to motorized cross-country travel would continue to be open for cross-country mountain bike use. In non-WSA lands with wilderness characteristics, this would be the same as described under Alternative A under the OHV Travel Management section above. Any new development of trails for mountain bikes in non-WSA areas would be in conflict with the primitive forms of trail use. If there were substantial levels of use on the trails (by foot, horse, and/or bike) in the non-WSA lands, the visitor's ability to find and experience solitude would be reduced. Construction of new trails would create surface disturbance that would detract from the

BLM_0010334

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 139 of 293

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

natural character of the landscape and non-WSA lands, depending on the type of landform and vegetation cover. The change to the natural landscape, however, is expected to be minimal.

<u>Common to Alternatives B, D, and the Proposed Plan</u>

Under the action alternatives, mountain bikes would only be allowed on routes open for motorized use for resource protection purposes. Some routes would only be designated for non-motorized use only. Two of these non-motorized routes identified specifically for mountain bike use would be the "Baby-Steps" trail in Arches Adjacent non-WSA area and the Hunter Canyon Rim trail in the Behind the Rocks non-WSA land with wilderness characteristics. If there were substantial levels of use on the trails (by foot, horse, and/or bike) in the non-WSA lands, the visitor's ability to find and experience solitude would be reduced. The change to the natural landscape, however, is expected to be minimal.

Under all of the alternatives are varying miles of projected mountain-bike routes that would be designated. Because they would generally be on already existing inventoried routes that would not be designated for motorized use, impacts to naturalness would be negligible on the non-WSA lands with wilderness characteristics. Where mountain bike trails are designated within non-WSA areas, however, substantial levels of use on the trails (by foot, horse, and/or bike), would reduce the visitor's ability to find and experience solitude and primitive recreation.

### 4.3.8.2.13.3 Non-Mechanized Recreational Travel (Hiking, Backpacking and Equestrian)

<u>Alternative A</u>

Although numerous trails exist in non-WSA lands with wilderness characteristics, there would be no specific plans to design, implement, sign, or manage a non-mechanized trail system. Because these forms of recreation are complementary to the wilderness characteristic values of non-WSA lands, and can help focus the primitive recreational user, some opportunities to improve the recreational experience may be foregone.

<u>Alternatives B, D, and the Proposed Plan</u>

Under all of the action alternatives, the Amphitheater Loop and Fisher Towers Trails, both in the Fisher Towers non-WSA lands with wilderness characteristics, and the Corona Arch Trail in the Goldbar non-WSA area would be managed for non-mechanized travel. In addition, there are varying miles of existing trails that would be specifically managed for hiking and other non-mechanized recreation opportunities under each of the action alternatives. All of them would convert existing inventoried routes to non-mechanized travel. Impacts to naturalness would be negligible on the non-WSA lands with wilderness characteristics. Managing additional trails for hiking and horseback riding would provide further opportunities for primitive forms of recreation where the trails would be located in any of the non-WSA lands with wilderness characteristics. Under all three action alternatives, the Castleton trail in Mary Jane Canyon non-WSA area, and the Culvert-Goldbar loop trail in Goldbar non-WSA area would be marked and managed for hiking, and a new hiking trail would be signed and managed from Onion Creek to the Amphitheater Loop in the Fisher Towers non-WSA area. Any additional managed trails would be specified at the activity-level stage of planning following completion of the RMP.

BLM_0010335

### 4.3.8.2.14 IMPACTS OF VEGETATION DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Under all alternatives, control of noxious weeds would have both positive and negative impacts on the wilderness characteristics of non-WSA lands, depending on the method of control. The use of fire, chemical, and biological treatments would control noxious weeds and insects with no apparent evidence of human intervention on the landscape. Thus there would be no noticeable effect on the natural character of the non-WSA lands with wilderness characteristics, if those treatments were necessary in the non-WSA areas that have wilderness characteristics. Control of non-native vegetation, and restoration of native vegetation communities, however, would result in a more natural vegetation community and thus, natural condition of the non-WSA areas. The use of mechanical treatments to eradicate non-native vegetation and would leave a noticeable imprint of human work on the landscape, and degrade the natural character of non-WSA lands, if the treatments were to occur in the non-WSA areas. Depending on the vegetation community treated (grassland and shrubland versus a woodland or coniferous forest), the length of time the evidence of mechanical treatments remained on the landscape would vary before the surface and vegetation disturbances returned to a more natural or unmodified condition.

Reclaiming or restoration of up to 257,809 acres of sagebrush-steppe habitat would have the same impact on the natural character of the non-WSA lands as described above. Depending on the treatment method used, the effects on naturalness would be of little effect and beneficial to the natural condition of the non-WSA lands or an apparent evidence of human intervention on the land, and longer-lasting.

### 4.3.8.2.15 IMPACTS OF VISUAL RESOURCE MANAGEMENT DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

There are four objectives for visual resources management (VRM Classes I through IV) that provide for various levels of landscape protection and change. The objective of Class I is to preserve the characteristic landscape, while the objective of Class IV provides for landscape modifications (see Section 3.19, Visual Resources). The only lands identified under all alternatives to be designated VRM Class I are lands within WSAs. VRM Class II objectives would retain the characteristic landscape, allowing for minor changes to the landform and vegetation. This objective would protect the natural condition of the land in non-WSA areas. The objective of VRM Class III is to partially retain the existing character of the landscape, allowing for moderate changes to land and vegetation. This objective is not compatible with preserving the natural character of non-WSA lands. Class IV objectives provide for major modification of the landscape and are clearly incompatible with preservation of the natural character of non-WSA lands.

Table 4.65 shows the VRM designation (Classes I through IV) within non-WSA lands with wilderness characteristics, by alternative.

BLM_0010336

**Table 4.65. VRM Designation in Non-WSA Lands with Wilderness Characteristics (acres)**

| Name of non-WSA Area | Total Acres | VRM Class | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A[1] | B | PROPOSED PLAN | D |
| Arches Adjacent | 6,396 | II | 0 | 6,396 | 6,396 | 6,396 |
| Beaver Creek | 25,722 | I | 0 | 5,477 | 0 | 0 |
| | | II | 0 | 20,245 | 25,538 | 15,924 |
| | | III | 0 | 0 | 184 | 9,798 |
| Behind the Rocks | 3,643 | I | 0 | 1,460 | 0 | 0 |
| | | II | 0 | 2,183 | 2,007 | 0 |
| | | III | 0 | 0 | 1,636 | 3,643 |
| Big Triangle | 5,200 | II | 0 | 5,200 | 0 | 0 |
| | | III | 0 | 0 | 5,200 | 5,200 |
| Coal Canyon | 21,632 | II | 0 | 21,632 | 0 | 0 |
| | | III | 0 | 0 | 7,516 | 7,062 |
| | | IV | 0 | 0 | 14,116 | 14,570 |
| Dead Horse Cliffs | 797 | I | 0 | 35 | 0 | 0 |
| | | II | 0 | 762 | 797 | 797 |
| Desolation Canyon | 10,498 | II | 0 | 10,498 | 9,076 | 9,092 |
| | | III | 0 | 0 | 1,422 | 1,406 |
| Dome Plateau | 14,207 | I | 0 | 9,598 | 0 | 0 |
| | | II | 0 | 4,609 | 11,840 | 11,669 |
| | | III | 0 | 0 | 2,367 | 2,538 |
| Fisher Towers | 17,235 | I | 0 | 6,466 | 0 | 0 |
| | | II | 0 | 10,769 | 12,449 | 12,423 |
| | | III | 0 | 0 | 4,786 | 4,812 |
| Floy Canyon | 9,983 | II | 0 | 9,983 | 786 | 786 |
| | | III | 0 | 0 | 9,158 | 9,158 |
| | | IV | 0 | 0 | 39 | 39 |
| Flume Canyon | 3,520 | II | 0 | 3,520 | 0 | 0 |
| | | III | 0 | 0 | 1,471 | 1,418 |
| | | IV | 0 | 0 | 2,049 | 2,102 |
| Goldbar | 6,437 | I | 0 | 821 | 0 | 0 |
| | | II | 0 | 5,616 | 6,437 | 0 |
| | | III | 0 | 0 | 0 | 6,437 |
| Gooseneck | 843 | I | 0 | 843 | 0 | 0 |
| | | II | 0 | 0 | 843 | 0 |
| | | III | 0 | 0 | 0 | 843 |

BLM_0010337

**Table 4.65. VRM Designation in Non-WSA Lands with Wilderness Characteristics (acres)**

| Name of non-WSA Area | Total Acres | VRM Class | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A[1] | B | PROPOSED PLAN | D |
| Granite Creek | 4,528 | II | 0 | 4,528 | 3,150 | 3,150 |
| | | III | 0 | 0 | 1,378 | 1,378 |
| Harts Point (MFO) | 1,465 | II | 1,425 | 1,465 | 1,425 | 1,425 |
| | | III | 40 | 0 | 40 | 40 |
| Hatch Wash | 10,983 | II | 4,466 | 10,983 | 9,726 | 8,981 |
| | | III | 6,517 | 0 | 1,310 | 2,055 |
| Hatch/Lockhart | 2,670 | II | 0 | 2,670 | 2,088 | 2,088 |
| | | III | 0 | 0 | 582 | 582 |
| Hells Hole | 2,538 | II | 0 | 2,538 | 0 | 180 |
| | | III | 0 | 0 | 2,538 | 2,358 |
| Hideout Canyon | 11,607 | II | 0 | 11,607 | 0 | 0 |
| | | III | 0 | 0 | 11,607 | 11,607 |
| Horsethief Point | 8,358 | I | 0 | 739 | 0 | 0 |
| | | II | 0 | 7,619 | 6,026 | 1,171 |
| | | III | 0 | 0 | 2,332 | 7,187 |
| Hunter Canyon | 4,465 | I | 0 | 2,771 | 0 | 0 |
| | | II | 0 | 1,694 | 4,465 | 0 |
| | | III | 0 | 0 | 0 | 4,465 |
| Labyrinth Canyon | 25,361 | I | 0 | 5,668 | 0 | 0 |
| | | II | 0 | 19,693 | 11,991 | 8,954 |
| | | III | 0 | 0 | 13,370 | 16,407 |
| Lost Spring Canyon | 11,456 | II | 0 | 11,456 | 7,095 | 7,095 |
| | | III | 0 | 0 | 4,361 | 4,361 |
| Mary Jane Canyon | 24,779 | I | 0 | 17,854 | 0 | 0 |
| | | II | 0 | 6,925 | 24,779 | 24,779 |
| Mexico Point | 12,837 | II | 0 | 12,837 | 3 | 3 |
| | | III | 0 | 0 | 12,834 | 12,834 |
| Mill Creek Canyon | 3,388 | I | 0 | 2,344 | 0 | 0 |
| | | II | 0 | 1,044 | 3,388 | 3,388 |
| Negro Bill Canyon | 2,333 | I | 0 | 170 | 0 | 0 |
| | | II | 0 | 2,163 | 2,333 | 2,333 |
| Shafer Canyon | 1,842 | II | 0 | 1,842 | 1,842 | 0 |
| | | III | 0 | 0 | 0 | 1,842 |
| Spruce Canyon | 1,131 | II | 0 | 1,131 | 161 | 0 |

BLM_0010338

**Table 4.65. VRM Designation in Non-WSA Lands with Wilderness Characteristics (acres)**

| Name of non-WSA Area | Total Acres | VRM Class | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A[1] | B | PROPOSED PLAN | D |
| | | III | 0 | 0 | 970 | 1,131 |
| Westwater Canyon | 3,086 | I | 0 | 83 | 0 | 0 |
| | | II | 0 | 3,003 | 1,215 | 1,215 |
| | | III | 0 | 0 | 1,871 | 1,871 |
| Westwater Creek | 7,188 | II | 0 | 7,188 | 0 | 0 |
| | | III | 0 | 0 | 7,188 | 7,188 |
| Yellow Bird | 357 | II | 0 | 357 | 357 | 357 |

[1]VRM was not a management decision in the 1985 RMP (reflected in Alternative A), except for a plan amendment affecting only the Canyon Rims Recreation Area.

### 4.3.8.2.15.1 Alternative A

There were no VRM class objectives defined in the 1985 Grand RMP reflected in Alternative A, except for a plan amendment affecting only the Canyon Rims Recreation Area which incorporates Harts Point and Hatch Wash non-WSA lands with wilderness characteristics. Under this alternative, 5,892 acres in these two areas would be managed by VRM Class II objectives, protecting the natural character of those lands in the non-WSA areas. An additional 6,556 acres would be managed by VRM Class III objectives in these two areas. Because moderate changes could be allowed to the land and vegetation, this objective would not be compatible with preserving the natural character of non-WSA lands and could put these values at risk.

### 4.3.8.2.15.2 Alternative B

Under Alternative B, all 266,485 acres would be managed by VRM Class II objectives in the 32 non-WSA lands with wilderness characteristics. Retaining the natural character of these areas by precluding surface-disturbing activities would protect the natural character of those lands in the non-WSA areas.

### 4.3.8.2.15.3 Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage is located within the Beaver Creek, Mary Jane, and Fisher Towers areas. The entire acreage would be managed with VRM Class II objectives. Retaining the natural character of these areas by precluding surface-disturbing activities would protect the natural character of those lands in the non-WSA areas.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Under the Proposed Plan, 108,449 acres would be managed by VRM Class II objectives in all or parts of 24 non-WSA lands with wilderness characteristics, protecting the natural character of

BLM_0010339

those lands in the non-WSA areas. Ten of the 24 areas (Arches Adjacent, Dead Horse Cliffs, Goldbar, Gooseneck, Hunter Canyon, Mary Jane Canyon (in portion not managed to protect wilderness characteristics), Mill Creek Canyon, Negro Bill Canyon, Shafer Canyon, and Yellow Bird) would be wholly under the VRM Class II objectives, fully protecting those areas from visual intrusions and maintaining the natural character of the areas.

The areas not under the VRM II objectives would be managed by VRM III and IV objectives which would be incompatible with protecting wilderness characteristics values because changes to the landscape would be permitted. This would include all of seven non-WSA areas (Big Triangle, Coal Canyon, Flume Canyon, Hells Hole, Hideout Canyon, Mexico Point, and Westwater Creek) and portions of 22 non-WSA lands with wilderness characteristics.

### 4.3.8.2.15.4 Alternative D

Under Alternative D, 122,203 acres would be managed by VRM Class II objectives in all or parts of 19 non-WSA lands with wilderness characteristics, protecting the natural character of those lands in the non-WSA areas. Six of the 19 areas (Arches Adjacent, Dead Horse Cliffs, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Yellow Bird) would be wholly under the VRM Class II objectives, protecting those areas from visual intrusions and maintaining the natural character of the areas.

The areas not under the VRM II objectives would be managed by VRM III and IV objectives which would be incompatible with protecting wilderness characteristics values because changes to the landscape would be permitted. This would include all of 12 non-WSA areas (Behind the Rocks, Big Triangle, Coal Canyon, Flume Canyon, Goldbar, Gooseneck, Hideout Canyon, Hunter Canyon, Mexico Point, Shafer Canyon, Spruce Canyon, and Westwater Creek) and portions of 18 non-WSA lands with wilderness characteristics.

In summary, the visual resource management objectives proposed in Alternative B would provide protection of the natural character of all the non-WSA lands with wilderness characteristics. VRM objectives in the Proposed Plan would provide protection to the natural character of the 156,210 acres in all or parts of 25 non-WSA areas, followed by Alternative D with 122,203 acres protected in all or parts of 19 non-WSA areas. Alternative A only has VRM class objectives for two non-WSA area, of which only a portion of each would fall into a VRM II management class. Visual resource objectives in Alternatives A and D provide the least protection to the natural character of the non-WSA lands with wilderness characteristics.

### 4.3.8.2.16 IMPACTS OF WILDLIFE AND FISHERIES DECISIONS ON NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

### 4.3.8.2.16.1 Management Actions Common to All Alternatives

Under all alternatives, a variety of actions would be implemented to restore, maintain, and enhance native wildlife populations. Improved wildlife populations would enhance the natural character of the land in all of the non-WSA lands with wilderness characteristics. Further, larger and healthier wildlife populations would expand opportunities for primitive and unconfined recreation opportunities, including wildlife viewing, hunting, and natural history study.

A goal of the Dolores Triangle HMP is to manage and benefit wildlife, bird, and fish species through the installation of fencing and enclosures in Granite Creek. This could affect the Granite

BLM_0010340

Creek non-WSA lands with wilderness characteristics. Although a benefit for wildlife, construction of human made features on the land would degrade the natural, undeveloped character of the non-WSA lands with wilderness characteristics. Under Alternative B, this activity would most likely be precluded or mitigated within the wilderness characteristics lands due to the restrictive decisions in place.

Within pronghorn habitat, a common to all alternatives decision is to install and improve year-round water sources within the LaSal Management Unit and the Cisco Desert Herd Unit. This could affect the Hatch Wash and Harts Point non-WSA lands with wilderness characteristics in the LaSal Unit, and the Floy Canyon and Coal Canyon non-WSA lands with wilderness characteristics in the Cisco Desert Herd Unit. Construction of water sources to support wildlife populations would result in more wildlife and the benefits described above. Construction of human made features on the land, however, would degrade the natural, undeveloped character of the non-WSA lands with wilderness characteristics. Under Alternative B, new water developments or facilities would most likely be precluded or mitigated within the wilderness characteristics lands due to the restrictive decisions in place.

In bighorn sheep habitat, a decision to increase bighorn populations would involve installation of new water facilities and new water developments every 5 square miles in or within 2 miles of escape terrain and lambing grounds. This would involve Labyrinth Canyon, Shafer Canyon, Gooseneck, Goldbar, Horsethief Point, Dead Horse Cliffs, and Hatch/Lockhart non-WSA lands with wilderness characteristics. These lands are small areas within a large habitat, and the animals move in and out of wilderness characteristics lands. Construction of water sources to support wildlife populations would result in more wildlife and the benefits described above. Construction of human made features on the land, however, would degrade the natural, undeveloped character of the non-WSA lands with wilderness characteristics. Under Alternative B, new water developments or facilities would most likely be precluded or mitigated within the wilderness characteristics lands due to the restrictive decisions in place.

Within deer and/or elk habitat, elk forage would be increased through vegetation treatments such as chemical, mechanical, and prescribed fire on approximately 40,000 acres of elk winter range. This could include areas in the Big Triangle, Westwater Canyon, Hells Hole, Hideout Canyon, Mexico Point, Westwater Creek, Flume Canyon, Coal Canyon, Floy Canyon and Desolation Canyon non-WSA lands with wilderness characteristics. The use of fire and chemical treatments would have no apparent evidence of human intervention on the landscape. Thus there would be no noticeable effect on the natural character of the non-WSA lands with wilderness characteristics, if those treatments were necessary in the non-WSA areas that have wilderness characteristics. Restoration of vegetation communities, however, would result in a more natural vegetation community and thus, natural condition of the non-WSA areas. The use of mechanical treatments for vegetation manipulations would leave a noticeable imprint of human work on the landscape, and degrade the natural character of non-WSA lands, if the treatments were to occur in the non-WSA areas. Depending on the vegetation community treated (grassland and shrub land vs. a woodland or coniferous forest), the length of time the evidence of mechanical treatments remained on the landscape would vary before the surface and vegetation disturbances returned to a more natural or unmodified condition.

BLM_0010341

### 4.3.8.2.16.2 Alternative A and D

See Management Common to All.

### 4.3.8.2.16.3 Alternative B

Under this alternative, a NSO stipulation to protect bighorn sheep lambing, rutting, and migration habitat would be applied. This would involve small portions of Labyrinth Canyon, Shafer Canyon, Gooseneck, Goldbar, Horsethief Canyon, Dead Horse Cliffs, and Hatch/Lockhart non-WSA lands with wilderness characteristics, and protect the natural character of these areas from surface-disturbing activities associated with oil and gas development and other surface-disturbing activities.

### 4.3.8.2.16.4 Proposed Plan

Under the Proposed Plan, surface-disturbing activities in Fisher Towers, Beaver Creek, and Mary Jane would be precluded to protect natural resources including big-horned sheep.

Impacts of Woodlands Decisions on Non-WSA Lands with Wilderness Characteristics

Under all alternatives, permits for woodland products would continue to be sold to the public, consistent with the availability of woodland products and the protection of sensitive resource values. Each alternative prescribes areas where woodland product harvest is allowed or prohibited. Table 4.66 provides the acres of areas open or closed to woodland harvest by alternative for non-WSA lands with wilderness characteristics.

**Table 4.66. Wood-Cutting Restrictions in non-WSA Lands with Wilderness Characteristics**

| Name of non-WSA Area | Total Acres | Availability | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN* | D |
| Arches Adjacent | 6,396 | Open | 5,407 | 0 | 5,407 | 5,407 |
| | | Closed | 989 | 6,396 | 989 | 989 |
| Beaver Creek | 25,722 | Open | 25,722 | 0 | 0 | 25,722 |
| | | Closed | 0 | 25,722 | 25,722 | 0 |
| Behind the Rocks | 3,643 | Open | 2,807 | 0 | 1,538 | 2,807 |
| | | Closed | 836 | 3,643 | 2,105 | 836 |
| Big Triangle | 5,200 | Open | 5,200 | 0 | 5,200 | 5,200 |
| | | Closed | 0 | 5,200 | 0 | 0 |
| Coal Canyon | 21,632 | Open | 21,632 | 0 | 21,632 | 21,632 |
| | | Closed | 0 | 21,632 | 0 | 0 |
| Dead Horse Cliffs | 797 | Open | 482 | 0 | 482 | 482 |
| | | Closed | 315 | 797 | 315 | 315 |
| Desolation Canyon | 10,498 | Open | 10,498 | 0 | 5,182 | 10,498 |
| | | Closed | 0 | 10,498 | 5,316 | 0 |

BLM_0010342

**Table 4.66. Wood-Cutting Restrictions in non-WSA Lands with Wilderness Characteristics**

| Name of non-WSA Area | Total Acres | Availability | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN* | D |
| Dome Plateau | 14,207 | Open | 7,989 | 0 | 7,989 | 7,989 |
| | | Closed | 6,218 | 14,207 | 6,218 | 6,218 |
| Fisher Towers | 17,235 | Open | 9,699 | 0 | 9,559 | 9,699 |
| | | Closed | 7,536 | 17,235 | 7,676 | 7,536 |
| Floy Canyon | 9,983 | Open | 9,983 | 0 | 9,983 | 9,983 |
| | | Closed | 0 | 9,983 | 0 | 0 |
| Flume Canyon | 3,520 | Open | 3,520 | 0 | 3,520 | 3,520 |
| | | Closed | 0 | 3,520 | 0 | 0 |
| Goldbar | 6,437 | Open | 5,974 | 0 | 5,972 | 5,974 |
| | | Closed | 463 | 6,437 | 465 | 463 |
| Gooseneck | 843 | Closed | 843 | 843 | 843 | 843 |
| Granite Creek | 4,528 | Open | 4,528 | 0 | 4,528 | 4,528 |
| | | Closed | 0 | 4,528 | 0 | 0 |
| Harts Point (MFO) | 1,465 | Closed | 1,465 | 1,465 | 1,465 | 1,465 |
| Hatch/Lockhart | 2,670 | Closed | 2,670 | 2,670 | 2,670 | 2,670 |
| Hatch Wash | 10,983 | Closed | 10,983 | 10,983 | 10,983 | 10,983 |
| Hells Hole | 2,538 | Open | 2,358 | 0 | 2,358 | 2,358 |
| | | Closed | 0 | 2,538 | 0 | 0 |
| Hideout Canyon | 11,607 | Open | 11,607 | 0 | 11,607 | 11,607 |
| | | Closed | 0 | 11,607 | 0 | 0 |
| Horsethief Point | 8,358 | Open | 7,860 | 0 | 7,860 | 7,860 |
| | | Closed | 498 | 8,358 | 498 | 498 |
| Hunter Canyon | 4,465 | Open | 4,150 | 0 | 1,378 | 4,150 |
| | | Closed | 315 | 4,465 | 3,087 | 315 |
| Labyrinth Canyon | 25,361 | Open | 19,738 | 0 | 19,530 | 19,738 |
| | | Closed | 5,623 | 25,361 | 5,831 | 5,623 |
| Lost Spring Canyon | 11,456 | Open | 11,456 | 0 | 11,456 | 11,456 |
| | | Closed | 0 | 11,456 | 0 | 0 |
| Mary Jane Canyon | 24,779 | Open | 4,618 | 0 | 3,799 | 4,618 |
| | | Closed | 20,161 | 24,779 | 20,980 | 20,161 |

BLM_0010343

**Table 4.66. Wood-Cutting Restrictions in non-WSA Lands with Wilderness Characteristics**

| Name of non-WSA Area | Total Acres | Availability | Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN* | D |
| Mexico Point | 12,837 | Open | 12,837 | 0 | 12,837 | 12,837 |
| | | Closed | 0 | 12,837 | 0 | 0 |
| Mill Creek Canyon | 3,388 | Open | 2,481 | 0 | 608 | 2,481 |
| | | Closed | 907 | 3,388 | 2,780 | 907 |
| Negro Bill Canyon | 2,333 | Open | 1,398 | 0 | 1,393 | 1,398 |
| | | Closed | 935 | 2,333 | 940 | 935 |
| Shafer Canyon | 1,842 | Open | 40 | 0 | 40 | 40 |
| | | Closed | 1,802 | 1,842 | 1,802 | 1,802 |
| Spruce Canyon | 1,131 | Open | 1,131 | 0 | 1,131 | 1,131 |
| | | Closed | 0 | 1,131 | 0 | 0 |
| Westwater Canyon | 3,086 | Open | 3,086 | 0 | 3,086 | 3,086 |
| | | Closed | 0 | 3,086 | 0 | 0 |
| Westwater Creek | 7,188 | Open | 7,188 | 0 | 7,188 | 7,188 |
| | | Closed | 0 | 7,188 | 0 | 0 |
| Yellow Bird | 357 | Open | 367 | 0 | 357 | 367 |
| | | Closed | 0 | 357 | 0 | 0 |

*All areas managed to protect, preserve and maintain their wilderness characteristics would be closed to woodcutting. These areas include 25,722 acres in Beaver Creek, 5,540 acres in Fisher Towers and 16,499 acres in Mary Jane Canyon.

## Alternatives A and D

Under both of these alternatives, wood-cutting would be prohibited on 62,563 acres on all or portions of 17 non-WSA lands with wilderness characteristics. Four non-WSA areas would be completely restricted from wood-cutting activities (Gooseneck, Harts Point, Hatch Wash and Hatch/Lockhart), thereby preserving the natural character of the landscape from surface-disturbing activities associated with woodcutting. Those portions of the non-WSA lands with wilderness characteristics in the other 13 areas that are restricted from wood-cutting activities would be provided the same protections. However, in the 203,922 acres that remain open for wood-cutting (and where the resource exists), wilderness characteristics may be compromised by surface-disturbing activities such as driving cross-country to the trees, cutting the trunks of trees and leaving stumps and debris, and by affecting the solitude and primitive recreation opportunities with chain saws and surface disturbances associated with human activity.

## 4.3.8.2.16.5 Alternative B

All 266,485 acres of non-WSA lands with wilderness characteristics in the 32 areas within the MPA would be restricted from wood-cutting activities under this alternative. All wilderness

BLM_0010344

characteristics values would therefore be protected from this activity and maintain the natural character and opportunities for solitude and primitive recreation.

### 4.3.8.2.16.6 Proposed Plan

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

Under the Proposed Plan, 47,761 acres of non-WSA lands would be managed to protect, preserve, and maintain their wilderness characteristics. This acreage is located within the Beaver Creek, Mary Jane, and Fisher Towers areas. These acres are closed to woodcutting in their entirety and thus woodcutting activities would not affect their natural qualities.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

Under the Proposed Plan, wood-cutting would be prohibited on 52,740 acres on all or portions of 19 non-WSA lands with wilderness characteristics. Four non-WSA areas would be completed restricted from wood-cutting activities (Gooseneck, Harts Point, Harts/Lockhart, and Hatch Wash), thereby preserving the natural character of the landscape from surface-disturbing activities associated with woodcutting. Those portions of the non-WSA lands with wilderness characteristics in the other 14 areas that are restricted from wood-cutting activities would be provided the same protections. However, in the 165,984 acres that remain open for wood-cutting (and where the resource exists), wilderness characteristics may be compromised by surface-disturbing activities such as driving cross-country to the trees, cutting the trunks of trees and leaving stumps and debris, and by affecting the solitude and primitive recreation opportunities with mechanical chain saws and surface disturbances associated with human activity.

### 4.3.8.3 SUMMARY

The majority of adverse impacts to naturalness and outstanding opportunities would be caused by surface-disturbing activities such as woodland product harvest, land treatments, mineral development, and OHV use.

Woodland product harvest and land treatments would have the potential to denude vegetation and create surface and visual disturbances, thereby degrading naturalness. The noise created by vehicles accompanying these activities would adversely affect the outstanding opportunities for solitude. Harvesting in areas where mechanized vehicular travel is limited to existing/designated routes would concentrate harvest next to access roads. Due to the low level of woodland harvest in the MPA, however, and the fact that opportunities for solitude and primitive recreation are already impaired next to roads, the impacts to wilderness characteristics from this activity would be minimal. As vegetation reestablishes, this effect would be less noticeable, although it could take decades before the treated area would be indistinguishable from its surroundings. In areas closed to woodland product harvest and firewood gathering, wilderness characteristics would be protected.

In areas open to oil and gas leasing the presence and noise of people, vehicles, and equipment needed for exploration and production of energy resources would impact opportunities for solitude and primitive recreation in proximity to wells. Depending upon the terrain, vegetation, atmospheric conditions, etc., outstanding opportunities for solitude and primitive recreation could be lost in a substantial portion or the whole of these areas during the period of exploration

BLM_0010345

and development. In areas that are managed as NSO or closed to oil and gas leasing, wilderness characteristics would be maintained.

Wilderness characteristics would be adversely impacted by cross-country OHV use because of surface disturbance and noise. In the areas where OHV use is limited to designated routes there would be temporary impacts from noise. The noise and exhaust from vehicles may disperse some species of wildlife and may adversely impact recreationists seeking solitude. In areas that are closed to OHV use, wilderness characteristics would be protected.

Realty actions such as road, power line or pipeline ROWs would be allowed in areas open to surface-disturbing activities. Generally, areas open to oil and gas leasing with standard lease terms and special stipulations are open to other surface-disturbing activities. Many realty actions would affect the natural character of the area within the viewshed of the development. Some developments, such as roads, would also affect opportunities for solitude and primitive recreation. Managing lands as exclusion areas for ROWs would protect wilderness characteristics from adverse impacts. Managing lands as an avoidance area for ROWs may protect wilderness characteristics but this would not be guaranteed.

Managing lands as VRM Classes III and IV would have adverse impacts on wilderness characteristics because these classes allow for moderate to major changes in the landscape thereby allowing large visual disturbances. Managing lands as VRM Class I would beneficially impact wilderness characteristics because this class precludes surface disturbance. VRM Class II management would keep the level of change to the landscape low but should not attract the attention of the casual observer. This would protect the natural character on a landscape level but there would risks of small localized impacts being visible.

Tables 4.57–4.60 summarize how the 266,485 acres of land having wilderness characteristics would be managed by alternative, whether or not they are being managed to protect wilderness characteristics. In Alternative B, the entire 266,485 acres would be managed specifically to protect wilderness characteristics. In the Proposed Plan, 47,761 acres would be managed specifically to protect wilderness characteristics. The remaining acres in the Proposed Plan, as well as the total acreage in Alternatives A and D are not managed specifically to protect wilderness characteristics.

The management of the entire 266,485 acres is shown by alternative for oil and gas leasing, VRM management, OHV use, and availability for woodland product harvest. Restrictions are a result of various management decisions, depending upon alternative. A discussion of impacts by alternative follows these tables.

BLM_0010346

*Moab PRMP/FEIS*

*Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

**Table 4.67. Summary of Oil and Gas Leasing Involving Non-WSA Lands with Wilderness Characteristics**

| | | Alternative A | Alternative B | PROPOSED PLAN* | Alternative D |
|---|---|---|---|---|---|
| **Open to Leasing** | | | | | |
| Standard Lease Terms | Acres | 157,471 | 0 | 36,644 | 74,194 |
| | % | 59.0 | 0 | 14.0 | 28.0 |
| Controlled Surface Use/ Timing Limitations | Acres | 93,382 | 0 | 124,537 | 157,939 |
| | % | 35.0 | 0 | 47.0 | 59.0 |
| No Surface Occupancy | Acres | 13,033 | 0 | 87,512 | 34,352 |
| | % | 5.0 | 0 | 33.0 | 13.0 |
| **Closed to Leasing** | | | | | |
| Closed | Acres | 2,598 | 266,485 | 17,792 | 0 |
| | % | 1.0 | 100 | 6.0 | 0 |
| **Total** | | **266,485** | **266,485** | **266,485** | **266,485** |

*The 47,761 acres that are to be managed to protect, preserve and maintain their wilderness characteristics under the Proposed Plan are all no surface occupancy or closed. NSO = 35,630 acres   Closed = 12,131 acres

**Table 4.68. Summary of VRM Classes Involving Non-WSA Lands with Wilderness Characteristics**

| | | Alternative A | Alternative B | PROPOSED PLAN* | Alternative D |
|---|---|---|---|---|---|
| Class I | Acres | 130 | 45,048 | 2,689 | 0 |
| | % "with WC" lands | 1% | 17% | 1.0% | 0% |
| Class II | Acres | 168,983 | 221,437 | 147,799 | 115,995 |
| | % "with WC" lands | 63% | 83% | 55% | 43% |
| Classes III & IV | Acres | 97,462 | 0 | 115,997 | 150,490 |
| | % "with WC" lands | 36% | 0% | 44% | 57% |
| **Total** | | **266,485** | **266,485** | **266,485** | **266,485** |

*The 47,761 acres that are to be managed to protect, preserve, and maintain their wilderness characteristics under the Proposed Plan would be managed as VRM II.

BLM_0010347

*Moab PRMP/FEIS*

*Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

**Table 4.69. Summary of OHV Area Designations Involving Non-WSA Lands with Wilderness Characteristics**

| | | Alternative A | Alternative B | PROPOSED PLAN* | Alternative D |
|---|---|---|---|---|---|
| Open to cross-country OHV use | Acres | 136,816 | 0 | 0 | 0 |
| | % "with WC" lands | 58% | 0% | 0% | 0% |
| Limited to existing/designated routes | Acres | 96,929 | 266,485 | 266,485 | 266,485 |
| | % "with WC" lands | 42% | 100% | 100% | 100% |
| Closed to OHVs | Acres | 0 | 0 | 0 | 0 |
| | % "with WC" lands | 0% | 0% | 0% | 0% |
| **Total** | | **266,485** | **266,485** | **266,485** | **266,485** |

*The 47,761 acres that are to be managed to protect, preserve, and maintain their wilderness characteristics under the Proposed Plan would be managed as limited to designated routes. There are 8.36 miles of route designated in the Proposed Plan.

**Table 4.70. Acres of Woodland Harvest Designations Involving Non-WSA Lands with Wilderness Characteristics**

| | | Alternative A | Alternative B | PROPOSED PLAN* | Alternative D |
|---|---|---|---|---|---|
| Open to Woodland Harvest | Acres | 196,618 | 0 | 161,327 | 203,805 |
| | % "with WC" lands | 74% | 0% | 61% | 76% |
| Closed to Woodland Harvest | Acres | 69,867 | 266,485 | 105,158 | 62,680 |
| | % "with WC" lands | 26% | 100% | 39% | 24% |
| **Total** | | **266,485** | **266,485** | **266,485** | **266,485** |

*The 47,761 acres that are to be managed to protect, preserve, and maintain their wilderness characteristics under the Proposed Plan would be closed to woodcutting.

### 4.3.8.3.1 ALTERNATIVE A

Under Alternative A, no acreage would be managed to protect lands with wilderness characteristics. Alternative A provides the least emphasis on management of naturalness and opportunities for solitude and primitive recreation by:

- Having the most lands available for rights-of-way permits (249,363 acres in all or portions of 30 non-WSA areas)
- Allowing for land disposal of some non-WSA lands
- Providing the least restrictions for oil and gas leasing and development
- Leaving the most amount of land available for salable mineral disposal
- Focusing no areas within SRMAs for primitive recreation opportunities
- Allowing for cross-county OHV travel in some areas. Within acreage limited for travel, 294.8 miles of routes would be designated

BLM_0010348

- Managing no acres for ACECs
- Taking wild and scenic river studies only through eligibility findings
- Having no VRM inventory management direction (with few exceptions due to a land-use plan amendment)
- Closing only 62,563 acres of non-WSA lands to commercial and personal-use wood cutting (all or portions of 17 areas);

Approximately 250,853 acres (94%) of the 266,485 acres of lands with wilderness characteristics would be open to mineral leasing with standard lease terms or with controlled surface use/timing limitation stipulations and would be subject to impacts from oil and gas development and other surface-disturbing activities. These adverse impacts would compromise the naturalness of non-WSA areas with wilderness characteristics. The wilderness characteristics within the Bookcliffs and Greater Cisco RFDs would be subject to greater potential impacts due to higher predicted number of wells to be developed over the life of the plan. See the minerals section (4.3.7) for more details on the number of wells and surface disturbance predicted for these RFDs.

Approximately 36% of the lands with wilderness characteristics would be managed under VRM Classes III and IV. This would allow major surface-disturbing activities to occur and would potentially degrade the wilderness characteristics of the entire area. In addition 53% is open to cross-country OHV use and 74% is open to woodland harvest. Due to the high percentage of lands open to these surface-disturbing activities, wilderness characteristics would potentially be lost in the entire area over the life of the plan.

### 4.3.8.3.2 ALTERNATIVE B

Under Alternative B, 100% of the non-WSA lands with wilderness characteristics would be managed specifically to protect these characteristics. Alternative B focuses on protection to the natural values and opportunities for solitude and primitive recreation of the non-WSA lands with wilderness characteristics (266,485 acres) by:

- Making all non-WSA lands rights-of-way exclusion areas
- Retaining all non-WSA lands in public ownership to facilitate management of wilderness characteristics
- Closing all non-WSA lands to oil and gas leasing and development
- Closing all non-WSA lands to salable mineral disposal
- Focusing some SRMAs for primitive recreation opportunities
- Designating 117 miles of routes in non-WSA lands to OHV use (limited OHV category)
- Managing 9 ACECs overlying non-WSA lands to protect their relevant and important values
- Managing 43.66 miles of eligible wild and scenic river segments within 7 non-WSA areas as suitable to protect their outstandingly remarkable values
- Managing all non-WSA lands as VRM Class II to retain the characteristic landscape
- Closing the non-WSA lands to commercial and personal-use wood cutting
- Closing the non-WSA lands to road construction
- Allowing no surface disturbance (see Appendix C for a description of surface-disturbing activities)

BLM_0010349

These prescriptions would have beneficial impacts by protecting naturalness and opportunities for solitude and primitive recreation from surface-disturbing activities and noise and enhancing the continuity of wilderness characteristic lands. Therefore the entire inventory (266,485 acres) of lands having wilderness characteristics would be preserved under this alternative. This management is far more protective of these areas than the management of these areas under Alternative A.

### 4.3.8.3.3 PROPOSED PLAN

Impacts to Non-WSA Lands with Wilderness Characteristics Included in the Proposed Plan

The Proposed Plan manages 47,761 acres to protect, preserve, and maintain their wilderness characteristics. About 25,722 acres are in the Beaver Creek area, 5,540 acres are in the Fisher Towers area and 16,499 acres are in the Mary Jane area. These 47,761 acres would be:

- Managed as avoidance areas for rights-of-way
- Retained in public ownership
- Managed with a NSO stipulation or closure to oil and gas leasing and development
- Closed to salable mineral disposal
- Managed for primitive recreation opportunities within two SRMAs
- Managed as motorized travel limited to designated routes (with 8.36 miles of routes designated within the 47,761 acres),
- Portions of the Dolores River would be managed as a wild and scenic river to protect its outstandingly remarkable values
- Managed as VRM II
- Closed to commercial and private woodcutting activities

Based on the management prescription proposed for these 3 areas, wilderness characteristics including naturalness and outstanding opportunities for solitude and primitive recreation would be protected, preserved, and maintained.

Impacts to Non-WSA Lands with Wilderness Characteristics Not Included in the Proposed Plan

The Proposed Plan provides for some management of natural landscapes and opportunities for solitude and primitive forms of recreation by:

- Making 112,838 acres of non-WSA lands (all or portions of 28 non-WSA areas) rights-of-way avoidance or exclusion areas
- Retaining all non-WSA lands in public ownership
- Applying a NSO stipulation or closure to oil and gas leasing and development on 57,543 acres of non-WSA lands (all or portions of 21 areas)
- Closing 57,543 acres of non-WSA (all or portions of 21 areas) lands to salable mineral disposal
- Managing eligible wild and scenic river segments within 2 non-WSA areas as suitable to protect their outstandingly remarkable values
- Focusing some SRMAs for primitive recreation opportunities
- Designating 150.54 miles of routes in non-WSA lands to OHV use (limited OHV category)

BLM_0010350

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 155 of 293

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.8 Non-WSA Lands with Wilderness Characteristics*

- Managing 5 ACECs overlying non-WSA lands to protect their relevant and important values
- Managing 108,449 acres of non-WSA lands as VRM Class II (all or portions of 25 areas) to retain the characteristic landscape
- Closing 57,543 acres of non-WSA lands to commercial and personal-use wood cutting (all or portions of 19 areas)

About 218,724 acres of lands that have wilderness characteristics would not be managed specifically to protect naturalness and outstanding opportunities. About 161,181 acres (61% of the acreage not managed to protect wilderness characteristics) would be open to mineral leasing with standard lease terms or controlled surface use/timing limitation stipulations, and would be subject to impacts from oil and gas development and other surface-disturbing activities. These adverse impacts would compromise the naturalness of areas with wilderness characteristics. The wilderness characteristics within the Bookcliffs and Greater Cisco RFDs would be subject to greater potential impacts due to higher predicted number of wells to be developed over the life of the plan. Please see the minerals section (4.3.7) for more details.

While no acreage would be open to cross country OHV use, approximately 53% of these 218,724 acres would be managed under VRM Classes III and IV, and 61% would be open to woodlands harvest. These actions would allow major surface-disturbing activities to occur and would potentially degrade the naturalness of those lands not managed specifically to protect wilderness characteristics.

### 4.3.8.3.4 ALTERNATIVE D

Alternative D provides for a lesser amount (than Alternative B or the Proposed Plan) of management of natural landscapes and opportunities for solitude and primitive forms of recreation by:

- Making 242,030 acres of non-WSA lands (all or portions of 32 areas) rights-of-way avoidance or exclusion areas
- Retaining all non-WSA lands in public ownership
- Applying a NSO stipulation to oil and gas leasing and development on 34,352 acres of non-WSA lands (all or portions of 14 areas)
- Closing 34,352 acres of non-WSA (all or portions of 14 areas) lands to salable mineral disposal
- Focusing some SRMAs for primitive recreation opportunities
- Designating 169 miles of routes in non-WSA lands to OHV use (limited OHV category)
- Managing no ACECs overlying non-WSA lands to protect their relevant and important values
- Managing no miles of eligible wild and scenic river segments as suitable to protect their outstandingly remarkable values
- Managing 122,203 acres of non-WSA lands as VRM Class II (all or portions of 19 areas) to retain the characteristic landscape
- Closing 62,563 acres of non-WSA lands to commercial and personal-use wood cutting (all or portions of 17 areas)

BLM_0010351

Under Alternative D, no acreage would be managed to protect lands with wilderness characteristics. About 232,133 acres of lands with wilderness characteristics (87%) would be open to mineral leasing with standard lease terms or with controlled surface use/timing limitation stipulations and would be subject to impacts from oil and gas development and other surface-disturbing activities. These adverse impacts would compromise the naturalness of non-WSA areas with wilderness characteristics. The wilderness characteristics within the Bookcliffs and Greater Cisco RFDs would be subject to greater potential impacts due to higher predicted number of wells to be developed over the life of the plan. See the minerals section (4.3.7) for more details on the number of wells and surface disturbance predicted for these RFDs.

Approximately 54% of the 266,485 acres having wilderness characteristics would be managed under VRM Classes III and IV. This would allow major surface-disturbing activities to occur and would potentially degrade the wilderness characteristics of the entire area. While no acreage would be open to cross country OHV use, 76% would be open to woodlands harvest. These actions would allow major surface-disturbing activities to occur and would potentially degrade the naturalness of those lands not managed specifically to protect wilderness characteristics. Due to the high percentage of lands open to these surface-disturbing activities, naturalness would potentially be lost in most of the non-WSA areas with wilderness characteristic over the life of the plan.

### 4.3.9 PALEONTOLOGICAL RESOURCES

This section discusses impacts to paleontological resources from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning paleontological resources are described in Chapter 3.

The BLM Regional Paleontologist for the State of Utah has classified all of the geologic units within the MPA according to the Potential Fossil Yield Classification System (PFYC). The BLM is currently using this study in lieu of the current paleontological resource management classification system in the process of considering the use of the PFYC as policy. The PFYC system is described in Section 3.9.4.2, and the results of the PFYC classification for the MPA form the basis for this impacts analysis.

#### 4.3.9.1 PALEONTOLOGICAL RESOURCE ASSESSMENT

For this analysis, the 73 mapped geologic units which occur within the MPA were classified according to the PFYC, and the results are listed in Table 4.71. Nine units are Class 1, twenty-two are Class 2, twenty-seven are Class 3, thirteen are Class 4/5, and two are Class 5. Surficial exposures of Class 1 units comprise approximately 34,505 acres, Class 2 units approximately 615,034 acres, Class 3 units approximately 722,457 acres, Class 4/5 approximately 378,366 acres, and Class 5 approximately 67,114 acres.

BLM_0010352

**Table 4.71. Mapped Geologic Units Within the MPA and their PFYC Classes in Approximate Descending Stratigraphic Order**

| Age | Mapped Geologic Unit(S) | PFYC Class |
|---|---|---|
| Quaternary (Holocene) | Alluvial fan deposits, undifferentiated alluvial gravel, stream alluvium, bouldery colluvium, landslide deposits, slumps and slides, talus and colluvium, tufa deposits, alluvial mud, eolian deposits | 2 |
| Quaternary (Pleistocene) | Basin fill alluvium, alluvial fan deposits, undifferentiated alluvial gravel, stream alluvium, pediment-mantle deposits, terrace gravel, bouldery colluvium, landslide deposits, slumps and slides, talus and colluvium, tufa deposits, alluvial mud, eolian deposits | 2 |
| Quaternary or Tertiary | Collapse Breccia | 2 |
| Tertiary | Geyser Creek Fanglomerate | 2 |
| Tertiary | Green River Formation - Douglas Creek Member, Tongue a and Tongue c | 3 |
| Tertiary | Green River Formation - Parachute Creek Member, Upper and lower parts | 3 |
| Tertiary | Wasatch Formation | 4/5 |
| Tertiary | Wasatch Formation - Renegade Tongue | 3 |
| Tertiary | Wasatch Formation-Renegade Tongue, unit w and unit x | 3 |
| Tertiary | Green River Formation-Flagstaff Member and North Horn Formation | 4/5 |
| Cretaceous | Mancos Shale | 3 |
| Cretaceous | Mancos Shale-Buck Tongue | 3 |
| Cretaceous | Mancos Shale - Bluegate Member | 3 |
| Cretaceous | Mancos Shale-Ferron Sandstone Member | 3 |
| Cretaceous | Mancos Shale-Lower Shale Member | 3 |
| Cretaceous | Mancos Shale - Sandstone Beds | 3 |
| Cretaceous | Mancos Shale - Sandstone Beds in Upper Shale Member | 3 |
| Cretaceous | Mancos Shale - Tununk Shale Member | 3 |
| Cretaceous | Castlegate Sandstone | 2 |
| Cretaceous | Blackhawk Formation | 4/5 |
| Cretaceous | Farrer Formation | 4/5 |
| Cretaceous | Neslen Formation | 4/5 |
| Cretaceous | Sego Sandstone | 2 |
| Cretaceous | Price River Formation-Upper part | 3 |
| Cretaceous | Tuscher Formation | 3 |
| Cretaceous | Blackhawk Formation and Star Point Sandstone | 4/5 |
| Cretaceous | Castlegate Sandstone and Blackhawk Formation, undivided | 4/5 |
| Cretaceous | Dakota Sandstone | 3 |

BLM_0010353

**Table 4.71. Mapped Geologic Units Within the MPA and their PFYC Classes in Approximate Descending Stratigraphic Order**

| Age | Mapped Geologic Unit(S) | PFYC Class |
|---|---|---|
| Cretaceous | Dakota Sandstone and Cedar Mountain Formation, undivided | 4/5 |
| Cretaceous | Burro Canyon Formation | 4/5 |
| Cretaceous | Cedar Mountain Formation | 5 |
| Jurassic | Brushy Basin (Shale) Member of Morrison Formation | 5 |
| Jurassic | Salt Wash (Sandstone) Member of Morrison Formation | 4/5 |
| Jurassic | Tidwell Member of Morrison Formation | 4/5 |
| Jurassic | Summerville Formation and Morrison Formation-Tidwell and Salt Wash Members | 4/5 |
| Jurassic | Morrison Formation - Tidwell Member and Summerville Formation, undivided | 3 |
| Jurassic | Summerville Formation | 3 |
| Jurassic | Summerville and Curtis Formations, undivided | 3 |
| Jurassic | Carmel Formation-Dewey Bridge Member | 2 |
| Jurassic | Curtis Formation-Moab Member, Entrada Sandstone - Slick Rock Member, of Carmel Formation-Dewey Bridge Member | 2 |
| Jurassic | Upper Carmel Formation | 2 |
| Jurassic | Lower Carmel Formation | 2 |
| Jurassic | Curtis Formation | 2 |
| Jurassic | Curtis Formation-Moab Member | 3 |
| Jurassic | Entrada Sandstone | 2 |
| Jurassic | Entrada and Carmel Formations, undivided | 2 |
| Jurassic | Curtis Formation-Moab Member, Entrada Sandstone - Slick Rock Member | 3 |
| Jurassic | Entrada Sandstone-Earthy Member | 2 |
| Jurassic | Entrada Sandstone-Slick Rock Member | 2 |
| Jurassic | Entrada Sandstone-Earthy Member and Entrada Sandstone-Slick Rock Member | 2 |
| Jurassic | Navajo Sandstone | 2 |
| Jurassic | Navajo Sandstone-Limestone beds | 3 |
| Triassic and Jurassic | Kayenta Formation | 3 |
| Triassic and Jurassic | Wingate Sandstone | 2 |
| Triassic | Chinle Formation | 4/5 |
| Triassic | Moenkopi Formation | 3 |
| Permian | Cutler Formation | 3 |
| Permian | Cutler Formation-Arkosic facies | 3 |
| Permian | Lower Cutler Group (Rico, Elephant Canyon, and Halgaito Formations) | 3 |

BLM_0010354

**Table 4.71. Mapped Geologic Units Within the MPA and their PFYC Classes in Approximate Descending Stratigraphic Order**

| Age | Mapped Geologic Unit(S) | PFYC Class |
|---|---|---|
| Permian | White Rim Sandstone | 3 |
| Pennsylvanian | Honaker Trail Formation | 2 |
| Pennsylvanian | Honaker Trail Formation - Upper and Lower Members | 2 |
| Pennsylvanian | Honaker Trail Formation and Paradox Formation, undifferentiated | 2 |
| Pennsylvanian | Paradox Formation caprock | 2 |
| Proterozoic | Aplite and pegmatite | 1 |
| Proterozoic | Granite | 1 |
| Proterozoic | Quartz pegmatite | 1 |
| Proterozoic | Granodiorite and quartz diorite gneiss | 1 |
| Proterozoic | Felsic gneiss | 1 |
| Proterozoic | Diorite, gabbro, and quartz diorite | 1 |
| Proterozoic | Early Proterozoic rocks | 1 |
| Proterozoic | Biotite gneiss, gneiss, and schist | 1 |
| Proterozoic | Amphibole gneiss | 1 |

Geologic mapping by Doelling 2002 (Moab and Eastern Part of San Rafael Desert 30' × 60' Quadrangle, scale 1:100,000); Doelling 2004 (La Sal 30' × 60' Quadrangle, scale 1:100,000); Witkind 2004 (Huntington 30' × 60' Quadrangle, scale 1:100,000); and Gualtieri 2004 (Westwater 30' × 60' Quadrangle, scale 1:100,000).

As discussed in Section 3.9.4.2, Class 1 geologic units have no sensitivity and no impact to paleontological resources is expected. Geologic units designated with a Class 2 have a low sensitivity, with little to low impact to paleontological resources anticipated. Class 3 geologic units have moderate sensitivity, and the risk of impacts to paleontological resources within these units is moderate. Class 4/5 and Class 5 geologic units have been designated high sensitivity units and have a high risk of adverse impacts. According to the PFYC (see Section 3.9.4.2 for detailed discussion), Class 4 units are Class 5 units with lowered risks of adverse impacts due to local conditions such as surficial cover and topography. Furthermore, Class 4 designations should be made on an action-specific basis once a determination of lowered risks to the resource has been made. For this analysis, probable Class 4 units are designated as Class 4/5 in order to best accommodate the language of the PFYC with the more programmatic approach of this study. For the purposes of this analysis, Class 3, 4/5 and 5 are considered sensitive geologic units, and Class 4/5 and Class 5 are considered highly sensitive. Since the risk of adverse impacts to paleontological resources in Class 1 and Class 2 units is negligible, only impacts to Class 3, Class 4/5 and Class 5 units are reported in the impacts analysis sections.

Within the MPA, significant vertebrate and non-vertebrate paleontological resources are generally most abundant in the Chinle, Morrison, Cedar Mountain, Neslen, Farrer, North Horn, Green River, and Wasatch Formations (PFYC Classes 4/5 and 5); and are locally present but generally less abundant in the Cutler, Moenkopi, Kayenta, Summerville, Dakota, Tuscher, Price River, and Mancos Formations (PFYC Class 3). Significant vertebrate and non-vertebrate fossils occur but are generally uncommon in the Paradox, Honaker Trail, Wingate, Navajo, Entrada, and

BLM_0010355

Carmel Formations, the Sego Sandstone and Geyser Creek Fanglomerate, and Pleistocene-age surficial deposits (PFYC Class 2). Significant vertebrate and non-vertebrate fossils do not occur in relatively young (Holocene-age) surficial deposits (PFYC Class 2), or in igneous and metamorphic rock units such as granite, pegmatite, gneiss, diorite and schist (PFYC Class 1).

## 4.3.9.2 PALEONTOLOGICAL RESOURCE IMPACTS

The loss of any identifiable fossil that could yield information important to prehistory, or that embodies the distinctive characteristics of a type of organism, environment, period of time, or geographic region, would be a significant adverse environmental impact. Direct adverse impacts on paleontological resources primarily concern the potential destruction of non-renewable paleontological resources and the loss of information associated with these resources. This includes the unlawful or unauthorized collection of fossil remains. If potentially fossiliferous bedrock or surficial sediments are disturbed, the disturbance could result in the destruction of paleontological resources and subsequent loss of information (adverse impact). Direct adverse impacts can typically be mitigated to below a level of significance through the implementation of paleontological mitigation.

Surface disturbance may result in the exposure of fossils that may never have been unearthed via natural processes. If mitigation measures are implemented, these newly exposed fossils become available for salvage, data recovery, scientific analysis, and preservation into perpetuity at a public museum (beneficial impact). The positive impacts of the results of mitigation include advances in scientific knowledge by both permitted field researchers and paleontologists who study fossils in museum collections, contributions to public education and interpretation, and community involvement and partnerships.

### 4.3.9.2.1 DIRECT IMPACTS TO PALEONTOLOGICAL RESOURCES

Direct impacts result from activities planned or authorized by the BLM, and occur at the same time and place as the surface-disturbing action. The potential for direct impacts on scientifically significant surface and sub-surface fossils in fossiliferous sedimentary deposits is controlled by two factors. These include: 1) the depth and lateral extent of disturbance of fossiliferous bedrock and/or surficial sediments; and 2) the depth and lateral extent of occurrence of fossiliferous bedrock and/or surficial sediments beneath the surface. Ground disturbance has the potential to adversely impact an unknown quantity of fossils which may occur on or underneath the surface in areas containing paleontologically sensitive geologic units. Without mitigation, these fossils, as well as the paleontological data they could provide if properly salvaged and documented, could be destroyed, rendering them permanently unavailable for future scientific research.

### 4.3.9.2.2 INDIRECT IMPACTS TO PALEONTOLOGICAL RESOURCES

Indirect impacts are caused by land management actions and occur later in time or further away in distance than direct impacts, but are still reasonably foreseeable. They typically include those impacts which result from the continuing implementation of management decisions and associated activities, and/or the normal ongoing operations of facilities constructed within a specific project area. An example of an indirect adverse impact on paleontological resources would be the construction of a new road which increases public access to a previously inaccessible area, and results in unauthorized fossil collecting and vandalism. Mitigation strategies could include surveys by permitted and qualified paleontologists to collect significant

BLM_0010356

surface fossils, transfer them to a public museum, and identify locations of fossil localities which have the potential to yield additional fossils as erosion occurs; augmentation of law enforcement staff and increased patrols; and the construction of protective fencing or other barriers around known paleontological sites.

### 4.3.9.3 IMPACTS TO PALEONTOLOGICAL RESOURCES COMMON TO ALL ALTERNATIVES

Management Actions under all alternatives would comply with Federal laws, regulations and agency guidelines governing the use and protection of paleontological resources, including but not limited to FLPMA, NEPA, CFR Title 43, Section 8365.1-5, and the BLM Manual H-8270-1 (1998b). These authorities mandate and direct the treatment of paleontological resources in the MPA. Project-specific assessments and mitigation measures would be implemented wherever and whenever significant paleontological resources would be damaged or destroyed by surface-disturbing actions.

Management strategies common to all alternatives for paleontological resources would have both long- and short-term beneficial impacts, and would lessen potential adverse impacts to below the level of significance. Each alternative promotes appropriate assessment to facilitate scientific research, encourages partnerships, manages access to significant fossils, reduces unauthorized use of paleontological resources, and provides for the mitigation of adverse impacts by qualified and permitted paleontologists where necessary and appropriate to protect them. Appropriate recreational use of common invertebrate and plant fossils is encouraged, as are public education and interpretation of paleontological resources.

The impacts of management actions related to fire management and paleontological resources on paleontological resources are common to all alternatives.

Management actions related to air quality, cultural resources, human health and safety, soil and water, special status species, vegetation, visual resource management, and wildlife and fisheries, would have negligible impacts on paleontological resources, and therefore will not be further analyzed. The impacts of these actions would be negligible because protecting air quality, protecting cultural resources under section 106, maintaining safety around AML sites and reducing the risks of hazardous materials spills, protecting sensitive soil and water resources, protecting federally listed species and their habitat, restoring and maintaining native vegetation communities, protecting non-listed wildlife and fish habitats, and maintaining scenic quality would neither inhibit nor enhance opportunities for the scientific study of important fossil resources nor the opportunities for recreational collection of fossils.

#### 4.3.9.3.1 IMPACTS OF FIRE MANAGEMENT DECISIONS ON PALEONTOLOGICAL RESOURCES

Actions related to fire management could have long-term direct and indirect adverse and beneficial impacts on paleontological resources. Surface-disturbing actions such as road construction, the building of fire lines, and prescribed burns, could damage or destroy surface fossils in paleontologically sensitive areas/geologic units. In these areas, paleontological mitigation would reduce potential direct adverse impacts to below the level of significance. Potential long-term adverse indirect impacts would result from the construction of new fire roads, which would increase access to BLM lands that were previously less accessible to the public, thus increasing the potential for unauthorized fossil collecting and vandalism. The recovery and preservation of fossils as the result of paleontological mitigation would be a

BLM_0010357

beneficial impact because it would permanently preserve paleontological resources which may have otherwise never been discovered, and make them available for scientific research, education and display.

### 4.3.9.3.2 IMPACTS OF PALEONTOLOGICAL RESOURCES DECISIONS ON PALEONTOLOGICAL RESOURCES

Paleontological resources identified as part of the Dinosaur Diamond National Prehistoric Byway would be recognized and protected. The Mill Canyon Dinosaur Trail, Copper Ridge Sauropod Trackway and Poison Spider Track Site would be managed as important scientific and public education resources as guided by future Special Recreation Management Area activity-level plans. All permitted activities would have lease notices and stipulations to prevent damage to paleontological resources. In areas where surface disturbance threatens significant fossils, current BLM paleontological resource management policy would be used to assess the threat and mitigate potential damage. Lands identified for disposal would be evaluated to determine whether such actions would remove significant fossils from Federal ownership. Appropriate (authorized under BLM regulations) recreational use of common invertebrate and plant fossils would be encouraged, as would public education and interpretation of paleontological resources. Commercial sales of petrified wood would be prohibited because of its limited availability. The casting of vertebrate fossils, including dinosaur tracks, would be prohibited unless allowed under a scientific research permit issued by the Utah State BLM Office. Paleontological Resource Use Permits issued and administered by the Utah State BLM Office for scientific research would provide important information to the BLM MFO about the locations (both geographic and stratigraphic) and kinds of significant paleontological resources in their jurisdiction, while promoting and facilitating scientific research and education. Providing websites, local interpretive sites, and written information to the public about fossils and hobby collection would directly increase public knowledge of the earth sciences, encourage good stewardship, reduce illegal collection, and increase the likelihood that important paleontological discoveries would be reported to the BLM in the future.

## 4.3.9.4 ALTERNATIVES IMPACTS

This section summarizes the impacts of the proposed management actions under each alternative on paleontological resources. Because the analyses of the management actions presented in this chapter do not reflect specific projects or actions, some impacts can only be expressed qualitatively. In most cases, subsequent site-specific analyses would be required in order to implement resource management decisions. These analyses would address potential site-specific impacts on a variety of resources, including (if appropriate) paleontological resources.

### 4.3.9.4.1 IMPACTS OF LANDS AND REALTY DECISIONS ON PALEONTOLOGICAL RESOURCES

Generally, land acquisitions by the BLM would affect paleontological resources by increasing public access to areas that contain paleontologically sensitive geologic units and areas that contain fossil localities. Public access to these areas could result in increased risk of adverse impact by the unauthorized collection or vandalism of paleontological resources. On the other hand, there would be an opportunity for the BLM to establish stewardship of paleontological resources on these newly acquired lands. This stewardship would include access to these lands by permitted paleontological researchers, and the resulting associated educational benefits

BLM_0010358

including interpretive opportunities and the permanent storage of scientifically significant fossils collected in public museums (beneficial impact). Transfer of BLM (public) lands to private ownership would have long-term indirect and cumulative adverse impacts on paleontological resources by removing scientifically significant fossils from the public domain, thus rendering them permanently unavailable for scientific research and education. As discussed above, paleontological mitigation would reduce adverse impacts to below the level of significance by ensuring the preservation of fossils in a public museum where they would be available for scientific research, education and display. Lands and Realty management actions under each alternative concern proposals for utility corridors and LTAs.

### 4.3.9.4.1.1 Alternative A

Actions related to lands and realty under Alternative A would have long-term indirect adverse and beneficial impacts on paleontological resources. The utility corridors proposed under Alternative A are 1 mile wide. Of all the alternatives, Alternative A provides for the least amount of land to be available for use as utility corridors in areas containing paleontologically sensitive geologic units (21,701 acres). Of these, 4,110 acres are in areas containing highly sensitive geologic units. Thus, this alternative has the lowest potential for direct adverse impacts on paleontological resources as it could result in the least amount of surface-disturbance associated with construction within these utility corridors. This surface disturbance has the potential to damage or destroy an unknown quantity of scientifically significant fossils. New utility corridors would also facilitate greater commercial and public access to BLM lands via associated access routes, thus increasing the potential for unauthorized fossil collecting and vandalism (indirect adverse impact).

### 4.3.9.4.1.2 Alternative B

Under Alternative B an I-70 utility corridor would be designated that includes all existing rights-of-way identified in the existing RMP with a 100 foot width on each side of the widest Right-of-Way corridor, the existing Moab Canyon utility corridor would be designated, and the utility corridor south of Spanish Valley would be split into two corridors identical to the existing corridors. Of all the alternatives, Alternative B opens the second lowest acreage for use as utility corridors in areas containing paleontologically sensitive geologic units (38,633 acres). Of these, 5,482 acres are in areas containing highly sensitive geologic units. Thus, this alternative has the second lowest potential behind Alternative A for direct adverse impacts on paleontological resources.

### 4.3.9.4.1.3 Proposed Plan

Under the Proposed Plan an I-70 utility corridor would be designated that includes all major existing rights-of-way identified with a 100 foot widths on each side of the widest Right-of-Way corridor, the existing Moab Canyon utility corridor would be designated, and the two utility corridors south of Spanish Valley would be combined into a single corridor that would include the approximately 2 to 3 miles separating the two segments. Of all the alternatives, the Proposed Plan opens the second highest acreage for use as utility corridors in areas containing paleontologically sensitive geologic units (101,359 acres). Of these, 24,313 acres are in areas containing highly sensitive geologic units. Thus, this alternative has the second highest potential behind Alternative D for direct adverse impacts on paleontological resources.

BLM_0010359

## 4.3.9.4.1.4 Alternative D

Under Alternative D the configurations of the proposed utility corridors are identical to those under the Proposed Plan, although the width is double. Of all the alternatives, Alternative D provides for the highest amount of land to be available for use as utility corridors in areas containing paleontologically sensitive geologic units (123,132 acres). Of these, 24,887 acres are in areas containing highly sensitive geologic units. Thus, this alternative has the highest potential for direct adverse impacts on paleontological resources.

### *4.3.9.4.2 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON PALEONTOLOGICAL RESOURCES*

Under each alternative, livestock grazing would be managed according to BLM guidelines for Grazing Management to achieve Standards for Rangeland Health. Livestock grazing management actions under each alternative concern amounts of acreage available for livestock grazing with the MPA as well as seasonal grazing restrictions.

## 4.3.9.4.2.1 Alternative A

Actions related to livestock grazing under Alternative A could have direct and indirect adverse impacts on paleontological resources if grazing occurs in areas containing occurrences of scientifically significant surface fossils. This is because damage or destruction of surface fossils is known to occur as a result of trampling by livestock. Generally, grazing would be evaluated for significant paleontological resources if they occur in areas containing paleontologically sensitive units. Avoidance of sensitive resources could be accomplished with the construction of fencing or other barriers around known fossil localities. However, this could lead to an increased risk of unauthorized collecting or vandalism of the resources as it would increase their visibility.

Of all the alternatives, Alternative A has the second least possibility for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the second least area (1,695,621 acres) to livestock grazing which could result in the destruction of some surface-occurring fossils by trampling. Of these, 394,972 acres are located in areas containing highly sensitive geologic units.

## 4.3.9.4.2.2 Alternative B

Of all the alternatives, Alternative **B** has the lowest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because the smallest area (1,668,732 acres) is potentially available for livestock grazing, thus creating the least likelihood of inadvertent surface fossil destruction by trampling. Of these, 394,718 acres are located in areas containing highly sensitive geologic units.

## 4.3.9.4.2.3 Proposed Plan

Of all the alternatives, the Proposed Plan has the third lowest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because the third smallest area (1,708,294 acres) behind Alternative B and the Proposed Plan is potentially available for livestock grazing, thus creating the second lowest likelihood of inadvertent surface fossil destruction by trampling. Of these, 394,841 acres are located in areas containing highly sensitive geologic units.

BLM_0010360

### 4.3.9.4.2.4 Alternative D

Of all the alternatives, Alternative D has the highest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because the largest area (1,770,314 acres) is potentially available for livestock grazing, thus creating the highest likelihood of inadvertent surface fossil destruction by trampling. Of these, 394,832 acres are located in areas containing highly sensitive geologic units.

### 4.3.9.4.3 IMPACTS OF MINERAL DECISIONS ON PALEONTOLOGICAL RESOURCES

Management actions related to mineral development would provide for a variety of mineral exploration and development activities for leasable, locatable and salable minerals. Because of the potential large scale surface disturbance resulting from leasable oil and gas exploration and development, this category is analyzed quantitatively and separately from other mineral types. Because mineral exploration and development activities, including geophysical surveys, typically involve significant amounts of surface disturbance, adverse impacts on paleontological resources would result under all alternatives without mitigation. Commercial exploration and development of BLM lands for energy resources would have both direct and indirect adverse impacts on paleontological resources. Surface-disturbing activities associated with exploration and development could damage or destroy scientifically significant surface and sub-surface fossils (direct adverse impact). The ongoing operations of commercial energy facilities and associated infrastructure on BLM lands would have indirect adverse impacts on paleontological resources by increasing access to lands that were previously inaccessible through new road development, thus increasing the likelihood of unauthorized fossil collecting and vandalism. These impacts are most likely to occur in paleontologically sensitive units which are designated as Class 3, 4/5 and 5. Therefore, the sensitivities of geologic units and surface acreage eligible for minerals exploration and development is of critical consideration when analyzing potential impacts to paleontological resources.

### 4.3.9.4.3.1 Alternative A

The number of acres open to oil and gas leasing under both standard and special stipulations on BLM lands within each RFD area under Alternative A and corresponding paleontological sensitivities of geologic units are provided in Table 4.72.

Of all the alternatives, Alternative A has the highest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the largest area (838,412 acres) to oil and gas leasing. Of these 838,412 acres in paleontologically sensitive geologic units, 262,895 acres are located in areas containing *highly* sensitive geologic units (Classes 4/5 and 5). For Alternative A, the Eastern Paradox RFD area has the highest potential for adverse impacts on paleontological resources because it contains the largest acreage of sensitive geologic units, followed in descending order by the Greater Cisco, Bookcliffs, Bigflat, Lisbon Valley, Hatch Point, Salt Wash, and Roan Cliffs RFD areas.

BLM_0010361

**Table 4.72. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under Alternative A for Each of the RFD Areas Within the MPA**

|  | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|---|---|---|---|---|---|
| Bigflat | 3,875 | 123,354 | 79,179 | 19,838 | 5,809 |
| Bookcliffs | n/a | 22,427 | 65,766 | 62,458 | n/a |
| Eastern Paradox | 16,665 | 200,657 | 224,685 | 52,718 | 31,777 |
| Greater Cisco | 77 | 52,246 | 147,512 | 11,443 | 4,424 |
| Hatch Point | 597 | 93,016 | 32,656 | 3,557 | 162 |
| Lisbon Valley | n/a | 56,059 | 16,282 | 35,930 | 6,133 |
| Roan Cliffs | n/a | 86 | 1,965 | 1,098 | n/a |
| Salt Wash | 6,561 | 11,107 | 7,472 | 11,782 | 15,766 |
| **Total** | **27,775** | **558,952** | **575,517** | **198,824** | **64,071** |

See Section 3.9.4.2 for detailed PFYC class descriptions (*Class* 1 = no sensitivity, no anticipated impact; *Class* 2 = low sensitivity, little to low anticipated impact; *Class* 3 = moderate sensitivity, moderate anticipated impact; *Class* 4/5 = high sensitivity, high anticipated impact, but sensitivity level may be lowered based on site-specific assessments; *Class* 5 = high sensitivity, high anticipated impact.

Of all the alternatives, Alternative A has the highest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the largest area (838,412 acres) to oil and gas leasing. Of these 838,412 acres in paleontologically sensitive geologic units, 262,895 acres are located in areas containing *highly* sensitive geologic units (Classes 4/5 and 5). For Alternative A, the Eastern Paradox RFD area has the highest potential for adverse impacts on paleontological resources because it contains the largest acreage of sensitive geologic units, followed in descending order by the Greater Cisco, Bookcliffs, Bigflat, Lisbon Valley, Hatch Point, Salt Wash, and Roan Cliffs RFD areas.

Under Alternative A, 2,397 acres of BLM Lands (3,504 acres of all lands) would be open to geophysical exploration within the MPA. Alternative A would have the highest potential for adverse impacts on surface fossils because it makes the most amount of land available for geophysical surveys.

### 4.3.9.4.3.2 Alternative B

The number of acres open to oil and gas leasing under both standard and special stipulations within each RFD area under Alternative B and corresponding paleontological sensitivities of geologic units are provided in Table 4.73.

BLM_0010362

**Table 4.73. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under Alternative B for Each of the RFD Areas Within the MPA**

|  | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|---|---|---|---|---|---|
| Bigflat | 624 | 53,742 | 26,779 | 2,472 | 1,249 |
| Bookcliffs | n/a | 15,959 | 41,642 | 38,562 | n/a |
| Eastern Paradox | 12,566 | 120,870 | 133,236 | 33,790 | 29,574 |
| Greater Cisco | 26 | 22,819 | 65,729 | 8,916 | 3,276 |
| Hatch Point | 598 | 53,502 | 11,370 | 1,752 | 162 |
| Lisbon Valley | n/a | 54,243 | 15,259 | 35,213 | 6,134 |
| Roan Cliffs | 6 | n/a | 1,392 | n/a | n/a |
| Salt Wash | 4,607 | 9,199 | 6,626 | 10,155 | 13,939 |
| **Total** | **18,427** | **330,334** | **302,033** | **130,860** | **54,334** |

See Section 3.9.4.2 for detailed PFYC class descriptions (*Class 1* = no sensitivity, no anticipated impact; *Class 2* = low sensitivity, little to low anticipated impact; *Class 3* = moderate sensitivity, moderate anticipated impact; *Class 4/5* = high sensitivity, high anticipated impact, but sensitivity level may be lowered based on site-specific assessments; *Class 5* = high sensitivity, high anticipated impact.

Of all the alternatives, Alternative B has the lowest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the smallest area (487,227 acres) to oil and gas leasing. Of these 487,227 acres in paleontologically sensitive geologic units, 185,194 are located in areas containing *highly* sensitive geologic units (Classes 4/5 and 5). For Alternative B, the Eastern Paradox RFD area has the highest potential for adverse impacts on paleontological resources because it contains the largest acreage of sensitive geologic units, followed in descending order by the Bookcliffs, Greater Cisco, Lisbon Valley, Salt Wash, Bigflat, Hatch Point, and Roan Cliffs RFD areas.

Under Alternative B, 1,404 acres of BLM Lands (2,052 acres of all lands) would be open to geophysical exploration within the MPA. Alternative B would have the lowest potential for adverse impacts on surface fossils because it makes the least amount of land available for geophysical surveys.

### 4.3.9.4.3.3 Proposed Plan

The number of acres open to oil and gas leasing under both standard and special stipulations within each RFD area under the Proposed Plan and corresponding paleontological sensitivities of geologic units are provided in Table 4.74.

**Table 4.74. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under the Proposed Plan for Each of the RFD Areas Within the MPA**

|  | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|---|---|---|---|---|---|
| Bigflat | 1,039 | 87,866 | 40,552 | 5,325 | 4,668 |
| Bookcliffs | n/a | 22,817 | 65,874 | 61,670 | n/a |
| Eastern Paradox | 15,207 | 160,346 | 183,712 | 45,612 | 31,262 |

BLM_0010363

**Table 4.74. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under the Proposed Plan for Each of the RFD Areas Within the MPA**

|  | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|---|---|---|---|---|---|
| Greater Cisco | 77 | 52,825 | 148,282 | 11,733 | 4,434 |
| Hatch Point | 598 | 90,198 | 31,284 | 3,516 | 162 |
| Lisbon Valley | n/a | 55,884 | 16,040 | 35,825 | 6,135 |
| Roan Cliffs | n/a | 93 | 2,053 | 1,260 | n/a |
| Salt Wash | 5,220 | 11,402 | 6,627 | 10,159 | 14,273 |
| **Total** | **22,141** | **481,431** | **494,424** | **175,100** | **60,934** |

See Section 3.9.4.2 for detailed PFYC class descriptions (*Class 1* = no sensitivity, no anticipated impact; *Class 2* = low sensitivity, little to low anticipated impact; *Class 3* = moderate sensitivity, moderate anticipated impact; *Class 4/5* = high sensitivity, high anticipated impact, but sensitivity level may be lowered based on site-specific assessments; *Class 5* = high sensitivity, high anticipated impact.

Of all the alternatives, the Proposed Plan has the second lowest potential behind Alternative B for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the second smallest area (730,458 acres) to oil and gas leasing. Of these 730,458 acres in paleontogically sensitive geologic units, 236,034 are located in areas containing *highly* sensitive geologic units (Classes 4/5 and 5). For the Proposed Plan, the Eastern Paradox RFD area has the highest potential for adverse impacts on paleontological resources because it contains the largest acreage of sensitive geologic units, followed in descending order by the Greater Cisco, Bookcliffs, Lisbon Valley, Bigflat, Hatch Point, Salt Wash, and Roan Cliffs RFD areas.

Under the Proposed Plan, 2,072 acres of BLM Lands (3,029 acres of all lands) would be open to geophysical exploration within the MPA. The Proposed Plan would have the second lowest potential behind Alternative B for adverse impacts on surface fossils because it makes the second least amount of land available for geophysical surveys.

### 4.3.9.4.3.4 Alternative D

The number of acres open to oil and gas leasing under both standard and special stipulations within each RFD area under Alternative D and corresponding paleontological sensitivities of geologic units are provided in Table 4.75.

**Table 4.75. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under Alternative D for Each of the RFD Areas Within the MPA**

|  | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|---|---|---|---|---|---|
| Bigflat | 3,807 | 116,602 | 73,397 | 17,106 | 5,612 |
| Bookcliffs | n/a | 22,818 | 66,798 | 62,584 | n/a |
| Eastern Paradox | 16,528 | 191,309 | 210,985 | 50,248 | 31,926 |
| Greater Cisco | 76 | 52,880 | 148,291 | 11,737 | 4,433 |
| Hatch Point | 598 | 93,099 | 32,532 | 3,547 | 162 |
| Lisbon Valley | n/a | 55,888 | 16,051 | 35,837 | 6,135 |

BLM_0010364

**Table 4.75. Proposed Acreages per PFYC Classes Open to Oil and Gas Leasing Under Alternative D for Each of the RFD Areas Within the MPA**

|              | Class 1 | Class 2 | Class 3 | Class 4/5 | Class 5 |
|--------------|---------|---------|---------|-----------|---------|
| Roan Cliffs  | n/a     | 93      | 2,238   | 1,385     | n/a     |
| Salt Wash    | 6,465   | 11,782  | 7,308   | 11,324    | 15,103  |
| **Total**    | **27,474** | **544,471** | **557,600** | **193,768** | **63,371** |

See Section 3.9.4.2 for detailed PFYC class descriptions (*Class 1* = no sensitivity, no anticipated impact; *Class 2* = low sensitivity, little to low anticipated impact; *Class 3* = moderate sensitivity, moderate anticipated impact; *Class 4/5* = high sensitivity, high anticipated impact, but sensitivity level may be lowered based on site-specific assessments; *Class 5* = high sensitivity, high anticipated impact.

Of all the alternatives, Alternative D has the second highest potential behind Alternative A for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the second largest area (814,739 acres) to oil and gas leasing. Of these 814,739 acres in paleontogically sensitive geologic units, 257,139 are located in areas containing *highly* sensitive geologic units (Classes 4/5 and 5). For Alternative D, the Eastern Paradox RFD area has the highest potential for adverse impacts on paleontological resources because it contains the largest acreage of sensitive geologic units, followed in descending order by the Greater Cisco, Bookcliffs, Bigflat, Lisbon Valley, Hatch Point, Salt Wash, and Roan Cliffs RFD areas.

Under Alternative D, 2,309 acres of BLM Lands (3,405 acres of all lands) would be open to geophysical exploration within the MPA. Alternative D would have the second highest potential behind Alternative A for adverse impacts on surface fossils because it makes the second least amount of land available for geophysical surveys.

#### 4.3.9.4.4 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON PALEONTOLOGICAL RESOURCES

Prescriptions for non-WSA lands with wilderness characteristics would generally have long-term beneficial impacts on paleontological resources that occur within their boundaries. Impacts to paleontological resources vary among alternatives based on the acreage managed for wilderness characteristics and the oil and gas leasing stipulations assigned within them.

#### 4.3.9.4.4.1 Alternative A

Alternative A would manage no lands to protect non-WSA lands with wilderness characteristics. Therefore, no restrictions on surface-disturbing activities would be imposed in Alternative A as a result of wilderness characteristics decisions and inadvertent adverse impacts to paleontological resources could occur.

#### 4.3.9.4.4.2 Alternative B

Alternative B would manage 266,485 acres to protect non-WSA lands with wilderness characteristics. These lands would be managed as closed to oil and gas leasing and with no surface disturbance allowed by other surface-disturbing activities. These restrictions would protect paleontological resources by precluding surface-disturbing activities.

BLM_0010365

### 4.3.9.4.4.3 Proposed Plan

The Proposed Plan would manage 47,761 acres (in Beaver Creek, Fisher Towers and Mary Jane) to protect non-WSA lands with wilderness characteristics. These lands would be managed as NSO for oil and gas leasing and by precluding other surface-disturbing activities. These restrictions would protect paleontological resources by precluding surface-disturbing activities.

### 4.3.9.4.4.4  Alternative D

Alternative D would manage no lands to protect non-WSA lands with wilderness characteristics. Therefore, no restrictions on surface-disturbing activities would be imposed in Alternative D as a result of wilderness characteristics decisions and inadvertent adverse impacts to paleontological resources could occur.

### *4.3.9.4.5 IMPACTS OF RIPARIAN DECISIONS ON PALEONTOLOGICAL RESOURCES*

Under all alternatives, riparian areas would be managed for properly functioning condition and management actions would ensure that stream channel morphology and functions are appropriate for local soil types, climates, and landforms. The loss or degradation of riparian areas, wetlands and associated floodplains would be avoided or minimized; natural and beneficial values would be preserved and enhanced; and fish, wildlife and special status species would be provided for. Specifically, management of riparian areas under each alternative concerns the amount of land in riparian areas that could be available for grazing and the seasonal availability of these areas.

Wherever riparian areas are underlain by paleontologically sensitive geologic units, surface disturbance (including ROWs) within these areas has the potential to adversely impact paleontological resources due to the trampling, breakage and crushing of fossil remains. Mitigation would include field surveys to collect significant surface fossils and associated data from bedrock exposures within areas that could be subject to trampling, and the transfer of all collected fossils to a public museum for curation and permanent storage. As an alternative mitigation avoidance of sensitive resources could be accomplished with the construction of fencing or other barriers around known fossil localities. However, this could lead to an increased risk of unauthorized collecting or vandalism of the resources as it would increase their visibility.

### 4.3.9.4.5.1 Alternative A

Under Alternative A, the Between the Creeks, North Sand Flats, South Sand Flats, Cottonwood and Diamond allotments would not be available for grazing to benefit riparian resources, and the Spring Creek, Castle Valley, Pear Park and Bogart allotments would continue to be managed as not available for grazing in order to protect riparian resources. Of all the alternatives, Alternative A places the fewest possible restrictions on grazing in riparian areas, both geographically and seasonally, and would therefore have the highest probability of short- and long-term direct adverse impacts on paleontological resources, although since most paleontological resources are subsurface, impacts would be minor.

### 4.3.9.4.5.2 Alternative B

Under Alternative B, grazing within riparian areas would be evaluated for exclusion from the following drainages with the installation of fencing while allowing for water access: Ten Mile from Dripping Spring to the Green River, Lower Gray Canyon of the Green River, Day Canyon,

BLM_0010366

Mill Creek, Seven Mile Canyon, East Coyote, Kane Springs, and Hatch Wash (4,422 acres. Development and implementation of the Watershed Management Plans and riparian studies for the following areas would be prioritized: Mill Creek (including North Fork, Rill, and Burkholder), Ten Mile Wash, Kane Springs, White Wash, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Professor Creek, Negro Bill Canyon, Cottonwood/Diamond, Spring Canyon, Red Wash, Green River, Colorado River, Onion Creek and Westwater Creek. Of all the alternatives, Alternative B places the most restrictions on grazing in riparian areas, both geographically and seasonally, and would therefore have the lowest probability of short- and long-term direct adverse impacts on paleontological resources.

### 4.3.9.4.5.3 Proposed Plan

Under the Proposed Plan, grazing in riparian areas would be evaluated for restriction while allowing for water access in the following drainages: Ten Mile from Dripping Spring to the Green River, Mill Creek, Seven Mile Canyon, and East Coyote (1,169 acres). Restrictions could include the development of an Allotment Management Plan, changing seasons of use, restricting the intensity of grazing, and the installation of fencing or other forms of exclusion. The development and implementation of the Watershed Management Plans and riparian studies for the following areas would be prioritized: Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood-Diamond, and Onion Creek. Of all the alternatives, the Proposed Plan places the second most restrictions on grazing in riparian areas behind Alternative B, both geographically and seasonally, and would therefore have the second lowest probability of short- and long-term direct adverse impacts on paleontological resources.

### 4.3.9.4.5.4 Alternative D

Under Alternative D, grazing management in riparian areas would be identical as described in Alternative A. Watershed Management Plans would not be prioritized. Of all the alternatives, Alternative D places the second fewest restrictions on grazing in riparian areas behind Alternative B, both geographically and seasonally, and would therefore have the second highest probability behind Alternative A for short- and long-term direct adverse impacts on paleontological resources.

### *4.3.9.4.6 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON PALEONTOLOGICAL RESOURCES*

Management of special designations could have indirect adverse and beneficial impacts on paleontological resources. For the purpose of this analysis, Special Designations fall into three categories: Areas of Critical Environmental Concern (ACECs), Wild and Scenic Rivers (WSRs), and Wilderness Study Areas (WSAs). There are 14 potential ACECs, 13 WSRs, and 10 WSAs within the MPA. To the extent that Special Designations in paleontologically sensitive areas/geologic units result in restricted public access and use, and prohibit surface-disturbing actions, paleontological resources would be less likely to be unlawfully collected or vandalized, or damaged or destroyed by vehicular traffic or construction. Therefore, in this general sense, Special Designations represent a beneficial impact on paleontological resources because they lessen the probability of their permanent loss to science and education. If public access to Special Designation areas such as ACECs is encouraged, and surface-disturbing actions are permitted, adverse direct and indirect impacts on paleontological resources could occur.

BLM_0010367

For all alternatives, there are 343,997 total acres designated as WSAs. Table 4.76 shows the acreage of paleontologically sensitive areas contained within each WSA in the MPA.

**Table 4.76. WSA Acreages by PFYC Class**

| WSA | Total Acreage | Class 1 | Class 2 | Class 3 | Class 4/5 |
|---|---|---|---|---|---|
| Behind the Rocks WSA | 13,056 | | 9,044 | 3949 | 64 |
| Black Ridge Canyons WSA | 57 | | 52 | 5 | |
| Coal Canyon WSA | 60,599 | | 1,409 | 18,066 | 41,124 |
| Desolation Canyon WSA | 81,363 | | 828 | 37,392 | 43,060 |
| Floy Canyon WSA | 71,899 | | 2,310 | 24,849 | 44,740 |
| Flume Canyon WSA | 47,823 | | 909 | 17,098 | 29,816 |
| Lost Spring Canyon WSA | 1,625 | 368 | 399 | 858 | |
| Mill Spring Canyon WSA | 9,841 | 380 | 5,953 | 3,507 | 1 |
| Negro Bill Canyon WSA | 7,557 | | 3,630 | 3,880 | 46 |
| Spruce Canyon WSA | 20,263 | | | 7,327 | 12,937 |
| Westwater Canyon WSA | 29,914 | 4,998 | 10,020 | 11,803 | 2,748 |
| **Total** | **343,997** | **5,746** | **34,554** | **128,734** | **174,536** |

See Section 3.9.4.2 for detailed PFYC class descriptions (*Class* 1 = no sensitivity, no anticipated impact; *Class* 2 = low sensitivity, little to low anticipated impact; *Class* 3 = moderate sensitivity, moderate anticipated impact; *Class 4/5* = high sensitivity, high anticipated impact, but sensitivity level may be lowered based on site-specific assessments; *Class* 5 = high sensitivity, high anticipated impact.

For all alternatives, there are 5,106 total acres of designated wilderness (Black Ridge Wilderness Area within the Colorado Canyon National Conservation Area) within the MPA. These include 871 acres underlain by Class 2 geologic units, 4,230 acres underlain by Class 3 geologic units, and 5 acres underlain by Class 4/5 geologic units. Thus, the designated wilderness provides some protection for paleontological resources.

### 4.3.9.4.6.1 Alternative A

Under Alternative A, no areas are designated as ACECs. The Negro Bill Canyon Outstanding Natural Area is the only special designation. This area encompasses a total of 1,287 acres. It is underlain by 726 acres of Class 2 geologic units, and 561 acres of Class 3 geologic units. Of all the alternatives, Alternative A designates the second smallest amount of BLM lands as special designations and/or ACECs, and thus has the second highest potential for adverse impacts on significant paleontological resources because it would provide the second least amount of restrictions on land access and use.

There are no rivers that would be managed as suitable for Congressional designation into the National Wild and Scenic Rivers System under Alternative A, However, because all eligible rivers would, by BLM policy, continue to be managed in a protective manner until suitability could be determined, paleontological values would benefit from that protection.

BLM_0010368

### 4.3.9.4.6.2 Alternative B

Under Alternative B, a total of 71,072 acres are would be determined and managed as suitable for congressional WSR designation with recreational, scenic and wild classifications. Of these, 2,864 acres are underlain by Class 1 geologic units, 25,257 acres are underlain by Class 2 geologic units, 21,962 acres are underlain by Class 3 geologic units, 14,128 acres are underlain by Class 4/5 geologic units, and 1,864 acres are underlain by Class 5 geologic units. Because no eligible rivers would be determined as suitable for congressional designation as WSRs under Alternatives A and D, and less acreage would be determined suitable and managed in a protective manner under the Proposed Plan, Alternative B would be most protective of paleontological resources because it determines and manages the most acreage as suitable

Under Alternative B, 14 ACECs are designated encompassing a total area of 610,703 acres. Of these, 4,483 acres are underlain by Class 1 geologic units, 118,323 acres are underlain by Class 2 geologic units, 273,861 acres are underlain by Class 3 geologic units, 195,305 acres are underlain by Class 4/5 geologic units, and 5,325 acres are underlain by Class 5 geologic units. Of all the alternatives, Alternative B designates the largest acreage of BLM lands as ACECs, and thus has the lowest potential for adverse impacts on significant paleontological resources because it would provide the most restrictions on land access and use, such as NSO or closed for mineral development.

### 4.3.9.4.6.3 Proposed Plan

Under the Proposed Plan, a total of 41,495 acres are proposed as suitable for congressional wild and scenic river designation with recreational, scenic and wild classifications. Of these, 2,651 acres are underlain by Class 1 geologic units, 15,546 acres are underlain by Class 2 geologic units, 11,122 acres are underlain by Class 3 geologic units, 6,209 acres are underlain by Class 4/5 geologic units, and 1,338 acres are underlain by Class 5 geologic units. Because no rivers would be determined suitable and managed in a protective manner under Alternative D, and the highest amount of acreage would be managed as suitable for congressional wild and scenic designation under Alternative B, the Proposed Plan has less potential than Alternative B but more potential than Alternative D to protect paleontological values from adverse surface-disturbing impacts. Alternative A is probably more protective than the Proposed Plan, because all rivers would continue to be managed in a protective manner until suitability determinations can be made.

Under the Proposed Plan, 5 ACECs are designated encompassing a total area of 63,232 acres. Of these, 131 acres are underlain by Class 1 geologic units, 9,632 acres are underlain by Class 2 geologic units, 24,079 acres are underlain by Class 3 geologic units, 24,324 acres are underlain by Class 4/5 geologic units, and 0 acres are underlain by Class 5 geologic units. Of all the alternatives, the Proposed Plan designates the second largest acreage of BLM lands as ACECs behind Alternative B, and thus has the second lowest potential for adverse impacts on significant paleontological resources because it would provide the second most amount of restrictions on land access and use, such as NSO or closed for mineral development.

BLM_0010369

### 4.3.9.4.6.4 Alternative D

There would be no rivers determined suitable and managed in a protective manner under Alternative D. Therefore, there is a higher potential for adverse impacts on paleontological resources than Alternative B and the Proposed Plan.

There are no ACECs (or ONAs) designated under Alternative D as this alternative has the highest potential for adverse impacts on significant paleontological resources because it would provide the least amount of restrictions on land access and use, such as NSO or closed for mineral development.

### 4.3.9.4.7 IMPACTS OF RECREATION AND TRAVEL MANAGEMENT DECISIONS ON PALEONTOLOGICAL RESOURCES

Under each alternative, decisions related to travel management would provide opportunities for a range of motorized recreation experiences on public lands while protecting resources and minimizing conflicts among various users. Specifically, travel management under each alternative address OHV use for both motorized and mechanized (e.g., mountain bikes) travel. All BLM lands would be designated as open, limited to designated routes, or closed. Areas that are either open to OHV use or limit OHV use to designated routes have the potential to adversely impact paleontological resources due to the resulting surface disturbance, and are analyzed separately below.

Generally, the construction of travel infrastructure such as roads, trails, and trailheads would be associated with construction-related surface disturbance that could damage or destroy fossils in paleontologically sensitive areas/geologic units. The designation of new routes for motorized and non-motorized travel would facilitate access to areas that were previously prohibited or inaccessible. This would also increase the potential for adverse direct impacts on surface fossils in paleontologically sensitive areas/geologic units. The overall increase in public access to BLM lands associated with travel management would increase the potential for unauthorized fossil collecting and vandalism.

### 4.3.9.4.7.1 Alternative A

Impacts related to travel management under Alternative A include potential adverse direct and indirect impacts on paleontological resources associated with damage by vehicles, and increased public access to BLM lands resulting in a greater potential for unauthorized fossil collecting or vandalism. Interpretive signs and displays in paleontologically sensitive areas, as well as the encouragement of lawful collecting of invertebrate and plant fossils, could foster a greater overall appreciation for paleontological resources and their scientific significance.

Of all the alternatives, Alternative A has the highest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it opens the largest area (391,133 acres) to unrestricted OHV travel, and hence provides the greatest amount of access to the general public. This increases the potential for damage and destruction of surface fossils by running over them with motorized vehicles and crushing them, as well as unauthorized fossil collection and vandalism. Of these 391,133 acres in paleontologically sensitive geologic units, 182,687 are located in areas containing highly sensitive geologic units.

BLM_0010370

Alternative A designates 764,260 acres in paleontologically sensitive geologic units as limited to designated, existing or inventoried routes.

### 4.3.9.4.7.2 Alternative B

Of all the alternatives, Alternative B has the lowest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it designates no lands as open to cross country OHV travel. Thus it prevents greater access to the general public which would increase the potential for damage and destruction of surface fossils by crushing, as well as unauthorized fossil collection and vandalism. Alternative B designates 860,291 acres in paleontologically sensitive geologic units as limited to designated routes. This alternative has the lowest overall potential for adverse impacts on paleontological resources. Of the 860,291 acres in paleontologically sensitive geologic units, 270,937 are located in areas containing highly sensitive geologic units.

### 4.3.9.4.7.3 The Proposed Plan

Of all the alternatives, the Proposed Plan has the second lowest potential behind Alternative B for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it designates the second smallest area (7 acres in paleontologically sensitive geologic units) as open to cross country OHV travel. Thus it provides less access to the general public than alternatives A and D, decreasing the potential for damage and destruction of surface fossils by crushing, as well as unauthorized fossil collection and vandalism. None of the 7 acres in paleontologically sensitive geologic units are located in areas containing highly sensitive geologic units. The Proposed Plan designates 831,367 acres in paleontologically sensitive geologic units to OHV travel limited to designated routes. This alternative has the third lowest overall potential for adverse impacts on paleontological resources. Of the 831,367 acres in paleontologically sensitive geologic units, 243,797 are located in areas containing highly sensitive geologic units.

### 4.3.9.4.7.4 Alternative D

Of all the alternatives, Alternative D has the second highest potential behind Alternative A for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it designates the second largest area (38 acres in paleontologically sensitive geologic units) as open to cross country OHV travel. This provides the second greatest amount of access to the general public, which increases the potential for damage and destruction of surface fossils by crushing, as well as unauthorized fossil collection and vandalism. It should be noted that although Alternative D has the second highest potential for adverse impacts behind Alternative A, Alternative D involves a much smaller area (38 acres in paleontologically sensitive geologic units) that is much closer is size to alternatives B (0 acres) and the Proposed Plan (7 acres in paleontologically sensitive geologic units), than A (391,133 acres in paleontologically sensitive geologic units). Alternative D designates 1,142,781 acres in paleontologically sensitive geologic units as limited to designated routes. This has the second highest overall potential for adverse impacts on paleontological resources. Of the 1,142,781 acres in paleontologically sensitive geologic units, 443,037 are located in areas containing highly sensitive geologic units.

BLM_0010371

### 4.3.9.4.8 IMPACTS OF WOODLANDS DECISIONS ON PALEONTOLOGICAL RESOURCES

Management of woodlands involves the harvesting of woodlands products for commercial and recreational uses on lands managed by the MFO. In general, the increase in public access resulting from new as well as existing routes would have indirect adverse impacts on paleontological resources because it could increase the potential for unauthorized fossil collecting and vandalism. On the other hand, an increase in public access could also benefit qualified and BLM-permitted paleontological researchers who are interested in conducting field research in the area, and facilitate the collection and study of fossils which may have otherwise never been discovered. The implementation of paleontological mitigation measures in paleontologically sensitive areas/geologic units prior to and during the construction of new roads and other surface-disturbing activities related to woodlands management would reduce potential adverse direct and indirect impacts on paleontological resources to below the level of significance.

#### 4.3.9.4.8.1 Alternative A

Actions related to management of woodlands under Alternative A would have direct adverse impacts on paleontological resources due to surface-disturbing actions associated with woodlands harvest. Of all the alternatives, Alternative A has the highest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it would result in the largest possible area (760,344 acres) of surface disturbance resulting from activities associated with woodlands product harvest. Of these, 249,548 acres are located in areas containing highly sensitive geologic units.

#### 4.3.9.4.8.2 Alternative B

Of all the alternatives, Alternative B has the lowest potential for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it would result in the smallest possible area (614,848 acres) open to surface-disturbing activities associated with woodlands harvest. Of these, 201,649 acres are located in areas containing highly sensitive geologic units.

#### 4.3.9.4.8.3 Proposed Plan

Of all the alternatives, the Proposed Plan has the second lowest potential behind Alternative B for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it would result in the second possible smallest area (737,198 acres) open to surface-disturbing activities associated with woodlands harvest. Of these, 241,866 acres are located in areas containing highly sensitive geologic units.

#### 4.3.9.4.8.4 Alternative D

Of all the alternatives, Alternative D has the second highest potential behind Alternative A for adverse impacts on paleontological resources in paleontologically sensitive geologic units because it would result in the second possible largest area (760,198 acres) open to surface-disturbing activities associated with woodlands harvest. Of these, 241,866 acres are located in areas containing highly sensitive geologic units, thus, impacts to highly sensitive paleontological resources would be the same as the Proposed Plan.

BLM_0010372

#### 4.3.9.5 SUMMARY OF IMPACTS TO PALEONTOLOGICAL RESOURCES

The impacts of implementing fire management, paleontological resources, lands and realty, livestock grazing, minerals development, riparian, special designations, travel management, wilderness characteristics, and woodlands decisions under all four alternatives are summarized in Table 2.2, located in Chapter 2. Those activities and alternatives which maximize the possibility of surface-disturbing activities provide the highest probability of adverse impacts to paleontological resources. Alternative B provides the most protection for these resources, followed by the Proposed Plan and Alternatives D and A, in that order.

### 4.3.10 RECREATION

This section discusses impacts to recreation from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning recreation are described in Chapter 3. The assumptions discussed below were made in order to analyze the level of impacts the proposed RMP management actions would have on recreational resources, opportunities, and expectations and on the likelihood for user satisfaction. Recreational resources are defined as the natural elements within the environment that provide the physical basis for recreation. Recreational opportunities are defined as the combination of the natural elements (e.g., scenery, vegetation, geology, land forms, weather) and human-controlled conditions (e.g., roads and trails, developed sites, signs, route markers, facilities) that create the potential for recreation. Recreational expectations are those assumptions made by the recreation resource user (e.g., the hiker, mountain biker, the scenic driver, etc.) that, having prepared for the desired recreational experience (e.g., choosing a recreation site, traveling to the site) and having entered the area of opportunity, he/she would have that desired experience (e.g., the natural sights and sounds of an undeveloped landscape along a hiking trail or an un-crowded and challenging mountain biking or driving while enjoying high quality scenery). It is important to note that achieving recreational expectations are not guaranteed even though the MFO manages the resource for a wide range of recreational opportunities. Unforeseen and/or changing conditions that are beyond the control of the BLM can influence and partially determine what the user experiences. Recreational user satisfaction can be defined as that subjective mental state in which the resource user is able to successfully benefit from the available recreational opportunities and recognizes that his/her recreational experiences meet or exceed his/her recreational expectations.

- While recognizing that recreation resource users are individuals with uniquely personal expectations, goals, and levels of recreational satisfaction, it was assumed for the purposes of impact analysis that recreational users within the MPA could be classified into specific user groups, each of which has its own set of recreational opportunities and expectations. It was also assumed that, because each user group has group-specific opportunities and expectations, each group also has specific recreational conditions and criteria that increase the likelihood for having satisfying user experiences. The user-group criteria described below were used in the impacts analysis of the proposed RMP management actions to determine the degree to which those actions would adversely or beneficially impact recreation users within the MPA. The descriptions, expectations, and criteria of these groups were derived from MFO resource specialist knowledge of visitor use of recreational resources and of what constitutes user group satisfaction, based on informal, but long-term, in-field interviews with visitors recreating throughout the MPA. For the action alternatives (Alternatives B, D, and the Proposed Plan), the MFO's benefits-based recreation management goals and objectives

BLM_0010373

(see Appendix F) for the proposed SRMAs were also used in analyzing the impacts of resource decisions on user groups and on the likelihood of those users having satisfying recreational experiences in these areas. The recreational user groups and assumed conditions/criteria for satisfactory recreational user experiences are as follows:

o **Scenic drivers** – This group would include users of passenger cars and recreational vehicles (RVs) driving for pleasure while enjoying scenic attractions.

This user group generally prefers paved access to scenic vistas, cultural sites, and interpretive stations with turnoffs and/or temporary parking.

High traffic volumes, crowded parking areas, impacts to visual resources from paved viewpoints, and crowded developed campsites would adversely affect this user group.

o **Motorized (off-highway) drivers** – This group would include users of off-road motorcycles, all-terrain vehicles (ATVs) and 4-wheel drive vehicles.

This group generally prefers a somewhat natural-appearing environment with non-paved surfaces ranging from graded, dirt roads to challenging routes with some evidence of human sights, sounds, and disturbances to remote, natural-appearing environments. The presence of other users and some presence of human-constructed structures are acceptable. The impacts of routes and facilities provided for group activities (including parking lots, route information, trailheads, and toilet facilities) are generally positive for this group.

Overcrowding and overuse of trails, particularly by slower users such as hikers or mountain bikers, would have adverse impacts on this group's recreational experience.

o **Mountain bikers** – Mountain bike users generally prefer a relatively natural or natural-appearing environment with trails ranging from beginner to advanced. They also prefer an environment in which evidence of human disturbances, restrictions, and controls is present but not appearing to dominate the environment. Recreation facilities would be optional and ideally would blend in with the natural environment. Recreation management would encourage user dispersal. Preferred facilities include semi-primitive camping with basic facilities (parking lots, trailheads, and toilets).

Overcrowded trails, noise (particularly from motorized users), dust/vehicle emissions, and poor trail etiquette by other users can have adverse impacts on this group's recreational experience.

o **Non-mechanized** users – This group would include hikers, backpackers, and equestrians.

This group prefers a natural-appearing environment with little evidence of disturbance, few restrictions or visitor controls, no motorized users, and few mountain bike users. Dispersed use is preferred.

Adverse recreational experiences include those listed for mountain bikers and also the high speeds of mechanized and motorized users. The speed and noise of motorized users is a particular concern to equestrian users.

o **River floating** users – This user group includes those recreating in boats, especially canoes, kayaks and rafts.

BLM_0010374

The needs of this group are similar to those of the non-mechanized user group. They prefer a natural-appearing environment that shows little evidence of human disturbances within the river corridor. Other than boat ramps and restroom facilities at the put-in and take-out locations and designated primitive campsites, needed facilities are few.

Overcrowding within river corridors and at campsites, noise, and impacts to river corridor scenic quality would detract from this group's user experience.

o **Specialized recreation** users –

This group prefers locations that provide the conditions for specialized recreation. BASE jumpers generally prefer high cliffs with favorable wind conditions and safe landing zones. Rock climbers prefer a range of challenging routes in sufficient numbers so that crowding and waiting at routes are minimized. Competitive motorized and non-motorized trail users prefer challenging routes, often with enough distance and open area to allow for speed.

Overcrowding within a given area may detract from the user or group experience for either BASE jumpers or rock climbers. Trail use conflicts with slower moving vehicles, people, or livestock would detract from the user experience for competitive motorized trail users.

- It was assumed that the designation of SRMAs and the management of recreation resources and activities within each SRMA under its specific management plan would allow the MFO to 1) protect, manage, and improve recreation resources, and 2) continue to manage the MPA for a broad range of recreational opportunities that meet recreational user expectations. In addition, areas not managed as SRMAs would lack protection for recreational opportunities from the impacts of increased visitation in the MPA, resulting in increasing resource user conflicts and intensifying recreation resource degradation (as indicated by recreational use trends for the MPA). These trends and impacts are discussed in Section 3.10.2.

- It was assumed that the management of recreation within the MPA through recreation focus areas would tend to concentrate specific recreational opportunities, activities, and users into spatially separate areas, thereby reducing conflicts among recreation resource uses. Focus areas are recreation management areas that promote specific recreational opportunities and activities while continuing to allow other recreational uses. It was assumed that a reduction in recreational use conflicts would enhance the recreational experiences within a particular focus area for certain user groups, because the focus area would be managed to meet the needs of specific user groups. It would do this by providing specific facilities and education to meet their needs (e.g., route marking, parking, campsites, and information), and thus the recreational experience would be more enjoyable and more likely to meet user recreation expectations.

- The National Visitor Use Monitoring Study, completed in the MPA in 2006, provides reliable data on user group participation. Visitors were asked what their "main activity" was while visiting Moab, and what activities they were participating in during their visit. The numbers in Table 4.77 show what activities visitors engage in as a percentage of use.

BLM_0010375

**Table 4.77. Recreation Activity Participation**

| Activity | Percentage Participating | Percentage as the Main Activity | Number of Respondents as Main Activity |
|---|---|---|---|
| Hiking/Walking/Backpacking | 53.3 | 18.9 | 220 |
| Equestrian | 1.2 | 0.9 | 3 |
| Bicycling | 17.9 | 13.5 | 118 |
| Scenic driving | 36.3 | 10.4 | 60 |
| Viewing nature/Wildlife | 96.9 | 9.7 | 89 |
| OHV Use/Motorized Trail Use | 11.5 | 6.0 | 59 |
| Camping | 22.6 | 2.8 | 26 |
| Relaxing | 42.4 | 3.8 | 24 |
| Boating | 6.9 | 3.9 | 27 |

### 4.3.10.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

Proposed recreation prescriptions common to all action alternatives (Alternative B, D, and the Proposed Plan) would:

- Apply no surface occupancy (NSO) stipulations for oil and gas leasing within 0.5 miles of developed recreation sites, resulting in long-term, beneficial impacts on scenic drivers, mountain bikers, non-mechanized users, and some motorized users, because scenic values would be preserved in the immediate vicinity of the recreation site.

- Apply adaptive management to dispersed camping (limiting camping to designated sites where dispersed camping is causing resource damage). This would be beneficial to all users, because management would ensure that a range of camping opportunities would be maintained for all visitors to the MPA.

- Place the area of the current Colorado River SRMA within three SRMAs: the Two Rivers SRMA, the Colorado Riverway SRMA, and Dolores River Canyons SRMA to provide more focused management. This would be beneficial in the long-term for all recreation resource users, because the focus area concept would be applied to the SRMAs to reduce user conflicts, to maintain satisfying user recreational experiences, and to maintain opportunities for recreational benefits to users.

### 4.3.10.2 ALTERNATIVES IMPACTS

This analysis discusses 1) the impacts to recreational resources (e.g., vegetation, soils, and scenic quality), 2) the impacts to recreational opportunities for the user groups described above, and 3) the likelihood of resource use conflicts and meeting resource use expectations for resource user groups. Quantitative analysis of impacts was based on 1) the acreages of SRMAs and focus areas within the SRMAs, with the assumptions discussed above, and 2) the miles of designated travel routes within the SRMAs. These were used as indicators of resource user conflicts and the likelihood of satisfactory recreational experiences.

BLM_0010376

Woodland areas were dismissed from impacts analysis because the prescriptions for managing woodland harvesting areas and permits and for imposing limitations and/or prohibitions on fuelwood gathering in specified areas would have negligible impacts on recreational resources and opportunities.

### 4.3.10.2.1 IMPACTS OF AIR QUALITY DECISIONS ON RECREATION RESOURCES

Air quality prescriptions common to all alternatives would have long-term, beneficial impacts on recreation. As noted in "Visual Resources" below (Section 4.3.10.2.17), an important component of recreation is scenic quality, so impacts that diminish or degrade scenic quality through the impacts of smoke, haze, or other air pollutants would have potentially adverse short-term or long-term impacts on the recreational opportunities that include scenic quality as part of the experience. All of the alternatives would mitigate the potential impacts from prescribed burns by timing prescribed burns to minimize potential impacts to air quality. Other air quality-mitigating prescriptions would include BLM-authorized activities that are managed to maintain and comply with air quality standards and meet PSD Class II standards and protect the Class I Areas of Arches and Canyonlands National Parks. The common prescriptions would also comply with interagency MOUs regarding smoke management. Thus, the levels of smoke, haze, and other air pollutants produced within the MPA would be managed so as to not diminish or degrade scenic quality in the long term. These actions would be beneficial for all recreation user groups because it is assumed that high scenic quality is a recreational expectation for all visitors to the MPA.

### 4.3.10.2.2 IMPACTS OF CULTURAL RESOURCE DECISIONS ON RECREATION RESOURCES

Current Federal laws and BLM policy promulgated to protect cultural resources would have impacts on recreation under all of the alternatives. Recreational activities would be limited for all recreational users in the short term in areas where site restoration, surveying, inventory, and interpretive activities would be conducted. Recreational opportunities and activities for all user groups would be limited or prohibited in the long term in or near known important cultural sites. Dispersed camping would be prohibited within or on sites eligible for listing on the NRHP, limiting recreational opportunities for all user groups in these areas. Eligible cultural resources would be protected, having long-term, beneficial impacts on all recreational user groups that include scenic/cultural resources as part of their recreational expectations. The Sego and Wall Street Rock Art Sites would be further developed as interpretive sites, which would be beneficial in the long term because of the expanded recreational opportunities to sightsee and to enjoy and understand regional cultural resources.

#### 4.3.10.2.2.1 Alternative A

This alternative would continue current prescriptions for cultural resources, including allocation of sites to scientific use or discharge of sites from management. Current grazing management would continue. There would be no priorities set for 1) public interpretation sites, 2) cultural resource field inventories, 3) scientific restoration of damaged sites, or 4) nominations for listing on the NRHP. These prescriptions would have long-term, adverse impacts on recreation resources, because they would not provide the flexibility to manage the increasing number of visitors to the MPA and the corresponding demand for recreational opportunities. These prescriptions would not manage the increasing number of motorized (OHV) users in the MPA and the associated surface disturbances created by these recreational activities in areas known to

BLM_0010377

have high densities of cultural sites (see Sections 3.10.2.6 and 3.10.2.7.1 for a discussion of OHV-related resource use conflicts and impacts). Nor would these prescriptions provide protection from long-term, adverse impacts caused by livestock to recreation-related cultural resources (e.g., trampling sites and rubbing against rock art panels) (see Section 4.3.2.4.1).

The impacts of Alternative A on all user groups that seek opportunities for cultural resource exploration, viewing, and interpretive study would be adverse in the long term, because the lack of specific prescriptions to address these concerns would perpetuate current conditions, exacerbate recreation-related cultural resource degradation, and allow resource user conflicts to intensify, resulting in a diminishing likelihood of recreation resource users having satisfactory recreational/cultural interpretive experiences.

### 4.3.10.2.2.2 Alternative B

This alternative would set priorities for cultural resource field inventories, with 50,000 acres prioritized for surveying. Scientific restoration would be conducted to prevent further degradation of cultural resources, sites would be developed for public interpretation, identified areas would be managed for grazing exclusion, and enhanced protection of resources would be implemented through the development of National Register nominations of sites within the MPA. These cultural resource protection-related actions would identify, preserve, and restore these resources, with long-term, beneficial impacts on recreation, because cultural resource-related scenic quality and interpretive opportunities would be maintained and enhanced. All recreation user groups that seek opportunities for cultural resource exploration, viewing, and interpretive study would benefit in the long term. Compared to Alternative A, Alternative B would have more beneficial impacts to recreation resources and recreational/cultural opportunities, because its preservation and protection actions would enhance public enjoyment of the resource.

### 4.3.10.2.2.3 Proposed Plan

The impacts of this alternative on recreation resources and user groups would be similar to those discussed under Alternative B, though to a lesser degree, because cultural resource protection and preservation-related actions would be reduced in scope. A total of 30,000 acres would be prioritized for cultural surveys; there would be fewer grazing exclusion areas; fewer cultural sites would be targeted for scientific restoration; and fewer sites would be nominated for listing on the NRHP. Compared to Alternative A, the Proposed Plan would be more beneficial for recreation for reasons similar to those discussed under Alternative B.

### 4.3.10.2.2.4 Alternative D

Alternative D would have impacts similar to those discussed under Alternative B, but to a lesser degree than under Alternative B and the Proposed Plan, because the protection and preservation-related actions for cultural resources would be less than under Alternative B and the Proposed Plan (with 20,000 acres prioritized for surveys, fewer areas with grazing exclusions, and fewer areas of scientific restoration). Compared to Alternative A, Alternative D would be more beneficial for the same reasons discussed under Alternative B.

BLM_0010378

### 4.3.10.2.3 IMPACTS OF FIRE DECISIONS ON RECREATION RESOURCES

All of the alternatives propose 5,000–10,000 acres/year for fuels reduction treatments, consistent with the 2005 Utah Plan for fire and fuels management (BLM 2005c). Prescriptions common to all of the alternatives would use fuels treatments, including prescribed fire, and chemical and mechanical treatments to restore ecosystems and to reduce hazards associated with fuel loading. Fire suppression would be a required consideration for all non-prescribed fires. The potential surface disturbances caused by these activities would have short-term impacts on recreational activities and recreation resources that could include the closing of recreational facilities and the loss of recreational opportunities within burned areas until the disturbed areas were adequately rehabilitated or restored. Scenic quality, as a component of recreational activities and experiences, would be degraded in the short-term in burned areas until vegetation re-growth. The long-term, beneficial impacts on recreation resources and opportunities would be produced for all user groups by the reduced risk or likelihood of naturally occurring and/or unplanned wildland fires within treated areas, and by the reduced risk of loss of remote and developed recreational areas and facilities from wildland fire. The improvement of wildlife habitat and enhancement of recreational opportunities for wildlife viewing and hunting in the long term by improving vegetation communities through fire management would be a long-term, beneficial impact to all user groups. It should be noted that fuels treatments to reduce the risk of wildland fire are similar to those used to improve vegetation communities and to improve or restore ecosystem health (see Section 4.3.10.2.16).

### 4.3.10.2.4 IMPACTS OF HEALTH AND HUMAN SAFETY DECISIONS ON RECREATION RESOURCES

The impacts on recreation resources and user groups of health and safety prescriptions common to all alternatives (e.g., improving the physical safety around abandoned mine land [AML] sites and mitigation and/or remediation of AML hazards) would be negligible in the short term but potentially beneficial in the long term. Sites within the MPA that are known to contain environmental hazards and that are a direct threat to public safety are incompatible with recreation. Therefore, in the short term the remediation and/or reclamation of these areas would have no impacts on recreation, because these areas would be closed to all recreational activities anyway. In the long term, once the health and safety concerns were addressed, these sites would be considered for recreation management, which could provide additional recreational opportunities (particularly as interpretive AML sites) for all user groups.

### 4.3.10.2.5 IMPACTS OF LAND AND REALTY DECISIONS ON RECREATION RESOURCES

Under prescriptions common to all of the alternatives, lands along the Colorado, Dolores, and Green Rivers (65,037 acres), along the Westwater (8,096 acres), and in the Black Ridge Wilderness area (5,200 acres) would continue to be withdrawn from mineral entry. The impacts to all recreation groups would be beneficial in both the short and the long term, because recreational opportunities and scenic quality would be preserved from locatable mineral surface disturbances. River runners on the Colorado, Dolores, and Green Rivers would continue to enjoy high scenic-quality views along the undeveloped river corridors. Scenic drivers, hikers, and OHV users on travel routes and trails along the Colorado River would continue to have opportunities to experience the high scenic values along Routes 128 and 279, along hiking trails

BLM_0010379

(e.g., Negro Bill, Fisher Towers), and on mountain biking and motorized OHV routes and trails within the riverway (e.g., Onion Creek, Wall Street, Poison Spider).

Under prescriptions common to the action alternatives, NSO mineral leasing stipulations would be applied to the withdrawn areas discussed above. This would increase the long-term, beneficial impacts to recreation by also protecting these areas from leasable and salable minerals exploration and development impacts and other potential surface disturbances. These areas would be avoidance areas for ROWs, providing long-term beneficial impacts to recreation users.

### 4.3.10.2.5.1 Alternative A

Under this alternative, there are no other specific prescriptions and impacts applicable to recreation, except for those discussed above under management common to all alternatives.

### 4.3.10.2.5.2 Alternatives B–D

Prescriptions and impacts applicable to recreation include those discussed above under actions common to all action alternatives. Compared to Alternative A, these alternatives would preserve more recreational resources and maintain more recreational opportunities for all resource user groups than would Alternative A, because, as discussed above, higher levels of protection from surface disturbances would be stipulated under the NSO leasing category.

### 4.3.10.2.6 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON RECREATION RESOURCES

The impacts on recreation of livestock grazing prescriptions common to all alternatives would be beneficial in the long term. Under all alternatives, approximately 48,220 acres within existing grazing allotments would be not be authorized for grazing, but would be used to benefit wildlife by reallocating forage for that purpose. This would enhance the recreational opportunities for all user groups for wildlife viewing, sightseeing, and hunting by improving wildlife habitat. The North Sand Flats, South Sand Flats and Between the Creek allotments are not available for grazing; this would benefit recreationists using the Sand Flats and Colorado Riverway SRMAs by eliminating livestock-people conflicts. Narrow strips along Utah Highway 128 (278,000 vehicles per year) and the Kane Creek Road (174,000 vehicles per year) would not be available for grazing, enhancing the safety of visitors

Under actions common to all action alternatives the 96,951-acre Hatch Point Allotment would be changed from sheep to cattle in order to benefit desert bighorn sheep and pronghorn, as these species are susceptible to diseases carried by domestic sheep. As discussed above, these actions would enhance the recreational opportunities for all recreation users by providing the opportunity to view wildlife.

### 4.3.10.2.6.1 Alternative A

Under this alternative the impacts of livestock grazing actions, through making grazing not available on an additional 78,612 acres (126,907 total acres), would benefit wildlife and have indirect, beneficial impacts on recreational opportunities for wildlife viewing and hunting, as discussed above. Cottonwood, Diamond, Bogart and Pear Park allotments are in prime big game hunting areas; making them not available for grazing would benefit wildlife and hunters/viewers of wildlife by increasing wild game numbers. Beaver Creek would not be available for grazing, enhancing backpacking opportunities in this perennial stream.

BLM_0010380

Grazing would be excluded within specified riparian areas but allowed in others, which would maintain beneficial, long-term, wildlife-related recreational opportunities for viewing within the protected areas. Grazing allotment vegetation treatments on approximately 67,125 acres to increase forage for wildlife and livestock would have short-term, adverse impacts on recreation but long-term, beneficial impacts to recreation resources and opportunities, as discussed above under Fire Management (Section 4.3.10.2.3).

### 4.3.10.2.6.2 Alternative B

Under this alternative, grazing could be made not available on an additional 105,497 acres (153,797 total acres). This would benefit wildlife and have indirect, beneficial impacts on recreational opportunities for wildlife viewing and hunting, as discussed above. Cottonwood, Diamond, Bogart and Pear Park allotments are in prime big game hunting areas; making them not available for grazing would benefit wildlife and hunters/viewers of wildlife by increasing wild game numbers. Beaver Creek would not be available for grazing, enhancing backpacking opportunities in this perennial stream. In addition, three allotments along Utah Highway 128 (Professor Valley, Ida Gulch and River) are in very high recreation use areas (over 278,000 vehicles/year); not making grazing available in these allotments would benefit visitors and their safety by reducing cattle-traffic conflicts. Mill Creek, an allotment in a popular hiking location, would not be available for grazing, benefiting visitors by allowing a more lush riparian area to be enjoyed.

In addition, 4,422 acres in riparian areas could be restricted using exclusion fences to protect vegetation and riparian areas in order to benefit wildlife. Vegetation treatments would be conducted on approximately 46,307 acres (69% of the acreage treated under Alternative A) to increase available forage for the benefit of wildlife. These actions would all have beneficial, indirect, and long-term impacts on recreation resources by improving wildlife habitat, thus enhancing the recreational opportunities for wildlife viewing and hunting for all recreational user groups. However, vegetation treatments would result in short-term, direct, adverse impacts on recreational resources and opportunities as discussed above under Fire Management. Compared to Alternative A, Alternative B would have similar impacts on recreation resources and opportunities but to a lesser degree, because fewer acres would be managed that would indirectly enhance opportunities for recreation-related wildlife viewing and hunting.

Closing a portion of Lower Gray Canyon to livestock grazing would also have long-term, beneficial impacts on recreation by creating the conditions and recreational opportunities for wildlife viewing. This decision would also improve the recreational experience for river runners in Lower Gray Canyon by heightening the sense of naturalness and remoteness, allowing them to float the Green River without encountering cattle on the shore.

### 4.3.10.2.6.3 Proposed Plan

The beneficial impacts to recreation resources and opportunities under this alternative would be similar to those discussed under Alternative B (the Proposed Plan would manage for the same acreage of vegetation treatments as Alternative B), but to a slightly less degree because fewer areas and restrictions would be placed on grazing (an additional 99,827 acres, or 132,047 total acres) as well as restricting 1,169 acres within riparian areas from grazing or 32% of the areas under Alternative B). The impacts of this alternative on recreation would be similar to Alternative B.

BLM_0010381

Cottonwood, Diamond, Pear Park, and Bogart allotments are in prime big game hunting areas; making them not available for grazing would benefit wildlife and hunters/viewers of wildlife by increasing wild game numbers. Beaver Creek would be available for grazing, detracting from backpacking opportunities in this perennial stream. In addition, three allotments along Utah Highway 128 (Professor Valley, Ida Gulch and River) are in very high recreation use areas (over 278,000 vehicles/year). Ida Gulch would be unavailable for grazing. The portions of Professor Valley and River allotments along Utah 128 would not be available by constructing a fence along the road, thus benefiting visitors and their safety by reducing cattle-traffic conflicts. Mill Creek, an allotment in a popular hiking location, would not be available for grazing, benefiting visitors by allowing a more lush riparian area to be enjoyed.

### 4.3.10.2.6.4 Alternative D

Alternative D would have impacts similar to those discussed under Alternative B for vegetation treatments, because the number of treated acres would be the same. Grazing would be restricted on an additional 3,921 acres (52,214 total acres), and grazing management in riparian areas would continue current prescriptions, with impacts on recreation similar to those discussed under Alternative A.

Cottonwood, Pear Park, Diamond, and Bogart allotments are in prime big game hunting areas; making them available for grazing would adversely impact wildlife and hunters/viewers of wildlife by reducing wild game numbers. Beaver Creek would be available for grazing, detracting from backpacking opportunities in this perennial stream. In addition, three allotments along Utah Highway 128 (Professor Valley, Ida Gulch and River) are in very high recreation use areas (over 278,000 vehicles/year). These allotments would continue to be available for grazing, adversely impacting visitors and their safety by reducing cattle-traffic conflicts. Mill Creek, an allotment in a popular hiking location, would not be available for grazing, benefiting visitors by allowing a more lush riparian area to be enjoyed.

### 4.3.10.2.7 IMPACTS OF MINERALS DECISIONS ON RECREATION RESOURCES

Under all alternatives, the development projected on existing potash leases in the Ten Mile area could have adverse impacts on recreation users, because the surface-disturbing activities would potentially degrade scenic quality within this highly used recreation area.

Under all action alternatives, beneficial impacts through avoiding surface disturbance would result from the withdrawal of lands from locatable mineral entry along the Colorado, Green, and Dolores Rivers and from NSO stipulations imposed to protect these areas from the impacts of leasable minerals development. No surface-disturbing activities, including the disposal of salable minerals, would be allowed within this area. NSO stipulations would also be applied to those areas where minerals development would unreasonably conflict with important natural resource values (see Appendix C for a list of these areas). The application of NSO stipulations in these areas would indirectly benefit recreation through preservation and protection of natural resources, including scenic quality, as surface-disturbing activities would be precluded.

Table 4.78 below shows the proposed MPA acreages that would be open to minerals development by alternatives for leasable, locatable and salable minerals, and also shows the 15-year RFD surface disturbances for fluid minerals (oil and gas) and geophysical exploration.

BLM_0010382

**Table 4.78. Acres Open to Minerals Development and Projected Acres of Surface Disturbance (RFD) Associated with Oil and Gas Development, by Alternative**

| | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard and Timing and Controlled Surface Use (% of MPA) | 1,427,949 | 808,096 | 1,234,267 | 1,387,473 |
| Locatable Minerals | 1,389,531 (353,510 open under WSA IMP) | 1,389,531 (353,510 open under WSA IMP) | 1,389,531 (353,510 open under WSA IMP) | 1,389,531 (353,510 open under WSA IMP) |
| Salable Minerals | 1,467,768 | 808,097 | 1,234,267 | 1,387,473 |
| Surface Disturbance from Oil and Gas Development (% of MPA) | 6,772 (0.4%) | 3,823 (0.2%) | 6,483 (0.4%) | 6,739 (0.4%) |
| RFD Geophysical | 2,397 | 1,404 | 2,072 | 2,329 |

Although the impacts of mineral development on recreation are discussed below throughout the MPA, it is important to note that recreation use does not occur equally within the MPA. It is estimated that recreation use occurs with regularity on 976,173 acres of the MPA (53% of the MPA). High use recreation areas are those that are proposed as SRMAs in one or more alternatives. Recreation use is generally highest in areas closer to the City of Moab. The impacts of minerals development on recreation are higher in areas receiving high recreation use, and lower in areas receiving less recreation use. The majority of impacts upon recreation users from mineral development would remain whether or not the area is managed as an SRMA, because SRMAs, for the most part, do not restrict mineral development. Since the projected levels of mineral development are not likely to impact current levels of recreation use, this use would most likely continue to occur (or increase) regardless of management direction.

#### 4.3.10.2.7.1 Alternative A

The MPA acres open to leasable, salable, and locatable minerals development would be subject to surface disturbances that would potentially have direct, short-term, and long-term adverse impacts on recreational opportunities and experiences, because natural resources, including scenic quality could be affected. While all minerals surface disturbances and activities would be required to comply with the impact area's VRM class objectives, adverse impacts would be caused by the following: ground-surface disturbances during the cross-country seismic exploration for fluid minerals (i.e., geophysical exploration disturbances); construction of oil and gas wells and pads, access roads, and pipelines that would potentially intrude upon recreational areas; and noise associated with wells, gas compressor stations, and other infrastructure construction, maintenance, and operation. The development associated with locatable minerals (e.g., copper, vanadium, uranium, placer gold) would also create surface disturbances that would potentially impact recreation resources. Night lighting of oil and gas wells and facilities would also degrade scenic quality related to recreational opportunities and recreational expectations. Indirect, adverse impacts to recreation resources and opportunities would include 1) soil erosion

BLM_0010383

from surface disturbances, 2) the potential creation of mine tailings piles during locatable mining, 3) potential air quality degradation from hydrocarbon releases during natural gas flaring, and 4) visual quality degradation from fugitive dust.

The majority of the oil and gas wells would be located within the Book Cliffs (104 wells), Greater Cisco (196 wells), Big Flat-Hatch Point (46 wells), and Lisbon Valley (56 wells) RFD areas. Based on the expected level of oil and gas development within the MPA, the impacts to recreation would be adverse in the short and long term from the potential surface disturbance impacts to scenic quality and recreation resources, as discussed above.

Under this alternative, geophysical RFD surface disturbances are estimated to affect approximately 0.1% of the MPA during the life of the RMP, with similar potential, long-term, adverse impacts to scenic quality because exploration activities could be permitted to travel cross-country off designated routes.

Leasable minerals other than oil and gas (e.g., potash, and salt) as well as locatable and salable minerals are estimated under RFD projections to have a total disturbance of approximately 1,015 acres (0.01% of the MPA) during the life of the RMP. The impacts to recreation resources would be adverse but minor, because of the relatively small area of potential surface disturbance.

### 4.3.10.2.7.2 Alternative B

The impacts of minerals development would be similar to but lesser than those discussed under Alternative A, because some types of activities would occur, the RFD prediction for oil and gas under this alternative would be approximately 56% of the level of disturbance expected under Alternative A, so these impacts would occur across less area. The majority of the oil and gas wells would be located within the Book Cliffs (64 wells), Greater Cisco (85 wells), Eastern Paradox (21 wells), and Lisbon Valley (54 wells) RFD areas.

The geophysical exploration impacts are estimated to affect approximately 1,404 acres of the MPA (58% of the acreage affected under Alternative A), with impacts similar to those discussed under Alternative A. Impacts to recreation from leasable minerals other than oil and gas and from locatable and salable minerals would be similar to those under Alternative A, because the predicted number of impacted acreage would be the same as in Alternative A.

Compared to Alternative A, Alternative B would have similar impacts, but to a lesser degree because fewer acres within the MPA would be potentially impacted by minerals exploration and development.

### 4.3.10.2.7.3 Proposed Plan

The impacts of minerals development on recreation would be similar to those under Alternative A because the same types of activities would occur, and the RFD for oil and gas under the Proposed Plan predicts a level of disturbance approximately 96% of that predicted under Alternative A. The majority of the oil and natural gas wells would be located within the Book Cliffs (104 wells), Greater Cisco (197 wells), Big Flat-Hatch Point (34 wells), and Lisbon Valley (56 wells) RFD areas. The RFD surface-disturbance acreages of leasable minerals other than oil and gas, locatable minerals, and salable minerals (e.g., sand and gravel, clay, building stone) would be the same as Alternative A. The estimated surface disturbances from geophysical exploration within the MPA would be 86% of the area estimated to be disturbed under

BLM_0010384

Alternative A. Thus, the impacts to recreation under the Proposed Plan would be similar to those discussed under Alternative A, because the estimated acreages of disturbance are similar.

### 4.3.10.2.7.4 Alternative D

The minerals impacts to recreation under Alternative D would be similar to those under Alternative A, because the RFD estimate of oil and gas development would be 99% of that under Alternative A, and because approximately 80% of the area proposed under Alternative A would be open to locatable mineral disposal. The majority of the RFD-predicted oil and natural gas wells would be located within the same RFD areas as discussed under Alternative A. The impacts on recreation from leasable minerals other than oil and gas, locatable minerals, and salable minerals, and from geophysical exploration would be similar to those discussed under Alternative A, because the predicted acreages and locations of impacts would be the same or similar to that of Alternative A.

### 4.3.10.2.8 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON RECREATION RESOURCES

#### 4.3.10.2.8.1 Alternative A

Under Alternative A, no specific prescriptions for non-WSA areas with wilderness characteristics were proposed. Thus, they would not be managed to retain those characteristics. In addition, Alternative A proposes management of large areas of land for cross country OHV use. This would adversely reduce the non-motorized recreational opportunities and degrade recreation resources in the long term for non-mechanized and other resource users that seek remote, primitive camping and hiking where solitude and natural landscapes are preferred.

#### 4.3.10.2.8.2 Alternative B

Under this alternative, approximately 266,485 acres would be managed to maintain areas with wilderness characteristics in non-WSA lands, with vehicle use limited to designated routes and the preclusion of surface-disturbing activities. This would have beneficial, long-term impacts on recreational resources and on motorized and non-motorized recreational opportunities because the recreational opportunities for remote OHV use along designated routes, and primitive camping and hiking where naturalness and solitude are the preferred recreational experiences, would be maintained. Compared to Alternative A, this alternative would benefit some types of recreation because remote, wilderness-related non-motorized travel, camping, and hiking opportunities and recreational resources would be preserved.

All of 21 and portions of 7 non-WSA lands with wilderness characteristics would fall within 8 designated SRMAs. These SRMAs would focus recreation opportunities on primitive recreation and solitude. This would preclude new mechanized route construction and limit or restrict motorized special recreation events, as well as cross country motorized use.

#### 4.3.10.2.8.3 Proposed Plan

The Proposed Plan would have similar impacts as Alternative B, but to a much lesser degree, because the prescriptions that affect recreation would be similar and 47,761 acres (or 20% of the area managed for wilderness under Alternative B) would be maintained for areas with wilderness characteristics. Compared to Alternative A, this alternative would be more beneficial because

BLM_0010385

remote, wilderness-related travel, camping, and hiking opportunities and recreational resources would be preserved, although to a lesser degree than Alternative B.

Beaver Creek, non-WSA lands with wilderness characteristics would fall within the Dolores River Canyons SRMA. Fisher Towers and Mary Jane Canyon would fall within the Colorado Riverway SRMA. SRMAs would focus recreation opportunities on primitive recreation and solitude. This would preclude new motorized route construction and limit or restrict motorized special recreation events, as well as cross country motorized use.

#### 4.3.10.2.8.4 Alternative D

This alternative would have impacts similar to Alternative A because the prescriptions would be the same (no lands would be managed for non-WSA wilderness characteristics protection). However, since OHV use in Alternative D is largely managed as Limited to Designated Routes, adverse impacts on those resource users seeking remote areas would be lessened as compared with Alternative A.

### 4.3.10.2.9 IMPACTS OF PALEONTOLOGY DECISIONS ON RECREATION RESOURCES

#### 4.3.10.2.9.1 Alternative A

Beyond established BLM policy, there are no specified paleontological prescriptions that would impact recreational resources and user groups under Alternative A. Except where specifically prohibited, fossil collection is an acceptable recreational activity on BLM-administered public lands, and recreational collectors are allowed to collect and retain reasonable quantities of common invertebrates and plant fossils for personal, non-commercial use.

#### 4.3.10.2.9.2 Alternatives B, D, and the Proposed Plan

Under actions common to all action alternatives, paleontological resources would be protected within the Dinosaur Diamond Prehistoric Byway; recreation-related fossil collection would be prohibited within the Colorado Riverway SRMA; and fossil collection would be prohibited near high-use areas (but allowed in other non-high-use areas) of the Labyrinth Rims/Gemini Bridges SRMA. The impacts on paleontology-related recreation resources would be the long-term preservation and protection of paleontological resources and values in areas where the resource is vulnerable to depletion. The preservation of recreational opportunities to enjoy and appreciate this limited resource in high-use recreation areas would have long-term, beneficial impacts on all recreational user groups, who enjoy viewing paleontological resources. Compared to Alternative A, the action alternatives would be more beneficial to recreational resources and recreational opportunities, because they would provide greater protection to paleontological resource values within high-use areas of the existing and proposed SRMAs and Scenic Byways, and because recreational viewing and interpretive opportunities of paleontological resources would be maintained.

### 4.3.10.2.10 IMPACTS OF RECREATION DECISIONS ON RECREATION RESOURCES

A summary of the recreation management actions by alternative is shown below in Table 4.79. An analysis of the impacts of the proposed recreation prescriptions follows the table.

BLM_0010386

**Table 4.79. Summary of SRMA Recreation Analysis Data by Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **Book Cliffs** | | | | |
| SRMA Acres (non-motorized focus) | None | 348,140 | None | None |
| Designated Routes in SRMA (miles of D-Class Roads) | N/A | 18 | N/A | N/A |
| **Cameo Cliffs** | | | | |
| SRMA Acres | 15,597 | 15,597 | 15,597 | 15,597 |
| Designated Routes in SRMA (miles of D Roads) | 62 | 61 | 61 | 61 |
| **Canyon Rims** | | | | |
| SRMA Acres | 101,531 | 101,531 | 101,531 | 101,531 |
| Designated Routes in SRMA (miles of D Roads) | 291 | 222 | 276 | 289 |
| Non-Mechanized Focus Area (acres) | N/A | 3,642 | 3,642 | N/A |
| **Colorado Riverway** | | | | |
| SRMA Acres | 17,983 | 103,467 | 89,936 | 79,126 |
| Designated Routes in SRMA (miles of D Roads) | 45 | 84 | 77 | 66 |
| Non-Mechanized Focus Area (acres) | N/A | 37,277 | 33,451 | 1,287 |
| Specialized Non-motorized Focus Area (acres) | N/A | N/A | 42 | 42 |
| Scenic Driving Focus Areas (corridor width) | N/A | 1-mile width | 1/2-mile width | 1/4-mile width |
| Boating – Commercial | 30 commercial outfitters permitted | 19 Unallocated, 2 Allocated Permits (100 user-days each) | 21 Unallocated Permits | 25 Unallocated Permits |
| **Dolores River** | | | | |
| SRMA Acres | N/A | 31,661 | 31,661 | N/A |
| Designated Routes in SRMA (miles of D Roads) | N/A | 14 | 30 | N/A |
| **Labyrinth Rims/Gemini Bridges** | | | | |
| SRMA Acres | N/A | 300,650 | 300,650 | 60,939 (Dee Pass SRMA only) |

BLM_0010387

**Table 4.79. Summary of SRMA Recreation Analysis Data by Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Designated Routes in SRMA (miles of D Roads and motorized single track) | N/A | 813 | 881 D road; 94 single track | 140 D road; 83 single track |
| Non-Mechanized Focus Area (acres) | N/A | 26,031 | 13,383 | N/A |
| Mountain Bike Backcountry Touring Focus Area (acres) | N/A | 17,530 | 23,702 | N/A |
| Motorized Backcountry Touring Focus Area (acres) | N/A | N/A | 16,299 | N/A |
| Scenic Driving Focus Areas (corridor width) | N/A | 1-mile width | 1/2-mile width | 1/4-mile width |
| Specialized Non-Motorized Focus Area (acres) | N/A | N/A | 928 | N/A |
| Specialized Motorized Focus Area acres | N/A | N/A | 35,575 | 57,875 |
| Open OHV Focus Area (acres) | N/A | N/A | 1,866 | 3,064 |
| **Lower Gray Canyon** | | | | |
| SRMA Acres | N/A | 3,759 | 3,759 | N/A |
| Designated Routes in SRMA (miles of D Roads) | N/A | 0 | 0 | N/A |
| Boating | 35,000 passenger-days/year; limit of 6 groups/day with group limits of up to 25 persons. | 35,000 passenger-days/year; limit of 6 groups/day with group limits of up to 25 persons. | 35,000 passenger-days/year; limit of 6 groups/day with group limits of up to 25 persons. | 35,000 passenger-days/year; limit of 6 groups/day with group limits of up to 25 persons. |
| **Sand Flats** | | | | |
| SRMA Acres | N/A | 6,246 | 6,246 | 6,246 |
| Designated Routes in SRMA (miles of D Roads) | N/A | 20 | 23 | 25 |
| **South Moab** | | | | |
| SRMA Acres | N/A | 63,999 | 63,999 | N/A |
| Designated Routes in SRMA (miles of D Roads) | N/A | 137 | 164 | N/A |

BLM_0010388

**Table 4.79. Summary of SRMA Recreation Analysis Data by Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Non-Mechanized Focus Area (acres) | N/A | 34,486 | 34,486 | N/A |
| Mountain bike Backcountry Touring Focus Area (acres) | N/A | 2,255 | 2,255 | N/A |
| Scenic Driving Focus Areas (corridor width) | N/A | 1-mile width | 1/2-mile width | NA |
| Specialized Non-Motorized Focus Area (acres) | N/A | 2,905 | 2,905 | N/A |
| Specialized Motorized Focus Area (acres) | N/A | N/A | 41 | N/A |
| **Two Rivers** | | | | |
| SRMA Acres | N/A | 29,839 | 29,839 | 14,056 |
| Designated Routes in SRMA (miles of D Roads) | N/A | 5 | 12 | 18 |
| **Boating Management** | | | | |
| Westwater Canyon | 30 commercial outfitters permitted. Maximum 24,000 passenger-days/year. | Daily launch limit of 48 people for each sector. Maximum group size of 16 (including guides on commercial trips). | Commercial and private permits required. Daily launch limit of 75 people per sector for both commercial and private. Maximum commercial trip size of 25 passengers plus one guide/craft and two additional crew members. Permit 18 commercial outfitters. Use levels distributed equally between commercial and private use. | Maximum group size of 32 (including guides on commercial trips). Daily launch limit of 128 people for each sector (commercial and private). |
| Cisco Landing to Dewey Bridge | | No restrictions on private use. 20 unallocated and 2 allocated (100 users/day each) permits for commercial use. | No restrictions on private use. 22 unallocated permits for commercial use. | 25 unallocated permits for commercial use. |

BLM_0010389

**Table 4.79. Summary of SRMA Recreation Analysis Data by Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Dolores River to Colorado River Confluence | | Bridge Canyon to Dolores/Colorado River confluence– Maximum group size of 16 (including guides on commercial trips). | Bridge Canyon to Dolores/Colorado River confluence– Commercial and private permits required. Maximum group size of 25 (including guides on commercial trips). No daily launch limits. Permit 14 unallocated commercial outfitters. | Colorado State Line to Colorado River confluence– Maximum group size of 32 (including guides on commercial trips). |
| Non-Mechanized Focus Area (acres) | N/A | 23,479 | 23,479 | N/A |
| **Utah Rims** | | | | |
| SRMA Acres | N/A | 15,424 | 15,424 | N/A |
| Designated routes (miles of D roads and single track routes) | N/A | 28 | 28 D road; 34 single track | N/A |

## 4.3.10.2.10.1 Book Cliffs SRMA

<u>Alternative A</u>

Under Alternative A the Book Cliffs would not be designated as a SRMA; instead, the area would continue to be managed for general recreational use and impacted by conditions that currently affect the area. As discussed in Section 3.10.1.2.12, the Book Cliffs area is remote, containing five WSAs whose natural, undeveloped settings would be maintained. It is not heavily used for recreation nor do recreational trends indicate an increasing use of the area. Conflicts between user groups would be minor because of its light use, remoteness, and size. Thus, the impacts on recreation resources and users would be minor.

<u>Alternative B</u>

Under Alternative B, the 348,140-acre Book Cliffs Undeveloped SRMA would be established as a focus area for non-mechanized recreational opportunities. Prescriptions would focus on promoting low-frequency visitor use and limiting OHV travel to 18 miles of designated routes, resulting in long-term, beneficial, protection-related impacts on recreation resources by limiting surface disturbances within the SRMA. Non-mechanized users would benefit in the long term from the focus on opportunities for remoteness, solitude, and naturalness, and from the reduced likelihood of recreational resource use conflicts with mountain biking or motorized users. Other user groups (e.g., motorized OHV users and mountain bikers), while limited to the designated

BLM_0010390

OHV routes, would benefit in the long term from opportunities to access and recreate in the SRMA. Under this alternative, the long-term outcome of reducing resource use conflicts and increasing the likelihood of having satisfying recreational experiences in a remote setting would have individual benefits that include improvements in outdoor skills and knowledge, improved outdoor-recreation self-confidence, and a greater sense of closeness with the natural world.

Compared to Alternative A, Alternative B would have greater beneficial impacts on recreation, because recreational resources would receive more protection from surface disturbances and because the potential for resource use conflicts between non-mechanized and mechanized user groups would be reduced. However, managing for non-mechanized use would adversely impose greater limits on recreational opportunities for other recreational user groups than the limits under Alternative A.

Alternative D and the Proposed Plan

Because the Book Cliffs SRMA would not be established under these alternatives and, therefore, additional prescriptions would not be proposed, the impacts of Alternative D and the Proposed Plan on recreation resources and resource user groups would be similar to those discussed under Alternative A.

## 4.3.10.2.10.2 Cameo Cliffs SRMA

Alternative A

Under Alternative A, the 15,597-acre Cameo Cliffs SRMA would be managed as a focus area for OHV (motorized) trail use, with use limited to designated trails. The impacts on recreation resources would be minor in the long term, because the area is currently managed for OHV motorized trail use with surface disturbances limited to designated routes. Management that promotes this kind of activity would result in long-term beneficial impacts on motorized and specialized-motorized users.

Alternatives B, D, and the Proposed Plan

Under the action alternatives, Cameo Cliffs would be managed as a 15,597-acre SRMA, providing recreational opportunities for motorized and mountain biking use on designated trails, and non-mechanized hiking and equestrian opportunities. The SRMA would not be managed with user focus areas. Specific management goals would include providing opportunities for 1) ATV and other OHV motorized use on old mining exploration roads, 2) horseback riding on the Old Spanish Trail, and 3) hiking in Hook and Ladder Gulch. Prescriptions would include coordination with San Juan County to implement an ATV plan and protection of scenic, cultural, wildlife, and vegetation resources. Under this alternative, camping restrictions would be imposed as needed, and an OHV trailhead facility would be constructed. The impacts on recreation resources would be beneficial in the long term, because prescriptions would protect recreation resource values. The impacts on non-mechanized, OHV (motorized), and mountain biking user groups would also be beneficial in the long term, because 1) recreational opportunities would be enhanced and expanded by the construction of SRMA recreational facilities and the development of mountain biking and non-mechanized routes, and 2) the proposed ATV plan would reduce the potential for user conflicts between motorized users, mountain bikers, and non-mechanized users. The anticipated long-term, benefits-based management outcome for this area would

BLM_0010391

include an increased sense of adventure, an appreciation for the region's history, and increased local, tourist-related revenue.

Compared to Alternative A, the impacts to recreation under these alternatives would be more beneficial in the long term, because prescriptions would 1) provide more recreational opportunities for mountain biking and non-mechanized forms of recreation, 2) provide additional facilities for users; and 3) protect and maintain recreation resource values within the SRMA through RMP prescriptions and coordination with San Juan County.

### 4.3.10.2.10.3 Canyon Rims SRMA

<u>Alternative A</u>

Under Alternative A, the current 101,531-acre SRMA would maintain recreational opportunities for scenic driver, motorized OHV, mountain biking, specialized, and non-mechanized user groups. Also, the Hatch Wash and the lower section of West Coyote Creek would be managed for primitive, non-motorized recreation. The SRMA would be 1) open to mineral leasing under controlled surface-use stipulations except for developed recreational sites that would be managed as open with NSO stipulations; 2) managed for OHV use limited to existing routes but restricting motorized events and special events to the existing Jeep Safari route; 3) designated as VRM Class III except for VRM Class II designation of western rim lands at Hatch Point; 4) managed to improve developed recreation sites and to restrict camping near developed recreation areas; and 5) closed to woodcutting and gathering.

Prescriptions 1 and 3 would have long-term, direct, adverse impacts on recreation resources by permitting potential mineral leasing activities within the eastern portion of the SRMA that would degrade scenic quality. Managing the SRMA under prescriptions 2, 4, and 5 would reduce surface disturbances and have long-term, beneficial impacts on recreation resources by preserving and/or protecting recreation-related scenic quality.

As the number of visitors to the SRMA increases and levels of recreational activity and demand also increase, there is the likelihood for increased recreational resource user conflicts between motorized and non-motorized user groups, with subsequently diminishing opportunities for satisfactory recreational experiences. As discussed in Section 3.10.2.6, the potential for displacement of non-mechanized users would likely increase as motorized OHV use increases along existing travel routes.

<u>Alternative B</u>

Alternative B would have the same prescriptions as Alternative A except that: 1) a 3,642-acre, non-mechanized focus area would be managed at Hatch Wash, and 2) two scenic driving corridor focus areas would be designated along the Needles and Anticline Roads (with widths of one mile or to the border of the adjoining focus area). The Windwhistle Nature Trail, Anticline Trail, Needles Trail, and Trough Springs Canyon Trail would be designated for non-mechanized (hiking) use only. The SRMA management goals would be to 1) provide scenic driving opportunities along the scenic byway and along the backcountry road system, 2) provide scenic overlook facilities to enhance the visitor experience, 3) provide quality camping in developed campgrounds, and 4) provide hiking and backpacking opportunities. The long-term impacts to recreational users under this alternative would be a reduced likelihood of resource use conflicts and an increased likelihood of satisfying experiences for scenic driver and non-mechanized user

BLM_0010392

groups within the SRMA, because of the management of focus areas that would emphasize activity areas and opportunities for each group. The beneficial impacts on recreational opportunities under this alternative would increase the likelihood that the benefits-based, targeted, recreational outcomes for the area would be achieved; these outcomes include 1) opportunities to escape from crowds to enjoy and appreciate nature; 2) easy access to natural landscapes for exercise and an improved capacity for outdoor physical activity; 3) increased tourism revenues; and 4) greater family bonding through a shared experience of the natural landscape. Compared to Alternative A, this alternative would have more beneficial impacts on recreational opportunities and experiences, because the potential for resource use conflicts would be reduced. However, the potential for degradation of scenic quality from minerals development would be similar to that under Alternative A.

### Proposed Plan

Under the Proposed Plan, prescriptions would be the similar to those under Alternative B, except that the width of the proposed Needles and Anticline Roads scenic driving corridors would be 1/2 mile (or to the border of the adjoining focus area), which would reduce the beneficial impacts to the scenic quality viewing experience within the scenic driving corridors by decreasing the width of the protected viewshed. The impacts on recreation resources under this alternative would be similar to those discussed under Alternative B, because the prescriptions are similar.

### Alternative D

Alternative D prescriptions would be similar to those under Alternative B, except that the width of the proposed Needles and Anticline Roads scenic driving corridors would be 1/4 mile (or to the border of the adjoining focus area), and there would be no management of a non-mechanized user focus area. While the Windwhistle Nature Trail, Anticline Trail, Needles Trail, and Trough Springs Canyon Trail would be designated for non-mechanized (hiking) use only under this alternative, the lack of a 3,642-acre, non-mechanized recreation focus area would maintain conditions for resource use conflicts between non-mechanized, mountain biking, and motorized resource user groups, as discussed under Alternative A. Managing the scenic driving corridors at 1/4 mile width would have similar beneficial impacts as discussed under Alternative B, but to a lesser degree, because the reduced width of the protected viewshed corridor would reduce the scenic quality of the viewing experience. Compared to Alternative A, opportunities for scenic driving users and hikers would be more beneficially enhanced by designation of scenic driving corridors and hiking-only trails; however, the impacts on other recreation resources and user groups under this alternative would be similar to those discussed under Alternative A, because the prescriptions would be similar.

## 4.3.10.2.10.4 Colorado Riverway SRMA

### Alternative A

Prescriptions under Alternative A for the existing 17,983-acre Colorado Riverway SRMA would include actions authorized under the current Colorado Riverway Plan that are focused on improving and constructing sites and facilities along the riverway to enhance the range of recreational opportunities, and to protect its scenic quality and other resource values. Prescriptions under this alternative would 1) include acquiring scenic easements on state and private lands, 2) restrict motorized and mountain biking travel to designated routes, 3) limit camping and campfires to designated sites, 4) close the area to woodcutting and limit wood

BLM_0010393

gathering. The Colorado River shoreline within the Riverway is currently withdrawn from mineral entry. The Riverway plan would limit Fisher Towers, Negro Bill Canyon, Hunter Canyon, and Corona Arch trails to non-mechanized (hiking) use only. Recreational boating management within the Riverway (including the Colorado and Dolores Rivers) would continue as under current prescriptions, allowing 30 commercial operators and 24,000 passenger-days per year.

Under this alternative, improving recreational facilities, maintaining the separation of recreational user groups and limiting surface disturbances would result in managing the SRMA to provide for satisfactory recreation opportunities and experiences by limiting user conflicts and maintaining the visual and resource setting.

<u>Alternative B</u>

Alternative B would establish the Colorado Riverway SRMA as a Destination SRMA and would expand its boundary to 103,467 acres under the same prescriptions as discussed under Alternative A. The SRMA would be managed to provide opportunities for scenic driving, quality camping experiences in the developed campgrounds, river floating, hiking, and horseback riding. Camping would be prohibited on the north side of the river along Highway 128 and in the Kane Creek Crossing area. Boating activities would be managed to provide recreational opportunities for scenic whitewater river running. No focus area would be managed for specialized recreation activities, but 37,277 acres would be managed as non-mechanized focus areas in Negro Bill Canyon and the Richardson Amphitheater/Castle Rock area. Prescriptions would manage one-mile-wide scenic driving focus areas along Highways 128 and 279 and along portions of the Lockhart Basin Scenic Byway and portions of the LaSal Mountain Loop Road. The prescriptions under this alternative would have long-term, beneficial impacts on recreation resources by 1) proposing an increased recreational area and additional recreational facilities for camping, information and education, trails and trail access, and sanitation; 2) managing focus areas for non-mechanized and scenic driving user groups; and 3) restricting camping to designated areas. The actions would have beneficial impacts on non-mechanized and scenic driving recreation because they would increase opportunities while reducing the potential for recreational user conflicts within the SRMA and would reduce or eliminate the adverse impacts currently caused by unmanaged camping within the SRMA (see Section 3.10.1.2.1). However, Alternative B would have no long term beneficial impacts on BASE jumping and rock climbing opportunities, because no specialized focus area would be established in the Kane Creek and Wall Street areas. River floating users would be adversely impacted in the long term by the elimination of camping opportunities along the north side of the Colorado River. The overall potential outcome would be a greater likelihood that the area's benefits-based, targeted outcomes would be achieved; these outcomes include increased tourism revenue and individual benefits such as an improved appreciation of nature's splendor, a greater sense of adventure, an enhanced awareness and understanding of nature, and improved outdoor skills.

When compared to Alternative A, Alternative B would be more beneficial, because it would 1) increase the size of the SRMA by 85,484 acres 2) expand recreational opportunities for all user groups; 3) further reduce the potential for resource-use conflicts through recreation focus areas; 4) further improve the likelihood of satisfactory recreational experience for all recreational resource users by proposing to construct or permit more recreational facilities within the SRMA; 5) eliminate potential resource degradation caused by unmanaged, boating-related shoreline

BLM_0010394

camping within the SRMA; and 6) designate more miles of OHV routes (84 miles under Alternative B compared to 45 miles under Alternative A).

## Proposed Plan

The Proposed Plan would establish the Colorado Riverway SRMA as an 89,936-acre Destination SRMA under the same prescriptions as discussed under Alternative A. The SRMA would be managed with prescriptions similar to those discussed under Alternative B, except that 1) the north shore of the Colorado River would be open to undeveloped camping and hiking opportunities (with prescriptions to protect wildlife habitat and other resource values); 2) the Kane Creek Crossing area would be open to designated camping; 3) two more facilities would be proposed than under Alternative B; 4) the focus areas for non-mechanized recreation would be managed on 33,451 acres in the same areas as Alternative B; 5) scenic driving focus areas would be managed along the same corridors as in Alternative B but with a 1/2-mile protected viewshed width; and 6) focus areas for specialized, non-motorized activities (e.g., BASE jumping and rock climbing) would be managed. The impacts on recreation would be similar to those discussed under Alternative B, except that there would be more beneficial impacts to non-mechanized and motorized OHV user groups from increased opportunities for camping, hiking, touring, and specialized recreation. The beneficial impacts to scenic drivers would be similar to those under Alternative B but reduced, because of the narrower corridors of protected viewsheds.

Compared to Alternative A, this alternative would be more beneficial for reasons similar to those discussed under Alternative B. The SRMA would be increased in size by 71,953 acres as compared to Alternative A; it would be managed for focus areas that would reduce user conflicts; and it would have an increase of 32 miles in the number of miles designated for OHV travel routes.

## Alternative D

Alternative D would establish the Colorado Riverway SRMA as a 79,126-acre SRMA, with prescriptions similar to those in the Proposed Plan except that 1) four fewer camping sites and facilities would be designated or proposed; 2) the non-mechanized focus area in Negro Bill Canyon would be reduced from 8,684 acres to 1,287 acres, and there would be no management of a non-mechanized focus area within the Richardson Amphitheater/Castle Rock area; and 3) the scenic driving corridors would have protected viewshed widths of 1/4 mile. This alternative would have long-term beneficial impacts on recreational resources and uses similar to those described for the Proposed Plan, but to a lesser degree than the Proposed Plan, because fewer recreational opportunities would be available within the smaller (and fewer) focus areas. There would be a greater likelihood for long-term adverse impacts from recreation user group conflicts between non-mechanized, specialized, mountain biking, and motorized users in the Richardson Amphitheater/Castle Rock area, because a focus area would not be established to manage the diversity and intensity of recreational use in this highly popular area (see Section 3.10.1.2.1). The reduction in size of the Negro Bill Canyon focus area under this alternative, when compared to the other action alternatives (an 11,223-acre reduction compared to Alternative B; a 7,397-acre reduction compared to the Proposed Plan), would increase the likelihood for resource use conflicts in the SRMA. This alternative would not propose camping sites at Entrada Bluffs, Hittle Bottom, and Kane Creek Crossing, nor would it propose constructing sanitary facilities at the Wall Street climbing area, which would adversely diminish the recreational experience of

BLM_0010395

recreation users in the long-term by not managing the proposed SRMA to meet the current or projected future need and demand for these facilities (see Section 3.10.2.5).

Compared to Alternative A, this alternative would be more beneficial in the long-term for recreation resources and users for reasons as discussed under the Proposed Plan, because the prescriptions are similar. Under Alternative D, the SRMA would be beneficially increased in size by 61,143 acres (a four-fold increase in area over Alternative A) with 21 more miles of designated OHV routes. These increases would provide more managed recreational opportunities for all resource users than would Alternative A.

### 4.3.10.2.10.5 Dolores River Canyons SRMA

<u>Alternative A</u>

Under this alternative, a portion of the Dolores River Canyons area would be managed for general recreational use under the current Colorado Riverway management plan. The potential impacts of this alternative on recreational resources in the Dolores River Canyons area would be adverse in the long-term, because no specific recreation management prescriptions or programs are proposed for this area, except for the current boating management limits discussed above under the Colorado River SRMA for Alternative A. The lack of specific recreation management prescriptions for this area would increase the likelihood of long-term degradation of recreation resources from lack of intensive management of shoreline use (e.g., overnight camping, campfires, and unrestricted wood gathering).

<u>Alternative B</u>

This alternative would manage the Dolores River Canyons as a 31,661-acre Undeveloped SRMA, separate from the proposed Colorado Riverway SRMA. Prescriptions for the Dolores River Canyons SRMA would prohibit motorized and mountain biking recreation within the Dolores River tributary canyons, consistent with the proposed Moab Travel Plan. The SRMA would be managed for recreational opportunities that include non-motorized boating, backpacking, and day hiking, with facilities that support primitive, non-motorized use of the SRMA. There would be no focus area management within the SRMA.

The prescriptions under this alternative would have beneficial impacts on recreational resources, as well as on river floating and non-mechanized resource user groups, because boating group size limits would be imposed to ensure high-quality boating opportunities with an emphasis on primitive, non-motorized uses. There would be adverse impacts on motorized and mountain biking user groups, because no new motorized routes would be proposed within the SRMA, and OHV opportunities would be limited to 14 miles of designated routes. Beneficial, long-term impacts would include a reduction in potential recreational resource use conflicts by promoting remote, non-mechanized recreational opportunities. These beneficial impacts would increase the likelihood of achieving the MFO's targeted individual outcomes for the area, including 1) opportunities for solitary exploration of the area to gain a sense of adventure, 2) improvements in outdoor knowledge and increased self-confidence, and 3) enjoying the natural landscape to develop a closer relationship with the natural world.

Compared to Alternative A, Alternative B would be more beneficial for non-mechanized and river-floating users, because there would be an emphasis on these recreational activities, and more recreational facilities would be proposed than under Alternative A. There would be more

BLM_0010396

adverse impacts under Alternative B for mountain biking and motorized forms of recreation because of limitations and restrictions on these recreational activities.

Proposed Plan

The impacts on recreation under this alternative would be similar to those discussed under Alternative B, because the prescriptions would be similar, except that 30 miles of designated routes would be open to OHV use within the SRMA, providing more opportunities for motorized use of the area.

Alternative D

The impacts of Alternative D on the Dolores River Canyons SRMA would be similar to those discussed under Alternative A, because the SRMA would not be established under this alternative.

### 4.3.10.2.10.6 Labyrinth Rims/Gemini Bridges SRMA and Dee Pass SRMA

Alternative A

This alternative would not establish a Labyrinth Rims/Gemini Bridges SRMA, and recreation-related prescriptions for the current RMP are not specified. Currently, under an interagency cooperative agreement with the State of Utah, the BLM manages a permit system for in-river and shoreline use, and river resources protection along the Green River. A one-mile-wide scenic corridor along SR 313 and the Island in the Sky entrance road is managed by the MFO for camping at designated campgrounds and for protection of scenic quality. The Gemini Bridges Road is similarly managed to protect resource values. The White Wash Sand Dunes area is managed for open (cross-country) OHV travel, and OHV use is limited to existing routes in an area south of Ten Mile Point Road. Current management and maintenance would continue for river takeouts, facilities, interpretive sites, and trails in the Labyrinth Rims/Gemini Bridges area. The 3-D, Crystal Geyser, Hellroaring Rim, Secret Spire, and Wipeout Hill areas would continue to be authorized for Jeep Safari and other uses.

Under this alternative, the impacts on recreation resources would be beneficial in the short term by continuing to provide recreational opportunities and facilities for resource user groups. In the short term, maintaining the existing management practices would adequately address the present level of river use through the river permitting system, and limitations and restrictions on camping and OHV use would continue to protect resource values in those areas where camping and OHV use restrictions are in place.

Resource use conflicts and user displacement in the Gemini Bridges area are presently occurring between motorized and mountain biking user groups (see recreation section 3.10.2 for a discussion of the area's current recreation conditions and trends). In the long term, the impacts on recreation resources in the area would be adverse because the lack of specific recreation-related prescriptions under this alternative would not address nor would be capable of adequately responding to the anticipated increase in visitor use of the area, the demand for recreational opportunities in the area, and the intensifying impacts of visitation on recreation resources. Long-term, adverse impacts on recreation would result in a degraded quality of recreational experiences, unsatisfied user expectations, and diminishing recreational opportunities for all user groups.

BLM_0010397

Alternative B

Alternative B would establish the Labyrinth Rims/Gemini Bridges area as a 300,650-acre SRMA with 813 miles of designated D-Class roads/routes. The SRMA would have the same prescriptions as Alternative A but with the following additions: 1) the White Wash Sand Dunes would be managed for ecological restoration and scenic quality, and travel would be limited to designated routes; 2) camping would be prohibited within the Bartlett/Tusher/ Courthouse/Ten Mile Areas to protect resource values; 3) the river permit system would be expanded to further protect river resources; 4) camping would be limited to designated sites in high-use areas; and 5) backcountry areas would be managed for scenic motorized touring, and the Mill Creek Dinosaur Trailhead would be improved to accommodate passenger vehicles. Under this alternative, the SRMA recreational facilities and campgrounds would be increased by two campgrounds. The SRMA would manage focus areas for scenic drivers with one-mile protected viewshed corridors, for non-mechanized users (26,031 acres), and for mountain biking groups (17,530 acres), providing visitors with the opportunities to have quality river recreation, camping, on- and off-trail hiking, mountain biking, motorized backcountry, and scenic driving experiences. Under this alternative there would be no specific, intensive management for several mountain biking recreation focus areas (Tusher, Slickrock, Mill Canyon/Upper Courthouse, Bartlett Slickrock); there would be no specific, intensive management of the motorized backcountry touring focus area (Gemini Bridges/Poison Spider Mesa); there would be no specific, intensive management of the specialized (motorized) sport focus areas (Dee Pass, Airport Hills); and there would be no specific, intensive management of the specialized (non-motorized) BASE-jumping focus area at Mineral Canyon/Horsethief Point. By not specifically managing these potential focus areas, there would be the likelihood for increasing resource user conflicts and adverse and diminishing quality of experiences for motorized, mountain biking, and specialized groups in these areas.

Alternative B prescriptions would have long-term beneficial impacts on recreation through the management of focus areas for some specific recreational uses (including non-mechanized and mountain biking) that would reduce or eliminate the potential for use conflicts in the managed focus areas. Under this alternative the proposed increase in the number of recreational facilities would ease user demands for these facilities and increase the likelihood of recreation users having satisfying experiences. The proposal to extend the existing cooperative permitting agreement with the State of Utah to commercial river use would beneficially maintain satisfying river recreational experiences and opportunities by reducing crowding and adverse impacts. Limiting camping to designated sites in high-use areas would reduce recreation-related surface disturbance impacts to the area and would have long-term, beneficial impacts on recreation resources by preserving visual quality. Managing the SRMA to maintain quality recreational opportunities and to preserve recreation resources would increase the likelihood for beneficial recreational outcomes that include 1) a greater sense of adventure and heightened outdoor self-confidence from opportunities for individual exploration and enjoyment, 2) improved outdoor skills, and 3) opportunities to escape from crowds to gain a sense of freedom and to maintain mental health.

Compared to Alternative A, Alternative B would be more beneficial to recreation because more areas would be managed to reduce resource use conflicts; the area would be managed to preserve recreation resources; more facilities would be proposed to accommodate the anticipated increase in recreational use and demand; and more routes would be managed for mountain biking and non-mechanized recreation to meet the anticipated demand for these activities.

BLM_0010398

Proposed Plan

The Proposed Plan would establish the Labyrinth Rims/Gemini Bridges area as a 300,650-acre SRMA with 881 miles of designated routes. The SRMA would have the same prescriptions as discussed under Alternative A, with the following additions: 1) expand the BLM/State of Utah river permit system to further protect river resources; 2) limit camping to designated sites in high-use areas; 3) manage backcountry areas for scenic motorized touring; 4) improve the Mill Creek Dinosaur Trailhead to accommodate passenger vehicles; and 5) consider development of an alternative mountain biking route on Poison Spider Mesa. Under this alternative, the SRMA would be managed to provide visitors with the opportunities to have quality river recreation, camping, on-trail and off-trail hiking, mountain biking, and backcountry motorized and scenic driving experiences.

The Proposed Plan prescriptions would have long-term, beneficial impacts on all recreation user groups through expansion of facilities and the management of focus areas for non-mechanized (13,383 acres), motorized (18,165 acres), mountain biking (23,702 acres), and specialized (36,503 acres) user groups. Scenic driving corridor focus areas with 1/2-mile protected viewshed widths along Highway 313 and the Island in the Sky road would be managed for this user group. These prescriptions would beneficially reduce the potential for resource-use conflicts, similar to the discussion of impacts under Alternative B but with more beneficial impacts on resource users than Alternative B offers, because the SRMA would be managed with more focus areas for a broader range of recreational activities. The proposal to extend the existing cooperative river permitting agreement would have similar impacts as discussed under Alternative B.

Compared to Alternative A, the Proposed Plan would be more beneficial to recreation for the reasons discussed under Alternative B: 1) more areas would be managed to reduce resource use conflicts, 2) more facilities would be proposed to accommodate the anticipated increase in recreational use and demand, and 3) more routes would be designated for motorized and mountain biking recreational use to meet the anticipated demand for these activities.

Alternative D

Alternative D would establish the 60,939-acre Dee Pass SRMA with a motorized trail-riding system at Dee Pass and the White Wash Open OHV-riding Focus Area. The proposed SRMA recreational facilities would be similar to those proposed under the Proposed Plan but with additional facilities to enhance motorized use of the White Wash Sand Dunes. No recreational focus areas would be managed except for the above-mentioned 57,875-acre specialized (motorized) area at Dee Pass and a 3,064-acre Open OHV area at White Wash Sand Dunes.

The impacts on recreation under this alternative would be similar to those discussed under Alternative A. While designating an SRMA for motorized recreation and managing motorized recreational use focus areas would reduce potential recreational resource use conflicts to some degree, the current conditions and trends toward adverse, long-term resource use conflicts between other recreational activities and user groups within the area would remain as cross country OHV use would continue in this area. Managing for motorized OHV use on designated trails and open OHV riding on the sand dunes would create opportunities for a sense of adventure, exploration, and excitement, with the likelihood of improvements in ATV-riding skills, a sense of freedom from urban living, and group enjoyment of the outdoors. Compared to

BLM_0010399

Alternative A, the increased number of proposed recreational facilities under this alternative
would provide a greater degree of resource protection and preservation.

### 4.3.10.2.10.7 Lower Gray Canyon SRMA

<u>Alternative A</u>

Under this alternative prescriptions from the Desolation-Gray Canyons Management Plan would
be brought forward. Current conditions and trends would continue, which include heavy
recreational river use along Lower Gray Canyon. The area would continue to be managed for
recreational river use with commercial and private river use stipulations. River use would remain
set at a maximum carrying capacity of a total of 35,000 passenger-days per year, which balances
recreational use of the river with resource protection. Minerals development would not be
allowed within the river corridor, and motorized travel on the river would be regulated to
preserve river resources. These prescriptions would continue to have a long-term, beneficial
impact on non-motorized recreation within the Lower Gray Canyon area, because the current
Desolation-Gray Plan would continue to protect recreation resources and river use by limiting or
prohibiting motorized boat travel; seeking to acquire private land within the river corridor in
order to protect the river corridor; establishing daily launch limits of 6 groups/day and group size
limits of 25 persons; and managing waste within the river and along the river corridor (BLM
1979).

<u>Alternative B</u>

Alternative B prescriptions would establish the Lower Gray Canyon as a 3,759-acre SRMA in
coordination with the Price FO. The SRMA would be managed in accordance with the
Desolation-Gray Canyons Management Plan, with the same group size and number limitations,
and with the same resource protection prescriptions as discussed under Alternative A. The
Desolation-Gray Plan would maintain opportunities for scenic river recreation on the Green
River and opportunities for quality camping, hiking, and horseback riding within the river
corridor. Prescriptions proposed under Alternative B would manage the existing riverside trails
for non-mechanized recreational use, and vehicle camping would be limited to designated sites.

The impacts of these management decisions would be beneficial in the long-term on recreation
resources within the proposed SRMA, because the area would continue to be managed under the
protection of the Desolation-Gray Plan prescriptions with additional beneficial prescriptions to
provide riverside recreational opportunities. By maintaining recreation resources and
opportunities within the SRMA, the MFO's targeted outcomes of beneficial visitor experiences
would likely be met. These individual experiences would potentially include improvements in
outdoor recreation skills from easy access to natural landscapes, strengthened family ties and
friendships from group activities such as river floating and camping, and maintenance of mental
health and reduction of mental stress from enjoyment of an uncrowded natural environment.
Compared to Alternative A, Alternative B would have more beneficial impacts on recreation,
because the alternative would expand the recreational opportunities within the proposed SRMA
while continuing to protect resource values and current recreational opportunities.

<u>Proposed Plan</u>

The impacts of the prescriptions under this alternative would be similar to those discussed under
Alternative B, because the prescriptions would be the same.

BLM_0010400

Alternative D

Under Alternative D the Lower Gray Canyon SRMA would not be established, but the Desolation-Gray Plan would be used to manage river use. The impacts to recreation would be similar to, but more protective of, river resources and opportunities than under Alternative A, because controlled surface-use leasing stipulations would also be applied to limit river corridor surface disturbances, with beneficial impacts for the recreation user.

## 4.3.10.2.10.8 Sand Flats SRMA

Alternative A

This alternative would apply decisions found in the current Sand Flats Management Plan. These include 1) a cooperative agreement with Grand County in which the county would be authorized to collect fees and participate in the operational management of the area; 2) limiting motorized OHV and mountain biking travel to designated road and trails; 3) provisions for fee uses; 4) campground development; and 5) development of camping, parking, and sanitation facilities. Management of the area would also include prescriptions for visitor protection, development of an entrance station, and information services. Camping would be limited to designated sites, and wood gathering and collecting would be prohibited.

While the prescriptions under the current Plan would, in the short term, beneficially address the need for recreational facilities in the area and control recreation-related surface disturbances, the long-term impacts to recreation resources and user groups would likely be adverse in that the prescriptions in the current RMP would not adequately address the intensifying user conflicts, the rising demand for OHV opportunities, the increasing number of visitors to the MPA, and the potentially adverse impacts that more visitors would have on the area's recreation resources. The lack of an adaptive-management plan for the area would, in the long term, have adverse impacts on the recreational experience and on user satisfaction because of over-crowding and resource use conflicts between mountain biking and motorized OHV user groups that share the same travel routes.

Alternative B

Alternative B would establish the 6,246-acre Sand Flats SRMA with 20 miles of designated routes. The prescriptions would be the same as those discussed under Alternative A, except that the Slickrock Bike Trail would be closed to all motorized users. The SRMA would be managed for a range of opportunities, including mountain biking on the Slickrock Trail, OHV challenge routes, and camping. No Surface Occupancy leasing stipulations would be applied to protect scenic and recreation values.

Prohibiting motorized OHV use of the Slickrock Trail would reduce the recreational opportunities of this group and would have long-term, adverse impacts on this group. Mountain bikers would enjoy beneficial impacts, including increased safety on the trail and reduced potential for resource-use conflicts and user displacement by motorized OHV users. Mountain bike users would benefit most from prohibitions on motorized use of the trail.

Beneficial impacts would also be produced through preservation and protection of scenic quality and other recreation values within the SRMA. The maintenance of recreational opportunities and resources within the proposed SRMA would also increase the likelihood of visitor-beneficial experiences that include physical challenges that could heighten the sense of adventure while

BLM_0010401

improving outdoor skills, a greater sense of freedom from urban living, and strengthening family bonds and friendships by sharing outdoor experiences. Compared to Alternative A, this alternative would have more beneficial impacts because surface disturbance would be precluded, providing greater resource protection, a potential reduction in resource-use conflicts, and increased safety within the SRMA.

Proposed Plan

The Proposed Plan would apply similar prescriptions to Sand Flats as does Alternative B, except that while the Slickrock Trail would be closed to ATV and four-wheeled vehicles for safety purposes, OHV motorcycles would be permitted on the trail. This alternative would also designate 23 miles of routes within the SRMA. The prescriptions would have impacts similar to Alternative B except that 1) the long-term, adverse impacts on some motorized users would be reduced because of expanded motorized (OHV motorcycle) opportunities; 2) the benefits to mountain bikers would be reduced by increased potential for user conflicts with and displacement by motorcycles; and 3) the level of safety along the Slickrock Trail would be diminished because of the combined motorized and mountain biking uses. Compared to Alternative A, the impacts of this alternative on recreation resources and user groups would be more beneficial, because the prescriptions would provide greater protection to resource values by precluding surface disturbance and provide higher quality recreational opportunities than Alternative A provides.

Alternative D

Alternative D would have the same prescriptions as in the Proposed Plan except that a Slickrock Trail mountain bike free-ride area would be established. Also, Controlled Surface Use stipulations would be applied to oil and gas leasing and other surface-disturbing activities to limit these kinds of impacts to scenic values. The impacts of this alternative on recreation would be similar to those discussed under the Proposed Plan, except that there would be more recreational opportunities that would benefit mountain bike users than under Alternative A from designation of the Slickrock mountain bike free-ride area.

## 4.3.10.2.10.9 South Moab SRMA

Alternative A

Under this alternative the Mill Creek Canyon hiking trailhead, the Ken's Lake recreation site, the Hidden Valley trailhead, and the Blue Hill trailhead would be managed as recreation sites. The Mill Creek trail, the Ken's Lake trail system, the Hidden Valley trail, the Steelbender/Flat Pass OHV/mountain bike route, the Behind the Rocks OHV route, the Strike Ravine OHV route, and the Kane Creek Canyon Rim OHV/mountain bike route would be managed as recreation trails. Camping would be limited to designated sites, with camping prohibitions on the west side of Spanish Valley and in Mill Creek.

The impacts to recreation resources and to motorized, mountain biking, and non-mechanized user groups under this alternative would be adverse in the long term, because continuation of current prescriptions under this alternative, without specific prescriptions that respond to resource impacts and recreation needs, would be inadequate. As discussed in Section 3.10.2, current conditions within the area include increasing resource use conflicts and non-motorized user displacement; a demand for more recreation facilities; heightened visitor use and recreation

BLM_0010402

resource use; adverse impacts to undeveloped camping sites; and increasing resource degradation. These use conflicts, lack of adequate facilities, and resource degradation would continue to occur.

<u>Alternative B</u>

Alternative B would establish the 63,999-acre South Moab Destination SRMA, with the same prescriptions as in Alternative A with the following exceptions:

- Recreation focus areas would be managed to provide opportunities for scenic driving along a one-mile-wide corridor that follows the LaSal Mountain Loop Road.
- Mill Creek Canyon, Behind the Rocks, and Hidden Valley Trail would be managed as non-mechanized focus areas (34,486 acres).
- Upper Spanish Valley would be managed as a mountain biking backcountry touring (2,255 aces) focus area.
- Potato Salad Hill would not be managed as a specialized (motorized) focus area.
- Mountain biking speed-events would be managed in the Twenty Four Hours of Moab specialized (non-motorized) focus area (2,905 acres).
- Additional emphasis would be placed on resource protection in the Ken's Lake area during development of a management plan for the area.
- New mountain biking and non-mechanized trails would be established.
- Existing trails would be extended in cooperation with municipal, state, and county agencies, and with private landowners.

The impacts on recreation from these prescriptions would be beneficial in the long term, because the establishment of the area as an SRMA and the management of recreation focus areas would increase the likelihood for satisfying scenic driving, mountain biking, and non-mechanized recreation by expanding opportunities and reducing the potential for recreation resource-use conflicts and user group displacement. The creation and extension of hiking and equestrian trails and biking lanes would beneficially expand the recreation opportunities for these users. Management plan prescriptions for the SRMA would protect the recreational resources for all users of the area. Specialized recreation (motorized OHV) groups would be adversely impacted in the long term, because the Potato Salad Hill route would be closed to motorized travel, resulting in a loss of opportunities for challenging OHV hill climbing.

Maintaining resource values and expanding recreational opportunities for non-motorized use under this alternative would increase the likelihood that individuals would have beneficial experiences that include enjoyable physical exercise and an improved capacity for recreational activities through easy access to the area's natural landscapes, improved outdoor knowledge and outdoor skills development, heightened self-confidence, and developing a greater sense of outdoor independence. Compared to Alternative A, Alternative B would be more beneficial, because it would more effectively address the recreation resource-use concerns associated with increased visitation, resource-use conflicts, and recreation resource degradation, while also providing more recreational opportunities than Alternative A.

BLM_0010403

## Proposed Plan

The prescriptions under the Proposed Plan would be similar to those discussed under Alternative B, except for the following: 1) additional resource protection in the Ken's Lake area would not be emphasized during recreation plan development; 2) the LaSal scenic driving focus area would have a corridor width of 1/2 mile; and 3) a 41-acre specialized (motorized) hill-climbing focus area would be managed at Potato Salad Hill.

The impacts to recreational opportunities for scenic, mountain biking, non-mechanized, and specialized motorized OHV users would be beneficial in the long term. These include expanded or maintained opportunities for these groups with the reduced potential for user-conflicts and displacement and the protection of recreation resources under the SRMA plan. Compared to Alternative A, this alternative would be more beneficial for the same reasons as discussed under Alternative B.

## Alternative D

No South Moab SRMA would be established under this alternative. The prescriptions and impacts to recreation resources and user groups would be similar to those discussed under Alternative A.

### 4.3.10.2.10.10 Two Rivers SRMA

Alternative A

Alternative A would continue to manage the Colorado and Dolores Rivers under existing river management programs, which focus on providing facilities and regulating commercial and private river use. Under this alternative, boating management would be a continuation of current prescriptions, including promoting safe and enjoyable river use while permitting 30 commercial outfitters and up to 24,000 passenger-days per year. The impacts of this alternative would be beneficial on river recreation and use in the short-term because management would be adequate for current levels of use. However, as demand increases for recreational use of the rivers (as recreational-use trends suggest [see Section 3.10.1.4]), resource-use conflicts and impacts to resources would likely increase, with long-term, adverse impacts on river resources and river running opportunities, particularly along river stretches that lie outside the proposed SRMA.

Alternative B

Alternative B would establish the 29,839-acre Two Rivers Destination SRMA, with the management objective to continue to provide high-quality river-related recreational opportunities on the Colorado and Dolores Rivers for river running and boating, hiking, and camping, and to protect outstanding river resource values. Group-size and daily launch limits would vary, depending on the type of boating recreational opportunities for which a particular river segment would be managed (see Table 4.79, SRMA Recreation Summary Table). The SRMA boating recreational opportunities would range from primitive, remote, and challenging whitewater river-running to scenic whitewater and flat water boating. A non-mechanized recreation focus area (23,479 acres) would be managed for river use and shoreline hiking within Westwater Canyon.

Under this alternative, additional public lands would be acquired for construction of additional facilities that would include river takeouts, parking and launch facilities, additional camping sites and additional access to camping sites. Prescriptions that would expand the number of facilities

BLM_0010404

for recreational camping and boating would beneficially enhance the river experience for river floating and non-mechanized users. Prescriptions limiting the number of river permits and the size of permitted groups could adversely impact the river floating user group in the short term by potentially denying permits to those seeking to have a river experience. However, these prescriptions would provide long-term opportunities for satisfying recreational boating, shoreline hiking, and river floating experiences by beneficially dispersing river users and thus creating conditions of solitude, quiet, and a sense of naturalness. Managing the area for high-quality river-running, hiking, and camping would allow visitors to develop a closer relationship with the natural world by having satisfying recreational experiences. Being able to escape from crowds and from urban environments would allow visitors to maintain mental health, reduce stress, and encourage the development of a more outdoor-oriented lifestyle.

Compared to Alternative A, Alternative B would be more beneficial to recreation users because of the reduced likelihood for use conflicts under the Alternative B permitting system. More river resource protection prescriptions would be applied, and more recreational facilities would be provided to enhance the river experience.

### Proposed Plan

Under the Proposed Plan the boating management prescriptions would be similar to those in Alternative B, except that: 1) a proposed take-out facility at the Westwater Ranger Station would be developed separately from the existing station launch facility in order to reduce congestion at the ranger station and 2) permitted group size and daily launch limits would be greater than under Alternative B (i.e., group sizes would be nine persons greater, and launch limits would allow more individuals per day [see Table 4.79]). The impacts to river floating and non-mechanized groups would be similar to but more beneficial than those discussed under Alternative B, because more opportunities would be available to have a river experience. The Proposed Plan would be more beneficial to recreation users than Alternative A for the same reasons as discussed under Alternative B.

### Alternative D

Alternative D would manage the Two Rivers area as a 14,056-acre Destination SRMA to provide opportunities for high-quality boating and camping. Boating prescriptions would be the same as those in the Proposed Plan except that the permitted group size would be increased by seven persons, and daily launch limits would allow more people per day to access each river sector. The number and type of proposed facilities would be the same as discussed under the Proposed Plan, but a non-mechanized river focus area would not be established. The impacts of this alternative on recreation would be both adverse and beneficial in the long term. Adverse impacts to those seeking a quality boating experience would be produced by expanding the maximum group size and number of permits for river segments within the SRMA, which would potentially reduce the river opportunities for those users who seek a less-crowded river experience. Beneficial impacts would be similar to those discussed under the Proposed Plan, but to a lesser degree, because no focus area-related recreation opportunities for river use and hiking would be proposed under this alternative, and, therefore, there would be long-term, adverse impacts on opportunities for a river/shoreline hiking experience. This alternative would be more beneficial than Alternative A for the reasons discussed under the Proposed Plan.

BLM_0010405

### 4.3.10.2.10.11 Utah Rims SRMA

<u>Alternative A</u>

Under Alternative A the Utah Rims area would continue to be managed under the current, and limited, recreation management program for the area. Prescriptions would include limiting travel to existing routes, managing Kokopelli's Trail for recreational use, managing the Bitter Creek campsite for camping, and managing Utah Rims for general recreation. The impacts of this alternative on the Utah Rims area would be adverse in the long term from the limited prescriptions that would not adequately address the adverse impacts to recreation resources from OHV use (e.g., surface disturbances to wildlife and range habitat, cultural resources, noise impacts to non-motorized users). The Alternative A prescriptions would not address resource use conflicts between OHV, mountain biking users, and non-mechanized groups, which would have adverse impacts on non-mechanized and mountain biking group recreational opportunities from OHV noise, incompatible trail use, and from user displacement by motorized users.

<u>Alternative B</u>

Under Alternative B Utah Rims would be managed as a 15,424-acre Community SRMA, with management goals to protect resource values while providing sustainable recreational opportunities for motorized and mountain biking scenic trail use, designated camping, and equestrian opportunities. Motorized and mountain biking travel would be limited to designated routes; a staging area would be developed for OHV group access to the trail system; limited camping facilities would be provided; and competitive, motorized events would be prohibited in order to maintain the area's single-track character. A separation of single-track use by time period would be considered. No new recreational routes would be established under this alternative.

The impacts of this alternative on recreation would be beneficial in the long term for several reasons: 1) OHV-caused impacts to recreation resources would be reduced by limiting travel to designated routes; 2) the addition of facilities such as OHV staging areas and campsites would beneficially enhance the recreational experiences for motorized users by responding to this group's demand for more facilities; and 3) separating types of single-track use by time period would potentially reduce resource use conflicts. Managing the SRMA to enhance recreational experiences and expand the opportunities for motorized and non-motorized groups would have individual benefits for the area's visitors, including opportunities to enjoy strenuous physical exercise, improve outdoor skills and abilities, reduce physical and mental stress through escape from crowds and urban environments, and gain a greater sense of adventure by participating in challenging and enjoyable mechanized and non-mechanized recreational activities.

Compared to Alternative A, this alternative would have more long-term, beneficial impacts on recreation for several reasons: 1) it proposes a greater expansion of recreational opportunities for motorized and mountain biking resource users; 2) it proposes more recreational facilities to support the proposed SRMA trail system; 3) it would address OHV-caused impacts to recreation resources by controlling cross country travel; and 4) it would address resource-use conflicts and displacement concerns.

BLM_0010406

<u>Proposed Plan</u>

The Proposed Plan prescriptions would be similar to those discussed under Alternative B; except that 1) the trail system would be expanded through acquisition of trail access across non-Federal lands; and 2) single-track routes would be added to the trail system upon adoption of the Travel Plan accompanying this RMP.

The impacts on recreation resources and user groups would be similar to, but more beneficial than, those discussed under Alternative B, because more opportunities for trail riding would be available from expansion of the trail system within the SRMA. The impacts of this alternative, when compared to Alternative A, would be similar to those discussed under Alternative B, because the prescriptions are similar (although no new motorized routes would be established in Alternative B).

<u>Alternative D</u>

Alternative D would not establish a Utah Rims SRMA, so the impacts would be similar to those discussed under Alternative A, but to a great degree, because user conflict could increase.

#### 4.3.10.2.10.12 Moab ERMA

Under management common to the action alternatives, a management plan would be developed for the Moab ERMA to provide recreational management guidance for addressing changes in user demand and conditions. Facilities would be constructed, as needed, within the ERMA to ensure visitor safety, reduce user group conflicts, and protect resources. These prescriptions would be beneficial to all user groups and to ERMA recreational resources by protecting the areas' recreational resources, maintaining recreational opportunities, and managing the area to meet visitor demands.

<u>Alternative A</u>

Consistent with the current RMP, Alternative A would continue current prescriptions to improve recreation sites and areas within the ERMA to balance the demand for recreational opportunities with protection of resources. The Kokopelli's Trail would be managed as a multi-day mountain bike and vehicle route with associated camping areas. The impacts of this alternative on motorized OHV and mountain biking groups would be adverse in the long term because current user conflicts along the Kokopelli's Trail would continue and most likely would intensify as increasing numbers of visitors use the trail for mountain biking and motorized use.

<u>Alternative B</u>

The MFO's targeted recreation management goals for the ERMA would be backcountry touring, and primitive hiking, backpacking, and equestrian use. Alternative B would manage 335,457 acres within the Bookcliffs area as an SRMA for non-mechanized recreation; the Sego Rock Art area would be managed for day-use (and provide a recreational opportunity to scenic drivers) and additional acquisition of adjacent land would be considered to expand this cultural/recreational interpretive site. Kokopelli's Trail would continue to be managed as a mountain biking and vehicle route with camping areas, and facilities would be developed at Lost Spring Canyon. Information boards would be installed along Interstate 70 main exits to inform visitors of such amenities. Current prescriptions would be followed to make improvements to sites and areas as

BLM_0010407

necessary, and to manage the ERMA for very low visitation and provide a custodial-level of management for recreational use.

Except for the long-term, adverse impacts to the Kokopelli's Trail from use conflicts (the prescriptions for the trail would be the same as Alternative A), the impacts of prescriptions under this alternative would be beneficial in the long term because developing additional recreational facilities and additional recreational opportunities for motorized and non-motorized recreation would alleviate potential resource-use conflicts and demands within the proposed SRMAs.

Compared to Alternative A, this alternative would be more beneficial to recreation users because it would continue to follow current prescriptions for the ERMA, as well as expand recreational opportunities and potentially enhance recreation experiences through informal recreation focus areas and facilities development. Visitor benefits from recreation in the ERMA would include opportunities to improve outdoor skills, maintain mental and physical health, and explore and experience a sense of adventure in remote, backcountry locales.

Proposed Plan

The Proposed Plan would have prescriptions similar to Alternative B, except that the Upper Fisher Mesa would be managed as a 1,365-acre area emphasizing mountain biking. The impacts on recreation resources and user groups would be similar to Alternative B, but more beneficial, as there would be more opportunities for mountain bikers under this alternative than under Alternative B.

Compared to Alternative A, the Proposed Plan would have impacts similar to Alternative B because the prescriptions are similar. However, the acreage of ERMA in the Proposed Plan is greater than that in Alternative B, so recreation management in the Proposed Plan is lessened.

Alternative D

Alternative D would have the same prescriptions as the Proposed Plan. The impacts would be similar to those discussed under the Proposed Plan except to a lesser degree because of the decreased number of acres within SRMAs. The impacts of this alternative, when compared to Alternative A, would be similar to those discussed under the Proposed Plan, but to a lesser degree.

## 4.3.10.2.10.13 Special Recreation Permits

Alternative A

Alternative A would continue current management for special recreation permits, including competitive and non-competitive OHV events. The prescriptions under this alternative would have beneficial long-term impacts on recreation by protecting recreation resources through permit stipulations while providing recreational opportunities for motorized tour groups, non-mechanized (horseback) groups, hunters, commercial outdoor education (survival school) groups, and other commercial and private enterprises, and managing and protecting recreation resources. These stipulations protect resources and help provide a quality recreation experience.

Alternative B

The prescriptions under this alternative would be similar to those discussed under Alternative A, but with more specific stipulations for protecting natural and cultural resources. For example,

BLM_0010408

permits would be required for all groups with 15 or more vehicles. Alternative B would have beneficial impacts similar to those discussed under Alternative A, but to a greater degree, because of the resource protection and preservation-related stipulations that would be associated with the issuance of special recreation permits. The stipulation that mandates a special recreation permit at 15 vehicles would beneficially impact user experiences because group size encounters would be smaller.

Proposed Plan

The prescriptions under this alternative would be similar to those discussed under Alternative B, except that permits would be required for all groups with 25 or more vehicles. The Proposed Plan impacts, when compared to Alternative A, would be similar to Alternative B because the group size of 25 is closer to the group size of 15 (Alternative B) than that of Alternative A (group size of 50).

Alternative D

Alternative D would have the same prescriptions as Alternative B, except that permits would be required for groups with 50 or more vehicles. This alternative would have similar impacts on recreation as discussed under the Proposed Plan, but to a lesser beneficial degree, because recreation and other resources would receive less protection (given the larger group size) under the special recreation permit process. In the short-term, this alternative's emphasis on providing more recreational opportunities to larger groups would have beneficial impacts (because permits would not be required until the threshold of 50 vehicles is reached) on all private user groups that require permits; however, the long-term impacts would be adverse because of the increased likelihood for recreation resource degradation and loss of recreation values. Compared to Alternative A, this alternative would be more beneficial in terms of reducing user conflict and protecting resources because there would be more protection and preservation-related stipulations on cultural and natural resources while still managing for support of the local economy.

### 4.3.10.2.11 IMPACTS OF RIPARIAN DECISIONS ON RECREATION RESOURCES

Under all of the alternatives, riparian resource prescriptions would control recreational use, where necessary, and manage camping in riparian areas to reduce vegetation disturbances, in compliance with the MFO's Recreation Rules regarding dispersed camping (Appendix E) and The Guidelines for Recreation Management for BLM Lands in Utah (Appendix R). The recreation rules and guidelines stipulate that camping within riparian areas would be restricted if it was determined that the camping areas were becoming degraded, or camping would be reduced in order to minimize vegetation and sedimentation impacts. Restricting riparian dispersed camping areas would reduce recreational opportunities and have short-term, adverse impacts on users seeking this recreational activity, but the impacts would be beneficial in the long term as these areas would be managed to preserve the recreational resources within riparian areas for wildlife viewing, hiking, and sightseeing.

### 4.3.10.2.11.1 Alternative A

Under Alternative A, the riparian prescriptions discussed for management common to all alternatives would impact recreational opportunities while preserving the riparian resource. Additionally, current trends and conditions under this alternative would have indirect impacts on

BLM_0010409

recreational opportunities: the current adverse impacts on riparian resources from OHV use, camping, trail erosion, livestock grazing, and exotic species encroachment (see Section 3.11.5.1) would continue to degrade riparian resources and would, in time, degrade recreational opportunities for wildlife viewing and sightseeing from the loss of riparian habitat. Scenic quality would be degraded and the risks of wildland fire in riparian areas would increase (with an associated increased risk of scenic quality degradation) from the invasion and establishment of exotic species. Livestock grazing in riparian areas could degrade such areas, reducing recreational opportunities for wildlife viewing, sightseeing, photography, day hiking, and camping for motorized OHV, mountain biking, and non-motorized recreational users.

### 4.3.10.2.11.2 Alternative B

Grazing prescriptions under Alternative B and riparian management common to all action alternatives would, where necessary, control livestock access to riparian habitat, restrict surface-disturbing activities within riparian areas and floodplains, and restore at-risk or non-functioning riparian areas, which would improve riparian conditions and beneficially enhance riparian recreational opportunities in the long term by improving recreation resources. Control of recreation in riparian habitat would be adverse in the long term for some potential surface-disturbing recreational opportunities, such as OHV use, because these activities would be reduced. However, prescriptions to reduce impacts to riparian resources would have long-term, beneficial impacts on other recreational opportunities and experiences (e.g., day hiking, equestrian, wildlife viewing, photography, and day camping) because of improvements to riparian resources. Compared to Alternative A, this alternative would be more beneficial to recreation users because it would apply more prescriptions to preserve and improve riparian recreational resources.

### 4.3.10.2.11.3 Proposed Plan

The impacts on recreation under this alternative would be similar to those discussed under Alternative B because the prescriptions concerning recreation use would be similar.

### 4.3.10.2.11.4 Alternative D

Impacts on recreation resources and opportunities under this alternative would be similar to Alternative B because prescriptions under management common to all action alternatives would manage riparian recreation resources for preservation, enhancement, and restoration.

### *4.3.10.2.12 IMPACTS OF SOILS/WATERSHED DECISIONS ON RECREATION RESOURCES*

### 4.3.10.2.12.1 Alternative A

The impacts of Alternative A on recreation would be negligible because either there are no specific soils prescriptions or they address grazing/saline soil concerns that would not impact recreational opportunities or resource uses.

### 4.3.10.2.12.2 Alternative B

Alternative B would have long-term, beneficial impacts on recreation from the closing of the Castle Valley and Mill Creek-Spanish Valley watersheds to all surface-disturbing activities, including oil and gas leasing and development. This would maintain recreation-related scenic

BLM_0010410

quality in Castle Valley for sightseers and those touring the valley on the LaSal Mountain Scenic Byway, and for those participating in recreational activities in areas that have views of the valley. Steep slope areas (>30%) would also be restricted, with no surface-disturbing activities allowed, with resultant decreases in soil erosion and scenic quality degradation. Compared to Alternative A, this alternative would be more beneficial to recreation because prescriptions would maintain recreation-related scenic quality.

### 4.3.10.2.12.3 Proposed Plan

The impacts would be similar to those discussed under Alternative B because the prescriptions are similar, except that the Castle Valley and Mill Creek-Spanish Valley watersheds would be no surface occupancy.

Soils and riparian decisions reduce motorized access to sensitive soil and riparian areas, impacting motorized users, but to a lesser degree than Alternative B (see Appendix G.)

### 4.3.10.2.12.4 Alternative D

The impacts would be similar to those discussed under Alternative B, except that surface-disturbance stipulations would not be applied to the Castle Valley and Mill Creek-Spanish Valley watersheds. This would result in possible degradation to the recreation-related scenic quality.

Soils and riparian decisions reduce motorized access to sensitive soil and riparian areas, impacting motorized users, but to a lesser degree than Alternative B and the Proposed Plan (see Appendix G.)

### *4.3.10.2.13 IMPACTS OF SPECIAL DESIGNATION DECISIONS ON RECREATION RESOURCES*

### 4.3.10.2.13.1 ACECs

Alternative A

Under Alternative A, no ACECs would be designated within the MPA. Thus, restrictions to protect recreation-related values would not be applied in this alternative. Therefore, these areas would be available for development, which would have adverse impacts on recreation resources as scenic quality could be diminished.

Under this alternative, the Ten Mile Wash area would be open to competitive motorized events, and the White Wash area would be open to competitive motorized events and cross-country OHV travel. This would continue to benefit motorized recreation users because the recreational opportunities for specialized and motorized OHV recreation groups would be maintained. The impacts on non-motorized users would continue to be adverse, because of the impacts of cross country travel on scenic resources (see Section 3.10.1.2.7).

Alternative B

Under Alternative B, approximately 610,086 acres would be designated as ACECs within the MPA for protection of relevant and important values that include cultural resources, paleontological resources, scenic quality, fish and wildlife, sensitive or endangered species, riparian resources and watersheds, and/or mitigation of wildland fire hazards.

BLM_0010411

Under this alternative, NSO minerals leasing stipulations would be applied to all ACECs, which would limit or prohibit surface-disturbance impacts to recreation resources, and have long-term, beneficial impacts on recreation because resources and opportunities would be preserved.

Vehicle-based, designated camping restrictions would be applied to the Behind the Rocks, Highway 279/Shafer Basin/Long Canyon, Colorado River Corridor, Upper Courthouse, Ten Mile Wash, and White Wash ACECs. Management of Canyon Rims would be consistent with the Canyon Rims Recreation Area Plan, and the Colorado River Corridor, Mill Creek, and Upper Courthouse Wash ACECs would be managed consistent with the SRMA prescriptions proposed for these areas. These actions, by managing ACECs through recreation plans and limiting vehicle surface disturbances, would tend to preserve recreation resources and provide a range of long-term recreational opportunities that would benefit recreation.

In the proposed Ten Mile Wash ACEC, no vehicular travel would be allowed from Dripping Springs to Green River, OHV competitive events would be prohibited in the White Wash and the Cottonwood-Diamond Watershed Potential ACECs. Also, commercial guiding or special group permits would be suspended within the Cottonwood-Diamond Watershed Potential ACEC. These prescriptions would restrict and/or prohibit motorized OHV, mountain biking, and specialized recreational use, which would have long-term, adverse impacts on opportunities for these recreational user groups. However, the emphasis on cultural resource interpretive rock art viewing along Wall Street in the Highway 279/Shafer Basin/Long Canyon ACEC, and proposed hiking trail construction in the Wilson Arch ACEC would beneficially expand the recreational opportunities for scenic driving, mountain biking, and non-mechanized recreational user groups in these areas.

Compared to Alternative A, Alternative B would be more beneficial for recreation because ACEC prescriptions would maintain recreation resources, limit surface disturbances, and, through SRMA-related management of these areas, provide a greater range of recreational opportunities for all resource user groups.

Proposed Plan

Under the Proposed Plan, approximately 63,232 acres would be designated as ACECs for preservation of relevant and important values (11% of the area proposed under Alternative B). More area would be open to oil and gas leasing, geophysical exploration, and salable minerals disposal than Alternative B, but less than Alternative A (see 4.3.10.2.7 above).

In areas proposed for ACEC designation under this alternative, and in non-ACEC proposed areas, recreation-related prescriptions would be similar to those discussed under Alternative B. Prescriptions that differ from Alternative B, because these areas are not proposed for ACEC designation under this alternative, and would affect recreation under this alternative include the following:

Bookcliffs – Standard and timing and controlled surface use minerals leasing stipulations would be applied on approximately 54,174 acres within the Bookcliffs area (there would be no proposed ACEC designation under this alternative) with permitted minerals-related surface-disturbances that could impact recreation-related scenic quality in the long term. The impacts on recreation resource users would be adverse, as approximately 1,563 acres of surface disturbances from oil and gas development are predicted within the Bookcliffs RFD Area during the 15-year life of the Plan.

BLM_0010412

Canyon Rims – Standard and timing and controlled surface use leasing stipulations would be applied to approximately 23,400 acres (the area proposed as an ACEC under Alternative B). Permits would be required for motorized recreational use, if monitoring indicates long-term damage to resources, and permits would be required for groups using more than 25 vehicles. Competitive events would be prohibited. Prescriptions for the Canyon Rims area would permit minerals-related surface disturbances within the area, with subsequent long-term, adverse impacts on recreation resources and on the recreational experiences and opportunities for all user groups that recreate in the area. Adaptive-management monitoring and permitting of motorized recreational use would reduce these potentially adverse impacts to non-motorized recreational user groups by limiting user conflicts. Prohibitions on competitive events would limit the opportunities for specialized recreational use, with long-term, adverse impacts on the specialized, motorized, and mountain biking user groups.

White Wash – Competitive motorized events would be allowed. This prescription would expand the recreational opportunities for specialized recreation in this OHV recreational focus area, with beneficial long-term impacts on specialized and motorized users.

Compared to Alternative A, the Proposed Plan would be more beneficial for recreation resources and users because the area open to oil and gas development surface disturbances would be less than Alternative A, and the range of recreational opportunities would be maintained or expanded.

Alternative D

Alternative D would not designate any ACECs for the protection of relevant and important resources values. Thus, restrictions to protect these values would not be applied in this alternative. Therefore, these areas would be available for development; this would have adverse impacts on recreation resources, similar to Alternative A.

### 4.3.10.2.13.2 Wild and Scenic Rivers

Alternative A

Under this alternative, no suitability determinations would be made for any eligible river segment within the MPA. Under the 1985 RMP, segments 1, 2, and 3 along the Colorado River and all Dolores River segments, with a total length of 46 river miles, were determined to possess ORVs and be eligible for suitability determinations. The impacts to recreation resources and users along the eligible Colorado and Dolores river segments would be negligible because they have been and would continue to be managed to prevent changes to their character (up to 1/4 mile on each side of the eligible river segments) until suitability determinations were made by the MFO. The impacts to recreation resources along the remaining river corridors within the MPA could be minimal because these river corridors would be protected from surface disturbances on a case-by-case basis until a suitability determination is made.

Alternative B

Under Alternative B, 28 river segments (totaling 287.5 river miles) would be recommended as suitable for Wild, Scenic, or Recreational classification under the National Wild and Scenic Rivers System (NWSRS). Those segments recommended as suitable for Wild classification would be managed under VRM Class I objectives; Scenic and Recreational-recommended segments would be managed under VRM Class II objectives. These VRM classes would protect scenic values. The impacts to recreation would be beneficial in the long term because recreation

BLM_0010413

resources would be preserved along these river corridors, surface disturbances would be limited to VRM Class II objectives, and recreational opportunities would be available to all user groups along the river corridors. Compared to Alternative A, this alternative would be more beneficial to recreation because more river miles would be preserved for their scenic, recreational, and wild qualities (6 times more river miles than Alternative A) while managing for a range of recreational opportunities, including boating and sightseeing, within these Wild and Scenic River corridors.

### Proposed Plan

This alternative would recommend 127.3 river miles (10 river segments) as suitable for Wild, Scenic, or Recreational classification. The impacts on recreation within river segments recommended as suitable would be beneficial, because VRM Class I and Class II objectives would be applied as discussed under Alternative B. Compared to Alternative D, this alternative would be more beneficial to recreation for similar reasons as discussed under Alternative B. However, because Alternative A would continue to protect all of the eligible rivers on a case-by-case basis, it may not be as protective as A.

### Alternative D

Alternative D would not recommend any eligible river segments as suitable. The river segments would not be managed to protect ORVs or their free-flowing conditions, with impacts similar to those discussed under Alternative A. Compared to Alternative A, this alternative would have more long-term, adverse impacts on river-related recreational opportunities and experiences because the recreation resource would receive less protection, be potentially open to more surface disturbances, and be less likely to satisfy the recreational expectations of river users.

## 4.3.10.2.13.3 Wilderness Study Areas (WSAs)

BLM has no discretion to manage WSAs through planning, with the exception of decisions relating to VRM designation and motorized vehicle use (closing ways or limiting use to ways that were identified in the WSA). Under management common to all alternatives, Wilderness Study Areas (WSAs) would continue to be managed consistent with the Interim Management Policy for Lands Under Wilderness Review (IMP).

### Alternative A

The MFO currently manages WSAs to preserve their wilderness values under VRM Class I objectives. The impacts on recreation resources and on opportunities for all resource user groups from continuing to manage these areas to preserve their wilderness characteristics would continue to be beneficial in the long term because the areas have been and would continue to be managed so that their wilderness suitability would not be impaired, but would still allow all recreational activities that would not degrade existing wilderness character. All inventoried routes within WSAs would be open to OHV use under Alternative A (except those in the Behind the Rocks WSA, which was closed to OHV in the Grand RMP), but the numbers of miles of routes designated in WSAs would be fewer under the action alternatives.

### Alternatives B, D, and the Proposed Plan

The impacts on recreation resources within the WSAs under the action alternatives would be similar to those under Alternative A because the IMP would be applicable. However, managing

BLM_0010414

OHV vehicle use as either closed or limited to designated routes in WSAs under the action alternatives would reduce the opportunities for motorized recreation, with adverse impacts on this user group. The impacts on other user groups would be negligible because the range of opportunities would not change from current conditions. Compared to Alternative A, the action alternatives would have adverse, but minor, impacts on motorized recreational opportunities. because all inventoried routes within WSAs would be open to OHV use under Alternative A, but the numbers of miles of routes designated in WSAs would be fewer under the action alternatives. In Alternative B, no inventoried routes would be open to motorized or mechanized travel. In the Proposed Plan, 3.1 miles of route would be designated, and in Alternative D, 16 miles of route would be designated.

### 4.3.10.2.14 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON RECREATION RESOURCES

Actions common to all of the alternatives for managing special status species would have long-term, beneficial impacts on recreational opportunities and experiences for all user groups by continuing to protect special status wildlife and plant species for sightseeing and nature study. Restrictions due to special status species management could impact the ability of recreationists to engage in permitted activities, as routes or areas could be temporarily prohibited to protect special status species.

### 4.3.10.2.15 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON RECREATION RESOURCES

#### 4.3.10.2.15.1 OHV Travel

<u>Alternative A</u>

Under Alternative A, 620,212 acres would be open to cross-country OHV travel, 1,196,920 acres would continue to be designated as limited to designated and inventoried routes, and 24,454 acres would be closed to OHV travel. Managing OHV use under the current open designation would be beneficial for motorized OHV recreational users because cross-country OHV use would continue to provide long-term recreational opportunities for this resource user group. However, the surface disturbance impacts to soils, water quality, scenic quality, cultural resources, wildlife, and vegetation (all components of the recreational experience) would continue to adversely impact recreation in the long term in the area designated as open to OHV use. Other OHV impacts to recreation would include the impacts associated with OHV noise and the potential user conflicts and user displacement associated with OHV use. The long-term impacts of OHV prescriptions under this alternative on natural and cultural resources, and on hikers, backpackers, mountain bikers, and equestrians, would be adverse because, as discussed in Sections 3.10.2.6 and 3.10.2.7, OHV use within the MPA is increasing, with the likelihood that OHV-related resource and recreation user conflicts with non-motorized users would continue to intensify.

Under this alternative, 6,199 miles of maintained and un-maintained routes (B- and D-Class roads, respectively) would be designated for travel, but no miles would be designated for motorized, single-track use (i.e., motorcycles). The impacts on recreation would be negligible, as B- and D-Class routes are currently being used for recreation access. The impacts on motorcycle

BLM_0010415

recreation would also be negligible, as 99% of the MPA would remain either open or limited to designated and inventoried-route recreation and access.

There are 178.2 miles of route identified as having possible recreation conflicts.

Alternative B

Under Alternative B, no acres would be designated as open to cross-country OHV use, with all OHV travel (1,475,074 acres) limited to designated routes and 347,424 acres designated as closed to OHV travel. Site-specific route adjustments would be allowed, based on access needs and resource constraints, and routes would be closed or restricted if monitoring determines that OHV use was adversely impacting an area's natural character. The long-term impacts on recreation resources from these travel actions would be beneficial because the potentially adverse impacts to natural and cultural resources from cross-country OHV use would be eliminated by restricting this form of travel to designated routes (see Section 3.10.2.7 for a discussion of OHV impacts). The effects of OHV route designations on recreation resource users would be variable: scenic drivers, mountain biking, and specialized motorized recreation users would not be impacted as these user groups typically follow designated routes; motorized OHV users would be adversely impacted because the recreation-related travel opportunities for motorized users would be reduced; non-mechanized users would be beneficially impacted because restricting motorized users to designated routes and closing routes would reduce the likelihood of resource use conflicts between the two user groups.

Under this alternative, no miles would be designated for motorized, single-track use, with adverse impacts on this user group because no recreational opportunities would be available. Approximately 3,278 miles of B- and D-Class roads (56% of the miles of designated routes proposed under Alternative A) would be designated as travel routes.

Compared to Alternative A, this alternative would have more adverse impacts on those recreational opportunities associated with cross-country OHV and motorcycle use because these opportunities would be eliminated. However, this alternative would also have more beneficial impacts on recreation resources and on recreational user groups than Alternative A because 1) resource use conflicts would more likely be reduced through management of OHV route designation and use, and 2) surface disturbance-related impacts to natural and cultural resources from cross-country OHV use would be greatly reduced.

There are 178.2 miles of designated routes with possible recreation conflicts. In Alternative B, 120.6 miles of these routes are not identified for travel.

Proposed Plan

The Proposed Plan would designate 1,866 acres as open for cross-country OHV use, 1,481,334 acres as limited to designated routes, and 339,298 acres as closed to OHV use. The impacts on recreation resources and user groups would be similar to those discussed under Alternative B because 1) the acreage designations are similar, with similar prescriptions, and 2) the open OHV area lies within a proposed Open OHV recreation focus area (1,866 acres within White Wash Sand Dunes) that would be managed for that activity.

This alternative would designate 123 miles of motorized (motorcycle), single-track routes. Approximately 3,653 miles of B- and D-Class roads (63% of route-miles designated under Alternative A) would be designated as travel routes. Single-track route designation would be

BLM_0010416

beneficial, in the long term, to motorized users as opportunities for this form of recreation would be available. The impacts to recreation-related travel along B- and D-Class roads would be similar to the impacts under Alternative B because the limitations on travel opportunities would be similar.

The impacts comparison between Alternative A and the Proposed Plan would be similar to the discussion under Alternative B, except that the adverse impacts to OHV recreation users would be reduced because the opportunities for cross-country OHV use, though limited, would be available. The impacts on motorcycle users would be more adverse because fewer opportunities would be available than under Alternative A.

There are 178.2 miles of designated routes with possible recreation conflicts. In the Proposed Plan, 59.8 miles of these routes are not identified for travel.

Alternative D

This alternative would manage 3,064 acres as open to cross-country OHV travel, 1,762,083 acres as limited to designated OHV routes, and 57,351 acres as closed to OHV travel. Under this alternative, the impacts on OHV recreation users would be beneficial because OHV recreational travel opportunities along designated routes would be available on approximately 97% of the MPA. The open OHV areas would have negligible impacts on recreation resources because the cross-country OHV areas would be within Open OHV and Specialized Motorized focus areas (the Dee Pass motorized trail area and White Wash Sand Dunes) that are currently being used as OHV play areas.

Alternative D would designate approximately 3,805 miles of B- and D-Class roads (66% of Alternative A), and 219 miles of motorized (motorcycle), single-track routes. The impacts would be similar to those discussed under the Proposed Plan, though to a more beneficial degree for motorized users, because more miles of single-track use (and opportunities for motorized recreation) would be available.

Compared to Alternative A, this alternative would have more beneficial recreational resource protection because less area would be open to cross-country OHV use. Because Alternative D would provide fewer opportunities for cross-country travel, the impacts on motorized OHV and motorcycle use would be more adverse than Alternative A, but more beneficial to non-motorized users by preserving scenic resources due to the lack of cross country OHV travel.

There are 178.2 miles of designated routes with possible recreation conflicts. In Alternative D, 29.7 miles of these routes are not identified for travel.

## 4.3.10.2.15.2 Mountain Biking

Alternative A

Under Alternative A, mountain biking would be allowed along the same OHV routes as motorized travel, with 4 miles of routes along the Jackson and Portal trails managed specifically for mountain biking travel. The impacts of these prescriptions on recreational mountain biking travel would be adverse in the long term because the actions do not address the current conditions within the MPA that indicate increasing recreation user conflicts, mountain biking user displacement, and recreational demand for mountain biking opportunities (see Sections 3.10.2.6 and 3.10.2.7). Without addressing these recreational concerns, recreational opportunities

BLM_0010417

and the likelihood of satisfying mountain biking experiences would be diminished in the long term.

Alternatives B, D, and the Proposed Plan

Under the action alternatives, additional miles of routes would be designed and managed for mountain biking trail use. The miles of proposed routes range from 75 miles under Alternative B and 150 miles under the Proposed Plan, to 300 miles under Alternative D. All of these alternatives would increase recreational opportunities for this user group and reduce resource user conflicts and user displacement by motorized OHV users from designating additional routes for mountain bikers, which would have long-term, beneficial impacts on this form of travel. Compared to Alternative A, these alternatives would be more beneficial to mountain biking recreation because they would address the user conflicts between motorized recreation and mountain biking.

### 4.3.10.2.15.3 Non-Mechanized Travel

Alternative A

Under Alternative A, non-mechanized travel (i.e., hiking, backpacking, and equestrian use) would be allowed along the same OHV routes as motorized and mountain biking travel, with similar adverse impacts to this form of travel for reasons as discussed above under Alternative A in Section 4.3.10.2.15.2: increasing numbers of users, user demand, and user conflicts. It should be noted that hikers and equestrian users are not restricted to designated routes.

Alternatives B, D, and the Proposed Plan

Under the action alternatives, additional miles of trails would be designed and managed for non-mechanized travel. The miles of proposed routes range from 25 miles under Alternative B and 50 miles under the Proposed Plan, to 100 miles under Alternative D. The impacts of these prescriptions would be similar to those discussed above for Alternatives B through D for non-motorized/mechanized travel, except that the impacts would be applicable to non-mechanized users, with a similar comparison to Alternative A, except that the impacts would be applicable to non-mechanized recreation.

### 4.3.10.2.16 IMPACTS OF VEGETATION DECISIONS ON RECREATION RESOURCES

### 4.3.10.2.16.1 Alternative A

No prescriptions for vegetation management are specified under Alternative A. However, prescriptions for Fire Management would have similar impacts on recreation resources, as discussed in Section 4.3.10.2.3.

### 4.3.10.2.16.2 Alternatives B, D, and the Proposed Plan

The impacts on recreation of vegetation prescriptions common to all of the action alternatives would be similar to those discussed under Fire Management because the vegetation prescriptions would be similar. Vegetation communities would be managed for fire suppression, stabilization, and fuel reductions; vegetation treatments would be applied to control exotic and invasive species using methods similar to those for fire management; re-seeding, restoration, and rehabilitation of disturbed areas would use techniques similar to those used for areas impacted by

prescribed and wildland fire. Potentially adverse short-term impacts to recreation would be produced by the drought management prescriptions for Extreme or Exceptional conditions if OHV use was restricted and if areas were closed to public entry during the time that these prescriptions were in effect. Under extreme drought conditions, specialized, motorized, and mountain biking recreational opportunities would be adversely reduced in the short term as access could be restricted; under exceptional drought conditions, recreational opportunities for the aforementioned user groups and non-mechanized users would be adversely impacted because areas could be closed to public entry to protect sensitive soils and reduce the risk of wildland fire. Compared to Alternative A, the action alternatives would be more beneficial to recreation because there are no specified prescriptions under Alternative A to enhance vegetation-related recreation resources, while the action alternatives would apply adaptive management, erosion control, fuel reductions, and vegetation treatments to reclaim and restore vegetation resources.

### 4.3.10.2.17 IMPACTS OF VISUAL RESOURCE DECISIONS ON RECREATION RESOURCES

Prescriptions common to all alternatives would have long-term, beneficial impacts on visual/scenic quality recreation resources on 354,015 acres through the management of WSAs and designated wilderness areas as VRM Class I areas. The scenery in the WSAs would be preserved for public enjoyment.

Under all of the action alternatives, recreational development (e.g., facility construction) would be required to meet both recreational and VRM management objectives if that development was sited within the foreground of sensitive viewing areas, in order to reduce visual contrasts that would detract from recreational scenic quality. This prescription would be beneficial to recreational resource users in the long term because it would require mitigation of potential impacts to visual/scenic quality in order to maintain recreational opportunities that include high scenic quality. No surface occupancy leasing stipulations (or closed to oil and gas leasing) would be applied to all VRM Class I areas for oil and gas development and other surface-disturbing activities, with long-term, beneficial, preservation-related impacts on recreation scenic quality.

VRM Class II areas would be managed with a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities. (Note that acreages in Alternative A are inventory class, while acreages in Alternatives B, D, and the Proposed Plan are management class). This stipulation would mitigate impacts to scenic quality by requiring screening and other actions, and thus, to recreation users. Table 4.80 displays VRM Class I and VRM Class II acreage, by alternative.

**Table 4.80. VRM Management Classes I and II Acreage, by Alternative**

| VRM Class | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|-----------|---------------|---------------|---------------|---------------|
| I | 349,110 | 453,462 | 358,911 | 349,617 |
| II | 401,015 | 373,647 | 365,566 | 245,773 |

### 4.3.10.2.17.1 Alternative A

Under the Alternative A/VRM inventory, the impacts on recreation-related visual resources would be beneficial because Alternative A would attempt to manage recreation-related scenic quality as determined by the MFO's VRM inventory for scenic quality and viewer sensitivity

BLM_0010419

(see Section 4.3.18 for a description of VRM Class acreages designated under each alternative and the VRM inventory process). As discussed above, WSAs, designated wilderness areas, and other VRM Class I areas (including the Negro Bill Outstanding Natural Area) would be managed to preserve their natural and scenic qualities, with long-term, beneficial impacts to recreation resources and to all user groups as scenery is preserved for their enjoyment. As mentioned in Section 4.3.18, under this alternative, the VRM inventory classes would become VRM management classes.

### 4.3.10.2.17.2 Alternative B

Under Alternative B, 453,462 acres would be managed to prevent or mitigate potential surface disturbances to visual/scenic quality under VRM Class I visual objectives, which would have more long-term, beneficial impacts on all recreational resource user groups as more scenery would be protected. Therefore, the impacts to recreation under this alternative would be more beneficial in the long term than Alternative A/VRM inventory.

### 4.3.10.2.17.3 Proposed Plan

Compared to Alternative A, the Proposed Plan would manage 9,910 more acres under VRM Class I objectives for visual resource protection than was determined by the inventory, with long-term, beneficial impacts to all user groups as more scenery would be protected. This would reduce surface-disturbing impacts to recreational scenic resources and resource users that expect high scenic quality. When compared to Alternative A, fewer acres within the MPA under this alternative would be managed to preserve high-quality scenic landscapes under VRM Class II management, and more acres would be managed to allow surface disturbances, development, and man-made alterations of the existing landscape. These surface disturbances could degrade the scenic qualities that recreation users value.

### 4.3.10.2.17.4 Alternative D

Compared to the Alternative A, this alternative would manage 507 more acres under VRM Class I objectives for the highest level of scenic quality protection. However, impacts to recreation-related scenic resources under this alternative would be more adverse in the long term because less of the MPA would be managed for the preservation of high scenic quality, and more of the MPA would be managed for permitted surface-disturbances and resources development. The impacts on recreation resources and user groups would be adverse in the long term because fewer areas, when compared to Alternative A, would be managed to maintain high scenic quality, which would diminish the recreational experiences and reduce recreation opportunities for all recreation resource user groups.

### 4.3.10.2.18 IMPACTS OF WILDLIFE AND FISHERIES DECISIONS ON RECREATION RESOURCES

Continuing to implement the Hatch Point, Potash-Confluence, and Dolores Triangle habitat management plans (HMPs) and conducting migratory bird conservation projects would benefit recreational wildlife viewing in the long term by maintaining deer, elk, bighorn sheep, raptor, game bird, and migratory bird populations under all of the alternatives.

Under prescriptions common to all action alternatives, 9,278 acres would be managed along the rim of Hatch Point as part of the Lockhart bighorn sheep habitat area and 317,523 acres on

BLM_0010420

grazing allotments would be managed as bighorn sheep habitat. In order to benefit wildlife populations, forage in specified grazing allotments would be reallocated to wildlife, native and naturalized fish and wildlife species would be re-introduced into suitable and/or historic ranges, and dispersed camping would be restricted in riparian areas (see Section 4.3.10.2.11) to protect riparian wildlife habitat. All of the prescriptions would be beneficial to recreation resources and to all recreation users in the long term by enhancing the opportunities for wildlife viewing and sightseeing.

### 4.3.10.2.18.1 Alternative A

Prescriptions to protect desert bighorn sheep habitat on 42,500 acres within the Potash-Confluence HMP by preventing major human disturbances during lambing and breeding seasons would have adverse impacts on recreational opportunities by limiting, in the short-term, those activities that produce noise or that tend to have concentrated group use that could disturb wildlife. Recreational user groups that would be affected in the short term would include motorized, mountain biking, and specialized groups. The long-term impacts would be beneficial for all recreation user groups by improving the opportunities for wildlife viewing.

### 4.3.10.2.18.2 Alternative B

Under this alternative, dispersed camping in riparian areas would be restricted or prohibited, except in designated campsites, and camping would be prohibited in Shafer Basin and Long Canyon (encompassing approximately 13,500 acres) to protect bighorn sheep habitat. These prescriptions would adversely reduce recreational opportunities for long-term, dispersed camping in these areas. Compared to Alternative A, this alternative would be more adverse to recreational users because more restrictions would be placed on dispersed camping opportunities than under Alternative A.

### 4.3.10.2.18.3 Proposed Plan

The impacts to recreation would be similar to those discussed under Alternative B because the prescriptions would be similar, although the acreage protected would be somewhat less.

### 4.3.10.2.18.4 Alternative D

Under this alternative, prescriptions would be the same as under Alternative B, except that camping would not be restricted to designated camping sites in lambing areas, benefiting those who value this experience. The impacts to dispersed camping recreational opportunities would be similar to those discussed under Alternative B, but to a lesser degree, because more areas would be open to camping in bighorn sheep habitat. Compared to Alternative A, this alternative would have impacts similar to those discussed under Alternative B.

### 4.3.10.3 SUMMARY OF IMPACTS

Table 2.2 (of Chapter 2) summarizes the impacts of the various alternatives and their program actions on recreation.

BLM_0010421

### 4.3.11 RIPARIAN RESOURCES

Within the MPA, riparian areas are typically associated with perennial, intermittent, and ephemeral streams, as well as isolated springs and other water sources. Management decisions with the potential to impact riparian resource health, the proper functioning condition (PFC) of streams, water resources necessary to riparian zone establishment and survival, or the physical environment on which riparian vegetation depends (e.g., stream stability) were the decisions evaluated in this analysis.

Analysis of impacts to the riparian resources of the MPA were conducted primarily by overlaying proposed management decisions (e.g., surface disturbances due to grazing, OHV travel, camping and other recreational use, and woodland harvest) upon the 13,450 acres of riparian areas in the MPA, as identified in the GIS-based, Utah GAP database (Lowry et al. 2005) of vegetation types. Quantitative impacts were measured as acres of riparian resource. Where GIS or other quantitative data were unavailable, potential impacts to riparian resources were analyzed qualitatively, based on these same criteria.

Under all alternatives, management actions for the following resources would result in negligible impacts to riparian resources: air quality, cultural resources, health and safety, paleontological resources, and visual resources. This is because protecting air quality, maintaining safety around AML sites and reducing the risks of hazardous materials spills and spill-site cleanup, protecting cultural resources under Section 106, protecting known fossil areas for fossil scientific study and recreational fossil collection, and protecting scenic quality would neither degrade nor improve the water, soil and vegetation components that comprise riparian resources. Accordingly, the impacts of management actions for each of these resources are not analyzed further in this section.

#### 4.3.11.1 IMPACTS OF FIRE MANAGEMENT DECISIONS ON RIPARIAN RESOURCES

Under all alternatives, fire management would follow the guidelines in the Utah Land-use Plan Amendment for Fire and Fuels Management (LUP; BLM 2005c). Management actions under the Utah LUP would have generally beneficial impacts on riparian resources, since non-fire fuel treatments would promote diversity in native riparian vegetation types and reduce exotic species.

#### 4.3.11.2 IMPACTS OF LANDS AND REALTY DECISIONS ON RIPARIAN RESOURCES

Under all action alternatives, riparian areas are protected from the impacts of lands and realty decisions because of the stipulation that requires no surface-disturbing activities within 100 meters of riparian areas.

However, an exception could be authorized if there are no practical alternatives, impacts could be fully mitigated, or the action is designed to enhance the resource values (see Appendix C, Stipulations Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities). In such instances that an exception is granted because there is no practical alternative, mitigation measures such as the Standards for Pipeline Crossings (See Appendix H) and the BMPs for soils and minerals would be employed.

LTAs could acquire riparian areas, and LTA criteria call for the retention of those already in public ownership. This would beneficially impact riparian resources as they would be protected by the stipulations placed upon them under all action alternatives.

BLM_0010422

## 4.3.11.3 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON RIPARIAN RESOURCES

In general, restricting grazing from riparian areas would provide long-term protection and enhancement of riparian areas because it would eliminate any improper livestock management practices that could result in the loss of riparian vegetative and cover and the trampling of riparian soils. Improper grazing practices may result in adverse impacts due to decreased growth or loss of riparian vegetation and possible loss or degradation of riparian soils, water quality, streambed and bank structure, and habitat quality." In this analysis, the impacts of livestock grazing decisions upon riparian resources are measured in the acres of riparian area that could become unavailable for grazing. Table 4.81 shows the riparian areas that could become unavailable due to grazing management decisions under each alternative.

**Table 4.81. Grazing Restrictions (i.e., in Riparian Areas, by Alternative)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Acres unavailable (out of 13,450 acres) calculated using GAP (satellite photo) data % of Total Riparian | Approx. 1,000  <br> 7.4 | 4,422  <br> 32.9 | 1,169  <br> 8.7 | Approx. 500  <br> 3.7 |
| Acres unavailable (out of 32,292) calculated by MFO using infrared photos and field tested | 4,414 | 4,946 | 4,392 | 1,177 |
| % of Total Riparian | 13.7 | 15.3 | 13.6 | 3.6 |

### 4.3.11.3.1 ALTERNATIVE A

Under Alternative A, current management, which prohibits grazing in the South Sand Flats, North Sand Flats, Between the Creeks, Pear Park, Beaver Creek (itself), Spring Creek, Cottonwood, Bogart, and Diamond allotments, would continue. These prohibitions prevent grazing on approximately 7.4% of the total riparian acres within the MPA using GAP data and 13.7% using field data (see Table 4.81), resulting in beneficial impacts to riparian habitat in these areas, in the forms described above.

### 4.3.11.3.2 ALTERNATIVE B

In addition to the grazing exclusions specified under Alternative A, grazing would not be authorized in the Ida Gulch, River, Mill Creek and Professor Valley allotments. Grazing would also be unavailable in the riparian areas of the following drainages under Alternative B: Ten Mile from Dripping Spring to the Green River, Day Canyon, Mill Creek Canyon, Seven Mile Canyon, East Coyote, Kane Springs, Lower Gray Canyon of the Green River, and Hatch Wash. Therefore, under Alternative B, grazing would not be permitted on approximately 32.9% of the total riparian acreage within the MPA—an increase of 444.6% in the amount of unavailable riparian acreage, compared to Alternative A (see Table 4.81). More riparian acres would be unavailable for grazing under Alternative B than under any other alternative.

BLM_0010423

### 4.3.11.3.3 PROPOSED PLAN

Grazing would not be allowed in the following allotments: Bogart, Cottonwood, Diamond, Ida Gulch, Pear Park, and Mill Creek. The riparian areas unavailable for grazing under the Proposed Plan are the same areas as under Alternative B, with the exception of Kane Springs, Lower Gray Canyon of the Green River, and Hatch Wash, which would remain available for grazing. Therefore, in total, grazing would be prohibited on approximately 8.7% of riparian areas within the MPA under the Proposed Plan, or 116.9% more than Alternative A (see Table 4.81). The Proposed Plan would protect more riparian acreage than Alternative A, but not as much as Alternative B.

### 4.3.11.3.4 ALTERNATIVE D

Grazing would be available in the Cottonwood, Diamond, and Bogart allotments. This would adversely impact riparian resources found in those allotments, including Cottonwood Wash, Diamond Canyon and Nash Wash. Impacts would be greater than under Alternative A because the acreage of riparian exclusion is far less in Alternative D.

### 4.3.11.4 IMPACTS OF MINERAL RESOURCE DECISIONS ON RIPARIAN RESOURCES

Mineral resource decisions that would affect riparian resources include the continuation of existing mineral withdrawals and the application of a controlled surface use (CSU) stipulation, which would prohibit surface-disturbing activities within the 100 year floodplain or within 100 meters of riparian areas.

Under all alternatives, adverse impacts to riparian resources from mineral development would be avoided because the controlled surface use stipulation requires a proponent to move operations up to 100 meters to avoid riparian areas, benefiting riparian resources by protecting them from surface disturbance.

However there are exceptions to this stipulation which allow for development in riparian areas if there are no practical alternatives, impacts could be fully mitigated, or the action is designed to enhance the resource values (see Appendix C). In such instances that an exception is granted because there is no practical alternative, mitigation measures such as the Standards for Pipeline Crossings (See Appendix H) and the BMPs for soils and minerals (Gold Book) would be employed. While some riparian resources could be removed in the course of such construction, the extent of the impact would be minimized using these measures.

Existing mineral withdrawals along the Colorado, Dolores, and Green Rivers would be continued under all alternatives, providing an additional level of protection for riparian resources by excluding them from the adverse impacts of locatable mining operations. The application of a no surface occupancy stipulation for all surface-disturbing activities to these areas under all alternatives would further protect riparian resources along these major river courses from potential adverse impacts associated with surface disturbance (e.g., vegetation degradation and introduction of noxious weeds). This stipulation would leave the riparian vegetation intact.

BLM_0010424

### 4.3.11.5 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON RIPARIAN RESOURCES

In general, managing non-WSA lands to maintain their wilderness characteristics would be beneficial to riparian resources by applying NSO or closed stipulations to oil and gas leasing and precluding all surface-disturbing activities, limiting travel to designated roads, and allowing no new ROWs. NSO stipulations and precluding surface-disturbing activities would prevent impacts and habitat disruption that could result from surface-disturbing activities in and adjacent to riparian areas. Limitations on travel and new ROWs would beneficially reduce disturbances associated with stream crossings and off-road travel, resulting in no damage to, or removal of, riparian vegetation.

Alternatives A and D would be the least protective of riparian resources, since they would not manage areas within the MPA to maintain wilderness characteristics. Alternative B would be the most protective since 266,485 acres would be managed to maintain wilderness characteristics. The Proposed Plan, which would manage 47,761 acres to maintain wilderness characteristics, would have intermediate impacts on riparian resources.

### 4.3.11.6 IMPACTS OF RECREATION AND TRAVEL DECISIONS ON RIPARIAN RESOURCES

Recreation management decisions affecting riparian resources include the number of acres managed as SRMA (specifying controls on recreation use, including controls on camping and campfires), limitations on the number of river users and their duration of use, and restrictions on OHV use and travel. See Table 4.82 for acreage of SRMA by alternative. Each of these limitations generally would reduce direct, adverse impacts to riparian resources by reducing the disturbance of riparian vegetation and stream banks, the spread of noxious weeds, soil compaction, and the potential for impacts due to human-caused fire.

A recent United States Geologic Survey (USGS 2007) synopsis of relevant literature summarizes several studies indicating that motorized travel through riparian areas can have negative impacts on water quality. Other studies summarized by USGS indicate negative impacts from OHV use on soil properties and vegetative cover, which can result in accelerated rates of erosion and sedimentation and elevated levels of turbidity in affected watersheds. The USGS study is summarized in Appendix G.

**Table 4.82. Acreage Managed as SRMA, by Alternative**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Acreage managed as SRMA | 141,234 | 976,173 | 658,642 | 277,471 |
| Percentage of MPA managed as SRMA | 8% | 54% | 36% | 15% |

User numbers and OHV use decisions vary by alternative. Table 4.83 outlines the approximate amount of riparian area open and closed/limited to OHV use under the travel plan. The impacts of limiting OHV use to designated roads and trails would be the same as closure of riparian areas to OHVs.

**Table 4.83. Acres of Riparian Areas, by OHV Area Designation, by Alternative**

| | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Calculated using GAP (satellite photo) data Acres Open | 2,100 | 0 | 0 | 0 |
| Acres Closed or Limited | 11,350 | 13,450 | 13,450 | 13,450 |
| **Total** | **13,450** | **13,450** | **13,450** | **13,450** |
| Calculated by MFO using infrared photos and field tested Acres Open | 6,192 | 0 | 792 | 840 |
| Acres Closed or Limited | 26,100 | 32,292 | 31,500 | 31,452 |
| **Total** | **32,292** | **32,292** | **32,292** | **32,292** |

### 4.3.11.6.1 ALTERNATIVE A

Among the alternatives, Alternative A would provide the lowest level of management for recreation resources and, thus, the least amount of protection for riparian resources. Most of the MPA would be managed as an Extended Recreation Management Area (ERMA), which allows for only minimal restrictions on recreation use, rather than as SRMAs with provisions for controlled recreation use (141,234 acres, or 8% of the MPA, would be managed as SRMA under Alternative A). In addition, allowable river-user numbers would remain at current level. This management decision would result in adverse impacts to riparian resources, of the forms described above, as recreation users would impact riparian resources through unrestricted camping and other activities.

Approximately 2,100 acres (using GAP data; 6,192 acres using field data) of riparian resources would be open to OHV use under Alternative A, which represents 16% and 47%, respectively, of the total riparian acreage within the MPA (see Table 4.83). Of all the alternatives, this management decision allows for the greatest potential adverse impacts to riparian resources as riparian vegetation would be destroyed by vehicles.

There are 321.9 miles of route identified as having possible riparian conflicts.

### 4.3.11.6.2 ALTERNATIVE B

Among the alternatives, Alternative B would manage 976,173 acres as SRMA (54% of the acreage in the MPA) and would provide the most intensive management for recreation use, and provide the most protection for riparian resources Alternative B would be most restrictive of user numbers on the Colorado and Dolores Rivers. River user decisions under Alternative B would therefore be beneficial to riparian resources by reducing the human imprint upon them, as compared to Alternative A, and would be the most protective to riparian resources of all the alternatives.

BLM_0010426

OHV use and camping would be limited to designated areas outside the riparian areas across most of the MPA, providing an increased level of protection from human disturbance for riparian resources, compared to Alternative A (see Table 4.83). This amounts to a beneficial impact to riparian resources compared to Alternative A because of the lack of recreation rules under Alternative A.

There are 321.9 miles of designated routes with possible riparian conflicts. In Alternative B, 179.6 miles of these routes are not identified for travel.

### 4.3.11.6.3 PROPOSED PLAN

The Proposed Plan would manage 658,642 acres as SRMA, providing management for recreation use (and protection of riparian resources) on 36% of the acreage in the MPA. The Proposed Plan would allow more visitors per day in the Colorado and Dolores River SRMAs than Alternative B, but fewer than Alternative A. Therefore, the Proposed Plan's adverse impacts to riparian resources from human use along the river corridors would be greater than under Alternative B but less than under Alternative A.

OHV use impacts would be the same as under Alternatives B and D (see Table 4.83). However, camping would be more limited under the Proposed Plan than under Alternative A or D, and therefore it would have slightly more beneficial impacts on riparian resources protected from camping and campfires. Overall, the Proposed Plan would provide more protection for riparian resources than either Alternatives A or D, and provide less protection than Alternative B.

There are 321.9 miles of designated routes with possible riparian conflicts. In the Proposed Plan, 50.1 miles of these routes are not identified for travel.

### 4.3.11.6.4 ALTERNATIVE D

Alternative D would manage 277,471 acres as SRMA, providing management for recreation use on 15% of the acreage in the MPA. More visitors would be allowed in the Colorado and Dolores River SRMAs under Alternative D than under Alternative B or the Proposed Plan, but fewer than under Alternative A. Therefore, this management decision would have a greater adverse impact on riparian resources by increasing human use along the river corridors than Alternative B or the Proposed Plan, but a lower adverse impact than Alternative A.

OHV use impacts under Alternative D would be the same as under Alternative B and the Proposed Plan (see Table 4.83).

There are 321.9 miles of designated routes with possible riparian conflicts. In Alternative D, 14.7 miles of these routes are not identified for travel.

## 4.3.11.7 IMPACTS OF RIPARIAN MANAGEMENT DECISIONS ON RIPARIAN RESOURCES

### 4.3.11.7.1 IMPACTS COMMON TO ALL ALTERNATIVES

Adherence with the Utah BLM Standards for Rangeland Health under all alternatives would promote the maintenance and restoration of the 13,450 acres of riparian resources in the MPA. Standard 2 states that "riparian and wetland areas [must be] in properly functioning condition (PFC). Stream channel morphology and functions [must be] appropriate to soil type, climate, and function" (BLM 1997a). Under all alternatives, the BLM would develop monitoring and

BLM_0010427

management strategies and restrictions as necessary to maintain or restore PFC, which would benefit riparian resources by ensuring that all stream corridors meet PFC criteria.

Pipelines crossing perennial, intermittent, and ephemeral streams would be constructed to withstand 100-year floods under all alternatives (see Appendix H). This would minimize the likelihood of breakage and subsequent contamination of riparian areas during high flow events. Each surface crossing would be constructed at a height adequate to remain above peak flows. Each subsurface crossing would be buried deeply enough to remain undisturbed by scour throughout peak flows. These stipulations would minimize adverse impacts to riparian resources resulting from unrefined petroleum or hazardous substance release and/or flood flow obstruction.

No new surface-disturbing activities would be allowed within active floodplains or within 100 m of riparian areas. Therefore, mineral activities in riparian areas and 100-year floodplains would not occur under any of the alternatives, thereby limiting the potential for adverse impacts to riparian resources from mineral development.

Under all alternatives, the MFO would also comply with the Colorado River Salinity Control Act and with Utah's state water quality standards. Activities within the MPA would be managed to minimize and mitigate damage to soils, to maintain and/or restore overall watershed health, and to reduce erosion, stream sedimentation, and salinization of water. These reductions and minimizations would limit short- and long-term adverse impacts to riparian resources by helping to maintain and restore overall watershed health. Riparian vegetation, as an integral part of a watershed's ecosystem, would benefit directly (through less saline water) and indirectly (through maintenance of a naturally stable stream channel) from these management actions.

Riparian areas would be excluded from public, commercial and private harvest of woodland products under all alternatives, except for Native American ceremonial purposes. Prohibiting woodland harvest would benefit riparian resources by limiting adverse impacts from vegetation disturbance, stream bank trampling, and the introduction/spread of noxious weeds during public access. Mechanical and other vegetation removal practices—for habitat, range, and watershed improvements—would be allowed and have been evaluated in the 1991 Vegetation EIS (BLM 1991a). Riparian areas would be protected against surface disturbance by mechanized or motorized equipment and from structural development under all alternatives.

Under all alternatives, requirements for the control of invasive and non-native weed species would minimize their introduction and spread in riparian areas, which would benefit the PFC of native riparian vegetation by reducing competition with invasive species. The MPA would reduce tamarisk where appropriate using allowable vegetation treatments. These actions would reduce and/or prevent adverse impacts to riparian resources from noxious weeds.

### 4.3.11.7.2 IMPACTS VARYING BY ALTERNATIVE

Riparian management decisions that vary by alternative include limitations on livestock grazing in riparian areas and the development of Watershed Management Plans (WMPs). Each alternative limits grazing in different allotments and areas of the MPA and prioritizes different watersheds for the development of WMPs.

These management actions are considered not only riparian management actions, but also livestock management and soil and water resource management actions, respectively, and represent one set of impacts each. To avoid duplication, the impacts of grazing restrictions in

BLM_0010428

riparian areas upon riparian resources are considered in Section 4.3.11.3, and the impacts of WMPs upon riparian resources are considered in Section 4.3.11.8.

### 4.3.11.8 IMPACTS OF SOIL AND WATER DECISIONS ON RIPARIAN RESOURCES

Under all alternatives, prohibiting surface-disturbing activities within 100-year floodplains would have a beneficial impact on riparian resources in the MPA; it would reduce the disturbance of riparian vegetation and soils and the introduction and establishment of weeds on floodplains.

The prioritization of Watershed Management Plans (WMPs) and riparian studies would vary among alternatives. In general, the development of WMPs and riparian studies would have beneficial impacts on riparian resources by:

- better integrating riparian management with watershed-wide management practices, which would improve the success of riparian management activities; and
- providing better information and data, which would enhance the BLM's ability to adaptively manage riparian resources.

#### 4.3.11.8.1 ALTERNATIVE A

Because no Watershed Management Plans (WMPs) or riparian studies are mandated under Alternative A, this riparian management decision would result in no impacts to riparian resources.

#### 4.3.11.8.2 ALTERNATIVE B

Seventeen watersheds would be chosen for development and implementation of Watershed Management Plans (WMPs) and riparian studies under Alternative B, the most of any alternative. Thus, Alternative B would have the greatest beneficial impact to riparian resources resulting from this management decision.

#### 4.3.11.8.3 PROPOSED PLAN

Eight watersheds would be chosen for development and implementation of WMPs and riparian studies under the Proposed Plan: fewer than under Alternative B, but more than under Alternatives A and D. Thus, the Proposed Plan would have greater beneficial impacts to riparian resources resulting from this management decision than Alternatives A and D, but less beneficial impacts than under Alternative B.

#### 4.3.11.8.4 ALTERNATIVE D

Impacts would be the same as under Alternative A because no WMPs would be prepared.

### 4.3.11.9 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON RIPARIAN RESOURCES

Special designations decisions affecting riparian resources would include: (1) the designation of ACECs with management prescriptions protective of riparian resources, such as restrictions on dispersed camping and on surface-disturbing activities in riparian areas and (2) determinations that river segments are suitable for Wild and Scenic River (WSR) designation.

BLM_0010429

- The impacts of ACEC designations on riparian resources would depend upon each potential ACEC's management prescriptions and are, therefore, discussed under each alternative, below.
- WSR designation would require that a river's "free flowing character" be maintained, and would prohibit activities that impact the "outstanding and remarkable values" of a river. Thus, any WSR designation would provide an increased level of protection for the given segment and would indirectly benefit riparian resources along that segment through the maintenance of the river's natural structure and ecosystem characteristics. It should be noted that riparian corridors would already be protected by the BLM National Riparian Policy and other stipulations proposed in this RMP. However, WSR designations may offer protections to those areas outside the riparian corridor but within the WSR management corridor, which is 1/4 mile from the high-water mark on each bank of the river segment.
- The impacts of Wilderness and WSA management on riparian resources would be beneficial, as these areas are managed as closed to mineral development.

### 4.3.11.9.1 ALTERNATIVE A

Under Alternative A, only the Negro Bill ONA (1,375 acres), a riparian corridor, would be designated. No ACECs would be designated under this alternative. No river segments would be determined suitable for WSR designation. Six segments of the Colorado and Dolores Rivers would remain eligible and would be managed to protect their ORVs, free-flowing nature, and tentative classification. This could offer some protections to riparian resources for those segments. Beneficial impacts associated with ONA designation would occur on only 1,375 acres and decisions on WSR suitability would not be made.

### 4.3.11.9.2 ALTERNATIVE B

Alternative B, the designation of the Mill Creek Canyon ACEC would benefit riparian resources, as it would exclude livestock grazing and prohibit campfires in its riparian areas and maintain a 3-cfs base flow in the South Fork of Mill Creek below the Sheley Diversion. This ACEC designation would reduce the adverse impacts of livestock grazing on riparian areas (in the forms described in Section 4.3.11.3.2) and reduce the risk of human-caused wildfire in riparian areas.

Under Alternative B, the designation of the Ten-Mile Wash ACEC would benefit riparian resources by prioritizing the ACEC for riparian restoration. The ACEC would also prohibit camping in riparian areas, which would limit human disturbance of vegetation and the risk of human-caused weed invasion and fire.

In addition, under Alternative B, designation of ACECs and the resulting no surface occupancy stipulation would protect riparian areas from destruction in the following ACECs: Colorado River Corridor, Behind the Rocks, Bookcliffs, Colorado River Corridor, Cottonwood-Diamond, Highway 279/Shafer Basin/Long Canyon, Labyrinth Canyon, Upper Courthouse, Westwater Canyon, and White Wash.

Alternative B would recommend 71,300 acres as suitable for some level of WSR designation, which would protect riparian vegetation within that area.

BLM_0010430

Thus, special designations decisions under Alternative B would provide more protection and benefits for riparian resources than Alternative A, as more riparian areas would be protected in Alternative B.

### 4.3.11.9.3 PROPOSED PLAN

Impacts from ACEC designation to Mill Creek Canyon and Ten Mile Wash would be the same as under Alternative B. Under the Proposed Plan, designation of ACECs and the resulting no surface occupancy stipulation would protect riparian areas in the following ACECs: Behind the Rocks, Cottonwood-Diamond, and Highway 279/Shafer Basin/Long Canyon.

The Proposed Plan would recommend 41,236 acres as suitable for some level of WSR designation, which would protect riparian vegetation within that area. Thus, the Proposed Plan would be less protective of riparian resources than Alternative B, but more protective than Alternatives A and D.

### 4.3.11.9.4 ALTERNATIVE D

Impacts from ACEC designation would be similar to Alternative A, although 1,375 acres of the Negro Bill ONA would not be designated. All river segments (other than Salt Wash) would be listed as "not suitable" for any WSR designation. Therefore, Alternative D provides the lowest level of protection of riparian resources.

### 4.3.11.10 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON RIPARIAN RESOURCES

Special status species management decisions would protect and/or enhance riparian resources under all alternatives. Recovery plans for the southwestern willow flycatcher, Colorado River fishes, bald eagle, and western yellow-billed cuckoo would benefit riparian resources via riparian habitat enhancement. The removal of invasive tamarisk for restoration or enhancement of these and other special status species' habitat would generally benefit riparian resources.

Under all alternatives, special status species management decisions would avoid further loss of cottonwood gallery riparian habitats and would eliminate surface disturbance in riparian areas to protect bald eagle roosting areas. Any disturbed riparian vegetation would be replaced with native species or ecological equivalents in all special status species use areas. These actions would help maintain existing riparian resources.

All alternatives would also impose year-round restrictions on surface-disturbing activities within 300 feet of suitable habitat for southwestern willow flycatcher and western yellow-billed cuckoo—species that primarily use riparian areas for all life phases. Restrictions on surface disturbance would reduce potential disturbance or removal of riparian vegetation and soils and the introduction of invasive weeds. The eradication of tamarisk would create short-term surface disturbance but would result in long-term enhancement of riparian resources.

All alternatives would also avoid loss of riparian habitats in designated critical habitat areas of endangered Colorado River fishes. Preserving riparian habitats along these drainages would prevent sedimentation and changes in water quality.

BLM_0010431

## 4.3.11.11 IMPACTS OF VEGETATION DECISIONS ON RIPARIAN RESOURCES

Under all alternatives, vegetation treatment decisions would reduce the prevalence of invasive Russian olive and tamarisk throughout the MPA and replace them with native willow and cottonwood stands. This would have a beneficial impact of unknown magnitude on riparian areas (depending on the success and extent of the treatments), as it would restore their native ecosystem characteristics.

## 4.3.11.12 IMPACTS OF WILDLIFE DECISIONS ON RIPARIAN RESOURCES

### 4.3.11.12.1 IMPACTS COMMON TO ALL ALTERNATIVES

- Implementation of the revised Dolores Triangle Management Plan would improve riparian habitat through the installation of fencing and exclosures in Granite, Coates, Ryan, and Renegade Creeks. This decision would prevent livestock from trampling riparian vegetation and carrying weed species into riparian areas, and it would prevent sedimentation and loss of soils.
- Impacts resulting from limitations on livestock grazing to benefit wildlife would be the same as those described in Section 4.3.11.3.

### 4.3.11.12.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

- Restrictions on camping in riparian areas to protect wildlife habitat under all alternatives, including prohibition and restriction to designated areas, would benefit riparian resources by reducing vegetation and soil disturbance and the human spread of invasive weeds.
- Management of migratory bird habitat would prioritize the maintenance and/or improvement of lowland riparian areas, which would have a beneficial impact of unspecified magnitude on those riparian resources.

## 4.3.11.13 IMPACTS OF WOODLANDS DECISIONS ON RIPARIAN RESOURCES

All alternatives would prohibit public fuelwood gathering from riparian areas. This decision would have beneficial impacts on riparian resources by preventing disturbances and weed introduction associated with public access for fuelwood gathering.

Under all alternatives, woodland management would allow sustainable harvest of willows and cottonwoods from riparian areas for Native American ceremonial purposes. This decision would have adverse, but negligible impacts on riparian areas due to the minimal removal of vegetation and associated disturbances.

## 4.3.11.14 SUMMARY OF IMPACTS

In general, Alternatives A and D would be the least protective of riparian resources, and would prioritize the least riparian area for restoration and enhancement-focused management. Alternative B would be the most protective by excluding the most areas from grazing, and prioritizing the most WMPs and riparian studies. It would therefore provide the greatest beneficial impacts and greatest reduction of past cumulative impacts on riparian resources. The Proposed Plan would provide an intermediate level of protection and restoration.

BLM_0010432

Table 2.2 (located in Chapter 2) summarizes the impacts to riparian resources due to the management decisions of applicable resources under each alternative.

## 4.3.12 SOCIOECONOMIC RESOURCES

This section discusses impacts to socioeconomic resources from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning socioeconomic resources are described in Chapter 3.

Grand County, Utah is entirely within the MPA, with approximately 1,500,000 acres of BLM land. In addition, approximately 300,000 acres of San Juan County fall under the jurisdiction of the Bureau of Land Management's MFO, comprising the entire northeast third of San Juan County. Therefore, land management decisions made in the MPA could have a potential impact on the socioeconomics of both Grand and San Juan counties. The following socioeconomic impact analysis includes Grand County as well as San Juan County where appropriate.

Implementation of any of the alternatives likely would result in impacts to the social and economic conditions of Grand and San Juan Counties. While the range of these socioeconomic impacts may vary depending on the alternative implemented, some land management actions would have greater impacts than others, and these are disclosed in the following analysis.

Potential economic impacts include changes in employment and income; changes in tax revenue for local, state, and Federal governments; and changes in the demand for housing and public service. Quantitative data was used to analyze these economic impacts, where available. Where quantitative data are not available, a qualitative analysis is performed based on the best available information.

Social impacts to communities cannot be measured in economic terms except to the degree that economic problems (e.g., unemployment) may lead to social problems (e.g., divorce, substance abuse, crime, etc.). Human impacts that are difficult to quantify include enhancements to or detractions from existing lifestyles, sense of place, and community values, and disproportionate impacts on low-income or minority populations. Accordingly, these impacts are assessed qualitatively.

Impacts to socioeconomic from implementation of alternatives would be considered significant if one or more of the following occurs and is attributable to the implementation of alternatives:

- Substantial gains or losses in population/employment
- Substantial alterations in the lifestyles or quality of life of individuals who use or inhabit the MPA.
- Disproportionately adverse changes to environmental or human health within an identified minority or low-income population

### 4.3.12.1 IMPACTS COMMON TO ALL ALTERNATIVES

#### 4.3.12.1.1 ENVIRONMENTAL JUSTICE

Executive Order (EO) 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, requires that disproportionately high and adverse

BLM_0010433

human health and environmental impacts of Federal programs, policies, and activities to minority or low-income populations be identified and addressed.

For each alternative, it has been determined that BLM resource management actions within the MPA would not result in disproportionate effects to "environmental justice populations" as defined in Executive Order 12898. Minority and low-income populations do exist in the MPA, but none of the proposed alternatives for BLM action would cause disproportionate adverse impacts to these populations in comparison to the general population.

### 4.3.12.1.2 PILT (PAYMENTS IN LIEU OF TAXES) PROGRAM

None of the alternatives would result in significant changes in Federal ownership in the MPA. Any future land exchanges or sales would be assessed to determine specific impacts, but, in general, actions proposed with the PRMP/FEIS would not change payments to Grand and San Juan Counties made under the PILT program according to established formulas.

### 4.3.12.1.3 POPULATION

Population changes in Grand and San Juan Counties that could be associated with the implementation of any of the alternatives considered in this EIS would likely be linked to employment changes. Activities such as livestock grazing and mineral development within the MPA that support jobs in the area are not expected to increase or decrease substantially under any of the alternatives (see impacts analysis below for further details). Therefore, it is not likely that BLM-related management decisions (apart from recreation decisions that could increase revenues to recreation-based businesses) would result in significant changes to current population trends (see Section 3.12.4.2.1 for local population data).

## 4.3.12.2 ALTERNATIVES IMPACTS

### 4.3.12.2.1 IMPACTS OF AIR QUALITY DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

None of the decisions concerning air quality are expected to adversely affect the social or economic conditions of Grand and San Juan counties.

### 4.3.12.2.2 IMPACTS OF CULTURAL RESOURCE DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

The MPA has approximately 4,200 inventoried cultural sites. Cultural sites draw recreationists to the area. Increases or decreases in access to sites as well as changes to the quality of the sites have the potential to impact visitor experience and local revenues.

Cultural resource management decisions could increase or decrease recreational visits to the sites, as well as influence the overall visitor experience. The level of impacts is related to several factors including 1) the importance of the sites to Native American communities in the area (the historic cultural sites in the area serve as a connection between the landscape and the local tribes' respective heritages), 2) any links between local residents and cultural sites, and 3) the degree to which specific sites draw visitors to the area.

Potential economic impacts resulting from cultural resource management decisions could include an increase or decrease in visitor spending. Increasing access could increase visitor spending in the area in the short term, but degradation to sites could lead to long-term adverse economic

BLM_0010434

impacts, as visitors may choose not to return to the area. For the purposes of this analysis, it is suggested that a greater emphasis on restoration, preservation, and inventories of cultural sites within the MPA would maintain and/or enhance recreationists' experience, leading to greater long-term beneficial impacts to socioeconomics.

### 4.3.12.2.2.1 Alternative A

Under Alternative A management of cultural sites would continue as it currently exists. No prioritizations would be made for field inventories, scientific restoration, public interpretation of sites, or nomination of sites to the National Register of Historic Places. The social and economic conditions resulting from the presence of cultural sites in the area would remain the same.

### 4.3.12.2.2.2 Alternative B

Alternative B offers the most protective plan for cultural resources within the MPA, because it would place greater restrictions on surface-disturbing activities such as mineral development, recreation use, and OHV travel. Additionally, it would provide more special designations, which, in turn, would reduce the possibilities for inadvertent adverse impacts to cultural resources. Alternative B also provides a proactive approach to cultural resources through the development and implementation of integrated cultural-recreational management plans.

Long-term beneficial impacts to local economic conditions resulting from cultural resource management decisions would be greatest under Alternative B. The identification, preservation, and restoration of sites within the MPA would attract the greatest number of visitors interested in the area's cultural history. Economic contributions to local towns from these visitors would be greatest under this alternative.

The social benefits resulting from cultural resource management decisions such as visitor experience, Native American connections to historic sites, and social connections that tie the landscape to a rich cultural history would be greatest under Alternative B. The long-term social benefits would be directly related to the restrictions on surface-disturbing activities, the opportunities for public interpretation, and the implementation of cultural-recreational management plans.

Revenue generated from cultural resource-related tourism and the historical and social connections would likely be greatest under Alternative B; however, impacts resulting from cultural resource management decisions could also have some adverse economic impacts to the area. By restricting surface-disturbing activities, such as mineral development and OHV travel, the revenue typically generated from these activities could be less under Alternative B in comparison to other alternatives.

### 4.3.12.2.2.3 Proposed Plan

The Proposed Plan would provide the next-greatest benefit to socioeconomics from cultural resource management decisions, as it provides slightly fewer prioritizations that would reduce opportunities for adverse impacts to cultural resources compared to Alternative B. The prioritizations would lead to long-term beneficial economic impacts resulting from resource-related tourism.

BLM_0010435

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 240 of 293

Moab PRMP/FEIS                    Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
                                                                              4.3.12 Socioeconomic Resources

Because the Proposed Plan allows for fewer restrictions that limit surface-disturbing activities, compared to Alternative B, opportunities for mineral development and OHV travel would be greater, thus allowing communities to generate revenue resulting from these activities. However, it is impossible to predict whether tourist-generated revenue would exceed commodity-based losses or revenues.

#### 4.3.12.2.2.4 Alternative D

Alternative D would provide the fewest socioeconomic benefits from cultural resource management decisions in the MPA. Alternative D opens the most acres to surface-disturbing activities, and, therefore, the potential for degradation of cultural resources sites would be highest. However, more opportunities for surface-disturbing activities would allow for more revenue generation from these activities and thus short-term beneficial economic impacts to local communities.

#### 4.3.12.2.3 IMPACTS OF FIRE MANAGEMENT DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Impacts of fire management decisions on social and economic conditions would be the same for all alternatives. During a normal fire year the Moab Fire District averages 100 wildfires resulting in 10,000-16,000 acres of burned land. The Moab Fire District encompasses the Monticello, Moab, and Price Field Offices. Most fire activity occurs in the eastern half of the district, including the area of the MPA, although fires can occur in almost all areas of each field office. In the twenty-five-year period between 1980 and 2005, approximately 74% of wildland fires occurring in the Moab Fire District were lightning-caused. Prior to 1995, an average of 100 fires per year burned an average of 10,000 acres. The past decade has shown a trend of increasing wildland fire, with an average of 130 fires each year burning an average of 16,000 acres. In the MPA specifically, over this 10-year period, an average of 4,000 acres were burned each year (personal communication between Dave Engleman, FMO MPA and Laura Burch, SWCA October 31, 2006). This annual average does not include the Diamond Creek Fire that burned approximately 90,000 acres in 2001. See Section 3.4 for further fire management details.

In the upper Snake River Plain, which has similar vegetation types as the Moab Fire District, the average cost of wildland fire treatment was estimated to be $105 per acre. The average cost for wildland fire suppression was estimated to be approximately $140 per acre (BLM 2006b). Based on an average of 4,000 acres burned per year in within the MPA, the annual cost to suppress fires would be an estimated $560,000. The cost of fighting fires, including supplies and labor, has the potential to impact local economies.

Of the total expenditures for the fire management program, the following are estimates of percentages spent in each category.

- 45% variable costs
- 30% fixed labor costs
- 25% other suppression costs (BLM 2006b)

Increased fire treatment and suppression could lead to more seasonal jobs in the region, since more firefighters would be needed during fire season. The fixed labor costs for suppression (see above) would be funneled back into the community as the firefighters are generally employed

BLM_0010436

locally and thus contribute to the local economy. Areas of the economy that are boosted by the variable costs for treatment and suppression include fuel, food, lodging, maintenance, vehicles, administration, aviation, warehousing, and seeding.

It should be noted that the expenditures related to fire management within the Moab Fire District are made on an inter-agency basis and do not solely rely on BLM funding. Other agencies involved in management activities are the Bureau of Indian Affairs; Utah's Forestry, Fire, and State Lands office; the U.S. Forest Service; the National Park Service; and the U.S. Fish and Wildlife Service. Funding for treatment and suppression of fires within the MPA are often out of BLM control and therefore out of the scope of this RMP. However, by looking at the expenditures for fire management on an annual basis, specifically the variable and fixed labor costs, fiscal impacts to local communities can be estimated.

Full suppression of increasingly larger fires could result in adverse fiscal impacts to affected agencies and local volunteer fire departments. If future demands for fire-fighting services cannot be met by current staffing levels and budgets, the MFO and other agencies that help fight BLM fires would be adversely impacted. Local governments may be required to expend money to fight larger fires.

It should be noted that wildfire treatment, such as actively managing lands to reduce fuel loads, is less costly to agencies than fire suppression ($105 per acre vs. $140 per acre). Expenditures for fuels treatments in the Moab Fire District (MFD), however, are currently paid almost exclusively to out-of-area contractors, providing only marginal direct economic benefits to the local economy (personal communication between Bill Stevens, MFO, and Brain Keating, MFD fuels specialist, on June 27, 2007). Actively managing BLM lands to reduce fuel loads would potentially provide economic benefits associated with the reduced risk of large-scale fires that could damage personal property (e.g., homes) and fewer expenditures on fire suppression.

Homes and structures that are located within areas faced by threat of wildfire are becoming increasingly susceptible to wildland fire; with that comes an accompanying risk to lives and property. Communities in need of management to reduce the threat from wildland fire on adjacent public lands are identified as wildland-urban interface areas, or "WUIs." WUIs presently recognized within the MPA include the communities of Brown's Hole, Castle Valley, Dewey, La Sal and Old La Sal, Moab and Spanish Valley, Pack Creek, Thompson Springs, Willow Basin, and Wilson Arch. Treatments to reduce fuel loads in these areas would potentially have long-term beneficial impacts on these communities because risk of damage to property is decreased. If there is a reduced risk of large-scale fires in WUI areas, people may be more likely to remain in these areas, and individuals interested in remote locations for primary or secondary homes could be more likely to build in these areas, thus maintaining or increasing the populations of local communities.

### 4.3.12.2.4 IMPACTS OF HEALTH AND SAFETY MANAGEMENT ON SOCIAL AND ECONOMIC CONDITIONS

For all of the alternatives, health and safety management actions that would identify and address safety concerns about abandoned minelands, respond to hazardous waste releases, and protect public health and safety would have negligible adverse impacts to social and economic conditions of Grand and San Juan Counties because no local expenditures would be required. Long-term beneficial impacts to socioeconomics would likely result with the reclamation of

BLM_0010437

abandoned mine land, as the lands would be safer to recreate on and improved soils and habitats could contribute to a positive visitor experience. The hazard management restrictions would not interfere with or restrict the local economy, government revenue, or the local social character of the two counties.

### 4.3.12.2.5 IMPACTS OF LANDS AND REALTY ON SOCIAL AND ECONOMIC CONDITIONS

For all of the alternatives, management decisions regarding access to, permits for, transfer of, acquisition, or exchanges of lands within the MPA would have negligible adverse impacts on socioeconomics in Grand or San Juan Counties. Alternative B and the Proposed Plan provide for rights-of-way (ROW) exclusion areas, including in non-WSA lands with wilderness characteristics. Alternative B could have adverse economic impacts to those individuals and businesses whose livelihood could be impacted by an inability to obtain a ROW. The Proposed Plan has 92 percent fewer acres (exclusive of WSAs) than Alternative B as ROW exclusion areas, with a corresponding reduced adverse economic impact.

Filming permits, which authorize local revenue-generating activity, would be granted under all alternatives provided they meet the criteria outlined in Table 2.1, Lands and Realty, Actions Common to All. Wind and solar energy and communication sites, R&PPs and utility lines throughout the MPA would be considered under all alternatives

### 4.3.12.2.6 IMPACTS OF LIVESTOCK GRAZING ON SOCIAL AND ECONOMIC CONDITIONS

There are a total of 83 allotments within the MPA boundaries; 74 are administered by the MFO, and 68 are currently permitted for livestock use. Total BLM acres within allotments equal 1,794,798 acres; of these, 1,706,171 acres are currently permitted for livestock use.

Economic benefits associated with livestock grazing in the MPA are associated with income and employment generated by ranching operations on BLM lands. Indirect economic benefits are related to secondary jobs, income, and sales and income taxes.

A decrease in the number of acres available for grazing has the potential to adversely impact the lifestyle of ranchers. Losses in grazing opportunities could result in lost income and consequently a decline in social well being for affected ranchers and their families. The inability for ranchers to continue with traditional practices could potentially impact the overall character and way of life for residents of Grand and San Juan Counties.

However, it is important to note that the majority of grazing permittees within the MPA do not reside within the MPA. Therefore, contributions from these ranchers to the local economy could be minimal since supplies and materials are often purchased outside of the Grand and San Juan County communities. According to BLM records, of the 42 grazing permittees in the MPA, 15 live within the MPA (BLM 2006a).

Reductions in ranching-based income could make it more difficult for families to earn a living on ranching alone. Family members may have to get second jobs or work off the farm to bring in additional income. If ranchers are unable to continue operations, effects to local communities could include loss of business activity and/or the businesses themselves, and a decline in population if individuals have to relocate to earn a living. The positive direct and indirect economic impacts associated with livestock grazing (such as income, employment, sales, and income tax) would continue under all four alternatives. Due to the slight variation among

BLM_0010438

alternatives in the acres and AUMs available for grazing (see Table 4.84), socioeconomic impacts would resemble current conditions regardless of the alternative selected. Because the acreage available for grazing differs by no more than 101,582 acres (out of 1,822,528 acres) across alternatives, it is unlikely that the lifestyle enjoyed by the local ranching community would be adversely impacted in the short-term or long-term. Approximately 77,256 acres are not available to grazing in the No Action Alternative (A); as a result, current livelihoods would not be affected. However, under Alternative B two allotments currently available for grazing would not be available. This could have adverse impacts on the permittee holding the allotments. In addition it should be noted that of the 153,797 acres under consideration for closures under Alternative B 126,907 acres are currently unavailable and were not available for grazing under the Grand RMP. Furthermore, impacts to local economic conditions would be minor because only a minority of grazing permittees live within the MPA and therefore they may not contribute substantially to the local economy.

**Table 4.84. Livestock Grazing Acres Available per Alternative**

|  | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Acres Available | 1,695,621 | 1,668,732 | 1,708,294 | 1,770,314 |
| Acres Unavailable | 126,907 | 153,797 | 114,234 | 52,214 |
| AUMs available | 107,071 | 106,437 | 107,179 | 108,876 |

### *4.3.12.2.7 IMPACTS OF MINERALS ON SOCIAL AND ECONOMIC CONDITIONS*

#### 4.3.12.2.7.1 Locatable Minerals

Uranium

As mentioned in Section 3.12.1.5.7, recent increases in the price of uranium have led to a substantial increase in the filing of uranium claims within the MPA. Between FY 2004 and FY 2006, 4,242 mining claims were filed within the MPA. While the exact percentage of uranium claims versus other locatable mineral claims is not known, it is likely that the majority of the claims filed were for uranium. In addition, the Mineral Potential Report (MPR) indicates a high potential for the occurrence of uranium in the La Sal and Lisbon Valley areas. Should extraction occur, the majority would take place on BLM land. While the increase in the filing of mining claims does not necessarily predict future development, any extraction activities would have beneficial impacts on local economic conditions, as developers would require goods and services in nearby towns. The number of acres open to uranium extraction is identical under Alternatives A, B, C and D, and represents no change from the current condition. Therefore, potential adverse impacts (i.e., restricting the number of acres open to extraction) would be negligible under all alternatives.

Other Locatables

As in the case of uranium, the extraction of other locatables such as copper, placer gold, and limestone would not be adversely impacted regardless of the alternative selected. This is due to the large number of acres open to extraction under all alternatives and the small amount of mining that is likely to take place.

BLM_0010439

The recently opened copper mine, located within the MPA, could continue operations under all alternatives. Contributions to the social and economic conditions in Grand and San Juan Counties from employment, property taxes (the mine is located partially on private land as well as BLM land), and indirect retail goods and services could continue regardless of the RMP alternative selected.

Salable Minerals

Sand, gravel, building stone, and clay have a high potential for occurrence, and extraction of these minerals would likely occur throughout the life of the RMP regardless of the alternative selected. Minor—or even negligible—impacts to socioeconomics would be likely since the operations are typically small, and the number of acres open to extraction would likely be adequate to accommodate demand. Alternative B has 808,097 acres open to development of salable minerals while the other three alternatives have over 1.2 million acres available. Under all alternatives, these acreages should be sufficient to meet demand for salable minerals (see Section 4.3.7.2 for exact acreages).

## 4.3.12.2.7.2 Leasable Minerals

Potash and Salt

Under all alternatives, the same minimum amount of potash and salt development would be expected. The expected level of development would not appreciably contribute to the economy of Grand County.

Oil and Gas Development

The greatest socioeconomic impacts from minerals decisions would result from changes to the oil- and gas-leasing program that currently exists in the MPA. Because of undefined market and non-market factors, the following analysis is based on simplified assumptions used to quantify general estimates of development costs, employment, production, and production revenue. This analysis is based on the following assumptions pertaining to the number of wells drilled per year, employment, production, and fiscal impacts.

Wells Drilled Per Year

This analysis is based on an estimate of potential oil and gas wells drilled annually over the life of the plan (LOP). The number of wells drilled per year has been figured by dividing the total number of wells per alternative by the 15-year life of the plan. Table 4.85 illustrates the annual well potential per alternative.

**Table 4.85.A. Summary of Well Potential and Acres Open to Leasing on BLM Land per Alternative**

|  | Predicted Wells | | | |
|---|---|---|---|---|
|  | **Alternative A** | **Alternative B** | **PROPOSED PLAN\*** | **Alternative D** |
| Acreage Open* | 1,427,949 | 808,097 | 1,234,267 | 1,387,473 |
| % Of Total Acreage Open Compared to Alternative A | -- | -43% | -13.5% | -2.8% |
| Total Number of Wells over 15 Years | 451 | 255 | 432 | 448 |

BLM_0010440

**Table 4.85.A. Summary of Well Potential and Acres Open to Leasing on BLM Land per Alternative**

|  | Predicted Wells | | | |
|---|---|---|---|---|
|  | **Alternative A** | **Alternative B** | **PROPOSED PLAN*** | **Alternative D** |
| Total Annual Well Potential | 30 | 17 | 29 | 30 |
| Total Number of Potential Oil Wells | 4 | 2 | 4 | 4 |
| Total Number of Potential Gas Wells | 26 | 15 | 25 | 26 |

*"Open" refers to acreage open for development, and excludes acreage available for leasing with no surface occupancy stipulations.

Employment

The drilling and completion of an oil well requires a crew of approximately 7 full-time employees (FTE). In addition to the crew members, several service and supply companies contribute to well development. One oil well could involve the services of up to 25 employees from drilling to completion. The majority of employees would be in the area on a short-term basis and would typically stay in a nearby hotel. Short-term construction workers may stay in on-site trailers or in local campgrounds. It is likely that the employees related to the oil and gas exploration and completion of wells within the MPA are not permanent residents of Grand or San Juan Counties (personal communication between Jeff Brown, Monticello FO, and Laura Burch, SWCA, on August 11, 2006).

Given the number of wells predicted annually per alternative (17–30), it is reasonable to assume that 2 crews of 7 FTEs and approximately 2 groups of service professionals (or equivalent in the number of employees) would be responsible for all wells throughout completion. Because the employees responsible for drilling and completion typically do not live in the area and because the overall number of employees required to complete the initial development phases is relatively small, it is predicted that the overall contribution to employment opportunities in Grand and San Juan Counties from oil and gas development is minimal, regardless of alternative. It is not likely that the employment derived from the drilling and completion of wells in the area would positively impact poverty or unemployment rates in Grand and San Juan Counties. Employees working on-site may stay in local hotels and patronize local business while in town, thus contributing to the local economy, but these contributions would be short-term and would vary from year to year. It should be noted that many oil and gas workers live in Grand Junction, and spend little, if any money in Grand County.

Once a well begins production (which can last up to 20 years), local employees could be employed on a long-term basis to maintain and operate the wells and to begin gradual reclamation of inactive wells and associated access roads. These oil and gas production jobs pay well (relative to other jobs within the county) and could employ up to 20-30 people over the life of the well. Because a small number of workers are needed to perform operation and oversight functions, contributions to the local economy and to overall county employment numbers are not significant. Employment related to all mining activities, including oil and gas development, only contributed 2.1% (120 jobs) to the total employment in Grand County and 5.6% (313 jobs) in San Juan County in 2000 (See Section 3.12.4.2.6).

BLM_0010441

Production

The majority of mineral development currently occurring within the MPA is natural gas production with 244 producing gas wells versus 30 producing oil wells on lands in the MPA (per Section 3.12.1.5.7, Table 3.40). Based on these numbers and historical trends, the following analysis assumes that 88% of the wells drilled in the MPA would be gas and 12% would be oil. See Table 4.85 for the number of oil and gas wells per year per alternative.

According to the Energy Information Administration, in January 2007 current-day oil price was $56.29 per 42-gallon barrel (EIA 2007). In 2004, the average yearly production per oil well in Utah was 7,141 barrels of oil. Potential annual revenue per oil well is $401,966 assuming that 7,141 barrels are recovered (7,141 × $56.29). The life of each well is estimated to be 15-20 years. The rate of production per oil well declines approximately 10% per year after the initial year. Therefore, annual revenue per well would begin at $401,966 and decrease 10% per year throughout the life of the well.

As of December 2006, the current natural gas price according to the Energy Information Administration was $6.65 per thousand cubic feet (MCF) for natural gas (EIA 2007). In 2004, the average yearly production per gas well in the state of Utah was 75,153 MCF (EIA, 2007), although gas wells in Grand County produce below the state-wide average. For analysis purposes, potential annual revenue per natural gas well is assumed to be at the state-wide average of $499,767 (75,153 × $6.65). The life of each well is estimated to be 20 years. The rate of production declines approximately 10% per year after the initial year, according to the UDNR. Therefore, the recovery value would begin at $499,767 and decline 10% per year throughout the life of the well.

Fiscal Impacts

The drilling and completion of wells in the MPA would have an impact on local and state governments resulting from taxes and other revenue received. Tax and royalty revenue would be realized for the life of the well, with diminishing returns after maximum production is reached. The severance taxes and royalty revenues generated from natural resource development are dependant on the amount of the commodity produced. Given the uncertainty of the geology and the market, the quantification of revenue is speculative.

Royalty revenue to the Federal, state, and county government equals 12.5% of production revenue. The Federal government returns 50% of the total royalties to the state where the mineral production occurs. The royalties are then distributed between the state and counties where the production takes place. Assuming the recovery value for one oil well is $401,966 per year, royalty revenues would be $50,245 per well at maximum production (401,966 × 0.125). If the recovery value for one natural gas well were $499,767 per year, royalty revenues would be $62,470 per well at maximum production ($499,767 × 0.125). The State of Utah receives 50% of this royalty payment, or $31,235 per gas well and $25,122 per oil well. Table 4.86.A. shows annual estimated royalty revenue by alternative.

BLM_0010442

**Table 4.86.A. Annual Estimated Royalty Revenue per Alternative**

|  | Estimated Revenue | | | |
|---|---|---|---|---|
|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
| Oil Wells | $200,980 | $100,490 | $200,980 | $200,980 |
| Gas Wells | $1,624,244 | $937,050 | $1,561,750 | $1,624,244 |

*Revenue shown is at maximum production. Table does not reflect 10% annual decrease in production and therefore, revenue.

In addition to royalty revenue, developers pay several taxes that benefit state and local governments, including severance, conservation, mineral withholding, and payroll taxes. In 2002 the severance tax rate for oil and gas development on Utah lands was 3% of the value up to and including the first $13 per barrel for oil, $1.50 per MCF of natural gas, plus an additional 5% of the value above these prices. The estimated ad valorem taxes for each mineral type are based on productions, assessed values, and current tax rates. Ad valorem taxes assessed on property associated with oil and gas operations generate tax revenue for the counties; with respect to this RMP, the greater the number of producing wells in the MPA, the greater the generation of property taxes associated with oil and gas extraction assets.

The State of Utah collects severance taxes on oil and gas and mining production within the state. In fiscal year 2006, these totaled over $17 million from mining, and over $71 million from oil and gas[2]. The amounts collected are a function of sales prices and actual production, making estimates of future collections tenuous at best. Severance tax revenues are remitted directly to the State's General Fund, making them available for expenditures as the Legislature sees fit. There is no direct correspondence between a particular County's natural resource production and the amount (if any) of severance tax revenues flowing indirectly back to a County[3].

Although there is no direct relationship between the amount of severance taxes produced within the MPA by natural resource production, one can estimate the contribution production activities make to the State. According to State of Utah data, severance taxes paid across the State totaled $70.1M in FY 2007. Although the different types of wells pay severance taxes at slightly different rates, a County's share of total production, regardless of well type, is the best estimate available with non-proprietary data. Table 4.86.B shows current severance tax benefits based on actual production in Grand County and estimates of production in that portion of San Juan County within the MPA. Estimates of future severance tax impacts from Alternatives B-D are based on projected changes in well activity. The State also collects severance taxes on metal and metalliferous minerals, which also go directly to the State's general fund. However, there are no planning decisions expected to affect production of these resources.

Figures from the Utah Tax Commission for 2006 indicate that estimated ad valorem (i.e., property) taxes collected from natural resources properties totaled $808,689 for Grand County, and $3,506,662 for San Juan County. The only property tax producing natural resources of significance in the MPA and potentially affected by planning decisions are oil and gas activities. Of those amounts, property taxes related to oil and gas were $593,754 for Grand and $2,855,217

[2] Source: Utah State Tax Commission, *Annual Report 2006 Fiscal Year*.
[3] Source: Conversation between Bill Stevens, Moab Field Office and Inge-Lise Goss, Auditing Division Manager, Minerals Section, Utah State Tax Commission, December 30, 2007.

BLM_0010443

for San Juan. On a per well basis, this averages to $1,041 per well for Grand and $3,767 per well for San Juan.[4] These are taxes levied on natural resources for *all* lands in the two counties, of which BLM constitutes a part. Given that active wells in Grand County on BLM lands constitute approximately 77 per cent of all wells and assuming that each of these wells produced property taxes at the average rate for all wells in Grand County, we can conclude that Grand County wells on BLM produced approximately $457,000 in property taxes for Grand County in 2006. For San Juan County, and assuming that all wells in the MPA are on BLM, active wells produced approximately $117,000 in property taxes for San Juan County in 2006. Table 4.86.B shows annual estimated ad valorem taxes per alternative.

**Table 4.86.B. Annual Estimated Severance and Ad Valorem (Property) Taxes per Alternative**

| | Alterative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Estimated annual property tax benefit from oil and gas production | $574,000 | $321,440 | $551,000 | $574,000 |
| Estimated annual severance tax benefits to State from oil and gas production on BLM in the Moab Planning Area | $865,732, based on relative share of total State production (State of Utah data, February, 2008). | Likely to be about 45 per cent less than A, due to decreased production opportunities | Similar to A, since estimated production only slightly less than A | Similar to A, since estimated production similar to A |

Bonus payments are one-time payments to the Federal government for a leased parcel of BLM land for a ten-year period that contribute to the state and local economies as a proportion of the payments are disbursed to state and local governments; these would continue under all alternatives. However, it is assumed that the more acres that are open to oil and gas development, the greater the opportunity for economic contributions from bonus payments.

Annual rental payments—$1.50 per acre for the first 5 years and $2.00 per acre each subsequent year—would also continue to contribute to state and local revenues as a proportion of the payments are disbursed to state and local governments under all alternatives. As in the case of bonus payments, annual rental payments have the potential to be greater in the future if more acres are open to mineral leasing.

As noted in Section 3.12.1.5.7, Grand and San Juan Counties receive a portion of Federal mineral lease monies returned to the State of Utah by the Federal government through the Permanent Community Impact Fund Board (CIB). The funds received by Grand and San Juan Counties for infrastructure projects would likely continue in amounts similar to recent contributions regardless of the BLM alternative selected, because CIB funding is not directly correlated with production by county but rather by applicant eligibility.

---

[4] Most of the current production in San Juan County (and presumably, most of the property tax base for these wells) lies outside the Moab Field Office boundary.

BLM_0010444

Alternative A

The number of employees needed to drill and complete the wells would remain the same. Given the historically inconsistent number of wells drilled annually within the MPA, the number of short-term employees would vary yearly. Should the maximum number of wells be drilled in a given year, it is likely that 2 crews of 7 FTEs and approximately 50 well service employees would be required. Under Alternative A (as well as all the other alternatives) the number of employees responsible for long-term production of the wells is expected to remain relatively unchanged since few local employees are required to perform maintenance and operation duties over the life of the wells. Should drilling of the actual annual well potential occur (30 wells annually) for several consecutive years, additional production employees would likely need to be hired. However the number necessary would likely be few. These additional jobs would have a minor beneficial impact to the local economy. Poverty and unemployment rates would not be positively or adversely impacted as a result of oil and gas related employment.

The annual estimated production royalty revenue from 4 oil wells would be $200,980; from 26 natural gas wells it would be $1,624,244. The range of economic contributions would vary depending on the combination of oil and gas wells that are producing annually. Assuming that producing wells occur on public lands, 50% of the production royalty revenues listed in Table 4.86 would go to the state; 10% of the royalties would go to the General Fund of the U.S. Treasury; and 40% of the royalties would to go the special purpose accounts of the reclamation fund (BLM 2005f).

Property taxes, including ad valorem taxes resulting from oil and gas development, would increase or decrease in proportion to the amount of production occurring within Grand and San Juan Counties. Overall, the contributions to the local economy from property tax and from other tax revenue generated from oil and gas extraction companies would be similar to current contributions. Annual oil and gas lease rental payments would also continue to contribute to the economy in a similar fashion under all alternatives.

Alternative B

Government revenues in the form of taxes and production royalties from oil and gas extraction under Alternative B would be less than those under Alternatives A, D, and the Proposed Plan given that the Alternative B's total well potential, at 255, is less (compared to approximately 450 under Alternatives A, D, and the Proposed Plan). With annual estimated revenue at $100,460 for oil and $937,050 for gas, local economic contributions from production royalties would be less and would thus adversely impact the local economies when compared to the other alternatives. Acres open for oil and gas development would be substantially fewer under Alternative B than under the other alternatives (43% fewer than in Alternative A), giving developers fewer exploration and extraction location options within the MPA. Employment related to oil and gas development would be less under Alternative B in comparison to the other alternatives. Hiring additional employees to manage the long-term production of the wells would be the least likely under this alternative, thus allowing for less of a potential beneficial impact to the local economy in comparison to the other alternatives.

An additional potential impact to state revenues is the potential loss to SITLA from not being able to lease or develop lands bordered all or in part by non-WSA lands with wilderness characteristics. The value of these lands for oil and gas leasing and/or development may be

BLM_0010445

reduced if all or portions of these public lands are closed to new oil and gas leasing. This in turn could reduce the monies collected by the state (through SITLA), including royalties and severance taxes. These impacts can be estimated using current data, and incorporating several assumptions. If one assumes that SITLA lands whose perimeter is more than fifty per cent bounded by acreage closed to new oil and gas leasing as a result of implementing Alternative B would be unavailable for development, and using the projections of the RFD, one can project that fewer than six wells (5.65) would not be drilled over the life of the plan. Using data provided by the State of Utah, royalty payments to wells on SITLA lands averaged $57,065 as of early 2008. Severance taxes averaged $9,335 for all wells, regardless of land ownership. Multiplying these figures by the wells assumed to not be drilled, the fiscal loss to the state would total $332,443 in royalties and $52,747 in severance taxes in any year in which all 5.65 wells would have been in operation. This amount could increase over the life of the plan, as it is likely that some fraction of these wells would be in operation in several (or even all) years of the plan.

The wages foregone in Grand and San Juan Counties as a result of adopting Alternative B can be estimated, given the assumptions of employment per well outlined earlier. Assuming 7 full-time equivalent jobs per well, and assuming that the probability of a well being situated in an area of non-WSA lands with wilderness characteristics, the number of jobs foregone on BLM in Grand County would be 15.69 in any given year. In the MFO portion of San Juan County it would total 1.88. These estimates are likely on the high side, given that direct employment in 2006 in Grand County (where most of the MPA's oil and gas activity occurs and is projected to occur in the future) was 25 employees, servicing over 250 wells. Using data provided by the University of Utah Bureau of Economic and Business Research, the average earnings in the oil and gas industry in Grand County was $34,421 in 2006.[5] (The study points out that most of the employees actually reside in Colorado.) Assuming that similar wages would be paid in Grand and San Juan Counties, and that these were *new* jobs going to county residents, the foregone wages would be $540,065 in Grand and $64,711 in San Juan County. Again, these estimates are likely on the high side, given that *total* wages in the industry in 2006 in Grand County were $829,000, which amounted to 0.8 per cent of total wages in the county.

Proposed Plan

Government revenues in the form of royalties and taxes from oil and gas production under the Proposed Plan would be similar to those under Alternative A, given that the total well potential between the alternatives is similar (451 under Alternative A and 432 under the Proposed Plan). Although the number of acres open for oil and gas development is less under the Proposed Plan by 13.5% (see Table 4.85.A.), the number of wells projected to be drilled would be only one well per year less. Employment levels related to oil and gas development would be similar to Alternative A.

Alternative D

Government revenues in the form of royalties and taxes from oil and gas production under Alternative D would be similar to those under Alternative A, given that the total well potential between the alternatives is almost identical (451 under Alternative A and 448 under Alternative D). When compared to the No-Action Alternative, the numbers of acres open for oil and gas

---

[5] Source: *The Structure and Economic Impact of Utah's Oil and Gas Exploration Industry Phase III – Grand County*, University of Utah, Bureau of Economic and Business Research (January, 2008)

BLM_0010446

development is less under Alternative D by 2.8% (see Table 4.85.A). Employment levels related to oil and gas development would be similar to Alternative A.

### 4.3.12.2.8 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Alternatives A and D do not propose any lands be managed for wilderness characteristics. Therefore impacts to revenues from mineral development would not be affected. However, some recreation revenues could be lost due to fewer opportunities for non-mechanized recreation in Alternatives A and D.

Alternative B proposes to manage 266,485 acres of lands to maintain their wilderness characteristics. These lands would be closed to oil and gas leasing. Under Alternative B, approximately 15.2% of all BLM lands would be managed to maintain wilderness characteristics In the Proposed Plan, the BLM would manage 47,761 acres of lands to maintain wilderness characteristics. These 47,761 acres (2.6%) would be limited to NSO. The management of wilderness characteristics under Alternative B (15.2%) and the Proposed Plan (2.6%) would have adverse impacts to oil and gas development and the subsequent revenue generated for the local economy, as fewer wells would be drilled, particularly under Alternative B.

Managing lands for wilderness characteristics may have some positive economic benefits to the local economy, above and beyond recreation benefits to individual users of these areas. There is an extensive body of literature which argues that protecting lands as wilderness provides local, regional and national economic benefits. A briefing paper prepared by the Wilderness Society (TWS 2004) summarizes some of the more relevant research on this topic. For example, some research suggests that private property located next to or near protected lands increases in value due to this proximity. Other research suggests that areas with protected lands are more likely to attract higher income individuals, as well as businesses, who value the types of recreation activities provided in protected areas. Still other research argues that certain types of high-dollar recreation, such as hunting, are enhanced by wilderness protection. While most of these studies have focused on the benefits accruing to designated wilderness, it is possible that the same arguments may be applicable to non-WSA lands with wilderness characteristics.

In the MPA, with its relatively large number of second homeowners, it is reasonable to expect that certain features of managing for wilderness characteristics, such as protection of visual resources, would contribute to the appeal of the area both as a second home locus and as an area in which to retire. This scenario could benefit the local economy to the extent that such newcomers spend locally on such items as housing (especially construction), financial services, and healthcare. For some current residents, however, the restrictions on mineral extraction in Alternative B and the Proposed Plan, with any corresponding loss in employment opportunities or local tax revenues, could pose an additional economic hardship.

In Alternative B and the Proposed Plan, OHV use on designated routes would be permitted on those lands with wilderness characteristics (see Section 4.3.8.2.13 for details). Thus, adverse social and economic impacts as a result of decreases in OHV use are not likely regardless of alternative selected, although greater opportunities for OHV use occur under Alternative A.

BLM_0010447

### 4.3.12.2.9 IMPACTS OF PALEONTOLOGICAL RESOURCES ON SOCIAL AND ECONOMIC CONDITIONS

Management actions for paleontological resources would have negligible impacts on socioeconomic resources because the recreational and scientific collection of fossils, as well as the protection of these resources would be similar to current conditions and are the same across alternatives. Personal collection of invertebrate and plant fossils would be allowed throughout the MPA. The recreational collection of vertebrate fossils, as well as of noteworthy invertebrate and plant fossils, is already prohibited within the MPA. Therefore, the recreational collection of fossils from BLM-administered lands would have minimal impacts on the local economy. The permit-required scientific gathering of fossils within the MPA occurs rarely; approximately a half-dozen permits are issued annually (See Section 3.9.3). The economic contributions, including sales and hotel tax revenue, from scientific collection would also be negligible under all alternatives.

### 4.3.12.2.10 IMPACTS OF RECREATION AND TRAVEL ON SOCIAL AND ECONOMIC CONDITIONS

Proposed recreation management decisions for the MPA have the potential to impact the local and regional socioeconomic conditions. The socioeconomic impacts would be primarily in the form of income and employment effects in the economies that serve the recreational user. Because the majority of recreation revenue occurs in Grand County, as do the majority of goods and services accessed by recreational users and tourists, the following analysis will not focus on the socioeconomic impacts to San Juan County. See the Monticello EIS/RMP for recreation impacts to San Juan County.

The relationship between changes in land-use decisions as they regard recreation and their associated social and economic impacts is difficult to quantify. Therefore, the following assumptions have been made:

- Increasing recreation opportunities could positively affect visitation, which could also benefit local businesses and overall traveler spending in the region.
- Improving the recreation experience would have a positive effect on the social component of recreation, potentially increasing visitation.
- Recreation Focus Areas, which would tend to segregate or concentrate specific recreational opportunities, activities, and users into spatially separate areas, would reduce recreation resource use conflicts. Focus areas are recreational management areas that would emphasize specific recreational opportunities and activities while permitting other recreational uses, in accordance with the Moab Travel Plan. It has also been assumed that a reduction in recreational use conflicts would enhance the expected recreational experiences within a particular focus area for certain user groups. Focus areas would be managed to meet the needs of specific user groups and thus the recreational experience would be more enjoyable and more likely to meet user recreation expectations. The number of focus areas within the MPA differs for each alternative. The focus areas emphasize recreational opportunities through facilities and education.
- Special Recreation Management Areas (SRMAs) are also intended to reduce user conflict as the BLM manages them more broadly for a specific recreational experience in comparison to focus areas. Each SRMA has been previously identified as an area where recreation issues or management concerns occur. Both focus areas and SRMAs would still allow for other

BLM_0010448

recreational uses within their boundaries in accordance with the Moab Travel Plan. For more information on the types of focus areas and SRMAs, see Section 4.3.10.2.10. Overall, focus areas and SRMAs would have long-term beneficial impacts on local socioeconomic conditions, because enhancing specific recreation opportunities in particular areas would likely reduce user conflict. With the reduction of user conflict in the MPA, it is likely that visitors would have a positive recreation experience and return to contribute more to the local economy.

- Specific user groups have their own sets of recreational expectations, goals, and needs. It has also been assumed that, because each user group has specific needs, goals, and expectations, each group also has recreational conditions and criteria that provide the opportunity for a satisfactory user experience. The recreation user groups and assumed conditions/criteria for satisfactory recreational user experiences are found in Section 4.3.10. Restrictions on dispersed camping and access routes to campsites may negatively affect recreationists seeking this type of experience.

With the trend toward increased recreation within the MPA, user conflicts are likely to remain an issue regardless of the alternative selected. User groups, as defined in Section 4.3.10, include motorized (on-road), motorized (off-road), non-motorized, non-mechanized, river floating, and specialized recreation. Increases in conflicts among user groups have the potential to adversely impact visitor experience to the area. The adverse impact to visitors regarding their recreation experiences would likely be short-term. However, long-term adverse impacts to the county's economy could be possible, as users might choose to recreate in other areas where they feel they are more likely to have a positive recreation experience. This would contribute to a loss in traveler spending in the area.

A recent United States Geologic Survey (USGS 2007) synopsis of relevant literature summarizes numerous studies of the impacts of OHV use on other users, often addressing the issue in the context of user conflicts. Other studies summarized by USGS concentrate on the economic benefits resulting from expenditures on OHV-related activities; the USGS was unable to find any published studies on the socioeconomic costs produced by OHV use, but concluded that such costs could exist. The USGS study is summarized in Appendix G.

### 4.3.12.2.10.1 Impacts Common to All Alternatives

Special Recreation Permits (SRPs) would be issued under all alternatives as a discretionary means to help meet BLM management objectives, facilitate recreational use of public lands, control visitor use, protect recreational and natural resources, provide for the health and safety of visitors, and provide opportunities for economic activity in the nearby communities. The number of land based commercial SRPs would not differ among the alternatives. Revenues generated by commercial SRPs (2006) total $6,270,676; of these revenues, $2,762,175 was generated by commercial river companies, and $3,508,501 was generated by land-based outfitters.

### 4.3.12.2.10.2 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

Among all action alternatives, within SRMAs, no surface occupancy for oil and gas leasing and other surface-disturbing activities would be permitted within 0.5 miles of developed recreation

BLM_0010449

sites, including current and potential future facilities. As a result, visitor experience within the SRMAs would likely be enhanced and user conflicts reduced.

### 4.3.12.2.10.3 Alternative A

As shown in Section 3.12.1.5.7, tourist spending in Grand County has grown consistently since the 1990s, contributing an annual average of $2 million in local sales tax revenue since 2000 (UDTD 2004). Under current management actions, recreation use is projected to continue existing trends. Visitation to local attractions would be anticipated to follow the existing growth trend. Local and regional social and economic impacts from recreation and tourism would be similar to those experienced currently.

Tourism-related spending in Grand County could total approximately $100 million dollars, as it did in 2003. Expenditures for leisure and hospitability services are taxed at the local and state level and are a benefit to counties. Under Alternative A, tax revenue from visitor spending (i.e., hotel, restaurant, and sales tax) would similarly contribute to the county's fiscal resource base.

Travel- and tourism-related employment could continue to increase according to existing trends. Recent increases in travel- and recreation-related employment in Grand County are illustrated with a jump from 1,878 to 1,999 jobs between 2000 and 2003, a 6.4% increase (UDTD 2004). Increases would reflect the trends of recent years and would have a positive impact on the local economic conditions. However, it should be noted that with increases in higher wage jobs, such as construction and infrastructure development as a result of second-home ownership in a recreational setting, lower wage service jobs could potentially become harder to fill with local residents.

Under Alternative A there would be 3 SRMAs (Canyon Rims, Cameo Cliffs, and Colorado River) totaling 135,094 acres designated, and no designation of focus areas. It is likely that user conflicts could increase as they have over recent years as more people come to the MPA for recreational purposes. User conflicts could result in adverse experiences for the users thereby decreasing the likelihood that they would return to the Moab area and patronize the local businesses, potentially a long-term adverse impact on the local economy.

Under Alternative A, 620,212 acres would be designated as open to OHV use and 1,196,920 acres would be designated as limited to Existing or designated routes. It is presumed that the number of acres available for OHV travel among all alternatives is sufficient to meet current demand (personal communication between Bill Stevens, MPA, and Laura Burch, SWCA, on November 9, 2006). However, if increased interest in OHVs continues as it has in recent years, the number of acres available under any alternative may not meet future need.

This alternative represents the current conditions for OHV access, and, as such, it is likely that the economic contributions from the user group would be similar to current contributions. Contributions to the local economy from hotel taxes, retail, maintenance, and restaurant sales would continue along the current path.

Recreational users who require motorized access would most enjoy short-term benefits under Alternative A. Fewer places would disallow motorized access, potentially decreasing the recreation experience and/or social well-being of individuals or groups who value solitude. Possible degradation of soil, water quality, cultural resources, wildlife, and scenic quality, in

BLM_0010450

areas associated with high OHV use and cross-country travel, could adversely impact the recreation opportunities and visitation in the long-term.

Special Recreation Permits are required for commercial outfitters along the Colorado Riverway SRMA and the Two Rivers SRMA. Both of these SRMAs permit a maximum of 30 outfitters and a total of 24,000 passenger days per year. Outfitters who currently receive permits would likely continue to receive permits, and the revenue generated from river runners within the local economy would continue at current levels.

### 4.3.12.2.10.4 Alternative B

Under Alternative B there would be 11 SRMAs totaling 1,016,554 acres and 22 focus areas. Generally, this alternative emphasizes non-motorized use while still providing opportunities for motorized vehicle use. Groups or individuals who value solitude and non-motorized activities would have the most places to enjoy under Alternative B, perhaps enhancing the visitor experience. This alternative is least responsive to the desires of individuals and groups who feel public lands should remain open to motorized vehicle access, potentially detracting from their social well-being. The potential for OHV-related damage to resources would be smallest under this alternative, thus having a long-term beneficial impact on visitation to the area.

Because this alternative focuses on non-motorized activities, it is possible that the focus areas would see an increase in hikers and a decrease in OHV users. The emphasis on non-motorized use could lead to greater visitor satisfaction among non-motorized users and a decrease in satisfaction among motorized users. It is possible that dissatisfaction among OHV users could lead to decreases in their economic contributions to Grand County. Given the continuing increase of OHV use within the MPA, a decrease in use by motorized users could be of greater significance than a decrease in use by non-motorized users. Although it is not certain how much money each user group contributes on a daily basis in the Moab area, it is possible that local government revenue from hotel, restaurant, and sales tax on goods purchased would be reduced under Alternative B, should OHV use decline. The fiscal resources of local government would potentially be indirectly impacted by a decrease in recreational visits to the county. Expenditures for leisure and hospitality services are taxed at the local and state levels and are a benefit to local government. Because the proportion of recreation expenditures compared to expenditures from local residents and/or non-recreation consumers is not possible to quantify, it is generally concluded that a decrease in recreation use in the area would lead to a decrease in tax revenues for local government.

Under Alternative B, zero acres would be designated as open to OHV use, with all OHV routes restricted to limited areas (1,475,074 acres). This alternative eliminates all acres open to cross-country travel, which includes closure of the popular White Wash Sand Dunes. While this may lead to an adverse impact to users who enjoy cross-county travel, the majority of OHV use occurs on existing routes according to the best professional judgment of the MFO (Personal communication with Bill Stevens, MPA, and Laura Burch, SWCA, November 9, 2006). Although the exact number of OHV users who use the areas currently designated as open for cross country travel is not known, decreases in their visits to the area because of the restrictions under Alternative B could have minor adverse economic impacts to the county as discussed in the paragraph above.

BLM_0010451

The recent trend towards the construction of second homes in the Moab area may be due to the scenic and non-motorized recreational opportunities in the area. Although the MPA has not been studied specifically, a multi-county sponsored study in Colorado suggests strongly that second home buyers are attracted to areas primarily based on access to scenery and recreation (Venturoni et al. 2005). The same study found that 82 per cent of these second home owners indicated hiking and jogging as their favorite recreational activities. To the extent that these results can be extrapolated to the MPA, this suggests that an emphasis on preservation of scenery and an emphasis on non-motorized recreation opportunities could fuel continued growth in the second home industry, with concomitant economic benefits to local communities. With the non-motorized focus of Alternative B, higher wage jobs such as construction and infrastructure development resulting from second home construction could likely increase similar to existing trends. The emphasis on non-motorized recreation would continue to draw those interested in non-motorized recreation opportunities to develop second homes and contribute to the local retail economy.

A potential downside to the above scenario exists. Given a limited supply of housing, growth in second home ownership could drive up housing prices in general, as seems to have been the case recently in Grand County. An increase in housing costs could make it more difficult to attract and retain workers in lower wage industries, of which tourism is typically a segment. If tourism-oriented employers find it more difficult to attract and retain employees, the kinds of services expected by al visitors may decline in quantity and/or quality. Such an outcome could pose adverse impacts to the local economy. Second home ownership also could cause changes in the demographic character of the local community, which some current residents may regard as undesirable for its perceived impacts on local culture and customs.

Within the 2 SRMAs that require SRPs for river rafting, Alternative B allocates the fewest permits when compared to the other alternatives. Within the Colorado Riverway SRMA, 19 unallocated permits and 2 allocated permits would be issued. Westwater Canyon, within the Two Rivers SRMA, allows for a daily 48-person launch limit for each sector (private and commercial). When compared to the other action alternatives, Alternative B has a 36% reduction in launch limits as compared to the Proposed Plan and a 63% reduction as compared to Alternative D. These reductions would have minor adverse impacts on socioeconomics as fewer river runners would be allowed to run rivers and contribute to the local economies before and/or after trips, assuming these river permits are at maximum capacity currently. Alternatively, a decrease in supply, even with demand constant, could allow commercial outfitters to increase prices, and therefore their own revenues.

### 4.3.12.2.10.5 Proposed Plan

Under the Proposed Plan there would be 10 SRMAs totaling 658,642 acres and 30 focus areas. The Proposed Plan emphasizes a balance of recreational opportunities for motorized and non-motorized uses within the MPA. Groups or individuals who value solitude and non-motorized activities would have the greatest number of focus areas emphasizing a range of recreational opportunities. This alternative also promotes the greatest amount of motorized backcountry touring and the most motorized, sporting-event focus areas (although the acreage for the White Wash Sand Dunes and Dee Pass is slightly reduced compared to Alternative D). This alternative is most responsive to those who feel that a balance of uses should be allowed within the MPA.

BLM_0010452

With its implementation of SRMAs and focus areas, the Proposed Plan would have the potential to reduce user conflicts to a greater degree than the other alternatives. The reduction in user conflict and the ability for user groups to recreate in specific areas geared toward their particular activities allow for the broadest range of satisfactory user experiences. By providing satisfactory experiences for the widest spectrum of users, the Proposed Plan would provide more potential for increased visitation and economic contributions to the region than would Alternatives A, B, and D. The Proposed Plan, therefore, potentially provides greater long-term economic contributions to the retail economy and, indirectly, to the local government in the form of sales tax revenue.

This alternative would designate 1,866 acres (White Wash Sand Dunes) as open to OHV use, with 1,481,334 acres designated as limited for OHV use. Allowing cross-country travel in the White Wash Sand Dunes would permit motorized users to recreate in a manner not permitted under Alternative B. In addition, the Gemini Bridges/Poison Spider Mesa motorized backcountry touring area and the Dee Pass motorized trail area would be established as focus area for OHV use. By allowing for cross-country travel and other motorized trail access, the Proposed Plan gives OHV users more opportunities to meet their recreation expectations and needs than does Alternative B. Thus, the economic contributions to the local economy by OHV users would be greater under the Proposed Plan than under Alternative B. Moreover, while user conflicts between motorized and non-motorized vehicle users would continue to occur under Alternative A, they would be less likely to occur under the Proposed Plan, and therefore the Proposed Plan would provide more satisfactory user experiences.

By providing for a range of recreational opportunities for all users, the Proposed Plan could have a beneficial impact on local employment. Satisfactory user experiences would result in more tourists returning to the MPA and a corresponding increase in the need for goods and services. A range of jobs would be necessary to meet the needs of tourists, including lower wage service jobs and higher paying professional jobs. Given the reduction in user conflicts under the Proposed Plan, recreation- and tourism-related employment is likely to steadily increase as it has under current conditions. This increase is expected, in the long-term, to exceed the employment needs generated by Alternative A, because user conflicts and resource degradation would be less likely.

The Proposed Plan would allow for similar amounts of Special Recreation Permits within the Colorado Riverway SRMA when compared to Alternatives B and D (21 commercial permits issued annually under Alternative B and the Proposed Plan and 25 under Alternative D). For Westwater Canyon, commercial and private permits are required. The daily launch limit would be 75 people and commercial group size would be 25 plus 3 additional crew. Because the Proposed Plan allows for 36% more people to be permitted on a daily basis on the SRMA rivers (compared to Alternative B), it improves the potential for an increase in local revenue generation. With a 41% decrease in launch limits, compared to Alternative D, potential revenue generated from river runners could be less under the Proposed Plan.

### 4.3.12.2.10.6 Alternative D

Alternative D emphasizes motorized uses and would provide 6 SRMAs totaling 277,495 acres and 10 focus areas. The majority of acres that would be designated as focus areas would be open to motorized vehicle use. Under Alternative D, 3,604 acres would be designated as open to OHV use, which includes White Wash Sand Dunes and Airport Hills. Alternative D would designate

BLM_0010453

1,762,083 acres as limited to designated routes, including the Dee Pass Motorized Trail Focus Area.

Emphasizing motorized recreation could have positive, short-term, social impacts on OHV user groups, because the specific group would have greater opportunities to meet their recreation objectives. However, impacts to all other user groups could be adverse under Alternative D and its emphasis on motorized use. Other user groups who believe that recreation on public lands should include opportunities for solitude would have a more challenging time finding places to meet their recreation objectives. The long-term impacts of emphasized motorized use would be adverse, as crowding, user conflicts, and the degradation of the environment would detract from the overall visitor experience for all user groups.

Dissatisfaction among non-motorized users could lead to decreases in economic contributions to Grand County. The decreases in satisfactory recreational experiences by non-motorized users, such as hikers, mountain bikers, and river rafters, may result in fewer returns to the MPA. Although it is not certain how much money each user group contributes on a daily basis in the Moab area, it is possible that local government revenue from hotel, restaurant, and sales tax would be reduced under Alternative D should OHV use be emphasized. While OHV users would still continue to patronize local businesses, the contributions from the range of other users would decrease, adversely impacting local economies. The fiscal resources of local governments would potentially be indirectly impacted by a decrease in recreational visits to the county, as the local- and state-level leisure and hospitality tax revenues would decrease.

Impacts of Alternative D to local employment would be similar to those of Alternative B. By emphasizing the recreation opportunities for one user group and not others, user conflicts and decreases in satisfactory experiences by the other groups could lead to a decrease in visits to the MPA. Thus, fewer goods and services—and therefore employees—would be needed to meet the demand from recreation-based tourism.

The number of individuals allowed per river trip within the Colorado Riverway SRMA and Two Rivers SRMAs is greatest under Alternative D. Should the demand for permits rise to meet Alternative D's permit maximums, benefits to local communities from recreation-based revenue would be greatest under this alternative.

### 4.3.12.2.11 IMPACTS OF RIPARIAN DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Management decisions common to all alternatives for riparian resources would have negligible impacts to the social and economic conditions of communities in Grand and San Juan Counties. The impacts would be negligible because all floodplains and riparian/wetlands would be managed in accordance with Executive Orders, the Clear Water and Endangered Species Act, and Utah's Standards for Rangeland Health, and because there is opportunity for mineral leasing across all alternatives outside of riparian areas. These mandates and management actions would not allow great variation in the management of the resource such that it would have a substantial impact on the local economy or social character of communities.

### 4.3.12.2.12 IMPACTS OF SOIL AND WATER ON SOCIAL AND ECONOMIC CONDITIONS

Soil and water resource actions common to all alternatives would have negligible impacts on socioeconomics. Approximately 58% of lands available for surface-disturbing activities are overlain by sensitive soils with high limitations (See Section 4.3.7.3.7 for details). Any surface

BLM_0010454

disturbance projects (e.g., minerals development) initiated on these sensitive soils would require the implementation of specifically tailored of Best Management Practices (BMPs) and mitigation measures. Although the implementation of BMPs may result in minor increases in cost and time on behalf of the project proponent, the medium and high limitations do not prohibit development and therefore do not represent economic loss to the county. Under all alternatives developers would be able to extract oil and gas from over three quarters of medium- and high-risk soils and, as a result, generate revenues for Federal and local governments as well as provide limited opportunities for local employment.

Development on slopes greater than 30% would require a controlled surface-use stipulation, and an additional timing limitation from November 1 through April 30 (181 days) for slopes such as those in the Book Cliffs RFD Area. These special stipulations may require additional costs and time to relocate well pads and pipelines, requirements that may result in a decrease in revenue for the developer. However, impacts to local economic conditions should be minor given that the lands would still be effectively open to development, assuming the requisite minimization of damage to sensitive soils is accomplished.

### *4.3.12.2.13 IMPACTS OF SPECIAL DESIGNATIONS ON SOCIAL AND ECONOMIC CONDITIONS*

### 4.3.12.2.13.1 Areas of Critical Environmental Concern (ACECs)

Protecting the relevant and important values associated with Areas of Critical Environmental Concern (ACECs) limits activities that are considered incompatible with the protection of the specific values and resources of concern. Specifically, surface-disturbing activities (mineral development, OHV use, road and facilities construction) would be limited as a result of ACEC designations. With specific regard to mineral resource development, ACEC designation could limit areas to development. ACEC designations could have adverse impacts upon oil and gas development in some locations and, therefore, to subsequent revenue for the local economy. Alternatives A and D do not designate ACECs and would not be limited by the special designation restrictions. Outside of WSAs, ACEC designation under Alternative B results in 16.5% of BLM lands with major restrictions for oil and gas leasing (no surface occupancy or closed). ACEC designation under the Proposed Plan (with 63,232 acres designated) results in 1.7% of BLM lands with a no surface occupancy stipulation for oil and gas leasing (See Section 4.3.7.2 for details on acres of potential ACECs available to mineral development). Under Alternative B and the Proposed Plan, the restrictions to and/or exclusion of lands from oil and gas development would lower the number of locations where potential wells could be drilled. The lower number of locations could indirectly lead to a lower yield and commercial supply of oil and natural gas and, therefore, fewer royalties paid to the Federal, state, and local governments. An approximate monetary impact would be difficult to estimate, because desired future locations of development in proposed ACEC sites is unknown.

Under the two alternatives where ACEC designations are proposed, OHV use would be allowed in ACECs on designated routes, although the miles of Class D roads would vary slightly among alternatives (see Table 4.136 in Section 4.3.16.2.6.1). Allowing OHV access within ACECs could be beneficial in the long-term for socioeconomics, because opportunities would remain available for recreational access. Revenue generated in local communities by OHV users would be similar to current conditions.

BLM_0010455

### 4.3.12.2.13.2 Wilderness Study Areas and Wilderness Areas

The MPA contains 11 existing WSAs totaling 348,815 acres (or approximately 16% of BLM lands). WSA designations would continue to apply across all alternatives and would be managed in a manner that does not impair their suitability for congressional designation (BLM 1991c). An ongoing debate exists in the literature as to the economic benefits (or lack thereof) of wilderness, and these arguments may extend to WSAs. However, management of WSAs is non-discretionary across alternatives, and therefore beyond the scope of this analysis. In addition, the management of the Black Ridge Wilderness Area (5,200 acres) is set by law and beyond the scope of this EIS.

### 4.3.12.2.13.3 Wild and Scenic River Recommendations

Under Alternative A, none of the eligible Wild and Scenic River (WSR) segments carried forward in this RMP would be evaluated for WSR suitability determination. However, the 6 river segments eligible for WSR designation would continue to be managed in a manner that would not impair the WSR eligibility. Social and economic impacts resulting from this management action would be similar to current conditions. Alternative D would not recommend rivers within the MPA for WSR designation. Therefore, special designation decisions under Alternative D regarding WSRs would have no impact on socioeconomics above and beyond current conditions (Alternative A). See Section 4.3.14.4 for river segments proposed for WSR designation under each alternative.

Suitable WSR segments impose no restrictions on oil and gas leasing or other mineral development. Special restrictions were not necessary to protect WSR values because restrictions imposed to benefit other resource values, such as riparian, visuals, and floodplains, were sufficient. Socioeconomic impacts from the restrictions imposed to protect these other resources (riparian, visuals, floodplain) are discussed under the relevant sections.

The designation of the WSRs under Alternative B could potentially lead to an increase in tourism revenue to the BLM and local communities, thus having long-term beneficial impact on the local economies. The designation of rivers and/or river segments could attract more people to the area who enjoy the type of recreation that often accompanies these designations (including high scenic qualities and opportunities for solitude). The increase in tourism based on river recreation could lead to increased revenue to local river-running companies and an increase in tourist dollars spent in nearby communities.

The designation of portions of the Colorado, Green and Dolores Rivers as suitable WSRs under the Proposed Plan could potentially lead to an increase in tourism revenue to the BLM and local communities, thus having long-term beneficial impact on the local economies. The impact of the Proposed Plan is estimated to be approximately the same as in Alternative B because the major rivers used by the river industry are designated as suitable in the Proposed Plan. The designation of rivers and/or river segments could attract more people to the area who enjoy the type of recreation that often accompanies these designations (including high scenic qualities and opportunities for solitude). The increase in tourism based on river recreation could lead to increased revenue to local river-running companies and an increase in tourist dollars spent in nearby communities.

BLM_0010456

### 4.3.12.2.14 IMPACTS OF SPECIAL STATUS SPECIES AND OTHER WILDLIFE AND FISHERIES DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Across all alternatives, the impacts to socioeconomics of management actions regarding special status species (e.g., temporary seasonal or spatial buffers and restrictions for roosting or nesting birds, and habitat enhancement to protect special status species) would be minor. Restriction on mineral development within Special Status Species habitats would adversely impact developers during specific times of the year (see Section 4.3.7.3.9). The timing limitations imposed by special status and other wildlife species could potentially hinder development. However, due to the large number of acres open to oil and gas development across alternatives (over 1 million acres) and the number of wells predicted annually (no more than 30 wells) within the MPA, a negligible to minor adverse economic impact would be anticipated, because drilling would commence during periods without seasonal restrictions and, in areas without restrictions, could go on year-round.

### 4.3.12.2.15 IMPACTS OF VEGETATION DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Vegetation management efforts may benefit the local economy if labor, seed, and equipment maintenance come from local communities. Since vegetation treatments are expected to be similar in size across all alternatives, there would be no differences among alternatives in social and economic conditions.

### 4.3.12.2.16 IMPACTS OF VISUAL RESOURCE DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

The demand for a range of recreation opportunities would not be limited as a result of VRM (Visual Resource Management) classifications; therefore, impacts to socioeconomics from recreational visitation would be minor under all alternatives. Opportunities for recreation with high levels of scenic quality (VRM Class I and Class II) would remain throughout Wilderness Study Areas (WSAs), Areas of Critical Environmental Concern (ACECs), Special Recreation Management Areas (SRMAs), and along eligible Wild and Scenic river segments. See Section 4.3.12.2.10 for more details on recreation impacts to socioeconomics.

Under all alternatives, designation of lands as VRM Class III or IV would not impose special restrictions on oil and gas development. However, VRM Class I and II do impose restrictions on oil and gas development. VRM Class I results in the imposition of major restrictions on oil and gas development (no surface occupancy or closed). VRM Class II results in the imposition of a controlled surface use stipulation, requiring specific controls or constraints to protect visual resources. Low levels of surface disturbance are permitted under VRM Class II, at a site-specific project level, as long as the disturbance is not visible over the long term, which often requires extensive mitigation.

It should be noted that all WSAs are designated as VRM Class I for all alternatives. However, the limitations to oil and gas development are a result of the WSA designation and not the VRM I classification. Table 4.87 provides the acreage of VRM classes by alternative.

BLM_0010457

**Table 4.87. VRM Class Acreages by Alternative**[6]

| VRM Class | Alternative A/ VRM Inventory | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| I | 349,110 | 453,462 | 358,911 | 349,617 |
| II | 401,015 | 373,647 | 365,566 | 245,773 |
| III | 800,782 | 784,246 | 829,158 | 956,724 |
| IV | 271,356 | 210,532 | 268,133 | 269,641 |
| **Total** | **1,822,263**[1] | **1,821,887** | **1,821,768** | **1,821,755** |

Source: BLM GIS form 2003 and 2006.

Alternative D would have the least amount of lands with VRM Class I and II designations (595,390 acres) compared to the other alternatives and therefore the most acres open for oil and gas development and greatest potential for mineral-based revenue. Alternatives A, B, and C have similar acreages with VRM I and II (750,125 acres under A, 796,736 acres, under B, and 714,840 acres under Proposed Plan) which would limit the placement of oil and gas wells. Therefore, the difference in economic impacts among Alternatives A, B, and the Proposed Plan would be minor.

A potential decrease in revenue based on tourism and sightseeing-based revenue would be greater under Alternative D, should oil and gas wells be visible from popular tourist destinations. Alternatives A and B provide the greatest amount of viewshed protection with VRM Class I and II designations (750,125 acres under Alternative A and 799,736 acres under Alternative B), and therefore the greatest potential for sightseeing-based revenue. The Proposed Plan designates a similar amount of VRM Class I and II, with oil and gas development restricted on 714,840 acres.

Overall, the socioeconomic impacts from visual resource management on oil and gas exploration would be relatively minor given that the maximum number of wells to be developed within the MPA is 450 (under Alternative A) and given the large amount of VRM Class II, III, and IV lands (over 1 million acres under every alternative) available for oil and gas development. The preservation of viewsheds with high scenic quality would allow for the greatest opportunity for recreation and sightseeing-based revenue, thus having long-term beneficial impacts on the local economy and visitor experience.

### 4.3.12.2.17 IMPACTS OF WOODLAND DECISIONS ON SOCIAL AND ECONOMIC CONDITIONS

Woodland management actions common to all alternatives would have negligible impacts on the social and economic conditions of communities in Grand and San Juan counties, because the private and commercial use of woodland products is not a substantial contributor to the local economy. No commercial timber sales have occurred within the MPA due to the lack of timber resources. The number of wood gathering permits is not anticipated to increase over the life of the RMP, and the percentage of acres available for woodland gathering does not vary appreciably across any of the alternatives.

---

[6] Totals are not exact due to GIS shapefile variances.

BLM_0010458

Willow and cottonwood harvesting by Native Americans for ceremonial uses in riparian areas would be allowed under all alternatives, with negligible impacts to riparian vegetation, since the level of collection is low.

### 4.3.12.3 SUMMARY OF IMPACTS

Overall, the local economy would not experience substantial adverse impacts from BLM resource management decisions in the form of lessened revenues. Beneficial impacts, in the form of positive visitor experiences and contributions to the local economy, are possible as a result of management decisions but benefits would not vary significantly among alternatives. Many resource management decisions regarding air quality, fire management, hazard management, paleontology, soil and water, special status species, and woodlands would have negligible impacts on the social and economic conditions of Grand and San Juan Counties. Resource management decisions regarding cultural resources, lands and realty, livestock grazing, minerals, non-WSA lands with wilderness characteristics, recreation and travel management, special designations, and visual resource management would have a greater impact. Population, employment, and local revenue would remain relatively unchanged with the implementation of any of the proposed alternatives. The influence of proposed resource management decisions would not contribute to a substantial change to the local economic diversity of Grand or San Juan Counties.

## *4.3.13 SOIL AND WATER*

This section discusses impacts to soil and water resources from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning soil and water resources are described in Chapter 3.

For the purposes of this broad scale analysis, the primary indicator of impacts to soil and water resources is the amount of surface disturbance caused by management decisions made for other resources, particularly surface disturbance that occurs in highly erodible, reclamation-limited, or other sensitive soils. Another important indicator of impacts to water resources is a decrease in water quality conditions in perennial streams, including levels of suspended sediments, sediment bedload, dissolved solids, nutrient loads, bacteria counts, and water temperatures. Once these parameters exceed the State water quality standards at a site, the perennial stream is listed on the 303d list, which is the final indicator of poor water quality conditions.

Surface disturbance would impact soil and water resources to varying degrees, depending on the amount, location, and type of surface disturbance; the soil type; the time of year and the surface hydrology. Surface-disturbing activities that currently occur and that are expected to continue include grazing, oil and gas and mineral exploration and development and associated access routes, recreation and OHV use, and woodland harvest and other forms of vegetation removal and treatments.

All soils in the MPA are susceptible to accelerated erosion, but sensitive soils are more susceptible to impacts. Surface-disturbing activities could result in any of the following impacts under any alternative: increased soil erosion and sedimentation, decreased soil productivity, changes to quantity and quality (e.g., salinity) of surface water and groundwater, loss of vegetation or prevention of revegetation, or introduction of noxious weeds and the attendant increases in water use (e.g., tamarisk uses large quantities of groundwater) and/or changes in soil

BLM_0010459

chemistry and productivity. Analyses of impacts to soil and water resources in this section are based upon the factors contributing to site degradation and their inherent risks (Table 4.88), according to SSURGO soils mapping for the MPA.

Some sites are at risk of degradation because surface layer wind and/or water erodibility factors are high. Kw refers to the relative ease of water erosion. The slope factor accounts for the tendency of steeper slopes to erode more easily. The wind erodibility group refers to the relative ease of wind transport of surface materials.

Other sites are at risk of degradation due to reclamation-limiting factors (i.e., factors that prevent soils from being fully reclaimed following surface disturbance). See Table 4.88 for a list of these factors. In reclamation-limited soils, one or more factors make site reclamation difficult in semi-arid environments, including alkalinity, droughty soils, soil rooting depth, salinity, available water capacity, and sodium adsorption. Available water capacity refers to the amount of water available for plant uptake. Salinity refers to the amount of salt within soils that can be dissolved in surface waters. The sodium adsorption ratio refers to the amount of sodium that can be held by the soils and influence nutrient uptake. Rooting depth refers to the depth of soil, which influences how far plant roots can grow. Finally, alkalinity refers to soil pH, which generally limits plants' ability to establish when it is higher (i.e., more basic).

**Table 4.88. Factors Contributing to Site Degradation and Their Inherent Risks\***

| Factors | High Risk | Moderate Risk | Low Risk | Restrictive Feature |
|---|---|---|---|---|
| **Erodibility** | | | | |
| Kw Factor (surface layer) and Slope (sl)[1] | K ≥ .37, sl ≥ 10%; or K = .20-.36, sl > 30% | K = .20-.36, sl 10-30%; or K < .20, sl > 30% | K < .20, sl 10-30%; or sl < 10% | Water erosion hazard |
| Wind Erodibility Group (surface layer) | 1, 2 | 3, 4, 4L | 5–8 | Wind erosion hazard |
| **Limits on Reclamation** | | | | |
| Available Water Capacity (average to 40 inches; in/in)[2] | < 0.05 | 0.05–0.10 | 0.10 < | Droughty soils |
| Salinity3 (mmhos/cm; surface layer) | 16 < | 8–16 | < 8 | Excess salt |
| Sodium Adsorption Ratio4 (surface layer) | 13 < | 4–13 | < 4 | Excess sodium |
| Depth to Bedrock or Hardpan (inches) | < 10 | 10–20 | 20 < | Rooting depth |
| Alkalinity (pH of surface layer) | 9.0 ≤ | 7.8–8.9 | < 7.8 | Excess alkalinity |

\* Draft parameters developed by the BLM's National Science and Technology Center, SSURGO soils mapping.

[1] K Factor of surface layer adjusted for the effect of rock fragments. Slope is the maximum value for the range of slope of a soil component within a map unit.

[2] Maximum value for the range of available water capacity for the soil layer; inches of water per inches of soil.

[3] Maximum value for the range in soil salinity.

[4] Maximum value for the range in sodium adsorption ratio.

BLM_0010460

An important soil component often affected by surface disturbance is the biological soil crust, comprised of cyanobacteria, lichens and mosses. These crusts help to stabilize soils, reducing erosion and increasing soil productivity. Biological soil crusts have not been mapped and could occur in most of the soils within the MPA.

Throughout this analysis, highly erodible soils, reclamation-limited soils, and biological soil crusts are collectively referred to as sensitive soils. Biological soil crusts are discussed only qualitatively and are not included in the tables. However, any of the other soil parameters may overlap in any area, and so acreages presented in this analysis are not additive. For example, a particular acreage may have soils with shallow rooting depth as well as high wind erodibility. Acreages are also only approximate, due to limitations in soil mapping techniques and the planning area-wide scale of analysis.

Decisions regarding the management of resources other than soil and water in the MPA may affect soil and water resources either directly or indirectly. Those impacts may be beneficial or adverse, and are described below. Management decisions regarding air quality, paleontology, socioeconomics, special status species, vegetation, visual resources, wildlife resources, or woodland resources would result in negligible impacts to soil and water resources. The impacts would be negligible because protecting air quality, allowing recreational fossil collection and scientific study of fossils, improving the local and regional economy, protecting federally listed species and their habitat under the Endangered Species Act, improving and maintaining native vegetation communities, protecting scenic quality, permitting woodland harvesting, and maintaining habitat for non-listed wildlife species would not have surface-disturbance impacts on sensitive soils and soil crusts. Therefore, impacts from these management decisions were not analyzed. Travel management decisions are included in the discussion of recreation decisions.

### 4.3.13.1 IMPACTS OF FIRE MANAGEMENT DECISIONS ON SOIL AND WATER

Under all alternatives, fire management would follow the guidelines in the Utah Land-use Plan Amendment for Fire and Fuels Management (LUP; BLM 2005c). Under all alternatives, estimated fuels reduction treatments of 5,000–10,000 acres per year would be targeted. Because specific areas are not designated for treatment each year, the specific soils affected are unknown; therefore, a qualitative assessment of short- and long-term impacts follows. Individual fire management projects will be analyzed at the implementation level with site-specific NEPA documentation under all alternatives.

The impacts of fire management on soil and water resources would be adverse in the short term due to increased erosion and sedimentation and runoff from areas where vegetation is removed during prescribed burns or other fuels-reduction treatments. Fuels-reduction treatments would be designed to limit these impacts in areas with sensitive soils and to surface hydrology via implementation of emergency stabilization techniques described in the LUP, which would reclaim plant cover and reduce erosion and subsequent sedimentation of surface waters.

Long-term, beneficial impacts to soil and water resources would occur under all alternatives due to a reduction of the risk of catastrophic fires and the establishment of a more natural fire return interval. Impacts would take the form of reduced frequency and number of high-intensity fires fewer hydrophobic soils, increased infiltration, decreased flood magnitude, and less erosion and sedimentation. These fire management decisions would also lower the potential for long-term loss of vegetative cover and the attendant stream sedimentation and changes in surface

BLM_0010461

hydrology that can occur with increased runoff timing and intensity. A detailed analysis of these treatments' impacts to soil and water resources is included in the LUP's EA (BLM 2005c).

## 4.3.13.2 IMPACTS OF HEALTH AND SAFETY DECISIONS ON SOIL AND WATER

Under all alternatives, where Abandoned Mine Lands (AMLs) are rehabilitated, the management of hazardous materials would result in beneficial impacts to soil and water resources in the short and long term by reducing water quality-related threats to public health and/or the environment. The impacts would be identical under all alternatives.

## 4.3.13.3 IMPACTS OF LANDS AND REALTY DECISIONS ON SOIL AND WATER

Under all alternatives, surface disturbance within utility corridors would potentially impact sensitive soils. Impacts to total acres disturbed and acres of sensitive soils disturbed were analyzed by alternative. Because no particular data on the distribution of biological soil crusts are available, only a qualitative discussion is included. The widths of proposed utility corridors vary by alternative, and are analyzed by approximate total acreage of disturbed soils and disturbed sensitive soils contained within the corridors. Table 4.89 presents these acreages within proposed utility corridors under each alternative.

### 4.3.13.3.1 ALTERNATIVE A

Under Alternative A, utility corridors have the potential to impact up to 32,502 acres of soils and up to 25,700 acres of sensitive soils; see Table 4.89). Based on a comparison of these maximum acreages of total soils and sensitive soils across all alternatives, Alternative A represents the least adverse impact to total soils and sensitive soils due to surface disturbance associated with utility corridors.

### 4.3.13.3.2 ALTERNATIVE B

Under Alternative B, utility corridors have the potential to adversely impact up to 65,865 acres of total soils and up to 56,500 acres of sensitive soils (see Table 4.89). Impacts would take the forms described under Alternative A. This potential for adverse impacts is greater than Alternative A because there are more acres of designated corridors, but much less than the Proposed Plan and Alternative D because there are fewer acres in this alternative.

### 4.3.13.3.3 PROPOSED PLAN

Under the Proposed Plan, utility corridors have the potential to adversely impact up to 173,099 acres of total soils and up to 135,500 acres of sensitive soils (see Table 4.89). Impacts would take the forms described under Alternative A. This potential for adverse impacts is much greater than Alternatives A and B, and slightly less than Alternative D due to the total number of acres proposed within utility corridors.

BLM_0010462

**Table 4.89 Sensitive Soils in Designated Utility Corridors**

| Sensitive Soil | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Acres | % of MPA | Acres | % of MPA | Acres O | % of MPA | Acres | % of MPA |
| Wind-erodible | 650 | <0.1 | 1,200 | <0.1 | 3,700 | 0.1 | 3,700 | 0.2 |
| Water-erodible | 80 | 0.0 | 20 | 0.0 | 220 | <0.1 | 220 | <0.1 |
| Alkalinity | 8900 | .05 | 18,500 | 1.0 | 33,000 | 1.8 | 38,700 | 2.1 |
| Droughty | 13,000 | 0.7 | 24,700 | | 58,700 | 3.2 | 68,500 | 3.7 |
| Rooting Depth | 25,700 | 1.4 | 56,500 | 1.4 | 135,500 | 7.4 | 164,200 | 9.0 |
| Salinity | 9,800 | 0.5 | 19,500 | 3.1 | 37,400 | 2.0 | 45,750 | 2.5 |
| Sodium Adsorption | 9,800 | 0.5 | 19,500 | 1.0 | 37,700 | 2.0 | 46,500 | 2.5 |
| **Total Acreage**\*\* | **32,502** | | **65,865** | **1.0** | **173,099** | | **204,168** | |

\* Comprises Standard Conditions and Controlled Surface Use/Timing Limitations leasing categories.

\*\* Acreages of soil types are not additive, as some soils may exhibit more than one sensitive soil characteristic. Total acreage refers to ALL soils types, not just sensitive soils.

BLM_0010463

### 4.3.13.3.4 ALTERNATIVE D

Under Alternative D, utility corridors have the potential to adversely impact up to 204,158 acres of total soils and 164,200 acres of sensitive soils (see Table 4.89). Impacts would take the forms described under Alternative A. This potential for adverse impacts is the greatest under Alternative D since the most acres would be proposed in utility corridors in this alternative.

### 4.3.13.4 IMPACTS OF LIVESTOCK GRAZING MANAGEMENT DECISIONS ON SOIL AND WATER

Under all alternatives, the impacts of livestock grazing management decisions on soil and water resources would depend upon the number of acres of total and sensitive soils, acres of riparian zone, and the miles of perennial streams in each allotment that are available for grazing Depending on season and duration of use, grazing could have direct, adverse impacts on soil productivity and indirect, adverse impacts to water quality due to trampling of soils and loss of biological soil crusts and vegetative cover, especially in riparian areas. Changes in timing may affect the degree of these adverse impacts. For example, limiting grazing during the growing season allows stream banks to retain their vegetation, which protects them from erosion caused by high flows and results in fewer adverse impacts. In addition, if the grazing season on saline soils ends by March 2, the freeze-thaw cycle can partially restore soil infiltration rates and reduce compaction.

Development of Allotment Management Plans (AMPs) and use of grazing systems, as well as the monitoring of grazing for compliance with all rangeland standards, would be beneficial to soil and water resources. AMPs and grazing systems promote proper grazing practices and reduce impacts to soils; where monitoring showed site degradation, adaptive management of livestock use would result in appropriate changes in seasons of use and other grazing management would mitigate impacts to soil and water resources.

The acres of sensitive soils affected by each alternative are shown in Table 4.90. The alternatives vary season of use on certain sensitive soils, with varying impacts to these soils. Therefore, the discussion of impacts is qualitative and not quantitative.

Livestock grazing would be excluded from riparian areas in the following allotments: Between the Creeks, North Sand Flats, South Sand Flats, and Castle Valley. This would provide relatively beneficial impact to 47,247 acres of soils, 10,026 acres of sensitive soils and 1,122 acres of riparian habitat.

Livestock grazing is dispersed on BLM lands, lessening the impacts of soils compaction. Soil compaction is of greatest concern near water sources, on livestock trails and in other areas of livestock concentrations. Wet or moist conditions exacerbate soil compaction problems.

The earlier in the year the grazing season ends, the fewer impacts to soil and water resources. Spring rest is important to soils, as the freeze-thaw cycle improves soil permeability and infiltration rates and therefore overall soil productivity. With productive soils, erosion is minimized and impacts to water quality are reduced. With later grazing seasons, soils are compacted and the freeze-thaw cycle improvements are negated. Also, late spring grazing tends to utilize riparian areas more, and may reduce proper functioning conditions and impact water quality conditions.

BLM_0010464

**Table 4.90. Grazing Impacts on Erodible and Reclamation-limited Soils, by Alternative**

| Alternative | Status | Erodible | | Reclamation-limited | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Wind-erodible | Water-erodible | High Alkalinity | Droughty Soils | Rooting Depth | High Salinity | Sodium Adsorption |
| A | Acres Available | 39,050 | 13,150 | 106,200 | 619,200 | 838,100 | 119,900 | 139,750 |
| | Acres Unavailable | 700 | 2,800 | 550 | 71,450 | 22,950 | 250 | 250 |
| | % Available | 98.2 | 82.4 | 99.5 | 89.7 | 97.3 | 99.8 | 99.8 |
| B | Acres Available | 37,850 | 13,100 | 106,200 | 602,300 | 823,250 | 119,900 | 139,750 |
| | Acres Unavailable | 1,900 | 2,850 | 550 | 88,400 | 37,800 | 250 | 250 |
| | % Available | 95.2 | 82.1 | 99.5 | 87.2 | 95.6 | 99.8 | 99.8 |
| C | Acres Available | 38,750 | 13,450 | 106,200 | 624,100 | 836,650 | 119,900 | 139,750 |
| | Acres Unavailable | 1000 | 2,550 | 550 | 66,550 | 24,400 | 250 | 250 |
| | % Available | 97.5 | 84.1 | 99.5 | 90.4 | 97.2 | 99.8 | 99.8 |
| D | Acres Available | 38,950 | 15,750 | 106,200 | 651,050 | 846,500 | 119,900 | 139,750 |
| | Acres Unavailable | 850 | 250 | 550 | 39,600 | 14,550 | 250 | 250 |
| | % Available | 97.9 | 98.4 | 99.5 | 94.3 | 98.3 | 99.8 | 99.8 |

Other grazing decisions that would vary among alternatives are the proposed adjustment of grazing practices, and the development of AMPs. These decisions, when implemented, would generally reduce surface disturbance. Manipulation would limit the intensity and duration of grazing impacts, but not entirely avoid them. AMPs would result in benefits because they may utilize both grazing manipulation and some timing restrictions. Timing restrictions would protect soils from compaction during wet periods and from subsequent increases in surface runoff and erosion, and would generally be the most protective of soil and water resources.

### 4.3.13.4.1 ALTERNATIVE A

Management of grazing in saline soils would reduce impacts from saline soil erosion through grazing manipulations. This would reduce surface and vegetation disturbance on moderate to highly saline soils in the MPA, providing some protection for sensitive soils. These management actions would provide the lowest level of protection for sensitive soils of any of the alternatives.

About 126,907 acres would not be available for grazing. This is a beneficial impact to 126,907 acres of soils, 84,949 acres of sensitive soils, and 4,418 acres of riparian habitat. Impacts are also reduced in the Mill Creek and Castle Valley municipal watersheds and the Cottonwood-Diamond watershed (because of the exclusion of grazing in the Castle Valley, Cottonwood and Diamond allotments). This would reduce impacts to water resources and floodplains and would improve overall watershed. Removal of grazing in the Diamond, Cottonwood and Nash watersheds (within the Diamond, Cottonwood and Bogart allotments) would lead to increased stability of stream channels and improved riparian health. Erosion and sedimentation would decrease with the removal of grazing from these very steep allotments.

BLM_0010465

The 2003 catastrophic wildfire which severely burned the Diamond and Cottonwood allotments released erosion of loose alluvial sediments at an accelerated rate. The stream channels are very unstable, with excessive bank erosion. Beneficial impacts in these watersheds would be realized with the continued cessation of grazing. These impacts would include increased time for post-fire ecological recovery, decreased sedimentation and erosion, increased water quality conditions (water temperature, sediment loads and turbidity), increased aquatic habitat conditions and increased riparian health and post-fire recovery.

While short term adverse impacts consisting of vegetation removal and soil erosion could occur, range projects, including vegetation treatments, implemented to benefit livestock and other resource values would result in long term benefits to soil and water resources.

### 4.3.13.4.2 ALTERNATIVE B

Under Alternative B, management of grazing in saline soils would reduce impacts from saline soil erosion by considering adjustments in seasons of use on allotments with saline soils to minimize soil compaction. Grazing management decisions would protect sensitive soils most under Alternative B; they would result in:

- reduced soil compaction and erosion of saline soils, due to timing restrictions during critical months of the year; and
- improved soil productivity and water quality over the long term.

About 153,797 acres would not be available for grazing. This is a beneficial impact to 153,797 acres of soils, 106,752 acres of sensitive soils and 4,953 acres of riparian habitat. Impacts are also reduced in the Mill Creek and Castle Valley municipal watersheds and the Cottonwood-Diamond watershed (because of the exclusion of grazing in the Castle Valley, Cottonwood and Diamond allotments). This would reduce impacts to water resources and floodplains and would improve overall watershed health. Removal of grazing in the Diamond, Cottonwood and Nash watersheds (within the Diamond, Cottonwood and Bogart allotments) would lead to increased stability of stream channels and improved riparian health. Erosion and sedimentation would decrease with the removal of grazing from these very steep allotments.

The 2003 catastrophic wildfire which severely burned the Diamond and Cottonwood allotments released erosion of loose alluvial sediments at an accelerated rate. The stream channels are very unstable, with excessive bank erosion. Beneficial impacts in these watersheds would be realized with the continued cessation of grazing. These impacts would include increased time for post-fire ecological recovery, decreased sedimentation and erosion, increased water quality conditions (water temperature, sediment loads and turbidity), increased aquatic habitat conditions and increased riparian health and post-fire recovery.

Grazing in 4,422 acres of riparian resources and along 58 miles of perennial stream would be excluded. This would provide beneficial impacts to water resources and floodplain stability, and improve overall watershed health.

While short term adverse impacts consisting of vegetation removal and soil erosion could occur, range projects, including vegetation treatments, implemented to benefit resource values would result in long term benefits to soil and water resources. No other alternative would implement range projects solely to reduce soil compaction and erosion; therefore, of all the alternatives,

BLM_0010466

Alternative B represents the greatest, short- and long-term, beneficial impacts to soil and water resources.

### 4.3.13.4.3 PROPOSED PLAN

Under the Proposed Plan, management of grazing in saline soils would reduce impacts from saline soil erosion via AMPs. These protection measures would result in increased forage and improved soil productivity and water quality over the long term, due to implementation of vegetation treatments to benefit wildlife or watershed values. While short term adverse impacts consisting of vegetation removal and soil erosion could occur, range projects, including vegetation treatments, implemented to benefit livestock and other resource values would result in similar long term benefits to soil and water resources.

About 114,234 acres would not be available for grazing. This is a beneficial impact to 114,234 acres of soils, 80,178 acres of sensitive soils and 4,279 acres of riparian habitat. Impacts are also reduced in the Mill Creek and Castle Valley municipal watersheds and the Cottonwood-Diamond watershed (because of the exclusion of grazing in the Castle Valley, Cottonwood and Diamond allotments). This would reduce impacts to water resources and floodplains and would improve overall watershed health. Removal of grazing in the Diamond, Cottonwood and Nash watersheds (within the Diamond, Cottonwood and Bogart allotments) would lead to increased stability of stream channels and improved riparian health. Erosion and sedimentation would decrease with the removal of grazing from these very steep allotments.

The 2003 catastrophic wildfire which severely burned the Diamond and Cottonwood allotments released erosion of loose alluvial sediments at an accelerated rate. The stream channels are very unstable, with excessive bank erosion. Beneficial impacts in these watersheds would be realized with the continued cessation of grazing. These impacts would include increased time for post-fire ecological recovery, decreased sedimentation and erosion, increased water quality conditions (water temperature, sediment loads and turbidity), increased aquatic habitat conditions and increased riparian health and post-fire recovery.

The Proposed Plan would restrict grazing in 1,169 acres of riparian resources. This would provide beneficial impacts to water resources and floodplain stability, and improve overall watershed health along 28 miles of perennial stream.

Overall, the Proposed Plan would provide more protection for saline soils than Alternatives A and D, but less protection than Alternative B.

### 4.3.13.4.4 ALTERNATIVE D

About 52,217 acres would be unavailable for grazing. This is a beneficial impact to 52,217 acres of soils, 43,999 acres of sensitive soils and 1,177 acres of riparian habitat. Impacts from grazing are reduced in the Mill Creek and Castle Valley municipal watersheds (because of the exclusion of grazing in the Mill Creek and Castle Valley allotments). This would reduce impacts to water resources and floodplains and would improve overall watershed.

Under this alternative, the Cottonwood and Diamond watersheds (within the Cottonwood and Diamond allotments) would be available for grazing, with adverse impacts to these watersheds. These watersheds, which suffered a catastrophic fire in 2003, could be subject to increased erosion of loose alluvial sediments and sedimentation. Stream channel stability would decrease,

BLM_0010467

bank erosion would be excessive, and riparian health would deteriorate if grazing were to be reintroduced into these allotments. Adverse impacts in these watersheds would result with the reintroduction of grazing. These impacts would include decreased time for post-fire ecological recovery, increased sedimentation and erosion, decreased water quality conditions (water temperature, sediment loads and turbidity), decreased aquatic habitat conditions and decreased riparian health and post-fire recovery.

### 4.3.13.5 IMPACTS OF MINERAL RESOURCE DECISIONS ON SOIL AND WATER

The impacts of mineral resource decisions on soil and water resources were assessed by the acres of potential surface disturbance to total soils/sensitive soils under each alternative. Throughout this analysis, it was assumed that areas open to minerals development would be more likely be subjected to surface-disturbing activities, although the actual amount of future mineral development cannot be predicted.

As mentioned in Section 4.3.13, above, biological soil crusts, which have potential to be impacted by surface-disturbing activities, have potential to occur on any soils in the MPA. No quantitative data are available for these soils. Therefore, the quantitative analysis in this section applies only to reclamation-limited soils and highly erodible soils.

Under all alternatives, disturbance of total soils/sensitive soils associated with mineral resource development would contribute to adverse impacts to soil and water resources in general, including loss of vegetative cover and soil productivity and sedimentation of surface waters. In particular, noxious weed infestation resulting from disturbance of reclamation-limited soils would impact soil productivity and would cause changes in surface water hydrology. Biological soil crusts would potentially be crushed during surface disturbance and would no longer be protected from wind and/or water erosion. Damaged biological soil crusts would also take longer to be reclaimed after the completion of development, due to the long period of time needed to develop these crusts (BLM 2001d).

Under all alternatives, the acreage of total soils/sensitive soils in each BLM leasing category (i.e., Standard Conditions, Controlled Surface Use and/or Timing Limitations, No Surface Occupancy, and Closed, listed from greatest to least amount of surface disturbance) would quantify impacts to sensitive soils in terms of acres of surface disturbance. Generally, areas that are Closed to development or subject to No Surface Occupancy would experience little or no surface disturbance due to minerals development; thus, negligible or no adverse impacts to soil and water resources would occur. Areas of sensitive soils subject to Standard Conditions or conditions of Controlled Surface Use and/or Timing Limitations would experience short- and long-term impacts to soil and water resources from surface disturbance associated with minerals development. These short- and long-term adverse impacts would include destruction of biological soil crusts; erosion and subsequent sedimentation of surface waters; changes in surface hydrology and infiltration; and possible alteration of soil chemistry and/or productivity by noxious weeds.

Across all alternatives, over the life of the RMP, projected surface disturbance in the Big Flat – Hatch Point, Eastern Paradox, Lisbon Valley, Roan Cliffs, and Salt Wash RFD areas would be minimal and negligible because the level of development is expected to be low. However, the Bookcliffs and Greater Cisco RFD Areas have far greater acreages of sensitive soils with potential to be impacted by surface disturbance associated with minerals development (BLM

BLM_0010468

2005e; see Table 4.1). Analysis of the alternatives therefore focuses on the Bookcliffs and Greater Cisco RFD areas (Tables 4.91 and 4.92). Surface disturbance due to geophysical exploration also has the potential to impact soil and water resources under each alternative.

Approximate acreages of exploration-associated surface disturbance over the life of the plan were determined (though exact locations of exploration and disturbance cannot be determined), and a quantitative analysis of impacts to sensitive soils due to geophysical exploration is also provided under each alternative.

Finally, approximately 1,015 acres of surface disturbance are expected to occur due to the development and extraction of locatable, salable, and leasable (other than oil and gas) minerals under all alternatives (BLM 2005f). Although the locations of these surface disturbances relative to sensitive soils in the MPA are unknown, they would have a adverse impact on soil and water resources through soil disturbance, soil compaction, and mixing of soil horizons. They could potentially increase runoff and erosion as well, and lead to the invasion of noxious weeds.

### 4.3.13.5.1 ALTERNATIVE A

Under Alternative A, at least 41% of soils in the MPA with at least one limiting factor have the potential to be disturbed by mineral resource development (see Table 4.91). Adverse impacts resulting from this disturbance would take the form of degradation of soil productivity, erosion, and sedimentation of surface waters. Under Alternative A, mineral leasing decisions would result in the highest total surface disturbance of all the alternatives. Therefore, Alternative A represents the greatest potential for adverse impacts to sensitive soils, because erodible, reclamation-limited, and biological crusted soils are most likely to be open to mineral development under this alternative (see Table 4.91).

Within the Book Cliffs and Greater Cisco RFD areas (approximately 14.5% of the MPA; see Table 4.92), more surface disturbance is expected than under Alternative B. A total of 300 wells would be installed in these RFD areas over the life of the plan, resulting in surface disturbance on 4,504 acres and impacting soil and water resources in the short and long term. Surface occupancy for oil and gas leasing would be allowed on a similar acreage of reclamation-limited soils to Alternative D and the Proposed Plan.

BLM_0010469

**Table 4.91. Sensitive Soils with Potential to be Impacted by Oil and Gas Leasing, All RFD Areas**

| Alternative | Status | Wind-erodible | Water-erodible | Alkalinity | Droughty | Rooting Depth | Salinity | Sodium Adsorption |
|---|---|---|---|---|---|---|---|---|
| Alternative A | Acres Open[1] | 36,800 | 9,700 | 106,600 | 519,800 | 743,250 | 120,000 | 129,950 |
| | Acres Closed[2] | 2,950 | 6,200 | 50 | 169,900 | 116,700 | 50 | 10,000 |
| | % of MPA Open | 2.0 | 0.5 | 6.0 | 29.0 | 41.0 | 7.0 | 7.0 |
| Alternative B | Acres Open[1] | 23,300 | 4,450 | 106,200 | 282,650 | 470,300 | 104,600 | 106,650 |
| | Acres Closed[2] | 16,400 | 11,500 | 500 | 407,700 | 390,700 | 15,500 | 33,400 |
| | % of MPA Open | 1.3 | 0.2 | 6.0 | 16.0 | 26.0 | 6.0 | 6.0 |
| PROPOSED PLAN | Acres Open[1] | 32,000 | 6,700 | 106,200 | 397,100 | 691,450 | 120,100 | 130,500 |
| | Acres Closed[2] | 7,800 | 9,200 | 500 | 293,200 | 169,500 | 0 | 9,500 |
| | % of MPA Open | 2.0 | 0.4 | 6.0 | 22.0 | 38.0 | 7.0 | 7.0 |
| Alternative D | Acres Open[1] | 34,800 | 9,300 | 106,200 | 492,750 | 732,500 | 120,100 | 130,500 |
| | Acres Closed[2] | 4,900 | 6,700 | 500 | 197,900 | 128,550 | 0 | 9,500 |
| | % of MPA Open | 2.0 | 0.5 | 6.0 | 27.0 | 40.0 | 7.0 | 7.0 |

[1] Comprises Standard Conditions and Controlled Surface Use/Timing Limitations leasing categories.
[2] Comprises No Surface Occupancy and Closed leasing categories.

BLM_0010470

**Table 4.92. Oil and Gas Leasing Impacts on Erodible and Reclamation-limited Soils in the Bookcliffs and Greater Cisco RFD Areas**

| Alternative | Status | Bookcliffs RFD Area Only | | | Greater Cisco RFD Area Only | | |
|---|---|---|---|---|---|---|---|
| | | Wind-erodible | Water-erodible | Reclamation-limited | Wind-erodible | Water-erodible | Reclamation-limited |
| Alternative A | Acres Open[1] | 0 | 3,300 | 74,000 | 2,200 | 430 | 189,400 |
| | Acres Closed[2] | 0 | 2,950 | 22,200 | 200 | 200 | 7,500 |
| | % of MPA Open | 0.0 | <1.0 | 4.1 | <1.0 | <1.0 | 10.4 |
| Alternative B | Acres Open[1] | 0 | 2,600 | 53,600 | 1,900 | 10 | 82,600 |
| | Acres Closed[2] | 0 | 3,700 | 42,900 | 500 | 630 | 114,400 |
| | % of MPA Open | 0.0 | <1.0 | 3.0 | <1.0 | <1.0 | 4.5 |
| PROPOSED PLAN | Acres Open[1] | 0 | 3,200 | 21,600 | 200 | 400 | 190,350 |
| | Acres Closed[2] | 0 | 3,050 | 74,900 | 2,200 | 200 | 6,700 |
| | % of MPA Open | 0.0 | <1.0 | 4.1 | <1.0 | <1.0 | 10.5 |
| Alternative D | Acres Open[1] | 0 | 3,300 | 75,300 | 2,200 | 200 | 190,400 |
| | Acres Closed[2] | 0 | 2,900 | 21,200 | 200 | 400 | 6,400 |
| | % of MPA Open | 0.0 | <1.0 | 4.1 | <1.0 | <1.0 | 10.5 |

[1] Comprises Standard Conditions and Controlled Surface Use/Timing Limitations leasing categories.
[2] Comprises No Surface Occupancy and Closed leasing categories.

BLM_0010471

Under Alternative A, geophysical exploration has the potential to disturb 2,397 acres within the MPA, any portion of which may be sensitive soils. Impacts, if they occur, would take the forms described above.

Overall, because it represents the highest acreage of sensitive soils Open to mineral resource development (and surface disturbance) of all the alternatives, Alternative A is most likely to adversely impact sensitive soils on a planning area-wide level. Assuming all alternatives adversely impact sensitive soils, Alternative A would impact the same number of acres as Alternatives C and D also resulting in the greatest acreage of adverse impacts to sensitive soils.

### 4.3.13.5.2 ALTERNATIVE B

Under Alternative B, at least 26% of soils in the MPA with at least one limiting factor have the potential to be disturbed by mineral resource development (see Table 4.91). Adverse impacts resulting from this disturbance would take the forms described under Alternative A. Alternative B is 15% less than Alternative A and represents the least potential for adverse impacts to sensitive soils, because erodible, reclamation-limited, and biological crusted soils are least likely to be open to mineral development under this alternative (see Table 4.91).

Under Alternative B, surface occupancy for oil and gas leasing would be allowed on reclamation-limited soils within the Book Cliffs and Greater Cisco RFD areas on approximately 7.5% of the MPA, which is approximately 50% fewer acres of reclamation-limited soils open to surface disturbance than under Alternative A. A total of 149 wells would be installed in these two RFD areas over the life of the plan resulting in surface-disturbance on 2,235 acres, which would result in approximately 50% less surface disturbance than Alternative A.

Under Alternative B, geophysical exploration has the potential to disturb 1,404 acres within the MPA, any portion of which may be sensitive soils. Impacts would take the forms described under Alternative A. Geophysical exploration under Alternative B is much less likely to adversely impact sensitive soils than it is under Alternative A.

Based on the acreages detailed in Tables 4.81 and 4.82, of all the alternatives, Alternative B would have the least adverse impacts to soil and water resources due to mineral resource development decisions.

### 4.3.13.5.3 PROPOSED PLAN

Under the Proposed Plan, at least 38% of soils in the MPA with at least one limiting factor have the potential to be disturbed by mineral resource development (see Table 4.91). Adverse impacts resulting from this disturbance would take the forms described under Alternative A. The Proposed Plan, only 3% less than Alternative A, closely resembles that alternative as well as Alternative D, in the magnitude of impacts to sensitive soils from oil and gas leasing decisions (see Table 4.92).

In addition, slightly fewer acres of reclamation-limited soils within the Book Cliffs and Greater Cisco RFD areas would be open to surface occupancy (approximately 14.5% of the MPA). The impacts from these activities would be extremely similar to other alternatives other than differences in the areas over which they would occur.

Under the Proposed Plan, geophysical exploration has the potential to disturb 2,072 acres within the MPA, any portion of which may be sensitive soils. Impacts would take the forms described

BLM_0010472

under Alternative A. Geophysical exploration under the Proposed Plan is somewhat less likely to adversely impact sensitive soils than Alternative A, but more likely than Alternative B.

### 4.3.13.5.4 ALTERNATIVE D

Under Alternative D, at least 40% of soils in the MPA with at least one limiting factor have the potential to be disturbed by mineral resource development (see Table 4.91). Adverse impacts resulting from this disturbance would take the forms described under Alternative A. Alternative D, being only 1% less than Alternative A, most closely resembles Alternative A in the magnitude of impacts to sensitive soils from oil and gas leasing decisions (see Table 4.91), but also closely resembles the Proposed Plan.

This is true for the amount of reclamation-limited soils within the Book Cliffs and Greater Cisco RFD areas open to surface occupancy (approximately 14.5% of the MPA) as well

Under Alternative D, geophysical exploration has the potential to impact 2,329 acres, any portion of which may be sensitive soils. This would result in the same amount of surface disturbance as under Alternative A and would take the forms described under Alternative A.

### 4.3.13.6 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS RESOURCE DECISIONS ON SOIL AND WATER

Management of lands that have wilderness characteristics varies by alternative. Generally, limits on surface disturbance and motorized recreation on lands with wilderness characteristics would protect soil and water resources from adverse impacts.

### 4.3.13.6.1 ALTERNATIVE A AND ALTERNATIVE D

There are no management decisions regarding non-WSA lands with wilderness characteristics under Alternatives A and D. Therefore, no additional protection for soil and water resources would occur under these alternatives.

### 4.3.13.6.2 ALTERNATIVE B

Under Alternative B, management decisions regarding non-WSA lands with wilderness characteristics would occur on 266,485 acres. One such decision would prohibit surface-disturbing activities on the entire 266,485 acres, any portion of which may be sensitive soils. Of all the action alternatives, Alternative B would manage the most acres to maintain wilderness characteristics. Management under Alternative B would therefore provide the most protection for sensitive soils against adverse impacts due to surface disturbance and motorized recreation.

### 4.3.13.6.3 PROPOSED PLAN

Under the Proposed Plan, management decisions regarding non-WSA lands with wilderness characteristics would occur on 47,761 acres. One such decision would prohibit surface-disturbing activities on the entire 47,761 acres. This restrictions applies on fewer acres than Alternative B, but more than Alternatives A and D. Management under the Proposed Plan would therefore potentially result in fewer impacts to soil and water resources than would Alternatives A and D.

BLM_0010473

### 4.3.13.7 IMPACTS OF RECREATION AND TRAVEL MANAGEMENT DECISIONS ON SOIL AND WATER

Under all alternatives, recreation and travel management decisions—primarily regarding OHV use—would affect soils, biological soil crusts, and water quality. Surface disturbance from OHV use would increase soil erosion, decrease soil productivity and infiltration rates, and may decrease water quality. Disturbance levels would be related to the amount of surface disturbance, soil type and slope, and proximity to water resources. Limiting OHV use to designated routes and closing some areas would minimize or eliminate adverse impacts to soil and water resources.

Where proposed under the alternatives, control of human waste through installation of vault toilets in high-use recreation areas generally would benefit water quality by reducing E. coli contamination and nutrient-loading of surface waters. Designation of camping areas generally would limit the surface disturbance that results from dispersed camping and unofficial fire pits and, thus, would limit adverse impacts to soils.

Under all alternatives, the proper management of designated trails (e.g., installing signage, enforcing closures, proper trail design on slopes, etc.) would limit impact to soil and water resources. However, the alternatives differ in the total acres of soils and the number of acres of sensitive soils as well as miles of perennial streams and acres of riparian resources that are open or closed to OHVs or in which OHVs are limited to designated routes. Because closures and limiting OHVs to designated routes both generally result in no additional surface disturbance that impacts soil and water resources, these two OHV use categories were analyzed together for each alternative (Table 4.93).

Under all alternatives, SRMAs would be established to manage recreational use and to mitigate impacts caused by this use, such as uncontrolled camping, parking, and other activities. The greater the proportion of public lands managed as SRMAs, the greater the ability to control the impacts resulting from recreation use, resulting in fewer impacts to soil and water resources. See Table 4.94 for acreage of SRMAs by alternative. In addition, river recreation user numbers differ by alternative, as specified in Chapter 2, Table 2.1. The user numbers for SRMAs, as specified in Table 2.1, are the basis for the analysis of impacts to soil and water resources resulting from foot, non-motorized, and motorized traffic and disturbance; fire; the potential for spread of noxious weeds; and potential for contamination in general.

BLM_0010474

**Table 4.93. Sensitive Soils with Potential to be Impacted by OHV Use, by Alternative**

| Alternative | Status | Wind-erodible | Water-erodible | Alkalinity | Droughty | Rooting Depth | Salinity | Sodium Adsorption |
|---|---|---|---|---|---|---|---|---|
| Alternative A | Acres Open | 11,300 | 8,000 | 10,450 | 213,900 | 262,900 | 11,100 | 19,100 |
| | Acres Closed or Limited | 28,500 | 7,900 | 96,300 | 476,500 | 598,000 | 109,100 | 120,900 |
| | % of MPA Open | 0.6 | 0.4 | 0.6 | 12.0 | 14.0 | 0.6 | 1.0 |
| Alternative B | Acres Open | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Acres Closed or Limited | 39,750 | 16,000 | 106,700 | 690,700 | 861,000 | 120,100 | 140,000 |
| | % of MPA Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| PROPOSED PLAN | Acres Open | 210 | 0 | 0 | 370 | 1,610 | 0 | 0 |
| | Acres Closed or Limited | 39,500 | 16,000 | 106,700 | 690,300 | 859,400 | 120,100 | 140,000 |
| | % of MPA Open | <0.1 | 0.0 | 0.0 | <0.1 | <0.1 | 0.0 | 0.0 |
| Alternative D | Acres Open | 270 | 0 | 0 | 1,150 | 2,700 | 0 | 0 |
| | Acres Closed or Limited | 39,500 | 16,000 | 106,700 | 689,500 | 858,300 | 120,100 | 140,000 |
| | % of MPA Open | <0.1 | 0.0 | 0.0 | <0.1 | 0.1 | 0.0 | 0.0 |

BLM_0010475

**Table 4.94. SRMA Acreage, by Alternative**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Acreage of SRMAs | 141,234 acres | 976,173 acres | 658,642 acres | 277,471 acres |

A recent United States Geologic Survey (USGS 2007) synopsis of relevant literature summarizes numerous studies of the impacts of OHV use on soil and water resources. The USGS concludes that the research reviewed found important effects of OHV activities on the functioning of soil and water resources including soil compaction, diminished water infiltration, diminished presence and impaired function of soil stabilizers (biotic and abiotic crusts, desert pavement), and accelerated erosion rates. Compacted soil inhibits infiltration of precipitation. In turn, soil moisture available to vegetation is diminished, volumes and velocities of precipitation runoff increase, and soil erosion accelerates, leading to the formation of gullies and other surface changes. Additionally, soil compaction may inhibit root growth among plants, in which case organic matter, litter, soil fertility, and vegetative cover are diminished, further exacerbating the soil's susceptibility to erosion. Where biotic and chemical crusts or other soil stabilizers are disturbed or destroyed, soil erosion from water and wind may increase beyond rates found in undisturbed sites with similar soils and conditions; nutrient-cycling processes also are likely to be disrupted, potentially leading to declines in soil fertility. The USGS study is summarized in Appendix G.

### 4.3.13.7.1 ALTERNATIVE A

Under Alternative A, a minimum of 620,212 acres of total soils and 262,000 acres of sensitive soils would be open to cross country OHV travel and associated surface disturbance due to recreation and travel management decisions. Twenty miles of perennial stream and 2,100 acres of riparian resources would be open to OHV travel and associated surface disturbance. If disturbed, these soils would be at risk of erosion and compaction, and water quality could decline. The numbers of acres (and the percentage of all BLM lands) open to cross country OHV use, and the potential for adverse impacts to soil and water resources, is by far the greatest under Alternative A.

Under Alternative A, most of the MPA would be managed as a general Extensive Recreation Management Area (ERMA) rather than as SRMAs, and user numbers would remain at current levels—the highest levels of all alternatives. The least amount of area would be established as SRMAs in Alternative A, and thus impacts to soil and water resources from unmanaged recreation use would continue at the highest rate of any of the alternatives. Recreation decisions under Alternative A would also provide the lowest level of management for recreation resources of any alternative and would, therefore, result in the highest level of adverse impacts to soil and water resources from human-caused surface disturbance, including fire risk and the spread of noxious weeds.

Under Alternative A, dispersed camping would be allowed at the Kane Creek Crossing. This is an adverse impact to soil and water resources in a major floodplain and stream corridor, and a public health and safety risk. Camping in the Bartlett/Tusher/Ten Mile area would also not be closed. This would provide an adverse impact to soil and water resources, because unrestricted camping leads to soil compaction and increased erosion.

BLM_0010476

There are 960.3 miles of route identified as having possible soils conflicts.

### 4.3.13.7.2 ALTERNATIVE B

Under Alternative B, the largest amount of area would be established as SRMAs, resulting in the greatest control of recreation use of any alternative. This would result in mitigating the greatest amount of potential impacts to soil and water resources from unmanaged recreation use, In addition, limitations on user numbers on the Colorado and Dolores Rivers within SRMAs would be greater than under any other alternative. No open OHV use areas would be designated (see Table 4.93), and camping would be limited to designated areas across much of the MPA, providing the greatest level of protection for soil and water resources of all the alternatives.

The installation of vault toilets in areas of high visitor use would limit adverse impacts to soil and water resources in these areas by keeping the human waste flow from entering the soil and water.

The Bookcliffs SRMA would provide non-mechanized recreation opportunities, with no new motorized routes and no motorized permits, which provides a relatively beneficial impact to soil and water resources in an area with a high density of steep slopes. The Canyon Rims SRMA would provide non-mechanized recreation opportunities, with no new motorized routes. This is a beneficial impact to soil and water resources. The Colorado Riverway SRMA would prohibit camping at the Kane Creek Crossing area. This would provide a relatively beneficial impact in this major floodplain and stream corridor, as well as protect public health and safety. Camping in the Barlett/Tusher/Ten Mile area of the Labyrinth Rims/Gemini Bridges SRMA would be closed, providing a relatively beneficial impact to soil and water resources because the soil compaction and erosion that accompany dispersed camping would not occur.

There are 960.3 miles of designated routes with possible soils conflicts. In Alternative B, 337.6 miles of these routes are not identified for travel.

### 4.3.13.7.3 PROPOSED PLAN

Under the Proposed Plan, the second largest amount of area would be established as SRMAs, resulting in the second greatest degree of control of potential impacts to soil and watershed. Under the Proposed Plan, more users would be allowed on the Colorado and Dolores Rivers within SRMAs than under Alternative B, but fewer than would be allowed under Alternative A, and Alternative D. Impacts from recreational users would take the forms described under Alternative A, but to lesser degree.

Under the Proposed Plan, all but 1,866 acres of soils be closed or limited to OHV use. This alternative represents fewer protection benefits to soil and water resources than Alternative B, but many more protection benefits than Alternatives A and D (see Table 4.93).

The Canyon Rims SRMA would provide non-mechanized recreation opportunities, with no new motorized routes. This is a beneficial impact to soil and water resources. The Colorado Riverway SRMA would provide responsible camping opportunities at the Kane Creek Crossing area. This would decrease adverse impacts in a major floodplain and stream corridor. Camping in the Bartlett/Tusher/Ten Mile area of the Labyrinth Rims/Gemini Bridges SRMA would not be closed, although it would be restricted to designated sites or campgrounds. This would provide a

BLM_0010477

limited adverse impact to soil and water resources. This alternative is more beneficial than Alternatives A and D but less protective than Alternative B.

There are 960.3 miles of designated routes with possible soils conflicts. In the Proposed Plan, 167.5 miles of these routes are not identified for travel.

### 4.3.13.7.4 ALTERNATIVE D

Under Alternative D, fewer acres of SRMA would be established, and more impacts to soil and water resources would result from unmanaged recreation use. This is particularly true because the Labyrinth-Gemini area, an area of very high recreation use, would not be managed as an SRMA and impacts to soils and vegetation from unmanaged recreation use would result. In addition, more users—including users of the Colorado and Dolores Rivers—would be allowed than under Alternative B and the Proposed Plan, but less than under Alternative A.

Under Alternative D, all but 3,096 acres of soils would be closed or limited to OHV use This alternative represents fewer protection benefits to soil and water resources than Alternative B and the Proposed Plan, but many more protection benefits than Alternative A (see Table 4.93). No vault toilets would be installed in high visitor use areas, and camping would not be limited to designated sites, except in a few specific areas, resulting in less protection than Alternative B and the Proposed Plan provide.

The Colorado Riverway SRMA would promote responsible camping opportunities at the Kane Creek Crossing area. This would decrease adverse impacts in a major floodplain. Camping in the Bartlett/Tusher/Ten Mile area would not be closed. This would result in adverse impacts to soil and water resources.

Overall, Alternative D would provide more protection for soil and water resources through recreation management than Alternative A provides, and far less protection than Alternative B and the Proposed Plan would provide.

There are 960.3 miles of designated routes with possible soils conflicts. In Alternative D, 51.0 miles of these routes are not identified for travel.

### 4.3.13.8 IMPACTS OF RIPARIAN MANAGEMENT DECISIONS ON SOIL AND WATER

Under all action alternatives, no surface disturbance would be allowed within 100 meters of riparian areas, perennial streams and springs, public water reserves, and 100-year floodplains. This would protect soils by reducing erosion and subsequent sedimentation, stabilizing stream banks and floodplains, and improving water quality. Healthy riparian resources are integral to good water resource conditions. Impacts to riparian resources would affect water quality and quantities.

The development and implementation of Watershed Management Plans (WMPs) would benefit soil and water resources because they would emphasize integration of soil and water resource management within basins for which plans are developed. All impacts associated with WMPs are described qualitatively. Generally, the alternatives differ in their development and implementation of the WMPs.

Limitations on livestock grazing in riparian areas would relatively benefit soil and water resources for the reasons described in Section 4.3.13.4.

BLM_0010478

#### 4.3.13.8.1 ALTERNATIVE A AND D

Alternatives A and D do not direct the development or implementation of any WMPs. Therefore, these alternatives would not provide any of the benefits of these plans to soil and water resources. Livestock grazing would be managed less protectively of riparian resources under Alternatives A and D than under the other alternatives, and would therefore have a greater adverse impact.

#### 4.3.13.8.2 ALTERNATIVE B

Of all the alternatives, Alternative B would develop and implement WMPs in the greatest number of watersheds, including Mill Creek, Ten Mile Wash, Kane Springs, White Wash, Professor Creek, Negro Bill Canyon, Cottonwood/Diamond, Spring Canyon, Red Wash, Green River, Colorado River, Onion Creek, and Westwater Creek. Alternative B therefore represents the most beneficial impacts to soil and water resources of the forms described under Alternative A because specific management direction would be provided for these watersheds.

Grazing would also be excluded from the following areas: Ten Mile from Dripping Springs to the Green River, Day Canyon, Mill Creek, Seven Mile Canyon, East Coyote, Lower Gray Canyon of the Green River, Kane Springs and Hatch Wash. This is a relatively beneficial impact to 4,422 acres of soils, and 28 miles of perennial stream.

Alternative B would therefore achieve the greatest reduction of adverse impacts to soil and water resources.

#### 4.3.13.8.3 PROPOSED PLAN

The Proposed Plan would develop and implement WMPs in fewer watersheds than under Alternative B, but more than under Alternatives A and D. WMPs would be developed and implemented in Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood/Diamond, and Onion Creek. The Proposed Plan therefore represents fewer beneficial impacts to soil and water resources than Alternative B, but more beneficial impacts than Alternatives A and D. Impacts would take the forms described under Alternative A.

Grazing would also be restricted in the following areas: Ten Mile from Dripping Springs to the Green River, Day Canyon, Mill Creek, Seven Mile Canyon, and East Coyote, This is a relatively beneficial impact to 1,169 acres of soils, and 28 miles of perennial stream.

Livestock grazing would be actively managed on more acres to reduce adverse impacts to soil and water resources, as compared to Alternatives A and D, and on fewer acres as compared to Alternative B. The Proposed Plan therefore provides an intermediate level of protection for soil and water resources.

#### 4.3.13.9 IMPACTS OF SOIL AND WATER MANAGEMENT DECISIONS ON SOIL AND WATER RESOURCES

#### 4.3.13.9.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, the BLM would comply with all laws to protect municipal watersheds and the watersheds of any public or private water supply. The BLM would continue to manage soil

BLM_0010479

and water resources in accordance with Executive Order 11988, the Clean Water Act, and the Endangered Species Act. These actions would have a beneficial impact of unknown magnitude on soil and water resources. BLM would also coordinate with UDOGM to remediate abandoned mine lands. The beneficial impacts of this remediation upon soil and water resources are discussed in Section 4.3.13.2.

### 4.3.13.9.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

The BLM would manage soil and water resources in accordance with Utah BLM's Rangeland Health Standards and Guidelines for Grazing and Recreation. This would maintain or improve soil and water conditions, and therefore would provide a beneficial impact common to all action alternatives.

The following management decisions would result in beneficial impacts to soil and water resources by protecting and restoring watershed health, healthy soils and good water quality conditions:

- Allow no surface disturbance within public water reserves, 100-year floodplains, or within 100 meters of natural springs or perennial streams whenever possible, and within 100 m of riparian zones.
- Continue to manage Mill Creek Planning Area in accordance with the Mill Creek Management Plan to provide relatively beneficial impacts on 1,164 acres of soils and 18 miles of perennial streams.

The following management decisions would reduce the accelerated erosion and other impacts associated with surface-disturbing activities. This can be considered a relative beneficial impact to soil and water resources.

- BLM management would follow TMDL recommendations in Mill Creek and Onion Creek watersheds, and any other impaired watersheds as defined by the State of Utah and the current 303d list of impaired waters. These recommendations refer to improving water quality conditions to meet state standards.
- Any proposed surface-disturbing activities, especially those located in sensitive soils (see Table 4.88) would incorporate BMPs and other mitigation measures to minimize soil erosion and maintain soil stability.
- Continue to require the Grand County Water Conservancy District to leave 3 cfs of stream flow in Mill Creek, downstream of the Sheley Tunnel diversion structure, providing a relatively beneficial impact to 6 miles of perennial streams.
- Apply a timing limitation to oil and gas leasing and other surface-disturbing activity prohibiting activities on moderate to highly saline soils (313,800 acres) from December 1 to March 31. This restriction includes road construction and traffic on existing roads associated with drilling operations.
- Erosion control practices for slopes greater than 20% would follow Utah's Nonpoint Source Management Plan (UDEQ 2001). A controlled surface use stipulation would be applied to oil and gas leases and other surface-disturbing activities on slopes in the Bookcliffs that are greater than 30% from November 1 to April 30.

BLM_0010480

- Guidelines from Technical Reference 1730-2 (BLM 2001d, as revised) regarding biological soil crusts would be applied or followed where feasible, These decisions would reduce impacts to biological soil crusts and would constitute a beneficial impact.
- Pipeline crossings would be constructed as recommended in the Guidance for Pipeline Crossings (Appendix H).
- The limitation of new OHV routes saline soils (not in the proposed travel plan) would beneficially impact soil and water resources by not accelerating the natural rate of erosion, therefore providing a relative beneficial impact to soil and water resources.

### 4.3.13.9.3 IMPACTS VARYING BY ALTERNATIVE

The primary municipal watersheds of concern in the MPA include the Castle Valley watershed aquifer system (a sole-source, unconfined surficial aquifer), the Thompson watershed, and the Mill Creek watersheds. These watershed sources provide drinking water for the towns of Castle Valley, Thompson and Moab respectively, as well as for the surrounding inhabited areas. Surface disturbance could lead to contamination of groundwater and surface waters by sediment and hazardous materials. Changes in surface hydrology due to road building would also have adverse impacts to these watershed resources, where rates of infiltration peak runoff would increase, causing lower rates of infiltration, increased peak runoff and higher rates of soil erosion. Generally, the elimination of surface-disturbing activities upstream of public water reserves would reduce adverse impacts to soil and water resources.

Under some alternatives, road construction and traffic associated with drilling operations would be prohibited seasonally in areas with saline soils underlain by Mancos Shale when wet soils are most susceptible to impacts. These timing limitations would protect soil and water resources by reducing accelerated rates of erosion preventing erosion of the moderate to highly saline soils associated with the Mancos Shale and reducing subsequent contamination of water resources.

Development of Allotment Management Plans (AMPs) and use of grazing systems would be beneficial to soil and water resources. The areas prioritized for AMPs vary by alternative, based on soil and water resource concerns. Because the development of AMPs is also proposed as a Livestock Management action, these impacts are discussed in Section 4.3.13.4.

The development of Watershed Management Plans (WMPs) would also be beneficial to soil and water resources. Because the development of WMPs is also proposed as Riparian Management, these impacts are discussed in Section 4.3.13.8.

### 4.3.13.9.3.1 Alternative A

Alternative A does not include specific decisions regarding oil and gas leasing or other surface-disturbing activities in the Castle Valley aquifer or the Mill Creek municipal watersheds. These water sources would therefore be subject to impacts such as surface disturbance and contamination of shallow groundwater by well drilling and changes in surface hydrology due to road building and access to lease areas, which would have and adverse impact on soil and water resources in these watersheds. (The Castle Valley municipal watershed totals 10,321 BLM acres; the Mill Creek municipal watershed not encompassed by the Mill Creek WSA totals 9,667 BLM acres.)

BLM_0010481

Case No. 1:20-cv-02484-MSK   Document 29-3   filed 04/27/21   USDC Colorado   pg 286 of 293

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
                                   *4.3.13 Soils and Water Resources*

There is no restriction on new motorcycle routes on saline soils in Alternative A. This would have an adverse impact on soil and water resources because soil compaction and erosion would result.

### 4.3.13.9.3.2 Alternative B and the Proposed Plan

Alternative B would close the Castle Valley and Mill Creek municipal watersheds to oil and gas leasing and other surface-disturbing activities. These closures would protect these surface waters and shallow aquifers from potential impacts such as contamination with drilling fluids and sedimentation within these watersheds, and impacts described under Alternative A would be prevented under Alternatives B. This alternative would provide more protection for these watersheds than does Alternative A.

The Proposed Plan would implement a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities within the Castle Valley and Mill Creek municipal watersheds. This limitation would protect these surface waters and shallow aquifers from potential impacts such as contamination with drilling fluids and sedimentation within these watersheds, and impacts described under Alternative A would be prevented under the Proposed Plan.

Under Alternative B and the Proposed Plan, a timing limitation would be applied to 330,142 acres of certain sensitive soils (saline or highly wind erodible) prohibiting surface-disturbing activities from December 1 to May 31. Additionally, road construction and use would be limited in these areas from December 1 to May 31, thus reducing short- and long-term, adverse impacts to soil and water resources. Alternative B and the Proposed Plan therefore provide more protection to sensitive soils, by area, than Alternatives A and D. Overall, Alternative B and the Proposed Plan would provide the greatest protection for soil and water resources.

### 4.3.13.9.3.3 Alternative D

Impacts regarding the Castle Valley and the Mill Creek municipal watersheds would be the same as under Alternative A.

Under Alternative D, no timing limitations would be applied to surface disturbance of moderately and highly saline soils. Therefore, Alternative D would result in adverse impacts to saline soil and water quality compared to Alternative A and would be the most adverse of all the alternatives.

### 4.3.13.10 IMPACTS OF SPECIAL DESIGNATION DECISIONS ON SOIL AND WATER

Although ACEC designation alone does not necessarily provide protection, special management attention designed for each ACEC often limits surface-disturbing activities, thereby protecting soil and water resources. Protections associated with ACEC designation that would affect soil and water resources include no surface occupancy stipulations, travel limitations, and grazing restrictions. Because of the complexity of the proposed ACECs' management criteria, their effects are addressed more generally under each of the alternatives.

Under all alternatives, the management of Wilderness Study Areas (WSAs) would be consistent with the BLM's Interim Management Policy (1995), which does not allow any motorized use or surface disturbance within WSAs. Thus, no impacts to soils or water resources would occur

BLM_0010482

within these areas under any alternative. Transportation and OHV management within WSAs varies between alternatives. These impacts are included in the discussion in Section 4.3.13.7 (Impacts of Recreation and Travel Management on Soil and Water).

Under all alternatives, designating specific river segments as Wild under the Wild and Scenic Rivers Act would uniformly, beneficially impact soil and water resources, as it would protect sensitive soils. The designation of river segments as Wild would limit surface-disturbing activities within 1/4 mile of those river segments, which in turn would limit potential decreases in soil productivity and potential increases in sedimentation of surface waters. These protections (where proposed) would overlap riparian management prescriptions preventing surface disturbance within 100 meters of riparian areas, springs, and 100-year floodplains.

The total number of river miles designated as Wild varies by alternative, as does the total number of acres of sensitive soils adjacent to those river segments (Table 4.95).

**Table 4.95. Acres of Sensitive Soils adjacent to River Segments Eligible for WSR Designation as Wild, by Alternative**

| Limiting Factor | Alt. A | Alt. B | | PROPOSED PLAN | | Alt. D | |
|---|---|---|---|---|---|---|---|
| | Acres | Acres | ± Compared to Alternative A | Acres | ± Compared to Alternative A | Acres | ± Compared to Alternative A |
| Wind-erodible | 0 | 3,100 | +3,100 | 2,700 | +2,700 | 0 | 0 |
| Water-erodible | 300 | 1,300 | +1,000 | 700 | +400 | 0 | -300 |
| Alkalinity | 0 | 100 | +100 | 0 | 0 | 0 | 0 |
| Droughty | 5,400 | 40,800 | +35,400 | 25,900 | +20,500 | 0 | -5,400 |
| Rooting Depth | 1,800 | 30,300 | +28,500 | 18,400 | +16,600 | 0 | -1,800 |
| Salinity | 0 | 100 | +100 | 0 | 0 | 0 | 0 |
| Sodium Adsorption | 0 | 200 | +200 | 100 | +100 | 0 | 0 |

#### 4.3.13.10.1 ALTERNATIVE A

Under Alternative A, no additional areas would be designated as ACECs, therefore no additional areas would be beneficially or adversely impacted by ACEC management prescriptions. Under Alternative A, no river segments would be determined suitable. However, all eligible rivers would continue to be managed as eligible under this alternative with the tentative classifications currently identified. Approximately 5,400 acres of sensitive soils are within 1/4 mile of the eligible river segments. These acres would continue to be protected from surface disturbance under Alternative A

#### 4.3.13.10.2 ALTERNATIVE B

All of the 14 proposed areas would be designated as ACECs under Alternative B. Special management attention prescribed for ACECs during planning varies by ACEC. Where management would limit surface disturbance (for example, by closing or limiting motorized routes, placing limitations on recreational activities, placing limitations on mineral development

BLM_0010483

activities, etc.) it would provide protection for soil and water resources. The Cottonwood-Diamond Watershed ACEC, in particular, would protect public health and safety by protecting soil and water resources and floodplains.

Because Alternative B would designate all 14 proposed areas as ACECs, it would result in the greatest amount of protection for soil and water resources compared to Alternatives A, D, and the Proposed Plan. 609,687 acres of soils, 398,318 acres of sensitive soils and approximately 100 miles of perennial stream would be protected due to ACEC designation and associated management.

Under Alternative B, the designation of river segments as suitable with a tentative classification as Wild would limit surface disturbance on 40,800 acres of sensitive soils adjacent to these segments. Designation of eligible segments as suitable in Alternative B, no matter what their tentative classification, would help protect 340 miles of perennial streams. Therefore, WSR designation decisions under Alternative B have the potential to provide the most protection to sensitive soils of all the alternatives.

### 4.3.13.10.3 PROPOSED PLAN

Under the Proposed Plan, 5 of the 14 proposed areas (63,232 acres) would be designated as ACECs. Impacts would be similar to Alternative A for those areas not proposed, and similar to Alternative B for those that are designated. The Proposed Plan would therefore provide more protection of soil and water resources through ACEC designation than Alternatives A and D but less than Alternative B. Under the Proposed Plan, the designation of one river segment as Wild would limit surface disturbance on approximately 25,900 acres of sensitive soils adjacent to these segments, and protect 185 miles of perennial stream. Therefore, WSR designation decisions under the Proposed Plan have the potential to provide protection to more acres of sensitive soils than Alternatives A and D, but to fewer acres than Alternative B

ACEC management would protect 63,252 acres of soils, 33,672 acres of sensitive soils and 15 miles of perennial streams under this alternative.

### 4.3.13.10.4 ALTERNATIVE D

As with Alternative A, no additional ACECs would be designated under Alternative D. No river segments would be designated and managed as suitable for congressional wild and scenic river designation under Alternative D; therefore, no protections for soil and water resources adjacent to any river segment would occur.

### 4.3.13.11 SUMMARY OF IMPACTS

The management of many resources within the MPA would have the potential to impact soil and water resources. Impacts related to fire management and health and human safety would have the same impacts for all alternatives. Impacts related to cultural resources, livestock grazing, mineral and utility corridor development, non-WSA lands with wilderness characteristics, recreation and travel, riparian, and special designations would have varying degrees of impact on soil and water resources. Table 2.2 (of Chapter 2) outlines the potential impacts for each alternative due to resource management.

BLM_0010484

Generally, the greatest level of adverse impacts to soil and water resources would occur under Alternatives A and D, and the lowest level of impacts would occur under Alternative B. The Proposed Plan would generally have an intermediate level of impacts.

The most significant difference between alternatives in terms of impacts to soil and water resources would be due to livestock grazing management, minerals development decisions, and the regulation of OHV use.

## 4.3.14 SPECIAL DESIGNATIONS

This section discusses impacts to areas of special designation from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning special designations are described in Chapter 3.

Special designations include Areas of Critical Environmental Concern (ACECs), a National Historic Trail (Old Spanish Trail), and Wild and Scenic Rivers (WSRs). The management of ACECs focuses on protecting specific relevant and important values. The management of the National Historic Trail seeks to enhance public enjoyment and understanding of the Old Spanish National Historic Trail. For river segments that are eligible/suitable for congressional designation as WSRs, management focuses on protecting specific, identified, outstandingly remarkable values, and the tentative classification and free-flowing character.

Wilderness Study Areas (WSAs) and Wilderness Areas (WAs) are also special designations that were previously established by law and policy. Nothing in this RMP will change these designations. There are eleven Wilderness Study Areas and one Wilderness Area (Black Ridge) in the MPA. The management of wilderness (WSAs and WAs) focuses on maintaining the wilderness characteristics of appearance of naturalness, outstanding opportunities for solitude and/or primitive, unconfined recreation, and size and guidelines have already been established for managing these areas. The only decisions that will be made in the RMP for WSAs are: OHV designations, route designations, and VRM designations. There are no decisions to be made for the Black Ridge Wilderness

### 4.3.14.1 ASSUMPTIONS

Some areas within the MPA may have two or more special designations. Any potential ACEC or WSR-eligible river segment that falls within a WSA[7] would be managed under the IMP, which strictly regulates surface disturbance[8] and protects the "relevant and important values" (in the case of an ACEC) or "eligibility" (in the case of a WSR) of the area. WSAs are closed to mineral leasing and development and most other surface-disturbing activities. Because WSA restrictions on surface-disturbing activities would generally protect the relevant and important values of potential ACECs, as well as the outstanding remarkable values of WSRs, the following analyses assume that WSAs have a beneficial impact on other lands considered for special designations. Because the management of WSAs is often more restrictive than the management of ACECs, the designation of an ACEC where a WSA already exists often does not provide significant additional resource protection.

---

[7] Some river segments border WSAs. Depending on the WSA border description, some of the area suitable for WSR designation would likely be within the WSA.
[8] Subject to valid rights existing at the time of the enactment of FLPMA.

BLM_0010485

In addition to protecting scenic resources (see Section 4.3.14), Visual Resource Management (VRM) designation of an area influences the surface-disturbing activities that can take place. VRM Class I is the most restrictive, allowing virtually no surface-disturbing activity. VRM Classes II and III allow little to moderate surface disturbance, respectively, and VRM Class IV generally does not restrict surface disturbance. The following analyses therefore assume that more restrictive VRM Classes (I and II) are more beneficial to the values of specially designated areas than less restrictive classes, since they serve to protect scenic resources and reduce surface disturbance.

Under all alternatives, mineral leasing would be conducted primarily for oil and gas within seven Reasonable Foreseeable Development (RFD) areas, which cover the entirety of the MPA except for WSAs. (WSAs are closed to mineral leasing by law and policy, which is the same for all alternatives.) The level of development in each RFD area varies from alternative to alternative and from special designation to special designation (e.g., ACECs, WSRs). Under all alternatives, areas designated as open to leasing with standard lease terms and open to leasing with timing limitation and controlled surface use stipulations are most likely to experience surface-disturbance due to oil and gas development. Therefore, the following analyses assume that acreage closed to leasing or managed with a no surface occupancy (NSO) stipulation for mineral leasing generally benefit areas considered for special designations by reducing or eliminating mineral development and associated resource impacts, such as surface disturbance. Conversely, the analyses assume that areas open to mineral leasing under standard terms or timing limitation/controlled surface use stipulations would be adversely impacted by mineral development.

Under Alternative A, all lands outside WSAs are open to the disposal of salable minerals. However, the disposal of salable minerals is not anticipated in these areas. Under Alternatives B, D, and the Proposed Plan salable minerals are subject to the stipulations governing oil and gas leasing and other surface-disturbing activities. This means that a NSO stipulation closes land to salable mineral disposal.

Under all action alternatives, the imposition of a closed or NSO stipulation for oil and gas leasing would preclude all other surface-disturbing activities, with the exception of locatable mineral development.

Under all alternatives, all public lands within the MPA are open to mining claim location unless they are within an existing withdrawal. It is possible that mining claims could be located in areas proposed for Special Designation (eligible rivers for Congressional WSR designation, or ACECs). Wilderness Areas are withdrawn by Congress. Mining claims can be located within WSAs, but development is subject to the non-impairment standard. Except where WSAs are in place and where development of claims would be subject to a non-impairment standard, claimants could conduct operations that would adversely impact the resources of concern. Locatable mineral development would be subject to timing limitations and controlled surface use stipulations. However, development in these areas is not anticipated, and therefore, for this analysis, it is assumed that adverse impacts to these areas from locatable mineral development would not occur

In general, the following analyses assume that woodland harvest would adversely affect the values of lands considered for special designations by increasing surface disturbance and human-

BLM_0010486

related disturbance. However, the low level of woodland harvest in the MPA minimizes the adverse impacts to these areas.

Except for Alternative A, NSO areas are avoidance areas for rights of way; closed areas are exclusion areas for rights of way. Rights of way are issued for roads, pipelines, power lines, wind and solar power sites, and communication sites. Rights of way in avoidance areas would only be granted if there are no feasible alternatives. Therefore, the following analyses assume that rights of way would not be placed within NSO or closed areas in any of the action alternatives. Rights of way could be granted in potential Special Designation areas under Alternative A.

Except for Alternative A, where a NSO stipulation does not preclude other surface-disturbing activities, NSO areas are avoidance areas for rights-of-way; closed areas are exclusion areas for rights of way. Rights of way are issued for roads, pipelines, power lines, wind and solar power sites, and communication sites. Rights-of-way in avoidance areas would only be granted if there are no feasible alternatives. Therefore, the following analyses assume that rights-of-way would not be placed within NSO or closed areas in any of the action alternatives. Rights-of-way could be granted in potential Special Designation areas under Alternative A, except where WSAs or designated wilderness exist.

Except for Alternative A, OHV use would be limited to designated routes unless otherwise specified. The following analyses assume that this would have beneficial impacts to the values of areas considered for special designations by minimizing surface disturbance from cross-country travel. Limiting OHV use to designated routes throughout the MPA would also likely result in fewer instances of inadvertent, casual, or deliberate illegal riding off designated routes, and would consequently also decrease the risk of impacts to resources within areas considered for special designations.

## 4.3.14.2 AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACECs)

ACECs are designated to provide special management attention to "relevant and important" values, resources, natural systems, and natural hazards, including the following, which are found in the MPA:

- Rare or relict plant species
- Special status plant, fish, and animal species (designated as threatened, endangered, or candidate by the USFWS, or as sensitive by the BLM)
- Important wildlife habitat
- Riparian areas
- Watersheds and other natural systems (e.g., flash flood hazards)
- Dune systems and sensitive soils
- Cultural resources (historical or prehistoric)
- Paleontological resources
- Scenic (i.e., visual) resources
- Natural hazards

Most of these are also resources in their own right requiring management and planning via this PRMP/FEIS, so they are discussed in greater detail at the planning area-wide level in other sections of this PRMP/FEIS. Therefore, the impacts analysis presented in this section focuses on

BLM_0010487

comparisons among the alternatives, based largely on the assumptions described in the section above. More detailed analyses of the impacts of particular management decisions on specific relevant and important resource values can be found under each specific resource section. For example, the effects of watershed management decisions on riparian areas can be found in Section 4.3.11 (Environmental Consequences of Alternatives, Riparian).

As stated above, any section(s) of a potential ACEC that falls within a WSA would be managed under the BLM's Interim Management Policy for Lands Under Wilderness Review (IMP), which strictly regulates surface disturbance and impacts that would alter the area's wilderness characteristics (appearance of naturalness and outstanding opportunities for solitude and primitive and unconfined recreation) One of the practical effects of this interim management is that permitted activities in WSAs (except grandfathered uses and valid existing rights) are limited to temporary uses that create no new surface disturbance, nor involve permanent placement of structures. (H-8550-1 Interim Management Policy for Lands Under Wilderness Review; BLM 1995). All prescriptions for ACEC/WSA overlap areas must comply with the IMP. Since the IMP imposes these special management conditions, it is assumed that there would be no impacts to the relevant and important values in the overlap areas and that ACEC management would be duplicative in most instances. Table 4.96 lists the ACECs with the percent of WSA overlap.

**Table 4.96. Acres ACEC Designated and % WSA by Alternative**

| ACECs | Alternative A (No Action) | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Acres | % WSA | Acres | % WSA | Acres | % WSA | Acres | % WSA |
| Behind the Rocks* | 0 | NA | 17,836 | 73% | 5,201 | 0% | 0 | NA |
| Book Cliffs | 0 | NA | 304,252 | 81% | 0 | NA | 0 | NA |
| Canyon Rims | 0 | NA | 23,400 | 0% | 0 | NA | 0 | NA |
| Cisco White-tailed Prairie Dog Complex | 0 | NA | 117,481 | 0% | 0 | NA | 0 | NA |
| Colorado River Corridor | 0 | NA | 50,483 | 5% | 0 | NA | 0 | NA |
| Cottonwood-Diamond Watershed | 0 | NA | 35,830 | 93% | 35,830 | 93% | 0 | NA |
| Hwy 279/Shafer Basin/Long Canyon | 0 | NA | 13,500 | 0% | 13,500 | 0% | 0 | NA |
| Labyrinth Canyon | 0 | NA | 8,528 | 0% | 0 | NA | 0 | NA |
| Mill Creek Canyon* | 0 | NA | 13,501 | 58% | 3,721 | 0% | 0 | NA |
| Ten Mile Wash | 0 | NA | 4,980 | 0% | 4,980 | 0% | 0 | NA |
| Upper Courthouse | 0 | NA | 11,529 | 0% | 0 | NA | 0 | NA |

BLM_0010488

**Table 4.96. Acres ACEC Designated and % WSA by Alternative**

|  | Alternative A (No Action) | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| Westwater | 0 | NA | 5,069 | 98% | 0 | NA | 0 | NA |
| White Wash | 0 | NA | 2,988 | 0% | 0 | NA | 0 | NA |
| Wilson Arch | 0 | NA | 3,700 | 0% | 0 | NA | 0 | NA |
| Total | 0 | NA | 613,077 | 50% | 63,232 | 53% | 0 | NA |

*The Behind the Rocks and Mill Creek ACECs differ in size between Alternative B and the Proposed Plan.

Any section(s) of a proposed or existing ACEC that falls within a WSA would be managed under the BLM's *Interim Management Policy for Lands Under Wilderness Review* (IMP), which strictly regulates surface disturbance and impacts that would alter the naturalness, primitiveness and solitude of the area. One of the practical effects of this interim management is that permitted activities in WSAs (except grandfathered and valid existing rights) are limited to temporary uses that create no new surface disturbance, nor involve permanent placement of structures. (H-8550-1 Interim Management Policy for Lands Under Wilderness Review; BLM 1995). All prescriptions for ACEC/WSA overlap areas must comply with or have a greater protective emphasis than those imposed by the IMP. Since the IMP imposes these special management conditions, it is assumed that there would be no impacts to the relevant and important values in the overlap areas and that ACEC management would be duplicative in most instances. Table 4.96 lists the ACECs with the percent of WSA overlap.

No beneficial or adverse impacts to these relevant and important values, resources, natural systems or hazards of the potential ACECs in the MPA would result from management decisions regarding air quality, or fire management.

Twelve of the fourteen Potential ACECs have acreage that is leased for oil and gas under stipulations developed in earlier RMPs. These oil and gas leases would remain valid until they expire (leases are issued for ten years). While all leases do not proceed to development, stipulations developed in this RMP for oil and gas leasing would not apply to leases issued under previous RMPs. Table 4.97 predicts the number of wells that could be drilled under valid existing leases, by Potential ACEC.

**Table 4.97. Potential ACECs, Number of Wells Predicted, and Currently Leased Acreage**

| Name of Potential ACEC | Total Acreage in ACEC | Acreage under Existing Leases | Percentage of Potential ACEC under Lease | RFD Area | Number of Wells Predicted under Existing Leases |
|---|---|---|---|---|---|
| Behind the Rocks[*] | 17,836 | 45 | <1.0 | Big Flat-Hatch Point | <1.0 |
| Bookcliffs Wildlife | 304,252 | 41,933 | 14 | Bookcliffs | 28.9 |
| Canyon Rims | 23,400 | 9,348 | 39 | Big Flat-Hatch Point | 1.2 |
| Cisco White-tailed Prairie Dog | 117,481 | 58,846 | 50 | Greater Cisco | 53.5 |

BLM_0010489