**Table 4.97. Potential ACECs, Number of Wells Predicted, and Currently Leased Acreage**

| Name of Potential ACEC | Total Acreage in ACEC | Acreage under Existing Leases | Percentage of Potential ACEC under Lease | RFD Area | Number of Wells Predicted under Existing Leases |
|---|---|---|---|---|---|
| Colorado River Corridor | 50,483 | 1,168 | 2 | Eastern Paradox | 0.07 |
| Cottonwood-Diamond Watershed | 35,830 | 1,592 | 4 | Bookcliffs | 1.1 |
| Highway 279/Shafer Basin/Long Canyon | 13,500 | 2,944 | 22 | Big Flat-Hatch Point | 0.37 |
| Labyrinth Canyon | 8,528 | 41 | 0.48 | Big Flat - Hatch Point | 0.005 |
| Mill Creek Canyon* | 13,501 | 130 | 0.96 | Eastern Paradox | 0.0078 |
| Ten Mile Wash | 4,980 | 6 | 0.12 | Big Flat-Hatch Point | <.01 |
| White Wash | 2,988 | 1,821 | 61 | Salt Wash | 0.43 |
| Wilson Arch | 3,700 | 2,624 | 71 | Lisbon Valley | 1.3 |

\* Behind the Rocks and Mill Creek ACECs include the WSA acreage in Alternative B; they do not include the WSA acreage in the Proposed Plan.

Two potential ACECs, Bookcliffs and Greater Cisco, have 28 and 53 wells predicted that could be drilled under valid existing rights. This could adversely impact the relevant and important values found in these ACECs. Three potential ACECs (Canyon Rims, Cottonwood-Diamond and Wilson Arch) have around one well predicted, which could have a minor adverse impact to the relevant and important values found in these ACECs. On the remainder of the ACECs, fewer than one well is predicted. This would not adversely impact the relevant and important values of the ACEC in question.

### 4.3.14.2.1 BEHIND THE ROCKS POTENTIAL ACEC (17,836 ACRES)

If designated, the Behind the Rocks Potential ACEC would be managed to preserve the relevant and important special status and relict plant species, cultural and scenic values where designated (Alternative B and the Proposed Plan).

The Behind the Rocks Potential ACEC would be managed to preserve the relevant and important values of special status and relict plant species, cultural resources, and scenery where designated (Alternative B and the Proposed Plan).

Approximately 12,836 acres of the potential ACEC overlaps with the Behind the Rocks WSA. This would result in beneficial impacts to the ACEC, as described above. The area would also be within the Colorado Riverway Special Recreation Management Area (SRMA). SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.

BLM_0010490

## 4.3.14.2.1.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Behind the Rocks Potential ACEC would not be designated an ACEC. The 5,201 acres of the proposed Behind the Rocks ACEC that do not overlap the Behind the Rocks WSA would not receive any special designation, and would be managed under the following stipulations:

- OHV use would be limited to existing routes.
- Rights-of-way could be approved outside the WSA.
- Manage as VRM inventory class.
- Oil and gas leasing would be closed on 3,652 acres. About 1,958 acres would be managed as no surface occupancy for oil and gas leasing, while about 694 acres would be open under standard lease terms.

Based on projections of oil and gas development in the Big Flat/Hatch Point RFD area, approximately 7.3 acres of surface disturbance within the proposed ACEC are likely to occur over the life of the plan (Table 4.98). This surface disturbance would detract from scenic values.

**Table 4.98. Acres of Behind the Rocks Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|:---:|:---:|:---:|:---:|
| Behind the Rocks | 7.3 | 0.0 | 0.0 | 7.0 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

## 4.3.14.2.1.2 Alternative B (17,836 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 17,836 acres proposed would be designated and managed as an ACEC. Of this acreage, 12,635 acres are within the Behind the Rocks WSA, and 4,231 acres of non-WSA lands (in Hunter Canyon and Behind the Rocks) would be managed for wilderness characteristics. This decision would result in the greatest beneficial impacts to the relevant and important values of the ACEC.

Management prescriptions on the entire area of the ACEC would generally be more beneficial than under Alternative A, and would include:

- Limiting OHV use to designated routes.
- Restricting vehicle-based camping to campgrounds and not allowing campfires outside of campgrounds.
- Closing the area to surface-disturbing vegetation treatments except for treatments of noxious weeds and exotics.
- Closing the area to woodland harvest.
- Designating as VRM Class I.
- Prioritizing Class III inventories for cultural resources.
- The 12,635 acres within the Behind the Rocks WSA would be managed under IMP.

BLM_0010491

- Manage the 12,635 acres within the WSA and the wilderness characteristics acreage (4,231 acres) as closed to oil and gas leasing. About 970 acres outside the WSA or wilderness characteristics area are managed as no surface occupancy for oil and gas leasing which precludes other surface-disturbing activities. The closed area is an exclusion area for rights-of-way, and the NSO area is an avoidance area for rights-of-way.

Prioritizing Class III inventories for cultural resources would have a beneficial impact by identifying significant cultural sites so that management efforts can be taken to prevent damage from activities from other management programs

Alternative B would have the least adverse impacts from oil and gas development (Table 4.98), and from all other surface-disturbing activities.

### 4.3.14.2.1.3 Proposed Plan (5,201 Acres Proposed for ACEC Designation)

Under the Proposed Plan, 5,201 acres of the potential ACEC would be designated and managed as an ACEC. None of these acres are within the Behind the Rocks WSA. Of these 5,201 acres, 4,231 acres of non-WSA lands are managed for wilderness characteristics. Management of the ACEC is similar to that described for Alternative B, except that the ACEC would be managed as VRM Class II[9] and the 4,231 acres with wilderness characteristics would be managed as NSO for oil and gas leasing as well as precluding other surface-disturbing activities. The impacts to the potential ACEC from the Proposed Plan would be essentially the same as under Alternative B. This is because the portion not designated would continue to be protected as a WSA, and management of the designated area as NSO for oil and gas leasing would also strictly limit all other surface-disturbing activities. As a result, the impacts to the ACEC from the Proposed Plan would be essentially the same as under Alternative B.

### 4.3.14.2.1.4 Alternative D (0 Acres Proposed for ACEC Designation)

Under Alternative D, zero acres would be designated as Behind the Rocks ACEC Although the WSA portion would be protected by the IMP, the 5,201 acres outside of the Behind the Rocks WSA would not be so protected. Although vehicle travel would be limited to designated routes, which is protective of the surface, in the non-WSA portion approximately 5,000 acres would be available for oil and gas leasing and development, which, along with a VRM Class III designation which allows for noticeable disturbance, could put scenic and cultural values and plant resources at risk in a portion of the potential ACEC. Based on projections of oil and gas development, approximately 7.0 acres of surface disturbance within the proposed ACEC are likely to occur over the life of the plan (Table 4.98). Therefore, Alternative D would have similar, although slightly less, potential for adverse impacts to the relevant and important values and resources of the ACEC than Alternative A.

### 4.3.14.2.2 BOOK CLIFFS POTENTIAL ACEC (304,252 ACRES)

If designated, the Book Cliffs Potential ACEC would be managed to preserve the relevant and important cultural resources, and important habitat for wildlife (i.e., Rocky Mountain bighorn sheep, mule deer, and elk) values where designated (Alternative B).

---

[9] Barring any prior existing rights, no oil and gas related surface disturbance is projected to occur.

BLM_0010492

Approximately 250,207 acres of the potential ACEC overlap with the Desolation, Flume, Floy, Coal, and Spruce WSAs. All acreage within the WSAs would be managed as VRM I.

## 4.3.14.2.2.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Book Cliffs ACEC would not be designated. The 54,045 acres of the proposed Book Cliffs ACEC that are not within WSAs would not receive any special designation, and would be managed under the following stipulations:

- Allow woodland harvest.
- Rights-of-way could be approved outside the WSAs.
- OHV use would be managed as open or limited to existing routes.
- Leasable mineral development would be allowed on 15,757 acres with standard lease terms, and on 38,415 acres with timing limitations and controlled surface use stipulations. Other surface-disturbing activities, including salable mineral development, would be precluded.

Based on projections of oil and gas development in the Book Cliffs, Roan Cliffs, Eastern Paradox and Greater Cisco RFD areas, approximately 841 acres of surface disturbance within the proposed ACEC (1.6% of the potential ACEC outside the WSAs) are likely to occur over the life of the plan (Table 4.99). This surface disturbance would impact wildlife habitat values.

**Table 4.99. Acres of Book Cliffs Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Book Cliffs | 841.0 | 0.0 | 805.9 | 805.9 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

## 4.3.14.2.2.2 Alternative B (304,252 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 304,252 acres proposed would be designated and managed as an ACEC. This management decision would result in the greatest beneficial impacts to the relevant and important values of the ACEC. The area would also be within the Bookcliffs and Lower Gray Canyon SRMAs. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC. Alternative B management prescriptions would beneficially impact the ACEC area more than Alternative A by:

- Restricting OHV use to designated routes.
- Closing the area to harvesting woodland products.
- Of the 54,405 acres outside the WSA, 34,363 acres are managed with a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities. The remaining 19,901 acres of non-WSA lands (in Coal Canyon, Desolation Canyon, Floy Canyon, Spruce Canyon and Mexico Point) are managed to protect wilderness characteristics and are closed to oil and gas leasing. Thus, no adverse impacts due to oil and gas development are expected under this alternative (Table 4.99).

BLM_0010493

- Prioritizing Class III inventories for cultural resources.
- The 249,988 acres within the WSAs would be managed under IMP and would be closed to oil and gas leasing.
- Designate the 19,901 acres with wilderness characteristics as VRM Class II. All areas of the proposed ACEC within a WSA would be designated as VRM Class I.

### 4.3.14.2.2.3 Alternative D and Proposed Plan (0 Acres Proposed for ACEC Designation)

Under Alternative D and the Proposed Plan, the Book Cliffs Potential ACEC would not be designated. The 54,045 acres of the proposed Book Cliffs ACEC that are not within WSAs would not receive any special designation. In addition, no acres would be managed to protect wilderness characteristics. The area would be managed under the same management prescriptions as Alternative A, with the following exceptions:

- Approximately 1,800 acres outside the WSAs along the Green River would be closed to woodland harvest to protect recreational resources.
- All mineral development would be subject to timing restrictions. The total acreage likely to be disturbed by mineral resource development would be 805.9 acres, or 1.5% of the potential ACEC lands that are outside the WSAs (Table 4.99).
- All OHV use would be limited to designated routes.
- Rights-of-way could be granted anywhere outside the WSA.

Because of these exceptions, the overall net impacts to the relevant and important values in this area due to Alternative D and the Proposed Plan would be adverse compared to Alternative B, but beneficial compared to Alternative A. Wildlife values could be adversely impacted by the habitat fragmentation and disruption caused by surface-disturbing activities.

### 4.3.14.2.3 CANYON RIMS POTENTIAL ACEC (23,400 ACRES)

If designated, the Canyon Rims Potential ACEC would be managed to preserve relevant and important scenic values where designated (Alternative B).

Under all alternatives, the potential Canyon Rims ACEC is within the Canyon Rims SRMA, SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.

### 4.3.14.2.3.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the proposed Canyon Rims ACEC would not be designated, but would continue to be managed as a SRMA. The majority of the area would be designated as VRM Class II, and mineral development would be allowed with controlled surface use stipulations to protect visual resources.

Based on projections of oil and gas development in the Big Flat/Hatch Point RFD area, approximately 33.2 acres (0.1% of the potential ACEC lands) of surface disturbance within the proposed ACEC are likely to occur over the life of the plan (Table 4.100).

BLM_0010494

**Table 4.100. Acres of Canyon Rims Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Canyon Rims | 33.2 | 0.0 | 24.0 | 31.7 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

Adverse impacts to the relevant and important value in this area (i.e., scenic resources) would be caused by mineral, development and the development of rights of way. No adverse impacts to the relevant and important value would result from recreation decisions, since the area is n SRMA; camping would be limited to designated sites, and routes for motorized events and motorized, mechanized, and non-mechanized sight-seeing would be delineated.

### 4.3.14.2.3.2 Alternative B (23,400 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 23,400 acres proposed would be designated and managed as an ACEC. Of this acreage, 3,417 acres of non-WSA lands (in Harts Point and Hatch/Lockhart) would be managed for wilderness characteristics and would be closed to oil and gas leasing. The remaining area would be managed with a NSO stipulation for oil and gas leasing. Because the entire area is either closed or NSO, no oil and gas development is expected under this alternative (Table 4.100), compared to the 33 acres projected in Alternative A. In addition, other surface-disturbing activities, including salable mineral development, would be precluded in the entire ACEC. Motorized or mechanized vehicles would be limited to designated routes, and no new routes would be allowed. As a result of the above management prescriptions, Alternative B would increase protection of scenic values over Alternative A.

### 4.3.14.2.3.3 Alternative D and Proposed Plan (0 Acres Proposed for ACEC Designation)

Under Alternative D and the Proposed Plan, none of the Canyon Rims Proposed ACEC would be designated as an ACEC. It would be managed as an SRMA. These alternatives would utilize the same management prescriptions as Alternative A, with the following exceptions:

- A portion of the area (943 acres in the Proposed Plan and 2,266 acres in Alternative D) would be subject to standard lease terms. The remainder of the area would be subject to a controlled surface use stipulation to protect visual resources. The total acreage of ACEC lands likely to be disturbed by oil and gas development would be 24.0 acres under the Proposed Plan and 31.7 acres under Alternative D (Table 4.100).
- A portion of the area (943 acres in the Proposed Plan and 2,266 acres in Alternative D) would be designated VRM Class III. As a result, the viewshed from the top of the canyon could be negatively affected by surface-disturbing activities.
- OHV use would be limited to designated routes.
- Due to the exceptions above, Alternative D and the Proposed Plan would result in less adverse impacts to the relevant and important value of scenery than Alternative A, but greater adverse impacts than Alternative B.

BLM_0010495

### 4.3.14.2.4 CISCO WHITE-TAILED PRAIRIE DOG COMPLEX POTENTIAL ACEC (117,481 ACRES)

If designated, he Cisco White-tailed Prairie Dog Complex ACEC would be managed to preserve the relevant and important value of wildlife where designated (Alternative B). White-tailed prairie dog habitat provides important habitat for other important wildlife species such as kit fox and ferruginous hawk.

#### 4.3.14.2.4.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Cisco White-tailed Prairie Dog Complex would not be designated as an ACEC. The area would be managed under the following actions:

- OHV use would be managed as open or as limited to existing routes.
- Leasable and salable mineral development would be primarily open under standard and special stipulations, with less than 1% of lands in this ACEC area being subject to no surface occupancy.
- The area would be open to rights-of-way development
- There are no visual resource management classes.

Based on projections of oil and gas development in the Greater Cisco, Book Cliffs and Eastern Paradox RFD areas, approximately 1,249 acres of surface disturbance (1.1% of the potential ACEC lands) within the proposed ACEC are likely to occur over the life of the plan (Table 4.101).

**Table 4.101. Acres of Cisco White-tailed Prairie Dog Complex Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Cisco White-tailed Prairie Dog Complex | 1,248.5 | 0 | 1,255.4 | 1,256.5 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area). The acreage of disturbance from oil and gas development includes ancillary facilities such as roads, pipelines, and power lines. There may be loss of individuals due to increased volume and speed of traffic.

#### 4.3.14.2.4.2 Alternative B (117,481 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 117,481 acres proposed would be designated and managed as an ACEC. Management prescriptions would be tailored to enhance habitat for the white-tailed prairie dog. The BLM would work with the UDWR and the USFWS to protect the species. OHV use would be restricted to designated routes, and no new routes for mechanized or mechanical travel would be allowed. Mineral leasing would be managed with a no surface occupancy stipulation. Because the entire area is managed as NSO, no oil and gas development is expected under this alternative (Table 4.101), compared to the 1,249 acres projected in Alternative A. Other surface-disturbing activities, including salable mineral development, would be precluded. Allotment Management Plans for grazing would be revised, which could include changing season of use, to protect prairie dog habitat.

BLM_0010496

Surveys for prairie dogs would be conducted prior to surface-disturbing activities. The results of these surveys will be used for avoidance and other mitigating measures. These measures would reduce the adverse impacts to prairie dogs and their habitat.

Restricting surface-disturbing activities would be beneficial to the White-tailed Prairie Dog by reducing vegetation loss and disruption of burrows. Managing livestock grazing to maximize seed production would enhance prairie dog forage and have a beneficial impact on the species. Limitation of travel to designated routes would reduce travel- and OHV-related impacts relative to Alternative A.

As a result of the above management prescriptions, Alternative B would offer an increase in the protection of wildlife values over Alternative A.

### 4.3.14.2.4.3 Proposed Plan (0 Acres Proposed for ACEC Designation)

Under the Proposed Plan, the Cisco White-tailed Prairie Dog Complex ACEC would not be designated. This alternative would apply the same management prescriptions as Alternative A, with the following exceptions:

- The area of the ACEC would be open with standard lease terms and/or a controlled surface use stipulation. A 660-foot buffer would be required around known active prairie dog colonies. The total acreage likely to be disturbed by oil and gas development within this ACEC area would be 1,255.4 acres, or 1.1% of the potential ACEC lands (Table 4.101).
- Rights of way could be authorized throughout the area
- Livestock grazing would be managed to maximize seed production of range vegetation using AMPs (this would be done without changing the season of use).
- OHV use would be limited to designated routes.
- Surveys for prairie dogs would be conducted prior to surface-disturbing activities in addition to other avoidance and other mitigating measures. These measures would reduce the adverse impacts to prairie dogs and their habitat

Because of these exceptions, the overall impacts to the relevant and important values in this area would be less adverse than under Alternative A, but also less protective than Alternative B.

### 4.3.14.2.4.4 Alternative D (0 Acres Proposed for ACEC Designation)

Alternative D would have the same impacts as the Proposed Plan, except that livestock grazing would not be managed to maximize seed production. This would limit the amount of forage available for the white-tailed prairie dog, possibly adversely impacting their populations.

About 86,295 acres would be open to oil and gas leasing with standard stipulations, rather than leasing with controlled surface use. This could have an adverse impact on the species, although surveys for prairie dogs would be conducted prior to surface-disturbing activities in addition to other avoidance and other mitigating measures. These measures would reduce the adverse impacts to prairie dogs and their habitat. Limitation of travel to designated routes would reduce travel- and OHV-related impacts relative to Alternative A.

The total acreage likely to be disturbed by oil and gas development within this ACEC area would be 1,256 acres (Table 4.101). As in Alternative B and the Proposed Plan, OHV use would be limited to designated routes. Therefore, Alternative D is far less protective than Alternative B,

BLM_0010497

similar to the Proposed Plan, but slightly more protective than Alternative A, because surface-disturbing activities could adversely impact prairie dogs.

### 4.3.14.2.5 COLORADO RIVER CORRIDOR POTENTIAL ACEC (50,483 ACRES)

If designated, the Colorado River Corridor ACEC would be managed to protect the relevant and important threatened, endangered, and sensitive plants, threatened and endangered fish, wildlife, and scenery values, where designated (under Alternative B).

Of the 50,483 acres proposed for ACEC designation, approximately 7,280 acres are within the Negro Bill WSA and would be managed under IMP. This acreage would be closed to mineral development and all other surface-disturbing activities under all alternatives. This would result in beneficial impacts to the relevant and important values of the ACEC.

Under all alternatives, impacts from the existing Three Rivers Withdrawal on a total of 18,519 acres of the ACEC would reduce or eliminate impacts to the relevant and important values on that acreage, regardless of whether the ACEC is designated. The withdrawal precludes the development of locatable minerals.

### 4.3.14.2.5.1 Impacts Common to All Action Alternatives (B, D, and the Proposed Plan)

The potential Colorado River Corridor ACEC is located within the Colorado Riverway SRMA: recreation in the ACEC area is to be managed in accordance with the management prescriptions outlined in this SRMA. The area of the Three Rivers Withdrawal is NSO for oil and gas leasing and other surface-disturbing activities under all action alternatives

### 4.3.14.2.5.2 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Colorado River Corridor ACEC would not be designated. The 43,329 acres[10] of the proposed ACEC that are not within the Negro Bill Canyon WSA would have the following management stipulations:

- A small portion of the river corridor would be managed for recreation activities as part of the Colorado River SRMA. A SRMA is established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.
- The 43,329 acres of the proposed ACEC outside the WSA would be open to oil and gas leasing. Of these 43,329 acres, 10,864 acres would be managed with timing limitations and controlled surface use stipulations, 1,189 acres would be managed with a NSO stipulation, and 31,276 acres would be open under standard lease terms.
- Woodland harvest would be limited to the area north of the Colorado River.
- There are no visual resource management classes; VRM would be managed according to inventory class.

Based on projections of oil and gas development in the Eastern Paradox RFD area, approximately 35 acres of surface disturbance within the proposed ACEC are likely to occur

---

[10] Due to acreage discrepancies between the existing RMP and new GIS data, the acreages for the mineral leasing categories do not match the acreage for the potential ACEC.

BLM_0010498

over the life of the plan (Table 4.102). This surface disturbance would adversely impact the scenic values and fragment wildlife habitat within the area.

**Table 4.102. Acres of Colorado River Corridor Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Colorado River Corridor | 34.8 | 0 | 26.1 | 30.4 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

### 4.3.14.2.5.3 Alternative B (50,483 Acres Proposed for ACEC Designation)

Under Alternative B, all 50,483 acres proposed would be designated and managed as an ACEC. Of this acreage, 7,280 acres are within the Negro Bill WSA, and 33,548 acres would be managed for wilderness characteristics. Management prescriptions applicable to the entire area would provide far more protection under this alternative than under Alternative A, due to the following prescriptions:

- No vegetation treatments would be allowed except to treat noxious weeds.
- The area would be managed as VRM Class I.
- OHV and mechanized vehicle use would be limited to designated routes and there would be no competitive OHV events.
- Approximately 40,828 acres would be closed to oil and gas leasing (within the Negro Bill WSA and non-WSA lands wilderness characteristics areas in Dome Plateau, Fisher Towers, Mary Jane Canyon and Negro Bill Canyon). The remaining acreage (9,655 acres) would be managed with a no surface occupancy stipulation for oil and gas leasing and would preclude other surface-disturbing activities. Because the entire area is managed as closed or NSO, no oil and gas development is expected under this alternative (Table 4.102), compared to the 35 acres of surface disturbance projected in Alternative A.
- Special Recreation Permit issuance would be adjusted to not interfere with bighorn sheep lambing habitat.
- Vehicular based camping (and associated campfires) would only be allowed in designated sites on the south side of the Colorado River.
- All public lands in the proposed ACEC would be retained in public ownership except for a parcel identified in the Professor Valley land exchange, and acquiring inholdings would be prioritized.
- No woodland harvest would be allowed.

Restricting vehicular camping to the south side of the Colorado River, and timing SRP issuance and livestock grazing seasons of use so as to not interfere with bighorn sheep lambing habitat would have the beneficial effect of reducing human disturbance to ewes and lambs during their most vulnerable periods. This would reduce mortality to newborn lambs.

The on-going Professor Valley land exchange has identified lands for disposal. Should the exchange fall through, the area proposed for exchange would be managed under the proposed

BLM_0010499

ACEC. No other parcels within the ACEC would be considered for disposal. There would be a beneficial effect to all resources, since the disposed public lands would likely be developed. The same benefit would result from acquiring inholdings within the ACEC.

Alternative B provides the greatest protection for the relevant and important values identified in the Colorado River Corridor Potential ACEC.

### 4.3.14.2.5.4 Proposed Plan (0 Acres Proposed for ACEC Designation)

The Colorado River Corridor ACEC would not be designated under the Proposed Plan, which would result in some adverse impacts to the relevant and important values of the area (Although T&E species would be protected by law). Overall impacts would be more adverse than under Alternative B. The area would be managed under the following management actions:

- The recreation management prescriptions in the Colorado Riverway SRMA for the Dry Mesa/Cache Valley area north of the Colorado River would be the same as under Alternative B, except that the Proposed Plan does not restrict river-based camping.
- The VRM designation outside the WSA would be VRM Class II.
- Most of the potential ACEC would be managed as closed or with a NSO stipulation for oil and gas leasing as well as precluding other surface-disturbing activities. However, the northwest portion of the potential ACEC would be managed as open with timing limitations and controlled surface use stipulations. As a result, the acreage projected to be disturbed within the area (outside the WSA) would be 26.1 acres (Table 4.102). This represents more disturbance than the 0 acres projected to be disturbed in Alternative B.

Because of the less restrictive VRM class, the Proposed Plan would have slightly less protective effect on scenic resources than would Alternative B. The prescriptions designed to protect desert bighorn would not be as stringent as in Alternative B. There would be less minerals-related surface disturbance than under Alternative A and D, but more than under Alternative B.

Management of the potential ACEC under the Proposed Plan is more beneficial to the relevant and important values than under Alternatives A and D but less than under Alternative B.

### 4.3.14.2.5.5 Alternative D (0 Acres Proposed for ACEC Designation)

Alternative D would result in nearly the same impacts to relevant and important values as the Proposed Plan, except that it would open the non-WSA, non-withdrawn lands to oil and gas leasing and other surface-disturbing activities with timing limitation and controlled surface use stipulations. This would result in more acreage open to oil and gas development than under Alternative B and the Proposed Plan, thereby resulting in greater adverse impacts to relevant and important values. Oil and gas development is projected to disturb 30.4 acres within the potential Colorado River Corridor ACEC.

Therefore, while many impacts to the relevant and important values would be the same as under the Proposed Plan, impacts from oil and gas development would be more adverse than under Alternative B and the Proposed Plan, although less adverse than Alternative A. Protection of T&E plants would occur under Alternative D.

BLM_0010500

### 4.3.14.2.6 COTTONWOOD-DIAMOND WATERSHED POTENTIAL ACEC (35,830 ACRES)

If designated, the Cottonwood-Diamond Watershed ACEC would be managed to preserve the relevant and important Cottonwood-Diamond watershed value, (under Alternative B and Proposed Plan). This area was severely burned in a 2003 wildfire. Since then, the danger of flash floods and mudslides has posed significant hazards to human life and safety.

Under all alternatives, out of the 35,830 acres of the potential ACEC, a total of 34,004 acres are located within the Flume, Coal Canyon, and Spruce WSAs. This would result in beneficial impacts to the watershed within that acreage, as WSAs are closed to oil and gas leasing and other surface-disturbing activities.

### 4.3.14.2.6.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Cottonwood-Diamond Watershed ACEC would not be designated. Approximately 1,825 acres of the proposed Cottonwood-Diamond Watershed ACEC that are outside of WSAs would be managed with the following management prescriptions:

- The potential ACEC is located within the Book Cliffs RFD area. Oil and gas development would be subject to timing limitation stipulations on 1,825 acres. On this acreage, it is projected that oil and gas development would result in about 1.1 acres of surface disturbance of the potential ACEC lands.
- Rights-of-way could be granted in this area.
- There are no visual resource management classes; VRM would be managed under the inventory class.
- Livestock grazing would not be available in the Cottonwood, Diamond or Bogart allotments.
- OHV use is limited to existing roads.

### 4.3.14.2.6.2 Alternative B (35,830 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 35,830 acres proposed would be designated as the Cottonwood Diamond Watershed ACEC until the watershed is restored to a healthy and functioning condition (PFC.) Management prescriptions in Alternative B would provide additional protection to the watershed (compared to Alternative A) by closing all roads except for administrative access, and withholding Special Recreation Permits for the area. The acreage within the WSA would be managed under IMP. Oil and gas leasing is managed as closed in the WSA. In Alternative B, management of non-WSA lands with wilderness characteristics in Flume Canyon and Spruce Canyon would close an additional 1,690 acres to oil and gas leasing with a NSO stipulation in the remaining 135 acres. Because the entire area is managed as either closed or with a NSO stipulation, there would be 0 acres of surface disturbance due to oil and gas development, as compared to 1.1 acres in Alternative A.

Alternative B would also designate the area as part of the Bookcliffs SRMA. A SRMA is established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC. Closing roads and not issuing Special Recreation Permits would have the effect of reducing human presence in the area, thus reducing human impacts that would slow the rehabilitation of the area.

BLM_0010501

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 13 of 355

*Moab PRMP/FEIS*          *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
                                                            *4.3.14 Special Designations*

Under Alternative B the area would not be available for grazing, as both the Cottonwood and Diamond allotments are not available. This would have beneficial impacts to the watershed by eliminating the erosion caused by livestock. Under Alternatives B, managing the area as an ACEC would provide more beneficial impacts to the relevant and important values of watershed protection than under Alternatives A and D.

### 4.3.14.2.6.3 Proposed Plan (35,830 Acres Proposed for ACEC Designation)

Under the Proposed Plan, the entire 35,830 acres proposed would be designated as the Cottonwood Diamond Watershed ACEC until the watershed is restored to a healthy and functioning condition (PFC.) Management prescriptions in the Proposed Plan would provide additional protection to the watershed (compared to Alternative A) by closing all roads except for administrative access, and withholding Special Recreation Permits for the area. The acreage within the WSA would be managed under IMP. Oil and gas leasing is managed as closed in the WSA. The remaining 1,825 acres are NSO in the Proposed Plan. Because the entire area is managed as either closed or with a NSO stipulation, there would be 0 acres of surface disturbance due to oil and gas development, as compared to 1.1 acres in Alternative A.

Under the Proposed Plan, the area would not be available for grazing, as both the Cottonwood and Diamond allotments are not available. This would have beneficial impacts to the watershed by eliminating the erosion caused by livestock. Under the Proposed Plan, managing the area as an ACEC would provide more beneficial impacts to the relevant and important values of watershed protection than under Alternatives A and D.

### 4.3.14.2.6.4 Alternative D (0 Acres Proposed for ACEC Designation)

Under Alternative D, the area would not be designated as an ACEC. OHV use would be limited to designated routes, which would be a beneficial impact to the relevant and important value of this area. Approximately 1.1 acres would likely be disturbed by oil and gas development. Under Alternative D, the area would be available for grazing, as the Cottonwood and Diamond allotments are available for livestock use. This would cause adverse impacts from the erosion caused by livestock. Adverse impacts, especially from the reinstatement of livestock grazing, to the relevant and important values are more than Alternatives B, A, or the Proposed Plan.

### *4.3.14.2.7 HIGHWAY 279 CORRIDOR/SHAFER BASIN/LONG CANYON POTENTIAL ACEC (13,500 ACRES)*

If designated, the Highway 279 Corridor/Shafer Basin/Long Canyon ACEC would be managed to preserve the relevant and important special status plant species, wildlife, and cultural and scenic resources values (under Alternative B and the Proposed Plan).

Under all alternatives, impacts from the existing Three Rivers Withdrawal on a total of 2,034 acres of the ACEC would reduce or eliminate impacts to the relevant and important values on that acreage, regardless of whether the ACEC is designated. The withdrawal precludes the development of locatable minerals.

The majority of the potential ACEC is located within the Colorado Riverway SRMA; recreation in the ACEC area is to be managed in accordance with the management prescriptions outlined in this SRMA. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC. The area of the Three Rivers

BLM_0010502

Withdrawal is NSO for oil and gas leasing and other surface-disturbing activities under all action alternatives.

### 4.3.14.2.7.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the area would not be designated as an ACEC, and would instead be subject to the following management:

- OHV use would be limited to existing routes.
- There are no visual resource management classes. VRM would be managed as inventory class.
- The majority of the potential ACEC would be open to oil and gas leasing under standard lease terms. About 4,606 acres of the potential ACEC would be open subject to special stipulations (controlled surface use or timing limitations). As a result, based on projections of oil and gas development in the Big Flat – Hatch Point, RFD area, approximately 19 acres of surface disturbance within the proposed ACEC are likely to occur over the life of the plan. (Table 4.103).

**Table 4.103. Acres of Highway 279/Shafer Basin/Long Canyon Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Highway 279/Shafer Basin/Long Canyon | 19.1 | 0 | 0.0 | 18.3 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

### 4.3.14.2.7.2 Alternative B (13,500 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 13,500 acres proposed would be designated as an ACEC. In Alternative B only, 3,502 acres of the ACEC would be managed for wilderness characteristics. The following prescriptions would result in beneficial impacts to the ACEC:

- Permitted activities would be confined to main roads within bighorn lambing habitat during lambing season.
- Limit OHV use to designated routes.
- The Wall Street rock art sites would be managed as interpretive sites.
- Vehicle-based camping would be restricted to campgrounds, and campfires would not be allowed outside of campgrounds.
- The area would be designated VRM Class I

The restrictions on permitted activities, vehicle-based camping, and campfires would result in no adverse impacts to the relevant and important values in this ACEC. The adverse impacts from all recreation decisions would be reduced under this alternative as camping would no longer occur.

Under Alternative B, 3,502 acres of non-WSA lands in Dead Horse Cliffs, Goldbar, Gooseneck, and Shafer Canyon that are managed for wilderness characteristics would be closed to oil and gas leasing. On the remaining 9,998 acres, oil and gas leasing would be managed with a NSO

BLM_0010503

stipulation. Because under Alternative B, the entire potential ACEC would be managed as either closed or with a NSO stipulation, no oil and gas development is projected to occur.

Setting up the Wall Street rock art sites as interpretive sites would have a beneficial effect by educating and enhancing the public's enjoyment of the resource. Although such development brings more human traffic to the sites, the higher level of management can reduce purposeful or inadvertent human-caused damage.

Under Alternative B, managing the areas as an ACEC would provide more beneficial impacts to the relevant and important values than under Alternatives A and D.

### 4.3.14.2.7.3 Proposed Plan (13,500 Acres Proposed for ACEC Designation)

Under the Proposed Plan, the entire 13,500 acres proposed would be designated as an ACEC.

The following prescriptions would result in beneficial impacts to the ACEC:

- Permitted activities would be confined to main roads within bighorn lambing habitat during lambing season.
- Limit OHV use to designated routes.
- The Wall Street rock art sites would be managed as interpretive sites.
- Vehicle-based camping would be restricted to campgrounds, and campfires would not be allowed outside of campgrounds.
- The area would be designated VRM Class I and VRM Class II under the Proposed Plan.

The restrictions on permitted activities, vehicle-based camping, and campfires would result in no adverse impacts to the relevant and important values in this ACEC. The adverse impacts from all recreation decisions would be reduced under this alternative as camping would no longer occur.

The entire ACEC would be managed with a NSO stipulation under the Proposed Plan. Because under Proposed Plan, the entire potential ACEC would be managed with a NSO stipulation, no oil and gas development is projected to occur.

Setting up the Wall Street rock art sites as interpretive sites would have a beneficial effect by educating and enhancing the public's enjoyment of the resource. Although such development brings more human traffic to the sites, the higher level of management can reduce purposeful or inadvertent human-caused damage.

Under the Proposed Plan, managing the areas as an ACEC would provide more beneficial impacts to the relevant and important values than under Alternatives A and D.

### 4.3.14.2.7.4 Alternative D (0 Acres Proposed for ACEC Designation)

This area would not be designated as an ACEC under Alternative D. Management prescriptions under this alternative would generally be the same as under Alternative A, with a few exceptions. Under Alternative D, limiting travel to designated routes would benefit the relevant and important values by protecting these values from the damage caused by cross-country travel. Therefore, Alternative D would have slightly less adverse impacts to the potential values of the ACEC than Alternative A, but greater adverse impacts than Alternative B and the Proposed Plan.

BLM_0010504

### 4.3.14.2.8 LABYRINTH CANYON POTENTIAL ACEC (8,528 ACRES)

If designated, the Labyrinth Canyon ACEC would be managed to preserve the relevant and important special status fish species and scenic resource values (under Alternative B).

Under all alternatives, impacts from the existing Three Rivers Withdrawal on the potential ACEC would reduce or eliminate impacts to the relevant and important values on that acreage, regardless of whether the ACEC is designated. The withdrawal precludes the development of locatable minerals.

#### 4.3.14.2.8.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the area would not be designated as an ACEC. It would be managed with the following stipulations:

- OHV use would be limited to existing roads.
- There would be no visual resource management classes; VRM would be managed as inventory class.
- The majority of the area is open to oil and gas leasing under standard lease terms. Based on projections of oil and gas development in the Big Flat – Hatch Point, RFD area, approximately 12 acres of surface disturbance within the proposed ACEC (0.1% of the potential ACEC lands) are likely to occur over the life of the plan. (Table 4.104).

**Table 4.104. Acres of Labyrinth Canyon Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Labyrinth Canyon | 12.1 | 0 | 10.1 | 11.5 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

#### 4.3.14.2.8.2 Alternative B (8,528 Acres Proposed for ACEC Designation)

Under Alternative B, 8,528 acres would be designated as an ACEC. Of the 8,528 acres, 5,492 acres would be managed for wilderness characteristics. Management prescriptions would provide more protection of the relevant and important values under this alternative than under Alternative A, due to the following prescriptions:

- OHV use would be limited to designated routes.
- No new roads or trails for mechanized or motorized use would be authorized.
- Approximately 5,943 acres of non-WSA lands in Labyrinth Canyon and Horsethief Point managed for wilderness characteristics and would be closed to oil and gas leasing. The remaining 3,036 acres would be managed with a NSO stipulation for oil and gas leasing as well as precluding other surface-disturbing activities, including ROWs. Because the entire area is either closed or NSO, no oil and gas development is projected to occur under this alternative (Table 4.104), compared to the 12 acres projected in Alternative A.
- Manage as VRM Class I

BLM_0010505

Not allowing any new road construction would prevent the resultant erosion and sediment/salt travel to the Green River. This could have a beneficial effect on threatened and endangered fish by reducing negative impacts to water quality. The same effect would be achieved by the closed and NSO stipulation for oil and gas leasing and other surface-disturbing activities.

Changing the VRM Class from no management (under Alternative A) to VRM I (under this alternative) would preclude most surface-disturbing activities. This would have a protective effect for threatened and endangered fish by preventing erosion that could negatively affect water quality in the Colorado River system.

As a result of the above management prescriptions, Alternative B would offer an increase in the protection of scenic and threatened and endangered fish values over Alternative A.

### 4.3.14.2.8.3 Alternative D and Proposed Plan (0 Acres Proposed for ACEC Designation)

This area would not be designated as an ACEC under Alternative D and Proposed Plan. The area's management prescriptions would generally be the same as under Alternative A, with a few exceptions. Under Alternative D and Proposed Plan, OHV use would be limited to designated routes, and the area would be designated as VRM Class II. Route designation would beneficially impact the relevant and important values by preventing the visual scarring of multiple travel routes, and the more stringent VRM class would slightly reduce adverse, surface-disturbance impacts Therefore, Alternative D and Proposed Plan would have similar impacts as Alternative A, with the exceptions stated above. Approximately 10-11 acres are likely to be disturbed by oil and gas development under these two alternatives. Thus, Alternative D and Proposed Plan are not as protective of the relevant and important values as is Alternative B, but they are more protective than Alternative A.

### 4.3.14.2.9 MILL CREEK CANYON POTENTIAL ACEC (13,501 ACRES)

If designated, the Mill Creek Canyon ACEC would be managed to protect the relevant and important cultural resources, fish and wildlife habitat, riparian/watershed and scenery values (under Alternative B and the Proposed Plan).

Under Alternative B and Proposed Plan, the potential Mill Creek Canyon ACEC is located within the South Moab SRMA. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.

Approximately 9,780 acres of the potential ACEC (13,501 acres) are located within the Mill Creek Canyon WSA. This would result in beneficial impacts to the relevant and important values within that acreage because management under IMP would preclude surface-disturbing activities.

### 4.3.14.2.9.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the Mill Creek Canyon ACEC would not be designated. The 9,780 acres within the WSA would continue to be managed under IMP. The 3,721-acre area proposed for designation that is outside the Mill Creek Canyon WSA would be subject to the following management:

- Vehicles are limited to existing/designated routes.

BLM_0010506

- There are no visual resource management classes; VRM would be managed under the inventory class.
- The area would be managed as open to oil and gas leasing under standard lease terms. Based on projections of oil and gas development in the Eastern Paradox RFD area, approximately 3 acres of surface disturbance (0.1% of the potential ACEC lands outside the WSA) are likely to occur over the life of the plan. (Table 4.105).

**Table 4.105. Acres of Mill Creek Canyon Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Mill Creek Canyon | 2.8 | 0 | 0.0 | 2.7 |

*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

Despite the restrictions on surface-disturbing activities in riparian areas, the surface-disturbing activities allowed under Alternative A may result in erosion and water quality impacts. Although limiting camping to designated areas would help reduce human disturbances, the continued use of hiking and OHV routes for recreation would result in adverse impacts to the relevant and important values. Therefore, the overall impacts of this alternative to the area's relevant and important values would result in more adverse impacts than Alternative B and the Proposed Plan, and similar to Alternative D.

## 4.3.14.2.9.2 Alternative B (13,501 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 13,501 acres proposed, including the WSA acreage (9,780 acres) would be designated as an ACEC, with these specific prescriptions:

- Only day-use recreation facilities could be developed.
- Closed to vehicle-based camping, recreational mining, and woodland harvest.[11]
- Prioritized for Class III cultural inventories to protect Native American traditional cultural areas.
- Maintenance of a 3 cfs flow in the South Fork of Mill Creek below the Sheley diversion.
- Designate as VRM Class I.
- Manage 2,335 acres of Mill Creek Canyon non-WSA lands with wilderness characteristics as closed to oil and gas leasing and other surface-disturbing activities.
- The portion of the ACEC that is within the Mill Creek WSA would be managed under IMP.
- The area would be unavailable for grazing.

This alternative would offer the greatest protection to cultural resources, scenery, and natural systems. Alternative B offers the greatest protection of all alternatives for the relevant and important values in the potential Mill Creek Canyon ACEC.

---

[11] Exceptions would be made for backpacking fires in the uplands; however, no campfires would be allowed in riparian areas.

BLM_0010507

### 4.3.14.2.9.3 Proposed Plan (3,721 Acres Proposed for ACEC Designation)

Under the Proposed Plan, only the 3,721 acres outside the Mill Creek Canyon WSA would be designated as an ACEC. Impacts under the Proposed Plan would be essentially the same as under Alternative B, except that there would be slightly greater potential for surface disturbance (including ROWs) due to the designation as VRM Class II under the Proposed Plan. Therefore, the Proposed Plan is more protective of relevant and important values than are Alternatives A and D, but slightly less protective than is Alternative B.

### 4.3.14.2.9.4 Alternative D (0 Acres Proposed for ACEC Designation)

Alternative D has impacts similar to Alternative A, and is more adverse than Alternative B and the Proposed Plan. However, it would result in slightly fewer adverse impacts than Alternative A, due to the following decisions under Alternative D:

- All vehicles would be limited to designated routes.
- Designate as VRM Class II.
- The area would be unavailable for grazing.

### 4.3.14.2.10 TEN MILE WASH POTENTIAL ACEC (4,980 ACRES)

If designated, the Ten Mile Wash ACEC would be managed to preserve the relevant and important values of cultural resources, riparian/watershed and wildlife values under Alternatives B and C.

### 4.3.14.2.10.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the potential Ten Mile Wash ACEC area would not be designated as an ACEC. The areas would be subject to the following management:

- OHV use would be limited to existing routes
- Woodland harvest would be allowed.
- There would be no visual resource management classes; VRM would be managed as inventory class.
- Oil and gas leasing would be open under standard lease terms. Based on projections of oil and gas development in the Big Flat – Hatch Point RFD area, approximately 7 acres of surface disturbance within the potential ACEC are likely to occur over the life of the plan. (Table 4.106).

**Table 4.106. Acres of Ten Mile Wash Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Ten Mile Wash | 7.0 | 0 | 0.0 | 6.7 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

BLM_0010508

### 4.3.14.2.10.2 Alternative B (4,980 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 4,980 acres would be designated as an ACEC, with the following prescriptions:

- Woodland harvest, livestock grazing, and vehicular travel would not be allowed.
- Voluntary relinquishment of grazing privileges allowed.
- Apply a NSO stipulation for oil and gas leasing and other surface-disturbing activities. Close 232 acres of non-WC lands with wilderness characteristics in Labyrinth Canyon to oil and gas leasing.
- Campfires and camping limited to Dripping Springs.
- Designate as VRM Class II.
- The area would be an avoidance area for ROWs.
- Prioritize for Class III cultural inventories, riparian restoration, and scientific research.

Restricting livestock grazing would have beneficial effects to riparian areas due to reduced trampling. Because the route in the wash is within the riparian area, closing the area to vehicular traffic would protect riparian areas and wildlife habitat, as well as making the area less accessible to human activity, reducing the safety hazard from flash flooding.

A no surface occupancy leasing stipulation would preclude oil and gas development and other surface-disturbing activities. This action would protect natural resource values. Therefore, Alternative B is more protective of relevant and important values than are Alternative A and D. It is slightly more protective than is the Proposed Plan.

### 4.3.14.2.10.3 Proposed Plan (4,980 Acres Designated as ACEC)

The Proposed Plan would designate the Ten Mile Wash area as an ACEC. The Proposed Plan proposes the same management prescriptions as Alternative B except that vehicular travel would be allowed on the designated route within the wash. Adverse effects from this travel could include vandalism and looting of cultural sites. Travel within the bottom the wash could also increase the risk to human safety from flash flooding. The presence of the road could result in loss of riparian vegetation and increased erosion, thereby adversely impacting riparian/watershed resource values. Therefore, the Proposed Plan would be slightly less protective than Alternative B of the relevant and important values.

### 4.3.14.2.10.4 Alternative D (0 Acres Designated as ACEC)

Under Alternative D, the area would not be designated as an ACEC, and would there therefore be subject to more adverse effects than under Alternative B and Proposed Plan. Alternative D would result in slightly less adverse impacts than Alternative A, due to the following management:

- Motorized travel would be limited to designated routes.
- No campfires would be allowed outside of designated sites.
- The area would be managed for oil and gas leasing with a timing limitation on 2,558 acres. The remaining 2,422 acres are open under standard lease terms. Oil and gas development would likely disturb 6.7 acres, or ~0.1% of the potential ACEC lands (see Table 4.106).

BLM_0010509

- The area would be available for ROWs.

### 4.3.14.2.11 UPPER COURTHOUSE POTENTIAL ACEC (11,529 ACRES)

If designated, the Upper Courthouse ACEC would be managed to preserve the relevant and important cultural resources, paleontological resources, and relict and special status plant species values, where designated (under Alternative B).

The potential Upper Courthouse ACEC is within the Labyrinth Rims/Gemini Bridges SRMA under Alternatives B and C. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.

Under all alternatives, harvesting of woodland products would be prohibited. This management decision would eliminate potential adverse impacts from woodland harvest by eliminating the cross country travel that occurs in association with woodcutting.

#### 4.3.14.2.11.1 Alternatives A (0 Acres Proposed for ACEC Designation)

Under Alternatives A, this area would not be designated as an ACEC, and would be subject to the following management:

- Vehicle use would be managed as limited to existing routes.
- There would be no visual resource management classes in Alternative A.
- Oil and gas leasing would be managed as open under standard lease terms. Based on projections of oil and gas development in the Big Flat – Hatch Point RFD area, approximately 16 acres of surface disturbance (0.1% of the potential ACEC lands) within the potential ACEC are likely to occur over the life of the plan (Table 4.107).

**Table 4.107. Acres of Upper Courthouse Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Upper Courthouse | 16.3 | 0 | 11.9 | 15.6 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

#### 4.3.14.2.11.2 Alternative B (11,529 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 11,529 acres proposed would be designated as an ACEC. This alternative would be more beneficial than any other alternative due to the following protective prescriptions:

- OHV use would be limited to designated routes.
- Restriction of vehicle-based camping to campgrounds and prohibiting campfires outside of campgrounds.
- Closing the area to vegetation treatments except to treat noxious weeds and exotics or to restore riparian areas.

BLM_0010510

- Apply a NSO stipulation for oil and gas leasing as well as precluding other surface-disturbing activities. The area would be an avoidance area for ROWs.
- Prohibiting new range improvements.
- Prohibition of petrified wood collection.
- Protection of archaeological sites from livestock grazing.
- Prioritization of Class III cultural resources inventories.

Precluding surface-disturbing activities would protect relevant and important values because cultural and paleontological resources and relict plants would not be subject to inadvertent disturbance. Treatment of noxious weeds and exotics could benefit native vegetation, including relict vegetation. Alternative B would be the most protective of all alternatives of relevant and important values.

### 4.3.14.2.11.3 Proposed Plan (0 Acres Proposed for ACEC Designation)

Under the Proposed Plan, the area would not be designated as an ACEC. The Proposed Plan would be less protective than Alternative B, but would be slightly more protective than Alternatives A and D (largely because special stipulations are provided for relict plant communities), due to the following management:

- In order to protect relict plant communities, mesa-top areas would be subject to a NSO stipulation for oil and gas leasing and other surface-disturbing activities.
- The remainder of the area (outside of the mesa-tops) would be subject to NSO and timing limitation stipulations. The total acreage likely to be disturbed by oil and gas development would be 11.0 acres, or 0.1% of the potential ACEC lands (see Table 4.107).
- Motorized travel would be limited to designated routes.
- The area would be designated as VRM Classes II, III and IV.
- The Proposed Plan is more protective of relevant and important values than Alternatives A and D, but less protective than Alternative B.

### 4.3.14.2.11.4 Alternative D (0 Acres Proposed for ACEC Designation)

Under Alternatives D, this area would not be designated as an ACEC, and would be subject to the following management:

- Vehicle use would be managed as limited to designated routes.
- Designate as VRM Class III.
- Oil and gas leasing would be managed as open under standard lease terms. Based on projections of oil and gas development in the Big Flat – Hatch Point RFD area, approximately 16 acres of surface disturbance (0.1% of the potential ACEC lands) within the potential ACEC are likely to occur over the life of the plan (Table 4.107). This would be more acres of surface disturbance than under Alternatives B or C.

### *4.3.14.2.12 WESTWATER CANYON POTENTIAL ACEC (5,069 ACRES)*

If designated, the Westwater Canyon ACEC would be managed to preserve the relevant and important special status fish species and scenery values where designated (under Alternative B).

BLM_0010511

The area proposed for designation as the Westwater ACEC is entirely within the Westwater WSA. As such, it is managed under IMP in its entirety and closed to oil and gas leasing and other surface-disturbing activities. Woodland harvest is also precluded. As long as the area remains a WSA, these resources management prescriptions would result in no impacts to the relevant and important values.

If the ACEC is designated, impacts from the acquisition and management of inholdings within that designated ACEC would be beneficial to the relevant and important values as surface-disturbing activities could be prevented on these parcels. The continuation of the existing withdrawal from locatable minerals development would continue to reduce impacts to the relevant and important values.

### 4.3.14.2.12.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternative A, the potential Westwater ACEC area would not be designated as an ACEC, and the area would continue to be managed under IMP. However vehicle use on existing routes could result in adverse impacts to scenery as routes proliferate.

### 4.3.14.2.12.2 Alternative B (5,069 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 5,069 acres proposed would be designated as an ACEC. In addition to the protections that WSA status confers upon this area and their attendant beneficial impacts for the relevant and important values (see above), all motorized travel would be limited to designated routes, and inholdings would be acquired.

Designation of routes would reduce miles of routes in the area and could therefore result in a slight decrease in erosion of sediments that could be carried to the Colorado River. This alternative would result in the greatest beneficial impacts to relevant and important values.

### 4.3.14.2.12.3 Alternative D and Proposed Plan (0 Acres Proposed for ACEC Designation).

Under Alternative D and Proposed Plan, the area proposed as the Westwater ACEC would not be designated. Impacts would be the same as under Alternative A because it is a WSA under all alternatives, except that travel would be limited to designated routes rather than the more loosely defined existing route categorization. Alternatives A, D, and Proposed Plan are slightly less protective of relevant and important values than Alternative B.

### 4.3.14.2.13 WHITE WASH POTENTIAL ACEC (2,988 ACRES)

If designated, the White Wash ACEC would be managed to preserve the relevant and important riparian dune systems value, where designated (under Alternative B).

Under all action alternatives, the potential White Wash ACEC is within a SRMA. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC.

### 4.3.14.2.13.1 Alternative A (0 Acres Proposed for ACEC Designation)

The potential White Wash ACEC would not be designated. It would be managed with the following stipulations:

BLM_0010512

- The area would be open to cross country OHV travel and to woodland harvest.
- Competitive motorized events would be allowed.
- There would be no visual resource management classes; VRM is managed as inventory class.
- The area would be subject to a NSO stipulation and open under standard lease terms for oil and gas leasing. Based on projections of oil and gas development in the Salt Wash RFD area, approximately 10.5 acres of surface disturbance (0.3% of the potential ACEC lands) are likely to occur over the life of the plan. (Table 4.108).

**Table 4.108. Acres of White Wash Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| White Wash | 10.1 | 0 | 9.4 | 10.2 |

\*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

## 4.3.14.2.13.2 Alternative B (2,988 Acres Proposed for ACEC Designation)

Under Alternative B, all 2,988 acres would be designated as the White Wash ACEC Management under Alternative B would be more protective than under Alternative A, primarily due to the prohibition of cross country OHV use and surface-disturbing activities, due to the following prescriptions:

- The area would be managed with a NSO stipulation for oil and gas leasing as well as precluding other surface-disturbing activities. The area would be an avoidance area for ROWs. No surface disturbance due to oil and gas development is likely to occur (Table 4.108).
- Motorized travel would be limited to designated routes.
- Vehicle-based camping would be allowed in campgrounds only.
- No wood gathering or campfires would be allowed.
- The area would be managed for primitive, non-motorized recreation as part of the Labyrinth/Gemini SRMA.

## 4.3.14.2.13.3 Proposed Plan (0 Acres Proposed for ACEC Designation)

Under the Proposed Plan, the area would not be designated as an ACEC. Management of the area would be similar to Alternative A, with the following exceptions:

- The area would be designated as VRM Class III.
- About 1,866 acres would be open to cross country OHV travel. The remaining 1,122 acres would be limited to designated routes.
- Harvesting of woodland products would not be allowed.
- Oil and gas leasing would be managed as open under standard lease terms. Oil and gas development would likely disturb 9.4 acres, or 0.3% of potential ACEC lands (Table 4.108).

BLM_0010513

This alternative would be more protective of the relevant and important values than Alternatives A and D, primarily because a portion of the area would be limited to designated routes, rather than be open to cross country motorized travel. About 1,866 acres would be open to OHV use under this alternative, making this alternative less protective than Alternative B. Alternatives A, D, and Proposed Plan are less restrictive to oil and gas development than Alternative B.

### 4.3.14.2.13.4 Alternative D (0 Acres Proposed for ACEC Designation)

Under Alternative D, the area would not be designated as an ACEC. Management prescriptions would be similar to Alternative A, except:

- The area would be designated as VRM Class III.
- The entire area would be managed for open OHV use as part of the Dee Pass SRMA.

As a result, Alternative D would have more adverse impacts to relevant and important values than Alternative B because cross country OHV travel and surface-disturbing activities could alter the riparian dune system. Alternative D would have similar adverse impacts to relevant and important values as Alternative A and Proposed Plan, with surface-disturbing activities, including open OHV travel, potentially altering the riparian dune system.

### *4.3.14.2.14 WILSON ARCH POTENTIAL ACEC (3,700 ACRES)*

If designated, the Wilson Arch ACEC would be managed to preserve the relevant and important value of scenery where designated (under Alternative B). Under all alternatives, the potential Wilson Arch ACEC is within the Cameo Cliffs SRMA. SRMAs are established to provide for intensive management of recreation activities, potentially benefiting the resource values of concern in the ACEC. Under all alternatives, travel is limited to designated routes.

### 4.3.14.2.14.1 Alternative A (0 Acres Proposed for ACEC Designation)

Under Alternatives A and D, the area would not be designated as an ACEC. The following management prescriptions would apply:

- There would be no VRM management for Alternative A; the area would be managed under the VRM inventory.
- Under Alternative A, the area is open to oil and gas leasing with standard lease terms Based on projections of oil and gas development in the Lisbon Valley and Big Flat – Hatch Point RFD areas, approximately 26 acres of surface disturbance (0.7% of the potential ACEC lands) are likely to occur over the life of the plan (Table 4.109). This would be more acres of surface disturbance than under Alternative B and approximately equal to the Proposed Plan.

Impacts would be very similar under these two alternatives, with slightly less adverse impacts under Alternative D because of a more restrictive VRM Class. Due to the potential impacts from oil and gas development, impacts to the relevant and important value of scenery would be similar under Alternatives A, D, and Proposed Plan and greater than under Alternative B.

BLM_0010514

**Table 4.109. Acres of Wilson Arch Potential ACEC Likely to be Impacted by Oil and Gas Development\*, by Alternative**

| ACEC | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Wilson Arch | 25.9 | 0 | 25.6 | 25.7 |

*Based on leasing stipulations and number of wells in the RFD scenario (pro-rated by the area of ACEC designated in each RFD area)

### 4.3.14.2.14.2 Alternative B (3,700 Acres Proposed for ACEC Designation)

Under Alternative B, the entire 3,700 acres proposed would be designated an ACEC, with the following prescriptions:

- Both mechanical and motorized traffic would be limited to designated routes, and one hiking trail would be built up to Wilson Arch.
- The area would be designated as VRM Class I.
- Oil and gas leasing would be managed with a NSO stipulation, it would be an avoidance area for ROWs, and the area would be closed to woodland harvest. Alternative B would offer the highest level of protection of scenic resources of all the alternatives.

### 4.3.14.2.14.3 Proposed Plan (0 Acres Proposed for ACEC Designation)

The Proposed Plan would differ from Alternative A in that the area would be managed with timing limitations and controlled surface use stipulations for oil and gas leasing and other surface-disturbing activities. The area would be designated as VRM Class II. Therefore, this alternative would provide a higher level of scenic resource protection than Alternatives A and D, but less than Alternative B. Approximately 25.6 acres are projected to be disturbed by oil and gas development in the potential ACEC during the life of the plan, which is similar to Alternatives A and D, but more than Alternative B. This surface-disturbing activity would adversely impact the scenic values of the ACEC.

### 4.3.14.2.14.4 Alternative D (0 Acres Proposed for ACEC Designation)

Under Alternative D, the area would not be designated as an ACEC. The following management prescriptions would apply:

- The area would be managed as VRM Class III.
- The area is open to oil and gas leasing with timing limitations. Based on projections of oil and gas development in the Lisbon Valley and Big Flat – Hatch Point RFD areas, approximately 26 acres of surface disturbance (0.7% of the potential ACEC lands) are likely to occur over the life of the plan (Table 4.109).

### 4.3.14.3 NATIONAL HISTORIC TRAIL – OLD SPANISH TRAIL

In all alternatives, the Old Spanish Trail would be managed to enhance historic interpretation and public enjoyment and understanding of the Old Spanish National Historic Trail consistent with

BLM_0010515

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 27 of 355

Moab PRMP/FEIS                    Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
                                                                                          4.3.14 Special Designations

the Old Spanish Trail Comprehensive Management Plan. This would minimize adverse impacts to the historic integrity of the trail.

## 4.3.14.4 WILD AND SCENIC RIVERS (WSRs)

### 4.3.14.4.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

In all action alternatives (B, D, and Proposed Plan), where eligible rivers are determined suitable, the BLM would manage these segments to protect or enhance the outstandingly remarkable values, tentative classification, and free-flowing nature of these rivers with specific protection allocations within the river corridor (1/4 mile of the high water mark on each side of the river). BLM management is limited to public lands, and is subject to valid existing rights.

The free-flowing character of eligible river segments would be protected to the extent that modifications such as stream impoundments, channelization, and/or riprapping would not be permitted along BLM shorelines. However, depending upon the alternative, values may be at risk from potential mineral development, OHV activity, or other surface-disturbing activities. Also, the protection is limited because there are no Federal reserved water rights established for in-stream flow purposes due to eligibility or suitability determinations. In addition, unless BLM land is involved in a proposed action, BLM has no control of potential modifications of the shoreline or other development (including development related to the perfection of water rights) on non-public lands. Because of these factors, there would be no effect on the Colorado River Compact from protective management of eligible/suitable segments. BLM's management authority only extends to public lands within the river corridor, and there are no water rights associated with suitability determinations. A suitability determination also has no effect on existing water compacts.

Table 4.110 outlines the segments of rivers that would be determined suitable by alternative.

**Table 4.110. River Segments that would be Determined Suitable and Total River Miles by Alternative**

| River/River Segment | Alternative A (River Miles)[1] | Alternative B (River Miles) | PROPOSED PLAN (River Miles) | Alternative D (River Miles) |
|---|---|---|---|---|
| **Beaver Creek** | | | | |
| Segment # 1 | 0.0 | 6.7 | 0.0 | 0.0 |
| Segment # 2 | 0.0 | 1.0 | 0.0 | 0.0 |
| **Colorado River** | | | | |
| Segment # 1 | 1.2 | 1.2 | 0.0 | 0.0 |
| Segment # 2 | 14.4 | 14.4 | 14.4 | 0.0 |
| Segment # 3 | 11.2 | 11.2 | 0.0 | 0.0 |
| Segment # 3(a) | 0.0 | 0.0 | 9.3 | 0.0 |
| Segment # 3(b) | 0.0 | 0.0 | 1.9 | 0.0 |
| Segment # 4 | 0.0 | 33.1 | 33.1 | 0.0 |
| Segment # 5 | 0.0 | 5.7 | 5.7 | 0.0 |

BLM_0010516

**Table 4.110. River Segments that would be Determined Suitable and Total River Miles by Alternative**

| River/River Segment | Alternative A (River Miles)[1] | Alternative B (River Miles) | PROPOSED PLAN (River Miles) | Alternative D (River Miles) |
|---|---|---|---|---|
| Segment # 6 | 0.0 | 3.7 | 3.7 | 0.0 |
| Cottonwood Canyon | 0.0 | 10.4 | 0.0 | 0.0 |
| **Dolores River** | | | | |
| Segment # 1 | 5.9 | 5.9 | 5.9 | 0.0 |
| Segment # 2 | 6.3 | 6.3 | 6.3 | 0.0 |
| Segment # 3 | 9.9 | 9.9 | 9.9 | 0.0 |
| **Green River** | | | | |
| Segment # 1 | 0.0 | 7.7 | 0 | 0.0 |
| Segment # 1(a) | 0.0 | 0.0 | 15.8 | 0.0 |
| Segment # 2 | 0.0 | 8.1 | 0.0 | 0.0 |
| Segment # 3 | 0.0 | 1.5 | 0.0 | 0.0 |
| Segment # 3(a) | 0.0 | 0.0 | 0.0 | 0.0 |
| Segment # 4 | 0.0 | 12.9 | 0.0 | 0.0 |
| Segment # 4(a) | 0.0 | 0.0 | 49 | 0.0 |
| Segment # 5 | 0.0 | 15.8 | 0.0 | 0.0 |
| Segment # 6 | 0.0 | 29.3 | 0.0 | 0.0 |
| **Mill Creek** | | | | |
| Segment # 1 | 0.0 | 1.4 | 0.0 | 0.0 |
| Segment # 2 | 0.0 | 4.6 | 0.0 | 0.0 |
| **Negro Bill Canyon** | | | | |
| Segment # 1 | 0.0 | 7.2 | 0.0 | 0.0 |
| Segment # 2 | 0.0 | 0.2 | 0.0 | 0.0 |
| North Fork Mill Creek | 0.0 | 11.2 | 0.0 | 0.0 |
| **Onion Creek** | | | | |
| Segment # 1 | 0.0 | 2.8 | 0.0 | 0.0 |
| Segment # 2 | 0.0 | 9.7 | 0.0 | 0.0 |
| **Professor Creek** | 0.0 | 7.3 | 0.0 | 0.0 |
| **Rattlesnake Canyon** | 0.0 | 31.6 | 0.0 | 0.0 |
| **Salt Wash** | 0.0 | 0.3 | 0.0 | 0.0 |
| **Thompson Canyon** | 0.0 | 5.5 | 0.0 | 0.0 |
| **Totals** | **0.0** | **266.6** | **155.0** | **0.0** |

[1]All river segments are eligible under Alternative A; those listed are considered suitable under Alternative A.

BLM_0010517

Valid Existing Rights and WSRs

Six of rivers listed above have acreage that is leased for oil and gas under stipulations developed in earlier RMPs. These oil and gas leases would remain valid until they expire (leases are issued for ten years). While all leases do not proceed to development, stipulations developed in this RMP for oil and gas leasing would not apply to leases issued under previous RMPs. Table 4.111 predicts the number of wells that could be drilled under valid existing leases, by river.

**Table 4.111. WSRs, Number of Wells Predicted, and Currently Leased Acreage**

| River | Total Acreage | Acreage under Existing Leases | Percentage of WSR under Lease | RFD Area | Number of Wells Predicted under Existing Leases |
|-------|------|------|------|------|------|
| Beaver Creek | 2,268 | 39 | 1.7 | Eastern Paradox | <1 |
| Colorado River | 23,623 | 3,786 | 1.6 | Eastern Paradox/Big Flat | <1 |
| Cottonwood Canyon | 2,938 | 907 | 30.0 | Bookcliffs | <1 |
| Dolores River | 6,823 | 1,584 | 23.0 | Eastern Paradox | <1 |
| Green River | 13,734 | 415 | 3.0 | Big Flat | <1 |
| Mill Creek | 1,864 | 153 | 8.0 | Eastern Paradox | <1 |

Fewer than one well is predicted because of current valid oil and gas leases on any river proposed for Wild and Scenic status. This would not adversely impact the outstandingly remarkable values of the WSR in question.

### 4.3.14.4.2 ALTERNATIVE A

Under Alternative A, portions of the Colorado and Dolores Rivers were found suitable as part of the Wild and Scenic River Study Final EIS (NPS 1979). For the remaining river segments, a suitability determination would not be made, but the other river segments that were determined eligible in the *Wild and Scenic Rivers Review Eligibility Determination* for the MFO would remain eligible under this alternative (BLM 2004g). Where BLM manages the shoreline or other lands within the river corridors, they would be managed to maintain the free-flowing nature, outstandingly remarkable values, and tentative classification. Because the eligible river corridors would be subject to the existing land-use plan as far as resource allocations are concerned, they may be subject to case-by-case actions. These would be addressed through the NEPA process with mitigation applied if appropriate. If any proposed actions would affect the eligibility of the river segment, it is BLM policy to deny the action until suitability can be considered.

All river segments not closed to oil and gas leasing due to WSA designation or management for other resources would be subject to leasing under standard lease terms or timing limitations and controlled surface use stipulation. This could result in surface disturbance to these river corridors. These segments include Beaver Creek, segments of the Colorado River below the Dolores River confluence, the Green River, Mill Creek, Onion Creek, Professor Creek and Thompson Canyon.

BLM_0010518

All segments except for those in the Three Rivers withdrawal (the Green, Colorado, and Dolores Rivers) would be open to mining claims for locatable minerals. Generally, impacts to riparian corridors would be avoided under standard lease terms and BLM riparian policy. Therefore, regardless of the leasing category, these areas would be protected from development. However there is an exception to allow for development in riparian areas if there are no other practical alternatives. In areas where the 1/4 mile WSR corridor extends beyond the riparian corridor, surface-disturbing activities may occur such as oil and gas or salable mineral development. These types of activities could adversely impact the outstandingly remarkable values of these rivers. Adverse impacts would include loss of vegetation, habitat fragmentation, and loss of scenic values.

Under Alternative A, portions of the Colorado River (parts of segments #2, #3, and #4) would be managed as the Colorado River SRMA. This management would enhance this segment's recreational values by providing boating opportunities, and would not affect the other outstandingly remarkable values. It would not affect the free-flowing nature of the river, and would be in keeping with the tentative classifications of scenic, recreational and wild.

Beaver Creek (Segment #2), the Colorado River (segments #2, #3(a), #3(b), and #4), Cottonwood Canyon, the Dolores River (Segments #1, #2, and #3), the Green River (Segments #3, #4(a), and #4(b)), Mill Creek (Segments #1 and #2), the North Fork Mill Creek, Onion Creek (Segments #1 and #2), Professor Creek, Rattlesnake Canyon, and Thompson Canyon would be open to cross-country OHV use, in part. Temporary impacts to their outstanding and remarkable values could occur from vehicular surface disturbance and noise. All the remaining eligible river segments would be in a limited or closed OHV category thereby protecting them from disturbance related to OHV activity.

### 4.3.14.4.3 ALTERNATIVE B

Under Alternative B, 266.6 river miles involving the Beaver Creek (Segments #1 and #2), Colorado River (Segments #1–6), Cottonwood Canyon, Dolores River (Segments #1-3), Green River (Segments #1–6), Mill Creek (Segments #1 and #2), Negro Bill Canyon (Segments #1 and #2), North Fork Mill Creek, Onion Creek (Segments #1 and #2), Professor Creek, Rattlesnake Canyon, Salt Wash, and Thompson Canyon river segments would be recommended as suitable for designation into the National Wild and Scenic River System (see Table 4.112). Overall, because of the increased acreage identified and managed as suitable, and because other resource allocations would be consistent with management of the rivers' suitability, this alternative would provide greater protection to outstanding remarkable values than does Alternative A.

All of the segments recommended as suitable would be managed as closed or with a NSO stipulation for oil and gas leasing as well as precluding other surface-disturbing activities, including ROWs. All segments except for those in the Three Rivers Withdrawal (the Green, Colorado, and Dolores Rivers) would be open to mining claims for locatable minerals. Since the entire area is either closed or NSO, the risks to the outstanding and remarkable values are negligible.

BLM_0010519

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Beaver Creek Segment #1 | RM: 6.7 Acres: 2,061 | Suitability not considered. Oil and gas leasing: open with standard stipulations. | Recommendation: Suitable-Wild. Within the Dolores River Canyon SRMA. All 6.7 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: Closed. | Recommendation: Not Suitable. Within the Dolores River Canyon SRMA. All 6.7 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Oil and gas leasing: NSO. |
| Beaver Creek Segment #2 | RM: 1.0 Acres: 207 | Suitability not considered. Oil and gas leasing: open with standard stipulations. | Recommendation: Suitable-Scenic. Within the Dolores River Canyon SRMA. All managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: Closed. | Recommendation: Not Suitable. Within the Dolores River Canyon SRMA. All managed to preserve non-WSA lands with wilderness characteristics (Beaver Creek WIA). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Oil and gas leasing: open with special stipulations. |
| Colorado River Segment #1 | RM: 1.2 Acres: 525 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: open with special stipulations. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: open with special stipulations. |
| Colorado River Segment #2 | RM: 14.4[a] Acres: 4,531 | Suitability not considered. Overlaps the Westwater WSA. Within the Colorado River SRMA. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Wild. Overlaps the Westwater WSA. Overlaps the Two Rivers SRMA. Overlaps the Westwater Canyon ACEC. Withdrawn from mineral entry. Oil and gas leasing: closed. | Recommendation: Suitable-Wild. Overlaps the Westwater WSA. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps the Westwater WSA. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Open with special stipulations. Oil and gas leasing: closed. |

BLM_0010520

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Colorado River Segment #3 | RM: 11.2 Acres: 4,200 | Suitability not considered. Within the Colorado River SRMA. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry. Oil and gas leasing: NSO. | N/A | Recommendation: Not Suitable. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry. Oil and gas leasing: NSO. |
| Colorado River Segment #3(a) | RM: 9.3 Acres: 3,535 | Not proposed under this Alternative. | Not proposed under this Alternative. | Recommendation: Suitable-Scenic. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Not proposed under this Alternative. |
| Colorado River Segment #3(b) | RM: 1.9 Acres: 665 | Not proposed under this Alternative. | Not proposed under this Alternative. | Recommendation: Suitable-Recreational. Overlaps the Two Rivers SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Not proposed under this Alternative. |
| Colorado River Segment #4* | RM: 33.1[b] Acres: 12,151 | Suitability not considered. Partially within the Colorado Riverway SRMA. Withdrawn from mineral entry. Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Recreational. Within the Colorado Riverway SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Partially within the Colorado River Corridor ACEC. Oil and gas leasing: NSO. | Recommendation: Suitable-Recreational. Within the Colorado Riverway SRMA. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Partially within the Colorado Riverway SRMA. Oil and gas leasing: NSO. |

BLM_0010521

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Colorado River Segment #5 | RM: 5.7 Acres: 1,275 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Suitable-Recreational. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. |
| Colorado River Segment #6 | RM: 3.7 Acres: 941 | Suitability not considered. Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Wild. Overlaps the Hwy 279 Corridor/ Shafer Basin/Long Canyon ACEC. Within the Colorado Riverway SRMA. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Overlaps the Hwy 279 Corridor/ Shafer Basin/Long Canyon ACEC. Within the Colorado Riverway SRMA. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Within the Colorado Riverway SRMA. Oil and gas leasing: Open with standard stipulations. |
| Cottonwood Canyon | RM: 10.4 Acres: 2,938 | Suitability not considered. Canyon bottom is the border between the Spruce Canyon and Coal Canyon WSAs. Oil and gas leasing: Closed. | Recommendation: Suitable-Scenic. Canyon bottom is the border between the Spruce Canyon and Coal Canyon WSAs. 0.08 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: closed. | Recommendation: Not Suitable. Canyon bottom is the border between the Spruce Canyon and Coal Canyon WSAs. Oil and gas leasing: closed. | Recommendation: Not Suitable. Canyon bottom is the border between the Spruce Canyon and Coal Canyon WSAs. Oil and gas leasing: closed. |
| Dolores River Segment #1 | RM: 5.9[c] Acres: 1,889 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Suitable-Recreational. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). |

BLM_0010522

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Dolores River Segment #2 | RM: 6.3[d]<br>Acres: 2,035 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Wild. Withdrawn from mineral entry (Three Rivers Withdrawal). Portion managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: closed. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Portion managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. |
| Dolores River Segment #3 | RM: 9.9<br>Acres: 2,899 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Within Two Rivers SRMA. Portion managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Suitable-Recreational. Withdrawn from mineral entry (Three Rivers Withdrawal). Within Two Rivers SRMA. Portion managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Within Two Rivers SRMA. Oil and gas leasing: NSO. |
| Green River Segment #1 | RM: 7.7<br>Acres: 1,060 | Suitability not considered. Partially within the Desolation Canyon WSA. Withdrawn from mineral entry. Oil and gas leasing: mostly closed. | Recommendation: Suitable-Wild. Partially within the Desolation Canyon WSA. Withdrawn from mineral entry (Three Rivers Withdrawal). Partially within Lower Gray Canyon SRMA. Oil and gas leasing: NSO and closed. | N/A because of differing segmentation. (see below). | Recommendation: Not Suitable. Partially within the Desolation Canyon WSA. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO and closed. |

BLM_0010523

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Green River Segment #1(a) | | Not proposed under this Alternative. | Not proposed under this Alternative. | Recommendation: Suitable-Scenic. Partially within the Desolation Canyon WSA. Withdrawn from mineral entry (Three Rivers Withdrawal). Partially within the Lower Gray Canyon SRMA. Oil and gas leasing: closed and NSO. | Not proposed under this Alternative. |
| Green River Segment #2 | RM: 8.1 Acres: 1,471 | Suitability not considered. Oil and gas leasing: mostly open with standard stipulations. | Recommendation: Suitable-Recreational. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | N/A. | Recommendation: Not Suitable. |
| Green River Segment #3 | RM: 1.5 Acres: 341 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: open with standard stipulations. | Recommendation: Suitable-Recreational. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO |
| Green River Segment #4 | RM: 12.9 Acres: 2,905 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: mostly open with standard stipulations. | Recommendation: Suitable-Scenic. Overlaps Labyrinth Canyon ACEC. Withdrawn from mineral entry (Three Rivers Withdrawal). Overlaps Labyrinth Rim/Gemini Bridges SRMA. Oil and gas leasing: NSO. | N/A because of river segmentation (see below). | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Overlaps Dee Pass SRMA. Oil and gas leasing: NSO. |

BLM_0010524

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Green River Segment #4(a) | RM: 49 | Not proposed under this Alternative. | Not proposed under this Alternative. | Recommendation: Suitable-Scenic. Overlaps East bank in Labyrinth Canyon ACEC. Withdrawn from mineral entry (Three Rivers Withdrawal). Overlaps Labyrinth Rim/Gemini Bridges SRMA. Oil and gas leasing: NSO. | Not proposed under this Alternative. |
| Green River Segment #5 | RM: 15.8 Acres: 2,577 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: mostly open with standard stipulations. | Recommendation: Suitable-Wild. Withdrawn from mineral entry (Three Rivers Withdrawal). East bank in Labyrinth Canyon ACEC. Overlaps Labyrinth Rim/Gemini Bridges SRMA. About 7.1 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | N/A because of river segmentation (see above). | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. |
| Green River Segment #6 | RM: 29.3 Acres: 5,380 | Suitability not considered. Withdrawn from mineral entry. Oil and gas leasing: open with standard stipulations. | Recommendation: Suitable-Scenic. Withdrawn from mineral entry (Three Rivers Withdrawal). Overlaps Labyrinth Canyon ACEC. Overlaps Labyrinth Rim/Gemini Bridges SRMA. Oil and gas leasing: NSO. | N/A because of river segmentation (see above). | Recommendation: Not Suitable. Withdrawn from mineral entry (Three Rivers Withdrawal). Oil and gas leasing: NSO. |

BLM_0010525

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Mill Creek Segment #1 | RM: 1.4 Acres: 572 | Suitability not considered. Oil and gas leasing: NSO. | Recommendation: Suitable-Recreational. Overlaps Mill Creek ACEC. Within the South Moab SRMA. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Mill Creek ACEC. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Oil and gas leasing: open with special stipulations. |
| Mill Creek Segment #2 | RM: 4.6 Acres: 1,292 | Suitability not considered. Overlaps Mill Creek WSA. Oil and gas leasing: NSO. | Recommendation: Suitable-Scenic. Overlaps Mill Creek WSA. Overlaps Mill Creek ACEC. Within the South Moab SRMA. 3 managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Mill Creek WSA. Overlaps Mill Creek ACEC. Within the South Moab SRMA. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Overlaps Mill Creek WSA. Oil and gas leasing: open with special stipulations. |
| Negro Bill Canyon Segment #1 | RM: 7.2 Acres: 1,687 | Suitability not considered. Overlaps Negro Bill WSA. Oil and gas leasing: closed. | Recommendation: Suitable-Wild Overlaps Negro Bill WSA. Between the Sand Flat and Colorado Riverway SRMAs. Within Colorado River Corridor ACEC. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Negro Bill WSA. Between the Sand Flat and Colorado Riverway SRMAs. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Negro Bill WSA. Between the Sand Flat and Colorado Riverway SRMAs. Oil and gas leasing: closed. |
| Negro Bill Canyon Segment #2 | RM: 0.2 Acres: 262 | Suitability not considered. Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Recreational. Between the Sand Flat and Colorado Riverway SRMAs. Within Colorado River Corridor ACEC. 0.08 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Between the Sand Flat and Colorado Riverway SRMAs. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Between the Sand Flat and Colorado Riverway SRMAs. Oil and gas leasing: NSO. |

BLM_0010526

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| North Fork Mill Creek | RM: 11.2<br>Acres: 3,027 | Suitability not considered.<br>Oil and gas leasing: closed. | Recommendation: Suitable-Wild.<br>Overlaps Mill Creek WSA.<br>Within the South Moab SRMA.<br>Oil and gas leasing: closed. | Recommendation: Not Suitable.<br>Overlaps Mill Creek WSA.<br>Within the South Moab SRMA.<br>Oil and gas leasing: closed. | Recommendation: Not Suitable.<br>Overlaps Mill Creek WSA.<br>Oil and gas leasing: closed. |
| Onion Creek Segment #1 | RM: 2.8<br>Acres: 726 | Suitability not considered.<br>Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Wild.<br>Within the Colorado Riverway SRMA.<br>Managed to preserve wilderness characteristics.<br>Overlaps Colorado River Corridor ACEC.<br>Oil and gas leasing: NSO. | Recommendation: Not Suitable.<br>Within the Colorado Riverway SRMA.<br>Managed to preserve wilderness characteristics.<br>Oil and gas leasing: NSO. | Recommendation: Not Suitable.<br>Within the Colorado Riverway SRMA.<br>Oil and gas leasing: open with special stipulations. |
| Onion Creek Segment #2 | RM: 9.7<br>Acres: 2,420 | Suitability not considered.<br>Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Recreational.<br>Within the Colorado Riverway SRMA.<br>7.06 miles managed to preserve non-WSA lands with wilderness characteristics.<br>Within Colorado River Corridor ACEC.<br>Oil and gas leasing: closed. | Recommendation: Not Suitable.<br>Within the Colorado Riverway SRMA.<br>7.06 miles managed to preserve non-WSA lands with wilderness characteristics.<br>Oil and gas leasing: NSO. | Recommendation: Not Suitable.<br>Within the Colorado Riverway SRMA.<br>gas leasing: open with special stipulations. |

BLM_0010527

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Professor Creek | RM: 7.3 Acres: 1,936 | Suitability not considered. Oil and gas leasing: open with special stipulations. | Recommendation: Suitable-Wild Within the Colorado Riverway SRMA. 7.3 miles managed to preserve non-WSA lands with wilderness characteristics. Within Colorado River Corridor ACEC. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Within the Colorado Riverway SRMA. 7.3 miles managed to preserve non-WSA lands with wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Within the Colorado Riverway SRMA. Oil and gas leasing: open with special stipulations. |
| Rattlesnake Canyon | RM: 31.6[e] Acres: 8,371 | Suitability not considered. Overlaps Desolation Canyon WSA. Oil and gas leasing: closed. | Recommendation: Suitable-Wild. Overlaps Desolation Canyon WSA. Overlaps Book Cliffs Wildlife Area ACEC. Within the Book Cliffs SRMA. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Desolation Canyon WSA. Oil and gas leasing: closed. | Recommendation: Not Suitable. Overlaps Desolation Canyon WSA. Oil and gas leasing: closed. |
| Salt Wash | RM: 0.3 Acres: 96 | Suitability not considered. Oil and gas leasing: open with special stipulations. | (Eligibility Determination Deferred) | (Eligibility Determination Deferred) | (Eligibility Determination Deferred) |
| Thompson Canyon | RM: 5.5 Acres: 1,620 | Suitability not considered. Oil and gas leasing: open with standard stipulations. | Recommendation: Suitable-Wild. Within the Dolores River Canyon SRMA. Managed to preserve wilderness characteristics. Oil and gas leasing: closed. | Recommendation: Not Suitable. Within the Dolores River Canyon SRMA. Managed to preserve wilderness characteristics. Oil and gas leasing: NSO. | Recommendation: Not Suitable. Oil and gas leasing: open with special stipulations. |

BLM_0010528

**Table 4.112. Management Proposed for River Segments Considered for WSR Designation, by Alternative**

| Segment | BLM River Miles (RM) and Acres | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|

N/A = Not applicable or not considered under that alternative.

*Alternative D includes only the portion from Hittle Bottom to Take Out Beach.

a. Includes 2.0 miles of the Little Delores River, 0.5 miles of Marble Canyon, and 0.3 miles of Star Canyon.

b. Includes 0.3 miles of Kane Springs Creek.

c. Includes 0.3 miles of Fisher Creek.

d. Includes 0.4 miles of Granite Creek.

e. Includes 10.9 miles of Flat Nose George Canyon.

f. Includes 11.2 miles of Flat Nose George Canyon.

BLM_0010529

Under Alternative B, Beaver Creek (Segment #1), Colorado River (Segments #2 and #6), Dolores River (Segment #2), Green River (Segments #1 and #5), Negro Bill Canyon (Segment #1), North Fork Mill Creek, Onion Creek (Segment #1), Professor Creek, Salt Wash, and Thompson Canyon would be designated as VRM Class I. The remaining segments would be designated as VRM II. Thus, all segments would have direct beneficial protection to their scenic values and indirect benefits to other resource values because VRM Class I and VRM Class II designation impose limits on surface disturbance.

Beaver Creek (Segments #1 and #2), Colorado River (Segments #2, 3, 4, and 6), Dolores River (Segment #3), Green River (Segments #1 and #4-6), Mill Creek (Segments #1 and #2), Negro Bill Canyon (Segments #1 and #2), North Fork Mill Creek, Onion Creek (Segments #1 and #2), Professor Creek, Rattlesnake Canyon, and Thompson Canyon would be managed within SRMAs under Alternative B. The SRMAs would manage recreational activities and enhance these segment's recreational values, and would not affect the other outstandingly remarkable values. SRMA management would not affect the free-flowing nature of the river, and would be in keeping with the tentative classification of scenic.

Beaver Creek (Segments #1 and #2), the Dolores River, Onion Creek, Professor Creek and Thompson Creek would be managed to protect wilderness characteristics under Alternative B. The management of these lands to maintain wilderness characteristics would protect outstandingly remarkable values and would not affect the free-flowing nature of the river.

All river segments would be in a closed or limited to designated routes OHV category River corridors would thus largely be protected from disturbance related to OHV activity. No loss of outstandingly remarkable values from OHV use would therefore be anticipated during the life of the plan.

### 4.3.14.4.4 PROPOSED PLAN

Under the Proposed Plan, 155 river miles involving the Colorado River (Segments #2, 3(a), 3(b), 4, 5, and 6), Dolores River (Segments #1-3), and Green River (Segments #1(a) and 4(a)) segments would be recommended as suitable for designation into the National Wild and Scenic River System (see Table 4.112). This alternative would be more protective to their outstanding and remarkable values than Alternative D, but less so than Alternative B. Since Alternative A protects the eligibility of all the river segments, it may be more protective than the Proposed Plan.

All remaining river segments not recommended as suitable would be managed as either NSO or closed for oil and gas leasing, as well as precluding other surface-disturbing activities. This would result in no surface disturbance. All of the segments recommended as suitable for designation would also be managed as NSO or closed to oil and gas leasing. All segments except for those in the Three Rivers withdrawal (the Green, Colorado, and Dolores Rivers) would be open to mineral entry.

Under the Proposed Plan, Colorado River (Segment #2) would be designated as VRM Class I and Colorado River (Segments #3(a), 3(b), 4, 5, and 6), Dolores River (Segments #1-3), and Green River (Segments #1(a) and 4(a)), would be designated as VRM Class II. These segments would have beneficial direct protection to scenic and other resource values because the classifications limit surface disturbance. The remaining river segments not recommended would

BLM_0010530

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 42 of 355

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
                                   *4.3.14 Special Designations*

be at risk for adverse impacts to their outstanding and remarkable values because surface-disturbing activities could be allowed.

Beaver Creek (Segments #1 and #2), Colorado River (Segments #2, 3(a), 3(b), 4, and 6), Dolores River (Segment #3), Green River (Segments #1(a) and 4(a)), Mill Creek (Segment #2), Negro Bill Canyon (Segments #1 and #2), North Fork Mill Creek, Onion Creek (Segments #1 and #2), Professor Creek, and Thompson Canyon would be managed as SRMAs. This would enhance these segments' recreational values as opportunities would be provide for recreation, and would not affect the other outstandingly remarkable values. It would not affect the free-flowing nature of the river, and would be in keeping with the tentative classification of scenic.

Areas within Beaver Creek (Segments #1 and #2), the Dolores River, Onion Creek, Professor Creek and Thompson Creek would be managed to protect wilderness characteristics under the Proposed Plan. The protection, preservation, and management of these lands to enhance wilderness characteristics would also enhance outstandingly remarkable values because surface-disturbing activities would be precluded. It would not affect the free-flowing nature of the river. It should be noted that of the eligible rivers managed as suitable for designation under the Proposed Plan, only the Dolores River is within an area managed to preserve, protect, and maintain wilderness characteristics. This area is Beaver Creek, which contain Dolores River WSR mileage.

All river segments would be in a limited to designated routes or closed OHV category, with most of the segments limited to designated routes. River corridors would largely be protected from disturbance related to OHV activity. No loss of outstandingly remarkable values from OHV use would be anticipated during the life of the plan.

### 4.3.14.4.5 ALTERNATIVE D

No segments would be recommended for designation under this alternative. This alternative would offer the least protections to the WSRs in comparison to Alternatives A, B, and C.

All river segments outside WSAs and outside of the Three Rivers Withdrawal area would be subject to oil and gas leasing under standard lease terms or with timing limitations and controlled surface use stipulations. These segments include Beaver Creek, Segment #6 of the Colorado River, Mill Creek, Onion Creek, Professor Creek and Thompson Creek. All segments except for those in the Three Rivers withdrawal (the Green, Colorado, and Dolores Rivers) would be open to mining claims for locatable minerals. However, as noted under Alternative A, riparian corridors would be avoided based on BLM Riparian Policy and through standard lease terms for oil and gas.

Under Alternative D, all segments not specifically designated VRM Class I or II under other resource decisions would be designated as VRM Class III or IV. Unless other management prescriptions limit surface disturbance in these areas, river segments designated as VRM Class III or IV would be at risk for adverse impacts to their outstanding and remarkable values from surface disturbance, loss of vegetation, habitat fragmentation, and loss of scenery.

Under Alternative D, parts of Colorado River (Segments # 2, 3, 4, and 6), Dolores River (Segment #3), Green River (Segment #4), Negro Bill Canyon (Segment #2), Onion Creek (Segments #1 and # 2), and Professor Creek would be managed as SRMAs. This would control recreational activities and would enhance these segments' recreational values. SRMA

BLM_0010531

management would not affect the other outstandingly remarkable values. It would not affect the free-flowing nature of the river.

All river segments would be in a limited to designated routes or closed OHV category, with most of the segments limited to designated routes. River corridors would largely be protected from disturbance related to OHV activity. No loss of outstandingly remarkable values from OHV use would be anticipated during the life of the plan.

### 4.3.14.5 WILDERNESS STUDY AREAS (WSAS) AND WILDERNESS AREAS (WAS)

#### 4.3.14.5.1 WSAs

In all alternatives, WSAs are managed under the Interim Management Plan for Lands Under Wilderness Review (IMP), which directs the BLM to manage an area so as not to impair its suitability for preservation as wilderness. IMP applies to all uses and activities except those specifically exempted from this standard, such as grandfathered uses (BLM 1995). In this PRMP, decisions about OHV designations and VRM designation within WSAs will be made. There would be no impacts to WSAs from other resources from implementation of this plan. Table 4.113 presents WSA acreages within the MPA.

Table 4.113. WSA Acreages within the MPA

| WSA | Acreage |
|---|---|
| Behind the Rocks | 12,635 |
| Black Ridge Canyons | 52 |
| Coal Canyon | 60,755 |
| Desolation Canyon | 81,603 |
| Floy Canyon | 72,605 |
| Flume Canyon | 50,800 |
| Lost Spring Canyon | 1,624 |
| Mill Creek Canyon | 9,780 |
| Negro Bill Canyon | 7,820 |
| Spruce Canyon | 20,990 |
| Westwater Canyon | 31,160 |
| **Total** | **349,824** |

### 4.3.14.5.1.1 Impacts to WSAs from Travel Management Decisions

Table 4.114 presents the OHV designation, by WSA and by alternative. For WSAs in the "Limited" category, Alternative A limits travel to inventoried routes. Alternative D and Proposed Plan limits travel to a subset of the inventoried routes, which would be designated.

BLM_0010532

**Table 4.114. OHV Designations in WSAs, by Alternative**

| WSA | Acres | Alt. A | Alt. B | PROPOSED PLAN | Alt. D |
|---|---|---|---|---|---|
| Behind the Rocks | 12,635 | Limited | Closed | Limited | Limited |
| Black Ridge | 52 | Limited | Closed | Limited | Limited |
| Coal Canyon | 60,755 | Limited | Closed | Closed | Limited |
| Desolation Canyon (MFO) | 81,603 | Limited | Closed | Closed | Limited |
| Floy Canyon | 72,605 | Limited | Closed | Closed | Limited |
| Flume Canyon | 50,800 | Limited | Closed | Closed | Limited |
| Lost Spring Canyon | 1,624 | Limited | Closed | Limited | Limited |
| Mill Creek Canyon | 9,780 | Limited | Closed | Closed | Limited |
| Negro Bill Canyon | 7,820 | Limited | Closed | Closed | Limited |
| Spruce Canyon | 20,990 | Limited | Closed | Closed | Limited |
| Westwater Canyon | 31,160 | Limited | Closed | Limited | Limited |

Table 4.115 presents the miles of route designated, by WSA, by alternative:

**Table 4.115. Miles of Route Designated, by WSA and by Alternative**

| WSA | Acres | A | B | PROPOSED PLAN | D |
|---|---|---|---|---|---|
| Behind the Rocks | 12,635 | 3.55 | 0 | 0.9 | 0.9 |
| Black Ridge | 52 | 0 | 0 | 0 | 0 |
| Coal Canyon | 60,755 | 8.0 | 0 | 0 | 1.5 |
| Desolation Canyon (MFO) | 81,603 | 8.2 | 0 | 0 | 0 |
| Floy Canyon | 72,605 | 23.5 | 0 | 0 | 1.55 |
| Flume Canyon | 50,800 | 10.13 | 0 | 0 | 0 |
| Lost Spring Canyon | 1,624 | 0.25 | 0 | 0.8 | 1.0 |
| Mill Creek Canyon | 9,780 | 1.83 | 0 | 0 | 1.48 |
| Negro Bill Canyon | 7,820 | 3.54 | 0 | 0 | 1.12 |
| Spruce Canyon | 20,990 | 1.0 | 0 | 0 | 0 |
| Westwater Canyon | 31,160 | 22.5 | 0 | 0 | 8.4 |
| **Totals** | **349,824** | **82.5** | **0** | **1.7** | **16.0** |

Travel management decisions which close WSAs to motorized travel promote opportunities for primitive and unconfined recreation, prevent additional intrusions, and enhance supplemental values; within the designated OHV category, those decisions which allow the least number of miles open to motorized travel are the most beneficial to these values and WSA management. Alternative B is the most restrictive of motorized travel within WSAs because all WSAs are closed to travel; Alternative B adversely impacts wilderness values the least. The Proposed Plan

BLM_0010533

is less restrictive of motorized travel than is Alternative B, but it is more restrictive than Alternatives A and D.

### 4.3.14.5.1.2 Impacts to WSAs from Visual Resource Management Decisions

Under all alternatives, WSAs would be designated as VRM Class I. Therefore, the impacts to WSAs from VRM decisions would be the same for all alternatives. VRM Class I allows no change to the existing landscape, thereby preserving the naturalness of the WSAs.

### *4.3.14.5.2 WAs*

In all alternatives, the Black Ridge WA (5,200 acres) would be managed as part of the McInnis Canyons National Conservation Area. Management prescriptions would prevent impacts to the wilderness values of the area.

### 4.3.14.6 SUMMARY OF IMPACTS

### *4.3.14.6.1 ACECs*

The management prescriptions for ACECs that would have the greatest impacts upon the relevant and important values in ACEC areas would be oil and gas leasing category, VRM designations and OHV/travel management. All fourteen of the potential ACECs (613,077 acres) would be designated under Alternative B, and would be managed with greater protection of their relevant and important values (see Table 2.2 of Chapter 2, Impact Summary Table). The Proposed Plan would designate five of the potential ACECs (63,232 acres), and provides protection of the relevant and important values within those areas. Alternatives A and D would not designate new ACECs, and would be the least protective of relevant and important values. Adverse impacts to potential the relevant and important values could occur under Alternatives A and D.

Acreages within the potential ACECs in the Greater Cisco and Lisbon Valley RFD areas that are open to oil and gas leasing with standard lease terms or timing limitations or controlled surface use stipulations would be vulnerable to development that could degrade or eliminate relevant and important values proposed for protection. The potential Cisco White-tailed Prairie Dog Complex and the Book Cliffs ACECs would be most impacted by oil and gas development (see Table 2.2).

### *4.3.14.6.2 NATIONAL HISTORIC TRAIL*

The Old Spanish Trail would be managed to provide for public understanding and enjoyment under all alternatives.

### *4.3.14.6.3 WSRs*

In all action alternatives (B, D, and Proposed Plan), where eligible rivers would be determined suitable, the BLM would manage these segments to protect or enhance the outstandingly remarkable values, tentative classification, and free-flowing nature of these rivers with specific protection allocations within the river corridor (1/4 mile of the high water mark on each side of the river). BLM management is limited to public lands, and is subject to valid existing rights.

BLM_0010534

Under Alternative A, a suitability determination would not be made, but those river segments that were determined eligible in the *Wild and Scenic Rivers Review Eligibility Determination* for the MFO would remain eligible under this alternative (BLM 2004g. Where BLM manages the shoreline or other lands within the river corridors, they would be managed to maintain the free-flowing nature, outstandingly remarkable values, and tentative classification. Under Alternative B, 267 miles of river would be recommended as suitable, with the greatest beneficial impacts to WSRs. The Proposed Plan would recommend 155 miles of river as suitable. Alternative D would not find any segments suitable.

### 4.3.14.6.4 WSAS

The management of WSAs would be the same under all alternatives, except for OHV management. Alternative B is the most beneficial to WSA management, followed by the Proposed Plan and Alternatives D and A. WSAs would be managed under the Interim Management Plan (IMP), which directs the BLM to manage the area so as not to impair their suitability for preservation as wilderness.

## 4.3.15 SPECIAL STATUS SPECIES

This section discusses impacts to special status species from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning special status species are described in Chapter 3.

Because of the large number of special status species—including Threatened, Endangered, and Sensitive species—in some cases, it was determined that the most effective way to disclose impacts at the programmatic level would be to analyze the impacts to the habitat cover types used by these species (see Chapter 3, Affected Environment) for species and habitat descriptions). Accordingly, for the purposes of analysis, the special status species described in Chapter 3, Section 3.3.16 are grouped here by habitat type, as shown in Table 4.116 below. Impacts to Federally listed species are also analyzed by habitat type, with the exception of some species for which site-specific population or other similar fine-scale data are available. In some areas, based on the limited impact varying by species type, impacts are discussed by alternative to give a more overall description of the impacts resulting from the management action.

### 4.3.15.1 ANALYSIS ASSUMPTIONS

In all of the following sections, management actions discussed for each of the management alternatives are in addition to those discussed under Impacts Common to All Alternatives. Furthermore, management actions discussed for Alternatives B, D, and the Proposed Plan are in addition to those discussed under both Impacts Common to All Alternatives and Impacts Common to All Action Alternatives. The Proposed Action and alternatives have the potential for adverse impacts on special status species through management actions such as travel management, recreational use of the land, vegetation treatments, and oil or gas development.

Air quality management does not directly result in additional emissions or air quality degradation. Potential impacts to air quality from actions, such as the construction of access roads to oil and gas development sites, would be analyzed as part of the energy and minerals program in the environmental analysis prepared for that action. Appropriate Section 7 consultation with USFWS would be conducted as a part of the environmental process. Therefore,

BLM_0010535

any potential impacts to air quality would result from implementing aspects of the energy and minerals program. Given the objectives and goals of the air quality program and the support function for maintenance of appropriate air quality standards, implementation of the air quality program would have not effect any of the listed threatened or endangered plant, fish, and animal species analyzed in this report and would not effect any of the designated critical habitat of the threatened or endangered fish and animal species analyzed in this report within the MPA.

It was determined that quantitative analyses would be made for Federally listed species as well as a few BLM Sensitive species selected as representative of a variety of vegetation types. These species include southwestern willow flycatcher (SWFL), endangered Colorado River fishes, Mexican spotted owl (MSO), bald eagle (nesting and wintering), Jones cycladenia, yellow-billed cuckoo, greater and Gunnison sage-grouse, and White-tailed and Gunnison prairie dog. The habitats associated with these species are representative of the habitats of the other special status species (Table 4.116). All habitat impacts analyzed in this section are approximations based on assumptions regarding the potential locations of facilities, vegetation treatments, grazing, and other management decisions. The black-footed ferret is not known to occur in the MPA. However, the possibility exists that at some point in time the introduction of experimental non-essential populations of ferrets may be considered. Because there are no specific plans or time frames for re-introductions, potential re-introductions are not analyzed and potential impacts to black-footed ferrets are not analyzed.

Acreage calculations used for analysis for SWFL and yellow-billed cuckoo habitat were made using riparian vegetation acreages. Because both species utilize micro-habitats within riparian habitat, all habitat acreage calculations are likely over-estimations for these species.

All references to the Colorado River fishes are specifically referring to the Federally endangered bonytail chub (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*). These four species are managed similarly, and impacts can typically be analyzed as a group.

The alternatives have the potential for both adverse and beneficial impacts on special status species through management actions such as travel management, recreational use of the land, vegetation treatments, and oil or gas development. Wherever possible, this document quantifies the amount and types of habitats that would be directly disturbed or reclaimed due to such actions. However, it is often difficult to quantify the loss or improvement of quality or condition of a habitat. Subtle increases or decreases in weeds, shrubs, forbs, water availability, undisturbed areas, or birthing or wintering grounds can greatly affect the distribution, health, and survival of a diversity of sensitive plant and animal species. The degree to which these impacts could occur varies by alternative, with alternatives that increase the amount of surface disturbance within special status species' habitats generally having greater potential adverse impacts on these species. Attempts are made to address potential impacts within each action analysis, but the discussions are often qualitative due to the difficulty in measuring such changes.

Additional assumptions for this chapter include the following: (1) implementation of all of the alternatives would be in accordance with existing laws, regulations, and standard management guidelines; (2) actions associated with emergency or public safety would be performed at the discretion of the Authorized Officer; (3) though impacts resulting from implementation of any of the alternatives may extend beyond MPA boundaries, they will be analyzed to their logical conclusion even if they extend beyond MPA boundaries (an example of this would be analyzing

BLM_0010536

impacts to aquatic species, including downstream impacts beyond the MPA boundaries); and that, (4) public land users will comply with the decisions and allocations contained in the alternatives.

BLM_0010537

**Table 4.116. Special Status Species in the MPA, by Habitat Type**

| Habitat Type | BLM Special Status Species | Federally Listed Species | Designated Critical Habitat |
|---|---|---|---|
| Desert Shrub | **Wildlife**<br>Allen's big-eared bat (*Idionycteris phyllotis*), big free-tailed bat (*Nyctinomops macrotis*), fringed myotis (*Myotis thysanodes*), spotted bat (*Euderma maculatum*), Gunnison prairie dog (*Cynomys gunnisoni*), White-tailed prairie dog (*Cynomys leucurus*), burrowing owl (*Athene cunicularia*) (Map 2-22), short-eared owl (*Asio flammeus*), ferruginous hawk (*Buteo regalis*) (Map 2-22), desert night lizard (*Xantusia vigilis*). | **Wildlife**<br>None. | **Wildlife**<br>None. |
| | **Plants**<br>Peabody's milkvetch (*Astragalus pubentissimus* var. *peabodianus*), Cisco milkvetch (*Astragalus sabulous* var. *sabulous*), stage-station milkvetch (*Astragalus sabulous* var. *vehiculus*), Cataract Canyon gilia (*Gilia latifolia* var. *imperialis*), Entrada rushpink (*Lygodesmia grandiflora* var. *entrada*), Shultz' stickleaf (*Mentzelia shultziorum*), Trotter's oreoxis (*Oreoxis trotteri*), Paradox breadroot (*Pediomelum aromaticum* var. *tuhyi*), Jane's globemallow (*Sphaeralcea janeae*), San Rafael globemallow (*Sphaeralcea psoraloides*). | **Plants**<br>Jones cycladenia (*Cycladenia humilis* var. *jonesii*) (T). | **Plants**<br>None. |
| Sagebrush and Perennial Grassland | **Wildlife**<br>Fringed myotis, Gunnison prairie dog, White-tailed prairie dog (Map 2-21), Gunnison sage-grouse, Greater sage-grouse (Map 2-20), burrowing owl, short-eared owl, ferruginous hawk. | **Wildlife**<br>Black-footed ferret (*Mustela nigripes*) (E)[12]. | **Black-footed ferret**<br>No critical habitat rules have been published for the black-footed ferret. |
| | **Plants**<br>Cataract Canyon gilia (*Gilia latifolia var. imperialis*), Dolores rushpink (*Lygodesmia doloresensis*) | **Plants**<br>None. | **Plants**<br>None. |

---

[12]The black-footed ferret does not occur in the MPA, but is included here due to its potential to occur in association with prairie dog habitat. See Sections 4.3.15.1 Analysis Assumptions and 4.3.15.2.9 Impacts Common to All Alternatives for further discussion.

BLM_0010538

**Table 4.116. Special Status Species in the MPA, by Habitat Type**

| Habitat Type | BLM Special Status Species | Federally Listed Species | Designated Critical Habitat |
|---|---|---|---|
| Oak/Mountain Shrub | **Wildlife**<br>Gunnison prairie dog, short-eared owl. | **Wildlife**<br>None. | **Wildlife**<br>None. |
| | **Plants**<br>None. | **Plants**<br>None. | **Plants**<br>None. |
| Piñon-Juniper Woodland | **Wildlife**<br>Allen's big eared bat, fringed myotis, Townsend's big-eared bat (*Corynorhinus townsendii*), Lewis's woodpecker (*Melanerpes lewis*), short-eared owl, Western toad (*Bufo boreas*), Eureka mountainsnail (*Oreohelix eurekensis*). | **Wildlife**<br>Mexican spotted owl (MSO; *Strix occidentalis lucida*) (T). | **MSO**<br>Portions of Grand and San Juan Counties. 55,645 acres of designated critical habitat exists within the MPA (Map 2-18). |
| | **Plants**<br>Peabody's milkvetch (*Astragalus pubentissimus var. peabodianus*), Dolores rushpink *(Lygodesmia doloresensis)*, Entrada rushpink (*Lygodesmia grandiflora var. entrada*), Trotter's oreoxis (*Oreoxis trotteri*), Paradox breadroot (*Pediomelum aromaticum var. tuhyi*), Canyonlands lomatium (*Lomatium latilobum*). | **Plants**<br>Jones cycladenia (T). | **Plants**<br>None. |
| Conifer and Mountain Shrub | **Wildlife**<br>Allen's big eared bat, big free-tailed bat, fringed myotis, spotted bat, Townsend's big-eared bat, Lewis's woodpecker, three-toed woodpecker (*Picoides tridactylus*), northern goshawk (*Accipiter gentilis*). | **Wildlife**<br>Mexican Spotted Owl (T). | **Wildlife**<br>None. |
| | **Plants**<br>None. | **Plants**<br>None. | **Plants**<br>None. |

BLM_0010539

### Table 4.116. Special Status Species in the MPA, by Habitat Type

| Habitat Type | BLM Special Status Species | Federally Listed Species | Designated Critical Habitat |
|---|---|---|---|
| Riparian and Wetland | **Wildlife**<br>Allen's big eared bat, big free-tailed bat, fringed myotis, cornsnake (*Elaphe guttata*), smooth greensnake (*Opheodrys vernalis*), American white pelican (*Pelecanus erythrorhyanchos*), Bobolink (*Dolichonyx oryzivorus*), northern goshawk, Arizona toad (*Bufo microscaphus*), Western toad, Bald eagle (*Haliaeetus leucocephalus*) (Map 2-19). | **Wildlife**<br>Southwestern willow flycatcher (SWFL; *Empidonax traillii*) (E), Western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) (C). | **Southwestern willow flycatcher**<br>Designated critical habitat for the SWFL includes portions of Washington County in southwestern Utah (USFWS 2005). |
| | **Fish**<br>Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*), bluehead sucker (*Catostomus discobolus*), roundtail chub (*Gila robusta*), flannelmouth sucker (*Catostomus latipinnis*). | **Colorado River Fishes**<br>Bonytail (*Gila elegans*) (E), Colorado pikeminnow (*Ptychocheilus lucius*) (E), humpback chub (*Gila cypha*) (E), razorback sucker (*Xyrauchen texanus*) (E). | **Endangered Colorado River Fishes**<br>Designated critical habitat includes portions of the Green River downstream from the Yampa and Colorado Rivers; along the San Juan River from Shiprock, NM to the inflow of Lake Powell; and the 100-year floodplain (Map 2-17). |
| | **Plants**<br>Alcove bog orchid (*Habenaria zothecina [Platanthera zothecina]*), alcove rock daisy (*Perityle specuicola*). | **Plants**<br>None. | **Plants**<br>None. |
| Caves and Rock Crevices | **Wildlife**<br>Allen's big eared bat, big free-tailed bat, fringed myotis, spotted bat, Townsend's big-eared bat, Yavapai mountainsnail (*Oreohelix yavapai*). | **Wildlife**<br>Mexican Spotted Owl (T), California condor (E; Experimental). | **Wildlife**<br>California condor: Potential nesting habitat occurs within the MPA; however, any individuals in Utah are part of an experimental, non-essential population. |
| | **Plants**<br>Alcove rock daisy (*Perityle specuicola*), Canyonlands lomatium (*Lomatium latilobum*). | **Plants**<br>None. | **Plants**<br>None. |

BLM_0010540

**Table 4.116. Special Status Species in the MPA, by Habitat Type**

| Habitat Type | BLM Special Status Species | Federally Listed Species | Designated Critical Habitat |
|---|---|---|---|
| Rocky Slopes and Canyons | **Wildlife**<br>Yavapai mountainsnail, common chuckwalla (*Sauromalus ater*). | **Wildlife**<br>Mexican Spotted Owl (T). | **Wildlife**<br>None. |
| | **Plants**<br>Canyonlands lomatium (*Lomatium latilobum*). | **Plants**<br>None. | **Plants**<br>None. |

(C) = Candidate for Federal listing.

(T) = Federally listed as threatened.

(E) = Federally listed as endangered.

BLM_0010541

### 4.3.15.2 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, the BLM would comply with management plans and conservation agreements for special status species as detailed in Chapter 2. Additionally, all special status species-related measures outlined in the BLM's Oil and Gas Stipulations (Appendix C), Conservation Measures and Best Management Practices for Federally Listed Species (Appendix K), and Best Management Practices and Recommended Buffers and Nesting Periods for Raptors (Appendix O) would be followed. Many of the special status species' habitat listed in Table 4.116 would be indirectly protected by the restrictions and buffers in place for the SWFL, yellow-billed cuckoo, endangered Colorado River fishes, MSO, bald eagle, California condor, Jones cycladenia, greater and Gunnison sage-grouse, White-tailed and Gunnison prairie dogs, the black-footed ferret, burrowing owl, and ferruginous hawk. Specific protections that are in place for these special status species are outlined below.

#### 4.3.15.2.1 SOUTHWESTERN WILLOW FLYCATCHER (SWFL)

In Southwestern willow flycatcher (SWFL) riparian habitat, there would be no surface-disturbing activities within 100 feet of suitable riparian habitat under all alternatives, which would reduce long-term adverse impacts to riparian special status species and their habitats within those buffer zones by eliminating disturbance and habitat degradation. Construction and other disruptive activities would not be permitted within a 0.25 mile buffer of occupied SWFL breeding habitat from May 1 through August 15. These requirements would help reduce disturbance levels for breeding birds during the breeding and nesting season. As discussed in the MSO section below, these requirements would help to mitigate the adverse effects of human disturbance on sensitive bird species during breeding and roosting seasons.

#### 4.3.15.2.2 YELLOW-BILLED CUCKOO

In yellow-billed cuckoo habitat, there would be no surface-disturbing activities within 100 meters of riparian habitat, which would have long-term beneficial impacts on riparian special status species and their habitats within those buffer zones by eliminating disturbance and habitat degradation. Construction and other disruptive activities would not be permitted within a 100 meter buffer of occupied breeding habitat from May 15 through July 20. These requirements would help reduce disturbance levels for breeding birds during the breeding and nesting season. As discussed in the MSO section, these requirements would help to mitigate the adverse impacts of human disturbance on sensitive bird species during breeding and roosting seasons.

#### 4.3.15.2.3 ENDANGERED COLORADO RIVER FISHES

The BLM will continue to cooperate with the UDWR and USFWS to protect habitat for the endangered Colorado River fishes. All water depletions from any portion of the Upper Colorado River drainage basin above Lake Powell have been determined to adversely affect or modify the critical habitat of the four resident endangered fish species (Table 4.116). Any new depletions would require formal Section 7 consultation with the USFWS, and would require implementation of the Conservation Measures dictated in the Programmatic Biological Opinion for depletions to the Colorado River system (USFWS 1987).

Surface-disturbing activities are precluded within the 100-year floodplain of the Colorado River, Dolores River, and at the confluence of the Dolores and Colorado Rivers, as well as backwaters

BLM_0010542

(47,840 acres; see Map 2-17, fish habitat map). Surveys and monitoring would be implemented for authorized exceptions to this stipulation that take place within the 100-year floodplain. Loss or degradation of these riparian habitats and all designated critical habitat would require Section 7 consultation with the USFWS. Any exceptions to the stipulation could affect, but are not likely to adversely affect, the endangered Colorado River fishes. The Utah Oil and Gas Pipeline Crossing Guidance would be implemented for all activities occurring near riparian areas (see Appendix H). These requirements would minimize adverse impacts on special status fish species within the MPA because of the associated reductions in human impacts such as grazing and surface-disturbing activities (Lentsch and Converse 1997).

### 4.3.15.2.4 MEXICAN SPOTTED OWL (MSO)

There would be no ground disturbing activities allowed within a 0.5-mile radius of known MSO nests. Because healthy, native vegetation is a key component of suitable habitat (food source and shelter for owl prey species), these restrictions would have long-term beneficial impacts on MSOs and other special status species in the same habitat type within the MSO nest buffer zones. MSO Protected Activity Centers (PACs) would be protected as outlined in the MSO Recovery Plan (USFWS 1995). MSO Designated Critical Habitat (55,645 acres) and suitable habitat would also be protected as outlined in the MSO Recovery Plan (USFWS 1995) and would be avoided or use restrictions would be implemented. Within suitable habitat, these would include staying on designated routes or revegetating access routes created by a project, which would help mitigate the adverse impacts of any surface disturbance associated with road construction on MSO prey habitat.

In addition, surveys would be required for temporary activities taking place within 0.5 miles of suitable MSO habitat (see Map 2-18, MSO habitat) during breeding season (March 1 through August 31). For all long-term actions, two years of surveys would be required prior to commencement of the activity. If owls were found during the surveys, no disturbing actions during breeding season, or permanent structures, would be allowed within 0.5 miles of any identified nest sites or PACs. Additionally, noise emissions would be reduced below 45 dBA at 0.5 miles from suitable habitat. This would help reduce the stress of noise on MSOs during the breeding season. Various studies have shown that human presence and noise disturbance leads to a significant reduction in prey handling and delivery by females, which would reduce nest success (Frid 2002; Swarthout and Steidl 2003). These requirements would help to reduce the adverse impacts of human disturbance on MSOs during breeding season.

### 4.3.15.2.5 BALD EAGLE

Activities on BLM lands containing nesting or winter roosting habitat for the bald eagle would be avoided or restricted (depending on the duration and timing of the activity). Raptors would be managed according to the USFWS Guidelines for Raptor Protection from Human and Land-use Disturbances (Romin and Muck 2002) and BLM BMPs. These management requirements would include restrictions and avoidance measures and would include required surveys prior to activity, monitoring during the activity, implementation of seasonal and spatial buffers during the breeding season of January 1 through August 31 and avoidance of disturbance in riparian areas unless impracticable. No ground disturbing activities or permanent structures would be authorized within one mile of known bald eagle nest sites year-round (2,439 acres). Deviations may be allowed only after appropriate levels of consultation and coordination with the USFWS.

BLM_0010543

Also, no permanent above-ground structures would be allowed within 0.5 miles of a winter roost site, if the structure would result in the habitat becoming unsuitable for future winter roosting by bald eagles.

As discussed in the MSO section, these requirements would help to mitigate the adverse impacts of human disturbance on bald eagles during breeding and roosting seasons.

### 4.3.15.2.6 CALIFORNIA CONDOR

Current threats to California Condors include collisions with man-made structures, including power lines. In addition, illegal shooting, poisoning, and habitat loss continue to threaten the species (USFWS 1996b). California condors and their habitat would be protected as outlined in the Recovery Plan for the California condor (USFWS 1996). If California condors are found to nest in the MPA, there would be no roads or permanent structures allowed within 1 mile of the nest. In addition, no surface-disturbing activities or special use permit groups would be allowed within 1 mile of the nest during breeding season. These requirements would help to mitigate the adverse impacts of human disturbance on nesting California condors.

### 4.3.15.2.7 JONES CYCLADENIA

Site-specific plant inventories would be required prior to any proposed surface-disturbing projects in suitable Jones cycladenia habitat. Activities that would be avoided in suitable habitat include road construction, land disposal and approval of right-of-way (ROW) corridors, and grazing activities (trailing, salting, trailing, watering, and herding). All motorized travel would be limited to designated routes in suitable Jones cycladenia habitat. The use of herbicide and chemical treatments would be restricted. These avoidance measures and restrictions would help to mitigate the adverse impacts of habitat degradation and fragmentation for the Jones cycladenia.

### 4.3.15.2.8 GUNNISON AND GREATER SAGE-GROUSE

Major threats to sage-grouse include the installation of roads which leads to destruction of vegetation and increased human activity, and fences and power poles that provide perches and viewing areas for raptors, which leads to an increase in predation levels in these areas (Connelly et al. 2000; Crawford et al. 2004). Additional threats to sage-grouse include reduction in native vegetation, fragmentation of suitable lekking and nesting habitat, and human disturbance during breeding and nesting season. The following plans would be implemented in suitable habitat in the MPA: BLM's National Sage-grouse Habitat Conservation Strategy (BLM 2004c), Strategic Management Plan for Sage-grouse (UDWR 2002), Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and the Gunnison Sage-grouse Range-wide Conservation Plan (GSRSC 2005). Adherence to BLM plans would reduce adverse impacts to Gunnison sage-grouse and other sensitive sagebrush species in the MPA because of the habitat protections and restrictions on human disturbance specified in these plans. These restrictions include surface disturbance and permanent structures and other human activity in or near leks. Specific spatial and temporal stipulations for sage-grouse are discussed in Section 4.3.15.13.2.1 below.

BLM_0010544

### 4.3.15.2.9 WHITE-TAILED AND GUNNISON PRAIRIE DOGS

Prairie dog habitats would be managed in accordance with UDWR and USFWS guidance and the White-tailed Prairie Dog Conservation Assessment. Additionally, cooperative agreements would be developed with other agencies to inventory prairie dog densities and identify suitable habitat for expansion. Adherence to the Conservation Assessment Plan would have beneficial impacts on White-tailed and Gunnison prairie dogs and other special status species in associated habitats in the MPA because of the habitat protection recommendations relevant to oil and gas development (including buffers around colonies), livestock grazing, and other potential threats.

### 4.3.15.2.10 BLACK-FOOTED FERRET

No critical habitat rules have been published for the black-footed ferret. However, the 1988 Recovery Plan states "direct reduction in the area occupied by prairie-dogs has been shown to reduce the number of black-footed ferrets linearly" (USFWS 1988). Therefore, it can be assumed that critical habitat for the black-footed ferret coincides with prairie-dog habitat including areas of short vegetation and bare ground, and that impacts described in this chapter for prairie dogs would be the same for the black-footed ferret. Sagebrush shrubs are among the largest plants found in the areas of preferred black-footed ferret and prairie-dog habitat (UDWR 2002).

### 4.3.15.2.11 BURROWING OWL

No surface-disturbing activities would be allowed within 0.25 mile of a known burrowing owl nest from March 1 through August 31 due to the stipulations developed in cooperation with USFWS (USFWS Guidelines for Raptor Protection from Human and Land-use Disturbances, Appendix O) for oil and gas leasing and other surface disturbance activities. Additionally, no domestic sheep camps, temporary watering sites, or salt and mineral blocks would be allowed within 0.25 mile during the same time period to avoid the congregation of domestic sheep and activity around the nests. Ground squirrel and prairie dog colonies would be maintained to provide habitat and nesting burrows for burrowing owls. As discussed in the MSO section, these requirements would help to mitigate the adverse impacts of human disturbance on burrowing owls during breeding and roosting seasons.

### 4.3.15.2.12 FERRUGINOUS HAWK

Management actions and impacts for ferruginous hawk would be identical to those described under burrowing owl except that no surface-disturbing activities would be allowed within 0.5 mile of a known ferruginous hawk nest from March 1 though August 1, and the activities described above would not be allowed within 0.5 mile during the same time period. This spatial buffer would reduce human disturbances to nesting ferruginous hawks.

### 4.3.15.3 IMPACTS OF CULTURAL RESOURCE DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.3.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under Alternatives B, D, and the Proposed Plan, all land-disturbing activities within Traditional Cultural Properties would be designated to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the site or area, avoid time of use by Native American groups, or would be eliminated altogether. Cultural sites may be closed to visitation if it is determined that visitation is endangering the integrity of the site.

BLM_0010545

Implementation of these criteria would reduce negative impacts to special status species and their habitats in the MPA by reducing surface-disturbing activities and visitor use associated with cultural resources. Implementation of these criteria would reduce negative impacts to special status species and their habitats in the MPA by reducing surface-disturbing activities and visitor use associated with cultural resources.

Under alternatives B, D, and the Proposed Plan, camping would be prohibited within archaeological and historic sites eligible for listing on the National Register of Historic Places. Eligible cultural sites would be protected from grazing activities when it is determined that they are being impacted, and any impacts would be mitigated.

Class III cultural resources inventory would be conducted on designated ATV, and motorcycle and mountain bike routes that are 48 inches wide or less, based on potential resource conflicts. Routes identified for survey would be prioritized based on landscape level overviews, cultural resource predictive models, and available site location, environmental, and contextual information. If it is shown that eligible archaeological sites along these routes are being adversely affected by continued route use, impacts would be mitigated. Additionally, the BLM would cooperate with counties to ensure that county road and trail construction and maintenance activities minimize impacts to cultural resources.

Cultural resource program-related actions include the development of interpretive sites, identification of cultural resources, increased vehicular traffic, the use of hand and power tools, the establishment of temporary camp sites, the building of fences, and the stabilization of deteriorating buildings. These actions have the potential to temporarily disturb or displace special status species due to the human activity associated with cultural resource actions.

### 4.3.15.3.2 PIÑON-JUNIPER WOODLAND AND DESERT SHRUB HABITATS

Under the Proposed Plan, cultural resource related actions may occur within Jones' cycladenia and other special status plant occupied or potential habitat that could negatively affect the species through inadvertent trampling of individuals or habitats. The use of power tools and heavy machinery has the potential to crush and destroy individuals, populations and habitat. The proposed action is likely to adversely affect Jones cycladenia due to potential for surface disturbance within known or potential habitat. Occupied or potential MSO special status wildlife habitats may also be negatively affected by increased noise and visual stimulation. The Proposed Plan is likely to adversely affect the MSO where interpretive sites or preservation actions that result in public advertisement result in long-term adverse effects as a result of human presence.

### 4.3.15.3.3 CONIFER AND MOUNTAIN SHRUB HABITAT

Occupied or potential MSO habitats may be negatively affected by increased noise and visual stimulation. Human activities in viable habitats may disrupt nesting and foraging behaviors and result in individual owls leaving the area or abandoning nests. The Proposed Plan is likely to adversely affect the MSO where interpretive sites or preservation actions that result in public advertisement result in long-term adverse effects as a result of human presence.

### 4.3.15.3.4 RIPARIAN, WETLAND, AND STREAM HABITATS

Cultural resource program-related actions under the Proposed Plan are likely to adversely affect the SWFL where interpretive sites or any preservation actions that result in public advertisement

result in long-term adverse effects as a result of human presence. The Proposed Plan is likely to adversely affect the endangered Colorado River fishes due to the potential for water quality degradation and aquatic habitat modification during cultural resource activities.

#### 4.3.15.3.5 CAVES AND ROCK CREVICES/ROCKY SLOPES AND CANYONS HABITATS

Cultural resource program-related actions under the Proposed Plan are likely to adversely affect the MSO where interpretive sites or preservation result in public advertisement and associated long-term adverse effects as a result of human presence.

### 4.3.15.4 IMPACTS OF FIRE MANAGEMENT DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.4.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, the Reasonable and Prudent Measures and Terms and Conditions identified in consultation with the USFWS for the Utah Land-use Plan Amendment for Fire and Fuels Management (BLM 2005c) would be implemented in fire-related actions. Maintenance of existing healthy ecosystems and protection of special status species are two of the criteria for establishing fire management priorities. Implementation of these criteria would reduce negative impacts to special status species and their habitats in the MPA by preserving native plant species and assuring that special status species would not be directly affected by fire.

Fuels management actions would occur under all of the alternatives. Wildland fire use may be authorized for special status species habitats, which could negatively impact special status species by burning or cutting of vegetative cover, reducing the overall quantity or quality of habitat or forage, or mortality of individuals due to fire, trampling, or crushing. Indirect impacts to special status species and their habitats could include increased exposure to predators due to reduced vegetation cover, increased soil erosion, or other impacts to habitat quality.

Wildland fire use would not be authorized in the following areas unless reasonable resource protection measures were in place: areas that are known to be highly susceptible to post-fire cheatgrass or other weed invasion, important terrestrial and aquatic habitats, and non-fire adapted vegetation communities (see Special Status Species section of Table 2.2, Summary of Impacts). This measure would also have beneficial impacts on special status species habitat by reducing the spread of weeds and preserving native plant species, thereby ultimately preserving the quality of special status species habitats.

Fuels management actions include surface-disturbing treatments on 5,000 to 10,000 acres annually (dependent on budgetary and time constraints). Over the life of the plan, this would result in a maximum of 75,000 to 150,000 acres of land subject to fuels management. Impacts would be analyzed with site-specific NEPA once it is determined where individual treatments would occur. Fuels management actions include: mechanical and manual treatments, prescribed fire, chemical and biological vegetation control, and aerial/ground seeding.

The LUP Amendment for Fire and Fuels Management indicates that the majority of treatments would occur in piñon-juniper woodland and sagebrush habitats and would impact the species dependent upon those habitats (Table 4.116). In the long term, however, vegetation treatments would benefit special status species habitat in an area by removing competition from weedy natives and invasive species. Once the competition is removed, a diverse native community has

BLM_0010547

the potential to establish itself in the area, which means more available forage and cover for sensitive wildlife species and potential habitat for sensitive plant species (Stevens 2004).

### 4.3.15.4.2 DESERT SHRUB HABITAT

Under all alternatives, wildland fire use or fuels management actions and associated surface-disturbing treatments would not be authorized in desert shrub habitats, which are known to be highly susceptible to post-fire cheatgrass or other weed invasion, unless reasonable Resource Protection Measures were in place. Protective measures would result in beneficial impacts because fire management activities that promote weed invasion could adversely impact special status plant species through direct impacts to individuals, competition from weed species, and indirectly impact special status wildlife through short and long-term changes in vegetation composition and structure, and weed-induced destabilization of biological soil crusts.

### 4.3.15.4.3 SAGEBRUSH AND PERENNIAL GRASSLAND AND PIÑON-JUNIPER WOODLAND

The LUP indicates that the majority of fuels management treatments would occur in piñon-juniper woodland and sagebrush habitats. Impacts would be analyzed with site-specific NEPA once it is determined where individual treatments would occur. Under all alternatives, fuels management actions would include surface-disturbing treatments on 5,000 to 10,000 acres annually within the MPA. Over the life of the plan, this would result in a maximum of 75,000 to 150,000 acres of land subject to fuels management.

Impacts to special status species would include trampling or removal of vegetation and associated disturbance to sensitive wildlife species from fire and human presence. In the long term, however, vegetation treatments would potentially benefit special status species habitat by removing competition from weedy natives and invasive species. Under the Proposed Plan, fire management decisions are likely to adversely affect the MSO and its habitat due to the loss of forage in piñon-juniper woodland habitat associated with wildland fire and prescribed fire.

### 4.3.15.4.4 RIPARIAN AND WETLAND HABITATS

Direct, adverse impacts from fire management actions include aquatic habitat degradation and modification including sedimentation and salinization resulting from soil erosion and stream bank destabilization, changes in water chemistry, changes in flow pattern, and possible water withdrawals (USFWS 2002a, BLM 2005c; Trombulak and Frissell 2000). Indirect, beneficial effects of fire management on special status species and their habitats include the reduction of catastrophic wildland fires that cause habitat modification, soil erosion, stream sedimentation, and water quality degradation. Indirect, adverse effects of fire management in riparian areas include the potential for alteration of plant community structure, species composition, and relative abundance of species. Fire is an imminent threat to special status species riparian habitats, as native riparian plants are neither fire-adapted nor are they fire-regenerated, whereby fires in riparian habitats can cause catastrophic, immediate and drastic changes in riparian plant density and species composition (USFWS 2002a). Under all alternatives, wildland fire and fuels management actions would not be authorized in potential special status species riparian habitats (see Section 4.3.15.1). Under the Proposed Plan, fire management decisions are likely to adversely affect the southwestern willow flycatcher and Colorado River fishes due to the potential for water quality degradation and habitat destruction or modification associated with fire and fuels treatments in riparian habitats.

BLM_0010548

### 4.3.15.4.5 ALL OTHER HABITATS IN THE MPA

Under all other habitat types, wildland fire use would not be authorized unless reasonable Resource Protection Measures were in place if the habitat is deemed susceptible to post-fire cheatgrass or other weed invasion, important as terrestrial and aquatic habitat for special status species, or a non-fire adapted vegetation community.

## 4.3.15.5 IMPACTS OF HEALTH AND SAFETY DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.5.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, abandoned mine lands (AMLs) would be prioritized for area reclamation and mitigation. Site-specific NEPA analysis would be completed on all potential AML projects, thereby preventing adverse impacts to special status species.

### 4.3.15.5.2 RIPARIAN AND WETLAND HABITATS

Hazardous waste contamination from AML sites could directly or indirectly impact special status species in the short and long-term. Special status fish and amphibian species may be particularly vulnerable to adverse impacts to water quality, which could result in mortality of individuals, reduced forage or prey availability, or impacts to other habitat qualities. Any impacts to water quality could indirectly impact sensitive wildlife species that utilize affected riparian or wetland habitats through exposure to contaminants or impacts to prey availability or habitat quality. Under the Proposed Plan, health and safety management decisions are likely to adversely affect the endangered Colorado River fishes due to impacts to the primary constituent elements for their designated critical habitat. Actions associated with health and safety management decisions also have the potential to adversely impact the SWFL due to surface disturbance impacts resulting in temporary, localized and down-stream water quality degradation, and increased human activities during mine reclamations.

Under all alternatives, some abandoned mine lands sites would be prioritized due to hazardous waste contamination and water quality issues. The top criteria used to prioritize water-quality-based AML programs include threats to the environment (see special status section of Table 2.2, Summary of Impacts), which takes into account habitat quality for all special status fish species (see Table 4.116). These actions are conducted under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) authority and follow CERCLA processes. These reclamations would help to mitigate for the adverse impacts of poor water quality on special status fish species because the threat of groundwater contamination would be removed. Long-term water quality monitoring would be required.

### 4.3.15.5.3 CAVES AND ROCK CREVICES

In addition to naturally occurring caves and rock crevices, abandoned mining structures are often used as roosting habitat by bats, including sensitive bat species. Of the 18 bat species in Utah, 14 species regularly occur in abandoned mines. One State special status species (Townsend's big-eared bat) has been found exclusively in abandoned mines (Grandison 2004). Of the special status bat species occurring in the MPA (see Table 4.116), three are known to use caves as winter, day, or night roosts (Townsend's big-eared bat, fringed myotis, and spotted bat; Oliver 2000). These species have the highest potential for being adversely affected by reclamation and

BLM_0010549

mitigation of AMLs. Completely sealing off AML entrances could have direct adverse impacts to roosting individuals and populations, which could include the reduction of suitable roosting habitats. Under all alternatives, potential mitigations to avoid and/or minimize impacts to special status bat species would include pre-construction surveys and the installation of bat compatible mine gates and cupolas, which allow bats to pass through but prohibit human entrance. Use of mitigation structures and monitoring would lessen adverse impacts of mine closures on bats.

Under the Proposed Plan, hazardous materials management activities is likely to adversely affect the MSO due to negative impacts to primary constituent elements of MSO designated critical habitat, and disturbance associated with the presence of humans and equipment.

#### 4.3.15.5.4 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

Under all alternatives, impacts to all other special status species from health and safety decisions would be negligible because they do not occur in areas that would be impacted by abandoned mine reclamation.

### 4.3.15.6 IMPACTS OF LANDS AND REALTY DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.6.1 IMPACTS COMMON TO ALL ALTERNATIVES

Lands and realty decisions that could potentially impact special status species include the following: access, easements, leases and permits, utility/transportation systems, exchanges, disposals and withdrawals. Under all alternatives, Wilderness Study Areas (WSAs) and Wilderness Areas would be exclusion areas for ROWs, and ACECs would be avoidance areas. In addition, the withdrawal of 78,333 acres from mineral entry within the MPA would be continued. Under all alternatives, the 65,037 acres from the Three Rivers Withdrawal and 8,096 acres from the Westwater Withdrawal includes critical riparian habitat and would be managed as NSO. These actions would contribute to the avoidance of both long-term and short-term adverse impacts to riparian-associated special status species (see Table 4.116) in withdrawal areas by removing threats from the surface-disturbing actions associated with lands and realty decisions.

All areas not identified as avoidance or exclusion would be available for ROWs and could be subject to multiple-use terms on a case-by-case basis (BLM 2004a). The use of ROWs for utility and communication infrastructure could have direct, long term, adverse impacts on special status plant and wildlife species habitat due to surface disturbance for utility lines, communication sites, solar and wind energy sites, or pipeline installation, trampling by workers and vehicles during construction activities, impacts to special status bird or bat species and migration routes from wind turbines, and construction of maintenance access roads. Additionally, noise and human presence associated with infrastructure installation could have adverse impacts on special status wildlife species in the MPA.

#### 4.3.15.6.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Applications for filming permits would have to meet criteria to avoid or minimize impacts to special status species and their habitats. Accordingly, implementation of these minimum impact criteria would help reduce adverse impacts to special status species from filming activities, such as surface disturbance due to vehicle use, noise and other human impacts, and an increased risk of fire.

BLM_0010550

### 4.3.15.6.3 DESERT SHRUB, SAGEBRUSH AND PERENNIAL GRASSLAND AND OAK/MOUNTAIN SHRUB HABITATS

Under all alternatives, the installation of power poles in these habitats would increase raptor predation on Gunnison prairie dog, White-tailed prairie dog, Greater sage-grouse, and Gunnison sage-grouse by providing hunting perches. Although this is a negative impact on these prey species, it would provide a short-term positive impact on special status raptor species in the MPA (Jacobsen 2005). Utility and communication infrastructure ROWs are also likely to fragment habitat, increase human access and increase invasive plants. These impacts would affect special status species, including prairie dogs and sage-grouse. Alternative A would impact the fewest acres of habitat (26,695 acres), followed by Alternative B (55,408 acres). Greater impacts to special status species would occur under the Proposed Plan (128,293 acres) and Alternative D (156,328 acres) (see Section 4.3.17.4, Table 4.137). Under the Proposed Plan, lands and realty management actions are likely to adversely affect Jones' cycladenia individuals or potentially suitable desert shrub habitats.

### 4.3.15.6.4 PIÑON-JUNIPER WOODLAND HABITAT

Potential impacts to special status species from utility corridor development in piñon-juniper woodland habitat would be greatest under the Proposed Plan (41,672 acres) and D (44,189 acres), followed by Alternative B (8,808 acres) and Alternative A (5,345 acres). Under the Proposed Plan, lands and realty management actions are likely to adversely affect Jones' cycladenia individuals or potentially suitable habitat, and the MSO and its designated critical habitats.

### 4.3.15.6.5 CONIFER/MOUNTAIN SHRUB HABITAT

Potential impacts to special status species from utility corridor development in conifer/mountain shrub habitat would be limited to a maximum of 19 acres under Alternative D and Proposed Plan, with 9 acres potentially impacted under Alternative A, and no acres impacted under Alternative B. Under the Proposed Plan, lands and realty management actions are likely to adversely affect the MSO and its designated critical habitats.

### 4.3.15.6.6 RIPARIAN AND WETLAND HABITATS

For Federally listed species, changes in utility corridor widths among alternatives would primarily affect riparian habitat, which is utilized by wintering bald eagles, the four endangered Colorado River fishes, Southwestern willow flycatcher and yellow-billed cuckoo, and as foraging habitat by the Mexican spotted owl, and riparian-associated BLM special status species (see Table 4.116). Table 4.117 below details the acreage and percentage of habitat for these species that is included within utility corridors by alternative. Some overlap may exist among species. Specific adverse impacts of utility corridors on special status species are as described above.

BLM_0010551

**Table 4.117. Federally Listed Species' Riparian Habitat Proposed for Utility Corridors, in Acres and Percent of Total Habitat in the MPA, by Alternative**

| Species | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | Acres | % |
| SWFL and Yellow-billed Cuckoo Habitat | 143 | 1 | 324 | 2 | 1,031 | 8 | 1,139 | 8 |
| Colorado River Fish Habitat | 41 | <1 | 281 | 1 | 565 | 1 | 571 | 1 |
| MSO Foraging Habitat | 4,609 | 1 | 8,979 | 2 | 41,301 | 7 | 44,491 | 8 |
| **Total Habitat Impacted** | **9,402** | **<4** | **13,806** | **<6** | **59,854** | **23** | **63,341** | **25** |

Under Alternative A, utility corridor widths would remain 1 mile throughout. Under Alternative B, an I-70 utility corridor would be designated with a 100-foot width on each side of the widest ROW corridor. Under the Proposed Plan, a 0.5-mile disturbance width on either side of the I-70 utility corridor would be designated. Also, under the Proposed Plan, a Moab Canyon Utility Corridor would be designated and expanded onto Gold Bar Rim, and two corridors south of Spanish Valley would be combined with 2–3 miles separating the segments, which would increase the number of acres in the MPA with potential to be adversely affected. Under Alternative D, allowable surface disturbance associated with the I-70 utility corridor would be a 1-mile width on each side of the widest ROW corridor, which would further increase the number of acres in the MPA with potential to be adversely affected by surface disturbance associated with these management decisions. Overall, Alternative A would impact the fewest acres of riparian habitat, and would therefore have the lowest potential impacts to riparian special status species, followed by Alternative B, the Proposed Plan, and Alternative D, in ascending order (see Table 4.117).

Under the Proposed Plan, lands and realty management decisions are likely to adversely affect the endangered Colorado River fishes due to direct and indirect impacts to designated critical habitat. Actions associated with health and safety management decisions are also likely to adversely affect the southwestern willow flycatcher due to habitat fragmentation and degradation resulting from surface-disturbing activities associated with utility corridor development.

### 4.3.15.6.7 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

No utility corridors are proposed for caves and rock crevices or rocky slopes and canyons habitats. Overall, Alternative A would potentially impact the lowest number of acres across all special status species habitats of the alternatives, followed by Alternative B, the Proposed Plan, and Alternative D.

ROW exclusion areas will be managed for wilderness characteristics by alternative, and would include no exclusions for wilderness characteristics under Alternatives A or D, 233,745 acres under Alternative B, and 47,761 acres under the Proposed Plan. Accordingly, the lowest potential impacts to special status species from ROWs in wilderness characteristics areas would occur under Alternative B, followed by the Proposed Plan, and Alternatives A and D, respectively.

BLM_0010552

### 4.3.15.7 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.7.1 IMPACTS COMMON TO ALL ALTERNATIVES

Livestock grazing allotments occupy approximately 2,329,900 acres (95% of all lands) within the MPA. Detrimental impacts from grazing could include loss of biodiversity, lowering of population densities, disruption of some ecosystem functions, changes to community organization, and changes to the physical characteristics of both terrestrial and aquatic habitats (Chaneton and Lavado 1996; Fleischner 1994; Olff and Ritchie 1998). Within grazing allotments, special status species may be impacted by trampling, reduced forage or cover vegetation, reduced quality of riparian and wetland habitats, and other impacts to habitat quality or quantity. Those allotments that remain unavailable for grazing are not subject to these impacts to special status species.

Under all alternatives, livestock grazing would be managed according to the Guidelines for Grazing Management to achieve the Standards for Rangeland Health. By adhering to these Standards, the impacts from livestock grazing on special status species are expected to be minimal. Grazing use would not be authorized on approximately 48,220 acres in the MPA, wherein negative impacts to special status species by livestock would be reduced or eliminated.

#### 4.3.15.7.2 DESERT SHRUB

Grazing can increase salinity in already saline soils (Chaneton and Lavado 1996) and lead to inhibited plant diversity, especially in arid and relatively infertile soils (Olff and Ritchie 1998). Further, changes in salinity in bodies of water such as the Colorado River have been shown to modify species composition within an ecosystem (Galindo-Bect and Glenn 1999; Hart et al. 1998). For these reasons, grazing eventually would reduce the habitat quality for special status species associated with riparian, desert shrub, and sagebrush habitats (see Table 4.116). Accordingly, Alternative B would exclude grazing from the greatest number of acres of potentially saline soils in desert shrub and sagebrush habitats (Table 4.118) and would have the greatest beneficial impacts to special status species, followed by Alternative A, the Proposed Plan, and Alternative D, in descending order.

**Table 4.118. Acres of Grazing Exclusions in Special Status Species Habitats, by Alternative**

| Habitat | Alternative A | Alternative B | Proposed Plan | Alternative D |
|---|---|---|---|---|
| Desert shrub | 13,697 | 23,880 | 23,280 | 13,324 |
| Sagebrush and perennial grassland | 3,806 | 5,569 | 5,569 | 1,767 |
| Conifer and mountain shrub | 23,155 | 23,404 | 22,579 | 587 |
| Piñon-juniper woodland | 84,301 | 98,628 | 77,548 | 35,369 |
| Riparian/Wetland | 1,568 | 1,852 | 1,556 | 862 |
| Agriculture, Developed, Disturbed, Water | 316 | 388 | 291 | 238 |
| Invasive Species and Noxious Weeds | 64 | 76 | 68 | 67 |
| **Total** | **126,907** | **153,797** | **132,047** | **52,214** |

BLM_0010553

Under the Proposed Plan, actions related to livestock grazing decisions are likely to adversely affect Jones' cycladenia individuals and desert shrub habitats due to direct effects from trampling and grazing, and indirect negative effects from soil compaction, incursion of weeds, and ground disturbance.

### 4.3.15.7.3 SAGEBRUSH AND PERENNIAL GRASSLAND AND PIÑON-JUNIPER WOODLAND HABITATS

The recommendations of the National Sage-grouse Habitat Conservation Strategy (BLM 2004c) and the Strategic Management Plan for Sage-grouse (UDWR 2002) would be followed under all alternatives as applicable. These plans are designed to benefit sage-grouse species, and would also help avoid adverse impacts to all species associated with the sagebrush and perennial grassland habitat type by setting forth objectives and strategies aimed to retain the quality of these habitats. See Section 4.3.15.2.7, above, for details.

Vegetation treatments for rangeland improvement in piñon-juniper woodland habitat are proposed under all alternatives. These treatments include plowing and seeding, chaining and seeding, drill seeding, and prescribed fire and seeding. See Table 4.116 to determine which special status species would be impacted by treatments to piñon-juniper woodland habitat. Potential short-term adverse impacts include mortality of individuals, displacement, and disturbance of habitat. However, in the long term, treatments would open canopy vegetation in or near special status species habitat, thereby improving conditions for re-colonization by native species. For example, the restoration of sagebrush habitats from piñon-juniper woodland encroachment can be done by cutting or chaining combined with post-treatment seeding (BLM 2004c). Rangeland improvements like this would generally benefit sagebrush habitats and sagebrush dependent species such as the greater and Gunnison sage-grouse.

Under Alternative A, vegetation treatments would be continued on 67,125 acres of piñon-juniper woodland habitat, including mechanical treatments on 11 allotments (52,976 acres) and prescribed fire treatments on 14,149 acres. Seeding would be done to ensure that forage would be created and enhanced for both wildlife and livestock. Special status wildlife species would likely have fewer adverse impacts with additional AUMs available, and sagebrush-dependent species would experience reduced impacts due to expanded habitat. Alternative B proposes 46,307 acres for vegetation treatments in piñon-juniper woodland habitat, which is 20,818 acres less than Alternative A. Alternative D and Proposed Plan would conduct the same vegetation treatments as Alternative B, with an additional 6,900 acres of new vegetation treatment areas.

Because the degree of direct and indirect impacts on special status species depends upon the quality of the treatment and the success rate of revegetating, differences among the alternatives are difficult to quantify. Alternative B would treat the fewest number of acres, followed by the Proposed Plan and Alternative D, with the largest treatment area under Alternative A. However, it is likely that Alternative B would have fewer improvements on special status species sagebrush habitat than the other Alternatives. Under the Proposed Plan, actions related to livestock grazing decisions are likely to adversely affect Jones' cycladenia individuals and piñon-juniper woodland habitats due to direct effects from trampling and grazing, and indirect negative effects from soil compaction, incursion of weeds, and ground disturbance. Livestock grazing under the Proposed Plan is likely to adversely affect the MSO and its habitats due to decreased habitat quality for MSO prey species.

BLM_0010554

#### 4.3.15.7.4 RIPARIAN AND WETLAND HABITATS

Although exclusions would help mitigate the adverse impacts of livestock grazing on water quality and riparian habitat in some areas, each alternative could result in direct and indirect, adverse impacts on riparian special status species in other areas. Indirect adverse impacts include loss of riparian habitat as a result of grazing of palatable native plant species, including vulnerable shrubs and tree saplings. Once disturbed, these areas are more susceptible to invasion by noxious and introduced weeds, which tend to be low value forage and cover species for sensitive wildlife (Popolizio et al. 1994; Kauffman et al. 1983; Sarr et al. 1996). Sensitive bird species relying on riparian habitat (e.g., bald eagles, SWFL, yellow-billed cuckoo) are typically adversely affected by the replacement of native vegetation with introduced species (Saab et al. 1995), as they rely on native riparian trees for nesting and roosting sites and protection from predators. There could also be adverse impacts on endangered and special status fish and amphibian species habitats due to increased overland flow associated with upland soil compaction. Cattle hooves compact the soil on upland slopes, which results in less rainwater infiltration into soils and more overland flows. The result is large, short-lived flows rather than small, perennial flows (Trimble and Mendel 1995).

Under Alternative A, grazing would continue to be excluded from 126,907 acres including 1,568 acres of riparian habitat (see Table 4.118 above). Alternative B would exclude grazing on 153,797 acres including 1,852 acres of riparian habitat which would have the lowest potential for adverse impacts to special status species from grazing under all alternatives. An additional 4,422 acres of riparian habitat would be evaluated to determine if exclusion from grazing would improve riparian functioning condition under Alternative B. This would help mitigate the adverse effects of livestock grazing in riparian areas discussed under Impacts Common to All Alternatives. Under the Proposed Plan, grazing would be excluded from 114,235 acres including five riparian areas totaling 1,556 acres. An additional 1,169 riparian acres would also be evaluated to determine if exclusion from grazing would improve riparian functioning condition. Under Alternative D, grazing would be excluded from 52,214 acres, including 862 acres of riparian habitat. Under the Proposed Plan, impacts associated with livestock grazing in riparian areas are likely to adversely affect the SWFL due to potential habitat degradation. Livestock grazing under the Proposed Plan is also likely to adversely affect the endangered Colorado River fishes due to direct and indirect impacts to water quality and habitat degradation.

#### 4.3.15.7.5 CONIFER AND MOUNTAIN SHRUB HABITAT

The elimination of grazing could potentially provide short- and long-term benefits to special status species occupying conifer and mountain shrub habitats. As indicated by the acres of grazing exclusions listed in Table 4.118, there would be similar levels of impacts to special status species under all Alternatives, with Alternatives A and B being the least impactful, followed by the Proposed Plan and Alternative D. Livestock grazing under the Proposed Plan is likely to adversely affect the MSO and its habitats due to decreased habitat quality for MSO prey species.

#### 4.3.15.7.6 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

Livestock grazing would likely have negligible impacts on caves and rock crevices, or rocky slopes and canyons habitats. Nevertheless, the allotments that would be available for grazing in Alternative D, and not in Alternatives A, B and Proposed Plan, include potential canyon nesting

BLM_0010555

and potential breeding habitat for MSO, as well as riparian habitat in the Cottonwood, Diamond and Nash watersheds. Accordingly, Alternative D would have more grazing-related adverse impacts on riparian-, piñon-juniper woodland-, mountain shrub-, and desert shrub-dependent special status species than Alternatives A, B and Proposed Plan. Overall, Alternative B would impact the fewest acres of special status species habitats, followed by the Proposed Plan and Alternatives D and A (Table 4.118).

### 4.3.15.8 IMPACTS OF MINERAL AND ENERGY DEVELOPMENT DECISIONS ON SPECIAL STATUS SPECIES

#### *4.3.15.8.1 IMPACTS COMMON TO ALL ALTERNATIVES*

Impacts to special status species associated with minerals exploration include loss and fragmentation of habitats, noise impacts to breeding and foraging activities, crushing or trampling of individuals, and changes in habitat structure or composition due to the introduction and spread of invasive and weedy plant species. In addition to specific protections for special status species (Section 4.3.15.1), approximately 358,806 acres of WSAs and Wilderness Areas would be closed to mineral leasing and development. This would eliminate loss of habitat and disturbance impacts to special status species using piñon-juniper and desert shrub habitats. All alternatives include the withdrawal of 65,037 acres along the Colorado, Dolores and Green Rivers from mineral entry, thereby eliminating surface-disturbing impacts to special status species riparian habitats in this area. Mineral exploration activities would also lead to greater road density, potentially creating greater opportunity for OHV and other human disturbance.

Acreages under the categories Standard Stipulations and Timing Limitations and Controlled Surface Use (special conditions) reflect the total BLM-administered areas within the MPA open to surface-disturbing activities (Table 4.1 Predicted Oil and Gas Development and Associated Surface Disturbance for Each RFD Area within the MPA). The impacts of surface-disturbing oil and gas activities on native vegetation (present and potential special status species habitat) are discussed in Section 4.3.17.6.

The oil and gas leasing stipulations (Appendix C) apply to all surface-disturbing activities, including the disposal of salable minerals. Closed and NSO restrictions do not apply to locatable minerals, although timing limitations and controlled surface stipulations are applicable. Under all alternatives, the projected development of salable and locatable minerals is expected to be minor and similar across all alternatives. A total of 27 acres per year of disturbance is expected due to the extraction of salable minerals and a total of 25 acres per year of disturbance is expected due to the extraction of locatable minerals. The impacts on special status species are therefore minor across all alternatives.

#### *4.3.15.8.2 DESERT SHRUB, SAGEBRUSH AND PERENNIAL GRASSLAND, PIÑON-JUNIPER WOODLAND, CONIFER AND MOUNTAIN SHRUB HABITATS*

#### 4.3.15.8.2.1 General Impacts

Potential direct adverse effects of oil and gas development on special status species in desert shrub, sagebrush and perennial grassland, piñon-juniper woodland, and conifer and mountain shrub habitats (see Table 4.116 and species-specific analysis section below) include placement of facilities or roads within occupied habitat or potential habitat necessary for recovery, resulting in

BLM_0010556

an overall reduction in suitable and potentially suitable habitat and an increase in habitat fragmentation (see Habitat Fragmentation and Road Impacts Analysis, below, and Table 4.123), as well as noise disturbance from construction and operation activities. Additional impacts include potential for spills, mortality from reserve pits, increased OHV access, and road mortality (see Section 4.3.19.6). The acreage of proposed surface disturbance differs by habitat type and alternative.

Overall, Alternative B would pose the least potential impact from salable minerals on these special status species habitats (Tables 4.109 through 4.112; see Table 4.116 for special status species). The Proposed Plan would pose the second lowest impacts, followed by Alternative D. Alternative A would have the greatest impacts, based upon the large number of acres subject to standard stipulations and no limits on timing and/or controlled surface use or surface occupancy.

**Table 4.119. Salable Minerals Acres of Desert Shrub Habitat by Alternative**

| Salable Minerals Category | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard stipulations | 613,154 | 148,613 | 229,437 | 402,178 |
| Timing limitations and/or controlled surface use | 0 | 195,559 | 281,105 | 164,370 |
| No surface occupancy | 0 | 249,975 | 92,081 | 46,646 |
| Closed to leasing | 147,717 | 166,724 | 158,249 | 147,677 |

**Table 4.120. Salable Minerals Acres of Sagebrush and Perennial Grassland Habitat by Alternative**

| Salable Minerals Category | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard stipulations | 105,679 | 25,614 | 39,544 | 69,317 |
| Timing limitations and/or controlled surface use | 0 | 33,705 | 48,449 | 28,330 |
| No surface occupancy | 0 | 43,084 | 15,870 | 8,040 |
| Closed to leasing | 25,460 | 28,735 | 27,275 | 25,453 |

BLM_0010557

**Table 4.121. Salable Minerals Acres of Piñon-Juniper Woodland Habitat by Alternative**

| Salable Minerals Category | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard stipulations | 607,166 | 147,162 | 227,196 | 398,250 |
| Timing limitations and/or controlled surface use | 0 | 193,650 | 278,360 | 162,765 |
| No surface occupancy | 0 | 247,534 | 91,182 | 46,191 |
| Closed to leasing | 146,275 | 165,096 | 156,703 | 146,235 |

**Table 4.122. Salable Minerals Acres of Conifer and Mountain Shrub Habitat by Alternative**

| Salable Minerals Category | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard stipulations | 57,974 | 14,051 | 21,693 | 38,026 |
| Timing limitations and/or controlled surface use | 0 | 18,490 | 26,579 | 15,541 |
| No surface occupancy | 0 | 23,635 | 8,706 | 4,410 |
| Closed to leasing | 13,967 | 15,764 | 14,963 | 13,963 |

Implementation of minerals management decisions under the Proposed Action is likely to adversely affect Jones' cycladenia individuals and potentially suitable habitat due to 48% of the species piñon-juniper woodland and desert shrub habitats open to minerals exploration and extraction, and the likelihood of direct and indirect effects associated with these activities.

### 4.3.15.8.2.2 Habitat Fragmentation and Road Impacts Analysis for Sage-Grouse

Construction of roads and utility corridors related to oil and gas exploration and extraction fragments habitat for special status species. This fragmentation has various impacts, including direct mortality from construction activities and increased vehicular traffic. Indirect impacts include loss of ecosystem function due to decreases in undisturbed habitat size, barriers to migration, and loss of buffers around key habitat. In terms of special status species, this particularly impacts predators, migratory animals, and habitat specialists (HSUS 2006).

For the purposes of this analysis, and as an example, the impacts of fragmentation were analyzed for greater and Gunnison sage-grouse. These species were analyzed for four reasons: First, they are species of high interest; second, manuscripts exist to analyze habitat fragmentation for these species; third, our GIS data could support such analyses for these species; and fourth, they represent a dominant habitat type in the RFD areas of the MPA.

<u>Methodology</u>

The first step in analyzing the impacts of human-caused fragmentation on greater and Gunnison sage-grouse species required calculating the total number of acres of BLM-managed suitable habitat available for these species in the MPA. This was done by referring to habitat acreage proposed under Alternative B, which is the most inclusive of BLM-proposed habitat.

BLM_0010558

Next, the projected number of miles of road open in suitable greater and Gunnison sage-grouse habitats for the life of the plan was calculated for each alternative (see Section 4.3.19.18, Habitat Fragmentation). The existing condition was calculated by analyzing fragmentation from the existing travel plan (Alternative A), which presents the current locations of known roads in the MPA.

The final step calculated the number of acres of greater and Gunnison sage-grouse habitat that could be impacted by vehicle and pedestrian traffic for all alternatives. It was assumed that the potential area of impact consisted of a 400 m area along each side of all proposed roads in the designated habitat. This number is an averaged distance based on applicable literature (Clark and Karr 1979; Connelly et al. 2000; Crawford et al. 2004; UDWR 2002). Note that this analysis could result in an overestimation of habitat degradation because road class and road use were not taken into account. It is possible that infrequently used roads would cause a disturbance less than 400 m for sage-grouse species. It is also possible that the analysis could underestimate habitat degradation because more frequently used roads could cause disturbance greater than 400 meters from the road.

Impacts

Table 4.123 displays the percentage of greater and Gunnison sage-grouse habitat that would be affected by vehicle and pedestrian traffic under each alternative.

**Table 4.123. Percentage of Species Habitat Affected by Habitat Fragmentation, by Alternative**

| Species | Existing Condition | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Gunnison Sage-grouse | 75% | 76% | 69% | 74% | 74% |
| Greater Sage-grouse | 37% | 38% | 33% | 35% | 35% |

For both species of sage-grouse, Alternative A would affect the greatest percentage of habitat. Alternative A would have virtually identical impacts as currently exist. Alternative B, which places the most restrictions on oil and gas activity, would reduce impacted habitat from the existing condition by 6% (15,276 acres) for Gunnison sage-grouse and 4% (484 acres) for Greater sage-grouse. The Proposed Plan and Alternative D have identical results for both species: 1% and 2% reductions from the existing condition for the Gunnison and sage-grouse species, respectively.

Sage-grouse species are sagebrush habitat specialists. They require sagebrush for food year-round and for cover during the nesting and brood-rearing periods. Because of this relationship, small increments of habitat degradation can lead to disproportionate effects on sage-grouse populations. Conversely, seemingly small amounts of intact (unfragmented) habitat can greatly benefit populations.

Although all alternatives propose oil and gas restrictions around specified distances from active leks (strutting grounds), none of the alternatives propose protection for nesting and/or brood rearing habitat. These activities have been documented an average of 0.6–3.9 miles from the lek, with some females nesting more than 12.5 miles away from a lek (as cited in UDWR 2002).

BLM_0010559

These numbers imply that sage-grouse species need a core of unaffected sagebrush habitat for breeding, nesting, and brood-rearing. Fragmentation of this core by roads can effectively reduce the suitable nesting area for this species by means of human-caused noise and physical disturbances to nesting and brooding females. As shown in Table 4.123, the existing project area condition includes a large proportion of fragmented habitat. Of the action alternatives, Alternative B would result in the least amount of fragmented habitat, followed by the Proposed Plan and Alternatives D and A, in ascending order.

### 4.3.15.8.3 RIPARIAN AND WETLAND HABITATS

Under the Stipulations Applicable to Oil and Gas Leasing and Other Surface Disturbance Categories (Appendix C), surface-disturbing activities are not allowed in riparian zones. However, this stipulation could be waived if there are no practical alternatives (such as a utility line to private property). Because of this restriction, combined with the spatial and temporal buffers for surface disturbance for SWFL and the yellow-billed cuckoo (see Section 4.3.15.2 and Appendix C), it is likely that these species and their habitat will experience minimal direct impacts from oil and gas development. However, indirect effects such as sedimentation, displacement, and the reduction of prey availability could still occur. Table 4.124 lists salable minerals acres in riparian habitat by alternative.

**Table 4.124. Salable Minerals Acres of Riparian Habitat by Alternative**

| Salable Minerals Category | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard stipulations | 17,235 | 4,177 | 6,449 | 11,305 |
| Timing limitations and/or controlled surface use | 0 | 5,497 | 7,901 | 4,620 |
| No surface occupancy | 0 | 7,026 | 2,588 | 1,311 |
| Closed to leasing | 4,152 | 4,686 | 4,448 | 4,151 |

Development of oil and gas wells requires on average 2.4 acre-feet of water per well for drilling and extraction, which could adversely affect riparian habitat. Each contracting company would identify its own water source and disposal methods for waste products. If this water is taken from sources that feed the Colorado River system, they will contribute to the cumulative water depletions affecting the endangered fish species of the Colorado River system. These impacts would require the implementation of conservation measures required by the Programmatic Biological Opinion for water depletions from the Upper Colorado River system. In spite of this, some indirect, adverse impacts to water quality due to sedimentation associated with soil compaction could occur. Road construction and use on upland slopes results in soil compaction, which results in less rainwater infiltration and more overland flows (Trimble and Mendel 1995). However, the relative amount of reasonably foreseeable mineral development in the MPA, in conjunction with BMPs to minimize erosion, would likely result in relatively minor impacts on these species.

Table 4.125, below, details the projected average acre-feet of water used for each alternative over the life of the plan (15 years). These projections were calculated by multiplying the average water requirement per well (2.4 acre-feet) by the average amount of wells projected for each

BLM_0010560

alternative. Alternative B would have the least amount of water-withdrawal effects on riparian special status species because 42% less water would be withdrawn for drilling and extractions for oil and gas activities, followed by the Proposed Plan and Alternatives D and A, respectively.

**Table 4.125. Average Acre-Feet of Water Required for Drilling and Extraction by Alternative, Over the Life of the Plan**

| Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| 1,082 | 634 | 1,037 | 1,078 |

These impacts would require the implementation of conservation measures required by the Programmatic Biological Opinion for water depletions from the Upper Colorado River system (see Section 4.3.15.2.3). In spite of this, some indirect, adverse effects to water quality due to sedimentation associated with soil compaction could occur. Road construction and use on upland slopes results in soil compaction, which results in less rainwater infiltration and more overland flows (Trimble and Mendel 1995). However, the relative amount of reasonably foreseeable mineral development in the MPA, in conjunction with BMPs to minimize erosion, would likely result in relatively minor impacts on these species. Under the Proposed Plan, implementation of minerals management decisions is likely to adversely affect the SWFL due to the potential for habitat degradation and modification in riparian areas. Adverse affects to the endangered Colorado River fishes are also likely due to the potential for water depletion and water quality degradation.

### 4.3.15.8.4 ROCKY SLOPES AND CANYONS HABITATS

MSO are known to occupy the rocky slope/canyon habitat in the MPA. This habitat would be subject to mineral development; however, development activities would not be allowed in potential habitats until presence/absence determinations surveys are complete and lack of MSO occupancy is determined, or during the owl breeding season (March 1 through August 31). Additionally, no permanent disturbing actions would be allowed within 0.5 miles of areas where MSO surveys have found nesting individuals. These measures would reduce disturbance to individual species from oil and gas development, but habitat degradation may occur within MSO suitable habitat. Under the Proposed Plan, actions related to minerals management decisions are likely to adversely affect the MSO due to the large amount of habitat open to oil and gas leasing.

### 4.3.15.8.5 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

Mineral and energy development would likely have negligible impacts on remaining special status species habitats in the MPA. Overall, Alternative B would impact the fewest acres of special status species habitats, followed by the Proposed Plan and Alternatives D and A, respectively.

### 4.3.15.8.6 SPECIES-SPECIFIC ANALYSIS

Table 4.126 below lists the acreage and percentage of protected species habitat that is designated as Closed or NSO by alternative. Note that the total habitat acreage used to calculate percentages differs by alternative. Spatially explicit protected habitat information is only available for these 12 special status species. Qualitative impacts to these species could also affect other special

BLM_0010561

status species utilizing similar habitat. See habitat groupings below and Table 4.116 to relate the species listed below with other species within habitat types. All acreages are approximate.

Alternative B proposes the greatest amount of special status species habitat as NSO or closed to oil and gas leasing activities which would benefit special status species, followed by the Proposed Plan and Alternatives D and A, in descending order.

Table 4.127 below displays the estimated annual acreage of oil and gas-related surface disturbance to special status species habitat by alternative. Annual habitat disturbance was estimated by multiplying the percentage of species habitat that is open to minerals leasing by the total acres of predicted annual surface disturbance under each alternative. Because exact well locations are not known at this time, this table serves to show the relative potential for disturbance among alternatives and does indicate exact disturbance acreages for each habitat type. Note that Alternative A does not designate habitat for Gunnison prairie dog, White-tailed prairie dog, Greater sage-grouse, or Gunnison sage-grouse. Additionally, no habitat acreage calculations for SWFL and yellow-billed cuckoo are shown in the table below because all riparian habitat is designated as NSO (see Appendix C).

**Table 4.126. Existing Protected Special Status Species Habitat, and Acres and Percentage of This Total Habitat Proposed as Closed to Leasing or NSO, by Alternative**

| Species | Total Habitat | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Acres | % | Acres | % | Acres | % | Acres | % |
| **Desert Shrub Habitat** | | | | | | | | | |
| Jones cycladenia | 26,232 | 692 | 3 | 26,203 | 100 | 26,203 | 100 | 13,192 | 50 |
| **Sagebrush and Perennial Grassland Habitat** | | | | | | | | | |
| Greater sage-grouse | 11,309 | 0 | 0 | 9,380 | 83 | 1,103 | 58 | 46 | 6 |
| Gunnison sage-grouse | 244,497 | 0 | 0 | 69,345 | 28 | 9060 | 5 | 2,670 | 6 |
| Gunnison prairie dog | 12,573 | 0 | 0 | 335 | 3 | 159 | 1 | 0 | 0 |
| White-tailed prairie dog | 197,361 | 0 | 0 | 132,193 | 67 | 304 | <1 | 0 | 0 |
| **Riparian and Wetland Habitat** | | | | | | | | | |
| SWFL and yellow-billed cuckoo[1] | 13,454 | 5,115 | 100 | 10,737 | 100 | 8,833 | 100 | 7,297 | 100 |
| Colorado River fish | 47,843 | 19,074 | 40 | 44,366 | 93 | 42,224 | 88 | 38,392 | 80 |
| Bald eagle (nesting) | 2,394 | 1,523 | 64 | 1,635 | 68 | 869 | 36 | 840 | 35 |
| Bald eagle (wintering) | 141,756 | 15,829 | 11 | 66,756 | 45 | 28,137 | 20 | 18,591 | 13 |
| **Piñon–Juniper Woodland (Conifer/Mountain Shrub, Caves/Rock Crevices, Rocky Slopes/ Canyons** | | | | | | | | | |
| Mexican spotted owl (designated critical habitat-DCH) | 55,645 | 3,606 | 6 | 36,758 | 66 | 10,974 | 20 | 1,189 | 2 |

BLM_0010562

**Table 4.126. Existing Protected Special Status Species Habitat, and Acres and Percentage of This Total Habitat Proposed as Closed to Leasing or NSO, by Alternative**

| Species | Total Habitat | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Acres | % | Acres | % | Acres | % | Acres | % |
| Mexican spotted owl (potential breeding) | 335,936 | 155,423 | 46 | 272,843 | 81 | 220,080 | 66 | 172,002 | 51 |
| Mexican Spotted Owl (potential foraging) | 590,302 | 179,360 | 30 | 327,953 | 56 | 230,887 | 39 | 184,397 | 31 |

[1] Due to the Oil and Gas Stipulations (Appendix C) all riparian areas are managed as NSO.

BLM_0010563

**Table 4.127. Acres of Predicted Special Status Species' Habitat Disturbance in the MPA, by Alternative**

| Species | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Acres of Habitat Open to Leasing (%) | Adjusted Predicted Annual Habitat Disturbance (acres) | Acres of Habitat Open to Leasing (%) | Adjusted Predicted Annual Habitat Disturbance (acres) | Acres of Habitat Open to Leasing (%) | Adjusted Predicted Annual Habitat Disturbance (acres) | Acres of Habitat Open to Leasing (%) | Adjusted Predicted Annual Habitat Disturbance (acres) |
| Colorado River fish | 28,416 (60%) | 270 | 3,498 (7%) | 19 | 5,616 (12%) | 51 | 9,446 (20%) | 89 |
| MSO designated critical habitat | 51,972 (94%) | 422 | 18,887 (34%) | 90 | 44,671 (80%) | 347 | 54,448 (98%) | 439 |
| MSO (potential breeding) | 179,952 (54%) | 242 | 63,093 (19%) | 50 | 115,835 (34%) | 149 | 163,933 (48%) | 219 |
| MSO (potential foraging) | 410,056 (70%) | 314 | 262,349 (44%) | 117 | 359,380 (61%) | 263 | 405,917 (69%) | 309 |
| Bald eagle nesting | 868 (36%) | 164 | 759 (32%) | 84 | 1,525 (64%) | 275 | 1,554 (65%) | 291 |
| Bald eagle wintering | 125,859 (89%) | 401 | 75,019 (55%) | 144 | 113,633 (80%) | 346 | 123,180 (87%) | 390 |
| Jones cycladenia | 25,513 (97%) | 439 | 29 (<1%) | 0 | 65 (1%) | 1 | 13,040 (50%) | 223 |
| Greater sage-grouse | NMA (100%) | NA | 1,928 (17%) | 45 | 806 (42%) | 182 | 781 (94%) | 424 |
| Gunnison sage-grouse | NMA (100%) | NA | 175,152 (72%) | 191 | 166,312 (95%) | 410 | 38,769 (94%) | 420 |
| Gunnison prairie dog | NMA (100%) | NA | 12,238 (97%) | 257 | 12,414 (99%) | 427 | NMA (100%) | NA |
| White-tailed prairie dog | NMA (100%) | NA | 65,502 (33%) | 88 | 124,989 (100%) | 431 | 29,446 (100%) | 449 |

NMA = No Management Actions; NA = Not applicable.

Predicted Annual Surface Disturbance from Oil and Gas Development in MPA (acres): 451 acres under Alternative A, 264 acres under Alternative B, 432 acres under the Proposed Plan, 449 acres under Alternative D.

BLM_0010564

### 4.3.15.8.7 SUMMARY OF MINERALS IMPACTS BY ALTERNATIVE

#### 4.3.15.8.7.1 Alternative A

Under Alternative A, a total of 1,038,344 acres of land would be open for oil and gas leasing under standard stipulations, and 389,605 acres would be open for oil and gas leasing with special conditions. Much of the increased oil and gas mineral development within BLM administered lands in the MPA would occur primarily in the Greater Cisco Area, and secondarily in the Book Cliffs area. A total of 6,772 acres of surface disturbance is projected for the MPA over the life of the plan (or 451 acres annually). Possible adverse effects are described above under Impacts Common to All Alternatives.

This disturbance would impact SWFL and yellow-billed cuckoo, Colorado River fish, wintering bald eagle, Jones cycladenia, and MSO potential breeding and foraging habitats. Additionally, all Gunnison prairie dog, White-tailed prairie dog and Greater sage-grouse, and Gunnison sage-grouse habitats would be open to oil and gas activities under Alternative A. These actions would lead to the greatest potential for negative effects on these species in comparison with the other alternatives. Similarly, Alternative A allows for the second largest number of acres of disturbance for MSO designated critical habitat and would, therefore, have the largest potential impacts after Alternative D. However, Alternative A would have fewer acres disturbance in bald eagle nesting habitat than Alternative D and the Proposed Plan, and more than Alternative B (see Table 4.127).

#### 4.3.15.8.7.2 Alternative B

Under Alternative B, a total of 264,344 acres of land would be open for oil and gas leasing under standard stipulations, and 543,751 acres would be open for oil and gas leasing with special conditions. A total of 3,963 acres of surface disturbance is projected for the MPA over the life of the plan, which is 2,809 acres less than Alternative A. Much of the increased oil and gas mineral development on BLM-administered lands in the MPA would occur primarily in the Greater Cisco RFD Area, and secondarily in the Book Cliffs RFD Area. Under Alternative B, 92 and 66 acres of annual surface disturbance are projected for these areas, respectively—considerably less surface disturbance than is projected under Alternative A. Alternative B would allow the least amount of predicted surface disturbance for all species listed in Table 4.127. Therefore, this alternative would have the fewest negative impacts on special status species when compared to all other Alternatives (see Table 4.127).

#### 4.3.15.8.7.3 Proposed Plan

Under the Proposed Plan, there would be a total of 427,273 acres of land open for oil and gas leasing-standard stipulations, and 806,994 acres open for oil and gas leasing with special conditions. A total of 6,483 acres of surface disturbance is projected for the MPA over the life of the plan, which is 289 acres less than Alternative A. The Proposed Plan proposes the second least amount of predicted special status species habitat disturbance for all species except bald eagle nesting. Therefore the Proposed Plan has the potential to negatively affect special status species more than Alternative B, but less than Alternatives A and D (see Table 4.127).

BLM_0010565

## 4.3.15.8.7.4 Alternative D

Under Alternative D, there would be a total of 797,031 acres of land open for oil and gas leasing-standard stipulations and 590,442 acres open for oil and gas leasing with special conditions. A total of 6,739 acres of surface disturbance is projected for the MPA over the life of the plan, which is 33 acres less than Alternative A. Among alternatives, acres of predicted annual disturbance are highest under Alternative D for nesting bald eagle, MSO designated critical, and Jones cycladenia habitats. Acreages of predicted surface disturbance would be the second highest for all other species (see Table 4.127). Furthermore, there would be no management actions proposed for the Gunnison prairie dog. Accordingly, this alternative would have the second greatest adverse impacts on special status species compared to Alternative A.

### 4.3.15.9 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON SPECIAL STATUS SPECIES

Management decisions regarding non-WSA lands with wilderness characteristics would generally reduce adverse impacts to the special status species that occur within their boundaries. Impacts to special status species vary among alternatives based on the acreage managed for wilderness characteristics and the oil and gas leasing stipulations assigned within them.

#### 4.3.15.9.1 IMPACTS COMMON TO ALL ALTERNATIVES

There are no impacts common to all alternatives for lands with wilderness characteristics.

#### 4.3.15.9.2 ALTERNATIVE A

Alternative A would not manage any non-WSA lands to protect wilderness characteristics, and would therefore have potentially adverse long-term impacts to special status species and their habitats.

#### 4.3.15.9.3 ALTERNATIVE B

Alternative B would manage 266,485 acres to protect wilderness characteristics. These lands would be managed as closed to oil and gas leasing and woodland harvest, and other surface-disturbing activities would also be precluded. Alternative B would protect the largest number of acres with wilderness characteristics and therefore have the fewest adverse impacts to special status species.

#### 4.3.15.9.4 PROPOSED PLAN

The Proposed Plan would manage 47,761 acres to protect wilderness characteristics. These lands would be managed as NSO for oil and gas leasing as well as precluding other surface-disturbing activities. These actions would reduce adverse impacts to special status species habitat within this acreage, but would have greater adverse impacts than Alternative B.

#### 4.3.15.9.5 ALTERNATIVE D

Alternative D would not manage any non-WSA lands to protect wilderness characteristics, and would therefore have the same potentially adverse long-term impacts to special status species and their habitats as Alternative A.

BLM_0010566

## 4.3.15.10 IMPACTS OF PALEONTOLOGICAL RESOURCES DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.10.1 IMPACTS COMMON TO ALL ALTERNATIVES

Management actions associated with paleontological resources program include survey and inventory, development of interpretive sites, establishment of temporary campgrounds, and construction of fences and erosion stabilization structures. Hand tools, power tools, and heavy machinery are used during these actions. Impacts to special status species may result from surface disturbance, foot traffic, soil erosion and compaction, and human presence. These actions can also result in increased potential for weed invasion or other changes to habitat structure and composition. Paleontological resource excavation or preservation actions are typically less than one acre in size and disturbances are generally isolated and short-term. Under all management alternatives, the collection of vertebrate fossils and associated activities would be limited to qualified individuals and would thereby limit surface-disturbing activities to permitted activities. Under the Proposed Plan and Alternatives B and D, surface disturbance could occur in association with recreational collection of vertebrate fossils and personal collection of invertebrate or plant fossils.

### 4.3.15.10.2 PIÑON-JUNIPER WOODLAND AND DESERT SHRUB HABITATS

Under the Proposed Plan and other management alternatives, implementation of the paleontological resource management program is likely to adversely affect Jones' cycladenia due to the potential for surface disturbance associated with discovery activities within known or potential piñon-juniper woodland and desert shrub habitats. Paleontological activities are also likely to adversely affect MSO designated critical habitat in piñon-juniper woodlands due to paleontology related actions such as digging, fencing, and excavations that could alter the habitats utilized by MSO prey and disrupt foraging behaviors.

### 4.3.15.10.3 CONIFER AND MOUNTAIN SHRUB HABITAT

Under the Proposed Plan and other management alternatives, paleontological activities are likely to adversely affect MSO designated critical habitat in conifer and mountain shrub habitats due to paleontology related actions such as digging, fencing, and excavations that could alter the habitats utilized by MSO prey and disrupt foraging behaviors.

### 4.3.15.10.4 RIPARIAN, WETLAND AND STREAM HABITAT

Under the Proposed Plan and other management alternatives, paleontological activities are likely to adversely affect the SWFL due to actions such as digging, fencing, excavations, or establishment of temporary camp sites in riparian habitats. Associated human activities may disrupt nesting and foraging behaviors and result in reduced reproductive success. Paleontological activities may also adversely affect the endangered Colorado River fishes due to potential for water quality degradation and aquatic habitat modification during paleontologic activities.

BLM_0010567

### 4.3.15.10.5 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

The impacts of paleontological resource management decisions on all other special status species habitats are expected to be negligible. Potential impacts are discussed in Section 4.3.15.11.1 Impacts Common to All Alternatives.

### 4.3.15.11 IMPACTS OF RECREATION DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.11.1 IMPACTS COMMON TO ALL ALTERNATIVES

Impacts to special status species from recreation include direct impacts from use of mechanized and non-mechanized vehicles, ground disturbance from trail development, trampling of individuals, habitat fragmentation, and increased access to fragile habitats and species vulnerable to illegal collection. Increased visitor use of recreational areas may also adversely impact special status species through increased noise and human presence. Indirect adverse impacts to riparian areas from recreation could include alternation of plant community structure and species composition, reduction in the relative abundance of species, and changes to stream channel morphology, all of which may contribute to habitat degradation. Management of recreational areas which includes measures to reduce surface disturbance and resource degradation would also reduce these negative impacts on special status species.

The adverse impacts of recreation decisions would be partially mitigated by the required reclamation of disturbed areas to meet the Utah Standards for Public Land Health and Guidelines for Recreation Management (Appendix R) and protective measures outlined for Federally listed species in Appendix C. Off-highway vehicle (OHV) use, non-motorized vehicle use, and dispersed camping are emphasized here due to the emphasis on these activities in the MPA and the potential for direct adverse impacts to Sensitive species and their habitats from these activities throughout the MPA.

Under all alternatives, the Colorado River SRMA would be replaced with the Two Rivers, Colorado Riverway and Dolores River Canyons SRMAs to provide for more focused management. In addition, a River Management Plan, for the Dolores River, and for the Colorado River from the Colorado State Line to Castle Creek would be completed. The recreation restrictions outlined in the Management Plan would lessen the adverse impacts of visitor traffic on special status riparian species. Nevertheless, there would still be surface disturbance associated with the potential trampling and crushing of special status plant species and wildlife habitat by humans, horses, and vehicles. The surface disturbance associated with foot and vehicle traffic could also lead to the introduction of invasive plant species, which can have long-term, adverse impacts on special status species plant and animal habitats as discussed in previous sections. Additional impacts on special status species and their habitat include direct and indirect disturbance of individual wildlife species by human visitors. Wildlife species, birds in particular, are sensitive to traffic and other human-related noise. Traffic noise has been shown to directly interfere with bird vocal communication, which affects territorial behavior and mating success (Reijnen and Foppen 1994). Increased road traffic would also potentially increase the risk of direct mortality to some special status species due to vehicle impacts; carrion-eating raptors are especially vulnerable.

Under all alternatives, dispersed camping would be allowed where not specifically restricted. Dispersed camping could lead to an increase in trampling and noise impacts to special status

BLM_0010568

species and their habitats, which could have an adverse effect on individuals and populations. Dispersed camping may be closed seasonally or as impacts or environmental conditions warrant. Management actions limiting camping, wood gathering, firewood cutting, and requiring the use of fire pans and portable toilets would be carried forward in all alternatives.

### 4.3.15.11.2 DESERT SHRUB, SAGEBRUSH AND PERENNIAL GRASSLAND, OAK/MOUNTAIN SHRUB, PIÑON-JUNIPER WOODLAND AND CONIFER AND MOUNTAIN SHRUB HABITATS

All alternatives would establish focus areas for motorized and multi-use recreation. Recreational OHV and mechanized travel would be consistent with area and route designations described in the travel management plan. The short and long term adverse effects of OHV use are varied and complex. Short-term adverse effects include human presence and noise disturbances (some species have become habituated to certain noises). Long-term adverse effects include habitat fragmentation from roads and cross-country riding, soil compaction, increased erosion, and reduced air quality. These impacts can reduce habitat quantity and quality for special status species. These effects can occur within any habitat type, and can affect a diverse range of species. For an annotated bibliography of the environmental effects of OHV use, see Stokowski and LaPointe (2000). Table 4.123, above, provides a relative comparison of the amount of habitat disturbance and fragmentation that would occur in the dominant sagebrush steppe habitat type under each alternative.

Some of the SRMAs (and one area within the Moab ERMA) within the MPA would include special "non-motorized focus areas" under some of the alternatives. Not all of the SRMAs would contain these focus areas, and for those that would contain them, the size of the areas would vary by alternative. These non-motorized focus areas would be set aside for recreational activities that do not require motorized vehicles. Each area would have a slightly different emphasis; in general, these activities could potentially include hiking, mountain biking (including specialized speed events), ecological study, equestrian use, mountain climbing, and BASE jumping. The restriction of motorized vehicles from these focus areas would alleviate both short- and long-term impacts on special status species in these areas by decreasing human traffic, noise, and habitat disturbance resulting from OHV use (Table 4.128).

**Table 4.128. Acres of Designated Non-motorized Focus Areas, by Alternative**

| SRMA Area | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Canyon Rims SRMA | 0 | 3,642 | 3,642 | 0 |
| Colorado Riverway SRMA | 0 | 37,277 | 33,451 | 1,287 |
| Labyrinth Rims/Gemini Bridges SRMA | 0 | 43,561 | 38,013 | 0 |
| South Moab SRMA | 0 | 39,646 | 39,646 | 0 |
| Two Rivers SRMA | 0 | 23,479 | 23,479 | 0 |
| Moab ERMA (Book Cliffs Area) | 0 | 335,457 | 335,457 | 141,679 |
| **Total** | **0** | **483,062** | **473,688** | **142,966** |

BLM_0010569

Under Alternative A, the Book Cliffs area, Cameo Cliffs SRMA, and the White Wash Sand Dunes would remain open to OHV use. These areas consist of piñon-juniper, conifer and mountain shrub, and sagebrush and perennial grasslands habitats. Special status species utilizing these habitats would be adversely impacted by OHV use in these areas (see Table 4.116) as described in Impacts Common to All Alternatives, above. In the Colorado Riverway SRMA, Labyrinth Rims/Gemini Bridges area, Sand Flats SRMA, South Moab area, and the Moab Extensive Recreation Management Area (ERMA), motorized and mechanized travel would be restricted to designated routes, partially mitigating for the adverse impacts of OHV use in piñon-juniper and desert shrub habitats (see Table 4.116). Areas that exclude motorized recreation would reduce adverse impacts to special status species because they help to mitigate the impacts of OHV use. While Alternative A limits some OHV use to designated routes, it does not set aside any acreage specifically for non-motorized recreation. Therefore, any of the other alternatives would be more beneficial for special status species in this respect.

Under Alternative A, management aspects of the South Moab area would limit camping to designated sites and wood gathering would not be allowed, thereby limiting impacts to special status species in piñon-juniper woodland habitats. Adverse impacts of wood gathering are discussed under Section 4.3.15.18 of this chapter.

Under Alternative B, a total of 483,062 acres would be designated non-motorized focus areas (see Table 4.128) and the Book Cliffs SRMA, Colorado Riverway SRMA, and Dolores River Canyon SRMA would be managed with an emphasis on non-mechanized recreation. The Cameo Cliffs SRMA would provide opportunities for motorized, mechanized, non-mechanized hiking, and equestrian activities. Additionally, the Moab Slickrock Bike Trail would be closed to all motorized vehicles. The remainder of BLM lands not established under this alternative as an SRMA would be managed as a Moab Extensive Recreation Management Area (ERMA), where 335,457 acres would be managed for non-mechanized recreation. The majority of these areas consist of piñon-juniper woodland and desert shrub habitats; therefore the exclusion of motorized vehicles from these areas would help to avoid both short- and long-term impacts resulting from OHV use for special status species utilizing these habitats (see Table 4.116). Alternative B would pose the least adverse impacts to special status species from OHV use of the alternatives.

Under Alternative B, Special Recreation Permits (SRP) would be given to groups with an emphasis on supporting conservation of natural and cultural resource values. Organized group permits would be required for groups with 15 or more vehicles, which would help to reduce adverse effects associated with visitor use. Adverse impacts due to heavy vehicle use described above under Impacts Common to All Alternatives would likely be incurred, although they would be fewer than under any other alternative. In the Colorado Riverway SMRA, Labyrinth Rims/Gemini Bridges SMRA would provide designated camping sites. The Bartlett/Tusher/Courthouse/Ten Mile area would be closed to camping. These actions would help to avoid the adverse effects of dispersed camping on piñon-juniper woodland and desert shrub associated species (see Table 4.116).

Under the Proposed Plan, a total of 473,688 acres would be designated non-motorized focus areas (see Table 4.128). Impacts from the Cameo Cliffs SRMA, Canyon Rims SRMA, and Dolores River Canyon SRMA, would be the same as under Alternative B. In the Colorado River SMRA, a non-motorized focus area would be established on 33,573 acres, which is 3,740 acres less than Alternative B. The Labyrinth Rims/Gemini Bridges SMRA (300,650 acres) would be

BLM_0010570

managed the same as under Alternative B with the following differences: 27,893 acres of non-motorized focus area would be established, and 53,740 acres would be established for either motorized backcountry touring, motorized sport venues, or open OHV areas. Impacts from the Sand Flats SRMA would be the same as under Alternative B except that the high-use Moab Slickrock Bike Trail would be closed to all four-wheeled vehicles and ATVs (motorcycles would be allowed). The South Moab SRMA would be established and managed similarly to Alternative A, except for an additional emphasis on non-motorized trails. Under this alternative, 39,646 acres of non-motorized focus areas and a 41-acre motorized focus area would be established. ERMA lands would be managed identically to Alternative B, except that the Upper Fisher Mesa (1,365) would also be managed to emphasize mountain biking. The Proposed Plan would create greater impacts to special status species from OHV use than Alternative B, but less than Alternatives D or A, respectively.

Under the Proposed Plan, special recreation permits would be given for a wide variety of uses. Organized group permits would be required for groups with 25 or more vehicles, which would create an increased risk of adverse impacts to special status species habitats relative to Alternative B. Under the Proposed Plan, implementation of recreation management decisions is likely to adversely affect Jones' cycladenia due to the potential for direct and indirect effects on individuals or potential piñon-juniper and desert shrub habitats. Recreation management decisions are also likely to adversely affect the MSO due to the high potential for human disturbance and indirect negative effects on prey habitat in piñon-juniper woodland and conifer and mountain shrub habitats.

Under Alternative D, a total of 142,966 acres would be designated non-motorized focus areas (see Table 4.128). Impacts on special status species and their habitat in the Book Cliffs area and Cameo Cliffs area would be the same as under the Proposed Plan. Instead of establishing a Labyrinth Rims/Gemini Bridges SRMA, the Dee Pass SRMA (60,939 acres) would be established. This area would consist of the Dee Pass motorized trail system and the White Wash Sand Dunes open OHV area (3,064 acres). Open OHV use in the Dee Pass SRMA could be detrimental to special status species utilizing desert shrub and piñon-juniper habitats as described above in Impacts Common to All Alternatives. The ERMA areas would be managed the same as under the Proposed Plan except that the Book Cliffs area (141,679 acres) would be managed for low frequency non-mechanized recreation. No new mechanized or motorized recreation would be established in the Book Cliffs area. This action would primarily reduce adverse impacts to species in piñon-juniper woodland and conifer and mountain shrub habitats (see Table 4.116). Alternative D would pose fewer impacts to special status species from OHV use than Alternative A, but would be more impactful than Alternative B or the Proposed Plan, respectively.

Under Alternative D, special recreation permits management would be the same as under the Proposed Plan except for the following: Organized group permits would be required for groups with 50 or more vehicles, which represents a concomitant increase in disturbance risk in relation to Alternative B. Overall, Alternative B would pose the lowest impacts to special status species from dispersed camping and related activities, followed by the Proposed Plan and Alternatives D and A, respectively.

### 4.3.15.11.3 RIPARIAN AND WETLAND HABITATS

Under all action alternatives, the BLM would consider and, where appropriate, implement management methods to protect riparian resources and riparian-associated special status species

BLM_0010571

habitat. Management methods may include: limitations of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions. Additionally, information would be provided to the public concerning the value of riparian wildlife habitat. These management and education efforts would reduce the adverse effects of visitor traffic on riparian associated special status species and their habitat.

Under Alternative B, in the Colorado Riverway SMRA the north shore of the river would be managed for high quality bighorn sheep habitat. An additional emphasis would be placed on the protection of riparian values in the Kens Lake area (South Moab SRMA). Under Alternative D and the Proposed Plan, no competitive motorized events would be allowed in the Cameo Cliffs SRMA to maintain riparian values in a current or improved condition. Under the Proposed Plan, this same goal for riparian values would be in place in the Utah Rims SRMA. All of these actions would reduce adverse impacts to special status species living in riparian habitats by improving habitat quality and limiting impacts from recreation in riparian areas as described above in Impacts Common to All Alternatives.

Under the Proposed Plan, the implementation of recreation management decisions is likely to adversely affect the SWFL due to high potential for human disturbance and riparian habitat degradation. Actions associated with recreation management is also likely to adversely affect the endangered Colorado River fishes due to high potential for human disturbance and direct negative effects on water quality.

### 4.3.15.11.4 Caves and Rock Crevices and Rocky Slopes and Canyons Habitats

Recreation activities such as climbing and canyoneering have the potential to impact caves and rock crevices and rocky slopes through increased access, therefore impacting canyon habitats. Dispersed recreation, such as rock climbing and canyoneering, in these habitats could potentially adversely impact roosting and hibernation sites for special status bat species, nesting MSO, and the alcove bog orchid which occurs in hanging garden and seep habitats in canyon. Adverse impacts may be greater under the Proposed Plan in the Colorado Riverway SRMA, due to a semi-developed campground to accommodate rock climbers as well as developments for the Wall Street Sport Climbing Focus Area. These activities may encourage more visitors and therefore lead to increased impacts through increased human presence. Under the Proposed Plan, recreation management decisions are likely to adversely affect the MSO and nesting habitat on rocky cliffs and caves due to high potential for human disturbance and indirect negative effects on prey habitat.

### 4.3.15.12 Impacts of Riparian Decisions on Special Status Species

#### 4.3.15.12.1 Impacts Common to All Alternatives

Under all alternatives, riparian resources would be managed to promote the proper functioning condition (PFC) of riparian resources. Proper functioning condition includes the presence of adequate vegetation, landforms, or large woody debris, which may be used by sensitive fish species for shelter and as habitat for forage, further improving habitat quality. Working towards PFC of riparian resources would be beneficial to all species utilizing riparian habitats. In particular, the promotion of adequate vegetation would imply improving habitat quality for riparian special status species. The SWFL recovery plan would be implemented in all suitable habitat areas. This plan would protect riparian areas determined as SWFL habitat from over-use

BLM_0010572

and destruction (USFWS 2002d). Not only would this benefit the flycatcher, but other species utilizing these riparian areas would also benefit.

### 4.3.15.12.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, riparian restoration treatments would be allowed in riparian areas. These treatments would have both beneficial and adverse effects on vegetation in riparian habitat. Long-term, beneficial effects would include reduction of weed populations and creation of favorable conditions for establishment of native species. This, in turn, would improve riparian habitat for special status wildlife species. Short-term, adverse effects would include crushing and inadvertent removal of special status plant species during the treatment process. There could also be short-term adverse effects on special status fish species habitat due to increased overland flow associated with soil compaction on soils adjacent to riparian areas. The long-term, beneficial impacts of proper riparian functioning would outweigh short-term adverse impacts to special status species.

Under all action alternatives, no surface-disturbing activities would be allowed in riparian areas (Appendix C). Except where withdrawn, they would be open to mineral entry. These restrictions would greatly decrease the intensity of the effects of surface disturbance on riparian habitat in the MPA because the adverse impacts of surface disturbances from minerals development would be avoided (see Section 4.3.15.7 for a description of impacts).

### 4.3.15.12.3 ALTERNATIVE A

Effects of riparian decisions on special status species under Alternative A are discussed in Impacts Common to All Alternatives.

### 4.3.15.12.4 ALTERNATIVE B

Under Alternative B, some riparian areas would be closed to livestock grazing, while others would be subject to seasonal restrictions. These restrictions would lessen the number of acres of special status species habitat subject to the adverse impacts from surface disturbance in sensitive riparian areas. This alternative would be less impactful to special status species and their habitats than Alternatives A and D, and would have the same impacts as the Proposed Plan.

### 4.3.15.12.5 PROPOSED PLAN

Under the Proposed Plan, the impacts of riparian management decisions on special status species and their habitats would be the same as for Alternative B, with fewer adverse impacts than Alternatives A or D. Impacts associated with riparian management decisions are likely to adversely affect Jones' cycladenia, MSO, SWFL, and the endangered Colorado River fishes due to potential habitat modifications and degradation associated with vegetation treatments and riparian management.

### 4.3.15.12.6 ALTERNATIVE D

The impacts of Alternative D on special status species and their habitats would be similar to Alternative A, with greater potential adverse impacts than Alternative B and the Proposed Plan.

BLM_0010573

### 4.3.15.13 IMPACTS OF SOIL AND WATER DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.13.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, all floodplains and riparian/wetlands would be managed in accordance with Executive Order 11988, which would protect the quality of stream water and Federally listed species habitat by requiring a site-specific NEPA analysis prior to disturbance within a floodplain. Also, all uses in the MPA would be managed to minimize and mitigate damage to soils, and activities located in areas with sensitive soils would be subject to site-specific NEPA. These restrictions would decrease the number of acres in the MPA subject to the adverse effects on special status species and riparian and rocky slopes and canyons habitats associated with surface-disturbing activities (see Table 4.116). This includes the indirect effects of potential stream water contamination associated with increased sedimentation from runoff associated with disturbed areas (see Chapter 3, Affected Environment, and Chapter 4, Environmental Consequences of Proposed Plan and Draft Alternatives).

#### 4.3.15.13.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

All action alternatives would prohibit surface-disturbing activities within 100-year floodplains, 100 meters of riparian areas, public water reservoirs, and 100 meters of springs (Oil and Gas Stipulations, Appendix C). This would help to mitigate the adverse effects of these activities on riparian-associated special status species (described in Section 4.3.15.7 of this chapter; see Table 4.116).

Timing limitation stipulations prohibiting surface-disturbing activities would be applied to all slopes in the Book Cliffs greater than 30% from November 1 through April 30. A controlled use stipulation would be applied for all slopes in the MPA greater than 30%, and a timing limitation stipulation would be applied, prohibiting all surface-disturbing activities on 330,142 acres of saline soils from December 1 through May 31. These restrictions and stipulations would help to decrease erosion and the attendant habitat degradation for special status species using piñon-juniper, desert scrub, and rocky slopes and canyons habitats (see Table 4.116). This action would also help to mitigate adverse impacts on special status fish species and their habitat due to increased overland flow associated with upland soil compaction. Special status species in piñon-juniper woodland habitat would benefit most from the large number of acres protected from surface-disturbing activities due to slope (200,559 acres). Table 4.141 in the Vegetation Section (Acres of Each Vegetation Type Protected Due to Slope Steepness Category) provides the total number of acres of each vegetation type in the MPA with slopes greater than 30%.

Grazing can increase salinity in already saline soils (Chaneton and Lavado 1996) and lead to inhibited plant diversity, especially in arid and relatively infertile soils (Olff and Ritchie 1998). Further, changes in salinity in bodies of water such as the Colorado River have been shown to modify species composition within an ecosystem (Galindo-Bect and Glenn 1999; Hart et al. 1998). For these reasons, grazing eventually would reduce the habitat quality for special status species associated with riparian, desert scrub, and sagebrush habitats (see Table 4.116). Alternatives that would manipulate grazing in the fewest acres of allotments would reduce impacts on highly saline soils and salinity in the Colorado River drainage. Alternative B would exclude grazing from the greatest number of acres of potentially saline soils in desert shrub and sagebrush habitats (see Table 4.118), followed by the Proposed Plan and Alternatives D and A, in descending order.

BLM_0010574

### 4.3.15.13.3 ALTERNATIVE A

Under Alternative A, grazing would be manipulated on portions of ten allotments. Additionally, surface-disturbing activities would be prohibited on 313,800 acres of Mancos Shale from November 1 through April 30. Both of these actions would lessen impacts on saline soils and reduce salinity in the Colorado River Drainage, which would help to mitigate for adverse impacts on special status species utilizing riparian habitats (see Table 4.116). Specific impacts are described in Section 4.3.15.7 of this chapter.

### 4.3.15.13.4 ALTERNATIVE B

Under Alternative B, the Castle Valley and Mill Creek municipal watersheds would be closed to oil and gas leasing and other surface-disturbing activities (10,321 acres). This would reduce impacts primarily to piñon-juniper woodland associated special status species and habitats in this watershed by avoiding the adverse impacts of oil and gas development described in Section 4.3.15.7 of this chapter (see Table 4.116). Watershed Management Plans would be developed and implemented for 17 areas under this alternative, and would generally reduce adverse impacts to special status species due to additional restrictions on human activities, grazing, and other surface disturbances.

A timing limitation for surface-disturbing activities would be applied to 330,142 acres of Mancos Shale. This is 16,342 acres more than Alternative A, and so would be more effective at mitigating adverse impacts on special status species that utilize riparian habitats. Overall, soil and water decisions under Alternative B would provide the greatest level of protection to special status species of the alternatives.

### 4.3.15.13.5 PROPOSED PLAN

Under the Proposed Plan, an NSO stipulation to oil and gas leasing and other surface-disturbing activities would be applied in the Castle Valley and Mill Creek municipal watersheds. This stipulation would help to mitigate for the adverse effects of oil and gas development on piñon-juniper woodland associated special status species (see Table 4.116), but to a lesser degree than Alternative B, which would avoid these effects.

Watershed Management Plans would be developed and implemented for 8 areas—9 fewer areas than under Alternative B. Although these plans would be beneficial for these areas, this action would have greater adverse impacts than Alternative B.

Effects of management actions regarding timing limitations on Mancos shale would be identical to that described under Alternative B. The Proposed Plan would have greater adverse impacts than Alternative B and less impacts than Alternatives A or D, respectively.

Soil and water resource management actions are likely to adversely affect MSO and SWFL due to potential habitat modification and reduction in prey species from increased erosion and water quality degradation. These actions are also likely to adversely affect the endangered Colorado River fishes due to potential water quality degradation and sedimentation.

### 4.3.15.13.6 ALTERNATIVE D

Under Alternative D, the impacts of soil and water resource management decisions on special status species and their habitats would be similar to Alternative A, except there would be no

BLM_0010575

timing limitations for surface-disturbing activities occurring on Mancos Shale. The allowance of surface disturbance on Mancos Shale in the winter could add to salinity in the Colorado River drainage and increase adverse impacts on special status species utilizing riparian habitats.

## 4.3.15.14 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.14.1 IMPACTS COMMON TO ALL ALTERNATIVES

Special Designation areas, such as Areas of Critical Concern (ACECs), Wilderness Study Areas (WSAs), Wilderness Areas, and Wild and Scenic Rivers would generally reduce long-term impacts to special status species that occur within their boundaries. Impacts to special status species vary among alternatives based on the acreage of these specially designated areas and the oil and gas leasing stipulations assigned within them. ACECs are designated to protect identified relevant and important values such as cultural resources, scenic qualities, and natural systems. ACEC designation would reduce impacts to special status species and habitats by limiting human activity and surface disturbances, preserving habitat, and limiting noise.

Wilderness Study Areas (WSAs) are established in order to provide for the protection of wilderness character and for the use and enjoyment of visitors in a manner that leaves it unimpaired for future use. By definition, no surface disturbance, permanent new development, or rights-of-way would be allowed in the WSAs; the lands would be closed to oil, gas, and mineral leasing. Under all alternatives, where ACECs overlap WSAs, WSA management would take precedence. This land would be managed according to the Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP).

Under all alternatives, any river segments found suitable for designation as a Wild and Scenic River (WSR) would be recommended to Congress. Once identified—but prior to their official designation by Congress—these river segments would be managed to protect their free-flowing condition and outstandingly remarkable values. These qualities would be maintained within 1/4 mile on each side of the river. The BLM would not seek water rights in these segments, and OHV travel would be limited to designated routes.

Most of the proposed ACECs in the MPA would only be established under one or two of the alternatives. See Section 4.3.14 Special Designations for details on ACECs by alternative. Under all alternatives, when an ACEC is established it would be designated NSO or Closed for oil and gas exploration and development. Oil or gas development would still be permitted to occur beneath the surface of land within an NSO designated portion of an ACEC, but it would have to be pursued through horizontal drilling or on State or private land within the ACEC boundaries. An exception to the NSO designation could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or if the use would provide suitable opportunities for public enjoyment of these resources. Due to these possible exemptions, an ACEC should not be considered blanket protection for special status species resources.

As stated above, some of the proposed ACECs would not be established under certain alternatives. In those situations where an ACEC is not established, the land would be managed in a variety of ways (see Table 2.1 in Chapter 2, Proposed Plan and Draft Alternatives), but would not be comprehensively designated NSO or Closed for oil and gas development. This means that a comparative analysis of the management (specifically relating to oil and gas leasing categories) of the ACECs under each alternative would be the best representative of potential impacts of

BLM_0010576

Special Designation decisions on special status species. Impacts of surface-disturbing oil and gas activities on special status species and their habitats include direct and indirect human-caused disturbance (i.e., vehicular traffic, trampling of vegetation, noise, and human presence) of individual species and their habitats. Further discussion of the qualitative impacts of surface-disturbing oil and gas activities on native vegetation (special status species habitat) can be found in Section 4.3.17.6.

Under all alternatives, all designated ACECs would be avoidance areas for all rights-of-way, including wind, solar energy and communication sites. Prohibiting these uses within ACECs would assist in preventing adverse impacts to special status species related to surface and human-caused disturbances. Regardless of whether or not an ACEC is established, OHV use would generally be permitted on at least some portion of the MPA. Impacts of OHV use on wildlife species and their habitats are discussed in Section 4.3.19.13.

### 4.3.15.14.2 DESERT SHRUB AND PIÑON-JUNIPER WOODLAND HABITATS

In many proposed ACECs, piñon-juniper woodland is the most prevalent habitat; though a few ACECs, including Cisco and White Wash, are dominated by desert shrub. Special status species that primarily use these habitats would experience the most protection under ACEC designation.

Under Alternative A, none of the proposed ACEC sites would be established with the exception of the existing 605 acre Negro Bill ONA. The management of oil and gas leasing within most ACECs under this alternative would include Standard and Timing stipulations. Specifically, 47% of the land within the proposed ACEC sites would be managed as Open (Standard or Timing stipulations), while 53% of the land would be Closed (NSO or Closed) to oil and gas production.

Under Alternative B, all of the proposed ACEC sites would be established. The management of oil and gas leasing within all thirteen ACECs under this alternative would exclude Standard and Timing stipulations and allow only NSO or Closed categories. Specifically, 0% of the land within the proposed ACEC sites would be managed as Open (Standard or Timing stipulations), while 100% of the land would be Closed (NSO or Closed) to oil and gas production. The acreage of Federally listed special status species that would be included in the ACECs, and therefore be managed as NSO or Closed, is shown in Table 4.129 below. ACECs are only listed if they encompass habitat for the species listed.

Under the Proposed Plan, five of the thirteen proposed ACEC sites would be established. The management of oil and gas leasing within the ACECs under this alternative would include a mix of Standard, Timing, NSO, and Closed stipulations. Specifically, 34% of the land within the proposed ACEC sites would be managed as Open (Standard or Timing stipulations), while 66% of the land would be Closed (NSO or Closed) to oil and gas production (Table 4.130). Actions related to special designations management decisions are likely to adversely affect the due to potential habitat modification associated with mineral development and livestock grazing activities allowed in piñon-juniper habitats under special designations management.

BLM_0010577

**Table 4.129. Special Status Species Habitats Included within ACECs for Alternative B**

| ACEC | SWFL and Yellow-billed Cuckoo | Colorado River Fish | MSO Critical Habitat | MSO Breeding Habitat | MSO Foraging Habitat | Bald Eagle Nesting | Bald Eagle Wintering | Jones Cycladenia |
|---|---|---|---|---|---|---|---|---|
| Behind the Rocks | 131 | 315 | 479 | 7,784 | 2,832 | 0 | 507 | 0 |
| Book Cliffs | 1,420 | 2,900 | 0 | 128,194 | 154,882 | 0 | 9,669 | 0 |
| Canyon Rims | 17 | 0 | 13,409 | 4,101 | 11,215 | 0 | 6,667 | 0 |
| Cisco White-Tailed Prairie Dog Complex | 757 | 656 | 0 | 1,068 | 571 | 582 | 2,281 | 0 |
| Colorado River Corridor | 944 | 8,335 | 0 | 18,655 | 8,295 | 0 | 7,534 | 24,370 |
| Cottonwood-Diamond Watershed | 423 | 0 | 0 | 10,107 | 22,115 | 0 | 0 | 0 |
| Highway 279/Shafer Basin/Long Canyon | 416 | 4,529 | 9,349 | 6,570 | 1,923 | 0 | 549 | 0 |
| Labyrinth Canyon | 1,461 | 7,197 | 0 | 4,037 | 1,087 | 0 | 96 | 0 |
| Mill Creek Canyon | 342 | 0 | 0 | 4,103 | 7,506 | 0 | 0 | 0 |
| Ten Mile Wash | 382 | 0 | 0 | 600 | 259 | 0 | 0 | 0 |
| Upper Courthouse | 123 | 0 | 0 | 1,471 | 688 | 0 | 0 | 0 |
| Westwater Canyon | 265 | 4,021 | 0 | 2,899 | 780 | 0 | 261 | 0 |
| White Wash | 3 | 0 | 0 | 70 | 0 | 0 | 0 | 0 |
| Wilson Arch | 0 | 0 | 0 | 684 | 817 | 0 | 667 | 0 |
| **Total** | **6,684** | **27,953** | **23,237** | **190,343** | **212,970** | **582** | **28,231** | **24,370** |

BLM_0010578

**Table 4.130. Special Status Species Habitats Included within ACECs for the Proposed Plan**

| ACEC | SWFL and Yellow-billed Cuckoo | Colorado River Fish | MSO Critical Habitat | MSO Breeding Habitat | MSO Foraging Habitat | Bald Eagle Nesting | Bald Eagle Wintering |
|---|---|---|---|---|---|---|---|
| Behind the Rocks | 118 | 129 | 478 | 1,844 | 788 | 0 | 364 |
| Cottonwood-Diamond Watershed | 423 | 0 | 0 | 10,107 | 22,115 | 0 | 0 |
| Highway 279/Shafer Basin/Long Canyon | 416 | 4,529 | 9,349 | 6,470 | 1,923 | 0 | 551 |
| Mill Creek Canyon | 117 | 0 | 0 | 1,161 | 3,815 | 0 | 0 |
| Ten Mile Wash | 382 | 0 | 0 | 600 | 259 | 0 | 0 |
| **Total** | **1,456** | **4,658** | **9,827** | **20,182** | **28,900** | **0** | **915** |

BLM_0010579

Under Alternative D, none of the thirteen proposed ACEC sites would be established. The management of oil and gas leasing within all ACECs under this alternative would include a mix of Standard, Timing, NSO, and Closed stipulations. Specifically, 43% of the land within the proposed ACEC sites would be managed as Open (Standard or Timing stipulations), while 57% of the land would be Closed (NSO or Closed) to oil and gas production.

Alternative B would encompass the most habitat for Federally listed and special status species within ACECs. Compared to the other alternatives, Alternative B would greatly reduce adverse impacts to special status species and their habitats as it would completely prohibit all disturbances related to oil and gas exploration and production within ACECs, leaving habitats intact and special status species undisturbed. The Proposed Plan would provide more protections than Alternatives D and A, respectively, but less than Alternative B.

### 4.3.15.14.3 RIPARIAN AND WETLAND HABITAT

The designation of a Wild and Scenic River would beneficially impact special status species that access the habitats directly associated with the river (e.g., SWFL, bald eagle, yellow-billed cuckoo, MSO, and the Colorado River fishes). See Section 4.3.15.10 (Impacts of Riparian Decisions on Special Status Species) for a discussion of the impacts of all alternatives on riparian-associated special status species habitat adjacent to wild and scenic rivers. See the Summary Table of Alternatives (Table 2.1) for detail on which river and stream segments would be considered for designation under each alternative.

Table 4.131 below details the amount of habitat that would be managed as a Wild and Scenic River for the SWFL and yellow-billed cuckoo, bald eagle (nesting and winter), MSO (Critical, Breeding, and Foraging), and the Colorado River fishes. Alternatives A and D would not designate Wild and Scenic Rivers.

**Table 4.131. Acres of Federally Listed Species Habitat Managed as Wild and Scenic River, by Alternative**

| Species | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SWFL and Yellow-billed Cuckoo | 0 | 5,668 | 4,259 | 0 |
| Colorado River Fish Habitat | 0 | 38,027 | 34,549 | 0 |
| Mexican Spotted Owl Critical Habitat | 0 | 0 | 2,190 | 0 |
| Mexican Spotted Owl Potential Breeding Habitat | 0 | 28,497 | 16,374 | 0 |
| Mexican Spotted Owl Potential Foraging Habitat | 0 | 15,680 | 5,027 | 0 |
| Bald Eagle Nesting Habitat | 0 | 468 | 468 | 0 |
| Bald Eagle Wintering Habitat | 0 | 5,731 | 2,748 | 0 |

Alternative B would designate the most special status species habitat as WSRs and would therefore provide the most protection for these species, followed by the Proposed Plan. Because Alternatives A and D would not designated Wild and Scenic River segments, they would provide

BLM_0010580

no additional protections for these species. As shown in Table 4.131, Alternative B would manage 94,071 acres of special status species habitat as Wild and Scenic Rivers, versus 65,615 acres under the Proposed Plan, and no WSR designations under Alternatives A and D. Actions related to special designations management decisions are likely to adversely affect the SWFL due to potential riparian habitat modification allowed under special designations management. Adverse affects on the endangered Colorado River fishes are also likely due to the potential for increased recreational use and habitat modification and degradation.

### 4.3.15.15 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON SPECIAL STATUS SPECIES

#### 4.3.15.15.1 IMPACTS COMMON TO ALL ALTERNATIVES

See Section 2.2 and Table 2.2 in Chapter 2 for specific impacts and management common to all alternatives regarding Special Status Species Decisions. There is currently no specific management under Alternative A for the habitats and species addressed below for desert shrub and sagebrush and perennial grassland habitats. The impacts of special status species management decisions for all other special status species and habitats would include those discussed in Section 4.3.15.2 Impacts Common to All Alternatives.

#### 4.3.15.15.2 DESERT SHRUB AND SAGEBRUSH AND PERENNIAL GRASSLAND HABITATS

Special status species decisions are expected to provide additional protections to species associated with desert shrub and sagebrush and perennial grassland habitats (see Table 4.116 and Section 4.3.15.1). Adherence to the BLM's National Sage-grouse Habitat Conservation Strategy, UDWR and USFWS guidance and the White-Tailed Prairie Dog Conservation Assessment, and other conservation plans identified in Sections 4.3.15.2.7 and 4.3.15.2.8, would reduce adverse impacts to greater and Gunnison sage-grouse and other sensitive sagebrush species in the MPA because of habitat protections and restrictions on human disturbance. These restrictions include surface disturbance and permanent structures and other human activity in or near these species desert shrub, sagebrush and perennial grassland, and oak/mountain shrub habitats.

#### 4.3.15.15.2.1 Greater Sage-Grouse and Gunnison Sage-Grouse

Under Alternative B, 12,850 acres of greater sage-grouse habitat and 246,107 acres of Gunnison sage-grouse habitat would be subject to controlled surface use and timing stipulations. Timing stipulations would preclude surface-disturbing activities from March 1 through May 15 within a 2.0 mile radius of an active greater sage-grouse strutting ground, and would apply to occupied nesting and brood-rearing habitat from March 15 through July 15, and occupied winter habitat from November 15 through March 14. For Gunnison sage-grouse, no permanent above-ground facilities would be allowed within a 2.0 mile buffer of year-round occupied habitat, and the construction of fence, power lines, and tall buildings would be prohibited or limited in year-round occupied habitat (within 6 miles of an active lek). These habitats would be managed to avoid or minimize any surface occupancy that would result in loss or fragmentation of sagebrush habitat. If surface occupancy could not be avoided, sagebrush habitat would be reclaimed at a ratio of 2:1.

Under the Proposed Plan, the impacts of special status species management decisions on special status species and habitat would be the same as those discussed in Alternative B, except for the following: 3,068 acres of greater sage-grouse habitat (9,782 acres or 76% less than Alternative

BLM_0010581

B) would be managed with the same management prescriptions as described under Alternative B; timing restrictions would preclude surface-disturbing activities within 0.5 miles from an active strutting ground, thereby reducing the acreage of sagebrush habitat under beneficial timing stipulations when compared to Alternative B. For Gunnison sage-grouse, 175,727 acres of habitat would be managed as described under Alternative B, and timing restrictions would preclude surface-disturbing activities within 2.0 miles of an active strutting ground. For both species, if surface occupancy cannot be avoided, sagebrush habitat would be reclaimed at a ratio of 1:1, which is 50% less than Alternative B. Because of these restrictions, there would be less adverse impacts on sensitive plant and wildlife species in sagebrush habitat associated with this alternative than with Alternative A, but more than under Alternative B.

Under Alternative D, 1,986 acres of greater sage-grouse habitat would be subject to surface use and timing stipulations with a 0.25 mile habitat buffer. For Gunnison sage-grouse, 41,620 acres of habitat (204,487 acres or 83% less than Alternative B) would be managed with the same management prescriptions as described under Alternative B. Timing restrictions would preclude surface-disturbing activities within 0.25-mile from active Gunnison sage-grouse strutting ground, thereby further reducing the acreage of sagebrush habitats under beneficial timing stipulations when compared to Alternative B and Proposed Plan. For both species, if surface occupancy cannot be avoided, sagebrush habitat would be reclaimed at a ratio of 1:1, 50% less than Alternative B, but the same as the Proposed Plan. The restrictions under Alternative D would have fewer adverse impacts on greater and Gunnison sage-grouse and other sagebrush associated special status species than under Alternative A, but greater impacts than under Alternative B and Proposed Plan.

## 4.3.15.15.2.2 White-tailed Prairie Dog and Gunnison Prairie Dog

Under Alternative B, 199,505 acres of historic white-tailed prairie dog habitat and 10,700 acres of Gunnison prairie dog habitat would be managed to prevent surface-disturbing activities within a 1,300-foot buffer of active colonies. This decision would reduce direct mortality, den destruction, habitat loss, and raptor predation in these colonies. Of this habitat, 117,481 acres would be managed as the Cisco White-tailed Prairie Dog Complex ACEC, which would be subject to an NSO stipulation for oil and gas leasing, which in turn would preclude habitat loss from oil and gas development and other surface-disturbing activities.

Under the Proposed Plan, the impacts of special status species management decisions on special status species and habitat would be the same as those discussed under Alternative B, except for the following: 117,481 acres of White-tailed prairie dog habitat (82,024 acres or 41% less than Alternative B) would be managed with the same management prescriptions described under Alternative B; no ACEC would be established for this species; and a 660-foot buffer around active colonies would be managed for controlled surface use. For the Gunnison prairie dog, a 660-foot buffer around active colonies would be managed for controlled surface use and new power lines would be avoided. Because these restrictions would mitigate for adverse impact of oil and gas leasing and reduce raptor predation on prairie dogs, there would be fewer adverse impacts on special status plant and wildlife species in sagebrush habitat under the Proposed Plan than Alternative A, but more adverse impacts than under Alternative B.

Under Alternative D, the impacts of special status species management decisions on special status species and habitat would be the same as those discussed under Alternative B except for the following: 31,186 acres of White-tailed prairie dog habitat (168,319 acres or 84% less than

BLM_0010582

Alternative B) would be managed as described under Alternative B; no ACEC would be established for this species; and a 660-foot buffer around active colonies would be managed for controlled surface use. Under Alternative D, there would be no management actions for Gunnison prairie dogs, which could result in adverse impacts from oil and gas leasing and other surface-disturbing activities. Because of these restrictions, there would be fewer adverse impacts on special status plant and wildlife species in white-tailed prairie dog habitat under this alternative than under Alternative A, but greater impacts than under Alternative B and Proposed Plan. Because there would be no restrictions for Gunnison prairie dogs, this alternative would pose similar impacts as Alternative A, as discussed in Section 4.3.15.1.

### 4.3.15.15.3 ALL OTHER SPECIAL STATUS SPECIES HABITATS IN THE MPA

The impacts of special status species management decisions on all other special status species habitats are discussed in Section 4.3.15.1 Impacts Common to All Alternatives.

## 4.3.15.16 IMPACTS OF TRAVEL DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.16.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, any new trail designations would consider special status species habitat through a site-specific NEPA analysis, which could reduce the adverse impacts of surface and noise disturbance on sensitive plant and animal species. Potential impacts from travel management include direct and indirect, short- and long-term impacts on all habitat types from unrestricted, cross-country OHV use within open OHV areas (Table 4.132). Impacts include short-term adverse impacts to air quality from dust production, short- and long-term loss of vegetation cover from vehicle damage and soil disturbance, habitat fragmentation, introduction of invasive and exotic weed species, and associated impacts to habitat quality and quantity.

A number of trails would be managed for non-mechanized travel (see Appendix G for list). Because these trails are already established and in use, there is not likely to be an appreciable increase in disturbance of special status species and habitat resulting from the continued use of these trails. There would also be trails and/or areas open to OHV use under all alternatives. OHV use can physically damage the vegetation in special status species habitat and cause noise disturbance, which could have direct, negative effects on special status species, especially birds, in the MPA (Reijnen and Foppen 1995; Gelbard and Belnap 2003). The surface disturbance associated with OHV use can have direct and indirect adverse effects on individual plants and animals as well as their habitat. These effects are described in Section 4.3.15.9, Impacts of Recreation Decisions on Special Status Species. Table 4.132 below displays the acreage proposed for each travel designation by alternative.

BLM_0010583

**Table 4.132. Acreage of OHV Travel Designation Impacts, by Alternative**

| Travel Designation | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Open | 620,212 | 0 | 1,866 | 3,064 |
| Limited to Existing Roads and Trails | 1,196,920 | 0 | 0 | 0 |
| Limited to Designated Routes | 0 | 1,475,074 | 1,481,334 | 1,762,083 |
| Closed | 5,062 | 347,424 | 339,298 | 57,351 |
| **Total** | **1,822,194** | **1,822,498** | **1,822,498** | **1,822,498** |

### 4.3.15.16.2 ALTERNATIVE A

There are a total of 620,212 acres open to cross-country OHV use under Alternative A, and 1,196,920 acres limited to existing trails and designated routes (including inventoried routes on 309,749 acres within WSAs; see Table 4.132). This is more acreage open to OHV use than under any of the other alternatives. The majority of open OHV areas are in piñon-juniper and desert shrub habitat types. The large amount of acreage open to cross-country OHV travel could be detrimental to piñon-juniper woodland and desert shrub associated special status species because of the short and long term adverse effects described above in Impacts Common to All Alternatives (see Table 4.116).

Alternative A designates 5,026 acres as closed to OHV use (2,330 acres of piñon-juniper woodland habitat, 1,360 acres of desert shrub habitat, and 1,337 acres of sagebrush and perennial grasslands habitat; see Table 4.155 in Section 4.3.19.13, Impacts of Travel Decisions on Wildlife for a breakdown of the closed areas by wildlife species habitat type). These closures would help to mitigate for the adverse effects of this alternative on special status species and their habitat in these protected areas by eliminating surface and noise disturbance associated with OHV use. A list of all areas that would be designated as closed to OHVs under each alternative is located in Table 2.1. Closed areas would include some ACECs and vegetation study areas. For a comparison of OHV closures within selected special status species habitats by alternative, see Table 4.133 below.

**Table 4.133. Acreage Within Select Special Status Species Habitats Closed to OHV Use, by Alternative**

| Habitat Type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SWFL and Yellow-billed Cuckoo | 30 | 3,105 | 2,450 | 678 |
| Colorado River Fishes Habitat | 7 | 9,702 | 7,191 | 4,477 |
| MSO Critical Habitat | 0 | 1 | 1 | 1 |
| MSO Potential Breeding Habitat | 515 | 141,991 | 140,106 | 20,340 |
| MSO Potential Foraging Habitat | 1,452 | 171,226 | 170,731 | 20,674 |
| Bald Eagle Nesting Habitat | 313 | 327 | 327 | 327 |

BLM_0010584

**Table 4.133. Acreage Within Select Special Status Species Habitats Closed to OHV Use, by Alternative**

| Habitat Type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Bald Eagle Wintering Habitat | 1,767 | 12,916 | 10,147 | 5,822 |
| Jones cycladenia | 0 | 0 | 0 | 0 |

The total acres closed to OHV use under each alternative in this table should only be used for comparative purposes; the totals do not correlate to the figures given in the text above for total acreages closed to OHV use. The reason for this discrepancy is that the habitat areas of the selected special status species often overlap and therefore some geographic areas are counted more than once in this table.

### 4.3.15.16.3 ALTERNATIVE B

Under Alternative B, there are a total of 0 acres open to OHV cross-country use. Approximately 1,475,074 acres limit OHV use to designated trails. This is 28% more than under Alternative A.

This alternative has 347,424 acres closed to OHV use, as compared with 5,062 acres closed under Alternative A (see Table 4.155 in Section 4.3.19.13 Impacts of Travel Decisions on Wildlife for a breakdown of the closed areas by wildlife species habitat type). These closures would affect species in all habitat types, and primarily in piñon-juniper and conifer and mountain shrub habitat (see Table 4.116). See Table 4.133 above for the acreage of special status species habitats closed to OHV use. The effects of this alternative are comparable to the effects of the Proposed Plan. There are fewer acres of native vegetation (special status species habitat) subject to adverse surface-disturbing effects under this alternative than under Alternative D.

### 4.3.15.16.4 PROPOSED PLAN

Under the Proposed Plan, there are a total of 1,866 acres open to cross-country OHV use under this alternative. This open area is located in desert shrub habitat and would affect those species utilizing that habitat (see Table 4.116). There are 1,481,334 acres where OHV use is limited to designated routes, which is 29% more than under Alternative A.

This alternative has 339,298 acres closed to OHV use, which is approximately 67 times more than under Alternative A. These closures would primarily affect special status species utilizing piñon-juniper woodland and conifer and mountain shrub habitats (see Table 4.116). Also, see Table 4.155 in Section 4.3.19.13, Impacts of Travel Decisions on Wildlife for a breakdown of the closed areas by wildlife species habitat type. See Table 4.133 above for the acreage of special status species habitats closed to OHV use. The effects of this alternative are comparable to the effects of Alternative B. There are fewer acres of special status species habitat subject to adverse surface-disturbing effects under this alternative than under Alternative D.

Actions related to travel management decisions are likely to adversely affect Jones' cycladenia due to indirect affects from fugitive dust and incursion of invasive weeds associated with OHV use. Travel management decisions under the Proposed Plan are also likely to adversely affect the MSO and SWFL due to the potential increase of human presence and disturbance from OHV

BLM_0010585

use. The endangered Colorado River fishes are likely to be adversely affected due to high potential for disturbance and water quality degradation.

### 4.3.15.16.5 ALTERNATIVE D

Under Alternative D, there are a total of 3,064 acres open to cross-country OHV use, as compared with 620,212 acres open to cross country travel under Alternative A. The majority of this open area is located in desert shrub habitat, and so would affect special status species utilizing that habitat type (see Table 4.116). There are 1,762,083 acres of the MPA with OHV limited to designated trails (including inventoried routes within WSAs). This is 53% more than under Alternative A.

This alternative has 57,351 acres closed to OHV use, as compared to 5,063 acres under Alternative A. These closures would primarily affect special status species utilizing piñon-juniper and conifer and mountain shrub habitats (see Table 4.116; also see Table 4.155 in Section 4.3.19.13, Impacts of Travel Decisions on Wildlife for a breakdown of the closed areas by wildlife species habitat type). See Table 4.133 above for the acreage of special status species habitats closed to OHV use. The adverse effects of OHV travel on special status species under this alternative would be less than under Alternative A, but more than under Alternative B or Proposed Plan.

## 4.3.15.17 IMPACTS OF VEGETATION DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.17.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, seed gathering and plant collection would be allowed in all areas meeting Utah's Rangeland Health Standards. This could have some short-term, direct, adverse impacts on special status species and their habitat due to trampling and human disturbance during collection activities. However, seed gathering is not widespread and is unlikely to have substantial impacts on special status species.

Control of noxious, invasive and non-native weed species would be implemented through the BLM's weed management policies and action plans. Actions taken to help slow/stop the spread of weeds in the MPA would help reduce the adverse effects of surface disturbance to special status species habitat from grazing, oil and gas development and other surface-disturbing activities.

Tamarisk and Russian olive would be treated in a number of areas to restore riparian areas (see Table 2.1). This could have short-term risk to special status species in the treatment areas, but would have long-term, beneficial effects on the treated, native vegetation community as a whole by removing undesirable, non-native plant species and providing riparian-associated special status species with improved habitat (see Table 4.116 for a list of species). In addition, the removal of noxious weeds and invasive species would benefit native riparian species by removing competition.

Sagebrush habitat would be managed as described in the Sage-grouse Habitat Conservation Strategy (BLM 2004c). Up to 257,809 acres of sagebrush habitat and shrub steppe ecosystems would be reclaimed or restored. These restoration treatments would have long-term, beneficial impacts on special status species in native sagebrush and perennial grasslands communities by providing them with improved habitat.

BLM_0010586

### 4.3.15.17.2 ALTERNATIVE A

Under Alternative A, reclamation would be done on a site-specific basis.

### 4.3.15.17.3 ALTERNATIVE B

Under Alternative B, loss of sagebrush steppe habitat deemed essential to wildlife would be reclaimed at a ratio of 2:1. These restoration treatments would have long-term, beneficial effects on special status species in native sagebrush communities by providing them with expanded and improved habitat.

### 4.3.15.17.4 ALTERNATIVE D AND THE PROPOSED PLAN

Under Alternative D and the Proposed Plan, any loss of sagebrush steppe habitat deemed essential to wildlife would be reclaimed at a ratio of 1:1, half the acres of sagebrush-steppe habitat that would be reclaimed under Alternative B. These restoration treatments would have fewer adverse impacts than Alternative A, and greater impacts to special status species sagebrush habitats than Alternative B.

Under the Proposed Plan, actions related to vegetation management are likely to adversely affect Jones' cycladenia due to the potential for direct negative impacts during vegetation treatments from treatment error, chemical drift, or trampling of individual plants. Vegetation management actions are also likely to adversely affect the MSO and SWFL due to the potential for short-term adverse impacts to prey species, and potential modification and degradation of habitats. The endangered Colorado River fishes are likely to be adversely affected by short-term impacts to water quality and stream bank aquatic habitat.

## 4.3.15.18 IMPACTS OF VISUAL RESOURCE DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.18.1 IMPACTS COMMON TO ALL ALTERNATIVES

All lands in the MPA would be inventoried as one of four visual resource management classes (see VRM Section 3.18 and Table 4.134 below). In areas designated as VRM III or IV, changes to the landscape could be moderate or high. Most types of surface-disturbing activities and human visitation would be allowed in VRM III or IV areas. These types of disturbance could have long-term adverse impacts on special status species habitat in the MPA. Under all alternatives, all WSAs would be managed as VRM I.

**Table 4.134. Acreages in Each VRM Class, by Alternative**

|         | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---------|---------------|---------------|---------------|---------------|
| VRM I   | 349,110       | 453,462       | 358,911       | 349,617       |
| VRM II  | 401,015       | 373,647       | 365,566       | 245,773       |
| VRM III | 800,782       | 784,247       | 829,158       | 956,724       |
| VRM IV  | 271,356       | 210,532       | 268,133       | 269,641       |
| **Total** | **1,822,263** | **1,821,887** | **1,821,768** | **1,821,755** |

BLM_0010587

### 4.3.15.18.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, Wild and Scenic River segments would be managed as VRM I or II. Limited and very limited management activities would be allowed in areas designated as VRM I or II. All VRM Class I areas would be classified as NSO for oil and gas leasing. A controlled surface use stipulation would be applied to all areas managed as VRM Class II. These limitations on human presence would help mitigate the adverse effects of management activities in special status species habitat.

### 4.3.15.18.3 ALTERNATIVE A

Under Alternative A, all lands have been inventoried, but only chosen portions would be managed under VRM classes. Of the four alternatives, this alternative would have the second largest area (750,125 acres) managed for VRM I or II restrictions. It would also have the second smallest area (1,072,138 acres) managed for VRM III or IV restrictions (see Maps 2-23 A-D for VRM locations). These Class II restrictions would beneficially affect a portion of piñon-juniper habitat and special status species utilizing it. The Class III restrictions under Alternative A would adversely affect an area of sagebrush and perennial grasslands habitat. See Table 4.116 to relate species with habitat types.

### 4.3.15.18.4 ALTERNATIVE B

Under Alternative B, some ACECs would also be managed as VRM I or II (see Summary Table of Alternatives, Table 2.1). Of the four alternatives, this alternative would have the largest area (827,093 acres) subject to VRM I and II restrictions. The VRM I and II areas would primarily affect the following habitat types: piñon-juniper, conifer and mountain shrub, desert shrub, and sagebrush and perennial grasslands. special status species associated with these habitats would gain the greatest benefits for this VRM class management (see Table 4.116). It would have the smallest area (994,780 acres) subject to VRM III and IV restrictions.

### 4.3.15.18.5 PROPOSED PLAN

Under the Proposed Plan, some ACECs would also be managed as VRM I or II (See Summary of Alternatives, Table 2.1). Of the four alternatives, this alternative would have the second smallest area (714,840 acres) subject to VRM I or II restrictions. These restrictions would affect the same habitat types listed under Alternative A, but would affect sagebrush and perennial grasslands habitat to a lesser degree. It would also have the second largest area (1,106,913 acres) subject to VRM III or IV restrictions.

### 4.3.15.18.6 ALTERNATIVE D

Under Alternative D, some ACECs would also be managed as VRM I or II (see Summary of Alternatives, Table 2.1). Of the four alternatives, this alternative would have the smallest area (595,390 acres) subject to VRM I or II restrictions. These restrictions would affect the same habitat types described under Alternative B, but would beneficially affect all of them to a lesser degree. It would have the largest area (1,226,365 acres) subject to VRM III or IV restrictions.

BLM_0010588

## 4.3.15.19 IMPACTS OF WILDLIFE AND FISHERIES DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.19.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, livestock grazing would not be allowed on 87,285 acres in order to protect wildlife resources. This would primarily take place within the following habitat types: piñon-juniper woodland, conifer and mountain shrub, and desert shrub (see Table 4.116). The removal of livestock grazing could have long-term beneficial impacts on special status species within these habitats by removing competition for food resources, improving vegetation composition, species diversity and age class, forage availability, vegetative cover, and reducing surface disturbance created by livestock.

In occupied priority migratory bird habitat, no surface disturbance would be allowed from May 1-July 30. Maintenance and/or improvement of lowland riparian, wetlands, and low and high desert shrub communities would be prioritized in the MPA. In addition, bird habitat conservation areas identified in the Coordinated Implementation Plan for Bird Conservation in Utah (Martinsen et al. 2005) would receive priority for conducting bird habitat conservation projects—including offsite habitat compensation—through cooperative funding initiatives such as the Intermountain West Joint Venture. These actions would benefit both migratory bird and special status species by maintaining and improving habitat necessary for survival.

Three Habitat Management Plans would continue to be implemented: the Hatch Point, Potash-Confluence, and Dolores Triangle HMPs. These plans focus on improving upland and riparian habitat for big game species including pronghorn, bighorn sheep, elk and deer, as well as other wildlife species such as chukar partridges and peregrine falcons. Habitat improvements according to these plans would also reduce adverse impacts to special status species that utilize upland and riparian habitat (including sage-grouse, bald eagle, and special status fish species).

### 4.3.15.19.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all Action Alternatives, the reintroduction of native and naturalized fish and wildlife species into historic or suitable ranges would be considered where it is determined to be appropriate. If the species to be reintroduced is a special status species, (e.g., any of the four Colorado River endangered fishes), that species would experience a direct, long-term benefit from the action. Even in situations where the species to be reintroduced is not a special status species, this action could help to reestablish special status species by encouraging a more balanced ecosystem dynamic within the habitats of the MPA.

Special status species that rely on riparian habitat for reproduction and survival (e.g., southwestern willow flycatcher, bald eagle, and yellow-billed cuckoo) would benefit from two decisions involving riparian areas. Dispersed camping would be restricted (limited to designated sites or prohibited, depending on the area) to protect riparian wildlife habitat. In addition, riparian areas would be managed for multi-aged, multi-layered vertical structure, allowing for the retention of snags and diseased trees. These actions would improve habitat quality for special status species that utilize riparian habitat because of the reduction in human trampling and noise and because of the improvement of habitat diversity and quality.

Raptors would be managed under the auspices of the Best Management Practices (see Appendix O), including spatial and seasonal buffers, to ensure the protection of nests. These BMPs would

BLM_0010589

directly benefit those raptors that are considered special status species, including the MSO, burrowing owl, bald eagle, golden eagle, and ferruginous hawk.

An additional 3,263 acres of livestock grazing allotments (aside from those listed under Impacts Common to All Alternatives) would be removed in order to benefit wildlife resources. The removal of livestock grazing could reduce adverse impacts to special status species by reallocating forage in these areas from livestock to wildlife use.

Fire suppression would be limited within the MPA and prescribed burns would be initiated in order to increase native vegetation productivity and forage for wildlife. Special status species that depend on habitat with new growth or relatively open ground (e.g., prairie dog and burrowing owl) may be adversely affected in the short term, but would experience long-term benefits from this action because of long-term habitat quality improvement.

### 4.3.15.19.3 ALTERNATIVE A

Under Alternative A, pronghorn fawning would be seasonally protected from development between May 15 and June 20. Approximately 42,500 acres of desert bighorn sheep habitat would be improved by preventing major human disturbance during breeding and lambing seasons. Approximately 194,560 acres of land would be designated and managed as Rocky Mountain bighorn sheep habitat. Seasonal protection would also apply on 260,769 acres of deer and/or elk winter range; exploration, drilling, and other development activity would be allowed only from May 16 through October 31. These restrictions would also protect special status wildlife species in these areas by mitigating for the adverse effects of surface disturbance related to minerals development (see Section 4.3.15.2.6).

Table 4.135, below, displays the total acreage of all wildlife timing limitations for each vegetation type by alternative. Total acreage includes deer and/or elk winter habitat; pronghorn fawning habitat; desert bighorn lambing, rutting, and migration habitat; and Rocky Mountain bighorn occupied habitat. Although these restrictions apply to big game habitats, special status species utilizing the habitat would benefit from surface disturbance restrictions. Tables S.1 through S.4 (4 tables) in Appendix S itemizes the acreage for each habitat type. See Table 4.116 to relate vegetation (habitat) types to special status species. Note that overlap occurs among species habitat and therefore acreage totals for each alternative may be more than the actual acreage represented on the ground.

**Table 4.135. Acreage of All Wildlife Timing Restrictions for Vegetation Types by Alternative**

| Vegetation Type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Conifer/Mountain shrub | 29,108 | 95,778 | 50,281 | 23,836 |
| Desert shrub | 20,585 | 757,208 | 312,877 | 285,004 |
| Invasive species and weeds | 818 | 21,950 | 15,222 | 15,024 |
| Piñon-juniper Woodland | 188,574 | 979,393 | 553,653 | 449,148 |
| Riparian/Wetland | 1,594 | 11,746 | 6,609 | 4,588 |

BLM_0010590

**Table 4.135. Acreage of All Wildlife Timing Restrictions for Vegetation Types by Alternative**

| Vegetation Type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Sagebrush/Perennial grassland | 16,549 | 138,867 | 102,413 | 98,225 |

Alternative A would have the least amount of wildlife habitat subject to special wildlife conditions (257,228 acres). Details on these conditions are found in the wildlife section and under Alternative B, below. Because timing limitations generally reduce adverse impacts to special status species utilizing big game habitat areas, Alternative A would provide the fewest beneficial restrictions.

### 4.3.15.19.4 ALTERNATIVE B

Under Alternative B, a total of 2,004,942 acres would be subject to timing and surface use stipulations to prevent disturbance and habitat impacts to pronghorn, Rocky Mountain bighorn sheep, deer, and elk. In addition to benefiting big game species, these restrictions would also protect special status wildlife and plant species in piñon-juniper woodland, desert shrub, and sagebrush and perennial grasslands habitats (see Tables 4.106 and 4.125). Maintenance and operation activities for mineral production as well as hunting would be allowed during seasonal restrictions. Therefore, these restrictions would offer only minor mitigation potential for the adverse effects of surface-disturbing activities on wildlife species and their habitats. Because timing limitations generally reduce adverse impacts to special status species utilizing big game habitat areas, Alternative B would provide the most beneficial restrictions for these species.

### 4.3.15.19.5 PROPOSED PLAN

Under the Proposed Plan, 1,041,055 acres of wildlife habitat would be subject to timing or surface use restrictions. This would reduce impacts over a larger area of piñon-juniper woodland, desert shrub, and sagebrush and perennial grasslands habitats (see Table 4.116) than Alternatives A or D, and a smaller area than Alternative B. This alternative would provide more habitat use restrictions benefiting special status species than Alternatives A or D, but fewer restrictions than Alternative B.

Actions related to wildlife management decisions are likely to adversely affect Jones' cycladenia, MSO and SWFL due to potential habitat modification and degradation from wildlife habitat enhancement and treatments. Adverse affects to the endangered Colorado River fishes are also likely due to potential habitat degradation resulting from wildlife habitat enhancements.

### 4.3.15.19.6 ALTERNATIVE D

Under Alternative D, 875,825 acres of wildlife habitat would be subject to timing or surface use restrictions. This would benefit special status species in piñon-juniper, desert shrub, and sagebrush and perennial grassland habitats (see Tables 4.106 and 4.125). Accordingly, Alternative D would provide more beneficial impacts for these species than Alternative A, but less than Alternative B and the Proposed Plan.

BLM_0010591

## 4.3.15.20 IMPACTS OF WOODLANDS DECISIONS ON SPECIAL STATUS SPECIES

### 4.3.15.20.1 IMPACTS COMMON TO ALL ALTERNATIVES

Impacts to special status species from woodland management activities include removal of trees used by these species as cover, roosting or breeding sites, direct impacts to individuals from trampling or crushing during harvesting, and indirect negative impacts due to changes in vegetation structure. Woodland harvest resulting in reduced probability of catastrophic wildfire would likely reduce potentially adverse impacts to special status species that occupy woodland habitats.

Indirect, adverse effects of wood gathering include trampling and removal of native vegetation, which result in special status species habitat degradation that can include reductions in prey species, forage species, and cover. Table 4.143 in Section 4.3.17.16, Impacts of Woodlands Decisions on Vegetation Resources, presents the number of acres of each vegetation type closed to woodland harvest as presented for each alternative for the MPA.

Sensitive wildlife species in piñon-juniper woodland habitat would face short- and long-term, adverse impacts from surface and noise disturbance associated with woodland harvest.

### 4.3.15.20.2 ALTERNATIVE A

Under this alternative, 1,243,743 acres of piñon-juniper woodland habitat would be open to woodland harvest and wood gathering. Of the four alternatives, this alternative would have the largest area open to woodland harvest and wood gathering, and therefore the greatest potential risk of disturbance to special status species utilizing this habitat (see Table 4.116).

### 4.3.15.20.3 ALTERNATIVE B

Under Alternative B, 1,071,335 acres of piñon-juniper woodland habitat would be open to woodland product harvest. Of the four alternatives, this alternative would have the lowest number of acres open to woodland harvest and wood gathering and, therefore, the lowest risk of disturbance for special status species utilizing this habitat.

### 4.3.15.20.4 PROPOSED PLAN

Under the Proposed Plan, 1,212,886 acres of piñon-juniper woodland habitat would be open to woodland product harvest. This alternative would have fewer potentially adverse impacts on special status species in this habitat than Alternatives A or D, but more than Alternative B. Activities associated with woodlands management decisions are likely to adversely affect Jones' cycladenia due to 27% of potential habitat areas open for woodcutting and harvesting that could result in habitat degradation and trampling of individual plants. Woodland management under the Proposed Plan would likely adversely affect MSO due to forest treatments that could result in habitat loss, displacement or mortality of individual birds, or prey reductions. Adverse affects to the SWFL and endangered Colorado River fishes are also likely due to the potential for habitat modification and degradation associated with woodland product harvesting activities in riparian habitats.

BLM_0010592

### 4.3.15.20.5 ALTERNATIVE D

The impacts of woodlands decisions on special status species under Alternative D are identical to those described for Alternative A.

### 4.3.15.21 SUMMARY OF IMPACTS

Table 2.2 of Chapter 2 summarizes the impacts of the various alternatives and their program actions on special status species.

## 4.3.16 TRAVEL MANAGEMENT

This section discusses impacts to travel from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning travel management are described in Chapter 3.

Travel management would affect a variety of travel modes as discussed in Section 3.16.1. OHV (motorized vehicle) travel would be managed under four possible categories, based on BLM land-use planning decisions on route utility, and on decisions to protect natural resources and maintain public safety. The OHV categories are: 1) Open to unlimited, cross-country travel, 2) Limited to Inventoried or Existing routes (under Alternative A only), 3) Limited to Designated Routes, or 4) Closed to OHV use.

The analysis of impacts to travel within the MPA was conducted under two assumptions. First, travel routes designated as available to OHV use would allow all forms of travel (i.e., motorized, mountain biking, and non-mechanized hiking and equestrian), which would have beneficial impacts to travel by providing opportunities for a wide range of travel modes. Second, routes not designated would adversely affect travel because of the reduced opportunities for mechanized and motorized access to areas within the MPA. The indicators for analyzing impacts to travel are: 1) miles of route (see below) designated or not designated for OHV use, and 2) the number of acres designated as open or closed to OHV access.

Utah State road classes were considered in the impacts analysis. The road classification relevant to the analysis was the Utah Department of Transportation Class-D roads. These are unpaved roads, and not regularly maintained nor funded for maintenance by the state. Most of the routes within the MPA are in this road class (see Travel Plan, Appendix G). Utah Class-B roads are also proposed as designated routes under the Travel Management prescriptions (see Chapter 2, Table 2.2 Impacts Summary Table); however, these routes were not used as analysis criteria because they are maintained San Juan County and Grand County roads that currently provide motorized access throughout the MPA and whose travel function or designation would not change under any of the proposed alternatives.

### 4.3.16.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

After approval of the RMP, if the MFO Authorizing Officer determines that OHV travel use would cause or have the potential to cause adverse impacts, then an area could be closed to travel or travel restrictions would be imposed. This would potentially have long-term, adverse impacts on travel because opportunities would be reduced.

Once Travel Plan routes are established in the RMP, (see Appendix G for a description of the route planning process) designated routes could be modified or adjusted at the implementation

BLM_0010593

and project-planning level. The route adjustments would be done through a collaborative process involving local governments and the public. The impacts to travel management would be beneficial in the long-term because potential travel-related resource use conflicts would be identified and satisfactorily resolved since the route modification process would include interested and/or concerned stakeholders.

## 4.3.16.2 ALTERNATIVES IMPACTS

Management decisions from the following resources would have negligible impacts on travel management and will not be analyzed further in this section: Fire Management, Health and Human Safety, Lands and Realty, Livestock Grazing, Paleontology, Recreation, Riparian, Soils/ Watershed, Special Status Species, Visual Resources, Wildlife and Fisheries, and Woodlands. The impacts would be negligible because reducing the risks of wildland fire; protecting public safety around AML sites and reducing the risks of hazardous materials spills; designating ROWs, lands acquisition, exchange, or sales; establishing livestock utilization levels and applying rangeland grazing standards and guidelines; managing recreational areas and user groups; protecting riparian areas, sensitive soils, water resources; protecting federally listed species and other non-listed wildlife and fish species; protecting scenic quality; and permitting woodland harvesting would not change designated travel routes and OHV travel within the MPA.

### 4.3.16.2.1 IMPACTS OF AIR QUALITY MANAGEMENT DECISIONS ON TRAVEL

Air quality management common to all of the alternatives would require compliance with Utah air conservation regulations that prohibit the use, maintenance, or construction of roads without fugitive dust abatement measures. BLM policy requires monitoring and managing exhaust emissions and fugitive dust to prevent deterioration of air quality within potentially affected national park Class I area (for the MFO, this would include the adjacent Canyonlands and Arches National Parks). The impacts on travel would be minor and short-term along unpaved travel routes (i.e., Class-D roads, single-track routes, mechanized trails) that require road surfacing-related dust abatement measures because travelers could experience some travel delays or re-routing around the affected road sections during dust abatement and maintenance projects.

### 4.3.16.2.2 IMPACTS OF CULTURAL RESOURCE DECISIONS ON TRAVEL

#### 4.3.16.2.2.1 Alternative A

Under Alternative A, there are no specific prescriptions that address travel opportunities or potential restrictions on travel within the context of cultural resources management.

#### 4.3.16.2.2.2 Alternatives B–D

Under all of the action alternatives (B, D, and Proposed Plan), cultural sites could be closed to visitation if it were determined that travel-related activity threatens cultural site integrity. If sites were closed, then travel opportunities could be adversely affected in the short-term or long-term, depending on MFO decisions to protect a threatened site. Compared to Alternative A, the action alternatives would potentially have more long-term, adverse impacts on travel opportunities because access would be reduced to protect cultural resources.

BLM_0010594

### 4.3.16.2.3 IMPACTS OF MINERALS DECISIONS ON TRAVEL

Minerals-related access roads would be constructed under all of the alternatives and would be generally available for use by the public, but the RFD-predicted level of mineral resource development would result in a relatively small number of additional access roads (i.e., spur roads to drilling sites) when compared to the existing or designated routes within the MPA. Minerals decisions that permit oil and gas exploration and development would have beneficial, but minor, impacts on travel access and opportunities because minerals-related access roads would increase opportunities.

### 4.3.16.2.4 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS MANAGEMENT DECISIONS ON TRAVEL

#### 4.3.16.2.4.1 Alternatives A and D

No lands would be managed for wilderness characteristics under Alternatives A and D; there would be no impacts to travel management from these decisions.

#### 4.3.16.2.4.2 Alternative B

Under Alternative B, over 177 miles of route within 26 non-WSA lands with wilderness characteristics would not be designated for motorized travel (compared to 294 miles in Alternative A). An additional 7 non-WSA lands with wilderness characteristics would have no routes would designated for travel (Arches Adjacent, Big Triangle, Dome Plateau, Floy Canyon, Horsethief Point, Mexico Point, Yellow Bird.) This would adversely impact those recreationists engaging in motorized activities by removing 177 miles of available route. However, this would provide a beneficial impact to those recreationists seeking a more primitive experience. Development of routes for mechanized travel would not be permitted on the 266,485 acres of non-WSA lands managed for wilderness characteristics.

#### 4.3.16.2.4.3 Proposed Plan

Travel in Beaver Creek would be limited to 12.45 miles of designated route (reducing route miles by 6.3 miles in Alternative A); travel in Fisher Towers would be limited to 4.3 miles of designated route (reducing route miles of 6.68 miles in Alternative A); travel in Mary Jane Canyon would be limited to 10.04 miles of designated route (reducing route miles by 23.28 miles in Alternative A). This would adversely impact those recreationists engaging in motorized activities by removing 36.26 miles of available route. However, this would provide a beneficial impact to those recreationists seeking a more primitive experience. Development of routes for mechanized travel would not be permitted on the 47,761 acres of non-WSA lands managed for wilderness characteristics.

### 4.3.16.2.5 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON TRAVEL

#### 4.3.16.2.5.1 ACECs and Wild and Scenic River Segments

Under all alternatives, OHV, mountain biking, and non-mechanized recreational travel and access opportunities within river segments being considered for WSR status, and travel within ACECs would be limited to routes either designated under prescriptions to protect resource values in these areas or under the Moab Travel Plan (see Section 4.3.16.2.6).

BLM_0010595

This would have negligible to minor impacts on travel opportunities because travel routes into these areas would be allowed under all alternatives. However, no areas would be designated as open to unlimited, cross-country OHV travel within special designations, which would have long-term, adverse impacts on this form of travel because cross-country travel opportunities within these areas would be prohibited.

## 4.3.16.2.5.2 WSAs and Wilderness Areas

Alternative A

Wilderness area and WSA prescriptions under Alternative A would continue to designate 12,635 acres in the Behind the Rocks WSA as Closed to OHV access, and travel limited to inventoried routes on 82.5 miles of way within 309,749 acres of Wilderness and WSAs. The impacts to travel opportunities would continue to be adverse in the long-term within the Behind the Rocks WSA because OHV access and travel opportunities would not be available in this area.

Alternative B

Alternative B prescriptions would manage all WSAs and the Black Ridge Wilderness (a total of 354,015 acres) as closed to OHV travel, which would have long-term, adverse impacts on travel opportunities within these special designation areas. No routes would be designated. The impacts to travel would be more adverse under this alternative, when compared to Alternative A, because more area would be closed to OHV travel.

Proposed Plan

Under the Proposed Plan, 344,056 acres of WSA and Wilderness would be closed to OHV travel, with 9,959 acres managed for OHV travel limited to designated routes (with 3.1 miles of route designated). The impacts to travel would be similar to Alternative B because only 3% of all WSA and Wilderness areas would be managed for OHV travel and access opportunities. Compared to Alternative A, this alternative would be similar to Alternative B because the total WSA area closed to travel opportunities would be similar.

Alternative D

Under Alternative D, motorized travel in all WSA and Wilderness areas would be designated as limited to designated routes (with 16 miles of route designated), with long-term, beneficial impacts on travel opportunities and access into these areas, since motorized opportunities will be available on these 16 miles of route. The impacts on travel would less beneficial to travel than Alternative A because although travel opportunities would be available in all WSA and Wilderness areas in Alternative D, there would be fewer miles of route available for use.

### 4.3.16.2.6 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON TRAVEL

## 4.3.16.2.6.1 Motorized (OHV) Travel

Alternative A

Under Alternative A, OHV travel would be managed under open, limited, and closed designations, as shown below in Table 4.136, with travel prescriptions as approved under the current RMP and subsequently modified by Federal Register limitations and restrictions issued after approval of the RMP. Alternative A would manage 620,212 acres as open for cross-country

BLM_0010596

travel, 1,196,920 acres as limited to existing, inventoried and/or designated routes, and 5,062 acres as closed to OHV travel. Designation of 620,212 acres of the MPA as open to OHV areas would have negligible impacts on travel opportunities because opportunities would be unrestricted for all modes of travel. Limited OHV use along inventoried and/or designated routes would also have negligible impacts on OHV travel because travel along these routes would remain unimpeded. The adverse impacts on OHV travel would be minor, in the long-term because, approximately 99% of the MPA would be accessible either by cross-country travel or along designated and inventoried/existing routes.

**Table 4.136. OHV Designations by Alternative**

| Travel Designation | Alternative A (Acres) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Open | 620,212 | 0 | 1,866 | 3,064 |
| Limited to Existing Roads and Trails | 1,196,920[4] | | | |
| Limited to Designated Routes | | 1,475,074 | 1,481,334 | 1,762,083 |
| Closed | 5,062 | 347,424 | 339,298 | 57,351 |
| Total[1] | **1,822,194** | **1,822,498** | **1,822,498** | **1,822,498** |
| D routes (miles)[2] | 4,673 | 2,144 | 2,519 | 2,671 |
| Designated Motorcycle Routes (miles)[2] | 0[3] | 0 | 123 | 219 |

[1]Acreage figures may vary by alternative due to the changes in GIS technology and variances in GIS shapefiles.

[2]These are the miles of designated routes at time of EIS publication. After the issuing of the ROD, minor adjustments may be made by the MFO to more accurately define the designated routes.

[3]The Slickrock Trail, while open to motorcycle use, was not designated as a motorcycle route under the current RMP.

[4] 48,169 acres would be limited to designated roads and trails; and 309,749 acres would be limited to inventoried routes in WSAs.

Alternative B

This alternative would designate no area as open to cross-country OHV travel. Limited OHV travel would be permitted on 1,475,074 acres of designated routes, with 347,424 acres closed to all OHV travel. These travel designations would allow opportunities on approximately 81% of the MPA, which would have adverse, long-term, but minor, impacts on travel opportunities because a small proportion (19%) of the MPA would not be available for travel access. Compared to Alternative A, this alternative would manage the MPA with more long-term, adverse, restriction-related impacts on OHV travel, as 342,362 more acres would be subject to long-term prohibitions on OHV access under the closed designation.

Proposed Plan

The Proposed Plan would have impacts similar to those discussed under Alternative B because the acreages designated as limited and closed to OHV use are similar, except that a small area (1,866 acres) would be designated as open to OHV travel within the White Wash Sand Dunes and managed as a motorized OHV focus area (see Recreation Section 4.3.10.2.10.6). Compared to Alternative A, the Proposed Plan would have impacts similar to those discussed under Alternative B because the acreage comparisons are similar: approximately the same number of acres would be closed to OHV cross-country travel.

BLM_0010597

By restricting the Bartlett Freeride area to bicycles only, open motorcycle opportunities would be restricted on 166 acres.

Alternative D

Under Alternative D OHV travel prescriptions, 57,351 acres would be closed, 1,762,083 acres would be designated as limited to designated routes, and 3,064 acres would be open to cross-country OHV travel within two motorized OHV focus areas (White Wash Sand Dunes and Airport Hills). Approximately 97% of the MPA would be available for travel opportunities and access. The impacts would be similar to those discussed under Alternative A, but to a lesser degree, because, although a large proportion of the MPA would be open to travel, the access would be along designated routes and not cross-country.

## 4.3.16.2.6.2 D-Class Road Travel

Note that the miles of D-Class routes are included within acreages of OHV travel discussed previously. Class B roads are available for travel under all alternatives.

Alternative A

Under Alternative A, 4,673 miles of D-class route would be available for travel (as either inventoried, existing or designated routes). About 122 miles would be available for single-track, motorized travel (i.e., motorcycle OHV travel). As shown above in Table 4.136, motorcycle use is currently allowed on the Slickrock Trail, but formal motorcycle trail-use designation was not included in the 1985 RMP. Under this alternative, the opportunities for travel along D-Class routes would be unimpeded, with long-term, beneficial impacts to travel.

Alternative B

Alternative B would designate approximately 2,144 miles of D-Class routes, with no miles designated for single-track, motorized use. Under this alternative, travel opportunities would be adversely reduced in the long-term because 2,144 miles of inventoried routes would not be designated due to lack of an identifiable purpose and need, and 655 miles would not be designated because of resource use conflicts (cultural, wildlife, sensitive soils, recreation, riparian, wilderness values, and floodplains). See Appendix G for a discussion of the collaborative BLM/County route designation process. Compared to Alternative A, this alternative would have greater adverse impacts on travel opportunities because the proposed Travel Plan would eliminate 2,529 miles of routes within the MPA that would otherwise be available for travel.

Proposed Plan

This alternative would propose approximately 2,519 miles of D-Class routes, and would designate 282 miles of motorcycle single-track routes. The impacts on travel would be similar to Alternative B and for the same reasons, except that the designated single-track routes would provide long-term, beneficial recreation-related travel opportunities for the off-highway motorcycle user group (see Recreation 4.3.10 for user group descriptions). When compared to Alternative A, the Proposed Plan would be similar to Alternative B because the miles of routes not designated (and the reduction in travel opportunities) would be similar: approximately 2,154 miles of routes would not be designated, resulting in long-term, adverse impacts on MPA travel opportunities.

BLM_0010598

Alternative D

This alternative would propose approximately 2,671 miles of D-Class routes and 340 miles as designated motorcycle single-track routes. When compared to Alternative A, the adverse impacts to travel would be similar to Alternative B, but to a lesser degree, because the miles of route closures would be similar. Approximately 2,002 miles of routes would not be designated, resulting in impacts similar to those identified in Alternative B.

### 4.3.16.2.6.3 Mountain Biking Recreational Travel

Under management common to all action alternatives, mountain biking travel opportunities would be allowed on all routes open to motorized travel use, and management would be applied to these routes to identify and modify routes, as needed, to meet mountain biking travel needs. Approximately 11 miles of existing single-track routes would be managed for mountain biking use only. These prescriptions would have long-term, beneficial impacts on mountain biking travel by expanding recreational travel and access opportunities for this user group.

Alternative A

Under Alternative A, the impacts of management on mountain biking travel would be adverse in the long-term because none of the prescriptions would specifically or adequately address the current trends of increasing resource-user conflicts between motorized OHV and mountain biking travelers and mountain biking user displacement by motorized OHV users. Under this alternative, mountain biking travel conditions would be degraded in the long term, and recreational travel opportunities and experiences would likely be diminished for the aforementioned reasons.

Alternatives B, D, and Proposed Plan

Proposed management under the action alternatives would have long-term, beneficial impacts on mountain biking travelers by developing additional mountain biking routes: 75 miles under Alternative B, 150 miles under the Proposed Plan, and 300 miles under Alternative D. These routes would include proposed additional support facilities (e.g., trailheads, signs, and route markers). The beneficial impacts would vary by degree, with Alternative D and the Proposed Plan having the most beneficial impacts on mountain biking travel. Compared to Alternative A, all of the action alternatives would be more beneficial to mountain biking travel because 1) travel user conflicts and displacement would be addressed by converting inventoried routes not designated for motorized OHV use to mountain biking travel; and 2) the demand for mountain biking travel facilities would be addressed by installing additional facilities.

### 4.3.16.2.6.4 Non-mechanized Recreational (Hiking, Backpacking, Equestrian) Travel

Management common to all action alternatives would provide non-mechanized travel opportunities on all routes open to motorized OHV and mountain biking users. Non-mechanized travel opportunities would be unrestricted within the MPA, except where limited or restricted to protect specific resources values. Seventeen miles of non-mechanized routes on existing trails would be managed for non-mechanized users. Equestrian users would be encouraged to participate with the MFO in identifying additional non-mechanized trails for development of equestrian and hiking routes. These actions would have long-term, beneficial impacts on non-

BLM_0010599

mechanized travelers by expanding the travel opportunities for this user group and by reducing user-conflicts with motorized and mountain bike travelers.

Alternative A

Under this alternative, equestrian use would continue to be discouraged in Negro Bill Canyon in order to protect canyon resources, but would have negligible impacts on non-mechanized travel as the canyon route would still be open to foot travel. Commercial equestrian use would not be allowed in Mill Creek Canyon, but private use would continue. In general, the prescriptions under Alternative A would have long-term, adverse impacts on non-mechanized travel because the alternative does not address current trends within the MPA, including: 1) the increase in resource user conflicts between non-mechanized and mountain biking travelers; 2) the increasing displacement of non-mechanized travelers from areas used by motorized OHV users and mountain bikers (see Section 3.10.2.6); and 3) the demand for recreational facilities to meet traveler needs, such as trailhead signs, route markers, and information kiosks (see Section 3.10.2.5).

Alternatives B, D, and Proposed Plan

The specific prescriptions under these alternatives would be beneficial in the long-term to non-mechanized travel because resource-use conflicts between non-mechanized and mechanized (including OHV and mountain bike) users would be addressed by developing exclusively non-mechanized travel routes. Support facilities would be installed along existing and new trails, and specified existing trails would be managed for equestrian use (with hiking allowed). The difference in impacts between the alternatives varies by degrees: Alternative B, Proposed Plan, and Alternative D would develop up to 25, 50, and 100 miles of additional routes and appropriate support facilities, respectively. Compared to Alternative A, all of the action alternatives would have more beneficial impacts on travel by providing more opportunities and more facilities for non-mechanized travel.

### 4.3.16.2.7 IMPACTS OF VEGETATION DECISIONS ON TRAVEL

### 4.3.16.2.7.1 Alternative A

Under this alternative, there would be no impacts from vegetation-related prescribed fire/fuel reduction or invasive/non-native plant control projects on travel opportunities or access because no drought management prescriptions on travel would be in place.

### 4.3.16.2.7.2 Alternatives B, D, and Proposed Plan

For all of the action alternatives, prescriptions for managing drought conditions under the proposed adaptive drought management plan could adversely restrict travel or reduce travel opportunities in the short-term by closing areas to public entry. This would potentially have more adverse impacts on travel than Alternative A because closing areas to public entry under the drought plan would restrict travel opportunities; however, these impacts would be minor because they would likely be short-term and would only be imposed under exceptional conditions.

BLM_0010600

### 4.3.16.3 SUMMARY OF IMPACTS

Table 2.2 of Chapter 2 summarizes the impacts of the various alternatives and their program actions on travel management.

## 4.3.17 VEGETATION

This section discusses impacts to vegetation from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning vegetation are described in Chapter 3.

Vegetation types for the MPA were categorized as conifer/mountain shrub, desert shrub, piñon-juniper, riparian and wetlands, and sagebrush/perennial grass communities.

For the purposes of this RMP, the primary indicator of impacts to vegetation is the acres of surface disturbance caused by management decisions regarding other resources. Such surface disturbance would impact vegetation resources to varying degrees, depending on the amount, location, and type of surface disturbance and the disturbed vegetation's characteristics or ability to withstand surface disturbance. Surface-disturbing activities that currently occur and that are expected to continue include grazing; minerals development; recreation and OHV use; woodland harvest; and vegetation treatments.

The following resource management decisions would have negligible impacts to vegetation and, therefore, are not discussed further: air quality, cultural resources, human health and safety, paleontological resources, and visual resources. The impacts would be negligible because protecting air quality, protecting and inventorying cultural resources, maintaining public safety around AML sites and reducing the risks of hazardous materials spills and site cleanup, allowing scientific study of and recreational collection of fossils, and protecting scenic quality under designated VRM Class objectives would neither improve nor degrade vegetation resources within the MPA.

### 4.3.17.1 IMPACTS COMMON TO ALL ALTERNATIVES

Weed management in the MPA would include control of existing noxious weed species and preventing the spread of invasive species. Restoration and rehabilitation activities would always use certified weed-free mulch and seed mixes; native seed mixes would be used whenever possible. Additionally, users with stock animals would be required to provide certified weed-free feed for stock animals. These actions would benefit vegetation resources by reducing the spread of noxious weeds.

### 4.3.17.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

In accordance with the BLM sagebrush conservation guidance, the MPA would reclaim and restore up to 257,809 acres of sagebrush habitat and shrub-steppe ecosystems. Efforts would include prioritizing sagebrush-steppe communities for wildfire suppression, emergency stabilization and fuels reduction, and following the BLM's Sage-Grouse Conservation Strategy. The Sage-Grouse Conservation Strategy would be used, when applicable, in the development and implementation of vegetation and land treatments, livestock manipulation techniques, fire projects, energy exploration and development, and any surface-disturbing activity within sagebrush and shrub-steppe communities. All of these actions would have beneficial, protection-

BLM_0010601

and enhancement-related impacts on native plant species from vegetation restoration and reclamation, and from the reduction of invasive species establishment.

Vegetation treatments, including biological, chemical, mechanical, and prescribed burns, would be used to reduce tamarisk and Russian olive where appropriate. In addition, the MPA would incorporate vegetation treatments from the Utah Record of Decision (ROD) for Vegetation Treatment on BLM Lands in Thirteen Western States EIS (BLM 1991a as amended). Management would also include restoration of riparian habitat to native willow and cottonwood communities, including replanting cottonwoods and willow subsequent to wildland fire or other disturbance in riparian areas, where appropriate. The impacts of the above-mentioned treatments and restoration activities on vegetation resources would be adverse, short-term, and minor due to vegetation removal and/or trampling; however, the treatments and restoration actions would reduce native plant species competition with noxious weeds and invasive plant species, which would have long-term, beneficial impacts on vegetation resources.

Under decisions common to the action alternatives, the MPA would establish criteria for restricting activities during drought, through an adaptive drought management program. These restrictions could result in beneficial, short-term and long-term impacts on vegetation because criteria would be established and BMPs applied to restrict or prohibit surface impacts to vegetation. These actions would result in beneficial impacts to vegetation from such actions as suspending or limiting seed collecting, suspending surface-disturbing activities, changing livestock use, and limiting prescribed burn and vegetation treatments during periods of drought. For more detail on adaptive drought management, refer to Chapter 2 Vegetation Management Common to All Action Alternatives.

### 4.3.17.3 IMPACTS OF FIRE MANAGEMENT DECISIONS ON VEGETATION RESOURCES

Under all alternatives, the Utah Land-use Plan Amendment for Fire and Fuels Management would be implemented in fire-related actions (BLM 2005c). As discussed in Section 4.3.3 Fire Management, the MFO would treat 5,000 to 10,000 acres annually (approximately 0.5% of the MPA), depending on budgetary and time constraints. The majority of these treatments would likely be concentrated in piñon-juniper vegetation. Wildland fire use would not be authorized in areas that are known to be highly susceptible to post-fire cheatgrass or other weed invasion, areas with important terrestrial and aquatic habitats, and non-fire adapted vegetation communities unless reasonable resource protection measures were in place. These actions would have long-term, beneficial impacts on vegetation by reducing the opportunities for the spread of weeds and exotic, invasive species into native vegetation communities.

Fuels management actions such as mechanical and manual treatments, prescribed fire, chemical or biological vegetation control, and aerial/ground seeding would have both beneficial and adverse impacts on vegetation communities in fire-treated areas. Long-term, beneficial impacts to vegetation would occur in treated areas once invasive species competition was eliminated or reduced, assuming that a diverse native community has the potential to establish itself in the area. The short-term, adverse impacts of fuels management actions on vegetation would include the unavoidable potential trampling and disturbance of rare native species, and the thinning and removal of ecologically desirable species. These actions could result in a short-term, adverse reduction of native species diversity. However, these treatments would improve vegetation communities in the long term once native or desirable non-native vegetation were reestablished.

BLM_0010602

These beneficial impacts would include more varied species and habitat structure, multiple age classes, and openings for forbs and woody species recruitment.

### 4.3.17.4 IMPACTS OF LANDS AND REALTY DECISIONS ON VEGETATION RESOURCES

Lands and Realty decisions that have the potential to have adverse impacts on vegetation would result from authorizations of right-of-way (ROW) grants and the expansion or development of utility corridors. These actions would create surface disturbances of various magnitudes depending on the size and location of the project. Impacts from minerals ROWs such as access roads and pipelines are accounted for in the minerals surface disturbance calculations (see Section 4.3.17.6). Surface impacts from construction of communication facilities and wind and solar energy development would be disclosed in site-specific NEPA documentation. There would also be potential for the introduction of noxious or invasive plant species via construction equipment, vehicles, and personnel. However, the adverse impacts would be mitigated through BMPs, noxious weed controls, and restoration and rehabilitation measures outlined in Management Common to All.

Beneficial impacts would result from identification of exclusion and avoidance areas for ROWs and mineral withdrawals. Because withdrawals are generally for mineral entry, they are discussed in Minerals, Section 4.3.17.6. Exclusion areas would offer greater protections for vegetation than avoidance areas because they would completely preclude surface-disturbing activities. Exclusion and avoidance areas would include any areas proposed as Closed (exclusion) NSO (avoidance) due to lands being managed for wilderness characteristics, ACECs, WSAs, Wilderness Areas, or Threatened and Endangered species habitat.

Under Alternatives A and D, potential vegetation-related surface disturbances within the proposed I-70 utility corridor would be up to 1-mile wide. Under the Proposed Plan, they would be up to a 0.5-mile wide and under Alternative B, they would be up to 100-foot-wide. The following Table 4.137 shows the acres of vegetation within each vegetation type under each alternative that would be potentially impacted by surface disturbances in the proposed utility corridors. Alternative A would have the least area of vegetation potentially impacted by the proposed utility corridors, followed by Alternative B, Proposed Plan, and Alternative D, respectively. Compared to Alternative A, all of the action alternatives would have potentially more adverse impacts on vegetation by expanding the width of MPA utility corridors.

**Table 4.137. Acreage of Vegetation Types Potentially Impacted in Utility Corridors, by Alternative**

| Vegetation type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Conifer/mountain shrub | 9 | 0 | 19 | 19 |
| Desert shrub | 25,144 | 52,053 | 113,917 | 141,797 |
| Invasive species and weeds | 308 | 1,327 | 2,084 | 2,492 |
| Piñon-juniper | 5,345 | 8,808 | 41,672 | 44,189 |
| Riparian/wetland | 143 | 323 | 1,031 | 1,139 |
| Sagebrush/ perennial grass | 1,551 | 3,355 | 14,376 | 14,531 |
| **Total** | **32,500** | **65,866** | **173,099** | **204,167** |

BLM_0010603

All alternatives would manage WSAs, and Wilderness Areas as exclusion areas, and all alternatives would manage ACECs as avoidance areas. Alternative B would manage non-WSA lands with wilderness characteristics as exclusion areas and the Proposed Plan would manage them as avoidance areas. All action alternatives (B, D, and Proposed Plan) would manage areas with NSO stipulations as avoidance areas. Since Alternative B would manage 266,485 acres of lands with wilderness characteristics as exclusion areas, this alternative would offer the greatest protection to vegetation of all the alternatives. The Proposed Plan would manage for five ACECs totaling 63,232 acres and three areas with wilderness characteristics totaling 47,761 acres. As a result, the Proposed Plan would provide for the second largest area of protection but only as avoidance areas. Thus, there could be circumstances by which ROWs could be approved, with accompanying surface disturbance in these areas. Alternatives D would not designate any ACECs and would offer the least protection of all the alternatives; Alternative A would continue management of the existing 1,375 acres Negro Bill Canyon ONA, offering only slightly more protection to vegetation. Alternatives A and D do not propose to manage any lands for wilderness characteristics, offering less protection for vegetation than either Alternative B or the Proposed Plan.

Under all of the alternatives, the continued withdrawal of lands from mineral entry along the Colorado, Dolores, and Green Rivers (encompassing 65,037 acres), and within the Westwater and Black Ridge wilderness areas (13,296 acres), would beneficially protect vegetation resources (mostly juniper and desert shrub) in the long term by eliminating potential surface-disturbance-related impacts from mineral entry.

### 4.3.17.5 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON VEGETATION RESOURCES

In general, making areas unavailable for grazing would provide long-term protection and enhancement of vegetation because it would limit the loss of vegetative cover and the trampling of species. Areas available for livestock grazing generally suffer some adverse impacts due to decreased growth or loss of riparian and other vegetation.

Under all of the alternatives, livestock grazing would be managed according to the Guidelines for Grazing Management in order to achieve and maintain the Standards for Rangeland Health. Under the Guidelines, the proper functioning condition of wetlands and riparian areas would be promoted, the use and perpetuation of native species would be emphasized, noxious weed establishment and spread would be minimized, and adjustments would be made to grazing practices when vegetation proper functioning conditions are not being met. These guidelines and standards would generally mitigate the impacts of livestock grazing on vegetation resources. However, the potential for impacts still exists and would be greater under alternatives with a higher percentage of lands available for grazing.

The following Table 4.138 shows a comparison of the numbers of acres excluded from livestock grazing by alternative. Alternative B would exclude the most acres, followed by Alternative A, the Proposed Plan, and Alternative D, respectively. Acreages vary slightly between alternatives.

BLM_0010604

**Table 4.138. Acres of Each Vegetation Type Excluded from Grazing by Alternative**

| Habitat | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Desert shrub | 13,697 | 23,880 | 23,380 | 13,324 |
| Sagebrush and perennial grassland | 3,806 | 5,569 | 5,569 | 1,767 |
| Conifer and mountain shrub | 23,155 | 23,404 | 22,579 | 587 |
| Piñon-juniper woodland | 84,301 | 98,628 | 77,548 | 35,369 |
| Riparian/Wetland | 1,568 | 1,852 | 1,556 | 862 |
| **Total** | **126,527** | **153,333** | **132,047** | **51,909** |

More areas would be unavailable for grazing under Alternative B than Alternative A, the Proposed Plan, and especially Alternative D, which could have beneficial impacts on native vegetation depending on the success of re-vegetation and weed control efforts following the removal of livestock. Management under the rangeland standards and guidelines would increase the likelihood of native vegetation establishment, with long-term beneficial impacts to vegetation resources. In the long term, Alternative B would likely have fewer adverse impacts on native vegetation in the MPA when compared to any other alternative because of the additional unavailable for livestock grazing. Alternative D would have the greatest likelihood of adverse impacts on native vegetation in the MPA because fewer acres are rendered unavailable for grazing in this alternative.

Fewer vegetation treatments are proposed under these alternatives than Alternative B, which would reduce the short-term surface disturbance impacts on vegetation removal but would also decrease the potential long-term benefits of increased vegetation health.

Vegetation treatments under all of the alternatives in allotments to increase wildlife forage would have long-term, beneficial impacts on vegetation by expanding the acreage of native and other desired vegetation species into existing piñon-juniper woodlands. Alternative B, Proposed Plan, and Alternative D would designate more area (a total of 46,307 acres under each alternative) for conversion than Alternative A (67,125 acres), but the relative size of the affected areas and the impacts under all of the alternatives would be similar.

### 4.3.17.6 IMPACTS OF MINERALS DECISIONS ON VEGETATION RESOURCES

Surface disturbance associated with mineral exploration and development would result in both short-term impacts and long-term adverse impacts on vegetation. In the short term, loss of vegetation associated with surface disturbances for well pads, access roads, and minerals infrastructure would increase the potential for invasion of undesirable plant species, including noxious weeds, and cause a potentially irretrievable loss of vegetation productivity during the period of disturbance and re-growth.

While the RFD assumes that reclamation of disturbance would be successful within a scope of 10 years, it does note that reclamation times would be dependent on soils, vegetation, and rainfall (BLM 2005f). The typically slow re-growth of vegetation within the MPA would cause surface

BLM_0010605

disturbance to have long-term, indirect, adverse impacts on vegetation resources. Initial establishment of sagebrush and other native species following seeding is estimated to take 3 to 4 years, depending on the successful exclusion of livestock and weedy annuals from the site during this time (Monsen et al. 2004). Revegetation is especially difficult in desert shrub habitat, because soils are shallow and highly saline, and moisture availability is relatively low (Monsen et al. 2004). The potential long-term, adverse introduction and establishment of undesirable plant species, particularly cheatgrass, is likely in the sagebrush/perennial grass vegetation cover type due to cheatgrass ability to out-compete native species in disturbed areas and to thrive in arid conditions (Morrow and Stahlman 1984; Piemeisel 1951).

Although the acreages open to mineral leasing vary by alternative and would include a substantial portion of the MPA, the true indicator of impacts to vegetation come from the surface disturbance associated with the predicted RFD for minerals. Proposed surface disturbances from these activities are outlined in Table 4.139. Impacts to vegetation resources would be adverse, but would impact a relatively small portion of the MPA.

**Table 4.139. Predicted Surface Disturbance on BLM Lands from Minerals Activities for the 15-Year Life of the Plan (Acres)**

| Type of Disturbance | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Surface disturbance from oil and gas development | 6,772 | 3,963 | 6,483 | 6,739 |
| Geophysical surface disturbance | 2,397 | 1,404 | 2,072 | 2,329 |
| Surface disturbance from mineral activities other than oil and gas | 1,015 | 1,015 | 1,015 | 1,015 |
| Total surface disturbance | 10,184 | 6,382 | 9,570 | 10,083 |
| % of surface disturbance within the MPA | 0.005 | 0.002 | 0.005 | 0.005 |

## 4.3.17.7 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON VEGETATION RESOURCES

### 4.3.17.7.1 ALTERNATIVES A AND D

Under these alternatives, no non-WSA lands with wilderness characteristics would be managed to maintain those characteristics. The impacts on vegetation resources would be potentially adverse in the long term because no prescriptions specifically to maintain wilderness characteristics would be specified to protect these areas from surface disturbances.

### 4.3.17.7.2 ALTERNATIVE B AND THE PROPOSED PLAN

Alternative B and the Proposed Plan would manage for wilderness characteristics on 266,485 acres and 47,761 acres, respectively. Logically, Alternative B would offer the greatest protection of all alternatives due to the large number of acres that would be managed as closed to mineral leasing and woodland harvest.

BLM_0010606

Non-WSA lands with wilderness characteristics would be designated as VRM Class II in both alternatives and would be closed to oil and gas leasing in Alternative B and would be managed as no surface occupancy in the Proposed Plan. They would be closed to woodland harvest under both alternatives. These actions would preclude most large-scale surface-disturbing activities, thereby offering beneficial impacts to vegetation resources.

Management of non-WSA lands with wilderness characteristics (266,485 acres in Alternative B and 47,761 acres in the Proposed Plan) would limit the type of treatments needed to reclaim or restore sagebrush-steppe habitat. Mechanical treatments would not be allowed in these areas.

### 4.3.17.8 IMPACTS OF RECREATION DECISIONS ON VEGETATION RESOURCES

In general impacts from recreation activities on vegetation would be limited to isolated surface disturbances where activities such as dispersed camping and cross country hiking occur. These impacts would be mitigated by the application of the MFO Recreation Rules and the Standards for Public Land Health and Guidelines for Recreation Management. Where recreation is managed using a Special Recreation Management Area, (SRMA) these rules and guidelines would limit or control activities through specialized management tools such as designated campsites, permits, area closures, and limitations on number of users and duration of use. In addition efforts would be made to educate public land visitors and users about the ethics of responsible use.

#### 4.3.17.8.1 ALTERNATIVE A

The short-term and long-term, adverse impacts from recreational activities within the 132,832 acres of existing SRMAs (Cameo Cliffs, Canyon Rims, and Colorado River) would be minor to vegetation because 1) motorized and non-motorized travel would be limited to existing, designated routes, and 2) adaptive management would be applied to camping sites to limit impacts to vegetation, as discussed above. Table 4.140 shows the approximate acreage of vegetation within each SRMA for all of the alternatives.

Within the Moab ERMA, motorized recreational OHV use would have short-term and long-term, adverse impacts on all vegetation types from OHV-related surface disturbances as approximately 620,212 acres (34% of the MPA) would continue to be designated as open to cross-country OHV use (see Section 4.3.17.13 below). This surface disturbance would adversely impact the scenic resources that visitors come to the MPA to enjoy.

**Table 4.140. SRMA Acreages Proposed Under Each Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Bookcliffs | 0 | 348,105 | 0 | 0 |
| Cameo Cliffs | 15,456 | 15,473 | 15,473 | 15,473 |
| Canyon Rims | 101,523 | 101,523 | 101,523 | 101,526 |
| Colorado Riverway | 15,853 | 101,523 | 87,336 | 76,375 |
| Labyrinth | 0 | 298,711 | 298,711 | 0 |
| Lower Gray | 0 | 3,527 | 3,527 | 0 |
| Sand Flats | 0 | 6,245 | 6,245 | 6,246 |

BLM_0010607

**Table 4.140. SRMA Acreages Proposed Under Each Alternative**

| SRMA | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| South Moab | 0 | 63,577 | 63,577 | 0 |
| Two Rivers | 0 | 28,540 | 28,540 | 12,481 |
| Utah Rims | 0 | 15,175 | 15,175 | 0 |
| Dee Pass | 0 | 0 | 0 | 60,421 |
| **Total** | **132,832** | **982,399** | **620,107** | **272,522** |

### 4.3.17.8.2 ALTERNATIVE B

Alternative B would manage 982,399 acres under existing and proposed SRMAs (seven times more acreage than under Alternative A). The impacts to vegetation within these SRMAs would be as discussed under Alternative A because of prohibitions and/or restrictions on surface disturbances to protect recreation resources and scenic values. The impacts on vegetation within the ERMA would be minor to negligible also because no acres would be designated as open to OHV cross-country travel, and all recreation-related travel would be restricted to existing, designated routes. The impacts to vegetation from dispersed camping within SRMAs would be negligible, as adaptive management could be applied to manage surface disturbance impacts resulting from dispersed camping to these areas. Compared to Alternative A, this alternative would have greater, long-term, beneficial impacts on vegetation because of the increased restrictions on cross-country OHV travel and dispersed camping.

### 4.3.17.8.3 PROPOSED PLAN

The Proposed Plan would manage a total of 620,107 acres under SRMAs (approximately five times more acreage than under Alternative A). The impacts to vegetation would be similar to those discussed under Alternative B, except that 1,086 acres would be managed as Open to OHV cross-country use within the White Wash Sand Dunes area. The impacts on vegetation in this OHV area would be negligible, as very little vegetation covers this proposed open OHV focus area.

### 4.3.17.8.4 ALTERNATIVE D

The impacts on vegetation under this alternative would be similar to the discussion under the Proposed Plan, because the limitations on surface disturbances to vegetation would be similar. However, this alternative would designate 272,522 acres as SRMAs (twice as much area as under Alternative A, but three times less than the Proposed Plan), with travel within the MPA limited to designated routes except for 3,064 acres of open OHV use in the White Wash Sand Dunes focus area (an area, as discussed above, that has little vegetation).

### 4.3.17.9 IMPACTS OF RIPARIAN DECISIONS ON VEGETATION RESOURCES

Compliance with the BLM National Riparian Policy under all alternatives and the exclusion of surface-disturbing activities within 100 meters of riparian areas under all action alternatives would result in long-term, beneficial impacts to riparian vegetation. This stipulation would eliminate surface-disturbing activities because surface disturbances would be avoided in order to

BLM_0010608

maintain and to improve riparian vegetation. These beneficial impacts would be the result of travel routes that would be located or re-located away from riparian areas; prohibitions on woodcutting (except for limited cutting of willows for Native American ceremonial purposes); dispersed camping in riparian areas that would be avoided and/or managed to reduce riparian vegetation impacts; exotic species management that would be applied to reduce their spread; and grazing actions that would be managed to ensure proper functioning condition of riparian vegetation.

### 4.3.17.10 IMPACTS OF SOILS/WATERSHED DECISIONS ON VEGETATION RESOURCES

Generally any decisions that protect soils from surface disturbance would also protect vegetation as the two resources are closely linked. Under all action alternatives, vegetative cover would be maintained, based on desired future conditions, to provide adequate ground cover to prevent accelerated erosion of wind-erodible soils. In addition, limited OHV routes would be allowed in saline soils other than those already designated in the proposed Travel Plan. These actions would have long-term, beneficial impacts on vegetation by maintaining and protecting vegetation in these areas.

All of the action alternatives would also apply a controlled surface use stipulation excluding surface-disturbing activities within 100-year floodplains, within 100 meters of springs, or public water reserves. In addition, a controlled use stipulation would be applied to all slopes in the MFO greater than 30%. These management actions would benefit vegetation in the long term by limiting surface-disturbance-related impacts to the resource. Table 4.141 shows the size of vegetation communities protected by the controlled surface use stipulation on steep slopes.

**Table 4.141. Acres of Each Vegetation Type Protected in the Action Alternatives Due to Slope Steepness Category**

| Vegetation Type | Acres protected due to slopes >30% | Acres protected due to slopes 21-30% |
|---|---|---|
| Conifer/mountain shrub | 33,954 | 13,856 |
| Desert shrub | 20,707 | 16,146 |
| Invasive species and weeds | 196 | 209 |
| Piñon-juniper | 200,559 | 108,046 |
| Riparian/wetland | 2,181 | 1,234 |
| Sagebrush/perennial grass | 9,352 | 5,841 |
| Total | 266,949 (14.6%) | 145,332 (0.08%) |

#### 4.3.17.10.1 ALTERNATIVE A

Under this alternative, a timing limitation would prohibit all surface-disturbing activities on 313,800 acres of saline, erodible, Mancos Shale soils (17% of the MPA) from November 1 to April 30. These restrictions would have indirect, beneficial impacts on vegetation by 1) reducing soil erosion that could otherwise adversely cover or bury existing plant communities, and 2) reduce the likelihood of exotic, invasive weed establishment in these areas as seeds are brought in by machinery.

BLM_0010609

### 4.3.17.10.2 ALTERNATIVE B AND THE PROPOSED PLAN

The indirect, beneficial impacts to vegetation would be similar to those discussed under Alternative A because the management actions are similar: timing restrictions would be applied to 330,142 acres of Mancos Shale soils (18% of the MPA).

### 4.3.17.10.3 ALTERNATIVE D

Under this alternative, no timing limitations on surface-disturbing activities within saline soils would be applied, which would have indirect, adverse impacts on Mancos Shale vegetation communities from potential surface disturbances that would increase the likelihood of invasive, exotic species establishment and erosion-related impacts to vegetation. Compared to Alternative A, this alternative would have greater adverse impacts on vegetation.

### 4.3.17.11 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON VEGETATION RESOURCES

### 4.3.17.11.1 AREAS OF CRITICAL ENVIRONMENTAL CONCERN

Under alternatives B and C, where Areas of Critical Environmental Concern (ACECs) overlap Wilderness Study Areas, WSA management would take precedence. This land would be managed according to the Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP) which precludes surface-disturbing activities. This would have beneficial impacts on vegetation resources. Please see the WSA section for details.

Any areas proposed for designation as ACECs would be managed as NSO for oil and gas leasing and preclude other surface-disturbing activities. They would also be managed as avoidance areas for ROWs. These actions would offer beneficial impacts because, as noted in the Lands and Realty section, surface-disturbing activities would be precluded.

### 4.3.17.11.1.1 Alternative A

No ACECs would be designated under Alternative A; therefore, no beneficial impacts would occur to vegetation as a result of ACEC designation.

### 4.3.17.11.1.2 Alternative B

Under Alternative B, all 14 potential areas totaling 613,077 acres would be designated as ACECs. Approximately 309,599 acres of this total are within WSAs and would be protected under the IMP as noted above. The remaining 300,576 acres would be managed with either a NSO or closed stipulation for oil and gas leasing and preclude other surface-disturbing activities. Since surface disturbance is one of the greatest threats to vegetation (due to the displacement of soil and plant matter and the subsequent risk of noxious weed spread) this prescription offers a high degree of beneficial protections.

Alternative B would include other management restrictions in each of the proposed ACECs that would provide greater increased protection for vegetation than the other alternatives. The additional management restrictions include restricting vehicle-based camping to campgrounds, not allowing campfires outside of campgrounds, closing areas to surface-disturbing vegetation treatments except for treatments for noxious weeds and exotics, and closing the area to harvesting woodland products. The greatest protection from the proposed ACECs would be to

BLM_0010610

the piñon-juniper and desert shrub vegetation types largely due to their abundance in proposed areas.

More restrictive management prescriptions to enhance white-tailed prairie dog habitat such as AMPs and grazing systems would be developed to benefit vegetation under Alternative B. Additionally, restrictions developed to protect the three special status plant species located in the Highway 279/Shafer Basin/Long Canyon and Behind the Rocks proposed ACECs including recreation restrictions for camping and OHV use would be beneficial to vegetation. Alternative B would not allow competitive OHV events in the Colorado River Corridor ACEC, thereby providing more protection that Alternative A. Additionally, no new road construction would be allowed in Labyrinth Canyon resulting in short- and long-term beneficial impacts to vegetation. Beneficial impacts would include protection from crushing, trampling, or uprooting by motorized vehicles.

### 4.3.17.11.1.3 Proposed Plan

Under the Proposed Plan, 5 areas (63,252 acres) would be designated as ACECs including, Behind the Rocks, Cottonwood-Diamond Watershed, Highway 279/Shafer Basin/Long Canyon, Mill Creek Canyon, and Ten Mile Wash. These designations would result in similar impacts to vegetation as discussed under Alternative B due to similar management requirements, but only for the five proposed areas.

### 4.3.17.11.1.4 Alternative D

Under Alternative D, none of the potential ACECs would be designated, so impacts would be similar to those in Alternative A. In comparison to the other action alternatives, Alternative D would allow the greatest number of acres open to oil and gas leasing resulting in the greatest number of adverse impacts to vegetation.

The Bookcliffs, Canyon Rim, Cisco White-tailed Prairie Dog Complex, Labyrinth Canyon, Westwater Canyon, and Wilson Arch areas would be managed with the same requirements as the Proposed Plan. Under this alternative, the Colorado River Corridor would experience similar impacts to vegetation as those described under the Proposed Plan with the exception that it would have greater potential for surface disturbance from the area being open to minerals material disposal and geophysical exploration for oil and gas

Alternative D would manage the White Wash area under the prescriptions of the White Wash Sand Dunes Open OHV Area within the proposed Dee Pass SRMA. Competitive motorized events would be allowed; however, since the open use is in a designated area that lacks vegetation, it is not anticipated that there would be any adverse impacts to vegetation. The area does include some cottonwoods and rocky areas but would not be affected by motorized use.

### 4.3.17.11.2 WILD AND SCENIC RIVERS

Under Alternative B and the Proposed Plan for Wild and Scenic Rivers, the stipulations that would be applied to oil and gas leasing and other surface-disturbing activities within suitable river segments were developed based on other resource values such as scenery, wildlife and fishery, riparian, and recreation. Any segments identified as suitable are either within areas either closed to oil and gas leasing or with a NSO stipulation under Alternative B and the Proposed Plan resulting in increased protection for riparian vegetation.

BLM_0010611

Under Alternatives A and D, no areas would be determined as suitable, thereby offering no protections to vegetation because of WSR designations.

Under Alternative B 287.5 river miles would be determined as suitable. This would protect riparian vegetation within these areas because they would be managed as NSO areas.

Under the Proposed Plan 112.3 river miles (9 river segments) would be determined as suitable and would be managed as NSO areas. About 15 river miles (Westwater Canyon of the Colorado River) would be determined as suitable and would be managed as closed to mineral leasing, as it is within the Westwater WSA.

### 4.3.17.11.3 WILDERNESS STUDY AREAS AND WILDERNESS AREAS

Under all alternatives, there is no surface disturbance, permanent new development, or rights-of-way allowed in WSAs or in Wilderness Areas. Additionally, these lands are closed to oil and gas leasing which would provide protection from surface-disturbing impacts to vegetation.

Approximately 348,815 acres of the MPA are included as WSAs for each of the alternatives. WSAs include Behind the Rocks; Black Ridge and Lost Spring Canyon; Desolation Canyon, Floy Canyon, Flume Canyon, Mill Creek Canyon, Negro Bill Canyon, and Spruce Canyon; and Westwater Canyon. Black Ridge is a 5,200 acre designated wilderness area

Alternative B offers the most protection to vegetation by closing all WSAs and Wilderness Area to OHV use while Alternative A offers the least protection by limiting motorized use to inventoried areas.

Additionally, all WSAs and Wilderness Areas would be designated as VRM Class I, which would preclude surface disturbance thereby offering beneficial protections to vegetation.

### 4.3.17.12 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON VEGETATION RESOURCES

Under all of the alternatives, compliance with the Endangered Species Act (ESA) requires avoiding and/or minimizing surface-disturbing activities in Threatened and Endangered species habitat. This would indirectly benefit vegetation by limiting or restricting activities that would disturb vegetation in these habitats. Managing sage-grouse as a Sensitive species, the BLM's National Sage-grouse Habitat Conservation Strategy, the Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats, and the Gunnison Sage-grouse Range-wide Conservation Plan would be implemented in suitable habitat in the MPA, including developing and implementing sage-grouse habitat restoration, conserving sage-grouse habitat, and identifying important habitat. Compliance with these plans would have similar beneficial impacts on vegetation resources by providing long-term, beneficial protection for sagebrush and perennial grassland vegetation types in the MPA.

There would be no ground-disturbing activities allowed within a 1.0-mile radius of known bald eagle nests and within a 0.5 mile radius of Mexican spotted owl (MSO) nests, which would provide long-term protection to conifer and mountain shrub vegetation in those buffer zones. MSO Protected Activity Centers (PACs) would be protected as outlined in the MSO Recovery Plan (USFWS 1995), and cooperative agreements would be established with other agencies and entities to inventory and monitor existing potential habitat and annually schedule assessment plans of MSO habitat to determine quality of habitat and presence of species. These actions

BLM_0010612

would have long-term, beneficial protection-related impacts on vegetation resources because habitat protection would also protect vegetation resources.

In Jones Cycladenia and suitable habitat, site inventories for all surface-disturbing projects (including prescribed burns) would be required, and road construction, land disposal, and ROW corridors in suitable *Cycladenia* habitat would be avoided. The use of chemical treatments, herbicides, and habitat manipulations in this habitat would also be restricted, which would have long-term beneficial impacts on vegetation resources.

Within endangered Colorado River fish habitat, there would be no surface-disturbing activities within the 100-year floodplain of the Colorado River, Green River, and at the confluence of the Dolores and Colorado Rivers, which would have long-term, beneficial impacts on riparian and wetland vegetation resources in those buffer zones. In addition, the riparian habitat utilized by southwestern willow flycatcher and yellow-billed cuckoo is governed by a controlled surface use stipulation excluding surface-disturbing activities, benefiting riparian and woodland vegetation resources.

### 4.3.17.12.1 GREATER SAGE-GROUSE

#### 4.3.17.12.1.1 Alternative A

Under Alternative A, no management actions are specified for protection of sage-grouse habitat, except as discussed under actions common to all alternatives above.

#### 4.3.17.12.1.2 Alternative B

The special status species management decisions for Alternative B would identify and manage more greater sage-grouse habitat acreage (12,850 acres) and this would benefit vegetation more than the other alternatives. This alternative would require that any surface occupancy that could result in the loss or fragmentation of this habitat be avoided or minimized. If surface occupancy cannot be avoided, sagebrush habitat would be reclaimed at a ratio of 2:1. This would beneficially protect approximately 12,850 acres of sagebrush-steppe habitat in the long term from surface disturbance and occupancy. Also under Alternative B, in lek habitat (a 2-mile radius around an active strutting ground), there would be no surface-disturbing activities from March 1 to May 15, and no aboveground facilities would be allowed within a 2-mile buffer year-round. In nesting and brood-rearing habitat there would be no surface-disturbing activities from March 15 to July 15. In winter habitat there would be no surface-disturbing activities allowed from November 15 to March 14 on 12,850 acres. These restrictions would mitigate the adverse impacts of surface-disturbing activities in lek, winter, and nesting and brood-rearing habitat, with beneficial impacts on the vegetation resources within these areas.

#### 4.3.17.12.1.3 Alternative D and the Proposed Plan

Alternative D and the Proposed Plan would identify 3,068 acres and 1,986 acres, respectively, of sagebrush habitat to be managed for sage-grouse. Similarly, the alternatives would avoid or minimize the loss or fragmentation of this habitat. If surface disturbance cannot be avoided, these alternatives would reclaim sagebrush habitat at a ratio of 1:1. Under all three action alternatives greater sage-grouse habitat would then be subject to controlled surface use and timing limitation

BLM_0010613

stipulations with subsequent reduced risks of surface disturbance to vegetation resources in 1,986 to 12,850 acres of sagebrush.

The same timing restrictions applied to greater sage-grouse habitat discussed under Alternative B would also apply to Alternative D and the Proposed Plan with similar beneficial impacts on vegetation resources; , the lek habitat radius would be 2.0 mile for the Proposed Plan, and 0.25 mile for Alternative D. The decrease in acreage excluded from surface disturbance and surface occupancy in and around sage-grouse leks would increase the risk of adverse impacts on vegetation resources. Under the Proposed Plan, 9,782 more acres (76%) of sage-grouse habitat, and under Alternative D, 1,082 more acres (35%) of greater sage-grouse habitat would be available for surface-disturbing activities and/or surface occupancy, compared to Alternative B. Compared to Alternative A, the action alternatives would be more beneficial because specific management prescriptions would be applied to protect greater sage-grouse habitat.

### 4.3.17.12.2 GUNNISON SAGE-GROUSE

Under Alternative B, 246,107 acres of pre-settlement Gunnison sage-grouse habitat would be subject to controlled surface use and timing stipulations if Gunnison sage-grouse are present. This area is 29% larger than the Proposed Plan (175,727 acres) and 83% larger than Alternative D (41,620 acres).

All of the action alternatives would prohibit surface-disturbing activities from March 20 to May 15 in lek habitat, and construction of fences would be prohibited or limited year-round. Alternative B and the Proposed Plan would provide for the highest degree of vegetation resource protection, with a 2-mile radius around active strutting grounds (within sagebrush and perennial grasses), which would have beneficial impacts as discussed above for greater sage-grouse. The impacts of Alternative D would also have habitat protection zones similar to greater sage-grouse, with impacts to vegetation resources as discussed above, with a similar comparison to Alternative A.

### 4.3.17.12.3 WHITE-TAILED PRAIRIE DOG

Under Alternative B, 117,481 acres of white-tailed prairie dog habitat within the Cisco White-tailed Prairie Dog ACEC would be managed to protect the species, which would have long-term, beneficial impacts to desert shrub vegetation by designating the area with an NSO leasing stipulation. An additional 82,024 acres of habitat outside of the ACEC would be managed as controlled surface use allowing no surface-disturbing activities within 1300 feet of prairie dog colonies. Compared to Alternative A, this alternative would be more beneficial to vegetation resources because surface disturbances to vegetation would be restricted within the NSO and CSU areas.

The Proposed Plan and Alternative D would manage 117,481 acres (41% less) of habitat and 31,186 acres (84% less) of habitat (respectively) than Alternative B, with controlled use leasing stipulations within 660 feet of active prairie dog colonies. The impacts to vegetation resources would be beneficial in the long term near active colonies because surface disturbances would be prohibited; however, outside of these active areas, surface disturbances would be permitted, which would have long-term, adverse impacts to the resource. Compared to Alternative A, these alternatives would have similar impacts because the level of permitted surface disturbances to vegetation would be similar.

BLM_0010614

### 4.3.17.12.4 GUNNISON PRAIRIE DOG HABITAT

Under Alternative B and the Proposed Plan, 10,700 acres of Gunnison prairie dog habitat would be managed under controlled use leasing stipulations, which would prohibit surface-disturbing activities within 1,300 feet of these colonies for Alternative B and 660 feet of prairie dog colonies for the Proposed Plan. The impacts to vegetation would be similar to those discussed above for the Proposed Plan and Alternative D for white-tailed prairie dogs because the habitat would be open to minerals-related disturbances except for the zones around active prairie dog colonies. The impacts to vegetation would be similar to those for the white-tailed prairie dog habitat and for the same reasons.

### 4.3.17.13 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON VEGETATION RESOURCES

A recent United States Geologic Survey (USGS 2007) synopsis of relevant literature summarizes numerous studies of the impacts of OHV use on soil and water resources. The USGS concludes that the research reviewed found important effects of OHV activities on soil and water functioning including soil compaction, diminished water infiltration, diminished presence and impaired function of soil stabilizers (biotic and abiotic crusts, desert pavement), and accelerated erosion rates. Compacted soil inhibits infiltration of precipitation. In turn, soil moisture available to vegetation is diminished, volumes and velocities of precipitation runoff increase, and soil erosion accelerates, leading to the formation of gullies and other surface changes. Additionally, soil compaction may inhibit root growth among plants, in which case organic matter, litter, soil fertility, and vegetative cover are diminished, further exacerbating the soil's susceptibility to erosion. Where biotic and chemical crusts or other soil stabilizers are disturbed or destroyed, soil erosion from water and wind may increase beyond rates found in undisturbed sites with similar soils and conditions; nutrient-cycling processes also are likely to be disrupted, potentially leading to declines in soil fertility. The USGS study is summarized in Appendix G.

### 4.3.17.13.1 ALTERNATIVE A

As discussed in Section 4.3.17.8 Recreation, Alternative A would have direct and indirect, short-term and long-term, adverse impacts on all vegetation types from cross-country OHV use within the 620,212 acres (34% of the MPA) designated as open to OHV use (see Table 4.142 below). Short-term, direct impacts would include fugitive dust production that would adversely inhibit vegetation productivity. Long-term, direct impacts would include loss of vegetation and long-term loss of vegetation productivity in disturbed areas from trampling and crushing. Indirect, adverse impacts to vegetation would result from unvegetated or sparsely vegetated, exposed, disturbed soils that would increase the opportunities for the establishment and spread of non-native, exotic weed species.

**Table 4.142. OHV Area Designations for All Alternatives**

| Designation | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Total Closed Acres | 5,062 | 347,424 | 339,298 | 57,351 |
| Total Open Acres | 620,212 | 0 | 1,866 | 3,064 |
| Total Limited to Designated Routes Acres | 1,196,920 | 1,475,074 | 1,481,334 | 1,762,083 |

BLM_0010615

### 4.3.17.13.2 ALTERNATIVES B, D, AND THE PROPOSED PLAN

Under the action alternatives, travel within the MPA would be confined to designated routes for motorized (scenic and OHV) and non-motorized/mechanized (mountain bike) use. In addition, trails would be provided for non-mechanized (hiking, equestrian, backpacking) travel. The Proposed Plan and Alternative D would permit open OHV use only in the focus area within the White Wash Sand Dunes, but this area is sparsely vegetated and would have negligible impacts on vegetation resources within the 1,866 acres proposed under the Proposed Plan or the 3,064 acres proposed under Alternative D. The impacts of travel along designated routes would have negligible impacts on vegetation because past and current use has already impacted these areas. Compared to Alternative A, these alternatives would be more beneficial to vegetation resources because the impacts from the open OHV use areas would be greatly reduced, and those areas impacted in the past could recover.

### 4.3.17.14 IMPACTS OF VEGETATION DECISIONS ON VEGETATION RESOURCES

Under management common to all action alternatives, consideration would be given to the preservation and improvement of sagebrush plant communities during the implementation of vegetation and land treatments, and during wildland fire suppression planning. In accordance with sagebrush conservation guidance, up to 257,809 acres of sagebrush and scrub-steppe habitat would be reclaimed and restored. Riparian vegetation communities would be managed to restore native species and to reduce invasive, non-native species. All of these actions would have long-term, protection- and preservation-related beneficial impacts on vegetation resources.

### 4.3.17.14.1 ALTERNATIVE A

There are no specific vegetation management decisions under this alternative.

### 4.3.17.14.2 ALTERNATIVE B

Under Alternative B, the loss of sagebrush-steppe habitat from BLM initiated or authorized actions would be avoided or minimized, and loss of sagebrush-steppe habitat essential to wildlife would be reclaimed at a ratio of 2:1. This would have long-term, beneficial impacts on these vegetation communities because reclamation would expand the range of these communities. This alternative would have more beneficial impacts on sagebrush-steppe vegetation than Alternative A because Alternative A does not propose to reclaim sagebrush-steppe vegetation communities.

### 4.3.17.14.3 ALTERNATIVE D AND THE PROPOSED PLAN

Under Alternative D and the Proposed Plan, the impacts of vegetation management decisions on vegetation resources would be similar to those discussed under Alternative B, but to a lesser degree, because the loss of sagebrush-steppe habitat essential to wildlife would be reclaimed at a ratio of 1:1 instead of 2:1. Therefore, 50% fewer acres of sagebrush-steppe habitat would be reclaimed when compared to Alternative B. Accordingly, these alternatives would have fewer beneficial impacts on vegetation resources than Alternative B, but compared to Alternative A the impacts would be more beneficial for reasons as discussed under Alternative B.

BLM_0010616

### 4.3.17.15 IMPACTS OF WILDLIFE AND FISHERIES DECISIONS ON VEGETATION RESOURCES

#### 4.3.17.15.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, surface-disturbance activities, vegetation-altering projects, and broad-scale use of pesticides in identified occupied migratory bird habitat would be avoided during nesting season (May 1 through July 30). Under all of the alternatives, continued implementation and modification of three Habitat Management Plans (HMPs) would take place. Sagebrush habitat improvements would occur under the Hatch Point HMP providing protection for sagebrush vegetation species in these areas. Implementation of the Dolores Triangle HMP would result in habitat improvements for riparian and native and naturalized fish habitat thus benefiting riparian vegetation. Additionally, 278,000 acres of habitat on land administered by the BLM would be maintained in good condition and habitat would be improved where needed under the Potash-Confluence HMP thereby benefiting varied vegetation types. These actions would have long-term, beneficial impacts on native vegetation in lowland riparian, wetland, and upland communities in the MPA.

#### 4.3.17.15.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND THE PROPOSED PLAN)

In the Cisco Desert HMP the percent of browse and forb species would be increased on 6,375 acres of perennial grass vegetation, and livestock grazing activities would be excluded from May 15 through June 20 to reduce disturbance and improve pronghorn habitat. In the Hatch Point HMP a total of 69 acres would be seeded with a combination of forbs, grasses, and shrubs, and a rest/rotation grazing plan would be recommended to improve pronghorn habitat. Improvement of 42,500 acres of crucial bighorn sheep habitat by limiting major human disturbance would take place in the Potash-Confluence HMP. In addition, any future proposal for a change in kind of livestock from cattle to sheep in Rocky Mountain bighorn habitat would be denied. These changes would help mitigate the adverse impacts of surface-disturbing activities on vegetation resources critical to pronghorn, desert bighorn sheep, and Rocky Mountain bighorn sheep survival. For additional information on vegetation types included in these habitats, including the acreages, please refer to Section 4.3.19, Wildlife and Fisheries.

#### 4.3.17.15.3 ALTERNATIVE A

Under Alternative A, surface-disturbance restrictions would be in place for wildlife habitat only during parts of the year. Specifically, exclusions for grazing would be in place during May and June to protect and improve pronghorn habitat. Protections for bighorn sheep and Rocky Mountain bighorn sheep habitat including reductions in grazing and human disturbance would be beneficial to vegetation particularly in the piñon-juniper vegetation type. Compared to Alternative B, the Proposed Plan, and Alternative D, Alternative A would have the least amount of wildlife habitat subject to special wildlife conditions.

#### 4.3.17.15.4 ALTERNATIVE B

Under Alternative B, management actions in riparian areas would be implemented with the goal of ensuring a multi-aged community, allowing for retention of snags and diseased trees, and providing multiple layers of vegetation within 10 feet of the ground. Additionally, restrictions concerning surface occupancy and surface-disturbing activities would be established for wildlife

BLM_0010617

habitat during parts of the year, dispersed camping in riparian areas would be restricted, prescribed fire treatments would be judiciously applied to improve vegetation productivity, and grazing season of use would be modified to improve wildlife forage productivity. Current pronghorn habitat (822,001 acres) within Cisco Desert and Hatch Point (the La Sal Wildlife Management Units) would be protected by applying a timing limitation stipulation that would preclude surface-disturbing activities from May 1 to June 15. Spring grazing would be removed on 188,975 acres of allotments to protect crucial pronghorn habitat and encourage forb production. This would likely reduce grazing impacts to the desert shrub and piñon-juniper vegetation cover types. An NSO stipulation for oil and gas leasing and precluding other surface-disturbing activities would protect desert bighorn sheep lambing, rutting, and migration habitat (130,419 acres) and the desert shrub vegetation type associated with this habitat. Under Alternative B, management of 458,242 acres of habitat for Rocky Mountain bighorn sheep would include improving or maintaining vegetative conditions and the ecological condition of rangelands in the sagebrush and perennial grass vegetation types. All of these actions would have long-term, beneficial impacts on vegetation by 1) reducing and/or minimizing surface disturbances to vegetation, and 2) managing for achieving proper functioning conditions in wildlife habitat and in riparian areas. Compared to Alternative A, this alternative would have more beneficial impacts to vegetation resources because more area would be managed for protection of the resource.

### 4.3.17.15.5 PROPOSED PLAN

Under the Proposed Plan, the impacts of wildlife and fisheries management decisions on vegetation resources would be similar to those discussed under Alternative B, but to lesser degree because grazing restrictions would be applied to a smaller area (293,741 acres of crucial pronghorn habitat to encourage forb production) and fewer acres of protection for desert bighorn sheep (101,897 acres) and Rocky Mountain bighorn sheep (310,726 acres). Additionally, restrictions concerning surface occupancy and surface-disturbing activities would be established for wildlife habitat during parts of the year. Under this alternative, there would be 42% more acres of recognized Rocky Mountain bighorn sheep habitat than under Alternative A, benefiting sagebrush and perennial grass vegetation types, and 77% more acres of protected deer and/or elk habitat than under Alternative A, benefiting all vegetation types discussed in this section. Because of these differences, management decision under the Proposed Plan would be less likely to adversely affect vegetation resources in wildlife protection areas of the MPA than those under Alternative A.

### 4.3.17.15.6 ALTERNATIVE D

Under Alternative D, the impacts of wildlife and fisheries management decisions on vegetation resources would be similar to the Proposed Plan, except that no season of use adjustments to protect pronghorn habitat would be made, pronghorn fawning habitat protection would encompass 78,477 acres, desert bighorn sheep protection would include 46,319 acres, and protection of Rocky Mountain bighorn sheep habitat would include 194,560 acres. When compared to Alternative A, this alternative would have more beneficial impacts to vegetation resources because management actions common to all action alternatives would ensure greater protection and enhancement of vegetation resources than Alternative A.

BLM_0010618

### 4.3.17.16 IMPACTS OF WOODLANDS DECISIONS ON VEGETATION RESOURCES

Short-term, adverse, direct impacts of woodland harvest would include trampling of understory vegetation from vehicles accessing harvesting areas and during woodland harvesting and removal. Long-term, indirect impacts would include the potential introduction of weedy, non-native species into areas with surface disturbances caused by woodland harvesting and removal, and related vehicle use. Table 4.143 shows the acreages open and closed to woodland harvest.

**Table 4.143. Number of Acres in the MPA Open and Closed to Woodland Harvesting**

| Zone | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Total Closed | 601,146 | 827,063 | 646,694 | 601,146 |
| Total Open (with comparison to Alternative A) | 1,217,635 | 991,198 (-19%) | 1,172,436 (-4%) | 1,217,635 (0%) |
| Actual Woodland Coverage (piñon-juniper) in Open Areas | 437,216 (35% of Open Area) | 329,895 (31% of Open Area) | 411,905 (34% of Open Area) | 437,216 (35% of Open Area) |

The potential short-term and long-term, direct and indirect, adverse impacts to vegetation resources would be similar for all of the alternatives because all open harvesting areas with woodland coverage would be similarly impacted by vehicles accessing harvesting sites and by trampling and other surface disturbances related to this activity. Under Alternative B, the impacts would be to a lesser degree because a smaller total area (107,321 fewer acres) would be open to harvesting-related surface disturbances.

### 4.3.17.17 SUMMARY OF IMPACTS

Table 2.2 (of Chapter 2) summarizes the impacts of the various alternatives and their program actions on vegetation.

## 4.3.18 VISUAL RESOURCES

This section discusses impacts to visual resources from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning visual resources are described in Chapter 3.

The BLM's VRM class objectives were used in analyzing impacts on visual resources. These objectives provide a baseline for determining how much a proposed management action would affect visual resources/scenic quality, as well as determining the level of disturbance an area can support while still meeting visual resource objectives.

The following BLM VRM class objectives and descriptions are summarized from BLM Manual Handbook H-8431-1 (1986b).

VRM Class I

The objective of Class I is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited

BLM_0010619

management activities. The level of change to the characteristic landscape should be very low and should not attract attention.

## VRM Class II

The objective of this class is to retain the existing character of the landscape. The level of change to the landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

## VRM Class III

The Class III objective is to partially retain the existing character of the landscape. The level of change to the landscape should be moderate. Management activities may attract the attention of the casual observer, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

## VRM Class IV

The objective of Class IV is to provide for management activities that require major modifications to the existing character of the landscape. The level of change to the landscape can be high. The management activities may dominate the view and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repetition of the basic visual elements of form, line, color, and texture.

In addition, since the current RMP did not identify visual management objectives for the MPA during the last RMP process (except for the Canyon Rims area) the VRM inventory will serve as the baseline (i.e., Alternative A) by which impacts to visual resources are analyzed in this EIS. If Alternative A were to be adopted, these VRM inventory classes would become management classes. The acres designated through the VRM inventory more accurately represent current scenic quality and visual sensitivity within the MPA.

The criteria for analysis was the number of acres proposed for designation under the Visual Resource Management (VRM) classes, and the level of impacts and surface disturbances permitted under each class. At the broad-scale level, analyses of the impacts on visual resources are discussed in terms of the number of acres in each VRM class because the proposed RMP management actions would be required to comply with (i.e., not exceed) the designated VRM class objectives within the MPA. For the fine-scale analysis, potential impacts from mineral development are discussed in terms of the number of acres of surface disturbance predicted within selected MPA visually sensitive areas.

The assumptions for analyzing the impacts to visual resources in the MPA are 1) that the greater the size and/or severity of surface disturbance and/or degree of air quality degradation, the greater the impact there would be to scenic quality, and 2) that all planning area resources with management actions that permit surface disturbances or degrade air quality would have adverse impacts on visual resources to some degree. Surface disturbances would introduce new visual elements onto the landscape or intensify existing visual elements, altering the line, form, color, and/or texture that characterize the existing landscape. Changes in air quality, either from smoke,

BLM_0010620

dust, haze, or other pollutants could potentially reduce or degrade scenic quality by obscuring distant views in the short-term and long-term. It should be noted, however, that the Clean Air Act sets limits on the allowable degradation of visibility within the adjacent national parks. Arches and Canyonlands National Parks have been designated as areas requiring the highest level of visibility (Prevention of Significant Deterioration [PSD] Class I), so smoke or haze that originates within the MPA cannot exceed the allowable NPS PSD I scenic quality standards for air pollutants.

### 4.3.18.1 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Actions that would designate utility corridors as VRM Class III within inventoried VRM Class II areas would have long-term, adverse impacts on visual resources within the MPA. These areas were inventoried as VRM Class II because of their high scenic quality and managing them under less-stringent VRM class objectives would allow surface-disturbance-related impacts that would eventually decrease the long-term visual aesthetics of the area.

Closed or No Surface Occupancy stipulations would be applied to all VRM Class I areas (see Tables VIS I and VIS II below), and VRM Class II-designated areas would have Controlled Surface Use leasing stipulations applied. These specific management actions would preserve and/or protect visual resources to the extent allowable under the VRM class objectives, with long-term, beneficial impacts on scenic quality in these areas.

### 4.3.18.2 ALTERNATIVES IMPACTS

Table 4.144 shows the proposed acres designated as each VRM class for all alternatives. The analysis logically assumes that areas designated as VRM Class III and VRM Class IV objectives would permit more surface-disturbing impacts and potentially have greater adverse impacts on visual resources and scenic quality than those areas designated as VRM Class I and II objectives. Table 4.145 illustrates the increase and decrease in VRM class acreages (as a percentage) within the MPA, compared to Alternative A. Note that Alternative A acreages are those designated through the VRM inventory process; Alternative B, Proposed Plan, and Alternative D are VRM Class acreages.

**Table 4.144. VRM Class Acreages by Alternative**

| VRM Class | Alternative A VRM Inventory | Alternative B Proposed Management Class | PROPOSED PLAN Proposed Management Class | Alternative D Proposed Management Class |
|---|---|---|---|---|
| Class II | 349,110 | 453,462 | 358,911 | 349,617 |
| Class II | 401,015 | 373,647 | 365,566 | 245,773 |
| Class III | 800,782 | 784,246 | 829,158 | 956,724 |
| Class IV | 271,356 | 210,532 | 268,133 | 269,641 |
| **Total** | **1,822,263[1]** | **1,821,887** | **1,821,768** | **1,821,755** |

Source: BLM GIS data 2003 and 2006.

[1]Acreage figures vary by alternative due to variances in GIS shapefiles.

BLM_0010621

**Table 4.145. MPA VRM Acreage Designations (by percent)**

| VRM Class | Alternative A % of MPA | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Class I | 19 | 25 (6)[1] | 20 (1) | 19 (0) |
| Class II | 22 | 20 (-2) | 20 (-2) | 14 (-8) |
| Class III | 44 | 43 (-1) | 45 (1) | 52 (8) |
| Class IV | 15 | 12 (-3) | 15 (0) | 15(0) |

[1]The numbers in parentheses represent the percent increase or decrease, compared to Alternative A.

### 4.3.18.2.1 ALTERNATIVE A

Under Alternative A, the 2003 visual inventory determined that 349,110 acres would be assigned VRM Class I scenic values, 401,015 acres would be assigned VRM Class II scenic values, and 1,072,138 acres would be assigned scenic values of VRM Class III and VRM Class IV. The impacts on visual resources under this alternative would be negligible because Alternative A would manage scenic quality as determined by the MPA VRM inventory. An acreage comparison of Alternative A with proposed VRM acreages under each action alternative is shown below in Table 4.146. Conversely, areas that were inventoried at high levels of scenic quality and were managed under lower VRM Class objectives would, in the long-term, assume the characteristics of lower VRM Classes because surface disturbances and visual intrusions would be allowed to degrade visual/scenic quality in those areas. So, the long-term shifts in scenic quality within the MPA would be based on the proposed VRM Classes.

**Table 4.146. Acreage Comparison of Action Alternatives' VRM Management Classes to Alternative A VRM Inventory Classes**

| | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Class I | 349,110 | +104,352 | +9,801 | +507 |
| Class II | 401,015 | -27,368 | -35,449 | -155,242 |
| Class III | 800,782 | -16,536 | +28,376 | +155,942 |
| Class IV | 271,356 | -60,824 | -3,223 | -1,715 |

### 4.3.18.2.2 ALTERNATIVE B

More acres (6%) within the MPA would be designated as VRM Class I under this alternative than under Alternative A, which would have more direct, long-term, beneficial impacts because more acreage would be protected at the highest degree of visual resource protection than indicated by the VRM inventory. Thus, this alternative would be the most protective of visual resources.

Under Alternative B, 266,485 acres of non-WSA lands with wilderness characteristics would be managed as VRM Class II. This would preclude surface-disturbing activities that do not retain the characteristic landscape, and could impact all programs and activities.

BLM_0010622

### 4.3.18.2.3 PROPOSED PLAN

In the long-term, the designation of VRM classes under this alternative would result in more beneficial impacts to visual resources than Alternative A because more acres (1%) within the MPA would be managed to preserve pristine and/or relatively undeveloped high-quality scenic landscapes than indicated by the VRM inventory. However, more acres would be designated as Class VRM III and IV (1%), with long-term, adverse impacts on those areas inventoried as having high scenic quality, but managed at lower levels of scenic quality. The Proposed Plan would, in the long-term, permit areas inventoried as having higher scenic quality to develop the characteristics of lower scenic quality areas because of permitted surface disturbances and visual intrusions, would be less protective of visual resources than Alternatives A or B.

Under Proposed Plan, 47,761 acres of non-WSA lands with wilderness characteristics would be managed as VRM Class II. This would preclude surface-disturbing activities that do not retain the characteristic landscape, and could impact all programs and activities.

### 4.3.18.2.4 ALTERNATIVE D

Compared to the Alternative A VRM inventory, Alternative D would have more long-term, adverse impacts on visual resources because more acres (8%) would be managed at lower levels of scenic quality protection (VRM Class III and IV) than indicated by the VRM inventory. This would subject a higher percentage of the MPA to surface-disturbing activities, and permit, in the long-term, areas with higher scenic quality to assume the characteristics of lower VRM Classes (III and IV). For this reason, Alternative D would manage the MPA with the least protection of visual resources.

### 4.3.18.3 VISUALLY SENSITIVE AREAS

Scenic and visually sensitive areas were selected within the MPA for analyses of impacts on visual resources. These visual analysis areas are Canyon Rims, Onion Creek, Fisher Towers, Richardson Amphitheater, the viewshed along the Colorado Riverway/Highway 128 from Dewey Bridge to the intersection of Highway 191, and public lands immediately adjoining Arches National Park. The analytical methodology of determining the impacts to these areas was a comparison of the VRM inventory with MPA management actions.

All of the visually sensitive areas discussed below are within either the Big Flat-Hatch Point or Eastern Paradox RFD Areas. The RFD predicted number of oil and gas wells for the 15-year life of the RMP and related surface disturbances are tabulated below in Table 4.147.

**Table 4.147. The 15-year Oil and Gas Reasonably Foreseeable Development within the Big Flat-Hatch Point and Eastern Paradox RFD Areas**

| RFD Area | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **Big Flat-Hatch Point** | | | | |
| Number of wells predicted | 46 | 19 | 34 | 44 |
| 15-year average surface disturbance (acres) | 697 | 292 | 508 | 665 |

BLM_0010623

**Table 4.147. The 15-year Oil and Gas Reasonably Foreseeable Development within the Big Flat-Hatch Point and Eastern Paradox RFD Areas**

| RFD Area | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Eastern Paradox | | | | |
| Number of wells predicted | 34 | 21 | 28 | 32 |
| 15-year average surface disturbance (acres) | 512 | 320 | 423 | 486 |

Source: BLM 2005f (RFD Scenario for the MPA)

### 4.3.18.3.1 CANYON RIMS

#### 4.3.18.3.1.1 Alternative A

Under Alternative A, the Canyon Rims SRMA was visually inventoried and is currently managed as VRM Class II (approximately 33,583 acres) along the western rim of the SRMA and the remainder of the area under VRM Class III objectives (67,943 acres). The western rim viewshed includes views along the Hatch Point escarpment that defines the boundary of the MPA, views into Lockhart Basin within the Monticello Field Office planning area, and views of the Island in the Sky and Needles Districts of Canyonlands National Park.

Management actions under this alternative would have visual resource-related impacts because the SRMA is open to minerals development with Controlled Surface Use leasing stipulations. If oil and gas exploration and/or other mineral resource development projects were conducted within the Canyon Rims SRMA, then areas managed under VRM Class III objectives would permit moderate short-term and long-term surface disturbances. The SRMA is a portion of the Big Flat-Hatch Point RFD area, which is projected to have an estimated 46 oil and natural gas exploration wells drilled resulting in an estimated 697 acres of surface disturbance during the 15-year life of the RMP.

Areas managed under VRM Class II objectives would require mitigation to reduce surface disturbances to a level that would not attract the attention of the casual viewer. Surface disturbance impacts in Canyon Rims, when viewed from Lockhart Basin within the Monticello Field Office planning area, would not likely be visible because the angle of view from the basin and the variation in elevation between the canyon rim and the basin would block views of surface disturbances. Surface disturbances in Canyon Rims might be visible from Canyonlands National Park, but site-specific visual analyses would be required to determine the level of impacts to visual resources. The impacts of minerals-related surface-disturbance from fugitive dust during well pad construction, access road construction, and minerals-related vehicle traffic on the Canyonlands National Park viewshed could adversely degrade visual quality, but dust-abatement mitigation would likely reduce this potential impact to a minor level, as required by the PSD standards mentioned in the introduction.

BLM_0010624

### 4.3.18.3.1.2 Alternative B

Under Alternative B, no acres within the Canyon Rims SRMA would be designated as VRM Class I, 40,450 acres would be designated as VRM Class II and 61,081 acres would be designated as VRM Class III. This is 6,867 more acres (7%) of VRM Class II than under Alternative A. The RFD for oil and gas development projects that 19 wells would be drilled during the 15-year life of the RMP in the Big Flat-Hatch Point RFD area, with approximately 292 acres of associated surface disturbance. The impacts to visual resources would be less than under Alternative A because a smaller area (approximately 41% of the area under Alternative A) would be subject to surface disturbances, and because more area would be protected under VRM Class II objectives.

### 4.3.18.3.1.3 Proposed Plan

Under this alternative, 33,515 acres within the Canyons Rims SRMA would be designated as Class VRM II (68 fewer acres than Alternative A) and 68,016 acres as VRM Class III. There would be no lands designated as VRM I. The Proposed Plan would have less predicted surface disturbance than Alternative A, as 34 wells (508 acres of surface disturbance) would be developed under this alternative during the life of the RMP in comparison to 46 wells (697 acres of surface disturbance) under Alternative A. This is approximately 73% of the area predicted to be disturbed under Alternative A. Therefore, the potential impacts to scenic values under this alternative would be greater than Alternative B but less than Alternative A.

### 4.3.18.3.1.4 Alternative D

Alternative D would have the same reduction in acreage from VRM Class II to VRM Class III (with the same long-term impacts to scenic quality) and a predicted level of oil and gas-related surface disturbances very similar to that described for Alternative A (95% of the area under Alternative A). Consequently, this alternative would have a similar level of potential impacts to visual resources as Alternative A.

### *4.3.18.3.2 ONION CREEK*

### 4.3.18.3.2.1 Alternative A

Under Alternative A, the Onion Creek trail system has a VRM Class II inventory classification. The western portion of the creek and trail lies within the Richardson Amphitheater. Upstream, the creek narrows into a steep-walled, scenic canyon. The area is a popular non-mechanized recreation destination for equestrian users, as well as a popular destination for mountain bike and motorized users. Surface disturbance impacts to this area include RFD predictions of 34 natural gas and/or oil wells drilled during the 15-year life of the RMP within the Eastern Paradox RFD area, with short-term and long-term degradation of visual/scenic quality associated with surface disturbances of approximately 512 acres from well pads, access roads, and infrastructure. (The Onion Creek area is a small portion of the Eastern Paradox RFD area). The locations of well sites are presently unknown; however, the VRM Class II objectives would require mitigation to reduce surface disturbances to a level that would not attract the attention of the casual viewer, so the impacts to visual resources would be minor.

BLM_0010625

#### 4.3.18.3.2.2 Alternatives B

Under Alternative B Onion Creek, as part of the Richardson Amphitheater Focus Area for non-mechanized recreation, would be established, within the proposed Colorado Riverway SRMA. The Onion Creek area would be designated as VRM Classes I and II; impacts to visual resources would be less than those discussed under Alternative A because the VRM Class I affords a higher level of protection. The RFD for oil and gas would be less than under Alternative A: 21 wells under Alternative B, with surface disturbances totaling approximately 320 acres (62% of Alternative A) over the 15-year life of the RMP. Visual resource/scenic quality degradation would not occur because the VRM Class I and II designation for this area would be the more restrictive than the Alternative A/VRM inventory class designation for the area. Under Alternative B, designation of some portions of Onion Creek as VRM Class I would provide stronger levels of protection for visual resources than in any of the other alternatives.

#### 4.3.18.3.2.3 Proposed Plan

Under the Proposed Plan, Onion Creek would be designated as VRM Class II. Impacts to visual resources would be similar to those discussed under Alternative A. The RFD for oil and gas would be less than under Alternative A, 28 wells in the Proposed Plan compared to 34 wells in Alternative A, with surface disturbances totally approximately 423 acres for the Proposed Plan (83% of Alternative A). Visual resource/scenic quality degradation would not occur because the VRM Class II designation for this area would be the same as the Alternative A/VRM inventory class designation for the area.

#### 4.3.18.3.2.4 Alternative D

Alternative D would have impacts similar to Alternative A because the level of RFD for oil and gas drilling in the Eastern Paradox RFD area would be very similar. The area would be designated as VRM Class II Management objectives (the same as Alternative B and the Proposed Plan) with the same level of impacts as discussed under B and the Proposed Plan. As discussed under Alternative B and the Proposed Plan, scenic quality degradation would not occur because the VRM Class II designation and objective would remain the same as the Alternative A/VRM inventory.

#### 4.3.18.3.3 RICHARDSON AMPHITHEATER/FISHER TOWERS

#### 4.3.18.3.3.1 Alternative A

Under Alternative A, the Richardson Amphitheater and Fisher Towers areas were visually inventoried as VRM Class II. As discussed above for Onion Creek, the Richardson Amphitheatre is a relatively flat, broad, and open area adjacent to the Colorado Riverway, bounded on its eastern side by scenic red-rock cliffs. The area is a popular hiking destination. Similarly, Fisher Towers is a popular hiking trail (see Section 3.10.1.2.18) that rises out of Fisher Valley and provides unobstructed views of Richardson Amphitheatre to the south, the Colorado Riverway and Arches National Park to the west, and views down into the Onion Creek Canyon from the eastern end of the trail. The RFD predicted level of surface disturbances from oil and gas development would be the same as discussed under Onion Creek because the area also lies within the Eastern Paradox RFD area. Impacts from surface disturbances within the Richardson Amphitheatre would be highly visible from the Fisher Towers trail because of the trail's elevated

BLM_0010626

point of view. Surface disturbances to the west of the Colorado Riverway and adjacent to Arches National Park would potentially be visible from the trail, but site-specific visual analyses would be required to determine if visual mitigation could reduce visual contrasts to meet VRM class objectives. Minerals-related surface disturbances and fugitive dust production from minerals-related activities could have long-term, adverse impacts to the park viewshed, particular in areas open to minerals leasing adjacent to the park boundary, but site-specific analyses would be required to determine the level of impacts.

### 4.3.18.3.3.2 Alternatives B, D, and the Proposed Plan

Under Alternative B, the Proposed Plan, and Alternative D, the Colorado Riverway SRMA would be established, with VRM Class II Management objectives (except for areas of VRM Class I in Alternative B). The Richardson Amphitheater and Fisher Towers areas would be designated as recreation focus areas for non-mechanized recreation (hiking, backpacking, and equestrian use) under Alternative B and the Proposed Plan. Under Alternative D, the focus areas would not be established. The potential impacts from oil and gas RFD surface disturbances under these alternatives would be the same as discussed under Alternative A because the level of predicted minerals-related surface disturbances would be the same. Under all of the action alternatives, the impacts to the Richardson Amphitheater/Fisher Towers area from potential scenic quality degradation would be negligible to minor because the Colorado Riverway would continue to be designated as VRM Class II to protect scenic quality, which is the same level of protection as indicated by the Alternative A VRM inventory. Under Alternative B, designation of some portions (approximately 6,700 acres) of the Richardson Amphitheater as VRM Class I would provide stronger levels of protection for visual resources than in any of the other alternatives.

### 4.3.18.3.4 HIGHWAY 128/ COLORADO RIVERWAY

#### 4.3.18.3.4.1 Alternative A

As discussed above for the Fisher Towers and Richardson Amphitheater, the Highway 128/Colorado Riverway recreation management area from Dewey Bridge to the intersection with Highway 191 was visually inventoried as VRM Class I (3,968 acres) and VRM Class II (13,761 acres. Visual impacts to the river corridor viewshed under Alternative A would potentially be similar to those discussed for the Richardson Amphitheater and Fisher Towers because the level of RFD predictions for minerals-related surface disturbances and visual intrusions from oil and gas exploration and development would be the same, and the topography of the areas are similar. Minerals-related activities and surface disturbances within the Richardson Amphitheater would likely be visible from the Riverway because of the relatively unobstructed view of the area from the Riverway.

#### 4.3.18.3.4.2 Alternative B

Under Alternative B, the Colorado Riverway SRMA would be established and expanded. The river corridor would be designated as VRM Class I, VRM Class II, and VRM Class III, with initial management guidance provided by the current Colorado Riverway Recreation Management Plan. The impacts of this alternative would be to proportionally increase the areas designated as VRM Classes I, II, and III when compared to the Alternative A VRM inventory for

BLM_0010627

the area: approximately 15 times more acres (58,950 acres total) would be designated as VRM Class I; two and a half times more acreage (a total of 33,615) designated as VRM Class II. The impacts would be to protect and enhance scenic quality in the long-term because more acreage would be protected for preservation of scenic quality than indicated by the VRM visual inventory for the Riverway. The impacts from minerals development would be less than the impacts discussed under Alternative A because the level of RFD for oil and natural gas development would be less.

### 4.3.18.3.4.3 Proposed Plan

The impacts on visual resources would be similar to Alternative B, but to a lesser degree, because fewer acres would be designated as VRM Class I and Class II when compared to the VRM inventory for the Riverway. Four times more acres would be designated as VRM Class I (16,639) and five times more acres would be designated as VRM Class II (67,655). In the long-term, the impacts on visual resources would be beneficial because more area would be protected and enhanced than indicated by the Alternative A/VRM inventory classes.

### 4.3.18.3.4.4 Alternative D

The impacts of this alternative on visual resources within the Riverway would be similar to Alternative B, but also to a lesser degree because fewer acres would be designated as VRM Class I and II when compared to the Alternative A VRM inventory. Under this alternative, two times more area (7,552 acres) would be designated as VRM Class I and three and a half times more area (50,551 acres) would be designated as VRM Class II. The impacts on visual resources would be beneficial in the long-term because, as discussed for the other action alternatives, more area would be protected from scenic quality degradation when compared to the VRM inventory for the area.

### *4.3.18.3.5 PUBLIC LANDS IMMEDIATELY ADJOINING ARCHES NATIONAL PARK*

Under all alternatives, the public lands immediately adjoining Arches National Park would be designated as VRM Class II to protect the views from critical key observation points within the park.

### 4.3.18.4 SUMMARY OF IMPACTS

Table 2.2 of Chapter 2 summarizes the impacts to visual resources in terms of acreages affected for each alternative.

### *4.3.19 WILDLIFE AND FISHERIES*

This section discusses impacts to wildlife and fisheries from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning wildlife and fisheries are described in Chapter 3.

The table below summarizes the habitat types utilized by the representative wildlife species found in the MPA. These representative species were chosen for their high public interest, such as deer or elk, or because they represent an important ecological group, such as neotropical birds. The Wildlife and Fisheries section in Chapter 3 (Section 3.20) explains the connection between specific habitat types and associated wildlife in more detail. Most of the quantitative analyses in

BLM_0010628

this section report impacts by habitat type, since there are too many wildlife species to address each one individually.

**Table 4.148. Grouping of Wildlife Species by Habitat Type**

| Vegetation/ Habitat Type | Wildlife Associations |
|---|---|
| Aquatic | Amphibians, fish, macro invertebrates |
| Conifer / Mountain shrub | Mule deer, elk, mountain lion, black bear (primarily in old growth stands), raptors, bobcat, coyote, neotropical birds, upland game birds, reptiles |
| Desert shrub | Pronghorn, desert bighorn sheep, elk (winter), raptors, neotropical birds, upland game birds, reptiles, mountain lion, bobcat, fox, coyote |
| Piñon-juniper | Mule deer, elk, pronghorn, mountain lion, neotropical birds, upland game birds, reptiles, bobcat, weasels, raptors |
| Riparian/ Wetland | Mule deer, elk, mountain lion, neotropical birds, upland game birds, amphibian and fish species, reptiles, fox, coyote, bobcat, river otter, beaver |
| Sagebrush/ Perennial grass | Mule deer, elk, Rocky Mountain bighorn sheep, mountain lion, neotropical birds, upland game birds, reptiles, pronghorn |

The BLM has designated habitat within the MPA for mule deer, elk, pronghorn antelope, Rocky Mountain bighorn sheep, and desert bighorn sheep. Mule deer and/or elk habitats have been combined by the BLM in an attempt to simplify the management of their closely overlapping ranges. With the exception of Alternative A (see below), further discussions and analyses will consider the two species together. Where available and appropriate, BLM-designated habitats for particular species are used rather than vegetation types. The BLM-designated habitats proposed under Alternative B for each species are generally the largest. The Proposed Plan generally recognizes less habitat for each species, and Alternative D the least.

The impacts analyses in this section are divided into impacts common to all alternatives (including Alternative A), impacts common to all action alternatives (Alternatives B, D, and Proposed Plan only), and impacts that vary by specific alternative. For each alternative, the total impacts include those specific to the alternative and those common to all alternatives (and all action alternatives where applicable). Therefore, the actions and impacts described under Alternatives B, D, and Proposed Plan include not only those actions and impacts unique to Alternatives B, D, and Proposed Plan but also those listed and discussed under, Impacts Common to All Alternatives and Impacts Common to All Action Alternatives.

Impacts to wildlife and their habitats will vary between alternatives by size, condition, and quality of those habitats and the degree to which those habitats can support viable populations.

Within habitats designated and managed for specific species, management prescriptions can be implemented that will benefit the target species as well as other wildlife species within the area. Increases in habitat size improve wildlife carrying capacity, thus benefiting wildlife. Within these habitats, management decisions from other resources could adversely impact wildlife

BLM_0010629

Development activities and human disturbances may alter or eliminate wildlife use, thus affecting the quality of wildlife habitats. By reducing human-related disturbances and conflicts in critical locations and during critical times of the year, the quality of the habitat may be protected and improved.

Surface-disturbing activities and other decisions that affect the biotic conditions of the vegetation and soil also affect wildlife habitats. Biotic conditions affect forage production and quality, vegetative cover, vegetative composition and species diversity. Changes in these biotic conditions affect the condition and quality of wildlife habitats and may alter or eliminate wildlife use. By reducing surface-disturbing activities and maintaining or improving biotic conditions, the condition and quality of the habitat may be protected and improved. The size of managed wildlife habitats, combined with the quality and condition of those habitats, will demonstrate impacts on those species.

Improving or maintaining the size, quality and condition of habitats would be beneficial to target and most non-target species, while decreasing size or degrading the quality or condition of those habitats would adversely impact most wildlife species.

### 4.3.19.1 IMPACTS OF RESOURCE MANAGEMENT DECISIONS WITH NEGLIGIBLE IMPACTS ON WILDLIFE AND FISHERIES

Management decisions related to the following resources would have negligible impacts on wildlife resources, and are therefore not included in the analyses below: Air Quality, Cultural Resources, and Paleontological Resources. The impacts of management decisions for these resources would be negligible because maintaining air quality, protecting and inventorying cultural resources, and allowing recreational fossil collection and scientific study of fossil resources would 1) not improve or degrade wildlife and fish habitat or 2) cause the gain or loss of wildlife and fish habitat.

### 4.3.19.2 IMPACTS OF FIRE MANAGEMENT DECISIONS ON WILDLIFE AND FISHERIES

The impacts of fire management on wildlife would be the same under all alternatives, with all use guided by the Utah Land-use Plan Amendment (LUP Amendment) for Fire and Fuels Management (BLM 2005c). Adherence with the LUP Amendment (which mandates the maintenance of existing healthy ecosystems and the protection of threatened, endangered, and special status species) would have beneficial impacts on wildlife habitat in the MPA wherever wildlife habitat overlaps with that of protected special status species, and would ensure that healthy ecosystems are not adversely impacted by fire management and fuels reduction. Wildland fire use would not be authorized in the following areas unless reasonable Resource Protection Measures (RPMs) were in place: areas that are known to be highly susceptible to post-fire cheatgrass or other weed invasion, important terrestrial and aquatic habitats, and non-fire adapted vegetation communities. These RPMs would have beneficial impacts on wildlife habitat by reducing the spread of weeds and preserving native plant species, thereby maintaining suitable wildlife forage, cover, and habitat.

Fuels management actions include fuels-reduction treatments on 5,000 to 10,000 acres annually. These actions include: mechanical and manual treatments, prescribed fire, chemical or biological vegetation control, and aerial/ground seeding. These fuels management decisions would likely have a beneficial long-term impact on wildlife and fish populations by helping to restore the

BLM_0010630

natural fire regime, which would improve habitat health (Lewis and Harshbarger 1976), forage, nesting opportunities, and cover. Restoring the natural fire regime would also reduce the chance of catastrophic fire, and the subsequent loss of major ecosystem components. In the short-term, vegetation treatments could result in trampling or removal of wildlife forage and/or habitat, and human-caused wildlife disturbance.

### 4.3.19.2.1 TERRESTRIAL SPECIES

Short-term adverse impacts from fire management actions include mortality, habitat destruction, and habitat displacement. These actions would likely affect habitat used by raptors, migratory birds, small mammals, amphibians, reptiles, and big game species. Direct impacts from wildfire suppression could include habitat corruption from fire retardant and aviation fuel, soil erosion from fireline construction on steep slopes, and damaged vegetation and soils from heavy equipment and fire camps.

The adverse impacts of fuels management actions include the short-term disturbance of wildlife habitat while it regenerates and the thinning and removal of ecologically desirable species. Short-term impacts of treatments would include the mortality of non-target plants due to herbicide use and from seeding methods that cause soil-surface disturbance. These actions could result in a reduction of native species diversity and consequently a reduction in wildlife habitat.

However, managed wildfire and prescribed burns provide long-term benefits to wildlife and wildlife habitat. Fire produces a varied mosaic of habitats and results in the regeneration of old and decadent vegetation, which can be favorable to big game. Fuel reduction treatments also reduce the risk of catastrophic fire, which otherwise could cause the long-term loss of wildlife habitat.

### 4.3.19.2.2 AQUATIC AND AMPHIBIOUS SPECIES

Adverse impacts to fish, amphibians, and other aquatic species would include an increased risk of contaminating water sources with fire retardant or vehicle fluids; soil erosion following surface-disturbing fire suppression measures; damage to riparian vegetation and soils by heavy equipment; and reduced stream flow where water for fire suppression is drawn directly from streams and water bodies. Erosion would increase the sedimentation of surface waters, which affects water temperature, turbidity, and chemistry. These changes in water quality would generally have adverse impacts on aquatic species.

### 4.3.19.3 IMPACTS OF HEALTH AND SAFETY DECISIONS ON WILDLIFE AND FISHERIES

Health and safety decisions would have the same impacts on wildlife and fisheries under all alternatives. The primary impacts on wildlife and fisheries would result from the prioritization of abandoned mine lands (AMLs) for reclamation and mitigation.

Because abandoned mining structures are often used as roosting habitat by bat species, completely sealing off AML entrances during reclamation would have direct adverse impacts on roosting individuals and populations by displacing them from this habitat and reducing the availability of suitable roosting sites. Of the 18 bat species in Utah, 14 species regularly occur in abandoned mines (Grandison 2004). However, mines would be surveyed for bats prior to being sealed, and mitigation including the installation of bat-compatible mine gates and cupolas (which

BLM_0010631

allow bats to pass through, but prohibit human entrance) would minimize the adverse impacts of mine closures on bats.

Some AML sites would be prioritized for reclamation due to hazardous waste contamination and water quality issues. These reclamations would have long-term beneficial impacts on fish, amphibians, and other aquatic species by improving water quality and reducing groundwater contamination.

### 4.3.19.4 IMPACTS OF LANDS AND REALTY DECISIONS ON WILDLIFE AND FISHERIES

#### 4.3.19.4.1 IMPACTS COMMON TO ALL ALTERNATIVES

The following lands and realty decisions would impact wildlife and fisheries in the MPA: ROWs, easements, permits, utility/transportation systems, acquisitions and disposals, and withdrawals. Under all alternatives, Wilderness Study Areas (WSAs) would be exclusion areas for rights-of-way (ROWs), which would benefit wildlife by preventing the fragmentation of habitat in WSAs. However, all areas not identified as avoidance or exclusion areas would be available for ROWs and could be subject to multiple-uses and surface disturbances. The authorization of ROWs for utility and communication infrastructure (among others) could have direct, long-term, adverse impacts on wildlife due to habitat loss or fragmentation and human disturbance during construction activities.

The withdrawal of 78,333 acres from mineral entry within the MPA would be continued, thereby reducing or eliminating surface-disturbing activities and associated impacts to wildlife and their habitat. Under all alternatives, approximately 14,740 acres of land would be listed for potential disposal. This would include 12,470 acres of desert shrub, 1,794 acres of piñon-juniper, 102 acres of riparian and wetland, and 208 acres of sagebrush/grassland habitats. Although disposals could lead to the loss of potential wildlife habitat, they could also lead to the beneficial acquisition of wildlife foraging habitat and relict vegetation areas as part of the exchange program. Where possible, TES species habitat, quality riparian areas, and key productive ecosystems would be retained or acquired under all alternatives. This would allow for protection and management of these key wildlife habitat areas, prevent their fragmentation from adjoining parcels, and mitigate the adverse impacts of land disposals.

Surface-disturbing activities associated with authorizing ROWs, roads, and other development projects in the MPA would have the potential to adversely impact wildlife species and their habitats. The ROW utility corridor around Highway I-70 would vary in width across alternatives; regardless of width, surface-disturbing activities within the corridor would cause the long-term loss or degradation of wildlife habitat and avoidance of the area by wildlife. It could also provide increased predation of small prey species by raptors perching on utility poles, and potentially electrocution of some birds.

#### 4.3.19.4.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under Alternatives B, D, and Proposed Plan ACECs would be avoidance areas for ROWs. The impacts of ROWs are discussed above. Minimum Impact Criteria for filming permits would ensure that filming projects would not: impact Sensitive species habitat, use exotic species, adversely impact relict environments or riparian areas, utilize excessive numbers of livestock, or

BLM_0010632

involve more than 15 vehicles and 75 people. These criteria would reduce human disturbance of wildlife and their habitat during filming.

All action alternatives would identify the entire MPA as available for wind or solar energy development in the MPA except in areas identified as closed or NSO for oil and gas leasing. These stipulations would preclude all other surface-disturbing activities, including ROWs. Areas designated as NSO or closed include non-WSA lands with wilderness characteristics, WSAs, WSR corridors, ACECs, raptor habitat, and special status species habitat. These ROWs would have adverse impacts to wildlife similar to those described above, with the exception that wind energy development would adversely impact birds to a greater degree.

### 4.3.19.4.2.1 Alternative A

Under Alternative A, the impacts of lands and realty decisions on wildlife resources would be limited to those common to all alternatives. Under this alternative, the existing utility corridor would continue to disturb approximately 32,183 acres of habitat, primarily of desert shrub vegetation (Table 4.149) associated with pronghorn, desert bighorn sheep, elk (winter), raptors, neotropical birds, upland game birds, and reptiles (see Table 4.148).

### 4.3.19.4.2.2 Alternative B

Under Alternative B, an additional 100 ft would be added to each side of the existing utility corridor, resulting in a total of up to 64,539 acres of surface disturbance concentrated in desert shrub habitats. Impacts to rare riparian and wetland habitat would be almost double that of Alternative A, but would be mitigated by no surface occupancy stipulations for riparian areas.

**Table 4.149. Acres of Surface Disturbance due to Utility Corridors by Major Habitat Type**

| Habitat Type | Associated Wildlife | Alt. A | Alt. B | PROPOSED PLAN | Alt. D |
|---|---|---|---|---|---|
| Desert shrub | Pronghorn, desert bighorn sheep, elk (winter), raptors, neotropical birds, upland game birds, reptiles, mountain lion, bobcat, fox, coyote | 25,144 | 52,053 | 113,917 | 141,797 |
| Piñon-juniper | Mule deer, elk, pronghorn, mountain lion, neotropical birds, upland game birds, reptiles, bobcat, weasels, raptors | 5,345 | 8,808 | 41,672 | 44,189 |
| Riparian and wetland | Mule deer, elk, mountain lion, neotropical birds, upland game birds, amphibian and fish species, reptiles, fox, coyote, bobcat, river otter, beaver | 143 | 323 | 1,031 | 1,139 |

BLM_0010633

**Table 4.149. Acres of Surface Disturbance due to Utility Corridors by Major Habitat Type**

| Habitat Type | Associated Wildlife | Alt. A | Alt. B | PROPOSED PLAN | Alt. D |
|---|---|---|---|---|---|
| Sagebrush and perennial grassland | Mule deer, elk, Rocky Mountain bighorn sheep, mountain lion, neotropical birds, upland game birds, reptiles, pronghorn | 1,551 | 3,355 | 14,376 | 14,531 |
| **Total** | | **32,183** | **64,539** | **170,996** | **201,656** |

Note: not every acre in a corridor would necessarily be disturbed.

Thus, impacts to riparian wildlife would primarily be caused by human disturbance, rather than physical disturbance of their habitat. Overall, Alternative B would disturb more than twice as much of most of the habitat types present as Alternative A.

### 4.3.19.4.2.3 Proposed Plan

Under the Proposed Plan, the surface disturbance to wildlife-associated habitat types would total 170,996 acres, more than 2.5 times greater than under Alternative B and more than 5 times greater than Alternative A (Table 4.149).

### 4.3.19.4.2.4 Alternative D

Under Alternative D, the surface disturbance to wildlife-associated habitat types would total 201,656 acres, slightly greater than the Proposed Plan, more than three times greater than under Alternative B, and more than six times greater than Alternative A (Table 4.149).

### 4.3.19.5 IMPACTS OF LIVESTOCK GRAZING DECISIONS ON WILDLIFE AND FISHERIES

Livestock grazing can have both adverse and beneficial impacts on wildlife. If not properly managed through Standards for Rangeland Health and Guidelines for Grazing Management, harmful impacts to wildlife can include loss of biodiversity, lowering of population densities, disruption of some ecosystem functions, change in community organization, and change in the physical characteristics of both terrestrial and aquatic habitats (Chaneton and Lavado 1996; Fleischner 1994; Olff and Ritchie 1998). Improper grazing can further increase salinity even in already saline soils (Chaneton and Lavado 1996), leading to inhibited plant diversity, especially in arid and relatively infertile soils (Olff and Ritchie 1998). Decreased plant diversity would have long-term adverse impacts on wildlife habitat. Many of the adverse impacts listed above occur when livestock are not carefully managed, and an overconcentration of animals causes excessive grazing and long-term disturbances. Carefully managed livestock grazing can potentially benefit some wildlife habitat by promoting regrowth of forage species, reducing the prevalence of some invasive plants, and creating openings and disturbed areas utilized by some species (GSRSC 2005: 116). Because of the level of management required for beneficial impacts to occur and the sensitivity of desert ecosystems, the following analyses assume that livestock grazing could potentially cause adverse impacts on wildlife species, except where active management intended to benefit wildlife is proposed.

BLM_0010634

### 4.3.19.5.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, livestock grazing would be managed according to the Guidelines for Grazing Management to achieve the Standards for Rangeland Health, which would benefit wildlife by maintaining or restoring the proper functioning condition (PFC) of riparian and wetland wildlife habitat, maintaining desired species (including native and non-native species) at a level appropriate to the site and conditions, and maintaining or improving aquatic habitat by ensuring that all state and Federal water quality standards are met. Additionally, the recommendations of the National Sage-grouse Habitat Conservation Strategy (BLM 2004c) and the Strategic Management Plan for Sage-grouse (UDWR 2002) would be followed where applicable. Sage-grouse management plans are generally beneficial for all sagebrush-associated species (see Table 4.148).

### 4.3.19.5.1.1 Mule Deer, Elk, Pronghorn

Management decisions common to all alternatives would exclude livestock grazing from certain allotments (including Between the Creek, North Sand Flats, South Sand Flats, and Castle Valley), directly benefiting big game by making more forage available. Vegetation treatments for rangeland improvement in piñon-juniper habitat are proposed under all alternatives, including plowing and seeding, chaining and seeding, drill seeding, and prescribed fire and seeding. Vegetation treatments would benefit pronghorn, deer, and elk by improving the quality of their winter habitats.

### 4.3.19.5.1.2 Riparian Species

Livestock grazing in riparian areas could have adverse impacts on riparian-associated wildlife species (Table 4.148). Direct adverse impacts would include competition with wildlife for forage, and possible trampling of individual animals or nests. Indirect adverse impacts of livestock use of riparian areas include an increased susceptibility to invasion by noxious weeds, which reduces the value of forage, and reduction of cover species for sensitive wildlife (Popolizio et al. 1994; Kauffman et al. 1983; Sarr et al. 1996). Bird species that rely on native riparian trees for nesting and roosting sites and protection from predators would be adversely affected by the replacement of native vegetation with introduced species (Saab et al. 1995).

### 4.3.19.5.1.3 Fishes, Amphibians, and Other Aquatic Species

Livestock-caused erosion in saline soils would contribute to increased salinity in the Colorado River and other surface waters in the MPA, which could modify species composition within an ecosystem (Galindo-Bect and Glenn 1999; Hart et al. 1998) and cause mortality of freshwater species (Nelson and Flickinger 1992). Sedimentation can also have similarly detrimental impacts. Soil compaction due to grazing in riparian areas would result in less rainwater infiltration into soils and more overland flow. The result would be large, short-lived flows rather than small, perennial flows (Trimble and Mendel 1995). This would reduce the duration of seasonal water availability for a wide range of wildlife species.

### 4.3.19.5.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, conversion of allotments from cattle to domestic sheep would not be considered in bighorn sheep habitat because of conflicts with bighorn sheep. This would have

BLM_0010635

beneficial impacts to desert bighorn because it would maintain the separation of wild and domestic sheep, thereby reducing or eliminating the transmission of *Pasteurella*, which has been suspected as the cause of catastrophic bighorn die-offs (UDWR 1999).

### 4.3.19.5.2.1 Alternative A

Under Alternative A, livestock would be excluded from a total of 126,907 acres (including the Beaver Creek, Bogart, Cottonwood, Diamond, Pear Park and Spring Creek allotments), in addition to those mentioned under Common to All Alternatives. Alternative A would exclude livestock from the second greatest amount of wildlife habitat, and would therefore have the second greatest beneficial impacts on wildlife forage, habitat, and cover as described above.

<u>Mule Deer, Elk, Pronghorn, Bighorn Sheep</u>

The exclusion of livestock from the Bogart, Cottonwood, Diamond, Pear Park and Spring Creek allotments would have beneficial impacts, especially on mule deer and/or elk, because these allotments are in these two species' crucial winter range. Wintering deer and/or elk would not be forced to compete with livestock for sagebrush and early season grasses. Competition for forage, escape terrain, and thermal cover would not occur between livestock and deer and/or elk. Increased forage would lead to increased reproductive success for both deer and/or elk.

Alternative A would continue vegetation treatments on 67,125 acres. This would include mechanical treatments on 11 allotments (52,976 acres) and prescribed fire treatments on 14,149 acres. The increase in AUMs would be split evenly between livestock and wildlife where both are present. Wildlife species would benefit from additional AUMs available for their use, and all sagebrush-dependent species would benefit from expanded habitat as vegetation treatments would be used to restore sagebrush.

<u>Riparian Species</u>

Under Alternative A, grazing would continue to be excluded from riparian areas within five allotments: South Sand Flats, North Sand Flats, Between the Creeks, Cottonwood, and Diamond (no acreages available). This action would benefit riparian-associated wildlife species by protecting their habitat from soil compaction, erosion, and grazing of vulnerable plant species. Alternative A would exclude grazing in the fewest acres of riparian habitat, approximately 53% of the area excluded under Alternative B, 72% of that excluded under the Proposed Plan, and 94% of that under Alternative D.

<u>Fishes, Amphibians, and Other Aquatic Species</u>

Under Alternative A, livestock grazing would continue to be adjusted in order to reduce salinity in the Colorado River drainage in seven allotments (Athena, Cisco, Cisco Mesa, Crescent Canyon, Highlands, Monument Wash, and Thompson Canyon). Grazing exclusions in riparian areas under Alternative A would also help to mitigate the adverse impacts of soil compaction and salinization in the Colorado River drainage.

### 4.3.19.5.2.2 Alternative B

Grazing would be excluded from a total of 153,797 acres (including Beaver Creek, Bogart, Cottonwood, Diamond, Pear Park, Professor Valley, Ida Gulch, River, Mill Creek and Spring Creek allotments), in addition to those mentioned under Common to All Alternatives. This is

BLM_0010636

*Moab PRMP/FEIS*

*Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.19 Wildlife and Fisheries Resources*

26,890 acres more than proposed under Alternative A. Therefore, Alternative B would be more beneficial to wildlife species and their habitats than Alternative A.

### Mule Deer, Elk, Pronghorn, Bighorn Sheep

The continued exclusion of livestock from the Bogart, Cottonwood, Diamond, Pear Park, Mill Creek and Spring Creek allotments would have beneficial impacts similar to those described under Alternative A, especially on mule deer and/or elk, because these allotments are in these species' crucial winter range.

Alternative B proposes 46,307 acres for vegetation treatments; 20,818 acres (35%) less than under Alternative A. Because the degree of indirect impacts depends upon the quality of the treatment and the success rate of re-vegetating, differences among the alternatives are difficult to quantify. However, it is reasonable to assume that fewer AUMs and/or less sagebrush habitat would be restored under Alternative B, and that big game species and other wildlife that depend on rangeland habitat would not benefit as much under Alternative B as under Alternative A.

### Riparian Species

Under Alternative B, grazing would be excluded from 4,673 acres of riparian habitat in nine allotments. These exclusions would help mitigate the adverse impacts of livestock grazing in riparian areas discussed under Impacts Common to All Alternatives. Therefore, livestock management under Alternative B would be the most beneficial for riparian habitat and associated wildlife because more acres would be unavailable for livestock grazing.

### Fishes, Amphibians, and Other Aquatic Species

Under Alternative B, grazing systems and Allotment Management Plans (AMPs) would be used on nine grazing allotments to minimize impacts to highly saline soils and reduce salinity in the Colorado River drainage. Aquatic species such as fish and amphibians would benefit from these AMPs with the subsequent reductions in turbidity and salinity and increased water availability. In addition, aquatic species would benefit from the continued exclusion of grazing from Cottonwood, Diamond and Bogart allotments.

## 4.3.19.5.2.3 Proposed Plan

Grazing would be excluded from a total of 132,047 acres (including Bogart, Pear Park, Ida Gulch, Cottonwood, Diamond, portions of Professor Valley, and River along Highway 128 and Mill Creek allotments), in addition to those mentioned under Common to All Alternatives. This is slightly less acres excluded from livestock grazing than under Alternatives A and B, and more than under Alternative D. Therefore, the impacts of these exclusions on wildlife would be very similar to Alternative B and Proposed Plan, but more protective of wildlife than Alternative D.

### Mule Deer, Elk, Pronghorn, Desert Bighorn Sheep

The exclusion of livestock from the Bogart, Cottonwood, Pear Park, Diamond, and Mill Creek allotments would have beneficial impacts especially on mule deer and/or elk, because these allotments are in these species' crucial winter range. These beneficial impacts include lack of competition with livestock for sagebrush and early season grasses, the elimination f competition for forage, escape terrain, and thermal cover, and increased reproductive success of deer and/or elk.

BLM_0010637

The impacts of vegetation treatments on big game would be the same as those discussed under Alternative B because the acreage proposed for treatment is similar.

Riparian Species

Under this alternative, grazing would be restricted in 1,169 acres of riparian habitat in five allotments. Restrictions would include the development of AMPs. In addition, 77 acres in Day Canyon would be unavailable for grazing. This alternative would protect more riparian wildlife habitat from the detrimental impacts of livestock grazing than Alternatives A and D, and less than Alternative B.

Fishes, Amphibians, and Other Aquatic Species

The Proposed Plan would implement AMPs on more allotments than under Alternative B. Therefore, livestock management under the Proposed Plan could increase salinity in soils and freshwater systems more than under Alternative B, and would have correspondingly greater impacts to fisheries and aquatic species. In addition, aquatic species would benefit from the continued exclusion of grazing from Cottonwood, Diamond, and Bogart allotments.

## 4.3.19.5.2.4 Alternative D

Grazing would be excluded from a total of 52,214 acres under Alternative D. The only allotment excluded, other than those in Common to All Alternatives, would be Mill Creek. The impacts of these exclusions on wildlife, especially deer and/or elk, would be more adverse than under any of other alternatives. In addition, many of the allotments available in this alternative (including Bogart, Diamond, Cottonwood, and Pear Park) are largely inaccessible, making management of livestock, including distribution, difficult to implement and maintain. Difficulties with cattle distribution could lead to greater adverse impacts to wildlife, especially to big game animals.

Grazing would only be restricted as needed to mitigate conflicts with wildlife under Alternative D. This would result in more detrimental consequences for wildlife than under Alternative B and Proposed Plan, because livestock-wildlife conflicts would not be avoided (as under Alternative B and Proposed Plan).

Mule Deer, Elk, Pronghorn, Desert Bighorn Sheep

Cottonwood, Diamond, Bogart, Spring Creek, and Pear Park, all allotments in deer and/or elk crucial winter range, would be available for grazing (cattle only). This would mean that cattle would compete with deer and/or elk for forage in these allotments. As a result, there would be less forage for established deer and/or elk herds. The social intolerance of elk for cattle would lead to the rate of elk use decreasing on these crucial winter grounds. Competition for forage, escape terrain, and thermal cover would occur, leading to decreased reproductive success for deer and/or elk. This would result in a reduction in herd viability and a decrease in herd population.

The impacts of vegetation treatments on big game would be the same as those discussed under Alternative B because the same number of acres are proposed for treatment.

Riparian Species

The adverse impacts of livestock grazing decisions in riparian areas on wildlife species would be greater than discussed under Alternative A because while North Sand Flats, South Sand Flats,

BLM_0010638

and Between the Creeks would continue to be unavailable for grazing, the riparian systems within the Bogart, Cottonwood and Diamond allotments would be available for livestock grazing. Because management in these allotments would be difficult due to their inaccessibility, needed riparian protections could not be implemented. This would result in watershed degradation in the headwaters of these large canyon systems, resulting in habitat loss.

<u>Fishes, Amphibians, and Other Aquatic Species</u>

The impacts of livestock grazing decisions on fish, amphibians, and other aquatic species would be the most adverse in Alternative D because the aquatic habitat in Bogart, Cottonwood and Diamond allotments would be available for grazing. Aquatic environments are rare in the MPA, and the species that they harbor are highly susceptible to environmental changes. Grazing would result in alteration of the aquatic habitat, which would result in habitat loss and species abandonment in the canyon systems within those allotments.

### 4.3.19.6 IMPACTS OF MINERALS DECISIONS ON WILDLIFE AND FISHERIES

Impacts from minerals decisions on wildlife and their habitats would include habitat loss and degradation resulting from the removal of vegetation (surface disturbance) and subsequent occupation of areas for oil/gas well pads, open pit mines, and associated roads and infrastructure. Wildlife avoidance of disturbed and occupied areas would reduce their value as habitat. Many species of wildlife avoid areas with high or inconsistent levels of noise, roads with frequent automobile/truck traffic, areas that are heavily lit at night, and areas surrounding structures.

Adverse impacts of minerals decisions on wildlife resources would be reduced by the implementation of BMPs outlined in Section 2.1 and Appendix O. Restrictions include no surface-disturbing activities within riparian habitat, required revegetation of oil and gas well sites upon project completion, and land management that meets or moves toward meeting Utah's Standards for Rangeland Health. In addition, the implementation of BMPs for the benefit of wildlife and their habitats (e.g., centralization of drill rigs and storage tanks, reduction of the number of access roads, and interim and final reclamation practices) would also reduce some of the short- and long-term adverse impacts listed above. Interim reclamation occurs during the operational phase of a project and consists of revegetating all areas surrounding wells and roads that are not actively used during oil or gas production. Final reclamation occurs when a well has been decommissioned and includes the practices of recontouring soil surfaces to match surrounding landforms, replacing topsoil, and reseeding with native plant species wherever possible. The number of years required for successful final reclamation would depend on the habitat type; grasslands recover more quickly than sagebrush or desert shrub, which recover more quickly than forested areas such as piñon-juniper or conifer habitat. A commonly used average value and goal for reclamation across the project area is 10 years. Following the successful reclamation of a well site or road, the long-term adverse impacts to wildlife species would be largely eliminated.

The amount of land that is open to oil and gas leasing or other mineral use is not necessarily indicative of the number of acres that would be directly disturbed. Areas managed under Standard or Timing and/or Controlled Surface Use stipulations allow minerals development, but not all of those acres would be subjected to surface disturbance. Habitat quality may be preserved by the implementation of seasonal restrictions and spatial buffers that protect crucial habitats. Areas categorized as NSO or Closed preclude all surface-disturbing minerals

BLM_0010639

development and therefore improve the quality and condition of wildlife habitats. Riparian and wetland habitat, lands with a slope greater than 30%, and VRM Class I areas have been excluded from analysis because they have been assigned the leasing category of NSO, which precludes them from all surface disturbance.

The impacts of minerals decisions are analyzed for the entire MPA rather than for each individual RFD area for the purposes of comparison. Impacts may be concentrated in particular RFD areas, however. Depending on the distribution of wildlife habitat across particular RFD areas with high levels of disturbance, the amount of particular habitats disturbed may not match the composition of vegetation in the MPA. The Bookcliffs and Greater Cisco RFDs are projected to experience the greatest minerals development-related disturbances, and therefore impacts to wildlife and their habitat. The Bookcliffs RFD contains predominantly piñon-juniper habitat with conifer/mountain shrub habitat as the second most common habitat. Greater Cisco is dominated by desert shrub followed by piñon-juniper.

Of the seven oil and gas development areas within the MPA, wildlife habitat in the Greater Cisco RFD area is expected to be most heavily impacted by minerals decisions because it has the highest predicted levels of oil and gas well development (almost 45% of the 451 wells in the MPA would likely be sited in the Greater Cisco RFD). Site-specific analysis would be necessary to determine the exact impacts to wildlife from oil and gas development. Appendix S, Wildlife Impacts by RFD Area provides the estimated number of acres of disturbance in each wildlife habitat type under all alternatives given the assumption that disturbance would occur proportionally to the vegetation distribution within each RFD.

### 4.3.19.6.1 ALTERNATIVE A

#### 4.3.19.6.1.1 Leasable Minerals

Surface disturbance and human-caused disturbance (noise, night-lighting, increased automobile traffic, and habitat fragmentation and loss) associated with well, pipeline, and road construction would result in both short- and long-term adverse impacts on wildlife. Surface disturbance would result in loss of habitat and would increase the potential for invasion of undesirable plant species, including noxious weeds (Piemeisel 1951). This loss of native vegetation would result in long-term adverse impacts on wildlife by decreasing the amount of available habitat and degrading existing habitat.

Wildlife species that use piñon-juniper and desert shrub habitats would be the most heavily impacted by surface disturbance and related impacts due to oil and gas development (Table 4.150) because these are the predominant habitat types in the areas most likely to be developed. Human occupancy and activities would cause the adverse displacement of wildlife.

Under Alternative A, approximately 277,678 acres of piñon-juniper habitat would be managed as either NSO or Closed, while approximately 41,086 acres of desert shrub would be managed under the same designations. A total of 389,633 acres (of all habitat types) would be managed as NSO or Closed.

BLM_0010640

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 152 of 355

Moab PRMP/FEIS
Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
4.3.19 Wildlife and Fisheries Resources

**Table 4.150. Estimated Surface Disturbance (in acres) for Oil and Gas Well Development, by Vegetation (Wildlife Habitat) Type**

| Habitat Type | Associated Wildlife | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Conifer and Mountain Shrub | Mule deer, elk, mountain lion, black bear (primarily in old growth stands), neotropical birds, upland game birds, reptiles | 267 | 157 | 256 | 266 |
| Desert Shrub | Pronghorn, desert bighorn sheep, elk (winter), raptors, neotropical birds, upland game birds, reptiles | 2,829 | 1,656 | 2,708 | 2,815 |
| Piñon-Juniper | Mule deer, elk, pronghorn, mountain lion, neotropical birds, upland game birds, reptiles | 2,801 | 1,639 | 2,682 | 2,788 |
| Sagebrush/ Perennial Grassland | Mule deer, elk, Rocky Mountain bighorn sheep, mountain lion, neotropical birds, upland game birds, reptiles | 488 | 285 | 467 | 485 |
| **Total Acres of Disturbance** | | **5987** | **3,737** | **6,113** | **6,354** |

**Mule Deer and/or Elk:** Under Alternative A, the BLM would not specifically manage habitat for elk. Out of a total of 79,361 acres of designated mule deer crucial habitat under Alternative A, 30,259 acres (38%) would be managed as either NSO or Closed (Table 4.151). These leasing categories would preclude new surface disturbance, resulting in beneficial protections in these areas to mule deer and other wildlife species that occur within designated mule deer crucial habitat.

**Pronghorn:** Of a total of 25,367 acres of designated pronghorn crucial habitat under Alternative A, no land would be managed as either NSO or Closed (Table 4.151). The entire designated habitat would be managed under controlled surface and timing stipulations (CST), which would allow leasable mineral entry with special protections for wildlife relating to the timing of construction and operation. Pronghorn and other wildlife that use their habitat would benefit from the restriction on leasable minerals development in these areas, but not as much as if the lands were managed as NSO or Closed.

BLM_0010641

**Table 4.151. Acres of Big Game Crucial Habitat Open and Closed to Surface Disturbance in the MPA by Alternative**

| Big Game Species | Alternative A | | Alternative B | | PROPOSED PLAN | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Open* | Closed** | Open | Closed | Open | Closed | Open | Closed |
| Mule Deer and/or Elk | 49,103 | 30,259 (38%) | 241,518 | 393,477 (62%) | 234,960 | 114,663 (33%) | 264,831 | 84,844 (24%) |
| Pronghorn | 25,367 | 0 (0%) | 469,781 | 351,919 (43%) | 291,902 | 1,822 (<1%) | 291,915 | 1,822 (<1%) |
| Desert Bighorn Sheep | 314,346 (95%) | 16,546 (5%) | 200,636 (59%) | 130,256 (41%) | 230,640 (70%) | 100,252 (30%) | 320,498 (96%) | 10,394 (4%) |
| Rocky Mountain Bighorn Sheep | 25,857 | 151,750 (85%) | 65,837 | 364,064 (85%) | 48,057 | 257,047 (84%) | 33,358 | 161,201 (83%) |

*"Open" includes Standard and CST lease categories.

**"Closed" includes NSO and Closed leasing categories. The percent of the total designated habitat closed is listed in parentheses.

**Desert Bighorn:** Of a total of approximately 330,892 acres of designated desert bighorn crucial habitat under Alternative A, 16,546 acres (30%) would be managed as either NSO or Closed (Table 4.151), resulting in beneficial protections in those areas to desert bighorn and other wildlife species that occur within designated desert bighorn crucial habitat.

**Rocky Mountain Bighorn:** Of a total of 177,607 acres of designated Rocky Mountain bighorn crucial habitat under Alternative A, 151,750 acres (85%) would be managed as either NSO or Closed (Table 4.151) resulting in beneficial protections in those areas to Rocky Mountain bighorn and other wildlife species that occur within designated Rocky Mountain bighorn crucial habitat.

### 4.3.19.6.1.2 Geophysical Activity

Under Alternative A, approximately 2,261 acres of wildlife habitat would be temporarily impacted by geophysical exploration over the life of the RMP (Table 4.152). Impacts to wildlife habitat associated with exploration would include short-term impacts such as noise and disturbance from people working in the area and long-term impacts such as the loss of vegetation and potential spread of invasive and weedy plant species within the areas directly disturbed by geophysical exploration.

BLM_0010642

**Table 4.152. Estimated Surface Disturbance (in Acres) on BLM Lands Associated with Geophysical Exploration by Vegetation Type**

| Habitat Types | Associated Wildlife | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Conifer and Mountain Shrub | Mule deer, elk, mountain lion, black bear (primarily in old growth stands), neotropical birds, upland game birds, reptiles | 95 | 55 | 82 | 92 |
| Desert Shrub | Pronghorn, desert bighorn sheep, elk (winter), raptors, neotropical birds, upland game birds, reptiles | 1001 | 587 | 866 | 973 |
| Piñon- Juniper | Mule deer, elk, pronghorn, mountain lion, neotropical birds, upland game birds, reptiles | 992 | 581 | 857 | 963 |
| Sagebrush/ Perennial Grasslands | Mule deer, elk, Rocky Mountain bighorn sheep, mountain lion, neotropical birds, upland game birds, reptiles | 173 | 101 | 149 | 168 |
| **Total Acres of Disturbance** | | **2,261** | **1,324** | **1,954** | **2,196** |

### 4.3.19.6.1.3 Salable Minerals

The exploration and development of salable minerals would have similar impacts to wildlife as other development described above. Under Alternative A, 1,467,768 acres of land in the MPA would be available for disposal of mineral materials. That is approximately 57% of the 1,821,374 acres in the MPA. However, the amount of expected salable development is low under all alternatives (up to 27 acres of disturbance per year), so Alternative A would not likely have much impact on wildlife.

### 4.3.19.6.1.4 Locatable Minerals

Under Alternative A, all public lands within the MPA would remain open to mining except within existing withdrawals. About 1,389,531 acres would be open to locatable minerals. Impacts resulting from locatable mineral exploration and development include habitat disturbance and fragmentation as described under Leasable Minerals, including direct loss of habitat, loss of forage, and disruption of migration routes. In addition, indirect impacts on individual animals related to the presence of roads, traffic, and human presence would occur. See discussions of impacts of minerals development to wildlife at the beginning of this section for more detail. However, the amount of expected locatable mineral development is low under all alternatives (up to 25 acres of disturbance per year), so Alternative A would not likely have much impact on wildlife.

BLM_0010643

### *4.3.19.6.2 ALTERNATIVE B*

Under Alternative B, the impacts of minerals decisions on wildlife resources would be of the same nature as those discussed under Alternative A, but would vary in the acreage over which those decisions would impact wildlife and wildlife habitat, as described below.

### 4.3.19.6.2.1 Leasable Minerals

Under Alternative B, approximately 3,737 acres of wildlife habitat disturbance due to oil and gas development would be expected, or approximately 2,809 acres (41%) fewer than under Alternative A (see Table 4.150). Because less surface disturbance would occur under Alternative B than under any other alternative (see Table 4.150), Alternative B would result in fewer oil- and gas-related impacts to wildlife than Alternative A.

As under all alternatives, the greatest surface disturbance, and therefore the greatest impact to wildlife, is expected in the Greater Cisco and the Bookcliffs RFD areas.

Impacts of oil and gas leasing on wildlife species and their habitats under Alternative B would be similar to those under Alternative A, with the following exceptions. Under Alternative B, approximately 535,373 acres of piñon-juniper habitat would be managed as either NSO or Closed, while approximately 337,807 acres of desert shrub would be managed under the same leasing category. The total number of acres (of all habitat types) to be managed as NSO or Closed approximate 996,175 under Alternative B. Compared to Alternative A, Alternative B would manage approximately 2.5 times the total number of acres for management as NSO or Closed. Overall, wildlife species in desert shrub and piñon-juniper habitats would benefit more from the impacts of NSO or Closed leasing categories under Alternative B than Alternative A.

**Mule Deer and/or Elk:** Of approximately 634,995 acres designated as mule deer crucial habitat under Alternative B, 393,477 acres (62%) would be managed as either NSO or Closed (see Table 4.151). More habitat would be managed as Closed under Alternative B than Alternative A. Alternative B designates seven times more crucial habitat for mule deer and/or elk than Alternative A designates. An increase in the acreage of designated habitat along with an increase in the percent of acres managed as Closed or NSO for mule deer and/or elk would directly benefit these species and other wildlife in the MPA by decreasing impacts related to surface disturbance (as described above). Alternative B would have considerably more beneficial impacts to deer and/or elk than any other alternative.

**Pronghorn:** Of approximately 821,700 acres designated as pronghorn crucial habitat under Alternative B, 351,919 acres (43%) would be managed as either NSO or Closed (see Table 4.151). Approximately 41% more habitat would be managed as NSO or Closed under Alternative B than Alternative A. Alternative B would designate approximately 32 times more crucial habitat for mule deer and/or elk than Alternative A. Therefore, Alternative B would have far more beneficial impacts to pronghorn than any other alternative.

**Desert Bighorn:** Of approximately 330,892 total acres of habitat, 130,256 acres would be managed as either NSO or Closed (see Table 4.151). More habitat would be managed as Closed under Alternative B than Alternative A. Alternative B designates 2.3 times more crucial habitat for desert bighorn than Alternative A designates. Therefore, Alternative B would have far more beneficial impacts to desert bighorn than Alternatives A and D, and similar impacts to the Proposed Plan.

BLM_0010644

**Rocky Mountain Bighorn:** Of approximately 429,901 acres designated as Rocky Mountain bighorn crucial habitat under Alternative B, 364,064 acres (85%) would be managed as either NSO or Closed (see Table 4.151). This is the same percentage that Alternative A would manage as closed, but includes a much greater number of acres. Alternative B would designate 2.4 times more crucial habitat for pronghorn than Alternative A. Therefore, Alternative B would have more beneficial impacts to Rocky Mountain bighorn than any other alternative.

#### 4.3.19.6.2.2 Geophysical Activity

Under Alternative B, there would be approximately 1,324 acres of surface disturbance to wildlife habitat associated with geophysical exploration. This is approximately 41% fewer acres of disturbance than would be expected under Alternative A; therefore, Alternative B would result in a smaller overall impact.

#### 4.3.19.6.2.3 Salable Minerals

Under Alternative B, 808,097 acres would be open to disposal of salable minerals under standard or controlled surface use and timing limitation stipulations. Thus, the alternative would allow disposal on 658,970 fewer acres than under Alternative A. No disposals would be allowed in NSO or closed areas on 1,014,643 acres. Overall, less land would be open to disposal of salable minerals under Alternative B than Alternative A; these limitations would benefit wildlife species by preventing surface-disturbing activities and associated human impacts over larger habitat areas.

#### 4.3.19.6.2.4 Locatable Minerals

Alternative B would manage 268,873 acres as open to locatable mineral entry under standard stipulations, and restrict 1,120,658 acres to controlled surface and timing limitation stipulations. For comparison, Alternative A would manage all open lands (1,389,531 acres) under standard stipulations. Under Alternative B, 79% of open lands would be managed under special stipulations. Due to this increased acreage managed with timing and/or surface restrictions on development, Alternative B would be more beneficial for wildlife species and their habitats than Alternative A.

#### *4.3.19.6.3 PROPOSED PLAN*

Under the Proposed Plan, the qualitative impacts of minerals decisions on wildlife resources would be similar to those discussed under Alternative A. However, the level of that impact would be different based on the acreages open to oil and gas leasing and mineral entry (more information is found in Appendix T, Vegetation).

#### 4.3.19.6.3.1 Leasable Minerals

Under the Proposed Plan, approximately 6,113 acres of wildlife habitat disturbance due to oil and gas development would be expected, or approximately 272 acres (4%) fewer than expected under Alternative A (see Table 4.150). More acres would be disturbed under the Proposed Plan than Alternative B.

Impacts of oil and gas leasing on wildlife species and their habitats under the Proposed Plan would be similar to those under Alternatives A and B, with the following exceptions. Under the

Proposed Plan, approximately 394,087 acres of piñon-juniper habitat would be managed as either NSO or Closed, while approximately 109,356 acres of desert shrub would be managed under the same designations. Approximately 586,437 acres (of all habitat types) would be managed as NSO or Closed under the Proposed Plan. The Proposed Plan would designate approximately 196,804 more acres for management under NSO and Closed designations than Alternative A, but 381,362 fewer acres than Alternative B. Wildlife species in all habitat types (especially in piñon-juniper and desert shrub) would experience more beneficial impacts related to oil and gas lease designations under the Proposed Plan than under Alternative A, but fewer than under Alternative B.

**Mule Deer and/or Elk:** Of approximately 349,623 acres designated as mule deer and/or elk crucial habitat under the Proposed Plan, 114,663 (33%) acres would be managed as either NSO or Closed (see Table 4.151). The Proposed Plan would set aside a smaller percentage of designated crucial habitat as NSO or Closed than Alternative A (38%) or Alternative B (61%). However, the Proposed Plan would close more acres than Alternative A (30,259), but fewer than Alternative B (387,563). The Proposed Plan would designate 4.4 times more total crucial habitat for mule deer and/or elk than Alternative A would designate.

**Pronghorn:** Of approximately 293,724 acres designated as pronghorn crucial habitat under the Proposed Plan, 1,822 (<1%) acres would be managed as either NSO or Closed (see Table 4.151). The Proposed Plan would set aside a slightly higher percentage of designated crucial habitat as NSO or Closed than Alternative A (0%), but a smaller percentage than Alternative B (41%). The Proposed Plan would designate 11.6 times more total crucial habitat for pronghorn than Alternative A. Overall, the Proposed Plan would be more beneficial for pronghorn than Alternative A, though not as beneficial as Alternative B.

**Desert Bighorn:** Of 330,892 acres designated as desert bighorn crucial habitat under the Proposed Plan, 100,252 (98%) acres would be managed as either NSO or Closed. This would be a larger percentage closed than Alternative A (30%) but less than Alternative B (100%) (see Table 4.151). The Proposed Plan would designate 1.8 times more total crucial habitat for desert bighorn than Alternative A. Overall, the Proposed Plan would be far more beneficial for desert bighorn than Alternative A, though not as beneficial as Alternative B.

**Rocky Mountain Bighorn:** Of approximately 305,105 acres designated as Rocky Mountain bighorn crucial habitat under the Proposed Plan, 257,047 acres would be managed as either NSO or Closed (see Table 4.151). The Proposed Plan would close a slightly smaller percentage of designated Rocky Mountain bighorn habitat to oil and gas activities than Alternatives A or B. However, when total acreages are considered, the Proposed Plan would close more total acres than Alternative A but fewer than Alternative B. The Proposed Plan designates 1.7 times more total crucial habitat for Rocky Mountain bighorn than Alternative A designates. Overall, the Proposed Plan would be much more beneficial for Rocky Mountain bighorn than Alternative A, though not as beneficial as Alternative B.

### 4.3.19.6.3.2 Geophysical Activity

Under the Proposed Plan, there would be approximately 1,954 acres of surface disturbance to wildlife habitat associated with geophysical exploration, or approximately 14% fewer acres of disturbance than under Alternative A and 47% more than under Alternative B. Therefore, the

BLM_0010646

Proposed Plan would result in fewer adverse impacts from geophysical exploration to wildlife than Alternative A, but more adverse impacts than Alternative B.

### 4.3.19.6.3.3 Salable Minerals

Under the Proposed Plan, 1,234,267 acres would be open to disposal under standard, CSU, or TL stipulations. Thus, the alternative would allow disposal on 233,501 fewer acres than under Alternative A and 684,531 more acres than under Alternative B. No disposals would be allowed in NSO or closed areas on 587,730 acres. The beneficial impacts of these limitations on wildlife are discussed under Alternative B, above.

### 4.3.19.6.3.4 Locatable Minerals

The Proposed Plan would designate 427,466 acres as open to locatable mineral entry under standard stipulations, and restrict 946,203 acres to controlled surface and timing limitation stipulations. For comparison, Alternative A would manage all open lands (1,389,531 acres) under standard stipulations. Under the Proposed Plan, 68% of open lands would be managed under special stipulations. Due to this increased acreage managed with and/or surface restrictions on development, the Proposed Plan would be more beneficial for wildlife species and their habitats than Alternative A, though less beneficial than Alternative B, which would manage 79% of lands under special conditions.

### *4.3.19.6.4 ALTERNATIVE D*

### 4.3.19.6.4.1 Leasable Minerals

Under Alternative D, approximately 367 more acres (<1%) of oil- and gas-related surface disturbance (see Table 4.150) would occur, as compared to Alternative A. Overall, Alternative D would include slightly more oil- and gas-related adverse impacts to wildlife than would Alternative A, since more surface disturbance translates to less intact habitat, more roads, and a higher level of human presence. Alternative D would provide less protection from disturbance than either Alternative B or the Proposed Plan.

Under Alternative D, approximately 226,524 acres of piñon-juniper habitat would be managed as either NSO or Closed, while approximately 57,892 acres of desert shrub would be managed under the same designations. Approximately 357,716 acres (of all habitat types) would be managed as NSO or Closed under Alternative D. Alternative D would designate approximately 31,917 fewer acres for management under NSO and Closed designations than Alternative A, 610,083 fewer acres than Alternative B, and 228,721 fewer acres than the Proposed Plan. Alternative D would be the least beneficial to wildlife because it would set aside the fewest number of acres as NSO or Closed to oil and gas leasing.

**Mule Deer and/or Elk:** Of 349,675 acres designated as mule deer and/or elk crucial habitat under Alternative D, 84,844 (24%) acres would be managed as either NSO or Closed (see Table 4.151). Alternative D would set aside the smallest percentage of designated crucial habitat as NSO or Closed (see Table 4.151) but would close more acres than Alternative A (though fewer than Alternative B or the Proposed Plan). Alternative D would designate 4.4 times more total crucial habitat for mule deer and/or elk than Alternative A, and less total habitat than Alternative

BLM_0010647

B or the Proposed Plan. Overall, Alternative D would be more beneficial for wildlife than Alternative A, though not as beneficial as Alternative B or the Proposed Plan.

**Pronghorn:** Of 293,737 acres designated as pronghorn crucial habitat under Alternative D, 1,822 (<1%) acres would be managed as either NSO or Closed (see Table 4.151). This is more acres than Alternative A, fewer than Alternative B, and the same number as the Proposed Plan (Table 4.150). Overall, Alternative D would be more beneficial for pronghorn than Alternative A, though not as beneficial as Alternative B.

**Desert Bighorn:** Of 330,832 acres designated as desert bighorn crucial habitat under Alternative D, 10,394 acres would be managed as either NSO or Closed. This represents slightly fewer closed acres than under Alternative A, and considerably fewer than under Alternative B or the Proposed Plan (see Table 4.151). Alternative D designates only 83% as much crucial habitat for desert bighorn than Alternative A designates. Overall, Alternative D would be less beneficial for desert bighorn than Alternatives A, B, or the Proposed Plan.

**Rocky Mountain Bighorn:** Of 194,559 acres designated as Rocky Mountain bighorn crucial habitat under Alternative D, 161,201 acres (83%) would be managed as either NSO or Closed. This represents more acres of closed areas than would be managed under Alternative A, but fewer than Alternative B or the Proposed Plan (see Table 4.151). Alternative D designates 1.1 times more total crucial habitat for Rocky Mountain bighorn than Alternative A designates. Overall, Alternative D would be more beneficial for Rocky Mountain bighorn than Alternative A, though not as beneficial as Alternative B or the Proposed Plan.

### 4.3.19.6.4.2 Geophysical Activity

Under Alternative D, there would be approximately 2,196 acres of surface disturbance to wildlife habitat associated with geophysical exploration, or approximately 3% fewer acres of disturbance than under Alternative A, 66% more than under Alternative B, and 12% more than under the Proposed Plan. Therefore, Alternative D would likely result in larger adverse impacts than Alternative B or the Proposed Plan, but slightly fewer adverse impacts than under Alternative A.

### 4.3.19.6.4.3 Salable Minerals

Under Alternative D, 1,387,473 acres would be open to disposal under standard, CSU, or TL stipulations. Thus, the alternative would allow disposal on 80,295 fewer acres than under Alternative A. No disposals would be allowed in NSO or closed areas on 434,991 acres. Therefore, Alternative D would have the greatest adverse impacts to wildlife due to the disposal of salable minerals.

### 4.3.19.6.4.4 Locatable Minerals

Alternative D would designate 797,031 acres of land in the MPA as open to locatable mineral entry under standard stipulations, and restrict 592,500 acres to controlled surface and timing regulations. For comparison, Alternative A would manage all open lands (1,389,531 acres) under standard stipulations. Though all alternatives would manage for the same number of open lands, Alternatives B, D, and the Proposed Plan would manage varying percentages of that land under controlled surface and timing use stipulations. Under Alternative D, 43% of open lands would be managed under special stipulations. Therefore, Alternative D would be more beneficial for wildlife species and their habitats than Alternative A, though less beneficial than Alternative B

BLM_0010648

or the Proposed Plan, which would manage 79% and 68% of lands under special conditions, respectively.

### 4.3.19.7 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON WILDLIFE AND FISHERIES

Managing non-WSA land to maintain wilderness characteristics would generally benefit wildlife by reducing habitat degradation and fragmentation. The management of these areas would prohibit surface-disturbing activities in areas managed as NSO or closed. Management of non-WSA lands with wilderness characteristics includes limiting vehicles to designated roads, and excluding or avoiding new ROWs.

#### 4.3.19.7.1 ALTERNATIVE A

Alternative A would not implement any specific wilderness characteristics decisions that would affect wildlife. This would have an adverse impact on wildlife as habitat fragmentation due to surface-disturbing activities would be more likely to occur.

#### 4.3.19.7.2 ALTERNATIVE B

Alternative B would manage 266,485 acres of non-WSA lands to maintain wilderness characteristics, and would have the greatest beneficial impacts on wildlife because habitat fragmentation would be less likely to occur on this acreage, since surface-disturbing activities would be precluded.

However, protection of wilderness characteristics could preclude fencing and enclosures in Granite Creek, new water installations to benefit pronghorn habitat in Hatch Wash, Harts Point, Floy Canyon and Coal Canyon, new water facilities for bighorn sheep in Labyrinth Canyon, Shafer Canyon, Gooseneck, Goldbar, Horsethief Point, Dead Horse Cliffs, and Hatch/Lockhart, and could preclude mechanical vegetation treatments for elk forage within Big Triangle, Westwater Canyon, Hells Hole, Hideout Canyon, Mexico Point, Westwater Creek, Flume Canyon, Coal Canyon, Floy Canyon, and Desolation Canyon. Any of these new projects, if mitigated appropriately, could be permitted within these areas.

#### 4.3.19.7.3 PROPOSED PLAN

The Proposed Plan would manage 47,761 acres of non-WSA lands to maintain wilderness characteristics, and would have more beneficial impacts on wildlife than Alternatives A or D, but less beneficial impacts than Alternative B. Habitat fragmentation would be less likely to occur on this acreage, which is less than the acreage protected under the Proposed Plan.

#### 4.3.19.7.4 ALTERNATIVE D

No non-WSA lands would be managed to maintain wilderness characteristics, so no beneficial impacts to wildlife would occur, and some adverse impacts may occur due to increased surface disturbance resulting in habitat fragmentation.

### 4.3.19.8 IMPACTS OF RECREATION DECISIONS ON WILDLIFE AND FISHERIES

The primary impacts of recreation on wildlife would include surface disturbance of wildlife habitat by vehicles and non-motorized recreationists, habitat fragmentation by motorized vehicle

BLM_0010649

use, the introduction and spread of noxious weeds, and direct mortality through wildlife collisions with motor vehicles and crushing of eggs or nests. In addition, many wildlife species (birds in particular) are sensitive to traffic and other human-caused noise. Traffic noise has been shown to directly interfere with bird vocal communication, which affects territorial behavior and mating success (Reijnen and Foppen 1994). Increased road traffic also increases the risk of direct mortality of wildlife species due to vehicle impacts; carrion-eating raptors and mule deer attempting to cross roads are especially vulnerable. Where designated, Special Recreation Management Areas (SRMAs) would reduce adverse impacts on wildlife by restricting recreation or reducing dispersed recreational activities, and would therefore have beneficial impacts on wildlife in the area.

The adverse impacts of recreation decisions would be partially mitigated by the required reclamation of disturbed areas to meet the Utah Standards for Public Land Health and Guidelines for Recreation Management and protective measures outlined for federally listed species under Impacts Common to All Alternatives. In addition, careful recreation management through actions such as group size permits and non-motorized focus areas (see below for more details) would help to mitigate some impacts.

### 4.3.19.8.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, the BLM would consider and, where appropriate, implement management methods to protect riparian resources and wildlife habitat while enhancing recreation. Management methods may include: limitations of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions. Additionally, information would be provided to the public concerning the value of riparian wildlife habitat. These management and education efforts would reduce the adverse impacts of recreational uses on riparian-associated wildlife species and their habitats.

### 4.3.19.8.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

All action alternatives would establish focus areas for motorized and multi-use recreation. Recreational OHV and mechanized travel would be consistent with area and route designations described in the travel management plan. The short- and long-term adverse impacts of OHV use are varied and complex. Short-term adverse impacts include human presence and noise disturbances (though some species can become habituated to certain noises). Long-term adverse impacts include habitat fragmentation from roads and cross-country riding, soil compaction, increased erosion, and reduced air quality. These impacts would reduce habitat quality and quantity for wildlife species in a variety of different habitats (Stokowski and LaPointe 2000).

Special "non-motorized focus areas" proposed under some of the action alternatives would help to alleviate both short- and long-term impacts due to increased human traffic, noise, and habitat disturbance resulting from OHV use. Table 4.153 summarizes the acres set aside for non-motorized use by alternative. However, because non-motorized recreation can also be disruptive of wildlife, these focus areas would also have slight adverse impacts on wildlife associated due to human presence in addition to their beneficial impacts described above.

**Table 4.153. Acres of SRMAs and Designated "Non-Motorized Focus Areas" by Alternative\***

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SRMAs | 135,094 | 1,020,313 | 658,642 | 277,495 |
| Non-Motorized Focus Areas | 0 | 483,062 | 473,688 | 142,966 |

\* "Non-motorized focus areas" are managed for hiking, mountain biking, ecological study, equestrian use, climbing, and BASE jumping.

Under all action alternatives, dispersed camping would be allowed where not specifically restricted. Dispersed camping could lead to an increase in human disturbance of wildlife. The creation of new, dispersed campsites would have both direct and indirect adverse impacts on wildlife by encouraging avoidance behavior in individual animals and reducing the quality of the habitat around the campsite (Buechner 1960). Dispersed camping may be closed seasonally or as impacts or environmental conditions warrant within SRMAs in order to decrease the adverse impacts of noise, vegetation trampling, and other human-caused wildlife disturbances.

Under all action alternatives, the BLM would provide visitor information and promote outreach programs focused on low impact recreation techniques. The program would focus on the prevention of the spread of invasive and exotic weeds and the value of wildlife species and their habitats, especially riparian habitats. Educating the public in this way would likely increase awareness and ultimately decrease human impacts on wildlife species and their habitats.

### 4.3.19.8.2.1 Alternative A

Under Alternative A, only 135,094 acres would be designated as SRMAs; therefore Alternative A has the least beneficial impacts on wildlife from SRMAs. While Alternative A would limit some OHV use to designated routes, it would not include any non-motorized focus areas. Therefore, OHVs would have the greatest adverse effect on wildlife under this alternative. Along with Alternative D, Alternative A would place the fewest limitations on dispersed camping and group size, and would therefore have the greatest potential for human disturbance of wildlife.

### 4.3.19.8.2.2 Alternative B

Alternative B would designate 1,020,313 acres as SRMAs, and would therefore have the greatest beneficial impacts to wildlife from the increased management and restrictions on recreation in these areas. In addition, 483,062 acres would be designated for non-motorized recreation (Table 4.153), thereby further benefiting wildlife by protecting and improving the quality of wildlife habitats.

In the Colorado Riverway SRMA, the north shore of the river would be managed for high quality bighorn sheep habitat. An additional emphasis would be placed on the protection of riparian values in the Kens Lake area (South Moab SRMA). Both of these actions would provide beneficial impacts for wildlife species living in these habitats by improving habitat quality and avoiding the adverse impacts of recreation in riparian areas as described above (see Impacts Common to All Alternatives).

BLM_0010651

Alternative B would be the most restrictive of dispersed camping and group size, and would therefore have the least adverse impacts on wildlife and their habitats due to human disturbance by campers and large groups.

### 4.3.19.8.2.3 Proposed Plan

The Proposed Plan would designate 658,642 acres (388% more than Alternative A) as SRMAs. The Proposed Plan would therefore have greater beneficial impacts on wildlife and their habitats than Alternative A, but less than Alternative B. The Proposed Plan would propose fewer acres (473,688 acres) to be managed with a non-motorized focus than Alternative B, but far more than Alternatives A and D (Table 4.153). Similarly, the Proposed Plan would limit camping and group sizes more than Alternatives A and D, but less than Alternative B.

### 4.3.19.8.2.4 Alternative D

Alternative D would designate 277,495 acres (105% more than Alternative A) as SRMAs. Alternative D would therefore have greater beneficial impacts on wildlife and their habitats than Alternative A, but less than Alternative B or the Proposed Plan. Alternative D would designate 142,966 acres as non-motorized focus areas, far more than Alternative A, and far less than Alternative B or the Proposed Plan. Therefore, Alternative D would result in fewer OHV impacts to wildlife than Alternative A, but more than Alternative B and the Proposed Plan. Dispersed camping and group size would be less restricted than under Alternative B or the Proposed Plan, but more than under Alternative A.

### 4.3.19.9 IMPACTS OF RIPARIAN DECISIONS ON WILDLIFE AND FISHERIES

Wildlife that utilizes riparian habitats would be affected by restrictions on livestock grazing in riparian areas under each alternative. Because these management actions are also proposed as livestock grazing decisions, they are discussed in Section 4.3.19.5 Impacts of Livestock Grazing Decisions on Wildlife and Fisheries.

### 4.3.19.10 IMPACTS OF SOILS/WATERSHED DECISIONS ON WILDLIFE AND FISHERIES

#### 4.3.19.10.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, soil and water decisions would comply with Utah's Standards for Rangeland Health and Guidelines for Grazing and Recreation. In addition, all floodplains and riparian/wetlands would be managed in accordance with Executive Order 11988, which would protect the quality of stream water and Federally listed species habitat. Uses in the MPA would be managed to minimize and mitigate damage to soils, and activities located in areas with sensitive soils would be subject to site-specific NEPA analysis. These restrictions would decrease the number of acres in the MPA subject to the adverse impacts of surface-disturbing activities on wildlife habitats, including surface water contamination and sedimentation by runoff from disturbed soils.

#### 4.3.19.10.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, vegetation would be maintained based on desired future conditions (DFCs) to provide adequate ground cover to prevent accelerated erosion in wind erodible soils. This would have a positive indirect impact on wildlife by increasing possible forage.

BLM_0010652

All action alternatives would prohibit surface-disturbing activities within 100-year floodplains, public water reservoirs, and within 100 meters of riparian areas and springs. These actions would help to mitigate the adverse impacts of surface-disturbing activities on wildlife that utilize riparian habitats. A combination of timing and controlled use stipulations would be applied for all slopes greater than 30% in the MPA, which would help to decrease erosion and therefore habitat degradation for wildlife species. Specifically, these action alternatives would also help to mitigate adverse impacts on fish and other aquatic species' habitat due to increased overland flow associated with upland soil disturbance. Seventy-five percent of protected areas (due to extreme slopes) occur in piñon-juniper habitat. Wildlife species such as mule deer, elk, pronghorn, mountain lion, and neotropical migrant birds in piñon-juniper habitat (Table 4.148) would benefit from these stipulations.

### 4.3.19.10.2.1 Alternative A

Under Alternative A, grazing would be manipulated on portions of ten allotments to lessen impacts on saline soils and reduce salinity in the Colorado River drainage. This action would protect fisheries and aquatic wildlife from salinity impacts, as well as help to lessen the adverse impacts of grazing on wildlife, which are described in Section 4.3.19.5.

### 4.3.19.10.2.2 Alternative B

Under Alternative B, the Castle Valley and Mill Creek municipal watersheds would be closed to oil and gas leasing and other surface-disturbing activities. This would benefit wildlife species and their habitats as described in Section 4.3.19.6.

Watershed Management Plans would be developed and implemented for 17 areas under Alternative B. These plans are generally beneficial to wildlife species and habitats because of specified restrictions on human activities, grazing, and other surface disturbances.

Grazing systems and the development of AMPs would be used to minimize impacts to saline soils in nine allotments. Both of these management strategies would have long-term beneficial impacts on wildlife and fisheries, as described above.

### 4.3.19.10.2.3 Proposed Plan

An NSO stipulation to oil and gas leasing and precluding other surface-disturbing activities would be applied in the Castle Valley and Mill Creek municipal watersheds. This stipulation would help to mitigate the adverse impacts of oil and gas development, but to a lesser degree than Alternative B, which would close this area to oil and gas development.

Watershed Management Plans would be developed and implemented for eight areas under the Proposed Plan. The Proposed Plan would provide fewer beneficial impacts than Alternative B.

Grazing systems would be used and AMPs developed to minimize impacts to saline soils in 16 allotments. The Proposed Plan would require the development of AMPs in seven more areas than under Alternative B.

### 4.3.19.10.2.4 Alternative D

Under Alternative D, the impacts of soil and water resource management decisions on wildlife and fisheries would be the same as under Alternative A.

BLM_0010653

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 165 of 355

Moab PRMP/FEIS                 Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives
                               4.3.19 Wildlife and Fisheries Resources

## 4.3.19.11 IMPACTS OF SPECIAL DESIGNATION DECISIONS ON WILDLIFE AND FISHERIES

Special Designation areas, such as Areas of Critical Concern (ACECs) and Wild and Scenic Rivers (WSRs) would generally have long-term positive impacts on the wildlife and fisheries that occur within their boundaries by limiting or preventing surface disturbance, human activities, and associated habitat degradation and fragmentation. Impacts to wildlife and fisheries vary between alternatives primarily according to the proposed acreage of these specifically designated areas.

ACECs designated specifically to protect wildlife and vegetation would directly benefit wildlife species and their habitats. ACECs designated to preserve historic, cultural, and scenic values (as opposed to wildlife or vegetation) would indirectly benefit wildlife by limiting human and surface disturbance, preserving habitat, or preventing noise. Therefore, all ACECs are assumed to be beneficial to wildlife. Where established, ACECs would be avoidance areas for all ROWs, including wind, solar energy, and communication sites. Prohibiting these uses within ACECs would prevent adverse impacts to wildlife related to these developments. The designation of a river as suitable for WSR status would beneficially impact wildlife that utilize habitats directly associated with the river (e.g., riparian, wetlands, open water) by mandating the protection of the river's "free-flowing character" and restricting surface-disturbing activities within 1/4 mile of the river.

### 4.3.19.11.1 IMPACTS COMMON TO ALL ALTERNATIVES

While they are non-discretionary, WSAs prohibit surface disturbance, permanent new development, and ROWs. In addition, WSAs are closed to mineral leasing. Under all alternatives, where ACECs overlap WSAs, WSA management takes precedence. All alternatives would close WSAs to OHV use or limit such use to designated routes. Therefore, both WSA and ACEC designation would benefit wildlife by reducing surface disturbance in wildlife habitat and habitat fragmentation due to OHV use.

### 4.3.19.11.2 ALTERNATIVE A

Under Alternative A, none of the proposed ACEC sites would be established (with the exception of the existing 1,375 acre Negro Bill ONA). No rivers would be designated as suitable for WSR status, but eligible rivers would be managed to preserve their wild and scenic qualities. This alternative would generally be less beneficial than Alternative B and the Proposed Plan, which would designate multiple segments as suitable, but more beneficial than Alternative D.

### 4.3.19.11.3 ALTERNATIVE B

Under Alternative B, all thirteen of the proposed ACEC sites would be established and managed with NSO or closed leasing stipulations. Compared to Alternative A, Alternative B would be much more beneficial to wildlife and their habitats by eliminating disturbances related to salable and leasable mineral development in these areas. Alternative B would designate the most river segments as suitable for WSR status, and would therefore have the greatest beneficial impacts on riparian and aquatic wildlife.

BLM_0010654

### 4.3.19.11.4 PROPOSED PLAN

Under the Proposed Plan, five of the thirteen proposed ACEC sites would be established. They would be managed with closed or NSO leasing stipulations. The Proposed Plan would be more beneficial to wildlife and their habitats than Alternative A, and less than Alternative B. The Proposed Plan would designate fewer river segments as suitable for WSR status than Alternative B, and would therefore have slightly less beneficial impacts on riparian and aquatic wildlife.

### 4.3.19.11.5 ALTERNATIVE D

Under Alternative D, none of the thirteen proposed ACEC sites would be established. All eligible river segments would be designated as not suitable for WSR status under Alternative D, which would therefore have no beneficial impacts on wildlife and fisheries.

### 4.3.19.12 IMPACTS OF SPECIAL STATUS SPECIES DECISIONS ON WILDLIFE AND FISHERIES

### 4.3.19.12.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, no management action would be permitted on public lands that would jeopardize the continued existence of plant or animal species that are listed, officially proposed, or candidates for listing as Threatened and Endangered (T&E). The BLM would commit to current and future conservation agreements, management plans, and recovery plans specific to T&E and BLM Sensitive Species, as described in the Special Status Species section of Table 2.1 (in Chapter 2). Although meant to protect and conserve special status species, the actions would also benefit other wildlife species that share habitat with the targeted special-status species.

### 4.3.19.12.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, protective management of prairie dog and sage-grouse habitats would benefit big game species because of their overlapping ranges. Limitations on surface-disturbing activities within greater sage-grouse habitat would indirectly benefit deer and/or elk that winter in the same region by preventing disturbances such as vegetation removal and noise related to traffic or other human activities. Although some protection is common to all action alternatives, they differ in the number of acres affected. Table 4.154 lists the quantitative impacts of sage-grouse and prairie dog habitat conservation on the habitat of mule deer and Rocky Mountain elk, pronghorn antelope, desert bighorn sheep, and Rocky Mountain bighorn sheep.

**Table 4.154. Number of Acres Within Big Game Habitats That are Protected for Special Status Species**

| Big Game Wildlife Species | Relevant Associated Habitat Types | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Mule Deer and/or Elk | Sagebrush, Grassland, Conifer/ Mountain Shrub, Piñon-Juniper, Riparian/Wetland | 0 | 116,176 | 64,201 | 18,223 |
| Pronghorn | Grassland and Desert Shrub, Piñon-Juniper | 0 | 250,572 | 135,449 | 34,942 |
| Desert Bighorn Sheep | Desert Shrub | 0 | 0 | 0 | 0 |

BLM_0010655

**Table 4.154. Number of Acres Within Big Game Habitats That are Protected for Special Status Species**

| Big Game Wildlife Species | Relevant Associated Habitat Types | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Rocky Mountain Bighorn Sheep | Sagebrush, Grassland | 0 | 9,855 | 1,082 | 0 |
| **Total Acres** | | **0** | **376,603** | **200,732** | **53,165** |

### 4.3.19.12.3 ALTERNATIVE A

Alternative A would not implement any special status species decisions that would affect wildlife other than those common to all alternatives.

### 4.3.19.12.4 ALTERNATIVE B

Alternative B would place restrictions on development within 469,162 more acres of special status species habitat than Alternative A, thereby benefiting other wildlife species. Habitat protections for greater sage-grouse, Gunnison sage-grouse, white-tailed prairie dog, and Gunnison prairie dog habitats would generally benefit other wildlife that utilize desert shrub or sagebrush and perennial grassland habitats, including mule deer, elk, pronghorn, desert bighorn sheep, mountain lion, various raptors, and upland game species.

Approximately 376,603 acres of special status species habitat that would be protected under Alternative B overlap with big game range, thereby conferring some level of protection to big game habitat as well (see Table 4.154). Pronghorn would benefit the most from special status species protections, followed by deer and/or elk. The habitat of desert bighorn within the MPA does not overlap with any special-status species protected lands under any of the alternatives; therefore, desert bighorn would not experience any benefits from special status species management. The benefits to big game under Alternative B would be far greater than under Alternative A.

### 4.3.19.12.5 PROPOSED PLAN

The Proposed Plan would place restrictions on development within 306,976 more acres of special status species habitat than Alternative A. The Proposed Plan would therefore benefit wildlife species more than Alternative A, but less than Alternative B.

Approximately 200,732 acres of protected special status species habitat would overlap with big game range under the Proposed Plan (see Table 4.154). As under Alternative B, pronghorn would benefit the most from special status species protections, followed by deer and/or elk, while desert bighorn would not receive any benefit. Although the Proposed Plan would benefit big game more than Alternative A, it would be less beneficial to big game than Alternative B.

BLM_0010656

### *4.3.19.12.6 ALTERNATIVE D*

Alternative D would place restrictions on development within 74,792 more acres of special status species habitat than Alternative A, but considerably less than Alternative B and the Proposed Plan.

Approximately 53,165 acres of protected special status species habitat would overlap with big game range under Alternative D, which is more than under Alternative A and less than under Alternative B and the Proposed Plan. The benefits to individual species would be similar to those described under Alternative B and the Proposed Plan, but to a lesser magnitude.

### 4.3.19.13 IMPACTS OF TRAVEL MANAGEMENT DECISIONS ON WILDLIFE AND FISHERIES

The impacts of travel decisions on wildlife would primarily depend on the number of acres open and closed to OHV use under each alternative. OHV use can cause damage to vegetation used as wildlife forage and cover, as well as cause noise disturbance. OHV use therefore generally has adverse impacts on wildlife species, especially birds, in the MPA (Reijnen and Foppen 1994; Gelbard and Belnap 2003). Areas closed to OHV use would include some WSAs. OHV use also contributes to habitat fragmentation and habitat degradation, including the spread of noxious weeds. The impacts of habitat fragmentation due to minerals and travel decisions under each alternative are discussed in Section 4.3.19.18.

A recent United States Geologic Survey (USGS 2007) synopsis of relevant literature summarizes numerous studies of the impacts of OHV use on soil and water resources. The USGS concludes that the research reviewed found important effects of OHV activities on soil and water functioning including soil compaction, diminished water infiltration, diminished presence and impaired function of soil stabilizers (biotic and abiotic crusts, desert pavement), and accelerated erosion rates. Compacted soil inhibits infiltration of precipitation. In turn, soil moisture available to vegetation is diminished, volumes and velocities of precipitation runoff increase, and soil erosion accelerates, leading to the formation of gullies and other surface changes. Additionally, soil compaction may inhibit root growth among plants, in which case organic matter, litter, soil fertility, and vegetative cover are diminished, further exacerbating the soil's susceptibility to erosion. Where biotic and chemical crusts or other soil stabilizers are disturbed or destroyed, soil erosion from water and wind may increase beyond rates found in undisturbed sites with similar soils and conditions; nutrient-cycling processes also are likely to be disrupted, potentially leading to declines in soil fertility. The USGS study is summarized in Appendix G.

### *4.3.19.13.1 IMPACTS COMMON TO ALL ALTERNATIVES*

Under all alternatives, any new route designations would consider wildlife habitat, thereby reducing surface and noise disturbances on wildlife species and their habitats.

### *4.3.19.13.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)*

Under all action alternatives (B, D, and Proposed Plan), travel by motorized vehicles on all lands administered by the MFO would be limited to designated roads and designated OHV and motorcycle routes. OHV access for game retrieval, antler collection, and dispersed camping would only be allowed on designated routes. Restricting all vehicles to designated roadways would benefit wildlife by limiting adverse disturbance and noise impacts on wildlife (Fletcher 1980, 1990).

BLM_0010657

### 4.3.19.13.3 ALTERNATIVE A

Alternative A would close only 5,060 acres to OHV use (Table 4.155). A total of 620,212 acres would be open to cross-country OHV use under Alternative A (Table 4.156), which is more than under any other alternative. Alternative A would adversely impact wildlife species and their habitats more than the other alternatives because it would continue to manage a large percentage of the MPA as open to OHV use. In addition, travel would be allowed on "existing routes" which also adversely affect wildlife. Existing routes often originate from the unauthorized creation of new trails.

**Table 4.155. Wildlife Habitat Closed to OHV Use Under Each Alternative**

| Habitat Type | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Conifer/mountain shrub | 0 | 46,945 | 46,945 | 188 |
| Desert shrub | 1,360 | 20,579 | 17,934 | 8,977 |
| Invasive species and weeds | 3 | 483 | 345 | 19 |
| Piñon-juniper | 2,330 | 258,913 | 255,205 | 42,589 |
| Riparian/wetland | 30 | 3,105 | 2,450 | 678 |
| Sagebrush/perennial grass | 1,337 | 16,787 | 15,968 | 4,519 |
| **Total** | **5,060** | **346,812** | **338,847** | **56,970** |

**Table 4.156. OHV Use Stipulations in Wildlife Habitat Under Each Alternative**

| Stipulation | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Open to Cross-country Travel | 620,212 | 0 | 1,866 | 3,064 |
| Limited to Designated (or Existing in A only) Routes | 1,123,987 | 1,475,074 | 1,418,334 | 1,762,083 |
| Closed | 5,060 | 346,812 | 338,847 | 56,970 |

Under Alternative A, almost two times more piñon-juniper habitat would be affected than desert shrub or sagebrush/perennial grasses, which are the next most dominant habitats (see Table 4.155)

There are 367.4 miles of route identified as having possible wildlife habitat conflicts.

### 4.3.19.13.4 ALTERNATIVE B

No land would be open to cross-country OHV use under Alternative B. OHV use would be limited to designated trails on 1,475,074 acres. This is 622,721 acres (74%) more than under Alternative A. Restricting OHV use to designated rather than existing routes would benefit wildlife by resolving problems caused by the unauthorized creation of new routes, which then become "existing" routes. Specific benefits to wildlife species would include decreased damage to forage and cover vegetation by travel on unauthorized routes, and decreased disturbance of individual wildlife from human presence and noise associated with OHV use, as well as

BLM_0010658

decreased wildlife habitat fragmentation. Therefore, Alternative B would protect and improve the condition and quality of wildlife habitats and provide more benefits to wildlife species and their habitats than Alternative A. Alternative B would close approximately 346,812 acres to OHV use, which is 341,752 acres more than under Alternative A (see Table 4.155).

Within the areas designated as closed to OHV use, piñon-juniper habitat would be the most prevalent. Wildlife species that depend on piñon-juniper habitat for survival and reproduction (including mule deer, elk, pronghorn, mountain lion, and songbirds) would benefit more than other species from the decision to close areas to OHV use. The impacts to various habitat types would be proportionally similar to Alternative A, although fewer acres would be open to OHV impacts.

There are 367.4 miles of designated routes with possible wildlife habitat conflicts. In Alternative B, 132.3 miles of these routes are not identified for travel.

### 4.3.19.13.5 PROPOSED PLAN

Under the Proposed Plan, 1,866 acres would be open to cross-country OHV use, which is 618,346 acres less than under Alternative A. OHV use would be limited to designated routes on 1,481,334 acres, 357,347 acres more than under Alternative A. Finally, the Proposed Plan would close 338,847 acres to OHV use, 334,236 acres more than under Alternative A.

The impacts of this alternative on wildlife are comparable to the impacts of Alternative B, although Alternative B would be slightly more beneficial. Fewer acres would be subject to adverse OHV impacts than under Alternative D. The impacts to various habitat types would be proportionally similar to Alternative A, although fewer acres would be open to OHV impacts (see Table 4.155).

There are 367.4 miles of designated routes with possible wildlife habitat conflicts. In the Proposed Plan, 51.8 miles of these routes are not identified for travel.

### 4.3.19.13.6 ALTERNATIVE D

Under Alternative D, 3,064 acres would be open to cross-country OHV use; 617,148 acres fewer than under Alternative A. OHV use would be limited to designated routes on 1,762,083 acres, or 638,096 more acres than under Alternative A. Finally, 56,970 acres would be closed to OHV use, which is 52,289 more acres than under Alternative A. Travel decisions under Alternative D would be less detrimental to wildlife than under Alternative A, but more detrimental than under Alternative B or the Proposed Plan. The impacts to various habitat types would be proportionally similar to Alternative A (see Table 4.155).

There are 367.4 miles of designated routes with possible wildlife habitat conflicts. In Alternative D, 11.1 miles of these routes are not identified for travel.

### 4.3.19.14 IMPACTS OF VEGETATION DECISIONS ON WILDLIFE AND FISHERIES

### 4.3.19.14.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, seed gathering and plant collection would be allowed in all areas meeting Utah's Rangeland Health Standards. This could have short-term, direct, adverse impacts on wildlife species and habitat due to trampling and human disturbance during collection activities,

BLM_0010659

and in some cases depletion of food sources for some species. The spread of noxious, invasive, and non-native weed species would be controlled through implementation of the BLM weed management policies and action plans. Actions taken to help slow/stop the spread of weeds in the MPA would help reduce the adverse impacts of surface disturbance associated with stock use, oil and gas development, and other activities that result in the adverse alteration of wildlife habitat. Tamarisk and Russian olive would be treated in a number of areas to restore riparian areas. This would have short-term, adverse impacts on wildlife species in the treatment areas, but would have long-term, beneficial impacts by removing undesirable, non-native plant species, thereby improving riparian habitat.

Sagebrush habitat would be managed under the Sage-grouse Habitat Conservation Strategy (BLM 2004c), which would have long-term beneficial impacts on wildlife species that utilize sagebrush habitat (Monsen et al. 2004).

### 4.3.19.14.2 ALTERNATIVE A

The impacts to wildlife and fisheries would be limited to those common to all alternatives.

### 4.3.19.14.3 ALTERNATIVE B

Under Alternative B, any loss of sagebrush steppe habitat deemed essential to wildlife would be reclaimed at a ratio of 2:1. This requirement would have long-term, beneficial impacts on wildlife by preventing the net loss of essential sagebrush habitat.

### 4.3.19.14.4 PROPOSED PLAN

Under the Proposed Plan, any loss of sagebrush steppe habitat deemed essential to wildlife would be reclaimed at a ratio of 1:1. This would have similar impacts as those under Alternative B, except that habitat would be replaced at only half the rate.

### 4.3.19.14.5 ALTERNATIVE D

Under Alternative D, the impacts of vegetation management decisions on wildlife and fisheries resources would to the same as those described under the Proposed Plan.

### 4.3.19.15 IMPACTS OF VISUAL RESOURCES DECISIONS ON WILDLIFE AND FISHERIES

### 4.3.19.15.1 IMPACTS COMMON TO ALL ALTERNATIVES

The impacts to wildlife from visual resources decisions are primarily associated with limitations on surface disturbance intended to reduce impacts to areas with high visual resource values. VRM Class I and II designations are the most restrictive of oil and gas development and other surface-disturbing activities, and would therefore be the most beneficial to wildlife and their habitats (as described in Section 4.3.19.6). In areas designated as VRM Classes I or II, surface-disturbing activities are generally prohibited or limited.

### 4.3.19.15.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives, WSR segments would be managed as VRM Class I or II. 'Limited' and 'very limited' management activities would be allowed in areas designated as VRM Classes

BLM_0010660

II or I, respectively. All VRM Class I areas would be classified as NSO for oil and gas leasing. A controlled surface use stipulation would be applied to all areas managed as VRM Class II.

### 4.3.19.15.3 ALTERNATIVE A

Alternative A would designate 750,125 acres (or 41% of MPA) as VRM Class I or II.

### 4.3.19.15.4 ALTERNATIVE B

Under Alternative B, 827,093 acres would be designated as VRM Class I or II. Alternative B would manage the highest percentage of the MPA (45%) as VRM Class I or II; it would therefore be the most beneficial for wildlife.

### 4.3.19.15.5 PROPOSED PLAN

Under the Propose Plan, 724,587 acres (or 40% of the MPA) would be designated as VRM Class I or II, less than under Alternatives A and B, and more than under Alternative D.

### 4.3.19.15.6 ALTERNATIVE D

Under Alternative D, 595,390 acres would be designated as VRM Class I or II. Alternative D would manage the smallest percentage of the MPA (33%) as VRM Class I or II; it would therefore be the least beneficial to wildlife.

### 4.3.19.16 IMPACTS OF WILDLIFE AND FISHERIES MANAGEMENT DECISIONS ON WILDLIFE AND FISHERIES

### 4.3.19.16.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, the Hatch Point, Potash-Confluence, and Dolores Triangle Habitat Management Plans (HMPs) would continue to be modified and implemented to benefit wildlife. Each HMP would be managed to benefit target species; however all species within those habitat types would benefit. Beneficial protections that may be included in HMPs include: conservation measures, replacement and mitigation stipulations, monitoring protocols, and species-specific management stipulations.

Livestock would be excluded from 48,220 acres on portions of seven allotments in order to benefit wildlife and recreation. The removal of grazing would lead to long-term beneficial impacts to wildlife utilizing those areas. The adverse impacts of grazing on wildlife are discussed in Section 4.3.19.5.

### 4.3.19.16.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under all action alternatives (by utilizing Rangeland Health Standards) modification of grazing seasons and livestock classes to accommodate wildlife would enhance forage needs of wildlife in the MPA. The introduction, transplantation, augmentation, and re-establishment of wildlife species such as (but not limited to) pronghorn, desert bighorn sheep, Rocky mountain bighorn sheep, wild turkey, bison, beaver, otter, and Colorado River cutthroat trout would be considered. Where implemented, these actions would increase the viability and genetic diversity of the affected species' populations.

BLM_0010661

#### 4.3.19.16.2.1 Impacts to Pronghorn

Under all action alternatives, 78,476 acres in the La Sal (Hatch Point herd) wildlife management unit would continue to be managed for pronghorn habitat, with an additional 743,524 acres of habitat managed in the Bookcliffs management unit (Cisco herd). Management actions benefiting pronghorn would include the following: installing and improving year-round water resources, supporting beneficial changes in livestock grazing classes (changing from sheep to cattle), installing water developments every 2 square miles on summer and fawning areas, constructing fences that allow for pronghorn passage, dismantling unnecessary fences, installing restrictive fences that stop pronghorn passage onto highways, and implementing vegetation treatments to increase forage on approximately 4,400 acres.

#### 4.3.19.16.2.2 Impacts to Bighorn Sheep

Under all action alternatives, the recommendations for management actions in the BLM Bighorn Sheep Management Plan (1993b, as revised), the Utah BLM Statewide Desert Bighorn Sheep Management Plan (1986a, as revised), and the Revised Guidelines for the Management of Domestic Sheep and Goats in Native Wild Sheep Habitats (BLM 1998a) would be followed. The current population of desert bighorn sheep would be supported on 330,892 acres, and management would focus on increasing bighorn populations. A timing limitation stipulation for oil and gas and other surface-disturbing activities applied to 9,278 acres of habitat in the Hatch Point area would reduce noise and human activity during bighorn lambing and rutting seasons. Approximately 317,523 acres on 13 grazing allotments would be managed as desert bighorn sheep habitat; reduced livestock grazing could make additional forage available to desert bighorn sheep. Conversion of cattle allotments to sheep would be prohibited and the Hatch Point Allotment would be converted to cattle; these actions would help prevent the passage of diseases between domesticated sheep and desert bighorn sheep. Timing limitations for filming would be put in place on 123,490 acres to protect bighorn from the disturbance of film crews during bighorn lambing and rutting. Habitat management decisions benefiting bighorn sheep would include: installing water developments every 5 square miles in or within 2 miles of escape terrain; precluding exotic ungulates, wild horses, or burros within 10 miles of habitat; constructing fences that would allow for bighorn sheep passage; and dismantling unnecessary fences. In addition, water developments would be maintained to help bighorn sheep survive drought periods.

#### 4.3.19.16.2.3 Impacts to Deer and/or Elk

Under all action alternatives, current mule deer and/or elk habitat (534,329 acres in the Bookcliffs, 313,551 acres on the La Sal Mountains) would be managed to improve vegetative and ecological conditions for both deer and/or elk. A timing limitation stipulation would be applied to all oil and gas and other surface-disturbing activities within 105,636 acres of BLM-designated crucial and substantial deer and/or elk habitat, which would protect these species from human-caused disturbances during crucial times of year such as fawning and/or calving periods. Deer habitat would be enhanced by allocating all forage to deer in crucial winter range on acquired state lands in Upper Castle Valley. Elk habitat would be enhanced by increasing elk forage on approximately 40,000 acres of elk winter range through vegetation treatments.

#### 4.3.19.16.2.4 Impacts to Raptors

Raptor management would be guided by the use of Best Management Practices for Raptors and Their Associated Habitats in Utah (see Appendix O), utilizing seasonal and spatial buffers, as well as mitigation, to maintain and enhance raptor nesting and foraging habitat, while allowing other resource uses. BLM would also cooperate with utility companies, UDWR, and USFWS to prevent raptor electrocution. Seasonal closures or spatial restrictions would be used to eliminate disturbance near raptor nests from recreation, mineral development, and other activities that might result in nest abandonment.

#### 4.3.19.16.2.5 Impacts to Migratory Birds

Adherence with the Migratory Treaty Bird Act and Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory Birds) under all action alternatives would have beneficial impacts on migratory birds, including priority species identified on the USFWS "Birds of Conservation Concern" list (2002f and as updated) and the "Partners-in-Flight" priority species list (as updated). The use of adaptive management strategies would more effectively conserve habitat and avoid impacts to these species. Avoidance of surface-disturbing activities and vegetation-altering projects during the nesting season (May 1 through July 30), including broad-scale use of pesticides, would improve the habitat of migratory birds in the MPA and reduce adverse disturbance of birds and their habitats. These benefits would be most pronounced in the Cisco Desert Bird Habitat Conservation Area, the Colorado and Dolores River Bird Habitat Conservation Area, the Green River Bird Habitat Conservation Area, and the Cottonwood and Willow Creek Bird Habitat Conservation Area (see Appendix N).

Under all action alternatives, the prioritization of habitat types most commonly used by migratory birds (lowland riparian, wetlands, and low and high desert shrub) for maintenance and improvement would increase the availability of high-quality habitat and reduce the adverse impacts of invasive plants (e.g., cheatgrass, tamarisk, Russian olive).

#### 4.3.19.16.3 IMPACTS VARYING AMONG ALTERNATIVES

Impacts of wildlife and fisheries management decisions that would vary between alternatives would primarily result from temporal and spatial restrictions on development and other surface-disturbing activities in BLM-designated wildlife habitats. These protections would benefit big game species by reducing surface disturbance and other human-related disturbances in crucial locations and during crucial times of the year and improve the quality and condition of wildlife habitats. They would also benefit other wildlife species such as birds, small mammals, and reptiles that use the same habitats. Additional impacts that may affect wildlife would come from the size of designated and managed wildlife habitats and the extent of other resource uses within those habitats, as well as how prescriptions would affect the biotic condition and quality of those wildlife habitats.

Under all alternatives, protections for deer and/or elk habitat occur primarily in sage/shrublands, piñon-juniper woodlands, and grasslands, while those in pronghorn habitat occur primarily in desert shrubland and desert grasslands. Land protected for desert bighorn is dominated by desert shrub, while Rocky Mountain bighorn habitat consists mainly of mountain and desert shrublands and limited piñon-juniper woodlands. Therefore, wildlife species that occur mainly in shrubland

BLM_0010663

and piñon juniper woodland habitats (see Table 4.148) would benefit most from the special protection of big game habitats.

### 4.3.19.16.3.1 Alternative A

Under Alternative A, the management of 260,769 acres of deer and/or elk winter range would restrict exploration, drilling, and other development activity from November 1 through May 15. Development restrictions would protect pronghorn fawning habitat between May 15 and June 20. Approximately 42,500 acres of desert bighorn sheep habitat would be protected by preventing human disturbance during breeding and lambing seasons. Approximately 194,560 acres of land would be designated and managed as Rocky Mountain bighorn sheep habitat.

Alternative A would have the fewest acres of wildlife habitat subject to special wildlife conditions (497,829 acres), and would therefore benefit wildlife and fisheries resources the least.

### 4.3.19.16.3.2 Alternative B

Under Alternative B, the management of 635,774 acres of crucial and substantial deer and/or elk winter habitat would preclude surface-disturbing activities from November 1 through May 15. Alternative B would place restrictions on almost 2.5 times as much deer and/or elk habitat as Alternative A.

Management of approximately 822,001 acres of crucial antelope habitat would preclude surface-disturbing activities from May 1 through June 15 to protect fawning areas. In addition, spring livestock grazing would be modified on 188,975 acres of crucial pronghorn habitat by removing livestock by February 28 each year to encourage forb production and vegetative cover. Livestock would also be removed from fawning areas on Hatch Point between May 1 and June 30 to reduce competition for space and forage between livestock and pronghorn fawns. The elimination of spring grazing in Alternative B would improve habitat quality and condition compared to Alternative A, and would also lead to greater carrying capacity and herd recruitment. More acreage would be managed as pronghorn habitat (and for a longer time period) under Alternative B than Alternative A and 188,975 acres would be managed to improve the quality and condition of pronghorn habitat.

A total of 130,419 acres of desert bighorn lambing, rutting, and migration habitat would be managed under No Surface Occupancy (NSO) stipulations for oil and gas as well as precluding all other surface-disturbing activities. In addition, within 46,319 acres of desert bighorn sheep lambing habitat, camping would be limited to designated sites. Livestock grazing would be removed by March 31 on the North River and Taylor (Dry Mesa Pasture only) allotments. More habitats would be managed for desert bighorn sheep under Alternative B than under Alternative A. Limited grazing, camping restrictions and no surface occupancy in Alternative B would improve habitat quality and condition compared to Alternative A and would also lead to greater carrying capacity and herd recruitment.

Under Alternative B, 458,242 acres of land would be designated and managed as Rocky Mountain bighorn sheep habitat. This is substantially more than the 194,560 acres designated as such under Alternative A. This increase in the habitat size improves carrying capacity, thus benefiting bighorn more than Alternative A.

BLM_0010664

Under this alternative, there would be 1,548,607 more acres (or three times more area) subject to special wildlife conditions than under Alternative A. Therefore, Alternative B would protect and improve the condition and the quality of wildlife habitats, and be more beneficial to wildlife than Alternative A.

### 4.3.19.16.3.3 Proposed Plan

Under the Proposed Plan, management of 349,955 acres of crucial deer and/or elk habitat would preclude surface-disturbing activities from November 15 through April 15 each year. The Proposed Plan would restrict activities on more deer and/or elk habitat than Alternative A, but less than Alternative B.

Management of approximately 293,741 acres of pronghorn antelope fawning habitat would preclude surface-disturbing activities from May 1 through June 15. In addition, spring livestock grazing would be adjusted on a case-by-case basis within 188,975 acres of crucial pronghorn habitat to encourage forb production. Rest/rotation management systems would also be considered for grazing areas within crucial pronghorn habitat. Limited grazing in the Proposed Plan would improve habitat quality and condition more than under Alternative A, but less than Alternative B and would also lead to greater herd recruitment. The Proposed Plan would restrict surface-disturbing activities and grazing on more acres of pronghorn habitat than Alternative A, but fewer than Alternative B.

A total of 111,337 acres of desert bighorn lambing, rutting, and migration habitat would be managed with NSO stipulations for oil and gas as well as precluding all other surface-disturbing activities. However, within migration corridors, pipeline construction and geophysical exploration for oil and gas development would be allowed outside lambing and rutting periods from June 16 through September 30 and from January 1 to March 31. In addition, within 46,319 acres of desert bighorn sheep lambing habitat, camping and livestock grazing would be limited. Limited grazing, camping and surface disturbance in the Proposed Plan would improve habitat quality and condition more than under Alternative A but less than Alternative B and would also lead to greater herd recruitment. More habitat would be conserved for desert bighorn sheep under the Proposed Plan than under Alternative A. However, the Proposed Plan would not be as beneficial to desert bighorn sheep or the other wildlife species that share its habitat as Alternative B, since the Proposed Plan would restrictively manage fewer acres.

Under the Proposed Plan, 310,726 acres of land would be designated and managed as Rocky Mountain bighorn sheep habitat. This is substantially more acres and carrying capacity than would be designated under Alternative A, but less than under Alternative B.

The Proposed Plan would manage 567,930 more acres (or twice as much area) under special wildlife conditions than Alternative A. Therefore, the Proposed Plan would be more beneficial to wildlife species in the MPA than Alternative A. The Proposed Plan would be less beneficial to wildlife species and their habitats than Alternative B, since the Proposed Plan would manage half as many acres under special wildlife conditions than Alternative B.

### 4.3.19.16.3.4 Alternative D

Alternative D would preclude surface-disturbing activities on 349,955 acres of crucial deer and/or elk habitat from December 1 through April 15 each year. This restriction is the same as the Proposed Plan.

BLM_0010665

Approximately 78,477 acres of pronghorn antelope fawning habitat would preclude surface-disturbing activities from May 1 through June 15. Alternative D would be more beneficial to wildlife than Alternative A, but less so than Alternative B or the Proposed Plan. Alternative D would not offer specific management opportunities to maintain or improve antelope habitats; therefore the condition and quality of 188,975 acres of crucial antelope habitat would be degraded or removed, reducing herd recruitment. Alternative D would be less beneficial to antelope habitat than Alternatives A, B, and the Proposed Plan.

A total of 46,319 acres of desert bighorn lambing and rutting habitat would preclude surface-disturbing activities from April 1 to June 15 and from October 15 to December 15. Livestock restrictions would be the same as under Proposed Plan. In addition, camping would be unrestricted within this area. Limited grazing in Alternative D would improve habitat quality and condition more than under Alternative A, the same as the Proposed Plan, but less than Alternative B and would also lead to herd recruitment. Alternative D would not be as beneficial to desert bighorn sheep as Alternative B, or the Proposed Plan

Under Alternative D, 194,560 acres of land would be designated and managed as Rocky Mountain bighorn sheep habitat. This is equal to the amount of land designated under Alternative A, but less than under Alternative B or the Proposed Plan. Therefore, Alternative D would be less beneficial to bighorn sheep than Alternative B and the Proposed Plan and the same as A

There would be 171,482 more acres subject to special wildlife conditions under Alternative D than under Alternative A. Therefore, Alternative D would be more beneficial to wildlife than Alternative A and less beneficial to wildlife than Alternative B or the Proposed Plan.

### 4.3.19.17 IMPACTS OF WOODLANDS DECISIONS ON WILDLIFE AND FISHERIES

Woodlands decisions' impacts on wildlife would depend primarily upon the number of acres of wildlife habitat open to woodland harvest under each alternative. Adverse impacts to wildlife from woodland harvest include direct habitat loss, habitat degradation, and habitat fragmentation. Indirect, adverse impacts of wood gathering on wildlife species and their habitats include trampling and removal of native vegetation, which result in habitat degradation that can include reduction of prey species, forage species, and cover.

Although large areas of the MPA are open to woodland harvest under all alternatives, adverse impacts would be concentrated in areas with vegetation types that would support public and commercial harvesting activities. Piñon-juniper woodland and conifer/mountain shrub are generally the only habitat types considered for harvest. Therefore, the impacts under each alternative were assessed according to the area of those vegetation types open to woodland harvest (Table 4.157).

BLM_0010666

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 178 of 355

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.19 Wildlife and Fisheries Resources*

**Table 4.157. Number of Acres in the MPA Open and Closed to Woodland Harvesting**

| Zone | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|------|--------------|--------------|--------------|--------------|
| Total Closed | 601,146 | 863,227 | 646,694 | 601,146 |
| Total Open | 1,217,635 | 961,039 | 1,172,436 | 1,217,635 |
| Open Areas with Woodland Vegetation (Piñon-juniper or Conifer / Mountain Shrub vegetation) | 455,134 | 300,950 | 420,967 | 455,134 |

### 4.3.19.17.1 IMPACTS COMMON TO ALL ALTERNATIVES

The Healthy Forests Restoration Act of 2003 would be implemented under all alternatives. This action would help mitigate the adverse impacts of woodland product use on wildlife species and their habitats in areas of the MPA open to wood harvesting.

### 4.3.19.17.2 ALTERNATIVES A AND D

Approximately 455,134 acres of woodlands with piñon-juniper or conifer vegetation would be open to harvest under Alternatives A and D. These alternatives would have the largest impact on wildlife.

### 4.3.19.17.3 ALTERNATIVE B

Approximately 300,950 acres of woodlands with piñon-juniper or conifer vegetation would be open to woodland harvest under Alternative B, which would have the fewest adverse impacts on wildlife.

### 4.3.19.17.4 PROPOSED PLAN

Approximately 420,967 acres of woodlands with piñon-juniper or conifer vegetation would be open to harvest under the Proposed Plan. Therefore, the Proposed Plan would be less detrimental to wildlife than Alternatives A and D, but more detrimental than Alternative B.

### 4.3.19.18 IMPACTS OF HABITAT FRAGMENTATION ON WILDLIFE

In addition to directly disturbing wildlife habitat, roads associated with minerals and travel decisions also fragment adjacent (undisturbed) habitat, thereby degrading its value to wildlife. Habitat fragmentation may be less obvious than direct impacts such as vehicle collisions with wildlife or vegetation removal, but often carries considerable consequences for long-term population and reproductive success. Large expanses of habitat may be required to meet the minimum habitat requirements of the largest, most widely roaming species, including top carnivores and large migrating herd animals.

The impacts of habitat fragmentation from foreseeable oil and gas development and each alternative's travel management plan were analyzed for deer and/or elk, desert bighorn, Rocky Mountain bighorn, sage-grouse, and migratory birds (discussions of impacts to sage-grouse are provided in Section 4.3.15, Special-Status Species). These species were selected for analysis for

BLM_0010667

*Moab PRMP/FEIS*

*Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.19 Wildlife and Fisheries Resources*

three reasons: 1) they are species of high interest; 2) published studies were available that provided suitable fragmentation thresholds to assess impacts to the species; 3) GIS data were available to support the analyses. Other wildlife species (e.g., amphibians, reptiles, small game, and raptors) would likely also be impacted by habitat fragmentation, but did not meet the analysis criteria above.

### 4.3.19.18.1 GENERAL METHODOLOGY

GIS models were created to analyze the degree of habitat fragmentation under each alternative. The models were based on the BLM's best available GIS data for existing roads within the MPA (the Travel Plan from Alternative A). The model also utilized habitat acreages proposed under Alternative B for each species, which is the most inclusive of BLM-proposed habitat. Within areas of the MPA that would be open to oil or gas well development (under Standard, Controlled Surface Use, or Controlled Surface Use and Timing Stipulations), the number of wells expected under the RFD scenario were randomly distributed by RFD area. Only roads impacts were considered in the models; individual wells were assumed to have no area and no effect on fragmentation.

Once the wells had been distributed within the network of existing roads, the model generated new roads that connected each well to the nearest existing road. Roads were generated as the shortest straight line from well to existing road, without consideration for topography or ease of travel. The habitat fragmentation analysis considered the impacts of all BLM-identified existing roads and new computer-generated roads on the habitat of each wildlife species examined.

Several potential sources of error affect these analyses. First, not all existing roads were included in the GIS database utilized in the models due to unofficial and uninventoried roads. Therefore, these analyses may slightly underestimate some adverse impacts from habitat fragmentation. Second, many roads in the MPA are rarely traveled by vehicles (personal communication, Katie Stevens), and would therefore have little contribution to habitat fragmentation. Including roads with little travel would tend to overestimate the impacts of roads on wildlife habitat. Because the impacts of under- and over-estimation would be consistent across all alternatives, the results presented should be useful for comparative purposes.

### 4.3.19.18.2 ANALYSIS OF IMPACTS TO WILDLIFE

#### 4.3.19.18.2.1 Mule Deer

**Methodology:** Habitat fragmentation for mule deer was assessed by determining the proportion of habitat where road densities would exceed 0.16 km/km². Habitat where this threshold would be exceeded was considered unfavorable, following Sawyer et al. (2006a, 2006b), who found in a case study over a year's time that mule deer preferentially use habitat where road densities are ≤ 0.16 km/km² in a natural gas field in western Wyoming. A large body of evidence finds that mule deer are impacted by the density of roads. Road density was calculated per km² of BLM-designated habitat in the MPA.

**Results:** Table 4.158 presents the proportion of BLM-designated mule deer and/or elk habitat that would be considered unfavorable to mule deer due to fragmentation by roads under each alternative.

BLM_0010668

**Table 4.158. Percent of Mule Deer and/or Elk Habitat Considered Unfavorable After Fragmentation by Roads (road density > 0.16 km/km²)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Percent Mule Deer and/or Elk Habitat Unfavorable | 50% | 39% | 42.5% | 48% |

Under Alternative A, approximately half of the mule deer and/or elk habitat in the MPA would be unfavorable to mule deer due to existing roads and those expected due to reasonably foreseeable minerals development. Existing roads are by far the largest contributor to this fragmentation, with less than 100 miles of new roads expected due to minerals development. Alternative B would be the least detrimental to mule deer, adversely affecting 39% of the available habitat, 11% less (of the total) than under Alternative A.

### 4.3.19.18.2.2 Elk

**Methodology:** Habitat fragmentation for elk was assessed by determining the proportion of habitat where road densities would exceed 0.62 km/km². Habitat where this threshold would be exceeded was considered unfavorable, following Lyon (1983), who found that elk preferentially use habitat where road densities are </= 0.62 km/km². Road density was calculated per square km of BLM-designated habitat in the MPA.

**Results:** Table 4.159 presents the proportion of BLM-designated mule deer and/or elk habitat that would be considered unfavorable to elk due to fragmentation by roads under each alternative.

**Table 4.159. Percent of Mule Deer and/or Elk Habitat Considered Unfavorable After Fragmentation by Roads (road density > 0.62 km/km²)**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Percent Mule Deer and/or Elk Habitat Unfavorable | 39% | 29% | 32% | 33% |

Under Alternative A, approximately 39% of the mule deer and/or elk habitat would be unfavorable to elk due to existing roads and those expected due to reasonably foreseeable minerals development within the MPA. Existing roads are by far the largest contributor to this fragmentation, with less than 100 miles of new roads expected due to minerals development. Alternative B would be the least detrimental to elk, adversely affecting 29% of the available habitat, 10% less (of the total) than under Alternative A.

### 4.3.19.18.2.3 Bighorn Sheep

**Methodology:** The impacts of habitat fragmentation on both Rocky Mountain and desert bighorn sheep were assessed using habitat patch size, rather than road density (as with mule deer and/or elk above). This assessment assumed that patch sizes smaller than 159 km² were generally unsuitably fragmented, following Singer et al. (2001), who found that bighorn sheep released into habitat patches of at least 158.7 km² ± 60.3 km² colonized an average of one neighboring

BLM_0010669

patch, while bighorn released in smaller patches did not colonize neighboring areas and eventually left the area. Patch colonization is a necessary precursor to reproduction and population maintenance. Desert and Rocky Mountain bighorn sheep are more sensitive to encroachment and habitat fragmentation than are other ungulates in the MPA (Singer et al. 2001).

**Desert Bighorn Sheep Results:** Table 4.160 presents the acres of BLM-designated desert bighorn sheep habitat (128,028 acres of the total habitat of 330,892 acres) that would be found in patches larger or smaller than 159 km² under each alternative.

**Table 4.160. Desert Bighorn Sheep Habitat Fragmentation**

| Alternative | Acres of Habitat in Patches <159 km² | Acres of Habitat in Patches >=159 km² |
|---|---|---|
| Alternative A | 128,028 | 0 |
| Alternative B | 128,832 | 0 |
| Proposed Plan | 128,659 | 0 |
| Alternative D | 128,619 | 0 |

Under Alternatives A, B, D, and the Proposed Plan no unfragmented or favorable habitat exists within the MPA. Therefore, all desert bighorn habitat would effectively be unsuitable due to fragmentation. However, as stated above in the General Methodology section, many roads within desert bighorn habitat are not heavily traveled, and may not have as strong of an impact as the results suggest. Alternative B (with the fewest number of new roads planned) would provide the greatest amount of suitable bighorn habitat.

**Rocky Mountain Bighorn Sheep Results:** Table 4.161 presents the acres of BLM-designated Rocky Mountain bighorn sheep habitat that would be found in (unfragmented) patches larger or smaller than 159 km² under each alternative.

**Table 4.161. Rocky Mountain Bighorn Sheep Habitat Fragmentation Analysis (acres)**

| Alternative | Acres of Habitat in Patches <159 km² | Acres of Habitat in Patches >=159 km² |
|---|---|---|
| Alternative A | 117,518 | 310,814 |
| Alternative B | 67,729 | 361,113 |
| Proposed Plan | 70,202 | 358,551 |
| Alternative D | 70,202 | 358,503 |

Alternative B would be the most favorable alternative for Rocky Mountain bighorn within the MPA. Alternative A would fragment approximately 47,316 more acres into unsuitably small patches than the Proposed Plan or Alternative D, and 49,789 more acres than Alternative B.

BLM_0010670

### 4.3.19.18.2.4 Migratory Birds

**Methodology:** Fragmentation of migratory bird habitat was assessed by calculating the percentage of migratory bird habitat that would be impacted by vehicle and pedestrian traffic. The potential area of impact was assumed to be a 400-meter buffer along each side of all roads in designated migratory bird habitat. This buffer represents an average distance based on applicable literature (Clark and Karr 1979; Connelly et al. 2000; Crawford et al. 2004; UDWR 2002).

Because numerous migratory bird species use various habitats in the MPA, impacts were analyzed based on habitat types, which could then be extrapolated to specific bird species.

**Results:** Table 4.162 presents the percentage of each habitat type that falls within the 400-meter buffer surrounding roads in the in the MPA by alternative, as well as representative bird species that would be impacted. Although other birds utilize these habitats, these migratory birds were selected for analysis because many of them are found on lists of Sensitive species (Partners in Flight and Birds of Conservation Concern). The presence of roads can have many detrimental impacts on avian communities, including displacement, loss of habitat, and vehicular-related mortalities. Vehicles often hit and kill birds that are attracted to roadside vegetation, spilled grain, or dead animals (Forman and Alexander 1998).

**Table 4.162. Percentage of Vegetation Habitat Types Impacted by 400-meter Road Buffer for Migratory Birds**

| Vegetation Type | Associated Species | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| Conifer and Mountain Shrub | Clark's Nutcracker, Flammulated Owl, Grace's Warbler, Gray Vireo | 24.1 | 15.0 | 16.8 | 19.4 |
| Desert Shrub | Ash-throated Flycatcher, Brewer's Sparrow, Golden Eagle | 74.6 | 50.9 | 56.2 | 58.0 |
| Piñon-Juniper | Black-throated Gray Warbler, Gray Vireo, Juniper Titmouse, Piñon Jay | 48.2 | 37.7 | 41.1 | 42.7 |
| Riparian and Wetland | Blue Grosbeak, Cooper's Hawk, Hermit Thrush, Peregrine Falcon, Northern Harrier | 65.3 | 45.9 | 54.3 | 56.7 |
| Sagebrush and Perennial Grassland | Horned Lark, Brewer's Sparrow, Sage Thrasher, Western Meadowlark | 69.9 | 58.7 | 64.4 | 65.2 |
| **Average** | | **60.2** | **44.0** | **48.4** | **50.0** |

BLM_0010671

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 183 of 355

*Moab PRMP/FEIS*   *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.19 Wildlife and Fisheries Resources*

Under each of the alternatives, birds that use desert shrub habitats would experience the most habitat fragmentation. Migratory birds that utilize piñon-juniper woodlands would be the next most heavily impacted by road effects and habitat fragmentation.

Of all the alternatives, Alternative A would cause the most fragmentation by allowing approximately 294,700 more acres of disturbance compared to Alternative B, 216,099 more than the Proposed Plan, and 185,650 more than Alternative D. Alternative B would cause the least amount of road-related disturbance to migratory bird habitat (in total and within each habitat type).

### 4.3.19.19 SUMMARY OF IMPACTS

See Table 2.2 of Chapter 2 for a summary of impacts to wildlife and fisheries resources.

## 4.3.20 WOODLANDS

This section discusses impacts to woodlands from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning woodlands are described in Chapter 3.

For analysis purposes, the management of non-WSA land with wilderness characteristics, high use recreation areas, some ACECs and all WSAs prohibits the harvesting of woodland products. This restriction would result in adverse impacts to the harvesting of woodland products. The great majority of this harvesting is casual collection by individuals, such as for firewood, fence posts, Christmas trees, landscaping, greenwood cutting, and sundry use). Conversely, it was assumed that areas within the MPA that were open to woodlands harvesting would have beneficial impacts on the resource because 1) opportunities would be available to the public to harvest wood for a variety of uses, and 2) managed woodland harvesting (harvesting-related fuel load reductions).would reduce wildland fire risks in dense woodland stands. The criteria for impacts analysis were the number of acres available and unavailable for woodland harvesting within the MPA.

There have been no timber sales in the MPA in the recent past. Therefore, for analysis, it is assumed that there would be no timber sales within the MPA during the life of the plan. Any future timber sale would only be allowed within open to woodland harvest areas, and would be analyzed on a site-specific basis.

Utah Riparian Policy prohibits the harvest of riparian species such as cottonwood and willow (except for Native American uses). Harvest of these riparian species is therefore not analyzed further.

### 4.3.20.1 IMPACTS COMMON TO ALL ALTERNATIVES

Under all alternatives, permits for woodland harvesting would continue to be sold, and wood gathering areas would continue to be designated. These management actions would reduce the need for fire treatments in dense woodlands, support the goals of the Fire Management Plan, and improve woodland ecosystem health by thinning woodlands stands and allowing the removal of dead and diseased trees. This management action would have long-term, beneficial impacts to woodland resources.

BLM_0010672

### 4.3.20.2 IMPACTS COMMON TO ALL ACTION ALTERNATIVES (B, D, AND PROPOSED PLAN)

Under Alternatives B, D, and the Proposed Plan implementing the Healthy Forest Initiative and the 2003 Healthy Forests Restoration Act would have long-term, beneficial impacts on woodland resources, along with the MPA Fire Management Plan mentioned above, by maintaining and/or restoring woodland ecosystem health and ensuring the sustainability of woodland resource productivity for long-term harvesting.

### 4.3.20.3 ALTERNATIVES IMPACTS

Air quality, cultural resources, human health and safety, lands and realty, livestock grazing, paleontology, minerals, special status species, soil/watershed, travel management, vegetation, visual resources , and wildlife and fisheries management actions would have negligible to minor impacts on woodland resources and will not be analyzed further in this section. The impacts would be negligible because maintaining air quality within the MPA, protecting the public from AML site hazards and reducing the risks of hazardous materials spills and cleanup, establishing utilization levels and maintaining proper functioning condition on rangelands, allowing fossil study and recreational collection of fossils, leasing areas for minerals exploration and development, maintaining and improving native vegetation communities, protecting scenic quality under designated VRM Class objectives, and maintaining and improving wildlife habitat would neither reduce or enhance the opportunities for woodland harvesting nor inhibit the ability of the Moab FO to maintain a healthy, sustainable woodland ecosystem.

Decisions concerning fire management, recreation, special designations, non-WSA lands with wilderness characteristics and woodlands will be discussed below.

#### 4.3.20.3.1 IMPACTS OF FIRE MANAGEMENT DECISIONS ON WOODLANDS RESOURCES

Under all alternatives, woodland resources would be subject to fire management fuels treatments to reduce the risk of wildland fire through a fire management program. Estimated fuels reduction treatments of 5,000 to 10,000 acres/year would be conducted dependent on budgetary and time constraints. This could cause surface disturbance-related soil erosion and increase the likelihood of noxious weed invasion and establishment and long-term displacement of woodland species. These fire-related activities would increase the likelihood of short-term and long-term, adverse impacts on woodland resources productivity. Fire treatments would also have short-term adverse impacts on woodlands harvesting from restrictions placed on entry into fuels reduction-treated areas during vegetation re-growth. Fire management actions under this alternative would be beneficial in the long-term because they would reduce the risk of wildland fire in dense stands, improve fire condition classes, and protect woodland resources for sustainable yields of woodland products.

#### 4.3.20.3.2 IMPACTS OF NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS DECISIONS ON WOODLANDS RESOURCES

#### 4.3.20.3.2.1 Alternative A

Under this alternative, no non-WSA lands would be managed for wilderness characteristics, which would result in no impacts to woodland harvesting from these decisions. Woodland resources may be impacted because woodlands would remain intact.

BLM_0010673

### 4.3.20.3.2.2 Alternative B

Under Alternative B, 266,485 acres of non-WSA lands would be managed for wilderness characteristics, with prohibitions on wood cutting. These areas have limited woodland resources, are remote and isolated, and have limited motorized access. For these reasons, non-WSA lands with wilderness characteristics are not popular for woodcutting activities. Thus, there would be no long-term, adverse impacts on the harvesting of woodland products within the MPA. Woodland resources would be retained on those 266,485 acres.

### 4.3.20.3.2.3 Proposed Plan

Under the Proposed Plan, 47,561 acres of non-WSA lands would be managed for wilderness characteristics, with prohibitions on harvesting in these areas. Three of these areas have limited woodland resources and have limited access. (Beaver Creek non-WSA lands are remote and isolated from populated areas). For these reasons, these areas are not popular for woodcutting activities. Thus, there would be no long-term, adverse impacts on the harvesting of woodland products within the MPA. Woodland resources would be retained on those 266,485 acres.

### 4.3.20.3.2.4 Alternative D

Under Alternative D, no non-WSA lands would be managed for wilderness characteristics, resulting in no impacts to woodland harvesting from these types of decisions. Woodland resources may be impacted because woodlands would remain intact.

Table 4.163 illustrates acres closed to Woodland Harvest within non-WSA lands with wilderness characteristics, by alternative.

**Table 4.163. Acres Closed to Woodland Harvesting within Non-WSA Areas Identified with Wilderness Characteristics**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Non-WSA acres managed for wilderness characteristics (acres) | 0 | 266,485 | 47,561 | 0 |

### 4.3.20.3.3 IMPACTS OF RECREATION DECISIONS ON WOODLANDS RESOURCES

SRMAs and portions of SRMAs that are heavily used by recreationists are closed to woodland harvest to prevent unnecessary degradation to vegetation. SRMAs include Canyon Rims, Colorado Riverway, and portions of Labyrinth Rims/Gemini and South Moab. A comparison of acres closed to woodland harvesting within SRMAs is shown below in Table 4.164.

**Table 4.164. Acres Closed to Woodland Harvesting within SRMAs**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SRMA acres closed to woodland harvesting | 180,657 | 234,590 | 255,555 | 180,657 |

BLM_0010674

For the Proposed Plan and Alternative D, the impacts of recreation management actions on woodland resources would be similar to those discussed for Alternative B.

### 4.3.20.3.4 IMPACTS OF SPECIAL DESIGNATIONS DECISIONS ON WOODLANDS RESOURCES

#### 4.3.20.3.4.1 All Alternatives (Including the Proposed Plan)

**Wilderness Areas and Wilderness Study Areas (non-discretionary decision).** For all of the alternatives, the preservation of wilderness values within WSAs and Wilderness areas on approximately 354,015 acres preclude any activities that could degrade or cause the loss of wilderness values. No woodland harvest is allowed within Wilderness Study Areas or Wilderness Areas.

#### 4.3.20.3.4.2 Alternative A

**ACECs.** Under the No Action Alternative, there are no ACECs designated, resulting in no impacts to woodland products harvesting from decisions associated with ACECs.

**Wild and Scenic River Segments.** Under this alternative, 24 miles of river segments along the Colorado River (segments 1, 2, and 3) and 22 miles along the three segments of the Dolores River would be recommended as eligible. Until suitability determinations were made, the segments would be managed to protect their outstandingly remarkable values (ORVs). Protection of these river segments would prohibit harvesting, which would have long-term, adverse impacts on woodland resources because harvesting would not be permitted in woodland areas along the 46 miles of river corridor.

#### 4.3.20.3.4.3 Alternative B

**ACECs.** Under Alternative B, approximately 55,050 acres would be managed to preserve the relevant and important values within the proposed ACECs (Behind the Rocks, Bookcliffs, Colorado River, Labyrinth Canyon, Mill Creek, Upper Courthouse, Westwater Canyon, White Wash, Wilson Arch), including prohibitions on woodland products harvesting. Compared to Alternative A, this alternative would prohibit woodland harvesting within a larger area of the MPA and would have more long-term, adverse impacts to availability of woodland resources.

#### 4.3.20.3.4.4 Proposed Plan

**ACECs.** The Proposed Plan would prohibit woodland resource harvesting on approximately 15,498 acres within the ACECs designated in the Proposed Plan. This area represents less than 2% of the MPA, and the impacts on woodland harvesting would be adverse in the long-term, but minor because the area of impact would be relatively small in comparison to the total MPA.

#### 4.3.20.3.4.5 Alternative D

**ACECs.** No ACECs would be designated under this alternative. Table 4.165 illustrates acres closed to Woodland Harvesting within Potential ACECs, by alternative.

BLM_0010675

**Table 4.165. Acres Closed to Woodland Harvesting within Potential ACECs**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC acres closed to woodland harvesting (within ACECs designated in that alternative or Plan) | 0[1] | 55,050 | 15,478 | 0 |

[1] Represent total acres of proposed ACECs by alternative.

#### 4.3.20.3.5 IMPACTS OF WOODLANDS DECISIONS ON WOODLANDS RESOURCES

#### 4.3.20.3.5.1 Alternative A

Woodland harvesting would be used to support fire management goals of fuels reductions, and harvesting and salvage would be allowed in beetle-kill areas. The management actions for woodland resources under this alternative would have long-term, direct, beneficial impacts on the resource by: 1) permitting selective harvesting and salvage that would reduce the risks of stand-destroying wildland fire (and reduce the potential for long-term loss of the resource and woodland productivity) in the MPA; and 2) improving woodland resource conditions through selective removal of dead and diseased trees, and selective thinning of dense stands of woodlands.

#### 4.3.20.3.5.2 Alternative B

This alternative would have similar beneficial impacts as discussed under Alternative A, but to a lesser degree, because fewer acres would be managed for harvesting and salvage (Table 4.166).

**Table 4.166. Woodland Acres in the MPA**

|  | Alternative A | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Open to Woodland Harvesting | 1,243,734 | 958,124 | 1,168,988 | 1,243,734 |
| Actual Woodland Coverage in Open Areas | 437,216 (35% of Open Area) | 329,895 (31% of Open Area) | 411,905 (34% of Open Area) | 437,216 (35% of Open Area) |
| Closed to Harvesting | 609,385 | 863,250 | 652,386 | 609,385 |

#### 4.3.20.3.5.3 Proposed Plan

The Proposed Plan would have similar beneficial impacts as discussed under Alternative A, but to a slightly lesser degree, because relatively fewer acres would be available for harvesting and salvage (see Table 166). The adverse restriction-related impacts to harvesting discussed under Alternative B would be the same for the Proposed Plan. The comparison of this alternative to Alternative A would be the same as discussed for Alternative B.

BLM_0010676

### 4.3.20.3.5.4 Alternative D

The impacts on woodland resources under this alternative would be the same as those discussed under the Alternative A as both alternatives would manage the same number of acres for woodland harvesting, salvage, and wood gathering and the same number of acres for exclusion from these activities.

### 4.3.20.4 SUMMARY OF IMPACTS

Table 2.2 (of Chapter 2) summarizes the impacts of the various alternatives and their program actions on woodland resources.

## 4.3.21 UNAVOIDABLE ADVERSE IMPACTS

Unavoidable adverse impacts are those that remain following the implementation of mitigation measures or impacts for which there are no mitigation measures. Mitigation measures include stipulations and the BMPs specified for the RMP alternatives. They also include compliance with the applicable laws, regulations, policies, and guidelines. Furthermore, implementation decisions require project-specific planning and NEPA analysis where additional mitigation measures are imposed as conditions of approval.

Some unavoidable adverse impacts would occur as a result of implementing the decisions in the RMP. Implementation decisions require appropriate project-specific planning and NEPA analysis and constitute BLM's final approval authorizing on-the-ground activities to proceed.

Surface-disturbing activities (e.g., construction of well pads and roads, pits and reservoirs, pipelines and power lines, mining, and vegetation treatments), OHV use, fire management and ecology, some recreational activities, and operation and maintenance of existing facilities and infrastructure in the MPA will cause fugitive dust, exhaust emissions, and smoke, thereby adversely impacting air quality.

Surface-disturbing activities, OHV use, fire management and ecology, some recreational activities, uncontrolled animal concentrations, and operation and maintenance of existing facilities and infrastructure in the MPA may cause soil erosion and soil compaction. These same activities, in combination with precipitation events, also may result in runoff and sedimentation to existing surface waters. Additional unavoidable adverse impacts from these activities include transport and spread of noxious weeds in the MPA. Noxious weeds will continue to spread via the wind, in water courses, and by attaching to livestock, wildlife, humans, and vehicles. The presence of noxious weeds in the MPA is considered an unavoidable impact.

Surface-disturbing activities and the development of mineral, energy, and other facilities in the MPA are expected to cause the unavoidable degradation, loss, and fragmentation of habitats. OHV use, fire management and ecology, some recreational activities, concentrated livestock grazing, and operation and maintenance of existing facilities and infrastructure in the MPA may contribute to the unavoidable degradation, loss, and fragmentation of wildlife habitats.

Protection of some resource values (e.g., wildlife, special status species, cultural, and paleontological resources) will adversely impact the use of other resources, such as minerals and renewable energy. Conversely, use of minerals and renewable energy are expected to adversely impact the distribution of some wildlife, special status species, and vegetative communities.

BLM_0010677

Minerals exploration and development, rights-of-way development, road and trail construction, fence and water developments, and mechanical vegetation manipulation would cause unavoidable adverse impacts on the natural character of the planning area as well as on opportunities for solitude and primitive recreation that would not be mitigated through project location and design.

Surface-disturbing activities and development from BLM actions unavoidably will change the landscape, scenic quality and setting in the MPA. Non-BLM actions on lands adjacent to BLM administered lands also will change the landscape and setting. Fire, insect and disease damage, and development also are expected to temporarily impact the scenic quality of the MPA. Surface-disturbing activities, OHV use, vandalism, and natural processes (e.g., fire and erosion) may adversely impact cultural and paleontological resources in the MPA.

There would continue to be impacts to cultural and paleontological resources associated with dispersed recreation activities, OHV use, vandalism, and other types of activities not authorized by the BLM. Unavoidable damage to cultural resources from permitted activities could occur if resources undetected during surveys were identified during ground disturbing activities. In these instances, further impacts would be ceased upon discovery and the resource would be mitigated to minimize data loss.

### 4.3.22 SHORT-TERM USE VERSUS LONG-TERM PRODUCTIVITY

Short term use is defined as activities that occur within a time frame of 1 to 5 years. Long term productivity is defined as a time frame of over 5 years and within the life of the plan (15 to 20 years).

#### 4.3.22.1 AIR QUALITY

Prescribed fire may result in short and long-term (to a lesser degree) degradation of air quality through increases in wind-borne particulate ($PM_{10}$ and $PM_{2.5}$) due to loss of vegetation. Such degradation is not projected to be substantial if revegetation measures are adequately monitored and supported for regrowth.

Adverse impacts to air quality are not projected to occur under any of the proposed mineral development alternatives.

#### 4.3.22.2 CULTURAL RESOURCES

Following the Section 106 process and standard BLM policy would generally maintain the long-term productivity (i.e., the availability or presence) of cultural sites in the project area.

#### 4.3.22.3 FIRE MANAGEMENT

The unavoidable impacts described above would potentially impact the long-term efficiency of fire management in the MPA. However, if non-surface-disturbing vegetation treatments and fire suppression were effectively implemented, they would not result in a long-term loss of key ecosystem components or the long-term productivity of natural resources in the MPA.

BLM_0010678

### 4.3.22.4 HEALTH AND SAFETY

There would be no loss in either short-term or long-term productivity as they relate to hazardous materials.

### 4.3.22.5 LANDS AND REALTY

There would be no loss of long-term productivity from short-term uses.

### 4.3.22.6 LIVESTOCK GRAZING

Management of some resources would cause short-term detriment to livestock grazing but would eventually be a benefit to the resource and contribute to long-term productivity of rangeland resources. Vegetation treatments would cause short-term loss of acres and AUMs available to livestock but could contribute to a greater area and amount of forage in the future. The exclusion of livestock grazing in areas to benefit wildlife or watersheds would result in a long term loss of forage for grazing.

Some management actions could possibly decrease the long-term productivity of livestock grazing, such as construction, minerals extraction, and other surface-disturbing activities that are planned to continue long-term. However, these are unlikely to eliminate the long-term productivity of livestock forage in the MPA for the foreseeable future.

### 4.3.22.7 MINERALS

Once fossil fuel and mineral resources are extracted and the short-term, beneficial uses (e.g., increased supply of minerals to meet demand, increased royalties) are realized, the resources would no longer be available for long-term or future production.

### 4.3.22.8 NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

The construction of oil and gas exploration or coal-bed methane access roads and well pads would produce a long-term loss of naturalness and opportunities for solitude and primitive recreation in producing areas and other locations where reclamation is problematic or unsuccessful. The effects of prescribed fire for vegetation treatments would, in the long-term, enhance vegetation condition and the natural character of non-WSA lands. A more natural landscape would improve opportunities for both solitude and primitive forms of recreation. Further, construction of riparian fences or new water developments, would degrade the natural character of non-WSA lands in the short term, but enhance the riparian vegetation community in the long term, providing for a more natural landscape and settings for primitive recreational activities.

Other long-term activities that would degrade wilderness characteristics include above-ground rights-of-ways and power line corridors, construction of roads and trails, and allocation of areas and routes to motorized vehicle use. Further, implementation of these structures, land treatments, and uses would change the natural setting to a more developed and industrial landscape that is not conducive to primitive recreation activities and experiences of solitude. Land and vegetation disturbance, the presence of human-made structures on the land, and the noise and presence of people, equipment, and vehicles does not support an experience of solitude and conflicts with primitive recreational activities

BLM_0010679

### 4.3.22.9 PALEONTOLOGICAL RESOURCES

Short-term uses of BLM lands for activities involving surface-disturbance or increased public access would have long-term impacts on non-renewable paleontological resources. In paleontologically sensitive areas/geologic units, surface-disturbing activities affecting paleontological resources would include mineral development including oil and gas, trampling by livestock, and the construction of infrastructure such as roads, trails, reservoirs, buildings, and fire lines. Travel decisions involving OHV use would also have long-term adverse impacts on paleontological resources in sensitive areas/geologic units. Enhancing or restricting public access due to resource conflicts would create the potential for long-term impacts, either adverse or beneficial. In most cases, implementation of paleontological mitigation measures would reduce adverse impacts to below the level of significance, and result in beneficial impacts by salvaging and preserving fossils that otherwise may have never been discovered in a public museum where they would be permanently available for scientific research, education, and public display. Accordingly, these long-term impacts would not result in a loss of the long-term productivity of this resource.

### 4.3.22.10 RECREATION

Recreation users can be displaced or their experiences or desired outcomes can be substantially interfered with by other land uses. Short term uses such as mineral exploration could disrupt recreation users for a short term. However, long-term disturbance of areas for mineral development could affect the long-term use of some lands for certain recreation users.

### 4.3.22.11 RIPARIAN RESOURCES

The short-term use of riparian areas for recreation and livestock grazing would not impact the long-term productivity as long as Utah BLM Standards for Rangeland Health are met, thereby reducing or eliminating effects of those actions known to cause degradation of riparian habitat or loss of PFC. Short-term use of riparian areas for utility corridors would impact the long-term productivity of riparian resources where infrastructure replaces riparian resources or alters its physical or biological processes.

### 4.3.22.12 SOCIOECONOMIC RESOURCES

Short-term use of resources in the MPA would have negligible impacts on the long-term social and economic health and stability in Grand and San Juan Counties.

### 4.3.22.13 SOIL AND WATER

Short-term uses that cause surface disturbance of sensitive soils—including improper livestock grazing, recreation and travel, fire management, and minerals development—would result in reduction of long-term soil productivity due to the reclamation limitations of these soils and in a propensity for erosion.

### 4.3.22.14 SPECIAL DESIGNATIONS

Any loss of relevant and important values within potential ACECs, or outstanding remarkable values in WSRs, would persist throughout the life of the RMP, and would constitute a long-term loss of these values as a result of short-term uses.

BLM_0010680

## 4.3.22.15 SPECIAL STATUS SPECIES

As discussed throughout this section, some of the short term, multiple uses of the MPA are likely to impact or reduce SS species populations and/or their habitat. These uses include oil and gas development, improper livestock grazing, camping, off-road vehicle travel and woodland harvest. Most of these impacts would be partially mitigated by the actions discussed in the Management Common to All sections for each management decision. Implementation of these conservation measures, as well as adherence to BLM requirements and the Endangered Species Act would prevent these short-term resource uses from substantially impacting the long term productivity of SS species habitat in the MPA.

## 4.3.22.16 TRAVEL MANAGEMENT

Future actions to control fuel loading and to manipulate vegetation could have short-term impacts by restricting travel in treatment areas. Limiting use to designated routes would result in perceived short term loss of access, but long term access on designated routes would be maintained due to decreases in impacts to other resource values. Otherwise, short-term use of resources in the MPA would have no impact on the long-term productivity of travel.

## 4.3.22.17 VEGETATION

As discussed throughout this section, some of the short-term, multiple uses of the MPA would negatively impact the short-term productivity of native vegetation. These uses include oil and gas development, improper livestock grazing, camping, off-road vehicle travel, and woodland harvest. These impacts, however, provide economic benefits, and would be partially mitigated by the protective measures discussed in the Management Common to All sections for each management decision. Effective implementation of these protective measures would prevent these uses from substantially impacting the long-term productivity of these resources.

## 4.3.22.18 VISUAL RESOURCES

Disturbance due to vegetation treatments for fire management, facility/campground construction, minerals exploration and development, and exotic species control would have short-term adverse impacts on visual resources. However, some of these activities would also have long-term, beneficial impacts on visual resources and scenic quality by reducing the potential for visual quality degradation from wildland fire, or by producing variations in the vegetation mosaic that would create a more diverse (and a potentially more visually interesting) landscape. Reclamation of minerals-related surface disturbances would reduce the impacts to the short-term. However, long term mineral development would impact the long-term productivity of visual resources in visually sensitive areas.

## 4.3.22.19 WILDLIFE AND FISHERIES RESOURCES

Short-term, multiple uses of the MPA would negatively impact wildlife habitats. These uses include oil and gas development, improper livestock grazing, dispersed and developed camping, off-road vehicle travel, and woodland harvest. Permanent alteration of wildlife habitat due to clearing activities such as oil well pad installation and woodland harvest would constitute long-term adverse impacts on wildlife.

BLM_0010681

Most of these impacts would be partially mitigated by the protective measures discussed in the Management Common to All Alternatives sections for each management decision. Effective implementation of these protective measures would prevent these uses from substantially impacting the long-term productivity of wildlife and fisheries resources.

Short-term uses of BLM lands for some permitted activities could affect the long-term sustainability of some special status species habitat. Uses could affect species by displacing animals or removing plants from primary habitats and removing components of these habitats which may not be restored for greater than 20 years. For example, since translocation of sage-grouse between populations has not proven successful, long-term loss of sage-grouse habitat due to the oil and gas development and other mineral activity could result in the displacement and/or loss of localized sage-grouse populations.

### 4.3.22.20 WOODLANDS

Short-term uses that could affect the long-term productivity of woodland resources would include those activities that inhibit the re-establishment and renewal of woodland resources. Short-term uses that could adversely impact the long-term productivity of woodland resources include 1) fuels reduction treatments that could limit woodland resources productivity and could have short-term adverse impacts on woodlands harvesting from restrictions placed on entry into fuels reduction-treated areas, and 2) failure to prevent noxious weed invasion and establishment after woodland treatment or other surface disturbances, which could adversely alter successional patterns and fire regimes that favor non-woodland vegetation.

## *4.3.23 IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES*

Section 1502.16 of CEQ regulations requires that the discussion of environmental consequences include a description of "any irreversible or irretrievable commitment of resources which would be involved in the proposal should it be implemented." An irreversible commitment of a resource refers to decisions impacting the use of nonrenewable resources, and results in the resource being permanently lost. For example, the production of oil and gas is an irreversible commitment of these resources. An irretrievable commitment of a resource refers to decisions resulting in the loss of production or use of a resource. For example, in the construction of a road, the forage is lost for as long as the road remains.

No irreversible and irretrievable commitment of resources are anticipated for air quality, health and safety, livestock grazing, recreation, socioeconomics, travel management, vegetation, visual resources, and wildlife.

### 4.3.23.1 CULTURAL RESOURCES

Because the location and nature of all cultural resources in the area under consideration are unknown, it is not possible to determine the amount or level of irreversible and/or irretrievable impacts to cultural resources in the MPA. However, it is likely that, in spite of Section 106 of the NHPA and BLM policy and guidelines, some non-mitigatable impacts would occur and would likely be irreversible since restoration of an archaeological site is typically very difficult.

BLM_0010682

### 4.3.23.2 FIRE MANAGEMENT

The prohibition of fuels reduction and vegetation treatments could result in irretrievable losses in habitat value as vegetation types move away from DWFC. However, non surface-disturbing vegetation treatments and/or effective suppression followed by effective rehabilitation/restoration could prevent these impacts from being irreversible.

### 4.3.23.3 LANDS AND REALTY

All alternatives permit Land Tenure Adjustments (sales, exchanges) that may result in the irretrievable loss of lands from public ownership when they are transferred to state or private ownership.

### 4.3.23.4 MINERALS

The extraction and development of mineral resources from the MPA would result in both an irreversible and irretrievable loss of those mineral resources due to the finite nature of the resource. The impacts would be irretrievable and irreversible because once extracted, the mineral resource cannot be used again, nor can it be replaced in the foreseeable future.

### 4.3.23.5 NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Within non-WSA lands not managed to protect, preserve, and maintain their wilderness characteristics, the loss of naturalness and/or solitude due to surface-disturbing activities (such as mineral development, wood harvest or cross country OHV use) could be irretrievable.

### 4.3.23.6 RIPARIAN RESOURCES

Irretrievable loss of riparian habitat could occur due to grazing, visitor trampling, and construction-related removal of riparian habitat. It is possible that noxious weed infestation of disturbed riparian areas could become an irreversible impact based on past difficulties in controlling invasive species, such as tamarisk and Russian olive, in riparian habitat. An irretrievable loss of riparian habitat could also occur if riparian habitat is converted to upland habitat (by filling, draining, or other landscape alterations) in association with the placement of utility corridor infrastructure.

### 4.3.23.7 SOIL AND WATER

Surface-disturbing activities may result in soil erosion. Soil formation requires thousands of years to replenish. Eroded soil and lost productivity cannot be recovered. The loss of topsoil from soil erosion results in an irretrievable loss of soil productivity.

Depletion of water from BLM actions may result in an irretrievable commitment of water. The production of water from oil and gas wells in the planning area may be an irretrievable commitment of groundwater once it reaches the surface.

### 4.3.23.8 SPECIAL DESIGNATIONS

In ACECs or WSRs not designated in an alternative, surface-disturbing activities (such as mineral development and cross country OHV use) could result in adverse impacts to relevant and

BLM_0010683

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 195 of 355

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.24 Cumulative Impacts*

important values and outstandingly remarkable values, respectively. However, these impacts are not expected to result in an irreversible and irretrievable commitment of these resource values.

### 4.3.23.9 SPECIAL STATUS SPECIES

Irretrievable impacts associated with surface-disturbing activities proposed throughout the MPA include the loss of Special Status species habitat from mineral development, fire treatments, or OHV use.

## 4.3.24 CUMULATIVE IMPACTS

Cumulative impacts occur when there are multiple impacts on the same resources. These are incremental impacts of proposed activities or projects when combined with past, present, and future actions. As stated in 40 CFR 1508.7 (1997), a "cumulative impact" is the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Resource decisions from this RMP could combine with other past, present, and reasonably foreseeable future actions to produce cumulative impacts to resources within the MPA. These resources could include air quality, livestock grazing, mineral development, wildlife habitat, and recreation use. Co-occurring planning projects in the region that could contribute to cumulative impacts include the Manti-La Sal National Forest and the BLM Monticello, Price, and Vernal RMPs. Also, similar management direction and resource uses would occur in the adjacent BLM Field Offices in Colorado. Activities on Utah School and Institutional Trust Land Administration lands (SITLA), private lands, and City and County use plans for surrounding communities could have cumulative impacts where land is developed adjacent to BLM lands.

Past actions that have affected the resources in the Moab planning area are reflected in the "Affected Environment" section in Chapter 3 of the Proposed RMP/FEIS. Present, ongoing and reasonably foreseeable actions are included in the "Reasonably Foreseeable Actions" described below.

The following reasonably foreseeable actions were identified that may contribute cumulative impacts to the project. Reasonably foreseeable actions are planned or proposed, not speculative or in the distant future. They also include continuation of recent trends in use. The following actions are identified as reasonably foreseeable:

- Land and Resource Management planning in the planning area and surrounding adjacent areas.
- Residential growth and business development throughout the planning area.
- Continued expansion of mineral extraction activities including oil and gas on BLM lands within the planning area and surrounding adjacent areas along with State and private lands.
- Utility corridor development.
- Increase in motorized and non-motorized recreational use of BLM lands.
- National Fire Plan activities for federal and state land management agencies.
- Continuing implementation of Utah BLM's Rangeland Health Standards and Guides.

BLM_0010684

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 196 of 355

*Moab PRMP/FEIS*                     *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
*4.3.24 Cumulative Impacts*

- Expansion of U.S. Highway 191, including development of a network of bike paths.
- BLM's 13 Western States Vegetation Environmental Impact Statement.
- Planning for streams not meeting State water quality standards.
- Continued noxious weeds infestation.
- Continued human-caused, including prescribed burning, and natural ignitions.
- Vegetation treatments and sagebrush restoration.
- New coal-fired power plants.

### 4.3.24.1 AIR QUALITY

Activities contributing to cumulative impacts to air quality include prescribed burning; construction, equipment operation, and surface-disturbing activities related to oil and gas development; and OHV activity throughout most of the MPA. The emissions analysis conducted for this analysis does not quantify potential impacts to air quality but provides a basis for comparing alternatives and estimating future emissions as related to current emissions. Modeling of cumulative air impacts requires specific information not available at the programmatic analysis stage. Cumulative impacts from projects will be addressed at the project planning level, as appropriate.

Direct and indirect short-term impacts include increases in airborne particulate and gaseous emissions from prescribed burning, construction sites, and/or OHV trails/use areas. OHV related air-quality emissions are generally very short-term and site-specific in nature and are not projected to affect the wider planning area. Assuming appropriate application of control measures and strict adherence to existing regulatory and permitting processes, no appreciable cumulative, short-term, adverse air-quality effects can be projected specific to oil and gas development. Ozone concentrations in Canyonlands National Park, a Class I area, are already very close to the NAAQS criteria. The 4th highest daily maximum 8-hr three-year average ozone concentration in Canyonlands National Park in 2007 was 0.070 μg/m$^3$. The NAAQS for the same averaging period is 0.075 μg/m$^3$. Emissions of VOCs and NOx, both precursors to ozone formation, are projected to increase by 4% and 7% respectively due to projected oil and gas development under the Proposed Plan. These slight increases could further impact air quality at the Canyonlands National Park site and threaten to push the area into non-compliance with NAAQS. More definitive and quantitative predictions of concentrations related to oil and gas development requires air dispersion modeling, which has not been employed in this analysis because the locations of oil and gas wells cannot be determined at the programmatic planning level. However, air dispersion modeling is recommended for project specific NEPA in the MPA for which specific well locations would be known. Appropriate application of control measures and strict adherence to existing regulatory and permitting processes, will also aid in minimizing any potential cumulative adverse air quality impacts.

Long-term cumulative impacts from the activities proposed for all resource decisions on air quality include increases in particulate and gaseous emissions from equipment specific to oil and gas development, and associated use of service roads.

Implementing the National Fire Plan across Utah would cause additional short-term localized increased in particulate emissions from planned ignitions. However, a long-term reduction in the risk of violations of air quality standards from large, uncontrolled smoke emissions would occur.

BLM_0010685

Increased motorized recreational use, ongoing growth and development, and new coal-fired power plants would contribute particulate matter emissions and fugitive dust emissions. The contribution of emissions from activities occurring under the Proposed Plan and the alternatives to the past, present, and reasonably foreseeable actions are incremental.

## 4.3.24.2 CULTURAL RESOURCES

Impacts associated with resource decisions from this RMP, combined with other past, present, and reasonably foreseeable actions, could produce cumulative impacts on cultural resources and resources of religious or traditional importance to Native American tribes associated with the decision area. The potential for cumulative impacts includes neighboring lands with connected cultural resources including adjoining BLM Field Offices, state and private lands within the planning area, the Uintah and Ouray Indian Reservation, and the Manti-LaSal National Forest. The same general management direction and resource uses occur on all BLM managed lands and the Forest Service. Surface-disturbing activities such as mineral development taking place across the region can contribute to cumulative impacts of cultural resources. However, these activities would require adherence to cultural resource laws and regulations, resulting in the inventory and identification of cultural sites, avoidance, and in some cases data recovery.

Oil and gas development and mineral exploration and development has occurred across this region in the past and would continue into the future, both on BLM lands under the RMP and on state and private inholdings. Minerals development of inholdings and lands adjacent to the MPA will continue to increase the human presence in the general area, thereby increasing the risk to cultural resources from looting, vandalism, and inadvertent impacts. However, the cumulative impacts of these activities on cultural resources in the general vicinity of the planning area would likely be less than the potential impacts from the continually increasing recreational visitation that cultural sites in the region are subject to; recreational activity in and around the MPA would continue to increase regardless of which alternative the BLM selects for its RMP. The advent of the internet has resulted in the wide publicizing of the locations and types of cultural resources in and around the planning area. This, combined with handheld GPS technology and the easy and rapid access afforded by the substantial increase in OHV ownership and recreational use, will continue to subject cultural resources in the region to heightened risk of damage, vandalism, and/or looting.

Many decisions related to visual resource management, special designations, and restrictions on surface disturbance have the potential to provide a net positive benefit to cultural resources within the MPA. These decisions would reduce or control the frequency and extent of ground-disturbing activities that present the greatest threat to maintaining the use values of cultural resources. In general, all minerals and recreation decisions under all alternatives have the potential to increase or at least maintain current levels of adverse impacts to cultural resources. Decisions for minerals and recreation generally increase or maintain current levels of surface and subsurface disturbance and have as an indirect effect an increase in human activity within those areas of minerals development and recreational use. Increased human activity tends to equate with increased adverse impacts to cultural resources, even if these impacts are inadvertent.

In general, implementation of the array of resource decisions under Alternative B would have the lowest degree of potential negative impact on cultural resources within the MPA, and in many cases Alternative B has the highest overall benefit for cultural resources. Overall, fewer acres of land would be open for ground-disturbing activities under this alternative than under any other

BLM_0010686

Case No. 1:20-cv-02484-MSK   Document 29-4   filed 04/27/21   USDC Colorado   pg 198 of
355

*Moab PRMP/FEIS*                    *Chapter 4: Environmental Consequences of Proposed Plan and Draft Alternatives*
                                    *4.3.24 Cumulative Impacts*

alternative. Although no direct correlation exists between acres of surface and subsurface disturbance and numbers of cultural resources impacted, this general trend holds true. By comparison, Alternative D and Alternative A have the potential for roughly comparable levels of potential adverse impact to cultural resources. Decisions under the Proposed Plan would have a potential for adverse impacts between those in Alternative B and those in Alternative D. Under all alternatives, specific undertakings that could result in surface and subsurface disturbance and have the potential to impact cultural resources are subject to the Section 106 process of the NHPA which calls for the identification of historic properties (i.e., National Register listed sites or sites determined eligible for listing on the National Register) within the area of potential effects and the consideration of alternatives to the planned undertaking that could avoid impacts to said properties. In the event that avoidance is not possible, mitigation of the impacts is to be considered.

The incremental contribution of the Proposed Plan and the alternatives on the cumulative impacts to cultural resources is anticipated to be minimal since cultural resources are managed in compliance with Federal laws, regulations, and policies.

### 4.3.24.3 HEALTH AND SAFETY

Cumulative impacts would be the same under all of the alternatives. The potential impacts would be due to management actions and planning within those lands surrounding the MPA, including the Vernal, Price, Monticello, Grand Junction, Montrose and Durango BLM offices, Arches and Canyonlands National Parks and the Manti-LaSal National Forest. Minerals development within surrounding areas would increase the use, generation and transportation of hazardous materials. City and County use plans for surrounding communities could have cumulative effects, whereby mineral resources are developed adjacent to BLM lands. State lands, including SITLA, that are surrounded by BLM land could have impacts from inholding development.

Hazardous materials are regulated by the EPA and administered by state agencies regardless of land status. The incremental contribution of the Proposed Plan and the alternatives on the cumulative impacts to health and safety is anticipated to be minimal if all applicable laws, regulations, safeguards, and procedures are followed.

### 4.3.24.4 LANDS AND REALTY

The number of land-use authorizations, particularly rights-of-way and permits, is a function of demand for these uses. Future development of adjacent Federal, state, and private lands would likely result in additional requests for and approval of land-use authorizations for facilities such as roads, utilities, and communication sites.

City and County use plans could have cumulative impacts where land is developed adjacent to BLM lands. Both the Grand and San Juan County Use Plans have a no net loss of private land as a result of government agency land ownership adjustments. This position could affect land ownership and the cumulative impacts of future development by favoring disposals of public land over purchases of private land.

The designation of right-of-way avoidance and exclusion areas on BLM lands, along with similar restrictions on right-of-way development on adjacent lands, particularly National Forest lands, would contribute to the cumulative impact of reducing routing options for right-of-way facilities

BLM_0010687

such as utilities and roads. Alternative B has the most avoidance and exclusion areas followed next by the Proposed Plan.

#### 4.3.24.5 LIVESTOCK GRAZING

Cumulative impacts to livestock grazing can result from activities and actions within the MPA that affect available forage. This includes BLM lands, private lands, State lands, and lands on the Manti-La Sal National Forest. Surface-disturbing activities such as mineral development can reduce the amount of vegetation available for livestock grazing. However, these disturbances have resulted in minor impacts to livestock grazing in the past and up to the present time. These disturbances are also projected to be minor in the future. Activities such as vegetation treatments and fire rehabilitation projects can provide additional forage for livestock grazing.

Due to resource conflicts resulting primarily with wildlife habitat and recreation use, the Proposed Plan and the alternatives recommend areas as not available for livestock grazing. The acreage not available to grazing under the Proposed Plan and the alternatives is as follows: Proposed Plan – 114,234 acres; Alternative A – 126,907 acres; Alternative B – 153,797 acres; and Alternative D – 52,214 acres. In all cases, this amounts to only a small percentage of the 1.8 million acres of public lands within the MPA.

Therefore, the incremental contribution of the Proposed Plan and the alternatives on the cumulative impacts to livestock grazing is minimal.

#### 4.3.24.6 MINERALS

The restrictions imposed by resource programs under the Proposed Plan and alternatives result in impacts to mineral development. These restrictions are depicted on maps 2-5 A-D. For oil and gas, the restrictions include closed to leasing along with no surface occupancy, controlled surface use, and timing limitation stipulations. These restrictions reduce the unrestricted number of wells that were projected in the Reasonably Foreseeable Development scenario for oil and gas. In general, the restrictions also increase development costs and reduce production. An average of 600 wells is projected on all lands (State, Forest Service, private) within the MPA over the next 15 years when no restrictions are applied.

The restrictions identified above are not applied to non-Federal (state and private) wells. While other restrictions may be applied to non-Federal wells, the impact of such restrictions cannot be quantified for this analysis. Similar restrictions could be applied on the Manti La Sal National Forest but the potential for oil and gas development is low. The projections of well numbers under each alternative as compared to the baseline are as follows:

**Baseline - 600; Alt A - 452; Alt B - 255; Proposed Plan - 432; Alt D - 448**

As shown above, the incremental contribution to the overall cumulative impacts on minerals, resulting in a reduction of the projected oil and gas wells from the baseline, is highest under Alternative B followed by the Proposed Plan. The impacts to locatable and salable minerals are projected to be minimal for the Proposed Plan and all the alternatives.

#### 4.3.24.7 NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

Within the MPA, a total of 553,956 acres of non-WSA lands were evaluated for wilderness characteristics. Out of these acres, a total of 266,485 acres (32 areas) was found to have

BLM_0010688

wilderness characteristics and are proposed for management in Alternative B. Under the Proposed Plan, wilderness characteristics would be managed on 47,761 acres (3 areas). No lands would be managed for wilderness characteristics under Alternatives A and D. Therefore, the potential for adverse cumulative impacts to lands with wilderness characteristics would be the greatest under alternatives A and D (266,485 acres). Alternative B would have no cumulative impacts to lands with wilderness characteristics and the Proposed Plan would result in cumulative impacts to about 218,724 acres (266,485 acres – 47,761 acres = 218,724 acres) of lands with wilderness characteristics.

The analysis of cumulative impacts for areas with wilderness characteristics (designated wilderness, WSAs, and areas identified with wilderness characteristics) includes all Federal lands with wilderness characteristics in Utah that are currently being managed for management of wilderness characteristics to protect those values. Under Alternative B, wilderness characteristics would be maintained on 266,485 acres. This would make the statewide total of Federal lands where wilderness characteristics are protected by law or administrative decision to 5,932,521 acres or about 4.5% of the statewide total. Under the Proposed Plan, wilderness characteristics would be maintained on 47,761 acres. This would make the statewide total of Federal lands where wilderness characteristics are protected by law or administrative decision to 5,713,797 or about 0.8% of the statewide total. Alternatives A and D would contribute to the loss of areas with wilderness characteristics in the region.

### 4.3.24.8 PALEONTOLOGICAL RESOURCES

Unauthorized activities such as OHV use, dispersed recreation, and vandalism would continue to have adverse impacts to paleontological resources under all alternatives. These impacts would be reduced under Alternative B and to a lesser extent under the Proposed Plan because they provide more constraints on OHV use and dispersed recreation activities. There would also be impacts as a result of permitted surface-disturbing activities such as mineral development in areas containing significant paleontological resources. The potential for inadvertent adverse impacts to paleontological resources from surface-disturbing activities would be greater under Alternatives A and D. However, existing laws, regulations, and policies provide for mitigation through avoidance or data recovery efforts. Although it is expected that some fossils would be destroyed in the course of legitimate uses of public lands, mitigation measures would likely bring paleontologist to areas where fossils had not been previously studied. Thus, fossils that would otherwise have disintegrated over time due to weathering and erosion would be collected, placed in repositories, and protected in perpetuity. Cumulative impacts on paleontological resources could occur through incremental degradation of the resource base by a variety of sources, reducing the information and interpretive potential of the paleontological resources in the region. Activities on lands that are not protected by Federal laws or policies protecting paleontological resources could decrease the regional resource base, increasing the scientific value of the paleontological resources within the decision area.

The incremental contribution to the overall cumulative impacts on paleontological resources would be greatest under Alternatives A and D. Alternative B would have the least potential for adverse cumulative impacts followed to a lesser extent by the Proposed Plan.

BLM_0010689

### 4.3.24.9 RECREATION

Past and present actions that have had and are having impacts on recreation include mineral development, wildland fire suppression and fuels treatments, OHV travel, utility corridor development, grazing and recreational activities in riparian areas, and management within existing SRMAs and the ERMA. Reasonably foreseeable future or potential prescriptions and impacts on recreation are included in each of the resources discussed in this section. Other administrative agencies, including the Forest Service and adjacent BLM FOs, and state and local agencies contribute to the cumulative impacts.

The potential cumulative impacts on recreation from actions within the MPA and adjacent and local administrative agencies are:

- Oil, gas, locatable, and salable minerals exploration and development could have a long-term, cumulative effect on the recreational viewshed from surface disturbances and facilities. VRM mitigation would reduce these effects, but it is likely that the activities would remain visible from points of view within the MPA and from viewpoints within the adjacent National Parks.

- Wildland fire suppression would temporarily affect recreation use in or adjacent to areas where prescribed fire or other vegetation treatments are being conducted. The long-term cumulative effects would reduce fire risks to recreation area and facilities within the MPA and on lands under other administrative agencies. Prescribed burning would temporarily degrade air quality (and scenic quality), but with the reduced risks of wildland fire, there would be a cumulative decrease in smoke emissions.

- OHV travel management would have beneficial cumulative effects on recreational experiences and resources by reducing surface impacts to soils, cultural resources, riparian areas, and wildlife habitat by generally confining travel to designated routes within the MPA. The reduction in OHV-related surface disturbances would also cumulatively reduce the spread and establishment of exotic, invasive plant species.

- Riparian areas would be beneficially affected by cumulative actions to improve ecological conditions within these sensitive areas, which would improve recreation experiences for wildlife viewing, camping, and hiking.

- The cumulative effect on recreation resources would be enhanced in the long-term by managing existing and proposed SRMAs and the ERMA in the MPA and in adjacent BLM FOs (Price, Monticello). The designation of SRMAs would help to reduce the conflicts between the different recreation uses. The cumulative effect of managing the MPA to respond to the expected increase in visitation, changes in recreational demand, and the wide range of recreational activities would have beneficial effects on recreation.

The incremental contribution to the overall cumulative impacts on recreation opportunities, setting, and experience would be greatest under Alternatives A and D, as restrictions on surface development and protections afforded to natural resources within the planning area would be less intensive under these alternatives. Alternative B would contribute the least amount to the cumulative impacts because it would provide the greatest protection to natural resources and the highest level of non-motorized recreation opportunities. The Proposed Plan would contribute an amount in between Alternative B and Alternative D to the cumulative impacts on recreation.

BLM_0010690

### 4.3.24.10 RIPARIAN RESOURCES

Past and present actions within the MPA and on adjacent USFS-administered lands, state lands, and private lands that affect and have affected riparian areas include livestock grazing, recreational uses (including OHVs, non-motorized recreation, etc), mineral exploration and development, and upstream water withdrawals and impoundments. In general, these actions have all had cumulatively adverse impacts on riparian health. Livestock grazing, recreation, and mineral-related activities have led to surface disturbance, soil compaction, removal of riparian vegetation, bank trampling, and alteration of riparian areas' physical structure. They have also resulting in the widespread introduction of invasive weeds. Water withdrawals and impoundments have limited the health and extent of riparian zones by decreasing water availability, and encouraged the introduction of invasive plants through the stabilization of formerly dynamic sediment deposits, such as bars and banks.

Reasonably foreseeable future actions that would affect riparian areas include an expansion of recreational use and ongoing mineral exploration, development, and extraction. All of these actions could have a potential adverse effect on riparian areas. Beneficial impacts would result from Forest Service planning efforts, which will reduce negative impacts to riparian resources on National Forest lands. Future impacts on private lands may include both positive and negative impacts as described above.

Under the Proposed Plan and the alternatives, riparian resources would benefit from management for Properly Functioning Condition, in accordance with the Utah Standards for Public Rangeland Health for BLM Lands in Utah and with the Grazing Guidelines for Grazing Management. This would mitigate many of the adverse impacts from past, present, and future actions. In addition, continuing closure of several allotments to grazing with perennial streams and riparian vegetation would continue the restoration and enhancement of riparian areas in these areas. The Proposed Plan and the alternatives would also preclude surface-disturbing activities within 100-year floodplains and 100 meters of riparian areas which should benefit riparian resources.

Therefore, the incremental contribution of the Proposed Plan and the alternatives to the cumulative impacts on riparian resources is expected to be minimal.

### 4.3.24.11 SOCIOECONOMIC RESOURCES

Resource decisions from the Proposed Plan and the alternatives would combine with other past, present, and reasonably foreseeable actions to produce cumulative impacts to the social and economic conditions of Grand and San Juan Counties. Resource decisions for the Monticello Field Office, Arches and Canyonlands National Parks and the Manti La Sal National Forest, which are adjacent to the MPA, could potentially result in socioeconomic impacts to local communities. Changes in management actions that increase or decrease visitation to these areas could have beneficial or adverse impacts on the local economy, with regard to tourism-based revenue.

Mineral development outside the MFO's jurisdiction, but within or near the MPA could also impact social and economic conditions. According to the BLM's RFD, the total maximum amount of wells predicted to be drilled on all lands within the planning area over the life of the RMP is 600 wells. According to the Alternative A, the No Action Alternative, the maximum amount of wells projected for BLM lands is 451. Additional development of producing oil and gas wells could bring additional tax and royalty revenue to the counties, beyond the amount

BLM_0010691

estimated in the analysis above. Additional jobs may be created with the production of 151 more wells, but as stated above, the amount of full-time, local residents employed by oil and gas developers is a relatively small portion of the employed population.

Additional mineral development, including the potential increase in uranium mining on non-BLM lands and the establishment of the Lisbon Valley Copper Mine, could have short and long-term beneficial impacts on local economic conditions with regard to employment and tax revenue. The Lisbon Valley Copper Mine is expected to employ approximately 145 people and produce more than 12,500 tons of ore per day (BLM 2004e). A potential increase in uranium extraction throughout the MPA could have some short-term beneficial economic impact on local communities; however, uranium development is not projected to be extensive, and therefore should not adversely impact visitor experience and recreation-related revenues.

In addition to BLM management decisions, the remediation of the Moab Uranium Mill Tailings by the Department of Energy (DOE) could potentially impact socioeconomics. Beneficial economic impacts would likely come from short and long-term increases to the regional tax base. An increased demand for temporary housing by a workforce coming in from outside the region and support services (hotels and restaurants) would bring a temporary increase in tax revenues. Direct and indirect employment related to the transport of the tailings would result in over 300 jobs and over $13,400,000 in labor earnings. Employment related to the site monitoring and ground water remediation is not anticipated to have long-term substantial impacts on local employment levels, earnings, and revenues from goods and services (DOE 2005).

Utah Department of Transportation (UDOT) is currently developing a network of bike paths and transit facilities that would provide alternative access to Moab's popular recreation sites. The project, entitled the North Moab Recreation Areas Alternative Transportation Project, is anticipated to increase safety of visitors by separating non-motorized from motorized users, enhance visitor experience by allowing them to see the area via bicycle or walking, and benefit the environment by reducing air and noise pollution and reducing the footprint of motorized vehicles on the desert ecosystem. UDOT has estimated that the completed project would alleviate an estimated 20% of traffic congestion in the area and approximately 500,000 people would use the transit hub and non-motorized infrastructure annually. This project would likely have long-term beneficial impacts on local social and economic conditions, as the trail system would provide increased opportunities for recreation in the Moab area.

### 4.3.24.12 SOIL AND WATER

Past and present actions that affect and have affected soil and water resources include livestock grazing, recreational uses (including OHVs, non-motorized recreation, etc), mineral exploration and development, woodland harvest, and vegetation treatments (including those for fire management). In general, these actions have all had cumulatively adverse impacts on soil resources by causing surface disturbance contributing to reduced soil productivity, soil compaction, erosion, and subsequent sedimentation. They have also resulted in the widespread introduction of invasive weeds, which can affect water resources through increased evapotranspiration rates, and soil resources through alterations to soil chemistry and productivity. Water withdrawals and impoundments have limited water availability and quality.

Reasonably foreseeable future actions in the MPA and on Federal, state, private, and other lands within and adjacent to the MPA that would affect soil and water resources include an expansion

BLM_0010692

of recreational use and ongoing mineral exploration, development, and production. All of these actions will have an adverse effect on soil and water resources in the MPA. Beneficial impacts would result from Forest Service planning efforts, which would reduce negative impacts to soil and water resources on adjacent Forest Service lands and on MPA lands adjacent to and downslope and downstream from Forest Service lands. Future impacts from private land uses may be positive or negative, as described above.

Under all alternatives, soil and water resources would benefit from management, in accordance with the Utah Standards and Guidelines for Rangeland Health. Adherence with these standards would reduce many of the adverse impacts from future actions. In general, Alternatives A and D would be the least protective of soil and water resources, result in the least beneficial impacts to soil and water resources, and have the least mitigating effect on past impacts to soil and water resources in the MPA. Alternative B would be the most protective and would provide the greatest reductions of cumulative impacts by excluding the most areas from grazing and other forms of surface disturbance, and prioritizing the most WMPs. The Proposed Plan would provide a level of protection and mitigation of cumulative impacts between that in Alternative B and D, however, Alternative A excludes more acreage from grazing.

### 4.3.24.13 SPECIAL DESIGNATIONS

ACECs and WSRs

There would be negligible cumulative impacts to those areas managed in the Proposed Plan as Special Designations for ACECs or WSRs. Cumulative impacts to areas proposed for Special Designation in Alternative B can result from decisions on BLM lands and State lands. Adverse impacts would occur mainly from surface-disturbing activities such as mineral development. Impacts could include the loss of vegetation resulting in impacts to soils, wildlife habitat, and visual resources. These cumulative impacts could lead to the loss of relevant and important values for ACECs and outstanding remarkable values for Wild and Scenic Rivers not designated in the Proposed Plan.

Those rivers not found suitable for Wild and Scenic River designation in the Proposed Plan could be subject to the alteration of their free-flowing character resulting from potential future water developments.

Therefore, the incremental contribution to the cumulative impacts on Special Designations is greatest for Alternatives A and D, least for Alternative B, and in between Alternative B and Alternatives A and D for the Proposed Plan.

Wilderness and WSAs

The Proposed Plan and the alternatives would contribute no adverse cumulative impacts to Wilderness or Wilderness Study Areas because they are protected by law, regulation and policy.

### 4.3.24.14 SPECIAL STATUS SPECIES, VEGETATION, AND WILDLIFE

Surface disturbance associated with consumptive uses such as oil, gas and other minerals development, and forage use by livestock and wildlife species would result in cumulative effects over a larger landscape scale than the planning area for the Moab RMP.

BLM_0010693

Oil and gas development has occurred across this region on both BLM and non-BLM lands in the past and will continue into the future. The combined amount of surface disturbance of these past, present, and future actions could be detrimental to sensitive plants and animals. The spatial layout of oil and gas facilities disturbs a large proportion of vegetation and wildlife habitat when considered across the region. Each disturbed area for a well pad increases the opportunity for weed invasions and disrupts the spatial continuity of vegetation communities, and hence, habitat for sensitive plant and animal species. Other activities such as road building and increased OHV use could increase human access to sensitive areas that SS species, vegetation, and wildlife are dependent upon for survival. For example, increased human access into prairie dog sites could increase mortality by shooters and indirectly impact all the species associated with them.

The overall cumulative impact of activities proposed on these resources could be detrimental at localized areas within the short term, with long-term improvements for (non-special-status) vegetation and wildlife habitat. Major contributors on both BLM and non-BLM lands include OHV activities; habitat destruction from mineral development related activities; some vegetation treatments such as sagebrush removal; and possible livestock water developments resulting in redistribution of livestock into previously unused areas that are sensitive to disturbance. Direct impacts would be due to loss of individual sensitive plants or animals from mineral, oil, and gas related development. Indirect impacts on both BLM and non-BLM lands would also occur with habitat fragmentation due to development, changes in OHV use due to increased roads, and rock/fossil collection. These activities would concentrate grazing pressures and recreation use on habitat sites for some plant and wildlife species. The conversion of land use from agricultural lands to residential and commercial uses would increase the habitat values of undeveloped land. The change in land use could result in the loss of habitat for some wildlife species.

The cumulative impacts of all the uses discussed above on both BLM and non-BLM lands could lead to lower populations of sensitive (and non-sensitive) plants and animals in the future. However, protections provided by the Endangered Species Act would minimize the potential adverse cumulative impacts to listed species. Conversely, beneficial impacts would be obtained with BLM designation of proposed ACECs, Wild and Scenic Rivers, and management of non-WSA lands for wilderness characteristics, because numerous plant populations and wildlife habitats would be given special management protection within the boundaries of those areas. As a result of these proposed designations, the incremental contribution to the cumulative impacts on plant and animal habitats would be the greatest under Alternatives A and D, the least amount under Alternative B, and in between Alternative B and Alternatives A and D under the Proposed Plan.

### 4.3.24.15 TRAVEL MANAGEMENT

Past, present, and future actions impacting travel management include the addition of routes for fire and fuels management to reduce the risks of wildland fire, vegetation treatments to control invasive species, new minerals exploration and development routes, managing for increasing recreational demand and visitation by adding new routes, and other changes in travel management; however, these actions would likely be minor.

Transportation and road networks adjacent to BLM lands include routes shared with other Federal agencies, SITLA, and private landowners. Cumulative impacts to transportation and access would occur primarily from actions that facilitate, restrict or preclude motorized access, including the designation of routes on BLM land. Management actions that restrict OHV use

BLM_0010694

would limit the degree of travel opportunities and the ability to access certain portions of the planning area. The continued maintenance of Federal and state highways would provide arterial connections to BLM roads. County maintained routes that connect Federal and state highways to BLM-system routes would maintain and improve access to the MPA's resources.

Therefore, the incremental contribution of the Proposed Plan and the alternatives to the cumulative impacts on Travel Management is expected to be minimal because the designated routes under the Proposed Plan and the alternatives provide sufficient travel opportunities throughout the MPA.

### 4.3.24.16 VISUAL RESOURCES

#### 4.3.24.16.1 ALTERNATIVE A-NO ACTION

Under Alternative A, only 100,273 acres on BLM-administered lands within the MPA are managed for visual resources. Past and present actions on BLM and non-BLM lands causing cumulative impacts to visual resources include fire suppression, minimal fuels treatments, and minimal prescribed fire treatments, resulting in a buildup of hazardous fuels materials. Minerals exploration, development, and extraction have been and are being conducted within the MPA, producing surface disturbances within the MPA. The demand for recreational opportunities has been and is presently intensifying resulting in impacts to backcountry and frontcountry recreation areas as visitors expand into previously undisturbed areas of the MPA.

Reasonably foreseeable future actions include vegetation treatments to reduce fuel loading and to improve vegetation community and enhance wildlife habitat. Recreational activity and use within the MPA is expected to increase, including OHV use, backcountry camping, mountain biking, rock climbing, and on-road sightseeing, with expected increased visitation to the adjacent national parks and national forests, and foreseeable increases in demand for recreational facilities and recreational opportunities. Mineral exploration, development and extraction, including oil and natural gas well drilling, are expected to increase over the next 15 to 20 years.

Therefore, the incremental contribution of Alternative A to the cumulative impacts on Visual Resources is expected to be extensive because this alternative provides minimal protection for Visual Resources.

#### 4.3.24.16.2 ACTION ALTERNATIVES-ALTERNATIVES B, D, AND THE PROPOSED PLAN

Under the Proposed Plan, as well as under Alternatives B and D, BLM lands are managed to protect Visual Resources. The protection provided is greatest under Alternative B, least under Alternative D and in between Alternative B and Alternative D under the Proposed Plan. Past and present management, and reasonably foreseeable future actions, combined with the proposed action alternatives (Alternative B, D, and Proposed Plan) would have cumulative impacts on visual resources that preserve scenic quality within the MPA. The risks of wildland fire would be reduced within the MPA and on adjacent national forests through increased vegetation treatments to reduce fuel loads; recreation activities and off-road travel would be managed to limit surface disturbances by greatly reducing areas open to OHV use so that areas inventoried as having high scenic quality would be preserved. Mineral exploration, development and extraction, including oil and natural gas well drilling, are expected to increase over the next 15 years to 20 years, but visual resource management and associated mitigation would likely limit the impacts in

BLM_0010695

viewsheds with high scenic quality in the MPA and in the adjacent national parks and national forests. Visual resource management would include conformance of minerals exploration and development activities with VRM Class objectives, which would preserve scenic quality in the long-term in areas that the MPA has designated for scenic quality protection.

Therefore, the incremental contribution to the cumulative impacts on Visual Resources is expected the greatest under Alternative D, the least under Alternative B, and in between Alternative B and Alternative D under the Proposed Plan.

## 4.3.24.17 WOODLANDS

The cumulative impacts of past, present, and reasonably foreseeable future actions would have long-term, beneficial and adverse impacts on woodland resources. Under the guidance of the Moab Fire Plan, and fire plans in adjacent BLM and USDA Forest Service Districts, fuel load reductions, vegetation treatments, and woodland salvaging would reduce the risks of wildland fire and long-term loss of woodland resources and productivity within the MPA. These activities (including stand thinning and salvage of dead, diseased, and infested trees) would also improve woodland resource productivity by indirectly improving woodland ecological conditions. Woodland productivity would be lost as woodlands were converted into rangeland for increased livestock forage. Cumulative travel management impacts would be beneficial to woodland resources because surface disturbance and soil loss would be lessened. Other resource use management actions would have adverse impacts on woodland resources by restricted resource harvesting (WSAs and Wilderness Areas, ACECs, SRMAs, and wilderness characteristics areas), and would continue to restrict resource harvesting in the future; however, the area of harvesting restrictions would be relatively small compared to the area managed as open to opportunities for resource harvesting.

BLM_0010696

# 5.0 CONSULTATION AND COORDINATION

## 5.1 INTRODUCTION

During the planning and decision-making process for this Moab Proposed Resource Management Plan (PRMP)/Final Environmental Impact Statement (FEIS), the Bureau of Land Management (BLM) made formal and informal efforts to consult and coordinate with other Federal agencies, State and local governments, Indian tribes, and the interested public, in accordance with the requirements of the National Environmental Policy Act (NEPA), the Federal Land Policy Management Act (FLPMA), and all applicable Council on Environmental Quality (CEQ) and Department of Interior regulations, policies and procedures. NEPA, FLPMA, and applicable regulations and policy require that all federal agencies involve the interested general public in their decision making, consider reasonable alternatives to the preferred alternative/proposed plan, and prepare environmental documents that disclose the potential impacts of the preferred alternative/proposed plan the reasonable alternatives.

Such public involvement, consultation, and coordination have been at the heart of the planning process leading to the Moab PRMP/FEIS to ensure that (1) the most appropriate data have been gathered and employed for the analyses and (2) agency and public sentiment and values are considered and incorporated into decision making. This was accomplished through *Federal Register* notices, formal public and informal meetings, individual contacts, news releases, planning bulletins, the planning website, and public comments and responses thereto on the Draft RMP/EIS.

The BLM initiated the planning process on June 4, 2003 by publishing in the *Federal Register* a Notice of Intent (NOI) to conduct land-use planning for the Moab Field Office. The NOI invited the participation of the affected and interested agencies, organizations, and members of the general public in determining the scope of and the significant issues to be addressed in the planning alternatives and analyzed in the EIS. Scoping remained open until January 2004. As part of the resource inventory, members of the interdisciplinary (ID) team formally and informally contacted various relevant agencies to request data to supplement BLM's existing resource database.

On August 27, 2007, the BLM published in the Federal Register a Notice of Availability of the Draft RMP/EIS to announce and solicit public comments on the alternatives and impacts and effects of those alternatives on the human environment. The BLM distributed to relevant agencies and the interested public the Draft RMP/EIS for review and comment. The comment period ended November 30, 2007. The comments and the BLM's responses thereto are addressed in this Proposed RMP/Final EIS (PRMP/FEIS or Proposed Plan).

The following sections of this chapter describe the public involvement, consultation, and coordination process including key consultation and coordination activities undertaken to prepare a comprehensive PRMP/FEIS for the Moab Field Office (Moab FO).

## 5.2 CONSULTATION AND COORDINATION WITH TRIBES, STATE AND LOCAL GOVERNMENTS, AND FEDERAL AGENCIES

In the development of this PRMP/FEIS, the BLM is required to consult and coordinate with other Federal agencies, State and local government agencies and officials, both elected and appointed, and federally recognized Indian tribes. More specifically, Federal law, including FLPMA, NEPA, the National Historic Preservation Act of 1966 (NHPA) (16 USC Sec. 470 et seq.), the Fish and Wildlife Coordination Act (16 USC Sec. 661 et seq.), the Endangered Species Act of 1973 (ESA) (16 USC Sec 1531 et seq.), and other applicable laws, regulations, policies, and executive orders, direct BLM to coordinate and consult with Native Americans, the State Historic Preservation Office (SHPO), the U.S. Fish and Wildlife Service (USFWS), and the Environmental Protection Agency (EPA) during the planning/NEPA decision-making process. This section documents the specific consultation and coordination efforts undertaken by BLM throughout the entire process of developing the PRMP/FEIS.

Coordination with other agencies and consistency, to the extent possible, with other plans were accomplished through frequent communications, meetings, and cooperative efforts among the BLM planning and interdisciplinary team and involved federal, state, and local agencies and organizations. The cooperating agencies that were formally involved assisted BLM throughout the planning process in the development of the PRMP/FEIS.

Cooperating agency status has been extended to state and local agencies with regard to the Moab RMP/EIS planning effort. Both San Juan and Grand Counties signed Memorandums of Agreement in 2003 to be cooperating agencies. The State of Utah signed a cooperating agency agreement in 2003. More than 60 meetings have been held with the cooperating agencies throughout the planning process, occurring between March 2003 and March 2007. RMP/EIS-related topics discussed in these meetings include socioeconomics, Wild and Scenic River suitability, ACEC relevance and determination, travel plans, and the development of alternatives for all resources.

In addition to the cooperating agencies, the Moab FO has held meetings with and sought the input of other agencies that have land management jurisdiction within or adjacent to the planning area. Agencies include the U.S Fish and Wildlife Service, the U.S. National Park Service, the U.S. Forest Service, and adjoining BLM field offices, including Grand Junction, Durango, Montrose, Price, Monticello, and Vernal.

### 5.2.1 NATIVE AMERICAN CONSULTATION

Protective measures for culturally sensitive Native American resources are established through consultation and coordination with the appropriate Native American tribes or entities. Pursuant to NEPA, the NHPA, FLPMA, the American Indian Religious Freedom Act (AIRFA), Executive Order 13007, and BLM Manuals 8160, *Native American Coordination and Consultation*, and H-8160-1, *General Procedural Guidance for Native American Consultation*, the BLM has engaged in consultation with Native American representatives throughout the planning process. The applicable laws and guidance require that the consultation record demonstrates, "that the responsible manager has made a reasonable and good faith effort to obtain and consider appropriate Native American input in decision making" (H8160-1, 2003:4). Recommended procedures for initiating the consultation process include project notification, preferably by certified mail, follow-up contact (i.e. telephone calls), and meetings when appropriate (H8160-1,

BLM_0010698

2003:15). Native American consultation is an ongoing process that will continue after the PRMP/FEIS is completed.

Native American organizations were invited to participate at all levels of the planning process for the RMP. The BLM State Director notified tribes of the BLM's intent to prepare the RMP and the Monticello and Moab Field Offices jointly invited tribes to consult regarding the entire range of cultural and natural resource issues.

As part of the RMP/EIS scoping process, by letter dated August 1, 2003, Utah State Director Sally Wisely initiated consultation for land-use planning with 34 tribal organizations (Table 5.1). In the letter, the BLM requested information regarding any concerns the organizations might have within the planning areas, specifically requested input concerning the identification and protection of culturally significant areas and resources located on lands managed by the Moab and Monticello Field Offices, and offered the opportunity for meetings. Between November 2003 and May 2004, all 34 tribal organizations were contacted by SWCA ethnographer Molly Molenaar, under contract with and on behalf of the BLM, to 1) ensure that the appropriate tribal contact had received the consultation letter and 2) determine the need for additional or future consultation for the study areas identified in the consultation letter. Meetings were arranged when requested.

In consulting with tribes or tribal entities under the NHPA, the BLM emphasized the importance of identifying historic properties having cultural significance to tribes (commonly referred to as Traditional Cultural Properties (TCPs). The BLM held meetings with 12 tribal organizations between December 2003 and May 2004, but no TCPs were identified (Table 5.2). The BLM was represented at most of these meetings by the Field Office manager and archaeologist from both the Moab and Monticello Field Offices along with the representative from SWCA. During these meetings, tribal organizations were invited to be a cooperating agency in the development of the land-use plan; however, none of the tribal organizations the BLM came into contact with requested to be a cooperating agency.

Several tribal organizations requested that an additional meeting be held after the DRMP/EIS alternatives were prepared. The Moab FO mailed a draft copy of the range of alternatives to 12 tribal organizations in December 2005. In 2006 and 2007, the Moab FO manager and archaeologist, assisted by the SWCA ethnographer, participated in a second round of meetings with 5 tribes (Table 5.3). At these meetings, the draft RMP/EIS alternatives were discussed with special emphasis on cultural resource issues. A copy of the Moab Draft RMP/EIS was mailed in August 2007 to the tribal organizations listed in Table 5.2. Consultation with interested tribes is ongoing. In April 2008, the BLM extended an invitation to meet with tribal organizations regarding the PRMP/FEIS.

**Table 5.1. Tribal Organizations Contacted by the BLM, Utah State Director**

| Navajo Nation | Hopi Tribe |
|---|---|
| Navajo Utah Commission | Navajo Nation, Aneth Chapter |
| Navajo Nation, Dennehotso Chapter | Navajo Nation, Mexican Water Chapter |
| Navajo Nation, Navajo Mountain Chapter | Navajo Nation, Oljato Chapter |
| Navajo Nation, Red Mesa Chapter | Navajo Nation, Teec Nos Pos Chapter |
| Ute Mountain Ute Tribe | White Mesa Ute Council |

BLM_0010699

**Table 5.1. Tribal Organizations Contacted by the BLM, Utah State Director**

| | |
|---|---|
| Southern Ute Tribe | Paiute Indian Tribe of Utah |
| Uintah and Ouray Ute Indian Tribe | Eastern Shoshone Tribe |
| San Juan Southern Paiute Council | Kaibab Paiute Tribe |
| Pueblo of Cochiti | Pueblo of Acoma |
| Pueblo of Jemez | Pueblo of Isleta |
| Pueblo of Nambe | Pueblo of Laguna |
| Pueblo of Pojoaque | Pueblo of Picuris |
| Pueblo of Santa Ana | Pueblo of Sandia |
| Pueblo of Santo Domingo | Pueblo of Santa Clara |
| Pueblo of Tesuque | Pueblo of Taos |
| Pueblo of Zuni | Pueblo of Zia |

**Table 5.2. Meetings with Tribal Organizations as part of Scoping for the Land-use Plan**

| | |
|---|---|
| Navajo Nation | Hopi Tribe |
| Navajo Utah Commission | Paiute Indian Tribe of Utah |
| Navajo Nation, Dennehotso Chapter | Pueblo of Santa Clara |
| Pueblo of Zia | Pueblo of Zuni |
| Pueblo of Laguna | Southern Ute Tribe |
| Uintah and Ouray Ute Indian Tribe | Ute Mountain Ute Tribe |

**Table 5.3. Meetings with Tribal Organizations to Discuss Draft Alternatives**

| | |
|---|---|
| Navajo Nation | Hopi Tribe |
| Paiute Indian Tribe of Utah | Ute Mountain Ute Tribe |
| Southern Ute Tribe | |

## 5.2.2 COOPERATING AGENCY INVOLVEMENT

The Moab Field Office extended cooperating agency status to state and local agencies with regard to the Moab land-use planning effort. The State of Utah signed a Memorandum of Understanding (MOU) to be a cooperating agency in January 2003. San Juan County signed a MOU in April 2003 to be a cooperating agency. Grand County signed a similar MOU in May 2003 to be a cooperating agency. Cooperating agencies that have participated in the development of the Moab land-use planning process include: State of Utah, San Juan County, and Grand County.

NEPA requires that the BLM work closely with cooperating and other responsible trustee state agencies in preparing an EIS. The cooperating agencies participated in more than 60 meetings to assist the Moab Field Office with travel plans and Off Highway Vehicle route designations, Wild and Scenic River eligibility and suitability determinations, ACEC relevance and importance determinations, mineral development, recreation, socioeconomic considerations, and

BLM_0010700

development of alternatives (Chapter 2) for the RMP. These meetings occurred between March 2003 and March 2006. A draft of the alternatives was sent to the cooperating agencies in March 2007 for review and comment before the release of the Draft RMP/EIS in August 2007.

The BLM has continued to involve the cooperating agencies in addressing comments raised during the public comment period for the Draft RMP/EIS and in developing the proposed alternative for the PRMP/FEIS.

### 5.2.3 STATE AGENCY COORDINATION

The NHPA and the regulations at 36 CFR Part 800 govern BLM's cultural resource management program. The regulations provide specific procedures for consultation between the BLM and the State Historic Preservation Office (SHPO). A copy of the DRMP/EIS was sent to the SHPO for review and comment. The comments submitted by SHPO have been addressed in the comment and response section of this chapter. In May 2008, formal consultation was initiated with SHPO regarding the potential affects to cultural resources regarding the Proposed Alternative in the PRMP/FEIS. The BLM will finalize SHPO consultation before the Record of Decision is signed.

The BLM consulted with the Utah Division of Wildlife Resources regarding management of wildlife habitat and in developing the alternatives for the DRMP/EIS.

The Mineral Potential Report and the Reasonably Foreseeable Development scenario for oil and gas regarding the Moab planning area were prepared in cooperation with the Utah Geological Survey.

### 5.2.4 CONSULTATION AND COORDINATION WITH OTHER FEDERAL AGENCIES

In developing the Proposed RMP/FEIS, the BLM coordinated with numerous other federal agencies. There are legal requirements for consultation with some federal agencies. The consultation and coordination efforts are described below.

#### 5.2.4.1 U.S. FISH AND WILDLIFE SERVICE

The BLM consulted with the U.S. Fish and Wildlife Service (USFWS) as required prior to initiation of any project by a federal agency that may affect Federally listed special status species or its habitat in accordance with Section 7 of the Endangered Species Act and with the Fish and Wildlife Coordination Act, 16 USC Sec 661 et seq.

In July 2004, the BLM requested assistance from the USFWS in identifying threatened, endangered, proposed, and candidate plant and animal species that may be located in the Moab planning area. A letter was sent by the BLM Utah State Office to the USFWS initiating informal consultation for the Moab planning effort. The USFWS responded with lists of species that may be present in or may be affected by projects in the project area. Table 3.45 of the PRMP/FEIS presents a comprehensive list of sensitive species that may be present in the planning area and indicates whether they could be affected by any of the land-use plan alternatives.

The Moab land-use plan is considered a major Federal project and the BLM initiated informal consultation with the USFWS in February 2008 by submitting the Biological Assessment (BA) for the Proposed Action in the PRMP/FEIS. In the BA, the BLM determined that the implementation of the Proposed Action in the PRMP/FEIS "may affect" or is "not likely to adversely affect" the species on which consultation occurred. The USFWS may concur with the

BLM_0010701

BLM's determination in the BA via memorandum, or prepare a Biological Opinion which advises the BLM on the actions that must be taken to protect Federally listed special status species. The BLM will finalize Section 7 consultation before the Record of Decision is signed.

## 5.2.4.2 ENVIRONMENTAL PROTECTION AGENCY

The BLM provided the Environmental Protection Agency (EPA) with a copy of the DRMP/EIS and the EPA has submitted comments on this document. The EPA rated the document as Environmental Concerns-Insufficient Information, "EC-2". The EPA expressed concern about the lack of information associated with BLM's analysis of air quality impacts within the Moab planning area. Additional analysis and information regarding air quality has been included in Chapter 4 of the PRMP/FEIS based on EPA comments.

## 5.2.4.3 NATIONAL PARK SERVICE

The Moab planning area includes Arches National Park and shares a boundary with Canyonlands National Park. Coordination with Park Service representatives was held early in the land-use planning process and during the development of alternatives to the RMP in order to identify issues of concern. The Park Service was provided copies of the DRMP/EIS and it submitted comments.

## 5.2.4.4 U.S. FOREST SERVICE

The Moab planning area includes the Manti La Sal National Forest. The Forest Service is also engaged in revising its land-use plan. Coordination with representatives of the Forest Service was held to identify common issues. The major common issue is Wild and Scenic River eligibility and suitability. The Manti La Sal National Forest was provided a copy of the DRMP/FEIS.

## 5.3 CONSISTENCY WITH OTHER PLANS

The BLM's planning regulations require that resource management plans be consistent with officially approved or adopted resource-related plans of other federal agencies, state and local governments, and Indian tribes, so long as the guidance and resource management plans are also consistent with the purposes, policies, and programs of federal law and regulations applicable to public lands.

43 U.S.C. §1712(c) (9) states that the Secretary of the Interior (through the land-use plans of the federal agencies under it) shall "coordinate the land-use inventory, planning, and management activities of or for such lands with the land-use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located." It further states that "the Secretary shall assure that consideration is given to those State, local, and tribal plans that are germane in the development of land-use plans for public lands [and] assist in resolving, to the extent practical, inconsistencies between Federal and non-federal government plans…" This language does not require the BLM to adhere to or adopt the plans of other agencies or jurisdictional entities, but rather to give consideration to these plans and make an effort to resolve inconsistencies to the extent practical.

The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, the

BLM_0010702

BLM is bound by Federal law. The FLPMA requires that the development of an RMP for public lands must be coordinated and consistent with County plans, to the maximum extent possible by law, and inconsistencies between federal and non-federal government plans be resolve to the extent practical (FLPMA, Title II Sec. 202 (c)(9)). Where State and local plans conflict with Federal law, there will be an inconsistency that cannot be resolved or reconciled.

Thus, while County and Federal planning processes, under FLPMA, are required to be as integrated and consistent as practical, the Federal agency planning process is not bound by or subject to County plans, planning processes, or planning stipulations. The BLM will identify these conflicts in the FEIS/PRMP, so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. A consistency review of the PRMP with the State and County Master Plans is included in Chapter 5. In addition, the relevant goals, objectives or policies of a County are often equivalent to an activity or implementation level decision and not a land-use plan decision. The very specific County goals would be addressed in any subsequent BLM activity or implementation level decision.

Table 5.4 outlines the planning consistency of the Proposed Plan with the approved management plans, land-use plans, and controls of other agencies with jurisdiction in or adjacent to the planning area. With a few exceptions, the Proposed RMP/FEIS is consistent with the Grand and San Juan County Plans. The authorized officer will continue to collaborate with federal agencies, state and local governments, and Indian tribes on implementation of the RMP and on pursuing consistency with other plans and will move toward integration of such plans to the extent that they are consistent with federal laws, regulations, and policy directives.

### Table 5.4. Plan Consistency Review

| Moab RMP | | | | |
|---|---|---|---|---|
| **Category** | **Grand County General Plan Update (2003)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Strong Economy | Supports multiple use of public lands including continued recreation uses and oil and gas exploration and development. | X | | |
| Watersheds | Supports multiple use of public lands including continued recreation uses and oil and gas exploration and development. | X | | |
| Land Tenure Adjustments | County will work to protect watersheds from activities and uses that are injurious to them and adopt policies that enhance and restore them. | X | | |

BLM_0010703

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| Travel Management | Recognizes that allowing open, cross-country travel by mechanized vehicles is no longer an appropriate management practice. Supports more restrictive travel designations limiting mechanized travel to designated roads and trails and a "no new tracks" policy. | X | | |
| ACECs | Encourages identification and conservation of areas with unaltered plant communities and soils through ACEC designations. | X | | |
| Wilderness | Supports recommendation for Beaver Creek designation adopted by the Grand County Council in 1995. The plan is partially inconsistent in the addition of the Mary Jane Canyon and Fisher Towers areas. Will follow State of Utah's recommendation concerning wilderness designation where consistent with the interests of the people of Grand County. | | X | |
| Wild and Scenic Rivers | Will participate and promote cooperation in planning and administration of Wild & Scenic River designations. | X | | |
| Reintroduction of Animal Species | Grand County would participate in evaluation of feasibility and advisability of reintroductions. | X | | |
| **Category** | **Grand County River Road (SR-128) Corridor Plan (12/1998)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Land-use | Promotes protection of agriculture and ranching activities along with aesthetics of agricultural fields and open spaces. | X | | |
| Canyon Character | States that preservation of the area's canyon character and spaciousness is the most important purpose of the plan. | X | | |
| Economic Development | Supports creating economic assets and diversity for the county without creating adverse fiscal impacts. | X | | |

BLM_0010704

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|:---:|:---:|:---:|
| Recreation | Supports limitation of recreation in the river corridor to rafting, climbing, hiking, horseback riding, camping, and similar activities. Opposes use of vehicles off established roads and trails. | X | | |
| Transportation | Supports multi-purpose pathway or trail connection from US-191 to improve safety as long as canyon character is not adversely affected. | X | | |
| Sensitive Areas | Supports protection of sensitive areas and resources, including steep slopes, roadless areas, wildlife habitats and water quality. | X | | |
| **Category** | **Crescent Junction to Thompson Springs Future Land-use Plan Amendment to the Grand County General Plan (3/2003)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| General Uses | This area is intended to accommodate a wide variety of commercial activities meeting the needs of local business and residents, to make Thompson Springs a more attractive and energetic place to live, work and shop and to enhance the economic development. | X | | |
| | All development in the designated Industrial category area will protect the environment, minimize visibility and excessive site disruption, and take into consideration the health and welfare of area residents. Development in the area should be asked to demonstrate reasonable mitigation of environmental impacts; and, demonstrate best efforts with respect to the utilization of color, shape, contrast, land-sculpting and site design to avoid drawing undue attention to its presence on the landscape. <u>BLM response</u>: The restrictions would require a VRM II designation which is not proposed for this area. | | X | |

BLM_0010705

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| **Category** | **Grand County Master Plan for Non-Motorized Trails (3/2005)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Guiding Principles | Trails are vital to the responsible use of natural resources; important to livable neighborhoods and a vibrant business community; must be viewed as part of a total, integrated trail system; must be properly designed to achieve a successful trail system and the entire system must be properly maintained to keep it viable. | X | | |
| Recommendations | The County recommends involving local government; growing and maintaining partnerships; active coordination; seeking easements, and updating plans. | X | | |
| **Category** | **Moab/Grand County North Corridor Gateway A General Plan Amendment (4/2001)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Visual Resources | The plan focuses on the areas north and south of the Colorado River Bridge with particular emphasis on the visual impression it gives to visitors. | X | | |
| County Goals | Create a positive first impression and economic opportunity. Make the north corridor gateway a people place – welcoming and accommodating. Provide adequate and affordable public facilities and services that are compatible with city infrastructure. Achieve the goals and objectives of this Plan through communication, coordination and cooperation. | X | | |
| **Category** | **The Wilderness Plan an Amendment to the Grand County General Plan (9/1999)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Recommended Wilderness 7 Designation | Beaver Creek Unit (UWC proposal) (5-2). The entire 28,200-acre UWC unit excluding the roaded top of Seven Mile Mesa and that portion traversed by the annual Jeep Safari Trail (See attached map entitled "Grand County Wilderness Proposal"). | X | | |

BLM_0010706

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| | Labyrinth Canyon Unit (UWC proposal) (4-3). Wilderness designation is recommended for the lower reaches of Ten Mile Canyon and the east side of the Green River Canyon downstream to Hey Joe Canyon. Wilderness is also recommended for the east side of the Green River Canyon downstream from Spring Canyon to the mouth of Hell Roaring Canyon (See attached map entitled "Grand County Wilderness Proposal"). This latter area could continue on the west side of the Green River all the way to the Canyonlands National Park boundary. These areas are considered contiguous with the Upper Horseshoe Canyon Unit in Emery County. <u>BLM response</u>: The unit was not recommended for management as non-WSA lands with wilderness characteristics due to other proposed management that protects wilderness values. These include a recommendation for Wild & Scenic River designation along the Green River, an ACEC in Ten Mile Canyon, and surface use restrictions along the entire Green River corridor. | | | X |
| **Category** | **The Wilderness Plan an Amendment to the Grand County General Plan (9/1999)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Areas Not Recommended | Fisher Towers Unit (UWC proposal) (consensus). It was recommended that the three State Trust Land sections in the unit be prioritized for exchange in order to protect the integrity of the area for filming and recreation. <u>BLM response</u>: The proposal to manage areas for non-WSA lands with wilderness characteristics protects the visual resources of concern to Grand County. | | X | |
| | Mary Jane Canyon Unit (UWC proposal) (consensus). Again, the Trust Land Sections should be prioritized for exchange to protect | | X | |

BLM_0010707

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| | filming and recreation in the area.<br>BLM response: The proposal to manage areas for non-WSA lands with wilderness characteristics protects the visual resources of concern to Grand County. | | | |
| Areas Not Recommended For Wilderness, But Recommended For Alternative Protective Management | Granite Creek Unit (UWC proposal) (consensus). It is recommended that the entire unit be studied by BLM for designation as an Area of Critical Environmental Concern because of the unique riparian habitat and high wildlife values there.<br>BLM response: Granite Creek was studied for ACEC designation but was found to not contain the relevant and important values. | X | | |
| | Goldbar Canyon Unit (UWC proposal) (consensus). It is recommended that the unit be designated a Recreation Special Management Area to enhance opportunities for managing heavy recreational use | X | | |
| **Category** | **Town of Castle Valley General Plan (9/2007)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Land-use | The County's goal is to remain a peaceful, quiet rural residential/ agricultural community characterized by a sense of open space and the ability to enjoy landscape and sky. | X | | |
| Transportation | The County's goal is to improve and actively maintain our road and storm drainage infrastructure. | X | | |
| Water Quality and Quantity | The County's goal is to maintain or enhance water quality and quantity in the Castle Valley watershed by improving our knowledge, developing policies, and taking action as needed. | X | | |
| Fire Protection | The County's goal is to improve fire prevention and to take steps that will help assure that fire-fighting can be effective. | X | | |

BLM_0010708

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| Fire Protection | The County's goal is to protect and enhance the local environment and, where possible, respond to national and global environmental issues including, watershed, hazardous/solid wastes, weed control, dust, wildlife, energy, and the viewshed. | X | | |
| **Category** | **San Juan County Master Plan (1996)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Public Access | San Juan County has strong opinions regarding public access and its impact on economic stability in the county. The county claims all roads and trails over public land constructed prior to Oct. 21, 1976. Supports working with BLM to develop off-road trails for ATV use and bikes. | X | | |
| Recreation and Tourism | Support for increased recreational activity on public lands, however, agency needs to acknowledge and aggressively address the impact that recreation has on the county's essential services (i.e. law enforcement, emergency services, water and waste management, and search & rescue. | X | | |
| Wilderness | County does not support designation of large wilderness areas but will accept areas that meet the criteria of wilderness in the 1964 Wilderness Act. The County plan (Appendix E) includes the County's preferred alternative for wilderness designation. | X | | |
| Wild and Scenic Rivers | Statement that any special land-use classifications or designations should include analysis of adverse economic impact on local economy and stability of communities and commitment to adequate mitigation. | X | | |
| Threatened and Endangered Species | Statement that any special land-use classifications or designations should include analysis of adverse economic impact on local economy and stability of communities and commitment to adequate mitigation. | X | | |

BLM_0010709

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| Areas of Critical Environmental Concern | Statement that any special land-use classifications or designations should include analysis of adverse economic impact on local economy and stability of communities and commitment to adequate mitigation. | X | | |
| Socioeconomics | States that social and economic environment (of the communities most impacted by public land-use decisions) needs to be included in environmental review. | X | | |
| **Category** | **San Juan County Master Plan (1996)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| Wildlife | States that forage allocations between livestock and wildlife should be balanced and based upon fair and equitable assumptions. San Juan County is not in favor of and will generally oppose introduction of exotics or species not native to the area. | X | | |
| Land Tenure Adjustments | States that public land acreage currently owned and managed by Federal and State agencies is sufficient for the public interest. Supports a "no net loss of private" and no expansion of National parks position relative to federal-state property exchanges and transfers. (No net loss refers to both acreage and value.) Also, no net increase of public lands within San Juan County. | X | | |
| Water Resources | Supports protection of limited water resources by promoting efficient use and management. | X | | |
| **Category** | **San Juan County Amendment to Master Plan (8/2002)** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| All-terrain Vehicle Plan | Establishes an all-terrain transportation plan, on developed trails within the county, as an opportunity for increased recreational use and economic benefit to the county. | X | | |

BLM_0010710

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| **Category** | **Dead Horse Point State Park Resource Management Plan April 2007** | **Consistent** | **Partially Consistent** | **Not Consistent** |
| | The State Park planning team included the Moab BLM Recreation Branch Chief. The MFO Proposed Plan incorporates the Park's goal to protect the Park's viewshed. | X | | |
| Water Resources | **Utah Division of Water Resources Utah State Water Plan (May 2001)** | X | | |
| Water Resources | **Utah Division of Water Resources Southeast Colorado River Basin (October 2000) Utah State Water Plan** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Northern River Otter Management Plan January (January 2005)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Conservation Agreement and Strategy for Colorado River cutthroat Trout (March 1997)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Range-Wide Conservation Agreement for Roundtail Chub, Bluehead Sucker and Flannelmouth Sucker (January 2004)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Statewide Management Plan for Mule Deer (November 2003)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Statewide Management Plan for Elk (March 2005)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources Statewide Management Plan for Bighorn Sheep (September 1999)** | X | | |

BLM_0010711

**Table 5.4. Plan Consistency Review**

| Moab RMP | | | | |
|---|---|---|---|---|
| Wildlife and Fisheries | **Utah Division of Wildlife Resources**<br>**Utah Black Bear Management Plan (June 2000)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources**<br>**Utah Cougar Management Plan (January 1999)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources**<br>**Utah Gunnison's Prairie Dog and White-tailed Prairie Dog Conservation Plan (November 2007)** | X | | |
| Wildlife and Fisheries | **Utah Division of Wildlife Resources**<br>**Strategic management Plan for Sage-grouse (June 2002)** | X | | |
| **Consistency with State of Utah Code 63j-4-401:** | | | | |
| **ACECs** | **State of Utah**<br>It is the policy of the State of Utah to withhold support for ACEC designation unless or until relevant and important values or significant natural hazards are clearly identified and the area requires special management protections not afforded by normal multiple-use management. ACECs should be no larger than necessary and management should be no more restrictive than necessary to prevent irreparable damage to relevant and important values or protect human safety. To the extent allowed by federal law, management prescriptions should comport with the plans and policies of the State and of the county where the proposed designation is located. These prescriptions should not result in management equivalent to that afforded congressionally designated wilderness areas. | **BLM**<br>The potential ACECs brought forward for designation into the Proposed Plan have gone through a rigorous and stringent process in accordance with FLPMA, the planning regulations at 43 CFR 1600, Land-use Planning Handbook (H- 1601-1), and in accordance with BLM Manual 1613 and ACEC Policy and Procedures Guidelines (45 FR 57318). Appendix I outlines the process the interdisciplinary team underwent to determine whether a nominated ACEC had relevance and/or importance values. The size of the proposed ACECs is limited only to the area(s) of geography where the relevance and importance values are manageable to protect and prevent irreparable damage. In the Proposed Plan, the potential ACECs generally do not have redundant special designations and/or other existing protections applied.<br><br>The potential ACECs carried forward into the Proposed Plan necessitate an ACEC designation because special management protection is necessary (outside of normal multiple-use management) to specifically protect | |

BLM_0010712

**Table 5.4. Plan Consistency Review**

| Moab RMP | | |
|---|---|---|
| | | the relevance and importance values within the areas identified. The special management prescriptions that have been proposed are narrowly tailored to protect the identified relevant and important values; none of which are recognized as wilderness resources. For these reasons, the potential ACEC decisions carried forward into the Proposed Plan are considered by BLM to be consistent with Utah Code 63j-4-401. |
| **Wild and Scenic Rivers** | **State of Utah:** It is the policy of the State of Utah that federal land managers should refrain from applying a non-impairment management standard to river segments inventoried as "eligible" for inclusions in the national Wild and Scenic Rivers and all eligible segments should promptly be evaluated for suitability. The State of Utah will work with federal land managers to identify suitable segments and work towards a recommendation to congress for designation where careful analysis: (1) identifies and evaluates regionally significant segments, (2) addresses the impact designation will have on physical, biological, and economic resources, (3) demonstrates that suitable segments have water present and flowing at all times, and (4) not interfere with water resources development. Interim management of suitable segments should not interfere with development of valid existing water rights, including development of waters apportioned to the State under all interstate compacts or agreements, including the Bear River Compact and the Upper Colorado River Compact. To the extent allowable by federal law and where not in conflict with state law or policy, interim management of suitable segments and congressional recommendations for designation should be consistent with plans and policies of the county or counties where the river segment is located. | **BLM:** The State of Utah has worked as a Cooperating Agency throughout this planning process and has been intimately involved with the BLM's wild and scenic river planning process. The State has assisted Field Office specialists to help determine eligibility findings for each of the river segments, and has provided social and economic expertise and advice as the BLM determined which eligible segments to carry forward as suitable into the Proposed Plan. BLM has committed to working cooperatively among Federal, State, and local governments and communities during the post-planning wild and scenic river study phase when statewide recommendations for inclusion of river segments into the National Wild and Scenic Rivers System would go forward to Congress. Prior to this post-planning phase, BLM would work with affected partners to help identify in-stream flows necessary to protect the outstandingly remarkable values for which the subject river segments were found suitable via this planning process. Thus, because there are no effects of this planning decision on valid existing rights, and because suitability findings in this planning process do not create new water rights for the BLM, the land-use planning wild and scenic river suitability determinations are found by BLM to be consistent with the Utah Code 63j-4-401. |

BLM_0010713

**Table 5.4. Plan Consistency Review**

| Moab RMP | | |
|---|---|---|
| Livestock Grazing | **State of Utah:**<br>It is the policy of the State of Utah that the citizens of the state are best served by applying multiple-use and sustained-yield principles in public land-use planning and management. Public lands should continue to produce food and fiber, and the rural character and landscape should be preserved through a healthy and active agricultural and grazing industry. Land management plans should maximize forage availability for domestic livestock and wildlife use. The State favors active management to restore and maintain rangeland health, increase forage, and improve watershed for the mutual benefit of local communities, domestic livestock, and wildlife.<br>Adjustments in AUM levels may occur as required by range and watershed conditions, based on scientific, on-the-ground analysis. Grazing AUMs should be placed in suspension where range conditions will not sustain the current level of AUMs or where necessary to protect range and watershed health. Any suspended AUMs should be returned to active use when range conditions improve. The State generally opposes forced relinquishment or forced retirement of grazing AUMs but will continue to recognize voluntary relinquishments and retirements agreed to prior to RMP revisions. | **BLM:**<br>Grazing decisions carried forward into the Proposed Plan are considered by BLM to be consistent with Utah Code 63j-4-401. Proposed Plan decisions on public lands would continue to promote a healthy active grazing industry. Forage allocations for livestock and wildlife are fully allocated on public lands. Numerous RMP decisions under other identified resources allow for the restoration and maintenance of rangeland and watershed health. For example, the Proposed Plan provides the umbrella to allow implementation-level actions for hazardous fuel reductions, fire rehabilitation, vegetation treatments, riparian improvements, range and wildlife habitat improvements, UPCD projects – including Healthy Lands Initiative projects, seed collection, etc. Minor, if any, adjustments to current permitted livestock AUMs are made in the Proposed Plan. Prior voluntary relinquishments and/or retirements have been recognized. |
| **Non-WSA Lands with Wilderness Characteristics** | **State of Utah:**<br>It is the policy of the State of Utah to oppose<br>management of public lands as wilderness except where congress designates lands as wilderness. Under State policy and FLPMA's multiple-use mandate, BLM ascribed management prescriptions for non-WSA lands inventoried as possessing wilderness characteristics should take into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife, and fish. | **BLM:**<br>The Proposed Plan identifies certain "non-WSA lands with wilderness characteristics" in order to protect, preserve, and maintain their wilderness characteristics. BLM recognizes that it cannot, through the planning process, designate these lands as WSAs nor is it possible to manage them in accordance with IMP. For example, there is no provision to meet the "non-impairment criteria" mandated in IMP for WSA management. However, in following Section 201 of FLPMA, BLM has maintained its wilderness inventory |

**Table 5.4. Plan Consistency Review**

| Moab RMP | | |
|---|---|---|
| | Designation as VRM Class I, closure to oil and gas leasing, withdrawal from mineral entry, and closure to motorized and mechanized use affords protections comparable to those associated with formal wilderness designation and should be avoided for non-WSA lands with wilderness characteristics. Non-WSA lands with wilderness characteristics should be managed in a manner consistent with the multiple-use, sustained yield standard that applies to BLM lands other than congressionally designated wilderness or WSAs. | and has determined that lands previously found not to possess wilderness characteristics during the FLPMA Section 603 inventory process in the late 1970's and early 1980's, now have been determined to possess them. The focus of management in the areas carried forward in the Proposed Plan is to primarily provide for an experience of solitude and primitive recreation. This is enhanced by maintaining the naturalness of the geographic areas. However, management prescriptions do not mirror those for WSAs or designated wilderness since these two management objectives are sufficiently dissimilar that imposing similar prescriptions would not allow BLM to meet the planning objectives outlined in the Draft RMP/Draft EIS. WSAs and designated wilderness are rights-of-way exclusion areas, closed to fluid mineral leasing by law, and do not allow for surface-disturbing activities. In comparison, lands with wilderness characteristics have no set management by either law, rule, regulation, or policy. The Proposed Plan would allow for surface-disturbing activities where and when they are compatible with enhancing management objectives identified in the Proposed Plan. In order to ensure that BLM's planning decisions regarding the management of wilderness characteristics are consistent with Utah law, potential adjustments may be made in the Record of Decision to nomenclature. This editorial change would not affect management or goals and objectives. |

BLM_0010715

**Table 5.4. Plan Consistency Review**

| Moab RMP | | |
|---|---|---|
| **RS-2477 Assertions** | **State of Utah:**<br>The State of Utah will defend its interest, and that of its political subdivisions, in rights-of-way accepted under the self-effectuating grant process set forth in Revised Statute 2477 (repealed by the Federal Land Policy and Management Act of 1976) and <u>SUWA v. BLM</u>, 425 F.3d 735 (10th Cir. 2005). The State of Utah expects and requests the BLM to fully consider all information concerning individual rights-of-way submitted to BLM. Further, the State of Utah expects and requests BLM's consideration of this information as part of the preparation and implementation of Resource Management or Management Framework Plans, and preparation or implementation of Transportation Plans as part of the ongoing inventory of resources on the public lands. | **BLM:**<br>The Proposed Plan makes no commitments with respect to any valid existing rights, particularly those concerning RS-2477. Chapter 1 of this land-use plan states that resolution of this issue is outside the purview and scope of public lands planning efforts and must be adjudicated by a court of law or other legal means. Therefore, nothing in this plan extinguishes any valid rights-of-way or alters, in any way, the legal rights of the State of Utah to assert RS-2477 rights or to challenge any use restrictions imposed by the RMP that they believe are inconsistent with their rights. |

In addition, the Moab Field Office RMP is consistent with the following agency plans: Manti-LaSal National Forest Management Plan, Arches National Park Management Plan, Canyonlands National Park Management Plan, Uintah-Ouray Indian Reservation Plan, and Management Plans being prepared for State of Utah and SITLA lands. **No comments were received to indicate inconsistency of these plans with the Proposed RMP.**

## 5.4 PUBLIC OUTREACH AND PARTICIPATION

Public outreach and participation in the land-use planning process began with the publication of the Notice of Intent (NOI) to plan in the Federal Register and will be ongoing up until the Record of Decision for the Moab RMP. Public outreach and participation has included public meetings, development of a mailing list, planning bulletins, newspaper articles, a RMP website, and workshops. It has also included informal meetings with individuals, groups, and organizations.

### 5.4.1 NOTICE OF INTENT (NOI) TO PLAN AND SCOPING

This planning process began on June 4, 2003 with the publication in the Federal Register of a Notice of Intent (NOI) to plan. The NOI announced the BLM's intent to conduct land-use planning for the public lands administered by the Moab Field Office by preparing an RMP and associated EIS. The NOI began what is known as the scoping process and invited the general public as well as Federal, State, and local government agencies and Indian tribes to identify potential issues and submit concerns regarding the intended planning effort. In addition to the NOI, the BLM provided the public with planning bulletins, and newspaper articles. Through all this outreach, the public was notified of public meetings and the BLM requested information regarding planning criteria, resources, nominations for Areas of Critical Environmental Concern,

BLM_0010716

nominations for Wild and Scenic Rivers, and proposals for route designations. Public service announcements on the radio were also utilized to inform the public about open house public meetings. The BLM distributed planning bulletins to all interested agencies, organizations, and individuals along with any other entity that requested to be included on the mailing list.

The scoping period began June 4, 2003 and ended January 31, 2004. The BLM relied on various public outreach methods for the scoping process, including 6 open houses in different communities (see Table 5.5), a mobile "comment cruiser" that visited 12 locations, a website with provision for e-mailing comments, and an invitation for the public to provide written comments via letters. In its Scoping Report, completed in July 2004, the Moab FO provided an analysis of the information received. The Scoping Report is available at the Moab FO, or online at the Moab RMP website. The BLM received 6,138 comment letters with 19,437 comments identified in these letters and emails. Comments from the 6 open houses totaled 1,250, and the "comment cruiser" gathered 200 comments, resulting in a grand total of 20,887 comments. It should be noted that the Scoping Report covers both the Moab and Monticello Field Offices. The information received during the scoping period was utilized to establish the scope of the RMP/EIS.

**Table 5.5. Open House Locations and Attendance**

| Location | Date | Attendance |
|---|---|---|
| Green River, UT | October 14, 2003 | 15 |
| Grand Junction, CO | October 15, 2003 | 14 |
| Moab, UT | October 16, 2003 | 53 |
| Monticello, UT | October 21, 2003 | 54 |
| Blanding, UT | October 22, 2003 | 87 |
| Salt Lake City, UT | November 13, 2003 | 96 |
| **Total** | | **321** |

## 5.4.2. MAILING LIST

As directed by 43 CFR 1610.2(d), the BLM has established and maintained a list of "individuals and groups known to be interested in or affected by a resource management plan." This list was initially developed from the Moab Field Office mailing list and supplemented/updated throughout the planning process. Scoping meeting participants were given the option to be added to the mailing list. In addition, individuals were able to add themselves to the project mailing list by registering on the project website, as well as through requests to be placed on the mailing list by contacting the BLM.

The mailing list was used during the distribution of planning bulletins and postcards throughout the planning process. Postcards were mailed to the entire list, announcing the availability of the Draft RMP/EIS and the Proposed RMP/Final EIS. There are currently over 1500 individuals, organizations, and agencies included on the mailing list.

BLM_0010717

### 5.4.3 PLANNING BULLETINS

Planning bulletins were developed to keep the public informed about the Moab land-use planning process. They were provided to the public included on the mailing list for the Moab RMP. The planning bulletins were also posted on the website for the Moab RMP.

The **first planning bulletin** (6/30/03) announced the intention of the BLM Moab Field Office to prepare a Resource Management Plan. It also included preliminary planning issues, a request for nominations of Areas of Critical Environmental Concern (ACEC) and Wild and Scenic Rivers, an announcement of public scoping meeting, and information on how to participate in the land-use plan process.

The **second planning bulletin** (11/1/03) provided information regarding the preliminary review of river segments found eligible for consideration as Wild and Scenic Rivers. The public was invited to provide comments on the findings.

The **third planning bulletin** (11/17/03) requested route data from the public to be considered in the alternatives for route designation in the Travel Plan.

The **fourth planning bulletin** (5/7/04) provided the preliminary planning criteria for public comment and review.

The **fifth planning bulletin** (7/9/04) provided the results of the public scoping process and included the issues to be addressed in the plan.

The **sixth planning bulletin** (2/21/06) provided the results of the ACEC review process.

### 5.4.4 WEBSITE

Information regarding the Moab land-use plan was made available to the public on the Moab RMP website. This website is currently found at http://www.blm.gov/ut/st/en/fo/moab/planning.html. The website serves as a virtual repository for documents related to development of the Moab RMP including news releases and bulletins, background documents, schedule, the land-use planning process, preliminary issues, maps, photos, and the draft and final RMP/EIS. The documents are available in pdf format to ensure that they are available to the widest range of users. During the scoping period, the website allowed members of the public to add themselves to the project mailing list or to submit comments/concerns to be considered in the scoping process. In addition, during the public comment period on the DRMP/EIS, the website served as one of the ways in which the public could submit comments.

### 5.4.5 NOTICE OF AVAILABILITY (NOA) OF THE DRAFT RMP/EIS

On August 24, 2007, the BLM and EPA published a Notice of Availability in the *Federal Register* which marked the beginning of the formal 90-day public comment period. The DRMP/EIS states that BLM is revising its current land-use plan and proposes several alternative ways of managing public lands within the Moab planning area. The DRMP/EIS was designed to provide a comprehensive look at the impacts to natural and cultural resources from various planning alternatives. The formal 90-day public comment period ended on November 30, 2007. The BLM provided hard copies of the DRMP/EIS directly to cooperating agencies, other federal, state, and local agencies, tribal representatives, the Utah BLM Resource Advisory Committee

BLM_0010718

members, public libraries, and elected officials. Also, hard copies and CDs were made available to the public upon request, and the DRMP/EIS was placed on the Moab RMP website and in its public room at the BLM Utah State Office. Additionally, the BLM widely distributed newspaper and radio press releases regarding the availability of the DRMP/EIS.

## 5.4.6 PUBLIC MEETINGS

Five open houses were held during the 90-day comment period for the Draft RMP/EIS. The open house locations, dates, and attendance are provided in Table 5.6. The locations, dates, and times of the open houses were announced to over 1,500 people included on the mailing list via a postcard. Press releases in local and regional newspapers and radio spots supplemented the mailing. In addition, the locations, dates, and times of the open houses were posted on the Moab RMP website.

**Table 5.6 Open House Locations, Dates, and Attendance**

| Location | Date | Attendance |
|---|---|---|
| Moab, Utah | September 25,2007 | 10 |
| Monticello, Utah | September 26, 2007 | 88 |
| Grand Junction, Colorado | September 27, 2007 | 109 |
| Salt Lake City, Utah | October 3, 2007 | 158 |
| **Total** | | **365** |

The open houses were geared to provide information to the public on the content of the Draft RMP/EIS as well as to provide guidance on commenting on the document and answer questions. Each open house included a PowerPoint presentation which provided an overview of the planning process and a comparison of major elements contained in the alternatives. Attendees were then encouraged to visit with BLM representatives and managers regarding questions or concerns about the Draft RMP/EIS. The public was provided with the opportunity to submit written comments at the open houses.

## 5.5 PUBLIC COMMENTS ON THE MOAB DRMP/EIS

### 5.5.1 PROCESS AND METHODOLOGY

According to National Environmental Policy Act (NEPA), the BLM is required to identify and formally respond to all substantive public comments received during the comment period for the DRMP/EIS. The BLM developed a systematic process for responding to comments to ensure all substantive comments were tracked and the content seriously considered. A description of this process follows.

First, the BLM developed a **coding structure** to help sort comments into logical groups by topics and issues. Codes were derived from resources covered in the DEIS or by common issues. Submissions (letters, emails, faxes, etc) were given a unique identifier for tracking purposes and then each submission was carefully reviewed to capture all comments, if substantive (more description of this process is set forth below). All comments received can be tracked to the original submission.

BLM_0010719

Second, the BLM created a **Comment Database**. For each comment in a unique submission, the BLM captured the name and address of the Commenter, assigned a code to the comment, and captured the text of all substantive comments.

The coding and comment database processes aimed at assisting the ID-team in determining if the substantive issues raised by the public warranted modification of one or more of the alternatives or further analysis of issues and impacts. With the information provided through the public review process, the BLM reconsidered the draft alternatives, made changes as appropriate, and developed the Proposed Resource Management Plan and Final EIS (PRMP/FEIS). Factual or grammatical errors which led to a change in text are not summarized but were incorporated into the PRMP/FIES.

Finally, the BLM used the comment database to prepare a narrative summary of the substantive comments. Opinions, feelings, and preferences for one element or one alternative over another, and comments of a personal and/or philosophical nature were all read, analyzed, and considered, but because such comments are not substantive in nature, the BLM did not respond to them.

### 5.5.2 COMMENT ANALYSIS

During the 90-day public comment period for the Moab DRMP/EIS, the Moab Field Office received written comments by mail (1,248), fax, e-mail (31,853), website (483), and submitted directly at the public meetings or to the Moab Field Office. All comments submitted by fax were also e-mailed. This amounted to over 33,000 comment submissions. Many of the submissions were form letters (letters containing identical or nearly identical text submitted by a number of individuals) in which there were 13 different types. Outside the form letters, there were 1,027 unique submissions of which 391 submissions contained substantive comments. These submissions amounted to about 2,600 comments. Additional submissions were received after the close of the comment period on November 30, 2007. However, none of the late submissions raised substantially new issues or concerns not already addressed by comments received before the deadline.

Where warranted, the BLM responded to substantive comments by making revisions to the PRMP/FEIS (text changes). If no change was warranted, the BLM responded to the substantive comment in writing. The BLM responded to all substantive comments. In many cases the BLM chose to respond to non-substantive comments in order to clarify a point or position.

The comments received from cooperating agencies and the BLM responses are provided in Tables 5.9a, 5.9b, and 5.9c. Tables 5.10a through 5.10t provide the comments and responses by resource category that resulted in a change to the PRMP/FEIS. All comments and the BLM responses are provided in the compact disc (CD) attached to the PRMP/FEIS.

The BLM considered every comment in the analysis process, whether it came repeatedly from many people with the same message(s) or from a single person raising a technical or personal point. In analyzing comments, the BLM emphasized the content of the comment rather than the number of times a comment was received.

Respondents invested considerable time and effort to submit comments on the DRMP/EIS. Comments covered a wide spectrum of thoughts, opinions, ideas, and concerns. The commonly addressed themes include: travel, recreation, special designations (ACECs, Wild and Scenic Rivers), wilderness values, wildlife, and minerals/energy development.

BLM_0010720

While each person's viewpoint was diligently considered, the comment analysis involved determining whether a comment was substantive or non-substantive in nature. According to NEPA, the BLM is required to identify and formally respond to all substantive public comments. On the basis of the Council on Environmental Quality's (CEQ) regulations, a substantive comment does one or more of the following:

- Questions, with a reasonable basis, the accuracy of the information and/or analysis in the EIS.
- Questions, with a reasonable basis, the adequacy of the information and/or analysis in the EIS.
- Presents reasonable alternatives other than those presented in the DEIS that meet the purpose and need of the proposed action and addresses significant issues.
- Questions, with a reasonable basis, the merits of an alternative or alternatives.
- Causes changes in or revisions to the proposed action.
- Questions, with a reasonable basis, the adequacy of the planning process itself.

The NEPA handbook identifies the following types of substantive comments:

- **Comments on the Adequacy of the Analysis:** Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate are substantive in nature but may or may not lead to changes in the PRMP/FEIS. Interpretations of analyses should be based on professional expertise. Where there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some cases, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the BLM does not think that a change is warranted, the response should provide the rationale for that conclusion.
- **Comments Which Identify New Impacts, Alternatives, or Mitigation Measures:** Public comments on a draft EIS that identify impacts, alternatives, or mitigation measures that were not addressed in the draft are substantive. This type of comment requires the BLM to determine if it warrants further consideration. If it does, the BLM must determine whether the new impacts, new alternatives, or new mitigation measures should be analyzed in either the FEIS; a supplement to the draft EIS; or a completely revised and recirculated draft EIS.
- **Significance Determinations:** Comments that directly or indirectly question, with a reasonable basis, determinations regarding the significance or severity of impacts are substantive. A reevaluation of these determinations may be warranted and may lead to changes in the FEIS. If, after reevaluation, the BLM does not think that a change is warranted, the response should provide the rational for that conclusion.

**Non-substantive comments** simply state a position in favor of, or against, an alternative or a management action proposed in an alternative; merely agree or disagree with BLM policy; provide information not directly related to issues or impact analyses, or otherwise express an unsupported personal preference or opinion. For additional clarification, types of non-substantive comments are as follows:

BLM_0010721

- **Expressions of Personal Preferences or Opinion:** Comments which express personal preferences or opinions on the proposals are non-substantive and thus do not require further agency action. This includes comments in favor of or against the proposed action or alternatives, comments that only agree or disagree with BLM policy, or comments that raise, debate, or question a point of fact or policy. However, such comments are summarized whenever possible and brought to the attention of the BLM.

The BLM has reviewed and considered all non-substantive comments, but has not provided formal responses to such comments. Although non-substantive comments, including personal preferences and opinions, may be may be considered by the decision maker as he or she chooses the final agency's preferred action, they generally will not affect the analysis.

The results of the comment analysis were important to the development of the PRMP/FEIS. From the nearly 33,000 total comment submissions that BLM received on the DRMP/EIS, it extracted about 2,600 individual substantive comments. The BLM has presented these comments and the BLM responses in the CD attached to the PRMP/FEIS. A list of the organizations and individuals that submitted substantive comments are provided below in Table 5.7. and Table 5.8.

BLM_0010722

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| B | Bill Barrett Corporation | -- |
| B | Cabot Oil and Gas Corporation | -- |
| B | Delta Petroleum Corporation | |
| B | Delta Petroleum Corporation | Harris, C.E. |
| B | Dolar Energy | Dolar, Mark |
| B | EnCana Oil and Gas (USA) Inc. | -- |
| B | Fidelity Exploration and Production Co. | Green, Rachel |
| B | Green River Ranches | Stark, Nancy |
| B | Holiday Expeditions | Holladay, Dee |
| B | International Adventure Tours | Key, Kathy |
| B | Intrepid Potash | York, Eric |
| B | Lisbon Valley Mining Co | Indergard, Lantz M. |
| B | PacficCorp | -- |
| B | Questar Exploration and Production Company | -- |
| B | Red River Canoe Company | Butler, Theresa M. |

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| B | Ruby Ranch | Rozman, Curtis and Kerry |
| B | Samson | -- |
| B | Slate River Resources | Johnston, Bruce E. |
| B | Tag a Long | -- |
| B | Union Telephone Company | Fujimoto, Shirley |
| G | Arches National Park | -- |
| G | BLM - Grand Junction Field Office | -- |
| G | Colorado Division of Wildlife | -- |
| G | Environmental Protection Agency | -- |
| G | Grand County Council | Lewis, Jim |
| G | Green River City | Harris, Dan |
| G | San Juan County | -- |
| G | State of Utah - Public Lands Policy Coordination | -- |
| G | The Hopi Tribe | Kuwanwisiwma, Leigh Mogrart, Terry |
| G | Town of Castle Valley | Bollermann, Damian |
| G | U.S. Fish and Wildlife Service | Romin, Laura |

BLM_0010723

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| G | US Geological Survey | Devine, James |
| G | Utah State Office of Education | Shumway, Larry |
| G | Ute Mountain Ute Tribe | House Sr, Ernest |
| I | Great Old Broads for Wilderness | Egan, Veronica |
| I | Van Loan Ranches | Van Loan, Jay |
| O | -- | Boucher, Carla |
| O | American Motorcyclist Association | Harris, Nicholas |
| O | American Rivers | McKew, Quinn (Director, River Heritage) |
| O | Back Country Horsemen of Utah | Allen, Craig |
| O | Blueribbon Coalition, Inc. | -- |
| O | Bookcliff Rattlers Motorcycle Club | -- |
| O | Businesses/Organizations in Support of the Green River | -- |
| O | Californians For Western Wilderness | Painter, Michael |

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| O | Canyonlands Field Institute | -- |
| O | Capital Trail Vehicle Association | -- |
| O | Center for Native Ecosystems | Robertson, Erin (Senior Staff Biologist) |
| O | Center for Water Advocacy | Shepherd, Harold (Staff Attorney) |
| O | Coconino Trail Riders | Greenwalt, Keith Hall, James |
| O | Colorado 500 | Riggle, Don |
| O | Colorado Off-Highway Vehicle Coalition (COHVCO) | -- |
| O | Colorado Plateau Archaeological Alliance | -- |
| O | ECOS Consulting | -- |
| O | Environment Preservation Foundation | -- |
| O | Florida 4x4 | McRory, Andrew |
| O | Foundation for North American Wild Sheep | -- |
| O | Glen Canyon Group | Binyon, Jean |
| O | Grand County Backcountry Council | Bodner, Dave |

BLM_0010724

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| O | Howard County Bird Club | Schwarz, Kurt |
| O | Independent Petroleum Assoc. of Mountain States | Sgamma, Kathleen |
| O | International Mountain Bicycling Association | -- |
| O | Moab Area Climbers Association | Lightner Jr, Sam |
| O | Moab Friends-for Wheelin' | Stevens, Jeff Jensen, Holly |
| O | Moab Solutions | Melnicoff, Sara |
| O | Moab Trails Alliance | -- |
| O | Moab Trails Alliance | Schappert, Kimberly |
| O | National Parks Conservation Association | Nimkin, David |
| O | National Trust for Historic Preservation | Hays, Ti |
| O | New Mexico OHV Alliance | Spivack, Joanne |
| O | NOLS/ Outdoor Industry Association | Cukjati, Gary Kleiner-Roberts, Amy |
| O | Outward Bound Wilderness | -- |
| O | Outward Bound Wilderness | DeHoff, Mike |

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| O | Pack Creek Water Company | Sleight, Jane |
| O | Public Lands Advocacy | Moseley, Claire M. (Executive Director) |
| O | Public Lands Equal Access Alliance | -- |
| O | Red Rock 4-Wheelers, Inc. | Bandle, Bob |
| O | Ride with Respect | -- |
| O | Rising Sun 4x4 Club | Morgan, Jr, Williams H. |
| O | Sage Riders Motorcycle Club | -- |
| O | San Juan Public Entry and Access Rights | Qurri, Bob |
| O | San Juan Trail Riders | -- |
| O | Sierra Club Utah Chapter | Hoskisson, Wayne |
| O | Southern Utah Wilderness Alliance (SUWA) | -- |
| O | Sportsmen for Fish and Wildlife | -- |
| O | The Nature Conservancy | Tuhy, Joel |

BLM_0010725

**Table 5.7. List of Organizations and Individuals that Submitted Substantive Comments**

| Commenter Type | Organization | Individual(s) |
|---|---|---|
| O | Theodore Roosevelt Conservation Partnership | Webster, Joel A. |
| O | Utah 4 Wheel Drive Association | Edmunds, Steve |
| O | Utah Farm Bureau Federation | -- |
| O | Utah Four Wheel Drive Association | Jackson, Steve |
| O | Utah Rivers Council | Danenhauer, Mark |
| O | Utah Rock Art Research Association | Scotter, Troy |
| O | Western Watersheds Project | Carter, John |
| O | Western Wildlife Conservancy | Robinson, Kirk C. |

Notes: B=Business, G=Government, I-Individual, and O-Organization

BLM_0010726

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|---|---|
| Abernathy | Leroy P. |
| Ahearn | John J. |
| Alderson | George and Frances |
| Allender | William |
| Allender | Jen |
| Amrase | Gwenn |
| Andersen | Brandon |
| Anderson | Lisa |
| Anderson | Rachel |
| Anderson | Justin |
| Apicella | Peter |
| Armitage | Kevin |
| Artley | Dick |
| Askew | Ed |
| Avalos | Marty |
| Bailey | Bryan |
| Baird | Janelle |
| Baker | Shawn |
| Bassett | Mike |
| Bates | Harley |
| Bauer | Kincade |
| Benson | Chris |
| Berger | Bruce |
| Berhrmann | Rick |
| Biaswell | Kelly |
| Bigelow | Kerry |
| Bodner | David W |
| Bowers | Seth |
| Brown | Josh |
| Browning | Gay |
| Brunner | Christian |
| Bruno | Pete |
| Brunvand | Amy |
| Bulkeley | Jim |
| Bullard and Family | Larry |

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|---|---|
| Burch | David Paul Xavier |
| Burns | Alton |
| Burns | Allen |
| Burton | Jan Ellen |
| Butter | Jane |
| Butts | Raymond |
| Cameron | Laura (with Michael Peck) |
| Carlson | Ginny |
| Chalmers | D'ahna |
| Christie | Richard Lance |
| Ciscell | Michael |
| Clark | Robert L. |
| Clark | Robert |
| Clinard | Gary and Sallie |
| Connely | Arlene |
| Coronella | Mike |
| Crandall | Dell |
| Creighton | Katie |
| Croates | Jason |
| Crockett | Geoff |
| Crockett | Roger |
| D | Mike |
| Dallolio | Nate |
| Davidson Jr. | John |
| Davis | Keith and Rachael |
| Davis | Dan |
| Davis | Steven |
| De Sonne | Marcia |
| Deschamps | Justin |
| Deschamps | Michael |
| Dinkins | Dawna |
| Dozier | Steven |
| Edwards | Scott |
| Edwards | Lori |
| Edwards | Michael |

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|------------|
| Elson | Eric S. |
| Engholm | Greta |
| Evans | Bud and Patty |
| Faleck | Adam |
| Farley | Bill |
| Farnsworth | David |
| Farnsworth | Tracey |
| Feantz | Nona Kay |
| Fitzgerald | Kathryn |
| Flasro | Robby |
| Foisy | Roger |
| Foster | Scott |
| Foster | Tom and Jane |
| Freethey | Sandra |
| Frisbie | Steve |
| Fryer | Colin |
| Gartlan | Naill |
| Gartlan | Alison |
| Gilliam | Charles E. |
| Glatz | Kathy |
| Gouer | Will |
| Gough | Joan |
| Grange | Dale |
| Granquist | Cindy |
| Greenberg | Bob |
| Greenberg | Bob |
| Griffin | Richard |
| Hackley | Pam |
| Halterman | George |
| Hansen | Bruce |
| Harris | Tracy |
| Harris | Dan |
| Hauer | John and Sena |
| Hawkins | Edwin D. |
| Himes | Alex |

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|------------|
| Hoff | Wendy |
| Hogan | Sharon |
| Hopkins | Larry |
| Huber | Zachary |
| Hughes | William |
| Iannelli | Gina |
| Illingworth | Garth |
| Israels | Monica |
| Jarrett | Brad |
| Jenkins | Nick |
| Jenkins | Jolene |
| Johnson | Steve |
| Johnson | Tom |
| Johnson | Tom |
| Johnstun | Burke |
| Judd | Michael |
| Judge | Glen |
| Karnopp | Jerry |
| Kauffman | Christopher |
| Kemp | Kevin and Nan |
| Kennedy | John |
| Kilthau | Olaf |
| Kis | Jon |
| Klaus | Marion |
| Knight | Ber |
| Kobak | Steve |
| Koedoot | Joel |
| Kokjohn | Tyler |
| Kokjohn | Tyler |
| Krefting | Adam |
| Kyle | Tom L. |
| LaRoque | Fred and Susan |
| Lee | David |
| Leman | Doug |
| Lindley | Laura |

BLM_0010728

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|-----------|
| Linton | Ronald |
| Lippman | Robert |
| Lish | Christopher |
| Lively | Sean |
| Lowe | Zachary |
| Lund | Adrea |
| Lynch | James P. |
| Mair | Amanda |
| Malapanes | James |
| Malonado | Claire |
| Mandera | Tom |
| Manley | Michael and Judith |
| Marshall | Greg |
| Martin | Dirk |
| Martin | Steve |
| Maxey | Jim |
| McCollum | Ferris |
| McCracken | Nick and Bronwyen |
| McElhaney | Carma |
| McElhaney | Doug |
| McGill | J |
| McPhail | Michael |
| McVey | Stan |
| Messenger | Thomas J |
| Messenger | Tom |
| Mock Family | Bobby |
| Mohler | Wayne |
| Moore | Chad |
| Morgan | Meade |
| Muller | Joseph P. |
| Murrell | Mark |
| Narris | Shuanee |
| Neff | John |
| Nemitz | Robert W. (with Christine M. Warren) |

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|-----------|
| Newcomb | Richard |
| Newman | Stacy |
| Newren | Josh and Tamara |
| Nichols | Jason T. |
| Niederhauser | Mark G |
| Noble | Ruxton |
| Norton | Joey |
| Norton | Robert L. |
| Nosack | Kurt and Carissa |
| Nuckas | V. |
| Obert | Paul |
| Okubo | Byron |
| Orr | Diane |
| Panos | Nick |
| Parish | Ian |
| Parmelee | Steve |
| Parsons | Randall |
| Peavler | Terry J |
| Peay | Don |
| Pederson | Dusty |
| Pendergast | Jim |
| Peters | Wayne |
| Petti | Caroline |
| Phillips | Sue |
| Phillips | Sara Ann |
| Phillips | Ann |
| Phillips | Greg |
| Pincock | Kara |
| Pistorius | Shelley |
| Powell | Barry |
| Price | Jeff |
| Reddy | Shilpa |
| Reece | Justin |
| Reingold | Benjamin L. |
| Renwick | Kiel |

BLM_0010729

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|------------|
| Ress | Frank |
| Reynolds | Marc |
| Riches | Randy |
| Robertson | Cris |
| Robinson | W.W. |
| Rodgers | David |
| Rogers | David |
| Rohde | David |
| Rose | Meredith |
| Rossiter | Paul |
| Royse | Cindy |
| Rue | Judy |
| Ruffin | Larry and Kris |
| Rust | Terry |
| Rzeczycki | John |
| Salbaum | J. Michael |
| Salmana | Stacy |
| Sanchez | Carlo |
| Schiller | Penny |
| Schmidt | Jason |
| Schoen | Erika |
| Schwartz | Alex |
| Sennett | Michael |
| Sevenhoff | Mark |
| Sharp | Marlin and Julia |
| Sheets | Lee |
| Silliman | Rodney |
| Silver | Duncan Wanda |
| Smith | Cynthia |
| Sorensen | LaDawn and Darwin |
| Speidel | Steve |
| Spengler | Diane |
| Stembridge | Charles |
| Stoy | Daniel |
| Stroud | David |

**Table 5.8. List of Individuals that Submitted Substantive Comments**

| Last Name | First Name |
|-----------|------------|
| Stroud | David |
| Sudar | Jonathon |
| Swank | Gary |
| Swanke | Denice |
| Swanson | Fred and Bessann |
| Sweeten | Shannon |
| Tangren | Shane |
| Taylor | Molly |
| Taylor | Alan |
| Taylor | Tammy |
| Taylor | Gary C. |
| Taylor | Zane |
| Teisl | Philip |
| Telepak | Robert J |
| Tennyson | Raven |
| Thurston | Mike |
| Tipps | B |
| Tisovec | Phil |
| Tocher | Ross |
| Tolman | Roland |
| Tomka | Peter |
| Triolo | Phil |
| Trow Jr. | Richard |
| Turner | Jeff |
| Underwood | Teri |
| VanDuyn | David |
| Veranth | John M. |
| Vetere Jr. | John and John Cory Jr. |
| Vidiella | Patricia |
| Wade | R. Lance |
| Wade | Doug |
| Wakeman | TeriAnn |
| Washburn | Mary |
| Weaver | Mark |
| Weilmuenster | Mike, Becky, and Mason |

**Table 5.8. List of Individuals that
Submitted Substantive Comments**

| Last Name | First Name |
|---|---|
| Werkmeister | Mark R. |
| West | Jaclyn |
| Westwood | Ryan |
| Whitaker | John M |
| Whiteman | David |
| Widdison | James |
| Williams | Candace |
| Williams | Gabriel |
| Wilson | Maggie |

BLM_0010731

### 5.5.3 SUMMARY OF PUBLIC COMMENTS

During the public comment period for the DRMP/EIS, comments were received from government agencies, organizations, businesses, and individuals. The greatest number of comments concerned travel management, recreation, non-WSA lands with wilderness characteristics, and minerals, in this order. Commenters focused on their own definitions of "multiple use" and "balance among resource uses and natural resource values". Comments ranged from those urging the BLM to impose maximum restrictions on resource uses to those expressing dissatisfaction with the restrictions imposed in the Preferred Alternative of the DRMP/EIS.

Travel management comments ranged from those expressing a desire for more open to cross country travel areas and for the maximum number of routes being designated, to those expressing a desire for no open to cross country travel areas and to a minimum number of routes being designated. Recreation comments ranged from those favoring larger Special Recreation Management Areas with an emphasis on motorized recreation to those who wanted a de-emphasis on motorized recreation throughout the planning area. Comments involving non-WSA lands with wilderness characteristics showed both support for and opposition to this resource value. Minerals comments included those favoring fewer restrictions to those who wanted stricter stipulations on the recovery of mineral resources.

Many Commenters addressed the impact analyses on various resources. Those Commenters who alleged deficiencies in the impact analysis often were comparing the preferred alternative not to the No Action alternative (as required by the Council on Environmental Quality), but rather to the Commenter's version of an ideal environment. For example, those who favored fewer designated routes and more lands to be managed to protect their wilderness characteristics often compared the Preferred Alternative with a landscape devoid of all existing routes; those who favored more routes compared the Preferred Alternative to their entire "wish list" of future motorized recreation opportunities.

The interest of the public in the management of BLM lands in the Moab planning area was manifest in the number and complexity of the submissions received.

### 5.5.4 PUBLIC COMMENTS AND RESPONSES

The following tables present a subset of the comments received by the Moab BLM during the comment period. The first set of tables (Tables 5.9a, 5.9b, and 5.9c) provides all the comments submitted by the three Cooperating Agencies – the State of Utah, Grand County, and San Juan County. These tables are organized by the commenter, comment number, whether the comment resulted in a change to the document, the resource category being addressed, the comment, and the BLM's response. The second set of tables (Tables 5.10a through 5.10t) provides the comments that resulted in a change to the document. These tables include similar information to that provided in the first set of tables except they are grouped by resource category.

All comments received during the public comment period are available on a CD accompanying this document. This CD contains two tables in Adobe Portable Document Format (PDF). Both tables have the following columns: **Commenter Name or Organization, Resource, Comment, Response**. The first table is sorted and grouped by Commenter Name or Organization and the second table is sorted and grouped by resource.

**Table 5.9.a. Public Comments and Responses: State of Utah**

| Record ID | Commenter | Comment Number | Requires Change / Resource | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 120 | State of Utah | 1 | No / Minerals: Oil and Gas | The BLM should consider the potentially large economic effects the oil and gas industry might have on Grand and San Juan Counties as shown in the Economic and Business Research Study (Phase I) for oil and gas in the Uintah Basin. | The BLM acknowledges the oil and gas study referenced for the Uintah Basin. However, the applicability to Moab is limited. The Moab Field Office prepared a Reasonably Foreseeable Development (RFD) scenario for oil and gas development over the next 15 years. The development predicted in the RFD was utilized to generate the economic impacts in the Draft RMP/EIS as detailed on pg. 4-259 through 4-264. |
| 120 | State of Utah | 2 | No / Wild and Scenic Rivers | Utah State law indicates that river segments proposed for Wild and Scenic designation should contain water at all times. | According to the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), "there are no specific requirements concerning minimum flow for an eligible segment". The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, BLM is bound by Federal law. As a consequence, there may be inconsistencies that cannot be reconciled. The FLPMA requires that BLM's land-use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved. The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |

BLM_0010733

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 3 | No | The state is concerned about suitability findings for those streams where there are significant water diversions upstream. | According to the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), Congress has allowed for the existence of some human modification of a riverway, the presence of impoundments or major dams above or below a segment under review (including those that may regulate the flow regime through the segment). The existence of minor dams, diversion structures, and riprap within the segment shall not by themselves render a reach ineligible. |
|---|---|---|---|---|---|
| | | | Wild and Scenic Rivers | | |
| 120 | State of Utah | 4 | No | The state contends that while federal reserve water rights are not asserted prior to designation, those stream reaches found suitable are managed as if they were designated . | Barring congressional action, there is no effect on water rights or instream flows related to suitability findings made in a land-use plan decision. Even if Congress were to designate rivers into the National Wild and Scenic Rivers System, any such designation would have no effect on existing water rights. Section 13(b) of the Wild and Scenic River Act states that jurisdiction over waters is determined by established principles of law. In Utah, the State has jurisdiction over water. Although the Wild and Scenic Rivers Act implies a federal reserved water right for designated rivers, it does not require or specify any amount, and as noted above, confirms that Utah has jurisdiction over water rights. The BLM would be required to adjudicate the water right, in the same manner as any other entity, by application through state processes. Thus, for congressionally designated rivers, BLM may assert a federal reserved water right for appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation. The Draft RMP/EIS states (pg. 2-39) that the BLM would not seek water rights as part of a suitability determination made in the Record of Decision for the RMP. |
| | | | Wild and Scenic Rivers | | |

BLM_0010734

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 5 | No | State policy discourages permanent closure of grazing allotments for improving watershed health, wildlife habitat, and the economic benefits of livestock production. The state strongly suggests that BLM support flexibility within the management provisions for livestock grazing time (duration) and timing (season of use) in the final plan. | Allotments proposed for closure on page 2-12 are not permanent and the decision to close these allotments or areas may be revisited in the development of subsequent RMPs or the revision of this one. However, certain allotments may not be available for grazing over the life of the plan. The allotments considered, as not available are spread by alternative. Subsequent revisions of the land-use plan may consider opening these areas to livestock grazing.<br><br>The vast majority (over 95%) of the Moab Planning Area is available for livestock grazing. For those limited number of allotments shown on page 2-12 of the DRMP/EIS, the BLM is proposing that other uses of the BLM land are the highest and best use of these areas. Both FLPMA and BLM's Land-use Planning Handbook authorizes BLM to close specific areas to livestock grazing to place an emphasis on these areas for other purposes or values, such as wildlife use, watershed protection, and recreation. As indicated by the variable uses of the BLM lands, as shown in the proposed action, it is BLM's intention to emphasize "multiple use" of the public lands within the planning area.<br><br>s stated in the DRMP/EIS (pg. 2-12), for those areas open to livestock grazing, grazing would be managed on an allotment basis according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health (see Appendix Q), including duration and adjustment in season of use. This will provide the manager flexibility to adjust the permitted numbers of livestock, and the season and duration of use on specific allotments after the careful evaluation of monitoring and inventory data in full compliance with appropriate rules and regulations and BLM policy. |
| | | | Livestock Grazing | | |

BLM_0010735

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 6 | Yes<br><br>Livestock Grazing | The State supports the conversion of livestock AUMs to wildlife AUMs for the Diamond, Cottonwood, Bogart, and Pear Park allotments. | The BLM has recognized (Alts A, B, & C) the wildlife value of the Cottonwood, Diamond, and Bogart allotments as acknowledged in the 1994 Memorandum of Agreement among the BLM, UDWR, and the Nature Conservancy. The Pear Park allotment, which is unavailable in Alts A & B, has been made part of the PRMP/FEIS. |
|---|---|---|---|---|---|
| 120 | State of Utah | 7 | Yes<br><br>Wildlife | The State believes the BLM should only employ the term "critical habitat" when referring to the legal habitat designations for endangered and threatened species under the Endangered Species Act. The State requests that the BLM use the "crucial habitat" designations mapped by the UDWR. | The term critical has been reserved to Threatened and Endangered (T &E) species. Corrections in the text have been made in the PRMP/FEIS. For non-T&E species the BLM relied on the UDWR crucial habitat designations. |
| 120 | State of Utah | 8 | No<br><br>Wilderness Characteristics | The State asks BLM to provide a detailed explanation of the rationale and authority for management of lands solely because of wilderness characteristics, and why such management does not circumvent the provisions of the statutorily required wilderness review process. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712). This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield. Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, section 103(c) (43 U.S.C. §1702(c).) |

BLM_0010736

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The FLPMA intended for the Secretary of the Interior to use land-use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land-use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
| 120 | State of Utah | 9 | No<br><br>Wilderness Characteristics | The BLM should give strong consideration to recommendations submitted by local government and not manage lands to protect wilderness character where such management would, in the opinion of local governments, be contrary to the interests of local residents. | Sections 103, 201, and 202 of FLPMA direct the BLM to take into account the national interest, as well as the local interest. In accordance with FLPMA and BLM rules, regulations, and policies, the BLM must provide for the balanced management of all resources and resource uses on public lands.<br><br>The BLM gave strong consideration to the concerns of local governments throughout the planning process. In particular, Grand and San Juan Counties are cooperating agencies and have been active cooperators, including during the development of alternatives where Non-WSA areas with wilderness characteristics were considered.<br><br>See also response to comment 121-70. |

BLM_0010737

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | | 10 | Yes<br><br>Adequacy of Analysis | The State strongly disagrees with the BLM's analytical assumption at page 4-3 of the Draft RMP/EIS that non-BLM lands would suffer minimally direct impacts from RMP decisions. SITLA lands may have reduced revenue potential or management objectives that differ from the BLM. The BLM planning decisions on rights-of-way, withdrawals from mineral leasing, special designations, and other determinations impact state trust lands. | Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly. For specifics regarding the impacts on mineral revenue see comment 120-101.<br><br>The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3). A sentence will be added to Chapter 2, Lands and Realty.<br><br>Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly.<br><br>For specifics regarding the impacts on mineral revenue see comment 120-101.<br><br>The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3). Information will be added to Chapter 2, Lands and Realty, Management Common to all action alternatives, that states that reasonable access to State land would be provided including across BLM lands within avoidance and exclusion areas for rights-of-way as specified by the Cotter decision (Utah v. Andrus, 10/1/79). In addition, the Moab DRMP/DEIS travel management plan recognizes the requirement to provide access to SITLA lands per the Cotter decision. Also, please see the revised analysis under Socioeconomics in Chapter 4 of the PRMP/FEIS. |
| 120 | State of Utah | 11 | No<br><br>Lands and Realty | The need for BLM to give priority to state-federal land exchanges has been recognized. The disposal land list is inadequate and lands should be added to this list including the following: | The Federal Land Policy and Management Act (FLPMA) Section 203 requires the BLM to use the land-use planning process to identify lands for disposal through sales. Identifying lands for Section 203 sale requires the BLM to meet certain criteria set out specifically in the Statute. |

BLM_0010738

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | 1) all lands proposed for BLM disposal in the pending Utah Recreation Land Exchange Act; 2) the block of BLM lands west of the Canyonlands airport that are currently subject to Potash preference right leases, and 3) all lands in Lisbon Valley. | FLPMA allows the BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally. The DRMP/EIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition. The DRMP/EIS does not contain a schedule or prioritize these lands, but the BLM understands that State in-lieu and other exchanges are a high priority for the State and for the BLM. |
| 120 | State of Utah | 12 | No<br><br>Process and Procedures | The BLM should commit to utilizing the State's expedited energy permitting process. | Federal laws, rules, regulations, and policies govern the procedures for processing all Federal projects. |
| 120 | State of Utah | 13 | No<br><br>Air Quality | The State encourages the BLM to impose air emission standards as lease conditions and conditions of approval for Applications for Permit to Drill. | The BLM does not have the responsibility to set air emission standards. That responsibility lies with EPA and the State of Utah. The BLM can only approve actions that meet the National Ambient Air Quality Standards as set by EPA or the State. Site specific mitigation or conditions of approval may be applied at the APD or implementation phase but not during land-use planning and leasing. |
| 120 | State of Utah | 14 | No<br><br>Air Quality | Future air quality analysis should include modeling with the following factors: 1) oil and gas proponents should assume that leasing and exploration will result in full field development, 2) air quality analyses should be cumulative and include not only planned development but existing omission sources, 3) air quality analyses should be based on | The BLM may consider the Commenter's recommendation for future air quality modeling and analyses. |

BLM_0010739

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | anticipated worst-case meteorological conditions for each dispersion scenario, 4) air quality analyses should address compliance/attainment with all applicable air quality-related requirements and standards, and 5) air quality analysis should specifically address impacts to sensitive visual resources and other air quality-related values. | |
| 120 | State of Utah | 15 | No<br><br>Travel Management | Under the preferred alternative (Alt C), certain existing routes that provide the only physical access to trust lands would be terminated. The Draft RMP does not address the impact of these closures on the economic value of the affected trust lands in either this section or its section on socioeconomic impacts. | The travel plan provides restrictions to the public for recreational purposes, but does not restrict uses permitted or authorized by the BLM. State inholdings may or may not currently have access, depending upon whether or not existing vehicle routes lead to them. Under different alternative scenarios, existing routes may be proposed to closure. BLM policy, as required by the Cotter decision (State of Utah v. Andrus, 10/1/79), is that "the state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common school…" This decision confined the issue of access to situations directly involving economic revenues generated for the school trust. The recreation restrictions do not prohibit the State from reasonable access to its lands for economic purposes through separate permit authorization as specified by the Cotter decision. Routes to State sections may not have been identified for recreation purposes due to resource conflicts or actual route conditions. |

BLM_0010740

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 16 | No<br><br>Travel Management | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives. Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it... pursuant to RS 2477. | A "D" route does not equate to a County road assertion. The routes identified as "D" routes in the land-use plan are routes located on public lands and managed by the BLM until properly adjudicated. The DRMP/EIS proposes four different alternatives for which to manage these routes<br><br>As specified in the Draft RMP/EIS (pg. 1–12), addressing RS 2477 assertions is beyond the scope of this planning effort. However, nothing extinguishes any right-of-way or alters in any way the legal rights the State and counties have to assert and protect RS 2477 rights.<br><br>The Proposed RMP/Final EIS will not address RS 2477 assertions. Such assertions will be settled administratively on a case-by-case basis or as confirmed through other legal means. |
| 120 | State of Utah | 17 | No<br><br>Travel Management | The use of vehicles along the course of the Green River impacts natural resources and other recreational users of the corridor far beyond the traveled path due to noise. | The BLM assessed the impacts on natural resources and recreation conflict between motorized access and river based recreation. The BLM determined that the purpose and need associated with the route outweighed the specified conflict. |
| 120 | State of Utah | 18 | Yes<br><br>Water Resources | No mention is made of water rights. The State Engineer recommends that the BLM consider the impact its actions may have on water rights in general and non-BLM water rights in particular. | On pg. 1–13 of the Moab DRMP/EIS under Planning Criteria, it is noted 1) the planning process recognizes the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including State water laws). The text was clarified to ensure that valid water rights are recognized as valid existing rights. On page 1–13 of the DRMP/EIS under Planning Criteria, the BLM states 1) the planning process would recognize the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including state and local laws). The text has been edited to ensure that water rights are recognized as valid existing rights. See also response to comment 120-4. |

BLM_0010741

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 19 | Yes | The proper description of deer and elk crucial winter habitats and Rocky Mountain bighorn habitat should occur regardless of the alternative. | As required by NEPA, the BLM considered a range of alternatives. For non-special status species the alternatives varied by the size of the habitat and the timing restrictions. The management of habitat is consistent with the goals and objectives of each alternative. |
|---|---|---|---|---|---|
| | | | Wildlife | | In the Draft RMP/EIS, Alt B has a timing limitation for what is referred to as "winter habitat." This habitat actually includes both crucial and high value winter habitats (635,774 acres). These habitats, although not separated in the draft, have been properly described in the PRMP/FEIS. |
| | | | | | Alts C and D provide timing limitations for crucial winter habitat only (349,955 acres), not for both crucial and high value habitats. The text has been changed to correct the error of confusing crucial and high value winter habitats. |
| 120 | State of Utah | 20 | No | None of the alternatives address the fact that desert bighorn sheep wander between Crystal Geyser, Duma Point, and the Blue Hills. This migration corridor should be recognized in the final RMP. | Duma Point and Blue Hills habitat and migration corridors are recognized in the Draft RMP/EIS. Crystal Geyser is a small satellite population of recognized habitat located more than 10 miles across flat terrain from Duma Point. Defining a migration corridor across this flat terrain is unknown at this time. No known habitat exists between Duma Point and Crystal Geyser. Current studies are underway that may identify a migration corridor. |
| | | | Wildlife | | |

BLM_0010742

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 21 | Yes | | |
|---|---|---|---|---|---|
| | | | Special Status Species | The estimate of disturbed acreage to white-tailed prairie dogs as identified on page 4-315 is under estimated. Increased volume and speed of traffic, frequent road upgrades, and construction of utility poles and storage tanks, noise from wells and compressors, and increased recreational use will negatively impact prairie dogs. | Table 4.91 (pg. 4-315) has been changed to clarify that the acreage of disturbance from oil and gas development includes ancillary facilities such as roads, pipelines, and power lines. The BLM acknowledges in the impact analysis that there may be additional loss of individuals due to increased volume and speed of traffic. |
| 120 | State of Utah | 22 | No | | |
| | | | Lands and Realty | It is unclear how State comments will be sought for new rights-of-way for pipelines or service-access roads. | Where applicable, coordination with other Federal, State, and local entities will be sought as mandated under FLPMA, NEPA, and individual program requirements. All current NEPA documents prepared by the Utah BLM are posted on the Environmental Notification Bulletin Board via the BLM internet site. Access to this database is available to the State and the public. |
| 120 | State of Utah | 23 | Yes | | |
| | | | Wildlife | Surveys for wildlife are not considered to be a valid form of compensatory mitigation. | The language on pg. 4-315 has been clarified to state: "The results of these surveys will be used for avoidance and other mitigating measures." |
| 120 | State of Utah | 24 | Yes | | |
| | | | Special Status Species | The BLM should recognize that prairie dogs create important habitat for many other wildlife species. There is room to enhance the discussion in the Proposed RMP/Final EIS. | The Proposed RMP/Final EIS (pg. 4-314) includes discussion about the benefits provided by prairie dog habitat to other important habitat. |
| 120 | State of Utah | 25 | No | | |
| | | | Wildlife | The BLM should only allow the use of utility poles in areas where underground conduits are not practical. Raptor excluders should be placed on utility poles where needed. | Upon receipt for proposed development, the BLM will analyze the impacts to prairie dogs and other wildlife as part of the NEPA process and would apply the appropriate mitigation measures as necessary. This may include underground conduits and raptor excluders. |

BLM_0010743

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 26 | No<br><br>Wildlife | The BLM should work with the U.S. Department of Agriculture Wildlife Services to reduce nesting by ravens on storage tanks and other oil and gas infrastructure (i.e. design structures to be less suitable for nests). | Refer to comment 120-25. |
|---|---|---|---|---|---|
| 120 | State of Utah | 27 | No<br><br>Wildlife | Enforce a 45 mile-per-hour speed limit on secondary roads in oil and gas development areas from July through September to prevent deaths of young hawks and owls due to vehicle impact. | The speed limit on secondary roads is 25 mph unless otherwise posted. |
| 120 | State of Utah | 28 | No<br><br>Wildlife | When existing roads in raptor areas where they are likely to experience greatly increased traffic due to oil and gas well development, roads should be relocated as far as practical from the raptor nests regardless of whether or not the wells themselves are within a nest buffer. | Refer to comment 120-25. |
| 120 | State of Utah | 29 | Yes<br><br>Special Status Species | On pg. 3-143, the RMP states "the planning area is not considered a suitable reintroduction area for black-footed ferrets due to dramatic declines in prairie dog populations". DWR considers the Cisco Desert the number 2 priority for black-footed ferret reintroduction in Utah and request that this language be removed from the RMP/EIS | The language in the text (pg. 3-143) of the Proposed RMP/Final EIS that states "the planning area is not considered a suitable reintroduction area for black footed ferrets" has been deleted . |

BLM_0010744

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 30 | No | The BLM should consider including the parcel surrounding the Gunnison's prairie dog habitat northwest of Bridger Jack Mesa as part of the Behind the Rocks ACEC. | When the BLM developed alternatives, the Commenter did not identify this area as Gunnison's prairie dog habitat. Furthermore, most of the area referred to is State land. |
|---|---|---|---|---|---|
| | | | Special Status Species | | |
| 120 | State of Utah | 31 | Yes | Parcel R-11 which is identified for disposal under all alternatives contains Gunnison's prairie dog habitat. The State urges caution regarding the disposal of this land because the Gunnison's prairie dog may become petitioned for listing under ESA. | Parcel R-11 has been dropped from the disposal list (Appendix D, pg. D-3). |
| | | | Special Status Species | | |
| 120 | State of Utah | 32 | No | Map 2-25 does not delineate pronghorn fawning habitat south of I-70 in the Cisco Desert. | Although pronghorn habitat is identified south of I-70, the BLM and UDWR agreed that the majority of fawning occurs north of I-70 due high population densities. UDWR habitat data from 2003 does not identify any pronghorn habitat south of I-70. Pronghorn habitat south of I-70 was added by BLM due to known and potential occupancy. |
| | | | Wildlife | | |
| 120 | State of Utah | 33 | No | Fragmentation of crucial big game winter habitat due to oil and gas development should be mitigated through restoration at 4 acres for every 1 acre disturbed. | According to Washington Office Instruction Memorandum 2005-069, the BLM may identify off-site mitigation opportunities to address impacts of the project proposal, but is not to carry them forward for detailed analysis unless volunteered by the applicant. |
| | | | Wildlife | | |
| 120 | State of Utah | 34 | Yes | Reference the Utah Comprehensive Wildlife Strategy as the Utah Wildlife Action Plan. | This reference has been changed on pg. 2-44. |
| | | | Wildlife | | |

BLM_0010745

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 35 | No | The State recommends listing the following nine species of concern: Allen's big-eared bat, American three-toed woodpecker, big free-tailed bat, cornsnake, ferruginous hawk, spotted bat, and Townsend's big-eared bat. | These species are listed on pg. 3-146 to 3-148. |
|---|---|---|---|---|---|
| | | | Special Status Species | | |
| 120 | State of Utah | 36 | Yes | The State recommends a 2 mile buffer within active sage-grouse leks. The habitat reclamation ratio should be 4:1. There are currently no alternatives or reparations known to suitably replace a sage-grouse lek. | There are currently no active Gunnison or greater sage-grouse leks in the Moab Field Office. |
| | | | Special Status Species | | In 2005, the BLM and UDWR signed the Gunnison Sage-grouse Rangewide Conversation Plan. One of the conservation measures identified in the plan was "apply a lease stipulation of No Surface Occupancy within 0.5 miles of occupied lek sites year round". Since the Moab Field Office currently has no active leks a Controlled Surface Use/Timing Limitation stipulation of 2.0 miles was applied so that any leks discovered in the future could be protected. This stipulation also precludes permanent surface occupancy within 2.0 mile of an active lek and no surface-disturbing activities allowed within 0.5 miles year round. |
| | | | | | To be consistent with the Utah State Sage-grouse strategy, the controlled surface use/timing limitation lek buffer for greater sage-grouse has been changed from 0.5 mile to 2.0 mile in the Preferred Alternative (Alt C). The BLM agrees that sage-grouse leks are irreplaceable, and Alts B and C offer the greatest degree of protection for them (2 mile lek buffer). Alt B, if selected in the final decision document, would provide the greatest level of protection for any leks identified, while Alt D would provide the least amount of protection. |
| | | | | | See the response to comment 120-33. |

BLM_0010746

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 37 | Yes<br><br>Wildlife | It is stated on pg. 4-453 that interim and final reclamation will use native seeds. The State believes there are situations and circumstances where non-native plants may be the only tool to mange non-native weeds. | On pg. 2-50 it is stated that "Restoration and rehabilitation would use native seed mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species." The reference on pg. 4-453 has been changed to reflect this. |
|---|---|---|---|---|---|
| 120 | State of Utah | 38 | No<br><br>Wildlife | Seasonal restrictions and spatial buffers should be required of energy development. Use the U.S. Fish and Wildlife Service's Raptor Protection Guidelines. | On pg. 2-53 it is specified that raptors are to be managed in accordance with the Best Management Practices (BMPs) included in Appendix O. These BM's implement the Utah Field Office Guidelines For Raptor Protection From Human and Land-use Disturbances (F&WS, 2002) and provide for modifications of spatial or temporal raptor nest buffers, if an established set of criteria can be met.<br><br>The document specifies that the BMPs, or specific elements of the BMPs, which pertain to the proposal, should be attached as Conditions of Approval to all BLM use authorizations that have the potential to adversely affect nesting raptors, or would cause occupied nest sites to become unsuitable for nesting in subsequent years. Therefore, the raptor BMPs can be applied to any surface-disturbing action, including energy development activities, where raptor nesting may be affected.<br><br>As specified in the U.S. Fish and Wildlife Service "Guidelines" document, modifications of spatial and seasonal buffers for BLM-authorized actions would be permitted, so long as protection of nesting raptors is ensured. State and/or federally listed, proposed, and candidate raptor species, as well as BLM State-sensitive raptor species, should be afforded the highest level of protection through this BMP process; however, all raptor species would continue to receive protection under the Migratory Bird Treaty Act. Modification of the buffers for threatened or endangered species would be considered pending results of Section 7 Consultation with USFWS. |

BLM_0010747

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 39 | Yes / Socioeconomics | The economic impacts summary Table 2.2 (pg. 2-78) for minerals is incomplete. It only mentions lease rental royalty payments for oil and gas. Severance tax and property tax should be addressed as economic benefits. The same table discusses the economic impacts of recreation through sales tax and employment (2,000 jobs), but fails to indicate whether or not those are low or high paying, seasonal or permanent jobs. | The economic benefits of severance taxes to the State of Utah as a whole are referenced on pg. 4-262. Information on the economic benefits of severance tax has been added to Table 2.2. Property taxes levied on natural resources can be broken by commodity and county and this has been added to Table 2.2 (pg. 2-79). The economic benefits of property taxes (ad valorem) are also discussed on pg. 4-262. Information on wage distribution for recreation jobs has been added to Chapter 3 (pg. 3-104). |
|-----|---------------|-----|----------------------|--------|--------|
| 120 | State of Utah | 40 | No / Minerals: Oil and Gas | The summary of impacts section should be expanded to discuss constraints upon mineral development when all requirements proposed under each alternative are considered concurrently. This should include the acreage available under each alternative, but the viability of development in light of restrictive but not prohibitive requirements such as Class II Visual Quality. | The summary of impacts section is a summary and does not provide a detailed discussion. The acreage provided under each alternative is provided in the summary. A discussion of the impacts to minerals from visual resource restrictions is provided on pg. 4-107. |
| 120 | State of Utah | 41 | No / Locatable Minerals | The discussion of locatable minerals notes that the anticipated effect of uranium development would be the same under all alternatives because the acres open to extraction would be the same across all alternatives (see pg. 4-259). | On pg. 4-106 to 4-108, it is acknowledged that special stipulations (timing and visual restrictions) impose additional constraints and costs to locatable mineral operations. The actual costs depend on many factors and cannot be quantified on a landscape level document. |

BLM_0010748

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 42 | No / Socioeconomics | None of the alternatives adequately analyze the loss of revenue from formally or effectively from eliminating mineral development in many of the lands subject to Special Designations and restrictive viewshed. | On pg. 4-264 the royalty revenues generated under each alternative are provided for oil and gas. The Moab Field Office has only one producing locatable mineral mine (Lisbon copper mine) and revenues (severance and property taxes) from this do not vary across alternatives. |
|---|---|---|---|---|---|
| 120 | State of Utah | 43 | No / Air Quality | The air quality analysis assumed all new compressors would operate at a NOx emission rate of 0.7 g/hp-hr (pg. 4–17). How will the BLM ensure this projection for newly permitted compressors. | This figure (0.7 g/hp-hr) was used as an analysis assumption and is based on the best available control technology. Air quality impacts will be analyzed for specific proposed oil and gas development on a case by case basis during the NEPA process. Air quality emission restrictions can be imposed at that time. |
| 120 | State of Utah | 44 | No / Air Quality | The air quality analysis assumed well spacing of 40 acres and 40 kilometers. Please confirm this analysis spacing. | The analysis assumption was based on 40 acre well spacing as stated on pg. 4–20. This spacing was utilized because it represents a conservative estimate for the oil and gas operations conducted within the Moab Field Office. The spacing varies by area. |
| 120 | State of Utah | 45 | Yes / Air Quality | Assumptions regarding the number of compressors and dehydrators listed on page 4–20 are inconsistent with those shown in Table 4.7. If the numbers in Table 4.7 are correct and the analysis was based on the numbers discussed in the text, the analysis could significantly understate air quality impacts. | The BLM recognizes this discrepancy and has made appropriate changes to both the table and the text (pg. 4–20) in the Proposed RMP/Final EIS. |

BLM_0010749

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 46 | No<br><br>Cultural Resources | The State recommends the BLM undertake a final check to ensure that other potential areas of high cultural resource densities or values are examined for potential conflicts. The MFO should use techniques such as GIS, existing site databases. | In accordance with the BLM Land-use Planning Handbook (1601.1), a Class I cultural survey was conducted. For site specific actions the BLM conducts a Class III cultural survey as appropriate.<br><br>On pg. 4-30 a model of cultural resource site density is described that was used to predict potential impacts to cultural resources. This model identified high, medium, and low site densities and this information was used to quantify the impacts. The model was tested by intersecting 4,259 known cultural sites with the probability coverage in GIS. |
|-----|---------------|----|-------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 120 | State of Utah | 47 | No<br><br>Cultural Resources | The State suggests that the BLM develop a specific ongoing program to identify and target identification efforts under Section 110 of the National Historic Preservation Act. | These type of actions are administrative and do not require land-use planning decisions to accomplish. However, on pg. 2-8, cultural resource inventory areas under Section 110 are prioritized. |
| 120 | State of Utah | 48 | Yes<br><br>Cultural Resources | The State suggests enhancing and strengthening the density analyses utilized in the Draft RMP/EIS. These techniques could be significantly enhanced and strengthened in implementation of the Final Plan for high cultural resource value areas which include Sego Rock Art, Wall Street/Colorado River Rock Art, Behind the Rocks, Ten mile Wash, Mill Creek Canyon/South and North Forks of Mill Creek, the Wall Street portion of the Highway 279/Shafer Basin/Long Canyon proposed ACEC, Westwater Canyon, Kane Springs Canyon, Seven mile Canyon, Bartlett/Hidden Canyon, Hell Roaring Uplands, and the Dolores River Canyon. | The BLM will continue to enhance the inventory and density techniques for high cultural value areas identified in the final plan. Each of the cultural high value areas mentioned by the Commenter has been included in the Proposed Plan for inventory in the Final EIS including Seven mile Canyon (refer to pg. 2-8). |

BLM_0010750

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 49 | Yes<br><br>Cultural Resources | The State requests that a cultural resource management plan be developed for Special Recreation Management Areas. | In Management Common to All Action Alternatives for Cultural Resources (pg. 2-7), several specific areas are mentioned for cultural resource management priority; Ten Mile Wash, Mill Creek Canyon, Behind the Rocks, and Wall Street. These 4 areas coincide with high visitation areas managed as SRMAs. The text has been changed to state that Cultural Resource Management Plans will be a component of the implementation plans for the SRMAs that include the 4 cultural areas. |
|---|---|---|---|---|---|
| 120 | State of Utah | 50 | Yes<br><br>Cultural Resources | The State suggests that BLM specify in the RMP the subsequent development of specific cultural resource management plans, especially in areas with potential resource conflicts between cultural and recreation/travel. These plans could provide for potential heritage tourism development where warranted. | See response to comment 120-49. In addition, potential heritage tourism development would be a component of the aforementioned Cultural Resource Management Plans (pg. 2-7). |
| 120 | State of Utah | 51 | No<br><br>Wilderness Characteristics | The BLM should clarify the criteria utilized to determine which areas with wilderness characteristics (WC) were included in the preferred alternative. | Four alternatives for managing public lands, including lands with wilderness characteristics, are present in the Draft RMP/EIS. The range of alternatives considered issues and concerns raised during the scoping period, planning criteria, and the guidance applicable to resource uses. The alternatives constitute a range of management actions that set forth different priorities and measures to emphasize certain uses or resource values over other uses or resource values under the multiple use and sustained yield mandate of FLPMA to achieve certain goals and objectives. The preferred alternative, Alternative C was crafted by an interdisciplinary team and cooperating agencies to provide a balance between commodity production and resource uses while providing protection to a wide spectrum of resource values. |

BLM_0010751

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | These resource values include those associated with wilderness characteristics, ACECs, Wild and Scenic Rivers, sensitive soils, watersheds, visual resources, wildlife values, and floodplain/riparian areas. |
|---|---|---|---|---|---|
| 120 | State of Utah | 52 | No<br><br>Wilderness Characteristics | The BLM needs to consider the new information on roads (2007) to reevaluate the findings of the 1999/2003 wilderness inventory. | The 2003 Revision Document for the Moab Field Office made adjustments to Wilderness Inventory Areas based on county road data, none of which differs from the current county inventory. BLM stands by its 1999/2003 data. |
| 120 | State of Utah | 53 | No<br><br>Wilderness Characteristics | The BLM inconsistently applied road data between the 1999 inventory and the 2007 WC review. | The BLM did not inconsistently apply the road data, but used the policies and procedures applicable at the time of review. The Wilderness Study Area Interim Management Policy (IMP, H-8550-1; BLM 1995). The "IMP" or "WSA Handbook" was used during the inventory process conducted prior to 2004. The WSA IMP emphasized the difference between "roads" and "ways". Under that policy, the presence of a "road" was considered to negatively affect the wilderness characteristics of an inventory unit, therefore, the road and affected area needed to be excluded. The presence of a "way" however, was not considered, in and of itself, to have a sufficient negative affect on naturalness of an area to disqualify all or part of an inventory unit.<br><br>In 2004, the BLM settled the ongoing litigation with the State of Utah (Utah v. Norton Settlement Agreement). It was acknowledged that the BLM may continue to inventory public lands for resources or other values, including wilderness characteristics, as a part of managing the public lands and land-use planning. Inventories conducted post-2004 applied current policy, which is based on Washington Office Instruction Memorandum 2003-275, Change 1, which emphasizes naturalness and does not distinguish "roads" from "ways". |

BLM_0010752

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The BLM has evaluated wilderness characteristics since 2004 on the basis of affects to the naturalness of an area, which could either be from roads or ways. |
| 120 | State of Utah | 54 | No / Wilderness Characteristics | On page 4-157, the DEIS states that under Alt B, all 266,485 acres of non-WSA lands with wilderness characteristics would be managed as VRM class II. Table 4.55 indicates some WC lands that would be managed as VRM class I; please clarify. | The VRM I acreage within WC areas in Alt B results from other decisions made under Alt B. For example, Beaver Creek, Fisher Towers, Mary Jane Canyon, and Mill Creek Canyon contain rivers found suitable as "wild" for Wild and Scenic River status. Wild Rivers are managed as VRM I. Portions of the other areas are managed as scenic ACECs under Alt B resulting in VRM I management in that alternative. WC management alone does not result in VRM I management under any alternative. |
| 120 | State of Utah | 55 | No / Wilderness Characteristics | On pages 4-158 and 159, the DEIS states that under Alternative B, new water development facilities for wildlife would likely be precluded within non-WSA lands with wilderness characteristics. Please discuss the extent to which Alt C would preclude development of water facilities. | New water developments would be precluded under Alt B since non-WSA lands with wilderness characteristics (WC) are closed to surface-disturbing activities. However, in Alt C WC lands are managed as No Surface Occupancy which provides an exception if the use is consistent and compatible with protection or enhancement of the resource values (see Appendix C). Under Alt C, a new wildlife water development could potentially be considered an enhancement of the natural values based on future NEPA analysis for such a proposal. |
| 120 | State of Utah | 56 | No / Wilderness Characteristics | Many of the WC areas were divided into sub-units based on "substantially noticeable routes". Is this division appropriate? | In Appendix P (pg. P-2), the BLM discusses the size criteria for areas with WC. The size criterion of 5,000 acres was applied only to stand alone units. Units contiguous with other federal lands with WC were evaluated for naturalness alone. |

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 57 | Yes | Portions of Arches Adjacent WC subunits 4-6 are not identified on the map. The text discussing unit five identifies wilderness characteristics for 625 acres, but the map does not show contiguity with the Park. | Placement of the labels on the WC supplemental maps have been refined for clarity. |
|-----|---------------|----|-----|-----|-----|
| | | | Wilderness Characteristics | | |
| 120 | State of Utah | 58 | Yes | The text for the Diamond Canyon WC indicates that unit six does not meet wilderness characteristic requirements but the map appears to indicate otherwise. | The WC supplemental map for the Diamond Canyon WC shows a small portion of unit 6 as possessing WC. This is a mapping error which has been corrected; the text is correct. |
| | | | Wilderness Characteristics | | |
| 120 | State of Utah | 59 | Yes | The map for the Goldbar WC show two exclusions from the analysis area (blue circles) that are not discussed in the text. What are these areas? Area six is discussed in the text but not identified on the map. | These exclusions are "doughnuts" in the data provided by the proponent and are meant to be exclusions due to impacts on naturalness. Unit six is shown on the map but the label has been improved. |
| | | | Wilderness Characteristics | | |
| 120 | State of Utah | 60 | No | Portions of the Labyrinth Canyon and Lost Spring WC area determined to possess wilderness characteristics in the 1999–2003 review appear to have high route density. Please explain why these routes do not compromise either naturalness or the outstanding opportunities for solitude or a primitive and unconfined type of recreation. | Refer to response to comments for 120-52 & 53 for an explanation of roads vs. ways and the withdrawal of the Wilderness Handbook. The 2003 Revision Document removed from the original Wilderness Inventory Area those portions with "way" density so high as to preclude such opportunities. The routes in the remaining Wilderness Inventory Area are sufficiently unnoticeable and unused that their inclusion does not substantially detract from the wilderness characteristics. |
| | | | Wilderness Characteristics | | |
| 120 | State of Utah | 61 | Yes | Area four of the Labyrinth Canyon WC is mapped as having WC but the text is contradictory. | The label for Area 4 has been repositioned to be more clear. |
| | | | Wilderness Characteristics | | |

BLM_0010754

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 62 | No<br><br>Wilderness Characteristics | The Mary Jane Canyon WC area appears to have high route density. Please explain why these routes do not compromise either naturalness of the outstanding opportunities for solitude or a primitive and unconfined type of recreation. | See response to comments G-120-52,53, & 60 on route density. Most of the routes depicted in the Mary Jane Canyon area are substantially unnoticeable oil and gas seismic lines which are not being designated for travel under any of the Action Alternatives (B, C, & D). Alt C removes from WC management virtually all of the lands in the Mary Jane Canyon WC area in which these routes are located. |
|-----|---------------|----|-------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 120 | State of Utah | 63 | No<br><br>Wilderness Characteristics | The text and map for the Mill Creek WC area conclude that the analysis area lacks wilderness characteristics, but the wilderness characteristics review form shows that "some or all of the area has wilderness characteristics as shown on the attached map". | The 1999/2003 review found 3,388 acres of the Mill Creek WC area to possess wilderness characteristics. Subsequent review in 2007 found no additional areas to possess WC. The supplemental WC files on the BLM website state this in the text and on the map. |
| 120 | State of Utah | 64 | No<br><br>Areas of Critical Environmental Concern | The State is opposed to the establishment of ACECs overlapping Wilderness Study Areas (WSAs). The State also does not favor creation of ACECs that exceed the scope of the resources they are designed to protect. | The BLM has separate policies and guidelines, as well as criteria, for establishing ACECs and WSAs. These differing criteria make it possible that the same lands will qualify as both an ACEC and a WSA but for different reasons. The BLM is required to consider these different policies.<br><br>The values protected by WSA management prescriptions do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa. The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC Evaluation (Appendix I). The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values. None of these values includes wilderness characteristics. |

BLM_0010755

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Additionally, the management prescriptions for the ACECs is limited in scope to protect the relevant and important values, and the BLM maintains that the size of the ACEC areas is appropriate for protection of the relevant and important values identified. |
| 120 | State of Utah | 65 | No<br><br>Lands and Realty | State Parks currently has an R&PP lease for land along the east side of Dead Horse Point State Park that is within both the Colorado River SRMA and the Highway 279 Corridor/Shafer Basin/Long Canyon ACEC. The State would like to request an exception for the land currently under R&PP lease that would eventually allow this land to be patented to the Division. | The R&PP lease is a valid existing right and therefore the State of Utah has the right to go to patent upon completion of its plan of development. |
| 120 | State of Utah | 66 | No<br><br>Recreation | The State seeks information on developing and approving Recreation Area Management Plans (RAMP) and River Management Plans. | After completion of the RMP, those SRMAs that do not currently have RAMPs will be subject to the development of a site specific RAMP, subject to NEPA. The process is identical for River Management Plans. |
| 120 | State of Utah | 67 | Yes<br><br>Recreation | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, backcountry touring on designated roads. This statement appears to indicate that those portions of SRMAs that are not subject to a more specific focus area will be managed to emphasize motorized recreation. | The BLM acknowledges that there are entire SRMAs that are focused on a particular type of recreation. The decision on pg. 2-18 has been changed to reflect this; "where a specific type of SRMA or focus area is not identified, the focus of that area is motorized backcountry touring on designated routes". Focus areas particularly for backcountry motorized touring would be managed more intensively than the default management. For example, focus areas for motorized backcountry touring could be considered for new route creation. |

BLM_0010756

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring. Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for motorized backcountry touring. | |
| 120 | State of Utah | 68 | Yes / Recreation | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19). Please explain what a "destination SRMA" is and how such areas would be managed. | Destination SRMAs are those where the majority of visitation is from without the local area. A destination SRMA definition has been added to pg. 2-18. |
| 120 | State of Utah | 69 | Yes / Areas of Critical Environmental Concern | The Cottonwood-Diamond Watershed Potential ACEC notes that the proposed designation would remain in force, "until the watershed is restored to a healthy and functioning condition". Please clarify what management conditions would apply once the desired future condition is attained and the mechanism used to change prescriptions. | The Draft RMP/EIS states on pg. 4-320 that the ACEC would be designated until "the watershed is restored to a healthy functioning condition". The text has been changed to state that the ACEC would be designated until a determination is made by an interdisciplinary team that the Cottonwood and Diamond Watersheds are in properly functioning condition (PFC). |
| 120 | State of Utah | 70 | Yes / Recreation | Clarify launch limits in Westwater Canyon. | Table 4.69 (on pg. 4-207) states that the daily launch limit for Westwater Canyon is 75 people. This has been changed to state "75 people for the commercial sector and 75 people for the private sector". This equals the 150 person launch limit shown on the BLM website. |

BLM_0010757

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 71 | No | The State is concerned that Wild and Scenic River designations may limit water development by communities for future growth, limit industrial and agricultural growth, and reduce funding for the Colorado River Salinity Control program. | The Wild and Scenic Rivers Act implies a federal reserved water right; however, it must be the minimal amount necessary for purposes of the Act, it must be adjudicated through State processes, and it would be junior to existing water rights. The amount of federal water right will vary from river to river, depending on the river's flows, the un-appropriated quantities in the river, and the values for which the river is being protected. There is no effect whatsoever on water rights on in-stream flows related to suitability findings made in a land-use plan decision, barring Congressional action. Even if Congress were to designate rivers in the National Wild and Scenic Rivers System, any such designation would have no affect on existing, valid water rights. Section 13 (b) of the Wild and Scenic Rivers Act states that jurisdiction over waters is determined by established principles of law. In Utah, the State has jurisdiction over water. Although the Wild and Scenic Rivers Act implies a federal reserved water right for designated rivers, it does not require or specify any amount, and instead establishes that only the minimum amount for purpose of the Act can be acquired. Because the State of Utah has jurisdiction over water, BLM would be required to adjudicate the right as would any other entity, by application through State processes. Thus, for Congressionally designated rivers, BLM may assert a federal reserved water right to appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation.

During the suitability phase of the Wild and Scenic River process, both Grand and San Juan Counties, as well as the State of Utah and SITLA, were asked to supply information on uses, "including reasonably foreseeable potential uses of the area and related |
|-----|---------------|----|-----|-----|-----|
| | | | Wild and Scenic Rivers | | |

BLM_0010758

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | waters, which would be enhanced, foreclosed, or curtailed if the area were included in the national system of rivers, and the values which could be foreclosed or diminished if the area is not protected as part of the national system." (Appendix J-12). Attachment 4 of Appendix J summarizes suitability input by the public as well as local communities. Suitability decisions were made considering the results of this input. For example, the agricultural, residential, commercial and municipal development in and around the town of Green River was cited as a reason that segments 3 and 4 of the Green River were not suitable for consideration.<br><br>In 1994, Public Law 98-569 amended the Colorado River Basin Salinity Control Act and directed the Secretary to develop a comprehensive program for minimizing salt contributions from lands administered by BLM and to provide a report on this program to the Congress and the Advisory Council. The BLM's Colorado River Basin Salinity Control program is designed to provide the best management practices (BMP) of the basic resource base. Successes with the resource base will translate to improved vegetation cover, better use of onsite precipitation, and stronger plant root systems. In turn, a more stable runoff regime and reduced soil loss should result, thus benefiting water quality of the streams in the Colorado River Basin including the Green River and San Rafael River. In Section 1(b) of the Wild and Scenic Rivers Act, Congress states that one of the objectives of the Act is to protect the water quality of designated rivers. Congress further specified that the river-administering agencies cooperate with the EPA and State water pollution control agencies to eliminate or diminish water pollution (Section 2(c)). |

BLM_0010759

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Comparing the two, it is clear that the Wild and Scenic Rivers Act and the Colorado River Basin Salinity Control Act are not only complementary of one another, but share the same objective with regard to water quality. The Wild and Scenic Rivers Act directs the Secretary of the Interior or any government agency to prohibit any loan, grant, license, or otherwise construction of any water resources project that would have a direct effect on the values for which such river designation was established. The law also states that it cannot preclude licensing of, or assistance to, developments below or above a wild, scenic, or recreational river area or on any stream tributary thereto that will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System. However, projects intended to comply with the Colorado River Salinity Control Act are those that would generally benefit stream segments instead of affecting or unreasonably diminishing its values including water quality. |
| 120 | State of Utah | 72 | No | The State believes that the BLM should disclose the reasons and rationale for determinations of eligibility and suitability for proposed additions to the National Wild and Scenic River System, and to fully meet the requirements of state and federal law in doing so. | Appendix J of the DRMP/DEIS details the steps undertaken in the eligibility review process including the identification of outstandingly remarkable values as well as the Suitability Considerations by eligible river segments. The BLM complied with all applicable Federal laws, regulations, and policies in the Wild and Scenic Rivers Study Process. The BLM is aware that there are specific State laws relevant to aspects of public land management that |

BLM_0010760

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | Wild and Scenic Rivers | | are discrete from, and independent of, Federal law. However, BLM is bound by Federal law.<br><br>As a consequence, there may be inconsistencies that cannot be reconciled. The FLPMA requires that BLM's land-use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved. The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| 120 | State of Utah | 73 | No | The State is concerned that the Draft RMP/EIS does not state the authority for protection of river segments while studies are underway. | Section 5(d) of the Wild and Scenic Rivers Act requires that federal land management agencies make wild and scenic river considerations during land-use planning. Two stages of review are involved. Eligibility is an inventory, solely involving river values. Suitability involves consideration of manageability and resource conflicts.<br><br>As per BLM Manual 8351-Wild and Scenic Rivers-Policy and Program, Section .32C, all eligible rivers are considered in the EIS for the planning effort as to their suitability for congressional designation into the National Wild and Scenic Rivers System. With any suitability determination made in the ROD for the PRMP/FEIS, the free-flowing, outstandingly remarkable values, and tentative classification of rivers would continue to be protected until Congress makes a decision on designation.<br><br>Appendix J describes the process and authority for the Wild and Scenic Rivers Study.<br><br>The FLPMA gives the BLM broad authority to manage the public lands, including management of eligible and suitable river segments. |
| | | | Wild and Scenic Rivers | | |

BLM_0010761

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | For eligible rivers, it is BLM's policy to protect certain values identified in the eligibility determination process to ensure that a decision on suitability can be made. To accomplish this objective, the BLM's management prescriptions must protect the free-flowing character, tentative classifications, and identify outstandingly remarkable values of eligible rivers according to the prescriptions and directions of the current, applicable land-use plan per BLM Manual Section 8351.32C. The BLM Manual further states that should a determination on suitability not be made during the planning process, "the RMP must prescribe protective management measures to ensure protection shall be afforded the river and adjacent public land area pending the suitability determination" (Section 8351.33A).<br><br>The NEPA specifies that while work on the EIS is in progress, BLM cannot undertake or authorize any actions in the interim that would prejudice the RMP decision or, in this case, the suitability determination (40 CFR 1505.1 (c)(3)). A case-by-case evaluation of potential impacts resulting from a proposed action must be made to ensure that all eligible rivers are not limited from being considered for suitability among the range of RMP alternatives, thus eliminating the opportunity to prejudice the decision. Implementation of the interim management to protect eligible rivers, therefore, is applied through site-specific NEPA analysis of environmental impacts on a case-by-case basis. The NEPA compliance, required for all federal actions that could significantly affect the environment, ensures that BLM consider alternatives to the proposed action and provides BLM an opportunity to apply mitigation measures that will reduce impacts on a given resource such as an eligible stream. |

BLM_0010762

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | This mechanism of applying management must be in conformance with the current land-use plan. Protective prescriptions would be applied to rivers determined suitable in the ROD for the Field Office RMP. Resource allocations (such as those for visual resources, OHV use, and mineral leasing) compatible with protecting river values would be prescribed for suitable river corridors as part of the decision. In addition, no special management objectives would be applied to eligible rivers determined not to be suitable in the ROD. Instead, they would be managed without additional consideration according to the provisions of the plan. |
| 120 | State of Utah | 74 | Yes<br><br>Wild and Scenic Rivers | The BLM has not sufficiently divulged the proposed management prescriptions for river segments identified in the Draft RMP/EIS. | Table 4.102, Management Proposed for River Segments Considered for WSR Designation by Alternative, details these management prescriptions. The Oil and Gas Leasing Stipulations detailed in Table 4.102 by river segment are applicable to all surface-disturbing activities authorized in the plan as explained in Appendix C. These prescriptions have been moved to the Wild and Scenic River section of Chapter 2. |
| 120 | State of Utah | 75 | Yes<br><br>Wild and Scenic Rivers | Reference is made to 29 eligible segments that will be further reviewed for suitability; however, at several places, including pages 2-4, ES-5 and ES-6, 28 eligible segments are indicated. The Draft RMP/EIS identifies the number of eligible rivers as 13 at several places and 12 at many other locations. | There are 29 eligible river segments. On Salt Wash, which adjoins Arches National Park, the suitability determination has been delayed pending Park Service action. Therefore, 28 river segments were found suitable in one or more of the alternatives. This has resulted in some inconsistencies in the text which have been corrected. The same reasoning applies to the number of rivers which has also been corrected. |

BLM_0010763

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 76 | Yes | The term "designation" in place of "classification" on pgs 2-4 and 2-91, is inappropriate. | The term "designation" has been changed to "determine" in accordance with the BLM Land-use Planning Handbook (H 1601-1). |
|---|---|---|---|---|---|
| | | | Wild and Scenic Rivers | | |
| 120 | State of Utah | 77 | Yes | The cumulative effects analysis would be enhanced by developing a map depicting the cumulative effect of all use restrictions imposed under each alternative. Such a map could resemble maps 4-1 through 44 in the Kanab Field Office Draft RMP/EIS. | The maps referred to for the Kanab Draft RMP/EIS depict oil and gas restrictions by alternative. The same maps are contained in the Moab Draft RMP/EIS and are referred as Maps 2-5A-D. The oil and gas restrictions shown on these maps apply to all surface-disturbing activities (see Appendix C). These maps have been referred to in the cumulative impact section for minerals (pg. 4-504) and other applicable resources. |
| | | | Adequacy and Analysis | | |
| 120 | State of Utah | 78 | Yes | The BLM should clearly identify all reasonably foreseeable non-BLM actions within the planning area. As written, it is unclear what -- if any -- non-BLM actions were considered. | The BLM has added the following reasonably foreseeable non-BLM actions to the cumulative impact analysis: minerals extraction on private and SITLA lands; on-going residential growth and business development throughout the planning area; and expansion of U.S. Highway 191. |
| | | | Adequacy and Analysis | | |
| 120 | State of Utah | 79 | No | Please clarify the identification of alternatives. For example, pgs 2-2 through 2-5 identify Alternative A as the No Action Alternative, Alternative B as the Preferred Alternative, Alternative C as the Alternative emphasizing Resource Protection and Alternative D as the Alternative emphasizing Development. Page 4-1 identifies Alternative B as the Alternative emphasizing Resource Protection, Alternative C as the Preferred Alternative, and Alternative D as the Alternative emphasizing Development. | Our review of these sections shows that the terminology for the alternatives is consistent and is summarized as follows: Alternative A is No Action. Alternative B emphasizes protection/preservation of natural resources. Alternative C is the Preferred Alternative, as it provides for a balanced approach of protection/preservation of natural resources while providing for commodity production. Alternative D emphasizes commodity production. |
| | | | Adequacy and Analysis | | |

BLM_0010764

### Table 5.9.a. Public Comments and Responses: State of Utah

| 120 | State of Utah | 80 | No<br><br>Adequacy and Analysis | Pages 2-2 through 2-5 indicates that under Alternative C, 31 percent of the MPA would be closed to oil and gas development and only five percent of the MPA would be open under standard lease terms and conditions. In comparison, Alternative B would close only 14 percent of the MPA and leave 48 percent of the planning area open under standard terms and conditions. However, Table 4.3 indicates that despite the less stringent stipulations applied under Alternative B, 2,652 fewer oil and gas wells are anticipated compared to the more restrictive Alternative C. Please clarify this discrepancy. | The only reference to oil and gas restrictions is Summary Table C which shows 370,250 acres closed to oil and gas development in Alt C. This amounts to 20 percent of the BLM lands within the planning area. It should be noted that 19% of the BLM lands within the planning area are closed to oil and gas leasing by BLM policy. Also, as shown on this table, 427,273 acres are open with standard lease terms and conditions for Alt C. This amounts to 23% of the BLM lands within the planning area. On the same table, Alt B closes 36% of the BLM lands and leaves 14% of the BLM lands open with standard terms and conditions.<br><br>Table 4.3 shows the total predicted surface disturbance for mineral development in acres by alternative. The more restrictive Alt B results in 3,321 fewer acres (not wells) of surface disturbance than Alt C for oil and gas development. |
| 120 | State of Utah | 81 | No<br><br>Travel Management | The BLM should designate OHV "training trails" near dispersed camp sites to reduce OHV damage in those areas. | As stated in the Draft RMP/EIS (pg. 2-48) routes may be modified through subsequent implementation planning on a case by case basis. No specific trails or suggestions for "training trails" were submitted during the scoping period. After the RMP is completed and on a site specific basis, the BLM could consider training trails near dispersed camp sites in areas designated in the limited or open to OHV category. |
| 120 | State of Utah | 82 | No<br><br>Travel Management | To avoid having routes closed in the future which cross properties owned by SITLA, rights-of-ways should be placed in public ownership for OHV access. | The BLM recognizes that under Utah v. Andrus the State is entitled to reasonable access across public lands to school trust lands, including those located within WSAs and other areas where management prescriptions would restrict general public access. Any restrictions such as route closures within these management areas pertain to general public access. Public access to OHV routes on public lands is accomplished through travel management planning. |

BLM_0010765

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | We make a distinction between closures to the public, and State access entitlements and access needs of others that can be addressed as specific needs arise. Land tenure adjustment efforts including pending and anticipated land exchanges between the BLM and the State should properly focus on SITLA lands located within WSAs and other special management areas identified in RMPs. Therefore, the BLM does not believe it is necessary or prudent to globally grant rights-of-way or designated routes to school trust lands for public use. The BLM is happy to work with the State to process any FLPMA Title V ROW application the State feels is necessary to protect ingress and egress to State property.<br><br>The concern about DRMP/EIS access restrictions other than those for general public access, such as the designation of right-of-way avoidance or exclusion areas, can be clarified with specific mention in the PRMP/FEIS that these designations are subject to State access entitlements under Utah v. Andrus, as described above. |
| 120 | State of Utah | 83 | Yes<br><br>Travel Management | The White Wash sand dunes OHV open area should be larger than proposed under Alternative C. There should be a larger mix of sand and slick rock with a logical boundary. | A larger OHV open area for the White Wash area is proposed in Alt D. A portion of this larger open area has been added to the PRMP/Final EIS which consists of the popular camping area to the west of the sand dunes and just east of the Ruby Ranch Road. |

BLM_0010766

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 84 | No / Travel Management | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives. Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it pursuant to RS 2477. | See response to comment 120-16. |
|---|---|---|---|---|---|
| 120 | State of Utah | 85 | Yes / Travel Management | Table 4.54 on page 4-147 indicates that, under Alternative C and D, no portion of Lost Canyon would be either "open" or subject to "limited" OHV use. | The limited acreage is identical in Alternatives B, C, & D. Table 4.54 has been corrected. |
| 120 | State of Utah | 86 | No / Travel Management | Driving off designated routes to access dispersed camp sites would be in violation of the proposed travel plan. This plan should address this issue so that legitimate camp spots can be accessed from a legal route. | Driving off designated routes to access dispersed campsites would be a violation. Access to dispersed campsites is addressed on pg. 2-48 of the Moab DRMP/DEIS; "designated routes and spurs were identified specifically for dispersed camping" under all action alternatives. Many of the designated routes lead to or access dispersed campsites. Dispersed camping was considered in designating routes in all of the action alternatives. So that the public is aware of these sites, the dispersed campsites would be signed. Additional routes to dispersed campsites can be considered after the RMP process is completed on a case-by-case basis in areas designated as limited or open to OHV use. |

BLM_0010767

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 87 | No / Travel Management | Duplicate routes may provide beneficial recreation experiences to OHV users of varying skills and interests. | No information was provided during the scoping phase identifying specific duplicate routes for consideration in this planning effort. During the development of the travel plan with Grand and San Juan Counties, consideration of these types of needs was discussed. However, most duplicate routes not designated were routes receiving little or no use and thus presumably not providing the experience suggested in the comment. After the RMP process is completed, additional routes can be considered on a case-by-case basis in areas designated as limited or open to OHV use. |
|---|---|---|---|---|---|
| 120 | State of Utah | 88 | No / Travel Management | The BLM is encouraged to coordinate route alignments with other jurisdictions including the border with Colorado in the Rabbit Valley/Bitter Creek area. | During development of the travel plan, the Moab BLM coordinated with Grand and San Juan Counties, the National Park Service, the Forest Service, SITLA, and all adjoining BLM offices, including the Grand Junction Office concerning the Rabbit Valley area. |
| 120 | State of Utah | 89 | No / Travel Management | There are a few additional connecting routes needed in the travel plan for Alt C to create loops for ATVs and full-sized vehicles | All route data received during scoping was considered in the alternatives for the travel plan. No specific information is provided about these "additional connecting routes". Any new routes can be considered for addition to the travel plan after the RMP is completed on a case by case basis in areas designated as limited to OHV use. |
| 120 | State of Utah | 90 | Yes / Travel Management | There are no ATV/motorcycle only routes proposed in the preferred alternative. This is a useful designation to complete the array of OHV alternatives. The initial inventory and subsequent designation of motorcycle routes was incomplete. | During the scoping period, the BLM received data on routes proposed for motorcycle use. The majority of these routes are included in the Travel Plan for Alt C or Alt D. During the comment period for the DRMP/EIS, some of the motorcycle route proposals were modified by their proponents to indicate that a few of these motorcycle routes were also suitable for ATVs. |

BLM_0010768

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The map has been corrected in the PRMP/FEIS to delineate these ATV/motorcycle routes where they are identified in the Travel Plan for Alt C and Alt D. The BLM incorporated all route data received during scoping into formulation of travel plan alternatives. |
| 120 | State of Utah | 91 | No<br><br>Travel Management | There are no designated routes in the Duma Point area under any of the alternatives and there is no explanation as to why these routes were omitted. | The BLM received several route submissions in the Duma Point area during the scoping period. Several of these routes were not identified in any of the action alternatives due to resource conflicts, particularly with big horn sheep and sensitive soils. The BLM received a comment from UDWR regarding the bighorn sheep herd in this area with respect to human disturbance. The BLM Manual 8342.1 requires that OHV designations must "minimize harassment of wildlife and/or significant disruption of wildlife habitat". |
| 120 | State of Utah | 92 | No<br><br>Travel Management | The State requests that the OHV riding area just north of the Airport on the Blue Hills Road remain open. The area is well-suited to the existing use (shale soils with no vegetation) and provides an authorized area for hill climbing. | The area described is actually west of the airport. This area was limited to existing roads and trails in the 1985 RMP due to concerns with sensitive soils. There are no identified routes within any of the alternatives for the travel plan. However, in Alt C, provisions are made for the Airport Hills Motocross Focus Area (285 acres) to be established upon application by local government under the Recreation and Public Purposes Act. |
| 120 | State of Utah | 93 | No<br><br>Travel Management | Please clarify whether page G-11's reference to wildlife habitat includes habitat for all species or is it intended to apply to habitat for more significant species or groups of species. | Page G-11 refers to the guidance found in BLM Manual 8342.1 which states that OHV designations "must minimize harassment of wildlife and/or significant disruption of wildlife habitat". On pg. G-25 BLM lists the relevant species considered in formulation of the alternatives for the travel plan. |

BLM_0010769

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 94 | No | Page G-11, uses the term "extreme". Explain what constitutes an "extreme" hazard which can be considered an element of subjectivity. | This language is verbatim from BLM Manual 8342.1 which states "designations must minimize or eliminate OHV use in areas of extreme natural or man-made hazards". |
|---|---|---|---|---|---|
| | | | Travel Management | | |
| 120 | State of Utah | 95 | No | Page G-15, Emergency Limitation or Closure: Perhaps "immediately closed" should read, "immediately mitigated or closed" or some similar wording. | The federal regulations at 8341.2(a) state "the authorized officer shall immediately close the areas affected to the types of vehicle causing the adverse affect". The wording on page G-15 is derived directly from the referenced regulations. |
| | | | Travel Management | | |
| 120 | State of Utah | 96 | No | The implementation process section on page G-29 should stress the need for maps and signing as both are needed. | On pg. G-30, the Draft RMP/EIS states "in the final RMP decisions, designated OHV routes will be portrayed by a map. This map will be the basis for signing and enforcement. The implementation goals include completing signage, maps, public information, kiosks, and working with partners". |
| | | | Travel Management | | |
| 120 | State of Utah | 97 | No | SITLA requests a detailed reference under Issue 8 of the Issues Identified for Consideration in the Moab RMP concerning inheld state lands within special areas such as WSAs, ACECs, and lands managed for wilderness characteristics. | See response to comments 120-101, 103, and 106. It is not necessary to have this specific language stated in the description of the issue. |
| | | | Lands and Realty | | |
| 120 | State of Utah | 98 | No | Section 1.3.3-Development of Planning Criteria (pg. 1-13). The BLM states that the RMP will "apply only to public lands and, where appropriate, split estate lands where the subsurface mineral estate is managed by the BLM". | Information regarding leasing and development on split estate lands is found at the following Washington Office website: www.blm.gov/bmp/Split_Estate.htm.

Instruction Memorandum No. 2003-202 outlines the policy, procedures and conditions for approving oil and gas operations on split-estate lands. |
| | | | Minerals Oil and Gas | | |

BLM_0010770

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | The BLM should reconsider whether it can impose its standard on split estate lands where it does not own the surface as mentioned in the Planning Criteria on pg. 1-13. | In particular, the BLM will not consider and Application for Permit to Drill or a Sundry Notice administratively or technically complete until the federal lessee or its operator certifies that an agreement with the surface owner exists, or until the lessee or its operator complies with Onshore Oil and Gas Order No. 1. Compliance with Onshore Oil and Gas Order No. 1 requires the federal mineral lessee or its operator to enter into good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the disturbed areas, or payment in lieu thereof, to compensate the surface owner for loss of crops and damages to tangible improvements, if any. In addition, the BLM will invite the surface owner to participate in the onsite inspection and will take into consideration the needs of the surface owner when reviewing the Application for Permit to Drill. The BLM will offer the surface owner the same level of surface protection BLM provides on federal surface (Instruction Memorandum No. 89-201). |
|---|---|---|---|---|---|
| 120 | State of Utah | 99 | No | Paragraph 3.6.2.1 - Land Tenure Adjustments (Pg. 3-28). This paragraph should specifically reference the need for federal acquisition of State school trust lands that are captured by federal reservations and withdrawals such as wilderness study areas will be a priority, in accordance with applicable BLM policy guidance. In addition State selection should be mentioned as an equally preferred method of land disposition as land exchanges. | See response to comments 120-106 and 120-11.

The FLPMA Section 203 requires the BLM to use the land-use planning process to identify lands for disposal through sales. Identifying lands for Section 203 sale requires BLM to meet certain criteria set out specifically in the statute.

The FLPMA authorizes BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally. The Moab DRMP/DEIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition. |
| | | | Lands and Realty | | |

BLM_0010771

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The DRMP/DEIS does not contain a schedule or prioritize these lands, but BLM understands that State in-lieu and other exchanges are a high priority for the State and for BLM. |
| 120 | State of Utah | 100 | Yes<br><br>Lands and Realty | Section 3.6.2.1.2-Exchanges and Acquisitions (pg. 3-29). The State encourages the BLM to add a new paragraph after the first paragraph, as follows: Facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exchange is considered an important public objective, and will be given priority. | See response to comments 120-106 and 120-11. |
| 120 | State of Utah | 101 | Yes<br><br>Minerals Oil and Gas | Paragraph 4.1.2 - Analytical Assumptions (pg. 4-2/3). The BLM's second to last analytical assumption, that non-BLM lands would be minimally directly impacted by RMP decisions, since BLM does not make land decisions on non-BLM lands, is incorrect with respect to state trust lands. The largest source of revenue for the Utah school trust is from oil and gas bonuses and royalties. In much of Utah, in order to establish an economic oil and gas resource play, the exploration company needs a large areal footprint. It is likely that multiple sections would have to be leased and developed in order to develop the necessary reserves to make the play economic. | The BLM acknowledges that the closure of adjoining public lands to oil and gas leasing may have a potentially negative impact on SITLA's mineral revenue. The assumption on pg. 4-3 has been changed to reflect this fact. In Alternative C, the closure of the 354,015 acres managed as WSA or Wilderness Areas is nondiscretionary and beyond the scope of this plan.<br><br>In Alternatives A, C, and D there are no SITLA lands affected by discretionary closure. Chapter 4 of the PRMP/FEIS has been revised to reflect the impacts in Alternative B on SITLA inholdings of the discretionary closures of 266,485 acres of public land. It should be noted that under any Alternative, the proposed ACECs are not managed as closed to mineral leasing. Areas with wilderness characteristics are recommended as closed under Alternative B and No Surface Occupancy in Alternative C. |

BLM_0010772

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | BLM decisions from mineral lands from leasing in WSAs, areas with wilderness characteristics, ACECs, and other areas directly affect the economic viability of state trust lands inholdings. | |
| 120 | State of Utah | 102 | No<br><br>Lands and Realty | BLM's last analytical assumption, that reasonable access to state lands , across BLM lands, would be provided under all alternatives, needs to be specifically repeated in Table 2.1 under the heading "Management Common to All Alternatives" with a notation that access to state trust lands will be granted even if an area is otherwise an avoidance or exclusion area for ROWs. | See response to comment 120-10. |
| 120 | State of Utah | 103 | Yes<br><br>Minerals Oil and Gas | Section 4.1.3.1/Table 4.2-Oil and Gas. The BLM withdrawals and special designations directly affect development of oil and gas on SITLA lands. The BLM should assume that, in addition to the loss of oil and gas wells on BLM lands, there would be an additional loss of wells on SITLA lands in proportion to the amount of SITLA land within the proposed special designations under each alternative. | As explained in comment 120-101, the only discretionary oil and gas closures imposed by this plan that negatively impact SITLA inholdings are in Alt B where 266,485 acres are closed to protect wilderness characteristics. An estimate of oil and gas wells foregone on SITLA lands as a result of the BLM closure has been added to the text on pg. 4-94. |

BLM_0010773

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 104 | Yes | Section 4.3.5-Lands and Realty (pgs. 4-63/69). The second paragraph of section 4.3.5.1 (Impacts Common to All Alternatives) incorrectly states that 354,015 acres within WSAs and the Black Ridge Wilderness Area are closed to surface-disturbing activities and thus excluded to new ROWs. | Narrative has been added to the text on these pages to clarify that the BLM has an obligation to grant reasonable access to inheld State lands in WSAs subject to Utah v. Andrus and the Interim Management Policy. There are no State lands within the Black Ridge Wilderness Area. |
|---|---|---|---|---|---|
| | | | Lands and Realty | | |
| 120 | State of Utah | 105 | No | Section 4.3.12-Socioeconomic Resource (pgs 4-252/277). BLM decisions to withdraw mineral lands from leasing (WSAs, etc.) directly affect the economic viability of state trust lands inholdings. This should be acknowledged appropriately in the discussion of socioeconomic impacts. In particular, the BLM should assume that in addition to the decline in the number of wells drilled on BLM lands, there will be a proportionate decrease in the number of wells drilled on trust lands if Alternative B is adopted. | See comments 120-101 & 120-103 for an explanation of closed acreage by alternative. In Alt B, the loss of revenue from SITLA wells foregone has been calculated and added to the analysis on page 4-264. |
| | | | Socioeconomics | | |
| 120 | State of Utah | 106 | Yes | Appendix A.1.1. Land Tenure Adjustment Criteria. Add a new numbered paragraph stating that facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exchange is considered an important public objective, and will be given priority in accordance with existing BLM policy direction. | Current BLM Utah State Policy is to give priority to State of Utah exchanges and such exchanges do not require a land-use planning decision. |
| | | | Lands and Realty | | |

BLM_0010774

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 107 | No | Delete numbered paragraph 9 in A.1.1. It is inconsistent with county plans, and may hinder necessary exchanges to acquire state inholdings. | This paragraph refers to retaining 1,806,413 acres in public ownership including all lands in WSAs, ACECs, SRMAs, and other designated areas. This paragraph has been restated as follows: "Retain all public lands within WSAs, ACECs, SRMAs, and other designated areas". |
| --- | --- | --- | --- | --- | --- |
| | | | Lands and Realty | | |
| 120 | State of Utah | 108 | No | Please consider adding a new section, A.1.5, State Selections, which should read as follows: "State selections under the Utah Enabling Act and other applicable law will also be given priority pursuant to BLM Manual 2621.06A-C. All lands not encumbered by a withdrawal or other special designation will be available for state selection." | See the response to comment 120-106. |
| | | | Lands and Realty | | |
| 120 | State of Utah | 109 | No | Under the Mill Creek Canyon Potential ACEC, Alternatives B and C propose to "maintain 3 cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37). Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | The BLM does not have instream flow rights on Mill Creek. The BLM would maintain 3 cfs through a stipulation in the right-of-way grant to the Grand County Water Conservancy District. The BLM does not control appropriation of water rights. Water rights are appropriated by the State of Utah. In Utah, the only agencies that can hold instream flow rights are the UDWR and the Utah State Parks. |
| | | | Water Resources | | |
| 120 | State of Utah | 110 | No | The enhancement of riparian and wetland areas will increase the depletion of water within the Moab FO. | Restoration of riparian vegetation will not result in water depletion. In fact, this activity should increase the amount of available water. Enhancing riparian vegetation results in a decrease in stream temperature, a decrease in evaporation, and the storage of water in the bank for low flow seasons (summer). |
| | | | Water Resources | | |

BLM_0010775

**Table 5.9.a. Public Comments and Responses: State of Utah**

| | | | | | |
|---|---|---|---|---|---|
| | | | | The State requests the BLM modify its goal to require mitigation of any increased water depletion that may result from its activities. Such mitigation may require the acquisition and change of a valid existing water right. As part of a mitigation effort, it is suggested the BLM consider the institution of a program to eradicate tamarisk and other highly water consumptive, non-native species and their replacement with native species. Water required for any enhancement effort will need to be obtained in accordance with State law. | In addition, the replacement of tamarisk and Russian olive by native vegetation results in reduced water use and higher stream flow. If any additional water should become necessary, the BLM will obtain this water in accordance with Utah State law. On pg. 2-50 under Management Common to All for Vegetation, it states "Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments. Restore riparian habitat to native willow and cottonwood communities". |
| 120 | State of Utah | 111 | No<br><br>Water Resources | The UDWQ suggests the following practices identified in the TMDL that would reduce Mill Creek water temperatures to bring conditions into compliance with standard for Class 3A waters. These practices include: 1) provide higher stream flows during summer by maintaining 3 cfs flow below the Ken's Lake diversion, 2) increase water depth by narrowing the stream channel with restoration techniques involving use of heavy equipment, and 3) plant and protect riparian vegetation to increase shading a minimum of 11 percent to attain water quality standard. | The Draft RMP/EIS on pg. 2-31 states under Management Common to All Alternatives for Soil and Water "Coordinate with Grand Water and Sewer Service Agency to ensure required minimum instream flow of 3.0 cfs in Mill Creek below the Sheley diversion". Through ongoing restoration and management actions stream channel dimensions are improving without the use of heavy equipment. The use of heavy equipment is not appropriate due inaccessibility, the size of the stream system, and other sensitive resources. On pg. 2-50 under Management Common to All for Vegetation, the Draft RMP/EIS states "Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments. Restore riparian habitat to native willow and cottonwood communities". Mill Creek has been and will continue to be a high priority for such restoration efforts due to its TMDL status. |

BLM_0010776

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 112 | No | Onion Creek is impaired for temperature. To attain a temperature reduction in Onion Creek, the TMDL recommends restricted access to the stream channel by off road vehicles and riparian restoration to facilitate canopy cover. To restore the beneficial use in the creek, a more protective alternative than those described by the BLM/Moab RMP may be required. | Under all alternatives, travel within the Onion Creek stream corridor is restricted to the "B" road. Riparian restoration in this area has been ongoing; as a TMDL, Onion Creek is a priority for restoration efforts. In addition, the BLM has worked with the Grand County Road Department to improve the stability of the "B" road, thus improving riparian and water quality conditions in Onion Creek. |
| --- | --- | --- | --- | --- | --- |
| | | | Water Resources | | |
| 120 | State of Utah | 113 | No | Ken's Lake should be protected for cold water species of game fish and other cold water aquatic life. It is impaired for temperature. The protection of riparian vegetation may improve conditions around the lake. | The Ken's Lake TMDL concludes that stream temperatures are appropriate for the beneficial uses. The impairments are due to natural conditions and not management actions. Ongoing recreation management efforts for Ken's Lake have involved promoting native vegetation. |
| | | | Water Resources | | |
| 120 | State of Utah | 114 | No | Best Management Practices should be included in the plan for impaired water bodies. | The BLM is adopting the State's TMDL recommendations for impaired waterbodies. These constitute the best management practices for those streams. |
| | | | Water Resources | | |
| 120 | State of Utah | 115 | Yes | Monitoring should be defined for the plan, including water quality and biological parameters. Monitoring of recreation events should also be conducted to help provide data of the impacts. | The federal regulations at 43 CFR 1610.4-9 require that land-use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved. The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the ROD. |
| | | | Water Resources | | |

BLM_0010777

**Table 5.9.a. Public Comments and Responses: State of Utah**

| 120 | State of Utah | 116 | Yes | A statewide social survey was conducted by Utah State University in 2007. The State provides the key survey results for Grand County (146 responses) and for San Juan County (124 responses). | The Commenter provides an additional source of data not considered in the Draft RMP/EIS, due to the unavailability at the date of publication. The Commenter has identified this data as preliminary and no conclusions are provided. This is a study done by Utah State University for the State of Utah (USU). The USU study surveyed residents of all Utah counties on an equal (equal sample size per county) basis. The Commenter has not provided BLM with the raw data, but has compiled summary statistics by county. The survey is described as a social survey, and it "attempts to assess the ways in which Utah residents use and value public land resources, and their views about public land management". Because it is a survey of a sample of the population, the results are not directly comparable to most of the state government agency-generated data used in the Draft RMP/EIS. Portions of the study do not distinguish among types of public lands; in the study, this label includes all state and federal lands, and not just BLM lands. This makes some of the results more difficult to use in BLM planning and analysis since both counties in the MPA contain significant amounts of state, NPS and USFS lands. Nonetheless, the study provides interesting results not available elsewhere, and the summaries for Grand and San Juan counties incorporated in Attachment B may be useful in future implementation actions. None of the results provided affect either the formulation of alternatives in Chapter 2, nor the analysis of impacts in Chapter 4. Where appropriate, pertinent results are incorporated in Chapter 3 of the PRMP/FEIS. |
| | | | Socioeconomics | | |

BLM_0010778

**Table 5.9.b. Public Comments and Responses: Grand County**

| Record ID | Commenter | Comment Number | Requires Change Resource | Comment Text | Response To Comment |
|---|---|---|---|---|---|
| 982 | Grand County | 1 | No | We would like to thank you for including the Grand County Council in the RMP process. It has been a pleasure working with you over the years. Although many challenges were presented, the final product came out extremely well. Thank you for your cooperation and time devoted to this project. We look forward to working closely with you on the future phases of the RMP process. | Thank you. |

**Table 5.9.c. Public Comments and Responses: San Juan County**

| Record ID | Commenter | Comment Number | Requires Change Resource | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 121 | San Juan County | 1 | No<br><br>Process and Procedures | The BLM's interpretation of the Multiple Use mandate where all uses occur someplace but not together is flawed. Landscapes can be managed so that a broad spectrum of resource uses can create social, economic and ecological wealth simultaneously. Multiple use management results in benefits to various resources. For example, grazing can be a tool to benefit wildlife and their habitats. | In developing land-use plans, the BLM is mandated by FLPMA to observe the principles of multiple use and sustained yield. FLPMA defines multiple use as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people…the use of some land for less than all of the resources, a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources….with consideration given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output".<br><br>The final land-use plan for the Moab Field Office will define multiple use for this area. |

BLM_0010779

## Table 5.9.c. Public Comments and Responses: San Juan County

| 121 | San Juan County | 2 | No | More emphasis should be placed on monitoring the plan decisions both to measure the results of the plan and to insure that actions are taken to incorporate any changes needed. Watershed function, livestock use, recreation, OHV use and wildlife populations are uses that should be monitored more closely. The plan should have greater flexibility to adapt to changing conditions. | The federal regulations at 43 CFR 1610.4-9 require that land-use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved. The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the ROD. |
|---|---|---|---|---|---|
| | | | Process and Procedures | | |
| 121 | San Juan County | 3 | No | San Juan County asks for more cooperation and collaboration with local, state, and federal agencies (as well as interest groups) in actions and decisions within the Field Office. Misunderstandings could then be worked out in advance -- in the field rather than the courtroom. Within the framework of this RMP, the BLM should provide more opportunities to facilitate cooperative relationships and foster better collaboration efforts. | The State of Utah, Grand County, and San Juan County are cooperating agencies involved in the preparation of the RMP. The BLM has involved the cooperating agencies in all aspects of the land-use planning process including participation in the interdisciplinary team meetings. Cooperation and collaboration will continue on site specific projects after the RMP is completed and this does not require a plan decision to accomplish. |
| | | | Process and Procedures | | |
| 121 | San Juan County | 4 | No | San Juan County feels more emphasis should be placed on sustaining and developing healthy watersheds. The functionality of watersheds underlies all resources values. The best way to improve the functionality of watersheds is by Increasing the ground cover. Well managed grazing is one of the best, most economical, large scale tools for increasing ground cover. | The BLM actively supports efforts to improve watersheds and is a partner in the Healthy Lands Initiative for Utah. The RMP, under all action alternatives, specifies that restoration efforts be undertaken in cooperation with the Utah Partners for Conservation and Development (pg. 2-50). The RMP, under all alternatives, also specifies that grazing would be managed according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health. Implementation of these standards would improve watershed health and functioning. |
| | | | Water Resources | | |

BLM_0010780

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 5 | No | San Juan County supports livestock grazing in a prescriptive manner to accelerate progress toward improved rangeland health and reduction of catastrophic fire. The BLM should reassess timing and season of use for grazing. | The BLM Land-use Planning Handbook (H-1601-1) requires the BLM to identify lands available or not available for livestock grazing. This is the only planning decision within the RMP. Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
|---|---|---|---|---|---|
| | | | Livestock Grazing | | |
| 121 | San Juan County | 6 | No | San Juan County feels that social/economic analysis for livestock grazing is inadequate, as many allotments have been reduced or closed. The county urges BLM to look at grazing on a watershed basis vs. an allotment basis so that livestock operations would have opportunities to be more profitable but also to benefit wildlife and other resources. | Only one livestock allotment is proposed under any alternative for non-availability in San Juan County (Mill Creek: 3,921 acres). Of those proposed for non-availability (including those in Grand County) under Alt C, only Mill Creek is available for grazing now. Most of the other allotments have been unavailable for grazing since 1994, and some since the 1985 Grand RMP. The socioeconomic impacts of lost grazing opportunities is analyzed on pg. 4-258.

Decisions concerning numbers of livestock and seasons of use are made on a allotment basis using Standards for Rangeland Health and Guidelines for Grazing Management during the permit renewal process. |
| | | | Livestock Grazing | | |
| 121 | San Juan County | 7 | No | San Juan County supports Alt C for travel management. The county wants the BLM to highlight specific prescriptions to promote responsible use, such as areas that would be highlighted for OHV use, maps, signing, kiosks etc. In addition, BLM does not mention impacts from hikers or mountain bikers. | The RMP proposes many areas to be focus areas or SRMAs emphasizing responsible motorized use. These include Cameo Cliffs SRMA, Gemini Bridges/Poison Spider Mesa Motorized Touring Area, Utah Rims SRMA, Dee Pass Motorized Trail Area, and the Airport Hills Moto Cross Area. These areas are proposed for specialized management emphasizing that activity. |
| | | | Travel Management | | |

BLM_0010781

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The RMP would designate these areas but a Recreation Area Management Plan will follow the RMP, where specific prescriptions suggested by the county be detailed. The Travel Plan (Appendix G, pg. 30) details mapping, signing, and construction of kiosks as actions that would be part of implementation of this Plan.<br><br>Mountain bikes are restricted to the designated route system under all action alternatives. Impacts of mountain bikes vs. motorized travel were not separated out in the discussion. All impacts of off-route travel were combined for all types of wheeled vehicles. The impacts of hikers were not considered because no decision in this plan requires hikers to stay on trail. |
| 121 | San Juan County | 8 | Yes | BLM erroneously uses the term critical habitat (defined as applicable only to threatened and endangered species). This error occurs on Maps 2-27 B and C/D, on pages 3-169 and 3-171 and on page N-6. The term crucial habitat is used too loosely; UDWR uses crucial habitat as descriptive designations. They are not intended to mislabel resource concerns and result in a limitation of compatible uses. San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County and submits information from Dr. Charles Kay in that regard. | Maps 2-27B and C/D refer to the term crucial winter range and the term critical is not used. The term critical is used erroneously on pgs. 3-32, 3-38, 3-39, 3-40, 3-125, 3-127, 3-169, 3-171, 3-174, 3-177, and N-6. This term will be changed to crucial in the final RMP/EIS.<br><br>The UDWR is the jurisdictional agency for wildlife management within the State. The BLM relied on the expertise of this agency for delineating wildlife habitats, estimating population numbers, and recommending wildlife restrictions.<br><br>Also, refer to comment response 121-39. |
| | | | Wildlife | | |

BLM_0010782

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 9 | No | San Juan County is opposed to "layering" or the establishment of ACECs or SRMAs over WSAs or Wild and Scenic Rivers. | "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land-use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, the BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". |
|---|---|---|---|---|---|
| | | | Process and Procedures | | The BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land-use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land-use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land-use plan. |

BLM_0010783

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations. |
| | | | | | FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations, and policies for many different and often competing land-uses and to resolve conflicts and prescribe land-uses through its land-use plans. BLM's Land-use Planning Handbook requires that specific decisions be made for each resource and use (See, Appendix C, Planning Handbook "H-1601-1"). Specific decisions must be included in each of the alternatives analyzed during development of the land-use plan. As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result. |
| | | | | | For example, the BLM has separate policies and guidelines as well as criteria for establishing Areas of Critcal Environmental Concern (ACECs) as when the Wilderness Study Areas (WSAs) were established. These differing criteria make it possible that the same lands will qualify for both an ACEC and a WSA but for different reasons. The BLM is required to consider these different policies. |
| | | | | | The values protected by WSA management prescription do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa. |

BLM_0010784

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC evaluation (Appendix I). The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values. None of these values include wilderness characteristics. Additionally, the management prescriptions for the ACEC are limited in scope to protect the relevant and important values and the BLM maintains that the size of the ACEC areas is appropriate to the relevant and important values identified.<br><br>SRMAs are not restrictive of resource uses but rather are utilized to control recreation use. The South Moab SRMA does overlay the Mill Creek and the Behind the Rocks ACECs, but the management proposed in each is for differing purposes.<br><br>Please see Response 120-64 |
| 121 | San Juan County | 10 | No | Managing Non-WSA Lands for so-called wilderness characteristics violates FLPMA, Utah Code 63-38d-401(6)(b), the San Juan County master plan, the Norton-Leavitt Agreement and other agreements. | The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).<br><br>This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.<br><br>Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)))<br><br>Further, FLPMA makes it clear that the term |

BLM_0010785

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | Non-WSA lands and Wilderness Characteristics | | "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c))) The FLPMA intended for the Secretary of the Interior to use land-use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations. |
|---|---|---|---|---|---|
| | | | | | The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired. All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711). In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs. |
| | | | | | The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law. |
| | | | | | However, BLM is bound by Federal law. As a consequence, there may be inconsistencies that cannot be reconciled. The FLPMA requires that BLM's land-use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an |
| | | | | | inconsistency that cannot be resolved. The |

BLM_0010786

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.<br><br>Finally, the Utah v. Norton Settlement Agreement does not affect BLM's authority to manage public lands. This Agreement merely remedied confusion by distinguishing between wilderness study areas established under FLPMA §603 and those lands required to be managed under §603's non-impairment standard, and other lands that fall within the discretionary FLMPA §202 land management process. |
| 121 | San Juan County | 11 | No<br><br>Adequacy and Analysis | In the analysis of the impacts for the Draft RMP/EIS, almost all the impacts are attributable to OHV use, oil and gas use, and, to some extent, grazing. The underlying theme is that these 3 things are the cause of all negative impacts and if they are eliminated or controlled then everything else is take care of. The BLM should consider cheat grass and juniper encroachment, invasive weed problems, and catastrophic fires. The BLM should utilize livestock to control invasive plants. | In the Draft RMP/EIS surface-disturbing activities are considered potential negative impacts to natural and cultural resources. On page C-1, surface-disturbing activities are defined. Surface-disturbing activities include, among many other things, oil and gas development and cross country OHV use. Neither grazing nor vehicle travel on vehicular routes are defined as surface-disturbing activities.<br><br>On pg. 2-50 in decisions common to all action alternatives, the BLM specifies controlling and reducing invasive and noxious weed species. Vegetation treatments areas for piñon-juniper area are identified on pg. 2-14.<br><br>On an allotment basis, Standards for Rangeland Health and Guidelines for Grazing Management could be utilized to control invasive species. |
| 121 | San Juan | 12 | Yes | San Juan County commends the BLM for the | The BLM has reviewed the Utah State |

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | County | | Socioeconomics | effort that has been expended to better understand and portray socioeconomic impacts in this DRMP. This has been a weakness in previous plans. San Juan County encourages BLM to use studies done by Utah's universities to enhance this information such as the social survey undertaken by USU and the economic studies done by the U of U. Every NEPA action in the RMP should include a discussion on socioeconomic conditions and fully disclose all impacts. | University survey of rural counties conducted by the State of Utah. The BLM has received preliminary data from this study received after completion of the Draft RMPM/EIS. The BLM has incorporated findings in the PRMP/FEIS as appropriate.<br><br>The BLM has incorporated findings from recent research completed by the University of Utah's Bureau of Economic and Business Research into the PRMP/FEIS.<br><br>On a broad land-use planning level, the BLM has disclosed the socioeconomic impacts from various resource actions as discussed in Chapter 4 of the DRMP/EIS. It is not practical to separate out the socioeconomic impacts of the many resource decisions specified in the plan. |
| 121 | San Juan County | 13 | No<br><br>Livestock Grazing | San Juan County is opposed to relinquishment of preference or retirement of grazing rights in favor of conservation (p. 2-12). BLM should clarify goals in encouraging relinquishment and what would happen to voluntarily relinquished AUMs if BLM proposes to retire AUMs. What mechanism would be used to retire grazing rights? | The BLM does not encourage or discourage relinquishment of grazing preference. The BLM policy concerning the voluntary relinquishment of grazing preference is included on pg. 2-12 of the DRMP/EIS. As stated in this policy, relinquished permits and the associated preference would remain available for application by qualified applicants<br><br>after the BLM considers if such action would meet rangeland health standards and is compatible with achieving land-use plan goals and objectives. Upon voluntary relinquishment, the BLM may determine through site specific evaluation and associated NEPA analysis that the public lands involved<br><br>are better used for other purposes... any decision issued concerning discontinuous of |

BLM_0010788

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | livestock grazing is not permanent and may be reconsidered and changed through future land-use plan amendments. |
| 121 | San Juan County | 14 | No<br><br>Livestock Grazing | Alternatives B and C should not favor a single use regarding vegetation treatments, but should benefit multiple use objectives (p. 2-14). | In the Draft RMP/EIS (pg. 2-14), Alt D specifically favors livestock grazing in conducting vegetation treatments. Alt C specifies vegetation treatments that would benefit multiple use objectives including livestock grazing and wildlife as well as watershed health. Alt B specifies vegetation treatments to benefit wildlife, watershed, soils, and riparian health. Multiple use is defined by FLPMA as 1) the use of some land for less than all of the resources, and 2) a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources. |
| 121 | San Juan County | 15 | No<br><br>Minerals Oil and Gas | BLM should give due consideration to the most efficient program for the development of oil and gas resources in favor of exclusionary management for other uses. BLM is using exclusionary management for non-WSA lands with wilderness characteristics, ACECs and wildlife areas. | Alt B of the Draft RMP/EIS favors the protection of resources over the extraction of mineral development. Alt D favors mineral development over protection of resources. Alt C is designed to be a balance between mineral development and protection of resources.<br><br>There are no "exclusionary areas" proposed in the Draft RMP/EIS for Alt C within San Juan County for oil and gas. There are no ACECs or non-WSA lands with wilderness characteristics proposed for Alt C within San Juan County. Only timing restrictions for wildlife are proposed in Alt C within San Juan County. |

BLM_0010789

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 16 | Yes / Socioeconomics | The socioeconomic analysis for oil and gas is inadequate. A study in Uintah County found that oil and gas account for 60% of total wages, with the average wage of an oil worker at $84,795. | On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. |
|-----|------------------|-----|----------------------|--------|--------|
| 121 | San Juan County | 17 | Yes / Socioeconomics | Please explain how the extremely restrictive Alt B would have only slightly lower economic benefits. Many of the new restrictions on oil and gas proposed in this RMP are not warranted. BLM should make reasonable adjustments in the preferred alternative. | The fiscal impacts have been described in Table 2.2 on pg. 2-78 (DRMP/EIS) in terms of royalty revenue. This table shows that royalty revenues will be reduced by 50% in Alt B. In addition property tax revenue, and severance tax data have been added to the table for the PRMP/FEIS and likewise show a 50% reduction in revenues in Alt B as compared to Alt C. |
| 121 | San Juan County | 18 | No / Wilderness Characteristics | BLM should not manage lands for wilderness characteristics, taking into account the Utah v. Norton settlement, the opinions of local governments and residents, the existence of inholdings and valid existing rights, and the existence of SITLA lands. BLM has ignored county travel route and intrusion information in the 1999 wilderness inventory. BLM should clarify the difference between "natural", "largely natural", and "generally natural", and define "allotment files" and "master title plat data". | Refer to response to comment 121-10. No non-WSA lands with wilderness characteristics are proposed for management in Alt C for San Juan County. County travel route information was utilized in the Travel Plan and in the selection of non-WSA lands for the preferred alternative. For impacts to SITLA lands refer to response to comments 120-101 and 120-103. The terms specified for clarification are taken from the 1999 Wilderness Inventory and cannot be changed at this time. |
| 121 | San Juan County | 19 | No / Recreation | Will future "recreation area management plans" and "river management plans" be subject to NEPA. What is the process for developing and approving these plans? | After completion of the RMP process, those SRMAs that do not currently have RAMPs will need to develop a site specific RAMP, subject to full compliance with the NEPA. The process is identical for River Management Plans. |

BLM_0010790

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 20 | Yes | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, backcountry touring on designated roads. This statement appears to indicate that those portions of SRMAs that are not subject to a more specific focus area will be managed to emphasize motorize recreation. This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring. Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for motorized backcountry touring. | See response to the State of Utah's comment 120-67. |
|---|---|---|---|---|---|
|  |  |  | Recreation |  |  |
| 121 | San Juan County | 21 | Yes | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19). Please explain what a "destination SRMA" is and how such areas would be managed. | See response to the State of Utah's comment 120-68. |
|  |  |  | Recreation |  |  |
| 121 | San Juan County | 22 | No | The Mill Creek Canyon Potential ACEC. San Juan County is opposed to protecting wilderness characteristics and layering. Alt. D best describes this unit. | Alt C proposes no management to protect wilderness or wilderness characteristics within the Mill Creek Potential ACEC. Of the 3,721 acres in this ACEC in Alt C, 1,474 acres are within San Juan County.<br><br>Alt. B contains 295 acres of non-WSA lands with wilderness characteristics within San Juan County. Of these acres, all are within the Mill Creek Potential ACEC as outlined in Alt. B. |
|  |  |  | Areas of Critical Environmental Concern |  |  |

BLM_0010791

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 23 | No | Alternatives B and C propose to "maintain 3cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37). Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | See response to comment 120-109. |
|---|---|---|---|---|---|
| | | | Water Resources | | |
| 121 | San Juan County | 24 | No | Wilson Arch Potential ACEC. This should be dropped in all alternatives because of surrounding private land. The area should be VRM Class III in all alternatives. The arch should be protected with a hiking trail up to it. | The Wilson Arch Potential ACEC is proposed only in Alt. B. The potential ACEC meets the relevance criteria and must be included in 1 alternative. The area is managed as VRM II in Alt C, providing protection to the arch, and managed as VRM III in Alt. D, providing virtually no protection to the arch. |
| | | | Areas of Critical Environmental Concern | | |
| 121 | San Juan County | 25 | No | Southwestern Willow Flycatcher. What is their habitat? There is no map provided. | The Southwestern Willow Flycatcher is an endangered species; the U. S. Fish and Wildlife Service has not mapped their critical habitat within the Moab Field Office boundaries. The USFWS defines their breeding habitat as dense riparian tree and shrub communities associated with rivers, swamps, and other wetlands (USFWS Recovery Plan, Southwestern Willow Flycatcher). |
| | | | Special Status Species | | |
| 121 | San Juan County | 26 | No | Are there any Gunnison sage-grouse leks within the MPA? Will the restrictions be imposed whether or not the grouse are present? | There are currently no Gunnison sage-grouse leks or occupancy within the MPA. On page 2-47, the Draft RMP/EIS states: "If sage-grouse occupancy is identified, the stipulations would be imposed as follows:" Thus, stipulations would only be imposed if the grouse are present. |
| | | | Special Status Species | | |

BLM_0010792

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 27 | No | VRM Management appears to be the same for Alts C and D within San Juan County. San Juan County would like Shafer Basin managed as VRM I, Mill Creek managed as VRM II and the rest of San Juan County managed the same as Alt. A. BLM should adjust Alt. C. | Alts C and D are not identical within San Juan County, with 15,326 acres managed as VRM I, 65,273 acres of VRM II, 116,101 acres of VRM III, and 96,471 acres of VRM IV within the county in Alt C and 6,316 acres of VRM I, 42,887 acres of VRM II, 147,496 acres of VRM III and 96,471 acres of VRM IV within the county in Alt D. In Alt C, Shafer Basin is managed as VRM I, and the areas around Mill Creek are managed as VRM II. The 1985 Grand RMP did not manage for VRM. However, in 2002, a plan amendment was completed for the Canyon Rim Recreation Area, which is managed as VRM II and III. All WSAs, including Behind the Rocks WSA within San Juan County, are managed as VRM I. However, in Alt A, the remainder of San Juan County has no VRM management. This is not an option for the revised RMP. |
| :--- | :--- | :--- | :--- | :--- | :--- |
| | | | Visual Resource Management | | |
| 121 | San Juan County | 28 | No | San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County. San Juan County asks that Alt. A coverage be used for deer and elk winter range. Prescriptions should be added to the alternatives to allow for collaborative monitoring and studies conducted that will allow for habitat designations to be biologically and scientifically based. | The BLM relied on UDWR, the agency with jurisdictional expertise regarding deer and elk. In the 1985 Grand RMP, the BLM did not impose restrictions on the entire deer and/or elk habitat (approximately 110,000 acres) delineated by UDWR within San Juan County. Restrictions were only imposed on about 4,000 acres of this habitat. A prescription in the alternatives is not necessary in order to allow for collaborative monitoring and studies. |
| | | | Wildlife | | |
| 121 | San Juan County | 29 | Yes | The term "critical" is used inappropriately for wildlife habitats on the following pages: p. 3-38, 3-39, 3-169 (in Table 3.52), 3-171. Critical is used only for 'sensitive species' habitat. | These terms have been corrected in Chapter 3 of the PRMP/FEIS. |
| | | | Wildlife | | |

BLM_0010793

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 30 | No | "Competition between deer and livestock" (pg. 3-38) is used inappropriately because both livestock and deer should be managed under an allocation system for both. | This statement is only intended to clarify the uses occurring on the Between the Creeks allotment. |
|-----|-----|-----|-----|-----|-----|
| | | | Wildlife | | |
| 121 | San Juan County | 31 | No | With over 300,000 vehicles per year, are there conflicts between people and habitat for desert bighorn, bald eagle, SWWF, T and E fish, peregrine falcon and other sensitive raptors; since the RMP states that there are conflicts between people and livestock on the Professor Valley, River and Ida Gulch allotments (pg-3-39). | The conflicts between the vehicles and the livestock are in the form of vehicle collisions with cattle. Utah State Highway 128 does not cross desert bighorn habitat, and there have been no collisions between vehicles and the other species listed. |
| | | | Livestock Grazing | | |
| 121 | San Juan County | 32 | Yes | There is a discrepancy between Tables 3.56 and 3.57 on DWR population objectives for elk. BLM should clarify or correct this. San Juan County questions the accuracy of DWR's elk counts. | Tables 3.56 and 3.57 have been changed to correct the discrepancies. |
| | | | Wildlife | | |
| 121 | San Juan County | 33 | Yes | BLM should remove the crucial winter range for elk in San Juan County, including all prescriptions, impacts, environmental consequences, etc. from the DRMP (pg. 3-173). | Throughout the DRMP/EIS, the reference to "deer and elk habitat" has been replaced with "deer and/or elk" habitat. Since the prescriptions and environmental consequences for the two animals are very similar, the habitats were considered together. |
| | | | Wildlife | | |
| 121 | San Juan County | 34 | Yes | Pronghorn do not use piñon-juniper habitat. Correct this inconsistency in Table 4.138 on page 4-442. | Pronghorn do utilize piñon juniper habitat occasionally but their primary habitat is sagebrush/perennial grass. This has been corrected in Table 4.138. |
| | | | Wildlife | | |

BLM_0010794

## Table 5.9.c. Public Comments and Responses: San Juan County

| 121 | San Juan County | 35 | No | BLM has presented no data that would justify range extensions for mule deer, elk, bighorn sheep or antelope. BLM assumes that habitat is the most important factor limiting ungulate populations, but data from studies indicate that numbers are limited by predation. | UDWR is the agency with jurisdictional authority for mule deer, bighorn sheep, elk, and antelope. The BLM relies on the UDWR for their expertise regarding habitats. The BLM does not have any authority to regulate predation. |
|---|---|---|---|---|---|
| | | | Wildlife | | |
| 121 | San Juan County | 36 | No | Much of the area listed as antelope/kidding habitat on Map 2-25 is seldom actually used by antelope. The failure of antelope to increase in numbers are due to factors other than habitat, such as low fences in the southern end of the area and predation. Unless BLM can produce data showing that the area is heavily used by antelope, multiple use activities should not be restricted. | The BLM has not restricted multiple use activities due to the existence of antelope habitat in San Juan County. A minor timing restriction (45 days) for surface-disturbing activities is imposed on antelope habitat during kidding periods. This timing restriction is within the standard operating procedures for oil and gas activities. UDWR is the agency with jurisdictional authority for predator control.

The DRMP/EIS states on pg. 2-53 "Construct fences that allow for pronghorn passage and dismantle unneeded fences" in pronghorn habitat. |
| | | | Wildlife | | |
| 121 | San Juan County | 37 | No | BLM proposes an increase in bighorn sheep habitat over that proposed in the 1985 RMP. Much of the area proposed is seldom visited by bighorns, as they are never far from escape terrain. Studies have shown that hikers have a greater negative impact on desert bighorns than do motorized users. Predation is the key limiting factor on bighorn, an issue not addressed in the DEIS. | Only the Shafer Basin (within San Juan County) was proposed as bighorn habitat in 1985. The addition of bighorn habitat delineated by UDWR within San Juan County is along the rims of Canyon Rims, and in the Hatch Wash area. The majority of the bighorn habitat is within 0.5 to 1 mile from escape terrain. The BLM is aware of the studies that document the impact of hikers on bighorn sheep. Permitted hiking is restricted on a case by case basis within bighorn habitat under the issuance of Special Recreation Permits as stated on pg. 2-30 of the DRMP/EIS. UDWR is the agency with jurisdictional authority for predator control. |
| | | | Wildlife | | |

BLM_0010795

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 38 | Yes<br><br>Wildlife | BLM has combined deer and elk habitat throughout the analysis. This should be corrected for the following reasons: habitat manipulations that favor elk do not benefit mule deer; elk are above herd objective and need to be reduced; combining habitats is a way to increase elk numbers; BLM ignores the fact that elk will displace mule deer; elk and deer respond differently to development and human use, with elk being more easily displaced than deer; Monticello BLM maps deer and elk habitat separately; there is no elk use on BLM land that BLM wants to classify as "crucial habitat" in San Juan County | The BLM combined deer and elk habitat for the purposes of analysis. On pg. 4-442, the DRMP/EIS states "Mule deer and elk habitat have been combined in an attempt to simplify the management of their closely overlapping ranges…Further discussions and analyses will consider the two species together". The BLM chose to map deer and/or elk habitat on the same map to simplify readability. In the PRMP/FEIS the habitats will be delineated separately on a map.<br><br>However, throughout the PRMP/EIS the wording has been changed from "deer and elk" to "deer and/or elk". The BLM acknowledges that elk are not found on every acre of deer habitat. The land-use plan provides for broad landscape level planning prescriptions. These habitats will be separated for analyses on a site specific project level. UDWR has the jurisdictional authority for population objectives of big game species. |
| 121 | San Juan County | 39 | No<br><br>Wildlife | The 1985 Grand RMP designated only a small area near the LaSal Mountains as habitat for mule deer. The BLM wants to propose an increase with no justification. San Juan County's study (undertaken in the Spring of 2006) found little mule deer use south of East Coyote Wash. BLM ignored these data. Additionally, there is virtually no elk use, except at Lackey Fan and on Three Step Hill. Calling the area deer and elk winter range is without merit. BLM should produce data south of East Coyote Wash to show that this is crucial deer or elk winter range. | UDWR has the jurisdictional authority for the identification of deer and elk habitat. The BLM relied on this expertise. As stated in response to comment 121-38, the BLM has corrected the wording of the habitats to read "deer and/or elk habitats". |

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 40 | No | BLM should not use the phrase "a thriving natural ecological balance" because it does not know what "natural" is (p. 2-5). On Map 2-20, "historic habitat" for sage-grouse is identified as "pre-settlement" habitat. San Juan county has been settled for 10,000 years. | The statement on pg. 2-5 is a simple statement directed to the general public that the BLM attempts to develop management prescriptions on a landscape level which will support and protect wildlife habitats while allowing for multiple use. Pre-settlement habitat of sage-grouse is defined on pg. 34 of the Gunnison Sage-grouse Range Wide Conservation Plan. The term pre-settlement in this document refers to the early 19th century. |
| --- | --- | --- | --- | --- | --- |
| | | | Wildlife | | |
| 121 | San Juan County | 41 | No | Page 2-50: BLM says it will "work in coordination with UDWR to reduce wildlife numbers as necessary to restore sagebrush habitat." BLM does not do this. The factor most responsible for the decline of sagebrush is browsing by mule deer, not drought. | UDWR is the agency with jurisdictional authority for wildlife population numbers. The DRMP/EIS states that BLM will work with UDWR to achieve the UDWR goals. |
| | | | Wildlife | | |
| 121 | San Juan County | 42 | No | Page 3-168. The species name for elk is *Cervus elaphus*, not *Cervus canadensis*. | UDWR lists elk as *Cervus canadensis* and this nomenclature was adopted by the BLM in the DRMP/EIS. |
| | | | Wildlife | | |
| 121 | San Juan County | 43 | Yes | Page 3-169 - 171. Mule deer do not eat dry and dead grass during the winter. Predation, not drought, is the reason for reduced mule deer numbers. ATV's, oil and gas development, mining, livestock grazing do not have the impact that predators have had on mule deer populations. Predation must be discussed in the Draft RMP/EIS. | The BLM stands by the statement on pg. 3-169 that mule deer will eat dead grass during the winter. Predation, although not within the BLM's jurisdiction, can also contribute to mule deer population declines. This has been added to Chapter 3 of the PRMP/FEIS. |
| | | | Wildlife | | |

BLM_0010797

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 44 | No | Page 3-171. BLM states that 90% of the local deer and elk population is located on BLM during an average of five winters out of ten. These data must be produced. On p. 3-172, DWR herd objectives and population estimates for elk are listed. These are imaginary numbers. DWR's elk population estimates are consistently 30-40% low because the agency ignores scientific studies. BLM should acknowledge the error of DWR's estimates. | The BLM has relied on information provided by the UDWR for elk and deer populations and habitat in the DRMP/EIS. UDWR is the agency with jurisdictional authority on these matters. |
| --- | --- | --- | --- | --- | --- |
| | | | Wildlife | | |
| 121 | San Juan County | 45 | Yes | Page 3-173. BLM states that "livestock competition for forage is increasing as the elk herd numbers continue to grow." Forage was allocated to livestock when the allotments were adjudicated; thus, the problem is the increasing elk herd. | The BLM has reworded the sentence on pg. 3-173 to state that forage competition between livestock, other wildlife, and elk is increasing in the Cisco desert. |
| | | | Wildlife | | |
| 121 | San Juan County | 46 | Yes | Page 3-173. Elk use in Hatch Point is zero, in Lisbon Valley and on most of Black Ridge it is near zero. The agency has no data to support its assertions. | Deer and elk habitats were combined for mapping purposes. As stated in response to comment 121-38, these habitats have been delineated separately on a map. |
| | | | Wildlife | | |
| 121 | San Juan County | 47 | No | Table 3.58. BLM's age objectives for antelope make no sense. Antelope do not normally live to 14, and an age objective of 2 means the herd is under extreme harvest pressure, which is not the case. | This information was provided by the UDWR which is the agency with jurisdictional authority. |
| | | | Wildlife | | |
| 121 | San Juan County | 48 | No | What evidence is there that desert bighorns actually use the Redd Sheep Trail? | Pellets from bighorn have been gathered from the Redd Sheep Trail; tracks have also been seen on it, as well as extensively along the rims accessed by this trail. |
| | | | Wildlife | | |

BLM_0010798

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 49 | No | Mule deer, elk and pronghorn do not utilize piñon-juniper habitat, as is asserted in the DEIS. There is no need to protect piñon or juniper; there is the need to clear them to restore natural conditions. Maintenance of chainings must specifically be addressed in the RMP. | See response to comment 121-34. Pronghorn use has been noted in areas where piñon-juniper interfaces with shrub-steppe/grasslands. These piñon-juniper areas are utilized for thermal protection.\n\nThe DRMP/EIS (pg. 2-14) recognizes the need for maintaining vegetation treatments to increase the availability of forage. Many of these treatments involved the removal of piñon-juniper. |
|---|---|---|---|---|---|
|   |   |   | Wildlife |   |   |
| 121 | San Juan County | 50 | No | Page 4-449. Cattle do not eat sagebrush; cattle grazing at the proper time of year can improve sagebrush habitat for mule deer. Livestock do not compete for escape terrain or thermal cover with deer and elk. | Although cattle prefer grass, they will eat sagebrush when necessary. For example, during severe winters cattle may not be able to access grass and as a result they are forced to eat sage brush.\n\nDuring summer months cattle will seek the shade along the edge of piñon-juniper interfaces with sagebrush/grassland. These are areas that deer typically occupy for thermal protection and escape terrain. |
|   |   |   | Wildlife |   |   |

BLM_0010799

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 51 | No | Page 4-452. BLM mentions that elk are intolerant of cattle, which is true, but the BLM fails to mention that mule deer are intolerant of elk. The DEIS needs to discuss elk-deer competition. BLM needs to discuss the negative impact deer browsing has on sagebrush. | UDWR is the agency with jurisdictional authority for big game populations. Elk and deer competition must be addressed by UDWR population objectives.<br><br>Sagebrush communities across the west have been in decline from a myriad of reasons. The BLM Sagebrush Conservation Guidance is prescribed as management common to all action alternatives on pg. 2-50 of the DRMP/EIS. UDWR has not identified overpopulation issues among local deer herds utilizing sagebrush communities. |
|-----|-----|-----|----|----|----|
|     |     |    | Wildlife |  |  |
| 121 | San Juan County | 52 | No | Pages 4-483 and 4-484. Sections 4.3.19.18.2.1 and 4.3.19.18.2.2 erroneously assess the impact of habitat fragmentation on mule deer and elk. BLM's analyses are flawed and should be corrected or removed. Sawyer's 2006 study is not applicable to San Juan County. DWR's study plots are near roads and DWR would not locate its plots close to roads if mule deer and elk use was reduced near roads as claimed by BLM. | The fragmentation analyses in the referenced sections are not an attempt to quantify specific impacts from site specific projects but are presented to analyze the degree of habitat fragmentation under each alternative. GIS models were based on the BLM's best available data. These models address fragmentation differences between alternatives on a landscape level. Habitat fragmentation is one of many factors that play an important role in land management decisions. |
|     |     |    | Wildlife |  |  |
| 121 | San Juan County | 53 | No | Pages 4-484 to 4-485. BLM's analysis of bighorn sheep fragmentation is flawed (p. 4-484- 4-485). BLM fails to mention that hikers disturb sheep more than do vehicles. Predation should also be mentioned, as should the dense growth of non-native woody riparian vegetation found along the Colorado River. | As stated in response to comment 121-52, the analysis of habitat fragmentation for bighorn sheep is a tool to understand the differences in fragmentation among alternatives.<br><br>See response to comment 121-37 for a discussion of hikers on bighorn sheep.<br><br>Predation is under the jurisdiction of UDWR.<br><br>Tamarisk encroachment along the Colorado River was not raised as an issue in the Draft RMP/EIS. |
|     |     |    | Wildlife |  |  |

BLM_0010800

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | However, the BLM recognizes the need for bighorn watering catchments, and has an active program of wildlife watering projects. |
|---|---|---|---|---|---|
| 121 | San Juan County | 54 | No<br><br>Wildlife | Page G-25 (last paragraph). What reduces the survival rate of fawns and calves is predation. | BLM does not manage predation efforts; UDWR is the agency with jurisdictional authority over predation. |
| 121 | San Juan County | 55 | No<br><br>Wildlife | Page N-5. BLM's 1989 RMP amendment gave 1,440 as the "prior stable number" of desert bighorn sheep. On p. 3-176, it states that the DWR's population objective for the Moab area is 450 desert bighorn sheep. Why are these numbers different? | The number of 1,440 was used in the 1989 RMP amendment. The number 450 is an updated number utilized in the DRMP/EIS (2007). The difference is a reflection of the number of years between the two documents (18 years). |
| 121 | San Juan County | 56 | Yes<br><br>Special Status Species | Bald Eagles are not on the Federal Endangered Species List. The animal was removed last June. | The delisting of the Bald Eagle had not occurred prior to the printing of the DRMP/EIS. This change has been made to the PRMP/FEIS. |
| 121 | San Juan County | 57 | No<br><br>Process and Procedures | BLM has not coordinated with local Native American governments regarding wilderness planning, as is required in Section 202 of FLPMA. Anything less than the opportunity for full participation will be considered a violation of law subject to legal action. | During the development of the DRMP, the BLM invited the affected tribal governments to fully participate in the RMP process, to consult on any aspect of the RMP's management prescriptions or actions, and to provide comments or issues of tribal concern. As outlined in Chapter 5 of the Moab DRMP/EIS, the BLM held several meetings with tribal governments concerning the development of the RMP, including holding additional meeting after the DRMP/EIS alternatives were prepared, as requested by the tribal governments. All consulted tribes were provided copies of the alternatives and draft documents. |

BLM_0010801

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | For example, the BLM held several meetings with the Navajo Nation. The BLM met with the Navajo Utah Commission on February 11, 2004, and with the Navajo Nation Historic Preservation Office on December 9, 2003, and on November 13, 2006. The BLM also met with the Southern Ute Tribe on March 30, 2004, and on October 11, 2006; meetings with the Ute Mountain Ute Tribe were held on August 26, 2004, and on February 9, 2007.<br><br>A summary of tribal consultation, including all meetings with tribal governments and issues raised is contained in Chapter 5 of the DRMP/EIS. A complete record of the consultations is available in the Administrative Record for the DRMP/EIS. |
|---|---|---|---|---|---|
| 121 | San Juan County | 58 | No<br><br>Wilderness Characteristics | For lands in question in the wilderness re-inventory, BLM has not adequately considered historical uses of the land, present and potential future uses of the land. Several court cases show that the wilderness planning process fails to adequately address several issues. Wilderness is a land classification and not a management modality. Wilderness is not within the scope of multiple use management. BLM is a rogue agency because it has a single-minded, headlong thrust to declare additional wilderness study areas within San Juan County. BLM has openly and brazenly defied the will of congress and the will of the people. BLM must coordinate with local plans, such as that of San Juan County | No lands are proposed to be managed as Wilderness or WSA in any alternative of the DRMP/EIS. However, the impacts of protecting Non-WSA lands with wilderness characteristics is fully disclosed in Chapter 4 of the DRMP/EIS. The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103© (43 U.S.C. §1702©).) The FLPMA intended for the Secretary of the Interior to use land-use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations. |

BLM_0010802

**Table 5.9.c. Public Comments and Responses: San Juan County**

| 121 | San Juan County | 59 | No | BLM has refused to issue oil and gas leases because of the introduction of H.R. 1500, "America' Red Rock Wilderness" | Certain oil and gas parcels were deferred from leasing pending completion of the Moab RMP because of dated NEPA analysis. The BLM does not manage public land based on pending draft or proposed legislation. |
|---|---|---|---|---|---|
| | | | Wilderness Characteristics | | |
| 121 | San Juan County | 60 | No | BLM must have public hearings, adequate notice and opportunity to comment upon, and participate in the formulation of plans and programs. There have only been two meetings to give the public an opportunity for clarification, and it was unclear whether the meetings held were "open houses" or "public hearings". | Public participation opportunities are detailed in Chapter 5 of the DRMP/EIS. To satisfy the public participation requirements of FLPMA, the BLM initiated the public scoping process on June 4, 2003 and the scoping period extended until January 31, 2004. Six open houses and a comment cruiser were utilized to gather public input as well as a website with provisions for emailing comments and an invitation to provide written comments via letters. A mailing list has been established of interested parties and a planning website has been maintained throughout the process. The public was invited to review and comment on the DRMP/EIS from August 27, 2007 to November 30, 2007. Four open houses were held to solicit comments from the public on the DRMP/EIS. The public was notified about the open houses through newspaper advertisements and articles, radio announcements, the RMP website, and postcards mailed to everyone on the mailing list. The open house format was utilized because it is more conducive to full public participation. |
| | | | Process and Procedures | | |
| 121 | San Juan County | 61 | No | BLM must make a clear statement of whether it intends to designate WSAs for those areas that have wilderness character. | The BLM is not authorized to designate "Non-WSA Lands with Wilderness Characteristics" as WSAs or manage these lands under the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995). |
| | | | Wilderness Characteristics | | |

BLM_0010803

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The BLM authority to establish new WSAs pursuant to Section 603 of FLPMA expired no later than October 21, 1993, therefore as stated on pg. 1-12 of the Moab DRMP/EIS designation of new wilderness areas or WSA proposals are decisions outside of the scope of the DRMP/EIS. |
| 121 | San Juan County | 62 | No<br><br>Wilderness Characteristics | BLM should have a more generous road set-back. The BLM "standard" is indefensible. It provides no reasonable or rational opportunity for maintenance of roads. The BLM's boundaries are at man made barriers, which has resulted in capturing large chunks of State Trust land as well as some parcels of private land. This violates the County Comprehensive Plan which calls for no net loss of private land within the county. | The road set-back described by San Juan County only applies to roads within or adjacent to WSAs. The WSA setback is established by National BLM policy and is beyond the scope of the plan.<br><br>Routes adjacent to or within Non-WSA lands with wilderness characteristics have been accorded setbacks varying according to the classification of the road. These setbacks range from 3 to 91 meters. The acreage of Non-WSA areas with wilderness characteristics has been reduced to realize these setbacks. Information has been added to Chapter 3 of the PRMP/FEIS to clarify these setbacks.<br><br>The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, the BLM is bound by Federal law. As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled. The FLPMA requires that BLM's land-use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there |

BLM_0010804

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | will be an inconsistency that cannot be resolved. The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| 121 | San Juan County | 63 | No<br><br>Wilderness Characteristics | San Juan County objects to the 1996-99 Wilderness Character Re-inventory process. FLPMA does not provide for wilderness as a multiple use. | The BLM is required by FLPMA to maintain inventories of all resources and to use the inventory information during land-use planning (FLPMA Section 201 and 202 (43 U.S.C. §1711-1712)). The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."(FLPMA, Section 103(c) (43 U.S.C. §1702(c))) The FLPMA intended for the Secretary of the Interior to use land-use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>See also responses to comments 120-8 and 121-10. |
| 121 | San Juan County | 64 | No<br><br>Wilderness Characteristics | BLM did not make information public regarding the impact of additional WSA designations. | The DRMP/EIS proposes no lands for additional WSA designation.<br><br>The document identifies non-WSA lands that are proposed to be managed to maintain their wilderness characteristics. |

BLM_0010805

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | There are 26,162 acres of such lands within San Juan County in Alt B, and none in the Preferred Alternative, Alt C. All of the information that was utilized in making these determinations is publicly available, and any information which is not on the Moab RMP website will be provided to any interested party. |
| 121 | San Juan County | 65 | No<br><br>Wilderness Characteristics | BLM must consider all grazing files, mineral files, lands cases, recreation use permits etc. in terms of the suitability of the land to be managed for wilderness designation. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land-use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.<br><br>Chapter 4 of the DRMP/DEIS analyzes the impacts from management prescriptions which protect Non-WSA lands with wilderness characteristics, and the impacts on other resources and uses because of that protection. In addition, during the inventory process, the majority of the existing land-uses were identified and taken into consideration when determining areas with wilderness characteristics. The source of the information was documented unit-by-unit during the wilderness review. An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the units, was part of the review process. This inventory is available on the Moab RMP website, and is part of the Administrative Record. The information is also available upon request.<br><br>Those non-WSA lands that are considered for management of wilderness characteristics in Alternative B were analyzed for their suitability for other uses. |

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | These uses were the reasons why there are no non-WSA lands within the county that are managed for wilderness characteristics in the Preferred Alternative.<br><br>Those Non-WSA lands that are considered to be managed to maintain the wilderness characteristics in Alternative B were also analyzed for their suitability for other uses.<br><br>See also response to comment 121-63. |
| 121 | San Juan County | 66 | No<br><br>Wilderness Characteristics | BLM must consider access, economic analyses, Native American issues and alternatives for management in terms of manageability for wilderness. | No lands are considered for wilderness designation.<br><br>Those non-WSA lands that are considered for management for wilderness characteristics in Alternative B were analyzed for access, economic uses, alternatives for management, and Native American concerns. These were among the reasons why there are no non-WSA lands within the San Juan County that are managed for wilderness characteristics in the Preferred Alternative (Alt C). |
| 121 | San Juan County | 67 | No<br><br>Wilderness Characteristics | The mineral evaluations associated with the wilderness re-inventory are inadequate. The values of the foregone minerals must be calculated in areas under study for possible WSA designation. BLM violates its national minerals policy. BLM has failed to issue oil and gas leases because of planning. USGS is not involved in the wilderness process. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land-use planning effort, as identified on pg. 1-2 of the DRMP/EIS.<br><br>A comprehensive Mineral Report was prepared for the entire Moab planning area. This report was prepared by the Utah Geological Survey, in cooperation with the BLM. The report includes a comprehensive evaluation of the mineral potential of all mineral resources in the area. It also included an assessment of the development potential of all mineral resources in the area. |

BLM_0010807

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | In addition, a Reasonably Foreseeable Development scenario for oil and gas resources was prepared in cooperation with the Utah Geological Survey. The scenario provides projections of the potential oil and gas development in the entire area over the next 15 years.<br><br>The mineral evaluations included all the Non-WSA lands found to have wilderness characteristics and were conducted in conformance with the BLM national minerals policy. The EPCA inventory of oil and gas resources prepared by the USGS was used in drafting the Mineral Report. Impacts to the affected mineral resources were analyzed and disclosed in Chapter 4 of the DRMP/EIS. |
| 121 | San Juan County | 68 | No<br><br>Wilderness Characteristics | The BLM should examine and discuss the potential economic losses to those areas associated with potential wilderness or WSA designation. It should also put forth alternatives where these adverse economic affects can be mitigated, such as larger PILT payments. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land-use planning effort, as identified on pg. 1-12 of the DRMP/DEIS.<br><br>Those Non-WSA lands that are considered for management of wilderness characteristics were analyzed for the economic effects of that action. For example, on pg. 4-94 of the DRMP/DEIS, the number of oil and gas wells foregone in Alternative B is discussed.<br><br>The PILT payments are outside the scope of the land-use planning process. |
| 121 | San Juan County | 69 | No<br><br>Wilderness Characteristics | San Juan County objects to using "cherry stemming" to create wilderness where none exists under the law. If BLM recognizes a road as a boundary, what is the setback? | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land-use planning effort, as identified on pg. 1-2 of the DRMP/DEIS. |

BLM_0010808

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "Cherry stemming" is a land management technique that facilitates better land management by allowing ingress and egress without compromising a special designation. This technique is often applied to WSAs. However, the BLM is not proposing any WSAs under any alternative in the Moab DRMP/DEIS. Furthermore, no lands are proposed for management of wilderness characteristics in San Juan County for Alternative C of the DRMP/DEIS.<br><br>Road setbacks are addressed in response to comment 121-62. |
| 121 | San Juan County | 70 | No<br><br>Wilderness Characteristics | FLPMA requires a consistency review with local plans. The San Juan County Comprehensive Plan must be considered. Any diversions from the objectives of this plan by BLM must be accompanied by an explanation of why the BLM could not lawfully conform to the county plan. | The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, the BLM is bound by Federal law. The FLPMA requires that the development of an RMP for public lands must be coordinated and consistent with County plans, to the maximum extent possible by law, and inconsistencies between federal and non-federal government plans be resolve to the extent practical (FLPMA, Title II Sec. 202 (c)(9)). As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled.<br><br>Thus, while County and Federal planning processes, under FLPMA, are required to be as integrated and consistent as practical, the Federal agency planning process is not bound by or subject to County plans, planning processes, or planning stipulations. |

BLM_0010809

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The BLM will identify these conflicts in the PRMP/FEIS, so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. A consistency review of the PRMP with the State and County Master Plans is included in Chapter 5.<br><br>No lands are considered for wilderness designation in the DRMP/EIS. Also, no non-WSA areas with wilderness characteristics are proposed for management in Alt C. |
| 121 | San Juan County | 71 | No<br><br>Wilderness Characteristics | Solitude is a subjective concept. Area ranchers would express the view that recreationists have a negative influence on solitude. What do "outstanding" opportunities for solitude mean? What constitutes primitive or unconfined recreation. What is more important -- the economic viability of a county or solitude for an elite few? | Congress crafted the terms "outstanding opportunities for solitude" and "primitive or unconfined recreation" when it enacted the Wilderness Act of 1964. The BLM Washington Office Instruction Memorandum 2003-275 Change 1 defines these terms for the purposes of land-use planning. In general, when the sights, sounds, and evidence of other people are rare or infrequent, where visitors can be isolated, alone or secluded from others, where the use of the area is through non-motorized, non-mechanical means, and where no or minimal developed recreation facilities are encountered can provide visitors with the opportunity for solitude or primitive or unconfined recreation.<br><br>The economic impacts of managing non-WSA lands with wilderness characteristics were analyzed in Chapter 4 of the DRMP/EIS. |
| 121 | San Juan County | 72 | No | Comment Analysis on the 1999 Wilderness Inventory found that those supporting wilderness were from out of state. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land-use planning effort, as identified on pg. 1-2 of the DRMP/DEIS. |

BLM_0010810

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | Wilderness Characteristics | Those supporting wilderness that were from Utah were from Salt Lake, Ogden and Logan. San Juan County residents were clearly opposed to any action by BLM to designate more land for WSAs. Native American comment letters were opposed to wilderness designation. Local comments are more impassioned, knowledgeable and we believe warrant more weight being placed on them. Unit specific comments follow. The 1999 inventory was not really field-truthed and there is a lack of consistency between field personnel. In this (1999) inventory, the BLM has developed their own set of rules and definitions as to what constitutes wilderness. BLM has not followed the direction of Congress in defining wilderness. | Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people.<br><br>As part of BLM's wilderness characteristics inventory maintenance, BLM performed a combination of data and on-site reviews. This included specific field inspections, ID team review of data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness re-inventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office website, and in the Administrative Record). The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings which involved wilderness characteristics inventory maintenance. |
| 121 | San Juan County | 73 | No<br><br>Wilderness Characteristics | Comment from 1999 Wilderness Inventory: Behind the Rocks: this area should not be considered for further wilderness activities. It is within the Paradox Fold and Fault Belt and has high potential for oil and gas. It has the potential for uranium and vanadium, as well as potash and copper. It does not qualify for wilderness because of past impacts. There are 13 roads within the unit, each of which is discussed specifically, with photos provided. | No lands are considered for wilderness designation in the DRMP/EIS.<br><br>No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Behind the Rocks area. |
| 121 | San Juan County | 74 | No<br><br>Wilderness | Comment from 1999 Wilderness Inventory: Gooseneck: San Juan County has no information that would refute BLM's finding | No lands are considered for wilderness designation in the DRMP/EIS. |

BLM_0010811

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | Characteristics | in this area. It contains about 5,000 acres of public land, and to our knowledge has few intrusions. It should be pointed out, however, that this area does have the potential for minerals including potash, uranium and oil and gas. The economic potential of these minerals should be done if the area is designated wilderness. The minerals values outweigh the wilderness values. The BLM did miss four roads within or adjacent to the unit (photos and write-ups provided). | No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Gooseneck area. |
| 121 | San Juan County | 75 | No<br><br>Wilderness Characteristics | Comment from 1999 Wilderness Inventory: Hatch Wash: this unit is particularly disturbing to San Jan County. BLM is creating wilderness where wilderness does not exist. There are roads, seismograph lines, fences and other intrusions covering the landscape. The Hatch Wash area has high potential for oil and gas, uranium, vanadium, copper and potash. San Juan County requests that the area be dropped from further wilderness consideration. Specific roads in the area are identified by San Juan County. | No lands are considered for wilderness designation in the DRMP/EIS.<br><br>No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hatch Wash area. |
| 121 | San Juan County | 76 | No<br><br>Wilderness Characteristics | Comment from 1999 Wilderness Inventory: Hunter Canyon: Mineral values will be foregone if wilderness is designated for this area. It has oil and gas, uranium, vanadium, copper, barite and potash. Specific roads are discussed within the comment. | No lands are considered for wilderness designation in the DRMP/EIS.<br><br>No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hunter Canyon area. |
| 121 | San Juan County | 77 | No<br><br>Wilderness Characteristics | Comment from 1999 Wilderness Inventory: Shafer Canyon: This unit is not suitable or manageable as wilderness, and it violates the 5,000 acre requirement. It has oil and | No lands are considered for wilderness designation in the DRMP/EIS.<br><br>No non-WSA lands with wilderness characteristics are proposed for management |

BLM_0010812

**Table 5.9.c. Public Comments and Responses: San Juan County**

| | | | | | |
|---|---|---|---|---|---|
| | | | | gas, uranium, vanadium, copper and potash resources. Individual roads are also discussed. San Juan County suggests that it could easily be managed as an area of critical environmental concern to protect the scenic qualities and vistas from Dead Horse Point. | in Alternative C (Preferred) of the DRMP/EIS in the Shafer Canyon area.<br><br>The area does constitute a portion of the Highway 279/Long Canyon/Shafer Basin ACEC that is proposed in Alt C (Preferred) to protect scenic resources, particularly the vista from Dead Horse Point State Park. |

BLM_0010813

**Table 5.10.a. Comments Requiring a Change in the Document: Air Quality**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 8 | Arches National Park | 1 | Yes | In Section 3.2, Table 3.2 of the draft RMP/EIS, there are only ozone concentrations for La Plata County and Mesa Verde National Park in Colorado included, though ozone has been monitored at Canyonlands National Park for a number of years and is considerably nearer the area of interest. Those data should be included in the EIS, as well. NPS data shows a deteriorating trend for ozone, which may reflect more current data than that used for the RMP. Data for 2005 are available at www2.nature.nps.gov/air/monitoring/ads/ADSReport.cfm. | This data has been added to applicable table in Chapter 3 of the PRMP/FEIS. |
| 124 | SUWA | 115 | Yes | The Draft RMP fails to analyze the impacts of climate change to MFO resources. Soil disturbing activities such as recreation, grazing, and energy exploitation reduce or remove the natural components that stabilize desert soil, increasing soil loss through wind and water erosion. The BLM should design alternatives that minimize soil disturbance. BLM should designate an alternative with far fewer than the 2600 miles of back country ORV routes that Alternative C contains. The cumulative effects of various uses like ORV recreation and grazing should be considered in the context of climate change. The BLM is urged to develop and adopt an alternative that minimizes the extent of soil disturbance and reduces the Field Office's vulnerability to the effects of climate change. | The assessment of so-called "greenhouse gas" emissions and climate change is in its formative phase; therefore, it is not yet possible to know with confidence the net impact to climate. However, the intergovernmental Panel on Climate Change (IPCC 2007) recently concluded that "warming of the climate system is unequivocal" and "most of the observed increase in globally average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic (man-made) greenhouse gas concentrations."

The last of scientific tools designed to predict climate change on regional or local scales limits the ability to quantify potential future impacts. However, potential impacts to air quality due to |

BLM_0010814

**Table 5.10.a. Comments Requiring a Change in the Document: Air Quality**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | climate change are likely to be varied. For example, if global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased wind blown dust from drier and less stable soils. Cool season plant species' spatial ranges are predicted to move north and to higher elevations, and extinction of endemic threatened/endangered plants may be accelerated. Due to loss of habitat, or due to competition from other species whose ranges may shift northward, the population of some animal species may be reduced. Less snow at lower elevations would be likely to impact the timing and quantity of snowmelt, which, in turn, could impact aquatic species.<br><br>Information regarding global climate change has been added to Chapters 3 and 4 of the PRMP/FEIS.<br><br>The BLM will not, in the foreseeable future, have tools to predict the effects of oil and gas development on climate change. This type of analysis can only be done at the research level, and then only on large (near-continental size areas) of wide spread emissions. It will be a long time before the BLM can say anything about specific projects on climate change or the impact of climate change on our resources. |

BLM_0010815

### Table 5.10.a. Comments Requiring a Change in the Document: Air Quality

| 215 | EnCana Oil | 15 | Yes | The assumption on page 4-18 that a control efficiency of 37% would be obtained by watering of all exposed disturbance areas is inconsistent with the assumption on page 4-16 that 50% control of particulate emissions would be obtained by watering. The DRM should be corrected to consistently reflect the assumptions actually used in the quantification of impacts | The PRMP/FEIS has been corrected in Chapter 4 on air quality to reflect consistent assumptions. |
|---|---|---|---|---|---|
| 479 | Environmental Protection Agency | 1 | Yes | The BLM (in Table 4-8 of the DRMP/EIS) indicates that projected concentrations (of air pollutants) would be below National Ambient Air Quality Standards for criteria pollutants and hydrogen sulfide, but does not show the concentrations. The DRMP/EIS does not describe the methods used to calculate the projected concentrations. EPA recommends that the BLM disclose this information in the Final RMP/EIS. | The methods used to calculate the projected concentrations of pollutants and hydrogen sulfide are included in the PRMP/FEIS.<br><br>Analyses of impacts on ozone, visibility, and deposition are included in Chapter 4 of the PRMP/FEIS.<br><br>No comparisons are made to NAAQS in the PRMP/FEIS. |
| 479 | Environmental Protection Agency | 2 | Yes | The air quality analysis omits potential impacts to ozone, visibility or deposition. The planning area encompasses class I National Park Service airsheds. Ozone is of particular concern because of the potential emissions of volatile organic compounds and oxides of nitrogen from oil and gas development. | Analysis of impacts to ozone, visibility, and deposition require air dispersion modeling. |
| 479 | Environmental Protection Agency | 3 | Yes | The Final RMP/EIS should include information on the effects of oil and gas development on climate change (from $CO_2$ emission). EPA recommends that the BLM encourage oil and gas lessees to participate in EPA's Natural Gas STAR program. | See response to comment 124-115. |
| 479 | Environmental Protection Agency | 4 | Yes | Because a semi-quantitative approach to air quality analysis was taken in the Moab RMP, it is not possible to determine potential impacts to air quality from specific oil and gas development (see Section 4.3.1.3 of the DRMP/EIS). Nevertheless, it is important to assign | A statement has been added to Chapter 2 of the PRMP/EIS, under Management Common to All, which states the following: "As appropriate, quantitative analysis of potential air |

BLM_0010816

**Table 5.10.a. Comments Requiring a Change in the Document: Air Quality**

| | | | | | |
|---|---|---|---|---|---|
| | | | | responsibility for project-specific air quality analyses for the future. EPA recommends that the Final RMP/EIS contain this wording from the Rawlins BLM DRMP/EIS, which also used a comparative, emissions-based approach: "As project-specific developments are proposed, quantitative air quality analysis would be conducted for project-specific assessments performed pursuant to NEPA." | quality impacts would be conducted for project specific developments. |
| 479 | Environmental Protection Agency | 19 | Yes | On pg. 4-17 of the DRMP/EIS, the BLM discusses rates of emissions from compressor engines in grams per horsepower-hour. Table 4.6 shows emission rates in grams per second, but the text does not explain whether BLM made this calculation in order to estimate impacts using the semi-quantitative method or for some other reason. An explanation is needed in the Final RMP/EIS as to why different units appear in this section, or convert emission rates to the same units. | The text and tables in Chapter 4 of the PRMP/EIS have been modified to provide an explanation regarding the units of analyses. Conversions were made from AP-42 emission factors using assumptions typical for compressors used in oil/gas in Utah. |
| 826 | James Lynch | 1 | Yes | I did not find a discussion of air or water pollution in the alternative discussion. | A statement has been added to Chapter 2 under "Management Common to All," which states: "As appropriate, quantitative analyses of potential air quality impacts would be conducted for project specific developments. |

**Table 5.10.b. Comments Requiring a Change in the Document: Areas Of Critical Environmental Concern**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 124 | SUWA | 86 | Yes | Upper Labyrinth ACEC nomination - SUWA nominates the area south of the town of Green River and north of the Ruby Ranch. The nominated ACEC that the Price BLM has on the west side of the | The BLM considered this ACEC nomination which was submitted during the comment period for the DRMP/EIS. The values mentioned by the Commenter in the Upper |

BLM_0010817

**Table 5.10.b. Comments Requiring a Change in the Document: Areas Of Critical Environmental Concern**

| | | | | Green River. | Labyrinth area are scenic, historical, fish, and natural processes. The BLM convened an interdisciplinary team to consider this nomination. The team found the historical, fish, and natural processes to be relevant. Scenery was not found to be relevant. While the canoe trip along the Green River is a |
|---|---|---|---|---|---|
| | | | | This ACEC meets that relevant criteria due for scenic, historical, fish, and natural processes associated with the river and its surrounding landscape; historic values ranging from Crystal Geyser to the Powell expedition; and fish and wildlife | |
| | | | | habitat. The scenery and landscape of this are is outstanding and offers visitors and outstanding experience either by hiking or by canoeing. | highly sought after recreational experience, this portion of the Green River is only a portal to the scenery in the lower part of the canyon below Ruby Ranch. |
| | | | | The nomination meets the importance criteria for scenery and for historical values. In addition, the Green River is habitat to Threatened and Endangered fish and Labyrinth Canyon is an internationally acclaimed canoe trip through BLM lands. This area faces heightened threats from oil and gas development or with the state of Utah leasing portions of the riverbed. | The relevant values of historical, fish, and natural processes were not found to be important. While John Wesley Powell did float this portion of the river, there were no significant events occurred in this portion from a historical perspective. The threatened and endangered fish that may inhabit this portion of the river are found throughout the Colorado and Green River system. This particular reach of the river provides no special habitat for these fish. |
| | | | | | The natural processes along this portion of the Green River are neither fragile, sensitive, rare, irreplaceable, exemplary, or unique. |
| | | | | | Because the nomination does not meet the importance criteria, it will not be carried forward as a potential ACEC in the PRMP/FEIS. |
| | | | | | The analysis supporting this conclusion has been incorporated into Appendix I of the PRMP/FEIS. |

BLM_0010818

**Table 5.10.b. Comments Requiring a Change in the Document: Areas Of Critical Environmental Concern**

| 203 | Independent Petroleum Assn. of Mountain States | 13 | Yes | The DRMP/EIS fails to demonstrate that the proposed ACEC decisions meet the regulatory criteria of importance and relevance. 43 CFR § 1610-7-2. Secondly, many of the identified resource values already receive adequate protection through other management prescriptions. 43 USC § 1702 (a) (ACECs may be designated "where special management attention is required…to prevent irreparable damage"); BLM Manual 1613.51-53 (ACECs unnecessary when other designations are adequate to protect a resource or value.) | A rationale for designating or not designating ACECs in the Preferred Alternative of the DRMP/EIS is found in the Administrative Record referred to as the ACEC Final Report. The List of Threats and the Rationale for Designating or Not Designating ACECs in the Proposed Alternative is available to the public upon request. Relevant text has been added to Appendix I of the PRMP/FEIS. |

**Table 5.10.c. Comments Requiring a Change in the Document: Cultural Resources/Native American Consultation**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 1 | Colorado Plateau Archaeological Alliance | 26 | Yes | The tiered approach reflected in the three action alternatives (more under Alternative B, less under Alternative C and even less under Alternative D) is problematic and would appear to reflect a common misperception that National Register designations are accompanied by greater levels of protection for listed resources. | All cultural resources are protected by law regardless if they are listed on the National Register or not. The priority for nominating cultural sites to the National Register has been removed. |

BLM_0010819

**Table 5.10.c. Comments Requiring a Change in the Document: Cultural Resources/Native American Consultation**

| 123 | COHVCO/Blue Ribbon | 48 | Yes | "Inadvertent impacts" is undefined and is not discussed in the EIS. Inadvertent impacts are therefore an unfounded assumption which cannot be attributable to OHV or mechanized use. BRC believes a plan of mitigation, rather than prohibition, is possible and beneficial. This particularly so because numerous recreators use OHVs to access important historical sites. | Information has been added to Chapter 3 of the PRMP/FEIS that cultural resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. Basically that increased access results in increased inadvertent impacts, looting, and vandalism. References will be cited. |
|---|---|---|---|---|---|
| 430 | Ute Mountain Ute Tribe | 1 | Yes | Upon review of your draft it seems some of the Utah Mountain Ute Tribe's important cultural issues have not been addressed. The women of White Mesa Ute Community, located south of Blanding, Utah, have traditionally made baskets from squawbush. One of the most critical areas where they gather this plant is off Highway 128, adjacent to the Arches National Park boundary and the river. These baskets play an important role in the culture and traditions of the White Mesa Community. The Tribe would therefore formally request that gathering of squawbush be allowed to continue in this area, and that it be made clear that the proposed restrictions in this area do not apply to gathering of plans for both medicinal and traditional practices such as basket making. Allowing these traditional gathering practices to continue would result in minor environmental impacts, while simultaneously allowing the White Mesa community to practice and preserve their cultural heritage. | On page 2-56 of the DRMP/EIS, under management common to all alternatives, it states: "Permit sustainable harvest (including cutting of green willows and cottonwoods) for Native American traditional ceremonial use". Squawbush has been added to this list of plants to specifically accommodate the Utah Mountain Ute Tribe's request. |
| 489 | National Trust for Historic Preservation | 2 | Yes | The Draft RMP may exempt hundreds, if not thousands, of route miles from the requirements of Section 106 by labeling them "existing" routes. | A sentence has been added on pg. 2-7 of the DRMP/EIS defining "new route": New routes are defined as those not designated in the Travel Plan accompanying this RMP". |

BLM_0010820

**Table 5.10.c. Comments Requiring a Change in the Document: Cultural Resources/Native American Consultation**

| | | | | | |
|---|---|---|---|---|---|
| | | | | Under the preferred alternative, BLM would not perform Class III inventories prior to designating an "existing" OHV route for continued use. Draft RMP at 2-7. This management prescription comes from a BLM Instruction Memorandum (1M) issued in December 2006, which generally requires Class III inventories for the designation of "new" routes but not for the designation of continued use on "existing" routes. IM No. 2007-030. However, neither the DRMP nor the IM define the term "existing route." BLM must define the term "existing" route to mean only those routes previously designated through the land-use planning process and for which BLM completed the Section 106 process. | |
| 868 | The Hopi Tribe | 1 | Yes | Regarding B, C, and D, we do not support the 2/3 of sites allocated for scientific use, and less than 1/3 for conservation for further use. Avoidance of Hopi sacred sites and traditional use areas is the only real means of preventing impairment of these resources. | The BLM concurs with the Hopi Tribe that archaeological resources cannot be allocated to various uses prior to the study of these resources. The decision allocating archaeological resources has been removed from the PRMP/FEIS. |
| 492 | Diane Orr | 1 | Yes | The National Historic Preservation Act directs the BLM to do inventories, actively manage and nominate sites for historic registration. | National Register nomination is done on a site-specific basis and does not require a land-use plan decision. The prioritization of National Register nominations has been removed from the PRMP/DEIS. |
| 492 | Diane Orr | 2 | Yes | There are two different totals given as to the number of cultural sites on BLM lands within the Moab Field Office. | The number of identified cultural sites has been corrected on p. 4-253. |

BLM_0010821

**Table 5.10.d. Comments Requiring a Change in the Document: Cumulative Impacts**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 658 | Richard Griffin | 1 | Yes | The cumulative impact analysis for the RMP is inadequate. It does not support the conclusions reached and does not provide sufficient information to evaluate the impact. | The BLM has added reasonably foreseeable non-BLM actions to the cumulative impact analysis. |

**Table 5.10.e. Comments Requiring a Change in the Document: Hazardous Materials**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 9 | ECOS Consulting | 21 | Yes | Page 4-241,3rd Paragraph, 4.3.11: "AML" is not defined and is not listed in the "Acronyms and Glossary" section. It is highly probable that the protection of sites from "hazardous materials spills and spill site cleanup" will involve some amount of soil disturbance and drainage re-direction and/or storage. | The acronym AML is defined on pg. 2-10 of the DRMP/EIS as Abandoned Mine Lands. This acronym will be added to the glossary. AML projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land-use plan. |

BLM_0010822

**Table 5.10.f. Comments Requiring a Change in the Document: Lands and Realty**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 12 | Pacificorp | 12 | Yes | PacifiCorp does not support the BLM's proposal in the RMP to eliminate the existing utility corridor from Cisco to US Highway 191. | Under Alternatives C and D, the Interstate Highway 70 utility corridor has been widened to include all major existing utilities. The wider corridor merges two corridors designated in the 1985 Grand RMP. Currently, there are no rights-of-way for electrical lines within the corridor south of I-70.<br><br>This language has been corrected to state that "the existing utility corridor from Cisco to Highway 191 north of Arches National Park would be merged with the I-70 corridor under all action alternatives" (pg. 4-65 of the DRMP/EIS). In addition, the statement on page 2-11 of the DRMP/EIS that the "utility corridor from Cisco to Highway 191 north of Arches has been eliminated" has been deleted from the text of the PRMP/FEIS. |
| 215 | EnCana Oil and Gas | 19 | Yes | There is a typographical error on page 4-68 in the last line of the second full paragraph. The line should read, "Alternative D, and would have corresponding impacts on the construction of future ROWs" | This is a typographical error, and it has been fixed. |
| 586 | U.S. Fish and Wildlife Service | 5 | Yes | page 2-11, table 2.1 We recommend that BLM identify and incorporate the FWS Interim Guidelines for Wind Power (2003) in the "Management Common to All Action Alternatives" for the Lands and Realty section. Implementation of these recommendations will help to minimize impacts from wind power development projects to wildlife, particularly birds and bats, and their habitat. | The text on pg. 2-11 of the DRMP/EIS has been changed to read "Authorization of any ROW for wind or solar energy development would incorporate best management practices (including the United States Fish and Wildlife Service's "Guidelines for Wind Power"..." |

BLM_0010823

**Table 5.10.g. Comments Requiring a Change in the Document: Livestock Grazing**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 9 | ECOS Consulting | 26 | Yes | Page 4-242, Table 4.71: Percentages are wrong. Actually they are: 32.9% (Alternative B), 8.7% (Alternative C), or 7.4% (Alternative A), or 3.7% (Alternative D). | The BLM agrees that the percentages on Table 4.71 and in the text are wrong and that the percentages provided by the Commenter are correct. The corrections to the table and text have been made in the PRMP/FEIS. |
| 204 | The Nature Conservancy | 21 | Yes | We notice that the next-to-last item under Management Common to All Action Alternatives refers to grazing not being authorized on portions of Beaver Creek – which we support, but which appears to be inconsistent with the treatment of Beaver Creek in Alternatives C and D on Page 2-13. Further, this list contains reference to "Bogart," and in this context it is not clear if it refers to grazing not being authorized on the entire Bogart Allotment (which we support), or just along portions of streams within that allotment. | The reference to Beaver Creek and Bogart being unavailable for grazing in Riparian: Management Common to All Action Alternatives is incorrect and this error has been corrected.) |
| 416 | John and Sena Hauer | 2 | Yes | Suggestions regarding Alternative C: Build a livestock fence only on the southeast side of the highway, and do not permit grazing between the highway and the river. Build the fence only 1,900 feet from the highway on the southeast side instead of 2,000 feet, in order to compensate the permitee for lost grazing between the highway and the river.<br><br>Advantages: Only one fence would have to be constructed. Livestock would not be permitted in the campground areas and raft put-ins at Onion Creek. The campground and put-ins at Hittle Bottom are already fenced. | The text in Chapter 2 of the PRMP/FEIS for Alt C has been changed to read: "A fence would be constructed along the southeast side of Highway 128 (set back to protect the scenic resources of the National Scenic Highway)". |

BLM_0010824

**Table 5.10.g. Comments Requiring a Change in the Document: Livestock Grazing**

|  |  |  |  | Since the grazing between the river and the highway would be fragmented into such small areas, it would appear to be more convenient for the permitee to have an equal amount of grazing added to the northeast side than to attempt to utilize the small parcels of the northwest side of the highway. |  |
| --- | --- | --- | --- | --- | --- |
| 586 | U.S. Fish and Wildlife Service | 6 | Yes | page 2-12, table 2-1 It is unclear why Alternative C (Preferred) would make available for grazing 12,673 more acres than Alternative A (No Action). We recognize that this may be to allow for greater flexibility in grazing management, such as rest rotation techniques, which can benefit range and habitat. This is unclear, however, and we recommend that the purpose of increasing grazing acreage NOT be to increase AUMs within the MPA. | Pear Park and Ida Gulch have been added to the list of allotments that are unavailable for grazing in the preferred alternative. Pear Park was unavailable for grazing in the 1985 Grand RMP (for wildlife forage). Ida Gulch is in habitat for Jones cycladenia. Other allotments that are unavailable in Alt A but available in Alt C would be subject to range studies prior to determining suitable grazing allocations. If there were suitable permittees interested in applying for these permits, an Environmental Assessment would be conducted. One consideration that may be identified would involve nearby permittees utilizing these newly available allotments without an increases in total AUMs. Additionally, all newly available allotments would require Section 7 consultation which will insure that the concerns and recommendations of the USFWS are considered. |
| 195 | Van Loan Ranches | 2 | Yes | There are two different Utah grazing allotments named Spring Creek in the Dolores Triangle. One is the spring Creek-Colorado allotment, managed by Colorado BLM as part of our Colorado allotment. The other allotment is Spring Creek-Utah, which has been unavailable for livestock grazing for a number of years. These are two separate, non-contiguous allotments. | The confusion regarding the two Spring Creek allotments has been corrected in the PRMP/FEIS. The map of grazing allotments has also been corrected. |

BLM_0010825

**Table 5.10.h. Comments Requiring a Change in the Document: Minerals–Oil and Gas**

| | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 124 | SUWA | 98 | Yes | The BLM must consider a no leasing alternative. The current draft of the RMP fails to consider such an alternative. Federal courts have made clear that a no leasing alternative should be a vital component in ensuring that agencies have all possible approaches before them (See, e.g., Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 [9[th] Cir. 1988]. | The BLM's consideration of the no leasing alternative has been added to Chapter 2 of the PRMP/FEIS under the section on Alternatives Considered but Eliminated from Analysis. |
| 201 | Samson Resources | 6 | Yes | Section 1.4.7 -Memorandum of Understanding with Forest Service: The BLM improperly references a 1991 Memorandum of Understanding between the BLM and the United States Department of Agriculture, Forest Service (Forest Service) establishing joint BLM and Forest Service procedures for managing oil and gas leasing and operational activities in the Moab DRMP/EIS. The BLM and the Forest Service issued the Memorandum of Understanding required by Section 363 of the Energy Policy Act in April of 2006. | The reference to the Memorandum of Understanding between the BLM and the Forest Service regarding oil and gas leasing has been changed in the PRMP/FEIS from 1991 to 2006. |
| 202 | Cabot Oil & Gas | 7 | Yes | | |
| 214 | Bill Barrett Corp. | 27 | Yes | On page 3-113 of the Moab DRMP/EIS, the analysis of the contribution of mineral resources, which as mentioned above does not provide an overall economic contribution of oil and gas, notes that production peaked in 1994 and has declined since. However, the data stops at 2000, just about the time that oil and gas commodity prices started to rise and, coupled with advances in the technology to recover unconventional resources, production throughout Utah and the Intermountain West started to soar. | Chapter 3 of the PRMP/FEIS has been updated to reflect the current trend in oil and gas production. |

BLM_0010826

**Table 5.10.h. Comments Requiring a Change in the Document: Minerals–Oil and Gas**

| 215 | EnCana Oil | 14 | Yes | The reference to the release of saline groundwater during drilling has been deleted from the text of the PRMP/FEIS. | The number of wells by alternative utilized in the air quality analysis in Chapter 4 of the DRMP/EIS. In the PRMP/FEIS the wording has been changed from proposed wells to projected wells. |
|---|---|---|---|---|---|
| 306 | Delta Petroleum | 6 | Yes | The economic analysis presented in the DEIS is based on old and outdated information with respect to oil and gas development. It relies on data from 2003 and older. The economic picture, development activities and approaches to resource extraction have undergone a major shift . . . That information is readily available from both state and federal sources, including some information in 2007, yet none of this recent information has been included in the DEIS. This is a major flaw under NEPA, since readily available information should be used for decision-making. This affects economic impacts and projections within all of the alternatives. Since this information is readily available, the BLM should amend the DEIS to reflect that information | Additional recent data has been added to Chapter 4 of the PRMP/FEIS pertaining to oil and gas employment, potential impacts to State revenues from oil and gas restrictions, information on property taxes and information on severance taxes. |
| 491 | Public Lands Advocacy | 5 | Yes | Offsite Mitigation – Under management Common to All Alternatives in Chapter 2, BLM indicates it will seek to "Fully mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio." While we recognize that many companies have offered to perform off-site mitigation, several concerns must be raised. According to IM 2005-69, compensation or off-site mitigation must be entirely voluntary. While BLM may identify offsite mitigation opportunities, it stated they will not be carried forward unless volunteered by the applicant. We oppose any program that would impose off-site or compensation mitigation as a BLM requirement. | Chapter 2 of the PRMP/FEIS has been changed. The statement has been changed to "Mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio, where required by policy or law". |

BLM_0010827

**Table 5.10.i. Comments Requiring a Change in the Document: Non-WSA Lands With Wilderness Characteristics**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 124 | SUWA | 233 | Yes | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness characteristics by using legal lines as boundaries. | This appears to be a mapping error and has been corrected. About 338 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| 124 | SUWA | 234 | Yes | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness and fails to provide justification. | This appears to be a mapping error and has been corrected. About 165 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| 124 | SUWA | 250 | Yes | A small area of Horsethief Point adjoins the Park (Canyonlands National Park), with no physical impact or separation and has wilderness character. | This appears to be a mapping error and has been corrected. About 24 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| 209 | Sierra Club Glen Canyon Group | 46 | Yes | There appear to be errors and/or muddied discussion in the first paragraph, sentences 3 and 4, of page 4-143 attributing to Alternative C comments which apparently refer to another alternative.) | The fourth sentence in paragraph 1 of page 4-143 has been changed to state: "...same as in Alternative B." |
| 209 | Sierra Club Glen Canyon Group | 47 | Yes | Summary Pages 4-162 thru 4-168<br><br>The VRM table (Table 4.58) is incorrect in showing 0% Class I in Alternative B, while Table 4.55 designates some Class I in Beaver Creek, Behind the Rocks, Dead Horse Cliffs, Dome Plateau, Goldbar, Gooseneck, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Westwater. | The Commenter is correct. There are 45,048 acres of non-WSA lands with wilderness characteristics that are designated as VRM Class I in Alt B. The designation is for other reasons, usually the establishment of an ACEC. Table 4.58 has been corrected to show that 45,048 acres are VRM Class I (17%) in Alt. B, while 221,437 acres are VRM Class II (83%) in Class B. |

BLM_0010828

**Table 5.10.i. Comments Requiring a Change in the Document: Non-WSA Lands With Wilderness Characteristics**

| 215 | EnCana Oil and Gas | 20 | Yes | The first sentence of this Section (p. 4-93) should be modified to say that no additional BLM lands would be closed to salable and leasable mineral resource development. Table 4.38 on page 4-85, shows that there are already 392,205 acres (2.1%) of closed BLM lands. This is an inaccurate sentence and needs to be modified to correctly identify that there are closed areas under Alternative A | The wording in this section has been changed to "Under Alternative A, no acres of lands with wilderness characteristics are to be managed to protect these characteristics, resulting in no additional closures of BLM lands to salable and leasable mineral resource development." |

**Table 5.10.j. Comments Requiring a Change in the Document: Paleontology**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 123 | COHVCCO/Blue Ribbon | 49 | Yes | The DEIS, however, lacks the nexus between OHV use and an increase in vandalism or unauthorized collection of paleontological resources. Additionally, although it is difficult to determine the extent to which existing routes in paleontologically sensitive areas will be eliminated, again, existing routes will have not been shown with any data in the DEIS to pose an unreasonable risk to those resources. | Information has been added to Chapter 3 of the PRMP/FEIS that paleontological resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. Basically that increased access results in increased inadvertent impacts, looting, and vandalism. References will be cited. |

BLM_0010829

**Table 5.10.k. Comments Requiring a Change in the Document: Recreation**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 124 | SUWA | 102 | Yes | The total acreage of SRMAs in the planning area, by alternative differs in two Tables. Table 2.1 does not match the acreage in Table 4.69. Table 4.21 does not match the acreage in Table 2.1. | The acreage in the tables has been corrected in the PRMP/FEIS. |
| 199 | Canyonlands Field Institute | 1 | Yes | Dolores River Canyons SRMA - Support Alternative C with exceptions: In the boating management section, we request a CHANGE in party number to match the other sections of river managed by BLM in SE Utah i.e. change the party size to be 25 PLUS guides. In order to serve school groups, the 25 maximum passengers is necessary in most cases. In addition, make this number consistent with other stretches will make it easier on the public and our office staff in comparing trip options. | The BLM agrees with the Commenter that it is important to have consistent river rules. The BLM also agrees that school groups have special needs because the guide-passenger ratio must often be increased. The text has been changed to read "25 people, excluding guides." |
| 204 | The Nature Conservancy | 18 | Yes | Reference is made on Page 2-21 to allowing motorized travel use on (among other routes) "the motorized access route to the viewpoint of Ida Gulch (the saddle between Adobe Mesa and Castle Rock)." This appears to be confusing, because (to our knowledge) the saddle between Adobe Mesa and Castle Rock does not look down northward into Ida Gulch, but into an unnamed side drainage of Professor Creek. Motorized access into this saddle from the south (Castle Valley side) via a single designated route is fine. The view down into Ida Gulch is obtained from the saddle between Castle Rock and Parriott Mesa – a saddle to which motorized travel must NOT be allowed from either direction, i.e. the foot path up from the Castle Valley side, or the road into Ida Gulch from Highway 128. | The Commenter is correct that the route looks downward into Professor Valley and not into Ida Gulch. The wording has been corrected.<br><br>The route that ascends the ridge and looks down into Ida Gulch is and will remain non-motorized only. |

BLM_0010830

**Table 5.10.k. Comments Requiring a Change in the Document: Recreation**

| 209 | Sierra Club Glen Canyon Group | 27 | Yes | Re: The Bookcliffs SRMA, <br><br> There's an inconsistency in the RMP/EIS making the Bookcliffs SRMA a non-mechanized focus on page 2-18 (Alternative B) and non-motorized per page 4-135? | This is an error in Chapter 4 and has been changed to read "non-mechanized in both chapters. |
|---|---|---|---|---|---|
| 209 | Sierra Club Glen Canyon Group | 30 | Yes | Colorado Rivers SRMA: <br><br> For boating management in the Colorado River, Two Rivers and Dolores River SRMAs, Alternative C should be the same as Alternative B in stating that no restrictions on private use would be established unless unacceptable resource impacts occur. | A sentence has been added to alternatives C and D for these SRMAs stating that no restrictions on private use would be established unless unacceptable resource impacts occur. |

**Table 5.10.l. Comments Requiring a Change in the Document: Riparian**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 1025 | Western Watersheds Project | 39 | Yes | Significant discrepancies exist within the riparian sections and other sections referencing riparian resources within the DRMP/EIS. | The discrepancy in riparian data identified by the Commenter has been corrected in the PRMP/FEIS. The riparian analysis in Chapter 4 of the PRMP/FEIS has been changed accordingly. |

BLM_0010831

**Table 5.10.m. Comments Requiring a Change in the Document: Socioeconomics**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 221 | Fidelity Exploration | 2 | Yes | BLM has a responsibility to include a comprehensive socioeconomic analysis that is lacking in this DRMP. The following should be giving more consideration:<br><br>-Oil and gas are vital sources of energy for the nation. BLM should discuss increasing energy demands, decreasing strategic necessity for development of mineral resources. Utah oil and natural gas resources need to be identified as crucial to help offset the deficit between supply and demand.<br><br>-Federal lands contribute nearly one-third of the nation's natural gas supply; therefore, accounting for every resource rich area is crucial to producers and consumers. The DRMP should discuss the role of the planning area in the nation's natural gas supply.<br><br>-The full, positive economic impact of mineral development in the planning area was not adequately analyzed, nor did the document analyze the negative impact associated with the severe restrictions called for in the Preferred Alternative C. Furthermore, the DRMP states that under Alternative b, the long-term economic benefits from oil and gas development would be slightly less than current circumstances or if Alternatives C or D were adopted (Table 2.2, p.2-78-2-79). This conclusion is counter-intuitive; it defies logic how the extremely restrictive Alternative B would have only slightly lower economic benefits from oil and gas when it would place so many more restrictions on development. Clearly, that analysis is flawed. | In 2007, Grand County provided 0.5% of Utah's total oil production and 1.8% of Utah's total gas production (DOGM, 2006). Utah ranks 12th nationally in oil production and 10th nationally in gas production (DOGM, 2008). These figures do not support the Commenter's assertion that this is crucial to the nation's energy supply.<br><br>The impacts of minerals on social and economic conditions are detailed on pg. 4-259 through pg. 4-264. This analysis provides a reasonable assessment of the socioeconomic impacts.<br><br>The restrictions imposed on oil and gas leasing in Alt B would result in fewer wells developed than in Alts, C, D, or A. These numbers are 264, 432, 448, 451, respectively. Therefore, Alt B would result in 168 fewer wells over the life of the plan. The well numbers were based on the Reasonably Foreseeable Development scenario for oil and gas and spread by alternative based on the restrictions imposed under each alternative. Impacts of minerals on socioeconomics are based on these wells numbers. Economic information on royalties, employment, severance taxes, and impacts to State revenues has been augmented in Chapter 4 of the PRMP/FEIS. |

BLM_0010832

**Table 5.10.m. Comments Requiring a Change in the Document: Socioeconomics**

| | | | | | |
|---|---|---|---|---|---|
| | | | | BLM would greatly benefit from a comprehensive economic analysis of the impact of oil and gas to the region such as is currently underway by the University of Utah's Bureau of Economic and business Research for the Utah Governor's Office of Public Land Policy Coordination Office (The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase I- The Uinta Basin) (Draft, November 2007)<br><br>-Each alternative contained in the DRMP includes some lands closed to energy resource development. Such closures are based on BLM's assessment of resource values on those lands. Closure also implications, however, in terms of national energy consumption and commodity prices, foregone employment opportunities, tax revenues, and support for state and local economies. Although BLM must necessarily base land-use decisions on consideration of all resources values, social and economic impacts of closure decisions should be estimated to fulfill the agency's mandate under FLPMA, and to comply with guidelines contained in BLM's Land-use Planning Handbook (H-1601-H) and Instruction Memorandum (IM) No. 2002-167 | Information has been added to the PRMP/FEIS using the newly completed study by the University of Utah Bureau of Economic and Business Research (January 2008) "The Structure and Economic Impact of Utah's Oil and Gas Production and Industry, Phase III - Grand County". Therefore, use of the study in Uintah County suggested by the Commenter is not appropriate. |
| 299 | Dan Harris | 2 | Yes | The analysis states that Alternative B will have only slightly lower economic benefits than Alts C and D. This is not true, especially for Green River | Economic information on royalties, employment, severance taxes, and impacts to State revenues has been augmented in Chapter 4 of the PRMP/FEIS. Information has been added to the PRMP/FEIS using the newly completed study by the University of Utah Bureau of Economic and Business Research (January 2008) "The Structure and Economic Impact of Utah's Oil and Gas Production and Industry, Phase III - Grand County". |

BLM_0010833

**Table 5.10.m. Comments Requiring a Change in the Document: Socioeconomics**

| 318 | Mike D. | 1 | Yes | The town of Green River should be covered in the Moab RMP. By placing too many restrictions on this development, oil and gas companies may go elsewhere, including outside the country, for their operations. This will have severe negative economic impact on our local economy. | The text in Chapter 3 concerning socioeconomics has been altered to include the fact that economic effects include those on the neighboring communities of Green River and Grand Junction. |
|-----|---------|---|-----|---|---|
| 319 | Bruce Hansen | 1 | Yes | | |

**Table 5.10.n. Comments Requiring a Change in the Document: Soils**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|-----------|-----------|----------------|-----------------|--------------|---------------------|
| 309 | Pam Hackley | 3 | Yes | The analysis should reevaluate the amount of potential disturbance to soils, especially from OHV use. | Numbers have been added to Chapter 4 and to Appendix G that show the miles of route designated and not designated in erodible soils types. There are 167 miles of route that are closed in the preferred alternative because of soils conflicts. |

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|-----------|-----------|----------------|-----------------|--------------|---------------------|
| 204 | The Nature Conservancy | 1 | Yes | In addition to the species in the MPA with formal status as listed above, we urge that special attention be given to one additional plant: *Astragalus iselyi* (Isely's milkvetch). At present this plant has no special status. We had recommended that it be added to the Utah BLM list of Sensitive Plants when that list was being reviewed for revision in March 2007… the need for special status is heightened by a particular proposal for public-land disposal that | The Moab RMP does not add or subtract potential special status species to the Utah BLM list of Sensitive Plants.<br><br>Parcel R-11, which contains habitat for the *Astragalus iselyi*, has been removed from the list of lands identified for disposal. |

BLM_0010834

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| | | | | | |
|---|---|---|---|---|---|
| | | | | appears within the three Action Alternatives of the DRMP. This action would, if implemented, remove from BLM control a major population center for this plant, probably increasing the need for BLM Sensitive designation of the remaining occurrences, and possibly creating a rationale for federal listing of the whole species. | |
| 214 | Bill Barrett Corp. | 24 | Yes | It would be inappropriate to require oil and gas leasees to "fully mitigate" impacts from oil and gas operations when oil and gas development is mandated and appropriate use of public lands. | The statement on pg. 2-44 of the DRMP/EIS which states "Fully mitigate all unavoidable habitat losses for special status species at a minimum of 1:1 ratio" has been changed from "fully mitigate" to "mitigate". |
| 485 | Center for Native Ecosystems | 3 | Yes | Alternative B applies a 1300' buffer for white-tailed and Gunnison's prairie dog habitat (C-22, 4-57). Alternative C applies a 660' buffer within white-tailed and Gunnison's prairie dog habitat (2-34, 2-47, 2-48, 4-57, 4-394). However, pages 2-84 and 4-316 refer to a 600' buffer for Alternative C. Page 4-395 seems to indicate that under Alternative D, white-tailed prairie dog habitat will be granted a 660' buffer while Gunnison's prairie dog habitat will not be conserved.<br><br>This is confusing, and could easily be considered arbitrary and capricious. | The buffer was listed wrongly page 2-84 & 4-316 of the DRMP/EIS. The buffer is 660 feet, no 600; these errors have been corrected. |
| 586 | U.S. Fish and Wildlife Service | 2 | Yes | The bald eagle was removed from the Endangered Species list. It is, however, still protected under the MBTA and the BGEPA. | The wording in the plan has been corrected to correspond to this action. The two laws protecting bald eagles have been added to the text on pg. 3-143 of the DRMP/EIS. |

BLM_0010835

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| 586 | U.S. Fish and Wildlife Service | 3 | Yes | Page 2-5, Section 2.1.1.5: 1st paragraph: The MFO has 3 listed bird species (and 1 candidate species), 1 listed mammal species, 1 listed plant species, and 4 listed fish species (see also Section 3.16). According to page 3-140, there are additionally 43 "Sensitive Species", not 4 as stated here. | The number of sensitive species has been corrected to 43. In addition, the enumeration of listed species has been changed to match USFWS's wording. |
|---|---|---|---|---|---|
| 586 | U.S. Fish and Wildlife Service | 4 | Yes | Page 2-5, Section 2.1.1.5 1st paragraph: The standard stipulations that have been developed in coordination between BLM and FWS (i.e., the Species Conservation Measures in the BO for Existing Utah BLM RMPs (2007)), should be included in the document. Appendix K is a close approximation in many respects, but there are inconsistencies and rearranged organization, and it is difficult to determine if items have been left out. The 2007 BO conservation measures were mutually developed and agreed to by FWS and BLM, and should be included in their entirety in the new RMP to ensure long-term species conservation as well as streamlined section 7 consultation. | This last sentence in the first paragraph on p. 2-5 of the DRMP/EIS has been changed to: "Species conservation measures (see Appendix K) have been developed in coordination with the United States Fish and Wildlife Service. They will be implemented under all alternatives."<br><br>Appendix K has been updated with the 2007 "Species Conservation Measures for Utah BLM RMPs". |
| 586 | U.S. Fish and Wildlife Service | 7 | Yes | page 2-95, table 2.2, Special Status Species - Impacts from Riparian management: There must be typos in these descriptions (at the bottom of page 2-95), because they do not make sense. Alt. C cannot be the same as Alt. B, except with less riparian acres excluded than under Alt. C. | The wording has been corrected. |
| 586 | U.S. Fish and Wildlife Service | 9 | Yes | page 3-38, section 3.73. A number of the allotments identified in this section contain special status species and should be further discussed in Section 4.3.15.6 (page 4-367). | The following sentence has been added to Chapter 4: "Those allotments that remain unavailable for grazing are not subject to these impacts to special status species." |

BLM_0010836

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| 586 | U.S. Fish and Wildlife Service | 10 | Yes | page 3-125, section 3.15.1.1.2.2 (Bookcliffs wildlife area ) Is the clay reed mustard within the Moab Planning Area? | The USFWS is correct. This is an error. The clay reed mustard is not within the planning area; it is only within Uintah county. |
|---|---|---|---|---|---|
| 586 | U.S. Fish and Wildlife Service | 11 | Yes | page 3-125, section 3.15.1.1.2.2. (Bookcliffs wildlife area ) typo-Jones cycladenia, with a small c. | The Jones cycladenia is not found in the Bookcliffs area. The text has been corrected. |
| 586 | U.S. Fish and Wildlife Service | 12 | Yes | page 3-127, section 3.15.1.2.5 (Colorado River Corridor ACEC) 4th paragraph mentions "two state sensitive rare plants" but the State of Utah has no sensitive plant list. Are these listed on the UNPS rare plant guide or NatureServe? | The sentence has been changed to "Two BLM sensitive plants, alcove rock daisy (*Perityle specuicola*)and alcove bog orchid (*Habenaria zothecina*) occur in Negro Bill Canyon." |
| 586 | U.S. Fish and Wildlife Service | 14 | Yes | page 3-128, section 3.15.1.2.5 The Colorado River Corridor ACEC "...contains about one quarter of all threatened Jones cycladenia plants." Does this mean within the MPA or across the range of the species? What is the source of this information (citation)? | The sentence has been changed to read: "The potential ACEC also contains threatened Jones cycladenia plants." |
| 586 | U.S. Fish and Wildlife Service | 15 | Yes | 3-143, section 3.16.1.3 This bald eagle section should be moved to Section 3.16.2 (Sensitive Species). | This correction has been made. |
| 586 | U.S. Fish and Wildlife Service | 16 | Yes | 3-143, section 3.16.1.4 The first sentence ("MSO habitat includes high canopy closure...") should be eliminated. The second sentence should read: "Steep slopes and canyons with rocky cliffs characterize much of the MSO habitat in Utah." | The sentence has been eliminated and the second sentence has been adjusted in accordance with the Commenter's request. |
| 586 | U.S. Fish and Wildlife Service | 18 | Yes | page 4-355, table 4.106 Place Latin names after common names for plant species. | The Latin names have been added to Table 4.106 for all plants. |

BLM_0010837

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| 586 | U.S. Fish and Wildlife Service | 20 | Yes | 4-363 section 4.3.15.3.5 What habitat types is this section referring to, and what special status species might be affected? | The title of the section has been changed. |
|---|---|---|---|---|---|
| 586 | U.S. Fish and Wildlife Service | 21 | Yes | 4-365, section 4.3.15.5.3 Utility and communication infrastructure ROWs are also likely to fragment habitat, increase human access, and increase non-native invasive plants. These effects would have resulting impacts on various special status species, including prairie dogs and sage-grouse. | This sentence has been added to Section 4.3.15.5.3 of the DRMP/EIS. |
| 586 | U.S. Fish and Wildlife Service | 22 | Yes | page 4-370 section 4.3.15.7.1 Mineral exploration activities would also lead to greater road density, creating greater opportunity for OHV and other human disturbance. | This sentence has been added to Section 4.3.15.7.1 of the DRMP/EIS. |
| 586 | U.S. Fish and Wildlife Service | 23 | Yes | page 4-371, section 4.3.15.7.2.1 Potential direct adverse effects from oil and gas development would include: potential for spills, mortality from reserve pits, increased human access, OHV access, road mortality. | This sentence has been added to Section 4.3.15.7.2.1. |
| 586 | U.S. Fish and Wildlife Service | 24 | Yes | page 4-372, section 4.3.15.7.2.2 Explanation for greater detailed analysis on sage-grouse is reasonable, but you should still describe the impacts to other species as well. | Wording has been added to clarify that the habitat fragmentation analysis was performed for sage-grouse as an example of this type of action. |
| 586 | U.S. Fish and Wildlife Service | 25 | Yes | 4-372, section 4.3.15.7.2.2. 5th paragraph: It's also possible that the analysis could be an underestimate of habitat degradation because more frequently used roads could cause disturbance greater than 400m. | The following sentence has been added to pg. 4-372 of the DRMP/EIS: "It is also possible that the analysis could underestimate habitat degradation because more frequently used roads could cause disturbance greater than 400 meters from the road." |

BLM_0010838

**Table 5.10.o. Comments Requiring a Change in the Document: Special Status Species**

| 586 | U.S. Fish and Wildlife Service | 26 | Yes | page 4-375, section 4.3.15.7.4 MSO do occupy rocky slope/canyon habitat in the MPA (not just the "potential" to occupy this habitat type). | The sentence now reads: "MSO are known to occupy the rocky slope/canyon habitat in the MPA. |
|-----|-------------------------------|----|-----|---|---|
| 586 | U.S. Fish and Wildlife Service | 27 | Yes | page 4-376, table 4.116. Why is there a difference of 37 acres between Alternative B and C for Jones cycladenia? Are these 37 acres in Jones cycladenia habitat? If so, we suggest these acres also be made NSO/Closed. | The 37 acres has been added to the Jones cycladenia habitat that is NSO or closed to leasing in Alt C. |
| 586 | U.S. Fish and Wildlife Service | 29 | Yes | 4-390, table 4.119. The document states there are 24,370 acres of habitat for Jones cycladenia. Please clarify, is this the size of the amount of suitable habitat or habitat potential for the plant? | The habitat is suitable for Jones cycladenia. The word has been added to Table 4.119. |
| 586 | U.S. Fish and Wildlife Service | 34 | Yes | page C-35, table C-4. Golden eagles are not listed under ESA. They are protected under the MBTA and BGEPA. | The title has been changed in Appendix C to read "federally protected species" |
| 586 | U.S. Fish and Wildlife Service | 37 | Yes | Appendix K. The BLM Committed Conservation Measures identified in this appendix should be consistent with the Species Conservation Measures developed for the Biological Opinion for Existing Utah BLM RMPs (2007) (see attached document). | Appendix K will be replaced with the correct and updated document. |
| 586 | Moab Trails Alliance | 11 | Yes | p. I-8 Under Relevance Criteria, seventh line, ".......threatened plants do not occur....." Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been corrected |

BLM_0010839

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 6 | Colorado 500 | 12 | Yes | the MFO staff's choice to separate the citations from the body of the text makes it extremely cumbersome to review the use of the literature in this analysis. We have selected a citation that is pretty obviously aimed at roads, and because our comment is about roads, it seemed the most likely match. Please bear with us. From the Chapter in the DEIS called "References:" Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics '29:207-231. This does not have anything to do with undeveloped dirt roads and narrow trails, lightly trafficked, in a desert ecosystem. Just so you do not have to take our word for it, we have located and read the article, plus we have followed the citations in the article. None of the material we found is related to what this DEIS is analyzing. (multiple reference examples followed, text not included here) | Placing all references at the back of the document is standard operating procedure when assembling Environmental Impact Statements.<br><br>The reference to the article by Foreman and Alexander is found on pg. 4-485 of the DRMP/EIS in the section on wildlife habitat fragmentation. The reference to the article concerns vehicles killing birds that are attracted to road kills.<br><br>The BLM has added an expanded discussion to Appendix G of the extensive research on the impacts of OHV use on a variety of natural resources, including soil and water, vegetation, wildlife and habitat, and water and water quality . The BLM has also added an expanded discussion of the impacts of OHV use on socioeconomics, including user conflict, to Appendix G. Where appropriate, references to this section of Appendix G will be added to the relevant resource sections of Chapter 4. |
| 6 | Colorado 500 | 20 | Yes | The placement of a "Mountain Bike Focus Area" (Map 2-9-C) exactly where the popular Copper Ridge motorcycle trail already is. This is an existing single-track loop, plus single-back connectors to the Sovereign Trails system (state land) and an existing single-track connector to Thompson Springs. | 1. As stated explicitly in the DRMP/EIS. Focus areas are not designed to exclude other uses, such as the single-track motorcycle trail cited by the Commenter. Klondike Bluffs is a mountain bike focus area because the predominant use of Klondike Bluffs is mountain bike use. The Copper Ridge motorcycle trail was submitted to the BLM during scoping; the route could not be |

BLM_0010840

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| | | | | | |
|---|---|---|---|---|---|
| | | | | Requests that will resolve this comment:<br><br>1. We want BLM to provide the analysis that supports the statement "There are no routes solely dedicated to OHV use." Reprinting the same sentence from the AMS will not satisfy this request, as there is no analysis in the AMS that supports BLM's claim in 3.11.1.2.16. This additional analysis will obviously include maps of every existing road and trail. This analysis must detail who made each route, for what purpose, and when it was made. To accomplish this, interviews with residents of the Moab area, as well as residents of western Colorado and western Utah will be necessary, and interviews with motorcycle clubs and businesses, to gather the factual evidence that supports (or refutes) the claim that off-road motorcycles do not have their own dedicated system of routes in the MPA and in the MFO jurisdiction.<br><br>2. We want a third-party, non partisan review of this analysis. The reason that is necessary is that many private citizens donated hundreds of hours to help BLM map the single-track OHV routes in the run-up to this DEIS. Hundreds of miles of motorcycle trails were mapped. Since BLM has no compunctions about discarding that work, we have no reason to trust BLM in the conduct of any new route inventory or route development history.<br><br>3. Reprinting the same sentence from the AMS will not satisfy this request, because there is no analysis in that document that supports BLM's claim in 3.11.1.2.16.<br><br>4. If there is no such analysis, we want BLM to add this statement to 3.11.1.2.16: "MFO staff has | verified on the ground. This means that it was not popular enough to be evident on the ground. See also response to comment 122-36.<br><br>2. The BLM acknowledges the comment cited by the Commenter, but fails to see its relevance to the issue at hand.<br><br>3. The sentence referred to by the Commenter from the 1985 Grand RMP is simply a statement by the BLM that there are no trails managed solely for OHV use, which is the case in the No Action alternative. No amount of research or interviews or third-party analysis will change this fact from the 1985 Grand RMP. The Commenter provides no evidence to suggest otherwise. The fact that user groups may have their own trail systems does not mean that the BLM manages these for that single use. Additionally, no user group has the self-appointed authority to manage trails on public lands for their exclusive use.<br><br>4. The BLM, as part of its scoping for the land-use planning process, requested route information from the public. A result of this request, the BLM received several hundred miles of routes from the public, including numerous motorcycle routes. Most, but not all, of these routes were verified on the ground by the BLM and were included in one or more action alternatives for analysis. This process is described in detail in Appendix G of the DRMP/EIS. These include many (perhaps most, but the BLM is not familiar |

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| | | | | | |
|---|---|---|---|---|---|
| | | | | elected to omit at least 200 miles of existing motorcycle single-track trails from the inventory and to eliminate from consideration the designation of a "system" of existing single-track OHV trails in Alternative C. Staff has chosen to remove this data in advance of the Deciding Offer's review and Decision. Staff realizes that this will prevent the Deciding Officer any opportunity to evaluate and designate single-track OHV systems. Based on the record supporting this DEIS and Plan, it will likely be perceived as a pre-emptive Decision by the ID Team. There is no analysis that supports this action. There is ample evidence that these routes do exists, as many members of the public assisted in located and mapping them. However, MFO staff has elected to discard that data. Please refer to 3.11.1.2.16."<br><br>Alternatively, and less contentious and less time consuming, and more likely to get this project to a Decision in a more timely way, we want the Moab BLM to restore the trails in the MFO database that were collected under the public perception that the trails would be called "motorcycle single-track" and included in the travel plan for consideration. We will not try to guess at the name BLM has assigned these trails. Restoring these trails to the database will simplify completion of the RMP, and it would fill several glaring voids in the "Travel Plan." Then, in the post-ROD implementation, site-specific monitoring would support the eventual site specific analysis of the impacts of these trails.<br><br>We also request that BLM add the following section to Chapter 3:<br><br>1. Beginning on page 3-79, part 3.11.1.2.16 must be changed to "Popular Motorcycle Routes." These will be the same as the "popular bicycle" trails, plus | with each group's route naming system) of the routes presented by the Commenter. Some of the routes mentioned by the Commenter were not presented to the BLM during scoping, and were therefore not included in the travel plan process. The BLM is not in a position to forego travel planning indefinitely to accommodate new route proposals. As the DRMP/EIS explicitly states, new routes can be considered for inclusion in the travel plan on a site-specific basis in the future. See also response to comments 122-15 and 122-30.<br><br>It is worth noting that several of the routes proposed by the Commenter are located in an area limited to existing trails as of 1985. The Commenter needs to be aware that on pg. 2-32 of the DRMP/EIS, it is stated: "No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan".<br><br>The Slickrock Bike Trail has been added to the motorcycle trail route map (2-11-E). The following routes mentioned by the Commenter are open to all motorized vehicles, including motorcycles: Gemini Bridges, Amasa Back, Flat Pass, Klondike Bluffs, Kokopelli's Trail, Poison Spider, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Hurrah Pass and Onion Creek.<br><br>The Commenter should consult the motorcycle trail map (2-11-E) to see if the routes he names are available to motorcycles. The BLM is unfamiliar with some of the names used by the Commenter. |

BLM_0010842

### Table 5.10.p. Comments Requiring a Change in the Document: Travel Management

| | | | | | |
|---|---|---|---|---|---|
| | | | | many more miles. The reason they are the same is, BLM changed the usage for this DEIS even though (because it is in the record) BLM cannot dispute the fact that motorcycles were suing those trails when the 1985 RMP was written.<br><br>2. We want BLM to include … (many named trails). | The Mel's Loop route has been placed in the proposed alternative for the PRMP/FEIS. |
| 8 | Arches National Park | 5 | Yes | Several roads are shown within Arches NP that are not park roads. These are circled on the attached map; please delete them. Alternately, since the RMP does not apply to Arches, we would prefer that the park simply be shown as a "blank spot" on the map, with all roads removed. | All routes within Arches National Park have been deleted from the Travel Plan maps accompanying the PRMP/FEIS. |
| 970 | National Parks and Conservation Association | 7 | Yes | | |
| 122 | Ride with Respect | 5 | Yes | Section 3.11.2.6 (page 3-85&6&7) addresses use conflict and displacement, but not adequately so. It crudely lists a few circumstances the agency believes to exist. The lists are arbitrary, and should be removed. | The list of recreation conflicts in Section 3.11.2.6 of the DRMP/EIS is based upon professional judgment of Moab Field Office BLM staff. The areas listed are those that have come to the attention of BLM staff due to reports of conflicts by users themselves. The sentence on pg. 3-86 of the DRMP/EIS has been changed to read: "specific areas in which BLM staff have had reports of user conflict and displacement include…" |
| 122 | Ride with Respect | 15 | No | By any of these definitions, many OHV trails exist in the Moab field office beyond the data from BLM, RWR, or any other known source. RWR'S data is the best available information. All of the routes we submit currently exist, and new data of existing routes includes photographs to aid your staff in verification. RWR expects that you to contact us before determining that any of these routes are not legal, existing travel ways. | The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Ride with Respect, and verified on the ground by BLM staff (see pgs. G-15 through G-21). On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes. The provision states "identification of specific designated routes would be initially established through the |

BLM_0010843

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

|  |  |  |  |  | chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis". New routes proposed by the Commenter will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area to OHV use. However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |
|---|---|---|---|---|---|
| 122 | Ride with Respect | 21 | Yes | Table 2.1 Wilderness & Travel Management (page 2-43 & 2-48) refer to WSA ways when stating that "If Congress designates the area as Wilderness, the routes will be closed." This sentence should be removed. | The sentence has been changed to read "If Congress designates the area as Wilderness, the routes could be closed." This sentence means that the will of Congress would override any route designation made in the DRMP/EIS. Congress does have the final authority, and close any route that it chooses. |
| 122 | Ride with Respect | 22 | Yes | Alternative C would require Special Recreation Permits for groups with "25 vehicles." The document ought to explicitly exclude counting more than one vehicle per person, since he/she can only use one vehicle at a time. | The 25 vehicle rule is intended to mean the primary vehicle driven by the participant. The phrase "one driver/vehicle" has been added to the Special Recreation Permit decisions in the PRMP/FEIS for clarification. |
| 122 | Ride with Respect | 23 | Yes | Table 2.1 Travel Management (2-48) also states "Only designated roads are available for motorized commercial and organized group use." | The words "and managed open areas" have been added to the appropriate section of the PRMP/EIS to clarify that permittees would be allowed in these areas. |
| 122 | Ride with Respect | 24 | Yes | Section 4.3.10.2.10.6 (page 4-220) should acknowledge that Labyrinth Rims in Alternative C would negatively impact motorcycling to the extent that it prohibits future use of Bartlett Slickrock by motorcycle. | The impacts of this restriction on motorcycling opportunities have been added to the text of the PRMP/FEIS. |

BLM_0010844