**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| 122 | Ride with Respect | 26 | Yes | Likewise Section 4.3.10.2.12 (page 4-229) should state that soil decisions substantially reduce vehicular access to certain environments, including high-saline soils, and both riparian and non-riparian washes. | Text has been added to Chapter 4 of the PRMP/EIS acknowledging that soils and riparian decisions limit motorized users. The decision in soils has been changed so that soils are a limiting factor, rather than a factor that absolutely forbids new routes in saline soils. |
|---|---|---|---|---|---|
| 122 | Ride with Respect | 42 | Yes | For consistency, Slickrock Trail should appear on the map of designated motorcycle routes. | The Slickrock Trail has been added to the map of motorcycle routes in the PRMP/EIS for alternatives C and D. |
| 123 | COHVCO/Blue Ribbon | 4 | Yes | The BLM must disclose how the Recreational Settings may or may not affect future management decisions, allowable uses, including and especially travel management. | A sentence has been added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states "routes identified in the Travel Plan would be available regardless of other proposed management actions'. |
| 123 | COHVCO/Blue Ribbon | 5 | Yes | The DEIS is far from a model of clarity in distinguishing between program-level and project-level decision-making and management prescriptions. We urge BLM to clarify this distinction, and to specifically identify program-level management guidance from project-level management prescriptions for all management decisions, especially travel management. | The BLM followed the Land-use Planning Handbook (H-1601-1) to develop program level management guidance. In 2004, the Washington Office (WO) clarified the guidance in the handbook by issuing WO Instruction Memorandum 2004-005, which states specifically, "Selection of a network of roads and trails should be performed for all limited areas in each RMP. This requires establishment of a process that includes selecting specific roads and trails within the limited area or subarea and specifying limitations placed on use." The management decisions in Chapter 2 of the PRMP/FEIS will clearly show which |

BLM_0010845

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| | | | | | decisions are planning decisions and which decisions are implementation (project-level) decisions. |
|---|---|---|---|---|---|
| 123 | COHVCO/Blue Ribbon | 8 | Yes | A map is provided of the White Wash area which displays an area where access to dispersed camping sites has been eliminated. | The open area to the west side of the White Wash Sand Dunes has been enlarged to accommodate the camping that occurs to the south of the oil well. See also response to comment 120-83. |
| 123 | COHVCO/Blue Ribbon | 10 | Yes | BRC strongly opposes the fee system proposed for White Wash Sand Dunes in Alts C and D. A fee system at White Wash will be difficult to implement because of the distance from the Moab Field Office and ease of access to the Dunes and nearby trails. A fee system with the Federal Lands Recreation Enhancement Act. The BLM should remove the section requiring the Special Recreation Permit idea, and instead, insert guidance to pursue funding sources. | The possibility of a fee system for use of the open area in White Wash Sand Dunes is proposed in the DRMP/EIS as a means of funding the cost of the intensive management that this area would require to keep it open to cross country travel and provide services to visitors. Actual implementation of any new fee would follow the guidelines of the Federal Lands Recreation Enhancement Act, and be considered by the Utah BLM Resource Advisory Council. This action does not preclude pursuing other funding sources to help manage the White Wash Sand Dunes. For clarity the statement on pg. 2-25 of the DRMP/EIS has been changed to read "Implement a fee system under the guidelines of the Federal Lands Recreation Enhancement Act. |

BLM_0010846

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| 124 | SUWA | 32 | Yes | The plan says that all alternatives would ensure PFC, and that "the loss or degradation of riparian areas, wetlands and associated floodplains would be avoided or minimized; natural and beneficial values would be preserved and enhanced; and fish and wildlife and special status species would be provided for," 4-182, there is no explanation of how ORV use in these same streams affects that conclusion. | On page 4-245 of the DRMP/EIS, the impacts of travel on riparian resources are analyzed. The acres of riparian areas by OHV designation are specified. No cross-county travel is allowed in riparian areas under any of the action alternatives. To provide further analyses, a table has been added to Appendix G of the PRMP/FEIS detailing the number of miles of routes not designated due to resource conflicts including riparian areas. This data has been incorporated into the appropriate resource sections of Chapter 4. In Appendix G of the DRMP/EIS it is acknowledged that OHV use in riparian areas can result in loss of vegetation, degraded stream banks, and erosion. |
| --- | --- | --- | --- | --- | --- |
| 196 | Moab Trails Alliance | 2 | Yes | The amount of new trail ("C"= 150 miles, "B"= 75, etc) should be specifically stated as, "In addition to trails developed on existing roads as mapped on the Grand County Transportation Inventory map". The allotted new mileage will include only those routes mapped across previously undisturbed terrain. | Wording has been added to the DRMP/EIS on pg. 2-49 to clarify that the mileage is for new trails; converted existing routes are in addition to the specific mileage listed for each alternative. |
| 196 | Moab Trails Alliance | 5 | Yes | Typos: p. 4-464 second paragraph line 4 "carefuly" should be careful. | The grammatical correction has been made in the PRMP/FEIS. |
| 196 | Moab Trails Alliance | 6 | Yes | Typos: p. I-8 Under Relevance Criteria, seventh line, "...threatened plants do not occur..." Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been deleted. |

BLM_0010847


**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| 204 | The Nature Conservancy | 11 | Yes | See DRMP 2-48* Finally, within this area we would like to see the designation of motorized travel on the road up Ida Gulch from Hwy 128 proceed no farther up-valley than the northern boundary of our section of private land (Sec 32, T24S R23E, SLM) in Ida Gulch. In the DRMP under all Action Alternatives this route is shown as designated for motorized travel through our property and onto BLM-administered lands to the east. | The BLM does not designate routes on private land. The Nature Conservancy may restrict travel on this route. The route will be removed from the designated travel maps in Alts C and D. This would restrict all motorized travel past the Nature Conservancy's private land. |
|---|---|---|---|---|---|
| 206 | Red Rock 4-Wheelers | 11 | Yes | There are a number of permitted Jeep Safari routes not included in Alternative C, and these should be added to this Alternative. These include segments of the Copper Ridge, Strike Ravine, 3D, Dolores Triangle, and Flat Iron Mesa routes. | The short segments on BLM are mapping errors which have been corrected (route numbers 13637, 15331, 15332, 15334, 15336). Strike Ravine and Flat Iron Mesa routes will need to be hand digitized, since they are not part of current Travel Plan database. Several of the segments are exclusively on State lands, and beyond the scope of the Travel Plan formulation. |
| 208 | Bookcliff Rattlers Motorcycle Club | 9 | Yes | BLM should identify routes suitable for ATVs in its travel plan, rather than passively assuming that many of the OHV routes submitted in scoping are motorcycle-only. | The BLM has incorporated the Commenter's suggestion for a change in route use involving ATVs in the PRMP/EIS. See also response to State of Utah comment 120-90. |
| 209 | Sierra Club Glen Canyon Group | 10 | Yes | . . .confusing Table 4.126 OHV Designations by Alternative on page 4-409. The table which contains both acres and miles has four footnotes, of which the second is not referenced in the table itself. "These are the miles of designated routes at time of EIS publication. After the issuing of the ROD, minor adjustments may be made by the MFO to more accurately define the designated | Footnote 2 refers to the bottom two rows of Table 4.126; this has been fixed. The "minor adjustments" that the Commenter wishes defined relate to GIS data smoothing issues, which the BLM would expect (but cannot predict with certainty before the data smoothing is completed) to add up to well less than one per cent in either direction. |

BLM_0010848

## Table 5.10.p. Comments Requiring a Change in the Document: Travel Management

| | | | | | |
|---|---|---|---|---|---|
| | | | | routes." BLM should let us know where the superscript belongs in the table, what the definition of "minor" is, and how the public will be involved. | The manner of public involvement is an implementation activity. The process is described on page 2-48 of the DRMP/EIS. |
| 209 | Sierra Club Glen Canyon Group | 44 | Yes | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6

The paragraph beginning at the bottom of page 4-149 also apparently contains an error. Clearly, it means that OHV use will be limited to designated, not existing, routes. The same error is found in the last paragraph on page 4-150. Under all of the action alternatives, vehicles must stay on designated routes. | The Commenter is correct, and the wording has been changed to "designated". |
| 209 | Sierra Club Glen Canyon Group | 55 | Yes | The Glossary is not comprehensive. For example, "way" is defined, but "route" are not. "Mechanized" and "non-mechanized travel" are not defined at all. Attachment A of Appendix G includes additional terms which should be justified with Glossary definitions and/or referenced in the Glossary. It is possible that there are definitions in other appendices or the text of the document itself which, if added to the Glossary, would make it more user friendly. | The BLM has added the referenced words (route, mechanized and non-mechanized) to the glossary. The BLM would need more specifics to address the other glossary changes which the Commenter recommends. |
| 218 | Colorado b Division of Wildlife | 1 | Yes | Closing many of the spur roads that have no destination will also be of great benefit to wildlife. There is one road that is identified to be closed under preferred Alternative C in the travel management plan that concerns us, as we would like to have this road remain open. | As this route provides the only public access to public lands in Colorado, it has been added to the preferred alternative. The route has been designated in Alternatives C and D. |
| 195 | Van Loan Ranches | 1 | Yes | In the Dolores River Triangle there is a road starting in Township 21S Range 26E Section 32 SW 1/4 (state school section) that heads south for approximately one mile before it braches; both | Two routes that start in the State Section (T. 21 S., R. 26 E., Sec. 32) on the Colorado state line, cross Utah BLM land, and entre the state of Colorado have been added to the Preferred Alternative |

BLM_0010849

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| | | | | | |
|---|---|---|---|---|---|
| | | | | branches head southeast up different forks of spring Canyon along Spring Creek before entering into Colorado. This road provides the only public access into BLM land on the Colorado side of the border.<br><br>The proposed road closures will eliminate our historic access. | |
| 264 | Curtis Rozman Ruby Ranch | 2 | Yes | It is very clear that BLM intends to make a large area in White Wash "open" to motorized use. We request that any "open" areas do not directly border our private property and that there is an adequate buffer between our private property and any designated open area. Please include a .25 - .5 mile buffer to minimize the vandalism and destruction of property that has been occurring ( fence vandalism-- wires cut, posts used for firewood, gates destroyed-- also property shot at, livestock harassment, etc). See attached map. | The BLM proposes an open area of fewer than 2,000 acres in White Wash. The open area is primarily the sand dunes themselves. Everywhere else, all travel would be limited to designated routes. The acreage of open area in the PRMP/FEIS has been greatly reduced from the acreage of open area in the No Action (current) alternative. The southwest boundary of the open area has been adjusted to provide a buffer between the open area and the private property to accommodate the Commenter. |
| 964 | Moab Trails Alliance | 7 | Yes | Whenever different user groups are listed in the RMP, road cycling should be included as a category just the same as "driving for pleasure". This is fast becoming a popular use on the spectacular scenic byways of Grand County. | Road cycling has been added to the list of recreation activities in the Moab Field Office on pg. 3-80 of the DRMP/EIS. |
| 310 | Benjamin Reingold | 2 | Yes | The difference between an RMP and the Travel Plan is not clearly described in the DEIS. | A sentence has been added to the PRMP/FEIS under Travel Management that clarifies this distinction. |

BLM_0010850

**Table 5.10.p. Comments Requiring a Change in the Document: Travel Management**

| 941 | Great Old Broads for Wilderness | 4 | Yes | Not enough has been done to determine the impact of the designated routes on cultural, riparian or wildlife resources. | Additional information on the impacts of travel on resources has been added to Chapter 4 of the PRMP/FEIS and to Appendix G (Travel). |
|---|---|---|---|---|---|
| 995 | Fred and Bessann Swanson | 7 | Yes | | |

**Table 5.10.q. Comments Requiring a Change in the Document: Water Resources**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 215 | EnCana Oil | 7 | Yes | Section 3.14.3.2.2 Salinity (p. 3-112)<br><br>The second paragraph of this section states that the release of saline groundwater during drilling activities is a point source for salinity. This statement is inaccurate because groundwater is not released during drilling activities in natural gas drilling operations. | The reference to the release of saline groundwater during drilling has been deleted from the text of the PRMP/FEIS. |

BLM_0010851

**Table 5.10.r. Comments Requiring a Change in the Document: Wild and Scenic Rivers**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 124 | SUWA | 89 | Yes | Segment 5 of the Colorado river should be scenic or wild. | The classification of Segment 5 was changed from scenic in Alt B to recreational in Alt C. Upon closer review, it was determined that the classification in Alt C should be changed to scenic in order to match the classification of scenic on the other side of the river in the Monticello Field Office. This change has been made in the PRMP/FEIS. |
| 213 | Utah Rivers Council | 2 | Yes | The preferred alternative in the Draft on page 2-41 changes the classification of one segment of the Green River, from Coal Creek to Nefertiti from its original classification of 'Wild' in the eligibility study to 'Scenic' under the preferred alternative. There is no basis for such a change due to a manageability issue. The Council urges the Moab F.O. to find the Coal Creek to Nefertiti segment of the Green River as a 'Wild' river in the preferred alternative, as it was in the eligibility study and in Alternative B. | The BLM has reevaluated the determination of the classification of the Green River from Coal Creek to Nefertiti. The classification of this river segment in the proposed alternative for this river segment has been changed to "wild". |

BLM_0010852

**Table 5.10.r. Comments Requiring a Change in the Document: Wild and Scenic Rivers**

| 213 | Utah Rivers Council | 9 | Yes | The list of eligible segments of the Green River and the segments that are analyzed for suitability are inconsistent. In Appendix J, seven suitability factors were considered for each of the different rivers, including the Green River. Attachment 2 in Appendix J, pages J-61 to J-64, shows that 6 segments of the Green River are eligible to become a Wild and Scenic River. However, attachment 4, pages J-81 and J-82, lists the suitability considerations for the, "Green River – Segments 1 through 5". Thus, the suitability analysis fails to even include all 6 eligible segments in the analysis. It is impossible to determine which of the 6 eligible river segments were not included in the analysis because they are not listed nor mentioned. | There are 6 river segments along the Green River and this error has been corrected in the PRMP/FEIS. The heading on pg. J-81 of the DRMP/EIS has been changed to "Green River segments 1 through 6". |
| 213 | Utah Rivers Council | 10 | Yes | The suitability analysis of the Green River includes segments 1 through 5 together. The response to each of the seven suitability factors does not make it clear which of the segments the response applies to. This completely muddles the entire suitability analysis as it is impossible to determine why some segments were found suitable and others were found not suitable. | There are 6 river segments along the Green River and this error has been corrected in the PRMP/FEIS. Attachment 4, Suitability Considerations by Eligible River Segment, has been augmented for the Green River and this augmentation makes the suitability determinations more clear. |

BLM_0010853

**Table 5.10.s. Comments Requiring a Change in the Document: Wildlife**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 9 | ECOS Consulting | 58 | Yes | Page 4-442, Table 4.138, 4.3.19: This table is missing a number of very important wildlife associations that must be considered by the BLM in its analyses of impacts in this Moab RMP/EIS. Add the wildlife association "aquatic macro-invertebrates" with the Aquatic habitat type. | The tables referred to have been modified as suggested by the Commenter in the PRMP/FEIS. |

**Table 5.10.t. Comments Requiring a Change in the Document: Woodlands (Forestry)**

| Record ID | Commenter | Comment Number | Requires Change | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| 204 | The Nature Conservancy | 29 | Yes | Woodlands (Pg 2-55—2-56) As a more technical note, the language used in each of the four Alternatives on DRMP Page 2-56 appears to be confusing. Each one is a single run-on sentence that seems to combine the concepts of provide and prohibit. Although one can figure out which acreage value applies to which concept, it would be best for the Final RMP to use language such as separate sentences so that the distinction between "provide" and "prohibit" is clear and unambiguous. | The language on page 2-56 has been corrected to be more direct. |

BLM_0010854

## 5.6 RECORD OF DECISION

Following publication by the EPA and BLM of a Notice of Availability of the PRMP/FEIS in the Federal Register, there is a 30-day protest period. In addition, a 60-day Governor's Consistency Review period runs concurrently with the first half of the protest period.

The State Director will approve the PRMP/FEIS by issuing a public Record of Decision (ROD), which is a concise document summarizing the findings and decisions brought forth from the PRMP. However, approval shall be withheld on any portion of a plan being protested until final action has been completed on such protest. Before such approval is given, there shall be public notice and opportunity for public comment on any significant change made to the proposed plan.

Management actions specified for the Proposed Alternative in Chapter 2 of the PRMP/FEIS are labeled as follows:

Land-use Plan Decisions (P): These broad-scale decisions guide future land management actions and subsequent site-specific implementation decisions. Land-use plan decisions fall into two categories: desired outcomes (goals; standards, including land health standards; and objectives) and allowable uses and actions to achieve outcomes. Proposed land-use plan decisions are protestable to the BLM Director.

Implementation Decisions (I): These decisions take action to implement land-use plan decisions on a site-specific basis. They may be incorporated into implementation plans or may exist as stand-alone decisions. When issued, implementation decisions are generally appealable to the Interior Board of Land Appeals as outlined in 43 CFR Part 4.

Administrative and Policy Decisions (A): These decisions are based on law, regulation, and/or policy and do not require a land-use plan decision or implementation decision. They are not protestable or appealable.

## 5.7 DISTRIBUTION LIST FOR THE PROPOSED RMP/FINAL EIS

A copy of the PRMP/FEIS has been sent to all the entities identified in the distribution list below (Table 5.11). The individuals, groups, organizations, and agencies included in the mailing list for the Moab RMP will be notified that the PRMP/FEIS is available and a hard copy or compact disc of the document can be provided upon request. In an effort to reduce printing costs, the PRMP/FEIS is also available on the Moab RMP website at http://www.blm.gov/ut/st/en/fo/moab/planning.html, the Moab Field Office, the public room in the BLM Utah State Office, and the public libraries listed on the distribution list.

BLM_0010855

**Table 5.11. Distribution List Proposed RMP/Final EIS**

| Federal Agencies (Required) | Local Federal Agencies |
|---|---|
| Bureau of Reclamation<br>Denver Federal Center<br>Denver, CO | Arches National Park<br>Moab, UT |
| U.S. Fish and Wildlife Service<br>Division of Environmental Quality<br>Arlington, VA | Canyonlands National Park<br>Moab, UT |
| Office of Environmental Compliance<br>Department of Energy<br>Washington, DC | U.S. Geological Survey<br>Moab, UT |
| U.S. Environmental Protection Agency<br>Office of Federal Activities<br>Washington, DC | Manti-LaSal National Forest<br>Price, UT |
| U.S. Geological Survey<br>Environmental Affairs Program<br>Reston, VA | Manti-LaSal National Forest<br>Moab, UT |
| U.S. Environmental Protection Agency<br>Region 8<br>Denver, CO | Colorado Canyons NCA<br>Grand Junction, CO |
| Minerals Management Service<br>Environmental Division<br>Herndon, VA | BLM Monticello Field Office<br>Monticello, UT |
| U.S. Geological Survey<br>Reston, VA | BLM Grand Junction Field Office<br>Grand Junction, CO |
| National Park Service<br>Washington, DC | BLM Price Field Office<br>Price, UT |
| Bureau of Indian Affairs<br>Reston, VA | BLM Montrose Field Office<br>Montrose, CO |
| Office of Surface Mining<br>Washington, DC | BLM Durango Field Office<br>Durango, CO |
| U.S. Department of the Interior<br>Office of Environmental Policy and Compliance<br>Washington, DC | BLM Vernal Field Office<br>Vernal, UT |
| U.S. Department of the Interior<br>Natural Resources Library<br>Washington, DC | |

BLM_0010856

**Table 5.11. Distribution List Proposed RMP/Final EIS**

| Other Federal Agencies | Utah BLM Resource Advisory Council |
|---|---|
| Mineral Management Service<br>Denver, CO | Mr. Carl Albrecht<br>Richfield, UT |
| Federal Highway Administration<br>Utah Division<br>Salt Lake City, UT | Mr. Norman Carroll<br>Orderville, UT |
| U.S. Department of Energy<br>Grand Junction Office<br>Grand Junction, CO | Mr. Michael Jenkins<br>Salt Lake City, UT |
| U.S. Fish and Wildlife Service<br>West Valley City, UT | Mr. Lowell Braxton<br>Salt Lake City, UT |
| Bureau of Reclamation<br>Provo, UT | Mr. Ray Bloxham<br>Salt Lake City, UT |
| Natural Resources Conservation Service<br>Provo Service Center<br>Provo, UT | Ms. Ashley Korenblat<br>Moab, UT |
| U.S. Army Corps of Engineers<br>Chief, Planning Division<br>Sacramento, CA | Mr. Clair "Riley" Cutler<br>Salt Lake City, UT |
| Deputy Assistant Secretary of the Air Force<br>Environment, Safety, and Occupational Health<br>Washington, DC | Mr. Jerry Spangler<br>Ogden, UT |
| Federal Depository Library System<br>Government Printing Office<br>Washington, DC | Mr. Gordon Topham<br>Monroe, UT |
|  | Mr. Drew Sitterud<br>Castle Dale, UT |
|  | Mr. F.E. "Fee" Busby<br>Logan, UT |
|  | Mr. Tom Clawson<br>Salt Lake City, UT |
|  | Mr. Lynn Stevens<br>Blanding, UT |
|  | Mr. Manuel Morgan<br>Aneth, UT |

BLM_0010857

**Table 5.11. Distribution List Proposed RMP/Final EIS**

| State Agencies | County Governments |
|---|---|
| Public Lands Policy Coordination Office<br>Salt Lake City, UT | Grand County Council<br>Moab, UT |
| Utah State Historic Preservation Office<br>Salt Lake City, UT | Grand County Council<br>Administrator<br>Moab, UT |
| Utah School and Institutional Trust Lands Administration<br>Moab, UT | Grand County Road Department<br>Moab, UT |
| Utah School and Institutional Trust Lands Administration<br>Salt Lake City, UT | San Juan County Commission<br>Monticello, UT |
| Utah Governor's Office of Planning and Budget<br>Salt Lake City, UT | San Juan County Planner<br>Monticello, UT |
| Utah Department of Transportation<br>Price, UT | |
| Utah State Parks<br>Moab, UT | |
| Utah Governor's Office of Planning and Budget<br>Salt Lake City, UT | |
| **City Governments** | **Elected Officials** |
| City of Moab<br>Moab, UT | Senator Orrin Hatch<br>Washington, DC |
| Town of Castle Valley<br>Moab, UT | Senator Bob Bennett<br>Washington, DC |
| City of Monticello<br>Monticello, UT | Representative Jim Matheson<br>Washington, DC |
| Town of Green River<br>Green River, UT | Mike Dmitrich<br>State Senator<br>Price, UT |
| | Brad King<br>State Representative<br>Price, UT 84501 |
| | John Mathis<br>State Representative<br>Vernal, UT |
| **Tribal Governments** | |
| Hopi Tribal Council<br>Kykotsmovi, AZ | Governor<br>Pueblo of Laguna<br>Laguna, N.M. |

BLM_0010858

**Table 5.11. Distribution List Proposed RMP/Final EIS**

| | |
|---|---|
| Hopi Cultural Preservation Office<br>Hopi Tribal Council<br>Kykotsmovi, AZ | NAGPRA Coordinator<br>Pueblo of Laguna<br>Laguna, NM |
| President<br>Navajo Nation<br>Window Rock, AZ | Governor<br>Pueblo of Santa Clara<br>Espanola, NM |
| Cultural Specialist<br>Navajo Nation<br>Window Rock, AZ | Land Claims and Rights Protection<br>Officer<br>Pueblo of Santa Clara<br>Espanola, NM |
| Director<br>Navajo Utah Commission<br>Montezuma Creek, UT | Governor<br>Pueblo of Zia<br>Zia Pueblo, NM |
| Chairman<br>Southern Ute Tribe<br>Ignacio, CO | Cultural Preservation Officer<br>Pueblo of Zia<br>Zia Pueblo, NM |
| NAGPRA Coordinator<br>Southern Ute Tribe<br>Ignacio, CO | Governor<br>Pueblo of Zuni<br>Zuni, NM |
| Chairman<br>Ute Mountain Ute Tribe<br>Towaoc, CO | Manager<br>Zuni Cultural Resources<br>Enterprise<br>Zuni, NM |
| Tribal Cultural Representative<br>Ute Mountain Ute Tribe<br>Towaoc, CO | Manager<br>Uintah & Ouray Agency<br>Bureau of Indian Affairs<br>Fort Duchesne, UT |
| Chairwoman<br>Uintah and Ouray Tribal Business Committee<br>Fort Duchesne, UT | Chairwoman<br>Paiute Indian Tribe of Utah<br>Cedar City, UT |
| Director<br>Cultural Rights and Protection<br>Fort Duchesne, UT | Cultural Resources Director<br>Paiute Indian Tribe of Utah<br>Cedar City, UT |
| **Public Libraries** | **Adjoining State Agencies** |
| Public Reading Room<br>Salt Lake City Public Library<br>210 East 400 South<br>Salt Lake City, UT 84111 | Colorado Division of Wildlife<br>Grand Junction, CO |
| Grand County Public Library<br>257 East Center<br>Moab, UT 84532 | |

BLM_0010859

**Table 5.11. Distribution List Proposed RMP/Final EIS**

| | |
|---|---|
| San Juan County Public Library<br>P.O. Box 66<br>Monticello, UT 84535 | |
| Public Reading Room<br>Marriott Library<br>University of Utah<br>295 S. 1500 East<br>Salt Lake City, UT 84112-0860 | |
| Mesa County Public Library<br>Public Reading Room<br>530 Grand Avenue<br>Grand Junction, CO 81502-5019 | |
| Library of Congress<br>101 Independence Avenue SE<br>Washington DC 20540 | |

## 5.8 LIST OF PREPARERS

The BLM Moab FO PRMP/FEIS was written and produced by a team composed of Moab FO interdisciplinary resource specialists and SWCA Inc., an independent, third-party consulting firm. In accordance with 40 CFR 1506.5(c), SWCA certified that it does not have any financial or other interest in the outcome of the decisions made pursuant to this RMP/EIS. Under the guidance and direction of the BLM, and in collaboration with the cooperating agencies, the team developed alternatives, collected baseline data to be used in the analysis, assessed potential affects of the alternatives, and prepared all the necessary elements of an RMP/EIS with additional participation, comments, and critique from the cooperating agencies and resource specialists with the BLM Utah State Office. Table 5.8 lists the name, position, and planning role of the team members associated with preparation of the PRMP/FEIS.

**Table 5.12. List of Preparers**

| Name | Position | Education | Planning Role |
|---|---|---|---|
| **BLM** | | | |
| Ann Marie Aubry | Hydrologist | B.S. | Air Quality, Soils/Watershed |
| Dusty Carpenter | Ecology SCEP | B.S. | Livestock Grazing |
| Jean Carson | GIS Specialist | | GIS Mapping |
| Kate Juenger | Planning Coordinator, Fire | | |
| Brent Northrup | Resource Advisor | B.S. | RMP Project Manager, Minerals, Health and Safety |
| Marilyn Peterson | Outdoor Recreation Planner | B.S. | Wild and Scenic Rivers |

BLM_0010860

**Table 5.12. List of Preparers**

| Name | Position | Education | Planning Role |
|------|----------|-----------|---------------|
| Pam Riddle | Wildlife Biologist | B.S. | Wildlife and Fisheries, Special Status Animal Species |
| Bill Stevens | Planning Specialist | Ph D. | Wilderness, Socioeconomics, Travel |
| Katie Stevens | Outdoor Recreation Planner | Ph D. | Areas of Critical Environmental Concern, Recreation |
| Rob Sweeten | Landscape Architect | B.S. | Visual Resource Management |
| Daryl Trotter | Environmental Protection Specialist | B.S. | NEPA Specialist, Riparian, Special Status Plant Species, Vegetation, Woodlands |
| Donna Turnipseed | Archaeologist | B.S. | Cultural, Paleontology, National Historic Trails |
| Mary von Koch | Realty Specialist | M.S. | Lands and Realty |
| Doug Wight | GIS Coordinator | M.S. | GIS Mapping |
| Dave Williams | Range Conservationist | B.S. | Livestock Grazing |
| Maggie Wyatt | Moab Field Office Manager | M.A. | Management |
| **SWCA Inc.** | | | |
| Laura Burch | Environmental Planner | M.P.A. | Socioeconomics, Hazardous Materials |
| Linda Burfitt | Technical Editor | B.A. | General |
| Karl Chalker | Technical Editor | M.A. | General |
| Tonya Dombrowski | Environmental Chemist | Ph D. | Air Quality |
| Sherri Ellis | Cultural Resources Lead | M.S. | Cultural Resources, Lands and Realty |
| Janet Guinn | Project Coordinator | B.A. | Project Coordination, Formatting |
| David Harris | NEPA Specialist | M.S. | Recreation, Travel, Visual Resource Management, Woodlands |
| Kristen Knippenberg | Resource Specialist, Technical Editor | M.F.A. | Minerals, editing |
| Greg Larson | Resource Specialist | M.S. | Fire, Lands, Soils |
| Cynthia Manseau | Technical Editor | B.A. | General |
| Susan Martin | Ecologist | M.S. | Special Status Plant Species, Vegetation |
| Eric McCulley | Geologist | B.S. | Riparian, Soils/Watershed |
| Molly Mollenaar | Cultural Anthropologist | M.A. | Native American Consultation |

BLM_0010861

**Table 5.12. List of Preparers**

| Name | Position | Education | Planning Role |
|------|----------|-----------|---------------|
| Paul Murphey | Principal Investigator, Paleontology | Ph D. | Paleontology |
| Matt Peterson | Principal Ecologist | M.S. | NEPA Specialist/QA/QC |
| Deb Reber | Natural Resource Planner | B.S. | Project Manager/QA/QC |
| Jan Reed | Ecologist | B.A. | Livestock Grazing |
| Dave Reinhart | GIS Coordinator | B.A. | GIS Mapping |
| Tyson Schreiner | GIS Coordinator | B.S. | GIS Mapping |
| Thomas Sharp | Ecologist | M.S. | Special Status Animal Species, Wildlife |
| Sherri Wysong | Resource Specialist | B.S. | Special Designations, Wilderness Characteristics |

BLM_0010862

# ACRONYMS AND GLOSSARY

## ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AML | Abandoned mine lands |
| AMP | Allotment Management Plan |
| AMS | Analysis of the Management Situation |
| APD | Application for Permit to Drill (an oil or gas well) |
| APHIS | Animal and Plant Health Inspection Service (USDA) |
| ARPA | Archeological Resource Protection Act (of 1979) |
| AUM | Animal unit month |
| BA | Biological Assessment |
| BCC | Birds of Conservation Concern |
| BCF | Billion cubic feet (a measure of quantity of natural gas) |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management |
| BMP | Best Management Practice |
| BO | Biological Opinion |
| CAA | Clean Air Act (of 1970) |
| CEQ | Council on Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act (of 1980) |
| CFR | Code of Federal Regulations |
| CFS | Cubic Feet Per Second (a unit of water flow) |
| CO | Carbon Monoxide |
| COA | Conditions of Approval |
| CRMP | Cultural Resource Management Plan |
| CSU | Controlled Surface Use |
| DEIS | Draft Environmental Impact Statement |
| DFC | Desired Future Condition |
| DOGM | (Utah) Division of Oil, Gas and Mining |

| | |
|---|---|
| DOI | (United States) Department of the Interior |
| DPC | Desired Plant Community |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act (of 1975) |
| ERMA | Extended Recreation Management Area |
| ESA | Endangered Species Act (of 1973) |
| ESR | Emergency Stabilization and Rehabilitation |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FLPMA | Federal Land Policy and Management Act (of 1976) |
| FMP | Fire Management Plan |
| FMZ | Fire Management Zone |
| FO | Field Office |
| FR | Federal Register |
| GAP | Geographical Analysis Program |
| GIS | Geographic Information Systems |
| HFRA | Healthy Forests Restoration Act (of 2003) |
| HMA | Herd Management Area |
| HMAP | Herd Management Area Plan |
| HMP | Habitat Management Plan |
| HUC | Hydrologic Unit Code |
| IBLA | Interior Board of Land Appeals |
| IMP | Interim Management Policy |
| KRCRA | Known Recoverable Coal Resource Area |
| LTA | Land Tenure Agreement |
| LUP | Land Use Plan |
| LWCF | Land and Water Conservation Fund |
| MBTA | Migratory Bird Treaty Act (of 1918) |
| MCF | Thousand cubic feet |

| | |
|---|---|
| MMCF | Million cubic feet |
| MOU | Memorandum of Understanding |
| MFO | Moab Field Office |
| MPA | Moab Planning Area |
| NAAQS | National Ambient Air Quality Standards |
| NAGPRA | Native American Graves Protection and Repatriation Act (of 1990) |
| NEPA | National Environmental Policy Act (of 1969) |
| NHPA | National Historic Preservation Act |
| NOx | Nitrogen Oxides |
| $NO_2$ | Nitrogen Dioxide |
| NOA | Notice of Availability (published in the Federal Register) |
| NOI | Notice of Intent (published in the Federal Register) |
| NPS | National Park Service |
| NRA | National Recreation Area |
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy (a stipulation on an oil and gas lease) |
| NWSRS | National Wild and Scenic River System |
| OHV | Off-Highway Vehicle |
| ORV | Off Road Vehicle (an older acronym, replaced by OHV) |
| PFC | Proper Functioning Condition (of riparian/wetland areas) |
| PM | Particulate Matter |
| $PM_{2.5}$ | Particulate Matter (less than 2.5 microns in diameter) |
| $PM_{10}$ | Particulate Matter (less than 10 microns in diameter) |
| R&I | Relevance and Importance |
| R&PP | Recreation and Public Purposes (Act of 1926) |
| RAMP | Recreation Area Management Plan |
| RDCC | (Utah) Resource Development and Coordinating Committee |
| RFD | Reasonably Foreseeable Development |
| RHS | Rangeland Health Standards |
| RMIS | Recreation Management Information System |
| RMP | Resource Management Plan (BLM land use plan under FLPMA) |

BLM_0010865

| ROD | Record of Decision |
|---|---|
| ROS | Recreation Opportunity Spectrum |
| ROW | Right of Way |
| S&G | Standards & Guidelines |
| SHPO | State Historic Preservation Officer |
| SITLA | (Utah) School and Institutional Trust Lands Administration |
| SOx | Sulfur Oxides |
| $SO_2$ | Sulfur Dioxide |
| SRMA | Special Recreation Management Area |
| SRP | Special Recreation Permit |
| SWREGAP | Southwest Regional Geographical Analysis Program |
| T&E | Threatened and/or Endangered (species as per ESA of 1973) |
| TDS | Total Dissolved Solids |
| TMDL | Total Maximum Daily Load |
| TPY | Tons Per Year |
| UAAQS | Utah Ambient Air Quality Standards |
| UAC | Utah Administrative Code |
| UDA | Utah Division of Aeronautics |
| UDAQ | Utah Department of Air Quality |
| UDEQ | Utah Division of Environmental Quality |
| UDOGM | Utah Division of Oil, Gas, and Mining |
| UDOT | Utah Department of Transportation |
| UDWaR | Utah Division of Water Resources |
| UDWQ | Utah Division of Water Quality |
| UDWR | Utah Division of Wildlife Resources |
| UGS | Utah Geological Survey |
| USFWS | United States Fish and Wildlife Service |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFS | United States Forest Service |
| USGS | United States Geological Survey |

BLM_0010866

| | |
|---|---|
| VRM | Visual Resource Management |
| WAFWA | Western Association for Fish and Wildlife Agencies |
| WMA | Wildlife Management Area |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River(s) (Act of 1973) |
| WUI | Wildland Urban Interface |

BLM_0010867

Case No. 1:20-cv-02484-MSK   Document 29-5   filed 04/27/21   USDC Colorado   pg 24 of 117

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0010868

# GLOSSARY

Activity Plan: Site-specific plan which precedes actual development. This is the most detailed level of BLM planning.

**All-Terrain Vehicle (ATV)**: A wheeled or tracked vehicle, other than a snowmobile or work vehicle, designed primarily for recreational use or for the transportation of property or equipment exclusively on undeveloped road rights of way, open country or other unprepared surfaces.

**Allotment**: An area of land where one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Categorization**: Grazing allotments and rangeland areas used for livestock grazing are assigned to an allotment category during resource management planning. Allotment categorization is used to establish priorities for distributing available funds and personnel during plan implementation to achieve cost-effective improvement of rangeland resources. Categorization is also used to organize allotments into similar groups for purposes of developing multiple use prescriptions, analyzing site-specific and cumulative impacts, and determining trade-offs.

**Animal Unit Month (AUM)**: A standardized measurement of the amount of forage necessary for the sustenance of one cow unit or its equivalent for 1 month. Approximately 800 pounds of forage.

**Area of Critical Environmental Concern (ACEC)**: Areas within the public lands where special management attention is required to: (1) protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or (2) protect life and safety from natural hazards.

**Authorized Officer**: The Federal employee who has the delegated authority to make a specific decision.

**Avoidance Areas**: Areas with sensitive resource values where rights-of-way leases, and easements would be strongly discouraged. Authorization made in avoidance areas would have to be compatible with the purpose for which the area was designated and not is otherwise feasible on lands outside the avoidance area.

**Best Management Practices (BMPs)**: A suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes. Best management practices are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory. They may be updated or modified without a plan amendment if they are not mandatory.

**Big Game**: Large species of wildlife that are hunted, such as elk, deer, bighorn sheep, and pronghorn antelope.

**Browse**: To browse (verb) is to graze; also, browse (noun) is the tender shoots, twigs, and leaves and shrubs often used as food by livestock and wildlife.

BLM_0010869

**Candidate Species**: Any species included in the Federal Register notice of review that are being considered for listing as threatened or endangered by the U.S. Fish and Wildlife Service.

**Casual Use**: Mining activities that only negligibly disturb federal lands and resources. Casual use generally includes the collecting of geochemical, rock, soil, or mineral specimens using hand tools, hand panning, and nonmotorized sluicing. It also generally includes use of metal detectors, gold spears, and other battery-operated devices for sensing the presence of minerals, and hand battery-operated dry washers. Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Closed**: Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.

**Code of Federal Regulations (CFR)**: The official, legal tabulation or regulations directing federal government activities.

**Collaboration**: A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. This may or may not involve an agency as a cooperating agency.

**Competitive Forage**: Those forage species utilized by two or more animal species.

**Conditions of Approval**: Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Conformance**: That a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation Agreement**: A formal signed agreement between the U.S. Fish and Wildlife Service or National Marine Fisheries Service and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species. CA's can be developed at a State, regional, or national level and generally include multiple agencies at both the State and Federal level, as well as tribes. Depending on the types of commitments the BLM makes in a CA and the level of signatory authority, plan revisions or amendments may be required prior to signing the CA, or subsequently in order to implement the CA.

**Conservation Strategy**: A Strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

**Contiguous**: Lands or legal subdivisions having a common boundary; lands having only a common corner are not contiguous.

BLM_0010870

**Cooperating Agency**: Assists the lead Federal agency in developing an Environmental Analysis or Environmental Impact Statement. The Council on Environmental Quality regulations implementing NEPA defines a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA. Any tribe of Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor**: A wide strip of land within which a proposed linear facility could be located.

**Council on Environmental Quality (CEQ)**: An advisory council to the President of the United States established by the national Environmental Policy Act of 1969. It reviews Federal programs for their effect on the environment, conducts environmental studies, and advises the president on environmental matters.

**Critical Habitat. For listed species**:  Consists of 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act, on which are found those physical or biological features (constituent elements) a) essential to the conservation of the species and b) which may require special management considerations or protection; and 2) specific areas outside the geographical are occupied by the species at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act upon a determination by the Secretary that such areas are essential for the conservation of the species. Designated critical habitats are described in 50 CFR§ 17 and 226.

**Crucial Habitat**. Habitat on which a species depends for survival because there are no alternative ranges or habitats available.

**Crucial Winter Habitat (Range)**: Parts of the habitat necessary to sustain a wildlife population at critical periods of its life cycle. This is often a limiting factor on the populations, such as breeding habitat, winter habitat, etc.

**Cryptobiotic (Cryptogrammic) Soils**: Biological communities that form a surface layer or crust on some soils. These communities consist of cyanobacteria (blue-green bacteria), micro fungi, mosses, lichens, and green algae and perform many important functions, including fixing nitrogen and carbon, maintaining soil surface stability, and preventing erosion. Crypto biotic crusts also influence the nutrient levels of soils and the status and germination of plants in the desert. These crusts are slow to recover after severe disturbance, requiring 40 years of more to recolonize even small areas.

**Cultural Resources**: Nonrenewable elements of the physical and human environment including archeological remains (evidence of prehistoric or historic human activities) and sociocultural values traditionally held by ethnic groups (sacred places, traditionally utilized raw materials, etc.).

**Cultural Site**: Any location that includes prehistoric and/or historic evidence of human use or that has important sociocultural value.

**Cumulative Impact**: The impact on the environment that results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative

BLM_0010871

impacts can result from individually minor but collectively significant actions taking place over a period of time.

**Current Habitat**: habitat currently occupied by a species during the development of the plan.

**Desired Condition**: Description of those factors, which should exist within ecosystems both to maintain their survival and to meet social and economic needs.

**Development Well**: A well drilled within the known or proven productive area of an oil field with expectation of producing oil or gas from the producing reservoir.

**Discretionary Closure**: Those lands where the BLM has determined that fluid minerals leasing, even with the most restrictive stipulations, would not adequately protect other resources, values, or land uses.

**Dispersed/Extensive Recreation**: Recreation activities of an unstructured type, which are not confined to specific locations such as recreation sites. Example of these activities may be hunting, fishing, off-road vehicle use, hiking, and sightseeing.

**Disturbance Area**: Area of influence around a disturbance causing a change in animal behavior such as: leaving the area, increased stress, abandoning young, not breeding, and aberrant behavior.

**Drought**: Drought is a protracted period of deficient precipitation resulting in extensive damage to crops, resulting in loss of yield.

**Easement**: A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Endangered Species**: A plant or animal species whose prospects for survival and reproduction are in immediate jeopardy, as designated by the Secretary of the Interior, and as is further defined by the Endangered Species Act.

**Environmental Assessment (EA)**: A concise public document that analyzes the environmental impacts of a proposed federal action and provides sufficient evidence to determine the level of significance of the impacts.

**Environmental Impact Statement (EIS)**: A detailed written statement required by the National Environmental Policy Act when an agency proposes a major federal action significantly affecting the quality of the human environment.

**Erosion**: The wearing away of the land surface by running water, wind, ice, or other geological agents.

**Exclusion Area**: Areas with sensitive resource values where rights-of-way , leases, and easements would not be authorized.

**Extensive Recreation Management Area (ERMA)**: An area where significant recreation opportunities and problems are limited and explicit recreation management is not required. Minimal management actions related to the BLM's stewardship responsibilities are adequate in these areas.

**Fawning Habitat**: an area where big game animals usually give birth during a specific time of year.

BLM_0010872

**Federal Land Policy and Management Act of 1976 (FLPMA)**: Public Law 94-579. October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction, policy, and basic management guidance.

**Federal Register**: A daily publication, which reports Presidential and Federal Agency documents.

**Fire Management Plan**: A strategic plan that defines a program to manage wild land and prescribed fires and documents the fire management program in the approved land use plan; the plan is supplemented by operational procedures such as preparedness plans, preplanned dispatch plans, prescribed fire plans, and prevention plans.

**Floodplain**: The relatively flat area or lowlands adjoining a body of standing or flowing water, which has been or might be covered by floodwater.

**Fluid Minerals**: Oil and gas resources.

**Focus Area**: A recreation management zone that emphasizes particular types of recreation activities.

**Fossil**: Mineralized or petrified form from a past geologic age, especially from previously living things.

**Geographic Information System (GIS)**: A computer system capable of storing, analyzing, and displaying data and describing places on the earth's surface.

**Goal**: A broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

**Grandfather (to)**: To exempt groups or individuals from provisions of laws or regulations because of preexisting conditions, such as exempting mining operations existing before new mining regulations are implemented from provisions of those new regulations.

**Grazing System**: The manipulation of livestock grazing to accomplish a desired result.

**Guidelines**: Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory.

**Habitat**: A specific set of physical conditions that surround a species, group of species, or a large community. In wildlife management, the major constituents of habitat are considered to be food, water, cover, and living space.

**Habitat Fragmentation**: The disruption (by division) of extensive habitats into smaller habitat patches. The effects of habitat fragmentation include loss of habitat area and the creation of smaller, more isolated patches of remaining habitat.

**Historic Habitat**: habitat occupied by a species prior to the development of this plan.

**Impact**: A modification of the existing environment caused by an action. These environmental consequences are the scientific and analytical basis for comparison of alternatives. Effects may be either direct, which are caused by the action and occur at the same time and place, or indirect,

BLM_0010873

which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable, or cumulative.

Implementation Decisions: Decisions that take action to implement land use plan decisions. They are generally appealable to Interior Board of Land Appeals.

**Implementation Plan**: A site-specific plan written to implement decisions made in a land use plan. An implementation plan usually selects and applies best management practices to meet land use plan objectives. Implementation plans are synonymous with "activity" plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans.

**Indian Tribe**: Any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status.

**Interdisciplinary Team**: A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembles to solve a problem or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more disciplines or BLM program interests.

**Lambing Habitat**: An area where bighorn sheep deliver and nurse young during a specific time of year.

**Land Use Allocation**: The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan**: A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process, regardless of the scale at which the decisions were developed.

**Land Use Plan Decision**: Establishes desired outcomes and the actions needed to achieve them. Decisions are reached using the BLM planning process. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Leasable Minerals**: Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, sulphur, potassium, and sodium minerals, and oil, gas, and geothermal.

**Lease**: (1) A legal document that conveys to an operator the right to drill for oil, gas; (2) the tract of land, on which a lease has been obtained, where producing wells and production equipment are located.

**Lease Notice**: Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, and operational orders. A Lease Notice also addresses special items the lessee would consider when planning operations, but does not impose new or additional restrictions.

BLM_0010874

**Lease Stipulation**: A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek**: An assembly area where birds, especially sage grouse, carry on display and courtship behavior.

**Limited Roads and Trails Designation**: Designated areas where the use of off-road vehicles is subject to restrictions, such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), and limiting all use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year.

**Locatable Minerals**: Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Management Decision**: A decision made by the BLM to manage public lands. Management decisions are made on both land use plan decisions and implementation decisions.

**Management Opportunities**: A component of the analysis of the management situation; actions or management directions that could be taken to resolve issues or management concerns.

**Mechanized Travel**: Travel by use of a machine, either motorized or non-motorized.

**Mineral Entry**: The filing of a claim on public land to obtain the right to any minerals it may contain.

**Mineral Estate**: The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials**: Materials such as common varieties of sand, stone, building stone, gravel, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Mineral Materials Act of 1947, as amended. These are also called salable minerals.

**Mineral Reserves**: Known mineral deposits that are recoverable under present conditions but are as yet undeveloped.

**Mineral Withdrawal**: A formal order that withholds federal lands and minerals from entry under the Mining Law of 1872 and closes the area to mineral location (staking mining claims) and development.

**Minimize**: To reduce the adverse impact of an operation to the lowest practical level.

**Mining Claim**: A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law of 1872, as amended, and local laws and rules. A single mining claim may contain as many adjoining locations as the locator may make or buy.

**Mitigation Measures**: Methods or procedures that reduce or lessen the impacts of an action.

**Multiple Use**: The management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these resources or related

BLM_0010875

services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources, including but not limited to, recreation, range, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output.

**National Environmental Policy Act of 1969 (NEPA)**: An act that encourages productive and enjoyable harmony between man and his environment and promotes efforts to prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; enriches the understanding or the ecological systems and natural resources important to the Nation, and establishes the Council on Environmental Quality.

**National Wild and Scenic Rivers System**: A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three river classifications: (1) recreation-rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) scenic-rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) wild-rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**Neotropical Migratory Birds**: Birds that travel to Central America, South America, the Caribbean, and Mexico during the fall to spend the winter and then return to the United States and Canada During the spring to breed. These birds include almost half of the bird species that breed in the United States and Canada.

**No Surface Occupancy (NSO)**: A fluid minerals leasing constraint that prohibits occupancy or disturbance on all or part of the lease surface to protect special values or uses. Lessees may exploit the fluid mineral resources under the leases restricted by this constraint through use of directional drilling from sites outside the area.

**Non-mechanized Travel**: Travel by foot or on an animal.

**Non-WSA Lands with Wilderness Characteristics**: Undeveloped federal land that has been inventoried and/or reviewed by a BLM interdisciplinary team and determined to possess wilderness characteristics such as those listed in section 2(c) of the Wilderness Act of 1964. These lands do not possess special management designations like WSAs or protective management measures such as the IMP.

**Noxious Weeds**: A plant species designated by Federal of State law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the United States.

BLM_0010876

**Objective**: A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

**Occupied Habitat**: An area occupied by a species during the development of this plan.

**Open**: Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.

**Off-Highway Vehicle (OHV)**: Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used in times of national defense emergencies.

**One-Hundred-Year Flood**: A hydrologic event with a magnitude that has a recurrence interval of 100 years.

**Open OHV Areas**: Designated areas where off-road vehicles may engage in cross country travel.

**Operator**: Any person who has taken formal responsibility for the operations conducted on the leased lands.

**Outstandingly Remarkable River Values**: Values between those listed in Section 1(b) of the Wild and Scenic Rivers Act are "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values…" Other similar values, which may be considered, include botanical, hydrological, paleontological, or scientific. Professional judgment is used to determine whether values exist to an outstandingly remarkable degree.

**Paleontological Resources (Fossils)**: The physical remains of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for understanding past environments, environmental change, and the evolution of life.

**Paleontology**: A science dealing with the life forms of past geological periods as known from fossil remains.

**Plan of Development**: A mandatory plan, developed by an applicant of a mining operation or construction project that specifies the techniques and measures to be used during construction and operation of all project facilities on public land. The plan is submitted for approval to the appropriate Federal agency before any construction begins.

**Plan of Operations**: A plan for mining exploration and development that an operation must submit to BLM for approval when more than 5 acres a year will be disturbed or when an operator plans to work in an area of critical environmental concern or a wilderness area. A plan of Operations must document in detail all actions that the operator plans to take from exploration through reclamation.

**Planning Area**: A geographical area, including all land ownerships, for which BLM land use and resource management plans are developed and maintained for the BLM-administered lands within that geographical area.

BLM_0010877

**Planning Criteria**: The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

**Potential Wild and Scenic River**: A flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, rills, and small lakes.

**Prescribed Fire**: The introduction of fire to an area under regulated conditions for specific management purposes.

**Primitive and Unconfined Recreation**: Non-motorized, non-mechanized and undeveloped types of recreational activities.

**Production Well**: A well drilled in a known field that produces oil or gas.

**Project Area**: The area of land upon which an operator conducts mining operations, including the area needed for building or maintaining of roads, transmission lines, pipelines, or other means of access.

**Project Plan**: Detailed survey and design plan.

**Public Land**: Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

**Quarry**: An open or surface working, usually for the extraction of stone, slate, limestone, etc.

**Range Development**: A structure, excavation, treatment or development to rehabilitate, protect, or improve lands to advance range betterment.

**Rangeland**: Land used for grazing by livestock and big game animals on which vegetation is dominated by grasses, grass-like plants, forbs, or shrubs.

**Raptor**: Bird of prey with sharp talons and strongly curved beaks such as hawks, owls, vultures, and eagles.

**Reasonably Foreseeable Development Scenario (RFD)**: The prediction of the type and amount of oil, gas and other mineral activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Record of Decision (ROD)**: A document signed by a responsible official recording a decision that was preceded by the preparing of an environmental impact statement.

**Recreational River**: A wild and scenic river classification that identifies those rivers are river segments that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

**Relict**: A remnant or fragment of the vegetation of an area that remains from a former period when the vegetation was more widely distributed.

**Resource Management Plan (RMP)**: A land use plan as prescribed by the Federal Land Policy and Management Act which establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives and actions to be achieved.

BLM_0010878

**Right-of-Way (ROW)**: A ROW grant is an authorization to use a specific piece of public land for a specific project, such as roads, pipelines, transmission lines, and renewable energy and communication sites. The grant authorizes rights and privileges for a specific use of the land for a specific period of time.

**Riparian Area**: A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian-Functioning at Risk (FAR)**: Riparian-wetland areas are considered to be in functioning condition, but an existing soil, water, or vegetation attribute makes them susceptible to degradation.

**Riparian-Non-Functioning (NF)**: Riparian-wetland areas that are clearly not providing adequate vegetation, landform, or large wood debris to dissipate stream energy associated with high flows, and thus are not reducing erosion, improving water quality, etc.

**Riparian-Properly Functioning Condition (PFC)**: Riparian/wetland areas are in PFC when adequate vegetation, landform, or woody debris is present to: dissipate high-energy water flow, filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks; develop diverse fluvial geomorphology (pool and channel complexes) to provide habitat for wildlife and support greater biodiversity

**Rock Art**: Petroglyphs or pictographs.

**Route**: A linear line for motorized travel.

**Rutting Habitat**: An area where big game species engage in breeding activities during specific times of the year.

**Salable Minerals**: Common variety minerals on the public lands, such as sand and gravel, which are used mainly for construction and are disposed of by sales or special permits to local governments. Also referred to as mineral materials.

**Scenic Byways**: Highway routes, which have roadsides or corridors of special aesthetic, cultural, or historic value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

**Scoping**: The process of identifying the range of issues, management concerns, preliminary alternatives, and other components of an environmental impact statement or land-use planning document. It involves both internal and public viewpoints.

**Section 7 Consultation**: The requirement of Section 7 of the Endangered Species Act that all federal agencies consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service if a proposed action might affect a federally listed species or its critical habitat.

**Section 106 Compliance**: The requirement of Section 106 of the National Historic Preservation Act that any project funded, licensed, permitted, or assisted by the Federal Government by

BLM_0010879

reviewed for impacts to significant historic properties and that the State Historic Preservation Officer and the Advisory Council on Historic Preservation be allowed to comment on a project.

**Sediment Yield**: The amount of sediment produced in a watershed, expressed in tons, acre feet, or cubic yards, of sediment per unit of drainage are per year.

**Sensitive Species**: All species that are under status review, have small or declining populations, live in unique habitats, or need special management. Sensitive species include threatened, endangered, and proposed species as classified by the Fish and Wildlife Service and National Marine Fisheries Service.

**Significant**: An effect that is analyzed in the context of the proposed action to determine the degree or magnitude of importance of the effect, wither beneficial or adverse. The degree of significance can be related to other actions with individually insignificant but cumulatively significant impacts.

**Slope**: The degree of deviation of a surface from the horizontal.

**Special Recreation Management Area (SRMA)**: Areas, which require explicit recreation management to achieve recreation objectives and provide specific recreation opportunities.

**Special Status Species**: Includes proposed species, listed species, and candidate species under the Endangered Species Act; State-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840-Special Status Species Policy).

**Stipulations**: Requirements that are part of the terms of a mineral lease. Some stipulations are standard on all Federal leases. Other stipulations may be applied to the lease at the discretion of the surface management agency to protect valuable surface resources and uses.

**Strategic Plan**: A plan that establishes the overall direction for the BLM. This plan is guided by the requirements of the Government Performance and Results Act or 1993, covers a 5-year period, and is updated every 3 years. It is consistent with FLPMA and other laws affecting the public lands.

**Surface Disturbance**: activities that normally result in more than negligible disturbance to public lands and that accelerate the natural erosive process. These activities normally involve use and/or occupancy of the surface, cause disturbance to soils and vegetation, and are usually caused by motorized or mechanical actions. Surface disturbance may result from activities using earth-moving and drilling equipment; geophysical exploration; off road vehicle travel; vegetation treatments; the use of pyrotechnics and explosives; and construction of facilities like powerlines, pipelines, oil and gas wells, recreation sites, livestock facilities, wildlife waters, or new roads. Surface disturbance is not normally caused by casual use. Activities that are not typically surface disturbing include, but are not limited to, proper livestock grazing, cross-country hiking, minimum impact filming and vehicle travel on designated routes.

**Sustainability**: The ability of an ecosystem to maintain ecological processes and functions, biological diversity, and productivity over time.

**Threatened Species**: Any plant or animal species defined under the Endangered Species Act as likely to become endangered within the foreseeable future throughout all or a significant portion of its range; listings are published in the Federal Register.

BLM_0010880

**Timing Limitation Stipulation**: A fluid minerals leasing constraint that prohibits surface use during specified time periods to protect identified resource values. The constraint does not apply to the operation and maintenance of production facilities unless analysis demonstrates that such constraints are needed and that less stringent, project-specific constraints would be insufficient.

**Undertaking**: (16 USC Sec. 470w(7)) A project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

**User Day**: Any calendar day, or portion thereof, for each individual accompanied or serviced by an operator or permittee on the public lands of related waters; synonymous with passenger day or participant day.

**Utility Corridor**: A parcel of land that has been identified by law, Secretarial order, through a land use plan or by other management decision as being the preferred location for existing and future right-of-way grants and suitable to accommodate one type of right-of-way or one or more rights-of-way which are similar, identical or compatible.

**Valid Existing Rights**: Valid existing rights are legal rights to use the land that were in existence prior to implementation of the decisions in the RMP. The most significant types of valid existing rights are oil and gas leases, potash and salt leases, mining claims, and right-of-way authorizations. The oil and gas leasing stipulations specified for specific areas in the RMP would not apply to existing leases. These existing leases would be subject to the specific lease stipulations that were applied under the previous land use plan. Mining claims that exist on the effective day of a withdrawal may still be valid if they can meet the test of discovery of a valuable mineral required under the Mining Laws. An existing right-of-way would only be subject to the specific terms and conditions that were applied when it was authorized even if it is located within a right-of-way exclusion or avoidance area specified under the RMP.

**Vegetation Manipulation**: Alteration of vegetation by using fire, plowing, or other means.

**Vegetation Type**: A plant community with distinguishable characteristics described by the dominant vegetation present.

**Visual Resources**: The visible physical features of a landscape (topography, water, vegetation, animals, structures, and other features) that constitute the scenery of an area.

**Waiver**: Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Water Quality**: The chemical, physical, and biological characteristics of water with respect to its suitability for a particular use.

**Watershed**: All lands, which are enclosed by a continuous hydrologic drainage, divide and lay upslope from a specified point on a stream.

**Way**: A vehicle route within a wilderness study area that was in existence and identified during the FLPMA Section 603-mandated wilderness inventory. The *Interim Management Policy for Lands under Wilderness Review (H-8550-1)* defines a way as "a trace maintained solely by the passage of vehicles which has not been improved and/or maintained by mechanical means to

ensure relatively regular and continuous use." The term is also used during wilderness inventory to identify routes that are not roads. The term developed from the definition of the term "roadless" provided in the *Wilderness Inventory Handbook* (September 27, 1978), as follows: "roadless: refers to the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road."

**Wild, Scenic or Recreational River**: The three classes of what is traditionally referred to as a "Wild and Scenic River." Designated river segments are classified as wild, scenic and/or recreational, but the segments cannot overlap.

**Wild, and Scenic River Study**: Rivers identified in Section 5 of the Wild and Scenic Rivers Act for study as potential additions to the National Wild and Scenic Rivers System. The rivers shall be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

**Wilderness Study Area**: A roadless area or island of undeveloped federal land that has been inventoried and found to possess wilderness characteristics described under Title VI, Section 603 of FLPMA and Section 2C of the Wilderness Act of 1964. These characteristics are: (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value.

**Wilderness**: A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation that is protected and managed to preserve its natural conditions as described in Section 2A of the Wilderness Act of 1964.

**Wilderness Characteristics:** Features of the land associated with the concept of wilderness that specifically deal with naturalness and opportunities for solitude and primitive and unconfined recreation. These characteristics may be considered in land use planning when BLM determines that those characteristics are reasonably present, of sufficient value (condition, uniqueness, relevance, importance), and need (trend, risk), and are practical to manage (from IM-2003-275, Change 1, Considerations of Wilderness Characteristics in LUP, Attachment 1). Key characteristics of wilderness listed in section 2 (c) of the Wilderness Act of 1964 were used by BLM in conducting wilderness inventories. These characteristics are features of land associated with the concept of wilderness.

**Wildfire**: Any unwanted wild land fire.

**Wildland Fire**: Any nonstructural fire, other than prescribed fire, that occurs in the wild land.

**Winter Range**. The portion of the winter range to which a wildlife species is confined during periods of heaviest snow cover.

**Withdrawal**: An action that restricts the use of public lands by removing them from the operation of some or all of the public land or mining laws.

BLM_0010882

**Woodland**: A forest community occupied primarily by noncommercial species such as juniper, mountain mahogany, or quaking aspen groves; all western juniper forestlands are classified as woodlands, since juniper is classified as a noncommercial species.

BLM_0010883

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0010884

# REFERENCES

Agency for Toxic Substances and Disease Registry (ATSDR). 1999. Toxicological Profile for Hydrogen Sulfide. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, Georgia.

Anyon, Roger. 1995. Letter to the Editor. *Society for American Archaeology Bulletin* 13(5).

Armour, C., D. Duff, and W. Elmore. 1994. The effects of livestock grazing on western riparian and stream ecosystems. *Fisheries* 19: 9-12.

Atwood, D., J. Holland, R. Bolander, B. Franklin, D. E. House, L. Armstrong, K. Thorne, and L. England. 1991. Utah Threatened, Endangered, and Sensitive Plant Field Guide. Bureau of Land Management, Utah State Office, Salt Lake City.

Atwood, G., and H. H. Doelling. 1982. History of Paradox Salt Deformation. Utah Geological and Mineral Survey Notes, Volume 16, No. 2. Utah Geological Survey, Salt Lake City.

Bearnson, Margaret S. 1994. Moab [online publication]. Utah History Encyclopedia, University of Utah Press. [Last Accessed June 18, 2007]. Available at http://www.media.utah.edu/UHE/m/MOAB.html.

Belsky, A. Joy, and Dana M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West. *Conservation Biology* 11(2):315-327.

Bon, R. L., and Sharon Wakefield. 2002a. Map of large mine permits in Utah, 2002. In Utah Geological Survey Open File Report 398, 3 p., 1 pl. Approximate scale 1" = 14 miles.

Bon, R. L., and Sharon Wakefield. 2002b. Map of small mine permits in Utah, 2002. In Utah Geological Survey Open File Report 405, 7 p., 1 pl. Approximate scale 1:750,000.

Brown, P. E. 1996. A survey for bats of the Soledad Mountain project, Mojave, Kern County, California [online publication]. Bureau of Land Management, California State Office, Sacramento. [Accessed April 13, 2005]. Available at http://www.ca.blm.gov/GoldenQueen/pub-biob.htm.

Brugge, D. 1983. Navajo Prehistory and History to 1850. In *Southwest*, edited by A. Ortiz, pp. 489-501. Handbook of North American Indians, Vol. 10, W. Sturtevant, general ed. Smithsonian Institute, Washington, D.C.

Buckles, W. 1971. The Uncompahgre Complex: Historic Ute Archaeology and Prehistoric Archaeology of the Uncompahgre Plateau, West Central Colorado. PhD dissertation, Department of Anthropology, University of Colorado. University Microfilms, Ann Arbor.

Buechner, H. K. 1960. The bighorn sheep in the United States: Its past, present and future. Wildlife Monograph 4. The Wildlife Society, Washington, D.C.

Bureau of Economic Analysis (BEA). 2005. Regional Economic Accounts [online database]. Bureau of Economic Analysis, U.S. Department of Commerce. [Accessed December 21, 2005]. Available at http://www.bea.gov/bea/regional/definitions/nextpage.cfm?key= Per%20capita%20personal%20income.

Bureau of Land Management (BLM). 1979. Desolation and Gray Canyons of the Green River Management Plan [online publication]. Bureau of Land Management, Price River Resource Area, Moab District, Moab, Utah. [Last Accessed June 15, 2007]. Available at http://www.ut.blm.gov/planning/OTHERS/DESOGRP%20JUNE%201979.PDF.

BLM. 1982. Management Situation Analysis for the Grand Resource Area. Bureau of Land Management, Grand Resource Area, Moab District, Moab, Utah.

BLM. 1985a. Grand Resource Area Resource Management Plan. Bureau of Land Management, Moab District, Moab, Utah.

BLM. 1985b. Final Environmental Impact Statement on the Book Cliffs Resource Management Plan. Bureau of Land Management, Vernal District, Vernal, Utah. July.

BLM. 1985c. Grand Junction Resource Area Resource Management Plan and Final Environmental Impact Statement. Bureau of Land Management, Grand Junction District, Grand Junction, Colorado.

BLM. 1985d. San Juan/San Miguel Resource Management Plan. Bureau of Land Management, Montrose District, Montrose, Colorado.

BLM. 1985e. Energy and Mineral Resources Assessment. Rel. 3-115. BLM Manual 3031. Bureau of Land Management, Washington, D.C. June 19.

BLM. 1986a. Statewide Desert Bighorn Sheep Management Plan. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 1986b. Visual Resource Contrast Rating. BLM Handbook H-8431-1. Bureau of Land Management, Washington, D.C.

BLM. 1987. Uncompahgre Basin Resource Management Plan and Final Environmental Impact Statement. Bureau of Land Management, Uncompahgre District, Montrose, Colorado.

BLM. 1989a. San Rafael Resource Management Plan/Final Environmental Impact Statement. Bureau of Land Management, San Rafael District, Price, Utah. July.

BLM. 1989b. Planning Criteria for Land Tenure Adjustments, Exchanges, Acquisitions, and Disposals: An Amendment to the 1985 Grand Resource Area Resource Management Plan. Bureau of Land Management. Moab District, Moab, Utah. February.

BLM. 1990. Utah BLM Statewide Wilderness Environmental Impact Statement. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 1991a. Final Environmental Impact Statement: Vegetation Treatment on BLM Lands in Thirteen Western States. BLM-WY-91-022-4320. Bureau of Land Management, Wyoming State Office, Cheyenne. May.

BLM_0010886

BLM. 1991b. Riparian-Wetland Initiative for the 1990s. BLM/WO/GI-91/001+4340. Bureau of Land Management, Denver, Colorado.

BLM. 1991c. Utah Statewide Wilderness Study Report. Bureau of Land Management, Utah State Office, Salt Lake City. October.

BLM. 1992a. Environmental Assessment: Utah's Colorado Riverway Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1992b. Visual Resource Management. BLM Manual 8400. Bureau of Land Management, Washington, D.C.

BLM. 1993a. Diamond Mountain Resource Area Resource Management Plan and Environmental Impact Statement. Bureau of Land Management, Vernal District, Vernal, Utah. March.

BLM. 1993b. Bighorn Sheep Rangeland Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1993c. Process for Assessing Proper Functioning Condition. TR-1737-9. Bureau of Land Management, Proper Functioning Condition Work Group, Denver.

BLM. 1993d. Greater Sagers Wash Watershed Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1994a. Sand Flats Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1994b. Mineral Reports, Preparation and Review. Rel. 3-284. BLM Manual 3060. Bureau of Land Management, Washington, D.C.

BLM. 1995. Interim Management Policy for Lands Under Wilderness Review. BLM Handbook H-8550-1. Bureau of Land Management, California State Office, Sacramento.

BLM. 1997a. Standards for Rangeland Health and Guidelines for Grazing Management of BLM Lands in Utah. BLM-UT-GI-97-001-4000. Bureau of Land Management, Utah State Office, Salt Lake City. May.

BLM. 1997b. Environmental Impact Statement for Lisbon Valley Copper Project, San Juan County, Utah. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1998a. Revised Guidelines for Domestic Sheep and Goat Management in Native Wild Sheep Habitats. Instruction Memorandum No. 98-140. Bureau of Land Management, Washington, D.C.

BLM. 1998b. General Procedural Guidance for Paleontological Resource Management. BLM Handbook H-8270-1. Bureau of Land Management, Washington, D.C.

BLM. 1998c. A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lotic Areas. TR-1737-15. Bureau of Land Management, Proper Functioning Condition Work Group, Denver.

BLM. 1999. Utah Wilderness Inventory. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM_0010887

BLM. 2000. Soils Suitability Extension (SSE), v1.0. An ArcView tool developed by the BLM for the management of soils. Bureau of Land Management, National Science and Technology Center, Denver.

BLM. 2001a. Colorado Riverway Special Recreation Area Management Plan Amendment. EA # UT-062-99-151. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2001b. Mill Creek Canyon Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2001c. Questar, Williams and Kern River Pipeline Draft Environmental Impact Statement. State # 01-533. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 2001d. Biological Soil Crusts: Ecology and Management. TR 1730-2. Bureau of Land Management, National Science and Technology Center, Denver.

BLM. 2002a. Preparation Plan for the Moab Field Office Resource Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2002b. Standards for Public Land Health and Guidelines for Recreation Management for BLM Lands in Utah [online publication]. Bureau of Land Management, Utah State Office, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.ut.blm. gov/Recreation/recstandards.html.

BLM. 2002c. Environmental Justice. Instruction Memorandum No. 2002-164. Bureau of Land Management, Washington, D.C. May.

BLM. 2002d. Draft BLM Sensitive Plant Species List. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 2002e. Forest and Woodland Management Action Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2003a. Resource Management Plan and Environmental Impact Statement for the Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness. Bureau of Land Management, Grand Junction Field Office, Grand Junction, Colorado.

BLM. 2003b. Canyon Rims Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2003c. Moab Field Office Visual Resource Inventory Map. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2003d. Socioeconomic Profile - Pinedale. Bureau of Land Management, Pinedale Field Office, Pinedale, Wyoming. January.

BLM. 2003e. Native American Coordination and Consultation. BLM Manual 8160. Bureau of Land Management, Washington, D.C.

BLM. 2003f. General Procedural Guidance for Native American Consultation. BLM Handbook H-8160-1. Bureau of Land Management, Washington, D.C.

BLM_0010888

BLM. 2004a. Moab Field Office Land Ownership (Memorandum). Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004b. Three Rivers Withdrawal. Bureau of Land Management, Moab Field Office, Moab, Utah and Price Field Office, Price, Utah.

BLM. 2004c. National Sage-grouse Habitat Conservation Strategy. Bureau of Land Management, Washington, D.C. November.

BLM. 2004d. Moab Field Office Analysis of Management Situation. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004e. Moab Field Office Social and Economic Baseline Study. Bureau of Land Management, Moab Field Office, Moab, Utah. April.

BLM. 2004f. Relevance and Importance Evaluations of Area of Critical Environmental Concern (ACEC) Nominations. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004g. Wild and Scenic Rivers Review Eligibility Determination, Moab Field Office. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004h. Email of development scenario questionnaire (developed by BLM NSTC-AQ staff), from Dave Moore, BLM, Vernal Field Office, to Craig Nicholls, BLM, April 12.

BLM. 2005a. Land Use Planning Handbook. BLM Handbook H-1601-1. Bureau of Land Management, Washington, D.C.

BLM. 2005b. Cameo Cliffs Special Recreation Management Area Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2005c. Utah Land Use Plan Amendment for Fire and Fuels Management, September. UT-USO-04-01 [online publication]. Bureau of Land Management, Utah State Office, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.ut.blm.gov/fireplanning/ LUPEAFire92605FINAL.pdf

BLM. 2005d. Final Programmatic Environmental Impact Statement for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. Bureau of Land Management, Washington, D.C. June.

BLM. 2005e. Mineral Potential Report for the Moab Planning Area, Grand and San Juan Counties, Utah. Bureau of Land Management, Moab Field Office, Moab, Utah. August.

BLM. 2005f. Reasonable Foreseeable Development Scenario for Oil and Gas. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2005g. Land and Mineral Records – LR2000 System Data [online database]. Bureau of Land Management, Washington, D.C. [Accessed January 15, 2005]. http://www.blm.gov/lr2000/.

BLM. 2005h. The Ancestral Pueblos (Anasazi) [website]. Anasazi Heritage Center, Bureau of Land Management, Colorado State Office. [Accessed December 14, 2005]. Available at http://www.co.blm.gov/ahc/anasazi.htm#Who.

BLM. 2005i. Summary Data for Bureau of Land Management. Appendix D in Recreational Fee Demonstration Program Annual Report, FY 2003. Department of the Interior and Department of Agriculture, Washington, D.C.

BLM. 2006a. Normal Year Fire Rehabilitation and Stabilization Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2006b. Moab Fire District Fire Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM 2007. Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic Environmental Impact Statement and Associated Record of Decision. USDI BLM. FES 07-21.

BLM 2007b. Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic Environmental Report. USDI BLM. FES 0721.

BLM 2007a. Northeast National Petroleum Reserve - Alaska Draft Supplemental Integrated Activity Plan/Environmental Impact Statement. USDOI BLM, August 2007. Available at: http://www.blm.gov/ak/st/en/prog/planning/npra_general/ne_npra/ne_npr-a_supplement.html.

Butler, B. S., G. F. Loughlin, V. C. Heikes, and others. 1920. The Ore Deposits of Utah. U.S. Geological Survey Professional Paper 111. U.S. Geological Survey, Washington, D.C.

Chaneton, E. J., and R. S. Lavado. 1996. Soil nutrients and salinity after long-term grazing exclusions in a Flooding Pampa grassland. *Journal of Rangeland Management* 49(2):182-187.

Chatman, M. L. 1987. Mineral Resources of the Black Ridge Canyons (CO-070-113), Black Ridge Canyons West (CO-070-113A/UT-060-1166/117), and Westwater Canyon (UT-060-118) Wilderness Study Areas, Mesa County, Colorado, and Grand County, Utah. U.S. Bureau of Mines Open-File Report MLA 44-87. U.S. Bureau of Mines, Washington, D.C.

Chenoweth, W. L. 1981. The Uranium and Vanadium Deposits of the Uravan Mineral Belt and Adjacent Areas, Colorado and Utah. New Mexico Geological Society Thirty-second Field Conference. New Mexico Geological Society, Socorro.

Chenoweth, W. L. 1989. Uranium Deposits of the Canyonlands Area. Four Corners Geological Society Guidebook, Eighth Field Conference. Four Corners Geological Society, Durango, Colorado.

Chenoweth, W. L. 1996. The Uranium Industry in the Paradox Basin. In Geology and Resources of the Paradox Basin – 1996 Special Symposium: Utah Geological Association and Four Corners Geological Society Guidebook 25, edited by A. C. Huffman, Jr., W. R. Lund, and L. H. Godwin, pp. 95-108. Utah Geological Association and Four Corners Geological Society.

Clark, W. D., and J. R. Karr. 1979. Effects of highways on red-winged blackbird and horned lark populations. *Wilson Bulletin* 91: 143-145.

BLM_0010890

Connelly, John W., Michael A. Schroeder, Alan R. Sands, and Clait E. Braun. 2000. Guidelines to Manage Sage Grouse Populations and Their Habitats. *Wildlife Society Bulletin* 28(4): 967–985.

Connelly, John W., Steven T. Knick, Michael A. Schroeder, and San J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming.

Constellation Copper Corporation (Constellation Copper). 2006. News Releases [internet website]. Constellation Copper Corporation. [Accessed March 2006]. Available at http://www.summominerals.com/press.html.

Cowardin, L. W., V. Carter, F. C. Golet, and E. T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. FWS/OBS-79/31. U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C.

Crawford, J. A., R. A. Olson, N. E. West, J. C. Mosley, M. A. Schroeder, T. D. Whitson, R. F. Miller, M. A. Gregg, and C. S. Boyd. 2004. Ecology and management of sage-grouse and sage-grouse habitat. *Journal of Rangeland Management* 57(1): 2-19.

CRCT Task Force. 2001. Conservation agreement and strategy for Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*) in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins.

Dames & Moore. 1978. Inventory and market analysis of the potash resources of the Paradox Basin. Job No. 08699-011. Prepared by Dames & Moore, Salt Lake City. Prepared for Bureau of Land Management, Utah State Office, Salt Lake City.

Dane, C. H. 1935. Geology of the Salt Valley Anticline and Adjacent Areas, Grand County, Utah. U.S. Geological Survey Bulletin 863. U.S. Geological Survey, Washington, D.C.

Department of Energy (DOE). 2003. Assessing the Potential for Renewable Energy on Public Lands. Department of Energy, Energy Efficiency and Renewable Energy, and Department of the Interior, Bureau of Land Management, Washington, D.C.

DOE. 2005. Remediation of the Moab Uranium Mill Tailings, Grand and San Juan Counties, Utah, Final Environmental Impact Statement. DOE/EIS-0355. Department of Energy, Office of Environmental Management, Grand Junction, Colorado.

Department of Energy and Bureau of Land Management (DOE and BLM). 2006. West-wide Energy Corridor Programmatic EIS Information Center: "Programmatic Environmental Impact Statement for Designation of Energy Corridors on Federal Land in 11 Western States." DOE/EIS-0386 [internet website]. Department of Energy and Bureau of Land Management, Washington, D.C. [Last Accessed June 15, 2007]. Available at http://corridoreis.anl.gov/index.cfm.

Desert Bighorn Council Technical Staff. 1990. Guidelines for management of domestic sheep in the vicinity of desert bighorn habitat. *Desert Bighorn Council Transactions* 34:33-35.

BLM_0010891

Doelling, H. H. 1972a. Sego coal field. In *Eastern and Northern Utah Coal Fields*, compiled by H. H. Doelling and R. L. Graham, pp. 191-267. Utah Geological and Mineralogical Survey Monograph Series No. 2. Utah Geological and Mineralogical Survey, Salt Lake City.

Doelling, H. H. 1972b. La Sal-San Juan coal fields. In *Eastern and Northern Utah Coal Fields*, compiled by H. H. Doelling and R. L. Graham, pp. 269-280. Utah Geological and Mineralogical Survey Monograph Series No. 2. Utah Geological and Mineralogical Survey, Salt Lake City.

Doelling, H. H. 2002. Geologic map of the Moab and Eastern Part of San Rafael Desert 30' × 60' Quadrangle, Grand and Emery Counties, Utah, and Mesa County, Colorado. Utah Geological Survey Map 180. 3 sheets (scale 1:100,000).

Doelling, H. H. 2004. Geologic map of the La Sal 30' × 60' Quadrangle, San Juan, Wayne and Garfield Counties, Utah, and Montrose and San Miguel Counties, Colorado. Utah Geological Survey Map 205. 2 sheets (scale 1:100,000).

Doelling, H. H., A. D. Smith, F. D. Davis, and D. L. Hayhurst. 1979. Methane Content of Utah Coals. In *Coal Studies*, edited by Martha Smith, pp. 1-43. Utah Geological and Mineral Survey Special Studies 49. Utah Geological and Mineral Survey, Salt Lake City.

Doelling, H. H., C. G. Oviatt, and P. W. Huntoon. 1988. Salt Deformation in the Paradox Region. Utah Geological and Mineral Survey Bulletin 122. Utah Geological and Mineral Survey, Salt Lake City.

Draxler, R. R., and G. D. Hess. 1998. An overview of the HYSPLIT-4 modeling system for trajectories, dispersion and deposition. *Australian Meteorological Magazine* 47(4): 295–308.

Eckels, M. T., D. H. Suek, and P. J. Harrison. 2005. New, old plays in southern Uinta basin get fresh look with 3D seismic technology. *Oil and Gas Journal* 103(11):32-40.

Edwards, T. C., Jr., C. G. Homer, S. D. Bassett, A. Falconer, R. D. Ramsey, and D. W. Wight. 1995. Utah Gap Analysis: An Environmental Information System. Final Project Report 95-1. Utah Cooperative Fish and Wildlife Research Unit, Utah State University, Logan.

Eisinger, C., and C. Lowe. 1999. A Summary of the Ground Water Resources and Geohydrology of Grand County, Utah. Utah Geological Survey Circular. Utah Geological Survey, Salt Lake City.

Elevatorski, E. A. 1978. Uranium Guidebook for the Paradox Basin, Utah-Colorado. Dana Point, California: Minobras.

Ellis, M. S., and J. T. Hopeck. 1985. Geologic map showing coal beds in the Dakota Sandstone, Harley Dome quadrangle and parts of the Bitter Creek Well, Westwater 4 SE, and Westwater 4 SW quadrangles, Colorado and Utah. U.S. Geological Survey Miscellaneous Field Studies Map MF-1800. Approximate scale 1:50,000.

Energy Information Administration (EIA). 2007. Official Energy Statistics from the U.S. Government [internet database]. Energy Information Administration, Washington, D.C. [Accessed February 2, 2007]. Available at http://www.eia.doe.gov/.

BLM_0010892

Environmental Protection Agency (EPA). 2001. Visibility in Mandatory Federal Class I Areas (1994-1998). Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina.

EPA. 2003a. Nonattainment Area Map [online database]. AIRData Homepage, Environmental Protection Agency. [Accessed April 11, 2003]. Available at http://www.epa.gov/air/data/nonat.html.

EPA. 2003b. Monitoring Values Report [online database]. AIRData Homepage, Environmental Protection Agency. [Accessed July 2, 2003]. Available at http://www.epa.gov/air/data/monvals.html.

EPA. 2003c. Visibility in our Nation's Parks and Wilderness Areas [internet website]. Visibility Homepage, Environmental Protection Agency. [Accessed May 22, 2008]. Available at http://www.epa.gov/oar/visibility/monitor.html.

EPA. 2003d. Designated Sole Source Aquifers in Region VIII [online publication]. Environmental Protection Agency. [Last Accessed June 18, 2007]. Available at http://www.epa.gov/safewater/sourcewater/pubs/qrg_ssamap_reg8.pdf.

EPA. 2003e. STORET Legacy Data Center [online database]. Environmental Protection Agency. [Last Accessed June 18, 2007]. Available at http://www.epa.gov/storpubl/legacy/gateway.htm.

EPA. 2003f. Integrated Risk Information System (IRIS) [online database]. Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina. [Accessed April 16, 2006]. Available at http://www.epa.gov/iris/index.html.

EPA. 2006. Chapter 1: External Combustion Sources, and Chapter 13: Miscellaneous Sources. In *Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources AP-42*, Fifth Edition. Research Triangle Park, North Carolina. December.

EPA. 2008. Emissions Factors & AP 42. Technology Transfer Network Clearinghouse for Inventories & Emissions Factors. Available at: www.epa.gov/ttn/chief/ap42/.

Ferguson, T. J. 1997. Hopi Reconnaissance of the Carlota Copper Project: Ethnohistoric Overview and Cultural Concerns. Available at SWCA Environmental Consultants, Tucson, Arizona.

Ferguson, T. J., Kurt Dongoske, Leigh Jenkins, Mike Yeatts, and Eric Polingyouma. 1993. Working Together: The Roles of Archaeology and Ethnohistory in Hopi Cultural Preservation. *CRM* 16: 27-37.

Fitzgerald, J. P., C. A. Meaney, and D. M. Armstrong. 1994. *Mammals of Colorado*. Niwot: Denver Museum of Natural History and University Press of Colorado.

Fleischner, Thomas L. 1994. Ecological costs of livestock grazing in western North America. *Conservation Biology* 8(3): 629-644.

BLM_0010893

Fletcher, J. L. 1980. Effects of noise on wildlife: a review of relevant literature 1971-1978. In *Proceedings of the Third International Congress on Noise as a Public Health Problem*, edited by J. V. Tobias, G. Jansen, and W. D. Ward, 611-620. American Speech-Language-Hearing Association, Rockville, Maryland.

Fletcher, J. L. 1990. Review of noise and terrestrial species: 1983-1988. In *Noise as a Public Health Problem Vol. 5: New Advances in Noise Research Part II*, edited by B. Berglund and T. Lindvall, 181-188. Swedish Council for Building Research, Stockholm.

Foreyt, W. J., and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. *Journal of Wildlife Disease* 18(2):163–168.

Forman, R. T. T., and L. E. Alexander. 1998. Roads and their major ecological effects. *Annual Review of Ecology and Systematics* 29:207-231.

Frid, A., and L. M. Dill. 2002. Human-caused disturbance stimuli as a form of predation risk. *Conservation Ecology* 6(1): 11.

Frison, G. 1978. *Prehistoric Hunters of the High Plains*. New York: Academic Press.

Galindo-Bect, M. S., and Glenn, E. P. 1999. Panaeid shrimp landing in the upper Gulf of California in relation to Colorado River freshwater discharge. *Fishery Bulletin* 98(1): 222-225.

Gautier, D. L., G. L. Dolton, K. I. Takahashi, and K. L. Varnes. 1996. 1995 National Assessment of the United States Oil and Gas Resources – Results, Methodology, and Supporting Data. U.S. Geological Survey Digital Data Series DDS-30, release 2. U.S. Geological Survey, Washington, D.C.

Gelbard, Jonathan L., and Jayne Belnap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. *Conservation Biology* 17(2):420–432.

Gleason, R. S., and D. R. Johnson. 1985. Factors influencing nesting success of Burrowing Owls in southeastern Idaho. *Great Basin Naturalist* 45:81-84.

Gloyn, R. W. 2004. Uranium Potential in Utah. Unpublished report. Utah Geological Survey, Salt Lake City.

Gloyn, R. W., C. D. Morgan, D. E. Tabet, R. E. Blackett, B. T. Tripp, and M. Lowe. 1995. Mineral, Energy, and Ground Water Resources of San Juan County, Utah. Geological Survey Special Study 86. Utah Geological Survey, Salt Lake City.

Goddard Institute for Space Studies. 2007. Annual Mean Temperature Change for Three Latitude Bands. Datasets and Images. GISS Surface Temperature Analysis, Analysis Graphs and Plots. New York, New York. Available on the Internet: http://data.giss.nasa.gov/gistemp/graphs/Fig.B.lrg.gif.

Goldhor-Wilcock, A., and B. Stevens. 2003. Economic Impact of Public Land Recreation and Tourism on Moab City and Grand County, Utah. Bureau of Land Management, Washington, D.C.

BLM_0010894

Grand County. 2004. Grand County General Plan Update. Prepared by Grand County, Moab, Utah.

Grandison, K. W. 2004. Monitoring the effectiveness of bat compatible gates in the Silver Reef, East Reef and Tushar Mountain mining districts in southwestern Utah [online publication]. Bureau of Land Management, Utah State Office, Salt Lake City. [Last Accessed June 20, 2007]. Available at http://www.blm.gov/aml/pdfs/ BLM2004SummaryReportUtahBat.pdf.

Gualtieri, J. L. 2004. Geologic map of the Westwater 30' × 60' Quadrangle, Grand and Uintah Counties, Utah, and Garfield and Mesa Counties, Colorado. Utah Geological Survey Open File Report 441DM. 4 sheets (scale 1:100,000).

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife, Denver. April.

Hahn, Gregory, and Jon P. Thorson. 2002. Geology of the Lisbon Valley Sandstone-hosted Disseminated Copper Deposits, San Juan County, Utah. Unpublished manuscript. Available at Society of Economic Geologists, Littleton, Colorado.

Hart, C. M., M. R. Gonzalez, E. P. Simpson, and S. H. Hurlbert. 1998. Salinity and fish effects on Salton Sea microecosystems: Zooplankton and nekton. *Hydrobiologia* 381: 129-152.

Hart, E. Richard. 1993. The Fence Lake Mine Project: Archaeology as Traditional Cultural Property. *CRM* 16:38-41.

Haug, E. A., B. A. Millsap, and M. S. Martell. 1993. Burrowing Owl (*Speotyto cunicularia*). In *The Birds of North America*, No. 61, edited by A. Poole and F. Gill. Philadelphia: The Academy of Natural Sciences, and Washington, D.C.: The American Ornithologists' Union.

Hayden, M. 2003. UGS paleontology locality search for Grand County. Utah Geological Society, Salt Lake City.

Hite, R. J. 1960. Stratigraphy of the saline facies of the Paradox Member of the Hermosa Formation of southeastern Utah and southwestern Colorado. In *Geology of the Paradox Fold and Fault Belt*, Four Corners Geological Society Guidebook, Third Field Conference, pp. 86-89. Four Corners Geological Society, Durango, Colorado.

Holmer, R. 1978. A Mathematical Typology for Archaic Projectile Points of the Eastern Great Basin. Unpublished PhD dissertation, Department of Anthropology, University of Utah, Salt Lake City.

Holzworth, G. C. 1972. Mixing Heights, Wind Speeds, and Potential for Urban Air Pollution Throughout the Contiguous United States. Office of Air Programs AP-10, Environmental Protection Agency, Research Triangle Park, North Carolina.

Hopi Cultural Preservation Office. 1995. Definition and Application of the TCP Concept for the Hopi Tribe. Available at Hopi Cultural Preservation Office, Kykotsmovi, Arizona.

Horn, Jonathan C., Alan D. Reed, and Susan M. Chandler. 1994. Grand Resource Area Class I Cultural Resource Inventory. Alpine Archaeological Consultants, Montrose, Colorado.

BLM_0010895

Huffman, A. Curtis, Jr. 1996a. Paradox Basin Province (021). In *1995 National Assessment of United States Oil and Gas Resources—Results, Methodology, and Supporting Data*, edited by D. L. Gautier, G. L. Dolton, K. I. Takahashi and K. L. Vranes. U.S. Geological Survey Digital Data Series DDS-30. U.S. Geological Survey, Washington, D.C.

Huffman, A. Curtis, Jr. 1996b. Paradox Basin Province (021). In *1996 Digital Map Data, Text, and Graphical Images in Support of the 1995 National Assessment of United States Oil and Gas Resources*, compiled by W. R. Beeman, R. C. Obuch, and J. D. Brewton. U.S. Geological Survey Digital Data Series DDS-35. U.S. Geological Survey, Washington, D.C.

Humane Society of the United States (HSUS). 2006. Wildlife Crossings—Wild Animals and Roads [internet website]. Humane Society of the United States, Washington, D.C. [Last Accessed June 20, 2007]. Available at http://www.hsus.org/wildlife/issues_facing_ wildlife/wildlife_crossings_wild_animals_and_roads/.

IMPROVE. 2002. IMPROVE Optical Data Webpage [online database]. National Park Service and Colorado State University, Cooperative Institute for Research in the Atmosphere, Fort Collins, Colorado. [Last Accessed June 20, 2007]. Available at http://vista.cira. colostate.edu/ improve/Data/IMPROVE/Data_IMPOptical.htm.

Institute for Outdoor Recreation and Tourism (IORT). 2001. Utah River Study Results Report: Recreational Use, Value, and Experience of Boaters on Rivers Managed by the BLM in Utah. Institute for Outdoor Recreation and Tourism, Utah State University, Logan.

Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: The Physical Basis (Summary for Policymakers). Cambridge University Press. Cambridge, England and New York, New York. Available at: http://www.ipcc.ch/pdf/assessment-report/ar4/wg1/ar4-wg1-spm.pdf.

IORT. 2002. Slickrock Trail Mountain Bike Survey: Implications for Resource Managers and Area Communities. No. NR/RF/012. Institute for Outdoor Recreation and Tourism, Utah State University Extension, Moab.

Jackson, A. Lynn. 1983. Humates and their Development at Harley Dome: Utah, Grand Junction. In *Geological Society – 1983 Field Trip*, pp. 17-19. Utah Geological Society, Salt Lake City.

Jackson, Lynn. 2003. Mancos Shale Dust Research Final Report. Document provided in an email to Yu Shan Huang, Trinity Consultants, on October 21, 2003. Bureau of Land Management, Moab Field Office, Moab, Utah.

Jackson, M. K. 2000. Mineral Potential Report for the Shafer Canyon Wilderness Inventory Area. Bureau of Land Management, Moab Field Office, Moab, Utah.

Jacobsen, S. L. 2005. Mitigation Measures for Highway-caused Impacts to Birds. General Technical Report PSW-GTR-191. USDA Forest Service, Washington, D.C.

Jessup, D. A. 1985. Diseases of domestic livestock which threaten bighorn sheep populations. *Desert Bighorn Council Transactions* 29:29-30.

BLM_0010896

Johnson, E. A. 2003. Geologic Assessment of the Phosphoria Total Petroleum System, Uinta-Piceance Province, Utah and Colorado. Chapter 9 in *Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado*, compiled by USGS Uinta-Piceance Assessment Team. U.S. Geological Survey Digital Data Series DDS-69-B. U.S. Geological Survey, Washington, D.C.

Johnson, H. S., and William Thordarson. 1959. The Elk Ridge-White Canyon Channel System, San Juan County, Utah: Its Effects on Uranium Distribution. *Economic Geology* 54:119-129.

Johnson, M. G. 1973. Placer Gold Deposits of Utah. U.S. Geological Survey Bulletin 1357. U.S. Geological Survey, Washington, D.C.

Katzenstein, A. S., L. A. Doezema, I. J. Simpson, D. R. Blake, and F. S. Rowland. 2003. Extensive regional atmospheric hydrocarbon pollution in the southwestern United States. *Proceedings of the National Academy of Sciences* 100(21):11975–11979.

Kauffman, J. D., W. C. Krueger, and M. Vavra. 1983. Effects of cattle grazing on riparian plant communities. *Journal of Rangeland Management* 36:683-685.

Konrad, P. M., and D. S. Gilmer 1984. Observations on the nesting ecology of Burrowing Owls in central North Dakota. *Prairie Naturalist* 16:129-30.

Kufeld, R. C. 1973. Foods eaten by the Rocky Mountain elk. *Journal of Rangeland Management* 26:106-113.

Laronne, J. B. 1977. Dissolution Potential of Surficial Mancos Shale and Alluvium. Unpublished PhD dissertation, Colorado State University, Fort Collins.

Lentsch, L., and Y. Converse. 1997. Conservation Agreement and Strategy for Colorado River Cutthroat Trout (*Oncorhynchus clarki pleuriticus*) in the State of Utah. Publication Number 97-20. Utah Division of Wildlife Resources, Salt Lake City.

Leonard, S., G. Staidl, J. Fogg, K. Gebhardt, W. Hagenbuck, and D. Prichard. 1992. Riparian Area Management: Procedures for Ecological Site Inventory with Special Reference to Riparian-wetland Sites. BLM/SC/PT-92/004. Bureau of Land Management, Service Center, Denver, Colorado.

Lewis, C. E., and T. J. Harshbarger. 1976. Shrub and herbaceous vegetation after 20 years of prescribed burning in the South Carolina Coastal Plain. *Journal of Rangeland Management* 29:13-18.

Lloyd Levy Consulting. 2004. Job Generation in the Colorado Mountain Resort Economy: Second Homes and Other Economic Drivers in Eagle, Grand, Pitkin, and Summit Counties. Lloyd Levy Consulting, Denver, Colorado.

Lowry Jr., J. H., R. D. Ramsey, K. Boykin, D. Bradford, P. Comer, S. Falzarano, W. Kepner, J. Kirby, L. Langs, J. Prior-Magee, G. Manis, L. O'Brien, T. Sajwaj, K. A. Thomas, W. Rieth, S. Schrader, D. Schrupp, K. Schulz, B. Thompson, C. Velasquez, C. Wallace, E. Waller and B. Wolk. 2005. Southwest Regional Gap Analysis Project: Final Report on Land Cover Mapping Methods. RS/GIS Laboratory, Utah State University, Logan.

Lyon, L. J. 1983. Road density models describing habitat effectiveness for elk. *Journal of Forestry* 81:592-596.

MacMahon, J. A. 1988. Introduction to Vegetation of Utah. In *Atlas of the Vascular Plants of Utah*, edited by B. J. Albee, L. M. Shultz, and S. Goodrich. Occasional Publication No. 7. Salt Lake City: Utah Museum of Natural History.

Madsen, R. 1977. Prehistoric Ceramics of the Fremont. Museum of Northern Arizona Ceramic Series No. 6. Museum of Northern Arizona, Flagstaff.

Martinsen, W., D. Paul, J. McCreary, F. P. Howe, T. Aldrich, J. R. Parrish, R. Berger, R. Player, S. Hedges, T. Wallace, J. Tuey, and D. Fagan. 2005. Coordinated Implementation Plan for Bird Conservation in Utah, Version 1.0. Utah Steering Committee, Intermountain West Joint Venture, Missoula, Montana.

McFaul, E. J., G. T. Mason Jr., W. B. Ferguson, and B. R. Lipin. 2000. U.S. Geological Survey Mineral Databases—MRDS and MAS/MILS, U.S. Geological Survey Digital Data Series DDS-52, 2 disks. U.S. Geological Survey, Washington, D.C.

McMurtrie, Deborah. 2002. Emission inventory data provided to Yu Shan Huang, Trinity Consultants, in a March 28 email. Utah Department of Environmental Quality, Salt Lake City. Forwarded by Teri Bateman, Utah Department of Environmental Quality, Salt Lake City.

Merrell, H. W. 1979. Mineral Resource Inventory of the Paradox Salt Basin, Utah and Colorado. Utah Geological and Mineral Survey Report of Investigation No. 143. Utah Geological Survey, Salt Lake City.

Molenaar, Molly R. 2003a. Utah Department of Transportation Highway 6 Improvement Project: Native American Consultation and the Identification of Traditional Cultural Properties. SWCA Environmental Consultants, Salt Lake City.

Molenaar. 2003b. Stone Cabin 3D Seismic Survey Project: Native American Consultation and the Identification of Traditional Cultural Places. Prepared for Bill Barrett Corporation, Denver, Colorado. Submitted to Bureau of Land Management, Price Field Office, Price, Utah.

Molenaar. 2003c. Native American Ethnographic Survey: Price and Vernal Resource Management Plans. SWCA Environmental Consultants, Salt Lake City.

Monsen, Stephen B., Richard Stevens, and Nancy L. Shaw (compilers). 2004. Restoring Western Ranges and Wildlands. General Technical Report RMRS-GTR-136-VOL-1. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado.

Morgan, C. D. 1993. Paradox Basin Plays – Overview. In *New Mexico Bureau of Mines and Mineral Resources Atlas of Major Rocky Mountain Gas Reservoirs*, pp. 90-94. New Mexico Bureau of Mines and Mineral Resources, Santa Fe.

Morrow, L. A., and P. W. Stahlman. 1984. The history and distribution of downy brome in North America. *Weed Science Supplement* 32:2-6.

BLM_0010898

Case No. 1:20-cv-02484-MSK  Document 29-5  filed 04/27/21  USDC Colorado  pg 55 of 117

National Academy of Sciences. 2006. Understanding and Responding to Climate Change: Highlights of National Academies Reports. Division on Earth and Life Studies. National Academy of Sciences. Washington, D.C. Available at: http://dels.nas.edu/basc/Climate-HIGH.pdf.

National Climatic Data Center (NCDC). 2004. Climate date for Utah [online database]. National Climatic Data Center, National Oceanic and Atmospheric Association. [Last Accessed June 20, 2007]. Available at http://lwf.ncdc.noaa.gov/oa/climate/research/cag3/city.html.

National Park Service (NPS). 1974. Canyonlands National Park General Management Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 1979. Wild and Scenic River Study Final Environmental Statement, Colorado and Lower Dolores Wild and Scenic Rivers. National Park Service, Denver Service Center, Denver, Colorado. September.

NPS. 1989. General Management Plan, Development Concept Plan: Arches National Park, Utah. National Park Service, Arches National Park, Moab, Utah.

NPS. 1995. Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Area Backcountry Management Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 2003. Canyonlands National Park Long-range Interpretive Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 2006. Superintendent's Orders Established for Canyonlands National Park. Compendium on 36 CFR 1.7(b). National Park Service, Canyonlands National Park, Moab, Utah.

Natural Resources Conservation Service (NRCS). 1981. Soil Survey of Grand County, Utah. U.S. Department of Agriculture, Natural Resources Conservation Service, Washington, D.C.

NRCS. 1989. Grand Area Soil Survey – Central Part. U.S. Department of Agriculture, Natural Resources Conservation Service, Washington, D.C.

Nelson, S. M., and S. A. Flickinger. 1992. Salinity tolerance of colorado squawfish. *Hydrobiologia* 246: 162-168.

Newton, Virginia. 1999. An Overview of Native American Land Use in East Central Utah, Grand, Emery, Carbon, Sanpete, and Utah Counties: The Aspen Products Pipeline Project. Cultural Resources Report No. 99-24. SWCA Environmental Consultants, Salt Lake City.

Office of Pipeline Safety. 2005. Office of Pipeline Safety [internet website]. Pipeline and Hazardous Materials Safety Administration, Washington, D.C. [Last Accessed June 20, 2007]. Available at http://ops.dot.gov/.

Olff, H., and M. E. Ritchie. 1998. Effects of herbivores on grassland plant diversity. *TREE* 13(7):261-265.

BLM_0010899

Oliver, George V. 2000. The Bats of Utah: A Literature Review. UDWR Publication 00-14. Utah Natural Heritage Program, Utah Division of Wildlife Resources, Salt Lake City.

Parker, J. M. 1981. Lisbon Field Area, San Juan County, Utah. In *Geology of the Paradox Basin*, edited by D. L. Wiegand, pp. 89-100. 1981 Rocky Mountain Association of Geologists Field Conference. Rocky Mountain Association of Geologists, Denver, Colorado.

Parker, Patricia L., and Thomas F. King. 1989. Guidelines for Evaluating and Documenting Traditional Cultural Properties. National Register 38. National Park Service, Interagency Resources Division, Washington, D.C.

Parrish, J. R., F. P. Howe, and R. Norvell. 2002. The Utah avian conservation strategy, version 2.0. UDWR Publication No. 02-27. Utah Partners in Flight Program, Utah Division of Wildlife Resources, Salt Lake City.

Patterson, Charles G. 1989. Mineral Resources of the Indian Creek, Bridger Jack Mesa, and Butler Wash Wilderness Study Areas, San Juan County, Utah. U.S. Geological Survey Bulletin 1754. U.S. Geological Survey, Washington, D.C.

Perlman, Susan E. 1998. Traditional Cultural Properties Survey of the Mid-America Pipeline Company's Proposed Rocky Mountain Expansion Project, Northwestern New Mexico, Western Colorado, and Eastern Utah. Cultural Resource Report 98-163. SWCA Environmental Consultants, Albuquerque.

Pettit, Jan. 1990. *Utes: The Mountain People*. Boulder: Johnson Books.

Piemeisel, R. L. 1951. Causes affecting change and rate of change in vegetation of annuals in Idaho. *Ecology* 32:53-72.

Popolizio, C. A., H. Goetz, and P. L. Chapman. 1994. Short-term response of riparian vegetation to four grazing treatments. *Journal of Rangeland Management* 47: 48-53.

Reed, Henry E. 1996. Limestone Exploration in the Paradox Basin. In *Geology and Resources of the Paradox Basin*, 1996 Special Symposium Guidebook 25. Utah Geological Association, Salt Lake City, and Four Corners Geological Society, Durango, Colorado.

Reijnen, R., and R. Foppen. 1994. The effects of car traffic on breeding bird populations in woodland, 1: Evidence of reduced habitat quality for willow warblers breeding close to a highway. *Journal of Applied Ecology* 31: 85-94.

Reiter, D., and D. Blahna. 2001. Utah River Study Results Report: Recreational Use, Value, and Experience of Boaters on Rivers Managed by the BLM in Utah. Institute for Outdoor Recreation and Tourism, Utah State University, Logan.

Reiter, D., D. Blahna, and R. Von Koch. 1998. Off-highway Vehicle Four-wheeler Survey: A Summary Report of 1997 Moab Easter Jeep Safari Participants. Institute for Outdoor Recreation and Tourism, Utah State University, Logan.

Roberts & Schaefer. 1996. Executive Report of the Revision to the Final Feasibility Study for the Lisbon Valley Copper Project Located in Lisbon Valley, Utah. Prepared by Roberts & Schaefer. Prepared for Summo USA Corporation.

BLM_0010900

Romin, L. A., and J. A. Muck. 2002. Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances. U.S. Fish and Wildlife Service, Utah Field Office, Salt Lake City.

Saab, V. A., C. E. Bock, T. D. Rich, and D. S. Dobkin. 1995. Livestock grazing effects in western North America. In *Ecology and Management of Neotropical Migratory Birds: A Synthesis and Review of Critical Issues*, edited by T. E. Martin and D. M. Finch, 311-353. London: Oxford University Press.

San Juan County. 1996. San Juan County Master Plan. Prepared by San Juan County, Monticello, Utah.

Sarr, D., R. A. Knapp, J. Owens, T. Balser, and T. Dudley. 1996. Ecosystem recovery from livestock grazing in the southern Sierra Nevada. Aldo Leopold Wilderness Research Institute, Missoula, Montana.

Sawyer, H., R. Neilson, and L. McDonald. 2006a. Sublette Mule Deer Study (Phase II): Long-term Monitoring Plan to Assess Potential Impacts of Energy Development on Mule Deer in the Pinedale Anticline Project Area, 2006 Annual Report. Western Ecosystems Technology, Inc., Cheyenne, Wyoming.

Sawyer, H., R. M. Neilson, F. Lindzey, and L. L. McDonald. 2006b. Winter habitat selection of mule deer before and during development of a natural gas field. *Journal of Wildlife Management* 70:396-403.

Schroedl, A. 1991. Paleo-Indian Occupation in the Eastern Great Basin and Northern Colorado Plateau. *Utah Archaeology* 4(1):1-15.

Seal, Franklin. 2002. Local prospector eyes humate mine near Crescent Junction, takes out lease from SITLA. *Moab Times-Independent*, p. A1-A2.

Seidel, J. W. 1977. Elk calving behavior in west central Colorado. In *Proceedings of the Western States Elk Workshop*, pp. 38-40. Colorado Division of Wildlife, Denver.

Shackleton, D. M., C. C. Shank, and B. M. Wikeem. 1999. Natural History of Rocky Mountain and California Bighorn Sheep. In *Mountain Sheep of North America*, edited by R. Valdez and P. R. Krausman, pp. 78-138. Tucson: University of Arizona Press.

Shubat, M. A., B. T. Tripp, C. E. Bishop, and R. E. Blackett. 1991. Mines and Prospects Containing Gold in Utah. Utah Geological and Mineral Survey Open-File Report 207. Utah Geological and Mineral Survey, Salt Lake City.

Singer, F. J., L. C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction in bighorn sheep. *Conservation Biology* 15(5):1347–1354.

Sogge, M. K., R. M. Marshall, S. J. Sferra, and T. J. Tibbitts. 1997. A Southwestern Willow Flycatcher Natural History Summary and Survey Protocol. Technical Report NPS/NAUCPRS/NRTR-97/12. U.S. Geological Survey Biological Resources Division, Colorado Plateau Field Station, Northern Arizona University, Flagstaff.

Sonoran Institute. 2003. Population, Employment, Earnings and Personal Income Trends: San Juan County, Utah. Sonoran Institute, Tucson, Arizona. April.

BLM_0010901

Sonoran Institute. 2005. Socioeconomic Profile: San Juan County Utah. Economic Profile System Community, Sonoran Institute, Tucson, Arizona. December.

Spangler, Jerry D. 1995. Paradigms & Perspectives: A Class I Overview of Cultural Resources in the Uinta Basin and Tavaputs Plateau. Uinta Research, Salt Lake City.

Sprinkel, D. A. 1999. Digital Geologic Resources Atlas of Utah. Bulletin 129DF. Utah Geological Survey, Salt Lake City.

Squires, J. R., and R. T. Reynolds. 1997. Northern Goshawk (*Accipiter gentilis*). In *The Birds of North America*, No. 298, edited by A. Poole and F. Gills. The Academy of Natural Sciences, Philadelphia, and the American Ornithologists' Union, Washington, D.C.

Stevens, R. 2004. Incorporating wildlife habitat needs into restoration and rehabilitation projects. In *Restoring Western Ranges and Wildlands*, edited by S. B. Monsen, R. Stevens, and N. L. Shaw, 155-174. General Technical Report RMRS-GTR-136-VOL-1. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado.

Stiver, S. J., A. D. Apa, J. R. Bohne, S. D. Bunnell, P. A. Deibert, S. C. Gardner, M. A. Hilliard, C. W. McCarthy, and M. A. Schroeder. 2006. Greater Sage-grouse Comprehensive Conservation Strategy. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming. December.

Stokowski, P. A., and C. LaPointe. 2000. Environmental and Social Effects of ATVs and ORVs: An Annotated Bibliography and Research Assessment. School of Natural Resources, University of Vermont, Burlington.

Swarthout, E. C. H., and R. J. Steidl. 2003. Experimental effects of hiking on breeding Mexican spotted owls. *Conservation Biology* 17(1): 307-315.

The Wilderness Society (TWC). 2004. The Economic Benefits of Wilderness: Focus on Property Value Enhancement. Ecology and Economics Research Department, The Wilderness Society, Washington, D.C. March.

Trimble, S. W., and A. C. Mendel. 1995. The cow as a geomorphic agent: A critical review. *Geomorphology* 13: 233-253.

Trinity Consultants (Trinity). 2003. 1996 Mesoscale Model (MM5) data processed using the CALMET meteorological model. Trinity Consultants, Phoenix.

Trinity Consultants (Trinity), and Craig Nicholls. 2006. Air Quality Assessment Report - Vernal and Glenwood Springs Resource Management Plans. Trinity Consultants, Phoenix. August.

U.S. Census Bureau. 2000. Census of Population [online database]. U.S. Census Bureau, Washington, D.C. [Accessed December 22, 2005]. Available at http://www.census.gov/main/www/cen2000.html.

U.S. Census Bureau. 2005. Poverty [online database]. U.S. Census Bureau, Washington, D.C. [Accessed December 22, 2005]. Available at http://www.census.gov/hhes/www/poverty/poverty.html.

BLM_0010902

U.S. Department of Agriculture (USDA). 2002. 2002 Census of Agriculture [online database]. National Agricultural Statistics Service, U.S. Department of Agriculture. [Last Accessed June 18, 2007]. Available at http://www.nass.usda.gov/Census_of_Agriculture/index.asp.

USDA, Forest Service (USFS). 1986. Land and Resource Management Plan, Manti-La Sal National Forest. USDA Forest Service, Manti-La Sal National Forest, Price, Utah.

USFS. 1992. Recommended Old-Growth Definitions and Descriptions and Old-Growth Allocation Procedure. USDA Forest Service, Southwestern Region, Albuquerque, New Mexico. September.

USFS. 1993. Characteristics of Old-growth Forests in the Intermountain Region. USDA Forest Service, Intermountain Region, Ogden, Utah. April.

USFS. 1996. Potential fossil yield classification (PFYC). Paleontology Center of Excellence and the Region 2 Paleo Initiative, USDA Forest Service, Washington, D.C.

USFS, BLM, and NPS. 1996. Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use. Available at Bureau of Land Management, Utah State Office, Salt Lake City.

U.S. Department of the Interior (USDI). 2005. Payment In Lieu of Taxes: County Payments and Acres [online database]. U.S. Department of the Interior. [Accessed December 22, 2005]. Available at http://www.nbc.gov/pilt/search.cfm#search.

U.S. Fish and Wildlife Service (USFWS). 1983. Northern States Bald Eagle Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1987. Environmental Assessment for the Upper Colorado River Endangered Fish Recovery Program. U.S. Fish and Wildlife Service, Upper Colorado River Endangered Fish Recovery Program, Lakewood, Colorado.

USFWS. 1988. Black-footed Ferret Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1990a. Humpback Chub (*Gila cypha*) Recovery Plan, 2nd Revised. U.S. Fish and Wildlife Service, Denver.

USFWS. 1990b. Bonytail Chub Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

USFWS. 1991. Colorado Pikeminnow Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

USFWS. 1995. Mexican Spotted Owl (*Strix occidentalis lucida*) Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1999. Razorback Sucker Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

BLM_0010903

USFWS. 2002a. Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Plan (Amendment and Supplement for Recovery Goals), Final Revision 2. U.S. Fish and Wildlife Service, Utah Field Office, Salt Lake City.

USFWS. 2002b. Humpback Chub (*Gila cypha*) Recovery Goals: amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2002c. Bonytail (*Gila elegans*) Recovery Goals, Amendment and Supplement to the Bonytail Chub Recovery Plan, Final Revision 2. U.S. Fish and Wildlife Service, Denver.

USFWS. 2002d. Razorback Sucker (*Xyrauchen fexanus*) Recovery Plan, Amendment and Supplement for Recovery Goals, Final Revision 1. U.S. Fish and Wildlife Service, Denver.

USFWS. 2002e. Final Recovery Plan for the Southwestern Willow Flycatcher (*Empidonax traillii extimus*). U.S. Fish and Wildlife Service, Albuquerque.

USFWS. 2002f. Birds of Conservation Concern, 2002. U.S. Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia.

USFWS. 2005. Designation of Critical Habitat for the Southwestern Willow Flycatcher (*Empidonax traillii extimus*). U.S. Fish and Wildlife Service, Washington, D.C.

U.S. Geological Survey (USGS). 2003. Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado. Compiled by Uinta-Piceance Assessment Team. U.S. Geological Survey Digital Data Series DDS-69-B. U.S. Geological Survey, Washington, D.C.

U.S. Geological Survey (USGS), 2007. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies and Internet Resources.

University of Utah, 2008. The Structure and Economic Impact of Utah's Oil and Gas Exploration Industry Phase III – Grand County. Bureau of Economic and Business Research.

Utah Department of Environmental Quality (UDEQ). 2001. Utah's Non-Point Source Management Plan [online publication]. Utah Department of Environmental Quality, Salt Lake City. [Last Accessed June 18, 2007]. Available at http://www.waterquality.utah.gov/documents/NPS_Mgmt_Plan_2001.pdf.

UDEQ. 2002. Utah's 2002 303(d) List of Waters. Utah Department of Environmental Quality, Salt Lake City.

Utah Department of Workforce Services (UDWS). 2005. Grand County: Demographic and Economic Profile [online database]. Utah Department of Workforce Services, Salt Lake City. [Accessed August 2005]. Available at http://jobs.utah.gov/.

BLM_0010904

Utah Division of Air Quality and Environmental Protection Agency (UDAQ and EPA). 2006. US EPA Air Data Mapping and Emissions Tool, Nonattainment Areas Maps for Utah [online database]. Utah Division of Air Quality, Salt Lake City. [Last Accessed June 18, 2007]. Available at http://www.airmonitoring.utah.gov/ and http://www.epa.gov/air/data/ nonat.html?st%7EUT%7EUtah.

UDOGM. 2008. Data Research Center [online database]. Utah Division of Oil Gas and Mining. Available at http://oilgas.ogm.utah.gov/Data_Center/DataCenter.cfm#production

Utah Division of Oil Gas and Mining (UDOGM). 2002. Map of Abandoned Mine Sites within Grand County [online database]. Abandoned Mine Reclamation Program, Utah Division of Oil, Gas, and Mining, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.ogm.utah.gov.

UDOGM. 2004. December 2003 Production Book [online publication]. Utah Division of Oil Gas and Mining. [Accessed January 2004]. Available at http://ogm.utah.gov/oilgas/ PUBLICATIONS/Reports/2003_prd/book1203.htm.

Utah Division of Travel Development (UDTD). 2004. 2004 State and County Economic Travel Indicator Profiles. Utah Division of Travel Development, Salt Lake City.

Utah Division of Water Resources (UDWRe). 2000. Utah State Water Plan, Southeast Colorado River Basin. Utah Division of Water Resources, Salt Lake City.

Utah Division of Water Rights (UDWRi). 2003. Water Use Records Application [application download]. Utah Division of Water Rights, Salt Lake City. [Last Accessed June 18, 2007]. Available at http://waterrights.utah.gov/cgi-bin/wuseview.exe.

Utah Division of Wildlife Resources (UDWR). 1985a. Cisco Desert Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1985b. Hatch Point Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1985c. Dolores Triangle Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1986. The Potash-Confluence Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1999. Statewide Management Plan for Bighorn Sheep. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2000a. Utah Upland Game Annual Report, 1999. Publication 00-27. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2000b. Utah Black Bear Management Plan. Publication 00-23. Utah Division of Wildlife Resources, Salt Lake City. June 27.

UDWR. 2002. Strategic Management Plan for Sage-grouse. Publication 02-20. Utah Division of Wildlife Resources, Salt Lake City. June.

BLM_0010905

UDWR. 2005a. Utah Comprehensive Wildlife Conservation Strategy. Publication Number 05-19. Utah Division of Wildlife Resources, Salt Lake City. September.

UDWR. 2005b. Utah Sensitive Species List. Unpublished document, Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2006. Utah Big Game Annual Report, 2005. Publication 06-21. Utah Division of Wildlife Resources, Salt Lake City.

UDWR, 2007. Aerial Survey Counts (Pronghorn).  Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2007.  Utah Bighorn Sheep State-wide Management Plan.  Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2008.  2008 Antlerless Deer Permit Summary and Recommendations.  Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2008.  2008 Antlerless Elk Permit Summary and Recommendations.  Utah Division of Wildlife Resources. Salt Lake City.

Utah Geological and Mineralogical Survey (UGMS). 1966. Gold Placers in Utah – A Compilation. Utah Geological and Mineralogical Survey Circular 47. Utah Geological and Mineralogical Survey, Salt Lake City.

Utah Geological Society (UGS). 2003. Maps [online database]. Utah Geological Survey, Salt Lake City. [Last Accessed June 18, 2007]. Located at http://www.ugs.state.ut.us/maps/index.htm.

Utah Native Plant Society. 2005. Utah Rare Plant Guide [online database]. Utah Native Plant Society, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.utahrareplants.org/rpg_species.html.

Utah State Governor's Office of Planning and Budget (GOPB). 2001. Cities and Counties of Utah: First in a Series of Census 2000 Analyses [online publication]. Utah State Governor's Office of Planning and Budget, Salt Lake City. [Accessed April 2002]. Available at http://www.governor.state.ut.us/dea/ccBrief3.pdf.

GOPB. 2002. Race and Ethnicity in Utah: Third in a Series of Census 2000 Analyses [online publication]. Utah State Governor's Office of Planning and Budget, Salt Lake City. [Accessed April 2002]. Available at http://governor.utah.gov/dea/Minorities.pdf

Venturoni, L., P. Long, and R. Perdue. 2005. The Economic and Social Impacts of Second Homes in Four Mountain Resort Counties of Colorado. 2005 Annual Meeting of the Association of American Geographers, Denver, April 7.

Walcek, C. J. 2002. Effects of wind shear on pollution dispersion. *Atmospheric Environment* 36: 511–517.

Welsh, S. L., N. D. Atwood, S. Goodrich, and L. C. Higgins. 2003. *A Utah Flora*, Third Edition, revised. Provo, Utah: Brigham Young University.

BLM_0010906

Western Regional Climate Center (WRCC). 2004. Temperature and precipitation for meteorological stations in Eastern Utah [online database]. Western Regional Climate Center, Desert Research Institute. [Last Accessed June 18, 2007]. Available at http://www.wrcc.dri.edu/index.html.

Witkind, I. J. 2004. Geologic map of the Huntington 30' and 60' Quadrangle, Carbon, Emery, Grand, and Uintah Counties, Utah. Utah Geological Survey Open File Report 440DM. 5 sheets (scale 1:100,000).

World Climate. 2003. Climate data for Moab, Grand County, Utah and Monticello, San Juan County, Utah [online database]. World Climate. [Last Accessed June 19, 2007]. Available at http://www.worldclimate.com/.

Zeveloff, S., and F. Collett. 1988. *Mammals of the Intermountain West.* Salt Lake City: University of Utah Press.

BLM_0010907

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0010908

# INDEX

**B**

Beaver Creek, 2-11, 2-13, 2-16, 2-17, 2-30, 2-40, 2-54, 2-57, 2-58, 2-101, 3-44, 3-69, 3-70, 3-83, 3-26, 3-127, 3-144, 3-160, 3-174, 3-187, 4-50, 4-59, 4-71, 4-76, 4-77, 4-81, 4-97, 4-104, 4-114, 4-116, 4-117, 4-118, 4-122, 4-123, 4-127, 4-128, 4-130, 4-132, 4-134, 4-135, 4-136, 4-138, 4-139, 4-140, 4-141, 4-143, 4-145, 4-146, 4-148, 4-149, 4-151, 4-152, 4-153, 4-154, 4-158, 4-160, 4-163, 4-165, 4-166, 4-171, 4-187, 4-201, 4-202, 4-203, 4-207, 4-244, 4-337, 4-339, 4-340, 4-341, 4-351, 4-352, 4-416, 4-457, 4-495, 5-8, 5-10, 5-57, 5-128, 5-132, I-13, J-23, J-63, J-64, J-73, J-86, J-87, P-3, P-4, U-5

Behind the Rocks Potential ACEC, 2-33, 4-311, 4-312, 2-33, 2-45, 2-90, 4-189, 4-235, 4-311, 4-312, 4-313, 4-417, 5-97, C-14

Best management practices, 2-11, 2-15, 2-46, 2-47, 3-125, 4-68, 5-51, 5-63, 5-81, 5-127, C-3, G-31, L-8, O-2, Q-4

Black Ridge WSA, 2-45

Black-footed ferret, 1-11, 2-46, 3-148, 3-150, 4-359, 4-366

Bonytail, 1-4, 1-11, 2-46, 3-133, 3-134, 3-136, 3-139, 3-148, 3-151, 3-187, 4-357, 4-361, I-11, I-16, I-21, J-27, J-30, J-33, J-36, J-40, J-42, J-66, J-68, K-19

Bookcliffs Potential ACEC, 2-33, U-8, U-14

Bookcliffs SRMA, 2-18, 4-138, 4-140, 4-141, 4-298, 4-322, 5-135, U-10

Burrowing owl, 2-48, 3-153, 3-157, 3-186, 4-61, 4-359, 4-363, 4-366, 4-411, C-40, O-1, O-14

**C**

Cameo Cliffs SRMA, 2-19, 2-73, 3-78, 4-212, 4-335, 4-391, 4-393, 5-85, U-10

Canyon Rims Potential ACEC, 2-34, 4-315, 4-316

Canyon Rims SRMA, 2-19, 2-34, 2-74, 3-77, 4-103, 4-138, 4-141, 4-213, 4-298, 4-315, 4-390, 4-391, 4-445, 4-446

Coal Canyon WSA, 2-46, 2-45, 4-189, 4-343

Colorado Pikeminnow, 1-4, 1-11, 2-46, 3-133, 3-134, 3-136, 3-139, 3-148, 3-151, 3-187, 4-357, 4-361, I-11, I-16, I-21, J-27, J-30, J-33, J-36, J-40, J-42, J-47, J-61, J-66, J-68, K-19

Colorado River Corridor Potential ACEC, 2-34, 4-319, 4-320, 4-321

Colorado River SRMA, 1-13, 3-78, 3-79, 3-85

Colorado River, 1-2, 1-3, 1-7, 1-11, 2-11, 2-14, 2-31, 2-32, 2-39, 2-47, 2-54, 2-55, 2-101, 3-1, 3-15, 3-21, 3-24, 3-35, 3-36, 3-39, 3-42, 3-44, 3-45, 3-62, 3-63, 3-64, 3-76, 3-77, 3-78, 3-85, 3-86, 3-87, 3-89, 3-91, 3-93, 3-94, 3-95, 3-98, 3-99, 3-101, 3-102, 3-126, 3-128, 3-130, 3-133, 3-134, 3-135, 3-136, 3-137, 3-139, 3-143, 3-144, 3-148, 3-149, 3-150, 3-151, 3-152, 3-154, 3-155, 3-158, 3-160, 3-161, 3-163, 3-164, 3-167, 3-172, 3-174, 3-183, 3-187, C-5, C-6, C-12, C-16, C-40, C-42, E-1, E-2, E-3, ES-1, F-5, F-14, F-15, I-5, I-6, I-10, I-11, I-14, I-16, I-17, I-20, I-21, I-23, I-25, J-4, J-5, J-18, J-20, J-22, J-26, J-27, J-28, J-28, J-29, J-30, J-31, J-32, J-32, J-33, J-34, J-34, J-35, J-36, J-37, J-38, J-38, J-39, J-40, J-40, J-41, J-42, J-43, J-44, J-45, J-47, J-48, J-50, J-51, J-52, J-53, J-54, J-56, J-58, J-59, J-60, J-61, J-62, J-64, J-65, J-72, J-73, J-75, J-76, J-77, J-78, N-5, N-7

Colorado Riverway SRMA, 2-18, 2-20, 2-34, 2-35, 2-34, 2-52, 2-74, 4-138, 4-140, 4-141, 4-197, 4-201, 4-207, 4-214, 4-215, 4-216, 4-217, 4-272, 4-273, 4-274, 4-275, 4-298, 4-299, 4-319, 4-321, 4-323, 4-342, 4-343, 4-347, 4-348, 4-349, 4-390, 4-391, 4-393, 4-447, 4-448, 4-472, E-3, I-29

Colorado Riverway, 1-12, 3-77, 3-78, 3-79, 3-92, 3-167, E-1, E-2, F-6

Colorado Squawfish, 2-46

Conservation Strategy, 2-12, 2-46, 2-47, 2-52, 3-159, 3-160, 4-365, 4-375, 4-402, 4-407, 4-422, 4-433, 4-456, 4-481

Cottonwood Canyon, 2-41, 2-45, 2-101, 3-94, 3-143, 4-338, 4-339, 4-340, 4-343, J-18, J-22, J-23, J-43, J-44, J-62, J-72, J-79

Cottonwood-Diamond Watershed Potential ACEC, 2-35, 4-233, 4-322, 5-61

Cycladenia humilis, 2-48, 3-148, 4-149, 4-359, K-15

**D**

Desert Bighorn Sheep, 1-4, 2-12, 2-55, 2-56, 2-57, 3-44, 3-133, 3-134, 3-135, 3-136, 3-139, 3-182, 3-183, 3-184, 4-75, 4-76, 4-80, 4-82, 4-83, 4-112, 4-113, 4-201, 4-242, 4-321, 4-411, 4-438, 4-439, 4-450, 4-454, 4-457, 4-458, 4-459, 4-462, 4-463, 4-464, 4-465, 4-467, 4-469, 4-476, 4-477, 4-482, 4-483, 4-484, 4-485, 4-486, 4-487, 4-488, 4-490, 4-491, 5-46, 5-98, 5-99, 5-102, 5-105, C-25, C-26, C-26, G-25, I-11, I-13, I-15, I-16, I-21, J-36, J-39, J-42, N-3, N-4, N-5, N-6

Desolation Canyon WSA, 2-45, 3-145, 4-189, 4-344, 4-345, 4-349, J-88, J-90

Dolores River Canyon SRMA, 4-341, 4-349, 4-391, 2-18, 2-22, 2-74, 4-139, 4-140, 4-141, 4-197, 4-207, 4-217, 4-218, 4-389, 5-134, F-8, U-4

Dolores River, 1-2, 1-13, 2-11, 2-14, 2-22, 2-27, 2-39, 2-40, 2-41, 2-45, 2-47, 2-54, 2-55, 2-78, 2-102, 3-35, 3-36, 3-39, 3-62, 3-63, 3-64, 3-78, 3-86, 3-87, 3-89, 3-93, 3-94, 3-95, 3-98, 3-99, 3-126, 3-143, 3-144, 3-152, 3-160, 3-161, 3-164, 3-167, 3-174, 3-187, C-5, C-6, C-40, E-1, E-2, E-3, ES-1, F-9, F-14, I-13, J-4, J-5, J-18, J-19, J-20, J-22, J-23, J-24, J-31, J-32, J-34, J-56, J-57, J-58, J-58, J-59, J-60, J-60, J-61, J-62, J-63, J-64, J-72, J-73, J-85, J-86, N-7

Drought, 2-12, 2-52, 2-53, 2-80, 2-108, 3-2, 3-3, 3-24, 3-28, 3-40, 3-124, 3-125, 3-133, 3-158, 3-169, 3-170, 3-177, 3-182, 3-186, 3-188, 3-189, 3-190, 4-13, 4-57, 4-73, 4-109, 4-240, 4-421, 4-423, 4-483, 5-101, G-25, H-6, I-10, L-1, L-4, L-7, L-8, L-12, L-13, L-14, L-21, L-24, M-1, M-2, O-5

**E**

Emergency stabilization, 2-8, 2-10, 2-52, 3-25, 3-28, 3-29, 3-135, 4-115, 4-282, 4-422, I-13

Environmental justice, 3-121, 3-122, 4-8, 4-254, 4-255

EPCA, 1-11, 3-45, 3-46, 3-47, 4-85, 5-112

Equestrian, 2-18, 2-19, 2-21, 2-24, 2-25, 2-26, 2-27, 2-29, 2-39, 2-52, 3-15, 4-139, 4-140, 4-141, 4-156, 4-195, 4-197, 4-212, 4-224, 4-227, 4-228, 4-231, 4-239, 4-390, 4-391, 4-414, 4-420, 4-421, 4-437, 4-446, 4-448, 4-472, E-4, F-3, F-4, F-6, F-9, F-11, G-2, G-19, G-26, G-27

**F**

Ferruginous Hawk, 2-48, 3-157, 3-186, 4-61, 4-317, 4-359, 4-363, 4-366, 4-411, 5-50, C-40, J-29, J-32, N-7, O-1

Floy Canyon WSA, 2-45, 4-189

Flume Canyon WSA, 2-45, 2-46, 4-189

**G**

Grand County, 1-1, 1-2, 1-3, 1-10, 2-18, 2-24, 2-26, 2-51, 2-120, 3-4, 3-10, 3-11, 3-16, 3-17, 3-30, 3-33, 3-37, 3-45, 3-62, 3-64, 3-67, 3-80, 3-82, 3-88, 3-100, 3-101, 3-102, 3-103, 3-104, 3-105, 3-106, 3-107, 3-108, 3-109, 3-110, 3-111, 3-112, 3-113, 3-114, 3-115, 3-116, 3-117, 3-118, 3-119, 3-120, 3-121, 3-122, 3-125, 3-137, 3-148, 3-150, 3-162, 3-163, 3-164, 3-171, 3-172, 4-21, 4-24, 4-27, 4-30, 4-222, 4-254, 4-261, 4-262, 4-263, 4-264, 4-267, 4-269, 4-271, 4-272, 4-273, 4-275, 4-301, 4-414, 5-4, 5-7, 5-8, 5-9, 5-10, 5-11, 5-12, 5-27, 5-28, 5-36, 5-79, 5-81, 5-82, 5-83, 5-84, 5-85, 5-136, 5-137, 5-137, 5-151, 5-154, 5-162, 5-163, ES-1, F-12, G-2, G-3, G-6, G-11, G-13, G-14, G-15, G-16, G-17, G-18, G-19, G-21, I-4, I-17, J-4, J-11, J-13, J-76, J-77, L-8, T-1, T-2, T-3, T-4, T-6, T-7, T-8, T-9, T-10, U-8, U-12, U-14

Greater sage-grouse, 1-15, 2-47, 2-48, 2-106, 3-153, 3-158, 3-185, 4-61, 4-107, 4-108, 4-359, 4-365, 4-372, 4-380, 4-383, 4-385, 4-386, 4-402, 4-403, 4-433, 4-434, 4-435, 4-476, 4-477, 5-50, U-6

Green River, 1-2, 2-11, 2-13, 2-14, 2-23, 2-24, 2-30, 2-31, 2-32, 2-37, 2-39, 2-42, 2-44, 2-47, 2-52, 2-54, 2-55, 2-57, 2-102, 3-1, 3-18, 3-21, 3-35, 3-36, 3-55, 3-64, 3-65, 3-66, 3-76, 3-81, 3-82, 3-83, 3-85, 3-86, 3-87, 3-89, 3-93, 3-95, 3-98, 3-99, 3-101, 3-

BLM_0010910

115, 3-126, 3-131, 3-136, 3-137, 3-139, 3-144, 3-148, 3-149, 3-150, 3-151, 3-152, 3-154, 3-158, 3-160, 3-161, 3-166, 3-174, 3-175, 3-182, 3-185, 3-187, C-5, C-6, C-40, E-1, E-2, E-3, ES-1, F-3, F-7, F-10, F-11, H-3, I-8, I-16, I-18, I-21, J-8, J-17, J-19, J-35, J-39, J-41, J-65, J-66, J-67, J-68, J-68, J-69, J-73, J-74, J-89, N-5, N-8

Gunnison prairie dog, 2-5, 2-47, 2-50, 2-106, 4-61, 4-107, 4-108, 4-357, 4-359, 4-360, 4-363, 4-366, 4-372, 4-383, 4-385, 4-386, 4-387, 4-403, 4-404, 4-436, 4-477, C-24, C-23, C-24, C-24, G-26, U-6

Gunnison sage-grouse, 2-5, 2-47, 2-49, 3-44, 3-153, 3-158, 4-61, 4-107, 4-108, 4-357, 4-359, 4-363, 4-365, 4-372, 4-375, 4-379, 4-380, 4-383, 4-385, 4-386, 4-402, 4-403, 4-433, 4-435, 4-477, 5-50, 5-96, 5-101

**H**

Highway 279/Shafer Basin/Long Canyon Potential ACEC, 2-36, 4-324

**J**

Jones cycladenia, 3-133, 3-134, 3-148, 3-150, 4-357, 4-359, 4-360, 4-363, 4-365, 4-367, 4-383, 4-385, 4-386, 4-387, 4-406, 5-129, 5-141, 5-143, C-44, C-45, C-47, C-48, I-11, I-12, K-1, K-15, U-4

**K**

Kit Fox, 2-48, 3-156, 4-317, C-42

**L**

Labyrinth Canyon Potential ACEC, 2-36, 4-326
Lost Spring Canyon WSA, 2-45, 4-189
Lower Gray Canyon SRMA, 2-25, 2-75, 4-221, 4-222, 4-314, 4-344, 4-345, F-11, J-90

**M**

Mexican Spotted Owl, 1-4, 1-11, 2-46, 2-47, 3-43, 3-44, 3-45, 3-150, 4-61, 4-357, 4-360, 4-361, 4-362, 4-363, 4-364, 4-365, 4-366, 4-367, 4-368, 4-369, 4-371, 4-372, 4-373, 4-376, 4-377, 4-382, 4-383, 4-384, 4-385, 4-386, 4-387, 4-388, 4-392, 4-393, 4-394, 4-396, 4-399, 4-400, 4-401, 4-405, 4-406, 4-408, 4-411, 4-412, 4-413, 4-433, 5-141, 5-143, C-32, C-33, C-34, J-26, J-28,

J-29, J-35, J-39, J-41, J-52, J-54, J-56, J-66, J-68, K-1, K-3, K-4, K-5, N-7, N-8, O-1, U-12

Mill Creek Canyon Potential ACEC, 2-8, 2-36, 4-327, 4-328, 5-79, 5-95

Mill Creek Canyon WSA, 2-36, 2-45, 2-46, 4-327, 4-329, C-17, F-13, J-84, J-85

Mill Creek, 1-13, 2-8, 2-8, 2-13, 2-17, 2-26, 2-30, 2-32, 2-43, 2-102, 3-43, 3-44, 3-69, 3-71, 3-77, 3-80, 3-82, 3-84, 3-87, 3-91, 3-93, 3-95, 3-98, 3-126, 3-127, 3-130, 3-136, 3-137, 3-143, 3-145, 3-146, 3-163, 3-168, 3-180, 3-188, C-13, C-17, C-29, E-1, E-2, E-3, E-4, G-19, I-5, I-6, I-17, I-23, I-26, J-21, J-50, J-51, J-52, J-53, J-54, J-55, J-56, P-3, P-5

Moab Extensive Recreation Management Area, 2-29, 4-391, F-9

Motorcycle, 1-15, 1-16, 2-7, 2-25, 2-25, 2-51, 2-64, 2-75, 2-76, 2-114, 3-84, 3-90, 3-165, 4-50, 4-55, 4-223, 4-236, 4-237, 4-238, 4-303, 4-367, 4-418, 4-419, 4-420, 4-478, 5-72, 5-73, 5-144, 5-145, 5-146, 5-144, 5-145, 5-146, 5-148, 5-149, 5-152, ES-3, F-15, G-3, G-15, U-6, U-12, U-13, U-15

Mountain biking, 1-3, 2-21, 2-24, 2-29, 2-74, 2-75, 2-76, 2-77, 2-78, 2-79, 2-80, 3-76, 3-78, 3-79, 3-80, 3-81, 3-84, 3-85, 3-113, 3-166, 3-167, 4-139, 4-194, 4-201, 4-211, 4-212, 4-213, 4-214, 4-216, 4-217, 4-218, 4-219, 4-220, 4-222, 4-223, 4-224, 4-225, 4-227, 4-228, 4-229, 4-231, 4-233, 4-234, 4-237, 4-238, 4-239, 4-240, 4-242, 4-390, 4-392, 4-414, 4-416, 4-420, 4-421, 4-472, 4-516, F-10, F-12, F-15, G-19

**N**

Negro Bill Canyon WSA, 2-21, 2-34, 2-46, 4-189, 4-319, C-16, J-83

Negro Bill Canyon, 2-17, 2-20, 2-21, 2-30, 2-31, 2-32, 2-34, 2-43, 2-45, 2-46, 2-52, 2-103, 3-42, 3-69, 3-71, 3-79, 3-80, 3-84, 3-95, 3-97, 3-98, 3-133, 3-134, 3-143, 3-145, 3-146, 3-174, 3-187, 4-114, 4-117, 4-120, 4-122, 4-126, 4-128, 4-131, 4-132, 4-139, 4-143, 4-144, 4-146, 4-151, 4-152, 4-153, 4-154, 4-155, 4-159, 4-161, 4-165, 4-188, 4-189, 4-215, 4-216, 4-300, 4-319, 4-320, 4-338, 4-340, 4-347, 4-351, 4-352, 4-353, 4-354, 4-421, 4-425, 4-433, 5-132, 5-141, C-16, C-29, C-30, E-2, E-4, G-27, I-11, I-

BLM_0010911

12, J-21, J-34, J-47, J-48, J-50, J-72, J-82, J-83, P-4

North Fork Mill Creek, 2-43, 2-103, 4-104, 4-338, 4-340, 4-348, 4-351, 4-352, J-22, J-73, J-84, J-85

**O**

Old Spanish Trail, 2-19, 2-39, 3-16, 3-138, 3-139, 4-212, 4-306, 4-336, 4-355, F-4, I-19

Onion Creek, 2-20, 2-21, 2-30, 2-31, 2-32, 2-44, 2-52, 2-103, 2-111, 3-79, 3-84, 3-92, 3-93, 3-95, 3-98, 3-126, 3-127, 3-128, 3-133, 3-143, 3-163, 3-165, 3-174, 3-187, 4-104, 4-143, 4-145, 4-148, 4-157, 4-188, 4-201, 4-300, 4-301, 4-338, 4-339, 4-340, 4-348, 4-351, 4-352, 4-444, 4-446, 4-447

Onion Creek, 5-81, 5-128, 5-146, F-6, G-27, I-10, J-20, J-44, J-45, J-45, J-72, J-80

**P**

Petrified wood, 2-17, 2-38, 3-72, 3-73, 4-137, 4-179, 4-332, J-38

Planning criteria, 1-5, 1-6, 1-9, 2-1, 3-33, 5-20, 5-22, 5-55, G-2, G-8, 1-6, 1-14, 2-1, 4-1, 5-1, 5-13, 5-36, 5-44, 5-50, 5-55, 5-68, 5-72, 5-94, 5-110, 5-111, 5-111, 5-123, 5-125, 5-129, 5-136, 5-138, 5-153, 5-156, ES-2, ES-5, I-2, I-28, I-29, I-30, J-91, U-3

prescribed fire, 4-500

Professor Creek, 2-20, 2-21, 2-31, 2-32, 2-44, 2-103, 3-95, 3-126, 3-143, 4-104, 4-143, 4-145, 4-188, 4-300, 4-338, 4-339, 4-340, 4-349, 4-351, 4-352, 5-134, J-21, J-46, J-72, J-80, J-81

**R**

Rattlesnake Canyon, 2-13, 2-25, 2-30, 2-44, 2-103, 3-99, 3-144, 4-338, 4-340, 4-349, 4-351, J-17, J-68, J-69, J-74, J-88, J-89

Razorback Sucker, 1-11, 2-46, 3-133, 3-134, 3-139, 3-152, 3-187, 4-357, 4-361, I-11, I-21, J-27, J-30, J-33, J-36, J-40, J-42, J-66, J-68, K-19

Reasonably foreseeable, 1-1, 4-3, 4-8, 4-177, 4-381, 4-382, 4-490, 4-505, 4-507, 4-511, 4-512, 4-513, 4-516, 4-517, 5-62, 5-68, 5-126, J-12, J-75, J-77, J-79, J-80, J-81, J-82, J-83, J-84, J-85, J-86, J-87, J-88, J-91, U-12

Reintroductions, 2-47, 2-55, 3-150, 4-289, 4-410, 5-8, 5-48, K-20

Relinquishment, 2-12

Richardson Amphitheater, 2-11, 2-17, 2-21, 2-111, 3-84, 3-133, 4-140, 4-215, 4-216, 4-444, 4-446, 4-447, 4-448, F-6, I-5, I-10, I-11, I-25, J-34

Rocky Mountain Bighorn Sheep, 1-4, 2-57, 3-132, 3-184, 3-185, 4-80, 4-82, 4-84, 4-112, 4-113, 4-313, 4-411, 4-412, 4-438, 4-439, 4-450, 4-455, 4-462, 4-463, 4-464, 4-466, 4-467, 4-469, 4-476, 4-477, 4-484, 4-485, 4-486, 4-487, 4-488, 4-491, 5-46, I-8, J-66, J-68, J-69, N-5

**S**

Salt Wash, 2-4, 2-44, 2-82, 2-104, 3-49, 3-52, 3-57, 3-58, 3-60, 3-61, 3-95, 3-126, 3-143, 4-4, 4-5, 4-15, 4-16, 4-21, 4-23, 4-26, 4-29, 4-40, 4-44, 4-49, 4-53, 4-87, 4-92, 4-93, 4-94, 4-96, 4-104, 4-175, 4-182, 4-183, 4-184, 4-185, 4-186, 4-252, 4-289, 4-311, 4-334, 4-338, 4-340, 4-349, 4-351, 5-67, J-18, J-21, J-37, J-47, J-72, J-81, J-82, S-1, S-2, U-5

San Juan County, 1-1, 1-2, 1-3, 1-10, 2-1, 2-19, 2-26, 3-10, 3-11, 3-67, 3-100, 3-101, 3-105, 3-106, 3-107, 3-112, 3-120, 3-121, 3-122, 3-160, 3-163, 3-164, 4-21, 4-22, 4-24, 4-27, 4-30, 4-212, 4-213, 4-254, 4-259, 4-262, 4-264, 4-265, 4-267, 4-269, 4-414, 4-508, 5-4, 5-7, 5-13, 5-14, 5-27, 5-36, 5-82, 5-83, 5-84, 5-85, 5-86, 5-87, 5-89, 5-91, 5-92, 5-91, 5-92, 5-93, 5-94, 5-95, 5-96, 5-97, 5-98, 5-99, 5-100, 5-101, 5-102, 5-103, 5-104, 5-105, 5-106, 5-107, 5-108, 5-109, 5-110, 5-110, 5-111, 5-112, 5-113, 5-113, 5-114, 5-115, 5-115, 5-116, 5-117, 5-162, 5-164, ES-1, G-2, G-3, G-6, G-7, G-11, G-12, G-13, G-14, G-15, G-16, G-17, G-18, G-21, I-4, I-14, J-11, J-13, J-78, T-1, T-2, T-3, T-4, T-6, T-7, T-8, T-9

Sand Flats SRMA, 2-26, 2-75, 4-98, 4-139, 4-141, 4-222, 4-391, 4-392, C-9, F-12

Southwestern Willow Flycatcher, 1-4, 1-11, 2-46, 2-47, 3-44, 3-45, 3-148, 3-151, 3-187, 3-188, 4-61, 4-252, 4-357, 4-361, 4-363, 4-367, 4-369, 4-370, 4-372, 4-373, 4-376, 4-381, 4-382, 4-383, 4-386, 4-388, 4-393, 4-394, 4-396, 4-399, 4-400, 4-401, 4-402, 4-405, 4-406, 4-408, 4-410, 4-412, 4-

BLM_0010912

413, 4-434, 5-96, 5-98, C-37, C-39, J-26, J-28, J-29, J-32, J-35, J-39, J-41, J-43, J-52, J-54, J-56, J-57, J-59, J-61, J-66, J-68, K-1, K-5, K-6, K-7, K-8

Spruce Canyon WSA, 2-46, 4-189, J-79

State of Utah, 1-8, 1-10, 2-7, 2-11, 2-23, 2-39, 2-40, 2-53, 2-84, 3-11, 3-34, 3-39, 3-68, 3-88, 3-105, 3-107, 3-123, 3-127, 3-141, 3-147, 3-154, 3-155, 3-159, 3-168, 3-172, 3-180, 3-181, 3-182, 4-22, 4-25, 4-27, 4-30, 4-56, 4-69, 4-90, 4-173, 4-218, 4-219, 4-220, 4-263, 4-264, 4-265, 4-267, 4-301, 5-2, 5-4, 5-8, 5-16, 5-17, 5-18, 5-20, 5-27, 5-36, 5-37, 5-38, 5-39, 5-40, 5-41, 5-42, 5-43, 5-44, 5-45, 5-46, 5-47, 5-48, 5-49, 5-50, 5-51, 5-52, 5-53, 5-54, 5-55, 5-56, 5-57, 5-58, 5-59, 5-60, 5-61, 5-62, 5-64, 5-65, 5-67, 5-68, 5-69, 5-70, 5-71, 5-72, 5-73, 5-74, 5-75, 5-76, 5-77, 5-78, 5-79, 5-80, 5-81, 5-82, 5-84, 5-92, 5-95, 5-141, 5-152, G-29, G-33, H-4, I-4, I-15, J-3, J-4, J-5, J-6, J-7, J-11, J-13, J-27, J-30, J-33, J-77, J-90, J-92, J-93, J-94, O-9, Q-3, R-3, T-1, T-2, U-3, U-4, U-6, U-8, U-11, U-13, U-14

**T**

Ten Mile Wash Potential ACEC, 2-37, 4-329

Thompson Canyon, 2-13, 2-45, 2-104, 3-144, 3-180, 4-75, 4-83, 4-338, 4-339, 4-340, 4-349, 4-351, 4-352, 4-457, J-23, J-62, J-73, J-87, J-88, N-5

Total Maximum Daily Load, 2-30, 2-32, 3-127, 3-128, 4-301, 5-80, 5-81, J-56

Two Rivers SRMA, 2-20, 2-27, 2-76, 4-139, 4-141, 4-197, 4-225, 4-272, 4-273, 4-275, 4-341, 4-342, 4-344, 4-390, F-14, I-30, U-4, U-10

**U**

U.S. Fish and Wildlife Service, 1-11, 1-16, 1-17, 2-5, 2-8, 2-11, 2-34, 2-46, 2-47, 2-48, 2-55, 3-29, 3-147, 3-148, 3-151, 3-152, 3-158, 3-176, 4-106, 4-258, 4-308, 4-317, 4-356, 4-361, 4-363, 4-364, 4-365, 4-366, 4-368, 4-369, 4-394, 4-402, 4-433, 4-484, 5-2, 5-5, 5-27, 5-51, 5-96, 5-127, 5-129, 5-139, 5-140, 5-141, 5-142, 5-143, 5-160, 5-161, C-34, C-36, C-37, C-39, C-39, C-40, C-41, C-42, C-44, C-48, G-29, H-3, I-10,

J-27, J-30, J-33, J-36, J-40, J-42, J-68, K-1, K-2, K-3, K-6, K-8, K-9, K-10, K-11, K-12, K-13, K-14, K-15, K-16, K-17, K-18, K-19, K-20, K-21, N-4, O-1, O-2, O-8, O-15, O-16, U-3, U-4, U-12, U-13, U-14

Upper Courthouse Potential ACEC, 2-37, 4-331

Utah Division of Wildlife Resources, 1-13, 1-17, 2-12, 2-33, 2-34, 2-46, 2-47, 2-48, 2-49, 2-50, 2-52, 2-53, 2-55, 2-56, 2-57, 3-131, 3-132, 3-133, 3-151, 3-152, 3-156, 3-157, 3-158, 3-159, 3-160, 3-161, 3-162, 3-176, 3-177, 3-178, 3-179, 3-180, 3-181, 3-182, 3-184, 3-185, 3-187, 4-111, 4-317, 4-363, 4-365, 4-366, 4-375, 4-380, 4-402, 4-456, 4-457, 4-484, 4-492, 5-5, 5-15, 5-16, 5-40, 5-49, 5-50, 5-73, 5-79, 5-86, 5-97, 5-99, 5-100, 5-101, 5-102, 5-104, 5-105, I-8, I-10, I-28, J-57, J-59, J-61, K-2, K-3, K-8, N-1, N-2, N-4, O-1, O-2, O-3, O-8, U-2, U-4, U-7, U-9, U-13

Utah Rims SRMA, 1-14, 2-28, 2-76, 4-227, 4-228, 4-393, 5-85, U-5

**V**

VRM, *see* Visual Resource Management, 4-148

**W**

Westwater Canyon Potential ACEC, 2-38, 4-332

Westwater Canyon WSA, 2-38, 2-46, 4-189, C-19, U-11

White Wash Potential ACEC, 2-38, 4-333, 4-334

White-tailed prairie dog, 2-47, 3-132, 3-133, 3-153, 3-157, 4-61, 4-107, 4-108, 4-317, 4-318, 4-359, 4-372, 4-383, 4-385, 4-386, 4-403, 4-432, 4-435, 4-436, 4-477, 5-47, 5-139, C-22, C-23, U-7

Wild and Scenic River, 4-148

Wilson Arch Potential ACEC, 2-39, 4-335, 4-336, 5-96

**Y**

Yellow-billed Cuckoo, 2-48, 3-148, 3-151, 3-187, 4-61, 4-252, 4-357, 4-361, 4-363, 4-372, 4-373, 4-376, 4-381, 4-383, 4-386, 4-399, 4-400, 4-401, 4-405, 4-410, 4-434, C-39, C-40, J-66, N-7, N-8

BLM_0010913

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0010914

# 2.0 PROPOSED PLAN AND DRAFT ALTERNATIVES

This chapter presents the Proposed Plan which was crafted from the four alternatives in the Draft RMP/EIS. The Proposed Plan primarily mirrors the Preferred Alternative (Alternative C) from the Draft RMP, but has been modified through public comment, internal review, and cooperating agency coordination to reflect specific decisions carried forward from the other alternatives in the Draft RMP. The Moab field office (MFO) formulated this Proposed Plan from the reasonable range of alternatives presented in the Draft RMP/EIS for managing resources within the planning areas that considered issues and concerns raised during the scoping period (see Chapter 1, Section 1.3.2), planning criteria, and the guidance applicable to the resource uses. The Proposed Plan and the draft alternatives constitute a range of management actions that set forth different priorities and measures to emphasize certain uses or resource values over other uses or resource values under the multiple-use and sustained yield mandate so as to achieve certain goals or objectives.

BLM recognizes that social, economic, and environmental issues cross land ownership lines and that extensive cooperation is needed to actively address issues of mutual concern. To the extent possible, the Proposed Plan and the draft alternatives (Alternatives A, B, and D) were crafted utilizing input from public scoping comments, Grand and San Juan County representatives, and other cooperating agencies. There are two other alternatives that were considered for detailed analysis, but did not meet the purpose and need for this plan revision or were not technically feasible or economically practical to carry forward. They were eliminated from detailed consideration and are briefly discussed in the last section of this chapter.

Chapter 2 has been organized in the following manner:

- Section 2.1 provides a brief summary of the major components of the Proposed Plan and of each draft alternative, and Table 2.1 provides the detailed alternative management strategies proposed under all four alternatives.
- Section 2.2 provides a comparative summary of the environmental impacts associated with the Proposed Plan and with each draft alternative.
- Section 2.3 outlines those alternatives the BLM initially considered but later eliminated, and the justifications for their dismissal from further evaluations.

Evaluation of a reasonable range of alternatives is required by NEPA and by the Council on Environmental Quality (CEQ) (40 CFR Part 1502.14), as well as by BLM planning regulations. As is also required in the CEQ regulations, one alternative consists of "no action," which is the same as the continuation of management under the current Grand RMP (BLM 1985a) and subsequent plan amendments.

The range of alternatives has been developed to:

- meet the Purpose and Need outlined in Chapter 1;
- respond to environmental, operational, and economic concerns raised by the public, agencies, business and other special interest groups during the scoping process; and
- address potential environmental issues identified during review of the proposed management actions.

## 2.1 DESCRIPTION OF ALTERNATIVES FROM THE PROPOSED RMP/EIS

The four alternatives presented in detail in Table 2.1 of this chapter are as follows:

- Alternative A is the No Action alternative and represents the continuation of existing management under the current Grand Resource Area RMP (1985a), as amended.
- Alternative B emphasizes the protection/preservation of natural resources and minimizes human activities, over commodity production and extraction and motorized recreation access.
- The Proposed Plan provides for a balanced approach of protection/preservation of natural resources while providing for commodity production and extraction.
- Alternative D emphasizes commodity production and extraction as well as motorized recreation access over the protection/preservation of natural resources.

Some of the decisions in this PRMP/FEIS are carried forward from the existing Grand RMP (BLM 1985a) because there are no impending issues associated with them, and they do not need to change. They are decisions that are common to all alternatives, thus, a range of alternative decisions are not necessary for these resources or uses. Other decisions are common to all action alternatives (Alternatives B, D and the Proposed Plan), but are different from the No Action Alternative due to a change in circumstances.

### 2.1.1 BRIEF SUMMARY AND HIGHLIGHTS OF THE PROPOSED PLAN AND DRAFT ALTERNATIVES IN TABLE 2.1

The major resources/uses where issues were identified during scoping were: travel management, recreation, oil and gas leasing and development, special designations (ACECs and Wild and Scenic Rivers), special status species, wildlife, and non-WSA lands with wilderness characteristics. These resources/uses, among others, are displayed under a range of management alternatives that set forth different priorities and measures to emphasize uses or resource values over other uses or resource values to achieve specific goals or objectives outlined in detail in Table 2.1. Below is a brief summary of the range of alternatives for those major resources/uses brought forward during scoping. Much more detail for each of these resources and uses, among others, and their proposed management is in Table 2.1.

#### 2.1.1.1 TRAVEL MANAGEMENT

All public lands are required to have off-highway vehicle (OHV) area designations. Areas must be classified as open, limited, or closed to motorized travel activities. OHV designation areas, or categories, are listed by alternative. Within the "Limited" category, routes would be limited to "designated roads and trails" (43 CFR Part 8340.0-5(g)). Specific routes are being designated as open to motorized use by alternative as part of implementation level planning. Summary Table A portrays how travel and access management would be designated under each alternative.

**Summary Table A. OHV Categories (acres), by Alternative**

| Category | Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Closed | 5,062 | 437,424 | 339,298 | 57,351 |
| Limited | 1,196,920 | 1,475,074 | 1,481,334 | 1,762,083 |

BLM_0010916

**Summary Table A. OHV Categories (acres), by Alternative**

| Category | Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Miles of D Routes Designated[1] | 4,673 | 2,144 | 2,519 | 2,671 |
| Open | 620,212 | 0 | 1,866 | 3,064 |

[1] At time of publication

## 2.1.1.2 RECREATION

Special Recreation Management Areas (SRMAs) are proposed to manage intensively used recreation areas, and do not restrict other uses. Focus Areas are Recreation Management Zones and are proposed in order to emphasize and provide particular types of recreation opportunities. In Alternative B, non-motorized recreation in emphasized; in Alternative D, motorized recreation is emphasized. The Proposed Plan provides opportunities for both non-motorized and motorized recreation, as depicted in Summary Table B.

**Summary Table B. SRMAs (quantity and acres) and Focus Areas (quantity), by Alternative**

| Category | Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SRMAs | 3 (141,252 acres) | 11 (976,173 acres) | 10 (658,642 acres) | 6 (277,471 acres) |
| Focus Areas | 0 | 22 | 30 | 10 |

## 2.1.1.3 OIL AND GAS LEASING AND DEVELOPMENT

One of the major decisions in a land-use plan is to determine which areas should be: 1) open to leasing subject to the terms and conditions of the standard lease form stipulations, 2) areas open to leasing subject to moderate constraints such as timing limitations (TL) or controlled surface use (CSU) restrictions, 3) areas open to leasing subject to major constraints such as no surface occupancy (NSO) stipulations, or 4) areas unavailable to leasing. All of these proposed decisions must be consistent with the goals and objectives of other resources and uses for each alternative. Summary Table C depicts how oil and gas leasing would be managed under each alterative.

**Summary Table C. Oil and Gas Leasing Stipulations (acres), by Alternative**

| Stipulation | Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Standard | 1,038,344 | 264,344 | 427,273 | 797,031 |
| TL/CSU | 389,605 | 543,751 | 806,994 | 590,442 |
| NSO | 38,912 | 342,931 | 217,480 | 84,772 |
| Closed | 353,293 | 671,444 | 370,250 | 350,219 |

BLM_0010917

In addition, this planning revision has applied the same oil and gas stipulations to all other surface-disturbing activities where they are not contrary to laws, regulations, or policy under all of the action alternatives. For example, if an area has a timing stipulation on it for oil and gas development, it would also apply that same timing stipulation on a right-of-way (ROW) construction proposal or an organized recreational event.

### 2.1.1.4 SPECIAL DESIGNATIONS

#### 2.1.1.4.1 POTENTIAL AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACEC)

The *Federal Register* Notice of Intent (June 2003) for this plan revision requested ACEC nominations from the public for consideration in the planning effort. In order to be considered and carried forward into the range of alternatives for planning, an ACEC must meet the relevance and importance criteria in 43 CFR 1610.7-2(a), and must require special management. The MFO received and evaluated a total of 35 ACEC nominations of which 14 were determined to meet the relevance and importance criteria. The relevance and importance criteria encompass scenery, sensitive plant species, rare plants, cultural and historic resources, wildlife, fish, natural systems, and natural hazards. Summary Table D shows that all of the 14 potential ACECs were brought forward into Alternative B for designation consideration, and 5 potential ACECs were brought forward into the Proposed Plan for designation consideration. There are no existing designated ACECs in the Moab Planning Area (MPA); thus, there are none in the No Action Alternative (Alternative A). There were no ACECs brought forward for consideration in Alternative D. Where ACECs are designated, special management attention would be directed at the relevant and important values, resources, natural systems and/or natural hazards.

**Summary Table D. Potential ACECs (quantity and acres) Meeting the Relevance and Importance Criteria, by Alternative**

| Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| 0 | 14 (613,077 acres) | 5 (63,232 acres) | 0 |

#### 2.1.1.4.2 WILD AND SCENIC RIVERS (WSRS)

During planning, the BLM must assess all eligible river segments and determine which are suitable or non-suitable per Section 5(d)(1) of the Wild and Scenic Rivers Act of 1958, as amended. The MFO reviewed all river segments for wild and scenic river eligibility and suitability as part of the RMP process. Twenty-eight river segments were found to meet the eligibility criteria. BLM Manual 8351 directs BLM to provide tentative classifications of Wild, Scenic, or Recreational to the eligible river segments. Because the No Action Alternative (Alternative A) currently has no suitable river segments designated, the 29 river segments identified for eligibility would remain in eligibility status by BLM policy. Alternative B would propose all the segments, except Salt Wash, as suitable for Congressional designation into the Wild and Scenic River System, and the Proposed Plan would propose 10 river segments as suitable for Congressional designation into the system. This information is condensed in Summary Table E. Where rivers are determined to be suitable, protection of the outstandingly remarkable values, tentative classification, and free-flowing nature would be provided.

BLM_0010918

**Summary Table E. Eligible/Suitable WSR Segments (river miles) with Tentative Classifications, by Alternative**

| Alternative | # River Segments | River Miles | Suitable or Eligible? | Classifications |
|---|---|---|---|---|
| A | 29 | 287.5 | Eligible | 12 Wild, 9 Scenic, 8 Recreational |
| B | 28 | 287.2 | Suitable | 11 Wild, 9 Scenic, 8 Recreational |
| PROPOSED PLAN | 10 | 127.3 | Suitable | 1 Wild, 4 Scenic, 4 Recreational, 1 Scenic/Recreational |
| D | 0 | NA | NA | NA |

## 2.1.1.5 SPECIAL STATUS SPECIES

Land-use plan decisions must be consistent with BLM's mandate to recover listed species and must be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species. The MFO has three listed bird species (and one candidate species), one listed mammal species, and one listed plant species. Species conservation measures (Appendix K) have been developed in coordination with the U.S. Fish and Wildlife Service. They will be implemented under all alternatives.

In addition, there are 43 sensitive species, including the Greater and Gunnison Sage-grouse, White-tailed and Gunnison prairie dog, where there is some discretion in management.

Timing Limitations and Controlled Surface Use stipulations are applied to the habitat for these four species and are spread by alternative.

## 2.1.1.6 WILDLIFE

In planning, BLM should identify actions and area wide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships. The range of alternatives for wildlife actions and habitats includes:

- **Pronghorn antelope** – A Timing Limitation stipulation for surface-disturbing activities, including oil and gas development, of 45 days would be applied to pronghorn habitat. The size of habitat varies by alternative.
- **Desert bighorn sheep** – Alternatives B and the Proposed Plan: A no surface occupancy stipulation would be applied to lambing/rutting grounds and migration corridors. Alternative D: a Timing Limitation stipulation would be applied to lambing habitat.
- **Deer and elk** – A Timing Limitation stipulation for surface-disturbing activities, including oil and gas development. Timing limitation and acreage vary by alternative.
- **Rocky mountain bighorn sheep** – The objective is to manage and improve habitat. Habitat size varies by alternative.

## 2.1.1.7 NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

During planning, the MFO identified decisions to protect, preserve and maintain non-WSA lands with wilderness characteristics (naturalness, outstanding opportunities for solitude, and

BLM_0010919

outstanding opportunities for primitive and unconfined recreation). In Alternative B and the Proposed Plan, there are goals and objectives to protect the resource and there are management actions presented that are necessary to achieve those goals and objections. As portrayed in Summary Table F, there are 33 areas, totaling 266,485 acres that were found to have wilderness characteristics outside of existing WSAs; all of them would be protected, preserved and maintained to preserve their wilderness characteristics values in Alternatives B. In the Proposed Plan, three of the areas totaling 47,761 acres would have decisions carried forward to protect, preserve and maintain the wilderness characteristics values. In Alternatives A and D, management of other resources values and uses would take precedent over the protection of wilderness characteristics.

**Summary Table F. Non-WSA Lands Managed to Protect Wilderness Characteristics (quantity and total acres), by Alternative**

| Alternative A No Action | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| 0 areas | 33 areas 266,485 acres | 3 areas 47,761 acres | 0 areas |

Table 2.1 provides a comprehensive description of the alternatives carried forward for detailed environmental analysis.

BLM_0010920

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| AIR QUALITY |
|---|

**Goals and Objectives:**

Maintain existing air quality and air quality related values (e.g., visibility) by ensuring that all authorized uses on public lands comply with and support Federal, State, and local laws and regulations for protecting air quality.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- As appropriate, quantitative analysis of potential AQ impacts would be conducted for project-specific developments.
- Prescribed burns would be consistent with the State of Utah Division of Environmental Quality (UDEQ) permitting process and timed so as to minimize smoke impacts.
- Comply with Utah Air Conservation (UAC) Regulation R446-1. The best air quality control technology, as per guidance from the Utah Division of Air Quality (UDAQ), would be applied to actions on public lands as needed to meet air quality standards.
- Comply with UAC Regulation R446-1-4.5.3, which prohibits the use, maintenance, or construction of roadways without taking appropriate dust abatement measures. Compliance would be obtained through special stipulations as a requirement on new projects and through the use of dust abatement control techniques in problem areas.
- Manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks).
- Comply with the current Smoke Management Memorandum of Agreement (MOU) between BLM, USFS, and UDAQ. The MOU, in accordance with UAC regulation R446-1-2.4.4, requires reporting size, date of burn, fuel type, and estimated air emissions from each prescribed burn.
- BLM will continue to work cooperatively with state, federal, and tribal entities in developing air quality assessment protocols to address cumulative impacts and regional air quality issues.
- BLM will continue to work cooperatively with the Utah Airshed Group to manage emissions from wildland and prescribed fire activities.
- National Ambient Air Quality Standards are enforced by the Utah Department of Environmental Quality, Division of Air Quality (UDEQ-DAQ), with EPA oversight. Special requirements to reduce potential air quality impacts will be considered on a case-by-case basis in processing land-use authorizations.
- BLM will utilize BMPs and site-specific mitigation measures, when appropriate, based on-site specific conditions, to reduce emissions and enhance air quality. Examples of these types of measures can be found in the Four Corners Air Quality Task Force Report of Mitigation Options, November 1, 2007.
- Project-specific analyses will consider use of quantitative air quality analysis methods (i.e. modeling), when appropriate as determined by BLM, in consultation with state, federal, and tribal entities.

| CULTURAL RESOURCES |
|---|

**Goals and Objectives:**

- Identify, preserve and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103(c), 201(a) and (c); National Historic Preservation Act, Section 110(a); Archaeological Resources Protection Act, Section 14(a)).
- Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA, Section 103(c), National Historic Preservation Act, Sections 106, 110(a)(2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- The BLM would comply with all pertinent statutes, regulations, formal agreements, Executive Orders, and policy as it applies to cultural resource management for all actions resulting from decisions in this land-use plan.
- Protect burial sites, associated burial goods, and sacred items in accordance with the Native American Graves Protection and Repatriation Act and the Archaeological Resources Protection Act.
- Native American requests to practice traditional activities on public lands would be considered on a case-by-case basis and would be allowed where practical and appropriate. Reasonable access to specific sacred sites would be allowed under the American Indian Religious Freedom Act.
- All treaty and trust responsibilities as they apply to public lands within the resource area would be honored.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- All land-disturbing activities within Traditional Cultural Properties would be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the area or site, avoid time of use by Native American groups, or would be eliminated altogether. Cultural sites may be closed to visitation when it is determined that this visitation is endangering site integrity.
- Camping would be prohibited and posted within or on archaeological and historic sites eligible for listing on the National Register of Historic Places.
- Class III inventory is not required prior to designations that allow continued use of an existing route, impose new limitations on an existing route, close an open area or travel route, keep a closed area closed, or keep an open area open.
- Class III cultural resources inventory would be conducted on newly designated ATV, motorcycle and mountain bike routes (48" wide or less) based on potential resource conflicts. Routes identified for survey would be prioritized based on landscape level overviews, cultural resource predictive models, and available site location, environmental, and contextual information. If eligible archaeological sites along these routes are being adversely impacted by continued route use, impacts would be mitigated. "New routes" are defined as those designated in the Travel Plan accompanying this RMP.
- Where there is a reasonable expectation that a proposed route designation would shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with Section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.
- Proposed designations of new routes would require Class III inventory of the Area of Potential Effect (APE) and compliance with Section 106 prior to designation. Class III inventory of the APE and compliance with Section 106 would also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.
- Eligible cultural sites would *be* protected and impacts mitigated when it is determined that they are being impacted from grazing activities.
- New field inventories would be prioritized in areas of special cultural designation (e.g., ACECs, National Historic Trails, National Historic Landmarks) that have not been fully inventoried.
- Sego Rock Art Site and Wall Street/Colorado River Rock Art District, which have educational and recreational values, would be developed for public visitation and interpretation as long as such does not contribute to the deterioration or destruction of the resources being interpreted. Work would be conducted in partnership with universities, museums, Tribes, and interested site stewards for the creation of interpretive materials on the archaeology of the Moab Planning Area (MPA.)
- Specific management plans would be developed for up to seven culturally sensitive areas unless integrated into other activity plans. These plans would also include, but would not be limited to, developing a site monitoring system; identifying sites in need of stabilization, restoration, and protective measures (e.g., fences, surveillance equipment); developing research designs for selected sites/areas; and developing specific mitigation measures.
- Cooperate with counties to ensure county road and trail construction and maintenance activities avoid or minimize impacts to cultural resources.
- Cultural plants, once identified by interested tribes, would be managed to ensure that ground-disturbing activities on the land do not contribute to the decline of cultural sensitive plant communities. Collection of plant resources would be considered on a case-by-case basis and would be allowed where practical and

BLM_0010921

**Table 2.1.** MOAB PROPOSED PLAN and Draft RMP Alternatives

| appropriate. |
|---|
| • Cultural resource management priority for the Ten Mile Wash and Mill Creek Canyon would be scientific research of prehistoric sites and cultural landscapes. Manage the Mill Creek planning area in accordance with the Mill Creek Management Plan (2001b). |
| • Continue to allocate cultural sites, including ethnographic properties, to one of six management categories: a) scientific use; b) conservation for future use; c) traditional use; d) public use; e) experimental use; and f) discharged from management. |
| • Alternative management strategies for cultural resources are disclosed in the Special Designations sections. This section identifies areas with substantial cultural resources and alternative management prescriptions to protect these resources. These areas include the Behind the Rocks, Ten Mile Wash, and Mill Creek Canyon ACFCs, and the Wall Street portion of Highway 279/Shafer Basin/Long Canyon proposed ACFC. |
| • Cultural use allocations would be made at the time of site documentation; allocations can be changed as new information or management direction becomes available, subject to consistency with the approved plan. |
| • Cultural management plans will be a component of the implementation plans for the Labyrinth Canyons, Colorado Riverway, and South Moab SRMAs. Heritage tourism may be considered in cultural management plans. |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| No priority for field inventory. | Priority for new field inventory would be a 1.00-mile vulnerability zone surrounding cities and towns.<br><br>Prioritize for Class II and Class III surveys: a total of 50,000 acres within the following areas: Bookcliffs, Dolores Triangle, Hidden Canyon/Bartlett Lisbon Valley, North Fork of Mill Creek , South Fork of Mill Creek, Seven Mile Canyon with adjacent uplands, and Ten Mile Wash and its tributaries. | Priority for new field inventory would be a 0.50-mile vulnerability zone surrounding cities and towns.<br><br>Prioritize for Class II and Class III surveys: a total of 30,000 acres within the following areas: Bookcliffs, Dolores Triangle, North Fork of Mill Creek, South Fork of Mill Creek, Seven Mile, and Ten Mile Wash and its tributaries. | Priority for new field inventory would be a 0.25-mile vulnerability zone surrounding cities and towns.<br><br>Prioritize for Class II and Class III surveys: a total of 20,000 acres within the following areas: North Fork of Mill Creek, South Fork of Mill Creek, and Ten Mile Wash and its tributaries. |
| No priority for restoration of damaged cultural resources. | To prevent further degradation from occurring, target the following areas for restoration of damaged cultural resources: Kane Springs Canyon from Highway 191 downstream to the Colorado River, Seven Mile Canyon, South and North Forks of Mill Creek, Bartlett/Hidden Canyon and Hell Roaring uplands, Ten Mile Wash and Wall Street Rock Art District. | To prevent further degradation from occurring, target the following areas for restoration of damaged cultural resources: South and North Forks of Mill Creek, Bartlett/Hidden Canyon, Hell Roaring uplands, Ten Mile Wash and Wall Street Rock Art District. | To prevent further degradation from occurring, target the following areas for restoration of damaged cultural resources: South and North Forks of Mill Creek, Ten Mile Wash and Wall Street Rock Art District. |
| No priority for public interpretation sites. | The following sites would be hardened and interpreted for public use: 3 sites in the Wall Street Rock Art District. | The following sites would be hardened and interpreted for public use: one site in Lower Kane Springs Canyon, and 3 sites in the Wall Street Rock Art District. | The following sites would be hardened and interpreted for public use: 3 sites in Lower Kane Springs Canyon, and 4 sites in the Wall Street Rock Art District. |

## FIRE MANAGEMENT

**Goals and Objectives:**

Fire management would adopt the comprehensive Utah Land-use Plan Amendment for Fire and Fuels Management, September 2005 (LUP Amendment; BLM 2005c). This document maybe found at www.ut.blm.gov/fireplanning/index/htm. Direction and guidance approved by the LUP Amendment is carried forward under all alternatives and incorporated by reference into this PRMP/FEIS. The content and purpose of the LUP Amendment is summarized as follows:

- Establishes landscape-level, fire management goals and objectives.
- Describes Desired Wildland Fire Conditions (DWFC) and the management strategies and actions to meet DWFC goals.
- Describes areas where fire may be restored to the ecosystem through wildland fire use for resource benefit and areas where wildland fire use is not appropriate.
- Identifies Resource Protection Measures (RPMs) for fire management practices to protect natural and cultural resource values.
- Identifies criteria used to establish fire management priorities.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- The Moab Fire District Fire Management Plan (FMP) would be updated and amended to meet the direction and objectives of the RMP.
- Firefighter and public safety are the primary goals in all fire management decisions and actions.
- Wildland fire would be utilized to protect, maintain and enhance resources and, when possible, will be allowed to function in its natural ecological role.
- Hazardous fuels reduction treatments would be used to restore ecosystems; protect human, natural and cultural resources; and reduce the threat of wildfire to communities.
- Fires would be suppressed at minimum cost, taking into account firefighter and public safety as well as benefits and values to be protected that are consistent with resource objectives.
- The BLM would implement a consistent, safe and cost-effective fire management program through appropriate planning, staffing, training, and equipment.
- Fire management objectives would be established for every area with burnable vegetation, based on sound science and consideration of other resource objectives.
- Emergency stabilization, rehabilitation, and restoration efforts would be implemented to protect and sustain resources, public health and safety, and community infrastructure.
- The BLM would work together with partners and other affected groups and individuals to reduce risks to communities and to restore ecosystems.
- The Reasonable and Prudent Measures and Terms and Conditions identified in consultation with the USFWS for the LUP Amendment would be implemented in fire-related actions.

BLM_0010922

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

**Criteria for Establishing Fire Management Priorities:**

Protection of human life is the primary fire management priority. Establishing a priority among protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources is based on human health and safety, the values to be protected, and the costs of protection. When firefighters and other personnel have been committed to an incident, these human resources become the highest values to be protected. Priorities for all aspects of fire management decisions and actions are based on the following:

- Protecting the Wildland-Urban Interface (WUI; including At-risk Communities and At-risk Watersheds).
- Maintaining existing healthy ecosystems.
- High priority sub-basins (HUC-4) or watersheds (HUC-5).
- Threatened, endangered, or special species.
- Cultural resources and/or cultural landscapes.

**Suppression:**

An "Appropriate Management Response" (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use). Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives. The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the MPA. While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential, threats to life and property, potential to impact high-value resources such as critical habitat for threatened, endangered and sensitive species, crucial wildlife habitat, cultural resources and/or riparian areas, historic fire regimes, and other special considerations such as wilderness and/or adjacent agency lands.

**Wildland Fire Use for Resource Benefit:**

Wildland fire is authorized as a tool, when appropriate, to allow naturally ignited wildland fire to accomplish specific resource management objectives. Due to existing resource conditions and proximity to values at risk, fire cannot be allowed to resume its natural role on all BLM lands in the MPA. Consideration of ongoing management actions and other natural changes would direct periodical reassessment of DWFC and determination of potential areas for wildland fire use. Operational management of wildland fire use is described in the Wildland Fire Implementation Plan (WFIP).

The FMP identifies areas (FMUs) that may have the potential for wildland fire use. Wildland fire use may be authorized for all areas, except when the following resources and values may be negatively impacted and there are no reasonable Resource Protection Measures to protect such resources and values:

- WUI areas.
- Areas that are known to be highly susceptible to post-fire cheatgrass or invasive weed invasion.
- Important terrestrial and aquatic habitats.
- Non-fire-adapted vegetation communities.
- Sensitive cultural resources.
- Areas of soil with high or very high erosion hazard.
- Class I air attainment areas and PM-10 non-attainment areas.
- Administrative sites.
- Developed recreation sites.
- Communication sites.
- Oil, gas and mining facilities.
- Above-ground utility corridors.
- High-use travel corridors, such as interstates, railroads, and/or highways.

**Fuels Treatment:**

Fuels management activities outlined in the FMP would be consistent with the resource goals and objectives contained in the RMP. To reduce hazards and to restore ecosystems, authorized fuels management actions include wildland fire use, prescribed fire, and mechanical, manual, chemical, biological, and seeding treatments. The FMP describes fuels management goals and objectives and the full range of fuels management strategies and actions authorized for fuels reduction. Fuels treatments are focused on the DWFC of restoring historic fire regimes to ecosystems when feasible, so that future wildland fire use actions can be more easily implemented.

- Fuels management actions may include but are not limited to the following activities:
  - Mechanical treatments such as mowing, chopping, or chipping/grinding (brush cutter), chaining, tilling, or cutting.
  - Manual treatments such as hand-cutting (chainsaw or handsaw) and hand-piling.
  - Prescribed fire including broadcast, underburn, and hand-pile burning.
  - Chemical spraying or biological treatments such as insects or goats/sheep.
  - Seeding including aerial or ground application (manual or mechanical).
- Targeted areas may be treated in phases over a period of several years and may involve multiple and varied treatments.
- Estimated fuels reduction treatments of 5,000 to 10,000 acres/year are targeted dependent on budgetary and time constraints. These treatments are in addition to those to be accomplished under the Utah Watershed Restoration Initiative and the National Healthy Lands Initiative.
- Implementation of fuels management actions would be prioritized using the following criteria:
  - WUI areas.
  - Areas with fuel loading that could potentially result in the loss of ecosystem components following wildland fire.
  - Resource management goals and objectives.

BLM_0010923

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

**Prevention and Mitigation:**

- Prevention and mitigation goals target a reduction in unauthorized wildland fire ignitions. Goals include coordination with partners and affected groups and individuals, and a wide range of prevention and mitigation activities such as personal contacts, mass media, signing, and defensible space education.
- Implementation of fire prevention activities would be prioritized using the following criteria:
  - WUI areas.
  - Major travel corridors.
  - Recreation sites.
  - Public lands as a whole.

**Emergency Stabilization and Rehabilitation (ESR):**

A Normal Year Fire Stabilization and Rehabilitation Plan (NFRP) is in place to meet emergency stabilization and rehabilitation (ESR) needs and to comply with up-to-date ESR policy and guidance. The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations. Treatment actions are designed according to the type and severity of wildfire impacts and priorities include, but are not limited to, areas where the following criteria apply:

- It is necessary to protect human life and safety as well as property.
- Unique or critical cultural and/or historical resources are at risk.
- It is determined soils are highly susceptible to accelerated erosion.
- Perennial grasses and forbs (fire-tolerant plants) are not expected to provide soil and watershed protection within two years.
- There is a need to establish a vegetative fuel break of less flammable species (greenstrips).
- Unacceptable vegetation, such as noxious weeds, may readily invade and become established.
- Shrubs and forbs are a crucial habitat component for wintering mule deer, pronghorn, sage-grouse, or other special status species.
- Stabilization and rehabilitation are necessary to meet RMP resource objectives, including rangeland seedings.
- It is necessary to protect water quality.
- It is necessary to quickly restore threatened, endangered, or special species habitat populations to prevent adverse impacts.

## HEALTH AND SAFETY

**Goals and Objectives:**

BLM would strive to ensure that human health and safety concerns on public lands remain a major priority.

**Management Common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

Comply with all applicable Abandoned Mine Lands (AML) policies.

In conformance with BLM's long-term strategies and national policies regarding Abandoned Mine Lands (AML), this RMP recognizes the need to work with our partners toward identifying and addressing physical safety and environmental hazards at all AML sites on public lands. In order to achieve this goal, a State strategy has been written. National program criteria for determining site priorities were used to develop the work plan. This State strategy is entitled "Utah's Abandoned Mine Land Multi Year Work Plan."

The criteria that would be used to establish physical safety hazard program priorities are:

- The AML physical safety program's highest priority would be the cleaning up of those AML sites where (a) a death or injury has occurred, (b) the site is situated on or in immediate proximity to developed recreation sites and areas with high visitor use, and (c) upon formal risk assessment, a high or extremely high risk level is indicated.
- AML would be factored into future recreation management area designations, land-use planning assessments, and all applicable use authorizations.
- The site is presently listed or is eligible for listing in the Abandoned Mines Module of Protection and Response Information System.
- AML hazards should be, to the extent practicable, mitigated or remediated on the ground during site development.

The criteria used to establish water quality-based AML program priorities are:

- The State has identified the watershed as a priority based on (a) one or more water laws or regulations; (b) threat to public health or safety; and (c) threat to the environment.
- The project reflects a collaborative effort with other land managing agencies.
- The site is presently listed or is eligible for listing in the Abandoned Mines Site Cleanup Module of Protection and Response Information System.
- The project would be funded by contributions from collaborating agencies.

Identify and clean up unauthorized dumping sites and hazardous materials spills in the MPA as required to comply with applicable State, local, and Federal regulations.

The State Multi Year Work Plan will be maintained and updated as needed to reflect current policy for identifying program physical safety and water quality AML sites priorities for reclamation and remediation.

BLM_0010924

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

**LANDS AND REALTY**

**Goals and Objectives:**
- Retain lands within its administration except where necessary to accomplish resource goals and objectives outlined in the Plan. BLM would transfer lands out of Federal ownership or acquire non-Federal lands where needed to accomplish resource goals, improve administration of public lands, or meet essential community needs.
- Meet public needs for use authorizations such as rights-of-way (ROWs), alternative energy sources, and permits while minimizing adverse impacts to resource values.
- Using the Visual Resource Management (VRM) system, maintain generally undeveloped landscapes in the backgrounds of popular filming locations.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**
- Under IMP and Congressional action, Wilderness Study Areas and Wilderness Areas would be exclusion areas for any ROWs (Section 501(a) FLPMA).
- Continue the withdrawal of lands along the Colorado, Dolores and Green Rivers (totaling 65,037 acres within the MPA) from mineral entry (Three Rivers Withdrawal, October 6, 2004). In addition, continue the Westwater (8,096 acres) and Black Ridge Wilderness (5,200 acres) withdrawals (see Map 2-1).
- Give land exchanges with the State of Utah priority consideration to resolve inholding issues.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**
- Areas of Critical Environmental Concern (ACECs) would be avoidance areas for any new ROWs (including communication sites and wind and solar sites).
- Decisions on LTAs and withdrawals would be made in accordance with the criteria contained in Appendix A.
- Determinations on authorizing commercial filming in the MPA would be made in accordance with the criteria outlined in Appendix B.
- Right-of-way (ROW) avoidance and exclusion areas would be consistent with the stipulations identified in Appendix C for oil and gas leasing and other surface-disturbing activities. These stipulations have been developed to protect important resource values.
- As per the State of Utah v. Andrus, Oct. 1, 1979 (Cotter Decision), BLM would grant the State of Utah reasonable access to State lands for economic purposes, on a case-by-case basis.
- To reduce surface use conflicts along the U.S. Highway 191 utility corridor within Moab Canyon, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C), except those associated with utility ROWs.
- Authorization of any ROW for wind or solar energy development would incorporate best management practices including the USFWS's "Guidelines for Wind Power" and provisions contained in the Final Wind Energy Programmatic EIS (June 24, 2005, BLM 2005d).
- Both wind and solar energy development (renewable energy) can be considered wherever ROWs could be authorized.
- To be consistent with the existing withdrawals from mineral entry, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities within the area of the Three Rivers and Westwater Mineral Withdrawals. This action would further protect the riparian, wildlife, scenic, and recreation values addressed in these withdrawals. Applying a no surface occupancy stipulation for oil and gas leasing to lands within the Three Rivers Withdrawal, in combination with other areas where a no surface occupancy stipulation is applied, results in tracts of land that are physically inaccessible to oil and gas operations. For this reason, portions of the lands within the Three Rivers Withdrawal (e.g., along the Colorado River near the Richardson Amphitheater and along the Dolores River near Beaver Creek) would be closed to oil and gas leasing. These areas would be managed as no surface occupancy for other surface-disturbing activities (see Appendix C).
- Lands and/or interest in lands (such as minerals and conservation easements) acquired through future LTA would take on the management of the surrounding area. Land acquisitions would be pursued if they meet the criteria in Appendix A.

**Utility Corridors**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| All utility corridors would be 1 mile wide, except the existing Moab Canyon utility corridor, which is constrained by the topography of Moab Canyon. This physical corridor is only 1/4 mile wide at its narrowest point. | Designate an I-70 utility corridor that includes all major existing ROWs as identified in the RMP with a 100-foot width on each side of the widest ROW corridor (Map 2-2-B). Designate the existing Moab Canyon utility corridor (Map 2-2-B). | Designate an I-70 utility corridor that includes all major existing ROWs as identified in the RMP with a 1/2-mile width on each side of the widest ROW corridor ( 2-2-C). Designate the existing Moab Canyon utility corridor (Map 2-2-C). | Designate an I-70 utility corridor that includes all major existing ROWs as identified in the RMP with a 1-mile width on each side of the widest ROW corridor (Map 2-2-D). Designate the existing Moab Canyon utility corridor (Map 2-2-D). |
| | Split the utility corridor south of Spanish Valley into two corridors, identical to existing corridors (Map 2-2-B). | Combine the two corridors south of Spanish Valley into a single corridor (Map 2-2-C). The corridor would include the approximately 2 to 3 miles separating the two segments. | Combine the corridors south of Spanish Valley into a single corridor (Map 2-2-D). This corridor would include the approximately 2 to 3 miles separating the two segments. |

**Avoidance/Exclusion Areas for Rights-of-way (ROWs)**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| About 354,015 acres would be exclusion areas for ROWs. | About 672,724 acres would be exclusion areas for ROWs. | About 370,250 acres would be exclusion areas for ROWs. | About 355,146 acres would be exclusion areas for ROWs. |
| About 48,245 acres would be avoidance areas for ROWs. | About 341,919 acres would be avoidance areas for ROWs. | About 217,480 acres would be avoidance areas for ROWs. | About 84,772 acres would be avoidance areas for ROWs. |

**Disposal Land List**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| The list of parcels identified for disposal totals 12,415 acres. | Parcels identified for disposal total 14,961 acres and are shown on Map 2-3 and in Appendix D. | Parcels identified for disposal total 14,961 acres and are shown on Map 2-3 and in Appendix D. | Parcels identified for disposal total 14,961 acres and are shown on Map 2-3 and in Appendix D. |

BLM_0010925

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| LIVESTOCK GRAZING |
|---|

**Goals and Objectives:**

- Achieve the attainment of Standards for Rangeland Health and other desired resource conditions by maintaining appropriate utilization levels of the range through management prescriptions and administrative adjustments of grazing permits.
- Achieve healthy, sustainable rangeland ecosystems that support the livestock industry while providing for other resource values such as wildlife habitat, recreation opportunities, clean water, and functional watersheds.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- Grazing would be managed according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health, including adjustment in seasons of use.
- On all allotments, allow allotment boundaries adjustments, joining and splitting, and modification of grazing season subject to appropriate NEPA review and analysis (see Map 2-4 for a map of grazing allotments).
- Continue to authorize grazing at the current preference levels (as per ten-year grazing permits) and adjust, if necessary to meet Standards for Rangeland Health.
- As amended in previous planning documents (the 1985 Grand RMP and a Plan Amendment analyzed in EA#068-94-047), grazing use would continue to not be authorized on the following allotments/areas (or portions of allotments/areas):
  · Between The Creeks with 3,960 acres and 221 AUMs, to protect municipal watersheds, improve mule deer winter range, improve riparian habitat, and reduce recreation conflict.
  · North Sand Flats with 18,246 acres and 798 AUMs, to reduce recreation conflict, improve mule deer winter range, and improve riparian habitat.
  · South Sand Flats with 10,209 acres and 592 AUMs, to reduce recreation conflict, improve mule deer winter range, and improve riparian habitat.
  · A portion of Arth's Pasture Allotment (Poison Spider area) with approximately 7,634 acres and 425 AUMs, to improve desert bighorn sheep habitat and reduce recreation conflict.
  · Castle Valley with 6,074 acres and 190 AUMs, to protect the Castle Valley sole source aquifer, to improve mule deer winter range, and to reduce recreation conflict.
  · Along Highway 128 from U.S. 191 to the Castle Valley Road, along U.S. 191 from Highway 313 to Moab, and along Highway 279 with 1,139 acres, to reduce recreation traffic conflict (no reduction in AUMs).
  · A portion of the Kane Spring Allotment (that portion in Kane Spring Canyon between the open valley and the river; 558 acres and no reduction in AUMs), to reduce recreation traffic conflict and to enhance riparian species' habitat.
  · An area along the Colorado River between Hittle and north of Dewey Bridge (400 acres and no reduction in AUMs), to reduce recreation traffic conflict and to enhance riparian species' habitat.
- Develop AMPs on seven allotments (Agate, Cisco, Cisco Mesa, Harley Dome, Highlands, Monument Wash, and San Arroyo) and on any additional allotments if resource issues are identified to benefit vegetation, wildlife, livestock grazing and soils.
- Identify appropriate utilization levels based on allotment or site-specific management practices, such as season-of-use, grazing intensity and duration, and utilization patterns, as well as vegetative conditions, the presence or absence of range improvements, and resource issues or concerns. Use utilization levels as an indicator to evaluate if current grazing use is appropriate to meet resource objectives for the area. Generally moderate utilization levels (40–60%) would be used to indicate if general management objectives can be met. Utilization levels above those identified as appropriate would be used to adjust livestock use on a yearly basis through pasture and possible early removal from allotments as needed. Utilization levels may be especially important during periods of drought. Long-term adjustments to livestock use (term permits adjustments) require the evaluation of monitoring data including climate, actual grazing use, current or historic impacts, utilization mapping, and long-term trend data, as well as utilization levels.
- Follow the recommendations of the National Sage-grouse Habitat Conservation Strategy (BLM 2004c) and the Strategic Management Plan for Sage-grouse (UDWR 2002) where applicable.
- Conversion of allotments from cattle to domestic sheep would not be considered in recognized bighorn sheep habitat (see Maps 2-25 and 2-28).
- Collect monitoring data, including trend, utilization, actual use, and climate data to determine if existing livestock management practices are meeting land-use planning and resource objectives.
- Change class of livestock from sheep to cattle on the Hatch Point Allotment (96,951 acres) to benefit wildlife.
- Rangelands that have been burned, reseeded, or otherwise treated to alter vegetative composition would have livestock grazing use temporarily suspended as follows: (1) burned rangelands, whether by wildfire or prescribed burning, would be ungrazed for a minimum of one complete growing season following the burn; (2) rangelands that have been reseeded, or otherwise mechanically treated would be ungrazed for a minimum of two complete growing seasons following treatment.

**Relinquishment of Preference:**

- Voluntary relinquishments of grazing permits and preference, in whole or in part, submitted by a permittee in writing to the BLM, would be handled on a case-by-case basis. BLM would not recognize as valid, relinquishments which are conditional on specific BLM actions and BLM would not be bound by them. Relinquished permits and the associated preference would remain available for application by qualified applicants after BLM considers if such action would meet rangeland health standards and is compatible with achieving land-use goals and objectives. Prior to re-issuance of the relinquished permit, the terms and conditions may be modified to meet RMP goals and objectives and/or site-specific resource objectives. However, upon relinquishment, BLM may determine through a site-specific evaluation and associated NEPA analysis that the public lands involved are better used for other purposes. Grazing may then be discontinued on the allotment through an amendment to the existing RMP or a new RMP effort. Any decision issued concerning discontinuance of livestock grazing is not permanent and may be reconsidered and changed through future LUP Amendments and updates.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| AUMs allotted to livestock: 107,071 | AUMs allotted to livestock: 106,574 | AUMs allotted to livestock: 106,479 | AUMs allotted to livestock: 108,876 |
| Acres available for grazing: 1,695,621 | Acres available for grazing: 1,668,732 | Acres available for grazing: 1,690,481 | Acres available for grazing: 1,770,314 acres |
| Acres not available for grazing: 126,907 | Acres not available for grazing: 153,797 | Acres not available for grazing: 132,047 | Acres not available for grazing: 52,214 |
| Note: Please see Map 2-4-A for areas not available for livestock grazing under this alternative. | Note: Please see Map 2-4-B for areas not available for livestock grazing under this alternative. | Note: Please see Map 2-4-C for areas not available for livestock grazing under this alternative. | Note: Please see Map 2-4-D for areas not available for livestock grazing under this alternative. |
| **Allotments Not Available for Grazing:** | **Allotments Not Available for Grazing:** | **Allotments Not Available for Grazing:** | **Allotments Not Available for Grazing:** |
| • Bogart with 14,744 acres and 209 AUMs (to benefit wildlife, especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Bogart with 14,744 acres and 209 AUMs (to benefit wildlife mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Bogart with 14,744 acres and 209 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Mill Creek with 3,921 acres and 137 AUMs (to reduce recreation and cultural conflict and to protect municipal watershed). |
| • Cottonwood with 27,193 acres and 900 AUMs (to benefit wildlife, especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Cottonwood with 27,193 acres and 900 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Cottonwood with 27,193 acres and 900 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | |
| • Diamond with 18,620 acres and 588 AUMs (to benefit wildlife, especially mule deer and/or elk habitat, riparian habitat, watershed health | • Diamond with 18,620 acres and 588 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and | • Diamond with 18,620 acres and 588 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, | |

BLM_0010926

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| and erosive soils). | erosive soils). | watershed health and erosive soils). | |
| | | • Pear Park, with 14,201 acres and 200 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | |
| | | • Ida Gulch, with 3,612 acres and 112 AUMs (to reduce recreation conflict and enhance riparian habitat). | |
| • Pear Park, with 14,201 acres and 200 AUMs (to benefit wildlife, especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Pear Park, with 14,201 acres and 200 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils). | • Portions of Professor Valley, Ida Gulch, and the River along Highway 128**, with 1,467 acres and 0 AUMs (to reduce recreation conflict and enhance riparian habitat). | |
| • Spring Creek, with 1,550 acres and 45 AUMs (to benefit wildlife, especially mule deer and/or elk winter range). | • Spring Creek-Buckhorn, approx. 600 acres and 45 AUMs (to benefit wildlife especially mule deer and/or elk winter range). | • Mill Creek with 3,921 acres and 137 AUMs (to reduce recreation and cultural conflict and to protect municipal watershed). | |
| • Beaver Creek with 2,304 acres and 0 AUMs (to benefit wildlife, especially riparian species and Colorado cutthroat trout). | • Beaver Creek with 2,304 acres and 0 AUMs (to benefit wildlife especially riparian species and Colorado cutthroat trout). | | |
| | • Professor Valley, with 18,966 acres and 378 AUMs (to reduce recreation conflict and enhance riparian habitat). | **A fence would be constructed along the southeast side of Highway 128 (set back to protect the scenic resources of the National Scenic Highway). This would result in all BLM lands between the Colorado River and Highway 128 being unavailable for grazing. This would reduce acreage in the allotments, but it would not reduce the AUMs, because the quality of the forage is low due to heavy use by motorists and other recreationists. | |
| | • Ida Gulch, with 3,612 acres and 112 AUMs (to reduce recreation conflict and enhance riparian habitat). | | |
| | • River, with 386 acres and 7 AUMs (to reduce recreation conflict and enhance riparian habitat). | | |
| | • Mill Creek, with 3,921 acres and 137 AUMs (to reduce recreation and cultural conflict and to protect municipal watershed). | | |
| **Allotments Currently Not Available for Grazing that would be Available for Grazing:** | **Allotments Currently Not Available for Grazing that would be Available for Grazing:** | **Allotments Currently Not Available for Grazing that would be Available for Grazing:** | **Allotments Currently Not Available for Grazing that would be Available for Grazing:** |
| None | None | After allotment specific evaluation to assure resource objectives are met, the following areas would be available for livestock grazing: | After allotment specific evaluation to assure resource objectives are met, the following areas would be available for livestock grazing: |
| | | Spring Creek. | • Pear Park (no domestic sheep would be allowed). |
| | | | • Spring Creek. |
| | | | • Bogart (no domestic sheep would be allowed). |
| | | | • Cottonwood (no domestic sheep would be allowed). |
| | | | • Diamond Canyon (no domestic sheep would be allowed). |
| **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:** | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:** | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:** | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:** |
| None | None | Beaver Creek with 1,351 acres and 0 AUMs. | Beaver Creek with 1,351 acres and 0 AUMs. |
| **Grazing in Saline Soils:** | **Grazing in Saline Soils:** | **Grazing in Saline Soils:** | **Grazing in Saline Soils:** |
| Manage livestock grazing on portions of the following allotments to stabilize impacts on highly saline soils and reduce salinity in the Colorado River drainage. This includes the following allotments: Athena, Cisco, Cisco Mesa, Crescent Canyon, Highland, Monument Wash, and Thompson Canyon (1985 Grand RMP). | Use grazing systems and develop AMPs to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Agate, Big Flat-Ten Mile, Cisco Mesa, Crescent Canyon, Floy Creek, Harley Dome, Highlands, and San Arroyo.<br><br>If Rangeland Health Standards indicate that soil compaction is an issue on the following allotments, assess all available data and determine if a change in the livestock season of use would correct the problem: Athena, Cisco, Coal Canyon, Horse Canyon, Little Grand, Lone Cone, and Monument. | Use grazing systems and develop AMPs to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Agate, Athena, Big Flat-Ten Mile, Cisco, Cisco Mesa, Crescent Canyon, Floy Creek, Harley Dome, Highlands, Horse Canyon, Little Grand, Lone Cone, Monument, and San Arroyo. | Same as Alternative A. |
| **Grazing in Riparian Areas:** | **Grazing in Riparian Areas:** | **Grazing in Riparian Areas:** | **Grazing in Riparian Areas:** |
| Continue no grazing in South Sand Flats, North Sand Flats, Between the Creeks, Cottonwood, and Diamond, to benefit riparian areas. | Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if exclusion from grazing would improve riparian functioning condition.<br><br>The following riparian areas would be given priority for evaluation: Lower Gray Canyon of the Green River from Rattlesnake Canyon to Swasey's Beach, Ten Mile from Dripping Spring to the Green River, Day Canyon, Mill Creek, Seven Mile Canyon, East Coyote, Kane Springs, and Hatch Wash (totaling | Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing would improve riparian functioning condition.<br><br>The following riparian areas would be given priority for evaluation: Ten Mile from Dripping Spring to the Green River, Mill Creek, Day Canyon, Seven Mile Canyon, and East Coyote (totaling 1,169 acres). | Continue present grazing management. |

BLM_0010927

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | | |
|---|---|---|---|
| | 4,422 acres). | | |
| **Vegetation Treatments:** Areas treated prior to 1985 are considered existing treatments. Land treatments on 11 allotments would be implemented to increase available forage by 8,514 AUMs to allow for increased use by livestock and wildlife. The increase in AUMs would be split evenly between livestock and wildlife where both are present. Land treatments include plowing and seeding, chaining and seeding, drill seeding.<br><br>The following allotments are included in the land treatments: Bar X, Black Ridge, Buckhorn, Corral Wash, Hatch Point, Lisbon, Lower Lisbon, San Arroyo, Sand Flats, Taylor and Winter Camp.<br><br>Initiate prescribed fire and seeding on approximately 14,149 acres (in 10 allotments), as currently proposal in existing LUP Amendments, thereby increasing AUMs by approximately 1,700 for livestock and wildlife. The allotments include Showerbath Spring, Floy Canyon, Cottonwood, Diamond, Middle Canyon, Little Hole, Buckhorn, Adobe Mesa, Hatch Point, and Lisbon.<br><br>**Total Acres: 67,125.**<br><br>**Implement Range Projects to meet or exceed Rangeland Health Standards:**<br>Implement livestock manipulation techniques (fences and water development) to benefit wildlife and livestock. | **Vegetation Treatments:** Maintain the existing vegetation treatments (46,307 acres) to increase available forage within the following allotments. These areas have been treated over the past 50 years and consist primarily of pinyon-juniper woodlands. These areas would be treated by prescribed fire, chemical or mechanical or other means in accordance with BLM sagebrush conservation guidance and other applicable resource goals. The improved forage would benefit wildlife.<br><br>Allotments: Adobe Mesa, Big Triangle, Black Ridge, Buckhorn; Cisco;East Coyote, Fisher Valley, Granite Creek, Hatch Point, Lisbon, Lower Lisbon, Mountain Island, Rattlesnake South, Scharf Mesa, Spring Creek, Steamboat Mesa, Taylor, Windwhistle.<br><br>**Total Acres: 46,307.**<br>Conduct no new vegetation treatments except those beneficial to other resource values such as wildlife or watershed.<br><br>**Implement Range Projects to meet or exceed Rangeland Health Standards:**<br>Implement range projects that would benefit resource values such as habitat for wildlife, reducing soil compaction and erosion, and improving the health of riparian areas. | **Vegetation Treatments:** Maintain the existing vegetation treatments (46,307 acres) to increase available forage within the following allotments. These areas have been treated over the past 50 years and consist primarily of pinyon-juniper woodlands. These areas would be treated by prescribed fire, chemical or mechanical or other means in accordance with BLM sagebrush conservation guidance and other applicable resource goals. The improved forage would benefit multiple use objectives including livestock and wildlife use.<br><br>Allotments: Adobe Mesa, Big Triangle, Black Ridge, Buckhorn, Cisco, East Coyote, Fisher Valley, Granite Creek, Hatch Point, Lisbon, Lower Lisbon, Mountain Island, Rattlesnake South, Scharf Mesa, Spring Creek, Steamboat Mesa, Taylor, Windwhistle.<br><br>**Total Acres: 46,307.**<br>Conduct new vegetation treatments (6,900 acres) for increased forage in the following allotments with prescribed fire, chemical, mechanical or other means: Floy Canyon, Hatch Point, Lisbon, and Showerbath. Other vegetation treatments would be considered to benefit other resource values such as wildlife or watershed.<br><br>**Implement Range Projects to help maintain Rangeland Health Standards:**<br>Implement range projects that would equally benefit livestock grazing and other resource values. | **Vegetation Treatments:** Same as the Proposed Plan, but other vegetation treatments would be considered specifically to benefit livestock.<br><br><br><br><br>**Implement Range Projects to help maintain Rangeland Health Standards:**<br>Implement range projects that would emphasize livestock production. |

| MINERALS |
|---|

**Goals and Objectives:**

- Provide opportunities for environmentally responsible exploration and development of mineral and energy resources subject to appropriate BLM policies, laws and regulations.
- Establish conditions of use through land-use planning to protect other resource values.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- Continue the withdrawal of lands along the Colorado, Dolores, and Green Rivers, totaling 65,037 acres within the MPA, from mineral entry (Three Rivers Withdrawal, October 6, 2004). In addition, continue the Westwater (8,096 acres) withdrawal. Black Ridge Wilderness (5,200 acres) will remain closed, by law, to entry under the mining law.
- Wilderness Study Areas and designated Wilderness (358,806 acres) would remain closed, by law, to mineral leasing and development.
- Where public lands are sold or exchanged under 43 U.S.C. 682(B)(Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S. C. 1718 (Sales) or 43 U.S. C. 1716 (Exchanges), the minerals reserved to the United States would continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly recommends restoring the land to mineral entry.

**Leasable Minerals:**

Split-estate lands (private surface/Federal minerals) and lands administered by other Federal agencies are not managed by the BLM. The lands include about 29,678 acres of split-estate lands and the lands administered by the Manti-LaSal National Forest (141,241 acres). The surface owner or surface management agency (SMA) manages the surface. BLM administers the operational aspects of mineral leases. On lands administered by other Federal agencies, lease stipulations would include those required by the SMA. On 20,061 acres of split-estate lands, the BLM would apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM would close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix C). Mitigation measures to protect other resource values would be developed during the appropriate site-specific environmental analysis and would be attached as conditions of approval to permits in consultation with the surface owner or SMA.

*Coal:*

The coal resources within the MPA include the Sego and the La Sal coal fields. Approximately 80% of the Sego coal field is within Wilderness Study Areas and is not available for development. For the remaining coal resources, no interest has been expressed for coal leasing and the potential for development of coal resources is low (see Mineral Potential Report). At such time as interest is expressed in coal leasing, the RMP would be amended as appropriate and mining unsuitability criteria (43 CFR 3461) would be applied by the MFO before any coal leases are issued. If coal leases are issued, they would be subject to special conditions developed in the RMP and the unsuitability assessment. This may restrict all or certain types of mining techniques. Before any coal could be removed, MFO would have to approve the mining permit application package, incorporating stipulations developed in the RMP.

**Locatable Minerals:**

Existing operations would continue to be subject to the stipulations developed for the notice or the plan of operations. The BLM would evaluate all operations authorized by the mining laws in the context of its requirement to prevent unnecessary and undue degradation of Federal lands and resources. Consistent with the rights afforded claimants under the mining laws, operations conducted after this RMP would be required to conform to the surface disturbing stipulations developed in this RMP.

Operations on BLM-administered lands open to mineral entry must be conducted in compliance with BLM's surface management regulations (43 CFR 3715, 3802, 3809, and 3814). BLM surface management regulations do not apply to operations on other Federal lands but do apply to split-estate lands.

BLM_0010928

## Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

**Management Common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- To be consistent with the existing withdrawals from mineral entry, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within the area of the Three Rivers and Westwater Mineral Withdrawals. This action would further protect the riparian, wildlife, scenic, and recreation values addressed in these withdrawals.
- To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable). These stipulations are found in Appendix C. Leasable minerals include oil and gas, coal, and potash. Locatable minerals include gold, copper, and uranium. Salable minerals include sand and gravel, clay, and building stone.
- In areas where mineral activities would be incompatible with existing surface use, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). These areas are as follows: Moab and Spanish Valley, Castle Valley (including Mayberry Orchard), Thompson Springs, Moab Landfill, Moab Airport, and Dead Horse Point State Park.
- The Federal minerals within the incorporated city of Moab and town of Castle Valley are closed to oil and gas leasing by Federal regulation at 43 CFR 3100.0-3 (a)(2)(iii).

**Leasable Minerals:**

*Oil and Gas:*

The plan would recognize and be consistent with the National Energy Policy Act and related BLM policy by adopting the following objectives:

- Recognizing the need for diversity in obtaining energy supplies.
- Encouraging conservation of sensitive resource values.
- Improving energy distribution opportunities.

In accordance with an UDEQ-DAQ letter dated June 6, 2008, (see Appendix V) requesting implementation of interim nitrogen oxide control measures for compressor engines, BLM will require the following as a Lease Stipulation and a Condition of Approval for Applications for Permit to Drill:
- All new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower must not emit more than 2 gms of NOx per horsepower-hour. This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower.
- All new and replacement internal combustion gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gms of NOx per horsepower-hour.

Lease stipulations would be developed to mitigate the impacts of oil and gas activity (see Appendix C and Maps 2-5-A through 2-5-D). The stipulations would adhere to the Uniform Format prepared by the Rocky Mountain Regional Coordinating Committee in March 1989. Stipulations reflect the minimum requirements necessary to accomplish the desired resource protection and would contain provisions/criteria to allow for exception, waiver and modification if warranted. Stipulations would be determined unnecessary if duplicative of Section 6 of the Standard Lease Terms. The BLM has identified Land-use Plan leasing allocations for all lands within the Moab Field Office. In addition, the Proposed RMP describes specific lease stipulations and program-related Best Management Practices (both found in Appendix C. Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface Disturbing Activities) that apply to a variety of different resources.

Oil and gas leases issued prior to the RMP would continue to be managed under the stipulations in effect when issued. Those issued subsequent to the plan would be subject to the stipulations developed in the plan. Environmental best management practices would be incorporated into subsequent permits and authorizations to mitigate impacts and conflicts with other uses and resource values (see Appendix C).

*Potash and Salt (Non-energy Leasable):*

Within the MPA, three areas fall within known potash leasing areas (KPLAs). KPLA designations, based on known geologic data, would remain in place until potash resources are depleted. In KPLAs, potash leases are acquired through competitive bidding. In areas where potash values are not known, MFO could issue prospecting permits, which could lead to issuance of a preference right lease. There are currently 8 leases and 13 pending prospecting permit applications within the MPA (Map 2-6). Additional KPLAs could be designated, based on geologic data, if interest warranted. Potash leasing and prospecting permits issued prior to the RMP would continue to be managed under the stipulations in effect when issued. Those leases issued subsequent to the RMP would be consistent with the oil and gas leasing stipulations developed in the RMP (see Appendix C).

**Locatable Minerals:**

A no surface occupancy stipulation cannot be applied to locatable minerals without a withdrawal. All public lands overlying Federal minerals are open to mining claim location unless specifically withdrawn from mineral entry by Secretarial order or by a public land law. Therefore, other than the existing withdrawals (Three Rivers, Westwater, and Black Ridge Wilderness), all public lands with the MPA remain open under the mining laws. Future withdrawals may be recommended in areas identified as closed or with a no surface occupancy stipulation if it becomes necessary to prevent unacceptable resource impacts.

**Salable Minerals:**

There are currently 12 community pits totaling about 2,693 acres designated in the MPA (Map 2-7). Existing mineral material sale contracts, free use permits, and material sites, including community pits, would continue to be subject to the permit stipulation conditions. Sales, permits, community pits or common use areas issued or designated after the RMP would be subject to permit stipulations developed in the RMP. These stipulations would be the same as those stipulations for oil and gas leasing except that areas with a no surface occupancy stipulation and closed would be closed to the disposal of salable minerals.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| **Oil and Gas Leasing (see Map 2-5-A):** | **Oil and Gas Leasing (see Map 2-5-B):** | **Oil and Gas Leasing (see Map 2-5-C):** | **Oil and Gas Leasing (see Map 2-5-D):** |
| • Approximately 1,038,344 acres would be open to oil and gas leasing, subject to standard lease terms (Category 1). | • Approximately 264,344 acres would be open to oil and gas leasing, subject to standard terms and conditions. | • Approximately 427,273 acres would be open to oil and gas leasing, subject to standard terms and conditions. | • Approximately 797,031 acres would be open to oil and gas leasing, subject to standard terms and conditions. |
| • Approximately 389,605 acres would be open to oil and gas leasing subject to special conditions (controlled surface use/timing limitation stipulations [CSU/TL], or Category 2). | • Approximately 543,751 acres would be open to oil and gas leasing subject to CSU and TL stipulations. | • Approximately 806,994 acres would be open to oil and gas leasing subject to CSU and TL stipulations. | • Approximately 590,442 acres would be open to oil and gas leasing subject to CSU and TL stipulations. |
| • Approximately 38,912 acres would be open to oil and gas leasing with no surface occupancy (NSO; Category 3). | • Approximately 342,931 acres would be open to oil and gas leasing subject to an NSO stipulation. | • Approximately 217,480 acres would be open to oil and gas leasing subject to an NSO stipulation. | • Approximately 84,772 acres would be open to oil and gas leasing subject to an NSO stipulation. |
| • Approximately 353,293 acres would be closed to oil and gas leasing. (Category 4). | • Approximately 671,444 acres would be open to oil and gas leasing, of which 318,709 acres are outside Wilderness or Wilderness Study Areas. Of these 318,709 acres, 20,288 acres are within the Castle Valley and Moab-Spanish Valley watersheds, and 266,455 are within lands with wilderness characteristics. The remaining 31,966 acres are closed to oil and gas leasing because it is not reasonable to apply an NSO stipulation. This includes areas where the oil and gas resources are physically inaccessible by current directional drilling technology from outside the boundaries of the NSO areas. (These lands closed to oil and gas leasing | • Approximately 370,250 acres would be closed to oil and gas leasing, of which 25,306 acres are outside Wilderness or Wilderness Study Areas. About 25,306 acres are closed to oil and gas leasing because it is not reasonable to apply an NSO stipulation. This includes areas where the oil and gas resources are physically inaccessible by current directional drilling technology from outside the boundaries of the NSO areas. (These lands closed to oil and gas leasing would be managed to preclude all other surface-disturbing activities.) Should technology change, a Plan Amendment would be initiated to place these 25,306 acres under an NSO | • Approximately 350,219 acres would be closed to oil and gas leasing. In addition, 8,078 acres of Federal minerals (split-estate lands) would be managed as open to oil and gas leasing with an NSO stipulation, and 1,539 acres of Federal minerals (split-estate lands) would be closed to oil and gas leasing (see Appendix C). |

BLM_0010929

Moab PRMP/FEIS

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | would be managed to preclude all other surface-disturbing activities.) Should technology change, a Plan Amendment would be initiated to place these 31,966 acres under an NSO stipulation for oil and gas leasing. In addition, 7,259 acres of Federal minerals (split-estate lands) would be managed as open to oil and gas leasing with an NSO stipulation, and 2,358 acres of Federal minerals (split-estate lands) would be closed to oil and gas leasing (see Appendix C). | stipulation for oil and gas leasing. In addition, 8,078 acres of Federal minerals (split-estate lands) would be managed as open to oil and gas leasing with the NSO stipulation, and 1,539 acres of Federal minerals (split-estate lands) would be closed to oil and gas leasing (see Appendix C). | |
| **Salable Minerals:** Allow the disposal of salable minerals on 1,466,861 acres. | **Salable Minerals (see Map 2-5-B):** • Approximately 264,244 acres would be open to the disposal of salable minerals subject to standard terms and conditions. • Approximately 543,751 acres would be open to the disposal of salable minerals subject to CSU and TL stipulations. • Approximately 342,931 acres would not be open to the disposal of salable minerals (in those areas subject to an NSO stipulation for oil and gas leasing). • Approximately 671,444 acres would be closed to the disposal of salable minerals. In addition, 7,259 acres of Federal minerals (split-estate lands) would not be open to the disposal of salable minerals in those lands subject to an NSO stipulation for oil and gas, and 2,358 acres of Federal minerals (split-estate lands) would be closed to the disposal of salable minerals (see Appendix C). | **Salable Minerals (see Map 2-5-C):** • Approximately 427,273 acres would be open to the disposal of salable minerals subject to standard terms and conditions. • Approximately 806,994 acres would be open to the disposal of salable minerals subject to CSU and TL stipulations. • Approximately 217,480 acres would not be open to the disposal of salable minerals (in those areas subject to an NSO stipulation for oil and gas leasing). • Approximately 370,250 acres would be closed to the disposal of salable minerals. In addition, 8,078 acres of Federal minerals (split-estate lands) would not be open to the disposal of salable minerals in those lands subject to an NSO stipulation for oil and gas, and 1,539 acres of Federal minerals (split-estate lands) would be closed to the disposal of salable minerals (see Appendix C). | **Salable Minerals (see Map 2-5-D):** • Approximately 797,031 acres would be open to the disposal of salable minerals subject to standard terms and conditions. • Approximately 590,442 acres would be open to the disposal of salable minerals subject to CSU and TL stipulations. • Approximately 84,772 acres would not be open to the disposal of salable minerals (in those areas subject to an NSO stipulation for oil and gas leasing). • Approximately 350,219 acres would be closed to the disposal of salable minerals. In addition, 8,078 acres of Federal minerals (split-estate lands) would not be open to the disposal of salable minerals in those lands subject to an NSO stipulation for oil and gas, and 1,539 acres of Federal minerals (split-estate lands) would be closed to the disposal of salable minerals (see Appendix C). |
| **Locatable Minerals:** • Approximately 1,389,531 acres are open to operations for locatable minerals. • Approximately 78,333 acres are withdrawn from operations to locatable minerals. • Approximately 353,510 acres within WSAs are open to operations for locatable minerals subject to the *Interim Management Policy for Lands Under Wilderness Review (IMP; 1650-1)*. | **Locatable Minerals:** • Approximately 268,873 acres are open to operations for locatable minerals subject to standard terms and conditions. • Approximately 1,120,658 acres are open to operations for locatable minerals subject to CSU and TL stipulations. • Approximately 78,333 acres are withdrawn from operations to locatable minerals. • Approximately 353,510 acres within WSAs are open to operations for locatable minerals subject to the IMP (1650-1). | **Locatable Minerals:** • Approximately 427,273 acres are open to operations for locatable minerals subject to standard terms and conditions. • Approximately 962,258 acres are open to operations for locatable minerals subject to CSU and TL stipulations. • Approximately 78,333 acres are withdrawn from operations to locatable minerals. • Approximately 353,510 acres within WSAs are open to operations for locatable minerals subject to the IMP (1650-1). | **Locatable Minerals:** • Approximately 797,031 acres are open to operations for locatable minerals subject to standard terms and conditions. • Approximately 592,500 acres are open to operations for locatable minerals subject to CSU and TL stipulations. • Approximately 78,333 acres are withdrawn from operations to locatable minerals. • Approximately 353,510 acres within WSAs are open to operations for locatable minerals subject to the IMP (1650-1). |

## NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS

BLM has identified non-WSA lands with wilderness characteristics for management consideration in this planning effort. Wilderness characteristics include the appearance of naturalness and outstanding opportunities for solitude or primitive and unconfined recreation (see Appendix P for more information).

**Goals and Objectives:**
• Protect, preserve and maintain wilderness characteristics (appearance of naturalness, outstanding opportunities for primitive and unconfined recreation or solitude) of non-WSA lands with wilderness characteristics as appropriate, considering manageability and the context of competing resource demands. Manage these primitive lands and backcountry landscapes for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Non-WSA lands with wilderness characteristics were not addressed in the 1985 Grand RMP, as amended. These lands are managed according to the 1985 RMP prescriptions. | Manage 266,485 acres of non-WSA lands (see Map 2-24-B) to protect, preserve and maintain wilderness characteristics by applying the following prescriptions: • Closed to oil and gas leasing (see Appendix C). • Preclude other surface-disturbing activities, including mineral material sales (see Appendix C). • Retain public lands in Federal ownership. • Prohibit woodland harvest. • Manage vehicle use as limited to designated roads. • Designate as VRM Class II. • Manage as exclusion areas for ROWs. **Non-WSA lands to be managed for wilderness characteristics:** Arches Adjacent (6,396 acres) Beaver Creek (25,722 acres), Behind the Rocks (3,643 acres), Big Triangle (5,200 acres), Coal Canyon (22,135 acres), Dead Horse | Manage 47,761 acres of non-WSA lands (see Map 2-24-C) to protect, preserve and maintain wilderness characteristics by applying the following prescriptions: • Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). Applying a no surface occupancy stipulation for oil and gas leasing to non-WSA lands with wilderness characteristics, in combination with the no surface occupancy applied because of the Three Rivers Withdrawal, results in tracts of land which are physically inaccessible to oil and gas operations within the Fisher Towers, Mary Jane, and Beaver Creek areas. For this reason, portions of non-WSA lands in these areas with wilderness characteristics would be closed to oil and gas leasing. • These areas would be managed to preclude other surface-disturbing activities (see Appendix C) including mineral material sales (see Appendix C). | No non-WSA lands would be managed to maintain wilderness characteristics. |

BLM_0010930

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | |
|---|---|---|
| | Cliffs (797 acres), Desolation Canyon (10,498 acres), Dome Plateau (14,207 acres), Fisher Towers (17,235 acres), Floy Canyon (9,983 acres), Flume Canyon (3,520 acres), Goldbar (6,437 acres), Gooseneck (843 acres), Granite Creek (4,528 acres), Harts Point (1,465 acres), Hatch Wash (10,983 acres), Hatch/Lockhart (2,670 acres), Hells Hole (2,538 acres), Hideout Canyon (11,607 acres), Horsethief Point (8,382 acres), Hunter Canyon (4,465 acres), Labyrinth Canyon (25,361 acres), Lost Spring Canyon (11,456 acres), Mary Jane Canyon (24,779 acres), Mexico Point (12,837 acres), Mill Creek Canyon (3,388 acres), Negro Bill Canyon (2,333 acres), Shafer Canyon (1,842 acres), Spruce Canyon (1,131 acres), Westwater Canyon (3,086 acres), Westwater Creek (7,188 acres), and Yellow Bird (357 acres). | ◆ Retain public lands in Federal ownership.<br>◆ Prohibit woodland harvest.<br>◆ Manage vehicle use as limited to designated roads.<br>◆ Designate as VRM Class II.<br>◆ Manage as avoidance areas for ROWs.<br>**Non-WSA lands to be managed for wilderness characteristics:** Beaver Creek (25,722 acres), Fisher Towers (5,540 acres within the Richardson Amphitheater), and Mary Jane Canyon (16,499 acres within the Richardson Amphitheater). | |

## PALEONTOLOGY

**Goals and Objectives:**

- Protect paleontological resources from surface-disturbing activities. Promote the scientific, educational, and recreational uses of fossils.
- Foster public awareness and appreciation of the MPA's paleontological heritage.
- Promote and facilitate scientific investigation of fossil resources.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- Vertebrate fossils may be collected only by qualified individuals under a permit issued by the BLM Utah State Office. Vertebrate fossils include bones, teeth, eggs, and other body parts of animals with backbones such as dinosaurs, fish, turtles, and mammals. Vertebrate fossils also include trace fossils, such as footprints, burrows, gizzard stones, and dung.
- Fossils collected under a permit remain the property of the Federal government and must be placed in an approved repository (such as a museum or university) identified at the time of permit issuance.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Locate, evaluate, and protect significant paleontological resources. Provide for public visitation and education opportunities while simultaneously protecting and supporting the scientific and research value of paleontological resources in the MPA.
- Recreational collectors may collect and retain reasonable amounts of common invertebrate and plant fossils for personal, non-commercial use. Surface disturbance must be negligible, and collectors may only use non-power hand tools.
- Casting of vertebrate fossils, including dinosaur tracks, is prohibited unless allowed under a scientific/research permit issued by the BLM Utah State Office.
- Lands identified for disposal would be evaluated to determine whether such actions remove significant fossils (see Appendix D) from Federal ownership.
- Recognize and protect paleontological resources identified as part of the Dinosaur Diamond National Prehistoric Byway.
- Prohibit petrified wood gathering within the Colorado Riverway Special Recreation Management Area (SRMA) to protect these paleontological resources for future public enjoyment. Prohibit private petrified wood collection only near high visitation sites within the Labyrinth Rims/Gemini Bridges SRMA. Manage petrified wood gathering outside these two SRMAs to allow for private collection of petrified wood (43 CFR 3620).
- Prohibit commercial sales of petrified wood products due to limited availability of such resources.
- Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.
- Manage Mill Canyon Dinosaur Trail, Copper Ridge Sauropod Trackway, and Poison Spider Track Site as important scientific and public education resources as guided by future SRMA activity-level plans.
- Personal collection of a reasonable amount of invertebrate and plant fossils would be allowed throughout the MPA. Where areas with rare and significant invertebrate and plant fossils are identified, these areas would be closed to personal collection.

## RECREATION

**Goals and Objectives:**

To provide for multiple recreational uses of the public lands and sustain a wide-range of recreation opportunities and potential experiences for visitors and residents, while supporting local economic stability and sustaining the recreation resource base and sensitive resource values.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

Management of recreation would be generally guided by the Utah Standards for Public Land Health and Guidelines for Recreation Management. The guidelines describe in a broad sense the conditions to be maintained or achieved for rangeland health within the recreation program.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Where unacceptable damage to natural or cultural resources by recreational use is anticipated or observed, BLM would seek to limit or control activities by managing the nature and extent of the activity or by providing site improvements that make the activity more sustainable or by a combination of management controls and facility development. Such management actions would seek to reduce or eliminate the adverse impact while maintaining the economic benefits associated with a wide range of recreation uses.
- BLM would consider and, where appropriate, implement management methods to protect riparian resources, special status species, and wildlife habitat while enhancing recreation opportunities. Management methods may include limitation of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions to be approved through normal BLM procedures.
- BLM would coordinate management of recreation use with other agencies, State and local government and tribal units to provide public benefits.
- Recreational off-highway vehicle (OHV) and mechanized travel would be consistent with area and route designations described in the travel management plan. BLM would work with agency and government officials and permit holders to develop procedures, protocols, permits or other types of authorization, as appropriate, to provide reasonable access for non-recreational use of OHVs for military, search and rescue, emergency, administrative, and permitted uses.
- Dispersed camping is allowed where not specifically restricted. Dispersed camping may be closed seasonally or as impacts or environmental conditions warrant. All vehicle use associated with dispersed camping activities is required to stay on designated routes.
- Management actions limiting camping, wood gathering, firewood cutting, and requiring use of fire pans and portable toilets implemented through published closures limitations, restrictions, or special rules applicable to specific land areas within the MPA are carried forward in all alternatives (see Consolidation of

BLM_0010931

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| |
|---|
| Moab Field Office Rules, Closures, and Restrictions in Appendix E). |
| • Lands acquired within a management area through future land tenure adjustment would take on the management of the surrounding area. |
| • Provide visitor information and outreach programs that emphasize the value of public land resources and low impact recreation techniques while also providing information about recreation activities, experiences and benefits. |
| • Provide public information concerning the prevention of the spread of invasive and exotic weeds, and about wildlife species and their habitat especially in riparian areas. |
| • Continue to manage the Slickrock Bike Trail and Fisher Towers Trail as a National Recreation Trails consistent with their current secretarial designation. National Trails designation would be consistent with this plan. |
| • Continue supporting public use and enjoyment of the Prehistoric Highway National Scenic Byway. Assist with the development and implementation of a management plan. |
| • Support Grand County's efforts to obtain approval of corridor management plans for Utah Scenic Byways (Utah Highways 128, 313 and 279) and provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP. |
| • Continue to manage Kane Creek Road to Hurrah Pass and the roads to Needles, Anticline, and Minor overlooks as Utah Scenic Backways. |
| • BLM Back Country Byways and National Recreation Trails may be designated in the future as deemed appropriate with site-specific environmental analysis. |
| • Continue managing Kokopelli's Trail to facilitate its use as a potential segment of the American Discovery Trail. Seek to acquire public access along the entire route to facilitate potential designation as a National Recreation Trail. |

| Special Recreation Management Areas (SRMAs) |
|---|
| **Management Common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D (see SRMA Maps 2-8-A through 2-8-D; see Appendix F for details on SRMAs):** |
| • Criteria for establishment of SRMAs, or adding or revising SRMA boundaries (using the Plan Amendment process, where appropriate) include: |
| ·   Recreation use requires intensive management strategies to provide recreation opportunities or maintain resource values. |
| ·   A recreation area management plan or interdisciplinary plan with intensive and specific recreation management values is approved. |
| ·   BLM announces the management plan and plan approval through media. |
| • Generally, where SRMA boundaries are revised, management actions applicable to the original SRMA would also apply to the revised area. |
| • Manage all public lands within SRMAs for retention in Federal ownership consistent with the MFO exchange criteria and acquire high value non-Federal lands from willing sellers where such acquisition would further the purposes of each SRMA. |
| • Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) within 0.5 miles of developed recreation sites (current and planned as Potential Future Facilities; see each SRMA). |
| • Manage all SRMAs for sustainable camping opportunities. Camping may be restricted to designated sites if use and conditions warrant. |
| • Manage all SRMAs according to Visual Resource Management Class for each respective alternative to protect scenic values and settings important to recreation. |
| • Approved recreation facilities supporting recreation area management objectives would be planned and designed to reduce visual impacts where feasible (see Visual Resource Management). |
| • Replace The Colorado River SRMA (24,124 acres) with the Two Rivers, Colorado Riverway and Dolores River Canyons SRMAs (Maps 2-8-A through 2-8-D) to provide for more focused management. |
| • Provide general recreation management guidance and subsequent implementation of management actions for activity plan level actions for SRMAs through continuation and modification of approved recreation area management plans (RAMPs) and development of new RAMPs for all SRMAs. |
| • A River Management Plan for the Colorado River from the Colorado State Line to Castle Creek, and for the Dolores River, would be completed. |
| • De-signate SRMAs as either Destination SRMAs (majority of visitation from outside the area), Community SRMAs (the majority of visitation is from the local community), or Undeveloped SRMAs (the focus of the SRMA is to maintain the backcountry setting.) |
| **Facilities:** |
| • Build and maintain additional recreation facilities consistent with the guidance provided in RAMPs and in the various focus areas as established in the RMP. In the absence of a RAMP, facilities may be considered through the NEPA process where they support the objectives of the SRMA. |
| • Campground facilities may be constructed; however, they would be located to avoid wetland, riparian, cultural resources, floodplains, and special status plant and animal species habitats. If avoidance is not possible, mitigation would be implemented to augment the values affected by the construction (MCA and Executive Orders). |
| • Continue to manage and maintain for recreation use all existing developed recreation sites. Follow site management guidance contained in RAMPs. |
| • Continue existing ROWs issued to BLM for all existing developed recreation sites and facilities. Issue similar protective ROWs for all new recreation facilities. |
| • Manage developed sites as necessary under the authority of 43 CFR Part 8360, inclusive of published closures, restrictions, and supplemental rules developed for the public lands within the MPA (see above), to protect visitor health and safety, reduce visitor conflicts, and provide for the protection of government property and resources. |
| **Focus Areas or Recreation Management Zones (see Maps 2-9-A through 2-9-D; see Appendix F for more detail on SRMAs)** |
| • Focus areas are Recreation Management Zones (RMZ) for emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan. As RMZs, Focus Areas are established as a mechanism for enhancing specific recreation opportunities through facilities and education such as route marking, parking, camping, and information. Where a single focus SRMA or a specific RMZ (Focus Area) is not identified, the default focus of that area is motorized, backcountry touring on designated roads. The roads are those identified in the Travel Plan accompanying this RMP. |
| • The following types of Focus Areas are considered under the alternatives: Non-mechanized Recreation, Mountain Bike Backcountry Touring, Motorized Backcountry Touring, Scenic Driving Corridors, Specialized Sport Venue Non-motorized, Specialized Sport Venue Motorized, and Managed Open OHV Area. |

| Bookcliffs SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Continue to manage the Bookcliffs for general recreation use. | The Bookcliffs SRMA (Map 2-8) would be established as an Undeveloped SRMA at 348,140 acres for non-mechanized recreation, especially equestrian use, hiking, backpacking, and big game hunting. It would be managed for low frequency of visitor interaction by not establishing new motorized, mechanized routes; no commercial motorized permits would be issued and competitive events would not be allowed. | The Bookcliffs SRMA would not be established. | The Bookcliffs SRMA would not be established. |

BLM_0010932

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Cameo Cliffs SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| BLM authorization of the ROW to San Juan County for the Hook and Ladder OHV trailhead and several sections of connector route would continue.<br><br>In June 2005, the Cameo Cliffs Special Recreation Area (Map 2-8) was designated under a Plan Amendment to the Grand RMP. OHV designation for the area is Limited to Designated Routes. The focus activity in the Cameo Cliffs SRMA is motorized route use. | Same as the Proposed Plan. | Manage the Cameo Cliffs area as a Destination SRMA (15,597 acres) under the Cameo Cliffs Recreation Area Management Plan. The Cameo Cliffs SRMA would provide sustainable opportunities for road-related motorized and mechanized outdoor recreation on a marked route system, and provide a non-mechanized hiking and equestrian area in Hook and Ladder Gulch and along the route of the Old Spanish Trail, while protecting and maintaining resource values including range, wildlife habitat, scenic, cultural, historical, recreational, and riparian values in current or improved condition. To facilitate use of the area for touring purposes, no motorized competitive events would be authorized.<br><br>Work with San Juan County to further implement the Cameo Cliffs portion of the San Juan County All-terrain Vehicle Plan, and to protect and manage wildlife, vegetation, and cultural resources.<br><br>Implement camping management rules as use levels and resource impacts warrant.<br><br>**Potential Future Facilities:**<br>Install Cameo Cliffs OHV Trailhead toilet. | Same as the Proposed Plan. |

| Canyon Rims SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Manage the Canyon Rims SRMA (101,531 acres) (Map 2-8) to protect, manage and improve the natural resources of the area while allowing for recreation activities such as developed camping, visiting scenic overlooks, auto touring on the primary road system, touring the secondary road system by motorized vehicle and mountain bike, and hiking and backpacking the canyons (in accordance with the ROS classes) utilizing interpretive and educational opportunities to realize the potential of the area.<br><br>Major management actions include:<br>1. Manage the area as open to mineral leasing with controlled surface occupancy except for developed recreation sites, which would be managed as open to leasing with no surface occupancy.<br>2. Manage the area to maintain ROS classes as inventoried.<br>3. Acquire or exchange private and State lands from willing landowners.<br>4. Manage the entire area as OHV travel limited to existing roads (mapped as part of the planning process).<br>5. Manage the western rim land areas of Hatch Point as VRM Class II and the remainder of the area as VRM Class III.<br>6. Maintain and/or improve all existing developed recreation sites as specified in the Canyon Rims Recreation Area Management Plan.<br>7. Restrict camping near developed recreation sites.<br>8. Close the entire recreation area to wood cutting and gathering.<br>9. Manage Hatch Wash and the lower section of West Coyote Creek for primitive, non-motorized recreation.<br>10. Restrict backcountry motorized events to commercial and non-race special events on the Flat Iron Mesa Jeep Safari route only.<br>11. Consider development of additional trails and recreation facilities only as necessary. | Same as the Proposed Plan. | Same as Alternative A except:<br>• Manage the Canyon Rims SRMA as a Destination SRMA (101,531 acres).<br>• Motorized travel would be limited to designated roads and trails.<br>• Manage the Windwhistle Nature Trail, Anticline Overlook Trail, Needles Overlook Trail, and Trough Spring Canyon Trail for hiking use only. | Same as the Proposed Plan. |

BLM_0010933

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| **Focus Area: Non-mechanized Recreation:** <br> N/A | **Focus Area: Non-mechanized Recreation:** <br> Same as the Proposed Plan. | **Focus Area: Non-mechanized Recreation (3,642 acres):** <br> Hatch Wash Hiking and Backpacking Focus Area inclusive of the area from Goodman Canyon to the confluence of Hatch Wash with Kane Creek Canyon including the lower section of West Coyote Creek (from private land west to confluence with Hatch Wash) and the lower section of Troutwater Canyon. <br><br> New motorized routes would not be considered. | **Focus Area: Non-mechanized Recreation:** <br> The focus area would not be established. |
| **Focus Area: Scenic Driving Corridors:** <br> N/A | **Focus Area: Scenic Driving Corridors:** <br> Needles and Anticline Roads – Utah Scenic Backways. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1 mile from centerline (or to border of adjoining focus area). | **Focus Area: Scenic Driving Corridors:** <br> Needles and Anticline Roads – Utah Scenic Backways. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline (or to border of adjoining focus area). | **Focus Area: Scenic Driving Corridors:** <br> Needles and Anticline Roads – Utah Scenic Backways. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/4 mile from centerline (or to border of adjoining focus area). |
| **Colorado Riverway SRMA** | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| The Colorado Riverway (Map 2-8) was established as a recreation management area in 1992 and extended in 2001. Management has focused upon providing improvements to sites to facilitate recreation use and protection of scenic and other resource values. Subsequent recreation plan amendments have addressed camping in the Onion Creek area, the construction of a bike lane along SR 128 from the Porcupine Rim Trail to Lion's Park, the construction of a non-motorized bridge on non-Federal land at Lion's Park, and the establishment of a non-mechanized route system in the area between Onion and Professor Creeks. <br><br> Major management actions include: <br> 1. Acquiring specific tracts of State land. <br> 2. Acquiring private lands or scenic easements from willing sellers. <br> 3. Restricting motorized and mechanized travel to designated routes. <br> 4. Developing and managing recreation facilities and uses. <br> 5. Limiting camping and camp fires to designated sites. <br> 6. Closing the area to firewood cutting and limiting firewood gathering to riverside driftwood. <br> 7. Recommending withdrawal of the area from mineral entry. <br> 8. Limiting use of the Fisher Towers, Negro Bill Canyon, Hunter Canyon, and Corona Arch trails to foot travel.* <br><br> Lands along the Colorado River within the riverway are withdrawn from mineral entry through the Three Rivers Withdrawal. | Same as the Proposed Plan, except: <br> • Expand boundary to include the entire Top of the World area and lands along the Entrada Bluffs Road up to the boundary of the Colorado River SRMA (103,467 acres). <br> • Prohibit camping on the north side of the river along Highway 128. <br> • Prohibit camping at the Kane Creek Crossing Area. | Colorado Riverway SRMA would be established as a Destination SRMA at 89,936 acres. Management would be the same as Alternative A with the following exceptions and additions: <br> • Expand the boundary of the Colorado Riverway to include the lands north of the Entrada Bluffs Road to the boundary of the Two Rivers SRMA, as well as lands south of the Entrada Bluffs Road (one mile corridor). <br> • Manage the Colorado Riverway as a Destination SRMA to manage camping, boating, river access, trail, and interpretive facilities in popular areas along or near the Colorado River and to protect the outstanding resource values of the area. Guidance for management is included in the Colorado Riverway Recreation Area Management Plan. <br> • Manage the Dewey Bridge to Castle Creek portion of the Colorado River to provide opportunities for high use boating in a scenic setting (see Boating Management below). <br> • Manage south shore recreation sites (from Dewey Bridge to Lion's Park) under the Colorado Riverway RAMP. <br> • Manage the north shore to provide quality undeveloped designated camping and hiking opportunities while assuring protection of high quality habitat for bighorn sheep as well as for other resource values. <br> • Manage the Kane Creek Crossing area to emphasize responsible designated camping and scenic touring. <br> • Manage the Entrada Bluffs Road area to emphasize designated camping opportunities, and scenic touring. <br> • Manage the Shafer Basin addition to emphasize scenic backcountry driving opportunities (no camping allowed in this area). <br> • Manage the Amphitheater Loop, Fisher Towers, Negro Bill Canyon, Hunter Canyon, and Corona Arch trails and Professor Creek to provide high quality hiking-only opportunities while preserving ecological resources. <br> • Provide for parking and manage the Kings Bench route (above the Kane Creek Road near the Kings Bottom camping area) as a hiking route. Obtain public access from a willing seller across the short section of private land that is located along the route. <br> • Manage the seldom-used 1.5-mile long route (that spurs left from the Poison Spider Mesa Road) on the intermediate bench between the Colorado River and Poison Spider Mesa for hiking use. If future use levels warrant, develop a return hiking trail loop on the river side of the road bed. <br> • Manage the Kane Creek Road to Amasa Back Jeep Road section of the Historic Jackson's Ladder trail as hiking and biking only. | Colorado Riverway SRMA would be established at 79,126 acres (this acreage excludes the Entrada Bluffs area). Management prescriptions would be the same as the Proposed Plan. |

BLM_0010934

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | | ✦ Establish the proposed Pothole Arch and Rockstacker trails on Amasa Back (Kane Creek) as mountain bike routes. Work with Monticello Field Office to designate the Jackson's Ladder historic horse trail as a mountain bike trail from Jackson's Hole to the Amasa Back Jeep Road. Work with private land owners to secure non-motorized access to the bottom of this route.<br>✦ Manage the Portal Trail to provide both hiking and mountain bike opportunities. | |
| **Potential Future Facilities:**<br>N/A | **Potential Future Facilities:**<br>✦ Entrada Bluffs Camping Area; camping in this area would be limited to this campground.<br>✦ Hittle Bottom Group Campsites; camping in this area would be limited to this campground.<br>✦ Kane Creek Crossing Camping Area; camping in this area would be limited to this campground.<br>✦ Kane Creek Road Riverway Information Area.<br>✦ Utah Highway 279 Riverway Information Area.<br>✦ Wall Street climbing area toilet.<br>✦ Lower Castle Creek Trail head and parking area.<br>✦ Utah Highway 128 Bike Lane. | **Potential Future Facilities (in addition to those already in the Colorado Riverway Plan):**<br>✦ Castle Valley Interpretive Site.<br>✦ Entrada Bluffs Camping Area; camping in this area would be limited to this campground.<br>✦ Hittle Bottom Group Campsites.<br>✦ Kane Creek Crossing Camping Area. Work with SITLA to implement joint camping management in this area.<br>✦ Kane Creek Road Riverway Information Area.<br>✦ Lower Castle Creek Trail Access.<br>✦ Poison Spider Dinosaur Track Trail.<br>✦ Utah Highway 128 Bike Lane.<br>✦ Utah Highway 279 Riverway Information Area.<br>✦ Wall Street climbing area toilet. | **Potential Future Facilities:**<br>Same as the Proposed Plan except:<br>✦ Do not designate Entrada Bluffs Camping Area or limit camping.<br>✦ Do not designate Hittle Bottom Group Campsites or limit camping.<br>✦ Do not designate Kane Creek Crossing Camping Area or limit camping.<br>✦ Do not construct Wall Street climbing area toilet. |
| **Focus Areas: Non-mechanized Recreation:**<br>N/A | **Focus Areas: Non-mechanized Recreation:**<br>Negro Bill Hiking and Ecological Study Focus Area (12,510 acres) inclusive of Negro Bill Canyon from the Sand Flats Recreation Area boundary to the eastern rim of Mat Martin Point with allowance for recreational mechanized use of the Porcupine Rim Trail from the junction approximately 1.55 miles east of Little Spring (upper exit to Sand Flats Road) to Highway 128.<br>✦ Negro Bill Canyon would be restricted to day use only. Equestrian use of Negro Bill Canyon would be prohibited.<br>✦ Manage the Porcupine Rim Trail to provide only hiking and mountain biking opportunities. Management of this trail may change pending resolution of wilderness designation for the Negro Bill Canyon WSA.<br>✦ No new motorized routes would be considered.<br>✦ Temporal zoning, permitting and vehicle type restrictions would be used to mitigate user conflicts on the Porcupine Rim Jeep Safari Route.<br>Richardson Amphitheater/Castle Rock, Hiking, Climbing and Equestrian Focus Area:<br>✦ Same as the Proposed Plan.<br>✦ Up to 15 miles of equestrian trails would be marked within this focus area. | **Focus Areas: Non-mechanized Recreation:**<br>Negro Bill Hiking and Ecological Study Focus Area (8,684 acres) inclusive of Negro Bill Canyon between the Sand Flats Recreation Area and the Porcupine Rim Trail. Manage for recreational mechanized use on the main portion of the Porcupine Rim Trail from the junction approximately 1.55 miles east of Little Spring (upper exit to Sand Flats Road) to Highway 128 (with the exception of the Porcupine Rim Trail to Coffeepot Rock which would be managed for motorized use.)<br>✦ Manage the Negro Bill Canyon Trail for hiking use only. Equestrian use of Negro Bill Canon would be prohibited.<br>✦ Manage the Porcupine Rim Trail to provide only hiking and mountain biking opportunities. Management of this trail may change pending resolution of wilderness designation for the Negro Bill Canyon WSA.<br>✦ No new motorized routes would be considered.<br>Richardson Amphitheater/Castle Rock, Hiking, Climbing and Equestrian Focus Area (24,767 acres) bounded by Fisher Valley, the rim of "Top of the World" escarpment, Highway 128, and non-Federal lands along the east side of the Castle Valley Road. Motorized use allowed on the Fisher Towers Road, the Onion Creek Road, roads serving private ranches and water developments in the Professor Valley area, and the motorized access route to the viewpoint in Professor Valley (the saddle between Adobe Mesa and Castle Rock) and the road to designated undeveloped campsites below Castle Rock. Work with Utah Open Lands (a private land conservation organization) to establish a semi-developed camping area to serve rock climbers.<br>✦ The Onion Creek Benches equestrian trail system between Onion and Professor Creeks would be managed to provide opportunities for equestrian trail riding. An equestrian-oriented reservable camping area would be managed in Onion Creek upstream from Highway 128. Up to 30 miles of equestrian trails would be marked within this focus area.<br>✦ Manage the Amphitheater Loop and Fisher Tower Trails for hiking only.<br>✦ Consider connecting hiking trails between Onion Creek and the | **Focus Areas: Non-mechanized Recreation:**<br>Negro Bill Hiking and Ecological Study Focus Area (1,287 acres) inclusive of the core of Negro Bill Canyon as identified in the 1985 RMP as the Negro Bill Canyon Outstanding Natural Area.<br>✦ Equestrian use of Negro Bill Canyon would be prohibited.<br><br><br>Richardson Amphitheater/Castle Rock, Hiking, Climbing and Equestrian Focus Area:<br>✦ The Richardson Amphitheater/Castle Rock, Hiking, Climbing and Equestrian focus area would not be established. |

BLM_0010935

## Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | Amphitheater Loop Trail. | |
|---|---|---|---|
| **Focus Area: Scenic Driving Corridors:**<br>N/A | **Focus Area: Scenic Driving Corridors:**<br>Same as the Proposed Plan, except increase scenic corridor average width to 1 mile from centerline or line of sight (whichever is shorter) or to border of adjoining focus area (see VRM for management prescriptions). | **Focus Areas: Scenic Driving Corridors:**<br>These corridors include Highways 128 and 279 (which are both designated Utah Scenic Byways), as well as the Kane Creek/Hurrah Pass portion of the Lockhart Basin Scenic Backway and the BLM portion of the LaSal Mountain Loop Road Scenic Backway. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline, or line of sight or to border of adjoining focus area (whichever is shorter; see VRM for management prescriptions). | **Focus Area: Scenic Driving Corridors:**<br>Same as the Proposed Plan, except reduce scenic corridor average width to 1/4 mile from centerline (or to border of adjoining focus area; see VRM for management prescriptions). |
| **Focus Areas: Specialized Sport Venue, Non-motorized:**<br>N/A | **Focus Areas: Specialized Sport Venue, Non-motorized:**<br>• No specialized sport venue-non motorized would be established.<br>• BASE jumping would not be allowed in developed recreation sites. | **Focus Areas: Specialized Sport Venue, Non-motorized:**<br>• Tombstone Competitive BASE Jumping Focus Area (42 acres):<br>Manage Tombstone area to provide BASE jumping opportunities along the Kane Creek Road.<br>BASE jumping would not be allowed in developed recreation sites.<br>• Wall Street Sport Climbing Focus Area (44 acres) (with special protective measures taken for rock art):<br>Manage Wall Street area to provide rock climbing opportunities along the Potash Road. | **Focus Areas: Specialized Sport Venue, Non-motorized:**<br>Same as the Proposed Plan, except BASE-jumping would be allowed in all areas. |
| **Boating Management:**<br>Dewey to Castle Creek: Continue the existing river management program on the Colorado and Dolores Rivers (24,000 passenger days per year: 30 commercial outfitters) to provide for the safe and enjoyable long-term use of the rivers. | **Boating Management:**<br>Same as the Proposed Plan, except:<br>• Dewey to Castle Creek: No restrictions on amount of private use would be established unless unacceptable resource impacts occur. Permit 20 unallocated and 2 allocated (100 user days each) commercial permits. Establish additional restrictions on amount of commercial use if conditions warrant based on desired resources objectives.<br>• Camping would be restricted to existing campgrounds along the Colorado River from Dewey to Castle Creek. There would be no camping along the north side of the Colorado River. | **Boating Management:**<br>• Dewey to Castle Creek: Manage to provide an opportunity for scenic, mild whitewater boating. No restrictions on amount of private use would be established unless unacceptable resource impacts occur. Permit 22 unallocated commercial permits. No further restrictions on amount of commercial use would be established.<br>• Camping would be restricted to designated campsites along the north side of the Colorado River and existing campgrounds on the south side of the Colorado River. | **Boating Management:**<br>Same as the Proposed Plan, except:<br>• Dewey to Castle Creek: Permit 25 unallocated commercial permits.<br>• River access camping by boaters would be allowed on the north side of the Colorado River and limited to existing campgrounds on the south side of the Colorado River.<br>• Camping on the south side of the river: same as the Proposed Plan. |

| Dolores River Canyons SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Continue to manage the Dolores River Canyons area for general recreation use. BLM presently has no recreation management plan in place for the area except for private and commercial boating management.<br>The Dolores River and its floodplain is an existing SRMA (Colorado River SRMA). | Same as the Proposed Plan. | Manage the Dolores River Canyons (Map 2-8) as an Undeveloped SRMA (31,661 acres).<br>• Maintain high quality opportunities for non-motorized boating and day hiking or backpacking in a remote setting supported by basic trailheads, trails, and car camping facilities that support primitive, non-motorized use of the canyon system.<br>• Major management actions would include prohibition of motorized and mechanized recreation use within the Dolores River's tributary canyons consistent with the Travel Plan.<br>• No new motorized routes would be considered. | Dolores River Canyons SRMA would not be established. |
| **Boating Management:**<br>Colorado State Line to Bridge Canyon: Continue the existing river management program on the Colorado and Dolores Rivers (24,000 passenger days per year: 30 commercial outfitters) to provide for the safe and enjoyable long-term use of the rivers. | **Boating Management:**<br>Same as the Proposed Plan, except:<br>• Colorado State Line to Bridge Canyon: establish maximum group size of 16 (including guides on commercial trips). | **Boating Management:**<br>Colorado State Line to Bridge Canyon: Manage to provide opportunities for scenic whitewater boating trips. Permits required for day and commercial use. Establish maximum group size of 25 (excluding guides on commercial trips). Do not establish daily launch limits. Permit 14 unallocated commercial outfitters. | **Boating Management:**<br>Dolores River Canyons SRMA would not be established. |

| Labyrinth Rims/Gemini Bridges SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| No specific recreation decisions were made under the Grand RMP for this area. | Same as the Proposed Plan, except: | Manage the Labyrinth Rims/Gemini Bridges area (Map 2-8) as a Destination | Establish Dee Pass SRMA (60,939 acres), consisting of the Dee Pass |

BLM_0010936

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | | |
|---|---|---|---|
| BLM manages private boating use in Labyrinth Canyon in conjunction with the Utah Divisions of State Parks and Recreation and Fire, Forestry and State Lands under the terms of a cooperative agreement. The agreement establishes an interagency river permit system and coordinates implementation of common river protection rules including group size and use of fire pans and portable toilets. BLM also issues permits for shoreline use related commercial river trips.<br><br>Lands along the Green River in Labyrinth Canyon were withdrawn from new entry under the mining laws through the Three Rivers Withdrawal.<br><br>Front country type use takes place along SR 313 and the Island in the Sky Road. This highway was designated the Dead Horse Mesa Scenic Byway by the State of Utah in the early 2000s. To manage dispersed camping and protect scenic values, BLM established a 1-mile-wide corridor along SR 313 and the Island in the Sky Entrance Road where camping is limited to designated sites, wood cutting and firewood gathering are prohibited, and portable toilets are required. BLM currently limits camping in the corridor to the Horsethief Campground, the Big Mesa, and Cowboy Camp camping areas. BLM also limits camping and prohibits woodcutting and firewood gathering in a one-mile-wide corridor along the Gemini Bridges Road. Manage the small Cowboy Camp for tent camping and manage the Big Mesa area for group use.<br><br>OHV and mountain bike travel are limited to existing roads and trails in the portion of the area south of the Ten mile Point Road (except for the Bartlett/Tusher Slickrock area which was left open for 2 wheel riding).<br><br>The area around the White Wash Sand Dunes is Open to OHV travel.<br><br>In addition to the Mineral Bottom Takeout, BLM manages several additional facilities in the area including the Mill Canyon Dinosaur Interpretive Trail, the Halfway Stage Station Interpretive Site, and the Copper Ridge Sauropod Trackway Interpretive site. BLM also manages and maintains route markings (with user group assistance) on the Monitor and Merrimac, Seven Mile Rim, Poison Spider Mesa, Golden Spike, Goldbar Rim, Gemini Bridges, Lower Monitor and Merrimac, Bar M, and Klondike Bluffs routes which are used by both motorized and non-motorized visitors. The 3-D, Crystal Geyser, Hellroaring Rim, Secret Spire, and Wipeout Hill routes are authorized for Jeep Safari and other uses. | • The White Wash Sand Dunes and surrounding uplands would be managed to restore their ecological and scenic values and provide an opportunity for ecological interpretation and study. Emphasis would be placed upon protection of the cottonwood trees found in the open dune fields, water source protection, stream bank stabilization, and bighorn sheep habitat protection. Motorized travel in the White Wash Wash (like the rest of the SRMA) would be limited to designated routes.<br>• Close the Bartlett/Tusher/Courthouse/Ten Mile area to camping. | SRMA (300,650 acres). General management guidance includes building upon current management as outlined in Alternative A with the following additions:<br><br>• Continue issuing permits, for both private and commercial users, with common river protection rules for Labyrinth Rims/Gemini Bridges SRMA and consider extending the BLM/State cooperative agreement for management of non-commercial use to include management of commercial river use. If future use levels warrant, relocate the Mineral Bottom Takeout or a more suitable location and initiate cooperative site operations with the National Park Service.<br>• Limit camping to designated sites in place-use areas including the Scenic Driving Corridors and all areas east of the Dubinky Well Road as well as along Ten Mile Wash.<br>• Manage backcountry areas to facilitate scenic motorized touring on designated routes with special emphasis upon establishment of low-development, end of route parking areas and route signing.<br>• Improve road to the Mill Canyon Dinosaur Trailhead to accommodate passenger car traffic.<br>• Consider development of an alternative single-track mountain bike route on Poison Spider Mesa across the mesa top to the top of the Portal Trail. | motorized route system and the White Wash open OHV area. This area constitutes a subset of the Labyrinth Rims/Gemini Bridges area. |
| **Potential Future Facilities:**<br>N/A | **Potential Future Facilities:**<br>Same as the Proposed Plan, except:<br>• There would be no campground constructed in Bartlett Wash. Camping would not be allowed in Bartlett Wash.<br>• There would be no campground constructed at Courthouse Rock. Camping would not be allowed in the Courthouse Rock area. | **Potential Future Facilities:**<br>• Bartlett Campground: camping in this area would be restricted to this campground.<br>• Big Mesa Campground: camping in this area would be restricted to this campground.<br>• Blue Hills Road OHV Trailhead.<br>• Courthouse Rock Campground, camping in this area would be restricted to this campground.<br>• Cowboy Camp Campground, camping in this area would be restricted to this campground.<br>• Monitor and Merrimac Bicycle and OHV Trailhead relocation.<br>• White Wash Sand Dunes OHV Parking and Camping Area.<br>• Gemini Bridges Parking Area and Trailhead. | **Potential Future Facilities:**<br>Same as the Proposed Plan, except:<br>• Bartlett Campground would not be built; dispersed camping would be allowed in Bartlett.<br>• Expand White Wash Sand Dunes OHV Base Area, including campground. |
| **Focus Areas: Scenic Driving Corridors:**<br>N/A | **Focus Areas: Scenic Driving Corridors:**<br>Highway 313 and the Island in the Sky Road (Dead Horse Mesa Utah Scenic Byway): Manage for scenic driving enjoyment. The corridor is defined as having a width of 1 mile from centerline (or to border of adjoining focus area; see Appendix C). | **Focus Areas: Scenic Driving Corridors:**<br>Highway 313 and the Island in the Sky Road (Utah Scenic Byway): Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline (or to border of adjoining focus area; see Appendix C). | **Focus Areas: Scenic Driving Corridors:**<br>No scenic driving focus areas would be established. |
| **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** |

BLM_0010937

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| N/A | ◆ Goldbar/Corona Arch Hiking Focus Area (4,787 acres) covers the lands below the Golden Spike OHV route inclusive of the Culvert Canyon drainage to the southern rim of Long Canyon. Manage the Corona Arch Trail for hiking only. Develop a hiking loop route in Culvert Canyon from the canyon bottom up to Jeep Arch and back on the western bench of Culvert Canyon. Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to protect primitive hiking opportunities and scenic values.<br>◆ White Wash Sand Dunes Ecological Study and Hiking Focus Area (9,708 acres) would be established.<br>◆ Ten Mile Canyon Hiking and Equestrian Focus Area (1,871 acres) inclusive of Ten Mile Wash from Dripping Spring to the Green River with equestrian use limited to the main canyon.<br>◆ Spring Canyon Hiking Focus Area (457 acres) would be established upstream from the Spring Canyon Bottom Road. No new motorized routes would be considered.<br>◆ Labyrinth Canyon Canoe Focus Area (8,182 acres) inclusive of the rims along the east side of Labyrinth Canyon from Placer Bottom to Canyonlands National Park excluding the Hey Joe Mine OHV and mountain bike route and the route downstream from Spring Canyon. Temporal zoning, permitting and vehicle type restrictions would be used to mitigate user conflicts on the Hey Joe Mine Route.<br>◆ Seven Mile Canyons Equestrian Focus Area same as the Proposed Plan. | ◆ Goldbar/Corona Arch Hiking Focus Area (4,191 acres) covers the lands below the Golden Spike OHV route inclusive of the Culvert Canyon drainage to the northern rim of Long Canyon exclusive of the main stem of the Day Point Road. Manage the Corona Arch Trail for hiking only. Develop a hiking loop route in Culvert Canyon from the canyon bottom up to Jeep Arch and back on the western bench of Culvert Canyon to the canyon to just up canyon from the railroad spur. Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to protect primitive hiking opportunities and scenic values. No new motorized routes would be considered.<br>◆ White Wash Sand Dunes Ecological Study and Hiking Focus Area would not be established.<br>◆ Ten Mile Canyon Hiking and Equestrian Focus area would not be established.<br>◆ Spring Canyon Hiking Focus Area (457 acres) would be established from the Spring Canyon Bottom Road. No new motorized routes would be considered.<br>◆ Labyrinth Canyon Canoe Focus Area (7,709 acres) inclusive of the rims along the east side of Labyrinth Canyon from Placer Bottom to Mineral Bottom exclusive of the Hey Joe Mine OHV and mountain bike route. No new motorized routes would be considered.<br>◆ Seven Mile Canyons Equestrian Focus Area (1,026 acres) inclusive of the north and south forks of Seven Mile Canyon westward from the junction of the two canyons. Equestrian use in this area would be restricted to private (non-commercial) horse use. No new motorized routes would be considered. | No non-mechanized focus areas would be established. |
| **Focus Areas: Mountain Bike Backcountry Touring:** | **Focus Areas: Mountain Bike Backcountry Touring:** | **Focus Areas: Mountain Bike Backcountry Touring:** | **Focus Areas: Mountain Bike Backcountry Touring:** |
| N/A | ◆ Klondike Bluffs Mountain Biking Focus Area (14,626 acres) between Arches National Park and U.S. 191. Roads would be restricted to non-motorized access with the exception of Class B roads and the Copper Ridge Jeep Safari Route. Management same as the Proposed Plan (42 miles of road designated for motorized travel; 40 miles of route managed for mechanized use only).<br>◆ Bar M Mountain Biking Focus Area (2,904 acres) between Arches National Park, U.S. Highway 191 and the Bar M area state lands, exclusive of motorized access for the Copper Ridge Jeep Safari Route and the 191 rock quarry access road. Convert selected existing routes to mechanized routes. Recommend that the old highway route in Moab Canyon be managed for non-motorized use to facilitate use of the route as part of the 191 bike lane (12 miles of road designated for motorized travel; 10 miles of route managed for mechanized use only).<br>◆ Tusher Slickrock Mountain Biking Focus Area would not be established and would not be available for slick rock mountain biking (there are no designated routes in this area).<br>◆ Mill Canyon/Upper Courthouse Mountain Biking Focus Area would not be established. Manage the Mill Canyon Dinosaur Trail for hiking only. | ◆ Klondike Bluffs Mountain Biking Focus Area (14,626 acres) between Arches National Park and U.S. 191. Work with Grand County and SITLA to establish mountain-bike only opportunities in the Klondike area. Manage the Copper Ridge Sauropod Trackway Interpretive Trail for hiking only.<br>◆ Bar M Mountain Biking Focus Area (2,904 acres) between Arches National Park, U.S. Highway 191, and the Bar M area state lands, exclusive of motorized access for the Copper Ridge Jeep Safari Route and the 191 rock quarry access road. Convert existing routes to mechanized use and provide for a limited number of new and connecting routes to support use of area as the destination for the 191 bike lane. Recommend that the old highway route in Moab Canyon be managed for non-motorized use to facilitate use of the route as part of the 191 bike lane.<br>◆ Tusher Slickrock Mountain Biking Focus Area (428 acres) on slickrock between Bartlett and Tusher Washes with main access from Bartlett Wash to reduce traffic in Tusher Canyon. Manage the Tusher Canyon slickrock and Bartlett slickrock areas for mountain bike and hiking use only. Cross-country mountain biking across slick rock would be allowed throughout this area. | No mountain bike backcountry touring focus areas would be established. |
| | | ◆ Mill Canyon/Upper Courthouse Mountain Biking Focus Area (5,744 acres) inclusive of areas within the Mill Canyon and upper Courthouse drainages with continued use of the Seven Mile Rim Jeep Safari route for motorized use, with non-motorized trailheads near the Mill Canyon Dinosaur Trail and the Halfway Stage Station. Manage the Mill Canyon Dinosaur Trail for hiking only (35 miles of road designated for motorized travel; 23 miles of route managed for mechanized use only). | |
| **Focus Area: Motorized Backcountry Touring:** | **Focus Area: Motorized Backcountry Touring:** | **Focus Area: Motorized Backcountry Touring:** | **Focus Area: Motorized Backcountry Touring:** |

BLM_0010938

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| N/A | Gemini Bridges/Poison Spider Mesa Focus Area would not be established. | Gemini Bridges/Poison Spider Mesa Focus Area (16,299 acres) for multiple use, including full-size OHV, ATV, and motorcycle use with consideration given to managing routes suitable for each vehicle type. Travel would be intensively managed on designated routes only. Close the spur route to Gemini Bridges to facilitate public use and help restore damaged lands along the spur route. Construct a parking area near the bridges. | • No motorized backcountry touring focus areas would be established. |
|---|---|---|---|
| **Focus Areas: Specialized Sport Venues (Non-motorized):** | **Focus Areas: Specialized Sport Venues (Non-motorized):** | **Focus Areas: Specialized Sport Venues (Non-motorized):** | **Focus Areas: Specialized Sport Venues (Non-motorized):** |
| N/A | • Mineral Canyon/Horsethief Point Competitive BASE Jumping Focus Area would not be established.<br>• Bartlett Slickrock Freeride Focus Area would not be established. | • Mineral Canyon/Horsethief Point Competitive BASE Jumping Focus Area (762 acres) would be established.<br>• Bartlett Slickrock Freeride Focus Area (166 acres) would be established. No man-made structures would be added to facilitate "stunt riding." | • No specialized sport venues (non-motorized) would be established. |
| **Focus Areas: Specialized Sport Venue (Motorized):** | **Focus Areas: Specialized Sport Venue (Motorized):** | **Focus Areas: Specialized Sport Venue (Motorized):** | **Focus Areas: Specialized Sport Venue (Motorized):** |
| N/A | • Dee Pass Motorized Trail Focus Area would not be established.<br>• Airport Hills Motocross Focus Area would not be established. | • Dee Pass Motorized Trail Focus Area (35,290 acres) for motorcycle and ATV use. This is the area for competitive motorized events. Competitive routes within this area would be identified based on site-specific NEPA analysis. All routes designated for motorized use in the accompanying Travel Plan would remain open while Section 106 cultural resource inventories are conducted. If these inventories indicate the presence of eligible sites within the travel corridor, the route would be altered or closed. All new routes would require Section 106 cultural resource inventory prior to designation. Establish a managed OHV route system with provision for ongoing management of existing single-track routes to maintain their single-track character.<br>• Airport Hills Motocross Focus Area (285 acres): Manage the focus area for motocross use in partnership with local government under the Recreation and Public Purposes Act. A patent would be issued to local government. | • Dee Pass Motorized Trail Focus Area (57,875 acres) for motorcycle and ATV use. This is the area for competitive motorized events. Competitive routes within this area would be identified based on site-specific NEPA analysis. All routes designated for motorized use in the accompanying Travel Plan would remain open while Section 106 cultural resource inventories are conducted. If these inventories indicate the present of eligible sites, the route would be altered or closed. All new routes would require Section 106 cultural resource inventory prior to designation. Establish a managed OHV route system with provision for on-going management of existing single-track routes to maintain their single-track character. |
| **Focus Areas: Managed Open OHV Areas (cross country travel allowed):** | **Focus Areas: Managed Open OHV Areas (cross country travel allowed):** | **Focus Areas: Managed Open OHV area (cross country travel allowed):** | **Focus Areas: Managed Open OHV Areas (cross country travel allowed):** |
| N/A | • No open areas for OHV use would be designated on public lands in the MPA.<br>• Open OHV use areas would not be considered for lease or patent under the Recreation and Public Purposes Act. | • White Wash Sand Dunes Open OHV Focus Area, (1,866 acres) encompassing the area round the dunes themselves. Manage the central portion of the White Wash Sand Dunes for motorized sand play with exception of the dune field cottonwood trees and White Wash water sources which would be closed to motorized travel and fenced.<br>• Limit camping use in the White Wash Sand Dunes area to designated sites and establish basic camping facilities on the bench on the north side of White Wash.<br>• Implement a fee system, under the guidelines of the Federal Land Recreation Enhancement Act, to help fund cost of intensive management of the White Wash Sand Dunes area. | • Greater White Wash Sand Dunes Open OHV Focus Area (3,064 acres) bounded by the Duma Point Road, the Red Wash/Ruby Ranch Road, and portion of the Crystal Geyser Jeep route between the Ruby Ranch Road and the Duma Point Road. Manage the entire Greater White Wash Sand Dune area as Open to OHV use for motorized sand play except for the dune field cottonwood trees and White Wash water sources which would be closed to motorized travel and fenced.<br>• Limit camping use in the White Wash Sand Dunes area to designated sites and establish basic camping facilities on the bench on the north side of White Wash.<br>• Implement a fee system to help fund cost of intensive management of the White Wash Sand Dunes area. |

| **Lower Gray Canyon SRMA** | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Continue existing management as described in the 1979 Desolation-Gray Canyons Management Plan prepared by the BLM Price Field Office. | Same as the Proposed Plan. | • Manage the Lower Gray Canyon SRMA (3,759 acres within the MPA; see Map 2-8) as a Destination SRMA in coordination with the Price Field Office.<br>• Manage river recreation in accordance with the Desolation-Gray Canyons Management Plan.<br>• Manage the existing riverside and the parallel bench route loop trails from Nefertiti Rapid to Rattlesnake Canyon for hiking and equestrian use.<br>• Vehicle camping limited to designated sites. | Lower Gray Canyon SRMA would not be established. |

BLM_0010939

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Sand Flats SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| The Sand Flats RAMP was approved in August of 1994. Management of the Sand Flats Recreation Area is also supported by the June 1994 Cooperative Agreement with Grand County, which authorizes the county to collect fees for the benefit of the recreation area and participate in the operational management of the area to help implement the recreation area management plan.<br><br>The plan includes:<br>1. Acquisition of State lands through exchange.<br>2. OHV travel limited to designated roads and trails.<br>3. Provision for entrance and use fees.<br>4. Development of campgrounds.<br>5. Potential development of a drinking water source.<br>6. Provision for parking lots at the Slickrock and Little Spring trailheads.<br>7. Installation of toilets.<br>8. Development of an entrance station.<br>9. Provision for visitor protection.<br>10. Information and various services.<br>11. Limit camping to designated sites.<br>12. Limit OHV and mountain bike travel to designated routes.<br>13. Prohibit wood collecting and gathering. | Same as the Proposed Plan, except:<br>• Close the Moab Slickrock Bike Trail to all motorized vehicles. | Same as Alternative A, plus:<br>• Manage the Sand Flats Area (Map 2-8) as a Destination SRMA (6,246 acres). Guidance for management is included in the Sand Flats RAMP.<br>• Close the Moab Slickrock Bike Trail to four-wheeled vehicles and ATV use for safety purposes.<br>• The Slickrock Bike Trail would be open to motorcycles and mountain bikes only.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to protect recreation and scenic values. | Same as the Proposed Plan, except:<br>• Establish a Slickrock mountain bike free-ride area.<br>• Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) to protect scenic values (VRM Class II). |

| South Moab SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Continue to manage the Mill Creek Power Dam hiking trailhead, the Ken's Lake Recreation Site, the Hidden Valley hiking trailhead and the Blue Hill multi-use trailhead and undeveloped camping area as recreation sites. Continue to manage the Mill Creek Canyon hiking trails, the Ken's Lake hiking trail system, the Hidden Valley Hiking trail, the Steelbender/Flat Pass OHV/mountain bike route, the Behind the Rocks OHV route, the Strike Ravine OHV route, and the Kane Creek Canyon Rim OHV/mountain bike route as recreation routes.<br><br>Continue to limit camping to designated sites and prohibit wood gathering and cutting along the Black Ridge Road, the Pack Creek Road, the LaSal Mountain Loop Road and the Kane Creek Canyon Rim Road out to the Picture Frame Arch area. Prohibit camping on the west side of Spanish Valley, and in Mill Creek. | Same as the Proposed Plan. | Manage the South Moab SRMA (Map 2-8) as a Destination SRMA (63,999 acres).<br>• Same as Alternative A, except provide additional emphasis upon development of non-motorized trails through agreements with neighboring land owners through preparation of management guidance covering the Ken's Lake area.<br>• Work with Grand and San Juan counties to establish the New Spanish Trail Bicycle Lane to provide safe bicycle access from Canyonlands Field to the Pack Creek Picnic Area.<br>• Work with Moab City and Grand County to extend the Mill Creek Parkway to the Power Dam trailhead to provide safe access for cyclists and hikers.<br>• Formalize and continue the existing partnership with the water district to share management expenses at Ken's Lake. | South Moab would not be established as an SRMA. |
| Continue to manage Ken's Lake as a developed recreation site in partnership with the holders of the ROW for Ken's Lake (Spanish Valley Water and Sewer District).<br><br>Continue to manage the Mill Creek Canyon planning area in accordance with the approved interdisciplinary Mill Creek Canyon Management Plan. | | • Manage the Mill Creek Canyon planning area in accordance with the approved interdisciplinary management plan (as in Alternative A).<br>• Work with Grand County, SITLA, and private land owners to establish the "Power line" trail along the west side of Moab and Spanish Valleys from Kane Creek Road near the river portal south via the Hidden Valley Trailhead to the southern end of Behind the Rocks area.<br>• Work with San Juan and Grand Counties, SITLA, and private land owners to establish the Red Rock Horse Trail along the east side of Spanish Valley via Ken's Lake from the Johnson's Up-on-Top Road to the Loop Road/Pack Creek junction area.<br>• Work with the Backcountry Horsemen, SITLA and San Juan County to establish *equestrian riding loop routes south from the Ken's Lake Trailhead.* | |

BLM_0010940

Case No. 1:20-cv-02484-MSK   Document 29-5   filed 04/27/21   USDC Colorado   pg 97 of 117

Moab PRMP/FEIS

Chapter 2: Proposed Plan and Draft Alternatives
Table 2.1 Moab PROPOSED PLAN and Draft RMP Alternatives

## Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| Focus Areas: Scenic Driving Corridors: | Focus Areas: Scenic Driving Corridors: | Focus Areas: Scenic Driving Corridors: | Focus Areas: Scenic Driving Corridors: |
|---|---|---|---|
| N/A | LaSal Mountain Loop Road Scenic Backway: Manage for scenic driving enjoyment. The corridor is defined as: having a width of 1 mile from centerline (or to border of adjoining focus area; see Appendix C). | LaSal Mountain Loop Road Scenic Backway. Manage for scenic driving enjoyment. The corridor is defined as: having a width of 1/2 mile from centerline (or to border of adjoining focus area) (see Appendix C). | South Moab would not be established as an SRMA. |
| **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** | **Focus Areas: Non-mechanized Recreation:** |
| N/A | • Mill Creek Canyon Hiking Focus Area: Same as the Proposed Plan, except include motorized routes identified in the Travel Plan for this alternative. Temporal zoning, permitting and vehicle type restrictions would be used to mitigate user conflicts on the Steel Bender Routes.<br>• Behind the Rocks Hiking Focus Area: Same as the Proposed Plan. Temporal zoning, permitting, and vehicle type restrictions would be used to mitigate user conflicts on the Pritchett Canyon and Moab Rims. Hunter Canyon Rim Road at the end of the Jeep Safari route is available for mountain bike travel.<br>• Manage Hidden Valley Trail as non-mechanized only. | • Mill Creek Canyon Hiking Focus Area (16,950 acres) inclusive of the north and south forks of Mill Creek, Rill Creek, and Burkholder Draw south to the LaSal Mountain Loop Road with motorized use limited to the Steelbender OHV route and routes identified in the Travel Plan for this alternative. Emphasize management of the core area of Mill Creek to provide primitive hiking opportunities. Commercial equestrian use of Mill Creek Canyon and its tributaries would be prohibited except for use along the Steelbender/Flat Pass OHV/mountain bike route. No new motorized routes would be considered.<br>• Behind the Rocks Hiking Focus Area (17,536 acres) inclusive of the area currently closed to motorized use in the 1985 RMP and the Hunter Canyon area between Pritchett Canyon and the eastern rim of Kane Creek Canyon exclusive of the Pritchett Canyon and Behind the Rocks OHV route. Manage the Hunter Canyon trail for hiking only. Emphasize the management the core area of Behind the Rocks to provide primitive hiking opportunities. No new motorized routes would be considered. | South Moab would not be established as an SRMA. |
| **Focus Area: Mountain Bike Backcountry Touring:** | **Focus Area: Mountain Bike Backcountry Touring:** | **Focus Area: Mountain Bike Backcountry Touring:** | **Focus Area: Mountain Bike Backcountry Touring:** |
| N/A | Same as the Proposed Plan. | Upper Spanish Valley Mountain Biking Focus Area (2,255 acres; Mud Spring Area) for development of a beginner to intermediate skill level mountain bike trail system through conversion of existing routes and development of new routes. Work with SITLA to expand route system on adjacent state lands. | South Moab would not be established as an SRMA. |
| **Focus Area: Specialized Sport Venue (Non-motorized):** | **Focus Area: Specialized Sport Venue (Non-motorized):** | **Focus Area: Specialized Sport Venue (Non-motorized):** | **Focus Area: Specialized Sport Venue (Non-motorized):** |
| N/A | Same as the Proposed Plan. | 24 Hours of Moab Focus Area (2,905 acres) would be established to facilitate mountain bike speed-related events. | South Moab would not be established as an SRMA. |
| **Focus Area: Specialized Sport Venue (Motorized):** | **Focus Area: Specialized Sport Venue (Motorized):** | **Focus Area: Specialized Sport Venue (Motorized):** | **Focus Area: Specialized Sport Venue (Motorized):** |
| N/A | Potato Salad Hill spur route would be closed to motorized travel. | Potato Salad Hill Climbing Focus Area (41 acres) would be established within the boundary of the fenced areas emphasizing hill climbing events. Parking limitations would be established to limit vehicle group size.* | South Moab would not be established as an SRMA. |

| Two Rivers SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| The 1985 RMP provided for continuation of the river management program, which was initiated in early 1970s in response to increased demand for recreational boating. Existing management of the Colorado River focuses upon providing facilities and management to support and regulate commercial and private river use of the Colorado and Lower Dolores Rivers. Management activities are described in the annual Colorado and Dolores Rivers operating plan. | Same as the Proposed Plan. | Manage the Two Rivers SRMA (29,839 acres) as a Destination SRMA (Map 2-8) with the objective of continuing to provide distinct, high quality opportunities for recreational boating and camping, and to protect the outstanding resource values. Use launch systems and campsite assignments to reduce inter-party contacts. | Manage the Two Rivers SRMA (14,056 acres) as a Destination SRMA with the objective of continuing to provide distinct, high quality opportunities for recreational boating and camping. Use launch systems and campsite assignments to reduce inter-party contacts. |
| **Boating Management:**<br>Continue the existing river management programs on the Colorado and Dolores Rivers (24,000 passenger days per year; 30 commercial outfitters) to provide for the safe and enjoyable long-term use of the rivers. | **Boating Management:**<br>Same as the Proposed Plan except:<br>• State Line to Westwater Ranger Station: Seek to manage for moderate use flat water boating in conjunction with the Ruby/Horsethief Canyons section in Colorado.<br>• Westwater Canyon: Manage to provide an opportunity for whitewater boating in a highly primitive and very remote setting. Establish maximum group size of 16 (including guides on commercial trips). Establish daily launch limit of 48 people for each sector. | **Boating Management:**<br>• State Line to Westwater Ranger Station: Manage for relatively high use flat water boating in conjunction with the Ruby/Horsethief Canyons section in Colorado. Co-administer a private boating or parking permit system and user limitations and fees in conjunction with Colorado BLM as a means of providing for adequate take-out.<br>• Westwater Canyon: Manage to provide for whitewater boating in a primitive and remote setting. Permits required for private and commercial use. Distribute potential use levels equally from May 1 to | **Boating Management:**<br>Same as the Proposed Plan, except:<br>• State Line to Westwater Ranger Station: Seek to manage for of high use flat water boating in conjunction with the Ruby/Horsethief Canyons section in Colorado.<br>• Westwater Canyon: Manage to provide an opportunity for whitewater boating in a semi-primitive (social only) and remote setting. Establish maximum group size of 32 (including guides on commercial trips). Establish daily launch limit of 128 people for each sector. |

2-27

BLM_0010941

## Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | | |
|---|---|---|---|
| | • Cisco Landing to Dewey Bridge: For private use, no restrictions on amount of private use would be established unless warranted by future use levels. Permit 20 unallocated and 2 allocated (100 user days each) commercial permits. Establish additional restrictions on amount of commercial use if conditions warrant based on desired resource objectives.<br>• Dolores River from Bridge Canyon to its confluence with the Colorado River: Establish maximum group size of 16 (including guides on commercial trips). | September 30 (allocation season) between private and commercial sectors (including guides). Establish maximum private group size of 25 people and a daily launch limit of 75 people. For commercial use, establish a maximum trip size of 25 passengers, plus one crew member per passenger carrying craft, plus two additional crew. Establish a commercial daily launch limit of 75 passengers. Permit 18 commercial outfitters.<br>• Cisco Landing to Dewey Bridge: Manage to provide an opportunity for scenic flat water boating or as an extension of Westwater Canyon trips. For private use, no restrictions on amount of use would be established. Permit 22 unallocated commercial permits. No further restrictions on amount of commercial use would be established. Manage the Dewey Bridge Recreation Site under the Colorado Riverway RAMP.<br>• Dolores River from Bridge Canyon to its confluence with the Colorado River: Manage to provide opportunity for scenic whitewater boating trips. Permits required for private and commercial use. Establish maximum group size of 25 (excluding guides on commercial trips). Do not establish daily launch limits. Permit 14 unallocated commercial outfitters. | • Cisco Landing to Dewey Bridge: Permit 25 unallocated commercial permits.<br>• Dolores River from Colorado State Line to its confluence with the Colorado River: Establish maximum group size of 32 (excluding guides on commercial trips). |
| **Potential Future Facilities:**<br>N/A | **Potential Future Facilities:**<br>Same as the Proposed Plan, except do not seek to develop a take-out facility separate from the Westwater Ranger Station launch ramp. | **Potential Future Facilities:**<br>Acquire additional lands at the Westwater Ranger Station to include additional camping, parking and launch facilities. Seek to develop a take-out facility separate from the Westwater Ranger Station launch ramp to reduce congestion at the ranger station. Seek opportunities to expand legal and physical access to facilitate camping at the Ranger Station. | **Potential Future Facilities:**<br>Same as the Proposed Plan. |
| **Focus Area: Non-mechanized Recreation:**<br>N/A | **Focus Area: Non-mechanized Recreation:**<br>Same as the Proposed Plan. | **Focus Area: Non-mechanized Recreation:**<br>• Establish the Westwater Canyon River Use and Hiking Focus Area (23,479 acres) inclusive of Westwater Canyon along the Colorado River between Westwater Ranch and Rose Ranch and the surrounding uplands.<br>• New motorized routes would not be considered. | **Focus Area: Non-mechanized Recreation:**<br>The focus areas would not be established. |

| Utah Rims SRMA | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Continue to manage the Utah Rims area for general recreation use. BLM presently has a limited management program in place for the area included in the proposed Utah Rims SRMA.<br><br>Manage the Kokopelli's Trail for recreation use.<br><br>Manage Bitter Creek Campsite for camping.<br><br>Continue limiting travel to existing routes. | Same as the Proposed Plan, except:<br>• No new recreational routes would be established. | Manage the Utah Rims area (Map 2-8) as a Community SRMA (15,424 acres) to provide sustainable opportunities for motorized, mechanized and non-motorized route related recreation while protecting and maintaining resource values including range, wildlife habitat, scenic, cultural, recreational, and riparian values in current or improved condition. Work with Colorado BLM to coordinate management of the Utah Rims and Rabbit Valley Colorado areas.<br><br>Management actions would include:<br>1. Limiting motorized and mechanized travel to a designated road and route system, including where feasible, the establishment and management of a network of single-track routes.<br>2. Acquisition of public access across non-Federal lands for the route system.<br>3. Development of a staging area.<br>4. Potential separation of types of single-track route use by time period.<br>5. Limited provision of camping facilities.<br>6. Prohibition of competitive, motorized events on the single-track route system to maintain its single-track nature.<br>Add single-track routes to the route system on a case-by-case basis pending resolution of resource concerns. | Utah Rims SRMA would not be established. |

BLM_0010942

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| Moab Extensive Recreation Management Area (ERMA) Establishment |
|---|

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Manage all lands within the MPA not within an SRMA as the Moab Extensive Recreation Management Area (ERMA; see Maps 2-8-A through 2-8-D) and Appendix F).
- ERMA lands may be designated as SRMAs in the future based on intensity of use and would be analyzed through the plan amendment process.
- Minimal facilities may be constructed in the ERMA as needed to insure visitor health and safety, reduce user conflict, and protect resources.
- Provide general recreation management guidance and subsequent implementation of management actions for activity plan level actions for the Moab ERMA through development of a Recreation Area Management Plan (RAMP). Address both site-related issues (development and management in response to user demand and changing conditions) and backcountry management issues (the retention of backcountry characteristics, e.g., low level of development, relative lack of crowding, and feeling of remoteness).
- Amend the RMP, as necessary, for RMP level recreation and non-recreation actions proposed through the RAMP developed subsequent to RMP approval.
- Manage OHV travel as limited to designated routes or closed, depending on the specific area (see Travel Management section, beginning on page 2-47).
- Monitor recreation activity in the Moab ERMA to maintain recreation opportunities and protect resource values.

| Moab ERMA Management Guidance |
|---|

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Continue making improvements to sites and areas as necessary and supported by activity and project level planning to balance demand for recreation opportunities and protection of the recreation resource base.<br><br>Continue to manage the Utah portion of the Kokopelli's Trail as a multi-day mountain bike and vehicle route (in part) with associated camping areas. | Same as the Proposed Plan, except:<br><br>• Upper Fisher Mesa would not be managed to emphasize mountain biking use. | • Continue making improvements to sites and areas as necessary and supported by activity and project level planning to balance demand for recreation opportunities and protection of the recreation resource base.<br>• Continue to manage the Utah portion of the Kokopelli's Trail as a multi-day mountain bike and vehicle route (in part) with associated camping areas.<br>• Develop basic camping and trailhead facilities to serve the Lost Spring Canyon area should use levels and impacts warrant.<br>• Construct information boards at the main exits along I-70 to inform visitors about recreation opportunities, travel management, low impact recreation techniques, and visitor safety issues.<br>• Upper Fisher Mesa (1,365 acres) would be managed to emphasize mountain biking. BLM would convert existing roads and provide new connecting routes for bicycle use in conjunction with the existing bike route within the Manti-LaSal National Forest. Motorized access would be retained along the main existing Fisher Mesa access road.<br>• Manage the Bookcliffs area (335,457 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It would be managed for low frequency of visitor interaction by not establishing new motorized or mechanized recreation routes, no commercial motorized permits would be issued, and competitive events would not be allowed.<br>• Manage the Sego Canyon Rock Art Site as a day use recreation area. Consider acquisition of the adjacent private rock art area north of the interpretive site to expand interpretive opportunities. | Same as the Proposed Plan, except:<br><br>• Manage the Bookcliffs area (141,679 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It would be managed for low frequency of visitor interaction by not establishing new motorized or mechanized recreation routes, no commercial motorized permits would be issued, and competitive events would not be allowed. |

| General Policy for Issuance and Management of Special Recreation Permits (SRPs) |
|---|

**Management Common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- SRPs would be issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs would be applied where appropriate.
- Priority for authorization of new SRPs for events would be given to applicants proposing uses that: do not duplicate existing events; take place outside of March, April, May, and October; make use of less-crowded weekdays; utilize facilities off public lands for overnight accommodation of guests; display and communicate the Canyon Country Minimum Impact Practices; and focus visitation on sites and areas capable of withstanding repeated use.
- All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns.
- There would be no competitive mechanized or motorized events in Wilderness Study Areas while these areas are managed under the IMP.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Continue to issue and manage special recreation permits (e.g., four-wheel drive vehicle tours, horseback trips, bear hunting camps, survival school) to enhance outdoor recreational opportunities and provide business opportunities for | Same as the Proposed Plan, except:<br><br>• Increased emphasis would be placed upon mitigating the impacts of new | • Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of | • Same as the Proposed Plan, except that increased emphasis would be placed upon realizing positive economic and community benefits through SRP management. |

BLM_0010943

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | |
|---|---|---|
| private enterprise.<br>Continue to permit competitive and noncompetitive OHV events. | uses in support of conservation of natural and cultural resource values.<br>• Organized group permits required for groups with 15 or more vehicles (one driver/vehicle.) | such uses upon natural and cultural resources.<br>• Organized group permits required for groups with 25 or more vehicles (one driver/vehicle.) | • Organized group permits required for groups with 50 or more vehicles (one driver/vehicle.) |

#### RIPARIAN

**Goals and Objectives:**
- Manage riparian areas for properly functioning condition (PFC) and ensure stream channel morphology and functions are appropriate for local soil type, climate, and landform.
- Avoid or minimize the disturbance, loss, or degradation of riparian, wetland, and associated floodplains; preserve and enhance natural and beneficial values; and provide for fish, wildlife and special status species habitats.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**
- Manage riparian resources for PFC, which is described as the presence of adequate vegetation, landforms, or large woody debris, in accordance with the Utah Standards for Public Rangeland Health and Guidelines for Recreation Management for BLM Lands in Utah and with the Grazing Guidelines for Grazing Management.
- Retain the Between the Creeks, North Sand Flats, and South Sand Flats Allotments as not available for grazing to benefit riparian resources. These allotments include the following streams: Negro Bill Canyon, portions of Mill Creek, and Rill Creek.
- Mitigation to reduce impacts to floodplains and riparian areas include (from Standards for Public Land Health and Guidelines for Recreation Management for BLM Lands in Utah and BLM Riparian Manual 1737):
  1. Where feasible and consistent with user safety, developed travel routes would be located/relocated away from sensitive riparian/wetland areas.
  2. Camping in riparian areas would be avoided and must be managed, monitored, and modified as conditions dictate to reduce vegetation disturbance and sedimentation.
  3. Stream crossings would be limited in number dictated by the topography, geology, and soil type. Design any necessary stream crossings to minimize sedimentation, soil erosion and compaction (minimize longitudinal routes along stream banks, design crossings perpendicular to the stream).
  4. Where necessary, control recreational use by changing location or kind of activity, season, intensity, distribution and/or duration.
  5. Grazing actions to meet riparian objectives include vegetation use limits, fencing, herding, change of livestock class, temporary closures, change of season, and/or alternate development or relocation of water sources.
  6. Any water diversions from riparian areas by BLM or non-BLM entities would be designed and constructed to protect ecological processes and functions.
  7. Implement weed management stipulations and education to reduce spread of noxious weeds along stream corridors.
  8. To the extent possible, mineral removal and lease development (including placer mining) must be located away from water's edge and outside of riparian/wetland zones.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**
- Limit activities in riparian areas, as necessary, to achieve and maintain PFC.
- Grazing actions to meet riparian objectives can include fencing, herding, change of livestock class, temporary closures, and/or change of livestock season of use.
- Preclude surface-disturbing activities within 100-year floodplains, 100 m of riparian areas, public water reserves, and 100 m of springs.
- Prioritize restoration activities in riparian systems that are Functioning at Risk or Non-functioning.
- Continue to apply integrated species management to accomplish riparian restoration through biological, chemical, mechanical, and manual methods (e.g., tamarisk control, willow plantings).
- Acquire riparian lands and water resources (from willing sellers) to preserve and maintain riparian habitat and instream flow.
- Do not dispose of riparian or wetland resources unless resource loss is mitigated.
- Develop watershed management plans for impaired systems as identified in current TMDL reports (e.g., Onion Creek, Mill Creek, and Castle Creek).
- Close riparian areas to woodcutting, except where permitted for traditional cultural practices identified for Native Americans or for restoration to benefit riparian values.
- Establish Lower South Fork of Seven Mile Canyon as a Riparian/Wetland Demonstration Area for the improvement and restoration of riparian, wetland and wildlife resources.
- Grazing would not be authorized on portions of the following streams (listed with affected allotments): the Colorado River from Dewey Bridge to Hittle Bottom (Professor Valley), and Lower Kane Creek (Kane Creek Springs).
- Management strategies would be implemented to restore degraded riparian communities, protect natural flow requirements, protect water quality, and manage for year-round flow.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| **Grazing Actions:** | **Grazing Actions:** | **Grazing Actions:** | **Grazing Actions:** |
| • Retain the Between the Creeks, North Sand Flats, South Sand Flats, Spring Creek, Castle Valley, Pear Park, Bogart, Cottonwood and Diamond Allotments as not available to grazing to benefit riparian resources.<br>• Maintain the reduction of AUMs in the Cisco Allotment (1,819 AUMs allocated to livestock). | • Evaluate non-functioning and functioning at risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if exclusion from grazing would improve riparian functioning condition.<br>• The following riparian areas would be given priority for evaluation: Lower Gray Canyon of the Green River from Rattlesnake Canyon to Swasey's Beach, Ten Mile from Dripping Spring to the Green River, Mill Creek, Seven Mile Canyon, East Coyote, Kane Springs, and Hatch Wash (totaling 4,673 acres).<br>• BLM would be required to build and maintain fences and provide access to water in Seven Mile Wash, and East Coyote wetland areas.<br>• Cottonwood, Bogart and Diamond Allotments (which include Cottonwood and Diamond Canyons) would continue to not be available | • Evaluate non-functioning and functioning at risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing would improve riparian functioning condition. The following riparian areas would be given priority for evaluation: Ten Mile from Dripping Spring to the Green River, Mill Creek, Seven Mile Canyon, and East Coyote (totaling 1,420 acres).<br>• Cottonwood, Bogart, Pear Park and Diamond Allotments (which include Cottonwood and Diamond Canyons) would continue to be not available to grazing to benefit riparian resources. Castle Valley would also not be available for grazing. Spring Creek would be available for grazing. | • Grazing management in riparian areas would be identical as described in Alternative A, except that Spring Creek, Pear Park, Castle Valley, Cottonwood, Diamond and Bogart Allotments would be available for grazing. |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | to grazing to benefit riparian resources. Castle Valley, Spring Creek and Pear Park would also be not available for grazing. | | |
| **Season-of-Use:** <br> N/A | **Season-of-Use:** <br> Season of use adjustments would be made on a case-by-case basis to achieve PFC. | **Season-of-Use:** <br> Season of use adjustments would be made on a case-by-case basis to achieve PFC. | **Season-of-Use:** <br> Season of use adjustments would be made on a case-by-case basis to achieve PFC. |
| **Watershed Management Plans:** <br> Not specified. | **Watershed Management Plans:** <br> Prioritize development and implementation of the Watershed Management Plans and riparian studies for the following areas: Mill Creek (including North Fork, Rill, and Burkholder), Ten Mile Wash, Kane Springs, White Wash, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Professor Creek, Negro Bill Canyon, Cottonwood/Diamond, Spring Canyon, Red Wash, Green River, Colorado River, Onion Creek and Westwater Creek. | **Watershed Management Plans:** <br> Prioritize development and implementation of the Watershed Management Plans and riparian studies for the following areas: Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood-Diamond, and Onion Creek. | **Watershed Management Plans:** <br> Do not prioritize Watershed Management Plans. |

## SOIL AND WATER

**Goals and Objectives:**

- Manage watersheds to enhance ecosystem health and provide for public uses.
- Maintain and improve existing water quality by ensuring that all authorized uses on public lands comply with State water quality standards and with the Colorado River Basin Salinity Control Act.
- Manage watersheds to maintain or improve soil quality and long-term productivity.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- Comply with all State, Federal and local laws to protect municipal watersheds (Thompson, Moab, and Castle Valley), and watersheds of any public or private water supply such as Windwhistle Campground, Westwater Ranger Station, La Sal Creek, and Browns Hole.
- Coordinate with Utah Division of Oil, Gas, and Mining to remediate existing Abandoned Mine Lands sites.
- Comply with Floodplain Executive Order 11988.
- BLM would work with partners to implement Best Management Practices (BMPs) and continue BLM's cooperative work with the Utah Divisions of Water Rights and Water Quality in accordance with the administrative memorandum of understanding (MOU) and the cooperative agreement addressing water quality monitoring.

**Management Common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

- Allow no surface occupancy and preclude surface-disturbing activities (see Appendix C) within 100-year floodplains, within 100 m of a natural spring, or within public water reserves.
- In cooperation with Grand and San Juan Counties, develop BMPs for road maintenance and construction in high risk areas (e.g., floodplains, riparian zones, and areas with sensitive soils).
- Continue management of the Mill Creek planning area in accordance with the Mill Creek Management Plan (2001).
- Develop watershed management plans for municipal watersheds to ensure water sources are protected adequately. Monitor municipal water quality/watershed conditions.
- To protect sensitive soils on slopes, apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) prohibiting surface-disturbing activities on slopes in the Bookcliffs (see Map 2-12) greater than 30% from November 1 to April 30. This restriction includes road construction and traffic on existing roads associated with initial drilling operations. In addition, apply a controlled surface use stipulation for oil and gas and other surface-disturbing activities (see Appendix C) on slopes greater than 30% throughout the MPA.
- Follow Total Maximum Daily Load (TMDL) recommendations on 303(d) listed streams, currently Mill, Castle, and Onion Creeks.
- Minimize surface disturbance in areas identified as having "sensitive soils" (see Chapter 3, Soil and Water) unless long-term impacts can be mitigated.
- Maintain vegetation based on desired future condition to provide adequate ground cover to prevent accelerated erosion in wind erodible soils.
- Apply environmental BMPs to all oil and gas authorizations in accordance to WO IM 2007-021 and the most current version of the "Goldbook."
- Develop BMPs to address health and safety concerns associated with blowing dust along U.S. 191 and I-70.
- Maintain or improve soil quality and long-term soil productivity through the implementation of Standards for Rangeland Health and other soil protection measures.
- Manage uses to minimize and mitigate damage to soils.
- Maintain and/or restore overall watershed health and reduce erosion, stream sedimentation, and salinization of water.
- Coordinate with Grand Water and Sewer Service Agency to ensure required minimum instream flow of 3.0 cfs in Mill Creek below the Sheley diversion.
- Implement portions of Greater Sagers Wash Watershed Management Plan that pertain to surface disturbance.
- No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan accompanying this RMP (see Appendix G). An exception would be considered on a case-by-case basis for proposed routes in the Dee Pass Motorized Focus Area and in the Utah Rim SRMA. Exceptions could also be considered on a case-by-case basis outside these two areas if potential impacts could be mitigated and if the action would benefit other natural and cultural resources.
- Develop BMPs for activities on saline and other sensitive soils.
- Specific recommendations regarding surface and subsurface pipeline crossings found in Guidance for Pipeline Crossings (see Appendix H) would be implemented to prevent breakage and subsequent contamination.
- Implement guidelines from Technical Reference 1730-2, where feasible, to protect or restore the functions of biological soil crusts.
- Manage public lands in a manner consistent with the Colorado River Salinity Control Program, implementing BMPs and watershed restoration projects to reduce salinity contributions to the Colorado River system.

BLM_0010945

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| **Aquifers/Watersheds:** <br><br> The Castle Valley aquifer was not addressed. <br><br> The Mill Creek-Spanish Valley aquifer was not addressed. | **Aquifers/Watersheds:** <br><br> Close the Castle Valley watershed to oil and gas leasing and other surface-disturbing activities to protect the Castle Valley sole source, unconfined, surficial aquifer. <br><br> Close the Mill Creek-Spanish Valley watershed to oil and gas leasing and other surface-disturbing activities to protect the aquifer for the Moab area. | **Aquifers/Watersheds:** <br><br> Apply a no surface occupancy stipulation to oil and gas leasing and preclude other surface-disturbing activities in the Castle Valley watershed in order to protect the sole source, unconfined, surficial aquifer. <br><br> Apply a no surface occupancy stipulation to oil and gas leasing and preclude other surface-disturbing activities in the Mill Creek-Spanish Valley watershed in order to protect the aquifer for the Moab area. | **Aquifers/Watersheds:** <br><br> Do not apply a stipulation to protect the Castle Valley aquifer. <br><br> Do not apply a stipulation to protect the Mill Creek-Spanish Valley aquifer. |
| **Saline Soils in Mancos Shale:** <br><br> Apply a timing limitation on 313,800 acres of Mancos Shale prohibiting surface-disturbing activities from November 1 to April 30. | **Saline Soils in Mancos Shale:** <br><br> To minimize watershed damage on saline soils in the Mancos Shale, apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) prohibiting surface-disturbing activities on 330,142 acres of moderately to highly saline soils in the Mancos Shale (see Map 2-13) from December 1 to May 31. This restriction includes road construction and traffic on existing roads associated with drilling operations. | **Saline Soils in Mancos Shale:** <br><br> Same as Alternative B. | **Saline Soils in Mancos Shale:** <br><br> Do not apply a timing limitation to saline soils in the Mancos Shale. |
| **Grazing:** <br><br> Manipulate livestock grazing on portions of ten allotments to lessen impacts on saline soils and reduce salinity in the Colorado River Drainage. | **Grazing:** <br><br> Use Standards for Rangeland Health and Guidelines for Grazing Management to consider adjusting season of use on allotments with saline soils to minimize soils compaction. | **Grazing:** <br><br> Use grazing systems and develop AMPs to minimize impacts to saline soils. | **Grazing:** <br><br> Same as Alternative A. |
| **Watershed Management Plans:** <br> Not specified. | **Watershed Management Plans:** <br><br> Prioritize development and implementation of the Watershed Management Plans for the following areas: Mill Creek (including North Fork, Rill, and Burkholder), Ten Mile Wash, Kane Springs, White Wash, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Professor Creek, Negro Bill Canyon, Cottonwood/Diamond, Spring Canyon, Red Wash, Green River, Colorado River, Onion Creek and Westwater Creek. | **Watershed Management Plans:** <br><br> Prioritize development and implementation of the Watershed Management Plans for the following areas: Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood-Diamond, and Onion Creek. | **Watershed Management Plans:** <br><br> Do not prioritize Watershed Management Plans. |

## SPECIAL DESIGNATIONS – AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACECs)

The term "Area of Critical Environmental Concern" means areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards (FLPMA, 43 U.S.C. 1702(a)).

**Goals and Objectives:**

Designate, modify and manage areas as ACECs where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards.

**Management Common to the PROPOSED PLAN and Draft RMP Alternative B (see Maps 2-14-A through 2-14-D for ACECs by alternative; see Appendix I for the Relevance and Importance Evaluations of Area of Critical Environmental Concern Nominations)**

- In those areas where ACECs overlap with WSAs, the WSA management prescriptions, as stipulated in the Interim Management Policy for Lands Under Wilderness Review (IMP), would take precedence.
- ACECs would be avoidance areas for all ROWs, including wind, solar energy and communication sites.

### Behind the Rocks Potential ACEC

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| The area is not designated as an ACEC. <br><br> Behind the Rocks WSA would be managed according to the IMP to protect wilderness values (12,635 acres). <br><br> Manage 694 acres as open to oil and gas leasing, 1,958 acres as no surface occupancy, and 15,196 acres as closed. | Behind the Rocks Potential ACEC (17,836 acres) would be designated as an ACEC. This area includes the Behind the Rocks WSA (12,635 acres) in its entirety. <br><br> **Special Management:** To protect the relevant and important values of natural systems (threatened, sensitive, and endangered plants), cultural resources and scenery, the following management prescriptions would apply: <br> • Designate as VRM Class I. <br> • No vegetation treatments except for noxious weeds and exotics. <br> • Cultural resources would be prioritized for Class III inventory. <br> • Vehicle-based camping only in campgrounds. No campfires outside of | Behind the Rocks Potential ACEC (5,201 acres) would be designated as an ACEC. This area excludes the Behind the Rocks WSA, which would be managed according to the IMP to protect wilderness values. <br><br> **Special Management:** To protect the relevant and important values of natural systems (threatened, sensitive, and endangered plants), cultural resources and scenery, the following management prescriptions would apply: <br> • Designate as VRM Class II. <br> • No vegetation treatments (except for exotic/noxious weeds). <br> • Cultural resources in Behind the Rocks ACEC would be prioritized for Class III inventory. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to: <br> • The Behind the Rocks WSA would be managed according to the IMP to protect wilderness values (12,635 acres). <br> • The remaining 5,201 acres will be managed as follows: <br> Designate as VRM Class III. <br> Allow vegetation treatments. <br> Open to oil and gas leasing with standard terms and conditions. |

BLM_0010946

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | campgrounds.<br>• No new motorized or mechanized routes, motorized/mechanized travel limited to designated routes.<br>• Manage the WSA as closed to oil and gas leasing and other surface-disturbing activities (12,635 acres). Manage the non-WSA lands with wilderness characteristics as closed to oil and gas leasing (4,231 acres). In the remaining 970 acres, apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities.<br>• No commercial or private use of woodland products. | • Vehicle-based camping only in campgrounds. No campfires outside of campgrounds.<br>• No new motorized or mechanized routes, motorized/mechanized travel limited to designated routes.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No commercial or private use of woodland products.<br>There are approximately 12,635 acres of this potential ACEC proposed for designation under another statutory authority (Wilderness Study Area) and no further management attention is required. | |

| Bookcliffs Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC.<br><br>Desolation, Flume, Floy, Coal and Spruce WSAs would be managed according to the IMP to protect wilderness values (250,207 acres).<br><br>Manage 15,757 acres as open to oil and gas leasing, 38,415 acres with timing limitations and controlled surface use, and 250,207 acres as closed.<br><br>OHV designations include open and limited to existing routes. | Bookcliffs Potential ACEC (304,252 acres) would be designated as an ACEC. This area includes Desolation, Flume, Floy, Coal, and Spruce WSAs (250,207 acres).<br>**Special Management:** To protect the relevant and important values of wildlife and cultural resources, the following management prescriptions would apply:<br>• All WSAs would be managed according to the IMP.<br>• Work with UDWR and other agencies to create and implement a Habitat Management Plan for the Bookcliffs.<br>• No new motorized or mechanized routes. Motorized and mechanized travel is limited to designated routes outside the WSA and closed in the WSA.<br>• Manage WSAs as closed to oil and gas leasing and other surface-disturbing activities (249,988 acres). Manage the non-WSA lands with wilderness characteristics as closed to oil and gas leasing (19,901 acres). In the remaining 34,363 acres, apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No commercial or private use of woodland products.<br>• Prioritize Bookcliffs for Class III cultural inventory. | Proposed area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• The WSAs (Desolation, Flume, Floy, Coal, and Spruce) would be managed according to the IMP.<br>• Areas outside of the WSAs (54,174 acres) would be managed according to the following prescriptions:<br>   • Apply standard and controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). | Same as the Proposed Plan. |

| Canyon Rims Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Not designated as an ACEC.<br><br>Manage as part of the Canyon Rims SRMA (see SRMA prescriptions).<br><br>Designate as VRM Class II.<br><br>Manage with timing limitations and controlled surface use for oil and gas leasing. | Canyon Rims Potential ACEC (23,400 acres) would be designated as an ACEC. **Special Management:** To protect the relevant and important value of scenery, the following management prescriptions would apply:<br>• Designate as VRM Class II.<br>• No new motorized or mechanized routes. Motorized and mechanized travel limited to designated routes. Manage consistently with the Canyon Rims Recreation Area Plan.<br>• Manage the non-WSA lands with wilderness characteristics as closed to oil and gas leasing (3,417 acres). Apply a no surface occupancy stipulation for oil and gas leasing, and preclude other surface-disturbing activities (see Appendix C) on the remaining 19,983 acres. | Proposed area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Manage as part of the Canyon Rims SRMA (see SRMA prescriptions).<br>• Designate as VRM Class II.<br>• Avoid permitting new ROWs.<br>• Apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities in 15,422 acres. The Scenic Byway corridor (7,035 acres) would be managed as controlled surface use for oil and gas leasing and other surface-disturbing activities (see Appendix C). The remainder of the area (943 acres) would be managed as open with standard stipulations. | Proposed area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Manage as part of the Canyon Rims SRMA (see SRMA prescriptions).<br>• Designate as VRM Class II and III.<br>• Avoid permitting new ROWs.<br>• The area would be managed with the following stipulations for oil and gas: 2,226 acres are open to leasing subject to standard terms and conditions, and apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities to 17,420 acres. The Scenic Byway corridor (3,754 acres) would be managed as controlled surface use for oil and gas leasing and other surface-disturbing activities (see Appendix C). |

| Cisco White-tailed Prairie Dog Complex Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC. | Cisco White-tailed Prairie Dog Complex Potential ACEC (117,481 acres) | Proposed area would not be designated as an ACEC. Management of the | The area would not be designated as an ACEC. Management of the acreage |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| Currently implemented Seasons of Use for livestock grazing: Agate - 3/15, Cisco - 5/10, Cisco Mesa - 5/15, Corral Wash - 5/10, Harley - 5/12, Highlands - 5/15, Monument Wash - 5/15, Pipeline - 5/15, San Arroyo - 5/25, and Sulphur Canyon - 4/12.<br><br>Manage 97,089 acres as open to oil and gas leasing, 19,240 acres with timing limitations and controlled surface use, and 1,152 acres as no surface occupancy. | would be designated as an ACEC.<br><br>**Special Management:** To protect the relevant and important value of wildlife, the following management prescriptions would apply:<br><br>• Use grazing systems and develop AMPs to protect prairie dog habitat in the following allotments or portions of allotments: Agate, Cisco, Cisco Mesa, Harley Dome, Highlands, Monument Wash, Pipeline, San Arroyo. Establish rest-rotation system to allow adequate recovery for seed dispersal and establishment.<br>• Work with UDWR to prohibit shooting of prairie dogs year-round and ban prairie dog poisoning on public lands.<br>• Develop cooperative agreements with UDWR and USFWS to inventory prairie dog densities and to manage habitat for prairie dogs, ground squirrels and raptors.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No new motorized or mechanized routes. Motorized and mechanized travel is limited to designated routes. | acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br><br>• Maintain current season of use, and manage grazing to allow for adequate seed production.<br>• Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 660 feet of active prairie dog colonies. No permanent above-ground facilities would be allowed within the 660-foot buffer. | would default to prescriptions applicable to the general area. |

| Colorado River Corridor Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Negro Bill Canyon would be designated as Outstanding Natural Area (1,375 acres).<br><br>Continue the Three Rivers Withdrawal for locatable minerals (18,519 acres).<br><br>Manage the river corridor as part of the Colorado River Recreation Area and the Colorado River SRMA.<br><br>Manage 34,342 acres as open to oil and gas leasing, 10,864 acres with timing limitations and controlled surface use, 1,189 acres as no surface occupancy, and 3,613 acres as closed. | Colorado River Corridor Potential ACEC (50,483 acres) would be designated as an ACEC.<br><br>• Negro Bill Canyon would no longer be designated as an Outstanding Natural Area, but would be included within the Colorado River Corridor ACEC. Negro Bill Canyon WSA would be managed according to the IMP to protect wilderness values.<br>• Manage recreation use according to the Colorado Riverway SRMA (see SRMA prescriptions) with the exception of the Dry Mesa/Cache Valley area north of the Colorado River.<br>• **Special Management:** To protect the relevant and important values of natural systems (threatened, sensitive and endangered plants), fish and wildlife, and scenery, the Colorado River Corridor would be designated as an ACEC with the following management prescriptions:<br><br>Designate as VRM Class I.<br><br>No permitted activities north of the river (excluding immediate river corridor) during crucial bighorn lambing and rutting periods, April 1 through June 15 and October 1 to December 15, respectively.<br><br>Motorized and mechanized travel limited to designated routes.<br><br>No competitive OHV events.<br><br>Vehicle-based camping only in designated campsites on south side of the Colorado River.<br><br>Campfires for vehicle-based camping would be allowed only within designated campsites on the south side of the Colorado River.<br><br>No Special Recreation Permits would be issued north of the river (except for immediate river corridor used by river runners).<br><br>No vegetation treatments except for noxious weeds and exotics.<br><br>Season of use adjustments for livestock grazing in crucial bighorn lambing and rearing habitat (see Wildlife).<br><br>Retain ACEC in public ownership except lands involved in the existing Professor Valley land exchange.<br><br>Prioritize acquisition of inholdings as opportunity presents itself.<br><br>Apply a no surface occupancy stipulation on 9,196 acres for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). Close | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br><br>• Negro Bill Canyon would no longer be designated as an Outstanding Natural Area. The Negro Bill Canyon WSA would be managed according to the IMP to protect wilderness values.<br>• Designate as VRM Class II (see VRM section starting on page 2-50) except for Negro Bill WSA, which would be managed as VRM Class I.<br>• Manage recreation use according to the Colorado Riverway SRMA (see SRMA prescriptions) with the exception of the Dry Mesa/Cache Valley area north of the Colorado River, which would be managed according to the following prescriptions: No permitted activities north of the river (except in the immediate river corridor) during crucial bighorn lambing and at rutting seasons, April 1 through June 15 and October 1 to December 15, respectively.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) in VRM Class II areas, areas within the Three Rivers Withdrawal (see Map 2-1) and in crucial bighorn lambing and rearing areas. Within these areas, prohibit geophysical exploration for oil and gas, and close to minerals material disposal. Close areas unreachable by directional drilling to oil and gas leasing. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br><br>• Negro Bill Canyon would no longer be designated as an Outstanding Natural Area. The Negro Bill Canyon WSA would be managed according to the IMP to protect wilderness values.<br>• Manage recreation use according to the Colorado Riverway SRMA (see SRMA prescriptions).<br>• Area would be managed the same as the Proposed Plan, with the following exceptions:<br><br>Permitted activities would be allowed year-round.<br><br>Apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C).<br><br>Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) within the Three Rivers Withdrawal (see Map 2-1).<br><br>Open to minerals material disposal.<br><br>Open to geophysical exploration for oil and gas.<br><br>No commercial or private collection of woodland products on the south side of the river. |

BLM_0010948

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| | 33,548 acres of non-WSA lands with wilderness characteristics to oil and gas leasing. Close 8,008 acres, which are unreachable by directional drilling to oil and gas leasing.<br>No commercial or private collection of woodland products. | | |

**Cottonwood-Diamond Watershed Potential ACEC**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| This area is not designated as an ACEC.<br>Manage the portions of the Cottonwood-Diamond Watershed Potential ACEC (34,004 acres) within the Flume, the Coal Canyon and the Spruce WSAs according to the IMP to protect the wilderness values.<br>Manage areas outside the WSAs with timing limitations and controlled surface use for oil and gas leasing (1,825 acres). | Cottonwood-Diamond Watershed Potential ACEC (35,830 acres) would be designated as an ACEC.<br>**Special Management: NOTE: ACEC would only be designated until hazard is no longer present. At that point, management would revert to the IMP.** To protect the relevant and important values of natural systems, and to mitigate the natural hazards due to fire, the following management prescriptions would apply:<br>• Continue to keep area not available to livestock grazing.<br>• Close to vehicle use at the end of the Class B-road system, except for administrative access.<br>• No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes outside the WSA, and closed in the WSA.<br>• No competitive events.<br>• Suspend commercial permits (guiding or special groups).<br>• Manage the acreage within the WSAs (34,027 acres) as closed to oil and gas leasing and other surface-disturbing activities. Manage the remaining acreage within non-WSA lands with wilderness characteristics as closed to oil and gas leasing (1,690 acres). Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities on the remaining acreage (113 acres; see Appendix C). | Cottonwood Diamond Watershed would be designated as an ACEC with the same prescriptions as in Alternative B, except that 34,027 acres within the WSA are closed to oil and gas leasing, and the remaining 1,804 acres would be managed as no surface occupancy for oil and gas leasing. Other surface-disturbing activities would be precluded (see Appendix C). | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Manage portions of the area that are in the Flume, Spruce or Coal WSA according to IMP. |

**Highway 279/Shafer Basin/Long Canyon Potential ACEC**

| Alternative A (No Action) | Alternative B | Proposed Plan | Alternative D |
|---|---|---|---|
| This area is not designated as an ACEC.<br>Manage 6,425 acres as open to oil and gas leasing, 4,606 acres with timing limitations and controlled surface use, 2,094 acres as no surface occupancy, and 362 acres as closed.<br>Continue the Three Rivers Withdrawal for locatable minerals (2,034 acres).<br>Avoid permitting new ROWs. | Highway 279/Shafer Basin/Long Canyon Potential ACEC (13,500 acres) would be designated as an ACEC.<br>**Special Management:** To protect the relevant and important values of scenery, wildlife, natural systems (threatened, sensitive, and endangered plants), and cultural resources, the following management prescriptions would apply:<br>• Designate as VRM Class I.<br>• Permitted activities would be confined to main roads within crucial bighorn lambing habitat from April 1 through June 15. This restriction would not apply to filming if the filming meets the minimum impact criteria (see Appendix B).<br>• Wall Street rock art sites would be managed for public use with the emphasis on interpretation.<br>• Motorized and mechanized travel limited to designated routes.<br>• Vehicle-based camping only in designated campgrounds.<br>• No campfires except in campgrounds.<br>• Retain ACEC in public ownership except for the previously initiated Moab Salt Exchange Parcel (635 acres).<br>• Manage non-WSA lands with wilderness characteristics as closed to oil and gas leasing (3,502 acres). Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to the remaining acreage (9,998 acres). | Highway 279/Shafer Basin/Long Canyon would be designated as an ACEC with the same prescriptions as in Alternative B, except:<br>• Designate Highway 279 and Long Canyon as VRM Class II; manage the remainder of the ACEC as VRM I.<br>• Manage the entire area as no surface occupancy for oil and gas leasing and preclude other surface-disturbing activities. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Designate as VRM Class III.<br>• The area would be managed with the following stipulations for oil and gas: 5,741 acres would be open to leasing subject to standard terms and conditions, and apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities on 5,370 acres. In addition, 2,389 acres along the Colorado River would be managed as no surface occupancy (see Appendix C). |

BLM_0010949

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Labyrinth Canyon Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC.<br><br>Manage as open to oil and gas leasing subject to standard terms and conditions and as open with controlled surface use stipulations for oil and gas.<br><br>Continue the Three Rivers Withdrawal for locatable minerals.<br><br>No commercial or private use of woodland products. | Labyrinth Canyon Potential ACEC (8,528 acres) would be designated as an ACFC.<br><br>**Special Management:** To protect the relevant and important values of scenery and fish, the following management prescriptions would apply:<br>• Designate as VRM Class I.<br>• No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.<br>• Manage non-WSA lands with wilderness characteristics as closed to oil and gas leasing (5,492 acres). Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) on the remaining lands (3,036 acres).<br>• No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Designate as VRM Class II.<br>• No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No commercial or private use of woodland products. | Same as the Proposed Plan. |

| Mill Creek Canyon Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC.<br><br>Manage Mill Creek Canyon WSA (9,780 acres) according to the IMP to protect wilderness values.<br><br>Manage the WSA as closed to oil and gas leasing and other surface-disturbing activities. Manage remainder of the area as open with standard stipulations.<br><br>Livestock grazing would be available in the Mill Creek Allotment. | Mill Creek Canyon Potential ACEC (13,501 acres) would be designated as an ACEC. This area includes the Mill Creek Canyon WSA (9,780 acres) in its entirety.<br><br>**Special Management:** To protect the relevant and important values of cultural resources, scenery, and natural systems (cold water fishery/riparian/watershed and wildlife), the following management prescriptions would apply:<br>• Recreation activities would be managed according to the South Moab SRMA.<br>• Prioritize Mill Creek for Class III cultural inventory.<br>• Protect Native American traditional cultural places.<br>• Designate as VRM Class I.<br>• Livestock grazing would not be available.<br>• No vehicle-based camping.<br>• No campfires in riparian areas.<br>• Motorized competitive events would be prohibited.<br>• No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.<br>• All recreational events would be confined to the designated roads in the ACEC.<br>• Limit recreation facility development to day-use only.<br>• Acquire state land within ACEC as the opportunity arises.<br>• Maintain 3 cfs in the South Fork of Mill Creek below the Sheley diversion.<br>• Manage the area as closed to oil and gas leasing. No recreational mining would be allowed.<br>• No fuel wood harvesting permits would be issued.<br>• Private wood gathering for backpacking campfires would be allowed in the uplands only. | Mill Creek Canyon Potential ACEC (3,721 acres) would be designated as an ACEC. This area excludes the Mill Creek Canyon WSA. The Mill Creek Canyon WSA (9,780 acres) would be managed according to the IMP to protect wilderness values.<br><br>**Special Management:** To protect the relevant and important values of cultural resources, scenery, natural systems (cold water fishery/riparian/watershed and wildlife), the following management prescriptions would apply to 3,721 acres in the ACEC:<br>• Recreation activities would be managed according to the South Moab SRMA.<br>• Prioritize Mill Creek for Class III cultural inventory.<br>• Protect Native American traditional cultural places.<br>• Designate as VRM Class II.<br>• Livestock grazing would not be available.<br>• No vehicle-based camping.<br>• No campfires in riparian areas.<br>• Motorized competitive events would be prohibited.<br>• No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.<br>• All recreational events would be confined to the designated roads in the ACEC.<br>• Limit recreation facility development to day-use only.<br>• Acquire state land within ACEC as the opportunity arises.<br>• Maintain 3 cfs in the South Fork of Mill Creek below the Sheley diversion.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No recreational mining would be allowed.<br>• No fuel wood harvesting permits would be issued.<br>• Private wood gathering for backpacking campfires would be allowed in the uplands only. | The proposed area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• The Mill Creek Canyon WSA would be managed according to the IMP to protect wilderness values (9,780 acres).<br>• The remaining 3,721 acres would be managed as follows:<br>Recreation activities would be managed according to the South Moab SRMA in that portion within the SRMA.<br>Designate as VRM Class II.<br>Livestock grazing would not be available.<br>Apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Ten Mile Wash Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC.<br><br>Manage as controlled surface use for oil and gas use.<br><br>Open to competitive motorized events. | Ten Mile Wash Potential ACEC (4,980 acres) would be designated as an ACEC.<br>**Special Management:** To protect the relevant and important values of natural systems (riparian/wetlands), wildlife, cultural resources and natural hazards, the following management prescriptions would apply:<br>• Prioritize Ten Mile for Class III cultural inventory.<br>• Prioritize Ten Mile as a scientific research area.<br>• No grazing in Ten Mile Canyon downstream from Dripping Springs.<br>• Prioritize area for riparian restoration.<br>• No vehicular travel in Ten Mile Wash from Dripping Springs to the Green River.<br>• Restrict camping and campfires to designated sites at Dripping Spring.<br>• Manage non-WSA lands with wilderness characteristics as closed to oil and gas leasing (232 acres). Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to the remaining acreage (4,748 acres).<br>• No commercial or private collection of woodland products.<br>NOTE: In Alternative B, Ten Mile does not have a designated road in it; therefore, all the road-related prescriptions have been removed from Alternative B. | Ten Mile Wash Potential ACEC (4,980 acres) would be designated as an ACEC with the following management prescriptions:<br>• Prioritize Ten Mile for Class III cultural inventory.<br>• Prioritize Ten Mile as a scientific research area.<br>• No grazing in Ten Mile Canyon downstream from Dripping Springs.<br>• Prioritize area for riparian restoration.<br>• Restrict camping and campfires to designated sites at Dripping Spring.<br>• Motorized and mechanized travel limited to designated routes.<br>• No competitive events.<br>• Establish speed limits.<br>• Reroute designated road around the wetlands south of the cattle guard near Dripping Springs.<br>• Restrict vehicle access at the Green River; designate a parking area at the Green River.<br>• Permits for motorized recreational use may be required if monitoring indicates long-term damage.<br>• Require permits for groups greater than 25 vehicles.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>• No commercial or private collection of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Continue present grazing management in Ten Mile Canyon.<br>• No campfires outside of designated sites.<br>• Motorized travel on designated routes only (see Map 2-11-D).<br>• Require permits for groups greater than 50 vehicles.<br>• Apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) to 2,558 acres. |

| Upper Courthouse Potential ACEC | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| This area is not designated as an ACEC.<br><br>Managed as open to oil and gas leasing with standard terms and conditions.<br><br>No commercial or private use of woodland products. | Upper Courthouse Potential ACEC (11,529 acres) would be designated as an ACEC.<br>• Recreation use would be managed in accordance with the Labyrinth Rims/Gemini Bridges SRMA.<br>• **Special Management:** To protect the relevant and important values of historic/cultural/paleontological resources and natural systems (threatened, sensitive, endangered, and relict plants), the following management prescriptions would apply:<br>Prioritize Upper Courthouse for a Class III cultural inventory.<br>No collection of petrified wood.<br>No new range improvements except for fencing.<br>No vegetation treatments except for noxious weeds and exotics, and to restore riparian environments.<br>Active protection of archeological sites from grazing.<br>Limit OHVs to designated routes (no sandhill climbing routes would be designated).<br>No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.<br>Vehicle-based camping only in designated sites.<br>No campfires outside of campgrounds.<br>No competitive OHV events.<br>Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C).<br>No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Recreation use would be managed in accordance with the Labyrinth Rims/ Gemini Bridges SRMA.<br>• Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to mesa-top relict plant communities.<br>• Avoid permitting new ROWs on the mesa-top relict plant communities.<br>• No commercial or private use of woodland products.<br>• Recommend the mesa-top relict plant communities for the withdrawal of locatable minerals. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to:<br>• Manage as open for oil and gas leasing (see Map 2-5-D).<br>• Open to locatable mineral development.<br>• No commercial or private use of woodland products. |

BLM_0010951

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

### Westwater Canyon Potential ACEC

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| This area is not designated as an ACEC. Manage the Westwater WSA according to the IMP to protect wilderness values. Manage as closed to oil and gas leasing and other surface-disturbing activities. Continue with the existing withdrawal for locatable minerals. Avoid permitting new ROWs. | Westwater Canyon Potential ACEC (5,069 acres) would be designated as an ACFC. This area is within the Westwater Canyon WSA. **Special Management:** To protect the relevant and important values of scenery and fish, the following management prescriptions would apply: • Manage the Westwater Canyon WSA according to the IMP to protect wilderness values. • Designate as VRM Class I. • Closed to motorized and mechanized travel. • Acquire inholdings within ACEC. • Manage as closed for oil and gas leasing and other surface-disturbing activities. • No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to: • Manage the Westwater Canyon WSA according to the IMP to protect wilderness values. | Same as the Proposed Plan |

### White Wash Potential ACEC

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| This area is not designated as an ACEC. Competitive motorized events would be allowed. Open to cross country OHV travel. Manage as no surface occupancy for oil and gas leasing. Open to locatable mineral development. | White Wash Potential ACEC (2,988 acres) would be designated as an ACEC. **Special Management:** To protect the relevant and important value of natural systems (riparian dune systems), the following management prescriptions would apply: • Limit OHVs to designated routes. • Competitive motorized events would not be allowed. • Vehicle-based camping in campgrounds only. • No fires or wood gathering allowed. • Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). • No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to: • Recreational use in this area would be managed according to the White Wash Sand Dunes Open OHV Focus Area (1,866 acres) within the Labyrinth Rims/ Gemini Bridges SRMA. The remaining 1,122 acres would be managed according to the Dee Pass Motorized Trail Focus Area in the same SRMA. • About 1,866 acres are open to OHV, and 1,122 acres are limited to designated routes. • Competitive motorized events would be allowed. • Manage as open to oil and gas leasing (see Map 2-5-C). • Open to locatable mineral development. • No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to: • Recreational use in this area would be managed according to the White Wash Sand Dunes Open OHV Focus Area within the Dee Pass SRMA for this alternative. • The entire area would be open to OHV use. • Competitive motorized events would be allowed. |

### Wilson Arch Potential ACEC

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| The area is not designated as an ACEC. Managed as open to oil and gas leasing. | Wilson Arch Potential ACEC (3,700 acres) would be designated as an ACEC. **Special Management:** To protect the relevant and important value of scenery, Wilson Arch would be designated as an ACEC with the following management prescriptions: • Designate as VRM Class I. • Build one trail up to Wilson Arch for hiking use only. • Motorized and mechanized travel limited to designated routes. • Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). • No commercial or private use of woodland products. | The area would not be designated as an ACEC. Management of the acreage would default to prescriptions applicable to the general area, which include, but are not limited to: • Designate as VRM Class II. • Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). | Same as the Proposed Plan, except designate as VRM Class III. |

### SPECIAL DESIGNATIONS – NATIONAL HISTORIC TRAIL – OLD SPANISH TRAIL

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

• Segments of the Old Spanish Trail would be identified and classified for historic integrity and condition. These segments would then be designated for appropriate types of management and travel.
• Landmarks along the Old Spanish Trail would be identified for historic integrity and interpreted only if the interpretation would not impact the values at the site. All interpretation projects would be done in consultation with Native Americans and other interested parties including the Old Spanish Trail Association and

BLM_0010952

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

National Park Service.
- Consider plan amendment, as necessary, to incorporate provisions of the forthcoming Old Spanish Trail Comprehensive Management Plan.
- Participate in the development of the management plan for the Old Spanish Trail and assist with its implementation as opportunities arise, consistent with other decisions of the RMP.
- Support protective management, interpretation, and public enjoyment and understanding of the National Historic Old Spanish Trail, consistent with the Old Spanish Trail Comprehensive Management Plan.
- Seek to acquire public access to the site of the Old Spanish Trail ford of the Green River, upstream from the town of Green River, Utah, for the purpose of developing an interpretive site.
- Consistent with the Cameo Cliffs and Canyon Rims Recreation Area Management Plans (RAMPs), consider developing and managing a section of Old Spanish Trail for equestrian use.

**SPECIAL DESIGNATIONS – WILD AND SCENIC RIVERS (WSRs)**

**Goals and Objectives:**
- Review all eligible rivers to determine suitability for Congressional designation into the National Wild and Scenic Rivers System (NWSRS).
- To the extent of the BLM's authority (limited to BLM lands within the river corridor), maintain and enhance the free flowing character, preserve and enhance the outstandingly remarkable values, and allow no activities within the river corridor that would alter the tentative classification of those river segments determined suitable for congressional designation in the NWSRS until Congress acts.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**
- River segments found suitable and recommended for designation be managed to protect their free-flowing condition and to protect the outstandingly remarkable values and maintain the tentative classification within line-of-sight up to 1/4 mile (1/3 miles on the Colorado and Dolores Rivers) from the high water mark on each bank of the river (not to exceed 320 acres per mile). Management that would apply any rivers be designated by Congress is identified in BLM Manual 8351.51 (see Appendix J and Maps 2-15-B and 2-15-C for river segments found suitable for WSR designation, by alternative).
- BLM would not seek water rights as part of a suitability decision made in the Record of Decision for this RMP.
- WSR segments recommended as suitable for Wild would be designate as VRM Class I; Scenic and Recreational segments would be designated as VRM Class II.
- OHV travel would be limited to designated routes or closed, depending on the river segment.
- The stipulations that would be applied to oil and gas leasing and other surface-disturbing activities within suitable river segments have been developed based on other resource values such as scenery, wildlife and fisheries, riparian, and recreation. In all cases, these stipulations are sufficient to protect the outstandingly remarkable values. All suitable segments would be managed with a no surface occupancy stipulation for oil and gas leasing as well as all other surface-disturbing activities, or as closed to oil and gas leasing (see Appendix C and Maps 2-5-B and 2-5-C for the surface stipulations application to oil and gas leasing and other surface-disturbing activities, by alternative).
- BLM would work with the State of Utah, local and tribal governments, and other federal agencies, in a state-wide study, to reach consensus regarding recommendations to Congress for the inclusion of rivers in the National Wild and Scenic Rivers System. Besides applying consistent criteria across agency jurisdictions, the joint study would avoid piece-mealing of river segments in logical watershed units in the state. The study would evaluate, in detail, the possible benefits and effects of designation on the local and state economies, agricultural and industrial operations and interests, outdoor recreation, natural resources (including the outstandingly remarkable values for which the river was deemed suitable), water rights, water quality, water resource planning, and access to and across river corridors within, and upstream and downstream from the proposed segments(s). Actual designation of river segments would only occur through congressional action or as a result of Secretarial decision at the request of the Governor in accordance with provisions of the Wild and Scenic Rivers Act (the Act). BLM will work with the State, local and tribal governments, and the agencies involved to coordinate its decision making on wild and scenic river issues and to achieve consistency wherever possible.
- BLM recognizes that water resources on most river and stream segments within the State of Utah are already fully allocated. Before stream segments that have been recommended as suitable under this Proposed Plan are recommended to Congress for designation, BLM will continue to work with affected local, state, federal, and tribal partners to identify in-stream flows necessary to meet critical resource needs, including values related to the subject segment(s). Such quantifications would be included in any recommendation for designation. BLM would then seek to jointly promote innovative strategies, community-based planning, and voluntary agreements with water users, under State law, to address those needs.
- Should designations occur on any river segment as a result of Secretarial or congressional action, existing rights, privileges, and contracts would be protected. Under Section 12 of the Act, termination of such rights, privileges, and contracts may happen only with the consent of the affected non-federal party. A determination by the BLM of eligibility and suitability for the inclusion of rivers on public lands to the Wild and Scenic Rivers System does not create new water rights for the BLM. Federal reserved water rights for new components of the Wild and Scenic Rivers System are established at the discretion of Congress. If water is reserved by Congress when a river component is added to the Wild and Scenic Rivers System, it would come from water that is not appropriated at the time of designation, in the amount necessary to protect features which led to the river's inclusion into the system. BLM's intent would be to leave existing water rights undisturbed and to recognize the lawful rights of private, municipal, and state entities to manage water resources under state law to meet the needs of the community. Federal law, including Section 13 of the Act and the McCarran Amendment (43 U.S.C. 666), recognizes state jurisdiction over water allocation in designated streams. Thus, it is BLM's position that existing water rights, including flows apportioned to the State of Utah interstate agreements and compacts, including the Upper Colorado River Compact, and developments of such rights would not be affected by designation or the creation of the possible federal reserved water right. BLM would seek to work with upstream and downstream water users and applicable agencies to ensure that water flows are maintained at a level sufficient to sustain the values for which affected river segments were designated.

**Beaver Creek (7.7 miles)**
- Segment 1 – Forest Service boundary to one mile from Dolores River
- Segment 2 – One mile to Dolores River

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for either of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable--Wild<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class I<br>Segment 2 – Suitable–Scenic<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Not suitable | Segment 1 – Not suitable<br>Segment 2 – Not suitable |

BLM_0010953

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
|  |

| **Colorado River (66.5 miles)** |
|---|
| • Segment 1 – Colorado-Utah state line to Westwater Canyon |
| • Segment 2 – Westwater Canyon (Mile 125) to River Mile 112 |
| • Segment 3 – River Mile 112 to confluence with the Dolores River |
| • Segment 3(a) – River Mile 112 to Cisco Wash |
| • Segment 3(b) – Cisco Wash to confluence with the Dolores River |
| • Segment 4 – Confluence with the Dolores River to River Mile 49 near Potash |
| • Segment 4 (portion for Alternative D only) – Hittle Bottom to Take Out Beach |
| • Segment 5 – River Mile 44.5 to Mile 38.5 state land boundary |
| • Segment 6 – River Mile 37.5 below state land to Mile 34 Canyonlands National Park |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for any of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 2 – Suitable-Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I<br>Segment 3 – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 4 – Suitable-Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 5 – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 6 – Suitable-Wild<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Suitable-Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I<br>Segment 3(a) – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 3(b) – Suitable-Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 4 – Suitable-Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 5 – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 6 – Suitable-Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Not suitable<br>Segment 3 – Not suitable<br>Segment 4 – Not suitable<br>Segment 5 – Not suitable<br>Segment 6 – Not suitable |

BLM_0010954

*Moab PRMP/FEIS*

Chapter 2: Proposed Plan and Draft Alternatives
Table 2.1 Moab PROPOSED PLAN and Draft RMP Alternatives

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Cottonwood Canyon (10.4 miles) | | | |
|---|---|---|---|
| Source near Cottonwood Point to private land (includes the first 1/2 mile of Horse Canyon) | | | |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Suitable–Scenic<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I | Not suitable | Not suitable |

| Dolores River (22.0 miles) | | | |
|---|---|---|---|
| Segment 1 – Colorado-Utah state line to Fisher Creek<br>Segment 2 – Fisher Creek to Bridge Canyon<br>Segment 3 – Bridge Canyon to Colorado River | | | |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for any of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 2 – Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class I<br>Segment 3 – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Suitable–Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 2 – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 3 – Suitable–Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Not suitable<br>Segment 3 – Not suitable |

| Green River (99.0 miles) | | | |
|---|---|---|---|
| Segment 1 – Coal Creek to Nefertiti Boat Ramp<br>Segment 2 – Nefertiti Boat Ramp to Swasey's Boat Ramp<br>Segment 3 – Swasey's Boat Ramp to I-70 Bridge<br>Segment 3(a) – Swasey's Boat Ramp to River Mile 97 (confluence with the San Rafael River; combination of Segment 3 and part of Segment 4)<br>Segment 4 – I-70 Bridge to River Mile 91 below Ruby Ranch<br>Segment 4(a) – Mile 97 (confluence with the San Rafael River) to Canyonlands National Park boundary (part of Segment 4 and all of Segments 5 and 6)<br>Segment 5 – Mile 91 below Ruby Ranch to Hey Joe Canyon<br>Segment 6 – Hey Joe Canyon to Canyonlands National Park Boundary | | | |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for any of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification | Segment 1 – Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed | Segment 1 – Suitable – Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed | Segment 1 – Not suitable<br>Segment 2 – Not suitable<br>Segment 3 – Not suitable |

BLM_0010955

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | VRM designation: Class I<br>Segment 2 – Suitable–Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 3 – Suitable–Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 4 – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 5 – Suitable–Wild<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class I<br>Segment 6 – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | VRM designation: Class I<br>Segment 2 – Suitable – Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 3 – Not suitable<br>Segment 3(a) – Not suitable<br>Segment 4 – Not suitable<br>Segment 4(a) – Suitable–Scenic<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II<br>Segment 5 – Not suitable<br>Segment 6 – Not suitable | Segment 4 – Not suitable<br>Segment 5 – Not suitable<br>Segment 6 – Not suitable |

| Mill Creek (6.0 miles) |
|---|
| • Segment 1 – National Forest boundary to private property below diversion |
| • Segment 2 – T26S, R23E, Section 19 to Power Dam |

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Suitability determination would not be made for either of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable–Recreational<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I<br><br>Segment 2 – Suitable–Scenic<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I | Segment 1 – Not suitable<br>Segment 2 – Not suitable | Segment 1 – Not suitable<br>Segment 2 – Not suitable |

BLM_0010956

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| **Negro Bill Canyon (7.4 miles)**<br>• Segment 1 – From state land below rim to 1/4 mile from Colorado River<br>• Segment 2 – Last 1/4 mile to Colorado River | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for either of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I<br>Segment 2 – Suitable–Recreational<br>Oil and gas leasing: NSO<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Not suitable | Segment 1 – Not suitable<br>Segment 2 – Not suitable |
| **North Fork Mill Creek (11.2 miles)**<br>• National Forest boundary near Wilson Mesa to Mill Creek | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I | Not suitable | Not suitable |
| **Onion Creek (12.5 miles)**<br>• Segment 1 – Source to Onion Creek Road<br>• Segment 2 – Beginning of Onion Creek Road to Colorado River | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for either of the eligible river segments. They would remain eligible and would be managed to protect their outstandingly remarkable values, free-flowing nature, and tentative classification. | Segment 1 – Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class I<br>Segment 2 – Suitable–Recreational<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class II | Segment 1 – Not suitable<br>Segment 2 – Not suitable | Segment 1 – Not suitable<br>Segment 2 – Not suitable |
| **Professor Creek (7.4 miles)**<br>• National Forest and state land boundary to diversion near private land | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Suitable–Wild<br>Oil and gas leasing: Closed | Not suitable | Not suitable |

BLM_0010957

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| | OHV category: Limited to designated routes<br>VRM designation: Class I | | |
| **Rattlesnake Canyon (31.6 miles)**<br>• Source to Green River (including Flat Nose George Tributary) | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Closed<br>VRM designation: Class I | Not suitable | Not suitable |
| **Salt Wash (0.3 miles)**<br>• Arches National Park boundary to Colorado River | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Salt Wash to be deferred until NPS does suitability on portion within Arches National Park. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification.<br>By default, the lower 0.25 miles of this 0.3-mile segment is within Segment 4 of the Colorado River. Consequently, it would be managed as suitable with a recreation classification | Salt Wash to be deferred until NPS does suitability on portion within Arches National Park. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification.<br>By default, the lower 0.25 miles of this 0.3-mile segment is within Segment 4 of the Colorado River. Consequently, it would be managed as suitable with a recreation classification | Salt Wash to be deferred until NPS does suitability on portion within Arches National Park. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. |
| **Thompson Canyon (5.5 miles)**<br>• Source of Thompson to Fisher Creek (Cottonwood Canyon; tributary of Dolores River) | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Suitability determination would not be made for this eligible river segment. It would remain eligible and would be managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. | Suitable–Wild<br>Oil and gas leasing: Closed<br>OHV category: Limited to designated routes<br>VRM designation: Class I | Not suitable | Not suitable |

BLM_0010958

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

## SPECIAL DESIGNATIONS – WILDERNESS AND WILDERNESS STUDY AREAS (WSAs)

**Goals and Objectives:**
- Preserve the wilderness character of Wilderness Study Areas (WSAs) until Congress designates them wilderness or releases them.
- Manage the Black Ridge Wilderness Area to provide for the protection of wilderness character and for the use and enjoyment of visitors in a manner that leaves it unimpaired for future use (43 CFR 8560).

**Management Common to PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**
- Manage WSAs under the Interim Management Policy for Lands Under Wilderness Review (IMP; USDI-BLM 1995; see Map 2-16). Manage for the continued preservation of each WSA's wilderness character.
- Manage Black Ridge Wilderness Area (5,200 acres; part of the McInnis Canyon National Conservation Area) in accordance with applicable law, regulation, policy, and management for the area (see Maps 2-16-A through 2-16-D).
- For WSAs, no surface disturbance, permanent new development, or ROWs are allowed, and the lands are closed to oil and gas leasing (see Appendix C).
- For designated Wilderness, any new development or surface disturbance is for wilderness purposes, and the lands are closed to mineral leasing and location. These are non-discretionary, non-planning decisions.
- Only Congress can release a WSA from wilderness consideration. Should any WSA, in part or in whole, be released from wilderness consideration, proposals in the released area would be examined on a case-by-case basis. All proposals inconsistent with Interim Management Policy (IMP) would be deferred until completion of requisite plan amendments. Because a plan amendment would be required, there is no separate analysis in this Land-use Plan to address resource impacts if any WSAs are released.
- Fire activities and projects in WSAs would follow the IMP.
- Designate WSAs and Wilderness as VRM Class I.
- Under the Proposed Plan and under Alternatives A and D, where routes would remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs – see Glossary) could continue as long as use of these routes does not impair wilderness suitability, as provided by the Interim Management Policy for Lands Under Wilderness Review (BLM 7/5/95). The miles of motorized routes in WSAs (see below for miles of route per WSA) are only conditionally open to vehicle use. If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or non-compliance are found through monitoring efforts to impair the area's suitability for wilderness designation, BLM would take further action to limit use of the routes, or close them. The continued use of these routes, therefore, is based on user compliance and non-impairment of wilderness values.

### Behind the Rocks WSA (12,635 acres)

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Designate the majority of the Behind the Rocks WSA as closed to OHV use. About 3.55 miles of inventoried way are designated. | Designate the Behind the Rocks WSA as closed to OHV use. No miles of route are designated. | Designate a portion of the Behind the Rocks WSA as closed to OHV use (11,822 acres). Designate OHV use in the remainder of the WSA as limited to designated routes (813 acres, with 0.9 miles of designated route). | Designate the Behind the Rocks WSA as limited to designated routes (with 0.9 miles of designated routes). |

### Black Ridge (52 acres) and Lost Spring Canyon (1,624 acres) WSAs
**Note: Most of the original Black Ridge WSA was designated Wilderness with the creation of the McInnis Canyon NCA. Most of the original Lost Spring Canyon WSA has been incorporated into Arches National Park.**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Designate Black Ridge and Lost Spring Canyon WSAs as limited to inventoried routes, with 0.25 miles of route designated in Lost Spring Canyon WSA and 0 miles of route designated in Black Ridge WSA. | Designate Black Ridge and Lost Spring Canyon WSAs as closed to OHV use, with 0.25 miles of route designated in Lost Spring Canyon WSA and 0 miles of route designated in Black Ridge WSA. | Designate Black Ridge and Lost Spring Canyon WSAs as limited to designated routes, with 0.25 miles of route designated in Lost Spring Canyon WSA and 0 miles of route designated in Black Ridge WSA. | Same as the Proposed Plan. |

### Desolation Canyon (81,603 acres), Floy Canyon (72,605 acres), Flume Canyon (50,800 acres), Coal Canyon (60,755 acres), Mill Creek Canyon (9,780 acres), Negro Bill Canyon (7,820 acres), and Spruce Canyon (20,990 acres) WSAs
**Note: Acreage of Desolation Canyon WSA is for the MPA portion only. Remainder of this WSA is managed by the Price Field Office. Acreage of Flume Canyon WSA includes 2,750 acres in areas administered by the Vernal Field Office.**

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Designate these WSAs as limited to inventoried routes, with: <br>• 8.2 miles of inventoried way designated in Desolation Canyon WSA.<br>• 23.5 miles of inventoried way designated in Floy Canyon WSA.<br>• 10.1 miles of inventoried way designated in Flume Canyon WSA.<br>• 8.0 miles of inventoried way designated in Coal Canyon WSA.<br>• 1.8 miles of inventoried way designated in Mill Creek Canyon WSA.<br>• 3.5 miles of inventoried way designated in Negro Bill Canyon WSA.<br>• 1.0 mile of inventoried way designated in Spruce Canyon WSA. | Designate these WSAs as closed to OHV. No miles of route would be designated. | Same as Alternative B. | Designate these WSAs as limited to designated routes, with <br>• 1.5 miles of inventoried way designated in Floy Canyon WSA.<br>• 1.5 miles of inventoried way designated in Coal Canyon WSA.<br>• 1.4 miles of inventoried way designated in Mill Creek Canyon WSA.<br>• 1.1 miles of inventoried way designated in Negro Bill Canyon WSA. |

### Westwater Canyon WSA (31,160 acres)

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Designate the Westwater Canyon WSA as limited to inventoried routes, with 22.5 miles of inventoried way designated. | Designate the Westwater Canyon WSA as closed to OHV, with no miles of route designated. | Designate a portion of the Westwater Canyon WSA as closed to OHV (23,690 acres). Designate the remainder of the WSA as limited to designated routes, | Designate the Westwater Canyon WSA as limited to designated routes, with 8.4 miles of route designated. |

BLM_0010959

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | with zero miles designated (7,470 acres). | |
|---|---|---|---|

### SPECIAL STATUS SPECIES

**Goals and Objectives:**

- Maintain, protect, and enhance habitats (including but not limited to designated critical habitat) of Federally listed threatened, endangered, or candidate plant or animal species to actively promote recovery to the point that they no longer need protection under the Endangered Species Act.
- Maintain, protect, and enhance habitats of BLM (State) Sensitive plant and animal species to prevent the listing of these species under the Endangered Species Act.
- Implement management strategies that restore degraded riparian communities; protect natural flow requirements; protect water quality; manage for stable, non-eroding banks; and manage for year-round flows where applicable.
- Allow or participate in research of threatened and endangered (T&E) and Sensitive species and their habitats.
- Avoid practices that permanently convert sagebrush shrubland to invasive species.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

As required by the Endangered Species Act:

- Implement recovery actions identified in Recovery Plans and in Conservation Agreements, Plans and Strategies in coordination with U.S. Fish and Wildlife Service (USFWS), Utah Division of Wildlife Resources (UDWR), and other interested entities. The BLM would be an active participant in all recovery implementation teams.
- The protection of habitat for listed and non-listed plant and animal species would be considered prior to authorizing any actions that could alter or disturb such habitat.
- No management action would be permitted on public lands that would jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E.
- Surveys of habitat or potential habitat for special status species (including any sensitive species under consideration for formal designation as T&E) would be made prior to taking any action that could affect these species. Surveys would be conducted using protocols established for potentially affected species.
- BLM would conduct or cooperate in surveys to determine the extent of listed and non-listed plant and animal species and their habitat or potential habitat. Any listed or non-listed special status species survey must be conducted by qualified biologists, botanists, or ecologists that have been approved by the BLM.
- Monitoring, using approved protocol, would be required on listed and non-listed special status species habitat that may be affected by BLM authorization of any activities within that habitat.
- Follow current and future recovery plans and manage habitat for T&E and BLM Sensitive species:
  - Colorado Squawfish Recovery Plan.
  - Colorado Pikeminnow Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan.
  - Humpback Recovery Plan.
  - Humpback Chub Recovery Goals: amendment and supplement to the Humpback Recovery Plan.
  - Bonytail Recovery Plan.
  - Bonytail Recovery Goals: amendment and supplement to the Bonytail Recovery Plan.
  - Razorback Sucker Recovery Plan.
  - Razorback Recovery Goals: amendment and supplement to the Razorback Sucker Recovery Plan.
  - Black-footed Ferret Recovery Plan.
  - Northern States Bald Eagle Recovery Plan.
  - Recovery Plan for the Mexican Spotted Owl.
  - Recovery Plan Southwestern Willow Flycatcher.
- Support and implement special status plant and animal Species Management Plans. Coordinate actions with UDWR and other involved entities. Support population and habitat monitoring.
- Support and implement current and future special status plant and animal species Conservation Plans, Strategies, and Agreements. Coordinate actions with USFWS and other involved entities. Support population and habitat monitoring. As of 2005, Conservation Plans Strategies and Agreements include:
  - Colorado River Cutthroat Trout Conservation Agreement and Strategy Conservation Agreement for the Roundtail Chub, Bluehead Sucker and Flannelmouth Sucker (see Map 2-17).
  - Follow current and future Conservation Measures and Best Management Practices (BMP) for Federally Listed Species (see Appendix K). Species include but are not limited to: Jones Cycladenia, Mexican Spotted Owl, Southwestern Willow Flycatcher, Bald Eagle, and the Endangered Fish of the Colorado River.
- Work with UDWR to implement the Utah Wildlife Action Plan (UDWR 2005a) to coordinate management actions that will conserve native species and prevent the need for additional listings.
- Mitigate all unavoidable habitat losses for special status species as required by policy or law.
- Avoid construction of new roads within listed and non-listed special status plant and animal species habitats.
- Apply lease notices for listed plant and animal species as determined by Section 7 consultation between BLM and USFWS. Apply appropriate lease notices for any non-listed special status plant and animal species that occur or could potential occur applicable proposed lease areas.
- Develop cooperative agreements with other agencies or entities to inventory and/or monitor existing or potential habitat for listed and non-listed special status plant and animal species.
- Plan and implement assessment and monitoring plans for T&E and BLM Sensitive species.
- Participate in the Colorado River Fishes Recovery and Implementation Program.
- Coordinate with USFWS and UDWR to allow for the reintroduction of T&E and BLM Sensitive species into historic or suitable range. These reintroductions would be analyzed with site-specific NEPA.
- Allow translocations and population augmentation of special status species to aid in conservation and recovery efforts. Implement necessary habitat manipulations and monitoring to ensure successful translocation efforts.
- Apply environmental best management practices (BMPs) to all oil and gas operations in accordance with WO IM 2007-021 and the latest version of the "Goldbook" (see Appendix C).

**Mexican Spotted Owl (MSO):**

- If BLM determines that a proposed action may affect MSO or its habitat, consultation with the USFWS would be initiated (see Map 2-18).

BLM_0010960

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

- Monitor and protect known Protected Activity Center (PAC) sites according to USFWS recommendations and MSO Recovery Plan.
- Manage habitat for MSO according to USFWS and UDWR recommendations and recovery plans.
- Develop cooperative agreements with other agencies and entities to inventory and monitor existing potential habitat and annually schedule assessment plans of MSO habitat to determine quality of habitat and presence of species.
- Protect occupied and potential habitat, including designated critical habitat for the MSO, by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C). These stipulations would preclude temporary activities within designated critical habitat from March 1 through August 31. Permanent actions are prohibited year-round within 0.5 miles of a PAC.

**Southwestern Willow Flycatcher (SWFL):**

- If BLM determines that a proposed action may affect SWFL or its habitat, consultation with the USFWS would be initiated.
- Monitor and protect known nesting sites according to USFWS recommendations and SWFL Recovery Plan.
- Manage habitat for SWFL according to USFWS and UDWR recommendations and recovery plans; avoid loss or disturbance of suitable riparian habitat.
- Develop cooperative agreements with other agencies and entities to inventory and monitor existing potential habitat and annually schedule assessment plans of SWFL habitat to determine quality of habitat and presence of species.
- Protect SWFL and their habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C) within suitable habitat. These stipulations would preclude activities within a 100-m buffer of suitable habitat year long. Activities within 0.25 miles of occupied breeding habitat would not occur during the breeding season, May 1 through August 15.

**Bald Eagle:**

- If BLM determines that a proposed action may affect bald eagles or its habitat, consultation with the USFWS would be initiated.
- Acquire lands with roost and nest sites through land exchange, purchase or donation.
- Conduct assessments of wintering bald eagle habitat to delineate essential winter habitat and to develop necessary protective measures.
- Monitor nesting territories annually during breeding season (generally January 1 through August 31).
- Protect bald eagle nest sites by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C) within 1.0 mile of documented nest sites (2,439 acres). These stipulations would preclude surface-disturbing activities within a 1.0 mile radius of nest sites from January 1 through August 31 (see Map 2-19). No permanent structures would be allowed within 0.5 miles of known bald eagle nest sites year-round. Deviations may be allowed only after appropriate levels of consultation and coordination with the USFWS.
- Protect bald eagle winter habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C) within 0.5 mile of winter roost areas. These stipulations would preclude activities and permanent structures within a 0.5 mile radius of winter roost sites from November 1through March 31 (see Map 2-19). No permanent structures would be allowed within 0.5 mile of winter roost sites, if the structure would result in the habitat becoming unsuitable for future winter roosting by bald eagles.

**Sage-grouse:**

- Advance the conservation of Greater sage-grouse as well as its habitat in accordance with the BLM National Sage-grouse Habitat Conservation Strategy to avoid contributing to its listing under the Endangered Species Act (see Map 2-20).
- Consistent with RMP goals and objectives, utilize and apply, as needed, the following plans as part of implementing the BLM's National Sage-grouse Habitat Conservation Strategy, Strategic Management Plan for Sage-grouse (UDWR 2002), Western Association of Fish and Wildlife Agencies, Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), Greater Sage-grouse Comprehensive Conservation Strategy (WAFWA 2006), and the Gunnison Sage-grouse Range-wide Conservation Plan. Follow The Gunnison Sage-grouse Range-wide Conservation Plan (GSRSC 2005) for suggested management practices within ⅜ miles of active Gunnison sage-grouse leks.
- Work cooperatively with UDWR; universities; State, county, and local agencies; and private organizations to develop expanded data; assist with analysis; identify important habitat and potential restoration areas and treatments; and form cooperative agreements with other agencies and organizations to inventory sage-grouse densities and identify suitable habitat for expansion.
- Develop and implement suitable sage-grouse habitat restoration projects.
- Allow for translocation of sage-grouse in suitable unoccupied habitat.

**White-tailed and Gunnison Prairie Dogs:**

- The White-tailed prairie dog and the Gunnison prairie dog are BLM and State sensitive species; translocations of these species would be considered in suitable unoccupied habitats (see Map 2-21).
- Manage both prairie dog species and their habitats in coordination with the UDWR. Apply habitat management guidance and population monitoring strategies as recommended in the newly developed multi-agency White-tailed and Gunnison's Prairie Dog Management Plan.
- Develop cooperative agreements with other agencies to inventory prairie dog densities and identify suitable habitat for expansion.

**Colorado River Endangered Fish:**

- No surface-disturbing activities within the 100-year floodplain of the Colorado River, Green River, and at the confluence of the Dolores and Colorado Rivers would be allowed. Any exceptions to this requirement would require consultation with the USFWS. Restrictions on surface disturbance within this critical habitat would be developed through this consultation process (see Map 2-17).

**Golden Eagle:**

- Known golden eagle nest sites would be protected according to the Bald and Golden Eagle Protection Act amended in 1978.
- Acquire lands with nest and roost sites through land exchange or acquisition.
- Conduct assessments of wintering golden eagle habitat.
- Protect golden eagle nest sites and habitat (12,902 acres) by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C). These stipulations would preclude surface-disturbing activities within 0.5 miles of documented nest sites from February 1 to July 15 (see Map 2-19).

**Burrowing Owl:**

- Protect burrowing owls by applying the standard terms and conditions developed in consultation with the USFWS (see Appendix O) for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C) by precluding surface-disturbing activities within 0.25 miles of known nests from March 1 through August 31 (see Map 2-22).
- Domestic sheep camps, temporary watering sites, and salt and mineral blocks would not be located within 0.25 miles of occupied burrowing owl nests from March 1 through August 31.

BLM_0010961