**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

- Maintain ground squirrel and prairie dog colonies to provide habitat and nesting burrows for burrowing owls.
- The species would be managed under the guidance provided by the Raptor Best Management Practices (BMPs; see Appendix O), which includes implementation of spatial and seasonal buffers to protect nesting raptors and their habitats.

**Kit Fox:**

- Protect kit fox by precluding surface-disturbing activities within 200 m of a kit fox den.

**Ferruginous Hawk:**

- Manage ferruginous hawk nesting and foraging habitat by applying the standard terms and conditions developed in consultation with the USFWS (see Appendix O) for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C) precluding surface-disturbing activities within 0.5 miles of active nests from March 1 through August 1 (see Map 2-22).
- Domestic sheep camps, temporary watering sites, and salt and mineral blocks would not be located within 0.5 miles of occupied ferruginous hawk nests from March 1 through August 1.
- The species would be managed under the guidance provided by the Raptor BMPs (see Appendix O), which includes implementation of spatial and seasonal buffers to protect nesting raptors and their habitats.

**Yellow-billed Cuckoo:**

- Avoid loss or distraction of yellow-billed cuckoo nesting and foraging habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C). These stipulations preclude surface-disturbing activities within 100 m of yellow-billed cuckoo habitat within riparian areas from May 15 through July 20.
- Compliance with BLM Riparian Policy would restrict surface disturbance within 100 m of riparian habitat and would therefore protect nesting habitat for yellow-billed cuckoo.

**Jones Cycladenia (Cycladenia humilis var. jonesii):**

- Require specific site inventories for all surface disturbing projects in areas with suitable *Cycladenia humilis* var. *jonesii* habitat.
- BLM would restrict activities, in suitable *Cycladenia humilis* var. *jonesii* habitat. Restrictions include limiting motorized travel to designated routes, precluding surface disturbing activities within 300 feet of plants and suitable habitat, and precluding construction activities from May 15th through June 30th with occupied habitat (see Standard Terms and conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C). Other restrictions include avoiding road construction, land disposal, and utilities in this habitat, as well as avoiding grazing activities such as trailing, salting, watering and herding.

**California Condor**

- Within potential habitat for the California Condor, surveys will be required prior to operations unless species occupancy and distribution information is complete and available.
- Surface disturbing activities will not occur within 1.0 mile of nest sites during the breeding season of August 1 to November 30 or within 0.5 mile of established roosting sites (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix C).
- No permanent infrastructure will be placed within 1.0 mile of nest sites and within 0.5 miles of established roosting sites.

| **Greater Sage-grouse Habitats** | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Not specified. | About 12,850 acres of pre-settlement habitat (see Map 2-20) would be subject to controlled surface use and timing limitation stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• **Leks (within 2 miles of active strutting grounds):** apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). These stipulations would preclude surface-disturbing activities from March 1 to May 15. Allow no permanent above-ground facilities within the 2 mile buffer year-round.<br>• **Nesting and Brood-rearing Habitat:** apply a timing stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude activities from March 15 to July 15.<br>• **Winter Habitat:** apply a timing limitation stipulation to oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities from November 15 to March 14 on 12,850 acres.<br><br>Any surface occupancy that would require or result in loss or fragmentation of 12,850 acres of habitat would be avoided or minimized. If surface occupancy cannot be avoided, BLM would recommend that sagebrush habitat be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance | About 3,068 acres of potential habitat would be subject to controlled surface use and timing limitation stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• **Leks (within 2 miles of active strutting grounds):** apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). These stipulations would preclude surface-disturbing activities from March 1 to May 15. Allow no surface-disturbing activities year-round within 0.5 mile buffer of active leks. Allow no permanent above-ground facilities within the two mile buffer.<br>• **Nesting and Brood-Rearing Habitat:** apply a timing stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities from March 15 to July 15.<br>• **Winter Habitat:** apply a timing limitation stipulation to oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities from November 15 to March 14 on 3,068 acres.<br><br>Any surface occupancy that would require or result in loss or fragmentation of 3,068 acres of habitat would be avoided or minimized. If surface occupancy cannot be avoided, BLM would recommend that sagebrush habitat be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance | About 1,986 acres of potential brooding habitat would be subject to controlled surface use and timing limitations stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• **Leks (within 0.25 miles of active strutting grounds):** apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). These stipulations would preclude surface-disturbing activities from March 1 to May 15. Allow no permanent above-ground facilities within the 0.25 mile buffer year-round.<br>• **Nesting and Brood-Rearing Habitat:** apply a timing stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude activities from March 15 to July 15.<br>• **Winter Habitat:** apply a timing limitation stipulation to oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities from November 15 to March 14 on 1,986 acres.<br><br>Any surface occupancy that would require or result in loss or fragmentation of 1,986 acres of habitat would be avoided or minimized. If surface occupancy cannot be avoided, BLM would recommend that sagebrush habitat be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance |

BLM_0010962

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| with 40 CFR 1508.20. | | with 40 CFR 1508.20. | with 40 CFR 1508.20. |
| **Gunnison Sage-grouse Habitat** | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Not specified. | About 246,107 acres of pre-settlement habitat (See Map 2-20) would be subject to controlled surface use and timing limitation stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• Lek habitat (within 2.0 miles of active strutting ground):<br>Apply controlled surface use and timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude permanent surface occupancy within 2.0 miles of an active lek. No surface-disturbing activities would be allowed from March 20 to May 15.<br>Allow no permanent above-ground facilities within the buffer.<br>Prohibit or limit year-round construction of fences. Where opportunity exists, remove existing fences.<br>Prohibit construction of power lines or other structures.<br>Avoid issuing ROWs that would result in permanent above-ground facilities within 2.0 miles of a lek.<br>Human caused disturbances would be avoided from March 20 to May 15.<br>• In year-round habitat (within 6.0 miles of active lek): avoid construction of fences, power lines, and tall structures. | About 175,727 acres of current potential habitat would be subject to controlled surface use and timing limitation stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• Leks (within 2 miles of active strutting grounds): apply controlled surface use and timing limitation stipulations for oil and gas leasing and other surface-disturbing activities (see Appendix C). These stipulations would preclude surface-disturbing activities from March 20 to May 15. Allow no surface disturbing activities year-round within 0.5 mile buffer of active leks.<br>Allow no permanent above-ground facilities within the two mile buffer.<br>Prohibit or limit year-round construction of fences. Where opportunity exists, remove existing fences.<br>Prohibit construction of power lines or other structures.<br>Avoid issuing ROWs that would result in permanent above-ground facilities within 0.5 miles of a lek.<br>Human caused disturbances would be avoided from March 20 to May 15.<br>• In year-round habitat (within 4.0 miles of active lek): minimize fence construction and avoid overhead power line construction where it would provide new raptor hunting perches and the possibility of collision for sage-grouse. Fences deemed necessary to construct should be built with materials that maximize visibility for sage-grouse to avoid collision. | About 41,620 acres of potential brooding habitat would be subject to controlled surface use and timing limitation stipulations (if sage-grouse occupation is identified by BLM in cooperation with UDWR) as follows:<br><br>• Lek habitat (within 0.25 miles of active strutting ground):<br>Apply controlled surface use and timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). These stipulations would preclude permanent surface occupancy within 0.25 miles of an active lek. No surface-disturbing activities would be allowed from March 20 to May 15.<br>Allow no permanent above-ground facilities within the buffer.<br>Prohibit or limit year-round construction of fences. Where opportunity exists, remove existing fences.<br>Prohibit construction of power lines or other structures.<br>Avoid issuing ROWs that would result in permanent above-ground facilities within 0.25 miles of a lek.<br>Human caused disturbances would be avoided from March 20 to May 15. |
| Not specified. | Any surface occupancy that would require or result in loss or fragmentation of 246,107 acres of habitat would be avoided or minimized. If surface occupancy cannot be avoided sagebrush habitat would be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance with 40 CFR 1508.20. | Any surface occupancy that would require or result in loss or fragmentation of any of the 175,727 acres of identified Gunnison sage-grouse habitat would be avoided or minimized. If surface occupancy cannot be avoided sagebrush habitat would be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance with 40 CFR 1508.20. | Any surface occupancy that would require or result in loss or fragmentation of 41,620 acres of habitat would be avoided or minimized. If surface occupancy cannot be avoided sagebrush habitat would be reclaimed. BLM would require onsite mitigation measures that prevent unnecessary or undue degradation to protect surface resources in accordance with 40 CFR 1508.20. |
| **White-tailed Prairie Dog Habitat** | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Not specified. | Manage 199,505 acres of historic habitat (see Map 2-21) designated by UDWR. Manage 117,481 acres of this habitat as the Cisco White-tailed Prairie Dog Complex ACEC; apply no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) within the ACEC.<br><br>Manage the remaining 82,024 acres of habitat to protect active prairie dog colonies by applying a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities within 1,300 feet of these colonies. No permanent above-ground facilities would be allowed within the 1,300-foot buffer. | Manage the contiguous 117,481 acres of historic habitat designated by UDWR. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 660 feet of active prairie dog colonies. This stipulation would preclude surface-disturbing activities within 660 feet of these colonies. No permanent above-ground facilities would be allowed within the 660-foot buffer. | Manage 31,186 acres of occupied habitat designated by UDWR. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 660 feet of active prairie dog colonies. This stipulation would preclude surface-disturbing activities within 660 feet of these colonies. No permanent above-ground facilities would be allowed within the 660-foot buffer. |
| **Gunnison Prairie Dog Habitat** | | | |
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Not specified. | Manage 10,700 acres of habitat designated by UDWR for Gunnison prairie dogs (see Map 2-21). Apply a controlled surface use stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) within 1,300 feet of active prairie dog colonies. This stipulation would preclude surface- | Manage 10,700 acres of habitat designated by UDWR for Gunnison prairie dogs. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 660 feet of active prairie dog colonies. This stipulation would preclude surface-disturbing | Manage Gunnison prairie dog habitat using standards terms and conditions. |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | |
|---|---|---|
| | disturbing activities within 1,300 feet of these colonies. | activities within 660 feet of these colonies. |
| | No permanent above-ground facilities would be allowed within 1,300 feet of prairie dog colonies. | No permanent above-ground facilities would be allowed within 660 feet of prairie dog colonies. |
| | Construction of new power lines would be prohibited within 1,300 feet of prairie dog colonies. | Power lines would be avoided within prairie dog colonies; however in the event that power lines are required within colonies, raptor anti-perch devices would be required. |

**TRAVEL MANAGEMENT**

**Motorized Travel**

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

Under the Proposed Plan and under Alternatives A and D, where routes would remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs – see Glossary) could continue as long as use of these routes does not impair wilderness suitability, as provided by the Interim Management Policy for Lands Under Wilderness Review (BLM 7/5/95). The miles of motorized routes in WSAs (see page 2-42 and 2-43 for miles of route per WSA) are only conditionally open to vehicle use. If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or non-compliance are found through monitoring efforts to impair the area's suitability for wilderness designation, BLM would take further action to limit use of the routes, or close them. The continued use of these routes, therefore, is based on user compliance and non-impairment of wilderness values.*

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- BLM, in preparing its RMP designations and its implementation-level travel management plans, is following policy and regulation authority found at 43 C.F.R. Part 8340; 43 C.F.R. Subpart 8364; and 43 C.F.R. Subpart 9268.
- Provide opportunities for a range of motorized recreation experiences on public lands while protecting sensitive resources and minimizing conflicts among various users. Identification of specific designated routes would be initially established through the chosen Travel Plan accompanying this RMP (see Appendix G) and may be modified through subsequent implementation planning and project planning on a case-by-case basis. These identified routes would be available regardless of other management actions. These adjustments would occur only in areas with limited route designations and would be analyzed at the implementation planning level. These adjustments would be done through a collaborative process with local government and which would include public review of proposed route changes. Site-specific NEPA documentation would be required for changes to the route designation system.
- All areas would be limited, open, or closed to motorized travel. Limit travel by motorized vehicle on all lands administered by the MFO to designated routes, except for Managed Open Areas, and for areas that are closed to motorized travel (see Maps 2-10-A through 2-10-D; see Appendix G for Travel Plan development).
- BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads.
- OHV access for game retrieval, antler collection and dispersed camping would only be allowed on designated routes (designated routes/spurs have been identified specifically for dispersed camping). Adherence to the Travel Plan is required for all activities, except where otherwise explicitly permitted.
- Only designated roads and managed open areas are available for motorized commercial and organized group use (see Maps 2-11-B through 2-11-D for route designations by alternatives).
- Where the authorized officer determines that off-road vehicles are causing or would cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public would be notified as to these closures and restrictions
- Any routes that are not baseline routes would be signed "Closed" on the ground. Such routes would be considered as impacts to the area's natural character, and use of such routes would be considered cross country use and not allowed. Non-inventoried routes should be rehabilitated.
- Under the Proposed Plan and under Alternatives A and D, where routes would remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs – see Glossary) could continue as long as use of these routes does not impair wilderness suitability, as provided by the Interim Management Policy for Lands Under Wilderness Review (BLM 7/5/95). The miles of motorized routes in WSAs (see below for miles of route per WSA) are only conditionally open to vehicle use. If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or non-compliance are found through monitoring efforts to impair the area's suitability for wilderness designation, BLM would take further action to limit use of the routes, or close them. The continued use of these routes, therefore, is based on user compliance and non-impairment of wilderness values.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Continue to manage motorized vehicle travel under the travel designations established in the 1985 Grand RMP as modified by subsequent Federal Register notices published under the authority of 43 CFR 8340 (see Map 2-10-A).<br><br>Manage 620,212 acres as open to off-road vehicle travel, 1,196,920 acres as OHV travel limited to existing roads and trails (of which 48,169 acres would be OHV travel limited to designated roads and trails and 309,749 acres within WSAs would be limited to inventoried routes) and 5,062 acres as closed to OHV travel. | • 437,424 acres would be closed to OHV travel.<br>• 1,475,074 acres would be limited to designated routes.<br>• 0 acres would be open to cross country travel (see Map 2-10-B). | • 339,298 acres would be closed to OHV travel.<br>• 1,481,334 acres would be limited to designated routes.<br>• Approx. 2,000 acres (White Wash Sand Dunes) would be open to cross country travel (see Map 2-10-C). | • 57,351 acres would be closed to OHV travel.<br>• 1,762,083 acres would be limited to designated routes and/or inventoried routes within WSAs.<br>• 3,064 acres (White Wash Sand Dunes and the Airport Hills) would be open to cross country travel (see Map 2-10-D). |
| **Miles of Route:** | **Designated Routes:** | **Designated Routes:** | **Designated Routes:** |
| 6,199 miles of motorized routes. | 3,328 miles motorized routes. | *3,693 miles motorized routes.[†]* | 3,855 miles motorized routes. |
| 199 miles inventoried verified motorized single-track. | 122 miles of full-sized motorized routes converted to motorcycle-only use | *313 miles for motorcycles (163 miles on inventoried routes and 130 miles on inventoried single-track).[†]* | 347 miles for motorcycles (151 miles on inventoried routes and 196 miles on inventoried single-track). |

This is an implementation decision that cannot be protested under the planning regulations. Please see the cover letter for further information

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Dirt Bike Trail/Route: | Dirt Bike Trail/Route: | Dirt Bike Trail/Route: | Dirt Bike Trail/Route: |
|---|---|---|---|
| Dirt bike route from Colorado State Line to Thompson not designated. | Do not designate dirt bike routes from the Colorado State Line to Thompson, Utah. | *Designate dirt bike route from Colorado State Line to Thompson (see Map 2-11), utilizing 9 miles of single-track and 22 miles of inventoried Grand County roads. These totals are reflected in the mileage under "designated routes."* [1] | Designate 58.3 miles of dirt bike route from the Colorado State Line to Thompson. Portions of this route (48 miles) are considered new and will require site-specific NEPA analysis prior to possible designation and use. The remaining 10 miles are already roaded. These totals are reflected in the mileage under "designated routes." |

| Mechanized Recreational Travel (e.g., mountain bikes) |
|---|

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Provide opportunities for mechanized travel on all routes open to motorized use.
- Prohibit new bike routes within non-WSA lands managed for wilderness characteristics or within hiking focus areas.
- Limit mechanized travel to designated trails and managed routes for resource protection purposes. Routes that are no longer available for motorized travel may be converted to bike routes upon application of site-specific NEPA analysis.
- Manage approximately 11.2 miles of routes on the following trails for non-motorized use only: Jackson Trail, "Baby Steps," Hunter Canyon Rim, Portal Trail, Hidden Valley, and Porcupine Rim single-track section. (Hidden Valley and Porcupine Rim Trails are subject to IMP.)
- Identification of specific designated routes would be initially established through the RMP process and may be modified through subsequent planning at the activity plan and project plan levels on a case-by-case basis. *These modifications would be analyzed through site-specific NEPA.*

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Continue to manage mechanized travel under closure and restriction notices published in the Federal Register under the authority of 43 CFR 8364.<br><br>Manage 4 miles of route on the following trails for mechanized use:<br>- Jackson Trail.<br>- Portal Trail. | Design and implement up to 75 additional miles of managed mechanized trails. Implement these new system routes solely by converting inventoried routes not designated for motorized travel to non-motorized use, where appropriate, and installing support facilities such as trailheads and route signage. No new single track trails would be considered (see Map 2-11-F(B)). | *Design and implement up to 150 new miles of managed mechanized trails. In addition, convert existing inventoried routes not designated for motorized travel to non-motorized use, where appropriate, and install appropriate support facilities such as trailheads and route signage* [1]<br><br>*Initially designate the following existing trails for mechanized use (totaling 11.3 miles; see Map 2-11-F(C)):*<br>- *Fisher Mesa (in conjunction with USFS; 5.8 miles).*<br>- *Pothole (on Amasa Back; 1.2 miles).*<br>- *Rockstacker (on Amasa Back; 0.9 miles).*<br>- *Lower Porcupine Singletrack (LPS; 1.4 miles).*<br>- *"Power line" Trail (0.07 miles on public land).*<br>- *Mill Creek Parkway Extension (0.16 miles on public land).* | Design and implement up to 300 new miles of managed mechanized trails. In addition, convert inventoried routes not designated for motorized travel to non-motorized use, where appropriate, and install appropriate support facilities such as trailheads and route signage.<br><br>Same as the Proposed Plan, except also initially designate the following additional trails for mechanized use (totaling 15.5 miles; see Map 2-11-F(D)):<br>- Goldbar Singletrack (4.4 miles)<br><br>This new proposed trail would be analyzed with site-specific NEPA before implementation. |

| Non-mechanized Recreational Travel (e.g., hiking, backpacking, and equestrian) |
|---|

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Non-mechanized travel is not restricted on public lands except where limited or prohibited to protect specific resource values, provide for public safety or maintain an identified opportunity.
- Provide opportunities for non-mechanized travel on all routes open to mechanized use and manage routes identified in each alternative to exclude motorized and mechanized use and provide opportunities for non-mechanized travel independent of motorized and mechanized routes.
- Limit non-mechanized travel on specific lands to designated trails and managed routes for resource protection purposes.
- Manage 17 miles of routes on the following trails for non-mechanized use: Amphitheater Loop, Fisher Towers, Negro Bill, Corona Arch, Trough Spring Canyon, Anticline Overlook, Needles Overlook, Windwhistle Nature Trail, Mill Canyon Dinosaur Interpretive Trail, Copper Ridge Sauropod Interpretive Trail, and Sego Canyon Interpretive Trail.
- Identify specific routes through the RMP process. These routes may be modified through subsequent planning at the RMP, activity plan, and project plan levels on a case-by-case basis.
- Work with equestrian groups to identify additional trails for equestrian and hiker use only. These trails would be designated based on site-specific NEPA analysis.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Not addressed. | - Design and implement up to 25 additional miles of managed non-mechanized trail system consistent with the Travel Plan. Implement these new system routes largely by converting roads to non-mechanized use and installing appropriate support facilities such as trailheads and route signage.<br>- Manage the Hidden Valley Trail as non-mechanized only.<br>- Mark the following existing trails: Castleton, Culvert-Goldbar Loop. Mark a new trail from Onion Creek to Amphitheater Loop. | - Design and implement up to 50 miles of managed non-mechanized trail system consistent with the Travel Plan. Implement these new system routes largely by converting existing, low utilization roads to non-mechanized use and installing appropriate support facilities such as trailheads and route signage.<br>- Mark the following existing trails: Castleton, Culvert-Goldbar Loop. Mark a new trail from Onion Creek to Amphitheater Loop. | - Design and implement up to 100 additional miles of managed non-mechanized trail system consistent with the Travel Plan. Implement these new system routes largely by converting existing, low utilization roads to non-mechanized use and the installation of appropriate support facilities such as trailheads and route signage.<br>- In addition to the trails proposed in the Proposed Plan, work to gain public access to the Heavenly Stairway Trail. |

| Equestrian Use: | Equestrian Use: | Equestrian Use: | Equestrian Use: |
|---|---|---|---|

BLM_0010965

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

| | | | |
|---|---|---|---|
| All public lands within the field office are presently available for equestrian use. Equestrian use in Negro Bill Canyon has been discouraged because the sandy hiking trail is easily damaged by equestrian use.<br><br>The Mill Creek Canyon Plan specifies that commercial equestrian use would not be renewed. | Same as the Proposed Plan, except the following additional equestrian trails would be developed. Hikers would also be allowed on this trail, but there would be no motorized or mechanized vehicles allowed:<br>• Ten Mile from Dripping Springs to Green River. | The following trails would be managed for equestrian use. Hikers would also be allowed on these trails, but there would be no motorized or mechanized vehicles allowed:<br>• Onion Creek Benches (Colorado Riverway SRMA).<br>• Ida/Stearns Gulch Equestrian Trail System.<br>• Castle Creek Equestrian Trail.<br>• Rattlesnake Trail above Nefertiti Boat Launch.<br>• Seven Mile Canyons.<br>• Red Rock Horse Trail (Ken's Lake to Johnson's Up-on-Top). | Same as the Proposed Plan. |

## VEGETATION

### Goals and Objectives:

• Manage vegetation resources for desired future conditions (DFC) ensuring ecological diversity, stability, and sustainability, including the desired mix of vegetation types, structural stages, and landscape/riparian function and provide for livestock grazing and for native plant, fish, and wildlife habitats (see Appendix L for Desired Future Conditions for Vegetation).
• Maintain existing vegetation treatment areas as appropriate.
• Control invasive and non-native weed species and prevent the introduction of new invasive species by implementing a comprehensive weed program (as per national guidance and local weed management plans in cooperation with state, federal, and affected counties), including: coordination with partners; prevention and early detection; education; inventory and monitoring; and using principles of integrated weed management.
• Manage for vegetation restoration, including control of weed infestations and control of invasive and undesirable nonnative species.
• Maintain, protect and enhance special status plant and animal habitats in such manner that the potential need to consider any of these species for listing as threatened or endangered under the Endangered Species Act does not arise.
• Develop management prescriptions for all surface-disturbing resource uses during times of extended drought (see Adaptive Drought Management, below).
• Maintain or enhance the integrity of current sagebrush and sage steppe communities and identify areas in need of restoration. Initiate restoration or rehabilitation efforts to ensure sustainable populations of sage-grouse, mule deer and other sagebrush obligate species.

### Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:

• Utilize the BLM National Sage-grouse Conservation Strategy – Guidance for Management of Sagebrush Plant Communities for Sage-Grouse Conservation, when applicable, in the development and implementation of vegetation and land treatments, livestock manipulation techniques, fire projects, energy exploration and development and any surface-disturbing activity within sagebrush and sage steppe communities.
• Sagebrush/steppe communities would be a high priority for wildfire suppression, emergency stabilization and fuel reduction to avoid catastrophic fires in these communities.
• Reclaim and restore up to 257,809 acres of sagebrush habitat and shrub-steppe ecosystems where appropriate in accordance with the BLM sagebrush conservation guidance. Reclamation/restoration would be undertaken in cooperation with the Utah Partners for Conservation and Development (UPCD) and may include removing surface material, re-contouring, spreading topsoil, seeding or planting seedlings, and/or changing livestock grazing strategies, such as, changing season of use, type of use, removing or reducing spring grazing, reducing livestock numbers, reducing grazing intensity, improving distribution, requiring rest rotation practices, or exclusion. Work in coordination with UDWR to reduce wildlife numbers, as necessary, to restore sagebrush habitat.
• Provide opportunities for seed gathering of various vegetation types while protecting other resources.
• Restoration and rehabilitation would use native seed-mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species.
• Gather necessary vegetation information and continue monitoring to assess if planning objectives are being met.
• Utilize the techniques and methods for vegetation treatments identified in the Utah ROD for Vegetation Treatments using Herbicides on Bureau of Land Management Lands in Seventeen Western States (2007).
• Control noxious weed species and prevent the infestation and spread of invasive species. Develop cooperating agreements with other Federal, State, local and private organizations to control invasive and noxious weed species.
• Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments. Restore riparian habitat to native willow and cottonwood communities.
• Where appropriate, replant cottonwoods and willow subsequent to wildland fire or other disturbance in riparian areas.
• Promote science and research opportunities in the San Arroyo Area/Exclosures, Sagers Watershed Area/Exclosures and Big Flat Area/Exclosures (approximately 300 acres each).
• Establish Lower South Fork of Seven Mile Canyon as a Riparian/Wetland Demonstration Area for the improvement and restoration of the riparian area.
• Insect pests would be treated in coordination with the State of Utah, other Federal agencies, affected counties, adjoining private land owners and other directly affected interests.
• See Livestock Grazing for other vegetation treatments.

### Adaptive Drought Management:

Establish criteria for restricting activities during drought (see Appendix M for Drought Classification System) based on the following measures/parameters:

*Severe (D2):*
• Send drought letters.
• UDWR coordination for big game herd control.
• Prepare local seasonal precipitation graphs.
• Suspend or limit seed collecting activities.

BLM_0010966

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

*Extreme (D3):*
- No new surface-disturbing activities in areas with sensitive soils (subject to valid existing rights or actions associated with other valid permitted activities; see oil and gas Appendix C for definition of surface-disturbing activities).
- Changes in livestock use would be based on site-specific data on those allotments that are affected by drought.
- OHV use and competitive motorized events would be confined to designated roads and routes within the open OHV area.
- Require additional erosion-control techniques/BMPs for surface-disturbing activities (e.g., hydromulching).
- Limit prescribed burns and vegetation treatments.

*Exceptional (D4):*
- Changes in livestock use will be based on site-specific data on those allotments that are affected by drought.
- No new surface-disturbing activities (subject to valid existing rights or actions associated with other valid permitted activities).
- Consider closing areas to public entry.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| Not specified. | Avoid or minimize to the extent possible the loss of sagebrush/steppe habitat from BLM-initiated or authorized actions. The BLM recommends that loss of sagebrush/steppe habitat essential to wildlife (e.g., sage-grouse, mule deer, and sagebrush obligate species) be reclaimed or mitigated off-site. | Avoid or minimize to the extent possible the loss of sagebrush/steppe habitat from BLM-initiated or authorized actions. The BLM recommends that loss of sagebrush/steppe habitat essential to wildlife (e.g., sage-grouse, mule deer, and sagebrush obligate species) be reclaimed or mitigated off-site. | Same as the Proposed Plan |

## VISUAL RESOURCE MANAGEMENT (VRM)

**Goals and Objectives:**
- Manage public lands in a manner that protects the quality of scenic values.
- Recognize and manage visual resources for overall multiple use, filming, and recreational opportunities for visitors to public lands.
- Manage BLM actions to preserve those scenic vistas that are most important.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

WSAs and designated wilderness would be designated as VRM Class I.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

- Wild and Scenic River (WSR) segments recommended as suitable for Wild would be designated as VRM Class I, Scenic would be designated as VRM Class II, and Recreational would be managed the same as the underlying VRM management class.
- For all VRM classes, all resource uses and management activities would be required to meet VRM objectives. However, recreation developments in the immediate foreground of Key Observation Points (KOPs) in VRM Class I and II areas would require special consideration to meet both recreational and VRM objectives. These facilities often create more contrast than would be acceptable; however this contrast would be allowed if the facilities are part of the expected image of the public being served. The contrast should be allowed only to the extent needed for the function of the facility, which should reflect design excellence and be a positive element of the built environment. Structures should blend into the landscape while retaining functionality.
- Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) to all areas designated as VRM Class I.
- Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) to all areas designated as VRM Class II. This would require surface-disturbing activities to meet the objectives of VRM Class II.
- Designated utility corridors within VRM Class II areas would be designated as VRM Class III only for utility projects.
- Necessary road maintenance could occur regardless of VRM class.
- Public lands within the viewshed of Arches National Park would be designated as VRM Class III.
- See Maps 2-23-A through 2-23-D for VRM Management Classes, by alternative.

| Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|
| VRM management classes identified only for Canyon Rims (33,037 acres designated as VRM Class II; 67,236 acres designated as VRM Class III). Interim management classes would be assigned through site-specific analysis based on the current VRM inventory. | Areas with high potential for oil and gas development (Big Flat/Hatch Point/Lisbon Valley and Eastern Bookcliffs/Greater Cisco) would be designated according to the underlying VRM inventory (VRM Classes II and III). | Areas with high potential for oil and gas (Big Flat/Hatch Point/Lisbon Valley, and Eastern Bookcliffs/Greater Cisco) would be designated as VRM Class III with the exception of those portions of SRMAs and ACECs that have more stringent VRM classifications. | Areas with high potential for oil and gas (Big Flat/Hatch Point/Lisbon Valley, and Eastern Bookcliffs/Greater Cisco) development would be designated as VRM Class III or IV with the exception of the more stringent VRM classification established for the rims of the Canyon Rims Recreation Area. |
| Wilderness, WSAs, and Negro Bill Outstanding Natural Area would be designated as VRM Class I. | The following ACECs would be designated as VRM Class I: Behind the Rocks, Canyon Rims, Colorado River, Highway 279/Shafer Basin/Long Canyon, Mill Creek Canyon, Upper Courthouse, Westwater and Wilson Arch. Manage the remaining ACECs according to the underlying VRM inventory class.

Scenic driving corridors would be designated as VRM Class II within a specified viewshed not to exceed 1 mile from centerline. Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C) within 1 mile of scenic driving corridors. | Manage the Shafer Basin portion of the Highway 279/Shafer Basin/Long Canyon ACEC as VRM Class I.

Scenic driving corridors would be designated as VRM Class II within a specified viewshed not to exceed 0.5 mile from centerline. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 0.5 mile of scenic driving corridors.

Manage the following areas with high-quality visual resources as VRM Class II: Sand Flats, Gemini Bridges/Monitor and Merrimac/Poison Spider/Goldbar/Corona Arch area, the Colorado, Dolores and Green River corridors, Tusher | Scenic driving corridors would be designated as VRM Class II within a specified viewshed not to exceed 0.25 mile from centerline. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix C) within 0.25 mile of scenic driving corridors.

Manage the following areas with high quality visual resources as VRM Class II: Sand Flats, the Colorado, Dolores and Green River corridors, Tusher Canyon (Bookcliffs), the Colorado Riverway, Matt Martin Point, areas bordering Arches National Park, Hatch Wash, the rims of Canyon Rims, the Mill Creek area, and Beaver Creek (see Map 2-23-D). |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | Manage the following areas with high quality visual resources as VRM Class II: Sand Flats, Gemini Bridges/Monitor and Merrimac/Poison Spider/Goldbar/ Corona Arch area, the Colorado, Dolores and Green River corridors, Tusher Canyon (Bookcliffs), areas of the Colorado Riverway not within the Colorado River ACEC, Matt Martin Point, areas bordering Arches National Park, Kane Creek, Hatch Wash, the rims of Canyon Rims, Beaver Creek and the eastern Book Cliffs (see Map 2-23-B). | Canyon (Bookcliffs), the Colorado Riverway, Matt Martin Point, areas bordering Arches National Park, Kane Creek, Hatch Wash, the rims of Canyon Rims, the Mill Creek and Behind the Rocks ACECs, Beaver Creek, and Long Canyon (see Map 2-23-C). | |
|---|---|---|---|
| 349,110 acres would be designated as VRM Class I. | 453,462 acres would be designated as VRM Class I. | 358,911 acres would be designated as VRM Class I. | 349,617 acres would be designated as VRM Class I. |
| 401,015 acres inventoried as VRM Class II, of which 33,037 acres would be designated as VRM II. | 373,647 acres would be designated as VRM Class II. | 365,566 acres would be designated as VRM Class II. | 245,773 acres would be designated as VRM Class II. |
| 800,782 acres inventoried as VRM Class III, of which 67,236 would be designated as VRM III. | 784,246 acres would be designated as VRM Class III. | 829,158 acres would be designated as VRM Class III. | 956,724 acres would be designated as VRM Class III. |
| 271,356 acres inventoried as VRM Class IV. | 210,532 acres would be designated as VRM Class IV. | 268,133 acres would be designated as VRM Class IV. | 269,641 acres would be designated as VRM Class IV. |

### WILDLIFE AND FISHERIES

**Goals and Objectives:**

* Maintain, protect, and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy, self-sustaining population of wildlife and fish species.
* Manage crucial, high-value, and unfragmented habitats as management priorities.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**

* Continue to implement and modify three Habitat Management Plans (HMPs) summarized in Appendix N: Hatch Point HMP, Dolores Triangle HMP, and the Potash-Confluence HMP.
    * The Hatch Point HMP: Manage to benefit pronghorn and improve sagebrush habitat for sage-grouse and other wildlife species. Emphasize habitat management, change in livestock class from sheep to cattle, and maintenance of land treatments.
    * Potash-Confluence HMP: Manage to benefit desert bighorn sheep, but also include guidance for chukar partridge, bald eagle, and peregrine falcon. Water developments to benefit desert bighorn are to be maintained; under this HMP, 278,000 acres of land administered by the BLM are to be maintained in good condition and habitat is to be improved where needed. Eight specific management objectives were established (see Appendix N for details).
    * The Dolores Triangle HMP: Manage to benefit deer, elk, and bighorn sheep. Improve bald eagle, riparian and native and naturalized fish habitat through the installation of fencing and enclosures in Granite, Coates, Ryan, and Renegade Creeks by installing six in-stream structures (see Appendix N for details).
* Livestock grazing would not be authorized on the following allotments/areas (or portions of allotments/areas) in order to benefit wildlife resources:
    * A portion of the Kane Spring Allotment (that portion in Kane Spring Canyon between the open valley and the river; 558 acres and 0 AUMs).
    * An area along the Colorado River between Hittle and north of Dewey Bridge (400 acres, AUMs would remain the same).
    * Between The Creeks with 3,960 acres and 221 AUMs.
    * North Sand Flats with 5,860 acres and 798 AUMs.
    * South Sand Flats with 10,209 acres and 592 AUMs.
    * A portion of Arth's Pasture Allotment (Poison Spider area; approximately 6,200 acres and 425 AUMs).
* Support and implement current and future animal species Conservation Plans, Strategies and Agreements. Coordinate actions with UDWR and other involved entities. Support population and habitat monitoring.

**Migratory Birds:**

* Executive Order 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds," would be integrated into all activities with potential adverse impacts, wildlife management programs, and other resources including but not limited to riparian-wetland habitat, rangeland health standards and guidelines raptor protection, fire, special status species, off-site mitigation and habitat enhancement. Management actions would emphasize birds listed on the current USFWS "Birds of Conservation Concern" (2002f or as updated) and Utah Partners-in-Flight priority species. Habitats that would be emphasized are the Cisco Desert Bird Habitat Conservation Area, Colorado and Dolores River Bird Habitat Conservation Area, Green River Bird Habitat Conservation Area, and the Cottonwood and Willow Creek Bird Habitat Conservation Area (see Appendix N). As a supplement to complying with Executive Order 13186, the Bird Habitat Conservation Areas identified in the Coordinated Implementation Plan for Bird Conservation in Utah (Martinsen et al. 2005 or as updated), would receive priority for conducting bird habitat conservation projects, through cooperative funding initiatives such as the Intermountain West Joint Venture.
* Implement Executive Order 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds" during all activities to protect habitat for migratory birds. Management would emphasize birds listed on the current USFWS "Birds of Conservation Concern" (2002 or as updated) and Partners-in-Flight priority species (as updated).
* As specific habitat needs and population distribution to "Birds of Conservation Concern" and Partners-in-Flight priority species are identified, BLM would use adaptive management strategies to further conserve habitat and avoid impacts to these species.
* Prioritize the maintenance and/or improvement of lowland riparian, wetlands, and low and high desert scrub communities which are the four most important and used habitat types by migratory birds in MPA.
* Prevent the spread of invasive and non-native plants, especially cheatgrass, tamarisk, and Russian olive. Strive for a dense under story of native species in riparian areas with a reduction in tamarisk and improvement of cottonwood and willow regeneration.
* During nesting season for migratory birds (May 1 – July 31), avoid surface-disturbing activities and vegetative-altering projects and broad-scale use of pesticides in identified occupied migratory bird habitat.

**Management common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**

* Coordinate with UDWR and other partners to help accomplish the population and habitat goals and objectives of big game Herd Management Plans that are consistent with and meet the goals and objectives of this land-use plan.
* The BLM will approach compensatory mitigation on an "as appropriate" basis where it can be performed onsite, and on a voluntary basis where it is performed offsite, or, in accordance with current guidance.
* Restrict dispersed camping in riparian areas to protect riparian wildlife habitat. Restrictions could include limiting camping to designated sites or prohibiting camping.
* Implement a limited fire suppression policy and initiate prescribed fires where treatment by fire would increase vegetation productivity and increase forage for wildlife.
* Modify the grazing season of use or change class of livestock for individual allotments as necessary to accommodate forage needs for wildlife.

BLM_0010968

### Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives

- Predator management would continue to be coordinated with Animal and Plant Health Inspection Service (APHIS)-Wildlife Services and UDWR and would be conducted utilizing the guidance provided by the existing MOU with APHIS-Wildlife Services.
- BLM would continue to coordinate with, and provide support to UDWR for introduction/reintroduction of native or naturalized fish or wildlife species into historic or suitable habitats as determined appropriate.
- Introduction, transplantation, augmentation and re-establishment of both naturalized and native species would be considered and would include, but may not be limited to, pronghorn, desert bighorn sheep, wild turkey, bison, beaver, chukar, otter, and Colorado River cutthroat trout and other native and naturalized fish species, pursuant to guidance and direction provided in BLM's 1745 Manual.
- Raptors would be managed under the auspices of Best Management Practices (BMPs; see Appendix O), which would include implementation of spatial and seasonal buffers. These BMPs implement the USFWS's Guidelines for Raptor Protection From Human and Land-use Disturbances, with modifications allowed as long as protection of nests is ensured. Seasonal and spatial buffers are also listed in Appendix O. Cooperate with utility companies to prevent electrocution of raptors. Temporarily close areas (amount of time depends on the species) near raptor nest to rock climbers or other activities if the activity could result in nest abandonment.
- Support and implement where possible the Northern River Otter Management Plan, coordinate with UDWR to determine potential release sites, support population monitoring.
- Manage riparian areas to ensure a multi-aged, multi-layered structure, allowing for retention of snags and diseased trees. Provide multiple layers of vegetation (vertical structure) within 10 feet of the ground.
- Minor adjustments to crucial wildlife habitat boundaries periodically made by the Utah Division of Wildlife Resources (UDWR) would be accommodated through plan maintenance.

**Pronghorn Habitat:**

- Manage 78,476 acres of current pronghorn habitat that UDWR has designated in the La Sal (Hatch Point Herd) Wildlife Management Unit. Implement the Hatch Point HMP. Manage 743,524 acres of pronghorn habitat that UDWR has designated in the Cisco Desert and on the following allotments: Cisco, Cisco Mesa, Harley Dome, San Arroyo, Horse Canyon, Pipeline, Floy Creek, Athena, Little Grand, Corral Wash Canyon, Agate, Little Hole, Monument Wash, Highlands, 10-Mile Point, Big Flat, Ruby Ranch, Bar-X, Crescent Canyon, Squaw Park, and San Arroyo (see Map 2-24).
- Management of pronghorn habitat (see Map 2-25) would be done in coordination with UDWR and may include (but would not be limited to) the following actions:
  · Installing and improving year-round water resources within the La Sal Management Unit and the Cisco Desert Herd unit.
  · Supporting a change in class of livestock from sheep to cattle on the Hatch Point Area. Changing class of livestock from cattle to sheep would not be allowed within pronghorn habitat.
  · Installing water developments every 2 square miles on summer and fawning areas.
  · Constructing fences that allow for pronghorn passage.
  · Dismantling un-needed fences.
  · Installing restrictive fencing to stop pronghorn passage onto highways.
  · Increasing forage through vegetation treatments on approximately 4,400 acres.

**Bighorn Sheep Habitat:**

- Film permits would comply with minimum impact criteria (see Appendix B) from April 1 through June 15 and from October 15 through December 15 within 123,490 acres of crucial bighorn sheep habitat (see Maps 2-25-B through 2-25-D).
- No change in class of livestock from cattle to sheep conversions would be recognized bighorn habitat. (see Maps 2-26 and 2-28).
- Follow the recommendations found in the BLM Bighorn Sheep Rangeland Management Plan, as revised (1993b); the Utah BLM Statewide Desert Bighorn Sheep Management Plan, as revised (1986a); and the Revised Guidelines for the Management of Domestic Sheep and Goats in Native Wild Sheep Habitats (BLM 1998a).
- Support the current bighorn sheep population and manage to increase desert bighorn population (prior stable numbers) on 330,892 acres. Population goals would be reached by releases, by reestablishment, and through change of livestock class and installation of new water facilities (see Appendix N for details).
- Management of bighorn sheep habitat in coordination with UDWR would include: installing water developments every 5 square miles in within 2 miles of escape terrain, precluding exotic ungulate, wild horses or burros within 10 miles of habitat, and constructing fences that allow for bighorn sheep passage (3 strands with bottom wire smooth) and dismantling un-needed fences.
- Manage 9,278 acres along the rim of Hatch Point as part of the Lockhart Bighorn Sheep habitat areas. Apply a timing limitation stipulation to oil and gas leases and other permitted uses, which would restrict surface-disturbing activities from April 1 through June 15 for lambing and from October 15 through December 15 for rutting (see Appendix C).
- Manage 317,523 acres of total desert bighorn sheep habitat on the following grazing allotments: Buckhorn, North River, Little Grand, Taylor, Ten Mile Point, Arth's Pasture, Spring Canyon Bottom, Big Flat, Kane Springs, Potash, Horsethief, Behind the Rocks, and Ruby Ranch.
- Support conversion of sheep AUMs to cattle on Hatch Point Allotment.*
- Improve desert bighorn habitat by installing and improving year-round water resources within all desert bighorn habitat and provide additional water sources at a minimum spacing of one water development in each 2 square mile area on lambing grounds.

**Deer and/or elk:**

- Manage UDWR current deer habitat of 534,329 acres in the Bookcliffs and 313,551 acres on the La Sal Mountains as mule deer habitat by improving or maintaining vegetative conditions to benefit both livestock and wildlife and by maintaining or improving the ecological condition of rangelands.
- Increase elk forage through vegetation treatments such as chemical, mechanical, and prescribed fire on approximately 40,000 acres of elk winter range (see Livestock Grazing).
- Manage crucial and high value deer and/or elk summer range (105,636 acres) within the Bookcliffs and La Sal Wildlife Management Unit by applying a timing limitation stipulation that would preclude surface-disturbing activities from May 15 to June 30 (see Appendix C; see Maps 2-27-B and Map 2-27-C/D.
- All forage on acquired state lands in upper Castle Valley within crucial deer winter range would be allocated to deer.

| Pronghorn Habitat | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| For pronghorn fawning habitat, exploration, drilling, and other development is prohibited from May 15 through June 15. | Protect current pronghorn habitat (822,001 acres) within Cisco Desert (743,524 acres) and Hatch Point (78,477 acres; the La Sal Wildlife Management Units: see Map 2-24) by applying a timing limitation stipulation that would preclude surface-disturbing activities from May 1 to June 15 (see Appendix C). | Protect pronghorn fawning habitat (293,741 acres) within Cisco Desert and on Hatch Point (the La Sal Wildlife Management Units) by applying a timing limitation stipulation that would preclude surface-disturbing activities from May 1 to June 15 (see Appendix C). | Protect pronghorn fawning habitat on Hatch Point (78,477 acres) by applying a timing limitation stipulation that would preclude surface-disturbing activities from May 1 to June 15 (see Appendix C). |
| **Cisco Desert HMP:** Improve pronghorn habitat by excluding livestock grazing activities from May 15 through June 20 or during extreme snow conditions. Change season of use on fawning grounds to reduce disturbance.<br><br>**Hatch Point HMP:** Pronghorn fawning areas would exclude livestock grazing | Spring grazing would be adjusted on 188,975 acres on allotments within crucial pronghorn habitat in the Cisco Desert to encourage forb production. These allotments include: Athena, Cisco, Cisco Mesa, Crescent, Harley Dome, San Arroyo, Pipeline, and Bar X. | Spring grazing would be adjusted on a case-by-case basis on 188,975 acres on allotments within crucial pronghorn habitat in the Cisco Desert to encourage forb production. These allotments include Athena, Cisco, Cisco Mesa, Harley Dome, and San Arroyo. | No adjustments to season of use would be made. |

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| | | | |
|---|---|---|---|
| from May 1 till June 30. Changes in season of use (November 1 through June 1) number of livestock (27% reduction), change in livestock class from sheep to cattle, fencing, seeding, and rest/rotation to improve habitat are recommended.<br><br>**Cisco Desert HMP:** Increase the percent browse and forb species on 6,375 acres of grass vegetation from less the 5% to 30% browse and forb.<br><br>**Hatch Point HMP:** Implement rest/rotation on three pastures developed on the Hatch Point Allotment. One pasture to be grazed from November 1 to March 1, the second from March 1 to June 1, and the third to receive a year-long rest from grazing. A total of 69 acres were to be seeded to attain a combination of succulent forbs, grasses, and shrubs that would provide spring forage. Fencing would be utilized as a management tool to accomplish this. | Pronghorn fawning areas would not be grazed from May 1 till June 30 on Hatch Point. These allotments include: Hatch Point, Lisbon, and Windwhistle. | Develop, where applicable, a rest/rotation of pasture or other grazing management systems within allotments that have crucial pronghorn habitat to encourage forb production prior to fawning. Change in livestock class from sheep to cattle, fencing, seeding, and rest/rotation to improve habitat would be encouraged. | |

| **Desert Bighorn Sheep Habitat** | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Avoid situating major ROWs within 48,245 acres in the Mineral Bottom, Potash and Westwater areas to protect crucial bighorn sheep habitat. Apply a Category 2 mineral leasing stipulation in order to protect 25,431 acres of bighorn sheep. | To protect lambing, rutting, and migration habitat (130,419 acres), apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). | To protect lambing, rutting, and migration habitat (101,897 acres), apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix C). Within migration corridors pipeline construction and geophysical exploration for oil and gas development would be allowed outside lambing and rutting periods from June 16 through October 14 and from December 15 through March 31, respectively. | To minimize disturbance within bighorn lambing and rutting areas (46,319 acres) apply a timing limitation stipulation for oil and gas and other surface-disturbing activities (see Appendix C). This limitation would preclude surface-disturbing activities from April 1 through June 15, and from October 15 through December 15. |
| **Potash-Confluence HMP:** Improve 42,500 acres of crucial bighorn sheep habitat by preventing surface disturbance during lambing and breeding seasons.<br><br>Assist in the development of livestock manipulation techniques on Horsethief Point, Spring Canyon Bottom, and Ten-Mile Point Allotments to improve or maintain bighorn sheep habitat.<br><br>Change season of use on the Potash Allotment to reduce competition on lambing and breeding grounds. | Manage 46,319 acres of lambing habitat (with Map 2-26-B) with the following prescriptions:<br>• Camping would be allowed in designated campsites only.<br>• No camping in Shafer Basin and Long Canyon.<br>• Livestock use would be adjusted on North River and, Taylor Allotments (Dry Mesa Pasture). | Manage lambing areas and manage 46,319 acres (see Map 2-26-C) with the following prescriptions:<br>• Camping would be allowed in designated campsites except for areas within the Green River riparian corridor, which remain open to unrestricted camping.<br>• No camping in Shafer Basin and Long Canyon.<br>• Livestock use would be adjusted on North River and, Taylor Allotments (Dry Mesa Pasture). | Same as the Proposed Plan with the exception that camping would not be restricted to designated campsites in lambing areas (see Map 2-26-D). |

| **Rocky Mountain Bighorn Sheep Habitat** | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| The 1990 amendment to the 1985 RMP recognized 194,560 acres of Rocky Mountain bighorn sheep habitat. | Manage the entire 458,242 acres of habitat for Rocky Mountain bighorn sheep that UDWR has designated from the Green River to the Colorado border according to the stipulations described in management common to all. This management would include improving or maintaining habitat and vegetative conditions to benefit bighorn sheep while maintaining or improving the ecological condition of rangelands (see Map 2-28). | Manage 310,726 acres of currently occupied Rocky Mountain bighorn habitat from the Green River to Pipeline Canyon according to stipulations described in management common to all. This management would include improving or maintaining habitat and vegetative conditions to benefit bighorn sheep while maintaining or improving the ecological condition of rangelands (see Map 2-28). | Manage 194,560 acres of occupied habitat defined in the 1985 RMP. (Same as Alternative A) according to stipulations described in management common to all.<br><br>This management would include improving or maintaining habitat and vegetative conditions to benefit bighorn sheep while maintaining or improving the ecological condition of rangelands (see Map 2-28). |
| Any future proposal for a change in kind of livestock from cattle to sheep in Rocky Mountain bighorn habitat would be denied. | Support conversion of sheep to cattle on allotments that are within nine miles of the 458,242 acres of managed Rocky Mountain bighorn sheep habitat. Once conversion occurs, do not allow re-conversion (from cattle to sheep). Allotments include Agate, Bar-X, Cisco, Cisco Mesa, Corral Wash Canyon, Floy Creek, Harley Dome, Rattlesnake North, and San Arroyo. | Support conversion of sheep to cattle on allotments that are within nine miles of the 310,726 acres of managed Rocky Mountain bighorn sheep habitat. Once conversion occurs, do not allow re-conversion (from cattle to sheep). This includes the Cisco and Cisco Mesa Allotments, San Arroyo, Winter Camp and Harley Dome. | Same as Alternative A. |

| **Deer and/or Elk Habitat** | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| In order to protect deer and/or elk winter range, exploration, drilling, and other development activity would be allowed only from May 16 to October 31 on 260,769 acres of deer and/or elk winter range. | Protect deer and/or elk crucial and high value winter habitat (635,774 acres) by applying a timing limitation stipulation for oil and gas leasing as well as other surface-disturbing activities (see Appendix C). This stipulation would preclude surface-disturbing activities from November 1 through May 15. (This acreage includes 240,258 acres in WSAs, which are already closed to leasing.) | Protect deer and/or elk crucial winter habitat (349,955 acres) by applying a timing limitation stipulation for oil and gas leasing as well as other surface-disturbing activities (see Appendix C). (This includes 73,160 acres in WSAs, which are already closed to leasing.) This limitation would preclude surface-disturbing activities from November 15 through April 15. | Protect deer and/or elk crucial winter habitat (349,955 acres) by applying a timing limitation stipulation for oil and gas leasing as well as other surface-disturbing activities (see Appendix C). (This includes 73,160 acres in WSAs, which are already closed to leasing.) This limitation would preclude surface-disturbing activities from December 1 through April 15. |

BLM_0010970

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Livestock Grazing Allotment Decisions Affecting Wildlife | | | |
|---|---|---|---|
| **Allotments Not Available for Grazing:**<br>• Bogart with 14,751 acres and 209 AUMs.<br>• Cottonwood with 27,193 acres and 900 AUMs.<br>• Diamond with 19,112 acres and 588 AUMs.<br>• Pear Park, with 14,202 acres.<br>• Spring Creek, with 924 acres.<br>• Beaver Creek with 1,351 acres and 0 AUMs. | **Allotments Not Available for Grazing:**<br>• Bogart with 14,751 acres and 209 AUMs.<br>• Cottonwood with 27,193 acres and 900 AUMs.<br>• Diamond with 19,112 acres and 588 AUMs.<br>• Pear Park, with 14,202 acres.<br>• Spring Creek, with 924 acres.<br>• Beaver Creek with 1,351 acres and 0 AUMs.<br>• Professor Valley with 20,424 acres and 378 AUMs.<br>• Ida Gulch with 3,624 acres and 112 AUMs.<br>• River, with 388 acres and 7 AUMs.<br>• Mill Creek, with 3,922 acres and 137 AUMs. | **Allotments Not Available for Grazing:**<br>• Bogart with 14,751 acres and 209 AUMs.<br>• Cottonwood with 27,193 acres and 900 AUMs.<br>• Diamond with 19,112 acres and 588 AUMs.<br>• Portions of Professor Valley along Highway 128.<br>• Ida Gulch with 3,624 acres and 112 AUMs.<br>• Portions of River along Highway 128.<br>• Mill Creek with 3,922 acres and 137 AUMs.<br>• Pear Park with 14,202 acres | **Allotments Not Available for Grazing:**<br>Mill Creek with 3,922 acres and 137 AUMs. |
| **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>None. | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>None. | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>After performing rangeland health assessments, the resulting AUMs could be made available for grazing:<br>• Spring Creek. | **Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>After performing rangeland health assessments, the resulting AUMs could be made available for grazing:<br>• Pear Park (no domestic sheep would be allowed).<br>• Spring Creek.<br>• Bogart (no domestic sheep would be allowed).<br>• Cottonwood (no domestic sheep would be allowed).<br>• Diamond Canyon (no domestic sheep would be allowed). |
| **Areas Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>None. | **Areas Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>None. | **Areas Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>Beaver Creek. | **Areas Currently Not Available for Grazing that are to be Reconsidered for Allocation:**<br>Beaver Creek. |
| **WOODLANDS** | | | |

**Goals and Objectives:**
- Manage forests and woodlands for healthy conditions that contribute to healthy habitat for animal and plant species, proper watershed functioning conditions, and riparian restoration and enhancement.
- Provide woodland products on a sustainable basis consistent with maintaining ecosystem health and other resource management objectives to meet local needs where such use does not limit the accomplishment of goals for the management of other important resources.
- Encourage, where feasible, the harvest of forest products in areas of proposed or existing vegetation treatments to lessen the need for additional treatment or land disturbance, and in areas that need restoration for ecological benefits.
- Identify, maintain, and restore forests with late successional characteristics to a pre-fire suppression condition. The MFO would adopt the USFS old-growth definitions and identification standards as per the USFS document "Characteristics of Old-Growth Forests in the Intermountain Region (April 1993)." In instances where the area of application in the previous document does not apply (e.g., *Pinus edulis*), use the document "Recommended Old-Growth Definitions and Descriptions, USDA Forest Service Southwestern Region (Sept. 1992)."

**Management common to the PROPOSED PLAN and Draft RMP Alternatives A, B, and D:**
- Permits for harvest of woodland products would continue to be sold to the public, consistent with the availability of woodland products and the protection of sensitive resource values.
- As needed, designate private and commercial wood gathering areas for the following uses: firewood, fence posts, Christmas tree cutting, green wood cutting, and plant gathering for landscaping.
- Use woodland harvest to assist in managing woodlands to accomplish goals outlined in the Fire Management Plan.
- Prohibit public fuelwood gathering in riparian areas.
- Permit sustainable harvest (including cutting of green willows, squawbush, and cottonwoods) for Native American traditional ceremonial use.

**Management Common to the PROPOSED PLAN and Draft RMP Alternatives B and D:**
- Additional areas may be closed to wood gathering and wood harvest as needed to protect sensitive resources.
- Follow national BLM Forest Health and Forest Management Standards and Guidelines to assess conditions and guide management actions for the forest and woodland resource.
- Provide for salvage harvest of wood in beetle-kill areas, when compatible with other resource objectives.

BLM_0010971

**Table 2.1. MOAB PROPOSED PLAN and Draft RMP Alternatives**

| Areas Available for Woodland Harvest | | | |
|---|---|---|---|
| **Alternative A (No Action)** | **Alternative B** | **PROPOSED PLAN** | **Alternative D** |
| Provide 1,243,734 acres for woodland harvest and wood gathering. See Map 2-29-A for areas in which woodland harvest and wood gathering is prohibited (609,385 acres) to protect resources values. | Provide 958,124 acres for woodland harvest and wood gathering. See Map 2-29-B for areas in which woodland harvest and wood gathering is prohibited (863,250 acres) to protect resource values. | Provide 1,168,988 acres for woodland harvest and wood gathering. See Map 2-29-C for areas in which woodland harvest and wood gathering is prohibited (652,386 acres) to protect resource values. | Provide 1,243,734 acres for woodland harvest and wood gathering. See Map 2-29-D for areas in which woodland harvest and wood gathering is prohibited (609,385 acres) to protect resource values. |

BLM_0010972

## 2.2 SUMMARY OF IMPACTS

Table 2.2 provides a comparative summary of the environmental impacts associated with the Proposed Plan and with each alternative.

BLM_0010973

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **AIR QUALITY** | | | | |
| Cultural Resources, Paleontological Resources, Visual Resources, Lands and Realty, Livestock Management, Riparian Resources, Soil and Water, Special Designations, Special Status Species, Vegetation, Wildlife, and Woodlands | Incremental benefits due to restrictions and/or reductions in surface disturbing activities, grazing, vegetation disturbance, and riparian disturbance. Alternative A is generally the least restrictive of these activities, and therefore has the lowest associated potential benefit but is not expected to result in a substantial decrease in air quality. | Generally the most restrictive of the proposed alternatives and therefore has the highest potential for incremental benefits to air quality. | The Proposed Plan is less restrictive than Alternative B, but more beneficial than Alternatives A and D. | Alternative D is less restrictive than Alternative B and the Proposed Plan, but more beneficial than Alternative A. |
| Fire Management | Reduce fuel loads and wildfire severity would reduce air quality impacts. Limited short-term impacts would result from controlled burns and prescribed fire. | Same as Alternative A | Same as Alternative A | Same as Alternative A |
| Hazard Management | Small to negligible adverse impacts due to surface disturbance and operation of heavy equipment during remediation. | Same as Alternative A | Same as Alternative A | Same as Alternative A |
| Mineral Resources | Adverse emissions of atmospheric pollutants on both short-term and long-term durations. Alternative A would have the most mineral development activities, but is not expected to result in a substantial decrease in air quality or exceedance of state or federal air quality criteria. | Same as Alternative A, except that the least oil and gas development would occur under this alternative. | Same as Alternative A, except that the second least oil and gas development would occur under this alternative. | Same as Alternative A, except that the third least (or second most) oil and gas development would occur under this alternative. |

BLM_0010974

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **CULTURAL RESOURCES** | | | | |
| Cultural Resources | NHPA and BLM policy to identify resources, and avoid, minimize, or mitigate adverse impacts would apply. | Livestock grazing restrictions in high site density areas provide long-term benefits to cultural resources in restricted areas. 50,000 acres targeted for priority site identification studies; more than any other alternative. Greater focus on restoration of damaged sites than any other alternative. There would be mixed, long-term, beneficial and adverse impacts from site interpretation. | Livestock grazing restrictions in high site density areas (fewer than Alternative B) provide long-term benefits to cultural resources in restricted areas. 30,000 acres targeted for priority site identification studies; the second most of all alternatives. Second greatest focus on restoration of damaged sites of all alternatives. There would be mixed, long-term, beneficial and adverse impacts from site interpretation; more sites developed for public use than under Alternative B. | Same as the Proposed Plan except livestock grazing would be restricted in fewer areas, and fewer sites would be targeted for restoration. More sites would be allocated for public use than under any other alternative. 20,000 acres would be targeted for resource identification studies; less than any other action alternative. |
| Fire Management | Negative impacts from fuels treatments over 5,860 acres and non-fire fuels treatments over 1,347 acres every 10 years in high site-density areas. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Mineral withdrawals on 13,296 acres reduce opportunities for adverse impacts to cultural resources. Adverse impacts over 3,776 acres of high site density lands encompassed by designated utility corridors. | Same as Alternative A except 6,309 acres of high site density lands encompassed by designated utility corridors, and reduced opportunities for adverse impacts in WSAs or Was (exclusion areas) and ACECs (considered avoidance areas for rights-of-way). | Same as Alternative B except 28,400 acres of high site density lands encompassed by designated utility corridors. | Same as Alternative B except 29,983 acres of high site density lands encompassed by designated utility corridors. |

BLM_0010975

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Livestock Grazing | Reduced opportunities for long-term adverse impacts over 126,907 acres of existing grazing closures and 24,329 acres of high site density lands also closed to grazing. Long-term adverse impacts from trampling and rubbing over 273,890 acres of high site density lands. | Reduced opportunities for long-term adverse impacts over 153,797 acres of grazing closures, 3,263 acres of wildlife closures, and 29,758 acres of high site density lands closed to grazing. Long-term adverse impacts from trampling and rubbing over 272,818 acres of high site density lands This alternative has slightly greater benefit and lesser impact to cultural resources than any other alternative. | Same as Alternative B except that 114,235 acres of grazing closures would occur, with 25,177 acres of high site density land closed to livestock grazing and 277,399 acres of high site density lands open to grazing.<br>This alternative has slightly higher overall potential for adverse impact than Alternative B but less than Alternatives A and D. | Same as Alternative B except that 52,214 acres of grazing closure would occur, with approximately 12,386 acres of high site density lands closed to livestock grazing and 290,190 acres of high site density lands would be open to grazing.<br>This alternative has slightly higher overall potential for adverse impact than Alternative B and the Proposed Plan but less than Alternative A. |
| Minerals | Reduced of opportunities for direct and inadvertent impacts from ground disturbance and increased human activity over 458,665 acres closed to mineral entry, leasing, and development.<br>Approximately 618 acres of disturbance could occur on high site density lands for oil and gas development.<br>Approximately 407 acres of disturbance could occur on high site density lands for geophysical work.<br>Adverse impacts possible over 1,467,758 acres of land available for salable minerals. | Same as Alternative A except:<br>• An additional 41,488 acres of high site density lands closed to mineral entry, leasing, and development,<br>• 401 acres of oil and gas disturbance on high site density lands,<br>• 239 acres of geophysical disturbance on high site density lands, and<br>• 836,137 acres of land available for salable minerals.<br>This alternative has the least potential adverse impact and greatest beneficial impact to cultural resources. | Same as Alternative B except:<br>• Approximately 527 acres of disturbance on high site density lands for oil and gas development.<br>• Approximately 352 acres of disturbance on high site density lands for geophysical work.<br>• 1,234,717 acres of land available for saleable minerals.<br>This alternative has the second least potential adverse impact and second greatest beneficial impact to cultural resources s. | Same as Alternative B except:<br>• Approximately 594 acres of disturbance on high site density lands for oil and gas development.<br>• Approximately 396 acres of disturbance on high site density lands for geophysical work.<br>• 1,387,473 acres of land available for saleable minerals.<br>This alternative has the third least (second most) potential adverse impact and greatest beneficial impact to cultural resources. |

BLM_0010976

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Paleontological Resources | Limited long-term adverse impacts from collection of fossil materials. Limited long-term beneficial impacts from raising awareness about fossil collecting and preservation goals. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Recreation—SRMAs | Reduced long-term, adverse impacts over 49,543 acres of high site density lands managed as SRMAs. | Reduced long-term, adverse impacts over 217,994 acres of high site density lands managed as SRMAs. | Same as Alternative A except 160,885 acres of high site density lands would be managed as SRMAs. This would result in less protection from long-term adverse impacts to cultural resources than under Alternative B and more than Alternatives A and D. | Same as Alternative A except 74,278 acres of high site density lands would be managed as SRMAs. |
| Special Designations | Long-term benefits due to reduced surface disturbance over 243 acres of high site density lands managed as Outstanding Natural Area (ONA). | Same as Alternative A except up to 109,809 acres of high site density lands would be managed as ACECs with restrictions on surface disturbance. | Same as Alternative A except up to 19,029 acres of high site density lands would be managed as ACECs with restrictions on surface disturbance. | NO ACECs or ONAs would be designated. |

BLM_0010977

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Travel Management | 1,049 acres of high site density lands closed to OHV use with long-term benefits to cultural resources.<br><br>208,757 acres of high site density lands where OHV use is limited to designated routes, with mixed long-term beneficial and adverse impacts to cultural resources.<br><br>92,628 acres of high site density lands open to cross country OHV use without designated routes, with long-term adverse impacts to cultural resources.<br><br>Existing levels of direct and indirect impacts, primarily adverse, to cultural resources along travel routes would be maintained.<br><br>This alternative has the least benefit and most potential for adverse impacts to cultural resources of all alternatives. | Same as Alternative A except the acreages are as follows:<br>• 72,415 acres closed<br>• 230,160 acres limited to designated routes<br>• 0 acres open to cross country OHV use<br>This alternative has the most long-term benefits for cultural resources and least potential for long-term adverse impacts of all alternatives.<br><br>327 linear miles of travel routes in high site density areas would be closed, providing long-term direct and indirect benefits to cultural resources.<br><br>This alternative has the most benefit to cultural resources of all alternatives. | Same as Alternative B except as follows:<br>• 69,215 acres closed<br>• 232,875 acres limited to designated routes<br>• 486 acres open to cross country OHV use 19 miles of designated motorcycle routes on high site density lands<br>This alternative has the second most long-term benefits for cultural resources and second least potential for long-term adverse impacts of all alternatives.<br><br>238 linear miles of travel routes in high site density areas would be closed, providing long-term direct and indirect benefits to cultural resources.<br><br>This alternative has the second most benefit to cultural resources of all alternatives. | Same as Alternative B except as follows:<br>• 17,981 acres closed<br>• 283,951 acres limited to designated routes<br>• 643 acres open to cross country OHV use<br>• 21 miles of designated motorcycle routes on high site density lands<br>This alternative has the second least long-term benefits for cultural resources and second most potential for long-term adverse impacts of all alternatives.<br><br>214 linear miles of travel routes in high site density areas would be closed, providing long-term direct and indirect benefits to cultural resources.<br><br>This alternative has the third most (second least) benefit to cultural resources of all alternatives. |
| Visual Resources | Long-term, indirect, benefits due to reduced surface disturbance over 349,101 acres of WSAs and WAs and 72,609 acres of high site density lands outside of WSAs and WAs managed as VRM Class I.<br><br>This alternative has the least long-term benefit to cultural resources of all alternatives. | Same as Alternative A except 106,105 acres of high site density lands outside of WSAs, WAs, and WSRs and an additional 18,301 acres of high site density lands in WSRs managed as VRM Class I.<br><br>This alternative has the most long-term benefit to cultural resources of all alternatives. | Same as Alternative B except 74,672 acres of high site density lands outside of WSAs, WAs, and WSRs and an additional 3,447 acres of high site density lands in WSRs managed as VRM Class I.<br><br>This alternative has the second most long-term benefit to cultural resources of all alternatives. | Same as Alternative A except 72,703 acres of high site density lands outside of WSAs, WAs, and WSRs managed as VRM Class I.<br><br>This alternative has the third most (second least) long-term benefit to cultural resources of all alternatives. |

BLM_0010978

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Non-WSA Lands with Wilderness Characteristics | There are no management actions for non-WSA lands with wilderness characteristics under Alternative A. | Limited, long-term, benefits to cultural resources from restrictions on woodcutting in non-WSA areas managed for wilderness characteristics. Management of 47,784 acres of high site density lands with restrictions on surface disturbance provide long-term benefits for cultural resources in those areas. This alternative has the most long-term benefit to cultural resources of all alternatives. | Same as Alternative B except: ◆ Management of 12,773 acres of high site density lands with restrictions on surface disturbance provide long-term benefits for cultural resources in those areas. This alternative has the second most long-term benefit to cultural resources of all alternatives. | Same as Alternative A. |
| Woodlands | Reduced disturbance over 144,146 acres of high site density lands closed to use of woodland products. | Same as Alternative A except 183,677 acres of high site density lands closed to use of woodland products. | Same as Alternative A except 159,985 acres of high site density lands closed to use of woodland products. | Same as Alternative A except 144,146 acres of high site density lands closed to use of woodland products. |
| **FIRE MANAGEMENT** | | | | |
| Fire Management | Reduced fuel loads and wildfire severity over 5,000 to 10,000 acres per year of prescribed fire and non-fire treatment areas concentrated in pinyon-juniper woodland and wildland/urban interfaces. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Slightly decreased risk of inadvertent fire starts due to limits on the number of people and vehicles associated with filming, and on the use of pyrotechnics and explosives. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0010979

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Minerals | Mineral development-related surface disturbance and activities would slightly increase the risk of human-caused fires surrounding 6,765 acres of projected disturbance. | Same as Alternative A except 3,975 acres of projected disturbance in the MPA. | Same as Alternative A except 6,480 acres of projected disturbance in the MPA. | Same as Alternative A except 6,720 acres of projected disturbance in the MPA. |
| Recreation and Travel | Increased risk of human- and vehicle-caused wildland fires over 678,250 acres open to cross-country OHV travel,. Slightly reduced risk of wildfire over 29,654 acres would be closed to all OHV travel. Slightly reduced risk of human-caused fire over 151,252 acres closed to dispersed camping within SRMAs. | Slightly reduced risk of wildfire over entire MPA (closed to cross-country OHV travel), and 358,126 acres closed to all OHV travel. The impacts of limiting camping would be the same as Alternative A, except within 976,173 acres. | Fire risk would be slightly higher than Alternative B, with 1,866 acres open to cross-country OHV travel and 349,843 acres closed to OHV travel. The impacts of limiting camping would be the same as Alternative A, except within 658,642 acres. | Fire risks would be higher than Alternatives B and C (but lower than A), with 3,348 acres open to cross-country OHV travel and 29,654 acres closed to OHV travel. The impacts of limiting camping would be the same as Alternative A, except within 277,471acres. |
| Special Designations, Woodlands, Wildlife, Special Status Species | Alternative A is generally the least restrictive of vegetation treatments and woodland harvest and, therefore, has the lowest risk of fuel loading and catastrophic wildfire. | Alternative B is generally the most restrictive of vegetation treatments and woodland harvest and, therefore, has the highest risk of fuel loading and catastrophic wildfire. | The Proposed Plan is generally the most second restrictive of vegetation treatments and woodland harvest and, therefore, has the second highest risk of fuel loading and catastrophic wildfire. | Alternative B is generally the second least restrictive of vegetation treatments and woodland harvest and, therefore, has the second lowest risk of fuel loading and catastrophic wildfire. |
| HEALTH AND SAFETY | | | | |
| Minerals | Hazardous materials risk from the use, generation, storage, transportation, and/or disposal of hazardous materials would be negligible given the small number of wells projected. Nevertheless, any mineral exploration and development would increase the potential for adverse and long-term hazardous materials risks in the planning area. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0010980

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Abandoned Mine Land | Abandoned mine land site and area mitigation and reclamation priorities would assist in minimizing risks to health and safety. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| **LANDS AND REALTY** | | | | |
| Lands and Realty | Alternative A would have the smallest impacts to the placement of future ROWs due to ROW exclusion and avoidance and restrictions on surface disturbance of any of the alternatives (353,293 acres closed to surface disturbing activities; 38,912 acres designated as NSO; and 389,605 acres with timing and controlled surface use limitations). | Alternative B would have the greatest impacts to the placement of future ROWs due to ROW exclusion and avoidance and restrictions on surface disturbance of any of the alternatives (672,724 acres closed to surface disturbing activities; 341,919 acres designated as NSO; and 544,412 acres with timing and controlled surface use limitation stipulations). | The Proposed Plan would have fewer impacts to the placement of future ROWs due to ROW exclusion and avoidance and restrictions on surface disturbance than Alternative B, but more so than Alternatives A or D (370,250 acres closed to surface disturbing activities; 217,480 acres designated as NSO; and 806,994 acres with timing and controlled surface use limitation stipulations). | Alternative D would have fewer impacts to the placement of future ROWs due to ROW exclusion and avoidance and restrictions on surface disturbance than Alternatives B and C, but greater impacts than Alternative A (355,146 acres closed to surface disturbing activities; 84,772 acres designated as NSO; and 590,442 acres with timing and controlled surface use limitation stipulations). |
| **LIVESTOCK GRAZING** | | | | |
| Fire Management | Short-term, adverse impacts on livestock grazing in treated areas. Long-term, beneficial impacts from reduced risk of fire and improved forage. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Livestock Grazing | Adverse impacts to grazing from making 126,907 acres unavailable for grazing. | Adverse impacts to grazing from making 153,797 acres unavailable for grazing. | Adverse impacts to grazing from making 114,234 acres unavailable for grazing. | Adverse impacts to grazing from making 52,214 acres unavailable for grazing. |
| Minerals | Surface disturbing activities on 679 total acres annually under this alternative could lead to losses of AUMs and acres available to livestock grazing. | Surface disturbing activities on 426 total acres annually under this alternative could lead to losses of AUMs and acres available to livestock grazing. | Surface disturbing activities on 721 total acres annually under this alternative could lead to losses of AUMs and acres available to livestock grazing. | Surface disturbing activities on 743 total acres annually under this alternative could lead to losses of AUMs and acres available to livestock grazing. |

BLM_0010981

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation | Loss of AUMs from grazing restrictions at developed recreation sites. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Travel | Impacts resulting in potential loss of vegetation for livestock grazing from cross country OHV travel on 602,212 acres. | No impacts because cross country travel is not allowed. | Impacts resulting in potential loss of vegetation for livestock grazing from cross country OHV travel on 1,866 acres. | Impacts resulting in potential loss of vegetation for livestock grazing from cross country OHV travel on 3,064 acres. |
| Riparian | Short-tem negative impacts to livestock grazing when site closures are necessary; possible long-term beneficial impacts after a site is rehabilitated. | Same as Alternative A with eight additional sites excluded from livestock grazing. | Same as Alternative A with six additional sites excluded from livestock grazing. | Same as Alternative A. |
| Soils/Watershed | Temporary or permanent decreases in acres or AUMs available to livestock to mitigate damage to soils. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Vegetation | Short-term, adverse impacts on livestock grazing in areas that are closed following treatment. Long-term, beneficial impacts from improved forage. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Wildlife | Slight changes in grazing season of use in pronghorn and bighorn sheep habitat (using Rangeland Health Standards). | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0010982

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **MINERAL RESOURCES** | | | | |
| Mineral Resources | Most beneficial impacts to mineral development with 1,427,949 total leasable acres under standard lease terms and special stipulations, 451 oil and gas wells, 2,397 acres geophysical exploration, and 1,467,768 salable acres. | Most adverse impact to mineral development with 808,096 total leasable acres under standard lease terms and special stipulations, 264 oil and gas wells, 1,404 acres geophysical exploration, and 808,097 salable acres. 11,207 acres with limiting designations. | Second most adverse impacts with 1,234,267 total leasable acres under standard lease terms and special stipulations, 432 oil and gas wells, 2,072 acres geophysical exploration, and 1,234,267 salable acres. 10,437 acres with limiting designations. | Second most beneficial impacts to mineral development with 1,387,473 total leasable acres under standard lease terms and special stipulations, 448 oil and gas wells, 2,329 acres geophysical, and 1,387,473 salable acres. |
| Soil and Water | Adverse impacts to mineral development on 313,800 acres of saline soils and 823,094 acres of high-limitations soils closed to surface disturbance. | Adverse impacts to mineral development on 330,142 acres of saline soils and 487,917 acres of high-limitations soils closed to surface disturbance, and 2 watersheds closed to mineral development. | Adverse impacts to mineral development on 330,142 acres of saline soils and 710,129 acres of high-limitations soils closed to surface disturbance, and 2 watersheds NSO for mineral development. | Adverse impacts to mineral development 487,917 acres of high-limitations soils closed to surface disturbance. |
| Special Designations | Adverse impacts to mineral development over 1,287 acres in Negro Bill Outstanding Natural Area. | Adverse impacts to mineral development within 301,115 acres designated as ACECs and limiting development. | Adverse impacts to mineral development within 30,563 acres designated as ACECs and limiting development. | No impact. |
| Visual Resources | Second-least adverse impacts to minerals development on 349,110 acres (of WSAs) managed as VRM Class I and 401,015 acres designated VRM Class II. | Most-adverse impacts to minerals development on 453,462 acres managed as VRM Class I and 373,647 acres designated VRM Class II. | Second-most adverse impacts to minerals development on 358,911 acres managed as VRM Class I and 365,567 acres designated VRM Class II. | Least adverse impacts to minerals development on 349,617 acres managed as VRM Class I and 245,773 acres designated VRM Class II. |
| Non-WSA Lands with Wilderness Characteristics | No non-WSA lands with wilderness characteristics would be managed. | Most adverse impacts to mineral development, with 266,485 acres managed to protect WC. These acres would be closed to oil and gas leasing. | Second-most adverse impacts, with 47,761 acres managed to protect WC.NSO for oil and gas leasing. | Same as Alternative A. |

BLM_0010983

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Wildlife and Fisheries | Least adverse impacts to mineral development over 503,574 acres of total habitat with restrictive stipulations over 227 days. | Most adverse impacts to mineral development with 1,553,233 acres total habitat with restrictive stipulations over 273 days. | Second most adverse impacts to mineral development with 1,379,134 acres total habitat with restrictive stipulations over 273 days. | Third most adverse impacts to mineral development (second least) with 590,442 acres total habitat with restrictive stipulations over 273 days. |
| **NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS** | | | | |
| Non-WSA Lands with Wilderness Characteristics | Adverse impacts to 94% of the non-WSA areas inventoried with wilderness characteristics. Adverse impacts would include major surface disturbing activities and degradation of the wilderness characteristics of the entire area. Approximately 81% would be open to mineral leasing with standard lease terms or with controlled surface use/timing limitation stipulations. In addition, 53% would be open to cross-country OHV use and 74% would be open to woodland harvest. Potential loss of wilderness characteristics on non-WSA lands across the entire area over the life of the plan. | Beneficial protection of naturalness and opportunities for solitude and primitive recreation across all non-WSA lands inventoried with wilderness characteristics. Beneficial management including closed to oil and gas leasing, NSO for other surface disturbing activities, retained in federal ownership, vehicle use limited to designated roads, woodland harvest prohibited, VRM Class II, and exclusion areas for ROWs. Therefore the entire inventory (266,485 acres) of non-WSA lands with wilderness characteristics would be preserved under this alternative. | Beneficial protection of naturalness and opportunities for solitude and primitive recreation across 18% of the non-WSA lands with wilderness characteristics (47,761 acres). Adverse impacts to naturalness and outstanding opportunities on 61% of the non-WSA lands with wilderness characteristics open to mineral leasing, 53% managed under VRM Classes III and IV, and 61% open to woodlands harvest. Potential degradation of the wilderness characteristics of those non-WSA lands not managed specifically to protect wilderness characteristics. | Adverse impacts to 87% (232,133 acres) of the non-WSA areas inventoried with wilderness characteristics (as described under Alternative A). Approximately 87% would be open to mineral leasing with standard lease terms or with controlled surface use/timing limitation stipulations. In addition, 74 % would be open to woodland harvest. Potential loss of wilderness characteristics on non-WSA lands across the entire area over the life of the plan. |

BLM_0010984

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| | | **PALEONTOLOGICAL RESOURCES** | | |
| Fire Management, Lands and Realty, Livestock Grazing, Minerals, Special Designations, Travel, Non-WSA Lands with Wilderness Characteristics, and Woodlands | Long term direct and indirect adverse impacts from construction of roads, fire lines, prescribed burns, 21,701 acres of utility corridors, 1,695,621 acres (total) open to livestock grazing, 838,412 acres open to oil and gas development, 391,133 acres open to unrestricted OHV travel, and 760,344 acres open to woodland harvest in paleontologically sensitive areas/geologic units. Beneficial impacts from fossils recovered as a result of mitigation and designation of ACECs, WSRs, WSAs, WA. Designates the fewest acres of land as ACECs, WSAs and WSRs. 0 acres as WSRs, and 1,287 acres as ACEC. No acres designated to be managed for wilderness characteristics on non-WSA lands<br><br>Has highest overall potential for adverse impacts. | Same as Alternative A, except: 38,633 acres of utility corridors, 1,668,732 acres (total) open to livestock grazing, 487,227 acres open to oil and gas development, no lands open to unrestricted OHV travel, and 614,848 acres open to woodland harvest in paleontologically sensitive areas/geologic units. 71,072 acres designated as WSRs, 610,703 acres as ACECs. 266,485 acres of non-WSA lands to be managed for wilderness characteristics.<br><br>Has lowest potential for adverse impacts. | Same as Alternative A except: 101,359 acres of utility corridors, 1,708,294 acres (total) open to livestock grazing, 730,458 acres open to oil and gas development, 7 acres open to unrestricted OHV travel, and 737,198 acres open to woodland harvest in paleontologically sensitive areas/geologic units. 41,495 acres designated as WSRs, 63,781 acres as ACECs. 47,761acres of non-WSA lands to be managed for wilderness characteristics.<br><br>Has second lowest potential for adverse impacts. | Same as Alternative A except: 123,132 acres of utility corridors, 1,770,314 acres (total) open to livestock grazing, 814,739 acres open to oil and gas development, 38 acres open to unrestricted OHV travel, and 760,198 acres open to woodland harvest in paleontologically sensitive areas/geologic units. 0 acres designated as WSRs, 35,042 acres as ACECs<br><br>Has second highest potential for adverse impacts. |
| Paleontology | Long- and short-term direct and indirect beneficial impacts from mitigation of surface disturbing actions in paleontologically sensitive areas/geologic units; designation of some paleontologically sensitive sites as SRMAs; and enhanced educational, interpretive and scientific opportunities. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0010985

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| RECREATION | | | | |
| Air Quality | Long-term, beneficial impacts to scenic quality from interagency MOUs and BMPs controlling smoke, haze, and air pollutants. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Cultural | Long-term, adverse impacts on all users from least protection of cultural resources. | Protection-related actions applied to 50,000 acres of recreation/cultural resources would have long-term, beneficial impacts on recreation. | Impacts similar to Alternative B, but to a lesser degree, from protection of 30,000 acres of recreation/cultural resources. | Impacts similar to Alternative B, but to a lesser degree than the Proposed Plan. |
| Fire Management | Short-term, adverse impacts on recreation from surface disturbances, scenic quality degradation, and loss of vegetation. Long-term, beneficial impacts on recreation resources from reduced fire risks, enhanced wildlife habitat, and improved scenic quality. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Health and Human Safety | Negligible short-term impacts, with beneficial, long-term impacts from increased recreational opportunities for all users in remediated/reclaimed hazardous areas. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Long-term, beneficial impacts on all recreation user groups from protection of 70,237 acres of scenic and recreation resources in the Three Rivers and Westwater Mineral Withdrawal Areas. | Similar to Alternative A, but more beneficial impacts, from NSO leasing stipulations within the withdrawal areas. | Same as Alternative B. | Same as Alternative B. |

BLM_0010986

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Livestock Grazing | Direct and indirect, long-term, beneficial impacts on wildlife viewing and hunting from changes in allotment use and grazing exclusion in riparian areas. Grazing vegetation treatments on 67,125 acres would have short-term, adverse impacts on recreation, but long-term benefits from reduced fire risks, enhanced wildlife habitat, and improved scenic quality. | Beneficial, long-term, indirect impacts to wildlife viewing and hunting from forage treatments on 46,307 acres and exclusion of grazing in 4,673 acres of riparian areas. | Impacts slightly less beneficial than Alternative B, with riparian grazing exclusion on 1,497 acres. | Same beneficial impacts from forage treatments as Alternative B, but less beneficial riparian protection than Alternatives B or C. Slightly more beneficial than Alternative A. |
| Minerals | Indirect and direct, short-term and long-term, adverse impacts on recreational opportunities from surface-disturbing impacts to natural resources from noise, intrusive night lighting, soil erosion, and cross-country geophysical activities. | Impacts similar to Alternative A, except that fewer acres of RFD predicted development (56% of Alternative A) would reduce the adverse impacts to recreation. | Impacts similar to Alternative A, with slightly reduced adverse impacts from RFD predicted development (96% of Alternative A). | Impacts negligibly less adverse than Alternative A. |
| Recreation, Book Cliffs SRMA | Minor, adverse impacts to recreation resources and users from resource use conflicts. | Long-term, beneficial impacts to recreation resources and non-mechanized from reduced conflicts and preservation of resources in 348,140-acre Undeveloped SRMA. Mechanized users would be adversely restricted to 18 miles of routes. | SRMA would not be established, with impacts to the same as Alternative A. | SRMA would not be established, with impacts to the same as Alternative A. |
| Recreation, Cameo Cliffs SRMA | Minor impacts to resources from OHV surface disturbances along designated routes. Adverse impacts to non-motorized users from continued use of the 15,597-acre SRMA as a focus area for OHVs. | Beneficial, long-term impacts on resources and on motorized and non-motorized users from resource protection, expanded recreational opportunities, additional facilities, and reduced user conflicts within the 15,597-acre SRMA. | Same as Alternative B. | Same as Alternative B. |

BLM_0010987

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation, Canyon Rims SRMA | Potential long-term, adverse impacts from minerals leasing, VRM III objectives, and user conflicts within the 101,531-acre SRMA. Long-term, beneficial resource protection impacts from travel route designation, camping restrictions. | Long-term, beneficial impacts from reduced user conflicts for motorized, mountain biking, and non-mechanized users within the SRMA from management of focus areas and increased recreational opportunities. | Same as Alternative B. | Impacts similar to Alternative A, but with more beneficial impacts to scenic drivers and hikers. |
| Recreation, Colorado Riverway SRMA | Long-term, beneficial impacts for all user groups from continued management for reduced user conflicts and restrictions on surface disturbances within the 17,983-acre SRMA. | Long-term, beneficial impacts from resource protection, reduced user conflicts from additional facilities, additional focus areas, and restricting camping to designated areas in the 103,467-acre SRMA. Long-term, adverse impacts to specialized, river floating groups. | Impacts similar to Alternative B, but with more beneficial impacts to all user groups. | Beneficial impacts to recreation from designated of a 79,126-acre SRMA, but long-term, adverse impacts from user conflicts because of management of fewer, and smaller, focus areas, and fewer facilities. |
| Recreation, Dolores River Canyons SRMA | Long-term, adverse impacts to resources from lack of management prescriptions for the area, creating the likelihood of user conflicts and resource degradation. | Long-term, adverse impacts on motorized and mountain biking users. Beneficial, long-term impacts to resources and users within the 31,661-acre SRMA from expanded recreational opportunities for boating and hiking, and a reduction in user conflicts. | Same as Alternative B. | Same as Alternative A. |

BLM_0010988

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation, Labyrinth Rims/Gemini Bridges/Dee Pass SRMAs | Beneficial, short-term impacts to resources from maintained opportunities and facilities, and maintained protection of resources. Long-term, adverse impacts to resources and all user groups from lack of management prescriptions to protect resources from increased visitation, increased recreation demands. | Long-term, beneficial impacts on recreation through focus areas for non-motorized and motorized users within the 300,650-acre SRMA and the increased number of facilities that would reduce user conflicts and surface disturbances. Long-term, adverse impacts on motorized, specialized and mountain biking groups from user conflicts in SRMA areas without focus area management. | Impacts similar to Alternative B, but more beneficial, through focus areas for scenic driving, non-motorized, motorized, specialized, and mountain biking users within the 300,650-acre SRMA. | Impacts similar to Alternative A, except for increased long-term, beneficial motorized recreational opportunities within the 60,939-acre Dee Pass SRMA and the White Wash Open OHV area. |
| Recreation, Lower Gray Canyon SRMA | Long-term, beneficial impacts along Lower Gray Canyon from continued management under the Desolation-Gray Management Plan. | Long-term, beneficial impacts on resources from continued management under the current management plan and from increased opportunities within the 3,759-acre SRMA. | Same as Alternative B, with the same management prescriptions. | Same as Alternative A, as the SRMA would not be designated. |
| Recreation, Sand Flats SRMA | Short-term, beneficial impacts from adequate management of current levels of user needs and demands. Long-term, adverse impacts from lack of adequate management to address over-crowding, increasing user demands, and increasing user conflicts. | Long-term, beneficial protection of resource values within the 6,246-acre SRMA. Beneficial impacts on mountain bikers, but adverse impacts on OHV users from prohibitions on Slickrock Trail use. | Impacts similar to Alternative B, except for beneficial impacts to OHV motorcycle user from access to the Slickrock Trail and reduced beneficial impacts on mountain bikers. | Impacts similar to the Proposed Plan, except more beneficial, long-term recreational opportunities for mountain biking within the free-ride area. |

BLM_0010989

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation, South Moab SRMA | Long-term, adverse impacts to motorized, mountain biking, and non-mechanized users from inadequate management to address user needs, demands, resource impacts, user displacement, and resource impacts. | Long-term, beneficial impacts on scenic driving, mountain biking, and non-mechanized users from reduced conflicts, reduced displacement, protection of resources, and expanded recreational opportunities within focus areas of the 63,399-acre SRMA. Long-term, adverse impacts on specialized (motorized) users from reduced opportunities. | Impacts similar to Alternative B, except for additional beneficial impacts to specialized users from opportunities on Potato Salad Hill. | Same as Alternative A. |
| Recreation, Two Rivers SRMA | Short-term, beneficial impacts on river recreation from continued management. Long-term, adverse impacts on river recreation from inadequate management to address increasing user demands, resource impacts, user conflicts. | Long-term, beneficial impacts on river and non-mechanized users from enhanced river and shoreline recreation opportunities, increased facilities, focus areas, and permit system modification within the 29,839-acre SRMA. Short-term, adverse impacts on river opportunities from permit limits. | Impacts similar to Alternative B, but more beneficial to recreation users from more river opportunities under less restrictive permit limits. | Impacts similar to the Proposed Plan, except for long-term, adverse impacts from lack of river focus area and potential degradation of river experiences by increasing permit numbers and group sizes within the 14,056-acre SRMA. |
| Recreation, Utah Rims SRMA | Long-term, adverse impacts from continued management allowing OHV noise, surface disturbances, and from intensifying user conflicts between mountain bikers, motorized OHV, and non-mechanized users. | Long-term, beneficial impacts from reduced OHV impacts, additional facilities, and reduced user conflicts within the 15,424-acre SRMA. | Impacts similar to Alternative B, except more benefits from increased opportunities from expanded 7 system and single-track (motorcycle) opportunities. | Same as Alternative A. |

BLM_0010990

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation, Moab ERMA | Long-term, adverse impacts on recreation from inadequate management of intensifying user conflicts along Kokopelli's Trail. | Adverse impacts to users of Kokopelli's Trail similar to Alternative A. Long-term, beneficial impacts from additional facilities and opportunities to reduce user conflicts and meet user demands. | Impacts similar to Alternative B, except more beneficial impacts from additional mountain biking opportunities on 1,365-acre Upper Fisher Mesa. | Similar to the Proposed Plan, but to a lesser degree, from reduced acres managed for recreation. |
| Recreation, Special Recreation Permits | Long-term, beneficial impacts on recreation from current management by providing recreational opportunities for commercial and private groups, and protecting resources. | Similar to Alternative A, but to a greater degree, from emphasis on resource protection while managing for a wide range of opportunities. | Impacts similar to Alternative B, but to a greater degree, from more specific permit stipulations to protect resources. | Impacts similar to the Proposed Plan, but to a less beneficial degree, from reduced resource protection. Short-term, beneficial impacts from providing permits (and opportunities) to large groups, but long-term, adverse impacts from increased likelihood of resource degradation and loss of recreation values. |
| Riparian | Long-term, adverse impacts on recreation from continued degradation of riparian areas that would reduce opportunities to enjoy riparian areas. | Long-term, beneficial impacts to recreation experiences and opportunities from improved riparian areas through livestock grazing controls and limits on recreational use of these areas. Long-term, adverse impacts from reduced OHV opportunities from riparian area protection. | Same as Alternative B. | Same as Alternative B. |
| Soils/Watershed | Negligible impacts on recreation resources or resource users. | Long-term, beneficial impacts from maintained scenic quality in Castle Valley from reducing surface disturbances in the watershed, and from restrictions on steep slopes. | Same as Alternative B. | Impacts same as Alternative B, but to a lesser degree, because Castle Valley surface disturbance-restricting stipulations would not be applied. |

BLM_0010991

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Special Designations, ACECs | Long-term, adverse impacts from lack of prescriptions to protect recreation resource values in areas proposed as ACECs under other alternatives. Continued long-term, beneficial impacts on motorized OHV users within Ten Mile Wash and White Wash. | Long-term, beneficial impacts on recreation resources within 610,086 acres designated as ACECs from NSO protection from minerals development, and from restrictions on motorized use. Long-term, adverse impacts on specialized, motorized, and mountain biking users from reduced recreational opportunities in some areas. Long-term, beneficial impacts on scenic, mountain biking, and non-mechanized users from expanded opportunities in some areas. | Impacts similar to Alternative B in 63,232 acres proposed as ACECs (11% of Alternative B area) and areas not proposed as ACECs, except for long-term, adverse impacts to all recreation users within Canyon Rims, and long-term, beneficial impacts from expanded opportunities for motorized OHV users in White Wash. | Long-term, adverse impacts on all users and recreation resources from lack of protection to scenic resources because no ACECs would be designated. |
| Special Designations, Wild and Scenic Rivers | Negligible impacts to recreation along 46 miles of eligible river segments of the Colorado and Dolores Rivers. Impacts on recreation along the remaining MPA river segments would be adverse in the short-term and long-term from lack of protection from intensifying use, user conflicts, and potential surface disturbances. | Long-term, beneficial impacts on recreation resources and on all user groups along 287.5 miles of river corridor determined to be suitable for recommendation as Wild and Scenic. | Long-term beneficial impacts as compared to Alternative B, because 127.3 river miles would be suitable for recommendation. | Impacts similar to Alternative A, except no river segments would be suitable for recommendation, with adverse impacts on resources and river-related recreation. |
| Special Designations, WSAs | Beneficial, long-term impacts to recreation because WSAs have been and would continue to be managed to protect their wilderness values. Adverse impacts from managing OHV as limited to inventoried routes. | Same as Alternative A, except for adverse, minor impacts to motorized OHV users from use limited to designated routes. | Same as Alternative B. | Same as Alternative B. |

BLM_0010992

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Special Status Species | Long-term, beneficial impacts on opportunities from continued protection of wildlife and plants for recreational sightseeing and nature study. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Travel Management, OHV | Long-term, adverse impacts to recreation from intensifying user conflicts and displacement, noise, from surface disturbances, and destruction of recreation-related cultural resources. Long-term, beneficial impacts to motorized OHV opportunities from unrestricted cross-country travel on 620,212 acres. | Long-term, beneficial impacts to non-motorized users and resources from OHV route designation and elimination of all cross-country travel. Beneficial impacts from reduced user conflicts. Long-term, adverse impacts to motorized OHV users from travel opportunities limited to designated routes within 1,475,074 acres and 3,278 miles of B and D class routes. | Impacts on resources and user groups would be similar to Alternative B, except that the adverse impacts to motorized users would be reduced by limiting OHV travel to designated routes within 1,481,334 acres and along 3,653 miles of B and D class routes, 123 miles of single-track routes, with 1,866 acres open to cross-country travel. | Long-term, beneficial impacts on motorized OHV users from opportunities along designated routes. Impacts on resources similar to Alternative B, except that OHV travel limited to designated routes would be permitted on 1,762,083 acres, 3,805 miles of B and D class routes, 219 miles of single-track routes, with 3,064 acres open to cross-country travel. |
| Travel Management, Mountain Biking | Long-term, adverse impacts to mountain biking recreation from inadequate management to address increasing user conflicts, increasing user demand, and user displacement. | Long-term, beneficial impacts from 75 new miles of routes managed for mountain biking recreation, by increasing opportunities, and reducing conflicts and displacement. | Impacts similar to Alternative B, except 150 new miles would be designated for mountain biking recreation. | Impacts similar to Alternative B, except 300 new miles would be designated for mountain biking recreation. |
| Travel Management, Non-Mechanized | Long-term, adverse impacts to non-mechanized recreation from inadequate management to address increasing user conflicts, increasing user demand, and user displacement. | Long-term, beneficial impacts from 25 new miles of routes managed for non-mechanized recreation, by increasing opportunities, and reducing conflicts and displacement. | Impacts similar to Alternative B, except 50 new miles would be designated for non-mechanized recreation. | Impacts similar to Alternative B, except 100 new miles would be designated for non-mechanized recreation. |

BLM_0010993

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Vegetation | Short-term, adverse impacts on recreation from surface disturbances, scenic quality degradation, and loss of vegetation. Long-term, beneficial impacts on recreation resources from enhanced wildlife habitat and improved scenic quality. | Same as Alternative A, except that drought management would have short-term, adverse impacts on motorized and mountain biking opportunities. | Same as Alternative B. | Same as Alternative B. |
| Visual | Long-term, beneficial impacts on recreation resources and all user groups because Alternative A would attempt to manage recreation-related scenic quality as determined by the VRM inventory. | Long-term, beneficial impacts to all recreational users and resources from managing more acres than determined by the VRM inventory for VRM I. | Long-term, adverse impacts to recreational users and resources from fewer acres managed for high scenic quality than determined by the VRM inventory. | Adverse impacts similar to the Proposed Plan, but to a greater degree, from fewer acres managed for high scenic quality than determined by the VRM inventory. |
| Non-WSA Lands with Wilderness Characteristics | Long-term, adverse impacts to motorized and non-motorized users from lack of management to preserve non-WSA lands with wilderness characteristics areas. | Long-term, beneficial impacts on resources and motorized and non-motorized users from maintained opportunities within 266,485 acres of non-WSA areas with wilderness characteristics. | Impact similar to Alternative B, but to a lesser degree, from management of 47,761 acres of non-WSA lands for wilderness characteristics (20% of the area under Alternative B). | Same as Alternative A. |
| Wildlife and Fisheries | Short-term, adverse impacts on opportunities for motorized, mountain biking, and specialized users in the Potash-Confluence HMP (42,500 acres) from actions to protect wildlife. | Long-term, adverse impacts on dispersed camping opportunities in riparian areas to protect habitat, and in Shafer Basin and Long Canyon (13,500 acres) to protect bighorn sheep habitat. | Same as Alternative B. | Similar impacts as Alternative B, but to a lesser degree, from more opportunities for dispersed camping in bighorn sheep habitat. |
| **RIPARIAN RESOURCES** | | | | |
| Fire Management | Long-term, beneficial impacts due to reduction in catastrophic fire risk. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0010994

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Lands and Realty | No impacts unless exceptions are granted in which case they would be mitigated. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Livestock Grazing | Beneficial impacts from excluding grazing on 9% of MPA's riparian areas. | Beneficial impacts from excluding grazing on 34% of MPA's riparian areas. | Beneficial impacts from excluding grazing on 12% of MPA's riparian areas. | Same as Alternative A. |
| Mineral Resources | No impacts unless exceptions are granted in which case they would be mitigated. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Recreation and Travel | Adverse impacts in the form of disturbance of vegetation and soils; introduction of weeds; and potential for fire due to 2,100 acres of riparian areas being open to OHVs.\n\nBeneficial impact from managed recreation use on 141,234 acres of SRMA.\n\nAdverse impacts (forms described above) due to high number of river users and few limitations on camping. | Beneficial impacts from reductions in vegetation and soil disturbance and introduction of weeds; reduced fire potential from closing all riparian areas to OHVs or limiting travel.\n\nBeneficial impact from managed recreation use on 976,173 acres of SRMA.\n\nReduced disturbance by river users relative to Alternative A. | OHV impacts the same as Alternative B.\n\nBeneficial impact from managed recreation use on 658,642 acres of SRMA.\n\nImpacts from river users less than Alternative A and more than Alternative B. | OHV impacts the same as Alternative B.\n\nBeneficial impact from managed recreation use on 277,471 acres of SRMA.\n\nImpacts from river users less than Alternative A and more than Alternatives B and C. |
| Riparian Resources | Under all alternatives, beneficial impacts from maintenance of PFC; guidance on pipeline crossings; No Surface Occupancy stipulations in riparian and floodplain areas; prohibition of public wood gathering; and weed control measures. Beneficial impacts from excluding grazing on 9% of MPA's riparian areas. | Same as Alternative A, plus beneficial impacts from excluding grazing on 17% of MPA's riparian areas and prioritization of 17 watersheds for Watershed Management Plans (WMP). | Same as Alternative A, plus beneficial impacts from excluding grazing on 12% of MPA's riparian areas and prioritization of 8 watersheds for Watershed Management Plans (WMP). | Same as Alternative A. |

BLM_0010995

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Soil and Water | Beneficial impacts due to a controlled surface use stipulation restricting surface disturbing activities in 100-year floodplains, under all alternatives. No impacts from WMPs. | Same as Alternative A, plus beneficial impacts to riparian management from prioritizing 17 watersheds for WMPs. | Same as Alternative A, plus beneficial impacts to riparian management from prioritizing 8 watersheds for WMPs. | Same as Alternative A. |
| Special Designations | Beneficial protection from designation of Negro Bill ONA. WSR eligible sections would be managed to protect ORVs which may offer indirect protections to riparian resources. | Greatest beneficial protection from designation of 12 ACECs. Beneficial protection of riparian resources by declaring 71,300 acres suitable for some level of WSR designation. | Second greatest beneficial protection from designations of 5 ACECs. Beneficial protection of riparian resources by declaring 41,236 acres suitable for some level of WSR designation. | No ACEC s designated, thus no riparian benefit. Adverse impacts to riparian resources from listing all eligible river segments (except Salt Wash) as "not suitable" for WSR designation. |
| Special Status Species | Beneficial enhancement (or reduction of degradation) of riparian areas designated for recovery of Special Status Species. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Vegetation | Beneficial enhancement of riparian health through removal of invasive species and replacement with native species. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Non-WSA Lands with Wilderness Characteristics | No specific management of non-WSA lands with lands with wilderness characteristics is proposed; so no direct impacts to riparian resources would occur. | Beneficial protection from the prohibition of surface disturbance, off road travel, and new ROWs on 266,485 acres of non-WSA lands managed to maintain wilderness characteristics. | Beneficial protection from the prohibition of surface disturbance, off road travel, and new ROWs on 47,761 acres of non-WSA lands managed to maintain wilderness characteristics. | No non-WSA lands would be managed for wilderness characteristics, so adverse impacts to riparian resources would be possible. |

BLM_0010996

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Wildlife | Benefits from reduced livestock impacts due to exclosures under Dolores Triangle Habitat Management Plan (Appendix N). Beneficial reduction of vegetation and soil disturbance and reduced spread of weeds due to camping restrictions in riparian wildlife habitats. Beneficial improvement in riparian habitat for migratory bird management. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Woodlands | Beneficial reduction in disturbance due to prohibition on public fuelwood gathering under all alternatives. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| **SOCIOECONOMIC RESOURCES** | | | | |
| Cultural | Socioeconomic impacts resulting from cultural resource management decisions would continue. | Long-term beneficial social and economic impacts related to cultural resource visitation and subsequent revenue generation would be greatest because the identification, preservation, and restoration of sites would be highest under this alternative. | Similar to Alternative B with slightly fewer prioritizations that would reduce adverse impacts to cultural sites. | With the fewest amount of prioritizations and greatest opportunity for surface disturbing activities, adverse impacts to social and economic conditions resulting from cultural resources would be greatest under this alternative. |
| Lands and Realty | Socioeconomic impacts would remain similar to current conditions. | About 318,709 acres (outside WSAs) would be rights-of-way exclusion areas, resulting in potential adverse economic impacts. | About 25,306 acres (outside WSAs) would be rights-of-way exclusion areas, resulting in potential adverse economic impacts. | Socioeconomic impacts would remain similar to current conditions. |
| Livestock Grazing | Socioeconomic impacts would remain similar to current conditions. | The additional 26,890 acres unavailable for grazing would not alter socioeconomic impacts compared to Alternative A. | The additional 12, 673 acres unavailable for grazing would not alter socioeconomic impacts compared to Alternative A. | Similar to Alternative A. The additional 74,693 acres available for grazing would not alter socioeconomic impacts compared to Alternative A. |

BLM_0010997

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Minerals | Economic benefits (taxes, royalties, bonus payments and annual rent payments) from minerals development would be long-term and beneficial to local communities. Estimated annual royalty revenue: oil – $200, 980, gas – $1,624,244 Employment would remain similar to current conditions with minor beneficial impacts to the local economy. Long-term production jobs would likely continue at current rates. Estimated annual property tax benefit from oil and gas production - $574,000 Estimated annual severance tax benefits to State from oil and gas production in the Moab Planning Area - $1,356,000, based on relative share of total State production (State of Utah data, February, 2008.) | Long-term economic benefits from minerals development would be slightly less under this Alternative, thus having a negligible to minor impact in comparison to the other Alternatives. Estimated annual royalty revenue: oil – $100,490, gas – $937,050. Estimated annual property tax benefit from oil and gas production - $321,440 Estimated annual severance tax benefits to State from oil and gas production in the Moab Planning Area is likely to be about 45% less than A, due to decreased production opportunities. | Long-term beneficial socioeconomic impacts slightly less than Alternative A, but greater than Alternative B. Estimated annual royalty revenue: oil – $200,980, gas – $1,561,750 Estimated annual property tax benefit from oil and gas production - $551,000 Estimated annual severance tax benefits to State from oil and gas production in the Moab Planning Area would be similar to A, since estimated production would be only slightly less than A. | Long-term beneficial socioeconomic impacts same as Alternative A, but greater than Alternatives B and C. Estimated annual royalty revenue: oil – $200, 980, gas – $1,624,244 Estimated annual property tax benefit from oil and gas production - $574,000 Estimated annual severance tax benefits to State from oil and gas production in the Moab Planning Area would be similar to A, since estimate production would be similar to A. |

BLM_0010998

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation and Travel Management | Long-term beneficial impacts from tourist-related spending (approx. $2 million in sales tax revenue annually) and employment (2000 jobs) would continue. With no designation of focus areas and 3 SRMAs, user conflicts are likely to escalate and adversely impact visitor experience.<br><br>Economic contributions from OHV users would be similar to current conditions. There could be a potential decrease in social well-being and contribution to the local economy from recreationists seeking non-motorized opportunities. There could be possible degradation of other resources that could adversely impact recreation opportunities and visitation in the long term. | Slight decrease in revenue generation and tourist-related employment due to emphasis on non-motorized recreation. With 11 SRMAs and 22 focus areas, user conflicts would likely decrease, having long-term beneficial impacts on visitor experience. Decreased OHV user satisfaction due to emphasis on non-motorized users.<br><br>Potential decrease in OHV visitation with corresponding potential increase in non-motorized recreation. Adverse economic impacts to businesses focusing on OHV use; but positive economic benefits to businesses focusing on non-motorized recreation.<br><br>Potential increase in second home and retirement relocation, with corresponding benefits to businesses involved in this market. Potential adverse impact to local residents from increases in housing costs and changes to local customs and culture. | Emphasis on a balance of recreational uses could lead to greatest opportunity for revenue generation and a range of employment opportunities in the region. Socioeconomic impacts would be long-term and beneficial. With 10 SRMAs and 30 focus areas, the greatest opportunity for reduction in user conflicts and satisfactory visitor experiences for all recreation types is emphasized under this Alternative.<br><br>Greatest potential for social and economic benefits to the extent that user conflicts are reduced, and that sufficient opportunities exist for both motorized and non-motorized recreation. | Slight decrease in revenue generation and tourist-related employment due to emphasis on motorized recreation. With 6 SRMAs and 10 focus areas, user conflicts may decrease, having long-term beneficial impacts on visitor experience. Decreased non-motorized user satisfaction due to emphasis on motorized users.<br><br>Social and economic benefits to OHV users and associated businesses higher than under the Proposed Plan, but less than under current conditions. Social and economic benefits to non-motorized recreationists less than under the Proposed Plan, but greater than under current conditions. |

BLM_0010999

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Special Designations | Opportunities for adverse socioeconomic impacts resulting from the designation of ACECs would be negligible as no ACECs are designated. With 63 river miles designated as eligible for WSR status, socioeconomic impacts would be negligible. | Opportunities for adverse impacts to socioeconomics resulting from the designation of ACECs would be minor, as 92,056 acres would be excluded from oil and gas development. WSR designation on 340 river miles could have long-term beneficial economic impacts related to tourism-related revenues. | Opportunities for adverse socioeconomic impacts resulting from the designation of ACECs are likely to be minor as 29,205 acres of ACECs would have major restrictions on oil and gas development. An additional 34,027 acres of ACECs are excluded from development due to their WSA status.<br><br>WSR designation would have most of the beneficial impacts of tourism-related revenue in comparison to Alternative B, as the major recreational rivers are included (Colorado, Dolores and Green). | Similar to Alternative A. Potential adverse and/or beneficial impacts of WSR designation are negligible as no miles are designated. |
| Visual | Negligible to minor impacts due to VRM restrictions on minerals development. | Slightly greater VRM restrictions on minerals development than Alternative A. | Slightly less VRM restrictions on minerals development than Alternative A. | Slightly less VRM restrictions on minerals development than Alternative A, but greater than the Proposed Plan. |
| Non-WSA Lands with Wilderness Characteristics | No impacts, as no non-WSA lands would be managed for wilderness characteristics. | Adverse economic impacts from reduction in oil and gas development on 266,485 acres of non-WSA lands with wilderness characteristics. Possible increases in revenues from primitive recreation opportunities. | Negligible adverse economic impacts from reduction in oil and gas development on 47,761 acres of non-WSA lands with wilderness characteristics. Possible increases in revenues from primitive recreation. | No impacts, as no non-WSA lands would be managed for wilderness characteristics. |
| **SOIL AND WATER** | | | | |
| Cultural Resources | No new impacts on soil and water resources. | Beneficial removal of grazing from 42 miles of perennial stream. | Same as Alternative B. | Beneficial removal of grazing from 28 miles of perennial stream. |

BLM_0011000

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Fire Management | Short term adverse increased sedimentation and runoff. Long-term beneficial reduction of catastrophic fire risk, reduced frequency/number of high-intensity fires, fewer hydro-phobic soils, increased infiltration, decreased flood magnitude, less erosion and sedimentation. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Human Health and Safety | Beneficial long-term reduction of water quality-related threats to public health and/or the environment where Abandoned Mine Lands (AMLs) are rehabilitated. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Utility corridors have the potential to adversely impact soils on up to 32,502 acres. | Utility corridors have the potential to adversely impact soils on up to 65,865. | Utility corridors have the potential to adversely impact soils on up to 173,099 acres. | Utility corridors have the potential to adversely impact soils on up to 204,168 acres. |
| Livestock Grazing | Reduced saline soil erosion due to 84,949 acres of sensitive soils being unavailable for grazing. Alternative A would provide more protection for sensitive soils than Alternatives C and D but less than Alternative B. | Reduced saline soil erosion due to 106,752 acres of sensitive soils being unavailable for grazing. Alternative B represents the greatest, short- and long-term, beneficial impacts to soil and water resources. | Reduced saline soil erosion due to 80,178 acres of sensitive soils being unavailable for grazing. | Reduced saline soil erosion due to 43,999 acres of sensitive soils being unavailable for grazing. Least protective of sensitive soils of all the alternatives. |
| Minerals | Potential for adverse disturbance of up to 41% of sensitive soils by mineral resource development. | Potential for adverse disturbance of up to 26% of sensitive soils by mineral resource development. | Potential for adverse disturbance of up to 38% of sensitive soils by mineral resource development. | Potential for adverse disturbance of up to 40% of sensitive soils by mineral resource development. |

BLM_0011001

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Recreation | Adverse impacts to 620,212 acres of soils open to cross country OHV travel and associated surface disturbance. Greatest adverse impacts to soil and water resources due to lowest level of recreation management (141,234 acres of SRMA). | No soils open to cross-country OHV use. Beneficial impacts from the greatest level recreation management (976,173 acres of SRMA). | Adverse impacts to 1,866 acres of soils open to cross country OHV travel and associated surface disturbance. Management of recreation impacts would be less than Alternative B and more than Alternatives A and D (658,642 acres of SRMA). | Adverse impacts to 3,096 acres of soils open to cross country OHV travel and associated surface disturbance. Management of recreation impacts would be less than Alternatives B and C and more than Alternative A (277,471 acres of SRMA). |
| Riparian | Least beneficial impacts from least protective riparian management. | Greatest beneficial impacts from development and implementation of WMPs in the greatest number of watersheds, management of livestock grazing on most acres, and grazing exclusion on portions of nine allotments protecting 28 miles of perennial stream. | Fewer benefits from WMPs than under Alternative B, but more than Alternatives A and D. Fewer benefits from livestock grazing management than Alternative B, but more than Alternatives A and D. | Same as Alternative A. |
| Soils/Water Resources | Adverse impacts due to oil and gas leasing and other surface-disturbing activities in the Castle Valley or the Mill Creek watersheds. Beneficial impacts over 313,800 acres of saline soils and 823,094 acres of high-limitations soils closed to surface disturbance. | Beneficial impacts due to closure of Castle Valley and Mill Creek municipal watersheds for mineral resource development and other surface-disturbing activities. Beneficial impacts over 330,142 acres of saline soils and 487,917 acres of high-limitations soils closed to surface disturbance. | Same as Alternative B, except areas within the municipal watersheds would be no surface occupancy for surface disturbing activities, and 330,142 acres of saline soils and 710,129 acres of high-limitations soils would be closed to surface disturbance. | Impacts regarding the Castle Valley r and the Mill Creek municipal watersheds would be the same as under Alternative A. Beneficial impacts over 487,917 acres of high-limitations soils closed to surface disturbance. |
| Special Designations | Minor beneficial impacts from protective management of 5,400 acres of sensitive soils are within 1/4 mile of two currently eligible WSR segments. | Greatest beneficial protection of soil and water with all 14 proposed areas managed as ACECs, limits on surface disturbance over at least 40,800 acres of sensitive soils due to WSR designation. | Moderate beneficial protection with 5 of the 14 proposed areas managed as ACECs, limits on surface disturbance over at least 25,900 acres of sensitive soils due to WSR designation. | No beneficial impacts to sensitive soils. |

BLM_0011002

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| SPECIAL DESIGNATIONS | | | | |
| All Potential ACECs (613,077 acres) | None of the 14 Potential ACECs would be designated, with the exception of the existing 1,375 acre Negro Bill Outstanding Natural Area, which would continue to be protected. Relevant and important values, resources, and natural systems in the 13 potential ACECs that would not be designated could be at risk of irreparable damage due to the potential for adverse impacts except for those portions of potential ACECs that are in existing WSAs (approximately 306,000 acres), which would continue to be protected. | All of the 14 Potential ACECs would be designated. Special management provisions would be applied to 613,077 acres and relevant and important values, resources, and natural systems would be protected, and hazards addressed. | Five of the Potential ACECs would be designated. Special management provisions would be applied to 63,232 acres, and the relevant and important values, resources, and natural systems in these areas would be protected (and hazards addressed). In most cases the relevant and important values in 9 potential ACECs would be protected from long-term adverse impacts by other proposed management actions. | None of the 14 Potential ACECs would be designated. Some of the relevant and important values, resources and natural systems in the potential ACECs could be at risk of irreparable damage due to the potential for adverse impacts. |

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Behind the Rocks | Not designated. Relevant and important values within the Behind the Rocks WSA (12,635 acres) would be protected. Of the 5,201 acres outside the WSA: About 2,549 acres are closed to oil and gas leasing thereby providing protection to relevant and important values; About 1,958 acres are NSO for oil and gas leasing thereby providing protection to relevant and important values; and About 694 acres would be open to oil and gas leasing, resulting in about 7.3 acres of surface disturbance due to oil and gas development. These acres would also be open to cross country OHV use thereby impacting relevant and important values. | About 17,836 acres designated, including 12,635 acres within the WSA. All relevant and important values would be protected by managing as either closed or NSO for oil and gas leasing and other surface disturbing activities. In addition, 17,836 acres would be managed as closed to woodlands harvest and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values. | About 5,201 acres (outside the WSA) would be designated. The ACEC would be NSO for oil and gas leasing and other surface disturbing activities. In addition, the 5,201 acres would be managed as closed to woodlands harvest and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values. | Not designated. Relevant and important values within the Behind the Rocks WSA (12,635 acres) would be protected. About 5,201 acres outside the WSA would be open to oil and gas leasing and other surface disturbing activities. This would result in about 7.0 acres of surface disturbance due to oil and gas development. However, there would be beneficial impacts to relevant and important values from limiting OHV travel to designated routes. |

BLM_0011004

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Book Cliffs | Not designated. Relevant and important values within Book Cliffs WSAs (250,207 acres) would be protected.<br>Of the 54,045 acres outside the WSAs:<br>All 54,045 acres are open to oil and gas leasing, with adverse impacts to relevant and important values possible from oil and gas development. There is a projected disturbance of 841 acres.<br>There would be additional adverse impacts on these 54,045 acres from woodland harvest, open OHV use, and ROWs. | About 304,252 acres designated, including 250,207 acres within the WSAs. All relevant and important values would be protected by managing as either closed or NSO for oil and gas leasing and other surface disturbing activities.<br>In addition, the entire 304,252 acres would be managed as closed to woodlands harvest, managed as an SRMA, and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values.<br>Greatest beneficial impacts to relevant and important values under this alternative. | Not designated. Relevant and important values within the WSAs (250,207 acres) would be protected.<br>About 54,045 acres outside the WSAs would be open to oil and gas leasing and other surface disturbing activities. This would result in about 806 acres of surface disturbance due to oil and gas development.<br>There would be a beneficial impact by limiting OHV use to designated routes. | Same as the Proposed Plan. |
| ACEC, Canyon Rims | Not designated. About 23,400 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 33 acres of surface disturbance due to oil and gas development. | About 23,400 acres designated. The area would be closed or NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values. | Not designated. About 23,400 acres would be open to oil and gas leasing with a controlled surface use stipulation, which could result in adverse impacts to relevant and important values. There would be about 24 acres of surface disturbance due to oil and gas development. | Same as the Proposed Plan except mineral leasing disturbance would be 32 acres. |

BLM_0011005

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| | Additional adverse impacts from surface disturbance associated with ROWs could occur.<br>The 23,400 acres would also limit OHV travel to existing routes, benefiting relevant and important values, but to a lesser degree than would limit travel to designated routes.<br>Beneficial impacts would result from SRMA and VRM II management. Least protective of all the alternatives. | Additional adverse impacts from surface disturbance associated with ROWs could occur.<br>Beneficial impacts would result from limiting OHV travel to designated routes and from SRMA and VRM II management.<br>Greatest beneficial impacts to relevant and important values under this alternative. | Additional adverse impacts to view shed from VRM III management in portions of the area. Additional adverse impacts from surface disturbance associated with ROWs could occur.<br>Beneficial impacts from SRMA management and from limiting OHV travel to designated routes. | |
| ACEC, Cisco White-tailed Prairie Dog Complex | Not designated. About 117,481 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 1,249 acres of surface disturbance due to oil and gas development.<br>Least protective of all alternatives. | About 117,481acres designated. The area would be managed as NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values.<br>Beneficial protections from management of livestock grazing to maximize seed production and from limiting OHV travel to designated routes.<br>Greatest beneficial impacts to relevant and important values under this alternative. | Same as Alternative A except there would be beneficial impacts from requirements for a 660- foot buffer around known active prairie dog colonies and changes in livestock use (except for seasons of use) to maximize seed production. Additional beneficial impacts from limiting OHV travel to designated routes. | Same as the Proposed Plan except for adverse impacts from not managing livestock grazing to maximize seed production. |

BLM_0011006

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Colorado River Corridor | Not designated. Relevant and important values within the Negro Bill WSA (7,280 acres) would be protected.<br><br>Of the 43,203 acres outside the WSA, about 31,276 acres would be open to oil and gas leasing, resulting in about 35 acres of surface disturbance due to oil and gas development. These acres would also be open to cross country OHV use thereby impacting relevant and important values.<br><br>The Three Rivers withdrawal for locatable minerals would have beneficial impacts to relevant and important values.<br><br>Least protection of relevant and important values under this alternative. | About 50,483 acres designated, including 7,280 acres within the WSA. All relevant and important values would be protected by managing as either closed or NSO for oil and gas leasing and other surface disturbing activities.<br><br>In addition, the 50,483 acres would be managed as closed to woodlands harvest, managed as an SRMA, and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values.<br><br>Additional beneficial impacts from VRM I and SRMA management and from the Three Rivers withdrawal for locatable minerals.<br><br>Greatest beneficial impacts to relevant and important values under this alternative. | Not designated. Relevant and important values within the Negro Bill WSA (7,280 acres) would be protected.<br><br>Of the acreage outside the WSA, the majority would be managed as closed or NSO for oil and gas leasing and other surface disturbing activities, providing beneficial impacts to relevant and important values. The northwest corner of the Potential ACEC would be open to oil and gas leasing and other surface disturbing activities. This would result in about 26 acres of surface disturbance due to oil and gas development.<br><br>Restrictions on river-based camping, limiting OHV travel to designated routes.<br><br>SRMA management, VRM II management, and the Three Rivers withdrawal for locatable minerals, would also have beneficial impacts. | Same as the Proposed Plan except that more of the acreage is open to oil and gas leasing and other surface disturbing activities, resulting in greater impacts to relevant and important values. |

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Cottonwood-Diamond Watershed | Not designated. Relevant and important values within the Book Cliffs (Coal, Flume, and Spruce) WSAs (34,004 acres) would be protected.<br><br>The 1,825 acres outside the WSAs are open to oil and gas leasing, with adverse impacts to relevant and important values possible from oil and gas development projected at about 1 acre of surface disturbance. | About 35,830 acres designated, including 34,004 acres within the WSAs. All relevant and important values would be protected by managing as either closed or NSO for oil and gas leasing and other surface disturbing activities.<br><br>In addition, the 35,830 acres would be managed as closed to woodlands harvest, livestock grazing would be excluded, and SRPs would be withheld until the area is rehabilitated.<br><br>The area would be managed as an SRMA, and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values.<br><br>Greatest beneficial impacts to relevant and important values under this alternative. | Same as Alternative B. | Same as Alternative A except beneficial impacts from limiting OHV travel to designated routes. |

BLM_0011008

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Highway 279/Shafer Basin/Long Canyon | Not designated. About 11,466 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 19 acres of surface disturbance due to oil and gas development.<br><br>There would be beneficial impacts from NSO management for oil and gas leasing on 2,034 acres.<br><br>Some beneficial impacts from limiting OHV travel to existing routes but not as protective as limiting OHV travel to designated routes. | About 13,500 acres designated. The area would be closed or NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values. Beneficial impacts would result from limiting OHV travel to designated routes, and from SRMA and VRM I management.<br><br>Greatest beneficial impacts to relevant and important values under this alternative. | Same as Alternative B except that area would be NSO for oil and gas leasing and other surface disturbing activities, and the area would be managed as VRM II. There would be virtually no difference in impacts as compared to Alternative B. | Same as Alternative A except the area would be managed as VRM III resulting in slightly greater protections than under Alternative A. |
| ACEC, Labyrinth Canyon | Not designated. About 8,528 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 12 acres of surface disturbance due to oil and gas development.<br><br>Some beneficial impacts from limiting OHV travel to existing routes but not as protective as limiting OHV travel to designated routes.<br><br>This alternative would offer the least beneficial protection to relevant and important values. | About 8,528 acres designated. The area would be closed or NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values. Beneficial impacts would result from limiting OHV travel to designated routes, and from SRMA and VRM I management.<br><br>Greatest beneficial impacts to relevant and important values under this alternative. | Same as Alternative A except the area would be managed as VRM II and OHV travel would be limited to designated routes rather than existing routes, thereby offering slight more beneficial protections. | Same as the Proposed Plan. |

BLM_0011009

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Mill Creek Canyon | Not designated. Relevant and important values within the Mill Creek WSA (9,780 acres) would be protected. The 3,721 acres outside the WSA would be open to oil and gas leasing, resulting in about 3 acres of surface disturbance due to oil and gas development. Some beneficial impacts from limiting OHV use to existing routes but not as protective as and limiting OHV travel to designated routes. This alternative would offer the least beneficial protection to relevant and important values. | About 13,501 acres designated, including 9,780 acres within the WSA. All relevant and important values would be protected by managing as either closed or NSO for oil and gas leasing and other surface disturbing activities. The 13,501 acres would be managed as VRM I, closed to woodlands harvest and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values. Additional beneficial impacts from limiting grazing, maintaining a 3 cfs flow in the South Fork of Mill Creek, and recreation restrictions such as closures to vehicle based camping. Greatest beneficial impacts to relevant and important values under this alternative. | About 3,721 acres (outside the WSA) would be designated. The ACEC would be NSO for oil and gas leasing and other surface disturbing activities. In addition, the 3,721 acres would be managed as closed to woodlands harvest and OHV travel limited to designated routes, which would have beneficial impacts to relevant and important values. Same impacts as Alternative B but for a lesser area and less beneficial impacts from VRM II management rather than VRM I. | Same as Alternative A with greater beneficial impacts from limiting OHV travel to designated routes, managing as VRM II, and only allowing grazing in Mill Canyon allotment. |
| ACEC, Negro Bill ONA | The 1,375-acre ONA was designated in the Grand RMP. | Not designated. | Not designated. | Not designated. |

BLM_0011010

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Ten Mile Wash | Not designated. About 4,980 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 7 acres of surface disturbance due to oil and gas development.<br>Some beneficial impacts from limiting OHV travel to existing routes but not as protective as limiting OHV travel to designated routes.<br>This alternative would offer the least beneficial protection to relevant and important values. | About 4,980 acres designated. The area would be NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values.<br>Beneficial impacts would result from eliminating motorized travel in the canyon, closing it to woodland harvest, and SRMA and VRM II management.<br>Greatest beneficial impacts to relevant and important values. | About 4,980 acres designated. Same as Alternative B except motorized travel in the canyon would be allowed on designated routes instead of being closed. This would offer less beneficial protections than Alternative B. | Same as Alternative A except slightly greater beneficial impacts from limiting motorized travel to designated routes and not allowing campfires outside of designated sites. |
| ACEC, Upper Courthouse | Not designated. About 11,529 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 19 acres of surface disturbance due to oil and gas development.<br>Some beneficial impacts from limiting OHV travel to existing routes but not as protective as limiting OHV travel to designated routes.<br>This alternative would offer the least beneficial protection to relevant and important values. | About 11,529 acres designated. The area would be NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values.<br>Beneficial impacts would result from limiting OHV travel to designated routes, closing it to woodland harvest, and SRMA and VRM II management.<br>Greatest beneficial impacts to relevant and important values. | Not designated.<br>The majority of the Potential ACEC would be open to oil and gas leasing and other surface disturbing activities. This would result in about 11 acres of surface disturbance due to oil and gas development. The relict plant mesa tops would be NSO for oil and gas leasing and other surface disturbing activities, protecting some relevant and important values.<br>Beneficial impacts from limiting motorized travel to designated routes, closures to woodland harvest, and SRMA management. | Same as the Proposed Plan except mesa tops would not be NSO for oil and gas leasing and other surface disturbing activities, and there would be no SRMA management. |

BLM_0011011

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Westwater Canyon | Not designated. Relevant and important values within West-water WSA (5,069 acres) would be protected. The existing Westwater Withdrawal would protect relevant and important values. Some beneficial impacts from limiting OHV travel to existing routes but not as protective as limiting OHV travel to designated routes. | About 5,069 acres designated. Same beneficial impacts as Alternative A with additional benefits from limiting OHV use to designated routes. Greatest beneficial impacts to the relevant and important values. | Same as Alternative A, but OHV travel limited to designated routes. | Same as Alternative A, but OHV travel limited to designated routes. |
| ACEC, White Wash | Not designated. About 2,988 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 11 acres of surface disturbance due to oil and gas development. Adverse impacts from open OHV travel. Least beneficial protections of all the alternatives. | About 2,988 acres designated. The area would be NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values. Beneficial impacts would result from limiting OHV travel to designated routes, restrictions on vehicle based camping, and from SRMA management. Greatest beneficial impacts to relevant and important values under this alternative. | Not designated. Same impacts as Alternative A except additional beneficial impacts from limiting OHV travel to designated routes in portions of the ACEC (1,122 acres), and closing the area to woodland product use. Adverse impacts from managing the area as VRM III and from about 1,866 acres open to cross country OHV use. | Not designated. Same impacts as Alternative A except additional adverse impacts from VRM III management. |

BLM_0011012

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| ACEC, Wilson Arch | Not designated. About 3,700 acres would be open to oil and gas leasing, which could result in adverse impacts to relevant and important values. There would be about 26 acres of surface disturbance due to oil and gas development. Beneficial impacts from SRMA management and limiting OHV travel to designated routes. Least beneficial protections of all the alternatives. | About 3,700 acres designated. The area would be NSO for oil and gas leasing and other surface disturbing activities. This would provide beneficial protections to relevant and important values. Beneficial impacts would result from limiting OHV travel to designated routes, closing the area to woodland harvest, restrictions on vehicle based camping, and from SRMA and VRM I management. Greatest beneficial impacts to relevant and important values under this alternative. | Not designated. The majority of the Potential ACEC would be open to oil and gas leasing and other surface disturbing activities. This would result in about 26 acres of surface disturbance due to oil and gas development. Beneficial impacts from limiting motorized travel to designated routes, closures to woodland harvest, and SRMA management. | Not designated. Same as the Proposed Plan. |

BLM_0011013

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| All eligible Wild and Scenic River (WSR) segments | Continued case-by-case protection of all 13 eligible rivers involving BLM lands would result in the sustaining of the free-flowing nature, outstandingly remarkable values (ORVs), and tentative classifications of these rivers until suitability determinations are made. | All of the 13 eligible rivers would be found suitable for inclusion into the Wild and Scenic River System. All segments on BLM lands would be directly and indirectly managed in such a manner the outstandingly remarkable values, free-flowing nature, and tentative classification of these rivers would be sustained and enhanced. | The Green, Dolores, and Colorado Rivers would be found suitable for inclusion into the Wild and Scenic River System. BLM lands along these rivers would be directly and indirectly managed in such a manner that the free-flowing nature, ORVs, and tentative classifications of these rivers would be sustained and enhanced. Ten rivers would be found not suitable. No direct protections would be afforded any of these eligible rivers. Any protections to the ORVs or tentative classification would be indirect, resulting from management associated with other resource programs. Because no direct protections would be afforded, there is potential that to the free-flowing nature, ORVs and tentative classification of these rivers could be severe enough to preclude these rivers from any future opportunities for W&SR consideration. However, the restrictions from other resource programs would afford greater protection to these rivers than does Alternative D. | None of the 13 eligible rivers would be found suitable for inclusion in the Wild and Scenic River System. No direct protections would be afforded any eligible rivers. Any protections to the free-flowing nature, ORVs and tentative classifications of these rivers would be indirect, resulting from management associated with other resource programs. Because no direct protections would be afforded, there is a potential that impacts to the free-flowing nature, ORVs and tentative classification of these rivers could occur and be severe enough to preclude the rivers from any future opportunities for W&SR consideration. None of the 13 eligible rivers would be found suitable for inclusion in the Wild and Scenic River System. No direct protections would be afforded any eligible rivers. Any protections to ORVs or tentative designations would be indirect resulting from management associated with other resource programs. Because no direct protections would be afforded, there is a potential that impacts could occur on ORVs and tentative designations that could be severe enough to preclude them from any future opportunities for WSR consideration. |

BLM_0011014

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| WSR, Beaver Creek | About 7.7 miles and 2,268 acres would be managed as eligible for WSR consideration. | About 7.7 miles and 2,268 acres would be managed to preserve Wild (Segment 1) and Scenic (Segment 2) qualities. | Although found not suitable, 7.7 miles and 2,268 acres would be managed as NSO for oil and gas leasing to preserve non-WSA lands with wilderness characteristics. Therefore, impacts to ORVs, free flowing nature and tentative classification would be minimal. | Not suitable. Some areas of Beaver Creek could be impacted by surface disturbing activities. Therefore, impacts to ORVs, free flowing nature and tentative classification could occur. |
| WSR, Colorado River | About 69.3 miles and 24,288 acres would be managed as eligible for WSR consideration. | About 69.3 miles and 24,288 acres would be managed to preserve Scenic (Segments 1, 3 and 5), Wild (Segments 2 and 6), and Recreational (Segment 4) qualities. | About 68.1 miles and 23,763 acres would be managed to preserve Scenic (Segments 3a and 6), Wild (Segment 2), and Recreational (Segments 3b, 4 and 5) qualities. About 1.2 miles and 525 acres would be found not suitable. However, these lands would be managed as NSO for oil and gas leasing and withdrawn from locatable minerals, thereby protecting eligibility for WSR consideration. | Although found not suitable, 69.3 miles and 24,288 acres would be managed as NSO for oil and gas leasing and withdrawn from locatable minerals, thereby protecting eligibility for WSR consideration. |
| WSR, Cottonwood Canyon | About 10.4 miles and 2,938 acres would be managed as eligible for WSR consideration. | About 10.4 miles and 2,938 acres would be managed to preserve Scenic qualities. | Although found not suitable, 10.4 miles and 2,938 acres would be managed for protection of riparian resources and the WSA's on either side of the river would protect the ORVs, free flowing nature, and tentative designation. | Same as the Proposed Plan. |

BLM_0011015

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| WSR, Dolores River | About 22.1 miles and 6,823 acres would be managed as eligible for WSR consideration. | About 22.1 miles and 6,823 acres would be managed to preserve Scenic (Segments 1 and 3) and Wild (Segment 2) qualities. | About 22.1 miles and 6,823 acres would be managed to preserve Recreational (Segments 1 and 3) and Scenic (Segment 2) qualities. | Although found not suitable, 22.1 miles and 6,823 acres would be managed as NSO for oil and gas leasing and withdrawn from locatable minerals, thereby protecting eligibility for WSR consideration. |
| WSR, Green River | About 75.3 miles and 13,393 acres would be managed as eligible for WSR consideration. | About 75.3 miles and 13,393 acres would be managed to preserve Scenic (Segment 4) Wild (Segments 1 and 5) and Recreational (Segments 2 and 3) qualities. | About 64.8 miles and 10,976 acres would be managed to preserve Wild (Segment 1), Recreation (Segment 2), and Scenic (Segment 4a) qualities. About 10.5 miles and 2,417 acres would be found not suitable. However, the lands along the river would be managed as NSO for oil and gas leasing and withdrawn from locatable minerals, thereby protecting eligibility for WSR consideration. | Although found not suitable, 75.3 miles and 13,393 acres would be managed as NSO for oil and gas leasing and withdrawn from locatable minerals, thereby protecting eligibility for WSR consideration. |
| WSR, Mill Creek | About 6.0 miles and 1,864 acres of would be managed as eligible for WSR consideration. | About 6.0 miles and 1,864 acres would be managed to preserve Recreational (Segment 1) and Scenic (Segment 2) qualities. | Although found not suitable, 4.6 miles and 1,292 acres are within the WSA, providing protection for eligibility for WSR consideration. An additional 1.4 miles and 572 acres not within the WSA would be managed as NSO for oil and gas leasing, thereby protecting eligibility for WSR consideration. | Same as the Proposed Plan. |

BLM_0011016

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| WSR, Negro Bill Canyon | About 7.4 miles and 1,949 acres would be managed as eligible for WSR consideration. | About 7.4 miles and 1,949 acres would be managed to preserve Recreational (Segment 2) and Wild (Segment 1) qualities. | Although found not suitable, 7.2 miles and 1,687 acres are within the WSA, providing protection for eligibility for WSR consideration. An additional 0.2 miles and 262 acres not within the WSA would be managed as NSO for oil and gas leasing thereby protecting eligibility for WSR consideration. | Same as the Proposed Plan. |
| WSR, North Fork Mill Creek | About 11.2 miles and 3,027 acres would be managed as eligible for WSR consideration. | About 11.2 miles and 3,027 acres of the waterway on BLM lands would be managed to preserve Wild qualities. | Although found not suitable, 11.2 miles and 1,687 acres are within the WSA, thereby protecting eligibility for WSR consideration. | Same as the Proposed Plan. |
| WSR, Onion Creek | About 12.5 miles and 3,146 acres would be managed as eligible for WSR consideration. | About 12.5 miles and 3,146 acres would be managed to preserve Recreational (Segment 2) and Wild (Segment 1) qualities. | Although found not suitable, 12.5 miles and 3,146 acres would be managed as NSO for oil and gas leasing to preserve non-WSA lands with wilderness characteristics. Therefore, impacts to ORVs, free flowing nature and tentative designation would be minimal. | Not suitable. Some areas of Onion Creek could be impacted by surface disturbing activities. Therefore, impacts to ORVs, free flowing nature and tentative designation could occur. |
| WSR, Professor Creek | About 7.3 miles and 1,936 acres would be managed as eligible for WSR consideration. | About 7.3 miles and 1,936 acres would be managed to preserve Wild qualities. | Although found not suitable, 7.3 miles and 1,936 acres would be managed as NSO for oil and gas leasing to preserve non-WSA lands with wilderness characteristics. Therefore, impacts to ORVs, free flowing nature and tentative designation would be minimal. | Not suitable. Some areas of Professor Creek could be impacted by surface disturbing activities. Therefore, impacts to ORVs, free flowing nature and tentative designation could occur. |
| WSR, Rattlesnake Canyon | About 31.6 miles and 8,371 acres would be managed as eligible for WSR consideration. | About 31.6 miles and 8,371 acres would be managed to preserve Wild qualities. | Although found not suitable, 31.6 miles and 8,371 acres are within the WSA thereby protecting eligibility for WSR consideration. | Same as the Proposed Plan. |

BLM_0011017

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| WSR, Salt Wash | About 0.3 miles and 96 acres would be managed as eligible for WSR consideration. | About 0.3 miles and 96 acres would be managed as NSO for oil and gas leasing, protecting ORVs. The suitability decision would be deferred until the NPS makes a suitability determination on the portion in Arches National Park. | Same as Alternative B. | Same as Alternative B. |
| WSR, Thompson Canyon | About 5.5 miles and 1,620 acres of would be managed as eligible for WSR consideration. | About 5.5 miles and 1,620 acres would be managed to preserve Wild qualities. | Although found not suitable, 5.5 miles and 1,620 acres would be managed as NSO for oil and gas leasing to preserve non-WSA lands with wilderness characteristics. Therefore, impacts to ORVs, free flowing nature and tentative designation would be minimal. | Not suitable. Some areas of Thompson Canyon could be impacted by surface disturbing activities. Therefore, impacts to ORVs, free flowing nature and tentative designation could occur. |
| WSAs | **There would be beneficial impacts to WSAs under all alternatives from management under the IMP.** There would be potential for adverse impacts in areas where there are valid existing rights. VRM Class I would apply to all WSAs under all alternatives. | See A. | See A. | See A. |
| WSAs, Miles of designated way/route | 82.5 | 0 | 3.1 | 16 |
| SPECIAL STATUS SPECIES | | | | |
| Fire Management | Long term beneficial impacts from reduced weedy and invasive species. Short term adverse effects from surface disturbance, trampling, and crushing. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0011018

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Health and Safety Decisions | Potentially adverse loss of bat habitat. Benefits to fish species due to reduced threat of groundwater contamination. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Adverse removal of individual plants, surface disturbance, and habitat degradation due to construction within ROWs and utility corridors. | Same as Alternative A, but more adverse impacts from utility corridors, and less adverse impacts from other ROWs. | Same as Alternative B, but with more acreage available for utility corridors (and therefore greater impacts). | Same as Alternative B, but Alternative D would have the greatest impacts due to the greatest acreage available for utility corridors. |
| Livestock Grazing | Alternative A, would have the second largest total area excluded from grazing. This alternative would have the second most beneficial effects on Special Status species. | Alternative B provides the largest area (riparian and total) excluded from grazing, which would have long-term, beneficial effects on native vegetation in excluded areas. | The Proposed Plan provides the third largest area (riparian and total) excluded from grazing, which would have long-term, beneficial effects on native vegetation in excluded areas. | Alternative D would have the smallest area excluded from grazing among all alternatives. It would make Cottonwood and Diamond watersheds available for grazing. |
| Minerals | Possible adverse impacts include direct mortality, surface disturbance, habitat degradation, and habitat fragmentation due to mineral development and exploration. This alternative has the highest risk of adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the lowest risk of adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the second lowest risk of adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the second highest risk of adverse impacts. |
| Non-WSA Lands with Wilderness Characteristics | No acres managed as Non–WSA lands with wilderness characteristics. | Beneficial impacts from managing 266,485 acres to maintain naturalness, providing habitat protection for Special Status species. | Beneficial impacts from managing 47,761 acres to maintain naturalness, providing habitat protection for Special Status species. | No acres managed as Non WSA lands with wilderness characteristics. |
| Recreation | Adverse impacts to habitat quantity and quality from the greatest amount of mechanized recreational use and the least restriction on recreational use. | Least adverse impacts to habitat due to greatest management of recreation and focus on non-motorized uses. | Slightly less adverse impacts than Alternative B due to slightly less focus on non-motorized recreation. | Less adverse effects on SS species that Alternative A, but more than Alternatives B and C due to management of recreation and motorized uses. |

BLM_0011019

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Riparian | Vegetation treatments would result in long-term beneficial reductions of weed populations and restoration of native vegetation, as well as Short-term adverse crushing and removal of native vegetation during the treatment process. Adverse impacts from OHV use and grazing in riparian areas. | Same as Alternative A, expect that riparian areas would be closed to livestock grazing or subject to seasonal restrictions, lessening adverse surface disturbance. This alternative would be more beneficial than Alternatives A and D. | Same as Alternative A, except the riparian acres excluded would be less than under Alternative B. | Same as Alternative A. |
| Soils/Watershed | Greatest potential for adverse effects on steep-slope vegetation located in disturbance areas. | Least potential for adverse effects due to restriction of surface-disturbing activities on slopes greater than 30% and closure of the Castle Valley watershed to oil and gas leasing. | Same as Alternative B except that the Castle Valley watershed would have an NSO stipulation applied to oil and gas leasing (instead of being closed). | Same as Alternative A. |
| Special Designations | No ACECs or WSRs would be designated, so no beneficial protection would occur. | Beneficial management of 85,825 acres of federally listed SS species habitat as ACECs, and 44,227 acres of federally listed Special Status species habitat as WSRs. | Beneficial management of 16,345 acres of federally listed SS species habitat within the designated ACECs, and 79,910 acres of federally listed Special Status species habitat within the WSRs. | Same as Alternative A. |
| Special Status Species | Alternative A would not manage for the Gunnison and greater sage-grouse or for the white-tailed and Gunnison prairie dog beyond what is required by law. This alternative would be the most detrimental for these species and other Special Status species utilizing these habitats. | Alternative B would provide the most acres of protected habitat for the Gunnison and greater sage-grouse and for the white-tailed and Gunnison prairie dog in the MPA. This would indirectly provide protection for other Special Status species utilizing similar habitats. | The Proposed Plan would provide the second least acres of protected habitat for Special Status species. | Alternative D would provide the fewest number of acres of surface disturbance restrictions in Special Status species habitat, which would result in a greater potential for adverse effects on other species utilizing these habitats. |

BLM_0011020

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Travel Management | Greatest adverse impact from surface disturbance and human-caused disturbance due to closure of the least (7,558 acres) federally listed SS species habitat to OHVs. | Least adverse impact from surface disturbance and human-caused disturbance due to closure of the most (22,946 acres) federally listed SS species habitat to OHVs. | Second least adverse impact from surface disturbance and human-caused disturbance due to closure of the second most (17,666 acres) federally listed SS species habitat to OHVs. | Second greatest adverse impact from surface disturbance and human-caused disturbance due to closure of the second least (10,627 acres) federally listed SS species habitat to OHVs. |
| Vegetation | Negligible adverse disturbance from seed gathering and plant collection. Beneficial wildlife habitat improvement from treatment of tamarisk and Russian olive. | Same as Alternative A except for additional long term beneficial effects from replacing lost sagebrush steppe habitat deemed essential to wildlife. | Same as Alternative A except for additional long term beneficial effects from replacing lost sagebrush steppe habitat deemed essential to wildlife. | Same as the Proposed Plan. |
| Visual Resources | Greatest adverse surface disturbance due to the smallest area subject to VRM Class I and II restrictions, and the second smallest area subject to VRM Class III and IV restrictions. | Least adverse surface disturbance due to the largest area subject to VRM Class I and II restrictions and the smallest area subject to VRM Class III and IV restrictions. | Second least adverse surface disturbance due to the second largest area subject to VRM Class I and II restrictions and the second largest area subject to VRM Class III and IV restrictions. | Second greatest adverse surface disturbance due to the second smallest area subject to VRM Class I and II restrictions and the largest area subject to VRM Class III and IV restrictions. |
| Wildlife | Least beneficial impacts from special conditions placed on 257,228 acres of wildlife habitat. (Note: some acreage may overlap). | Greatest beneficial impacts from special conditions placed on 2,004,942 acres of wildlife habitat: (Note: some acreage may overlap). | Second greatest beneficial impacts from special conditions placed on 1,041,055 acres of wildlife habitat. (Note: some acreage may overlap). | Second least beneficial impacts from special conditions placed on 875,825 acres of wildlife habitat. (Note: some acreage may overlap). |
| Woodlands | Short-term, adverse disturbance and long-term habitat degradation over 1,243,743 acres of pinyon-juniper habitat open to woodland harvest. | Short-term, adverse disturbance and long-term habitat degradation over 1,071,335 acres of pinyon-juniper habitat open to woodland harvest. | Short-term, adverse disturbance and long-term habitat degradation over 1,212,886 acres of pinyon-juniper habitat open to woodland harvest. | Same as Alternative A. |
| TRAVEL MANAGEMENT | | | | |
| Air Quality | Short-term, adverse travel delays or detours during dust abatement or road maintenance. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0011021

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Cultural | No prescriptions address travel opportunities under this alternative. | Short- and long-term adverse impacts from reduced or prohibited access to closed cultural sites. | Same as Alternative B. | Same as Alternative B. |
| Minerals | Minor long-term beneficial increase in travel opportunities along minerals access roads. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| ACECs/Wild and Scenic Rivers | Negligible to minor reduction of travel opportunities in these areas. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| WSAs/Wilderness Areas | Long-term adverse impacts from closure of 29,654 acres of WSAs to OHVs. | Long-term adverse impacts from closure of 354,015 acres of WSAs to OHVs. | Long-term adverse impacts from closure of 279,110 acres of WSAs to OHVs. | Long-term beneficial impacts from OHV access to all WSAs. |
| Travel Management and Recreation, Mountain Biking and Non-mechanized travel | Long-term, adverse impacts from inadequate management to address current conditions and trends. | Long-term, beneficial impacts from decreased conflicts between mountain bikers and motorized users, and from 75 miles of additional proposed routes bike routes and 25 miles of proposed non-mechanized routes. | Same as Alternative B, except that 150 additional miles of bike routes and 50 additional miles of non-mechanized routes would be proposed. | Same as Alternative B, except that 300 additional miles of bike routes and 100 additional miles of non-mechanized routes would be proposed. |
| Travel Management and Recreation, Motorized (OHV) | Negligible to minor impacts on motorized travel. | Long-term adverse impacts from 347,424 acres closed to OHV use. | Slightly less adverse impacts than Alternative B, with 339,298 acres closed to OHV use. | Less adverse impacts than Alternative C, with 57,351 acres closed to OHV use. |
| Travel Management and Recreation, Road | Long-term, beneficial impacts from unimpeded travel along 4,673 miles of D-Class roads. | Long-term, adverse impacts from route closures, with travel designated along 2,144 miles of D-Class roads. | Impacts similar to Alternative B, except that 2,519 miles of routes would be designated along D-Class roads. | Impacts similar to C, except that 2,671 miles of routes would be designated along D-Class roads. |
| Vegetation | No impacts to travel from vegetation decisions. | Minor short-term adverse impacts from area closures under drought management plan. | Same as Alternative B. | Same as Alternative B. |

BLM_0011022

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| **VEGETATION RESOURCES** | | | | |
| Fire Management | Long-term, beneficial reduction of invasive species. Short-term, adverse trampling and loss of vegetation from treatments. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Lands and Realty | Beneficial, long-term impacts from minerals withdrawals. Long-term, adverse impacts from energy facility development, 32,502 acres within utility corridors, and ROWs. | Same as Alternative A, except greater adverse impacts in ROWs and utility corridors (65,865 acres). | Same as Alternative A, except greater adverse impacts in ROWs and utility corridors (173,099 acres). | Same as Alternative A, except greater adverse impacts in ROWs and utility corridors (204,168 acres). |
| Livestock Grazing | Long-term, beneficial impacts from vegetation treatments to expand forage for livestock and wildlife. | Similar impacts to Alternative A. | Similar impacts to Alternative A. | Similar impacts to Alternative A. |
| Minerals | Direct, adverse, long-term impacts from minerals exploration and development. 10,184 acres of disturbance projected) which could eliminate vegetation on these acres. | Same as Alternative A, but with fewer acres of disturbance projected (6,382 acres) which could eliminate vegetation on these acres. | Same as Alternative A , but with fewer acres of disturbance projected (9,750 acres) which could eliminate vegetation on these acres. | Same as Alternative A , but with fewer acres of disturbance projected (10,083 acres) which could eliminate vegetation on these acres. |
| Non-WSA with Wilderness Characteristics | Long-term, adverse impacts to vegetation from permitted surface disturbances. | Long-term, beneficial impacts from reduced vegetation disturbance on 266,485 acres. | Same as Alternative B, except to a lesser degree, from protection on 47,761 acres. | Same as Alternative A. |
| Recreation | Minor short- and long-term, adverse impacts from motorized and non-motorized travel. Beneficial limitations on camping sites within 132,832 acres of SRMA. | Same as Alternative A, except additional beneficial restrictions on cross-country OHV impacts and dispersed camping impacts within 982,399 acres of SRMA. | Same as Alternative B, except reduced beneficial restrictions on cross-country OHV impacts, and reduced dispersed camping impacts within only 982,399 acres of SRMA. | Same as Alternative A except for increased acreage open to motorized travel and OHV cross-country use. Decreased impacts on 272,522 acres of SRMA |
| Riparian | Compliance with the BLM National Riparian Policy would result in long-term, beneficial impacts to riparian vegetation. | Same as Alternative A, but with greater benefits from the application of CSU stipulations within 100 meters of riparian areas. | Same as Alternative B. | Same as Alternative B. |

BLM_0011023

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Soils/Watershed | Indirect, beneficial impacts from reduced soil erosion and subsequent impacts to plant communities, and reduced invasive weed establishment. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A, except greater impacts due to lack of timing restrictions. |
| Special Designations | Beneficial reduction of surface disturbance in 1,375-acre Negro Bill ONA. | Long-term beneficial reduction of surface disturbing activities in ACECs (613,077 acres). | Same as Alternative B except 63,232 acres would be designated as ACECs. | No acreage designated as ACEC, so no beneficial impacts. |
| Special Status Species | Long-term, beneficial impacts from sensitive species habitat protection, which would preserve vegetation. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Travel Management | Long-term adverse loss of vegetation and productivity, and spread of weeds. 620,212 acres open to cross country travel. | Greatly reduced impacts from OHV use compared to Alternative A, with zero acres open to cross country travel. | Same as Alternative B, except 1,086 acres open to cross country travel. | Same as Alternative B, except 3,045 acres open to cross country travel. |
| Vegetation | None specified. | Long-term, beneficial impacts to vegetation resources through conservation and reclamation measures. | Same as Alternative B except for fewer acres of sagebrush-steppe habitat that would be reclaimed. | Same as Alternative B except for fewer acres of sagebrush-steppe habitat that would be reclaimed. |
| Wildlife | Long-term, beneficial surface-disturbance activities and vegetation-altering projects. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Woodland | Short-term, adverse trampling of understory vegetation and long-term adverse introduction of weed species. | Same as Alternative A, except lesser impacts (107,321 fewer acres open to woodland harvest). | Same as Alternative A. | Same as Alternative B, expect slightly more acres open to woodland harvest. |
| **VISUAL RESOURCES** | | | | |
| Class I | 349,110 acres | 453,462 acres | 358,911 acres | 349,617 acres |
| Class II | 401,015 acres | 373,647 acres | 365,566 acres | 245,773 acres |
| Class III | 800,782 acres | 784,246 acres | 829,158 acres | 956,724 acres |
| Class IV | 271,356 acres | 210,532 acres | 268,133 acres | 269,641 acres |

BLM_0011024

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Scenic Quality/Viewshed, Canyon Rims | Short-term and long-term minerals-related degradation of scenic quality in VRM III areas. | Scenic quality protection from additional 6,867 acres of VRM II; Approximately 41% of area subject to minerals disturbance. | Impacts similar to Alternative B but to a lesser degree, because more area (68 more acres than Alternative A) would be subject to disturbance under VRM III than determined by the VRM inventory. Approximately 73% of area subject to minerals disturbance. | Impacts similar to Alternative A, as 95% of the area could be subject to minerals disturbances. |
| Scenic Quality/Viewshed, Onion Creek | No scenic quality degradation because of management under VRM II. | Same as Alternative A, except management under VRM I would provide more visual resource protection. | Same as Alternative A. | Same as Alternative A. |
| Scenic Quality/Viewshed, Richardson Amphitheater/Fisher Towers | Potentially adverse impacts to Arches NP viewshed from minerals activities. | Impacts similar to Alternative A, except greater visual resource protection from proposed VRM I objectives. | Impacts similar to Alternative B, but to a lesser degree, from no VRM I management. | Same as the Proposed Plan. |
| Scenic Quality/Viewshed, Colorado Riverway/Highway 128 | Potentially adverse impacts to Arches NP viewshed from minerals activities. Mitigation would reduce fugitive dust impacts to viewshed to minor levels. | Long-term, beneficial impacts to visual resources from increased protection under VRM I and VRM II Management Classes. | Same as Alternative B, but to a lesser degree, because fewer acres managed under VRM I and II. | Impacts similar to Alternative B but to a lesser degree because fewer acres managed under VRM I and II. |
| WILDLIFE AND FISHERIES RESOURCES | | | | |
| Fire Management | Short-term adverse impacts due to habitat disturbance and stream sedimentation. Long-term beneficial impacts due to reduced fuel loading, reduced fire risk, and diversified habitat. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| Health and Safety | Adverse displacement and habitat reduction of bats. Reclamation would benefit aquatic species by improving water quality. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0011025

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Lands and Realty | Under all alternatives, wildlife would benefit from continued mineral withdrawals on 78,333 acres.<br><br>Utility corridors would disturb up to 32,183 acres of desert shrub wildlife habitat. | Same as Alternative A.<br><br>Utility corridors would disturb up to 64,539 acres of desert shrub wildlife habitat. | Same as Alternative A.<br><br>Utility corridors would disturb up to 170,996 acres of desert shrub wildlife habitat. | Same as Alternative A.<br><br>Utility corridors would disturb up to 201,656 acres of desert shrub wildlife habitat. |
| Livestock Grazing | Management under Utah Standards for Rangeland Health would benefit wildlife, particularly in riparian and aquatic habitats. Grazing in riparian areas would increase salinity and sedimentation. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| | Beneficial exclusion of livestock grazing and increased forage on 126,907 acres.<br>Cottonwood, Diamond and Bogart allotments not available for grazing, with beneficial impacts for deer and/or elk.<br><br>Short-term adverse and long-term beneficial impacts from vegetation treatments on 67,125 acres. | Same as Alternative A, but livestock exclusion from 153,797 acres.<br>Cottonwood, Diamond and Bogart allotments not available for grazing, with beneficial impacts for deer and/or elk.<br><br>Same as A, but vegetation treatments would occur on 46,307 acres. | Same as Alternative A, but livestock exclusion from 114,234 acres.<br>Cottonwood, Diamond and Bogart allotments not available for grazing with beneficial impacts for deer and/or elk.<br><br>Vegetation treatments would be the same as under Alternative B. | Same as Alternative A, but livestock exclusion from 52,214 acres.<br>Cottonwood, Diamond and Bogart allotments available for grazing with adverse impacts for deer and/or elk in crucial winter range. Could reduce herd sizes and viability.<br><br>Vegetation treatments would e are the same as under Alternative B. |
| Minerals | Adverse impacts include direct mortality, surface disturbance, habitat degradation, and habitat fragmentation due to mineral development and exploration. This alternative has the highest disturbance and adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the lowest adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the second lowest adverse impacts. | Same as Alternative A, except that less mineral development and exploration would occur. This alternative would have the second highest adverse impacts. |

BLM_0011026

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Non-WSA Lands with Wilderness Characteristics | Alternative A would not implement any specific non-WSA lands with wilderness characteristics, so no beneficial impacts to wildlife would occur. | Beneficial closure to surface disturbing activities, and new ROWs over 266,485 acres to maintain wilderness characteristics on non-WSA lands. | Same as Alternative B, except over 47,761 acres and with an NSO stipulation for all surface disturbing activities. | No non-WSA lands would be managed to maintain wilderness characteristics, so no beneficial impacts to wildlife would occur. |
| Recreation | Adverse impacts including noise, vehicle traffic, trampling of vegetation, habitat fragmentation, and other human-related disturbances. Greatest impacts due to greatest amount of mechanized recreational use and the least restriction on recreational use. | Same as Alternative A. Least adverse impacts to habitat due to greatest management of recreation and focus on non-motorized uses. | Same as Alternative A. Slightly less adverse impacts than Alternative B due to slightly less focus on non-motorized recreation. | Same as Alternative A. Less adverse effects on wildlife species than Alternative A, but more than Alternatives B and C due to management of recreation and motorized uses. |
| Riparian | Vegetation treatments would result in long-term beneficial reductions of weed populations and restoration of native vegetation, as well as Short-term adverse crushing and removal of native vegetation during the treatment process. Adverse impacts from OHV use and improper grazing in riparian areas. | Same as Alternative A, expect that some riparian areas would be unavailable for livestock grazing, lessening adverse surface disturbance. This alternative would be more beneficial than Alternatives A and D. | Same as Alternative B. | Same as Alternative A. |
| Soils/Watershed | Benefit impacts from compliance with Utah Standards for Rangeland Health and NSO stipulations applied within 100-year floodplains and within 100 feet of natural springs or public water reserves. | Same as Alternative A, except reduced impacts to aquatic by prohibiting surface-disturbing activities on slopes greater than 30 percent and closing the Castle Valley and Mill Creek watersheds to oil and gas leasing. | Same as Alternative B, except The Proposed Plan would apply an NSO stipulation to the Castle Valley and Mill Creek watersheds. More beneficial than Alternative A, but less beneficial than Alternative B. | Same as the Proposed Plan. |

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Special Designations | Beneficial habitat protection in 1,375 acres in Negro Bill ONA, and short-term protection along eligible WSR segments managed to preserve their wild and scenic qualities. | Beneficial habitat protections in 613,005 acres designated as ACECs and the most river segments found suitable as WSRs; most beneficial to wildlife. | Beneficial habitat protections in 63,232 acres designated as ACECs and the second most river segments found suitable as WSRs; second most beneficial to wildlife. | Alternative D would not designate any ACECs or find any WSRs suitable, and would therefore not benefit wildlife. |
| Special Status Species | No impacts beyond special status species decisions required by law that would affect wildlife. | Beneficial wildlife habitat protection over 469,162 acres managed as special status species habitat. | Beneficial wildlife habitat protection over 306,976 acres managed as special status species habitat. | Beneficial wildlife habitat protection over 74,792 acres managed as special status species habitat. |
| Travel Management | Beneficial closure of 5,060 acres to OHV use, which is more than Alternative D, but fewer than Alternatives B or C. | Beneficial closure of 346,812 acres to OHV use, which is the most of any alternative. | Beneficial closure of 338,847 acres to OHV use, which is more than Alternatives A and D, but fewer than Alternative B. | Beneficial closure of 56,970 acres to OHV use, which is more than Alternative A, but fewer than Alternatives B and C. |
| | Adverse disturbance on 620,212 acres open to cross-country OHV use, which is more than any other alternative. | No areas would be open to cross-country OHV use. | Wildlife would be adversely impacted on 1,866 acres open to cross-country OHV use. | Wildlife would be adversely impacted on 3,064 acres open to cross-country OHV use. |
| | About 6,199 miles of road would be utilized, potentially fragmenting the most wildlife habitat. | About 3,328 miles of road to be designated; 122 miles for motorcycle use; potentially fragmenting the least wildlife habitat | About 3,693 miles of road to be designated; 282 for motorcycle use, potentially fragmenting more habitat than Alternative B but less than Alternatives A and D. | About 3,855 miles of road to be designated; 340 for motorcycle use, potentially fragmenting more habitat than Alternatives B or C, but less than Alternative D. |
| Vegetation | Under all alternatives, seed gathering and plant collection could have short-term, direct, adverse impacts on wildlife species and habitat. Restoration of riparian areas would have short-term, adverse effects on wildlife, but would have long-term, beneficial impacts. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0011028

**Table 2.2. Impacts Summary Table**

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| | Not Applicable-wasn't addressed. | Beneficial maintenance of sagebrush wildlife habitat by reclaiming sagebrush. | Beneficial maintenance of sagebrush wildlife habitat by reclaiming sagebrush. | Same as the Proposed Plan. |
| Visual Resources | Reduction of habitat/surface disturbance over 750,125 acres designated as VRM Class I or II; second most beneficial. | Reduction of habitat/surface disturbance over 827,093 acres designated as VRM Class I or II; most beneficial. | Reduction of habitat/surface disturbance over 724,587 acres designated as VRM Class I or II; second least beneficial. | Reduction of habitat/surface disturbance over 595,390 acres designated as VRM Class I or II; least beneficial. |
| Wildlife | Wildlife would benefit from the removal of grazing from 124,512 acres.<br>Least acres managed with development restrictions to benefit wildlife, providing the least benefit to wildlife and fisheries resources. | Beneficial impacts from the removal of grazing from 134,491 acres. Beneficial impacts to pronghorn, bighorn sheep, deer, elk, and raptors from specific habitat and cooperative management. Greatest number of acres managed with development restrictions to benefit wildlife, providing the greatest benefit to wildlife and fisheries. | Beneficial impacts from the removal of grazing from 109,903 acres. Second greatest number of acres managed with development restrictions to benefit wildlife, benefiting wildlife more than Alternatives A and D, but less than Alternative B. | Beneficial impacts from the removal of grazing from 51,179 acres. Adverse impacts could result from grazing Cottonwood, Diamond and Bogart allotments Second least number of acres managed with development restrictions to benefit wildlife, benefiting wildlife more than Alternative A, but less than Alternatives B and C. |
| Woodland | Beneficial reduction of human disturbance and habitat degradation over 601,146 acres closed to woodland harvest; least beneficial. | Beneficial reduction of human disturbance and habitat degradation over 863,227 acres closed to woodland harvest; most beneficial. | Beneficial reduction of human disturbance and habitat degradation over 646,694 acres closed to woodland harvest; second most beneficial. | Same as Alternative A. |
| **WOODLANDS RESOURCES** | | | | |
| Fire Management | Short-term and long-term, adverse impacts to woodland productivity from soil erosion, invasive species from surface disturbances. Long-term, beneficial impacts from reduced wildland fire risks. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |

BLM_0011029

## Table 2.2. Impacts Summary Table

| Management Action | Alternative A (No Action) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Non-WSA Lands with Wilderness Characteristics | No impacts on woodland harvesting because non-WSA lands with wilderness characteristics areas are unspecified. | Long-term, adverse impacts on woodland harvesting opportunities from closure of 224,125 acres to woodland harvest (not closed by other decisions). | Impacts similar to Alternative B, but greatly reduced, from closure of 15,478 acres. | Same as Alternative A. |
| Recreation | Long-term, adverse impacts to woodland harvesting from harvesting restrictions on 180,657acres in SRMAs. | Similar to Alternative A, from harvesting prohibitions on 234,590 acres in SRMAs. | Impacts similar to Alternative B from harvesting prohibitions on 255,555acres in SRMAs. | Impacts similar to Alternative B from harvesting prohibitions on 180,657acres in SRMAs. |
| Special Designations | WSAs – long-term, adverse impacts from harvesting prohibitions within WSAs and designated wilderness areas. ACECs – negligible impacts on woodland harvesting. | WSAs – same impacts as Alternative A. ACECs – long-term, adverse impacts from harvesting prohibitions on 55,050 acres within ACECs. | WSAs – same impacts as Alternative A. ACECs – long-term, adverse, impacts from harvesting prohibitions on 15,478 acres within ACECs. | WSAs – same impacts as Alternative A. ACECs – No designation of ACECs under this alternative. |
| Woodlands | Long-term, beneficial impacts from selective harvesting and salvage to reduce wildland fire risks, and improve woodland ecological conditions on 1,243,734 acres. | Impacts similar to Alternative A, but to a lesser degree, because fewer acres would be open to woodland harvesting and salvage 958,124 acres). Long-term adverse and beneficial impacts to harvesting from protection of riparian resources and other sensitive resources: adverse impacts from harvesting restrictions, but beneficial impacts to sustainable use of the resource. | Impacts similar to Alternative A, but to a lesser degree, because fewer acres would be open to woodland harvesting and salvage (1,168,988 acres). Impacts from harvesting restrictions within sensitive resource areas similar to Alternative B. | Impacts would be similar to Alternative A because impacted acreages would be the same. Impacts from harvesting restrictions within sensitive resource areas similar to Alternative B. |

BLM_0011030

## 2.3 ALTERNATIVES CONSIDERED BUT ELIMINATED FROM ANALYSIS

### 2.3.1 LIVESTOCK GRAZING ADJUSTMENTS ALTERNATIVE

During scoping and comment on the Draft EIS it was suggested that BLM consider adjustments to livestock numbers, livestock management practices, and the kind of livestock grazed on allotments within the Moab Field Office to benefit wildlife and protect and promote land health including soils, hydrologic cycles and biotic integrity.

BLM policy regarding adjustments to the levels of livestock use authorized is to monitor and inventory range conditions under existing stocking levels and make adjustments to livestock use as indicated by this data to help assure that Rangeland Health Standards (RHS) and resource objectives are met. Regulations at 43 CFR 4130.3 require that the terms and conditions under which livestock are authorized "ensure conformance with the provisions of subpart 4180" (Standards for Rangeland Health) and further that "livestock grazing use shall not exceed the livestock carrying capacity of the allotment". It would be inappropriate and unfeasible to estimate and allocate the available forage, design specific management practices and determine if changes to the kind of livestock are necessary for each allotment in the Moab Field Office or in the area as a whole in the RMP/EIS. Such changes would not be supportable considering the type and amount of data required and the analysis necessary to make such changes.

According to BLM policy decisions regarding authorized livestock use levels and the terms and conditions under which they are managed is an implementation decision (H-1610-1, Appendix C, Page 15). BLM assesses RHS, conducts monitoring and inventories, and evaluates this data on a periodic basis, normally on an allotment and/or watershed basis. After NEPA analysis, necessary changes to livestock management and implementation of Utah's Guidelines for Rangeland Management are implemented through a proposed decision in accordance with 43CFR 4160. These decisions determine the exact levels of use by livestock in conformance with the LUP and to meet resource objectives and maintain or enhancing land health. For these reasons this alternative has been dismissed from further consideration in this land-use plan revision.

### 2.3.2 NO GRAZING ALTERNATIVE

An alternative that proposes to make the entire planning area unavailable for grazing would not meet the purpose and need of this RMP/Draft EIS. The National Environmental Policy Act (NEPA) requires that agencies study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. No issues or conflicts have been identified during this land-use planning effort which requires the complete elimination of grazing within the planning area for their resolution. Where appropriate, removal of livestock and adjustments to livestock use have been incorporated into the alternatives on an allotment or area basis to address issues identified in this planning effort. Since the BLM has considerable discretion through its grazing regulations to determine and adjust stocking levels, seasons-of-use, and grazing management activities, and to allocate forage to uses of the public lands in RMPs, the analysis of an alternative to entirely eliminate grazing is not needed.

An alternative that proposes to make the entire planning area unavailable for grazing would also be inconsistent with the intent of the Taylor Grazing Act, which directs the BLM to provide for

BLM_0011031

livestock use of BLM lands, to adequately safeguard grazing privileges, to provide for the orderly use, improvement, and development of the range, and to stabilize the livestock industry dependent upon the public range.

The Federal Land Policy and Management Act (FLPMA) requires that public lands be managed on a "multiple use and sustained yield basis" (FLPMA Sec. 302(a) and Sec. 102(7)) and includes livestock grazing as a principal or major use of public lands. While multiple use does not require that all lands be used for livestock grazing, complete removal of livestock grazing on the entire planning area would be arbitrary and would not meet the principle of multiple use and sustained yield.

Livestock grazing is and has been an important use of the public lands in the planning area for many years and is a continuing government program. Although the Council on Environmental Quality (CEQ) guidelines for compliance with NEPA require that agencies analyze the No Action Alternative in all EISs, for purposes of this NEPA analysis, the No Action Alternative is to continue the status quo, which includes livestock grazing (CEQ Forty Most Asked Questions, Question 3). For this reason and those stated above, a no grazing alternative for the entire planning area has been dismissed from further consideration in this RMP/EIS.

### 2.3.3 NO LEASING ALTERNATIVE

During scoping and/or the comment period for the DRMP/EIS, it was suggested that BLM should address a "No-Leasing Alternative" because the "No-Leasing Alternative" is the equivalent of the "No Action Alternative" that must be analyzed in all EISs.

The "No-Leasing Alternative" in an RMP revision is actually an action alternative because where lands have already been leased, the no-action for NEPA purposes continues to allow for (honor) valid existing rights. Proposing a "No-Leasing Alternative" would require revisiting existing leases and either buying them back from the leasee, or allowing them to expire on their own terms. The first option (buying back) is outside the scope of any RMP. This is a political decision that BLM has no authority to undertake in planning. As a result, BLM does not regularly include a "No-Leasing Alternative".

The purpose and need for the land-use plan is to identify and resolve potential conflicts between competing resource uses rather than to eliminate a principle use of the public lands in the Moab Field Office Area. Leasing of the public lands for oil and gas exploration and production is required by the Mineral Leasing Act of 1920, as amended, and BLM's current policy is to apply the least restrictive management constraints to the principal uses of the public lands necessary to achieve resource goals and objectives. A field office-wide "No-Leasing Alternative" would be an unnecessarily restrictive alternative for mineral exploration and production on the public lands.

The National Environmental Policy Act (NEPA Section 102 (E)) requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources". No issues or conflicts have been identified during this land-use planning effort which requires the complete elimination of oil and gas leasing within the planning area for their resolution. BLM's Land-use Planning Handbook (BLM MANUAL Rel. 1-1693), Appendix C. item H. requires that land-use plans identify areas as open or unavailable for leasing.

BLM_0011032

Given the potential range of decisions available in the DRMP/DEIS, the analyzed alternatives include no leasing for certain areas; but a field office-wide "No-Leasing Alternative" is not necessary in order to resolve issues and protect other resource values and uses.

As mentioned above, a "No-Leasing Alternative" should not be confused with the "No Action Alternative" for purposes of NEPA compliance. Leasing and No Leasing on the public lands has previously been analyzed in several NEPA documents. In 1973, the Department of Interior published the Final Environmental Impact Statement on the Federal Upland Oil and Gas Leasing Program (USDI, 1973). The proposed action was to lease Federal lands for production of oil and natural gas resources. Alternatives included the No Action Alternative, which at initiation of the program was "No Leasing". To supplement that EIS, BLM prepared a series of Environmental Assessments (then titled "Environmental Analysis Records or EARs") including the Grand Resource Area Oil and Gas Program Environmental Analysis Record (EAR), 1988 which addressed oil and gas leasing for the public lands in the Moab Field Office area. Alternatives again included the No Action or "No Leasing" alternative. The outcome was a category system for leasing which categorized all public and Forest Service lands into four groups: 1) open to leasing with standard lease stipulations, 2) Special Stipulations to address special concerns, 3) No surface occupancy and 4) No Leasing. Since completion of the EAR in 1988 oil and gas leasing in the Moab Field Office Area has been an ongoing federal program under the established categories.

The Council on Environmental Quality (Section 1502.14(d) of NEPA) requires the alternatives analysis in an EIS to "include the alternative of no action", but explains that there are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. "The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed." (CEQ Forty Most Asked Questions, Question 3). Therefore, for the MFO DRMP/DEIS, the "No-Action Alternative" is to continue the *status quo* which is to lease under the oil and gas stipulations (formerly categories) established in the Grand Resource Area RMP.

### 2.3.4 THE RED ROCK HERITAGE TRAVEL PLAN ALTERNATIVE

An alternative that proposes to remove all travel routes from all areas proposed for wilderness by external groups from the Travel Plan that would accompany this RMP would not meet the purpose and need of this RMP/Draft EIS. NEPA requires that agencies study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

On September 7, 2004, BLM received a Travel Plan alternative from Red Rock Heritage (RRH). The narrative explains the philosophy and objectives underlying its plan and offers rationale for not designating specific routes for motorized travel within the BLM Travel Plan. RRH emphasizes that the primary objective of its plan is a "fair allocation of recreational opportunities" between motorized and non-motorized uses. RRH specifically states that the best practical alternative for comparing travel plans on this dimension is by "measuring the

BLM_0011033

percentage of the field office area within various distances of the nearest motorized trail." RRH suggests that the appropriate percentage to achieve this goal is approximately 25%.

Near the end of their narrative, RRH provides data with such computations at varying distances from motorized routes, contrasting its plan with the BLM-verified Grand County inventory. It is important to note that the Grand County Travel Plan was approved unanimously by the Grand County Council. This plan recommends elimination of approximately 2,000 miles of inventoried "D" roads from motorized travel. BLM feels that the Grand County Travel Plan is a better basis of comparison to the RRH plan, and not the County inventory.

BLM agrees with RRH that an equitable allocation between non-motorized and motorized recreation is a desirable outcome of the BLM Travel Plan. BLM believes, however, that the RRH plan is not a viable alternative, for several reasons:

1.  The RRH plan's roadless polygons match almost identically with wilderness proposals submitted by SUWA and/or other citizens' groups. To achieve this roadlessness, RRH has recommended for closure virtually all roads within these proposed wilderness polygons, without specific mention or regard for purpose and need.[1] This results in several hundred miles of County "B" roads being recommended for closure. BLM has determined that these roads, which are constructed, regularly maintained by mechanical means, and serve specific purposes and needs, need to be included in all alternatives of the BLM Travel Plan.

2.  RRH includes SITLA lands in all its analyses. BLM cannot mange travel on SITLA lands, and BLM confines its analysis to public lands managed by the MFO.

3.  RRH focuses their analyses on lands south of I-70, which leaves out those portions of the MPA where opportunities for non-motorized recreation are most available. BLM believes this division is arbitrary, and will focus its analyses on the entire MPA.

4.  RRH analyses are done only in comparison to the Grand County route inventory. BLM's analyses will encompass the travel plans carried forward under the alternatives considered in the Draft EIS.

5.  RRH states that any travel plan presented as an alternative to its plan should "achieve the same degree of balance (i.e., 25% of the MPA more than a mile from a road, 12% more than two miles, etc.)." BLM agrees that an equitable allocation between motorized and non-motorized use is a desirable outcome of the BLM travel plan. However, the BLM cannot justify using an unsubstantiated percentage to achieve this goal.

6.  RRH uses only a portion of what is commonly referred to as the Recreation Opportunity Spectrum (ROS). RRH limits its ROS analysis to physical separation, but ROS also looks at such facets as topography and social interactions (e.g., likelihood of meeting others) within the broader analysis. The MFO chose not to use ROS as a management tool for decision making in this RMP because the varied topography of the MPA results in ROS analysis, using physical separation only, misrepresenting opportunities for primitive, non-motorized recreation. The RRH Travel Plan mirrors the Red Rock Wilderness proposal, which encompasses over 46% of public lands in the MPA. RRH assumes that lands without access would be eligible to be considered for the protection of their wilderness characteristics. This is a false assumption; for instance, within close proximity to the city of Moab, primitive

---

[1] Per BLM Instruction Memorandum 275, Change 1 (9/29/03), BLM is prohibited from establishing new wilderness areas. BLM *may* choose to manage certain areas to protect wilderness characteristics, but is not required to do so.

BLM_0011034

recreation opportunities are available in 3 WSAs and within Arches and Canyonlands National Parks.

7. In its narrative, RRH discusses numerous specific routes, as well as areas, that it recommends that BLM not designate as available for motorized travel. Rather than discuss each route or area individually, several general comments are appropriate:

- Almost all of these routes and areas lie within RRH wilderness proposals. In its comments, there is repeated emphasis on the need to set aside areas for non-motorized recreation and, if necessary, to "create a rare remote and wild area." Current BLM policy prohibits the creation of new wilderness study areas, although it does allow managing areas to protect wilderness characteristics. Several of the areas cited in RRH's proposal were found by BLM in 1999 to lack wilderness character. Many of the specific routes identified by RRH were either described as roads in the BLM 1999 inventory or described as roads at the time of the establishment of the original WSAs. Roads, by definition, are an impact on wilderness characteristics.

- Other resource concerns are usually mentioned (e.g., wildlife, sensitive soils, riparian), but no specific data is presented to support the contention (unstated) that a particular existing route is causing the problem cited.

- Several of the routes specified are county B roads, which are constructed and maintained and receive regular use.

For the reasons outlined above, the RRH Travel Plan in total is eliminated from further analysis.

BLM_0011035

Case No. 1:20-cv-02484-MSK   Document 29-6   filed 04/27/21   USDC Colorado   pg 75 of 301

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0011036

# Comments of the Draft EIS by Commentor Type

## *Table of Contents*

Comments from BUSINESSES ............................................................................................................................... 2

Comments from GOVERNMENT ...................................................................................................................... 102

Comments from INDIVIDUALS ........................................................................................................................ 186

Comments from ORGANIZATIONS .................................................................................................................. 460

BLM_0011037

| BUSINESSES | | | |
|---|---|---|---|
| **Organization** | **Record ID & Comment Number** | **Comment Text** | **Response to Comment** |
| Tag a Long | 10 | 1 | The entire Green River is suitable and should be designated as a Wild and Scenic River in order to maintain the connectivity and ecology of the Green River Corridor. | The section of the Green River from Swasey's Rapid to the San Rafael River contains large percentages of private and state land. It is for this reason that that section of the Green River is not proposed for Wild and Scenic River designation. |
| PacficCorp | 12 | 1 | The BLM has indicated that Alternative C is preferred which identifies 806,994 acres available for oil and gas leases and development but no new utility corridor or provisions for the required infrastructure. | Designation of utility corridors is intended to facilitate and channel major utilities that pass through the Moab Field Office area. These corridors are for major transmission lines, not individual distribution lines. Management actions in the DRMP/EIS address individual rights-of-way for arterial distribution lines and facility-specific tap lines. Until production is established on oil and gas leases, the location of power needs will not be known. Authorization of new electrical distribution lines would continue to be handled on a case by case basis, as is provided for in the DRMP/EIS. |
| PacficCorp | 12 | 2 | PacifiCorp does not support the BLM's proposal in the RMP to eliminate the existing utility corridor from Cisco to US Highway 191. | Under Alternatives C and D, the Interstate Highway 70 utility corridor has been widened to include all major existing utilities. The wider corridor merges two corridors designated in the 1985 Grand RMP. Currently, there are no rights-of-way for electrical lines within the corridor south of I-70.<br><br>This language has been corrected to state that "the existing utility corridor from Cisco to Highway 191 north of Arches National Park would be merged with the I-70 corridor under all action alternatives" (pg. 4-65 of the DRMP/EIS). In addition, the statement on page 2-11 of |

| | | | | the DRMP/EIS that the "utility corridor from Cisco to Highway 191 north of Arches has been eliminated"  has been deleted from the text of the PRMP/FEIS. |
|---|---|---|---|---|
| PacficCorp | 12 | 3 | The RMP also contains many surface occupancy, visual or other resource constraints that could preclude new rights-of-way, development of renewable energy resources or construction of facilities required to service the growing development and surrounding areas. | Under all alternatives in the DRMP/EIS, the closure to rights-of-way of approximately 350,000 acres for Wilderness Study Areas (WSA) and Wilderness is not discretionary, and is beyond the scope of this plan. WSAs and designated wilderness are exclusion areas by Federal regulation.  This represents 19% of the planning area under all alternatives.<br><br>In the DRMP/DEIS, the remainder of the planning areas is managed as follows: All areas managed as closed are exclusion areas for rights-of-way.  All areas managed as no surface occupancy are avoidance areas for rights-of-way.  By combining no surface occupancy acreage and discretionary closed acreage by alternative, the following percentages of the Moab planning area are not available for rights of way:  Alt B = 44%; Alt C = 15%; Alt D = 4%.  It should be noted that the avoidance areas allow some flexibility in the development of rights-of-way.<br><br>Conversely, under Alternatives B, C and D, 56% , 85%, and 96% of the Moab planning area (exclusive of WSAs and wilderness) would be open to rights-of-way with only minor restrictions, respectively.  These minor restrictions include timing limitation and controlled surface use stipulations.<br><br>See Appendix C of the DRMP/DEIS for details regarding avoidance and exclusion areas.<br><br>The BLM concludes that it has offered a reasonable range of alternatives for the development of rights-of-way. |
| PacficCorp | 12 | 4 | A map submitted to the Department of Energy as part of the West-Wide Energy Corridor Programmatic identified current and proposed high-voltage transmission line | The map in the West Wide Energy Corridor Programmatic EIS (Map #66-212)  identifies one corridor in the Moab planning area.  The identified corridor in the West Wide |

BLM_0011039

| | | | locations within the study area. | Energy corridor Programmatic EIS is identical to the U.S. 191 corridor which is included in all alternatives of the DRMP/EIS. |
|---|---|---|---|---|
| PacficCorp | 12 | 5 | The BLM should expand its description on oil and gas development to include related electrical infrastructure and state that analysis and approvals of proposed development will include associated utlity facilities. | In the Moab planning area, electricity has not been essential for development of oil and gas resources. Where distribution lines are already present, oil and gas companies may select electricity to run pumps and cathodic protection sites.<br><br>A Reasonably Foreseeable Development (RFD) scenario for oil and gas was prepared for the Moab Field Office as part of the DRMP/EIS.  The RFD projected the amount of oil and gas development that would occur in the planning area over the next 15 years.  Tthis projection includes infrastructure to support oil and gas, which consists of roads, pipelines, and electrical infrastructure. |
| PacficCorp | 12 | 6 | Pacificorp supports any effort to promote the development of all renewable electrical generation methods, especially wind development.  Pacificorp asks that the BLM evaluate future proposals based on the current technology, scientific studies, and potenial resource impacts. | Under all action alternatives of the DRMP/EIS, wind and solar development can be considered wherever rights-of-way can be authorized.  Avoidance and exclusion areas for rights-of-way are specified in Appendix C of the DRMP/EIS. |
| PacficCorp | 12 | 7 | The EIS states there is one bald eagle nest on the MPA on pg 3-178 and that there are three Bald eagle nests in the MPA on pg. 3-143. | There are three bald eagle nests on the Colorado River within the Moab planning area.  One is located on BLM land and the other two are on private land.  The reference on page 3-178 of the DRMP/EIS refers to BLM land only.  The reference on pg. 3-143 of the DRMP/EIS is to all lands within the planning area. |
| PacficCorp | 12 | 8 | The Bald Eagle has been de-listed from a threatened status.  It is uncertain from the language in the the draft whether the BLM's management objectives would be changed due to the status change. | See response to comment 121-56.<br><br>Management objectives for bald eagles would not change because of the status change.  Bald eagles remain federally protected. |
| PacficCorp | 12 | 9 | The DRMP/EIS states on pg. 4-365…."the existing utility corridor that runs from Cisco to US 191 would be eliminated which would help mitigate for the adverse effects of utility corridors on special status species.  The | See response to  comment 12-2 above.  This corridor has not been eliminated, but has been widened to include this portion. |

BLM_0011040

| | | | BLM has not described in the EIS how the existing Cisco to US 191 utility corridor adversely affects special status species and why it needs to be eliminated. | |
|---|---|---|---|---|
| PacficCorp | 12 | 10 | PacificCorp asserts that the predation issue in unfounded and that these buffer restrictions are exessive and an unnecessary measure to protect the greater sage-grouse and prairie dogs. | For greater sage grouse, the management prescriptions apply to sage grouse strutting grounds, nesting, and brood-rearing habitat and active leks.   For prairie dogs, the prescriptions refer to a 660 foot buffer around occupied colonies.  The BLM has worked with the Utah Division of Wildlife Resources and the U.S. Fish and Wildlife Service to formulate prescriptions that would protect these animals so that they would not be listed as Endangered Species.<br><br>It should be noted that the Moab planning area currently contains no active leks for either greater or Gunnison sage grouse. The buffer around leks is 2.0 miles.  The prairie dog buffer is 660 feet. |
| PacficCorp | 12 | 11 | Chapter 3, Section 19, pg. 167 of the DRMP/DEIS states that visual resource inventory classes were considered in the EIS prepared for the RMP but the RMP did not recognize visual resources as a program requiring specific management action.  Is the Cisco to U.S. 191 corridor being eliminated because of visual concerns? | No corridor is proposed for elimination for either visual or sensitive species reasons.  See response to comment 12-2.<br><br>Chapter 3.19, pg. 167 of the DRMP/EIS refers to the formulation of visual resource management for the 1985 Grand RMP.  In that effort, visual resource inventory classes were prepared for the Environmental Impact Statement , but visual resources were not placed in a management class as part of that 1985 RMP. |
| PacficCorp | 12 | 12 | PacificCorp recommends that the EIS and final RMP include siting criteria for facilities on existing and future communication sites. | Future communication sites may be located anywhere outside an exclusion area, although efforts would be undertaken to locate outside avoidance areas.  Future communication sites would be addressed during the site-specific NEPA analysis undertaken for the future facility. |
| PacficCorp | 12 | 13 | Pacific Corp supports the less restrictive and wider utility corridor in Alternative D and requests that the BLM incorporate the utility corridors in Alternative D into the Preferred Alternative. | The commentor's preference that the utility corridors be incorporated as described in Alterantive D is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for |

| | | | | the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives. |
|---|---|---|---|---|
| Samson | 201 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particularly for development in the Lisbon Valley, Eastern Paradox, and Greater Cisco Areas and does not consider an alternative to no surface occupancy in environmentally sensitive areas. See Moab DRMP/EIS, map 3-16. The BLM determined that the vast majority of the Moab RA has high potential for oil and gas. See DRMP/EIS, Map 3-2, Mineral Potential Report, pgs. 51-52, Maps 6a, 6b, 6c, and 6d. Nonetheless, the BLM's RFD Scenario appears to be based on past permitting rather than potential development given the geologic conditions as required by BLM Washington Office Instruction Memorandum 2004-089 (Jan. 16, 2004). See also BLM Land Use Planning Handbook H-1624-1 Planning for Fluid Minerals (Chapter III, B.)(Release 1-1583, 5/7/06), as modified. The Preferred Alternative, Alternative C, only projects 432 wells in the next 15 years. See Moab DRMP/EIS, pg. 4-91. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. Recent APD filings suggest the fifteen-year RFD should be far higher than the level anticipated by BLM. | See response to comment 214-1 and 214-28. |
| Samson | 201 | 2 | Operators are also concerned about the BLM's proposal to manage so-called "non- Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness values. There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA), and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the wilderness evaluation process required by Section 603 of FLPMA was complete in the early 1990's, the BLM and the | See response to comment 214-2. |

| | | | | |
|---|---|---|---|---|
| | | | Department of the Interior were not required to conduct further wilderness inventories. 43 U.S.C. § 1782; State of Utah v. Norton, 2006 WL 2711798, Civ No. 96-CV-0870, *2, *8 (Sept. 20, 2006). The question of which lands should be included in the National Wilderness Preservation System is now reserved solely to Congress. State of Utah v. Norton, at *8. The BLM has not explained the need for managing additional lands for wilderness qualities. | |
| Samson | 201 | 3 | In order to avoid potential litigation from those opposed to the use of categorical exclusions, and in order to comply with Congress' unequivocal directive, the BLM must incorporate the Energy Policy Act of 2005 categorical exclusions into the Moab RMP and develop an overall management goal encouraging their use. | See response to comment 214-5. |
| Samson | 201 | 4 | 43 U.S.C. ' 1702(j) (2006). If Alternative B is selected, the BLM would make a total of 71,444 acres unavailable to oil and gas leasing and, under Alternative C a total of 370,250 acres unavailable for oil and gas leasing. Even under the "development alternative" 350,219 acres would be closed to oil and gas leasing. Because withholding such large areas of land from oil and gas leasing constitutes a withdrawal, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA. 43 U.S.C. § 1714 (2006).<br>FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an area of 5,000 acres or more to mineral development. Id. Among the other requirements imposed on the Department of the Interior is the requirement for the Secretary of the Interior, as compared to the Director of the BLM or a State Director, to make all withdrawals of federal lands. 43 U.S.C. § 1714(a) (2006). Only the Secretary-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-is authorized to make withdrawals under | See response to comment 214-7. |

FLPMA. The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal. 43 U.S.C. § 1714(b)(l) and (h) (2006). Finally, the Secretary is required to notify both houses of Congress of the proposed withdrawal. See 43 C.F.R. § 1610.6 (2006). The notice must include information: (1) regarding the proposed use of the land; (2) an inventory and evaluation of the current natural resource uses and value of the land and adjacent public and private land which may be affected; (3) an identification of present users and how they will be affected; (4) an analysis of the manner in which the existing and potential uses are incompatible with or in conflict with the proposed uses; (5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed uses; (6) a statement as to whether suitable alternative sites are available; (7) a statement of the consultation which has been or will be had with other federal, regional, state, and local government bodies; (8) a statement regarding the potential effects of the withdrawal on the state, local, and regional economy; (9) a statement of the length of time needed for the withdrawal; (10) the time and place of the hearings regarding the withdrawal; (11) the place where the records of the withdrawal can be examined; and (12) a report prepared by a qualified mining engineer, engineering geologist, or geologist, which shall include information on mineral deposits, mineral production, existing mining claims, and an evaluation of future mineral potential. 43 U.S.C. § 1714(c)(2) (2006). To date, the BLM and Department of the Interior have not complied with these requirements.

Additionally, FLPMA requires the Secretary of the interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the

| | | | | |
|---|---|---|---|---|
| | | | public lands for a period of two or more years on a tract of land more than 100,000 acres in size. 43 U.S.C. § 1712(e). Oil and gas development is defined as a principal or major use of the public lands. 43 C.F.R. § 1702(1). The BLM would close well over 300,000 acres to oil and gas leasing under Alternatives B, C, and D, yet BLM has not complied with the clear requirements of FLPMA. BLM must notify Congress of its intent to close significant areas to future oil and gas development prior to finalizing the Moab RMP. | |
| Samson | 201 | 5 | Section 1.4.5 -Energy Policy and Conservation Act (EPCA)<br><br>The BLM indicates in Section 1.4.5 of the Moab DRMP/EIS that the agency integrated the general principles from the EPCA Study into the RMP revision. See Moab DRMP/EIS, pg. 1-15. The BLM should also carefully review the results and analysis contained in the Scientific Inventory of Onshore Federal Land's Oil and Gas Resources and the Extent and Nature of Restrictions or Impediments to Their Development (2006) (EPCA II) prepared in compliance with § 604 of the Energy Act of 2000, Pub. L. No. 106-469, and § 364 of the Energy Policy Act of 2005, Pub. L. No. 109-58. The EPCA II study demonstrates the significant negative impacts that stipulations have upon oil and gas leasing and development. The EPCA II study demonstrates that approximately 38.5% of federal lands containing natural gas resources within the Paradox/San Juan Basin are available with Standard Lease Terms and that over 50% of the federal lands are encumbered with restrictions to development. Se EPCA II, pg. 96. However, approximately 49% of the federal lands within the Paradox/San Juan Basin are unavailable for leasing. Id. at 89, 96. That means that 23% (96 MMbbls) of the federal oil and 7% (2.0 TCF) of federal natural gas would be unrecoverable. Id. at 89. | See response to comment 214-9 |

| | | | The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure that stipulations imposed are only as restrictive as necessary. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3), 119 Stat. 594, 723 (2005). | |
|---|---|---|---|---|
| Samson | 201 | 6 | Section 1.4.7 -Memorandum of Understanding with Forest Service<br><br>The BLM incorrectly references a 1991 Memorandum of Understanding between the BLM and the United States Department of Agriculture, Forest Service (Forest Service) establishing joint BLM and Forest Service procedures for managing oil and gas leasing and operational activities in the Moab DRMP/EIS. See Moab DRMP/EIS, pg. 1-16. Section 363 of the Energy Policy Act of 2005 directed the BLM and Forest Service to develop a new Memorandum of Understanding regarding oil and gas leasing and operational activities on lands administered by the BLM and Forest Service. Energy Policy Act of 2005, Pub. L. No. 109-58, § 363, 119 Stat. 594, 722-23 (2005). Congress specifically directed the BLM and Forest Service to develop administrative procedures and timeline to ensure the timely processing of oil and gas lease applications, surface use plans of operations, and applications for permits to drill. Id. The Energy Policy Act of 2005 further required the BLM and Forest Service to ensure that lease stipulations are applied consistently, coordinated between the agencies, and only as restrictive as necessary to protect the resource for which the stipulations are applied. Id. (emphasis added). The BLM and the Forest Service issued the Memorandum of Understanding required by Section 363 of the Energy Policy Act in April of 2006. See BLM MOU WO300-2006-07. The new Memorandum of Understanding | See response to comment 202-7. |

| | | | clearly and unequivocally "supersedes the BLM and Forest Service Interagency Agreements on leasing and operations dated November 1991." Id. The BLM must correct this inference in the Final EIS for the Moab RMP and ensure that the Moab Field Office reviews and complies with the 2006 Memorandum of Understanding when developing and adopting the Moab RMP, and when permitting or approving future oil and gas leasing or development operations within the Moab RA. The 1991 memorandum has no legal impact or effect at this time.<br>In particular, the BLM must ensure that the stipulations attached to any future leases are the least restrictive necessary to protect the particular resource values in question. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3)(C), 119 Stat. 594, 722-23 (2005); BLM MOU WO300-2006-07, pg. 2 of 16. | |
|---|---|---|---|---|
| Samson | 201 | 7 | On page 2-7 of the Moab DRMP/EIS the BLM proposes the following management action common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks." See Moab DRMP/EIS, pg. 2-7. The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and confuses the BLM's authority over air quality and air emissions.<br>The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act. 42 U.S.C. §§ 7401 et seq. Under the express terns of the CAA, the Environmental Protection Agency (EPA) has the authority to regulate air emissions. In Utah, the EPA has its authority to the State of Utah, Department of | See response to comment 214-10. |

| | | | Environmental Quality (UDEQ). The BLM has not, and under the CAA cannot, be delegated such authority. ....The BLM must eliminate or revise the proposed management action. | |
| --- | --- | --- | --- | --- |
| Samson | 201 | 8 | The BLM's authority to manage potential visibility impacts is similarly limited by existing federal law. Under the CAA, a federal land manager such as the BLM only has the authority to evaluate and consider whether a "proposed major emitting facility will have an adverse impact" on visibility within designated Class I areas. 42 U.S.C. § 7475(d)(2)(B) (2006). Even then, the final decision whether to approve the siting of the facility rests with the state and EPA, not the federal land manager. With respect to oil and gas development, BLM's role is even more limited because oil and gas operations do not meet the definition of a major emitting facility. Further, under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407(a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410(a)(2)(J). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no such jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Accordingly, the BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts. With these limitations in mind, the BLM must revise its air quality management goal on page 2-7 of the Moab DRMP/EIS. The BLM cannot attempt to impose air emission regulations through its normal management responsibilities. Further, even assuming the BLM had the authority to regulate air quality or emissions, the | See response to comments 214-10 and 214-11. |

BLM_0011048

| | | | | |
|---|---|---|---|---|
| | | | management goal is poorly worded and could lead to increased litigation. Opponents to natural gas development would likely suggest the above proposed management action prevents the BLM from authorizing actions that may increase emissions within the planning area. Opponents to natural gas development have used similar language in the existing RMPs in the States of Utah and Wyoming to suggest not only that BLM has authority over air quality, but that the BLM cannot authorize actions which may impact air quality. The BLM must revise its air quality goal to state that BLM's only management goal, objective, or action will be to ensure the BLM does not interfere with the UDEQ's permitting authority. In the event the BLM unwisely retains the potentially illegal objective contained in the Moab DRMP/EIS, the BLM must include clear language in the RMP disavowing any attempt by BLM to regulate air emissions or air quality in the planning area. | |
| Samson | 201 | 9 | Unfortunately, the BLM has not mapped or identified the exclusion or avoidance areas under the various alternatives. Based on the acreage calculations, it appears that the ROW exclusion designation applies to lands closed to oil and gas leasing and that the ROW avoidance designation applies to lands with a no surface occupancy stipulation. See Moab DRMP/EIS pgs. 2-11 and 2-15. Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided Operators with sufficient information to analyze how such restrictions may impact its operations. BLM must provide this information in the Final EIS for the Moab RMP revision. | See response to comment 214-12. |
| Samson | 201 | 10 | The BLM partially recognizes that existing oil and gas leases within the Moab RA must be honored. See DRMP/EIS, pg. 2-15. However, the BLM must indicate more clearly that the revised RMP cannot modify or alter existing lease rights by developing a Goal specifically addressing existing lease rights. The BLM | See response to comment 214-14. |

| | | | | |
|---|---|---|---|---|
| | | | more accurately recognized the nature of existing lease rights in the Draft EIS for the Pinedale Resource area in Wyoming in 2007. "Surface use and timing restrictions resulting from this RMP cannot be applied to existing leases." See Pinedale RMP Draft EIS (2007), pg. 2-8. The Draft RMP for the Pinedale Resource Area also recognized that surface use restrictions, timing limitation stipulations, and NSO stipulations, as well as the creation of areas unavailable for leasing restrictions cannot be retroactively applied to valid existing oil and gas leases. "Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations (e.g., Application for Permit to Drill [APD])." See Pinedale RMP Draft EIS, pg. 4-46. The BLM cannot adjust a lessee's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). In order for the public to be fully informed, the Moab RMP should contain similar statements and guarantees. | |
| Samson | 201 | 11 | In the event the BLM designates the Mill Creek Canyon ACEC, the BLM must ensure that operations on adjoining state lands are not impacted. Although it appears BLM intends to either close the Mill Creek Canyon area to oil and gas leasing or impose stringent NSO stipulations, see Moab DRMP/EIS, pg. 2-36, maps 2-14-6, 2-5-6, the BLM must not allow its decisions to inhibit development on nearby State of Utah lands by denying ROWS or other means. The BLM should not close the Mill Creek Canyon area to all oil and gas leasing as it proposes under Alternative B because some development of federal minerals may be possible | See response to comment 120-10.<br><br>The BLM does not propose to chose Alt B, which closes Mill Creek Canyon to oil and gas leasing. |

| | | | | |
|---|---|---|---|---|
| | | | from adjoining state lands. The BLM must not select Alternative B and close the Mill Creek Canyon area to all oil and gas leasing. | |
| Samson | 201 | 12 | On page 2-30 of the Moab DRMP/EIS, the BLM states that surface-disturbing activities would be precluded within 100-year floodplains, 100m of riparian areas, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | See response to comment 214-20. Appendix H, Guidance for Pipeline Crossings, is included in the DRMP/EIS so that proper pipeline placement and crossing can occur. |
| Samson | 201 | 13 | Soils and Watershed On page 2-32 the BLM indicates that it will not allow surface occupancy and preclude surface-disturbing activities within 100-year floodplains, 100m of riparian area, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. The BLM also indicates under this section that it will minimize surface disturbance in areas with sensitive soils. Although the BLM mapped areas with saline soils, it has not mapped sensitive soils. See DRMP/EIS, Map 2-13. The BLM should map sensitive soils within the planning area so that the public better understands how this management action will impact use of the public lands. In particular, the BLM should disclose and analyze how oil and gas leasing and oil and gas development operations would be impacted by this management approach. Similarly, although the BLM indicates that limitations placed on "fragile soils" will adversely impact oil and gas operations, see | See response to comment 214-21. |

| | | | DRMP/EIS, pg. 4-96, the BLM does not provide any specific information on where fragile or sensitive soils may be located. | |
|---|---|---|---|---|
| Samson | 201 | 14 | Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trial so that the public and oil and gas operators such as Operators understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources. | See response to comment 214-22. |
| Samson | 201 | 15 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations when -oil and gas development is a mandated and appropriate use of the public lands. See, e.g., 30 U.S.C. § 226; 43 U.S.C. § 1702(1). Congress has directed public lands to be leased for oil and gas development, the BLM cannot require operators to "fully mitigate" the potential where impacts of an activity that Congress has approved and encouraged. The management action should be eliminated. | See response to comment 214-24. |
| Samson | 201 | 16 | The United States Fish and Wildlife Service (USFWS) determined that the current condition of the greater sage-grouse did not warrant protection under the Endangered Species Act (ESA) in January of 2005. 70 Fed. Reg. 2244 (Jan. 12, 2005). As such, the species is not entitled to any specific protection under the ESA. The BLM must ensure it has sufficient flexibility to manage the public lands for other multiple uses in sage brush habitat, particularly oil and gas development. | See response to comment 203-40.  The BLM can choose to impose stipulations for animals so that they not be listed under ESA. |
| Samson | 201 | 17 | The BLM's proposed management for Gunnison sage-grouse is similarly restrictive, particularly under Alternative B, which would prohibit most multiple use activities, including oil and gas development, in that vast majority of the Lisbon Valley area. See DRMPIEIS, | See response to comments 203, 40, 203-41 and 203-42.<br><br>Existing leases are subject to the terms and conditions in place at the time of the lease.  The BLM has chosen to impose stipulations on operations in Gunnison sage- |

| | | | | |
|---|---|---|---|---|
| | | | pg. 2-47, Map2- 20. BLM's proposal to limit most surface occupancy on 175,727 acres of potential habitat under Alterative C, or 246,107 acres of "pre-settlement" habitat under Alternative B is unnecessary and potentially illegal. BLM cannot impose limitations inconsistent with Operators existing lease rights in the Lisbon Valley area and, therefore, would be precluded from imposing additional timing or controlled use conditions of approval on Operators operations if such limitations were inconsistent with the terms of Operators leases. Once the BLM has issued a federal oil and gas lease, a lessee has not only the right to utilize the leasehold, but the obligation to develop oil and gas resources therefrom. See 43 C.F.R. § 3101-1-2. | grouse habitat to prevent the listing of this species. |
| Samson | 201 | 18 | On page 2-54 the BLM indicates that it will be increasing the timing limitation for pronghorn habitat by two weeks by changing the stipulation from May 15 - June 15 to May 1 to June 15 of each year. The BLM must ensure that this change in the timing stipulation is not imposed on existing leases through COAs on individual well activities. Further, the BLM cannot adjust Operators valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). Because the authority conferred in FLPMA is expressly made subject to valid existing rights, 43 U.S.C. § 1701 note, an RMP prepared pursuant to FLPMA, after lease execution and after drilling and production has commenced, is likewise subject to existing rights. See Colovado Envivonmental Coal, et al., 165 IBLA 221,228 (2005). | See response to comment 214-4. |
| Samson | 201 | 19 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time | See response to comment 214-28. |

BLM_0011053

in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again." See Moab DRMP/EIS pg. 4-3. This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development in the Moab RA. Such a position has been rejected by the BLM nationally, and by the Secretary of the Interior through the IBLA. The RFD Scenario is a tool for NEPA compliance, not a decision in the resource management plan. In the event oil and gas development exceeds the level predicted in the
Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development through project level analysis; the BLM will not be required to revise its resource management plan.
The BLM should clearly state in the Final EIS, the Record of Decision, and the actual RMP for the Moab RA confirming the nature of the RFD Scenario and the fact that the RFD Scenario is not a planning decision or limitation on the level of development that can be authorized within the Moab RA. The RFD Scenario is defined by the BLM as a "baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is neither a Planning Decision nor the "No Action Alternative" in the NEPA document. "In the NEPA document, the RFD based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control potential for oil and gas resource

BLM_0011054

occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD Scenario also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004). The RFD should be based solely or primarily on permitting. The BLM should revise its RFD Scenario given
the high potential for oil and gas development in the planning area.

The IBLA has made clear in six separate decisions that the RFD Scenario is not a planning decision, nor is it a limit on future development. National Wildlife Fed'n, 170 IBLA 240, 249 (2006) (holding with respect to the Great Divide RMP that the RFD Scenario is not a limitation on development); Wyoming Outdoor Council, et al., 164 IBLA 84, 99 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point past which further exploration and development is prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Theodore Roosevelt Conservation Partnership, et al., IBLA Doclret No. 2007-208, Order at *22 (September 5, 2007); Wyoming Outdoor Council, et al., IBLA Docket No. 2006-155, Order at *26 - 27 (June 28, 2006) (determining RFD Scenario for Pinedale RMP is not a limitation on future development); Biodiversity Conservation Alliance, et al., IBLA No. 2004-316, Order at *7 (Oct. 6, 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding with respect to the Great Divide RMP that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area."). As indicated by the number of decisions cited above, the purpose of the
RFD Scenario continues to be a source of confusion,

| | | | | |
|---|---|---|---|---|
| | | | and litigation, for some groups and individuals. In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. Additionally, the BLM must delete or significantly revise the potentially confusing and incorrect language on page 4-3 of the Moab DRMP/EIS. | |
| Cabot Oil and Gas Corporation | 202 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particularly for development in the Lisbon Valley, Eastern Paradox, and Greater Cisco Areas. The BLM determined that the vast majority of the Moab RA has high potential for oil and gas. See DRMP/EIS, Map 3-2, Mineral Potential Report, pgs. 51-52, Maps 6a, 6b, 6c, and 6d. Nonetheless, the BLM's RFD Scenario appears to be based solely on past permitting rather than potential development given the geologic conditions as required by BLM Washington Office Instruction Memorandum 2004-089 (Jan. 16, 2004). See also BLM Land Use Planning Handbook H-1624-1 Planning for Fluid Minerals (Chapter III, B.)(Release 1-1583, 5/7/06), as modified. The Preferred Alternative, Alternative C, only projects 432 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. Recent APD filings demonstrate the RFD scenario for the Moab RA should be at least 975, based on 2006 data of 65 APDs. | See response to comment 214-1 and 214-28. |
| Cabot Oil and Gas Corporation | 202 | 2 | Cabot is also concerned about the BLM's proposal to manage so-called "non- Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness values. There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA), and no process requirement for engaging in an ongoing Wilderness inventory and | See response to comment 214-2. |

| | | | | |
|---|---|---|---|---|
| | | | review. Once the wilderness evaluation process required by Section 603 of FLPMA was complete in the early 1990's, the BLM and the Department of the Interior were not required to conduct further wilderness inventories. 43 U.S.C. § 1782; State of Utah v. Norton, 2006 WL 2711798, Civ No. 96-CV-0870, *2, *8 (Sept. 20, 2006). The question of which lands should be included in the National Wilderness Preservation System is now reserved solely to Congress. Id. at *8. The BLM has not justified the need for managing additional lands for wilderness qualities. | |
| Cabot Oil and Gas Corporation | 202 | 3 | The BLM promulgated policies regarding the contractual rights granted in an oil and gas lease. First, the BLM's Planning Manual specifically mandates the protection of existing lease rights. "All decisions made in land use plans, and subsequent implementation decisions, will be subject to valid existing rights. This includes, but is not limited to, valid existing rights associated with oil and gas leases…" See BLM Manual 1601 – Land Use Planning, 1601.06.G (Rel. 1-166 11/22/00). BLM Instruction Memorandum 92-67 similarly states that "[t]he lease contract conveys certain rights which must be honored through its term, regardless of the age of the lease, a change in surface management conditions, or the availability of new data or information. The contract was validly entered based upon the environmental standards and information current at the time of the lease issuance." As noted in the BLM's Instruction Memorandum, which is binding upon the agency, the lease constitutes a contract between the federal government and the lessee which cannot be unilaterally altered or modified by the BLM. | See response to comment 214-4. |
| Cabot Oil and Gas Corporation | 202 | 4 | In order to avoid potential litigation from groups opposed to natural resources development on federal lands, and in order to comply with Congress' unequivocal directive, the BLM must incorporate the Energy Policy Act of 2005 categorical exclusions into | See response to comments 214-5 and 214-9. |

| | | | the Moab RMP and develop an overall management goal encouraging their use. | |
|---|---|---|---|---|
| Cabot Oil and Gas Corporation | 202 | 5 | 43 U.S.C. ' 1702(j) (2006). If Alternative B is selected, the BLM would make a total of 71,444 acres unavailable to oil and gas leasing and, under Alternative C a total of 370,250 acres unavailable for oil and gas leasing. Even under the "development alternative" 350,219 acres would be closed to oil and gas leasing. Because producing oil and gas leasing on such large areas constitutes a withdrawal under FLPMA, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA. 43 U.S.C. § 1714 (2006).<br>FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an area of 5,000 acres or more to mineral development. Id. For example only the Secretary of the Interior, as compared to the Director of the BLM or a State Director, has the authority to make withdrawals of federal lands. 43 U.S.C. § 1714(a) (2006). The Secretary-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-is authorized to make withdrawals under FLPMA. The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal. 43 U.S.C. § 1714(b)(l) and (h) (2006). Finally, the Secretary is required to notify both houses of Congress of the proposed withdrawal. See 43 C.F.R. § 1610.6 (2006). The notice must include information: (1) regarding the proposed use of the land; (2) an inventory and evaluation of the current natural resource uses and value of the land and adjacent public and private land which-may be affected; (3) an identification of present users and how they will be affected; (4) an analysis of the manner in which the existing and potential uses are incompatible with or in conflict with the proposed uses; (5) an analysis of the manner in | See response to comment 214-7. |

| | | | | |
|---|---|---|---|---|
| | | | which such lands will be used in relation to the specific requirements for the proposed uses; (6) a statement as to whether suitable alternative sites are available; (7) a statement of the consultation which has been or will be had with other federal, regional, state, and local government bodies; (8) a statement regarding the potential effects of the withdrawal on the state, local, and regional economy; (9) a statement of the length of time needed for the withdrawal; (10) the time and place of the hearings regarding the withdrawal; (11) the place where the records of the withdrawal can be examined; and (12) a report prepared by a qualified mining engineer, engineering geologist, or geologist, which shall include information on mineral deposits, mineral production, existing mining claims, and an evaluation of future mineral potential. 43 U.S.C. § 1714(c)(2) (2006). To date, the BLM and Department of the Interior has not complied with these requirements. Additionally, FLPMA requires the Secretary of the interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size. 43 U.S.C. § 1712(e). Oil and gas development is defined as a principal or major use of the public lands. 43 C.F.R. § 1702(1). The BLM would close well over 300,000 acres to oil and gas leasing under Alternatives B, C, and D, yet BLM has not complied with the clear requirements of FLPMA. BLM must notify Congress of its intent to close significant areas to future oil and gas development prior to finalizing the Moab RMP. | |
| Cabot Oil and Gas Corporation | 202 | 6 | Section 1.4.5 -Energy Policy and Conservation Act (EPCA)<br><br>The BLM indicates in Section 1.4.5 of the Moab DRMP/EIS that the agency integrated the general | See response to comment 214-9. |

| | | | | |
|---|---|---|---|---|
| | | | principles from the EPCA Study into the RMP revision. See Moab DRMP/EIS, pg. 1-15. The BLM should also carefully review the results and analysis contained in the Scientific Inventory of Onshore Federal Land's Oil and Gas Resources and the Extent and Nature of Restrictions or Impediments to Their Development (2006) (EPCA II) prepared in compliance with § 604 of the Energy Act of 2000, Pub. L. No. 106-469, and § 364 of the Energy Policy Act of 2005, Pub. L. No. 109-58. The EPCA II study demonstrates the significant negative impacts that stipulations have upon oil and gas leasing and development. The EPCA II study demonstrates that approximately 38.5% of federal lands containing natural gas resources within the Paradox/San Juan Basin are available with Standard Lease Terms and that over 50% of the federal lands are encumbered with restrictions to development. Se EPCA II, pg. 96. However, approximately 49% of the federal lands within the Paradox/San Juan Basin are unavailable for leasing. Id. at 89, 96. That means that 23% (96 MMbbls) of the federal oil and 7% (2.0 TCF) of federal natural gas us unrecoverable. Id. at 89. The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure that stipulations imposed are only as restrictive as necessary. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3), 119 Stat. 594, 723 (2005). | |
| Cabot Oil and Gas Corporation | 202 | 7 | Section 1.4.7 -Memorandum of Understanding with Forest Service<br><br>The BLM improperly references a 1991 Memorandum of Understanding between the BLM and the United States Department of Agriculture, Forest Service (Forest Service) establishing joint BLM and Forest Service procedures for managing oil and gas leasing | The reference to  the Memorandum of Understanding between the BLM and the Forest Service regarding oil and gas leasing has been changed in the PRMP/FEIS from 1991 to 2006. |

and operational activities in the Moab DRMP/EIS. See Moab DRMP/EIS, pg. 1-16. Section 363 of the Energy Policy Act of 2005 directed the BLM and Forest Service to develop a new Memorandum of Understanding regarding oil and gas leasing and operational activities on lands administered by the BLM and Forest Service. Energy Policy Act of 2005, Pub. L. No. 109-58, § 363, 119 Stat. 594, 722-23 (2005). Congress specifically directed the BLM and Forest Service to develop administrative procedures and timeline to ensure the timely processing of oil and gas lease applications, surface use plans of operations, and applications for permits to drill. Id. The Energy Policy Act of 2005 further required the BLM and Forest Service to ensure that lease stipulations are applied consistently, coordinated between the agencies, and only as restrictive as necessary to protect the resource for which the stipulations are applied. Id. (emphasis added). When developing the Moab RMP the BLM must ensure that any and all stipulations developed for future leasing with the Moab RA are the least restrictive possible.

The BLM and the Forest Service issued the Memorandum of Understanding required by Section 363 of the Energy Policy Act in April of 2006. See BLM MOU WO300-2006-07. The new Memorandum of Understanding clearly and unequivocally "supersedes the BLM and Forest Service Interagency Agreements on leasing and operations dated November 1991." Id. The BLM must correct this inference in the Final EIS for the Moab RMP and ensure that the Moab Field Office reviews and complies with the 2006 Memorandum of Understanding when developing and adopting the Moab RMP, and when permitting or approving future oil and gas leasing or development operations within the Moab RA. The 1991 memorandum has no legal impact or effect at this time.

In particular, the BLM must ensure that the stipulations

BLM_0011061

| | | | attached to any future leases are the least restrictive necessary to protect the particular resource values in question. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3)(C), 119 Stat. 594, 722-23 (2005); BLM MOU WO300-2006-07, pg. 2 of 16. | |
|---|---|---|---|---|
| Cabot Oil and Gas Corporation | 202 | 8 | On page 2-7 of the Moab DRMP/EIS the BLM proposes the following management action common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks." See Moab DRMP/EIS, pg. 2-7. The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and potentially unreasonably limits the BLM's ability to effectively manage public lands. The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act. 42 U.S.C. §§ 7401 et seq. Under the clear provisions of the CAA, the EPA and delegated states, such as Utah, have the authority to regulate air emissions. The Secretary of the Interior, through the Interior Board of Land Appeals (IBLA) has recognized that in states such as Wyoming and Utah, the Department of Environmental Quality, not the BLM, has the authority over air emissions. | See response to comment 214-10.<br><br>The BLM recognizes that it does not have the responsibility to set air emission standards.  That responsibility lies with EPA and the State of Utah.  The BLM's can approve actions that meet the National Ambient Air Quality Standards as set by EPA or the State. |
| Cabot Oil and Gas Corporation | 202 | 9 | The BLM similarly lacks authority over potential visibility impacts. Under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407 (a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410 (a)(2)(J). Although federal | See response to comment 214-10. |

land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Under CAA, a federal land manager's authority is strictly limited to considering whether a "proposed major emitting facility will have an adverse impact" on visibility within designated Class I areas. 42 U.S.C. § 7475(d)(2)(B) (2006). Oil and gas operations do not meet the definition of a major emitting facility and, thus, federal land managers have even less authority. The BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts. Even then, the final decision whether to approve the siting of the facility rests with the state and EPA, not the federal land manager. With respect to oil and gas development, BLM's role is even more limited because oil and gas operations do not meet the definition of a major emitting facility. Further, under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407(a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410(a)(2)(J). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no such jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Accordingly, the BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts.

The BLM cannot attempt to impose air emission regulations through its normal management

| | | | | |
|---|---|---|---|---|
| | | | responsibilities and must revise the objective on page 207 of the Moab DRMP/EIS. Even assuming the BLM had the authority to regulate air quality or emissions, the management goal is unclear and could lead to additional challenges or litigation. Opponents to natural gas development on public lands could, and likely would suggest the above goals prevent the BLM from authorizing actions that may lead to increase emissions within the planning area. Opponents to natural gas development have used similarly phrased language in the existing RMPs in the States of Utah and Wyoming to suggest not only that BLM has authority over air quality, but that the BLM cannot authorize actions which may impact air quality. The BLM must revise its air quality goals to more accurately reflect its lack of authority over air quality. In the event the BLM unwisely retains the potentially illegal objective contained in the Moab DRMP/EIS, the BLM must include clear language in the RMP disavowing any attempt by BLM to regulate air emissions or air quality in the planning area. | |
| Cabot Oil and Gas Corporation | 202 | 10 | The BLM is proposing huge right-of-way (ROW) exclusion and avoidance areas to be created under all of the alternatives. See Moab DRMP/EIS, pg. 2-11. The BLM has, however, not mapped or identified the exclision or avoidance areas under the various alternatives. Given the acreage calculations, it appears that the right-of-way exclusion designation applies to lands closed to oil and gas leasing and that the avoidance designation applies to lands with a no surface occupancy stipulation. See Moab DRMP/EIS pgs. 2-11 and 2-15. Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided Cabot with sufficient information to analyze how such restrictions may impact its operations. | See response to 214-12. |
| Cabot Oil and Gas Corporation | 202 | 11 | The BLM insufficiently recognizes that existing oil and gas leases within the Moab RA must be honored. The revised RMP for the Moab RA cannot modify or alter | See response to comment 214-14. |

BLM_0011064

| | | | existing lease rights. The BLM should include more accurate and unequivocal statements regarding existing lease rights in the Moab RMP. For example, the BLM stated in the Draft EIS for the Pinedale RMP released earlier in 2007 that, "Surface use and timing restrictions resulting from this RMP cannot be applied to existing leases." See Pinedale RMP Draft EIS (2007), pg. 2-8. The Draft RMP for the Pinedale Resource Area also recognized that surface use restrictions, timing limitation stipulations, and NSO stipulations, as well as the creation of areas unavailable for leasing restrictions cannot be retroactively applied to valid existing oil and gas leases. "Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations (e.g., Application for Permit to Drill [APD])." See Pinedale RMP Draft EIS, pg. 4-46. The BLM does not have the authority to modify a lessee's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). | |
| Cabot Oil and Gas Corporation | 202 | 12 | In the event the BLM designates the Mill Creek Canyon ACEC, the BLM must ensure that operations on adjoining state lands are not impacted. Although it appears BLM intends to either close the Mill Creek Canyon area to oil and gas leasing or impose stringent NSO stipulations, see Moab DRMP/EIS, pg. 2-36, maps 2-14-6, 2-5-6, the BLM must not allow its decisions to inhibit development on nearby State of Utah lands by denying ROWS or other means. The BLM should not close the Mill Creek Canyon area to all oil and gas leasing as it proposes under Alternative B because | See response to comment 120-10. |

| | | | some development of federal minerals may be possible from adjoining state lands. The BLM must not select Alternative B and close the Mill Creek Canyon area to all oil and gas leasing. | |
| --- | --- | --- | --- | --- |
| Cabot Oil and Gas Corporation | 202 | 13 | On page 2-30 of the Moab DRMP/EIS, the BLM states that surface-disturbing activities would be precluded within 100-year floodplains, 100m of riparian areas, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | See response to comment 214-20. |
| Cabot Oil and Gas Corporation | 202 | 14 | Soils and Watershed<br>On page 2-32 the BLM indicate that it will allow no surface occupancy and preclude surface-disturbing activities within 100-year floodplains, 100m of riparian area, public water reserves, and 100m of springs. The BLM must redraft this requirement slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area.<br>The BLM also indicates that it will minimize surface disturbance in areas with sensitive soils. Although the BLM mapped areas with saline soils, it has not mapped sensitive soils. See DRMP/EIS, Map 2-13. The BLM should map sensitive soils within the planning area so that the public better understands how this management action will impact use of the public lands. The BLM must also disclose and analyze how oil and gas leasing and oil and gas development operations would be impacted by this management approach. | See response to comment 214-21. |

BLM_0011066

| | | | Although the BLM indicates that limitations placed on "fragile soils" will adversely impact oil and gas operations, see DRMP/EIS, pg. 4-96, the BLM does not provide any specific information on where fragile or sensitive soils may be located. | |
|---|---|---|---|---|
| Cabot Oil and Gas Corporation | 202 | 15 | Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trail so that the public and oil and gas operators such as Cabot understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources.Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trail so that the public and oil and gas operators such as Cabot understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources. | See response to  comment 214-22. |
| Cabot Oil and Gas Corporation | 202 | 16 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations when oil and gas development is a mandated and appropriate use of the public lands. See, e.g., 30 U.S.C. § 226; 43 U.S.C. § 1702(1). The management action should be eliminated or, at the very least, redrafted as follows: "Reasonably mitigate unavoidable habitat losses for special status species when such losses are anticipated to have a direct, measurable impact on sensitive species." | See response to comment 214-24. |
| Cabot Oil and Gas Corporation | 202 | 17 | The BLM's proposed management for Gunnison sage-grouse is similarly unduly restrictive, particularly under Alternative B, which would prohibit most multiple use | See response to comments 203-40, 203-41, & 203-42. |

| | | | activities, including oil and gas development, in that vast majority of the Lisbon Valley area. See DRMPIEIS, pg. 2-47, Map 2-20. BLM's proposal to limit most surface occupancy on 175,727 acres of potential habitat under Alterative C, or 246,107 acres of "pre-settlement" habitat under Alternative B is unwise, unnecessary, and potentially illegal. BLM cannot impose limitations inconsistent with Cabot's existing lease rights in the Lisbon Valley area and, therefore, would be precluded from imposing additional timing or controlled use conditions of approval on Cabot's operations if such limitations were inconsistent with the terms of Cabot's leases. Once the BLM has issued a federal oil and gas lease, a lessee has not only the right to utilize the leasehold, but the obligation to develop oil and gas resources therefrom. See 43 C.F.R. § 3101-1-2. | |
|---|---|---|---|---|
| Green River Ranches | 448 | 1 | Our comments are directed to Appendix D, Lands Identified for Disposal in Revised Moab RMP, specifically lands in the Green River area.<br><br>The lands currently identified for disposal in the draft RMP in the Green River area would be of benefit to the Green River community, as well as improving the manageability for the BLM. We believe there are additional lands in that area that could be considered for disposal which would also benefit the community and help the BLM in its mission to manage the public lands.<br><br>FLPMA states that the BLM may sell public lands that meet one or more of three criteria as defined in the Act. The lands on the attached list would fall under criteria (2) and (3) in FLPMA. Criteria (2) states, Disposal of such tract shall service important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved and prudently or feasibly on lands other than public | Section 102(a) of FLPMA states, "The Congress declares that it is the policy of the United States that – (1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest."<br><br>In the draft RMP, BLM identified approximately 9,500 acres of public lands in the Green River area that are isolated tracts (surrounded by private and State Lands) and would meet the criteria for community expansion of the City of Green River.<br><br>Green River Ranches, LLC has suggested for disposal approximately 32 sections of additional public land that are not isolated tracts and are not difficult or uneconomic for BLM to manage as part of the public lands.  It would not be in the national interest for BLM to dispose of these additional lands and they will not be added to the lands identified for disposal in the RMP. |

| | | | lands and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in federal ownership. Criteria (3) states, Such tract, because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands and is not suitable for management by another Federal department or agency. Some of the lands on the list are isolated from any large blocks of public land would appear to be difficult and uneconomic to manage by the BLM. The other tracts, even though not isolated, would appear to be good disposal lands because they are adjacent to other private and state lands and could be developed in order to expand the community of Green River.<br><br>In looking through the RMP it appears there are no overriding reasons to keep these lands in public ownership. We could find no reference to recreation or other values that would preclude their disposal. The configuration of the selected lands on the attached list would in our minds make a more manageable boundary for the BLM and private landowners. The selected lands would be critical to development of agriculture in order to perfect water rights allocated from the Green River. The use of allocated water for agricultural purposes could not occur except on the identified public lands. The proposed boundary, for the most part, closely conforms to the topographic changes in the public land to the north and east of the private lands in the area. The flats could be developed and the steeper, rougher country would remain in public ownership. [See attached list of lands for disposal.] | |
| Cabot Oil and Gas Corporation | 202 | 18 | On page 2-54 the BLM indicates that it will be increasing the timing limitation for pronghorn habitat by two weeks by changing the stipulation from May 15 - June 15 to May 1 to June 15 of each year. The BLM | See response to  comment 214-4. |

| | | | | |
|---|---|---|---|---|
| | | | must ensure that this change in the timing stipulation is not imposed on existing leases through COAs on individual well activities. The BLM cannot adjust Cabot's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). Because the authority conferred in FLPMA is expressly made subject to valid existing rights, 43 U.S.C. § 1701 note, an RMP prepared pursuant to FLPMA, after lease execution and after drilling and production has commenced, is likewise subject to existing rights. See Colorado Environmental Coal, et al., 165 IBLA 221,228 (2005). | |
| Cabot Oil and Gas Corporation | 202 | 19 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again." See Moab DRMP/EIS pg. 4-3. This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development in the Moab RA. Such a position has been rejected by the BLM nationally, and by the Secretary of the Interior through the IBLA. The RFD Scenario is a tool for NEPA compliance, not a decision in the resource management plan. In the event oil and gas development exceeds the level predicted in the Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development. The BLM will not be required to revise its resource management plan simply because additional development is authorized; project level NEPA analysis will provide the necessary analysis of potential impacts from increased oil and gas development. | See response to  comment 214-1, |

The BLM should include specific information in the Final EIS, the Record of Decision, and the actual RMP for the Moab RA confirming the nature of the RFD Scenario and the fact that the RFD Scenario is not a planning decision or limitation on the level of development that can be authorized within the Moab RA. The RFD Scenario is defined by the BLM as a "baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is neither a Planning Decision nor the "No Action Alternative" in the NEPA document. "In the NEPA document, the RFD based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD Scenario also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004).
The IBLA has made clear in six separate decisions that the RFD Scenario is not a planning decision, nor is it a limit on future development. National Wildlife Fed'n, 170 IBLA 240, 249 (2006) (holding with respect to the Great Divide RMP that the RFD Scenario is not a limitation on development); Wyoming Outdoor Council, et al., 164 IBLA 84, 99 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point past which further exploration and development is

| | | | | |
|---|---|---|---|---|
| | | | prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Theodore Roosevelt Conservation Partnership, et al., IBLA DocIret No. 2007-208, Order at *22 (September 5, 2007); Wyoming Outdoor Council, et al., IBLA Docket No. 2006-155, Order at *26 - 27 (June 28, 2006) (determining RFD Scenario for Pinedale RMP is not a limitation on future development); Biodiversity Conservation Alliance, et al., IBLA No. 2004-316, Order at *7 (Oct. 6, 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding with respect to the Great Divide RMP that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area."). As indicated by the number of decisions cited above, the purpose of the RFD Scenario continues to be a source of confusion, and litigation, for some groups and individuals. In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. Additionally, the BLM must delete or significantly revise the potentially confusing and incorrect language on page 4-3 of the Moab DRMP/EIS. | |
| Questar Exploration and Production Company | 210 | 1 | Questar has become increasingly concerned recently with attempts made via the NEPA process to impose new restrictions on existing legal rights, e.g., leases, rights-of-way, previous Records of Decision, etc. Questar regards this as a serious legal issue and is pleased to note that the Moab DRMP/EIS recognizes that valid existing rights are not subject to new Special Designations, Areas of Critical Environmental Concern (ACECs), wilderness characteristics, wild and scenic rivers, etc. Recommendation: FEIS should continue recognition of valid existing rights. | Valid existing rights are considered Administrative Actions by the BLM and do not require a specific planning decision to implement.  As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights.  The BLM will work with and subject to the agreement of holders of valid existing rights to modify proposed actions or activities to reduce the effect of the actions or activities on resource values and uses.  These modifications may be necessary to maintain the choice of alternatives being considered |

| | | | | during land use plan development and implementation, and may include appropriate stipulations, relocations, redesigns, or delay of proposed actions. |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 2 | The DRMP/EIS contains many restrictions on oil and gas development. Questar finds the following restrictions in the Preferred Alternative to be excessive and in conflict with the Energy Policy Conservation Act of 2000 and Executive Order 13211 which will require identification of and efforts to eliminate impediments to natural gas and oil development:<br>-Lands open to oil and gas leasing under standards stipulations – 59% decrease<br>-Lands with Controlled Surface Use (CSU) and timing limitations – 107% increase<br>-Lands designated No Surface Occupancy (NSO) – 459% increase<br>-NSO imposed on private surface overlying federal minerals<br>The overlapping surface stipulations identified in Appendix C will result in severe and unacceptable adverse impacts on the ability of the oil and gas industry to develop the mineral resource within the Moab Field Office planning area.<br>Recommendation: BLM must ensure that its decisions comply with the Energy Policy Act (EPA 2005), (Energy Policy and Conservation Act (EPCA 2000), the National Energy Policy (NEP), and Executive Order 13212, (66 Fed Reg 28357 May 18, 2001) and reduce rather than increase impediments to federal oil and gas leasing. Under FLPMA, BLM is required to manage public lands under the principles of multiple use and sustained yield to meet the needs of present and future generations. 43 USC § 1701 (a)(7), (8) & (12); 43 USC § 1732(a) & (b); 43 CFR § 1610.5-3. FLPMA identifies "mineral exploration and production" as one of the "principle or major uses" of public lands. See 43 USC § 1702(1). The removal of expansive acreage from leasing and | In accordance with the Energy Conservation Policy Act, the restrictions on oil and gas leasing developed in the DRMP/EIS for the preferred alternative (Alt C) are the least restrictive stipulations necessary to protect the resources under consideration.  The RFD indicates that the restrictions in Alt C results in reducing the number of wells from 451 in Alt A to 432 to in Alt C.  This is a reduction of 19 wells representing a 4% reduction in development between the two alternatives. See Table 4.2 of the DRMP/EIS (on pg. 4-5) for a summary of wells foregone due to restrictions on oil and gas leasing by alternative.  Nineteen wells (out of a total of 451) does not represent an unreasonable restriction on oil and gas operations.<br><br>The impacts of each of the restrictions on oil and gas development are detailed in Chapter 4 of the DRMP/EIS. |

BLM_0011073

| | | | | |
|---|---|---|---|---|
| | | | development in the DRMP/EIS does not comply with BLM objectives. | |
| Questar Exploration and Production Company | 210 | 3 | Right-of-way Exclusion and Avoidance Areas Analysis: The DRMP/EIS Preferred Alternative (Alternative C) designates 370,250 acres as right-of-way (ROW) exclusion and avoidance areas. This restriction of surface access will negatively impact the ability of oil and gas operators to access mineral leases and transport their product to market which, in turn, negatively impacts the local, state, and national economies. The additional restrictions contemplated in the DRMP/EIS are not adequately analyzed in terms of EPA 2005, EPCA 2000, NEP, and Executive Order 13212 and are unnecessarily applied to energy development.<br>The Moab Field Office is primarily comprised of federal land. Management decisions made on those federal lands will not only affect energy development but will also directly impact the ability of state and private landowners to develop their land. The DRMP/EIS should fully analyze and disclose the impacts to state and private landowners if access is denied to their properties due to right-of-way exclusion and avoidance restrictions.<br>Recommendation: Thoroughly analyze and disclose the impacts of the ROW exclusion and avoidance areas on access to valid existing legal rights and state and private lands. Ensure that the RMP provides necessary access. | See response to comments 214-12, 214-13, and 214-14. |
| Questar Exploration and Production Company | 210 | 4 | Areas of Critical Environmental Concern. New ACECs are proposed under each of the alternatives; however, it is unclear how the BLM determined that the proposed ACECs met the "importance and relevance" criteria. The BLM has not demonstrated that existing management practices and designation do not adequately protect the resource values of concern and that an ACEC is necessary. BLM provides no | Alt C proposes to manage 5 areas totalling 63,000 acres as ACECs.  Information has been added to Appendix I which details the threats to the ACECs and the rationale for designating or not designating them.  See also response to comments 203-8, 203-9 and 203-10. |

| | | | | |
|---|---|---|---|---|
| | | | justification for fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, or threatened criteria have been met. The information and data used by the BLM to make these determinations should be fully disclosed to the public as required by NEPA and BLM policy.<br>Recommendation: FEIS should disclose the information upon which the proposed ACECs were determined to meet the "importance and relevance" criteria. Eliminate the following proposed ACECs from further consideration based on failure to demonstrate that additional protections are necessary and/or that they meet the importance and relevance criteria:<br>Behind the Rocks<br>Bookcliffs<br>Cisco White-tailed Prairie Dog Complex<br>Colorado River Corridor<br>Labyrinth Canyon<br>Upper Courthouse<br>Westwater Canyon<br>White Wash<br>Wilson Arch | |
| Questar Exploration and Production Company | 210 | 5 | Twelve of the 14 ACECs that are being considered for designation have existing oil and gas leases within them. Though these leases will remain valid until expiration, the ACEC designation limits the potential for future development within these prospective areas. The DRMP/EIS should note that many of the resource values that are meant to be protected by the proposed ACECs are already protected through management prescriptions that are applied to the leases and/or APDs. ACEC designation is unnecessary when other designations are adequate to protect a resource or value. FLPMA states that the least restrictive management technique to protect a resource should be applied. Since many of the resources identified in the proposed ACECs are already protected by current | See response to comments 203-8, 203-9 and 203-10, 203-11, 203-12, 203-13 and 203-14.  For a discussion of valid existing rights, see response to comment 214-14.<br><br>Alt. C designates 5 of the proposed ACECs, totalling 63,000 acres. |

| | | | management practices or existing designations, the new ACEC designations would disregard FLPMA. | |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 6 | Non-Wilderness Study Area (WSA) Lands with Wilderness Characteristics. The DRMP/EIS proposes 33 non-WSA lands with wilderness characteristics within the Moab planning area. The Preferred Alternative proposes to manage 47,761 acres to preserve wilderness characteristics. It appears that many of these areas do not meet the criteria for wilderness as described in the DRMP/EIS. Human impacts, primarily consisting of oil and gas development, are evident throughout the proposed areas. IPAMS has submitted information depicting existing human activity within the proposals for wilderness characteristics protection should preclude such a designation. It is interesting to note that BLM's consideration of these as wilderness characteristics areas demonstrates that energy development is temporary and that reclaimed energy development sites can be considered to possess wilderness characteristics.<br>Recommendation: The basis for wilderness-like protections seems tenuous. BLM must disclose the information used to determine that these lands meet the wilderness criteria and how the boundaries were designated. Management of non-WSA lands should continue current practices without additional restrictions to preserve "wilderness characteristics." The document should acknowledge that impacts of energy development are temporary and reclamation technology has progressed to a point that the footprint is imperceptible in later years. | See response to comments 203-5, 203-6 and 203-7. |
| Questar Exploration and Production Company | 210 | 7 | The DRMP/EIS should clearly state that Best Management Practices can only be required or applied when both economic and technical feasibility criteria are met. The DRMP/EIS should also acknowledge that many operators work with the BLM in the permitting and | See response to comment 215-1. |

| | | | | |
|---|---|---|---|---|
| | | | planning process to develop new BMPs or modify existing BMPs to make them meet the feasibility criteria. Recommendation: Clarify that BMPs are only required when they are both technically and economically feasible. | |
| Questar Exploration and Production Company | 210 | 8 | Reasonably Foreseeable Development. The Reasonably Foreseeable Development (RFD) analysis severely underestimates the potential oil and gas development within the planning area. The Preferred Alternative projects 432 wells in the next 15 years despite the fact that 2006 APD activity alone suggests a figure nearly double that. Instruction Memorandum 2004-089 requires that BLM use the best available information that data at the time of the RFD study. The BLM does not disclose the methodology or information that was used in developing the RFD, nor whether input from the oil and gas industry was solicited, but it appears that recent data may contradict some of the assumptions that went into it. Recent advances in technology, including 3-D seismic surveys, coupled with higher commodity prices would indicate a higher RFD would be more accurate. Recommendation: The predicted magnitude of the energy resource and the resulting number of wells that could be drilled should be reevaluated based on the best available information and data, taking into account new technology and increased gas prices. Information should be solicited from the oil and gas industry to aid in the evaluation. | See response to comments 203-15 and 214-1. |
| Questar Exploration and Production Company | 210 | 9 | The socio-economics analysis does not adequately discuss the role of the planning area in contributing to the nation's natural gas supply. The full positive impact of mineral development in the planning area was not considered, nor was the negative impact that will result from imposing stringent restrictions on energy development. The Preferred Alternative closes nearly 60% of the lands currently open to leasing under | See response to comments 203-25, 203-26, 203-27, 203-28, 203-29, 203-30, 203-31 and 203-32. |

| | | | standard stipulations and the amount of land designated NSO increases by an amazing 459%! Added to that are the right-of-way exclusion and avoidance areas prescribed by the document which severely limit operator's abilities to access and develop leases and to transport energy products to market. These actions will result in significantly less benefit to the local communities in terms of employment and economy, as well as to the state and the nation in terms of available energy, and cannot justifiably be characterized as only slightly impacting socio-economics. | |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 10 | Because the oil and gas potential has been severely underestimated in this document, it is likely that the economies of Grand and San Juan counties would be severely impacted. Section 3.13.1.6.7 discusses the contribution of tourism to the Grand County economy, but does not reference the energy industry's contribution. The DRMP/EIS acknowledges that tourism-related revenues have leveled off in Grand County. Because the document also underestimates the Reasonably Foreseeable Development (RFD), the public is not being provided adequate information on the actual impacts to local communities. | See response to comments 203-32, 203-33, 203-34 and 203-35. |
| Questar Exploration and Production Company | 210 | 11 | Questar believes it is important that the DRMP/EIS provide an accurate RFD analysis and fully consider the economic benefits oil and gas activities rather than simply seeking to put huge areas off-limits to responsible energy development. Although Questar realizes that there is usually a lag time between the time of the RFD is prepared and the final Record of Decision, we have recently seen several Draft RMPs that undervalue the energy potential. This is not in the spirit of NEPA and does a disservice to the local communities by underestimating the economic benefits of energy development. BLM should correct this deficiency in the DRMP/EIS. Questar would be happy to | See response to comments 214-1 and 203-15, as well as to the socioeconomic comments 203-25 through 203-35. |

| | | | provide BLM with its assessment of those economic impacts if that would be helpful. The socio-economic analysis should more accurately depict the negative socio-economic impacts of the myriad of additional restrictions that the DRMP/EIS would apply to energy development, as well as the positive economic impacts associated with tax revenues, increased employment opportunities, and increased national energy supply from the potential energy development within the Moab Field Office. | |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 12 | The DRMP/EIS uses a grossly overstated average of 15 acres per well surface disturbance associated with oil and gas exploration. Using a normal well pad size of 3 acres, this would mean that the road and pipeline associated with teach well would disturb 12 acres, or approximately 2.5 miles for a 40' easement. This is unrealistic. A more realistic figure of 5 to 7 total acres disturbance would be consistent with other recently published BLM RMPs. An average of 7 acres, allowing 4 acres for the road and pipeline (approximately ½ mile) should be used for the DRMP/EIS. It also important to note that the pipeline disturbance is minimal and temporary. After pipeline construction, the easement would revert to the standard 24' roadway resulting in an immediate reclamation of approximately one acre. The DRMP/EIS also assumes only 1500 acres would be reclaimed over the 15-year life of the RMP and only wells drilled in the first five years would be successfully reclaimed within the life of the plan. This assumption is pessimistic and does not take into account most operators' standard practice of reclaiming a well location back to producing size immediately upon putting the well on production. Recommendation: Use a 5 to 7 acre average per well location for surface disturbance and a 50% interim reclamation assumption per well. Adjust Table 4.3, Summary of Total Predicted Surface Disturbance for | See response to comment 203-28. |

| | | | Mineral Development Activities on page 4-7 to reflect this. | |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 13 | Greater and Gunnison Sage-grouse. The conditional surface use (CSU) and no surface occupancy (NSO) buffer expansion to a 0.5 mile radius surrounding Greater Sage-grouse leks and a 0.6 mile radius surrounding Gunnison Sage-grouse for nesting and brood rearing is excessively restrictive and contradicts existing, well established protocol found in recent BLM RMP and EIS decisions and the science upon which those decisions are based (Wallestad and Pyrah 1974, Braun et al. 1977). In areas where relatively higher levels of development occur, monitoring efforts indicate increasing or stable sage-grouse populations. For example, within Questar's Pinedale Anticline Project Area in Southwestern Wyoming, which has seen considerable oil and gas development since 2000, spring 2006 male grouse numbers on the 31 agency-monitored leks were the highest on record since accelerated development began in 2000 (1,559 birds in spring 2000 versus 1,873 birds in spring 2006); relatively consistent monitoring protocol were applied in all years. A 0.25-mile active lek No Surface Occupancy (NSO) buffer and a 2.0-mile CSU seasonal avoidance area are generally applied on the Pinedale Anticline. Furthermore, only 8 of the 31 leks are considered to have declining trends while 7 leks appear to be increasing in abundance (2006 Wildlife Studies, Pinedale Anticline Project by TRC Mariah Associates, Inc. 2007). According to a study by R.C. Kaiser, (2006, Recruitment by Greater Sage-grouse in Association with Natural Gas Development in Western Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. Recommendation: Remove the expansion of CSU/NSO | See response to comments 203-40, 203-41 and 203-42. |

| | | | | |
|---|---|---|---|---|
| | | | buffers and continue to use the proven adequate nesting and breeding buffer of 0.25 miles. | |
| Questar Exploration and Production Company | 210 | 14 | The DRMP/EIS introduces further restrictions on oil and gas with large portions of the planning area being designated as VRM Class II. The Preferred Alternative designates 365,567 acres as Class II. It is not clear from the document if the Class II restrictions overlap other restrictions; however, because oil and gas development is a temporary disturbance to the surface with temporary visual impacts, the VRM restrictions do not represent a reasonable balance between protecting vistas and developing energy resources needed by the nation. | See response to comment 203-21. |
| Bill Barrett Corporation | 214 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particulary for development within Lisbon Valley, Eastern Paradox, and Greater Cisco Areas.  The BLM's RFD Scenario is based soley on past permitting, not potential development based exclusively on geologic factors as required by BLM Washington Office Instruction Memorandum 2004-089. | The Reasonably Foreseeable Development scenario  was prepared  in August 2005 and was revised in September of 2006.  The revision in 2006 was prompted by a considerable increase in oil and gas prices and on the development activity.  Up to the present time (2008) oil and gas prices have continued to climb and activity has continued to increase.  However, the numbers projected in the revised RFD are still within the range of surface disturbance and the impacts analyzed in the DRMP/EIS.  If the trend continues the RFD may have to  be revised.<br><br>The RFD was prepared in accordance with BLM Washington Office IM 2004-89.  It is based on geoologic factors, past permitting, and many discussion with oil company personnel (geologists, engineers, and mangers).<br><br>See response to comment 214-28. |
| Bill Barrett Corporation | 214 | 2 | There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA) and no process requirement for engaging in an ongoing Wilderness Inventory and review. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the |

BLM_0011081

| | | | | Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, section 103(c) (43 U.S.C. §1702(c)).) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 3 | The BLM's Land Use Planning Handbook specifies that RMPs are not normally used to make site-specific implementation decisions. The BLM must ensure that it leaves itself sufficient flexibility to manage the public lands in light of ever-changing resource demands, uses, and technologies. By developing overly restrictive management practices, such as specific reclamation or mitigation ratio's, the BLM is limiting its ability to manage the public lands in light of new information. The management objectives, goals, and actions | If conditions change radically the BLM can prepare a land use plan amemdment. The BLM Land Use Planning Handbook (H-1601-1) on pg. 45 states that plan amedments can be promted to 1) respond to new, intensified, or changed uses on public land; and 2) consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions. |

| | | | | |
|---|---|---|---|---|
| | | | established in the revised Moab RMP must be sufficiently flexible to manage the Moab RA for at least the next decade. | |
| Bill Barrett Corporation | 214 | 4 | The BLM cannot attempt to impose stipulations or conditions of approval (COAs) on BBC's existing leases that are inconsistent with its valid existing rights. | The DRMP/EIS as stated on pg. 1-13 and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), the planning process would recognize the existence of valid existing rights.

Subject to valid existing rights, the BLM will work with a lease holder to modify proposed actions or activities to reduce the effect of the actions or activities on resource values and uses and  also to  protect threatened/endangered species and cultural resources. Additional modifications may be necessary to prevent undue and unnecessary degradation of public lands. |
| Bill Barrett Corporation | 214 | 5 | In developing the Moab RMP, the BLM must provide for and allow itself sufficient flexibility to utilize the categorical exclusions developed by Congress to streamline oil and gas permitting on federal lands. | The application of categorical exclusions for oil and gas operations is determined for site specific proposals.  This process does not require a land use planning decision. |
| Bill Barrett Corporation | 214 | 6 | When finalizing the Moab RMP, the BLM should also acknowledge the BLM's recent decision to include geophysical exploration, when no temporary or new road construction is proposed, to the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement. | The NEPA documentation required for geophysical operations is determined on a site specific basis and does not  require a land use planning decision. |
| Bill Barrett Corporation | 214 | 7 | FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an area of 5,000 acres or more to mineral development. Among the other requirements imposed on the Department of the Inteior is the requirement for the Secretary of the Inteior, as compared to the Director of the BLM or a State Director, to make all withdrawals of federal lands. | There are no withdrawals proposed  under any of the alternatives in the DRMP/EIS.  Withdrawals only apply to the general land laws which includes the Mining Law of 1872, as amended.  The action alternatives do propose removing areas from mineral leasing which is discretionary and does not require a withdrawal. |
| Bill Barrett Corporation | 214 | 8 | FLPMA requires the Secretary of the Interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal | If the BLM decides to eliminate a principal use on over 100,000 acres on a tract of land, then we will approach Congress. |

BLM_0011083

| | | | | |
|---|---|---|---|---|
| | | | or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size. | |
| Bill Barrett Corporation | 214 | 9 | The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure stipulations imposed are only as restrictive as necessary. | The analysis in Chapter 4 of the DRMP/EIS considers the impacts of restrictive stipulations on oil and gas development.  The preferred alternative (Alt C) imposed the least restrictive stipulations necessary to protect the resources of concern while still allowing oil and gas development. |
| Bill Barrett Corporation | 214 | 10 | The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act..  The BLM does not have authority to regulate emissions in Utah.  The BLM must eliminate or revise the proposed management action. | We agree that the BLM does not have direct authority over air quality or emissions under the Clean Air Act.  The State of Utah has primacy for compliance with the CAA.  Permitted activities must meet air quality standards set by the State or the Environmental Protection Agency.  The BLM and its permittees are subject to compliance with air quality standards. <br><br> The goal stated for Air Quality in the DRMP/EIS (pg. 2-7) states "Maintain existing air quality and air quality related values by ensuring that all authorized uses on public lands comply with and support Federal, State, and local laws and regulations for protecting air quality". <br><br> This statement does not imply that the BLM has the authority to regulate emissions or air quality.  However, the BLM must ensure that all permitted activities on public lands are in compliance with air quality standards. <br><br> Under Management Common to All for Air Quality in the DRMP/EIS pg. 2-7 it states "Manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards. |
| Bill Barrett Corporation | 214 | 11 | In anticipating potential air quality impacts the BLM also misunderstands the nature of oil and gas emissions.  Emissions from oil and gas operations are not simply a matter of the number of wells in a particular area.  The BLM should not attempt to impose restrictions on air quality through the RMP process.  The BLM must revise | Our estimate of  air quality impacts was based on the best available information and basic analysis assumptions.  The commentor provides no specific information on how the analysis was in error. <br><br> Refer to response to comment 214-10. |

BLM_0011084

| | | | its air quality goal to state that BLM's only management goal, objective, or action will be to ensure that the UDEQ is invited to participate in the NEPA process as part of the State of Utah's cooperating agency status. | |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 12 | The BLM indicates that huge right-of-way (ROW) exclusion and avoidance areas will be created under all of the alternatives. Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided BBC with sufficient information to analyze how such restrictions may impact its ooperations. BLM must provide this informtion in the Final EIS for the Moab RMP revision. The BLM has also not adequately explained or justified the ROW avoidance and exclusion areas. | On pg. 2-11 of the DRMP/EIS it states that right-of-way avoidance and exclusion areas would be consistent with the stipulations identified in Appendix C for oil and gas leasing and other surface disturbing activities. The justification for the stipulations imposed are provided in Appendix C. The oil and gas leasing stipulations are shown on Maps 2-5-A, 2-5-B, 2-5-C, and 2-5-D. |
| Bill Barrett Corporation | 214 | 13 | The BLM has not adequately analyzed the impacts ROW avoidance and exclusion areas will have upon exinting oil and gas leases. The BLM must ensure that access is allowed to both existing and newly issued oil and gas leased in the Moab RA. | Refer to response to comment 214-4.<br><br>Oil and gas leases issued after completion of the land use plan will be subject to the terms and conditions of the plan.<br><br>The impacts of proposed right-of-way exclusion and avoidance areas is analyzed on pg. 4-64 through pg. 4-68 of the DRMP/EIS. |
| Bill Barrett Corporation | 214 | 14 | Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations. The BLM cannot adjust a lessee's valid and existing rights. | Refer to response to comment 214-4. |
| Bill Barrett Corporation | 214 | 15 | The BLM should acknowledge the BLM's recent decision to include geophysical exploration, when no temporary or new road construction is proposed, to the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement. | Refer to response to comment 124-6. |

BLM_0011085

| Bill Barrett Corporation | 214 | 16 | The BLM has not analyzed or disclosed the potential impacts the restrictions on future leasing may have upon operations on existing leases.  It is not enough for the BLM to simply assert that existing lease rights will be protected, the BLM must analyze how existing lease rights will be impacted by future limitations on leasing and development and what protection it will afford to said existing leases in the above described scenario. | The analysis in Chapter 4 of the DRMP/EIS identifies the impacts to oil and gas development from furture leasing stipulations.  Although  stipulations  imposed on future leasing could impact existing leases, this type of analysis would require site specific information which can not be analyzed on a land use planning level. The commentor has not provided any information regarding the potential impacts to existing leases. |
| Bill Barrett Corporation | 214 | 17 | The BLM has not adequately justified managing areas which were not included in the original Wilderness Study Areas (WSAs) for wilderness qualities. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences."  (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).)  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."  (FLPMA, section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation).  Include goals and objectives to protect the resource and |

| | | | | management actions necessary to achieve these goals and objectives.  For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 18 | The BLM received new information from the Southern Utah Wilderness Alliance (SUWA), but does not specify what that new information was.  That information should be readily available to the public in order to assess the quality of the information. | Information was received from the Southern Utah Wilderness Alliance regarding wilderness proposals both prior to, and during scoping.  A reference to this information is made in Appendix P in the DRMP/EIS.  This information is part of the adminstrative record for the land use planning process and is available to the public upon request. |
| Bill Barrett Corporation | 214 | 19 | Many of the non-WSA lands that supposedly have wilderness characteristics do not meet the criteria for wilderness, and should not be managed as wilderness and closed to oil  and gas development.  Human impacts can be seen throughout the areas, including active wells, plugged and abandoned wells, pipeline ROWs, roads, structures, and other imprints of human activitiy.  This arbitrary drawing of boundaries enables the designation of wilderness in land that reallly by any common sense analysis does not meet the criterio of undisturbed land. | Refer to response to comment 124-54 and 121-71. |
| Bill Barrett Corporation | 214 | 20 | The BLM states that surface disturbing activities would be precluded within 100-year floodplains, 110  m of riparian areas, public water reserves, and within 100 m of springs.  As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | In Appendix C (page C-5) of the DRMP/EIS it states that an exception to these restrictions can be granted if 1) there are not practical alternatives or, 2) all long term impacts can be fully mitigated, or, 3) the activitiy will benefit and enhance the resource values.  Appendix H provides the guidance for pipelines crossing stream crossings. |
| Bill Barrett Corporation | 214 | 21 | The BLM should map sensitive soils within the planning areas so that the public better understands how this management action will impact use of the public lands.  In particular, the BLM should disclose and analyze how oil and gas leasing and oil  and gas development operations would be impacted by this management approach. | Map 2-13 of the DRMP/EIS displays moderate to high saline soils.  Saline soils are the component of sensitive soils of most concern to the Moab Field Office.  A map of these soils is also referenced in Chapter 3.  The stipulations for oil and gas leasing and other surface disturbing activities is provided in Appendix C under sensitive soils.  The sensitive soils of concern are the saline soils delineated on Map 2-13. |

| Bill Barrett Corporation | 214 | 22 | The BLM should include a map showing the location of the Old Spanish Trail so that the public and oil and gas operators such as BBC understand how the trail designation may impact future uses of the public lands. | The National Park Service is currently preparing the Draft Comprehensive Management Plan/Environmental Impact Statement for the Congressionally designated Old Spanish Trail.  Maps will be included in this document when it is issued to the public expected by the end of year 2008.  The commentor should refer to this document for detailed maps when it is competed.  The DRMP/EIS states on pg. 2-39 that this Old Spanish Trail Comprehensive Management Plan will be incorporated into the Moab RMP based on a Congressional mandate. |
| Bill Barrett Corporation | 214 | 23 | The BLM does not have the authority to require offsite mitigation.  Further, offsite mitigation is not appropriate for most oil  and gas projects.  The BLM's Instruction Memorandum also instructed the BLM not to impose specific ratios for mitigation measures, a provision of the Insturction Memorandum the BLM has ignored in the Moab DRMP/EIS. | See response to comment 120-33 regarding BLM policy on off-site mitigation.  The commentor provides no information regarding where off-site mitigation is a management action in any of the alternatives in the DRMP/EIS. |
| Bill Barrett Corporation | 214 | 24 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations when oil and gas development is mandated and appropriate use of public lands.  The management action should be eliminated or, at the very least, redrafted as follows:  "Reasonably mitigate unavoidable habitat losses for special status species when such losses are anticipated to have a direct, measurable, and negative impact upon sensitive species."  To the extent this requirement is intended to apply to species listed under the Endangered Species Act (ESA), the requirement is unnecessary because the formal consultation process required  by the ESA already contains a requirement to consider "reasonable and prudent alternatives" to mitigate potential impacts. The BLM should clarify this management action, define exactly which species or type of  species to which it applies, and indicate that the BLM does not  have the authority to reauire offsite mitigation. | The statement on pg. 2-44 of the DRMP/EIS which states "Fully mitigate all unavoidable habitat losses for special status species at a minimum of 1:1 ratio" has been changed from "fully mitigate" to "mitigate". |
| Bill Barrett | 214 | 25 | When developing the Moab RMP, the BLM should not | BLM Manual 6840 states "Ensure actions requiring |

| Corporation | | | place unnecessary restriction on management activities for the Gunnison's prairie dog in anticipation of potential listing. | authorizations or approval by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to list any special status species under provision of the Endangered Species Act.". The proposed restrictions in the preferred alternative of DRMP/EIS were developed to meet this Manual requirement.<br><br>BLM policy is to protect the habitat of the Gunnison's prairie dog so that management actions do not result in listing under the Endangered Species Act. |
| Bill Barrett Corporation | 214 | 26 | The Moab DRMP/EIS does not properly assess the affects restrictive land management decisions will have on the local economy, and the opportunities denied by severely restricting access to energy resources through a whole range of overlapping restrictions including wilderness-like designation of land, NSO, CSU, VRM, timing limitations, and others. | The impacts of imposing restrictions on oil and gas leasing are analyzed in Chapter 4 of the DRMP/EIS. The commentor provides no specific information on where the analysis is insufficient or improper. |
| Bill Barrett Corporation | 214 | 27 | On page 3-113 of the Moab DRMP/EIS, the analysis of the contribution of mineral resources, which as mentioned above does not provide an overall economic contribution of oil and gas, notes that production peaked in 1994 and has declined since. However, the data stops at 2000, just about the time that oil and gas commodity prices started to rise and, coupled with advances in the technology to recover unconventional resources, production throughout Utah and the Intermountain West started to soar. | Chapter 3 of the PRMP/FEIS has been updated to reflect the current trend in oil and gas production. |
| Bill Barrett Corporation | 214 | 28 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continuing increase in oil and gas prices, then the analysis will have to be updated again." This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas | The language referred to on pg. 4-3 does not refer to any limitation on oil and gas development. The RFD is merely an analytical tool to assess the impacts of proposed BLM decisions regarding oil and gas leasing. A land use plan amendment would not be required.<br><br>The BLM has revised the RFD scenario based upon public comment. The RFD scenario is an analytical |

BLM_0011089

| | | | development in the Moab RA.  In the event oil and gas development exceeds the level predicted in the Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development.  The BLM will not be required to revise its resource management plan. | model, which estimates oil and gas activity that could potentially occur.  The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.

The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.

As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement. |
| Bill Barrett Corporation | 214 | 29 | In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself | The RFD scenario is an analytical model, which estimates oil and gas activity that could potentially occur.  The RFD |

BLM_0011090

| | | | describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. | scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.<br><br>The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement. |
| EnCana Oil and Gas (USA) Inc. | 215 | 1 | The Moab DRMP appears to make several management decisions that are most appropriately left to site-specific authorizations.  For example, the BLM appears to impose best Management Practices | The procedures referred to are based on Washington Office Instruction Memorandum 2007-021 as well as the Gold Book.   They will be applied as appropriate. |

regardless of their applicability or feasibility.  The text on page C-3 states, "The following appropriate environmental Best Management Practices ("BMP") will be applied on individual Applications for Permit to Drill and associated right-of-way in the Moab Field Office." [emphasis added]

EnCana strongly supports use of environmental Best Management Practices for all ail and gas operations ands strives to incorporate all practical BMPs on EnCana operations where applicable and appropriate based on site-specific considerations and reasons.  BMPs should more consistently relate to the letter of IM No. 2007-021 and Surface Operating Standards and Guidelines for Oil and Gas  Development (Gold Book), 2006 or the policy basis.  IM No. 2007-021 states:

Field Offices must be cautious to avoid the "one size fits all" approach to the application of BMPs.  Environmental BMPs, by their very nature, are dynamic, innovations and must be flexible enough to respond to new data, field research, technological advances, and market conditions.  Following implementation, Field Offices should monitor, evaluate, and modify BMPs as necessary for use in future permit approvals.

Some of the listed BMPs are not appropriate and/or are impossible to comply with in all cases.  For example, compare the statement in the Sixth bullet, "all flower lines will be buried in or immediately adjacent to the access roads" [emphasis added] to the statement in the Gold Book, "Flowline routes should take advantage of road corridors wherever possible to minimize surface disturbance and provide better leak detection and access for installation and repair operations.  Consider maintenance needs and safety when burying power and pipelines in or immediately adjacent to the road" [emphasis added].  Notwithstanding those different approaches, currently recommendation from the BLM to

BLM_0011092

| | | | minimize surface disturbance on and across solid or rocky surfaces.<br>As a second example, compare the statement in the Eleventh Bullet, "Nose reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment" [emphasis added] to the statement in the Gold boo, "Noise that has the potential to disturb wildlife, livestock and private surface owners or neighbors should be controlled to reduce sound levels" [emphasis added]. Such a blanket requirement over the entire planning area is not justifiable where oil and gas operations and compressors are in very remote areas or areas near mining activity, and have no impact on wildlife, livestock and nearby surface owners. | |
|---|---|---|---|---|
| EnCana Oil and Gas (USA) Inc. | 215 | 2 | The BLM's Reasonably Foreseeable Development ("RFD") Scenario for the Moab Planning Area is inaccurate and would limit the opportunities to explore for new resources.<br>Rather than Relying on outdated USGS data, the RFD Scenario should be based on the current levels of 3-D seismic activity and of the application for permits to drill in the area.  The BLM should also include additional information explaining the purpose of the RFD Scenario and its role in the planning process.<br>First, the BLM must update the RFD Scenario in light of the increase in drilling activity since it was developed.  For example, Preferred Alternative C projects 435 wells in the next 15 years.  Based solely on the 65 APDs approved in 206, the 15-year projection should be at least 975 wells.  The Moab FO issued an updated RFD Scenario in August 2005 as part of the RMP revision currently underway.  The 2005 RFD Scenario projected that 75 wells would be drilled in Lisbon Valley area over the next 15 years, 56 which would be drilled on BLM lands (see DRMP p.4-84). This equates to less than four wells per year.  In 2007 EnCana alone drilled seven wells in Lisbon Valley area, and EnCana | See response to comment 214-1 and 214-28. |

| | | | | |
|---|---|---|---|---|
| | | | anticipated drilling nine to twelve wells in 2008.  The Moab DRMP recognizes that the number of wells drilled has increased significantly due to higher energy prices and projects that twice as many wells will be drilled in 2007 as compared to 2007 (see DRMP p.3-44), yet the Moab DRMP does not take the increased level of activity into account.  The BLM's RFD Scenario should be updated to reflect continued growth. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 3 | In addition, the BLM assumption that complex subsurface geologic conditions could result in only 50% of the wells being successful producers likely underestimates the actual number of productive future wells by 50%.  EnCana has experienced a 90% success rate in its Lisbon Valley over the last four years. | The success rate in the BLM assumption is based on the entire Moab planning area and not just on drilling in Lisbon Valley. |
| EnCana Oil and Gas (USA) Inc. | 215 | 4 | The assumptions in the RFD underlying projects of geophysical activity are also inaccurate.  An assumption of four linear miles of source line for each square mile of 3D seismic activity cannot be uniformly applied.  The BLM must make it clear that this number is not a limitation | See response to comment 124-28. |
| EnCana Oil and Gas (USA) Inc. | 215 | 5 | The BLM should adequately identify the purposes of the RFD, which is not a limitation on development.  EnCana appreciated the BLM's recognition that "the total number of wells cited in the RFD report does not represent upper limits on the number of wells that could be drilled in the Moab Planning Area during the life of the plan." (DRMP page 4-4) However, the statement on page 4-3, "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again," incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development.  The BLM should include additional, specific information the Final EIS, the Record of Decision, and the actual Resource Management Plan for the Moab Planning Area | See response to comment 214-28. |

confirming the fact that the RFD Scenario is not a planning decision of limitation on the level of development authorized within the Moab Planning Area. The RFD is defined by the BLM as a "basline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004).  The RFD is neither a Planning Decision nor the "No Action Alternative" in the NEPA document.  "In the NEPA document, the RFD is based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control the type and level of oil and gas activity. The RFD also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas.  BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004).

On Several occasions the Interior Board of Land Appeals has confirmed that the RFD Scenario is not a limitation on development.  In these decisions, the IBLA has made it clear that the RFD Scenario is not a planning decision, nor is it a limit on future development.  Wyoming Outdoor Council, 164 IBLA 84, 89 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point past which future exploration and development is prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Wyoming Outdoor

| | | | | |
|---|---|---|---|---|
| | | | Council, et al.  IBLA No. 2006-155 at *26 (June 28, 2006) (holding that the Pinedale RMP does not restrict the number of wells that can be drilled within the Pinedale Resource Area); Biodiversity Conservation Alliance, et al.  IBLA No. 2004-316 at *7 (Oct. 6 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area.") As indicated by the number of decisions cited about, the purpose of the RFD Scenario continues to be a source of confusion and litigation.  In order to reduce such confusion and litigation, the BLM should include language in the Moab DRMP itself describing the purpose of the RFD Scenario, and the fact that the RFD in the Moab DRMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 6 | The 1-hour ozone standard of 0.12 ppm shown in Table 3.2 was revoked by the EPA in June 2005.  The table should be corrected. The ozone concentration for Mesa Verde National Park of 0.078 ppm shown in Table 3.2 does not agree with the concentration of 0.070 shown in the table on the National Park service website (http://www2.nature.nps.gov/air/monitoring/exceed.cfm). The source of the data in Table 3.2 is not clear.  It is important to note, however, that the comparison to the ozone NAAQS is the 4th highest daily maximum 8-hour average, averaged over three years.  For Mesa Verde National Park, using the three-year average of 2001, 2002, and 2003, the average for compliance comparison is 0.067 ppb.  In addition, due to rounding, an exceedance of the standard is not binding until a three year average is 0.085 ppb or higher. The statement in the first paragraph on page 3-9, "The | The BLM will comply with whatever air quality standard is in place at the time of permitting actions. |

| | | | | |
|---|---|---|---|---|
| | | | UDEQ indicated that ozone concentrations in Class I areas of the western states have shown significant increases in the past decade and are approaching the NAAQS level" is not supported by the table from the National Park Service.  Only in Rocky Mountain National park did ozone levels peak in 2002 and 2003; the levels have since dropped | |
| EnCana Oil and Gas (USA) Inc. | 215 | 7 | Section 3.14.3.2.2 Salinity (p. 3-112)<br><br>The second paragraph of this section states that the release of saline groundwater during drilling activities is a point source for salinity.  This statement is inaccurate because groundwater is not released during drilling activities in natural gas drilling operations | The reference to the release of saline groundwater during drilling has been deleted from the text of the PRMP/FEIS. |
| EnCana Oil and Gas (USA) Inc. | 215 | 8 | EnCana believes that several of the ACECs do not contain adequate justification for closing those lands to development.  Twelve of the 14 ACECs listed in the DRMP have existing leases.  While the leases would remain valid until they expire, the potential exists to limit future development in prospective areas because of ACEC designations.  This is unjustifiable where there are existing laws, stipulations, and policies to protect sensitive areas identified in many of the ACECs while still developing the energy resource.<br>NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs.  Isle Royale, 154 F. supp. 2d at 1127; Trout Unlimited, 509F.2d at 1284; BLM ACEC Manual 1613.06-.4. The DRMP does little to disclose to the public how and on what information the proposed ACEC determinations were reached.<br>New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP were nominated by various organizations.  However, there is a lack of disclosure about these submissions, the | See response to comment 203-9. |

| | | | materials serving as the basis of analysis by the BLM interdisciplinary team, and how these procedures compiled with existing bLM policy.  The DRMP fails to explain why other management prescriptions or designations in place are inadequate and necessitate the proposed ACEC designations in lieu of less restrictive alternatives.<br>Regardless of how the ACECs were determined, the examination requires much more than merely examining the importance and the relevance criteria.  Disclosing this information allows the public to ascertain the quality of information used by BLM, the location of the source of information and the availability of the information for public review. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 9 | 43 U.S.C 1702(j) (2006). Because the decision to make an area unavailable for leasing constitutes a withdrawal, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA.  43 U.S.C 1714 (2006).  Among other things, only the Secretary of the Interior-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-has the authority to make withdrawals of federal lands.  43 U.S.C 1714(a) (2006).  The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal.  43 U.S.C 1714(b) (1) and (h).  Finally, the Secretary is required to notify both houses of Congress of specific information relating to the proposed withdrawal.  See 43 C.F.R. 1610.6; 43 U.S.C. 1714 (c ) (2)<br>The Moab DRMP does not contain adequate justification for declining to reissue expired leases under these standards.  The DRMP notes that withdrawals "are used to preserve sensitive environmental values, protect major Federal investments in facilities or other improvements, support national security, and/or provided for public health and safety." (See DRMP | See response  to comment 214-7. |

BLM_0011098

| | | | | |
|---|---|---|---|---|
| | | | page 3-31) But no such analysis is provided.  Before the BLM takes such steps, it "must ensure that withdrawals are supported by a definite show of need and must recommend revocation of withdrawals that lack sufficient justification." 43 C.F.R. 231.1-2. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 10 | As development operations are proposed in the future, the  BLM cannot attempt to impose new stipulations or conditions of approval (COA) on existing leases that are inconsistent with their valid existing contractual rights.  Once the BLM has issued a federal oil and gas lease without a no surface occupancy stipulation (NSO), and in the absence of a nondiscretionary statutory prohibition against development, the BLM cannot completely deny development on the leasehold, nor impose mitigation measures inconsistent with the BLM's authority under 43 C.F.R. 3101.1-2.  Only Congress has the right to completely prohibit development once a lease has been issued. On Page 4-8 of the DRMP, the following statement appears:  "Due to these existing leases, it is possible that wells could be drilled in areas that are proposed in this plan to be managed as closed or NSO for oil and gas leasing." In the Final EIS, the BLM should expand this statement to discuss the fact that oil and gas lease is a contract between the federal government and the lessee, and that the lessee has certain rights thereunder.  See Mobil Oil Exploration & Production Southeast, Inc V. United States, 530 U.S. 604, 620 (2000). The Moab RMP, when revised, cannot defeat or materially restrain valid and existing rights to exploit its leases through COAs or other means.  See, eg., 43 C.F.R. 1610.5-3. | See response to comment 214-4. |
| EnCana Oil and Gas (USA) Inc. | 215 | 11 | Section 3.16.2.1.14 on page 3-151 states, "No sightings [of Gunnison sage grouse] have been reported in the past ten years."  The imposition of restrictions associated with leks is incongruous with the lack of presence of the species.  In addition, the buffer around Sage Grouse leks is excessive.  Preferred Alternative C | See response to comment 203-40. |

| | | | specifies a 0.6 mile buffer around all Gunnison Sage Grouse leks within approximately 175,727 acres of potential habitat, and a 0.5 mile bugger around all Greater Sage Grouse leks within approximately 3,068 acres of habitat. (See DRMP page 4-105) These buffers are excessive. Normal practice throughout the Intermountain West is reflected Alternative D, 0.25 mile buffers around leks, which should be the buffer specified in the final RMP | |
|---|---|---|---|---|
| EnCana Oil and Gas (USA) Inc. | 215 | 12 | The characterization of geophysical activity in the DRMP as a surface disturbing activity is inaccurate (see p 4-8). The BLM should also acknowledge its recent decision to include geophysical exploration, when no temporary or new road construction is proposed, in the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement. See DOI Manual, Chapter 11.9.B(6), (516 DM 11.9.B9b)), 72 Fed.Reg. 45504, 45539 (August 14, 2007). The BLM recognized the limited and temporary impacts associated with such activities. The assumption that impacts resulting from geophysical exploration surveys would require 10 years for surface reclamation is also in error and contradicts the premise of the categorical exclusion that such surveys are, in fact, a casual use operation whose impacts are sufficiently insignificant that they may be approved without an analysis by an environmental assessment or environmental impact statement if no new road construction is involved. In fact, geophysical survey operations to reflect the concept of "usage," where no grading and/or blading of the surface are required. The inaccurate characterization of geophysical survey activities should be corrected throughout the DRMP, including pages 4-16, 4-83, and all other references to "seismic disturbance." | See response to comment 214-6.<br><br>For the purpose of analysis in Chapter 4 of the DRMP/EIS, it is assumed that cross country travel for geophysical operations result in surface disturbace that require about 10 years to fully reclaim. These assumptions are based on BLM experience in the area. |
| EnCana Oil and Gas (USA) | 215 | 13 | The assumptions made by the BLM are inconsistent in some places within the DRMP. Assumptions made to | On pg. 4-16 it states that conservative assumptions were used to better ensure that the findings do not |

| | | | | |
|---|---|---|---|---|
| Inc. | | | assess impacts should be uniform and consistent throughout the analyses for all resources.  See 43 C.F.R. 1610.3-2.<br>The assumption used for the analysis of air quality impacts is that "all proposed wells would go into production within 15 years and then operate at full production levels with no 'dry holes' or 'shut ins'." (see p.4-16)  This assumption is contradicted by the assumption for reclamation described in section 4.1.3.10 on p. 4-7 (and also on p. 4-83): "The assumptions for reclamation for oil and gas are that 50% of the wells drilled would be productive and 50% would be abandoned and reclaimed and revegetation would be successful." (See comment on page 3, infra, regarding EnCana's success rate.) Nevertheless, without consistent and defensible assumptions, impacts to resources from each of the alternatives cannot be compared.  For example, Table 4.3, which displays predicted surface and disturbance, does not appear to consider the 50% plugging and abandonment rate assumption.  It is difficult to determine where the assumption was considered and where it was not. | underestimate future impacts.  For example, it was assumed that all proposed wells would go into production within 15 years, and then operate at full production levels with no "'dry hoes or "shut- ins," while in reality a small percentage of dry holes and shut-ins would be expected to occur.  This is a full production scenario to determine if air quality standards would be exceeded over the life of the plan.  The assumption on surface disturbance associated with wells drilled is more realistic.  Although the two assumptions are different they serve different anaytical purposes. |
| EnCana Oil and Gas (USA) Inc. | 215 | 14 | The reference to "proposed wells" is inaccurate.  The DRMP analysis should refer to the number of wells projected by the RFD Scenario | The number of wells by alternative utilized in the air quality analysis in Chapter 4 of the DRMP/EIS.  In the PRMP/FEIS the wording has been changed from proposed wells to projected wells. |
| EnCana Oil and Gas (USA) Inc. | 215 | 15 | The assumption on page 4-18 that a control efficiency of 37% would be obtained by watering of all exposed disturbance areas is inconsistent with the assumption on page 4-16 that 50% control of particulate emissions would be obtained by watering.  The DRM should be corrected to consistently reflect the assumptions actually used in the quantification of impacts | The PRMP/FEIS has been corrected in Chapter 4 on air quality to reflect consistent assumptions. |
| EnCana Oil and Gas (USA) Inc. | 215 | 16 | The assumption on page 4-17 that flaring emissions are primarily NOx and CO is incorrect.  Flares are used to dispose of unrecoverable gas emerging concurrently with the crude oil.  During flaring, gaseous methane | This assumption was based on the Vernal Air Quality modeling. See Trinity and Nicholls 2006 for justification of assumptions. |

| | | | | |
|---|---|---|---|---|
| | | | reacts with atmospheric oxygen to form primarily carbon dioxide and water.  Other minor emissions from flaring include unburned hydrocarbons, CO, and other partially burned and altered hydrocarbons.  Acetylene (non-HAP) is typically formed as a stable intermediate product; however, acetylene formed in combustion reactions may react further to form polycyclic hydrocarbons (HAP).  Flaring operations usually achieve at least 98 percent combustion, such that hydrocarbon and CO emissions amount to less than two percent of the hydrocarbons in the gas stream (U.S. Environmental Protection Agency (EPA). 2005. AP 42, Fifth Edition Compilation of Air pollutant Emission Factors, Volume 1: Stationary Point and Area Sources). | |
| EnCana Oil and Gas (USA) Inc. | 215 | 17 | Table 4.10 on page 4-27 estimates the number of compressors at each RFD Scenario area at 0.063 compressor per well within a minimum of 2 compressors per RFS area.  Compressors are located in areas where natural gas is produced into pipelines.  The broad assumption allotting compressors to all RFD Scenario areas where the predominant mineral produced is liquid hydrocarbons and/or where no pipelines exist for gas transport out of the area. | The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures.  This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Thus, the number of compressors per well is for analysis purposes only.

As project-specific drilling operations are being considered, the BLM performs a land use plan conformance review and site specific NEPA analysis. |
| EnCana Oil and Gas (USA) Inc. | 215 | 18 | The BLM has not adequately explained or justified the right of way ("ROW") exclusion area throughout the Moab Planning Area.  EnCana owns numerous oil and gas leases in the planning area and its ability to develop | See response to  comment 214-12 and 214-13. |

| | | | | |
|---|---|---|---|---|
| | | | those leases would be significantly impacted if the BLM inappropriately limits EnCana's ability to access its leases.  EnCana is concerned that the proposed restriction and avoidance of future ROWs under all alternatives may prevent it from delivering produced natural gas via pipeline to a distribution system in place.  Preferred Alternative C exclusion and avoidance areas comprise over 20% of the planning area (a total of 370,250 acres would be ROW exclusion areas and an additional 217,480 acres where surface disturbance activities are limited would be avoidance areas for new ROWs) (See p 4-67) The DRMP does not have any maps that show all areas where ROWs would be excluded and/or avoided.  Consequently, EnCana cannot evaluate possible impacts from proposed ROW monument to its operations.  It is also not clear if the creation of the ROW exclusion and avoidance areas was done talking into consideration valid and existing lease rights.  While the issuance of the oil and gas leases does not guarantee access to the leasehold, a federal lessee is entitles to use such part of the surface as may be necessary to produce the leases substance.  43 C.F.R. 3101.1-2 (2006) | |
| EnCana Oil and Gas (USA) Inc. | 215 | 19 | There is a typographical error on page 4-68 in the last line of the second full paragraph.  The line should read, "Alternative D, and would have corresponding impacts on the construction of future ROWs" | This is a typographical error, and it has been fixed. |
| EnCana Oil and Gas (USA) Inc. | 215 | 20 | The first sentence of this Section (p. 4-93) should be modified to say that no additional BLM lands would be closed to salable and leaseable mineral resource development.  Table 4.38 on page 4-85, shows that there are already 392,205 acres (2.1%) of closed BLM lands.  This is an inaccurate sentence and needs to be modified to correctly identify that there are closed areas under Alternative A | The wording in this section has been changed to "Under Alternative A, no acres of lands with wilderness characteristics are to be managed to protect these characteristics, resulting in no additional closures of BLM lands to salable and leasable mineral resource development." |
| EnCana Oil and Gas (USA) | 215 | 21 | In this Section, effects on soils and water resources are determined by comparing the Alternatives against one | The mitigation measures identified by the commentor are applied to site specific proposals.  The assessment of |

| | | | | |
|---|---|---|---|---|
| Inc. | | | another. However, there appears to be no determination that any of the four alternatives are so detrimental to soil and water resources as to be unacceptable.  Please keep in mind that the BLM has developed standards for stormwater controls and reclamation using certified seed mixtures, etc., and Spill Prevention, Countermeasure and Control Regulations are also applied to this area for soil and groundwater protection.  To be consistent with the air quality determination, the following statement should be included in this section:<br>    Assuming appropriate application of control measure and strict adherence to existing regulatory and permitting processes, no appreciable cumulative, short-term or long-term, adverse soil and water resource effects are projected specific to oil and gas development. | impacts to soils was based on projections of surface disturbance by alternative.  This provides a reasonable basis for the comparison of impacts by alternative.  Control measures can reduce impacts such as soil erosion but they do not eliminate the impacts. |
| EnCana Oil and Gas (USA) Inc. | 215 | 22 | EnCana is concerned about the level of personnel and staffing at the Moab Field Office.  Operators already experience significant permit delays, and it is not clear to us how the BLM will manage and implement even the Preferred Alternative C absent an increase in personnel | The DRMP/EIS asserts that adequate personnel and staffing will be provided to implement the preferred alternative.  This is stated on pg. 4-3 of the DRMP/EIS: "BLM would have the funding and work force to implement the selected alternative." |
| Delta Petroleum Corporation | 220 | 1 | The economic analysis presented in the DEIS is based on old and outdated information with respect to oil and gas development.  It relies on data from 2003 and older.  The economic picture, development activities and approaches to resource extraction have undergone a major shift in the last 7 years based on several factors including demand for energy resources, federal policy and legislation and rises in the energy costs.  It is critical that the DEIS depend on the best and most recent data available.  The analysis on oil and gas resources does not rely on available recent data, but primarily on information prior to 2004 which does not reflect changes in the economy, need to increase domestic supplies of energy, impacts of high energy costs on communities and federal resource priorities | The BLM has incorporated updated production data in Chapter 3 of the DRMP/EIS.  State of Utah data shows a continuing decline in production in Grand County through 2007.  The BLM acknowledges that production could increase in the future, and has incorporated its predictions of future well activity in its RFD. The BLM has also incorporated data from The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase III - Grand County.  This recent study (January, 2008), commissioned by the State of Utah and done by the University of Utah, confirms the relatively minor contribution that minerals development makes to the planning area's economy. |

BLM_0011104

| | | | from the Energy Policy Act of 2005. That information is readily available from both State and Federal sources, including some information in 2007, yet non of this recent information has been included in the DEIS. This is a major flaw under NEPA, since readily available information should be used for decision making. This affects economic impacts and projections within all of the alternatives. Since this information is readily available, the BLM should amend the DEIS to reflect that information. A decision that affects land uses for the next 15-20 years should not be based on faulty assumptions and old information | |
| Delta Petroleum Corporation | 220 | 2 | It appears that the BLM policies for establishing an ACEC and demonstrating that existing laws and regulations are inadequate to protect these special areas has not been followed. The information used by the BLM to reach a decision that up to 14 ACECs are needed within the MRA has not been included in the DEIS as required by NEPA<br><br>The inclusion of existing leases within these areas would suggest that management by stipulation is the appropriate way to consider oil and gas development within these areas. Lease stipulations should be developed that are specific to the purpose of the ACEC and the protections warranted by omission from other laws and regulations. Such analysis of risk versus multiple uses is not present in the DEIS so there is no way to evaluate how the BLM can reach the land restrictions proposed for the ACES's. In addition, there are a number of existing laws, regulations and policies to protect the water, air, cultural and other resources identified in the ACECs. In what appears to be a failure to meet regulatory requirements, the RMP contains little in the way of explaining to the public how the BLM reached the designations and proposed land restrictions. | The preferred alternative manages five ACECs, totalling 63,000 acres. Valid existing rights within these areas are recognized and would be honored.<br><br>See also response to comments 203-2, 203-9, 203-10, 203-10, 203-11, 203-12, 203-13 and 203-14.<br><br>None of the ACECs mentioned as having conflicts with utility corridors are proposed for management under the preferred alternative. |

| | | | Several of the proposed ACEC's overlie existing utility corridors within the MRA.  The existing and future use of these utility corridors needs to be recognized and protected within any new designation of an ACEC.  This is particularly true for the proposed Upper Courthouse, Wilson Arch, Cisco White Tailed Prairie Dog Complex, and Colorado River Corridor ACECs | |
| Delta Petroleum Corporation | 220 | 3 | On September 28, 2007, the Utah BLM canceled its November 13th lease sale covering 141,717 acres.  The financial impact of this cancellation can be measured by taking the average price per acre paid at the previous lease sale of August 21, 2007 of $31 per acre times 141,717 acres to be sold.  The projected value of this sale would have been over $4,500,000.  However, that number does not take into account lost wages, royalty payments, taxes and other economic benefits related to production from that acreage.  Nor does it take into account the shift in trade balance from domestic production versus foreign importing of oil and gas resources.  These are important considerations that must be included within the economic analysis for the DEIS.

Finally, the economic value of proposed land restrictions must be evaluated for the economic losses and penalties to the resource industry as well as the economic value produced by protections to those lands ecological or other perceived benefits.  Economic impacts occur both from lost extraction as well as ecological and social benefits.  The value of a pristine vista must be weighted against the temporary impact to that vista from oil and gas development in implementing land use restrictions.  It is not an either or decision, nor an irrevocable commitment of resources in this case.  A true valuation of both sides of the equation is needed to reach a truly balanced decision on how to administer | Addressing the economic impacts of a single past lease sale cancellation is beyond the scope of the DRMP/EIS.  The BLM acknowledges the (temporary) loss of revenue from this cancelled sale.  There is no reason to believe, however, that a future lease sale involving these (or similar) parcels would not generate similar positive economic benefits.  The DRMP/EIS attempts to address the impacts over a longer period of time than a single sale, and estimates economic impacts from the projected number of wells expected to be drilled over the 15-20 year life of the plan.  There is no way for the BLM to predict the exact timing of these sales, or to predict their results.

Data on the fiscal impacts from the various action alternatives have been added to the PRMP/FEIS.

The shifts in trade balance suggested by the commentor are influenced by a myriad of local, national and international factors, most of which are beyond the control of the BLM, and certainly beyond the scope of planning for the Moab Field Office.

CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management |

| | | | | |
|---|---|---|---|---|
| | | | multiple land use policies.  Such evaluations and considerations have not been presented within the DEIS.  The BLM has not presented a rationale for reaching a balance as claimed in alternative C | prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/EIS and can create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple-use mandate.<br><br>The term "multiple use" as defined in FLPMA means "the management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people."  This direction indicates that not all uses need to be accommodated in all areas.  The DRMP/EIS includes a detailed evaluation of all options to ensure a balanced approach.  This balanced approach will ensure protection of resource values and sensitive resources while allowing opportunities for mineral exploration and production.  The PRMP/FEIS will offer management flexibility to ensure that resource values and uses are protected while allowing for acceptable levels of mineral development. |
| Fidelity Exploration and Production Co. | 221 | 1 | The BLM's analysis does not provide Fidelity with a sufficient understanding of how its existing lease rights or potential future operations may be impacted by the adoption of the revised RMP.  The BLM must present detailed information and analysis in the revised RMP in a coherent and focused format in order to comply with its procedural obligations under the NEPA | See response to comment 214-4. |
| Fidelity Exploration | 221 | 2 | BLM has a responsibility to include a comprehensive socio-economic analysis that is lacking in this DRMP. | In 2007, Grand County provided 0.5% of Utah's total oil production and 1.8% of Utah's total gas production |

| | | | | |
|---|---|---|---|---|
| and Production Co. | | | The following should be giving more consideration:<br><br>-Oil and gas are vital sources of energy for the nation. BLM should discuss increasing energy demands, decreasing domestic energy supplies, and the strategic necessity for development of mineral resources. Utah oil and natural gas resources need to be identified as crucial to help offset the deficit between supply and demand.<br><br>-Federal lands contribute nearly one-third of the nation's natural gas supply; therefore, accounting for every resource rich area is crucial to producers and consumers. The DRMP should discuss the role of the planning area in the nation's natural gas supply<br><br>-The full, positive economic impact of mineral development in the planning area was not adequately analyzed, nor did the document analyze the negative impact associated with the severe restrictions called for in the Preferred Alternative C. Furthermore, the DRMP states that under Alternative b, the long-term economic benefits from oil and gas development would be slightly less than current circumstances or if Alternatives C or D were adopted (Table 2.2, p.2-78-2-79) This conclusion is counter-intuitive; it defies logic how the extremely restrictive Alternative B would have only slightly lower economic benefits from oil and gas when it would place so many more restrictions on development. Clearly, that analysis is flawed.<br><br>BLM would greatly benefit from a comprehensive economic analysis of the impact of oil and gas to the region such as is currently underway by the University of Utah's Bureau of Economic and business Research for the Utah Governor's Office of Public Land Policy Coordination Office (The Structure and Economic | (DOGM, 2006). Utah ranks 12th nationally in oil production and 10th nationally in gas production (DOGM, 2008). These figures do not support the commentor's assertion that this is crucial to the nation's energy supply.<br><br>The impacts of minerals on social and economic conditions are detatiled on pg. 4-259 through pg. 4-264. This analysis provides a reasonable assessment of the socioeconomic impacts.<br><br>The restrictions imposed on oil and gas leasing in Alt B would result in fewer wells developed than in Alts, C, D, or A. These numbers are 264, 432, 448, 451, respectively. Therefore, Alt B would result in 168 fewer wells over the life of the plan. The well numbers were based on the Reasonably Foreseeable Development scenario for oil and gas and spread by alternative based on the restrictions imposed under each alternative. Impacts of minerals on socioeconomics are based on these well numbers. Economic information on royalties, employment, severance taxes, and impacts to State revenues have been augmented in Chapter 4 of the PRMP/FEIS.<br><br>Information has been added to the PRMP/FEIS using the newly completed study by the University of Utah Bureau of Economic and Business Research (Juanuary 2008) "The Structure and Economic Impact of Utah's Oil and Gas Production and Industry, Phase III - Grand County". Therefore, use of the study in Uintah County suggested by the commentor is not appropriate. |

| | | | Impact of Utah's Oil and Gas Exploration and Production Industry Phase I-The Uinta Basin) (Draft, November 2007))<br><br>-Each alternative contained in the DRMP includes some lands closed to energy resource development. Such closures re based on BLM's assessment of resource values on those lands.  Closure also implications, however, in terms of national energy consumption and commodity prices, foregone employment opportunities, tax revenues, and support for state and local economies.  Although BLM must necessarily base land use decisions on consideration of all resources values, social and economic impacts of closure decisions should be estimated to fulfill the agency's mandate under FLPMA, and to comply with guidelines contained in BLM's Land Use Planning Handbook (H-1601-H) and Instruction Memorandum (IM) No. 2002-167 | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 3 | BLM has not adequately addressed the negative impacts to the School and Institutional Trust Lands Administration (SITLA) that would follow adoption of Alternatives B or C.  Restrictions imposed by these alternatives would impede access to SITLA minerals, severely reduced the income generated by Federal mineral royalties, and thereby, significantly impact all public schools in the region. | See response to 120-10 and 120-101. |
| Fidelity Exploration and Production Co. | 221 | 4 | Prior to implementing oil and gas stipulations, BLM should conduct a complete cost/benefit analysis of individual stipulations, conduct a thorough data review on the proposed stipulations, and adopt a monitoring program to tract the effectiveness of and continuing need for the stipulations | The BLM analyzed the socioeconomic impacts of the different alternatives on oil and gas leasing and development.  This information is presented on pg. 4-259 through 4-265 of the DRMP/EIS.  It is neither feasible nor practical to conduct cost/benefit analysis on individual stipulations at the land use planning level.  The leasing stipulations applied in the Preferred Alternative of the DRMP/EIS are the least restrictive necessary to protect the resource value of concern.  Exceptions, modifications, and waivers can be applied to stipulations based on certain condition (see Appendix C).  The BLM conducts |

| | | | | monitoring during implementation of site specific actions. |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 5 | There should be recognition and disclosure in the DRMP that changes in oil and gas technology will create the benefit of allowing development and operations to take place with less disturbance and impact that might have been the case historically. Some examples include horizontal dripping reducing well numbers, electronic flow measurement reducing trips to the well, coiled tubing operations reduction completion time, etc. | The BLM is aware that changes in industry technology occur and the adjustments to stipulations will take place accordingly.  It is not necessary to make a statement as proposed by the commentor in the DRMP/EIS. |
| Fidelity Exploration and Production Co. | 221 | 6 | Several of the Areas of Critical Environmental Concern (ACECs) do not contain adequate justification for closing those lands to development.  Twelve of the 14 ACECs listed in the DRMP have existing leases.  While the leases would remain valid until they expire, the potential exists to limit future development in prospective areas because of ACEC designations.  This is not necessary as there are existing laws, stipulations, and policies to protect resources identified in many of the ACECs.

-NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs (Isle Royale, 154 F Supp. 2d at 1127; Trout Unlimited, 509 F.2d at 1284; BLM ACEC Manual 1613.06-4.) The DRMP, however, does little to disclose to the public how and on what information the proposed ACEC determinations were reached.

-New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP were nominated by various organizations.  There is a lack of disclosure about these submissions, however, as well as the materials serving as the basis of analysis by the BLM interdisciplinary team and how these procedures | See response to comments 214-4, 203-8, 203-9, 203-10, 203-11, 203-12, 203-13 and 203-14.

It should be noted that only 5 of the 14 ACEC proposals are designated in the preferred alternative.  The total acreage of those designated in the preferred alternative is 63,000 acres. |

BLM_0011110

| | | | | |
|---|---|---|---|---|
| | | | complied with existing BLM policy. THE DRMP fails to explain why other management prescriptions or designation in place are inadequate and necessitate the proposed ACEC designations.<br><br>-Regardless of how the ACECs were determined, the examination requires much more than merely examining the importance and relevance criteria. Disclosing this information allows the public to ascertain the quality of information used by BLM, of the source of information, and the availability of the information for public review.<br><br>-The DRMP fails to demonstrate that the proposed ACEC decisions meet the regulatory criteria of importance and relevance (43 VFR 1610-7-2) Secondly many of the identified resource values already receive adequate protection through other management prescriptions:<br><br>   -ACECs may be designated "where special management attention is required…to protect and prevent irreparable damage" (43 USC 1702(a). )<br><br>   -ACECs are unnecessary when other designations are adequate to protect a resource or value (BLM Manual 1613.51-53.) | |
| Fidelity Exploration and Production Co. | 221 | 7 | As development operations are proposed in the future, the BLM cannot attempt to impose new stipulations or COAs on Fidelity's existing leases that are inconsistent with its valid existing contractual rights. In addition to proposed closures or NSO stipulations, the BLM should also note that constraints associated with the management of other resources would not necessarily apply to exploration or development activities on leases that pre-date the DRMP. The DRMP cannot deny Fidelity's valid and existing rights to exploit its leases | Valid existing rights are considered Administrative Actions by the BLM and do not require a specific planning decision to implement. As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights. The BLM will work with and subject to the agreement of holders of valid existing rights to modify proposed actions or activities to reduce the effect of the actions or activities on resource |

| | | | | |
|---|---|---|---|---|
| | | | through COAs or other means. | values and uses.  These modifications may be necessary to maintain the choice of alternatives being considered during land use plan development and implementation, and may include appropriate stipulations, relocations, redesigns, or delay of proposed actions. |
| Fidelity Exploration and Production Co. | 221 | 8 | The Reasonable Foreseeable Development (RFD) section, which protects the amount of oil and natural gas development within the planning area is inadequate and would limit the opportunities to explore fore new resources. Preferred Alternative C projects 435 wells in the next 15 years.  Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of application for permit to drill (APD) activity.  Just based on 2006 APD data of 65 APDs, the 15 year projection should be at least 975 wells.  BLM should also solicit information about the potential for oil and gas development from the operators within the DRMP area to assist in the preparation of a realistic, potential reasonable foreseeable development. | See response to comment 203-15. |
| Fidelity Exploration and Production Co. | 221 | 9 | The RFDS for Big Flat-Hatch Point area is too low. BLM states: "The RFD is a hypothetical scenario which allows the discussion to focus the analysis of potential impacts" (p.4-83) Fidelity strongly urges the BLM to consider revising its RFDS in active cooperation with the oil and gas operators that hold leases in the Moab planning area to increase the projected well count.<br><br>The Moab Field Office issues RFDS as part of the RMP revision currently underway.  The RFDS projected that 60 wells would be drilled in the Big Flat-Hatch Point area over the next 15 years, 50 of which would be drilled on BLM lands (p.4-84)  This rate of activity equates to approximately four wells per year.  During 2007, Fidelity drilled two federal wells in the big Flat area and plans to drill one additional Federal well and possibly two State wells in 2008.  Fidelity anticipates | See response to comment 203-15. |

| | | | | |
|---|---|---|---|---|
| | | | additional activity in the Hatch Point area in the future. Fidelity is concerned that the level of oil and gas development in the Big Flat-Hatch Point area has been greatly underestimated by the RFDS, and that the level of impacts to other resources that may result within as few as seven years may exceed the level of impacts analyzed in the DRMP.<br><br>The DRMP was developed without use of the most recent data and/or with input from oil and gas lease holders.  The use of 1995 data drawn from the USGS National Assessment of United States Oil and gas Resources to provide the basis for oil and gas activity for the Paradox Basin (p.3-43) has resulted in a substantial underestimation of oil and gas exploration/development in this area.  Recent and proposed activity levels in the Big Flat-Hatch Point area, planned infill operation, or possible development  of unconventional wells using new technology were not considered in the description of the existing environment in the DRMP.  Thus, the analysis of future impacts that may result from oil and gas activity is critically flawed | |
| Fidelity Exploration and Production Co. | 221 | 10 | RFD guidance issued on January 23, 2004, states that an RFDS is not a planning decision, partially because it is speculative to project oil and gas activity fat into the future.  In 2004, the BLM issued an Instruction Memorandum (IM 2004-089) to provide clarification of the use of RFDS in planning.  The IM states, and the DRMP should reflect, that exceeding the number of projected wells may not result in exceeding the predicted level of associated environmental effects. Further, it states that mitigation of environmental effects through successful reclamation can percent the level of impacts from substantially exceeding the analyzed impacts.  The DRMP states that about 10 years may be required for reclamation to be successful (p.4-7) | See response to comment 214-28. |

| | | | Fidelity disagrees with a blanket 10-year reclamation period. BLM has not provided any data substantiating this conclusion.  While 10 years for successful reclamation may be appropriate for some areas of the Moab planning area, two to three years would be sufficient in other areas (e.g. grassy regions.) | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 11 | The BLM does not clearly associate possible resource management decision in the text with the maps | No specific comments are provided which can be evaluated. |
| Fidelity Exploration and Production Co. | 221 | 12 | Map 2-5-B<br><br>Fidelity does not understand with certainty what resource protective measures would be taken under alternative B that would preclude surface occupancy along the Highway 313 corridor, bit it surmises that it relates to visual resource protection.  The NSO constraint must be explained for this alternative because VRM II (Visutal Resource Management) assignment would not preclude occupancy.<br><br>Fidelity is actively seeking options for beneficial use of natural gas that may be produced in association with oil on Big Flat.  To that end, Fidelity objects to any management of the Gold Bar area with wilderness characteristics that would disallow issuance of a right-of-way (ROW) that may be required to permit the installation of a natural gas pipeline | The text on pg. 2-52 of the DRMP/EIS states under Alt B "scenic driving corridors would be designated as VRM Class II within a specified viewshed not to exceed 1 mile from centerline.  Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface distrubing activities (see Appendix C) within 1 mile of scenic corridors."  In addition this restriction is explained in Appendix C on pg. C-9.<br><br>Gold Bar is managed for wilderness characteristics only in Alt B. |
| Fidelity Exploration and Production Co. | 221 | 13 | Preferred Alternative C specifies a 0.6-mile buffer around all Gunnison Sage Grouse leks within approximately 175,727 acres of potential habitat, and a 0.5-mile buffer around all Greater Sage grouse leks within approximately 3,068 acres of habitat.  These buffers are excessive.  Normal practice throughout the Intermountain West is 0.25-mile buffers around leks, which is supported by research data and should be the same in the final RMP. | See response to comments 203-40, 203-41 and 203-42. |

| | | | | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 14 | Preferred Alternative C specifies that timing limitations would apply from March 20th to May 15th each year in the potential habitat for Gunnison Sage Grouse.  Also, timing limitations would apply from March 1st to May 15th each year in the potential habitat for Greater Sage Grouse.  The DRMP should instead specify a buffer around actual nesting habitat, as is common practice throughout the Intermountain West, rather than a blanket restriction for the entire potential habitat.  The highest concentration of nesting is within two miles of a lek. Therefore, the final RMP should only limit activity within a two-mile buffer around leks in the 175,727 acres of habitat for Gunnison and the 3,068 acres for Great Sage Grouse, rather than a blanket timing restriction in areas that may not have sage grouse. According to a study by R.C. Kaiser, (2006, Recruitment by Greater Sage-Grouse in Association With Natural Gas Development in Western Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. | See response to comment 203-40. |
| Fidelity Exploration and Production Co. | 221 | 15 | The DRMP states: "…if projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again" (p. 4-3).  The BLM should clarify the consequences of an RFDS that does not adequately project the number of wells that may be drilled within a 15-year time frame.  Does the BLM mean that the final RMP would require amendment?  If so, the BLM should re-examine the projections of future well development now that the DRMP would sufficiently address potential impacts from oil and gas development over 15 future years | See response to comment 214-28. |
| Fidelity Exploration and Production Co. | 221 | 16 | The DRMP states: "Only wells drilled during the first 5 years would be successfully reclaimed over the next 15 years…" (p.4-7). Reclamation following the removal of mature sagebrush and piñon-junipers may require | Based on BLM experience in the area, it can take up to 10 years to fully reestablish vegetative communities. Depending on the vegetation disturbed it could take much less time.  BLM objectives are to establish vegatative |

BLM_0011115

| | | | several years before the species composition and succession stage is similar to surrounding areas. Fidelity is aware that sagebrush and piñon-juniper communities are slow growing and may take as long as 25 years for sagebrush and up to 75 years for the piñon-juniper communities to reach maturity. Disturbance to grasslands without the presence piñon-juniper or sagebrush would facilitate reclamation much more quickly, perhaps in as little as five years with the addition of amendments or reclamation procedures that facilitate accelerate vegetative growth.  Such practices are amount the best management practices that may be used by Fidelity on a site-specific basis and should be recognized by BLM in the DRMP. | diversity and not a monoculture of grass. |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 17 | The DRMP reads: "For geophysical exploration the assumptions are that reclamation of disturbance would be successful within a scope of 10 years depending on reclamation times related to soils, vegetation, and rainfall…" (p.4-8).  The Federal Register notice dated August 18, 2007, allows the approval of geophysical exploration surveys with a categorical exclusion. The assumption that impacts resulting from geophysical exploration surveys would require 10 years for surface reclamation is in error and contradicts the premise of the categorical exclusion that such surveys are, in fact, a casual use operation whose impacts are sufficiently insignificant that they may b approved without an analysis by an environmental assessment or environmental impact statement if no new road construction is involved.  In fact, geophysical survey operations primarily require use of the surface, not disturbance of the surface.  The BLM should alter its language in addressing impacts that may result from geophysical survey operations to reflect the concept of "usage," where no grading and/o blading of the surface are required.  The inaccurate characterization of geophysical survey activities should be corrected | See response to comment 214-6. |

| | | | throughout the DRMP, including pages 4-16, 4-83, and all other references to "seismic disturbance." | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 18 | The DMRP fails to note that the use of alternative drilling technologies, particularly directional/horizontal drilling, typically greatly increases the time required to drill and results in increased emissions from drilling rigs | The analysis in Chapter 4 of the DRMP/EIS could not consider all the potential alternatives for drilling that could result in different drilling times and air emissions. On a land use planning level, the analysis must be made on some general assumptions. |
| Fidelity Exploration and Production Co. | 221 | 19 | Assumptions made to assess impacts should be uniform and consistent throughout the analyses for all resources. The DRMP does not make clear if this assumption was sued throughout the remainder of the document for the analyses of impacts to resources other than air quality. Another assumption states: "The assumptions for reclamation for oil and gas are that 50% of the wells drilled would be productive and 50% would be abandoned and reclaimed and revegetation would be successful" (p.4-7. p. 4-83). Without consistency, impacts to resources from each of the alternative cannot be compared. For example, Table 4.3 displays predicted surface disturbance without considering the 50% P&A assumption. | See response to comment 215-13. |
| Fidelity Exploration and Production Co. | 221 | 20 | The DRMP reads" "Flaring emissions applicable to this analysis were assumed to be primarily NOx and CO" (p.4-17). This assumption is incorrect. Flares are used to dispose of unrecoverable gas emerging concurrently with the crude oil. During flaring, gaseous methane reacts with atmospheric oxygen to form primarily carbon dioxide and water. Other, minor emissions from flaring include unburned hydrocarbons, CO, and other partially burned and altered hydrocarbons (HAP). Flaring operations usually achieve at least 98 percent combustion, such that hydrocarbons and CO emissions amount to less than two percent of the hydrocarbons in the gas stream (U.S. Environmental Protection Agency (EPA). 2005. AP 42, Fifth Edition Compilation of Air Pollutant Emission Factors, Volume 1: Stationary Point and Area Sources) | This assumption was based on the Vernal Air Quality modeling. See Trinity and Nicholls 2006 for justification of assumptions. |

BLM_0011117

| | | | | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 21 | The DRMP reads: "It was assumed that watering of all exposed disturbance areas…would occur as appropriate…a conservative control efficiency of 37%...was assumed…" (p.4-18).  This statement is contradicted in the DRMP:  "It was also assumed that…50% control of particulate emissions would be obtained by watering" (p.4-16) The DRMP should be corrected to consistently reflect the assumptions actually used in the quantification of impacts | Analysis assumptions relating to control efficiencies have been made consistent within the document and with modeling done for the Vernal FO. The assumptions include a 25% efficiency for watering and a 75% efficiency for graveling of roads. It is assumed that 10% of roads would be watered and 40% of roads would be graveled. |
| Fidelity Exploration and Production Co. | 221 | 22 | Table 1.10 in the DRMP estimates the number of compressors at each RFDS area at 0.063 compressor per well with a minimum of two compressors per RFS area (p.4-27)  Compressors are located in areas where natural gas is produced into pipelines.  The broad assumption allotting compressors to all RFDS areas may be inaccurate for RFDS areas where the predominate mineral produced is liquid hydrocarbons and/or where no pipelines exist for gas transport out of the area.  For example, the Big Flat area currently has no pipelines with which to transport natural gas.  Compressors would not be installed in this area unless a pipeline was constructed. | See response to 215-17. |
| Fidelity Exploration and Production Co. | 221 | 23 | Table 4.10 of the DRMP assumes that NSO areas are not open for development (p.4-27).  This assumption is used inconsistently throughout the DRMP. On page 4-84, the text reads: "Because the resource underlying SNO-stipulated surfaces are more difficult and costly to extract, developers are less likely to opt to develop…."  Fidelity contends that in those areas where geological/reservoir conditions would facilitate production from a horizontal/directional well bore and when economic conditions, including well costs, are favorable, horizontal/directional will be used and would likely be considered for NSO areas.  Consideration of horizontal/directional drilling is site specific; to assume, however, that the minerals beneath all NSO areas will not be developed likely underestimates the surface | On pg. 4-27 of the DRMP/EIS it states "for the purpose of analyzing impacts of mineral decisions on the total number of oil and gas wells, BLM lands designated as no surface occupancy were not considered for development. This is an analysis assumption regarding the impact of restrictions on the number of wells.  The BLM contends that the other analysis assumption the commentor refers to involving the greater difficulty and cost of drilling areas designated as no surface occupancy is accurate and is not inconsistent with the first assumption. |

| | | | disturbance resulting from oil and gas activity over the next 15 years as well as the resultant production | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 24 | The DRMP reads: "The potential risks associates with oil and gas development include geologic hazards…include seismic activity…" (p.4-61) "Seismic activity" should be replaced with "geophysical survey activity." | The statement referred to by the commentor is accurate and refers to the possiblility of seimic activity in the form of small earthquakes. |
| Fidelity Exploration and Production Co. | 221 | 25 | The DRMP reads: "A total of 370,250 acres would be ROW exclusion areas under Alternative C.  An Additional 217,480 acres where surface disturbance activities are limited are avoidance areas for new ROWs" (p.4-67)  The proposed restrictions/exclusions of future ROWs under all action alternatives may prevent Fidelity from delivering produced natural gas via pipeline to a distribution system already in place.  Moreover, in areas such as Big Flat where oil is the primary produced hydrocarbon, there is no distribution system for associated natural gas.  Fidelity may be forced to examine other means of disposal/use for the natural gas if ROWs were not available.  Preclusion of the issuance of ROWs may result in a loss of federal or state revenues, or a total los of the productive value of the resource.  Preferred Alternative C represents exclusion/restriction areas that comprise over 20% of the planning area.  Fidelity has not been provide sufficient information in the text in the form of maps that would allow it to evaluate possible impacts from proposed ROW management to its operations.  The DRMP lacks maps that show all areas where ROWs would be excluded and/or avoided.  To ascertain the effects of the implementation of the differing management strategies under each alternative, Fidelity must search through several maps describing proposed ACECs, non-Wilderness Study Area (WSA) lands with wilderness characteristics, wildlife habitat, high recreation use areas, scenic driving corridors, etc.  Fidelity cannot evaluate the possible impacts to its | See response to comments 203-22, 203-24, and 214-12. |

BLM_0011119

| | | | | |
|---|---|---|---|---|
| | | | current and future operations without the inclusion of maps that clearly illustrate the ROW exclusion areas | |
| Fidelity Exploration and Production Co. | 221 | 26 | The DRMP reads: "29,678 acres on split-seate lands, of which 9,617 acres (or 0.5% of all Federally leased lands) would be subject to NSO or closed to leasing" (p.4-87) Fidelity fails to understand how BLM can impose on NSO condition to the surface of a land which it does not own/administer.  The minerals may be closed to leasing because on split-estate lands, the management of the mineral resource lies within federal authority. BLM cannot, however, impose conditions on the sue of a surface that is not federal outside of the National Historical Preservation Act and Endangered Species Act | See response to comment 120-98. |
| Fidelity Exploration and Production Co. | 221 | 27 | Under Alternative B, DRMP read: "An estimate of wells foregone is…8 wells in the Big Flat-Hatch Point RFD area…"  (p4-94)  The area within this RFD where wells would be foregone cannot be determined with certainly from Map 2-24-B: however, to the extent that this area where wells would be foregone overlaps Fidelity's existing leases, the BLM estimate is likely in error. Fidelity will operate pursuant to its valid existing rights | See response to comment 124-4. |
| Fidelity Exploration and Production Co. | 221 | 28 | The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase I-The Uinta Basin

Prepared for:
Public Land Policy Coordination Office
Utah Governor's Office
5110 State Office Building
PO Box 141107
Salt Lake City, UT 84114

Prepared by:
Bureau of Economic and Business Research
University of Utah
1645 East Campus Center Drive | The BLM is aware of this study.  In addition, the Moab BLM has been given an advance copy of the study done for Grand County on the same subject.  This study was done by the University of Utah for the Public Land Policy Coordination Office.  Results from the Grand County study of oil and gas development have been added to chapter 4.

See also response to comment 203-25. |

| | | | Salt Lake City, UT 84112 <br><br> November 2007 | |
|---|---|---|---|---|
| Ruby Ranch | 264 | 1 | The maps outlining the White Wash "open area" are not in enough detail to make any detailed analysis of your proposals. | The White Wash open area comprises 1,866 acres east of the Ruby Ranch road.  It primarily encompasses the sand dunes proper. |
| Ruby Ranch | 264 | 2 | It is very clear that BLM intends to make a large area in White Wash "open" to motorized use. We request that any "open" areas do not directly border our private property and that there is an adequate buffer between our private property and any designated open area. Please include a .25 - .5 mile buffer to minimize the vandalism and destruction of property that has been occuring ( fence vandalism-- wires cut, posts used for firewood, gates destroyed-- also property  shot at, livestock hassassment, etc). See attached map. | The BLM proposes an open area of fewer than 2,000 acres in White Wash.  The open area is primarily the sand dunes themselves.  Everywhere else, all travel would be limited to designated routes.  The acreage of open area in the PRMP/FEIS has been greatly reduced from the acreage of open area in the No Action (current) alternative.  The southwest boundary of the open area has been adjusted to provide a buffer between the open area and the private property to accommodate the commentor. |
| Ruby Ranch | 264 | 3 | It is very clear that BLM intends to make a large area in White Wash "open" to motorized use. Noise level limits should be implemented. We have been kept awake all hours of the night. It disturbs wildlife and livestock as well. Even other motorized recreationists have commented to us on this. Cities and Counties have been using noise level restrictions in areas of OHV use as far back as the 1970s.These should be implented.  Is it possible to implement an hour restrictions for the open area? Even if the actifity in the open area as allowed bdetween 6 AM and 11 PM and closed from 11PM to 6 AM, it would be a huge benefit to us and the majority of OHV people who come out here. | Noise level limits on machines are a matter of state law. See response to comment 122-7. |
| Ruby Ranch | 264 | 4 | Please consider making sure there are at least several strategic locations on each BLM grazing permit where there is no OHV use allowed. This would allow cattle that are being harassed to have some areas they could go to escape. | All OHV use outside the Dunes themselves have been limited to designated routes.  This would provide cattle with escape from motorized uses. |
| Ruby Ranch | 264 | 5 | We are requesting that the area close to the Ruby Ranch and north of the Ruby Ranch Ranch road , where there are no currently roads or designated trails | The area referred to by the commentor is not within the Dee Pass Motorized Focus Area in Alt C.  The area has been limited to designated routes in the PRMP/FEIS. New |

| | | | | |
|---|---|---|---|---|
| | | | be left closed to OHV use so that livestock and wildlife have a safety zone. | route construction would be minimized in this area because it is not within a focus area intended to provide for such uses.  Any new route authorized in this area would be required to undergo site specific NEPA analysis.<br><br>The Dee Pass Motorized Focus Area was drawn to specifically exclude the area to the north of the commentor's property. |
| Ruby Ranch | 264 | 6 | White Wash and Salt Wash are definitely riparian zones. They are acknowledged as such in the EIS for the Ruby Ranch Allotment. However, it seems that this fact is minimized in the Moab RMP. In section 4.3.11.2, page 4-241, it states that "stipulations require that no surface disturbing activities within 100 meters of riparian areas".  In many other areas of the Moab RMP, it highlights and emphasizes the fact that the riparian areas within the Moab RMP area are both rare, unique and should be protected.  They are in fact critical zones for watersheds, veg and wildlife, but  in the past 20 years, White Wash has been horribly desecrated and Salt Wash is showing significant damage form OHVs. | The BLM acknowledges that motorized travel in washes can impact riparian values.  By limiting travel to designated routes, many washes will be spared motorized travel.  There are some washes, however, that would be designated for motorized travel in the Travel Plan. |
| Ruby Ranch | 264 | 7 | On pages 2-37 of the RMP it talks about how permits for motorized recreational use may be required if monitoring indicates long-term damage. Overwhelming long-term damage by OHV use has already been documented in the EIS for the Ruby Ranch Allotment. Permits should definitely be required for motorized use in high impact areas, especially riparian zones. | The statement referred to by the commentor applies to Ten Mile Wash.  Within Ten Mile Wash, motorized travel is limited to the marked, designated route.  The statement on pg. 2-37 of the DRMP/EIS means that if there were continued use off the Ten Mile route, permits for this one route could then be required. |
| Ruby Ranch | 264 | 8 | I would suggest closing the upper portion of White Wash to all motorized use. | The commentor provides no specific evidence as to why the upper portion of White Wash should be closed, nor is the "upper portion" of White Wash defined. |
| Ruby Ranch | 264 | 9 | There are many roads and trails that have been created in these areas in the last 20 years. Many of the roads and trails have been included in BLM planning and have been included on the Moab BLM planning maps. Many of these roads and trails were created in violation of BLM policy. Many were included in the inventory after | The BLM acknowledges that the singletrack motorcycle routes included in the DRMP/EIS analysis were user made.  Those that were made in "open" areas were not in violation of any law.  Those that were made in "limited" areas may have been in violation, but it is difficult to prove what was "existing" prior to 1985, which was the |

| | | | | |
|---|---|---|---|---|
| | | | someone on an OHV logged their favorite trails on a GPS and brought them into the Moab FO. Have these newly constructed roads and trails has to undergo any significant scrutiny? | timeframe of the RMP which limited travel to existing routes in some areas of the Moab planning area. This difficulty is one reason why the current plan revision does not propose that any area be limited to existing roads -- all routes in the travel plan are to be limited to mapped, designated routes.<br><br>Appendix G explains the Travel Plan process. County-submitted route data was verified by BLM using random sampling techniques.  All route data submitted by the public was verified on the ground by BLM staff.  Those routes that actually existed on the ground  were considered in the Travel Plan formulation.  Those routes that presented resource conflicts (those resources are listed in Appendix G) were not designated in one or more alternatives.  Thus, the BLM provided scrutiny" regarding those routes that are to be designated in the Travel Plan accompanying the PRMP/FEIS.<br><br>After the Record of Decision, all new routes must undergo a case by case NEPA analysis.  Travel off those routes designated in the Travel Plan will be illegal.  The legal routes will be known, mapped and incontrovertable. |
| Red River Canoe Company | 283 | 1 | The 90-day comment period was entirely too brief to allow the average public time to peruse the draft RMP. | See response to comment 124-1. |
| Red River Canoe Company | 283 | 2 | Many routes on the travel plan map (Alt C) run within a half-mile or less from one another and arrive at the same destination. (See areas north of Dead Horse Point S.P., Mineral Point, Gemini Bridges area, Black Ridge, and Canyon Rims for instance) This cannot possibly be a defined purpose and need (as required by the BLM instruction memoranda on designating routes) for each of these redundant routes. If there is a low purpose and need for a route, even if there are no resource conflicts present, the routes need to be taken out. Its mere existence is not grounds for designation. A | A purpose and need was identified for each road not eliminated from Alt. C.  Oftentimes, this determination was made by seeing that the route had been used for travel within the past time frame.  Adjustments to the travel plan can be made a later date, should it be demonstrated the route is not in use. |

| | | | purpose and need must be present. | |
|---|---|---|---|---|
| Red River Canoe Company | 283 | 3 | While travel-planning looks at impacts generated by each individual route segment, the cumulative impact of a 3,693-mile route network (alt C) is not addressed. Even though the impact of road construction already exists out there, BLM is not taking into account the additional and probably impacts of people traveling off-trail (there are countless incidences of this), nor the benefit to wildlife, soils, and habitat of allowing currently constructed roads to reclaim themselves. | Off route travel constitutes illegal activity, and is not the focus of the analysis of the RMP.  The BLM has removed over 2500 miles of routes for the reasons mentioned by the commentor. |
| Red River Canoe Company | 283 | 4 | BLM mandates state that new route construction must first go through rigorous environmental assessments before construction may begin. Why is that existing routes never underwent such assessments and never will? This is an inconsistency in management regulations, to the detriment of uninventoried resources. | Routes that were constructed prior to FLPMA (1976) were not subject to NEPA analysis. |
| Red River Canoe Company | 283 | 5 | Routes to the Labyrinth Canyon area also conflicts with current river management and use. The Price FO wrote the plan for the river and found it to have Wild and Scenic values, but such values are blatantly ignored by the Moab FO which plans to designate routes along the river, from Mineral Bottom upstream. Nothing precludes motorized recreationalists from camping on the river – a direct conflict with existing river use – and motorists aren't required to follow the same rules as river users (like using fire pans, hauling out trash, collecting human waste, etc). | Should vehicle camping along the Green River be deemed a resource conflict, this type of camping can be curtailed without a plan amendment being required.  The instances of camping use from the Mineral  Bottom boat ramp upstream to Hell Roaring Canyon are not common, nor has a conflict been reported to the BLM from this type of activity. |
| Red River Canoe Company | 283 | 6 | On the subject of local business, BLM makes blanket assumptions about the economic impacts of its plan (i.e. that motorized access and extractive industry opportunities will enhance Moab's economy) with no study to back up these postulations. In fact, in looking at the NVUM data, more motorized use and extractive industry will drive away the bulk of Moab's visitors who come here for a quiet, natural experience. As BLM turns more backcountry areas into front country managed recreation sites (alt C creates five new campgrounds in | See response to comments 124-2, 124-133 and 124-134. |

| | | | | |
|---|---|---|---|---|
| | | | areas farther a field than current sites), visitors are setting up camp and recreating farther away from Moab and are less likely to even come into town and spend money. Everyone from restaurants to retail shops to gas stations will be affected. | |
| Lisbon Valley Mining Co | 286 | 1 | The draft RMP documents coordination with adjoining RMP's including Vernal, Grand Junction, Uncompahgre, Dolores, and Price Fos (BLM 1985b, 1985c,1985d, 1987, 1989a, 1993a). These documents were developed in the 1980's and early 1990's. It is difficult to tell whether these reviews included newer mineral development and recent commodity price increases. | The Mineral Potential Report and the Reasonably Foreseeable Development Scenario were prepared for the current planning effort.  These two reports were done in conjunction with the Utah Geological Survey, and are dated 2005. |
| Lisbon Valley Mining Co | 286 | 2 | Scoping appears top emphasize environmental protection over the intended multiple use concepts mandated by FLPMA. Example- BLM asks for "nominations for Areas of Critical Environmental Concern (ACEC's) and nominations for rivers for potential inclusion in the National Wild and Senic Rivers System. No where in the process is there similar opportunity to nominate or designate mineral areas or mining districts." One example is the overlapping development potential for lacatable minerals (copper, uranium, and limestone) and oil & gas in Lisbon Valley. | The Mineral Potential Report (2005) prepared for the Moab RMP details the mineral potential of the planning area.  This report was done in conjunction with the Utah Geological Survey. |
| Lisbon Valley Mining Co | 286 | 3 | How has Critical Issue #2. (What areas will be available for mineral development, and what restrictions should be imposed?)  Related to mineral development in the draft RMP been evaluated? | The Utah Geological Survey assisted in the preparation of the Mineral Potential Report and the Reasonably Foreseeable Development Scenario.  These reports were prepared in 2005 for the Moab RMP revision effort.  Both of these reports are available on the Moab RMP Internet site.  Hard copies of these reports are also available on request. |
| Lisbon Valley Mining Co | 286 | 4 | The RMP references three EIS's within the Moab Field Office Area that were developed as part of planned economic development. This tends to skew results, management and recommendations towards the preservation of environmental and wilderness characteristics. | Socioeconomic Baseline Report for Grand County and a Socioeocnomic Baseline Report for San Juan County were prepared specifically for the current planning effort. These reports were prepared in 2004;  they are available on the Moab RMP Internet site, as well as by request. |

| Lisbon Valley Mining Co | 286 | 5 | The Minerals Section of Chapter 3 covers 22 pages of data on the minerals in the Moab FO Area. This section appears comprehensive and well documented. The mineral potential is clearly significant when compared to other resource descriptions, yet other disciplines appear to receive a higher ranking of importance with management. | The Minerals Section of Chapter 3 represents a summary of the information found in the background documents concerning minerals -- the Mineral Potential Report and the Reasonably Foreseeable Development Scenario. The "minerals discipline" has received much attention in this RMP. |
|---|---|---|---|---|
| Lisbon Valley Mining Co | 286 | 6 | In the assumption used for mineral development (Section 4.1.3) there is discussion of the fact that the Oil and Gas section needed to be revised due to escalating prices due to demand. However, there is no similar consideration for minerals. If you look at the prices and projections for the demand of copper, uranium, gold, aggregate, and other minerals, the demand world wide is expected to increase and warrents greater expansion consideration than what was presented in the Draft RMP. If you look at copper alone, the permitting of Lisbon Valley was done when copper prices were around $0.70/pound. Current prices are more than 4 times greater than in 1996. The BLM should provide the back-up for their projections (especially prices and projected acreage). These estimates should be a function of geology, reported reserves, and prices. | The BLM is aware of the fact that minerals prices have risen over the past year.  However, the commensurate contribution of hard rock minerals to the economic analysis in the RMP remains stable.  Furthermore, copper, uranium and gold are all locatable minerals.  The RMP makes no decisions regarding locatable minerals. |
| Lisbon Valley Mining Co | 286 | 7 | The Draft RMP tends to project "adverse impacts" to mineral development, including "unquantifiable risk" to cultural resources. It fails to balance this with the favorable impacts. Aside from economic benefits to both private and public sectors, mineral development expends greater resources to study the affected environment. Modern mineral development provides a vast amlount of environmental information. This leads to a better understanding of a particular area/discipline, and provides the framework for land use management. Not all impacts from mineral development are adverse. BLM has worked closely with LVMC to mitigate environmenal impacts in Lisbon Valley. Specific favorable impacts include detailed hydrologic studies, | The land use plan analyzes activities on a broad, landscape level.  The actions mentioned by the commentor have been developed on a site specific, project level.  The BLM does not deny the contribution of such mitigating actions by mineral development companies. |

BLM_0011126

| | | | | |
|---|---|---|---|---|
| | | | geochemical studies, and comprehensive cultural studies. Hydrologic work has served to characertize groundwater occurrence, quality and movement in an area previously devoid of comprehensive technical information. Geochemical studies address soil conditions and potential amendments necessary to reclaim rangeland to higher standards. Wildlife mitigation includes rangeland rehabilitation, surface water harvesting and spring rehabilitation plans with specific objectives to offset the impacts of ongoing drought. Cultural work includes detailed inventories of cultural resources, and comprehensive synthesis of Prehistoric Archaeology. These collaborative efforts are clearly favorable impacts of mineral development. | |
| Lisbon Valley Mining Co | 286 | 8 | The seperation of mineral impacts with other geologically related resources (i.e., paleontological resources) is erroneous, as they are related. Pitting one discipline against another is wrong in this instance. As stated earlier, the ability to gather information as part of a proposed development project affords the best ability to obtain data for management decisions. | The RMP analyzes the impacts of decisions concerning one discipline with the effects upon another discipline. There is no attempt to "pit" disciplines against one another. The site-specific instances mentioned by the commentor are mitigations developed at the project level. They are not analyzed in the RMP process. |
| Lisbon Valley Mining Co | 286 | 9 | The evaluation and designation of ACEC's is a one-sided look at impacts. In the Draft RMP, the BLM has looked at development impacts on ACEC's. In the case of mineral and other resource development, ACEC's could adversly impact potential resource development adjacent to ACEC's. As such, it appears the BLM would intend to place greater restrictions on the proposed development. | The preferred alternative manages 63,000 acres in five ACECs. There are restrictions placed on leasable and saleable minerals (but not locatable minerals) in these areas. The effects of restrictions on minerals in these 63,000 acres are disclosed in Chapter 4 of the DRMP/EIS. |
| International Adventure Tours | 287 | 1 | Installing fences around the cottonwood trees and "water sources" at the White Wash Sand Dunes is impractical and not necessary and will only add unnecessary costs. It has been our experience that the public at large are interested in being responsible users. Therefore, making it an educational matter seems more relevant – install a marker/sign indicating the value of protecting the trees and water sources would be as | See response to comments 208-3 and 479-6. |

| | | | effective both in purpose and cost. | |
|---|---|---|---|---|
| International Adventure Tours | 287 | 2 | The open area at White Wash in Alt C and D must be expanded. | See response to comment 123-35. |
| International Adventure Tours | 287 | 3 | We would like to see BLM seek answers through a more active effort to involve these resources [various interest groups] rather than closing use due to BLM's inability to provide the needed resources to keep the land open and appropriately managed. | Involving interest groups and volunteers does not require a planning decision.  BLM is required to keep lands open to cross country travel only when there are no resources at risk.  Vegetation, cultural resources, wildlife habitat and other natural resources are generally at risk when cross country travel is allowed. |
| International Adventure Tours | 287 | 4 | There has to be other answers or solutions that do not exclude the greater majority of the users that the proposed alternatives do. We ask that you reconsider alternatives outside of the ones proposed that will allow broader multiple user access. | There are over 3,000 miles of route open to travel in the preferred alternative.  Almost all lands within the Moab Field Office are readily accessible by motorized travel. The commentor offers no specifics as to the "broader multiple use" being referred to. |
| Delta Petroleum Corporation | 306 | 1 | Alternatives B and C in their present forms, fail to satisfy direction, mandates, and principles articulated in the Energy Act of 2000, the Energy Policy Act of 2005 and Executive Orders 12898 and 13211. Alternatives B and C do not adequately represent a balance between conservation, resource development and other multiple uses and would severely impact and limit growth of the economy within this region. If implemented, Alternative B and C would also significantly restrict oil and natural gas development throughout the planning area due to overly burdensome and unnecessary land use restrictions. | See response to comment 210-2. |
| Delta Petroleum Corporation | 306 | 2 | The BLM is mandated under FLPMA to encourage multiple uses of federal land. The multiple uses are not mutually exclusive and can co-exist in a number of ways. With appropriate planning, mitigation, and management of impacts, the BLM can allow these uses to occur in ways that conserve and protect the environment for the enjoyment, use, and benefit of all and future generations. | See response to comment 121-1. |
| Delta | 306 | 3 | The multiple use mandate can achieve a diversification | The economic benefits of oil and gas development have |

| | | | | |
|---|---|---|---|---|
| Petroleum Corporation | | | and expansion of the local economies. Encouraging resource development and all the other myriad uses that may be undertaken on public lands should be paramount concerns of the BLM. The result will be stable local economies and potentially bright futures for the residents of these communities and the country.<br><br>The BLM needs to recognize within the RMP that the balancing of multiple uses must still provide for economic growth and stability in the planning area and not overly restrict those uses in favor of ones that limit or eliminate the few economic opportunities that exist for residents of the MRA. | been fully disclosed in the DRMP/EIS on pgs. 4-259 through 4-265. |
| Delta Petroleum Corporation | 306 | 4 | The BLM should not consider the description provided for in alternatives B and C since they do not accurately portray what is included in each alternative. Under NEPA a no action alternative is included to establish a basis for evaluating impacts from changes to the existing management plan. | The commentor has not provided any information on how the descriptions of the alternatives are not an accurate portrayal. |
| Delta Petroleum Corporation | 306 | 5 | We do not believe that the full economic impact of Alternative C was adequately considered, particularly with respect to both resource development and motorized recreation. | The commentor has not provided any infomration regarding the inadequacy of the economic impacts discussed in Chapter 4 of the DRMP/EIS. |
| Delta Petroleum Corporation | 306 | 6 | The economic analysis presented in the DEIS is based on old and outdated information with respect to oil and gas development. It relies on data from 2003 and older. The economic picture, development activities and approaches to resource extraction have undergone a major shift in the last 7 years based on several factors including demand for energy resources, federal policy and legislation and rises in energy costs. It is critical that the DEIS depend on the best and most recent data available. The analysis on oil and gas resources does not rely on available recent data, but primarily on information prior to 2004 which does not reflect changes in the economy, need to increase domestic supplies of energy, impacts of high energy costs on | See response to comment 220-1.  Additional data has been added to Chapter 4 of the PRMP/FEIS pertaining to oil and gas employment, potential impacts to State revenues from oil and gas restrictions, information on property taxes and information on severance taxes.<br><br><br><br>On pgs. 4-259 through 4-265 |

| | | | communities and federal resource priorities from the Energy Policy Act of 2005. That information is readily available from both State and Federal sources, including some information in 2007, yet none of this recent information has been included in the DEIS. This is a major flaw under NEPA, since readily available information should be used for decision-making. This affects economic impacts and projections within all of the alternatives. Since this information is readily available, the BLM should amend the DEIS to reflect that information. A decision that affects land uses for the next 15-20 years should not be based on faulty assumptions and old information. | |
| Delta Petroleum Corporation | 306 | 7 | Alternative C contains five Areas of Critical Environmental Concern (ACEC) that do not seem to have adequate justification for closure to development. Twelve of the fourteen ACECs already have existing leases. While the ACEC has been identified the information used to determine the need for the ACEC and the area to include in it has not been provided and is required by NEPA. | See response to comment 203-9 and 203-10. |
| Delta Petroleum Corporation | 306 | 8 | Analysis of risk versus multiple use is not present in the DEIS, so there is no way to evaluate how the BLM can reach the land restrictions proposed for the ACEC's. In addition, there are a number of existing laws, regulations and policies to protect the water, air, cultural, and other resources identified in the ACECs. In what appears to be a failure to meet regulatory requirements, the RMP contains little in the way of explaining to the public how the BLM reached the designations and proposed land restrictions. | See response to comment 203-13. |
| Delta Petroleum Corporation | 306 | 9 | Several of the proposed ACECs overlie existing utility corridors within the MRA. The existing and future use of these utility corridors needs to be recognized and protected within any new designation of an ACEC. This is particularly true for the proposed Upper Courthouse, Wilson Arch, Cisco White Tailed Prairie Dog Complex, | None of the ACECs identified by the commentor are within the Proposed Alternative.  There is not a conflict with the utility corridor identified for the Proposed Alternative in the PRMP/FEIS. |

| | | | and Colorado River Corridor ACECs. | |
|---|---|---|---|---|
| Delta Petroleum Corporation | 306 | 10 | The DEIS uses an estimate of 15 acres per well for impact analysis. However, in other recent RMP's a 5 acre estimate is used. The basis for using a figure 3 times larger than used in other RMP's has not been provided. The impact analysis should reflect a 5 acre impact as used elsewhere by the BLM or a justification should be provided in the DEIS for the need of a policy change for this MRA. | See response to comment 203-38. |
| Delta Petroleum Corporation | 306 | 11 | There is ongoing reclamation of impacts from exploration and development. This is often required within site specific lease stipulations and should be recognized in the DEIS. | On pg. 4-83 of the DRMP/EIS it states that revegetation will be successful within a scope of 10 years (for oil and gas development). |
| Delta Petroleum Corporation | 306 | 12 | The Energy Policy Act of 2005 and Executive Orders 12898 and 13211, asked that the BLM identify and remove roadblocks to energy development on federal lands. | See response to comment 210-2. |
| Delta Petroleum Corporation | 306 | 13 | On September 28, 2007, the Utah BLM canceled its November 13th lease sale covering 141,717 acres. The financial impact of this cancellation can be measured by taking the average price per acre paid at the previous lease sale of August 21, 2007 of $31 per acre times 141,717 acres to be sold. The projected value of this sale would have been over $4,500,000. However, that number does not take into account lost wages, royalty payments, taxes and other economic benefits related to production from that acreage. Nor does it take into account the shift in trade balance from domestic production versus foreign importing of oil and gas resources. These are important considerations that must be included within the economic analysis for this DEIS. | This action does not pertain to the current land use planning process.  See also response to comment 220-3. |
| Delta Petroleum Corporation | 306 | 14 | The economic value of proposed land restrictions must be evaluated for both economic losses and penalties to the resource industry as well as the economic value produced by protections to those lands ecological or | See response to comment 220-3. |

| | | | | |
|---|---|---|---|---|
| | | | other perceived benefits. Economic impacts occur both from lost extraction as well as ecological and social benefits. The value of a pristine vista must be weighted against the temporary impact to that vista from oil and gas development in implementing land use restrictions. It is not an either or decision, nor an irrevocable commitment of resources in this case. A true valuation of both sides of the equation is needed to reach a truly balanced decision on how to administer multiple land use policies. Such evaluations and consideration shave not been presented within the DEIS. The BLM has not presented a rationale for reaching a balance as claimed in alternative C. | |
| Slate River Resources | 312 | 1 | We believe the lands in Townships 16 South, Ranges 24 and 25 east should not be designated as lands with wilderness characteristics, but should be left in multi-use designation. I have enclosed a plat that shows the number of existing wells in the area of Sections 2-4 and 6-T16S-R25E and Sections 9 and 10-T16S-R24E. *See attached map. | These lands (in the Hell's Hole area) are not designated as lands with wilderness characteristics in the preferred alterantive. |
| Slate River Resources | 312 | 2 | In addition to the well activity, Monument Ridge Road runs through these sections eventually connecting with Seep Ridge road. This is a major agricultural and oil field access between Vernal and Fruita. | Hell's Hole is not designated to be managed to protect its wilderness characteristics in the preferred alternative. |
| Dolar Energy | 423 | 1 | The Reasonable Foreseeable Development (RFD) scenario for oil and natural gas development within the planning area is inadequate. The Alternative C (which is the preferred alternative) projects 435 wells in the next 15 years. I believe this to be far below the levels that should be anticipated. | See response to comment 214-1. |
| Dolar Energy | 423 | 2 | With respect to oil and gas resources, BLM Manual 1624, Planning for Fluid Minerals, specifically directs BLM not only to identify which areas would be subject to different categories of restrictions as included in the DRMP/EIS, but also to show that the least restrictive lease stipulation that would offer adequate protection of a resource has been selected. BLM failed to provide | See response to comment 214-9. |

| | | | this critically important analysis in the planning document. This omission is of critical concern because it demonstrates that BLM has not carefully considered the effect of restrictive lease stipulations or permit conditions of approval (COA) on current and project future oil and gas activities in the area. Given the fact that the plan will be used to make future decisions on activities, this lack of analysis is a fatal flaw. | |
|---|---|---|---|---|
| Dolar Energy | 423 | 3 | Alternative B is very restrictive for human use, and I am very concerned about the proposal to manage so-called "non-Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness. There is no justification and no mandate in the Federal Land Policy and Management Act (FLPMA) and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness Review. The question of which lands should be included in the National Wilderness Preservation System will be a decision of Congress. Other than the management of existing WSAs, the BLM should have no part of this issue. To do so would obviate that FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of energy resources for the state and nation. | See response to comments 214-17, 214-18, 214-19, 120-8 and 121-10. |
| Dolar Energy | 423 | 4 | In the Moab DRMP/EIS, the BLM has failed to adequately consider reasonable access to federal and private minerals and to consider the effects its proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy. A recent study by the University of Utah's Bureau of Economic and Business Research found that the oil and gas industry provides for jobs that receive wages 86% higher than the average wage for recreation jobs. Artificially limiting energy development in the Moab Planning Area will deny the local economy | See response to comment 203-25. |

BLM_0011133

| | | | | |
|---|---|---|---|---|
| | | | of similar benefits. The Moab BLM also must take into consideration the loss of income the state of Utah is denied from rental payments, royalties, and taxes that industry and business provide, that are lost when lands are locked away. | |
| Dolar Energy | 423 | 5 | I would also suggest the BLM sell No Surface Occupancy leases rather than lock up areas with no leasing opportunities. Future technology may allow the ability to reach minerals to develop them without disturbing the surface. | The preferred alternative uses the "no surface occupancy" restriction (rather than closed) wherever possible to protect resources.  The only discretionary areas that are closed to leasing in the Preferred alternative (25,306 acres) are those that are further than one mile from lands on which occupancy can occur.  The DRMP/EIS specifically states (on pg. 2-15) that "should technology change, a Plan Amendment would be initiated to place these 25,306 acres under an NSO stipulation for oil and gas leasing.". |
| Intrepid Potash | 435 | 1 | In the Moab DRMP/EIS, the BLM has failed to adequately consider reasonable access to federal and private mineral resources and to consider the effects its proposed management strategy will have on current and future mineral exploration and development activities, and on the rural economy. Artificially limiting mineral development in the Moab Planning Area will deny the local economy of substantial economic benefits. | Access to federal minerals has been considered throughout the RMP process.  The impacts of restrictions on mineral activity to mineral production are outlined in Chapter 4 of the DRMP/EIS in Section 4.3.7.  The economic benefits of mineral development are analyzed in Chapter 4 of the DRMP/EIS and are detailed in Section 4.3.12.2.7.  The contribution of mineral development in the economy of the Moab Planning area has been studied by the University of Utah.  The BLM has also incorporated data from its study, "The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry: Phase III - Grand County."  This recent study (January, 2008), commissioned by the State of Utah, confirms the relatively minor contribution that minerals development makes to the planning area's economy. |
| Intrepid Potash | 435 | 2 | There is no justification and no mandate in the Federal Land Policy and Management Act (FLPMA)  and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness Review. The question of which lands should | See response to comments 120-8 and 121-10. |

BLM_0011134

| | | | | |
|---|---|---|---|---|
| | | | be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so would obviate the FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of mineral resources for the state and nation. | |
| Intrepid Potash | 435 | 3 | The designation of areas within the Cane Creek Known Potash Leasing Area ("KPLA") as Closed or Open Subject to No Surface Occupancy in the DRMP/EIS will unnecessarily limit the development of potash resources within the Cane Creek KPLA and within the Moab Planning Area as a whole.<br><br>According to the DRMP/EIS, the analysis of "Open Subject to No Surface Occupancy" stipulations "assumes that development and production of the underlying mineral resources are administratively available by directional drilling from outside the area." Although some mineral resources may be efficiently extracted with directional drilling, directional drilling may not always be possible or feasible. Some "Open Subject to No Surface Occupancy" designation within the Cane Creek KPLA could effectively close the designated areas to potash exploration and development.<br><br>Cane Creek KPLA is the most significant of the three existing KPLAs in the Moab Planning Area, and the site of the only commercial production of potash in the Moab Planning Area. Notwithstanding the fact that it is the largest KPLA, Cane Creek KPLA covers a very small percentage of the Moab Planning Area. Closing portions of the Cane Creek KPLA to the development of potash resources through the imposition of either "Closed or "Open Subject to No Surfact Occupancy" restrictions would provide little over all benefit to the | Valid existing rights are not affected by the current planning effort.  See response to comment 214-4.<br><br>New leases would be subject to the restrictions imposed in the PRMP/FEIS.  The Cane Creek Known Potash Leasing Area is partially open to leasing with no surface occupancy.  It is true that the mineral resources in these areas would only be available by directional drilling.  The areas in the KPLA that are closed are within the Behind the Rocks WSA and have been closed since that WSA was established.<br><br>The determination has been made in the DRMP/EIS that the other values in the area outweigh the value of the mineral resource. |

| | | | | |
|---|---|---|---|---|
| | | | Moab Planning Area, while effectively stifling the only viable commercial potash production within the Moab Planning Area. Regarding the Cane Creek KPLA, the agency should implement the Oil and Gas Leasing Stipulations set forth in Alternatives A or D. | |
| Intrepid Potash | 435 | 4 | The DRMP/EIS contemplates the establishment of several Areas of Critical Environmental Concern "ACEC" which encompass portions of the Cane Creek KPLA. Only a  very small portion of the MPA contains workable potash deposits, the most significant of which are located in the Cane Creek KPLA. Restrictions on potash mining attendant to the establishment of ACECs could significantly limit the exploration for and development of potash resources within the Cane Creek KPLA. The agency should designate any ACECs in or near the Cane Creek KPLA in a manner that does not substantially interfere with the extraction of potash. | The Shafer Basin/Highway 279/Long Canyon ACEC partially overlays the Cane Creek KPLA.  This ACEC is established to protect the scenic values of the area, including the views from Dead Horse Point State Park, as well as wildlife values.  Restrictions on potash mining were considered in the designation of this ACEC;  the relevant and important values of the ACEC were deemed to be more important than the potash deposits. |
| Intrepid Potash | 435 | 5 | Under Alternatives B and C of the DRMP/EIS, portions of the Cane Creek KPLA are designated as VRM I and II. As noted in the DRMP/EIS, "designation of an area as VRM Class I essentially closes the area to mineral resource activity" and "meeting VRM Class II objectives imposes additional costs on mineral resource developers." Exploration for and development of potash deposits are valid and important uses of the area within the Cane Creek KPLA. The Visual Resource management designations proposed in Alternatives B and C will significantly limit the development of the largest and most viable KPLA in the MPA. | See response to comment 214-4 for the issue of valid existing rights.  Any rights currently held in the KPLA would not be affected by the PRMP/FEIS.

VRM restrictions in the area of the Cane Creek KPLA were imposed to protect the scenic values of the area. The visual resources of the area are of importance nationally and internationally, and VRM restriction have been imposed in this RMP to protect those important values. |
| | 637 | 1 | Trail segments that should be included: Flat Iron Mesa – From about 4346450 N 636300 E heading NW to the pipeline road. From about 4345600 N 634700 E going SW to Plan trail 2. From 4246200 N 633400 E going SW to the county B road 4. From about 4242400 N 633400 E south then east to the plan road. | See response to comment 206-17. |
| | 637 | 2 | Trail segments that should be included: Strike Ravine – A portion of the "Big Ugly" hill at about | The Strike Ravine Jeep Safari route in its entirety is in all travel plan alternatives. |

| | | | | |
|---|---|---|---|---|
| | | | 4254500 N 636600 E. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right of way in claim court). | |
| | 637 | 3 | Trail segments that should be included:<br>3-D Trail – From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See response to comment 206-11. |
| Union Telephone Company | 751 | 1 | In the Final EIS and revised RMP, The BLM should continue to leave most of the Moab Resource Area open for wireless communications infrastructure. Specifically, the BLM should adopt Alternative A or Alternative D because they would allow the siting of wireless communications infrastructure on a large percentage of BLM-administered land, while adopting fewer restrictions on the types o f uses and facilities. | Any application filed for establishment of a new communication site wiould be evaluated on a case-by-case basis. Generally, communication sites require locations with a high elevation for site distance, adequate access, and a power source. Where the infrastructure is not already present, these needs must be considered as part of the project that is analyzed through the NEPA process. The resources identified for protection in Alternatives B and C may be a factor in decisions affecting new communication sites regardless of which plan alternative is selected. |
| Holiday Expeditions | 980 | 1 | I would like BLM to consider designating some buffer zones next to the quality lands that should exist along the borders of State and National Parks. These buffer zones would guard against the pollution of sight, smell, and noise that are going to exist on certain BLM lands. Also, BLM should provide buffer zones along the Green River and the undeveloped lands that are left next to the Colorado and Dolores Rivers in the Moab District. | The preferred alternative manages lands along the Green, Colorado and Dolores rivers as no surface occupancy for oil and gas development as well as all other surface disturbing activities. A no surface occupancy stipulation has also been placed on BLM lands surrounding Dead Horse Point State Park. In addition, a VRM II designation has been placed along the border of Arches National Park. |

| GOVERNMENT | | | |
|---|---|---|---|
| **Organization** | **Record ID & Comment Number** | **Comment Text** | **Response to Comment** |
| Arches National Park | 8 | 1 | In Section 3.2, Table 3.2 of the draft RMP/EIS, there are only ozone concentrations for La Plata County and Mesa Verde National Park in Colorado included, though ozone has been monitored at Canyonlands National Park for a number of years and is considerably nearer the area of interest. Those data shouuld be included in the EIS, as well. NPS data shows a deteriorating trend for ozone, which may reflect more current data than that used for the RMP. Data for 2005 are available at www2.nature.nps.gov/air/monitoring/ads/ADSReport.cfm. | This data has been added to applicable table in Chapter 3 of the PRMP/FEIS. |
| Arches National Park | 8 | 2 | The oil and gas leasing maps for Alternatives B, C, and D (Maps 2-5-B, C, and D) show some land as open to leasing in Arches NP (No Surface Occupancy), along the southwest boundary of the park adjoining highway 191. We believe this is an error and should be deleted. | The oil and gas leasing maps are in error in showing a portion of the park open to leasing with no surface occupancy.  These maps have been corrected in the PRMP/FEIS. |
| Arches National Park | 8 | 3 | Map 2-6 shows a Known Potash Leasing Area adjacent to the southwest corner of Arches NP, and possibly jutting slightly across the boundary into the park. We assume that this designation is not the same as an actual lease, which is shown in a different color on the map. If this KPLA does indeed cross into the park, and it is possible to remove the designation inside the park boundary, we would request that this change be made. | The Known Potash Leasing Area is a classification that delineates where there are known potash resources that can be economically recovered.  However, area included in the National Park is closed to leasing and will never be developed.   This classification was made prior to the establishment of the Park and can not be easily modified. |
| Arches National Park | 8 | 4 | The plan states (page 2-48) "Any routes that are not baseline would be signed "closed" on the ground. " Since this suggest that anything not signed "closed" would be considered open, which could be an incentive for removal of "closed" signs, we would prefer a policy of signing roads as open and if not signed, roads are closed. | The BLM will use a combination of "closed" and "open" signing, along with a required Travel Plan map, to inform the public of which routes are designated for travel. |

| Arches National Park | 8 | 5 | Several roads are shown within Arches NP that are not park roads.  These are circled on the attached map;please delete them. Alternately, since the RMP does not apply to Arches, we would prefer that the park simply be shown as a "blank spot" on the map, with all roads removed. | All routes within Arches National Park have been deleted from the Travel Plan maps accompanying the PRMP/FEIS. |
|---|---|---|---|---|
| Arches National Park | 8 | 6 | Various routes or spurs that approach Arches (Salt Valley, Yellow Cat, Lost Spring Canyon and Cache Valley/Dry Mesa areas) are shown as class D roads in alternative C but not in alternative B. We would prefer, as in alternative B, that these routes not be designated roads. | The desire of Arches National Park for Alt. B route designations near the Park has been noted. |
| Arches National Park | 8 | 7 | We would suggest that the visual impact analysis consider night lighting and effects on night sky. | Night lighting is a component of Visual Resource Management and would be considered on a case by case basis as projects are analyzed for impacts to visual resources.  Impact to night skies would be considered a cumulative impact within these site-specific analyses. |
| Arches National Park | 8 | 8 | The RMP states (page 2-50) that "Restoration and rehabilitation would use native seed-mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species." We would request that only native species be used near Arches and Canyonlands. | The desire for only native seed mixes to be used near the National Parks has been noted. |
| State of Utah - Public Lands Policy Coordination | 120 | 1 | The BLM should consider the potentially large economic effects the oil and gas industry might have on Grand and San Juan Counties as shown in the Economic and Business Research Study (Phase I) for oil and gas in the Uintah Basin. | The BLM acknowledges the oil and gas study referenced for the Uintah Basin.  However, the applicability to Moab is limited.  The Moab Field Office prepared a  Reasonably Foreseeable Development (RFD) scenario for oil and gas development over the next 15 years.  The development predicted in the RFD was utilized to generate the economic impacts in the Draft RMP/EIS as detailed on pg. 4-259 through 4-264. |
| State of Utah - Public Lands Policy Coordination | 120 | 2 | Utah State law indicates that river segments proposed for Wild and Scenic designation should contain water at all times. | According to the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), "there are no specific requirements concerning minimum flow for an eligible segment".  The BLM is aware that there are specific State laws relevant |

| | | | | |
|---|---|---|---|---|
| | | | | to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| State of Utah - Public Lands Policy Coordination | 120 | 3 | The state is concerned about suitability findings for those streams where there are significant water diversions upstream. | According to the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), Congress has allowed for the existence of some human modification of a riverway, the presence of impoundments or major dams above or below a segment under review (including those that may regulate the flow regime through the segment).  The existence of minor dams, diversion structures, and rip-rap within the segment shall not by themselves render a reach ineligible. |
| State of Utah - Public Lands Policy Coordination | 120 | 4 | The state contends that while federal reserve water rights are not asserted prior to designation, those stream reaches found suitable are managed as if they were designated. | Barring congressional action, there is no effect on water rights or instream flows related to suitability findings made in a land use plan decision.  Even if Congress were to designate rivers into the National Wild and Scenic Rivers System, any such designation would have no effect on existing water rights.  Section 13(b) of the Wild and Scenic River Act states that jurisdiction over waters is determined by established principles of law.  In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a federal reserved water right for designated rivers, it does not require or specify any amount, and as noted above, confirms that Utah has jurisdiction over water rights.  The BLM would be required to adjudicate the water right, in the same manner as any other entity, by application through state processes.  Thus, for congressionally designated rivers, BLM may |

| | | | | |
|---|---|---|---|---|
| | | | | assert a federal reserved water right for appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation.<br><br>The Draft RMP/EIS states (pg. 2-39) that the BLM would not seek water rights as part of a suitability determination made in the Record of Decision for the RMP. |
| State of Utah - Public Lands Policy Coordination | 120 | 5 | State policy discourages permanent closure of grazing allotments for improving watershed health, wildlife habitat, and the economic benefits of livestock production. The state strongly suggests that BLM support flexibility within the management provisions for livestock grazing time (duration) and timing (season of use) in the final plan. | Allotments proposed for closure on page 2-12 are not permanent and the decision to close these allotments or areas may be revisited in the development of subsequent RMPs or the revision of this one. However, certain allotments may not be available for grazing over the life of the plan.  The allotments considered, as not available are spread by alternative.  Subsequent revisions of the land use plan may consider opening these areas to livestock grazing.<br><br>The vast majority (over 95%) of the Moab Planning Area is available for livestock grazing.  For those limited number of allotments shown on page 2-12 of the DRMP/EIS, the BLM is proposing that other uses of the BLM land are the highest and best use of these areas. Both FLPMA and BLM's Land Use Planning Handbook authorizes BLM to close specific areas to livestock grazing to place an emphasis on these areas for other purposes or values, such as wildlife use, watershed protection, and recreation.  As indicated by the variable uses of the BLM lands, as shown in the proposed action, it is BLM's intention to emphasize "multiple use" of the public lands within the planning area.<br><br>As stated in the DRMP/EIS (pg. 2-12), for those areas open to livestock grazing, grazing would be managed on an allotment basis according to the Guidelines for Livestock Grazing Management to meet the Standards for |

| | | | | |
|---|---|---|---|---|
| | | | | Rangeland Health (see Appendix Q), including duration and adjustment in season of use.  This will provide the manager flexibility to adjust the permitted numbers of livestock, and the season and duration of use on specific allotments after the careful evaluation of monitoring and inventory data in full compliance with appropriate rules and regulations and BLM policy. |
| State of Utah - Public Lands Policy Coordination | 120 | 6 | The State supports the conversion of livestock AUMs to wildlife AUMs for the Diamond, Cottonwood, Bogart, and Pear Park allotments. | The BLM has recognized (Alts A, B, & C) the wildlife value of the Cottonwood, Diamond, and Bogart allotments as acknowledged in the 1994 Memorandum of Agreement among the BLM, UDWR, and the Nature Conservancy.  The Pear Park allotment, which is unavailable in Alts A & B, has been made part of the PRMP/FEIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 7 | The State believes the BLM should only employ the term "critical habitat" when referring to the legal habitat desigantions for endangered and threatened speicies under the Endangered Species Act.  The State requests that the BLM use the "crucial habitat" designations mapped by the UDWR. | The term critical has been reserved to Threatened and Endangered (T &E) species.  Corrections in the text have been made in the PRMP/FEIS.  For non-T&E species the BLM relied on the UDWR crucial habitat designations. |
| State of Utah - Public Lands Policy Coordination | 120 | 8 | The State asks BLM to provide a detailed explanation of the rationale and authority for management of lands solely because of wilderness characteristics, and why such management does not circumvent the provisions of the statutorily required wilderness review process. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences."  (FLPMA, Section 202©(2) (43 U.S.C. §1712©(2)).)  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."  (FLPMA, section 103© (43 U.S.C. §1702©).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a |

|  |  |  |  | mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations. |
|---|---|---|---|---|
|  |  |  |  | In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
| State of Utah - Public Lands Policy Coordination | 120 | 9 | The BLM should give strong consideration to recommendations submitted by local government and not manage lands to protect wilderness character where such management would, in the opinion of local governments, be contrary to the interests of local residents. | Sections 103, 201, and 202 of FLPMA direct the BLM to take into account the national interest, as well as the local interest. In accordance with FLPMA and BLM rules, regulations, and policies, the BLM must provide for the balanced management of all resources and resource uses on public lands.

The BLM gave strong consideration to the concerns of local governments throughout the planning process. In particular, Grand and San Juan Counties are cooperating agencies and have been active cooperators, including during the development of alternatives where Non-WSA areas with wilderness characteristics were considered.

See also response to comment 121-70. |
| State of Utah - Public Lands Policy Coordination | 120 | 10 | The State strongly disagrees with the BLM's analytical assumption at page 4-3 of the Draft RMP/EIS that non-BLM lands would suffer minimally direct impacts from RMP decisions. SITLA lands may have reduced revenue potential or management obectives that differ from the BLM. The BLM planning decisions on rights-of-way, withdrawals from mineral leasing, special | Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly. For specifics regarding the impacts on mineral revenue see comment 120-101.

The BLM does provide for reasonable access to all SITLA |

BLM_0011143

| | | | | |
|---|---|---|---|---|
| | | | designations, and other determinations impact state trust lands. | lands under all alternatives (pg. 4-3).  A sentence will be added to Chapter 2, Lands and Realty : Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively.  The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly.<br><br>For specifics regarding the impacts on mineral revenue see comment 120-101.<br><br>The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3).  Information will be added to Chapter 2, Lands and Realty, Management Common to all action alternatives, that states that reasonable access to State land would be provided including across BLM lands within avoidance and exclusion areas for rights-of-way as specified by the Cotter decision (Utah v. Andrus, 10/1/79).  In addition, the Moab DRMP/DEIS travel management plan recognizes the requirement to provide access to SITLA lands per the Cotter decision.  Also, please see the revised analysis under Socio-Economics in Chapter 4 of the PRMP/FEIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 11 | The need for BLM to give priority to state-federal land exhanges has been recognized.  The disposal land list is inadequate and lands should be added to this list including 1) all lands proposed for BLM disposal in the pending Utah Recreation Land Exchange Act; 2) the block of BLM lands west of the Canyonlands airport that are currently subject to Potash preference right leases, and 3) all lands in Lisbon Valley. | The Federal Land Policy and Management Act (FLPMA) Section 203 requires the BLM to use the land use planning process to identify lands for disposal through sales.  Indentifying lands for Section 203 sale requires the BLM to meet certain criteria set out specifically in the Statute.<br><br>FLPMA allows the BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally.  The DRMP/EIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition.  The DRMP/EIS does not contain a schedule or prioritize these lands, but the BLM understands that State in-lieu and other exchanges are a high priority for the State and |

| | | | | for the BLM. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 12 | The BLM should commit to utilizing the State's expedited energy permitting process. | Federal laws, rules, regulations, and policies govern the procedures for processing all Federal projects. |
| State of Utah - Public Lands Policy Coordination | 120 | 13 | The State encourages the BLM to impose air emission standards as lease conditions and conditions of approval for Applications for Permit to Drill. | The BLM does not have the responsibility to set air emission standards. That responsibility lies with EPA and the State of Utah. The BLM can only approve actions that meet the National Ambient Air Quality Standards as set by EPA or the State. Site specific mitigation or conditions of approval may be applied at the APD or implementation phase but not during land use planning and leasing. |
| State of Utah - Public Lands Policy Coordination | 120 | 14 | Future air quality analysis should include modeling with the following factors: 1) oil and gas proponents should assume that leasing and exploration will result in full field development, 2) air quality analyses should be cumulative and include not only planned development but existing omission sources, 3) air quality analyses should be based on anticipated worst-case meteorological conditions for each dispersion scenario, 4) air quality analyses should address compliance/attainment with all applicable air quality-related requirements and standards, and 5) air quality analysis should specifically address impacts to sensitive visual resources and other air quality-related values. | The BLM may consider the commenter's recommendation for future air quality modeling and analyses. |
| State of Utah - Public Lands Policy Coordination | 120 | 15 | Under the preferred alternative (Alt C), certain existing routes that provide the only physical access to trust lands would be terminated. The Draft RMP does not address the impact of these closures on the economic value of the affected trust lands in either this section or its section on socioeconomic impacts. | The travel plan provides restrictions to the public for recreational purposes, but does not restrict uses permitted or authorized by the BLM. State inholdings may or may not currently have access, depending upon whether or not exisitng vehicle routes lead to them. Under different alternative scenarios, existing routes may be proposed to closure. BLM policy, as required by the Cotter decision (State of Utah v. Andrus, 10/1/79), is that "the state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common school..." This decision confined the issue of access to situations |

BLM_0011145

| | | | | |
|---|---|---|---|---|
| | | | | directly invloving economic revenues generated for the school trust.  The recreation restrictions do not prohibit the State from reasonable access to its lands for economic purposes through separate permit authorization as specified by the Cotter decision.   Routes to State sections may not have been identified for recreation purposes due to resource conflicts or actual route conditions. |
| State of Utah - Public Lands Policy Coordination | 120 | 16 | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives.  Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it… pursuant to RS 2477. | A "D" route does not equate to a County road assertion.  The routes identified as "D" routes in the land use plan are routes located on public lands and managed by the BLM until properly adjudicated.  The DRMP/EIS proposes four different alternatives for which to manage these routes<br><br>As specified in the Draft RMP/EIS (pg. 1-12), addressing RS 2477 assertions is beyond the scope of this planning effort.  However, nothing extinguishes any right-of-way or alters in any way the legal rights the State and counties have to assert and protect RS 2477 rights.<br><br>The Proposed RMP/Final EIS will not address RS 2477 assertions.  Such assertions will be settled administratively on a case-by-case basis or a s confirmed through other legal means. |
| State of Utah - Public Lands Policy Coordination | 120 | 17 | The use of vehicles along the course of the Green River impacts natural resources and other recreational users of the corridor far beyond the traveled path due to noise. | The BLM assessed the impacts on natural resources and recreation conflict between motorized access and river based recreation.  The BLM determined that the purpose and need associated with the route outweighed the specified conflict. |
| State of Utah - Public Lands Policy Coordination | 120 | 18 | No mention is made of water rights.  The State Engineer recommends that the BLM consider the impact its actions may have on water rights in general and non-BLM water rights in particular. | On pg. 1-13 of the Moab DRMP/EIS under Planning Criteria, it is noted 1) the planning process recognizes the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including State water laws). The text was clarified to ensure that valid water rights are recognized as valid existing rights.On page 1-13 of the |

| | | | | DRMP/EIS under Planning Criteria, the BLM states 1) the planning process would recognize the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including state and local laws). The text has been edited to ensure that water rights are recognized as valid existing rights.<br><br>See response to comment 120-4. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 19 | The proper description of deer and elk crucial winter habitats and Rocky Mountain bighorn habitat should occur regardless of the alternative. | As required by NEPA, the BLM considered a range of alternatives.  For non-special status species the alternatives varied by the size of the habitat and the timing restrictions.  The management of habitat is consistent with the goals and objectives of each alternative.<br><br>In the Draft RMP/EIS, Alt B has a timing limitation for what is referred to as "winter habitat." This habitat actually includes both crucial and high value winter habitats (635,774 acres). These habitats, although not separated in the draft,  have been properly described in the PRMP/FEIS.<br><br>Alts C and D provide timing limitations for crucial winter habitat only (349,955 acres), not for both crucial and high value habitats.  The text has been changed to correct the error of confusing crucial and high value winter habitats. |
| State of Utah - Public Lands Policy Coordination | 120 | 20 | None of the alternatives address the fact that desert bighorn sheep wander between Crystal Geyser, Duma Point, and the Blue Hills.  This migration corridor should be recognized in the final RMP. | Duma Point and Blue Hills habitat and migration corridors are recognized in the Draft RMP/EIS.  Crystal Geyser is a small satellite population of recognized habitat located more than 10 miles across flat terrain from Duma Point. Defining a migration corridor across this flat terrain is unknown at this time.  No known habitat exists between Duma Point and Crystal Geyser.  Current studies are underway that may identify a migration corridor. |
| State of Utah - Public Lands Policy | 120 | 21 | The estimate of disturbed acreage to white-tailed prairie dogs as identified on page 4-315 is under estimated. Increased volume and speed of traffic, frequent road | Table 4.91 (pg. 4-315) has been changed to clarify that the acreage of disturbance from oil and gas development includes ancillary facilities such as roads, pipelines, and |

| Coordination | | | upgrades, and construction of utility poles and storage tanks, noise from wells and compressors, and increased recreational use will negatively impact prairie dogs. | powerlines.  The BLM acknowledges in the impact analysis that there may be additional loss of individuals due to increased volume and speed of traffic. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 22 | It is unclear how State comments will be sought for new rights-of-way for pipelines or service-access roads. | Where applicable, coordination with other Federal, State, and local entities will be sought as mandated under FLPMA, NEPA, and individual program requirements.  All current NEPA documents prepared by the Utah BLM are posted on the Environmental Notification Bulletin Board via the BLM internet site.  Access to this database is available to the State and the public. |
| State of Utah - Public Lands Policy Coordination | 120 | 23 | Surveys for wildlife are not considered to be a vaild form of compensatory mitigation. | The language on pg. 4-315 has been clarified to state: "The results of these surveys will be used for avoidance and other mitigating measures." |
| State of Utah - Public Lands Policy Coordination | 120 | 24 | The BLM should recognize that prairie dogs create important habitat for many other wildlife species.  There is room to enhance the discussion in the Proposed RMP/Final EIS. | The Proposed RMP/Final EIS (pg. 4-314) includes discussion about the benefits provided by prairie dog habitat to other important habitat. |
| State of Utah - Public Lands Policy Coordination | 120 | 25 | The BLM should only allow the use of  utility poles in areas where underground conduits are not practical.  Raptor excluders should be placed on utility poles where needed. | Upon receipt for proposed development, the BLM will analyze the impacts to prairie dogs and other wildlife as part of the NEPA process and would apply the appropriate mitigation measures as necessary.  This may include underground conduits and raptor excluders. |
| State of Utah - Public Lands Policy Coordination | 120 | 26 | The BLM should work with the U.S. Department of Agriculture Wildlife Services to reduce nesting by ravens on storage tanks and other oil and gas infrastructure (i.e. design structures to be less suitable for nests). | Refer to comment 120-25. |
| State of Utah - Public Lands Policy Coordination | 120 | 27 | Enforce a 45 mile-per hour speed limit on secondary roads in oil and gas development areas from July through September to prevent deaths of young hawks and owls due to vehicle impact. | The speed limit on secondary roads is 25 mph unless otherwise posted. |
| State of Utah - Public Lands Policy | 120 | 28 | When existing roads in raptor areas where they are likely to experience greatly increased trafffic due to oil and gas well development, roads should be relocated | Refer to comment 120-25. |

| Coordination | | | as far as practical from the raptor nests regardless of whether or not the wells themselves are within a nest buffer. | |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 29 | On pg. 3-143, the RMP states "the planning area is not considered a suitable reintroduction area for black-footed ferrets due to dramatic declines in prairie dog populations". DWR considers the Cisco Desert the number 2 priority for black-footed ferret reintroduction in Utah and request that this language be removed from the RMP/EIS | The language in the text (pg. 3-143) of the Proposed RMP/Final EIS that states "the planning area is not considered a suitable reintorduction area for black footed ferrets" has been deleted . |
| State of Utah - Public Lands Policy Coordination | 120 | 30 | The BLM should consider including the parcel surrounding the Gunnison's prairie dog habitat northwest of Bridger Jack Mesa as part of the Behind the Rocks ACEC. | When the BLM developed alternatives, the commentor did not identify this area as Gunnison's prairie dog habitat. Furthermore, most of the area referred to is State land. |
| State of Utah - Public Lands Policy Coordination | 120 | 31 | Parcel R-11 which is identified for disposal under all alternatives contains Gunnison's prairie dog habitat. The State urges caution regarding the disposal of this land because the Gunnison's prairie dog may become petitioned for listing under ESA. | Parcel R-11 has been dropped from the disposal list (Appendix D, pg. D-3). |
| State of Utah - Public Lands Policy Coordination | 120 | 32 | Map 2-25 does not delineate pronghorn fawning habitat south of I-70 in the Cisco Desert. | Although pronghorn habitat is identified south of I-70, the BLM and UDWR agreed that the majority of fawning occurs north of I-70 due high population densities. UDWR habitat data from 2003 does not identify any pronghorn habitat south of I-70. Pronghorn habitat south of I-70 was added by BLM due to known and potential occupancy. |
| State of Utah - Public Lands Policy Coordination | 120 | 33 | Fragmentation of crucial big game winter habitat due to oil and gas development should be mitigated through restoration at 4 acres for every 1 acre disturbed. | According to Washington Office Instruction Memorandum 2005-069, the BLM may identify off-site mitigation opportunities to address impacts of the project proposal, but is not to carry them forward for detailed analysis unless volunteered by the applicant. |
| State of Utah - Public Lands Policy Coordination | 120 | 34 | Reference the Utah Comprehensive Wildlife Strategy as the Utah Wildlife Action Plan. | This reference has been changed on pg. 2-44. |
| State of Utah - | 120 | 35 | The State recommends listing the following nine | These species are listed on pg. 3-146 to 3-148. |

| | | | | |
|---|---|---|---|---|
| Public Lands Policy Coordination | | | species of concern:  Allen's big-eared bat, American three-toed woodpecker, big free-tailed bat, cornsnake, ferruginous hawk, spotted bat, and Townsend's big-eared bat. | |
| State of Utah - Public Lands Policy Coordination | 120 | 36 | The State recommends a 2 mile buffer within active sage grouse leks.  The habitat reclamation ratio should be 4:1.  There are currently no alternatives or reparations known to suitably replace a sage grouse lek. | There are currently no active Gunnison or greater sage-There are currently no active Gunnison or greater sage-grouse leks in the Moab Field Office.

In 2005, the BLM and UDWR signed the Gunnison Sage-grouse Rangewide Conversation Plan.  One of the conservation measures identified in the plan to minimize impacts from mineral development was "apply a lease stipulation of No Surface Occupancy within 0.5 miles of occupied lek sites year round".  Since the Moab Field Office currently has no active leks a Controlled Surface Use/Timing Limitation stipulation of 2.0 miles was applied so that any leks discovered in the future could be protected.  This stipulation also precludes permanent surface occupancy within 2.0 mile of an active lek and no surface disturbing activities allowed within 0.5 miles year round.

To be consistent with the Utah State Sage-grouse strategy, the controlled surface use/timing limitation lek buffer for greater sage-grouse has been changed from 0.5 mile to 2.0 mile in the Preferred Alternative (Alt C).

The BLM agrees that sage-grouse leks are irreplaceable, and Alts B and C offer the greatest degree of protection for them (2 mile lek buffer).  Alt B, if selected in the final decision document, would provide the greatest level of protection for any leks identified, while Alt D would provide the least amount of protection.

See the response to comment 120-33. |
| State of Utah - Public Lands | 120 | 37 | It is stated on pg. 4-453 that interim and final reclamation will use native seeds.  The State believes | On pg. 2-50 it is stated that "Restoration and rehabilitation would use native seed mixes wherever possible. Non- |

| Policy Coordination | | | there are situations and circumstances where non-native plants may be the only tool to mange non-native weeds. | native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species." The reference on pg. 4-453 has been changed to reflect this. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 38 | Seasonal restrictions and spatial buffers should be required of energy development. Use the U.S. Fish and Wildlife Services Raptor Protection Guidelines. | On pg. 2-53 it is specified that raptors are to be managed in accordance with the Best Management Practices (BMPs) included in Appendix O. These BM's implement the Utah Field Office Guidelines For Raptor Protection From Human and Land Use Disturbances (F&WS, 2002) and provide for modifications of spatial or temporal raptor nest buffers, if an established set of criteria can be met.

The document specifies that the BMPs, or specific elements of the BMPs, which pertain to the proposal, should be attached as Conditions of Approval to all BLM use authorizations that have the potential to adversely affect nesting raptors, or would cause occupied nest sites to become unsuitable for nesting in subsequent years. Therefore, the raptor BMPs can be applied to any surface disturbing action, including energy development activities, where raptor nesting may be affected.

As specified in the U.S. Fish and Wildlife Service "Guidelines" document, modifications of spatial and seasonal buffers for BLM-authorized actions would be permitted, so long as protection of nesting raptors is ensured. State and/or Federally-listed, proposed, and candidate raptor species, as well as BLM State-sensitive raptor species, should be afforded the highest level of protection through this BMP process; however, all raptor species would continue to receive protection under the Migratory Bird Treaty Act. Modification of the buffers for threatened or endangered species would be considered pending results of Section 7 Consultation with U. S. Fish and Wildlife Service. |
| State of Utah - Public Lands | 120 | 39 | The economic impacts summary table 2-2 (pg. 2-78) for minerals is incomplete. It only mentions lease rental | The economic benefits of severance taxes to the State of Utah as a whole are referenced on pg. 4-262. Information |

| | | | | |
|---|---|---|---|---|
| Policy Coordination | | | royalty payments for oil and gas.  Severance tax and property tax should be addressed as economic benefits. The same table discusses the economic impacts of recreation through sales tax and employment (2,000 jobs), but fails to indicate whether or not those are low or high paying, seasonal or permanent jobs. | on the economic benefits of severance tax have been added to table 2-2.  Property taxes levied on natural resources can be broken by commodity and county and this has been added to table 2-2 (pg. 279).  The economic benefits of property taxes (ad valorem) are also discussed on pg. 4-262.  Information on wage distribution for recreation jobs has been added to Chapter 3 (pg. 3-104). |
| State of Utah - Public Lands Policy Coordination | 120 | 40 | The summary of impacts section should be expanded to discuss constraints upon mineral development when all requirements proposed under each alternative are considered concurrently.  This should include the acreage available under each alternative, but the viability of development in light of restrictive but not prohibitive requirements such as Class II Visaul Quality. | The summary of impacts section is a summary and does not provide a detailed discussion.  The acreage provided under each alternative is provided in the summary.  A discussion of the impacts to minerals from visual resource restrictions is provided on pg. 4-107. |
| State of Utah - Public Lands Policy Coordination | 120 | 41 | The discussion of locatable minerals notes that the anticipated effect of uranium development would be the same under all alternatives because the acres open to extraction would be the same across all alternatives (see pg. 4-259). | On pg. 4-106 to 4-108, it is acknowledged that special stipulations (timing and visual restrictions) impose additional constraints and costs to locatable mineral operations.  The actual costs depend on many factors and can not be quantified on a landscape level document. |
| State of Utah - Public Lands Policy Coordination | 120 | 42 | None of the alternatives adequately analyze the loss of revenue from formally or effectively from eliminating mineral development in many of the lands subject to Special Designations and restrictive viewshed. | On pg. 4-264 the royalty revenues generated under each alternative are provided for oil and gas.  The Moab Field Office has only one producing locatable mineral mine (Lisbon copper mine) and revenues (severance and property taxes) from this do not vary across alternatives. |
| State of Utah - Public Lands Policy Coordination | 120 | 43 | The air quality analysis assumed all new compressors would operate at a NOx emission rate of 0.7 g/hp-hr (pg. 4-17).  How will the BLM ensure this projection for newly permitted compressors. | This figure (0.7 g/hp-hr) was used as an analysis assumption and is based on the best available control technology.  Air quality impacts will be analyzed for specific proposed oil and gas development on a case by case basis during the NEPA process.  Air quality emission restrictions can be imposed at that time. |
| State of Utah - Public Lands Policy Coordination | 120 | 44 | The air quality analysis assumed well spacing of 40 acres and 40 kilometers.  Please confirm this analysis spacing. | The analysis assumption was based on 40 acre well spacing as stated on pg. 4-20.  This spacing was utilized because it represents a conservative estimate for the oil and gas operations conducted within the Moab Field Office.  The spacing varies by area. |
| State of Utah - Public Lands | 120 | 45 | Assumptions regarding the number of compressors and dehydrators listed on page 4-20 are inconsistent with | The BLM recognizes this discrepancy and has made appropriate changes to both the table and the text (pg. 4- |

BLM_0011152

| | | | | |
|---|---|---|---|---|
| Policy Coordination | | | those shown in Table 4.7.  If the numbers in Table 4.7 are correct and the analysis was based on the numbers discussed in the text, the analysis could significantly understate air quality impacts. | 20) in the Proposed RMP/Final EIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 46 | The State recommends the BLM undertake a final check to ensure that other potential areas of high cultural resource densities or values are examined for potential conflicts.  The MFO should use techniques such as GIS, existing site databases. | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted.  For site specific actions the BLM conducts a Class III cultural survey as appropriate.<br><br>On pg. 4-30 a model of cultural resource site density is described that was used to predict potential impacts to cultural resources.  This model identified high, medium, and low site densities and this information was used to quantify the impacts.  The model was tested by intersecting 4,259 known cultural sites  with the probability coverage in GIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 47 | The State suggests that the BLM develop a specific ongoing program to identify and target identification efforts under Section 110 of the National Historic Preservation Act. | These type of actions are administrative and  do not require land use planning decisions to accomplish.  However, on pg. 2-8, cultural resource inventory areas under Section 110 are prioritized. |
| State of Utah - Public Lands Policy Coordination | 120 | 48 | The State suggests enhancing and strengthening the density analyses utilized in the Draft RMP/EIS.  These techniques could be significantly enhanced and strengthened in implementation of the Final Plan for high cultural resource value areas which include Sego Rock Art, Wall Street/Colorado River Rock Art, Behind the Rocks, Tenmile Wash, Mill Creek Canyon/South and North Forks of Mill Creek, the Wall Street portion of the Highway 279/Shafer Basin/Long Canyon proposed ACEC, Westwater Canyon, Kane Springs Canyon, Sevenmile Canyon, Bartlett/Hidden Canyon, Hell Roaring Uplands, and the Dolores River Canyon. | The BLM will continue to enhance the inventory and density techniques for high cultural value areas identified in the final plan.  Each of the cultural high value areas mentioned by the commentor has been included in the Proposed Plan for inventory in the Final EIS including Sevenmile Canyon (refer to pg. 2-8). |
| State of Utah - Public Lands Policy Coordination | 120 | 49 | The State requests that a cultural resource management plan be developed for Special Recreation Management Areas. | In Management Common to All Action Alternatives for Cultural Resources (pg. 2-7), several specific areas are mentioned for cultural resource management priority; Ten Mile Wash, Mill Creek Canyon, Behind the Rocks, and Wall Street.  These 4 areas coincide with high visitation |

BLM_0011153

| | | | | areas managed as SRMAs.  The text has been changed to state that Cultural Resource Management Plans will be a component of the implementation plans for the SRMAs that include the 4 cultural areas. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 50 | The State suggests that BLM specify in the RMP the subsequent development of specific cultural resource management plans, especially in areas with potential resource conflicts between cultural and recreation/travel.  These plans could provide for potential heritage tourism development where warranted. | See response to comment 120-49.  In addition, potential heritage tourism development would be a component of the aforementioned Cultural Resource Management Plans (pg. 2-7). |
| State of Utah - Public Lands Policy Coordination | 120 | 51 | The BLM should clarify the criteria utilized to determine which areas with wilderness characteristics (WC) were included in the preferred alternative. | Four alternatives for managing public lands, including lands with wilderness characteristics, are present in the Draft RMP/EIS.  The range of alternatives considered issues and concerns raised during the scoping period, planning criteria, and the guidance applicable to resource uses.  The alternatives constitute a range of management actions that set forth different priorities and measures to emphasize certain uses or resource values over other uses or resource values under the multiple use and sustained yield mandate of FLPMA to achieve certain goals and objectives.  The preferred alternative, Alternative C was crafted by an interdisciplinary team and cooperating agencies to provide a balance between commodity production and resource uses while providing protection to a wide spectrum of resource values.  These resource values include those associated with wilderness characteristics, ACECs, Wild and Scenic Rivers, sensitive soils, watersheds, visual resources, wildlife values, and floodplain/riparian areas. |
| State of Utah - Public Lands Policy Coordination | 120 | 52 | The BLM needs to consider the new information on roads (2007) to reevaluate the findings of the 1999/2003 wilderness inventory. | The 2003 Revision Document for the Moab Field Office made adjustments to Wilderness Inventory Areas based on county road data, none of which differs from the current county inventory. BLM stands by its 1999/2003 data. |
| State of Utah - Public Lands | 120 | 53 | The BLM inconsistently applied road data between the 1999 inventory and the 2007 WC review. | The BLM did not inconsistently apply the road data, but used the policies and procedures applicable at the time of |

BLM_0011154

| | | | | |
|---|---|---|---|---|
| Policy Coordination | | | | review.  The Wilderness Study Area Interim Management Policy (IMP, H-8550-1; BLM 1995).  The "IMP" or "WSA Handbook") was used during the inventory process conducted prior to 2004.  The WSA IMP emphasized the difference between "roads" and "ways".  Under that policy, the presence of a "road" was considered to negatively affect the wilderness characteristics of an inventory unit, therefore, the road and affected area needed to be excluded.  The presence of a "way" however, was not considered, in and of itself, to have a sufficient negative affect on naturalness of an area to disqualify all or part of an inventory unit.<br><br>In 2004, the BLM settled the ongoing litigation with the State of Utah (Utah v. Norton Settlement Agreement).  It was acknowledged that the BLM may continue to inventory public lands for resources or other values, including wilderness characteristics, as a part of managing the public lands and land use planning.  Inventories conducted post-2004 applied current policy, which is based on Washington Office Instruction Memorandum 2003-275, Change 1, which emphasizes naturalness and does not distinguish "roads" from "ways".  The BLM has evaluated wilderness characteristics since 2004 on the basis of affects to the naturalness of an area, which could either be from roads or ways. |
| State of Utah - Public Lands Policy Coordination | 120 | 54 | On page 4-157, the DEIS states that under Alt B, all 266,485 acres of non-WSA lands with wilderness characteristics would be managed as VRM class II.  Table 4.55 indicates some WC lands that would be managed as VRM class I, please clarify. | The VRM I acreage within WC areas in Alt B results from other decisions made under Alt B.  For example, Beaver Creek, Fisher Towers, Mary Jane Canyon, and Mill Creek Canyon contain rivers found suitable as "wild" for Wild and Scenic River status.  Wild Rivers are managed as VRM I.  Portions of the other areas are managed as scenic ACECs under Alt B resulting in VRM I management in that alternative.  WC management alone does not result in VRM I management under any alternative. |
| State of Utah - | 120 | 55 | On pages 4-158 and 159, the DEIS states that under | New water developments would be precluded under Alt B |

| Public Lands Policy Coordination | | | Alternative B, new water development facilities for wildlife would likely be precluded within non-WSA lands with wilderness characteristics.  Please discuss the extent to which Alt C would preclude development of water facilities. | since non-WSA lands with wilderness characteristics (WC) are closed to surface disturbing activities.  However, in Alt C WC lands are managed as No Surface Occupancy which provides an exception if the use is consistent and compatible with protection or enhancement of the resource values (see Appendix C).  Under Alt C, a new wildlife water development could potentially be considered an enhancement of the natural values based on future NEPA analysis for such a proposal. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 56 | Many of the WC areas were divided into sub-units based on "substantially noticeable routes".  Is this division appropriate? | In Appendix P (pg. P-2), the BLM discusses the size criteria for areas with WC.  The size criterion of 5,000 acres was applied only to stand alone units.  Units contiguous with other Federal lands with WC were evaluated for naturalness alone. |
| State of Utah - Public Lands Policy Coordination | 120 | 57 | Portions of Arches Adjacent WC subunits 4-6 are not identified on the map.  The text discussing unit five identifies wilderness characteristics for 625 acres, but the map does not show contiguity with the Park. | Placement of the labels on the WC supplemental maps have been refined for clarity. |
| State of Utah - Public Lands Policy Coordination | 120 | 58 | The text for the Diamond Canyon WC indicates that unit six does not meet wilderness characteristic requirements but the map appears to indicate otherwise. | The WC supplemental map for the Diamond Canyon WC shows a small portion of unit 6 as possessing WC.  This is a mapping error which has been corrected; the text is correct. |
| State of Utah - Public Lands Policy Coordination | 120 | 59 | The map for the Goldbar WC show two exclusions from the analysis area (blue circles) that are not discussed in the text.  What are these areas?  Area six is discussed in the text but not identified on the map. | These exclusions are "doughnuts" in the data provided by the proponent and are meant to be exclusions due to impacts on naturalness.  Unit six is shown on the map but the label has been improved. |
| State of Utah - Public Lands Policy Coordination | 120 | 60 | Portions of the Labyrinth Canyon and Lost Spring WC area determined to possess wilderness characteristics in the 1999-2003 review appear to have high route density.  Please explain why these routes do not compromise either naturalness or the outstanding opportunities for solitude or a primitive and unconfined type of recreation. | Refer to response to comments for 120-52 & 53 for an explanation of roads vs. ways and the withdrawal of the Wilderness Handbook.  The 2003 Revision Document removed from the original Wilderness Inventory Area those portions with "way" density so high as to preclude such opportunities.  The routes in the remaining Wilderness Inventory Area are sufficiently unnoticeable and unused that their inclusion does not substantially detract from the wilderness characteristics. |

| State of Utah - Public Lands Policy Coordination | 120 | 61 | Area four of the Labyrinth Canyon WC is mapped as having WC but the text is contradictory. | The label for Area 4 has been repositioned to be more clear. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 62 | The Mary Jane Canyon WC area appears to have high route density.  Please explain why these routes do not compromise either naturalness of the outstanding opportunities for solitued or a primitive and unconfined type of recreation. | See response to comments G-120-52,53, & 60 on route density.  Most of the routes depicted in the Mary Jane Canyon area are substantially unnoticeable oil and gas seismic lines which are not being designated for travel under any of the Action Alternatives (B, C, & D).  Alt C removes from WC management virtually all of the lands in the Mary Jane Canyon WC area in which these routes are located. |
| State of Utah - Public Lands Policy Coordination | 120 | 63 | The text and map for the Mill Creek WC area conclude that the analysis area lacks wilderness characteristics, but the wilderness characteristics review form shows that "some or all of the area has wilderness characteristics as shown on the attached map". | The 1999/2003 review found 3,388 acres of the Mill Creek WC area to possess wilderness characteristics.  Subsequent review in 2007 found no additional areas to possess WC.  The supplemental WC files on the BLM website state this in the text and on the map. |
| State of Utah - Public Lands Policy Coordination | 120 | 64 | The State is opposed to the establishment of ACECs overlapping Wilderness Study Areas (WSAs).  The State also does not favor creation of ACECs that exceed the scope of the resources they are designed to protect. | The BLM has separate policies and guidelines, as well as criteria, for establishing ACECs and WSAs.  These differing criteria make it possible that the same lands will qualify as both an ACEC and a WSA but for different reasons.  The BLM is required to consider these different policies.

The values protected by WSA management prescriptions do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa.  The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC Evaluation (Appendix I).  The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values.  None of these values includes wilderness characteristics.  Additionally, the management prescriptions for the ACECs is limited in scope to protect the relevant and important values, and the BLM maintains that the size of the ACEC areas is appropriate for protection of the relevant and important values identified. |

BLM_0011157

| State of Utah - Public Lands Policy Coordination | 120 | 65 | State Parks currently has an R&PP lease for land along the east side of Dead Horse Point State Park that is within both the Colorado River SRMA and the Highway 279 Corridor/Shafer Basin/Long Canyon ACEC. The State would like to request an exception for the land currently under R&PP lease that would eventually allow this land to be pantented to the Division. | The R&PP lease is a valid existing right and therefore the State of Utah has the right to go to patent upon completion of its plan of development. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 66 | The State seeks information on developing and approving Recreation Area Management Plans (RAMP) and River Management Plans. | After completion of the RMP, those SRMAs that do not currently have RAMPs will be subject to the development of a site specific RAMP, subject to NEPA. The process is identifcal for River Management Plans. |
| State of Utah - Public Lands Policy Coordination | 120 | 67 | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, backcountry touring on designated roads. This statement appears to indicate that those portions of SRMAs that are not subject to a mor specific focus area will be managed to emphasize motorize recreation. This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring. Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for motorized backcountry touring. | The BLM acknowledges that there are entire SRMAs that are focused on a particular type of recreation. The decision on pg. 2-18 has been changed to reflect this; "where a specific type of SRMA or focus area is not identified, the focus of that area is motorized backcountry touring on designated routes". Focus areas particularly for backcountry motorized touring would be managed more intensively than the default management. For example, focus areas for motorized backcountry touring could be considered for new route creation. |
| State of Utah - Public Lands Policy Coordination | 120 | 68 | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19). Please explain what a "destination SRMA" is and how such areas would be managed. | Destination SRMAs are those where the majority of visitation is from without the local area. A destination SRMA definition has been added to pg. 2-18. |
| State of Utah - Public Lands Policy Coordination | 120 | 69 | The Cottonwood-Diamond Watershed Potential ACEC notes that the proposed designation would remain in force, "until the watershed is restored to a healthy and functioning condition". Please clarify what management conditions would apply once the desired future condition is attained and the mechanism used to change prescriptions. | The Draft RMP/EIS states on pg. 4-320 that the ACEC would be designated until "the watershed is restored to a healthy functioning condition". The text has been changed to state that the ACEC would be designated until a determination is made by an interdisciplinary team that the Cottonwood and Diamond Watersheds are in propoperly functioning condition (PFC). |

| State of Utah - Public Lands Policy Coordination | 120 | 70 | Clarify launch limits in Westwater Canyon. | Table 4.69 (on pag. 4-207) states that the daily launch limit for Westwater Canyon is 75 people. This has been changed to state "75 people for the commercial sector and 75 people for the private sector".  This equals the 150 person launch limit shown on the BLM website. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 71 | The State is concerned that Wild and Scenic River designations may limit water development  by communities for future growth, limit industrial and agriculutrual growth, and reduce funding for the Colorado River Salinity Control program. | TThe Wild and Scenic Rivers Act implies a Federal reserved water right; however, it must be the minimal amount necessary for purposes of the Act, it must be adjudicated through State processes, and it would be junior to existing water rights.  The amount of Federal water right will vary from river to river, depending on the river's flows, the un-appropriated quantities in the river, and the values for which the river is being protected. There is no effect whatsoever on water rights on in-stream flows related to suitability findings made in a land use plan decision, barring Congressional action.  Even if Congress were to designate rivers in the National Wild and Scenic Rivers System, any such designation would have no affect on existing, valid water rights.  Section 13 (b) of the Wild and Scenic Rivers Act states that jurisdiction over waters is determined by established principles of law.  In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a Federal reserved water right for designated rivers, it does not require or specify any amount, and instead establishes that only the minimum amount for purpose of the Act can be acquired.  Because the State of Utah has jurisdiction over water, BLM would be required to adjudicate the right as would any other entity, by application through State processes.  Thus, for Congressionally designated rivers, BLM may assert a Federal reserved water right to appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation. |

| | | | | During the suitability phase of the Wild and Scenic River process, both Grand and San Juan Counties, as well as the State of Utah and SITLA, were asked to supply information on uses, "including reasonably foreseeable potential uses of the area and related waters, which would be enhanced, foreclosed, or curtailed if the area were included in the national system of rivers, and the values which could be foreclosed or diminished if the area is not protected as part of the national system." (Appendix J-12).  Attachment 4 of Appendix J summarizes suitability input by the public as well as local communities. Suitability decisions were made considering the results of this input.  For example, the agricultural, residential, commercial and municipal development in and around the town of Green River was cited as a reason that segments 3 and 4 of the Green River were not suitable for consideration.<br><br>In 1994, Public Law 98-569 amended the Colorado River Basin Salinity Control Act and directed the Secretary to develop a comprehensive program for minimizing salt contributions from lands administered by BLM and to provide a report on this program to the Congress and the Advisory Council. The BLM's Colorado River Basin Salinity Control program is designed to provide the best management practices (BMP) of the basic resource base. Successes with the resource base will translate to improved vegetation cover, better use of onsite precipitation, and stronger plant root systems.  In turn, a more stable runoff regime and reduced soil loss should result, thus benefiting water quality of the streams in the Colorado River Basin including the Green River and San Rafael River.  In Section 1(b) of the Wild and Scenic Rivers Act, Congress states that one of the objectives of the Act is to protect the water quality of designated rivers. Congress further specified that the river-administering agencies cooperate with the EPA and State water |

BLM_0011160

| | | | | |
|---|---|---|---|---|
| | | | | pollution control agencies to eliminate or diminish water pollution (Section 2(c)). Comparing the two, it is clear that the Wild and Scenic Rivers Act and the Colorado River Basin Salinity Control Act are not only complementary of one another, but share the same objective with regard to water quality. The Wild and Scenic Rivers Act directs the Secretary of the Interior or any government agency to prohibit any loan, grant, license, or otherwise construction of any water resources project that would have a direct effect on the values for which such river designation was established.  The law also states that it cannot preclude licensing of, or assistance to, developments below or above a wild, scenic, or recreational river area or on any stream tributary thereto that will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System. However, projects intended to comply with the Colorado River Salinity Control Act are those that would generally benefit stream segments instead of affecting or unreasonably diminishing its values including water quality. |
| State of Utah - Public Lands Policy Coordination | 120 | 72 | The State believes that the BLM should disclose the reasons and rationale for determinations of eligibility and suitability for proposed additions to the National Wild and Scenic River System, and to fully meet the requirements of state and federal law in doing so. | Appendix J of the DRMP/DEIS details the steps undertaken in the eligibility review process including the identification of outstandingly remarkable values as well as the Suitability Considerations by eligible river segments.  The BLM complied with all applicable Federal laws, regulations, and policies in the Wild and Scenic Rivers Study Process.

The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where |

| | | | | |
|---|---|---|---|---|
| | | | | State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| State of Utah - Public Lands Policy Coordination | 120 | 73 | The State is concerned that the Draft RMP/EIS does not state the authority for protection of river segments while studies are underway. | Section 5(d) of the Wild and Scenic Rivers Act requires that Federal land management agencies make wild and scenic river considerations during land use planning.  Two stages of review are involved.  Eligibility is an inventory, solely involving river values.  Suitability involves consideration of manageability and resource conflicts.<br><br>As per BLM Manual 8351-Wild and Scenic Rivers-Policy and Program, Section .32C, all eligible rivers are considered in the EIS for the planning effort as to their suitability for congressional designation into the National Wild and Scenic Rivers System.  With any suitability determination made in the ROD for the PRMP/FEIS, the free-flowing, outstandingly remarkable values, and tentative classification of rivers would continue to be protected until Congress makes a decision on designation.<br><br>Appendix J describes the process and authority for the Wild and Scenic Rivers Study.<br><br>The FLPMA gives the BLM broad authority to manage the public lands, including management of eligible and suitable river segments.  For eligible rivers, it is BLM's policy to protect certain values identified in the eligibility determination process to ensure that a decision on suitability can be made.  To accomplish this objective, the BLM's management prescriptions must protect the free-flowing character, tentative classifications, and identify outstandingly remarkable values of eligible rivers according to the prescriptions and directions of the |

BLM_0011162

current, applicable land use plan per BLM Manual Section 8351.32C.  The BLM Manual further states that should a determination on suitability not be made during the planning process, "the RMP must prescribe protective management measures to ensure protection shall be afforded the river and adjacent public land area pending the suitability determination" (Section 8351.33A).

The NEPA specifies that while work on the EIS is in progress, BLM cannot undertake or authorize any actions in the interim that would prejudice the RMP decision or, in this case, the suitability determination (40 CFR 1505.1 (c)(3)).  A case-by-case evaluation of potential impacts resulting from a proposed action must be made to ensure that all eligible rivers are not limited from being considered for suitability among the range of RMP alternatives, thus eliminating the opportunity to prejudice the decision.  Implementation of the interim management to protect eligible rivers, therefore, is applied through site-specific NEPA analysis of environmental impacts on a case-by-case basis.  The NEPA compliance, required for all Federal actions that could significantly affect the environment, ensures that BLM consider alternatives to the proposed action and provides BLM an opportunity to apply mitigation measures that will reduce impacts on a given resource such as an eligible stream.  This mechanism of applying management must be in conformance with the current land use plan.  Protective prescriptions would be applied to rivers determined suitable in the ROD for the Field Office RMP.  Resource allocations (such as those for visual resources, OHV use, and mineral leasing) compatible with protecting river values would be prescribed for suitable river corridors as part of the decision.  In addition, no special management objectives would be applied to eligible rivers determined not to be suitable in the ROD.  Instead, they would be managed without additional consideration according to the provisions of the plan.

BLM_0011163

| State of Utah - Public Lands Policy Coordination | 120 | 74 | The BLM has not sufficiently divulged the proposed management prescriptions for river segments identified in the Draft RMP/EIS. | Table 4.102, Management Proposed for River Segments Considered for WSR Designation by Alternative, details these management prescriptions.  The Oil and Gas Leasing Stipulations detailed in Table 4.102 by river segment are applicable to all surface disturbing activities authorized in the plan as explained in Appendix C. These prescriptions have been moved to the Wild and Scenic River section of Chapter 2. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 75 | Reference is made to 29 eligible segments that will be further reviewed for suitability; however, at several places, including pages 2-4, ES-5 and ES-6, 28 eligible sements are indicated.  The Draft RMP/EIS identifies the number of eligible rivers as 13 at several places and 12 at many other locations. | There are 29 eligible river segments.  On Salt Wash, which adjoins Arches National Park, the suitability determination has been delayed pending Park Service action.   Therefore, 28 river segments were found suitable in one or more of the alternatives.  This has resulted in some inconsistencies in the text which have been corrected.  The same reasoning applies to the number of rivers which has also been corrected. |
| State of Utah - Public Lands Policy Coordination | 120 | 76 | The term "designation" in place of "classification" on pgs 2-4 and 2-91, is inappropriate. | The term "designation" has been changed to "determine" in accordance with the BLM Land Use Planning Handbook (H 1601-1). |
| State of Utah - Public Lands Policy Coordination | 120 | 77 | The cumulative effects analysis would be enhanced by developing a map depicting the cumulative effect of all use restrictions imposed under each alternative.  Such a map could resemble maps 4-1 through 44 in the Kanab Field Office Draft RMP/EIS. | The maps referred to for the Kanab Draft RMP/EIS depict oil and gas restrictions by alternative.  The same maps are contained in the Moab Draft RMP/EIS and are referred as Maps 2-5A-D.  The oil and gas restrictions shown on these maps apply to all surface disturbing activities (see Appendix C).  These maps have been referred to in the cumulative impact section for minerals (pg. 4-504) and other applicable resources. |
| State of Utah - Public Lands Policy Coordination | 120 | 78 | The BLM should clearly identify all reasonably foreseeable non-BLM actions within the planning area. As written, it is unclear what -- if any -- non-BLM actions were considered. | The BLM has added the following reasonably foreseeable non-BLM actions to the cumulative impact analysis: minerals extraction on private and SITLA lands; on going residential growth and business development throughout the planning area; and expansion of U.S. Highway 191. |
| State of Utah - Public Lands Policy Coordination | 120 | 79 | Please clarify the identification of alternatives.  For example, pgs 2-2 through 2-5 identify Alternative A as th No Action Alternative, Alternative B as the Preferred Alternative, Alternative C as the Alternative | Our review of these sections shows that the terminology for the alternatives is consistent  and is summarized as follows:<br>Alternative A is No Action.  Alternative B emphasizes |

BLM_0011164

| | | | emphasizing Resource Protection and Alternative D as the Alternative emphasizing Development.  Page 4-1 identifies Alternative B as the Alternative emphasizing Resource Protection, Alternative C as the Preferred Altenraitve, and Alternative D as the Alternative emphasizing Development. | protection/preservation of natural resources.  Alternative C is the Preferred Alternative, as it provides for a balanced approach of protection/preservation of natural resources while providing for commodity production. Alternative D emphasizes commodity production. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 80 | Pages 2-2 through 2-5 indicates that under Alternative C, 31 percent of the MPA would be closed to oil and gas development and only five percent of the MPA would be open under standard lese terms and conditions.  In comparison, Alternative B would close only 14 percent of the MPA and leave 48 percent of the planning area open under standard terms and conditions.  However, Table 4-3 indicates that despite the less stringent stipulations applied under Alternative B, 2,652 fewer oil and gas wells are anticipated compared to the more restrictive Alternative C.  Please clarify this discrepancy. | The only reference to oil and gas restrictions is Summary Table C which shows 370,250 acres closed to oil and gas development in Alt C.  This amounts to 20 percent of the BLM lands within the planning area.  It should be noted that 19% of the BLM lands within the planning area are closed to oil and gas leasing by BLM policy.  Also, as shown on this table, 427,273 acres are open with standard lease terms and conditions for Alt C.  This amounts to 23% of the BLM lands within the planning area.  On the same table, Alt B closes 36% of the BLM lands and leaves 14% of the BLM lands open with standard terms and conditions.

Table 4.3 shows the total predicted surface disturbance for mineral development in acres by alternative.  The more restrictive Alt B results in 3,321 fewer acres (not wells) of surface disturbance than Alt C for oil and gas development. |
| State of Utah - Public Lands Policy Coordination | 120 | 81 | The BLM should designate OHV "training trails" near dispersed camp sites to reduce OHV damage in those area. | As stated in the Draft RMP/EIS (pg. 2-48)  routes may be modified through subsequent implementation planning on a case by case basis.  No specific trails or suggestions for "training trails" were submitted during the scoping period. After the RMP is completed and on a site specific basis, the BLM could consider training trails near dispersed camp sites in areas designated in the limited or open to OHV category. |
| State of Utah - Public Lands Policy Coordination | 120 | 82 | To avoid having routes closed in the future which cross properties owned by SITLA, rights-of-ways should be placed in public ownership for OHV access. | The BLM recognizes that under Utah v. Andrus the State is entitled to reasonable access across public lands to school trust lands, including those located within WSAs and other areas where management prescriptions would restrict general public access.  Any restrictions such as |

| | | | | route closures within these management areas pertain to general public access.  Public access to OHV routes on public lands is accomplished through travel management planning.  We make a distinction between closures to the public, and State access entitlements and access needs of others that can be addressed as specific needs arise.  Land tenure adjustment efforts including pending and anticipated land exchanges between the BLM and the State should properly focus on SITLA lands located within WSAs and other special management areas identified in RMPs.  Therefore, the BLM does not believe it is necessary or prudent to globally grant rights-of-way or designated routes to school trust lands for public use.  The BLM is happy to work with the State to process any FLPMA Title V ROW application the State feels is necessary to protect ingress and egress to State property.  The concern about DRMP/EIS access restrictions other than those for general public access, such as the designation of right-of-way avoidance or exclusion areas, can be clarified with specific mention in the PRMP/FEIS that these designations are subject to State access entitlements under Utah v. Andrus, as described above. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 83 | The White Wash sand dunes OHV open area should be larger than proposed under Alternative C.  There should be a larger mix of sand and slick rock with a logical boundary. | A larger OHV open area for the White Wash area is proposed in Alt D.  A portion of this larger open area has been added to the PRMP/Final EIS which consists of the popular camping area to the west of the sand dunes and just east of the Ruby Ranch Road. |
| State of Utah - Public Lands Policy Coordination | 120 | 84 | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives.  Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it… pursuant to RS 2477. | See response to comment 120-16. |
| State of Utah - Public Lands Policy | 120 | 85 | Table 4.54 on page 4-147 indicates that, under Alternative C and D, no portion of Lost Canyon would be either "open" or subject to "limited" OHV use. | The limited acreage is identical in Alternatives B, C, & D.  Table 4.54 has been corrected. |

| Coordination | | | | |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 86 | Driving off designated routes to access dispersed camp sites would be in violation of the proposed travel plan. This plan should address this issue so that legitimate camp spots can be accessed from a legal route. | Driving off designated routes to access dispersed campsites would be a violation.  Access to dispersed campsites is addressed on pg. 2-48 of the Moab DRMP/DEIS; "designated routes and spurs were identified specifically for dispersed camping" under all action alternatives.  Many of the designated routes lead to or access dispersed campsites.<br><br>Dispersed camping was considered in designating routes in all of the action alternatives.   So that the public is aware of these sites, the dispersed campsites would be signed.  Additional routes to dispersed campsites can be considered after the RMP process is completed on a case-by-case basis in areas designated as limited or open to OHV use. |
| State of Utah - Public Lands Policy Coordination | 120 | 87 | Duplicate routes may provide beneficial recreation experiences to OHV users of varying skills and interests. | No information was provided during the scoping phase identifying specific duplicate routes for consideration in this planning effort.  During the development of the travel plan with Grand and San Juan Counties, consideration of these types of needs was discussed.  However, most duplicate routes not designated were routes receiving little or no use and thus presumably not providing the experience suggested in the comment.  After the RMP process is completed, additional routes can be considered on a case-by-case basis in areas designated as limited or open to OHV use. |
| State of Utah - Public Lands Policy Coordination | 120 | 88 | The BLM is encouraged to coordinate route alignments with other jurisdictions including the border with Colorado in the Rabbit Valley/Bitter Creek area. | During development of the travel plan, the Moab BLM coordinated with Grand and San Juan Counties, the National Park Service, the Forest Service, SITLA, and all adjoining BLM offices, including the Grand Junction Office concerning the Rabbit Valley area. |
| State of Utah - Public Lands Policy Coordination | 120 | 89 | There are a few additional connecting routes needed in the travel plan for Alt C to create loops for ATVs and full-sized vehicles | All route data received during scoping was considered in the alternatives for the travel plan.  No specific information is provided about these "additional connecting routes".  Any new routes can be considered for addition to the travel plan after the RMP is completed on a case by |

BLM_0011167

| | | | | case basis in areas designated as limited to OHV use. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 90 | There are no ATV/motorcycle only routes proposed in the preferred alternative.  This is a useful designation to complete the array of OHV alternatives.  The initial inventory and subsequent designation of motorcycle routes was inclomplete. | During the scoping period, the BLM received data on routes proposed for motorcycle use.  The majority of these routes are included in the Travel Plan for Alt C or Alt D.  During the comment period for the DRMP/EIS, some of the motorcycle route proposals were modified by their proponents to indicate that a few of these motorcycle routes were also suitable for ATVs.  The map has been corrected in the PRMP/FEIS to delineate these ATV/motorcycle routes where they are identified in the Travel Plan for Alt C and Alt D.  The BLM incorporated all route data received during scoping into formulation of travel plan alternatives. |
| State of Utah - Public Lands Policy Coordination | 120 | 91 | There are no designated routes in the Duma Point area under any of the  alternatives and there is no explanation as to why these routes were omitted. | The BLM received several route submissions in the Duma Point area during the scoping period.  Several of these routes were not identified in any of the action alternatives due to resource conflicts, particularly with big horn sheep and sensitive soils.  The BLM received a comment from UDWR regarding the bighorn sheep herd in this area with respect to human disturbance.  The BLM Manual 8342.1 requires that OHV designations must "minimize harassment of wildlife and/or significant disruption of wildlife habitiat". |
| State of Utah - Public Lands Policy Coordination | 120 | 92 | The State requests that the OHV riding area just north of the Airport on the Blue Hills Road remain open.  The area is well-suited to the existing use (shale soils with no vegetation) and provides an authorized area for hill climbing. | The area described is actually west of the airport.  This area was limited to existing roads and trails in the 1985 RMP due to concerns with sensitive soils.  There are no identified routes within any of the alternatives for the travel plan.  However, in Alt C, provisions are made for the Airport Hills Motorcross Focus Area (285 acres) to be established upon application by local government under the Recreation and Public Purposes Act. |
| State of Utah - Public Lands Policy Coordination | 120 | 93 | Please clarify whether page G-11's reference to wildlife habitat includes habitat for all species or is it intended to apply to habitat for more significant species or groups of species. | Page G-11 refers to the guidance found in BLM Manual 8342.1 which states that OHV designations "must minimize harassment of wildlife and/or significant disruption of wildlife habitat".  On pg. G-25 BLM lists the relevant species considered in formulation of the alternatives for the travel plan. |

| State of Utah - Public Lands Policy Coordination | 120 | 94 | Page G-11, uses the term "extreme".  Explain what constitutes an "extreme" hazard which can be considered an element of subjectivity. | This language is verbatim from BLM Manual 8342.1 which states "designations must minimize or eliminate OHV use in areas of extreme natural or man-made hazards". |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 95 | Page G-15, Emergency Limitation or Closure:  Perhaps "immediately closed" should read, "immediately mitigated or closed" or some similar wording. | The Federal regulations at 8341.2(a) state "the authorized officer shall immediately close the areas affected to the types of vehicle causing the adverse affect".  The wording on page G-15 is derived directly from the referenced regulations. |
| State of Utah - Public Lands Policy Coordination | 120 | 96 | The implementation process section on page G-29 should stress the need for maps and signing as both are needed. | On pg. G-30, the Draft RMP/EIS states "in the final RMP decisions, designated OHV routes will be portrayed by a map.  This map will be the basis for signing and enforcement.  The implementation goals include completing signage, maps, public information, kiosks, and working with partners". |
| State of Utah - Public Lands Policy Coordination | 120 | 97 | SITLA requests a detailed reference under Issue 8 of the Issues Identified for Consideration in the Moab RMP concerning inheld state lands within speical areas such as WSAs, ACECs, and lands managaged for wilderness characteristics. | See response to comments 120-101, 103, and 106.  It is not necessary to have this specific language stated in the description of the issue. |
| State of Utah - Public Lands Policy Coordination | 120 | 98 | Section 1.3.3-Development of Planning Criteria (pg. 1-13).  The BLM states that the RMP will "apply only to public lands and, where appropriate, split estate lands where the subsurace mineral estate is managed by the BLM".  The BLM should reconsider whether it can impose its standard on split estate lands where it does not own the surface as mentioned in the Planning Criteria on pg. 1-13. | Information regarding leasing and development on split estate lands is found at the following Washington Office website: www.blm.gov/bmp/Split_Estate.htm.<br><br>Instruction Memorandum No. 2003-202 outlines the policy, procedures and conditions for approving oil and gas operations on split-estate lands.  In particular, the BLM will not consider and Application for Permit to Drill or a Sundry Notice administratively or technically complete until the Federal lessee or its operator certifies that an agreement with the surface owner exists, or until the lessee or its operator complies with Onshore Oil and Gas Order No. 1.  Compliance with Onshore Oil and Gas Order No. 1 requires the Federal mineral lessee or its operator to enter into good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the |

| | | | | disturbed areas, or payment in lieu thereof, to compensate the surface owner for loss of crops and damages to tangible improvements, if any.  In addition, the BLM will invite the surface owner to participate in the onsite inspection and will take into consideration the needs of the surface owner when reviewing the Application for Permit to Drill.  The BLM will offer the surface owner the same level of surface protection BLM provides on Federal surface (Instruction Memorandum No. 89-201). |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 99 | Paragraph 3.6.2.1 - Land Tenure Adjustments (Pg. 3-28).  This paragraph should specifically reference the need for Federal acquisition of State school trust lands that are captured by Federal reservations and withdrawals such as wilderness study areas will be a priority , in accordance with applicable BLM policy guidance.  In addition State selection should be mentioned as an equally preferred method of land disposition as land exchanges. | See response to comments 120-106 and 120-11.<br><br>The FLPMA Section 203 requires the BLM to use the land use planning process to identify lands for disposal through sales.  Identifying lands for Section 203 sale requires BLM to meet certain criteria set out specifically in the statute.<br><br>The FLPMA authorizes BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally.  The Moab DRMP/DEIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition.  The DRMP/DEIS does not contain a schedule or prioritize these lands, but BLM understands that State in-lieu and other exchanges are a high priority for the State and for BLM. |
| State of Utah - Public Lands Policy Coordination | 120 | 100 | Section 3.6.2.1.2-Exchanges and Acquisitions (pg. 3-29).  The State encourages the BLM to add a new paragraph after the first paragraph, as follows: Facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exchange is considered an important public objective, and will be given priority. | See response to comments 120-106 and 120-11. |
| State of Utah - Public Lands Policy | 120 | 101 | Paragraph 4.1.2 - Analytical Assumptions (pg. 4-2/3). The BLM's second to last analytical assumtion, that non-BLM lands would be minimally directly impacted by | The BLM acknowledges that the closure of adjoining public lands to oil and gas leasing may have a potentially negative impact on SITLA's mineral revenue.  The |

BLM_0011170

| | | | | |
|---|---|---|---|---|
| Coordination | | | RMP decisions, since BLM does not make land decisions on non-BLM lands, is incorrect with respect to state trust lands.  The largest source of revenue for the Utah school trust is from oil and gas bonuses and royalties.  In much of Utah, in order to establish an economic oil and gas resource play, the exploration company needs a large areal footprint.  It is likely that multiple sections would have to be leased and developed in order to develop the necessary reserves to make the play economic.  BLM decisions from mineral lands from leasing in WSAs, areas with wilderness characteristics, ACECs, and other areas directly affect the economic viability of state trust lands inholdings. | assumption on pg. 4-3 has been changed to reflect this fact.  In Alternative C, the closure of the 354,015 acres managed as WSA or Wilderness Areas is nondiscretionary and beyond the scope of this plan.

In Alternatives A, C, and D there are no SITLA lands affected by discretionary closure.  Chapter 4 of the PRMP/FEIS has been revised to reflect the impacts in Alternative B on SITLA inholdings of the discretionary closures of 266,485 acres of public land.  It should be noted that under any Alternative, the proposed ACECs are not managed as closed to mineral leasing.  Areas with wilderness characteristics are recommended as closed under Alternative B and No Surface Occupancy in Alternative C. |
| State of Utah - Public Lands Policy Coordination | 120 | 102 | BLM's last analytical assumption, that reasonable access to state lands , across BLM lands, would be provided under all alternatives, needs to be specifically repeated in Table 2.1 under the heading "Management Common to All Alternatives" with a notation that access to state strust lands will be granted even if an area is otherwise an avoidance or exclusion area for ROWs. | See response to comment 120-10. |
| State of Utah - Public Lands Policy Coordination | 120 | 103 | Section 4.1.3.1/Table 4.2-Oil and Gas.  The BLM withdrawals and special designations directly affect development of oil and gas on SITLA lands.  The BLM should assume that, in addition to the loss of oil and gas wells on BLM lands, there would be an additional loss of wells on SITLA lands in proportion to the amount of SITLA land within the proposed special designations under each alternative. | As explained in comment 120-101, the only discretionary oil and gas closures imposed by this plan that negatively impact SITLA inholdings are in Alt B where 266,485 acres are closed to protect wilderness characteristics.  An estimate of oil and gas wells foregone on SITLA lands as a result of the BLM closure has been added to the text on pg. 4-94. |
| State of Utah - Public Lands Policy Coordination | 120 | 104 | Section 4.3.5-Lands and Realty (pgs. 4-63/69).  The second paragraph of section 4.3.5.1 (Impacts Common to All Alternatives) incorrectly states that 354,015 acres within WSAs and the Black Ridge Wilderness Area are closed to surface disturbing activities and thus excluded to new ROWs. | Narrative has been added to the text on these pages to clarify that the BLM has an obligation to grant reasonable access to inheld State lands in WSAs subject to Utah v. Andrus and the Interim Management Policy.  There are no State lands within the Black Ridge Wilderness Area. |
| State of Utah - | 120 | 105 | Section 4.3.12-Socioeconomic Resource (pgs 4- | See comments 120-101 & 120-103 for an explanation of |

| | | | | |
|---|---|---|---|---|
| Public Lands Policy Coordination | | | 252/277).  BLM decisions to withdraw mineral lands from leasing (WSAs, etc.) directly affect the economic viability of state trust lands inholdings.  This should be acknowledged appropriately in the discussion of socioeconomic impacts.  In particular, the BLM should assume that in addition to the decline in the number of wells drilled on BLM lands, there will be a proportionate decrease in the number of wells drilled on trust lands if Alternative B is adopted. | closed acreage by alternative.  In Alt B, the loss of revenue from SITLA wells foregone has been calculated and added to the analysis on page 4-264. |
| State of Utah - Public Lands Policy Coordination | 120 | 106 | Appendix A.1.1. Land Tenure Adjustment Criteria.  Add a new numbered paragraph stating that facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exchange is considered an important public objective, and will be given priority in accordance with existing BLM policy direction. | Current BLM Utah State Policy is to give priority to State of Utah exchanges and such exchanges do not require a land use planning decision. |
| State of Utah - Public Lands Policy Coordination | 120 | 107 | Delete numbered paragraph 9 in A.1.1.  It is inconsistent with county plans and may hinder necessary exchanges to acquire state inholdings. | This paragraph refers to retaining 1,806,413 acres in public ownership including all lands in WSAs, ACECs, SRMAs, and other designated areas.  This paragraph has been restated as follows:  "Retain all public lands within WSAs, ACECs, SRMAs, and other designated areas". |
| State of Utah - Public Lands Policy Coordination | 120 | 108 | Please consider adding a new section, A.1.5, State Selections, which should read as follows:  "State selections under the Utah Enabling Act and other applicable law will also be given priority pursuant to BLM Manual 2621.06A-C.  All lands not encumbered by a withdrawal or other special designation will be available for state selection." | See the response to comment 120-106. |
| State of Utah - Public Lands Policy Coordination | 120 | 109 | Under the Mill Creek Canyon Potential ACEC, Alternatives B and C propose to "maintain 3 cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37).  Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | The BLM does not have instream flow rights on Mill Creek.  The BLM would maintain 3 cfs through a stipulation in the right-of-way grant to the Grand County Water Conservancy District.  The BLM does not control appropriation of water rights.  Water rights are appropriated by the State of Utah.  In Utah, the only agencies that can hold instream flow rights are the UDWR and the Utah State Parks. |

| State of Utah - Public Lands Policy Coordination | 120 | 110 | The enhancement of riparian and wetland areas will increase the depletion of water within the Moab FO. The State requests the BLM modify its goal to require mitigation of any increased water depletion that may result from its activities.  Such mitigation may require the acquisition and change of a valid existing water right.  As part of a mitigation effort, it is suggested the BLM consider the institution of a program to eradicate tamarisk and other highly water consumptive, non-native species and their replacement with native species.  Water required for any enhancement effort will need to be obtained in accordance with State law. | Restoration of riparian vegetation will not result in water depletion.  In fact, this activity should increase the amount of available water.  Enhancing riparian vegetation results in a decrease in stream temperature, a decrease in evaporation, and the storage of water in the bank for low flow seasons (summer).  In addition, the replacement of tamarisk and Russian olive by native vegetation  results in reduced water use and  higher stream flow.  If any additional water should become necessary, the BLM will obtain this water in accordance with Utah State law.<br><br>On pg. 2-50 under Management Common to All for Vegetation, it states "Reduce tamarisk and Russian olive where appropirate using allowable vegetation treatments. Restore riparian habitat to native willow and cottonwood communities". |
| State of Utah - Public Lands Policy Coordination | 120 | 111 | The UDWQ suggests the following practices identified in the TMDL that would reduce Mill Creek water temperatures to bring conditions into compliance with standards for Class 3A waters.  These practices include: 1) provide higher stream flows during summer by maintaining 3 cfs flow below the Ken's Lake diversion, 2) increase water depth by narrowing the stream channel with restoration techniques involving use of heavy equipment, and 3) plant and protect riparian vegetation to increase shading a minimum of 11 percent to attain water quality standard. | The Draft RMP/EIS on pg. 2-31 states under Management Common to All Alternatives for Soils and Watershed:  "Coordinate with Grand Water and Sewer Service Agency to ensure required minimum instream flow of 3.0 cfs in Mill Creek below the Sheley diversion".  Through ongoing restoration and management actions stream channel dimensions are improving without the use of heavy equipment.  The use of heavy equipment is not appropriate due inaccessibility, the size of the stream system, and other sensitive resources.  On pg. 2-50 under Management Common to All for Vegetation, the Draft RMP/EIS states "Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments.  Restore riparian habitat to native willow and cottonwood communities".  Mill Creek has been and will continue to be a high priority for such restoration efforts due to its TMDL status. |
| State of Utah - Public Lands Policy Coordination | 120 | 112 | Onion Creek is impaired for temperature.  To attain a temperature reduction in Onion Creek, the TMDL recommends restricted access to the stream channel by off road vehicles and riparian restoration to facilitate | Under all alternatives, travel within the Onion Creek stream corridor is restricted to the "B" road.  Riparian restoration in this area has been ongoing; as a TMDL, Onion Creek is a priority for restoration efforts.  In |

| | | | | |
|---|---|---|---|---|
| | | | canopy cover.  To restore the beneficial use in the creek, a more protective alternative than those described by the BLM/Moab RMP may be required. | addition, the BLM has worked with the Grand County Road Department to improve the stability of the "B" road, thus improving riparian and water quality conditions in Onion Creek. |
| State of Utah - Public Lands Policy Coordination | 120 | 113 | Ken's Lake should be protected for cold water species of game fish and other cold water aquatic life.  It is impaired for temperature.  The protection of riparian vegetation may improve conditions around the lake. | The Ken's Lake TMDL concludes that stream temperatures are appropriate for the beneficial uses.  The impairments are due to natural conditions and not management actions.  Ongoing recreation management efforts for Ken's Lake have involved promoting native vegetation. |
| State of Utah - Public Lands Policy Coordination | 120 | 114 | Best Management Practices should be included in the plan for impaired water bodies. | The BLM is adopting the State's TMDL recommendations for impaired waterbodies.  These constitute the best management practices for those streams. |
| State of Utah - Public Lands Policy Coordination | 120 | 115 | Monitoring should be defined for the plan, including water quality and biological parameters.  Monitoring of recreation events should also be conducted to help provide data of the impacts. | The Federal regulations at 43 CFR 1610.4-9 require that land use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved.  The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the ROD. |
| State of Utah - Public Lands Policy Coordination | 120 | 116 | A statewide social survey was conducted by Utah State University in 2007.  The State provides the key survey results for Grand County (146 responses) and for San Juan County (124 responses). | The commentor provides an additional source of data not considered in the Draft RMP/EIS, due to the unavailability at the date of publication.  The commentor has identified this data as preliminary and no conclusions are provided.  This is a study done by Utah State University for the State of Utah (USU).  The USU study surveyed residents of all Utah counties on an equal (equal sample size per county) basis.  The commentor has not provided BLM with the raw data, but has compiled summary statistics by county.  The survey is described as a social survey, and it "attempts to assess the ways in which Utah residents use and value public land resources, and their views about public land management".  Because it is a survey of a sample of the population, the results are not directly comparable to most of the state government agency-generated data used in the Draft RMP/EIS.  Portions of |

BLM_0011174

| | | | | |
|---|---|---|---|---|
| | | | | the study do not distinguish among types of public lands; in the study, this label includes all state and Federal lands, and not just BLM lands.  This makes some of the results more difficult to use in BLM planning and analysis since both counties in the MPA contain significant amounts of state, NPS and USFS lands.  Nonetheless, the study provides interesting results not available elsewhere, and the summaries for Grand and San Juan counties incorporated in Attachment B may be useful in future implementation actions.  None of the results provided affect either the formulation of alternatives in Chapter 2, nor the analysis of impacts in Chapter 4. Where appropriate, pertinent results are incorporated in Chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 1 | The BLM 's interpretation of the Multiple Use mandate where all uses occur someplace but not togetether is flawed. Landscapes can be managed so that a broad spectrum of resource uses can create social, economic and ecological wealth simultaneously.  Multiple use management results in benefits to various resources. For example, grazing can be a tool to benefit wildlife and their habitats. | In developing land use plans, the BLM is mandated by FLPMA to observe the principles of multiple use and sustained yield.  FLPMA defines multiple use as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people…..the use of some land for less than all of the resources, a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources….with consideration given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output".<br><br>The final land use plan for the Moab Field Office will define multiple use for this area. |
| San Juan County | 121 | 2 | More emphasis should be placed on monitoring the plan decisions both to measure the results of the plan and to insure that actions are taken to incorporate any changes needed. Watershed function, livestock use, recreation, OHV use and wildlife populations are uses that should be monitored more closely. The plan should | The Federal regulations at 43 CFR 1610.4-9 require that land use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved.  The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the |

| | | | have greater flexibility to adapt to changing conditions. | ROD. |
|---|---|---|---|---|
| San Juan County | 121 | 3 | San Juan County asks for more cooperation and collaboration with local, state, and federal agencies (as well as interest groups) in actions and decisions within the Field Office.  Misunderstandings could then be worked out in advance -- in the field rather than the courtroom.  Within the framework of this RMP, the BLM should provide more opportunities to facilitate cooperative relationships and foster better collaboration efforts. | The State of Utah, Grand County, and San Juan County are cooperating agencies involved in the preparation of the RMP.  The BLM has involved the cooperating agencies in all aspects of the land use planning process including participation in the interdisciplinary team meetings. Cooperation and collaboration will continue on site specific projects after the RMP is completed and this does not require a plan decision to accomplish. |
| San Juan County | 121 | 4 | San Juan County feels more emphasis should be placed on sustaining and developing healthy watersheds. The functionality of watersheds underlies all resources values.  The best way to improve the functionality of watersheds is by increasing the ground cover.  Well managed grazing is one of the best, most economical, large scale tools for increasing ground cover. | The BLM actively supports efforts to improve watersheds. The BLM is a partner in the Healthy Lands Initiative for Utah.  The RMP, under all action alternatives, specifies that restoration efforts be undertaken in cooperation with the Utah Partners for Conservation and Development (pg. 2-50).  The RMP, under all alternatives, also specifies that grazing would be managed according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health.  Implementation of these standards would improve watershed health and functioning. |
| San Juan County | 121 | 5 | San Juan County supports livestock grazing in a prescriptive manner to accelerate progress toward improved rangeland health and reduction of catastrophic fire.  The BLM should reassess timing and season of use for grazing. | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or not available for livestock grazing.  This is the only planning decision within the RMP.  Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| San Juan County | 121 | 6 | San Juan County feels that social/economic analysis for livestock grazing is inadequate, as many allotments have been reduced or closed. The county urges BLM to look at grazing on a watershed basis vs. an allotment basis so that livestock operations would have opportunities to be more profitable but also to benefit wildlife and other resources. | Only one livestock allotment is proposed under any alternative for non-availability in San Juan County (Mill Creek: 3,921 acres).  Of those proposed for non-availability (including those in Grand County) under Alt C, only Mill Creek is available for grazing now.  Most of the other allotments have been unavailable for grazing since 1994, and some since the 1985 Grand RMP.  The socioeconmic impacts of lost grazing opportunities is analyzed on pg. 4-258. |

BLM_0011176

| | | | | Decisions concerning numbers of livestock and seasons of use are made on a allotment basis using Standards for Rangeland Health and Guidelines for Grazing Management  during the permit renewal process. |
|---|---|---|---|---|
| San Juan County | 121 | 7 | San Juan County supports Alt C for travel management. The county wants the BLM to highlight specific prescriptions to promote responsible use, such as areas that would be highlighted for OHV use, maps, signing, kiosks etc.  In addition, BLM does not mention impacts from hikers or mountain bikers. | The RMP proposes many areas to be focus areas or SRMAs emphasizing responsible motorized use.  These include Cameo Cliffs SRMA, Gemini Bridges/Poison Spider Mesa Motorized Touring Area, Utah Rims SRMA, Dee Pass Motorized Trail Area, and the Airport Hills Moto Cross Area.  These areas are proposed for specialized management emphasizing that activity.  The RMP would designate these areas but a Recreation Area Management Plan will follow the RMP, where specific prescriptions suggested by the county would be detailed. The Travel Plan (Appendix G, pg. 30) details mapping, signigng, and construction of kiosks as actions that would be part of implementation of this Plan.<br><br>Mountain bikes are restricted to the designated route system under all action alternatives.  Impacts of mountain bikes vs. motorized travel were not separated out in the discussion.  All impacts of off-route travel were combined for all types of wheeled vehicles.  The impacts of hikers were not considered because no decision in this plan requires hikers to stay on trail. |
| San Juan County | 121 | 8 | BLM erroneously uses the term critical habitat (defined as applicable only to threatened and endangered species).  This error occurs on Maps 2-27 B and C/D, on pages 3-169 and 3-171 and on page N-6. The term crucial habitat is used too loosely; UDWR uses crucial habitat as descriptive designations.  They are not intended to mislabel resource concerns and result in a limitation of compatible uses.  San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County and submits information from Dr. Charles Kay in that regard. | Maps 2-27B and C/D refer to the term crucial winter range and the term critical is not used.  The term critical is used erroneously on pgs. 3-32, 3-38, 3-39, 3-40, 3-125, 3-127, 3-169, 3-171, 3-174, 3-177, and N-6.  This term will be changed to crucial in the final RMP/EIS.<br><br>The UDWR is the jurisdictional agency for wildlife management within the State.  The BLM relied on the expertise of this agency for delineating wildlife habitats, estimating population numbers, and recommending wildlife restrictions. |

| | | | | |
|---|---|---|---|---|
| | | | | Also, refer to comment response 121-39. |
| San Juan County | 121 | 9 | San Juan County is opposed to "layering" or the establishment of ACECs or SRMAs over WSAs or Wild and Scenic Rivers. | "Layering" is planning.  Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands.  Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives.  Under the multiple use concept, the BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands.  The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering".  The BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area.  Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation.  Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner.  All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.<br><br>FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations, and policies for many different and often competing land uses and to resolve conflicts and |

BLM_0011178

prescribe land uses through its land use plans.  BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (See, Appendix C, Planning Handbook "H-1601-1").  Specific decisions must be included in each of the alternatives analyzed during development of the land use plan.  As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.

For example, the BLM has separate policies and guidelines as well as criteria for establishing Areas of Critcal Environmental Concern (ACECs) as when the Wilderness Study Areas (WSAs) were established.  These differing criteria make it possible that the same lands will qualify for both an ACEC and a WSA but for different reasons.  The BLM is required to consider these different policies.

The values protected by WSA management prescription do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa.  The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC evaluation (Appendix I).  The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values.  None of these values include wilderness characteristics.  Additionally, the management prescriptions for the ACEC are limited in scope to protect the relevant and important values and the BLM maintains that the size of the ACEC areas is appropriate to the relevant and important values identified.

SRMAs are not restrictive of resource uses but rather are utilized to control  recreation use.  The South Moab

BLM_0011179

| | | | | |
|---|---|---|---|---|
| | | | | SRMA does overlay the Mill Creek and the Behind the Rocks ACECs, but the management proposed in each is for differing purposes.<br><br>Please see Response 120-64 |
| San Juan County | 121 | 10 | Managing Non-WSA Lands for so-called wilderness chracteristics violates FLPMA, Utah Code 63-38d-401(6)(b), the San Juan County master plan, the Norton-Leavitt Agreement and other agreements. | The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).<br><br>This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2))) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired.  All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711).  In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially |

| | | | | |
|---|---|---|---|---|
| | | | | similar to the manner in which such lands are protected as WSAs.<br><br>The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.<br><br>Finally, the Utah v. Norton Settlement Agreement does not affect BLM's authority to manage public lands.  This Agreement merely remedied confusion by distinguishing between wilderness study areas established under FLPMA §603 and those lands required to be managed under §603's non-impairment standard, and other lands that fall within the discretionary FLMPA §202 land management process. |
| San Juan County | 121 | 11 | In the analysis of the impacts for the Draft RMP/EIS, almost all the impacts are attributable to OHV use, oil and gas use, and, to some extent, grazing.  The underlying theme is that these 3 things are the cause of all negative impacts and if they are elimanated or contolled then everything else is take care of.  The BLM should consider cheat grass and juniper encroachment, invasive weed problems, and catastrophic fires.  The BLM should utilize livestock to control invasive plants. | In the Draft RMP/EIS surface disturbing activities are considered potential negative impacts to natural and cultural resources.  On page C-1, surface disturbing activities are defined.  Surface disturbing activities include, among many other things, oil and gas development and cross country OHV use.  Neither grazing nor vehicle travel on vehicular routes are defined as surface disturbing activities.<br><br>On pg. 2-50 in decisions common to all action alternatives, the BLM specifies controlling and reducing invasive and noxious weed species.  Vegetation |

| | | | | treatments areas for pinyon-juniper area are identified on pg. 2-14.<br><br>On an allotment basis, Standards for Rangeland Health and Guidelines for Grazing Management could be utilized to control invasive species. |
|---|---|---|---|---|
| San Juan County | 121 | 12 | San Juan County commends the BLM for the effort that has been expended to better understand and portray socioeconomic impacts in this DRMP.  This has been a weakness in previous plans.  San Juan County encourages BLM to use studies done by Utah's universities to enhance this information such as the social survey undertaken by USU and the economic studies done by the U of U. Every NEPA action in the RMP should include a discussion on socioeconomic conditions and fully disclose all impacts. | The BLM has reviewed the Utah State University survey of rural counties conducted by the State of Utah.  The BLM has received preliminary data from this study received after completion of the Draft RMPM/EIS.  The BLM has incorporated findings in the PRMP/FEIS as appropriate.<br><br>The BLM has incorporated findings from recent research completed by the University of Utah's Bureau of Economic and Business Research into the PRMP/FEIS.<br><br>On a broad land use planning level, the BLM has disclosed the socioeconomic impacts from various resource actions as discussed in Chapter 4 of the DRMP/EIS.  It is not practical to separate out the socioeconomic impacts of the many resource decisions specified in the plan. |
| San Juan County | 121 | 13 | San Juan County is opposed to relinquishment of preference or retirement of grazing rights in favor of conservation (p. 2-12).  BLM should clarify goals in encouraging relinquishment and what would happen to voluntarily relinquished AUMs if BLM proposes to retire AUMs.  What mechanism would be used to retire grazing rights? | The BLM does not encourage or discourage relinquishment of grazing preference.  The BLM policy concerning the voluntary relinquishment of grazing preference is included on pg. 2-12 of the DRMP/EIS.  As stated in this policy, relinquished permits and the associated preference would remain available for application by qualified applicants after the BLM considers if such action would meet rangeland health standards and is compatible with achieving land use plan goals and objectives.  Upon voluntary relinquishment, the BLM may determine through site specific evaluation and associated NEPA analysis that the public lands involved are better used for other purposes… any decision issued concerning discontinuous of livestock grazing is not |

BLM_0011182

| | | | | permanaent and may be reconsidered and changed through future land use plan amendments. |
|---|---|---|---|---|
| San Juan County | 121 | 14 | Alternatives B and C should not favor a single use regarding vegetation treatments, but should benefit multiple use objectives (p. 2-14). | In the Draft RMP/EIS (pg. 2-14), Alt D specifically favors livestock grazing in conducting vegetation treatments. Alt C specifies vegetation treatments that would benefit multiple use obectives including livestock grazing and wildlife as well as watershed health. Alt B specifies vegetation treatments to benefit wildlife, watershed, soils, and riparian health. Multiple use is defined by FLPMA as 1) the use of some land for less than all of the resources, and 2) a combination of balanced and diversed resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources. |
| San Juan County | 121 | 15 | BLM should give due consideration to the most efficient program for the development of oil and gas resources in favor of exclusionary management for other uses. BLM is using exclusionary management for non-WSA lands with wilderness characteristics, ACECs and wildlife areas. | Alt B of the Draft RMP/EIS favors the protection of resources over the extraction of mineral development. Alt D favors mineral development over protection of resources. Alt C is designed to be a balance between mineral development and protection of resources. There are no "exclusionary areas" proposed in the Draft RMP/EIS for Alt C within San Juan County for oil and gas. There are no ACECs or non-WSA lands with wilderness characteristics proposed for Alt C within San Juan County. Only timing restrictions for wildlife are proposed in Alt C within San Juan County. |
| San Juan County | 121 | 16 | The socio-economic analysis for oil and gas is inadequate. A study in Unitah County found that oil and gas account for 60% of total wages, with the average wage of an oil worker at $84,795. | On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. |
| San Juan County | 121 | 17 | Please explain how the extremely restrictive Alt. B would have only slightly lower economic benefits. Many of the new restrictions on oil and gas proposed in this RMP are not warranted. BLM should make reasonable adjustments in the preferred alternative. | The fiscal impacts have been described in Table 2.2 on pg. 2-78 (DRMP/EIS) in terms of royalty revenue. This table shows that royalty revenues will be reduced by 50% in Alt B. In addition property tax revenue, and severance tax data have been added to the table for the PRMP/FEIS and likewise show a 50% reduction in revenues in Alt B as compared to Alt C. |
| San Juan County | 121 | 18 | BLM should not manage lands for wilderness characteristics, taking into account the Utah v. Norton | Refer to response to comment 121-10. No non-WSA lands with wilderness characteristics are proposed for |

| | | | | |
|---|---|---|---|---|
| | | | settlement, the opinions of local governments and residents, the existence of inholdings and valid existing rights, and the existence of SITLA lands. BLM has ignored county travel route and intrusion information in the 1999 wilderness inventory. BLM should clarify the difference between "natural", "largely natural", and "generally natural", and define "allotment files" and "master title plat data". | management in Alt C for San Juan County. County travel route information was utilized in the Travel Plan and in the selection of non-WSA lands for the preferred alternative. For impacts to SITLA lands refer to response to comments 120-101 and 120-103. The terms specified for clarification are taken from the 1999 Wilderness Inventory and can not be changed at this time. |
| San Juan County | 121 | 19 | Will future "recreation area management plans" and "river management plans" be subject to NEPA. What is the process for developing and approving these plans? | After completion of the RMP process, those SRMAs that do not currently have RAMPs will need to develop a site specific RAMP, subject to full compliance with the NEPA. The process is identical for River Management Plans. |
| San Juan County | 121 | 20 | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, backcountry touring on designated roads. This statement appears to indicate that those portions of SRMAs that are not subject to a more specific focus area will be managed to emphasize motorize recreation. This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring. Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for motorized backcountry touring. | See response to comment 120-67. |
| San Juan County | 121 | 21 | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19). Please explain what a "destination SRMA" is and how such areas would be managed. | See response to comment 120-68. |
| San Juan County | 121 | 22 | The Mill Creek Canyon Potential ACEC. San Juan County is opposed to protecting wilderness characteristics and layering. Alt. D best describes this unit. | Alt C proposes no management to protect  wilderness or wilderness characteristics within the Mill Creek Potential ACEC. Of the 3,721 acres in this ACEC in Alt C, 1,474 acres are within San Juan County.

Alt. B contains 295 acres of non-WSA lands with wilderness characteristics within San Juan County. Of |

| | | | | |
|---|---|---|---|---|
| | | | | these acres, all are within the Mill Creek Potential ACEC as outlined in Alt. B. |
| San Juan County | 121 | 23 | Alternatives B and C propose to "maintain 3 cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37).  Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | See response to comment 120-109. |
| San Juan County | 121 | 24 | Wilson Arch Potential ACEC.  This should be dropped in all alternatives because of surrounding private land.  The area should be VRM Class III in all alternatives.  The arch should be protected with a hiking trail up to it. | The Wilson Arch Potential ACEC is proposed only in Alt. B.  The potential ACEC meets the relevance criteria and must be included in 1 alternative.  The area is managed as VRM II in Alt C, providing protection to the arch, and managed as VRM III in Alt. D, providing virtually no protection to the arch. |
| San Juan County | 121 | 25 | Southwestern Willow Flycatcher.  What is their habitat?  There is no map provided. | The Southwestern Willow Flycatcher is an endangered species;  the U. S. Fish and Wildlife Service has not mapped their critical habitat within the Moab Field Office boundaries.  The USFWS defines their breeding habitat as dense riparian tree and shrub communities associated with rivers, swamps, and other wetlands (USFWS Recovery Plan, Southwestern Willow Flycatcher). |
| San Juan County | 121 | 26 | Are there any Gunnison sage grouse leks within the MPA?  Will the restrictions be imposed whether or not the grouse are present? | There are currently no Gunnison sage grouse leks or occupancy within the MPA.  On page 2-47, the Draft RMP/EIS states:  "If sage grouse occupancy is identified, the stipulations would be imposed as follows:"  Thus, stipulations would only be imposed if the grouse are present. |
| San Juan County | 121 | 27 | VRM Management appears to be the same for Alts C and D within San Juan County.  San Juan County would like Shafer Basin managed as VRM I, Mill Creek managed as VRM II and the rest of San Juan County managed the same as Alt. A.  BLM should adjust Alt. C. | Alts C and D are not identical within San Juan County, with 15,326 acres managed as VRM I, 65,273 acres of VRM II, 116,101 acres of VRM III, and 96,471 acres of VRM IV within the county in Alt C and 6,316 acres of VRM I, 42,887acres of VRM II, 147,496 acres of VRM III and 96,471 acres of VRM IV within the county in Alt D.  In Alt C, Shafer Basin is managed as VRM I, and the areas around Mill Creek are managed as VRM II. |

| | | | | The 1985 Grand RMP did not manage for VRM. However, in 2002, a plan amendment was completed for the Canyon Rim Recreation Area, which is managed as VRM II and III. All WSAs, including Behind the Rocks WSA within San Juan County, are managed as VRM I. However, in Alt A, the remainder of San Juan County has no VRM management. This is not an option for the revised RMP. |
|---|---|---|---|---|
| San Juan County | 121 | 28 | San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County. San Juan County asks that Alt. A coverage be used for deer and elk winter range. Prescriptions should be added to the alternatives to allow for collaborative monitoring and studies conducted that will allow for habitat designations to be biologically and scientifically based. | The BLM relied on UDWR, the agency with jurisdictional expertise regarding deer and elk. In the 1985 Grand RMP, the BLM did not impose restrictions on the entire deer and/or elk habitat (approximately 110,000 acres) delineated by UDWR within San Juan County. Restrictions were only imposed on about 4,000 acres of this habitat. A prescription in the alternatives is not necessary in order to allow for collaborative monitoring and studies. |
| San Juan County | 121 | 29 | The term "critical" is used inappropriately for wildlife habitats on the following pages: p. 3-38, 3-39, 3-169 (in Table 3.52), 3-171. Critical is used only for 'sensitive species' habitat. | These terms have been corrected in Chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 30 | "Competition between deer and livestock" (pg. 3-38) is used inappropriately because both livestock and deer should be managed under an allocation system for both. | This statement is only intended to clarify the uses occurring on the Between the Creeks allotment. |
| San Juan County | 121 | 31 | With over 300,000 vehicles per year, are there conflicts between people and habitat for desert bighorn, bald eagle, SWWF, T and E fish, peregrine falcon and other sensitive raptors; since the RMP states that there are conflicts between people and livestock on the Professor Valley, River and Ida Gulch allotments (pg-3-39). | The conflicts between the vehicles and the livestock are in the form of vehicle collisions with cattle. Utah State Highway 128 does not cross desert bighorn habitat, and there have been no collisions between vehicles and the other species listed. |
| San Juan County | 121 | 32 | There is a discrepancy between Tables 3.56 and 3.57 on DWR population objectives for elk. BLM should clarify or correct this. San Juan County questions the accuracy of DWR's elk counts. | Tables 3.56 and 3.57 have been changed to correct the discrepancies. |
| San Juan County | 121 | 33 | BLM should remove the crucial winter range for elk in San Juan County, including all prescriptions, impacts, | Throughout the DRMP/EIS, the reference to "deer and elk habitat" has been replaced with "deer and/or elk" habitat. |

BLM_0011186

| | | | | |
|---|---|---|---|---|
| | | | environmental consequences, etc. from the DRMP (pg. 3-173). | Since the prescriptions and environmental consequences for the two animals are very similar, the habitats were considered together. |
| San Juan County | 121 | 34 | Pronghorn do not use pinyon juniper habitat.  Correct this inconsistency in Table 4.138 on page 4-442. | Pronghorn do utilize pinyon juniper habitat occassionally but their primary habitat is sagebrush/perennial grass.  This has been corrected in Table 4.138. |
| San Juan County | 121 | 35 | BLM has presented no data that would justify range extensions for mule deer, elk, bighorn sheep or antelope.  BLM assumes that habitat is the most important factor limiting ungulate popularions, but data from studies indicate that numbers are limited by predation. | UDWR is the agency with jurisdictional authority for mule deer, bighorn sheep, elk, and antelope.  The BLM relies on the UDWR for their expertise regarding habitats.  The BLM does not have any authority to regulate predation. |
| San Juan County | 121 | 36 | Much of the area listed as antelope/kidding habitat on Map 2-25 is seldom actually used by antelope.  The failure of antelope to increase in numbers are due to factors other than habitat , such as low fences in the southern end of the area and predation.  Unless BLM can produce data showing that the area is heavily used by antelope, multiple use activities should not be restricted. | The BLM has not restricted multiple use activities due to the existence of antelope habitat in San Juan County.  A minor timing restriction (45 days) for surface disturbing activities is imposed on antelope habitat during kidding periods.  This timing restriction is within the standard operating procedures for oil and gas activities.  UDWR is the agency with jurisditional authority for predator control.  The DRMP/EIS states on pg. 2-53 "Construct fences that allow for pronghorn passage and dismantle uneeded fences" in pronghorn habitat. |
| San Juan County | 121 | 37 | BLM proposes an increase in bighorn sheep habitat over that proposed in the 1985 RMP.  Much of the area proposed is seldom visited by bighorns, as they are never far from escape terrain.  Studies have shown that hikers have a greater negative impact on desert bighorns than do motorized users.  Predation is the key limiting factor on bighorn, an issue not addressed in the DEIS. | Only the Shafer Basin (within San Juan County) was proposed as bighorn habitat in 1985.  The addition of bighorn habitat delineated by UDWR within San Juan County is along the rims of Canyon Rims, and in the Hatch Wash area.  The majority of the bighorn habitat is within 0.5 to 1 mile from escape terrain.  The BLM is aware of the studies that document the impact of hikers on bighorn sheep.  Permitted hiking is restricted on a case by case basis within bighorn habitat under the issuance of Special Receration Permits as stated on pg. 2-30 of the DRMP/EIS.  UDWR is the agency with jurisditional authority for predator control. |
| San Juan County | 121 | 38 | BLM has combined deer and elk habitat throughout the analysis.  This should be corrected for the following reasons:  habitat manipulations that favor elk do not | The BLM combined deer and elk habitat for the purposes of analysis.  On pg. 4-442, the DRMP/EIS states "Mule deer and elk habitat have been combined in an attempt to |

BLM_0011187

| | | | | |
|---|---|---|---|---|
| | | | benefit mule deer;  elk are above herd objective and need to be reduced; combining habitats is a way to increase elk numbers; BLM ignores the fact that elk will displace mule deer; elk and deer respond differently to development and human use, with elk being more easily displaced than deer; Monticello BLM maps deer and elk habitat spearately; there is no elk use on BLM land that BLM wants to classify as "crucial habitat" in San Juan County | simplify the management of their closely overlapping ranges…Further discussions and analyses will consider the two species together".  The BLM chose to map deer and/or elk habitat on the same map to simplify readibility. In the PRMP/FEIS the habitats will be delineated separately on a map.<br><br>However, throughout the PRMP/EIS the wording has been changed from "deer and elk" to "deer and/or elk". The BLM acknowledges that elk are not found on every acre of deer habitat.<br><br>The land use plan provides for broad landscape level planning prescriptions.  These habitats will be separated for analyses on a site specific project level.<br><br>UDWR has the jurisdictional authority for population objectives of big game species. |
| San Juan County | 121 | 39 | The 1985 Grand RMP designated only a small area near the LaSal Mountains as habitat for mule deer. The BLM wants to propose an increase with no justification. San Juan County's study (undertaken in the Spring of 2006) found little mule deer use south of East Coyote Wash.  BLM ignored these data.  Additionally, there is virtually no elk use, except at Lackey Fan and on Three Step Hill.  Calling the area deer and elk winter range is without merit. BLM should produce data south of East Coyote Wash to show that this is crucial deer or elk winter range. | UDWR has the jurisdictional authority for the identification of deer and elk habitat.  The BLM relied on this expertise.  As stated in response to comment 121-38, the BLM has corrected the wording of the habitats to read "deer and/or elk habitats". |
| San Juan County | 121 | 40 | BLM should not use the phrase "a thriving natural ecological balance" because it does not know what "natural" is (p. 2-5). On Map 2-20, "historic habitat" for sage grouse is identified as "pre-setttlement" habitat. San Juan county has been settled for 10,000 years. | The statement on pg. 2-5 is a simple statement directed to the general public that the BLM attempts to develop management prescriptions on a landscape level which will support and protect wildlife habitats while allowing for multiple use.<br><br>Presettlement habitat of sage grouse is defined on pg. 34 |

| | | | | of the Gunnison Sage Grouse Range Wide Conservation Plan. The term presettlement in this document refers to the early 19th century. |
|---|---|---|---|---|
| San Juan County | 121 | 41 | Page 2-50: BLM says it will "work in coordination with UDWR to reduce wildlife numbers as necessary to restore sagebrush habitat." BLM does not do this. The factor most responsible for the decline of sagebrush is browsing by mule deer, not drought. | UDWR is the agency with jurisdictional authority for wildlife population numbers. The DRMP/EIS states that BLM will work with UDWR to achieve the UDWR goals. |
| San Juan County | 121 | 42 | Page 3-168. The species name for elk is cervus elaphus, not cervus canadenisis. | UDWR lists elk as cervus canadenisis and this nomenclature was adopted by the BLM in the DRMP/EIS. |
| San Juan County | 121 | 43 | Page 3-169 - 171. Mule deer do not eat dry and dead grass during the winter. Predation, not drought, is the reason for reduced mule deer numbers. ATV's, oil and gas development, mining, livestock grazing do not have the impact that predators have had on mule deer populations. Predation must be discussed in the Draft RMP/EIS. | The BLM stands by the statement on pg. 3-169 that mule deer will eat dead grass during the winter.<br><br>Predation, although not within the BLM's jurisdiction, can also contribute to mule deer population declines. This has been added to chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 44 | Page 3-171. BLM states that 90% of the local deer and elk population is located on BLM during an average of five winters out of ten. These data must be produced. On p. 3-172, DWR herd objectives and population estimates for elk are listed. These are imaginary numbers. DWR's elk population estimates are consistently 30-40% low because the agency ignores scientific studies. BLM should acknowledge the error of DWR's estimates. | The BLM has relied on information provided by the UDWR for elk and deer populations and habitat in the DRMP/EIS. UDWR is the agency with juridictional authority on these matters. |
| San Juan County | 121 | 45 | Page 3-173. BLM states that "livestock competition for forage is increasing as the elk herd numbers continue to grow." Forage was allocated to livestock when the allotments were adjudicated; thus, the problem is the increasing elk herd. | The BLM has reworded the sentence on pg. 3-173 to state that forage competition between livestock, other wildlife, and elk is increasing in the Cisco desert. |
| San Juan County | 121 | 46 | Page 3-173. Elk use in Hatch Point is zero, in Lisbon Valley and on most of Black Ridge it is near zero. The agency has no data to support its assertions. | Deer and elk habitats were combined for mapping purposes. As stated in response to comment 121-38, these habitats have been delineated separately on a map. |
| San Juan County | 121 | 47 | Table 3.58. BLM's age objectives for antelope make no sense. Antelope do not normally live to 14, and an age | This information was provided by the UDWR which is the agency with jurisdictional authority. |

| | | | | |
|---|---|---|---|---|
| | | | objective of 2 means the herd is under extreme harvest pressure, which is not the case. | |
| San Juan County | 121 | 48 | What evidence is there that desert bighorns actually use the Redd Sheep Trail? | Pellets from bighorn have been gathered from the Redd Sheep Trail;  tracks have also been seen on it, as well as extensively along the rims accessed by this trail. |
| San Juan County | 121 | 49 | Mule deer, elk and pronghorn do not utilize pinyon-juniper habitat, as is asserted in the DEIS.  There is no need to protect pinyon or juniper;  there is the need to clear them to restore natural conditions.  Maintenance of chainings must specifically be addressed in the RMP. | See response to comment 121-34.  Pronghorn use has been noted in areas where pinyon-juniper interfaces with shrub-steppe/grasslands.  These pinyon-juniper areas are utilized for thermal protection.<br><br>The DRMP/EIS (pg. 2-14) recognizes the need for maintaining vegetation treatments to increase the availabilty of forage.  Many of these treatments involved the removal of pinyon-juniper. |
| San Juan County | 121 | 50 | Page 4-449.  Cattle do not eat sagebrush;  cattle grazing at the proper time of year can improve sagebrush habitat for mule deer.  Livestock do not compete for escape terrain or thermal cover with deer and elk. | Although cattle prefer grass, they will eat sagebrush when necessary.  For example, during severe winters cattle may not be able to access grass and as a result they are forced to eat sage brush.<br><br>During summer months cattle will seek the shade along the edge of pinyon-juniper interfaces with sagebrush/grassland.  These are areas that deer typically occupy for thermal protection and escape terrain. |
| San Juan County | 121 | 51 | Page 4-452.  BLM mentions that elk are intolerant of cattle, which is true, but the BLM fails to mention that mule deer are intolerant of elk.  The DEIS needs to discuss elk-deer competition.  BLM needs to discuss the negative impact deer browsing has on sagebrush. | UDWR is the agency with jurisdictional authority for big game populations.  Elk and deer competition must be addressed by UDWR population objectives.<br><br>Sagebrush communities across the west have been in decline from a myriad of reasons.  The BLM Sagebrush Conservation Gidance is prescribed as management common to all action alternatives on pg. 2-50 of the DRMP/EIS.   UDWR has not identified overpopulation issues among local deer herds utilizing sagebrush communities. |
| San Juan County | 121 | 52 | Pages 4-483 and 4-484.  Sections 4.3.19.18.2.1 and 4.3.19.18.2.2 erroneously assess the impact of habitat fragmentation on mule deer and elk. BLM's analyses | The fragmentation analyses in the referenced sections are not an attempt to quantify specific impacts from site specific projects but are presented to analyze the degree |

| | | | | |
|---|---|---|---|---|
| | | | are flawed and should be corrected or removed. Sawyer's 2006 study is not applicable to San Juan County. DWR's study plots are near roads and DWR would not locate its plots close to roads if mule deer and elk use was reduced near roads as claimed by BLM. | of habitat fragmentation under each alternative. GIS models were based on the BLM's best available data. These models address fragmentation differences between alternatives on a landscape level. Habitat fragmentation is one of many factors that play an important role in land management decisions. |
| San Juan County | 121 | 53 | Pages 4-484 ti 4-485. BLM's analysis of bighorn sheep fragmentation is flawed (p. 4-484- 4-485). BLM fails to mention that hikers disturb sheep more than do vehicles. Predation should also be mentioned, as should the dense growth of non-native woody riparian vegetation found along the Colorado River. | As stated in response to comment 121-52, the analysis of habitat fragmentation for bighorn sheep is a tool to understand the differences in fragmentation among alternatives.<br><br>See response to comment 121-37 for a discussion of hikers on bighorn sheep.<br><br>Predation is under the jurisdiction of UDWR.<br><br>Tamarisk encroachment along the Colorado River was not raised as an issue in the Draft RMP/EIS. However, the BLM recognizes the need for bighorn watering catchments, and has an active program of wildlife watering projects. |
| San Juan County | 121 | 54 | Page G-25 (last paragraph). What reduces the survival rate of fawns and calves is predation. | BLM does not manage predation efforts; UDWR is the agency with jurisdicational authority over predation. |
| San Juan County | 121 | 55 | Page N-5. BLM's 1989 RMP amendment gave 1,440 as the "prior stable number" of desert bighorn sheep. On p. 3-176, it states that the DWR's population objective for the Moab area is 450 desert bighorn sheep. Why are these numbers different? | The number of 1,440 was used in the 1989 RMP amendment. The number 450 is an updated number utilzed in the DRMP/EIS (2007). The difference is a refliction of the number of years between the two documents (18 years). |
| San Juan County | 121 | 56 | Bald Eagles are not on the Federal Endangered Species List. The animal was removed last June. | The delisting of the Bald Eagle had not occurred prior to the printing of the DRMP/EIS. This change has been made to the PRMP/FEIS. |
| San Juan County | 121 | 57 | BLM has not coordinated with local Native American governments regarding wilderness planning, as is required in Section 202 of FLPMA. Anything less than the opportunity for full participation will be considered a violation of law subject to legal action. | During the development of the DRMP, the BLM invited the affected tribal governments to fully participate in the RMP process, to consult on any aspect of the RMP's management prescriptions or actions, and to provide comments or issues of tribal concern. As outlined in Chapter 5 of the Moab DRMP/EIS, the BLM held several |

| | | | | |
|---|---|---|---|---|
| | | | | meetings with tribal governments concerning the development of the RMP/EIS, including holding additional meeting after the DRMP/EIS alternatives were prepared, as requested by the tribal governments. All consulted tribes were provided copies of the alternatives and draft documents.<br><br>For example, the BLM held several meetings with the Navajo Nation. The BLM met with the Navajo Utah Commission on February 11, 2004, and with the Navajo Nation Historic Preservation Office on December 9, 2003, and on November 13, 2006. The BLM also met with the Southern Ute Tribe on March 30, 2004, and on October 11, 2006; meetings with the Ute Mountain Ute Tribe were held on August 26, 2004, and on February 9, 2007.<br><br>A summary of tribal consultation, including all meetings with tribal governments and issues raised is contained in Chapter 5 of the DRMP/EIS. A complete record of the consultations is available in the Administrative Record for the DRMP/EIS. |
| San Juan County | 121 | 58 | For lands in question in the wilderness re-inventory, BLM has not adequately considered historical uses of the land, present and potential future uses of the land. Several court cases show that the wilderness planning process fails to adequately address several issues. Wilderness is a land classification and not a management modality. Wilderness is not within the scope of multiple use management. BLM is a rogue agency because it has a single-minded, headlong thrust to declare additional wilderness study areas within San Juan County. BLM has openly and brazenly defied the will of congress and the will of the people. BLM must coordinate with local plans, such as that of San Juan County | No lands are proposed to be managed as Wilderness or WSA in any alternative of the DRMP/EIS. However, the impacts of protecting Non-WSA lands with wilderness characteristics is fully disclosed in Chapter 4 of the DRMP/EIS. The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103© (43 U.S.C. §1702©).) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations. |

BLM_0011192

| San Juan County | 121 | 59 | BLM has refused to issue oil and gas leases because of the introduction of H.R. 1500, "America' Red Rock Wilderness" | Certain oil and gas parcels were deferred from leasing pending completion of the Moab RMP because of dated NEPA analysis.  The BLM does not manage public land based on pending draft or proposed legislation. |
|---|---|---|---|---|
| San Juan County | 121 | 60 | BLM must have public hearings, adequate notice and opportunity to comment upon, and participate in the formulation of plans and programs.  There have only been two meetings to give the public an opportunity for clarification, and it was unclear whether the meetings held were "open houses" or "public hearings". | Public participation opportunities are detailed in Chapter 5 of the DRMP/EIS.  To satisfy the public participation requirements of FLPMA, the BLM initiated the public scoping process on June 4, 2003 and the scoping period extended until January 31, 2004.  Six open houses and a comment cruiser were utilized as gather public input as well as a website with provisions for emailing comments and an invitation to provide written comments via letters.  A mailing list has been established of interested parties and a planning website has been maintained throughout the process.  The public was invited to review and comment on the DRMP/EIS from August 27, 2007 to November 30, 2007.  Four open houses were held to solicit comments from the public on the DRMP/EIS.  The public was notified about the open houses through newspaper advertisements and articles, radio announcements, the RMP website, and postcards mailed to everyone on the mailing list.  The open house format was utilized because it is more conducive to full public participation. |
| San Juan County | 121 | 61 | BLM must make a clear statement of whether it intends to designate WSAs for those areas that have wilderness character. | The BLM is not authorized to designate "Non-WSA Lands with Wilderness Characteristics" as WSAs or manage these lands under the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  The BLM authority to establish new WSAs pursuant to Section 603 of FLPMA expired no later than October 21, 1993, therefore as stated on pg. 1-12 of the Moab DRMP/EIS designation of new wilderness areas or WSA proposals are decisions outside of the scope of the DRMP/EIS. |
| San Juan County | 121 | 62 | BLM should have a more generous road set-back.  The BLM "standard" is indefensible.  It provides no reasonable or rational opportunity for maintenance of roads.  The BLM's boundaries are at man made | The road set-back described by San Juan County only applies to roads within or adjacent to WSAs.  The WSA setback is established by National BLM policy and is beyond the scope of the plan. |

| | | | | |
|---|---|---|---|---|
| | | | barriers, which has resulted in capturing large chunks of State Trust land as well as some parcels of private land. This violates the County Comprehensive Plan which calls for no net loss of private land within the county. | Routes adjacent to or within Non-WSA lands with wilderness characteristics have been accorded setbacks varying according to the classification of the road.  These setbacks range from 3 to 91 meters.  The acreage of Non-WSA areas with wilderness characteristics has been reduced to realize these setbacks.  Information has been added to Chapter 3 of the PRMP/FEIS to clarify these setbacks.<br><br>The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, the BLM is bound by Federal law.  As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| San Juan County | 121 | 63 | San Juan County objects to the 1996-99 Wilderness Character Reinventory process.  FLPMA does not provide for wilderness as a multiple use. | The BLM is required by FLPMA to maintain inventories of all resources and to use the inventory information during land use planning (FLPMA Section 201 and 202 (43 U.S.C. §1711-1712)).  The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."(FLPMA, Secton 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a |

BLM_0011294

| | | | | |
|---|---|---|---|---|
| | | | | mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>See also responses to comments 120-8 and 121-10. |
| San Juan County | 121 | 64 | BLM did not make information public regarding the impact of additional WSA designations. | The DRMP/EIS proposes no lands for additional WSA designation.<br><br>The document identifies non-WSA lands that are proposed to be managed to maintain their wilderness characteristics.  There are 26,162 acres of such lands within San Juan County in Alt B, and none in the Preferred Alternative, Alt C.  All of the information that was utilized in making these determinations is publicly available, and any information which is not on the Moab RMP website will be provided to any interested party. |
| San Juan County | 121 | 65 | BLM must consider all grazing files, mineral files, lands cases, recreation use permits etc. in terms of the suitability of the land to be managed for wilderness designation. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.<br><br>Chapter 4 of the DRMP/DEIS analyzes the impacts from management prescriptions which protect Non-WSA lands with wilderness characteristics, and the impacts on other resources and uses because of that protection.  In addition, during the inventory process, the majority of the existing land uses were identified and taken into consideration when determining areas with wilderness characteristics.  The source of the information was documented unit-by-unit during the wilderness review.  An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the units, was part of the review process.  This inventory is available on the Moab RMP website, and is part of the Administrative Record.  The information is also available upon request.<br>Those non-WSA lands that are considered for management of wilderness characteristics in Alternative B |

| | | | | |
|---|---|---|---|---|
| | | | | were analyzed for their suitability for other uses.  These uses were the reasons why there are no non-WSA lands within the county that are managed for wilderness characteristics in the Preferred Alternative.<br><br>Those Non-WSA lands that are considered to be managed to maintain the wilderness characteristics in Alternative B were also analyzed for their suitability for other uses.<br><br>See also response to comment 121-63. |
| San Juan County | 121 | 66 | BLM must consider access, economic analyses, Native American issues and alternatives for management in terms of manageability for wilderness. | No lands are considered for wilderness designation.<br><br>Those non-WSA lands that are considered for management for wilderness characteristics in Alternative B were analyzed for access, economic uses, alternatives for management, and Native American concerns.  These were among the reasons why there are no non-WSA lands within the San Juan County that are managed for wilderness characteristics in the Preferred Alternative (Alt C). |
| San Juan County | 121 | 67 | The mineral evaluations associated with the wilderness re-inventory are inadequate.  The values of the foregone minerals must be calculated in areas under study for possible WSA designation.  BLM violates its national minerals policy.  BLM has failed to issue oil and gas leases because of planning.   USGS is not involved in the wilderness process. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/EIS.<br><br>A comprehensive Mineral Report was prepared for the entire Moab planning area.  This report was prepared by the Utah Geological Survey, in cooperation with the BLM.  The report includes a comprehensive evaluation of the mineral potential of all mineral resources in the area.  It also included an assessment of the development potential of all mineral resources in the area.  In addition, a Reasonably Foreseeable Development scenario for oil and gas resources was prepared in cooperation with the Utah Geological Survey.  The scenario provides projections of the potential oil and gas development in the entire area over the next 15 years. |

| | | | | The mineral evaluations included all the Non-WSA lands found to have wilderness characteristics and were conducted in conformance with the BLM national minerals policy.  The EPCA inventory of oil and gas resources prepared by the USGS was used in drafting the Mineral Report.  Impacts to the affected mineral resources were analyzed and disclosed in Chapter 4 of the DRMP/EIS. |
|---|---|---|---|---|
| San Juan County | 121 | 68 | The BLM should examine and discuss the potential economic losses to those areas associated with potential wilderness or WSA designation.  It should also put forth alternatives where these adverse economic affects can be mitigated, such as larger PILT payments. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-12 of the DRMP/DEIS.<br><br>Those Non-WSA lands that are considered for management of wilderness characteristics were analyzed for the economic effects of that action.  For example, on pg. 4-94 of the DRMP/DEIS, the number of oil and gas wells foregone in Alternative B is discussed.<br><br>The PILT payments are outside the scope of the land use planning process. |
| San Juan County | 121 | 69 | San Juan County objects to using "cherry stemming" to create wilderness where none exists under the law.  If BLM recognizes a road as a boundary, what is the setback? | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.<br><br>"Cherry stemming" is a land management technique that facilitates better land management by allowing ingress and egress without compromising a special designation. This technique is often applied to WSAs.  However, the BLM is not proposing any WSAs under any alternative in the Moab DRMP/DEIS.  Furthermore, no lands are proposed for management of wilderness characteristics in San Juan County for Alternative C of the DRMP/DEIS.<br><br>Road setbacks are addressed in response to comment 121-62. |
| San Juan County | 121 | 70 | FLPMA requires a consistency review with local plans. The San Juan County Comprehensive Plan must be | The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land |

| | | | | |
|---|---|---|---|---|
| | | | considered.  Any diversions from the objectives of this plan by BLM must be accompanied by an explanation of why the BLM could not lawfully conform to the county plan. | management that are discrete from, and independent of, Federal law.  However, the BLM is bound by Federal law.  The FLPMA requires that the development of an RMP for public lands must be coordinated and consistent with County plans, to the maximum extent possible by law, and inconsistencies between Federal and non-Federal government plans be resolve to the extent practical (FLPMA, Title II Sec. 202 (c)(9)).  As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled.<br><br>Thus, while County and Federal planning processes, under FLPMA, are required to be as integrated and consistent as practical, the Federal agency planning process is not bound by or subject to County plans, planning processes, or planning stipulations.  The BLM will identify these conflicts in the PRMP/FEIS, so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.  A consistency review of the PRMP with the State and County Master Plans is included in Chapter 5.<br><br>No lands are considered for wilderness designation in the DRMP/EIS.  Also, no non-WSA areas with wilderness characteristics are proposed for management in Alt C. |
| San Juan County | 121 | 71 | Solitude is a subjective concept. Area ranchers would express the view that recreationists have a negative influence on solitude.  What does "outstanding" opportunities for solitude mean?  What constitutes primitive or unconfined recreation.  What is more important -- the economic viability of a county or solitude for an elite few? | Congress crafted the terms "outstanding opportunities for solitude" and "primitive or unconfined recreation" when it enacted the Wilderness Act of 1964.  The BLM Washington Office Instruction Memorandum 2003-275 Change 1 defines these terms for the purposes of land use planning.  In general, when the sights, sounds, and evidence of other people are rare or infrequent, where visitors can be isolated, alone or secluded from others, where the use of the area is through non-motorized, non-mechanical means, and where no or minimal developed |

| | | | | recreation facilities are encountered can provide visitors with the opportunity for solitude or primitive or unconfined recreation.<br><br>The economic impacts of managing non-WSA lands with wilderness characteristics were analyzed in Chapter 4 of the DRMP/EIS. |
|---|---|---|---|---|
| San Juan County | 121 | 72 | Comment Analysis on the 1999 Wilderness Inventory found that those supporting wilderness were from out of state.  Those supporting wilderness that were from Utah were from Salt Lake, Ogden and Logan.  San Juan County residents were clearly opposed to any action by BLM to designate more land for WSAs.  Native American comment letters were opposed to wilderness designation. Local comments are more impassioned, knowledgeable and we believe warrant more weight being placed on them.  Unit specific comments follow. The 1999 inventory was not really field truthed and there is a lack of consistency between field personnel. In this (1999) inventory, the BLM has developed their own set of rules and definitions as to what constitutes wildereness.  BLM has not followed the direction of Congress in defining wilderness. | 1Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.<br><br>Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people.<br><br>As part of BLM's wilderness characteristics inventory maintenance, BLM performed a combination of data and on-site reviews.  This included specific field inspections, Interdisciplinary team review of data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings which involved wilderness characteristics inventory maintenance. |
| San Juan County | 121 | 73 | Comment from 1999 Wilderness Inventory: Behind the Rocks:  this area should not be considered for further wilderness activities.  It is within the Paradox Fold and Fault Belt and has high potential for oil and gas. It has the potential for uranium and vanadium, as well as | No lands are considered for wilderness designation in the DRMP/EIS.<br><br>No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of |

BLM_0011199

| | | | | |
|---|---|---|---|---|
| | | | potash and copper. It does not qualify for wilderness because of past impacts. There are 13 roads within the unit, each of which is discussed specifically, with photos provided. | the DRMP/EIS in the Behind the Rocks area. |
| San Juan County | 121 | 74 | Comment from 1999 Wilderness Inventory: Gooseneck: San Juan County has no information that would refute BLM's finding in this area. It contains about 5,000 acres of public land, and to our knowledge has few intrusions. It should be pointed out, however, that this area does have the potential for minerals including potash, uranium and oil and gas. The economic potential of these minerals should be done if the area is designated wilderness. The minerals values outweigh the wilderness values. The BLM did miss four roads within or adjacent to the unit (photos and write-ups provided). | No lands are considered for wilderness designation in the DRMP/EIS.  No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Gooseneck area. |
| San Juan County | 121 | 75 | Comment from 1999 Wilderness Inventory: Hatch Wash: this unit is particularly disturbing to San Jan County. BLM is creating wilderness where wilderness does not exist. There are roads, seismograph lines, fences and other intrusions covering the landscape. The Hatch Wash area has high potential for oil and gas, uranium, vanadium, copper and potash. San Juan County requests that the area be dropped from further wilderness consideration. Specific roads in the area are identified by San Juan County. | No lands are considered for wilderness designation in the DRMP/EIS.  No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hatch Wash area. |
| San Juan County | 121 | 76 | Comment from 1999 Wilderness Inventory: Hunter Canyon: Mineral values will be foregone if wilderness is designated for this area. It has oil and gas, uranium, vanadium, copper, barite and potash. Specific roads are discussed within the comment. | No lands are considered for wilderness designation in the DRMP/EIS.  No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hunter Canyon area. |
| San Juan County | 121 | 77 | Comment from 1999 Wilderness Inventory: Shafer Canyon: This unit is not suitable or managable as wilderness, and it violates the 5,000 acre requirement. It has oil and gas, uranium, vanadium, copper and potash resources. Individual roads are also discussed. | No lands are considered for wilderness designation in the DRMP/EIS.  No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of |

| | | | San Juan County suggests that it could easily be managed as an area of critical environmental concern to protect the scenic qualities and vistas from Dead Horse Point. | the DRMP/EIS in the Shafer Canyon area.<br><br>The area does constitute a portion of the Highway 279/Long Canyon/Shafer Basin ACEC that is proposed in Alt C (Preferred) to protect scenic resources, particularly the vista from Dead Horse Point State Park. |
|---|---|---|---|---|
| Colorado Division of Wildlife | 218 | 1 | Closing many of the spur roads that have no destination will also be of great benefit to wildlife.  There is one road that is identified to be closed under preferred alternative C in the travel management plan that concerns us, as we would like to have this road remain open.<br><br>In the Dolores River Triangle there is a road starting in Township 21S Range 26E Section 32 SW 1/4 (state school section) that heads south for approximately one mile before it branches; both branches head southeast up different forks of spring Canyon along Spring Creek before entering into Colorado.  This road provides the only public access into BLM land on the Colorado side of the border.  Closing this road to motorized use will have large impacts on hunger opportunity and harvest in Colorado's Game Management Unit 40.  Our elk herd in GMU 40 is currently well over it's population objective and helping hunters achieve success is of great importance to us.  Due to the large amount of private ground on the Colorado side and the difficulty in getting hunters onto private ground, public opportunity in this unit is limited.  The Spring Creek area is a popular spot for GMU 40 hunters to go, particularly in the later rifle seasons.  It is one of the most consistent locations in GMU 40 for hunters restricted to public land to harvest cow elk during this time period.  If this road is closed to motor vehicle access, it would greatly decrease hunter opportunity and success in this area, potentially leading to even higher elk population numbers in the unit.  A large number of the elk in this unit winter across the | As this route provides the only public access to public lands in Colorado, it has been added to the preferred alternative.  The route has been designated in Alternatives C and D. |

| | | | boarder in Utah and left unchecked will have significant impacts to habitat on both sides of the border | |
|---|---|---|---|---|
| Green River City | 263 | 1 | Request that BLM ensure there are no conflicts between developable mineral deposits and areas being proposed (or currently managed) as having strict restrictions on surface disturbance. The Energy Policy Act of 2005 and other legislation sought to identify and mitigate circumstances that limit domestic energy production that is important to our nation's energy independence. | In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied to protect important natural resources. See response to comments 203-46 and 210-2.<br><br>See response to comment 121-15 regarding other restrictions. |
| Green River City | 263 | 2 | Under Chapter 3 of the DEIS, (socio conditions/context) Green River encourages, without significantly delaying the final RMP, the addition of a section highlighting the context and overlap of Energy Development in Grand County and its importance to the economy of Green River. Many truckers, contractors, and vendors do or will utilize services in Green River and these numbers need to be measured and included in your analysis. The contributions to our community from these taking place in Grand County lands adjacent to our municipal borders need to be described in your final document as our town will likely comment on future projects that affect our community. In recent years, Grand County relinquished its portion of Green River to Emery County, making Green River City an anomaly of sorts and as such, Green River encourages the BLM to identify what exploratory and long-term mineral production benefits will occur in Green River as the closest municipality to exploratory development north and south of I-70 within the Moab planning area. Such an addition would enhance the quality of the NEPA analysis by acknowledging the role Green River plays in servicing the mineral operations that occur in the Moab BLM field office planning area. Green River asks that this item be addressed in the final EIS and ROD. | As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities.  However, acknowledgement of the potential economic benefits to the surrounding communities of Green River and Grand Junction has been added to the document.<br><br>The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the MPA. |
| US Geological Survey | 410 | 1 | Section 3.8.1.2.1, Resource Overview, page 3-49 | Our assessment is specific to coalbed  methane contained in the Sego coal field.  The Uintah-Piceance |

| | | | The USGS has updated its assessment of coalbed methane resources of the Nation and results are reported in the following documents. For the Uinta-Piceance Province, the most recent (2002) USGS estimate of technically recoverable coalbed methane is 2.3 trillion cubic feet of gas (TCFG).<br><br>Assessment of Undiscovered Oil and Gas Resources of the Unita-Piceance Province of Colorado and Utah, 2002, USGS Fact Sheet FS-026-02, http://pubs.usgs.gov/fs/fs-0026-02-fe-0026-26.pdf<br><br>National Oil and Gas Assessment, 2007 Update (PDF map showing mean coalbed methane resources for Uintah Piceance and other provinces) http://certmapper.cr.usgs.gov/data/noga00/natl/graphic/2007/mean_gas_CBM_07.pdf | province lies to the north and east of the Moab field office. |
| US Geological Survey | 410 | 2 | Section 3.16, Special Status Species (pages 3-140 to 3-157); Section 4.3.15, Special Status Species (pages 4-353 to 4-404); and Section 4.3.19, Wildlife and Fisheries (pages 4-442 to 4-486)<br><br>There are several special status species (threatened, endangered, and candidate species) identified in the DEIS that have been found in the study area in the past 10 years. The document includes an impacts summary table for special status species and for wildlife and fisheries resources (Table 2.2, pages 2-94 – 2-97 and pages 2-101 – 2-105, respectively). However, a summary analysis of proposed mitigation measures with respect to these species for the various proposed alternatives is not provided. It would benefit the public if the final EIS included a summary analysis of proposed mitigation measures based on available scientific studies with supporting references. | Appendix C of the DRMP/EIS details the stipulations applicable to special status species for oil and gas leasing and other surface disturbing activities.  The U.S. Fish and Wildlife Service will issue a Biological Opinion on the impacts to candidate and listed threatened and endangered species. |
| Ute Mountain | 430 | 1 | Upon review of your draft it seems some of the Utah | On page 2-56 of the DRMP/EIS, under management |

BLM_0011203

| Ute Tribe | | | Mountain Ute Tribe's important cultural issues have not been addressed.<br><br>The women of White Mesa Ute Community, located south of Blanding, Utah, have traditionally made baskets from squawbush. One of the most critical areas where they gather this plant is off Highway 128, adjacent to the Arches National Park boundary and the river. These baskets play an important role in the culture and traditions of the White Mesa Community. The Tribe would therefore formally request that gathering of squawbush be allowed to continue in this area, and that it be made clear that the proposed restrictions in this area do not apply to gathering of plans for both medicinal and traditional practices such as basket making.<br><br>Allowing these traditional gathering practices to continue would result in minor environmental impacts, while simultaneously allowing the White Mesa community to practice and preserve their cultural heritage.<br><br>When spring comes the Cultural Resource staff from the tribe and the tribal elders have agreed to meet with any of the Moab BLM staff to show them culturally significant gathering areas. If there is further information the Tribe can provide, or to arrange a meeting with the staff and elders, please contact Cultural Resources Coordinator, Terry Knight at (970) 759-6790 or Lynn Hartman at (970) 564-5600. | common to all alternatives, it states:  "Permit sustainable harvest (including cutting of green willows and cottonwoods) for Native American traditional ceremonial use".  Squawbush has been added to this list of plants to specifically accommodate the Utah Mountain Ute Tribe's request. |
| BLM - Grand Junction Field Office | 473 | 1 | McInnnis Canyon NCA supports the need for an adequate takeout for users of the Ruby -Horsethief section of the river. Any permit system that would affect these users will need to be developed cooperatively with the NCA and incorporate resources and public use concerns for this entire section of  the river, including | The Moab BLM welcomes the opportunity to work with McInnis Canyon NCA regarding takeouts for Ruby users. |

| | | | the portion in Colorado. Follow-up discussions needed with the NCA staff. | |
|---|---|---|---|---|
| BLM - Grand Junction Field Office | 473 | 2 | Utah Rims SRMA (adjacent to Rabbit Valley):  The Alt C direction and management actions are overall consistent with management in the Rabbit Valley portion of the NCA. MFO and MCA staff should meet to discuss all designated roads and trails that cross the state line to ensure consistency on route designations and provide loop opportunities for recreationists. | A meeting between NCA and Moab BLM staff has already occurred to ensure consistency on route designations. |
| BLM - Grand Junction Field Office | 473 | 3 | re: designated routes map: The MFO draft plan does not show a designated route on a road that comes from the south end of Rabbit Valley out of the NCA and to the railroad tracks at May Flat, Thisis a designated route in CO and a popula roadused by recreationsits to access the May Flat area. | This route was not designated because it leads primarily to state and private land and because of a cultural conflict on a large sand hill right next to the route.  The route will remain non-designated in the Moab RMP. |
| BLM - Grand Junction Field Office | 473 | 4 | re: designated routes map: There is a  road from May Flats that goes upriver in the floodplain and accesses a private parcel in CO. A 1/2 mile portion of this road is shown on the MFO draft map as a designated route, without a connection to any other designated routes. | This piece of road is in error -- it was to be removed along with the rest of the May Flat loop. |
| BLM - Grand Junction Field Office | 473 | 5 | re: designated routes map:  The MFO draft map shows a designated route starting at the State line near the Little Dolores River, crossing private and State of Utah land, following the Black Ridge Canyon Wilderness boundary, and ending at the CO river., approx 2 miles downstream from the Westwater Ranger station. The CO pportion of this road does not have legal public access in Colorado. It should not show on the MFO map as a route open for public use. | This route was designated in error.  It has been removed from the designated route map. |
| BLM - Grand Junction Field Office | 473 | 6 | NCA staff should meet and discuss all road and trail linkages that cross the state line. | This meeting has already occurred. |
| BLM - Grand Junction Field Office | 473 | 7 | Alt C shows that most of the land on the Utah-Co border currently open to OHV travel would be limited to designated routes, The GJFO has completed an extensive inventory of routes near the UT-CO border. The routes on which potential conflicts exist are in the | The requested meeting has occurred and the routes in question were discussed. |

| | | | | |
|---|---|---|---|---|
| | | | area N of I-70 along bitter creek and near coates creek. Our staff has identified a few routes that would be closed under Alt C that are known to be well-used by visitors crossing the UT-CO border. Our Rec staff is having difficulty interpreting some of the maps in the EIS and cannot be certain of the extent of these conflicts.  It is not clear, for example, why some motorized routes (single-track trails) that cross the border north of I-70 do not appear on the MFO inventory nor is it clear what would happen to them under Alt C. GJFO must assume that they would be closed, since they are not shown on may 2-11E designated motorcycle routes. We request a meeting between the MFO and GJFO to clarify and resolve these questions. | |
| BLM - Grand Junction Field Office | 473 | 8 | Alt. C for the Dolores River SRMA on the Dolores River , from the CO border to Bridge Canyon specifies a permit requirement for both private and commercial use and it limits commercial outfitters to 14. The GJFO has outfitters using the Dolores River, some shared with the MFO, that will be required to take out at the state line if they are not one of the 14 outfitters. Private boaters using the Dolores River in CO are not currently required to have a permit and would also have to take out at the state line. This may significantly affect recreation opportunities available on the Dolores river for private boaters, given the limited and unpredictable flows of the river, it seems unnecessary to restrict use. How would private permits be administered? And, why only permit half of MFO's portion of the Dolores? In any case, this issue could influence management options fro the Gateway SRMA and would be a good topic of discussion between the MFO and GJFO. | Permits are required of all users on the dolores River in Utah.  This is not a new planning decision -- it has been the case since the 1970's.  The Moab BLM urges the Grand Junction office to consider a permit process for its portion of the Dolores river.<br><br>Commercial boating permits on the Dolores River are on an allocated system. |
| Environmental Protection Agency | 479 | 1 | The BLM (in Table 4-8 of the DRMP/EIS) indicates that projected concentrations (of air pollutants) would be below National Ambient Air Quality Standards for criteria pollutants and hydrogen sulfide, but does not | The methods used to calculate the projected concentrations of pollutants and hydrogen sulfide are included in the PRMP/FEIS. |

| | | | | |
|---|---|---|---|---|
| | | | show the concentrations.  The DRMP/EIS does not describe the methods used to calculate the projected concentrations.  EPA recommends that the BLM disclose this information in the Final RMP/EIS. | |
| Environmental Protection Agency | 479 | 2 | The air quality analysis omits potential impacts to ozone, visibility or deposition.  The planning area encompasses class I National Park Service airsheds.  Ozone is of particular concern because of the potential emissions of volatile organic compounds and oxides of nitrogen from oil and gas development. | Analyses of impacts on ozone, visibility, and deposition are included in Chapter 4 of the PRMP/FEIS. |
| Environmental Protection Agency | 479 | 3 | The Final RMP/EIS should include information on the effects of oil and gas development on climate change (from CO2 emission).  EPA recommends that the BLM encourage oil and gas lessees to participate in EPA's Natural Gas STAR program. | A growing body of scientific evidence supports the concern that global climate change will result from the continued build-up of greenhouse gases in the atmosphere.  While uncertainties remain, particularly in the area of exact timing, magnitude and regional impacts of such changes, the vast majority of scientific evidence supports the view that continued increases in greenhouse gas emissions will lead to climate change.  This statement has been added to Chapter 3 of the PRMP/FEIS.<br><br>The Environmental Protection Agency (EPA) has not developed regulatory protocol or emission standards regarding global climate change.  When these protocols and standards are available, the BLM will analyze potential effects to global warming in the NEPA documentation prepared for site-specific projects.  A statement to this effect has been added to Chapter 4 of the PRMP/FEIS. |
| Environmental Protection Agency | 479 | 4 | Because a semi-quantitative approach to air quality analysis was taken in the Moab RMP, it is not possible to determine potential impacts to air quality from specific oil and gas development (see Section 4.3.1.3 of the DRMP/EIS).  Nevertheless, it is important to assign responsibility for project-specific air quality analyses for the future.  EPA recommends that the Final RMP/EIS contain this wording from the Rawlins BLM DRMP/EIS, which also used a comparative, emissions-based | A statement has been added to Chapter 2 of the PRMP/EIS, under Management Common to All, which states the following:  "As appropriate, quantitative analysis of potential air quality impacts would be conducted for project specific developments. |

|  |  |  | approach: "As project-specific developments are proposed, quantitative air quality analysis would be conducted for project-specific assessments performed pursuant to NEPA." |  |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 5 | The EPA commends the BLM for moving from "open" OHV travel to designated routes.  Unrestricted OHV use and unrestricted camping are damaging natural and cultural resources, especially in heavy use areas. | The BLM recognizes that resource damage is occurring due to unrestricted OHV use and unrestricted camping as indicated in Chapter 3, pg. 3-87of the DRMP/EIS.  The action alternatives presented in this document are intended to lessen the impacts from these activities. |
| Environmental Protection Agency | 479 | 6 | The EPA supports the open designation in the White Wash Sand Dunes Area in the Final RMP/EIS only if the BLM is able to restore and protect the Dunes' ecological resources and scenic values including the cottonwood trees found in the open dune fields, drinking water sources, stream banks, and bighorn sheep habitat.  If these actions cannot take place, EPA suggests that travel in the White Wash area be limited to designated routes. | The BLM contends that Alternative C (Preferred Alternative) in the DRMP/EIS will protect the resources of the Dunes while allowing open OHV use.  To achieve this goal, the following management actions are proposed in Alt C:  1) closing by fencing the dune field Cottonwood trees and White Wash water sources and 2) limiting camping to designated sites.  In addition motorcycle trails have not been identified for travel in bighorn sheep escape terrain. |
| Environmental Protection Agency | 479 | 7 | Ten Mile Wash is the second largest tributary drainage in the Moab planning area, and is a rich riparian/wetland/cultural/scenic/hydrologic resource.  It provides wildlife habitat within a very arid region of the Moab planning area.  These resources are considered vulnerable from surface disturbances such as OHV travel.   We are concerned that proposing designation of a travel route through the Canyon's unique riparian corridor for OHV travel will substantially increase the likelihood of further significant impacts to these resources, including loss of riparian vegetation and increased erosion, thereby adversely affecting riparian/watershed resource values.  The EPA supports the ACEC designation in the preferred alternative, but recommends that no OHV travel route be designated in the Wash in the Final RMP/EIS. | Alternative C (Preferred Alternative) in the DRMP/EIS lists the Ten Mile Wash area as "limited to designated roads and trails" for OHV use.  The BLM contends that this designation will protect the unique resource values in this area and still allow OHV travel.  On the ground actions to ensure travel on the one route within the wash have included marking, constructing barricades, closing side canyons, and installing educational information.  The BLM is committed to continuing these efforts in Ten Mile Wash. |
| Environmental Protection Agency | 479 | 8 | The EPA supports the designation of the 10 proposed SRMAs in the preferred alternative and recommends the management prescriptions proposed for them.  The | Enforcement, field presence, monitoring, compliance, education, and signage are all administrative actions and do not require land use planning decisions.  These |

| | | | EPA recognizes that the BLM has limited law enforcement capability and recommends that the BLM leverage its existing law enforcement resources. Specifically, we recommend that BLM maintain a credible field presence for promoting and monitoring recreation user compliance by hiring seasonal field technicians to educate the public, construct signage, fencing and other barriers, to remediate any new impacts and to report violations to BLM enforcement officers for ticketing. | suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 9 | The EPA supports the Areas of Critical Environmental Concern (ACEC) proposed in Alt. C. | Comment noted. |
| Environmental Protection Agency | 479 | 10 | The EPA also supports the designation of the following ACEC proposed in Alt B.<br>White Wash Sand Dunes:  The EPA supports leaving 1,833 acres of the dunes open to cross country travel, but including the remaining management prescriptions from the ACEC proposed in Alt B.  These prescriptions are necessary to protect the valuable resources in the dunes.  The BLM should be prepared to close this remaining area of "open" OHV travel if the prescriptions are not successful in restoring and protecting the health of the ecological and cultural resources. | See response to comment 479-6. |
| Environmental Protection Agency | 479 | 11 | The EPA also supports the designation of the following ACEC proposed in Alt B.<br>Labyrinth Canyon: The EPA supports designating this viewshed as VRM I, closing or stipulation no surface occupancy for oil and gas development, and prohibiting new road construction.  These management actions would protect visual resources and prevent water quality impacts to the Green River and to its endangered fish species. | In the preferred alternative, this portion of Labyrinth Canyon is managed as no surface occupancy for oil and gas development.  It is designated as VRM II.  Surface disturbing activities are prohibited (see Appendix C of the DRMP/EIS), which would include new road construction.  The BLM contends that the management actions provided in the preferred alternative are sufficient to protect visual resources and to prevent water quality impacts to the Green River and to its endangered fish species.  Therefore, the management actions proposed in Alt C (Preferred Alternative) are sufficient to protect the relevant and important values in the area and an ACEC designation is not required. |

| Environmental Protection Agency | 479 | 12 | The EPA also supports the designation of the following ACEC proposed in Alt B. Upper Courthouse: This ACEC contains two rare plants on the state sensitive list, irreplaceable historic resources, relict plant communities, cryptobiotic soils crusts, and significant paleontological deposits of dinosaur bones similar in quality to those found in Dinosaur National Park. The EPA believes that ACEC designation is necessary to fully protect these unique and valuable resources. | In the preferred alternative, the area containing relict plant communities is managed as no surface occupancy. The majority of the remainder of the Upper Courthouse area is also managed as no surface occupancy to protect bighorn sheep crucial habitat. The rare plants, historical resources and paleontological values are protected by law. Therefore, the management actions proposed in Alt C (Preferred Alternative) are sufficient to protect the relevant and important values in the area and an ACEC designation is not required. |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 13 | The EPA also supports the designation of the following ACEC proposed in Alt B. Colorado River Corridor: This ACEC contains rare and irreplaceable wildlife habitat (for mule deer, desert bighorn, endangered fish, yellow-breasted chats, Lewis woodpeckers, river otter, spotted bat and big free-tailed bat). It is home to rare and endangered plants including Jones cycladenia, Dolores rushpink, cave primrose, alcove bog orchid, alcove rock daisy, endemic alcove columbine and Shultz stickleaf. It has unique visual resources. The EPA believes that the Area should be designated as VRM I and closed or NSO for oil and gas development. | In the preferred alternative (Alt C), the Colorado River Corridor is managed as no surface occupancy or as closed for oil and gas leasing. Surface disturbing activities are prohibited in areas delineated as no surface occupancy (see Appendix C of the DRMP/EIS). In this alternative the area is designated as VRM II. Therefore, the BLM contends that the management actions proposed in Alt C are sufficient to protect visual resources and to prevent harm to wildlife and plant habitat along the Colorado River. |
| Environmental Protection Agency | 479 | 14 | The EPA also supports the designation of the following ACEC proposed in Alt B. Canyon Rims: The scenic views are some of the most spectacular in the western United States and are highly visible to the recreating public. The EPA believes that the area should be designated VRM II, should be NSO for oil and gas development and that no new routes be allowed. | In the preferred alternative (Alt C), this portion of the Canyon Rims is managed as controlled surface use for oil and gas leasing, as it is designated as VRM II. Surface disturbing activities must meet the constraints of VRM II management (see Appendix C of the DRMP/EIS). The BLM contends that the prescriptions provided in Alt C are sufficient to protect visual resources along the rims of the Canyon Rims area. |
| Environmental Protection Agency | 479 | 15 | The EPA supports the management of Beaver Creek, Mary Jane Canyon, and Fisher Towers to protect their wilderness characteristics (WC). The EPA believes that additional WC lands or portions of WC lands need to be managed for wilderness characteristics. These include those areas of WC that are within ACEC designations | All areas determined to have wilderness characteristics are managed to protect these resources in Alt B. The additional areas suggested by the commentor for protection of wilderness characteristics in the preferred alternative (Alt C) are proposed for no surface occupancy because of other resource values. This proposed |

| | | | | |
|---|---|---|---|---|
| | | | recommended above: Negro Bill Canyon (9 acres), portions of Goldbar (35 acres), Gooseneck (843 acres), portions of Labyrinth Canyon (5,436 acres) and portions of Mill Creek Canyon (2,335 acres) | management would also protect the wilderness values of these areas. |
| Environmental Protection Agency | 479 | 16 | Consistent with EPA's regulatory responsibilities under the Clean Water Act, we consider the protection of the 13,450 acres of riparian/wetlands within the MPA a high priority. Table 3.22 of the DRMP/EIS indicates that only 57% of these areas are in proper functioning condition (PFC). The EPA believes that the 100 meter riparian buffer zone, while affording some degree of protection, is not sufficient. The EPA believes that the ¼ mile buffer zone created when a river is found suitable for Wild and Scenic River status should be considered for all wetlands 1) not in PFC, 2) vulnerable to impacts from oil and gas production, recreation and grazing, and 3) along stream segments with steeper slopes. The EPA supports all the stream segments found suitable for Wild and Scenic River Status in Alt C. The EPA believes that the following additional eligible segments be found suitable for Wild and Scenic River designation in the preferred alternative: Onion Creek, Mill Creek, Thompson Wash, Negro Bill Canyon, Beaver Creek, Professor Creek, Rattlesnake Canyon, Thompson Canyon and all segments of the Green River. | The 100 meter buffer zone for riparian areas is based on BLM policy found in Utah State Office Instruction Memorandum 2005-091. The EPA provides no rational as to why they believe a for why a 1/4 mile buffer is necessary. All of the stream segments suggested by the commentor for suitability as Wild and Scenic River status are included in Alt B. In Alt C, these river segments are recommended for management as no surface occupancy or closed to protect other resource values. This proposed management would protect the riparian areas along these stream segments.

Following procedures, it is a suitability decision for the BLM to make. It is a management decision. Every one of these NSO or closed. |
| Environmental Protection Agency | 479 | 17 | The EPA recommends the grazing decisions proposed in Alt B to reduce soil compaction and erosion. These actions would protect and restore to PFC up to 4,442 acres of riparian/wetlands along 58 miles of perennial streams. | These grazing actions are site specific and can be implemented under the Standards for Rangeland Health and Guidelines for Livestock Grazing Management under all alternatives in the DRMP/EIS. |
| Environmental Protection Agency | 479 | 18 | The EPA is concerned that the Greater Cisco and Bookcliffs RFD areas have large acreages of sensitive soils and would be impacted by oil and gas development. The EPA recommends that development in these areas be limited to the 149 wells proposed under Alt. B. This represents approximately 50% less surface disturbance than proposed under any of the | Under alternatives B and C in the DRMP/EIS sensitive soils are protected with timing limitation stipulations (see Appendix C). The BLM analyzed the impacts to soils from oil and gas development under the various alternatives. Alt C balances commodity production with resource protection. |

| | | | | |
|---|---|---|---|---|
| | | | other alternatives.  This would lessen the impacts of development to biological soil crusts, reduce erosion and sedimentation/salinization of surface waters, improve visibility, reduce the loss of soil productivity and reduce the invasion of noxious weeds. | |
| Environmental Protection Agency | 479 | 19 | On pg. 4-17 of the DRMP/EIS, the BLM discusses rates of emissions from compressor engines in grams per horsepower-hour.  Table 4.6 shows emission rates in grams per second, but the text does not explain whether BLM made this calculation in order to estimate impacts using the semi-quantitative method or for some other reason.  An explanation is needed in the Final RMP/EIS as to why different units appear in this section, or convert emission rates to the same units. | The text and tables in Chapter 4 of the PRMP/EIS have been modified to provide an explanation regarding the units of analyses. |
| Environmental Protection Agency | 479 | 20 | In the Final RMP/EIS, the BLM should address the potential for wind events and the contribution of erosion-prone soils to them.  The Final RMP/EIS should also address the BLM's plans to mitigate the impact of wind events. | The potential for wind events is addressed on pg. 3-4 and pg. 3-9 of the DRMP/EIS.  Management actions proposed under the preferred alternative that would reduce wind blown dust include 1) eliminating cross country travel by limiting OHV use to identified routes and 2) timing restrictions on surface disturbing activities in sensitive soils. |
| Environmental Protection Agency | 479 | 21 | The BLM should provide more specific information on the role of increased OHV use in potential air quality impacts and whether/how the BLM's decision to move to a designated recreational trail system may affect this.  The BLM should present details of its estimates of increases in OHV use (e.g. in vehicle-miles traveled or similar measure). | On pg. 4-26 of the DRMP/EIS it identifies a moderate benefit to air quality by restrictions to cross country travel.  The effects of OHV use on air quality is discussed on pg. 3-9 of the DRMP/EIS.  On pg. 3-157 the increase in OHV use is recognized.  Specific quantifiable details on the impacts of OHV use are not available.<br><br>Land use planning level decisions involve broad resource allocations and qualitative analysis is often all that is available.  Further site specific analysis on the impacts to the resources specified by the commentor will be conducted on the project level. |
| Environmental Protection Agency | 479 | 22 | More site-specific information is needed (e.g., on pg. 4-294) in the Final RMP/EIS on how water quality is being threatened and impacted from contaminant sources.  These sources include intrusion of saline groundwater, | Land use planning level decisions involve broad resource allocations and qualitative analysis is often all that is available.  Further site specific analysis on the impacts to the resources specified by the commentor will be |

| | | | | |
|---|---|---|---|---|
| | | | erosion of saline soils, invasive plants, introducing salts into riparian streams, metals and other chemical contaminants leaching from abandoned mines, temperature and restricted flows from return irrigation, erosion from fire-impacted areas, sedimentation from grazing and impacts from OHV travel and dispersed camping.  Of special concern are the Kane Creek Crossing, Bartlett/Tusher/Ten Mile areas and Mill Creek. | conducted on the project level.  The DRMP/EIS on pg. 1-14 recognizes that the BLM must comply with the Clean Air Act, the Clean Water Act, and many other nondiscretionary laws.  This would include conformance with State and local laws. |
| U.S. Fish and Wildlfie Service | 586 | 1 | Specific land management measures should be developed to ensure and enhance long-term survival of Jones cycladenia, with the goal of de-listing the species.  We would like to work with you to include in the final RMP resource management protections specific to the species' long term recovery. | Decisions within the plan protect the Jones cycladenia.  These include limiting travel to designated routes and the imposition of a no surface occupancy stipulation for oil and gas and other surface disturbing activities within Jones cycladenia habitat.  The Ida Gulch grazing allotment, which is almost entirely within Jones cycladenia habitat, is unavailable for grazing in both Alts B and Alts C (the preferred alternative). |
| U.S. Fish and Wildlfie Service | 586 | 2 | The bald eagle was removed from the Endangered Species list.  It is, however, still protected under the MBTA and the BGEPA. | The wording in the plan has been corrected to correspond to this action.  The two laws protecting bald eagles have been added to the text on pg. 3-143 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 3 | Page 2-5, Section 2.1.1.5 1st paragraph: The MFO has 3 listed bird species (and 1 candidate species), 1 listed mammal species, 1 listed plant species, and 4 listed fish species (see also Section 3.16).  According to page 3-140, there are additionally 43 "Sensitive Species", not 4 as stated here. | The number of sensitive species has been corrected to 43.  In addition, the enumeration of listed species has been changed to match USFWS's wording. |
| U.S. Fish and Wildlfie Service | 586 | 4 | Page 2-5, Section 2.1.1.5 1st paragraph:  The standard stipulations that have been developed in coordination between BLM and FWS (i.e., the Species Conservation Measures in the BO for Existing Utah BLM RMPs (2007)), should be included in the document.  Appendix K is a close approximation in many respects, but there are inconsistencies and rearranged organization, and it is difficult to determine if items have been left out.  The 2007 BO conservation measures were mutually developed and agreed to by | This last sentence in the first paragraph on p. 2-5 of the DRMP/EIS has been changed to: "Species conservation measures (see Appendix K) have been developed in coordination with the United States Fish and Wildlife Service.  They will be implemented under all alternatives."  Appendix K has been updated with the 2007 "Species Conservation Measures for Utah BLM RMPs". |

| | | | | |
|---|---|---|---|---|
| | | | FWS and BLM, and should be included in their entirety in the new RMP to ensure long-term species conservation as well as streamlined section 7 consultation.<br>See attached document. | |
| U.S. Fish and Wildlfie Service | 586 | 5 | page 2-11, table 2.1 We recommend that BLM identify and incorporate the FWS Interim Guidelines for Wind Power (2003) in the "Management Common to All Action Alternatives" for the Lands and Realty section. Implementation of these recommendations will help to minimize impacts from wind power development projects to wildlife, particularly birds and bats, and their habitat. | The text on pg. 2-11 of the DRMP/EIS has been changed to read "Authorization of any ROW for wind or solar energy development would incorporate best management practices (including the United States Fish and Wildlife Service's "Guidelines for Wind Power"…" |
| U.S. Fish and Wildlfie Service | 586 | 6 | page 2-12, table 2-1 It is unclear why Alternative C (Preferred) would make available for grazing 12,673 more acres than Alternative A (No Action).  We recognize that this may be to allow for greater flexibility in grazing management, such as rest rotation techniques, which can benefit range and habitat.  This is unclear, however, and we recommend that the purpose of increasing grazing acreage NOT be to increase AUMs within the MPA. | Pear Park and Ida Gulch have been added to the list of allotments that are unavailable for grazing in the preferred alternative.  Pear Park was unavailable for grazing in the 1985 Grand RMP (for wildlife forage).  Ida Gulch is in habitat for Jones cycladenia.  Other allotments that are unavailable in Alt A but available in Alt C would be subject to range studies prior to determining suitable grazing allocations.  If there were suitable permittees interested in applying for these permits, an Environmental Assessment would be conducted.  One consideration that may be identified would involve nearby permittees utilizing these newly available allotments without an increases in total AUMs.  Additionally, all  newly available allotments would require Section 7 consultation which will insure that the concerns and recommendations of the USFWS are considered. |
| U.S. Fish and Wildlfie Service | 586 | 7 | page 2-95, table 2.2, Special Status Species - Impacts from Riparian management: There must be typos in these descriptions (at the bottom of page 2-95), because they do not make sense. Alt. C cannot be the same as Alt. B, except with less riparian acres excluded than under Alt. C.  ?? | The wording has been corrected. |
| U.S. Fish and Wildlfie Service | 586 | 8 | page 2-95, table 2.2 Special Status Species - Impacts from Minerals: A more quantitative comparison between | Table 2.2 is only a summary table; please  refer to pages 4-371 through 4-380 for a more complete discussion and |

BLM_0011214

| | | | the alternatives would be more illuminating than simply saying "less mineral development… would occur" and that it would have the lowest/second lowest/second highest/highest adverse impacts. We recommend that you identify acreages for Closed, NSO, CSU, and Standard Stips to allow for a more informative, quick overview. | a comparison of leasing stipulations and acreages within habitats. |
|---|---|---|---|---|
| U.S. Fish and Wildlfie Service | 586 | 9 | page 3-38, section 3.73. A number of the allotments identified in this section contain special status species and should be further discussed in Section 4.3.15.6 (page 4-367). | The following sentence has been added to Chapter 4: "Those allotments that remain unavailable for grazing are not subject to these impacts to special status species." |
| U.S. Fish and Wildlfie Service | 586 | 10 | page 3-125, section 3.15.1.1.2.2 (bookcliffs wildlife area ) Is the clay reed mustard within the Moab Planning Area? | The USFWS is correct. This is an error. The clay reed mustard is not within the planning area;  it is only within Uintah county. |
| U.S. Fish and Wildlfie Service | 586 | 11 | page 3-125, section 3.15.1.1.2.2. (bookcliffs wildlife area )  typo-Jones cycladenia, with a small c. | The Jones cycladenia is not found in the Bookcliffs area. The text has been corrected. |
| U.S. Fish and Wildlfie Service | 586 | 12 | page 3-127, section 3.15.1.2.5 (colorado River corridor ACEC) 4th paragraph mentions "two state sensitive rare plants" but the State of Utah has no sensitive plant list.  Are these listed on the UNPS rare plant guide or NatureServe? | The sentence has been changed to "Two BLM sensitive plants, alcove rock daisy ( perityle specuicola)and alcove bog orchid (habenaria zothecina) occur in Negro Bill Canyon." |
| U.S. Fish and Wildlfie Service | 586 | 13 | page 3-127, section 3.15.1.2.5 (colorado River corridor ACEC) 4th paragraph  "Alcove rock daisy (listed)": listed by whom, and what is the latin name? | See response to comment 586-12. |
| U.S. Fish and Wildlfie Service | 586 | 14 | page 3-128, section 3.15.1.2.5 The Colorado River Corridor ACEC "...contains about one quarter of all threatened Jones cycladenia plants."  Does this mean within the MPA or across the range of the species? What is the source of this information (citation)? | The sentence has been changed to read: "The potential ACEC also contains threatened Jones cycladenia plants." |
| U.S. Fish and Wildlfie Service | 586 | 15 | 3-143, section 3.16.1.3 This bald eagle section should be moved to Section 3.16.2 (Sensitive Speces). | This correction has been made. |
| U.S. Fish and Wildlfie Service | 586 | 16 | 3-143, section 3.16.1.4 The first sentence ("MSO habitat includes high canopy closure…") should be eliminated.  The second sentence should read: "Steep slopes and canyons with rocky cliffs characterize much of the MSO habitat in Utah." | The sentence has been eliminated and the second sentence has been adjusted in accordance with the commentor's request. |

| U.S. Fish and Wildlfie Service | 586 | 17 | page 3-145, section 3.16.2 The descriptions for the sensitive species should include a description of their distribution within the MPA. | The addition of this information would require an array of maps that cannot be added to this section of the DRMP/EIS.  Information on sensitive species distribution is available at the Moab Field Office. |
| U.S. Fish and Wildlfie Service | 586 | 18 | page 4-355, table 4.106 Place latin names after common names for plant species. | The Latin names have been added to Table 4.106 for all plants. |
| U.S. Fish and Wildlfie Service | 586 | 19 | page 4-357, table 4.106 MSO has designated Critical Habitat that contains habitat types of "Caves and Rock Crevices" and "Rocky Slopes and Canyons" within the MPA. | The Mexican Spotted Owl is listed under these two habitat types on pg. 4-357 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 20 | 4-363 section 4.3.15.3.5 What habitat types is this section referring to, and what special status species might be affected? | The title of the section has been changed. |
| U.S. Fish and Wildlfie Service | 586 | 21 | 4-365, section 4.3.15.5.3 Utility and communication infrastructure ROWs are also likely to fragment habitat, increase human access, and increase non-native invasive plants.  These effects would have resulting impacts on various special status species, including prairie dogs and sage-grouse. | This sentence has been added to Section 4.3.15.5.3 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 22 | page 4-370 section 4.3.15.7.1 Mineral exploration activities would also lead to greater road density, creating greater opportunity for OHV and other human disturbance. | This sentence has been added to Section 4.3.15.7.1 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 23 | page 4-371, section 4.3.15.7.2.1 Potential direct adverse effects from oil and gas development would include: potential for spills, mortality from reserve pits, increased human access, OHV access, road mortality. | This sentence has been added to Section 4.3.15.7.2.1. |
| U.S. Fish and Wildlfie Service | 586 | 24 | page 4-372, section 4.3.15.7.2.2 Explanation for greater detailed analysis on sage-grouse is reasonable, but you should still describe the impacts to other species as well. | Wording has been added to clarify that the habitat fragmentation analysis was performed for sage grouse as an example of this type of action. |
| U.S. Fish and Wildlfie Service | 586 | 25 | 4-372, section 4.3.15.7.2.2. 5th paragraph: It's also possible that the analysis could be an underestimate of habitat degradation because more frequently used roads could cause disturbance greater than 400m. | The following sentence has been added to pg. 4-372 of the DRMP/EIS:  "It is also possible that the analysis could underestimate habitat degradation because more frequently used roads could cause disturbance greater than 400 meters from the road." |

| U.S. Fish and Wildlfie Service | 586 | 26 | page 4-375, section 4.3.15.7.4 MSO do occupy rocky slope/canyon habitat in the MPA (not just the "potential" to occupy this habitat type). | The sentence now reads: "MSO are known to occupy the rocky slope/canyon habitat in the MPA. |
| U.S. Fish and Wildlfie Service | 586 | 27 | page 4-376, table 4.116. Why is there a difference of 37 acres between Alternative B and C for Jones cycladenia? Are these 37 acres in Jones cycladenia habitat? If so, we suggest these acres also be made NSO/Closed. | The 37 acres has been added to the Jones cycladenia habitat that is NSO or closed to leasing in Alt C. |
| U.S. Fish and Wildlfie Service | 586 | 28 | 4-376, table 4.116. Some of the percentages of habitat designated NSO are very low -- for example, Alternative C (preferred) only sets 5% NSO for Gunnison sage-grouse, 1% for Gunnison prairie dog; <1% for white-tailed prairie dog, and 20% for MSO. These are very low levels of protection from oil and gas development and would seemingly have significant impacts. What other measures would be in place to provide protection for these species? | Controlled Surface Use and Timing Stipulations within identified habitats for many species have been imposed to protect the individual animals if an area is occupied. Standard Stipulations also provide mechanisms to allow for seasonal changes and local adjustments to avoid negative impacts to specific species or individuals.   See Appendix C as well as species maps. |
| U.S. Fish and Wildlfie Service | 586 | 29 | 4-390, table 4.119. The document states there are 24,370 acres of habitat for Jones cycladenia. Please clarify, is this the size of the amount of suitable habitat or habitat potential for the plant? | The habitat is suitable for Jones cycladenia. The word has been added to Table 4.119. |
| U.S. Fish and Wildlfie Service | 586 | 30 | 4-390, table 4.119. Confused on the number of acres protected for Jones cycladenia. How is this number being obtained. Where is it being considered closed to leasing? | Jones cycladenia occurs in the Richardson Amphitheater area on gympsophile semi-barren soils. Within the Amphitheater, there are approximately 24,470 acres of this soil type, making it suitable habitat. It should be noted that the Jones cycladenia actually grows on a limited subset of this acreage. The Richardson Amphitheater area is closed or NSO for leasing due to a number of special values, of which the Jones cycladenia habitat is one. |
| U.S. Fish and Wildlfie Service | 586 | 31 | page 4-393, section 4.3.15.13.2.1. Are active Greater sage-grouse leks buffered in any way from construction of permanent structures? Permanent structures near leks increase habitat fragmentation and can create disturbance that can affect strutting, breeding, nesting, brood-rearing behavior, no matter what time of year they are actually constructed. We recommend a 2.0 | Protections are provided for active Greater sage-grouse leks, including from the construction of permanent structures. See pgs. C-19 & C-21, which stipulate that no above ground facilities will be allowed within 2, 0.5 or 0.25 miles (differs by Alternative) from an occupied lek, on a year round basis. |

| | | | mile buffer unless it can be shown that the development will not affect sage-grouse or habitats during breeding, nesting, brood-rearing, and wintering periods. | BLM notes USFWS's recommendation of a 2 mile buffer.<br><br>We currently have no active lek sites and have not had any known resident occupancy of sage grouse in over 10 years.  On page 2-45 of the DRMP/EIS, it is stated that the BLM would follow pertinent Conservation Strategies and Management Plans, as needed, and work cooperatively with UDWR and other agencies.  If occupancy and lek sites are discovered, the BLM would coordinate closely with UDWR, and if necessary, USFWS, to ensure propagation of new resident sage grouse within the Field Office. |
|---|---|---|---|---|
| U.S. Fish and Wildlfie Service | 586 | 32 | page 396, Table 4.123. Why are there no acres closed to OHV / lack of protection for Jones cycladenia?  OR are these areas already currently closed? | See response to comment 586-1.  Only heavily used roads are designated within the Jones cycladenia habitat area.  No Jones cycladenia grow on the roadbeds. No new routes are proposed in this habitat, nor would new routes be granted in the future. |
| U.S. Fish and Wildlfie Service | 586 | 33 | page 4-486, Table 4.152 This habitat fragmentation analysis is a worthwhile and commendable effort.  The table begs several question given, for example, that 64% of sagebrush/grassland habitats (and 54% of riparian and wetland habitat) will be "impacted" by habitat fragmentation caused by roads:  1) What will be the associated effects to these avian species?  2) Which of these species will be affected the greatest and to what degree (could it contribute to the listing of a species)?  3) How much of an increase is this from the baseline (existing condition)?  4) What are the cumulative effects on a regional scale (i.e. across the State of Utah, across the Intermountain West)?  5) What mitigating measures will be taken? We recommend that regional cumulative effects be evaluated, and species-specific evaluation be made to determine, to the extent possible, if future actions taken under direction of this RMP will be likely to significantly impact a species. | The habitat fragmentation analysis in Chapter 4 is intended to provide broad comparisons of the impacts of the four alternatives on wildlife habitat.  It is not intended for specific comparisons or analyses.  The analysis suggested by the commentor is not feasible in a broad document such as a land use plan. |
| U.S. Fish and | 586 | 34 | page C-35, table C-4. Golden eagles are not listed | The title has been changed in Appendix C to read |

| | | | | |
|---|---|---|---|---|
| Wildlfie Service | | | under ESA.  They are protected under the MBTA and BGEPA. | "Federally protected species" |
| U.S. Fish and Wildlfie Service | 586 | 35 | Page C-36, Table C-4. SWWF: As per the Species Conservation Measures in the BO for Existing Utah BLM RMPs (2007), 1) permanent surface disturbance should be avoided within 0.5 mi of suitable SWWF habitat, and 2) all surface disturbing activities should be restricted within a 0.25 mile buffer from suitable SWWF riparian habitat. | This stipulation was developed through coordination with the Utah BLM state office and the Utah USFWS state office specifically for oil and gas leasing and development.  Appendix K gives additional Conservation Measures that would be followed.  Additionally, any proposed project that is in proximity to potential or suitable SWWF habitat is subject to Section 7 consultation and will therefore have the needed protective measures implemented through this processes. |
| U.S. Fish and Wildlfie Service | 586 | 36 | Appendix D. The parcels identified for disposal should be specifically evaluated for potential for special status species. | The parcels identified for disposal have been screened for the presence of special status species.  Parcel R-11 has been removed from the list because of the presence of Gunnison prairie dogs.  Appendix A (pg. A-1) lists the criteria for the disposal of public lands.  It states:  "Lands will not be considered for disposal if they have: (a) any habitat for listed, endangered or special status species or (b) any habitat for any non-listed species if such action could lead to the need to list any species as threatened or endangered."  Thus there is no need to specifically evaluate the potential for impacts to special status species. |
| U.S. Fish and Wildlfie Service | 586 | 37 | Appendix K. The BLM Committed Conservation Measures identified in this appendix should be consistent with the Species Conservation Measures developed for the Biological Opinion for Existing Utah BLM RMPs (2007) (see attached document). | Appendix K will be replaced with the correct and updated document. |
| The Hopi Tribe | 868 | 1 | Regarding B, C, and D, we do not support the 2/3 of sites allocated for scientific use, and less than 1/3 for conservation for further use. Avoidance of Hopi sacred sites and traditional use areas is the only real means of preventing impairment of these resources. | The BLM concurs with the Hopi Tribe that archaeological resources cannot be allocated to various uses prior to the study of these resources.  The decision allocating archaeological resources has been removed from the PRMP/FEIS. |
| Town of Castle Valley | 981 | 1 | With regard to fire management, we fail to see anywhere in Section 4.3.3 on Fire Management a discussion of the issue of fire management on a designated sole source aquifer. We expect that any | Specifics as to fire management within the Castle Valley area are not a land use planning decision.  Such specifics would be handled at the site specific fire project level. |

| | | | | |
|---|---|---|---|---|
| | | | such activities need to be discussed and coordinated with our Town, and, as is stated in your draft, would need to undergo an EPA environmental review for compliance with the goals of the regulation, since they fall into the category of a federal project. | |
| Utah State Office of Education | 1036 | 1 | It is an incorrect analytical assumption by the BLM that "Non-BLM lands would not be directly impacted by RMP decisions since BLM does not make land decisions on BLM lands." [4.1.2 Analytical Assumptions, page 4-3.] Trust lands being managed in the most prudent and profitable manner is a very significant issue for Utah's public schools. None of the alternatives provide any analysis of the loss of revenue to the in-held school lands from formally or effectively eliminating development on lands surrounding the BLM property. | Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively.  The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly.  For specifics regarding the impacts on mineral revenue see comment 120-101. The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3).  A sentence will be added to Chapter 2, Lands and Realty,:  Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively.  The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly.  For specifics regarding the impacts on mineral revenue see comment 120-101. The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3).  Information will be added to Chapter 2, Lands and Realty, Management Common to all action alternatives, that states that reasonable access to State land would be provided including across BLM lands within avoidance and exclusion areas for rights-of-way as specified by the Cotter decision (Utah v. Andrus, 10/1/79).  In addition, the Moab DRMP/DEIS travel management plan recognizes the requirement to provide access to SITLA lands per the Cotter decision.  Also, please see the revised analysis under Socio-Economics in Chapter 4 of the PRMP/FEIS. |
| Utah State Office of Education | 1036 | 2 | The Moab RMP addresses the impacts on tribal lands and interests. But it does not have similar sections addressing the SITLA lands and impacts, particularly on economic matters. Further, the BLM should go much further in counting the cost in economic impact to people of the state of Utah. The economic impact for the people in this area will be immense. This RMP has, in general, vastly understated the economic costs, and | See comments 120-101 & 120-103 for an explanation of closed acreage by alternative.  In Alt B, the loss of revenue from SITLA wells foregone has been calculated and added to the analysis on page 4-264. |

| | | | | |
|---|---|---|---|---|
| | | | vastly overstated the proportional importance of recreation. | |
| Utah State Office of Education | 1036 | 3 | Cutting off access devalues in-held school land, especially in Desolation Canyon area. For the BLM not to develop oil and gas in its sections also makes it impractical for development to occur on ours, which amounts to an unconstitutional taking. This is true where there are known resources, and may become true for areas in which no drilling has occurred. If the BLM decides that large areas of its land are off limits for drilling, that can effectively prevent feasible drilling on our in-held sections, amounting to a taking of the mineral value of our subsurface resources. The BLM should consider whether it will allow directional drilling from leases on school sections to access oil and gas lands on BLM property, with no surface occupancy of the BLM property. | The BLM acknowledges that the closure of adjoining public lands to oil and gas leasing may have a potentially negative impact on SITLA's mineral revenue. The assumption on pg. 4-3 has been changed to reflect this fact.  In Alternative C, the closure of the 354,015 acres managed as WSA or Wilderness Areas is nondiscretionary and beyond the scope of this plan. In Alternatives A, C, and D there are no SITLA lands affected by discretionary closure.  Chapter 4 of the PRMP/FEIS has been revised to reflect the impacts in Alternative B on SITLA inholdings of the discretionary closures of 266,485 acres of public land.  It should be noted that under any Alternative, the proposed ACECs are not managed as closed to mineral leasing.  Areas with wilderness characteristics are recommended as closed under Alternative B and No Surface Occupancy in Alternative C. |
| Utah State Office of Education | 1036 | 4 | Paragraph 1.3.2.2 – Issues Identified for Consideration - Issue 8 (page 1-10). This discussion should contain detailed reference to the issue of in-held state lands in special designations, particularly WSAs, ACECs, and areas to be managed for "wilderness characteristics," and the need to give priority to resolution of the in-held school land issue. | See response to comments 120-101, 120-103, and 120-106.  It is not necessary to have this specific language stated in the description of the issue. |
| Utah State Office of Education | 1036 | 5 | Table 2-1 Description of Alternatives – Lands and Realty. It should be noted for all alternatives that, pursuant to the decision of the United States District Court for the District of Utah in Utah vs. Andrus, BLM is obligated to grant reasonable access to the State of Utah and its leases to school trust lands notwithstanding any special designation or avoidance/exclusion area for rights-of-way on intervening BLM lands. 486 F. Supp. 995 (D. Utah 1979). In furtherance of this obligation, no existing roads providing access to trust lands should be closed | The travel plan provides restrictions to the public for recreational purposes, but does not restrict uses permitted or authorized by the BLM.  State inholdings may or may not currently have access, depending upon whether or not exisitng vehicle routes lead to them.  Under different alternative scenarios, existing routes may be proposed to closure.  BLM policy, as required by the Cotter decision (State of Utah v. Andrus, 10/1/79), is that "the state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common school…" |

| | | | without the consent of SITLA. | This decision confined the issue of access to situations directly involving economic revenues generated for the school trust.  The recreation restrictions do not prohibit the State from reasonable access to its lands for economic purposes through separate permit authorization as specified by the Cotter decision.   Routes to State sections may not have been identified for recreation purposes due to resource conflicts or actual route conditions. |

## INDIVIDUALS

| Commentor Name | | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|---|
| Geoff | Crockett | 2 | 1 | I am concerned that the public is not being given enough time to comment on the Draft RMPs that will be coming out over the next several months, beginning in August with the Moab plan. I am writing to ask that you extend the public comment period from 90 days to at least 180, to give people a legitimate chance to review the recommendations and make substantive comments.<br><br>This is especially true for those without access to a computer or high speed internet, as it is my understanding tha the public is expected to view the document online. This seems like an unnecessary impediment to many members of the public who may wish to submit comments. The BLM should make paper copies of the document available to members of the public who wish to have one. The public should not be forced to pay exorbitant fees to have a copy of the plan printed. | See response to comment 124-1 |

| Jim | Maxey | 5 | 1 | I feel that the Area of Critical Environmental Concern (ACEC) designations in Alternative "B" are completely inappropriate. | The BLM has followed the dictates of Manual 1613 concerning ACEC consideration. The commentor's opinion is noted. |
|---|---|---|---|---|---|
| William | Hughes | 200 | 18 | Squaw Park Area-A road from the Highlands departs from the Auger Springs area, UTM 4297680N 0637240E, to descend a slickrock dome into Squaw Park. From there it travels through some sand hills, into a wash bottom passing Caves Spring before ascending from the wash to the level of the road in Squaw Park, which it joins at UTM 4296820N 0638920E. Most of this route is clearly visible and mechanically constructed, the obscure parts are in the sandy sections. | This route seems to be the same as identified in Alternative A and included in the Grand County inventory. The County was unable to identify a purpose or need for this route, nor was any suggested by a member of the public during scoping. See response to comment 206-4. |
| Nick | Panos | 393 | 1 | Coyote Canyon is missing from Alternative C | See response to comment 206-11 |
| Brad | Jarrett | 394 | 1 | Gemini Bridges should close | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Brad | Jarrett | 394 | 2 | Missing Segments include Flat Iron Mesa, Strike Ravine, and 3-D | See response to comment 206-11 |
| Brad | Jarrett | 394 | 3 | I hope to be able to go to White Wash Sand Dunes and oppose fees. | See response to comment 123-10 |
| Jolene | Jenkins | 395 | 1 | I want to see trails such as Flat Iron Mesa, Gemini Bridges, and Coyote Canyon open | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Lori | Edwards | 396 | 1 | Do not close Flat Iron Mesa, Coyote Canyon, and White Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel |

BLM_0011223

| | | | | | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Alan | Taylor | 397 | 1 | Gemini Bridges to stay open | See response to comment 206-14 |
| Alan | Taylor | 397 | 2 | White Wash Sand Dunes should be enlarged | See response to comment 123-35 |
| Lisa | Anderson | 398 | 1 | Trails that exist already should stay open such as the West Wakes WSA route. These proposals should have no "missing" sections because then you will conveniently forget to put them back on. The maps such as those of Flat Iron Mesa and Strike Ravine. Leave Gemini Bridges open for drivers and walkers. White Wash Dunes travel area should be much larger. | See response to comment 206-11 |
| Rachel | Anderson | 399 | 1 | The two acres that stood out to me the most (that shouldn't be closed) were the 3-D Jeep Trail and the White Wash Sand Dunes. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Justin | Anderson | 400 | 1 | Alternative D closes far too many trails, specifically the White Wash Sand Dunes | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Justin | Anderson | 400 | 2 | Do not close Flat Iron Mesa, Gemini Bridges, 3D Jeep Trail, Strike Ravine, White Wash Sand Dunes | See response to comment 206-11 |
| Ross | Tocher | 401 | 1 | White Wash Sand Dunes. BLM is on the right track in proposing an Area of Critical Concern here. I would urge expansion of the ACEC to cover the dune complex, along with associated bighorn sheep habitat, cottonwood groves, and water | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0011224

| | | | | | |
|---|---|---|---|---|---|
| | | | | sources. Situated less than 15 miles off I-70, these dunes will be popular with visitors for their beauty and ecological interest. It is time to phase out ORVs here and welcome the larger public to enjoy the area. | resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ross | Tocher | 401 | 2 | I believe Canyon Rims should be managed as a quiet recreation area. | Commentors desire noted. |
| Carma | McElhaney | 402 | 1 | The overlooks of the Colorado River off Dry Mesa and the Egg Ranch Fin part of the Behind the Rocks WSA should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Doug | McElhaney | 403 | 1 | The overlooks of the Colorado River off Dry Mesa and the Egg Ranch Fin part of the Behind the Rocks WSA should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Byron | Okubo | 404 | 1 | It is my understanding that you are considering designating some areas open to "cross country travel" by Trails Motorcycles and Mountain Bikes. I believe one area you are looking at is Pole Canyon. That would be a fantastic area for our sport. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Byron | Okubo | 404 | 2 | Parts of Black Ridge should remain open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Carlo | Sanchez | 405 | 1 | The current proposal is unworkable because it puts too much strain on the resources in a limited | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed |

| | | | | area with a very confusing boundary guideline. I am specifically talking about the camping area to the West of the Dunes. | camping. |
|---|---|---|---|---|---|
| Carlo | Sanchez | 405 | 2 | Implementing a "Fee System" with the introduction of the "Individual Special Recreation Permit" is unlawful, illegal, and counterproductive to the National OHV Recreation Fee Act set forth by Congress. The Moab BLM office is not above the mandates outlined by Congress. There are funding and grant programs that are REQUIRED to be exhausted first and then the public is again REQUIRED to be involved in the process. | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| Carlo | Sanchez | 405 | 3 | The camping policy outlined in Appendix E is irresponsible as well. If an area is to be closed this MUST involve a lawful public planning process. Inclusively, if you look at your maps it is impossible to toll if the campsites we use are going to be open or closed. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Kiel | Renwick | 406 | 1 | After reviewing the management plan options I feel there is a serious lack of details and boundaries missing. Many trails are missing sections that appeared to other 4x4 and biking enthusiasts such as Strike Ravine | See response to comment 206-11 |
| Kiel | Renwick | 406 | 2 | Please add Coyote Canyon to your maps as it's the only 5 rated true trail in the Moab area. | See response to comment 206-11 |
| Bruce | Berger | 438 | 1 | Hell Roaring Canyon is no place for ORVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

| | | | | | based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Bruce | Berger | 438 | 2 | The Comment period for two decades of management for the RMP for such a vast area appears to be a rush to judgment. I recommend that the RMP be withdrawn as it currently stands, to give more time for serious deliberation by the BLM as well as unstampeded public comment. | See response to comment 124-1 |
| Zachary | Huber | 439 | 1 | Don't close White Wash. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Duncan | Silver | 441 | 1 | To change the present land uses appears to be an attempt to add more de-facto park type area without any documented need. The DRMP indicates that there are changes that need to be addressed, but the needs are not specified. What are the changes that require this action? | Purpose and Need are outlined in Chapter 1, page 1-1 to 1-2. The BLM conducted a scoping period prior to the development of alternatives. The scoping process invites the public to raise issues that should be addressed in the plan. The public addressed such changes, such as the growing numbers of recreation users, the need for a travel plan and other changes since the 1985 RMP. Chapter 3 contains information regarding the affected environment, including how the resource or resource use has change over time.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| Duncan | Silver | 441 | 2 | The wilderness issue has been addressed and identified, it is time to move on and not create a | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | subclass wilderness designation as proposed. What is the legal basis for continuing to designate new wilderness areas? | |
|---|---|---|---|---|---|
| Duncan | Silver | 441 | 3 | All existing roads, trails and travel ways should remain open to all the public. The closures to motorized travel will stop our less fortunate public, the handicapped, from enjoying this area. Does the plan address the needs of the handicapped and address the federal ADA requirements? | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA. However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| Duncan | Silver | 441 | 4 | The camping policy, Appendix E, lacks specifics as to where and what kind of camping is allowed in each area. Maps of camping should be detailed for the public information, with the camping opportunities clearly defined. Can you provide public readable camping maps? | Appendix E outlines areas of controlled and dispersed camping. See responses to comments 123-8 and 120-86 regarding designated and dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number depends upon site specific conditions. Dispersed campsites would be signed; however, maps and signage are not land use planning decisions. |
| Justin | Deschamps | 442 | 1 | Let's stick to the criteria that defined "wilderness" when the bill was passed years ago. The BLM should not be revising or altering this. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Justin | Deschamps | 442 | 2 | White Wash- The suggested open area is too small and will feel the impact of so many users in one small area. Please expand this at least to the Ruby Ranch Road beyond on the west, Duma Point on the east, and the Blue Hills Road on the north. | See response to comment 123-35 |
| Justin | Deschamps | 442 | 3 | The camping policy in Appendix E is no good. The suggested policy will put everyone in tight spots, which will create impact problems. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| Justin | Deschamps | 442 | 4 | Right of way – Some of the trail designations outlined in Alternative D need to be reevaluated. | See response to comment 120-90 |

BLM_0011228

| | | | | Many trails are both ATV and Motorcycle trails. Many ATV and Motorcycle trails need to be opened to the other. | |
|---|---|---|---|---|---|
| Jason | Croates | 443 | 1 | Keeping some trails open: including Flat Iron Mesa, Coyote Canyon, and Gemini Bridges | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Jason | Croates | 443 | 2 | Lowering in number of rigs limited to running a trail together (49 down to 24) | See response to comment 123-26. |
| David | Whiteman | 444 | 1 | Include 300 miles or more of single-track trail | See response to comment 122-46 |
| Gary C. | Taylor | 445 | 1 | Specific areas I would like to explore and that are in danger of closure are the White Wash Dunes, Flat Iron Mesa, Strike Ravine and Barlett Wash areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Mark | Murrell | 446 | 1 | One of our favorite areas for dispersed camping has been closed to that activity (the Blue Hills Road, Bartlett Wash area). Please don't close any more areas off to dispersed camping. I fully support that the final management plan must mandate full public involvement in any established and management of "restricted camping areas" or "controlled camping areas." | Blue Hills and Bartlett Wash areas are available for dispersed camping presently, although campers are restricted to designated sites and are required to carry out solid human waste. Camping at Bartlett Wash remains as is under the DRMP/EIS; should a developed campground be proposed at Bartlett Wash, site specific NEPA analysis would be undertaken. Full public involvement would be part of the NEPA analysis. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| Marty | Avalos | 447 | 1 | The White Wash area in Alternative C & D is not adequate. It restricts in some areas, which are the main reasons for going there in the first place. | See response to comment 123-35 |
| Marty | Avalos | 447 | 2 | Mitigating potential problems with fencing is impractical and does not conform to the | See response to comments 208-3 and 479-6. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | environment. | |
| Marty | Avalos | 447 | 3 | Yellowcat and the Utah Rims should have a SRMA designation: Yellowcat to utilize the maze of existing mining roads, and Utah Rims should, as a minimum, extend to include Mel's Loop. | See response to Comment 122-38 regarding Yellow Cat, and 122-39 regarding Utah Rim SRMA. |
| Marty | Avalos | 447 | 4 | One area not addressed is the ability to manage the Public Lands in the Moab area. I suggest evaluation of the ratio of clerical staff vs. "in the field" staff. There is clearly a significant imbalance. | Staffing allocations are not a land use planning issue. The analyses on pg. 4-3 of the DRMP/DEIS assumes that there will be funding and work force to implement the selected alternative. |
| Cindy | Granquist | 449 | 1 | The Green River is not the right place for motorized vehicles. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Meredith | Rose | 450 | 1 | Closing off all but the necessary access roads into the area by Hell Roaring Canyon – there are irreplaceable cultural artifacts (pictograph panel and inscriptions) nearby and great access puts these resources at risk. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Meredith | Rose | 450 | 2 | Close off the road that runs along the river [in Labyrinth Canyon] for approximately three miles. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Shilpa | Reddy | 451 | 1 | I hope the BLM will not put additional roads through [Labyrinth & Hell Roaring Canyon] these canyons. There are cultural resources (like pictographs  ) and more roads would increase the opportunity for people to come in and vandalize these artifacts. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Kelly | Biaswell | 452 | 1 | Hearing of SUWA's proposal to keep this area [Dead Man's Point and Hell Roaring Canyon] unaffected by ORVs – by limiting current roads, I feel compelled to express my sincere support of maintaining what wilderness there is and increasing wilderness boundaries. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Arlene | Connely | 453 | 1 | Block off the side roads – specifically the one going into Spring Canyon. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Jason | Schmidt | 454 | 1 | The travel plan should include areas south of I-70 where a person can experience a primitive outing. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Jason | Schmidt | 454 | 2 | Please do not go ahead with your preferred. Excessive amounts of roads, especially south of I-70 and [Labyrinth Canyon] | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Josh | Brown | 455 | 1 | I worry that this area [Deadman's Point in general] will be negatively impacted under the new Travel Plan. It seems to me that the more roads and vehicles that criss-cross this area will bring more environmental degradation. I would love to see less roads included in this plan. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| Alex | Schwartz | 456 | 1 | I camp at Dead Man Point at the entrance to Hell Roaring Canyon. I would greatly prefer that the area is managed to minimized motorized vehicle traffic off of the main road access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Alex | Schwartz | 456 | 2 | Labyrinth Canyon. I would like to see minimal motorized vehicle traffic in that vicinity as well. Please designate as few roads as possible. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| R. Lance | Wade | 457 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto Wilderness management are unlawful. Congress put a deadline on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| R. Lance | Wade | 457 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. It closes the killer hill climb and camping area to the west of the dunes. | See response to comment 123-35 |
| Jay | Van Loan | 195 | 1 | Our main concerns include the possible loss of our grazing allotments in Utah, one managed by Colorado (error in labeling and road closure) and one managed by Utah (Non-WSA w/ Wilderness Characteristics), and the proposed road closures in Utah (Designated Routes), some of which will close our historic and only access across public land to our Colorado deeded land and Colorado/Utah BLM summer range. The proposed road closures will eliminate our historic access to our Utah BLM and State winter range. | Two routes that start in the State section (T. 21 S, R 26 E, Section 32) on the Colorado State line, cross Utah BLM land, and enter the state of Colorado have been added to the preferred alternative.<br><br>Policy for voluntary relinquishments is given on page 2-12 of the RMP. |
| Jay | Van Loan | 195 | 2 | Livestock Grazing. There are two different Utah grazing allotments named Spring Creek in the | The confusion regarding the two Spring Creek allotments has been corrected in the PRMP/FEIS.  The map has |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Dolores Triangle. One is the Spring Creek-Colorado allotment, #16115, managed by Colorado BLM as part of our Colorado allotment because it is not accessible from Utah. The other allotment is Spring Creek-Utah, which has been unavailable for livestock grazing for a number of years. These are two separate, non-contiguous allotments. The Spring Creek-Colorado allotment has been available for livestock grazing since the Taylor Grazing Act was enacted and has been managed by the BLM as part of our Colorado allotment since 1992. However, on map #2-4-A and map #2-4-B and in the narrative on page 2-13 the Spring Creek-Colorado allotment is incorrectly labeled as being unavailable for livestock and the Spring Creek-Utah allotment is not mentioned in the narrative or shown on the map. The Spring Creek-Colorado allotment would be made available for grazing under Alternatives C and D; however, this is also incorrect since it is already an active allotment. Please correct the status of the Spring Creek-Colorado allotment, located in Utah at the Colorado/Utah State Line, to an active allotment managed by Colorado BLM as part of our Spring Creek-Colorado allotment. Mr. David Williams, BLM Moab office, is familiar with the correct status of these two separate allotments. | been corrected. |
| Jay | Van Loan | 195 | 3 | Non-WSA Lands with Wilderness Characteristics, Alternative B.  Our winter permit is the Big Triangle allotment, #05872, located in the Dolores Triangle. We acquired this permit in 1951. This allotment is designated as having Wilderness Characteristics in Alternative B. We disagree with this assessment due to the number of roads and uses within this allotment. The BLM 1999 Utah Wilderness Inventory did not include this allotment. On page 8 of the September 2001 Renewal of Term Grazing | The PRMP/FEIS restricts all vehicles to designated routes over the majority of the field office area.  This is true regardless of the land's status as wilderness characteristics.  That is, cross country travel is not allowed.  If the permittee has a specific need to access a specific site by motorized vehicle, motorized access can be granted to the permittee.  Horse use remains unrestricted. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Permit for Big Triangle Allotment it is stated, "At this time, no new significantly different information has been submitted that would compel BLM to reconsider the wilderness character of these lands or to believe that there is a reasonable probability that the area in question may have wilderness characteristics." The Wilderness Characteristics Review submitted by SUWA dated December 30, 2003, had "No" checked after the question "Was new information submitted by a member of the public for this area?"<br><br>Should it be decided in the final Moab RMP to manage the Big Triangle allotment for wilderness characteristics, we request the use of motorized vehicles, including ATVs, by us and future permittees be grandfathered in for the movement and gathering of livestock, improvement work and allotment monitoring, which sometimes requires ATV off road use. | |
| Jay | Van Loan | 195 | 4 | Designated Routes-Spring Creek Canyon-Colorado access (Dolores Triangle). The Spring Creek Canyon-Colorado access road enters Colorado and then meanders back and forth across the state line as one travels up the south fork of the canyon to the Colorado BLM lands located on the western end of Pinion Mesa. This road is proposed to be changed to non-motorized in Alternative A and closed on Alternatives B, C and D. This is the only route across public lands we have available to access our upper private deeded land and Colorado BLM. This is the only route open to the public to access thousands of acres on top of the western portion of Pinion Mesa which includes the popular areas known as the "Hogback" and "The Big Lake." We need this road to stay open so we can stay in | Two routes that start in the State section (T. 21 S, R 26 E, Section 32) on the Colorado State line, cross Utah BLM land, and enter the state of Colorado have been added to the preferred alternative. |

| | | | | business. | |
|---|---|---|---|---|---|
| Jay | Van Loan | 195 | 5 | Attachments: 3 files with referenced maps-Spring Creek Access Road; Big Triangle Access Road; Big Triangle + Spring Creek Access Roads Arial Map. | See response to 218-1. |
| Jay | Van Loan | 195 | 6 | Why are some roads which were constructed in relatively recent times for access to wildfires or for energy research and which were never intended to be public right of ways left open while long standing routes constructed to meet specific and vital needs many years earlier are selected to be closed? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| William | Hughes | 200 | 1 | Travel Management Map C is the best choice, with the adjustments listed below to correct errors or add interesting roads that were omitted. 1. Parts of roads used on five permitted Jeep Safari routes are missing from your Alternative C designated road map. I think this issue needs to be addressed before finalizing the plan. Details are provided in Appendix A. 2. There are a couple road segments in existing WSAs that I think could be reopened without impairing the suitability of the area for preservation. In one instance Search and Rescue efforts would be enhanced by this action. Details are provided in Appendix B. 3. The connection of the Klondike Bluffs Road from US 191 to the northern section of the Little Valley Road, as well as the connection at this point of the southern and northern sections of the Little Valley Roads, is missing from the maps. This is a part of the Copper Ridge Safari route and mentioned in Appendix A, but I imagine a lot of mountain bikers will be upset to lose this access to | See responses to comments 206-3, 206-10 through 21. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | the parking area for Klondike Bluffs as well.<br>4. Some routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C or D, do not appear on Alternative C. Three examples of this are included in Appendix C that are important to me, and I urge that they be added to the Alternative C map.<br>5. There are some road segments that are not Jeep Safari trails, but I feel they are important enough to note and ask for revisions on Alternative C to add them. These are covered in Appendix D. | |
| William | Hughes | 200 | 2 | SRMAs. I do not have any major objections to the establishment of the additional SRMAs as proposed. However, some boundary adjustments to allow for better, more understandable enforcement are needed for the White Wash Dune Area. I think the proposed South Moab SRMA should be expanded in size to include Black Ridge. I have seen the Ride with Respect group's proposal for additional focus areas in the enlarged version of this SMRA and it appears to contain excellent ideas. My only reservation is that the corrections to the Strike Ravine Safari Trail I mentioned in my Appendix A need to be incorporated into this proposal. | See responses to comments 206-2 , 206-9 and 206-10. |
| William | Hughes | 200 | 3 | I think that identification of Non-WSA lands with Wilderness Characteristics was outside the scope of analysis for an RMP. The time has long since passed that for WSA analysis, a point recent decisions in lawsuits concerning this matter reinforce. These areas should not have been isolated for special management, and therefore 0 acres should be selected under this heading, just like in Alternative A. | See response to comment 206-6. |
| William | Hughes | 200 | 4 | Permitted Jeep Safari Routes not on Alternative C. Copper Ridge-connection between southern and northern Little Valley Roads at Klondike | See response to comment 206-11 and 206-12. |

| | | | | Bluffs Road intersection is missing. Another segment of the route, one that is used to bypass the difficult pipeline hill, is not shown on the map in it's entirety. It departs from the newer pipeline near US 191 at UTM 4282150N 0614340E and connects with a route shown on Alternative C at about 4283390N 0615420E. Next, there has been some discussion among CR trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character. These changes would require two road segments to be left in Alternative C that are eliminated from Alternative A. While there is no plan at present to ask for any changes to the Jeep Safari Permit, it would be desirable to keep these roads legal for future incorporation into the permit. The first starts at UTM 4286060N 0615910E in the Sovereign area, proceeds roughly ESE, and then turns NE to connect with the pipeline road about 4286190N 0617590E. This would allow using a segment of road that passed dinosaur tracks on the way to the usual lunch spot. The second road segment is a loop that starts from the Little Valley Road at approximately 4290630N 0614020E it starts in a SW direction, climbs the hill top, then beads NW along the ridgeline before dropping into a wash and bearing NE to reconnect back with Little Valley Road at 4291230N 0612940E. This loop provides some elevation gain and therefore produces nice views into Arches NP. | |
|---|---|---|---|---|---|
| William | Hughes | 200 | 5 | Strike Ravine Trail-two sections are missing. The N-S road crossing the private property that the Club had to defend it's right to use in court is not shown, approximate UTM4253670N 0638440E on the northern end, | See response to comment 206-11. |

| | | | | 4252320N 0638040E on the southern end; a portion of the "Big Ugly" hill is not shown UTM 4254480N 0638550E. | |
|---|---|---|---|---|---|
| William | Hughes | 200 | 6 | 3D Trail-a section of road is missing from about UTM 4285900N 609900E north then west to UTM 4286400N 609300E. | See response to comment 206-11. |
| William | Hughes | 200 | 7 | Dolores Triangle Trail-an E-W shortcut near Steamboat Mesa, at about UTM 4295500N 668000E, is eliminated, and it is quite useful. | See response to comment 206-11. |
| William | Hughes | 200 | 8 | Flat Iron Mesa Trail-four portions of this trail are not included in Alternative C. First, from UTM 4246450N 636300E jiggling NW to the pipeline road. Second, from UTM 4245600N 634700E going SW to Plan trail. Third, from UTM 4246200N 633400E going SW to meet the SJ County B road. Also, at approximately UTM 4246440N 634910E the roads do not appear to connect, when in fact they do, and this connection is used on the Flat Iron safari trip. Last, the loop around "Hammerhead Rock" from about UTM 4242400N 633400E southerly and then east to the plan route. Another note for this trail, the last bit of the permitted route to the county B road has been fenced across with no gate, and a longer existing road is now used to reach the county road. It would be helpful to update this on the official map. | See response to comment 206-11. |
| William | Hughes | 200 | 9 | Road segments suggested for designation as open in existing WSAs: 1) Behind the Rocks WSA- Short segment to "Egg Ranch Fin", a nice viewpoint and a real thrill to drive. 2) Negro Bill Canyon WSA-the road west from Coffee Pot Rock. The western end is shown in Alternative D, but the connection to the Porcupine Rim Trail near Coffeepot Rock is not. It should all be in Alternative C. | See response to comment 206-20. |

| William | Hughes | 200 | 10 | Day Canyon Point-A side spur from the main road that heads west to an overlook of Long Canyon does not show the route's full length. It proceeds beyond what is shown to cross a small wash and end at a turnaround point. This serves as both a natural turnaround point as well as a nice starting point for a hike to overlooks of Long Canyon and the interesting rock formations along the rim in this area, it adds only about 1/8 mile. It begins at UTM 4268370N 0614600E and ends about 4267570N 0614830E. | See response to comment 206-13. |
| William | Hughes | 200 | 11 | Gemini Bridges-The club would like to see the road across the top of the bridges remain open. | See response to comment 206-14. |
| William | Hughes | 200 | 12 | Mill Canyon-A road that connects from the Mill Canyon Road on the north heads southward into Courthouse Pasture, connecting with roads there. It would also seem to be an important road for Search and Rescue efforts in the pasture area. | See response to comment 206-15. |
| William | Hughes | 200 | 13 | The Pickle-This challenging wash bottom route appears to be shown on the Alternative C map, but we want to be sure. It begins at the Bartlett Wash Road about UTM 4285183N 0605027E and heads up the wash to intersect the road to Hidden Valley about 4284925N 0604272E. | See response to comment 206-16. |
| William | Hughes | 200 | 14 | Flat Iron Mesa- A strong, useful connecting road that is shown on USGS maps exists between UTM 4245328N 0634685E (the main Flat Iron Road) and UTM 4245272N 0636835E (US191). This road connects with one shown on Alternative C, making that a connecting road rather than a dead end as currently mapped. | See response to comment 206-17. |
| William | Hughes | 200 | 15 | Ray Mesa & Lisbon Gap 15' Quad Area-There are some roads along the Utah/Colorado border that leave Utah and continue in Colorado. The roads referred to are in the Ray Mesa and Island Mesa area. A check with the Colorado BLM affirmed that | See response to comment 206-18. |

BLM_0011239

| | | | | these roads were part of their existing legal travel routes (Julie Jackson, Uncompahgre Office, Nov. 13, 2007). Therefore, it makes no sense to eliminate the Utah end of a road if the Colorado end is legally open to travel, particularly when the Utah end is needed to access the Colorado section. The first road departs from a road shown on alternative C at UTM 4234752N 0669852E to head northeast, it wanders back and forth across the state border around UTM 4235280N 0670139E, and then continues northeast to intersect with another road in the Yip Yip Mine vicinity. The next road also departs from the same road shown on alternative C that was referred to above, about UTM 4233247N 0669563E. It travels generally eastward, crossing the state line at UTM 4233513N 0670416E as it travels along the southern end of Ray Mesa. The final road departs from the above mentioned alternative C road at UTM 4227870N 0670144E and heads eastward toward the Colorado line. Just before reaching the state line it heads north, and finally crosses the border about UTM 4227870N 0671005E as it continues eastward along a bench of Island Mesa. | |
| William | Hughes | 200 | 16 | Levi Well Road spur-There is an interesting route that follows a small, sandy wash bottom to access a unique terrace that features an array of balanced rocks. The route stays in the wash bottom, and visitors stop when they are in closest proximity to the balanced rocks. At this point they begin a hike to the terrace. I have personally done this trip several times, and it has been a thrill every time. It starts at UTM 4290910N 0593370E and | This route is not part of the Grand County route inventory, nor was it proposed during scoping.  As a result, it was not evaluated in the DRMP/EIS.  This route can be considered for identification on a site-specific basis in the future.  See also response to comment 206-4. |

| | | | | terminates within sight of the terrace around UTM 4290510N 0595440E. See Pictures included with this Appendix. | |
|---|---|---|---|---|---|
| William | Hughes | 200 | 17 | Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from the rim viewpoints on this side of the wash into the wash itself. It is a well defined road that is only partially shown on the Alternative A map. It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it. The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a fence, and then proceed pretty directly to a descent down the last little bit into Tenmile at about UTM 4287670N 0588320E. | See response to comment 206-19. |
| Steve | Johnson | 329 | 1 | The BLM's proposed plan is badly over-weighted in favor of Off Road Vehicle Use. | See response to 124-9. |
| Steve | Johnson | 329 | 2 | The BLM plan promotes large-scale oil and gas development in sensitive areas. | The BLM strongly disagrees with the commentor's assertion that it is promoting large scale oil and gas development in sensitive areas.

The BLM has excluded oil and gas development in the preferred alternative of the DRMP/EIS in many sensitive areas.   These areas are identified in Appendix C of the DRMP/EIS and on Map 2-5-C. |
| Ian | Parish | 330 | 1 | Leave the Sand Dunes open to travel. The Dunes are the dunes, they recover from track at the nest wind storm, let people play. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Ian | Parish | 330 | 2 | Increase the number of people needed for group special permits. My friends, family and I can easily be a group of 24 people. Make use get a permit and special insurance for a weekend trip to Moab is silly. | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112, and 124-110 regarding clarification of SRP policies and SRP group numbers. |
| Jim | Pendergast | 331 | 1 | Please review and rethink the proposed resource management plan and reduce the motorized areas, especially access to and along the Green River. Eliminate the road access through Hell Roaring Canyon. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Thomas J | Messenger | 332 | 1 | The preferred alternative fails to provide adequate protection for lands of wilderness character. Too often, especially in the transportation plan, the allowed uses are seen as balancing the claims of different recreation communities while actually it's a question of maintaining the natural character of the land. The most glaring example is the inclusion of only 18% of the land with wilderness character outside WSAs as AWCs. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-0550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some of all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| Thomas J | Messenger | 332 | 2 | The whole route from the mouth of Spring Canyon to the Hey Joe Mine should be closed to preserve the natural character of the river corridor and prevent conflict with recreation not at odds with that character. Additionally, route extends degradation of natural qualities on the floor of Hey | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

BLM_0011242

| | | | | Joe Canyon well above the mine and turn-around by offering access to ATVs. | and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Molly | Taylor | 333 | 1 | The status of the rivers and streams on the Green River: I support the dropping of the Swasey's to Ruby Ranch section. This stretch is highly impacted by road, highway, city (Green River), a low head dam, the boat ramp, a highway bridge, areas of historic use and then private land with structures (large homes) of Ruby Ranch area. | See response to comments 124-88,  124-91 and 407-3. |
| Molly | Taylor | 333 | 2 | The impact of groups of motorized ATV's or motorcycles is extreme [in Hey Joe Canyon] due to the nature of the echo of the canyon. A solution would be to eliminate ORV access to Hey Joe Canyon. Visitation to Spring Canyon and the river at Spring Canyon doesn't result in the noise since the groups tend to turn the motors off and lunch/visit the river. Spring Canyon seems to be a grazing allotment at the moment so the road access is necessary for the grazing. | See response to comment 122-7 |
| Molly | Taylor | 333 | 3 | On other specifics I support the organization, Ride with Respect's RMP comments:<br>-increase in ERMAs and SRMAs<br>-some important links in the travel plan are missing and some roads could be closed<br>-trails were not properly inventoried for bicycles, motorcycles and ATVs<br>-White Wash should be open to cross country travel | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| David W | Bodner | 334 | 1 | The Price Field Office did the draft for the Green River in Grand County while the Moab Field Office did the land portion in Grand County. The two offices did their work at different times and did not consult during the process. Price has found wild and scenic values for the river corridor while the Moab office wants to open the river corridor to 4x4, ATV, and motorcycle travel both on the rim and in the river corridor. The Moab plan will diminish, if | See response to comment 124-91. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | not ruin, the experience of those who float the river and enjoy its wild and scenic values. | |
| David W | Bodner | 334 | 2 | The preferred alternative has eliminated areas identified, by the BLM as having wilderness characteristics. These areas are to be managed as wilderness and protected until congress decides on their management. Turning them into motorized recreation is in direct conflict with the BLM mission and makes it impossible for these lands to be maintained with wilderness values. All areas identified by the BLM as having wilderness character need to be restored to that designation. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| David W | Bodner | 334 | 3 | The BLM has not identified a purpose and need for all 2642 miles for roads in the travel plan. As a matter of fact, the BLM did not ground truth the roads but only looked at a portion of them on aerial photographs. Multiple roads going to the same dead end location are neither needed nor sensible in the fragile desert country. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| David W | Bodner | 334 | 4 | The BLM used a map of roads that was provided by Grand County to create their travel plan. Grand County's plan was provided by a member of a local 4 wheel drive club. The BLM did not ground truth these roads due to a complete lack of adequate man power in the Moab field office. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| David W | Bodner | 334 | 5 | The BLM has not done adequate cultural surveys in the river corridor or the side canyons and rim, to determine if the travel plan will damage resources. | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted. Travel Plan formulation is described in |

| | | | | | |
|---|---|---|---|---|---|
| | | | | The National Park Service has been doing surveys in Canyonlands National Park, just downstream, and is locating multiple sites and many artifacts. | Appendix G. Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. The BLM will continue to enhance the inventory for high cultural value areas identified in the final plan. See also response to the submission by the Colorado Plateau Archaeological Alliance. |
| David W | Bodner | 334 | 6 | No economic impact study has been done to determine what this plan will do to our business community in Moab and Grand County. The BLM is ignoring their NVUM study that provides them with data that the vast majority of visitors come for quiet recreation. Why does the BLM see a need to change from less impactful recreation to extremely impactful recreation? Only 10.5% of the visitors surveyed came for motirzed recreation while 49.3% came for hiking. The results of the NVUM surveys are in direct conflict with the BLM's assumptions that all these roads are necessary. | See response to comments 124-2, 124-133 and 124-134. and 124-135. The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA. The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. The BLM has no data to separate out motorized versus non-motorized recreation spending at this time, even assuming that the two groups are completely distinguishable. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive OHV management. There is no reason to expect that a more restrictive environment for OHV recreation (as would be the case in all action alternatives) would harm these |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | industries. Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. |
| David W | Bodner | 334 | 7 | The BLM is ignoring FLPMA in not managing these lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values: that, where appropriate, will preserve and protect certain public lands in their natural condition." | See response to comment 122-9 |
| John | Vetere Jr. | 335 | 1 | The BLM is always insisting that everything is based on these range assessments, however, you are proposing to continue to keep Bogart, Cottonwood, and Diamond Allotments closed in your RMP. We are not aware that the BLM has ever completed a range assessment on those allotments to decide if they should or should not be closed. This contradicts everything that we have been told by your office. The Moab BLM should take a hard look at whether or not these allotments can sustain grazing use. The BLM should work with permittees that would want to graze those areas to develop both a short term and long term plans. Closing these areas without study data and without field visits from concerned permittees is wrong and should not be supported. We were never notified of any such visits to the area or heard of the BLM doing any studies to support their stand that those allotments should be closed. If your staff has visited the area and collected information recently for the RMP we would like to request copies of it. | The decision to reallocate 100% of the forage previously reserved for livestock grazing was not based on specific range assessments for the allotments mentioned by the commentor. The forage on these allotments were reallocated to wildlife to enhance, protect and improve wildlife habitat, riparian vegetation and watershed values.

In 1990, the Nature Conservancy purchased large private land holdings (Cunningham and Graham Ranches) and acquire the associated BLM grazing permit.  Since that time, the ranches have been turned over to the Utah Division of Wildlife Resources.  The State of Utah supports the continuation of the reallocation of forage in the Cottonwood, Diamond and Bogart allotments to wildlife.  See response to the State of Utah's comment, 120-6. |
| John | Vetere Jr. | 335 | 2 | If the BLM really wants to solve some grazing issues they would look at some of the poor desert allotments near the Colorado River way, and | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or nonavailable for livestock grazing. This is the only |

| | | | | | |
|---|---|---|---|---|---|
| | | | | allotments that keep burning every year like San Arroyo and Harley Dome. | planning decision within the RMP. Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| John | Vetere Jr. | 335 | 3 | We would like to see the BLM take an active approach to grazing management in the Bookcliffs. | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or nonavailable for livestock grazing. This is the only planning decision within the RMP. Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| B | Tipps | 336 | 1 | I hope that you will consider extending the deadling for comments on this plan and the others that are on the street for comment or coming. That way, I can provide more specific comments. | See response to comment 124-1 |
| B | Tipps | 336 | 2 | All areas identified in America's Redrock Wilderness proposal should be identified as wilderness in this plan and managed to conserve these values while the issue is being decided in court and congress. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| B | Tipps | 336 | 3 | My other large concern is regarding the archeological, historic, and Native American resources in the field office area. The protections specified in the draft RMP seem woefully inadequate to locate and protect these national treasures. | The commentors concerns about the proposed protections for cultural resources are not sufficiently articulated to allow a more detailed response. In addition, all cultural resources are protected by law. |
| Sara Ann | Phillips | 337 | 1 | I clearly see the holes in the Moab Resource Management Plan and the lack of a balanced-approach when it comes to managing these magnificent public lands. | The commentor has not provided any specific information regarding a lack of a balanced approach to which to respond.<br>Alt C provides a balance between resource protection and commodity production. |
| Sara Ann | Phillips | 337 | 2 | It appears that much (almost 90%) of the lands with scenic, cultural, or ecological importance and qualify for "Areas of Critical Environmental Concern" will not receive that protection. Yet, it is federal law that those lands be given PRIORITY consideration. | See response to comment 124-68 regarding ACEC designations. |

| | | | | | |
|---|---|---|---|---|---|
| Sara Ann | Phillips | 337 | 3 | Of the 464,777 acres of non-WSA lands that qualify as wilderness, which are in America's Red Rock Wilderness Act, you propose to protect just 47,761 acres or 10%. And, your agency proposes to designate 2,652 miles of ORV routes, many on lands within America's Red Rock Wilderness Act and which BLM previously said had wilderness character, i.e., were "roadless." Damage from ORV use will be widespread and cannot be reversed. | The BLM examined about 558,807 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics.  The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B. |
| Sara Ann | Phillips | 337 | 4 | I am disappointed in how the agency handled the "Public Participation" as required by FLPMA. First, by having RMP's for five other areas in Eastern Utah in some form of public comment right now, you are creating confusion and frustration for the public and stakeholders, thereby probably detracting from the quality of public comment that you will receive. Even worse, you have taken seven years to write this version and now you give the public 90 days. For a plan that covers 1.8 million acres, with a time of over twenty years, this is hardly adequate to gather a wide and deep pulse for how your public would like to see their lands managed. | See response to comment 124-1 |
| Mike, Becky, and Mason | Weilmuenster | 338 | 1 | Places that have been open to vehicle traffic for decades are now being called Wilderness by people that most certainly don't travel through the area other than on the dirt roads. | Not a comment; no response required. |
| Mike, Becky, and Mason | Weilmuenster | 338 | 2 | Having designated camping spots is unecessary. People camp or park in the places they have been doing it in for years. The lay of the land already limits how many can park there. Most of the vehicles that camp there are self-contained RVs. So I stronly oppose the camping policy in as outlined in Appendix E of your current draft plan. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| Mike, Becky, | Weilmuenster | 338 | 3 | Plans proposed by the group "Ride with Respect" and USA ALLIANCE/BLUE RIBBON COALLITION | NRR |

| and Mason | | | | make far more sense than the other options. | |
|---|---|---|---|---|---|
| Mike, Becky, and Mason | Weilmuenster | 338 | 4 | The FEIS should consider adding more single-track and designated OHV areas and maintaining them with proper signage containing trail ettiquite reminds along with historical or ecology facts about the specific trail/road/wash/mine/well site/ranch etc. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Mike, Becky, and Mason | Weilmuenster | 338 | 5 | The BLM needs to sitck with it's congressional mandate to manage these lands according to the multiple use/ sustained yield paradigm described by law. Allowing OHV enthusiasts, mountain bikers, hikers, equestrians, and energy developers to share these public lands and use them wisely. | Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people. |
| Dusty | Pederson | 339 | 1 | Your open area at White Wash in Alternative C and D should be expanded. Closing the challenging trails like killer hillclimb will not add to the experience of Moab. | See response to comment 123-35 |
| Dusty | Pederson | 339 | 2 | Fencing off areas around resources will not add to the aesthetics, public education for all would be a better alternative | See response to comments 208-3 and 479-6. |
| Dusty | Pederson | 339 | 3 | The fee system as proposed does not seem to make much sense, I am willing to support funding for infrastructure if existing funding is inadequate but please do not impose "individual Special Recreation Permit" programs. Everyone should pay the same no matter what mode of transportation. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| Dusty | Pederson | 339 | 4 | The Utah Rims SRMA would help manage this popular area. | Commentor's statement is noted. |
| Diane | Spengler | 340 | 1 | Your open area at White Wash in Alternative C and D should be expanded. Closing the challenging trails like killer hillclimb will not add to the experience of Moab. | See response to comment 123-35 |
| Diane | Spengler | 340 | 2 | Fencing off areas around resources will not add to | See response to comments 208-3 and 479-6. |

BLM_0011249

| | | | | the aesthetics, public education for all would be a better alternative | |
|---|---|---|---|---|---|
| Diane | Spengler | 340 | 3 | The fee system as proposed does not seem to make much sense, I am willing to support funding for infrastructure if existing funding is inadequate but please do not impose "individual Special Recreation Permit" programs. Everyone should pay the same no matter what mode of transportation. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRPs policies. |
| Diane | Spengler | 340 | 4 | The Utah Rims SRMA would help manage this popular area. | Commentor's statement is noted. |
| Bobby | Mock Family | 341 | 1 | As for fencing cottonwood trees in White Wash, this seems utterly unecessary and costly. | See response to comments 208-3 and 479-6. |
| Bobby | Mock Family | 341 | 2 | The final plan should include full public involvement, and not just specialm monied, environmental groups. If "user conflict" is noted, the BLM should simply re-route one of the uses. Horses or hikers can easily take a side trail. | See response to comment 123-14 |
| David | Rodgers | 945 | 1 | after reviewing the entire Moab RMP, I have some serious concerns about your management plans. I do not agree that  any of the Alternatives go far enough in protecting the wilderness, wildlife, wildlife habitat and cultural values (archaeological sites) in the WSA lands and on the non-WSA lands with wilderness characteristics. Since these lands have been recognized as having wilderness potential by the BLM (and many other individuals and organizations, of course), they should be managed as wilderness until final decisions are made regarding their inclusion in normally designated wilderness areas. Therefore, they should be closed entirely to (1) motorized vehicle use on or off existing roads/ routes; (2) minerals, oil and gas exploration/ development; and (3) livestock grazing. These land with wilderness potential make up only a small part of the Moab BLM area--- there is plenty of land reamining | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.

For example, in Alternative B, most of the Non-WSA lands are open to oil and gas leasing subject to standard lease terms and conditions.  While Alternative C is designed to provide maximum conservation and |

| | | | | | |
|---|---|---|---|---|---|
| | | | | available for properly-managed vehicle use, livestock grazing, and mining/oil & gas exploration. | protection of natural resources from resource development and use.  Under Alternative C, some Non-WSA lands with wilderness characteristics would be closed to leasing and most Non-WSA lands with wilderness characteristics would be leased subject to either minor operational constraints like timing limitations or controls on surface use, or major constraints like no surface occupancy.  Alternative D reflects existing management direction, and Alternative A (the Preferred Alternative in the DRMP/DEIS) is designed to provide for a wide variety of resource needs, including mineral resource development and some level of protection of natural resources |
| David | Rodgers | 945 | 2 | all critical wildlife habitat (including ACEC's in Alternative B) and archaeological sites outside the lands with wilderness potential should be given the protection they need to preserve them. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.   An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. |

BLM_0011251

| | | | | | . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.  The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and recreation and development on our public lands The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of recreation and development. |
|---|---|---|---|---|---|
| David | Rodgers | 945 | 3 | _____ appropriate wildlife habitat improvements, such as non-native vegetation control, guzzler construction, and depleted rangeland restoration as needed throughout the Moab BLM area. | The commentor's desire for the BLM to undertake wildlife habitat improvements throughout the MPA is noted. |
| David | Rodgers | 945 | 4 | Regarding the Wild & Scenic Rivers designation, I would agree with Alternative B but with the strong recommendation that all motorized vehicle and mining activities be kept outside of corridor along both sides of the rivers so that those floating the rivers cannot hear or see these activities, and so that wildlife dependant on these riparian areas are not disturbed. | See response to comment 124-88. |
| Ruxton | Noble | 946 | 1 | Many of the important motorcycle trails are not on any of the alternatives. The Utah Rims area, for example, is far from a complete inventory, as well is the area north of I-70. The Thompson Trail is an epic ride that offers an endless single track experience that is vary hard to find. It should be combined with Copper Ridge Motorcycle Loop in the final plan. Since no inventory was done on single track trails, the BLM should continue accepting data. I recommend that routes provided by Ride with Respect, the Sage Riders, and other individuals be investigated and considered for the | See response to comment 122-14 |

| | | | | final plan. | |
|---|---|---|---|---|---|
| Ruxton | Noble | 946 | 2 | The "individual Special Recreation Permit" program does not seem reasonable, and since it would be accessable from all directions, difficult to enforce. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. Enforcement actions are administrative and do not require land use planning decisions. |
| Ruxton | Noble | 946 | 3 | The Bartlett Wash Slickrock is also a favorite. This needs to continue to be open to motorcycles as well as the Slickrock Bike Trail which was developed by motorcyclists. | See response to comment 122-42 |
| Mike | Coronella | 947 | 1 | What is the justification for this plan? The vast majority of local residents AND visitors don't want the Moab area to be destroyed, yet this proposal not only allows for such destruction, it facilitates irreversible damage. | The BLM's Alt C provides protections to important resources within the planning area. |
| Mike | Coronella | 947 | 2 | When the proposed road density is as great as the BLM accepts in this RMP, it becomes literally unmanageable--- a plan that allows high impact activity on such a huge proportion of our PUBLIC lands is simply a recipe for chaos. | The commentor's preference for fewer designated routes is noted.  Alt. C designates 2,500 fewer miles of route than under the No Action alternative. The BLM asserts that by eliminating over 2,500 miles of routes, it will have created a more manageable route system. |
| Mike | Coronella | 947 | 3 | I'll also put out this perspective: I am a member of Grand County Sheriff's Search and Rescue; are we now being forced to travel into more and more dangerous situations merely so someone can have easy motorized access? This plan opens up a huge and unnecessary challenge to those who volunteer their time for the public's well being. | The Travel Plan restricts travel by not designating 2,500 miles of "D" route that was inventoried by the county and verified by BLM.  Thus, the "easy motorized access" referred to by the commentor has not been opened up. |
| Mike | Coronella | 947 | 4 | I wish I had more time to offer comments in greater debth and detail, but the BLM has seemingly done it's best to limit the time and quality of comments by puttingn no less than six major RMPs on the table at once--again (like this plan) doing a great disservice the very people who own, use, and enjoy these public lands. | See response to comment 124-1 |

| Alison | Gartlan | 948 | 1 | Federal Law requires the BLM to give priority to the protection of lands which qualify as "Areas of Critical Environmental Concern" because of senic, cultural or ecological importance. However, the Moab BLM plan would fail to protect 90% of the 613,077 acres which qualify for ACEC designation. Please revise the RMP to reduce the destructive and redundant web or ORV routes. The Moab area, as with the rest of the state, should provide opportunities for traditional non-motorized use and provide ecological havens for the long-term health of the land, the wildlife, water and other natural and cultural resources. | See response to comment 124-68 regarding ACEC designations. |
|---|---|---|---|---|---|
| J. Michael | Salbaum | 949 | 1 | Specifically, I would hope that you would reconsider the closure of several Jeep Safari Trails. Short segments for the Flat Iron Mesa, Strike Ravine, and 3-D trails are missing from the travel plan. This seems to me as a backhanded way to close EJS trails, because when parts of the trail are missing , the entire trail becomes unusable. Closing long- accepted and established EJS trails is not a good idea, and I would like to point out how important the famous EJS trails are for the economy of a small town like Moab. | See response to comment 206-11 |
| Cynthia | Smith | 950 | 1 | I think the comment period should be opened up again. Ninety days was not adequate time in which to review the huge volume of material covering this historic decision concerning this special Redrock country. | See response to comment 124-1 |
| Cynthia | Smith | 950 | 2 | I would like to see the Green, Colorado, Dolores, Mill Creek, and Negro Bill Canyonas suitable to become Wild and Senic Rivers. I am especially concerned about the Colorado and even more so about the Green River. All the Green River needs is to be declared suitable, including the section from Swasey to river mile 97 as was seen in the Price Office preferred draft in 2004. To leave out | See response to comments 124-88 and 124-91. |

BLM_0011254

| | | | | this section would endanger the rest of the river system. All of the suitable river segments should maintain their stattus. These rivers offer unparalleled opportunities to enjoy flowing waters in a wilderness setting. They are also the backbone of a significant part of our tourist industry, and if they are denigrated people will not come. This is already happening to the biking industry as more areas are opened to up to motorized vehicles. | |
|---|---|---|---|---|---|
| Raven | Tennyson | 951 | 1 | Where is the historic information which shows us how the land has changed over time, giving the BLM the reasons to make changes? | Chapter 3 contains information regarding the affected environment, including how the resource or resource use has changed over time. A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative.  The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives. |
| Raven | Tennyson | 951 | 2 | Where is the analysis of the drought conditions of the land and its effects on grazing? | All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q).  On pg. 2-50 of the DRMP/EIS, criteria for restricting activities, including grazing, during drought are given in management common to all action alternatives. |
| Raven | Tennyson | 951 | 3 | Where is the analysis as to whether cattle grazing is financially still feasible? What other sustainable options are available which support long term health of the land? Where is the long term plan for phasing out allotments that are not economically sustainable? Where are the allotments that will be phased out to allow for increased rangeland diversity of plants? Is there a balanced approach to plant diversity and use of the land? | The land use planning decision regarding grazing is only whether or not a particular allotment is available or unavailable for grazing during a particular planning cycle. All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q). A socioeconomic analysis of the feasibility of cattle grazing is not part of land use planning decision and is beyond the scope of the RMP |
| Raven | Tennyson | 951 | 4 | Where are the sections that show how you are | See response to comment 121-2. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | monitoring the success of the plan and that show us the success of the last plan? | The 1985 Grand RMP has a monitoring report that is updated to track the implementation of plan decisions. |
| Raven | Tennyson | 951 | 5 | Where are the sections that address NOISE POLLUTION in the plan? One of the unique great gifts of the area is its quiet and it is not even addressed! | See response to comment 122-7. |
| Raven | Tennyson | 951 | 6 | Where are the specifics as to how you will educate the public to the value of these lands in concrete ways. How will you monitor the success of this? | See response to comment 123-20 |
| Raven | Tennyson | 951 | 7 | What are the strategies for visitor outreach? What has been done? What are the projections for the 20 years? | Education/public outreach are all administrative actions and not land use planning decisions. The BLM projects that recreation use in the Moab planning area will increase slightly, but not at the rates of increase in the 1990s. |
| Raven | Tennyson | 951 | 8 | How do you monitor noise levels in WSAS? | Noise levels in WSAs are not monitored on a routine basis.  Since WSAs are closed to motorized travel and other surface disturbance, any noise is likely to be from outside the WSA boundaries.  WSAs must provide either outstanding opportunities for solitude or primitive and unconfined recreation, but such opportunities need be present only somewhere within the WSA, and not necessarily everywhere. |
| Raven | Tennyson | 951 | 9 | How do you monitor people who violate WSAs while driving in closed areas? | Enforcement actions are administrative and do not require land use planning decisions. |
| Raven | Tennyson | 951 | 10 | What are the projections for use in wilderness? How do you measure the intrinsic and spiritual value of sacred lands? | See response to comment 121-71. |
| Joey | Norton | 953 | 1 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. This route has been open for decades, and it appears on USGS topographical maps from the 1970's. Alternative D proposes that this route remain open, and we would like to see that | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0011256

| | | | | recomandation implemented in the Final RMP and Travel Plan. | |
|---|---|---|---|---|---|
| Joey | Norton | 953 | 2 | Several short route segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. I was informed this is merely an accidental omission, but would like to formally request that these segments be included on the final maps. | See response to comment 206-11 |
| Joey | Norton | 953 | 3 | The proposed action of limiting vehicle camping to "designated campsites" is unheard of on such large portions of public land. I strongly oppose the camping restrictions as outlined in Appendix E. while many campsites appear to remain open, the detail level of the available maps limits our ability to determine if all of the most favored campsites will be open. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Randall | Parsons | 954 | 1 | We have greatly enjoyed the time we have spent there and are very disturbed at the plans you are attempting to set forth there. This area is not a national park and should not be treated as such. These areas have along history of mining and ranching with many established access routes. They are the epitome of the Multiple Use/ Sustained yeild principal that has successfully guided the decision making process for the BLM for many years. The Wilderness Study areas and areas with wilderness character are just plain wrong. They are de-facto wilderness. Wilderness areas must meet specific criteria to be designated as wilderness by congress. Either these areas fit | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712). This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained use. Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related |

| | | | | | |
|---|---|---|---|---|---|
| | | | | the criteria or they don't. Those that do not should be released back to general use immediately. I am strongly opposed to the proposal set forth by the Southern Utah Wilderness Association. | services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives.  For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics."<br><br>See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Randall | Parsons | 954 | 2 | Regarding the three alternatives proposed for travel management by BLM there appears to be very little to distinguish them apart. None of them are acceptable to me in terms of motorized recreation. The increased motorized use of the area by the citizenry is a strong indicator that what the public wants are more places to ride, not less! In the twenty years I have been riding these areas I have seen little change in the land which is for the most part rock and sand. The area is totally formed and shaped by erosion. How can some tracks in the sand make any difference at all? Frequently after a rain or wind event you really have to search to determine where the trail is. Please remember that as a public agency you | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | need to seriously weigh the needs of all the people who want to use the land, not just those who would reserve it for the uses they see fit. | |
| Randall | Parsons | 954 | 3 | The proposed camping regulations and fee system for the White Wash area are completely off base. These are public lands served by country roads. There are no services such as water or electricity offered. The camping is on sandy rocky barren areas. We do not want to be crowded into restricted areas. If funding is needed there is existing funding and grant programs that can be utalized. There are many areas that can be used for dispersed camping. The money needed to enforce and monitor such a program if available would be better spent addressing issues such as parking, signing and trail maintaince. | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. |
| Randall | Parsons | 954 | 4 | In reviewing Appendix E of the plan regarding camping in designated camp sites only I find that wholly unnacceptable. There are so many areas that I have camped where you only need to pull off the road a short distance and have a wonderful camping experience that I shudder to think of losing the ability to do that. Again we are talking about an area that is likely san and rock that is constantly being scoured by the elements such that traces of your camp will soon be obliterated. Also there are new and old mine sites and gas and oil drilling rigs nearby in most areas. These areas are not a National Park! Dispersed camping must be allowed. Any closures of camping areas should be done with the full involvement of the general public so that the public is allowed to comment specifically on each location. | See response to comments 123-8 regarding dispersed and designated camping. Dispersed camping is allowed on over 95% of the Moab planning area.  See response to comment 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| Randall | Parsons | 954 | 5 | Special Recreation Management Areas are useful tools for managing areas of special interest or high recreational use. They need to be dynamic rather than static so that as demands change the trail | See response to comment 413-9. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | systems can be expanded or changed to accommodate increased public usage. These areas will by nature have a particular focus but must not let that focus exclude usage by other user groups. | |
| Randall | Parsons | 954 | 6 | The Utah Pims SRMA is important to manage a high use area with a primary focus on motorized and mechanized recreation. Given the high levels of usage the abiltiy to expand and modified trail networks is important. Also the area should be expanded to the southwest to include the popular Mel's Loop area which provides a changelling long distance single track motorcycle trail. | See response to comment 122-39. |
| Randall | Parsons | 954 | 7 | I would like to suggest the Yellow Cat area east and north of Arches NP to be considered as potential SRMA. The area is seeing increased use and as it has a dense network of old mining roads it would be an ideal area for a trail network. | See response to Comment 122-38 |
| Randall | Parsons | 954 | 8 | No inventory was done on the single track trail network. Because of this I believe that there should be an ongoing evaluation of new trails to be considered as part of the trail network. I would like to see about 300 miles of trail through out the area in question. That would keep the users spread around and provide a challenging and interesting system of looping and interconnecting trails. These types of trails are the best means for keeping on designated trails. | See response to comment 122-14 |
| Maggie | Wilson | 955 | 1 | Among the mountain bike user group I have noticed a steady increase in the appreciation and demand for single track trails with all levels of difficulty. I request the BLM continue to provide and develop additional opportunities for these kinds of quality experiences. In Grand County there exists a special relationship and understanding between the mountain biking and motorcycling user groups; all enjoy and prefer to | The BLM asked for specific route submissions from mountain bikers and motorcyclists during the scoping period for the Draft RMP/EIS.  The BLM received specific route submissions during that time.  Each of these submissions was verified, and considered during the planning process (see Appendix G for a description of the Travel Plan).  Those single track routes that are in the Travel Plan are a result of this process. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | ride on single-track trails! By providing diverse recreational opportunities with sufficient quantity and quality, like those proposed by Ride with Respect, the BLM can succeed in protecting natural resource values while providing increased recreational opportunities which will reflect positively on the social economy by attracting more recreationists and visitors to Grand County. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Maggie | Wilson | 955 | 2 | Support limiting motorized travel to designated routes, areas and inventoried roads for mechanized travel. Sections 3.11.1.2.16 and 17.2 (pages 3-79 and 3-158) of the DRMP estimate road mileage based on county inventories which identify "motorcycle routes" that exist around White Wash. This area has historically served much of the motorized community by providing motorcycle singletrack and ATV trails specificially. The off-highway vehicle trails that exist in high concentration from "Utah Rims" to Cottonwood Wash, isolated OHV routes that exist throughout the Moab field office, such as the Thompson Trail and MOUNTAIN BIKE TRAILS THAT EXIST BEYOND THOSE MAPPED IN ALTERNATIVE D SHOULD ALSO BE INCLUDED IN THE FINAL RESOURCE MANAGEMENT PLAN (RMP). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adam | Faleck | 216 | 1 | I support the area and route designations proposed by Ride with Respect, nonprofit | NRR |
| Adam | Faleck | 216 | 2 | The plan should more explicitly state that conflict is exacerbated by crowding.  Additionally, the plan should better address the scope of conflicts. They occur at society, group, and individual levels. They occur between management, user groups, and within user groups.  Although conflicts generally begin asymmetrically, the direction is not always consistent.  Finally, the plan should acknowledge that conflicts become symmetrical when management actions unduly restrict the | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. The general nature of societal conflicts is not a land use planning issue. |

| | | | | more dominate uses. | |
|---|---|---|---|---|---|
| Adam | Faleck | 216 | 3 | For planning, I suggest highlighting one more critical item.  Noise is the most common complaint against OHVs. Thus for all vehicles across the entire field office I recommend implementing and enforcing and 96-decibel limit based on the "20 inch" test (SAEJ1287) | See response to comment 122-14 |
| Adam | Faleck | 216 | 4 | Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on country inventories.  They mention that "motorcycle routes" exist around White Wash. The document should specify that this includes motorcycle singletrack and ATV trails.  Additionally, off-highway vehicle trails exist in high concentration from "Utah Rims" to Cottonwood Wash.  Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail.  Mountain bike trails also exist beyond those mapped in Alternative D | See response to comment 122-46 |
| Adam | Faleck | 216 | 5 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried. The only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as n inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands.<br>Short of performing an inventory of trails, Moab BLM plans should at least acknowledge that they cannot fully measure the impacts to bicycling, motorcycling, and ATV riding in the absence of train inventory.  To compensate for this, the agency should consider designation trail data provided during the planning process.  Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation | See response to comment 122-46 |

BLM_0011262