| | | | | techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access.  Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preferences to SRMAs, and especially to the appropriate focus areas.  Trail expansion would avoid pitting recreationists against one another on a rigid system of roads.  By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restucting them to smaller vehicles. | |
|---|---|---|---|---|---|
| Adam | Faleck | 216 | 6 | Designating campsites should be done with public participation.  Camping should not be confined to one mass site for any given.  Most public-land users prefer dispersed camping.  The Ruby Ranch Road and Utah Rims should provide a dozen sites | Public participation has been solicited throughout the land use planning process.  Camping is not limited to one mass site in any of the alternatives to the DRMP/EIS. See response to comments 123-8 regarding dispersed and designated camping. Dispersed camping is allowed on over 95% of the Moab planning area. |
| Adam | Faleck | 216 | 7 | In areas where camping is not restricted to designated sites, the travel plan should be adjusted to access campsites | See response to comments 120-86 regarding access to dispersed campsites.  One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| Adam | Faleck | 216 | 8 | The Moab Extensive Recreation Management Area should provide primitive roads, singletrack trails, and dry washes to connect SRMAs and towns.  Such routes offer opportunities for long-distance tours, which are increasingly popular amount motorized and mechanized enthusiasts. Additionally, such links boost rural economies and disperse use, thereby alleviating conflicts | See response to comment 122-49 and 123-45 regarding the ERMA.The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Adam | Faleck | 216 | 9 | In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness.  Trail adoption by volunteers could preserve its singletrack character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail | See response to comment 122-29 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | creates a unique route from Sovereign Trail to Colorado.  The Green River Gap and Browns Wash tie Colorado to the town of Green River.  These singletracks should be preserved along with adjacent doubletracks.  Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | |
| Adam | Faleck | 216 | 10 | Likewise, Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel.  The RMP should pledge to construct a Kokopelli Singletrack and mark a Kokopelli Doubletrack that would roughly parallel one another.  Through Utah Rims, the Singletrack should be open to motorcycles.  Through Yellowjacket, the Singletrack should actually be ATV trail.  Everywhere else, the Singletrack should be non-motorized.  The Doubletrack would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adam | Faleck | 216 | 11 | Northeast of Green River, the non-WSA alnds surrounding Tusher Canyon have great potential for mountain bike trails.  This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development.  Similar to bicycle trails in Fruita, a Tusher Canyon trail systerm would boost the economy of Green River and dedicate quality trails for mountain biking. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adam | Faleck | 216 | 12 | I generally support establishment of Labyrinth Rims SRMA in Alternative C.  However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the powerlines.  The White Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D (northward to Ruby | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS.  See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. Commenter's suggestions regarding additional trail designations are noted. The DRMP/EIS specifically allows for routes to be |

| | | | | Ranch Road and southward toward Red Wash road). Fee programs should be determined with public involvement through a Resource Advisory Council. Approximately twenty-five miles of the surrounding OHB trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Tenmile Point area from Dripping spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Tenmile Wash should be designated without speed limits, since speed has little influence on biopsical impacts of travel. | added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
|---|---|---|---|---|---|
| Adam | Faleck | 216 | 13 | The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality. Spring Canyon, Hellroaring Canyon, Spring Canyon Point, Deadman Point, and south Horsethief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks. Closing the river road downstream from spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine. Dubinky Was is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles | See response to comment 122-46 |
| Adam | Faleck | 216 | 14 | North of Highway 313, the singletrack which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon-Sevenmile Rim mountain bike area should be rotated to become Mill Canyon-Tusher Rims. Tusher has better bicycling potential then Sevenmile due to less sand, more slickrock, and fewer roads. Then Sevenmile-Upper Courthouse motorized backcountry touring area could be | See response to comment 122-46 |

BLM_0011265

| | | | | created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground.  Upper Sevemile Equestrian Area should be expanded by four square-miles to include some terrain above the rim | |
|---|---|---|---|---|---|
| Adam | Faleck | 216 | 15 | South of Highway 313, an additional focus area west of south Fork Sevennile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini  Bridges should remain open to allow the unique experience of driving the bridge. Mountain bike alternates to the roads cold be developed in this area, as proposed by Trail Mix. The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adam | Faleck | 216 | 16 | The Klondike Mountain Bike focus area is a great foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas.  Still, the Sovereign ATV Loops should be permitted in its current location.  Spur roads should also be closed north of the Copper Ridge Sauropod Trackway.  Copper Ridge Motorcycle Loop is highly valuable to motorcyclists.  Trail adoption could help to ensure enjoyment for mountain bikers, like the Sovereign Trail.  And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative | See response to comment 122-46 |
| Adam | Faleck | 216 | 17 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation.  Yellow Cat and Yellow Jacket are densely roaded and increasingly popular amount four-wheeled visitors, so they | See response to comment 122-38 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | should have a motorized backcountry touring focus.  Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved.  A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge.  Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | |
| Adam | Faleck | 216 | 18 | Utah Rims SRMA ought to extend further southwest to the Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Guy's Trail and associated singletracks.  From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat. A non-mechanized focus area could be expanded from the Westwater WSA further southwest all the water to private property.  The entire spur road to Big Hold could be closed to enhance primitive characteristics.  Non the less, the Westwater Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | See response to comment 122-39 |
| Adam | Faleck | 216 | 19 | The Dolores Triangle includes a few remote areas where primitive character should be preserved.  By closing two less-valuable spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South | See response to comment 122-40 regarding routes in the Dolores Triangle. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems.  Also, a road on the southeast ridge of the South Beaver Mesa lies outside of this focus area, and should remain open | |
| Adam | Faleck | 216 | 20 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things.  Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system.  Thus OHVs should be permitted to use Sand Flats from Hells Revenge exit to the end of the pavement.  The new, reduced speed limit of 25 mph should be preserved.  A non-motorized lane should be constructed to parallel the road and reduce congestion.  Additionally, the 1/4-mile slickrock route connecting Slickrock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road.  All of these measure would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-42 |
| Adam | Faleck | 216 | 21 | Special policies should continue permitting slickrock exploration.  The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does north further disturb vegetation or soils" (dated March 8, 2001 as part of emergency resections) In these areas, travel could be further restricted, but not so drastically as the draft RMP intends.  Mechanized travel should still be allowed on any barren rock surface.  Slickrock within one hundred yards of designated route could remain open to | See response to comment 122-42 |

| | | | | motorized travel, except for Tusher slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas | |
|---|---|---|---|---|---|
| Adam | Faleck | 216 | 22 | The Black Ridge area presents many potential recreation opportunities nearby Moab.  The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and provides enough room for a full-days's ride.  Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas.  Durable and irregular terrain that is suitable for motorcycle and bicycle trails riding exists in Pole Canyon for the powerlines to Area BFE.  In the same vein, a rock crawling area could be established on black Ridge east of the powerlines.  This area is littered with old mine roads, and is currently open to cross-country travel.  The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of the powerline, the north flank of Black Ridge could be designated for equestrian use, and the backdrop to a residential area.  The south flank could be a bicycle freeride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adam | Faleck | 216 | 23 | Hatch Wash backpacking focus area could be expanded for better backpacking.  Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash.  However, only five are necessary to view most stretches of the Canyon | See response to comment 122-45.  The backpacking opportunities in Hatch Wash are below the rim.  There are no backpacking opportunities on top of the canyon. |
| Adam | Faleck | 216 | 24 | Cameo Cliffs SRMA should also be expanded for | When the Cameo Cliffs SRMA was created, the areas to |

BLM_0011269

| | | | | better OHV riding.  The current boundary offers a meager half-day for the skilled rider.  Extending the SRMA east to Big Indian Valley could still avoid mining activity.  Shifting the boundary north o the Browns Hole Road could still skirt the nearby residential area | the east were specifically excluded due to mining hazards. Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area. |
|---|---|---|---|---|---|
| Jan Ellen | Burton | 257 | 1 | The entire Green River is suitable for Wild and Scenic Designation. The entire river corridor supports a diversity of habitat and wildlife, from its headwaters in CO  to the Town of Green River and is an outstandign value for Utah. | See response to comment 124-88. |
| Joan | Gough | 258 | 1 | The real issue is inadequate notification and enforcement. Roads such as Poison Spider and Gold Bar keep getting pushed further and further into the trackless areas. There are spurs off Gold Bar trail that are just for the sake of seeing where ATVs, jeeps, motorcycles and bicycles can do. These spurs needs to be blocked off where possible and we need people on the ground enforcing the plans. With out enforcement, the whole plan in an exercise in futility | See response to comment 122-18 |
| Michael | McPhail | 259 | 1 | The Green from Labyrynth Canyon to the confluence should be enjoyed without the distrubance of motors. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Steve | Kobak | 260 | 1 | Please consider an alternatate plan that will not impact the river user so negatively at Ten Mile and Spring Canyons. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Sandra | Freethey | 261 | 1 | I would like to see Gemini Bridges remain open to motorized users after blocking off all extranous | See response to comment 206-14 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | roues into the birdges.  The historic use of the are ais important but has been abused.  I urge you to keep it open, while working with the community to repair damage and begin controlled use of the area. | |
| Chris | Benson | 262 | 1 | There are areas that should not be devastated due to an increase or introduction of OHVs. We do not know what the effects would be because there is no assessment process going on! How can you uunderstand the effect this plan will have? For example, what would the effects be on riparian corridors (Green River, Ten Mile, White Wash, etc)? | See response to comment 124-11 |
| Chris | Benson | 262 | 2 | Also important is the proximity of some of the proposed routes to Archaeological areas/sites. How has the RMP assessed and accounted for these areas? The plan has dramatically failed to be both thorough as well as legal. Is it not imperative to incorporate existing laws into this plan like NEPA, as well as the Antiquities Act? | Travel Plan formulation is described in Appendix G. In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted.  Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. Under Management Common to All Action Alternatives (page 2-7), Cultural Class III inventories would be required for all new roads and trails. All land disturbing activities within Traditional Cultural Properties would be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the area or site, avoid time of use by Native American Groups, or would be eliminated altogether. See also response to the submission by the Colorado Plateau Archaeological |

| | | | | | Alliance. |
|---|---|---|---|---|---|
| Chris | Benson | 262 | 3 | Please extend the comment period, so we have time to comment. | See response to comment 124-1 |
| Dawna | Dinkins | 265 | 1 | It is my understanding that you are in the process of formulating the new Moab RMP that will affect our town.  The plan may not have totally considered (or at least doesn't mention) the benefits of ongoing energy extraction to our economy and how future access to minerals will be important in keeping our economy moving in the right direction. I believe the RMP is required by law to consider those effects even though Green River isn't in the boundaries of he Moab RMP. Decisions reached in the RMP will have big impacts on Green River's economy. | As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities.<br>The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the MPA. |
| Scott | Foster | 266 | 1 | Protect areas like Beaver Creek, Behind-the-Rocks, Desolation Canyon, Fisher Towers, Goldbar, Granite Creek, Hatch Wash, Hunter Canyon, Mary Jane Canyon, Shafer Canyon, Westwater Canyon, Coyote Wash from OHV use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Kevin | Kemp | 268 | 1 | Our concern is that we have not seen any estimates of how many campsites are available currently, compared to how many will be available should Alternative C be implemented. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions |
| Kevin | Kemp | 268 | 2 | There are missing trail segments on Flat Iron Mesa and 3D, and there have been private land issues on Strike Ravine.  Our request is that | See response to comment 206-11 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | missing segments be included in the final plan, including the segment on Strike, which has been settled in court. | |
| Tom | Foster | 269 | 1 | Management objective that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character to create a de-facto Wilderness management is unlawful. Congress put a deadline on inventory and study for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Tom | Foster | 269 | 2 | Your open area at White Wash in Alternative C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| Tom | Foster | 269 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| Tom | Foster | 269 | 4 | We look at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions.  The commentor has not provided any information regarding specific campsite locations of concern. |
| Tom | Foster | 269 | 5 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| Tom | Foster | 269 | 6 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Roger | Foisy | 271 | 1 | OHV rights-of-way across STILA properties: Many | See response to comment 120-82 |

|  |  |  |  | designated OHV routes cross properties owned by STILA. To avoid having these routes closed in the future by sale of these lands, rights-of-way should be placed in public ownership. Programs and funding are in place to accomplish the goal. This opportunity should be noted in the plan. |  |
| Roger | Foisy | 271 | 2 | White Wash Sand Dunes Open OHV area: It should be enlarged. There should be a better mix of sand and slick rock with a logical boundary. | See response to comment See response to comment 123-35 |
| Roger | Foisy | 271 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| Roger | Foisy | 271 | 4 | Motorcycle: Single Track Routes. In several cases, motorcycle trails shown in Alternatives C and D have been used for several years, and are currently being used, by ATVs and or 4x4s as integral segments of longer loop routes. Most of all these trails have been used by ATVs from the mid 1980s. We feel these routes should be designated as motorized, or ATV/OHM routes, with some as 4x4. When we contacted your office we were told that the ATV community did not ask for any routes. This is not true PLEAA used your TRIMBLE GPS and did this inventory for the Moab Field Office. Putting these routes as motorcycle only on this draft RMP shows a bias and a predetermination of the outcome. The proposed changes in these route designations are shown on the attached maps. Also, the initial inventory and subsequent designation of motorcycle routes was incomplete. Recommended additions are also shown on the attached map. | See response to comment 120-90 |
| Roger | Foisy | 271 | 5 | Access to dispersed camping areas: Technically anyone driving off a designated route to access a dispersed camping area would be in violation of the proposed travel plan. Where this type of camping is permitted it may not be feasible to | See response to comments 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be |

| | | | | | |
|---|---|---|---|---|---|
| | | | | carry all the necessary camping gear to a camp spot. The plan should address this issue so that legitimate camp spots can be accessed on a legal route. The Fishlake National Forest has implemented a program to address this subject, which as been successful. | added at a future date through site-specific NEPA analysis. |
| Roger | Foisy | 271 | 6 | Missing links for loop routes: There are a few additional connected routes needed. Some are double track ATV routes and were probably missed in the field inventory. In other cases, routes were designated as motorcycle routes where ATVs or even full-sized vehicles had been using them to complete loops. These missing links are shown on the attached map along with their vehicle type designation. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Roger | Foisy | 271 | 7 | ATV motorcycle routes: There were no ATV/Motorcycle only routes designated in the proposed alternative. This is a useful designation to complete the array of OHV alternatives, especially for routes where use by the larger vehicles is not desired or acceptable. | See response to comment 22-46 |
| Roger | Foisy | 271 | 8 | Duma Point Area (excluding the sand dune open area): With few exceptions, there are no designated routes in this area in any of the alternatives and there is no explanation as to why this occurred. We recommend the routes shown on the attached maps be included in Alternative C as the final preferred alternative. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Roger | Foisy | 271 | 10 | Alignment of routes with those of other jurisdictions. See attached map for a few suggested changes. This may be difficult to do for motorcycle routes in some areas because inventories are probably not complete. This is particularly critical for the border with Colorado in the Rabbit Valley/Bitter Creek area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Roger | Foisy | 271 | 11 | It is very important that the Final RMP mandate full public involvement in any establishment and | Public participation has been solicited throughout the land use planning process. No areas are closed to |

| | | | | management of "restricted camping areas" or "controlled camping areas." We have looked at your maps and can't tell if the campsites we use are going to be open or closed. | camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|------|------|------|------|------|------|
| Roger | Foisy | 271 | 12 | Yellowcat/The Poison Strip/Dome Plateau is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network county and of mine roads that already exist. | See response to Comment 122-38 |
| Roger | Foisy | 271 | 13 | Page G-11, 7.1 OHV Designation Criteria 2. Wildlife: Does the reference to wildlife habitat include habitat for all species or is it intended to apply to habitat for more significant species or groups of species? | The reference to wildlife habitat is for all species. The BLM acknowledges that there is general wildlife habitat in every acre of the planning area. However, the routes that were examined for wildlife conflicts were where there were specialized areas, such as bighorn sheep lambing and rutting, or sage grouse areas. |
| Roger | Foisy | 271 | 14 | Page G-11, Public Safety: The term "extreme" should be further defined. What is an extreme hazard to one person may not be to another, depending on their riding/driving skills. In some cases these hazards add to the use experience. | The wording on page G-11 is directly from the BLM Manual at 8340. The Moab BLM has no authority to change the wording of BLM Manuals. |
| Roger | Foisy | 271 | 15 | Page G-15, Emergency Limitation or Closure: Perhaps "immediately closed should read, "immediately mitigated or closed" or some similar wording. Some mitigation can be immediately put in place and closure would not be necessary. | Mitigation can be put in place without an emergency limitation or closure. The statement on pg. G-15 is a quote from the federal regulations at 43 CFR 8341.2. The BLM cannot alter the wording of Federal regulations. |
| Roger | Foisy | 271 | 16 | Page G-29, Implementation Process: This section should stress the need for maps and signing. It takes both. Most users cannot use maps as a navigational tool, especially broad scale maps | Map and signage decisions are all administrative actions and do not require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | without sufficient detail to allow accurate location of designated routes. All designated routes should have a number or some other identifying symbol or name that corresponds to the number, name or symbol on the map. These same identifiers should correspond to what is shown on route signage. With good signs and good maps, it is reasonable to expect users to stay on the designated routes. Until these aids are in place, law enforcement personnel and users will be equally frustrated. | |
| Roger | Foisy | 271 | 17 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Charles E. | Gilliam | 272 | 1 | All roads, jeep roads/trails, OHV double track trails and single track trails in the Moab BLM management area, I would like to remain open. | See response to comment 122-46 |
| Charles E. | Gilliam | 272 | 2 | Jeep and ATV roads and trails out of Rabbit Valley on the Utah side of the state line. The Kokopelli trails is just one of these route's. Please keep this area open for all to enjoy. *See attached map. | See response to comment 206-11 |
| Charles E. | Gilliam | 272 | 3 | There is a road going into Granite Creek (close to the Colorado State line) that accesses an old homestead. Please keep this area open to ATV/Dirt Bike, Jeeps, and other OHV enthusiasts. *See attached map. | See response to comment 206-11 |
| Jerry | Karnopp | 273 | 1 | We oppose any fee systems and the closing of Gemini Bridges. | See response to comment 123-10 regarding fee systems. Commentor's opposition to closing Gemini Bridges noted. |
| Greta | Engholm | 274 | 1 | Gemini Bridges, Mill Canyon, Courthouse Wash, Tenmile Canyon, Island Mesa Trail, Rail Mesa open for OHV. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Daniel | Stoy | 275 | | Please expand the White Wash area and establish one at Sand Flats. | See response to comment 123-35 |
| Daniel | Stoy | 275 | | Connect Thompson trail with copper ridge motorcycle trail. | See response to comment 122-29 |
| Daniel | Stoy | 275 | | I support Ride with Respect's recommendations that open travel would not be allowed 100 yards from a designated trail on slick rock. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Daniel | Stoy | 275 | | The Hillclimb and camping areas in the west side of the White Wash Dunes need to be included as they are, or expanded, not reduced. | See response to comment 123-35 |
| Daniel | Stoy | 275 | | URSMA should include Mel's Loop and the surrounding southwest area. | See response to comment 122-39. |
| Daniel | Stoy | 275 | | The Yellowcat area has an excellent network of old mining roads to explore. Please designate an SRMA to manage Yellowcat. | See response to comment 122-38 |
| Daniel | Stoy | 275 | | The Gemini Bridge Crossing is a highlight of my tour. Please keep it open. | See response to comment 206-14 |
| Daniel | Stoy | 275 | | Keep 10 mile wash and surrounding motorcycle trails open. | See response to comment 211-20 |
| LaDawn | Sorensen | 276 | | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| LaDawn | Sorensen | 276 | | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the network of mining roads that already exist. | See response to Comment 122-38 |
| LaDawn | Sorensen | 276 | | Keep the last bit of Gemini Bridges open. Please Keep the Thompson Trail and Copper Ridge loop as proposed by Ride with Respect. Then Mile Wash has been a popular OHV route for several decades. Popular washes that have had vehicle use for years should remain open! | See response to comment 206-14 |

| LaDawn | Sorensen | 276 | | Management objectives that use such things as primitive recreation zones, area of critical environmental concern, and "areas with wilderness character" to create de-facto Wilderness management is unlawful. Congress put a deadline on inventory and study for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
|---|---|---|---|---|---|
| LaDawn | Sorensen | 276 | | Requiring fences around the cottonwood trees and water sources is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| LaDawn | Sorensen | 276 | | The plan for open area at White Wash in Alt C and D needs to be expanded. | See response to comment 123-35 |
| Dale | Grange | 277 | 1 | The RMP DEIS should have a recreation-emphasis alternative and the travel plan should have a pro-access guidance as well. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Dale | Grange | 277 | 2 | The fencing proposal for the cottonwood trees and water sources are a waste of time and effort and are completely impractical. | See response to comments 208-3 and 479-6. |
| Dale | Grange | 277 | 3 | The routes included for designation are not inclusive of the routes that are "on the ground." This would be particularly true for some ATV and more single-track motorcycle routes. Local groups that have provided maps of these routes should be commended for their efforts and these routes added to the travel plan inventory. Also, provisions for the addition of routes to the final travel plan should be included in the final RMP. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Dale | Grange | 277 | 4 | "Lands with wilderness Character." This issues should have been dropped from BLM planning in 1991! | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Ronald | Linton | 278 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | management is unlawful. | |
|---|---|---|---|---|---|
| Ronald | Linton | 278 | 2 | We can't tell by your maps if the campsites we use are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Ronald | Linton | 278 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| Ronald | Linton | 278 | 4 | Some of the motorcycle trails are really ATV trails. | See response to comment 120-90 |
| Ronald | Linton | 278 | 5 | Yellowcat is very popular for four wheeling and ATV riding. Designating a SRMA there would utilize the network of roads that already exist. | See response to Comment 122-38 |
| Steven | Dozier | 279 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Steven | Dozier | 279 | 2 | Your open area at White Wash in Alt C and D must be expanded. | See response to comment 123-35 |
| Steven | Dozier | 279 | 3 | I can't tell by your maps if the campsites we use are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural |

BLM_0011280

| | | | | | resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|---|---|---|---|---|---|
| James | Widdison | 280 | 1 | Some of the trails are not complete on the maps. | See response to comment 206-11 |
| Sue | Phillips | 281 | 1 | I found the statement that soils in the area have low to moderate wind erodibilty in the Draft RMP (Chpt 4, Fugitive Dust [Page 4-23]). I believe that very good data from the local USGS (see work by Jayne Belnap et al.) shows that although this may be the case for undisturbed soils, many of these soils are highly erosive from the time they are disturbed until they are rained on, a time period that could last months in this region. Not only is good data available to show this SSURGO data is flawed and/or not applicable to disturbed soils. | The statement referenced by the commentor on low to moderate wind erodibility of soils in the MPA is found on page 4-23 of the DRMP/DEIS. Although the first sentence in the Fugitive Dust paragraph on p. 4-23 generalized the soils as having low to moderate wind-erodibility rating.  However, the remainder of the paragraph acknowledges that the MPA has high wind erodibility ratings on some of the soils. SSURGO data is the best available data regarding soils for the planning area.  This is the recommended data set from the NRCS, the agency with jurisdictional responsibility for soils.  The BLM referenced all published Belnap studies.  Any studies as yet unpublished have not been referenced in this DRMP/EIS.  See also the soils nad watershed section of the DRMP/EIS (Section 4.3.13.7) which discusses the effects of travel management, and other disturbances, on the erodibility of soils. |
| Shane | Tangren | 282 | 1 | Alt C and D for the White Wash area is too small and must be expanded, the dunes should be open for all to enjoy. | See response to comment 123-35 |
| Shane | Tangren | 282 | 2 | Fencing around the cottonwoods and water is impractical; the draft plan should be abandoned. | See response to comments 208-3 and 479-6. |
| Shane | Tangren | 282 | 3 | I am opposed to the fee system in alternatives C and D the final RMP should not require fees. | See response to comment 123-10. |
| Shane | Tangren | 282 | 4 | The Utah Rims SRMA is a popular area to locals and tourists and should be extended to the southwest. | See response to comment 122-39. |
| Shane | Tangren | 282 | 5 | Yellowcat area is and has been a place that is and | See response to Comment 122-38 |

| | | | | has been used by everyone for years. Designating a SRMA there would utilize the old mining roads. | |
|---|---|---|---|---|---|
| Shane | Tangren | 282 | 6 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| Christopher | Lish | 284 | | Please protect places like Fisher Towers, Goldbar Rim, Labyrinth Canyon, and the viewsheds of Arches and Canyonlands National Parks from oil and gas development and excessive ORV use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Christopher | Lish | 284 | | Federal law requires the BLM to give priority to the protection of lands which qualify as "Areas of Critical Environmental Concern" (ACEC) because of its scenic, cultural, or ecological importance. However, the BLM plan would fail to protect 90% of the 613,077 acres which qualify for ACEC designation. | See response to comment 124-68 regarding ACEC designations. |
| Christopher | Lish | 284 | | The BLM is making it as onerous as possible for the public to participate in this and other land use plans. The BLM should to extend the public comment deadlines by at least another 180 days to allow for meaningful comment for each of the upcoming land use plans. It is a reasonable extension to provide the public a real chance to comment on the future of over 11 million acres of public land. | See response to comment 124-1 |
| Christopher | Lish | 284 | | The BLM has done no site-specific studies to determine the impact of these routes on Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist. | See response to comment 123-12 |
| Jane | Butter | 285 | 1 | I am asking for an extension of the comment period. 90 days is simply not enough time to sift through this thick and confusing document to determine its effects on the land. | See response to comment 124-1 |

| Jane | Butter | 285 | 2 | The Fisher Towers area, as well as Labyrinth Canyon are destinations where I believe ORV traffic should be aggressively eliminated. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Rick | Berhrmann | 290 | 1 | The Congressional mandate to manage BLM land pursuant to the Multiple Use/Sustained Yield paradigm described in law. Congress put a deadline on inventory and study for Wilderness and the BLM should no longer be allowed to manage solely for "wilderness character." | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Rick | Berhrmann | 290 | 2 | There is not much difference that I can see in the three alternatives formulated by the BLM that would allow limited or no motorized access. Is the BLM exempt from the ADA passed by congress? | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA. However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| Rick | Berhrmann | 290 | 3 | Some of the motorcycle trails in the BLM Moab Travel Plan are very popular with ATV users. | See response to comment 120-90 |
| Rick | Berhrmann | 290 | 4 | The FEIS should consider opening more ATV trails especially between White Wash and Red Wash. I encourage you to take another look at the proposeal developed by Ride with Respect. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Rick | Berhrmann | 290 | 5 | Building fences around cottonwood trees and water sources is unnecessary and impractical. | See response to comments 208-3 and 479-6. |
| Rick | Berhrmann | 290 | 6 | Please keep the following routes open: The last stretch of the Gemini Bridges road. The Thompson Trail and the Copper Ridge loop as proposed by Ride with Respect. Ten Mile Wash and other popular washes that | See response to comment 206-14 |

BLM_0011283

| | | | | have had vehicle use for years should remain open. | |
|---|---|---|---|---|---|
| George | Alderson | 291 | 1 | We believe this [2,642 mile] network exceeds BLM's ability to enforce regulations keeping vehicles on the designated routes. | See response to comment 122-18 |
| George | Alderson | 291 | 2 | Hatch Point and Canyon Rims: This area is remote, with few signs of human activities except a primitive ORV road and ATV tracks we saw about a mile off that road. This segment of Canyon Rims is wild but easily accessible for hiking and other quiet forms of recreation. It is just off the Needles/Anticline Overlooks Road and near the Windwhistle Campground.  Excluding ORVs will greatly benefit quiet recreation uses and secure critical wildlife habitat for desert bighorn sheep and pronghorn. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| George | Alderson | 291 | 3 | Hatch Canyon: A tributary of Kane Springs Canyon, Hatch Canyon is remote, but close to Highway 191 and Needles/Anticline Overlooks Road. It should be protected from ORVs and oil/gas leasing. | Under Alternative C of the DRMP/EIS, Hatch Wash is proposed as a backpacking focus area, and no new motorized routes could be proposed for this area.  There are no routes within the wash.  There is a controlled surface use stipulation on all riparian and floodplain areas for oil and gas leasing. |
| George | Alderson | 291 | 4 | White Wash Sand Dunes: We urge BLM to proceed with an expanded ACEC, as the boundaries in Alternative B (map 2-14-B) leave much of the complex exposed to continued ORV traffic. Please bar ORVs from the entire dune complex, water sources, cottonwoods, and associated desert bighorn sheep habitat ecological values of the dune complex. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| George | Alderson | 291 | 5 | We urge closure to ORVs and mineral leasing of the following, plus their designation as ACECs: Green River corridor; also recommend it for Wild and Scenic River status Mesas by Labyrinth Canyon: Deadman Point, Horsetheif Point, Mineral Point, Spring Canyon Point, and Tenmile Point | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | Side canyons: Tenmile Canyon, White Wash, Hell Roaring Canyon | |
|---|---|---|---|---|---|
| George | Alderson | 291 | 6 | We urge the BLM to establish wider buffer zones around park [Canyonlands and Arches] boundaries and along SR 313. | See response to comment 980-1.  The 'buffer zones" that have been established are considered sufficient to protect the resources in question.  The commentor provides no data to indicate why wider zones are needed. |
| George | Alderson | 291 | 7 | We urge the BLM to establish wider buffer zones around park [Canyonlands and Arches] boundaries and along SR 313. | The BLM has worked with the National Park Service to establish controlled surface use stipulations to protect the major viewsheds of the parks.  In addition, a controlled surface use stipulation has been placed along the entire length of Utah Highway 313 to protect the visual resources along this State Scenic Byway. These protections are found in Alt C of the DRMP/EIS. |
| George | Alderson | 291 | 8 | The tract around the Deadhorse Point road should receive protection. The ACEC proposed in map 2-14-B ("Highway 279 Corridor/Shafer Basin/Long Canyon"), with a ban on oil/gas leasing and ORVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| George | Alderson | 291 | 9 | The tract around the Deadhorse Point road should receive protection. The ACEC proposed in map 2-14-B ("Highway 279 Corridor/Shafer Basin/Long Canyon"), with a ban on oil/gas leasing and ORVs. | The ACEC mentioned by the commentor is proposed in the preferred alternative.  Oil and gas leasing would be managed with a no surface occupancy stipulation, and motorized vehicles would be restricted to designated routes.<br><br>In addition, Highway 313, the entry road to Dead Horse Point, is protected with a controlled surface use stipulation to protect the scenic values of this State scenic byway. |
| W.W. | Robinson | 292 | 1 | It's not just the OHV traffic you must factor into the equation. There is also the increasing numbers of super-sized trucks hauling huge trailer loads of off-road machines with dirty-burning engines from all across the region. Encouraging this action would make no contribution at all to downsizing the | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | |
|---|---|---|---|---|---|
| | | | | state's carbon footprint.<br><br>Please reconsider your plan to expand off-road travel routes and limit this to the generous miles of existing roads. | and site specific NEPA analysis. |
| Edwin D. | Hawkins | 293 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Edwin D. | Hawkins | 293 | 2 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| Edwin D. | Hawkins | 293 | 3 | Some of the motorcycle trails are really ATV trails. | See response to comment 120-90 |
| Edwin D. | Hawkins | 293 | 4 | We believe there should be more ATV trails designated, especially between White Wash and Red Wash. It seems to us that the proposal by Ride with Respect should be carefully considered. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Edwin D. | Hawkins | 293 | 5 | Please keep the last bit of Gemini Bridges road open. | See response to comment 206-14 |
| Edwin D. | Hawkins | 293 | 6 | We agree with Ride with Respects proposal to keep the Copper Ridge loop and the Thompson trail open. Many washes that have been open to vehicle traffic for many years are being proposed for closure. We believe that Ten Mile Wash should remain open, as should others. | See response to comment 122-29 |
| Mark G | Niederhauser | 294 | 1 | I can't tell from your maps if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Mark G | Niederhauser | 294 | 2 | Some of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| Mark G | Niederhauser | 294 | 3 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Mark G | Niederhauser | 294 | 4 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| Mark G | Niederhauser | 294 | 5 | I would like to see the last bit of Gemini Bridges road remain open. This is one of a few that can be driven across and has been a thrill and available for decades. Also the Thompson trail and the Copper Ridge Loop as proposed by Ride with Respect. I would also like to see the Ten Mile Wash and many other riparian washes as being proposed for closure left open. | See response to comment 206-14 |
| Kurt | Nosack | 295 | 1 | Keep open Moab Rim, Poison Spider Mesa, Fins 'n Things, Metal Masher, Porcupine Rim, Kane Creek, Elephant Hill, Lockhart Basin, Hole in the Rock Trail. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added to the Travel Plan or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Kurt | Nosack | 295 | 2 | I looked at your maps and cannot tell if my favorite camping spots are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to |

| | | | | | designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|---|---|---|---|---|---|
| Kurt | Nosack | 295 | 3 | Requiring fences around the cottonwood trees and "water sources" is impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| Kurt | Nosack | 295 | 4 | We feel the Utah Rims SRMA is necessary to properly manage this popular recreation area. It must have motorized and mountain bike focus and include a process whereby new routes can be designated or constructed as is deemed necessary. It also needs to be extended to include the Mel's Loop area and beyond. | See response to comment 122-39. The DRMP/EIS specifically allows for routeThe DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). s to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| David | Farnsworth | 297 | 1 | Because the US has a national policy of encouraging the development of its native resources, the BLM is required to remove impediments to domestic oil and gas development. | See response to comments 203-46 and 210-2. |
| Tracey | Farnsworth | 298 | 1 | The acreage available to oil and gas leasing has been reduced from just over 1 million acres to a little over 400,000 acres - a 60% reduction. The DRMP identifies 14 Areas of Critical Environmental Concern. 12 of these contain current leases (which of course will remain valid until they expire).<br><br>These recommendations do not seem to follow the directive that the BLM encourage as much development as possible on federal lands. | The acreage open for oil and gas leasing in the preferred alternative is 1,451,124 acres, of which 217,480 acres are open to oil and gas leasing subject to a no surface occupancy stipulation.  About 806,994 acres are open to oil and gas leasing subject to controlled surface use and timing limitation stipulations.  About 353,000 acres are within Wilderness Study Areas and are closed to oil and gas leasing by policy.  About 25,306 acres are closed to oil and gas leasing because it is not reasonable to apply an NSO stipulation.<br><br>Although 14 Areas of Critical Environmental Concern are proposed in Alt B, 5 of them, totaling 63,000 acres, are |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | carried forward to Alt C, the preferred alternative.<br><br>The BLM has proposed the least restrictive stipulations necessary to protect the resource values identified for these areas. See response to comments 203-46, 210-2 and 214-9.<br><br>See response to comment 124-96 and 121-15 regarding oil and gas development potential in the MPA. |
| Dan | Harris | 299 | 1 | I am writing to compel you to follow the Energy Policy Act and remove as many roadblocks to energy development on BLM land as you can. The RMP, as written, contains too many limitations on energy development. | See response to comments 214-9, 210-2 and 203-46. |
| Dan | Harris | 299 | 2 | The analysis states that Alternative B, which is the most restrictive, will have only slightly lower economic benefits than Alt C and D (which contain more energy development). That may be true for Moab, itself, but certainly not communities like Green River. I believe the analysis is severely flawed - it defies common sense. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people. The BLM's analysis is based on the RFD. On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. Alternative B projects 264 wells over the life of the plan; Alt. C projects 432 wells over the life of the plan. The economic returns from 264 wells are compared with the economic returns from 432 wells.  The economic returns from 432 wells are greater than those from 264 wells. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. Although Green River is outside the planning area, the fact that planning area decisions affect neighboring towns has been added to Chapter 3. |
| Doug | Leman | 300 | 1 | The Congressional deadline on inventory and study for "wilderness" must be acknowledged as unacceptable and unlawful. The BLM cannot and should not manage for "wilderness" character to create more de-facto "wilderness areas." | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Doug | Leman | 300 | 2 | "Open areas" in alternatives C and D must be expanded and should be designated along easily | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

| | | | | identifiable geographical features and formations or preferable along boundary roads like the Ruby Ranch Road on the west, the Blue Hills Road on the North, and the Duma Point/Ruby Ranch (back way) on the east. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Doug | Leman | 300 | 3 | Please keep the following routes open:<br>The last portion of the Gemini Bridges Road<br>The Thompson Trail and Copper Ridge loop, as proposed by Ride With Respect<br>The Ten Mile Wash OHV route – including washes that have been open to vehicle use for many years now. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Jeff | Turner | 301 | 1 | Integral parts of the following Jeep Safari Trails added to the inventory of designated routes in Map 2-11-C: Strike Ravine Trail, 3-D Jeep Trail, Flat Iron Mesa Trail. I have included maps with GPS tracks of the routes for these existing trails, shown in red. Please add the missing trail segments to the designated route inventory on Map 2-11-C. *See attached maps. | See response to comment 206-11 |
| Robert J | Telepak | 303 | 1 | Keep me as an active participant in this process and on your active mailing list/notification list. | NRR |
| Robert J | Telepak | 303 | 2 | I believe that it is illegal to try to create a de-facto Wilderness by some of the management policies you propose to use: Only congress, not he BLM, can make Wilderness or National Parks. Yet the overly restrictive use of management tools such as primitive recreation zones, ACECs, and "areas with wilderness character" have the practical on-the-ground effect of making de-facto Wilderness in some areas, or expanding the territory of Arches and Canyonlands National Parks. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Robert J | Telepak | 303 | 3 | There must be full public involvement in any establishment and management of "restricted camping areas" or "controlled camping areas." | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. See response to |

| | | | | | comments 123-8 regarding dispersed and designated camping. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2. |
|---|---|---|---|---|---|
| Robert J | Telepak | 303 | 4 | The BLM is mandated to promote multiple-use, so the designation of "exclusive use zones" to decrease minimal or non-existent conflict is functionally against BLM management guidelines. | Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people. |
| Robert J | Telepak | 303 | 5 | If the Moab BLM is going to try to use user conflict as a management tool, it has to be on the basis of a significant amount of factual data collected by the BLM, not just reports of perceived conflict by extremist groups. | See response to comment 122-9 |
| Robert J | Telepak | 303 | 6 | Please note that these are already-existing roads that have been overlooked by the Moab BLM. These areas include: Copper Ridge/Little Valley/Klondike Bluffs Sovereign area Strike Ravine 3-D Trail Flat Iron Mesa Behind the Rocks Negro Bill Canyon Dry Mesa Ten Mile Canyon Rainbow Rocks Gemini Bridges Mill Canyon Flat Iron Mesa A short segment (less than ¼ mile of road from an existing recognized road to the edge of the cliff overlooking Junes Bottom on the Green River. A short road segment that should be recognized nearby going to a viewpoint of Trin-Alcove *see attached maps. | See response to comment 206-11 |
| Robert J | Telepak | 303 | 7 | Special Recreation Management Areas as | The DRMP/EIS specifically allows for routes to be added |

| | | | | addressed in the draft RMP need to be expanded by the addition of language that would permit additional roads to be added, or connections between roads to be constructed in the future. This will give the Moab BLM the needed flexibility to respond to changing user needs or as a way of mitigation in case future difficulties develop over time. | to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
|---|---|---|---|---|---|
| Robert J | Telepak | 303 | 8 | Open play areas for such vehicles in most of the White Wash Sand Dunes -a Copper Ridge Motorcycle Loop -A Cisco Desert Wash area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Robert J | Telepak | 303 | 9 | -development of a Utah Rims SRMA | Commentor's statement is noted. |
| Christopher | Kauffman | 304 | 1 | Cross country unrestricted OHV travel should not be an option anywhere except the special sand dunes recreation area that is proposed. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adrea | Lund | 305 | 1 | All 66.5 miles of the Colorado River proposed in Alternative B should be included as wild/scenic. | See response to comment 124-88. |
| Adrea | Lund | 305 | 2 | Cross country OHV travel should not be an option anywhere except the special sand dunes recreation area that is proposed in option C under Travel management consisting of 1,886 acres. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Adrea | Lund | 305 | 3 | A designated route of Hell Roaring Canyon (the route doesn't go as far up-canyon in alternative B) is upsetting - there are numerous archeological sites in the canyon's upper reaches, it | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

| | | | | encompasses a riparian area, and the current route up-canyon hasn't been used in years and is overgrown with brush. Why designate this little-used route, especially when riparian and cultural resources are at risk of degredation? | based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Sharon | Hogan | 307 | 1 | It's apparent that all of the alternatives, even "C", fall short of a true trail inventory, as many non-road mountain bike, motorcycle and ATV trails are missing. That can be addressed by allowing for additions to the trail inventories as the planning process continues. Also as Kim [Schappert, Moab Trails Alliance] points out, new trail mileage allotments in the Alternatives should "include only those routes mapped across previously undisturbed terrain" and not be reduced by "trails developed on existing mapped roads." Anything already on the Grand County Transportation Inventory map should not be included as a "new" trail, even when used as part of a newly developed trail system. | See response to comment 122-15 |
| Sharon | Hogan | 307 | 2 | Emphasis should be placed on motorized vs. non-motorized, rather than mechanized vs. non-mechanized when planning for recreational land use. Bicycles are human-powered, lightweight craft and should not be categorized with OHVs. This is consistent with your BLM National Mountain Biking Strategic Action Plan. Please remove bicycling from any definitions of OHVs and other all-encompassing variations of 'wheeled vehicle' classifications and remove any references to bicycles as mechanized vehicles. At times it is right to group bicucles and motorcycles together, but separate from other motorized vehicles when addressing specific single-track and slick rock areas. | The BLM recognizes that bicycles are not motorized vehicles. The Moab RMP is consistent with the BLM National Mountain Biking Strategic Action Plan. However, bicycles are mechanized conveyances. As such, they are not allowed in areas that are managed for hiking only (such as Wilderness Study Areas). Bicycles are allowed on all routes in the Travel Plan. In addition, the Travel Plan designates some routes and areas for mountain bike use only; this designation excludes motorized vehicles. |
| Sharon | Hogan | 307 | 3 | Alternative C addresses open cross country travel for ATVs but proposes strict boundaries around | See response to comment 124-14 |

| | | | | these areas. I would like to see included in the plan, areas where cross-country travel by hikers, bikers, equestrians, and motorcycles is allowed. These are the many large areas of slickrock in the resource area such as the Bartlett Wash area, the Monitor Merrimac area and the Slickrock Trail. | |
|---|---|---|---|---|---|
| Bob | Greenberg | 308 | 1 | I will be joining Councilman McNeely at future RMP meetings and request that my name be added to the notice list for meetings on the RMP that involve Grand County as a cooperating agency. | Commenter's request has been noted. |
| Bob | Greenberg | 308 | 2 | The proposed motorized travel route from where Dubinky Wash crosses the county road to Spring Canyon (near Jug Rock Flat) to its confluence with Hell Roaring Canyon. This route and all travel up Hell Roaring above the school section should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Bob | Greenberg | 308 | 3 | The map for Alternatives C and D show a short route immediately to the south of the confluence of Hell Roaring and Dubinky Wash and going about 0.5 miles above Hell Roaring onto the sand dune before it turns north and dead ends. This appears to be a relict uranium-prospecting tract that has not been used in decades. It appears to have no purpose and should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Bob | Greenberg | 308 | 4 | Ten Mile Wash below the midway cut off should be closed to motorized travel. As the only purpose for keeping Ten Mile below the midway cut off open to motorized recreation is for the purpose of motorized recreation itself, this would be an appropriate compromise between motorized and non-motorized recreation uses. There does not appear to be any other need or purpose for motorized access into lower Ten Mile. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| Bob | Greenberg | 308 | 5 | The Northwest end of Castle Valley via the "Golden Stairs" route to the Big Bend area on the river. This use [motorized recreation] should be eliminated as the entire Mat Martin Point area has outstanding value for non-motorized recreation. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Pam | Hackley | 309 | 1 | I find the Soil/Watershed analysis to be very good on the whole despite the fact that critical mapping of cryptogrammic soils was not made available to the analyst. The integrity of the soil resource is the foundation for protection for all the other resources identified. I encourage you to give much weight to effects on the soil resource to select even more protective measures than those outlined in Alternative B. Section 4.3.21, which describes unavoidable adverse impacts, also gives you supporting documentation to choose more protective measures. | The commentor's desire for the BLM to adopt more protective soil resource protection measures than those in Alternative B is noted. |
| Pam | Hackley | 309 | 2 | Based on much reading of this literature and on-the-ground experience, I disagree that impacts from all the potential activities described are short term (5-year). Please provide more supporting data and discuss the justification for identifying soil impacts as short-term. Please provide supporting information concerning what reclamation techniques are contemplated and why they will succeed within the 5-year time frame. | Most, if not all, of the existing routes in the Labyrinth, Hatch Point and Harts areas were constructed prior to 1985.  They were in existence at the time of the 1985 RMP.  All three of these areas were left open to cross country travel in the 1985 RMP, although Labyrinth was limited to existing roads by a FEderal Register notice in 2001 (to be in effect only until the new RMP was revised, and Harts and Hatch were limited to existing road by the 2002 Plan Amendment to the Grand RMP.  Thus, the designation of a subset of the existing roads in the present Travel Plan does not represent a "loss" of wilderness values, since these roads have been in existence since the 1950's and 1960's. Limiting travel to designated roads, and eliminating cross country travel enhances any wilderness values that may lie in these areas. |
| Pam | Hackley | 309 | 3 | Since the metric for soils (watershed) impact analysis is 'amount of disturbance' and | BLM acknowledges that soil disturbance from dispersed activity can be substantial. However, BLM stands by the |

BLM_0011295

| | | | | | |
|---|---|---|---|---|---|
| | | | | considering all the activity that is out there, ranging from hikers to OHVers to commercial boating to fuels management to industrial mining and beyond, I think the analysis should reevaluate the amount of potential disturbance. Disturbances from larger scale activities that require permitting, even grazing, may be addressed in site-specific mitigation plans but the actual disturbance caused by 'dispersed' activity that is not reviewable by project-level analysis can lead to very extensive damage, very quickly. | acres of disturbance impact analysis conducted for soil resources. In its analysis BLM took into account disturbance from dispersed and site specific activities to the extent possible. It is not possible for BLM to adequately quantify the amount of surface disturbance from most dispersed activities, such as hiking, because the data does not exist. Numbers have been added to Chapter 4 and to Appendix G that show the miles of route designated and not designated in erodible soils types.  There are 167 miles of route that are closed in the preferred alternative because of soils conflicts. |
| Pam | Hackley | 309 | 4 | I would ask that cryptogrammic soils be mapped and quantitatively incorporated into the analysis because the extent of cryptogrammic communities is almost district wide. If I understand the analysis, these types of soils were considered sensitive (and key to soil integrity) but since they were not mapped, there was not a quantitative way to identify the full extent of impacts to them and thus sensitive soils as a whole which was used as the basis for analysis. | To date no mapping of biological soil crusts has occurred in the MPA. For the purposes of a planning level analysis this level of data is not necessary to adequately assess resource impacts especially given that implementation level decisions, prior to being made, will undergo site specific analysis. Further, extensive resources would be required to complete MPA wide mapping of biological soil crusts. BLM cannot justify allocation of these resources for such a mapping effort in light of the fact that current data is adequate for purposes of analysis of impacts in this document. |
| Pam | Hackley | 309 | 5 | The proposed road density is not acceptable and does not reflect a sound scientific analysis. This density will most assuredly result in deterioration of the foundation soil resource. This aspect of disturbance is not adequately addressed under soil/watershed resources. The road density when compared to adjacent BLM resource areas (e.g. San Rafael) is startlingly different. Please include road disturbance in the analysis of direct, indirect, and cumulative impacts. | The Moab Field Office area has been subject to a great deal more mineral activity (especially uranium exploration and oil and gas exploration and drilling) than has the San Rafael area.  This is why Moab has six times the number of inventoried miles of route.  The percentage of routes designated in Moab's preferred alternative is actually a lower percentage than those routes designated in the San Rafael Travel Plan.  Road density was not a factor in the analysis of soils, as the greatest disturbance to soils occurred at the time the road was constructed/bladed.  Miles of route, by alternative, in highly erodible soils has been added to the analysis. |
| Pam | Hackley | 309 | 6 | You have not chosen to review the Redrock Heritage Plan for Sustainable Economies and | See response to comment 124-9. |

BLM_0011296

| | | | | Ecosystems. I think that the Redrock Heritage Plan does meet the purpose and need and respectfully ask you to consider and evaluate this proposal as a reasonable and viable alternative. Proposed areas of road closure do meet the purpose and need to protect riparian/soil/watershed resources from ground disturbing activities that may have unavoidable (4-495/496), irreversible/irretrievable (4-499), and cumulative (4-506/5-8) impacts. | |
|---|---|---|---|---|---|
| Pam | Hackley | 309 | 7 | I ask you to incorporate the recommendations and justification provided by the Utah Rivers Council and Holiday Expeditions that addresses designations for segments of the Green River. | See response to comment 124-88. |
| Pam | Hackley | 309 | 8 | I ask you to work in conjunction with other BLM jurisdictions that cover the Green River to attain a unified plan for the Green River watershed. It does not meet resource protection goals when there are separate jurisdictions to manage this very important area. | See response to comment 120-88 |
| Benjamin L. | Reingold | 310 | 1 | There is not a true range of management options in the Alternatives.<br><br>It needs to be made clearer that comments are needed on Alternatives for the RMP and Alternatives for the Travel Plan. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| Benjamin L. | Reingold | 310 | 2 | The difference between an RMP (general guidance) and the Travel Plan (implementation decision) is not clearly described in the DEIS. The FEIS should clearly articulate the difference. | The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/DEIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and Non-WSA lands with wilderness jurisdictions.  A sentence was added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states, "routes identified in the Travel Plan would be available regardless of other proposed management actions".  The Travel Plan process is described in Appendix G of the DRMP/EIS.. |
| Benjamin L. | Reingold | 310 | 3 | None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates unworkable and impractical management of camping and motorized travel.<br><br>Alternative D fails to provide a true motorized focus. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Benjamin L. | Reingold | 310 | 4 | Many of the restrictions in all of the Action Alternatives are simply not justified, and that the FEIS should clearly draw a connection between the facts on the ground and the decision made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| Benjamin L. | Reingold | 310 | 5 | BLM's open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Benjamin L. | Reingold | 310 | 6 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We strongly oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| Benjamin L. | Reingold | 310 | 7 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the Northwest of the Sand Dunes. | See response to comment 123-35 |
| Benjamin L. | Reingold | 310 | 8 | BLM's open area should be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Benjamin L. | Reingold | 310 | 9 | I oppose the fee system contemplated in Alternatives C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The final RMP should not require a fee system. However, if funding for infrastructure needs cannot be met with existing funding and | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | grant programs, then a fee system should be implemented only with the full involvement of the Recreational Fee Advisory Council. Because the open area boundary will not easily be identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely difficult to enforce. We suggest that the BLM consider other funding mechanisms to pay for the needed management infrastructure. | |
| Benjamin L. | Reingold | 310 | 10 | Proposing a "close first – mitigate last" approach to OHV use is unacceptable.<br><br>The final RMP should mandate that adaptive management practices be used across the field office.<br><br>The final RMP should direct that mitigation efforts will be exhausted prior to closure.<br><br>The final RMP should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure.<br><br>When using adaptive management principles, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | See response to comment 122-18 |
| Benjamin L. | Reingold | 310 | 11 | Providing opportunity for a non-motorized recreation experience is great, but by imposing a near categorical exclusion of other uses it removes the ability to designate key motorized uses that are needed in a well managed road and trail system.<br><br>When addressing "user conflict," the Final RMP | See response to comment 122-9 |

| | | | | should avoid "exclusive use zones" where based on perceived or potential "user conflict" one or more conflicting uses is categorically prohibited.<br><br>Most of the non-motorized focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will perceive these focus areas as establishing blanket restrictions on motorized use. The unintended consequences will likely result in increasing, not reducing actual or perceived "user conflict."<br><br>In order to address the "user conflict" issue, the final RMP should direct land managers to educate the non-motorized visitors (who may perceive conflict with the motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters.<br><br>The Final RMP should direct land managers to educate vehicle-assisted visitors of where a road or trail might be shared with non-motorized visitors, and if appropriate, direct lower speeds.<br><br>The Final RMP should direct land managers to re-route either use so as to avoid sections of roads or trails that are extremely popular with both groups. For example, a hiking trail can be constructed to avoid a section of a popular OHV route. Or an equestrian trail may be constructed to avoid a section of popular mountain bike route, etc. | |
| Benjamin L. | Reingold | 310 | 12 | Moab BLM is closing a huge number of dispersed campsites, as outline in Appendix E. The Final EIS should disclose how many campsites would be closed under each alternative. Policy should | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to |

|  |  |  |  | support that existing campsites are open, unless determined closure was necessary via lawful public planning process. The Final RMP should mandate full public involvement in any establishment and Management of "restricted camping areas" or "controlled camping areas." BLM maps should easily show if campsites will be closed, and show if road is designated right up to campsite. | comments 123-8 and 120-86 for a discussion of dispersed camping. . The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Dispersed campsites would be signed; however, maps and signage are not land use planning decision. |
|---|---|---|---|---|---|
| Benjamin L. | Reingold | 310 | 13 | The Travel Plan and the Administrative Setting must be consistent in all SRMAs. | The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/EIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and non-WSA lands with wilderness jurisdictions. A sentence has been added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states "routes identified in the Travel Plan would be available regardless of other proposed management actions'.  The administrative setting described for each SRMA in Appendix F is a general setting for the entire SRMA.  When Recreation Activity Management Plans are prepared for each SRMA, specific settings will be identified for each portion of the SRMA. |
| Benjamin L. | Reingold | 310 | 14 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| Benjamin L. | Reingold | 310 | 15 | SRMAs and their "focus areas" should avoid excluding other uses categorically. The Preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones." | See response to comment 413-9. |
| Benjamin L. | Reingold | 310 | 16 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See response to comment 122-39 regarding the proposed boundary. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | they be needed in the future. In addition, limiting camping to one small designated area, in the RMP, is not wise. The RMP should provide general direction and not limit camping in such a way.<br><br>The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrants the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | |
| Benjami n L. | Reingold | 310 | 17 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Benjami n L. | Reingold | 310 | 18 | Although many popular ATV routes are classified as roads in the travel plan, some ATV trails are not proposed as open and some of the Motorcycle routes should be designated as ATV/motorcycle trails as well. Some of the "motorcycle trails" are very popular with ATV users. The final travel plan should designate a mix of single-track and ATV trails.<br><br>The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. I strongly suggest looking closely at the proposal developed by Ride with Respect. | See response to comment 120-90 |
| Benjami n L. | Reingold | 310 | 19 | In the Moab Field Office, true mountain bike single track trails are in short supply. The Mill Canyon-Sevenmile Rim biking focus area should be redrawn as Mill Canyon-Tusher Rims in order to provide better terrain for pedaling. The Final Plan should extend the South Spanish Valley biking area further south towards Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| Benjamin L. | Reingold | 310 | 20 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling, to hardcore rock crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps even part of Black Ridge could remain unrestricted for this purpose. | See response to comment 124-14 |
|---|---|---|---|---|---|
| Benjamin L. | Reingold | 310 | 21 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | See response to comment 122-42 |
| Benjamin L. | Reingold | 310 | 22 | Some important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single track. Alternative D adds another 100 miles. But in total, the final plan should spare roughly 300 miles of non-road motorcycle routes from being closed.<br><br>Alternative D falls just short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider them for implementation.<br><br>The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience and spread people. The Copper Ridge Motorcycle Loop should be combined with | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Thompson Trail in the final plan.<br><br>A few more non-riparian washes should be left open, especially in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | |
| Benjamin L. | Reingold | 310 | 23 | The Moab BLM has included the White Wash Sand Dunes as a proposed Area of Critical Environmental Concern (ACEC) in Alternative B. This in turn; "gives SUWA whatever they want, despite the existing, traditional uses that have existed for decades" alternative. The White Wash ACEC is especially inappropriate. | Refer to response to comment 124-69. |
| Benjamin L. | Reingold | 310 | 24 | Congress gave very specific instructions to the BLM regarding Wilderness or Lands with Wilderness Character. Those instructions are contained in Section 603 of FLPMA. Congress instructed the agency to inventory all of their lands, identify which were definitely not of wilderness quality and then to begin an intensive inventory and analysis to determine which of the remaining lands would be recommended for inclusion into the National Wilderness Preservation System.<br><br>There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603" process was completed, the agency was done with its Wilderness Review.<br><br>Other than the management of existing WSAs, the BLM should have no part in this issue. TO do so is a tragic loss of management resources. When formulating land use plans and considering opportunites for solitude and unconfined recreation, the BLM must consider all other resource values and uses and attempt to balance | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | the competing uses and values using the Multiple Use/Sustained Yield paradigm. | |
|---|---|---|---|---|---|
| Rodney | Silliman | 313 | 1 | Our community [Green River] has three main bases – natural resources, local tourism, and people passing through needing gasoline, food, and lodging. The decisions reach in the DRMP will have an impact on the future of energy development in our area, and thus, on our community.<br><br>Your analysis does not give enough consideration to these aspects and how energy development may benefit Green River over the next 15 years or so years. It seems that the impacts on the city of Moab are the only items considered. While it's the largest, richest, and most influential community in our area, its concerns shouldn't be the only ones considered. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The large-scale development that has occurred in certain areas would not occur in the MPA. A recently completed study by the University of Utah concludes that less than 1 per cent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 4. |
| Gwenn | Amrase | 314 | 1 | As a resident of Green River, Utah, energy development and Off-Road Use are important to our future economy and community. The "Preferred" Alternative C which supposedly balances environmental and natural resource aspects, places too many restrictions on natural resource development. | The projected level of oil and gas activities in the MPA is low, with consequently low expected socio-economic impacts. Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects, relatively few wells would be drilled and would employ relatively few people. The large-scale development that has occurred in certain areas, such as Vernal, would not occur in the MPA. The BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, p. 4-271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the Moab planning area's economy in the context of OHV management.<br><br>The number of wells projected in Alt C is 432. Alternative A (no action) projects 451 wells; Alt. D projects 448 wells.  That is, even with all the |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "restrictions" imposed on oil and gas production in the preferred alternative, there are only 19 fewer wells over the life of the plan in Alt. C than in the no action alternative.  Thus, the economic value of those 19 foregone wells is the "cost" of all the oil and gas restrictions imposed in Alt. C.  It should be remembered that these 19 foregone wells are spread throughout the entire field office area; only a few of these wells are reasonably expected to be in the vicinity of Green River. |
| Gwenn | Amrase | 314 | 2 | Federal Law requires the BLM to do as much as possible to encourage smart, clean, safe energy development on Federal Lands. | See response to comment 124-115. |
| Cindy | Royse | 315 | 1 | My main concern is that your agency complies with ALL federal laws that try to make sure that energy exploration and development can continue in our area. Federal Energy Policy Acts have directed public land managers to do what they can to encourage domestic energy production on federal lands. The current RMP does not go far enough in this regard. In fact, I believe it closes too many areas to production. For instance, buffers for endangered species are included that are greater than standard practices (grouse). | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.

The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.<br><br>The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development. |
| Cindy | Royse | 315 | 2 | I think the BLM minimizes the potential economic benefits of energy production and over-estimates the benefits of conservation. While Moab will see positive impacts from Conservation – it is after all a relatively wealthy community with a major tourism base – other smaller and less wealthy communities like Green River will not see much in the way of those benefits. Green River will see much greater opportunity from more energy development. | The BLM's analysis is based on the RFD. The large-scale development that has occurred in certain areas would not occur in the MPA. As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. A recently completed study by the University of Utah concludes that less than 1 per cent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 4. |
| Shuanee | Narris | 316 | 1 | From what I have seen, the "multiple-use" directive is not receiving adequate attention in the Moab RMP. My request to you is to include in the RMP considerations of multiple use of the land and also of detailed statistics and projections on the effects of foreseeable resource development on the | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management |

| | | | | economy and businesses of Green River, Utah. Failure to make these findings could be considered failures in your process under NEPA. | prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations. |
| Alton | Burns | 317 | 1 | Does the DRMP use outdated USGS data to determine the potential for energy extraction? Did the BLM in any way understate the oil, gas, and uranium potential in our region? | The Mineral Potential Report (2005) provides an assessment of all the mineral resources within the MPA. It provides a description of the geology and the mineral resources, a summary of exploration and development, a classification of the occurrence and development potential of each resource, and a projection of future development.  The occurrence potential of each mineral resource is classified using the ratings system provided in BLM Manual 3031.<br>See response to comments 121-67 and 124-95 regarding the Mineral Potential Report for the Moab Field |

| | | | | | Office. |
| --- | --- | --- | --- | --- | --- |
| | | | | | The Reasonable Foreseeable Development scenario is an analytical model, which estimates oil and gas activity that could potentially occur.  The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.<br><br>The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures.  This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operations are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental |

|  |  |  |  |  | assessment or an environmental impacts statement. |
|--|--|--|--|--|------|
|  |  |  |  |  | See response to comment 214-1 regarding the RFD for oil and gas. |
|  |  |  |  |  | The Mineral Potential Report provides a projection of development for all other minerals in the Moab planning area. This report is available on the Moab RMP website. The information contained in the Mineral Potential Report is summarized in Chapters 3 and 4 of the DRMP/EIS. |
| Alton | Burns | 317 | 2 | Also, does the DRMP restrict too many areas from both natural resource extraction and other uses? Does it in any way violate the spirit of federal directives that encourage domestic energy production? | In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied to protect important natural resources. See response to comments 203-46 and 210-2.<br><br>See response to comment 121-15 regarding other restrictions. |
| Mike | D | 318 | 1 | The town of Green River is actually in Emery County and may be covered in a different RMP; however, I think it should also be covered in the Moab RMP since the activities on your lands affect our town and business. Development in the Moab RMP will have enormous effects on our community. By placing too many restrictions on this development, oil and gas companies may go elsewhere, including outside the country, for their operations. This will have a severe negative economic impact on our local economy. | See response to comment 124-125 .There appears to be confusion concerning the Reasonably Foreseeable Development (RFD) scenario for oil and gas development in the Moab planning area with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development. Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people, especially those from within the planning area. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264.<br><br>The number of wells projected in Alt C is 432. Alternative A (no action) projects 451 wells; Alt. D projects 448 wells.  That is, even with all the "restrictions" imposed on oil and gas production in the |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | preferred alternative, there are only 19 fewer wells over the life of the plan in Alt. C than in the no action alternative.  Thus, the economic value of those 19 foregone wells is the "cost" of all the oil and gas restrictions imposed in Alt. C.  It should be remembered that these 19 foregone wells are spread throughout the entire field office area; only a few of these wells are reasonably expected to be in the vicinity of Green River.<br><br>The text in Chapter 3 concerning socioeconomics has been altered to include the fact that economic effects include those on the neighboring communities of Green River or Grand Junction.  Green River is within the Price BLM planning area. |
| Bruce | Hansen | 319 | 1 | It states that most restrictive alternative B will only have a minimally lower economic benefit to communities affected. This doesn't make sense. If we were to fully develop ALL natural resources that are reasonably available, the local economies would all do extraordinarily well. Because of this, it seems that the analysis in the RMP does not adequately consider economic effects (or possibilities) especially on the rural communities outside of Moab. | The fiscal impacts have been described in Table 2.2 on pg. 2-78 (DRMP/EIS) in terms of royalty revenue. This table shows that royalty revenues will be reduced by 50% in Alt B. In addition property tax revenue, and severance tax data have been added to the table for the PRMP/FEIS and likewise show a 50% reduction in revenues in Alt B as compared to Alt C. On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. The effects on employment and wages have been added to Chapter 4 of the PRMP/FEIS. However, it is important to note that under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people, especially those from within the planning area. The BLM's analysis is based on the RFD; the commentor has provided no evidence that the RFD is incorrect.<br><br>Although Green River is outside the planning area, the fact that planning area decisions affect neighboring towns has been added to Chapter 3.  It should be noted that the 1985 Grand RMP makes available virtually all |

BLM_0011312

| | | | | | |
|---|---|---|---|---|---|
| | | | | | natural resources of the planning area.  These resources have not been leased or developed to date. |
| Allen | Burns | 320 | 1 | Many people who live and work in Green River would like the Moab RMP to acknowledge the importance that ongoing mineral development like uranium and natural gas have on our community. Our current economic base is very dependent on both recreation and supporting the resource industries. Development in the Moab RMP will have enormous effects on our community – some positive and some negative that you need to adequately consider in your deliberations. | See response to 124-125. There appears to be confusion concerning the Reasonably Foreseeable Development (RFD) scenario for oil and gas development in the Moab planning area with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development. As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities.<br><br>The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the Moab planning area (MPA). |
| Kerry | Bigelow | 321 | 1 | It closes too many areas, not only to oil and gas, but also to motorized vehicle use. Both of these items are extremely important to the current and future economy of Green River. The preferred alternative will restrict the economies of the rural communities of eastern Utah, both within the RMP area and areas outside the area, including Green River and Monticello. | The projected level of oil and gas activities in the MPA is very low, with consequently low expected socio-economic impacts.<br><br>The BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, p. 4-271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the Moab planning area's economy in the context of OHV management. |
| Kerry | Bigelow | 321 | 2 | I encourage you to be sure that you adequately considered the Energy Policy Conservation Act and Executive Order 13211, which requires you to remove as many impediments to oil and gas exploration as possible. The RMP in its current | See response to comments 203-46 and 210-2. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | form includes too many restrictions on energy development. In fact, it closes more areas than leaving things as is. The RMP claims to balance these items. | |
| Claire | Malonado | 322 | 1 | Green River is very close to the area being discussed in the Moab RMP. Green River's economy is currently depending on recreation [activities]. However, natural resource development is the best way for us to take the next step and really improve the economic well being of residents here. All of these things need to be considered and analyzed in your proceedings with regard to the Moab RMP. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects. relatively few wells would be drilled and would employ relatively few people. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. |
| Erika | Schoen | 323 | 1 | I understand that public review deadlines for several other lengthy DRMP and DEIS documents impacting southern Utah are also upcoming in the next few months. While BLM encourages specific comments, preparation of specific comments would require more time for public review. Therefore, I would like to comment that extended public review period for these many documents would generate more useful comments for the BLM to consider. | See response to comment 124-1 |
| J | McGill | 324 | 1 | 90 days is not enough time to comment on these complex proposals. The time limit must be extended and more public input sought. | See response to comment 124-1 |
| Mike | Bassett | 325 | 1 | I feel that the draft Moab RMP unfairly favors consumptive resource use like off road vehicle access to wilderness-quality lands, as well as unrestrained oil and gas leasing.

The current draft of the Moab RMP is just another step in [the land's] degradation. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was |

given to all potential alternatives identified.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.

The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.

The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development.

Alt C of the DRMP/EIS provides balanced management for the resources in the Moab planning area. Over 2,500 miles of existing route are not designated in Alt C;  oil and gas leasing is subjected to both major and minor

BLM_0011315

| | | | | | stipulations. |
|---|---|---|---|---|---|
| Patricia | Vidiella | 326 | 1 | Alternatives A and D are absolutely outrageous, if we take into consideration all the body of scientific research and evidence (remember those pictures of dust storms, and the cheat grass fires in the news?) indicating that such type of management would produce irreversible damage to the land with severe consequences for all living beings (including those who enjoy riding their OHV cross country!)<br><br>The preferred alternative, C, is a little bit less outrageous, but also unacceptable because it proposes to convert a vast area (almost 2000 acres) in potential hazard for the rest of the land (again remember the pictures of dust storms, and the cheat grass fires in the news?). | The commentor's thoughts regarding management under Alternatives A, C, and D are noted. |
| Patricia | Vidiella | 326 | 2 | Alternatives A and D are absolutely outrageous, if we take into consideration all the body of scientific research and evidence (remember those pictures of dust storms, and the cheat grass fires in the news?) indicating that such type of management would produce irreversible damage to the land with severe consequences for all living beings (including those who enjoy riding their OHV cross country!)<br><br>The preferred alternative, C, is a little bit less outrageous, but also unacceptable because it proposes to convert a vast area (almost 2000 acres) in potential hazard for the rest of the land (again remember the pictures of dust storms, and the cheat grass fires in the news?). | Alternative C proposes to manage 1,866 acres in and around the White Wash Sand Dunes as open to cross country travel by OHVs.  Alternative C limits travel to designated routes in the remainder of the planning area.  Chapter 4 of the DRMP/EIS acknowledges that Alt B, with 0 acres open to cross country travel, results in fewer impacts to soils than does Alt C.  The area around White Wash Sand Dunes is primarily sand dunes, and cheat grass is not an issue. |
| David | Rohde | 327 | 1 | Please consider expanding the "open" area at White Wash, to be large than drafted in Alternatives C & D. I practice "staying the trail," but there are such few places left that will sustain | See response to comment 123-35 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | cross country travel and open riding, this is one suited for that. I express this for leaving open area for dispersed camping also. The proposed boundaries of open vs restricted/closed would leave too small an area for the amount of vehicle use this area experiences. And the boundaries are not well defined which would make it difficult to identify on the ground. | |
| David | Rohde | 327 | 2 | The camping policy as stated in Appendix E. I support a policy where existing campsites are open, unless closure was determined via a lawful public planning process. It is important for the final RMP to mandate having full public involvement in any establishment and management of designated camping areas. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions |
| Philip | Teisl | 328 | 1 | I believe it is unlawful to go backwards and create wilderness areas where the BLM so chooses to appease other groups. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Philip | Teisl | 328 | 2 | It is not sound management to close areas, as in the White Wash area, to restrict users to a small area, is not a good idea, if anything, the open areas in Alt C and D should be increased. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Philip | Teisl | 328 | 3 | Proper signage and education should be tried prior to fencing around trees and water holes. | See responses to comments 208-3 and 479-6 regarding fencing. Education and Signage are all administrative actions and do not require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |

| Philip | Teisl | 328 | 4 | The proposed "Individual Recreation Permit" If the current needs cannot be met with the normal funding/grand programs, only then should a fee system be utilized. | See response to comment 123-10. |
|---|---|---|---|---|---|
| Philip | Teisl | 328 | 5 | The camping policy suggested in Appendix E – the existing campsites should remain open until solid proof shows that different management should be used, and then with public input on new proposals. | Public participation has been solicited throughout the land use planning process. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
| Philip | Teisl | 328 | 6 | There should be increased focus for motorized and mountain bike use in the Utah Rims SRMA, including the ability to construct new routes in the future, and the area should extend southwest to also encompass Mel's Loop. | See response to Comment 122-39. The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Philip | Teisl | 328 | 7 | The Yellowcat area is should also be in a SRMA, using the existing networks of roads, etc. | See response to Comment 122-38 |
| Philip | Teisl | 328 | 8 | Many of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| Bobby | Mock Family | 341 | 3 | Alternative D is too restrictive. The dry washes should be left open, as they provide travel-ways for dirt bikes/ATVs, and are not harming important wildlife habitat. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Bobby | Mock Family | 341 | 4 | Please rethink your plans and allow for more public input. | See response to comment 124-1 |
| John M | Whitaker | 343 | 1 | Given the lack of visibility I was not aware of your efforts to create a Moab DRMP or the deadline for comments on november 30. I read the paper and watch the news. I have seen nothing to indicate what you guys are up to. Is it a secret? | See response to comment 124-1 |

| John M | Whitaker | 343 | 2 | Poor public notification and short comment period | See response to comment 124-1 |
|--------|----------|-----|---|---|---|
| Judy | Rue | 344 | 1 | Your open area at White Wash in Alternative C and D needs to be expanded. The current proposal is unworkable because it closes the killer hillclimb and camping area to the west of the Dunes. | See response to comment 123-35 |
| Judy | Rue | 344 | 2 | I looked at your maps and cannot tell if the campsites we used are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Judy | Rue | 344 | 3 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39 |
| Judy | Rue | 344 | 4 | Yellowcat is increasingly popular for 4-wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| Kincade | Bauer | 345 | 1 | I believe that none of the 4 alternatives are adequate to meet the needs of most visitors to Moab and futher reasonable alternatives proposed by interested parties such as Ride with Respect are required to be studied prior to issuing a decision. At the least, a supplemental study of these alternatives should be conducted. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Kincade | Bauer | 345 | 2 | In regards to the inventory done by Moab BLM, I believe that there are many motorcycle, mountain bike, and ATV trails that were not included, I would strongly suggest that these need to be inventoried | Although this issue was raised during scoping, the application in the DRMP/EIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

| | | | | prior to the final plan. The current inventory is deeply flawed and omits some very important trails. | based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Roland | Tolman | 347 | 1 | Please reconsider your deadline for public comment. The DRMP is a very large, poorly researched document and I feel that those of us with an interest in it have not had sufficient time to give it a thorough review in the time allotted before the public comment period ends. It seems that every special interest group out there is scrambling to get whatever information they can out on the internet for their members to make comment according to. Even they (the special interest groups) aren't completely certain about all the consequences of the different proposed alternatives. Without more time for the public to review the DRMP, I worry about hasty commentary without sufficient thought and review put into it. Also, I worry about the litigation that will surely come about as the BLM attempts to implement the Final RMP due to the short timeline of public involvement and the confusing and conflicting maps. | See response to comment 124-1 |
| Roland | Tolman | 347 | 2 | Easter Jeep Safari should remain fully open and accessible to motor vehicles and be included in full in the designated routes of the Final RMP. | See response to comment 206-11 |
| Roland | Tolman | 347 | 3 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Dry Mesa (N38º43'15.75"/W109º27'20.72" heading Southwest- the area south of Wolf Ranch as you leave the Arches National Park boundary with view into the park itself and down into the Colorado Riverway) | See response to comment 206-11 |
| Roland | Tolman | 347 | 4 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Mat | See response to comment 206-11 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Martin Point (N38º37'32.28"/W109º27'34.38" heading Northeast – the far northern area of Porcupine Rim as bounded by Castle Valley, the Colorado Riverway, and Negro Bill Canyon) | |
| Roland | Tolman | 347 | 5 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: The Rusty Nail Trail (N38º36'5.76"/W109º39'20.18" heading East – the alternate route that connects the lower portion of the Gold Bar Rim trail and the Golden Crack area of the Golden Spike trail) | See response to comment 206-11 |
| Roland | Tolman | 347 | 6 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Hunter Canyon Rim (N38º29'43.84"/W109º33'53.53" heading Northwest to N38º30'25.67"/W109º35'13.78" – the spur between the Pritchett Canyon route and Kane Creek Blvd) | See response to comment 206-11 |
| Roland | Tolman | 347 | 7 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: The Shafer Trail Spur (N38º28'16.80"/W109º42'45.88" heading North – the spur that heads north off Shafer Trail and dead ends directly below the eastern side of Dead Horse Point) | See response to comment 206-11 |
| Roland | Tolman | 347 | 8 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Long Canyon Overlook (38º33'04.68"/W109º42'02.76" heading East-the area that is bounded by Long Canyon to the South, the Colorado Riverway to the East, and Day Canyon to the North) | See response to comment 206-11 |
| Roland | Tolman | 347 | 9 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Coyote Canyon (N38º24'40.40"/W109º25'43.41" | See response to comment 206-11 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | heading North – located in the area west of Area BFE) | |
| Roland | Tolman | 347 | 10 | I believe that the following routes / areas were mistakenly mapped incompletely on the DRMP on Alternative C, I oppose these route remaining partially or completely absent from the designated trails in the Final RMP; I support the position of the Utah 4 Wheel Drive Association and Red Rock 4 Wheelers with respect to these omissions and any that I may have personally overlooked: Flat Iron Mesa Route. It appears that several short sections of the Flat Iron Mesa Easter Jeep Safari route are missing from the designated routes maps, including the popular Easter Egg Hill. I hope this is an accidental omission. I would like to see the entire route shown clearly on the Final RMP. Strike Ravine route. The popular obstacle, the "Big Ugly," as well as the section of Strike Ravine that crosses Kiley Miller's property have been left off the designated routes maps. Again I hope that this is an accidental omission. I remind BLM that the Red Rock 4 Wheelers have successfully defended this route as legal in court over the last few years. I would like to see the entire route shown clearly on the Final RMP. Crystal Geyser route. Short sections of the Crystal Geyser Easter Jeep Safari route are missing from the designated routes maps. Hopefully accidentally omitted, I would like to see the entire route shown clearly on the Final RMP. 3D route. Short sections of the 3D Easter Jeep Safari route are missing from the designated route maps. Hopefully accidentally omitted, I would like to see the entire route shown clearly on the Final RMP. | See response to comment 206-11 |
| Roland | Tolman | 347 | 11 | I believe the following routes / areas are conflictingly mapped. Each of these listed | See response to comment 206-11 |

| | | | | designated routes, as shown on the maps for Alternative C, appear to be within the boundaries of areas that are closed to motorized vehicles as shown on the travel plan. These conflicting maps are confusing to me as I have attempted to decipher them. I know that the Blue Ribbon Coalition is working hard to identify additional conflicts and inconsistencies and might find some that I have overlooked in the short time that I've had available to review the documents; I support the position of the Blue Ribbon Coalition concerning mapping conflicts. Please assure that all designated routes are clearly mapped and that the boundaries of areas closed to motorized travel are adjusted so as to clarify the status of all proposed designated routes as open to motor vehicle use, especially the following: Rusty Nail (N38º36'5.76"/W109º39'20.18" heading East) Moab Rim (N38º33'34.05"/W109º34'57.88" heading Northeast) Pritchett Canyon (N38º32'11.49"/W109º35'55.15" heading Southeast) Long Canyon "Overlook" (38º33'04.68"/W109º42'02.76" heading East) | |
| Roland | Tolman | 347 | 12 | The Black Ridge area, the Sand Flats Recreation Area, and the Yellow Circle Mine area have terrain that could work well to incorporate additional open travel. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Roland | Tolman | 347 | 13 | It is not clear how many existing campsites would be inaccessible under the policy. The FEIS should clearly state how many campsites would be closed under each alternative. | No areas are closed to camping by action of the DRMP/DEIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for |

| | | | | | adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
|---|---|---|---|---|---|
| Roland | Tolman | 347 | 14 | More clarification is needed as to what is considered obtrusive damage. The stipulation of "trampled vegetation" seems vague to me. It could be interpreted too broadly, resulting in unintended restrictions. | The commentor refers to the discussion of dispersed camping in Appendix E, Section E.1.2.  The determination of obtrusive damage must be made on a site-specific basis; the examples given in the appendix are intended to show what type of damage might lead to a future action.  Professional judgment would guide this decision in the future, along with a site specific study of damage. |
| Roland | Tolman | 347 | 15 | The restriction that disbursed campers must stay on designated routes is confusing. Does it mean that a campsite that is 50 yards off a designated route cannot be accessed by motor vehicles? | Yes. See response to Comment 120-86 regarding access to dispersed campsites. See responses to comments 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| Roland | Tolman | 347 | 16 | I feel that many of the restrictions in all of the Action Alternative are unclear in purpose. I feel that the FEIS needs to draw a clear connection between facts on the ground and any decision made. Also, I feel the DEIS does not clearly describe the difference between the Recreation Management Plan and the Travel Plan. The FEIS should clarify the difference. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the |

| | | | | | issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
|---|---|---|---|---|---|
| Zachary | Lowe | 353 | 1 | There are certain areas that OHV use is allowed and quite prominent such as Sand Flats and Behind the Rocks and both areas show heavy impact from OHV use both on and off the designated trails. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Larry | Ruffin | 354 | 1 | Just look at the Piute Trail System west of Moab and see the benefits it gives to the small towns interconnected to it. It is managed and there are rules to follow but it does not exclude any one user group. Please consider it as a successful case study as you formulate a proposed resource management plan for the Moab area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Paul | Obert | 355 | 1 | We love camping out there and accessing Mary's Trail, 10 Mile Wash, White Wash, and all the areas around the town of Moab and south of Green River. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Paul | Obert | 355 | 2 | Gemini Bridges road has amazing bridges to ride across, please keep these open. Ride with Respect has addressed ten Mile Wash, the Thompson Trail and Copper Ridge all, and we support their proposal. | See response to comment 206-14 |
| Bud | Evans | 356 | 1 | At a time when more people are retiring and population is increasing it is counterproductive to close off recreation areas. For example, the White Wash area in Alternative C & D needs more open areas. Confining vehicles and campers to smaller areas is not the way to go. | See response to comment 123-35 |

| Bud | Evans | 356 | 2 | Gemini Bridges, Thompson Trail, and Copper Ridge loop and Ten Mile Wash need to be kept open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Steve | Frisbie | 357 | 1 | When we are riding our dirt bikes, we enjoy riding the White Wash Sand Dunes, 10 Mile Wash, Green River Trail, and the area's other great motorcycle trails. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Steve | Frisbie | 357 | 2 | Your open area at White Wash in Alternative C and D must be expanded. The current proposal is unworkable because it closes outstanding hill-climbing and camping area to the West of the Dunes. | See response to comment 123-35 |
| Steve | Frisbie | 357 | 3 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| Mike | Thurston | 358 | 1 | I would like to see the entire Flat Iron Mesa Trail included on the proposed maps. | See response to comment 206-11 |
| Mike | Thurston | 358 | 2 | I would like to see "Big Ugly" on the Strike Ravine Trail included. | See response to comment 206-11 |
| Mike | Thurston | 358 | 3 | Sections of Crystal Gyser and 3D trails are also not included on the proposed maps. | See response to comment 206-11 |
| Mike | Thurston | 358 | 4 | I would like Coyote Canyon Trail to be included on proposed maps. | See response to comment 206-11 |
| Scott | Edwards | 386 | 1 | Expansion of the open area in White Wash along with the trails named; Flat Iron Mesa, Strike Ravine, 3D trail, Gemini Bridges, White Wash Sand Dunes, and Coyote Canyon. | See response to comment 123-35 |
| Michael | Judd | 387 | 1 | Flat Iron Mesa, Strike Ravine, and 3D Trails left | See response to comment 206-11 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | open for future travels. | |
| Nick | Jenkins | 388 | 1 | Include the Coyote Canyon Trail, expand the open area at White Wash, and include the "missing areas" of Flat Iron Mesa, Strike Ravine, 3D Trail | See response to comment 206-11 |
| Amanda | Mair | 389 | 1 | Flat Iron Mesa and Gemini Bridges left open for public use. | See response to comment 206-14 |
| Robby | Flasro | 390 | 1 | Flat Iron Mesa, Coyote Canyon, and Gemini Bridges must remain open for access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Candace | Williams | 391 | 1 | I do not want Gemini Bridges to close | See response to comment 206-14 |
| Paul | Rossiter | 392 | 1 | Flat Iron Mesa, Strike Ravine, 3D, Gemini Bridges, White Wash Sand Dunes, and Coyote Canyon to be open for access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Teri | Underwood | 409 | | The DRMP is unbalanced in favor of ORV users. The BLM DRMP plan for recreation is substantially unbalanced. It is unreasonably weighted in representation of ORV users and does not adequately address other recreational users such as hikers, bikers, and campers. In addition, the plan does not address the fact that the majority of the public is in favor of limiting ORV routes.<br><br>In the scoping summary section 2.1, the BLM lists major challenges facing the planning team. Creating public interest in attending the scoping meetings and reaching those who use the public lands was identified. To combat these problems BLM says that is created a public participation plan | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS. The ID team reviewed each route for purpose and need weighed against resource conflicts. These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record. The impacts identified for travel management in the DRMP/DEIS are derived from this data. |

to ensure all voices are heard, rather than a dominant fee and contained tactics to draw dialogue from stakeholders representing a cross-section of viewpoints rather than from polarized views. Although BLM recognizes these important elements it fails to carry through with implementing them in the plan. This is evidenced by unilateral reliance on the counties road map to develop the travel plan.

The travel plan involves numerous stake holders and they all need representation.

The Moab BLM responsible for developing the DRMP has admitted that the ORV special interest groups are loud and fanatic. The Moab BLM consulted closely with the county in development of their road plan. In fact the road plan in their preferred alternative is almost identical to the counties plan. According to several people I know in Moab, when the BLM was consulting with the county they spent a substantial portion of time working with a county representative named Jerry McNeely (whom I do now know). Although this can not be substantiated in this document, Moab residents have told me that Jerry McNeely is sympathetic to ORV special interests and that Jerry McNeely did not consider other interests, such as hikers, campers, and mountain bikers when recommending travel routes to the BLM for the DRMP.

When looking through the scoping document it can be seen that the majority of comments were about ORVs and it appears from the document that the majority of comments were in favor of restricting ORV use. Yet when developing the DRMP the

| | | | | |
|---|---|---|---|---|
| | | | entire travel route was prepared with unreasonable reliance of parties with a special interest in ORV trails. | |
| Teri | Underwood | 409 | The DRMP does not adequately address the important recreation issue of NOISE. Noise pollution eliminates my recreation experience entirely. How are you going to reduce noise pollution? An issue that was not adequately addressed but yet is of huge importance in the recreation arena is noise. This issue must be addressed because there is been a huge, huge influx of new ORVs using the DRMP lands in comparison to a decade ago, there are thousands of miles of proposed OHV routes in the DRMP, and there is a predicted increase in the population and OHV users in the coming decades. I can no longer go to many areas I used to enjoy because of the noise and fumes of ORVs. This includes but is not limited to: Gemini Bridges, Moab Rim, Upper Courthouse Wash area, Klondike Bluffs, and Porcupine Rim.<br><br>Table 4.3.8.2.13.1 on page 146 of chapter 4 shows how ORV management would be applied in each alternative, in acres, as open or limited to lands inventoried as having wilderness character. In this same chapter, the EIS admonishes that under ALL alternatives Noise of vehicles using routes proposed would reduce opportunity of visitors to find solitude in wilderness character lands, especially in proximity to the routes. Motorized routes would conflict with primitive and unconfined recreation opportunities found in wilderness character lands. | See response to comment 122-7. |
| Teri | Underwood | 409 | DRMP proposed management of SRMAs (2-18, 2-8-B, 2-8-C) are too general and leaves wilderness character lands open to irreparable damage that | The impacts to all of 266,485 acres of non-WSA lands that were found to have wilderness characteristics are disclosed in Chapter 4 of the DRMP/EIS.  Land use |

| | | | | | |
|---|---|---|---|---|---|
| | | | | will compromise its wilderness character. The DRMP needs to address how it will specifically handle each section of land that had been inventoried to have wilderness character. The current DRMP is inadequate in this area because lands that have been inventoried as having wilderness characteristics have been chopped up into different management categories and not considered in their entirety. | planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.  The land use plan provides allocations for each acre of land in the planning area.  As stated in Chapter 4 of the DRMP/EIS, over 40% of the lands with wilderness characteristics are managed as no surface occupancy, whether or not they are specifically managed to protect wilderness characteristics.<br><br>After completion of the RMP process, those SRMAs that do not currently have RAMPs will need to develop a site specific RAMP, subject to full compliance with the NEPA.<br><br>See also response to comment 121-9 regarding the layering of designations and response to comment 124-53 regarding management of Non-WSA lands. |
| Teri | Underwood | 409 | | Need to consider existing funding and staff for plan management. Several issues were raised through public scoping and described in the Scoping Summary. In the summary is a list of issues beyond the scope of the plan. On that list is "availability of funding and personnel for managing problems." Availability (of more $) is different than EXISTING funding and personnel. And this issue of whether the BLM can manage this plan with the current budget and staff that now exists is a huge part of the success or demise of this plan or any plan. This issue IS a basic tenet of managing all programs in both public and private sectors on a worldwide basis. Therefore, I feel this plan needs to be revised to consider this basic tenet of management. In view of the criticism BLM has gotten for not being able to properly manage the lands with current status, I find it ridiculous to NOT consider it. | See response to comment 124-20 |
| Teri | Underwoo | 409 | | The DRMP fails to consider the fact that many of | See response to comment 121-67 regarding mineral |

| | | | | |
|---|---|---|---|---|
| | d | | | the lands with wilderness characteristics are already leased. These include: Arches Adjacent, Dead Horse Cliffs, Dome Plateau, Floy Canyon, Flume Canyon, Goldbar, Shafer Canyon, Hunter Canyon, Coal Canyon, Goldbar, Hatch Wash, Labyrinth Canyon, and Hunter Canyon. The DRMP needs to determine how they will manage these lands to retain their wilderness characteristics with their current leases. This is not addressed in the plan. | policy.  The valid existing leases on the lands with wilderness characteristics are disclosed on pg. 4-118 and 4-119.  Arches Adjacent contains 56 leased acres (<1%); Dead Horse Cliffs contains 237 leased acres (30%); Dome Plateau contains 2,364 leased acres (17%); Floy Canyon contains 8,859 leased acres (86%), Flume Canyon contains 1,356 leased acres (38%), Goldbar contains 1,125 leased acres (17%); Shafer Canyon contains 179 leased acres (9%), Hunter Canyon contains 251 leased acres (5%), Coal Canyon contains 13,312 leased acres (62%), Hatch Wash contains 3,006 leased acres (27%) and, Labyrinth Canyon contains 3,658 leased acres (14%).  Valid existing rights are guaranteed regardless of decisions in the Land Use Plan.  Should these leases be developed, wilderness characteristics would not be retained in that portion of the unit.<br><br>None of the listed units is proposed for management to protect its wilderness characteristics in the preferred alternative. |
| Teri | Underwood | 409 | | Moab RMP needs to rely on the inventory of the wilderness character lands to revise their management plan, as required by law. This means that wilderness character lands found in the inventories need to be managed to protect their values. The Interior Department's settlement with the State of Utah in 2003 established that the BLM does not have the authority to establish Wilderness Study Areas. But the Interior's BLM Instruction Memorandum 2003-274 and 275 clarified the procedure in Consideration of Wilderness Characteristics in Land Use Plans. The Memorandums said that the settlement did not diminish the BLM's authority to inventory public land resources and to consider them during land use planning. According to FLPMA, section 201, | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | |
|---|---|---|---|---|
| | | | the Secretary is required to maintain on a continuing basis an inventory of all public lands and their resource and other values (including but not limited to, outdoor recreation and scenic values) giving priority to areas of critical environmental concern. In addition, FLMPA section 202 c-3 and c-4 respectively, say that the Secretary is also required to give priority to the designation and protection of areas of critical environmental concern and rely, to the extent it is available, on the inventory of the public lands, their resources, and other values when developing and revision of land use plans.<br><br>All the lands inventoried as wilderness contained in HR 1796 and S639, America's Red Rock Wilderness Act, including all the lands listed in table 15B-1 in the DRMP EIS and found to have wilderness character in the BLM's 1999 inventory should be off limits to ORV routes,  ROW, mineral exploitation and other activities that will irreparably damage their wilderness character. There is no doubt that activities proposed in Alternative C will irreparably damage these lands and this is documented in the BLM's EIS (chapter 4). It is the BLM's fiduciary responsibility to the national interest, as is evidenced by the choice of Alternative C as their preferred alternative, is more seriously in question than prior to the release of this document. | |
| Teri | Underwood | 409 | Scoping inadequate and does not lead to balanced plan. Federal law dictates that you need to determine who the public is when planning land use. The methods you used to ensure a cross section of representation was not robust enough. For example: a survey would be expected as a legitimate method to define the public "market mix" | The BLM initiated the scoping process with the publication of the June 2003 NOI in the Federal Register. The scoping period lasted from June 4, 2003 to January 31, 2004.  A mailing list for public scoping was developed.  A website on the Moab RMP/EIS was continuously maintained throughout the planning process.  Six open houses were held during the scoping |

BLM_0011332

| | | | | (a very common definition and practice widely available in worldwide marketing arenas to narrow down the characteristics of a big group).<br><br>Your reach was relatively small in the numbers of comments you received in comparison to the annual visitiation per year (1 million visitors with only approximately 6500 comments). This makes me suspect ineffective PR. I realize you sent out the press releases and PSAs etc. But were they effective and did they reach all interested public? For example. Although you had a meeting in Grand Junction, I do not see that you sent press releases or PSAs to other Colorado media, yet Colorado users are significant. Federal law specifically mentions that in land use revision plans adjacent states should be included. The number of visitors from Denver, Apsen, Durango, and other Colorado towns is significant. Wider representation from Colorado should have been included in the scoping.<br><br>BLM had surveys available to them that would have helped them define "whothe public is" and did not use them. The National Visitor Use Monitoring Study conducted by MFO in 2006. Another survey was published in the Moab Times March, 2005.<br><br>The Scoping document in the table of contents is not complete.<br><br>I would specifically like to know how you address group comments as a percentage of the whole. I did not see this addressed in the scoping document. | period, and several planning bulletins were issued.  The public was informed of the planning process through the media.  The BLM attempted to include the public during the scoping process. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Comments should be categorized in a more meaningful way. For example, on pg. 115, you list 110 letters from Moab open house that want the BLM to close mineral development on land with wilderness values and only 9 letters that want exploitation. I would like to see all comments expressed as a percentage of the whole.<br><br>I would specifically like to know what percentage of the comments were in favor of preserving wilderness characteristics on wilderness character lands. | |
| Teri | Underwood | 409 | | The DRMP does not adequately consider the total impact to the land from the combined destructive activities that it will permit (in particular: ORV routes, roads, and oil and gas leasing) and fails to determine the impact that the proposed travel plan will have on the land over the course of 10-20 years. | A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative. The best available data were used for travel planning analysis, including wildlife data from the Utah Division of Wildlife Resources and U.S. Fish and Wildlife Service. The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.<br><br>Alt C of the DRMP/EIS limits all OHV travel to designated routes, with the exception of 1,866 acres near the White Wash Sand Dunes.  The analysis in Chapter 4 discloses the benefits to resources from this proposed action.  In addition, Alt C does not designate over 2,500 miles of route.  This action benefits both natural and cultural resources.  Chapter 4 also analyzes the impacts from oil and gas development to natural resources.  Cultural resources are protected by law. |
| D'ahna | Chalmers | 412 | 1 | The time frame for comments on such an important document being so short and our lives being so full and demanding, I would request that | See response to comment 124-1 |

| | | | | you grant an extension period for more comments to be submitted. | |
|---|---|---|---|---|---|
| D'ahna | Chalmers | 412 | 2 | Monitor and Merrimac Blues. Please close this unique, excellent and sensitive area to motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| D'ahna | Chalmers | 412 | 3 | Please close The Poison Spider Rim trail to motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| D'ahna | Chalmers | 412 | 4 | Please eliminate the user created road spurs that travel next to the Green River in Labyrinth Canyon – another area where noise impacts are extreme, echo loudly, and destroy the river experience. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| D'ahna | Chalmers | 412 | 5 | Please address the criss/cross of trails over the hills and ridges at Professor Valley. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| D'ahna | Chalmers | 412 | 6 | Please use your efforts to close the illegal UPS Trail. Keeping bicycles off is the first step. If the trail is not closed, motorcycles will follow. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| D'ahna | Chalmers | 412 | 7 | I urge you to close all trails, tracks, routes or roads on Mat Martin Point to any and all motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Tammy | Taylor | 414 | 1 | See Taylor Grazing Act: Title 43 Chapter 8A Sub Chapter I 315D: AUMs are for domestic livestock, not deer, bison, elk, and all other wildlife. stock, not deer, bison, elk, and all other wildlife. | While the Taylor Grazing Act provides for livestock use of BLM lands in terms of AUMs, the BLM also has other requirements, including providing habitat for wildlife. Vegetation can be allocated to livestock and wildlife. Section 102 of FLPMA requires that the "BLM provide food and habitat for fish and wildlife and domestic animals." As used in this RMP, AUMs are used to reflect the forage and habitat requirements of livestock and wildlife using BLM lands. It is a reflection of the numbers of animals and the length of time they are on specific areas resulting in the need for a particular level of AUMs for their use. |
| John | Hauer | 416 | 1 | Permitting livestock to graze along the highway [Highway 128] poses a danger to our family, and to may of our friends and neighbors who also drive the River Road. And, as mentioned in the draft RMP, tens of thousands of vehicles travel that road. Some are tourists passing through the area, some are guests at the two guest restorts on the highway, and many are Moab residents who travel the scenic route on their way to and from Grand Junction, CO.  Other vehicles that drive on the road include trucks taking supplies to the aforementioned guest resorts, tour buses, and rafting companies with busloads of customers (trailers in tow, heavily loaded with rafts) driving to the Colorado River put-ins at Westwater, Hittle Bottom and Onion Creek.

Allowing grazing along any highway is dangerous | The BLM recognizes that ther are safety issues regarding cattle along Highway 128.  In addition, the BLM recognizes that visual resources need to be protected along this National Scenic Highway.  For this reason, the BLM proposes in Alt C (preferred alternative) of the DRMP/EIS to remove 1,467 acres from livestock grazing in the Professor Valley, Ida Gulch, and River Allotments.  This would be accomplished by building a fence set back up to 2,000 feet from Highway 128. |

BLM_0011336

| | | | | | |
|---|---|---|---|---|---|
| | | | | of both the cattle and the people traveling on the highway.  It is especially hazardous on a narrow, windy, hilly, road with little to no shoulder, such as Hwy 128. | |
| John | Hauer | 416 | 2 | Suggestions regarding Alternative C:<br><br>Build a livestock fence only on the southeast side of the highway, and do not permit grazing between the highway and the river.<br><br>Build the fence only 1,900 feet from the highway on the southeast side instead of 2,000 feet, in order to compensate the permitee for lost grazing between the highway and the river.<br><br>The red line on the attached map shows approximately where the fence would go if built 2,000 feet from the highway on the northwest side.<br><br>The areas outlined in green on the map are the areas that would be available if a fence were built between the highway and the river, a very few acres in five widely dispersed areas.<br><br>Advantages:<br><br>Only one fence would have to be constructed. Livestock would not be permitted in the campground areas and raft put-ins at Onion Creek.  The campground and put-ins at Hittle Bottom are already fenced.<br><br>Since the grazing between the river and the highway would be fragmented into such small areas, it would appear to be more convenient for the permitee to have an equal amount of grazing added to the northeast side than to attempt to | The text in Chapter 2 of the PRMP/FEIS for Alt C has been changed to read:  "A fence would be constructed along the southeast side of Highway 128 (set back to protect the scenic resources of the National Scenic Highway)". |

| | | | | | |
|---|---|---|---|---|---|
| | | | | utilize the small parcels of the northwest side of the highway. | |
| Raymond | Butts | 417 | 1 | White Wash Sand Dunes: The suggested open area should be expanded to an easily identified boundary that allows a larger area to reduce impact in too small of an area. I would like to suggest the boundary to extend to the Ruby Ranch Roach on the west, Blue Hills Road on the north and Duma Point on the east. | See response to comment 123-35 |
| Raymond | Butts | 417 | 2 | Exclusive Use Zones: These will create user conflict not eliminate it in a way it is suggested to be managed. Whereas an exclusive use zone allows cherry stemmed routes to pass through and give the idea to other users it is not allowed due to perceived blanket restrictions. Multiple route designations with proper signage would be a better way to go. | See response to comment 122-9 |
| Raymond | Butts | 417 | 3 | A general policy of closing dispersed campsites without first determining a reason for it with the proper analysis is wrong. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| Raymond | Butts | 417 | 4 | The Copper Ridge should be combined with Thompson Trail. | See response to comment 122-29 |
| Raymond | Butts | 417 | 5 | Lands with Wilderness Character: There is no justification for this process, once the 603 process was completed the agency was supposed to be done with this. The 603 process determined that 3.2 million acres were suitable for congressional consideration; the BLM should not be reviewing this yet again. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| John | Kennedy | 418 | 1 | Open riding must exist in the White Wash Area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

BLM_0011338

|  |  |  |  |  | based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|------|---------|-----|---|---|---|
| John | Kennedy | 418 | 2 | Each alternative is greatly lackin in "true" trail inventory. Several long standing routes were omitted and it is my understanding that miles of single track were not even inventoried. In an era of "closed unless marked open" management, how is this the right thing to do? | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| John | Kennedy | 418 | 3 | Implementation of any fee system MUST include the uses affected as well as the Recreational Fee Advisory Group. | See response to comment 123-10. |
| Peter | Tomka | 419 | 1 | I suggest BLM's open area at White Wash in Alternatives C and D be expanded. | See response to comment 123-35 |
| Peter | Tomka | 419 | 2 | The Final RMP must mandate full public involvement in the establishment and management of "restricted camping areas" or "controlled camping areas." BLM's maps are unclear as to whether or not the camp sites the public uses are going to be open or closed. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Peter | Tomka | 419 | 3 | Yellowcat should be a SRMA. | See response to Comment 122-38 |
| Peter | Tomka | 419 | 4 | We noted that some of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| Colin | Fryer | 421 | 1 | I am in favor of alternative C that includes a fence for highway safety, except that the recommended fence set back of 2000 is drastically too restrictive and would result in almost total loss of the grazing | The BLM proposes to build a fence set back up to 2,000 feet from Highway 128 in order to address safety issues regarding cattle along Highway 128 and to protect visual resources along the National Scenic Highway. See |

BLM_0011339

| | | | | resource. A 2000 foot set back would take away practically all of the north side of the highway which is the best ½ of the allotment. In addition the south side of the highway is better grazing closer to the highway and the resource gets poorer as you head toward the south cliffs. The 2000 foot set back effectively eliminates a good 75% of the resource for grazing. | Response to comment 416-1 |
|---|---|---|---|---|---|
| Terry | Rust | 422 | 1 | Increase opportunities in order to decrease impacts on a particular area. | This is not an answerable comment.  Please check it out as to whether or not it is complete. |
| Terry | Rust | 422 | 2 | None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates the unworkable and impractical management of camping and motorized travel. In addition, in all of the Alternatives, management for the White Wash Sand Dunes is fatally flawed and must be reconsidered. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Terry | Rust | 422 | 3 | Alternative D fails to provide a true motorized focus. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Terry | Rust | 422 | 4 | I am concerned that many of the restrictions in all of the Action Alternatives are simply not justified. The FEIS MUST clearly draw a logical and easily understood connection between the facts on the ground and the decisions made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. |

|  |  |  |  |  | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| Terry | Rust | 422 | 5 | The White Wash Sand Dunes management plan is totally unacceptable and unworkable. The draft plan bans nearly all camping until the agency gets around to constructing a developed campground. Further, the agency would also implement a "fee system using individual Special Recreation Permits" although I do not find a timetable or fee structure included. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. |
| Terry | Rust | 422 | 6 | The proposed open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Terry | Rust | 422 | 7 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. Further, please define the term 'water source' would this include ephemeral springs? What period? Would the fences be required on the off chance water could be sourced there or only during actual flow? | See response to comments 208-3 and 479-6. |
| Terry | Rust | 422 | 8 | The open area should be bounded by easily | See response to Comment 123-35. The BLM asserts |

| | | | | identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. Because the open area boundary, as proposed will not be easily identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely difficult to enforce. | that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding.

Enforcement actions are administrative and do not require land use planning decisions. |
| Terry | Rust | 422 | 9 | A fee system should be implemented only with the full involvement of the Recreational Fee Advisory Council and affected user group. | See response to comment 123-10. |
| Terry | Rust | 422 | 10 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. I strongly encourage you to look at the proposal developed by Ride With Respect. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Terry | Rust | 422 | 11 | The Mill Canyon- Sevenmile Rim biking focus area should be redrawn as Mill Canyon-Tusher Rims in order to provide better terrain for pedaling. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Terry | Rust | 422 | 12 | The Final Plan should extend the South Spansih Valley Biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Terry | Rust | 422 | 13 | Alternative D falls short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider | See response to comment 122-14 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | them for inclusion, again, a meaningful decision cannot be made while data is incomplete. | |
| Terry | Rust | 422 | 14 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. | See response to comment 122-46 |
| Terry | Rust | 422 | 15 | The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See response to comment 122-29 |
| Ginny | Carlson | 424 | 1 | See Appendix P "The current BLM Land Use Planning Handbook (H-1601-1, 2005) states that land use plans must: "Identify decisions to protect or preserve wilderness characteristics…" By losing the identity of 82% of the land that BLM recognized had WC, please explain how BLM is following the dictates of this handbook. Certainly the 366,485 acres determined to have WC are "sliced and diced" in so many ways under the various other resource allocations, that this land will first lose its WC label and then lose it on the ground as it becomes just a part of a SRMA, IRMA, VRM category, grazing allotment, oil and gas exploration area etc. | See response to comment 124-53. |
| Ginny | Carlson | 424 | 2 | I recommend that the following areas be managed for wilderness characteristics: Hunter Canyon Hatch Wash Fisher Towers (alt C shows 5,540, however there are 17,235 acres with WC) Mary Jane (alt C shows 16,499 acres, however there are 24,779 acres with WC) Big Triangle Behind the Rocks Mill Creek (3,388 acres adjacent to Mill Creek WSA) Gooseneck Shafer Horsethief Labyrinth Westwater Canyon | The management and level of protection of the wilderness characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. See response to comment 124-53. |

| Ginny | Carlson | 424 | 3 | Since there do not appear to be any maps in the entire document to show the boundaries that MFO has decided to protect as WC and the areas that will not be retained as WC, I cannot determine reviewing the information provided whether there are any other user conflicts. | Volume 3 of the DEIS/RMP provides maps of non-WSA lands with wilderness characteristics (Maps 2-24-B and 2-24-C).  Any areas not on the maps were judged by the BLM not to possess wilderness characteristics.  Detailed maps of each of these areas are available on the Moab BLM planning website, under "background documents". |
| Ginny | Carlson | 424 | 4 | See Table 4.74 Livestock Grazing Acres Available per Alternative.Please explain how BLM can have fewer acres per AUM in the conservation alternative B, than in the commodity alternative D. Does this table have the numbers backward, or are there erroneous calculations in the RMP? | The figures in Table 4.74 are correct: Under Alternative B, 1,668,731 acres are available for grazing, 153,797 acres would not be available for grazing, and 106,437 AUMs would be available. Under Alternative D, those figures are 1,770,314, 52,214, and 108,876, respectively. Thus Alternative D has more acres and AUMs available for grazing, and fewer acres unavailable than Alterative B. The relationship between acres available and AUMs, to which the commentor referred, is fewer under Alternative B is because Alternative has designated almost 200% acres more as being unavailable for grazing than Alternative D. This is consistent with the designation of Alternative B being the conservation alternative and Alternative D the commodity alternative. |
| Ginny | Carlson | 424 | 5 | What authority does BLM have under Federal Law to ignore the majority of the land users (hiking, horse, sightseeing in highway vehicles) in favor of a minority who drive off-road vehicles. What authority does BLM have under Federal Law to give locals much more say in the roads than the rest of the US citizens who equally pay taxes and should have an equal say in land management. What authority does BLM have to only take input on road decisions from the county whose representative openly consulted with 4x4 drivers while never consulting or asking for input from the quiet users, who are the majority of users in the MFO? | See response to comment 124-9 |
| Robert | Lippman | 425 | 1 | The BLM's present statewide effort, covering the long term management and destiny of over 11 | See response to comment 124-1 |

| | | | | million acres of land, requires more time for study and detailed, informed comment. Indeed, representatives of widely differing and divergent interests have united in requesting an extension which was unjustifiably denied by the agency. | |
|---|---|---|---|---|---|
| Robert | Lippman | 425 | 2 | The Plan and preferred alternative contemplate significant changes in management that, far from providing a "balanced approach," are tremendously weighted towards industrial/commodity development and motorized recreation access, all of which will have a significant if not devastating impact upon the health of the lands in issue, and upon wilderness values previously identified by the BLM. | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| Robert | Lippman | 425 | 3 | The travel plan component, in blatant disregard of the agency's own findings regarding lands determined to have wilderness character, and additionally in disregard of lands proposed for wilderness designation in the America's Red Rock Wilderness Act, designates thousands of miles of roads for ORV and motorized access. | See response to comment 124-54 |
| Robert | Lippman | 425 | 4 | Canyon Rims area south of the Hell Roaring Point Road should be protected from the present and proposed access by indiscriminate ORV use and RV-type recreation. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Robert | Lippman | 425 | 5 | Public opinion overwhelmingly supports non-motorized uses over ORV and mining/drilling access. Land use decisions must be science-based, pursuant to FLPMA and other standards, | See response to comment 122-9 |

| | | | | as opposed to commodity-based… | |
|---|---|---|---|---|---|
| Mark R. | Werkmeister | 426 | 1 | The BLM is no longer allowed to manage solely for supposed "wilderness characteristics." | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| V. | Nuckas | 427 | 1 | Some of your formulated alternatives fail to provide motorized access. Please provide alternative that permits and maximizes all recreational uses in Alt D including motorized and non-motorized trails. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| V. | Nuckas | 427 | 2 | FEIS should include more ATV trails in White Wash and Red Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Richard | Trow Jr. | 428 | 1 | BLM has forumalted three alternatives to create the appearance of fairness. Each seems to have a poison pill in it to force the acceptance of the "preferred alternative." Alternative D, the "pro-motorized" alternative is less friendly to the motorized recreationalists than the "preferred alternative." | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| Richard | Trow Jr. | 428 | 2 | The White Wash Open area is much to small. | See response to comment 123-35 |
| Richard | Trow Jr. | 428 | 3 | Many washes in the 10 Mile area are being proposed for closure. They should be left open. | See response to comment 211-20 |
| Richard | Trow Jr. | 428 | 4 | Extend [Utah Rims SRMA] to include Mel's Loop and beyond | See response to comment 122-39 |

BLM_0011346

| Richard | Trow Jr. | 428 | 5 | Create a Yellowcat area SRMA | See response to Comment 122-38 |
|---------|----------|-----|---|------------------------------|-------------------------------|
| Larry | Bullard and Family | 429 | 1 | Our first comment is the extensive amount of proposed changes that BLM is requesting comment on. We find this to be much too complicated for easy comment. We sincerely believe you are doing an injustice to the public comment period by including such a vast amount of data that needs independent documentation for comment. It would literally take pages and days of work to comment on our concerns on this vast proposal. | See response to comment 124-1 |
| Larry | Bullard and Family | 429 | 2 | It certainly appears to be a shotgun approach instead of addressing specific management problems. Your public presentations clearly leave only Alternative A (do nothing) or C (as BLM sees it) as reasonable alternatives. Neither is satisfactory as a whole. | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| Larry | Bullard and Family | 429 | 3 | Our first concern is the designation of the Green River (Segment 5: Mile 91 below Ruby Ranch to Hey Joe Canyon) as a wild river. Our concern is that this designation opens the door to manage this short section of river differently from the rest of the Green River (I-70 Bridge to the National Park). We are greatly concerned that this will bottleneck or remove accessibility by imposing recreational use sanctions. This could wind up much like the Westwater Canyon Wild and Scenic River section. The Guides and Outfitters will have 90% of the | See response to comment 124-88. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | access (Commercial interests) and the public gets access by lottery. Jet Boat use and travel up and down stream could be restricted. That could effectively eliminate open public access under the guise of "Wild River Management."<br><br>We don't see the "Wild" river designation based on the number of traditional uses by recreational and commercial boaters, the historic road build into June's bottom, the trails into the river bluffs, and River Register Rock with all its inscriptions, etc. Segmented classification is unacceptable. This is a navigable river by law. It needs to me managed as such. | |
| Pete | Bruno | 431 | 1 | Management objectives that use such things as primitive recreation zones. Areas of critical concern, and so-called "areas with wilderness character create a de-facto Wilderness management is unlawful. Congress put a dead line on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Pete | Bruno | 431 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| Pete | Bruno | 431 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| Pete | Bruno | 431 | 4 | I support a policy where existing campsites are open unless closure was determined necessary via lawful public planning process. It is very important that the final RMP mandate full public involvement in any establishment and management of "restricted camping areas" or controlled camping areas. | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| Pete | Bruno | 431 | 5 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and |

| | | | | | 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|---|---|---|---|---|---|
| Pete | Bruno | 431 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| Pete | Bruno | 431 | 7 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Pete | Bruno | 431 | 8 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| Barry | Powell | 432 | 1 | Management objectives that use such things as primitive recreation zones. Areas of critical concern, and so-called "areas with wilderness character create a de-facto Wilderness management is unlawful. Congress put a dead line on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Barry | Powell | 432 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| Barry | Powell | 432 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| Barry | Powell | 432 | 4 | I support a policy where existing campsites are open unless closure was determined necessary via lawful public planning process. It is very important that the final RMP mandate full public involvement in any establishment and | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |

| Barry | Powell | 432 | | management of "restricted camping areas" or controlled camping areas. | |
|-------|--------|-----|---|----------------------------------------|---|
| Barry | Powell | 432 | 5 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Barry | Powell | 432 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| Barry | Powell | 432 | 7 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Barry | Powell | 432 | 8 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| George | Halterman | 433 | 1 | When riding our Jeep, we like to explore the many back roads and the "lower than 4 rated" Moab Jeep Safari trails. When we take our ATV/dirt bikes, we enjoy riding the White Wash Sand Dunes, 10 Mile Wash | See response to comment 206-11 |
| George | Halterman | 433 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| George | Halterman | 433 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| George | Halterman | 433 | 4 | I looked at your maps and can't tell if the | No areas are closed to camping by action of the |

| | | | | campsites we use are going to be open or closed. | DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|---|---|---|---|---|---|
| George | Halterman | 433 | 5 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| George | Halterman | 433 | 6 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| George | Halterman | 433 | 7 | Some of the "motorcycle trails" are ATV trails. | See response to comment 120-90 |
| Shelley | Pistorius | 436 | 1 | You must restrict OHV use to designated roads and trails. There should be no "open" areas and all routes through riparian areas and other ecologically damaging routes should be off-limits. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Christian | Brunner | 437 | 1 | Ruby Ranch / White Wash Sand Dune area must be kept open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| R. Lance | Wade | 457 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We strongly oppose this provision of | See response to comments 208-3 and 479-6. |

|  |  |  |  | the draft plan. |  |
|---|---|---|---|---|---|
| R. Lance | Wade | 457 | 4 | We oppose the fee system contemplated in Alternatives C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The Final RMP should not require a fee system; however, we are willing to support funding for infrastructure if needs cannot be met with existing funding and grant programs, but not with an "individual Special Recreation Permit" program. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| R. Lance | Wade | 457 | 5 | Additionally, it is impossible to tell from examination of your maps whether the campsites we use are to be closed or are to remain open. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| R. Lance | Wade | 457 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39 |
| R. Lance | Wade | 457 | 7 | Yellowcat is increasingly popular for fourwheeling and ATV riding and is one of the areas that we enjoy. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| R. Lance | Wade | 457 | 8 | Some of the "motorcycle" trails are actually ATV trails. | See response to comment 120-90 |
| Ryan | Westwood | 467 | 1 | Management objectives that use such things as primitive recreation zones, areas of critical environmental concern, an so-called areas with wilderness character to create a de-facto wilderness management is unlawful. Congress put | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | a deadline on inventory and study for wilderness. The BLM should no longer be allowed to manage solely for wilderness character. | |
|---|---|---|---|---|---|
| Ryan | Westwood | 467 | 2 | Your open area at White Wash in Alt C and D must be expanded.The current proposal is unworkable because it closes the killer hill climg and camping area to the west of the Dunes. Such as small area, confines a huge amount of vehicles use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | See response to comment 123-35 regarding expansion of White Wash. |
| Ryan | Westwood | 467 | 3 | Requiring fences around the cottonwood trees and water sources, is both impractical and unnecessary. We strongly oppose this provision of the draft plan. | See response to comments 208-3 and 479-6. |
| Ryan | Westwood | 467 | 4 | We oppose the fee system contemplated in Alts C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The final RMP should not require a fee system. However, I am willing to support funding for infrastructure if needs cannot be met with existing funding and grant programs, but not with an "individual special recreation permit" program. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112, and 124-110 regarding clarification of SRP policies. |
| Ryan | Westwood | 467 | 5 | We oppose camping policy as outlined in App E. I support a policy where existing campsites are open unless closures was determined to be necessary via a lawful public planning process. The Final RMP must mandate full public involvement in any establishment and management of "restricted camping areas" or 'controlled camping areas" | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. . |
| Ryan | Westwood | 467 | 6 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural |

| | | | | | resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern |
|---|---|---|---|---|---|
| Ryan | Westwood | 467 | 7 | Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future. The Utah Rims SRMA should extend further southwest to concompass Mel's Loop and beyond. | See response to comment 122-39. |
| Ryan | Westwood | 467 | 8 | Yellowcat is increasingly popular for 4 wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Ryan | Westwood | 467 | 9 | Some of the "motorcycle trails" are actually ATV trails. We support the recommendation of the Utah State Parks onwhich should be open to ATVs. | See response to comment 120-90 |
| Will | Gouer | 469 | 1 | Hell Roaring Canyon is in no way a viable road in my eyes or in those of whom are with me. To include this, among many others illogical roads does nothing but ask for a degradation of the area in the near future. Please, take time to check out "roads" in the plan in person, see which ones truly need to be designated as such and eliminate the numerous redundant pathways to pointless dead ends that many create. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Roger | Crockett | 470 | 1 | We are in crisis mode with the overuse  of C02 and shortage of fuel causing intense pollution. At present clear days are rare, usually only after snow or rain. The air quickly becomes polluted again. We don't know yet the extent of the damage Done by OHVs and pollution. | See responses to G-479-21 and G 479-3 regarding emissions from OHV use and global warming issues, respectively. |

BLM_0011354

| Jim | Bulkeley | 471 | 1 | The DEIS/DRMMP did not address any meaningful mitigation plans to mitigate the loss of existing motorized routes. The plans should be withdrawn and revised to include measures to mitigate loss of any recreational opportunities. | See response to comment 122-9 |
|-----|----------|-----|---|------|------|
| Jim | Bulkeley | 471 | 2 | Proposal to allow vehicle camping only in designated campsites in all areas of the FO is overly restrictive and should be abandoned. By closing carious areas to camping have found other new areas to camp, resulting in more disturbed areas. Some of the areas BLM has designated as Open to Camping are next to railroad tracks and in close proximity to highly traveled roads. Not very desirable locations. I am strongly opposed to the camping policy outlined in App E. | See response to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding vehicular access to dispersed camping sites. One of the express purposes of leaving a route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| Jim | Bulkeley | 471 | 3 | Due to the growing numbers of people who enjoy the motorized recreational opportunities Moab has to offer, more areas should be opened to motorized recreation the policy of closing areas only increases the impacts to the remaining open areas. More people, less area equals more impacts to these areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Jim | Bulkeley | 471 | 4 | Gemini Bridges: The road allowing access to drive across the bridges should remain open. This is the only place in Utah--maybe the world--where you can drive across a large natural bridge. This unique driving experience should remain open. If people desire the experience to viewing natural bridges with out vehicles driving across them, they merely drive a few miles to Arches National Park, Bridges national monument and numerous other arches/bridges in the area. | See response to comment 206-14 |
| Jim | Bulkeley | 471 | 5 | Please add the following to your proposal: to reduce traffic conflict and increase motorized opportunities, a motorized route should be designated between upper end of Mine Sweeper Road and Cliff Hanger Road. I would be glad to | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | assist in the route selection. | resources. This action would be based on monitoring and site specific NEPA analysis. |
| Tyler | Kokjohn | 474 | 1 | Travel plan says BLM is required to follow a non-impairment standards with regard to management of WSA tracts. The preferred alternative proposes managing roughly 20% of the areas acknowledged as having wilderness character. This seems out of line with the expressed non impairment mandate. | The non-impairment mandate applies only to WSAs, and not to non-WSA lands identified as possessing wilderness characteristics. |
| Tyler | Kokjohn | 474 | 2 | Transportation plan seems to present alternatives that in ways do not vary much. For example, the total open route mileage varies between 2,144 for the most conservation -oriented alternative to 2,671 for the least. | The least conservation-oriented alternative for travel is Alternative A, which has 5,033 miles of "D" Road (the two figures provided by the commentor refer to "D" roads for Alts. B and D). The BLM therefore presents a range of alternatives in route designation of 2,889 miles difference between Alts. A and B. |
| Tyler | Kokjohn | 474 | 3 | Allowing too many OHV routes in tracts that BLM has inventoried and acknowledged to possess wilderness characteristic would undermine active Congressional legislation to formally designate and permanently protect portions of BLM areas within the Red Rock Wildness. | See response to comment 124-53. |
| Tyler | Kokjohn | 474 | 4 | Allowing OHV routes within areas of wilderness character would put irreplaceable cultural resources at risk of destruction and looting. The clear mandate to the agency is to protect and preserve these resources for future generations. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration.<br><br>The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS. See also response to comments124-68 and 124-82. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. |

BLM_0011356

| Tyler | Kokjohn | 474 | 5 | The draft plan proposed to take cultural resource inventory and assessments for areas subject to development-great idea, since so little inventory data is on hand to inform decisions. Unfortunately the preferred alternative includes only 60% of the total acreage potentially in play for assessment. It is unclear why the most conservation-oriented alternative would propose more inventory and assessment be performed in the face of markedly less potential development threat. The amount of cultural resources inventory and assessment must be commensurate with the threat and I urge BLM to be certain the final plan will allow for such activities to be performed at the scale necessary to ensure archaeological assets are safeguarded. | The commentor is assumed to be referring to the spread, by alternatives, of cultural field inventory.  A larger acreage is prioritized for cultural field inventory in the conservation alternative because the BLM is proposing a pro-active, conservation oriented alternative.  Alternative D emphasizes commodity production.  While the laws protecting cultural resources must be followed in implementing all actions, Alternative D is less concerned with a pro-active conservation approach.  Cultural resource inventories will be undertaken in response to the development proposal. Thus, the prioritization of cultural field inventories fits the theme of each of the action alternatives. |
| Ann | Phillips | 477 | 1 | When excavating a site, archaeologists leave a large portion of the site unexcavated, saving it for a future time when techniques improve and more data can be gathered. The BLM is charged with protecting these archaeological sites for perpetuity. The archaeological sites including Carrier Canyon rock art sites in Upper Courthouse Wash, Canyon Rims, and Westwater Canyon are well known and priceless. With easy access, the sites will be disturbed and in some cases, destroyed. It is imperative for the BLM not to let any more motorized roads into areas that are known to be rich inn archaeological sites. Correlation between public access and graffiti is well known and has been documented. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See response to comment 1-3. |
| Ann | Phillips | 477 | 2 | The areas between Hey Joe Canyon, and Bowknot Bend via Spring Canyon and Hell Roaring Canyon and Mineral Canyon in the Green River corridor, Tenmile Canyon, Hell Roaring Canyon, Horsethief Point, Deadman Point, Tenmile Point, Hatch Point, Beaver Creek area, or Goldbar Rim need to remain roadless until detailed | See response to comment 124-48.  The BLM is not required to create roadless areas where none exist.  See also response to comment 1-3 concerning the designation of routes. |

| | | | | surveys can be done. The BLM needs to do those surveys carefully and thoroughly before designating and allowing new roads in those areas. | |
|---|---|---|---|---|---|
| Bob | Greenberg | 484 | 1 | I recently hiked the proposed motorized travel route from where Dubinky Wash crosses the county road to Spring Canyon (near Jug Rock Flat) to its confluence with Hell Roaring Canyon. There is no evidence of human activity in Dubinky Wash except for a couple of claim markers that appeared to have been dropped from aircraft as they displayed no evidence of having been hammered or otherwise anchored into the ground. The wash bottom is pristine and allowing travel up it does not appear to serve any actual purpose while destroying a significant opportunity for back-country hiking/non-motorized recreation and solitude. This route and all travel up Hell Roaring above the school section should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Bob | Greenberg | 484 | 2 | In addition, the map for Alternatives C & D show a short route immediately to the south of the confluence of Hell Roaring and Dubinky Wash and going about .5 miles above Hell Roaring onto the sand dune before it turns north and dead ends. This appears to be a relict uranium-prospecting tract that has not been used in decades. It appears to have no purpose and should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Bob | Greenberg | 484 | 3 | I recently explored Ten Mile Wash are by four-wheeled drive vehicle and on foot. Ten mile Wash below the midway cut off should be closed to motorized travel. This out-and-back section of the proposed route serves no apparent purpose and compromises an area with outstand opportunities | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

BLM_0011358

| | | | | | |
|---|---|---|---|---|---|
| | | | | for hiking and solitude. Limiting the motorized access in Ten Mile to the area above (and including) the fun midway cut off route would preserve a trail that is great for motorized recreation and the wonderful area below midway for hiking and non-motorized recreation. As the only purpose for keeping Tem Mile below the midway cut off open to motorized recreation is for the purpose of motorized recreation itself, this would be an appropriate comparison between motorized recreation and non-motorized uses. There does not appear to be any other purpose or need for motorized access into lower Ten Mile. | and site specific NEPA analysis. |
| Bob | Greenberg | 484 | 4 | This past winter I had the occasion to hike from the northwest end of Castle Valley via the "Golden Stairs" route to the Big Bend area on the river by several different routes. In doing so I noticed several discontinuous "road" segments on top of Mat Martin point north of the Porcupine Rim Bike Trail. Alternatives C & D propose to allow motorized recreation in this area, presumably via these remaining pieces of road. This use should be eliminated as the entire Mat Martin Point area has outstanding value for non-motorized recreation. The quiet, solitude and amazing views and hiking routes down to the river make this area ideal for non-motorized use. The use of the Porcupine Rim bike trail does not disrupt this. Given the great difficulty of following the old roads, let along driving them and the lack of any real purpose for keeping them open, non-motorized use for this area should be preserved no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Jaclyn | West | 490 | 1 | BLM's analysis does not adequately account for its treatment of non-WSA lands with "wilderness characteristics" (Sections 3.9, 3.11, 3.15, 4.3.84.3.10, and 4.3.14). BLM's preferred | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | | |
|---|---|---|---|---|---|
| | | | Alternative C, thus, does not comply with FLPMA's multiple use principle. As explained in further detail below, protection of ACECs and non-WSA lands with "wilderness characteristics" for alleged wilderness properties violates "multiple use." BLM should select portions of alternatives that protect the environment, yet fully comply with the development of resources under multiple use principles. | |
| Jaclyn | West | 490 | 2 | Wilderness Inventories Under FLPMA – The Moab RMP contains analysis of non-WSA lands with "wilderness characteristics: although the lands are neither defined in FLPMA nor given any definition in any federal statute or regulation. BLM has no formal guidance of these areas. BLM is under no duty to protect these lands or provide them with special protections beyond any other public lands. The RMP/EIS should explain under what specific authority BLM is using to provide specific protection for non-WSA lands with "wilderness characteristics," because I am unaware of any. BLM's statements regarding SUWA v. Norton decision are of no support because that was purely NEPA supplementation issue.<br><br>From the EIS, it appears that BLM accepted submissions from the Southern Utah Wilderness Alliance and accepted their assertions regarding whether lands contained wilderness characteristics. If BLM intends to protect these areas as if they were WSAs, those decisions should be done through the public process as was the WSA process completed in the 1980s and 1990s. BLM did not take into account existing oil and gas leases, grazing allotments, and other factors that would impact so called "wilderness characteristics." If BLM plans to restrict multiple | See response to comments 120-8, 121-10, 121-58, and 121-61. |

use of these non-WSA lands with "wilderness characteristics," it must make the decisions of which areas are so designated available to public scrutiny and comment.

FLPMA directed the Secretary of the Interior to inventory roadless lands of 5,000 acres or more for their wilderness characteristics within 15 years from October 21, 1976. 43 USC § 1782. The Secretary was to recommend to the President which areas should be studied for protection as wilderness by July 1, 1980. These "wilderness study areas" ("WSA") would be managed so as not to impair their suitability as wilderness pending further action by Congress. Following his study, the Secretary was to submit his recommendations to the President, who in turn would submit recommendations to Congress. Id.

The process of designating WSAs in Utah had three parts. First, BLM conducted an initial inventory to decide which areas would be fully reviewed for their wilderness values. BLM published its findings in the BLM Utah Initial Wilderness Inventory. Utah; Initial Wilderness Inventory, Final Decisions and Official Start of Intensive Inventory, 44 Fed. Reg. 4651 (Aug. 8, 1979). Second, BLM conducted a more intensive review of the lands that it included in the initial inventory to "determine whether they are in fact of wilderness character." Id. at i. This intensive inventory resulted in the determination of what land should be studied as WSAs. Utah Final Wilderness Inventory Decision, 45 Fed. Reg. 75602 (Nov. 14, 1980). Third, in 1991, Secretary Lujan recommended that approximately 1.9 million acres in Utah should be included as part of the

National Wilderness Preservation System. Utah Statewide Wilderness Study Report at 3. On June 29, 1992, President Bush presented this recommendation to Congress. See Letter to Congressional Leaders Transmitting Proposed Legislation on Utah Public Lands Wilderness Designation.

In the late 1970s, as part of the first step, BLM initially inventoried the areas in the Moab Resource Area that now include the WIAs and citizen wilderness proposals. BLM determined that several of these areas would not be inventoried any further. Utah Final Wilderness Inventory Decision at 35-41. 1 Second, after a further inventory, BLM decided not to include 24 areas in the Moab resources area as WSAs. BLM Intensive Wilderness Inventory, Final Decision on Wilderness Study Areas at 223-349 (Utah 1980). 2 The IBLA affirmed BLM's decisions and consistently held that these decisions are administratively final and that BLM's authority to establish new WSAs has expired. SUWA, 151 IBLA 338, 342 (2000); SUWA, 128 IBLA 52, 65-66 (1992) ("final administrative decisions relating to the designation of lands as WSAs in Utah were completed in the 1980s…the lands in question were not included in a WSA. Therefore, BLM may administer them for other purposes, including the approval of drilling for oil and gas.") (internal citations omitted).

Furthermore, the Board has also held that BLM need not protect these areas as if they are WSAs of give them any added protections. See SUWA, 163 IBLA 142 (2004) (BLM approval of EA/FONSI for ROW and approximately 60 acres of surface

BLM_0011362

| | | | | disturbance in Desolation Canyon WIA affirmed). Any protections of these areas under the non-impairment standard violates BLM's multiple use mandate. See 43 USC § 1701 (a)(7), (8) & (12); 43 USC § 1732 (a) & (b); 43 CFR § 1610.5-3. | |
|---|---|---|---|---|---|
| Jaclyn | West | 490 | 3 | Continuing Inventory Requirement for Land Use Planning – I am very concerned about the proposal to manage so-called "non-Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain those "wilderness" values. There is no justification and no mandate in the FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness review. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so would obviate the FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of energy resources for the state and nation.<br><br>Section 201(a) of FLPMA provides that "the Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values…" 43 USC § 1711 (a). The purpose of keeping this inventory current is "to reflect changes in conditions and to identify new and emerging resources and other values." Id.<br><br>While BLM has a duty under section 201 to inventory lands, including those that may contain | See response to comments 120-8, 121-10, 121-58, and 121-61. |

"wilderness characteristics," BLM may not unlawfully apply the WSA non-impairment standard to any of those lands found to contain wilderness characteristics. State of Utah v. Norton, 96-cv-870, (D. Utah), Stipulated Settlement at ¶¶13, 17. The requirements to inventory and protect are distinct. BLM must still provide for multiple use even if certain lands contain what BLM considers to be the elements of "wilderness." Furthermore, containing elements and properties of "wilderness" is entirely distinct from meeting the statutory definition of wilderness under the Wilderness Act. The decision to designate WSAs, the treatment of land s under the non-impairment standard, and designation of lands to include in the National Wilderness Preservations System are not proper decisions that BLM can make during the land use process. BLM must continue to provide for multiple use for lands outside WSAs.

BLM should strike the wilderness characteristics areas as unlawful and abide by the final agency decisions made during the FLPMA wilderness inventory process, explained above, and completed in the 1990s. These 1996-1999 Re-inventories were not made as part of section 201 of FLPMA and were designed to create new WSAs. Any creation of new WSAs, the treatment of lands under the non-impairment standard, or creation of de facto wilderness areas through the RMP process is unlawful.

BLM has failed to provide any data or information on the "wilderness characteristics" areas and how many people actually use these areas for these purposes. It is one thing to claim that an area has "outstanding opportunities for primitive and

| | | | | | |
|---|---|---|---|---|---|
| | | | | unconfined recreation," but it these places are not actually seeing recreation, why designate them as such. If BLM is going to protect non-WSA areas for their alleged wilderness characteristics—which as explained above is unlawful and in violation of multiple use—it must provide specific information on why these lands are of "wilderness character." BLM originally determined that they were not eligible for consideration to be included in the National Wilderness Preservation System, so any further management of these areas for the sole protection of "wilderness characteristics," must provide specific reasons for such. | |
| Jaclyn | West | 490 | 4 | BLM has already agreed through the settlement of the lawsuit brought by the State of Utah over the 1999 Unlawful Re-inventory that it will not create any new WSAs or protect any areas under the non-impairment standard. By closing all or part of Mary Jane Canyon, Fisher Towers, and Beaver Creek areas to oil and gas, grazing and other types of development, BLM is violating its FLPMA obligation of multiple use. BLM proposes to create three wilderness characteristics areas (Mary Jane Canyon, Fisher Towers, and Beaver Creek) that would be almost entirely closed to oil and gas leasing. These three "wilderness characteristic" areas were originally citizen wilderness proposals and were part of BLM's 1996-1999 reinventory.

Additionally, BLM's use of cherry-stems to exclude man-made imprints to establish "wilderness characteristics" areas violates the purpose of The Wilderness Act and restrictions of access and multiple use of these areas violates FLPMA's principles. While cherry-stemming is a practice long recognized by the BLM, it truly contradicts the spirit of the Wilderness Act. BLM's use of cherry- | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0011365

| | | | | | |
|---|---|---|---|---|---|
| | | | | stems to gerrymander the boundaries of wilderness areas-exclusion of roads, fences, well-pads and other human imprints—in establishing non-WSA areas that do or may contain wilderness characteristics undermines the purpose of the Wilderness Act and the National Preservation Wilderness System. It is hard t imagine how one could truly feel alone and in an area "untrampled by man," when you have your back to a road, well-pad or other intrusion that has been "cherry-stemmed" from a "wilderness area." Wilderness areas and any other area that BLM considers that possess "wilderness characteristics" should truly be 5000 acres of continuous lands and not areas that are cherry-stemmed on all sides. | |
| Jaclyn | West | 490 | 5 | The Reasonable Foreseeable Development (RFD) scenario for oil and natural gas development within the planning area is inadequate. The Preferred Alternative projects 435 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. APD activity alone suggests the fifteen-year RFD should be 975, based on 2006 data of 65 APDs.

With respect to oil and gas resources, BLM Manual 1624, Planning for Fluid Minerals, specifically directs BLM not only to identify which areas would be subject to different categories of restrictions as included in the DRMP/EIS, but also to show that the least restrictive lease stipulation that would offer adequate protection of a resources has been selected. BLM failed to provide this critically important analysis in the planning document. This omission is of critical concern because it demonstrates that BLM has not carefully considered the effect of restrictive | See response to comments 214-1 and 124-95 regarding the RFD and MPR.

The RFD scenario is an analytical model, which estimates oil and gas activity that could potentially occur. The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.

The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities. Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis |

| | | | | | |
|---|---|---|---|---|---|
| | | | | lease stipulations or permit conditions of approval (COA) on current and projected future oil and gas activities in the area. Given the fact that the plan will be used to make future decisions on activities, this lack of analysis is a fatal flaw. | associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement |
| Diane | Orr | 492 | 1 | The law encourages the BLM to be proactive in the protection of cultural resources. The National Historic Preservation Act directs the BLM to do inventories, actively manage and nominate sites for historic registration. Overall, this Management Plan is not proactive. It does not carry out the spirit of Preservation Act, Section 110. Instead of using field inventories, you are basing decisions on archeological density averages. You are relying on Section 106 of the Preservation Act almost entirely.<br><br>Even Alternative B fails to offer cultural resource protection, but it is the best in the plan. I urge you to select B and do the intensive field inventory work necessary to make the decisions you have prematurely made in other alternatives. | National Register nomination is done on a site-specific basis and does not require a land use plan decision. The prioritization of National Register nominations has been removed from the PRMP/DEIS.  A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available.  All cultural resources are protected by law, regulation and policy.  The commentor's preference for Alt. B is noted. |
| Diane | Orr | 492 | 2 | We believe that the BLM has done a poor job of cultural resource management associated with this RMP. We are especially concerned with the use of computer modeling to determine cultural resource | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted.  the cultural model was developed by a BLM professional archeologist. The model identified high, |

locations.

"A limited percentage of lands within the MPA have been physically inspected for the presence of cultural resources, and such an effort is cost-prohibitive as part of preparing the RMP. Therefore, the relative site density potential for areas within the MFO was estimated using environmental factors known to influence site location and type. All areas of the MFO were then ranked as having high, medium, or low potential for containing cultural sites." (Page 3-19)

This problematic approach does not acknowledge that people and their archaeological footprint are not entirely predictable. We recognize that complete surveys have not been done. However, there has been extensive documentation of cultural resources. "The MPA has approximately 5,200 inventoried cultural sites." (Page 4-253) It is not clear to us that these actual site locations have been given consideration in the RMP.

The RMP is bereft of information regarding the amount of protection that will be provided to cultural resources. Pages 2-2 through 2-6 provide helpful information regarding the coverage of Off-Highway Vehicle designations, Special Recreation Management Areas, Oil and Gas Leasing and Development, River Classifications, Wildlife, and Wilderness under the various proposed alternatives. No information is provided for cultural resources. There is no way to determine what percentage of the modeled high, medium, or low site probability acreage (Table 3-7, Page 3-19) is covered by an ACEC or special management consideration. Nor is there any way to determine

medium, and low site densities and this information was used to quantify the impacts. The model was tested by intersecting 4,259 known cultural sites with the probability coverage in GIS. The DRMP/EIS states on pg. 4-30 "while the site density prediction model used in this analysis is by no means a perfect predictor of site density it is sufficiently accurate (73% success rate) to be utilized as a tool for analyzing potential relative involvement of cultural resource sites in management decisions.  A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. The BLM will continue to enhance the inventory and density techniques for high cultural value areas identified in the final plan.

The number of identified cultural sites has been corrected on p. 4-253.  There are approximately 4,200 cultural sites in the Moab planning area.  All cultural sites are protected by law.  An ACEC designation is not required to protect cultural sites.  Three areas are proposed for ACEC designation in the preferred alternative for the relevant and important value of cultural resources:  Behind the Rocks (5,201 acres), Mill Creek Canyon (3,721 acres) and Ten Mile Wash (4,980 acres). All three of these proposed ACECs have a concentration of cultural resources.

| | | | | how many of the 5,200 inventoried cultural sites are protected.<br><br>We strongly encourage the BLM to do a better job of managing and protecting cultural resources in the development of future regional management plans. | |
|---|---|---|---|---|---|
| Diane | Orr | 492 | 3 | Development – We are concerned with development near rock art sites. Allowing camping, roads, oil and gas, and mining near rock art sites is a concern to us. It is clear to us that the greater the number of people that have access to a site, the higher the probability that the site will be vandalized. Unless sites are actively managed and hardened for visitation we suggest that development be kept away from most rock art sites. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Cultural Class III inventories would be required for all new roads and trails.<br>Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. All land disturbing activities within Traditional Cultural Properties would be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the area or site, avoid time of use by native American groups, or would be eliminated altogether.   Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. |
| Diane | Orr | 492 | 4 | Behind the Rocks – We strongly advocate an ACEC oriented to archeological protection designation for the entire 17,836 acres included in this area because of the high archeological site density in the area and the potential for inclusion on the National Register of Historic Places as an Archaeological District. Rock art in this area is extensive, from multiple cultures over thousands of years, and is acknowledges as being of national significance.<br><br>We believe all roads should be closed beyond the existing spur road to "Old Folks Home." Additional | The commentor's preference for the Behind the Rocks ACEC designation as outlined in Alternative B is noted. The difference between the area of the ACEC in Alt B and Alt C is that Alt C removes the acreage within the WSA.  The Behind the Rocks WSA is managed according to the Interim Management Policy for Lands Under Wilderness Review.<br><br>The road beyond the "Old Folks Home" is closed to motorized vehicles in Alt C of the DRMP/EIS.<br><br>Refer to response to comment 124-69. |

| | | | | protection as described in alternative B (page 2-33) is appropriate. | |
|---|---|---|---|---|---|
| Diane | Orr | 492 | 5 | Bookcliffs – From a cultural resource point of view, we believe that there is a middle ground between alternatives B and C that is appropriate. Alternative C does not establish an ACEC in the Bookcliffs. Alternative B would manage 304,252 acres. Cultural resources are primarily located along the Green River, the base of the Book Cliffs, and in major drainages from the highlands of the Bookcliffs. We advocate the establishment of an ACEC oriented to archeological protection in these more restricted areas of Alternative B. Specifically, the entire Green River corridor, East Canyon, Middle Canyon, Hay Canyon, Spring Canyon, Crescent Junction, Sego Canyon, Thompson Canyon, Coal Canyon, and Tusher Canyon. The current maps appear not to include the rock art at Crescent Junction. These are significant sites and should be included. | The commentor's preference that an ACEC be established to  protect archeological resources for the Green River corridor, East Canyon, Middle Canyon, Hay Canyon, Spring Canyon, Crescent Junction, Sego Canyon, Thompson Canyon, Coal Canyon, and Tusher Canyon is noted.  All archeological sites are protected by law whether or not they are included in an ACEC.

See response to comment 124-68 and 124-69. |
| Diane | Orr | 492 | 6 | Highway 279 / Shafer Basin / Long Canyon – We find Alternative C to be an acceptable alternative from a cultural resource viewpoint except that the map appears to exclude "Wall Street" rock art district from the ACEC. We believe that it is important for the entire river corridor including "Wall Street" to be protected in an archeologically focused ACEC. For the past two years URARA (Utah Rock Art Research Association) has been working in cooperation with the MFO archaeologist for the BLM to document the sites along "Wall Street" with the objective of nominating it to the National Register. We would like to see this project continue when a new archeologist is named for the district. The "Wall Street" area receives high visitation and should be managed to minimize visitor impact and to provide interpretation and | The Wall Street rock art district is contained within the ACEC boundary in Alt C (the boundary does not differ between Alts B and C for the Highway 279/Shafer Basin/Long Canyon ACEC.

National Register nominations can be done at any time; they are not a land use planning issue. |

BLM_0011370

| | | | | education. | |
|---|---|---|---|---|---|
| Diane | Orr | 492 | 7 | Canyon Rims – The BLM recommendations for the Canyon Rims potential ACEC says that the area qualifies for an ACEC but Alternative C does not include this area as an ACEC. Which is a bit confusing. It is difficult to determine the boundaries of this district from the maps provided. However, we are concerned that it includes Lockhart Basin which has documented archaic archeological sites. Alternative B provides no cultural resources protection. We would like to see cultural protection in the Lockhart Basin portion of this district. | The commentor's preference that the Canyon Rims potential ACEC be included in Alternative C is noted. In the preferred alternative (Alt C), this portion of the Canyon Rims is managed as controlled surface use for oil and gas leasing, as it is designated as VRM II. Surface disturbing activities must meet the constraints of VRM II management (see Appendix C of the DRMP/EIS). The BLM contends that the prescriptions provided in Alt C are sufficient to protect visual resources along the rims of the Canyon Rims area.<br><br>Refer to response to comment 124-69.<br><br>Lockhart Basin is entirely within the Monticello BLM planning area. |
| Diane | Orr | 492 | 8 | Mill Creek may be the richest source of archeological information within the Moab district. To quote the proposed management plan document "Cultural resources are extensive and span the entire prehistoric context" (page 3-130) and "Mill Creek Canyon's cultural resources have also been identified as being of exceptional importance to Native Americans" (page 3-131). Rock art panels are extensive and meet National Register qualifications. Potential for research questions may be addressed in Mill Creek Canyon because many of the sites have greater depth and integrity than those in other areas.<br><br>The supplied maps are insufficient to indicate whether the culturally rich uplands are included. It is imperative that these lands be protected within an archaeologically focused ACEC.<br><br>We are concerned about a proposed residential development on SITLA land immediately adjacent | Mill Creek Canyon Potential ACEC is designated as an ACEC in Alternative B and C.<br>Under both alternatives, the area would be prioritized for Class II inventory and would protect native American traditional cultural places.  Alt C does manage the Mill Creek uplands as part of the Mill Creek Canyon ACEC. The Mill Creek Canyon ACEC in Alt C differs from  Alt B only in that the WSA acreage is removed from the ACEC in Alt. B.<br><br>Under All Action alternatives, Mill Creek Canyon would have a cultural resource priority of scientific reach of prehistoric sites and cultural landscapes and would be managed in accordance with the Mill Creek Management Plan (2001).<br><br>Refer to response to comment 124-69.<br><br>Actions on SITLA lands are not within the authority of the BLM. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | to this area. We believe that strong cultural resource protection needs to be in place prior to the completion of this development. | |
| Diane | Orr | 492 | 9 | Upper Courthouse – We recommend Alternative B for this proposed ACEC. Upper Courthouse with its riparian areas has a high density of archaeological sites. Known sites exist near Hidden Valley, Brink Spring, Bartlett Wash, and unnamed drainages to the north. The Courthouse Rock area has already experienced vandalism to rock art panels (The Buffalo Blue was rubbed out several years ago) and recreational use in this area continues to be high and is increasing in intensity each year. We believe active protection of archeological sites needs to extend beyond grazing to also include visitation. | The commentor's preference that the Upper Courthouse potential ACEC be designated as proposed in Alt B is noted.<br><br>Refer to response to comment 124-69.<br><br>The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria. The BLM can choose management actions from within the range of alternatives.<br><br>All cultural sites, including those in the Upper Courthouse area, are fully protected by the law.  The Upper Courthouse area is part of the Labyrinth Rims/Gemini Bridges SRMA.  This enables the BLM to manage recreationists in a more intense manner.  This area is one in which camping must occur at designated sites. |
| Diane | Orr | 492 | 10 | Kane Creek Canyon – We do not see any proposed protection under ACEC for the BLM land along the south side of the Colorado River downstream from Moab and up Kane Creek. This area is dense with rock art and other archeological sites of national register quality. It is being documented as part of the proposed Wall Street rock art district. This area receives high visitation, is experiencing non-approved off-road vehicle use, and need appropriate protection and interpretation at highly visible rock art sites. We believe this area from the Moonflower Site up canyon for approximately 6.5 miles needs to be protected under an archeologically focused ACEC. | Kane Creek Canyon is included in the Behind the Rocks ACEC, which is included in the preferred alternative. Archeology is a relevant and important value of the Behind the Rocks ACEC.   In addition, the area referred to by the commentor is managed as part of the Colorado Riverway SRMA.  This designation gives the BLM the ability to manage recreationists.  In addition, all cultural sites, including rock art, are fully protected by law. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Page 2-8 proposes scientific restoration of archeological sites from Highway 191 to Kane Creek Canyon. We see no reason to stop at Kane Creek Canyon and suggest that this restoration continue within our proposed area. | |
| Diane | Orr | 492 | 11 | Seven Mile Canyon – Seven Mile Canyon is an area with many national register quality rock art sites. The campground is located at the mouth of the canyon and the road through the canyon recently washed out. We recommend that this road and campground should not be re-established. We also recommend that this area be included in an archeologically focused ACEC. | The commentor's preference that Seven Mile Canyon be established in an archeologically focused ACEC is noted.

The camping area at the mouth of Seven Mile Canyon has been closed since 2006.  As part of an SRMA, this area can be managed for camping management.  The BLM intends to keep the Seven Mile Canyon area closed to camping.

The road in Seven Mile Canyon is designated in Alt. C; however, it has been truncated closer to Highway 313.

Refer to response to comment 124-69. |
| Diane | Orr | 492 | 12 | Hellroaring Canyon – An unauthorized off-road vehicle road has been created to the Barrier Canyon Style pictograph site in this canyon. We recommend that this road be closed to protect the rock art site. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. The vehicle route in the main part of Hell Roaring Canyon was bladed during the uranium mining era of the 1950's.  This constructed route has been designated in the preferred alternative.  The user-made spur route from that route to the actual rock art site is not designated. |
| Diane | Orr | 492 | 13 | Klondike Bluffs – It is not clear from the maps if there is any special protection for the rock art sites located at Klondike Bluffs outside of Arches National Park. We recommend an archeologically focused ACEC for this region if it is not protected. | The commentor's preference that the Klondike Bluffs be designated as an ACEC is noted.  This area was not proposed during scoping to be considered as an ACEC by either the public nor by BLM staff. |

| | | | | | All archaeological sites are protected by law, including all rock art sites.<br><br>Refer to response to comment 124-69 regarding ACEC designation. |
|---|---|---|---|---|---|
| Diane | Orr | 492 | 14 | Levi Well – We are concerned about a road segment which bisects an area with a high archeological site density. It is south of Levi Well located in the south half of section 25 Township 23S, Range 18E. In addition to a very extensive lithic scatter, there are rock art panels and dinosaur bone area. Recently a Site Steward encountered remains of a new campfire and camping activity on the site. The area needs to be managed to protect site integrity. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See also response to comment 415-13. |
| Diane | Orr | 492 | 15 | Rock Art Nomination Districts – URARA is committed to the documentation and preservation of Utah rock art sites. The Moab district contains one of the highest densities of rock art in the state. We are willing to donate our time and resources to assisting the BLM in creating the Rock Art Districts described on Page 2-8 under Alternative B. Mill Creek Canyon needs to be added to this list. | Under all Action Alternatives, the cultural resource management priority for Mill Creek Canyon would be scientific research. Both the north and south forks of Mill Creek would be prioritized for Class II and II surveys and would be targeted for scientific restoration of damaged cultural resources. BLM believes that these measures are more appropriate to document and preserve this site than development of the site for public visitation and interpretation. On pg. 1-11 of the DRMP/EIS, volunteer coordination is identified as an issue addressed through policy or administrative action and does not require a land use planning decision.<br>The decision to prioritize sites for National Register Nomination has been removed.  National Register nomination is not a planning decision.  See response to comment 1-26. |
| Bryan | Bailey | 620 | 1 | All trails in the Moab area should be left open. It is not right that while you do these reports you only show the bad. You purposely leave out all the beauty you will be closing off to majority of people that visit this area. In the name of save it for the | Comment noted. The BLM attempts to provide recreation opportunities for many and diverse types of recreation. However, the Moab planning area has finite recreation resources and for the BLM to commit to providing alternative opportunities for all types of potential |

| | | | | next generation? | recreation uses is not realistic.  Therefore a balanced multiple use approach, as required by FLMPA, is used to provide recreation opportunities. |
|---|---|---|---|---|---|
| David Paul Xavier | Burch | 622 | 1 | BLM's proposal will result in 84 percent of public lands near Moab (those south of I-70 which attract most of the area's visitors) being within ½ mile of a designated ORV route (see proposed route map on our website). At the same time, BLM has done no-site specific studies to determine the impact of these routes on Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist in this document. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Keith | Davis | 628 | 1 | Keep the following routes open to motorized and non-motorized recreation: <br>-White Wash Sand Dunes <br>-Goblin Valley <br>-The last bit of Gemini Bridges <br>-Thompson Trail and Copper Ridge Loop (as proposed by Ride with Respect) <br>-Ten Mile Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| John | Rzeczycki | 629 | 1 | I was glad to see that Coyote Ugly Trail in the Black Ridge area was not included in any of the options. I strongly agree with the BLM decision not to include this trail, but I am also concerned that the BLM may change their decision due to pressure from the OHV groups. The reasons why this trail should not be designated: <br><br>1-The trail was established just over 2 years ago under questionable conditions. Even though this area is designated open to cross country travel, it seems that some laws were broken in its establishment. The creation of the trail has created "unique and unnecessary degradation" to the land, i.e. killing of trees and plants, scaring of rock and large quantities of spilled oil and gas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | 2-      The Trail is not a thoroughfare, it is a simple horseshoe that exits close to its entry.<br>3-      San Juan County has made no claims on this trail as a road or right of way.<br>4-      The Coyote Ugly is in very close proximity to 4 large parcels of private property. One of which has been sub-divided for development.<br>5-      My property is located between the Coyote Ugly and Area BFE, this creates a trespassing problem, i.e. cutting of fences and creating spur trails, along a wash on our property, this was has not been claimed as a road or right of way by San Juan County or State of Utah.<br>6-      The BLM has done extensive research on its draft and chose not to include it.<br>7-      No person or government office made any claim to this trail. | |
| Katie | Creighton | 631 | 1 | While not all of the listed WSA lands may become designated wilderness in the future, managing as many as feasible now will leave more options for future land managers and public users. While I commend the BLM for picking a Preferred Alternative that protects Beaver Creek, Fischer Towers, and Mary Jane Canyon, I implore you to take a further look at protecting Desolation Canyon, Goldbar, Granite Creek, Hatch Wash, Hunter Canyon, Shafer Canyon, Westwater Canyon, and Coyote Wash as WSAs. The Preferred Alternative C protects three (3) of these areas compared with Alternative B's thirty-three (33). For trying to be a "balanced approach of protection/preservation" and "commodity production and extraction" this does not seem like a fair compromise. | The commenter is confusing Wilderness Study Areas (WSAs) with non-WSA lands with Wilderness Characteristics.  All WSAs are managed to preserve their suitability for wilderness designation.<br>The management and level of protection of the wilderness characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. See response to comment 124-53. |
| Monica | Israels | 632 | 1 | We've noticed some fantastic kiosks and information areas in many places in the Moab | See response to 413-9 regarding focus areas. Education and signage are all administrative actions and do not |

| | | | | | |
|---|---|---|---|---|---|
| | | | | area. It would be fantastic if more of these could be created and maintained. I think that education is the solution to our "user conflict" in the area, rather than segregating the different types of users. Through I have not experienced much difficulty with user conflicts, I can see how it would happen if people were caught by surprise. If everyone knew what to expect and how to behave on each individual trail, there would be no surprises or conflicts. The continued and increased use of informational kiosks at trailheads would be very welcome and useful. | require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
| Lee | Sheets | 633 | 1 | Please consider both hands of Millcreek to be designated as Wild and Scenic River sections. They both contain historical and cultural artifacts. They both have fish and wildlife. They both offer recreation to many people, especially the tourists who keep this local economy alive. And not to mention the biological, botanical and ecological systems are extremely diverse and thriving. I hope that this area continues to thrive and I feel this would be achievable if these special river systems were protected by the Wild and Scenic River policy. | See response to comment 124-88. |
| Naill | Gartlan | 634 | 1 | Federal law requires the BLM to give priority to the protection of lands which qualify as Areas of Critical Environmental Concern because of scenic, cultural, or ecological importance. However, the Moab BLM plan would fail to protect 90 percent of the 613,077 acres which qualify for ACEC designation. Please revise the RMP to reduce the destructive and redundant web of ORV routes. The Moab area, as with the rest of the state, should provide opportunities for traditional non-motorized use and provide ecological havens for the long-term health of the land, the wildlife, the water, and other natural and cultural resources. | See response to comment 124-68 regarding ACEC designations. |

| Eric S. | Elson | 635 | 1 | In Chapter 2, Table 2.1 page 2-25 – I disagree with Alt C statement: "close the spur route to Gemini. Bridges to facilitate public use and help restore damaged lands along the spur route. Construct a parking area near the bridges."<br><br>Closing route to access areas doesn't facilitate "public use." Area should be open and read "Spur to Gemini Bridges will remain open. If unacceptable damage to natural or cultural resources be recreational use is anticipated or observed, BLM would seek to limit or control activities by managing the nature and extent of the activity or providing site improvements." | Comment noted. |
|---|---|---|---|---|---|
| John M. | Veranth | 636 | 1 | Both alternative B and C are major improvements over the current situation, Alternative A. As a general comment, I consider Alternative B to be the most appropriate of the listed alternatives and am disappointed that the BLM did not consider a true "maximum resource protection alternative" that would have been more restrictive than B. NEPA requires consideration of a full spectrum of alternatives. | See response to comment 124-9 |
| John M. | Veranth | 636 | 2 | Regarding ORV travel, I strongly support the closing of areas to unlimited cross country travel and the designation of routes. ORV trespass has been an ongoing problem on my property and on that of adjacent landowners since the BLM-private boundary is not completely fenced. On the adjacent BLM land I have noted extensive ORV tracks cut into hillsides that disturb the limited vegetation and will lead to future erosion and other resource loss. This area is also rich in archeological resources and I have hiked along ORV tracks that pass directly through significant chipping sites on BLM land. Closure of unlimited cross-country travel will improve the situation. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |

BLM_0011378

| John M. | Veranth | 636 | 3 | Regarding specific routes in the Westwater area, I am especially concerned about the two southward spur extensions in the Little Hole area which are shown as ORV routes by BLM but which are not proposed as vehicle routes by Grand County nor are in Alternative B. I frequently hike the Little Hole area and every year I see more extensive tracks pushed through previously undisturbed vegetation that is within the WSA boundary. It appears that these spurs attract vehicle trespass further into the designated WSA. These spurs should be closed as proposed in Alternative B. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---------|---------|-----|---|---|---|
| John M. | Veranth | 636 | 4 | I have a BLM R/W lease for access from the existing County D road, mapped as an ORV route to the boundary of my property. My existing vehicle track was correctly not designated as an open ORV route, but I presume the current R/W lease will continue and be able to be renewed under all alternatives. | See response to comment 120-16 |
| John M. | Veranth | 636 | 5 | Having addressed specific road issues near Westwater, I will comment that in general, the proliferation of ORV routes shown in BLM Alt C is far in excess of any reasonable accommodation of recreational vehicle use and will lead to future resource management problems. A well defined network of main routes, scenic loops, and spurs to overlooks is manageable and enforceable. The haphazard jumble of proposed routes in areas such as Mineral Point and Tenmile Point is not. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| John M. | Veranth | 636 | 6 | Reviewing the BLM public information pages versus the draft EIS, I notice a serious conflict in relative priorities of recreation versus Oil and Gas in Alternative C. The BLM webpage reports "over two million visitors per year" and recreation being "62% of the Grand County economy." On the other hand, existing oil and gas is 43 and 270 wells, and since many of these are small producers the | In Chapter 4 of the DRMP/EIS, the BLM acknowledges the economic values of recreation in the Moab planning area.<br><br>In Alt C of the DRMP/EIS, the highest value recreation areas within Labyrinth Canyon, such as the Green River and its major tributaries, are protected from oil and gas disturbance by the application of a no surface occupancy |

| | | | | | |
|---|---|---|---|---|---|
| | | | | economic contribution is small. Yet many of the areas prized for their recreation values such as Labyrinth Canyon, Fisher Towers, and Match Point are proposed for energy leasing. I urge the BLM to amend the DEIS to 1) Close to leasing areas with high recreational use or high wildlife value, 2) Require more restrictive stipulations on adjacent areas where development will impact the high recreational use areas.

Important and necessary restrictions include "no surface occupancy," seasonal restrictions to protect wildlife (an especially important issue in the Book Cliffs), and ripping and restoring roads after exploratory drilling and seismic surveys. The restrictions mapped in Alternative B are a much better reflection of recreational values. | stipulation.  Fisher Towers is proposed to be managed as either closed to oil and gas leasing, or with a no surface occupancy stipulation.  Hatch Point is proposed to be managed with a controlled surface use stipulation for oil and gas leasing to protect its important visual resources.  Other high value recreation areas are similarly restricted from oil and gas leasing and all other surface disturbing activities.  These areas include , but are not limited to,,the entire Green, Colorado and Dolores River corridors, Sand Flats SRMA, Goldbar Hiking Focus Area,  and Beaver Creek.  A no surface occupancy stipulation is sufficient to protect the recreation values in these and other areas, since surface occupancy is precluded.
Important wildlife values are protected in Alt C. by timing limitation stipulations and controlled surface use stipulations.  Desert bighorn sheep habitat is protected with a no surface occupancy stipulation. |
| John M. | Veranth | 636 | 7 | I support the NSO and Special Stipulations designations shown in Alternative B for the Westwater area and would urge that these restrictions be expanded. An energy development corridor following the railroad tracks and existing D roads south of I-70 would suffice for reasonable exploration access and would protect the dark skies, solitude and viewsheds in this remote area. | Westwater WSA is closed to oil and gas leasing under all alternatives.  Alt C of the DRMP/EIS, manages the rest of the Westwater area much the same as Alt. B. |
| Laura | Lindley | 639 | 1 | I strongly object to management of so called "wilderness areas" as de facto wilderness study areas. The Federal Land Policy and Management Act provided a mechanism for the designation of wilderness study areas and that congressionally designated process should not be evaded through the land management process. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Randy | Riches | 640 | 1 | There are a couple sections of this trail [Flat Iron Mesa] that are not clearly documented in your plan. Based on what we've seen in the past, if it isn't clearly documented as a road, it will be | See response to comment 206-11 |

| | | | | closed. I was also looking forward to trying Strike Ravine, but it also has missing sections in our documentation. | |
|---|---|---|---|---|---|
| Chad | Moore | 642 | 1 | I believe your office underestimated the value and suitability of some of these rivers, only preferring three of the studied rivers to be suitable for this [WSR] designation. I encourage you to take a second look at the rivers not found suitable. I'm particularly bothered by the segmenting of the Green River into suitable and non-suitable areas. This goes against the basic theme of watershed management- dividing up the river into discrete unrelated sections. Protection will clearly be strengthened by including the segment around the town of Green River and management will be easier. I can just imagine future land managers rolling their eyes at the difficult situation you are about to deed them. Please if you err, err on the side of conservation and long-term sustainability. | See response to comment 124-88. |
| Gabriel | Williams | 643 | 1 | While this comment period allows us to voice our concerns for the land use, remember these decisions affect not just the dirt, but the surrounding communities. Green River, Fruita/Mack and Moab all reap a large portion of their economy from the OHV community. Attractions such as Arches NP, Dead Horse, Canyonlands, etc., while a large "tourist draw" will not sustain these communities should OHV be greatly limited, especially areas like Green River which are not close to the "parks." These communities will suffer deep economic impacts. | Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. |
| Gabriel | Williams | 643 | 2 | There must be opportunities for "open" riding. The White Wash Dunes have supported OHV use for decades and should be kept open at all costs. Making this area "foot traffic only" is utterly ridiculous. The distances and sand dune character make the idea of this being a "hiking" area pretty | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | |
|---|---|---|---|---|---|
| | | | | remote. | and site specific NEPA analysis. |
| Gabriel | Williams | 643 | 3 | Each alternative is greatly lacking in "true" trail inventory. Several long standing routes were omitted and it is my understanding that miles of single-track were not even inventoried. In an era of "closed unless open" management, how is this the right thing to do? In addition there are several areas including the Cisco Desert area where many of the washes should be listed as "open" to the Copper Ridge system should be added/included in the Thompson Trail. | See response to comment 122-29 |
| Terry J | Peavler | 644 | 1 | Dispersed camping is critical to a pleasant public lands visit. When we visit a National Park, we expect to be shoe-horned into designated, sterile campgrounds. A significant reason for visiting USFS and BLM lands is to enjoy camping experience. In my area, whenever dispersed camping has been banned the result has been illegal camping that is extremely destructive. If your wish is to protect the public lands you have to give users alternatives other than stay home, camp in the equivalent of a Walmart parking lot, or break the law. Your plan never mentions how many campsites may be available or how they will be determined. The public should have a say—aren't these supposed to be PUBLIC lands? | Public participation has been solicited throughout the land use planning process. See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding vehicular access to dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| Greg | Marshall | 645 | 1 | Please consider, if you have not already, putting this trail [Cisco Desert trail approx. 80 mile trail just outside of Thompson Springs]. This trail appears to be on the Designated Motorcycle Routes Alternatives C & D, but only as an alternative D route. Since the plan appears to be the acceptance of Alternative C I am assuming this trail will no longer be open – please reconsider if this is true. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Dick | Artley | 646 | 1 | I demand (emphasis added) that every acre of the public land that you were mistakenly given control | The BLM has no obligation to close to oil and gas to all lands that are within a bill introduced in Congress, the |

of that is part of the area covered by the America's Red Rock Wilderness Act to be put off-limits to any and all development activities in your final RMP>

This is an official public request for a new alternative to be analyzed. If you know anything about the federal rules on planning you will know what this means. I do not expect you to analyze this alternative and then illegally chuck it into an "analyzed, but not given an opportunity to be selected" bin.

Implementing a version of Alt B is as close as you can come to the most obvious alternative...which would have been the first alternative to come to mind for any thinking human that was not bought-and-paid for by corporate America. So start with B and change it!

If you will read your Purpose and Need again, you will select it!

Red Rock Wilderness Act. Should Congress direct the BLM to close all lands to oil and gas leasing, the BLM will comply with the law.

The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping.

The BLM examined about 558,956 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics. The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B. The remaining 292,322 acres of the Red Rock proposal did not have wilderness characteristics based on the inventory maintenance conducted by the BLM between 1996 and 2007.

The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.). While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. Public participation was essential in this process and full consideration was given to all potential alternatives identified.

The BLM determined that a single alternative analyzing

BLM_0011383

| | | | | | |
|---|---|---|---|---|---|
| | | | | | the protection of all Non-WSA lands with wilderness characteristics would best provide a reasoned choice among the alternatives.  Although the other alternatives do not provide specific management prescriptions to protect Non-WSA, these alternatives analyze and disclose the impacts of the proposed resource management prescriptions, uses and actions on the Non-WSA lands with wilderness characteristics.  This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands.  If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable.<br><br>The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/DEIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple-use mandate. |
| Kathy | Glatz | 647 | 1 | The current road and trail network in SE Utah is the unplanned result of historical seismic and mineral exploration. This haphazard spider web of routes makes no sense whatsoever as a reasonable recreational transportation plan. Consider the Redrock Heritage transportation plan which is based on the following principles:<br><br>-Vehicles should be restricted to designated roads and trails throughout the entire SE Utah region no "open" ORV play areas<br>-In order to facilitate enforcement, there should be a "closed unless signed open" policy<br>-All routes should serve some identifiable and | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |

| | | | | compelling purpose<br>-There needs to be adequate opportunities for both motorized and non-motorized recreation while avoiding conflicts between these two groups<br>-Ecologically damaging routes, such as route through riparian areas, should be closed.<br>-There needs to be adequate opportunities to get out of earshot of motorized trails | |
|---|---|---|---|---|---|
| Marlin | Sharp | 650 | 1 | Klondike Bluff's Area. We hope it will remain a multiple use area allowing bicyclists and motorized travel to enjoy this route. The views are spectacular into Arches National Park and it's a unique route to see ancient dinosaur tracks. I hope the route over the top into the north road above Arches National Park will remain open as it has been for years to come. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Michael | Manley | 651 | 1 | You have created new ways to close areas with litigation in the future. Areas of Critical Environmental Concern and Lands with Wilderness Character are a tactic from the "wilderness area study" playbook. The WSA's lingered for years without any action and became de facto wilderness. The more of these categories you create, the more you please the anti-access groups. You only respond to special interest group lawyers, leaving the public to fend for themselves. 'Public lands' seems to be an historical reference with no equivalent in current times. From all alternatives, please drop all references to ACECs, LWCs WSAs, and whatever special categories that you will be using to limit public access. We could appreciate your managing the lands for today's public and for multiple users' per Congressional directives to BLM. It is not obvious from this that will be happening. | See response to comment 121-58 |
| Adam | Krefting | 653 | 1 | Additional closure of the more well known and established motorized routes, such as the | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

| | | | | proposed closure of Rabbit Valley/Westwater motorcycle riding area in alternative D is, to me, a profound tragedy. I cannot understand why this area is seriously being considered for closure. I have never seen a hiker or an equestrian in this area. The trails are sustainable and generally in good condition. The area is not overused. Please do not close Rabbit Valley/Westwater to motorized use. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Tom | Johnson | 655 | 1 | I am a Moab resident and am extremely concerned about the future economic vitality of Moab in relation to the disproportionate emphasis in the Draft RMP placed on motorized recreation. According to a recent user survey, only 6% of the visitors come for motorized recreation and 94% come for non-motorized recreational opportunities. | The commentor is referring the Table 4.67 which 59 respondents (6%) indicated OHV use as their MAIN activity. The commenter has not included the 10+% that participate in scenic driving as their MAIN activity. Table 4.67 also includes percentages of those that participated in motorized recreation to some extent, regardless of main purpose of their visit. Those percentages are 11.5 and 36.3 respectively.<br><br>See also response to comments 124-134 and 124-135 The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA. The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. Morevoer, The BLM has no data to separate out motorized versus non-motorized recreation spending. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive leasing and OHV management. There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these industries. For the reasons outlined in Chapter 4, pg. |

BLM_0011386

| | | | | | 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management.<br><br>The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. Even assuming that the two groups are completely distinguishable, the BLM has no data to separate out motorized versus non-motorized recreation spending. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive leasing and OHV management. There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these industries. For the reasons outlined in Chapter 4, pg. 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management. |
| Tom | Johnson | 655 | 2 | None of the Alternatives proposed by BLM adequately address the off-road-vehicle crisis that is evolving in the Moab area. The BLM's Preferred Alternative calls for a network of unnecessary roads to nowhere that puts 96.5% of the BLM land south of I-70 less than a mile from a road. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. |

| | | | | | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| Steve | Parmelee | 656 | 1 | Please add me and my comments to the scoping process. | NRR |
| Steve | Parmelee | 656 | 2 | Please keep access open to all Americans. Some Americans are disabled, less able, or just older. Denying access is not fair and maybe in violation of Federal ADA regulations. | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA. However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| Richard | Griffin | 658 | 1 | The cumulative impact analysis for the RMP is inadequate. The analysis of cumulative impacts does not support the conclusions reached and does not provide sufficient information to evaluate the impact. For instance, the first resource category listed in section 4.3.24.1 is air quality. The analysis of cumulative impacts on air quality for all alternatives is only two paragraphs in length, containing a mere 264 words. The document states, "Long term cumulative impacts from the activities proposed for all resource decisions on air quality are projected to be minimal to negligible | See response to comment 124-7.<br><br>The BLM has added the following reasonably foreseeable non-BLM actions to the cumulative impact analysis: minerals extraction on private and SITLA lands; on going residential growth and business development throughout the planning area; and expansion of U.S. Highway 191. OK |

| | | | | | |
|---|---|---|---|---|---|
| | | | | under all alternatives," but provides very little data to support this conclusion. The only supporting statement for this conclusion is a single sentence that states, "Detrimental effects from oil and gas development are expected to be small as emissions and fugitive dust control would be a required part of the permitting process." Well, how small is small and how does this relate to other impacts from other past, present, and reasonably foreseeable future projects? Without providing more specificity on the impacts of this project and the impacts of other related projects, including those of other RMPs the BLM has under consideration, there is no way to determine the magnitude or significance of the cumulative impact or the degree to which this RMP contributes to these impacts. This comment is not limited to just air quality but to all resources addressed in the cumulative impacts section. | |
| Richard | Griffin | 658 | 2 | The RMP failed to consider any of the many connected actions they may result with implementation of the alternatives. Consider air quality again as just one example. The RMP addresses the direct and indirect impacts on air quality from different management decisions such as mineral development but didn't identify any connected actions that would not occur if it were not for these management decisions. For instance, there may be significantly regional air quality impacts resulting from coal fire power plant emissions that would not have occurred if it were not for the management decisions made in this RMP. | Cumulative impacts are addressed in Chapter 4 of the DRMP/EIS. |
| Richard | Griffin | 658 | 3 | Your website provides the following direction for submitting comments, "Comments may identify new impacts, recommend reasonable alternatives, or disagree with the determination of significance." | A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Unfortunately, the RMP completely fails to address the significance of the impacts of any of the alternatives. The RMP identifies direct and indirect impacts but not the significance of those impacts. Without knowing the significance of the impacts of their actions, how can BLM decision makers expect to make an informed decision as to which alternative to implement and how can the BLM expect the public to provide meaningful comment on the alternatives without this information. | or prescriptions under each alternative. [Note: A statement on travel planning's analysis specific to Moab is needed] The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives. |
| Stacy | Newman | 659 | 1 | Alternative C itself needs some work (i.e. the segments of Flat Iron Mesa, Strike Ravine, and 3D trails are missing, and I think Yellowcat is becoming popular for 4x4 activities and should be reviewed for further use). I also see things in Alt C that confine vehicle use to small areas without easily identified ground boundaries (i.e. White Wash area. | See response to comment 206-11 |
| Robert L. | Clark | 660 | 1 | I have relatives who live near the White Wash Sand Dunes area and we all like to spend time together there on scenic trails when we visit. I understand from them that your agency is in the process of implementing a fee system, using Individual Special Recreation Permits, to help fund the cost of managing the area. I believe that this proposed fee system skirts the intent of the Federal Land Recreation Enhancement Act handed down by Congress in that it does not involve the public when charging fees for recreation and doesn't ensure that the funds benefit the area where they are paid.<br><br>I am opposed to an individual special recreation permit for this area and other areas that the BLM manages for the reasons I have stated and believe that without full public involvement in the recreational fee process the BLM is | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes and the Federal Lands Recreation Enhancement Act. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | countermanding the voice of the people and Congress as dictated by the FLREA. Furthermore, it is my opinion that the BLM should manage all other funding sources, including RTP, OHV and other grand programs until they are expended before any fee program is established in any BLM managed area. | |
| David | VanDuyn | 662 | | I am concerned on the timing of your comment period. I do not understand why you are only giving us one month to comment, plus the fact that you have placed that month at one of the most hectic times of the year suspicious of your commitment to public input. | See response to comment 124-1 |
| Dirk | Martin | 663 | 1 | Coalbed Methane – Development Potential Map 3-3<br><br>This is ridiculous. Where would the water come from that is needed to extract the coalbed methane? The already over-used Colorado river? The 1922 Colorado Compact is already divvied up the river and then some to the 7 western states. They will not give up any water rights for extraction so that means it will have to come from somewhere else. Plus, what about the pollution factor? CBM extraction is a notoriously dirty operation. Can the BLM guarantee that there will be no pollution to the ground water and tributaries to the Colorado River? I don't think so. | On pg. 4-6 of the DRMP/EIS, it is stated that coalbed methane development is expected to occur in the northeast corner of the Moab planning area, where there is high development potential.   Future coalbed methane exploration over the next 15 years is expected to entail testing at 3 5 spot well clusters, or 15 new wells, with a cumulative surface disturbance of 225 acres.  Until a specific proposal is provided, the water needs of such a project cannot be analyzed. |
| Mark | Sevenhoff | 665 | 1 | It is obvious that the old way of sharing routes with everyone, the basis of mountain biking in Moab, no longer works, Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology, the alterations (Damage) to the trails are such that cyclists cannot use the same routes unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes | See response to comment 122-46 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | alternate route in each of these areas. The Green Dot / Bull Canyon (Gemini area), Blue Dot (Gold Bar single-track listed in "D"), and Wags Way- which is all slickrock (Poison Spider area). Trails should be priority projects ASAP. There are user created routes that traverse slickrock in areas that have been overrun by motorized traffic. | |
| Laura | Cameron | 666 | 1 | I do not feel that the 10 areas designated in Alternative C for Wild and Scenic Rivers is sufficient. Since none of the rivers in Utah have yet achieved this designation I feel that the proposal for 24 areas in Plan B, to be designated as Wild and Scenic Rivers are a more appropriate number. Water is becoming a more precious commodity as global warming continues to bring more droughts to the area. We need to protect our waterways. | See response to comment 124-88. |
| TeriAnn | Wakeman | 668 | 1 | I feel that the final RMP should not lock public lands away from the public, nor should access be fee based. Fee based systems are discriminate against those with limited resources and generate an animosity between the user and those who administer the fees. It also requires a police like enforcement  program that would require financial resources to carry out. | See response to comment 123-10 regarding possibility of a fee system for use of the open area in White Wash Sand Dunes. Enforcement actions are administrative and do not require land use planning decisions. |
| Gina | Iannelli | 670 | 1 | One of my main concerns is the short time frame for public comment. Ninety days is a totally insufficient amount of time to try and read, digest, and comprehend the scope of the plan which took years to put together. Something of this magnitude needs the ample time it deserves for the public, whom you are serving and who are interested in how the land is used and maintained, to be able to participate in this crucial step. The public comment period is woefully inadequate, unfair and limiting. You claim to look for a balanced approach to conflict resolution but you cant expect that when you don't allow for the opportunity for a fair and | See response to comment 124-1 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | balanced input. A land use plan that has been in effect since 1985 is getting only 90 days for a comment period. That is truly unbalanced. | |
| Nick | McCracken | 672 | 1 | Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road | See response to comment 206-11 |
| Nick | McCracken | 672 | 2 | Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court). | See response to comment 206-11 |
| Nick | McCracken | 672 | 3 | 3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See response to comment 206-11 |
| Joel | Koedoot | 673 | 1 | Fisher Towers area. Your preferred alternative would allow oil and gas development on the mesa north of the towers, and to the west of the towers. It also proposes ORV routes on the mesa north of the towers. I have hiked and climbed in this area many times and greatly enjoy the solitude and views which can be experienced from the mesa top. I feel that ORV routes on the mesa would ruin the wilderness values critical to my recreational experience in this area. Furthermore, I believe that oil and gas development on these visually spectacular lands would leave lasting scars and permanently degrade the wilderness values of nearby areas. Please reconsider your preferred alternative so that it will not impact the non-motorized recreational user so negatively and will protect existing wilderness values. | The commentor's preference for Alt B is noted.  The scenic values of the Fisher Towers area are protected in Alt C by the imposition of a closed category and no surface occupancy stipulation in the entire Richardson Amphitheater.

The BLM has chosen not to manage the Top of the World mesa to protect its wilderness characteristics. |
| Joel | Koedoot | 673 | 2 | Fisher Towers area. Your preferred alternative would allow oil and gas development on the mesa north of the towers, and to the west of the towers. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

| | | | | | |
|---|---|---|---|---|---|
| | | | | It also proposes ORV routes on the mesa north of the towers. I have hiked and climbed in this area many times and greatly enjoy the solitude and views which can be experienced from the mesa top. I feel that ORV routes on the mesa would ruin the wilderness values critical to my recreational experience in this area. Furthermore, I believe that oil and gas development on these visually spectacular lands would leave lasting scars and permanently degrade the wilderness values of nearby areas. Please reconsider your preferred alternative so that it will not impact the non-motorized recreational user so negatively and will protect existing wilderness values. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Joel | Koedoot | 673 | 3 | Tenmile Canyon: Your preferred alternative proposed an ORV route down the entire length of Tenmile Canyon, from Dripping Springs all the way to the confluence with the Green River. Tenmile Canyon has one of the few perennial streams in the Moab area and is home to some of the oldest archaeological sites in the state. As such, it is difficult to imagine a less appropriate place for an ORV route than Tenmile Canyon. To make matters worse, your agency has not surveyed the archaeological sites in the canyon, so the risks associated with ORV use (such as vandalism and looting) are unknown. I have hiked in this canyon several times; each time I was continually disturbed by noise from ORVs. Unfortunately, ORVs can be heard form very far away when one is hiking in a naturally quiet place. I have also witnessed the damage that ORVs have inflicted on stream banks and "off-trail" areas in Tenmile Canyon. Please reconsider your preferred alternative so that it will protect the riparian, archaeological, and wilderness values of this area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Joel | Koedoot | 673 | 4 | Professor Creek: Your preferred alternative drops | See response to comment 124-88. |

| | | | | Professor Creek from Wild and Scenic designation even though it is eligible. Professor Creek / Mary Jane Canyon is quite a popular hike and a real favorite of mine – with canyon narrows, a waterfall, waterslides, and pools. Please reconsider your preferred alternative so that it will include Wild and Scenic designation for Professor Creek, in order to protect the creek from future water diversions. | |
|---|---|---|---|---|---|
| Joel | Koedoot | 673 | 5 | Onion Creek – Your preferred alternative drops Onion Creek from Wild and Scenic designation even thought it is eligible. Onion Creek is no less deserving of protection than its neighbor, Professor Creek. | See response to comment 124-88. |
| Joel | Koedoot | 673 | 6 | Beaver Creek – Your preferred alternative drops Beaver Creek from Wild an Scenic designation even though it is eligible. I have hiked into this remote creek only once and was very impressed by its vibrant riparian zone, seemingly untouched by human impacts. It is very rare to find such an intact riparian zone in southeastern Utah. Please reconsider your preferred alternative so that it will keep this area closed to grazing and bestow upon it the status it deserves – for it is both truly wild and highly scenic. | See response to comment 124-88. |
| Joel | Koedoot | 673 | 7 | I would also like to comment genrally on the DRMP as it relates to designated ORV routes. Your preferred alternative designates a spaghetti-like tangle of ORV routes across the world-renowned scenic public lands surrounding Moab. Maps of the proposed routes near Moab clearly show that ORVs will be able to drive to within a short distance of just about anywhere; in other words, non-motorized recreational users will find it difficult to get away from ORVs on the vast majority of BLM lands near Moab. This plan is ill-conceived and will unnecessarily promote conflict between motorized and non-motorized | See response to comment 122-9 |

| | | | | recreational users. Please reconsider your preferred alternative so that it will reduce the destructive, redundant web of ORV routes and will protect the quiet, natural backcountry experiences of traditional non-motorized users. | |
|---|---|---|---|---|---|
| Justin | Reece | 675 | 1 | Fences around cottonwood trees: This is completely unnecessary and takes away from a lot of the area's natural magic. The best thing that can be done for the cottonwood's is to remove the invasive tamarisk. Fences solve nothing for the long term health of the Cottonwoods. | See response to comments 208-3 and 479-6. |
| Michael | Ciscell | 677 | 1 | The current timeframe for responding to your plan is very limited, given the nature of the material, the scope of the uses proposed, and the length of time the resulting plan would be in effect (a long time). In order to read, much less formulate responses to, your Mgmt plan , I request that you extend the comment period for another 3-6 months. | See response to comment 124-1 |
| Cris | Robertson | 678 | 1 | The proposed amendments are difficult for me to review and fully understand, however many familiar trail names I have enjoyed using jump out at me. It want to continue using routes such as Strike Ravine, 3-D, Gemini Bridges, and the Flat Iron Mesa as they exist now. | See response to comment 206-11 |
| Tom | Mandera | 679 | 1 | The Easter Jeep Safari is a popular event for myself and my friends. I believe that some portions of Flat Iron Mesa, Strike Ravine, and the 3-D Trail have been left out of the new travel plan. These trails include the following segments:<br><br>Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road | See response to comment 206-11 |

| | | | | Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court).<br><br>3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | |
|---|---|---|---|---|---|
| Tom | Mandera | 679 | 2 | Gemini Bridges is a popular destination for my family and I'm saddened to see that it's proposed for closure. It's hard to imagine much resource damage to rocks from vehicles. | See response to comment 206-14 |
| Tom | Mandera | 679 | 3 | I don't see a need to decrease the number of participants allowed in a non-permitted group, unless this is either an attempt to generate additional revenue, or to punish large families and recreation groups. | See response to Comment 124-110 and 124-110. |
| David | Lee | 680 | 1 | Keep the route in Westwater WSA open. This has been accessible for years and should remain so. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| David | Lee | 680 | 2 | Provide the missing segments to the maps for Flat Iron Mesa, Strike Ravine, and 3-D. These should be included in the final maps. | See response to comment 206-11 |
| David | Lee | 680 | 3 | Keep the Gemini Bridges route open. My son and I were in Moab last spring in Gemini Bridges. We met with a group of senior citizens. Several of these seniors would have been unable to fully enjoy the arches as if they were required to hike to them as opposed to driving to them. | See response to comment 206-14 |
| David | Lee | 680 | 4 | Special Permits. As part of the Toyota Land Cruiser Association, I enjoy the Cruise Moab events in the spring. I believe that limiting the | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRPs policies and SRP group numbers. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | number of vehicles in a group to 24 may be a burden on some clubs and groups that want to run a trail together. Please consider a more reasonable number--say 35 to 40. | The BLM recognizes the benefits of working with clubs and user groups and will seek to streamline permitting wherever possible. |
| David | Lee | 680 | 5 | White Wash Sand Dunes - Please expand the open travel area beyond what is contemplated in Alt C. Please do away with the proposed fee system. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes |
| David | Lee | 680 | 6 | The campsite restrictions for vehicle camping on public lands should not be included in the plan. This is over restrictive for public land. | See response to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area.  See response to comment 120-86 regarding vehicular access to dispersed camping sites. |
| Ferris | McCollum | 682 | 1 | There are a couple of trails on the Utah/Colorado border with access from the Utah side. They are Island Mesa and Wray Mesa. Both of these should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ferris | McCollum | 682 | 2 | Gemini Bridges should not be closed to motor vehicles. | See response to comment 206-14 |
| Ferris | McCollum | 682 | 3 | Mill Canyon and Courthouse Wash should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ferris | McCollum | 682 | 4 | The rock fall in the Tenmile Canyon Trail should be removed and opened to all motorized traffic. | See response to comment 211-20 |
| Jason T. | Nichols | 683 | 1 | Your open area at White Wash must be expanded. The current proposal is unworkable because it | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the |

| | | | | closes killer hill climb and the areas west of the dunes. Requiring fences and boulders around cottonwood trees and water sources is impractical and ridiculous. We strongly oppose any fee system. We pay enough in registration for motorcycles and ATVs. However, I am willing to support funding if the needs of outdoor enthusiasts are met. | Travel Plan for the DRMP/EIS. See response to comment 208-3 and 479-6 regarding fencing. See response to comment 123-10 regarding the possibiity of a fee system for use of the open area. |
|---|---|---|---|---|---|
| Olaf | Kilthau | 684 | 1 | Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court). | See response to comment 206-11 |
| Olaf | Kilthau | 684 | 2 | Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road | See response to comment 206-11 |
| Olaf | Kilthau | 684 | 3 | 3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Olaf | Kilthau | 684 | 4 | I feel that the requirement for Special Recreation Permits should be required for groups of 35 vehicles and over, and that Alt C should be amended as such, rather than the 24 vehicle limit. | See response to comment 124-122. |
| Olaf | Kilthau | 684 | 5 | The Camping Policy in Appendix E should disclose how many campsites would be closed under each alternative, it should also state that existing campsites should remain open unless a closure is necessitated via a lawful public process, and the Final RMP should mandate public involvement to | Public participation has been solicited throughout the land use planning processNo areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates |

| | | | | establish and manage "restricted camping areas" and or "controlled camping areas." | existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
|---|---|---|---|---|---|
| David | Stroud | 687 | 1 | Mountain bike single-track. The Mill Canyon - Sevenmile Rim biking focus area should be expanded as Mill Canyon-Tusher Rims in order to provide terrain for pedaling. | See response to comment 122-46 |
| David | Stroud | 687 | 2 | The Final plan should extend the South Spanish Valley biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| David | Stroud | 689 | 1 | An open area in addition to White Wash could provide a different terrain for everything from bicycle free riding to trails motorcycling to hardcore rock crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps parts of Black Ridge could remain unrestricted for this purpose. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| David | Stroud | 689 | 2 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | See response to comment 122-42 |
| Janelle | Baird | 691 | 1 | I support all of the following rivers being found suitable to become Wild and Scenic Rivers – | See response to comments 124-88 and 124-91, as well as response to comments 213-12 and 213-13. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Green, Colorado, Dolores, Mill Creek, Professor Creek, Onion Creek, Negro Bill Canyon, and Beaver Creek. The entire Green River is suitable as a Wild and Scenic River. It is vital that the entire Green River be found suitable. The segment from Swasey's down to the confluence of the San Rafael River is spectacular and as the BLM Moab FO has found, possesses outstanding values. | |
| Tom | Johnson | 692 | 1 | I am particularly concerned about the impact of ORV use at a location named Potato Salad Hill on Mill Creek, just outside the town of Moab.<br><br>As is pointed out in the RMP, less than 1% of BLM administered lands are riparian in nature, and "are often among the first landscape features to reflect impacts from management activities. These habitats are used as indicators of overall land health and watershed condition."<br><br>The Potato Salad Hill area is one that has seen substantial recent degradation immediately adjacent to Mill Creek, the most important drainage in the Moab RMP that originates in the Moab area. To continue to allow this high impact use in such a sensitive area is an indication that care and protection of the resource is secondary to allowing ORVs to do anything they want. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Seth | Bowers | 693 | 1 | I am backing the position of the Utah 4 Wheel Drive Association. The analysis ithis group has done is thorough and ground level. I would ask in my personal interest to keep the user created trail known as Coyote Canyon open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Duncan | Silver | 694 | 1 | All existing roads, trails, and travel ways should remain open to the all the public. The closures to motorized travel will stop our less fortunate public, | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that |

| | | | | the handicapped from enjoying this area. Does the plan address the needs of the handicapped and address the federal ADA requirements? | all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA. However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
|---|---|---|---|---|---|
| Duncan | Silver | 694 | 2 | The camping policy, Appendix E, lacks specific as to where and what kind of camping is allowed in each area. Maps of camping should be detailed for public information, with the camping opportunities clearly defined. Can you provide readable camping maps? | Appendix E outlines areas of controlled and dispersed camping, See responses to comments 123-8 and 120-86 regarding designated and dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number depends upon site specific conditions. Dispersed campsites would be signed;  however, maps and signage are not land use planning decisions. |
| Gary | Swank | 695 | 1 | Please don't close roads and trails that have been open for many years such as the Gemini Bridges road and the Ten Mile Wash. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Jonatho n | Sudar | 697 | 1 | The roads traversing Flat Iron Mesa and those around Gemini Bridges are places I enjoy taking my family, I would be very disappointed to lose access to those areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Glen | Judge | 752 | 1 | I have included maps showing GPS tracks of existing routes for these trails indicated in red. Please add the missing segments to the designated route inventory on Map 2-11-C. | See response to comment 206-11 |
| Zane | Taylor | 817 | 1 | Paving the road, and prohibiting OHV's from pavement, has fragmented the trail system. Thus | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

| | | | | OHV's should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Zane | Taylor | 817 | 2 | Additionally, the 1/4-mile Slickrock route connecting Slickrock Trail with Fins 'N' Things should be designated for two-wheeled use to alleviate traffic along the main road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Zane | Taylor | 817 | 3 | Special policies should continue permitting Slickrock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that  "Two-wheel motorcycles are allowed on established Slickrock riding areas in the Slickrock Trail. Bartlett Wash and Tusher Canyon areas and on Slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel could be further restricted, but not so drastically as the Draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Zane | Taylor | 817 | 4 | The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the varrity of terrain, and provides | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0011403

| | | | | enough room for a full-days ride. Sweeping travel restrictions associated with the Draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durrable and irregular terrain that is suitable for motorcycle and bicycle trail riding exists in Pole Canyon from the powerlines to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHV's to create a loop with Behind-The-Rocks while avoiding the highway. | resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 1 | No roads are included in WSA's. Shouldn't plans consider the event that some WSA's may be "released" rather than "designated"? | Should WSAs be released from such status, a plan amendment would have to be prepared.  At that time, routes available for motorized use would be identified. |
| Ber | Knight | 818 | 2 | AGATE: For connecting purposes, shouldn't we keep the good NE-SW pipeline road (perhaps as "Frontage Road") that joins the major road at its northeast end about 4328400 N 655200E (NAD27 CONUS). {Apparently excluded is a short segment needed for continuity going southwest from about 4320000 N 659000 E. There is a disconnect about 4223000 N 655400 E (disconnected on Alt. D, as well) where the included road near the the old railroad grade road seems not to meet an included road to the northeast. Although the road on the northwest side of the railroad tracks does connect (despite a rather abrupt wash crossing) to roads | See response to comment 206-11 |

BLM_0011404

| | | | | on both sides of the tracks.} | |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 3 | ANTONE CANYON: Some of the roads in the southeast quarter of the quad make efficient connections, especially to the road above the first rim (in Alt. D). | See response to comment 206-11 |
| Ber | Knight | 818 | 4 | BAR X WASH: The road up Winter Camp Draw does connect at about 4348800 N 663300 E (see Bitter Creek Well) and could be well included. | See response to comment 206-11 |
| Ber | Knight | 818 | 5 | BIG BEND: {The spur to an overlook on Dry Mesa at about 4283200 N 633700 E is worth the whole trip}. Opening thwe road into Cache Valley wash from about 4287200 N 634400 E and some of the wash is worthwhile (scenic upstream, access to view and hike to Cache Arch downstream). | See response to comment 206-11 |
| Ber | Knight | 818 | 6 | BIG TRIANGLE: Why not lower Coats Creek? There are some fine roads to consider in case the Westwater WSA is not designated: North of the river going southwest and including a road into Big Hole, and espically, on the south side of the river as far as Star Canyon. | See response to comment 206-11 |
| Ber | Knight | 818 | 7 | BITTER CREEK WELL: The road from about 4240700 N 666200 E going east through a SITLA section to the Rabbit Valley Interchange (in Colorado) is a valuable connection. {Why is the road up Winter Camp Draw not included? It connects in Bar X Wash (included in Alt. D). An important connection from a dugway west from about 4336100 N 663200 E appears to be excluded, denying access without driving the dugway}. | See response to comment 206-11 |
| Ber | Knight | 818 | 8 | BLUE CHIEF MESA: {No terrible problems, but the continuation of the dead-end road from about 4296500 N 657900 E to the west on the southwest side of Scharf Mesa was a fine experience to drive, as well as the road through Buckhorn Draw from about 4302900 N 658400 E. Both of these | See response to comment 206-11 |

BLM_0011405

| | | | | roads were considered to have impasses during inventory, but they can be traversed with good equipment and determination (making it more fun)}. | |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 9 | BOBBY CANYON N: I got about 3km farther up Left Hand Tusher (in Alt. D), but was thwarted by rockfall in Naylor Canyon. | NRR |
| Ber | Knight | 818 | 10 | BOBBY CANYON S: Upper Coal Canyon (seems to be in "closed" area) is interesting, having some apparent historical use for locals gathering coal (a bit is in Tusher Canyon). | NRR |
| Ber | Knight | 818 | 11 | BRYSON CANYON: Saddle Ridge (west side of quad) seems like a nice view area to the dead-end. Why not? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 12 | CALF CANYON: A few connecting roads could be considered arount Pinto Wash (in Alt. D). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 13 | CISCO SPRINGS: A few roads below the Book Cliffs are worthy of consideration; e.g., one going west from Corral Canyon Bench and one going past Strychnine Pond. {Starting at 4320300 N 636900 E, a connection toward the north (only about 500 meters) is excluded (it's in Alt.D)}. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 14 | CISCO SW: Some roads in lower Fish Seep Draw are interesting enough to keep. Some of the included roads in the Poison Strip area are very-to-extremely faint and of questionable value. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0011406

| | | | | | |
|---|---|---|---|---|---|
| | | | | | resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 15 | CRESCENT JUNCTION: Why not access to the nice ride to the D&RGW radio tower; the road leaves 1-70 at an "informal interchange" at about 4309600 N 698200 E to die tower at about 4310900 N 698900 E? Numerous access to the railroad are ignored. {A seis line is included continuing straight (roughly west) at about 4313800 N 604300 E, where the original route meets some bad washes and is not being used (Oct. '07); the inventoried parallel route just to the south is in good condition and considerably used. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 16 | DANISH FLAT: Missing are two worthwhile roads3 on Cisco Mesa, one to a dam, one to a DH. Why is pipeline road here included but not elsewhere (see AGATE)? Ditto old railroad grade? In the northeast corner at roughly 4330500 N 650500 E, the old railroad grade appears to be included, but the bypass (which must have been made for a reason) is not. | See response to comment 206-11 |
| Ber | Knight | 818 | 17 | DEE PASS: We wish for some connections in the vicinity of 4298000 N 591000 E although the transient (due to flooding) nature of some gully crossings makes it hard to define exact routes. {We would like access to a challenging road (in SITLA) going west from the Duma Point road about 4295900 N 592500 E3.5 and climbing northerly to a dugway to about 4296000 N 591400 E | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 18 | DEWEY: The USGS-mapped road that meets the Owl Draw road at about 4300800 N 642400 E is essentially invisible, and I can't tell if it or another merely poor road is the included road, which would be ok. Possible useful connection to tie roads together is a short E-W road at about 4299300 N 641500 E3. Fun-to-explore | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | roads to Roberts Mesa top3 and along Dolores River down from Roberts Bottom are missing. {Road with dugway down west side of Hotel Mesa from about 4298400 N 650100 E3 to a defunct placer gold operation with historic equipment at about 4299300 N 649000 E. The included road going south from 4301564 N 643464 E is difficult to find (I missed it on GPS trips in '92, '95, '98, '05 and found it with determination in '07) and may not have been machine constructed; a better choice for connections is the road going south from about 4301300 N 642700 E3 to about 4298800 N 642200 E3 with a junction at about 4300200 N 642600 E3 with a road going east to join the aforementioned included road at 4300641 N 643501 E. The latter roads are on the USGS map; the included road is not.} | |
|-----|--------|-----|----|-----|-----|
| Ber | Knight | 818 | 19 | DOLORES POINT N: The spur from the river up Beaver Creek is a good start for hiking and perhaps horsebacking. (See also: Fisher Valley re dead-end road on N. Beaver Mesa.) {For connections to and from Colorado, we should keep two E- W roads about 4276800 N5 and 4278100 ~, both about 668300 E.} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 20 | DOLORES POINT SOUTH: The road going west from about 4276000 N 668300 E is significant access to Colorado roads.3 The road from a mine to the Forest boundary about 4276200 N 665000 E (in Alt. D) continues east in the Foresf and is interesting despite its grown-over condition. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 21 | DRY CANYON: Why not access to Pear Park Gas Field3? The road climbing out of Bull Canyon3 (4355800 N 646700 E) was blocked by rockfalls at the time of my visit, but it has all the elements of a scenic, challenging, and exciting | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

| | | | | ride (I am told it used to be maintained, but is not passable by a road grader now). | resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 22 | DUBINKY WASH: {We believe a useful connection into Tenmile Wash is at "Texas Bob Dugway," once a challenging sandy climb at 4287000 N 587500 E3A but now bypassed directly into the wash just below a fairly new cattle guard (!) at a fence line. A NE-SW seis. line is shown in the inventory as discontinuous at a wash crossing about 594000 E 4287000 N. In fact, if a straight-line route at that crossing was ever used, a constructed bypass was in use at least when my GPS data were gathered in October 1994, May 2003, and October 2007. That (excluded) route was much the best way in 2007, rather than the included way from the south, which was in very poor condition, not being used, and even difficult to find in 2007. }4A As a separate issue, the same seis line is interesting where it continues NE to near the cliff at about 596000 E. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 23 | EIGHTMILE ROCK: A fairly long spur goes NE from about 4245500 N 624600 EI; (this is appropriately named "Behind the Rocks Overlook" on Barnes' Canyon Rims Rec. map and is of value for touring and exploring). There is a nest of roads, virtually all in SITLA, having recreational value in and out of an interesting canyon in the vicinity of 423700 N 621000 E1, but short BLM access roads are needed; preferred eastern access is from 4237200 N 622100 E and a western access is from 4236700 N 620000 E (on Lockhart Basin quad) ( other west accesses could be chosen). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 24 | FISHER TOWERS: Several BLM roads in Professor Valley, roughly 4281400-4285000 N 642000-645000 E are pleasant to visit, and | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

| | | | | | |
|---|---|---|---|---|---|
| | | | | sharing with other users should be considered. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 25 | FISHER VALLEY: On N. Beaver Mesa, the included road ends about 4287700 N 662100 E3 where the road continues up to a ridge and dead-ends -scenic possibilities. {The included road at about 4281100 N 655600 E enters private property, effectively denying on access to BLM roads farther south, while a parallel public road3 just to the east is excluded.}4A Some BLM roads in the south end of Fisher Valley are fun to explore. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 26 | FLOY CANYON N: With only one mile of D road (not reservation) on the whole quad, why can't we have Showerbath Canyon3, if only for the name? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 27 | FLUME CANYON: We wish the cherry-stem could be extended somewhat farther into Diamond ~anyon; it can be challenging to drive but beautiful (in Alt. D). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 28 | GOLD BAR CANYON: We consider the route to and across Gemini Bridges an important rare treat for motorized users.3A We'll miss the spur to beneath Gemini Bridges (picnic spot), but we understand the problem. The road on Amasa Back from about 4265500 N 618300 E to above The Billboard is challenging fun for driver and navigator. My data show "no gate" at the State Park boundary about 4265200 N 610600 | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | E, making the BLM road rather useless. Old mine roads, often interesting to visit, about 4275700 N 616000-617000 E3A are have value for recreation. {Beginning at the junction of the Gemini Brides road and the road south to Bull Canyon bottom, Alt. C shows three spurs from the Bull Canyon road, apparently departing at about 4272660 N going east, 4271500 N going east, and 4271100 N going west. Having not found tltese spurs in previous inventories, r searched again Nov. 8 & 19, 2007, possibly seeing evidence of two of tlte tltree. I also searched from tlte west end of one (I've been told it connects tltrough) and found only scattered A TV tracks off of tlte visible road. In tltis heavily visited area, tlte absence of usage on these spurs reenforces tlte notion that tltey are essentially invisible and suggests tltat they are not very important. I suggest that these tltree be deleted from Alt. C ; hard-to-find roads in popular areas b~get off-road tracks.} | |
| Ber | Knight | 818 | 29 | JUG ROCK: {RMP maps in the vicinity of Big Mesa campground do not match current activity. Alt C includes some roads that are now posted closed, some roads that are being "rehabbed," one road spur tltat has disappeared, and one road soutlt of UT-313 that I have been unable to find. | See response to comment 206-11 |
| Ber | Knight | 818 | 30 | KANE SPRINGS: There is a rocky, small canyon loopl just north of tlte Black Ridge road, beginning and ending about 4252350 N 637380 E, called "Coyote Canyon" by rock-crawling entltusiasts; tltis is one of the places that can divert extreme four-wheelers away from creating new routes along better-known, heavily traveled trails. (A map copy is attached.) The spur running N-S toward Kane Creek at about 633000 | See response to comment 206-11 |

| | | | | E terminates before its time (about 4250900 N), considering viewpoints.1 A connecting road going from about 4254000 N 632500 E northeast to an obscure junction at about 4256000 N 633700 E1 ha~ some slickrock and is fun to drive, and it offers a long bypass to the daunting crossing of "High-Dive Canyon" on tlte Behind tlte Rocks trail. lt passes a less important, hardly used connecter, which includes a steep dirt hill, from about 4255150 N 633000 E going north to cross an included road. {Missing are two portions of the Jeep Safari Strike Ravine trail. (1) The N-S road accessing and traversing tlte contentious private property (where San Juan County supported tlte road claim!). (2) A portion of the "big ugly" hill at roughly 4254500 N 636600 E.} | |
| Ber | Knight | 818 | 31 | KLONDIKE BLUFFS: {I have been unable to find tlte road going SW from about 4299600 N 618700 E; tlte combination of its unused condition and its questionable status witltin Arches N.P. (tlte county inventory stopped at the boundary) make its inclusion in Alt. C moot. Missing is a vital tiny part of "Klondike Bluffs (bicycle) Trall" access going NE at about 4291900 N 611600 E3 and its shortcut used by "Copper Ridge Trail".} | See response to comment 206-11 |
| Ber | Knight | 818 | 32 | LA SAL EAST: There are two largely scenic routes that also provide north-south access in tlte SE quarter of tltis quad tltat should be preserved (both were seriously machine-made roads, but labeled "pack" by USGS). The western one is included, but ironicaliy, is currently nearly impassable (large rock, huge "Pondie", and BRUSH!). We drove it painfully 6/1/07; it could be salvaged witlt some volunteer work. The eastern route, which splits into multiple roads at | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0011412

| | | | | | |
|---|---|---|---|---|---|
| | | | | about 4238500 N 661600 E3, is in good condition for 4WD, but is excluded. This route is coded "non-motorized" in tlte San Juan County Map Book; we would like to know why. | |
| Ber | Knight | 818 | 33 | LA SAL JUNCTON: I expected inclusion of a pretty good road going east from Hwy. 191 about 4245200 N 636900 E to join included roads -even the terminus of one of the included roads. I suggest keeping the road from about 4244800 N 632600 E going north (to complete a loop witlt an included road) to the county B road at about 4245650 N 632600 E1. {Four portions of tlte Flat Iron Mesa Jeep Safari trail are not included: (1) From about 4246450 N 636300 E jiggling NW to the pipeline road. (2) From about 4245600 N 634700 E going SW to an included road [this popular route may not be in the permit]. (3) Although this now-faint section has not been used recently (in favor of the county B road), from about 4246200 N 633400 E going SW to meet the county Broad. (4) The loop around the south side of "Hammerhead Rock" from about 4242400 N 633400 E south then east to the included road.}4 Again, including roads through a not-gated fence is confusing. In this area, an included road segment that looks like a short-cut (from about 4242500 N 634400 E to about 4243300 N 634500 E) has been in very poor condition and has no redeeming values to merit inclusion, in my opinion. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 34 | LISBON GAP: Are we trying to keep Utah people in state or keep Colorado people out? I count two important accesses and three useful but less important that are not included! A really fine trip is to circumnavigate the Colorado part of Island Mesa beneath its rim. As near as I can | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | tell, the Colorado roads are in the Uncompaghre F.O., which limits travel to existing roads, suggesting that access is valuable. One can start a counter-clockwise loop from the main E- W road in Colorado and reach the N-S road east of Island Canyon by either a poor road that joins at about 4227100 N 670300 E1 or a decent road that joins at about 4228100 N 670050 E2 near the rock-house ruins. The "poor road" makes an interesting connection but is so little used that it is hard for me to defend, but the "decent road" is valuable as part of the loop. Neither road is on the "San Juan County 7.5 Minute Map Book". From about 4233250 N 669600 E, a strong road2 goes basically east to access the many old roads of Ray Mesa. An included seis' line goes NNW dead-ending near the Colo. line, but an interesting road departs northeast from about 4223800 N 671200 E1, and branches south then east into Colorado and back to the main road (useful). Travel downstream in Greasewood Canyon bottom is fascinating for the drive and scenery, although continuation into Colorado (once all the way to the Dolores River) is now limited. I note one consequence of the fat lines on the map; some roads that are not continuous may appear to connect (e.g. 4227900 N 667300 E had no connection at the time of my inventory). | and site specific NEPA analysis. |
| Ber | Knight | 818 | 35 | LISBON V ALLEY: On Three Step Hill there is a dead-end(core drill) road that departs NE from included roads at about 4221300 N 662900 E1 offering excellent views to the north (if you like to see the copper mine). Only partly included is a pleasant drive along the ridge on the NE side of Lisbon Valley from about 4231700 N 656600 E to about 4225100 N 562900 E1 with | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | a connection NE to included roads. | |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 36 | LOCKHART BASIN: Worthwhile further views are to be had on an extension of about a quarter mile beyond the B road at about 4338400 N 615000 E1. Barnes' "Kamikaze Trail" has a spur running SSE-NNW ending about 4243700 N 620000 E1 that is worthwhile for another view of Lockhart Basin. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 37 | MARBLE CANYON: For access to and from Colorado roads; two roads (one of them forking farther south) start at about 4211100 N 668700 E3 go southerly then easterly, and one southerly extension crosses and re-crosses the border. (What are isolated roads north of Picture Gallery Ranch? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 38 | MERRIMAC BUTTE: We think the road through Mill Canyon3 going south from the Mill Canyon Dinosaur Site as well as the N-S road on the west side of Courthouse Rock connecting to near the old stage station3 are important for the scenic experience and some challenge in driving in the canyons. We would like: the road on NE side of Merrimac Butte completing circumnavigation of butte, and the road heading SE from about 4277800 N 617200 E3 to the NP boundary (for hiking access through a pedestrian "maze ") .{Not included is the part of 3D Trail from about 4285900 N 609900 E3 north then west to 4286400 N 609300 E}3,4. The included road that connects to the 3D Trail going southwest from about 4286900 N 610100 E appears to be user created and has little merit. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 39 | MINERAL CANYON: The ride up Mineral Canyon is a desirable experience past the SITLA section, despite impasses on original road that can be bypassed in the wash bottom. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | resources. This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 40 | MOAB: The spur to parking for Halls Bridge hike (4263600 N 625600 E3) not shown, although. few hikers are likely to drive there anymore Looks as if the road through SMM Wetlands is includeds (as well as the road on S side of tailings pileS). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 41 | MOLLIE HOGANS: {To complete a gorgeous scenic loop, the short NE-SW road that reaches the NP boundary at about 4294800 N 623400 E3 should be included (Alt. A inventory shows a discontinuity; my 1994 data are continuous, and a revisit in 2007 finds a decent road all the way). Be aware that the road that enters Salt Wash at 4297827 N 623160 E has virtue as a connector but is faint at best and fully obscured by deep brush in Salt Wash (2007).} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 42 | MOUNT TUK: "Ride with Respect" has proposed devoting an area near Yellow Circle l)1ines to rock crawling activity. As with the "Coyote Canyon" loop, such a designation would help preserve other established trails that are more oriented toward touring. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 43 | PR SPRING: At the time of my visit (1996), the road in upper Middle Canyon (above 4360700 N 645300 E) was "not seen" and the included side canyon was blockaded. | NRR |
| Ber | Knight | 818 | 44 | RAY MESA: No significant problems, but it would be desirable to include a Colorado access below the cliffs (access to a dam and pond plus other connections in Colorado) going SE from about 4242700 N 669700 E; there is no other nearby access to this road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |

| Ber | Knight | 818 | 45 | RILL CREEK: Porcupine Rim jeep/bike trail included only to WSA boundary; motorized cannot reach start of single-track and beyond (to maintain the single-track junction and to find lost bikers who ignored the junction!). Would like the scenic spur going NW starting at about 4263700 N 638000 E3A; and another short spur to access "old mail trail" at about 4265900 N 638000 E.3A Could the road west from Coffee Pot Rock'A be included in case the WSA is not designated, or at least to the WSA boundary (I used it as part of a Labor Day Camp-Out trail in 1985)? A challenging, scenic, and fun-to-drive spur to the rim starts about 4274900 N 637800 E1. Why not road SE to overlook starting about 4270000 N 635830 E3? | See response to comment 122-46 |
| Ber | Knight | 818 | 46 | SAGERS FLAT: A dead-end road giving westerly access from about 4213900 N 627900 E excluded (even in Alt. D), but its good condition suggests some usefulness. I wish we could use the roads along the RR tracks; how else could we access the old railroad grade, along with other disconnected segments, that appear on Alt. D? {Something seems strange near 4209000-42010000 N 620000 E: A discontinuity (apparently at 4209500 N 619800 E where there is a washed-out, deep wash crossing) near the SITLA section. The included road has become invisible in places; I was able to find very little of it in Oct~ '07. Some better new roads access some dam work near there, but best access seems to be from an excluded road going SW from about 4210000 N 620800 E, then another, perhaps new, road to the west. In this area of deep washes, the only active (passable) wash crossing we found (in '07) was at about 4209100 N | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | 620200 E. See also Thompson Springs. } | |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 47 | SANDSTONE: No significant problems, but there are many old mine roads that are fun to explore. | NRR |
| Ber | Knight | 818 | 48 | SHAFER BASIN: An included road is only the beginning of a wonderful spur going south from about 4258300 N 611900 E continuing south and reaching a scenic bench across from Chicken Comers, with foot access to area of in-matrix petrified wood about 4256900 N 611700 El (mentioned in Barnes' guide book) just above a historic drill site beside the river. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 49 | SOP CANYON: No significant problems. For possible inclusion, is a strong road angling 450 NE-SW from about 4219350 N 663500 E and connecting an included road to the continuation of an included road into the Monticello F. O. (it has a short spur to a stock pond). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 50 | STEAMBOAT MESA: {We use (permitted for Dolores Triangle trail) the tiny EW shortcut at about 4295500 N 668000 E.} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 51 | TEPEE CANYON: Cottonwood Canyon is an adventure -more than I undertook (in Alt D.) | NRR |
| Ber | Knight | 818 | 52 | THOMPSON SPRINGS: Blaze Canyon3 might be worthwhile. {I re-visited and found (absent from my earlier inventory) the included seis line going northeast from about 4306000 N 617500 E, where there is an impassable gully, reachable via a (cross-country?) bypass beyond the gully. The included line basically reaches recent dam construction on the Sagers Flat quad. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | This line is parallel to an excluded line just southeast of it, but the excluded line is a better road and the 'dozer-tracks (possibly a pre-existing route) that reached it northeast of the included connection seems the better way.} | |
|---|---|---|---|---|---|
| Ber | Knight | 818 | 53 | TROUGH SPRINGS: In the vicinity of an oil tank near 4254000 N 624000 E are two roads going northeast to canyon rim views; one, the more southern, is worthwhile. There is a "seismic mesa lite" at about 4253000-4254000 N 628000-629000 E with access roads from north and south -not great recreation significance and surely needing no more than one of the seis lines to complete the loop, but interesting country to visit. I'll miss having access to a loop that reaches east to about 4258100 N 629300 E, although some spurs are trivial. The "Cane Creek Canyon Rim Trail" (Barnes) continues beyond the proposed end about 3/4 mile to other excellent views (it was apparently for core drilling above mines in the canyon). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 54 | VALLEY CITY: Seems reasonable access in an area of (my observations) "v. faint" and "x. faint" roads, which are, at best, very and extremely faint. {Includes Canyonlands Airport runway?} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 55 | WARNER LAKE: {Includes a road (not on my inventory) going SE from about 4272200 N 644100 E, entering private land but excludes a parallel road about 300 meters NE.}4A | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 56 | WESTWATER: Is the BLM teasing us with the road (through private and to private) along the | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Little Dolores River, then out to the Colorado River, where there is no public access? | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Ber | Knight | 818 | 58 | WINDOWS, THE: {Just to improve credibility of the map, it would be desirable to remove the foot trails to Double Arch, Delicate Arch, Park Avenue, and Tower Arch, and in the MOLLIE HOGANS quad, the Devils Garden trail (the foot trail to landscape, Double O, ad Fin Canyon was already removed!) | See response to comment 206-11 |
| Marc | Reynolds | 819 | 1 | Alternative D fails just short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider them for implementation. | See response to comment 122-14. |
| Marc | Reynolds | 819 | 2 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Marc | Reynolds | 819 | 3 | The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the Final Plan. | See response to comment 122-29 |
| Marc | Reynolds | 819 | 4 | A few more washes should be left open, especially in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Marc | Reynolds | 819 | 5 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren | See response to comment 122-42 |

| | | | | surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | |
|---|---|---|---|---|---|
| Marc | Reynolds | 819 | 6 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the Northwest of the Sand Dunes.<br><br>BLM's open area should be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (backway) on the East. | See response to comment 123-35 |
| Charles | Stembridge | 820 | 1 | I know that one of the biggest objections to motorized vehicle use by others is the noise from unmuffled engines. On suggestion then is to create noise limits for OHV's if 90 db is the limit, responsible OHVers will find a way to keep the noise down. | See response to comment 122-7 |
| Charles | Stembridge | 820 | 2 | Another objection to both bicycle and motorized vehicle use can be a speed conflict. If the BLM imposes a speed limit, responsible OHVers will be willing to maintain speed limits as needed. | See response to comment 122-9 |
| Fred | LaRoque | 821 | 1 | I understand all of the Green River is suitable as Wild and Scenic. Apparently there is some discrepancy about the suitability (from Swasy's to River Mile 97) between the BLM Price Field Office Draft and the BLM Moab FO Draft. The Moab FO should support the decision of the Price FO. | See response to comment 124-91. |
| Steve | Speidel | 822 | 1 | I support keeping motorized travel open in the following places:<br><br>White Wash: This is a sandy area and impact is minimal. Pit toilets and an info kiosk would help. 10 Mile Wash: This is also very sandy trail and impact is minimal. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Monitor and Merrimac Area including Bartlet Wash, Tusher Canyon, Dubinky Rd<br>Sovereign Trail<br>The Poison Strip<br>Rabbit Valley Colorado<br>San Rafael Reef<br>Indian Creek | |
| Mark | Weaver | 823 | 1 | In particular, all of the alternatives for the White Wash Dunes area are ill-thought out. This is an important and heavily used area for off-road vehicle recreation, and there is little conflict with other actual users. The open area of the White Wash Dunes in alt C and D is far too small for the use the area receives. It must be expanded to include all the traditional open-use area, and the boundary must be located along easily identifiable geologic features and/or roads, so that it is clear to users on the ground. | See response to comment 123-35 |
| Mark | Weaver | 823 | 2 | I think the BLM is making a mountain out of a molehill regarding "user conflict." I have been bicycling and hiking there for many many years, and I have had no issues with motorized users. Likewise, in my motorized recreation there, I have had no issues with non-motorized users. In my opinion and experience, the "user conflict" issue is one that has been manufactures as an excuse to further restrict motorized recreation. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. User conflict was an issue raised by the public during the scoping period for the DRMP/EIS. The general nature of societal conflicts is not a land use planning issue Education and signage are all administrative actions and do not require land use planning decisions. |
| Mark | Weaver | 823 | 3 | Designation of the White Wash area as an ACEC in Alt B. This is an area of longstanding sustainable motorized use over many decades, and there is no basis for the caving in to the desires of extremists in designating the area as an ACEC. | Alternatives A, C (the preferred Alternative) and D do not designate White Wash as an ACEC.<br><br>Refer to response to comment 124-69. |
| Mark | Weaver | 823 | 4 | The second issue is the continuing and never-ending poush for more (and more inappropriate) wilderness designations. The BLM was given a very clear mandate in FLPMA regarding the | See response to comments 120-8, 121-10, 121-58, and 121-61. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | inventory of wilderness-quality lands. This clearly mandated process was completed over 15 years ago. There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSA's, the BLM should have no further part in this issue. | |
| David | Rogers | 824 | 1 | Since these lands have been recognized as having wilderness potential by the BLM (and many other individuals and organizations, of course) they should be managed as wilderness until final decisions are made regarding their inclusion in formally designated wilderness areas. Therefore, they should be closed entirely to (1) motorized vehicle use on or off existing roads/routes; 2) minerals, oil and gas exploration/development; and 3) livestock grazing. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.

For example, in Alternative B, most of the Non-WSA lands are open to oil and gas leasing subject to standard lease terms and conditions.  While Alternative C is designed to provide maximum conservation and protection of natural resources from resource development and use.  Under Alternative C, some Non-WSA lands with wilderness characteristics would be closed to leasing and most Non-WSA lands with wilderness characteristics would be leased subject to either minor operational constraints like timing limitations or controls on surface use, or major constraints like no surface occupancy.  Alternative D reflects existing |

| | | | | | management direction, and Alternative A (the Preferred Alternative in the DRMP/DEIS) is designed to provide for a wide variety of resource needs, including mineral resource development and some level of protection of natural resources. |
|---|---|---|---|---|---|
| Bill | Farley | 825 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto Wilderness management are unlawful. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| James P. | Lynch | 826 | 1 | In the time available for review of the document, I did not find a discussion of air or water pollution in the alternative discussion. I submit that these will be a problem that should be addressed in considering more intense alternatives, such as C and D. | Analyses of impacts on air quality and water resources are included in Chapter 4 of the PRMP/FEIS. A statement has been added to Chapter 2 of the PRMP/EIS, under Management Common to All, which states the following: "As appropriate, quantitative analysis of potential air quality impacts would be conducted for project specific developments. |
| James P. | Lynch | 826 | 2 | In the time available for review of the document, I did not find a discussion of air or water pollution in the alternative discussion. I submit that these will be a problem that should be addressed in considering more intense alternatives, such as C and D. | Impacts to air quality and soils and watersheds are discussed in detail in the DRMP/DEIS in Sections 4.3.1 and 4.3.13, respectively. |
| Jon | Kis | 827 | 1 | I support keeping motorized travel open in the following places:<br><br>White Wash: This is a sandy area and impact is minimal. Pit toilets and an info kiosk would help. 10 Mile Wash: This is also very sandy trail and impact is minimal.<br>Monitor and Merrimac Area including Bartlet Wash, Tusher Canyon, Dubinky Rd<br>Sovereign Trail<br>The Poison Strip<br>Rabbit Valley Colorado<br>San Rafael Reef<br>Indian Creek | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| Frank | Ress | 828 | 1 | I spent over 3/4 of an hour putting in comments on your web comment form for the Moab RMP, click the submit button, and get an "address cannot be found" error, or something like that. Of course, when I hit the back button, everything is gone. | We apologize for the inconvenience. |
|-------|------|-----|---|---|---|
| Michael | Edwards | 829 | 1 | In addition, you should treat wilderness eligible lands as designated wilderness, until a decision is made to take those lands off the wilderness eligible listing. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. |
| Michael | Edwards | 829 | 2 | In addition, would you please provide me with an explanation of why exactly you are not choosing the environmentally preferred alternative in this sensitive area? | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| Marion | Klaus | 831 | 1 | The preferred alternative in the BLM Moab FO DRMP is inconsistent with the BLM Price FO DRMP for the suitability of the Green River. | See response to comment 124-91. |

| Don | Peay | 832 | 1 | How can the BLM even consider reauthorizing grazing on some of those allotments when sportsmen and the DWR spent millions of dollars to provide for forage for wildlife-the rancherswho left were fairly compensated. Are there any provisions in the RMP to alocate additional forage for wildlife if a grazing permitee wants to allocate the forage for wildlife, or two, if forage is created via rangeland improvements and thus there is more forage available for lifestock and wildlife. | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS. Site specific decisions are not land use planning decisions |
|---|---|---|---|---|---|
| Shawn | Baker | 833 | 1 | Moab BLM has always provided a huge number of dispersed campsites. Dispersion allows both users' solitude and also minimizes over-use pressures. Please include more dispersed campsites (or maintain existing counts) in final Alternatives. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| Shawn | Baker | 833 | 2 | I also firmly believe that "user conflicts" are more of a perceived than actual problem. I am a mountain biker, hiker, and OHV owner. Trails that are enticing to bikes are not to OHVs, and only somewhat to hikers. Trails that offer challenges and scenic vistas to OHV operators are typically not challenging (or too steep/rough in some spots) for bikes, and uninteresting and wide to hikers. Trails that are already open to hiking are not applicable to OHV use. Potential user conflicts at trail interfaces are easily alleviated with user training and good etiquette. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. User conflict was an issue raised by the public during the scoping period for the DRMP/EIS. The general nature of societal conflicts is not a land use planning issue Education and signage are all administrative actions and do not require land use planning decisions. |
| Sean | Lively | 928 | 1 | The Final RMP should direct land managers exhaust mitigation efforts prior to closure of any area. | Mitigation can be put in place without an emergency limitation or closure. |
| Sean | Lively | 928 | 2 | Final RMP should also direct land managers to work with recognized groups, such as the 4x4WDA and USAALL, to ensure mitigation efforts have been exhausted. | Mitigation can be put in place without an emergency limitation or closure. |
| Larry | Hopkins | 929 | 1 | Wilderness areas in southeastern Utah do not work because of the travel problems on foot or | See response to comment 121-71. The 1990 Utah BLM Statewide Wilderness |

| | | | | | |
|---|---|---|---|---|---|
| | | | | horse back and carrying enough water- thus the lands will become areas of NO USE. | Environmental Impact Statement (EIS) assessed the relative uses to which the areas now known as Wilderness Study Areas (WSAs) could be put to use. The EIS proposed a range of alternatives, from no wilderness to all wilderness, for the lands in question. The EIS was never acted upon by Congress, and they continue to be managed by the BLM under the non-impairment standard until Congress takes action. |
| Larry | Hopkins | 929 | 2 | In regards to camping you do not tell us the details as to how many areas will be closed or where folks will be able to camp. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| Larry | Hopkins | 929 | 3 | The four options need to be reworked and expanded upon with details and the addition of single track trails for mt. biking and motorcycles that have been left out of your planning. | The BLM specifically asked for route information during the scoping period for the RMP.  All routes submitted by the public at that time were considered for inclusion in the Travel Plan.  See Appendix G for a description of the Travel Planning process.  For the addition of new routes to the travel plan, see response to comments 122-15 and 122-30.  The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Peter | Apicella | 930 | 1 | Areas that are greater than one, two, or three miles away from a road are increasingly rare-- this unfortunately makes it more and more difficult to find silence from humans and our machines out on the land. I will remind land managers that the sound envelop/impact for one Off Road Vehicle is significantly larger than the visual impact. | See response to comment 122-7. The commenter is also reminded that the topography of the Moab Field Office means that the one-, two- or three-miles buffer from a road is less important than it may be in a landscape that does not have the topographical variety of the Moab Field Office planning area. |
| Peter | Apicella | 930 | 2 | The Green River non-motorized canoe corridor. People travel from all over the USA and the world | The BLM assessed the impacts on natural resources and recreation conflict between motorized access and |

| | | | | | |
|---|---|---|---|---|---|
| | | | | for multi-day paddle trips down the Green. Its one of the few places in Grand County where multi-day, non-mechanized travel can be engaged in. What a way to impact sombody's immersion in natural sound with the loud, multi-mile shredding, ehco- amplified buzz of an ATV posse. | river based recreation. The BLM determined that the purpose and need associated with the route outweighed the specified conflict. |
| Brandon | Andersen | 931 | 1 | With the focus areas being talked about in the proposal, I feel that a designated "4x4" area would be appropriate. Giving the 4x4 community an area that was designated to rockcrawling and 4-wheeling specifically would not only give those of us who enjoy this type of recreation an area to do so like hikers already have in most of the open areas in Utah, but also give an opportunity to educate about land use and ways in which 4x4 and OHV users can contribute to keeping our public lands open to everyone. | Four wheel drive opportunities are specifically provided for in the Gemini Bridges Motorized Focus Area.  In addition, four wheel drive opportunities are available on any of the over 2,500 miles of "D" road designated in the Travel Plan accompanying the DRMP/EIS.  Many of these routes (such as Pritchett Canyon and Behind the Rocks) offer challenge to very extreme four wheel drive vehicles.  No rockcrawling area is specifically designated in the DRMP/EIS, apart from Potato Salad Hill. However, rockcrawling opportunities are available on nearby private lands.  Education is valuable, but it is an administrative action and does not require a land use planning decision. |
| Brandon | Andersen | 931 | 2 | The White Wash Sand Dunes is also an area that I have enjoyed for many years, both as a campsite and just to drive around on in the afternoon. I do not have anything against paying a fee to use an area or camp there, If my fees keep the land open, then I will pay the fees, but the proposed action seems that the area will be closed, and then in the future there is a possibility of re-opening the area after a campgound is built, if the campground is ever built. This is unacceptable . The White Wash Sand Dunes is one of the few areas where open recreation will not harm any vegetation. This area needs to remain open, even if a campgoround is eventually built. | See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| Kara | Pincock | 932 | 1 | Keep Ten Mile Wash and other riparian washes open as they have had use for decades. A great example of why a wash is approiate for motorized use is what happened to Ten Mile Wash in the | See response to comment 211-20 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | storm 10 months ago. The area was totally resurfaced by the storm and all use evidence was erased. | |
| James | Malapanes | 933 | 1 | If camping is only dispersed, and we are not allowed to go off of established trails, does that mean we have to camp (or park RV's) in the middle of the road? Or will the "trails" be wide enough to park on the edges, like a highway? | See response to comments 123-8 regarding dispersed and designated camping. See response to comment 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| James | Malapanes | 933 | 2 | Surly you are joking about fencing off the trees and water sources! What a ridiculous waste of money, not to mention the destruction to the area involved in building the fences. How will the wildlife get to the water or the trees? | See response to comments 208-3 and 479-6. |
| James | Malapanes | 933 | 3 | The White Wash Dunes should be left as is, or expanded. This area recieves a huge number of ATV's and dirt bikers, and should remain as a premier recreation location. Being sand, it does not deteriorate from heavy use like other dirt or grass areas would, and is perfect for riding in the winter time, since it is warmer there. Likewise, the Ten Mile Wash area should be left open to ATV's, dirt bikes, horses, hikers, and anyone else that wants to travel that route. Although it is definitely not a big draw for hikers or mountain bikes due to the sand! It's a beautiful area, but definitely NOT wilderness area potential. | See response to comment 123-35 |
| James | Malapanes | 933 | 4 | The number of motorcycle trails in the final version should include at least several hundred miles of trails. I suggest connecting the Copper Ridge and Thompson trails. | See response to comment 122-29 |
| James | Malapanes | 933 | 5 | Motorized recreation requires more miles of trails than mountain bikes, horses, or hiking, because motorized travel faster. A normal ATV or dirt bike ride covers 50-70miles, where a normal mountain | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

| | | | | bike ride covers 15-20 miles, and hikers cover maybe 10-15miles in a normal hike. | based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|---|
| Gary | Clinard | 934 | 1 | We have tried to read and study the Moab RMP and have found it to be so long and involved that the general public cannot be expected to understand and be able to preform an informed public review on all the various areas about which they are concerned. It is our belief that this project should be seperated in to two or three areas for study. We oppose the document as written. | See response to comment 123-14. |
| Gary | Clinard | 934 | 2 | It is not clear in the document that the BLM is addressing not only their RMP, but a travel management plan as well. These two different plans should be presented seperately. We oppose the way the document is written | See response to comment 124-71 |
| Gary | Clinard | 934 | 3 | The document fails to provide factual evidence to support many of the restrictions placed in all the Alternatives. The document must not make restrictive decisions which are not based on conditions which are confirmed and presented to the public in this document. We oppose making decisions which lack firm facts for their necessity. | Chapter 3 contains information regarding the affected environment, including how the resource or resource use has change over time. A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative.  The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.<br><br>The commentor has not provided specific examples of a decision that seems restriction given the conditions presented in the document. |
| Gary | Clinard | 934 | 4 | White Wash Sand Dunes: a- the boundaries for the area need to be easily identified by visitors. Roads and natural boundaries need to be selected, otherwise there will be an ongoing problem with visitors straying out of the openarea. We oppose arbitrary boundaries unworkable. | See response to Comment 123-35. The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding. |

| Gary | Clinard | 934 | 5 | b- The area needs to be larger than proposed. This is a popular area and will continue to receive heavy use. Forcing more visitors in to a smaller area will create continuing management problems. If the area is as small as proposed usage will spill over into adjacent areas, especially into areas which have traditionally been used, such as the hill-climb to the northwest. These traditionally used areas need to be included. We oppose these smaller open area proposals. | The commentor is referring to the White Wash Area. See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| --- | --- | --- | --- | --- | --- |
| Gary | Clinard | 934 | 6 | c- It is a waste of time and money to fence the cottonwood trees and water sources in an open area. We oppose this unnecessary use of BLM time and money. | See response to comments 208-3 and 479-6. |
| Gary | Clinard | 934 | 7 | d- Camping should continue at White Sands as currently allowed until the BLM constructs a permanent, developed campground. It is unreasonable to ban or restrict camping for the length of time it will take the BLM to complete any project. We oppose any camping ban or restriction before a developed campground is providid for visitors. | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| Gary | Clinard | 934 | 8 | e- We oppose any fee system for White Sands which is developed or implemented without detailed input and agreement from the visitors who will be affected. | See response to comment 123-10. |
| Gary | Clinard | 934 | 9 | It is not clear that user conflicts are such a major problem that "exclusive use zones" need to be established. We oppose excluding certain groups fromusing particular areas. This approach unfairly penalizes motorized recreation. Non-motorized remains free to use all public land. Motorized recreation becomes even more limited than it already is. A satisfactory motorized experience means participants cover many more miles in a day than non-motorized, so the creation of more areas where motorized is excluded unfairly | See response to comment 413-9 regarding focus areas and 123-10 regarding fees. |

BLM_0011431

| Gary | Clinard | | | reduces the opportunities for this legitimate recreation. | |
|------|---------|-----|-----|-----------|-----------|
| Gary | Clinard | 934 | 10 | "Exclusive use zones" do not necessarily mean a better experience for non-motorized. With out access to the interior of these areas, non-motorized use will be limited to the fringes where participants can park their vehicles. Having roads open to vehicles through all areas means that all types of recreation will have access to more public land. Non-motorized can park and hike, ride horses, or mountain bike starting anywhere along the roads. We oppose limiting access, which would occur with "exclusive use zones" | See response to comment 413-9. |
| Gary | Clinard | 934 | 11 | Visitors who are not comfortable sharing the public lands with all types of recreation should be directed to areas which already prohibit motorized use. There are vast numbers of acers where solitude can be enjoyed without further restricting the recreation of a large percentage of visitors to the Moab area. We oppose creating more areas which allow exclusive use by one type of recreationalist. | See response to comment 122-9 |
| Gary | Clinard | 934 | 12 | The trails and roads for motorized, and the non-motorized trails can be seperated in the same area so different types of users have minimal contact with eachother. The needs of all users can be accommodated without unduly restricting one (motorized) group. We oppose allowing public lands to become virtually exclusive domain of non-motorized users. | See response to comment 127-8 |
| Gary | Clinard | 934 | 13 | Even if an area has a non-motorized focus, roads and trails for motorized should be allowed through all areas so that motorized recreationalists can continue on to enjoy other public lands. We oppose blocking any motorized routes. | See response to comment 127-8 |
| Gary | Clinard | 934 | 14 | Dispersed campsites should not be closed unless a resource problem is fully documented and | Public participation has been solicited throughout the land use planning process. No areas are closed to |

BLM_0011432

| | | | | reviewed by the open public planning process. The number of campsites which would be closed under each alternitave should be disclosed in the RMP. We oppose closing any dispersed campsites without public review. | camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
|---|---|---|---|---|---|
| Gary | Clinard | 934 | 15 | ATV use in the Moab area is increasing and this activity needs to be recognized. There will be a need for more ATV trails in the future and a way to provide this need must be addressed in this document. Some trails that are listed for motorcycles should be for both motorcycles and ATVs. We oppose any plan which ignores planning for the increased ATV use which is coming. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Gary | Clinard | 934 | 16 | We strongly oppose the inclusion of "Land with Wilderness Character" issues in this document. The designation of wilderness study areas was completed in 1991 and there is no plausible reason for reopening that issue in this RMP. The BLM would be in conflict with the direction that congress gave in section 603 of FLPMA, since there has been no statement by congress that the BLM should open this discussion again. Inclusion of "Lands with Wilderness Character" in this document will surly lead to lawsuits. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Gary | Clinard | 934 | 17 | It is important to keep as many motorized routes open as possible. It does not help to close routes, it only puts more pressure on the remaining ones. As roads become more crowded, more dusty from use, and provide fewer places to go, the satisfaction level of the motorized recreationalist | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring |

| | | | | | |
|---|---|---|---|---|---|
| | | | | diminishes greatly. This dissatisfaction and the perception that motorized recreation is being treated unfairly when compared to non-motorized leads to management problems. | and site specific NEPA analysis. |
| Gary | Clinard | 934 | 18 | Close a road or trail only after all means of eliminating or reducing a problem have been exhausted. Work closely with local groups to identify and remedy damaging situations. Hold public meetings to explain problems and ask for help in resolving issues. Create education directed at illuminating a specific problem to those who may not know it is a problem. Rigorously enforce complience to regulations and laws, and fine those who do not cooperate. | See response to comment 122-18 |
| Gary | Clinard | 934 | 19 | Use barriers or rerouters to protect resources. | Barriers and rerouters refer to means of implementation of the Travel Plan.  The BLM will utilize all reasonable techniques to implement its Travel Plan |
| Gary | Clinard | 934 | 20 | Provide more open areas, where those who just want to play around with their vehicles can do so legally. This will help take that behavior off of the roads and trails. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| Gary | Clinard | 934 | 21 | Provide detailed information for OHVs about where they can go, what laws and regulations are in effect, what the BLM needs from OHVers to keep trails open, how to report problems, how bad behavior affects riding privileges, and how to respect other people who are using public lands. | See response to comment 122-18 |
| Gary | Clinard | 934 | 22 | Educate non-motorized recreationalists about the legitimacy of motorized use on public lands. | See response to comment 123-25 |

| Gary | Clinard | 934 | 23 | Provide positive interaction in the field between the BLM and motorized recreationalists. Give positive reinforcement and encouragement to users who are doing such things as staying on the trail, or driving/riding slowly past others on the road. | Positive interaction between BLM staff and recreationists is not a planning issue.  The BLM recognizes the need for education, and its field staff endeavors to positively reinforce proper behaviors. |
|------|---------|-----|-----|---|---|
| Tom | Messenger | 935 | 1 | The preferred alternative fails to provide adequate protection for lands of wilderness character. Too often, especially in the transportation plan, the allowed uses are seen as balancing the claims of different recreation communities while actually it's a question of maintaining the natural character of the land. The most glaring example is the inclusion of only 18% of land with wilderness character outside WSAs as AWCs. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-0550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some of all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| Tom | Messenger | 935 | 2 | The whole route from the mouth of Spring Canyon to the Hey Joe Mine should be closed to preserve the natural character of the _____ corridor and prevent conflict with recreation not at odds with that character.  Additionally, the route extends degradation of actual qualities on the floor of Hey Joe Canyon well above the mine and turn-around by offering access to ATVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| John | Neff | 936 | 1 | "Special Recreation Management Areas" should stress accommodation of as much recreation as shows up, with the aim of mitigating impact, not diminishing user satisfaction. Expansion of active management in many areas, such as the Utah Rims, Yellowcat, Mill Canyon, Sevenmile Rim, | The BLM has proposed ten SRMAs in the preferred alternative.  Mill Canyon, Sevenmile Rim, South Spanish Valley, Utah Rims, White Wash, Black Ridge, Rabbit Valley and Westwater are all within SRMAs (Mill Canyon, Sevenmile Rim and White Wash are within the Labyrinth Rims/Gemini Bridges SRMA, South Spanish |

BLM_0011435

| | | | | South Spanish Valley, White Wash, Black Ridge, Rabbit Valley, and Westwater is appropriate and needed. | Valley and portions of Black Ridge are in the South Moab SRMA, Utah Rims and Rabbit Valley are in the Utah Rims SRMA, and Westwater is in the Two Rivers SRMA.  The commentor should remember that recreation is but one of the multiple uses for which BLM manages its lands. See response to Comment 122-38 regarding Yellowcat. See response to comment 122-39 regarding Utah Rims See response to Comment 123-35 regarding the boundary of White Wash. See response to comment 122-43 regarding the Black Ridge area. |
|---|---|---|---|---|---|
| Marcia | De Sonne | 937 | 1 | The draft so-call Management Plan is a sham as no attempt is made to balance between preservation, recreation, and dubious energy development. It is skewed entirely to business special interests at the expence of the American public - vacationers, campers, hunters, birders and everyone else who may choose to just drive through this incredible land. And another special interest is the ORV business which hopes to profit from new open terrain. The BLM plan makes 80% of the area open to oil and gas leasing and opens 81% of the area for Off Road Vehicle (ORV) use. | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| Marcia | De Sonne | 937 | 2 | Fully protect all wild places around Moab such as Fisher Towers, Goldbar Rim, Labyrinth Canyon, and certainly the vast entire viewsheds of Arches and Canyonlands National Parks from oil and gas development and ORV use. | The management and level of protection of the wilderness characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness |

| | | | | | characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. |
|---|---|---|---|---|---|
| | | | | | See response to comment 124-53. |
| Marcia | De Sonne | 937 | 3 | Adopt the needed protections by adhering to the Redrocks Herritage Plan put forth by the Southern Utah Wilderness Alliance as a balanced alternitive to the present BLM suggestion. The Redrocks Herritage Plan reconciles competing interests without precluding any. It would protect fragile wilderness lands and other sensitive areas from oil/gas leasing and development, and from excessive Off Road Vehicle use. It offers a reasonable transportation plan that lessens the impact of ORVs on the land while providing opportunities for primitive and non-motorized recreation. | See response to comment 124-9. |
| Michael | Deschamps | 938 | 1 | I would like to see Muddy Creek be re-opened to complete the loop to Factory Butte. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Penny | Schiller | 939 | 1 | First, I'd like to mention the Areas of Critical Environmental Concern (ACECs). There is an incredibly huge difference between Alt. B and C with regards to ACECs. Fourteen of them are brought forward to B, encompassing 613,000 acres. Alt. C only brings forward 5 ACECs with _3,000 acres. There is no balance in Alt. C. It does not adequately preserve critical areas. It does not recognize the need for maintaining diverse and wild lands for their senic beauty, solitude, and the preservation of species. I am particularly | See response to comment 124-68, 124-69,  and 124-5 regarding ACEC designations |

| | | | | | |
|---|---|---|---|---|---|
| | | | | concerned about the vulnerability of the Book Cliffs region, with it's abundance of natural beauty and cultural/ wildlife resources. The 5 ACEC's proposed in Alt. C are completely inadequate and unacceptable. | |
| Penny | Schiller | 939 | 2 | Second, I'm concerned about the non-WSA lands with Wilderness Characteristics. It scares me to read that Alt. C abandons all but three of these areas and protects a paltry 48,000 acres out of the potential 266,000 acres. I find that incredibly disturbing. How can you possibly consider that to be balanced? It's a giveaway. It's immoral. It worries me to think about what other 'uses' in our irreplaceably beautiful lands may have to endure. They must be protected. Do not allow the despolaition of the few undisturbed places we have left. | See response to comment 124-53. |
| Dan | Davis | 940 | 1 | SUWA's arguments are invalid. They are unhappy with the noises put off by off-road vehicles. How can you look at closing lands and not enforce muffler restrictions? | See response to 122-7. |
| Veronica | Egan | 941 | 1 | First, I wish to state my dismay that Utah State BLM Director Selma Sierra has refused to extend the comment period for any of the RMPs. This is hardly a way to foster public participation in the planning process! | See response to comment 124-1 |
| Veronica | Egan | 941 | 2 | Under the BLM proposed plan, wilderness landscapes will, in large part, become sacrifice zones for off-road vehicles. | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |

| Veronica | Egan | 941 | 3 | BLM proposes to designate 2,642 miles of ORV routes, many on lands within America's Red Rock Wilderness Act, including many which the BLM previously recognized as wilderness-quality. Damage from ORV use will be widespread. And peace and quiet will be extremely difficult to find: BLM's proposal will result in 84% of public lands near Moab (those south of I-70 which attract most of the areas visitors) being within 1/2mile of a designated ORV route. Where are we non-motorized folks to go to escape these machines? | See response to comment 124-53. The Moab Field Office manages over 350,000 acres as Wilderness Study Areas, in which only primitive recreation is allowed.  In addition, the DRMP/EIS designates lands as non-motorized (hiking) focus areas.  Non-motorized recreation is to be emphasized in these areas. |
|---|---|---|---|---|---|
| Veronica | Egan | 941 | 4 | At the same time, BLM has done no site-specific studies to determine the impact of these routes on Native American Cultural sites or other natural resources like riparian areas and wildlife habitat. Science to back up the ORV route designations does not exist in this document. These resources belong to all Americans, and deserve far more scrutiny before being permanently impacted by energy development and motorized traffic. | The impacts of travel on natural resources are analyzed in Chapter 4 of the DRMP/DEIS, including the No Action alternative. Additional information on the impacts of travel on resources has been added to Chapter 4 of the DRMP/EIS and to Appendix G (Travel). Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations. DRMP/EIS. Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the RMP. |
| Burke | Johnstun | 942 | 1 | I'd like to address a few concerns I have with the alternatives currently on the table. First, I believe that none of the 4 alternatives are adequate to meet the needs of most visitors to Moab and further reasonable alternatives proposed by interested parties such as Ride With Respect are required to be studied prior to issuing a decision. At least, a supplemental study of these alternatives should be conducted. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Burke | Johnstun | 942 | 2 | In regards to the inventory done by the Moab BLM, I believe that there are many motorcycle, mountain bike, and ATV trails that were not included. I would strongly suggest that these need to be inventoried prior to forming a final plan. The current inventory | See response to comment 122-14 |

| | | | | is deeply flawed and omits some very important trails. | |
|---|---|---|---|---|---|
| Burke | Johnstun | 942 | 3 | I believe the plan is to disallow any camping that is not a developed campsite is neither adequate or appropriate to meet the needs of the visitors to this area. Many visitors to Moab enjoy dispersed camping, and we enjoy being able to get some space from our fellow man. Also, designating campsites should be done with public participation. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding access to dispersed campsites. Public participation has been solicited throughout the land use planning process. |
| John | Davidson Jr. | 943 | 1 | In my experience on these trails, the individual user groups maintain a courteous and respectful co-existence. It seems to me that the conflicts are not with the individual users, but with some of the more extreme organizations that claim to represent the users. I strongly discourage the 'exclusive use zones' proposed for existing trails. This will be difficult to manage especially for less frequent visitors to the area and cause confusion when focus areas are overlapped or contain multi-use trails. | See response to comment 413-9. |
| John | Davidson Jr. | 943 | 2 | I note that there is a camping policy proposed in Appendix E. I am concerned with closing a high number of vehicle accessible campsites. This puts a financial bind on many  who visit the area. | See response to comments 123-8 regarding dispersed and designated camping. There is no regional prohibition against vehicle based camping; although vehicle based camping is restricted to designated sites in heavily used areas around Moab (about 5% of the area), due to public health and sanitation concerns. See comment 120-86 regarding vehicular access to dispersed camping sites. |
| John | Davidson Jr. | 943 | 3 | Expanding the Sevenmile Rim area to include Mill Canyon and Tusher Rim would provide more than a single day of riding in this area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Wendy | Hoff | 944 | 1 | The 2004 scoping period for drafting the RMP received 6,244 comments reflecting a pro-conservation position, and only 25 a pro-off-road- | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and |

| | | | | vehicle position. Why do all of the draft alternatives include thousands of miles of off-road -vehicle use? | alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| Wendy | Hoff | 944 | 2 | Your alternatives slash Proposed Wilderness Areas. The BLM is the one that actually concluded these places have wilderness character. How could they completely reverse their position? There should be NO motorized access in these areas. | See response to comment 124-53. |
| Wendy | Hoff | 944 | 3 | Federal law requires the BLM to give PRIORITY to the protection of lands with senic, cultural, or ecological importance, which most of the Moab area qualifies for. The BLM needs to do site-specific studies to determine the impact of ORV routes on cultural and natural resources | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations. Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the RMP. See response to comment 124-68 regarding ACEC designations.  In addition, all cultural resources are protected by the full force of the law. |
| Wendy | Hoff | 944 | 4 | as for oil and gas exploration, all of my above comments apply. Money-spending tourists are not here to see oil wells, trucks, and helicopters. Most comments received during the 2004 scoping period were not in favor of drilling. Exploration means, once again, lack of solitude for humans, and noise and roads that disrupt the soil, plants and animals, and cultural sites. Utah posseses such a meager percentage of the worlds energy reserves, why destroy our rural areas? | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. |

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.

The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.

The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development.

The Moab Field Office interdisciplinary team carefully considered the recreation resources of the Moab planning area in applying oil and gas lease stipulations in Alt C.  Important scenic and recreation areas are managed as closed to leasing, or as open to leasing with

BLM_0011442

|  |  |  |  |  | a no surface occupancy stipulation.  These areas include the lands along the Colorado, Green and Dolores Rivers, the areas around Fisher Towers and Mary Jane Canyon, and in areas along Highway 313.  In addition, a controlled surface use stipulation to protect visual resources has been applied to other important recreation areas.<br><br>All cultural sites are protected by law. The BLM worked with the Utah Division of Wildlife Resources, as well as the U.S. Fish and Wildlife Service, to provide protective stipulations for wildlife.  Timing limitation stipulations have been applied to lands with sensitive soils in Alt C. |
| Wendy | Hoff | 944 | 5 | Grazing is ill suited to our lands, Cattle tear up the plants and soils almost as musch as vehicles. Appreciating wilderness… does not include cresting a hilll only to see..a herd of cattle. | Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. See Response to Comment 9-3. |
| Maggie | Wilson | 955 | 3 | In addition to the county roads inventoried by the BLM, SEVERAL HUNDRED MILES OF TRAIL EXISTS THAT WERE NOT INCLUDED IN THE BLM'S INVENTORY. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, some of which are not included in the BLM's inventory.  I believe this is a violation of the 2001 BLM National Management  Strategy for motorized OHV use that states "Successful resource management depends on gathering quality data using the best science available" (page 15) and the 2006 BLM technical reference on Planning and Conducting Route Inventories which states "Route inventories are an integral part of Land Use Plans (LUPs)/ Resource Management Plans (RMPs)" (page 5). The Moab RMP should acknowledge that the impacts to bicycling, motorcycling, and ATV riding cannot be fully measured in the absence of a complete trail inventory. PLEASE CONSIDER DESIGNATING TRAIL DATA THAT | See response to comment 122-14 |

| | | | | WAS PROVIDED DURING THE PLANNING PROCESS. | |
|---|---|---|---|---|---|
| Maggie | Wilson | 955 | 4 | Once the travel plan is implemented, the BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. | See response to comment 123-25 |
| Maggie | Wilson | 955 | 5 | The BLM should prioritize the development of new specific bicycle, motorcycle, and ATV trails, with preference to special recreation management areas (SRMAS), and especially to the appropriate focus areas. Trail expansion should avoid pitting recreationalists against one another on a rigid system of roads. To proactively manage recreation, SMRAs should be designated in anticipation of increasing visitation, not in reaction to it. SRMA boundaries and focus areas should be large enough to "grow into" as trends emerge. Focus areas should provide for a wide range of specialized sports. | See response to comment 413-9 regarding focus areas. BLM lands are managed for multiple use under FLPMA; mechanized recreation is but one of these uses.  The BLM has placed 10 SRMAs in the preferred alternative. These SRMAs are designed to meet the future needs of recreationists.  See also response to comment 122-14. |
| Maggie | Wilson | 955 | 6 | Likewise, trails should not be ruled out simply by virtue of their low use levels. Low-use trails represent an opportunity for Grand County to be prepared for times of high volume visitation by particular user groups when recreationalists seek out less popular routes. Some trails only appear to experience low use because they are durable, or have not been abused. LOW-USE TRAILS OFTEN PROVIDE A UNIQUE EXPERIENCE FOR RECREATIONISTS SEEKING SOLITUDE. | Assuming the commentor is referring to motorized routes for non full-size vehicles, no such route was ruled to be not identified for motorized use on the basis of low usage.  Any such route not identified for motorized use in one or more action alternatives was a result of resource conflicts outweighing purpose and need.  In the case of full-size vehicle routes, the process of route designation is outlined in Appendix G.  The DRMP/EIS also provides a mechanism for future motorized routes to be added to the travel plan on a site-specific basis. |
| Maggie | Wilson | 955 | 7 | The Moab Extensive Recreation Management Area (ERMA) should provide primitive roads, singletrack trails, and dry washes to connect SRMAs and towns. Such routes offer opportunities for long-distance tours, which are increasing in popularity among motorized and mechanized enthusiasts, and promise to boost rural economies | See response to comment 122-49 and 123-45 regarding the ERMA. The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |

BLM_0011444

| | | | | | |
|---|---|---|---|---|---|
| | | | | and disperse use, thereby alleviating conflicts. | |
| Maggie | Wilson | 955 | 8 | The road plan in alternitave C provides sufficient road-based opportunities. More of the existing roads surrounding Interstate 70 should be designated for long-diastance touring. Compared to the road plan, motorized and mechanized trail designations are scarce. So the FINAL RMP SHOULD DESIGNATE TRAILS IN ALTERNATIVE D, PLUS OTHERS SUBMITTED BY RECREATIONISTS DURING THIS ENTIRE PLANNING PROCESS. The travel plan in Alertnative C does little to expand non-motorized oppertunities. Several areas could provide substancial primitive oppertunities by closing a few less-valuable roads. Homogeneity of the road plan would intensify conflicts and hurt all user groups in the long term. Alternatively, a few steps to diversify the travel plan could benefit recreationists across the activity spectrum. | See response to comment 124-55. |
| Maggie | Wilson | 955 | 9 | The ERMA, Thompson Trail is unique by virtue of its sheer length and remotness. Trail adoption by volunteers could preserve its singletrack character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These singletracks should be preserved, along with dajacent double-tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | See response to comment 122-29 |
| Maggie | Wilson | 955 | 10 | Likewise, the Kokopelli Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to CONSTRUCT A KOKOPELLI SINGLETRACK AND MARK A KOKOPELLI DOUBLETRACK that would roughly parallel one another. Through Utah | See response to comment 122-46 |

BLM_0011445

| | | | | | |
|---|---|---|---|---|---|
| | | | | Rims, the singletrack should be open to motorcycles. Through Yellowjacket, the singletrack should actually be ATV trail. Everywhere else, the singletrack should be non-motorized. The doubletrack would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | |
| Maggie | Wilson | 955 | 11 | Northeast of Green River, the NON-WSA LANDS SURROUNDING TUSHER CANYON HAVE GREAT POTENTIAL FOR MOUNTAIN BIKE TRAILS. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bicycle trails in Fruita, a Tusher Canyon system would boost the economy of Green River, and dedicate quality trails for mountain biking. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Maggie | Wilson | 955 | 12 | GENERALLY SUPPORT ESTABLISHMENT OF LABRYNTH RIMS SRMA IN ALTERNATIVE C; HOWEVER, MOTORIZED USERS MUST HAVE SUFFICIENT AREA TO RECREATE OR THEY ARE MORE LIKELY TO ROAM, EXPOLORE OR TRESPASS AREAS RESTRICTED TO THEIR USER GROUP. The Dee Pass Motorized Trail focus area should be expanded beyond Alternative __ eastward to the powerlines. The White Wash Sand Dunes OHV Open Area should be expanded by two square miles beyond Alternative D (northward to Ruby Ranch Road and southward toward Red Wash Road). Fee programs should be determined with public involvement  through a Resource Advisory Council. Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Tenmile | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0011446

| | | | | | |
|---|---|---|---|---|---|
| | | | | Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Tenmile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel. | |
| Maggie | Wilson | 955 | 13 | THE SOUTHWEST CORNER OF LABYRINTH RIMS IS A RELATIVELY PRIMITIVE AREA, AND SHOULD BE MANAGED TO PRESERVE THIS QUALITY. Spring Canyon, Hellroaring Canyon, Spring Canyon Point, and South Horse Thief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, focus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hay Joe Mine. Dubinky Wash is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles. | See response to comment 122-46 |
| Maggie | Wilson | 955 | 14 | NORTH OF HIGHWAY 313, THE SINGLETRACK WHICH DROPS OFF HIDDEN CANYON RIMS IS A KEY LINK FOR MOTORCYCLISTS AND BICYCLISTS, ALIKE. The Mill Canyon- Sevenmile Rim mountain bike area ahould be rotated to become Mill Canyon- Tusher Rims. Tusher has better bicycling potential than Sevenmile due to less sand, more slickrock, and fewer roads. Then Sevenmile- Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground. Upper Sevenmile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See response to comment 122-46 |
| Maggie | Wilson | 955 | 15 | SOUTH OF HIGHWAY 313, AN ADDITIONAL BICYCLE FOCUS AREA WEST OF SOUTH FOR SEVENMILE CANYON COULD PROVIDE | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

| | | | | | |
|---|---|---|---|---|---|
| | | | | CROSS-COUNTRY AND VEHICLE-ASSISTED RIDES FROM THE UPPER GEMINI TRAILHEAD DOWN TO THE WITCHBACKS ON HIGHWAY 313. the Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim. The spur to Gemini Bridges should remain open to allow the unique experience of driving to the bridge. MOUNTAIN BIKE ALTERNATES TO THE ROADS COULD BE DEVELOPED IN THIS AREA, AS PROPOSED BY TRAIL MIX. The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Maggie | Wilson | 955 | 16 | The Klondike Mountain Bike Focus Area is a great foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should remain permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. THE COPPER RIDGE MOTORCYCLE LOOP IS HIGHLY VALUABLE TO MOTORCYCLISTS AND MOUNTAIN BIKERS ALIKE BECAUSE OF THE POINT-TO-POINT APPEAL THAT SINGLETRACK USERS COVET IN OUR AREA. Trail adoption could help to ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward legal alternative. | See response to comment 122-46 |
| Maggie | Wilson | 955 | 17 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel | See response to Comment 122-38 |

BLM_0011448

| | | | | | |
|---|---|---|---|---|---|
| | | | | plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area should buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple of overlooks of Lost Spring Canyon and Dome Plateau are needed, but thety should remain open all the way to the rim. | |
| Maggie | Wilson | 955 | 18 | Utah Rims SRMA ought to extend further southwest to Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the ground work for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help reserve Guy's Trail and associated singletracks. From Westwater road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of hay flat. a non-mechanized focus area could be expanded from the Westwater WSA further southwest all the water to private property. The entire spur road to Big Hole could be closed to enhance primitive characteristics. None the less, the Westwater Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | See response to comment 122-39. |
| Maggie | Wilson | 955 | 19 | The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing the less-valuable tours, Big Triangle substantially expands the Westwater roadless area to the north. Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well. From Steamboat Mesa to South Bever Mesa, another focus area should be designated for primitive recreation. Half of the | See response to comment 122-40 regarding routes in the Dolores Triangle. |

BLM_0011449

| | | | | Dolores River overlooks could be reserved as cherry stems. Also, a road on the southeast ridge of South Bever Mesa lies outside of this focus area, and should remain open. | |
|---|---|---|---|---|---|
| Maggie | Wilson | 955 | 20 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system. Thus OHVs should remain permited to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25mph should be preserved. A NON-MOTORIZED LANE SHOULD BE CONSTRUCTED TO PARALLEL THE ROAD TO INCREASE SAFTY AND REDUCE CONGESTION. ADDITIONALLY, THE 1/4-MILE SLICKROCK ROUTE CONNECTING SLICKROCK TRAIL WITH FINS 'N THINGS SHOULD BE DESIGNATED FOR TWO-WHEELED USE TO ALLEVIATE TRAFFIC ALONG THE MAIN ROAD. All of these measures would make it and Flats more user-friendly and manageable, without further impacts to the environment. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Maggie | Wilson | 955 | 21 | PE__AL POLICIES SHOULD CONTINUE PERMITTING SLICKROCK EXPLORATION. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the Slickrock trail, Bartlett Wash and Tusher Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel should be further restricted, but not so drastically as the DRMP intends. MECHANIZED TRAVEL SHOULD STILL BE ALLOWED ON ANY BARREN ROCK | See response to comment 122-42 |

| | | | | SURFACE. Slickrock within 100yds of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accomidate the ways that people currently enjoy slickrock areas. | |
|---|---|---|---|---|---|
| Maggie | Wilson | 955 | 22 | The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments a varrity of terrain, and provides enough room for a full day's ride. Sweeping travel restrictions associated with the DRMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trails riding exists in Pole Canyon from the powerlines area to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. THE SOUTH FLANK COULD BE A BICYCLE FREERIDE AREA, SINCE IT PROVIDES ONE THOUSAND FEET OF VERTICAL RELIEF, AND GRADED ROADS FOR SHUTTLING. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-the-Rocks  while avoiding the Highway. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Maggie | Wilson | 955 | 23 | Hatch Wash backpacking focus area could be expanded for better backpacking. Alternative C proposes to designate roughly 20 spur roads to | See response to comment 122-45 regarding additional routes. |

| | | | | the rim of hatch wash. However, only five are necessary to view most stretches of the canyon. | |
|---|---|---|---|---|---|
| Maggie | Wilson | 955 | 24 | Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole oasis could still skirt the nearby residential area. | When the Cameo Cliffs SRMA was created, the areas to the east were specifically excluded due to mining hazards. Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area. |
| Michael | Sennett | 956 | 1 | The BLM is allowing the use of helicopters to stake mining claims which destroy the silence we hikers regard as essential to our experience. | This is not an RMP comment.  The BLM does not have authority over air space. |
| Michael | Sennett | 956 | 2 | There should be buffer zones around Arches, Island In The Sky, Fisher Towers and Labyrinth Canyon. I have hiked in Goldbar Canyon and it is no place for ORVs. I have floated through Labyrinth Canyon and its environs are no place for ORVs. The Fisher Towers should be off limits to machines. | See response to comment 980-1.  The 'buffer zones" that have been established are considered sufficient to protect the resources in question.  The commentor provides no data to indicate why wider zones are needed. |
| Michael | Sennett | 956 | 3 | The BLM should be keeping ORVs out of WSAs as well. The long term values of the canyon country are in its natural state- the spectacular scenery, solitude and serenity provide refuge from the misery of modern times. | The preferred alternative designates only 1.7 miles of route within over 350,000 acres of Wilderness Study Area. |
| Tyler | Kokjohn | 957 | 1 | I am writing to request that the Final RMP include a travel plan that will adequately protect the natural and cultural resources harbored within this BLM planning area. The transportation plan simple proposes far too many miles of vehicle routes in areas of rare and unique value. In the appended information regarding the travel plan (section 7.1, page G-11) is a reiteration that the BLMis required to follow a non-impairment standard with regard to the management of WSA tracts. The preferred alternative proposes managing roughly 20% of areas acknowledged as possessing wilderness characteras such and seems  out of line with the | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. |

| | | | | expressed non-impairment mandate. In general, the transportation plan seems to present alternatives that in ways do not vary much. For example, the total open route milage varies between 2,144 for the most conservation-oriented alternative to 2,671 for the least. While there will be constraints on closing some routes, I urge the BLM to explore the possibility that for some regions the preferred transportation alternative may not fully protect existing resources. | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| Tyler | Kokjohn | 957 | 2 | Allowing too many OHV routes in tracts that the BLM has inventoried and acknowledged to possess wilderness characteristics could place at risk a rapidly vanishing national resource-- roadless and primitive areas. In addition, such actions would undermine active congressional legislation to formally designate and permanently protect portions of BLM areas within the Red Rock Wilderness. Allowing OHV routes within areas of wilderness character will also put irreplaceable cultural resources at risk of distruction and looting. The clear mandate to the agency is to protect and preserve these resources for future generations. | See response to comment 124-53. See also response to comment 124-48 concerning cultural conflicts. |
| Tyler | Kokjohn | 957 | 3 | The Draft Plan proposes to undertake cultural resource inventory and assessments for areas subject to development. This is a great idea since so little inventory data is on hand to inform management decisions. Unfortunately, the preferred alternative includes only about 60% of the total acreage potentially in play for assessment. It is unclear why the most conservative-oriented alternative would propose more inventory and assessment be preformend in | The commentor is assumed to be referring to the spread, by alternatives, of cultural field inventory.  A larger acreage is prioritized for cultural field inventory in the conservation alternative because the BLM is proposing a pro-active, conservation oriented alternative.  Alternative D emphasizes commodity production.  While the laws protecting cultural resources must be followed in implementing all actions, Alternative D is less concerned with a pro-active conservation approach.  Cultural resource inventories will be undertaken in response to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | the face of markedly less potential development threat. The amount of cultural resources inventory and assessment must be commensurate with the threat and I urge the BLM to be certain the final plan will allow for such activities to be preformed at the scale necessary to ensure archaeological assets are safeguarded. | the development proposal. Thus, the prioritization of cultural field inventories fits the theme of each of the action alternatives. |
| Wayne | Mohler | 958 | 1 | The final EIS should disclose how many camp sites would be closed under each alternative. With self-contained campers or Toy Haulers, there are not the sanitation issues that might exist with tent campers. We self-contained campers would support a policy where existing camping sites are open, unless determined closure is deemed necessary through lawful, public planning process. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
| Wayne | Mohler | 958 | 2 | The White Wash area has many camping sites, which are used every week by different groups, which do not apprear on your maps. The Final RMP should mandate full public involvement for any establishment and management of "restricted camping areas" or "controlled camping areas" | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. Public participation has been solicited throughout the land use planning process; however, the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision |
| Wayne | Mohler | 958 | 3 | When addressing "User conflicts" the final RMP should not have "exclusive use zones". Any percieved or potential "oser conflict" could result in prohibiting one or more user groups, again causeing that excluded user group to be compressed into a smaller avaliable space, thus increasing the potential for higher impact. | See response to comment 413-9. |
| Wayne | Mohler | 958 | 4 | The Utah Rim SRMA is needed to properly manage this popular area. There should be two-track, single-track (motorized and mountain bikes)_focus, and feature the ability to designate or construct additional routes as they become | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See response to comment 122-39 regarding the proposed boundary. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | needed in the future. Limiting camping to one small designated area in the RMP would be foolish. The RMP should provide general guidelines and not limit camping in such a way. The SRMA must utalize the dense network of mining road that already exist throughout the Moab area. The Utah Rims SRMA should extend further South and West to encompass Mel's Loop and beyond. Increased visits by our citizens currently warrant a more active management of the SMRA. A larger area could provide sufficient room for a full-day motorcycle rides and the creation of a new area for mountain bike focus. | |
| Wayne | Mohler | 958 | 5 | Since no single track inventory was preformed, the BLM should continue accepting data on existing single track routes and consider them for implementation. Saying that there is a lack of funds or resources to review these routes is not an acceptable reason for not providing access to this user group. | See response to comment 122-14 |
| Wayne | Mohler | 958 | 6 | An open area, in addition to the White Wash area would provide addiotional and different terrain for everything from trails motorcycle riding to rock crawlers, with separate loops for hikers, bicycles and equestrian users. The Black Ridge could remain unrestricted for this purpose. | See response to comment 123-35 |
| Steven | Davis | 959 | 1 | In the '70's, '80's and into the '90's, the WTA used to hold annual events in the rocks just above the Slickrock Trail parking lot, but a few years ago there was a push to close much of the rock area, and we were restricted from being able to use that area for our competitions. I would love to see the slick rock trail area expanded laterally to allowfor exploration and allow us room to navigate around the bicycle riders. | See response to comment 122-42 |
| Steven | Davis | 959 | 2 | I understand that a proposal is in the works to create a dedicated "open" trails motorcycle/bicycle | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following |

| | | | | | |
|---|---|---|---|---|---|
| | | | | area at Pole Mountain near the BFE area. I whole heartedly applaud this effort, and hope that you will do everything possible to make it happen. Although we enjoy the opportunities in Moab of riding on designated roads and trails, we also need open areas where we can set our competition sections as the sport requires rugged terrain that can't be found on marked roads and trails. Please don't make the mistake of trying to lock us into a small area. As I am sure you are all well aware, OHV's are the fastest growing sport in the nation, and we need an area large enough that will accomidate those growing numbers. | resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| Greg | Phillips | 960 | 1 | It seems that the BLM is proposing a "close first-mitigate last" approach to OHV use. I would suggest that the final RMP mandate that adaptive management practices be used across the Field Office and that the RMP should direct that mitigation efforts will be exhausted prior to closure. If a closure does take place another area equal in recreational opportunity should be opened elsewhere. This will prevent congestion and 'over use' of any particular area. This is important to maintain the environment and still allow recreation. When an area is closed it just doubles the demand on another area. | Mitigation can be put in place without an emergency limitation or closure. |
| Greg | Phillips | 960 | 2 | Recreationalists need a few distinct areas open for travel. In 1.8million acrea, White Wash is not quite enough. An open area in addition to White Wash could provide different terrain for everything from bicycle riding, to motorcycling, to hard core rock crawling. As much of the Moab area becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. I hope the final RMP designates some additional open areas. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |

| Nate | Dallolio | 961 | 1 | Fee systems are very controversial and unpopular with the recreating public. The accepted version of the RMP should not include or require a fee system. Not only are these system not viewed well by the general public, but they are discriminatory against Americans with lower incomes. Individuals with considerable financial means barely notice the impact, while those with less struggle can't afford to use the land thay already should have option upon. | See response to comment 123-10. |
| --- | --- | --- | --- | --- | --- |
| Nate | Dallolio | 961 | 2 | It is acceptable to add recreation areas to what has been available in the past that include primary focus opportunities for recreating groups; it is unconstitutional to arrange the plan that excludes specific groups from the right to use public lands | See response to comment 413-9 regarding focus areas. Focus Areas are not intended to be for the exclusive use of any one group of recreationists. |
| Caroline | Petti | 963 | 1 | Labyrinth Canyon- the Green River flows through Labyrinth into Canyonlands National Park, a river segment that has long been enjoyed by the public on float trips. The area has valuable habitat for desert bighorn sheep and pronghorn antelope. It should be protected by barring ORVs and oil/gas leasing from the canyon and its rims and approaches, including Ten Mile Canyon, Ten Mile Point, White Wash, Hell Roaring Canyon, Mineral Point, Horsetheif Point, Deadman Point, and Springs Canyon Point. An "Area of Critical Environmental Concern" (ACEC) should be designated to protect this entire area. | Although Labyrinth Canyon is not proposed as an ACEC in Alt C, many management decisions protect the values brought up by the commentor.  Desert bighorn sheep habitat and migration corridors are protected by the imposition of a no surface occupancy (NSO) stipulation for oil and gas leasing and all other surface disturbing activities.  The Green River, Ten Mile Canyon, Hell Roaring Canyon, Mineral Canyon and Spring Canyon are managed with an NSO stipulation.  Areas near the rim of the Green River (such as Deadman Point, Horsetheif Point, Mineral Point and Spring Canyon Point) are also managed with a no surface occupancy stipulation for oil and gas leasing and all other surface disturbing activities.<br><br>All motorized travel in the Labyrinth area is limited to designated routes.  The Travel Plan for Alt C designates some, but not all, existing routes. |
| Caroline | Petti | 963 | 2 | White Wash Sand Dunes- ORVs have dominated this area for too long, jepordizing it ecological value as a dune comples with cottonwood trees and with bighorn sheep habitat close by. BLM is | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

BLM_0011457

| | | | | | |
|---|---|---|---|---|---|
| | | | | right to close part of the dunes in Alternative C, but I urge you to close the entire complex. It is too valuable to be left to ORV activity, which keeps the rest of the public from enjoying the area. | based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Caroline | Petti | 963 | 3 | Colorado River Corridor- Fisher Towers and Mesa, Dome Plateau, the Dolores River and its tributaries should be part of protected ACEC barring ORVs and mineral leasing. Visitors to Moab are enjoying this area by float trips, horse riding, hiking, and siteseeing along Highway 128 on the way to Moab. It is also central in the panoramas people enjoy from popular viewpoints in Arches National Park. ORV traffic and oil/gas drilling would mar these grand views. | In the preferred alternative (Alt C), the Colorado River Corridor, including Highway 128, is managed as no surface occupancy or as closed for oil and gas leasing. Surface disturbing activities are prohibited in areas delineated as no surface occupancy (see Appendix C of the DRMP/EIS). In this alternative the area is designated as VRM II. Therefore, the BLM contends that the management actions proposed in Alt C are sufficient to protect visual resources and to prevent harm to wildlife and plant habitat along the Colorado River. |
| Stacy | Salmana | 965 | 1 | The final RMP should mandate that adaptive management practices be used across the Field Office. The final RMP should direct that mitigation efforts will be exhausted prior to closure. The Final Rmps should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. When using adaptive management principles, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Adaptive management merely means using site specific factors to guide future decisions. |
| Stacy | Salmana | 965 | 2 | The Final RMP should avoid "exclusive use zones" where, based on percieved or potential "user conflict," one or more "conflicting uses" is categorically prohibited. Most of the non-motorizrd focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C and D, many visitors will precieve these focus areas as establishing blanket restrictions on motorized use. The unintended concequences will likely result in increasing, not reducing actual or perceived "user | See response to comment 122-9 |

| | | | | conflict". | |
|---|---|---|---|---|---|
| Stacy | Salmana | 965 | 3 | The Final RMP should direct land managers to educate the non-motorized visitors (who may perceive conflict with motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters. The Final RMP should direct land managers to educate vehicle-assisted visitors of where road or trail might be shared with non-motorized visitors, and if appropriate, direct slower speeds. The Final RMP should direct land managers to re-route either use so as to avoid sections of roads or trails that are extremely popular with both groups. | See response to comment 122-9 |
| Stan | McVey | 966 | 1 | We started out riding competitions around the Slick Rock Trail Head (near what I believe is called the Sand Flats Recreation area?) but were denied access to that area for confusing reasons. The Slick Rock "bike" trail, by the way, was designed for and by off-road motorcycle users. Its popularity as a mountain bike trail has overshadowed the use by OHVs, and I suppose I'm okay with that, but I ask that, in return, we are provided with trails-specific use area.<br><br>The Nature of trails dictates that we have an open area with suitable terrain. This includes, but is not limited to, rocks, logs, mud, sand, dirt, and some more rocks. With the revision of the Moab Field Office RMP, this is an opportune time to consider a trails specific riding area and a dedicated rock crawling area for those who enjoy those forms of recreation. I fully support the proposal by Ride With Respect for additional mountain bike, trails, and rock crawling areas. For trails use, we don't require a large area as long as the terrain is suitable. One square mile would be more than | See response to comment 208-7, 122-42 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | sufficient, contingent on the terrain. The area around Pole Mountain near Area BFE, as described by Ride With Respect, would likely be suitable location. | |
| Stan | McVey | 966 | 2 | The proposed White Wash open area is much too small. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps parts of Black Ridge could remain unrestricted for this purpose? The Moab DRMP would reduce the "open" portion of the Moab Field Office from 38% to 0.001%. That's outrageous. However, a mere additional 0.001% left open would greatly improve the options for certain specialized sports like rock crawling and bicycle/motorcycle trails. A reserved rock crawling area could be centered around the previously disturbed lands of the Yellow Circle Mine. | See response to comment 123-35 |
| Stan | McVey | 966 | 3 | I ask you to seriously consider the needs of rock crawlers, trails/freestyle bicyclist, and motorcycle trails riders. Providing badly needed open areas for them will take much pressure off other restricted areas and give us a place to recreate where we won't bother those desiring a "wilderness experience". | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Wayne | Peters | 967 | 1 | I was amazed to learn that there was a prairie dog population off of I-70. This whole area should be protected, as praitie dogs should be on the Endangered Species list. | The commentor's desire for the BLM to protect the area around the known prairie dog population near Interstate-70 is noted. |
| Richard | Newcomb | 968 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create de-facto Wilderness management is unlawful. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Richard | Newcomb | 968 | 2 | All SRMAs with the motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |

| | | | | there be a need. | |
|---|---|---|---|---|---|
| Richard | Newcomb | 968 | 3 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future.<br><br>The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| Richard | Newcomb | 968 | 4 | BLM should consider a SRMA in the Yellowcat area. Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there could utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Richard | Newcomb | 968 | 5 | The Mill Canyon- Sevenmile Rim biking focus area should be expanded as Mill Canyon- Tusher Rims in order to provide better terrain for pedaling. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Richard | Newcomb | 968 | 5 | The Final Plan should extend the South Spanish Valley biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Richard | Newcomb | 968 | 6 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling, to hardcore rock | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

| | | | | | |
|---|---|---|---|---|---|
| | | | | crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accomidating specialized sports Perhaps part of Black Ridge could remain unrestricted for this purpose. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Richard | Newcomb | 968 | 7 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride With Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accomidate the ways that people currently enjoy Sand Flats. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Richard | Newcomb | 968 | 8 | Since no singletrack inventory was preformed, the BLM should continue accepting data on existing routes to consider them for implementation. | See response to comment 122-14 |
| Richard | Newcomb | 968 | 9 | The Utah Rims single-track network should include at least 25miles of additional routes, in order to be as complete as the Dee Pass network. | See response to comment 122-46 |
| Richard | Newcomb | 968 | 10 | Long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. The Copper Ridge Motercycle Loop should be combined with Thompson Trail in the Final Plan. | See response to comment 122-29 |
| Richard | Newcomb | 968 | 11 | A few more non-riparian washes should be left open, especially in the Cisco Desert. Wash riding is very popular. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14 |
| Phil | Tisovec | 971 | 1 | Additionally was shocked at the comment in the Special Designations section that pinpointed specific damage to the [White Wash] area as "especially OHV users using the cottonwood trees as slalom poles". Maybe it's been observed, but that does not mean it is the norm. Biased, catch-all statements such as that really made me question the integrity of the document as a whole. The BLM | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative |

| | | | | needs to be sure that there exists a factual justification for making any of the decisions and proposals existing in any of the plans. | record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
|---|---|---|---|---|---|
| Phil | Tisovec | 971 | 2 | I am also concerned with how the proposal may be addressing closure of trails and areas for OHV use- basically closingbefore testing all alternatives. The Final RMP should mandate that adaptive management practices be used across the Field Office concerning closures. All mitigation efforts should be attempted before closure including working with the affected public to ensure all efforts have been exhausted. When possible, attempts should be made to balance closures with designations of new areas that are similar and more sustainable. | Adaptive management merely means using site specific factors to guide future decisions. |
| William | Allender | 973 | 1 | I am a Geographic Information Systems Professional (GISP) and have had the opportunity to closely review the GIS data used for the maps that were submitted as part of this Draft RMP-EIS. By zooming in on certain areas of the data, using ArcMap, it is clear that this plan is setting up user groups to be at odds with each other for many years to come. In particular, the designation of lines on the map as "motorized use" traveling through a polygon area listed as "non-motorized use" sets the stage for future court battles between groups like the Southern Utah Wilderness Alliance (SUWA), a varity of Off-Highway Vehicle (OHV) user groups, and the BLM. I am referring specifically to the designations shown in Alternative C, your preferred alternative, for locations such as Pritcherd Canyon, and the OHV corridors of Gold Bar, Rusty Nail, and Gold Spike. Rather than have a corridor or route "line" sit directly on top of a "polygonal" area, I would hope that the single polygonal area be split into multiple areas, to eliminate this "vagueness of use" and | See response to comment 127-8 |

| | | | | future conflict among user groups. Let's please try to get this right the first time and not have the user groups spend many years bickering over the definition of words and "intent", in court, if that's even in the realm of possibility. | |
|---|---|---|---|---|---|
| William | Allender | 973 | 2 | I am extreamly disappointed at the exclusion of the current Cisco Desert single-track, the trail connects the Colorado Border to Thompson Springs, UT, from the preferred alternative. Simply traveling down the only other alternative, a pothole-laden interstate frontage road, is a poor substitution for this wonderful trail system (shown in Alternative D) that has minimal impact on the area. I hope that you will reconsider and keep this trail open from the Colorado border to Thompson Springs, as the premier alternative for dual rport riders like me, for traveling cross-country and staying out of earshot of the interstate highway system. | See response to comment 122-46 |
| Ed | Askew | 974 | 1 | Your own data shows that there has been an increase of hundreds of percent in the number of people recreating using ATV's and other ORV since the last time you did a travel plan, I find it hard to understand that with the increase and the trends showing that more people will be buying ATV's and needing a place to recreate that we are closing 2/3 of the trails. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Phil | Triolo | 975 | 1 | Suffcient time has not been allowed for comments. The plans took many years to prepare and are quite detailed. As the BLM is to manage these lands in public interest, more time should be allowed for the public to comment. Because of the limited time allowed for comment, it appears as if the intent is to remove public input on public lands, rather than solicit it. | See response to comment 124-1 |
| Phil | Triolo | 975 | 2 | The preferred alternative, and indeed, none of the other alternatives, adequately protect wilderness | Wilderness Study Areas cannot be released by the land use planning process.  The Moab DRMP/EIS states that |

| | | | | | |
|---|---|---|---|---|---|
| | | | | study areas. These areas were selected and set aside for study because they exhibit wilderness characteristics. Trails have been illegally etched onto the landscape in these areas by OHVs. Illegal activities should not disqualify these lands from wilderness designation, and by proposing to drop them as wilderness study areas, the BLM is condoning illegal activity which it failed to adequately curtail. | if these lands are released by congress (at some point in the future), they will be subject to a plan amendment before actions can be authorized. The Moab BLM has over 350,000 acres of Wilderness Study Area.  These areas are monitored monthly; their suitability for wilderness has not been impaired.<br><br>As described in Chapter 1, pg. 1-11 of the DRMP/DEIS under the title "Issues Addressed Through Policy or Administrative Action," WSAs are managed in accordance with the Interim Management Policy for Lands Under Wilderness Review (IMP, H-8550-1; BLM 1995).  The WSAs are statutorily required, pursuant to FLPMA Section 603(c), to be managed to protect their suitability for Congressional designation.  Applying a visual resource management objective of Class I and managing the WSA as either limited to designated ways or closed to OHVs are the only two decisions that this land use planning effort has authority to make.  All other decisions for the management of WSAs are outside the scope of this RMP/EIS process. |
| Phil | Triolo | 975 | 3 | I have rafted and canoed Labyrinth and Stillwater Canyons several times, most recently on a family trip in 2005. The development proposed for theses canyons-particularly the designated trails and proposed oil development- are not at all consistant with the reason that I have floated there. This is one of the few stretches of river in Utah that is easily accessible, is not difficult (class II) and thus allows trips with young children, and is not permitted. This stretch is a perfect introduction to calm, scenic whitewater. It would be irreparably damaged by the establishment of permanent trails and oil development in the area. I suggest that the area be designated as off limits to OHV and oil development, and proposed for Wild and Senic designation. | See response to comment 124-88. |

| Phil | Triolo | 975 | 4 | It is my understanding that over 80% of the 1.8 million acres covered by the plan will be within 1/2 mile of an OHV trail. Too much wildlife habitat and wildlife are disturbed by such a pattern of trail. We need to protect ecosystems. An understanding of the need for biological integrity of the areas studied is lacking. Concentrate all of the vehicular use in one area. Let the rest of the land- huge expanses that allow for continuous habitat for local fauna and minimize the introduction of exotic species-remain off-limits to OHV use. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Amy | Brunvand | 976 | 1 | BLM should extend the comment period in proportion to the task of trying to evaluate thousands of pages of data and maps in a few months. | See response to comment 124-1 |
| Amy | Brunvand | 976 | 2 | The plan is so heavily slanted towards commodities development and motorized recreation that it completely fails to meet the goal of balance. When I do a thought experiment and imagine what the Moab area is going to look like once Alternative C is "built out" I see a landscape that is no longer "natural" in any real sense, but largely devoted to motorized recreation, with roads built through areas that used to have natural character. Alternative C does far too little to protect the natural character of the land in the face of population growth and potential commodities development boom, and wrongly assumes that a compromise should be made by sacrificing areas that currently have wilderness characteristics. | See response to comment 124-9 |
| Amy | Brunvand | 976 | 3 | "Map 2-24-C Areas with Wilderness Characteristics Alternative C" is even more shocking since the BLM preferred Alternative C proposes eliminating conservation management for nearly all the areas that are identified as having Wilderness Characteristics in Map 2-24-B. Page 2-5 suggests that it is somehow a reasonable | See response to comment 124-53.<br><br>As described in Chapter 1, pg. 1-11 of the DRMP/DEIS under the title "Issues Addressed Through Policy or Administrative Action," WSAs are managed in accordance with the Interim Management Policy for Lands Under Wilderness Review (IMP, H-8550-1; BLM |

| | | | | | |
|---|---|---|---|---|---|
| | | | | "balance" to slash 33 non- WSA areas with wilderness characteristics (266, 485 acres) to 3 (47, 761). True balance would mean protecting every single one of those 266, 485 natural acres. Given how much of the Moab area is already roaded, or susceptible to commodity development and how little of the Moab area is still "natural" and considering how central the area has become as a destination for adventure tourism it is clearly urgent to maximize protection for WSAs, areas with wilderness characteristics, areas that qualify as Wild and Scenic Rivers, and all river corridors and riparian areas while there is still something to save. | 1995).  The WSAs are statutorily required, pursuant to FLPMA Section 603(c), to be managed to protect their suitability for Congressional designation.  Applying a visual resource management objective of Class I and managing the WSA as either limited to designated ways or closed to OHVs are the only two decisions that this land use planning effort has authority to make.  All other decisions for the management of WSAs are outside the scope of this RMP/EIS process.<br><br>In addition, the preferred alternative of the DRMP/EIS proposed that the Green, Dolores and Colorado Rivers be managed as Wild and Scenic Rivers.  These river corridors are to be managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities. |
| Amy | Brunvand | 976 | 4 | The plan needs a better balance between conservation and mining impacts A report from the Environmental Working Group U.S. Mining Database. Http://www.ewg.org/sites/mining_google/US/analysis.php says that between January 2003 to July 2007, 864 mining claims were staked on BLM lands within 5 miles of Arches National Park, and 233 new claims were staked on BLM lands within 5 miles of Canyonlands National Park. At the October 3rd public meeting at the Salt Lake Public Library a BLM representative said that because BLM has no control over legitimate mining claims the potential impacts of this boom in mining claims didn't need to be considieered in trying to create balance. While it may be true that BLM has no control to prevent legitimate mining claims it is also clear that these mining claims are essentially a time-bomb that may (or may not) explode into a mining boom at any time bringing with it a population boom, road construction, surface | The location of mining claims does not correlate with production and development.  Many mining claims are located for speculation purposes and no development occurs.  The development that BLM projects for locatable minerals in the Moab planning area is provided in the Mineral Potential Report and is summarized in Chapters 3 and 4 of the DRMP/EIS.  Unless withdrawn, BLM lands are available for mining claim location. Iin Appendix C, on pg. C-1 and C-2, it states: "where necessary in the future, areas identified as no surface occupancy could be recommended for withdrawal from operations conducted under the mining laws if unacceptable resource impacts are occurring."<br><br>The preferred alternative in the DRMP/EIS proposes to continue the Three Rivers Withdrawal (see Map 2-1). |

| | | | | disturbances, and increased motorized travel in the backcountry. It is clear that the minimal protections which Alternative C offers to existing natural areas would become entirely inadequate if a mining boom actually does develop to the current potential. | |
|---|---|---|---|---|---|
| Amy | Brunvand | 976 | 5 | The plan needs a better balance between conservation and motorized recreation impacts. In every alternative, the maps show a spider web of redundant motor vehicle routes, particularly in the area East of the Colorado River. Many of these routes travel through areas identified by the Utah Wilderness Coalition as having wilderness values, which means that these particular areas are the ones that many citizens consider especially important to manage for natural character and potential for primitive and unconfined recreation. Motorized recreation in these areas is a completely incompatible use. At the October 3rd Public meeting at the Salt Lake Public Library, a BLM representative said that the density of vehicle routes in this area is "not a problem, because when I go out there I almost never see another vehicle." It is true that low population has helped protect public lands in the Moab area in the past, but low population is a bad assumption for future management. A report in the Deseret News (11/16/2007) says that in the past year the state grew by 84,425 people, adding 10 people per mile. That makes it especially poor management strategy to assume that Off-Road Vehicle use will continue to be low. If the BLM representative was accurate in saying that very few vehicles travel on these roads, it is clearly unnecessary and undesirable to leave so many different routes to the same places. | As described in detail in Appendix G, the BLM assessed several thousand miles of inventoried motorized routes, assessing each on for purpose and need balanced against resource conflicts.  As a result of its deliberations, over 2500 miles of currently available motorized routes were identified for non-motorized use. In addition, the BLM reduced the acreage available for open cross-country travel to zero (or near-zero) in all action alternatives.  The commentor provides no specifics as to which particular routes are redundant. |
| Amy | Brunvand | 976 | 6 | Wherever Off-Road Vehicle use is allowed it has | The routes identified as "D" routes in the DRMP/DEIS |

| | | | | | |
|---|---|---|---|---|---|
| | | | | the potential to expand the maximum allowed level, so it seems worse than foolish to write a travel plan that specifically assumes a particular Class D road will never become a popular off-road recreation route. | are roads located on public lands and managed by the BLM until properly adjudicated.  The DRMP/DEIS proposes four different alternatives to manage these routes. |
| Amy | Brunvand | 976 | 7 | The sheer number of roads on the map looks like it would be impossible for the BLM to adequately monitor off-road vehicle impacts such as unauthorized trail-building. | See response to comment 122-18 |
| Amy | Brunvand | 976 | 8 | At the public meeting the BLM representative stated that the redundant routes are necessary because "nearly all of them access a view". This excuse seems absolutely unjustifiable since pretty much the entire Moab area constitutes a "view" and clearly non-motorized users would also like to see views without the smoke, exhaust, noise, and landscape scars caused by motorized recreation. | See response to comment 120-87 |
| Amy | Brunvand | 976 | 9 | The information on the OHV use and user conflicts on pages 3-82 through 3-88 pretty clearly shows why merely expanding the areas  subject to OHV recreation pressure is an exceptionally poor management strategy to cope with growing numbers of OHVs. BLM already knows that OHV management is a huge headache and that OHV use conflicts not only with non-motorized recreation but with other land uses such as oil and gas and ranching. When OHVs start using an area, even in realitively small numbers, the concept of multiple use goes out the window because intentionally or not a fairly low level of motorized recreation use still bullies all other uses out of the way for various reasons. The example given in the Draft RMP (p. 3-85) of Gemini Bridges is exactly right. 10 years ago that was an area where I enjoyed bicycling, but nowadays the number of OHVs has made riding in the area too unpleasant for anyone else to enjoy the area. | See response to comment 122-9 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Essentially any area that is open to unrestricted OHV use is being managed to potentially become and area that is ONLY for OHV use. The RMP is the only chance to develop stratigies that will make the problem truly manageable. That means OHV recreation should be limited to marked roads and trails. Areas should be closed to OHV travel unless they are clearly marked as open. OHVs should be excluded from all areas that area currently identified as having wilderness characteristics. Redundant routes should be trimmed from the map. Recreational OHVs should be kept away from all river corridors and riparian areas. | |
| Jen | Allender | 977 | 1 | User fees- The group that decides how the funding should be spent is not spelled out. I do not want to risk paying a fee that might be used to limit access to public lands. The affected user groups, the Recreational Fee Advisory Council, and the BLM Resource Advisory Council absolutely need to be the main contributers to such funding decisions and this fact needs to be spelled out. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes and the Federal Lands Recreation Enhancement Act. The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |
| Jen | Allender | 977 | 2 | I disagree with constructing fences or anyother structure on migrating sand dunes. I say this with emphasis as a Geologist. The whole point of migrating sand dunes is that they MIGRATE and whatever plants take hold or not have to adapt to the CHANGING conditions. The fence idea appears to be an attempt to stabilize migrating sand dunes for no logical purpose. | See response to comments 208-3 and 479-6. |
| Jen | Allender | 977 | 3 | I strongly support the inclusion of the Cisco Desert single-track because it is miles and miles of enjoyment. I thoroughly enjoy riding the tight little sandy washes and winding sandy hills. I find the views of the Bookcliffs and La Sals from the Cisco Desert trail to be starkly beautiful and I would hate to loose such a perspective. Because the Cisco Desert single-track is a long trail not located near | See response to comment 122-46 |

| | | | | anything else, it could be developed as a way to disperse recreation from other more concentrated areas. | |
|---|---|---|---|---|---|
| Jen | Allender | 977 | 4 | I disagree with the non-motorized area designations surrounding the Gold Bar Rim, Rusty Nail, and Pritchett Canyon trails. These trails are shown on the alternative maps as a single motorized line running through a non-motorized area. The lack of identifiable or logically-sized corridor inherently creates confusion and is a target for future disputes. These particular trails are historically classic and extremely popular trails that get a huge amount of use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Robert | Clark | 978 | 1 | I did my best to look through allof the alternatives presented and can't find many differences between them. The two things they all appear to have in common is that they do not aknowledge the need for and historic use of the area via motorized means and that they drastically reduce the open areas. The lack of recognition for motorized uses is totally unacceptable. There needs to be an alternative that maximizes all recreational uses, including motorized and non-motorized trails. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| Robert | Clark | 978 | 2 | There should be a provision in the plan for future growth and expansion of these [SRMA] areas as the need arises. | The addition of acreage to an SRMA would require a plan amendment.  However, the DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comments 122-15 and 122-30 concerning adding routes to the Travel Plan. |
| Robert W. | Nemitz | 985 | 1 | I would like you to consider reducing the available grazing permits in the Valley to the side of Highway 128 opposite the river. | All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q). See response to comment 9-3 and 120-5 |
| Dell | Crandall | 988 | 1 | My comment is about an area south and east of Levi Well, located in the S ½ of Section 25 T23S R18E. This has a high density of Cultural | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Resources, including rock shelters/residential sites, and numerous rock art panels, including one site that is very unusual and unique in this management area. Most of the shelter sites have suffered pothunting activities. Although there is still extensive lithic scatter, it is disappearing rapidly. A 4 wheel drive/ATV road passes through the center of the area – in some places within feet of sites. Recent camping activity has been discovered. | alternatives due to conflicts with cultural resources. Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See also response to comment 415-13. |
| Kathryn | Fitzgerald | 989 | 1 | As I understand it, some habitats would be protected from construction during vulnerable times for wildlife during the year they drill or roads are constructed. However, as I understand it, no such protection continues after construction. Drills and pumps are not shut down and roads are not closed to traffic in future years, when the animals are no less vulnerable during the designated times; ie, the animals' critical habitats are still destroyed—it just takes longer. If I'm right in this interpretation, I hope that the BLM will rewrite the restrictions on all of these areas to ensure that the habitat remains viable in perpetuity. | Timing restrictions for oil and gas development are for construction activities (road building, well drilling, pipeline construction, etc.). Once wells are drilled and roads and pipelines are constructed ongoing resource extraction can occur during the periods when construction activities are prohibited. These timing stipulations for well drilling, pipeline construction, and road construction are in accordance with UDWR BMPs for protection of big game and other species. UDWR is the agency with jurisdictional authority over wildlife in Utah. These stipulations have been crafted in cooperation with UDWR. UDWR has indicated that these stipulations are sufficient to protect the animals in question. |
| Richard Lance | Christie | 991 | 1 | The point relevant to the DRMP/DEIS which illustrates its incompetence is that there is no credible assessment of the impacts of this rather intense density of motorized recreation on the natural values of lands already recognized by the BLM as having wilderness character, much less resource values on other lands within the Moab Area DRMP's jurisdiction. Eighty-two percent of the lands inventoried by the BLM and confirmed to have wilderness characteristics qualifying them for inclusion in the National Wilderness Preservation System would be "roaded" with designated motorized routes under Alternative C. This is a significant federal action clearly having | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS. The ID team reviewed each route for purpose and need weighed against resource conflicts. These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record. The impacts identified for travel management in the DRMP/DEIS are derived from this data. |

| | | | | environmental effects. What are they? Alas, the DRMP/EIS does not credibly enlighten me. | |
|---|---|---|---|---|---|
| Richard Lance | Christie | 991 | 2 | The so-called "range of alternatives" in this DEIS does not meet the requirements of NEPA. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/DEIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple-use mandate. |
| Steve | Martin | 993 | 1 | We request that you remove the "as amended" part of Alternative A. We also request that all parts of the RMP that deal with any changed to Alternative A be removed as well.

The reason this should be removed is by the nature of Alternative A being a 'no action' alternative. By amending the alternative you are in effect providing a change. Here are some examples of where you are stating change in Alternative A. This being a 1500 page document I am not able to state all the places in time to make the close of the comment period.

Example 1 – In section 2.1.1.7 the last sentence reads "In Alternatives A and D, management of other resources values and uses would take | The No Action alternative (Alt A) is required by CEQ regulations.  The No Action alternative provides a basis of comparison for the action alternatives.

"As amended" means that the plan amendments to the 1985 Grand RMP are included as part of the Grand RMP. |

| | | | | precedent over the protection of wilderness characteristics." This is suggesting that there are areas of wilderness characteristics in Alternative A. Please remove Alternative A from this sentence.<br><br>Example 2. In Table 2.1 Moab RMP Description of Alternatives there are definitions listed for Alternative A as follows;<br>Alternative A (No Action) – All utility corridors would be 1 mile wide, except the existing Moab Canyon utility corridor, which is constrained by the topography of Moab Canyon. This physical corridor is only ¼ mile wide at its narrowest point.<br>Alternative A (No Action) – About 354,015 acres would be exclusion areas for ROWs.<br>About 48,245 acres would be avoidance areas for ROWs.<br>Alternative A (No Action) – The list of parcels identified for disposal totals 12,415 acres.<br><br>There are just two examples of 'amendments' (change) to Alternative A. Please remove all of them. | |
| Steve | Martin | 993 | 2 | We request that you halt any decision on the RMP until proper and accurate economic and social benefit is studied and included into the RMP in section 3.<br><br>I am sending along with my comment a copy of The Economic Contribution of Off-Highway Vehicle Use in Colorado report from July 2001. Their report was done my Hazen and Sawyer for the Colorado Off-Highway Vehicle Coalition. I feel this is an excellent example of the kind of economic numbers that are available to the BLM for use. I understand that the report is done for Colorado. I | Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, pg. 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management.<br><br>The economic value of recreation to the Grand County economy is analyzed in the DRMP/EIS.  With the data available, it is not possible to fully separate the economic benefits that accrue from various types of recreationists. |

BLM_0011474

| | | | | feel that when the Moab BLM office does a similar report for their area that with the geographic proximity that the numbers will be similar.<br><br>In the report on pages 4, you will see that there is a total of $519,333,239 spent on OHV recreation in Colorado. This I feel is a considerable amount that is not listen in your RMP in section three as it should.<br><br>I won a motorcycle shop in Grand Junction and the Moab area is a substantial part of that business. I gross 2.2 mil a year in sales and feel that people from Mesa County traveling to Moab and other travelers account for about 3 to 5 percent of my business. That is about $110,000 a year in income to my business. If that is impacted by a reduction in available OHV recreation the economic and social dis-benefit is a trickle down effect. Lost jobs, lost travel opportunities, and less purchases are just a few that are not included in the RMP.<br><br>Recently two friends and I took a trip down the Kokapelli, stayed the night in Moab, purchased gas, had dinner and breakfast, rode to Sovereign Trail to Thompson, purchased food and fuel, used the Thompson single-track to come back home to Rabbit Valley. This trip included a huge social benefit to three people. We took time off work, time away from family, traveled to the put in area. Enjoyed the scenery, discussed where we were and the geography of the area we were in, and had a great time. This is the type of social benefit that I feel is not in section three and must be put in there. | The Hazen and Sawyer report was a report commissioned by the Colorado Off Highway Vehicle Coalition. The engineering firm of Hazen and Sawyer analyzed the economic contribution of OHV use in Colorado. The report was paid for with OHV fees and pertains only to Colorado. It does not contain data specific to the economy of Moab, Utah.<br><br>The social benefit of recreation of all types is recognized in the DRMP/EIS. Appendix F provides specific benefits to recreationists, although the list is not meant to be exhaustive. FLPMA requires that BLM lands be managed for multiple use, of which recreation, including motorized recreation, is one. The DRMP/EIS provides a great deal of recreation opportunities, both to enhance economic return and to provide social benefit to groups and to individuals. |
| Steve | Martin | 993 | 3 | We request that you remove the closure of Gemini | The commentor's desire to keep Gemini Bridges open to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Bridges area on the basis of migratory and bedding sheep. The reason this should be removed is from your own data concerning water. There is no water listed in that area in your own hydrological study. For this reason the sheep will not bed in this area. It does not take an expert in animal behavior to figure this out. Please remove any closure for the Gemini Bridges in all Alternatives. | motorized travel under all alternatives is noted. The Gemini Bridges route was not closed due to conflicts with bighorn sheep. The conflicts were with other recreationists. Gemini Bridges is a highly used area, and driving over the Bridges is not appropriate at such a crowded location. See also response to comment 206-14. |
| Alex | Himes | 994 | 1 | I am in favor of alternative C but would like to have integral parts of the following trails used in the Easter Jeep Safari added to the inventory of designated routes in Map 2-11-C: Strike Ravine, 3-D Jeep Trail, Flat Iron Mesa.<br><br>I have included maps showing GPS tracks of existing routes for these trails indicated in red. Please add the missing segments to the designated route inventory on Map 2-11-C.<br><br>*See map info. | See response to comment 206-11 |
| Fred | Swanson | 995 | 1 | There appears to be no case-by-case analysis of (1) the need for each individual route, (2) the likelihood and potential impact of riders fanning out from each route anyway, in spite of the ban on cross-country travel, and (3) whether the needs of vehicle users could be met with a much smaller network of roads, while leaving larger areas of wild land intact. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Fred | Swanson | 995 | 2 | The analysis of the overall OHV issue in the EIS is not very illuminating. The document needs to forthrightly address the tremendous loss of wilderness-type recreation opportunities that has occurred since 1985. The discussion of Alternative C should state that under it, places such as Labyrinth Canyon, the Harts Point, and Hatch Point Cliffs, and other undeveloped areas will | The areas mentioned by the commentor have been reviewed by the BLM for wilderness characteristics. Those areas deemed to possess such characteristics are proposed for management to protect wilderness characteristics under one or more action alternatives. The loss of wilderness character referred to by the commentor, for those areas judged to lack such character, is the result of those areas having a large |

| | | | | | |
|---|---|---|---|---|---|
| | | | | continue to suffer serious damage to their wildland values. | number of impacts to naturalness, typically in the form of constructed motorized routes.  Most, perhaps all, of these routes have been in existence for many years and predate 1985.  The resultant lack of naturalness (and thus wilderness characteristics) is not a result of decisions from the 1985 nor the current plan, but a reflection of the on-the-ground reality.  The BLM does not have the legal authority to create roadless areas where they currently do not exist. |
| Fred | Swanson | 995 | 3 | Based on the EIS, it is very difficult to asses the overall impact of each alternative, beyond some broad-brush qualitative comparisons. The EIS breaks up the discussion of impacts into what amounts to a huge matrix, with an analysis of how decisions made under each resource category would affect all other resource categories. This is fine as far as it goes, but there needs to be a "summing up" of the overall impacts on particular resources. The EIS needs to give a clear idea of what will happen to soils, riparian areas, etc. in toto under each alternative. Specifics are needed, not generalities.<br><br>Ordinarily this could be done under the analysis of cumulative impacts, which is an extremely important part of any EIS. But the cumulative analysis in this EIS is rather cursory and does not provide the in-depth comparison of alternatives that is needed. There needs to be more than a simple qualitative comparison, as in saying that Alternative C would be worse than B but better than D. How many acres can we expect to see stripped of their protective biotic crusts under each alternative? How many miles of stream bottoms and riparian areas would be damaged? How much land would be subject to noisy intrusions from vehicles? Only if the EIS provides such information | See response to comment 123-14 regarding complexity of the DRMP/DEIS. See also response to comment 124-7 about direct, indirect and cumulative impacts. The DRMP/EIS gives estimates of acres of surface disturbance expected under each alternative.<br><br> Noise is not within the jurisdiction of the BLM. |

| | | | | is it possible to truly evaluate and compare the alternatives. | |
|---|---|---|---|---|---|
| Fred | Swanson | 995 | 4 | The EIS needs to assess how route restrictions will realistically be implemented. | See response to comment 122-18 |
| Fred | Swanson | 995 | 5 | For each mile of designated route, there should be an assumption factored in for the total acreage of soils damaged on surrounding land. | Disturbance off the road would be illegal under the terms of the Travel Plan.  The DRMP/EIS assumes that users will engage in legal activity.  Illegal activity is not analyzed in a DRMP/EIS. |
| Fred | Swanson | 995 | 6 | The document should note that mountain biking, as well as motorized OHV use, displaces hikers from trails and routes they have formerly used. | See response to comment 122-9 |
| Fred | Swanson | 995 | 7 | The EIS states that OHV use impacts on riparian resources would generally by the same under the preferred alternative as under Alternatives B and D (page 4-246). How can this be when the preferred alternative would designate riparian zones such as Tenmile Canyon for extensive motorized use? | The comparison on pg. 4-246 is based on the number of riparian acres that is "limited" vs. open to cross country travel. Using this level of comparison, there is very little difference among the action alternatives.  Additional data regarding the miles of route designated in riparian areas, by alternative, has been added to Chapter 4 and to Appendix G.  This mile by mile analysis clearly shows that there is less mileage designated in Alternative B than in Alternatives C or D.  See also response to comment 123-51. |
| Tom L. | Kyle | 996 | 1 | Generally I see some flaws in both choice of language and nature of the material. For both the DRMP and the DEIS the lack of clarity between descriptive language intended to be "general guidance" and that intended to be "decision implementing" is quite troubling. When prepared, the Final EIS should make these distinctions much clearer. In addition, the preparation of the FEIS should very clearly state connections between the current facts on the ground and the decisions to be made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| Tom L. | Kyle | 996 | 2 | The following suggesting with respect to the "alternatives" have been attributed to Mr. Seaman and I concur. Alternatives should include: -Educating the non-motorized visitors about when and where they may encounter vehicle traffic, as well as informing them of areas where they may avoid such encounters. -Educating the vehicle assisted visitor of where the road or trail might be shared with non-motorized visitors, and encouraging slower speeds and a more courteous ethic in these areas. -Re-routing either use so as to avoid sections of roads or trails that are extremely popular with both groups. For example, a hiking trail can be constructed to avoid a section of popular OHV route. Or an equestrian trail may be constructed to avoid a section of popular mountain bike route, etc. -Dispersing all forms of recreational use so as to minimize conflict and create a more desirable experience. | See response to comment 122-18 |
| Tom L. | Kyle | 996 | 3 | Several short sections of the Flat Iron Mesa Easter Jeep Safari route are missing from the proposed maps. One missing section includes the popular obstacle "Easter Egg Hill." Hopefully this is an accidental omission, but I (we) want to bring it to your attention. | See response to comment 206-11 |
| Tom L. | Kyle | 996 | 4 | On the OHV trail known as Strike Ravine, the obstacle often referred to as "big ugly" has been left off the maps. Additionally, the section of Strike Ravine that crosses Kiley Miller's property is also missing from the maps. The RR4W group has successfully defended the legality of this route in court over the last few years, and this valid route | See response to comment 206-11 |

| | | | | should be included on BLM maps.<br><br>Short sections of the Easter Jeep Safari routes for Crystal Geyser and 3D trails are also omitted from the BLM maps. Again, this is probably just an accidental exclusion, but something to bring to your attention.<br><br>Coyote Canyon is a popular OHV "hardcore" trail on public land west of Area BFE. This trail is not included on current proposed maps, but should be established as a designated route. | |
|---|---|---|---|---|---|
| Mary | Washburn | 997 | 1 | The BLM should consider a SRMA in the Yellowcat area. Many ATV riders like the Yellowcat area. Designating a SRMA there could utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Mary | Washburn | 997 | 2 | Some important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single-track. Alternative D adds another 100 miles. But in total, the final plan should keep roughly 300 miles of non-road motorcycle routes from being closed. | See response to comment 122-14 |
| John J. | Ahearn | 999 | 1 | It is my understanding that at the same time, BLM has done no site-specific studies to determine the impact of these routes in Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist in this document. | See response to comment 123-12 |
| Jeff | Price | 1001 | 1 | I do not see on Map 2-11-E (included) the motorcycle trails that are between highway 191 and Arches, are they included in the travel plan?<br><br>*see attached maps | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

| Robert L. | Norton | 1003 | 1 | I have included a copy of a portion of topographical map (Exhibit #1) that shows a GPS track of the route along the spur road and the slickrock climb. I urge that the BLM allow continued use of this last few hundred feet of route. Exhibit #2 details other Labyrinth Canyon overlooks that I have traveled.<br><br>*Map included. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Robert L. | Norton | 1003 | 2 | On Exhibit #3, I point out a route in that region that is missing on the BLM travel plan maps.<br><br>*see attached maps | See response to comment 206-11 |
| Harley | Bates | 1007 | 1 | I would support Alternative C "Preferred" except for a 2000 foot setback from the road. That is overly restrictive. 2000 feet is over a third of a mile and result in a terrific loss of resource. Even though plan C does not call of a reduction in AUMs, a 2000 foot setback would quickly result in lost AUMs or even total grazing cancellation as the area lost for grazing would be most of the good grazing land. A 2000 foot setback doesn't make any sense.<br><br>If the 2000 foot was a typo mistake and it was supposed to be a 200 foot setback, I would endorse alternative C. | The BLM proposes to build a fence set back up to 2,000 feet from Highway 128 in order to address safety issues regarding cattle along Highway 128 and to protect visual resources along the National Scenic Highway. See Reponse to comment 416-1. |
| Josh | Newren | 1008 | 1 | There are several trails that appear to have portions missing on the maps provided. Flat Iron Mesa has 4 parts missing. Strike Ravine has 2 parts missing on the map – such as a portion of the Big Ugly Hill and the portion of the trail that crosses through the Miller property. 3-D – a portion of the trail near the head of mill canyon that is missing from the map. | See response to comment 206-11 |
| Leroy P. | Abernathy | 1026 | 1 | I am very angry about 3 specific things associated with this document. 1. The document itself, it's size | This is not a comment that the BLM can respond to, but a statement of opinion. |

| | | | | (954 pages) and lack of usability. 2. The accusation that OHV users are vandals and theif's. PDF pg 3-87 3.11.2.7.1 Off-Highway Vehicle (OHV). 3. Lack of documentation to support your theory that the OHV community is a Medium user in the Moab area and has minimal economic impact. | |
|---|---|---|---|---|---|
| Leroy P. | Abernathy | 1026 | 2 | PDF pg. 57 Letter to the Reader: Makes reference to the decision maker but I can't find out who the decision maker is and what weight will be placed on the input based on what criteria. | The decision maker is the Utah State Director of the BLM.  This is the signatory of the "Dear Reader" letter. That individual is the decision maker. |
| Leroy P. | Abernathy | 1026 | 3 | PDF pg. 64 pg. ES.5.1 Alternative A- No Action. Designated as No Action but closes 5,062 acres to motorized use. | NRR |
| Leroy P. | Abernathy | 1026 | 4 | PDF pg. 65 ES.5.4 Alternative D: Is focused on Motorized use but has fewer miles designated. Alt A has 4,673 Alt D has 2,890 motorized miles. | NRR |
| Leroy P. | Abernathy | 1026 | 5 | PDF pg. 75 pg 1-5 Example of double speak with legal terms: Read the first sentence last paragraph, and tell me what it actually means. I have no idea what is said there. | This sentence means that each of the four alternatives were developed to emphasize certain uses or values. For example, Alt B emphasizes the protection of natural resources, while Alt. D emphasizes the production of commodities.  Alt. C provides a balance between protection and production. |
| Leroy P. | Abernathy | 1026 | 6 | PDF pg. 77 1-7 Section 1.3.2.2 Issue 1: It says "OHV use needs particular attention --- for the protection of other resource values." Does that mean other resources have a greater value than OHV use? What exactly does this mean? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| Leroy P. | Abernathy | 1026 | 7 | PDF pg. 78 1-7 Section 1.3.2.2 Issue 1 Related Recreational Issues: Using the term "conflict" between OHV and other. What does that mean? In my 18 years of riding I have only had one | User conflict was raised as an issue by the public during the scoping period for the RMP.  User conflict and displacement is defined on pg. 3-85 of the DRMP/EIS. See also response to comments 6-10, 6-24 and 122-9. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | "Conflict" with another user, she yelled at me. If conflict means "Contact" then that is a whole other disscussion. | |
| Leroy P. | Abernathy | 1026 | 8 | PDF pg. 78 pg 1-8 Section 1.3.2.2 Issue 1 Related Recreational Issues- Last bullet- How will Visual Resources be Managed. What exactly does that mean I have read the VRM in Table 2 but am still confused as to what that means. | The BLM's goals and objectives for visual resources are to protect the quality of scenic values; manage them for multiple use, filming and recreational opportunities; and preserve those scenic vistas that are most important (See Table 2.1, page 2-51). The reader is directed to Section 3.19 for an overview of the visual resources of the area and how they are being impacted by current management practices; and to Section 4.3.18 for an overview of the BLM VRM management class system. The visual portion of Table 2.1 applies the classification system to BLM lands within a range of alternatives designed to meet the goals and objectives listed above. |
| Leroy P. | Abernathy | 1026 | 9 | PDF pg. 79 pg 1-9 Section 1.3.2.2 Issue 6Identifies OHV as a particular impact to Riparian areas. How did you come to that conclusion as in my 30 years of riding I avoided Riparian areas to ride because they are difficult to ride who wants to fall into the river? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| Leroy P. | Abernathy | 1026 | 10 | PDF pg 80 pg 1-9 Section 1.3.2.2 Issue 7: How do you know there are Paleontological locations if they "have yet to be recorded"? | There are known sites for which the details have yet to be catalogued for reference (i.e., recorded). For example, page 3-67 of the DRMP/ DEIS notes that in the Utah Geological Survey fossil database of 246 fossil locations in the MPA, details are lacking in 177 known localities. The probability of paleontological resources is based on the geologic formation that is exposed at the surface. |
| Leroy P. | Abernathy | 1026 | 11 | PDF pg 81 pg 1-11 Section 1.3.2.3 Sixth Bullet down says there348,800 acres of WSA in 11 areas however PDF pg 64 ES.5 says there are 348,815 in 11 WSA locations. Which is correct? | Acreage data may vary slightly due to the mathematical algorithms utilized in GIS software.  The final plan will use one figure consistently. |

BLM_0011483

| Leroy P. | Abernathy | 1026 | 12 | PDF pg 95 Chapter 2.1 table is unreadable. The PDF format is so small that when you blow it up to read the words you are unable to get the full context of where they apply to the other blocks. This is a classic example trying to read the fine print of a contract. | The 11x 17 page size was necessary to show the alternatives side by side so that direct comparison could be made. |
|---|---|---|---|---|---|
| Leroy P. | Abernathy | 1026 | 13 | PDF pg. 162 pg. 2-74 Table 2 Travel Management OHV. Under Alternative A. It says "destruction of recreational-related Cultural Resources" What in the world does that mean? | The BLM recognizes that destruction of cultural resources is illegal.  The analysis summarized in Table 2.2 points out that if people (of any type or activity) do not have access to cultural resources, they can do them no harm.  "Recreation related cultural resources" means that recreationists of any type may cause advertent or inadvertent impacts. |
| Leroy P. | Abernathy | 1026 | 14 | PDF pg. 275 pg.3-77 3.11.1.2.9 Kane Creek Crossing. You say "Off Highway Vehicle play at camp is the major threat to senic values to the area" If you have ever been to this area you would know that most all of this area is not visible to someone traveling on the access road most of it is in a low lying area blocked by the trees and bushes adjacent to Kane Creek. Unless you can see through the trees riding in this area hass little if any affect on "Senic Value". | The scenic vista the commentor refers is experienced by all recreationists in the area.  Off road vehicle play is currently illegal in the Kane Creek Crossing Area.  It is not entirely confined to the riparian area and is not entirely invisible to those travelling on the Utah State Scenic Backway (Kane Creek Road).  The commentor should remember that visual resources are not the only values in the Kane Creek area.  Riparian values are also affected by cross country travel.  In addition, the trees are not foliated all year long, and cross country OHV riders can be seen, even in the riparian areas, during some parts of the year.<br><br>The BLM has been directed to designate open OHV areas only where other resources are not at risk.  There are many other resources in the Kane Creek Crossing area, including visuals and riparian. |
| Leroy P. | Abernathy | 1026 | 15 | In this section you state: "A survey conducted by the institute of Outdoor Recreation and Tourism (IORT 2002)" Why were only Mountain Bikers surveyed? It "appears" that the survey was conducted in the Slick Rock area and focused on the use of the Slick Rock area. This is a partial survey of users and limited to a specific area. | Slickrock Trail was chosen because it was one of the first trail designated primarily for mountain bike use and is one of the most popular mountain bike trails in the world, and due to its popularity it as has a variety management issues including crowding, vegetation trampling, soil compaction and erosion, safety, litter, and vandalism. Mountain bikers were chosen by the Institute |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | of Outdoor Recreation and Tourism as the sample survey group because the authors wished to gather information regarding perceptions regarding management of mountain biking. The BLM cannot dictate to Utah State University (home of the IORT) where to or on whom to conduct its research studies. The DRMP/EIS acknowledges on page 3-79 that the survey is not indicative of the entire mountain biking community.<br><br>The study can be found in its entirety at http://extension.usu.edu/files/publications/publication/NR _RF_012.pdf |
| Leroy P. | Abernathy | 1026 | 16 | You have OHV use listed as a medium level of activity. Based on my 18 years of use in the Moab area, looking at the number of Motorized carriers vs. non-motorized carriers in the parking lots I believe that this table is wrong. How did you come to that conclusion? | Table 3.18 merely attempts to give some indication of the levels of recreation use. OHV use (dirt biking and ATVing) does not approach the levels of "jeeping", hiking, sight seeing or camping. The preliminary data from the National Visitation Use Monitoring Study (NVUM) (2006) is provided in Table 4.67. This preliminary data confirms the use levels given in Table 3.18. The commenter should remember that the recreation use levels are for all BLM lands. For instance, the commenter may recreate in the White Wash area, which mainly has OHV users. The hundreds of thousands of recreation users along Highway 128 are counted as "sightseeing" and/or "hikers". The conclusions in Table 3.18 are based on observational data of BLM staff. The numbers in Table 4.67 are the preliminary NVUM results. |
| Leroy P. | Abernathy | 1026 | 17 | You say in this paragraph that motorized use has increased which seems to contradict what you put in the table PDF pg 278 pg 3-80 Table 3.18 activities in the MPA by Use Level. | A use may increase without that use being the "highest use". For example, an increase from 10 to 20 is a 100% increase. If another value is at 100 and has no increase, 100 is still 5 times greater than 20. Thus, increase and rank order are not equivalent. |
| Leroy P. | Abernathy | 1026 | 18 | PDF pg 283 pg 3-85 3.11.2.6 User Conflict and Displacement: Second paragraph you site as an example that mountain bikers in the Gemini bridge | See response to comment 122-9 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | area have been displaced by the "faster moving and louder modes of transportation" First time I went to Gemini Bridge area was in 1990 and there were no Mountain Bikers in the area, for that matter what few mountain bikers that were in Moab, almost all of them were in the Slickrock area. They may not be choosing to go to the Gemini Bridge area but they are not being displaced. | |
| Leroy P. | Abernathy | 1026 | 19 | You list 9 examples of conflict area. Every one of these conflict area lists motorized as one of the conflict parties. This supports my theory that the majority of use in the Moab area is by motorized users. | See response to comment 122-9 |
| Leroy P. | Abernathy | 1026 | 20 | Last sentence "may lead to increased vandalism and theft" How did you come to the conclusion that OHV users are vandals and theifs? How can this document be an unbiased report on the best use of BLM land if you feel that a particular user group are vandals and theifs? | The BLM does not conclude that OHV users (or recreationists in general) are vandals and thieves. Access to sites makes it easier for those who are vandals to vandalize. Vandalism may occur if access is on foot, horseback or non-motorized boat. |
| Leroy P. | Abernathy | 1026 | 21 | Again having no idea how you came up with the number of respondents. What is the basis for this table. It is not explained in this chapter | For a discussion of Table 3.18, see response to comment 124-15. |
| Leroy P. | Abernathy | 1026 | 22 | PDF pg652 pg 4-272 4.3.12.2.10.6 Alternative D. This whole section seriously flawed. Pharaphrasing, the more OHV users, the less likely the other users will not return to the Moab area and thus hurt the overall economy.  That assumes that the OHV user community has a greater impact without increasing itself. This whole study disproves that because you have continued to state that the OHV community and it's presence is increasing. Increasing the OHV activity increases the Moab Economy. I also contend that the OHV community spends a great deal more money in Moab than any other user group. The OHV user group is the one staying in the | See response to comment 124-127 |

| | | | | motels/hotels and eating at the restaurants. The mountain bikers, hikers are the ones sleeping at the campsites and using the ground as a toilet facility | |
|---|---|---|---|---|---|
| Leroy P. | Abernathy | 1026 | 23 | In many areas in this study you have stated that you do not fully understand how much money is being spent by each of the different user groups yet you have come to the conclusion that severly limiting the motorized community will not have an economic impact. | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used best available data to assess impacts. The BLM has no data to separate out motorized versus non-motorized recreation spending (assuming that the two groups are completely distinguishable). The BLM's discussion to which the commentor refers is heavily qualified, due to the lack of available data on which to project economic impacts from changes from recreation patterns under the various action alternatives. On pg. 4-269 of DRMP/EIS, the BLM argues that should OHV use decline in the planning area, it is possible that there could be a decline in local revenues. |
| Leroy P. | Abernathy | 1026 | 24 | The fact that comments are needed on Alternatives for the RMP and the Alternatives for the travel plan is not made clear in the document.<br><br>The difference between an RMP (general guidance) and the Travel Plan (implementation decision) is not clearly described in the DEIS. The FEIS should clearly articulate the difference. | See response to comment 124-71 |
| Leroy P. | Abernathy | 1026 | 25 | The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Leroy P. | Abernathy | 1026 | 26 | Because the open area boundary will not be easily identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely | The commentor is referring to the White Wash open area. See response to Comment 123-35. The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for |

| | | | | | |
|---|---|---|---|---|---|
| | | | | difficult to enforce. We suggest the BLM consider other funding mechanisms to pay for needed management infrastructure. | public understanding.<br><br>Enforcement actions are administrative and do not require land use planning decisions. |
| Leroy P. | Abernathy | 1026 | 27 | The Final RMP should mandate that adaptive management practices be used across the Field Office | Adaptive management merely means using site specific factors to guide future decisions. |
| Leroy P. | Abernathy | 1026 | 28 | The Final RMP should direct mitigation efforts will be exhausted prior to closure | Mitigation can be put in place without an emergency limitation or closure. |
| Leroy P. | Abernathy | 1026 | 29 | The Final Rmp should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. | Mitigation can be put in place without an emergency limitation or closure. |
| Leroy P. | Abernathy | 1026 | 30 | When using adaptive management principals, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Adaptive management merely means using site specific factors to guide future decisions. |
| Leroy P. | Abernathy | 1026 | 31 | The final EIS should disclose how many campsites would be closed under each Alternative. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| Leroy P. | Abernathy | 1026 | 32 | I am not sure based on the maps provided which campsites will actually be closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when |

BLM_0011488

| | | | | | |
|---|---|---|---|---|---|
| | | | | | damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. |
| Leroy P. | Abernathy | 1026 | 33 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Leroy P. | Abernathy | 1026 | 34 | SRMAs and their "focus areas" should avoid excluding other uses categorically. The preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones" | See response to comment 413-9. |
| Leroy P. | Abernathy | 1026 | 35 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future. In addition, limiting camping to one small designated area, in the RMP, is not wise. The RMP should provide general direction and not limit camping in such a way. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See response to comment 122-39 regarding the proposed boundary |
| Leroy P. | Abernathy | 1026 | 36 | The Utah Rims SRMA should extend further southwest to southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-days motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 122-39. |
| Leroy P. | Abernathy | 1026 | 37 | Some of the "motorcycle trails" are very popular with ATV users. The final travel plan should designate a mix of single track and ATV trails. | The BLM has worked with the user groups to delineate those motorcycle routes that are appropriate for ATVs. The PRMP/FEIS shows those routes that are for both ATVs and motorcycles.  In addition, the DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Leroy P. | Abernathy | 1026 | 38 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. We strongly suggest looking closely at the | The BLM has worked with the user groups to delineate those motorcycle routes that are appropriate for ATVs. The PRMP/FEIS shows those routes that are for both |

| | | | | | |
|---|---|---|---|---|---|
| | | | | proposal developed by Ride with Respect. | ATVs and motorcycles.  In addition, the DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Leroy P. | Abernathy | 1026 | 39 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling to hard core rockcrawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more criticle role for accommodating specialized sports. Perhaps parts of Black Ridge could remain unrestricted for this purpose. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Leroy P. | Abernathy | 1026 | 40 | The Utah Rims single-track network should include at least 25miles of additional routes, in order to be as complete as the Dee Pass Network. | See response to comment 122-46 |
| Leroy P. | Abernathy | 1026 | 41 | In particular, long-distance single-tracks and ruged roads that connect SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See response to comment 122-36 |
| Leroy P. | Abernathy | 1026 | 42 | A few more non-riparian washes should be left open, especiall in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14 |
| Leroy P. | Abernathy | 1026 | 43 | When addressing "user conflict" the Final RMP should avoid "exclusive use zones" where, based on preceived or potential "user conflict," one or more "conflicting uses" is categorically prohibited. Most of the non-motorized focus areas have been designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will perceive these focus areas as establishing blanket restrictions on motorized use. | See response to comment 413-9. |
| Leroy P. | Abernathy | 1026 | 44 | Assumptions made concerning the economic impact to the Moab area have no documented information to support those assumptions | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used the best available data to assess impacts; in many cases, no data were |

| | | | | | available. In a landscape level plan such as the RMP, qualitative discussions are often all that are necessary (or even possible). |
|---|---|---|---|---|---|
| Leroy P. | Abernathy | 1026 | 45 | The document shows a clear bias against the OHV user group PDF pg. 285 pg. 3-87 3.11.2.7.1 Off-Highway Vehicle (OHV). | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.

The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| Garth | Illingworth | 1029 | 1 | The Draft Moab RMP has serious flaws. It gives far too much weight to exploitive and environmentally destructive activities. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping |

BLM_0011491

| | | | | | process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| Garth | Illingworth | 1029 | 2 | As a 4x4 and ORV user I would actually like to see less trails and more areas of quiet and solitude made available. Every square mile does NOT need an ORV trail and immediate access. The quality of the outdoor experience is being systematically destroyed by excessive ORV trail use. The Draft Moab RMP needs to be changed to limit ORV use, not increase it. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Garth | Illingworth | 1029 | 3 | The changes that have occurred between earlier BLM draft plans and the current plan are a betrayal  of the broad goals of the BLM and its responsibility to be a steward of the lands for all Americans, for a wide variety of uses, balanced across all regions - not just large extractive industries whose political contributions bias local, state, and federal processes. | The specific changes referred to by the commentor are so vague that a response is not possible. |
| Garth | Illingworth | 1029 | 4 | The limited time available for responses to such | See response to comment 124-1. |

| | | | | large changes are also symptomatic of a process that is being distorted for narrow goals by self-interest groups. | |
|---|---|---|---|---|---|
| Denice | Swanke | 1030 | 1 | Page 1-2, last paragraph. Due to ease of access and through formal agreement with the Moab FO, the BLM Vernal FO presently manages a small amount of public land (33,331 acres) at the top of the Book Cliffs along the northern portion of the MPA. Management decisions for these 33,331 acres are contained in the Vernal RMP and are not re-evaluated in this EIS.<br><br>Note: the language at the bottom of page 1-11 re: Black Ridge Canyons has good wording for this as another option for rewriting. I believe the above sentence appears in the Executive Summary as well and it should be revised. | The commenter is is referring to 2 different areas. The text on page 1-11 refers to the Black Ridge Canyons wilderness area, which is managed by the Grand Junction FO.  The area referred to on page 2-1 is the in the northern Bookcliffs and is managed, by agreement, by the Vernal FO. |
| Denice | Swanke | 1030 | 2 | P. 1-10 Issue #9. A fire management plan would be developed to address high risk areas, fire prevention, prescribed burns, rehabilitation and restoration, hazardous fuels reduction, and the protection of life and property.<br><br>Note: this text differs from other issues statements because the above sentence indicates future planning. Does that carry throughout the document? And are all issues evaluated in light of future planning that will tier to the RMP/EIS? I'm sure they are, but only says so overtly for one issue is at least a yellow flag. I would revise or delete the above sentence and make the statement about the need for and commitment to future fire management planning later (probably in the affected environment for this issue). Look at Issue 10 as a template if you decide to reword #9. This comment may be meaningless as it relates to completed analysis/might not be worth the time to | The text in question has been revised. The revised text states: Fire management planning is necessary to address these and other wildfire related issues. |

| | | | | address because of that. | |
|---|---|---|---|---|---|
| Denice | Swanke | 1030 | 3 | P 1-16, section 1.4.8. It seems reasonable to mention the relationship of the MPA to Grand RMP here, unless it was already covered in the description of the planning area (i.e., is there a discussion of the relationship of "old" to "current" terminology for the areas of administrative responsibility – Moab FO vs. Grand RA for example.) | The relationship of the current RMP revision to the Grand RMP is explained on the first page of Chapter 1. |
| Denice | Swanke | 1030 | 4 | P 2-1, Section 2.1, last paragraph This paragraph talks a lot about decisions – I noticed this wording earlier in the document as well. "Proposed management actions" or "actions" seems like a better choice of words in light of the fact that the RMP/EIS is not a decision document. This would be a search/replace chore, because I notice "proposed decisions again in 2.1.1.3 and elsewhere. | Commentors suggestion is noted. The correct terminology has been used in the PRMP/FEIS. |
| Denice | Swanke | 1030 | 5 | P 2-5, section 2.1.1.5.What does "spread by alternative" mean? Clarify. Timing Limitations and Controlled Surface Use stipulations are applied to the habitat for these four species under each alternative. | In the DRMP/DEIS "Timing Limitations and Controlled Surface Use stipulations are applied to the habitat for these four species and are spread by alternative" means that these stipulations are varied by alternative to create a reasonable range of alternatives with respect to timing and controlled surface use stipulations intended to reduce impacts to these species.  Either the time period or the acreage has been increased in Alt. B (Conservation) and/or decreased in Alt D (Commodity). |
| Denice | Swanke | 1030 | 6 | P 2-5, section 2.1.1.7….all of them would be protected and managed to preserve their wilderness characteristics and values in Alternatives B. Or maybe you just want to say "to preserve their wilderness characteristics"? | The word "value" was chosen deliberately. |
| Denice | Swanke | 1030 | 7 | P 2-63, Health and Safety. This seems like a narrow definition of health and safety, what about occupational exposures, etc? | Occupational exposure is not a land use planning issue; it is governed by the Occupational Health and Safety Administration. |
| Denice | Swanke | 1030 | 8 | P 2-76. Fire mgmt comparison across alts seems | The impacts of fire management decisions on riparian |

| | | | | | |
|---|---|---|---|---|---|
| | | | | incomplete – wouldn't there be greater improvements to riparian under some alternatives vs. alt A? | resources are the same across all alternatives because all fire management decisions are common to all alternatives; they do not vary by alternative. See pages 2-8 through 2-10 in the DRMP/DEIS. |
| Denice | Swanke | 1030 | 9 | P 2-90, table 2.2, column for Alternative C/WSR segments. Duplicate text appears in this column | Duplicate text has been deleted from the PRMP/FEIS. |
| Denice | Swanke | 1030 | 10 | P 3-29, section 3.6.2.1.3. It would be reasonable (and consistent with 3.6.2.1.1, 3.6.2.1.2 and subsequent sections) to list R&PP actions within the MPA if any have occurred since the 1985 RMP—or state that none have occurred. | The only R&PP actions within the MPA since 1985 have been an R&PP lease to Dead Horse Point State Park (165 acres), and an R&PP patent to Grand County for the Klondike landfill (80 acres).  This information is found in the Analysis of Management Situation, pg. 6-6, which is available on the RMP website. |
| Denice | Swanke | 1030 | 11 | P 4-1, last paragraph. For the analysis, BLM staff used existing data, science, current methodologies, professional judgments, and projected actions and levels of use. The analysis takes into account the stipulations described in chapter 2 and describes how each alternative would change the conditions described in chapter 3. | Comment noted, thank you. |
| Denice | Swanke | 1030 | 12 | P 4-10, section 4.3. Existing conditions are described in chapter 3. I can only assume that existing conditions are described for more than air quality…If this statement truly is specific to AQ, it should be moved to 4.3.1. | The statement the reader refers to will be moved from Section 4.3, to Section 4.3.1 Air Quality. |
| Denice | Swanke | 1030 | 13 | P 5-4, section 5.2.1.1 Tribal Concerns, Comments, and Recommendations<br>Below is a summary of the tribal consultation and coordination meetings held during the RMP planning process. Only comments concerning actions in the Moab FO are included below. The second sentence is unclear because it implies that consultation was undertaken for more than the Moab FO. Maybe this is the intended message: Although the planning area encompasses Arches National Park, Dead Horse Point State Park, and the La Sal Mountains of the Manti-La Sal National | Consultation was initially undertaken jointly for the Moab and Monticello FOs. After the initial consultations, the Moab and Monticello Field Offices undertook separate consultation process.  Chapter 5 of the DRMP/EIS covers only the consultation efforts made by the Moab Field Office.  Comments relating to the Monticello planning effort are not included in Section 5.2.1.1 of the Moab DRMP/DEIS; the consultations concerning the Monticello plan are contained in the Monticello DRMP/EIS.<br><br>The commentor is correct in assuming that tribal |

BLM_0011495

| | | | | Forest, consultation and comments are limited to actions proposed in the Moab FO. | consultation efforts only included Moab BLM planning decisions. Other federal agencies engage in their own tribal consultation efforts. |
|---|---|---|---|---|---|
| Paul W. | Holyoak | 1038 | 1 | am opposed to the four proposals that will do away with cattle grazing in the Millcreek allotment. I purchased this allotment for $18,000 from Carol Meador. I asked the BLM if there would be problems – no one told me about the proposed changes or that there might be problems. Grazing permits should be kept in the Millcreek area. | The BLM analyzed the natural and cultural resources that are present in the 3,921 acre Mill Creek allotment and decided that this allotment would be made unavailable for grazing in the three action alternatives of the RMP. The Mill Creek allotment is in an area of very high cultural occurrence. It has high recreation conflicts and is within the municipal watershed of Moab and Spanish Valley. |

## ORGANIZATIONS

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 1 | An examination by CPAA of the Moab Field Office Draft EIS has identified deficiencies as they relate to cultural resources, both in terms of general theoretical assumptions applied throughout the document, as well as specific strategies identified for addressing cultural resource concerns. One such fundamental concern is the absence of a meaningful and representative statistical sample of inventoried lands within the Moab Field Office whereby the density, diversity and distribution of cultural resources could be adequately considered during the planning process. | In preparing the PRMP/DEIS, the BLM used the best available information to form the basis for the cultural resources analysis. This baseline data is a result of Section 106 and 110 inventories of the area and represents the volume of information available. Any potential surface disturbing activities based on future proposals will require compliance with Section 106 and site-specific NEPA documentation. Since the Section 106 and 110 inventories that have been done make up all of the cultural resource information that presently exists in the Moab Field Office, this information forms the basis for the DRMP/EIS discussion. Any surface disturbing activities based on future proposals would require compliance with Section 106 and site specific NEPA documentation. |
| Colorado Plateau | 1 | 2 | Of the alternatives presented in the Draft EIS, Alternative B offers the best management approach to | Regardless of the planning decisions chosen in the PRMP/FEIS, the BLM will adhere to all laws, regulations |

BLM_0011496

| | | | | |
|---|---|---|---|---|
| Archaeological Alliance | | | facilitate the long-term preservation and protection of cultural resources. It is also acknowledged that Alternatives C (preferred) and D are both improvements over the current management approach to lands within the resource area (e.g., no action Alternative A). It is also emphasized that the management alternatives articulated in all three action alternatives may be inadequate to meet the BLM's obligations under federal laws and regulations regarding protection of cultural resources. | and policies concerning cultural resources.  The RMP does not supercede laws, regulations or policies.<br><br>The commentor's preference for Alt. B is noted. |
| Colorado Plateau Archaeological Alliance | 1 | 3 | The failure of the agency to adequately consider the direct, indirect, and cumulative effect of various activities on the integrityof historic properties, for example the absence of Section 106 compliance prior to the official designation of OHV routes; (2) The failure of the plan to consider Class III inventories of areas adjacent to proposed OHV routes but clearly witin the area of potential effect and (3) The failure of the agency to more aggressively embrace its Section 110 responsibilities to edtentify, evaluate and nominate properties under its management jurisdiction ot the National Register of Historic Places. | The BLM analyzed cumulative impacts in Chapter 4 and presented a reasonable estimate of what may happen to cultural resources as a result of trends in management direction, oil and gas development, increased recreational use of public lands and the protection or lack thereof afforded by the various alternatives.  While these impacts are impossible to quantify, the Draft RMP/EIS presents what the BLM considers to be a realistic and qualitative forecast of the general types of impacts that may be expected from various uses.  This forecast is comparative; for example, these kinds of impacts would increase or decrease more under alternative X than they would under alternative Y.  The analysis is based in large part on existing legislation, regulation and policy that require inventory and mitigation on all federal undertakings.<br><br>The DRMP/EIS acknowledges that the illegal activities, such as vandalism and looting, may be impacted by changes in access, as is specifically identified in section 4.3.2.  In particular, Chapter 4 notes that increased access to cultural sites could increase contact by visitors who could intentionally damage sites by collecting surface artifacts, vandalizing, illegally digging, or otherwise excavating the sites.  The DRMP/DEIS does analyze under the various alternatives the illegal activities in association with the level of access as restricted by the |

| | | | | alternatives and does not imply that illegal activities are restricted solely to the areas adjacent to the OHV routes.<br><br>The BLM will comply with its Section 106 responsibilities as directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information.<br><br>A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open.<br>B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with Section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.<br>C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the Area of Potential Effect and compliance with Section 106 prior to designation.  Class III inventory of the APE and compliance with Section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.<br>D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available. |

| | | | | See the Appendix for SHPO concurrence with Section 106 consultation. |
|---|---|---|---|---|
| | | | | The White Wash open area has already been surveyed for cultural resources. |
| | | | | The Area of Potential Effect for any project is determined in consultation with the appropriate SHPO/THPO in accordance with 36 CFR 800.4(a)(1).  This will occur upon initiation of the Section 106 consultation process for this RMP. |
| | | | | The BLM integrates the protection of resource values such as cultural resources with its responsibilities for land use planning and resource management under FLPMA to ensure that the affects of any activity or undertaking is taken into account.  In addition, National Programmatic Agreement, which regulates BLM's compliance with National Historic Preservation Act, serves as the procedural basis for BLM managers to meet their responsibilities under Section 106, and 110. |
| | | | | Until 1980, Section 106 of the NHPA required agencies to consider the effects of their undertakings only on properties listed on the National Register of Historic Places.  However in 1980, Section 106 was amended to require agencies to consider an undertaking's effects on properties included in or eligible for inclusion in the National Register.  Since that time the BLM, through its land use planning process, outlines specific management prescriptions and mitigation measures to protect sites both listed and eligible for the National Register.  Any potential surface disturbing activities based on future proposals will require compliance with Section 106 and site-specific NEPA documentation. |
| Colorado | 1 | 4 | CPAA strongly disagrees that Class III inventories | The BLM will adhere to its Section 106 responsibilities as |

| | | | |
|---|---|---|---|
| Plateau Archaeological Alliance | | should not be required prior to official designations that allow continued use of existing routes. | directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information.<br><br>A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open.<br>B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.<br>C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the APE and compliance with section 106 prior to designation.  Class III inventory of the APE and compliance with section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.<br>D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available.<br><br>See the PRMP/FEIS for SHPO concurrence with Section 106 consultation.<br><br>The open OHV area in the White Wash Sand Dunes area |

| | | | | has undergone an on-the-ground Class II cultural inventory. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 5 | The Draft EIS should clearly articulate the agency's intent ot avoid or minimize all impacts, including indirect and cumulative impacts, that may alter, directly or indirectly, the character of historic properites, inclduing TCPs, "in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association" (36C CFR 800.5 (a)(1). | The DRMP/EIS on pg. 2-7 states that damage to TCP's would be avoided.  The BLM will follow all laws, regulations and policies regarding TCPs.<br><br>The BLM analyzed cumulative impacts in Chapter 4 and presented a reasonable estimate of the incremental impact to cultural resources as a result of trends in management direction, oil and gas development, increased recreational use of public lands and the protection or lack thereof afforded by the various alternatives.  While these impacts are impossible to quantify, the DRMP/DEIS presents what the BLM considers to be a realistic and qualitative forecast of the general types of impacts that may be expected from various uses.  This forecast is comparative; for example, these kinds of impacts would increase or decrease more under alternative B than they would under alternative D. The analysis is based in large part on existing legislation, regulation and policy that require inventory and mitigation on all federal undertakings. |
| Colorado Plateau Archaeological Alliance | 1 | 6 | CPAA recommends that the term "visitation" be clearly defined to include all uses of public lands that are shown to endanger the integrity of sties eslgible for lsiting on the National Register (e.g.,industrial, vehicular, recreational. | Visitation means the use of public lands by recreationists, whether on foot, on horseback, or in a vehicle.  Industrial uses of the public lands are not considered visitation. |
| Colorado Plateau Archaeological Alliance | 1 | 7 | Camping should be prohibited at sites eligible for listing on the National Register. CPAA recommends that this prohibition be extended to include a ban on camping "on or Near" elibgible sites. | On pg. 2-7 of the DRMP/EIS, a management decision common to all action alternatives states:  "Camping would be prohibited and posted within or on archeological and historic sites eligible for listing on the National Register of Historic Places."  "Near" is far too vague a term to include the PRMP/EIS.  When posting this decision, the BLM extends the camping ban to a reasonable and enforceable distance, as it has at Sego Canyon Rock Art Site. |
| Colorado | 1 | 8 | "Class III inventories of Areas of Potential Effect (APE) | The BLM has considered the cumulative impacts of its |

| | | | | |
|---|---|---|---|---|
| Plateau Archaeological Alliance | | | will be conducted in connection with new OHV routes prior to such designations". CPAA agrees but also recommends tha this language be modified to reflect the agency's intent to consider the cumulative impacts from designating thousands of miles of official routes. Concerns related to nature and scope of such Class III inventories are addressed below. | decisions in Chapter 4 of the DRMP/EIS. |
| Colorado Plateau Archaeological Alliance | 1 | 9 | "The BLM will cooperate with counties to ensure road and trail construction and maintenance minimized impacts to cultural resources. CPAA recommends this language be modified to reflect a preferred strategy of avoidance of impacts to cultural properties, with a secondary strategy of minimizing impacts when avoidance is not possible. | The word "avoid" has been added to the sentence. |
| Colorado Plateau Archaeological Alliance | 1 | 10 | CPAA agrees that the site density model may be a valuable tool in identifying some areas with higher potential for cultural resources.  CPAA also agrees that it is difficult to plan for and manage cultural resources that remain largely unknown and undocumented. However, CPAA believes that model is fundamentally flawed as a primary planning tool in that the data used to create the model are derived from previous archeological inventories that do not comprise a meaningful and statistically valid sample.  These investigations were driven by the location of extraction projects and other site-specific uses of federal lands that did not result in the investigation of all the environmental and ecological ranges where cultural resources are likely to occur.  Hence, the predictive model used by BLM staff to identify probability zones for cultural resources is actually a reflection of the amount of Section 106 compliance in a particular area and may not reflect actual site densities.  A review of archeological site data on file with the Antiquities Section of the Utah Division of State History reveals astonishingly few archeological block surveys within the MFO that would contribute to an understanding of | See response to comments 124-25 and 415-1. |

| | | | | |
|---|---|---|---|---|
| | | | potential site densities or to the distribution of archeological sites across an entire landscape. | |
| Colorado Plateau Archaeological Alliance | 1 | 11 | Although the identification of areas such as Tenmile Wash, Mill Creek, and Dolores Triangle as priorities for such surveys are laudable and should be encouraged, this approach fails to address broader perspectives of prehistoric land-use patterns across entire landscapes, including areas of low probability. | Ten Mile Wash and Mill Creek were identified as priority areas for surveys because of there known potential for occurrence of cultural resources.  The Dolores Triangle was prioritized due to lack of cultural information in this area.  The prioritization of areas does not mean that other areas won't be surveyed. |
| Colorado Plateau Archaeological Alliance | 1 | 12 | Hence, management considerations articulated in the various action alternatives are predicted on site quantity rather than actual site significance.  This approach fails to recognize that sites of tremendous scientific and cultural significance may be located in areas deemed to have a low probability for archeological sites, and that the rarity of such site may actually accentuate the importance of those sites within the context of broader cultural landscapes. | The cultural model developed in the DRMP/EIS was for analysis purposes only.  It will not be utilized to determine actual site significance.<br><br>On pg. 4-30 it states that model was developed as a means of estimating general site densities.  Impacts of the alternative  management actions were then assessed "with regard to how much of the action is likely to result in surface disturbing activities within the high or medium density zones.  This method enables a quantifiable assissment of probable relative affects of planning action alternatives. |
| Colorado Plateau Archaeological Alliance | 1 | 13 | It is therefore recommended the probability model developed by BLM planners be augmented to include addition variables that would precipitate greater understanding of the potential impacts to significant cultural resources from the various action alternatives.  These variables should include, at a minimum, site types and National Register eligibility.  These data are readily available on the Intermountain Antiquities Computer System database (IMACS) and could be incorporated into the probability model with minimal effort.  Such data would better facilitate management decisions related to significant sites or clusters of significant sites in low probability areas. | See response to comments 1-12,  124-25, and 415-1. |
| Colorado Plateau Archaeological Alliance | 1 | 14 | Any assumption that site avoidance results in no adverse effects, or insignificant effects, is inherently flawed and is at odds with 36 CFR 800.  Avoidance of cultural sites evident on the ground surface may avoid | The BLM agrees with the commentor that site avoidance does not always mean that there are no adverse affects. |

BLM_0011503

| | | | | |
|---|---|---|---|---|
| | | | direct damage to the surface evidence.  However, there is a potential for damage to archeological sites not clearly evident on the site surface, as well as adverse effects to sites outside the area of direct impact.  Particularly relevant is 36 CFR 800.5(1) that states "an adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association.  Consideration shall be give to all qualifying characteristics of a historic property..." (emphasis added; See also 65 Fed. Reg. 77698, 77720 (Dec. 12, 2000) discussing indirect effects). | |
| Colorado Plateau Archaeological Alliance | 1 | 15 | It is therefore recommended that the EIS clearly acknowledge the indirect adverse effects of undertakings on historic properties, and it should include a clear strategy with measurable benchmarks to avoid, minimize or mitigate those indirect effects through the Section 106 review process. | The BLM acknowledges that there may be potential adverse effects from the proposed management actions in the alternatives of the PRMP/FEIS on cultural resources.  Avoiding, miniimizing, or mitigating indirect effects to cultural resources through the Section 106 process is a legal requirement and is reiterated on pg. 2-7 of the DRMP/EIS. |
| Colorado Plateau Archaeological Alliance | 1 | 16 | The Draft EIS should reflect the intent of the BLM to adequately consider all indirect impacts of undertakings on National Register-eligible properties that may be a consequence of the undertaking but not directly related to it.  Such intent is not now articulated in Draft EIS. | See response to comment 1-15. |
| Colorado Plateau Archaeological Alliance | 1 | 17 | CPAA concurs with that assessment, but also recommends that the Draft EIS be modified to acknowledge that recreation on such a massive scale could result in cumulative effects to site setting and integrity, even if the historic properties themselves are not directly impacted by vandalism and/or looting (see 36 CFR 800.5(a)(2)(v)). | While Special Recreation Management Areas (SRMAs) are proposed for designation in the alternatives of the DRMP/EIS, the numbers of people visiting the Moab area can not be controlled by the land use plan.  SRMAs allow the BLM to impose special rules on visitor use thereby reducing potential impacts to cultural resources.  In the cumulative impact ssection on pg. 4-502 of the DRMP/EIS the BLM acknowledges the continually increasing  visitation and its affects on cultural resources.  However, it goes on to say that "recreational activity in |

BLM_0011504

| | | | | and around the Moab planning area would continue to increase regardless of which alternative the BLM selects for its RMP. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 18 | The designation of thousands of miles of OHV routes within the MFO has significant potential to create cumulative  adverse effects that are not anticipated by the draft EIS. | The Travel Section in Chapter 3 of the DRMP/EIS presents the baseline (current situation) for analysis in Chapter 4.  It discusses the ongoing and baseline issues surrounding cross-country travel that is currently permitted by the existing land use plan for the Field Office.  The planning area was inventoried as having 6,199 miles of non-paved routes.  This number represents the baseline for analysis, however, it is also recognized that cross-country travel is currently allowed in many other areas within the Field Office.  The impacts associated with cross-country OHV use are described in Chapter 4 under the No Action Alternative.  The action alternatives limit travel to designated routes.  The routes that are already in use are considered part of the baseline, and therefore, it is not reasonable to consider the impacts to vegetation from these already disturbed linear surfaces. |
| Colorado Plateau Archaeological Alliance | 1 | 19 | The fundamental component of the Draft EIS Travel Plan is the BLM's intent to establish thousands of miles of designated trails suitable for OHV travel, and the stated management strategy that Section 106 compliance (e.g., Class III inventories) will not be required prior to designation of routes currently in use. As such, the Travel Plan is fundamentally flawed on two important points: (1) The failure of the BLM to conduct adequate analysis in the past related to OHV impacts along routes currently being used by motorized vehicles was and still remains an abrogation of agency's Section 106 responsibilities, and the failure of the agency to recognize or correct this deficiency in the new Travel Plan appears to validate and perpetuate the agency's failure to comply with Section 106 requirements in the past; and (2) The failure to require Class III inventories along routes prior to designation suggests the agency | See response to comment 124-43. |

| | | | | |
|---|---|---|---|---|
| | | | official has already made a determination, as per 36 CFR 800.3(a), that travel route designations in such instances are not an undertaking as defined in 36 CFR 800.16(y). | |
| Colorado Plateau Archaeological Alliance | 1 | 20 | On this point, the Draft EIS reflects remarkable inconsistencies.  The BLM clearly recognizes OHV travel is an activity requiring Section 106 review in that Class III surveys would be required for all "new" OHV routes.  But no such requirements are articulated for routes currently in use, even though Section 106 compliance should have occurred in the past related to these activities. | See BLM Instruction Memorandum No. 2007-030 for Travel Management considerations and Cultural Resources. |
| Colorado Plateau Archaeological Alliance | 1 | 21 | As stated throughout the Draft EIS, the BLM clearly recognizes that OHVs have significant potential to cause future adverse effects to historic properties, and that these adverse effects are already accelerating due to growing OHV travel along and adjacent to routes already in use.  But no convincing rationale is offered as to why Section 106 compliance will be required in the future, but pre-existing uses are exempt from compliance. | See response to comments 1-3 and 489-3. |
| Colorado Plateau Archaeological Alliance | 1 | 22 | CPAA has been unable to identify any public outreach effort by the BLM in Utah to educate OHV users as to the fragile and irreplaceable nature of cultural resources, to promulgate proper etiquette among OHV users who visit these resources or to enlist the vigilance of the OHV community in reporting vandalism and looting. | On pg. 1-11 of the DRMP/EIS it states that education is an issue addressed through policy or administrative action. |
| Colorado Plateau Archaeological Alliance | 1 | 23 | However, the more designation of official OHV routes is meaningless without a BLM commitment of necessary resources to enforce such travel restrictions.  The MFO has not demonstrated such a commitment in the past, as evidenced by the willful and repeated violation of travel restrictions in Tenmile Canyon and the tepid BLM enforcement response to widespread violation (Spangler and Boomgarden 2007) | On pg. 1-11 of the DRMP/EIS it states that enforcement is an issue addressed through policy or administrative action.

See also response to comment 124-38. |

| Colorado Plateau Archaeological Alliance | 1 | 24 | Given that caveat, it is imperative that Section 106 compliance be initiated as a component regardless of which alternative is chosen.  In short, the BLM cannot manage for and properly protect resources that the agency does not know are there. | See response to comment 1-20. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 25 | As discussed in Section 3.3.2.3, formal listing of sites on the National Register occurs for a small portion of the total sites in any given county or state (DEIS 3-14). | Comment noted, thank you. |
| Colorado Plateau Archaeological Alliance | 1 | 26 | The tiered approach reflected in the three action alternatives (more under Alternative B, less under Alternative C and even less under Alternative D) is problematic and would appear to reflect a common misperception that National Register designations are accompanied by greater levels of protection for listed resources. | All cultural resources are protected by law regardless if they are listed on the National Register or not.<br><br>The priority for nominating cultural sites to the National Register has been removed. |
| Colorado Plateau Archaeological Alliance | 1 | 27 | CPAA recommends that the BLM consider two addition areas for listing on the National Register.  As discussed above, the Tenmile Canyon drainage features a potential for 310 to 385 sites within a narrow, spatially defined canyon corridor from Dripping Springs to the canyon confluence with the Green River. | According to the BLM's  land use planning handbook (1601-1), nominating cultural resource sites to the National Register of Historic Places is not a land use planning decision. |
| Colorado Plateau Archaeological Alliance | 1 | 28 | Another area worthy of consideration within the Draft EIS is an expansion of the current boundaries of the Desolation Canyon National Historic Landmark along the Green River corridor in lower Desolation and Gray Canyons. | See response to comment 1-27. |
| Colorado Plateau Archaeological Alliance | 1 | 29 | CPAA recommends the Moab Field Office Draft EIS reflect support for expanding NHL boundaries to include all of Desolation and Gray Canyons give (1) The BLM management of the river corridor is identical for NHL properties along the river, (2) the non-NHL properties are all federally or tribally owned, (3) the historic properties within the NHL are identical to sites outside the NHL that have been deemed eligible for listing, (4) most BLM lands adjoining the river are wilderness study areas afforded significant environmental protections, | Expanding the NHL boundaries does not require a land use planning decision. |

| | | | | |
|---|---|---|---|---|
| | | | and (5) there is widespread public support for maintaining the remarkable environmental and cultural values found in Desolation and Gray Canyons. | |
| Colorado Plateau Archaeological Alliance | 1 | 30 | As expressed above, CPAA is fundamentally concerned that BLM decision making has been predicated on insufficient data related to the nature, diversity and distribution of archeological resources within the planning area, and the Draft EIS articulates dew proactive measures whereby these data gaps will be ameliorated.  Quite simply, the BLM cannot manage resources it does not know exist, and management decisions  made without baseline data will inevitably result in adverse and unanticipated consequences to the integrity of historic properties.  This is particularly relevant to the Draft EIS Travel Plan where thousands of miles of OHV routes would be designated without any attempt to determine the nature, diversity, and distribution of cultural resources that have already been adversely effected along those routes, or that could be adversely effected in the future. | See response to comment 489-3.<br><br>Furthermore, FLPMA states that in the development of land use plans the BLM will rely, to the extent it is available, on the inventory of public lands, their resources, and other values |
| Colorado 500 | 6 | 1 | Comments start at #3. | Comments start at #3. |
| Colorado 500 | 6 | 2 | Comments start at #3. | Comments start at #3. |
| Colorado 500 | 6 | 3 | I would like the BLM to change the language in the Alternatives and in the Introduction so that BLM's intentions for the Bookcliffs ERMA are fully disclosed.<br><br>From page 1-11 "Introduction" please note that MFO has no wilderness areas of its own; 5,200 acres of the Black Ridge Canyon Wilderness Area lies in the MFO but is managed by the Grand Junction Field Office.<br><br>Now Please refer to page 2-30, Alternative C, "Manage the Bookcliffs area (335,457 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It would be managed for low frequency of visitor interaction by not | Under Alt B of the DRMP/EIS, the Bookcliffs are to be managed as a SRMA emphasizing hunting, hiking, and backpacking.  In Alts A, C, and D the Bookcliffs are to be managed as the Moab ERMA.  ERMA management is defined on pg. 2-29.<br><br>On pg. 2-43 of the DRMP/EIS it is stated "Manage the Black Ridge Wilderness Area (5,200 acres) part of the McInnis Canyon National Conservation Area…"  The Moab and Grand Junction Field Offices have an agreement on the management of the Wilderness Area.<br><br>That portion of the Bookcliffs that is within WSAs is managed under the Interim Management Policy for Lands |

establishing new motorized or mechanized recreation routes, no commercial motorized permits would be issued, and competitive events would not be allowed.

Now Please note what BLM has omitted from the analysis:
Although described in glowing ecological terms in Chapter 3, the Bookcliffs are in fact an extremely hostile environment. It is not conducive to pleasurable hiking, backpacking, or equestrian use, because there is no permanent water and it is lethally dry for human habitation (from page 3-2:  The average annual precipitation of the northern section of the MPA is 9.2 inches). BLM accurately describes that there is very little human access. Why?  Because not only is it not unusually scenic, it's not a comfortable place for "traditional pedestrian and equestrian recreation activities. That is why there are few roads, no popular hiking trails and no developed recreational areas.  And with no roads, how can anybody go big game hunting? Horses need established routes exactly as vehicles do.

Summertime temperatures often exceed 100 degrees with extremely low humidity.... There is no contiguous or even sparse vegetative canopy to provide relief from the relentless heat. Winters are harsh with night-time temperatures dropping well below freezing for sustained lengths of time.  The wildlife is hardy and hostile and presents well-documented dangers to humans and domestic stock.

It appears as though the BLM is doing what is called in the trade "manufacturing Wilderness." This is a covert effort to circumvent both FLPMA, which strictly limited the BLM's authority to set aside lands, and more recent judicial proceedings, which affirmed FLPMA and further limited BLM authority to "set aside" lands.

Under Wilderness Review.  In Alt C of the DRMP/EIS no lands are proposed for management to protect non-WSA lands with wilderness characteristics.

Hiking, backpacking, and primitive hunting are human activities which occur with some regularity in the Bookcliffs.

All motorized travel would be managed in accordance with the Travel Plan accompanying Alt C of the PRMP/FEIS.  This plan provides designated travel routes in the Bookcliffs. Motorized travel would be restricted to these routes.

The BLM contends that the affected environment in Chapter 3 of the DRMP/EIS adequately describes in the environment for the Bookcliffs area.

| | | | The closures proposed in this RMP correspond exactly with the polygons of the WSA's in the Bookcliffs, plus enough proximate acreage added by BLM and called "areas with wilderness characteristics outside of the WSA's" to create a large block of land in which human activity is illegal. | |
|---|---|---|---|---|
| Colorado 500 | 6 | 4 | Referring to Chapter III, on page 3-72, MFO states "at least" 1.6 million people visit the MPA per year. That is, one million six hundred thousand people visit because of various and different intrinsic values present in the MPA.  On page 3-109 the figure "2 million" visitors is cited.  For the purpose of our analysis, we use the 1.6 million numbers.  This could be confirmed by presenting the numbers that were collected at the 16 traffic counters that were named in the Analysis of the Management Situation, also called the AMS (a separate document from the DEIS, required by the BLM 1600 planning regulations but in this case was not published as part of the DEIS)> However, BLM has elected to leave out of the DEIS all information about the presence of these traffic counters.  BLM relies exclusively upon staff estimates and various regional tourism data. In order that our results be exactly comparable, we will base our analysis on the same material.<br>On page 3-82, table 3.19 sorts recreation activities according to use levels.<br>Since we are allocating land use, we would logically look at the high-use column to see<br>How our limited agency resources would be best utilized.<br>"River Activities" is found in the high-use column.  Here the recreation use numbers on four segments of river in the MPA are provided. Although the DEIS does not say so, we will assume this represents annual river use. The total appears to be 92,000 boaters. The word "boater" clearly indicates individuals, not groups.  More | The BLM acknowledges that it does not know the activity that each and every visitor comes to Moab to enjoy.  Furthermore, the Moab Field Office does not know the exact numbers of visitors that come to the planning area.  The text in Chapter 3 of the DRMP/EIS states that the field office has "at least" 1.6 million visitors; it is also stated that the actual number may be up to 2 million visitors.<br><br>There are 16 traffic counters in the Moab Field Office.  If the commentor wishes to know the locations of these counters, he may call and ask for the locations of these counters.  To further understand visitor numbers, the Moab BLM participated in the National Visitation Use Monitoring Study in 2006 (these data are still being analyzed).<br><br>The purpose of Table 3.18 (reference is in error) was to give a general idea of the types of activities that are engaged in by visitors.  With so many activities in the Moab planning area, 11% participation can represent a high use activity. |

BLM_0011510

| | | | | |
|---|---|---|---|---|
| | | | than four river segments are described in Chapter 3 but the overlap of use between segments is not reported. Thus, it is reasonable to calculate that the total could be 184,000 boaters.<br>If the reader does the arithmetic using the numbers provided in the DEIS, boaters constitute 11.5% of one million six hundred thousand visitors.<br>Because Table 3.19 sets forth three undefined categories: "high, medium, and low," placing the 11.5% in the "high use" column clearly indicates this high use relative to the uses names in the "medium" and "low" columns.<br>Accepted. However, bear in mind the perception shift when the phrase "high-use" replaces "eleven percent." Flowing from that, bear in mind the degree to which that shift may affect development of all the proposed actions.<br>To further define the activity proportions provided in table 3.19, hiking is also listed as a "high use" activity. Yet how to calculate the actual number of hikers visiting the BLM lands in the MPA? The usual Agency method is to count vehicles at trailheads, and to count visitor contacts, but the known results of this method always produces an undercount. The only government agency attempts to quantify the accuracy of this method revealed that personal contacts with visitors, even when it is the only job assigned to a park ranger, will touch just 10% of the total visitors (Applegate & Hamilton; USDA Forest Service Mendocino N.F. 1993 Annual Report to the State OHMVR Division).<br>For the purpose of the recreational land use allocation on two million acres of public land, we prefer calculations that might provide a stronger basis for decisions affecting more than one million people. | |
| Colorado 500 | 6 | 5 | The Moab BLM lands are not one contiguous maze of beautiful canyons and wind-sculpted cliffs. Mostly it is thousands of miles of dirt roads, vast, featureless and | Hiking is a very common recreation activity in the Moab Field Office.  The preliminary National Visitation Use Monitoring (NVUM) study data indicate that hiking is the |

sparsely vegetated acreage (just one example to provide proper evidence for our point here: DEIS page 1-162 states, "desert shrub" covers 41% of the BLM lands in the MPA; that is greasewood, shadescale, saltbrush, blackbrush; these species survive in alkaline and salty soils…and they are not scenic. That is to say, people coming from Oregon or Kansas or Washington D.C. do not come to see the greasewood). Hostile desert temperatures (see page 3.1.2 Climate, from Western Regional Climate Center 2004 Temperatures and precipitation for meteorological stations in Eastern Utah), no shade, no permanent water, and no reliable maps. With description in mind, it must be admitted that most of the BLM lands in the MPA are not an attractive hiking destination.

Hiking as an activity, does not commonly occur throughout the BLM lands in the MPA. To develop a successful recreation program for pedestrian activities such as hiking, it must be kept in mind that the vast majority of hikers arriving in a desert environment want a marked trail that is short and predictable, and that as a rule, a recreation hikers do not hike alone in unmarked territory, and even more reliably, hikers want a scenic or remarkable destination for their hike.

Furthermore, if 1.6 million people were hiking elsewhere off of the popular hiking trails, we would find user-made hiking trails on every acre of the Field Office, because user-made trails are a manifestation of demand. We do not find any new user made hiking trails because the best places to have hiking trails in the MFO are already occupied by hiking trails. What we do find is vast starches of lands under the MFO jurisdiction with no footprints on them whatsoever. Literally tens of thousands of acres and the only tracks are roads, used exclusively by motorcycle, ATV, and 4 wheel drive

single most commonly engaged in activity in the Moab planning area. (The NVUM study was done in the Moab Field Office using the U.S. Forest Service data-gathering system. It involved actual random interviews with visitors).

There are many popular hiking trails in the Moab planning area on BLM lands, including Corona Arch, Negro Bill, Fisher Towers, Amphitheater Loop, Hidden Valley, and others. The trail register data for the Negro Bill Trail alone shows that over 25,000 people per year hike the trail. The BLM stands by its assertion that hiking is a popular recreation activity in the Moab planning area.

BLM_0011512

| | | | | |
|---|---|---|---|---|
| | | | motor vehicles. No footprints. None.<br>If the reviewers of this document disagree, we want you to provide factual evidence that this description is not true.<br>So. Because we know that the hiking trails on BLM could not possible be occupied at the rate of 50,000 people per mile, stretch that out over a season. Let's say that BLM hiking trails receive use on the order of 50,000 people per mile per season, and a season is seven months of the year as noted on page 3-72 in the DEIS. That gets the on-the-ground population of hikers down to 1,786 per weekend, at the occupancy rate of 89 people per mile. The trails would be occupied at a rate of one hiker every 60 feet. That is still only 3.125% of the total visitor-ship to the MPA.<br>Imagine only taking a hike and meeting someone every 60 feet. Does this amount of hiking actually occur? It can be safely assumed that it does not, because CEQ regulations require that wherever it is available, document and factual information be used to develop the "Affected Environment" chapter, and BLM 1600 Planning regulations require documented, factual information be used to develop the "Analysis of the Management Situation (AMS). It is unlikely in the extreme that MFO staff would conceal those kinds of numbers.<br><br>So, we can use the old fashioned person-contact-&vehicle-count method that we know always results in an undercount, or we can estimate according to the maximum carrying capacity of the present hiking trails, but either method, the actual number of people who hike in the MPA very likely amounts to about 5% of the 1.6 million visitors per year. | |
| Colorado 500 | 6 | 6 | Camping is also found in the "high use" column, so let's do the numbers for developed camping opportunities. Conspicuous by its absence in the DEIS, are the actual | The purpose of Table 3.18 in the DRMP/EIS on pg. 3-80 is to show the range of activities that visitors are engaged in within the Moab Field Office.   A general range of use |

| | | | | |
|---|---|---|---|---|
| | | | number of fee-paying campers at the 22 fee campgrounds. This is a significant omission. Without any hard numbers, the reader must extrapolate using the information that is provided: According to the MFO recreation website, there are 450 campsites (including the fee sites), with a vehicle limit of 2 per site, and using the most generous standard visitor-use multiplier of 3.5 people per vehicle this adds up to 3,185 people per weekend if every site is at the legal occupancy limit, Multiple that by 28 (weekends in the seven-month season see page 3-72), and we have 89,180 people stashed in the campgrounds each year. Add another 40,000 people for the people who are there during the week or who don't pay their fees or who pack too many people into their campsite, that gives us 129,000 people camping in developed sites. That's another 8% of the MFO annual visitor-use of 1.6 million.<br><br>If we assume that the hikers and the people in the developed campgrounds and the boaters are discrete groups to be counted separately, all of the above named activities together amount to only 22.6% of the 1.6 million people that visit Moab BLM land each year.*<br><br>** (Find another way to calculate it. Or, please provide hard numbers of actually counted people to support the statement in Table 3.18. If there are no hard numbers please add this statement to the "Affected Environment:" NO ACTUAL VISITOR NUMBERS ARE AVAILABLE TO SUPPORT THE INFORMATION IN TABLE 3.18. | levels was provided based on available data including actual observations from BLM staff.<br><br>The BLM does not accept the calculations that the commentor has performed.  The note at the Table 3.18 clearly states that this list was provided by BLM staff.  There is no claim that these estimates are based on actual visitor accounts.  See also response to comment 122-3.<br><br>The numbers of paying campers visiting the Moab Field Office is publicly available information.<br><br>There is no attempt in the DRMP/EIS to not provide for lower use activities.  For instance, two Focus Areas are provided for Basejumpers in Alt C which are a very low use group. |
| Colorado 500 | 6 | 7 | In the calculations above, the three activities [boating, hiking, camping] described are afforded the benefit of being counted as three discrete groups, entitled to their own numbers. It is more likely that there is a tremendous overlap, given that most of the developed | The National Visitor Use Monitoring Study (NVUM) was completed by the Forest Service in 2006.  The data gathered from visitors during that year using random sampling has not been fully analyzed.  Table 4.67 provided some very preliminary data from the NVUM |

camping areas are near rivers and notable natural features.

Recall if you will, these activities are analyzed because they are listed in the "high use" column of Table 3.18 on page 3-80.

If hiking, at 3.1 % and boating, at 11.5%, and camping, at 8% of the total are considered "high-uses," then the number of people participating in the activities in the "low-use" category must be minuscule. The entire list in the low-use category could not make up the difference.

With no actual numbers to work with, the reader might guess that each of those eight activities in the low-use column might constitute 2% each of the totals, combining to claim 16% of the 1.6 million people, or another 25,600 people. Remember, BLM placed the activities in the "low-use" category. They must, by implication, constitute smaller percentages than anything else in the other two columns.

In other words, the three "high-use" activities (hiking, boating, and camping) are placed into the same high-use category as something else---and that "something else" accounts for 80% of the activities that people come to Moab BLM to pursue.

Looking for more clues about what people do on Moab BLM lands, we find on page 4-192 of the DEIS Table 4.67 "Recreational Activity Participation." The table is described in Chapter 4 as follows:

"The National Visitor Use Monitoring Study, completed in the MPA in 2006, provides reliable data on user group participation. Visitors were asked what their "main activity" was while visiting Moab, and what activities they were participating in during their visit. The

study.  These preliminary visitor activity data were provided in Chapter 4 of the DRMP/EIS for analysis and because the Moab Field Office have fielded many questions regarding visitor activities.  There is a wealth of other data in the study which will be available to the public at the time of its publication.  When complete the NVUM study will be available for the Moab BLM on the US Forest Service website.  In the interim, a draft copy of the study is available by contacting the Moab Field Office.  See also response to comments 122-2 and 124-2.

The NVUM data provided in Table 4.67 do not support the claims made by the commentor.

NVUM data were gathered only on visitors to BLM lands.  Visitors were asked where they had recreated.  Only those visitors who had recreated on BLM lands were interviewed. National Park, State Park or Forest Service visitors were not interviewed for the NVUM Study and data from these visitors are not included.

The BLM has no evidence that interest in hiking, camping or boating is waning.  The preliminary NVUM data support these conclusions.

numbers in Table 4.67 show what activities visitors engage in as a percentage of use."

This table is reporting on the "MPA" or, the Moab Planning Area. What is the MPA? According to Map 1-1, "Planning Area," and on page 1-2 to quote: "The MPA encompasses Arches National Park, Dead Horse Point State Park, the La Sal Mountains of the Manti-La Sal National Forest, and the Uintah/Ouray Indian Reservation."

No source for this study is provided and it is not readily available to reviewers of the Moab DEIS. If this survey was professional done, the resulting data would far exceed the scant information provided by Table 4-67, thus what is provided in the table is clearly compressed and arranged by MFO staff, The absence of any information about where this survey was physically conducted is conspicuous and by itself, invalidates the words "reliable data" in the context of BLM managed lands.

The phrase "while visiting Moab" can mean only one thing; the respondent is in or very near to the town of Moab. Why? Because any organization trying to acquire sufficient numerical data to do a "study" of human activity patterns is going to go to where the highest densities of humans are.  The proximity and paved-road access of Arches National Park for exclusively nonmotorized and scenic driving on improved roads will unequivocally skew the numbers toward nonmotorized activities such as "hiking, backpacking, relaxing, viewing, camping and scenic driving" (on improved roads).  Furthermore, Moab itself is not a popular starting point for backpacking, so it is even more critical that we know where this survey was taken and where the "backpacking" numbers fit in, as we already know

that the vast majority of the BLM lands under examination in this RMP are not suitable for backpacking or equestrian activities.  The reader is left to wonder if this "study" is appropriate to BLM managed lands at all, because it is hard to find a connection between the 1.6 million BLM visitors and the respondents to this survey.  We need the EIS writers to help us here, yet they conspicuously do not.  Do all 1.6 million BLM lands visitors pass through the town of Moab?  Surely MFO staff does not think any reviewer of this document will believe this.  We request that this study be presented in full in the appendix, including the source and the methodology.  The reason is, in its current presentation, this study odes not appear to provide accurate information for planning decisions on BLM managed lands. If MFO staff has selected data that is inappropriate to BLM managed lands, a long term mis-allocation of resources will result.  If the presentation of the entire study reveals that it is not appropriate to this DEIS, we request that the study be removed from the document and its conclusion must not be used in this analysis.  So how do we figure out what people are doing when they visit BLM lands in Moab?  The DEIS writers do supply us with solid numbers for the tourism-related tax trends.  Table 3.35 on page 3-19 reveals that the total Gross Retail Sales in Grand County (not just the town of Moab) have continued to climb between 1997 and 2003.  So, people are visiting.  Continuing on page 3-109 the DEIS writers state:  "Visitation to the Grand County area, outside of BLM lands, follows the traveler-spending trend, as it increased throughout the 1990s and has leveled off in the new century.  The following table shows visitation numbers for several locations in Grand County that can be used as indicators for visitation to the area."  This is a rather astonishing misstatement, because the table that follows on page 3-110, Table 3.36, "Visitation

| | | | | |
|---|---|---|---|---|
| | | | Trends," does not support the writers' statement that visitation has followed visitor spending trend. Comparing the figures in Tables 3.35 and 3.36 reveals that while visitor spending has climbed slightly, visitation to the parks (Arches, Dead Horse, and Canyonlands) has dropped, and dropped rather precipitously in the "new century." Please correct this false statement. And we are still asking the question, what are those 1.2 million "other" visitors to Moab BLM doing? They are clearly losing interest in passive activities like "scenic driving" and in the hiking opportunities and developed camping opportunities offered int eh parks shown in Table 3.36. Yet plenty of non-residents are still spending money in Grand County. | |
| Colorado 500 | 6 | 8 | Now please refer to 3.11.1.2.1 The Colorado Riverway. QUOTE: "The Colorado Riverway includes the public lands managed by the BLM in the following areas: Along the Colorado River and Utah Highway 128 from Dewey Bridge to U.S. 191, including Negro Bill Canyon Trailhead, Onion Creek, Castleton Tower (Castle Rock) and Fisher Towers. Utah Highway 128 is a State Scenic Byway, and is also a portion of the Prehistoric Highway National Scenic Byway. Along the Colorado River and Utah Highway 279 from Moab Valley to Canyonlands National Park, including Wall Street, Poison Spider Trailhead and Shafer Basin. Utah Highway 279 is a State Scenic Byway. Along Kane Creek Road from Moab Valley to the block of state land south of Hunter Canyon, including Amasa Back totals 76,503.35 acres. A very small portion of this area (Dewey Bridge to Castle Creek) is within the Colorado River SRMA, with the great majority of the Riverway lying within the Grand ERMA. The Riverway is the most popular destination of MPA visitors, with recent visitation estimated at approximately 1.04 million people. Visitors engage in camping, hiking, four-wheel | Fee recreation programs are not a planning issue, but are rather regulated by the Federal Land Recreation Enhancement Act. The camping and boating programs management by the Moab BLM are self-funded. Campers at developed campgrounds pay fees which are used to maintain the campgrounds. Boaters pay for the operation of the boating program. The activities referred to by the commentor receive less of the "attention" because they do not generate fees for the maintenance of these activities.<br><br>Throughout the DRMP/EIS, motorcycling, four wheel driving and dispersed camping are provided for. Alt C of the DRMP/EIS provides 280 miles of motorcycle route, and over 3,000 miles of four wheel drive routes. The Moab planning area has over 1.6 million acres that are available for dispersed camping. A great deal of "attention" has been paid to these recreation users in the DRMP/EIS. |

| | | | | |
|---|---|---|---|---|
| | | | driving, scenic auto touring, mountain biking, bouldering, BASE (Building, Antennae, Span, Earth) jumping, rock art viewing, dinosaur track viewing, rock climbing, and rafting and boating within the Colorado Riverway." ...while we do not dispute BLM's statement that this is a very popular area, we do think that by working backward from the estimate to the carrying capacity of the geographical area, 1.04 million people cannot possibly want to return for an enjoyable relief from the confines of urban life, because it would be like going to New York City without the buildings. ...by withholding the actual counter numbers, and providing only "estimates," BLM has created an un-credible scenario. It is not our intent to declare that 1.6 million do not visit. It is our intent to use the information provided by BLM in this analysis to demonstrate that because the heavily used areas require so much detailed and expensive Agency attention (campgrounds, restrooms, boat launches, permit systems), BLM has failed to account for an entire demography which requires almost no attention: Long-distance off-road driving, using motorcycles and 4WD vehicles, and dispersed camping in self-contained travel trailers and motor homes. | |
| Colorado 500 | 6 | 9 | Why do we say this is (visiting Co. River SRMA) is what the other 1 million people are doing? To answer this question, we do have hard numbers, supplied by the writers of this DEIS. On page 3-84, we learn that Utah OHV registration has jumped 207% statewide, and 305% in Grand County during the same time frame the above non-motorized and "passive" visitation has dropped. (Table 3.36) Conspicuous by it absence in the DEIS is any mention of the increase of OHV registration in Colorado (recall page 3-84 of the DEIS: "It is important to note that the majority of OHV and dirt bike users on the Moab BLM lands are residents of Colorado"). Because the Moab DEIS has omitted any | OHV registrations have increased in both Utah and Colorado since 1998. This is acknowledged in Chapter 3 of the DRMP/EIS. Percentage increases do not always mean greater raw numbers than for other types of users, however. In addition, there ris anecdotal evidence that registrants in Utah have increased since 1998 due to more compliance with registration laws. The BLM does not accept the commentor's statement that "passive" visitation has dropped. At the same time, the BLM acknowledges that registrations have increased.

Alt C. of the DRMP/EIS provides recreation opportunities (in 30 Focus Areas) for all types of recreation activities, |

information about Colorado OHV visitors, we will use The NSRE 2000-2003 Colorado Outdoor Recreation Study (SCORP) for hard numbers about Colorado trends.  On page 37, Table 7, they found a 37.28% increase in "land resource-based activities."  Table 8 shows a 37.44% increase in trail/street/road activities and in the same chart, "outdoor adventure" saw a 31.41% increase.  According to this study, between 1995 and 2003 the number of people participating in the activity called "primitive camping" increased by only 6% while Colorado OHV registrations increased by 223%.  We think the DEIS writers provide us with a highly suitable description of the phenomena that is occurring, on page 10-25 of the AMS: QUOTE:  "It may be surprising to some that the Moab FO area receives more visitors than the surrounding national parks (see Table10-5).  However, many of the activities that visitors come to the Moab area to enjoy can only be done on public lands.  For instance, OHV activity, mountain biking, rock hounding and other such activities are available on BLM land, and not on national park lands.  In addition, once visitors come to the area to visit a national park, they find that there is a much larger land area available for recreation outside those national parks."  The sheer remoteness of what these folks discover poses a different problem for BLM planners:  how do you count those people?  The answer is, the Moab Field Office apparently does not.  The MFO has no traffic counters on the roads that access the start points for these sorts of trips, or, if they do, they have omitted them from this analysis.  MFO has no counters on the popular motorcycle trails.  MFO has no counters on the prime long-distance routes that people come from all over the world to ride.  And MFO has never surveyed any visitors in their self-contained motor homes in the remotest parts of the Moab Field Office.

both motorized and non-motorized.

The Moab Field Office has or has had traffic counters throughout the planning area, including in popular OHV areas such as the road to White Wash, Ten Mile, the Kane Creek Road and Cameo Cliffs OHV SRMA.  The National Visitor Use Monitoring Study sampled visitors throughout the field office area, including motor home users engaged in dispersed camping.

BLM_0011520

| Colorado 500 | 6 | 10 | To summarize:  Between 1997 and 2006, 1. Visitation to Arches N.P. (non-motorized) has dropped 11.5% (DEIS Table 3.36)  2.  Visitation to Dead Horse S.P. (non-motorized) has dropped 20% (DEIS Table 3.36). Visitation to Canyonlands NP (non-motorized) has dropped 13.5% (DEIS Table 3.36) .  Interest in primitive camping in Colorado increased by only 6% (Colorado SCORP 2003)  5.  OHV registrations in Utah have increased by 205% (DEIS Table 3.21)  6.  OHV registrations in Colorado increased by 223% *Colorado SCORP 2003)  7.  Interest in "outdoor adventure" increased by 31.4% Colorado SCORP 2003)  8. Interest in "trail/street/road" activities increased by 37.44% (Colorado SCORP 2003)  9.  Moab BLM lands provide the essence of trail-dependent outdoor adventure by virtue of the vast unmapped road system and hostile desert environment (DEIS Page ES-7)  10. Tourism-dependent revenue in Grand County has remained steady (DESI Table 3.35); 11.  MFO has no visitor numbers for BLM lands outside the developed activity areas  12.  The source citation for Table 3-18 page 3-80, "Activity by Use Level" states that these proportions are purely anecdotal, and note derived from any factual source such as traffic counters or surveys. 13.  BLM's visitation estimates for the "most popular" BLM sites are so far beyond those sites' carrying capacity that the estimates are not credible.  These thirteen items together reveal the flaw in the analysis: When the factual information is placed alongside the voids in information, without hundreds of pages between them, we find some very strong clues.  There are 1.2 million visitors to Moab BLM lands who are not camping, hiking or boating.  These "new century" recreationists appear to want to participate more actively in their public land experience, and off highway vehicles are clearly one of the primary instruments of this demographic and cultural shift. II.  What to do | The Moab BLM did not have accurate numbers on the activities engaged in by visitors when the planning process started.  That is the reason why activity use levels in Table 3.18 are classified as "High", "Medium and "Low".  If exact use numbers were known, exact use numbers would have been provided in the table.  See also response to comment 122-3.<br><br>Since the inception of the planning process, the Moab BLM office was a pilot office for the implementation of the National Visitor Use Monitoring study that is standard operating procedure for Forest Service areas.  Preliminary data were available at the time of the DRMP/EIS.  Since the largest unknown recreation factor was activity use levels, the preliminary data were supplied from the NVUM study in Table 4.67 regarding the percentage of BLM visitors engaging in various activities on Moab BLM lands. BLM lands in the planning area were surveyed, including the backcountry and dispersed areas mentioned by the commentor.  The data in Table 4.67 represents the best information that the BLM has regarding the activities that its visitors engage in during their stays in the Moab area.<br><br>The DRMP/EIS provides for the needs of motorized users, as is evidenced in the 3,693 miles of four wheel drive routes and the 282 miles of motorcycle routes. Visitor numbers were not an indicator of how much attention should be paid to the activities of various visitors.  If that were the case, BASEjumping (with its low visitor use numbers) would not be provided for at all.<br><br>All of the motorcycle trails that were submitted by the public during the scoping period and were verified on the ground by BLM staff were considered for designation in the alternatives for the Travel Plan.  As described in Appendix G of the DRMP/EIS, the purpose and need for each route was weighed against possible resource |

BLM_0011521

about it.  What are we asking for, now that sufficient doubt has been cast upon the visitor activity numbers as presented in the Draft EIS?  We will only ask for things that are possible for the BLM to accomplish within the scope of this analysis, in order to produce a timely and defendable Record of Decision.  The details and citations supporting the following six requests begin on page 13.  I.  Recall from the above analysis of hikers and hiking trails that user-made trails are a manifestation of demand.  Cutting the available mileage in half for any user group will resolve none of the problems set forth in the Purpose and Need statement. Therefore, we want to have all existing road and trail mileage designated by this decision.  We will provide peer-reviewed research to assist BLM in justifying this change.  Incorporated into this change we fully expect the BLM to conduct site specific analyses (during the decision steps that follow the Record of Decision) of any routes or areas that BLM considers resource problems.  If time permits, there may be some areas that this EIS will analyze in sufficient detail to enable a change in designation with this Decision.  II.  We want all of the motorcycle single-track maps submitted by the public during this comment period to be placed into the designated trail inventory, including but not limited to the routes submitted by the Colorado 500 in separate comments.  III. We especially want the BLM to abandon the major change of course that omitting 271 miles of "motorcycle trail" represents.  This mileage was named in the AMS as "motorcycle trail," and "Motorcycle trails" were discussed during the time the "scope" of this analysis was being determined.  We consider this omission a questionable change of course because the mileage was withdrawn after the public could no longer provide input, and after the time that is customarily available for dialogue between the affected public and the BLM ("scoping").  This withdrawal was apparently

conflicts.  See response to comments 124-71, 122-15 and 122-30 for a description of the Travel Plan process and on how to add new routes after the Travel Plan process is complete.  See the response to comment 208-2 for an explanation of why all inventoried routes are not found in Alt. C.

There are 282 miles of motorcycle routes designated in Alt C.

A planning bulletin was issued during the scoping period of the land use planning process to interested parties that specifically asked the public to submit all route data in a timely manner.  All data submitted by the public was considered during alternative formulation.  See Appendix G for an explanation of the travel planning process and for a list of those who submitted route data.  No trails were "withdrawn" from consideration.  All motorcycle trails were not designated in Alt C because some of them posed unacceptable resource conflicts.  For instance, the motorcycle route along the Hidden Canyon Rim had unresolvable conflicts with cultural resources.  This route was not designated for use by either motorcycles or by bicycles.  The motorcycle routes on the top of Duma Point were inventoried and verified by BLM staff.  They were not designated because of conflicts with bighorn sheep escape terrain.

The management concepts described by SRMA in Appendix F are required by BLM policy.  The Land Use Planning handbook (H-1601-1) requires the BLM to identify, for each SRMA, the recreation opportunities, outcomes and benefits.  The manual further requires the setting character to be delineated.  The commentor is correct that this is
  new; the previous planning manual did not require these items to be identified.  However, the planning manual that

| | | | | |
|---|---|---|---|---|
| | | | initiated by staff with no explanation or legal authority for doing so.  IV. We want the BLM to abandon certain management concepts that this Draft EIS newly introduces to public lands recreation management, as described in Appendix F and called "Activity-Outcome-Benefit" charts, upon which many of the land allocations have been created.  These concepts fall outside the authorities as set forth in FLPMA and BLM 1600 Handbook, and they are confusing to the public.  In a separate comment we will provide an explanation for this request that will sufficiently justify dropping those concepts without changing any of the major outcomes desired by BLM in this EIS.  V.  We want the BLM to revise the discussions in Chapter 3 that relentlessly repeats that people using motor vehicles are the cause of 80% of this "problem" that BLM calls "user conflict," because the fact is, at least 80% of the visitors are using motor vehicles as the primary instrument of their visit.  VI.  We want the BLM to review the references used in support of the Analysis, and remove all inappropriate, obsolete, or mis-used research.  We will be happy to provide current research to guide staff as they strive to avoid decreasing MFO's present road and trail carrying capacity. | was issued on March 11, 2005 (Appendix C, pg. 15) requires the identification of these concepts.<br><br>The BLM has received reports of user conflict from visitors.  BLM staff have experienced user conflict in the field.  The BLM does not lay blame for these conflicts with any one group.  The issue of user conflict was raised by the public during scoping, and the BLM is required to address user conflict as an issue in the development of alternatives.  The list of instances of user conflict in Chapter 3 was provided to address user conflict as a part of the affected environment.<br><br>The BLM is not aware of any inappropriate research in the DRMP/EIS.  There is no attempt on the part of the BLM to deliberately decrease the Moab Field Office's road carrying capacity.  The BLM worked closely with its county cooperators (Grand and San Juan counties) to provide a transportation system that accounted for the recreation uses of roads by the public.  For instance, all Jeep Safari routes are in Alt C, as are almost all routes used regularly by recreationists.  The BLM consulted guidebooks and commercially available maps to ensure that these routes were included, for the most part, in the Travel Plan accompanying Alt. C.  See also response to comments 1031-5 and 1031-6. |
| Colorado 500 | 6 | 11 | Soils:  Adding the 271 miles of motorcycle trails and rounding off, we cannot say that roads and trails disturb a maximum of 4% of the land base.  The most recent cited working a USFS document was prepared by D.B. Coe and published in 2006.  Coe's objective was to determine the production and delivery of sediment to forest streams via the road system, but in the course of his field work he observed, measured, and recorded another phenomena.  Quoting from Page 21 of the D.B. Coe 2006 paper:  "The native surface road segments that had been recently graded produced about twice as | The issue of road maintenance is not a planning issue. The roads that are regularly graded in the Moab Field Office belong to the "B" road system.  All B roads are included in all of the alternatives.<br><br>The majority of miles of route that are not designated between Alts. A and C are routes that have never been used by anyone. This is why they were deemed to have no purpose and need.  See response to comments 1031-5 and 1031-5 for a discussion of the types of routes that were not designated.  Those routes that are designated in |

much sediment per unit erosivity as the ungraded segments (p=0.02) (Figure 2.8).  A pairwise comparison indicated that there was no evidence of a decline in sediment production rates between the first and second years after grading (p=0.86).  Page 26 & 27, Coe 2006: "The data from four recently-graded road segments show that sediment production rates per unit precipitation were much higher in the early portion of the wet season (Figure 2.11).  The high initial sediment pulse can be attributed to the rapid removal of the thick, fine dust layer that had formed on the road surface as a result of [heavy vehicle traffic].  The subsequent decline in sediment production per unit rainfall suggests that the recently-graded roads rapidly become supply limited as the road surface becomes armored and more resistant to sediment detachment and transport processes."  And a review of USDA General Technical Report 193 (2004) confirms Coe's work: ungraded native surface roads consistently produced lower sediment loads than graded roads in every year that was studied.  In Coe's work and in the USFS Technical Report, the results suggested that partially overgrown routes, and routes with irregular surfaces such as rocks, ledges, and roots, and lighter traffic loads, produced far less soil loss from the road surface.  This research clearly indicates that reducing the mileage available for vehicle access by @50% (as all action alternatives propose) will result in soil losses that are worse, and not just a little worse.  Over time, the losses will be worse by several orders of magnitude. Assuming that all traffic will be restricted to designated roads and trails regardless of the alternative used in the ROD, the proposed action in any alternative except A will result in more erosion, more road damage, and increased demands for maintenance.  Increased maintenance, as the 2006 Coe study has revealed, will exacerbate the losses.  In other words, concentrating traffic on few routes is a significant concern in the

the preferred alternative would be graded only if they are "B" routes.  There is no maintenance performed by either Grand or San Juan counties, or by the BLM on D roads.  The difference in mileage among the four alternatives is entirely made up of D routes, which will not be maintained no matter what their use.  See also response to comment 208-2.

Thus, although the mileage of routes designated in all action alternatives is less than the mileage that is inventoried in A, Alt. A includes all inventoried routes.  Many of these inventoried routes consist of old seismic lines, pack trails (which have never been opened to motorized use, but are a line on a USGS map, and were included in the Grand County inventory) and other never-used or seldom-used routes.  The commentor's suggestion that this means that the designated routes will receive substantially more traffic than they did previously is in error.  Those routes that have been used over the last two decades, and thus have demonstrated purpose and need, vary from 3,855 miles designated in Alt D to 3,328 designated in Alt B (3,693 miles are designated in C).  This represents a percentage decrease of less than 5% between roads that have purpose and need and/or are regularly used (virtually all of these are included in Alt D) and those roads that are designated in the preferred alternative.  That fact, and the fact that D roads are nor maintained, means that soil losses of the type mentioned by the commentor would not result from the BLM's decision to designate 3,693 miles of full sized motorized vehicle route and 282 miles for motorcycles in the preferred alternative.

See also response to comment 208-2.

| | | | consideration of cumulative impacts. | |
|---|---|---|---|---|
| Colorado 500 | 6 | 12 | ...the MFO staff's choice to separate the citations from the body of the text makes it extremely cumbersome to review the use of the literature in this analysis.  We have selected a citation that is pretty obviously aimed at roads, and because our comment is about roads, it seemed the most likely match.  Please bear with us.  From the Chapter in the DEIS called "References:" Forman, R.T.T. and L.E. Alexander.  1998.  Roads and their major ecological effects.  Annual Review of Ecology and Systematics '29:207-231.  This does not have anything to do with undeveloped dirt roads and narrow trails, lightly trafficked, in a desert ecosystem.  Just so you do not have to take our word for it, we have located and read the article, plus we have followed the citations in the article.  None of the material we found is related to what this DEIS is analyzing.  (multiple reference examples followed, text not included here) | Placing all references at the back of the document is standard operating procedure when assembling Environmental Impact Statements.<br><br>The reference to the article by Foreman and Alexander is found on pg. 4-485 of the DRMP/EIS in the section on wildlife habitat fragmentation.  The reference to the article concerns vehicles killing birds that are attracted to roadkills.<br><br>The BLM has added an expanded discussion to Appendix G of the extensive research on the impacts of OHV use on a variety of natural resources, including soils and watersheds, vegetation, wildlife and habitat, and water and water quality .  The BLM has also added an expanded discussion of the impacts of OHV use on socioeconomics, including user conflict, to Appendix G.  Where appropriate, references to this section of Appendix G will be added to the relevant resource sections of Chapter 4. |
| Colorado 500 | 6 | 13 | Please include this information in the "Environmental Consequences."  Please correct the assumption that more roads will inevitably cause more invasions.  What this author is saying is that more disturbance is the culprit.  The greatest possible disturbance to a dirt road is grading, as it deposits loose soil on the verge, whereupon exotics transported by the vehicles can gain a foothold.  If the natural road "armor" is left undisturbed, the native vegetation is fully capable of outcompeting invading exotics. | The BLM stands by its disclosure of the impacts of travel on vegetation (pg. 4-428 of the DRMP/EIS).  Travel leads to disturbed soils, whether it is caused by grading, route widening, or other disturbances.  Noxious weeds are spread by the disturbance of soils. Furthermore, vehicles themselves can cause the spread of noxious weeds as their seeds are transported by the vehicles.<br><br>Please see response to 6-12. |
| Colorado 500 | 6 | 14 | I would like you to correct a mistake in the Travel Plan.  The mistake has its origin in the absence of an OHV Specialist on staff.  Evidence that this lack of skills on staff has produced a serious omission in the Travel Plan is revealed by the following examples.  1)  Ch.10 P.32:  [.. Making management of this activity (OHV) more difficult…].  The fact is, recreation managers who | he adequacy of BLM staffing is not a land use planning decision.<br><br>The BLM cannot find the reference to "Chapter 10, pg. 32."  There is no Chapter 10 in the DRMP/EIS.  There is a reference on page 32 of Chapter 10 in the Analysis of Management Situation that lists  "Issues and Concerns". |

| | | are experienced in motor recreation will unequivocally disagree.  Motorized users are actually the easiest to manage.  However, if the recreations manager has no understanding of what the motor visitors seek, it will appear that motor recreation is harder to manage.   2) Discussions like this are not even in the analysis: 'Providing sufficient quality route opportunities gives the land manager enormous control, by removing, or moving, desirable access.  There are many nuances to "desirable:" destination, the difficulty level, the touring aspect of driving for pleasure, the sense of "going somewhere," and always important to every Moab visitor, the sightseeing.  3)  Appendix F, page F-3 through page F-17, Tables of Activity/Experience/Benefits.  These tables reveal a profound lack understanding of all motor recreation.  4) The absence (on the maps) of recreational mileage that the public has shown to MFO staff. …the MFO staff has disregarded the BLM Washington Office Technical Reference 9113-1, "Planning and Conducting Route Inventories."  If MFO had an OHV specialist on staff this would be excusable.  We request that in the Travel Plan, five categories of routes for RMP level management be established, and general criteria (width, surface, level of improvement) be prepared for each, as follows:  1.  Commercial Routes ( O&G); 2. 2WD Routes; 3.  4WD Routes; 4. ATV Routes; and 5. Motorcycle Singletrack Routes.  This will qualify as a minor variation of the preferred alternative, and because it is well within the spectrum of Alternatives it is entitled to consideration under the authority of CEQ 1503.4, as explained in the 40 Questions 29b, "How must an agency respond to a comment on a draft EIS that raises a new alternative not previously considered which is a minor variation of one of the alternatives discusses in the draft EIS, but this variation was not given any consideration by the agency.  The answer is, | The BLM is required to identify issues prior to working on the land use plan.  Issues were listed for many types of recreation users, including river users.<br><br>The BLM has recognized the need to provide route opportunities.  The purpose and need of the majority of routes designated in the Travel Plan accompanying the PRMP/FEIS was recreation.  This was true of each of the motorcycle singletrack routes that are designated in the Travel Plan.  Routes that are highlighted on commercial maps and guidebooks were included in the Travel Plan solely to provide recreation opportunities.<br><br>Appendix F provides a very brief summary of each of the Special Recreation Management Areas.  Each of the SRMAs will have a Recreation Activity Management Plan (RAMP) prepared after its designation.  The development of these RAMPs will allow for further explanation of the recreation resources of these areas.<br><br>Technical Reference 9113-1 is a database requirement for classification.  See response to comments 123-7 and 124-58.<br><br>The Travel Plan has designated four categories of routes, which are shown on the maps accompanying the PRMP/FEIS.  These categories are "routes" (which are opened to all types of vehicles, including motorcycles, bicycles and ATVs), ATV routes (which are opened to ATVs, motorcycles and bicycles), motorcycle routes (which are opened to motorcycles and bicycles), and bike routes (which are opened to bicycles only).<br><br>There are 33,000 route segments in the Travel Plan accompanying the PRMP/FEIS.  A description of each of them is not feasible.  The GIS data which accompanies each of these 33,000 route segments indicates the |

| | | | | |
|---|---|---|---|---|
| | | | in such a case, the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS.  If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed."  In fact, a new alternative is not needed; rather, a simple modification of Alternative C will satisfy the issue.  This will entail only two changes to the Travel Plan: 1) GIS data revisions so that all the routes in the database are included on the maps pending site-specific analysis, and each route is attributed with the simple criteria noted above.  2) Short descriptions of each type of route will be added to the Travel Plan narrative and to the Route Selection Criteria.  Including these descriptions will make it clear that the stipulations for each type of route will be very, very different than those for O&G roads.  This will facilitate the post-ROD decision steps required for implementation.  In the event that staff refuses to consider this minor variation, and wishes to leave the route selection criteria as it is presently written, please add the following true statement at the beginning of Page G-11, immediately prior to the discussion of route selection criteria:  "Full Disclosure:  Table 5 on page G-8 shows that the Moab ID Team lacks the skills to find existing motorcycle/ATV routes; and, the team's capacity to evaluate the purpose and need for recreational motorcycle, ATV, or 4-wheel-drive routes is severely constrained and impaired by the absence of a motorized recreation specialist, or any Team member who can offer serious discussion of the purpose and need for any given route or of the appropriate stipulations for each type of route. | purpose of the route.  That is, those that are for motorcycles and/or ATVs are tagged in the GIS data.<br><br>The Moab BLM asked for route inventories from the public.  Many segments of the public provided routes, including motorcyclists and bicyclist.  The BLM verified each of the routes provided on the ground.  Those routes that were verified were included in the Travel Plan deliberations.  Appendix G explains the process for route designation.<br><br>The Moab BLM team does actually have expertise in motorized use.  However, BLM staffing is not a land use planning decision. |
| Colorado 500 | 6 | 15 | We take serious issue with this newly evolved "mission" called "MFO's benefits-based recreation management goals and objectives… for the proposed SRMAs." (page 4-190).  1.  Benefits-based recreation management does not flow from the Purpose and | See response to comment 124-104.  BLM policy requires field offices to consider the benefits that accrue to visitors from its decisions and actions.  Benefits based recreation management does not lie outside the authority of the BLM.  The BLM has incorporated benefits based |

| | | | | |
|---|---|---|---|---|
| | | | Need.  2.  Benefits-based recreation management does not flow from the NOI.  3.  Benefits-based recreation management does not flow from the Scoping.  4. Benefits-based recreation management adds a burden of analysis to this RMP that lies outside the professional expertise of BLM specialists.  5.  Benefits-based recreation management lies outside the authority of BLM.  There is nothing in FLPMA or NEPA that requires BLM to sort visitors according to "user groups" and then expend government resources upon assuring their satisfaction.  6.  In the context of applying the concept to the MFO for the purposes of making land use allocation decisions, the ID Team ahs not used any factual evidence. Professional judgment is professional because it uses a mix of an individual's professional training, peer-reviewed research, factual information from the area under study (monitoring, for example, or the Administrative Record), and their person's experience.  This person's "Professional judgment" is also expected to be a) confined to that person's area of professional expertise and b) reasonably consistent with the research and factual information available in this person's area of expertise.  If we do not hold government specialists to these standards, there is nothing to prevent them from simply making up management plans based on their own personal favorite activities.  The narrative on page 4-190 is very sophisticated, but it looks like it was written to do exactly that.  Remedy that would resolve this comment: We want BLM to abandon the entire "benefits-based" management concept. | management throughout its recreation program. "Recreation and Visitor Services (BLM): A Unified Strategy to Implement BLM's Priorities for Recreation and Visitor Services" guides BLM national policy.

Washington Office Instruction Memorandum IM 2006-060, "Incorporating Benefits Based Management Within Recreation and Visitor Services Programs" directs BLM field offices to utilize benefits based recreation management in planning for recreation use on BLM lands. The purpose of this IM is given: "Purpose: This IM affirms the Bureau of Land Management's (BLM) program direction approved by the Executive Leadership Team (ELT) to adopt an expanded conceptual framework for planning and managing recreation on public lands. Strategies and policy for planning and managing recreation-tourism use is described in two key documents: "The BLM's Priorities for Recreation and Visitor Services" (see WO IB No. 2004-072) and in Sections II.C and II.D of Appendix C to the Land Use Planning (LUP) Handbook (H-1601-1, Release 1-1693, dated March 11, 2005).  The BLM's recreation constituents and gateway communities have affirmed these changes are appropriate direction for the future management of recreation and visitor services at both the 2004 BLM National Recreation and 2005 Western States Tourism Policy Council forums."

The Moab Field Office has been directed by BLM policy to use benefits based management. |
| Colorado 500 | 6 | 16 | Please refer to page 4-292, 4.3.13.7 paragraph 2. Quote:  "Where proposed under the alternatives, control of human waste through installation of vault toilets in high-use recreation areas generally would benefit water quality by reducing E. coli contamination and nutrient-loading of surface waters.  Designation of camping | The BLM has no authority to favor one type of camping over another.  BLM staff recognize that motorhomes and travel trailers have sanitation facilities.

Motorhomes and travel trailers generally use routes that are maintained.  All B roads, which receive regular |

| | | | | |
|---|---|---|---|---|
| | | | areas generally would limit the surface disturbance that results from dispersed camping and unofficial fire pits and, thus, would limit adverse impacts to soils." End Quote. In another comment we requested that you revise the Affected Environment --- (specifically, 3.11.2.72.2 "INADEQUATE FACILITIES/PUBLIC HEALTH AND SAFETY  The availability of facilities is directly related to public health.  Inadequate numbers of organized campgrounds and restroom facilities contribute to unhealthy levels of human waste in some areas, posing a health risk to visitors.")  ---and the Proposed Actions, to encourage the use of self contained motor homes and travel trailers for the specific purpose of addressing these problems in undeveloped camping areas.  ...we make the following requests for revisions to the FEIS and the Proposed Actions:  1.  In the analysis and in all the Proposed Actions, we want you to emphasize the sanitation advantage of self-contained travel trailers' and motor homes.  2.  In the analysis, we want you to emphasize the fact that people who camp using self-contained travel trailers and motor homes do not "need" campfires, and considering their extra carrying capacity, these people are far less likely to build "unofficial firepots:" because they can bring their own firepans and firewood if BLM so requires.   4.  We want this analysis to acknowledge and take into consideration that reduced access will discourage these vehicles. | maintenance, are designated in all of the action alternatives.  These B roads lead to a myriad of dispersed camping opportunities for motorhome and travel trailer users.

The great majority of routes that are not designated in the Travel Plan accompanying the PRMP/FEIS are routes that in such poor condition that they receive very little use (thus having no purpose and need).  Neither travel trailers nor motorhomes are able to negotiate these routes, so dispersed camping opportunities have not been removed.

The routes designated in the Travel Plan offer ample opportunities for dispersed camping. |
| Colorado 500 | 6 | 17 | Please refer to Appendix F.2 Special Recreation Management Areas beginning on Page F-3.  In these Tables, MFO staff attempts to compare the experience associated each activity, in order to determine a "targeted outcome" whose "benefits" will help determine the management and resource allocations for each activity. First of all, BLM has failed to establish a coherent relationship between the need to sort people this way and RMP planning. | See response to comments 123-4 and 124-104 for a discussion of Appendix F.

The list of preparers includes those with advanced degrees in socioeconomics.

See response to comment 6-15 for a discussion of the BLM's benefits based management recreation and visitor services policies. |

| | | | Even worse than irrelevance, however, is that in the list of preparers for this DEIS, no professional sociologist is listed. In the literature cited there is no peer-reviewed, broad-based sociological works that might give these tales at least an air of professionalism. Neither in the Appendix to this document or in the Analysis of the Management Situation are there any peer-reviewed site-specific surveys of all types of visitors to the BLM lands in MFO jurisdiction.<br>And finally, BLM has provided no evidence -- not even evidence collected by amateurs -- that these "benefits" are not completely interchangeable between activities. Indeed, entering the arena of the psychological and personal values of the individuals who recreate on BLM lands places a significant burden upon this analysis, by widening the scope of its inquiry into an area that lies far outside the mission and expertise of the agency. If the agency should pursue this aspect of the inquiry, we want the following changes made:<br>a) Cite the law, regulation, or Executive Order authorizing the agency to promulgate new regulations that segregate recreational visitors according to the local Moab FO staff perceptions of the value of each type of visitors' personal experience<br>b) Provide empirical and physical evidence, in the form of a peer-reviewed field and sociological research including user surveys with peer-reviewed question formulation and accurate sample sizes for every type of public land visitor, to confirm that these emotional differences actually exist and are in fact significant enough to expend government resources on allocating land and resources based on these differences. A popular dodge for this requirement is to interview only the visitors that staff wants to interview, or only the visitors that are easy to find. We expressly demand the BLM refrain from doing this<br>c) Provide an analysis of the social benefits (accruing to | User conflict was an issue raised repeatedly by the public during scoping, and the BLM is required to address issues raised by the public. See also response to comment 6-12.<br><br>The BLM's Land Use Planning Handbook (H-1601-1) requires that "discrete Recreation Management Zones" (which are called Focus Areas in the Moab DRMP/EIS) must be delineated in each SRMA. In addition, Recreation Management Zones are extensively defined in the land use planning document. "To address these four variables within each RMZ, make the following land-use allocation decisions: 1) identify the corresponding recreation niche to be served; 2) write explicit recreation management objectives for the specific recreation opportunities to be produced and the outcomes to be attained (activities, experiences and benefits); 3) prescribe recreation setting character conditions required to produce recreation opportunities and facilitate the attainment of both recreation experiences and beneficial outcomes, as targeted above and 4) briefly describe an activity planning framework that addresses recreation management, marketing, monitoring and administrative support actions (e.g. visitor services, permits and fees, recreation concessions and appropriate use restrictions), necessary to achieve explicitly-stated recreation management objectives and setting prescriptions." (pg. 15-16 of Appendix C of the BLM Land Use Planning Manual (H-1601-1).<br><br>User conflict is not merely an issue with non-motorized recreationists. There are documented user conflicts among motorized recreationists as well.<br><br>Enforcement actions are not a planning decision. It is assumed that the commentor is referring to Focus Areas. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | all BLM recreationists, and to the taxpaying public) of imposing criminal penalties from crossing the regulatory boundaries that will be established to support these alleged differences<br>d) Provide sufficient justification thereby, for agency law enforcement resources to be expended on physically sorting public land visitors with the intention of applying criminal penalties to violations of these standards, in the present and the indefinite future as this document proposes<br>e) Provide a description of how the government will measure the success of this strategy.<br>Alternatively, We want the BLM to abandon the concept of using individual recreationists' "values/benefits/outcomes/experience" as the basis for any management plan or any regulations or any on-the-ground boundaries. | Focus Areas do not constitute exclusive use. The focus is to manage these areas for the identified recreation use. Other users are not excluded, but their uses would not be provided for. |
| Colorado 500 | 6 | 18 | Adaptive Management:  This phrase appears frequently throughout the document.  BLM plans to use "adaptive management" techniques to correct problems or make changes during the life of this plan.  However, for the travel management proposals, there do not appear to be any standards for determining when management adjustments may be needed.  Please add to the FEIS reasonable, predictable, and feasible standards and triggers to guide future changes that may be needed.<br><br>We realize that in the context of an RMP these standards will be general, and not site-specific.  But there are any number of benchmarks and/or markers that can be set in the RMP to guide site-specific situations.<br>In other words, we want this RMP to provide a level of predictability for the business-oriented and the recreating public.<br>The problem with setting those standards now, after the close of comment, is that we will have no public review | A decision under Travel Management (pg. 2-48 of the DRMP/EIS) allows additions to the Travel Plan (using NEPA analysis) as travel needs are identified.  The purpose and need for a proposed new route would be provided in the Environmental Assessment prepared to add the route to the system.  Public review is provided for each Environmental Assessment written by the BLM. That is, each proposed new route to be added to the Travel Plan will undergo the NEPA process, including public review.  The public may comment on each new travel plan proposal.<br><br>The need for adding a specific route to the Travel Plan after completion of the land use planning process is a site-specific item and cannot be specified in advance in the land use plan. |

| | | | | |
|---|---|---|---|---|
| | | | of the standards.  Therefore, we request that BLM prepare those standards and offer a separate review period in order to provide for that legal necessity. | |
| Colorado 500 | 6 | 19 | Please refer to Chapter 3, 3.11.1.2.16 in DEIS: Quote [There are no routes solely dedicated to OHV use.  These activities take place on the same routes as used by four-wheel drive vehicles, and often occur on Jeep Safari routes.  There is an informal, user-made network of motorcycle routes in the White Wash Dunes Ares.] end quote<br> The total exclusion in the 2007 DEIS of a type of OHV route called "motorcycle trails" is a radical change, inserted by staff after the close of scoping.  Furthermore, there was absolutely nothing, general or specific, in the Notice of Intent published 6/4/2003 that could be perceived to even imply that recreational routes called "motorcycle trails" would be eliminated from consideration in this RMP and Travel Plan.<br>3.11.1.2.16 contradicts several statements in this EIS that explicitly describe the presence of "casual systems" of motorcycle trails (as in the quote above.)<br>3.11.1.2.16 contradicts with the data provided in the original Alternative A that was on the website prior to the issuance of the DEIS.  That document listed 271 miles of motorcycle trails.<br>3.11.1.2.16 contradicts Page 3-84.  "It is important to note that the majority of OHV and dirt bike users in the MPA are residents of Colorado."  A detail reference in the original scoping was omitted:  "dirt bikers" come from Colorado to ride single-track OHV trails.  They do not come to ride on roads.<br>3.11.1.2.16 contradicts the published BLM map #2-11E "Designated Motorcycle Routes Alternative C and D," now withdrawn from public review.<br>3.11.1.2.16 contradicts the tiny, scattered mileage shown on the DEIS Alternative C map 2-11-E called "Designated Motorcycle Trails."  According to that map | Chapter 3 of the DRMP/EIS describes the actual situation when the plan is under preparation.  There are currently no routes in the Moab Field Office that are designated for ATV or dirt bike use under previous planning efforts (four wheel drive vehicles are also considered OHVs).  The BLM acknowledges that there are user-made routes that ATV drivers and dirt bike riders have made on their own.  These routes, however, have never been designated for any particular use; they have not been limited to any one use, nor have they been sanctioned by the BLM.<br><br>The new land use plan under preparation seeks to remedy this by designating routes specifically for ATV and/or dirt bike use.  These routes are identified on Map 2-11-E;  hose routes that are in the preferred alternative would be designated at the time of the ROD.  It should be noted that they would be designated without any further environmental analysis.  This RMP/EIS is the environmental analysis for these routes.  Two hundred and eighty two miles of motorcycle route are designated in Alt C of the DRMP/EIS.  The BLM fails to understand how "motorcycle trails" have been excluded from the planning process.<br><br>On November 1, 2003, the Moab BLM issued a "Request for Route Data" planning bulletin.  This bulletin, which asked the public to submit information on all types of motorized routes, was posted on the Moab internet page, and was sent to every interested party in the RMP process.  The majority of the motorcycle trail data was obtained by the BLM as a result of this data call.  The BLM has not eliminated motorcycle trails from consideration in the RMP or the Travel Plan. |

BLM_0011532

| | | | | |
|---|---|---|---|---|
| | | | there is some sort of "dedicated OHV trail."  But 3.11.1.2.16 says there are "no routes solely dedicated to OHV use." | The figure of 271 miles of motorcycle trail in Alt. A was an estimate of existing motorcycle trails in the No Action alternative.  This numerical estimate was provided to provide a baseline comparison for Chapter **4**. The motorcycle trails in the existing condition were entirely user made.<br><br>Dirt bikers from Colorado may very well come to Utah to ride the user-made network of motorcycle routes.  The Travel Plan accompanying the DRMP/EIS attempts to systematize this user-made network and designate those routes that do not cause unacceptable resource damage. See Appendix G for a description of the Travel Plan process.  See also response to comment 12**4**-71.  Many dirt bikers do ride on roads in the Moab Field Office. Many of the "roads" in the Moab Field Office present a challenge to any dirt bike rider.<br><br>Chapter 3 describes the current Affected Environment. There are no routes solely dedicated to dirt bike or ATV use currently.  Map 2-11-E is a depiction of routes that would be designated for motorcycles under the action alternatives of the DRMP/EIS.  Thus, this land use planning effort does provide for motorcycle users. |
| Colorado 500 | 6 | 20 | We dislike using the expression, but the dishonesty of the MFO staff inserting "popular mountain bicycle" trails in place of motorcycle trails is exposed by: 1) The placement of a "Mountain Bike Focus Area" (Map 2-9-C) exactly where the popular Copper Ridge motorcycle trail already is.  This is an existing singletrack loop, plus singleback connectors to the Sovereign Trails system (state land) and an existing single-track connector to Thompson Springs. 2) The record supporting this analysis:  refer to the "Comments" section, quote, "Keep it (lands) open to mountain bikers and motorbikes.  We are mountain bikers and appreciate the motorcyclists who discovered | 1. As stated explicitly in the DRMP/EIS. Focus areas are not designed to exclude other uses, such as the single-track motorcycle trail cited by the commentor.  Klondike Bluffs is a mountain bike focus area because the predominant use of Klondike Bluffs is mountain bike use. The Copper Ridge motorcycle trail was submitted to the BLM during scoping; the route could not be verified on the ground.  This means that it was not popular enough to be evident on the ground. See also response to comment 122-36.<br><br>2.  The BLM acknowledges the comment cited by the commentor, but fails to see its relevance to the issue at |

it. Everyone that we met on the trail was respectful to us and as far as we could see, the environment too (Slickrock Trail Parking Lot, Comment Cruiser Comments, 11 October 2003). This comment is especially important because it does not originate from the "self-selected" commenter's who attended meetings or wrote letters.***

3) The 1985 Grand RMP.(LISTS passages form the 1985 Grand RMP)

Requests that will resolve this comment:

1. We want BLM to provide the analysis that supports the statement "There are no routes solely dedicated to OHV use." Reprinting the same sentence from the AMS will not satisfy this request, as there is no analysis in the AMS that supports BLM's claim in 3.11.1.2.16. This additional analysis will obviously include maps of every existing road and trail. This analysis must detail who made each route, for what purpose, and when it was made. To accomplish this, interviews with residents of the Moab area, as well as residents of western Colorado and western Utah will be necessary, and interviews with motorcycle clubs and businesses, to gather the factual evidence that supports (or refutes) the claim that off-road motorcycles do not have their own dedicated system of routes in the MPA and in the MFO jurisdiction.

2. We want a third-party, non partisan review of this analysis. The reason that is necessary is that many private citizens donated hundreds of hours to help BLM map the single-track OHV routes in the run-up to this DEIS. Hundreds of miles of motorcycle trails were mapped. Since BLM has no compunctions about discarding that work, we have no reason to trust BLM in the conduct of any new route inventory or route development history.

3. Reprinting the same sentence from the AMS will not satisfy this request, because there is no analysis in that

hand.

3. The sentence referred to by the commentor from the 1985 Grand RMP is simply a statement by the BLM that there are no trails managed solely for OHV use, which is the case in the No Action alternative. No amount of research or interviews or third-party analysis will change this fact from the 1985 Grand RMP. The commentor provides no evidence to suggest otherwise. The fact that user groups may have their own trail systems does not mean that the BLM manages these for that single use. Additionally, no user group has the self-appointed authority to manage trails on public lands for their exclusive use.

4. The BLM, as part of its scoping for the land use planning process, requested route information from the public. A result of this request, the BLM received several hundred miles of routes from the public, including numerous motorcycle routes. Most, but not all, of these routes were verified on the ground by the BLM and were included in one or more action alternatives for analysis. This process is described in detail in Appendix G of the DRMP/EIS. These include many (perhaps most, but the BLM is not familiar with each group's route naming system) of the routes presented by the commentor. Some of the routes mentioned by the commentor were not presented to the BLM during scoping, and were therefore not included in the travel plan process. The BLM is not in a position to forego travel planning indefinitely to accommodate new route proposals. As the DRMP/EIS explicitly states, new routes can be considered for inclusion in the travel plan on a site-specific basis in the future. See also response to comments 122-15 and 122-30.

It is worth noting that several of the routes proposed by

document that supports BLM's claim in 3.11.1.2.16. 4. If there is no such analysis, we want BLM to add this statement to 3.11.1.2.16: "MFO staff has elected to omit at least 200 miles of existing motorcycle singletrack trails form the inventory and to eliminate form consideration the designation of a "system" of existing singletrack OHV trails in Alternative C. Staff has chosen to remove this data in advance of the Deciding Offer's review and Decision. Staff realizes that this will prevent the Deciding Officer any opportunity to evaluate and designate singletrack OHV systems. Based on the record supporting this DEIS and Plan, it will likely be perceived as a pre-emptive Decision by the ID Team. There is no analysis that supports this action. There is ample evidence that these routes do exists, as many members of the public assisted in located and mapping them. However, MFO staff has elected to discard that data. Please refer to 3.11.1.2.16."

Alternatively, and less contentious and less time consuming, and more likely to get this project to a Decision in a more timely way, we want eh Moab BLM to restore the trails in the MFO database that were collected under the public perception that the trails would be called "motorcycle singletrack" and included in the travel plan for consideration. We will not try to guess at the name BLM has assigned these trails. Restoring these trails to the database will simplify completion of the RMP, and it would fill several glaring voids in the "Travel Plan." Then, in the post-ROD implementation, site-specific monitoring would support the eventual site specific analysis of the impacts of these trails.

We also request that BLM add the following section to Chapter 3:

1. Beginning on page 3-79, part 3.11.1.2.16 must be changed to "Popular Motorcycle Routes." These will be

the commentor are located in an area limited to existing trails as of 1985. The commentor needs to be aware that on pg. 2-32 of the DRMP/EIS, it is stated: "No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan".

The Slickrock Bike Trail has been added to the motorcycle trail route map (2-11-E). The following routes mentioned by the commentor are open to all motorized vehicles, including motorcycles: Gemini Bridges, Amasa Back, Flat Pass, Klondike Bluffs, Kokopelli's Trail, Poison Spider, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Hurrah Pass and Onion Creek.

The commentor should consult the motorcycle trail map (2-11-E) to see if the routes he names are available to motorcycles. The BLM is unfamiliar with some of the names used by the commentor.

The Mel's Loop route has been placed in the proposed alternative for the PRMP/FEIS.

the same as the "popular bicycle" trails, plus many more miles.  The reason they are the same is, BLM changed the usage for this DEIS even though (because it is in the record) BLM cannot dispute the fact that motorcycles were suing those trails when the 1985 RMP was written.

2.  We want BLM to include Gemini Bridges, Porcupine Rim, the Slickrock Bike trail, Amasa Back, Flat Pass, Klondike Bluffs, Kokpelli's Trails, Poison Spider, Lower Monitor and Merrimac, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Bar M, Hurray Pass and Onion Creek ("popular bicycle trails),

3.  And, add trails including but not limited to:

4.  Copper Ridge Singletrack

5.  Thompson Wash Singletrack

6.  Guy's Trail Singletrack

7.  Enduro Trail Singletrack

8.  Bitter Creek Singletrack

9.  Beyond Bitter Creek Singletrack

10. Thompson Trail Singletrack

11. Western Rim Singletrack

12. Zion Curtain Singletrack

13. Westwater Rim Singletrack

14. Mel's Loop Single-track

15. Mel's Westwater Connector Singletrack

16. Prairie Canyon Singletrack

17. Dubinky Singletrack

18. Whitewash Singletrack system

19 Ten Mile Wash Singletrack system

These trails are part of the database that a trusting public helped MFO staff to assemble, with the hope of an accurate analysis.

It is not our intention to stop BLM's progress toward a Decision, and it is not our intention to "torpedo" Alternative C as the preferred.  It is our intention to encourage the government to produce accurate planning documents that truly reflect the conditions in

BLM_0011536

| | | | | |
|---|---|---|---|---|
| | | | front of the Planning Team. That is why in each of our comments, and especially this comment, we offer a solution that BLM can achieve in the FEIS. | |
| Colorado 500 | 6 | 21 | ...the published Final Scoping Summary has aroused suspicion. ...in approximately 750 to 1,000 comments in support of "OHV," the word motorcycle appears just once and "motorcycles" only twice, although "dirt bikes" and "motorbikes" slipped through someone's word search.  Yet off-road motorcyclists never refer to themselves as OHV or ORV users, and never refer to their trails as "OHV trails."  They refer to their trails as "singletrack." For example, the Bookcliff Rattlers Motorcycle Club does not call itself the Bookcliff Rattlers OHV Club.  This is a universal trend; a Google search of "OHV" clubs will turn up none who use that acronym in their club name. And we noticed something odd in the comments as published in the BLM AMS "Summary of Public Comment Final."  Relying on BLM interpretation, as we do not have access to original material, we note here for the record, the following: "OHV" appears 257 times and "ORV" appears 25 times.  "Dirt bike" never appears.  "Dirt bike" appears once.  "Motorcycle" appears once in the name of the club, and "motorcycles" appears twice. And for some strange reason, there is not one occurrence of the word "singletrack" in the scoping record, either, and "single track" appears only once, in spite of the fact that for both motorcyclists and mountain biers, singletrack is the most prized type of trail. Because this makes us suspicious that the scoping comments may have been "interpreted" we will briefly examine the published scoping comments that mention "Trails, OHV, and Recreation."  We present this as additional evidence that both motorized users and | The BLM received scoping comments from the Bookcliff Rattlers Motorcycle Club.  Many of their inventoried routes were verified by BLM and are included in the Travel Plan.

The BLM summarized the scoping comments that it received from the public.  All these comments are publicly available and the commentor is welcome to look at them at any time.

The BLM has included singletrack routes in the Travel Plan accompanying the DRMP/EIS.  The BLM called for these routes to be submitted to the agency during the scoping process.  The BLM verified each of the submitted routes on the ground and analyzed each for resource conflicts. The BLM has designated 282 miles of motorcycle route in the preferred alternative of the DRMP/EIS.

The BLM considered all scoping comments received from the public.  These comments are publicly available for inspection.  It should be noted that a Scoping Meeting for the Moab RMP was held in Grand Junction, Colorado on October 14, 2005.  Fourteen people were in attendance, including members of the Book Cliff Rattlers Motorcycle Club. |

| | | | | |
|---|---|---|---|---|
| | | | nonmotorized users do recognize a specific type of one-track trail that is used only by motorcyclists. This is the record that staff will present to the Deciding Officer in the FEIS.  Thus, for staff to truncate the results in such a way that an entire type of very popular and economically positive recreation (which has thousands of clubs, organized events, and is recognized worldwide), is concealed, is a serious issue for the public. | |
| Colorado 500 | 6 | 22 | We are particularly concerned about Moab BLM's motorized recreation strategy, because there is not a single OHV management information source in the DEIS list of citations. In light of the mandate that the BLM use the "best available information" for its analysis this is a serious omission.  It clearly appears as though MFO staff is not measuring their assumptions, strategies and predicted environmental consequences according to currently accepted resource management standards and research. BLM has split the list of references from the body of the text, so the utility of every site is impaired, and we don't have the time to identify how many are actually needed to support this document.  The following samples are intended as evidence to support our requests. Examples of relevant research that is omitted (PLEASE SEE LETTER): Examples of apparently irrelevant citations (PLEASE SEE LETTER): We request seven changes: 1.  We want professional recreation management literature included and utilized in the guidance of the travel plan development and the designation of recreational routes. 2.  We want the citations to be joined with the relevant text, in order that the discussions and analysis in the DEIS be supported and guided by the existing research | The Travel Plan process is described in full in Appendix G of the DRMP/EIS.  The BLM worked with county cooperators to designate routes in all three action alternatives.  Designation or non-designation was based not on literature, but on on-the-ground resource conflicts that may or may not have been present along the route.  For instance, the Hidden Canyon Rim was not designated for motorcycles or bicycles because of the prevalence of cultural resources.   The Travel Plan was developed on a site specific basis, with each of 33,000 road segments examined individually.<br><br>Professional recreation management literature concerns the management of the routes, once designated.  The criteria for designation or non-designation are not found in literature, but rather in the on-the-ground conditions of each of the routes.<br><br>Citations are commonly listed at the end of EIS.  The references in the text refer to documents listed under "References".<br><br>The BLM utilized the BLM National OHV Strategy throughout the document. The BLM considered all verified routes proposed by the public during scoping.  These routes were analyzed on a route by route basis.  There is no literature that relates to each of these routes.  The Travel Plan was not formulated as an academic exercise, |

| | | | | |
|---|---|---|---|---|
| | | | and guidelines and to enable the public to check them.<br>3. We want motorized recreation management to be guided by the current nationally recognized OHV professions, using standard OHV management strategies.<br>4. More specifically, we want the MFO to use standard recreation management protocols to formulate the Travel plan and Alternatives, and we want the Environmental Consequences re-analyzed where the proposed actions in the DEIS conflict with that literature that has been developed by nationally recognized experts in OHV management.<br>5. In the absence of supporting literature and in the absence of the actual presence of impacts to any wildlife species, we want all restrictions on OHV (based on that species) removed from consideration. We want confirmation of the actual presence of the species, and not the "potential" for the species, to guide the designation of all OHV trails.<br>6. We want the obvious fact that the presence of any species cannot possibly precede the presence of motorized recreation prominently acknowledged (unless the species of concern as a life span of more than 30 years).<br>7. We want the potential for all river recreation impacts on the natural resource analyzed, and restrictions proposed as needed to protect riparian resources. | but rather on a site-specific basis.<br><br>There were very few routes not designated due to the presence of wildlife. Those few that were not designated were because of the presence of bighorn sheep. The Moab BLM has extensive radio collar studies of the bighorn herds in the planning area. These data are available upon request.<br><br>Although motorized recreation has occurred throughout the planning area for the past 30 years, the Moab DRMP/EIS anticipates increased motorized use. Travel planning considers this possible increased use.<br><br>The river recreationists utilizing the Moab planning area are currently under strict restrictions. These restrictions are carried forward in the DRMP/EIS. Westwater river users are restricted to 75 private users per day and 75 commercial users per day, There are no more than 5 private launches and 4 commercial launches per day. There is also a yearly limit on the numbers of boaters. Campsites are strictly regulated and are assigned at the put-in. The Moab BLM river program's requirements limit riparian impacts. These impacts are disclosed on p. 4-245 – 246 in the DRMP/EIS.<br><br>See response to comment 6-12. |
| Colorado 500 | 6 | 23 | We have four specific requests regarding the re-do of the analysis when BLM gives up pretending that these singletrack OHV trails do not exist:<br>1. Please add all OHV singletrack submitted by the public, both individuals and organizations, and those individuals who personally assisted BLM in finding the OHV singletrack trails, to the DEIS inventory.<br>2. Please provide peer-reviewed evidence that they represent or could sometime in the future represent an irretrievable loss, keeping front and foremost in the | All the OHV singletrack submitted by the public was considered. Each route submitted was verified on the ground by BLM staff and some of them were also verified by Grand County personnel. These routes are in the BLM's administrative record and are publicly available to the commentor. As described in Appendix G, those singletrack routes that did not pose unacceptable resource conflicts were placed in Alts C and/or D of the DRMP/EIS. See Appendix G of the DRMP/EIS and the administrative record accompanying the Travel Plan. |

| | | | | |
|---|---|---|---|---|
| | | | analysis the fact that MFO staff has suggested those trails have grown over and/or staff could not find them. 3. In the event no such evidence is uncovered please revise the Affected Environment so that it is consistent with the new information, and consistent with staff statements about indiscernible trails and/or the trails disappearing both on the ground and in aerial photos. 4. Please designate these singletrack trails as motorized OHV singletrack trails, after following the above steps, in the ROD. We realize that this will require reworking some of the SRMA's. We appreciate your work on this request. | Where BLM staff could not find an inventoried trail, they were assisted by county personnel. Thus, more than one individual attempted to find the trails in question. Motorcyclists were asked about unfound routes and stated that they "never went the same way twice". Not following a specified route constitutes cross country travel and not trail or route travel.<br><br>The BLM has provided an entire Focus Area for Motorized singletrack (Dee Pass), an SRMA for motorized trails (Utah Rims) and an SRMA for ATVs (Cameo Cliffs).<br><br>See also response to comment 6-12. |
| Colorado 500 | 6 | 24 | Please refer to 3.11.2.5 User Conflict Displacement Quotation: "Another source of tension is among various recreation user groups. When recreational use reaches a certain threshold, user groups start to resent the multi-use nature of public lands. For example, ...Poison Spider Trail - conflict between OHVs and mountain bikers"] end of quote Please provide a peer-reviewed analysis which support the implication of "OHV" as the origin of 100% (one hundred percent) of the conflict cited above. If there is none, please add in a prominent position in the discussion on page 3-86 the following statement: "MFO has no data or peer-reviewed analysis supporting any of the above statements." The MFO staff analysis is omitting from his investigation the defining study in this field, "Conflicts on Multiple-Use Trails." (Moore 1995). It comprises a thorough synthesis of the literature in the sociological field that examines the exact type of conflicts the MFO staff is concerned about. In order to address the core issue that is identified as the source of almost every problem cited in 3.11.2.6, 3.11.2.7.1, the solution is to offer more opportunity, not less. If is the frequency of the | The mountain bike community has been vocal during scoping that it is being displaced by increases in motorized use along shared trails. This is evident in scoping comments as well as in comments on the DRMP/EIS. Thus, the issue raised during scoping of "user conflict" was not as a basis of research, but rather a specific issue raised by users of the Moab public lands.<br><br>The articles by R.L. Moore on user conflicts concern crowding on urban, paved bike paths. Moore does not dismiss user conflict, but rather offers urban planners management suggestions to alleviate user conflict.<br><br>The BLM has provided 30 Focus Areas and 10 SRMAs to provide recreation opportunities. The BLM has increased recreation opportunities. If the commentor is referring to the roads designated in Alt C, he can be assured that the great majority of recreationally utilized routes have been included in Alt C.<br><br>Law enforcement is not a planning issue.<br><br>See response to comment 6-12. |

| | | | | |
|---|---|---|---|---|
| | | | encounters, not the type, that elicit the greatest number of dis-satisfied visitor responses.  Adding well-designed trail mileage will attack the problem at its source.<br>If the MFO staff chooses to ignore the standard and most accessible research in the field, please provide the analysis and peer-reviewed literature that staff is relying upon that shows that reducing recreation opportunities will resolve the above cited problems.  If there is none, please add the following in the Executive Summary and in the Environmental Consequences assumptions:  "There is no peer-reviewed research that sets forth the recreation management concept that a reduction of opportunity will resolve the user conflicts cited in this analysis."<br>Please cite the legal authority that mandates imposing criminal penalties upon any lawful activity in the total absence of any sociological, physical, or scientific evidence that such criminalization is a worthwhile and constructive management strategy.  If there is none, please add to the Executive Summary and in the Alternatives the following true statement:  BLM does not have any evidence to support the concept that criminalizing a lawful activity is a worthwhile and constructive management strategy. | |
| Colorado 500 | 6 | 25 | Quote form Page 11-20 [To date, only half of the allotments have implemented the livestock adjustments identified in the 1985 Grand RMP through agreements with the livestock operator or by monitoring adjustments (Appendix D, page A-29). ...Table 11-2 identifies issues by selected steams that are currently receiving restoration or focus.]  End Quote<br>Request to correct a significant omission:<br>Based on the above quotes:  ...grazing, a significantly surface disturbing and riparian disturbing activity, occupies 66 percent of the MFO landbase.<br>Off-Highway Vehicle use, and specifically motorcycle use, is permitted on existing roads and trails and in one | Grazing is permitted under the Taylor Grazing Act. Grazing is a permitted activity, governed by the Standards for Rangeland Health and Guidelines for Grazing Management.  These standards guide season of use and stocking decisions.  That is, livestock are permitted in certain numbers and at certain times.  The RMP makes the decision as to which allotments are available or unavailable for grazing.<br><br>Travel by the general public on designated routes is governed by the Travel Plan accompanying the RMP.  In areas limited to designated routes, all travel would be allowed only on roads designated in this plan. |

| | | | | |
|---|---|---|---|---|
| | | | open area, with intermittent off-road and cross country travel. The MFO supplies no data on acreage affected. This is a significant omission, given that one of the primary concerns of the MFO staff is the perceived negative effects of motorcycle use upon soil and vegetation and the MFO staff insistence upon including singletrack OHV effects on the soil and vegetation with the effects of grazing on the soil and vegetation. This concern is so hysterical that MFO has apparently elected to eliminate 90% of the singletrack OHV opportunity in the planning area.<br>However, before the government disrupts the social and economic structures of a community, government is supposed to use the "best available" information. That information is readily available, but it has been omitted from this analysis. Therefore, we will provide the information in this comment with the express request that it be used in the EIS.<br>** (This figure is from the AMS, which has been taken off the website. The removal of several key data components of the AMS before is re-used as the "Affected Environment" in this DEIS is the subject of another comment. | Miles of singletrack route have been provided in the DRMP/EIS. All singletrack routes proposed during scoping were verified and analyzed (see Appendix G for a description of the travel planning process.) The great majority of the routes proposed were in fact designated in the DRMP/EIS. The BLM expended much effort in designating single tracks and has no agenda to eliminate them.<br><br>Cross country travel by cows, horses or hikers is not regulated by the land use plan. Cross country travel by motorized and mechanized vehicles is regulated by the land use plan. |
| Colorado 500 | 6 | 26 | Request to add field research that is absent from this analysis. Riparian/ ephemeral/ dry washes<br>In the study that examined erosion during weather events, in every sample over a 3-year program, the amount of soil loss into the live waterway from the trail was always below the EPA standard for nonpoint pollution sources and with a single exception, the samples were far below the EPA standard. In the one exception, one sample from a three year program approached the limit but did not exceed it. | Unrestricted travel in wash bottoms results in resource impacts as judged by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors. In addition, observations indicate that some users do not remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel. See response to comment 6-12 for a summary of research regarding this issue. |
| Colorado 500 | 6 | 27 | Request to rewrite inaccurate portions of the document ...we request that in this Planning document, references which place OHV activity in the same class of disturbance and impacts as grazing as well as other | The DRMP/EIS analyzes the impacts of each resource on every other resource so that the decision maker has full information. Please see response to comment 6-12. |

BLM_0011542

| | | | | |
|---|---|---|---|---|
| | | | landscape scale impacts such as fire and flood, be removed.  We want all references to singletrack OHV to be rewritten according to the actual surface impacts. The discussion above would suffice to enlighten any disinterested reader to the extent of the difference between these activities and we request that the MFO staff use it verbatim. | |
| Colorado 500 | 6 | 28 | Request to add information: We formally request that the following five steps be taken to correct this gross omission and resulting inaccuracy: a) the acreage of motorcycle-disturbed soil be calculated and included in the data provided in this analysis; b) the discussion of the nature of the acreage (linear, and lightly used due to extensive mileage) be included in the recreation/OHV section of the AMS; c) the two dedicated OHV-stream intersection field studies be included and utilized in the Affected Environment chapter, and the Environmental Consequences  revised so it is consistent with this new information; d) the acreage of cattle-disturbed soil be calculated and provided in this analysis; e) The level of agency resources (by percentage) devoted to ensuring compliance with the agency's own agreements, policy, and regulation for grazing vs. motorcycle use, is provided in this analysis. With this information, the Deciding Officer will be able to compare the actual effects upon the natural resources of different activities, and by understanding the existing situation more accurately, select more appropriate actions for the Final Decision. | The BLM lacks data of the specificity requested by the commentor.  The linear miles of motorcycle routes are provided as the basis of the analysis.  There is no suggestion that the disturbed soil is beyond the width of the motorcycle route.  That is, no miles of singletrack motorcycle route are provided in Alt. B.  Thus, Alt B assumes no impacts from motorcycles.  The comparison among alternatives is based on linear miles of route, with Alt. B being the least impacting, and Alt. D being the most impacting.<br><br>See response to comment 6-12 for the addition of research regarding the impacts of OHVs on public lands. The commentor is also referred to "Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources (U.S. Geological Survey, 2007).<br><br>Law enforcement is not a land use planning issue. Grazing and off highway vehicle use are governed by separate laws, regulations and policies. |
| Colorado 500 | 6 | 29 | We have reviewed the citations in the "References" chapter and there is not a single one which provides professional field research to indicate or even imply that trail-based OHV recreation has any measurable | See response to comment 6-12.<br><br>The following summary of studies has been added to the Travel Plan Appendix G, and is referred to in the analysis: |

| | | | | |
|---|---|---|---|---|
| | | | negative effects.  In fact, we did not find one that even mentioned "OHV" at all.  In other words, it appear to be the case that there is no science informing the analysis supporting the road closures and OHV recreation curtailments proposed in all of the action alternatives. Our revisions: 1. We want all the roads and trails proposed for closure be designated open, along with the present proposals. The reason is, this analysis has uncovered no evidence to implicate trail-based OHV recreation in any negative natural resource results. 2.  After the ROD is settled, if any road or trail may potentially cause resource damage we want independent field monitoring programs instituted, with public review. | "Environmental Effects of off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources" (U.S. Geological Survey, 2007). Routes not designated in the preferred alternative will not be available for travel after the Record of Decision is signed.  For the most part, these 2,506 miles of route had no discernible purpose and need, including the purpose of recreational use.  For additions of routes to the Travel Plan, see response to comments 122-15 and 122-30. See the above cited study for evidence of OHV effects on natural resources. |
| Colorado 500 | 6 | 30 | We request that you remove "OHV" from any discussion that implies that OHV has the same impacts on the natural environment as landscape-scale events such as fires, floods, windstorms, drought, livestock grazing, and vegetation treatments.  The reason is, this analysis has uncovered no evidence to support that OHV has effects on that scale. Our point here is threefold (PLEASE SEE LETTER FOR SPECIFIC REFERENCES DISCUSSED): A.  Trail based recreation is not present in any of these discussions (no surprise; the present acreage of MFO lands classified as erodible and accessed by OHV is absolutely minute, as previously noted). B. According to this RMP, BLM has implemented none of the methods listed to determine what if any sediment loads are delivered to waterways from activities on BLM lands. C.  At this time, if BLM is receiving reports of NPS pollution from BLM lands it is the height of irresponsibility for BLM to remain silent on the subject in this RMP, and even worse, to fail to institute any program based on the priorities and research in the | Please see response to comment 6-12.  See also "Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources", compiled by the U.S. Geological Survey in 2007.  Information from this ompilation of studies has been added to the PRMP/FEIS. |

BLM_0011544

Utah Plan, to reduce the NPS problem.
Since we are quite sure that BLM would never intentionally conceal this information, we can safely assume that the grazing and mining and the present level of recreation management is adequately managed by MFO, and downstream problems have been successfully prevented.
And finally, the single cite provided in this RMP on the activity itself:  Stokowski, P. A., and C. LaPointe.  2000. Environmental and Social Effects of ATVs and ORVs: An Annotated Bibliography and Research Assessment. School of Natural Resources, University of Vermont, Burlington.
Abstract:  This report provides an annotated bibliography of published research related to the environmental and social effects of ATVs on public and private lands.  Citations were gathered in a literature review of published research reports and peer-reviewed scholarly writing, and from a review of internet sources. Key findings from the research are synthesized and evaluated, and suggestions for future research are provided.
The reference that MFO resource specialists accessed for their information on "ORV's and "ATV's" is a list of other research.  Whether that other research is relevant to proposed MFO management actions is unknown. Whether any of the research listed provides monitoring results, or whether the research is peer-reviewed, or whether it is even research, or whether there is any original field research such as monitoring at specific sites to verify or refute hypotheses, is unknown, because the MFO specialists only used the list. According to the references cited in the RMP, no specialist retrieved and used any of the actual research itself.
So the answer to our original inquiry about the science that informs the Moab RMP and Travel Plan proposals

BLM_0011545

| | | | is that, there does not appear to be any. No monitoring; no original, peer-reviewed research; no sociological research. This makes the relentless references to "resource damage caused by OHV" not credible. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 1 | The Moab RMP/EIS doesn't to adequately address indirect impacts and their cumulative effects. BLM's conclusions regarding potential impacts were presented without supporting scientific analysis or rationale, and as such, appear arbitrary and unfounded. Soley listing acreage directly impacted by various uses is not adequate for proper environmental impact analysis. | See response to comment 124-7. |
| ECOS Consulting | 9 | 2 | #2-page 5. When there is nearby surface disturbance, the proposed BLM buffer of "100 meters" is inadequate in this dry desert environment, because of the ease of the spread of soil distrubance and erosion, vegetation loss, and soil and water contamination that can spread into the floodplain and riparian habitat. These direct, indirect, and cumulative impacts can be effectively reduced by increasing the buffer to 1500 meters. | The 100 meter buffer is based on Utah State Office Instruction Memorandum UT 2005-091 regarding Utah Riparian Management Policy. |
| ECOS Consulting | 9 | 3 | The alternatives in the Moab RMP show very little difference in range regarding how much actual grazing wil be permitted. The present Alternative range of allowing livestock grazing on 91.5% (Alternative A) to 97% (Alternative D) is unacceptable. | The land use planning decision for livestock grazing involves identifying the areas that are available or not available for grazing. There is a narrow range in the alternatives for livestock grazing because the entire area is considered chiefly valuable for livestock grazing. Therefore, only areas with known major resource conflicts were considered for not grazing during the life of the land use plan. All other resource concerns involving livestock grazing are evaluated on a site specific allotment basis during permit renewal utilizing the Standards for Rangeland Health and Guidelines for Grazing Management. See also Chapter 2, which details the grazing alternatives considered but dismissed from further analysis.<br><br>The MFO is actively monitoring allotments and assessing if the RHS are being met. Allotments found not to be meeting are evaluated and changes made to the grazing |

permit that will move the allotment or watershed towards meeting Standards. This is an implementation phase of the current RMP and will continue in this RMP as proposed.

It is BLM policy to monitor existing livestock use levels, forage utilization, and the trend of resource condition and make necessary adjustments on an allotment or watershed basis.  These actions are activity-based actions and are part of the implementation of an RMP to assure that Rangeland Health Standards are met, as well the other objectives of the RMP.  Regulations at 43 CFR 4130.3 require that the terms and conditions under which livestock are authorized "ensure conformance with the provisions of subpart 4180," the Standards for Rangeland Health and further 43 CFR 4130.3-1 require that "livestock grazing use shall not exceed the livestock carrying capacity of the allotment".

It would be inappropriate and unfeasible to estimate variable levels of livestock and wildlife use and determine what specific changes to livestock and wildlife numbers and management are appropriate at the RMP planning level.  Such changes would not be supportable and need to be made by considering the monitoring data on a site-specific basis.  The BLM policy directs that monitoring and inventory data be evaluated on a periodic basis and that change to livestock numbers and management be made through a proposed decision under 43 CFR 4160. These implementation level decisions will be in conformance with the Goals and Objectives of the applicable RMP, and must protect and enhance the conditions and uses of the BLM lands.

The state of Utah monitors water quality and coordinates and cooperates with BLM to conduct water quality testing. When Standard #4 (water quality) is not meet and

| | | | | livestock management is found to be a significant contributing factor changes will be made to the affected grazing permits to make progress towards meeting this Standard. At this time no water quality testing has failed to meet Standard."

See allotments map 2-4. |
| --- | --- | --- | --- | --- |
| ECOS Consulting | 9 | 4 | Table 4.73 on page 4-245 indicates that Alternatives B, C, and D...Hell Roaring Canyon. ...The BLM should state clearly and unequivocally that "limited" means that OHV use will merely be limited to designated routes within riparian areas, that OHV use will not be precluded from riparian areas, and that such OHV use will adversely affect the riparian areas.  In fact, the limited category does, indeed, have routes in riparian areas-i.e. Tenmile Canyon, White Wash, and Hell Roaring Canyon.

The BLM should state clearly and unequivocally that "limited" mean that OHV use will mere be limited to designated routes within riparian areas, that OHV use will not be precluded from riparian areas, and that such OHV use will adversely affect the riparian areas. | Table 4.73 shows the acreage of riprian area by OHV designation.  The table does not indicate that there are no routes in riparian areas.  The BLM acknowledges that some routes are designated within riparian areas.

The definition of limited routes is found on pg. X-35 of the DRMP/EIS.

On pg. G-24 of the Travel Plan it is  acknowledged that the use of routes located in riparian areas can contribute to loss of riparian vegetation, degrade stream banks, and lead to erosion problems.



Hell Roaring canyon has a total of 5 riparian acres. |
| ECOS Consulting | 9 | 5 | The DRMP should also address future relocation and closure due to deteriorating riparian conditions and deteriorating route conditions due to continuous wear and tear and storm events. | On pg. 2-48 of  the DRMP/EIS it states that "Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse affects, the authorized officer shall close or restrict such areas". |
| ECOS Consulting | 9 | 6 | Riparian Section 9.3.3 on Page G-24 of the Moab RMP states that there are OHV routes in a total of 118.9 miles of riparian area, and 230.2 miles within floodplain areas, but there are no maps or lists of which riparian or floodplain areas. Have the conditions in these riparian areas been monitored? If so, by whom, and are there | The riparian conflict is identified on a route by route basis for about 33,000 routes in the attribute table for the GIS database.  This data are part of the administrative record and are available to the public upon request.

A monitoring plan will be developed upon completion of |

| | | | | |
|---|---|---|---|---|
| | | | any reports with analyses, conclusions, and recommendations? Have there been any analyses of direct, aindirect, and cumulative effects for specific areas? If so, is there a report? Has there been any monitoring of the number of vehciles that use the different riparina and floodplain routes? These are all questions that should be answered before 10-20 years of management planning is finalized, as it will be in this Moab RMP | the Resource Management Plan where riparian routes will be taken into consideration.<br><br>See response to comment 124-33. |
| ECOS Consulting | 9 | 7 | The environmental damage from OHV use is well documented in the literature (Andrews 1990, Brown 1994, Dittmer and Johnson 1975, Forman and Hersperger 1996, Forman and Alexander 1998, Gelbard 1999, Harris and Gallagher 1989, Harris and Scheck 1991, Iverson et al. 1981, Langton 1989, Miller et al 1996, Montgomery 1994, Oxley et al. 1974, Schmidt 1989).  Negative direct and indirect ecological effects of OHV use in and near riparian areas include: 1) increased soil erosion and compactions; 2) increased water velocity; 3) plant community destruction; 4) loss of terrestrial and aquatic insect communities; 5) soil, water and air pollution; 6) sound pollution; 7) exotic plant invasion; 8) loss of fish and wildlife habitat; 9) reduction of fish and wildlife populations; 10) Stream bank destruction.<br><br>These direct and indirect effects all add up to serious adverse cumulative effects over time.  Cumulative effects include the near and total loss of wildlife habitat and wildlife species; the destruction of vegetation; sediment buildup due to increased flow velocity, which gets worse over time as more and more vegetation is lost; and arroyo cutting and the lowering of the water table, which robs the adjacent flood plains habitat of moisture transforming it into upland habitat.<br><br>Does BLM have baseline data for riparian area | See response to comment 124-7.<br><br>The BLM utilized the best riparian data available  in development of the DRMP/EIS..<br><br>The BLM acknowledges that routes in riparian areas can have adverse impacts.  However, the majority of the impacts occur when the route was constructed.  The designated routes consist of previsouly created routes. According to Utah State Office Instruction Memorandum 2005-91 related to Utah Riparian Management Policy, no new surface disturbing activities will be allowed within 100 meters of riparian areas unless it can be shown there are no practical alternatives.  Thus, new route construction in riparian areas would very seldom occur.<br><br>See response to comment 9-5. |

| | | | | |
|---|---|---|---|---|
| | | | vegetation? Has the BLM analyzed any of its riparian areas for former extent of riparian vegetation compared to today?  Does the BLM have any idea what the potential future conditions and extent of riparian habitat could be in any of its perennial or ephemeral streams?  If so, BLM must include this information in the Drat Moab RMP/EIS so that the public can make an informed assessment.  It is highly recommended that the BLM perform these types of analysis before committing to 10-20 more years of management without adequate background baseline, trend, and potential habitat extent information. | |
| ECOS Consulting | 9 | 8 | How can the BLM cite a scientific publication like the Stokowski and LaPointe (2000) paper (BLM Moab RMP/EIS page 4-464 Sec 4.3.19.8.2), and then ignore all the conclusions about the adverse environmental and social effects of roads?  By not providing and adequate range of alternatives for the number and extent of "D Roads"/OHV routes allowed, the BLM is ignoring its own admissions of serious impacts, and appears to discount these adverse impacts as insignificant.<br><br>Many of the "D Roads" were originally formed by mineral exploration and development activities that have ceased long ago.  They are unplanned and redundant, and many of these areas can be easily accessed using other "B Roads", and /or state highways.  All designated routes should have a designated function.  What are the purposes for many of the "D Roads" currently in the Travel Plan?  If many of these roads remain open for the next 10-20 years, the future of much wildlife habitat is at risk due to many of the adverse impacts listed above.  This has not been adequately addressed in the Moab RMP/EIS | See response to comment 124-40 regarding the range of alternatives.<br><br>See response to comments 124-43 and 124-59 relating to purpose and need of routes.<br><br>The BLM asserts that by limiting travel to designated routes and by eliminating about 2500 miles of inventoried routes would have a positive impact on wildlife habitat. |
| ECOS Consulting | 9 | 9 | Inadequate Analysis of Short- and Long-Term Effects of Livestock Grazing.  The BLM has failed to consider | See response to comment 9-3. |

| | | | adequately the extensive adverse long-term and historic direct and, indirect, and cumulative impacts of livestock grazing.  The extremely high historical stocking rates and overgrazing, and livestock preferences for certain more palatable plants, has lead to significant alterations in the species composition of vegetation types across the Southwest (Leopold 1924; Cottam and Steward 1940; Cooper 1960, Buffington and Herbel 1965; Humphrey 1987; Grover and Musick 1990, Archer 1994, Fleischner 1994; Pieper 1994; Mac et al. 1998). Livestock also altered vegetation composition by serving as the vehicle for the spread of weedy and exotic plant species (Mac et al. 1998, Warshall 1995). Livestock use of riparian zones has had particularly significant negative ecological impacts (General Accounting Office 1988; Szaro 1989; Bahre and Shelton 1993; Fleischner 1994, Mac et al. 1998).<br><br>In this Draft Moab RMP/EIS, the BLM proposes to exclude livestock from only 48,220 acres for the benefit of wildlife?  This is woefully inadequate because it represents only 2.6% of the 1,800,000 acres of the Moab Planning Area.  In other words, livestock grazing will be allowed on more than 97% of the Moab Planning Area, even though most of the soils and vegetation types are extremely susceptible to damage form livestock.  The BLM is ignoring the serious short- and long-term adverse impacts from livestock grazing in desert environments that have been documented in so many published papers, see above list.  Livestock grazing has one of the most widespread and greatest negative impacts on the ecosystem than any other land use.  Overgrazing is widely considered a major trigger of soils erosion, flooding, and arroyo cutting in the Southwest (Wooton 1908; Leopold 1924, Cooperrider and Hendricks 1937; Cottam and Stewart 1940; Smith 1953; Cook and Reeves 1976; Bahre and Bradbury | Alt C of the DRMP/EIS proposes to close 114,234 acres to grazing. |

BLM_0011551

1978; Branson 1985; Bahre 1991, Mac et al. 1998).

How can allowing livestock grazing on over 97% of the Moab Planning Area be considered "multiple use" when this activity adversely affects all habitats and all other activities? How can allowing livestock grazing on over 97% of the Moab Planning Area enable the BLM to achieve "sustained yield" when this activity is known to have serious adverse impacts on biological soil crusts and vegetation? Along with OHV use, this is one of the primary issues that the BLM must begin to manage properly, if its management is to have any effect on providing a healthy ecosystem for future generations.

The range of alternatives for livestock grazing is not adequate and must be expanded to include alternatives that allow little (15-25%) or no grazing (0%) or some grazing (50%), or a lot of grazing (90%). As currently planned, with most of the area with in the Moab Planning Area open to the widespread soil and vegetation adverse impacts of livestock grazing, on over 90% of the 1,800,000 acres, it appears that the mandates of "multiple use" and "sustained yield" are in jeopardy. This is a certainly is not "ecosystem management" for the good of the American people.

It is well documented in the scientific literature that the adverse impacts of livestock grazing have greatly altered the upland and riparian areas within the Southwestern U. S. for many, many, years (Fleischner 1994, Mac et al. 1998). So much so, that historic floodplains and riparian habitat have been transformed into uplands, many streams have become entrenched due to erosion an arroyo cutting, and native vegetation communities have been reduced to a fragment of what they once were. The disappearance of native vegetation an mature biological soil crusts in many

| | | | | |
|---|---|---|---|---|
| | | | areas is a direct effect of grazing.  Livestock grazing remains a key process affecting Southwestern ecosystems, and eliminating livestock entirely may be the only way to allow some systems to recover (Mac et al. 1998)  These adverse impacts have serious direct, indirect , and cumulative negative effects on soils, vegetation , water quality and quantity, wildlife populations viability, reproduction, and habitat suitability.   The extent and duration of theses impacts must not be ignored by the BLM in this document that plans for the next 10-20 years.  "The mission of the BLM is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations" (BLM 2001).  This mission is in jeopardy if livestock grazing is allowed to continue on over 90% of the Moab Planning Area, and if correcting these long-term and adverse impacts is not a top BLM priority. | |
| ECOS Consulting | 9 | 10 | The BLM is Not Using "Ecosystem Management" Principles.<br>The BLM must use the principles of "ecosystem management" in order to conserve its lands for future generations.  "In the Management of the Nation's public lands there is a shift form the traditional "multiple use" management model to a large scale "Ecosystem Management" paradigm in the BLM and other Federal management agencies" (Keith 1994).  Since 1993, the BLM has committed to a new approach that implements a scientifically sound, ecosystem based strategy for managing lands.  This is called "ecosystem management" which can be defined simply as keeping natural environments healthy, diverse and productive so people can benefit from them year after year.  The ecosystem management approach means identifying limits to the use and development of the land's recourses and managing within those limits in order to ensure the long-term health , biodiversity, and | The BLM does not have any rules or policies regarding Ecosystem Management in the land use planning process. |

BLM_0011553

| | | | | |
|---|---|---|---|---|
| | | | productivity of the environment.  For many areas, is also means trying to restore damaged land to healthy conditions.  In adopting "ecosystem management" the BLM recognizes that natural systems must be sustained in order to meet the social and economic needs of future generations. After examining the BLM's Draft Moab RMP/EIS, we are startled to find very little mention of "ecosystem management", especially when considering the wildlife and fisheries sections. According to this plan, management of the Moab Planning Area is to proceed pretty much as it has in the past 50-100 years, reactive and with very little room for actual "ecosystem management". The BLM's own publication "Ecosystem Management in the BLM: from Concept to Commitment. (USDI BLM 1994)", describes the principals and philosophical framework for ecosystem approaches.<br><br>Has the BLM defined limits to the use and development of the lands resources in habitats within the Moab Planning Area? Has the BLM formulated a strategy for managing within those limits? Is the BLM using any of the nine principals referenced above? No information of this sort can be found in the Draft Moab RMP/EIS. How does "ecosystem management" fit into planning the next 10-20 years in the Moab Planning Area? | |
| ECOS Consulting | 9 | 11 | Where there are healthy populations of top predators, like mountain lions, bobcats, bears, foxes, and coyotes; the prey species, such as mule deer, pronghorn antelope, bighorn sheep, and elk, must also live in abundance.  Where prey populations are healthy, there must be sufficient forage for them, therefore the protection of areas large enough to support populations of predators can result in the preservation of the whole range of species, both animals and plants, as well as the integrity of the complex ecosystem they inhabit. The management of habitat to ensure healthy | The BLM has worked with the Utah Division of Wildlife Resources (UDWR) to delineate important habitats for big game species of wildlife upon which predators depend. Proposed management decisions in the alternatives for the DRMMP/EIS to protect wildlife habitat include restrictions on oil and gas leasing and other surface disturbing activities, the removal of grazing in high value wildlife allotments (Cottonwood, Diamond, Bogart, Pear Park, North and South Sandflats, and Between the Creeks allotments).  Predators are managed by UDWR. |

| | | | | |
|---|---|---|---|---|
| | | | populations of predators must be the goal of the BLM in its future management of public lands, in order to obtain ecosystem balance and manage according to its own "ecosystem management" commitment. | |
| ECOS Consulting | 9 | 12 | BLM's Failure to make Trampling and other Surface Disturbance and Destruction Activities a Top Priority. Throughout this Moab RMP/EIS there are statements implying that trampling and other disturbances of the soil would have only short-term adverse impacts.  BLM provides no supporting data for this position, and based on my research and experience, this is simply not true.  This view denigrates the serious long-term adverse impacts of the destruction of biological soil crusts.  Any trampling of biological soil crusts (BSCs), which cover over 90% of exposed soil in the Moab Planing area, will have serious short- and long-term negative impacts because of the high soil erosion potential, importance to maintaining native vegetation communities, and slow natural restoration rates of these soil and vegetation types.

Trampling and other soild disturbances have serious widespeard and negative long-term ramifications on the quality of wildlife habitat and wildlife populations. Avoiding trampling and other surface destruction activities must be first and formost in the BLM planning of soil 'multiple use' management activities that have the goal of "sustained yeild". | On pg. 4-279 of the DRMP/EIS the BLM recognizes the importance of biological soil crusts.  On this page it states that these crusts help to stabilize soils, reducing erosion, and increasing soil productivity.  It is further noted that these soils have not been mapped and are therefore only discussed qualiatively.

On pg. 4-282 the BLM acknowledges that "grazing would have direct adverse impacts on soil productivity…due to trampling of soils and loss of biological soil crusts.

On pg. 4-286 the BLM acknowledges that mineral development to biological soil crusts.  It goes on to say biological soil crusts would potentially be crushed during surface disturbance….Damaged biological soil crusts would also take longer to be reclaimed after the completion of development due to the long period of time needed to develop these crusts.  On pg. 4-287 it states that minerals development would have both shot term impacts including the destruction of biological soil crusts.

The references cited above are examples of the analysis of impacts to biolgocial crusts in Chapter 4.

There are no laws, regulations, or policies requiring  the protection of biological soil crusts. |
| ECOS Consulting | 9 | 13 | All "right-of-ways" and "easements" must be limited to no more than 100 meters in width.  The width and extent of "Righ-of-Ways" and "Easments" planned in alternatives A, C, and D are too large to maintain functional ecosystems, viable unfragmented wildlife populations, natural vegetation communities, intact soil structure, and prevent widespread wind (dust) and soil | The commentor refers to rights-of-ways and easements being limited to no more  than 100 meters.  There is nothing in the alternatives of the DRMP/EIS limiting the width of right-of-ways.  The width right-of-ways is determined on a site specific basis.  The width of proposed utility corridors is specified by alternative in the DRMP/EIS.  A half mile width proposed for Alt C |

BLM_0011555

| | | | | |
|---|---|---|---|---|
| | | | erosion.  As planned these "adverse impacts of land and realty decisions" have a high probability of causing serious adverse impacts on wildlife habitat quality and connectivity. The BLM must analyze the extensive short-and long-term direct, indirect, and cumulative impacts of these decisions in more detail. | represents the area in which utilities would be placed.  This does not mean that surface disturbance would occur throughout the corridor.  Designation of a utility corridor is intended to reduce the impacts to resources by concentrating these necessary infrastructure needs. |
| ECOS Consulting | 9 | 14 | The BLM must plan for the protection of migratory birds by listing and mapping important habitat types, and keeping designated "D Roads" and other activities to a minimum in these areas.  None of this type of planning is evident in this document. | On pg. 4-252 of the DRMP/EIS there are six decisions common to all alternatives that provide protection for migratory birds.  The needs of wildlife including migratory birds were considered during the travel plan process. |
| ECOS Consulting | 9 | 15 | What are the direct, indirect, and cumulative effects of leaving the White Wash Dunes Area Open to OHV use?  Has the BLM assessed the cumulative effects of past management on this area? If so, are there any data, analyses, reports?  Does BLM have baseline data for resources such as vegetation, soil, wildlife, invertebrates and macro-invertebrates, and water quality for the dune area?  If yes, where is this data and when was the baseline data collected? Does BLM have resource monitering data for the dune area predating the use of the area by OHVs? This information must be disclosed in the DRMP so that the public can review and assess the BLM's proposal to allow cross-country OHV use in this unique ecosystem. The BLM determined in 2005 that most of the riparian habitat in White Wash was in a "Functional at Risk" condition with a downward trend.  Of a total of 1066 acres of riparian habitat in White Wash, 1042 acres are Functional at Risk with a downward trend (BLM 2005).  Has the BLM monitored this since 2005? What is the current condition of the riparian areas in the White Wash Dunes area? | Alt C in the DRMP/EIS greatly reduces the area open to cross country travel thus reducing the impacts from cross country travel in this area.  In addition, within the proposed open area the BLM imposes management decisions to protect the White Wash water sources and dune field Cottonwoods.  The BLM does not have any monitoring data predating OHV use in this area.  The BLM contracted a study with Brigham Young University in 2005 to inventory the dunes for rare and unique plants.  No rare unique or endemic plants were found.  Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts of the White Wash open area on natural resources. |
| ECOS Consulting | 9 | 16 | The DRMP fails to adequately assess and disclose the direct, indirect, and cumulative effects of designating the White Wash Dunes Area "open" to cross-country OHV use.  I have been to this area numerous times in | Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts to the White Wash open area to natural resources. |

| | | | | |
|---|---|---|---|---|
| | | | the past two years and have documented extensive and continuing damage to the dunes, vegetation, and the riparian areas in and surrounding the dunes due to OHV use. I have also witnessed increased erosion and the loss of surface water due to the impacts of OHV use. The OHV's have elimitated the vegetation and widened the channels in the riparian areas, making them susceptible to erosion and higher rates of evaporation, thus, destroying wildlife habitat for a range of large and small species from macro-invertebrets, to amphibians, to migratory birds, to Desert Bighorn Sheep, to possibly Mexican Spotted Owls. It is recommended that the riparian area should be down-listed to a "Non Functional" rating due to continued soil compaction and incremental loss of riparian vegetation.

There is a known group of Desert Bighorn Sheep that live in and around the White Wash Sand Dune area and although it may appear that the OHV's do not disturbe them, how do we know what level of physiological stress is occurring? Could the disturbance heighten their susceptibility to disease, or lower their ability to reproduce? Have these questions been addressed and if so, what are the results? Are there any reports on this? What are the results of monitoring the Desert Bighorn Sheep in the area? What are the direct, indirect, and cumulative impacts of OHV's in the White Wash Sand Dune area on the local wildlife populations? | The BLM proposes management actions in Alt C of the DRMP/EIS that close by fencing the dune field Cottonwood trees and White Wash water sources thus protecting vegetation and riparian areas.

The degree of specificity of information desired by the commentor is not availablle.

In Alt C (preferred alternative) of the DRMP/EIS, the BLM has closed inventoried routes in bighorn sheep escape terrain and has limited the open area to exclude this terrain. |
| ECOS Consulting | 9 | 17 | The BLM mentions in this document that it is monitoring aquatic macroinvertebrates at various sites throughout the Moab Planning Area. What are the results of this monitoring program? This information can be extremely valuable in determining the condition of a water body or system, and must also be summarized and presented in this document. | The BLM could not find any reference to aquatic macroinvertebrate monitoring anywhere in the DRMP/EIS. Any data that the BLM may have would be used to analyze impacts for site specific proposals. |
| ECOS Consulting | 9 | 18 | The monitoring, analysis of data, and active protection of water quality and quantity in this desert environment | On pg. 3-121 of the DRMP/EIS it states that the BLM participates in a cooperative program with the Utah |

| | | | | |
|---|---|---|---|---|
| | | | must be a top priority in this Moab RMP/EIS. The results of past monitoring must be presented in order for the public to determine if these areas are being properly managed, and if not, what mitigation needs to be done to improve condidtions. | Department of Environmental Quality to sample sites for water chemistry. Through this cooperation streams that do not meet water quality standards are placed on the list of impaired waters of Utah. For the Moab planning area the streams are Onion Creek, Mill Creek, Castle Creek, and Kens Lake. The BLM is actively engaged with site specific measures to improve these water bodies ultimately hoping to remove them from the impaired list. Alt C of the DRMP/EIS provides measures to protect these streams. |
| ECOS Consulting | 9 | 19 | The BLM must develop Water Management Plans (WMPs) for each watershed as soon as possible in order to properly manage all the resources of a watershed, and in particular, to prevent, to protect vital and sensitive components such as riparian areas, perennial streams, seeps, and springs. | There is no policy, guidance, or legal requirement for the BLM to prepare watershed management plans. The BLM land use planning manual (H-1601-1) does not specify for management of BLM lands on a watershed basis.<br><br>On pg. 2-3 of the DRMP/EIS it states for all action alternatives that the BLM would develop watershed management plans for municipal watersheds to ensure water sources are protected adequately. These implementation plans would be prepared upon completion of the land use plan.<br><br>It also states on pg. 2-3 for all action alternatives to allow no surface occupancy and preclude surface disturbing activities within 100-year floodplains, within 100 meters of a natural spring, or within public water reserves. |
| ECOS Consulting | 9 | 20 | There are no Plans to Protect and Enhance Threatened and Endangered Fish Habitat. The goal stated in this Draft Moab RMP/EIS for wildlife and fisheries are to protect and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy self-sustaining population of wildlife and fish species. In addition, the BLM has committed to managing crucial, high value, and unfragmented habitats as management priorities.<br><br>Yet, nowhere in this document can there be found any | On pg. 2-45 of the DRMP/EIS it states that for all alternatives no surface disturbing activities would be allowed within the 100 year floodplain of the Colorado River, Green River, and at the confluence of the Dolores and Colorado Rivers. Any exceptions to this requirement would require consultation with the U.S. Fish and Wildlife Service. Restrictions on surface disturbance within this critical habitat would be developed through this consultation process.<br><br>On pg. 2-44 of the DRMP/EIS it states that the BLM |

| | | | | |
|---|---|---|---|---|
| | | | provisions for protecting, enhancing, or restoring crucial floodplain habitat along the Green and Colorado Rivers. The following fish species need backwaters in healthy floodplains in order to reproduce successfully and become self-sustaining: Roundtail chub, Flannel mouth sucker, Colorado Pike Minnow, and the Humpback Chub. These highly productive low-velocity habitats are thought to be an essential component of the life history of these species. But they have been hydraulically cut off because of low flows due to dams, water use upstream, and poor riparian and floodplain conditions.

The BLM must provide a plan for restoring and enhancing this valuable habitat along the Green and Colorado Rivers during the next 10-20 years. Natural healthy floodplain functions the BLM should manage for include: 1. Food, decay of plant material, phytoplankton, algae, zooplankton, invertebrates, small fish; 2. Enhanced water temperatures, nutrients, and light intensities; 3. High quality water; 4. Shelter from high velocities; 5. Vegetative cover for predator avoidance, a structurally complex environment; 6. Nursery rearing habitats; 7. Spawning habitats.

By working to restore, enhance, and protect riverine riparian and floodplain habitat for the Threatened and Endangered fish of the Green and Colorado Rivers, the BLM will also provide for the habitat needs of many other wildlife species, including migratory birds, the endangered willow flycatcher, the threatened Bald Eagle, and the Yellow-Billed Cuckoo. | would follow current and future recovery plans and manageme habitat for Threatened and Endangered and BLM sensitive species. Thiis would include the Colorado Squawfish recovery plan, the Colorado Pikeminnow recovery goals: amendment and supplement to the Colorado Squawfish recovery plan, the Humpback recovery plan, the Humpback Chub recovery goals: amendment and supplement to the Humpback recovery plan, the Bonytail recovery plan, the Bonytail recovery goals amendment and supplement to the Bonytail recovery plan, Razorback Sucker recovery plan, Razorback Sucker recovery goals: amendment and supplement to Razorback recovery plan. |
| ECOS Consulting | 9 | 21 | Page 4-241,3rd Paragraph, 4.3.11: "AML" is not defined and is not listed in the "Acronyms and Glossary" section. It is highly probable that the protection of sites from "hazardous materials spills and spill site cleanup" will involve some amount of soil disturbance and drainage re-direction and/or storage. Such activities | The acronym AML is defined on pg. 2-10 of the DRMP/EIS as Abandoned Mine Lands. This acronym will be added to the glossary. AML projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land |

| | | | | |
|---|---|---|---|---|
| | | | could seriously effect riparian soil, vegetation, and water quality resources and negatively impact these resources for many years.  Of course, these activities will be designated to avoid riparian impacts, but extreme care must be exercized in the design and short and long-term maintenance of these facilities. If anything goes wrong, such as a breach created by a flood, vandalism, or damage from off-road-vehicle activities, than the resualtant spill could have serious effects on the riparian resources of the surrounding area and downstream. These potential impacts must be considered in this RMP. | use plan. |
| ECOS Consulting | 9 | 22 | 4.3.11.1 Impacts of Fire Management Decisions on Riparian Resources. Page 4-241, 4th Paragraph, 4.3.11.1:  Non-fire fuel treatments are not the only issue to consider. Impacts of fire management decisions within the greater watershed could have serious environmental consequences in downstream riparian areas.  Fire fuel treatments upstream and adjacent to riparian resources have a great potential to increase soil erosion and introduce exotic weeds into the riparian areas.  Runoff from these upstream activities could also seriously impact water quality, increasing salinity, selenium, and many other chemicals in unnatural quantities. The direct, indirect, and cumulative impacts of these activities have not been, and must be analyzed in detail in this Moab RMP/DEIS. | Fire treatments are implementation actions in which environemtnal impacts would be analyzed on a cases by case, site specific basis following completion of the land use plan.  This environmental documentation would consider ptoential environmental impacts to soil, water, air, and potential for exotic species invasion. |
| ECOS Consulting | 9 | 23 | 4.3.11.2 Impacts of Lands and Realty Decisions on Riparian Resources. Page 4-241, 5th paragraph, 4.3.11.2:  The statement that riparian areas are protected from impacts of lands and realty decisions because surface disturbance is not allowed within 100meters of riparian areas is misleading and false presumption. Riparian areas are intimately connected to adjacent areas through a complex network of small and large drainage patterns that far exceed 100 meters. Any disturbance within this network has a distinct and | See response to comment 9-2.  Realty decisions are implementation actions in which environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan.  This environmental impacts would consider potential environmental impacts to riparian areas. |

BLM_0011560

| | | | | |
|---|---|---|---|---|
| | | | real possibility of impacting nearby riparian areas. Impacts include soil erosion and arroyo development, the introduction of exotic weed species, drainage into the system of pollutants and contaminants effecting water quality, and the disturbance of wildlife.  Riparian areas are the primary habitat, providing food, water, and shelter for most wildlife in the desert, and they are primary wildlife corridors, allwoing access to movement and protection from preditors.  One hundred meters is simply not enough of a buffer to mitigate wildlife disturbances and other impacts from BLM lands and realty activities. This buffer should be expanded to at least 1500 meters. | |
| ECOS Consulting | 9 | 24 | Page 4-241, 6th paragraph, 4.3.11.2:  Due to the extreme ecological importance of riparian areas exceptions should be granted in only the most dire and emergency situations.  When an exception is granted, the receiving party should be given mitigation orders that not only completely restore the disturbed area but also include extended projects that enhance the immediate area.  An example would be controlling any exotic weeds in the area and reseeding with native vegetation. These mitigation projects should be designated to have adequate follow-up procedures to ensure that restoration objectives have been achieved. This would satisfy BLMRiparian Guideline #3 (Mangement practices maintain or promote suficient residual vegetation to maintain, improve, or restore riparian-wetland functions of energy dissipation, sediment capture, groundwater recharge and stream bank stability.), and BLM Riparian Guideline #9 (Native species are emphasized in the support of ecological function.).  It would also satisfy the BLM Riparian Standard for Native Species: Healthy, productive and diverse populations of native species exist and are maintained.  These standards have been established in the 43 Code of Federal Regulations 4180.2. Has the | The Utah State Office Instruction Memorandum 2005-091 regarding Utah Riparian Management Policy defines the exceptions for the requirement that no new surface disturbing activities will be allowed within 100 meters of riparian areas.  This exception language was included in the DRMP/EIS. |

| | | | BLM developed mitigation plans that have been independantly reviewed and accepted by the general public?  If so, what specific measures is the BLM requiring? | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 25 | Page 4-242, 2 Paragraph, 4.3.11.3: Given the known and well documented adverse impacts of grazing, and the impairment this activity thrusts upon riparian ecosystems, the BLM should take a serious ecological approach to managing grazing more intensely and with effective rules and regulations that protect riparian resources.  Riparian areas are the most productive and ecologically important habitat type in the desert Southwest. Its is estimated that between 75-85% off all biological productivity occurs in riparian areas. According to the BLM's own numbers, riparian habitat makes up a scarce 0.75% of the total area of land that will be managed by the Moab RMP (13,450 acres out of a total of 1,800,000 acres). The Moab RMP is proposing management for about the next 10-20 years and probably even longer, thus BLM should take a proactive and critical stance on the effects of grazing on riparian resources. In the best scenario (Alternative B) the BLM proposes to protect only 34% of existing riparian area or only 4,422 acres out of a total of 13,450 acres of riparian area. This represents less than 0.25% of the total area managed by the Moab RMP/EIS.  This is clearly inadequate. Alternative C also falls far short of adequately protecting riparian resources because it protects even less total area.  This alternative proposes the protection of only 1,169 acres out of a total of 13,450, which represents less than 0.06% of the ntotal land in the Moab Planning area, and less than 9% of riparian habitat in the Moab Planning Area.  The Moab DRMP's range of alternatives with respect to grazing is unreasonably narrow and inadequate.

Protecting only 32.9% (Alternative B), or 8.7% | Riparian areas are evaluated on an allotment specific basis during the Permit Renewal process using Standards for Rangeland Health and Guidlelines for Grazing Management. |

BLM_0011562

| | | | (Alternative C), or 7.4% (Alternative A), or 3.7% (Alternative D) of the most important habitat in the Moab Planning Area from the known impacts of livestock grazing, especially when riparian habitat constitutes less than 1% of the total landscape, is clearly not acceptable. Especially considering that this plan will be in effect for the next 10-20 years. It is recommended that management is based on the BLM's own riparian standards and guidelines.  In order to achieve these guidelines the BLM must inventory all its riparian resources, prioritize these riparian areas according to severity of impacts, rate these riparian area according to BLM proper functioning condition methodologies (USDI 1993), and institute effective restoration plans of these valuable resources. Due to BLM's poor history of protecting riparian resources, this work must be done in cooperation with other agencies, and private groups and consultants in order to ensure unbiased results.  Adoption of these recommendations would satisfy the BLM's Riparian Standard fo Riparian/ Wetlands: Riparian-wetland areas are in properly functioning condition. These standards have been established in the 43 Code of Federal Regulations 4180.2. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 26 | Page 4-242, Table 4.71: Percentages are wrong. Actually they are: 32.9% (Alternative B), 8.7% (Alternative C), or 7.4% (Alternative A), or 3.7% (Alternative D). | The BLM agrees that the percentages on Table 4.71 and in the text are wrong and that the percentages provided by the commentor are correct.  The corrections to the table and text have been made in the PRMP/FEIS. |
| ECOS Consulting | 9 | 27 | Page 4-242, 4th Paragraph, 4.3.11.3.2: Is "River" an actual grazing allotment? If so, where is it? | Yes.  This allotment is located near the Colorado River along Highway 128 at milepost 15. |
| ECOS Consulting | 9 | 28 | Page 4-243, 3rd paragraph, 4.3.11.4:Although surface disturbing activities will be prohibited within 100 meters of the riparian area, what is to prevent any downstream flow from this disturbance from entering the riparian habitat?  Mineral resource ground disturbing activities dredge up much material from underground that, if allowed to spread into the riparian area, can be toxic to | The Utah State Office Instruction Memorandum 2005-091 regarding Utah Riparian Management Policy specifies a 100 meter buffer for riparian resources. Proposals for mineral development are implementation actions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land use plan. |

| | | | | |
|---|---|---|---|---|
| | | | vegetation, soil, and water quality. There is also the high probability of the introduction of noxious weeds from surface disturbing activities so close to the riparian area.  This has the potential to impact large areas downstream of the disturbed sites.  Vehicles and ground disturbance are the primary causes that allow the establishment of noxious weeds.  One hundred meters is not far enough from riparian areas to allow mining activities and avoid impacts.  This should be increased to 1500 meters from riparian areas in order to ensure adequate protection.  This would ensure the effectiveness of BLM Guideline # 6 (Management practices maintain or promote the physical and biological conditions necessary to sustain native populations and communities), and BLM Guideline # 13 (Facilities are located away from riparian-wetland areas wherever they conflict with achieving or maintaining riparian-wetland functions.). These recommendations would also allow the BLM to achieve their own Riparian Standards for Soils (Upland soils exhibit infltration and permeability rates that are appropriate to soil type, climate and land form.) and Native Species (Healthy, productive and diverse populations of native species exist and are maintained).  These standards have been established in the 43 Code of Federal Regulations 4180.2. | |
| ECOS Consulting | 9 | 29 | Page 4-243, 3rd paragraph, 4.3.11.4: Due to high disturbance and serious impacts, it is highly recommended that any mineral development within riparian areas should not be allowed. Exceptions should be issued only in emergency situations. Riparian areas are too rare (less than 1% of total Moab Planning Area), ecologically sensitive, and ecologically important, that mineral development activities within floodplains and riparian areas should be avoided at all costs. As mentioned above, ground disturbing activities should be kept at a minium of 1500 meters away from riparian | See response to comment 9-24. |

| | | | | |
|---|---|---|---|---|
| | | | areas and floodplains. Ths distance would serve to protect the soils, riparian/wetland functioning, stream functio, and the native species sections of the BLM's Riparian Standards and Guidelines as defined in the 43 Code of Federal Regulations 4180.2. | |
| ECOS Consulting | 9 | 30 | OHV routes have immediate and direct adverse impacts on wildlife, the appearance of naturalness, primitive recreation, and solitude. They abolish any semblance of undeveloped character for these areas.  How will the BLM be able to attain its goals and objectives if it allows OHV routes into these areas? The Moab DRMP should provide a list of Non-WSA lands with Wilderness Characteristics that will contain designated OHV routes. This will help tremendously in assessing impacts.  From what can be gleaned from the attached maps, it appears that over 90% of these wilderness characteristic areas will contain OHV routes if Alternative C, the preferred alternative, is selected. How many of these designated OHV routes will be in riparian areas, wetlands, and/or floodplains? The cumulative impacts of these OHV routes could be excessive and lead to the degredation of water quality and quanity, and the destruction of riparian habitat and all the ecological value it contains. These OHV routes within Non-WSA lands with Wilderness Characteristics make up less than 5% of the proposed designated OHV routes within the Moab Planning Area.

It is highly recommended that the BLM remove any OHV routes from Non-WSA lands with Wilderness Characteristics in order to attain the BLM goals and objectives of maintaining wilderness characteristics of these lands to assist in bringing the scarce riparian areas into Proper Functioning Condition. | The management of non-WSA lands with wilderness characteristics (WC) is discretionary.  Under Alt C, about 18% of the lands determined to have WC would be managed to protect wilderness values.

See response to comment 124-7. |
| ECOS Consulting | 9 | 31 | Page 4-244, 3rd Paragraph, 4.3.11.6: Here it is emphasized that limitations on the number and duration of river users and OHV use would minimize damage to | The BLM stands by the assertion that reducing the number of river users has beneficial impacts on riparian resources.  This is based BLM experience in managing |

| | | | riparian resources. This is not true. Regarding OHV damage, there are many studies that have shown that is the first few passes of an OHV that causes 80-90% of the damage in desert environments. Therefore, limiting the amount of use will only reduce the amount of actual damage by an insignificant amount. Thus, this management strategy is useless from protecting riparian areas from the negative impacts of OHV's.<br><br>The environmental damage caused by OHV use is well documented in the litature. (Andrews 1990, Brown 1994, Dittmer and Johnson 1975, Forman and Hersperger 1996, Forman and Alexander 1998, Gelbard 1999, Harris and Gallagher 1989, Harris and Scheck 1991, Iverson et al. 1981, Langton 1989, Miller et al. 1996, Montgomery 1994, Oxley et al. 1974, Schmidt 1989). Negative ecological effects of OHV use in and near riparian areas include:<br>1) increased soil erosion and compaction;<br>2) increased water velocity;<br>3) plant community destruction;<br>4) loss of terrestrial and aquatic insect communities;<br>5) soil, water, and air pollution;<br>6) sound pollution;<br>7) exotic plant invasion;<br>8) loss of fish and wildlife habitat;<br>9) reduction of fish and wildlife populations;<br>10) lowering of the water table.<br><br>In order to manage riparian areas successfully, so that they become functioning systems, OHV's must not be allowed. OHV use destroys vegetation, degrades stream banks, and forms channels that floodwaters follow and gouge during storms. The BLM must consider the direct, indirect, and cumulative impacts of OHV use in riparian areas more detail and must include its quantative and scientific analysis in this Moab | the major river systems in the area.<br><br>The BLM agrees with the commentor that most of the impacts associated with cross-country OHV use occurs with the first few passes. This is why cross-country travel has almost been completely eliminated, except for White Wash sand dunes,  in the action alternatives for the Travel Plan in the DRMP/EIS.<br><br>See response to comment 124-7. |
|---|---|---|---|---|

RMP/EIS. Can the BLM provide analyses and examples of riparian areas where OHV's are allowed but there are no serious impacts?

I have documented (Schelz 2006 and 2007) the destructive impacts of OHV's in Tenmile Canyon in the Moab RMP Planning Area and in Arch Canyon, just south of the Moab Planning Area. My documentation included a Proper Functioning Condition analysis, including before and after photos, showing many areas where impairment of riparian resources is occurring. OHV use in these riparian areas causes serious impacts to stream sinuosity, stream banks, vegetation, floodplain dynamics, etc.

In Tenmile Canyon, most of the length of the canyon investigated was found to be in a "Nonfunctional" condition, or at risk of becoming Nonfunctional with a downward trend, due to the use of OHV impacts. Except for a lack of the potential number of young cottonwood trees, the impacts I observed on the vegetation in Ten-mile Canyon focused primarily in areas where the OHV route was establishedd, and especially in the many areas where there was downstream erosion due to the route location within the streambed, on the stream bank, or where it crossed the stream channel.  At these locations, it was common to see denuded and washed out stream banks; a lack of regenerating shrubs (in contrast to the higher levels of shrub regeneration away from the route); a reduction and elimination of ground cover of native grasses, brushes and forbs; lower than expected deep binding root masses along the stream bank; and the presence of undesirable exotic plants (in particular, Tamarisk).

The exposed soil in Tenmile Canyon at route crossings, in the stream channel, and on the road bed allows an

intensifying cycle of erosion to occur at and downstream of the initial denuded areas, which includes all the attedant negative effects of erosion on water quality and quantity, the elimination of native vegetation, and changes in channel sinuosity and morphology. Negative hydrological impacts were obvious in areas where the OHV route ran alongside and where it crossed the stream channel. Although some segments of stream channels, meanders and point bar formation were evident in the canyon, much of the study area was negatively affected by the straightening of the channel and increased erosion effects caused by the OHV routes. In many instances multiple routes were evident in the same area, probably due to erosion problems and vehicle operators attempting to avoid eroded and damaged areas. Channel straightening occurred from high flows jumping into the incised channels of the OHV route that was adjacent to the stream channel, and from lateral cutting when high flows jumped up onto the route at stream crossings and scoured the stream banks causing the loss of soils and vegetation (Schelz 2007).

The impacts described above in Tenmile Canyon are common in riparian areas where OHVs are allowed. Similar impacts are also found in Arch Canyon near Blanding and in Salt Creek in Canyonlands National Park where OHV's are allowed (Schelz 2001, Schelz 2006). Similar negative impacts would be expected in most or all of the riparian areas in which the Moab BLM is proposing to allow OHV use.

The BLM's own management stategies recommended the the protection and restoration of riparian areas. Standard 2 states that "riparian areas and wetlands must be in properly functioning condition" (BLM 1997a). As described above, lands within the Moab Project Area

| | | | | |
|---|---|---|---|---|
| | | | have been assessed by independent researchers and found not to be properly functioning condition (Schelz 2007) and in great need of restoration. Whenever an OHV route is found in a riparian area, almost without exception, these routes can be linked as the primary cause of riparian degradation and impairment. | |
| ECOS Consulting | 9 | 32 | 4.3.11.7 Impacts of Riparian Management Decisions on Riparian Resources. Page 4-246, 5th Paragraph, 4.3.11.7.1: The BLM has had standards for Rangeland Health for almost 10 years now but there is very little evidence on BLM lands in the Moab area that riparian areas are in better condition due to BLM's stated management standards. Standard 2 states that "riparian and wetland areas must be in properly functioning condition (PFC)", yet there are many riparian areas within the Moab Planning Area that are clearly not in PFC. The DRMP fails to include BLM's monitoring reports and results that determine the condition of the riparian areas.  Does Moab BLM have any monitoring reports and results for each of the riparian areas it manages?  Who is doing the monitoring?  Is it a team of specialists, as specified by BLM PFC protocol, or is it just the range technician who preformes much of this work? Are there any outside reviews of these determinations?  Have there been any reports that analyze results and show the trends?  How often has any one area been assessed?  An area must be assessed more than one time for monitoring to occur and trends determined. | See response to comment 9-6 and 124-33. |
| ECOS Consulting | 9 | 33 | 4.3.11.8 Impacts of Soils and Water Resources. Page 4-247, last Paragraph, 4.3.11.8: What is the Definition of the "100-year floodplain". The Moab DRMP fails to define this term, although it is used numerous times. As mentiontioned above, the 100-year floodplain can be extremely difficult to define when considering the amounts of impacts from livestock overgrazing and other disturbances over the past 130 years. Oftentimes, | Maps of the 100-year floodplain are not available across BLM lands.  An evaluation of proposed projects within the 100-year floodplain would be conducted for site specifc projects.

See response to comment 9-2. |

| | | | | |
|---|---|---|---|---|
| | | | in this environment, the historic floodplain has been left "high and dry" from arroyo cutting, channelization, and erosion due to over grazing, mining and off-road vehicle impacts.  Under the pressure of these impacts, the former floodplain can be transformed over the years into an upland vegetation community that barely resembles a floodplain.  Of particular concern are areas adjacent to the "100-year floodplain" and the riparian areas. These areas should have a buffer zone that protects them and the adjacent floodplain from surface disturbing activities.

It is highly recommended that a buffer zone of 1500 meters from the riparian area and floodplain be established in order to greatly reduce the possibility of negative impacts stretching into the floodplain and riparian areas. | |
| ECOS Consulting | 9 | 34 | Page 4-248, 1st Paragraph, 4.3.11.8: The development of "Watershed Management Plans (WPM's)" must be a top priority for the BLM. These documents are the first step in effective management of these areas.  Impact issues can be best managed if analyzed from a watershed (big picture) perspective. It is unfortunate that none of these plans have been developed to date because proper management is much more difficult without them, and BLM's planning and implementation decisions area become based on inadequate data. When will WPM's be developed? Who will develop them? The DRMP must include a timline commitment to complete these, otherwise the promises in the RMP are hollow.  It is recommended that a cooperative effort amongst state, federal, and private organizations be organized. The development of these plans must become a top priority of this RMP in order for the BLM to effectively manage these natural resources for the next 10-20 years. | See response to comment 9-19. |
| ECOS | 9 | 35 | Page 4-248, 2nd- 5th Paragraphs: There is no mention | Table 3.22 on pg. 3-90 of the DRMP/EIS lists the |

| | | | | |
|---|---|---|---|---|
| Consulting | | | of how many actual watersheds there are in the planning area.  How many are there? Have they been prioritized according to condition? What percentage of watersheds are 17 watersheds as proosed in Alternative B, or 8 watersheds proposed in Alternative C? It is stongly recomened that WMP's are vitally necessary in order to properly manage an area into the next 10-20 years. It is extremely important that the development of WMP's for every watershed be given the highest priority. | watersheds and associated streams.  The Analysis of the Management Situation contains a map of the major watersheds (Figure 14-1).  This document is available to the public on the Moab RMP website.  See response to comment 9-19. |
| ECOS Consulting | 9 | 36 | Page 4-279, 1st paragraph, 4.3.13: Biological soil crusts naturally occur (not "could" occur as stated) on over 90% of the soils in the Moab Planning Area.  To map the occurrence of biological soil crusts would be extremely simple, wherever there are no rocks, there is, or should be, biological crusts. They do not occur only in small patches of Mancos Shale and in areas where the soil has been disturbed and the biological soil crusts have been destroyed.  Page 4-279, 2nd Paragraph, 4.3.13: Acreage may be approximate but it can be assumend that almost anywhere there is soil and not hard rock, you will find biological soil crusts. Since these crusts are anywhere there is soil, then all areas of the Moab Planning Area contain sensitive soils. This is not clear in this document, but should be stated unequivocally. | See response to comment 9-12. |
| ECOS Consulting | 9 | 37 | Page 4-279, 3rd Paragraph, 4.3.13: This paragraph is misleading in many ways. Decisions regarding the management of most of the listed resources do have an effect on soil and water quality.  Degraded air quality due to increased vehicle or industrial activities in an area can effect soil and water quality through increased dust in the air and "dry deposition" of toxic chemicals. This can lead to decreased productivity and other problems throughout the lifecycle of many plants and animals, and biological soil crusts. | See response to comment 124-7.  The narrative on pg. 4-279 of the DRMP/EIS states that management decisions regarding air quality, paleontology, socioeconomics, special status species, vegetation, visual resources, wildlife resources, or woodland resources would have negligible impacts to soils and water resources.  Air quality decisions involve protecting air quality so they |

| | | | | |
|---|---|---|---|---|
| | | | Allowing recreational fossil collection can lead to soil disturbance and the destruction of biological soil crusts. This can occur by vehicles driving to the sites, and by the actual digging of specimens or in areas where specimens are suspected.<br><br>What is meant by improving the local and regional economy?  If this means increasing visitors then there can be significant increase in soil disturbance and water quality degradation.  Increased trampling of soils from vehicles and walking can destroy the biological soil crusts. Human waste can contaminate water sites. Hydrocarbons from vehicles can also contaminate soils and water sites.<br><br>Improving and maintaining native vegetation communities can involve mechanical removal of exotics, application of herbicides, and mechanical placement of native seeds, seedlings, or grown plants. All these activities can trample and destroy the biologcal soil crusts and contaminate local water sources.<br><br>Activities associated with woodland harvesting can be enormously destructive of biological soil crusts.  Much soil trampling and compaction occurs when driving vehicles on biological soil crusts, and much trampling of the biological soil crusts can occur when retrieving, cutting, and dragging wood to vehicles, etc. These activities can also increase erosion rates and contaminate nearby water resources.<br><br>All of these activities must be analyzed in this EIS for direct, indirect, and cumulative impacts to soil, vegetation, and water resources. | would not impat soils and water resources.  Paleontology decisions involve protecting paleontological resources and restrictions to collection so impacts to soils and water resources would be negligible.  The socioeconomic benefits of the proposed management decisions would not result in impacts to soils and water resources. Vegetation decisions involve treatments, restoration and rehabilitation, stabilization, and control of weed infestation.  These decisions are intended to improve vegetation in order to meet the desired future conditions. Special status species decisions involve protecting these species so there would be no impacts to soil and water resources.  Vegetation projects are implementation decisions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land use plan.  Wildlife decisions involve protecting wildlife species so there would be no impact to soil and water resources.  The visual management decisions provide visual protections and do not impact soil and water resources in and of themselves.  The woodland decisions provide areas available for the casual collection of woodland resources. This collection  is limited to dead and down trees and access by designated routes.  The possibility of illegal cross-country travel is not analyzed because it is not allowed. |
| ECOS | 9 | 38 | 4.3.13.1 Impacts of Fire management Page 4-279, 5th | Fuel reduction projects are implementation actions in |

| Consulting | | | Paragraph, 4.3.13.1: This plan should discuss in greater detail the procedures used in fuel-reduction projects. Specifically, will machines be used? If so, what will be done to minimize the destruction of biological soil crusts (BSC's), and what is the projected amount of disturbance to soils?  In many cases, the destruction BSCs during these fuels reduction project areas can exceed 60-80% of the soil surface. Once destroyed, BSCs take many, many years to recover, depending on site characteristics and micro-environment. The benificial effects of emergency stabilization projects will oftentimes only last a year or at best a couple of years, and the advantages of many of these projects are often canceled by the amount of biological soil crusts disturbance that occurs during placement.

The BLM must state specifically what procedures it will follow in order to protect soil and vegetation resources during these fuel reduction projects. Otherwise, there is no ways that the potential damage can be assessed. Are there results of monitoring past fuel reduction projects that the BLM can summarize in this document, so that we can make informed decisions and recommendations? How many fuel reduction projects have been done in the past in the Moab Planning Area? How much soil surface was disturbed? How effective were these projects? What are the indirect and cumulative effects of those activities? | which environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan.  This anlysis would consider potential environmental impacts to air, water, and soil.

See response to comment 124-7. |
| ECOS Consulting | 9 | 39 | Page 4-279, 6th Paragraph, 4.3.13.1:  Are catastrophic fires a real and common threat to habitat of the Moab Planning Area?  How many have there been in the past 10 years? 50 years?  Has there been any research on the actual cause of these lands becoming more susceptible to catastrophic fire?  Isn't it possible that catastrophic fires can be a result of mismanagement and allowed destructive uses of the land?  There is no data in the DRMP that suggests that fuel reduction | On pg. 4-279 of the DRMP/EIS, for all alternatives, states that estimated fuel reduction treatments of 5,000 to 10,000 acres per year would be targeted.  Furthermore, because specific areas are  not designated for treatment each year, the specific soils affected are ukown; therefore, a qualitative assessment of short and long term impacts follows in the text.  The text further states that individual fire management projects will be analyzed at the implementation level with site specific NEPA |

| | | | | |
|---|---|---|---|---|
| | | | projects are really necessary. The associated activities can cause more problems because of widespread soil disturbance impacts. Is BLM using fuel reduction projects as a way to allow firewood gathering, or to clear an area for increased grazing potential? Has Moab BLM conducted any assessments of these "catastrophic" fires looking at the amount of actual damage that has occurred? Were the soils burned into sterility? Were the crusts completely destroyed? What recovered, and what was the recovery rate? These are all questions that need to be addressed in order to make informed decisions about managing fuel reduction activities for the next 10-20 years. | documentation under all alternatives. |
| ECOS Consulting | 9 | 40 | 4.3.13.2 Impacts of Health And Safety page 4-280, 2nd Paragraph, 4.3.13.2: Whereever Abandoned Mine Lands (AMLs) are rehabilitated, the amount of soild disturbance is usually enormous. What precautions will the BLM demand in order to keep surface disturbance to a minium? Is there a protocol that the BLM follows? If so, a summary of these must be included in this plan?<br><br>Although these toxic materials must be removed, but there are always ways to do it that will cause minimal impact. Does the BLMhave plans for the least destructive ways to rehabilitate these AML sites. Does the BLM insist on using these? The long-term benefits of removing hazardous material are obvious, but are they blinding us to the pitfals of the short- and long-term impacts to the vegetation and soils, such as loss of biological soil crusts destruction and soil compaction, without propper planning of minimal impact methods? | AML projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan. |
| ECOS Consulting | 9 | 41 | 4.3.13.3 Impacts of Lands and Reality page 4-280, 3rd paragraph, 4.3.13.3: The BLM states that no particular data on soil crusts exists. This is an avoidance of the issue. In the Moab Planning Area, wherever there is soil, there are likely soil crusts, subtract the exposed rock of an area and that is how much soil crust exists. | See response to comment 9-12. |

| | | | | |
|---|---|---|---|---|
| | | | Generally, if there are no soil crusts in an area without rocks, then the area has been highly impacted by some previous disturbance. Thus this discussion could be transformed from qualitative to quantitative with little effort.<br><br>We would like to see this discusion changed from qualitative to quantitative, so that we can make adjustments based on numbers not guesses. The DRMP must include an analysis of indirect and cumulative impacts of these activities. | |
| ECOS Consulting | 9 | 42 | Page 4-280, Alternatives: These sections are confusing. There are no reasons given for expanding the Utility Corridors, yet these areas get larger and larger with each consecutive Alternative. The BLM must explain in more detail the reasons for this enormous expansion from Alternative A through D.  These corridors must be kept to an absolute minimum in order to keep serious direct and indirect soil and vegetation impacts low, and to avoid fragmenting the landscape.  Why does the corridor expand from 32,502 acres in Alternative A to 65,865 acres in Alternative B. In Alternative C, it is more than 5 times that of Alternative A. What is going on here?  What new utilities are planned for the next 20-30 years in the Moab RMP Planning Area?<br><br>As the utility corridors expand with each Alternative there will be a corresponding increase in negative impacts to soil and vegetation resources in particular, and probably to water resources also. What are the purpose and need of the wide corridors as planned for Alternatives A, C and D? Please provide more detailed information on this so that we can analyze the impacts. | See response to comment 9-13.<br><br>The increase in acreage between the no action and action alternatives of the DRMP/EIS is due to the conjoining of two existing utility corridors south of Moab along Highway 191. |
| ECOS Consulting | 9 | 43 | Page 4-282, 2nd Paragraph, 4.3.13.4: As stated in this paragraph, livestock have many many indirect adverse effects on water quality.  However, not stated are the direct adverse effects on water quality and stream | All resource concerns involving livestock grazing are evaluated on a site specific allotment basis during permit renewal utilizing the Standards for Rangeland Health and Guidelines for Grazing Management. |

| | | | | |
|---|---|---|---|---|
| | | | morphology.  These must be considered in this analysis. Direct adverse effects include the introduction of waste material directly into a stream, increasing fecal coliform counts and total phosphorus; trampling within the streambed and the loss of stream roughness due to the destruction of point bars, stream bed materials, and stream banks; and the increase in salinity, dissolved solids and total suspended solids due to directly trampling and destruction of vegetation and soils on the streambed and stream banks. | See response to comment 9-3. |
| ECOS Consulting | 9 | 44 | Healthy Rangelands, Standard #1 states that " Upland soils exhibit permeability and infiltration rates that sustain or improve site productivity, considering the soil type, climate, and landform". Can tthe BLM show where the monitoring for this standard has taken place? What are the procedures and methods, and how is this monitoring documented? What are the results for the different allotments? Is there any independent analysis or review of this information? I know of numerous allotments in the Moab RMP Planning Area where the field conditions are below the BLM standards. If I don't hve access to the BLM's own monitoring information, how can citizens analyze whether the BLM is doing its job or not? Or how can we trust that the BLM will do its job for the next 10-20 years of the life of this RMP? Without the propper documentation, and an open system of citizen review, the BLM cannot be trusted to make the best decisions, especially considering its past performance and the conditions in the field. There is no mention of a citizen review process in this RMP. It is recommended that the BLM develop for this RMP a process whereby citizens can participate in and review grazing allotment management and monitoring programs. | See response to comment 9-43.  An administrative process for interested parties to participate in grazing decisions has been established.  This process is followed for all permit renewals and other actions taken on grazing allotments as part of the implementation of this plan. This planning process also includes public participations as provided for in Handbook 1610 and has been followed throughout the development of the RMP.<br><br>See response to comment 9-3. |
| ECOS Consulting | 9 | 45 | Page 4-282, 4th paragraph 4.3.13.2: Table 4.80 shows the acers of sensitive soils affected by each Alternative. It appears there is little difference between any of the | Table 4.80 refers only to the allotments that are available or not available to livestock grazing for the alternatives in the DRMP/EIS.  On allotments that will be available for |

| | | | | |
|---|---|---|---|---|
| | | | Alternatives.  What differences that do exist, are negligible. Is this anyway to manage this most destructive activity on land? Livestock grazing adversely effects just about every part of the ecosystem, its negative impacts are well documented, especially the destruction of soils and vegetation, and the contamination of water. This Moab RMP is a planning document of the next 10-20 years, and the BLM is skimming over the most ecological destructive activity, grazing, as if it could and should just manage itself. Estimated acres of disturbed land is not an analysis and is not adequate.  NEPA requires that the BLM perform an analysis of the short-term, long-term, direct, indirect, and cumulative impacts, and that conclusions be based on these analyses.<br><br>It is recommended that before this RMP is finalized, the BLM make a serious analysis of the effects of grazing on arid lands such as these in the Moab RMP Planning Area, and document their findings so that the public can see exactly what the costs of this activity are on our public lands. Has the BLM documented any studies or monitoring on specific areas within the Moab Planning Area? Are there any results? This information is necessary because it can seriously effect whether or not our public lands are in a functioning condition now and for the next 10-20 years. With this information,and the results of monitoring that the BLM has been doing for the past 40-60 years here in the Moab Planning Area, we, the public, can comment properly on the effectiveness, or lack therof, of grazing management by the BLM. | grazing after completion of the land use plan, site specific analysis will continue to be done during the permit renewal process using the Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 9-3.<br><br>The information requested by the commentor is available to the public by request and can be utilized by the public during the permit renewal process. |
| ECOS Consulting | 9 | 46 | Page 4-282, 6th paragraph, 4.3.13.4: The statement that "the earlier in the year the grazing season ends, the fewer impacts to soils and water resources" is misleading.  It implies that very little will be impacted if the BLM requires livestock to be removed before the | The assessment of impacts to soils and water from livestock grazing found on pg. 4-282 of the DRMP/EIS is a general statement of these impacts.  Resource concerns involving season of use are analyzed during the permit renewal process using the Standards for |

| | | | | |
|---|---|---|---|---|
| | | | onset of spring. When in fact, there are many negative impacts to upland and riparian soils, vegetation, and waters that take place regardless of the season, and sometimes they are even more severe. This is so because during late fall and winter the livestock need to move around more to find food and there is less protection of soils due to seasonal vegetation loss and over grazing. These impacts include: Wtaer contamination from livestock wastes; biological soil crust destruction from trampling, stream bank destruction and damage from the increased search for food during these low productivity periods; and many other serious impacts.<br><br>It is recommended that the BLM discontinue using the early season discontinuance of livestock grazing as an example of good management, when in fact, the practice merely inflicts more damage to other areas. Instead of seasonal movements, it is recommended that the BLM do an analysis of direct, indirect, and cumulative impacts from livestack in the Moab Planning Area, and keep animals out of areas with medium to high impacts. This will require a sophisticated monitoring program that is well funded and is able to make meaningful decisions based on field conditions and trends. These studies need to involve the public and outside monitors for the results to be credible and trustworthy. | Rangeland Health and Guidelines for Grazing Management.<br><br>Standards assessment and monitoring of rangeland conditions is an implementation phase of this plan and is currently an ongoing process." |
| ECOS Consulting | 9 | 47 | What are the results of water quality monitoring the BLM has been doing for many years now in the Moab Planning Area?  What are the trends for the particular areas? Is there a "Water Quality Report" with an analysis of the data and a full explanation of where, when, and what the BLM has been monitoring?  Is there an explanation of the results and how the relate to conditions on the ground, and to health standards set by the State of Utah Federal Government? Are there | See response to comment 9-18.<br><br>Other than the list of water bodies not meeting state water quality standards (303(d) list), water quality was not an issue raised to be resolved by the land use planning process.  Water monitoring data will be utilized for site specific projects and this data is available to the public upon request. |

| | | | | |
|---|---|---|---|---|
| | | | recommendations for improving the water quality? Does an area have to become seriously degraded or qualify for the Clean Water Act 303(d) list before any water quality mitigation is sanctioned by the BLM? Are there any areas within the Moab Planning Area where mitigation measures to improve water quality have been taken before listing on the 303 (d) list? Is the raw data all the BLM is willing or able to supply? The BLM must include summary water quality monitoring information on all water systems that it monitors within the Moab RMP Planning Area, and release a report of past monitoring results and water quality trends. Has there been any monitoring of aquatic macro-invertebrates as stipulated in the BLMs own standards? What is the methodology? Where are macro-invertebrates monitored? How often and when are they monitored? If so, is there a report with data and analyses of macro-invertebrate communities and how they relate to degraded waters? These results should be included in this Moab RMP so that citizens can determine the effects of livestock and other uses on our public lands. We request that the BLM include summary of aquatic macro-invertebrate monitoring information in this RMP, and release a report of past monitoring. | Water quality monitoring data will be utilzed for site specific projects. |
| ECOS Consulting | 9 | 48 | Page 4-286, 6th Paragraph, 4.3.13.5: An additional impact that must be considered is the possibility of a chemical spill at well and mine sites. Does the BLM have any information about the frequency and extent of these types of accidents occurring? If so, this should be included in this plan so that averages can be used and potential cumulative impacts determined. | The Council on Environment Quality regulations do not require an environmental document to analyze a worst case scenario. |
| ECOS Consulting | 9 | 49 | Page 4-287, 2nd Paragraph, 4.3.13.5: Is the BLM considering the price of uranium and the high likelihood of increased exploration and mining of this mineral? There have already been huge increases in interest in opening an re-opening uranium claims throughout the four-corners region. The BLM should be anticipating | The potential uranium development for the Moab planning area is discussed on pg. 4-6 of the DRMP/EIS.  This information is based on the Mineral Potential Report prepared for the Moab planning area. |

| | | | | |
|---|---|---|---|---|
| | | | this and include other areas besides the Book Cliffs andGreater Cisco RFD areas in the analysis. If areas, such as Hatch Point, Eastern Paradox, Lisbon Valley, Roan Cliffs, and Salt Wash are not included, then the BLM and the public will be in the dark when these activities increase again.  It is recommended the BLM focus on all of these important areas of the Moab RMP Planning Area in the analysis of the Alternatives. Otherwise, the analysis is woefully inadequate. | |
| ECOS Consulting | 9 | 50 | Page 4-287 4th Paragraph, 4.3.13.5: It is recommended that the BLM presume that most of the predicted 1,015 acres of surface disturbance contain sensitive soils in the form of biological soil crusts. | The commentor has not provided any information regarding the location of biological crusts.  There are no maps available of biological crusts and the BLM can not presume that most of this area would contain biological soil crusts. |
| ECOS Consulting | 9 | 51 | Page 4-287, Alternatives, 4.3.13.5: Under the alternatives presented, there are estimates of the amount of soils in the Moab Planning Area that will be disturbed.  Are these estimates based on total land surface that will be disturbed, or have the soils been mapped and the amount of actual soil disturbance calculated?  Since it is not clear, and there is no mention of seperating out the rock from the soil surfaces then we must presume the BLM is talking about total land surface. Is this correct?  If it is, then the BLM is describing some massive mining activities in the next 20-30 years. According to this Moab RMP, in Alternative A, 40% if the land surface of the Moab Planning Area will be disturbed. This represents roughly 720,000 acres of soil disturbance.  Under Alternative B, 26% of soils of the Moab Planning Area will be disturbed, reprresenting roughly 468,000 acres of soil disturbance. Under Alternative C, 38% of soils of the Moab Planning Area will be disturbed, representing roughly 684,000 acres of soil disturbance. Under Alternative D, 40% of soils of the Moab Planning Area will be disturbed, representing roughly 720,000 acres of soil disturbance. | Table 4.81, table 4.82, and table 4.83 on pgs. 4-288, 4-289, and 4-293 of the DRMP/EIS provide toatal acres by soil type for different resource activities and allocations. The numbers represent toal acreage by soil type and not the total acreage to be disturbed. |

This magnitude is unacceptable and completely ignores the importance of biological soil crusts to this ecosystem. It also ignores a number of Federal mandates concerning the management of BLM lands. All planning efforts by the BLM are bound to the legal and regulaory mandates contained in FLPMA, 43 CFR 1600, the National Enviromental Policy Act of 1969 (NEPA, 42 U.S.C. 4321 et seq.), the Council on Enviromental Quality (CEQ) regulations at 40 CFR 1500-1508, and other applicable Federal laws and regulations.

BLM's mandate under the Federal Land Policy and Management Act of 1976 (FLPMA) is to manage the public lands for multiple use, while protecting the long-term health of the land. Where is the multiple use if the range of Alternatives allows between 468,000 acres and 720,000 acres of land surface and biological soil crusts to be destroyed? Given the preferred Alternative (C), the BLM is willing to destroy approximately 684,000 acres of soil in order to allow mineral development. That represents almost 40% of the total Moab Planning Area! Is this management for multiple use, or primarily for one use?  Is this protecting the long-term health of the land?  It appears there isn't any room for other uses besides livestock grazing, mining, and oil and gas development. This is a backward vision that ignores the future and ignores the long-term health of the land.  The BLM must have a vision for the future that includes the mandates of FLPMA.  The BLM must make room for alternative uses of the land.  Uses that are less destructive and incorporate the spirit of FLPMA: to allow for multiple use, and to protect the long-term health of the land.

The National Enviromental Policy Act (NEPA) of 1969 specifically provides instructions to the BLM and other

Federal agencies for developing a range of reasonable alternatives in environmental impact statements (EIS). NEPA assures that the BLM other federal agencies) will consider the impact of an action on the human environment before decisions are mad and the action is taken. It requires that NEPA documents concentrate on issues that are significant to the action in question. The NEPA process is intended to help public officials make better decisions based on an understanding of the direct, indirect and cumulative environmental consequences and take actions that protect, restore, and enhance the human environment.

This Moab RMP/EIS appears to be ignoring the mandate of NEPA by not providing a reasonable range of alternatives nor sufficient indirect and cumulative effects. The BLM must develop different Alternatives for mining and mineral development activities that cover the whole spectrum from no activity, to a mix with other activities, to Alternative D. Also the BLM must analyze the indirect and cumulative impacts using commonly accepted methods such as a discussion on thresholds, trends analyses, and carrying capacity analysis? How about ecosystem analysis, economic system analysis , and social system analysis? Has the BLM attempted to engage any of these kinds of analyses with specific and known impacts. The lack of this information constitutes a major fault in this environmental analysis and thus in this Moab RMP/EIS.

The Council on Environmental Quality (CEQ) provides guidance to the BLM and other Federal agencies on the extent to which agencies of the Federal government are required to analyze the enviromental effects of past actions when they describe the cumulative environmental effect of a proposed action. In the Moab RMP, there is no apparent attempt to look at the

| | | | | |
|---|---|---|---|---|
| | | | environmental effects of past actions concerning the effects of mineral production, nor is there any mention of cumulative effects. Regarding cumulative effects, these can be significant when considering the destruction of soils and biological soil crusts. The destruction of biological soil crusts will affect all species at every trophic level, and result in a degraded state of the ecosystem, probably even impairment. These negative impacts will not be limited to the area disturbed but will spread out into the surrounding region. An example is the increase of wind-blown sand due to the destruction of biological soil crusts. This dust and sand eventually covers the biological soil crusts of the surrounding area, killing the crusts. We must be extremely careful when allowing activities that destroy biological soil crusts, these crusts are the glue that holds the natural system together. The continuum of impacts can spread out over large tracts of land, adding a cumulative impact that could spread to 60-80% of the Moab Planning Area.

It is recommended that the BLM fully consider the extent of ecosystem impairment caused by past mining and mineral development activities. We also recommend that the BLM completely analyze the cumulative effects of the proposed Alternatives. We need locations, numbers and acres affected by direct, indirect and cumulative impacts, not general statements, in order effectively analyze the effects of mining and mineral development on soils and water resources. | |
| ECOS Consulting | 9 | 52 | The Clean Water Act (CWA) is the cornerstone of surface water quality protection in the United States. The statute employs a variety of regulatory and non-regulatory tools to sharply reduce direct pollutant discharges into waterways, finance municipal wastewater treatment facilities, and manage polluted | The BLM is obligated to comply with the Clean Water Act, the Endangered Species Act, and Executive Order 11988.

See response to comment 9-2.

The types of impacts discussed by the commentor are |

| | | | runoff.  These tools are employed to achieve the broader goal of restoring and maintain the chemical, physical, and biological integrity of the nation's waters so that they can support "the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water." Under the water shed approach of the CWA, equal emphasis is placed on protecting healthy waters and restoring impaired ones.  The direct, indirect and cumulative impacts of a number of activities in and adjacent to flood plains would be in direct opposition to the Clean Water Act.  Thus it is recommended that all surface disturbing or destructive activities, in particular mining, oil and gas development, OHV use, and livestock grazing be kept at least 1500 meters from the edge of streams, riparian areas and flood plains.<br><br>We request that the BLM list and describe the known impacts of mining, oil and gas development, OHV use, and livestock grazing and to re-evaluate them in light of the mandates of Executive Order 11988, the Endangered Species Act, and the Clean Water Act.  The BLM should also consider the cumulative effects of past management of these activities on riparian ares, flood plains, streams, water quality, and uplands. | site specific and the impacts can only be analyzed at the implementation level. |
|---|---|---|---|---|
| ECOS Consulting | 9 | 53 | Page 4-297, 6th paragraph, 4.3.13.9.2: The BLM's on Rangeland Health Standards and Guidelines state:"...the BLM's 200 million+ acres of rangeland have long been valued for livestock grazing and mining, but rangelands now are also prized for their recreation opportunities, wildlife habitats, watershed, cultural values, and scenery". These guidelines also state: "...It is time for a change, and BLM is changing to meet the challenge. BLM is now giving management priority to maintaining functioning ecosystems.  This simply means that the needs of the land and its living and nonliving components (soil, air, water, flora, and fauna) | The BLM utilizes the Standards for Rangeland Health and Guidelines for Grazing Management during the permit renewal process for livestock grazing.  The permit renewal process does not involve a land use planning decision. |

are to be considered first.  Only when ecosystems are functioning properly can consumptive, economic, political, and spiritual needs of man be attained in a sustainable way".

These are very clear guidelines from the BLM's own handbook. They recognize the importance of ecosystems integrity in order to provide balanced uses of the land.  They recognize that there are many more uses of the land that are not as destructive as most of the traditional mining, mineral exploration, and grazing uses, and in order to manage for the other uses, these traditional, but outdated uses must be managed intensively, or eliminated, if found to impact ecosystem integrity.

It is recommended that the BLM follow its own directive as evidence in the BLM Standards and Guidelines for Rangeland Health, and manage for the "fundamentals of rangeland health". These include:

(a) Watersheds are in, or making significant progress toward, properly functioning physical conditions, including their upland, riparian-wetland, and aquatic components; soil and plant conditions support infiltration, soil moisture storage, and the release of water that are in balance with climate and landform and maintain or improve water quality, water quantity, and timing and duration of flow.

(b) Ecological processes, including the hydrologic cycle, nutrient cycle, and energy flow, are maintained, or there is significant progress toward their attainment, in order to support healthy biotic populations and communities.

© Water quality complies with State water quality standards and achieves, or is making significant

BLM_0011585

progress toward achieving established BLM management objectives such as meeting wildlife needs.

(d) Habitats are, or are making significant progress toward being, restored or maintained for Federal threatened and endangered species, Federal Proposed, Category 1 and 2 Federal candidate and other special status species.

In regards to (a) above, can the Moab BLM Office show significant progress toward properly functioning upland, riparian areas, and aquatic components? Is there documentation of this by independent monitors? Independence is vital because of the history of mismanagement and abuse by the BLM and its known support of that abuse. Is there procedure to insure the continuing health of uplands? Has there been any monitoring of aquatic components, including aquatic macro invertebrates? In upland and riparian areas do soil and vegetation conditions support infiltration? How do we know this? Is there documentation? Is there a report that shows trends since this BLM Standards and Guidelines for Healthy Rangelands was released? If not, is there any data and are there plans to write any reports? Is there a mechanism in place, besides the Freedom of Information Act, so that the public can examine data and results from BLM monitoring? What is the decision process for how to improve rangelands in the Moab Field Office?

In regards to (b) above, has there been significant progress toward the maintenance of the hydrologic cycle, nutrient cycle, and energy flow in uplands and riparian areas? If so, is there a report on this? How were decisions made? Was it just an opinion, or were decisions made based on data and analyses? Please provide a summary of the results of these reports in this

BLM_0011586

Moab RMP so that the public can make reasonable judgements and comments. Are the biotic populations and communities healthy? Has there been any monitoring of any biotic populations in uplands or riparian systems in the Moab Planning Area? Are there any reports on this? How can we, the public, know if the biotic populations are thriving or being extinguished?

In regards to © above, is water quality complying with state standards? If not, what paameters are not meeting state standards? Or is the BLM waiting for certain water bodies to be listed on the Clean Water Act 303 (d) list before any corrective action is considered? Waters on the 303 (d) list are highly impacted, is the BLM waiting for them to be so degraded before trying to fix the cause? What significant progress is being made toward water quality and wildlife habitat within the Moab Planning Area? Please provide information on this so that we can make informed decisions.

In regard to (d) above, is there significant progress for the restoration and maintenance of habitats for species on the Federal Threatened and Endangerd list in the Moab Planning Area? What effort have been made in behalf of Threatened and Endangered wildlife habitat? Had habitat been mapped in the Moab Planning Area? Has potential habitat that is now non-functional condition been mapped? Have any areas been prioritized for the restoration and maintain of Threatened and Endangered wildlife habitat? Has there been significant progress since these standards and guidelines were adopted by the BLM in the mid-1990's?

In this Moab RMP the BLM claims to be following its own rangeland health standards and guidelines but offers absolutely nothing to show that this is the case. There is a dire need for analyses of trends and results

| | | | | |
|---|---|---|---|---|
| | | | in order to determine if management is effective, and in order to plan successful future management. | |
| ECOS Consulting | 9 | 54 | Page 4-298, 6th Paragraph, 4.3.13.9.2: What are the Best Management Practices (BMPs) mentioned in this paragraph?  We need to see these BMP's in order to make a judgment as to their usefulness and efficacy. This is extremely important because increased soil erosion and dust storm activity is directly linked to soil disturbance activities.  Dust storms in the Cisco Desert area have covered biological soil crusts, destroying them and their ecological functions, and have caused numerous auto wrecks, many times with human injury and deaths. | Best Management Practices (BMPs) are found throughout BLM policy and guidance for each resource program. The reference on pg. 4-298 is to state the BLM will follow these policies.  BMPs are continually being updated and improved with experience.<br><br>On pg. 2-31 of the DRMP/EIS it states the BLM will work with partners to implement Best Management Practices and continue the BLM's work with the Division of Water Rights and Water Quality in accordance with the administrative Memorandum of Understanding and the Cooperative Agreement addressing water quality monitoring. |
| ECOS Consulting | 9 | 55 | Page 4-298, 9th paragraph, 4.3.13.9.2: Again, limiting activities to a certain time of year is of limited ecological value since biological soil crusts would be destroyed regardless of time of year at most sites in the Moab Planning Area.  It is recommended that slopes greater than 30% should not be disturbed.<br><br>BLM Manual 1730-2 states: "Stocking levels and season of use should be ascertained on an annual basis, jointly by managers and users, with optimal coverage of both vascular plants and biological soil crusts as the management goal (Kaltenecker and Wicklow-Howard 1994; Kaltenecker et al. 1999b). Optimal coverage should be based on site capability and rangeland health indicators of site stability and nutrient cycling".  Has the BLM determined proper rangeland health indicators of the site stability and nutrient cycling for the vegetation types in the Moab Planning Area?  If so, where is that information?  Shouldn't it be included in this important planning document since livestock grazing could have such a detrimental ecological effect on the landscape?  Is the | The purpose of the stipulation on pg. 4-298 of the DRMP/EIS is for erosion control on steep slopes greater than 30%.  The restriction is applied during the wet period of the yerar.  The stipulation was not intended to protect bilogical soil crusts.<br><br>Resource concerns involving stocking levels are analyzed during the permit renewal process using the Standards for Rangeland Health and Guidelines for Grazing Management. |

BLM_0011588

| | | | BLM using this information when planning annual grazing strategies?  If so, how is it being used, and are there records of this?  If so, are they available to the public?  This information is extremely important to the public so that the proper of improper management of the land can be determined. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 56 | Page 4-298, 10th paragraph, 4.3.13.9.2: The guidelines from BLM Technical Reference Manual 1730-2 should be strictly adhered to considering the extent and importance of biological soil crusts in the Moab Planning Area.  The BLM should remove the wording "where feasible" in this paragraph because it nullifies the strength of the commitment to land health. If the guidelines of the BLM Technical Reference Manual 1730-2 are not feasible, then a proposed project or activity should not be allowed, that is the intention and spirit of 1730-2. | Technical Reference 1730-2 is not a manual and therefore is not policy.  The BLM will adhere to this technical guidance where feasible. |
| ECOS Consulting | 9 | 57 | Page 4-300, 3rd paragraph, 4.3.13.9.3.2: The timing limitation listed, December 1 to May 31, would have little to no value in protecting biological soil crusts. The only time these crusts are remotely protected is when that are frozen, which only lasts a couple of weeks in December and/or January. Thus, this would not reduce short- or long-term effects of these activities.  The only viable protection of biological soil crusts is avoidance. Does the BLM have any guidance on avoidance of biological soil crusts when planning road construction and other surface disturbing activities?  If so, we would like to see this guidance. If not, we would like to see the BLM develop guidelines that truly limit surface destruction during many activities. | There are no laws, regulations, or policies requiring  the protection of biological soil crusts. |
| ECOS Consulting | 9 | 58 | Page 4-442, Table 4.138, 4.3.19: This table is missing a number of very important wildlife associations that must be considered by the BLM in its analyses of impacts in this Moab RMP/EIS.  Add the wildlife association " aquatic macro-invertebrates" with the Aquatic habitat type.  These are extremely important "indicators" of | The tables referred to have been modified as suggested by the commentor in the PRMP/FEIS. |

| | | | | |
|---|---|---|---|---|
| | | | water quality and aquatic habitat conditions and there has been a commitment by the BLM to monitor these. In the Conifer / Mountain Shrub habitat add the following important wildlife types: Raptors, bobcats, wolves, and coyotes.  In desert shrub add, mountain lion, bobcat, fox, and coyote. In Pinyon-Juniper add bobcat, weasels, and raptors.  In Riparian / wetland add raptors, bobcat, river otter, beaver, fox, and coyote. | |
| ECOS Consulting | 9 | 59 | Page 4-444, 2nd paragraph, 4.3.19.2: The last sentence states that trampling would have short-term negative effect. This is not true!  Any trampling and destruction of biological soil crusts, which the BLM classifies as "Sensitive Soils", in any of the habitats in the Moab Planning Area can have serious long-term effects due to high soil erosion and vegetation loss, and the slow natural restoration rates of these soil and vegetation types. Avoiding trampling and other surface destruction activities must be first and foremost in the planning of fire management activities. | The section referred to by the commentor in the DRMP/EIS (pg. 4-444) involves impacts of fire management decisions on wildlife and fisheries. Therefore, this section has nothing to do with soil impacts. The trampling referred to involves trampling of vegetation and human cause wildlife disturbance.<br><br>According to US Department of Interior Technical Reference 1730-2 on Biological Crusts, Ecology, and Management when biological crusts are completely removed, recovery can be excessively slow.  In contrast biological crusts crushed in place with vehicles, foot traffic, and horses recover much faster especially on fine textured soils. |
| ECOS Consulting | 9 | 60 | Page 4-444, Section 4.3.19.2.1: In what specific areas does the BLM plan to manage with prescribed fires? There are no maps or other resources in this Moab RMP or in the Utah Land Use Plan that show where, and what habitat will be treated.  It is difficult to make an assessment of this activity without specific plans, or at least a summary of the plans. Is there a high probability of catastrophic fire in many areas within the Moab Planning Area? What habitats would be susceptible? How much acreage is involved? It seems that most of the Moab Planning Area consists of desert scrub which is not susceptible to fire, unless the cheat grass is unusually thick. Pinyon-juniper is susceptible in many areas in the West but in the Moab Planning Area it is usually not thick enough in most areas to be a | See response to comment 9-39. |

| | | | catastrophic fire risk. Sagebrush is probably the most fire susceptible habitat but only incorporates less than 8% of the Moab Planning Area. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 61 | Page 4-444, Section 4.3.19.2.2: The adverse effects on aquatic and amphibious species are serious impacts that could eliminate certain species if not managed well. What safeguards does the BLM have in place that will minimize these serious impacts?  Aquatic species, including fish, macro-invertebrates, and amphibians, are the rarest and most sensitive wildlife species in this desert environment.  Thus, it is extremely important for the BLM to manage lands so that these impacts are absolutely minimal.<br><br>This section is not an analysis of impacts, as it is supposed to be, it is just a series of statements stating the obvious. What is the extent of the direct, indirect, and cumulative impacts on these species if fire suppression and management plans are enacted?  What percentage of aquatic habitat will be affected by the various Alternatives?  How much adjacent land will be affected by indirect and cumulative impacts?  Where are the analyses of these impacts, and what are the reasoned conclusions? | See response to comment 9-39. |
| ECOS Consulting | 9 | 62 | Page 4-445, Section 4.3.19.3: How will AML sites be reclaimed to minimize surface disturbance for the benefit of wildlife and water quality?  What safeguards or protocols will the BLM be following in order to minimize impacts? Will there be follow-up monitoring and restoration efforts?  How many AML sites are there and how large are they?  Are the prioritized according to need of restoration?  Are they privatize according to the sensitivity of their location and direct, indirect, and cumulative adverse impacts on aquatic and terrestrial wildlife and habitat?  What percentage of the different habitats of the Moab Planning Area will these projects impact?  What are the direct, indirect, and cumulative | See response to comment 9-40. |

| | | | effects of these activities on bats and other species? These questions need to be addressed before effective future management can be planned. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 63 | Page 4-445, section 4.3.19.4.1: This is not an analysis of impacts. How many ROW's easements, permits, utility/transportation systems, acquisitions, disposal and withdrawals are anticipated in the next 10-20 years? Without this estimate, an analysis of environmental impacts is impossible. Wilderness Study Areas make up a small percentage of the Moab Planning Area, making most of the rest of the 1,800,000 acres open to these types of impacts. If the authorization of ROW's would have potential direct, indirect, cumulative short- and long-term adverse impacts on wildlife, then there should be an in depth analysis of these impacts on wildlife and estimate of locations and extent of these impacts and what wildlife would be most impacted. As this Moab RMP is written, it is impossible to make even and educated guess, or to attempt to evaluate impacts. The BLM must provide this information, even if it is an estimate, for proper impact analysis. | See response to comment 9-23. |
| ECOS Consulting | 9 | 64 | Page 4-448, 2nd Paragraph, 4.3.19.5.1: The BLM's Standards and Guidelines for Rangeland Health were issued about 10 years ago, 1995 or so.  Since the BLM has had at least 10 years to follow and implement these guidelines, what have been the products?  Are there any peer reviewed studies and reports showing watersheds are in, or making significant progress toward, properly functioning ecological condition, including the upland, riparian-wetland, and aquatic components?  Do soil and plant conditions support infiltration, soil moisture shortage, and the release of their water that are in balance with climate and landform and maintain or improve water quality, water quantity, and tinning and duration of flow?  If so, we would like to see the data, analyses, and the location where this monitoring and analyses have occurred. | See response to comment 9-53. |

| | | | | |
|---|---|---|---|---|
| | | | Is the past any indication of future management? What is the intensity and extent of wildlife habitat that is negatively impacted by livestock grazing? These questions must be addressed before this Moab RMP is released. | |
| ECOS Consulting | 9 | 65 | Page 4-445, 3rd paragraph, 4.3.19.6: That is correct, the amount of land open to oil and gas and other mineral uses is not indicative of the number of acres that would be directly disturbed.  When considering the indirect and cumulative impacts, the area impacted often becomes far greater.  These impacts must be considered in detail in this Moab RMP/EIS.  Has there been an analysis of the indirect and cumulative impacts on wildlife of roads that are created to access these sites?  There is much in the scientific literature on this subject. Have there been studies in the Moab area on the indirect and cumulative impacts of downstream water resources affected by runoff of toxic materials from spills and tailings, or from soil erosion?  How about downstream contamination of soils? How about wind erosion and the destruction of biological soil crusts on adjacent lands due to being smothered by wind-blown sand and dust?  If the small direct impacts could be contained, then these activities would be much more manageable.  It is the indirect and cumulative impacts on the project area and adjacent lands that need to be analyzed and are most detrimental to wildlife and many other resources. | Section 4.3.19.6 of the DRMP/EIS is found on pg. 4-453.

The BLM statement on pg. 4-453 that states that the amount of land open to oil and gas and other mineral resources is not indicative of the number of acres that would be directly disturbed.  The analysis assumptions on pg. 4-3 and 4-4 specifies the number of wells projected over a 15 year period based on the restrictions applied to the diiferent alternatives.  It further assumes there would be 15 acres of surface disturbance per well.  The number of wells are projected across the areas available for oil and gas leaing and the exact locations can not be identified specifically.  Consequently, the amount of estimated surface disturbance is only a small amount of the total acreage available.

Proposed oil and gas development  projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan.  The environmental documentation would include an assessment of direct, indirect, and cumulative analysis.

See response to comment 124-7. |
| ECOS Consulting | 9 | 66 | Page 4-454, 1st paragraph, 4.3.19.6: Do the numbers representing surface areas disturbed in the tables in Appendix S include disturbance from routes used to access these areas?  If not, these must be included, and there must be and estimate of the amount of area impacted by indirect and cumulative impacts. | Appendix S of the DRMP/EIS includes the acreage of disturbance from projected oil and gas disturbance  by wildlife habitat.  The acreage of disturbance is based on 15 acres per well.  Based on the Reasonably Foreseeable Development scenario for  oil  and  gas in the Moab Field Office, the 15 acres of distubance includes the |

BLM_0011593

| | | | | disturbance for well pad, access route, pipelines, and infrastructure. This language has been included in the anlalysis assumptions for oil and gas development in the PRMP/FEIS. |
|---|---|---|---|---|
| ECOS Consulting | 9 | 67 | Page 4-454, Alternatives, 4.3.19.6.1-4: None of the four Alternatives provide adequate viable habitat for large wildlife within the Moab Planning Area. In the analysis in this section only direct effects, and only the estimated number of directly disturbed acres, are considered in the impact analysis. This is a violation of NEPA. The BLM is required to analyze the indirect and cumulative impacts of these disturbances. In the Moab Planning Area in particular, downstream and wind erosion effects can be widespread and particularly harmful to soils, vegetation, and water. The BLM is well aware of these impacts because of the data from their water monitoring program, and because of the many accidents that have occurred on Interstate 70 due to increase in dust and sand storms in the Moab Planning Area. These storms have been directly related to surface disturbance and the loss of viable biological soil crust within the Moab Planning Area. These indirect and cumulative effects must be analyzed in the area, including NSO and closed areas, adjacent to impacted sites. This applies particularly to the loss if viable predator habitat for elk, mule deer, pronghorn, desert bighorn, and Rocky Mountain Bighorn sheep. | Chapter 2 of the DRMP/EIS identifies management protections for all the big game species habitats identified in the Moab Field Office. These habitats were delineated through coordination with the Utah Division of Wildlife Resources. The management include protections for pronghorn habitat, desert bighorn sheep habitat, Rocky Mountain bighorn sheep habitat, and deer/elk habitat.<br><br>Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts to wildlife resulting from the management actions in the different alternatives.<br><br>See response to comment 124-7.<br><br>See response to comment 9-11. |
| ECOS Consulting | 9 | 68 | Page 4-464, 1st paragraph, 4.3.19.8: This analysis does not consider the effect of roads and 4-wheel drive routes on wildlife habitat fragmentation. Habitat fragmentation is a primary cause of the loss of many wildlife populations and habitat throughout the world, in particular large mammals: predators and ungulates. It is recommended that the BLM analyze the direct, indirect, and cumulative effects of the density of roads it is recommending for each Alternative throughout the 1,800,000 acres of the Moab Planning Area. It is also | See response to comment 124-39, 124-140, 1025-14, and 1025-15. |

| | | | | |
|---|---|---|---|---|
| | | | recommended that many of these roads/routes be closed and restored in order to provide habitat large enough to sustain viable populations of our large predators and hoofed mammals. These large areas must also provide migration routes and connectivity among sub-populations, unencumbered by the fragmentation effects of roads or 4-wheel drive routes, in order to ensure genetic mixing and species hardiness. | |
| ECOS Consulting | 9 | 69 | Page 4-464, 4th paragraph, 4.3.19.8.1: As cited in this Moab RMP, Stokowski and LaPointe (2000) list numerous negative impacts of roads/routes and OHV use on wildlife species and land degradation. This paragraph discusses the loss of wildlife habitat quality but barely mentions the fact that the complete loss of wildlife habitat quantity is also a major factor. Many wildlife species will completely abandon former habitat when there is a road or OHV route nearby, and the dust and disturbance created by designated and rogue OHV routes has contributed greatly to the degradation of adjacent wildlife habitat in the Moab Planning Area. When an agency cites a paper like the Stokowski and LaPointe paper, and proceeds to ignore all the conclusions about the negative environmental and social effects of roads and OHV's by not providing true Alternatives to the location and amount of roads/routes allowed, there is something terrible wrong.  There is a major disconnect between the scientific findings regarding impacts and BLM's proposal to continue to providing for the special interest uses that cause the greatest damage to natural resources: livestock grazing, gas, oil, minerals, and OHV's. | See response to comment 124-39, 124-140, 1025-14, and 1025-15.  Habitat fragmentation is caused, not by the routes themselves, but by use of the routes.  In fact, one could argue that closing routes concentrates traffic, thus increasing wildlife habitat fragmentation.  However, the BLM stands by its analysis of wildlife habitat fragmentation. |
| ECOS Consulting | 9 | 70 | Page 4-484, 3rd and 4th paragraphs, 4.3.19.18.2.3: Here is where the habitat fragmentation by roads/OHV routes has the highest impacts as far as the effect on a single significant species, the Desert bighorn sheep. From the BLM's own analysis, although there is at least | See response to comment 124-39, 124-140, 1025-14, and 1025-15.  The imposition of a No Surface Occupancy stipulation on bighorn sheep habitat in Alt C is intended to improve |

128,832 acres of Desert bighorn sheep habitat, there is no place within the entire Moab Planning Area that meets the required minimum habitat patch size of 159 [square] km or about 62,000 acres (Singer et al. 2001). In patches smaller than 159 [square] km, Singer showed that sheep will not stay in the area, it is unsuitable habitat. The BLM attempts to downgrade these results by quoting anecdotal information from a BLM employee, saying not many vehicles go out into these areas. Has the BLM ever set up vehicle counters to measure how much visitation there is? If so, can we see the data? Does the BLM really know how much visitation is out there, or is it all an estimate, based on a couple of visits to the area? Does the BLM know how much disturbance, in the form of number of vehicles, is required for the disturbance to be negligible?

Many of these "roads/OHV routes" go nowhere in particular, and are redundant relative to nearby roads/routes. It is recommended that the BLM act wisely and in the spirit of its mandates and commitments to maintain healthy wildlife populations, by eliminating and restoring many of these useless roads/routes. In Desert bighorn sheep habitat, it is recommended that the BLM eliminate 80% of all roads/routes that are ranked as "D roads". This will open up the habitat for viable populations of desert bighorn sheep and other wildlife species, and it would continue to provide access to much of the area by OHV and other users through the use of the "B roads" and state highways.

If these roads/OHV routes are truly rarely used, and if they fragment and degrade wildlife habitat, and if the BLM is committed to providing suitable habitat for fish, wildlife, and special status species of plants and animals, then it is logical and reasonable for the BLM to

bighorn habitat by decreasing the amount of new habitat fragmentation. Over 100,000 acres are in the No Surface Occupancy category solely for the protection of this species.

| | | | | |
|---|---|---|---|---|
| | | | close most of the "D roads" that are in crucial wildlife habitat. A management action of this type is a win-win situation: re creationists will not be disappointed because these routes are so little used, and wildlife habitat will be in a functioning condition and managed properly. However, if the roads/OHV routes are not closed and restored, wildlife habitat will continue to degrade and remain fragmented, and the ecosystem will continue disintegrate in the future. Is this the future vision of this Moab RMP? | |
| ECOS Consulting | 9 | 71 | Page 4-483, Analysis of Impacts on Wildlife, 4.3.19.18.2.1: It appears that the roads/OHV routes planned in all Alternatives of the Travel Management Plan will also have a serious impact on Pronghorn antelope habitat.  Causes of decline in pronghorn herds across the Southwest are numerous, but generally consistent.  Paramount to the persistence of any wildlife species is the presence of quality un-fragemented habitat. The direct, indirect, and cumulative impacts of the "D roads" in particular, must be analyzed for this species. | The Moab Field Office manages over 353,000 acres of Wilderness Study Area.  The routes in these WSAs have been closed to motorized travel in the Travel Plan accompanying the PRMP/FEIS. The WSAs provide large patches of unfragmented habitat within the planning areas.<br><br>Many miles of route in pronghorn habitat have been closed in the Travel Plan accompanying the PRMP/FEIS. This action has reduced pronhorn habitat fragmentation in the Moab BLM planning area. |
| ECOS Consulting | 9 | 72 | The primary legislation for the management of BLM lands is by the Federal Land Policy and Management Act (FLPMA, 43 U.S.C. §§ 1701-1785). FLPMA prescribes sustained-yield management principles (43 U.S.C. § 1702 (c)), which apply to an open-ended list of "renewable and nonrenewable resources," including fish and wildlife, recreation, timber, range, wilderness, mineral, watershed, and natural, scenic, scientific, and historical values.  Riparian areas are one of the few habitats where most of these values are found together. The act further directs BLM, in managing the public lands, "to take any action necessary to prevent unnecessary and undue degradation of the land" [43 USC §1732(b), FLPMA §302(b)].  This can easily be accomplished by closing riparian areas to resource destroying activities such as livestock grazing, OHV | The BLM adheres to all laws, regulations, policies, and Executive Orders pertaining to riparian areas.  There is nothing in these rules that require the BLM to entirely close all riparian areas to resource uses. |

use, and mining activities.

"Riparian/wetland habitats are fragile resources and are often among the first landscape features to reflect impacts from management activities. These habitats are used as indicators of overall land health and watershed condition. Some of the functions of a healthy riparian system include: filtering and purifying water as it moves through the riparian zone, reducing sediment loads and enhancing soil stability, reducing destructive energies associated with flood events, providing physical and thermal micro-climates in contrast to surrounding uplands, and contributing to ground water recharge and base flow" (BLM Riparian Area Management Policy, 1987).

In addition to those laws embedded in the very foundation of BLM as a public land management agency (Taylor Grazing Act, 1934, Federal Land Policy and Management Act 1976, and Public Rangelands Improvement Act, 1978), the premiere authority which provides for the most protection of riparian/wetland and associated resources is the Clean Water Act of 1977. In response to the Clean Water Act, two central Executive Orders (Wetland and Floodplain) were signed under Presidential authority to protect riparian/wetland and associated floodplain and wildlife values. Relevant regulations, policy, and guidance relative to management of riparian/wetland resources include:
*Executive Order (EO) 11988 (May 24, 1977), the Floodplain EO
*EO 11990 (May 24, 1977), the Wetlands EO
*EO 12088 (October 24, 1978), the Local Water Quality EO
*EO 12962 (1995), Fisheries and Aquatic Ecosystems EO
*EO 13186 (2001), EO in support of the Migratory Bird

Treaty Act of 1918
*Fundamentals of Rangeland Reform (1995), under 43 CFR 4180- Fundamentals of Rangeland Health and Guidelines for Grazing Administration (Standards and Guidelines)
*National Riparian Area Management Policy (NRAMP, 1987) Establishes standards and technical methods for riparian area assessment and inventory.
*National Cooperative Riparian Restoration Program (1996) Cooperative program between the BLM, USDA Forest Service, and NRCS" (BLM 2005).

Considering the abundance of policy, guidance, and regulation concerning the importance of maintaining healthy riparian habitat; and since it is estimated that only about 10% of the original extent of riparian area remains in the southwest; and since riparian areas cover only 1-2% of the Southwest landscape, and less than 1% of the Moab Planning Area; and since riparian areas are among the most productive and ecologically important habitats in the Western United States; the BLM must manage what little remains for the maximum good of the American public.  FLPMA prescribes sustained yield management principle, that the BLM is required to adhere to these principles, especially i regards to riparian area management.  To that end, it would be advantageous for the BLM to focus particular attention on preserving and restoring all the riparian areas within the Moab Planning Area.

If the riparian areas remain functioning and healthy, then adjoining uplands will likely follow. Thus, the BLM must manage the small percentage of riparian habitat that is in the Moab RMP project area, 0.75% of the total area, for the maximum benefit if renewable resources, and for the ecological benefit of surrounding areas. Renewable resources that the BLM should focus on

BLM_0011599

| | | | | |
|---|---|---|---|---|
| | | | with riparian areas include fish and wildlife, vegetation, watersheds, water quality, water quantity, and natural, scenic, and wilderness resources, as well as non-motorize recreation, scientific, and historical values. These uses provide a wide variety of experience and opportunities for the widest diversity of public users, and contribute to persevering the proper ecological functioning of these rare riparian areas.  Riparian areas have an extraordinary positive influence in adjacent uplands and thus, if in proper functioning conditions, will provide numerous additional benefits for all habitats. | |
| ECOS Consulting | 9 | 73 | Protect and Restore Specific Perennial and Intermittent Streams.<br>The following perennial streams should have the highest priority for protection and management of riparian and wetland resources in this Moab RMP. These areas should also have the highest priority for habitat preservation, conditions assessment, trend monitoring, and habitat enhancement:<br>1) Beaver Creek<br>2) Burkholder<br>3) Castle Creek<br>4) Coates Creek<br>5) Colorado River<br>6) Cottonwood (Books)<br>7) Cottonwood (Black R.)<br>8) Cowskin Canyon<br>9) Coyote Creek<br>10) Diamond Creek<br>11) Dolores Creek<br>12) Fisher Creek<br>13) Floy Creek<br>14) Granite Creek<br>15) Green River<br>16) Hatch Wash<br>17) Hatch Ranch Wash<br>18) Hell Roaring | The streams referred to by the commentor are proposed for management in the alternatives for the DRMP/EIS based on Utah Riparian Management Policy (Utah State Instruction Memorandum No. UT 2005-091). |

| | | | | |
|---|---|---|---|---|
| | | | 19) Hunter Creek<br>20) Kane Creek<br>21) La Sal Creek<br>22) Little Dolores<br>23) Little Water<br>24) Mill Creek<br>25) Mill Canyon (West of Arches NP)<br>26) Muleshoe Creek<br>27) Nash Wash<br>28) Negro Bill Creek<br>29) Onion Creek<br>30) Pack Creek<br>31) Poverty Creek<br>32) Professor Creek<br>33) Rattlesnake Creek<br>34) Rill Creek<br>35) Ryan Creek<br>36) Salt Wash<br>37) Seven Mile (north)<br>38) Spring Creek<br>39) Ten Mile<br>40) Thompson Wash<br>41) Three Mile Wash<br>42) Trough Spring Creek<br>43) Tusher (Books)<br>44) Westwater Creek<br>45) White Wash<br><br>Any areas with perennial or intermittent water, such as those listed above, must be managed for preservation because of their overall importance to humans, wildlife, fish, and sensitive and listed species. | |
| ECOS Consulting | 9 | 74 | Plan for Drought and Climate Change<br>Drought and Climate change has had and will have major negative ecological impacts on the upland, riparian and floodplain areas, especially areas where livestock grazing and OHV use is still allowed; thus, the | On pg. 251 of the DRMP/EIS, the BLM identifies adaptive drought management criteria to be implemented during times of drought. |

| | | | | |
|---|---|---|---|---|
| | | | DRMP must include drought-specific management for resource protection. "An issue of recent concern is the ongoing drought throughout the planning area. Since 1998, the planning area has suffered severe to extreme to exceptional drought conditions" (Utah Climate Center 2004). Drought has affected vegetation and soil moisture, with watershed health declining accordingly. Major decreases in the amount of ground cover, the vigor and diversity of plants, and soil moisture levels have been documented" (BLM 2005). Considering the current and projected drought problems the BLM must plan for the worst drought scenario as projected by the Utah Climate Center. This is extremely important for the new Moab RMP as it will dictate resource management for the next 10-20 years, and because drought will exacerbate and intensify any human caused impacts to the land, and in particular, to riparian habitat and wetlands. | |
| ECOS Consulting | 9 | 75 | Prohibit All OHV Routes in Floodplain and Riparian Areas.<br>The BLM must prohibit OHV routes and OHV use in floodplain and riparian habitat.  According to BLM's own assessment, "Road construction and maintenance in flood plains of perennial and intermittent stream systems is an important issue.  Impacts to the associated riparian zone are related. Streams with major road conflicts include Onion Creek, Kane Creek, Ten Mile Creek, Bartlett Wash, Tusher Wash, Cottonwood Creek, Diamond Creek, and Westwater Creek" (BLM 2005).  Due to the serious impacts of OHV routes and their influence I preventing many riparian areas from attaining Proper Functioning Condition, the BLM must not designate OHV routes in riparian and floodplain habitat. Most of the areas listed above were rated Functional at Risk with a downward trend a number of years ago. However the BLM has not followed up on much of its monitoring in order to look at | The Utah Riparian Management Policy (IM 2005-91) does not direct the BLM to close all existing routes within riparian areas. |

| | | | | |
|---|---|---|---|---|
| | | | any trends.  This can be easily remedied by simply closing the OHV routes. | |
| ECOS Consulting | 9 | 76 | Protect Areas with Wilderness Characteristics Exceptional protection and preservation efforts must be focused on riparian areas in "Non-WSA lands with Wilderness Characteristics", in "proposed wilderness" areas and in proposed "Wild and Scenic River" areas within the Moab Planning Area.  These areas make up such a small fraction of the Moab Planning Area, yet are extremely important in maintaining the ecological integrity of these specially designated lands and their adjacent habitats.<br><br>In particular, the BLM must protect the following riparian resources that are within "Non-WSA lands with Wilderness Characteristics" and in "proposed wilderness":<br>1) Beaver Creek<br>2) Cottonwood Canyon (Books) and tributaries<br>3) Cottonwood Canyon (Delores River)<br>4) Delores River<br>5) Diamond Canyon and tributaries<br>6) Fisher Creek<br>7) Granite Creek<br>8) Hatch Wash<br>9) Hell Roaring<br>10) Kane Creek<br>11) Kane Springs / Hunter<br>12) Kane Springs<br>13) Mill Creek and tributaries<br>14) Mineral Canyon<br>15) Nash Wash and tributaries<br>16) Negro Bill Creek<br>17) Onion Creek<br>18) Pritchett<br>19) Professor Creek<br>20) Rattlesnake Canyon and tributaries | See response to comment 124-53. |

| | | | | |
|---|---|---|---|---|
| | | | 21) Srping Canyon<br>22) Sections of the Colorado River<br>23) Sections of the Green River<br>24) Ten Mile Canyon<br>25) Tusher (Books)<br>26) White Wash<br>These areas are all know for their regional superlative scenic, geologic, ecological, wildlife, fish, historic, cultural and recreational values. | |
| ECOS Consulting | 9 | 77 | What are the projected number of oil and gas projects for the next 10-20 years? Where will they be located? How much potential riparian habitat will be affected? These questions must be addressed in detail for an effective cumulative analysis of impacts. | The number of wells projected for the alternatives in the DRMP/EIS is based on the Reaonable Foreseeable Development scenario for oil and gas in the Moab Field Office.  On pg. 4-4 of the DRMP/EIS, the number of wells is prorated based on restrictions included in the different alternatives.  The numbers are projected across broad areas available for development under the different alternatives and the exact locations can not be specified. Riparian areas are excluded from development under all alternatives. |
| ECOS Consulting | 9 | 78 | Heightened Management for Invasions of Exotic and Noxious Species.<br>Exotic species management must be a top priority for the BLM in riparian areas within the Moab Planning Area.  The Moab BLM offices states: "Exotic and noxious species (namely tamarisk, Russian olive, and Russian knapweed) are now common within most riparian/wetland ecosystems along major river ways, and involve all types [of] restoration methods. Possibly the most devastating aspect of invasive exotic species is the cumulative alteration to an unhealthy riparian ecosystem; however the individual functions or processes which exotic species can alter include:<br>*exotics often de-water riparian sites since they have deeper tap roots to out-compete natives for availability of water in acrid environments;<br>*tamarisk secrete slat and increase soil and water salinity, resulting in reduced seed establishment of | The BLM is aware of the impacts associated with noxious and exotic weeds.  There is an active program in place for monitoring and control of these  species.  This program involves adminstrative actions and policies that do not require land use planning decisions.  The direction for treating exotic and noxious species is found in the Vegetation Treatments Using Herbicides on BLM Lands in Seventeen Western States (2007) found in Appendix U of the DRMP/EIS. |

| | | | | |
|---|---|---|---|---|
| | | | native species, and reduced downstream water quality. This has severe economic impacts;<br>*exotics compete for sun, space in narrow available habitats;<br>*exotics reduce over bank flooding, decreasing establishment of nursery seed beds;<br>*exotics have large numbers of seeds and long seed establishment periods (very prolific in comparison ti native species);<br>*exotic communities have reduced bio diversity (significant decreases in numbers and types of associated biotic species including birds, bats, insects, amphibians ect );<br>*exotic communities promote entrenched systems with highly destructive flooding energies which remain un dissipated within deep channels, resulting in high bank loss, sedimentation, and salinity" (BLM 2005).The control of exotic species is most effective if the agents of introduction are eliminated or reduced. The two most important factors contributing to the introduction and spread of exotic weeds are livestock grazing and roads (including OHV routes). | |
| ECOS Consulting | 9 | 79 | Protection of vegetation, Biological crusts, and Water must be the Highest Priority.<br>Considering the extreme ecological importance of biological crusts, vegetation, and water in the arid environment of the Moab RMP Planning Area, we recommended that BLM's land management plans be centered around the maximum protection of these resouces.  The biological soil crusts and vegetation are what hold the ecosystem together, and the water is what drives all biological production processes.<br>The primary legislation for the management of BLM lands is by the Federal Land Policy and Management Act (FLPMA, 43 U.S.C. §§ 1701-1785). FLPMA prescribes sustained-yield management principles, which apply to an open-ended list of "renewable and | The BLM adheres to all laws, regulations, policies, and Executive Orders pertaining to vegetation, biological crusts, and water resources.  There is nothing in these rules that require the BLM to provide maximum protection of these resources.<br><br>The commentor has not provided any specific information on where the BLM has failed to follow the rules regarding vegetation, biological crusts, and water  in the land use planning process. |

| | | | | |
|---|---|---|---|---|
| | | | nonrenewable resources," including fish and wildlife, recreation, timber, range, wilderness, mineral, watershed, and natural, scenic, scientific, and historical values. The act further directs BLM, in managing the public lands, to take any action necessary to prevent unnecessary and undue degradation of the lands. (43 USC §1732(b)).<br>The DRMP should be guided by these mandates, because if a significant loss of either the biological soil crusts or the water resources should occur, then we would lose the capacity of the land to support all natural processes. We recommend that no activity or combination of activities be allowed that contribute to the destruction of either the soils or water resources over more than 10% of the total area of these resources within the Moab RMP Planning Area. | |
| ECOS Consulting | 9 | 80 | Provide a Wider range of Alternatives regarding Livestock grazing, Travel Management, and Mineral development activities.<br>It is imperative that the BLM develop meaningful alternative for the Moab DRMP so that, in the spirit of FLPMA, analysis and decisions can be made that are based on true alternates for multiple use and sustained yield, and the recovery and protection of the long-tern health of the land can proceed into the future.<br>BLM's mandate under the Federal Land Policy and Management Act of 1976 (FLPMA) is to manage the public lands for multiple use, while protecting the long-term health of the land. It appears that in developing the Moab RMP for the Moab Planning Area, the BLM is supporting livestock grazing, OHV recreation, and mineral development activities so blindly, that it is neither managing these lands for multiple use, nor is it protecting the land's long-term health, because it refuses to consider the well-documented and real devastating direct, indirect, and cumulative impacts of livestock grazing, OHV use, and mineral development | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM in developing the PRMP/FEIS can choose management from within the range of alternatives presented in the DRMP/EIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple use mandate.<br><br>See response to comment 124-7. |

on the soil, vegetation, and water resources.

The National Environmental Policy Act (NEPA) of 1969 specifically provides instruction to the BLM and other Federal agencies for developing a range of reasonable alternatives in environmental impact statements. NEPA assures that the BLM (and other federal agencies) will consider the impact of an action on the human environment before decisions are made and the action is taken. The NEPA process is intended to help public officials make better decisions based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the human environment. In this Moab DRMP, by not including a reasonable range of alternatives, and not dealing directly with the impacts of livestock grazing, OHV routes, and mineral development, the BLM is skirting the NEPA requirements that compel the agencies to concentrate on the significant issues that will seriously effect the protection, restoration, and enhancement of the human environment. Only by considering a full range of alternatives and the full direct, indirect, and cumulative impacts of these activities can the BLM make sound management decisions.

The DRMP fails to acknowledge and assess the enormous adverse direct, indirect, and cumulative impacts of livestock grazing and OHV routes on the soils, vegetarian, stream banks and channels, and the riparian areas. The BLM must include an in-depth analysis of the historic ecological damage and how it has affected conditions in the field today, and develop preferred future conditions based on the actual potential of these lands. We say the "actual" potential because for too long the BLM has based conditions on how they have been over the past 100 years, which is probably very different from the potential natural conditions, due primarily to the short- and long-term adverse effects of

| | | | intensive livestock grazing. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 81 | Protect Wildlife Habitat by precluding roads and OHV routes that effect and Fragment Wildlife Habitat. For many of the large mammals, there is no place within the entire Moab Planning Area that meets the required minimum habitat patch size. The BLM can remedy this and much of the projected 60-80% migratory bird habitat loss by closing and restoring many of the roads/OHV routes that are not necessary. It is recommended that the BLM analyze each and every "D Road" planned in the various Alternatives. Each of these "D Roads" should have a specific purpose that is stated supported in the Moab RMP, and must minimize impacts to wildlife, including migratory birds, and their habitat. If the proposed OHV routes do not minimize the impacts or if there is no overwhelming reason that the route should ne used by OHV's, the route should be closed and restored. Many of these wildlife habitat-destroying roads have no real purpose. Thus, the BLM should scale back its intended extent of "D Roads" in all the Alternatives, and rely on the "B roads" for access to most areas. The "B Roads" go practically everywhere in the Moab Planning Area, so closing "D Roads" should not inhibit access to most areas. This strategy would eliminate much of the wildlife habitat fragmentation and destruction that is currently occurring in the Moab Planning Area. | See response to comment 9-71. See response to comments 124-39, 124-40, 1025-14, and 1025-15. |
| Foundation for North American Wild Sheep | 11 | 1 | The UFNAWS is deeply concerned that the proposed RMP does NOT adequately protect the Rattlesnake and Range Creek Bighorn herds from potential domestic sheep disease tranmission. UFNAWS has been involved with the BLM in converting three domestic allotments to cattle in this areas, and there are still at least two more allotments east of Floy Wash that currently have domestic sheep on BLM lands. This herd continues to expland to the east, and this RMP is supposed to be a futuristic plan. | The DRMP/EIS would not allow the reconversion of cattle allotments to sheep in bighorn habitat. Type of livestock is an issue that is usually addressed at the allotment permit renewal level.  As these allotments are renewed, using Standards for Rangeland Health and Guidelines for Grazing Management, the class of livestock will be addressed. |

| Ride with Respect | 122 | 1 | The DRMP format frequently addresses the same points in different sections. Although our page references are not exhaustive, we request that changes be made consistent throughout the document.<br><br>The DRMP format frequently addresses the same points in different sections. Although our page references are not exhaustive, we request that changes be made consistent throughout the document.<br><br>Ride with Respect believes that the solution to managing motorized vehicle access is to provide diverse recreational opportunities with sufficient quantity and quality. The Draft plan could go further to this end. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
|---|---|---|---|---|
| Ride with Respect | 122 | 2 | Section 4.3.10 (page 4-192) mentions the National Visitor Use Monitoring Study for the Moab planning area asked visitors what their "main activity" while visiting Moab. This paragraph should make explicit that this study was not exclusive to BLM land, and probably includes substantial visitation to national parks and other areas. Beyond Table 4.67 (pg. 4-193), the entire study should be reproduced in the RMP, because of its significance for management and potential for misinterpretation. | The National Visitor Use Monitoring (NVUM) Study was conducted in the Moab Field Office in 2006 as a BLM pilot study by the U.S. National Forest Service. The study was, in actuality, exclusive to BLM visitation.<br><br>See also response to Comment 124-2.<br><br>The study is in draft form and for this reason it has not been included in the DRMP/EIS in its entirety. A draft of the study is currently available from the Moab Field Office. When the study is made final, it will be available from the Moab Field Office and will be posted on the U.S. Forest Service website. |
| Ride with Respect | 122 | 3 | Section 3.11.1.3 (page 3-80) estimates the relatively popularity of recreational uses in the Moab Field Office as of 2003. Since then, OHV riding has increased dramatically. So OHV riding should be categorized as "high use," at least on par with nature study. Also, the table should specify that these estimates are not based on empirical research.<br><br>Appendix F should acknowledge that recreation area visitation is estimated without activity-specific | The BLM stands by its estimate that ATVing and dirt biking are in the "medium use" category. Observation, traffic counter data and preliminary National Visitor Use Monitoring (NVUM) Study data all support the fact that the activities listed in the "high use" category exceed ATV and dirt bike riding in the Moab Field Office. While the commentor provides no data to show that OHV riding has increased dramatically, the actual issue is whether or not ATV and dirt bike activity levels are "high" or "medium". |

| | | | | |
|---|---|---|---|---|
| | | | monitoring data. That said, the best guess for Dee Pass (page F-7) is that current OHV use levels are light to heavy, not "light to moderate." This is also a more realistic use-level estimate for Utah Rims (page F-15). | The table to which the commentor refers has a note which clearly indicates that these are estimates by professional staff.  The empirical data that are available to the BLM (traffic counter and NVUM data) support these estimates.

The BLM makes no assertion that recreation activity levels are based on actual monitoring data.  Traffic counter data and professional estimates by field staff were used to estimate use levels.  On a year round basis, and throughout the week (i.e., not just on Saturdays), use levels in Dee Pass and in the Utah Rims area are light to moderate.  The words "light" and "moderate" are relative, and the implicit comparison is to activity levels in areas nearer to Moab. |
| Ride with Respect | 122 | 4 | Section 4.3.10 generalizes the interests of recreationists based on their types of travel.  BLM should dissect motorized use more fully.  Motorcyclists prefer singletrack trails, ATV riders prefer ATV trails and four wheeling drivers prefer doubletrack more than improved roads.  Converting roads to singletrack rarely satisfies two-wheeled trail users.  Pg. 2-49 should be changed to read that singletrack would be created "in part" by converting existing inventoried routes not designated for motorized travel.

Trials motorcyclists depend on small unrestricted areas.  The National Management Strategy for Motorized OHV Use on Public Lands states that the BLM recognizes designated OHV recreation sites play a vital role in satisfying a portion of the recreation experience for OHV enthusiasts.  The DRMP does not provide enough recreation sites for motorcycle trials and rock crawling. | The BLM has distinguished singletrack motorized routes from four wheel drive full sized vehicle routes in its travel plan formulation.  During the scoping period, the public was asked to provide input on the inventory of motorized routes in the Moab Field Office.  If these routes were verified by the BLM, they were considered for designation in one or more alternatives of the Travel Plan.  While singletrack and four wheel drive routes were provided to the BLM during this period, no ATV routes were submitted.  ATV travel in the Moab planning area occurs on full sized vehicle routes.  Subsequent to the Record of Decision, the BLM could consider new travel proposals (including singletrack routes) on a case by case basis, subject to NEPA review.  Pg. 2-49 offers the possibility that singletrack could be created by converting old routes to singletrack, with less new surface disturbance than would be required by a new route.  The statement is not intended to preclude new route development.

The BLM received no input during the scoping period regarding the public's desire for a trials motorcycle area.  In Alt C, there are 1,866 acres of lands open to cross country travel.  This acreage is available to all types of |

| | | | | vehicles, including trials motorcycles. |
|---|---|---|---|---|
| Ride with Respect | 122 | 5 | Section 3.11.2.6 (page 3-85&6&7) addresses use conflict and displacement, but not adequately so. It crudely lists a few circumstances the agency believes to exist. The lists are arbitrary, and should be removed. For example, does Monitor and Merrimac really have unique conditions that make "conflicts between motorcycle users and mountain bikers" any more common than, say "ATV users and mountain bikers"?  If not removed, the lists should at least disclose that its conflict assessment is based on personal experience, not empirical research or monitoring of any kind. Further they should include a wider array of examples to represent the scope of conflicts, including the following:<br><br>Dee Pass - conflicts between motorcyclists and ATV riders<br>Utah Rims - conflicts between motorcyclists and ATV riders<br>Hidden Valley - conflicts between bicyclists and hikers<br>Crystal Geyser - impacts of oil and gas industry on OHV trails<br>Thompson Trail - impacts of ranching industry on OHV trails<br>Sand Flats - impacts of BLM law enforcement  on bicyclists<br>Sand Flats - impacts of road improvement on OHV route connectivity | The list of recreation conflicts in Section 3.11.2.6 of the DRMP/EIS is based upon professional judgement of Moab Field Office BLM staff.  The areas listed are those that have come to the attention of BLM staff due to reports of conflicts by users themselves.  The sentence on pg. 3-86 of the DRMP/EIS has been changed to read: "specific areas in which BLM staff have had reports of user conflict and displacement include…"<br><br>The BLM agrees that user conflict can occur between other groups and in other areas.  The list of user conflicts on p.3-86 is intended to be illustrative of the fact that recreationists in the Moab planning area have conflicts with one another.  The three areas of user conflict mentioned by the commentor (Dee Pass, Utah Rims and Hidden Valley) have not been reported to BLM staff.  The three areas of resource conflict mentioned by the commentor do not follow the pattern of the listed resource conflicts on pg. 3-86 of the DRMP/EIS.  Those resource conflicts state where recreation use impacts other resources.  The commentor seeks to address the impacts of other resources on recreation use. |
| Ride with Respect | 122 | 6 | (Please refer to letter which quoted and attached: Recreational Trail Conflict:  Achieving Equity Through Diversity (Koontz 2005).  Applied to the Moab RMP, the above research could broaden and deepen its treatment of use conflicts. Ride with Respect supports many mitigation measures that can happen during implementation.  We are pleased to read Table 2.1 Recreation (page 2-17), which plans to provide visitor | Implementation actions are issues that are addressed through administrative actions or policy.  They do not require a land use planning decision (see pg. 1-11 of the DRMP/EIS).<br><br>On pg. G-29 of the DRMP/EIS the BLM recognizes the actions that are necessary for implementation of the Travel Plan. |

| | | | | |
|---|---|---|---|---|
| | | | information and outreach programs that foster a land ethic. | |
| Ride with Respect | 122 | 7 | For planning, we suggest highlighting one more critical item. Noise is the most common complaint against OHVs (American Motorcyclist Association 2005). Thus for all vehicles across the entire field office we recommend implementing and enforcing and 96-decibel limit based on the "20-inch" test (SAE J1287). | Specific decibel limitations on motorized vehicles are under the jurisdiction of the Environmental Protection Agency, and a matter of State Law. As stated in 43 CFR 8343.1(b): "No off-road vehicle equipped with a muffler cutout bypass, or similar device, or producing excessive noise exceeding Environmental Protection Agency standards, when established, may be operated on public lands." |
| Ride with Respect | 122 | 8 | Section 3.11.2.6 (pages 3-85&6) should insert the following paragraph: "Use conflicts can sometimes be resolved without separating uses. Managers can try a variety of mitigation techniques. If unsuccessful, displacement will occur in one of two ways. No restrictions will displace the less conspicuous use. Conversely, restrictions placed on the more conspicuous use will obviously displace that activity. Where mitigation fails, providing a quality alternative for one or both uses is key to resolving conflict." " | The DRMP/EIS does not seek to completely separate recreation uses. Focus areas have been established within Special Recreation Management Areas so that the BLM can emphasize opportunities for specific types of recreation. However, other uses are not precluded that are consistent with the Travel Plan. The majority of the planning area is not within a focus area, and there is no attempt to separate recreation uses in these areas. |
| Ride with Respect | 122 | 9 | Without providing alternatives, the supply for one or both uses will shrink, which leads to crowding. Crowding only intensifies use conflicts (Moore 1994). So the final RMP should also insert the following paragraph: "Where use conflict occurs, the BLM will take steps to mitigate the conflict and, if necessary, provide alternative opportunities for one or both uses." | The BLM attempts to provide recreation opportunities for many and diverse types of recreation. However, the Moab planning area has finite recreation resources and for the BLM to commit to providing alternative opportunities for all types of potential recreation uses is not realistic. Therefore a balanced multiple use approach, as required by FLMPA, is used to provide recreation opportunities. |
| Ride with Respect | 122 | 10 | Ride with Respect believes the draft travel plan falls short of providing adequate recreational opportunities, especially on mountain bike, motorcycle, and ATV trails. It is sensible to limit motorized travel to designated routes, plus inventoried roads for mechanized travel. Such an extensive restriction requires careful consideration of its impacts. Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on county inventories. They mention that | The BLM's travel plan formulation (see Appendix G of the DRMP/EIS) was based on a thorough inventory of routes for full sized, two wheeled vehicles, and mountain bikes. During the scoping period (June 4, 2003 to January 31, 2004), the BLM requested that the public submit routes for consideration for inclusion in the Travel Plan accompanying the DRMP/EIS. The BLM received submissions on dirt bike and mountain bike routes. No ATV route submissions were received. All routes |

| | | | | |
|---|---|---|---|---|
| | | | "motorcycle routes" exist around White Wash.  The document should specify that this includes motorcycle singletrack and ATV trails.  Additionally, off-highway vehicle trails exist in high concentration from "Utah Rims" to Cottonwood Wash. Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail.  Mountain bike trails also exist beyond those mapped in Alternative D. | received during the scoping period were verified by BLM staff on the ground.  Those that were verified as "existing" routes were considered for inclusion in one or more of the alternatives for the Travel Plan.  As described in Appendix G, the BLM's Travel Plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.  Those motorcycle and mountain bike routes that did not pose undue resource conflicts are proposed for designation in one or more alternatives of the DRMP/EIS.

Chapter 3 of the DRMP/EIS does not attempt to provide a complete description of every inventoried route.  Each inventoried route (around 33,000) was assigned a number, and the resource conflicts associated with that route are listed in the GIS data base accompanying the DRMP/EIS .  This information is available by request.

In addition, Chapter 4 of the DRMP/EIS details the impacts of travel routes on natural and cultural resources. |
| Ride with Respect | 122 | 11 | Appendix G (page G-8) lists members of the Travel Plan Interdisciplinary Team, which includes no avid ATV or motorcycle rider.  This lack of representation limits the ability to identify OHV opportunities and assess their value to that segment of visitors.  To compensate, the agency should formally involve OHV leaders in developing the final RMP. | The function of the interdisciplinary team for travel management was to weigh purpose and need for the route against resource conflicts.  The team included representatives from recreation, who stated the purpose and need for the motorcycle trails.  Of the 129 miles of inventoried and verified single track, 123 miles were included in the preferred alternative (Alt C).  The value of OHV opportunities were fully represented in the interdisciplinary team.

Representatives of various interest groups (wilderness, OHV, utility, oil and gas, mining) do not qualify for cooperating agency status and are not formally included in the development of the PRMP/FEIS.  The public, which includes OHV leaders, is involved  throughout the land |

BLM_0011613

| | | | | |
|---|---|---|---|---|
| | | | | use planning process (see Chapter 5 of the DRMP/EIS). Comments from the public and user groups will be considered in development of the PRMP/EIS. |
| Ride with Respect | 122 | 12 | Appendix G (pages 12&13) also lists the criteria for determining routes for the travel plan.  Absent from this list is route connectivity, route or area uniqueness, and any kind of diversity (such as encounter-types).  To form the final travel plan, the agency should consider these criteria.

Motorcyclists and ATV riders were not provided equal status in the Grand County travel planning process. | One of the criteria listed on pg. G-12 and G-13 for purpose and need for routes  is "recreation opportunities and experiences".  This general category includes the criteria mentioned by the commentator.

Grand County was a cooperator in the development of the DRMP/EIS.  How Grand County chose to structure its travel planning in preparation for its participation in the DRMP/EIS process is a matter for the county to consider. |
| Ride with Respect | 122 | 13 | Since 2005, Grand County endorsed a proposal by Ride with Respect to designate existing motorcycle singletrack known as Thompson Trail and Copper Ridge Motorcycle Loop.  Despite county support, the BLM included virtually none of  this proposal in its preferred Alternative. | Grand County was a full cooperator in the travel planning process.  County representatives endorsed the Copper Ridge Area as a Mountain Bike Focus Area (called Klondike Bluffs Mountain Bike Focus Area).  The county negotiated with representatives of that community to convert several routes in the area to non-motorized use.

The Thompson Trail as proposed by Ride with Respect is contained in Alt D (pg. 2-49 of the DRMP/EIS), although subsequent NEPA analysis would be required.  A modification to the Thompson Trail in Alt C was developed by BLM staff at the request of Grand County. This route is an alternative to the one proposed in Alt D. It presents lessened resource conflicts. |
| Ride with Respect | 122 | 14 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried.  The only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as an inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands.

Short of performing an inventory of trails, Moab BLM | See response to comment 122-10.

A route inventory was requested from the public during scoping.  Trail Mix provided their inventory of mountain bike trails to the BLM during scoping.

The Federal Land Policy and Management Act does not require complete and exhaustive inventories prior to land use planning efforts, but rather directs the BLM to plan with existing inventories. |

BLM_0011614

| | | | | |
|---|---|---|---|---|
| | | | plans should at least acknowledge that they cannot fully measure the impacts to bicycling, motorcycling, and ATV riding in the absence of a trail inventory. To compensate for this, the agency should consider designating trail data provided during the planning process. Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preference to SRMAs, and especially to the appropriate focus areas. Trail expansion would avoid pitting recreationists against one another on a rigid system of roads. By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restricting them to smaller vehicles. | There is a provision in the DRMP/EIS (pg. 2-48) for adding new routes to the Travel Plan once it is adopted. This will be accomplished through site specific NEPA analysis.

Unrestricted travel in wash bottoms results in resource impacts as judged by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors.  In addition, observations indicate that some users do not remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel. |
| Ride with Respect | 122 | 15 | The Moab field office developed criteria for inventorying OHV trails when Clifton Koontz mapped White Wash OHV trails in 2001 and 2002 (refer to "OHV trail inventory criteria" on CD).  It defined a "trail" as "any route that (1) is a continuous line void of vegetation and (2) can be followed by anyone with (i) a trained eye for OHV routes but (ii) no prior knowledge of the particular route in consideration.  The 'trained eye' accounts for natural forces that may temporarily conceal portions of a route, such as water in active washes, wind over sand flats, free-thaw cycles of clay-rich soil, hoof prints on heavily grazed areas, as well as the inability of bare rock to record the passage of vehicles."

The enclosed folder "agency definitions of existing trails" represent alternative definitions.  By any of these definitions, many OHV trails exist in the Moab field office beyond the data from BLM, RwR, or any other known source.  RwR's data is the best available information. All of the routes we submit currently exist, | Clifton Koontz was a short term volunteer for the BLM. His criteria for inventorying routes were never adopted by the BLM.

The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Ride with Respect, and verified on the ground by BLM staff (see pgs. G-15 through G-21).  On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes.  The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis".  New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area to OHV use.  However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |

and new data of existing routes includes photographs to aid your staff in verification. RwR expects that you to contact us before determining that any of these routes are not legal, existing travel ways. We urge you to discuss any other concerns you have about the submitted routes and areas. Feel free to request any further information or data. Please count all the trails RwR submits, including ones that we propose for closure, in the OHV trail mileage that your plan reports.

The draft plan insinuates that travel is currently limited to existing roads and designated trails. Sections 4.3.16.1 and 4.3.16.2.6 (page 4-405 & 4-408 through 411) intend to measure the impact of action alternatives on travel management. As is, they fail to document changes in trail access. In particular, Table 4.126 indicates that in most of the field office travel is completely "open" or limited to existing roads and trails." The table appropriately reports the mileage of Class D county roads, which accurately represent the mileage of existing roads. However, for trails the table reports "Designated Motorcycle Routes" as 0 miles.

Obviously the RMP should list the mileage of existing trails, just as it has done for existing roads. To do so, the table should consider all data submitted to BLM by November 30, 2007. The agency should include the mileage separately for routes submitted as ATV, motorcycle, or bicycle trails. Mileage should only be discarded if a particular route is (1) located in (a) an area limited to designated routes, (b) a closed area, © a WSA or is (2) proven to be (a) nonexistent, (b) nonexistent when the area became restricted to existing routes, or © virtually never used by the stated vehicle-type.

Since no trail inventory was performed in 95% of the

At present, there are no motorcycle routes designated for single track motorcycle use by the BLM in the Moab planning area. Thus, Table 4.126 lists 0 miles of designated motorcycle routes. The BLM acknowledges that many user-made motorcycle routes exist in the planning area. On pg. 2-48, 129 miles of inventoried motorcycle routes are listed in Alt A. Table 4.126 is intended to show a comparison of OHV acreage designations by alternative. The miles of existing motorcycle route in the No Action alternative is not listed in this table. The table does show the miles of designated motorcycle routes that would be identified in Alts C and D.

Section 202(c)(4) of the Federal Land Policy and Management Act states that the BLM shall "rely to the extent that it is available on the inventory of the public lands". The Moab Field Office in formulating the alternatives for the Travel Plan relied on the best available data at the time of alternative formulation. This included route data that the BLM requested from the public during the scoping period. The complex task of formulating Travel Plan alternatives required individual analysis and verification of over 33,000 route segments. Within the DRMP/EIS (pg. 2-48) a process has been established to consider the addition of new routes to the Travel Plan. Route additions would not require a land use plan amendment but only site specific NEPA analysis.

The new routes proposed by the commentor would require extensive amounts of time for field verification and analysis of purpose and need and resource conflicts. At this stage in the land use planning process, this amount of time cannot be expended if the land use plan is to be completed in a timely manner.

BLM_0011616

field office, this tally would not even approximate the total trail mileage. Therefore, Table 4.126 should list minimum mileage, such as 50+ miles bicycle trail, 500+ miles motorcycle trail, and 50+ miles ATV trail.  In lieu of an extensive trail inventory comparable to Grand County's road inventory, this is the only accurate way to report the planning baseline, and thus measure the impacts of each action alternative.

Table 2.1 Travel Plan (2-48) suggests that Alternative A limits travel to "129 miles of inventoried motorized single-track."  Switching from "limited to existing" to "limited to inventoried" requires that a complete inventory be performed for an area.   Using RwR's data, you have a legitimate inventory of Dee Pass and Utah Rims Trail Systems.  For the area that is contained by these trail systems, you could justifiably limit travel to inventoried trails.  Elsewhere you can only limit travel to inventoried trails after thoroughly inventorying the area for OHV and bicycle trails.

Considering new data on old trails is critical to making an informed decision. Existing trails that are newly submitted deserve the same designation as older data. That said, if it's impossible at this time, then new data should be given "provisional designation."

RwR apologizes for the complexity of this presentation. To summarize, proper travel planning requires a route inventory. Otherwise, special consideration should be given to utilizing the best available information, regardless of its timing. Structural limitations of the BLM planning process inevitably lead to a draft plan which provides a sufficient system of roads, but a scarcity of non-road trails for an array of uses.  Please work with trail users to finalize a plan which everyone can "live with."

| Ride with Respect | 122 | 16 | The Travel Plan appendix (page G-27) lists the considerations for travel plan amendment.  The criteria should include "provide ample quantity and quality of diverse recreational opportunities." | The Travel Plan Appendix on pg. G-27 lists factors that would be considered for inclusion of new routes.  One of the factors is "routes suitable for different categories of OHVs including dirt bikes, ATVs, dune buggies, and four wheel drive touring vehicles."  This factor provides for potential diverse recreational opportunities. |
| --- | --- | --- | --- | --- |
| Ride with Respect | 122 | 17 | Table 2.1 Travel Plan (2-48) states "Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects, the authorized officer shall close or restrict such areas."  The term off-road vehicles should be substituted by "a particular type of use" to broaden management's ability to stop degradation from any activity. | The sentence referred to by the commentor is contained in the Federal Regulations at 43 CFR 8341.2.  The BLM cannot alter the language of these Federal regulations. |
| Ride with Respect | 122 | 18 | Table 2.1 Travel Plan (2-48) should add the following statement:  "Before prohibiting use, the BLM will attempt to mitigate problems through an appropriate combination of visitor education, directional signage, trail maintenance (including tread stabilization), law enforcement, or other methods of adaptive management." | The actions suggested by the commentor do not require a specific land use planning decision.<br><br>These actions are specifically addressed in Chapter 1 of the DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Ride with Respect | 122 | 19 | Table 2.1 Travel Plan (2-48) should add another statement:  "BLM will invite individuals, organizations, and agencies to assist in land management projects and programs, such as route and facility maintenance, visitor education, and monitoring." | The BLM can utilize the resources of outside entities without a land use planning decision.  This is specifically addressed in Chapter 1 of the DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Ride with Respect | 122 | 20 | Section 3.11.2.7.1 states "The ability of OHV users to penetrate the backcountry where patrols are difficult may lead to secondary impacts to cultural resources from increased vandalism and theft."  If by "penetrate" the BLM means travel on designated routes, the term should be replaced by "reach." If "penetrate" means travel off-route, then the sentence should begin "The physical ability of OHV users to travel off-route into the backcountry where..." Also, the following statement should be inserted:  "Poaching cultural resources is | The statement in Section 3.11.2.7.1 that the commentor refers to does not distinguish between on and off road travel by OHV users.  It mans that the ability to access the backcountry puts cultural resources at risk.  This is true whether the travel is on or off road.<br><br>See also response to comment 123-48. |

| | | | | |
|---|---|---|---|---|
| | | | illegal.  Therefore individuals who poach artifacts are constrained by the physical terrain more so than the legality of vehicular travel." | |
| Ride with Respect | 122 | 21 | Table 2.1 Wilderness & Travel Management (page 2-43 & 2-48) refer to WSA ways when stating that "If Congress designates the area as Wilderness, the routes will be closed."  This sentence should be removed.  Congress has final authority, so if they want to close ways, they can easily do so.  However, prohibiting the option of cherry stems could prevent a Wilderness bill from passing. Furthermore, making cherry stem truncation a necessity pits Wilderness designation against those who utilize the current ways.  Therefore, the agency should not constrain its options on this issue. | The sentence has been changed to read "If Congress designates the area as Wilderness, the routes could be closed."  This sentence means that the will of Congress would override any route designation made in the DRMP/EIS.  Congress does have the final authority, and close any route that it chooses. |
| Ride with Respect | 122 | 22 | Alternative C would require Special Recreation Permits for groups with "25 vehicles."  The document ought to explicitly exclude counting more than one vehicle per person, since he/she can only use one vehicle at a time.  For example, without such a stipulation, the 25-vehicle rule would require a permit for a group of 9 friends who convene in Moab, each with a pickup truck carrying a motorcycle and bicycle. | The 25 vehicle rule is intended to mean the primary vehicle driven by the participant.  The phrase "one driver/vehicle" has been added to the Special Recreation Permit decisions in the PRMP/FEIS for clarification. |
| Ride with Respect | 122 | 23 | Route terminology throughout the documents is carelessly applied.  The terms "route," "road," and "trail" should be switched in many sentences.  These terms have very different meanings. Routes include roads and trails.  Roads are open to full-size vehicles.  Trails are restricted to ATV, motorcycle, bicycle, horse, or foot use.  Thus it's imperative to use proper terminology.  The DRMP/EIS states on pg. 2-48 that "only designated roads are available for motorized commercial and organized group use."  Further, the document periodically seems to treat the terms "OHV travel," "off-route travel," and "off-road | The term "route" is preferred by the BLM and has been used throughout the document.  In many instances, the use of terms "road"  and "trail" are in reference to regulations or policies that utilize the specific term.  The BLM will carefully review the text of the PRMP/FEIS to clarify any misuse of terms.  Route maps will be labeled as to the type of vehicles that are allowed.  For example, single track motorcycle routes will be labeled as open only to two-wheeled vehicles.  The words "and managed open areas" have been added to the appropriate section of the PRMP/FEIS to clarify that permittees would be allowed in these areas. |

| | | | travel" interchangeably.  Again these terms have distinct meaning that should be carefully chosen.  OHV travel refers to any travel by OHVs, on or off of designated routes.  Off-route travel specifically means travel off routes, usually by mechanized vehicles. Off-road travel refers to travel off roads, but can mean travel off or on designated routes.  Therefore, "off-road travel" is a nearly useless terms that should be avoided entirely.

The current treatment of these terms warrants an opportunity for stakeholders to review the final RMP for accuracy before it is implemented.  RwR encourages the BLM to solicit proof-reading from various recreation and industry representatives.

Here are a few examples of terminology misuse.  Table 2.1 Travel Management (2-48) states "BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads."  The term road should be replaced by route in both instances.  Table 2.1 Travel Management (2-48) also states "Only designated roads are available for motorized commercial and organized group use."  The term road should be replaced by route.  Furthermore, it should read "designated routes and areas."  Otherwise, a commercial tour operator would be prohibited from crossing White Wash Sand Dunes, since no route is designated.

Here are a few of the instances obscuring OHV travel from off-route travel.  Section 3.14.2.2.1 (page 3-119) identifies "off-road travel" as a surface-disturbing activity. It should read "off-route travel." Section | UTVs are wider than 50 inches and would not be allowed on routes specifically restricted to those vehicles under 50 inches in width. |

BLM_0011620

| | | | | |
|---|---|---|---|---|
| | | | 3.14.2.2.2 identifies "OHVs" as contributing to accelerated erosion.  Again the proper term is "off-route travel," since travel off-routes by any means could accelerate erosion.  Further examples that should be corrected include 3.15.1.2.3.1.4 (page 3-16) which states that "prairie dog habitat is fragile and very sensitive to damage from OHV use" but should read "damage from off-route travel." Sections 3.17.2.3, 3.17.2.4, 3.17.2.6 and 3.17.2.7 (pages 3-158&9) all should refer to damage from "off-route travel" instead of "OHVs."<br><br>Route terminology can help prepare for emerging activities.  The OHV industry predicts that side-by-side or Utility Terrain Vehicles (UTVs) will become very popular in the coming years.  These machines can be used appropriately on public lands.  However, they pose a concern about trail widening, as do all other vehicles.  UTVs are typically manufactured to be 55-inches wide, and are commonly modified to be 65-inches. Thus the Moab RMP should specifically regarded UTVs as full-size vehicles, and routes should be restricted by vehicle-width (ie "50-inch" trail, not "ATV" trail). | |
| Ride with Respect | 122 | 24 | Miscellaneous impacts of action alternatives should be revised.  In suggesting revisions to Chapter 4, RwR is not necessarily supporting the actions. Rather we are trying to improve the accuracy of reports.  Section 4.3.10.2.10.6 (page 4-220) should acknowledge that Labyrinth Rims in Alternative C would negatively impact motorcycling to the extent that it prohibits future use of Bartlett Slickrock by motorcycle. | Alt C of the DRMP/EIS provides an open area for bicycles only in the Bartlett Slickrock Freeride Focus area (166 acres) of the Labyrinth Rims Special Recreation Management Area.  The general negative impacts of restricting cross country travel to motorized users is stated in Chapter 4 on pg. 4-409.  The impacts of this restriction on motorcycling opportunities have been added to the text of the PRMP/FEIS. |
| Ride with Respect | 122 | 25 | Section 4.3.10.2.10.8 (page 4-220) claims Alternative B would be safer for bicyclists than Alternative C by closing Slickrock Trail to motorcyclists.  This point should be removed, since bicycle-bicycle and motorcycle-motorcycle collisions are more likely than | The consequences of a motorcycle-bicycle collision are greater than that of a bicycle-bicycle collision because motorcycles are heavier and faster than bicycles.  The BLM stands by its statement of increased safety for bicyclists by removing motorcycles from the Slickrock |

| | | | | |
|---|---|---|---|---|
| | | | bicycle-motorcycle ones. Bicyclists can hear motorcyclists approaching, which gives them reaction time that is critical to preventing accidents. | Trail. |
| Ride with Respect | 122 | 26 | Section 4.3.10.2.10.12 (pages 4-223&4) alleges that the Moab ERMA benefits all recreationists because Alternative C would provide more recreational opportunities.  Instead the section should state "All action alternatives significantly reduce motorized access by roads and trails, thus negatively impacting this form of recreation."   Likewise Section 4.3.10.2.12 (page 4-229) should state that soil decisions substantially reduce vehicular access to certain environments, including high-saline soils, and both riparian and non-riparian washes. | The negative impacts to motorized users of restricting travel to designated routes is disclosed in Chapter 4 on pg. 4-409 and 4-410 of the DRMP/EIS under Travel Management rather than under Recreation.<br><br>Text has been added to Chapter 4 of the PRMP/EIS acknowledging that soils and riparian decisions limit motorized users. The decision in soils has been changed so that soils are a limiting factor, rather than a factor that absolutely forbids new routes in saline soils. |
| Ride with Respect | 122 | 27 | Appendix G (page G-24) asserts that "the primary watershed concern identified in the RMP (1985) was the prevention and reduction of salinity and sedimentation from public lands.  Unless trail-based recreation is documented to significantly increase salt transport, remove the statement "No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan accompanying this RMP" (page 2-32).  If graded roads are the only types of route in concern, retain the above statement by replacing "OHV routes" with "graded roads.<br><br>Appendix G (page 24) also claims "Compaction of soils in these washes can lead to accelerated flood velocity, further contributing to erosion and sedimentary transfer." This seems counterintuitive. OHVs tend to loosen sediment in sand washes, not compact it. Even if some compaction occurred, how much could this effect large-scale flooding events? Please provide documentation of increased erosion resulting from OHV travel in washes, or remove the statement. | The BLM assembled an interdisciplinary (ID) team of resource specialists to assess the impacts of routes upon natural resources, including soils.  The impacts to soils of new routes, including those in washes, was deemed sufficient by the ID team to lead to the plan decision regarding no new routes in sensitive soils. |
| Ride with Respect | 122 | 28 | Broadly speaking, the road plan provides sufficient road-based opportunities.  So the final plan should add | All the alternatives for the Travel Plan provide a large number of routes which may be utilized by all types of |

| | | | | |
|---|---|---|---|---|
| | | | and subtract some roads based on Alternative C.  More of the existing roads surrounding Interstate 70 should be designated for long-distance touring.  Compared to the road plan, motorized and mechanized trail designations are scarce.  So the final plan should designate trails in Alternative D, plus others submitted by recreationists during this entire planning process.  For all of the recreation conflict that the draft RMP purports, the travel plan in Alternative C does little to expand non-motorized opportunities.  Several areas could provide substantial primitive opportunities by closing a few less-valuable roads.  Homogeneity of the road plan would intensify conflicts and hurt all user groups in the long term.  So the final plan should incorporate a subset of "wilderness character" or similar primitive designation from Alternative B. | motorized and mechanized recreationists.  In Alt C, 282 miles of route have been provided specifically for motorcycles and 22 miles of route have been provided specifically for bicycles.<br><br>Alt C of the Travel Plan provides a sufficient number of routes n the area surrounding Interstate 70 which could be utilized for  long-distance touring.<br><br>Alt D of the Travel Plan includes 3,855 miles of motorized routes and 345 miles of single track.  These routes include those submitted by recreationists<br><br>The BLM developed a variety of Special Recreation Management Areas (SRMAs), as well as a variety of Focus Areas to meet a variety of recreational needs including those for non-motorized users.  This includes designation of hiking Focus Areas and non-WSA lands with wilderness characteristics.  In addition Wilderness Study Areas (353,000 acres) are available for non-motorized recreation across all alternatives in the DRMP/EIS. |
| Ride with Respect | 122 | 29 | In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its singletrack character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado.  The Green River Gap and Browns Wash tie Colorado to the town of Green River. These singletracks should be preserved, along with adjacent doubletracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | The Thompson Trail as proposed by the commentor is included in Alt D of the DRMP/EIS, although additional NEPA documentation would be required prior to designation because the trail was not verified on the ground by the BLM.  The proposed Copper Ridge Motorcycle Trail was also not verified on the ground by the BLM;  it was not included in one of the alternatives in the same fashion as the Thompson Trail because of the inherent recreation conflict with the non-motorized focus area proposed for the area (Klondike Bluffs Mountain Bike Focus Area).<br><br>The Green River Gap and Browns Wash trails were not proposed to the BLM during the scoping period for the land use planning process. |

| | | | | The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes.  Future travel planning for new routes could be considered based on site specific NEPA analysis. |
|---|---|---|---|---|
| Ride with Respect | 122 | 30 | Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. Including Table 2.1 (pages 2-18&29) the RMP should pledge to construct a Kokopelli Singletrack and mark a Kokopelli Doubletrack that would roughly parallel one another.  Through Utah Rims, the Singletrack should be open to motorcycles.  Through Yellowjacket, the Singletrack should actually be an ATV trail.  Everywhere else, the Singletrack should be non-motorized.  The Doubletrack would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | The alternatives to the Travel Plan in the DRMP/EIS provide a reasonable range of routes for motorized use.  Routes included in the alternatives for the Travel consisted solely of routes that already existed on the ground.  The Travel Plan decisions could not include the myriad of possibilities for future new routes.  Following completion of the Moab RMP, new routes could be considered for inclusion into the Travel Plan based on site site specific NEPA analysis.\n\nSee also response to comment 122-15. |
| Ride with Respect | 122 | 31 | Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bicycle trails in Fruita, a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | There is essentially no recognized bicycle use in this portion of the Bookcliffs.  Therefore, the BLM did not see any need to consider this area for a mountain bike Focus Area.  The BLM does not consider this area as fulfilling a mountain bike recreation niche. |
| Ride with Respect | 122 | 32 | RwR generally supports establishment of Labyrinth Rims SRMA in Alternative C. However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the powerlines. The White Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D (northward to Ruby Ranch Road and southward toward Red Wash Road).  Fee programs should be determined with public involvement through a Resource Advisory Council (page 2-25) .  Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such.  The Dead | Expansion of the Dee Pass Motorized Trail Focus Area is not necessary to accommodate the motorized use currently taking place around the White Wash sand dunes.\n\nThe White Wash Sand Dunes Open Area has been expanded to the west to accommodate the camping that occurs between the Ruby Ranch Road and the dunes themselves (see response to comment 120-83).\n\nThe Dead Cow Loop (except for the low water alternative) is included in the Travel Plan for motorized use in Alt. C. |

BLM_0011624

| | | | | |
|---|---|---|---|---|
| | | | Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Tenmile Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Tenmile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel (page 2-37). | The Travel Plan in Alt C of the DRMP/EIS did not identify specific routes for ATVs because none were proposed by the public during scoping.<br><br>See response to comment 120-90 for discussion of ATV vs. motorcycle routes.<br><br>All fee programs instituted in the Moab Field Office will follow the procedures outlined in the Federal Land Recreation Enhancement Act (see response to comment 208-5).<br><br>The interdisciplinary team reviewing ACEC prescriptions identified excessive speed from motorized vehicles as an impact to the riparian values in Ten Mile Wash. |
| Ride with Respect | 122 | 33 | The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality. Spring Canyon, Hellroaring Canyon, Spring Canyon Point, Deadman Point, and south Horsethief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine. Dubinky Wash is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles. | A BLM interdisciplinary team reviewed each route for purpose and need weighed against resource conflicts. See Appendix G for details on the Travel Plan development process. The resource conflicts on the routes mentioned by the commentor were not sufficient enough to close these routes in the preferred alternative. |
| Ride with Respect | 122 | 34 | North of Highway 313, the singletrack which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. Bartlett Slickrock should remain open to motorcycling, since all of Tusher Slickrock will already be reserved for exclusively for bicycling. The Mill Canyon - Sevenmile Rim mountain bike area should be rotated to become Mill Canyon - Tusher Rims. Tusher has better bicycling potential than Sevenmile due to less sand, more slickrock, and fewer | The singletrack along Hidden Canyon Rims was inventoried, verified, and considered for designation in the Travel Plan. Due to resource conflicts (cultural), the route was not included in the Travel Plan accompanying the DRMP/EIS under any action alternatives.<br><br>The Bartlett Slickrock is proposed as a freeride mountain bike area under Alt. C. Motorized use would be excluded to reduce conflicts with non-motorized users. This |

BLM_0011625

| | | | | |
|---|---|---|---|---|
| | | | roads. Then Sevenmile - Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground. Upper Sevenmile Equestrian area should be expanded by four square-miles to include some terrain above the rim. | proposal recognizes that over 90% of the use is by bicycles.

The uses referred to by the commentor in the Mill Canyon area can occur consistent with the Travel Plan regardless of the boundaries of the mountain bike Focus Area. The boundary of the Focus Area was delineated to reflect the heavier mountain bike use in the eastern portion of the area.

Equestrian use is Sevenmile Canyon occurs almost totally within the canyon. There is no need to include terrain above the canyon on the rim in order to accommodate this use. |
| Ride with Respect | 122 | 35 | South of Highway 313, an additional bicycle focus area west of South Fork Sevenmile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313. The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim. The spur to Gemini Bridges should remain open to allow the unique experience of driving the bridge. Mountain bike alternates to the roads could be developed in this area, as proposed by Trail Mix. The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | An additional biking Focus Area is not necessary to allow bicycles to use the route from the upper Gemini traihead to Highway 313. Motorized use is allowed on Little Canyon Rim consistent with the Travel Plan. The spur to Gemini Bridges is not identified under all action alternatives due to user conflicts and demonstrated resource damage. The mountain bike route proposed by the commentor does not currently exist. It could be added later based on site specific NEPA analysis. The Goldbar Hiking Focus Area includes the majority of Day Canyon. Hikers can continue to utilize the rest of Day Canyon under all alternatives. |
| Ride with Respect | 122 | 36 | The Klondike Mountain Bike focus area is a great foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. The spur road contained within the Sovereign ATV Loop should be closed since it has little recreational value, yet invites four-wheeled users to poach the Sovereign Singletrack. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption | Some of the routes mentioned by the commentor are on State of Utah Land. The "Sovereign ATV Loop" does enter BLM lands, but it has been marked by users with no specific authority to do so from the BLM. The BLM routes in this area were not deleted from the Travel Plan because there were no specific resource conflicts. After the completion of the Travel Plan, these routes could be considered for closure on a case by case basis and site specific NEPA analysis.

Some of the spur routes near the dinosaur trackway are |

| | | | | |
|---|---|---|---|---|
| | | | could help to ensure enjoyment for mountain bikers, like the Sovereign Trail.  And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | on the permitted Jeep Safari system;  these routes have were determined to have a demonstrated purpose and need during the travel planning process.

The Copper Ridge motorcycle loop was not verified by the BLM on the ground during the travel planning process. Therefore, it was not included in the baseline route inventory during the travel planning process.  This route could be considered for inclusion in the Travel Plan at a later date based on site specific NEPA analysis. |
| Ride with Respect | 122 | 37 | RwR recommends designating Airport Hills as a managed OHV open area, with the boundary adopted from Alternative D. This location provides a small portion of Mancos Shale Hills that are distinct from the terrain around White Wash.  An open designation would be flexible for a lease to adjust course routing for competitive events.  The grey hills between powerlines and an airport make this use appropriate in terms of VRM. | The Airport Hills Motocross Focus Area (285 acres) is proposed only in the preferred alternative (Alt. C).  The decision in this alternative is to manage the area for motocross use in conjunction with local government under a Recreation and Public Purposes Act lease.  Under the terms of the lease, a course could be rerouted as necessary.

The Mancos Shale in this area is not considered suitable for open cross country riding, as it is highly erodible and creates dust, a special problem in the vicinity of an airport. |
| Businesses/Orgs in Support of the Green River | 407 | 1 | The resegmentation of the Green River in the Moab Draft is not justified, explained, and is inconsistent with the segmentation of the Green River in the Price Draft RMP.

The Moab Draft resegments the Green River in the preferred alternative (see Table 2.1 page 2-41). The rationale for this resegmentation is not explained nor justified anywhere in the Draft. Appendix J of the Draft documents the Wild and Scenic River Study process, including eligibility, tentative classifications, and the suitability study. Attachments 2 and 3 in Appendix J both have 6 segments of the Green River. These segments are consistent with the segments of the Green River in the Price Draft RMP. | The resegmentation of the Green River was done in order to find the proper river segments suitable that matched the goal of each alternative.

The Moab and Price Field Offices will work toward consistency regarding the segment of the Green River from Swasey's Beach to the San Rafael River confluence. |

| | | | | |
|---|---|---|---|---|
| | | | We urge the Moab Field Office to change the resegmentation of the Green River in the preferred alternative in Table 2.1 back to the original segments identified in the eligibility study (attachments 2 and 3 in Appendix J) and in alternatives B and D in Table 2.1. | |
| Businesses/Orgs in Support of the Green River | 407 | 2 | We are extremely concerned with the approach to suitability reviews provided in the Draft, due to the paucity of information provided in the suitability analysis, lack of justification for the conclusions reached regarding the suitability of the different segments, inaccuracies, and the failure to analyze the suitability of each segment independently. | See responses to 124-8 and 124-9.  The administrative record (available upon request) provides additional information regarding suitability reviews |
| Businesses/Orgs in Support of the Green River | 407 | 3 | The West side of the Green River is managed by the Price Field Office and the East side is managed by the Moab Field Office. It is important that the decisions reached by the two offices regarding the Green river are consistent. The Price Field Office released its Draft RMP in July 2004, in which it recommended all segments of the Green River as suitable as Scenic or Recreational under the preferred alternative (See the Price Draft RMP for the complete recommendations). Unfortunately, the Moab Draft recommended that the stretch of the Green River from Swasey's to River Mile 97 is not suitable as a Wild and Scenic River. It is vital that the two BLM field offices are consistent in terms of their recommendations for the Green River as a Wild and Scenic River.<br>The Moab Field Office must correct this inconsistency with the preferred alternative in the Price Draft and recommend that the entire Green River is suitable as Wild and Scenic River in the preferred alternative of the Draft. | The Moab and Price Field Offices will work toward consistency regarding the segment of the Green River from Swasey's Beach to the San Rafael River confluence. The PRMP/FEISs for each office will be in congruence. |
| Businesses/Orgs in Support of the Green River | 407 | 4 | The Green River qualifies for protection under the fishery and wildlife ORVs, the ecological ORV, the historic and cultural ORVs, the recreational ORV, and the geologic and scenic ORVs. | The BLM recognizes the outstandingly remarkable values of the Green River.  The majority of the Green River is recommended for WSR status in Alt C.  Those portions of the Green River that are not recommended are those with multiple private/state land use conflicts.  The entire Green |

| | | | | River is to be managed as No Surface Occupancy under the preferred alternative, regardless of whether or not it is found suitable for Wild and Scenic River status. |
|---|---|---|---|---|
| | 408 | 1 | The BLM must prepare a supplemental DEIS, taking into account a modified Alternative C, which would correct the following deficiencies in the DEIS.<br><br>Failure to adequately discuss the impacts in proportion to their significance regarding the reduction of OHV access and the resultant increase in number of users/uses in the areas remaining available. The DEIS fails to adequately disclose the impacts that will occur as a result of increased use in the areas remaining available to OHV use. For example, failure to disclose the impacts related to the same and growing number of OHVs utilizing less area. Alternative B and C have 68 times more closed areas than currently exists yet the agency does not expect the number of users to fall. The DEIS fails to disclose the environmental effects of having the same number of users squeezed into 68 times less area. Federal regulations require the agency to discuss any adverse environmental effects which cannot be avoided should be proposal be implemented. | The commentor's assertion that Alternatives B and C have "68 times" the closed area as under current management is incorrect.  The BLM believes that the commentor is confusing the "closed" category with the "limited" category.  The commentor provides no evidence to support the contention that environmental damage will occur as a result of more users being "squeezed" into a smaller area.  Nor does the commentor provide any evidence that the BLM has provided insufficient opportunities for OHV recreationists. The BLM acknowledges in the DRMP/EIS that all action alternatives will reduce OHV opportunities relative to Alternative A, but believes that sufficient opportunities will still be available. |
| | 408 | 2 | Failure to discuss the indirect effects and their significance on the travel plan and RMP direction regarding an increase in the number of acres designed closed or limited and regarding a decrease in the number of miles accessible for motor vehicle use. Federal regulations require the agency to include discussions of indirect effects, which are caused by the action and later in time or farther removed in the distance, but which are still reasonable foreseeable, including effects related to changes in pattern of land use and population density or growth rate. The DEIS has not discussed the indirect effect on areas which would be designated limited or open, when accommodating more users on less acreage. It is | The commentor offers no evidence to support the assertion that the BLM's efforts to accommodate more users on less acreage and fewer miles of routes will lead to adverse environmental impacts.  The commentor's assertion is founded on an unsupported hypothesis that there will be insufficient space for anticipated increases in users, and that this concentration of use will lead to undesirable impacts. The BLM has assessed the impacts of travel management alternatives on a wide variety of resources in Chapter 4 of the DRMP/EIS, and concludes that additional restrictions on OHV use will have largely beneficial impacts. |

BLM_0011629

| | | | reasonably foreseeable that areas designated limited or open will be impacted by an increase in use caused when users are displaced from areas newly designated as closed or newly designated as limited where they had been open in the past.<br><br>A court is likely to conclude that it, as well as the agency, can with high confidence say that the impacts are likely to occur. The agency can describe such impacts "now" with sufficient specificity to make their consideration useful. Furthermore, if the agency does not take them into account "now" it will not be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision. Commonwealth of Massachusetts v. Watt, 716 F2d 946, 952-53 (1st Cir. 1983). Therefore, the agency must consider the indirect effects and their significance on the travel plan and RMP direction regarding an increase in the number of acres designed closed or limited and regarding a decrease in the number of miles accessible for motor vehicle use in relation to the increased number of users/uses on such areas. | |
|---|---|---|---|---|
| Ride with Respect | 122 | 38 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | The recreation use in Yellow Cat is not at a high enough level to warrant a Special Recreation Management Area designation. The route in Owl Canyon was determined to lack purpose and need as an alternate route is available. Owl Canyon was identified with riparian values and was not identified with motorized travel.<br><br>A Focus Area for hiking around Arches National Park is not warranted because it currently receives very low use. However, hiking can occur in this area regardless of its designation as a Focus Area. |

| Ride with Respect | 122 | 39 | Utah Rims SRMA ought to extend further southwest to the Cisco Road.  From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails.  From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Mel's Loop and associated singletracks.  From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat.  A non-mechanized focus area could be expanded from the Westwater WSA further southwest all the way to private property.  The entire spur road to Big Hole could be closed to enhance primitive characteristics.  None the less, the Westwater Canyon overlook road should not be closed.  Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | The core values of the Utah Rims Special Recreation Management Area are found within the boundary delineated under Alts B and C of the DRMP/EIS.  With exception of the lands within the Westwater Wilderness Study Area, lands within the Moab ERMA, south and west of the proposed Utah Rims SRMA, are available for mechanized use consistent with the Travel Management Plan. |
| Ride with Respect | 122 | 40 | The Dolores Triangle includes a few remote areas where primitive character should be preserved.  By closing two less-valuable spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation. Half of the Dolores River overlooks could be preserved as cherry stems.  Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | The routes in the Dolores Triangle were analyzed by the interdisciplinary team for Travel Plan designation.  The routes mentioned by the commentor contained no specific resource conflicts that outweighed the purpose and need for the route.<br><br>The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes.  Future travel planning for new routes could be considered based on site specific NEPA analysis.<br><br>The Dolores River Canyons Special Recreation Management Area (SRMA) proposed in the preferred alternative (Alt C) would be managed to maintain primitive recreation opportunities.  Since the entire SRMA has a single focus of management, there is no need for individual focus areas within the SRMA. |
| Ride with Respect | 122 | 41 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things.  Paving the road, and prohibiting OHVs from pavement, | Grand County paved the Sand Flats Road.  In Grand County, non street legal vehicles are prohibited from travelling on paved roads.  The BLM does not contradict |

| | | | | |
|---|---|---|---|---|
| | | | has fragmented the trail system.  Thus OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25mph should be preserved.  A non-motorized lane should be constructed to parallel the road and reduce congestion.  Additionally, the 1/4-mile slickrock route connecting Slickrock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road.  All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | county law.<br><br>The route mentioned by the commentor is considered cross-country travel and was never recognized as an existing route.  Furthermore, the route was not proposed during the scoping period for the land use planning process and therefore was not considered in the Travel Plan process.  The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes.  Future travel planning for new routes could be considered based on site specific NEPA analysis. |
| Ride with Respect | 122 | 42 | Special policies should continue permitting slickrock exploration.  The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the Slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions).  In these areas, travel could be further restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface.  Slickrock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock , which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas.  For consistency, Slickrock Trail should appear on the map of designated motorcycle routes. | "Slickrock exploration" is the same as open designations where cross country travel is allowable.  Open designations are used for intensive OHV use areas where there are no special restrictions or where there are no special resource protection needs, user conflicts, or public safety issues to warrant limiting cross country travel.  Slickrock areas can include cultural resources, recreation conflicts, islands of soils and vegetation, and wildlife habitat.<br><br>The impacts from cross country travel are documented in Chapter 4 of the DRMP/EIS.  No open slickrock areas were proposed for motorized use during the scoping period for the land use planning process.<br><br>The Slickrock Trail has been added to the map of motorcycle routes in the PRMP/EIS for alternatives C and D. |
| Ride with Respect | 122 | 43 | The Black Ridge area presents many potential recreation opportunities nearby Moab.  The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and provides enough room for a full-day's ride.  Sweeping travel restrictions associated with | With the exception of trials motorcycling and cross-country rock crawling, all of the activities mentioned by the commenter can occur within the ERMA (which includes the Black Ridge area) consistent with the Travel Plan.  Current recreation use in this area is low and does not warrant designation as an SRMA. |

| | | | | |
|---|---|---|---|---|
| | | | the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exists in Pole Canyon from the powerlines to Area BFE.  In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines.  This area is littered with old mine roads, and is currently open to cross-country travel.  The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of the powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area.  The south flank could be a bicycle freeride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | Travel in Kane Creek poses cultural and riparian conflicts. For these reasons, this route was not identified for OHV use in the Travel Plan. |
| Ride with Respect | 122 | 44 | Cameo Cliffs SRMA should also be expanded for better OHV riding.  The current boundary offers a meager half-day for the skilled rider.  Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area.  The ATV trail immediately north of the OHV staging area should be designated for <50-inch vehicles, along with a couple miles of non-road trail above Hook & Ladder Gulch. While RwR generally agrees with mixes uses in a given SRMA, we believe that non-motorized opportunities should be developed in the adjacent Canyon Rims rather than Cameo Cliffs. Unnecessarily steering non-motorized use toward an established motorized trail system might create conflicts.  Moreover, Canyon Rims has spectacular scenery, including some of the same geologic formations of Cameo Cliffs.  The setting prescriptions and road plan for Canyon Rims are | When the Cameo Cliffs SRMA was created, the areas to the east were specifically excluded due to mining hazards.  Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area.

The Old Spanish Trail is recognized in the DRMP/EIS and various sites along it may be proposed for interpretation. |

| | | | | |
|---|---|---|---|---|
| | | | better-suited for hiking and equestrian trails.  If Cameo Cliffs contains an Old Spanish Trail site of particular interest, then it should be developed for interpretation and fairly accessible by full-size vehicles. | |
| Ride with Respect | 122 | 45 | Hatch Wash backpacking focus area could be expanded for better backpacking.  Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash.  However, only five are necessary to view most stretches of the canyon.  Hatch Wash is a great opportunity for solitude seekers with easy access from the highway. | The Hatch Wash backpacking Focus Area was designed to include the prime backpacking opportunities within the Canyon.  The routes mentioned by the commentor are on the rims of the canyon and were reviewed for purpose and need and weighed against resource conflict.  There were no resource conflicts identified that outweighed purpose and need for the routes mentioned.  Since all backpacking occurs below the rim the presence of the routes on the rim were not found to have a conflict with hiking in the canyon. |
| Ride with Respect | 122 | 46 | BLM's route designation process is not equitable among trail users.  The process relied on aerial photography interpretation.  It does not provide a system for non-full sized vehicle users.  It ignores ROS, which could be applied in a linear fashion to provide greater fairness in the travel plan.  Fairness could be achieved if the planners seriously considered the routes submitted by citizens, organizations and local government. | The BLM's travel plan provides opportunities for all types of motorized users.  The preferred alternative (Alt C) provides 282 miles of single track motorcycle trails.  These miles of trail are those submitted by the public, verified by the BLM on the ground, and designated under the preferred alternative.  The BLM fully considered all routes submitted by the public, organizations and local government.

While aerial photography was utilized in part for verification of full sized vehicle routes, on the ground field checks were undertaken on each of the submitted singletrack routes.

There is no policy or direction for the BLM to utilize the Recreation Opportunity Spectrum (ROS) in the land use planning process. |
| Ride with Respect | 122 | 47 | Special Recreation Management Areas should be large enough to "grow into".  Low use trails should be kept in the travel plan for those seeking solitude. | The BLM's Special Recreation Mangement Areas are proposed based largely on existing uses with consideration of potential future use.  Many of the routes proposed in the alternaitves for the Travel Plan currently see very little use. |

| | | | | See also response to comment 123-13. |
|---|---|---|---|---|
| Ride with Respect | 122 | 48 | Designating campsites should be done with public participation.  The travel plan should be adjusted to access campsites. | Public participation has been provided throughout the land use planning process.  One of the express purposes of leaving a route open for travel was its access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site specific NEPA analysis.<br><br>See also response to comment 123-8. |
| Ride with Respect | 122 | 49 | The Moab Extensive Recreation Management Area should provide roads, singletrack trails and dry washes to connect SRMAs and towns.  The ERMA targets "backcountry driving" and "primitive hiking" as outcomes.  We recommend targeting the ERMA for "an array of recreational opportunities." | The Extensive Recreation Management Area (ERMA) does provide a network of roads as well as some singletrack trails.  For information on dry washes, see response to comment 122-14.<br><br>The Moab Extensive Recreation Management Area (ERMA) identified in all alternatives of the DRMP/EIS recognizes several activities and specific targeted outcomes (see pg. F-9 and pg. 2-29).  The listed outcomes do not preclude non-listed activities as long as they are consistent with the Travel Plan.  The management guidelines for an ERMA are found on pg. C-16 of the Land Use Planning Handbook (H-1601-1) and states that actions in an ERMA are custodial only. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 1 | Moab BLM's Travel plan designates motorized routes in areas with a non motorized setting.  BRC understands that the planning team's intent is to have the Travel Plan "trump" (our word) the SRMA guidance. | Non-motorized focus areas are not intended to be managed as roadless.  On pg. 2-18 of the DRMP/EIS in Management Common to All Alternatives, Focus Areas "are Recreation Management Zones for emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan".  There are routes identified in the Travel Plan within non-motorized Focus Areas and these routes will remain available to travel. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 2 | It is likely that some relatively small adjustments will be necessary to the Travel Plan.  In addition, there is some guidance in the RMP which, in some areas, would allow the development of new travel routes should they be necessary. | The guidance concerning adjustments to the Travel Plan is outlined on pg. 2-48 of the DRMP/EIS.  See also response to comment 208-8. |

| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 3 | There is no mention in the Moab DEIS regarding the obvious conflict in the Draft RMP's guidance and the Travel Plan. There is nothing to indicate the Travel plan will "trump" any other management prescription. | See response to comment 123-1. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 4 | The BLM's Planning Handbook requires Field Offices to identify goal, settings, and targeted outcomes. The DEIS does this in Appendix F for SRMAs. In addition, the RMP outlines common management objectives for SRMAs in Chapter 2. The DEIS also outlines a general recreation policy in Appendix E. The Travel Plan is the final overlay.<br><br>The Final Plan must address whether Recreation Settings will or will not "actually determine, what kinds of recreational opportunities are produced." Regarding the example above it is suggested that the BLM specifically state what the Recreational Settings are meant to be (e.g. "standards" or "guidelines") and to disclose how the Recreational Settings may or may not affect future management decisions, allowable uses, including and especially travel management. | Management actions that apply to all Special Recreation Management Areas (SRMAs) are found on pg. 2-18. Specific management actions for each SRMA are listed on pg. 2-18 through pg. 2-29. Appendix F provides more specifics on goals, settings, and targeted outcomes for each SRMA. Appendix E provides general recreation rules for the Field Office. The management actions proposed in these sections are complementary and in no case does one management action contradict the other.<br><br>The recreation settings in Appendix F are descriptive and describe the physical, social, and administrative environment. Definitions of these terms are provided on pg. F-1.<br><br>The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/EIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and non-WSA lands with wilderness jurisdictions. A sentence has been added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states "routes identified in the Travel Plan would be available regardless of other proposed management actions".<br><br>A detailed discussion of Recreation Settings and the benefits that may acrue to that setting is found on pg. 4-190 through pg. 4-193 of the DRMP/EIS. Recreation Settings for each Special Recreation Management Area (SRMA) are found in Appendix F. |

BLM_0011636

| | | | | |
|---|---|---|---|---|
| | | | | This Appendix it states that "for each SRMA the management goal is to provide for a variety of visitor benefits.  In addition on pg. 4-192 it states that "Focus Areas' are Recreation Management Areas that promote specific recreational opportunities and activities while continuing to allow other recreational uses".<br><br>On pg. 2-18, Focus Areas are defined as "emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan".<br><br>See also response to comment 208-13. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 5 | The DEIS is far from a model of clarity in distinguishing between program-level and project-level decision-making and management prescriptions.  We urge BLM to clarify this distinction, and to specifically identify program-level management guidance from project-level management prescriptions for all management decisions, especially travel management. | The BLM followed the Land Use Planning Handbook (H-1601-1) to develop program level management guidance. In 2004, the Washington Office (WO) clarified the guidance in the handbook by issuing  WO Instruction Memorandum 2004-005, which states specifically, "Selection of a network of roads and trails should be performed for all limited areas in each RMP.  This requires establishment of a process that includes selecting specific roads and trails within the limited area or subarea and specifying limitations placed on use."<br><br>The management decisions in Chapter 2 of the PRMP/FEIS will clearly show which decisions are planning decisions and which decisions are implementation (project-level) decisions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 6 | The current procedural model presents challenges, if not insurmountable hurdles, to the proper execution of these varied planning elements. The agency and public are unable to fully, if at all, utilize appropriate "tiering" in the planning process. The programmatic RMP and the site-specific Travel Plan are both "moving pieces" of the same puzzle and there is no refinement (in the Travel Plan) that can occur through the subsequent reflection on the RMP. Similarly lost are any benefits that might | Washington Office Instruction Memorandum 2004-005, states specifically, "Selection of a network of roads and trails should be performed for all limited areas in each RMP.  This requires establishment of a process that includes selecting specific roads and trails within the limited area or subarea and specifying limitations placed on use."  Utah State Office Instruction Memorandum 2004-008 instructs Field Offices to undertake travel planning in conjunction with the RMP planning in Utah. |

BLM_0011637

| | | | | |
|---|---|---|---|---|
| | | | attend "amendment" of a programmatic RMP through a subsequent and more focused Travel Planning process that is procedurally distinct from RMP generation.<br><br>The Moab planning team should consider the prospect of severing travel planning from the RMP process. | Utah State Office Instruction Memorandum 2004-061 further directs how to undertake travel planning within the RMP efforts in the state.<br><br>The Moab Field Office followed the instructions of the State Office and Washington Office in designating routes within the RMP process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 7 | The Final Plan and ROD must more completely address routes which are subject to overlapping or concurrent jurisdiction, such as routes identified as county roads.<br><br>The BLM's Draft Travel Plans do not contain references to agency guidance on route classification. The DEIS and Travel Plan do not specify if a route is a Road, a Trail, or a Primitive Road pursuant to agency directives. This seems to be inconsistent with agency guidance. | All routes identified in the alternatives of the DRMP/EIS for the Travel Plan are BLM routes. It is stated on pg. 1-12 that the RMP does not adjudicate, analyze, or otherwise determine the validity of claimed RS 2477 right-of-ways.<br><br>The route names the commentor refers to were recommended in a BLM Washington Office Instruction Memorandum (IM) 2006-173, and will be applied to future route classification in the BLM's Facility Asset Management System. The implementation of this database requirement is still being refined and does not pertain to the identification of routes within the Travel Plan process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 8 | The BLM alternative assumes it will be able to completely change all vehicle based camping as currently available. This is a flawed approach due to the following: a) a regional prohibition on vehicle based camping does not absolve the agency of a duty to disclose and analyze the effects of camping on discrete, individual sites throughout the applicable region, b) it is impossible for the public and the decision makers to reasonably determine what affects each alternative will have on camping, c) there is no range of alternatives on the camping policy, and d) it is impossible to incorporate all the "spurs" necessary to provide access to many campsites resulting in areas where camping is nearly eliminated.<br><br>A map is provided of the White Wash area which | On pg. 2-17 of the DRMP/EIS in Management Actions Common to All Action Alternatives, it states that dispersed camping is allowed where not specifically prohibited. Dispersed camping is allowed on over 95% of the Moab planning area. There is no regional prohibition against vehicle based camping; although vehicle based camping is restricted to designated sites in heavily used areas around Moab (about 5% of the area). These actions were initially prompted due to concerns regarding public health and sanitation raised by local health officials.<br><br>In development of the alternative Travel Plans, all motorized routes considered during scoping were assessed for purpose need and weighed against resource conflicts. Recreation opportunities and experiences are listed as a purpose and need as specified on pg. G-13. |

BLM_0011638

| | | | | |
|---|---|---|---|---|
| | | | displays an area where access to dispersed camping sites has been eliminated. | Dispersed camping was considered a recreation opportunity and experience.  The interdisciplinary team, which included Grand County road officials, was very familiar with dispersed camp sites accessed by spur roads

As stated in Chapter 4, pg. 405, of the DRMP/EIS, the BLM can modify or adjust designated motorized routes at the implementation and project-planning level.  Therefore, specific spur routes to dispersed campsites can be added to the Travel Plan.  The open area to the west side of the White Wash Sand Dunes has been enlarged to accommodate the camping that occurs to the south of the oil well.  See also response to comment 120-83.

Since dispersed camping is tied to the availability of identified spur routes, the range of alternatives for vehicle based camping is provided in the alternatives for the Travel Plan.

Throughout Chapter 4 of the DRMP/EIS, the impacts to the resources affected by dispersed camping are analyzed.  A statement will be added to Chapter 4 of the PRMP/FEIS in the section on the Impacts of Recreation and Travel on Social and Economic Conditions which states "Restrictions on dispersed camping and access routes to campsites may negatively affect those recreationists seeking this type of experience".

Other than the White Wash area, the commentor has not provided any additional information regarding specific routes to dispersed camp sites that have allegedly been eliminated. |
| Colorado Off-Highway Vehicle Coalition | 123 | 9 | The agency should consider a policy that considers 1) interim camping rules that do not eliminate existing campsites; and 2) a process by which existing campsites are analyzed and determined to a) not cause | The BLM is unaware of any popular existing campsites that have been eliminated under the alternatives of the DRMP/EIS.  Those specific campsites identified by the commentor at White Wash have been restored in the |

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | considerable adverse effects; and b) managed in a way as to minimize impacts to natural resources. | preferred alternative (Alt C).  A process in which to evaluate existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision.  This process will be addressed during development implementation plans for the Special Recreation Management Areas. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 10 | BRC strongly opposes the fee system proposed for White Wash Sand Dunes in Alts C and D.  A fee system at White Wash will be difficult to implement because of the distance from the Moab Field Office and ease of access to the Dunes and nearby trails.  A fee system with the Federal Lands Recreation Enhancement Act.  The BLM should remove the section requiring the Special Recreation Permit idea, and instead, insert guidance to pursue funding sources. | The possibility of a fee system for use of the open area in White Wash Sand Dunes is proposed in the DRMP/EIS as a means of funding the cost of the intensive management that this area would require to keep it open to cross country travel and provide services to visitors.  Actual implementation of any new fee would follow the guidelines of the Federal Lands Recreation Enhancement Act, and be considered by the Utah BLM Resource Advisory Council.  This action does not preclude pursuing other funding sources to help manage the White Wash Sand Dunes.  For clarity the statement on pg. 2-25 of the DRMP/EIS has been changed to read "Implement a fee system under the guidelines of the Federal Lands Recreation Enhancement Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 11 | There is no justification, no mandate in FLPMA and no process requirement for engaging in ongoing wilderness inventory and review.  Once the "603 Process" was completed, the agency is done.  The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American People.  Other than the management of existing WSA's the BLM should have no part in this issue.  To do so is a tragic loss of management resources. | The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).

This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2))) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . |

. ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.

The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired.  All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711).  In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs.

The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.

Finally, the Utah v. Norton Settlement Agreement does not affect BLM's authority to manage public lands.  This Agreement merely remedied confusion by distinguishing between wilderness study areas established under FLPMA §603 and those lands required to be managed under §603's non-impairment standard, and other lands that fall within the discretionary FLMPA §202 land

| | | | | management process. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 12 | Generally speaking, the DEIS assumes and concludes that reduction of OHV use within an area will provide a beneficial result on a particular issue.  However, the DEIS fails to connect specific closures with site-specific data justifying the closure. | The BLM worked with an interdisciplinary team of resource specialists which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DEIS/RMP.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/EIS are derived from this data. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 13 | In the face of growing demand through varied modalities for access to public lands, BLM must carefully consider how to make satisfying and diverse opportunities for visitation available, rather than excessively constructing more and different uses in a manner that will exceed the impacts of an even unmanaged status quo.  It is not only legally required but logical to consider whether available "best science" truly supports possible management prescriptions. | In DRMP/EIS, the BLM has considered diverse opportunities for recreation and the potential conflicts with resources.  The BLM has provided a wide variety of recreation opportunites for both motorized and nonmotorized uses.  It is not possible for the BLM to envision all the possible recreation activities that may be developed in the future.  The commentor has not provided any information about how the BLM failed to consider "best science". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 14 | The alternatives are not presented in a fashion that allows sufficient public involvement and participation.  The DEIS fails to accurately describe the defferences in the various alternatives. | The BLM has followed the land use planning process and has involved the public throughout.  The public participation process is outlined in Chapter 5 of the DRMP/DEIS.  The public was afforded many opportunities for involvement.  The BLM acknowledges that the planning process is complex requiring participants to look in many locations within the document to get the answers to questions they may have.  This is why the BLM regulations require a 90-day a public comment period rather than the normal 45-day period for an Environmental Impact Statement.<br><br>A comparison of the alternatives in the DRMP/DEIS is provided in Table 2.2. |
| Colorado Off-Highway Vehicle | 123 | 15 | The DEIS fails to accurately and sufficiently disclose the nature of the Travel Planning decisions and how that plan relates to RMP decisions.  Indeed, the nature of | Refer to response to comments 123-4, 123-5, and 123-6. |

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | the Travel Plan decision is not even addressed until Chapter 2. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 16 | Issue 1 of the DEIS states "How can increased recreation use, especially motorized vehicle access, be managed while protecitng natural resource values?" The question has been answered, in large part, by BLM's national directives that require Field Offices to a "travel limited to designated roads, trails, and managed open areas." The agency has, in effect, modified the land use plan decision of "open" to "managed open". The alternatives should only differ in number of motorized routes and acres of managed open areas. | There commentor appears to have a misinterpretation of definitions. The Federal regulations at 43 CFR 8340.0-5 define an "open" OHV area as one "where all types of vehicle use is permitted at all times". These regulations also define limited as "an area restricted at certains times, in certain areas, or certain types of vehicular use. These restriction may be of any type." The BLM utilized these definitions in the land use planning process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 17 | Alternative B totally eliminates all dirt bike single track trails. It also totally eliminates the "dune riding" experience so popular at White Wash. Alt B provides even less opportunity for mountain bikers than Alt C. Alt B changes the use at White Wash from a popular OHV destination to an equestrian and hiking area. Alt D conversely does not eliminate any non-motorized opportunity or make any hiking areas in rockcrawling areas. It does put the Westwater area into an ERMA and the ERMA is non-motorized. These are among the examples of the manner in which the DEIS fails to present a reasonable range of Alternatives that respond to the issues. The range of alternaitives is inappropriately skewed toward significant closures to public access and vehicle-based recreation (Alt A - 4,673 miles, Alt B - 2,144 miles, Alt C - 2,519 miles, Alt D - 2,671 miles). | The White Wash area was determined to meet the criteria for an Area of Critical Environmental Concern (ACEC) and is proposed for designation in Alt B. The only recreation activities that are compatible with the management actions in the ACEC are non-motorized ones. Although cross-county OHV use is eliminated in Alt B, OHV travel is still available on identified routes. Alt D provides a larger open area for cross-country OHV travel and maintains the motorized focus areas while eliminating many hiking focus areas. However, hiking is not restricted anywhere on public lands. The Wilderness Study Area (WSA) in the Westwater Area is managed according to the Interim Management Policy for Lands Under Wilderness Review. This policy precludes motorized use except on identified routes. The remainder of the Westwater area outside the WSA is managed as an Extensive Recreation Management Area in Alt D. Travel in the ERMA is managed according to the Travel Management Plan (see pg. 2-29).<br><br>As described in Appendix G, the BLM used an interdisciplinary approach, which included County road officials, in formulating the alternatives for the Travel Plan in the DRMP/EIS. All routes submitted during the scoping period were evaluated. A large number of routes were |

| | | | | |
|---|---|---|---|---|
| | | | | found to lack purpose and need (over 2,500 miles) which explains the relatively large span between Alt A and the action alternatives.  The purpose and need of each route was weighed against potential resource conflicts which provided a spread across the action alternatives.  These alternatives provide a broad range of management actions to address the issues raised during scoping. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 18 | First Related Issue to Issue 1:  Which areas should be designated as open, limited, or closed to OHV use, and which OHV routes should be designated within the limited category? Again, we'll emphasize that given the analysis in the MSA, eliminating the open area in a place that has been recognized as one of the most popular OHV sand dune destinations is not a reasonable way to respond to the issue. The proposed open areas in both Alternatives B and C present substantial problems. BRC agrees with the approach of the managed open area and has embraced the concept in our proposal in the next section. One more thing to emphasize, adjustment of the western boundary of the Open area will be critical, unless you want everyone to camp on the dunes. | The commenter is mistaken about the closure of the White Wash sand dunes in Alt C of the DRMP/EIS.  The western boundary of the open area has been expanded to accommodate camping in Alt C.  See response to comment 120-83. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 19 | Third Related Issue: Where should adaptive management practices be applied in response to unacceptable resource impacts? The alternatives don't meaningfully respond to this issue.  In candor, this doesn't seem to be a very good planning issue. Adaptive management practices might be applied in response to new management challenges or unacceptable outcomes on individual sites.  This obvious reality is addressed within existing law and regulation and need not be identified or prioritized as a separate issue. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Colorado Off-Highway Vehicle | 123 | 20 | Fourth Related Issue:  How should recreational uses be managed to limit conflicts among recreational users? The alternatives appear to answer this by creating | On pg. 1-11 of the DRMP/EIS, education is identified as an issue addressed through policy or administrative action and does not require a land use planning decision. |

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | restrictive zones.  We are disappointed BLM didn't include an Alternative that took USA-ALL's scoping suggestion to aggressively mitigate social conflict with education. | On pg. 2-17 of the document, the BLM acknowledges the need to provide visitor information and outreach as part implementation of the RMP.  Also, as part of implementation a map will be provided to the public delineating where different recreation uses are emphasized. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 21 | Fifth Related Issue:  How should camping, human waste, fires, and wood collection be managed? Here all of the Alternatives fail miserably. There is no range of alternatives for vehicle based camping, only very slight variation among the various Travel Plan Alternatives.  There is very little reference to impacts to the various resources when OHV and camping activities are restricted. | See response to comment 123-8. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 22 | Sixth Related Issue:  Where should Special Recreation Management Areas (SRMAs) be designated? As we mentioned above, Alternatives B and D's SRMA are so unworkable they do not present a reasonable range of Alternatives.  Besides, again, this is not a very well crafted planning issue.  SRMAs themselves do not fit into the definition of Planning issue (a matter of controversy or dispute over resources management activities or land use that is well defined or topically discrete and entails alternatives among which to choose or decide. | The BLM Handbook (H-1601-1) at C-15 specifies that the primary land use planning decision for recreation is the identification of Special Recreation Management Areas. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 23 | Seventh Related Issue: How should conflicts with other, non-recreational uses be reduced? One option we would like to see in the Final Plan is a situation where the permitting process for oil and gas exploration/develop could benefit recreation by using the extensive environmental review to "clear" recreational routes or other infrastructure. | The permitting process for oil and gas operations is an implementation decision and involves site specific analysis of proposals on a case by case basis.  The BLM can not require an oil and gas operator to conduct clearances on non-related actions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 24 | Eighth Related Issue:  What management actions should be implemented to mitigate damage caused by recreational uses, including vehicles, on other resources and sensitive areas, especially riparian areas? | On pg. 1-11 of the DRMP/EIS, volunteer coordination is identified as an issue addressed through policy or administrative action and does not require a land use planning decision. |

| | | | Although we appreciate the direction to mitigate impacts to routes that are causing impacts (Appendix G), the most common management action BLM proposes is closure.  As noted above, this is not a "range" of management options. Such an approach squanders a huge opportunity to leverage volunteer and OHV grant programs to assist in management or mitigate challenges, such as combining tamarisk infestation, or other such work.  OHV groups can raise funds, just like hunting groups do, for wildlife guzzlers and other wildlife mitigations. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 25 | Ninth Related Issue:  How should recreation in the MPA be managed to ensure public health and safety? It is generally accepted that information is the primary tool to use in public health and safety.  We are disappointed to see BLM adopt a 'minimum management necessary' concept, especially for recreational uses.  We understand that we don't want a "carsonite forest" out there, but at least one Alternative should have had a more robust directive to provide information to recreationists. | Education and information are identified on pg. 1-11 of the DRMP/EIS as issues addressed through policy or administrative action and do not require a land use planning decision.  The analyses on pg. 4-3 of the DRMP/EIS assumes that there will be funding for implementation of the travel plan which will include public education, enforcement/prosecution, vandalism, and volunteer coordination. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 26 | Tenth Related Issue:  Where and under what circumstances should permitted recreation uses be available? PLEASE keep the group size limit at 50!  The DEIS fails to provide sufficient need for the proposed change in Alternative C.  We are at a loss to understand the agency's rationale for this proposal. We strongly urge the BLM to, as much as possible, streamline the manner in which recreational "club rides" can be permitted. These clubs should be viewed as a resource.  Especially in key motorized focus areas, we recommend the Final Plan include language that directs the manager to encourage cooperative efforts with OHV groups | The Federal regulations at 43 CFR 2932.11 allow the BLM to require special recreation permits (SRPs) for organized group activities when there are resource concerns, potential user conflicts, or public health and safety issues.  The group size numbers vary by alternative based on the emphasis of the alternative and provide a reasonable range of choice.  These numbers are based on professional judgment and extensive monitoring of motorized use in the planning area.  The lower the threshold for when a SRP is required the greater the opportunity for increased contact and educational outreach with groups.  More frequent contact would allow for more sustainable recreation use.  The BLM recognizes the benefits of working with clubs and user groups and will seek to streamline permitting wherever possible. |

| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 27 | Divide Labyrinth Rims into two SRMA's:  Gemini Bridges SRMA and Labyrinth Rims SRMA.  The rationale for this is based on a subtle difference in landscape and more significant difference in use pattern. | The BLM recognizes that Labyrinth Rims/Gemini Bridges Special Recreation Management Area is a large area with diverse use and terrain.  These factors will be considered during the development of the implementation plan for the SRMA. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 28 | Utah Rims SRMA.  Manage Utah SRMA for a variety of visitor benefits, provide opportunites for a) quality scenic trail-based motorcycling and mountain biking experiences; b) quality camping experiences; c) quality horseback riding experiences on existing routes.  Please seriously consider Ride with Respect's proposal on Utah Rims. | See response to comment 122-39. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 29 | BRC supports RwR's proposals:  Additional bicycle focus area. RwR proposes South of highway 313, an additional bicycle focus area west of South Fork Sevenmile Canyon could provide cross-country and vehicle assisted rides from the upper Gemini trailhead down the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini Bridges should remain open to allow the unique experience of driving the bridge. Mountain bike alternates to the roads could be developed in this area, as proposed by Trail Mix.  The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | See response to comment 122-35. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 30 | BRC supports RwR's proposals:  Additional "Yellow Cat" SRMA. RwR proposes Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus.  Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey | See response to comment 122-38. |

| | | | Bridge. Only a couple overlooks of Lost Spring Cnayon and Dome Plateau are needed, but they should remain open all the way to the rim.<br>A Yellow Cat SRMA seems one of those 'no brain'ers' and we are at a loss to understand why it wasn't in the alternative that was supposed to (but did not) emphasize motorized recreation. Clif's idea is a well conceived and well balanced proposal. It deserves serious consideration. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 31 | BRC supports RwR's proposals: New "Black Ridge" SRMA's. RwR proposes the Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain Bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and provides enough room for a full-day's ride.  Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas.  Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exists in Pole Canyon from the powerlines to Area BFE.  In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines.  This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area.  The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shutting.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway.<br>BRC strongly encourages the BLM to consider this proposal. All too often, the agency is in the position of | See response to comments 123-13 and 122-43. |

| | | | | |
|---|---|---|---|---|
| | | | responding, usually too late with too few resources, to emerging uses. This proposal is an opportunity to provide for existing uses and growth in popularity, in a controlled and environmentally sound manner.  The BLM should not pass this opportunity up.  Please refer to RwR's formal written comment for more info. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 32 | BRC supports RwR's proposals: This is a shocker. BRC actually supports the general concept of RwR's proposed expanded backpacking focus area in Hatch Wash.  Hatch Wash backpacking focus area could be expanded for better backpacking.  Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash.  However, only five are necessary to view most stretches of the canyon.  We support the additional backpacking focus area, but disagree only slightly with Clif's determination only 5 overlook spur roads are necessary.  During peak visitation season, 5 may not be enough. In fact, we are almost positive 5 are too few, but are unsure how many are actually used during peak seasons.  BRC suggests close consultation with San Juan County and recommends the BLM defer to their assessment of how many of these overlooks are needed. | See response to comment 122-45. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 33 | BRC supports RwR's proposals:  Expanded Cameo Cliffs SRMA.  RwR proposes Cameo Cliffs SRMA should also be expanded for better OHV riding.  The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity.  Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area.  This proposal seems only prudent, and we agree with Clif's assessment that the area is a bit short on quantity of opportunity.  Half day ride, maximum. | See response to comment 122-44. |
| Colorado Off-Highway Vehicle | 123 | 34 | The trail known as "the Tubes" or "Dead Cow Wash"; BRC differs with RwR and recommends keeping all of the existing routes in the area of this loop available for | The BLM considered this trail during the travel planning process.  The main loop is identified for motorcycle travel under Alt C (preferred alternative).  Several of the side |

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | motorized use. | routes of this main trail had riparian resource conflicts. These resource conflicts were considered to outweigh the purpose and need for the trail. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 35 | The second difference between BlueRibbon and RwR is White Wash Sand Dunes.  The rationale for our proposal here is that it will be relatively easy to implement because it mirrors, or more accurately, freezes, the existing use and the boundaries are on easily recognized roads.  It also incorporates the interim management philosophy by providing direction (objectives) to implement a RAMP. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area proposed by the commentor poses conflicts with many of these resources.  The boundary of the open area at White Wash has been expanded to the west to accommodate dispersed camping.  The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 36 | BRC believes a short trail should be included in the Travel Plan.  It is commonly known as "the High Teck" trail, described below.<br>Specific Route Suggestions:<br>The Hi Teck Trail should be open to motorized use.  The Hi Teck trail is shown on page 40.  This trail was featured in several UTMA club rides often led by Joel Frulli, from Denver, Colorado.  Please consider incorporating this trail into the final Travel Plan. | The trail referred to by the commentor was considered during the travel planning process.  Conflicts with desert bighorn sheep escape terrain outweighed the purpose and need for the trail in all action alternatives in the DRMP/EIS. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 37 | BRC supports RwR's proposals: The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non- | Refer to response to comment 122-36. |

| | | | | |
|---|---|---|---|---|
| | | | mechanized trails that surrounds by steering motorcyclists toward a legal alternative. Based on knowledge of this area, the Copper Ridge Motorcycle Loop serves a critical "connector loop" that brings riders north enough to either connect with the Thompson Trail or loop back around to the staging areas. We strongly suggest consideration of this route. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 38 | BRC supports RwR's proposals: Likewise, Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to construct a Kokopelli Single-track and mark a Kokopelli Double-track that would roughly parallel one another. Through Utah Rims, the Single-track should be open to motorcycles. Through Yellowjacket, the Single-track should actually be ATV trail. Everywhere else, the Single-track should be non-motorized. The Double-track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | See response to comment 122-30. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 39 | BRC supports RwR's proposals: Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bicycle trails in Fruita, a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | See response to comment 122-31. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 40 | BRC supports RwR's proposals:  North of Highway 313, the single-track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike.  The Mill Canyon – Sevenmile Rim mountain bike area should be rotated to become Mill Canyon - Tusher Rims.  Tusher has better bicycling potential than Sevenmile due to less and, more slick rock, and fewer roads.  Then Sevenmile – Upper Courthouse motorized backcountry touring area could be created to recognize | See response to comment 122-34. |

| | | | the high-value roads that extend through Monitor & Merrimac to Big Mesa campground. Upper Sevenmile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 41 | BRC supports RwR's proposals:  The Dolores Triangle includes a few remote areas where primitive character should be preserved.  By closing two less-valuable spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems. Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | See response to comment 122-40. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 42 | BRC supports RwR's proposals: The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and provhibiting OHVs from pavement, has fragmented the trails system. Thus OHVs should be permitted to use Sand Plats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25 mph should be preserved. A non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼ mile slick rock route connecting Slickrock Trail with Fins N' Things should be designated for two-wheeled use to alleviate traffic along the main road. All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-41. |
| Colorado Off-Highway Vehicle Coalition | 123 | 43 | BRC supports RwR's proposals: Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "two-wheeled motorcycles are allowed on established | See response to comment 122-42. |

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | slick rock riding areas in the Slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lover Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel could be further restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 44 | BRC supports RwR's proposals: In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its single-track character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These single tracks should be preserved, along with adjacent double tracks. Together such remote, rugged routes offer a chance to experience the deserts like neither SRMAs nor graded roads can do. | See response to comment 122-29. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 45 | The Moab BLM ERMA has decidedly non-motorized focus, with Targeted Outcomes being Backcountry driving and primitive hiking, backpacking and equestrian use. But the MSA clearly shows the proposed ERMAs to house a myriad of activities, including OHV trail riding, hunting and mountain biking. We recommend the BLM revise its management guidelines to provide for settings that are compatible with all existing uses. | The Moab Extensive Recreation Management Area (ERMA) identified in all alternatives of the DRMP/EIS recognizes several activities and specific targeted outcomes (see pg. F-9 and pg. 2-29). This list does not preclude non-listed activities as long as they are consistent with the Travel Plan. The management guidelines for an ERMA are found on pg. C-16 of the Land Use Planning Handbook (H-1601-1) and states that actions in an ERMA are custodial only. The setting referred to by the commentor is a statement of fact and not a desired condition. |

| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 46 | We are concerned about the assumption the agency seems to have regarding vehicle use on mancos shale soils contributing to salinity in the Colorado River.  The assumption is repeated throughout the DEIS.  The data we have reviewed would indicate erosion is occurring in such a massive scale than an increase of TSS/TDS/TMDL caused by all human activities, including road building activities and other vehicle use, cannot be detected.  It is insignificant compared to what occurs naturally. | The commentor provides no citation on the data referred.  Our sources (Lusby, 1963 and BLM, 1993d) on the Mancos conclude that land use activities, including OHV use, contribute to accelerated erosion and thus increase salinity to the Colorado River. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 47 | The portion of the DEIS discussing the Alternatives identifies as a goal and objective maintenance of current air quality.  BRC's difficulty with the air quality data is that it is difficult to ascertain from the DEIS the extent to which (a) the asserted incremental benefit influenced the decision to prefer Alternative C; and (b) if it did have significant influence on the decision, why the decision was made to reduce available OHV opportunities when there has been no showing that OHVs contribute to air quality degradation. BlueRibbon respectfully suggests more data on OHV emissions be included in the Final EIS and that a discussion of OHV emissions be included in the Final EIS if OHV emissions influence a decision. | Air quality emissions were not considered in Travel Plan decisions within the DRMP/EIS.  The designation of routes in the Travel Plan will not in itself increase travel and emissions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 48 | Alternatives A, B, and C each close significant miles of existing OHV routes in medium and high cultural site-density areas.  These closures are justified on the grounds that they will produce "long term beneficial impacts from reduced opportunities for inadvertent impacts, looting, and vandalism." Draft EIS, Sec. 4.3.2. There is no data in the EIS that cultural resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. BRC believes the closure approach in medium and high site-density areas cuts too broadly for the problem.  The identified risk is "inadvertent impacts."  "Inadvertent impacts" is undefined and is not discussed in the EIS. | The medium and high cultural site density areas referred to by the commentor relate to the model of cultural resource site densities.  This model included on pg. 4-30 of the DRMP/EIS was developed to analyze potential impacts to cultural resources from various land use actions.  For Travel Plan development documented cultural sites were utilized to determine whether or not a route had a cultural conflict.  The miles of closed route listed in the Chapter 4.3.2 include the 2500 miles of routes not identified because they had no purpose and need.  Many of these miles or routes are in high and medium site density areas and these closures would benefit cultural resources.  Specific route closures for |

| | | | | |
|---|---|---|---|---|
| | | | Inadvertent impacts are therefore an unfounded assumption which cannot be attributable to OHV or mechanized use.  BRC believes a plan of mitigation, rather than prohibition, is possible and beneficial.  This particularly so because numerous recreators use OHVs to access important historical sites. | protection of cultural resources are related to known sites.  The term "inadvertent" and according to the dictionary means "unintentional".  Therefore, inadvertent impacts result from actions of people or uses that accidentally cause damage to cultural resources.<br><br>Access to a large number of cultural sites is provided across all the alternatives for the Travel Plan of the DRMP/EIS.<br><br>Information has been added to Chapter 3 of the PRMP/FEIS that cultural resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism.  Basically that increased access results in increased inadvertent impacts, looting, and vandalism.  References will be cited. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 49 | Chapter 4.9 discusses the impacts to paleontological resources, and expresses a concern that the more OHV use in sensitive paleontological areas, the greater the risk these areas are for unauthorized fossil collection and vandalism. The DEIS, however, lacks the nexus between OHV use and an increase in vandalism or unauthorized collection of paleontological resources.  Additionally, although it is difficult to determine the extent to which existing routes in paleontologically-sensitive areas will be eliminated, again, existing routes will have not been shown with any data in the DEIS to pose an unreasonable risk to those resources. | Information has been added to Chapter 3 of the PRMP/FEIS that paleontological resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism.  Basically that increased access results in increased inadvertent impacts, looting, and vandalism.  References will be cited. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 50 | Much of the discussion of the Alternatives relating to the impact of OHV decisions on recreation (and specifically camping) discusses a perceived threat to soil and vegetation resources due to OHV use.  The DEIS lacks a meaningful analysis of the existing conditions and appears to favor closure over mitigation.  The result is a significant loss of recreational opportunities, including a significant loss of camping opportunities.  This, in an area which the DEIS recognizes is very important for | On pg. 4-235 of the DRMP/EIS the impacts of reducing recreation travel opportunities on motorized users are discussed.  On pg. 4-267, the effects of restricting dispersed camping are discussed.<br><br>See response to comment 123-8. |

| | | | | |
|---|---|---|---|---|
| | | | camping activities. As in other discussions of resource damage due to OHV use, such damage is simply and summarily presumed in the discussion of the camping resource. It is neither quantified or otherwise demonstrated in a useful manner. The resultant decision lacks evidence of the requisite "hard look" present in defensible NEPA documents. Moreover, the effects of the significant loss of OHV opportunities on other resources has not been analyzed, which they must pursuant to NEPA. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 51 | Again, it is difficult to ascertain the extent to which any concern of the impact of OHV use on riparian areas had on designating Alternative C as the preferred alternative, but to the extent it influenced the decision at all, there is less than meaningful analysis; there simply is none. Thus, closures are not justifiable on grounds that OHV use will adversely affect riparian areas. This section generally identifies the resource benefits of reducing OHV and camping activities without discussion of how existing OHV and camping activities will further impair resource protection. | The BLM utilized the Standards for Public Land Health and Guidelines for Recreation Management for BLM lands in Utah in considering the impacts of OHV use and dispersed camping on riparian areas (Appendix R of the DRMP/EIS). On pg. R-2, Rangeland Health Standard 2 directs the BLM to "where feasible, developed travel routes should be located away from sensitive riparian areas" and "camping in riparian areas should be avoided …to reduce vegetation disturbance and sedimentation". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 52 | The DEIS fails to adequately consider all resource values in its decision to establish "Areas with Wilderness Characteristics." It is improper to make decisions based upon an inventory for a single resource value, in this case; 'wilderness character'. FLPMA's Section 201, which is the section of FLPMA under which the Department claims authority for the 1999 wilderness inventory, does not give the Secretary authority to undertake such an inventory effort for just one resource value. | The DRMP/EIS includes 4 alternatives that provide different ways of managing uses and other resources. Wilderness characteristics are just part of the myriad of resources we consider in the land use planning process.<br><br>See response to comment 121-10. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 53 | One serious concern with utilizing the 1999 Wilderness Inventory has to do with the lack of public involvement both in the development of inventory criteria. These concerns are directly related to the agency's congressional mandates and obligations to the public when developing management plans. In fact, although | The criteria used by the BLm in its 1999 Wilderness Inventory were those of the noiw withdrawn "Wilderness Handbook." The Handbook itself was based on the criteria of the 1964 Wilderness Act, which had ample public input and comment as part of the normal legislative process. |

| | | | | |
|---|---|---|---|---|
| | | | the original Wilderness Inventory Handbook acknowledged the importance of public involvement when inventorying for Wilderness characteristics, the 1999 Wilderness inventory criteria and procedures went out of its way to eliminate public involvement. | Upon completion of the 1999 inventory, the BLM solicited comments from the public through public meetings and published invitations to comment.  The resultant approximately 12,000 responses led to numerous BLM field checks.  The findings from the BLM's response to comments for the Moab Field Office were incorporated in the 2003 "Revisions to the 1999 Utah Wilderness Inventory". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 54 | The "Utah Wilderness Review Procedures" adopts some of the guidelines and requirements laid out in the original WIH  and the Organic Act Directives (OAD's).  The Interior Department maintains that the re-inventory procedures are the same as the previous ones, thereby fulfilling Secretary Babbitt's commitment to the Utah's Congressional Delegation that the re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory" to his re-inventory effort.  Clearly, the re-inventory document has a much lower threshold for what qualifies as "natural" than the one applied in the original inventory. | See response to comments 120-8 and 121-10. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 55 | GIS mapping of vegetation and making assumptions about wildlife activity based upon the vegetation is not an accurate way of assessing importance of any given area for wildlife.  Without ground truthing of vegetation conditions it can only be assumed what both density and diversity is in an area.  Thus, invalid assumptions can be made about habitat and wildlife in an area and wrong decisions made about potential impacts on wildlife as the result of motorized routes and their use.  Trails could be removed or not allowed using unsubstantiated information. | Vegetation habitat types were utilized in Chapter 4 of the DRMP/EIS to analyze general potential impacts to sensitive species.  No travel plan decisions were based on this information.

Routes were only eliminated from identification in the alternatives for the Travel Plan based on specific wildlife habitat coverage. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 56 | Consideration has to be given to changing livestock grazing activity throughout the area.  Currently, much of the MPA is in need of changes in grazing practices.  Some areas should have livestock grazing entirely removed and other areas need to have the grazing | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS.  These site specific decisions are not land use planning decisions. |

| | | | | |
|---|---|---|---|---|
| | | | program modified.  Through these efforts habitat conditions would improve in many areas and wildlife would benefit.  It could be argued that changes in grazing practices with the resultant improved habitat would benefit wildlife and offset many impacts attributed to OHV activity. | Closures to livestock use have been considered during plan development to reduce conflicts with other uses. In most cases BLM believes that multiple use is most appropriate and conflicts between uses can be mitigated to an acceptable level while meeting Utah's Rangeland Health Standards. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 57 | Page 4-464 – It is stated that, "short term adverse impacts include human presence and noise disturbances (though some species can become habituated to certain noises).  Long-term adverse impacts include habitat fragmentation from roads and cross-country riding, soil compaction, increase erosion and reduced air quality".  It has been demonstrated by wildlife themselves just how adaptable they are and how readily they habituate to the presence of motorized activity.  When there are repetitive human activities they can and do adjust to these activities and use habitat adjacent to these areas.  Habitat fragmentation is always an issue.  All too often the argument is made that trails will fragment habitat.  In reality, the animals may move away from the trail when there is human activity, but will move back into the area when, in this case, the rider moves out of the area.  Also trails and roads do not serve as barriers to movement. | Designated routes will be utilized by motorized users although the level of use is impossible to determine.  The statememnt on 4-464 acknowledges the impacts to wildlife from use of the routes. Use of the routes results in short term habitat fragmenation.  The BLM stands by the statement on the impacts to wildlife.

The BLM assumes that designated routes will be utilized by motorized users.  During times of use, the animals will move away.  The BLM does not claim that the animals will not move back when the use passes. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 58 | There would have to be more supportive documentation to show why these areas (ACECs in Alt B) should be closed to motorized use.  Absent data demonstrating that both habitat and wildlife are being adversely affected by the presence of motorized trails the areas should not be closed to use. As shown in Alternative C the BLM must feel the same way about justification for these closures. | ACECs in Alt B are limited to identified routes and are not closed to motorized use as specified in the DRMP/EIS on pg. 2-33 through pg. 2-39. |
| Colorado Off-Highway Vehicle Coalition | 123 | 59 | Of the BLM Sensitive species mapping indicates that only burrowing owl habitat occurs in the area [White Wash Sand Dunes].  However, when looked at on a site-specific basis there is very little of the area that | The maps of habitats regarding sensitive species were obtained from the U.S. Fish and Wildlife Service and the Utah Division of Wildlife Resources.  These agencies are recognized as the agencies with jurisdictional expertise |

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | provides conditions for these birds. Much of the area lacks habitat for prairie dogs and ground squirrels which is their primary prey base. Suitable nesting habitat is also lacking. Suitable habitat for prey species may be found in areas where there are existing trails, but no new trails would be allowed. No prairie dog habitat is mapped for the area. | for sensitive species.<br><br>No routes were excluded from the White Wash area for sensitive species habitat management. The issues in the White Wash area were cultural, riparian and bighorn sheep habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 60 | This is an area [White Wash Sand Dunes] utilized by a small herd of desert big horn sheep. There is no lambing or rutting habitat shown for this area, but there are migration routes n the area. The existing motorized trail system and open area in the dunes area is not known to be adversely affecting the big horns. There are areas nearby where motorized traffic is lacking that provides suitable habitat for the sheep. Closing the Duma Point trail and not allowing motorized use in an area encompassed by Brian's Trail, the Dee Flat/Dee Pass Road and the Balanced Rock Trail to the Duma Rim Trail would provide an area where big horns would have escape cover and secure areas. The BLM has indicated they will close the Duma Point Trail to provide escape cover for the sheep. However, in a conversation with Bill Bates (UDWR) it was learned that the division has plans to relocate this herd to another area of the state that provides better habitat conditions and will help insure the viability of this small herd. With the relocation of this herd potential impacts to this small population will be eliminated.<br><br>If the big horns are relocated then the entire area proposed by BRC as shown on Figure 1 would be open to motorized use. Other than in the immediate sand dunes area, motorized use would still be limited to existing trails or slick rock areas, which would result in no additional impacts to habitat in the area. | The bighorn sheep herd around Crystal Geyser was recently relocated to Johns Canyon in San Juan County, Utah. The Utah Division of Wildlife Resources does not intend to relocate the herd from the Duma Point area. The need to provide escape terrain to the Duma Point bighorn herd has resulted in the non-designation of several miles of user-made motorcycle trails in the Duma Point area. The user made trails that are below the crucial bighorn habitat in the Duma Point area have been designated. |
| Colorado Off-Highway | 123 | 61 | None of the remainder of the area [White Wash Sand Dunes] is mapped as habitat for other listed species. | The BLM agrees that no other listed wildlife species are present in the White Wash area. The designation or non- |

| | | | | |
|---|---|---|---|---|
| Vehicle Coalition (COHVCO) | | | Obviously, other wildlife species use the area, including neo-tropical birds, mammals, amphibians and reptiles. Without surveys or studies to assess the importance of this area to any of these species, it must be assumed that use is in line with the available habitat.  It must also be assumed that at current use levels without any additional trail development wildlife use would remain constant. | designation of trails in the White Wash area was not due to the habitat needs for listed species. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 62 | There are opportunities in this area [White Wash Sand Dunes] to enhance water sources for all wildlife. Providing additional water sources in areas away from where motorized traffic occurs would reduces the changes of species being adversely affected as motorized activity increased in the area.  Fencing riparian areas to exclude livestock and motorized traffic there would be an increase in suitable habitat that would benefit a number of species. Other efforts to improve riparian conditions such as supplemental plantings would also benefit wildlife and compensate for potential impacts from OHV activities. | Wildlife improvements are not a resource allocation that requires a land use planning decision.  Alt C and Alt D in the DRMP/EIS propose to protect White Wash water sources which would benefit wildlife.  The BLM will seek to improve wildlife habitat in the White Wash area on a site-specific, case by case basis. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 63 | There are a few very small areas mapped in the Dee Pass Focus Area as potential Mexican Spotted Owl (MSO) foraging habitat.  These are very small isolated pockets and are well removed from any suitable nesting habitat, which precludes the chances of any of this area would be used by the owl.  Further, this mapped foraging habitat was based upon a model and it is probably safe to assume there was no ground truthing of the area to verify habitat conditions. | The BLM is directed by the U.S. Fish and Wildlife Service to utilize the model for identifying potential Mexican Spotted Owl (MSO) foraging habitat.  However, due to isolated pixels of breeding habitat and no foraging habitat this area is not suitable for MSO occupancy.   No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with MSO. Establishment of new routes would not require MSO surveys before they could be added to the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 64 | The desert big horns using this area [Dee Pass] would be the same herd that is found in the White Wash area. Relocation of the herd would result in there being no issues with these animals in this area. | The Utah Division of Wildlife Resources has no plans to relocate the bighorn sheep herd in the Duma Point and Dee Pass area.  Relocating sheep from Dee Pass would not be advantageous because other sheep from adjacent areas would emigrate into the Dee Pass area.  The BLM's travel plan has allowed public use of the Dee Pass area with the closure of only a few of the user-made motorcycle trails that are within the area. |

| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 65 | This area [Dee Pass] is mapped as providing suitable habitat for burrowing owls. This appears to have been a general observation about habitat availability in the area for these birds.  Without site-specific surveys of the area it cannot be assumed that these birds use the area for nesting and brood rearing.  Surveys of the area would have to be conducted before any determinations could be made about trail closures or the establishment of new trails. | No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with burrowing owls.  Establishment of new routes would require surveys before they could be added to the Travel Plan.  Burrowing owls are protected under the Migratory Bird Treaty Act. |
| --- | --- | --- | --- | --- |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 66 | Except for the Mexican Spotted Owl (MSO) none of this SRMA [Utah Rims], as currently laid out, is mapped as habitat for any of the federally listed Threatened, Engangered, or Candidate Species.<br><br>There are a few very small areas mapped as potential MSO foraging habitat. These are very small isolated pockets and are well removed from any suitable nesting habitat, which precludes the chances of any of this area would be used by the owl. Further, this foraging habitat was based upon a model and it is probably safe to assume there was not ground truthing of the area to verify habitat conditions. Any motorized or mountain bike trails in this area would be removed from these pockets of timber or cliff areas. | The BLM agrees that none of the Utah Rims SRMA is mapped as habitat for any federally listed species.  No routes were removed from the Utah Rims area due to issues with special status species.  Those routes not designated were primarily due to cultural resource conflicts.<br><br>Refer to response to comment 123-63. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 67 | The area [Utah Rims SRMA] is mapped as burrowing owl habitat.  The amount of burrowing owl activity in the area is unknown.  Given limited prairie dog activity in the area it must be assumed that this is probably helping to hold burrowing owl numbers down.  Burrowing owls also prey on ground squirrels and will be found where there are concentrations of these animals.  The small amount of habitat that is affected by single-track routes would not have an affect on the prey base or nesting and brood rearing habitat for the burrowing owl. | Refer to response to comment 123-65.  No routes in the Utah Rims area were not designated due to burrowing owl habitat.  The primary resource of concern in the Utah Rims area was cultural resource conflict. |
| Colorado Off-Highway | 123 | 68 | There is nesting and foraging habitat for both bald and golden eagles in the area [Utah Rims SRMA].  Nesting | The issue raised by the commentor is not a comment on the plan. No existing routes were closed in any of the |

| | | | | |
|---|---|---|---|---|
| Vehicle Coalition (COHVCO) | | | by these birds would occur on cliffs or cottonwoods along the river. Both summer and winter foraging habitat for bald eagles and to a lesser degree golden eagles is shown as occurring in the area where there are designated motorized trails. The chance of motorized activity affecting foraging activities is very minor. It is doubtful that there has been a problem in the past with riders disturbing foraging activities by these birds. It must also be assumed that with the large expanses of suitable nesting habitat in the canyonlands area that nest disturbance has not and will not be an issue. | alternatives for the Travel Plan in the DRMP/EIS due to conflicts with eagles, so the issues raised by thwe commentor are moot. Establishment of new routes would require surveys before they could be added to the Travel Plan. Eagles are protected under the Migratory Bird Treaty Act and the Bald Eagle Protection Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 69 | The Utah Rims SRMA is located in an area mapped as ferruginous hawk habitat. There are not known nest sites immediately adjacent to any of the trails. There is suitable P/J habitat in the area and is probably used by these birds. It was not indicated in the document to what degree the area is used for nesting and foraging. | The issue raised by the commentor is not a comment on the plan. No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with ferruginous hawks. Establishment of new routes would require surveys before they could be added to the Travel Plan. Ferruginous hawks and all raptors are protected under the Migratory Bird Treaty Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 70 | Thompson Trail has already been surveyed by the BLM and is shown on the Alternative C & D map. However, this route is not the same as that proposed by RwR. The alignment proposed by RwR does deviate from the BLM proposed route, but not significantly. While conducting an aerial survey of the route it was obvious that this route would provide a better riding experience than the BLM route. When compared to the BLM route, using the RwR route would not result in any additional measurable impacts on habitat and wildlife found in the area. | Establishment of any new routes, or realignment, would require surveys for raptors and sensitive species before they could be added to the Travel Plan. Raptors are protected under the Migratory Bird Treaty Act. The BLM is required to manage sensitive species so that impacts would not lead to Federal listing under the Endangered Species Act.<br><br>The Thompson Trail, a user made trail in an area that has been limited to existing routes since the 1985 Grand RMP, was not verified during the travel plan identification process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 71 | A review of wildlife information contained in the DRMP shows portions of the Thompson Trail passing through historic white-tailed prairie dog habitat. Because there are no roads accessing these prairie dog towns, people going to those areas to shoot prairie dogs would be the primary impact. | There are numerous routes in the alternatives for the Travel Plan of the DRMP/EIS that provide access to prairie dog habitat.<br><br>The shooting of prairie dogs is governed by wildlife regulations promulgated by the Utah Division of Wildlife |

| | | | | Resources.  Access to where persons wish to shoot is not always guaranteed by the BLM Travel plan. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 72 | The area [Thompson Trail] is mapped as burrowing owl habitat. The amount of burrowing owl activity in the area is unknown. The small amount of habitat that is affected by the single-track route would not have an affect on the prey base or nesting and brood rearing habitat for the burrowing owl. | Refer to response to comment 123-65.  The non-designation of the Thompson Trail is Alt C is not because of burrowing owl habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 73 | The area [Thompson Trail] where this trail is located provides habitat for golden eagles.  The active number of eagle nests along the cliffs indicated that ongoing human activity including motorcycle riders and oil/gas field development is not affecting their nesting activities. | Refer to response to comment 123-68. The non-designation of the Thompson Trail is not because of golden eagle habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 74 | The route [Thompson Trail] does go through mapped ferruginous hawk habitat.  There are no known nest sites immediately adjacent to the trail.  As a mitigation measure, trail user groups could help erect structures, monitor nesting activity, and provide data to the BLM. | Refer to response to comment 123-69.

Coordination with user groups to work with the BLM on a volunteer basis is an administrative action and does require a land use planning decision. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 75 | The area [Thompson Trail] has been mapped by the UDWR as antelope year around and kidding habitat.  Given the low numbers of antelope found in the area it is doubtful use of the single-track trail will affect these animals at the individual or population level.  During the winter there is little dirt bike use of the trail, which further minimizes the chances for impacting the antelope utilizing the area during the winter. | According to aerial surveys by the Utah Division of Wildlife Resources, large concentrations of antelope occupy areas along the Thompson Trail.  The BLM agrees that use of the trail during the winter would have minimal impacts; however, impacts would increase during the fawning season.  No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with antelope habitat. Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 76 | The area [Thompson Trail] is shown as being deer and elk habitat.  However, none of the area is mapped as crucial wintering habitat or as calving and fawning area. It must be assumed there is little deer and elk use of habitat along the single-track route.  Continued use of the route would have little or no affect on these animals. | The BLM agrees that there is minimal use of the deer and elk habitat in this area.   Deer and elk habitat is not an issue in the non-designation of the Thompson Trail in Alt. C.  No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat.  Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |

| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 77 | It has been stated that where the Thompson Trail crosses dry washes and washes supporting riparian vegetation there is a negative impact on the watercourse.  It has been indicated that soil stability is affected and increased salinity results.  It is questionable that this small area of disturbance could cause a detectable change in discharges of soils and elevated salinity at the discharge point of the wash into a perennial waterway.  Further, these small disturbances at the crossings have a minimal effect on riparian vegetation where it exists.  If these crossings were armored the minimal amount of impact that is occurring would be further reduced. | Unrestricted travel in wash bottoms results in resource impacts as determined by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors.  In addition, observations indicate that some users do not remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel and its related impacts to wildlife and other resource values. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 78 | Of greater significance to habitat condition in the area [Thompson Trail] is livestock grazing.  Observations made while flying the area made it evident that cattle grazing is having a significant impact on habitat conditions.  Cattle are concentrating around water sources and along riparian bottoms. This is resulting in poor habitat conditions in these areas.  Grazing can eventually reduce habitat quality species associated with riparian, desert shrub, and sagebrush habitats.  If livestock grazing were eliminated or grazing practices modified to improve habitat conditions there would be an expected increase in both density and diversity of wildlife.  This would more than compensate for the small amount of habitat disturbance associated with single-track trail. | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS.  These site specific decisions are not land use planning decisions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 79 | Changing grazing practices [near Thompson Trail] or eliminating grazing would result in improved habitat conditions for prairie dogs and subsequently species such as raptors. This could be especially true in the case of burrowing owls that are known to focus on prairie dog towns for nesting and brood rearing. | See response to comment 123-78. |
| Colorado Off-Highway Vehicle | 123 | 80 | In addition to improving vegetation and habitat conditions [near Thompson Trail] through changes in grazing practices soil compaction and salinity would be | See response to comment 123-78. |

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | reduced.  Soil compaction results in more rapid runoff when there are events and less moisture is retained in the soil to support vegetation.  It has also been found the livestock grazing results in increased salinity. Increasing the salinity in already saline soils especially in arid areas with relatively infertile soils can result in inhibited plant diversity and density.  Which, when runoff occurs, potentially moves down drainage to the Colorado River. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 81 | Except for the Mexican Spotted Owl (MSO) none of this area [Pole Canyon/Black Ridge] is mapped as habitat for any of the federally listed Threatened, Endangered, or Candidate Species.

Almost the entire area is mapped as potential MSO foraging habitat.  The mapped foraging habitat is based upon a model, which leaves the door open to question whether these birds do forage in the area.  There is no nesting habitat mapped for the area.  USFWS designated critical habitat is found well away from this area. | The BLM is directed by the U.S. Fish and Wildlife Service to utilize the model for identifying potential Mexican Spotted Owl (MSO) habitat.  Suitable habitat has been identified in or near the Pole Canyon/Black Ridge area and is under protocol surveys for MSO absence. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 82 | The area [Pole Canyon/Black Ridge] is mapped as crucial deer and elk winter range.  In a conversation with Bill Bates, biologist with UDWR, he stressed that the Black Ridge area is critical to wintering deer and elk also use the area.  To a lesser degree they use sagebrush areas found in the Pole Canyon area.  They have many years of data to support their observations about winter use by these big game species.  There are already a number of roads and trails that are frequently used in this area.  When conditions permit this area is used on a year around basis.  How much effect this has on winter use of the area by deer and elk is unknown. | The BLM agrees that this area is crucial deer and elk winter range.  This resource is one of the reasons that travel has been limited to designated routes within this area.

No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat.  Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition | 123 | 83 | If activities [in Pole Canyon/Black Ridge] as proposed by RwR are implemented motorized and mountain bike activity would be limited to specific areas.  Within these specified areas mitigation measures could be imposed | No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat.  Establishment of new routes would require site specific NEPA analysis before they are |

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | that would greatly reduce potential impacts on wintering deer and elk.  These could include closure of the areas during the winter months to eliminate disturbance of wintering animals by human activity.  As a mitigation measure habitat improvement work could be implemented in portions of the areas to provide better winter forage conditions for the animals.<br>Use of the area as proposed by RwR would be limited to areas that do not provide good winter range for big game. Trails bike, rock crawling, and mountain bike preferred areas of use do not include the better wintering habitat areas.  No new trails would be established and old trails closed in areas providing good winter habitat.  Habitat improvement by brush hogging and other activities could be implemented to further improve habitat conditions for wintering animals. Those off road user groups that utilize the area could fund habitat improvement work.<br>In addition to these measures there would be timing limitations on use of the area by OHVs and mountain bikes.<br>Bates indicated that if the area were closed to all of the above mentioned activities from April 15 through November 1 each year and habitat improvement measures implemented, the UDWR could support use of the area. | considered for inclusion in the Travel Plan.  The mitigation measures suggested by the commentor would be considered during the site specific NEPA analysis for new routes.<br><br>The activities in the Pole Canyon and Black Ridge area proposed by Ride with Respect were not considered in the DRMP/EIS because many of them were not suggested during the scoping period and were not analyzed as part of this EIS. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 84 | This area [Copper Ridge] is mapped as providing suitable habitat for burrowing owls.  This appears to have been a general observation about habitat for these birds. Without site-specific surveys of the area it cannot be assumed that these birds use the area for nesting and brood rearing. Surveys of the area would have to be conducted before any determinations could be made about the importance of this area to these birds. The absence of any mapped prairie dog towns further reduces the changes that any of these birds would be found in the area. | See response to comment 123-65. |

| | | | | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 85 | Prior to making final decision on whether some routes should be in or out, there is a need to conduct site-specific surveys to evaluate habitat conditions. Generally eliminating routes without these surveys is not warranted. Unless it can be proven that OHV use is causing a decline in habitat quality with a resulting impact on wildlife justification for elimination of a route would not be warranted. | In general, no routes were eliminated in the alternatives for the Travel Plan in the DRMP/EIS solely for wildlife conflicts.  A few routes were eliminated from the alternatives for the Travel Plan due to specific conflicts with bighorn sheep habitat.  Extensive research using data collected from radio transmitted collars supports these travel management decisions regarding bighorn sheep.<br><br>Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan.  The NEPA analysis may require wildlife surveys.<br><br>Section 202(c)(4) of the Federal Land Policy and Management Act directs the BLM "to rely to the extent it is available on the inventory of public lands, their resources, and other values" in the development or revision of land use plans. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 1 | The public comment period is far too short  to allow for a fully informed response to the draft plan. | The BLM provided the public with 90 days to review and comment on the DRMP/EIS, as required by the BLM land use planning regulations (43 CFR 1610.2(e)).  The standard comment period for a DEIS is 45 days in accordance with CEQ regulations at 40 CFR 1506.10(c). Per CEQ regulations, the BLM planning and NEPA processes are integrated.  Therefore, the BLM provides a 90-day comment period doubling the amount of time for the public to review and comment on the DRMP/DEIS. The BLM made the DRMP/DEIS available, free of charge to the public, in a variety of media, including paper, CD, and online.  In addition, the BLM staff has offered to meet individually with groups or individuals to explain the DRMP/DEIS and help focus review and comment efforts. Finally, the BLM held four open houses around the State to facilitate review of the Moab DRMP/DEIS.  online.<br><br>In addition, the Moab Field Office posted the draft |

| | | | | alternatives on the Moab RMP website for almost a year prior to the issuance of the Draft RMP/EIS. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 2 | The National Visitor Use Monitoring Survey (NVUM) conducted in 2006 was not made available to the public and certain data within that document is not adequately incorporated into the Draft RMP/EIS. | The NVUM report was in draft form at the time of the publication of the Draft RMP/EIS (and certain parts of the analysis have not been done yet).  The BLM provided the commentor with a draft version of NVUM despite its non-final form.  The commentor erroneously concludes that BLM failed to use NVUM data properly, and "provided more public lands for ORV use".  In fact, all action alternatives reduce OHV opportunities in the MPA by reducing open acreage significantly, and by significantly reducing miles of routes designated for travel.<br><br>The commentor selectively cites NVUM findings specific to its argument, while ignoring NVUM conclusions which may run counter to its argument.  For example, over half of the respondents indicated some form of motorized activity as one in which they participated in during their BLM visit.<br><br>The USFS (FS) conducted a pilot study of the potential applicability of NVUM to the BLM in FY 2007, using three BLM offices as the pilot.  The BLM was initially hesitant to release the results of the studies, but did so because of public interest.  The BLM hesitation was based on concerns that users of the data might not realize the limitations and caveats inherent in the pilot nature of the study and the preliminary nature of the data.<br>As the NVUM report explicitly states, the three pilot studies are just that-pilot studies.  From the beginning of the process, BLM shared concerns with FS that its model may not be fully applicable to the BLM and its management needs.  The FS agreed with the BLM, but suggested that we start with the FS model (with some modifications), and later evaluate the product generated to see if further modifications were desirable for future BLM studies (or even if such studies are warranted).  For |

| | | | | |
|---|---|---|---|---|
| | | | | example, the BLM felt from the beginning that certain strata (developed campgrounds, for example) might be oversampled, while other strata (for example, dispersed recreation) might be undersampled.  These concerns have been incorporated into future NVUM planning, based on feedback from the initial pilot studies.  The net result is that the findings of the NVUM studies for the three pilot study sites may not definitively represent actual visitation patterns and uses for the studied offices.<br><br>The preliminary nature of the NVUM data for the BLM pilot sites must be emphasized.  The FS has only recently posted on the NVUM website the adjusted data from FY 2005 studies.  Economic data collected as part of the NVUM process is compiled only every few years, and none is yet available for the 2007 studies. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 3 | The FOIA submitted by SUWA on August 23, 2007 requesting RMP background documents was not responded to during the public comment period even though the deadline for the provision of those documents has expired. | The FOIA process and the land use planning process are different and separate.  However, the FOIA procedures were followed by the BLM in responding to the commentor's FOIA request of 8/23/07 and the information requested was provided on December 12, 2007.  There are remedies through the FOIA process should the commentor seek to pursue them.  Much of the information in the FOIA request has been made available to the commentor over a period of time. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 4 | The Moab Draft RMP fails to acknowledge public will regarding land management preferences.   During the scoping period the majority of the public favored a pro-conservation and non-motorized position by a majority of 10:1. | The issues raised during the scoping period were incorporated into the Moab Draft RMP/EIS.  The scoping comments identified by the commenter are specified as Issues 1 & 10.  Issue 1 states:  How can increased recreation use, especially motorized vehicle access, be managed, while protecting natural resource values?  Issue 10 states:  How should non-WSA lands with wilderness characteristics be managed?  A range of management actions was developed to address the issues identified by the public.  All the action alternatives significantly reduce areas open to cross country use and significantlly reduce the number and mileage of routes |

BLM_0011669

| | | | | |
|---|---|---|---|---|
| | | | | open to motorized travel.  It should be noted that even the BLM's Alt D (the least restrictive alternative to motorized travel) proposes fewer routes than the travel plan submitted by the commentor during the scoping period. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 5 | FLMPA requires that BLM give priority to designation and protection of areas of critical environmental concern (ACEC).  Protection of existing ACECs and due consideration of proposed ACECs must be a priority in the RMP process.  The designation of only 63,252 acres of ACECs in the planning area of some 609,687 acres found eligible falls far short of FLMPA's mandate that BLM give "priority" to this resource.  SUWA recommends that the BLM follow the mandate of FLPMA and give priority to the designations of ACECs and not treat ACEC designation as merely another constituent management option in a matrix of options. | The BLM gave full consideration to designating and persevering ACEC during this land use planning process.  The BLM evaluated 35 ACEC nominations and found 14 to meet the criteria for designation as an ACEC.  All 14 ACECs are proposed for designation in Alternative B, 5 ACECs are proposed for designation in Alternative C, and 0 ACECs are proposed for designation in Alternative D.  These alternatives analyze and disclose the impacts of the proposed ACEC management prescriptions and protections.<br><br>The relevant and important values identified in the ACEC process are proposed for ACEC designation in one or more alternatives and in many cases where ACECs are not proposed for designation, these values are provided protective measures by other management actions.  The management of ACECs is considered within the entire spectrum of BLM's multiple-use mandate. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 6 | Certain elements of the RMP, most strikingly the travel plan, fail the test of the unnecessary or undue degradation (UUD) standard of FLPMA.  By several measures, the proposed travel plan will harm natural resources by increasing cumulative dust and decreasing air quality, unnecessarily fragmenting wildlife habitat, causing unnecessary damage to riparian areas, floodplains and cultural resources, and reduction of naturalness in areas with identified wilderness characteristics. | The BLM analyzed the impacts of travel management as outlined and described in Chapter 4 of the DRMP/EIS.  Congress recognized that, through the multiple-use mandate, that there would be conflicting uses and impacts on the public land.  Also, as a matter of clarification, the UUD is a management standard that the BLM applies to third party public land users. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 7 | In the context of this RMP, the decisions made with regard to travel planning must more fully analyze all effects of travel planning and other planning so that all cumulative and site specific environmental and social impacts are adequately analyzed. | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.  The direct, indirect, and cumulative impact analyses were analyzed in Chapter 4 of the DRMP/EIS.  Site specific analyses is |

| | | | | not possible at the land use planning level.  Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the  RMP. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 8 | The range of alternatives does not provide protection of natural and cultural resources is a fatal flaw to this plan. | The DEIS/RMP provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction.  These alternatives provide a broad range of management actions to address the issues raised during scoping. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 9 | The Draft RMP did not consider a more environmentally protective alternative consistent with FLPMA's requirement that BLM "minimize adverse impacts on natural, environmental, scientific, cultural, and other resources" and omiitted the Redrock Heritage Proposal. | In the Moab DRMP/EIS, Alternative B emphasizes the protection and preservation of natural resources and minimizes human activities, over commodity production and extraction and motorized recreation access. Alternative B best protects and preserves historic, cultural and natural resources fulfilling both the requirements of FPLMA and NEPA.  The BLM did give full consideration to the Redrock Heritage Proposal, in particular the concept that a desirable BLM Travel Plan contains an equitable allocation between non-motorized and motorized recreation.  Although for the reasons outlined in the DRMP/EIS on pg. 2-107 the Redrock Heritage Proposal was eliminated from detailed analysis, components of the proposal were carried forward for consideration and analysis in all the action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 10 | The Draft RMP/EIS does not have an alternative that mitigates the harm of designating certain routes such as Hey Joe. | The DRMP/EIS analyzed a range of reasonable alternatives.  Closing all roads is not considered a reasonable alternative.  The Hey Joe road was considered to have a purpose and need for recreational use (including permitted use) under all alternatives.  Alt A designates 2,871 more miles of routes than does Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 11 | Accurate, scientific analysis is wholly lacking with regard to travel planning, as well as many other aspects of the Moab Draft RMP. | :A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative. The best available |

BLM_0011671

| | | | | data were used for travel planning analysis, including wildlife data from the Utah Division of Wildlife Resources and U.S. Fish and Wildlife Service.  The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.<br><br>The DRMP/EIS used a systematic  interdisciplinary approach fully considering physical, biological, economic, and social aspects of management actions for the range of alternatives. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 12 | The existence of the National Visitor Use Monitoring survey, giving the BLM significant baseline data from which to draft alternatives, calls into question the validity of the baseline analysis and shows that the BLM ignored significant and new information regarding the affected environment. | See response to comment 124-2. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 13 | The dismissal of the Redrock Heritage Proposal is a clear indication of the BLM's refusal to entertain a responsible "opposing view" in the planning process. | See response to comment 124-9. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 14 | One of the most obvious and consequential flaws in the document is its failure to assess the ongoing impact of existing ORV use in the MFO.  For example on pg. 4-442 the BLM asserts that travel on designated routes would have negligible impacts on vegetation because past use has already occurred. | The impacts of travel on natural resources are analyzed in Chapter 4 of the DRMP/DEIS, including the No Action alternative.<br><br>The Travel Section in Chapter 3 of the DRMP/EIS presents the baseline (current situation) for analysis in Chapter 4.  It discusses the ongoing and baseline issues surrounding cross-country travel that is currently permitted by the existing land use plan for the Field Office.  The planning area was inventoried as having 6,199 miles of non-paved routes.  This number represents the baseline for analysis, however, it is also recognized that cross-country travel is currently allowed in many other areas within the Field Office.  The impacts associated with cross-country OHV use are described in Chapter 4 under the No Action Alternative.  The action |

BLM_0011672

| | | | | alternatives limit travel to designated routes.  The routes that are already in use are considered part of the baseline, and therefore, it is not reasonable to consider the impacts to vegetation from these already disturbed linear surfaces. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 15 | What is the basis for Table 3.18?  Could it be that ORV use is actually a "low" level use given that only 6% of visitors engage in it? | The information provided in Table 3.18 is based on professional judgement and observation of visitor use in the planning area.  It should be noted that jeeping, ATVing, and dirt biking are separated in Table 3.18 but all of these activities are considered as OHV use.<br><br>See also response to comment 124-2. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 16 | Existing conditions should include the presence of non-native species like cheatgrass.  Numerous studies are readily available on this subject and should have been described by the BLM or used as the basis for a description of the manner in which roads and ORVs spread weeds and contribute to wildfire. | Table 3.50 lists noxious and invasive species of Grand County and cheatgrass is listed in this table.  Complete inventories of noxious weeds are not availble across the planning area.  Within the action alternatives travel is limited to designated routes and open cross country travel is essentlly eliminated.  Therefore, the potential for the spread of noxious weeds by OHV use is substantially reduced (pg. 4-428). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 17 | Existing conditions should include the extent of soil erosion caused by ORVs and other uses.  For example, a study entitiled "Desert Biological Soil Crusts" indicate these crusts can be easily pulverized. | The DRMP/EIS on pg. 3-120 acknowledges the existence of biological soil crust in the planning area.  An complete inventory of the biological crusts across the planning area is not available from any source.  The impacts of cross counrty OHV use on soils and biological crusts is discussed on pg. G-24. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 18 | Existing conditions should include an explanation of how ORV use spreads non-natives which outcompete native plants and how ORVs crush native vegetation. | See response to comment 124-16.<br><br>The DRMP/EIS on pg. 4-428 assesses the impacts of OHVs crushing vegetation. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 19 | Existing conditions should include the impact of ORVs and other uses on riparian areas. | On pg. 4-244, the impacts of travel on riparian resources are discussed by alternative.  In all action alternatives, motorized travel in riparian areas is reduced.  Further details concerning the impacts of motorized travel on riparian resources are discussed on pg. G-24. |
| Southern Utah Wilderness | 124 | 20 | Existing conditions should include the relative demand for various recreation opportunities.  The BLM made a | See response to comment 124-15. |

BLM_0011673

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | false assumption about the demand for motorized recreation. | |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 21 | The BLM's failure to analyze and present information about impacts of existing ORV use violates its NEPA duties.  BLM falsely assumes that designating routes causes no new damage.  This designation does cause damage by facilitating back country use where enforcement and monitoring are challenging. | The BLM can not analyze the impacts of illegal activities. It is assumed that the public will adhere to the Travel Plan accompanying the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 22 | ORV impacts to vegetation are largely ignored.  For example, Chapter 4's discussion of this appears to be limited to two paragraphs, none of which is quantitative and none of which assess the probability of ORV's introducing and facilitating the spread of non-native species. | NEPA analysis for a landscape level document such as a land use plan analysis is done at a qualitative level and site specific quantitative analysis is not possible or practical.  Chapter 4 analysis acknowledges that cross county OHV use can spread noxious weeds and can crush vegetation.  This qualitative level of analysis is sufficient. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 23 | Chapter 4's discussion of soils at 4-279 and 280 provides that "no particular data on the distribution of biological soil crusts are available…"  This lack of information is particularly troublesome because these soils are so important to the health of the desert ecosystem in the MFO. | See response to comment 124-17. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 24 | The plan never considers whether current or proposed ORV use levels are sustainable over the long run. | The BLM will continue to monitor the impacts to resources from all uses and will make adjustments as necessary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 25 | The analysis of the impacts of ORV use and roads on cultural sites omits information that supports the use of methodology BLM employed to estimate impacts.  For example, the cultural modeling used by BLM is inadequate.  There is no information about whether there is any legal effect of the high, medium, low classifications or whether they are generally accepted by professionals in the field. The BLM is urged to conduct a full inventory of cultural sites and comply with NHPA. | The cultural model was developed by a BLM professional archeologist.  The DRMP/EIS states on pg. 4-30 "while the site density prediction model used in this analysis is by no means a perfect predictor of site density it is sufficiently accurate (73% success rate) to be utilized as a tool for analyzing potential relative involvement of cultural resource sites in management decisions.<br><br>A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. |

| | | | | Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 26 | "Based on consultation with Native Americans, the BLM would consider sites areas, issues, and objects important to their cultural and religious heritage." 1-13. There doesn't appear to be anything in Chapter 4 that reflects the BLM's considerations of these issues and what it did to accommodate Native American interests. | A summary of tribal consultation, including all meetings with tribal governments and specific issues raised by each tribe is contained on pgs. 5-4 through 5-11 in Chapter 5 of the Moab DRMP/EIS. A complete record of the consultations is available in the Administrative Record for the DRMP/EIS. The concerns raised by the tribal governments were addressed in one or more alternatives, where applicable. For example, the woodlands decisions allow the sustainable harvest (including cutting of green willows and cottonwoods) for Native American traditional ceremonial use. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 27 | Given the over 2600 miles of ORV trails the plan proposes to designate, the potential for soil erosion is significant. Soil erosion is one of the primary impacts of ORV use. | The alternative Travel Plans in the DRMP/EIS designate about 2600 miles of existing and constructed routes. In Alt C 123 miles of user made single track are designated for motorcycles. Impacts of OHV use on soils is extensively analyzed in section 4.3.13.7. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 28 | At 4-405, there's a list of resources that are not considered in the section on impacts to travel management on the theory that whatever BLM does to manage grazing, for example, or other types of recreation, won't impact travel. Wouldn't decisions to limit grazing based on riparian area destruction also impact ORV's. As would decisions to protect areas based on visual resources, or wildlife? Please provide an explanation for this approach. | Limiting grazing in riparian areas is considered on a case by case basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management. Restricting cattle in riparian areas is not directly related to OHVs. It is possible to restrict OHVs to designated routes, which minimizes impacts to riparian areas; however, cattle can not be limited in this fashion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 29 | The EIS does not meet NEPA's requirements to analyze cumulative impacts and connected actions. The EIS for the plan revisions generally provides little or no discussion of cumulative impacts or the effects of connected activities on various resources. | The cumulative impacts of plan alternatives are analyzed in Chapter 4 of the DRMP/EIS. This analyses does not require speculation about the impacts from possible future activities. The BLM asserts that the analyses of cumulative impacts satisfies the requirements of NEPA. |
| Southern Utah Wilderness | 124 | 30 | The plan provides for high levels of both grazing and ORV use in canyon bottoms where riparian areas and | See response to comment 124-28. |

BLM_0011675

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | cultural sites are also prevalent. The BLM should identify the areas in which ORV use is permitted and discuss the combined effects of grazing and ORVs on these riparian areas. | |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 31 | The plan notes that adverse effects from a variety of uses occur in Moab's riparian areas, and that reasonably foreseeable future uses will make it worse, but that mitigation would happen through implementation of PFC standards. There is no attempt to break down the assessment by alternative, or any real quantitative analysis. For example, on 4-282, there's a discussion of the significant adverse impacts to riparian areas from grazing. Can these same areas also sustain ORV use? | See response to comment 124-28.<br><br>The assumptions underlying this assertion are invalid. In the action alternatives of the DRMP/EIS, no open OHV use is allowed in riparian areas (pg. 4-425). In addition, under all action alternatives, no surface disturbing activities are allowed within 100 meters of riparian areas (pg. C-5). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 32 | The plan says that all alternatives would ensure PFC, and that "the loss or degradation of riparian areas, wetlands and associated floodplains would be avoided or minimized; natural and beneficial values would be preserved and enhanced; and fish and wildlife and special status species would be provided for," 4-182, there is no explanation of how ORV use in these same streams affects that conclusion. | On page 4-245 of the DRMP/EIS, the impacts of travel on riparian resources are analyzed. The acres of riparian areas by OHV designation are specified. No cross-county travel is allowed in riparian areas under any of the action alternatives. To provide further analyses, a table has been added to Appendix G of the PRMP/FEIS detailing the number of miles of routes not designated due to resource conflicts including riparian areas. This data has been incorporated into the appropriate resource sections of Chapter 4. In Appendix G of the DRMP/EIS it is acknowledged that OHV use in riparian areas can result in loss of vegetation, degraded stream banks, and erosion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 33 | There are trails in riparian areas, and there doesn't appear to be any criteria or methodology by which riparian areas are chosen for protective measures against ORV use. While it appears that the BLM has focused on how strategies to protect riparian areas would adversely affect ORV use, it does not analyze how ORV use damages riparian areas. | An interdisciplinary team of resource specialists including representatives for riparian, wildlife, vegetation, and soils reviewed each route with a potential riparian conflict (see pg. G-23). Where potential conflicts were identified, the team determined the extent of the conflict and what mitigation might be appropriate. The identified resource conflict was then balanced against the purpose and need for the route for each alternative. |
| Southern Utah Wilderness | 124 | 34 | The EIS lacks any statement of purpose and need for the ORV trail designations. How many trails designated | The purpose and need for designating travel routes are discussed on pgs. G-12 and G-13. This discussion |

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | in the plan addresses the needs of non-motorized visitors.  How many trails designated in the plan are for ORVs and how many for hikers? | provides all the criteria utilized for identifying the routes with a purpose and need.  The interdisciplinary team considered these criteria in designating routes.  The specific criteria utilized were not identified route by route.

The needs of non-motorized visitors have been addressed in the plan by providing Focus Areas specifically for their use, identifying routes previously available for motorized use as restricted to non-motorized use (2,506 miles in Alt C), and greatly reducing the amount of open OHV areas.  In addition hikers are not restricted anywhere on public lands. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 35 | At 2-17 under management common to all the language is vague and difficult to apply: "where unacceptable damage is anticipated or observed, BLM would seek to limit or control activities by managing the nature and extent of the ativity or by providing site improvements that make the activity more sustainable…Such management would seek to reduce or eliminate the adverse impact while maintaining the economic benefits associated with a wide range of recreation uses."  Why not just adopt the language of the federal regulations which requires closure where adverse effects occur?  The BLM doesn't know what the "economic benefits" of the range of recreational uses are, which deprives this standard of any real meaning. | The language on pg. 2-17 is under Recreation Management.  This language refers to all recreation activities including but not limited to just travel.

The purpose of the language, under actions common to all action alterntives, is to provide future flexibility under the plan for protection of natural and cultural resources from recreation activities, while maintaining the benefits of such activities to the community.

The language referred to in the comment on closures is found under the Federal regulations at 43 CFR 8341.2 on Off-Road Vehicles.  These regulations are  referred to on pg. 2-48 of the DRMP/EIS under Travel Management.

The economic benefits of recreation are analyzed in Chapter 4 on pgs. 4-266 through 4-272. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 36 | The plan admits that most recreation use occurs on 53% of the MPA, mostly close to Moab.  4-200.  So the closures and relatively fewer trail designations around I-70 don't really do much to address the core ORV impacts; and those areas close to I-70 are open to leasing anyway, right? | The 53% of the MPA is proposed for management as SRMAs under one or more of the alternatives.  It is erroneous to state that these are mostly close to Moab.  For example, the Book Cliffs SRMA (348,140 acres) is located far to the north of Moab and I-70.  The impacts of OHV use are primarily addressed by limiting OHVs to designated routes under all action alternatives.  Permitted actions under oil and gas leases are mitigated through |

| | | | | surface use restrictions and OHV use is often non-permitted. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 37 | Over one half of the wilderness characteristics lands in the Moab plan have VRMs of Class III or IV which would allow activities that will degrade wilderness values, and the area's world famous scenic vistas.  Yet there is no rationale for the application of the Class III/IV designations.  See 4-154 et seq and 164. | Under Alt B in DRMP/EIS all non-WSA lands with wilderness characteristics (WC; 266,485 acres) are managed for their protection and are managed at a minimum of VRM Class II.  Under Alt C, 47,761 acres of these WC lands (266,485 acres) are managed specifically to protect these characteristics, and are managed as VRM II.  However, in Alt. C, an additional 108,459 acres of these WC lands would be managed as VRM II based largely on the underlying visual resource inventory.  The remaining 110,275 acres are managed as VRM III and VRM IV in Alt C and are also based on the underlying visual resource inventory. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 38 | The BLM avoids dealing with a range of important issues by declaring some beyond the scope of this plan.  The issues of public education, enforcement/prosecution, vandalism, and volunteer coordination are not addressed but are critical to adequately analyzing the feasibility of implementing travel planning decisions and ORV route designations. | The items listed are admistrative actions and do not require land use planning decisions.  The analyses assumes that there will be funding for implementation of the travel plan which will include public education, enforcement/prosecution, vadalism, and volunteer coordination. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 39 | Management of Wilderness Study Areas is also considered outside the scope of the plan.  However, BLM should have a plan for management of these lands, which should include prescriptions for protecting WSA lands if they are released by Congress. | The DRMP/EIS states on pg. 2-43 that should WSA lands be released by Congress a plan amendment would be required prior to any actions.  Therefore, specific decisions for released WSA lands are not detailed in the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 40 | The Draft RMP should have analyzed and alternative with fewer ORV routes.  It fails to include an alternative that would preclude ORV use in WSAs, proposed wilderness areas, non-WSA lands with wilderness characteristics, and other sensitive areas.  There are only 512 miles of difference between the travel plan mileage in Alt B and Alt D.  Thus the Draft RMP viloates NEPA's requirement that the agency provide a reasonable range of alternatives for the public to consider, and for the agency to analyze in order to make a fully informed decision. | Alt B precludes OHV use in WSAs and Wilderness Areas.  In the 266,485 acres of non-WSA lands with wilderness characteristics proposed for management in Alt B, there are 117 miles of route designated.  Although the range of alternatives for miles of road differs by 512 miles between B and D, the difference between A and B is 2,871 miles of road. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 41 | The Moab Draft RMP should have fully analyzed an alternative designating new Wilderness Study Areas. SUWA maintains that BLM has the authority and the responsibility pursuant to FLPMA at Section 202 to fully analyze an alternative that would designate new wilderness study areas. | The BLM does not have the authority to designate new WSAs under the land use planning process.<br><br>The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).<br><br>This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield. Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2))) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c))) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired. All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711). In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs. |
| Southern Utah | 124 | 42 | NEPA requires that BLM not limit its review to the 4 | NEPA requires a reasonable range of alternatives in an |

BLM_0011679

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | proposed alternatives. For example, BLM could decide to protect additional lands with demonstrated wilderness character or designate additional river segments as suitable for protection under the Wild and Scenic Rivers Act. | Environmental Impact Statement. The BLM contends that the 4 alternatives in the DRMP/EIS meet the requirement for a reasonable range. Alt B includes management prescriptions for all lands identified with wilderness characteristics and management prescriptions for all river segments found eligible as Wild and Scenic Rivers. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 43 | The Moab Draft RMP does not fulfill the minimization criteria required by law especially pertaining to the designation of OHV routes. The Draft RMP fails to provide an alternative avoiding potential environmental effects of designating particular routes. The plan does not provide equal recreational opportunities for non-motorized opportunities. The Draft RMP fails to analyze the cumulative effects of a wide spread designation of motorized routes. | Impacts to natural and cultural resources from designation of OHV routes have been minimized by weighing purpose and need against resource conflict on a route by route basis. Of the 6,199 miles of inventoried routes in Alt A, 2,871 routes are excluded from any of the action alternatives. While these 2,871 miles or routes were determined to have no purpose and need, resource conflicts with these routes were eliminated or avoided. Furthermore, these routes are now available for non-motorized use. In addition, more routes were eliminated in the action alternatives due to resource conflicts. It is not reasonable all routes with any resource conflicts; the purpose and need for the routes must be considered. Of the 1,821,374 acres of public lands within the Moab Field Office there are 353,615 acres of land designated as Wilderness Study Areas and 5,200 acres Congressionally designated as Wilderness. The WSAs and the Wilderness Areas are designated across all alternatives in the DRMP/EIS and are available for primitive and non-motorized use. In addition the DRMP/EIS includes SRMAs and Focus Areas managed for non-motorized recreation. The preferred Alternative (Alt C) includes three entire SRMAs for non-motorized recreation (Dolores River - 31,661 acres; Two Rivers - 29,839 acres; and Lower Gray Canyon - 3,759 acres). In addition to the non-motorized SRMAs, non-motorized Focus Areas in Alt C total 107,282 acres. Therefore, Alt C provides substantial opportunities for non-motorized recreation. |

| | | | | The cumulative impacts of route designation are analyzed in Chapter 4 of the Draft RMP/EIS. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 44 | The BLM unjustifiably rejected the Red Rock Heritage Proposal.  The BLM has dismissed the Red Rock Heritiage Proposal entirely not even incorporating any of the excellent recommendations into the conservation alternative. | Refer to response to comment 124-9. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 45 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  The first of these factors is the inclusion of B routes in the Redrock Heritage Proposal. BLM should have altered the RHP to include B roads as cherry-stems to the RHP alternative. | See Chapter 2 of the DRMP/EIS, page 108.<br><br>BLM's rationale for its decision not to carry forward the Redrock Heritage Proposal in its entirety is clearly described in Chapter 2.  BLM is not obligated to take an external proposal and analyze it in its entirety or to alter the proposal. The commentor assumes that BLM relied on only one of its criticisms for rejecting the RHP plan. For example, the commentor's comment concerning B roads suggests that BLM rejected the entire RHP plan simply because it would have eliminated county B roads. B roads are regularly maintained to passenger car standards;  this maintenance is funded with state reimbursement.  Although an important factor, BLM rejected the RHP plan in its entirety for the combination of reasons described in Chapter 2 (Alternatives Considered but Eliminated from Further Analysis).<br><br>By eliminating B roads from its proposal, the commentor does not consider purpose and need for route designation throughout the field office. Cherry-stemming is a term used exclusively for WSAs and wilderness. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 46 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the inclusion of SITLA lands in the Redrock Heritage Proposal. Where there is not B route access (sic), the BLM could reserve administrative access to SITLA lands without providing access to the general public. | See Chapter 2 of the DRMP/EIS, page 108.<br>BLM's rationale for its decision not to carry forward the Redrock Heritage Proposal in its entirety is clearly described in Chapter 2.  BLM is not obligated to take an external proposal and analyze it in its entirety. The commentor's proposal includes SITLA lands;  BLM is obligated to provide reasonable access to SITLA lands based on Utah vs. Andrus. Furthermore, BLM cannot |

| | | | | remove routes from SITLA lands. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 47 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the focus of the RHP on BLM lands south of I-70.  BLM should create more non-motorized opportunities near Moab. | See Chapter 2 of the DRMP/EIS, page 108.<br><br>BLM is not required to create "roadless areas" in order to provide primitive recreation opportunities.<br><br>Three WSAs are located within four miles of the city of Moab.  In addition, there are two National Parks. Alt. C provides non-motorized focus areas near Moab (in the Colorado Riverway, Labyrinth and South Moab SRMAs.) Two non-WSA lands with WC areas are located near Moab.<br><br>Alternative B provides 266,485 acres of non-WSA lands with Wilderness Characteristics.<br><br>See also response to comment 124-43. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 48 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the comparison of the RHP with the county inventory rather than with the BLM's Alt. C travel plan alternative. | See Chapter 2 of the DRMP/EIS, page 108.<br><br>RHP does its analyses regarding distance from a road in comparison with the county inventory. The BLM reduced the miles of route by 2,871 miles by eliminating routes with no purpose and need.  The BLM used purpose and need as well as resource conflicts to eliminate routes, as described in Appendix G. Creating "roadless areas" was not the intent of the BLM's route designation process. The RHP's route designation seeks first and foremost to create "roadless areas"by eliminating roads in areas proposed for wilderness in external wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 49 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is that the RHP ROS analysis fails to account for topographic differentiation and such analyses unfairly impacts non-motorized recreation opportunities. | As stated clearly in Chapter 2 in the DRMP/EIS, pg. 108, ROS was not utilized by the BLM because the varied topography of the MPA results in greater opportunities for primitive, non-motorized recreation than would be indicated by ROS analyses.  There is no requirement to use ROS. |
| Southern Utah Wilderness | 124 | 50 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these | See Chapter 2 of the DRMP/EIS, page 109.  The BLM cannot create new WSAs. While non-WSA lands may be |

BLM_0011682

| Alliance (SUWA) | | | factors is that SUWA assumes wilderness character lands can only be enjoyed without motorized access and discounts the near-town opportunities for enjoyment of these wilderness characteristics. SUWA agrees that near-town recreational opportunities afforded by the WSAs and their access points and the roadless lands within the national Parks are a valuable resource for primitive, non-motorized recreation. However, this is not a justifiable argument for denying protection for the wilderness quality lands in the other parts of the planning area. | managed to protect their wilderness characterstics, there is no requirement to do so. Many of the lands to which the commentor refers have been found to lack wilderness characteristics due to a plethora of routes. Other areas have been proposed for management of wilderness characteristics under Alt. B. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 51 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP). One of these factors is that the BLM cannot create new WSAs. SUWA asserts that BLM can create new WSAs. | See Chapter 2 of the DRMP/EIS, page 109 and response to comment 124-41. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 52 | By excluding desingnation of new WSAs from the Draft RMP it risks violating FLPMA and NEPA and jeopardizes the validity of the entire planning process. | See response to comment 124-41. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 53 | Alt C does not sufficiently protect BLM roadless lands i.e. non-WSA lands with wilderness characteristics. Alt C only protects 10% of the non-WSA lands in the citizen's wilderness proposal. Until the wilderness issues is settled by legislative means, BLM should manage all wilderness characteristics areas to prevent actions causing degradation of their wilderness characteristics. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| Southern Utah | 124 | 54 | SUWA and others maintain that many wilderness | As part of BLM's wilderness characteristics inventory |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | quality lands have yet to be appropriately identified as possessing wilderness characteristics by the BLM. There remain some areas that the BLM has yet to conduct an appropriate on-the-ground inventory, and has instead relied on aerial photos (which tend to exaggerate impacts because vegetation patterns from old impacts are far more visible from the air than on the ground).  SUWA contends that BLM has only performed a cursory assessment of these wilderness character units. | maintenance, BLM performed a combination of data and on-site reviews.  This included specific field inspections, Interdisciplinary team review of data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings, which involved wilderness characteristics inventory maintenance.<br><br>The BLM examined about 558,807 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics.  The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B.  The remaining 292,322 acres of the Red Rock proposal did not have wilderness characteristics based on the inventory maintenance conducted by the BLM between 1996 and 2007. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 55 | The BLM erroneously includes in its travel plan "naturally reclaiming and seldom used routes".  The resultant damage caused by designating these routes would impact wilderness characteristics.  Appendix D provides specific information on various routes and lands. | In formulation of the Travel Plan, the BLM specifically considered resource conflicts along with purpose and need for individual routes in the action alternatives.  In these alternatives, the BLM identified over 2500 miles of currently available vehicle routes for non-motorized use. Furthermore, BLM reduces acreages in the areas "open" to cross country vehicle travel to nearly 0 and eliminates the category of "existing roads and trails" in all action alternatives.  These proposed management actions would reduce the resource damage asserted by SUWA.<br><br>It is beyond the scope of the plan for the BLM to create "roadless" areas where such areas do not currently exist. |

| | | | | Rather the BLM evaluates routes for purpose and need balanced against resource use conflicts.  A preference for a route not to be designated in order to create a "roadless" area is not in itself a resource conflict, let alone a conflict, which would always outweigh the purpose and need. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 56 | The BLM uses County route data as the boundary of naturalness for wilderness characteristics units.  The BLM performed no on the ground inventory of these routes. | See response to comment 124-54 regarding inventory procedures.<br><br>The County GIS route data used in the wilderness review process was verified by a combination of data and on-the-ground verification.  An Interdisciplinary team reviewed data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings, which involved wilderness characteristics inventory maintenance.<br><br>See also response to comment 124-55 for reference to route specific comments. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 57 | The BLM must use the edge of the significance of disturbance rather than relying on arbitray boundaries to account for the full extent of wilderness characteristics.  Aerial photograph can not be substituted for on the ground inventory. | The wilderness review process was verified by a combination of data and on-the-ground verification to determine areas of disturbance.  An Interdisciplinary team reviewed data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to |

| | | | | inventory the public lands and stands by its findings, particularly the findings which involved wilderness characteristics inventory maintenance.<br><br>See also respone to comment 124-54. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 58 | The travel plan accompanying the DEIS violates the BLM's own rules for designating trails outlined in its 2006 "Clarification Guidance".  The BLM has provided no definitions, criteria, or guidelines as provided by this guidance. | The Clarification Guidance referred to (Technical Reference 9113-1) was issued far after the Travel Plan was formulated.  On pg. 6 of this document it states "The document does not address how to establish an appropriate route designation, evaluate environmental effects, perform a condition assessment, or decide when to add or remove a route.  Rather the goal of the transportation route inventory is to identify and properly classify all existing routes whether planned or unplanned (user created)".  This guidance is not mandatory and was not intended for travel route designation in the land use planning process. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 59 | The BLM simply "inherited roads and trails from Grand County maps and from off-road vehicle advocates in violation of the Clarification Guidance of 2006.  In a meeting in Salt Lake City on October 3, 2007, the BLM staff informed SUWA that it has not visited each of the routes but simply relied on a statistical sampling technique to confirm the information on County maps. | As part of the scoping process for the DEIS/RMP, the BLM solicited route data from Counties and other interested parties.  As described in Appendix G on pgs. 15 and 16, the BLM verified the routes provided from the public by statistical sampling and on the ground verification.  The statistical sampling yielded a 99.7% accuracy rate at a 95% confidence level.  Each of the verified routes was then individually reviewed for purpose and need weighed against resource conflicts.  The BLM did not inherit roads and trails but rather examined each one individually. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 60 | The draft RMP does not demonstrate a full range of travel types.  ORV routes total 2600 miles and hiking routes total 20 miles. | The needs of non-motorized visitors have been addressed in the plan by providing Focus Areas specifically for their use, identifying routes previously available for motorized use as restricted to non-motorized use (2,506 miles in Alt C), and greatly reducing the amount of open OHV areas.  In addition hikers are not restricted anywhere on public lands.<br><br>The commentor implicitly assumes that the routes |

| | | | | identified in the BLM travel plan represent primarily "ORV trails". In fact, routes are identified to serve a wide variety of travel needs (range, minerals, private lands access, wildlife projects, etc), although they are all available for recreation. Use of the term ORV implies that these routes are designated only for the more extreme forms of motorized recreation, when in fact most are passable by common street-legal vehicles. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 61 | SUWA can not identify the basis for specific route designations to confirm that the BLM has complied with legal and policy obligations. | There are over 33,000 route segments considered in the Travel Plan. Information on each of these segments is coded in a GIS data base which was provided to the commentor during the comment period for the DRMP/EIS. This information is publicly available at the Moab Field Office. It is impractical to include this volume of data within the covers of the DRMP/EIS document. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 62 | The BLM should only designate routes with distinct purpose and need south of the Mineral Bottom road. Redundant routes within areas found to possess wilderness characteristics should be closed. A wild buffer to protect Canyonlands National Park should be provided. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives. The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals. As described in Chapter 2 of the DRMP/EIS, pp. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. Also, the BLM is not required to create buffers around National Parks. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 63 | The BLM should close the road along the Green River which accesses Hell Roaring Canyon (north of the airstrip) for the following reasons: 1) the route is seldom used, 2) the route in Hell Roaring Canyon is located in the floodplain and causes damage to riparian and water quality, 3) the route conflicts with non-motorized users in Labyrinth Canyon, and 4) designation of this route is inconsistent with management of the wilderness characteristics (WC) resource. | The commentor provides no evidence to support their assertions of resource damage and/or user conflicts. As described in Appendix G, the BLM used a interdisciplinary team to identify resource conflicts weighed against the purpose and need. The BLM stands by its route designation.<br><br>The route the commentor proposes closing lies almost entirely within their wilderness proposal. As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah | 124 | 64 | The BLM should close redundant low value routes on | In all action alternatives of the DRMP/EIS, the BLM does |