| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | Mineral Point to prevent habitat fragmentation, reduce user conflicts, and lower cumulative dust creation. | not identify for motorized use several of the routes in question, including routes found to be redundant.<br><br>The routes the commentor proposes closing lie almost entirely within its wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 65 | The BLM should close all ORV use past the state land on Deadman Point to eliminate redundant routes and routes through lands with wilderness characteristics. | In all action alternatives of the DRMP/EIS, the BLM does not identify for motorized use several of the routes in question, including routes found to be redundant.  SUWA provides no specific conflicts other than their wilderness proposal.<br><br>The routes the commentor proposes closing lie almost entirely within its wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 66 | The BLM should close the road along the Green River north of Spring Canyon (to Hey Joe Mine).  Motorized use on this road conflicts with comercial and private boating. | This route was identified as a road during the 1999-2003 wilderness inventory.  It leads to a large disturbed mining area.  It is a Jeep Safari route popular with motorized recreationists.  The commentor provides no evidence to support their assertion of a conflict with hikers and boaters.  The BLM made several visists to this route during Easter Jeep Safari.  At the time of these visits the BLM observed very little motorized use or river use let alone any user conflict.<br><br>The route the commentor proposes closing lies almost entirely within their wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance | 124 | 67 | White Wash is a unique riparian ecosystem that is proposed as a open ORV play zone in the preferred alternative.  The BLM admits to the uniqueness of this | The BLM recognizes the affected resources in this area.  Alt B proposes closing the dunes to motorized use and creating an Area of Critical Environmental Concern.  All |

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | system in alternative B.  Nevertheless, BLM proposes to sacrifice this area.  The BLM must manage this dune system to preserve it. | action alternatives propose significant reductions in the areas currently open to OHV use with mitigation to protect vegetative and riparian resources.  This area lies within the commentor's wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 68 | The BLM has not recognized the statutory mandate under FLPMA to give preference to ACEC designation. The agency must prioritize the designation of ACECs over other possible resource uses.  For example, BLM cannot reject designation of an area as an ACEC because it is attempting to balance development and conservation in Alternative C. | The FLPMA states that in developing land use plans the BLM shall give priority to the designation and protection of ACECs.  The BLM gave full consideration to the designation and preservation of ACECs during this land use planning process.  Nominations for ACECs from the public were specifically solicited during the scoping period.  A total of 37 ACEC nominations were received and the relevance and importance of each were determined.  Fourteen of the ACEC nominations were found to meet both the criteria of relevance and importance and all these were included for special management as proposed ACECs in Alternative B. |
| | | | | The BLM Manual 1613.23 states that "After completing the analysis of the effects of each alternative, the manager selects the preferred plan alternative which best meets the planning criteria and the guidance applicable to the area.  The preferred alternative reflects the BLM's proposals for designation and management of ACECs." The BLM has full discretion in the selection of ACECs for the various alternatives.  In the selection of the preferred alternative, a comparison of estimated effects and trade-offs associated with the alternative leads to development and selection of the preferred alternative. |
| | | | | Should BLM choose not designate potential ACECs, BLM Manual 1613 .33E provides direction in this process. Rational for not proposing designation of a potential ACEC in the preferred alternative must be provided, that is, the reasons for the decision not to provide special |

BLM_0011689

management attention must be clearly set forth.  Such reasoning may include:

1. Special management attention is not required to protect the potential ACEC because standard or routine management prescriptions are sufficient to protect the Relevance and Importance Values from risks or threats of damage/degradation.

2. The area is being proposed for designation under another statutory authority such as wilderness and would require no further management attention.

3. The manager has concluded that no special management attention is justified either because of exposure to risks of damage to threats to safety is greater if the area is designated or there are no reasonable special management actions which can be taken to protect the resource from irreparable damage or to restore it to a viable condition.

BLM ACEC guidance (Areas of Critical Environmental Concern; Policy and Procedures Guidelines, 45 FR 57318, 57319 (Aug. 27, 1980)) allows a manager to exercise discretion not to protect a potential ACEC through ACEC designation, but that decision has to be documented through the planning process.  If the manager decides to provide the necessary protection through another form of special management, the documentation will include specifics of the special management proposed.  Rationale for all ACEC decisions will be provided in the Record of Decision and supported by analysis in the EIS.  If the decision is to allocate the resources with relevant and important values, in whole or in part, to another use which would in result in damage or loss to such resource, the authorized officer must first find that there is an overriding public need for such other use;

BLM_0011690

| | | | | |
|---|---|---|---|---|
| | | | | that the public benefits of such other use outweigh the public benefits of use appropriate with ACEC designation, and that such other use will best meet the present and future needs of the American people.  In addition, any allocations to such other use will include all feasible planning and management to prevent, minimize, mitigate or restore any consequent damage to the resource, and these requirements will be specified in the documentation. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 69 | If a recommended area is not to be designated as an ACEC, the analysis supporting the conclusion must be incorporated into the plan and associated environmental document. | The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD).  The analysis that forms the basis of the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 70 | The BLM has improperly ignored or discounted the threats to special places (ACECs) from oil and gas development and ORV use and has failed to designate or incorporate sufficient protection for proposed ACECs. | The BLM followed the ACEC designation process outlined in BLM Manual 1613 and analyzed the implications of designating or not designating areas as ACEC.  In particular, in Chapter 4 of the DRMP/DEIS analyzes the impacts of ongoing and future uses on the relevance and importance values associated with potential ACECs under all alternatives.

In addition, see response to comments 124-68 and 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 71 | The BLM has specifically failed to designate ACECs to protect lands with wilderness characteristics.  SUWA believes that BLM's abandonment of its authority to designate any additional wilderness study areas (WSAs) is invalid and will ultimately be overturned in pending litigation and therefore does not prevent the BLM from designating new WSAs. | Pursuant to BLM Manual 1613, "An ACEC designation will not be used as a substitute for wilderness suitability recommendations".  The BLM does not have the authority to designate new WSAs under the land use planning process.

Under the provisions of FLPMA, the BLM has authority to designate ACECs where special management attention is required to protect and prevent irreparable damage to important cultural, historic, scenic values, fish and wildlife resources, other natural systems or processes, or to protect life and safety from natural hazards.  However to be considered as a potential ACEC, an area must meet |

| | | | | |
|---|---|---|---|---|
| | | | | the criteria or relevance and importance, which does not include wilderness characteristics (ACEC Manual at 1613.1).<br><br>See also response to comment 121-10. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 72 | The BLM must designate all WSAs as ACECs to protect them should they be released from Congress. | Refer to response to comment 124-39. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 73 | Behind the Rocks - The ACEC in Alternative C should include the area overlapping the WSA as proposed in Alternative B. | BLM Manual 1613 gives rationale for not designating potential ACECs.  This rationale includes that the area is being  proposed for designation under another statutory authority.<br><br>See response to comment 124-39 and 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 74 | Bookcliffs ACEC - The ACEC proposed in Alternative B must be carried forward to Alternative C based on the priority mandate in FLPMA. | See response to comment 124-68. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 75 | Cottonwood-Diamond Watershed ACEC - This ACEC should overlay the Bookcliffs ACEC so when the fire damage heals the land will be managed consistently with the wildife ACEC (Bookcliffs). | The Cottonwood-Diamond Watershed potential ACEC was proposed for the relevant and important values of natural hazards.  The natural hazard resulted from fire damage.  Wildlife was not one of the relevant and important values identified for this area.  In addition this area is managed as a wilderness study area.  Therefore, it is proposed for designation under another statutory authority which provides protection to the relevant and important values. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 76 | Dolores/Big Triangle - These two ACEC nominations should be combined to cross the threshold of importance for a wildlife corridor. | The BLM stands by its findings concerning the Dolores and Big Triangle ACEC nominations.  Even if these areas were to be combined the wildlife habitat is not unique, rare, sensitive, or fragile.  The habitat referred to was found to meet relevance but not importance because it is duplicated.<br><br>See Appendix I, pgs 7 & 13 of the DRMP/EIS. |

BLM_0011692

| | | | | |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 77 | Gemini Poison Spider - This nomination meets the importance criteria for scenery.  The vast expanse of Navajo sandstone fins and slickrock is equally important as a scenic resource as the Behind the Rocks ACEC or Mill Creek Canyon ACEC.  This ACEC also gives protection to wilderness characteristics. | This area was found to meet the relevance criteria for ACEC consideration.  However, the area did not meet the importance criteria for ACEC consideration because the scenery was found to be of no more than local significance as similar scenery is found throughout the Colorado Plateau.

See Appendix I, pg. 13. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 78 | Hatch Wash - This canyon is geologically unique and important, where Wingate walls typically soar over vast expanses.  The BLM should designate this as an ACEC. | Geology is not one of the relevant and important values for ACEC consideration. Hatch Wash did not meet the importance criteria for scenery because the scenery was of no more than local significance.

See Appendix I, pg. 13. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 79 | Labyrinth Canyon ACEC - This ACEC should be included in the preferred alternative.  It contains wilderness characteristics lands and is threatened by oil and gas development. | Refer to response to comment 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 80 | Mill Creek ACEC - The ACEC in Alternative C should include the area overlapping the WSA as proposed in Alternative B. | BLM Manual 1613 gives rationale for not designating potential ACECs.  This rationale includes that the area is being  proposed for designation under another statutory authority.

See response to comment 124-39 and 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 81 | Tenmile ACEC - The potential ACEC must be managed to protect the critical riparian and cultural resources.  Motorized travel is incompatible with this delicate riparian this delicate riparian environment rich in cultural resources. | The management of the ACEC for the protection of the riparian and cultural resources is compatible with motorized travel on the designated route.  The route has been marked on the ground so travel along the existing route is adhered to and the potential for impacts to cultural and riparian resources has been minimized. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 82 | Upper Courthouse ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | Refer to response to comment 124-69. |
| Southern Utah Wilderness | 124 | 83 | Westwater ACEC - This ACEC should be expanded to include the entire wilderness study area and added to | See response to comments  124-39 &124-71. |

BLM_0011693

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | the preferred alternative.  This would provide protection should Congress release this area from WSA status. | The relevant and important values for the potential ACEC include fish and scenery.  These values are found only along the Westwater Canyon corridor and only this corridor was included in the potential ACEC.

The following sentence has been added to the PRMP/FEIS explaining why Westwater potential ACEC is not in the preferred alternative:  "The area is proposed for designation under another statutory authority (wilderness study area) and requires no further management." |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 84 | White Wash ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | The following sentence has been added to the PRMP/FEIS explaining why the White Wash potential ACEC is not in the preferred alternative:  "The manager has concluded that the threats from damage/degradation to the relevant and important values of natural systems can be protected through restrictions imposed in a Special Recreation Management Area (SRMA)."   As stated on pg. 2-39 of the DRMP/EIS, this SRMA would manage the open OHV area with restrictions to protect the dune field Cottonwood trees and White Wash water sources. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 85 | Wilson Arch ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | The following sentence has been added to the PRMP/FEIS explaining why the Wilson Arch potential ACEC is not in the preferred alternative:  "The manager has concluded that the VRM II designation for this area is sufficient to protect the relevant and important values of scenery." |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 86 | Upper Labyrinth ACEC nomination - SUWA nominates the area south of the town of Green River and north of the Ruby Ranch.  The nominated ACEC that the Price BLM has on the west side of the Green River.

This ACEC meets that relevant criteria due for scenic, historical, fish, and natural processes associated with the river and its surrounding landscape; historic values ranging from Crystal Geyser to the Powell expedition; and fish and wildlife habitat.  The scenery and | The BLM considered this ACEC nomination which was submitted during the comment period for the DRMP/EIS.  The values mentioned by the commentor in the Upper Labyrinth area are scenic, historical, fish, and natural processes.  The BLM convened an interdisciplinary team to consider this nomination.  The team found the historical, fish, and natural processes to be relevant.  Scenery was not found to be relevant.  While the canoe trip along the Green River is a highly sought after recreational experience, this portion of the Green River is |

| | | | | |
|---|---|---|---|---|
| | | | landscape of this are is outstanding and offers visitors and outstanding experience either by hiking or by canoeing.<br><br>The nomination meets the importance criteria for scenery and for historical values.  In addition, the Green River is habitat to Threatened and Endangered fish and Labyrinth Canyon is an internationally acclaimed canoe trip through BLM lands.  This area faces heightened threats from oil and gas development , with the state of Utah leasing portions of the riverbed. | only a portal to the scenery in the lower part of the canyon below Ruby Ranch.<br><br>The relevant values of historical, fish, and natural processes were not found to be important.  While John Wesley Powell did float this portion of the river, there were no significant events occurred in this portion from a historical perspective.  The threatened and endangered fish that may inhabit this portion of the river are found throughout the Colorado and Green River system.  This particular reach of the river provides no special habitat for these fish.<br>The natural processes along this portion of the Green River are neither fragile, sensitive, rare, irreplaceable, exemplary, or unique.<br><br>Because the nomination does not meet the importance criteria, it will not be carried forward as a potential ACEC in the PRMP/FEIS.<br><br>The analysis supporting this conclusion has been incorporated into Appendix I of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 87 | Highway 313 ACEC nomination - SUWA nominates the Highway 313 corridor as an ACEC.  This ACEC would protect scenic values and cultural resources (Sevenmile Canyon) along Highway 313 from Highway 191 to Dead Horse Point State Park and spur of this highway leading to the Island in the Sky district of Canyonlands National Park.  This ACEC meets relevant criteria due to this route being already designated as a Scenic Byway, and is the highly scenic gateway to two destination parks.  Countless visitors experience this area as part of a larger southern Utah driving and windshield tour to enjoy the exceptional scenery of the landscape.<br><br>The importance criteria are met by the exceptional scenery as well as by the designation of Highway 313 | The BLM considered this ACEC nomination which was submitted during the comment period for the DRMP/EIS.  The values mentioned by the commentor in the Highway 313 area are scenic and cultural resources.  The BLM convened an interdisciplinary team to consider this nomination.  The team found the scenic and cultural resoures to be relevant.<br><br>The relevant values of scenic and cultural resources were not found to be important.  While the scenery in the area is attractive it is of no more than local significance.  Visitors enjoy the scenery along Highway 313 but their primary destination is the scenery of Dead Horse Point State Park and Canyonlands National Park.  The cultural values, primarily rock art, in Sevenmile Canyon are found |

| | | | | |
|---|---|---|---|---|
| | | | as a Scenic Byway.  Travelers from all over the world use this route to access adjoining BLM lands and both Canyonlands National Park and Dead Horse State Park.  The ACEC is found to have more than local significance.  These values and quality of the Scenic Byway and ACEC are threatened and currently being degraded by visible oil and gas development. | throughout the Moab Field Office and the Colorado Plateau.  These values are of no more than local significance.<br><br>Because the nomination does not meet the importance criteria, it will not be carried forward as a potential ACEC in the PRMP/FEIS.<br><br>The analysis supporting this conclusion has been incorporated into Appendix I of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 88 | Generally, the suitability and classifications expressed for Wild and Scenic Rivers by the BLM in the Moab RMP/DEIS in Alternative B are supported by SUWA. SUWA strongly disagrees with the suitability findings and tentative classifications presented in Alternative C. All streams except the main stem rivers are dropped from suitability, and the tentative classifications for the main stem rivers are all downgraded to less protective classifications.  There is no basis for downgrading suitability except attempts to make the preferred alternative more politically acceptable. | Alternative B emphasizes the protection/preservation of natural resources, thereby analyzing the impacts of finding all eligible river segments as suitable.  Alternative C is the preferred alternative because it provides a balanced approach of protection/preservation of natural resources while providing for commodity production and extraction.  As a result, Alternative B includes all eligible river segments as suitable with maximum protection provided for these segments.  Alternative C provides for Wild and Scenic River suitability with less management restrictions to allow for more flexibility in considering other land uses.  The BLM's Wild and Scenic River Manual (8351.33C) states "Alternatives may be formulated for any combination of designations or classifications.  Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives, continuity of management prescriptions, or other management considerations."  Appendix J fully discloses the review and evaluation process for determining which river segments are eligible and suitable for such designation. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 89 | Colorado River - The BLM suitability considerations in Appendix J suggest that suitability and classification on certain segments should be changed to reflect anticipated actions by private land owners included in the segment.  However, the BLM does not have the jurisdiction over these private parcels and future | Of the total river miles in Segment 1 of the Colorado River (6.7 miles) only 1 mile is administered by the BLM.  The lands are either privately owned or State administered. The suitability finding concluded that BLM could not properly manage this segment of the river for Wild and Scenic River consideration due to the large amount of |

| | | | | |
|---|---|---|---|---|
| | | | possible actions by private landowners are not specified in the Wild and Scenic Rivers Act as justification for lower protective classification.  Segment 1 should be suitable and classified as scenic.  Segment 3 should be scenic for the entire stretch instead of recreational.  Segment 5 should be scenic or wild.  Segment 6 should be wild. | non-Federal property.<br><br>The classification of a portion of Segment 3 was changed from scenic in Alt B to recreational in Alt C.  This segment, which extends from Cisco Wash to the Dolores River confluence, contains large amounts of private lands.  The classification change was intended to accommodate the potential for development on the private lands.  This development could require rights-of way from the BLM for roads, power, and other infrastructure.<br><br>The classification of Segment 5 was changed from scenic in Alt B to recreational in Alt C.  Upon closer review, it was determined that the classification in Alt C should be changed to scenic in order to match the classification of scenic on the other side of the river in the Monticello Fiedl Office.  This change has been made in the PRMP/FEIS.<br><br>The classification of Segment 6 was changed from wild in Alt B to scenic Alt C due to evidence of past human activities. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 90 | Dolores River - Segments 1 & 2 should be classified as scenic and wild in the preferred alternative as they are in Alternative B.  Segment 3 should be classified as scenic in the preferred alternaitve.  There is no rationale for the recreational classification. | The tentative classification was established along each river segment during the eligibility review.  This tentative classification is based on an inventory of existing characteristics of a river resulting from human caused change or level of development.  The tentative classification is considered in Alternative B.  However, because a river's tentative classification provides a framework for the management prescriptions applied within the area, some flexibility is allowed to consider a range of tentative classifications in the alternatives.  Alternative C provides for a balance between protection and other land uses.  Therefore, the classifications in Alternative C have been adjusted to provide for a wider range of alternatives (Manual 8351.32). |
| Southern Utah Wilderness | 124 | 91 | Green River - The preferred alternative of the MFO does not match the preferred alternative of Price. | The Moab Field Office (MFO) has coordinated with the Price Field Office (PFO) to ensure that the suitability |

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | | determination for this segment of the Green River in the preferred alternative is consistent on both sides of the river.   It was determined that the PFO would change their suitability findings to match that of the MFO. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 92 | Green River - Segment 2 (Alt B) should be classified as scenic.  Although a route is visible it is primitive.  Segment 4 should begin at Crystal Geyser and not the I-70 bridge and be classified as wild.  There are no developments until Ruby Ranch.  Segment 6 should be classified as wild to Mineral Canyon and as scenic from Mineral Canyon to Canyonlands National Park.  The ORV route to Hey Joe should be closed.  The route along the river north of Mineral Bottom should be closed. | The BLM stands by its inventory on tentative classification for the Green River.  The level of development along this river includes roads, and past human activitiy including mining and agriculture.  The roads mentioned in the comment are part of the existing inventory of impacts for tentative classification regardless of whether they are designated or not for travel.  Segment 4 would be classified as scenic in Alt B.  There is evidence of human activity throughout the segment. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 93 | All rivers found suitable in B should be carried forward to the preferred alternative for the following reasons:  1) Wild and Scenic protections aid watersheds, 2) perennial streams are a rarity, and 3) these streams are popular destinations for hikers and should be recognized for the outstanding recreational opportunities. | Refer to response to comment 124-88. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 94 | Tenmile Canyon should be found eligible and suitable for inclusion in the Wild and Scenic River System and should be classified as wild.  The outstanding remarkable features are a rare perennial stream and riparian ecosystem and nationally significant cultural resource. | A review of all the rivers within the Moab Field Office was undertaken to determine which ones were eligible.  Eligibility is an inventory step for agency planning.  An interdisciplinary team determined that Ten Mile Canyon did not meet the eligibiliy standard.  This documentation is available in the Administrative Record. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 95 | The BLM fails to consider known oil and gas locations in evaluating its oil and gas leasing stipulation alternatives and predicting oil and gas development.  One shortcoming common to every alternative analyzed in the Moab Draft RMP is that the BLM has not endeavored to match predicted oil and gas development figures with the actual known geologic reserves of oil and gas.  Instead, the BLM simply predicts future well numbers based on the total acreage available for leasing in each RFD area.  If the BLM were | The geology of the Moab Field Office is described in the Mineral Potential Report for the Moab DRMP/EIS.  As delineated by the oil and gas resource evaluation under the EPCA, the northern part of the Moab Field Office includes the southwestern portion of the Uinta Basin whereas the southern two-thirds includes the Fold and Fault Belt of the Paradox Basin.  These areas have very different geology although both are defined as having high occurrence potential for oil and gas.  Therefore, the entire area of the Moab Field Office has a high |

BLM_0011698

| | | | to analyze reasonably foreseeable development by acknowledging differentiating productive, known oil and gas fields from unproductive or unknown areas then it is likely that there may be little difference in the reasonably foreseeable prediction of well numbers in Alternative B.  There is little or no basis for BLM's prediction that the various alternatives with fewer leasing stipulations will result in significantly larger amounts of wells over the course of fifteen years.  The BLM must evaluate how the proposed leasing stipulations will actually impact access to the known oil and gas fields and reserves of the MPA.

The BLM completely ignores no surface occupancy leases in this analysis, a critical failure as these leases may still allow for substantial access and development, possibly eliminating differences among alternatives. | occurrence potential for oil and gas.

It is erroneous to assume that the known oil and gas fields shown on Map 3-1 of the DRMP/DEIS are synonymous with oil and gas reserves.  The fields shown represent areas where there has been historical and ongoing oil and gas production.  However, there is high potential for additional oil and gas development outside of the known fields across the entire Moab Field Office.  Based on the geology and the knowledge gained from the known oil and gas fields, the Moab Field Office was divided into 7 development areas.  New development within these areas is projected based on historical drilling, BLM experience, and communication with oil and gas operators.  New development is expressed in the number of wells likely to be drilled in the area over the next 15 years.  This development can occur anywhere within the development area and is not limited to oil and gas fields.

Refer to the Reasonably Foreseeable Development scenario for oil and gas available on the Moab RMP website.

The baseline projection of wells by development area is based on no restrictions.  Stipulations on oil and gas leasing were developed by alternative to protect other resource values.  The resultant restrictions result in a proportionate reduction in the number of wells throughout a given development area.  This is the basis for the variability in the number of wells across alternatives.

The analysis in Chapter 4 (pg. 4-84) of the DRMP/DEIS is based on acres of surface disturbance associated with oil and gas development.  Since No Surface Occupancy areas would be precluded from occupancy of the surface for operations, no surface disturbance would occur in those areas.  Therefore, the BLM fully considered No |
|---|---|---|---|---|

BLM_0011699

| | | | | Surface Occupancy leases and their impacts in the analysis provided in the DRMP/EIS. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 96 | The BLM should consider an alternative that removes the NSO stipulations in the productive portions of the Greater Cisco RFD.  The BLM must justify why the remaining stipulations in Alternative B would actually diminish oil and gas development. | The BLM has provided a reasonable range of alternatives for the oil and gas leasing stipulations.  Any proposed management action analyzed within the range of alternatives can be selected in the Record of Decision for the RMP.  The BLM does not see the need for creating a new alternative that combines elements of two existing alternatives.  There are a multitude of possible combinations that could be formulated into new alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 97 | The following areas do not contribute to oil and gas production based on the known oil and gas fields and should be protected under all alternative:  Labyrinth Canyon, the area south of the Colorado River and north of the La Sals, portions of Hatch Canyon and Harts Point, the areas with wilderness characteristics in the Bookcliffs, and the Arths Pasture, Big Flat, and Tenmile area. | See response to comment 124-95. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 98 | The BLM must consider a no leasing alternative.  The current draft of the RMP fails to consider such an alternative.  Federal courts have made clear that a no leasing alternative should be a vital component in ensuring that agencies have all possible approaches before them (See, e.g., Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 [9th Cir. 1988]. | The BLM's consideration of the no leasing alternative has been added to Chapter 2 of the PRMP/FEIS under the section on Alternatives Considered but Eliminated from Analysis. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 99 | The BLM has not developed an alternative that anticipates the Utah Recreational Land Exchange Act with its mineral restrictions. | On pg. 2-11 of the DRMP/EIS states that lands and or interest in lands (such as mineral and conservation easements) acquired through future land tenure adjustments would take on the management of the surrounding area.  Should the act be passed by Congress these acquired sections would be managed according to the will of Congress and in accordance with the management of the surrounding areas. |
| Southern Utah Wilderness Alliance | 124 | 100 | The BLM must take a hard look at the enviromental and recreational benefits of alternative B versus the potential foregone oil and gas. | Alt B emphasizes the protection/preservation of natural resources.  The impacts upon natural resources from the various mineral alternatives are fully described in Chapter |

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | | 4.  For example, the analysis of leasable minerals on wildlife on pg. 4-458 states that Alt B would have considerably more impacts to deer and elk than any other alternative.  As another example, the analysis of mineral development on soils and water resources on pg. 4-290 states that based on the acreages detailed in Table 4.81 and 4.82 Alt B would have the least adverse impacts to soil and water resources due to mineral resource development decisions.  For a final example, the analysis of minerals on recreation on pg. 4-202 states that Alt B would have fewer impacts because fewer acres within the Moab planning area would be potentially impacted by minerals exploration and development.   More examples are available in Chapter 4.  Nonetheless, the BLM contends that a hard look was taken. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 101 | BLM cannot dismiss consideration of directional drilling from existing wells.  BLM must analyze directional drilling and require all operators to include a directional drilling alternative on a site specific basis.  NEPA requires the BLM to consider the least environmentally damaging alternative.  The Draft RMP should require all oil and gas projects to include a directional drilling alternative. | On a land use planning level across a large area it is not reasonable to consider an alternative that limits oil and gas development to directional drilling from existing well sites.  The entire Moab planning area has a high occurrence and development potential for oil and gas.  Based on current technology the DRMP/EIS assumes a directional drilling reach of 1 mile.  Therefore, vast areas of the planning area with oil and gas resources would not be accessible and therefore would be closed to oil and gas leasing.  The commentor provides no rationale regarding the resource conflicts that would warrant this restriction.

Directional drilling is not conducive to all geologic and mineral environments.  It is an option available at the site specific level and would be analyzed at the permit stage for drilling. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 102 | The total acreage of SRMAs in the planning area, by alternative differs in two Tables.  Table 2.1 does not match the acreage in Table 4.69. Table 4.21 does not match the acreage in Table 2.1. | The acreage in the tables has been corrected in the PRMP/FEIS. |
| Southern Utah | 124 | 103 | The Draft RMP states on page 3-74 that "the areas with | The acreage of SRMAs in the No Action alternative totals |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | the greatest numbers of visitors and those that are in the greatest need of special management are currently within the Grand ERMA."  BLM must choose the greatest expansion of SRMA acreage as provided in Alternative B in order to ensure that the MPA is directing its resources to these areas in need of special management. | 141,252.  In each of the action alternatives, this acreage is increased (Alt. B = 976,173 acres;  Alt. C = 658,642 acres: Alt. D = 277,471 acres).  The areas that receive the greatest visitation and are in greatest need of special management (Colorado Riverway, Sand Flats and Labyrinth Rims/Gemini Bridges) are all analyzed in both Alts B and C.  The greatest difference acreage between Alts B and C is the inclusion of the Bookcliffs SRMA in Alt B.  The Bookcliffs is not an area with a great number of visitors nor does it require special management and is not an area referred to in Chapter 3 of the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 104 | In Appendix F of the Draft RMP, SRMAs are assigned standards as to the physical, social, and administrative setting of each SRMA.  There is no explanation for these standards.  The Moab RMP should use the Recreation Opportunity Spectrum (ROS). | The BLM followed the Land Use Planning Handbook (H 1601-1) for Special Recreation Management Areas (SRMAs) at Appendix C.  For each SRMA, the Handbook directs the following: 1) to identify a set of recreation opportunities, 2) to facilitate the attainment of different experience and benefit outcomes, and 3) to identify disctinctive recreation setting characteristics.  The Moab Field Office utilized the traditional physical, social, and administrative settings from the Recreation Opportunity Spectrum (ROS).  This process is summarized in Appendix F of the DRMP/EIS.  Appendix F provides the goals, settings, outcomes, and management prescriptions for each SRMA.  The format for considering ROS settings is currently taught in BLM's  Recreation Planning Course at the National Training Center; Effective Engagement in the BLM Land Use Planning Process (NTC Course 8300-11).  This approach is utilized extensively in other recent RMPs with the BLM.  Washington Office Instruction Memorandum 2006-060 requires the BLM to utilize benefits based planning in land use plans.  As part of this effort the BLM undertook to adapt the traditional Forest Service ROS to a more flexible framework.  Benefits management requires BLM to prescribe the specific character setting of an area.  The BLM decided to change ROS names to those more understandable to the public. These names are those used in the DRMP/EIS. |

| | | | | |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 105 | The Bookcliffs Special Recreation Management Area (SRMA) which is in Alternative B would protect recreational values and should be included in the Final RMP. | The commentor's preference that the Bookcliffs SRMA be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives.<br><br>The primitive recreational opportunities in the Bookcliffs are largely protected by the management under Interim Management Policy for Lands Under Wilderness Review. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 106 | The Canyon Rims Special Recreation Management Areas (SRMA) should be expanded to include the Hatch Wash Focus Area. | The Hatch Wash Focus Area is included in the Canyon Rims SRMA as described in the preferred alternative. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 107 | The Colorado Riverway Special Recreation Management Area should be delinated with the extra acreage as outlined in Alternative B.<br><br>SUWA objects to the establishment of any facilities or the improvements associated with the proposed BASEjumping focus area in Kane Creek, as the lands have been identified as possessing wilderness characteristics. | The commentor's preference that the Colorado Riverway SRMA be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives.<br><br>The BLM's preferred alternative manages the most highly visited portion of the area as an SRMA.<br><br>Any developed facilities associated with the proposed Basejumping focus area in Kane Creek would be along the maintained road.  The jumping platform, while in an area identified with wilderness characteristics, would see only non-motorized activitiy.  Furthermore, this area is not managed to protect wilderness characteristics in the preferred alternative.  Non-motorized activities are allowed even within wilderness study areas as specified in the Interim Management Policy for Lands Under Wilderness Review. |
| Southern Utah | 124 | 108 | SUWA cautions BLM to not designate the Labyrinth | The commentor's comment regarding the Labyrinth |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | SRMA because it is biased toward motorized recreation and development.  SUWA recommends the establishment of White Wash as a Hiking Area (as in Alt. B).  SUWA would like to see the western half of Labyrinth managed as a primitive and undeveloped SRMA.  SUWA recommends the Tenmile Hiking Focus Area as in Alt. B.  SUWA takes strong exception to the establishment of a motorized focus area at Dee Pass as this area is proposed for wilderness in America' s Redrock Wilderness Act. | SRMA is an unfounded assertion.  Under all action alternatives the BLM does not identify for motorized use a large  number of vehicle routes within the area.  Furthermore, all action alternatives place the area in question to a limited to designated routes category thereby reducing mortorized recreation opportunities from the no action alternative (Alt A).  Much of the Labyrinth SRMA lies within a SUWA wilderness proposal.  The BLM is not obligated to create roadless area in response to external preferences.<br><br>The commentor's preference that White Wash and Ten Mile be managed as proposed in Alt. B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives.<br><br>The Dee Pass area is located within SUWA's Duma Point wilderness proposal.  The BLM's Wilderness Characteristics Review (WCR) determined that this area lacked naturalness due to a profusion of constructed routes and other impacts.<br><br>The commentor's responses to the BLM WCR findings in the DRMP/EIS did not include an objection to the BLM's findings of no wilderness characteristics for the Duma Point Unit. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 109 | SUWA recommends that the Slickrock Trail be closed to motorized use as is proposed in Alt. B.<br><br>BLM should designate all the Special Recreation Management Areas (SRMAs) as described in Alt. B. | The commentor's preference that the Slickrock Trail and all SRMAs be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives. |
| Southern Utah | 124 | 110 | BLM must take a hard look at the issuance of special | The Moab DRMP/EIS analyzed a range of alternatives, |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | recreation permits (SRPs) on public lands. The Draft RMP does not explore direct, indirect or cumulative impacts of events and uses associated with SRPs even though they can have significant impacts. | which varied the number of vehicles associated with organized recreational groups from 15 vehicles for Alternative B to 50 vehicles for Alternative D.  Chapter 4 of the DRMP/EIS on pg. 4-227 states that SRPs allow the BLM to impose protective stipulations on users, thereby protecting the resources present and reducing user conflicts.  As the permits issued are increased, resource protection would also be enhanced.  As stated on pg. 4-228 increasing the number of SRP with specific stipulations to protect and preserve cultural and natural resources would result in more protection and a less likelihood of impact.  Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.  The issuance of a SRP is a site-specific implementation level authorization, which requires full compliance with NEPA, including analyzing the direct, indirect and cumulative impacts associated with each proposal. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 111 | The Moab Draft varies the number of vehicles that would require an organized group to obtain a Special Recreation Permit (SRP) by alternative.  This is not the kind of range that NEPA contemplates.  It is unreasonable for the only choice among alternatives to be whether 15, 25, or 50 vehicles as the threshold. | See response to comment 124-110. SRPs provide protective stipulations for public land users.  These stipulations do not apply to the general public.  Therefore, increasing the number of SRPs would be more beneficial in terms of reducing user conflict and protecting resources because there would be more protection and preservation related stipulations on cultural and natural resources.  The BLM asserts that DRMP/EIS provides a reasonable and adequate range of alternatives on group size for SRPs. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 112 | The BLM must take a hard look at factors that should be considered for future Special Recreation Permits (SRPs).  These factors are:  1) Duration of permit - SRPs should be temporary and | The Federal regulations at 43 CFR 2930 and the BLM Handbook (H-2930-1) govern the issuance of SRPs.  Permit durations are managed according to BLM Handbook H-2930-1, and are tailored to the specific |

| | | | | |
|---|---|---|---|---|
| | | | short term.<br>2) Number of vehicles permitted - BLM should revise its limits on the number of vehicles by type of vehicle.<br>3) Types of vehicles - BLM does not define what constitutes a vehicle.<br>4) Number of persons permitted - A threshold should be set for the number of people.<br>5) Location of SRPs - the Draft RMP should identify areas where SRPs would not be allowed which should include wilderness, wilderness study areas, non-WSA lands with wilderness characteristics, and lands being evaluated or managed for primitiveness.<br>6) Number of permits per year - there should be a cap on the number of SRPs within a specific area. | proposed use.<br><br>The BLM has a range of threshholds for vehicles, by alternatives (see response to comment 124-110).  These threshholds are intended as general guidance.  The BLM Handbook, H-2930-1, allows management discretion based on individual circumstances.  SRPs are analyzed on a site-specific basis.<br><br>The BLM utilized the definition of off-road vehicles as defined by the Federal regulations at 43 CFR 8340.<br><br>The BLM did not set a threshold of people because the impact of numbers of people varies by the type of proposed activity.  These impacts will be analyzed at the site specific level when an SRP is applied for.<br><br>The effects of SRPs on various categories of land management are analyzed at the site specific level.  It should be noted that the Wilderness Act of 1964 allows for commercial services in wilderness areas.  Non-motorized recreation activities, whether commercial or non-commercial, are allowed in wilderness study areas in accordance with the Interim Management Policy for Lands Under Wilderness Review.<br><br>Limiting the total number of SRPs would reduce management flexibility to accommodate requested uses, and reduce the ability to control impacts from recreational activities.  Refer to response to comment 124-111. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 113 | Transportation management within WSAs must minimize ORV motorized routes, which can impair wilderness characteristics. | Chapter 2, pgs, 2-43 and 2-44 summarizes travel management decisions with WSAs under the various alternatives.  Alternative B does not identify any motorized routes with WSAs (termed "ways" in WSAs, as "roads" by definition are outside the boundaries of wilderness character), because this alternative closes all WSAs to OHV use.  Alternative C identifies 2.55 miles of |

| | | | | |
|---|---|---|---|---|
| | | | | motorized routes in WSAs; these routes would be managed under Interim Management Policy for Lands Under Wilderness Review (IMP), and would be available only if they continued to meet the non-impairment standard imposed by IMP.  Alternative D closes most WSA acreage to OHV use, but those areas not closed would be in the limited OHV category. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 114 | If released by Congress, BLM should manage WSAs to protect their wilderness characteristics (sic), rather than examine management of these areas on a case-by-case basis for consistency with the goals and objectives of the RMP. | Chapter 2, pg. 2-43 states: "Only Congress can release a WSA from wilderness consideration.  Should any WSA, in part or in whole, be released from wilderness consideration, proposals in the released area would be examined on a case-by-case basis. All proposals inconsistent with the Interim Management Policy for Lands Under Wilderness Review would be deferred until completion of requisite plan amendments.  Because a plan amendement would be required, there is no separate analysis in this Land Use Plan to address resource impacts if any WSAs are released."<br><br>If WSAs lands are released by Congress, those lands would be managed to protect the wilderness characteristic until a plan amendment is prepared.  At such a time, there would be opportunity for full public participation and input.  The amendment would require a formulation of alternatives and environmental analysis similar to that of an RMP.<br><br>See also response to comment 124-39. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 115 | The Draft RMP fails to analyze the impacts of climate change to MFO resources.  Soil disturbing activities such as recreation, grazing, and energy exploitation reduce or remove the natural components that stabilize desert soil, increasing soil loss through wind and water erosion.  The BLM should design alternatives that minimize soil disturbance.  BLM should designate an alternative with far fewer than the 2600 miles of back country ORV routes that alternative C contains.  The | A growing body of scientific evidence supports the concern that global climate change will result from the continued build-up of greenhouse gases in the atmosphere.  While uncertainties remain, particularly in the area of exact timing, magnitude and regional impacts of such changes, the vast majority of scientific evidence supports the view that continued increases in greenhouse gas emissions will lead to climate change.  This information was added to Chapter 3 of the PRMP/FEIS. |

| | | | | |
|---|---|---|---|---|
| | | | cumulative effects of various uses like ORV recreation and grazing should be considered in the context of climate change.  The BLM is urged to develop and adopt an alternative that minimizes the extent of soil disturbance and reduces the Field Office's vulnerability to the effects of climate change. | The EPA has not developed regulatory protocol or emission standards regarding global climate change.  When these protocols and standards are available, the BLM will analyze potential effects to global warming in the NEPA documentation prepared for site-specific projects.  All information to this effect was added to the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 116 | The BLM should ensure that scenic value is a resource that is conserved.<br><br>All lands proposed for wilderness or with wilderness characteristics should be managed as VRM Class I.<br><br>Lands within popular and easily accessible vantage points should be managed as VRM II.<br><br>ACECs should be managed as VRM I or VRM II.<br><br>All lands within America's Red Rock Wilderness Act should be managed as VRM I or VRM II. | The BLM has designated VRM management for the entire planning area within the DRMP/EIS.  The scenic values of the planning area are placed in appropriate management classes by alternative .<br><br>All Wilderness Study Areas are designated as VRM I.  Non-WSA lands to be managed to protect their wilderness characteristics are designated as VRM II, as are many popular scenic attractions.  Those ACECs that are proposed for  management in Alt  C are designated as either VRM I and II.<br><br>The BLM has no obligation to designate all lands within the Red Rock Wilderness Act as VRM I or II.  The BLM's VRM designations rely on the underlying VRM inventory. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 117 | BLM's analysis is remiss in its assessment of impacts from oil and gas and off-road motorized recreation "with 80% of the planning area open to both uses".  Such uses "will have lasting, even permanent, impacts on the lands in the Moab Planning Area". | SUWA's comment is too general, and it relies on a false premise that BLM's alternatives "open" 80% of the planning area to oil and gas leasing and OHV use.  In fact, as the DEIS describes in detail, all action alternatives identify for non-motorized use more than 2500 miles of currently inventoried motorized routes.  All action alternatives reduce open OHV acreage to zero or close to zero.  Rather than "opening" large areas of the MPA to OHV use, the action alternatives greatly reduce such areas, which in turn should reduce (not increase) the impacts SUWA asserts will occur.  The reduction in impacts to a large number of resources which would result from adoption of any of BLM's travel plan action alternatives  are described in detail in Chapter **4** of the |

| | | | | DEIS. |
|---|---|---|---|---|
| | | | | SUWA's comment that BLM fails to analyze the costs associated with of oil and gas leasing is unfounded. Chapter 4 uses the best available data to assess these impacts, and the associated cost (and benefits) of the various leasing action alternatives. Characterizing the MPA as being 80% "open" to oil and gas leasing blurs the real distinctions of the various leasing categories labeled as "open", which range from relatively unrestricted to no surface occupancy.

SUWA provides no evidence to support their statement that the (misdescribed) BLM proposals for oil and gas and OHV management will have the lasting and permanent impacts |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 118 | The analysis of social and economic impacts is entirely speculative. | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used the best available data to assess impacts; in many cases, no data was available. In a landscape level plan such as the RMP, qualitative discussions are often all that are necessary (or even possible). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 119 | BLM must collect and analyze actual data on the economic impacts of the alternatives. BLM should use a specific data source suggested by SUWA. | SUWA's comment is too general. SUWA offers no specifics as to what "actual" data BLM failed to use, nor does SUWA provide any detail as to where BLM erred in its analysis.

SUWA suggests that BLM should rely on the data sources and methodologies outlined in Socio-Economic Framework for Public Land Management Planning, published by the Wilderness Society. Most of the data sources described in this publication were used by BLM, especially in Chapter 3. The Economic Profile System (EPS), developed by the Sonoran Institute for the BLM, aggregates many of the federal data sources in The Wilderness Society's publication. Similarly, BLM |

| | | | | incorporated the same Utah state government data sources as are included in The Society's document. Similarly, BLM used (preliminary) recreation data provided by the Forest service's NVUM data for the Moab Field Office.

SUWA incorporates several of the recommended analyses of the Society's document; these will be addressed in the responses to comments which follow. The Wilderness Society is an advocacy group, and their recommendations are understandably focused towards their specific goals and objectives.  BLM, on the other hand, must take a broader view under its multiple-use, sustained yield mandate. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 120 | BLM must include a fiscal analysis of alternative implementation and mitigation costs.  The assumption that BLM would have the funding and workforce to implement the selected alternative is dubious.  For example, an alternative resulting in resource damage will require more money to mitigate this resource damage than a less damaging alternative.  It makes no sense for taxpayers to subsidize a more damaging and costly alternative when a less damaging, less costly alternative is available. | Chapter 4, page 3 states that BLM would have the funding and work force to implement the selected alternative.  Implicit in this assumption is that BLM will seek and obtain funding for implementation and mitigation.  BLM goes on to state:  All decisions, projects, activities, and mitigation for the alternatives would be completed as described in Chapter 2 and Appendix C (Surface Stipulations Applicable to all Surface Disturbing Activities).There is no requirement in NEPA to do the detailed analysis SUWA request; this is an implementation issued outside the scope of the current planning effort. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 121 | BLM should choose  a less costly alternative in order to save taxpayer money and mitigate resource damage.  It makes no sense for taxpayers to subsidize a more damaging and costly alternative when a less damaging, less costly alternative is available. | SUWA's comment that BLM's as yet unchosen alternative will be more costly than the (unspecified) alternative SUWA prefers is unsupported, SUWA provided no evidence that  BLM's proposed alternative (whichever one that is) would be more costly to implement than SUWA's (unspecified) alternative.  Furthermore, the comment that BLM's alternative would cause more resource damage is also unsupported. |
| Southern Utah Wilderness | 124 | 122 | In order to fully comply with NEPA, BLM must include the costs of implementing each alternative, the costs of | See response to comment 124-120. |

| Alliance (SUWA) | | | mitigation plans within each alternative, the expected budget level and the probability of fully implementing the plan's mitigation measures. SUWA bases this demand on CEQ memorandum on NEPA requirements cited in NEPA Compliance Manual, 2nd Edition, 1994. | As evidenced by SUWA's citation presented in their comment, BLM is required in the EIS and ROD to indicate the "likelihood that such measures will be adopted or enforced by the responsible agencies." BLM will fulfill this requirement in the appropriate documents. SUWA's contention that this requirement means that BLM must calculate fully and compare the costs of each alternative is in error.

The CEQ Guidelines for Implementation of the Procedural Provisions of the NEPA does not require preparation of a cost-benefit analysis for all EISs. The regulations state that "If (emphasis added) a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences (40 CFR 1502.23 Cost-benefit analysis).

The Federal Land Policy and Management Act (FLPMA) requires that BLM manage the public lands for Multiple Use. Section 103 (c) of FLPMA defines Multiple Use as follows: "The term 'multiple use' means . . . Harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." Additionally, given that the implementation schedule for the RMP will vary in the future based on national priorities, available workforce, and funding, etc., there is no way to meaningfully evaluate costs and benefits of the alternatives. Therefore, a cost-benefit analysis is not central to the planning effort and is not required for consideration of multiple-use planning alternatives. |

BLM_0011711

| | | | | After selection of an alternative to establish multiple use, costs and benefits of management actions may be considered, depending on priorities and funding.  The BLM's National Planning Handbook (H1601-1) notes that even during implementation of land use plans "there is no requirement to develop a cost/benefit analysis, but management actions that have a high likelihood of improving resource conditions for relatively small expenditures of time and money should receive relatively higher priority (BM H-1601, IV. E. Developing Strategies to Facilitate Implementation of Land Use Plans). |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 123 | The total planning acreage varies by alternative, which indicates the possibility that other data might be inaccurate or inconsistent. | SUWA admits that these variances are "not large", yet imply" systematic inaccuracy" in the acreage reported by alternative.  SUWA provides no evidence to support their inference of systematic inaccuracy, nor do they define what constitutes such inaccuracy.  The BLM states in Chapter 4, p.3:"Acreages were calculated using GIS technology; there may be slight variations in total acres between disciplines. These variations are negligible and will not affect analysis. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 124 | In order to accurately assess the potential impacts of the alternatives, the BLM must treat any additional oil and gas leasing as an industry gain, and compare all leasing alternatives to currently leased lands.  The currently leased land should be regarded as the status quo, not any additional leasing that may take place under any of the alternatives.  Comparisons of all the alternatives should be made against this status quo. | The  DRMP in Chapter 4, page 82 states:  "In accordance with BLM policy and its recognition of the National Energy Policy and Conservation Act of 2000 (EPCA), as discussed in Chapters 2 and 3, mineral resource development would be allowed throughout the Moab planning area subject to standard lease terms unless precluded by other program prescriptions, as specified in this Draft RMP."  The commentor's proposal is basically to start from a "no lease" alternative, which BLM is not required to do.<br><br>The No Action alternative (pg. 2-2 of the DRMP/EIS) "represents the continuation of existing managament under the current Grand Resource Area RMP(1985a), as amended".   This plan provides allocations for oil and gas leasing.  The current land use plan specifies the number of acres available for leasing with various restrictions. |

BLM_0011712

| Southern Utah Wilderness Alliance (SUWA) | 124 | 125 | BLM's socioeconomic analyses focus almost exclusively on the potential benefits of increased oil and gas drilling and off-road motorized recreation, without corresponding analysis of the costs associated with these activities.  These costs include social impacts on local communities for example police and hospital services. | SUWA's premise in this comment is that the DRMP's "increase" the potential for leasing and for OHV recreation.  (This alleged increase is presumably in comparison to SUWA's leasing and travel plan alternatives provided during scoping and not to any of the action alternatives in the DRMP).  As described in detail throughout the DRMP. BLM's action alternatives place additional restrictions on leasing relative to the No Action alternative.  Similarly, all action alternatives identify for non-motorized use more than 2500 miles of vehicle routes currently available for motorized use.  Additionally, BLM reduces the amount of acreage "open" to unrestricted OHV use to zero or close to zero in all action alternatives.  These actions would reduce the litany of alleged costs that SUWA enumerates in its comment. These reductions are in response to the potential resource conflicts identified in Chapter 4.

BLM summarizes the (minor) costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. SUWA's reference to the impacts such activities have had in other parts of the West is unlikely to apply to the MPA.  The RFD predicts relatively few wells will be drilled, would employ relatively few people and produce negligible adverse social impacts.  SUWA seems to be confusing the MPA with the large-scale development that has occurred in certain areas.  BLM's analysis is based on the RFD; SUWA has provided no evidence that the RFD is incorrect.  A recently completed study by the University of Utah concludes that less than 1 percent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 3. |
| Southern Utah Wilderness Alliance | 124 | 126 | The BLM must make a full assessment of the social and economic costs that will accrue as a result of implementing the oil and gas drilling (sic) in the | See response to comment 124-125.

SUWA seems to confuse the MPA oil and gas scenario |

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | alternatives as described in "The Economic and Social Impacts of Oil and Gas Development". | with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development.  As described in Chapter 4, BLM does not expect to see significant oil and gas development in the MPA over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities. BLM's analysis is based on the RFD; if SUWA needs to provide evidence to support their contention.<br><br>The document cited by SUWA is not a peer-reviewed manuscript, but an advocacy position published by the Wilderness Society.  BLM has reviewed the publication, and has determined that there is no information which would altered the approach taken in the impact analyses of Chapter 4 in the DRMP.  Many of the issues raised in the paper have been addressed in responses to other comments in this section.  BLM believes that it is SUWA's responsibility to indicate which specifics in the attached document are relevant to BLM's planning efforts, and where failure to follow the document's recommendations have resulted in error by the BLM.<br><br>It should be noted that much of what the document discusses refers to very large scale oil and gas development, a scenario which the MPA RFD considers unlikely. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 127 | New businesses will be harmed or deterred from locating in the Moab planning area "by the potential single-use industrialization of vast public lands" under the preferred alternative in the Draft RMP EIS. | SUWA's characterization of the BLM's preferred alternative as "single-use industrialization" is unfounded. (Its phrase suggests that SUWA's own travel plan, which identified more miles of motorized routes than any BLM action alternative, must be "super-industrialized").  BLM agrees that communities in the West rely less on natural resource extraction and more on non-commodity resources such as scenery and recreation opportunities. In its discussion of the impacts of minerals on socioeconomics, BLM emphasizes that the predicted |

| | | | | activities would be relatively minor, and not likely to have significant impacts on local communities.  In its discussion on the impacts of travel and recreation decisions on socioeconomics, Chapter 4, pp. 266-272, BLM outlines many of the potential benefits (and costs) to both local communities and visitors of the various action alternatives.<br><br>BLM recognizes in Chapter 3, pp. 104-107, the importance of what the Sonoran Institute calls "The New West", with its lower reliance on natural resource extraction.  Throughout the DRMP, BLM recognizes the value of recreation and tourism to the local economy.  BLM recognizes throughout its action alternatives the desirability of making decisions that will not adversely impact these all-important sectors of the MPA economy.  SUWA implies that BLM's preferred alternative will negatively affect the local economy, but offers no evidence to support that claim.   It is worth noting that in another section of SUWA's comments to the DRMP/DEIS, it asks the BLM to close all wilderness quality lands to commercial activities.  This would include those guides and outfitters in the Moab planning area whose business relies to some extent on these areas.  Many of these individuals are the very entrepreneurs for whose economic well-being SUWA expresses concern.<br><br>It is worth noting the growth the MPA economy has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market.  This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative, with its less restrictive leasing and OHV management).  There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these industries. |
| --- | --- | --- | --- | --- |

BLM_0011715

| | | | | For the reasons outlined in Chapter 4, p.271, BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA economy in the context of OHV management.  BLM does recognize the potential for additional resource damage, as well as potential harm to the MPA economy from Alternative D's greater emphasis on motorized recreation. This is discussed explicitly in Chapter 4, p. 272. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 128 | The BLM must make a thorough examination of the full socioeconomic impacts likely to occur if the management alternatives are implemented.  These impacts include impacts on the surrounding communities, including the costs of providing additional services, the long-term costs of the likely environmental damage, and the impacts on other sectors of the economy. | See response to comments 124-117, and 124-125 through 124-127. BLM has analyzed the socioeconomic impacts of its alternatives in Chapter 4.  SUWA asserts that surrounding communities will have additional costs of providing services, but provides no evidence to support this claim.  SUWA asserts that long-term environmental damage from BLM actions are "likely", but provide no specifics in this comment, let alone evidence.  The socioeconomic section of Chapter 4 does analyze the impacts of BLM actions on the "other "(undefined by SUWA) sectors of the economy; that is the purpose of that section. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 129 | The Draft EIS does not account for the non-market values associated with undeveloped wild lands. | The non-market values to which the commentor refers are not available to the BLM.  The studies of which the BLM is aware are based on designated wilderness, the results of which may or may not be generalized to other "wild lands".  Even if the studies are generalizable to Wilderness Study Areas (WSAs), the impacts are irrelevant, since WSA management is outside the scope of the current planning effort.  The BLM is unaware of any evidence  that such studies are generalizable to non-WSA lands with wilderness characteristics<br><br>FLPMA Section 202, (c) (4)states:<br>"In the development and revision of land use plans, the Secretary shall…rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." |

| | | | | The BLM does recognize the potential importance of non-market values relative to managing for wilderness characteristics.  The lack of available data makes quantification outside the scope of the DRMP/EIS.  These values are discussed qualitatively in Chapter 4, pg. 265. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 130 | The BLM has an inherent responsibility to provide "public goods" in sufficient quantities to meet the demands of all U.S. citizens.  These goods include opportunities for solitude, outdoor recreation, clean air, clean water, the preservation of wilderness, and other undeveloped areas. | the commentor may be correct if they are referring to the BLM on a national level, as opposed to the individual Field Office level.  The BLM recognized its responsibility to provide such public goods, and believes it does so through its management actions.  The BLM is not required in each field office to provide an adequate supply of these goods to meet the demands of all U.S. citizens, a clearly impossible task even if one were able to quantify such a demand.  The BLM is required to provide for a multitude of uses, not all of which need be satisfied by every field office.<br><br>The BLM believes that its action alternatives do provide the public goods SUWA demands, but probably not in the quantities it desires.  For example, the Moab BLM manages approximately 350,000 acres of Wilderness Study Areas, a necessary ingredient of which is opportunity for solitude.  The BLM provides within the alternatives a wide range of outdoor recreation activities, and recognizes recreation as the driving force of the planning area's economy.  The BLM is required by law to adhere to the standards governing clean air and water, and will continue to follow such laws.  The BLM has no statutory authority to "preserve wilderness" beyond those lands designated as such by law.  The BLM will continue to manage WSAs under current policy to not impair their wilderness character, an action beyond the scope of the DRMP/EIS.  Finally, the  BLM has the option to manage non-WSA lands with wilderness characteristics, but not an obligation to do so.  As described in Chapter 4, the BLM proposes varying amounts of acreage in Alternatives B |

BLM_0011717

| | | | | |
|---|---|---|---|---|
| | | | | and C for management to protect their wilderness characteristics.  Whether that acreage is "enough" is a matter of preference, not law or policy.<br><br>The public goods to which SUWA refers are provided in abundance within and in near proximity to the Moab planning area (MPA).  In addition to the BLM management actions outlined above, other agencies and BLM field offices provide such opportunities.  For example, Arches National Park, with over 75,000 acres of administratively endorsed wilderness, is 4 miles from Moab.  The Manti-LaSal National Forest lies within 25 miles of Moab.  Canyonlands National Park, with over 330,000 acres of administratively endorsed wilderness, lies about 25 miles driving distance from Moab.  Adjoining Utah BLM field offices (Monticello, Price) contain 948,000 acres of WSAs all within a 1-2 hour drive from Moab. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 131 | The BLM must measure and account for changes in non-market values associated with the levels of oil and gas drilling in this RMP.  To do otherwise omits a very important socioeconomic impact that is the direct result of management actions.  The BLM must assess the non-market impacts on the owners of the lands in the Moab Planning Area-all Americans.  This must include the passive use values of wilderness characteristics. | See response to comment 124-129.  .  The BLM does not dispute the value of non-market data.  SUWA's premise is that, were such non-market data available, it would show a "very important" socio-economic impact that is the direct result of management actions.  As stated fully in the BLM's response to comment 124-126, all the action alternatives place additional restrictions on oil and gas leasing in the Moab planning area (MPA) relative to the no action alternative.  Furthermore, the projected level of oil and gas activities in the MPA is very low, with consequently low expected socio-economic impacts.<br><br>SUWA's demand that the BLM assess the non-market impacts of planning decisions on "all Americans" is impossible to quantify.<br><br>The "passive use" value to which SUWA refers is another name for the non-market values discussed in the BLM's response to comment 124-129. |
| Southern Utah | 124 | 132 | The significance criteria are incomplete because they | SUWA's premise is that the action alternatives will |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | only consider employment and population.  A complete analysis should include all sources of income (including non-labor income) and the impacts of alternatives on these components of income.  This is because of the importance of such income to retirees who are likely to leave the area as public lands become "severely degraded by motorized recreation and oil and gas (sic)."  This in turn will reduce non-labor income from these departing retirees. | produce degradation to public lands to such an extent as to dissuade individuals (specifically retirees) from relocating to, or staying in, the Moab planning area (MPA).  SUWA's claim that the BLM's action alternatives will result in such degradation is unsupported by any specific information.  See responses to comments 124-125 through 124-127.

SUWA's claim that retirees are likely to relocate from the MPA is unsupported by any data or evidence.  The BLM agrees that retirees are likely to be attracted to areas with natural amenities, but maintains that its planning decisions will not reduce such amenities, but should actually preserve and enhance them.  Chapter 3, pgs. 103-104, discusses the importance of non-labor income and its potential association with natural amenities.  See also response to comment 124-130.

The BLM is unaware of any methodology which reliably projects non-labor income and its components in a specific area over a 20 year period, let alone any method which could predict changes in these components likely to result from the BLM's action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 133 | The BLM must conduct an analysis of socio-economic impacts on incomes of businesses relying on the presence of protected public lands.  It is "almost certain" that the reduction in acreage of lands being managed to protect wilderness characteristics from Alternative B to Alternative C "will result in vastly different social and economic conditions in the planning area". | Chapter 4, pg. 4-265, discusses the likely impacts on the local economy of the various alternatives for managing non-WSA lands with wilderness characteristics.  The BLM is unaware of any methodology which would identify those specific businesses relying on "protected public lands".  The BLM is unaware of how any of its action alternatives would negatively affect such businesses, and the commentor provides no evidence to the contrary.  In fact, the commentor has asked the BLM to close these lands to commercial use (see response to comment 124-112), which would presumably negatively impact those businesses (such as guides and outfitters) whose incomes are most closely.  The commentor does not provide any evidence to support its assertion that a |

| | | | | |
|---|---|---|---|---|
| | | | | reduction in the acreage managed for wilderness characteristics would result in "vastly different social and economic conditions".<br><br>The commentor repeats in this comment several misstatements from earlier comments.  The commentor asserts that Alternative C reduces from 15.2 % to 2.6 % the amount of lands in the Moab planning area (MPA) managed to maintain wilderness characteristics", and this is the reduction which will produce the negative impacts to those businesses relying on "protected public lands". The commentor's calculations ignore the primary component of "protected public lands" within the MPA, which is the approximately 350,000 acres of WSAs. Including this acreage in the category of protected public lands is a more meaningful measure of the actual acreage meeting this description.<br><br>Similarly, the commentor once again refers to the "80 %" of BLM lands available for motorized recreation in Alternatives B and C.  In fact, as repeated elsewhere in BLM's responses to this commentor's comments, all of BLM's action alternatives reduce the miles of routes available for motorized recreation by more than 2500 miles, and reduce the amount of acreage open to cross-country OHV use to zero or close to zero. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 134 | Section 4.3.12.2.10 fails to acknowledge that the vast majority of recreation visits to public lands are non-motorized and makes broad assumptions about the positive impacts of motorized versus non-motorized recreation.  There are several instances where contributions to the local economy are implied to be attributable to motorized recreation. | SUWA provides no evidence to support its claim that 'the vast majority" of recreation visits to the Moab planning area (MPA) are non-motorized.  The only local data SUWA cites come from the 2007 National Visitation Use Monitoring (NVUM) study done for the Moab Field Office. All other data sources cited are either from areas outside the MPA, or aggregated to the extent that generalizing to the MPA is not possible. The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA; see response to comment 124-2.  It is not surprising, for example, that the top listed main activity |

was "Hiking / Walking/Trail run".  The design of the NVUM study resulted in 23 % of completed interviews occurring in Wilderness Study Areas, with the great majority of these interviews occurring specifically on the Negro Bill Canyon trail.

Even if one assumes that the NVUM data are definitive, it is incorrect to assert that the data indicate the "vast majority" are non-motorized recreationists.  For example, although the top two main activities are non-motorized, this does not mean that these respondents participated only in those activities while in the MPA.   This is recognized in the NVUM study:

"Because most BLM visitors participate in several recreation activities during each visit, participation rates usually exceed main activity rates.  After identifying their main recreational activity, visitors were asked how many hours they spent participating in that main activity during this BLM visit. Table 16 only gives the hours spent when the activity was identified as the MAIN activity.  Visitors who participated in this activity but not as a main activity might spend more or less time doing that activity (NVUM, p. 12)."

The "several instances" in the DRMP/EIS cited by SUWA which "imply" that contributions to the local economy are attributable to motorized recreation consist of a single quote from Chapter 4.  That quote (pg. 4-269) is very hedged, using terms such as "could be" and "it is possible".  Nowhere does the BLM say (or imply) that all (or even most) of the recreation impacts on the local economy are attributable to motorized recreationists. Rather, the BLM acknowledges that the different action alternatives tend to favor one type of recreationists over another.  Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation

BLM_0011721

| | | | | opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. SUWA provides no evidence that any of the action alternatives will produce the negative impacts. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 135 | The analysis fails to break down spending between motorized and non-motorized recreationists.  The BLM's own data indicate that the "overwhelming" number of visitors to the Moab area do not participate in motorized recreation. | See response to comment 124-134.  the comentor mischaracterizes the National Visitation Use Monitoring (NVUM) data, which does not support the assertion of the "overwhelming" number of non-motorized visitors.  The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group.  See response to comment 124-134.  The commentor also seems to assume that the BLM has data indicating what each group (assuming that they are discrete entities) contributes to the local economy.

The BLM has no data to separate out motorized versus non-motorized recreation spending, even assuming that the two groups are completely distinguishable.  The commentor provides no evidence that the existence of such data would change any of the BLM's conclusions in Chapter 4. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 136 | The preponderance of evidence is that most visitors are engaging in non-motorized recreation, making it likely that most visitor spending is due to the non-motorized recreation opportunities in the MPA.  It is likely that, as the landscape becomes overrun by off-road vehicles, these users are likely to choose other destinations.  This impact must be analyzed as part of the Final RMP EIS. | SUWA's comment consists of a series of unfounded claims, each one of which depends on the validity of the immediately preceding assertion. The BLM does not dispute the likelihood that most visitors are engaging in non-motorized recreation, at least as part of their recreation activities in the Moab planning area (MPA). Except for the preliminary and non-generalizable National Visitation Use Monitoring (NVUM) data, the BLM has no means to be certain about this.  The BLM has no data to support SUWA's next assertion that most visitor spending is due to non-motorized recreation.  The BLM disputes SUWA's final assertion that the "overrunning" of the landscape by OHV users (presumably an impact of the BLM's action alternatives), will lead to a loss of visitation |

| | | | | and visitor spending.<br><br>Under the current management plan (the no action alternative) in the DEIS/RMP) the MPA has seen an explosive growth in its tourist and recreation-driven economy.  Visitation and spending to date does not seem to have been deterred by the "overrunning" of the landscape that one might expect to be occurring (given SUWA's predictions) under current management.   As has been repeatedly stated in these responses, all BLM action alternatives in the DRMP/EIS close more than 2500 miles of currently available routes to motorized recreation.  All BLM action alternatives reduce to zero or close to zero the amount of acreage open to OHV cross-country travel.  It is an extraordinary leap of logic to suggest that the great reduction in OHV opportunities incorporated in the action alternatives will contribute to degradation of the landscape and a loss of visitors and visitor spending. The BLM believes that its recreation and travel management alternatives will increase and enhance opportunities and benefits for non-motorized recreationists.  The action alternatives dedicate more than 2500 miles of current vehicle routes to non-motorized use.  The action alternatives designate varying miles of new mountain bike routes.  The action alternatives close almost all of the MPA to cross-country OHV use, and eliminate altogether the category of "limited to existing roads and trails".  Alternatives B and C create several hiking and mountain biking focus areas, and identify primitive hiking and backpacking SRMAs.  Alternatives B and C close all inventoried ways within Wilderness Study Areas to motorized travel.  The BLM under its multiple use mandate has considered the needs of a wide variety of recreationists in the DRMP/EIS alternative formulation. |
| Southern Utah Wilderness Alliance | 124 | 137 | Making 80 % of the Moab Field Office open to off-road vehicles is inappropriate given the small number of participants, the important values which will be lost to all | SUWA's operating premise that the DRMP/EIS action alternatives "make 80 per cent of the Moab Field Office open to off-road vehicles", and that these alternatives will |

BLM_0011723

| (SUWA) | | | Americans, and the potential high cost that will be imposed on Utah and the rest of the region from higher levels of off-road motorized recreation in the Moab planning area (MPA).  Off-road motorized recreation has well-documented costs which have been "completely ignored" in the DEIS.  These include (with literature citations) increased soils compaction and erosion and disrupted hydrological function, air pollution, impacts on vegetation, impacts on wildlife, foregone passive use benefits, foregone wilderness/roadless recreation benefits, personal injury and safety, law enforcement costs, and costs to taxpayers. | produce higher levels of off-road motorized recreation is false.  See response to comments 124-133 and 124-135.  As stated repeatedly in the BLM's responses to SUWA's comments, the DRMP/EIS action alternatives close more than 2500 miles of routes available to motorized use and reduce to zero or near zero the amount of acreage "open" to OHV use (Alt C leaves open 1,833 acres open to cross country travel).  These facts differ from the 80 % figure SUWA repeatedly uses.

SUWA's list of the costs associated with OHV use might be applicable to some other, unspecified BLM planning area, but they are not applicable to the Moab DRMP/EIS.  As noted above, BLM's action alternatives greatly reduce the miles of routes and open areas available to motorized recreation.  In fact, even the least restrictive alternative (D) identifies for motorized use fewer miles of routes than SUWA's own travel plan submitted to the BLM during scoping.  Apparently, SUWA seems to ignore any OHV "costs" of travel on routes outside the lands it proposes for wilderness management.

As described in detail in Chapter 4, the BLM addressed the impacts from travel management to a wide variety of resources under its management.  SUWA provides no specifics as to where the BLM erred in its analysis, either for specific routes or specific resources.  The impacts on resources analyzed in Chapter 4 of the DRMP/EIS included many of the resources enumerated by SUWA, including soils, air quality, hydrology, riparian, vegetation, wildlife, and wilderness characteristics.  The BLM has never suggested that any of its management decisions are without impacts, including OHV and travel management decisions.  The BLM believes that its action alternatives, which greatly reduce both miles of motorized routes and open areas, should have a positive impact on the resources cited.  The BLM's responsibility is to |

BLM_0011724

| | | | | disclose and analyze the effects of those decisions; the BLM has fulfilled this responsibility in the analysis disclosed in Chapter **4**.<br><br>Several of the costs and impacts enumerated by SUWA have been addressed in other responses to comments. The responses to comments 124-129 and 129-130 address the issue of passive use benefits.   The responses to comments 124-133 and 124-134 address the issue of wilderness/roadless recreation benefits.  The responses to comments 124-120, 124-122 and 124-128 address the issue of economic costs to BLM and to local communities.  As regards SUWA's comment that BLM has ignored the risks to personal safety from OHV use, the BLM notes that it is beyond the scope of the plan to guarantee that individuals will follow commonly recognized OHV safety measures, as well as follow existing OHV laws and policies relating to safe operation. See also Chapter 1, pg. 11-13, for a discussion of issues beyond the scope of the current planning effort.<br><br>The literature SUWA cites refers primarily to the impacts of cross-country travel, not to the impacts of restricting travel to designated routes as proposed in the DRMP/EIS. Several of the studies were done in ecological and/or geological settings not necessarily relevant to the Moab planning area.  As stated above, the BLM has never implied that OHV use is without costs or impacts most of which result  from unrestricted cross-country travel. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 138 | The BLM should not designate routes based on R.S. 2477 claims.  The BLM must make decisions regarding motorized use base on its legal obligations to protect the resources of our public lands.  The BLM should not designate routes merely because of R.S. 2477 assertions. | The BLM did not designate routes based on RS 2477 claims as evidenced by its non-designation of over 2500 miles of routes.  Alternative A identifies 6,199 miles of routes while Alternative C identifies 3,693 miles of routes.  The RS 2477 is discussed on pg. 1-12 of the DRMP/DEIS as an issue eliminated from further analysis because it is beyond the scope of the plan.  The RMP does not adjudicate, analyze, or otherwise determine the validity of |

| | | | | claimed RS 2477 rights-of-way. |
|---|---|---|---|---|
| | | | | The BLM analyzed each travel route according to its purpose and need weighed against potential resource conflicts.  This process is detailed in Appendix G of the DRMP/DEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 139 | The Draft RMP does not present alternatives that would provide sufficient unfragmented habitat for wildlife. The Draft RMP should not only analyze the impacts of habitat fragmentation, but also consider and adopt a management alternative that substantially reduces the levels of fragmentation in the planning area.<br><br>Under the preferred alternative, 74% of Gunnison sage grouse and 35% of greater sage grouse habitat remain affected. Even under the most protective alternative, Alt B, 69% of Gunnison sage grouse and 33% of greater sage grouse habitat remain impacted by fragmentation. Unde rall of the alternatives, there is no unfragmented or favorable habitat for desert bighorn sheep within the entire planning area. | DRMP/EIS provides a range of alternatives for the protection of wildlife habitats.  Though fragmentation has been widely documented as causing an array of impacts to wildlife and their habitats, an alternative designed to provide totally unfragmented habitat is not a feasible and reasonable alternative. Fragmentation is an existing condition of wildlife habitat.<br><br>To ensure that all federally listed, state sensitive, and big game species received adequate protective measures  to protect  habitats used for breeding, migration and the rearing of young, the BLM worked closely with the United States Fish and Wildlife Service and the Utah Division of Wildlife Resources to developed controlled surface use stipulations, seasonal and spatial buffers, habitat restoration plans and other measures that support Recovery Plans, Conservation Agreements, Conservation Plans and Recommendations, and Herd Management Plans.  Other wildlife species, though not specifically addressed in the DRMP/EIS, will also benefit from the many management prescriptions in the preferred alternative.<br><br>There are currently no active sage grouse leks within the Moab planning area. The DRMP/EIS on pg. 4-373 states that the planning area condition includes a large proportion of fragmented habitat.  Of the action alternatives, Alt B would result in the least amount of additional fragmentation and its attendant impacts, followed by C, D and A in ascending order. |

| | | | | |
|---|---|---|---|---|
| | | | | Chapter 4 of the DRMP/EIS provides analysis of the impacts of habitat fragmentation on seveal wildlife species, including desert bighorn sheep on pgs. 4-482-486.  The analysis concludes that Alt B results in the least amount of new habitat fragmentation.  The DRMPEIS on pg. 4-484 recognizes that under all alternatives, "no unfragmented or favorable habitat exists within the Moab planning area." |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 140 | The Draft RMP improperly underestimates the impacts of habitat fragmentation. | The fragmentation analysis is not an attempt to quantify the specific impacts from the fragmentation that has or will result from existing or new road use and energy exploration and development, but is rather a tool  to understand the differing impacts among alternatives for future habitat fragmentation. The BLM has used the best available data to make an analysis of fragmentation differences among alternatives on a landscape level.  Habitat fragmentation is one of many factors that play an important role in wildlife management decisions.  Site specific impacts from future activities will be analyzed and when applicable, stipulations and mitigation measures may be implemented. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 141 | Managing lands to protect their wilderness characteristics reduces fragmentation and provides better habitat;  the Draft RMP should acknowledge these benefits and consider more alternatives to protect habitat. | Chapter 4 of the DRMP/EIS on pgs. 4-379-380 and 4-463 acknowledges the benefits of management to protect wilderness characteristics.  Alt B manages all non-WSA lands with wilderness characteristics to protect their natural values, including wildlife habitat. The DRMP/EIS provides a reasonable range of alternatives to protect habitat.<br><br>In addition to those lands managed for wilderness characteristics, the Moab planning area includes designated wilderness and WSAs, which also provide unfragmented habitats for wildlife species. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 142 | The National Park Service should have been a cooperating agency.  The exclusion of the NPS from cooperating agency status has limited the input from this most qualifed agency on the import of effects on | Cooperating agency status was extended to Federal, State, and local agencies, including the National Park Service.  In addition to the cooperating agencies, the BLM Moab Field Office held meetings with and sought the |

| | | | Arches National Park and Canyonlands National Park. | input of other agencies that have land management jurisdiction within or adjacent to the planning area.  In particular, the BLM conducted many coordination meetings with the National Park Service during the development of the DRMP/EIS in order to solicit its concerns.  Although not a formal cooperating agency, members of the National Park Service staff worked closely with the BLM to resolve issues and address concern, when possible. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 143 | SUWA's Exhibit I is a site specific list of travel plan comments.  A general point throughout Exhibit I is that SUWA believes a number of routes should be closed to motorized use for a variety of reasons. | The comments on the DRMP/EIS incorporated in Exhibit I are identical to the materials provided by the commentor during scoping.   As was the case with the commentor's scoping submission, the comments address the Grand and San Juan County route inventories, and not the travel plan encompassed by the action alternatives.  As such, the scoping comments as well as the comments received on the DRMP/EIS refer to Alternative A (No Action), as many of the routes in question are not identified for motorized travel in one or more action alternatives.<br><br>Appendix G to the DRMP/EIS explains in detail the methods and tools used by BLM to formulate its travel plan alternatives.  The road closures proposed by the commentor reflect their Red Rock Heritage Travel Plan, the BLM response to which can be found in Chapter 2, pgs. 108-109.<br><br>Most of the routes proposed for closure by the commentor lie within its wilderness proposals.  The commentor itself, in many of its specific route comments, expresses the concern that, were it not for the existence of the route(s) in question, the area would be roadless.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>Related to the above, many of this organization's |

| | | | | |
|---|---|---|---|---|
| | | | | comments call for a greater balance between motorized and non-motorized recreation.  The BLM's action alternatives recognize this concern.  OHV categories, in all action alternatives, greatly reduce the acreage currently "open", proposing that virtually all of it be in the "limited" category.  Similarly, the BLM proposes in one or more action alternatives that all lands in WSAs be in the "closed" category; alternative B does not identify any vehicle "ways" for motorized use, while alternative C identifies 2.55 miles of routes.<br><br>All action alternatives propose identifying more than 2500 miles of current vehicle routes for non-motorized use; all of these are potentially available for hiking, equestrian and bicycling use.  The BLM's proposal identifies fewer miles of routes for motorized use than the Red Rock Travel Plan proposed by the commentor in scoping.  All public lands remain open to hiking. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 144 | The BLM should close the upper RH Tusher route, as it has no need.  It contains some of Utah's important wildlife habitat.  The route is just a rough wash bottom.  Access should be limited to oil and gas leasees. | The route in question is a constructed and regularly maintained County B road which accesses several state sections, and is also used by grazing permittees and recreationists.<br><br>This route lies within a SUWA proposed wilderness area, which in effect would be "roadless", except for the fact that a route is present.  Closing this route to motorized use would not make the area "roadless", as the impact on naturalness would still exist.  It is beyond the scope of the plan for BLM to create "roadless" areas where such areas do not currently exist.  Rather, BLM evaluates routes for purpose and need balanced against resource conflict.  A preference for a route to not be present is not in itself a resource. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 145 | The route up Floy Canyon should be closed above the ranch.  Closing this route would help maintain wildlife and non-motorized recreation. | The route in question is not identified for motorized use in Alternatives B or C. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 146 | The route up Nash Wash should be closed.  This route is blocked by private land. | The route in question is not identified for motorized use in Alternatives B or C. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 147 | The route in Diamond Canyon should be closed above the ranch. | The route in question is a constructed and regularly maintained County B road.  The route in question is not identified for motorized use in Alternatives B or C beyond the end of the B road. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 148 | The route in Cottonwood Canyon should be closed above the ranch. | The route in question is a constructed and regularly maintained County B road.  The route in question is not identified for motorized use in Alternatives B or C beyond the end of the B road. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 149 | The BLM should close most routes on the flank of South Mountain, especially to improve deer habitat. | As part of its travel plan formulation process, the BLM conducted numerous meetings with its ID team, which included wildlife specialists.  Additionally, the BLM consulted with Utah DWR on all aspects of its plan, including travel.  The problems cited by the commentor were not raised as resource conflicts. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 150 | The BLM should close many routes in lower Sagers Wash, as the routes serve little purpose and lie in sensitive soils. | In all its action alternatives, the BLM closes numerous routes to motorized travel due to conflicts with sensitive soils. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 151 | Many routes on Dome Plateau should be closed to motorized travel, since they are redundant and pose resource conflicts.  Closing these routes would maintain opportunities for non-motorized recreation and protect deep microbial crusts and other soils. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  There is no distinction made on the basis of use, and the proposal includes closing county B roads and popular permitted motorized routes.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 152 | The BLM should close routes on Dry Mesa in order to "create a rare remote and wild area".  This would also protect the viewshed from Arches National Park. | Many of the routes on Dry Mesa are not identified for motorized use in one or more action alternatives.  The routes the commentor proposes closing consist entirely of routes lying within its wilderness proposals.  There is no distinction made on the basis of purpose or need.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to |

BLM_0011730

| | | | | |
|---|---|---|---|---|
| | | | | wilderness proposals.<br><br>The BLM has proposed viewshed protection surrounding Arches National Park in all action alternatives of the DRMP/EIS.  Travel on designated routes is not considered an impact to the viewshed of Arches because it is not a permanent surface disturbing activity. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 153 | The BLM should close the Winter Camp Ridge route to motorized travel to create non-motorized recreational opportunities.  This route does not lead to a good view point or logical destination. | This route accesses Arches National Park; contrary to the commentor's assertion, it leads to a spectacular viewpoint above Salt Wash.  The route in question lies within a SUWA wilderness proposal.  As described in Chapter 2, pg. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 154 | The BLM should close a "user-created" Jeep Safari route in the southwest part of the Dome Plateau area because "it intrudes into a high-priority non-motorized area". | As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  This route has a demonstrated purpose and need as it is part of the permitted route system. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 155 | The BLM should close the route on Fisher Mesa because of its scenic qualities, wildlife values, and opportunities for non-motorized recreation. | The route in question leads to a large chained area, and accesses several stock ponds and a state section.  The route itself was "cherry-stemmed" in HR 1500 (which formed the basis for the 1999-2003 wilderness inventory), presumably for these reasons stated above.  The BLM interdisciplinary team, reviewing travel routes, did not identify resource conflicts with the Fisher Mesa route.  Furthermore, the commentor did not provide any evidence regarding the conflicts it refers to. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 156 | The BLM should close routes on Adobe Mesa.  People in Castle Valley would like this route closed and there is no purpose and need for the route. | In all action alternatives, the BLM does close redundant routes on Adobe Mesa for motorized use.  The main route on Adobe Mesa remains open under all action alternatives.  The routes the commentor proposes closing consist entirely of routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The BLM has received no indication from residents of |

| | | | | Castle Valley that they would like routes on Adobe Mesa closed. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 157 | The BLM should close routes in the vicinity of Mary Jane and Fisher Canyons.  Vehicle routes are few and seldom used, as they do not lead to anything and are not especially enjoyable or challenging drive. | In all action alternatives, the BLM does not identify the majority of inventoried routes for motorized use in this area.  The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 158 | The BLM should close a variety of routes on Top of the World and Seven Mile Mesa, as they "intrude into priority non-motorized areas". | In all action alternatives, the BLM closes a number of routes to motorized use on these mesas, due to a lack of purpose and need.  As the commentor acknowledges in its comments, the routes to be closed consist of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 159 | There are too many redundant routes in the Dolores Triangle, and these should be closed by the BLM. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 160 | The BLM should close access routes beyond the campground near Castle Rock, and close routes in the upper part of Castle Valley.  The BLM should look at the Castle Valley road plan. | In all action alternatives, the BLM does not identify for motorized use several of the routes in question near Castle Rock.  In upper Castle Valley, the BLM proposes not identifying redundant routes.  The commentor's proposal closes all routes, including access to State lands and occupied private property, with no distinctions made as to purpose and need.<br><br>The BLM has not received a route proposal from the town of Castle Valley. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 161 | The BLM should close routes on Porcupine Rim and Mat Martin Point "in order to preserve the entire area for non-motorized use".  Motorized use is resulting in lessening the appeal for bikers and walkers. | In all action alternatives, the BLM does not identify for motorized use several of the routes in question near Castle Rock.  In one or more action alternatives, the BLM identifies for non-motorized use routes within the Negro Bill Canyon Wilderness Study Area.  The routes the commentor proposes closing consist almost entirely of |

BLM_0011732

| | | | | routes lying within its wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The commentor's assertion regarding the impacts to bikers and walkers from motorized use is unfounded. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 162 | The BLM should close most routes in the Beaver Creek area. The routes are rarely used and the area is excellent habitat for wildlife. | The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. The BLM has closed routes with resource conflicts in this area that were found to have no purpose and need and |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 163 | The BLM should close a number of routes in the Sand Flats area to protect non-motorized recreation. The Hells Revenge route should be closed. SUWA suggests that BLM incorporate the expertise of the Sand Flats team. | As is true of most of the commentor's comments on the DRMP/EIS, SUWA appears to be addressing the county road inventory, and not BLM's travel plan. The assertion that some of these routes are causing damage to the Wilderness Study Area is unfounded, and the BLM has ample evidence to the contrary. The Slickrock Trail would be closed to motorized use under one action alternative. However, it is closed to jeeps in all action alternatives. The Hells Revenge Jeep Trail is one of the most popular jeep routes in the area, and a major commercial activity for guided trips. The Sand Flats team is a Grand County entity and thus a cooperator in the BLM's planning effort; the BLM has considered its input.<br><br>Many of the routes the commentor proposes closing lie within its wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 164 | The BLM should close routes in the Mill Creek area. ORV use in the streambed is highly damaging to riparian and cultural resources. ORVs affect water quality, stream bank erosion, habitat, and Moab's water supply. | The commentor provides no evidence of its assertion of OHV damage in the streambed. As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary ID team (including vegetation, riparian, wildlife, and hydrology |

| | | | | specialists).  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.

The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 165 | The BLM should close a number of routes west of Westwater, which serve no purpose or need and "intrude on a priority non-motorized area". | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 166 | The BLM should close less-used routes that encroach on roadless areas of Arches National Park to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more of the action alternatives.  The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 167 | The BLM should close many of the side routes of Utah Highway 313 for visual resources, vegetation, soils, and cultural conflict reasons. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  Several others are routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team (including vegetation, soils, wildlife and cultural resource specialists).  Potential resource conflicts were identified, their extent evaluated, and then weighed against purpose and need for the particular route under discussion. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 168 | The BLM should close most of the routes on the Bull Canyon rims, as they serve little purpose and are barely used. | Several of the routes to which the comme ntor refers are not identified for motorized use in one or more action alternatives.  Several others are routes lying within SUWA's wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 169 | The BLM should close most routes in the Bull Canyon bottoms to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The route below Gemini Bridges will be closed under all action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 170 | The BLM should close a number of routes on Goldbar Rim and Poison Spider Mesa to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The principal route to which the commentor objects is a very popular permitted 4WD route.  As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.<br><br>Several of these are routes lying within SUWA's wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 171 | The BLM should close a number of routes in Shafer Canyon to protect the viewshed from Dead Horse Point. It also hosts bighorn sheep and Mexican spotted owls. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 172 | The BLM should close most of the route in Mineral Canyon, as "this is a good place for quiet recreation". | One or more action alternatives identify this route for motorized use only up to the state section in Mineral Canyon. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 173 | The BLM should close the route along the Green River to Hell-Roaring canyon to mitigate the "large conflict with non-motorized use in this canyon." | The commentor provides no evidence to support its assertion of the "large conflict". The route above the State section in Hell Roaring Canyon is closed to motorized use in one or more action alternatives.<br><br>The route the commentor proposes closing lies within its wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 174 | The BLM should close the route to Hey Joe Canyon along the Green River because of conflicts with non-motorized users.   There is a long tradition of both commercial and private non-motorized use of the river. These uses are being harmed by the noise of motors along the Hey Joe route. | This route was identified as a road in the 1999-2003 wilderness inventory. It leads to a large disturbed mining area. It is a permitted route popular with motorized recreationists. The "long tradition of non-motorized use of the river" to which the commentor refers is irrelevant to the existence of a route which has been in use for nearly 50 years. The commentor provides no evidence to support its assertion of harm to commercial businesses that use this area. The BLM made several documented visits to this route during a recent Easter Jeep Safari ; at the time of these visits, the BLM observed very little motorized or river use, let alone user conflict.<br><br>The route the commentor proposes closing lies within their wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 175 | The BLM should close the route in Ten Mile Canyon to protect riparian and cultural resources. The extreme well documented and steadily increasing damage to this place can only be mitigated if the canyon is closed to motorized use. | See response to comment 124-81.<br><br>This route, very popular with motorized recreationists, is not identified for motorized use in one or more action alternatives. The current travel route has been heavily signed to minimize damage to riparian and cultural resources. Side routes accessing cultural resources have |

| | | | | been closed to motorized travel.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 176 | The BLM should close many of the routes leading to "points" along the Labyrinth Canyon rims, leaving a few available for "quiet recreation". | The commentor proposes closing to motorized travel a large number of routes covering a large land mass.  Many of these routes do access popular viewpoints, and are described in guidebooks.  The BLM has recognized the needs of non-motorized recreationists by not identifying for motorized use many of the travel routes in the area in question.<br><br>The commentor provides no information as to why the specific routes they wish closed were selected.  The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 177 | The BLM should close most of the White Wash area to motorized use, due to a large number of resource conflicts including scenery, cultural, biological, riparian, wildlife, and water resources.  There are inadequate inventories of potential sensitive and Threatened and Endangered Species.  This is a lawless area and needs closure to motorized vehicles.<br><br>The likelihood of endemics is high in White Wash. Wildlife affected include amphibians, peregrines, and bighorn.  Negative impacts on riparian areas include loss of function, channelization, bank destabilization and erosion, turbidity, compaction, petrochemical contaminants, and loss of flood resilience. | Much of this comment could be characterized as a "rant" against the OHV community.  A representative sentence: "Gigantic unmonitored, unpermitted gatherings happen here most weekends in Spring.  If they were rainbow gatherings, every law enforcement agency within 200 miles would be alert and have a presence, but, since they are ORVers only here to rip out and burn live cottonwoods, chase wildlife and foot travelers, shoot off automatic weapons, and tear through the canyons at a breakneck speed, the BLM sees no need to be here or even provide toilets or guidelines."<br><br>The commentor provides no evidence to support these very broad assertions concerning the OHV community, and the BLM feels no need to respond to what is an emotional outburst of opinion. |

| | | | | |
|---|---|---|---|---|
| | | | | The BLM recognizes the affected resources in this area. Alternative B proposes closing the dunes to motorized use.  Other action alternatives propose significant reductions in the areas currently open to OHV use, with measures to protect vegetative and riparian resources. Several of the routes to which the commentor refers would not be designated for motorized use in one or more action alternatives.  Other routes which the commentor proposes closing lie within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The BLM contracted a study with Brigham Young University in 2005 to inventory the dunes for rare and unique plants in 2005.  No rare, unique, or endemic plants were found on the dunes.<br><br>The commentor provides no evidence to support its list of negative impacts to the White Wash area. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 178 | The BLM should close "recently pioneered" motorcycle routes in the Duma Point area to protect big horn sheep habitat, sensitive soils, and provide opportunities for quiet recreation.  The bighorn sheep herd is stressed. | Many of the "recently pioneered" motorcycle routes to which the commentor refers are constructed routes, primarily left over from minerals exploration.  The northern portion of this area contains a very large number of these routes.  This may be a reason why the commentor's comments to BLM proposals on managing lands for wilderness characteristics raised no explicit objection to BLM's Wilderness Characteristics Review finding that the large number of constructed impacts in this area rendered it as lacking wilderness characteristics.  The stress on bighorn sheep and the damage to soils referred to by the commentor is not backed up by any documentation.<br><br>Several of the motorcycle routes to which the commentor refers were not identified for motorized travel in any action alternative.  The BLM interdisciplinary team reviewing |

| | | | | travel routes, concluded that conflicts with bighorn sheep outweighed the purpose and need for these motorcycle routes.  Those routes BLM has concluded could affect wildlife are not identified for motorized use in any action alternative.<br><br>Most of the routes the commentor proposes closing are routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 179 | The BLM should close routes above the rim in the north Behind the Rocks area.  The area is popular with hikers and "this outweighs the not-very-special motorized recreation opportunities". | The routes to which the commentor refers are popular permitted 4WD routes which have been in use for over 30 years.  The comment that hiking use "outweighs" motorized use is simply stating a preference, but not a conflict.<br><br>The route the commentor proposes closing lies within their wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 180 | The BLM should close the dune area in north Behind the Rocks to motorized use.  It is a major embarrassment to the Moab FO.  SUWA uses photos of it in press releases.<br><br>The route beyond the top of the Moab Rim trail should be closed. | The dune area to which the commentor refers (and their website photo taken several years earlier) has had most of the user-created routes closed and BLM can document its recovery.<br><br>As with response to comment 124-179, the route the commentor proposes closing lies within their wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 181 | The BLM should close several routes in south Behind the Rocks, especially the route in Hunter Canyon which contains "near here" one of the few springs in the area.  This would enhance non-motorized recreation opportunities. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The route in upper Hunter Canyon is a constructed route popular with motorized recreationists and provides access to other constructed routes on the mesa top leading back to the main Behind the Rocks and |

BLM_0011739

| | | | | Kane Creek Rims routes. The commentor provides no evidence that the spring "near here" is being affected by motorized use.

Several of the routes the commentor proposes closing lie within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 182 | The BLM should close the Hunter Canyon rim route to motorized use since "this is a place where non-motorized gains clearly outweigh the motorized losses." This is a high priority hiking area and jeep noise is a problem. | The loss versus gain to which the ocmmentor refers is clearly a matter of opinion, with no documentation provided to support their assertion. The route to which the commentor refers receives little motorized use, and the commentor provides no evidence of the noise and conflict which its identification creates. The route itself is not identified for motorized use in one action alternative (Alt B). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 183 | The BLM should close the single-track bicycle route along the Hunter Canyon rim due to erosion and trail-widening. | Throughout its comments, the commentor chides the BLM for not providing more non-motorized recreation opportunities, which this trail represents. The commentor provides no evidence to support its assertion of damage along this trail. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 184 | The BLM should close a number of routes on Hatch Point, mostly little used jeep trails and seismic lines. This is an important area for pronghorns. | The commentor's proposal actually closes numerous routes in a very large land area, without regards to purpose or need. The only resource conflict identified is wildlife, specifically pronghorn antelope. The commentor provides no evidence that these routes are causing harm to this resource.

As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdiciplinary team (including wildlife). Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.

Virtually all the routes SUWA proposes closing lie within |

| | | | | their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 185 | The BLM should close most of the routes in the East Coyote area which receive little or no use in order to preserve a "remote/roadless area". The adjoining area in Colorado "has already been recognized for its wilderness values". | The commentor's characterization of the area as remote/roadless is not correct. The area has many routes from past minerals activities, all of which the commentor proposes closing. The entire area lies within SUWA's wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The reference to the adjoining "wilderness" in Colorado is irrelevant, and has been addressed in BLM's responses to SUWA's comments on wilderness characteristics alternatives. The area to which SUWA refers has not been recognized for "wilderness values" by any public agency. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 186 | The BLM should close the route along the Green River to Hey Joe mine. | See response to comment 124-174. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 187 | The BLM should close and rehabilitate an unnamed spur of Hey Joe access route. The spur is damaging to VRM and has no purpose and need. | This route is not identified for motorized use under any action alternative. Rehabilitation is an implementation level decision and outside the scope of the current planning effort. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 188 | The BLM should close the route along the Green River to Hell Roaring Canyon (1224) due to a lack of purpose and need and variety of resource conflicts. Hell Roaring Canyon possesses wilderness characteristics and is pristine. This route additionally conflicts with cultural, riparian, wildlife, and primitive recreation resources. | This route had not been identified as open to motorized use under one or more action alternatives. See response to comment 124-173. A BLM interdisciplinary team reviewed each route for purpose and need weighed against resource conflicts. See Appendix G for details on the Travel Plan development process. The resource conflicts in Hell Roaring Canyon were not sufficient enough to close this route in the preferred alternative. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 189 | The BLM should close the route in Hell Roaring Canyon (1223) due to a lack of purpose and need and variety of resource conflicts. The route is not in alignment with BLM OHV designation regulations. | See response to comment s 124-173 and 124-188. The commentor provides no rationale why this route is "not in alignment with BLM OHV designation regulations". |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 190 | The BLM should close an unnamed spur of Red Wash (2762) due to ORV resource damage warranting closure.  ORV use has damaged the naturalness of this popular lunch spot for boaters along the Green River. | Without a map, it is not possible to know to which "route" the commentor refers.  There is a motorcycle route in the vicinity, which would not be identified for motorized use across all action alternatives.  Similarly, there is a named (the commentor refers to an "unnamed" route) county route heading south from this spur, which would also not be identified for motorized use across all action alternatives.  The open to cross country OHV designation currently in Alt A has been changed to limited to designated routes in all action alternatives. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 191 | The White Wash Sand Dunes are an ecologically unique feature in the Moab planning area.  These dunes should be closed to OHV use and the proposed Ecological Study area should be established.  This scenic and unique area should be closed to open cross country travel area. | The BLM's Alternative B closes the dunes to OHV use and established them as an ACEC.   See response to comment 124-177. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 192 | The BLM should close the route in Ten Mile Wash because of conflicts from motorized use with riparian and cultural resources. In addition, there are conflicts with non-motorized users.  The BLM should protect these delicate resources. | The BLM should close the route in Ten Mile Wash because of conflicts from motorized use with riparian and cultural resources. In addition, there are conflicts with non-motorized users.  The BLM should protect these delicate resources. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 193 | The BLM should close the route in Salt Valley Gorge (4006) due to a lack of purpose and need and conflict with wilderness values. The route has nearly reclaimed. | The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  See also response to comment 124-188 for a discussion of the role of the interdisciplinary team in assessing resource conflicts. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 194 | The BLM should close Arches Salt Wash (3939) because it has no purpose and need and "paleontological resources are likely at risk." | This short (0.23 miles) route lies within SUWA's wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The commentor provides no evidence to support their assertion of possible risk to paleontological resources. |
| Southern Utah Wilderness Alliance | 124 | 195 | The BLM should close the route to Day Canyon Point I (1625) due to conflicts with hikers in Day Canyon and wilderness characteristics. | This route had not been identified as open to motorized use under one or more action alternatives.  The route the commentor proposes closing lies within its wilderness |

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | | proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The route in question does not create conflicts with hikers in Day Canyon, as the closest it comes to the rim is 0.25 miles.  Sound from motors above does not enter Day Canyon.  Utah Highway 279, a major paved road, intersects the canyon mouth and is much more likely to add to the asserted and undocumented conflict with Day Canyon hikers. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 196 | The entire Green River should be found suitable for inclusion in the Wild and Scenic River System.  Green River State Park to Crystal Geyser should be recreational.  Crystal Geyser to Ruby Rach should be wild.  Ruby Ranch to Mineral Canyon should be wild. Mineral Canyon to Canyonlands National Park should be scenic.<br><br>Tenmile Canyon should be found eligible and suitable as wild. | For the Green River, see response to comments 124-91 and 124-92.  For Tenmile Canyon, see response to comment 124-94. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 197 | The BLM should close motorized routes running along the river in Labyrinth Canyon, including the routes running up and down canyon from Spring Canyon.  This would correct the noise problems that "plague" river runners and hikers in the canyon. | See response to comments 124-174 and 124-186.<br><br>This route was identified as a road in the 1999-2003 wilderness inventory.  It leads to a large disturbed mining area.  It is a route popular with motorized recreationists, including those under BLM permit.  The commentor provides no evidence to support its assertion of the noise that plagues hikers and boaters.  The BLM made several visits to this route during a recent Easter Jeep Safari; at the time of these visits, the BLM observed very little motorized or river use, let alone user conflict.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness | 124 | 198 | The BLM should close the route alongside the river north of Mineral Canyon, since the route causes user | See response to comment 124-172.  The commentor provides no evidence to support its assertion of user |

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | conflicts along the river and resource damage in Hell-Roaring Canyon. | conflict and/or resource damage.  The route in Hell Roaring Canyon is identified for motorized use only to the state section in one or more action alternatives.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 199 | The BLM should close the motorized route in Ten Mile Canyon due to damage to cultural and riparian resources.  Ten Mile is a perennial stream and would be eligible for inclusion as a Wild and Scenic River. | See response to comments 124-94, 124-175, and 124-192. This route, which is very popular with motorized recreationists, is not identified for motorized use in one action alternative.  The current travel route has been heavily signed to minimize damage to riparian resources. Routes accessing cultural resources have been closed to motorized travel.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 200 | The BLM should close the proposed motorized route in Hell Roaring Canyon to protect scenic values, riparian values, and fragile soils. | See response to comments 124-173, 124-188, and 124-189.<br><br>The BLM identifies this route for motorized use only up to the state section in one or more action alternatives. This route provides access to a state section and a wildlife guzzler in the area.  The commentor provides no evidence to support its assertions of resource damage. As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team (including the resource specialists for riparian, soils, and scenery).  Potential resource conflicts were identified, their extent evaluated and weighed against purpose and need for the particular route under discussion.<br><br>The route the commentor proposes closing lies within its |

| | | | | |
|---|---|---|---|---|
| | | | | wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 201 | The BLM should close routes with no clear purpose and need, that have "a resource or use conflict", or overlap areas that "have been found to possess wilderness characteristics".  The specific areas of concern include Horsethief Point, Mineral Point, Deadman Point, Spring Canyon Point, Tenmile Point and the area north of Ruby Ranch extending to Crystal Geyser. | See response to comment 124-62, 124-63, 124-64, 124-65, and 124-143.  The commentor's proposal in this comment covers a very large land area covering tens of thousands of acres, and with hundreds of miles of inventoried routes.  SUWA provides no specific route data to support their broad assertions of resource and user conflicts. The principal "resource conflict" appears to be the fact that virtually all of these routes are within SUWA's wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The commentor asserts that the BLM should close routes that have a "resource or user conflict".  The presence of such a conflict does not in itself warrant not identifying a route for motorized use.  Rather, the BLM identifies potential resource conflicts, assesses the significance of such conflicts, and weighs any such conflicts against purpose and need.  As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 202 | The BLM should adopt a management plan that protects areas with wilderness characteristics. Wilderness characteristics should be one of the resources specifically protected in the expanded Labyrinth ACEC. | The relevant important values considered in the Area of Critical Environmental Concern process to not include wilderness characteristics.<br><br>The "expanded ACEC" to which the commentor refers has not been found by BLM to possess any relevant and important values to qualify it as an ACEC.  See response to comment 124-86. |
| Southern Utah Wilderness | 124 | 203 | The BLM should manage lands included in substantive citizens' wilderness proposals in such a way that no | See response to comments 124-52, 124-53, and 124-54 on BLM's requirements to manage lands for wilderness |

BLM_0011745

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | activities are permitted that permanently degrade the resource. | characteristics.<br><br>As described in detail in Chapter 4, as part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process (whose findings are available on the MFO planning website, and in the administrative record).  The BLM stands by its findings of its wilderness characteristics inventory maintenance.<br><br>The BLM assumes that the commentor's comment refers to the Labyrinth Canyon area, the focus of the commentor's Exhibit C.  Much of this area was found to lack wilderness characteristics in BLM's wilderness characteristics inventory maintenance process.  The area found to possess wilderness characteristics would be managed for such under Alternative B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 204 | The BLM should designate Labyrinth Canyon as a primitive, undeveloped SRMA.  Continue the interagency river management system and reduce route density. | In Alt C of the DRMP/EIS, Labyrinth Canyon is part of the Labyrinth Rims/Gemini Bridges Special Recreation Management Area (SRMA) which is a destination SRMA.  However, the portion of the Green River from Placer Bottom to Mineral Bottom is managed as non-mechanized Focus Area (7,709 acres).  The interagency river management system is an issue addressed through policy or adminstrative action and therefore does not require a land use planning decision (see pg. 1-11 of the DRMP/EIS.  For discussion of route density see response to comment 124-62 through 124-66. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 205 | Recreation generates more money than oil and gas.  Therefore, all lands within Labyrinth Canyon should closed or no surface occupancy for oil and gas.  The Green River corridor found by the BLM to possess wilderness characteristics should be closed to oil and | In Chapter 4 of the DRMP/EIS, the BLM acknowledges the economic values of recreation in the Moab planning area.  In Alt C, the BLM institutes no surface occupancy along the entire Green River corridor, including Labyrinth Canyon. |

| | | | | |
|---|---|---|---|---|
| | | | gas.  Lands contained in the Red Rock Wilderness Act should be no surface occupancy. | The BLM has no obligation to close to oil and gas to all lands that are within a bill introduced in Congres, the Red Rock Wilderness Act.  Should congress direct the BLM to close all lands to oil and gas leasing, the BLM will comply with the law. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 206 | The BLM must give priority to the designation of Labyrinth ACEC to protect natural resources (riparian, cultural, historical, wilderness characteristics, wildlife and sensitive soils).  The relevant and important values are the same as listed in Comment 86. | See response to comment 124-86. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 207 | For Arches Adjacent Unit 1, the BLM has performed a cursory and erroneous review concerning wilderness characteristics, failing to take into account new information presented to BLM on June 30, 2007. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process .  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 208 | For Arches Adjacent Unit 2, the BLM arbitrarily excludes an area from wilderness characteristics by using an inaccurate boundary. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 209 | For Arches Adjacent Unit 3, BLM arbitrarily excludes an area from wilderness characteristics that appears natural, providing no reason for doing so. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial |

| | | | | |
|---|---|---|---|---|
| | | | | photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The  BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 210 | For Arches Adjacent Unit 4, the BLM excludes an area from wilderness characteristics that appears natural. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO website and in the administrative record. The  BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 211 | The BLM erroneously excludes land with WC in Arches Adjacent Unit 5, relying on aerial photography and county route data.  BLM fails to include an area possessing wilderness characteristics. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The  BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 212 | The BLM erroneously relies on County GIS data to make an incomplete wilderness characteristics evaluation in Arches Adjacent Unit 6.  Specifically, the BLM uses "purported" county routes as boundaries of naturalness. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM |

| | | | | stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 213 | The BLM uses an arbitrary boundary down a cliff line, rather than go to the edge of naturalness in Dome Plateau. This excludes an area with wilderness characteristics. | The area in question totals 304 acres of steep talus slopes. Under Alternative C, this area is no surface occupancy for oil and gas leasing. This area was withdrawn from new mining claims under the Three Rivers Withdrawal. There are no travel routes proposed in this area under any alternative. Thus, the salient features of wilderness characteristics are being protected by other proposed management actions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 214 | The BLM excludes the Dry Mesa area from its findings of naturalness, although the area is natural, consisting mainly of "rehabilitating" seismic lines. This excludes an area with wilderness characteristics from the Dome Plateau. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 215 | The BLM fails to go to the edge of naturalness along the western boundary with Arches NP. These lands are endorsed for wilderness by the National Park Service. This excludes an area with wilderness characteristics from the Dome Plateau. | See response to comment 124-213, which refers to this area. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 216 | The BLM did not reconsider a portion of Beaver Creek in its 2007 wilderness characteristics review. The BLM fails to go to the edge of naturalness along Beaver Creek WIA's northern boundary with Granite Creek WIA. This excludes an area with wilderness characteristics. The BLM did not inventory this area on the ground. | The area in question was determined to lack wilderness characteristics in the 1999 inventory. The 2003 revision accounted for public comments regarding the 1999 findings. The BLM stands by its findings of its wilderness characteristics inventory maintenance. While the BLM did not perform additional on the ground inventory in 2007, ground truthing of the area was done for the 1999 inventory and its 2003 revision. Aerial photography review confirmed the findings of earlier field trips. |
| Southern Utah Wilderness | 124 | 217 | The BLM fails to go to the edge of naturalness in the Steamboat Mesa area, excluding lands with wilderness | As depicted by the commentor on the map submitted with this comment, most of the land in question was found to |

BLM_0011749

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | characteristics in the Beaver Creek Unit. | lack wilderness characteristics in the 1990-2003 wilderness inventory.  The BLM stands by its findings   of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 218 | SUWA disagrees with BLM's wilderness characteristics review determination on the lands below Steamboat Mesa.  This excludes lands with wilderness characteristics in the Beaver Creek Unit. | This comment refers to the BLM's findings from the 1999-2003 wilderness reinventory.  As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 219 | The BLM failed to consider adjacent wilderness character lands in Colorado when evaluating Beaver Creek Unit 4, and erred in its 1999-2003 findings on lands to the west. This excludes lands with wilderness characteristics from the Beaver Creek Unit. | The Colorado lands that the commentor refers have not been found to possess wilderness characteristics by any federal or state agency, but only by the Colorado Environmental Coalition.  It is beyond the scope of the Moab DRMP/EIS to evaluate wilderness characteristics beyond the field office boundary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 220 | The BLM fails to include lands with wilderness characteristics identified in the accompanying SUWA map as Area C of the Beaver Creek Unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory.  The 2003 revision accounted for public comments regarding the 1999 findings. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 221 | The BLM fails to include lands with wilderness characteristics identified in the accompanying SUWA map as Area D of the Beaver Creek Unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory.  The 2003 revision accounted for public comments regarding the 1999 findings. The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 222 | The BLM erred in its 2007 determination of non-wilderness characteristics for Beaver Creek, Unit 2. The BLM needs to expand the Beaver Creek Unit to include these natural lands as shown on the accompanying map. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well |

| | | | | as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 223 | The BLM uses a faint and reclaiming route as the boundary of naturalness for Beaver Creek, Unit 1. The BLM justifies the exclusion of the area to the west by noting that the route is "substantially noticeable." This excludes lands from wilderness characteristics. | This route was described as a road in the 1999-2003 inventory. It is shown as a 4WD route on the Blue Chief Mesa 24K topo. It is clearly visible on aerial photos. The commentor provides no documentation to support its assertion on the condition of this route. Furthermore, the commentor does not dispute the existence of this route, and suggests that the BLM could "cherry-stem" this route. The route is clearly not "natural", and thus is an appropriate boundary of naturalness. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 224 | The BLM erred in its conclusions in its 1999-2003 wilderness inventory for the area in Behind the Rocks south and west of the WSA. The BLM's inventory files and the on ground conditions confirm that natural characteristics remain. The BLM needs to extend the boundary of the unit to the south slightly and include this area, utilizing the used vehicle routes as the unit's boundary. Any other configuration in this area fails to identify natural and wilderness character lands. The BLM's WCR did not address this particular area. | As depicted by the commentor on the map submitted with this comment, the land in question was found to lack wilderness characteristics in the 1999-2003 wilderness inventory. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by the conclusions of the 1999-2003 inventory. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 225 | The BLM arbitrarily excluded the northern portion of Big Triangle by using an inappropriate boundary of naturalness, relying on county GIS data as "default boundaries". This excludes lands from wilderness characteristics. No on the ground inventory was performed. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 226 | The BLM erroneously excluded a small parcel (~32 acres as shown on accompanying map) of lands adjoining Coal Canyon WSA.  The current wilderness characteristics boundary does not follow an impact.  This excludes lands from wilderness characteristics. | As depicted by the commentor on the map submitted with this comment, the land in question was found to lack wilderness characteristics in the 1999-2003 wilderness inventory.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 227 | The BLM erroneously excludes a small parcel of land in the Coal Canyon area (~142 acres as shown on accompanying map) by not going to the boundary of naturalness.  There was no on the ground inventory of this area.  This excludes lands from wilderness characteristics. | As described in the 2003 revision document, BLM field checks subsequent to the 1999 inventory added several hundred acres to the Coal Canyon Wilderness Inventory Area (WIA).  Extensive fieldwork led the BLM to conclude that the resulting WIA boundary, drawn "point-to-point" in this area, was an appropriate boundary of naturalness designed to exclude impacts from oil and gas exploration and development.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 228 | The BLM erroneously excludes lands from wilderness characteristics units in the Coal Canyon area by not going to the boundary of naturalness, but instead uses a "point-to-point" feature.  There was no on the ground inventory of this area. | As explained in the Diamond Canyon wilderness characteristics review for Unit 5, the area in question is characterized by a large number of impacts from past minerals exploration and development.  These are clearly identifiable from high-resolution aerial photos.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 229 | The BLM erroneously excludes lands from a wilderness character (sic) unit in the Coal Canyon area by not going to the boundary of naturalness, but instead uses arbitrary legal lines. | The area in question is separated from the larger wilderness characteristics area by a combination of lands found to lack wilderness characteristics in the 1999-2003 inventory, and by verified constructed vehicle routes.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 230 | The BLM uses arbitrary boundaries to separate out lands in Diamond Canyon Unit 8 from lands found to have wilderness characteristics.  The BLM should exclude a few of the significant impacts in the area by using cherry-stems to include the complete areas with wilderness characteristics.  The BLM fails to include the full extent of wilderness characteristics lands in this area. | The concept of "cherry-stems" is irrelevant to the DRMP/EIS, since this is a term applicable to the creation and mapping of new Wilderness Study Areas.  The creation of new Wilderness Study Areas is beyond the scope of the land use planning process.  To remove the impacts from wilderness characteristics in this area would require several long cherry-stems, resulting in a convoluted management landscape.  Rather than do a tree-by-tree boundary exercise, the BLM looked at the |

| | | | | |
|---|---|---|---|---|
| | | | | area as a whole, concluding that the impacts present were sufficient to disqualify the area in question from wilderness characteristics. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 231 | The BLM arbitrarily excludes an area possessing wilderness characteristics in the Coal Canyon area. There are no significant impacts within this area that warrants the BLM's arbitrary section line boundaries. By using section lines as boundaries of impacts, areas with wilderness characteristics were excluded. | The area in question is not free of impacts.  County GIS data, as well as aerial photography review indicates several obvious vehicle routes.  The upper half of this area is almost completely encircled by visible routes.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 232 | The BLM should extend the boundary of wilderness characteristics in the Coal Canyon area to the major road to the south as the area to the north possesses wilderness characteristics. | This very small area is bisected by routes clearly visible from aerial photos.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 233 | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness characteristics by using legal lines as boundaries. | This appears to be a mapping error and has been corrected.  About 338 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 234 | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness and fails to provide justification. | This appears to be a mapping error and has been corrected. About 165 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 235 | The BLM uses a section line boundary in the Coal Canyon Area to separate out an area with natural character from the larger wilderness character unit. | As clearly indicated by GIS data and aerial photography verification, the area in question is completely encircled by routes, and is of insufficient size to possess wilderness characteristics as a stand-alone unit.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 236 | The BLM does not identify any of this remote and wild area (Coyote Wash) as having retained or possessing wilderness character. The BLM should identify the "core" of Coyote Wash as possessing opportunities for solitude and primitive recreation.  Additionally, this acreage abuts wilderness quality lands in Colorado which the BLM did not consider. | It is worth noting that the map provided by the commentor in its comment on the DRMP/EIS shows "wilderness quality" lands in the core of Coyote Wash at only about 40 per cent of SUWA's original proposal, despite the commentor's assertion that they did "detailed evaluation and inventory on the ground".  The "core" the commentor refers to is too small (under 5,000 acres) to possess wilderness characteristics as a stand-alone unit.  Whether or not any part of the unit abuts "wilderness quality" lands |

| | | | | in Colorado is irrelevant, since the adjoining lands have never been determined to possess wilderness characteristics by any state or federal agency. Additionally, a constructed route runs the entire length of the unit on the Utah side of the state line.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 237 | The BLM uses an arbitrary route in the Dead Horse Cliffs area as the boundary of naturalness.  The wilderness characteristics do not end at the Canyonlands National Park boundary, but instead extend onto Park Service lands. | The area in question was determined to lack wilderness characteristics in the 1999 Wilderness Inventory and its 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 238 | The BLM arbitrarily excludes lands between the Dead Horse Point basin overlooks which for many visitors are some of the most natural landscape views anywhere.  The BLM arbitrarily excludes these lands that proceed up a natural cliff face that retain natural characteristics. | As described in the Dead Horse Cliffs wilderness characteristics review document, these lands are too small to be managed for wilderness characteristics as a stand-alone unit.  This comment seems to be directed against the BLM's finding of non wilderness chararacter for the lands to the south in its 1999-2003 wilderness inventory.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 239 | The BLM arbitrarily excludes lands in the Dome Plateau area with outstanding natural character north of the BLM's wilderness character boundary. | In a signed Reasonable Probability Determination, and based on an extensive on-the-ground inventory, the BLM concluded that the lands in question lacked wilderness character.  The BLM stands by its conclusion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 240 | SUWA has provided BLM with supplemental wilderness character information both within the Dome Plateau submission (January 2002) and recently within the Arches Adjacent submission (June 2007). | See responses to comments 124- 213, 124-214 and 124-215. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 241 | In the Fisher Towers Wilderness Character Unit, wilderness character exists beyond BLM's arbitrary line.  The boundary used to separate lands retaining wilderness character from lands that lack wilderness character does not follow a human impact at all, but rather utilizes straight and arbitrary lines crossing the natural landscape.  This arbitrary placement excludes wilderness characteristics in the area. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date that this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is not included in the map of lands in the Red |

| | | | | Rock Wilderness Act which is on SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 242 | SUWA questions the findings of the 1999-2003 wilderness inventory in the Beaver Creek/Granite Creek area. The BLM identifies the route at the bottom of Granite Creek as a significant feature;   it does not diminish the natural characteristics of the landscape adjacent to and north of this route along the canyon wall. This natural and impressive area is not impacted or effected by human impacts and retains its natural character. | See response to comment 124-216. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 243 | The BLM has not identified the full extent of wilderness character (WC) north of the current WC Hatch/Harts/Lockhart Basin boundary.  The BLM's current boundary uses an old seismic line. | The area in question was determined to lack WC in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 244 | The Moab Field Office has failed to identify lands with wilderness character (WC) in the Lockhart Basin area adjoining similar lands in the Monticello Field Office, who also did not find wilderness characteristics in this area.  The Dripping Spring valley retains an overwhelming natural appearance and is free of human impacts; those that do remain are minimal in context.  The BLM only manages the high benches over the valley and Moab BLM will have to coordinate with Monticello BLM. | The area in question (both within the Moab and Monticello Field Offices) was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions.

The Dripping Spring valley is not within the boundaries of the Moab Field Office.  This valley is administered by the Monticello BLM. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 245 | The BLM did an inadequate wilderness characteristics determination on much of the bench lands above Lockhart Basin. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning |

| | | | | |
|---|---|---|---|---|
| | | | | website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 246 | The BLM Monticello Field Office did not include the full extent of wilderness characteristics in the Lockhart Basin area, which affects adjoining lands in the Moab Field Office. | This comment is directed towards the Monticello DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 247 | SUWA disputes the findings of non wilderness characteristics from the 1999-2003 reinventory for Harts Draw area.  The BLM utilizes the natural cliff band and a section line to eliminate wilderness values. The wilderness quality and values of the landscape do not end at these arbitrary features. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 248 | The BLM uses arbitrary legal boundaries in the Horsethief Point area to exclude areas of wilderness characteristics.  That boundary crosses the natural terrain and does not separate lands accurate.  This may be due to BLM not performing on the ground evaluation | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 249 | The BLM uses arbitrary legal boundaries to exclude areas of wilderness characteristics in the Horsethief Point area.  SUWA's inventories show that the area remains generally natural in appearance and possesses natural character.  The utilization of a section line inappropriately separates the lands that are natural in appearance | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness | 124 | 250 | A small area of Horsethief Point adjoins the Park (Canyonlands National Park), with no physical impact or | This appears to be a mapping error and has been corrected.  About 24 acres has been added to the non- |

| Alliance (SUWA) | | | separation and has wilderness character. | WSA lands with wilderness characteristics in Alt B. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 251 | A small area adjoining the Park (Canyonlands National Park) and endorsed by the Park Service for wilderness has wilderness characteristics and has been excluded. There is no physical impact separating this area from the park. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is net included in the Red Rock Wilderness Act map accessed from SUWA's website.  The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 252 | The current Hunter Canyon wilderness characteristics boundary excludes areas with wilderness characteristics on the cliffs above Kane Creek. | A portion of this area was reevaluated in the 1999-2003 reinventory and found to lack wilderness characteristics.  Most of the area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007).  The area was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wildereness characteristics review.  It is not included in the Red Rock Wilderness Act map accessed from SUWA's website.  The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 253 | The Labyrinth Canyon area has taken the biggest hit of eliminating wilderness character by BLM's needed lack of off road vehicle management. The area south of Spring Canyon is one which retains a significant natural appearance "yet remains to be fully identified by the BLM". | The area in question was determined to lack wilderness character in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 254 | The BLM overly states the impacts to naturalness on the south rim of Hell Roaring Canyon (in Labyrinth Canyon).  By far, there is more landscape here that does not have a human impact than does. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 255 | The BLM overly states the impacts to naturalness on the north rim of Hell Roaring Canyon (Labyrinth Canyon).  The BLM must end the arbitrary utilization of the natural rim and include the full range of lands to the south that continue to have natural values in its inventory of wilderness characteristics. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 256 | The BLM arbitrarily excludes from wilderness characteristics a small area on the southwest corner of the Hell Roaring Canyon Rim (Labyrinth Canyon). | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.   The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 257 | Whatever wilderness characteristics are no longer present in the Labyrinth Canyon area is due to BLM's failure to restrict OHV activity.  The BLM arbitrarily excludes some lands that retain their natural character from the Labyrinth Unit. | The BLM agrees with the commentor's characterization of the area as lacking wilderness characteristics.  The remainder of the area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 258 | An area of the Mary Jane Canyon unit which adjoins roadless areas in the National Forest has been omitted from BLM's inventory of wilderness characteristics.  This area is natural in appearance, and possesses wilderness character in association with National Forest Service lands. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is not included in the Red Rock Wilderness Act map |

| | | | | accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. The National Forest Service area in question has not been determined by that agency to possess wilderness characteristics (itself a BLM term), and its adjacency is irrelevant. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 259 | The BLM should include the small acreage south of the creek in the Mary Jane Canyon unit as having wilderness characteristics. SUWA's on the ground evaluations found that the area on the south side of the river outside of the camping area and north of the powerline remain overwhelmingly natural. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 260 | Lands in the Mary Jane unit are excluded from wilderness characteristics due to multiple vehicle routes and ORV disturbance. SUWA agrees with the BLM that this area has seen ORV use, but the lands continue to have natural characteristics north of this ORV use area. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 261 | The BLM arbitrarily excluded natural lands by using a section line as a boundary. As a result of the arbitrary boundary, wilderness values end along the natural terrain, opposed to using the edge of a natural disturbance that exists to the west. The BLM fails to use the edge of significant impact as a boundary of wilderness characteristics in the Mexico Point unit. | As clearly depicted on the wilderness characteristics review map for Mexico Point (available on the BLM planning website and in the administrative record), almost all of the lands in question lie on BLM lands administered by the Vernal Field Office. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 262 | Areas adjacent to the Wilderness Study Area retain their wilderness character and should be included within the larger Mill Creek Canyon unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |

| Southern Utah Wilderness Alliance (SUWA) | 124 | 263 | SUWA disagrees with the BLM on its finding of non wilderness characteristics for the lands south of the Mill Creek Canyon wilderness characteristics area.  The BLM's wilderness character boundary continues to utilize natural features and a section line to identify the full extent of wilderness resources.  These arbitrary boundaries do not reflect the separation of lands with and without wilderness character. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| --- | --- | --- | --- | --- |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 264 | Lands on the rims adjacent to Negro Bill Canyon Wilderness Study Area retain their natural character, and should be added to the larger Negro Bill Canyon unit. | A portion of the area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by BLM took place shortly before beginning the current plan revision, and BLM stands by its conclusions.  The remainder of the area to which the commentor refers has not been presented to BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is not included in the Red Rock Wilderness Act map accessed from SUWA's website.  The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 265 | The BLM's evaluation of the Mat Martin Point area (Porcupine Rim) is that the few routes on top are so impacted that they deter from the naturalness of the entire landscape.  This area appears free of significant impacts and retains its wilderness values and characteristics.  The BLM should add this area to lands with wilderness characteristics. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah | 124 | 266 | SUWA has submitted significant new information on the | As noted on the Moab BLM planning website, the BLM |

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | Renegade Point area, demonstrating that it has wilderness characteristics.  Without justification, the BLM divided the Renegade Point unit, stating that routes are substantially noticeable. | reviewed this new information (received in June, 2007), and found no reason to change its wilderness characteristics review conclusions. As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 267 | The BLM found unit 4 of Renegade Point wilderness character unit natural.  Had the BLM reviewed the Renegade Point unit in conjunction with lands with wilderness characteristics in Colorado, the WCR finding would have had a different outcome. | The Colorado lands to which the commentor refers have not been found to possess wilderness characteristics by any federal or state agency, but only by the Colorado Environmental Coalition.  It is beyond the scope of the Moab DRMP/EIS to evaluate wilderness characteristics beyond the field office boundary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 268 | The BLM states that areas in Unit 5 of Renegade Point have been chained and the area is unnatural.  SUWA asserts that by viewing these areas on the ground, the area appears "generally natural". | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The review included reviewing GIS data on vegetative treatments, including chaining.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process .  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings   of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 269 | The routes used by the BLM to separate out wilderness character Units 2 and 3 of Renegade Point are not significant impacts. | The commentor does not dispute the existence of these routes.  As part of its wilderness characteristics inventory maintenance,  the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999- |

BLM_0011761

| | | | | |
|---|---|---|---|---|
| | | | | 2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 270 | A small omission of wilderness characteristics in Westwater Canyon is located adjacent to the private land holding. | This very small area (approximately 10 acres) has not been presented to BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007). It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory. It was not part of the new proposals analyzed in the 2007 wilderness characteristics review. It is not included in the Red Rock Wilderness Act map (or is too small to see) accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 271 | SUWA disputes the BLM's finding that vegetative manipulation has rendered a small area on the east side of the Westwater Wilderness Study Area unnatural. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 272 | The BLM excludes lands north of the motorcycle trail in the Westwater wilderness characteristics area, which is not a significant impact. | The commentor does not dispute the existence of this route. This route marks the boundary of naturalness. As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics |

BLM_0011762

| | | | | inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 273 | The BLM uses an arbitrary boundary to exclude lands with wilderness characteristics in the Yellow Bird area. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 274 | The BLM characterizes this area by stating that it has a large number of substantially noticeable routes.  If BLM had performed an on the ground inventory, it would have noted that the boundary does not accurately separate lands with and without wilderness characteristics. The BLM uses an arbitrary boundary to exclude lands with wilderness characteristics in the Yellow Bird area. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Moab Trails Alliance | 196 | 1 | It is blatantly obvious that the old way of sharing jeep routes with everyone, the basis of mountain biking in Moab, no longer works. Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology the alterations (damage) to the trails are such that cyclists cannot use the same route unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes alternate routes in each of these areas. The Green Dot (Gemini area), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider area) Trails should be priority projects ASAP. These are user created routes that traverse slickrock in areas that have been overrun by motorized traffic. | The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Trail Mix and Moab Trails Alliance, and verified on the ground by BLM staff (see pgs. G-15 through G-21).  On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes.  The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis".  New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those |

| | | | | |
|---|---|---|---|---|
| | | | After a few years of trying to develop new trails in the Moab Field Office it is apparent that our niche here is slickrock. The predominantly sandy soils make for maintenance nightmares and undesirable routes. MTA recommends that more slickrock routes be developed and marked. A route from the Monitor-Merrimack area over to SR313 is an example. Slickrock riding made Moab famous, it is low impact, and it is what will keep people coming back. The Bartlett Wash Freeride area in "C" is a great idea. | routes are in a closed area.  However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |
| Moab Trails Alliance | 196 | 2 | The amount of new trail ("C"= 150 miles, "B"= 75, etc) should be specifically stated as, "In addition to trails developed on existing roads as mapped on the Grand County Transportation Inventory map". The allotted new mileage will include only those routes mapped across previously undisturbed terrain. | Wording has been added to the DRMP/EIS on pg. 2-49 to clarify that the mileage is for new trails;  converted existing routes are in addition to the specific mileage listed for each alternative. |
| Moab Trails Alliance | 196 | 3 | It is a sore spot with cyclists to be grouped with OHVs. The definition of OHV in the glossary on page X-37 precludes bicycles from this category. The explanation hidden at the bottom of page G-5 groups motorized and mechanized together. Please remove bicycling from any definitions of OHVs and other all-encompassing variations of "wheeled vehicle" classifications. While a bicycle has wheels, this is the extent of any similarity with motorized forms of transportation. Placing mountain biking within the non-motorized category is consistent with the BLM National Mountain Bicycling Strategic Action Plan and many other BLM management plans across the country. | The BLM recognizes that the BLM National Mountain Bicycling Strategic Action Plan does not group bicycles with OHVs. The statement on pg. G-5 is intended to clarify that bicycles are allowed on routes designated for OHVs.  Travel management covers mechanized as well as motorized use. |
| Moab Trails Alliance | 196 | 4 | In fact, the BLM Wilderness Study Area Interim Management Policy H-5880-1 (Wilderness IMP) does not categorically ban mountain biking from WSAs. MTA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas. While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and | Bicycles are allowed only on inventoried routes within Wilderness Study Areas.  The DRMP/EIS identifies some of these inventoried routes for vehicular use across various alternatives.  Bicycles would be allowed on those inventoried routes that are identified for vehicular travel.<br><br>The commentor mentions no specific trails in non-WSA areas that bicycles should be allowed on.  The plan |

| | | | | |
|---|---|---|---|---|
| | | | motorized areas. A decision to ban this use should be based on scientific reasoning. | manages specific hiking trails for hiking use only on pg. 2-49 of the DRMP/EIS..  Bicycles would not be allowed on these trails. |
| Moab Trails Alliance | 196 | 5 | Typos: p. 4-464 second paragraph line 4 "carefully" should be careful. | The grammatical correction has been made in the PRMP/FEIS. |
| Moab Trails Alliance | 196 | 6 | Typos: p. I-8 Under Relevance Criteria, seventh line, "…threatened plants do not occur…" Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been deleted. |
| Outward Bound Wilderness | 197 | 1 | Protect Labyrinth as a wild and scenic river (which it is!), do not let oil companies intrude their presence on its shores. | The PRMP/EIS proposes that Labyrinth Canyon be managed as suitable as a Wild and Scenic River from Ruby Ranch to the National Park Service boundary.  In Alt C, the entire Green River corridor is managed as no surface occupancy for oil and gas leasing and other surface disturbing activities.  This management action is intended to protect the values of the entire Green River corridor. |
| Canyonlands Field Institute | 199 | 1 | Dolores River Canyons SRMA - Support Alternative C with exceptions:  In the boating management section, we request a CHANGE in party number to match the other sections of river managed by BLM in SE Utah i.e. change the party size to be 25 PLUS guides. In order to serve school groups, the 25 maximum passengers is necessary in most cases. In addition, make this number consistent with other stretches will make it easier on the public and our office staff in comparing trip options. | The BLM agrees with the commentor that it is important to have consistent river rules.  The BLM also agrees that school groups have special needs because the guide-passenger ratio must often be increased.  The text has been changed to read "25 people, excluding guides." |
| Canyonlands Field Institute | 199 | 2 | Special Designations - Wild and Scenic Rivers - All sections as outlined, support Alternative B.  NOTE:  1) We believe the river segments should maintain the classifications they received in the eligibilty study.  2) We request that the Green River from Swasey's Beach to San Rafael River be included as "scenic" stretch. The Price BLM released draft RMP in 2004 that presented a preferred alternative in which the entire river from Swasey's to River Mile 97 to be "suitable". We support the Moab plan being consistent with the Price plan.  3) We are especially concerned that the upper Professor Creek (headwaters to diversion) is not found "suitable" | See response to comments 124-88 and 120-72.  The Price and Moab Field Offices have worked together to resolve the discrepancy regarding the section of the Green River from Swasey's Beach to the Sand Rafael River.  The upper portion of Professor Creek, while not managed as a WSR in Alt C, is protected by other means, including the imposition of NSO or closed for oil and gas leasing and all other surface disturbing activities. |

| | | | | |
|---|---|---|---|---|
| | | | for wild status in the preferred Alternative C. We are familiar with that stretch and it does meet criteria and should be protected. We would request involvement with any proposed management plan. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 1 | The impacts attributed to oil and gas development are overstated, and the BLM fails to provide a reasoned, scientific basis for many of the proposed decisions and stipulations that unduly restrict energy development. The DRMP/EIS conflicts with statutory and executive policies which pronounce and facilitate oil and gas development, including the adoption of lease mitigation measures in the planning process that are scientifically justifiable and the least restrictive necessary. Without sufficient explanation of the rationale for the stringent stipulations, and compliance with governing energy policies, the DRMP/EIS does not allow for meaningful analysis and informed decision-making required by NEPA, 40 CFR § 1502.9. Therefore, as described, the Preferred Alternative is arbitrary and capricious. | The assumptions utilized to analyze the impacts of oil and gas development are provided in Chapter 4 of the DRMP/EIS.  The commentor does not provide any specific information on how the impacts are overstated or are in error.  The stipulations proposed for oil and gas leasing were developed as mitigation to protect specific resource values from oil and gas development.  The preferred alternative (Alt C) imposed the least restrictive stipulation necessary to protect the resource of concern while still allowing oil and gas development.  The justifications for the stipulations proposed for oil and gas leasing are summarized in Appendix C of the DRMP/EIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 2 | Many of the decisions or possible decisions in this document involve taking large amounts of land that are prospective for development or have development and effectively removing these lands from multiple uses. Lands with so-called wilderness characteristics that receive protection exceed the BLM's authority under FLPMA.  In addition, many of these decisions that remove lands from mineral leasing require the BLM to follow FLPMA's withdrawal procedures under 43 USC § 1714.  Some of these decisions may exceed the authority granted BLM under its organic act. | The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."(FLPMA, Secton 103© (43 U.S.C. §1702©)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.

Refer to response to comment 214-7 for discussion on withdrawals. |
| Independent Petroleum | 203 | 3 | While the BLM has a duty under section 201 to inventory lands, including those that may contain | The BLM has not and will not impose the WSA non-impairment standard to any of those lands found to |

| | | | | |
|---|---|---|---|---|
| Assoc. of Mountain States | | | "wilderness characteristics," BLM may not unlawfully apply the WSA non-impairment standard too any of those lands found to contain wilderness characteristics. | contain wilderness characteristics. |
| Independent Petroleum Assoc. of Mountain States | 203 | 4 | FLPMA defines a withdrawal as "withholding an area of Federal land from settllement, sale, location, or entry, under some or all of the general land laws…". By a 2006 Directive, the BLM cannot effect a de facto closure of thousands of acres of public lands to oil and gas leasing without following FLPMA's Secton 204 withdrawal procedures. | There are no withdrawals proposed  under any of the alternatives in the DRMP/EIS.  Withdrawals only apply to the general land laws which includes the Mining Law of 1872, as amended.  The action alternatives do propose removing areas from mineral leasing which is discretionary and does not require a withdrawal.<br><br>The BLM is not aware of the Directive the commentor is referring to.  FLPMA requires the Secretary of the Interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size.  If the BLM decides to eliminate a principal use on over 100,000 acres on a tract of land, then we will approach Congress. |
| Independent Petroleum Assoc. of Mountain States | 203 | 5 | The DRMP/EIS proposes thirty three non-WSA lands with wilderness characteristics areas.  In Alternative B, all thirty three areas would be managed to preserve their wilderness characteristics values.   As the maps in the IPAMS Ajppendix A attached to the comments show, many of the non-WSA lands that supposedly have wilderness characterisitcs do not meet the criteria for wilderness, and  should not be managed as wilderness and closed to oil and gas development.. Human impacts can be seen throughout the areas, including active wells, plugged and abandoned wells, roads,and other imprints of human activity. | Refer to response to comment 124-54 and 121-71. |
| Independent Petroleum Assoc. of Mountain States | 203 | 6 | The BLM received new information regarding non-WSA lands with wilderness characteristics from the Southern Utah Wilderness Alliance (SUWA), but doesn't specify what that new information was.  That information should be readily available to the public in order to assess the qulaity of the information. | Information was received from the Southern Utah Wilderness Alliance regarding wilderness proposals both prior to, and during scoping.  A reference to this information is made in Appendix P in the DRMP/EIS. This information is part of the adminstrative record for the land use planning process and is available to the public |

| | | | | upon request. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 7 | On page 4-130 it states "Although small acreages may be lost in some of the non-WSA lands with wilderness characteristics, it is not predicted that any of the areas would lose the wilderness characteristics value in whole."  IPAMS strongly objects to the characteization of land being "lost" due to oil and gas activitiy.  IPAMS would like to remind the BLM that the impacts of oil and gas activity are small and temporary, and hence, there is no need for locking away large amounts of land from energy development. | Any surface disturbing activity, including oil and gas development, results in a loss of the natural character of the land.  The degree of the disturbance and the length of time needed for reclamation determine how long the natural character is lost. |
| Independent Petroleum Assoc. of Mountain States | 203 | 8 | No legal or regulatory mandate exists for prohibiting multiple use activities in Areas of Critical Environmental Concern (ACEC), Special Recreation Management Areas (SRMA), and Wild and Scenic Rivers areas (WSRs).  The BLM has apparently arbitrarily restricted other multiple use activities in the ACEC and WSR areas (Chapter 2 – Alternatives B,C, and D).  The DRMP/EIS (Chapter 2) should state that companies are allowed to request BLM review and approval of other multiple use actives are often compatible with the uses designated for ACECs and WSRs.  BLM should not unnecessarily restrict access or activities in these areas if the other proposed activities are compatible with the designated uses for the area, especially if a company proposes mitigation measures. | Refer to response to comment 203-2. |
| Independent Petroleum Assoc. of Mountain States | 203 | 9 | Several of the ACECs do not contain adequate justification for closing those lands to development.  Twelve of the fourteen ACECs listed in the RMP have existing leases.  While the leases would remain valid until they expire, the potential exists to limit future development in prospective areas because of the ACEC designations, when there are existing laws, stipulations, and policies to protect resources identified in many of the ACECs. | Appendix I of the DRMP/EIS details the relevant and important values identified for the potential ACECs included in the alternatives.  These values provide the justification for restricting uses.<br><br>As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights. |

| Independent Petroleum Assoc. of Mountain States | 203 | 10 | We object to the proposal to designate the following areas as ACECs because the BLM has failed to identify a prevailing need to protect significant values associated with these areas: Behind the Rocks 17,836 acres (5,201 acres in Alt C) Bookcliffs – 304,252 acres Cisco White-Tailed Prairie Dog Complex – 117,481 or 125,620 *difference between page 2-33 and I-9 Colorado River Corridor – 50,483 Labyrinth Canyon – 8,528 Upper Courthouse – 11,529 Westwater Canyon – 5,069 White Wash – 2,988 Wilson Arch – 3,700 Despite BLM's proposal to designate these areas as ACECs, the BLM has not made the case that ACEC designation is necessary to protect the values identified in Appendix I. No justification related to fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened resources have been identified. It seems that the BLM's intent is to arbitrarily create ACEC designations without meeting its own significance criteria in an attempt to placate special interest groups. | The BLM determined that the potential ACECs identified in the DRMP/EIS have relevant and important values which provides the need for protection.  Where potential ACECs are designated special management attention would be directed at the relevant and important values. |
| Independent Petroleum Assoc. of Mountain States | 203 | 11 | NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs. Isle Royale, 154 F. Supp. 2d at 1127; Trout Unlimited, 509 F2d at 1284; BLM ACEC Manual 1613.06 - .4.  The DRMP/EIS does little to disclose to the public how and on what information the proposed ACEC determinations were reached. | In June of 2003 the BLM requested nominations for Areas of Critical Environmental Concern (ACECs).  The public was informed through newspaper articles and a planning bulletin.  The BLM's findings regarding relevance and importance evaluations were posted on the BLM RMP websites in February 2006.  A planning bulletin was released notifying the public of these postings for both the Moab and Monticello Field Offices.  The BLM specifically notified nominators of potential ACECs which were found not to meet the relevance and importance criteria. |

BLM_0011769

| | | | | The BLM Handbook (1613) regarding Areas of Critical Environmental Concern. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 12 | New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP/EIS were nominated by various organizations. However, there is a lack of disclosure about these submissions, the materials serving as the basis of analysis by the BLM interdisciplinary team, and how these procedures complied with existing BLM policy. Disclosing this information allows the public to ascertain the quality of information used by BLM, the location of the source of information, and the availability of the information for public review. The DRMP/EIS fails to explain why other management prescriptions or designations in place are inadequate and necessitate the proposed ACEC designations. | See response to comment 203-11.<br><br>The BLM adhered to the ACEC policy found in Manual 1613. |
| Independent Petroleum Assoc. of Mountain States | 203 | 13 | The DRMP/EIS fails to demonstrate that the proposed ACEC decisions meet the regulatory criteria of importance and relevance. 43 CFR § 1610-7-2. Secondly, many of the identified resource values already receive adequate protection through other management prescriptions. 43 USC § 1702 (a) (ACECs may be designated "where special management attention is required…to prevent irreparable damage"); BLM Manual 1613.51-53 (ACECs unnecessary when other designations are adequate to protect a resource or value.) | A rationale for designating or not designating ACECs in the Preferred Alternative of the DRMP/EIS is found in the Administrative Record referred to as the ACEC Final Report. The List of Threats and the Rationale for Designating or Not Designating ACECs in the Proposed Alternative is available to the public upon request. Relevant text has been added to Appendix I of the PRMP/FEIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 14 | Many of the proposed ACECs in Alternative B contain portions of existing WSAs. WSA designation already provides a higher level of protection than ACEC designation, making ACEC designation unnecessary in such cases. IPAMS supports the elimination of | WSAs and ACECs are established through different processes and criteria. Therefore it is possible to have overlap of the two designations. In Alt B there is some overlap of ACECs and WSAs; however, in Alt C this overlap was eliminated because it was determined that |

| | | | | |
|---|---|---|---|---|
| | | | overlapping ACEC and WSA designations in Alternative C. According to FLPMA, the BLM should be applying the least restrictive management technique to protect a resource, and many of the proposed ACECs fail in that regard. | the WSA designation provides sufficient protection for the relevant and important values of the ACECs.  The management actions for the ACECs is considered the least restrictive to protect the relevant and important values identified.

Where areas were found to meet the relevance and importance criteria for an ACEC |
| Independent Petroleum Assoc. of Mountain States | 203 | 15 | The Reasonable Foreseeable Development (RFD) scenario, which projects the amount of oil and natural gas development within the planning area, is inadequate. The Preferred Alternative projects 435 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. APD activity alone suggests the fifteen year RFD should be 975, based on 2006 data of 65 APDs. Well projections must be adjusted in an EIS under each alternative to reflect administrative designations, management practices, and mitigation measures. IM 2004-089, Attachment 1-1 (2004). BLM does not disclose the methodology it used in projecting oil and gas well activity by alternative. | The Reasonably Foreseeable Development scenario  was prepared  in August 2005 and was revised in September of 2006.  The revision in 2006 was prompted by a considerable increase in oil and gas prices and on the ground activity.  Up to the present time (2008) oil and gas prices have continued to climb and activity has continued to increase.  However, the numbers projected in the revised RFD are still within the range of surface disturbance and the impacts analyzed in the DRMP/EIS. If the trend continues the RFD may have to  be revised.

The RFD was prepared in accordance with BLM Washington Office IM 2004-89.  It is based on geoologic factors, past permitting, and many discussion with oil company personnel (geologists, engineers, and mangers).

The methodology used in projecting wells by alternative is explained on pg. 4-83 of the DRMP/EIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 16 | The Energy Policy Conservation Act of 2000 and executive order 13211 place emphasis on identifying and eliminating impediments to natural gas and oil development. The Preferred Alternative would have a long-term adverse impact on mineral resource development in the planning area by placing additional restrictions on oil and gas development. Even the supposedly most extractive Alternative D would place many additional restrictions on oil and gas | The analysis in Chapter 4 of the DRMP/EIS considers the impacts of restrictive stipulations on oil and gas development.  The preferred alternative (Alt C) imposed the least restrictive stipulation necessary to protect the resources of concern while still allowing oil and gas development.

The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or |

| | | | development.. | minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.<br><br>The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral |
|---|---|---|---|---|

| | | | | development. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 17 | IPAMS appreciates that the BLM acknowledges the meaning of valid existing rights when it states that existing leases will be managed under the stipulations applied at issuance of the lease. Exploration or development activities on leases that pre-date the revised RMP should not be constrained by management decisions made by the revised RMP. | Existing leases are valid existing rights and are not affected by management decisions in the new Resource Management Plan. |
| Independent Petroleum Assoc. of Mountain States | 203 | 18 | The BLM fails to acknowledge in the DRMP/EIS that the impacts from oil and gas development are temporary, the footprint is small, and that reclamation is successful to the point that areas with previous oil and gas activity are now being proposed for wilderness protections. The fact that the impact is temporary – on average 20-30 years, the lifespan of a typical well – means that the activity does not irreparably harm the land and therefore does not require vast acreage to be put off limits. Rather, exploration and production activities are compatible with protecting the land, and locking away vast energy resources is not necessary. | The impacts from oil and gas development are analyzed in Chapter 4 of the DRMP/EIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 19 | Appendix C in the DRMP/EIS provides a table of surface stipulations applicable to all surface-disturbing activities. The overlapping surface stipulations are extremely restrictive and would result in severe and unacceptable adverse impacts on the ability of oil and gas industry to fulfill its lease obligations within the Moab Field Office planning area. | See response to comment 203-17. |
| Independent Petroleum Assoc. of Mountain States | 203 | 20 | The BLM assumes for purposes of its analysis of the impacts of NSO stipulations that the current extent of directional drilling technology is 1 mile, page 4-84. Directional drilling cannot generally exceed 1200 feet except under very limited circumstances. The BLM cannot assume directional drilling will be feasible over the distances proposed, particularly without specific analysis of the geologic formations involved. Directional drilling is both expensive and technologically challenging and the BLM cannot assume it can be | On pg. 4-84 of the DRMP/EIS it states that the extent of current directional drilling technology in the region is approximately one mile.  This estimate was based on actual drilling proposals submitted to the BLM. |

| | | | | |
|---|---|---|---|---|
| | | | reliable used in every situation. If the BLM is justifying its management decisions based on 1 mile of directional drilling, that analysis needs to be revised. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 21 | Visual Resource Management Restrictions: It is not clear from the document if the designation of large portions of the planning areas as VRM Class II is included in the acres of mineral estate that are considered as subject to major constraints, despite the fact that Class II restrictions would constitute a major impediment on development. Since oil and gas development is temporary disturbance to the surface with temporary visual impacts, as most wells are abandoned after 20 or 30 years, the VRM provisions do not provide a reasonable balance between protecting vistas and developing energy resources needed by the nation. Full field development would be virtually impossible under the Class II designation. | In Appendix C of the DRMP/EIS, a controlled surface use (CSU) leasing stipulation is applied to areas with proposed VRM II management.  A CSU stipulation is considered a minor constraint because it still allows for oil and gas development. |
| Independent Petroleum Assoc. of Mountain States | 203 | 22 | Right of Way Exclusion Areas: Denying access to pipelines and roads would further restrict access to land for oil and gas development, beyond the proposed 43% reduction in leasing acreage mentioned in the DRMP/EIS. The DRMP/EIS does not fully analyze the impact to land access and how this restriction would make additional lands inaccessible. The DRMP/EIS does not contain sufficient information to enable operators to evaluate the effect of ROW exclusions on their current and potential operations. Maps of the exclusion areas should be included in the DRMP/EIS. | See response to comment 214-12.<br><br>In Appendix C of the DRMP/EIS, it states that areas closed to oil and gas leasing are right-of-wat exclusion areas.  In Alt C there are 370,250 acres closed to oil and gas leasing and are right-of-way exclusion areas.  Most of this acreage is WSAs and designated wilderness which preclude leasing and development by policy and regulation.  The WSAs are not subject to management decisions in the land use planning process. |
| Independent Petroleum Assoc. of Mountain States | 203 | 23 | Alternative C would place 370,250 acres in ROW exclusion area, which again would further limit development and most likely make additional lands inaccessible. These further restrictions are not adequately analyzed in terms of EPCA, NEP, and Executive Order No. 13212, nor in terms of the impact on the economy. | See response to comment 203-22.<br><br>The WSAs were established prior to the existence of the EPCA, NEP, EO No. 13212. |
| Independent Petroleum | 203 | 24 | The BLM has not adequately explained or justified the ROW avoidance and exclusion areas.  Oil and gas | See response to comment 214-12. |

| | | | | |
|---|---|---|---|---|
| Assoc. of Mountain States | | | operators' ability to develop those leases could be significantly impacted if the BLM inappropriately limits access to leases. The BLM must be willing to work with oil and gas lessees and operators to design access routes to proposed oil and gas development projects. If reasonable access is denied, operators cannot develop their leases and significant resources will be lost, in turn, hurting the local economy and federal treasury. While the issuance of the oil and gas leases does not guarantee access to the leasehold, a federal lessee is entitled to use such part of the surface as may be necessary to produce the leased substance. 43 CFR § 3101.1-2 (2006). | |
| Independent Petroleum Assoc. of Mountain States | 203 | 25 | The socioeconomic analysis is fundamentally flawed in terms of depth and underlying assumptions. As stated in section 4.3.12, page 4-252, socioeconomic impacts are only considered significant if one or more of the following occurs and is attributable to the implementation of alternatives: 1) Substantial gains or losses in population/employment; 2) Substantial alterations in lifestyle or quality of life; 3) Disproportionately adverse changes that affect minority or low-income populations. IPAMS believes a major impact that should be considered is a decrease in the energy resources available to the community, state, and nation. Restricting development of vital energy resources is a significant socioeconomic impact at the same scale as those listed above. The analysis does not give adequate weight to the importance of energy supplies at all levels of the economy. Energy development can also positively impact all three of the above impacts, by providing economic growth that positively impacts population, employment, quality of life, and economic opportunities for minorities and low-income individuals. | The BLM expects that energy resource contributions in the Moab Field Office (MFO) will be very small relative to national production or even State production. According to a very recent study done under the auspices of the State of Utah (in cooperation with IPAMS), oil and gas production in Grand County accounts for an extremely small share of the Grand County economy, and virtually no jobs to residents of the County. References to this study and its conclusions have been added to Chapter 4 of the DRMP/DEIS. Moreover, The BLM does not expect to see significant energy development (such as that experienced in Uintah Basin or parts of Wyoming) in the planning area over the life of the plan as described in chapter 4. Therefore, BLM does not expect large (similar to the other areas noted above) socioeconomic benefits or costs from these activities to national, state, or local communities.<br><br>The DRMP/DEIS Environmental Justice analysis in section 3.6.3 follows Executive Order 12898. This analysis determined there are no environmental justice populations in the socioeconomic study area. In addition, oil and gas development in the DRMP/DEIS study area is not large enough relative to total national and global oil |

| | | | | and gas development to impact pump prices. Therefore, low-income communities would not be disproportionally impacted from oil and gas development restrictions by the DRMP/DEIS. Thus, actions required to identify and mitigate impacts to such populations are not required. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 26 | Despite the positive impacts from economic growth and opportunity from oil and gas development, the DRMP/EIS does not contain a comprehensive analysis of the restrictive management decisions and how they can constrain the current and future development. The socioeconomic analysis admits to this failure in section 4.3.12.1.3, where it is stated that "…it is not likely that BLM-related management decisions (apart from recreation decisions that could increase revenues to recreation-based businesses) would result in significant changes to current population trends." The BLM imposes several layers of severe restrictions on oil and gas development in the DRMP/EIS, and then claims that its decision only affects recreation revenues! This illustrates the fundamentally flawed nature of the analysis. | See response to comment 203-25.<br><br>As far as the commentor's concern with multiple management layers and restrictions, "layering" is a planning tool.  Under FLPMA's multiple-use mandate, the BLM manages many different resource values and uses on public lands.  Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives.  Under the multiple-use concept, the BLM does not necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands.  The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering".  The BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area.  Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation.  Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner.<br><br>Not all uses and values can be provided for on every acre.  That is why land use plans are developed through a public and interdisciplinary process.  The interdisciplinary process helps ensure that all resource values and uses are considered to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan.  Layering of program decisions is not |

BLM_0011776

| | | | | optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.<br><br>The FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)).  As a multiple-use agency, the BLM is required to implement laws, regulations and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans.  The BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (See, Appendix C, Land Use Planning Handbook "H-1601-1").  Specific decisions must be included in each of the alternatives analyzed during development of the land use plan.  As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.<br>For example, the BLM has separate policies and guidelines, as well as criteria, for establishing ACECs and when the WSAs were established.  These differing criteria make it possible that the same lands will qualify as both an ACEC and a WSA but for different reasons.  The BLM is required to consider these different policies.<br><br>See also response to comment 203-16. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 27 | The full positive economic impact of mineral development in the planning area was not adequately analyzed, nor did the document analyze the negative impact associated with the severe restrictions called for in the proposed Preferred Alternative C. In fact, in Table 2.2, page 2-78 – 2-79, it is stated that under Alternative B, the long-term economic benefits from oil and gas would be slightly less than current circumstances or if Alternatives C or D were adopted. It defies logic how the extremely restrictive Alternative B would have only | See responses to comment 203-25 and 203-26.<br><br>The BLM is unable to determine how the commentor arrived at the conclusion that Alternative B has 43 per cent less acreage available for oil and gas leasing.  In fact, Alternative B closes to oil and gas leasing an additional 318,000 acres compared to Alternative A, a reduction of 21.7 per cent.  Furthermore, the BLM's preferred alternative (Alternative C) closes to leasing an additional 17,000 acres relative to Alternative A, a |

| | | | | |
|---|---|---|---|---|
| | | | slightly lower economic benefits from oil and gas when it would place so many restrictions on development. Clearly, that analysis lacks depth.<br>It also defies logic that Alternative B, with 43% less acreage available for oil and gas leasing, would result in such a small negative economic impact. IMPAMS believes the economic analysis fails to account for the lost opportunities due to proposed management decisions, and seriously underestimates the negative impact of Alternative B and other restrictions proposed in the DRMP/EIS. | reduction of 4.8 per cent.  This is explicitly described in Table 4.38 of the DRMP/DEIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 28 | Each alternative contained in the DRMP/EIS includes some lands closed to energy resource development. Such closures are based on the BLM's assessment of resource values on those lands, but closure also has implications in terms of national energy consumption and commodity prices, foregone employment opportunities, tax revenues and support for state and local economies. Although BLM must necessarily base land use decisions on consideration of all resource values, social and economic impacts of closure decisions should be estimated to fulfill the agency's mandate under FLPMA, and to comply with guidelines contained in the BLM's Land Use Planning Handbook (H-1601-H) and Instruction Memorandum No. 2002-167. | See response to comment 203-25.<br><br>The BLM has expanded its discussion of fiscal impacts to state and local governments in Chapter 4 of the DRMP/DEIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 29 | BLM also fails to disclose how the restrictions may combine to increase the consumer cost of gas which may be disproportionately borne by low-income populations. Executive Order 12898, Federal Actions to Address Environmental Justice in Minority and Low-Income Populations, 59 Fed Reg 7629 (1994). | The DRMP/DEIS Environmental Justice analysis in section 3.13.3 follows Executive Order 12898. This analysis determined there are no environmental justice populations in the socioeconomic study area. In addition, oil and gas development in the DRMP/DEIS study area is not large enough relative to total national and global oil and gas development to impact pump prices. Therefore, low-income communities would not be disproportionally impacted from oil and gas development restrictions by the DRMP/DEIS. Thus, actions required to identify and mitigate impacts to such populations are not required. |

| Independent Petroleum Assoc. of Mountain States | 203 | 30 | In Section 3.13.1.6.2, the BLM acknowledges that the unemployment level in Grand County is nearly twice the state average and San Juan County has the highest unemployment in the state at 11%. Despite this recognition, many of the prescriptions in the DRMP/EIS would limit economic activity by restricting access to oil and gas development. The DRMP/EIS does not properly assess the effects restrictive land management decisions will have on the local economy, and the opportunities denied by severely restricting access to energy resources through a whole range of overlapping restrictions including wilderness-like designation of land, NSO, CSU, VRM, timing limitations, and others. Rather than providing the opportunity for developing energy resources, which would create jobs and diversify the economy away from low-paid, seasonal tourism and recreation jobs, the BLM is proposing land management measures that would restrict the rural economy. | See responses to comments 203-25 and 203-26. |
| Independent Petroleum Assoc. of Mountain States | 203 | 31 | Further, on page 4-261, it is stated that "it is not likely that the employment derived from the drilling and completion of wells in the area would positively impact poverty or unemployment rates in Grand and San Juan counties." This statement fails to take into account the indirect employment that derives from oil and gas development. In areas throughout Utah and the Intermountain West, areas experiencing oil and gas development generate thousands of jobs in local communities, besides the direct drilling and completion crews. These crews consume services in the local economy, but more importantly, local jobs are created by service and supply companies in areas where drilling occurs, many more than the direct drilling jobs created. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain States | 203 | 32 | A recent study by the University of Utah's Bureau of Economic and Business Research, which is attached in IPAMS Appendix D, found that the oil and gas industry in Uintah and Duchesne counties accounts for 49.5% of employment and 60% of total wages. The average | See response to comment 203-25. |

| | | | | |
|---|---|---|---|---|
| | | | wage for exploration and production jobs is $84,795, about 86% higher than the average wage for recreation jobs. These numbers include direct employment numbers of 19.9% of employment and 34.8% of total wages. This shows that the 19.9% of direct employment is multiplied throughout the economy and results in 49.5% of employment, with a similar multiplier effect for wages from 34.8% to 60%. There is no reason to assume, as in the DRMP/EIS, that the same type of multiplier effect would not be seen in Grand and San Juan Counties. The University is working on an additional phase of the study throughout the state. IPAMS recommends that the results of further phases of that study, The Structure and Economic Impact of Utah's Oil and Gas Industry, for Grand and San Juan counties, which will be out in early 2008, be included in the socio-economic analysis in the final RMP/EIS. *See attachment D* | |
| Independent Petroleum Assoc. of Mountain States | 203 | 33 | Section 3.13.1.6.3 points out that per capita personal income has fallen in Grand and San Juan counties in comparison to the rest of the state as mineral activity declined in the area.  With the rise in the economic and technical feasibility of developing unconventional resources like those found in the MPA and across the West, Grand and San Juan counties again stand to benefit from oil and gas development. However, the management proposals contained in the DRMP/EIS would constrain that growth and create missed opportunities for the citizens of Grand and San Juan counties.<br>Section 3.13.1.6.5 goes on further to state that "Resident spending of non-local income (dividends, interest, rent) accounted for about 16% of all jobs in the four counties studied. This type of income is closely linked to the type of wealthy households that tend to retire in amenity rich, resort type communities. Again, Grand County may be moving in this direction. | See response to comments 203-25 and 203-26.<br><br>The commentor seems to assume that amenity-rich communities must choose between retirees and local residents.  As discussed in Chapter 3 of the DRMP/DEIS, retirees (as well as second home owners) can make significant contributions to the incomes of local residents. One of the fastest growing segments of the Grand County economy, for example has been construction, much of which is caused by new home construction.  Similarly, the tourism industry is the major component of the Grand County economy, providing employment opportunities for long-term and newly arrived residents alike.  The commentor is in error in the assumption that the BLM's vision "is one of protected lands so that outsiders can come and retire there, living off their retirement and investment income".  The DRMP/DEIS contains no such statement or implication. |

BLM_0011780

| | | | | |
|---|---|---|---|---|
| | | | I think citizens of Grand County, especially those who have been in the area for many generations, would be appalled to learn that the vision of the BLM has for their county is one of protected lands so that outsiders can come and retire there, living off their retirement and investment income. IPAMS speculates that the local community would like good opportunities in their communities, so that their children do not have to go off to Salt Lake City or Denver to make money. The citizens of Grand and San Juan counties have the opportunity to benefit from reasonable development of their oil and gas resources so that they can build up their investment portfolios, rather than being relegated to low-paying tourism jobs and service jobs for wealthy retirees. That is the economic vision that IPAMS believes the BLM should support in the DRMP/EIS, not the one of keeping the locals in low-paying service jobs for wealthy outsiders. | The commentor assumes that, were it not for BLM decisions, there would be a large increase in minerals-related employment in the planning area. In fact, the commentor's own organization's assisted study underscores the very low presence of this industry in the local economy. |
| Independent Petroleum Assoc. of Mountain States | 203 | 34 | Section 3.13.1.6.7 states that the tourist contribution to the Grand County economy continues to remain around $100 million per year. There should be a similar statement of the contribution of the oil and gas industry to the economy, and the projected contribution for each of the Alternatives. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain States | 203 | 35 | Despite the deference given to the tourism sector of the economy in the DRMP/EIS, the analysis goes on to project that tourism-related revenues appear to have leveled off and are not expected to make gains in the future. A more balanced DRMP/EIS would enable the local economy to continue to enjoy the steady benefits of the tourism economy while achieving growth through responsible energy development that is not artificially restricted as proposed in the DRMP/EIS. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain | 203 | 36 | On page 3-113, the analysis of the contribution of mineral resources, which as mentioned above does not provide an overall economic contribution of oil and gas, notes that production peaked in 1994 and has declined | The BLM has incorporated updated production data in Chapter 3 of the DRMP/DEIS. State of Utah (Utah Division of Oil, Gas and Mining) data shows a continuing decline in production in Grand County through 2007. The |

| | | | | |
|---|---|---|---|---|
| States | | | since. However, since the data stops at 2000, just about the time that oil and gas commodity prices started to rise, and coupled with advances in the technology to recover unconventional resources, production throughout Utah and the Intermountain west started to soar. In fact, production throughout the Rockies has increased by 69% since 1996, as shown in the graph below. Development of unconventional resources in the MPA is on the cusp of similar growth. Therefore the analysis is outdated and does not realistically assess the economic contributions of the industry. *see graph in letter* | BLM acknowledges that production could increase in the future, and has incorporated its predictions of future well activity in its RFD. |
| Independent Petroleum Assoc. of Mountain States | 203 | 37 | The Sonoran Institute, the Wilderness Society, and other groups devoted to wilderness designation and opposed to oil and gas development have released studies over the years minimizing the economic importance of the industry and claiming that protected public lands actually result in a greater economic benefit than mineral extraction. Despite the obvious bias of these studies being done by groups that are advocating for more wilderness, these studies are fundamentally flawed in several respects. (We acknowledge that IPAMS could be accused of bias in the opposite direction, were we to issue our own studies. That is why we instead use studies and data from unbiased, third-party organizations such as the University of Utah and the Colorado School of Mines.) We urge the BLM not to be confused by these subjective studies and fall into the trap of minimizing an important industry for rural economies in the MPA, Utah and throughout the Intermountain West. A further problem with studies such as the Wilderness Society study is that they are based on old data which excludes the benefits experienced in the Intermountain West form the phenomenal growth of the industry from 2000 to present. In fact, a Wilderness Society report is one of the references for the DRMP/EIS. IPAMS urges the | See response to comment 203-25.  The BLM has not "incorporated" studies by the Wilderness Society, but has referenced them in guarded terms.  The BLM has also incorporated studies done by the University of Utah for the State of Utah; these studies, it should be noted, were done with IPAM's support and assistance. |

| | | | | |
|---|---|---|---|---|
| | | | BLM to reconsider any analysis based on the Wilderness Society report, given the biased, unscientific nature of their work. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 38 | Surface disturbance from oil and gas exploration and production activities is calculated at 15 acres per well in the MPA.  This is out of line with the usual calculation of surface disturbance used by the BLM throughout the Intermountain West. Usually the BLM calculates surface disturbance as five acres per well.  While it could be argued that disturbance would be greater in the MPA because of the remote locations and thus more miles of roads are necessary, this argument does not stand up because many locations throughout the West are just as remote. Surface disturbance throughout the DRMP/EIS should be recalculated using the standard 5 acres per well. | The analysis assumption utilized in Chapter 4 of the DRMP/EIS pertaining to surface disturbance for oil and gas development is 15 acres per well.  This estimate  is based on the BLM's experience.  The remoteness of the area requires more miles of roads and utilities. |
| Independent Petroleum Assoc. of Mountain States | 203 | 39 | Table 4.3 Summary of Total Predicted Surface Disturbance for Mineral Development Activities in section 4.1.3.10, page 4-7 is based on the erroneous 15-acre-per-well disturbance, as well as the assumption that 1,500 acres would be reclaimed over the fifteen year life of the plan, and only wells drilled in the first five years would be successfully reclaimed within the life of the plan.  This assumption is pessimistic, and does not take into account the interim reclamation and different vegetation types. Operators throughout the West routinely reclaim land right up to the well head once a well head is drilled, so that a very small amount remains disturbed per well. The chart should be redone using a 50% interim reclamation assumption per well and a five acre disturbance per well. | See response to comment 203-38.<br><br>The estimate for the time need to reclaim disturbed areas is based on BLM experience in this area. |
| Independent Petroleum Assoc. of Mountain States | 203 | 40 | In addition, the potential habitat for Gunnison Sage Grouse, timing limitations would apply from March 20th to May 15th each year.  In the potential habitat for Greater Sage Grouse, timing limitations would apply from March 1st to May 15th each year.  However, the DRMP/EIS should instead specify a buffer around the | The Gunnison sage grouse is a sensitive status species. Although some experts, such as Connolly, suggest a buffer of 2 miles, the BLM has established a minimum buffer of 0.5 miles as necessary to protect this species. The restriction imposed in the DRMP/EIS is to be enlisted in sage grouse habitat only if safe grouse occupancy is |

| | | | | |
|---|---|---|---|---|
| | | | actual nesting habitat, as is common practice throughout the Intermountain West, rather than a blanket restriction for the entire potential habitat. The highest concentration of nesting is within two miles of a lek. Therefore, the final RMP/EIS should only limit activity within a two mile buffer around the leks in the 175,727 acres of habitat for Gunnison and the 3,068 acres for Greater Sage Grouse, rather than a blanket timing restriction in areas that may or may not have sage grouse.  According to a study by R.C. Kaiser, (2006, Recruitment by greater sage-grouse in association with natural gas development in Western Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. | determined.  Currently, the Moab BLM has no active Gunnison sage grouse leks. |
| Independent Petroleum Assoc. of Mountain States | 203 | 41 | Table C.1, in the stipulation descriptions, for example for sage grouse habitat on page C-22, an exception may be granted "…if the operator submits a plan which demonstrates that impacts from the action would not result in any net loss of habitat." This should explicitly allow for the use of off-site mitigation in the operator's plan to demonstrate no net loss of habitat. | If an operator choses to offer off-site mitigation, the BLM can accept this offer. Off-site mitigation can be considered on a site-specific basis, and it is not a land use planning decision. |
| Independent Petroleum Assoc. of Mountain States | 203 | 42 | On pages 2-46 the BLM describes various management actions and mitigation requirements for relating to greater sage-grouse habitats. The BLM's proposed management for greater sage-grouse is unduly restrictive, particularly under Alternative B. The BLM cannot impose conditions of approval or other limitations which are inconsistent with the lease rights granted.  In particular, the BLM's proposal to prohibit all permanent above ground facilities within two miles of an active lek is unnecessarily restrictive when anti-perch devise can be installed as necessary to protect areas with leks. | The BLM proposes to choose Alt C, not B.  All valid existing rights granted prior to the issuance of the ROD would be recognized under the lease conditions that were granted at the time of the lease. |
| Independent Petroleum | 203 | 43 | Prairie Dog Habitat: IPAMS prefers the management measures in Alternative A, but if restrictions for prairie | The BLM proposes to choose Alt. C, which proposes a buffer of 660 feet around active prairie dog colonies. |

| | | | | |
|---|---|---|---|---|
| Assoc. of Mountain States | | | dogs are instituted, the BLM should choose the proposal in Alternatives C and D for CSU stipulations within 660 feet of active prairie dog colonies, rather than the blanket application of NSO and CSU within all potential habitat specified in Alternative B. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 44 | On page 2-7 of the DRMP/EIS the BLM states the following management action would be common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks)." The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and potentially unreasonably limits the BLM's ability to effectively manage the public lands. The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act (CAA). 42 USC §§ 7401 et seq. Under the express terms of the CAA, the EPA has the authority to regulate air emissions. In Utah, the EPA has delegated its authority to the State of Utah, Department of Environmental Quality (UDEQ). The Secretary of the Interior, through the Interior Board of Land Appeals (IBLA) has recognized that the state department of environmental quality, not the BLM has authority over air emissions. Wyoming Outdoor Council, et al., IBLA No. 2006-155, Order at *12 (June 28, 2006). The BLM does not have authority to regulate emissions in Utah. The BLM must eliminate or revise the proposed management action. | See response to comment 214-10. |
| Independent Petroleum Assoc. of Mountain | 203 | 45 | In section 3.2.2, Status of Emissions page 3-8, it states that the emissions sources with in the MPA consist mostly of oil and gas development facilities. However, as in many areas, mobile sources contribute | Data regarding non-point source emissions (including OHVs) are listed on pg. 3-9  under "Additional Sources of Emissions".  Section 3.2.2 lists point emission sources. |

| States | | | significantly to any air pollution. Given the large amount of vehicular traffic for tourism and OHV recreation, mobile sources are likely a large contributor of emissions in the MPA, and should be included in the analysis. In fact, the source attribution work done by the Colorado Department of Public Health and Environment (CDPHE) for the Denver ozone area showed a low contribution from oil and gas and the New Mexico Environment Department's work around ozone in the Farmington, NM area also showed contribution from oil and gas sources. In both cases, the largest source was boundary conditions transporting into the region. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 46 | IPAMS does not believe that the DRMP/EIS achieves the right balance of resource protection and energy development. The Moab Field Office has undervalued the oil and gas resource potential in the MPA, and feels free to place major restrictions on development of that resource. The DRMP/EIS places many layers of restriction on oil and gas development, while at the same time down playing the extent of those restrictions. The final RMP/EIS should be revised to reduce the restrictions, and the BLM should not incorporate additional aspects of Alternative B in the Record of Decision. The BLM should be following the dictates of the EPCA to reduce restrictions and encourage development of energy resources, not increase restrictions. The Moab DRMP/EIS has failed to adequately consider reasonable access to federal and private minerals and to consider the effects it proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy. Many of the new restrictions specified in the DRMP/EIS are unnecessary since oil and gas producers currently comply with existing laws protecting water, air, cultural, and other resources. | The BLM has identifed Alt C as the preferred alternative, which  the BLM contends reaches a balance between resource protection and resource production. The BLM has proposed restrictions in Alt. C to protect resource values.   These restrictions represent the minimal necessary to protect these values.  For example, the visual restrictions imposed surrounding Arches National Park are controlled surface use.  Controlled surface use is the least restrictive to protect the viewshed from Arches while still allowing for oil and gas development.  The land around Arches National Park could have been restricted with a no surface occupancy stiipulation, but this stipulation was not deemed to be the least restrictive stipulation. |

| | | | Please select Alternative A or D in the final RMP, and not Alternative B, which would severely restrict the economic growth of Grand and San Juan counties. Please ensure that the restrictive aspects of Alterative B are not added to the alternative that is ultimately selected. | |
| --- | --- | --- | --- | --- |
| Independent Petroleum Assoc. of Mountain States | 203 | 47 | IPAMS does not believe that the DRMP/EIS achieves the right balance of resource protection and energy development. The Moab Field Office has undervalued the oil and gas resource potential in the MPA, and feels free to place major restrictions on development of that resource. The DRMP/EIS places many layers of restriction on oil and gas development, while at the same time down playing the extent of those restrictions. The final RMP/EIS should be revised to reduce the restrictions, and the BLM should not incorporate additional aspects of Alternative B in the Record of Decision. The BLM should be following the dictates of the EPCA to reduce restrictions and encourage development of energy resources, not increase restrictions. The Moab DRMP/EIS has failed to adequately consider reasonable access to federal and private minerals and to consider the effects it proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy. Many of the new restrictions specified in the DRMP/EIS are unnecessary since oil and gas producers currently comply with existing laws protecting water, air, cultural, and other resources. Please select Alternative A or D in the final RMP, and not Alternative B, which would severely restrict the economic growth of Grand and San Juan counties. Please ensure that the restrictive aspects of Alterative B are not added to the alternative that is ultimately selected. | The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development. In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied in the preferred alternative to protect important natural resources. See response to comments 203-46 and 210-2. |

| The Nature Conservancy | 204 | 1 | In addition to the species in the MPA with formal status as listed above, we urge that special attention be given to one additional plant: Astragalus iselyi (Isely's milkvetch). At present this plant has no special status. We had recommended that it be added to the Utah BLM list of Sensitive Plants when that list was being reviewed for revision in March 2007. Through no revised BLM Sensitive Plant list has yet resulted from that process, the status of Astragalus iselyi as a G1 (globally impared) taxon is still valid, and potential threats to its occurrences – ALL of which world-wide are within the MPA – remain active and potent (renewed uranium prospecting, OHV use, etc.). The need for special status is heightened by a particular proposal for public-land disposal that appears within the three Action Alternatives of the DRMP. This action would, if implemented, remove from BLM control a major population center for this plant, probably increasing the need for BLM Sensitive designation of the remaining occurrences, and possibly creating a rationale for federal listing of the whole species. | The Moab RMP does not add or subtract potential special status species to the Utah BLM list of Sensitive Plants.\n\nParcel R-11, which contains habitat for the astragalus iselyi, has been removed from the list of lands identified for disposal. |
| The Nature Conservancy | 204 | 2 | The MPA contains several ecological communities or habitats that are of conservation concern by virtue of scarcity, sensitivity, decline, and/or importance to SSS. Perhaps of greatest merit for conservation attention in the Final FMP are: (1) riparian areas, especially at lower elevations; (2) sagebrush shrubland and steppe communities; and (3) presence of biological (cryptobiotic) soil crusts in appropriate habitats. | The DRMP/EIS provides protection for riparian areas by disallowing oil and gas development and other surface disturbing activities, in accordance with Utah Riparian Policy.  Provisions are made to enhance sagebrush steppe communities throughout the document.  In addition, the limiting of OHVs to designated routes throughout the MPA (except for 2,000 acres within the White Wash Sand Dunes) is intended to limit damage to biological soil crusts, among other resources. |
| The Nature Conservancy | 204 | 3 | Ideally, in the words of BLM Manual 6840.22A "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." However, the necessarily coarse level of resolution in an RMP may make it difficult to fine-tune every land allocation or | Analysis of impact to Special Status Species is required for every site-specific, implementation level action.  The intent of the RMP is to provide the guidance to give protection to Special Status Species.  The decisions on pgs. 2-44 through 2-48 do this.  In addition, see the specific stipulations for oil and gas leasing and other surface disturbing activities that are imposed as a result |

| | | | | |
|---|---|---|---|---|
| | | | resource use decision within it so that every potential conflict is avoided. Therefore, the RMP must ensure in over-arching terms that provisions for the conservation of SSS, particularly objectives from approved recovery plans and conservation agreements, are given priority. Then when subsequent activity-level plans and projects are developed, with their attendant EAs, the RMP serves as the higher-tier authority for requiring that unacceptable adverse effects to SSS do not occur at the finer scales of planning and implementation that are relevant to the occurrences of those species. | of management for special status species. |
| The Nature Conservancy | 204 | 4 | Under section 2.1.1.5 Special Status Species (page 2-5), the DRMP states that "Land use plan decisions should be consistent with…" various mandates, plans and agreements for T and E species. A stronger and more accurate statement to put into the Final RMP is that "Land use plan decisions must be consistent with…" those mandates and agreements etc. | The verb has been changed from 'should' to "must" in two places in the first sentence on pg. 2-5 of the DRMP/EIS to reflect the strength of the agreements and mandates to which the BLM is subject regarding special status species. |
| The Nature Conservancy | 204 | 5 | Under Management Common to All Alternatives, one point states that "The protection of habitat for listed and non-listed plant and animal species would be considered prior to authorizing any actions that could alter or disturb such habitat." While it is fine to consider such SSS habitat protection, the BLM needs to give primacy to the conservation of SSS in such cases—not necessarily a wholesale halting or precluding of other valid uses of public lands, but fine-scale design of such uses so as to be compatible with the priority of maintaining SSS habitats/occurrences. | The BLM is mandated to give primacy to the conservation of special status species. |
| The Nature Conservancy | 204 | 6 | Under Management Common to All Alternatives, a point states that "No management action would be permitted on public lands that would jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E." Given that the BLM Manual 6840.06E and the DRMP (page 3-140) provide Sensitive species with (at least) the same level of protection as Candidate | The BLM is aware of its obligation to prevent sensitive species from being listed on the Endangered Species list. |

| | | | species, then we would read this statement as being applicable to BLM Sensitive Species as well. | |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 7 | The final RMP must be explicit about giving priority to maintenance of SSS over the implementation of resources uses that may have adverse impacts on those species. For example, appreciable areas of the MPA that would be open to oil and gas leasing with standard stipulations or special stipulations under Alternatives C and D (Maps 2-5-C, 2-5-D) contain many occurrences of sensitive species, which must be maintained in the face of potential adverse impacts from energy actions and other resource uses. These Alternatives, and more importantly the Final RMP, would be acceptable in this regard only if the Standard and Special (CSU/TL) leasing categories contain specific, effective stipulations against adverse impact to SSS.<br>Further, because on-the-ground implementation of the RMP's protective measures for SSS would happen at the project-planning or activity level, it is of the utmost importance that the strategic level RMP explicitly mandate the protection of SSS as over-arching policy with which all finer-level actions must comply. Simply put, it is the SSS that must have primacy over resources uses where the two may conflict, not the other way around.<br>The reason this subject is so crucial, and that we repeat and emphasize it so greatly, is that the MPA contains several species that are found nowhere else. For example, the entire world-wide distributions of three special status plants [plus one worthy of Sensitive status], and most of the entire distributions of three other plants, occur within the MPA:<br>Entire distribution within MPA: Astragalus sabulosus var. sabulosus, Astragalus sabulosus var. vehiculus, Mentzeila shultziorum, [Astragalus iselyi]<br>Most of distribution within MPA: Lomatium latibloum, | BLM Policy 6840, Special Status Species Management, provides policy and guidance to conserve all special status speis, including "those designated by each State Director as sensitive".  No BLM actions would be permitted that would lead to the listing of or harm to any of the species mentioned by the commentor. |

| | | | | |
|---|---|---|---|---|
| | | | Oreoxis trotteri, Pediomelum aromaticum var. tuhyi Few or no alternate opportunities exist to conserve or maintain these seven plants elsewhere outside the MPA. If they are not conserved here, then they are vulnerable to extinction or (at best) would require more stringent federal listing. | |
| The Nature Conservancy | 204 | 8 | It would also be worthwhile to repeat the commitment to meet the Standards for Rangeland Health (as on Page 2-12) under Management Common to All Alternatives for Vegetation (Page 2-50), because uses other than grazing affect vegetation. | The BLM's commitment to meet the Standards for Rangeland Health are described under Livestock Grazing, but do apply to all uses. |
| The Nature Conservancy | 204 | 9 | We would recommend that all statements referenced above that demonstrate commitment to conserve or enhance SSS and "healthy" vegetation communities be carried forward into the Final RMP as broadly and strongly (i.e. as Management Common to All Alternatives) as possible. | The statements in the DRMP/EIS have been carried forward to the PRMP/FEIS. |
| The Nature Conservancy | 204 | 10 | We would prefer to see this area (Colorado River Corridor Potential ACEC) – or at least our (TNC-proposed) smaller "Professor Valley" subset of it – formally designated as an ACEC in the Final RMP for two primary reasons:<br>1)      The biotic resources that are not only relevant and important, but highly worthy of special management attention. Two such examples include an abundance of the Listed-Threatened Jones cycladenia (Cycladenia humilis var. jonesii), and presence of the entire world-wide distribution of the Sensitive Shultz stickleaf (Mentzelia shultziorum), in a very popular area that supports a great deal of recreational use.<br>2)      The Nature Conservancy considers the Colorado River Corridor to be a very high priority for conservation, and accordingly we have a relatively long history (15+ years) of putting substantial resources into this area. These mostly involve acquisitions of title or conservation easements on multiple tracts of private lands in the corridor, such as the Mayberry Orchard and | The BLM is well aware of the biotic resources of Professor Valley.  An ACEC was analyzed in Alt B of the DRMP/EIS.  The ACEC designation was not carried forward to the preferred alternative because it was felt that other management actions imposed in Alt C for the area were sufficient to protect the biotic resources.  The following paragraph has been added to Appendix I of the PRMP/FEIS detailing the rationale for not designating the Colorado River Corridor Potential ACEC in Alt C:<br><br>The Colorado River Corridor was not proposed in the preferred alternative because routine management prescriptions are sufficient to protect the resources or values from risks or threats of damage/degradation.  The Colorado River Corridor will be managed as the Colorado Riverway SRMA, and management prescriptions will be utilized to protect the scenic, fish and wildlife and natural systems: rare plants resources:  Stipulations will be placed on oil, gas and mineral development to protect the above values.  These stipulations include no surface |

BLM_0011791

| | | | | |
|---|---|---|---|---|
| | | | Matheson Wetlands Preserves. Given this demonstrated private-sector commitment to conservation on our part, we recommend a complementary effort be made by BLM to give formal recognition to the biotic values of the public lands in this area, or at least the Professor Valley portion of it, by virtue of the ACEC title.<br>At an absolute minimum, the Final RMP must contain management prescriptions for resources and uses that protect and enhance the biotic values of the Colorado River Corridor area. It is more important to have the needed management without a title, than to have a title without the needed management. So while we would strongly prefer ACEC designation of this area, we would not actively oppose its failure to be so designated – provided that the management of the area is adequate. | occupancy and closed for oil and gas activities and all other surface disturbing uses. Motorized activity will be allowed only on designated routes.<br>The Endangered Species Act will be employed to protect the endangered fish.<br>Visual Resource Management will include Class I and II VRM within the area to protect the unique scenic values. Recreation activities such as camping will be limited to campgrounds in order to avoid unacceptable impacts to the resources.<br><br>The management of uses in the Colorado River Corridor is very restrictive and has been deemed sufficient to protect the relevant and important values of the ACEC. The imposition of a no surface occupancy (or closed) restriction on oil and gas leasing and all other surface disturbing activities is protective of all biotic resources. |
| The Nature Conservancy | 204 | 11 | *See DRMP 2-48* Finally, within this area we would like to see the designation of motorized travel on the road up Ida Gulch from Hwy 128 proceed no farther up-valley than the northern boundary of our section of private land (Sec 32, T24S R23E, SLM) in Ida Gulch. In the DRMP under all Action Alternatives this route is shown as designated for motorized travel through our property and onto BLM-administered lands to the east. We do not oppose non-motorized travel on this route through our property, but would like to see motorized travel terminate at our boundary, and are prepared to construct a gate there for this purpose. | The BLM does not designate routes on private land. The Nature Conservancy may restrict travel on this route. The route will be removed from the designated travel maps in Alts C and D. This would restrict all motorized travel past the Nature Conservancy's private land. |
| The Nature Conservancy | 204 | 12 | If the ACEC boundary of Alternative C is brought forward into the Final RMP, then another concern could arise in the future: If the day ever comes when the interim status of WSAs is resolved by Congress (as designated wilderness or not), and if the Behind the Rocks WSA does not become wilderness, then we recommend that these 12,635 "released" acres receive the same ACEC title and management as the 5,201 | Should WSAs be released by Congress, the RMP stipulates that a plan amendment be done for those WSAs that are released. This is stated on pg. 2-43 of the DRMP/EIS. At the time that the Behind the Rocks WSA acres might be "released", a proposal for extending the ACEC could be suggested as part of the plan amendment addressing that release. |

BLM_0011792

| | | | | |
|---|---|---|---|---|
| | | | acres would under this new RMP. We don't know if this can be stipulated as a potential future condition in this pending RMP, or if a Plan Amendment would be required at the time that this situation came to pass. | |
| The Nature Conservancy | 204 | 13 | Upper Courthouse: we would prefer to see this area formally designated as an ACEC according to its treatment in Alternative B- or at least the smaller subset of this area as presented in our original proposal (ca. 7,600 acres). At an absolute minimum, the Final RMP must contain management prescriptions for resources/uses that protect and enhance the biotic values of the Upper Courthouse area. So while we would strongly prefer ACEC designation of this area, we would not actively oppose its failure to be so designated – provided that the management of the area is adequate. The items under Alternative C seem less than adequate because they focus provisions for the two Sensitive plants, particularly the State Station milkvetch which occurs on the flats below the mesas, right in the midst of a zone of very heavy motorized-vehicle camping use. Further, as best as we can interpret Map 2-5-C, the zone of No Surface Occupancy stipulation for oil and gas leasing (and preclusion of other surface-disturbing activities) under alternative C does not extend quite far enough to the north and northeast to cover all the known clusters of the Stage Station milkvetch. Therefore, if ACEC designation is not done in the Final RMP, we recommend carrying forward all of the Special Management items that now appear under Alternative B – including a northward extension of the NSO stipulation area – into the Final. | The biotic values of the Upper Courthouse area are protected by BLM Policy 6840 - Special Status Species Management. The BLM recognizes the biotic values in this area. Portions of the area are to be managed as No Surface Occupancy. In all areas, state sensitive plants would be protected under Policy 6840. All BLM approved actions would be required to avoid state sensitive plants.

Recreation impacts in the area are addressed in the DRMP/EIS. All travel is to be limited to designated routes. The area is subject to camping restrictions, and a future campground is recommended to concentrate campers in one area. When campsites in the area are designated, all sensitive plants would be avoided. |
| The Nature Conservancy | 204 | 14 | As a final comment on this subject, all of the ACECs designated in the MPA through the Final RMP should have subsequent management plans prepared and implemented for them. Such management plans would: 1) gather in one document all of the RMP-level management actions or prescriptions that apply to each | The BLM has the discretion to undertake an ACEC management plan for each ACEC designated in the PRMP/EIS. This is clearly stated in the ACEC Manual (1613.62). |

| | | | ACEC; and 2) identify more-detailed and/or proactive finer-scale actions needed in each ACEC, as tiered to the RMP. | |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 15 | All three Action Alternatives identify the same set of public-land parcels as suitable for disposal (Map 2-3 and Appendix D). We recommend that one particular parcel be removed from this list, either in whole or at least the parts of it that support an important biological resources. The parcel in question is R-11, consisting of S½ NE ¼ and SE ¼ of Section 19; Section 20 (all) and Sec 21 (all) of T27S R23E (SLM). This parcel contains a major population center of the rare Isely's milkvetch (Astragalus iselyi), a plant that is not on the current (August 2002) BLM Sensitive Plant list for Utah, but which has been proposed for addition to a revised Sensitive list that has not yet been finalized and approved. [See paragraph at the bottom of page 2 of this letter for additional information on this species.] Disposal of this parcel would remove from BLM control a significant portion of this plant's total numbers, given that its entire world-wide distribution lies within the MPA. The transfer of this parcel into either private or SITLA ownership (it is adjacent to a sizable SITLA block) would great increase the likelihood of development that would be detrimental to this occurrence of Astragalus iselyi. Such a situation could lead to the need for more stringent protective status or listing for this plant. The best way to avoid this undesirable scenario is to remove parcel R-11 from the suitable-for disposal category – a course that we strongly urge the BLM to adopt in the Final RMP. | Parcel R-11 has been removed from the list of lands available for disposal under all alternatives. |
| The Nature Conservancy | 204 | 16 | We recommend that rangeland assessments be done per Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000 or latest version) in order to know when those Standards are (and are not) being met. These items should all be carried forward into the Final RMP. The same should be done for the policy and | The guidelines referred to by the commentor are used in the permit renewal process as part of Standards for Rangeland Health and Guidelines for Grazing Management.  This is part of the Standrads and Guidelines Process and does not need to be included in the RMP. |

| | | | | |
|---|---|---|---|---|
| | | | procedures that are stated regarding Relinquishment of Preference. | |
| The Nature Conservancy | 204 | 17 | In providing for parking and managing the King's Bench route as a hiking route (page 2-20), we urge that only the minium be done to satisfy access and resource-protection issues. We do not want to see this area publicized as an entry point that draws large numbers of people into the Behind the Rocks fins, which support several Sensitive Plants (chiefly Lomatium latilobum) and pockets of relict vegetation and soil crusts. | Although this is a site-specific action, there is no intention to make the King's Bench route into a major entry point for Behind the Rocks. |
| The Nature Conservancy | 204 | 18 | Reference is made on Page 2-21 to allowing motorized travel use on (among other routes) "the motorized access route to the viewpoint of Ida Gulch (the saddle between Adobe Mesa and Castle Rock)." This appears to be confusing, because (to our knowledge) the saddle between Adobe Mesa and Castle Rock does not look down northward into Ida Gulch, but into an unnamed side drainage of Professor Creek. Motorized access into this saddle from the south (Castle Valley side) via a single designated route is fine. The view down into Ida Gulch is obtained from the saddle between Castle Rock and Parriott Mesa – a saddle to which motorized travel must NOT be allowed from either direction, i.e. the foot path up from the Castle Valley side, or the road into Ida Gulch from Highway 128. | The commentor is correct that the route looks downward into Professor Valley and not into Ida Gulch.  The wording has been corrected.<br><br>The route that ascends the ridge and looks down into Ida Gulch is and will remain non-motorized only. |
| The Nature Conservancy | 204 | 19 | With regard to camping locations and/or restrictions in Labyrinth Rim/Gemini Bridges proposed SRMA listed under Alternatives B and C (page 2-23), we do not recommend one or the other specific set up stipulations. Rather, we more generally raise a concern that while camping in the designated locations may be acceptable per se, adverse impacts are likely to occur in areas surrounding the camping location(s) by some number of irresponsible OHV riders who are camped there. This is a large potential concern for the State Station milkvetch (Astragalus sabulosus var. vehiculus), the only known location for which is in the area north and northeast of | Providing designated campgrounds and campsites in the Upper Courthouse area is a management action precisely to protect the resources at risk mentioned by the commentor.  There would be a site-specific NEPA document prepared concerning any camping facilities in the area.  At the time of the preparation of this EA, fencing or other actions could be proposed as mitigation.<br><br>All travel in this area would be limited to designated routes.  All off-road travel would be illegal and citable. |

BLM_0011795

| | | | | |
|---|---|---|---|---|
| | | | Courthouse rock. Any campgrounds of designated campsites established in this area must be well managed and monitored for impacts to surrounding lands. | |
| The Nature Conservancy | 204 | 20 | Alternative C provides for a Tusher Slickrock Mountain Biking Focus Area and a Barlett Slickrock Freeride Focus Area. These are both within the range of known occurrences of the Sensitive Trotter's oreoxis (Oreoxis trotteri). At present we do not have sufficient information to assess the potential for adverse impacts to this plant from these Focus Area proposals, but suggest that inventories be done prior to ratifying these Focus Areas in the Final RMP. | The freeriding opportunities are mapped so as to be on rock only.  The BLM has observational data that mountain bike use will not harm the population of Trotter's oreoxsis. The primary population of Trotter's oreoxsis is on the mesa between Mill and Courtouse washes.  This mesa is off limits to all wheeled vehicles, and is to be managed as no surface occupancy for all surface disturbing activities.

The BLM invites the commentor to work toward providing protective measures for the Trotter's oreoxis that may occur near the freeride focus areas.  Protective measures such as signing and fencing could be imposed if such actions are necessary to protect this rare plant. |
| The Nature Conservancy | 204 | 21 | We notice that the next-to-last item under Management Common to All Action Alternatives refers to grazing not being authorized on portions of Beaver Creek – which we support, but which appears to be inconsistent with the treatment of Beaver Creek in Alternatives C and D on Page 2-13. Further, this list contains reference to "Bogart," and in this context it is not clear if it refers to grazing not being authorized on the entire Bogart Allotment (which we support), or just along portions of streams within that allotment. | The reference to Beaver Creek and Bogart being unavailable for grazing in Riparian: Management Common to All Action Alternatives is incorrect and this error has been corrected.) |
| The Nature Conservancy | 204 | 22 | We support the provision for evaluating non-functioning and functioning-at-risk riparian areas under Alternatives B and C. However, the distinction between the two Alternatives in terms of exclusion (in B) versus restriction (in C) seems artificial and too rigid. Instead, each prescription – exclusion or restriction – should be applied where appropriate according to riparian resource conditions and management opportunities, and not according to a blanket, across-the-board approach as implied in the DRMP. [This same comment | Evaluating at-risk streams is an administrative procedure and does not require a land use planning decision. Assessing riparian functioning condition is an on-going process.  The BLM utilizes the Utah Riparian Policy  (IM 2005-91), which seeks to "establish an aggressive riparian area management program that will identify, maintain, restore and/or improve riparian values to achieve a healthy and productive ecologocal condition for maximum long-term benefits." |

| | | | | |
|---|---|---|---|---|
| | | | applies to the treatment of grazing in riparian areas under Alternatives B and C at the bottom of DRMP Page 2-13.] | Grazing in riparian areas is addressed on a case-by-case basis at the time of the grazing permit renewal . Site specific analysis of riparian areas is part of the Standards for Rangeland Health and Guidelines for Grazing Management process. |
| The Nature Conservancy | 204 | 23 | Soils and Watershed (Pg 2-31—2-32) The items listed under Management Common to All and All Action Alternatives are generally good and should be carried forward into the Final RMP. Several items under the latter heading, though very desirable, are stated pretty vaguely, for example: <br>-Maintain vegetation based on desired future condition to provide adequate ground cover to prevent accelerated erosion in wind erodible soils. <br>–Maintain or improve soil quality and long-term soil productivity through the implementation of Standards for Rangeland Health and other soil protection measures. <br>–Manage uses to minimize and mitigate damage to soils. <br>-Maintain and/or restore overall watershed health and reduce erosion, stream sedimentation, and salinization of water. <br>The key to making these items more specific and measurable, so that accomplishment (or not) can be judged, is mentioned within the second of these points. Implementing Standards for Rangeland Health in a credible way calls for a robust effort to conduct range and watershed assessments according to Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000 or latest version) in order to know when those standards are (and are not) being met. | Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000) is utilized during the permit renewal process.  It is the impelmentation tool of the Standards for Rangeland Health and Guidelines for Grazing Management process.  As such, it does not need to be mentioned in the PRMP/FEIS. |
| The Nature Conservancy | 204 | 24 | Is the total complement of land allocations and resource/use decisions that makes up each Alternative- and especially Alternative D- in compliance with all of these Common Management statements for special status species? We did not try to answer this, and it | The decisions under Management Common to All Alternatives or Management Common to All Action Alternatives apply to Alts. B, C, and D.  The BLM recognizes its obligations to protect special status species.  This protection is a matter of law, regulation and |

| | | | | |
|---|---|---|---|---|
| | | | would not be possible without thorough cross-checking. This is why we were so persistent and adamant earlier in this letter about the Final RMP serving as the higher-tier authority for requiring that unacceptable adverse effects to special status species do not occur at the finer scales of planning and implementation that are relevant to the occurrences of those species. Or stated more succinctly: Special status species must have primacy over resource uses where the two may conflict, not the other way around. | policy.  Nothing in this RMP is intended to abrogate the BLM 's duty to uphold law, regulation and policy. |
| The Nature Conservancy | 204 | 25 | Travel Management (Pg 2-28—2-50) The term "baseline routes" is used within the last of these Management Common points, but no definition of this term appears in the glossary. Are baseline routes all of those that are specifically designated for travel, or some subset of designated routes? | Baseline routes means those routes that are initially established in the Travel Plan accompanying the PRMP/FEIS.  All other existing routes that are not designated will be marked "closed" on the ground;  travel on these existing routes will cease to be legal at the time of the ROD. |
| The Nature Conservancy | 204 | 26 | Travel Management (Pg 2-28—2-50) The large issue within this point is the distinction and choice between a "closed unless signed as open" and "open unless signed as closed" policy to route identification. Each policy has its pros and cons, though in general we believe that "closed unless signed as open" has greater merit (and fewer signs or posts overall). However, the proposed management, which calls for signing any/all non-baseline routes (whatever they are) as "Closed," appears to indicate an "Open unless signed as closed" approach. Does this statement effectively apply a comprehensive policy of "open unless signed as closed" regarding route identification across the entire MPA? If so, that fact should perhaps be made more clear in the Final RMP. If not, then we advocate that the MFO choose one approach (we prefer "closed unless signed as open") and indlude it up-front in the Travel Management section of the Final RMP. | The Moab Field Office will use a combination of signing procedures to ensure on the ground compliance with the Travel Plan.  Many very obscure old routes may need no particular signing at all.  Open travel routes will be marked on the ground.  The ultimate arbiter of a legal route will be the Travel Plan map that will be made available to the public upon the signing of the ROD. |
| The Nature Conservancy | 204 | 27 | Travel Management (Pg 2-28—2-50) Several motorcycle routes that would be designated under Alternatives C and D (DRMP Map 2-11-E) are in the | The BLM is aware of the problems of cross country travel associated with motorbike trails.  However, the action in the RMP authorizes only on-trail use of these routes. |

| | | | | |
|---|---|---|---|---|
| | | | midst of the occurrences of the Stage Station milkvetch (Astragalus sabulosus var. vehiculus). Designation of these routes by the Final RMP would need to be accomplished by vigilant monitoring to avoid adverse impacts (from non-compliant bikers) to this Sensitive plant. | Travel off the designated trails would be illegal and subject to citation. It is hoped that by marking trails on the ground, cross country travel would lessen. |
| The Nature Conservancy | 204 | 28 | Woodlands (Pg 2-55—2-56) Though not specifically mentioned in this section of the DRMP, we assume that cross-country motorized travel off of designated routes would be prohibited for purposes of retrieving and transporting harvested woodland products. | Cross country motorized travel off designated routes is prohibited in the entire field office except for 2,000 acres near the White Wash Sand Dunes. There is no purpose which negates this rule. Neither wood cutting, antler collection, access to dispersed camping or any other purpose is a legal reason to engage in cross country travel in an area where travel is limited to designated routes. |
| The Nature Conservancy | 204 | 29 | Woodlands (Pg 2-55—2-56) As a more technical note, the language used in each of the four Alternatives on DRMP Page 2-56 appears to be confusing. Each one is a single run-on sentence that seems to combine the concepts of provide and prohibit. Although one can figure out which acreage value applies to which concept, it would be best for the Final RMP to use language such as separate sentences so that the distinction between "provide" and "prohibit" is clear and unambiguous. | The language on page 2-56 has been corrected to be more direct. |
| Sierra Club Utah Chapter | 205 | 1 | The section on Travel Management fails to meet the requirements of NEPA, APA, the Information Quality Act (IQA)(also known as the Data Quality Act), and legal requirements for recognizing state or county highway or road claims. The use of state and county road inventories is either beyond the scope of this DRMP or is inadequately analyzed and justified by the DRMP. | See response to comment 205-9. |
| Sierra Club Utah Chapter | 205 | 2 | Section 3.17 and 4.16 are cursory discussions of the impacts of roads on the human environment. The information provided is inadequate to for the agency to make an informed decision about the transportation system. For example Gelbard and Belnap (2003) are | The BLM recognizes that the great majority of impacts to soils were created when the route was initially bladed. The BLM must assume that, in identifying routes for travel, that the public will adhere to the travel management rules, and that the impacts to soils from |

| | | | | |
|---|---|---|---|---|
| | | | listed as a reference but no where is it shown how this information was used. Considering the import of this research it does not make sense to have the road densities in any of the alternatives. The BLM totally fails to use information contained in their own references. | cross country travel would be lessened.<br><br>The commentor should realize that the impact analysis compares the action alternatives to the No Action alternative.  The impacts to soils from the preferred alternative are demonstrably more positive than those in the No Action alternative, because cross travel motorized travel is virtually eliminated. |
| Sierra Club Utah Chapter | 205 | 3 | The DRMP also fails to consider the effects of an extensive and excessive travel map with regard to other issues such as the extent of ORV use permitted, the development potential for oil and gas, the effects of road dust on biological soil crusts (This is a particularly egregious failure since much of the available research comes from this region.), the effects of grazing on biomass and ground cover, and other permitted activities. | Throughout Chapter 4 of the DRMP/DEIS, the BLM has assessed the impacts of travel management on a wide variety of resources.  Nowhere in Chapter 4 does the BLM suggest that the presence of routes and their identification for travel is without environmental impact. The commentor should realize that the impact analysis compares the action alternatives to the No Action alternative.  The impacts to resources from the preferred alternative are demonstrably more positive than those in the No Action alternative, because cross travel motorized travel is virtually eliminated. The alternatives explicitly discuss the other issues raised by the commentor, including the extent of OHV use permitted, the development potential for oil and gas, the effects of grazing on biomass and ground cover, and other permitted activities.  The commentor does not indicate where the BLM erred in its choice of data, its analytical methods or the conclusions drawn from such analysis.<br><br>The article cited pertains to the spread of invasive weeds by vehicular travel.  The BLM is aware of this.  The impacts of "road dust" on biological soils crusts is not documented.  Vascular plants may be more susceptible to road dust than biological soil crusts. |
| Sierra Club Utah Chapter | 205 | 4 | The cumulative effects of these interacting activities is completely ignored and denied in 4.3.16.2. This section completely misunderstands the requirement to look at the cumulative impacts of a variety of activities that will be permitted in the decision. | The section of the DRMP/DEIS referred to by the commentor discusses the effects of various resource decisions on travel management, and has nothing to do with cumulative impacts.  The DRMP/DEIS discusses cumulative impacts in section 4.3.24.  The commentor |

| | | | | may disagree with the BLM's assessment of cumulative impacts, but offers no specifics as to where or how the BLM erred in its analysis or conclusions. |
|---|---|---|---|---|
| Sierra Club Utah Chapter | 205 | 5 | Because the DRMP makes only cursory, vague and unsupported statements concerning travel management it fails to meet the requirements of NEPA, any decisions resulting from this discussion would be arbitrary and capricious. For this reason it would also fail to meet the requirements of the APA. The DRMP discusses travel management for only 2.5 pages in Sec 3.17. Most of that is only a description of various locations within the Field Office Area. The DRMP discusses travel management for about 8.5 pages in Sec 4.16. Neither section contains substantive discussion of the problems and issues related to travel management. The environmental consequences are not well documented and avoid some crucial issues. | The commentor offers no specifics to support these very general assertions.  The commentor seems to be unaware of the extensive discussion of travel plan formulation in Appendix G.  The "crucial issues" to which the commentor refers are undefined, making response difficult.

An extensive administrative record, available for public inspection, underlies the conclusions reached by the BLM in its formulation of travel plan alternatives. |
| Sierra Club Utah Chapter | 205 | 6 | The consequences to non-mechanized recreation are considered to be the same for Alternatives B, C, and D. How could the road densities proposed for travel management not impact hiking, backpacking and equestrian activities negatively? If there is a difference between the alternatives then they should have different effects on non-motorized recreation. If there is no difference then this is one example of the lack of a reasonable range of alternatives in the DRMP. | The BLM discusses the impacts of travel management on these activities on pages 4-410 to 4-111 in the DRMP/EIS.  On these pages, the BLM specifically discusses the different impacts on these activities from the three action alternatives.  The commentor assumes that the three action alternatives will impact negatively these activities.  This ignores the fact that all three action alternatives greatly reduce (almost to zero) acreage designated open to OHV travel.  All three action alternatives identify over 2500 miles of routes currently available for motorized recreation as being restricted to non-motorized activities. The BLM believes that these alternatives will have positive impacts on non-motorized recreation, and this is stated explicitly on page 4-112 of the DRMP/EIS.

The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, 4 |

| | | | | |
|---|---|---|---|---|
| | | | | alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/EIS provides in comparative form the management actions associated with each alternative. |
| Sierra Club Utah Chapter | 205 | 7 | The creation of non-motorized routes does not mitigate the hiking or backpacking experience if one remains in earshot of motors, if one can see the dust plumes of ATVs, dirt bikes or 4WD vehicles, or see the evidence of off-route travel on most trips into the backcountry? The essence of good planning requires balance. The DRMP lacks any sense of balance between uses. (at 4-411 and 412) | The BLM is not required to guarantee that the adverse impacts suggested by the commentor will never be present in any part of the planning area.  Noise regulation of motors is a matter of state law.  See response to comment 122-7.

See also responses to comments 205-6 and 209-3. |
| Sierra Club Utah Chapter | 205 | 8 | While the DRMP makes a cursory analysis of the effects of vegetation management on travel management it fails to analyze the effects of travel management on vegetation. | Section 4.3.17.13 "Impacts of Travel Management Decisions on Vegetation Resources" contains the analysis the commentor asserts is not present in the DRMP/EIS. |
| Sierra Club Utah Chapter | 205 | 9 | The DRMP states: "Utah State road classes were considered in the impacts analysis. The road classification relevant to the analysis was the Utah Department of Transportation Class-D roads. These are unpaved roads, and not regularly maintained nor funded for maintenance by the state. Most of the routes within the MPA are in this road class (see Travel Plan, Appendix G). Utah Class-B roads are also proposed as designated routes under the Travel Management prescriptions (see Chapter 2 Summary Table of Alternatives); however, these routes were not used as analysis criteria because they are maintained San Juan County and Grand County roads that currently provide motorized access throughout the MPA and whose travel function or designation would not change under any of | The BLM solicited route information from all interested parties as part of its scoping process, leading to formulating travel plan alternatives.  The BLM received route information from both public bodies (such as the Counties) and private citizens.  The commentor seems to believe that using this route information as a basis for travel planning is designed to validate RS 2477 claims, which is not the case.  If this were the case, the BLM presumably would have included all County route inventories in all its action alternatives; instead, the BLM did not identify for motorized use more than 2500 miles of inventoried routes in its preferred alternative.  The assertion that the DRMP/EIS recognizes state and county road claims for planning purposes is incorrect.  The BLM accepts county route inventory data (as well as data from |

the proposed alternatives." (At 4-405)

BLM cannot use these because:

1)      The use of Utah State, Grand County and San Juan County road maps for purposes of planning is illegal. The county B and D roads are essentially equivalent to the county R.S. 2477 claims. The BLM attempts to dodge this by saying the plan will not make a decision regarding the validity of R.S.2477 claims. It does use the equivalent data in a planning decision. The BLM appears to be making a differentiation where there is none to be found. The BLM is attempting to establish a policy that would permit them to make non-binding determinations of R.S. 2477 claims for planning purposes. This concept has yet to pass legal challenge.

In essence the DRMP recognizes state and county road claims for planning purposes. In this way it exceeds any permissible or possibly permissible rule or policy. This process is far beyond even the limited decision making process conceived in the non-binding determination process outlined by the BLM.

The DRMP gives credence to R.S. 2477 claims since these are largely if not entirely equivalent to state and county road claims. It is entirely likely that the use of this information in planning violates the intent of Congress.

Congress prohibited the recognition of any R.S. 2477 rights of way. The language of the relevant statutory provision first appeared as substitute language to Senate Bill 1425, 104th Cong. "Revised Statutes 2477 Rights-of-Way Settlement Act." See S. Rep. 104-261 at 1. As the Senate later explained, "As originally written S. 1425 provided a process by which RS 2477 rights-of-

others) as the first step in its travel plan formulation.  As stated in Appendix G of the DRMP/EIS, the BLM then evaluates purpose and need of verified (not simply inventoried) routes against resource conflicts, spreading these analyses across alternatives.  See also response to comment 124-138.

The commentor assumes that the BLM accepted route data from the counties and other parties without qualification.  In fact, as explained in detail in Appendix G, the BLM used scientifically defensible sampling techniques to verify the route data presented.  The commentor does not provide a single instance of the BLM including in its database or in any of its alternatives a route which actually does not exist on the ground.  The commentor asserts that the county and state-provided data is "unlikely" to be accurate or unreliable, yet provides no evidence to support this assertion.

"B" and "D" routes do not equate to County road assertions. At some point in the future, the Counties may assert claims to any or all of these routes; conversely, they may choose not to assert claims to any or all of these routes. The routes identified as "B" and "D" routes in the DRMP/EIS are routes located on public lands and managed by the BLM until properly adjudicated.  The DRMP/EIS proposes four different alternatives to manage these routes.

As specified in the Draft RMP/EIS (pg. 1-12), addressing RS 2477 assertions is beyond the scope of this planning effort.  However, nothing extinguishes any right-of-way or alters in any way the legal rights the State and Counties have to assert and protect RS 2477 rights.  The commentor is insistent on the assertion that using county or state-provided route data as part of the input into the BLM's travel planning formulation effectively confirms RS

way could be validated by means other than a quiet title action in the courts. Because of controversy over the legislation the Full Committee on May 1, 1996 passed a substitute amendment by voice vote. The substitute amendment placed a permanent moratorium on any agency of the federal government from issuing final regulations on RS 2477 without Congressional approval."

While the RMP may not appear to be a final regulation, by using and recognizing state and county road claims it is making a decision that will be difficult to change in the future.

The state of Utah and the counties continue to have recourse to the courts to assert road claims. In fact this is still the only route by which the counties can assert and have adjudicated road claims.

2)      Using the state and county road claims also violates the IQA. The IQA (sometimes referred to as the "Data Quality Act") was meant to ensure that agencies, including the BLM, did not disseminate to the public or rely on information of dubious quality in the agency's public pronouncements or decision-making. The DOI and BLM guidelines make clear that when the agency makes a decision, the IQA's guidelines would apply to that decision and dissemination of information allegedly supporting that decision. DOI guidelines at 3; BLM guidelines at 4. DOI guidelines state that to ensure the "quality" of information the agency relies upon or disseminates, the agency must ensure that the information is "accurate, reliable, and unbiased," and is "presented in an accurate, clear, complete, andunbiased manner." DOI guidelines at 8; see also BLM guidelines at 6. Where the information at stake is "influential," the agency must more rigorously evaluate

2477 claims is unfounded, no matter how often the commentor makes this assertion.  The commentor repeatedly confuses route "data" with route "claims"; the BLM only considered route data in its travel plan formulation.  The maps referred to by the commentor are not maps of county "claims", but maps of verified routes which form the baseline (not the final product) for travel planning.

the information to ensure its integrity. DOI guidelines at 10; BLM guidelines at 4-5. DOI defines "influential information" to include that data that will have a "clear and substantial impact on important public policies." DOI guidelines at 10; see also BLM guidelines at 4 (influential information is that which is "expected to have a genuinely clear and substantial impact at the national level").

IQA guidelines make clear that BLM must ensure the objectivity of information provided to the agency by third parties that may form the basis for the agency's decision. DOI's guidelines state that if DOI "relies upon technical [or other] information submitted or developed by a third party, that information is subject to the appropriate standards of objectivity and utility" under the IQA.

The BLM fails to provide any reason for including the state and county road claims on the travel maps in the DRMP. It fails to indicate that the information is accurate, reliable and unbiased. Since the state and counties in Utah have repeatedly made adverse claims for roads against the United States it is entirely unlikely that the information provided would be unbiased. So far nearly all such claims have also failed to be adjudicated in favor of the counties or state. It is unlikely the information provided by the state or counties is accurate and reliable. Anyone looking at the travel maps would easily determine many of the routes are old seismic exploration scars and not roads or highways. They were not constructed for transportation purposes.

The Moab Field Office does not have the legal authority to determine the accuracy, reliability or unbiased nature of state or county road claims. It cannot fulfill the requirements of the IQA by using data from the state or

BLM_0011805

counties.

3)      The DRMP does not make it clear under what authority the state and county road claims were constructed (if they actually did construct them). Prior to the passage of FLPMA 1976 the roads could have been constructed under the authority of R.S. 2477. The BLM should research its records for adjudicated R.S. 2477 ROWs in the Field Office area to verify the accuracy and reliability of the state and county road maps. This also makes evident the conflict in using the state and county road claims in any planning process with intent of Congress.

Are the maps and road claims submitted by the state and counties consistent with Utah State law? Did the state or counties verify that the claims they submitted have been compared to the require plats of roads and highways as they existed in 1976 (or 1966 because of another requirement of Utah law)?

The 1977 Grand County Road Maps [see attached] show a very different set of roads claimed by the county. The three figures below show portions of Grand County Road Maps. We can make the full maps of Grand County available to the BLM if the Moab FO does not already have them.

You will note that one map shows the Utah Department of Transportation did not verify the accuracy of the maps. This would indicate that at least one agency responsible for the maps cannot assert the accuracy or reliability of these maps. Yet this is what was available in 1976 when FLPMA repealed R.S. 2477. Since these maps vary tremendously from the travel maps in the DRMP the BLM would need to verify the authority under which new roads could be claimed. The BLM once

again needs to verify roads claimed through adjudicated R.S. 2477 ROW claims or through records showing ROWs granted under Title V of FLPMA. Without either R.S.2477 or Title V authority the state and county road maps cannot be accurate, reliable or unbiased.

If the Moab Field Office is asserting these road claims are valid then it is acting contrary to the direction of Congress. If it is asserting these road claims are valid under FLPMA then it should be able to show the Title V authority for these claims. Again the nature of accepting these claims reaches far beyond any procedure the BLM has conceived for making even non-binding determinations. Either the BLM is acknowledging R.S. 2477 ROW claims or it is recognizing Title V ROW claims. Neither of these are permissible with the information given in the RMP. Both would be illegal under the information given.

Recommendation:

Since Travel Management and Travel Maps are an integral part of almost all aspects of management to be determined by the RMP revision most of the DRMP will require significant revision. The BLM should withdraw the DRMP and begin a truly collaborative process for creating a balanced Resource Management.

The integral and complex issues that relate to travel management must be explored. The relationship of roads and other mechanized routes to weeds, wildlife, cultural sites, wilderness, landscapes resilient to global and local climate change, and host of other issues must be analyzed.

Travel management cannot be adequately analyzed in a few pages especially considering the limited and

BLM_0011807

| | | | illegal range of materials used for analysis.<br><br>The entire Transportation Management Section should be withdrawn. The Travel Management maps should be discarded. Because travel management is integral to all aspects of the RMP the DRMP should be re-written. Because of the heavy dependence on information that the Moab Field Office cannot use for planning purposes a team of BLM staff from offices outside of the State of Utah may be needed to supervise the development of a new DRMP. The taint of the illegal use of state and county road claims would likely prejudice the outcome of a new DRMP if local field office staff continues to supervise the development of a new Resource Management Plan. | |
|---|---|---|---|---|
| Sierra Club Utah Chapter | 205 | 10 | The Moab Field Office should be considering actions to take in the face of climate change. While the MFO should do its part to reduce impacts to global climate change that is not the focus the BLM take in its resource management plan. The MFO manages approximately1,859,000 acres. Climate change will affect these acres. The BLM must plan to keep the lands healthy and resilient in the face of climate change. | See response to comment 124-115. |
| Sierra Club Utah Chapter | 205 | 11 | Dust arriving in Colorado from Utah is altering snow pack in the Rocky Mountains. This in turn will influence the amount of water in the Colorado River and the availability of water to millions of people. | See responses to comments 124-115 and 205-13. |
| Sierra Club Utah Chapter | 205 | 12 | Grazing will need to be managed in a much more ecologically sound manner in light of climate change that detrimental effects of less resilient landscape. *See attached photographs of White Wash, indicating erosion from grazing.* Jerry Holechek and others noted, "The authors' research and experience across a variety of landscapes, ranches, and countries shows a 25% harvest coefficient is the surest way to avoid chronic forage deficits and land degradation." (Galt, Dee, | See responses to comments 124-115, 205-14, 9-3 and 205-13. |

| | | | | |
|---|---|---|---|---|
| | | | Francisco Molinar, Joe Navarro, Jamus Joseph, and Jerry Holecheck, Grazing capacity and stocking rate. Rangelands, Dec. 2000, 7-11. This is a reference the BLM range conservation staff should already have on hand. If not we will track down a copy for you. The current utilization in the area of the photographs is probably 100% since there were no desirable forage plants visible. There is little chance that land degradation will not continue to occur. | |
| Sierra Club Utah Chapter | 205 | 13 | This must be added to the cumulative effects of vehicles. Six photographs show vehicles on the road. The vehicles traveled past me from 5:35 PM to 6:46 PM. Note the dust from each vehicle. Several of the vehicles towed trailers loaded with ATVs. It is likely the ATVs were creating dust for several hours prior to this. Along side I-70 were a series of colored bags. They appear to be related to a series of geophones (but this is only a guess). Over the last few weeks a vehicular way has become increasing pronounced with loose soil and diminishing vegetation. Again this activity needs to looked in its cumulative effects with grazing and other motorized uses. | The impacts of travel management decisions on soils are discussed on pages 4-292 through 4-296 of the DRMP/EIS.  The impacts of air quality decisions (including dust) are discussed in section 4.3.16.2.1 of the DRMP/EIS.  See also response to comment 202-8.

The geophone-related activity to which the commentor refers was likely from a recent seismic exploration project along I-70.  The BLM did a full environmental analysis of this activity on site-specific basis, and will continue to do the same level of analysis (including cumulative impacts) on a site-specific basis. The BLM has estimated the impact of geophysical exploration activities on pages 4-286 through 4-291 of the DRMP/EIS.  See also response to comment 205-4. |
| Sierra Club Utah Chapter | 205 | 14 | Large reference areas of 100 to 1000 acres should be created to assess the effects of grazing and motorized recreation on the productivity of the land. The reference areas should be large enough to allow a wide range of plants to grow in the absence of human disturbances. Only this will give the BLM a means to measure the result of management. The reference areas should be those least impacted by human or human related activities and preferably to have had no impacts for 10 years. If such areas cannot be found then specific sites should be identified and set aside as future reference areas. Grazing utilization should be closely monitored. Cattle should be removed when utilization exceeds | Monitoring of grazing activities are discussed on pages 4-70 and 4-82 of the DRMP/DEIS.  Monitoring of motorized activities are discussed on pages 4-231 and 4-235 of the DRMP/DEIS. Monitoring specifics are implementation issues, and outside the scope of the planning process.

The specific suggestions of the commentor are not supported by any accompanying documentation to suggest that this monitoring regime is the appropriate one for the BLM to follow.  The BLM relies on Standards and Guidelines for Rangeland Health to monitor the impacts of grazing on a variety of resources, and will continue to do so under the new plan.  See response to comments 9-3 |

| | | | 25%.<br>The BLM should be investigating climate change and its relationship to management needs. The Forest Service has several projects. Once can be found at http://www.fs.fed.us/psw/cirmount/. An equivalent program is essential particularly in the largely arid environments managed by the BLM in the intermountain west. | and 209-49. |
|---|---|---|---|---|
| Sierra Club Utah Chapter | 205 | 15 | Consider two sources re: effects of grazing:<br><br>1 – (Crider, F.J. 1955. Root-growth stoppage resulting from defoliation of grass. Washington, DC: USDA Forest Service, Tech. Bull. No. 1102.) We are supplying a copy of this seminal research on an accompanying CD. Crider's research is important because it indicates that grazing pressure will tend to favor fast-growing annuals (such as cheat grass) over perennial native grasses. Continued pressure from grazing will continue to result in diminished populations of perennial native grasses.<br><br>2 – When this is considered in the light of research conducted at the Idaho National Laboratory grazing becomes the single most effective mechanism to increase cheat grass. Below is a summary of the findings of Anderson and Inouye (Anderson, Jay, and Richard Inouye. 2001.  Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years.  Ecological Monographs 71(4):531-556.) We are supplying a copy of this research on an accompanying CD. Note pages 545-553, which show importance of native species, species richness, and which conclude increases in species diversity are due to drought recovery 1950-1975, not due to use of grazing. This study does not support opinion that removal of grazing would decrease species diversity. (Laycock 1994 Study). | The land use planning decision regarding grazing is only whether or not a particular allotment is available or unavailable for grazing during a particular planning cycle. All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q).<br><br>See response to comment 9-3. |

BLM_0011810

| Sierra Club Utah Chapter | 205 | 16 | In Sec. 3.7.1.2 Riparian areas, 45% of riparian areas are functioning at risk or not functioning. Standards and Guidelines for Rangeland Health have been in effect since 1996. It is unconscionable that any riparian area not in functioning condition should remain available for grazing in a decision to be made more than ten years later. | As individual allotments are reevaluated using the Standards for Rangeland Health and Guidelines for Grazing Management, decisions about specific riparian areas will be made.  See response to comment 9-3. |
|---|---|---|---|---|
| Sierra Club Utah Chapter | 205 | 17 | In Sec. 4.3.6 Livestock Grazing, Among other things this section states: " In the short term, actual forage use in the decision area may increase due to improving range condition and range recovery from recent drought. Over the long-term, forage demand may continue at historic levels." This is a strange statement since NOAA still lists the entire region as being in moderate drought or abnormally dry. The MFO area is not recovering from recent drought. The seasonal outlook also predicts drought will persist or increase in the area. | Decisions about actual range conditions and season of use are made on an allotment basis using Standards for Rangeland Health and Guidelines for Grazing Management.  See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 18 | Sec. 4.3.6.1 Impacts Common to All Alternatives Much of this section is typical of the all sections on analyzing the impacts of grazing and the response of the BLM to problems with grazing as they arise. There are consistently vague remedies to problems that are put off into the future. This is exemplified by statements like these: •Grazing practices would be modified if a grazing allotment fails to meet any of the BLM's UtahStandards for Rangeland Health… •      Data collected from rangeland monitoring studies would assist the Field Manager… •      Under all alternatives, certain allotments could undergo season-of-use changes to facilitate grazing management… No clear direction is given for resolving problems. Everything is put off to future decisions. The DRMP lacks direction or substance for grazing management. There are many activities that "could" change grazing | See response to comment 9-3. |

BLM_0011811

| | | | | |
|---|---|---|---|---|
| | | | management but no direction is given for when, how, or what changes will be made. | |
| Sierra Club Utah Chapter | 205 | 19 | Table 4.32 lists five riparian areas that would be unavailable for grazing under Alternative C. Are these all of the 45% of riparian areas that are not meeting Rangeland Standards and Guidelines? Where are those areas analyzed in the DRMP? How is the MFO going to deal with these poorly functioning riparian areas? | These are not the 45% of riparian areas that are not in Proper Functioning Condition.  It should be remembered that lack of Proper Functioning Condition can be due to reasons other than grazing.<br><br>All riparian areas will be considered during the permit renewal process, at which time Standards for Rangeland Health and Guidelines for Grazing Management are applied.  See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 20 | One of the stranger statements in the DRMP comes under the analysis of Alternative C. In subsection 4.3.4.7 the DRMP states, "Change in livestock class from sheep to cattle, fencing, seeding and rest/rotation to improve habitat would be encouraged." Is the BLM planning to "encourage" itself to make changes? The BLM has the authority to make many changes including most of these. Can the best it do is "encourage" itself to make changes? This seems indicative of the tenor of all the cursory analysis of problems. No decisions are made, all changes are put off to the future, and the BLM will encourage itself to change management. This is beyond belief. | The actions referred to by the commentor are those that would be considered during the permit renewal process, using Standards for Rangeland Health and Guidelines for Grazing Management.  By placing these actions in the DRMP/EIS, the BLM commits to consider them during that process. |
| Sierra Club Utah Chapter | 205 | 22 | The entire section on grazing needs to be given some actual management direction. It should not depend so heavily on the 1985 RMP or the 1991 BLM Vegetation Treat FEIS. These are both old and no longer relevant to current conditions or knowledge about grazing and the impacts of grazing. In particular they cannot help the BLM plan for the cumulative effects of grazing on a landscape impacted by climate change or help the BLM determine the adverse effects of grazing as climate change occurs. | See response to comment 9-3.  The Vegetation Treatment EIS has been updated since the DRMP/EIS was released to the public.  The new document, "Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in Seventeen Western States" (2007)  has been utilized in the PRMP/FEIS. |
| Sierra Club Utah Chapter | 205 | 23 | Also look at the recent 27 photographs on the Little Grand Allotment. Do the photographs reflect proper grazing management? Is the forage utilization | The land use planning document makes decisions only on whether or not an allotment is available or unavailable for grazing.   See response to comment 9-3.  Each allotment |

BLM_0011812

| | | | | |
|---|---|---|---|---|
| | | | appropriate according the standards? If not how would the DRMP guide the correction of the problems? *see attached CD* | would be analyzed on a site specific basis at the renewal stage using Standards for Rangeland Health and Guidelines for Grazing Management. |
| Sierra Club Utah Chapter | 205 | 24 | The Moab Field Office should initiate a round of forage capacity analyses including clipping studies, reviewing trend data to see if plant cover, variety, and biomass have changed over the years. We would recommend the MFO recover the SVIM studies conducted by the BLM back in the 1970s as a baseline for comparisons. (We would be glad to provide the information if you no longer have it.) Reference areas should be created as noted above. The current areas and proposed areas for removal of livestock will not completely meet the need. They may be adequate as references for some areas but not all. And many have other human impacts that would make their value for evaluating grazing minimal. Areas removed from grazing should have a monitoring system created so that what little information that can be gleaned from these areas can be used for comparison purposed with similar areas that continue to be grazed. | See response to comment 9-3.  The type of studies referred to by the commentor are done at the permit renewal stage. |
| Sierra Club Utah Chapter | 205 | 25 | The Redrock Heritage Plan should have been taken seriously and incorporated into the DEIS. The BLM should have worked with the proponents rather than reject the plan outright. | Many of the commentor's earlier remarks criticize the BLM for failing to take into account the numerous alleged negative environmental impacts from the BLM's travel plan.  In this comment, however, the commentor criticizes the BLM for not incorporating the Redrock Heritage Plan into the DRMP/EIS.  It is worth noting that this plan has more miles of motorized routes than any of the BLM's action alternatives, and would presumably create even greater negative environmental impacts of the type feared by the commentor. |
| Red Rock 4-Wheelers, Inc. | 206 | 1 | The Club supports Travel Management Alternative C, the preferred alternative, with a few changes that are detailed in the following section.<br>1. Parts of roads used on five permitted Jeep Safari routes are missing from your Alternative C designated road map. I think this issue needs to be addressed | See responses to comments 206-3, 206-10 through 21. |

| | | | | |
|---|---|---|---|---|
| | | | before finalizing the plan. Details are provided in Appendix A.<br>2. There are a couple road segments in existing WSAs that I think could be reopened without impairing the suitability of the area for preservation. In one instance Search and Rescue efforts would be enhanced by this action. Details are provided in Appendix B.<br>3. The connection of the Klondike Bluffs Road from US 191 to the northern section of the Little Valley Road, as well as the connection at this point of the southern and northern sections of the Little Valley Roads, is missing from the maps. This is a part of the Copper Ridge Safari route and mentioned in Appendix A, but I imagine a lot of mountain bikers will be upset to lose this access to the parking area for Klondike Bluffs as well.<br>4. A few routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C or D, do not appear on Alternative C. Three examples of this are included in Appendix C that are important to me, and I urge that they be added to the Alternative C map.<br>5. There are some road segments that are not Jeep Safari trails, but we feel they are important enough to note and ask for revisions on Alternative C to add them. These are covered in Appendix D. | |
| Red Rock 4-Wheelers, Inc. | 206 | 2 | Some boundary adjustments to allow for a better recreational experience and more understandable enforcement are needed for the White Wash Sand Dunes Open OHV Focus Area, a part of the Labyrinth Rims/Gemini Bridges SRMA. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS.<br><br>See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| Red Rock 4-Wheelers, Inc. | 206 | 3 | The Club urges the BLM to consider establishing another SRMA in the Yellow Cat area north and east of Arches NP as this is an area of growing interest and spectacular beauty along the park fringes. | See response to comment 122-38. |
| Red Rock 4-Wheelers, Inc. | 206 | 4 | All SRMAs should have language included to provide a mechanism for future new routes and route connections | The DRMP/EIS specifically allows for the addition of routes to the Travel Plan.  The document states on p. 2- |

| | | | as conditions warrant or recreational needs change. This would add additional flexibility to the management of these areas. | 48 that the Travel Plan "may be modified through subsequent implementation planning and project planning on a case-by-case basis". |
|---|---|---|---|---|
| Red Rock 4-Wheelers, Inc. | 206 | 5 | We recommend careful wording in the naming and signage for SRMAs, particularly the Focus Areas. Users need to know when other types of use are allowed in an area, even though an area is primarily focused for recreational enhancement of one group.  An example would be the Copper Ridge unit.  A 4x4 road will exist in the area, yet the main focus is mountain bikes.  The Sovereign area (non BLM) is an example of an area being designed for single track use, motorized and mechanized, however, mechanized riders have been encountered that expect exclusive use when on the trails. The Club believes careful wording and trailhead signage can reduce this problem, as well as working with local businesses to stress the importance of providing this same information to their customers. | A land use planning decision is not necessary for the BLM to undertake actions regarding signage and education. This is specifically addressed in Chapter 1 of the DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Red Rock 4-Wheelers, Inc. | 206 | 6 | We think that identification of Non-WSA lands with Wilderness Characteristics was outside the scope of analysis for an RMP.  The time has long since passed that for WSA analysis, a point recent decisions in lawsuits concerning this matter reinforce.  These areas should not have been isolated for special management, and therefore 0 acres should be selected under this heading, just like in Alternative A.  Existing management would appear to be adequate if they were selected as areas of naturalness, solitude, and areas for primitive and unconfined recreation.  Keep up the good work and manage them as you do now. | See response to comment 121-10. |
| Red Rock 4-Wheelers, Inc. | 206 | 7 | Special Recreation Permit (SRP) policy should remain at the 50 vehicle level to require a permit.  The 25 vehicle requirement proposal under Alternative C is too low. | See response to comment 123-26. |
| Red Rock 4-Wheelers, Inc. | 206 | 8 | Another problem area is the individual SRP policy proposed for the White Wash Sand Dunes Area focus area.  This would appear to be inconsistent with the | See response to comment 123-10. |

BLM_0011815

| | | | Federal Land Recreation Enhancement Act (FLREA), wherein the public is supposed to be involved in the decision making process for charging fees.  It would appear the best choice would be to omit this from the RMP and deal with the fee system through the existing Resource Advisory Council. | |
|---|---|---|---|---|
| Red Rock 4-Wheelers, Inc. | 206 | 9 | The Club is aware of some aspects of the Ride With Respect Group's proposal. The RR4WD Club would like to be involved in the decision making process concerning their proposal, but what we have seen is well thought out and easy to implement. Specifically this refers to ideas about: 1) utilizing existing roads in the Cisco Desert and Copper Ridge area to provide a motorcycle route from Fruita to Moab and 2) expansion of the proposed South Moab SRMA to include Black Ridge, and then establishing focus areas within the expanded area to deal with mountain bikes, equestrians, trials motorcycles, and rockcrawlers. | Alternative C of the Travel Plan in the DRMP/EIS provides a motorized motorcycle route relying primarily on existing routes from the Colorado border to Thompson.<br><br>See response to comment 122-36 regarding Copper Ridge.<br><br>See also response to comment 122-43 regarding the Black Ridge area. |
| Red Rock 4-Wheelers, Inc. | 206 | 10 | The only adjustments to the South Moab SRMA, proposed by Ride with respect, that seem to be required appear to be the inclusion of the segments of the Strike Ravine Jeep Safari trail mentioned in Appendix A, but the Club wants to stress its desire to be involved with the planning of this proposal, if accepted by the BLM. | See response to comment 206-11. |
| Red Rock 4-Wheelers, Inc. | 206 | 11 | There are a number of permitted Jeep Safari routes not included in Alternative C, and these should be added to this Alternative.  These include segments of the Copper Ridge, Strike Ravine, 3D, Dolores Triangle, and Flat Iron Mesa routes. | The short segments on BLM are mapping errors which have been corrected (route numbers 13637, 15331, 15332, 15334, 15336).   Strike Ravine and Flat Iron Mesa routes will need to be hand digitized, since they are not part of current Travel Plan database.  Several of the segments are exclusively on State lands, and beyond the scope of the Travel Plan formulation. |
| Red Rock 4-Wheelers, Inc. | 206 | 12 | There has been some discussion among Copper Ridge trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character.  These changes would require two road segments to be left in Alternative C that are eliminated | One of the two segments is on State land, and beyond the scope of Travel Plan formulation.<br><br>The other route was identified in the baseline route inventory.  The BLM requested information on routes from |

| | | | | |
|---|---|---|---|---|
| | | | from Alternative A.  While there is no plan at present to ask for any changes to the Jeep Safari Permit, it would be desirable to keep these roads legal for future incorporation into the permit. | the public for potential inclusion in the travel planning process.  No information was received regarding this route (segment numbers 15605, 15606, and 15623).  An interdisciplinary team, which included County road officials, determined that this route lacked purpose and need.  Once a route was determined to lack purpose and need, it was not weighed against potential resource conflicts and was not included in any of the action alternatives.<br><br>For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15. |
| Red Rock 4-Wheelers, Inc. | 206 | 13 | (Additional Roads Need Adjustment)<br>Day Canyon Point-A side spur from the main road that heads west to an overlook of Long Canyon does not show the route's full length.  It proceeds beyond what is shown to cross a small wash and end at a turnaround point.  This serves as both a natural turnaround point as well as a nice starting point for a hike to overlooks of Long Canyon and the interesting rock formations along the rim in this area, it adds only about 1/8 mile.  It begins at UTM 4268370N 0614600E and ends about 4267570N 0614830E. (See map) | This route is not part of the baseline route inventory utilized for formulating the alternatives for the Travel Plan in the DRMP/EIS.<br><br>The BLM requested information on routes from the public for potential inclusion in the travel planning process.  No information was received regarding this route.  As a result, this route was not analyzed.<br><br>For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15. |
| Red Rock 4-Wheelers, Inc. | 206 | 14 | (Additional Roads Need Adjustment)<br>Gemini Bridges-The club would like to see the road across the top of the bridges remain open. (See map) | The route in question was found to have a conflict with other recreational uses, as well as safety issues, that the BLM's interdisciplinary team concluded outweighed the purpose and need for this route. |
| Red Rock 4-Wheelers, Inc. | 206 | 15 | (Additional Roads Need Adjustment)<br>Mill Canyon-A road that connects from the Mill Canyon Road on the north heads southward into Courthouse Pasture, connecting with roads there. It would also seem to be an important road for Search and Rescue | This route was identified in the baseline route inventory .  The BLM requested information on routes from the public for potential inclusion in the travel planning process.  No information was received regarding this route (segment number 27493 and 31779 ).  An |

| | | | | |
|---|---|---|---|---|
| | | | efforts in the pasture area. (See map) | interdisciplinary team, which included County road officials, determined that this route lacked purpose and need.  Once a route was determined to lack purpose and need.  For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15.<br><br>The Federal regulations at 43 CFR 8340 state that any fire, military, emergency, or law enforcement vehicle when used for emergency purposes is exempted from OHV decisions.  This is state on G-15 of the DRMP/EIS. |
| Red Rock 4-Wheelers, Inc. | 206 | 16 | (Additional Roads Need Adjustment)<br>The Pickle-This challenging wash bottom route appears to be shown on the Alternative C map, but we want to be sure. It begins at the Bartlett Wash Road about UTM 4285183N 0605027E and heads up the wash to intersect the road to Hidden Valley about 4284925N 0604272E. (See map) | This route has been identified for motorized use in Alt C for the Travel Plan of the DRMP/EIS. |
| Red Rock 4-Wheelers, Inc. | 206 | 17 | (Additional Roads Need Adjustment)<br>Flat Iron Mesa- A strong, useful connecting road that is shown on USGS maps exists between UTM 4245328N 0634685E (the main Flat Iron Road) and UTM 4245272N 0636835E (US191).  This road connects with one shown on Alternative C, making that a connecting road rather than a dead end as currently mapped. (See map) | This route was evaluated by the BLM's interdisciplinary team, which included County road officials, as part of its travel plan formulation.  Resource conflicts, particularly cultural, were found to outweigh purpose and need.  The route is identified for motorized use in Alternative D of the Travel Plan for the DRMP/EIS. |
| Red Rock 4-Wheelers, Inc. | 206 | 18 | (Additional Roads Need Adjustment)<br>Ray Mesa & Lisbon Gap 15' Quad Area-There are some roads along the Utah/Colorado border that leave Utah and continue in Colorado.  The roads referred to are in the Ray Mesa and Island Mesa area.  A check with the Colorado BLM affirmed that these roads were part of their existing legal travel routes (Julie Jackson, Uncompahgre Office, Nov. 13, 2007.  Therefore, it makes no sense to eliminate the Utah end of a road if the | Although depicted on the USGS topographical maps, these routes were not identified by San Juan County in its route inventory, nor were these routes brought forward by the public during scoping period for the land use planning process.  See responses to comments 206-4 and 206-13. The area mentioned by the commentor in Colorado lies in an area open to cross-country OHV travel, meaning that all BLM lands in that part of the state are open to travel, regardless of whether it is on-road or off-road. |

| | | | | |
|---|---|---|---|---|
| | | | Colorado end is legally open to travel, particularly when the Utah end is needed to access the Colorado section. The first road departs from a road shown on alternative C at UTM 4234752N 0669852E to head northeast, it wanders back and forth across the state border around UTM 4235280N 0670139E, and then continues northeast to intersect with another road in the Yip Yip Mine vicinity. The next road also departs from the same road shown on alternative C that was referred to above, about UTM 4233247N 0669563E.  It travels generally eastward, crossing the state line at UTM 4233513N 0670416E as it travels along the southern end of Ray Mesa. The final road departs from the above mentioned alternative C road at UTM 4227870N 0670144E and heads eastward toward the Colorado line.  Just before reaching the state line it heads north, and finally crosses the border about UTM 4227870N 0671005E as it continues eastward along a bench of Island Mesa. (See map) | |
| Red Rock 4-Wheelers, Inc. | 206 | 19 | (Additional Roads Need Adjustment) Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from the rim viewpoints on this side of the wash into the wash itself.  It is a well defined road that is only partially shown on the Alternative A map.  It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it.  The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a fence, and then proceed pretty directly to a descent down the last little bit into Tenmile at about UTM 4287670N 0588320E. (See map) | See response to comment 206-13. |
| Red Rock 4-Wheelers, Inc. | 206 | 20 | Two short routes in Wilderness Study Areas (WSA) should be identified for motorized use in Alternative C. | The spur to Egg Ranch Fin is located in an area closed to motorized use as part of the 1985 Grand Resource Area |

| | | | | |
|---|---|---|---|---|
| | | | These are spurs to Egg Ranch Fin in the Behind the Rocks WSA, and a spur west from Coffee Pot Rock in the Negro Bill Canyon WSA. | RMP, in order to enhance primitive recreation opportunities.  It is situated in an area closed to motorized travel across all alternatives in the DRMP/EIS.  It was not part of the route inventory submitted to BLM during the scoping period for the land use planning process.  The spur west from Coffee Pot rock is identified for motorized use in Alternative D.  This route was not identified for motorized use in Alternative C, due to the BLM's conclusion that resource conflicts, particularly wilderness, outweighed purpose and need. |
| Red Rock 4-Wheelers, Inc. | 206 | 21 | There are several roads missing from the Alternative A map that should be included in Alternative C.  These include (1) two spurs to overlooks on Dry Mesa and an extension of the main road on its eastern end; (2) a road to an overlook in the Tenmile area; and (3) two overlook roads in the Rainbow Rocks area. | The routes in question on Dry Mesa are identified for motorized use in Alternative D of the Travel Plan for the DRMP/EIS.  They are not identified in Alt C due to resource conflicts, particularly wildlife, which the BLM concluded outweighed purpose and need.  These segments are 27532, 27569, 27611, 27644, 27631, 27322, 20323, 27333, 27346, and 27461.  The road to the overlook in the Tenmile area (number 27272) is identified for motorized use in Alternative D, but not in Alts B or C due to conflicts with wildlife and soils resources.  The two overlook roads in the Rainbow Rocks area (numbers 27285, 27460, 27430, 27422, 27394) are identified for motorized use in Alt D only due to wildlife conflicts. |
| Red Rock 4-Wheelers, Inc. | 206 | 22 | (Additional Roads Need Adjustment) Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from the rim viewpoints on this side of the wash into the wash itself. It is a well defined road that is only partially shown on the Alternative A map. It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it. The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a | See response to comment 206-13. |

| | | | | |
|---|---|---|---|---|
| | | | fence, and then proceed pretty directly to a descent down the last little bit into Tenmile at about UTM 4287670N 0588320E. (See map) | |
| San Juan Trail Riders | 207 | 1 | …we support the area and route designations proposed by Ride with Respect, nonprofit. | See response to comments 122-1 to 122-49. |
| San Juan Trail Riders | 207 | 2 | The plan should more explicitly state that conflict is exacerbated by overcrowding. Additionally, the plan should better address the scope of conflicts. They occur at society, group, and individual levels. They occur between management, user groups, and within user groups. Although conflicts generally begin asymmetrically, the direction is not always consistent. Finally, the plan should acknowledge that conflicts become symmetrical when management actions unduly restrict the more dominant uses. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. The general nature of societal conflicts is not a land use planning issue. |
| San Juan Trail Riders | 207 | 3 | We are pleased to read Table 2.1 Recreation (page 2-17), which plans to provide visitor information and outreach programs that foster a land ethic. For planning, We suggest highlighting one more critical item. Noise is the most common complaint against Off Highway Vehicles. Thus for all vehicles across the entire field office we recommend implementing and enforcing a 96-decibel limit based on the "20-inch" test (SAE J1287). | See response to comment 122-7. |
| San Juan Trail Riders | 207 | 4 | Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on county inventories. They mention that "motorcycle routes" exist around White Wash. The document should specify that this includes motorcycle single track and ATV trails. Additionally, off-highway vehicle trails exist in high concentration from " Utah Rims" to Cottonwood Wash. Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail. Mountain bike trails also exist beyond those mapped in Alternative D. | See response to comment 122-10. |
| San Juan Trail Riders | 207 | 5 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried. The | See response to comment 122-14. |

BLM_0011821

| | | | only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as an inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands. | |
|---|---|---|---|---|
| San Juan Trail Riders | 207 | 6 | Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preference to SRMAs, and especially to the appropriate focus areas. Trail expansion would avoid pitting recreational trail users against one another on a rigid system of roads. By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restricting them to smaller vehicles. | See response to comment 122-14, |
| San Juan Trail Riders | 207 | 7 | Designating campsites should be done with public participation. Camping should not be confined to one mass site for any given. Most public-land users prefer dispersed camping. The Ruby Ranch Road and Utah Rims should each provide a dozen sites. | See response to comment 122-48. |
| San Juan Trail Riders | 207 | 8 | In areas where camping is not restricted to designated sites, the travel plan should be adjusted to access campsites. | See response to comment 122-48. |
| San Juan Trail Riders | 207 | 9 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its single track character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Tail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These single track trails should be | See response to 122-29. |

|  |  |  | preserved, along with adjacent two-tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. |  |
| San Juan Trail Riders | 207 | 10 | (Please refer to maps provided by Ride with Respect, nonprofit) …Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to construct a Kokopelli Single track and mark a Kokopelli two track that would roughly parallel one another. Through Utah Rims, the single track should be open to motorcycles. Through Yellow Jacket, the single track should actually be an ATV trail. Everywhere else, the single track should be non-motorized. The two track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | See response to comment 122-30. |
| San Juan Trail Riders | 207 | 11 | (Please refer to maps provided by Ride with Respect, nonprofit) Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Book Cliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bike trails in Fruita a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | See response to comment 122-31. |
| San Juan Trail Riders | 207 | 12 | (Please refer to maps provided by Ride with Respect, nonprofit) We generally support establishment of Labyrinth Rims SRMA in Alternative C. However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the power lines. The White Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D ( northward to Ruby Ranch Road and southward toward Red Wash Road), fee programs should be determined | See response to comment 122-32. |

| | | | | |
|---|---|---|---|---|
| | | | with public involvement through a Resource Advisory Council. Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Ten Mile Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Ten Mile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel. | |
| San Juan Trail Riders | 207 | 13 | (Please refer to maps provided by Ride with Respect, nonprofit) The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality. Spring Canyon, Hell Roaring Canyon, Spring Canyon Point, Dead Man Point, and south Horse Thief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine. Dubinky Wash is valuable for all vehicle use, and the single track near jug Rock should remain available for motorcycles. | See response to comment 122-33. |
| San Juan Trail Riders | 207 | 14 | (Please refer to maps provided by Ride with Respect, nonprofit) North of Highway 313, the single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads. The Seven Mile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa | See response to comment 122-33. |

| | | | | |
|---|---|---|---|---|
| | | | campground. Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | |
| San Juan Trail Riders | 207 | 15 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>North of Highway 313, the single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads. The Seven Mile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa campground. Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See response to comment 122-34. |
| San Juan Trail Riders | 207 | 16 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help to ensure enjoyment for mountain bikers, like Sovereign Trail. And like Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | See response to comment 122-36. |
| San Juan Trail Riders | 207 | 17 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow | See response to comment 122-38. |

| | | | | |
|---|---|---|---|---|
| | | | Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches national Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | |
| San Juan Trail Riders | 207 | 18 | (Please refer to maps provided by Ride with Respect, nonprofit) Utah Rims SMRA ought to extend further southwest to the Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the West Water Road, a motorcycle focus would help preserve Guy's Trail and associated single track trails. From West Water Road to the state line, several existing single track trails should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat. A non-mechanized focus area could be expanded from the West Water WSA further southwest all the way to private property. The entire spur road to Big Hole could be closed to enhance primitive characteristics. None the less, the West Water Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | See response to comment 122-39. |
| San Juan Trail Riders | 207 | 19 | (Please refer to maps provided by Ride with Respect, nonprofit) The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing two less-valuable spurs, Big Triangle substantially expands the West Water road less area to the north. Further south toward Buckhorn Draw, a few | See response to comment 122-40. |

BLM_0011826

| | | | | |
|---|---|---|---|---|
| | | | roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well. From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation. Half of the Dolores River overlooks could be preserved as cherry stems. Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | |
| San Juan Trail Riders | 207 | 20 | (Please refer to maps provided by Ride with Respect, nonprofit) The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system. Thus, OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25 mph should be preserved. A non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼-mile slick rock route connecting Slick Rock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road. All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-41. |
| San Juan Trail Riders | 207 | 21 | (Please refer to maps provided by Ride with Respect, nonprofit) Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slick rock riding areas in the Slick Rock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated march 8, 2001 as part of emergency restrictions). In these areas, travel could be further | See response to comment 122-42. |

| | | | | |
|---|---|---|---|---|
| | | | restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher slickrock which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | |
| San Juan Trail Riders | 207 | 22 | (Please refer to maps provided by Ride with Respect, nonprofit) The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the variety of terrain, and provides enough room for a full-day's ride. Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exits in Pole Canyon from the power lines to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the power lines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the power line, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | See response to comment 122-43. |
| San Juan Trail Riders | 207 | 23 | (Please refer to maps provided by Ride with Respect, nonprofit) Hatch Wash backpacking focus area could be | See response to comment 122-45. |

BLM_0011828

| | | | | |
|---|---|---|---|---|
| | | | expanded for better backpacking. Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash. However, only five are necessary to view most stretches of the Canyon. | |
| San Juan Trail Riders | 207 | 24 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area. | See response to comment 122-44. |
| Bookcliff Rattlers Motorcycle Club | 208 | 1 | BLM should re-evaluate the overall planning direction. First, please seriously look at reducing the number of management "overlays". It is simply impossible to understand what the BLM wants to do. Second, Multiple Use requires a special balance between use and protection of resources. When attempting to strike that balance, look for ways to maximize uses. Oil and gas and other commercial uses should be viewed as an opportunity to enhance adjacent recreational uses. Utilize the analysis required for "clearance" of existing and proposed recreation infrastructure (trails, trail heads, campsites etc.). Aggressively mitigate impacts. Promote an ethic of 'shared use' instead of restrictive zoning. | See response to comment 121-9. |
| Bookcliff Rattlers Motorcycle Club | 208 | 2 | Alternative D has less of an emphasis on motorized recreation than Alternative C. There is no arguing this point. Although D designates a few more miles of trail and gives motorized users a tad more open area in White Wash and the focus area, it negates all that by putting the hugely popular Westwater area in an ERMA!<br><br>All of the Alternatives represent a huge reduction in motorized recreation. It is our understanding that NEPA and BLM's planning regulations require a wide range of Alternatives. Based on the DEIS and the other | The DRMP/EIS identifies 6,199 miles of inventoried routes in Alt A; 2,871 miles of inventoried routes are excluded from any of the action alternatives because there was no purpose and need for these routes. Alt C designates 3,693 miles of full-sized vehicle routes and 282 miles of motorized single track. Alt D includes 3,855 miles of full-sized vehicle routes and 340 miles of motorized single track. Therefore, Alt D provides more motorized opportunities than does Alt C.<br><br>The commentor's assertion that placing the Westwater |

| | | | | |
|---|---|---|---|---|
| | | | materials provided for review, it looks as if vegetation and wildlife indicators are trending upward and BLM is meeting its sustainability goals, despite a prolonged drought. It seems to us then that there is a responsibility, if not a legal mandate, to at least consider one Alternative that didn't represent a huge loss to motorized uses.<br><br>Regarding labeling Alternative D as "emphasizing motorized uses:" doesn't NEPA require that a DEIS be accurate in describing the agency's proposals? This seems to be a major problem. How will this be addressed in the final DIES without requiring additional public comment?<br><br>BRMC Recommendation:  BLM should develop another alternative that truly DOES emphasize motorized recreation by NOT effectively closing off large areas to it. | area in an Extensive Recreation Management Area (ERMA) negates the additional miles of motorized routes and open areas in Alternative D is incorrect.  The Westwater area is in a ERMA under the current plan (Alt A).  Travel management in the Westwater area is less restrictive under Alternative D than under Alternative C, although Alt C is more restrictive than Alt A.<br><br>The commentor's assertion that all the action alternatives represent a "huge loss" in motorized recreation is incorrect.<br>Although 2,871 miles of inventoried routes were eliminated between Alt A and the action alternatives, these routes were determined to have no purpose and need primarily because they were redundant or received virtually no use.  The comment assumes that the motorized recreation opportunities in the action alternatives are inadequate to meet current or anticipated future demand.   The BLM in Chapter 4 admits that all the action alternatives reduce motorized recreation opportunities, but that Alternative D emphasizes motorized use relative to the other action alternatives.<br><br>NEPA and CEQ require that BLM provide a reasonable range of alternatives in the DRMP/EIS, and the BLM asserts that it has done so.  As described in Appendix G, the BLM's travel plan formulation attempts to balance transportation needs (including motorized recreation) with other resource uses and protections. |
| Bookcliff Rattlers Motorcycle Club | 208 | 3 | Putting a requirement to erect miles of fences across the dune field in the RMP is problematic.  The obvious question is; if your RMP says "…the dune field cottonwood trees and White Wash water sources which would be closed to motorized travel and fenced," and that proves to be unworkable, would it take an RMP amendment to alter the plan? | Alt C and Alt D of the DRMP/EIS designate the White Wash area as open to cross country travel.  Fencing of the Cottonwood trees and water sources is an implementation action to protect these resources and does not require a land use planning decision.  The White Wash area would remain open to cross country travel unless the status is changed through an amendment to the land use plan. |

| | | | | |
|---|---|---|---|---|
| | | | BLM is concerned about the cottonwood trees, BRMC suggests that this concern be addressed in the RMP. This recommendation is based on the success the BLM has had in 10 Mile Wash.  The White Wash RMP could direct that, in "wet areas" travelways would be marked so as to minimize or eliminate impacts on young cottonwood trees. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 4 | The open area (at White Wash Sand Dunes) should be located along easily identified roads, as these are easier to locate and enforce.  We have reviewed and support the "encourage/allow /prohibit" plan proposed by the Blue Ribbon Coalition.  Not all cross country use occurs on the sand field.  There is a great deal of vehicle travel that will now be limited to designated roads.  Making that kind of change in use is hard to do overnight.  BRC's plan basically freezes the use as it is now, allows BLM to close areas should that be needed and directs review and analysis of the existing routes and their possible incorporation into the Travel Plan.  This sort of approach will be needed for proper implementation of BLM's plan. | See response to comment 123-35. |
| Bookcliff Rattlers Motorcycle Club | 208 | 5 | The BLM should remove the section requiring the Special Recreation Permit idea, and instead insert guidance to pursue funding sources, including but not limited to potential free programs at the White Wash Sand Dunes.  Implementation of this proposal will be difficult and perhaps unworkable. | See response to comment 123-10. |
| Bookcliff Rattlers Motorcycle Club | 208 | 6 | The BLM should not establish designated camping areas except in highly-developed areas.  The BLM has failed to designate spurs to campsites along the Ruby Ranch road near White Wash, leaving nowhere for users to camp.  This plan cannot be successfully implemented, and clearly demonstrates the flow in attempting to limit vehicle camping to designated sites only.

In addition, the DEIS does not sufficiently analyze the | A specific purpose and need of route designation in the alternatives for the Travel Plan was recreation opportunities and experiences which includes dispersed camping (see pg. G-12 of the DRMP/EIS).  The open area to the west side of the White Wash Sand Dunes has been enlarged to accommodate the camping that occurs to the south of the oil well.

The commentor's suggestion of a 300 foot wide area along designated motorized travel routes would effectively |

| | | | | |
|---|---|---|---|---|
| | | | impacts to dispersed camping, nor does it provide a wide range of Alternatives to address dispersed camping.<br><br>BRMC Recommendation:  Vehicle use be allowed 300 feet off designated roads for dispersed camping and vehicle use should be allowed on spurs that lead to an existing campsites. | greatly increase the acreage open to cross-country travel, which is inherently incompatible with the intention of moving to a system of designated routes.  The 300 foot area would result in unacceptable impacts to a number of natural and cultural resources.<br><br>See also responses to comments 120-83 and 120-86. |
| Bookcliff Rattlers Motorcycle Club | 208 | 7 | The DEIS should establish additional areas for competitive use.  Additional competitive routes should be established to create user variety and provide rest and rotation for other resources.  The permitting process and associated fees should be minimized. | In Alt C and Alt D of the DRMP/EIS, the Dee Pass Motorized Trail Focus Area (within the Labyrinth SRMA) has been identified as the area for competitive motorized events.  On pg. 2-25 it states: "competitive routes within this area would be identified based on site-specific NEPA analysis."<br><br>The BLM will continue to follow the NEPA process and its Special Recreation Permit (SRP) policies and fee structures for all events which fall under its jurisdiction. |
| Bookcliff Rattlers Motorcycle Club | 208 | 8 | All of the action alternatives fail to supply a sufficient number of OHV routes to meet existing demand.  There needs to be some process to consider adding routes to the Travel Plan, either in the FEIS or under subsequent site specific planning. | The commentor provides no data to support the assertion of an insufficient supply of OHV routes to meet existing demand.  Furthermore, the BLM must consider all resources and resource uses under the multiple use mandate of the Federal Land Policy and Management Act, of which motorized recreation is only one.  See responses to comments 208-2 and 208-6.<br><br>The DRMP/EIS specifically allows for the addition of routes to the Travel Plan.  The document states on p. 2-48 that the Travel Plan "may be modified through subsequent implementation planning and project planning on a case-by-case basis". |
| Bookcliff Rattlers Motorcycle Club | 208 | 9 | BLM should identify routes suitable for ATVs in its travel plan, rather than passively assuming that many of the OHV routes submitted in scoping are motorcycle-only.<br><br>The FEIS should consider designating more ATV trails. | The BLM has incorporated the commentors suggestion for a change in route use involving ATVs in the PRMP/EIS. See response to comment 120-90.<br><br>See also responses to comments 208-8 and 122-30 regarding the process for designating new routes. |

| | | | The BLM should identify routes as "roads, primitive roads, or trails". | See response to comment 123-7 for a discussion of BLM road terminology. |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 10 | There needs to be a mechanism built into the plan that allows for construction of new trails. | See responses to comments 122-30 and 208-8. |
| Bookcliff Rattlers Motorcycle Club | 208 | 11 | The plan should allow that wash bottoms be open to OHV use. These make challenging and interesting trails that naturally repair themselves after rain events and which are generally not visible to the public. | In formulating the alternatives for the Travel Plan in the DRMP/EIS, the BLM considered route designation by weighing purpose and need against resource conflicts. Floodplain and riparian areas were identified as resource conflicts that inventoried routes were weighed against. Travel in washes degrades stream banks, leads to accelerated flood velocity and erosion (see pg. G-24) See also response to comment 122-14.<br><br>The commentor provides no site specific information pertaining to motorized travel in wash bottoms.<br><br>See also response to comment 208-8. |
| Bookcliff Rattlers Motorcycle Club | 208 | 12 | The plan should stipulate that for every mile of trail closed, there must be another mile of new equivalent trail opened. | The commentor has not provided any site specific information on proposed additional routes to be added to the Travel Plan.<br><br>There are no laws, policies, or directions which require the BLM to substitute new routes for routes closed. |
| Bookcliff Rattlers Motorcycle Club | 208 | 13 | BRMC requests that BLM consider an additional SRMA – "Wild Cow Wash" – in the Final Plan.  We believe that there is a need to plan for a motorized singletrack trail system surrounding Wild Cow Wash beneath the Bookcliffs.  This SRMA should extend north into the Bookcliffs proper. | The recreation use in the eastern Bookcliffs (referred to by commentor as Wild Cow Wash) is not at a high enough level to warrant a Special Recreation Management Area designation.<br><br>The commentor has not provided any site specific information on proposed additional single track routes to be added to the Travel Plan.<br><br>The BLM identified through scoping a large number of |

| | | | | |
|---|---|---|---|---|
| | | | | recreation issues.  Based on these issues, the BLM developed a variety of Special Recreation Management Areas (SRMAs), as well as a variety of focus areas. These SRMAs and focus areas are designed to address a number of recreation needs, and the process is described in Chapter 4, page 192, of the DRMP/EIS.  The BLM believes that it has incorporated an adequate range of recreation opportunities in its action alternatives.  During the scoping period for the land use planning process, the BLM did not receive any comments identifying a need for the SRMA suggested by the commentor nor for the accompanying motorized trail system.  See response to comment 208-8. |
| Bookcliff Rattlers Motorcycle Club | 208 | 14 | The SRMAs that have a motorized focus should say they have a motorized focus. The only references to OHV use for the Labyrinth Rims SRMA is; "quality on-route mountain biking and backcountry driving experiences on established routes throughout the SRMA."  We understand this accurately describes some of this SRMA, but there is nothing in this management goal about trail based OHV use, or open riding on dunes, which are the predominant activities in much of the SRMA.  BRMC Recommendation: The Utah Rims, Labyrinth Rims and Cameo Cliffs all have an OHV focus. Trail based OHV recreation should be emphasized in all of the guidance, especially the management goals.  In motorized SRMA's, provisions for constructing new trails should be incorporated into the RMP. | The commentor is confusing the Labyrinth Canyons Special Recreation management Area (SRMA) with the large number of Focus Areas within this larger SRMA.  It is incorrect to say that the entire SRMA has a "motorized focus".  There are three areas within this SRMA that have the type of OHV-oriented focus that the commentor desires -- the White Wash Sand Dunes Managed Open Area (Alts C and D of DRMP/EIS), the Dee Pass Motorized Trail Focus Area (Alts. C and D) and the Gemini Bridges Motorized Touring Area (Alt. C).  The commentor's assertion that trail-based OHV use and open riding on dunes are the predominant activity in much of the SRMA is an inaccurate representation of how the SRMA would be managed under any of the action alternatives.  Additionally, it is not correct to label the Utah Rims as an OHV SRMA, as the DRMP/EIS specifically describes the management objectives for that particular SRMA as providing OHV, mechanized and hiking opportunities.  The Cameo Cliffs SRMA is described in the DRMP/EIS as providing a motorized/designated trail system. |

BLM_0011834

| | | | | As far as creating new routes are concerned, see response to comment 208-8. |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 15 | BRMC supports the adoption of this recommendation from RWR with modifications.  Utah Rims SRMA ought to extend further southwest to the Cisco Road.  From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Mel's Loop and associated singletracks.  From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat.  A non-mechanized focus area could be developed in the Westwater WSA but leaving the spur road to Big Hole open to motorized users.  The Westwater Canyon overlook road should not be closed. Mechanized visitors should be allowed at least these two viewpoints of the place that their activities are prohibited from. | See response to comment 122-39 regarding Utah Rims SRMA.  Concerning the creation of new routes, see response to comment 208-8.  The routes the commentor does not want closed are left open to motorized use in Alternative D. |
| Bookcliff Rattlers Motorcycle Club | 208 | 16 | BRMC supports the adoption of this recommendation from RWR with modifications.  Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation.  Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus.  Few adjustments are needed to the travel plan, except around Owl Canyon where Road access should be preserved.  A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge.  Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | See response to comment 122-38 regarding Yellow Cat, Yellow Jacket, and Dome Plateau.  Several of the routes of concern to the commentor are designated for motorized use in one or more of the action alternatives for the Travel Plan in the DRMP/EIS. |
| Bookcliff Rattlers Motorcycle | 208 | 17 | BRMC supports the adoption of this recommendation from RWR with modifications.  The Black Ridge area presents many potential recreation opportunities nearby | See responses to comments 122-43 and 208-8 the proposed Black Ridge Special Recreation Management Area and the addition of routes. |

BLM_0011835

| Club | | | Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the variety of terrain, and provides enough room for a full-day's ride. Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exits in Pole Canyon from the power lines to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the power lines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the power line, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 18 | BRMC supports the adoption of this recommendation from RWR with modifications. Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area. | See response to comment 122-44. |
| Bookcliff Rattlers Motorcycle Club | 208 | 19 | BRMC supports the adoption of this recommendation from RWR with modifications. Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to construct a Kokopelli Single track and mark a Kokopelli two track that would roughly parallel one | See response to comment 122-30. |

BLM_0011836

| | | | | |
|---|---|---|---|---|
| | | | another.  Through Utah Rims, the single track should be open to motorcycles.  Through Yellow Jacket, the single track should actually be an ATV trail.  Everywhere else, the single track should be non-motorized.  The two track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 20 | BRMC supports the adoption of this recommendation from RWR with modifications.  The single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads.  The Seven Mile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa campground.  Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See responses to comments 122-34 concerning the areas discussed by the commentor and 208-8 concerning the addition of new routes. |
| Bookcliff Rattlers Motorcycle Club | 208 | 21 | BRMC supports the adoption of this recommendation from RWR with modifications.  The non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails.  This northwest corner of the Book Cliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development.  Similar to bike trails in Fruita a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | See responses to comments 122-31 concerning the area northeast of Green River and 208-8 concerning the addition of new routes. |
| Bookcliff Rattlers Motorcycle Club | 208 | 22 | BRMC supports the adoption of this recommendation from RWR with modifications.  An additional bicycle focus area west of South Fork Seven Mile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini | See response to comment 122-35 regarding the area south of Highway 313.<br><br>The very short spur route to Gemini Bridge has been closed to motorized use in one or more action alternatives due to resource conflicts identified by the BLM in its Travel Plan formulation.  This process is described in detail in Appendix G of the DRMP/EIS. |

| | | | Bridges should remain open to allow the unique experience of driving the bridge.  Mountain bike alternatives to the roads could be developed in this area, as proposed by Trail Mix.  The Gold Bar hiking area could be expanded further up Day Canyon, while only closing one spur road. | |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 23 | BRMC supports the adoption of this recommendation from RWR with modifications.  The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track.  Most spur roads could be closed east of Bar M and Sovereign Trail areas.  Still, the Sovereign ATV Loop should be permitted in its current location.  Spur roads should also be closed north of the Copper Ridge Sauropod Trackway.  Copper Ridge Motorcycle Loop is highly valuable to motorcyclists.  Trail adoption could help to ensure enjoyment for mountain bikers, like Sovereign Trail.  And like Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | See response to comment 122-36. |
| Bookcliff Rattlers Motorcycle Club | 208 | 24 | BRMC supports the adoption of this recommendation from RWR with modifications.   The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing two less-valuable spurs, Big Triangle substantially expands the West Water road less area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems.  Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | See response to comment 122-40. |
| Bookcliff Rattlers | 208 | 25 | BRMC supports the adoption of this recommendation from RWR with modifications.  The Sand Flats Road | See response to comment 122-41. |

| | | | | |
|---|---|---|---|---|
| Motorcycle Club | | | traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system.  Thus, OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement.  The new, reduced speed limit of 25 mph should be preserved. A  non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼-mile slick rock route connecting Slick Rock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road. All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 26 | BRMC supports the adoption of this recommendation from RWR with modifications.  Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slick rock riding areas in the Slick Rock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions).  In these areas, travel could be further restricted, but not so drastically as the draft RMP intends.  Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher slickrock which would be reserved for non-motorized use.  This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | See response to comment 122-48 |
| Bookcliff Rattlers Motorcycle | 208 | 27 | BRMC supports the adoption of this recommendation from RWR with modifications.  In the ERMA, Thompson Trail is unique by virtue of its sheer length and | See response to comment 122-29. |

| Club | | | remoteness. Trail adoption by volunteers could preserve its single track character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Tail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These single track trails should be preserved, along with adjacent two-tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | |
| Glen Canyon Group | 209 | 1 | The Draft is comprehensive but extremely complicated and not well cross-referenced. | See response to comment 123-14. |
| Glen Canyon Group | 209 | 2 | Since eight months were allowed for the scoping process, it is still hoped that a similar amount of time will be allotted for this review and comment period. In the event that – as we've requested, an extension is granted, we will amend, extend and resubmit our Comments. | The BLM has provided the public with 90 days in which to review and comment on the DRMP/DEIS. The standard comment period for an EIS is 45 days in accordance with the Federal Council on Environmental Quality regulations. Thus, double the amount of time has been provided to comment on the DRMP/DEIS. BLM has made the DRMP/EIS available, free of charge, in a variety of mediums, including paper, CD, and online. In addition, BLM staff has offered to meet individually with groups or individuals to explain the Draft RMP/EIS and help focus review and comment efforts. Finally, BLM held four open houses around the State to facilitate review of the Moab DRMP/DEIS. |
| Glen Canyon Group | 209 | 3 | Given impacts of Alternative C, Alternative B should be the preferred alternative. The Executive Summary concludes that Alternative C was chosen as the preferred alternative based on: 1) Balance of use and protection of resources, and 2) Extent of the environmental impact. (Page ES-8) In our view, BLM's "preferred alternative" is not balanced and in fact abnegates their responsibility to protect the resources entrusted to their care in favor of satisfying the demands of off-roaders and oil/gas interests. As for "extent" of impact, the Draft RMP/EIS demonstrates that the Conservation Alternative (B) would produce less | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must |

| | | | total impact on the environment and definitely fewer adverse impacts than C. | balance competing resources within its sustained yield, multiple use mandate.<br><br>See also response to comment 121-1. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 4 | Labeled as the major issue identified during the scoping process was "Issue 1. – Recreation Use and OHVs – How can increased recreation use, especially motorized vehicle use, be managed while protecting natural resource values?" The RMP/EIS does not address both parts of the question. It is not balanced. A balanced plan would look to the future with protection as the primary aim, would listen to all legitimate voices, and would actually manage – not just recognize, the use, overuse, and abuse of natural resource values. A balanced plan that would be easier to decide and easier to defend, would be one that does the right thing – it upholds and holds fast to the paramount goal: Quality Environment. | This is not a comment that the BLM can respond to, but a statement of opinion. Also see response to comment 209-3. |
| Glen Canyon Group | 209 | 5 | We are dismayed that the Travel Management Plan has so many miles of road that the roads cannot be adequately patrolled or monitored by the BLM staff. | The issue raised by the commentor is one of implementation. See responses to comments 124-120 and 124-122. |
| Glen Canyon Group | 209 | 6 | We are also dismayed that although Grand County was closely consulted on all road decisions, BLM was aware that the County representative, Jerry McNeely, was consulting only with the motorized users and not with the "quiet" users. We feel totally disenfranchised from the process of selecting open and closed roads. A balanced travel plan is not developed by just consulting with OHV drivers.<br>    As shown on Table 8 of Appendix G (pages G-20 and G-21), numerous routes and segments of routes were added to the database, but BLM completely rejected the recommendations of the Red Rock Heritage Travel Plan on the excuse that there are conflicts with Grand County's road inventories.<br>    BLM even failed to examine the information available to them in draft form from the National Visitor | The BLM's Alternative C was supported by the entire Grand County Council, and not just one representative. As described in Appendix G, The DRMP/EIS used a systematic interdisciplinary approach fully considering physical, biological, economic, and social aspects of management actions for the range of alternatives. The BLM did not rely on the counsel of any one individual; the DRMP/EIS is the BLM's plan, and not that of any of the BLM's cooperating agencies.<br><br>See response to comment 124-9, explaining the several reasons for the BLM's rejection of the Red Rock Heritage Travel Plan. It is worth noting that the commentor's earlier comment complaining that the BLM would not be able to patrol all the miles of routes in the action alternatives, yet supports a plan with more miles of routes |

| | | | Use Monitoring study conducted by the MFO in FY 2006, which described numbers, motives, likes and dislikes and other characteristics of quiet users – hikers, bikers, boaters, and visitors driving for pleasure. | than any of the BLM's action alternatives.<br><br>See response to comment 124-2 concerning the BLM's incorporation of NVUM data into the plan. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 7 | BLM must be much more proactive on this Travel Management Plan, and anticipate the next two decades of motorized recreation. This RMP is the perfect time to actually put some "teeth" into what BLM refers to as a Travel Management Plan, but which appears to be just a Travel Plan. The Final RMP should do more than state where vehicles can go and where they can't go – It needs to provide meaningful management and enforcement. BLM should include in the Travel Plan the possibility of permits and temporary and permanent closures throughout the MFO area.<br>　　BLM has proved over the past 5 years of the Easter Jeep Safari that they can both monitor usage and manage travel. They set up a monitoring plan with specific goals and objectives, with before and after examination of effects over a 10-day period of high road usage. As they analyzed the results, they instituted one-way travel, exclusive use (ie permitting) and educational tools for keeping vehicles where they are permitted. This experience should be used as a model for monitoring the designated roads in the RMP. | The issues raised by the commentor are implementation issues.  See responses to comments 124-120, 124-122 and 120-95. |
| Glen Canyon Group | 209 | 8 | Using Scoping Comments to develop Travel Plan<br>As reflected in the Scoping Process Report, 2004, the great majority of those sending letters and emails called for restrictions on OHV travel, for unambiguous designation "on the ground," education of users, for closing unnecessary routes, and monitoring and enforcement. A small minority asked for increased access, playgrounds and open areas, and for no closure of routes, tracks and trails.<br>　　Similar sentiments were found in a survey of Grand County residents in February of '05 regarding tourism and off-road vehicle (ORV) activities. The poll | The BLM has addressed the concerns raised in scoping through its Travel Plan formulation.  The DRMP/EIS specifically addresses the desires of non-motorized recreationists and the impacts created by OHV use, especially cross-country travel.  See responses to comments 124-4 and 124-34. |

| | | | | |
|---|---|---|---|---|
| | | | showed that 63.5% of residents thought tourists were bothered by ORV activity. Forty percent thought that tourists came to the area for non-ORV recreation; 44.5% thought tourists were evenly divided between motorized and non-motorized sports enthusiasts, while only 6.5% thought most tourists came primarily "to play in an off-road vehicle." ("Results announced from local survey," Moab Times Independent 3/3/2005) | |
| Glen Canyon Group | 209 | 9 | Implementation and Project Planning<br>BLM defers modifications/adjustments of designated routes until "implementation and project-planning " phases through "a collaborative process involving local governments and the public. The impacts to travel management would be beneficial in the long-term because potential travel-related resource use conflicts would be identified and satisfactorily resolved since the route modification process would include interested and/or concerned stakeholders." (Page 4-405) Need we remind the BLM that this approach was tried and failed. Although carefully constructed for proportional representation of all relevant segments of the community, the County's Access Committee was finally dissolved as the members were unable to reach a consensus on anything. BLM needs to reconsider its approach, perhaps going to a public hearing and appeal process or a mediated decision-making process. | This is an implementation issue.  See responses to comments 124-120, 124-122 and 120-95. |
| Glen Canyon Group | 209 | 10 | ...confusing Table 4.126 OHV Designations by Alternative on page 4-409. The table which contains both acres and miles has four footnotes, of which the second is not referenced in the table itself. "These are the miles of designated routes at time of EISA publication. After the issuing of the ROD, minor adjustments may be made by the MFO to more accurately define the designated routes." BLM should let us know where the superscript belongs in the table, what the definition of "minor" is, and how the public will be involved. | Footnote 2 refers to the bottom two rows of Table 4.126; this has been fixed.  The "minor adjustments" that the commentor wishes defined relate to GIS data smoothing issues, which the BLM would expect (but cannot predict with certainty before the data smoothing is completed) to add up to well less than one per cent in either direction.<br><br>The manner of public involvement is an implementation activity.  The process is described on page 2-48 of the DRMP/EIS. |

| Glen Canyon Group | 209 | 11 | …it is not clear how the final acreage and boundaries were determined for: Behind the Rocks, Coal Canyon, Fisher Towers, Goldbar, Gooseneck, and Westwater Creek. | Table P-1 refers exclusively to areas inventoried during the 1999-2003 Utah Wilderness Inventory, the processes and results for which are fully described in the 1999 publication and the 2003 revision document, both of which have been publicly available for several years. Table P-2 refers exclusively to new wilderness proposals submitted to the BLM by external groups; none of these were included in the 1999-2003 inventory.  Maps for each of these areas, as well as the decision process undertaken by the BLM for each of these areas, are available on the Moab BLM's planning website. |
| --- | --- | --- | --- | --- |
| Glen Canyon Group | 209 | 12 | Above all, it is not explained how the title "Non-WSA Lands with Wilderness Characteristics" was arrived at. Wilderness Character is a stronger term than Wilderness Characteristics and is preferable. Most if these lands disappear partially or entirely into SMRA's, ERMA's, and/or ACEC's and the management protocols of these areas do not explain how their wilderness character/characteristics will be preserved, as required by the Handbook, I.e., "avoid or minimize impacts to wilderness characteristics". | Wilderness character is a term which applies to Wilderness Study Areas and designated wilderness, both of which must be managed to maintain wilderness character.  The term "Non-WSA Lands with Wilderness Characteristics" was an attempt by the state-wide Utah planning team to aggregate, for clarity, the various categories of lands found to possess wilderness characteristics (Wilderness Inventory Areas, external wilderness proposals, Reasonable Probability Determinations). These lands are then distinguished from Wilderness Study Areas, whose management is beyond the scope of the current planning effort.<br><br>Those lands which have overlapping management protocols will be managed under the most restrictive protocol, should the various protocols be in conflict. Thus, lands being managed to protect wilderness characteristics will have the necessary protocols to accomplish that objective, regardless of overlapping planning decisions.<br><br>Under at least one alternative in the DRMP/DEIS, all lands identified by BLM as having wilderness characteristics would be managed to protect the naturalness of the areas and the opportunities for solitude and primitive recreation.  Protecting the wilderness |

| | | | | characteristics would include, among other restrictive management prescriptions, making them unavailable for oil and gas leasing and closing the area to OHV use.  The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process.  In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 13 | Map 2-24-B Volume 3 shows WSA's in faint dots and Areas with Wilderness Characteristics in brighter dots and bold outlines. But they are not identified. It would have been easy to put the names of the designated areas on the map, as was done with other maps. (See, for example, Map 2-4 Grazing Allotments.) This very important map must be printed on an 11x14 inch page with all the areas clearly identified. | Detailed maps of each area are available either in the 1999 Utah Wilderness Inventory or (for areas proposed since 1999) on the Moab BLM's planning website.  The level of detail suggested by the commentor would be so great as to make any printed map smaller than plotter size almost unreadable.  This is because many of the areas in question are quite small "add-ons" to existing Wilderness Study Areas or National Park Service areas that are administratively endorsed for wilderness. |
| Glen Canyon Group | 209 | 14 | ...there should be individual maps of each Non-WSA Land with Wilderness Characteristics showing their boundaries and the portions of each which would be covered by SMRA's, ERMA's, and ACEC's, and clearly showing the overlaps, as well as portions which are outside these proposed management designations. Include them in the Final RMP/EIS. | The GIS data underlying this request is available to the public upon request. |
| Glen Canyon Group | 209 | 15 | RE: Impact of Lands and Realty Management Decisions – Section 4.3.8.2.3, Pages 4-113 to 4-117, Table 4.48, Pages 4-114 and 4-115<br>          Table 4.48 makes it clear that Alternative B would exclude all 32 areas from Rights of Way (ROW) | On non-WSA lands with wilderness characteristics that are not in avoidance or exclusion areas for rights-of-way, all applications for rights-of-way would be considered on a case-by-case basis and the project would be analyzed in an appropriate NEPA document  to determine if the |

| | | | | |
|---|---|---|---|---|
| | | | being established under the rubric of Lands and Realty Management Decisions. Under Alternative C, however, only a fourth of the Beaver Creek area would be excluded from ROWs. The rest of Beaver Creek and all of the remaining areas would be ROW "avoidance." In all areas except Gooseneck, Mill Creek Canyon, and Shafer Canyon, the number of acres of avoidance is less than the total acreage with wilderness characteristics. The text does a poor job of explaining what happens to the remaining acreage which would presumably be open to powerlines, pipelines, and othe utility corridors. | project would be authorized and under what conditions. |
| Glen Canyon Group | 209 | 16 | RE: Impact of Lands and Realty Management Decisions – Section 4.3.8.2.3, Pages 4-113 to 4-117, Table 4.48, Pages 4-114 and 4-115          We noticed in the Executive Summary that "rights of way" covered more than these utility corridors, per the sentence. "Other land uses within the planning area include rights-of-way (ROWs) for roads, pipelines, powerlines, and communication sites, film permits, and livestock grazing." (page ES-7) The Glossary similarly includes roads in the definition of ROWs. The Final RMP/EIS should convey the more restrictive definition from the Lands and Realty sections. | Title V of FLPMA provides authority for issuance of rights-of-way for various uses over, upon, under, and through the public lands, including roads, pipelines, powerlines, and communication sites.  The definition is beyond the scope of the plan. |
| Glen Canyon Group | 209 | 17 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129.          Table 4.53 on pages 4-120 through 4-123 of Leasing Stipulations is very misleading in that it lists all non-WSA areas as "closed" under Alternative B. However, quite a few of these areas contain portions which are currently leased – Arches Adjacent, Coal Canyon, Dead Horse Cliffs, Dome Plateau, Floy Canyon, Flume Canyon, Goldbar, Hatch Wash, Hatch/Lockhart/Hart, Hells' Hole, Hideout Canyon, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Lost Spring Canyon, Mexico Point, Shafer Canyon, Spruce Canyon, Westwater Creek, and Yellow Bird. | The land use plan makes decisions for new leasing actions.  Valid existing rights (previous leases) are recognized regardless of plan decisions. |

| | | | | |
|---|---|---|---|---|
| | | | The Plan should include the number of leases per area and just the acreage. | |
| Glen Canyon Group | 209 | 18 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. It is good to know that leases that are not developed or held in production will expire after 10 years under Alternative B. Presuming that the 10-year "clock" began running at the time of initial lease, the plan should include information on each current lease in each of the areas listed above, and the year that lease was granted. | The commentor's suggestion to close all areas currently not leased to new leasing "now" would require a plan amendment to the Grand RMP.  The current planning effort is a revision of the Grand RMP. What the commentor requests is basically adopting Alternative B without completing the planning process and proceeding to the Record of Decision, which the BLM clearly cannot do.  See also response to comment 124-98. |
| Glen Canyon Group | 209 | 19 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. BLM should improve their "Preferred Alternative" by reducing the acreage designated Standard stipulation and increasing or stipulating No Surface Occupancy in Coal Canyon, Desolation Canyon, Dome Plateau, Floy Canyon, Hatch Wash, and Lost Spring Canyon. We would like to see Behind the Rocks, Fisher Towers, Goldbar, Hunter Canyon, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Shafer Canyon closed to leasing. (We have noted that some of the areas which should be closed are projected by BLM to be low productivity for drilling, but when these leases expire, no new leases should be granted in these sensitive and popular areas.) | Some of the areas mentioned by the commentor would be managed as no surface occupancy for oil and gas leasing in Alt C, the preferred alternative.<br><br>The BLM must manage for multiple uses, only one of which is the protection of wilderness characteristics. |
| Glen Canyon Group | 209 | 20 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. Since BLM cannot predict the invention of new techniques for extraction of oil, gas and minerals, areas which do not have existing leases should be closed now, while there is no interest in them, to protect them in the future. | The commentor's suggestion to close all areas currently not leased to new leasing "now" would require a plan amendment.  What the commentor requests is basically adopting Alternative B without completing the planning process and proceeding to the Record of Decision, which the BLM clearly cannot do.  See also response to comment 124-98. |
| Glen Canyon Group | 209 | 21 | Bottom third of page 4-129 and first paragraph on page 4-130 Comment: We cannot determine where this summary referring to Oil and Gas (Section 4.3.8.2.5.1) belongs. If it is intended to come before, not after Section | The wells referred to for coal-bed methane are included in the projection of oil and gas wells in general on pg. 4-119.<br><br>The Behind the Rocks area would be managed as no surface occupancy in Alt C, thus prohibiting the disposal |

BLM_0011847

| | | | | |
|---|---|---|---|---|
| | | | 4.3.8.2.5.2 Coal-bed Methane, then the numbers of wells to be drilled in one and 15 years under each alternative, and the amount of acreage disturbed do not correspond with Table 4.52 on page 4-119. This should be corrected or clarified in the Final RMP.<br><br>Alternative C should echo Alternative B and limit development of salable materials sites in Horsethief Point and Behind the Rocks. | of salable minerals.  The Horsethief Point area would be managed as open with timing limitations, allowing the disposal of saleable minerals within certain time frames. |
| Glen Canyon Group | 209 | 22 | 4.3.8.2.5.5 Locatable Minerals (Uranium and Vanadium) Page 4-131<br>Comment: Map 3-6 displays the presence of uranium/vanadium deposits with development potential. Few permitted mines are shown on the map (mostly in San Juan County), but apparently there are many "prospects" for mines. Although eight of the lands in question are located within areas of moderate potential, there are existing claims in only two of them – Beaver Creek and Goldbar. But there are existing claims in an additional four areas  - Floy Canyon, Dome Plateau, Hatch/Lockhart/Hart and Hatch Wash. The Map should display the locations of existing claims. | Utanium and vanadium are classified as locatable minerals. A land use plan cannot withdraw lands from locatable minerals operations.  This decision requires the action of the Secretary of the Interior. |
| Glen Canyon Group | 209 | 23 | 4.3.8.2.5.5 Locatable Minerals (Uranium and Vanadium) Page 4-131<br>Under all alternatives, such mines (uranium/vanadium) should not be permitted in Non-WSA Lands with Wilderness Characteristics as they are not permitted in Wilderness Areas. | The BLM cannot withdraw from mining any area unless formally approved by the Secretary of the Interior.  To even recommend withdrawal from all area with wilderness characteristics across all alternatives would essentially carry the major management decisions of Alternative B across all alternatives.  This would overly reduce the range of options for analysis across the action alternatives.<br><br>Also see response to comment 209-3. |
| Glen Canyon Group | 209 | 24 | Re: 4.3.8.2.6 Impacts of Decisions, 4.3.8.2.6.2 Alternative B, and 4.3.8.2.6.3 Alternative C, Pages 4-132 to 4-133<br>Eight prescriptions are provided. The first should be "Visual resource management (VRM) no lower than | To even recommend that all areas with wilderness characteristics across all alternatives be managed as VRM II would essentially carry the major management decisions of Alternative B across all alternatives.  This would overly reduce the range of options for analysis |

| | | | Class II (see comments regarding Table 4.55 on pages 4-154 through 4-156).<br><br>These prescriptions should also apply to other popular hiking attractions for local residents and tourists alike. To decrease avoidable impacts, Alternative C should specify ROW exclusion, not just avoidance. | across the action alternatives.<br><br>See response to comment 209-15 for a discussion of avoidance areas. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 25 | Re: 4.3.8.2.8 Recreation Decisions – SRMAs, Pages 4-134 to 4-138; also, Volume I, Chapter Two, Table 2.1 Pages 2-2-18 to 2-29.<br><br>The overall management plan described on page 2-18 and corresponding maps 2-8-B and 2-8-C seem well thought out but much too general. Since all 21 non-WSAs Lands with Wilderness Characteristics and portions of seven others are subsumed within SMRAs , it is imperative that their management needs be specifically and separately addressed. | The purpose of SRMA management is to control and provide for recreation use.  The management of non-WSA lands with wilderness characteristics is to protect natural values and to provide opportunities for solitude and primitive recreation.  Many of the 21 wilderness characteristics areas do lie within the boundaries of SRMAs.  Many of these wilderness characteristics areas are proposed to be utilized for hiking and other non-motorized opportunities.  See the discussion of Focus Areas for the recreation management proposed for these areas. |
| Glen Canyon Group | 209 | 26 | Re: 4.3.8.2.8 Recreation Decisions – SRMAs, Pages 4-134 to 4-138; also, Volume I, Chapter Two, Table 2.1 Pages 2-2-18 to 2-29….as stated in line 29 of page 2-18 "where a specific RMZ (or Focus Area) is not identified within an SRMA, the focus of that area is motorized, backcountry touring on designated roads." Why not make it non-motorized? We are greatly concerned that hiding most of the Non-WSA Lands with Wilderness Characteristics within Special Recreational Management Areas will essentially result in their annihilation. | See response to comment 209-12. |
| Glen Canyon Group | 209 | 27 | Re: The Bookcliffs SRMA,<br>There's an inconsistency in the RMP/EIS making the Bookcliffs SRMA a non-mechanized focus on page 2-18 (Alternative B) and non-motorized per page 4-135? | This is an error in Chapter 4 and has been changed to read "non-mechanized in both chapters. |
| Glen Canyon Group | 209 | 28 | Re: The Bookcliffs SRMA,<br>         We see no reason for Alternative C to designate the Bookcliffs an Extension Recreation Management Area (ERMA) rather than a SRMA since – | The commentor's desire to have the Bookcliffs designated a non-mechanized SRMA in Alt. C is noted. |

|  |  |  | according to Chapter four, specific management would be the same, and since BLM would avoid having to amend the Plan at a later date to accomplish this change. (page 4-136 and 4-137) |  |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 29 | Re: Canyon Rims SRMA, Focus Area: Scenic Driving Corridors on page 2-19: Defining widths of corridors from the centerline – rather ¼, ½, or 1 mile is arbitrary. These corridors should be based on the unique values in each area, including terrain, visibility, and line of sight of scenic vistas. | A distance was provided as a guideline for VRM II management in the preferred alternative.  Controlled surface use would be applied for the widths discussed in each alternative. |
| Glen Canyon Group | 209 | 30 | Re: Colorado Rivers SRMA: Alternative C should be expanded to include the entire Top of the World area and….should protect all 12,510 acres of Negro Bill Canyon as a day-use only area set aside for a hiking and ecological study focus. (Alternative C protects only 8,684 acres – page 2-21.) For boating management in the Colorado River, Two Rivers and Dolores River SRMAs, Alternative C should be the same as Alternative B in stating that no restrictions on private use would be established unless unacceptable resource impacts occur. | The commentor gives no reason why this SRMA should be expanded in Alt C.

Also see response to comment 209-3.

There is no reason given to restrict Negro Bill Canyon to day use only in Alt C.

A sentence has been added to alternatives C and D for these SRMAs stating that no restrictions on private use would be established unless unacceptable resource impacts occur. |
| Glen Canyon Group | 209 | 31 | Re: Labyrinth Rims/Gemini Bridges SRMA: Defining widths of scenic driving corridors from the centerlines – rather ¼, ½, or 1 mile is arbitrary. These corridors should be based on the unique values in each area, including terrain, visibility, and line of sight of scenic vistas. | See response to comment 209-29. |
| Glen Canyon Group | 209 | 32 | Re: Labyrinth Rims/Gemini Bridges SRMA: Alternative C should establish the Tenmile Hiking and Equestrian Focus area; Tenmile Canyon should be closed to motorized use to ensure protection of cultural resources. Gemini Bridges is a world-class arch, one of the best outside the National Parks. Protect it by outlawing all vehicles on the bridge itself. Close and restore damaged lands in the Canyon under Gemini Bridges. | The commentor's preferences are incorporated in Alternative B.  The BLM can chose from any of the alternatives in formulating the PRMP/FEIS.  Also see response to comment 209-3.

The spur route to Gemini Bridges and the bridges themselves have been closed to motorized use under all action alternatives.  The route accessing the land beneath Gemini Bridges has been closed to motorized use in all |

| | | | | |
|---|---|---|---|---|
| | | | (page 2-25) | action alternatives.  Restoration of this land is an implementation action and does not require a land use plan decision. |
| Glen Canyon Group | 209 | 33 | Re: Labyrinth Rims/Gemini Bridges SRMA: Dee Pass (Alternative C): The Section 106 cultural resources inventory should be done before, not after, designation as a motorcycle/ATV "specialized sport venue," in order to protect all eligible sites. This should apply to existing and new routes as well as granting permits for competitive events. (page 2-25) | As stated in Washington Office Instruction Memorandum 2007-030, Section 106 cultural clearances are only required for decisions  proposing new routes or designating new open OHV areas, neither of which is proposed in Alt C. There is no requirement for a Section 106 inventory for competitive events, unless they fall under the exceptions outlined above. |
| Glen Canyon Group | 209 | 34 | Non-mechanized recreation: Steelbender and Pritchett Canyon should be one-way in order to prevent trail widening and damage to vegetation. (page 2-27) | The action requested by the commentor can be done at the implementation level, should the authorizing officer deem it appropriate.  Implementation decisions do not require a land use planning decision. |
| Glen Canyon Group | 209 | 35 | Hidden Valley trail should be hiking only to avoid erosion and user conflicts. The trail is not really conducive to bicycling. This is a favorite hiking trail for visitors and should be maintained solely for tourists and local hikers. (page 2-27) | The BLM monitors the condition of this trail on a regular basis, and has not noted any degradation of the trail which is attributable to mountain bike use. The BLM  has not received complaints regarding user conflicts between bicyclists and hikers.  The trail could be closed to mountain bike use should such use be determined to impair wilderness character.  This action could be undertaken under the Interim Management Policy for Lands Under Wilderness Review.  It does not require a land use planning decision. |
| Glen Canyon Group | 209 | 36 | The descriptions of all of the potential ACEC's carry the disclaimer that "The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation." While this is unfortunately true, we expect BLM to develop and implement approaches to eliminate this problem. If the noise of OHV's continues to disturb users, one possibility would be noise limitations in the form of mufflers especially on motorcycles. | The BLM is required to prepare plans subsequent to signing the Record of decision for the RMP to protect the relevant and important vales associated with any specific ACEC.  Opportunities for solitude and primitive forms of recreation are not a relevant and important value for any ACEC, and management of these areas would not address the noise issue raised by the commentor.  Noise restrictions on mufflers are beyond the scope of the DEIS/RMP. See response to comment.  See response to comment 122-7. |
| Glen Canyon Group | 209 | 37 | Re: Highway 279/Shafer Basin/Long Canyon Potential ACEC In addition to managing rock art for public use with | There is no requirement to carry forward all of the potential ACECs into the preferred alternative.  The BLM's ACEC Manual (1613) requires that all potential |

| | | | | |
|---|---|---|---|---|
| | | | interpretation, the BLM should acknowledge the national significance of the Wall Street Rock Art Site by preparing a National Register Nomination. | ACECs be carried forward as recommended for designation into at least one alternative in the DRMP/DEIS.  Alternative B analyzed the designation of all potential ACECs.  The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS.<br><br>See also response to comment 124-5. |
| Glen Canyon Group | 209 | 38 | The BLM should acknowledge the national significance of the Wall Street Rock Art Site and rock art sites within Mill Creek Canyon by preparing National Register Nominations. | In keeping with the National Programmatic Agreement and individual state BLM/SHPO protocol agreements, the BLM invites SHPO, public, governmental and Native American participation in all planning efforts.  According to the BLM's planning handbook (BLM-H-1601-1), nominating cultural sites to the National Register of Historic Places is not a land use planning decision and is therefore outside the scope of this EIS. |
| Glen Canyon Group | 209 | 39 | Re: Ten Mile Wash Potential ACEC<br>Furthermore, there should be no vehicular travel in Ten Mile at all under any alternative because speed limits cannot be enforced and because it has proven impossible to keep vehicles out of side canyons. For example, repeated re-signing of Trough Canyon has been ineffective. We have hiked the area several times and have seen motorcycle tracks up and down Trough as well as downed signs. | See responses to comments 124-38, 122-18 and 124-21. |
| Glen Canyon Group | 209 | 40 | No new motorized or mechanized travel routes should be established within the Canyon Rims potential ACEC.<br><br>All or portions of several potential ACECs should undergo a Class III cultural resources inventory.  These potential ACECs include Behind the Rocks, Bookcliffs, Mill Creek Canyon, and Upper Courthouse. | This area is limited to designated routes under all alternatives.  Identifying any additional routes could be done on a site-specific basis in the future, and would require site-specific environmental analysis.  The Canyon Rims Recreation Area Management Plan does not call for new OHV routes in this area.<br><br>A Class III inventory is not required as part of the ACEC identification or designation process.  ACEC designation |

| | | | | is sought to protect areas of high cultural occurrence. The BLM may prioritize certain ACECs (or other designations) for a Class III inventory, but the inventory itself is not a planning decision. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 41 | Re: White Wash Potential ACEC …however, we suggest that the BLM retain the option of closing the White Wash Sand Dunes to open use if damage is occurring to the riparian dune system and/or if OHVs are damaging resources outside the open use area. Its proximity to Ten Mile leads to vehicles – especially ATVs, crossing over into more fragile areas. (pages 2-38 and 2-39) | The BLM can change the OHV designation for White Wash from "open" to another category (such as "limited") if conditions warrant, although such an action would require a future plan amendment. |
| Glen Canyon Group | 209 | 42 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6 This section is very hard to fathom as the frame of reference changes back and forth from acres to miles of routes. Who can understand Table 4.54 (page 4-146 and 4-147) when it seems that Alternatives B, C, and D are identical with the sole exception of Long Spring Canyon? Also, the Table may be meaningless anyway because it does not define "limited." It would have been meaningful if it had been presented as was done in Table ES1 by categories: Closed, Limited to Existing, Limited to Designated, and Open. Does the BLM intend to mean "Limited to existing/designated routes," per summary Table 4.59 on page 4-164. | The "frame of reference" changes in the DRMP/EIS from acres to miles of routes because the BLM is required in planning to designate all areas of the planning area as "open", "limited", or "closed". Within the "limited" category, the BLM is encouraged to identify which routes are available for motorized use. These are separate, but related, planning decisions. The commentor is correct in noting that, for most areas in Table 4.54, the acreages are the same across all action alternatives. This is discussed explicitly on page 4-149. The data for Lost Spring Canyon in Table 4.54 is incomplete; alternatives C and Have the same acreage in "limited as in alternative B, and this has been corrected. The term "limited" means "limited to designated routes" for all action alternatives. This is explicitly stated on page 2-48. Table 4.59 includes the "no action" alternative; hence, the use of the label "Limited to existing/designated routes". |
| Glen Canyon Group | 209 | 43 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6 The paragraph on page 4-149 of impacts common to the "action alternatives" (B, C, and D) states that game | Page 2-48 states under Management Common to All Action Alternatives: "Adherence to the Travel Plan is required for all activities, except where otherwise explicitly permitted". |

BLM_0011853

| | | | | |
|---|---|---|---|---|
| | | | retrieval and antler collection must be done on foot, that vehicles are not permitted to go off designated routes for "such activities." What about rock collecting, gathering wood, etc? This paragraph should state that cross country travel for any activity would be impermissible. | |
| Glen Canyon Group | 209 | 44 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6<br>The paragraph beginning at the bottom of page 4-149 also apparently contains an error. Clearly, it means that OHV use will be limited to designated, not existing, routes. The same error is found in the last paragraph on page 4-150. Under all of the action alternatives, vehicles must stay on designated routes. | The commentor is correct, and the wording has been changed to "designated". |
| Glen Canyon Group | 209 | 45 | Re: 4.3.8.2.15 Visual Resource Management Pages 4-154 thru 4-158, Table 4.55<br>Regarding VRM decisions reflected in Table 4.55, we reiterate that the Non-WSA Lands with Wilderness Characteristics must be protected to permit future Congressional consideration as designated wilderness; this means that the preferred alternative should re-designate all areas as VRM I or II, allowing no more than minor changes to landforms and vegetation. Permitting major modifications (VRM IV) in Coal Canyon, Floy Canyon and Flume Canyon is clearly incompatible with Handbook dictates. | The commentor is essentially asking the BLM to manage all of these areas to protect wilderness characteristics in Alternative C, and to basically the same degree as in Alternative B. The commentor also asks the BLM to manage these lands in such a way as "to permit future Congressional consideration as designated wilderness." This is essentially the non-impairment standard applicable only to Wilderness Study Areas.  See response to comment 124-53 for a discussion of BLM's obligation to manage lands for wilderness characteristics. |
| Glen Canyon Group | 209 | 46 | Re: Summary Pages 4-162 thru 4-168<br>Summary tables 4.57 through 4.60 cover some, but not all, aspects of such surface disturbing activities affecting the 266,485 acres. Examples of these activities under BLM's preferred alternative: 1) 160,599 acres – 60%, of Non-WSA Lands with Wilderness Characteristics would be open for ROW's (pages 4-114 and 4-115, Table 4.48); 2) 225 acres would be open to coal bed methane development (page 4-129); 3) Horsethief Point and Behind the Rocks would be vulnerable to mining of salable minerals (sand and | See response to comment 124-53.<br><br>The fourth sentence in paragraph 1 of page 4-143 has been changed to state:  "…same as in Alternative B." |

| | | | | |
|---|---|---|---|---|
| | | | gravel, building stone) (page 4-131); 4) No portions of ten areas would be designated SRMA's, and four would not be covered by either SRMA's or ERMA's (pages 4-136 and 4-137); and 5) most would not be within designated ACEC's (pages 4-140 thru' 4-144). (Incidentally, there appear to be errors and/or muddied discussion in the first paragraph, sentences 3 and 4, of page 4-143 attributing to Alternative C comments which apparently refer to another alternative.) | |
| Glen Canyon Group | 209 | 47 | Re: Summary Pages 4-162 thru 4-168 The VRM table (Table 4.58) is incorrect in showing 0% Class I in Alternative B, while Table 4.55 designates some Class I in Beaver Creek, Behind the Rocks, Dead Horse Cliffs, Dome Plateau, Goldbar, Gooseneck, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Westwater. | The commentor is correct. There are 45,048 acres of non-WSA lands with wilderness characteristics that are designated as VRM Class I in Alt B. The designation is for other reasons, usually the establishment of an ACEC. Table 4.58 has been corrected to show that 45,048 acres are VRM Class I (17%) in Alt. B, while 221,437 acres are VRM Class II (83%) in Class B. |
| Glen Canyon Group | 209 | 48 | Re: Summary Pages 4-162 thru 4-168 Finally, in regard to Table 4.60 which lists 161,327 acres or 61% of woodland acres open to harvest under C, we direct BLM to correct errors on page 4-162 noting that "in the 165,984 acres that remain open for wood-cutting (and where the resource exists), wilderness characteristics may be compromised by surface disturbing activities such as driving cross-country to the trees…" | Driving cross-country in pursuit of wood-cutting activities would be illegal under all action alternatives except in areas designated as "open to OHV use". The areas the commentor describes are all in the "limited to designated routes" category under all action alternatives. See response to comment 209-43. |
| Glen Canyon Group | 209 | 49 | The RMP needs to contain monitoring stipulations which at a minimum contain the following: annual monitoring with photos, mile sections of road with the number of motorized tracks leaving the road, width of road, status of signs (shot, missing, down, defaced). Among actions which could be instituted are: one way travel, noise limitations (muffles), permits with maximum number of vehicles, closed during certain times of the season, closed to recover, closed permanently. | The establishment of monitoring stipulations is not a land use planning decision. The BLM will determine on a site-specific basis the level of monitoring required, and the appropriate response to the information gathered. The commentor provides no evidence to support specific monitoring measures as the only acceptable method. |
| Glen Canyon Group | 209 | 50 | Any route or segment of route which cannot be monitored by BLM should be closed. | See response to comment 209-49. |

| Glen Canyon Group | 209 | 51 | It is understood that only having two BLM rangers is not sufficient for 1.7 million acres. BLM needs to pursue some sort of in-the-field monitoring in highly used areas. People are more likely to behave when there is an official presence (law enforcement or not) then when no one is around. | See responses to comments 124-21 and 124-38. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 52 | Another area in which the RMP is very weak is how the Travel Plan is going to be implemented. We urge BLM to include in the RMP step they will take to ensure that vehicles stay on designated roads. One rule that could be instituted is: every road is closed unless there is a sign marking it open. Manpower to do this would come from many organizations when they find out that their travel is limited only because signs are not installed. Also, routes that are dead-end should be signed dead-end at the beginning, and the turnaround should also be signed. | See response to comment 120-96. |
| Glen Canyon Group | 209 | 53 | Re: 4.3.22.8 Non-WSA Lands with Wilderness Characteristics Pages 4-494 and 4-495 This section portends many more "costs" than "benefits", especially in the long-term, which is defined as the 15-20 year life of the Plan. Only prescribed fire for vegetation treatments, and construction of riparian fences or new water developments would enhance the natural character of Non-WSA lands in the long-term. All other uses would "degrade" – in BLM's terms, wilderness characteristics. To be honest, BLM should admit that these developments/uses would destroy wilderness characteristics, making them ineligible for wilderness designation, not just in the long term, but forever. | The BLM does not deny the negative impacts to these lands under certain alternatives. These impacts are stated explicitly in the section to which the commentor refers. The negative impacts are also included in the discussion of the impacts to wilderness characteristics from the various alternatives throughout Chapter 4. The BLM is not required to manage these lands under all alternatives to protect wilderness characteristics, let alone manage then according to the non-impairment standard required for Wilderness Study areas.

See also response to comment 124-53. |
| Glen Canyon Group | 209 | 54 | Re: 4.3.23.6 Non-WSA Lands with Wilderness Characteristics, Page 4-504 According to this section, the analysis of Cumulative Impacts "includes all Federal with wilderness characteristics in Utah that are currently being managed for management of wilderness characteristics to protect | The commentor's assertion that the referred quote includes non-WSA lands with wilderness characteristics is incorrect. The BLM is unaware of any law or administrative action that that requires this type of management. See also responses to comments 209-53 and 124-53. |

| | | | | |
|---|---|---|---|---|
| | | | those values." That is, it includes designated wilderness, WSAs and Non-WSA lands with wilderness characteristics, all of which are protected by law or administrative decision. Alternative B would protect a total of 5,932,521 acres or about 4.5% of the statewide total. Alternative C by contrast would protect only 0.8% - less than one per cent of the statewide total acres which are, in BLM's words quoted above, currently being managed for management of wilderness characteristics. The Interim Management Plan for Lands Under Wilderness Review (IMP) should thus govern all of these areas under all – or at least all action, alternatives. As stated in Appendix P, the current Land Use Planning Handbook (H-1601-1, 2005) BLM land use plans must avoid or minimize impacts to wilderness characteristics. Alternative C is incompatible with this charge. | |
| Glen Canyon Group | 209 | 55 | Re: Glossary Pages X-29 thru' X-42 The Glossary is not comprehensive. For example, "way" is defined, but "route" are not. "Mechanized" and "non-mechanized travel" are not defined at all. Attachment A of Appendix G includes additional terms which should be justified with Glossary definitions and/or referenced in the Glossary. It is possible that there are definitions in other appendices or the text of the document itself which, if added to the Glossary, would make it more user friendly. | The BLM has added the referenced words (route, mechanized and non-mechanized) to the glossary. The BLM would need more specifics to address the other glossary changes which the commentor recommends. |
| Glen Canyon Group | 209 | 56 | Re: INDEX Pages X-43 thru' X-46 We cannot discern the criteria used by BLM to decide on which terms to index and which to ignore. The various species of fish and wildlife are indexed. The names of creeks and canyons: of potential ACEC's, SRMA's, and WSA's: and of state/federal agencies are indexed. Non-WSA Lands with Wilderness Characteristics are not. All told, it is of limited helpfulness. | The index is not intended to be complete, but rather helpful to the reader. |
| Glen Canyon | 209 | 57 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, | The BLM is aware of these other data sources, but |

| Group | | | 4-252 thru 4-277, 4-49 and 4-507 The population data, along with other demographic and housing data in Chapter Three are taken from the 2000 Census, as analyzed by the Sonoran Institute. Had BLM consulted the Utah Governor's Office of Planning and Budget, they could have considered, as well, reliable estimates for year 2005 and projections to 2015 and 2025 for Grand and San Juan Counties. The Governor's Office also makes estimates and projections for employment figures. | incorporating them in the document would make no difference in the impact analysis. This is because growth projections for both Grand and San Juan Counties are well below the projections for Utah as a whole.  For example, the growth rate in Grand County is projected at below one percent annually (0.85%) from 2000 through 2025, which is less than half the projected rate for the state of Utah.  In terms of population density, Grand and San Juan counties would still have very low population densities by both state and national standards. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 58 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507 …the population increases of concern are not of the resident populations of these two counties, but the fast growing Wasatch Front of Utah and all parts of Colorado. According to the National Visitor Use Monitoring study conducted by the MFO in fiscal year 2006, these are the sources of most travelers to the Moab District. The single zip code with the greatest number of visitors, 82, was 84532 which is Grand County. There were an additional 117 from other parts of Utah principally the Wasatch Front. But even more than Utahns were Colorado visitors – there were 210 of them. They come for fun and recreation, for refuge and relaxation, for peace and quiet. Some observers contend that displacement would occur if there were tighter restrictions on OHV travel in the MFO. We would argue that such displacement has already taken place, but in reverse – I.e., tighter restrictions in Colorado have led to their visiting Utah for cross country and other off-highway activities. | The BLM does not dispute the potential growth rates for the Wasatch Front or Colorado Front Range areas.  The BLM does not dispute that these areas will continue to provide visitors to the Moab area.  The commentor provides no evidence to support the assertion that displacement of OHV users from Colorado to the Moab area has occurred due to tighter restrictions on OHV use in Colorado.  Even if this were the case, the action alternatives in the DRMP/DEIS greatly reduce the acreage open to OHV travel, as well as the miles of routes identified for motorized use.  To the extent that Colorado visitors come to the Moab area for the types of quiet recreation the commentor describes, the action alternatives should provide more of these opportunities. |
| Glen Canyon Group | 209 | 59 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507 Chapter four shows relatively few if any differences among alternatives in Socioeconomic impacts, whether beneficial, adverse, or unspecified. No differences were projected in Environmental justice, PILT payments, | The commentor reiterates the BLM's findings and does not suggest any errors in data or analysis.  The BLM concurs. |

BLM_0011856

| | | | Population, Fire management, Health and safety management, Lands and realty, Locatable minerals, Salable minerals, Paleontological resource decisions, Riparian decisions, Soil/Watershed, Wilderness Study Areas and Wilderness areas, Special status species, Vegetation decisions, and Woodland decisions. | |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 60 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507<br>We were struck by the conclusion in this section comparing Alternatives B and C that "adverse social and economical impacts as a result of decreases in OHV use are not likely regardless of alternative selected." This contrasts with the section on Recreation and Travel, in which they postulated that such a decrease under Alternative B would reduce tax revenues to local governments. This comes with the caveat, however, that it is impossible quantify the proportions of recreational expenditures which are attributed to resident consumers versus non-recreational consumers. (page 4-269)<br><br>There also socio-cultural and technological trends which impact planning and which BLM did not consider such as inter-peer texting, promotion of more "fun" and capable motor vehicles, or, conversely, a greater concern for the environment by a younger generation. | The BLM's discussion to which the commentor refers is heavily qualified, due to the lack of available data on which to project economic impacts from changes from recreation patterns under the various action alternatives. On pg. 4-269 of DRMP/EIS, the BLM argues that should OHV use decline in the planning area, it is possible that there could be a decline in local revenues. The BLM does not state that such a decline is likely, which is consistent with the statement quoted by the commentor.<br><br>The BLM agrees with the commentor that there are likely to be a large number of socio-cultural and technological developments which the plan does not (and cannot) consider. Many of these are so speculative as to make their inclusion and subsequent impact analysis equally speculative. A recent (February, 2008) publication of the National Academy of Sciences, for example, showed a very large decline in the pursuit of certain outdoor recreational activities, and postulates that a cause may be the increasing popularity of the electronic media, especially video gaming. The BLM believes that that these trends are almost impossible to predict, let alone quantify. Over the life of the plan there will likely be other developments of which no one is currently aware. |
| Glen Canyon Group | 209 | 61 | Re: Climate change<br>The other big-enormous, really, consideration which lies outside the RMP/EIS planning process is the undeniable reality of global warming. By all reliable measures, the pace is quickening. Planning for the condition of our environment 15 or 20 years down the road must take into account the certainty of drought, | See response to comment 124-115. |

BLM_0011859

| | | | | |
|---|---|---|---|---|
| | | | scarcity of resources, and changes in energy production and consumption, as well as related and resultant changes in political environment. | |
| Blueribbon Coalition, Inc. | 211 | 1 | White Wash Dunes Management Plan is unacceptable. | This comment represents the opinion of the commentor. For specific information on White Wash, see response to comments 120-83, 123-10 and 123-35. |
| Blueribbon Coalition, Inc. | 211 | 2 | Please keep the Thompson Loop and Tenmile Wash trails open. They are both widely enjoyed by me, and my friends and family. | See response to comment 122-29 for the Thompson Trail. Tenmile Wash is open to motorized travel in Alts A, C and D. |
| Blueribbon Coalition, Inc. | 211 | 3 | There needs to be a mechanism for new trails and also provisions for competition use trails. | See response to comments 122-15 and 122-30. |
| Blueribbon Coalition, Inc. | 211 | 4 | Many of these areas have been in use for many years by ranching, motorized groups and industries. You are "closing" routes, areas and trails by not including them in your Alternatives. | See response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 5 | Fee system when not in existence starts a plethora of problems for everyone. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 65 | I would like for you to consider designating more ATV trails, especially between White Wash and Red Wash. | See response to comment 122-15 and 122-30. |
| Blueribbon Coalition, Inc. | 211 | 66 | Please keep the Gemini Bridges road open. The natural stone bridges are awesome. I would like to be able to ride the Thompson trail and Copper Ridge loop in the future. | See response to 211-55. |
| Blueribbon Coalition, Inc. | 211 | 67 | I also oppose the fee system in C and D alternatives. If existing funding will not cover needs, then any fee system should be managed by all affected, including the public using those areas. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 68 | I oppose the fee system proposed in Alternatives C and D. Fee systems are unpopular with public land users. | See response to 123-10. |
| Blueribbon Coalition, Inc. | 211 | 69 | Requiring fences around cottonwood trees is impractical and not a good idea. | See responses to 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 70 | BLM's open areas should be located along existing boundary roads of Duma Point, Ruby Ranch, Blue Hills road. | See response to comment 123-35. |
| Blueribbon Coalition, Inc. | 211 | 71 | The FEIS should designate more ATV trails, between Ruby Wash and White Wash. | See response to comments 122-15 and 122-30. |

| | | | | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 72 | I oppose this camping policy as contained in Appendix E. Further – I support keeping existing campsites open unless closure is accomplished via lawful public planning process. | See response to comment 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 73 | Limiting camping to one small designated area in the RMP is not wise not needed. | Camping is not limited to one small area in any of the alternatives to the DRMP/EIS. |
| Blueribbon Coalition, Inc. | 211 | 74 | The White Wash area that is open is too small. The White Wash ACEC is not appropriate. I strongly oppose ACEC Alternative B. | See response to comment 123-35. |
| Blueribbon Coalition, Inc. | 211 | 75 | I oppose closing "the Dunes" to motorized travel as proposed in Alternative B. | The opinion of the commentor is noted. |
| Blueribbon Coalition, Inc. | 211 | 76 | Please keep existing riparian washes open. | See response to comment 122-14. |
| Blueribbon Coalition, Inc. | 211 | 77 | Keep the Copper Ridge loop and Thompson trail open as proposed by Ride with Respect. | See response to comments 122-29 and 122-36. |
| Blueribbon Coalition, Inc. | 211 | 78 | Keep open the last bit of the Gemini Bridges road. I look forward to being able to drive across a natural bridge. | See response to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 79 | Although there are many ATV roads open on BLMs travel plan some motorcycle routes should be introduced as ATV routes as well. | See response to comment 120-90. |
| Blueribbon Coalition, Inc. | 211 | 80 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. | See response to comments 122-15 and 122-30. |
| Blueribbon Coalition, Inc. | 211 | 81 | …most of all these roads being closed off are places that the will always exist because of the use of these roads in the past. | See Appendix G of the DRMP/EIS for a description of the Travel Plan alternative formulation process.  See also response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 82 | …in White Wash fencing the Cottonwoods doesn't make any sense to much of an expense to all of us. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 83 | I oppose the camping policy because there are no lists of how many camp sites there are going to be for motorized usage, you cannot park in the road and block it. I believe that we need all campsites left open that exist and are legal campsites. | See response to comment s123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 84 | I also believe all right-of-ways that would qualify under Rs 2477 remain open and any law under Utah Revised statute. | See response to comment 120-16. |
| Blueribbon | 211 | 85 | The fee system proposed in Alternative C and D are not | See response to comment 123-10. |

| | | | | |
|---|---|---|---|---|
| Coalition, Inc. | | | only unnecessary but in opposition to federal regulations concerning public use fees. | |
| Blueribbon Coalition, Inc. | 211 | 86 | The notion of fencing trees and water sources is both impractical and unnecessary . | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 87 | Another area that we use at present is the Rabbit Valley – Westwater area. It is close to Grand Junction and has long been a multiple use area. No changes in the area are necessary. | See response to comment 122-39.  This area, called Utah Rims, is proposed as an SRMA to enhance route opportunities in the preferred alternative. |
| Blueribbon Coalition, Inc. | 211 | 88 | The Yellow Cat area is an area that is very conducive to motorized recreation and multiple use. | See response to comment 122-38.  All travel in the Yellow Cat area would be in accordance with the Travel Plan in the preferred alternative. |
| Blueribbon Coalition, Inc. | 211 | 89 | The existing campsites should remain open and available unless closure is through lawful planning process. | See response to comment 123-8. |
| Blueribbon Coalition, Inc. | 211 | 90 | The triangle area on Glade park should remain open to allow public access to the west end of Pinyon Mesa. | The "Triangle" area is proposed to be limited to designated roads and trails under all action alternatives. The commentor should specify exactly which route he is referring to. |
| Blueribbon Coalition, Inc. | 211 | 91 | As for the White Wash Sand Dunes I believe that fencing the cottonwoods and water sources is impractical. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 92 | Alternatives C and D open areas should be expanded with no fees imposed for usage. | See response to comments 123-10 and 123-35. |
| Californians For Western Wilderness | 952 | 1 | It is a travesty that the BLM is releasing six RMP for the state within a short period of time, expecting the public to be able to comment on them in any meningful way, and only giving 90-day periods for each, with the comments periods all overlapping. This violates the spirit of the National Environmental Policy Act (NEPA). The scoping period for the Plan was something like 8 months. A similar time frame should have been established to comment on the _____  we urge you in strongest terms to re-open or extend the comment period now. Otherwise BLM's actions come across as being crass political ploy, despite State Director Sierra's comments to the Salt Lake Tribune to the contrary. | See response to comment 124-1. |

| Californians For Western Wilderness | 952 | 2 | Plan C is supposedly the most balanced plan, according to the executive summary. Balanced with regard to what? Most scoping comments came from people who favored quiet recreational uses: hiking, rafting & canoeing, photography, rock are viewing, rock climbing. That is the makeup of the majority of visitors to the Moab area. Yet the plan gives weight far out of proportion to their number to the interests of off-highway vehicle users and energy companies. If BLM had consulted its own surveys of users it would have seen how the numbers came out. Quiet recreationalists make up the huge majority of users in the Moab area. There cannot be any simultaneous use of an area by quiet recreationalists and OHV users. The OHV users will win out every time, since people who go to enjoy nature's quiet and wildlife will not go to areas where OHV use allowed. The noise is incredibly disturbing. | The DRMP/EIS presents four alternatives which seek to balance competing resources and uses.  Alt C  balances the needs of motorized and non-motorized users by providing Focus Areas for the needs of both groups.  The Travel Plan accompanying the RMP removes 2,500 miles of existing routes from designation, and reduces by 600,000 acres the lands open to cross country motorized travel.

For discussion of the noise of OHV's, see response to comment 122-7. |
| Californians For Western Wilderness | 952 | 3 | The Southern Utah Wilderness Alliance estimates that south of Interstate 70, 84% of the land that BLM manages will be within 1/2mile of a designated OHV route. This is incredible and unconscionable. And this doesn't even address the well-known environmentally damaging consequences of OHV use: erosion, crushed wildlife, pollution of streams, destruction of plant life and cryptobiotic crusts. | The Travel Plan accompanying Alt C of the DRMP/EIS eliminates close to 3,000 miles of existing route;  in addition, the DRMP/EIS eliminates cross country motorized travel on all but 2,000 acres.

See Appendix G for details of how the Travel Plan was formulated. |
| Californians For Western Wilderness | 952 | 4 | Thus it is inexplicable that the Plan fails to offer protections to those areas that both citizens of Utah and BLM itself have identified as having wilderness character. These include Labyrinth Canyon, areas near Fisher Towers, and the Dome Plateau. | The DRMP/EIS provides protections to many lands in the Moab planning area.  The prime mechanism for doing this is the imposition of a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities. Areas that are protected in this fashion include Labyrinth Canyon of the Green River, the entire area near Fisher Towers and the riverside portions of the Dome Plateau.

In Alt C, Fisher Towers is proposed to be managed to protect its wilderness characteristics. |
| Californians For Western | 952 | 5 | Instead, the Plan authorizes over 2,600 miles of OHV routes in areas that have wilderness character, | The full sized vehicle routes designated were not illegally made, but are rather constructed routes from the minerals |

| | | | | |
|---|---|---|---|---|
| Wilderness | | | including areas determined by the BLM to have such character. This is unconscionable. BLM and all the federal land management agencies find themselves strapped when it comes to their budgets, especially budgets for enforcement. It's not clear from the draft how the Moab office will police these routes to ensure that unacceptable damage is not being caused by OHV use. The better alternative would be not to authorize them in the first place. Especially, the office should not authorize any routes that were created by already illegal use. This merely serves to reward the illegal use. | exploration and ranching periods.  While over 2,600 miles of route are authorized, an addition 2,600 miles of route are not be designated in the Moab RMP.  The routes created by motorcyclists, while user made, were largely made in areas open to cross country travel, thus making the routes legal.<br><br>The BLM assumes that it will have the resources necessary to implement the plan, including the Travel Plan. |
| Californians For Western Wilderness | 952 | 6 | Back when the lawsuit settelment was enterend into between then- Secretary Gale Norton and the State of Utah regarding BLM's wilderness inventories it was widely stated by officials at the Interior Departement and in the BLM tha the settelment did not preclude protecting areas with wilderness character. So far, BLM has _____ itself of doing that, and this plan reinforces that perception. Lands in the Moab district with wilderness character and that are included in America's Red Rock Widerness Act should be protected as such until Congress decides to act. | The BLM has chosen to protect some of the lands referred to by the commentor.  Some of these lands are protected by managing them for wilderness characteristics;  others are protected through ACEC designation, and others are protected by imposing a no surface occupancy stipulation in Alt. C.  See Chapter 4 of the DRMP/EIS for an analysis of the impacts to lands with wilderness characteristics from the varying alternatives. |
| Blueribbon Coalition, Inc. | 211 | 6 | Camping is a big issue. You show a lack of areas to camp for motorized, but plenty for non-motorized. Is this intentional or an oversight? Where are we supposed to camp? In the middle of roads? | Access to dispersed campsites was considered as a purpose and need for keeping spur routes open.  Cross country travel to access campsites is not allowed in areas limited to designated (or existing) routes.  Parking in association with dispersed camping may occur on designated routes, or alongside the designated route in previously disturbed areas.  See also responses to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 7 | Issue – USEA conflict proposal to create exclusive use zones. The final document should not use the term exclusive use zone. This will only create conflict where little or none has existed in the past. | There are no exclusive use zones proposed in the DRMP/EIS.  Focus Areas (see definition on p. 2-18 of the DRMP/EIS) are those in which certain types of recreation are encouraged and provided for.  All use of all Focus Areas is to be consistent with the Travel Plan. |
| Blueribbon Coalition, Inc. | 211 | 8 | Issue – Special Recreation Management Area: If SMRA are to be used there are several that need to be | See response to comment 122-39. |

| | | | | |
|---|---|---|---|---|
| | | | expanded. The Utah Rims area needs to be interlaced with Rabbit Valley in Colorado since most of the trails start in Colorado it only makes sense to have only one staging area. The trails of this area should extend further west to include Mel's Loop. | |
| Blueribbon Coalition, Inc. | 211 | 9 | Issue: Some important motorcycle trails are missing from all of the alternatives. Specifically the Copper Ridge Trail should connect to the Thompson Trail. Non-riparian washes should be included in the plan. Additional inventories should be allowed and considered for implementation. | See response to comment 122-36 for discussion of the Copper Ridge route.  See response to comment 122-14 for discussion of riding in washes.  See response to comments 122-15 and 122-30 for a discussion of adding routes. |
| Blueribbon Coalition, Inc. | 211 | 10 | Issue: Keep White Wash Sand Dunes open. This is an area that has been a very popular area for all people to enjoy. There is not a weekend that goes by that people are not out there enjoying the experience. This is an area that restores itself and should remain as an open area. | White Wash is open in the preferred alternative, Alt. C.  In addition, the open area has been expanded to the west to accommodate dispersed camping (see response to comment 120-83). |
| Blueribbon Coalition, Inc. | 211 | 11 | Issue: Trails for competitive use. There is no allowance for competitive events in this area. This absolutely should be allowed on designated routes. The routes should be flexible to allow for connections and loops. | See response to comment 208-7. |
| Blueribbon Coalition, Inc. | 211 | 12 | My first comment regarding your RMP concerns fees. I am definitely opposed to fees. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 13 | The White Wash Sand Dunes management does not seem workable. How can it be practicable to fence each cottonwood tree? It would make more sense to put up signage so that users know to stay away from certain areas. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 14 | I oppose the BLM fee system in Alternative C and D. Public land should be free for all. Putting fences around trees is impractical. | See response to comments 123-10, 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 15 | Please do not use these issues to effectively close down public land recreation areas such as White Wash Sand Dunes! | White Wash Sand Dunes are open to cross country travel in Alts. C and D. |
| Blueribbon Coalition, Inc. | 211 | 16 | I love to go jeeping in the White Wash Sand Dunes so I would hate to see it closed to us and everyone else who | See response to comment 211-15. |

| | | | wheels there. | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 17 | One of our favorite riding areas is the White Wash Sand Dunes are near Green River. We understand that there is currently a review being done and policy being set for the White Wash area. We are concerned about the proposed fees that maybe charged for the area. We feel that the regulations of the law should be followed involving public input, also, any fees if charged should be used to improve the area and not taken out and used some where else. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 18 | Keep Gemini Bridges road (the stone bridge) open. | See response to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 19 | Keep the Thompson Trail and the Copper Ridge Loop as proposed by ride with respect. | See response to comments 122-29 and 122-36. |
| Blueribbon Coalition, Inc. | 211 | 20 | Ten Mile Wash, a popular area, should be accessible from the dunes area and open to the river, areas that have been in use for years should remain open. | Routes are available in all action alternatives of the Travel Plan to enable motorized users to access the dunes area from Ten Mile wash.  Ten Mile wash itself remains available for motorized travel on the designated route in Alt. C. |
| Blueribbon Coalition, Inc. | 211 | 21 | We are opposed to the fee system proposed in Alternative C and D. Fees are always unpopular. The White Wash Sand Dune management plan is unacceptable and unworkable. Special permits are unlawful. Any fee system should require involvement of affected user groups. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 22 | The proposed fencing around cottonwood trees and water courses is not feasible. The young cottonwoods/water sources vary with the precipitation in the area – in wet years, fencing will be dangerous and impossible to maintain. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 23 | The three alternatives aren't much different from each other. Alternative D fails to provide true motorized focus and renders Rabbit Valley/Westwater non-motorized. This area is a very important area for motorized users from western Colorado. | Alternative D does not identify Utah Rims (which is the Utah side of Rabbit Valley) as an SRMA with a motorized focus.  Travel would remain available in Utah Rims in accordance with the Travel Plan accompanying Alt. D. |
| Blueribbon | 211 | 24 | In the Moab BLM's travel plan some ATV trails are not | See response to comment 120-90 for  a discussion of |

| | | | | |
|---|---|---|---|---|
| Coalition, Inc. | | | proposed as open and some of the motorcycle routes should be designated ATV trails as well. More ATV trails are needed in White Wash and Red Wash and we suggest looking closely at the plan. | ATV vs. motorcycle routes.  See response to comments 122-15 and 122-30 for a discussion of adding new routes subsequent to the RMP. |
| Blueribbon Coalition, Inc. | 211 | 25 | Campground/campsites are being closed by the BLM. Designated campsites and more of them will control and encourage proper usage of BLM sites. | See response to comments 123-8 and 120-86 for a dicussion of dispersed camping. |
| Blueribbon Coalition, Inc. | 211 | 26 | We have no objections to multiple use of most trails but realize mountain bike trails are in short supply. Mill Canyon – Sevenmile Rim biking areas should be expanded and the travel plan should extend the south Spanish Valley bike area further south toward Black Ridge if possible. | See response to comments 122-34 and 122-43.. |
| Blueribbon Coalition, Inc. | 211 | 27 | We honor "travel limited to designated roads, trails, and areas" wherever we ride but feel some areas could be expanded such as the White Wash open area and the Sand Flats recreation area. | The White Wash open area has been expanded slightly to accommodate a popular hill climb and camaping area. See response to comments 122-42 and 123-35 for a further discussion of expansion of open areas. |
| Blueribbon Coalition, Inc. | 211 | 28 | Please keep the following routes open – Gemini Bridges, the Thompson trail and the Copper Ridge Loop (Ride with Respect) and Ten Mile Wash – we have ridden these trails for many years and feel they should remain open. | See response to comments 206-14 (Gemini Bridges), 122-29 (Thompson Trail), 122-36 (Copper Ridge Trail) and 211-20 (Ten Mile Wash) |
| Blueribbon Coalition, Inc. | 211 | 29 | I am totally opposed to the fee system that is being proposed for the White Wash Sand Dunes without input from the public. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 30 | As for camping with trailers, you have not allowed enough area for Holiday camping and not camping 5 feet from their neighbors. You have more camp areas for tent campers. | See response to comments 120-83, 123-8 and 120-86. The BLM is unaware that there is a bias toward tent campers in the DRMP/EIS. |
| Blueribbon Coalition, Inc. | 211 | 31 | I also disagree with the fee areas there. I am not sure this fee system is explained fully in the proposal. Is the fee system proposed for the need to limit use? Or is there a need for funding for the proposed fencing project? | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 32 | Fencing the trees off is not a practical or feasible solution to the problem. If the wet areas and trees are | See response to comments 208-3 and 479-6. |

| | | | | |
|---|---|---|---|---|
| | | | fenced off there will be an ugly maze of dangerous fences in the area. To protect young trees, if that is the purpose, other options should be considered. | |
| Blueribbon Coalition, Inc. | 211 | 33 | The camping policy outlined in Appendix E is vague….Closing off camping areas may not be a good idea because it will push people to areas that have never been camped in before. | No areas are closed to camping by action of the DRMP/EIS.  In certain areas, camping is limited to designated sites.  See response to comments 123-8 and 120-86 for a discussion of dispersed camping. |
| Blueribbon Coalition, Inc. | 211 | 34 | One of our favorite trails goes to Gemini Bridges. I would hate to see any changes made to that trail. It is such a beautiful area it would be a shame to limit access to that area as it is right now. | See response to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 35 | Ten Mile Wash has been an ATV trail for many years and should remain open. | See response to comment 211-20. |
| Blueribbon Coalition, Inc. | 211 | 36 | I strongly oppose the fee system for White Wash Sand Dunes area. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 37 | Building fences around the cottonwood trees and seasonal streams is not workable, not accepted, and not necessary. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 38 | I would really be opposed to a fee to be able to ride in this [White Wash Sand Dunes] area. One of my concerns here is that many times the fees collected are not used to benefit the users. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 39 | I am definitely against the closing of any OHV trails that are now open. | See response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 40 | The White Wash "area" is much too small and should be expanded. Additionally the idea of closing the White Wash Sand Dunes is truly alarming! Riding the dunes as part of our club's night ride is a tradition and one that is very important to a lot of people. | See response to comments 120-83 and 123-35.  White Wash is available for open cross country travel in Alt. C. |
| Blueribbon Coalition, Inc. | 211 | 41 | I ask you not to close Ten Mile Wash. It has been a popular OHV route for several decades now. | See response to comment 211-20. |
| Blueribbon Coalition, Inc. | 211 | 42 | The plan seems to recommend closure of washes that have had vehicle use for many years. | Certain washes would be designated for travel under Alt. C.  All washes, however, are not available for travel.  See response to comment 122-14 for more information. |
| Blueribbon Coalition, Inc. | 211 | 43 | The proposed fee area for White Wash should be rejected outright. Paying for the privilege to use public | See response to comment 123-10. |

BLM_0011868

| | | | | |
|---|---|---|---|---|
| | | | lands that exist because of public funding is absurd. | |
| Blueribbon Coalition, Inc. | 211 | 44 | Finally, the idea of vehicle camping only in designated campsites makes no sense for BLM managed lands. While it may be appropriate for national parks and monuments, on BLM land it is an unacceptable reduction in the freedom to use the land that is supposedly there to be protected for the public, not from the public. | The great majority of the Moab planning area is available for dispersed camping under all alternatives.  Travel associated with dispersed camping must be on designated routes;  many spur routes have been left available precisely for this purpose.  See also response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 45 | I support leaving White Wash Sand Dunes and surrounding areas open to "open" (cross country) recreation. This is one of few areas (left) that sustains this type of use. Slickrock is another sustainable terrain of open/cross country travel. | White Wash Sand Dunes is avialable for open travel under Alt. C.  See response to comment 122042 for a discussion of slickrock exploration. |
| Blueribbon Coalition, Inc. | 211 | 46 | I do not support the proposed fee system referenced in Alternatives C and D. It does not support the law congress passed regarding fees on public lands. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 47 | Fencing off trees and "water sources" is impractical and unnecessary. Use signs/directional arrows in sensitive areas, (that require no activity) to direct travel where it is sustainable terrain. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 48 | I am concerned about designated camping areas – to be decided in the future. This DEIS designation will directly affect that process. It is already required to have a "toilet" when camping. This is a very used area – around the Dunes and areas slated for closure will greatly affect where camping will be permitted. | The BLM must address sanitation issues where they arise.  In the White Wash area, the sanitation issues were brought to the agency's attention by the Grand County Sanitarian.  However, sanitation issue is a matter of implementation and does not require a land use planning decision.  See also response to comments 120-86 and 123-8. |
| Blueribbon Coalition, Inc. | 211 | 49 | I oppose the fee area in the White Wash Sand Dunes in Alternatives C and D. That area in Alternatives C and D needs to be expanded also. It's much too small. The whole White Wash Sand Dunes management plan isn't a good plan in my opinion. If you put fences around the trees they will be down the first big rain. It will be a waste of money and you will have to put them back up over and over again. It's totally unpractical. | See response to comments 123-10 (fees), 123-35 (larger open area) and 208-3 and 479-6 (cottonwoods). |
| Blueribbon | 211 | 50 | The trails need to be for ATV's and motorcycles both. | The BLM recognizes motorized singletrack as a |

| | | | | |
|---|---|---|---|---|
| Coalition, Inc. | | | It's too hard to make separate areas for each user group. We sometimes have friends that will come ride with our ATV's and they have a motorcycle. Are they not to ride with me? I hope not. We need more trails not less. | recreation resource.  Some routes are to be designated solely for two-wheeled use.  However, the issue of shared routes is discussed in response to comment 120-90. |
| Blueribbon Coalition, Inc. | 211 | 51 | I go camping to get away from it all. I oppose the camping policy that is outlined in Appendix E. They should be left open and the public must be involved. You are pushing us to camp on sensitive areas that you are trying to protect if you close the camping off. | See response to comments 211-33, 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 52 | I am concerned over several issues surrounding White Wash Sand Dunes. One is the closure and restriction of existing motorcycle single track. Single track should be left open, particularly Copper Ridge and Thompson Trail should be combined. Non riparian washes should be left open. The challenges found on some of these trails are exhilarating. | No specific concern is listed for White Wash Sand Dunes. The BLM designates mileage of motorcycle single track in both Alts C and D.  See response to comments 122-36 and 122-29 for Thompson Trail and Copper Ridge.  See response to comment 122-14 for a discussion of riding in washes. |
| Blueribbon Coalition, Inc. | 211 | 53 | Camping restrictions concern me as well. I am concerned with the closure of popular camping areas, such as the "Top of the Hill" if these areas are closed where, and how shall we camp. I am concerned that we will be left with nowhere to camp. | See response to comments 123-8 and 120-86.  If "Top of the Hill" refers to the White Wash area, the open area around White Wash has been expanded in the preferred alternative to include this popular camping area (see response to comment 120-83). |
| Blueribbon Coalition, Inc. | 211 | 54 | I also oppose the camping policy as outlined in Appendix E. I support a policy where existing campsites are open unless determined closure was necessary via lawful public planning process. | See response to comments 120-86 and 123-8. |
| Blueribbon Coalition, Inc. | 211 | 55 | Please keep the following routes open: The last bit of Gemini Bridges road, the Thompson Trail and Copper Ridge loop as proposed by Ride with Respect. Ten Mile Wash – popular washes that have had vehicle use for many years should remain open. | See response to comments 206-14 (Gemini Bridges), 122-29 (Thompson Trail), 122-36 (Copper Ridge) and 211-20 for Ten Mile wash. |
| Blueribbon Coalition, Inc. | 211 | 56 | We love the Sand Dunes and Ten Mile Wash and all the surrounding areas. Please keep them open. | The sand dunes are open to cross country travel in the preferred alternative, and the route in Ten Mile Wash is designated for travel in that alternative as well. |
| Blueribbon Coalition, Inc. | 211 | 57 | I would like to keep the White Wash area open to everyone. | See response to comment 211-56. |

BLM_0011870

| Blueribbon Coalition, Inc. | 211 | 58 | I am also against special fees in this area. Special recreation permits and fees are not supported by me. Fees should be implemented by public process. The public lands should be open to the public. | See response to comment 123-10. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 59 | The fencing of trees in the sand dunes is a huge waste of resources. It would be better just to mark the routes in washes to avoid the denser tree areas. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 60 | Your motorized alternative in my opinion is not a motorized plan. You need to keep more of the trails open and use your money to open new ATV trails. Don't close trails and not give us any other place to go. Look at what Grand Junction BLM is doing. Build trails for us. A lot of your two track roads would make really good ATV loops and give us a place to go. | See response to comments 122-15, 122-30, and 208-2. |
| Blueribbon Coalition, Inc. | 211 | 61 | I oppose the fee system. Any fee system that must be instituted needs to involve the affected user group. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 62 | Fences around trees and water areas is unnecessary. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 63 | Please keep the following routes open: the last bit of Gemini Bridges road, the Thompson Trail and the Copper Ridge loop as proposed by Ride with Respect, and Ten Mile Wash. | See response to comment 211-55. |
| Blueribbon Coalition, Inc. | 211 | 64 | I feel the camping policy as outlined in Appendix E does not tell us how many dispersed campsites would be closed and why they necessarily should be. There isn't enough areas now for the camping for motorized camping. | See response to comment 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 93 | There is no need for change in the White Wash Sand Dunes. Please keep it open as possible for future multiple use. | See response to comments 123-10. |
| Blueribbon Coalition, Inc. | 211 | 94 | I support designating more ATV trails, especially between White Wash and Red Wash. I suggest looking at the proposal made by Ride with Respect. | See response to comments 122-15 and 122-30 as well as the entire response to comments from commentor #122 (Ride with Respect). |
| Blueribbon Coalition, Inc. | 211 | 95 | How do you justify fencing the cottonwood trees and keep ranch cows from the shade. Sometimes we like to have lunch in the shade. | See response to comments 208-3 and 479-6. According to the BLM's range conservationist, cattle do not go onto the dunes as there is very little feed. |

| Blueribbon Coalition, Inc. | 211 | 96 | Currently the White Wash, Ten Mile, Dead Cow loop provide a great experience for motorcycle riding. These routes have been long time favorites. | All three routes (with the exception of the low water variant of the Dead Cow route along the Green River) are in the preferred alternative. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 97 | The multiple small campsites and pullout areas along roads provide dispersed camping and keeping as many open as possible is important to me. | An express purpose and need to retaining routes in the Travel Plan was "Recreational opportunities and experiences", which included dispersed camping.  Spur routes were retained that accessed dispersed sites.  See response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 98 | Appendix E: because there is nothing that tells how many or what campsites will be closed and it says nothing about public involvement. This needs to be changed. | See response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 99 | We strongly oppose the fee system. There is no way that the fees would be enough to even administer the program without being prohibitively high, and this country is PUBLIC LAND. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 100 | We have camped with our 5th wheel in the same area for twenty years. When we go back the next year we can't see any damage from where we were the year before. | See response to comments 120-83, 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 101 | The idea of making the White Wash Sand Dunes into a hiking and equestrian area is ridiculous! How many people or horses would have the strength or stamina to hike or travel through loose sand that is 6-12 inches deep? Making this an exclusive use area of this nature would effectively close the area. | There is no mention of White Wash as an equestrian area in any of the alternatives accompanying the DRMP/EIS. The White Wash area is proposed as a hiking area in Alt. B only. |
| Blueribbon Coalition, Inc. | 211 | 102 | …be sure that 80% of your fees collected in the charging areas should be used for upgrading travel trails, roads, camping areas, and toilet facilities. | See response to comment 123-8.  The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |
| Blueribbon Coalition, Inc. | 211 | 103 | If there is an existing two track to a site that has been historically used (for camping) it should not be closed. | Many such spurs to dispersed sites are available in the preferred Travel Plan alternative.  Access to campsites was considered an express purpose and need for designating a route. |
| Utah Rivers Council | 213 | 1 | …a pending or potential water resource development project on an eligible river would in fact make it that much more important to include the river in the National | The BLM did not remove any rivers from a suitability determination based on any pending or potential water resource projects, potentail projects, or any other |

| | | | Wild and Scenic River System because without such protection the values of the river may be lost forever or be negatively impacted by the project.  In other words, eligible rivers upon which there is a pending or potential water resource development or other project definitely and clearly make said river suitable to become a Wild and Scenic River.  Therefore, a pending or potential water resource development or other project leads towards a positive suitability finding.  Actual case examples back this up.  For example, in 1993 in Arizona the Santa Maria River was evaluated for suitability by the BLM Phoenix District.  The rational for finding the segment suitable states, "The downstream terminus of this segment coincides with an existing Corps of Engineers withdrawal for the floodwaters of the Alamo Dam.  If the spillway height of Alamo Dam were ever significantly raised, the newly created floodwaters would inundate the stream's important riparian values (one of the outstanding remarkable values of this river)." This same discussion on a potential water resource development project leading to a positive suitability finding can be applied to other suitability factors with potential development projects, potential transportation projects, and facilities or other developments such as a nuclear power plant that will take water out of the river since they would irreparably harm the values of the eligible river.  The Council urges the Moab F.O. to consider eligible rivers upon which there is a pending or potential water resource development project, potential development project, potential transportation project or other developments as suitable to become a Wild and Scenic River under all alternatives.  At the very least, potential projects can not be used as a reason to find a river segment not suitable. | developments. |
| Utah Rivers Council | 213 | 2 | The preferred alternative in the Draft on page 2-41 changes the classification of one segment of the Green | The BLM has reevaluated the determination of the classification of the Green River from Coal Creek to |

| | | | River, from Coal Creek to Nefertiti from its original classification of 'Wild' in the eligibility study to 'Scenic' under the preferred alternative. There is no basis for such a change due to a manageability issue. The Council urges the Moab F.O. to find the Coal Creek to Nefertiti segment of the Green River as a 'Wild' river in the preferred alternative, as it was in the eligibility study and in Alternative B. | Nefertiti. The classification of this segment in the proposed alternative for this river segment has been changed to "wild". |
|---|---|---|---|---|
| | | | There is nothing in the Wild and Scenic Rivers Act nor the BLM guidelines that state it is impossible to have a 'Wild' segment located adjacent to a 'Recreational' segment. These different classifications are based on the current development and accessibility to the particular river segment. While one segment may have a paved road paralleling it, the next segment may have no roads and no development. The different segments qualify for these classifications because of the development and accessibility in the different river segments. These segments have been managed with these differences in the past and designating adjacent segments as 'Wild' and 'Recreational' does not present any management issues. | |
| | | | Several rivers in the National Wild and Scenic System do consist of a 'Wild' segment adjacent to a 'Recreational' segment. For example, on the North Fork of the Kern River (CA) there is a 13.2 mile 'wild' segment adjacent to a 17.8 mile 'recreational' segment. Also, the South Fork of Kern River (CA) has a 27 mile 'wild' segment adjacent to a 3 mile 'recreational' segment, which is then bordered by a 14.3 mile 'wild' segment, and the Wilson River (North Carolina) has a 4.6 mile 'wild' segment adjacent to a 15.8 mile 'recreational' segment. | |
| | | | Therefore, the Council urges the Moab F.O. to find the Coal Creek to Nefertiti segment of the Green River as a 'Wild' river in the preferred alternative, as it was in the eligibility study and in Alternative B. | |

| Utah Rivers Council | 213 | 3 | Classification of River Segments Should Not be Downgraded from Eligibility Study to Sustainability Study. | According to the Wild and Scenic Rivers - Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual 8351) at least one alternative analyzed in detail shall provide for designation of those eligible river segments in accordance with the tentative classifications which have been made.  Another alternative shall provide for no designation.  The no-action alternative, i.e., a suitability determination is not made, should provide for on-going management, including continuation of protective management of eligible segments.  Additional alternatives may be formulated for any combination of designations and/or classifications. |

The classification of several river segments in the preferred alternative was downgraded from the original classifications given to them in the eligibility study. In Table 2.1 pages 2-39 to 2-42 of the Draft the following segments were downgraded in the preferred alternative from the classifications given in the eligibility study (J-67 to J-68): Colorado River – Segment 5: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Segment 6: 'Wild' in eligibility study to 'Scenic' in preferred alternative; Dolores River – Segment 1: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Segment 2: 'Wild' in eligibility study to 'Scenic' in preferred alternative; Segment 3: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Green River – Coal Creek to Nefertiti: 'Wild' in eligibility study to 'Scenic' in preferred alternative.

The Council urges the Moab F.O. to give all of these segments the classification that they were given in the eligibility study, which is the same as that given in Alternative B on pages 2-39 to 2-41.

Classification of rivers as wild, scenic, or recreational is an assessment of the degree of development in the river corridor.  The Draft acknowledges this reality in Appendix J where it states "Tentative classifications are based on the type and degree of human evaluation." But then the Draft goes on to muddle the clear language of the Wild and Scenic Rivers Act by finding segment 1 of the Green River "wild" in alternative B and "scenic" in Alternative C. Similarly, segments 5 and 6 of the Colorado River are found to be "scenic" and "wild" respectively in Alternative B and "recreational" and "scenic" in alternative C.  All of these segments are downgraded in the preferred alternative, Alternative C.

Under Alt B of the DRMP/EIS, all eligible river segments were determined suitable in accordance with the tentative classifications.  Under Alt C, the classification along the Colorado River for segment 6 was downgraded to a classification of scenic from its tentative classification in Alt B as wild.  This classification in Alt C was in line with the theme of the alternative and would provide more flexibility in considering future uses in comparison to Alt B while still providing a wild and scenic river designation proposal.  Segment 5 along the Colorado River was classified as recreational in Alt C of the DRMP/EIS.  This classification has been changed to scenic in the PRMP/FEIS to be consistent with the classification proposed by the BLM Monticello Field Office.

See response to comment 124-88.

BLM_0011875

| | | | | |
|---|---|---|---|---|
| | | | Classification is a relatively straightforward review of the degree of development in the river corridor, and not open to the degree of interpretation exercised here by the BLM Moab F.O. There is no basis in statute for the alternative classification schemes proposed under different Alternatives in the Draft.  The classifications in Alternative C – the preferred alternative – are particularly ill founded and not at all based in the reality of development on the ground. Much of the Green River area is undeveloped and primitive as references time and again throughout the Draft itself. Classification is not to be used to address political concerns or other factors – it is simply a way of representing the extent of development in the river corridor.<br><br>Downgrading the classification of river segments simply opens up these sections that are being downgraded to further developments or threats that are not in existence today. The entire point of the Wild and Scenic Rivers Act is to preserve certain select rivers as they are today. The tentative classification given to these segments is based on the actual development and accessibility to the river at the current time.  Thus, this is the classification that these segments should be given in the suitability determination.  Downgrading the classification of these segments is not consistent with the current development of these rivers and simply opens them up to future threats that may negatively harm the outstanding values of these rivers.<br><br>We respectfully request that the Moab F.O. use the classifications documented in Attachment 3 of Appendix J, pages J-67 to J-68, for the various segments listed above of the Green, Colorado, and Dolores Rivers. | |
| Utah Rivers Council | 213 | 4 | Existence of Road Affects Classification of River Segment Rather than Suitability | The Moab Field Office (MFO) has coordinated with the Price Field Office (PFO) to ensure that the suitability |

The Council would like to stress that the presence of a paved or dirt road affects the classification of a segment rather than the suitability of a segment. The preferred alternative finds two segments of the Green River as not suitable: from Swasey's to I-70 and from I-70 down to River Mile 91. There are paved or dirt roads along sections of both of these segments. However, the mere presence of these roads does not make these segments not suitable. The Council urges the Moab F.O. to find these two segments suitable with a 'Recreational' classification for the segment from Swasey's to I-70 and 'Scenic' for the segment from I-70 down to River Mile 91.

The existence of a paved or dirt road along the river segment or in a river corridor is something that must be considered when studying the potential for a river to be added to the National Wild and Scenic River System. However, it is important to note that the mere existence of a paved or dirt road does not disqualify a river segment from becoming a Wild and Scenic River. In other words a river segment that has a road adjacent to or in the corridor is not automatically determined to be not suitable. Instead the presence of a road or dirt road would affect the classification of the river segment.

Table 2 in Appendix J, page J-10, the classification criteria for Wild, Scenic, and Recreational River Areas, makes it very clear that a road simply affects the classification and has nothing to do with the suitability of a segment. In the row 'accessibility' the table states under 'Wild', "No roads, railroads or other provisions for vehicular travel within the river area." Then in the next column, 'Scenic', it states, "Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable." In the final column, 'Recreational', it states, "The existence of parallel roads or railroads on one or both banks as well

determination for this segment of the Green River in the preferred alternative is consistent on both sides of the river. It was determined that the PFO would change their suitability findings to match that of the MFO.

The Green River between Swasey's Rapid and river mile 91 contain a large amount of private land. This large amount of private ownereship along these river segments would make manageability difficult. The roads along the Green River were not a factor in this suitability decision. The presence of roads affects the classification but not the suitability.

| | | | | |
|---|---|---|---|---|
| | | | as bridge crossings and other river access points is acceptable." This table lays out clear standards as to how an eligible river should be classified based on the accessibility.<br><br>The Moab F.O. has no justification based on the Wild and Scenic Rivers Act and its own documents to determine a river segment not suitable based on the presence of a paved or dirt road. Therefore, the Council urges the Moab F.O. to find the segment from Swasey's to I-70 suitable with a 'Recreational' classification and the segment from I-70 down to River Mile 91 suitable with a 'Scenic' classification. | |
| Utah Rivers Council | 213 | 5 | Coal Creek to Nefertiti should be classified as 'Wild'. This segment of the Green River is not paralleled by any roads (see map 2-11-C Designated Routes Alternative C) nor is there any development in the river corridor. Additionally, this area is proposed to be closed to OHVs in the preferred alternative (Map 2-10-C Off Highway Vehicle Categories – Alternative C). Therefore, this segment should keep its wild classification in order to maintain the river corridor in its current state and because a wild classification is consistent with other management objectives. | The classification of the Green River from Coal Creek to Nefertiti has been changed to wild in Alt C.  The classification of wild is consistent with the management objectives for this alternative. |
| Utah Rivers Council | 213 | 6 | River mile 91 to Hey Joe Canyon segment should be classified as 'Wild'. This segment is also not paralleled by any roads nor is there any development corridor. There is a dirt road that heads up Hey Joe Canyon.  his dirt road does not go into this segment, but heads south from Hey Joe Canyon.  However, there are a few roads that lead to the boundary of the river area, but do not actually lead all the way to the river (see map 2-11-C Designated Routes Alternative C). As Table 2: Classification Criteria for Wild, Scenic, and Recreational River Areas on page J-10 states regarding a Wild river, "A few existing roads leading to the boundary of the river area is acceptable." Therefore, this segment should keep its 'Wild' classification in order to protect | The BLM has determined that the Green River is suitable for designation in Alt C from River Mile 97 (the confluence of the San Rafael River) downstream to Canyonlands National Park.<br><br>The classification of the Green River from River Mile 97 to Canyonlands National Park is scenic throughout the entire segment in Alt C.   The classification of the entire segment as Scenic is compatible with the other management objectives along the river in Alt C.  These include travel limited to designated routes, and no surface occupancy for oil and gas leasing and other surface disturbing activities.  The Green River is within the Labyrinth Rims/Gemini Bridges SRMA and the Labyrinth |

| | | | | |
|---|---|---|---|---|
| | | | the river corridor as it currently exists today. | River Canoe Focus Area.<br><br>The BLM asserts that the Green River from River Mile 97 to the Canyonlands National Park boundary is more manageable with a consistent classification throughout. The BLM does not see the need to further segment this portion of the Green River so that small reaches can be classified as "wild". |
| Utah Rivers Council | 213 | 7 | Majority of land in Green River corridor from I-70 bridge to River Mile 91 is public land.<br>    As stated earlier, this segment of the Green River is part of the incredible Green River corridor and should be found suitable as a Wild and Scenic River with a Scenic classification.  Discussions with the various BLM Moab F.O. point out that one of the reasons this section was found not suitable in the preferred alternative was the amount of private land in the corridor complicating manageability of the segment.<br>    However, a careful analysis of the amount of private land versus public land shows that by far the majority of the land in the river corridor between river mile 119 and 99 (Ruby Ranch property) is public land. Based on a review of the map provided in the Moab Draft, 18 of the 28 miles or 64% is public land and only 10 miles or 36% of the land is private.  This clearly shows that the majority of the land in the corridor is public, the manageability of this section of the corridor should not be an issue, especially considering that some of the private landowners support the river being designated as a Wild and Scenic River.<br>    Furthermore, the Wild and Scenic Rivers Act provides for collaboration between public agencies and state and local governments in order to manage the river. Thus, the issue of manageability of the river is simply not an over-riding concern because the Moab F.O. can collaborate with the private land owners (through the form of the local government or even via a | See response to comment 213-4.<br><br>The BLM stands by its assessment that the mix of private and public lands creates a manageabilty problem. |

| | | | | |
|---|---|---|---|---|
| | | | resource advisory committee) in the area to best manage the Wild and Scenic Green River. Section 11 (b)(1) of the Wild and Scenic Rivers Act specifically allows any Federal agency to cooperate with state and local governments to plan, protect, and manage river resources.<br><br>Therefore, the Moab F.O. should find the segment of the Green River from I-70 bridge down to River Mile 91 suitable to become a Wild and Scenic River with a scenic classification. | |
| Utah Rivers Council | 213 | 8 | It simply does not make any sense to protect the upper and lower sections of the Green River in the Moab F.O. and not include the middle section.  Failing to include this section opens the Green River up to possible threats that would then impact and harm all other stretches of the river.  Furthermore, anything that happened on this unprotected stretch of the Green River would impact any suitable or designated sections of the Green or Colorado Rivers downstream and possibly upstream.<br><br>Giving these river segments a positive suitability factor for their contribution to the river system and river basin integrity is consistent with the goals of the Wild and Scenic Rivers Act – to preserve select rivers in their free-flowing condition.  River systems are interconnected wholes. Main stems of rivers can provide habitat for core populations of aquatic organisms. Migration of organisms up and down stream along this river is often critical for the persistence of these populations, many of which on the Green River are now endangered species.  The core populations serve as stable sources of dispersers that can recolonize habitats (such as after flood or drying events) and help to maintain genetic diversity.<br><br>River are the circulatory system of landscapes. They filter and distribute nutrients, as well as pollutants, as they transport water throughout the river network. | See response to comment 213-7. |

| | | | Degradation in one location can adversely affect habitat or populations of organisms downstream.  For example, in-stream gravel mining can increase turbidity downstream of mining operations.  Also, the loss of riparian vegetation in headwater streams due to overgrazing or development can lead to an increase in nutrients, pollutants, and sediment entering streams and rivers. All of these effects reduce water quality and are detrimental to the health of many aquatic organisms.<br><br>Finally, it is vital to find every river segment suitable along the river system due to the importance of an interconnected river system and adverse effects that could arise due to fragmentation of a river. For example, finding one segment of the Green suitable and another not suitable could allow a dam or other project to be built on the non-suitable segment in the future. Dams are known to have adverse effects in downstream locations via changes in the timing, magnitude, duration, and frequency of flood events. Thus, a future dam or diversion on the Green River could present a significant threat to the integrity of a downstream segment designated as a Wild and Scenic River. This would be counter to the purposes of the Wild and Scenic River Act by destroying the natural character of the designated river.<br><br>This demonstrates the importance of designating all eligible components of the Green River as suitable to become a Wild and Scenic River in order to maintain the connectivity if the river system and to protect and maintain the integrity of the river system with its myriad values. Without this Wild and Scenic River designation it is impossible to guarantee the future of the Green River and to guarantee the protection of these outstanding values, such as scenic, recreation, and endangered fish species. | |
| Utah Rivers | 213 | 9 | The list of eligible segments of the Green River and the | There are 6 river segments along the Green River and |

| | | | | |
|---|---|---|---|---|
| Council | | | segments that are analyzed for suitability are inconsistent.  In Appendix J, seven suitability factors were considered for each of the different rivers, including the Green River.  Attachment 2 in Appendix J, pages J-61 to J-64, shows that 6 segments of the Green River are eligible to become a Wild and Scenic River.  However, attachment 4, pages J-81 and J-82, lists the suitability considerations for the, "Green River – Segments 1 through 5".  Thus, the suitability analysis fails to even include all 6 eligible segments in the analysis.  It is impossible to determine which of the 6 eligible river segments were not included in the analysis because they are not listed nor mentioned. | this error has been corrected in the PRMP/FEIS.  The heading on pg. J-81 of the DRMP/EIS has been changed to "Green River segments 1 through 6". |
| Utah Rivers Council | 213 | 10 | The suitability analysis of the Green River includes segments 1 through 5 together. The response to each of the seven suitability factors does not make it clear which of the segments the response applies to.  This completely muddles the entire suitability analysis as it is impossible to determine why some segments were found suitable and others were found not suitable. | There are 6 river segments along the Green River and this error has been corrected in the PRMP/FEIS. Attachment 4, Suitability Considerations by Eligible River Segment, has been augmented for the Green River and this augmentation makes the suitability determinations more clear. |
| Utah Rivers Council | 213 | 11 | There is a paucity of information included in the suitability analysis in Attachment 4 on pages J-81 to J-82.  A total of 7 factors are listed. T he only response to a factor that has some decent information in the response for land ownership and current use. However, even this response does not provide enough information to make a decision regarding the suitability of these five segments.<br><br>        For example, one of the responses to the suitability factors is not included in Attachment 4 on page J-81.  The response to the factor – Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated, states, "Uses and values affected will be addressed in the impact analysis for the Price RMP/EIS." This provides absolutely no information to a reader and does not | See response to comment 213-10. |

| | | | adequately address the suitability factor, which therefore provides no indication if this leads to a finding of suitable or not suitable for each of the different eligible segments of the Green River.  At a minimum the response to this factor should at least include a summary of the referenced impact analysis so that the Moab F.O. can make an informed decision and so that a reader may understand the justification for the decision reached.<br><br>      For the factor – the estimated costs of administering the river, including costs for acquiring lands, the response has no information. It simply is a blank space. This is yet another example of the paucity of information and demonstrates the incomplete and inconclusive suitability analysis.<br><br>      Additionally, the response to the factor – Characteristics which would or would not make it suitable, is not understandable. The statement lists, "These values are listed in detail in Table 3." Table 3 in Appendix J is on page J-13. This table, Suitability Study Interdisciplinary Meetings, has nothing to do with the values of the Green River.  This is yet another example of the incomplete nature of the suitability analysis.<br><br>      In other words the suitability analysis in the Draft fails to provide accurate information for 2 of the 7 suitability factors, and does not include any information on 1 of the 7 factors.  In addition, the seven factors that were considered are incomplete.  For example, it does not appear that the Moab F.O. considered the support of the public for designation nor is there any sign that the contribution of the river segment to the overall integrity of the river system was considered.  This is an excellent example of the incomplete and confusing nature of the suitability analysis.  The suitability recommendations reached from an incomplete and confusing suitability analysis are not justified. | |
| Utah Rivers | 213 | 12 | Nowhere in the draft document does the Moab F.O. | According to the Wild and Scenic Rivers - Policy and |

| Council | | | share how they evaluated the factors in order to come to a decision about suitability.  Nowhere in the Draft does it state how each of the seven suitability factors were evaluated.  It is impossible to determine why the Moab F.O. determined that certain segments of the Green River were suitable and other segments of the Green River were not suitable. | Program Direction for Identification, Evaluation, and Management (BLM Manual 8351) at least one alternative analyzed in detail shall provide for designation of those eligible river segments in accordance with the tentative classifications which have been made.  Another alternative shall provide for no designation.  The no-action alternative, i.e., a suitability determination is not made, should provide for on-going management, including continuation of protective management of eligible segments.  Additional alternatives may be formulated for any combination of designations and/or classifications. |
| | | | For example, how does the Moab F.O. interpret the response on page J-81 that states, "Uses and values affected will be addressed in the impact analysis for the Price RMP/EIS."  What does that actually mean in terms the suitability of the different segments of the Green River? Does that lead to or against a suitable finding for segments of the Green River? | Under Alt B of the DRMP/EIS, all eligible river segments were determined suitable in accordnace with the tentative classifications.  Under Alt Ct the classification are in line with the theme of the alternative and would provide more flexibility in considering future uses in comparison to Alt B while still providing a wild and scenic river designation proposal. |
| | | | Another example of the vagueness in interpreting the suitability factors relates to the response on page J-81, "State and local governments are unsupportive of any determination of suitable. There is likely support from the environmental community for determinations of suitability."  What does that mean for the suitability of these different segments of the Green River?  Does that lead towards or away from a suitable finding? | Appendix J of the DRMP/EIS provides the BLM's Suitability Study.  This study was completed in accordance with BLM Manual 8351.  The study is explained on pg. J-11 and is attached in its entirety on pgs. J-69 through J-82. |
| | | | Despite the confusion and lack of information in the suitability analysis the Draft includes recommendations for which segments are suitable under the different alternatives in Table 2.1, page 2-41 of the Draft.  These recommendations for suitable and non suitable segments are given no justification based on the documentation in the Draft. | |
| | | | Therefore, it appears that the Moab Field Office's suitability recommendations are completely arbitrary in nature.  Because of this disconnect, the Draft RMP's suitability determinations are not supported by substantial evidence on the record and so are not defensible.  Furthermore, the public has not been given a meaningful opportunity to provide substantive | |

| | | | | |
|---|---|---|---|---|
| | | | comments on the suitability analysis due to the paucity of information in the Draft and the vagueness in terms of interpreting the different factors.  The public would simply be taking a shot in the dark due to the confusing and incomplete nature of the suitability analysis in the Draft. | |
| Utah Rivers Council | 213 | 13 | Table 2.1, page 2-41, creates new segments for the Green River.  This further confuses the suitability analysis. These new segments are not consistent with either the six eligible segments of the Green River (J-61 to J-64) nor to the five segments of the Green River that were included in the mixed up suitability analysis (J-81 to J-82).  These new segments of the Green River are not consistent with the segmentation of the Green River in the Price Draft RMP. Therefore, any justification for creating new segments for the Green River does not exist nor does the suitability analysis cover these new segments. This is yet another example of the incomplete and inconclusive nature of the suitability analysis preformed by the Moab F.O.<br><br>        In conclusion, we respectfully request that the Moab F.O. conduct in depth suitability analysis of all segments of the Green River found eligible for protection using the approach recommended by the Interagency Wild and Scenic Rivers Coordinating Council (page 17 of "The Wild and Scenic River Study Process") and involving the public throughout the process. | The reference to 5 river segments along the Green River was in error and has been corrected in the PRMP/FEIS to 6 segments.   The Price and Moab PRMP/FEIS's are now consistent in  proposed management for Wild and Scenic Rivers.  The suitability analysis for all segments of the Green River has been augmented and information added to the PRMP/FEIS. |
| Utah Rivers Council | 213 | 14 | The resegmentation of the Green River in the Draft RMP is not justified, explained, and is inconsistent with the segmentation of the Green River in the Price Draft RMP.<br><br>        The Moab Draft resegments the Green River in the preferred alternative (see Table 2.1 page 2-41_. The rationale for this resegmentation is not explained nor justified anywhere in the Draft. Appendix J of the Draft documents the Wild and Scenic River Study | See response to comments 213-12 and 213-13. |

| | | | process, including eligibility, tentative classifications, and the suitability study. Attachments 2 and 3 in Appendix J both have 6 segments of the Green River. These segments are consistent with the segments of the Green River in the Price Draft RMP.<br><br>    We urge the Moab Field Office to change the resegmentation of the Green River in the preferred Alternative in Table 2.1 back to the original segments identified in the eligibility study (attachments 2 and 3 in Appendix J) and in alternatives B and D in Table 2.1. | |
|---|---|---|---|---|
| Utah Rivers Council | 213 | 15 | Inconsistency with Price BLM Draft RMP<br>    The West side of the Green River is managed by the Price F.O. an the East side is managed by the Moab F.O. It is important that the decisions reached by the two offices regarding the Green River are consistent. The Price F.O. released its draft RMP in July 2004, in which recommendations were made regarding the Green River as suitable to become a Wild and Scenic River. Unfortunately, the Moab Draft and the Price Draft differ in their preferred alternative. It is vital that both sides of the Green river are managed in the same manner so as to ensure cohesion and consistency. The table below summarizes the discrepancies between the two field offices for the Green River. (See Comparison of Price Draft RMP and Moab Draft RMP table included in the Utah Rivers Council comments, page 15.)<br>    It is vital that the two BLM field offices are consistent in terms of their recommendations for the Green River as a Wild and Scenic River. We have taken this into account in our recommendations for the Green River. Please see our recommendations for a Wild and Scenic Green River above to see a consistent approach between the two field offices for a suitable Wild and Scenic Green River. | See response to comments 213-12 and 213-13. |
| Utah Rivers Council | 213 | 16 | We are extremely concerned with the approach to suitability reviews provided in the Draft for these | See response to comment 124-88, 213-12 and 213-17. |

segments (from page 22: Mill Creek – National Forest Boundary to private property below diversion: Recreational, Mill Creek – T26S, R23E, Section 19 to Power Dam: Scenic, Onion Creek – Source to Onion Creek Road: Wild, Onion Creek – Beginning of Onion Creek Road to Colorado River: Recreational, Professor Creek – National Forest and state land boundary to diversion near private land: Wild, Beaver Creek – Forest Service boundary to one mile from Dolores River: Wild, Beaver Creek – One mile to Dolores River: Scenic, Negro Bill Canyon – from state land below rim to ¼ mile from Colorado River: Wild, Negro Bill Canyon – last ¼ mile to Colorado River: Recreational) due to the paucity of information provided in the suitability analysis, lack of justification for the conclusions reached regarding the suitability of the different segments, and vagueness in interpretation of each suitability factor. Based on these the Moab Draft does not provide adequate justification for finding these segments not suitable and we are at a loss as to how to refute the conclusion that these segments are not suitable. Therefore, the Moab F.O. should find all of these suitable under the preferred alternative with the classifications listed above.

First, nowhere in the draft documents does the Moab F.O. share how they evaluated each of the seven listed suitability factors in order to come to a decision about suitability of the segment. It is impossible to determine why the Moab F.O. determined that these rivers were not suitable.

For example, how does the Moab F.O. interpret the response on page J-75 regarding Negro Bill Canyon for the factor, 'Land ownership status and current use of the area', which states – 100% BLM? Does that lead to or against a suitable finding for segments of the Green River? This response appears to lead toward a positive suitability finding.

BLM_0011887

Another example of the vagueness in interpreting the suitability factors relates to the response on page J-76, "Interest/Support from some local residents, and environmental organizations." What does that mean for the suitability of these segments of Mill Creek? Does that lead towards or away from a suitable finding? This response appears to lead towards a positive suitability finding.

Despite the lack of information and vagueness in interpretation of the suitability factors in the suitability analysis the Draft recommends that all of these river segments are not suitable in the preferred alternative in Table 2.1, page 2-41 of the Draft. These recommendations for non suitable segments are given no justification based on the documentation in the Draft.

In fact, a review of the limited information presented on these segments in Appendix J Attachment 4 argues FOR suitability, rather than against it. For all of the segments we listed above, the only information listed in Appendix J that could possibly be interpreted as negatives is the occurrence of grazing on some stretches and the fact that some of the segments are open to mineral leasing and/or oil and gas leasing. Grazing or some oil and gas leasing are not a bar to suitability, nor would Wild and Scenic status necessarily harm those activities (for example, grazing can continue on Wild and Scenic stretches as long as the ORVs are protected). Most of the presented information actually argues in favor of suitability for the stretches, including the descriptions of the values, the public (particularly the local) support described, and even the lack of acquisition costs associated with the stretches. So, even with the extremely limited data presented in the Draft, the evidence argues for suitability.

Therefore, it appears that the Moab Field Office's suitability recommendations are completely arbitrary in nature. Because of this disconnect, the Draft

BLM_0011888

| | | | | |
|---|---|---|---|---|
| | | | RMP's suitability determinations are not supported by substantial evidence on the record and so are not defensible. The Council urges the Moab F.O. to find all of these segments suitable to become a Wild and Scenic under the preferred alternative with the classifications listed above. | |
| Utah Rivers Council | 213 | 17 | Finding these segments suitable is consistent with other management objectives<br><br>　　　These river segments all have other protective measures that are consistent with being found suitable to become a Wild and Scenic River. Therefore, all of these segments should be found suitable with the classifications listed above.<br>　　　First, the preferred alternative on page 2-16 recommends that nearly 26,000 acres in Beaver Creek, Fisher Towers and Mary Jane Canyon be managed as non WSA lands with wilderness characteristics. Beaver Creek, Professor Creek, and Onion Creek all fall within these areas. Therefore, managing Beaver Creek, Professor Creek, and Onion Creek as a Wild and Scenic River is consistent with managing the area as a non WSA land with wilderness characteristic.<br>　　　Secondly, the preferred alternative on page 2-36 to 2-37 recommends a Mill Creek Canyon ACEC. Such management is consistent with managing Mill Creek as a Wild and Scenic River. Therefore, Mill Creek should be found suitable as a Wild and Scenic River,<br>　　　Third, the preferred alternative on page 2-43 recommends that both Mill Creek Canyon and Negro Bill Canyon should be managed as wilderness study areas, which closes the area off to OHVs. Therefore, managing Mill Creek and Negro Bill Canyon as Wild and Scenic Rivers is consistent with this type of management.<br>　　　In summary, all of these segments are being recommended under the preferred alternative to be managed with these different types of protections. | The segments mentioned by the commentor are managed in the preferred alternative with other protective measures in place.  It is because of these protective measures (WSA, ACEC or wilderness characteristics) that the BLM chose not to find these streams as suitable.<br><br>Only rivers having a Recreation ORV which included boating and rafting were placed in Alt.C. Only a Wild and Scenic River proposed designation can protect a river from upstream federally-funded damming.  Wild and Scenic  River designation, in assuring downstream flows, would protect the Recreation ORV of floating and rafting by assuring instream flows.<br><br>The streams mentioned by the commentor do have non-boating Recreation ORVs.  These Recreation ORVs involve hiking in riparian areas.  The Recreation ORVs in these smaller streams can be  protected by the imposition of other management actions. |

BLM_0011889

| | | | | |
|---|---|---|---|---|
| | | | Therefore, this type of management is consistent with finding all of these rivers suitable to become Wild and Scenic Rivers. | |
| International Mountain Bicycling Association | 217 | 1 | IMBA supports the Grand County Non-Motorized Trails Master Plan recommendations for alternate routes in these areas.  IMBA also supports the recommendations of MTA that the Green Dot (Gemini), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider) trails be identified as critically in need of work to reduce damaging user-created routes,  Projects to rehabilitate trails and provide high-quality experiences often attract many volunteers from the mountain biking community. | The Green Dot and Wags Way were not analyzed in the current RMP effort.  At the conclusion of the planning effort, the Moab Field Office will entertain proposals for new trails.  See response to comment 122-15 and 122-30. |
| International Mountain Bicycling Association | 217 | 2 | IMBA objects to the term "mechanized" when describing bicycles because this definition is unclear.  Some pages in the draft RMP correctly categorize mountain biking as non-motorized, while other create this third category of recreation.  By doing so, travel management is needlessly complicated and the agency unfairly and incorrectly implies the impacts of mountain biking are similar to motorized travel and more than other non-motorized uses | Mountain bikes are restricted to designated routes within the DRMP/EIS.  The BLM uses the term "mechanized" to distinguish those routes that are open to mountain bike use, but not to motorized use.  This term is used in the National Mountain Bike Strategy. |
| International Mountain Bicycling Association | 217 | 3 | IMBA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas.  While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and motorized areas.  A decision to ban this use should be based on scientific reasoning | The policy referred to by the commentor is not a land use planning issue.  New bicycle trails outside WSAs can be considered in any area of the field office.  Only hiking focus areas would be excluded from new bike trail construction. |
| Utah Farm Bureau Federation | 219 | 1 | In the Taylor Grazing act, Congress gave the agency at the local, state and national levels, the obligation and responsibility to protect and safeguard livestock grazing rights. Any decisions by the agency that would impact the economic contribution, jobs, culture, and historic use must be consistent with congressional mandates. | FLPMA provides for BLM's land use planning process and the allocation of resources. The BLM has followed the dictates of the Taylor Grazing Act.  No specifics are provided of violations of this act. |
| San Juan Public Entry | 267 | 1 | The Cameo Cliff area should be designated as a focus area for ATV use. | Cameo Cliffs is to be managed to provide "sustainable opportunities for road-related motorized recreation on a |

| | | | | marked route system" (DRMP/EIS, pg. 2-18). These opportunities include ATV use. |
|---|---|---|---|---|
| and Access Rights | | | | |
| San Juan Public Entry and Access Rights | 267 | 2 | We do not agree with BLM's position on pursuing more wilderness. FLPMA provided a time frame for BLM to inventory wilderness. That time frame has long ago come and gone. BLM was forced to rescind their Wilderness Inventory and Study Procedures Handbook because it was inappropriate. In Oct 2003, BLM came out with an instruction memo 2003-275 Change 1 that says BLM may consider wilderness characteristics in preparing their RMPs. This sounds almost like abuse of Congress intent of FLPMA. | See response to comments 121-10, 120-8, 120-9, 121-61, 121-71 and 121-58. |
| San Juan Public Entry and Access Rights | 267 | 3 | We must admit we did not read your document verbatim, but we could find no reference to The American Disability of 1990, the Discrimination Act of 1991, or even the Age Discrimination Act of 1967. You are not providing for the elderly or the disabled in your plan. The only thing we are aware of that you do is provide disabled access to your outhouses. Some where in this plan you should be doing something special for the disabled and elderly. By shutting down certain areas to motorized use you are discriminating against the elderly and disabled. We realize it is impossible to provide access to every spot but if roads or trails exist, leave them so those who can't enjoy the values by hiking, can still see them by motorized access. We therefore recommend all existing roads be left available for the elderly and handicap to use by motorized methods. | The BLM worked with Grand and San Juan counties to provide a transportation plan that meets the access needs of recreationists. The plan designates over 3,000 miles of road for travel. |
| San Juan Public Entry and Access Rights | 267 | 4 | On page 4-253 you make the statement that it is not likely that BLM-related management decisions (apart from recreation decisions that could increase revenues to recreation based businesses) would result in significant changes to current population trends I don't know where you got your data for this statement. | Population data were obtained from the U.S Census Bureau. Population trends in Grand county have not been tied to BLM actions in past years; it is therefore assumed that BLM actions will have little to do with shaping population trends in the future. |
| San Juan Public Entry | 267 | 5 | Do you have scientific data to support the large deer and elk habitat areas? We do not think so. We had a | BLM has utilized data from the Utah Division of Wildlife Resources, the state agency with jurisdictional authority |

| | | | | |
|---|---|---|---|---|
| and Access Rights | | | member of our organization accompany the wildlife biologist (Charles Kay), hired by San Juan County to look at your proposed habitat areas in San Juan County. We observed that he found no scientific data or need for these large habitat areas. Studies paid for by San Juan County, and done by Charles Kay supports this statement. | on wildlife. |
| Theodore Roosevelt Conservation Partnership | 288 | 1 | Need for Upfront Comprehensive Planning Prior to Leasing: The Moab DEIS generally ignores timely scientific studies and does not provide adequate assurances for mule deer, desert bighorn sheep, Rocky Mountain bighorn sheep, pronghorn, elk, sage grouse, and Colorado cutthroat trout. The Moab DEIS fails to adequately address oil and gas development and how it can be conducted in a way that does not unnecessarily impact fish and wildlife in their habitat.

I am concerned that the DEIS would enable energy leasing in crucial wildlife habitats without the necessary upfront conservation planning. All areas of crucial fish and wildlife habitats available for oil and gas leasing and without NSO stipulations should have upfront planning prior to the leasing stage to ensure that energy development will be conducted responsibly. While timing stipulations are important, they do not address how an area will be developed in order to minimize impacts to wildlife.

Once a lease is sold, a contractual obligation to develop the energy resources is created and the BLM forfeits most of its right to plan energy developments. The impacts of development on big game and fisheries populations should be weighed in advance so that fish and wildlife losses can be prevented or minimized. While timing stipulations are important, they do not address how an area will be developed in order to minimize impacts on wildlife. Upfront planning prior to | The DRMP/EIS provides a range of alternatives that allows the BLM to develop management prescriptions to protect wildlife resources as energy development occurs.

The action of leasing itself does not provide the site specific details necessary for extensive analyses of oil and gas development.  Upon actual development of leasing tracts, environment analyses will be conducted to determine what the specific conflicts, impacts and mitigation will be.  Cumulative impacts will also be determined and mitigation measures developed.  Public lands are managed under a multiple use mandate.  All resources are considered, including wildlife. The BLM has a obligation to ensure that wildlife is protected. Stipulations that have been developed in the preferred alternative will be attached to leases so that the leasee is aware of potential restrictions that may be applied when development occurs.  If new information is presented at the time of development, the analysis will also include this new informatio |

| | | | leasing is a necessary component of responsible energy development. Below are some elements to upfront planning that should be seriously considered by the Moab FO for incorporation in the FEIS alternatives. | |
|---|---|---|---|---|
| Theodore Roosevelt Conservation Partnership | 288 | 2 | Geographically Phased Development: The Moab FO should consider geographically-phased energy development prior to leasing stage to responsibly balance the needs of fish and wildlife with natural gas excavation. Large geographic areas to be offered for oil and gas leasing first should be subdivided into smaller parcels to be leased. Those parcels should be developed fully and completely restored (with respect to fish and wildlife habitat) one at a time before subsequent parcels are developed. That way, wildlife displaced from the developed parcel can migrate to equal value habitat on adjacent lands. When the wildlife habitat on the developed parcel is restored, displaced wildlife can return, and the next parcel can be made available for development. In this way, smaller parcels are developed and restored over a longer period of time, not in the current mode of field development that is too fast. Species of interest to hunters that could be especially helped by geographically phasing are mule deer, pronghorn, elk, bighorn sheep, and sage grouse.<br><br>For geographically phasing to be effective in reducing adverse impacts on wildlife populations, the species-specific life stage habitat requirements must be known for the impact area so that all life-stage requirements are provided for; even in the face of parcel subdivision and development. Baseline conditions and future objectives should also be known before development proceeds. Corridors providing wildlife with access to seasonally-required habitat must remain intact and functional at a level acceptable to sustain populations. The area to be developed should be determined for each geographic area based on species present and an | The action proposed by the commentor is not within the scope of the DRMP/EIS.  At the oil field development stage, there may be an opportunity to utilize the concept of geographically phased development.   Prior to the development phase,  there is no 'purpose and need ' for the level of analysis suggested by the commentor. |

| | | | | |
|---|---|---|---|---|
| | | | assessment of overall habitat conditions in a larger, surrounding area including what is needed to sustain the populations through the development period. | |
| Theodore Roosevelt Conservation Partnership | 288 | 3 | Upfront Commitment of Funds for Management, Monitoring and Restoration: The DEIS fails to provide a commitment to adequate funding of wildlife management, monitoring, and restoration for oil and gas development projects. In times of increasing pressure from energy development on our public lands – fish and wildlife management needs more funding, not less. Funds targeted for fish and wildlife are being redirected to the processing of permits for expanded energy development or planning for large scale energy projects. Providing long-term funding to monitor, evaluate and protect fish and wildlife populations influenced by energy development through post-development habitat and population restoration is essential. Funding appropriated for fish and wildlife management should be used to proactively manage habitats and populations, not just mitigate damage, process energy permits or plan for energy projects. Funding increases for energy development must be matched by increases for fish and wildlife management. Funding assurances should be given for the duration of the development and subsequent restoration. Included with increases in funding should be provisions for ongoing, intensive monitoring of fish and wildlife species and their habitats to facilitate alterations in development if unintended adverse impacts occur. | Funding for various projects is not an objective for the Resource Management Plan. The RMP is not a funding tool.  The RMP assumes that the BLM will have the funding and personnel necessary to undertake the actions mandated by the decisions in the RMP. |
| Theodore Roosevelt Conservation Partnership | 288 | 4 | Mitigation Plan: Given the nature of leasing and the need for upfront comprehensive planning, it needs to be known during the RMP process how the Moab FO will establish plans for mitigation, including detailed monitoring and the use of adaptive management strategies to prevent, minimize or mitigate impacts of oil and/or gas exploration and development for future parcels offered for leasing. It needs to be known what | The RMP is landscape level planning tool to which site-specific proposals are tiered.  There must first be a proposed project prior to developing site specific mitigation.  Leasing itself is not a proposed action with a purpose and need, therefore, developing mitigation is not within the scope of this document. Site specific mitigation is developed at the time of the oil and gas development project, which is subject to site-specific NEPA analysis. |

| | | | | |
|---|---|---|---|---|
| | | | the BLM will do to ensure that the areas that are developed get restored so that they can be hunted again during the lifetime of Utah hunters and anglers Prior to leasing, it needs to be known how long these potential energy developments will take to be implemented, recovered, and mitigated. The Moab FO also needs to know how the amount of money suggested for mitigation will relate to the revenues that will come from the developed area, and how it relates to the habitat base and to the biological needs of wildlife populations being affected. Under the current practice of leasing prior to planning, the Moab FO is sacrificing their ability to adequately plan energy development and accomplish the mitigation tactics of avoiding, minimizing, and reducing impacts on the public's fish and wildlife habitat. | |
| Theodore Roosevelt Conservation Partnership | 288 | 5 | Multiple Use Management: The BLM should detail in the Moab RMP how public lands proposed for leasing and development within the Moab resource area will be managed for a balance of uses, as required by FLPMA. FLPMA sets for a multiple use mandate [The Organic Act for the BLM] that federal agencies must not ignore. With regards to energy development in the Moab FO, this means that the BLM must consider effects on outdoor recreation and the conservation of fish and wildlife species and habitat, notably mule deer, elk, desert and Rocky Mountain bighorn sheep, pronghorn, Colorado Cutthroat Trout, and sage-grouse in determining appropriate natural gas extraction management.<br><br>All alternatives should retain sufficient management discretion for BLM to permit development of the gas resource without improperly committing itself to wholesale conversion of the area from lands containing wildlife habitat, rangeland, watershed, and energy resources, into a single-use industrialized zone | The DRMP/EIS proposes many broad management prescriptions to protect wildlife and their habitats.  The specific issues raised by the commentor will be taken into consideration at the lease development stage. Planning is a tiered process, with the RMP setting the broad general guidelines.  Site specific NEPA analyses develop the mitigations that are to be imposed upon the specific project. |

| | | | | |
|---|---|---|---|---|
| | | | effectively committed to natural gas extraction to the exclusion of most other uses. Given the lack of upfront planning within the DEIS, it is concerning to us that the draft RMP is on track to such single-use zones. | |
| Theodore Roosevelt Conservation Partnership | 288 | 6 | Commitment to UT Division of Wildlife Resource's Management Objectives: The BLM fails to show how it will work to maintain wildlife objectives set by the UT Division of Wildlife Resources (UT DWR). Any determination of areas available for leasing and the appropriate development of these leases should be done with careful consideration of wildlife management objectives set by the UT DWR. All important habitat areas should not be opened for leasing until the Moab FO develops a plan for development that uses science based measurable benchmarks to allow the development to take place in a way that will not considerably impact UT DWR's ability to meet management objectives for fish and wildlife and provide public opportunities for hunting and fishing. This planning should incorporate a specific conservation strategy in concert with UT DWR on how to maintain current big game and upland game-bird population objective in the areas that will become available for leasing. | The Moab BLM has worked with the Utah Division of Wildlife Resources (UDWR) throughout the development of this RMP.

A specific plan of development is required once exploration determines the need for oil or gas field development. The plan of development is not developed at the leasing stage, as at this time, there is no 'purpose or need' for field development. All leases are offered with stipulations to protect known resource values. Upon exploration, an environmental analysis is conducted to determine the specific impacts of the project. Also taken into consideration at this time is any new information that has developed since the time of the RMP. This new information will also be analyzed, and mitigation measure will be developed. Once field development needs have been established, the Plan of Development further addresses impacts, mitigation and cumulative effects on a site-specific level. |
| Theodore Roosevelt Conservation Partnership | 288 | 7 | The BLM fails to correctly acknowledge crucial wildlife habitats that UT DWR has developed based on more than 20 years of data collection and wildlife observations by field biologists. These data are available to the public on the UT DWR website (http://dwrcdc.nr.utah.gov/ucdc/DownloadGIS/disclaim.htm) and should be considered under all RMP alternatives. Failure to consider these data and potential impacts to crucial deer and elk habitat under all alternatives will result in an incomplete NEPA analysis.

Alternative B is the only alternative that correctly | The BLM has worked closely with Utah Division of Wildlife Resource (UDWR) biologists in developing and correctly mapping ALL big games habitats, especially deer & elk winter ranges. This cooperation resulted in the BLM using the exact habitat coverages recommended by UDWR. Many UDWR habitat areas have been expanded as a result of BLM wildlife biologist recommendations. RMP decisions were made that protected these habitats. Alternatives C & D propose seasonal restrictions on winter ranges that were rated by UDWR as "crucial", whereas the 'high value' winter habitats are only restricted in Alternative B. Most of these 'high value' winter habitats are protected by seasonal restrictions (winter) for wet |

| | | | | |
|---|---|---|---|---|
| | | | acknowledges crucial mule deer and elk winter ranges. The proper description of crucial winter habitats should occur regardless of alternatives. The removal of habitats based on alternative is arbitrary – habitat either is crucial or isn't.<br><br>Rocky Mountain bighorn sheep habitat differs among the alternatives. Crucial sheep habitat identification is based on years of observational data by UT DWR and should not be subject to an administrative decision that could be altered by mapping. There currently are no bighorn sheep inhabiting the easternmost portion of the Book cliffs, due to the presence of domestic sheep. However, adequate bighorn sheep habitat exists along the entire Book Cliffs face, and alternative B is the only alternative which correctly describes this information. UT DWR recommends that BLM utilize the best information available to describe the wildlife occurring within the resource area. Therefore, the wildlife habitat data should be presented consistently within the given Alternatives and only the differing impact scenarios will differ among alternatives. | soils, steep slopes, or are in areas that are virtually inaccessible in winter months.<br><br>The BLM worked closely with UDWR on Rocky Mountain Bighorn Sheep habitat.  The BLM took full advantage of the decades of information and knowledge gathered by UDWR.  Much of this habitat is within a Wilderness Study Area, and is completely protected from all surface disturbing activities.  Rocky Mountain Bighorn are moving eastward.  The habitat the BLM has defined in Alternative C represents 100% of the UDWRs designated 'crucial habitat' as well as a large portion of UDWR's 'substantial habitat'.   Before we can even consider the eastern portion of the Bookcliffs as potentially suitable habitat for bighorn occupation, the domestic sheep conflicts must be removed or the entire bighorn population may be at risk. This conflict is being addressed; however, it will take time to resolve this issue. Until the issue is resolve, the main focus for both the BLM and the UDWR is the habitat proposed in Alternative C. |
| Theodore Roosevelt Conservation Partnership | 288 | 8 | Given the long-term nature of energy development, the BLM should include a plan in the FEIS for compensating hunters for the loss of big game that might occur as a result of energy development. The Moab FO must identify the hunting values of the areas being considered for energy development and then determine how subsequent development will impact the uses sportsmen make of our federal public lands during oil and/or gas exploration and development of these lands. Because energy development might keep our members from being able to hunt for the rest of their lives in areas of the Moab FO, it needs to be determined what the Moab FO will do to provide our members and UT sportsmen with alternative locations where they can continue hunting during the appropriate | Compensating hunters for the loss of big game due to energy development is not within the scope of the RMP.<br><br>Upon site specific analysis for specific oil and gas project proposals, hunting values will be considered if impacted. Mitigation may be developed at the project development stage.  Most public lands are open to hunting; therefore providing alternative locations on public lands is not applicable mitigation. |

| | | | lease-area determination process. | |
|---|---|---|---|---|
| Theodore Roosevelt Conservation Partnership | 288 | 9 | Under CEQ NEPA regulations, BLM must make use of all the best available scientific information to assess the effects of land management actions, including cumulative effects from existing, proposed, or foreseeable development projects in the resource management area. Referenced below are peer-reviewed scientific studies on the impacts on sage grouse, elk, and mule deer from vehicle traffic, roads, and oil and gas development. The information from these studies should be incorporated into the FEIS.

Big Game:

Rowland, M. M., M. J. Wisdom, B.K. Johnson, and M.A. Penninger 2005. Effects of roads on elk: Implications for management in forested ecosystems. March 20, 2004. Transactions of the North American Wildlife and Natural Resources Conference 69.

http://www.fs.fed.us/pnw/lagrande/starkey_na/PDFs_Preprints/ms-04_Rowland.pdf

Sawyer, H., R. Nielson, F. Lindzey, and L. McDonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70:396-403.

http://www.bioone.org/perlserv/?request=get-abstract&doi=10.2193%2F0022-541X(2006)70%5B369%3AWHSOMD%5D2.CO%3B2

Sawyer, H., R. Nielson, D. Strickland, and L. McDonald. 2005. Annual Report, Sublette Mule Deer Study (Phase II): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the Pinedale Anticline Project Area. Western Ecosystems | There is a great amount of data available that presents the best scientific information concerning the impacts of oil and gas development on wildlife. ALthough the BLM may not have used the specific article listed by the commentor in development of the DRMP/EIS, the BLM appreciates the commentor supplying the recommended articles. The BLM will review them and use them as needed in the development of oil and gas NEPA analyses. |

Technology, Inc. Cheyenne, WY.

http://www.lst-inc.com/PAPA_2005_report_med.pdf

Sawyer, H., and F. Lindzey. 2001. Sublette Mule Deer Study. Wyoming Cooperative Fish and Wildlife Research Unit, University of Wyoming, Laramie. 51 pp.

http://www.uppergreen.org/library/docs/Muledeerstudy1.pdf

Wisdom, M.J., N.J. Cimon, B.K. Johnson, E.O. Garton, and J.W. Thomas 2005. Spatial partitioning by mule deer and elk in relation to traffic. March 20, 2004. Transactions of the North American Wildlife and Natural Resources Conference 69.

http://www.fs.fed.us/pnw/lagrande/starkey_na/PDFs_Preprints/ms-05_Wisdom.pdf

Sage Grouse:

Holloran, Matt J. 2005. Greater sage-grouse (Centrocercus urophaisianus) population response to natural gas field development in Western Wyoming. PhD Dissertation, Univ. of Wyoming. Laramie, WY. 211 pp.

Available at: http://www.sagebrushsea.org

In Press. Walker, B.L., D.E. Naugle, and K.E. Doherty. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sage-grouse%20Lek%20Analysis_JWM(in_press).pdf

BLM_0011899

| | | | In Press. Doherty, K.E., D.E. Naugle, B.L. Walker, and J.M. Graham. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sagegrouse%20winter%20habitat%20and%20energy_JWM(in_press).pdf | |
|---|---|---|---|---|
| Grand County Backcountry Council | 289 | 1 | Two summers ago BLM instigated a study of the kinds of recreational use that occurs around Moab. This study, a part of the National Visitor Use Monitoring Program (NVUM), found that while 49.3 percent of visitors engaged in hiking as a part of their Moab experience, and 17.9 percent engaged in cycling activities, only 7.7 percent reported driving a 4WD vehicle and 3.8 percent rode dirt bikes or ATVs. Despite this data, BLM is designating 2,642 miles of motorized routes in its preferred alternative, an approach that is detrimental to quiet users (i.e. the majority of recreationalists). These NVUM results appear to make the RMP's recreation planning priorities null and void. | See response to comments 124-2, 124-133 and 124-134. |
| Grand County Backcountry Council | 289 | 2 | The results of the NVUM survey have not been released to the public by BLM, and they wont' be until after the RMP's public comment period is over with. Why is BLM withholding information that would help the public make more knowledgeable comments on the RMP? The public deserves to a clear picture of actual on-the-ground use, and BLM needs to use those stats- even if they're unrefined – in its planning process. Otherwise, this recreation planning is invalid. | See response to comment 124-2. |
| Grand County Backcountry Council | 289 | 3 | In the travel-planning process, BLM did little ground-truthing of potential designated routes. Thus determining only the existence of the routes. Surveys were not conducted to determine on-the-ground conflicts with archeological sites, riparian areas, or other sensitive resources. Only it is BLM's job to know the resources under its charge, but under the provisions | The BLM verified the existence of over 6,000 miles of route in the Moab planning area.  After the initial verification, over 2,500 miles of route were deleted from the designated system as having no purpose and need. An additional 500 miles of route were deleted because they posed resource conflicts with riparian, recreation, wildlife or cultural resources.  The result is a Travel Plan |

| | | | | |
|---|---|---|---|---|
| | | | of FLPMA, these resources must be preserved and protected. Unknowable future recreational uses should not trump unknown existing finite resources. | which designates a finite number of roads.  The Travel Plan provides fewer than 2,000 acres for cross country motorized travel. |
| Grand County Backcountry Council | 289 | 4 | Many routes on the travel plan map (Alt C run within a half-mile or less from one another and arrive at the same destination. (See areas north of Dead Horse Point SP, Mineral Point, Gemini Bridges area, Black Ridge and Canyon Rims, for instance.) There cannot possibly be a defined purpose and need (as required by the BLM instruction memoranda on designating routes) for each of these redundant routes. If there is a low purpose and need for a route, even if there are not resource conflicts present, the route should be closed. Its mere existence is not grounds for designation. A purpose and need must be present. | Purpose and ned for the routes was determined on the ground by seeing if travel had occurred on the routes in question.  In other words, if the route had been used, it was determined that there was some purpose for the route.  "Superfluous" routes included over 2,500 miles of route that are not designated for travel because there was no use on these routes.  Once a route was determined to have been used, a resource conflict was required in order to not designate a particular route.  See Appendix G of the DRMP/EIS for a detailing of the Travel Plan process. |
| Grand County Backcountry Council | 289 | 5 | While travel planning looks at impacts generated by each individual route segment, the cumulative impact of a 2,642-mile route network (Alt C) is not addressed. Even though the impacts of road construction already exist out there, BLM is not taking into account he additional and probable impacts of the people traveling off-trail, not he benefit to wildlife, soils and habitat of allowing currently constructed and little-used roads to reclaim themselves. | The route network to be designated under Alt C represents a reduction of over 2,500 miles of existing route, and a reduction of over 620,000 acres that are currently open to cross country travel.  The cumulative benefits to wildlife, soils and habitat of disallowing cross country travel is the largest benefit gained by travel restrictions.<br><br>The BLM does make the assumption that users will stay on the designated routes.  An RMP/EIS cannot analyze the effects of illegal activity. |
| Grand County Backcountry Council | 289 | 6 | Of specific concern are routes in Tenmile Canyon, Hell Roaring Canyon, and Spring Canyon – all tributary canyons of the Green River – and all along the Green River itself. Routes in these canyons and along the river pose threats to fragile riparian resources and numerous undocumented archaeological and historic sites. At the very least, extensive archaeological surveys should be conducted before route designation occurs in such areas. | The routes mentioned by the commentor are all constructed routes. Damage to archeological resources may have occurred at the time the route was constructed. Continued legal use of the routes does not further impact these sites.  Any new routes considered for construction would require archeological clearances. |
| Grand County Backcountry | 289 | 7 | Routes in the Labyrinth Canyon area also conflict with current river management and use. The Price FO wrote | The Green River in Desolation and Gray Canyons, as well as from the San Rafael River to Canyonlands National |

| | | | | |
|---|---|---|---|---|
| Council | | | the plan for the river and found it to have Wild and Scenic Values, but such values are blatantly ignored by the Moab FO which plans to designate routes along the river, from Mineral Bottom upstream. Nothing precludes motorized recreationalists from camping on the river – in direct conflict with existing river use – and motorists aren't required to follow the same rules as river users. | Park, has been determined to be suitable for Wild and Scenic River status in the preferred alternative.  The existence of routes along the Green River does not disqualify the river for Wild and Scenic status.<br><br>The route from the Mineral Bottom boat ramp upstream to Hell Roaring Canyon was constructed in the 1950's.  If vehicle camping should prove to be a problem in this section, it could be restricted.  In the BLm's experience, very few people (either in vehicles or in boats) camp just upstream from the Mineral bottom boat ramp. |
| Grand County Backcountry Council | 289 | 8 | As motorized use continues to impact the river experience – and many visitors stop running the Green for a quieter experience elsewhere – local businesses that rely on river runners (shuttles, equipment suppliers, guide services, etc) will be adversely impacted, negating the benefit of dollars motorized use might bring to town. | The BLM has monitored vehicle use along the Green River (at Spring Canyon) and has not found this use to be excessive.  There is far more vehicle use on the White Rim Road in Canyonlands National Park (along the Green River).<br><br>The BLM is aware of the economic values that river running (including the Green River) brings to the local economy. |
| Grand County Backcountry Council | 289 | 9 | Also on the subject of local business, BLM makes blanket assumptions about the economic impacts of its plan (i.e.: that more motorized access and extractive industry opportunities will enhance Moab's economy) with no study to back up these postulations. In fact, in looking at the NVUM data, more motorized use and extractive industry will drive away the bulk of Moab's visitors who come here for a quiet, natural experience. | See response to comments 124-133 and 124-134. |
| Grand County Backcountry Council | 289 | 10 | As the BLM turns more backcountry areas into frontcountry managed recreation sites (Alt C creates five new campgrounds in areas farther afield than current sites), visitors are setting up camp and recreating farther away from Moab and are less likely to even come into town and spend money. | The BLM does not intend to detract business from Moab. The campgrounds that are the closest to town fill up first -- campgrounds that are further afield will undoubtedly prove to be popular only when all sites near town are full. The campgrounds proposed in Alt C are still well within the range of Moab, which is still the only place near by in which to spend money. |
| Grand County Backcountry | 289 | 11 | Alternative C identifies only 47,761 acres of roadless backcountry that should be managed to preserve | Chapter 4 of the DRMP/EIS points out that, of the 266,485 acres of wilderness characteristics lands, over |

| | | | | |
|---|---|---|---|---|
| Council | | | wilderness character while 266,485 acres of wilderness-quality land are identified in the RMP. Why should over 200,000 acres with wilderness character be sacrificed? | 40% of these are protected through no surface occupancy stipulations in the Preferred Alternative.  For instance, while Gooseneck and Shafer are not labeled "WC" in the preferred alternative, they are protected through ACEC designation, managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities, and thus are not "sacrificed" in Alt. C. |
| Grand County Backcountry Council | 289 | 12 | Mill Creek is not recognized as eligible for Wild and Scenic Designation. This is a popular gem close to town that deserves recognition and protection. | Both the North and South Forks of Mill Creek are proposed to be managed as an ACEC, and as no surface occupancy for oil and gas leasing and other surface disturbing activities.  In addition, portions of the North Fork of Mill Creek are contained within the Mill Creek WSA.  These two designations are sufficient to protect the resources of Mill Creek in the preferred alternative. |
| Grand County Backcountry Council | 289 | 13 | BLM currently does not have the staff or resources to enforce any regulations outlined in the RMP. If the resource area is to be effectively managed, there needs to be a greater on-the-ground presence. | Enforcement is not a planning issue.  The BLM assumes that it will be given the staff needed to enforce its regulations. |
| Grand County Backcountry Council | 289 | 14 | Although it is a moot point now, the 90-day comment period was entirely too brief to allow the average public time to peruse the draft RMP. Furthermore, the comment period occurred largely during local business owners' busy fall season, leaving outfitters, restaurateurs, and other affected parties with little time to devote to the document. | See response to comment 124-1. |
| Sportsmen for Fish and Wildlife | 296 | 1 | The bighorn herd in the "Rattlesnake herd" is expanding east past Hay Canyon and Cottonwood Canyon, and this RMP does not adequately address the current and future expansion of this bighorn herd, east to the Colorado Border, nor does this proposed alternative adequately prevent the potential destructive loss of the entire herd of 250 plus bighorns. The BLM has specific guidelines requiring the separation of wild sheep and domestic sheep, and there are at least two domestic sheep allotments in the ledges and bighorn habitat that must be addressed, that the current RMP fails to address. | The DRMP/EIS encourages the conversion of sheep allotments to cattle allotments.  Furthermore, at the time of the permit renewal, the issue of livestock class may be addressed.  It would be consistent with the RMP to convert these allotments to cattle allotments. |

| | | | | |
|---|---|---|---|---|
| Sportsmen for Fish and Wildlife | 296 | 2 | There needs to be an adequate mechanism in place for future hunting guides and outfitters to be able to obtain the appropriate permits from the BLM to be able to guide hunters on lands within the RMP. | Hunting permits are granted through the Special Recreation Permit process out;lined in Chapter 2.  These permits continue to be issued in accordance with Handbook 2901-1. |
| Sportsmen for Fish and Wildlife | 296 | 3 | Since the BLM planning process started, and draft alternatives identified, President Bush issued an Executive Order on August 16, 2007, directing federal agencies to:<br>a)      evaluate the effect of agency actions on trends on hunting…And implement actions that expand and enhance hunting opportunities for the public<br>b)      consider the economic and recreational values of hunting in agency actions<br>c)      manage wildlife and wildlife habitat on public lands in a manner that expands and enhances hunting opportunities<br>d)      work with the states to manage and conserve game species and their habitats in a manner that respects private property rights and state management authority<br>e)      establish short and long term goals to foster healthy and productive populations of game species and appropriate opportunities to hunt those species | Nothing in the DRMP/EIS is inconsistent with this Executive Order. |
| Sportsmen for Fish and Wildlife | 296 | 4 | The Utah DWR and Utah Wildlife Board will most likely approve a Bison Management plan for the Book Cliffs on Nov. 28, 2007, and this RMP must recognize this new addition of an animal on these lands and assure adequate forage for Bison in the future. | The DRMP/EIS states that the BLM would work with the UDWR on plans for reintroductions. |
| Sportsmen for Fish and Wildlife | 296 | 5 | Since the last RMP, the Utah DWR and BLM have approved a plan for dramatic expansion of the elk and deer herds, along with flocks of turkey and Bison in the South Book Cliffs portion of the RMP area. This RMP needs to ensure that sufficient forage is made available for such herd expansion. | Forage allocation decisions are made using Standards for Rangeland Health and Guidelines for Grazing Management at an allotment level. |
| American Motorcyclist Association | 302 | 1 | We suggest that they [Moab Field Office] continue to look for opportunities to streamline and simplify the permitting process within the RMP. For example, the | The Dee Pass motorized Focus Area is identified for competitive events in Alts C and D of the DRMP/EIS.  Any routes not specifically identified on the Travel Plan |

BLM_0011904

| | | | Bookcliff Rattlers have funded several archeological inventories. Those routes should be identified in the RMP as being available for competitive events under standard stipulations. | accompanying the DRMP/EIS may be considered on a site-specific basis at a later date (see pg. 2-48 of the DRMP/EIS). |
|---|---|---|---|---|
| American Motorcyclist Association | 302 | 2 | Cottonwoods are found all over the Moab Field Office, including along the Colorado River corridor where "non-OHV use" is intensive and impacting soils near mature and young cottonwood trees. Yet the Draft Plan suggests no fencing in these areas. If BLM is concerned about the cottonwood trees, this concern should in fact be addressed in the RAMP. | See response to comment 208-3. |
| American Motorcyclist Association | 302 | 3 | Fees at White Wash Sand Dunes: The AMA strongly opposes the proposed fee system at White Wash Sand Dunes in Alt C and D. We question the need to implement a fee system at White Wash and believe a fee system will be difficult to implement because of the distance from the Moab Field Office and the ease of access to Dunes and nearby trails. That is in fact one of the most common reasons fee systems fail, and it was one of the main reasons Congress passed the Federal Land Recreation Enhancement Act (FLREA). | See response to comment 123-10. |
| American Motorcyclist Association | 302 | 4 | The travel plan alternatives along the Ruby Ranch Road hear White Wash have not proposed to designate any routes to the existing campsites along the road. So in all of the alternatives you close nearly all of the existing camping opportunities by default. This plan cannot be successfully implemented, and clearly demonstrates the flaw in attempting to limit vehicle camping to designated sites only. | The open area to the west of White Wash Sand Dunes has been expanded to accommodate dispersed camping. See response to comment 120-86. |
| American Motorcyclist Association | 302 | 5 | The DEIS does not sufficiently analyze the impacts to dispersed camping, nor does it provide a wide range of Alternatives to address dispersed camping. If BLM is taking site specific actions such as closing campsites, the public deserves the opportunity to comment and suggest alternatives to these closures. | See responses to comments 123-8 and 123-9.. |
| American Motorcyclist | 302 | 6 | Insufficient quantity of OHV routes: all of the action Alternatives fail to supply a sufficient number of OHV | See responses to comments 123-13 and 208-8. |

BLM_0011905

| | | | | |
|---|---|---|---|---|
| Association | | | routes to meet existing demand. | |
| American Motorcyclist Association | 302 | 7 | The AMA understands the reluctance to consider "new" routes for inclusion within the Travel Plan as described in the DEIS. However, this problem cannot be addressed without some process to consider adding routes to the Travel Plan, either in the FEIS or under subsequent site specific planning. | See responses to comments 122-30 and 208-8. |
| American Motorcyclist Association | 302 | 8 | Wash Bottoms- The plan should allow that wash bottoms be open to OHV use. | See response to comment 122-14. |
| American Motorcyclist Association | 302 | 9 | AMA also requests that BLM consider an additional SRMA in the Final Plan. We believe that there is a need to plan for a motorized single-track system surrounding Wild Cow Wash beneath the Bookcliffs. This area is entirely within a gas field, which stretches from Hay Canyon to the state line, which should significantly reduce the environmental analysis required to establish a SRMA there. If the BLM lacks resources to formally establish the SRMA in the RMP process, we request that it be referenced as a potential SRMA and include guidance to coordinate with other stakeholders in an effort to conduct the process necessary to get it done. | Wild Cow Wash was not brought up during the scoping period as an SRMA. The area was not placed into SRMA status in any alternative in the DRMP/EIS.<br><br>See response to comment 208-13 regarding SRMA designation of Wild Cow Wash. |
| American Motorcyclist Association | 302 | 10 | Wild Cow trails. Moab BLM should consider designating this trail system in the Travel Plan. | See responses to 122-15 and 122-30 regarding the addition of new routes to travel plan. |
| Western Wildlife Conservancy | 311 | 1 | The Moab RMP, especially under the "preferred" alternative, gives far too much weight to mineral exploration and motorized recreation at the expense of intrinsic values and the experiences of quiet recreationists. | See response to 124-9. |
| Western Wildlife Conservancy | 311 | 2 | WWC recommends that the entire length of the Green River within the Moab BLM District be granted wild or scenic status, including Labyrinth Canyon and the entire stretch between Swasey's and the Colorado influence. | Large portions of the Green River within the Moab planning area have been found suitable for Wild and Scenic River designation in the preferred alternative. The portion between Swasey's Rapid and the San Rafael River confluence were not found suitable in Alt C because of the conflicts with private land. |

| | | | | It should be noted that throughout its length, the Green River will be managed as No Surface Occupancy for oil and gas in the preferred alternative, thus protecting many of the outstandingly remarkable values. |
|---|---|---|---|---|
| Western Wildlife Conservancy | 311 | 3 | We wish to point out that the Moab RMP is inconsistent with the Price RMP with respect to this section of the Green River: The Price RMP recommends the west bank of the river for inclusion within the wild and scenic rivers system, while the Moab RMP does not. There is no significant difference between the east and west side of this river segment that would warrant this difference in status. Furthermore, the mere existence of a paved road or dirt road along a river segment or in a river corridor does not disqualify that river segment from being included in the wild and scenic river system. The presence of the road potentially affects only the classification of the river segment. (see Table 2, Appendix J, page J-10 of the classification criteria for Wild, Scenic, and Recreational River Areas.) Again, BLM seems to misunderstand this point. | The Moab BLM is aware of the inconsistency with the Price RMP. This inconsistency has been resolved as both plans move toward their final formulation. |
| Western Wildlife Conservancy | 311 | 4 | WWC finds the method employed by the Moab BLM for identifying possible archaeological sites-namely a computer program-to be a poor person's substitute for the real thing, which in this case would be on-the-ground surveys. Not only will a computer program inevitably fail to include some archeological resources, it cannot rank sites by importance or vulnerability. Any potential additions to the motorized trail system in the District should be held in abeyance until such surveys are completed. | The cultural model referred to in the DRMP/EIS was not a method of identifying sites, but rather a methodology for identifying those portions of the planning area where there was high, medium or low site densities. This allowed analysis of the potential impacts to cultural resources within the planning area.<br><br>Travel Plan formulation is described in Appendix G. Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. |
| Western Wildlife Conservancy | 311 | 5 | Mill Creek Canyon: Both forks of Mill Creek Canyon are rich with archaeological sites and should be given maximum protection. | The North Fork of Mill Creek Canyon is largely within the Mill Creek WSA. This designation means that the North Fork of Mill Creek is managed according to the Interim Management Policy for Lands Under Wilderness Review. |

| | | | | |
|---|---|---|---|---|
| | | | | The remainder of the North Fork of Mill Creek, and the South Fork of Mill Creek, are within the Mill Creek ACEC, which is designated in the preferred alternative.  The area is to be managed as No Surface occupancy for oil and gas drilling and all other surface disturbing activities, providing protection for Mill Creek.  In addition, all archaeological sites are fully protected by law. |
| Western Wildlife Conservancy | 311 | 6 | Behind the Rocks: We strongly advocate that this area be given continued protection as a wilderness study area. The entire 17,836 acres contain high archeological site density and have potential for inclusion on the National Register of Historic Places as an Archaeological District. Rock art in this area is extensive, spanning multiple cultures over thousands of years, and is acknowledged as being of national significance.

We believe all the roads should be closed beyond the existing spur road to "Olk Folks Home." Additional protection as described in Alternative B (page 2-33) is appropriate. | Behind the Rocks continues as a WSA regardless of any planning decision.  In addition, 5,000 acres beyond the 12,000 acre WSA are designated an ACEC to protect relevant and important values, of which cultural resources are one.  The entire area is managed as no surface occupancy for oil and gas drilling in Alt C.

The Behind the Rocks area has very few routes designated within it in Alt C.  The route to which the commentor refers has been removed from designation in Alt. C. |
| Western Wildlife Conservancy | 311 | 7 | Upper Courthouse: We recommend Alternative B for this proposed ACEC. Upper Courthouse, with its riparian areas has a high density of archaeological sites. Known sites exist near Hidden Valley, Brink Spring, Bartlett Wash, and unnamed drainages to the north. The Courthouse Rock area has already experienced vandalism to rock art panels (The Blue Buffalo was rubbed out several years ago) and recreational use in this area continues to be high and is increasing in intensity each year. We believe the active protection of archaeological sites needs to extend beyond grazing to also include visitation. | There is no requirement to carry forward all of the potential ACECs into the preferred alternative.  The BLM's ACEC Manual (1613) requires that all potential ACECs be carried forward as recommended for designation into at least one alternative in the DRMP/EIS. Alternative B analyzed the designation of all potential ACECs.  The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS.

See also response to comments124-68 and 124-82. |

| | | | | Archaeological damage violates Federal law.  Violations of law are beyond the scope of the land use plan under consideration. |
|---|---|---|---|---|
| Public Lands Equal Access Allaince | 346 | 1 | Designated routes called "training trails" offer a significant length of sustainable trail within a confined area that provide the experience these young riders are seeking. Off trail riding has become almost non-existent since these trails were put in place. Some provision for addressing this issue should be mentioned in Appendix G. | See response to comment 120-81. |
| Public Lands Equal Access Allaince | 346 | 2 | Many designated OHV routes cross properties owned by SITLA. To avoid having these routes closed in the future by sale of these lands, rights-of-way should be placed in public ownership. Programs and funding are in place to accomplish this goal. This opportunity should be noted in the plan. | See response to comment 120-82. |
| Public Lands Equal Access Allaince | 346 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comment 208-3. |
| Public Lands Equal Access Allaince | 346 | 4 | In several cases, motorcycle trails shown in Alternatives C and D have been used for several years, and are currently being used, by ATVs and or 4x4s as integral segments of longer loop routes. Most all of these routes have been used by ATVs, from the mid 1980s. We feel these routes should be designated as motorized, or ATV/OHM routes, with some as 4x4. When we contacted your office we were told that the ATV community did not as for any routes. This is not true PLEAA used your TRIMBLE GPS and did this inventory for the Moab Field Office. Putting these routes as motorcycle only on this draft RMP shows a bias and a predetermination of the outcome. | See response to comment 120-90.<br><br>The  commentor worked as a short term volunteer for less than a week well before initiation of travel management planning undertaken in conjunction with the DRMP/EIS. The Trimble GPS was returned in poor condition to the Richfield BLM office and the data  were not utilized. |
| Public Lands Equal Access Allaince | 346 | 5 | The initial inventory and subsequent designation of motorcycle routes was incomplete. Recommended additions are also shown on the attached map. | See responses to comments 122-15 and 122-30. |
| Public Lands Equal Access | 346 | 6 | We agree duplicate routes are generally not needed. However, they may be desirable when they provide | Alternative riding experiences were considered when formulating the alternatives to the Travel Plan |

BLM_0011909

| | | | | |
|---|---|---|---|---|
| Allaince | | | different riding/driving experiences or require very different user skills. Also, washes are not always reliable routes because of weather events. If these washes become temporarily impassible, the alternative route would still allow a person to complete a loop. A case in point would be the road adjacent to Salt Wash. | accompanying the DRMP/EIS. |
| Public Lands Equal Access Allaince | 346 | 7 | We have looked at your maps and can't tell if the campsites we use are going to be open or closed. | No new campsites have been closed in the DRMP/EIS. The open area near the White Wash Sand Dunes has been expanded to accommodate the camping that occurs to the east of the Ruby Ranch Road (see response to comment 120-83).<br><br>The commentor provides no specifics about campsites that he uses. |
| Public Lands Equal Access Allaince | 346 | 8 | Yellowcat/The Poison Strip/Dome Plateau is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network county and of mine roads that already exist. | See response to comment 122-38. |
| Public Lands Equal Access Allaince | 346 | 9 | Page G11, 7.1 OHV Designation Criteria, 2. Wildlife: Does the reference to wildlife habitat include habitat for all species or is it intended to apply to habitat for more significant species or groups of species? This should be clarified. | This wording is contained in the Federal regulations at 43 CFR 8342.1.  The Moab Field Office has no authority to clarify the wording of federal regulations. |
| Public Lands Equal Access Allaince | 346 | 10 | Page G11, Public Safety: The term "extreme" should be further defined. What is an extreme hazard to one person may not be extreme to another, depending on their riding/driving skills. | The wording on page G-11 is directly from the BLM Manual at 8340.  The Moab BLM has no authority to change the wording of BLM Manuals. |
| Public Lands Equal Access Allaince | 346 | 11 | Moab Jeep Safari Trails. When we take our ATV/dirt bikes, we enjoy riding in the White Wash Sand Dunes, 10 Mile Wash, Little Grand Wash, the Tubes, Red Wash, Oil Well Wash, Salt Wash. | In Alt. C of the DRMP/EIS, White Wash Sand Dunes remains available for open ATV/dirt bike travel.  The other routes mentioned by the commentor are available in one or more alternatives of the DRMP/EIS. |
| | 408 | 3 | Failure to adequately consider beneficial impacts when considering whether Alternatives B, C, and D significantly impact the environment when additional acres are closed or limited to OHV use, or when fewer miles of routes are designated. The agency is required to consider both the adverse and the beneficial effects | See responses to comments  408-1 and 408-2. |

| | | | | |
|---|---|---|---|---|
| | | | likely to occur when fewer acres are closed or limited to OHV use or when more miles of routes are designated. The DEIS fails to evaluate the beneficial impacts of an alternative where areas that are closed or limited are more than Alternative A but significantly less than the proposed alternatives. For example, the number of miles designated for OHV use in Alternative B, C, and D are similar in mileage to each other and all drastically differ in number of miles designated when compared to Alternative A. The DIES fails to analyze the beneficial impacts on the environment which are likely to occur when access is better dispersed, as would occur with a modified Alternative C. | |
| New Mexico OHV Alliance | 411 | 1 | Existing campsites should remain open unless closure was determined necessary through individual assessment and a lawful public planning process. The Final RMP must include full public involvement in any decisions to create "restricted camping areas" or "controlled camping areas." | See response to comment 123-8. |
| New Mexico OHV Alliance | 411 | 2 | Travel Plan Alternative D: This alternative fails to provide enough motorcycling opportunities. The analysis is deficient since you do not have an inventory of single-track routes. Therefore, the BLM should continue accepting data on existing routes and consider them for implementation. | See response to comment 122-15. |
| New Mexico OHV Alliance | 411 | 3 | Unused Roads: Roads and trails that are not used in the final version of the system should be retained in the inventory for future consideration. Some may be needed as re-routes, loop connectors, and to provide more recreation opportunities for the future needs. The unused routes should NOT be made to 'go away,' or disappear from the records as if they never existed, or as if they don't continue to exist. They should be classified as currently closed but retained in the system inventory. | The BLM worked with Grand and San Juan counties in developing the Travel Plan alternatives.  Grand County and the BLM agreed that 2,500 miles of largely unused routes had no purpose and need and should not be designated for motorized travel.<br><br>If any of these routes is found to be needed in the future, it could be added to the Travel Plan using site specific NEPA analysis.  See response to comment 122-30 for the process of adding new routes. |
| New Mexico OHV Alliance | 411 | 4 | Fee System: Any fee area proposal must now be reviewed under the Recreation Enhancement Act | See response to comment 123-10.  Wording has been added to clarify that fees would be instituted consistent |

| | | | (REA). Imposition of fees on unimproved areas, without the specific improvements listed in the REA is not allowed under the new act. | with the Federal Recreation Land Enhancement Act (FLREA). |
|---|---|---|---|---|
| Rising Sun 4x4 Club | 413 | 1 | Managing increasing acreage of BLM land as 'wilderness-like' not only is a violation of the BLM's mandate, but marginalizes legitimate motorized users into a smaller 'piece of the pie' with increasing per-mile impact. Ironically, this degrades the remaining OHV areas even more. | See responses to comment 121-10, 120-8 and 121-63. |
| Rising Sun 4x4 Club | 413 | 2 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto Wilderness management are unlawful. Managing increasing acreage of BLM land as 'wilderness-like' not only is a violation of the BLM's mandate, but marginalizes legitimate motorized users into a smaller 'piece of the pie' with increasing per-mile impact. Ironically, this degrades the remaining OHV areas even more. | The BLM manages for multiple uses, including all types of recreation, Areas of Critical Environmental Concern and non-WSA lands with wilderness characteristics.  See response to 121-10 and 120-8 for a discussion of wilderness characteristics.  The BLM has provided many opportunities for motorized users within Alt. C of the DRPM/EIS. |
| Rising Sun 4x4 Club | 413 | 3 | Please do NOT put the Rabbit Valley/Westwater area under custodial management with a hiking and equestrian emphasis. | The Rabbit Valley area is part of the Utah Rims SRMA, which is designated in Alt C for motorized and mechanized trail use.  The Westwater area (outside the Wilderness Study Area) is within the Moab Extensive Recreation Management Area (ERMA).  It is not managed for a hiking and equestrian emphasis.  All recreation activities can occur in the ERMA consistent with the Travel Plan. |
| Rising Sun 4x4 Club | 413 | 4 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. This route has been open for decades, and it appears on USGS topographical maps from the 1970's. | The Star Canyon route was within the Travel Plan inventory.  Grand County recommended to the BLM that the route be removed from all alternatives because it had no demonstrated purpose and need.  The BLM included the Star Canyon route in Alt D; the BLM eliminated the Star Canyon route in Alts. B and C.  The BLM knows that the Star Canyon route is on the USGS  map.  It is an inventoried way within the |

| | | | | Westwater WSA and presents conflicts with wilderness values. |
|---|---|---|---|---|
| Rising Sun 4x4 Club | 413 | 5 | Several short route segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. We understand that the Utah Four Wheel Drive Association has been informed this is merely an accidental omission, but we would like to formally request that these segments be included on the final maps. | See response to comment 206-11, |
| Rising Sun 4x4 Club | 413 | 6 | Any fee system should require the full involvement of the Recreation Fee Advisory Council, BLM's Resource Advisory Council, and the affected user group. | See response to comment 123-10. |
| Rising Sun 4x4 Club | 413 | 7 | The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. This will have the ironic effect of increasing environmental impact mentioned earlier, as well as creating user confusion. | The commentor does not explain exactly what the small area is. The BLM assumes that it is White Wash Sand Dunes. For a discussion of the open area at White Wash, see response to comment 123-35. |
| Rising Sun 4x4 Club | 413 | 8 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the West of the Sand Dunes. It should also be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. | See response to comment 123-35. In addition, the White Wash area has been expanded to the west to include the camping area and the hill climb mentioned by the commentor. See response to comment 120-83 for discussion of the expansion of the White Wash open area. |
| Rising Sun 4x4 Club | 413 | 9 | How should recreational uses be managed to limit conflicts among recreational users? BLM's draft plan indicates that your answer is to create "exclusive use zones." This is not the only answer to user conflict, and is, in fact, unworkable. Currently there is a large amount of Wilderness land appropriate for 'quiet use' advocates, but creating "exclusive use" zones in areas currently open for OHV use will concentrate increasing use on a smaller footprint, increasing impact. | Focus Areas are not intended to be for the exclusive use of any one group of recreationists. The BLM's Land Use Planning Handbook (H-1601-1) directs the BLM to designates Recreation Management Zones (which are called focus areas in the Moab DRMP/EIS). These areas are defined on pg. 2-18 in the DRMP/EIS as those that "emphasize particular types of redreation activities while still allowing for other uses in accordanced with the Travel Plan. Focus areas are established as a mechanism for enhancing specific recreation opportunities through facilities and education." |

BLM_0011913

| Rising Sun 4x4 Club | 413 | 10 | Keep Behind the Rocks area, OHV trails in Pritchett Canyon, also near Golden Spike/Gold Bar Rim, Rusty Nail 4x4, Goldbar/Corona Arch open to motorized vehicles. | The Golden Spike, Pritchett Canyon, Rusty Nail and Goldbar Rim routes are in the Travel Plan for Alternative C, the preferred alternative.  There are additional routes in the "Behind the Rocks Area", but without specifics, it is impossible to say which ones the commentor refers to.  The route to Corona Arch is confined to hikers only. |
|---|---|---|---|---|
| Rising Sun 4x4 Club | 413 | 11 | Also at issue is the lack of information about campsite closures; the analysis does not tell us how many campsites would be closed under each alternative. This makes it very difficult to gauge the impact of the alternatives on dispersed camping. For instance, it appears that the Appendix E rule change would effectively eliminate all camping in the Bartlett Wash area, at least in the interim until and if it is developed. We support a policy where existing campsites are open unless determined closure was necessary via lawful public planning process including specific impact analysis. This should include full public involvement with adequate information specific to each area. | See responses to comments 120-86 and 123-8.  Bartlett Wash is available for dispersed camping presently, although campers are restricted to designated sites and are required to carry out solid human waste.  Camping at Bartlett Wash remains as is under the DRMP/EIS;  should a developed campground be proposed at Bartlett Wash, site specific NEPA analysis would be undertaken. Full public involvement would be part of the NEPA analysis. |
| Rising Sun 4x4 Club | 413 | 12 | We do believe that all SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS).  See also response to comment 120-30. |
| Rising Sun 4x4 Club | 413 | 13 | Please clarify, up front, via signage or other on-the-ground means, that SRMA may emphasize a particular use without excluding other uses. | Signing on the ground is not a land use planning decision. See Chapter 1 of the DRMP/EIS on page 1-11, which clarifies which actions are administrative ones. |
| Rising Sun 4x4 Club | 413 | 14 | The BLM should also consider a SRMA in the Yellowcat area. Yellowcat is increasingly popular for four wheeling and ATV riding. | See response to comment 122-38. |
| Utah Rock Art Research Association | 415 | 1 | We believe that the BLM has done a poor job of cultural resource management associated with this RMP. We are especially concerned with the use of computer modeling to determine cultural resource locations. A limited percentage of lands within the MPA have been physically inspected for the presence of cultural resources, and such an effort is cost prohibitive as part of preparing the RMP. Therefore, the relative site | The commentor misunderstands the use of the computer modeling of cultural resources.  The model (described on pg. 4-30 of the DRMP/EIS) was developed by a professional BLM archaeologist, and used only to "analyze potential relative involvement of cultural resource sites in management decisions."  It is not used to predict site numbers involved in decisions, nor is it a replacement for full inventory for sites prior to surface |

| | | | | |
|---|---|---|---|---|
| | | | density potential for areas within the MFO was estimated using environmental factors known to influence site location and type. All areas of the MFO were then ranked as having either high, medium, or low potential for containing cultural sites. (page 3-19) This problematic approach does not acknowledge that people and their archaeological footprint are not entirely predictable. Nor does it consider the significance of sites, only density. We recognize that complete surveys have not been done. However, there has been extensive documentation of cultural resources. "The MPA has approximately 5,200 inventoried cultural sites." (Page 4-253) It is not clear to us that these documented site locations have been given consideration in the RMP. We do not support a decision-making process which is not based on actual rock art and archeological site inventories. | disturbance.  In other words, the model was used to make comparison among the alternatives as to which alternative would be most beneficial or potentially adverse to cultural resources.<br><br>The model was constructed by using the 5,200 known sites in the Moab planning area, and by constructing polygons of "high", "medium" or "low" potential for cultural resources.  These areas were then compared by alternative to see which alternative affected high and medium areas more intensively.<br><br>Site specific decisions in the DRMP/EIS (for instance, route designation) were made using the actual cultural resource inventories that have been performed in the Moab planning area.  As stated in the DRMP/EIS, all future surface disturbing activities will be required to have an archaeological clearance.<br><br>See also response to comment 124-25. |
| Utah Rock Art Research Association | 415 | 2 | The RMP is bereft of information regarding the amount of protection that will be provided to cultural resources. Pages 2-2 through 2-6 provide helpful information regarding the coverage of Off-Highway Vehicle designations, Special Recreation Management Areas, Oil and Gas Leasing and Development, River Classifications, Wildlife, and Wilderness under the various proposed alternatives. No information is provided for cultural resources. There is no way to determine what percentage of the modeled high, medium, or low site probability acreage (table 3-7, page 3-19) is covered by an ACEC or special management consideration. Nor is there anyway to determine how many of the 5,200 inventoried cultural sites are protected. | All cultural sites are protected by law, and will continue to be protected regardless of decisions made in this RMP effort.<br><br>Three ACECs, Ten Mile, Behind the Rocks and Mill Creek, were designated in the preferred alternative to provide additional protection for cultural resources. |
| Utah Rock Art Research | 415 | 3 | Maps need to be larger with better defined borders and known archeological sites need to be considered in the | Known archeological sites were considered in the DRMP/EIS.  However, these sites were not placed on a |

| | | | | |
|---|---|---|---|---|
| Association | | | management plan. | map for public viewing in order to protect the integrity of the site.<br><br>The maps in the text of the DRMP/EIS are also available on the internet.  In their electronic format, it is possible to enlarge and zoom in on each of the maps on the DRMP/EIS. |
| Utah Rock Art Research Association | 415 | 4 | We believe all roads should be closed beyond the existing spur road to "Old Folks Home." | The BLM believes that the commentor is referring to the archeological site near the end of the Moab Rim route.  The route past the existing spur road to this site has been closed to motorized use in Alt C.  The route remains open to hiking and mountain biking use. |
| Utah Rock Art Research Association | 415 | 5 | The current maps appear not to include the rock art at Crescent Junction. These are significant sites and should be included. | The maps in the DRMP/EIS do not include rock art sites.  The BLM is aware of the rock art at Crescent Junction.<br><br>No disturbance of cultural sites is allowed under any alternative.  All surface disturbing activities would be required to have a cultural clearance.  It is required to avoid or fully mitigate cultural  sites. |
| Utah Rock Art Research Association | 415 | 6 | It is difficult to determine the boundaries of this district [Canyon Rims] from the maps provided. | The maps can be enlarged in their electronic format.  The boundary of Canyon Rims SRMA is along the cliff above Lockhart Basin to the west, along the rim above Kane Creek to the north, along U.S. Highway 191 to the east, and  along the grazing allotment boundary  and the rim of Harts Draw to the south. |
| Utah Rock Art Research Association | 415 | 7 | Mill Creek Canyon: The supplied maps are insufficient to indicate whether the culturally rich uplands are included. | The Mill Creek Canyon ACEC includes much of the culturally rich uplands.  This ACEC has been established to protect the cultural resources found in this area.  The maps can be enlarged in their electronic format. |
| Utah Rock Art Research Association | 415 | 8 | Upper Courthouse: We believe the active protection of archaeological sites needs to extend beyond grazing to also include visitation. | The BLM protects all cultural sites.  This is required by law.  In the Upper Courthouse area, cultural resources have been fenced to protect them from OHV users.  Dispersed campsites have not been designated because they are on cultural sites.  The imposition of SRMA management, as is provided for in Alt C, will allow the BLM to impose other restrictions on visitors for the protection of cultural resources. |

BLM_0011916

| Utah Rock Art Research Association | 415 | 9 | We do not see any proposed protection under ACEC for the BLM land along the south side of the Colorado River downstream from Moab and up Kane Creek. This area is dense with rock art and other archeological sites of national register quality. It is being documented as part of the proposed Wall Street rock art district. This area receives high visitation, is experiencing non-approved off-road vehicle use, and needs appropriate protection and interpretation at highly visible rock art sites. We believe this area from the Moonflower Site up canyon for approximately 6.5 miles needs to be protected under an archeologically focused ACEC.<br><br>Page 2-8 proposes scientific restoration of archeological sites from Highway 191 to Kane Creek canyon. We see no reason to stop at Kane Creek Canyon and suggest that this restoration continue within our proposed area. | The Kane Creek Road is in the Behind the Rocks ACEC, which is proposed for the protection of cultural resources.<br><br>Travel is limited to designated routes in the DRMP/EIS, although it should be noted that this has been the case in this area since 1992. |
| Utah Rock Art Research Association | 415 | 10 | Seven Mile Canyon is an area with many national register quality rock art sites spanning thousands of years. The Inestine Man site is one of the finest examples of Barrier Canyon Style and world famous. This extraordinary site needs to be part of a thoughtful management plan.<br><br>The campground located at the mouth of the canyon and the road through the canyon recently washed out. We recommend that this road and campground should not be reestablished. We also recommend that this area be included in an archeologically focused ACEC. | Seven Mile Canyon, although not proposed as an ACEC, is specially mentioned in the DRMP/EIS.  It is prioritized for Class II and Class III surveys in Alt. C.<br><br>The camping sites at the mouth of the canyon have been decommissioned.  It is now illegal to camp in the mouth of Seven Mile Canyon.  This has been imposed to protect cultural resources. |
| Utah Rock Art Research Association | 415 | 11 | Hellroaring Canyon. An unauthorized off-road vehicle road has been created from the Green River to the Barrier Canyon Style pictograph site in this canyon. | The route in Hell Roaring Canyon was constructed during the uranium mining of the 1950's.  Off road travel off this route is illegal and will continue to be so under the DRMP/EIS, which limits travel to designated routes. |
| Utah Rock Art Research Association | 415 | 12 | Klondike Bluffs. It is not clear from the maps if there is any special protection for the rock art sites located at Klondike Bluffs outside of Arches National Park. We | All rock art sites in the Moab planning area were not proposed as cultural ACECs.  All rock art is protected by law.  The Klondike Bluffs area is proposed to be managed |

| | | | | |
|---|---|---|---|---|
| | | | recommend an archeological focused ACEC for this region if it is not protected. | as part of the Lavyrinth Rims/Gemini Bridges SRMA, which will allow the BLM to manage recreation users more directly. |
| Utah Rock Art Research Association | 415 | 13 | We are concerned about a road segment that bisects an area with a high archeological site density. It is south of Levi Well located in the south half of section 25 Township 23S, Range 18E. | All routes designated as part of the Travel Plan were analyzed for cultural resource conflicts.  The BLM professional archeologist noted which routes posed unacceptable cultural resource conflicts.  These routes were not designated in the preferred alternative unless the purpose and need outweighed the cultural conflict.<br><br>Any routes included in the Travel Plan may be reconsidered at a future date for designation or non-designation. |
| Utah Rock Art Research Association | 415 | 14 | Rock Art Nomination Districts, Mill Creek Canyon needs to be added to this list. | The Mill Creek Rock Art is sacred to many Native American tribes.  These tribes do not wish this rock art to be publicized by nomination to a Rock Art district. |
| Utah Four Wheel Drive Association | 420 | 1 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. | See response to comment 413-4. |
| Utah Four Wheel Drive Association | 420 | 2 | Several short reroute segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan Maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. We have been informed this is merely an accidental omission, but would like to formally request that these segments be included on the final maps. Maps detailing the missing segments are included at the end of this letter. [See attachments] | See responses to comments 206-11 and 206-17. |
| Utah Four Wheel Drive Association | 420 | 3 | The Gemini Bridges natural arch is one of the few natural bridges in the entire country that can still be driven. We feel that this route offers a unique driving opportunity that will be lost of the proposed closure is enacted. Please include this route in the Final RMP and Travel Plan. | See response to comment 206-14. |
| Utah Four Wheel Drive | 420 | 4 | White Wash Sand Dunes. This area is of particular concern to our members. First, the open travel area as | See response to comment 120-83, explaining that the open area has been expanded to the west to |

BLM_0011918

| | | | | |
|---|---|---|---|---|
| Association | | | proposed under Alternative C is too small. The open travel area should be expanded, and determined by easily identifiable geological boundaries or existing roads to make adherence to the new restrictions easy for all users. Second, the open travel area should include the challenging hill climb on the northwest portion of the sand dunes. Third, we oppose the proposed fee system described in Alternatives C and D. The proposed system seems to indicate that individual use and camping permits would be required for individuals and groups of any size. We strongly oppose such a fee system, and would encourage that a more appropriate fee system be established if it is necessary. | accommodate camping. This expansion would include the challenging hill climb on the west side of the dunes.<br><br>See response to comment 123-10 for discussion of a proposed fee system at White Wash. |
| Moab Area Climbers Association | 434 | 1 | The map for Option C shows a number of areas, most notably upper Kane Creek and Tusher Canyon/Mill Creek, as VRM-1. These areas are important to climbers. As such, we of course want them to be as beautiful as possible. Unfortunately, the VRM-1 status, being the highest level of visual resource management, could be construed in the future to curtail any activity, including climbing. If the VRM-1 status would mean changing the conditions that make climbing safe and enjoyable in those areas, then we are opposed to it. | Kane Creek and the Tusher Canyon Mill Creek area are both designated as VRM II in the preferred alternative (Alt. C).  The Behind the Rocks WSA is VRM I. |
| Moab Area Climbers Association | 434 | 2 | To have such a large area be deemed off-limits for a species [Mexican Spotted Owl] that none of us have ever seen seems out of character with the way a habitat management plan is established. If this area is deemed critical to the currently nesting birds, we understand the need for a limited closure. However, it would not be acceptable to close such a large section of cliff simple because it might be a future nesting area. A copy of the habitat management plan, which would explain how the areas were designated to be so large, would greatly aid in the public's understanding. | No specific recreation activities are proposed to be curtailed because of Mexican Spotted Owl habitat.  The Protected Activity Center for the nesting pair of owls in the planning area is not in a popular recreation area.  No sections of cliff have been proposed to be closed.<br><br>The habitat management plan for Mexican spotted owl is administered by the U.S. Fish and Wildlife Service. |
| Moab Area Climbers Association | 434 | 3 | The MACA would like to see the DRMP formally acknowledge that climbing is a legitimate use of the public lands around Moab. | The DRMP/EIS mentions climbing several times throughout the document.(e.g., p. 3-80).  In addition, Focus Areas are proposed specifically for climbing |

| | | | | activities.  Climbing is acknowledged as a legitimate use of public lands. |
|---|---|---|---|---|
| Moab Area Climbers Association | 434 | 4 | We also feel that certain areas in Kane Creek and on Potash Road are popular enough that toilet facilities are warranted. We would be able to work with the BLM, as the Access Fund and Friends of Indian Creek have done in the past, to help aid the building of these much-needed facilities. | Installing toilet facilities is not a land use planning decision. |
| Environment Preservation Foundation | 478 | 1 | …the Draft RMP/EIS completely overlooks the growing body of research completed in neighboring Wyoming that demonstrates unequivocally that impacts go way beyond just the surface of roads, utility corridors, and well pads.  As an example, the studies show that a single 10 acre well pad will result in significant "avoidance behavior" for a radius of nearly 1 mile around the pad by a variety of wildlife species.  Linear impacts from recreation trails, OHV trails, mineral development access roads and utility corridors, and grazing activities have the same effect.  Computations of lost habitat based only on direct surface disturbance are completely inadequate when considering the altered behavior brought about by these developments and the loss of critical habitat is far greater than suggested in the various tables. | See response to comment 124-39, 124-40, 1025-14, and 1025-15.<br><br>The commentor has not provided the specific study mentioned in the comment. |
| Environment Preservation Foundation | 478 | 2 | To address the limited direct surface impact only, the BLM turns to standard Timing Limitations as a mitigation measure (see Section 3.8.1).  In addition, the BLM suggests the possibility of vegetation manipulation, and/or restoration of surface impacts by re-vegetation over the lifetime of a given project such as mineral development, but that does not address adequately the loss of habitat from other activities that have indefinite lifetimes such as public hiking/OHV trails, roads, grazing and the like.  Nor does Timing Limitations or restoration of surface impacts over several years life of a project such as oil or gas development address the much larger impact resulting | See response to comment 124-7. |

| | | | | |
|---|---|---|---|---|
| | | | from avoidance behavior that increases habitat loss. | |
| Environment Preservation Foundation | 478 | 3 | When any project is approved and carried out, the impact is immediate, the habitat lost.  It takes years to replace or restore lost habitat but the impact on the wildlife is immediate.  Loss of habitat from direct impact and avoidance behavior result in concentrated competition in restricted habitat by more wildlife.  Timing Limitations and long-term vegetation manipulation have not proven to be effective in addressing the "immediate" impact to wildlife and the BLM needs to give consideration in the RMP/EIS to other mitigation measures such as permanent off-site habitat development in conjunction with and prior to project approvals to off-set the immediate and understated impacts from those developments. | See response to comment 120-33. |
| Environment Preservation Foundation | 478 | 4 | There is some information on projected emissions from a variety of equipment used in a variety of ways in the Draft in Section 3.2.  What the section does not address is the fact that most of the sources of hazardous emissions are small individual sites like compressors at well sites.  Under existing law, emission control equipment at these locations can be shut down and not monitored if the source falls under certain thresholds of emissions. | See response to comment 214-10. |
| Environment Preservation Foundation | 478 | 5 | Given the projections for continued growth in the mineral extraction activities within the Moab District, it is safe to assume that single sources of undesirable emissions will increase significantly. The Draft fails to consider the cumulative impact from these sources from what is really a single source or project (oil and gas extraction). The BLM needs to take a broader view of the cumulative impact from these sources and insist upon the use of newer technologies that are now coming available to reduce or eliminate these hazardous air pollutants. | See response to comment 214-10 and 214-11. |
| Environment Preservation | 478 | 6 | While the Draft notes the need to protect surface watersheds and water resources in general, there is no | Produced water from oil and gas development was not raised as an issue during the scoping period for the land |

| | | | | |
|---|---|---|---|---|
| Foundation | | | consideration of a significant planning issue that can result from mineral extraction such as oil and gas-produced water.  Produced water is more often than not of significantly reduced quality and often contains hazardous pollutants that are detrimental to all forms of life, especially wildlife.<br>          Typically the treatment of produced water is accomplished by evaporation, treated on or off-site with filtering, or subjected to deep-well injection. All three methods have advantages and disadvantages. Impounding for evaporation or filtering can result in difficulties keeping wildlife at bay.  Trucking or piping the water to off-site facilities can be expensive; impacts other habitat, can result in air quality issues, and travel safety hazards to wildlife.  Deep well injection is expensive. It could result in additional impacts to air quality from high-pressure compression needs and possibly migrate into higher quality aquifers. Contamination of better quality aquifers would be nearly impossible to correct and could have negative, long-term impacts on surface waters and all biological species. The BLM needs to significantly upgrade their efforts on planning for and mitigating impacts from all activities that could have long-term detrimental effects on the water resources (ground and subsurface) within the planning area. | use planning process.<br><br>See response to comment 124-7. |
| Center for Water Advocacy | 481 | 1 | The federal Wild and Scenic Rivers Act requires the BLM to either list as eligible or make suitablitlity recommendations as part of the RMP process regarding the above rivers and river sections before further development and impacts from man irretrievable eliminates the suitability criteria for such water bodies. In addition, during the September forum on Wild and Scenic Rivers, the BLM also told CWA that the agency will not make a recommendation in favor of suitability without local support. *Mill Creek Canyon Upper and Middle Sections, Green River through Labyrinth | The DRMP/EIS lists 14 rivers that were found eligible for Wild and Scenic river status.  Alt. C proposes that the Dolores, Colorado and portions of the Green River are suitable for wild and scenic river status.   The BLM has completed its suitability recommendations as part of this RMP process.<br><br>Beaver Creek, Professor Creek and Onion Creek are all within areas that are to be managed to protect their wilderness charactersitics, thus affording protection to these streams.  For a discussion of Mill Creek, see |

| | | | Canyon, Colorado and Dolores River, Onion Creek and Professor Creek, Beaver Creek all meet the eligibility requirements. | response to comment 289-12. |
|---|---|---|---|---|
| Back Country Horsemen of Utah | 482 | 1 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:<br><br>Negro Bill Canyon – This trail was originally constructed be livestock operators who utilized horses to move cattle. Under alt B, C, and D; you propose the closure of this trail to horse use. However, I cannot find the reason for this closure. Have you talked with horse users to determine If there is an alternative and will this closure block horse use from accessing other lands. There also seems to be some disconnect because you propose the designation of 2.5 miles of road for motorized travel in Negro Bill Canyon but are closing it to equestrian use. Can stock use of this canyon be determined by either improving the existing trail or constructing a new trail in the canyon? | There is no road proposed for motorized travel in Negro Bill Canyon. The BLM is aware that the trail was originally utilized for livestock operations. However, there has been no cattle grazing in Negro Bill Canyon since 1997. The foot trail currently in the canyon receives over 50,000 people per year. The trail is not maintained so that it can sustain horses. The trail was removed from equestrian use because each time a horse goes on it, the trail is severely compromised and needs repair.<br><br>Horses may still access the canyon from the stock trails in the upper portions of the canyon. The only portion of the trail that is forbidden to horses is the 2 miles in the lower part of the canyon. The BLm does not believe that the need for horse use there is great, nor is there an alternative location in which to build an equestrian trail. Each and every other part of the Moab Field Office remains open to equestrian use. |
| Back Country Horsemen of Utah | 482 | 2 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:<br><br>The Chapter 3 Existing Environment lists Negro Bill Canyon as being limited to hiking only, while Chapter 2 Alternatives 2 states that equestrian use is discouraged in Negro Bill Canyon. Which is correct? | In practicality, Negro Bill Canyon is limited to hiking only. The RMP proposes to close the 2 miles at the very mouth of Negro Bill Canyon to horse use because of the damage that the trail sustains when it is traversed by horses. |
| Back Country Horsemen of Utah | 482 | 3 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:<br><br>General – Common to all the non-mechanized recreation travel section in chapter 2 states "limit non- | No other trails are closed to horses other than Negro Bill Canyon in the DRMP/EIS. |

BLM_0011923

| | | | | |
|---|---|---|---|---|
| | | | mechanized travel on specific lands to designated trails and managed routes for resource protection purposes." No where can we find what this might refer to with the exception of Negro Bill Canyon. Chapter 3.11.1.2.1.8 Popular Hiking Trails does identify some trails that are presently open only for foot traffic. Are you planning to close additional areas or trails to horse use? If so we would request that it is done with a public process and a minimum of 30 day comment period. The public process should identify the trails being closed and the resource concerns for the closure. | |
| American Rivers | 483 | 1 | I was surprised to note the following:<br><br>A lack of consistency between the Price and Moab decisions on suitability. Does the BLM seriously believe that one side of the Green River can be suitable for Wild and Scenic designation and the other side not? This oversight must be corrected, or clearly explained. At the very least, the BLM needs to address how it will manage one side of the Green River to protect Outstandingly Remarkable Values, yet not the other. | The Price and the Moab field Offices have coordinated on management of the Green River for suitability. |
| American Rivers | 483 | 2 | I was surprised to note the following:<br><br>The BLM seems to misunderstand the W&S river evaluation process with regards to classification of the river segments under study. The "classification" of a river is a fact based on current river conditions: an eligible segment is "recreational," "scenic," or "wild." Once an agency has made a determination that a river segment is eligible and a classification has been determined, the BLM's Manual directs that the agency has an obligation to manage the river segment to maintain that level of classification until the status of the river is resolved. A segment's classification should not vary between one alternative and another. The classification should not be "downgraded between the eligibility study and the preferred alternative unless the | The tentative classification was established along each river segment during the eligibility review.  This tentative classification is based on an inventory of existing characteristics of a river resulting from human caused change or level of development.  The tentative classification is considered in Alternative B.  However, because a river's tentative classification provides a framework for the management prescriptions applied within the area, some flexibility is allowed to consider a range of tentative classifications in the alternatives. Alternative C provides for a balance between protection and other land uses.  Therefore, the classifications in Alternative C have been adjusted to provide for a wider range of alternatives (Manual 8351.32).<br><br>The tentative classification established through inventory |

| | | | | |
|---|---|---|---|---|
| | | | BLM can demonstrate that the quality of the river has changed to justify this downgrading, and explain how they failed to manage the river to maintain the previously determined classification. | for an eligible river will be considered in at least one alternative; however, because a river's tentative classification provides a framework for the management prescriptions applied within a river area, some flexibility is allowed to consider a range of tentative classifications in the alternatives.  The BLM's Wild and Scenic River Manual (Section 8351.33C) states: "Additional alternatives may be formulated for any combination of designations and/or classifications.  Whenever an eligible river segment has been tentatively classified, e.g. as a wild river area, other appropriate alternatives may provide for designation at another classification level (scenic or recreational)." Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives (whether BLM's or those of another official entity), continuity of management prescriptions, or other management considerations. |
| American Rivers | 483 | 3 | I was surprised to note the following:<br><br>The RMP finds any eligible river in an area of proposed development to be unsuitable, essentially claiming that this foreseen development precludes designation. This is an erroneous interpretation of the Wild and Scenic Rivers Act. The reason for including rivers in the National Wild and Scenic Rivers System (NWSRS) is to protect them before development occurs – to protect outstanding rivers that are threatened by development. See 16 USC § 1271 (purposes); § 1275 (only if development was undertaken (as opposed to threatened) would river be deemed unsuitable); HR Rep 90-1623 at 3808 ("priority shall be given to studying rivers that are most threatened by developments which, if they materialize, would render the rivers unsuitable for inclusion in the [NWSRS]"). | The eligibility study undertaken by the Moab Field Office is described in Appendix J.  Remarkably Outstanding Values were identified for each segment of river that was found eligible. |
| American Rivers | 483 | 4 | We are concerned by the process undertaken by the BLM to determine suitability for the Moab area. In the WSRA, the Secretary of the Interior (or where National | The BLM has followed the procedures outlined in the "Wild and Scenic river review in the State of utah, Process and Criteria for Interagency Use" (July 1996), as |

Forest lands are involved the Secretary of Agriculture) "shall study and submit to the President reports on the suitability or nonsuitability for addition to the [NWSRS] of rivers which are designated herein or hereafter by the Congress as potential additions to such system." 16 USC § 1275 (a) (emphasis added). The President "shall report to the Congress his recommendations and proposals with respect to the designation of each river or section thereof under this chapter…In conducting these studies the Secretary of the Interior and the Secretary of the Agriculture shall give priority to those rivers (i) with respect to which there is the greatest likelihood of developments which, if undertaken, would render the rivers unsuitable for inclusion in the [NWSRS]." Id. (emphasis added).

In terms of the content Congress stated that each suitability report, including maps and illustrations, shall show, among other things: (1) the area included within the report; (2) the characteristics that do or do not make the area a worthy addition to the NWSRS (i.e., the eligibility criteria); (3) the current status of land ownership and use in the area; (4) the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed if the area where included in the NWSRS; (5) the Federal agency administering the area; (6) the extent to which it is proposed that such costs of administration be shared by State and local agencies; (7) the estimated cost to the United States of acquiring necessary lands and interests in land and of administering the area should it be added to the NWSRS; and (8) a determination of the degree to which the State might participate in the preservation and administration of the river should it be proposed for inclusion in the NWSRS. 16 USC § 1275 (a) ; § 1276 (c) (hereinafter "the eight suitability factors").

well as the congressional legislative direction for Wild and Scenic river planning.  The BLM recognizes that congressional discretion is up to Congress itself.

All streams in the Moab Field Office were given consideration (including riparian areas) for their potential designation as a Wild and Scenic River.  Appendix J fully discloses the review and evaluation process for determining which are eligible and suitable for such designation. Designation of any streams and tributaries or drainage areas used as a municipal water source as Wild and Scenic Rivers could result in assertions of minimum water flows, which could affect the water rights and water flows to the communities.

The BLM has worked with cooperators to ensure that any effects of decisions regarding Wild and Scenic Rivers are considered. Barring congressional action, there is no effect on water rights or instream flows related to suitability findings made in a land use plan decision. Even if Congress were to designate rivers into the National Wild and Scenic Rivers System, any such designation would have no effect on existing water rights. Section 13(b) of the Wild and Scenic River Act states that jurisdiction over waters is determined by established principles of law. In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a Federal reserved water right for designated rivers, it does not require or specify any amount, and instead establishes that only the minimum amount for purposes of the Act can be acquired. Because the State of Utah has jurisdiction over water, the BLM would be required to adjudicate the right, as would any other entity, by application through State processes. Thus, for congressionally designated rivers, the BLM may assert a Federal reserved water right for appurtenant and unappropriated water with a priority date as of the date of

In the WSRA, Congress explicitly limited the suitability study to the eight factors. See 16 USC § 1275 (a); § 1276 (c). Once the suitability report is completed, and submitted to various officials for review and comment, it is submitted to the President who must then "report to the Congress his recommendations and proposals with respect to the designation of each such river." 16 USC § 1275 (a).

Here the BLM's application of the suitability standard is arbitrary because 1) it lacks a clear presentation of the decision-making process and ultimate unsuitability determination for the rivers, and 2) it appears to consider factors well beyond the 9 enumerated in the WSRA. The BLM repeatedly contends that the suitability determination is simply an analysis of whether they "should" designate the rivers. By adopting this vague approach the BLM is transforming the straightforward objective suitability standard outline in the WSRA (8 factors to be considered) into an amalgam of subjective criteria. The BLM is standing in Congress' shoes, seemingly rejecting rivers as unsuitable on purely political grounds. While it is true that factor number 4 of section 4 (a) of the WSRA does open the door to some balancing of competing uses by allowing consideration of "the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed" if included in the NWSRS, the BLM is taking it too far. Putting together an objective list of uses that will be enhanced or foreclosed (the good and the bad) does not equate to a river being deemed "unsuitable" because the BLM thinks other uses are more important than river protection or because the river is already "provided protection" by other management prescriptions. Indeed, any interpretation to the contrary would undermine the very purposes of the

designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation. In practice, however, Federal reserved water rights have not always been claimed if alternative means of ensuring sufficient flows are adequate to sustain the outstandingly remarkable values.

| | | | WSRA to preserve the Nation's outstanding rivers under the threat of development and regardless of their location.

In fact, the plain language of section 4 (a) of the WSRA., the legislative history, the 1982 43 Guidelines, and express policy goals of the WSRA suggest that some threat of future development does not, and should not, render a river "unsuitable." See 16 USC § 1275 (a)(i) (only those "developments which, if undertaken, would render the rivers unsuitable."); see also HR Rep No 90-1623 at 3808 (seeking to protect rivers that "are the most threatened by developments which, if they materialize, would render the rivers unsuitable"). White it is Congress' prerogative to make purely political decisions – as it has in the past with respect to various rivers (i.e., the Snake in Idaho) – it is not the Federal agencies' prerogative under the WSRA.

Moreover, any final suitability decision at this early stage in the NEPA/RMP process is premature. Pursuant to the BLM's own policies, final suitability determinations can only be made after completing the NEPA process and receiving and considering public input on the matter. See BLM Manual 8351 §§ .33 (A), .34 (B), and .42.

We strongly urge the BLM to reconsider the suitability findings and issue a revised Draft RMP to address the concerns raised by American Rivers and the Utah Rivers Council. | |
|---|---|---|---|---|
| Center for Native Ecosystems | 485 | 1 | The BLM must disclose why ACEC designation is not necessary for the Cisco Complex under some of the proposed alternatives.

 Only alternative B, which is not the preferred alternative, would designate the Cisco White-tailed | General information has been added to Appendix I which explains the rationale for designating or not designating ACECs under the preferred alternative.

The Cisco Complex ACEC is not designated an ACEC in Alt C because, under Alt C, there are management |

prairie dog complex ACEC.

Even when potential ACECs are not recommended for designation in the preferred plan alternative, the rationale for doing so must be included:

The rationale for ACEC designations in the preferred alternative must be discussed. The rationale for not proposing designation of a potential ACEC in the preferred alternative must also be provided. In other words, if the proposed plan does not call for special management attention of a potential ACEC in the preferred alternative (and therefore, it is not proposed for designation), the reasons for the decision not to provide special management attention must be clearly set forth. BLM Manual 1613.33.E

We were not able to locate such a discussion in the DEIS.

The BLM has determined that "the habitat within this area is essential for maintaining this species" (I-10, 3-126), so it is difficult to understand why the agency would not designate this area as an ACEC. FLPMA requires that the BLM give priority to the designation and protection of ACECs, so this is a responsibility that the agency should take seriously

prescriptions that will protect the relevant and important values of the area;  therefore, ACEC designation is not required.

The BLM will manage habitats within the proposed ACEC boundaries in coordination with UDWR and according to management guidance recommended in any state recommended management plans.
•        Alternative C makes specific provision for avoiding active colonies that can be implemented on new and existing leases.
By surveying areas planned for surface disturbing activities and by avoiding disturbance and destruction of active colonies, ensuring grazing practices that promote seed production and restricting travel to designated roads, the integrity of the relevant and important values of the occupied prairie dog habitats within the proposed ACEC would be preserved.  Much of the 177,481 acres of this area is currently not occupied, thus large tracts of land are available for population expansions.  Although there may be alteration to some of these unoccupied habitats, the management prescriptions will ensure that once these habitats become occupied, management prescriptions will also protect newly occupied areas in the future.

Although the prescriptions listed above are standard operating procedures, by presenting them in the proposed management prescriptions under Alternative C, the BLM has the ability to implement buffers on all leases. Currently prairie dog numbers are low, but if numbers approach those of earlier decades, it may become impossible to develop a lease and adhere to these stipulations.  For that reason, exception language was developed to ensure there would not be a taking on a lease holding.   Although the buffers are not those recommended by CNE, the BLM worked closely with

| | | | | USFWS and UDWR to develop management prescriptions that satisfy both of these agencies. |
|---|---|---|---|---|
| Center for Native Ecosystems | 485 | 2 | Half of the Cisco complex is already leased for oil and gas drilling – the BLM must adopt strict protections on the remaining acreage.<br><br>Table 4.87 indicates that half of the area within the Cisco White-tailed Prairie Dog ACEC has already been leased for oil and gas drilling. The BLM must act now to conserve the remainder of this area. One of the factors for listing a species under the Endangered Species Act is inadequate regulatory mechanisms. Since valid, existing rights have been granted for half of the Cisco Complex already, the BLM will be hard pressed to demonstrate that it is able to provide adequate management for this species even if it adopts stringent protections via this RMP. Instead, the BLM proposes to apply only a CSY with considerable leeway for exceptions and modifications to the remainder of the habitat that the agency still fully controls. As Table 4.117 indicates, under the preferred alternative 100% of the white-tailed prairie dog habitat in the Moab Field Office would be open to oil and gas leasing. This is unacceptable. | As mentioned in comment 485-1, Alternative C makes specific provision for avoiding active colonies that can be implemented on new leases. Because the buffer is within the parameters of Standard Operating Procedures, the stipulation can be applied to existing leases as well. The Controlled Surface Use stipulation proposed in Alternative C is essentially No Surface Occupancy within 660 feet of an active town. The BLM, in coordinating with USFWS and UDWR determined that the prescription developed in Alternative C will adequately protect active colony integrity. Due to the nature of prairie dog population growth and declines, it was not practical to identify all active colonies and place a No Surface Occupancy stipulation in these specific areas. The BLM, in conjunction with USFWS and UDWR, developed a flexible stipulation that will allow for adaptive management. |
| Center for Native Ecosystems | 485 | 3 | The BLM must disclose how it determined that proposed buffers are adequate, and why different buffers are applied in different situations.<br><br>The DEIS proposed buffers of differing sizes for prairie dogs, yet we were not able to locate an explanation of how any of these buffers were chosen and why they are believed to be adequate.<br><br>Alternative B applies a 1300' buffer for white-tailed and Gunnison's prairie dog habitat (C-22, 4-57). Alternative C applies a 660' buffer within white-tailed and Gunnison's prairie dog habitat (2-34, 2-47, 2-48, 4-57, | The buffer was listed wrongly page 2-84 & 4-316 of the DRMP/EIS. The buffer is 660 feet, no 600; these errors have been corrected.<br><br>In coordinating with the USFWS, a single research report was located that disclosed the distance from disturbance to prairie dogs. This study was conducted on the endangered Utah prairie dog;  1300' was the distance where prairie dogs reacted to events near their colony. As Alternative B presents the most protective management, 1300' was felt to be appropriate, given the lack of documented data on White Tailed or Gunnison's prairie dogs. |

4-394). However, pages 2-84 and 4-316 refer to a 600' buffer for Alternative C. Page 4-395 seems to indicate that under Alternative D, white-tailed prairie dog habitat will be granted a 660' buffer while Gunnison's prairie dog habitat will not be conserved.

This is confusing, and could easily be considered arbitrary and capricious.

In comparison the Utah BLM uses the following buffers for Utah prairie dogs in the T&E stipulations applied to oil and gas lease parcels in habitat for this species:
-Surface occupancy of other surface disturbing activity will be avoided within .5 mil of active prairie dog colonies.
-Permanent surface disturbance or facilities will be avoided within .5 mile of potentially suitable, unoccupied prairie dog habitat, identified and mapped by Utah Division of Wildlife Resources since 1976.

Half-mile buffers would be 2640', twice what the BLM is proposing even under the more conservative option in the DEIS.

In its set of comments to the Utah BLM from May 28, 2004 regarding a proposed oil and gas leasing in white-tailed prairie dog habitat, the US Fish and Wildlife Service stated:

We recommend lease notifications identifying the occurrence of white-tailed prairie dog colonies or habitat be added to all the parcels that either contain existing or historic prairie dog habitat. Stipulations should specify a no surface occupancy of at least 500 meters surrounding the prairie dog colonies (page 10)

This is equivalent to 1640', again, larger than any of the

Alternative C imposes a buffer that can be implemented on all leases, including active and existing leases, thus allowing the BLM to protect active colonies consistently throughout the entire area.

Alternative D presents the least protective management measures. The Moab BLM includes only small portions of the Gunnison prairie dog range. Much of the habitat indentified in Map 2-21 was delineated by soil and vegetative conditions that may have the potential to support active prairie dog colonies which are located on adjacent private and state lands. Currently, active colonies are very limited on public lands and few historical colonies have been identified. Due to the limited potential for Gunnison prairie dog expansion on public lands, it was determined that mitigation measures could be developed on a site specific basis and the development of protective measures was not applicable in the D Alternative.

The USFWS has developed specific protective measures to recover the once endangered, but now threatened Utah prairie dog. Of the four species of prairie dogs found the western US, the original range of Utah prairie dogs was less than 500,000 acres. The range of the white-tail prairie dog encompasses almost 50,000,000 acres and the Gunnison prairie dog encompasses over 65,000,000 acres. To recover a listed species that occupies a relatively small range, such as the Utah prairie dog, requires extreme protection measures. Both the White-tailed and Gunnison prairie dog are BLM state sensitive species that require the BLM to manage their habitat in a way that will not lead to listing. However, imposing the same protective measures that have been developed for the Utah prairie dog is overly restrictive to the multiple uses which are mandated for public lands. The Utah prairie dog is a threatened species that occupies less

BLM_0011931

| | | | | |
|---|---|---|---|---|
| | | | proposed buffers in the DEIS. It is important to note that the Service recommended No Surface Occupancy stipulations rather than Controlled Surface Use, as well.<br><br>In our ACEC nominations we advocated for NSO stipulations for prairie dog complexes plus .5 mile buffers, and we still believe that this is what the BLM should adopt. | than 1% of the range occupied by the White tailed and Gunnison prairie dogs. |
| Center for Native Ecosystems | 485 | 4 | The Cisco Complex is on the short list of sites that have been considered for ferret reintroduction and should be managed as such.<br><br>When I attended last spring's stakeholder meeting for the Utah Gunnison's Prairie Dog and White-tailed Prairie Dog Conservation Plan, I was surprised that UDWR was still talking about black-footed ferret reintroduction in the Cisco Complex. The BLM should be doing everything it can to facilitate prairie dog recovery in this area so that ferret reintroduction may become a reality. UDWR recently adopted the Northeastern Region Black-Footed Ferret Management Plan, and the BLM should carefully consider its management recommendations. These include:<br>-Place roads and well pads outside prairie dog complexes.<br>-If avoidance is not possible, place roads and well pads close to colony edge or in areas that keep surface disturbances of colonies to a minimum.<br>-After drilling activities cease, reduce well pad size to the smallest possible size (tear-drop shape).<br>-Keep road size width to a minimum.<br>-When roads/well pads are no longer needed, reclaim disturbed areas with suitable seed mix. This will also help control the spread of noxious weeds.<br>-Where possible, bury power lines to reduce raptor perching/hunting sites.<br>-Drill multiple wells from one pad where opportunities | The USFWS has reviewed the management prescriptions and land management decisions developed in Alternative C and the Cisco Desert still remains a viable black footed release site.   By policy, the BLM is required to support ESA recovery of species and will continue to coordinate with the USFWS in the ferret recovery program.<br><br>Though the BLM refers to 'colonies', proximity of colonies in relationship to the size of the disturbance will determine the site specific mitigation.   The PRMP/FEIS will provide general management prescriptions that will be tailored to site specific needs. |

| | | | | |
|---|---|---|---|---|
| | | | exist. (pp. 13-14)<br><br>It is important to note that UDWR has recommended that disturbances be kept out of complexes as a whole, rather than just outside of individual colonies. | |
| Center for Native Ecosystems | 485 | 5 | The BLM must ensure that it manages white-tailed prairie dogs appropriately – the agency should not rely on UDWR to take care of this.<br><br>In several places, the DEIS simply states that the BLM will manage white-tailed prairie dogs according to UDWR's plans or recommendations. For example, page 2-45 states, "Manage both prairie dog species and their habitats in coordination with the UDWR. Apply habitat management guidance and population monitoring strategies as recommended in the newly developed multi-agency white-tailed and Gunnison's prairie dog management plan." However, this plan has not yet been completed or adopted. In fact, on of our criticisms of the plan was that rather than reviewing what the BLM actually proposes to do in all of the DEISes out for plans under revision, it only listen options that may appear in the RMP alternatives. Here is the discussion for the white-tailed prairie dogs:<br><br>The WTPD in Utah is also considered a "State Sensitive Species" by the BLM. The BLM in Utah is currently revising land us plans in Moab, Vernal, Price and Salt Lake Field Offices, covering the entire range of the WTPD in Utah. In the revised land use plans, BLM will recognize the WTPD as a State Sensitive Species, and will address WTPD habitat conservation measures through a range of alternatives. Because the WTPD is considered a State Sensitive Species, the Bureau's 6840 Policy requires that the Bureau "…ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become | The responsibility of the Utah Division of Wildlife Resources (UDWR) is  for the animals themselves. The BLM is entrusted with the management of the habitat that supports animals residing in a given area.<br><br>As stated in response to comment 485-1, he BLM works in coordination with the UDWR, not only in the development of the DRMP/EIS,  but also in the development of conservation plans and management guidance for varying species.  The DRMP/EIS is a landscape level management plan that provides the BLM a general framework within which to work.  As various plans are developed, the PRMP/FEIS will provide the needed direction and authorization to implement recommendations from other state and federal agencies as applicable.  The BLM's Special Status Species Management Manual 6840 Policy functions as an implementation mechanism to adequate conserve sensitive species, including the prairie dog.  Manual 6840 directs the BLM to "…ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed." The BLM intends, by the management prescriptions imposed  in the DRMP/EIS, to follow state and federal recommendations where applicable. |

BLM_0011933

listed." Within these new plans, the BLM may propose to manage habitat for WTPDs according to UDWR recommendations, by; developing cooperative agreements with UDWR or other agencies to inventory WTPD habitat, consider suitable unoccupied habitat for population expansion, develop conservation measures to protect active WTPD colonies, mitigate impacts from new roads, oil and gas developments, and rights-of-way, adjust livestock grazing to favor spring plant growth where feasible, limit OHV use to existing roads and trails, and/or propose establishment of Areas of Critical Environmental Concern (ACECs) where WTPD habitat would receive management priority over other resource uses. (p. 20)

Most of these measures only appear in Alternative B, not the preferred alternative, in the Moab DEIS. There is a bit of a shell game going on – UDWR tries to reassure the Service in its plan that the BLM will take care of managing prairie dog habitat, and the BLM does the same by pointing to the UDWR plan as the one that will conserve the species. In reality, neither plan does much of anything to change the status quo.

The current draft of the UDWR plan also only proposes to implement management changes once a prairie dog species has registered a 40% decline range wide based on occupancy monitoring data. Here is an excerpt from our comments on the draft UDWR plan explaining why this is inappropriate:

Finally on page 37 we get to actions, and the plan straight out says "Implement actions … when/if a 40% decline [sic] (95% CI) range-wide occupancy decline is detected from the baseline survey; short-term trigger) [sic] or ongoing as appropriate." This is garbled to begin with, but it seems to state that nothing in Appendix C, or

the Assessments, or the Strategies, or the ferret plan will actually be implemented until we see this further 40% range-wide crash in one of the species. This also means that nothing could possibly be implemented until 2011 for white-tailed prairie dogs because this is the first year that such a decline could be registered based on the monitoring strategy. Perhaps the authors would argue that the "as appropriate" allows discretion to implement actions earlier, but the realities of budgets and program priorities will come into play and if you do not actually call for the implementation of actions in this plan, they will not occur.

Because the plan ties conservation measures to a 40% decline in occupancy range wide, it is doomed to be ineffective. If prairie dogs disappear from 40% of plots occupied in 2007 or 2008 in a three-year period, it is hard to imagine that the State of Utah would be able to do anything meaningful to bring these species back from the brink. Management in Utah itself also does not really factor into the trigger for conservation actions. For example, if Utah poisons every prairie dog in the state, the 40% decline threshold may still not be met range wide.

There still has been no attempt to show that a 40% decline in occupancy range wide would not be catastrophic for these species, and WAFWA and the states are wasting their time in developing these plans that evidentially will do nothing to change the status quo for prairie dogs. This is terribly disappointing, especially because, as the plan notes, conserving prairie dogs offers tremendous hang for the buck – you have the opportunity to bolster populations of many imperiled associated species at the same time.

Neither the BLM nor UDWR have shown in the plans

| | | | | |
|---|---|---|---|---|
| | | | that they have drafted that existing regulatory mechanisms are adequate to conserve either the white-tailed or Gunnison's prairie dog. This violates the BLM manual. | |
| Center for Native Ecosystems | 485 | 6 | The DEIS does not provide the type of protections that were promised to the US Fish and Wildlife Service according to their 90-day white-tailed prairie dog petition finding.<br><br>The language in the current draft of the UDWR plan was tempered from an earlier draft that (over)stated:<br><br>Within these new plans, the BLM proposes to manage habitat for prairie dogs according to USFWS and UDWR recommendations, develop cooperative agreements with other agencies to inventory prairie dog densities, and provide a suitable habitat for expansion, protect active colonies, and require buffer zones from new road and oil and gas development, and adjust grazing to allow spring plant growth (P. Riddle, BLM, Moab Field Office personal communication). In addition, the BLM restricts off-highway vehicle (OHV) use to designated roads, which benefits WTPDs. (April 5, 2007 draft)<br><br>The BLM keeps backpedaling on what it will actually do for prairie dogs. The Service's 90-day finding on our Endangered Species Act listing petition reported that neither the Price nor Moab RMPs currently specifically address white-tailed prairie dog protection (69 Fed. Reg. 649899 (Nov. 9, 2004)), but that the revised RMPs will include "protections similar to those for species protected under ESA." Unfortunately, almost all of the protections in the DEIS are only found within Alternative B, which is not the preferred alternative, and these pale in comparison to the protections that listing under the Act would convey. | Both the U.S. Fish and Wildlife Service (USFWS) and Utah Division of Wildlife Resources (UDWR) have reviewed the DRMP/EIS.  Neither agency has provided comments as to any deficiencies in Alternative C in relationship to prairie dog habitat management prescriptions.  The BLM worked closely with both agencies. Although the BLM did not completely adopt the initial recommendations from either agency (which were not identical), the BLM did use both USFWS and UDWR recommendations, giving consideration to the BLM's multiple use mandate.  The BLM developed a set of management prescriptions for the prairie dog, and these prescriptions met the approval of both agencies.   In 2004 (after the initiation of the RMP process), the Moab BLM has implemented and funded an agreement with UDWR to inventory all sensitive species (prairie dogs, ferruginous hawks, burrowing owl, kit foxes and bats) within the area encompassed by the ACEC proposal, as well as in wildlife corridors from other important habitats into this area.<br><br>Upon completion of the DRMP the Moab BLM is planning to develop a Habitat Management Plan in this area to address not only prairie dog habitat management, but all other sensitive species in the area.  The Moab BLM recognizes the importance of this area and the potential impacts of energy and recreational development and will use the HMP to future implement any management prescription that may be needed as new information is gather and developed.<br><br>There is expansive unoccupied prairie dog habitat within the area that will be protected as populations increase. Page 4-316 discusses the requirement for surveys and |

BLM_0011936

| | | | | |
|---|---|---|---|---|
| | | | The BLM should be aware that the Service has admitted that the petition findings for both the white-tailed and Gunnison's prairie dogs were illegally tampered with by political appointee Julie MacDonald, and the agency intended to move forward with listing under the Act by completing a status review for each species. Again, the agency has the perfect opportunity to provide adequate management via all of the RMPs that are under revision, but this DEIS does not indicate that the BLM is prepared to do so. | buffer zones that have been developed for the White tailed and Gunnison prairie dogs. Although these buffers are not as large as recommended for the Utah prairie dog (a threatened species), they are sufficient to facilitate colony protection. Grazing practices that will support spring plant growth and seed development, and travel management that will restrict travel to designated roads are also discussed in this section. Two of the biggest threats to prairie dog populations are Bubonic plague and drought. The BLM cannot develop land management prescriptions that will offset the declines that plague and drought can cause. As long as plague remains a threat, prairie dog populations will remain very cyclic. |
| Center for Native Ecosystems | 485 | 7 | The BLM must analyze impacts to all Special Status Species. The DEIS states, "It was determined that quantitative analyses would be made for Federally listed species as well as a few BLM sensitive species selected as representative of a variety of vegetation types." (p. 4-354) However, the BLM has considerable direction to address Special Status Species management during plan revision. For example:<br><br>-For priority plan species and habitats, "identify the actions and area wide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3.<br><br>-For priority populations, species, or habitats of fish and wildlife, "identify actions and area wide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.<br><br>-Also, BLM must "identify site-specific actions, such as riparian fencing, guzzler placement, etc. needed to | The BLM has analyzed impacts to Special Status Species in Chapter 4 where impacts are expected. Each of the special status species was aggregated by habitat type for purposes of analysis.<br><br>Actions to achieve desired vegetation conditions have been developed in the alternatives.<br><br>Actions and restrictions for priority fish and wildlife species have been developed in the alternatives. See Chapter 2 and Appendix C for these restrictions.<br><br>The BLM has not determined the need for site specific management needs for prairie dog habitats, but rather has developed prescriptions that will offer protection throughout large tracts of habitat. Site specific habitat improvements will be developed subsequent to the PRMP/FEIS and will be analyzed, using the NEPA process, on a case-by-case basis.<br><br>Strategies and decisions to conserve and recover special status species have been developed in the alternatives.<br><br>Conservation Strategies for special status species are |

manage ecosystems for all species and habitat for special status species." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Additionally BLM must:

Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all special status species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decision should be consistent with BLM's mandate to recover approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

BLM Land Use Planning Handbook H-1601-1, Appendix C at 5. Although neither the BLM manual nor the land use planning handbook appear to explicitly require the development of Conservation Strategies, such a responsibility is clearly inferred. The BLM Manual's definition of a "Conservation Strategy" further underscores this understanding:

A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plans and animals that are designated as BLM Sensitive Species or that

developed on a state wide basis, in cooperation with the U.S. Fish and Wildlife Service (USFWS), the Utah Division of Wildlife Resources (UDWR) and the surface-managing agencies that manage the habitat for the species. Once these Conservation Strategies are developed, the BLM's field offices are mandated to implement these strategies. Until such time as Conservation Strategies are developed, the BLM will defer to the prescriptions that have been developed in the DRMP/EIS. The BLM will also continue to coordinate with UDWR and USFWS on all actions, as applicable.

BLM_0011938

| | | | | |
|---|---|---|---|---|
| | | | have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal Candidates under the Endangered Species Act.<br><br>BLM Manual § 1601, Glossary at 2.<br><br>Instead, the BLM seems to have chosen the species that it feels are receiving the most scrutiny these days and included them in the DEIS while basically ignoring the other Special Status Species in the Field Office. | |
| Center for Native Ecosystems | 485 | 8 | The DEIS does offer some hope. Alternative B would go a long way to conserving prairie dogs – the BLM even appears to be considering a year-round shooting closure in the Cisco. And even Alternative D would require 660' buffers around active colonies. But all of the stipulations are much too weak now because of the broad exceptions and modifications that can be applied. The BLM should step back and consider how this RMP could foster recovery of the white-tailed prairie dog, Gunnison's prairie dog, black-footed ferret, ferruginous hawk, and burrowing owl – the entire prairie dog ecosystem – and then provide a more comprehensive conservation strategy in the FEIS. | The Moab BLM, in coordination with the Utah Division of Wildlife Resources and the U.S. Fish and Wildlife Service, plans to develop a Habitat Management Plan in the Cisco area to address not only prairie dog habitat management, but the management of all other sensitive species in the area. |
| NOLS/ Outdoor Industry Association | 487 | 1 | NOLS is compelled to participate in many of them [FO plans], including the Price Supplemental Environmental Impact Statement (EIS) due on December 13, the Vernal Supplemental EIS due on January 3, the Richfield Draft EIS due on January 23, and the Monticello Draft EIS due on February 8. Having so many comment periods open within the same limited time frame will have a negative effect on the quality of comments returned. | See response to comment 124-1. |
| NOLS/ Outdoor Industry Association | 487 | 2 | Permanent protection of the Green river corridor is both urgent and appropriate. Floating through the arid desert ecosystem between the breathtaking 5,000 foot walls of Desolation Canyon, out Gray Canyon, and through Labyrinth Canyon, our students gain invaluable insight | The Green River in its entirety is proposed to be managed as no surface occupancy for oil and gas and all other surface disturbing activities in the preferred alternative. The entire river (except for the portion between Swasey's Rapid and the San Rafael River confluence) is suitable for |

| | | | | |
|---|---|---|---|---|
| | | | into the diverse biology, geology, and cultural history of the American West against the backdrop of a historic and free-flowing wild river. For several years NOLS and other concerned outfitters have been protesting potential oil and gas leases that threaten to encroach on scenic vistas and wildlife habitat, and diminish the river experience of our customers and students. Preserving the wild character of the Green is critical not only to the health of outdoor education programs and outfitting businesses, but also to the long-term viability of river-related businesses in the area.<br><br>Economically speaking, the Green river is an asset for surrounding communities. NOLS alone teaches more than 20 courses per year, averaging over 2,400 user-days. A Wild and Scenic designation would preserve the outstanding and remarkable values of this free-flowing river and bolster the regional recreation and tourism economies. Given the overwhelming evidence qualifying the Green River as suitable, and given our school's desire to continue to operate courses in an ecologically, geologically, and cultural diverse landscape, we strongly support designating the Green a Wild and Scenic River in its entirety. NOLS and OIA are comfortable with the Wild, Scenic, and Recreational designations for which the entirety of the river is found eligible in Alternative B, and ask the MFO to retain these designations in its suitability that will accompany the Final EIS. | Wild and Scenic river designation. (The portion mentioned has a preponderance of private and state land along the shore). |
| NOLS/ Outdoor Industry Association | 487 | 3 | According to Map 2-24-B, entitled Areas with Wilderness Characteristics – Alternative B, a piece of Gray Canyon beyond the Desolation Canyon WSA, across from Gunnison Butte along the Book Cliffs, retains the wilderness qualities. Likewise, areas with wilderness characteristics border much of the Green River along Labyrinth Canyon. Only in Alternative B do these wilderness-quality areas receive Visual Resource | The Green river corridor is to be managed as no surface occupancy in the preferred alternative. This means that new surface disturbing activities would not be allowed. Given this oil and gas management, VRM II is deemed to be sufficient to protect visual resources along the Green River. |

BLM_0011940

| | | | | |
|---|---|---|---|---|
| | | | Management (VRM) Class I viewshed status, and even then it is only along the edge of the Labyrinth Canyon Rim. Everywhere else is Class II or Class III. In section 4.3.18 of the Moab DEIS, VRM Class II allows that, "Management activities may be seen, but should not attract the attention of the casual observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape" (p. 4-433). NOLS and OIA feel that VRM Class II inadequately protects the canyon viewshed.<br><br>VRM Class I "does not preclude very limited management activities," and specifies that, "the level of change to the characteristic landscape should be very low and should not attract attention" (p.4-432). Such a designation is more appropriate for a river viewshed with wilderness-quality characteristics. NOLS recommends that the Final RMP prescribe a VRM Class I viewshed for all areas along the Green River that have been shown to have wilderness characteristics in Alternative B in the Draft RMP, in both Gray and Labyrinth Canyons. | |
| NOLS/ Outdoor Industry Association | 487 | 4 | While in principal NOLS and OIA support the Moab Field Office's (MFO) efforts to inventory and identify all designated routes rather than opening up wide swaths of land to motorized recreation, in practice this initiative raises a few concerns. Unofficial, user-created routes that have previously not been recognized will enjoy administrative protection if they are included in the final RMP. It will be much harder to close routes the MFO deems to be detrimental to other multiple uses if they are incorporated into the plan. In fact, it would require a plan amendment. This limits the BLM's ability to manage routes in a timely manner.<br><br>In particular, there are two designated routes along the | The two roads that the commentor refers to were both built during the uranium mining days of the 1950's and 1960's.  These two roads are not new, nor are they user created.  While they are to be included in the travel plan that accompanies the preferred alternative, their removal would not require a plan amendment, but rather a simple EA.  The intent of the travel plan is to restrict travel to designated routes, not to open up new swaths of lands to motorized recreation.<br><br>Routes above the Green River rim do not generally cause conflicts with users below, as the distances are quite great. |

| | | | | |
|---|---|---|---|---|
| | | | Green River in Labyrinth Canyon that represent a clear conflict of uses. Most disconcerting is a route at Hey Joe that actually follows the canyon bottom and is accessible by jeep. OHV activity along the canyon bottom clearly conflicts with a primitive river experience. Further downriver, at Spring Canyon, a similar route extends too far north in both Alternatives B and C. Route development along the Labyrinth Canyon floor should be discouraged, not legitimized. The MFO is likely aware of the Horseshoe Canyon Wilderness Study Area within the Price Field Office that extends to the west bank of the river, immediately across from the route along Hey Joe. NOLS and OIA consider that having one bank of a river managed to retain its wilderness character while the other bank remains open to motorized jeep travel to be a flawed prescription.<br><br>Ideally, the MFO will create a larger buffer zone along the canyon rim, with the exception of a few limited access points, to better protect the visual resources, the air quality, the opportunities for solitude, and the primitive experience frequently associated with river trips. The Final RMP should provide at least a ¼ mile buffer from the canyon rim, unless the viewshed from the river extends beyond ¼ mile, in which case the buffer zone should be extended as well. A few limited access points can be maintained, but not at the excessive levels currently being considered. | |
| NOLS/ Outdoor Industry Association | 487 | 5 | Ideally, a preferred alternative demonstrates a balance between issues in the conservation alternative and the development alternative. In many cases it seems that the MFO worked hard to find a good balance between various needs. When considering wilderness characteristics, however, the preferred alternative seems less balanced. Alternative B identifies 266,485 acres that have wilderness characteristics, and proposes managing these acres in a fashion that would | While only 47,000 of the 266,000 acres of lands with wilderness characteristics are to be managed to protect these characteristics in the preferred alternative, over 40% of such lands are managed as no surface occupancy fo roil and gas development and other surface disturbing acititives. This management prescription will preclude development.  It should be noted that the entire Green River corridor is to be managed in this manner. |

BLM_0011942

| | | | | |
|---|---|---|---|---|
| | | | maintain those wilderness characteristics. Alternative D opts to manage zero acres for wilderness characteristics outside of WSAs. Alternative C, which should provide a balance between B and D, purports to manage only 47,761 acres to maintain wilderness characteristics, less than 1/5 of potential acreage.<br><br>Managing for wilderness characteristics does not preclude motorized travel. It merely confines motorized travel to designated routes. According to the Moab DEIS Table 2.1, on Non-WSA Lands with Wilderness Characteristics, the BLM purports to, "Manage these primitive lands and backcountry landscapes for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate" (p. 2-16).<br><br>A better balance can be found, and lands near Desolation Canyon and Labyrinth Canyon provide an excellent opportunity to find that balance. According to Table P1 (P-3) in the Moab DEIS, Non-WSA Lands with Wilderness Characteristics in Desolation Canyon and Labyrinth Canyon would add 35,330 acres to wilderness characteristics currently being considered in Alternative C. This would almost double the land being managed to preserve wilderness characteristics. Additionally, such an addition in the Final RMP would do much to protect the river corridor, which deserves protection until Congress has an opportunity to weight the merit of designating stretches of the Green River as Wild, Scenic, or Recreational. | All lands in the Moab field Office, with the exception of around 2,000 acres near the White Wash Sand Dunes, are to be managed as limited to designated routes.  This is intended to stop the cross country travel that currently occurs. |
| Coconino Trail Riders | 488 | 1 | The DRMP departs from the "Multiple Use/Sustained Yield" mandate imposed on the BLM by Congress and the Congressional time limit for Wilderness inventory has passed. The designation of quasi-wilderness areas through this planning process is inappropriate and unlawful. | See responses to comments 121-10, 120-8 and 121-63. |

| Coconino Trail Riders | 488 | 2 | The DRMP does not offer a true motorized alternative. ALL alternatives represent a major reduction in motorized use. The "motorized" Alternative D provides somewhat more miles of trail and gives motorized users somewhat more open area in White Wash and some other areas. These small increases in motorized use over the Preferred Alternative C do not nearly make up for the designation of all of Rabbit Valley /Westwater as non-motorized. A true motorized alternative is necessary. | See response to 208-2. |
|---|---|---|---|---|
| Coconino Trail Riders | 488 | 3 | Any trails planning must provide for motorized single track and motorcycle slickrock routes. Please incorporate the existing routes as suggested by Ride With Respect and the Blue Ribbon Coalition and please provide for future planning and implementation of such trails. | The DRMP/EIS provides 282 miles of singletrack motorcycle route in the preferred alternative.  See response to the Blue Ribbon Coalition (ID 123) and Ride with Respect (ID 122) comments for specific suggestions from these groups. |
| Coconino Trail Riders | 488 | 4 | We support the 200 yard motorcycle corridor and open area status for mountain bikes proposed by Ride With Respect and the Blue Ribbon Coalition on the Slickrock Trail. This is a good compromise between providing for exploration for motorcyclists while still providing an escape from motor noise for mountain bikers and hikers on the Slickrock Trail | See response to comment 122-42. |
| Coconino Trail Riders | 488 | 5 | The White Wash Dunes Fee Area is ill-advised and unworkable. From an Agency perspective, it would appear to be exceedingly difficult to administer and enforce. From an user perspective, it appears arbitrary and capricious with regards to limits and usefulness. It is also difficult to comply: where can a user conveniently purchase permits? While the CTR is not necessarily opposed to the fee concept, users need to be intimately involved in creation of thee areas, with appropriate oversight of how collected monies are spent. Funds need to be allocated to work on the ground, and not siphoned off for administrative and overhead fees, or be transferred to other districts. | See response to comment 123-10. |
| Coconino Trail | 488 | 6 | Dispersed camping is important to CTR members. It is | See responses to comments 120-86 and 123-8. |

| | | | | |
|---|---|---|---|---|
| Riders | | | an important part of the off-road recreational experience. With this in mind, it appears that dispersed camping is to be essentially eliminated, although the camping proposals relative to the various Alternates are unclear. The final plan must mandate full public involvement in the establishment of restricted or controlled camping areas. | |
| Coconino Trail Riders | 488 | 7 | Important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single-track. Alternative D adds another 100 miles. Instead, the final plan should - at a minimum—keep roughly 300 miles of non-road motorcycle routes from being closed. | The BLM asked the public to submit routes during the scoping period, including singletrack motorcycle routes. The BLM analyzed all routes that were verified by BLM personnel.<br><br>See response to comments 122-15 and 122-30 for a discussion of the addition of new routes to the Travel Plan. |
| Coconino Trail Riders | 488 | 8 | Travel Plan Alternative D falls short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes and consider them for implementation. | See responses to comments 122-15, 122-30 and 488-7. |
| Coconino Trail Riders | 488 | 9 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. | See responses to comments 122-15 and 122-30.<br><br>The Utah Rims motorcycle routes were inventoried by the BLM and user group representatives in Colorado prior to the initiation of the RMP revision.  On January 22, 2001, the Utah Rims area was limited to existing routes, which meant the existing inventory undertaken by the BLM. |
| Coconino Trail Riders | 488 | 10 | Long-distance single-tracks and rugged roads that connect 7 SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See responses to comments 122-29 and 122-36. |
| Coconino Trail Riders | 488 | 11 | A few more non-riparian washes should be left open, especially Cisco Desert. Wash riding is very popular. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14. |
| National Trust for Historic | 489 | 1 | The Draft RMP fails to explain how BLM intends to evaluate 2,642 miles of OHV routes in accordance with | Washington Office Instruction Memorandum 2007-30, "Clarification of Cultural Resource Considerations for Off- |

| | | | | |
|---|---|---|---|---|
| Preservation | | | the Section 106 process. Section 106 requires BLM to comply with several discrete requirements before approving a final action. See 16 U.S.C. § 470f; 36 C.F.R. §800.1(c). However, the Draft RMP provides virtually no explanation of when and how BLM will comply with each of these requirements before implementing the route designations proposed in the travel plan. For example, although BLM may "adjust" the proposed OHV route designations "through a collaborative process with local government," Draft RMP at 2-48, the Draft RMP does not discuss how and to what extent BLM will consult with Indian tribes prior to finalizing the route designations. See 16 U.S.C. § 470a(6)(b) (requiring tribal consultation). (FOOTNOTE: BLM did meet with twelve tribal organizations during the scoping process for the Draft RMP. Draft RMP at 5-3. Additionally, BLM held meetings with five more tribal organizations to discuss the Draft RMP alternatives. Id. However, the Draft RMP does not disclose whether BLM consulted with these or additional tribal organizations regarding the travel plan and, specifically, the proposed route designations.) Nor does the Draft RMP address how BLM will identify and address the indirect effects of designating OHV routes on cultural resources, including the effects of vandalism caused by the proximity of designated routes to cultural sites. See id. § 800.5(a)(1) (requiring an evaluation of indirect effects. As discussed above, these Section 106 requirements will require a significant commitment from BLM and thus warrant greater consideration in the Moab RMP. | Highway (OHV) Designation and Travel Management", details how the BLM complies with Section 106 of the National Historic Preservation Act for designation and management of areas, roads and trails.  This IM states that proposed designations that will not change or will reduce OHV use are unlikely to adversely affect historic properties and will require less intensive identification efforts.  The Moab RMP proposes to close over 2,500 miles of existing route.  This constitutes a reduction of OHV use and thus enhances historic properties.<br><br>The BLM has consulted with Native American tribes throughout the planning process.  See Chapter 5 for a detailing of these consultation efforts.  The Travel Plan was included as part of  this consultation.<br><br>Archeological vandalism is illegal. The RMP does not analyze illegal activity. |
| National Trust for Historic Preservation | 489 | 2 | The Draft RMP may exempt hundreds, if not thousands, of route miles from the requirements of Section 106 by labeling them "existing" routes. (FOOTNOTE: BLM currently interprets the Section 106 regulations to require a Class III inventory prior to the designation of new routes as well as prior to the designation of certain | A sentence has been added on pg. 2-7 of the DRMP/EIS defining "new route":  New routes are defined as those not designated in the Travel Plan accompanying this RMP". |

existing routes for continued use. IM No. 2007-030. Thus, to the extent BLM does not perform Class III inventories of "new" routes because it labels them "existing," it would contravene this interpretation.) Under the preferred alternative, BLM would not perform Class III inventories prior to designating an "existing" OHV route for continued use. Draft RMP at 2-7. This management prescription comes from a BLM Instruction Memorandum (1M) issued in December 2006, which generally requires Class III inventories for the designation of "new" routes but not for the designation of continued use on "existing" routes. IM No. 2007-030. However, neither the DRMP nor the IM define the term "existing route." Thus, an "existing" route may mean a route previously .designated for OHV use by BLM. See Draft RMP at App. G-4 (identifying areas limited to "designated" and "existing" routes under the current RMP). But it may also reasonably be interpreted to mean a route that is physically present on the ground. Both interpretations would frustrate Section 106 compliance. The former because a route previously designated through the land use planning process does not necessarily mean that a Section 106 review occurred in association with the designation. In fact, the Draft RMP is silent as to whether BLM complied with Section 106 for existing route designations in the Moab Field Office. See Draft RMP at 3-83 (discussing route designations under current RMP). The latter interpretation would also prevent BLM from fulfilling the requirements of the Section 106 process because each route proposed for designation under the preferred alternative currently exists on the ground. See Draft RMP at App. G-5. Thus, the "existing" route exception would effectively swallow the whole, and could entirely exempt all routes within the Moab Field Office from the requirements of Section 106, including those routes created by users through time and without regard for

| | | | | |
|---|---|---|---|---|
| | | | their direct and indirect effects on cultural resources. See, e.g., id at 3-79 (describing a "network" of user-created routes in the White Wash Dunes area). For the foregoing reasons, BLM must define the term "existing" route to mean only those routes previously designated through the land use planning process and for which BLM completed the Section 106 process. | |
| National Trust for Historic Preservation | 489 | 3 | We recommend that BLM develop a comprehensive strategy for complying with Section 106 prior to designating OHV routes, provide the public with an opportunity to review and comment on the strategy, and consider the following recommendations during the development of this strategy. These recommendations are not intended to represent an exhaustive list of what we believe Section 106 requires for this undertaking. Rather, we provide them here to highlight specific aspects of the Section 106 process that we feel are particularly important in this context:<br>1. Consult with Indian tribes. BLM must consult with Indian tribes that attach religious or cultural significance to historic properties in areas potentially affected by the proposed OHV designations. Additionally, BLM should revise the Travel Plan to reflect the findings of the ethnographic study referenced in the Draft RMP. Draft RMP at 3-16.<br>2. Define the areas of potential effect for the proposed routes broadly and in such away that fully captures-- their indirect and cumulative effects on cultural resources.<br>3. Identify cultural resources within the areas of potential effect in accordance with IM 2007-030. As discussed above, BLM should only exempt routes that have previously undergone Section 106 review from the IM's requirement for a Class III inventory.<br>4. Evaluate the direct, indirect, and cumulative adverse effects of the proposed routes. The Section 106 regulations require BLM to identify and resolve the | The BLM will adhere to its Section 106 responsibilities as directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information.<br><br>A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open.<br>B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.<br>C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the APE and compliance with section 106 prior to designation.  Class III inventory of the APE and compliance with section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.<br>D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III |

direct, indirect, and cumulative adverse effects of the proposed OHV designations on cultural resources. 36 C.F.R. § 800.5(a)(1). As part of this analysis, BLM must consider the possibility that OHV route designations will provide greater access to cultural sites and thus increase the likelihood of vandalism, looting, and the inadvertent destruction of cultural sites. See Jerry D. Spangler et al., Chasing Ghosts: An Analysis of Vandalism and Site Degradation in Range Creek Canyon, Utah 21 (2006) (finding a dramatically higher frequency of vandalized cultural sites within 200 meters of a section of the Range Creek Canyon road open to motorized use).

5. Develop a programmatic agreement in consultation with the Advisory Council on Historic Preservation, Indian tribes, Utah State Historic Preservation Office, and other interested parties. The Section 106 regulations allow federal agencies to develop a programmatic agreement (PA) "to govern the....resolution of adverse effects from certain complex project situations or multiple undertakings" in consultation with the Advisory Council. 36 C.F.R. § 800.14(b). The designation of OHV routes in the Moab Field Office clearly meets both of these criteria. A PA would allow BLM, in consultation with the Advisory Council, Utah SHPO, and other interested parties, to develop alternative methods for complying with the Section 106 requirements prior to implementing the OHV routes. .

inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available.

The BLM has consulted with Native American tribes concerning all decisions in the PRMP/FEIS, including the Travel Plan accompanying this RMP.

The BLM has consulted with the Utah SHPO regarding all decisions in the PRMP/FEIS, including the Travel Plan accompanying this RMP.

The Area of Potential Effect for any project is determined in consultation with the appropriate SHPO/THPO in accordance with 36 CFR 800.4(a)(1). This will occur upon initiation of the Section 106 consultation process for this RMP.

Each route designated in the Travel Plan was examined individually by a professional BLM archaeologist (see Appendix G for a description of the Travel Plan process). Those routes that posed cultural conflicts that outweighed the purpose and need for the route were not designated. The archaeologist looked at each of 33,000 road segments in the Moab planning area.

The Draft RMP/EIS acknowledges that the illegal activities, such as vandalism and looting, may be impacted by changes in access, as is specifically identified in section 4.3.5. The Draft RMP/EIS does not include a detailed analysis of illegal activities. Enforcing the RMP decisions is an implementation-level action. Concerning the impacts from OHV leaving routes that are identified in an alternative, the Draft RMP/EIS analyzes the effects of the proposed actions, which does not include public land users driving off identified routes in areas that where OHV use is limited to identified routes.

| | | | | Programmatic agreements are administrative actions and do not require a planning decision. |
|---|---|---|---|---|
| Public Lands Advocacy | 491 | 1 | BLM's Instruction Memorandum 92-67 clarifies how valid existing rights are to be honored.  It is legally required that valid Existing Rights be honored.  Therefore, not only must their acknowledgement be incorporated into the section that outlines Management Common to All Alternatives, but also throughout the entire EIS and the resulting resource management plan.<br><br>Of additional concern is that BLM has failed to analyze the impacts each alternative will have on existing leases and lessees, particularly given that many of the leases are isolated in remote areas and that under Alternatives B, C, and D, BLM has proposed sizeable withdrawals and no surface occupancy designations.  Nowhere has BLM disclosed the impacts these restrictions will have on existing leases and future development of energy resources on these leases.  We recommend that the final EIS fully address this omission. | See response to comment 214-4. |
| Public Lands Advocacy | 491 | 2 | BLM has ignored the direction contained in Instruction Memorandum (IM) 2003-137, Integration of the Energy Policy and Conservation Act (EPCA) Inventory Results into the Land Use Planning Process, to balance environmentally responsible energy development with sensitive resources.  According to this IM, the MFO is also required to review all current oil and gas lease stipulations to make sure their intent is clearly stated and that stipulations utilized are the least restrictive necessary to accomplish the desired protection.  Moreover, the IM directs that stipulations not necessary to accomplish the desired resource protection be modified or dropped using the planning process.  Nowhere in the DEIS has BLM demonstrated that it met the requirements of EPCA in the Moab land use planning process, i.e., ensuring that access and | See response to comment 214-9. |

BLM_0011950

| | | | | |
|---|---|---|---|---|
| | | | availability of the public land for energy resources are not unduly restricted.<br><br>In addition, BLM has ignored the findings of EPCA phase II. This report supersedes Phase I of the inventory. It evaluates the Paradox/San Juan Basins and analyzes the additional impact of drilling permit conditions of approval, as required by Section 364 of the Energy Policy Act of 2005. The EPCA II report found this area has more land subject to no leasing than all other EPCA study areas, 57%, more than 10 million acres. Added to that is the 1.6 million acres subject to no surface occupancy stipulations. Specifically, 66% of the Paradox/San Juan Basin is already unavailable for leasing or development. It is of grave concern that 20 percent of all existing federal natural gas reserves and 48 percent of the proven federal oil reserves are off limits to exploration and development. The fact that the DEIS proposed in Alternative C to set aside even more lands is contrary to the direction contained in EPCA II and the National Energy Policy as established in EO no. 13211. We urge BLM to reconsider its selection of Alternative C as the preferred management alternative. | |
| Public Lands Advocacy | 491 | 3 | We object to the fact that the analyses and discussions contained in this Draft RMP do not take into account routinely applied mitigation measures.  The manner in which environmental consequences is presented is tantamount to a worst case scenario. Section 1502 of the Council on Environmental Quality Regulations on the National Environmental Policy Act directs that mitigation measures be identified in the EIS which may be employed to reduce or entirely avoid impacts to other resource values.  While this direction has apparently been construed to mean that only lease stipulations and other mitigation measures need be identified somewhere in the document, it is necessary | The analysis assumptions for oil and gas development on pg. 4-4 of the DRMP/EIS is based on surface disturbance associated with projected well numbers.  This level of impact analysis is appropriate for land use planning.  This is not a worst case scenario but provides a comparison of the impacts across the alternatives.  This comparison of impacts for the alternatives is provided on Table 4.2.  More detailed analysis of impacts and mitigation are considered for site specific proposals after completion of the land use plan. |

| | | | | |
|---|---|---|---|---|
| | | | to address all mitigation measures utilized during oil and gas exploration and development activities by incorporating them into the environmental consequences analysis. The Draft RMP does not address any type of mitigation until after it has described the worst case scenario.  This does nothing more than fuel the flames of opposition to oil and gas activities.  It is crucial for mitigation measures to be acknowledged in the effects analysis to show that oil and gas activities are mitigated and are actually compatible with other resources uses, including those in sensitive areas. Therefore, it is crucial for this chapter be revised to incorporate mitigation measures in the cumulative effects and environmental consequences analyses. | |
| Public Lands Advocacy | 491 | 4 | CXs are an important tool used in BLM's administration of the federal oil and gas program. They are designed to facilitate the permit approval process by lessening needless paperwork and timeframes associated with these approvals. We recommend that the Final EIS fully examine and disclose the conditions under which they will be used.<br><br>Additionally, the DEIS fails to acknowledge that BLM has adopted a CX for geophysical exploration which eliminates the need for an environmental assessment or environmental impact statement when no roads are involved. This new CX must be incorporated into the record of decision for the Moab RMP. | See response to comment 214-5. |
| Public Lands Advocacy | 491 | 5 | Offsite Mitigation – Under management Common to All Alternatives in Chapter 2, BLM indicates it will seek to "Fully mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio."<br><br>Comment and Recommendation: While we recognize that many companies have offered to perform off-site mitigation, several concerns must be raised. According | Chapter 2 of the PRMP/FEIS has been changed.  The statement has been changed to "Mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio, where required by policy or law". |

| | | | | |
|---|---|---|---|---|
| | | | to Instruction Memorandum 2005-69, compensation or off-site mitigation must be entirely voluntary on the part of the applicant. While BLM may identify offsite mitigation opportunities, it stated they will not be carried forward unless volunteered by the applicant. We oppose any program that would impose off-site or compensation mitigation as a BLM requirement. | That the BLM would recommend a reclamation ratio of 1:1.  The word fully has been removed. |
| Public Lands Advocacy | 491 | 6 | Comment and Recommendation: The removal of these lands from availability for leasing constitutes a withdrawal. In accordance with FMPLA, only the Secretary of the Interior is authorized to make a withdrawal of lands as described above. The Secretary is also required to provide notice of a proposed withdrawal in the Federal Register, to conduct public hearings on the proposal and to notify Congress of the proposal. Clearly, such a "withdrawal" cannot be made through the resource management planning process. Therefore, it is necessary for the MFO to either revise its Draft RMP or follow the procedures for withdrawal outlined in FLPMA. | See response to comment 214-7. |
| Public Lands Advocacy | 491 | 7 | Comment and Recommendation: The restrictive management proposed in both Alternatives B and C, however, fail to comply with the FLPMA, which required public lands to be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 USC 21a). In addition, the Mining and Minerals Policy Act directs the federal government to "foster and encourage private enterprise" to develop minerals "to help assure satisfaction of industrial, security, and environmental needs." Clearly BLM has ignored these directives just as it has ignored the EPCA Phase II Study, not to mention the energy policy outlined in EO no. 13211. Because this EO directly affects BLM energy decisions and policies in Utah, a discussion of this EO is | See response to comment 210-2. |

| | | | | |
|---|---|---|---|---|
| | | | warranted in conjunction with the Preferred Alternative's effects on energy exploration, development, and production.<br><br>In addition, the excessively restrictive nature of the Preferred Alternative, as well as alternatives B and D, does not allow BLM the management flexibility needed to wisely manage the federal oil and gas program. Therefore, it is essential for BLM to revise its approach by adopting Alternative D which more closely comports with the agency's multiple use mission, complies with current energy status and policies, and recognizes BLM's authority to manage oil and gas development without restoring to broadly applied restrictions designed to thwart reasonable recovery of energy resources. It is illogical to assume that when technological improvements are made, the agency can conduct new environmental analyses.  Such an approach is needlessly costly and time consuming and will most likely be done at industry's expense. | |
| Public Lands Advocacy | 491 | 8 | PLA is concerned that the Reasonable Foreseeable Development Scenario does not take into account all relevant factors.  While historical uses are indeed part of the mix of factors that should be considered, it is also important to consider the most up-to-date geological information for the area and the technological advances made by the industry.  The EPCA II Report found that the Paradox/San Juan Basin has high value for energy resources in that it contains 464 MMbbls of oil and 38,119 BCF of natural gas.  As a result, in addition to past permitted activities,  BLM must also factor in future interest in development in the area based upon this potential and taking into account improved drilling and reclamation practices. In our assessment, even if BLM were to base its projections strictly on recently permitted activities, a minimum projection should be at least 975 wells. Clearly it is necessary for BLM to | See response to comment 203-15.<br><br>The EPCA Report was utilized in developing the Mineral Report and the Reasonably Foreseeable Development Report. |

BLM_0011954

| | | | | |
|---|---|---|---|---|
| | | | reevaluate its assumptions by utilizing the most up-to-date information to ensure the efficacy of the plan is not diminished by out-dated information. | |
| Public Lands Advocacy | 491 | 9 | We can find no legal basis for BLM to preserve purported wilderness values on lands not designated as wilderness or wilderness study areas.  BLM completed its Wilderness Study Process under Section 603 of FLPMA when it forwarded its recommendations to the President in 1991 and eliminated the lands in question from further wilderness consideration.  To date, no provisions exist for BLM to further evaluate or preserve lands for their wilderness characteristics.  In fact, new wilderness inventories are prevented under the settlement in State of Utah v. Norton, 2006.  It is now up to Congress to make the final decision on which land should be protected to preserve their wilderness character.  We recommend that BLM discard this proposed management in favor of multiple use management. | See response to comment 214-2. |
| Public Lands Advocacy | 491 | 10 | Avoidance / Exclusion Areas for Rights-of-Way – The DEIS indicates "Right-of-way (ROW) avoidance and exclusion areas would be consistent with the stipulations identified in Appendix C for oil and gas leasing and other surface disturbing activities. These stipulations have been developed to protect important resources values." Right-of-way exclusion and avoidance areas have been created under each of the management alternatives.

Comment and Recommendation: While the DEIS appears to indicate these exclusion and avoidance areas coincide with lands subject to NSO or no leasing, no specific analysis or justification is provided.  In addition to providing maps for each alternative that illustrate where these areas are located, detailed discussion that provides a rationale by alternative for these decisions is required.  Without such information, it | See response to comments 214-12 and 203-22. |

| | | | | |
|---|---|---|---|---|
| | | | is impossible to analyze the impacts these exclusions will have on energy and mineral activities as well as other multiple use activities. It would appear these decisions have been made in a vacuum without consideration of other land uses, including future oil and gas exploration and development activities. Neither does BLM appear to have considered the effects these de facto withdrawals will have upon valid existing rights of lessees who require adequate access for pipelines, flow-lines, and other transportation needs.  This is a fundamental flaw in the analysis that must be remedied. | |
| Public Lands Advocacy | 491 | 11 | Old Spanish Trail – Chapter 2 of the DEIS identifies various management options for the Old Spanish Trail including preparation of the "forthcoming Old Spanish Trail Comprehensive Management Plan."<br><br>Comment and Recommendation: BLM has failed to provide a map depicting the actual location of the Old Spanish Trail making it impossible to determine effects on multiple use activities.  Moreover, no analysis is provided that addresses the impacts the various management options will have on oil and gas activities in the area.  We recommend that a map and comprehensive analysis be included in the FEIS. | See response to comment 214-22. |
| Public Lands Advocacy | 491 | 12 | Sage Grouse – BLM proposes to mitigate sagebrush habitat loss using a 2:1 ratio under Alternative B, and a 1:1 ratio under Alternative C in Greater and Gunnison Sage-Grouse habitats.<br><br>Comment and Recommendation:  BLM's proposed management of Greater Sage-Grouse and the Gunnison Sage-Grouse is unjustifiable restrictive under both Alternatives B and C.  The fish and Wildlife Service found in 2005 that the Greater Sage-Grouse did not meet the criteria for protection under the Endangered Species Act (ESA) and removed the Gunnison Sage-Grouse from the candidate species list in 2006. | The BLM Manual at 6840 states that the policy for special status specis is to ensure that actions by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to list  any special status species under the Endangered Species Act.<br><br>The BLM, in fulfilling its obligation to avoid listing of the species, has chosen the 1:1 mitigation strategy as the least restrictive mechanism to avoid listing.  This 1:1 mitigation does not require off-site mitigation nor does it state that the mitigation must be imposed at the time of the disturbance.  The statement has been changed in the |

| | | | | |
|---|---|---|---|---|
| | | | Therefore, BLM's mitigation proposal is excessive.  We remind BLM that in accordance with valid existing rights, the agency does not have that authority to apply conditions of approval (COA) that exceed existing lease rights.<br><br>Given the fact that the neither of these Sage-Grouse species are listed under ESA, we find the proposal to require a 1 to 1 ratio of habitat improvement outlandish.  Since this could only be accomplished by requiring off-site mitigation, we object to this proposal.  As mentioned previously in these comments, it is BLM's policy that off-site mitigation can only be accomplished if VOLUNTEERED by an operator.  BLM's role is limited to possible identification of offsite mitigation opportunities which also means BLM cannot coerce an operator into performing habitat replacement by threatening to withhold approval of a permit.<br><br>In addition, we object to the broad application of timing stipulations on areas that may not be suitable habitat for either the Greater or Gunnison Sage-Grouse. The stipulations must be limited to specific areas known to contain active leks.<br><br>Moreover, BLM's excessive restrictions in its proposal to prohibit all above ground facilities within two miles of an active lek prevent any flexibility for addressing each case individually.  Many other measures are available to mitigate perceived impacts without resorting to this inflexible restriction. | PRMP/FEIS that the 1:1 mitigation is a recommendation.<br><br>See response to comment 214-4 regarding valid existing rights.<br><br>See response to comments 203-40 and 121-26. |
| Public Lands Advocacy | 491 | 13 | Gunnison Prairie Dog Habitat – BLM proposes under Alternative C to prohibit permanent above-ground facilities within 1,300 feet of prairie dog colonies.<br><br>Comment and Recommendation:  This proposal is overly restrictive and inflexible.  It is assumed that the | See response to comment 214-25. This stipulation was developed in coordination with the U.S. Fish and Wildlife Service.<br><br>The BLM recognizes an error for Alt C where the 1,300 feet restriction specified for colonies should be 660 feet. |

| | | | concern relates to predation from above-ground facilities.  BLM should be aware that there are many alternatives to preventing predation rather than resorting to a ban on certain facilities.  This management approach only serves to make oil and gas development needlessly burdened and should be eliminated. | The PRMP/FEIS has been changed to correct this error. In addition, exceptions are identified in Appendix C that allow flexibility in the placement of facilities. |
|---|---|---|---|---|
| Public Lands Advocacy | 491 | 14 | Pronghorn Antelope:  BLM proposes in Alternative to extend the timing limitation stipulations by two weeks. Comment and Recommendation: No scientific justification for this extension is provided. Absent justification, this seemingly arbitrary restriction must be returned to its original time frame. | The timing limitation for pronghorn is during the kidding season.  Although Alt A is two weeks shorter than the action alternatives, the proposed timing limitation is based on recommendations by UDWR, the agency with jurisdictional authority on pronghorn. |
| Public Lands Advocacy | 491 | 15 | BLM's socioeconomic analysis is fundamentally flawed because it failed to address the positive aspects of energy development.  Moreover, it also failed to analyze and document the negative economic impacts of the severe restrictions proposed under each management alternative. The current unavailability of lands with high potential for mineral development coupled with the increased restrictions contained in Alternatives B and C will have significant negative economic impacts on local, state, and federal revenues, not to mention the negative impacts on domestic energy supplies and cost to the consumer.<br><br>We are also concerned that the analysis manipulates the impacts associated with Alternative B. The analysis shows that the impacts associated with Alternative B, the most restrictive alternative, would have little more impact than Alternative C and D. This result is highly suspect because the alternative would make 43% less acreage available for oil and gas leasing. Therefore, it is necessary for BLM to revise its socioeconomic significance criteria.  For example, the energy sector generally generates a tremendous amount of Value Added.  Part of this the higher than average employee | See response to comments 203-25, 203-26, and 203-27. |

| | | | | |
|---|---|---|---|---|
| | | | compensation but also the higher returns on capital. Another variable that needs to be included in the RMP is Employee Compensation. Apparently these factors were not addressed in the analysis. | |
| Outward Bound Wilderness | 630 | 1 | I feel that it is important for our organization and many other commercial and private users to create a management plan for the Labyrinth Canyon area that ensures future users can enjoy the river corridor. Outward Bound brings students from all over the country and parts of the world to Labyrinth Canyon for its quiet and subtle beauty that is a crucial river corridor classroom for our students. Allowing the management plan to change in such a way that will allow more motorized users to be in the area and not protect the wilderness characteristics will impact (audibly and visually) the current quality of Labyrinth Canyon in a negative way. | The DRMP/EIS proposes to manage the entire Green river corridor as no surface occupancy for oil and gas and all other surface disturbing activities.  That portion of the Green River from the San Rafael River to Canyonlands National Park is recommended for Wild and Scenic River status.  Many routes along or near the Green river have not been designated for motorized travel to protect riparian resources.  The management of the Green River is more restricted under the new Moab RMP than under the old Grand RMP. |
| Outward Bound Wilderness | 630 | 2 | How is the BLM ensuring that areas with Documented Wilderness Characteristics are being appropriately monitored and preserved? How is the BLM ensuring that new routes are not being established? How is the BLM taking into account noise from these new routes and how they may audibly and visually affect the non-motorized users of Labyrinth Canyon? | Those areas of Wilderness Characteristics that the BLM choses to manage for are being managed as no surface occupancy in the preferred alterantive.  No new routes would be authorized in areas managed as No surface occcopancy.

BLM does not manage the noise of motor vehicles.  This is a matter of state law. |
| Outward Bound Wilderness | 630 | 3 | The BLM preferred alternative in the Moab RMP seems to favor designation and opening of more motorized routes yet downgrades and eliminates many Wilderness Characteristic areas, often in the same area. In lands administered by the Moab Field Office, a large amount of land with Wilderness Characteristics is adjacent to the Green River – why is it that the BLM finds it necessary to designate and open more routes in these areas vs. designating other areas as recreation areas for OHV users? | The DRMP/EIS drops approximately 2,500 miles of route from motorized travel, including many near or along the Green River.  No new motorized routes are proposed in the preferred alternative. |
| Outward Bound | 630 | 4 | The BLM should consider blocking roads and/or making trailheads on each road ½ - 1 mile up each canyon | In some of the canyons approaching the Green River, the route actually starts on the river and moves up the canyon |

| | | | | |
|---|---|---|---|---|
| Wilderness | | | before it opens to the Green River corridor. This would allow for both user groups and still allow foot access to motorized users. (This approach works well for Range Creek Canyon in Desolation Canyon and could be applied here) | (e.g. Mineral, Hell Roaring and Spring canyons).  This approach would thus not work in these canyons. |
| Outward Bound Wilderness | 630 | 5 | There are "new roads" that have been established by OHV users that would not have been considered viable roads that may now be considered as viable. Many of these roads are in areas that have been labeled as having Wilderness Characteristics. These areas include:<br>    -The route on the river left miles 93-91.5 and up the small canyon at mile 91.5.<br>    -The route from Spring Canyon (river mile 66.5) heading downriver towards the Mineral Bottom Road | The roads referred to by the commentator are along the Green River.  The first is in the Placer Bottom area.  This route was built to access mining operations before World War II.  The second route (which does not go all the way to Mineral Bottom) was built during the 1950's uranium boom and is not a "new road".  Althouygh these routes may recently have been adopted by OHV users, they were not established by them. |
| Outward Bound Wilderness | 630 | 6 | A further request on these issues, is how the current management plan proposes to ensure that there are not further "new routes" made in areas that have documented Wilderness Characteristics. To best help guide the public in making comments about the new management plan I feel the onus is on the BLM to show the public what routes are "new" and what routes are old since the last management plan was published. Without that information I do not feel the BLM is providing information necessary to inform the public about the impact of the management plan. (Has there been any NEPA work done on any of these new "routes?") | All of the full sized vehicle routes proposed in the Moab RMP are old, pre-existing routes.  Some of the user-made motorcycle trails do not fall into this category.  At the establishment of the Moab RMP, a set of designated routes would be established.  Future additions to these routes would require NEPA analysis, including archaeological clearances.<br><br>It should be noted that the Moab DRPM/EIS proposes to close over 2,500 miles of existing route. |
| Outward Bound Wilderness | 630 | 7 | Hatch Point: The Hatch Point Area has been a place where our courserse have traveled though Hatch Canyon and its tributaries, then up across Hatch Point, then finding their way down into Lockhart Basin. This area has a real remote feel to our students and offers us a chance to travel through canyons from the La Sal Mountains to the Colorado River as part of an extended backpacking experience. The idea that there may be an energy development out in that area is in direct conflict with our students looking to have an extended | The visual resources of Hatch Point are considered in the imposition of controlled surface use restrictions on oil and gas development. |

BLM_0011960

| | | | | |
|---|---|---|---|---|
| | | | backcountry expedition where they are away from the development of modern man. We would request that the BLM has no surface occupancy in this area for oil and gas development and takes into account the visual impact of any oil and gas leases in the area. In addition, the opening of any new roads in the area would also be in conflict of the use that we have in the area. | |
| Florida 4x4 | 649 | 1 | Trail segments that should be included: Flat Iron Mesa – From about 4346450 N 636300 E heading NW to the pipeline road. From about 4345600 N 634700 E going SW to Plan trail 2. From 4246200 N 633400 E going SW to the county B road 4. From about 4242400 N 633400 E south then east to the plan road. | See response to comment 206-17. |
| Florida 4x4 | 649 | 2 | Trail segments that should be included: Strike Ravine – A portion of the "Big Ugly" hill at about 4254500 N 636600 E. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right of way in claim court). | The Strike Ravine Jeep Safari Route is in the Travel Plan accompanying Alt C of the DRMP/EIS.  See also response to comment 206-11. |
| Florida 4x4 | 649 | 3 | Trail segments that should be included: 3-D Trail – From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See responses to comments 206-11 and 206-17. |
| Moab Solutions | 830 | 1 | I'd like to add my voice to the others calling for the BLM to extend the comment period on the new plan. I liked the way the Tribune put it in last Wednesday's paper. | See response to comment 124-1. |
| Sage Riders Motorcycle Club | 870 | 1 | The final DRMP should include 25 miles of additional routes, Utah Rim Trails, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. We recommend that more non-riparian washes should be left open, especially in the Cisco Desert. These travel ways provide ATV and motorcycle riders an unconfined challenge that roads cannot offer. We are concerned that many of the restrictions in all of the Action Alternatives are simply | See response to comments 122-39 (Utah Rims), 122-36 (Copper Ridge) and 122-29 (Thompson Trail).  For a discussion of travel in washes, see response to comment 122-14.  For a discussion of adding new routes, see response to comments 122-15 and 122-30. |

| | | | | |
|---|---|---|---|---|
| | | | not justified and the FEIS should clearly draw a connection between the facts on the ground and the decision made. | |
| Sage Riders Motorcycle Club | 870 | 2 | Some of the "motorcyle trails" are vary popular with the ATV users. The Final Travel Plan should designate a mix of single track and ATV trails. | See response to comment 120-90. |
| Sage Riders Motorcycle Club | 870 | 3 | The Final EIS should disclose how many campsites would be closed under each alternative. | See response to comments 120-86 and 123-8. |
| Sage Riders Motorcycle Club | 870 | 4 | We are requesting that the final RMP should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. When using adaptive management principals, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Working with volunteers and interest groups does not require a planning decision. |
| Sage Riders Motorcycle Club | 870 | 5 | The Sage Riders recommends that when addressing "user conflict" , the final RMP should avoid "exclusive use zones" where,  based on perceived or potential "user conflict", one or more "conflicting uses" is categorically prohibited. Most of the non-motorized focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will preceive these focus areas as establishing blanket restrictions on motorized use. The unintended consequences will likely result in increasing, not reducing actual or perceived "user conflict". | Focus Areas are not intended as exclusive use zones. This is clearly stated in the Recreation section. |
| Sage Riders Motorcycle Club | 870 | 6 | We recommend in order to address the "user conflict" issue, the Final RMP should direct land managers to educate non-motorized visitors (who may percieve conflict with motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters. The Final RMP should direct land managers to educate vehicle-assisted visitors of where a road or trail might | Education is not a land use planning issue. |

BLM_0011962

| | | | | |
|---|---|---|---|---|
| | | | be shared with non-motorized visitors, and if appropriate, direct slower speeds. | |
| Sage Riders Motorcycle Club | 870 | 7 | The Sage Riders is requesting that the Travel Plan and the Administrating Setting must be consistent in all SRMAs! All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. SRMAs and their "focus areas" should avoid excluding other uses categorically. The Preferred Alternitave BLM clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized zones. | Focus Areas are not intended as exclusive use zones. For the addition of new routes, see response to comments 122-15 and 122-30. |
| Sage Riders Motorcycle Club | 870 | 8 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 122-39. |
| Sage Riders Motorcycle Club | 870 | 9 | This area has very few miles of true mountain biking single track trail. Concerning Mill Canyon, Sevenmile Rim biking focus area should be redrawn as Mill Canyon- Tusher Rims in order to provide better terrain for pedaling. The Final Plan should extend the South Spanish Valley biking area further south toward Black Ridge. | The new SRMA boundaries suggested by the commentor were not analyzed in the DRMP/EIS. |
| Pack Creek Water Company | 904 | 1 | The riparian area, between the Pack Creek community and down stream to the Pack Creek Bridge and Adjoining areas, needs special care by the BLM and protection from erosion and pollution due to grazing. | The riparian area around Pack Creek is to be managed as no surface occupancy in the preferred alternative.<br><br>Grazing in the Pack Creek area must be addressed during the permit renewal process. |
| Pack Creek Water Company | 904 | 2 | We request the BLM addresses and stabilize this riparian area and streambed as soon as possible. Please advise us of BLM plans to deal with this stretch of Pack Creek and any other plans to address erosion issues in the seriously damaged Pack Creek watershed. Furthermore, we ask that the BLM inform and advise the Pack Creek Water Company on all | Grazing in this allotment will be addressed during the permit renewal process.  The Pack Creek Water Company should ask to be an interested public for this process. |

| | | | | |
|---|---|---|---|---|
| | | | watershed matters, actions, and proposed future actions that affect it and the Pack Creek Community. It is important to us that we be considered a joint stakeholder in all matters that affect us. | |
| Moab Area Climbers Association | 962 | 1 | The map for option C shows a number of areas, most notably Upper Kane Creek and Tusher Canyon/ Mill Creek, as VRM-1. These areas are important to climbers. As such, we of course want them to be as beautiful as possible. Unfortunately, the VRM-1 status, being the highest level of visual resource management, could be construed in the future to curtail any activity, including climbing. If the VRM-1 status would mean changing the conditions that make climbing safe and enjoyably in those area's, then we are opposed to it. | In Alt C, the only VRM I area outside the WSAs is the Shafer Basin.  Neither Upper Kane Creek nor the Tusher Canyon area are to be managed as VRM I in the preferred alternative. |
| Moab Area Climbers Association | 962 | 2 | While the area that is proposed to be habitat for Mexican Spotted Owl nesting (near the potash plant and ponds) is not heavily used by climbers, the closure seems somewhat expansive. None of our members, who include biologists as well as the most experienced climbers in this region, have ever found this species of owl nesting in the area. To have such a large area be deemed off-limits for a species that none of us have ever seen seems out of character with the way the habitat management plan is established. If this area is deemed critical to the currently nesting birds, we understand the need for a permited closure. However, it would not be acceptable to close such large section of cliff simply because it 'might' be a nesting area. A copy of the habitat management plan, which would explain how the areas were designated to be so large, would greatly aid in the publics understanding. | There is a nesting Mexican spotted owl pair in the Potash area.  Actions to protect this species are restricted as a site specific level and are based on the Protected Activity Center surrounding the actual nest site.  The BLM is unaware of any restrictions that Mexican spotted owl have imposed upon the climbing community. |
| Moab Area Climbers Association | 962 | 3 | Climbing venues such as Potash Road, The River Road, Longs Canyon, Castle Valley, The Fisher Towers, and Tusher Canyon are coveted destinations for climbers from all over the world. The MACA would like to see the D.R.M.P. formally aknowledge that climbing is a legitimate use of public lands around | The BLM has recognized the importance of climbing as a recreation activity in the DRMP/EIS.  Wall Street (along the Potash Road) is recommended for management as a climbing focus area.

The placement of toilet facilities does not require a land |

BLM_0011964

| | | | Moab. We also feel that certain areas in Kane Creek and on Potash Road are popular enough that toilet facilities are warrented. We would be able to work with the BLM, as The Access Fund and Friends of Indian Creek have done in the past, to help aid the building of these much- needed facilities. | use planning decision. |
|---|---|---|---|---|
| Moab Trails Alliance | 964 | 1 | To understand and comment on this draft is a daunting task for anyone other than those intimately involved in the process. I would recommend in the future, that a trusted representative from each of the user groups be hired to review and prepare a position paper that others in that user group could use in formulating their own responses. | Comment noted. |
| Moab Trails Alliance | 964 | 2 | It is blantantly obvious that the old ways of sharing jeep routes with everyone, the basis of mountain biking in Moab, no longer works. Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology the alterations (damage) to the trails are such that cyclists cannot use the same route unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes alternate routes in each of these areas. The Green Dot (Gemini area), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider area) Trails should be priority projects ASAP. These are user created routes that traverse slickrock in areas that have been overrun by motorized traffic. | The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Trail Mix and Moab Trails Alliance, and verified on the ground by BLM staff (see pgs. G-15 through G-21).  On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes.  The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis".  New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area.  However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |
| Moab Trails Alliance | 964 | 3 | After a few years of trying to develop new trails in the Moab Field Office it is apparent that our niche here is slickrock. The predominantly sandy soils make for maintenance nightmares and undesirable routes. MTA recommends that more slickrock routes be developed and marked. A route from the Monitor-Merrimack area over to SR313 is an example. Slickrock riding made | The DRMP/EIS provides for the addition of new mountain bike routes throughout the life of the plan.  Up to 75 miles of new route is authorized in Alt C.  Site specific NEPA analysis will be undertaken to approve new routes. |

| | | | Moab famous, it is low impact, and is what will keep people coming back. The Bartlett Wash Freeride area in "C" is a great idea. | |
|---|---|---|---|---|
| Moab Trails Alliance | 964 | 4 | The Slickrock Trail, up until a few years ago was thought to be open to cross country travel for bikes. Any resource damage, i.e. Crypto crushing or tree destroying was taboo. The Federal Register rules limiting travel to "designated routes only" are temporary until this RMP is adopted. The Slickrock Trail should be open to cross-country travel for bicycles (stated in Alternative "D") because it is the perfect practice area for beginner riders, the perfect technique area for experienced riders and the classic setting for tour companies to introduce clients to the ecology, geology, and scenery of Grand County. It is regulated and patrolled and this designation is consistant with historic use. | Alt C of the DRMP/EIS restricts travel on the Slickrock Trail to the designated route. The level of traffic on the Slickrock Trail does not lend itself to open free riding by mountain bikes. A slickrock free ride area for bicycles is provided in Alt C at the Bartlett Slickrock. |
| Moab Trails Alliance | 964 | 5 | The amount of new trail ("C"= 150 miles, "B"= 75, etc.) should be specifically stated as, "In addition to trails developed on existing roads as mapped on the Grand County Transportation Inventory map". The allotted new mileage will include only those routes mapped across previously undisturbed terrain. | Wording has been added to the text on pg. 2-49 to clarify that the "new trail" is in addition to decommissioned existing routes on the Grand County Inventory Map. |
| Moab Trails Alliance | 964 | 6 | It is a sore spot with with OHVs. The definition of OHV in the glossery on page X-37 precludes bicycles from this category. The explaination hidden at the bottom of G-5 groups motorized and mechanized together. Please remove bicycling from from any definitions of OHVs and other all-encompassing variations of "wheeled vehilcle" classifications. While a bicycle has wheels, this is the extent of any similarity with motorized forms of transportation. Placing mountain biking within the non-motorized category is consistant with the BLM National Mountain Bicycling Strategic Action Plan and many other BLM management plans across the country. | The DRMP/EIS has attempted to classify mountain bikes as their own category. Mountain bikes are restricted to designated routes, but any other definition of OHV's does not include mountain bikes. |
| Moab Trails | 964 | 7 | Please do not ban bicycling from non-WSA (ACEC) | Bicycles are allowed on all routes open to travel by |

BLM_0011966

| | | | | |
|---|---|---|---|---|
| Alliance | | | lands. MTA does not advocate for access to all trails and areas, but believes this particular policy might be based on the false assumption that bicycling would damage the wilderness characteristics of such lands. This is not true: as mentioned above, the environmental impacts of mountain bicycling are similar to hiking and far less than equestrian or OHV use. In fact, the BLM Wilderness Study Area Intrim Management Policy H-5880-1 (Wilderness IMP) does not categorically ban mountain biking from WSAs. MTA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas. While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and motorized areas. A decision to ban this use should be based on scientific reasoning. | wheeled vehicles.  There are several trails mentioned in the DRMP/EIS that are restricted to hikers (such as Fisher Towers).  There is no blanket ban of cycling on non-WSA lands in the Moab planning area. |
| Moab Trails Alliance | 964 | 8 | Whenever different user groups are listed in the RMP, road cycling should be included as a category just the same as "driving for pleasure". This is fast becoming a popular use on the spectacular scenic byways of Grand County. | Road cycling has been added to the list of recreation activities in the Moab Field Office on pg. 3-80 of the DRMP/EIS. |
| Moab Trails Alliance | 964 | 9 | The alt Lake Tribune article 11/04/07 titled  BLM Off-Road Excess Plans Need More Caution, Review by Daniel Patterson states that the number of miles of ORV roads in the Moab field office totals 5000, and the total throughout southern Utah would be 10,000. "Imagine driving three times across America on an ATV." That clearly makes the number sound excessive. It does not explain that some of these miles would be designated non-motorized for future biking and hiking trails. Perhaps this plan should put a percentage number on how much each user category would get out of these endless miles. | Alt C designates 2,527 of non-maintained dirt roads and 1,166 miles of regularly maintained dirt roads in the Moab Field Office.  These routes are available to all motorized (and non-motorized) users.  Those inventoried routes not designated (over 2,500 miles) would be available for non-motorized users. |
| Moab Trails Alliance | 964 | 10 | As avid defenders of biological soil crusts, MTA suggests they be highlighted as a star feature of the desert, thus emphasizing their importance. MTA along | The DRMP/EIS is a planning tool that guides BLM actions in the future.  Its purpose is not an educational tool for the public.  The DRMP/EIS does mention the importance of |

| | | | | |
|---|---|---|---|---|
| | | | with Trail Mix spends significant resources on public education and crypto biotic soil and this publication is an excellent opportunity to headline their attributes. The restrictions in this plan would be more palatable if readers completely understood the role these crusts play in holding the desert together. | biotic soil crusts. |
| Moab Trails Alliance | 964 | 11 | Typos: p. 4-464 second paragraph line 4 "carefully" should be careful | This typographical error has been corrected. |
| Moab Trails Alliance | 964 | 12 | Typos: p. I-8 Under Relevance Criteria, seventh line, "……threatened plants do not occur….." Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been corrected |
| National Parks Conservation Association | 970 | 1 | BLM's air quality analysis is flawed because they have utilized old data in the visibility analysis for Class I areas.  The visibility trend is from 1988 to 1997. However, according to the National Park's Service's 2005 GPRA report, the air quality for Arches and Canyonlands is deteriorating. BLM erroneously states that Table 3.2 contains "the most recent available data for each pollutant."  More recent adapt from 2005 and 2006 is available.  This analysis is further severely flawed because BLM has failed to incorporate the air quality data from Canyonlands monitoring station in Table 3.2, Ambient Air Quality Data for the MPA and has not utilized this data in its analysis. | Table 3.2 has been updated with 2007 air quality data. |
| National Parks Conservation Association | 970 | 2 | BLM assumes they will have the funding and the workforce to implement the selected alternative. The area of focus is huge-1.8 million acres. The proposed increase in oil and gas development and impacts on resources from recreation uses including off road vehicles is so substantial, that we don't believe that the agency has sufficient financial and human resources to implement the preferred alternative. Additionally, BLM assumes that non-BLM lands would be minimally directly impacted by RMP decisions simply because BLM does not make land decisions on non-BLM lands. This is circular and erroneous. Decisions made by adjacent land managers such as BLM have a huge | BLM lands are managed under FLPMA, which directs the agengy to manage the public lands for multiple use.  See response to comment 121-1 for a definition of the multiple use.

The BLM has developed stipulations to protect the values of the surrounding national parks.  For example, a controlled surface use stipulation has been imposed on oil and gas development surrounding Arches National Park. This controlled surface use stipulation states that oil and gas development cannot be within the viewshed of key observation points within Arches National Park. |

| | | | | |
|---|---|---|---|---|
| | | | potential to impact non-BLM lands, in particular the national parks in the region. Many uses permitted on BLM lands are not compatible with the mission and protection of the national parks such as Arches and Canyonlands. Air pollution, visibility, soundscapes, nightskies, and wildlife corridors are all impacts that do not respect boundaries. | The BLM assumes that it has the resources to effect the RMP. On pg. 1-13 of the DRMP/EIS, it states that BLM would hjave the funding and personnel for managing programs. |
| National Parks Conservation Association | 970 | 3 | All Alternatives of the RMP has oil and gas leases immediately adjacent to the boundaries of Arches NP. This is extremely concerning given the enormous potential impacts on viewsheds and resources within the Park and the impact on visitor experience. Some examples include the areas outside of Delicate Arch on Dome Plateau and the leases on Yellowcat Flat that would impact the campground, some of the most popular trails in the Park such as Devils Garden and many of the most popular Arches including Double O, Private Arch, Wall Arch, and Navajo. We request that BLM include an alternative that creates a buffer zone in the sensitive area adjacent to national parks. | Alt C of the DRMP/EIS creates an area of controlled surface use for oil and gas leasing around Arches National Park. This stipulation requires oil and gas facilities to not be visible from the National Park. This is stated on pg. 2-51 of the DRMP/EIS: "Public lands within the viewshed of Arches National Park would be designated as VRM Class II." VRM Class II requires controlled surface use stipulations for oil and gas.<br><br>Valid existing rights are not affected by the current planning effort. |
| National Parks Conservation Association | 970 | 4 | BLM fails to address potential impacts from ozone due to oil and gas development. According to the National Parks Service, "Tropospheric (ground-level) ozone concentrations were monitored in the park from 1987-1992, and are currently monitored in Canyonlands NP, 1992-present. An analysis of the data indicates that ozone concentrations have significantly increased in the park. The observed concentrations in Canyonlands NP fall within a range that may produce visible effects or growth effects on sensitive plant species under certain conditions. It is likely that ozone concentrations in Arches NP are similar." NPS goes on to state "Several plant species that occur in Arches NP are known to be sensitive to ozone (e.g., Rhus trilobata)." Studies already conducted in other Utah national parks including Bryce, Zion and Cedar Breaks have demonstrated symptoms of "ozone injury" on plant | Predicting ozone associated with oil and gas development requires air dispersion modeling, which was not used in this analysis. Estimated emissions of NOx and VOCs are included in the analysis, both of which are precursors to ozone formation. Increases in VOCs and NOx are estimated to be 7% and 4% respectively under the PRMP. |

BLM_0011969

| | | | | |
|---|---|---|---|---|
| | | | species.<br><br>BLM has relied on out-dated air quality trend data in determining their preferred alternative will have no impacts on the air quality in the affected Class I airsheds. The BLM is obligated to re-analyze their finding based on the most current air trend data, which is already showing a decline in air quality.<br>In Chapter 4.3.1 BLM states incorrectly "Background CO, Nox, and SO2 concentration information was not available within the MPA." They have again ignored air data from Canyonlands monitoring station and should be required to re-asses the air quality data utilizing the most comprehensive data. | |
| National Parks Conservation Association | 970 | 5 | Projected emissions rates for gas compressors (Table 4.6) were based on best available technology limits. However, nothing in the plan requires the application of BACT.  BLM needs to have permit conditions consistent with their analytical data. | Chapter 2 of the DRMP/EIS on pg. 2-7 states that the best air quality technology, as per guidance from the Utah Division of air quality would be applied to actions on public lands as needed to meet air quality standards.  It goes on to state "Manage all BLM and all BLM authorized activities to maintain air quality within the thresholds managed by the State of Utah ambient air quality standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD), and protect the Class I airshed of the National Parks (e.g. Arches and Canyonlands). |
| National Parks Conservation Association | 970 | 6 | Night skies are an important resource at Arches and Canyonlands NP. This resource is affected by both air quality and light emitting sources.  The BLM has completely failed to address the impact that increased oil and gas development would have upon the pristine night skies within the parks.  This resource is a critical component of the visitor experience. | In the Preferred Alternative of the DRMP/EIS the viewshed from Arches is managed as VRM II.  Tthe major viewshed from Canyonlands is Shafer Basin which is proposed as VRM I.  Night lighting can mitigated in a VRM II area and night lighting would be excluded in a VRM I area.  Impact to night skies would be considered a cumulative impact within these site-specific analyses. |
| National Parks Conservation Association | 970 | 7 | It is particularly troubling that BLM has included designated ORV routes that are within the boundaries of Arches NP. This error needs to be removed. The BLM also needs to address how it will monitor routes it | The BLM does not make decisions on route designations within Arches National Park.  The routes shown on the map within the park have been deleted from the PRMP/FEIS. |

| | | | intends to designate that run up to the park boundaries. | |
|---|---|---|---|---|
| | | | | Those designated routes that run up to the park boundaries may be monitored by either the BLM or the park.  If these routes are causing damage in the park, they can be closed on a site specific basis after the completion of the RMP.  Page 2-48 of the DRMP/EIS states that adjustments to the Travel Plan may be made at a site specific level, using the NEPA process. |
| National Parks Conservation Association | 970 | 8 | 4.3.24 of the draft RMP is purported to address cumulative impacts of the environmental consequences of the alternatives. In listing the "activities contributing to cumulative impacts to air quality" BLM fails to list the air pollution impacts from oil and gas including ozone, SO2, NOX.  Instead, BLM only mentions surface-disturbing activities from oil and gas. Additionally, BLM inadequately addresses the impact from other oil and gas development and potential increases in activity from surrounding BLM areas, most of which are also releasing DRMPs. | Analysis of oil and gas impacts includes calculation of emissions associated with compressors, glycol dehydrators, flaring, and surface disturbance. The sections have been updated with the new analysis. |
| National Parks Conservation Association | 970 | 9 | The primary purpose of NEPA is for Federal Agencies to identify the effects of their actions on the environment and the significance of those effects (CEQ 1502.16). It was the intent of Congress, with the passage of NEPA that Federal agencies would make informed decisions regarding the consequences of their actions and also to inform and involve the public in this process. Congress intended for better decisions to be made as a result of this information and with the involvement of the public affected.  The Moab RMP completely fails in this regard because the significance of the environmental impacts of the Proposed Action and all alternatives are not identified for any of the resource categories. Therefore, it would be impossible for the BLM to make a fully informed decision as to the consequences of their actions or for the public to meaningfully evaluate and comment on the | The BLM complies with NEPA and CEQ.  A Resource Management Plan is a land use plan.  An environmental impact statement accompanies the RMP because significant impacts  can result from the decisions in the RMP.  The  significant impacts are disclosed in the EIS accompanying the RMP.  Chapter 2 summarizes the impacts of each alternative and compares them. |

BLM_0011971

| | | | alternatives without knowing the significance of the anticipated effects of the alternatives. The BLM not only failed to follow the implementing regulations of NEPA but failed to meet the most basic underpinnings of law. We are requesting that the draft RMP be revised to include an analysis of the significance of environmental effects and to reissue the draft for review and comment. | |
|---|---|---|---|---|
| National Parks Conservation Association | 970 | 10 | In Chapter 5, BLM states who they are required by Federal law to consult with during an EIS process. BLM has erred in excluding the National Park Service as a cooperating agency. They have ignored the directive outline in the Jan 30, 2002 Memorandum from James Connaughton, Council on Environmental Quality (CEQ) Chair, which states that "The purpose of this Memorandum is to ensure that all Federal agencies are actively considering designation of Federal and non-federal cooperating agencies in the preparation of analyses and documentation required by the National Environmental Policy Act (NEPA), and to ensure that Federal agencies actively participate as cooperating agencies in other agency's NEPA processes. The CEQ regulations addressing cooperating agencies status (40 CFR § 1501.6 & 1508.5) implement the NEPA mandate that Federal agencies responsible for preparing NEPA analyses and documentation do so "in cooperation with State and local governments" and other agencies with jurisdiction by law or special expertise. (42 USC § 4331 (a), 4332(2)). Despite previous memoranda and guidance from CEQ, some agencies remain reluctant to engage other Federal and non-federal agencies as a cooperating agency. In addition, some Federal agencies remain reluctant to assume the role of a cooperating agency, resulting in an inconsistent implementation of NEPA. Studies regarding the efficiency, effectiveness, and value of NEPA analyses conclude that stakeholder involvement is important in ensuring decisionmakers have the environmental | See response to comment 124-142. |

BLM_0011972

| | | | information necessary to make informed and timely decisions efficiently."

Cooperating agencies are required to be involved in: identification of issues (43 CFR § 1610.4-1); development of planning criteria (43 CFR § 1610.4-2); inventory data and information collection (43 CFR § 1610.4-3); analysis of the management situation (43 CFR 1610.4-4); formulation of alternatives (43 CFR § 1610.4-5); estimating effects of alternatives (43 CFR § 1610.4-6); selection of preferred alternative (43 CFR § 1610.4-7); and selection of resource management plan (43 CFR § 1610.4-7). See also, BLM's "A Desk Guide to Cooperating Agency Relationships."

The exclusion of the NPS from cooperating agency status has limited the input from this most qualified agency on the import of effects on Arches National Park and Canyonlands NP and on the preferred approach to managing these effects.

BLM must invite the National Parks System to act as a cooperating agency for the remainder of the RMP revision, including assessment of comments and recommendations for revising the Preferred Alternative. In addition, the NPS should be given the opportunity to review the information previously provided to the other cooperating agencies, and then provide input on the analysis of effects and management recommendations pertaining to Arches National Park and Canyonlands National Park. | |
| Howard County Bird Club | 972 | 1 | We rely on land-managing agencies like BLM to advise us, through regulations and closures, which routes are not suitable for ORVs because of potential damage to the land and wildlife habitat. We want the agencies to place protection of the habitat as the highest priority. Every ORV route creates impacts harmful to wildlife | The preferred alternative of the Travel Plan considered purpose and need for each route versus any resource conflicts the route may have had.  Wildlife habitat was considered a resource conflict, and routes were removed from the Alt. C travel plan for this reason.  The route designation plans removes over 3,000 miles of existing |

| | | | | |
|---|---|---|---|---|
| | | | habitat. The impacts can be especially severe where the route is subject to erosion, where routes involve fording streams, and where too many routes fragment blocks of wildlife habitat.<br><br>The ORV routes in Alternative C (shown in map 2-11-C) are a dense network with many redundant routes, many that intrude on essential wildlife habitat, and many that would degrade the wilderness character of areas proposed for wilderness designation in America's Red Rock Wilderness Act. A total of 2,642 miles would be open to ORVs. In this planning area of 4,300 square miles, that means an average of six-tenths of a mile of ORV route for every square mile in the planning area. We urge BLM to exclude ORVs from the important wildlife and scenic areas. | route from designation.  In addition, all lands (with the exception of 2,000 acres) are limited to designated routes, removing over 600,000 acres from the "open to cross country travel" category.  The impacts to wildlife habitat from these actions are beneficial.<br><br>In addition, see response to comments124-15 and 124-55. |
| Howard County Bird Club | 972 | 2 | We compliment BLM for reviewing wilderness characteristics of the areas proposed in America's Red Rock Wilderness Act, although we may disagree with some of BLM's conclusion. We urge that all the areas proposed in that bill be held under protection until Congress has made decisions on wilderness designation. It is unfortunate that the Department of the Interior still clings to the unreasonable policy that no more areas will be recommended for wilderness stattus. That will change, and BLM will again be able to support deserving lands for protection as wilderness. In the final plan BLM should add protection for wilderness character of all qualifying. | The BLM chooses to manage three of the non-WSA areas with wilderness characteristics to protect those characteristics in Alt. C.  However, of the 266,485 acres of non-WSA lands that were found to have wilderness characteristics, 105,963 acres (40%) are either closed to leasing or have a no surface occupancy stipulation on the leases.  Four of these areas would be protected, in whole, from all surface disturbing activities: Beaver Creek, Gooseneck, Mill Creek Canyon, and Shafer Canyon.<br><br>The BLM has no obligation to protect all lands that it has inventoried as having wilderness characteristics.  See also response to comment 124-53. |
| Howard County Bird Club | 972 | 3 | The __ft EIS (map 3-2) indicates that most lands in the planning area have "high potential" for oil and gas development. Members of the Howard County Bird Club have seen oil/gas drilling just north of Canyonlands National Park, off State Highway 313, as well as in major gas fields north of Cisco and nearby in Colorado. It would be a mistake to promote drilling in valuable wildlife areas, in proposed wilderness, or near the | Map 2-5-C of the DRMP/EIS shows the areas that are to be protected from oil and gas development in Alt. C.  The no surface occupancy restriction would not allow surface disturbance in areas to the east of Canyonlands National Park, along the Colorado, Dolores and Green Rivers (which are very important wildlife habitat), in desert bighorn sheep migration corridors and lambing habitat, and other areas.  Furthermore, additional wildlife |

BLM_0011974

| | | | | |
|---|---|---|---|---|
| | | | national parks. The final plan should clearly define the areas to be protected for these values, so development can be steered into less critical areas. In the Moab plan, there need not be a conflict, because "high potential" extends throughout the planning area. | restrictions are proposed for Alt. C.  There are many acres subject to timing limitations to protect wildlife. |
| Howard County Bird Club | 972 | 4 | The watercourses and the riparian habitat along them are crucial for wildlife in this arid region, both resident species and those migrating through the Colorado Plateau region. BLM identified this as one of the 10 issues to be addressed in the Moab RMP (page 1-9). A total of 32,800 acres is identified by BLM as riparian habitat. Some 26,000 acres of this is within grazing allotments, and 34 percent of those lands were found to be "functioning-at risk," 11 percent as "not functioning" (page 3-35). We commend BLM for recognizing this problem. We ask the bureau to close jeopardized riparian habitat to grazing as proposed in Alternative B. We urge further closures to ORV traffic and mineral leasing to protect riparian habitat in areas. | The BLM recognizes the importance of riparian areas for wildlife.  Grazing in riparian areas is addressed not at the land use planning level, but rather when the grazing permit is renewed.  Standards for Rangeland Health and Guidelines for Grazing Management are utilized to protect riparian areas on a case-by case allotment basis. 

In designating routes for travel, riparian issues were carefully considered.  Of the 2,506 miles of existing route that are eliminated in the Travel Plan accompanying Alt. C, many were removed because of riparian conflicts. Where the purpose and need for the route outweighed the riparian conflict, the route was designated in Alt. C. Indiscriminate cross country travel in riparian areas has been almost entirely eliminated in Alt C, as has indiscriminate OHV riding in dry washes (which are used by wildlife as travel corridors).

All surface disturbing activities within floodplains and riparian areas are prohibited in all action alternatives. See Appendix C of the DRMP/EIS, pg. C-5, which states: "Allow no surface disturbing activities within 100 year floodplains or within 100 meters of riparian areas.  Also, no surface disturbing a ctivities within public water reserves or within 100 meters of springs." |
| Howard County Bird Club | 972 | 5 | The Green River is a major axis of wildlife habitat, serving as an interstatehighway for migrant birds and a home for resident species of birds and mammals. It is mostly wild, flowing through Dinosaur National Monument, Ouray National Wildlife Refuge, Desolation Canyon, Gray Canyon, Labyrinth Canyon and into Canyonlands National Park, where it joins the Colorado | The BLM has imposed a no surface occupancy stipulation for the entire Green River within the Moab Field Office. This stipulation states:  "There would be no surface disturbing activities within the area of the Three Rivers and Westwater mineral withdrawals (which includes the Green River)" (pg. C-5 of the DRMP/EIS).  This restriction applies to all surface disturbing activities, including oil and |

| | | | | |
|---|---|---|---|---|
| | | | River. The Moab plan addresses the segment from Gray Canyon to the boundary of Canyonlands. BLM should be giving better protection to the Green Corridor as a highly valuable area for wildlife and natural landscape. | gas development.  These stipulation will provide protection for wildlife along the Green River. |
| Howard County Bird Club | 972 | 6 | The Labyrinth Canyon segment includes habitat for desert bighorn sheep (lambing and rutting habitat), pronghorn antelope, and burrowing owl (maps 2-26, 2-25, 2-24 respectively). It is also a highly valued route for visitors enjoying a quiet float trip. The intrusion of ORVs and oil/gas activities should not be allowed here. We urge BLM to establish the Labyrinth ACEC, expanding it eastward to cover the desert bighorn lambing and migration areas and merging it with the proposed Tenmile and White Wash ACECs. Mesas and tributaries associated with Labyrinth should be included in the ACEC to protect riparian and upland habitats, including Hell Roaring Canyon, Mineral Point, Horsetheif Point, Deadman Point, Spring Canyon Point, and Tenmile Point. The Green sould be recommended for Wild and Senic River status. | Oil and gas leasing and all other surface disturbing activities are prohibited in Alt. C along the Green River and up into its major tributaries (Ten Mile, Spring, Hell Roaring and Mineral Canyons).  These prohibitions are imposed to protect the important wildlife habitat that is within these canyons and along the Green River.

The entire Greeen River, with the exception of the area between Swasey's Rapid and the San Rafael River, is recommended for Wild and Scenic River designation in the preferred alternative.

All OHV use along the Green River is limited to designated routes.  All these routes were constructed and have been in use for many years. |
| Howard County Bird Club | 972 | 7 | We commend BLM for ACEC proposal for White Wash sand dunes. We urge you to expand it to cover the entire dunes, cottonwood groves, water sources, and adjoining riparian habitat and desert bighorn sheep habitat. | The ACEC proposal for White Wash Sand Dunes is proposed only in Alt. B.

In Alt C, measures are proposed to protect the cottonwood groves and water sources.  The Duma Point area (where the bighorn habitat is) is proposed to be managed as no surface occupancy for oil and gas and all other surface disturbing activities. The White Wash area in Alt C includes approximately 2,000 acres of open area. The entire area surrounding the dunes would be managed as limited to designated routes in Alt C. |
| Howard County Bird Club | 972 | 8 | The Colorado River is a second major axis of wildlife habitat. Members of our club visited the river segment between Dewey Bridge and Moab, driving on Highway 128, the senic route from interstate 70 to Moab. It is a stunning introduction to the red rock topography of the | The Colorado River corridor is proposed to be managed as no surface occupancy for oil and gas leasing, and as no surface disturbance for all other activities.  In addition, the entire Colorado River is recommended for designation as a Wild and Scenic River.  Much of the area mentioned |

| | | | | |
|---|---|---|---|---|
| | | | Moab district. The Colorado River corridor will need secure protection in the years ahead, because it is threatened by oil and gas development and ORV trails.

BLM has recognized wildlife values here for desert bighorn lambing/rutting habitat (map 2-26-B) and has proposed a small ACEC of 50,000 acres. We urge the use of ACEC, ORV closures, and Wild Scenic River status to protect more of the corridor, including Fisher Towers, Fisher Mesa, Dome Plateau, Mat Martin Point, the Dolores River Canyon and its tributaries Beaver Creek and Thompson Canyon. The senic panoramas of these areas are enjoyed by visitors in Arches National Park, as well as those driving on Highway 128. Any damage to this landscape would be a blow to tourism in the Moab area. | by the commentor would be managed to protect its wilderness characteristics.

All vehicular travel in the areas mentioned by the commentor is limited to designated routes.  In much of the area, a no surface disturbing stipulation is imposed in Alt C, and no new routes would be allowed. |
| Howard County Bird Club | 972 | 9 | Our members visited the Canyon Rims Recreation area and Hatch Point. This is an excellent area for visitors seeking an easily accesible view of the Needles section of Canyonlands National Park and a grand panorama of canyon country. Go___ roads lead from State Highway 191 to Needles Overlook and three other viewing sites along the western rim of Hatch Point. The land between the road and the cliffs is highly valuable for quiet visitor use, where people can watch wildlife and enjoy the great canyon vistas. It is now being degraded by ORV traffic; our members saw tracks of ORVs far from the road. The final plan should close it to ORVs.

BLM has recognized habitat here for Sage-grouse (map 2-20), Burrowing Owl (map 2-22), Pronghorn kidding habitat (map 2-25), and desert bighorn sheep lambing/rutting habitat (map 2-26-B). We favor the proposed Canyon Rims ACEC, but it only protects the cliffs. We urge the BLM to use ACEC protection, with a closure to ORVs, for the area between the cliffs and Overlooks Road plus lands on the east side of the road | The Canyons Rims Recreation Area is prposed to be managed as an SRMA in Alt. C.  In addition, all travel would be limited to designated routes.  Illegal activity off the designated route system is not a planning issue.  The BLM assumes adherence to laws, regulations and policies.

The Canyon Rims area is recognized as a special visual resource.  It has a controlled surface use restriction on oil and gas leasing in Alt. C that protects its visual resources from oil and gas development.

See response to comment 1025-11 for the issue of forbidding OHVs across the planning area. |

| | | | including all the pronghorn kidding habitat (map 2-25) | |
|---|---|---|---|---|
| Howard County Bird Club | 972 | 10 | Members of our club have stayed in Moab as a base for their exploration of the region. With the concentration of visitor services here and growth in population, it is essential to protect the valuable areas of wildlife habitat close to town before more damage is done by ORVs and mineral development. BLM has recognized desert bighorn lambing/rutting habitat in the Shafer Basin (map 2-26-B) and proposed ACEC. We favor that proposal, plus Behind the Rocks and Mill Creek Canyon ACECs (map 2-14-B) and protection of Goldbar Rim. These areas are essential wild lands for visitors to Moab. | Alt C of the DRMP/EIS proposes to designate the Mill Creek and Behind the Rocks ACECs.  The Goldbar Hiking Focus Area is also managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities.  This stipulation will provide protection for wildlife habitat.<br><br>All vehicular travel within the Moab planning area (except for 2,000 acres in the White Wash Sand Dunes) would be limited to designated routes.  The BLM assumes that all visitors would adhere to the Travel Plan. |
| Utah 4 Wheel Drive Association | 979 | 1 | Several short sections of the Flat Iron Mesa Easter Jeep Safari (EJS) route are missing from the proposed maps. One missing section includes the popular obstacle Easter Egg Hill. Most likely this is an accidental omission, but this should be brought to the BLM's attention. | See response to comment 206-17. |
| Utah 4 Wheel Drive Association | 979 | 2 | On the Strike Ravine trail, the obstacle known as "Big Ugly" has been left off the maps. Additionally, the section of Strike Ravine that crosses Kiley Miller's property is also missing from the maps. RR4W has successfully defended the legality of this route in court over the last few years, and this valid route should be included to bring to the BLM's attention. | See response to 206-11. |
| Utah 4 Wheel Drive Association | 979 | 3 | Short sections of the Easter Jeep Safari routes for Crystal Geyser and 3D are also omitted from the BLM maps. Again, this is probably an accidental exclusion, but something to bring to the BLM's attention. | Corrections to Easter Jeep Safari routes have been made in the Travel Plan. |
| Utah 4 Wheel Drive Association | 979 | 4 | Coyote Canyon is a popular hardcore trail on public land west of Area BFE. This trail is not included on current proposed maps, but should be established as a designated route. | Coyote Canyon was not in the inventory of routes analyzed in the Travel Plan process (see Appendix G). For adding new routes to the Travel Plan after the signing of the Record of Decision, see response to comments 122-15 and 122-30. |
| Moab Friends- | 1002 | 1 | There are sections of several permitted Easter Jeep | All Easter Jeep Safari route data has been corrected.  All |

| | | | | |
|---|---|---|---|---|
| for-Wheelin' | | | Safari Trails that are left off the Travel plan maps.<br>-Copper Ridge Trail<br>-Strike Ravine Trail<br>-3D Trail<br>-Dolores Triangle Trail<br>-Flat Iron Mesa Trail | Jeep Safari routes are in Alt. C of the Travel Plan. |
| Moab Friends-for-Wheelin' | 1002 | 2 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | For the addition of new routes at the conclusion of the DRMP/EIS, see response to comments 122-15 and 122-30. |
| Western Watersheds Project | 1025 | 1 | We note that, in particular, livestock grazing is not analyzed in a range of alterantives (DEIS/RMP Chapter 2) which include No Grazing, Significantly Reduced Grazing, and No Action.  This failure must be corrected to meet the intent of NEPA and in order to provide a comparison of the impacts of livestock on riparian and upland areas, water quality, soils and wildlife under proposed stocking rates as compared to conditions in the absence of livestock.  Otherwise, no true evaluation of the impacts of livestock grazing can be claimed. | The No Grazing Alternative proposed by the commentor is an alternative considered but eliminated from analysis on pg. 2-107 of the DRMP/EIS.  This referenced section also covers the other concerns raised by the commentor.<br><br>See response to comment 9-3. |
| Western Watersheds Project | 1025 | 2 | An update of the AUM forage consumption value to reflect current livestock weights was completed in 2007. This analysis is also attached as Appendix 2. It shows that the forage values BLM uses underestimate forage consumption by livestock such that taking into account the most current information on livestock weights would automatically reduce current permitted nubmers by 1/3. | Forage allocations do not require land use planning decision but are specified on a site specific allotment basis.  The BLM Moab Field Office is currently evaluating each allotments using the Standards for Rangeland Health and Guidelines for Grazing Management for BLM in Utah and making adjustments in numbers and season of use, as necessary, based on these guidelines.  See Appendix Q of the DRMP/EIS.<br><br>See response to  comment 9-3. |
| Western Watersheds Project | 1025 | 3 | BLM, in relying on the State of Utah to list streams in its TMDL process, is abrogating its responsibility to manage so that water quality standards are met. | The Environmental Protection Agency has delegated the responsibilty under the Clean Water Act to the State of Utah.  The BLM manages the public lands so as not to exceed the State of Utah water quality standards.  The State identifies waters that are not meeting water quality standards. |

| | | | | |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 4 | By grazing livestock on the sensitive and erodible soils found in the RA, BLM is impairing watershed function, creating salinity problems in the Colorado River, which is in opposition to the Colorado River Salinity Control Act.  This also results in the impairment of habitat for sensitive, threatened and endangered fish.  It is BLM's obligation to research and provide citations and a summary of this research that clearly documents the role of livestock grazing within upland and riparian ecosystems in altering watershed function as well as water quality , and delineate what particular practices will be followed to protect water quality, including effectiveness monitoring. | The land use planning process is utilized to identify lands that are available not availble for livestock grazing. <br><br> The impacts of livestock grazing on the resources mentioned by the commentor are addressed not at the land use planning level but rather when the grazing permit is renewed.  Standards for Rangeland Health and Guidelines for Grazing Management are utilized to protect these resources on a case by case allotment basis. <br><br> Site specific impacts resulting from livestock grazing are addressed on a site specific allotment basis for soils, riparian areas, impairment of habitat, and threatened and endangered species. <br><br> See response to comment 9-3. |
| Western Watersheds Project | 1025 | 5 | The effects of surface disturance by livestock on soils, biological crusts and plant communities as they interact with wind must be analyzed in an appropriate model that takes into account ground cover, shrub and forest cover, erosion factor, wind patterns and speed to determine the impacts on ambient air quality and human health in nearby communities, National Parks and the region from particulate pollution. This analysis must incude consideration of all other surface disturbing activities such as recreatonal vehicles, normal traffic, oil, gas and mineral exploration, development and production activities. In addition, the relase of greenhouse gases ($CO_2$ and $CH_4$) and other organic or inorganic pollutants must be calculated and modeled to determine the impacts on air quality and human health in nearby communities, National Parks and the region from particulate pollution. This analysis must include consideration of all other surface disturbing activities such as recreational vehicles, normal traffic, oil gas and mineral exploration, development and production activities. In addition, the release of greenhouse gasess | See response to comment 1025-4. |

| | | | | |
|---|---|---|---|---|
| | | | (C02 and CH4) and other organic or inorganic pollutants must be calculated and modeled to dermine the impacts on air quality (DEIS/RMP 4.3.1 and 4.3.4), climate change and global warming, wildlife (DEIS/RMP 4.3.15, 4.3.19) and human health (DEIS/RMP 4.3.4) in a like manner. Form example the report recently released by the United Nationas, Livestock's Long Shadow, shows that the greenhouse gas emissions from livestock are greater than that from transportation. | |
| Western Watersheds Project | 1025 | 6 | The Moab FO should conduct a capability analysis to determine the areas that might be available for livestock grazing, excluding steep slopes >30%, low forage production <200 lbs/areas, ecosystems converted by wildfire or invasive weeds, and the ability of sensitive soils to respond following impacts (arid elevations, reclamation, soil chemistry, drought). Then, in consideration of wildlife competition and recreation impacts, determine those lands that will be made available (suitable) for livestock grazing. Areas that should not be considered suitable include riparian areas, wilderness areas, wilderness study areas, ACECs, sensitive soils, crucial wildlife areas, and public campgrounds and other administrative sites. Once this is done, BLM should then apply the current forage capacity and livestock consumption rates to determine the appropriate stocking rates and incorporate management as described in Appendix 1. This analysis, which will result in significant reduced grazing, should determine the levels and management of livestock for analysis for comparison with a NO Grazing Alternative and the Status Quo, or No Action Alternative. | See response to comment 1025-4. |
| Western Watersheds Project | 1025 | 7 | Despite an improper capability and suitability analysis, the DEIS/RMP failed to quantify and analyze the impacts of livestock grazing with riparian/wetland areas which are critical and sensitive ecosystems within the western landscape. | See response to comment 1025-4. |
| Western | 1025 | 8 | The DEIS/RMP failed to analyze the role and values of | This was not an issue brought up during the scoping |

| | | | | |
|---|---|---|---|---|
| Watersheds Project | | | predators in controlling rodent populations and fulfilling their role in a healthy ecosystem. | process and wastherefore not analyzed in the DRMP/EIS. The commentor has not provided any information or demonstated a need to conduct this level of analysis. |
| Western Watersheds Project | 1025 | 9 | The DEIS/RMP does not present an allotment by allotment summary of current monitoring information that describes the trend or condition as compared to the 1985 RMP. Claims of streams and riparian areas in PFC ignore that PFC is a minimal classification that does not address the wildlife habitat attributes of these most important areas, water quality or instream habitat for fish. In addition, springs, seeps and wetlands condition and trend are not described. Where is the analysis of utilization and annual stocking rates? | Monitoring of riparian areas and streams for properly functioning condition does not require a land use planning decision for livestock grazing.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comments 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 10 | The DEIS/RMP does not analyze or propose science based utilization standards for upland and riparian areas, stream bank stability standards or other critical livestock management mechanisms.  It does not analyze different grazing systems and their requirements for rest to protect plants during critical growth periods. These are fundamental decisions that must be made at the planning level or BLM cannot claim it is managing in a sustainable manner that does not impair productivity as mandated by FLPMA. Neither does the absence of specific monitoring. | Utilization and stream bank stability do not require a land use planning decision for livestock grazing.  These resource considerations are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 11 | The Moab FO should at a minimum, analyze alternatives including No Action (status quo), No ATVs, Dirt Bikes, or Snowmobiles, or the new experimental playtoys,  Personal Aerial Vehicles, and the level of use allowed in the current set of alternatives.  Some of the science regarding this issue is presented in the following paragraphs. | There is no snowmobile use on BLM lands within the Moab planning area.  An alternative which proposes to make the entire planning area unavailable to ATVs and dirt bikes does not meet the purpose and need for this document.  NEPA requires that agencies develop appropriate alternatives to recommended portions of actions which involves unresolved conflicts.  No issues or conflicts have been identified during this planning effort which requires the complete elimination of dirt bikes and ATVs within the planning area for their resolution.  An alternative which proposes to make the entire planning area unavailable to dirt bikes and ATVs would be inconsistent with the National Management Strategy for |

| | | | | Motorized Off-Highway Vehicle Use on Public Lands. |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 12 | DEIS/RMP must provide evidence that any proposed mitigation and enforcement efforts will be effective for those alternatives that allow any level of use by these machines. | On pg. 4-3 of the DRMP/EIS the assumption is made that "BLM will have the funding and workforce to implement the selected alternative". |
| Western Watersheds Project | 1025 | 13 | The combined effects of sediments from watershed uses such as roads, OHVs, grazing and logging, have not been addressed in a comprehensive analysis. No evaluation has been done for the contribution of hazardous pollutants to the air and watersheds where motorized vehicles are used. | See response to comment 124-7.

No logging occurs on BLM lands within the Moab planning area. |
| Western Watersheds Project | 1025 | 14 | Road densities have not been analyzed nor have their effects on wildlife been analyzed. A recent publication by the National Park Service discussed the effects of snowmobiles on wildlife. | An analysis of habitat fragmentation due to roads is found on pgs. 4-482 through 4-486 of the DRMP/EIS. |
| Western Watersheds Project | 1025 | 15 | BLM has not adequately analyzed the direct, indirect, and cumulative effects of the RA's road and trail network, the large number of closed roads and trails that continue to be used illegally by ATVs and dirt bikes, and the incidence of newly created, illegal routes. There has been no analysis of road density effects. These factors were not considered in addressing wildlife impacts in the DEIS. | An analysis of habitat fragmentation due to roads is found on pgs. 4-482 through 4-486 of the DRMP/EIS.

The DRMP/EIS proposes to close 2,506 miles of inventoried existing routes in the preferred alternative (Alt C).

Illegal activities are not a land use planning issue but, as stated on pg. 1-11 of the DRMP/EIS, is an issue addressed through policy or administrative action. |
| Western Watersheds Project | 1025 | 16 | Stipulations added to mitigate various management actions proposed within the DRMP/EIS are inconsistently applied throughout the proposed alternatives. The same types and degrees of stipulations designed to mitigate mineral and oil/gas extraction and development impacts should be applied to reduce all surface distrubing impacts including livestock grazing, and motorized and non-motorized recreation. Various types of stipulations recommended include seasonal timing limitations; controlled surface use limitations on slope >30%; spatial buffers for | Stipulations developed for oil and gas leasing are applied to all surface disturbing activities. These activities are defined in Appendix C of the DRMP/EIS on pg. C-1: "Surface disturbing activities are those that normally result in more than negligible disturbance to public lands and accelerate the natural erosive process". Many examples of surface disturbing activities are provided but the following are not considered surface disturbing: livestock grazing, cross-country hiking, minimum impact filming, and vehicular travel on designated routes. Many of the activites mentioned by the commentor have not |

| | | | | |
|---|---|---|---|---|
| | | | sensitive wildlife habitats; restrictions on uses within sensitive soils and municipal watersheds.  Each of these stipulations should be consistently identified and applied in common to all proposed alternatives and to all management actions and authorizations in all applicable locations, including authorization of livestock grazing; development of grazing systems/amps; motorized vehicle routes; mechanized vehicle routes; commercial recreation permitting; recreation events; filming permits; special management designations including ACECs, and SRMAs; right of ways, road and facilities maintenance and construction; vegetation treatments; as well as oil/gas and mineral extraction. | been defined as surface disturbing in the DRMP/EIS. New motorized routes, high impact film permits, and vegetation treatments are considered surface disturbing and would managed consistent with the oil and gas leasing stipulations. |
| Western Watersheds Project | 1025 | 17 | Many prescriptions within the DRMP/EIS are directed only toward "surface disturbing" activities, intended to exclude activities such as livestock grazing, cross-country hiking, minimum impact filming, and vehicular travel on designated routes. However within Moab RA, the extent of impacts associated with livestock grazing, hiking by vast numbers of recreationists, filming and the degree of motorized travel on designated routes certainly meet the referenced definition in Appendix C, which states "surface disturbing activities are those that normally result in more than negligible disturbance to public and that accelerate the natural erosive process. | See response to comment 1025-16. |
| Western Watersheds Project | 1025 | 18 | Overall, recreation proposals in the DRMP/EIS are very confusing and hard to evaluate due to the extent of management layering of Special Management Designations (SRMAs) and Focus Areas, relative to other Special Management Designations (ACEC, WSAs, WSRs). | See response to comment 121-9 and 123-14. |
| Western Watersheds Project | 1025 | 19 | However, the impacts from motorized vehicle use along authorized routes are not sufficiently nor scientifically quantified and analyzed, especially with over 300% increases in OHV registration within Grand County alone since 1998 (Table 3.21). | Although the percentage increase is large the actual numbers of registered non-street legal vehicles in Grand County rose from 238 in 1998 to 726 in 2002.  The impacts of vehicle use along designated routes is discussed throughout Chapter 4 of the DRMP/EIS as well as in Appendix G.  The commentor provides no specific |

BLM_0011984

| | | | | information about how the impacts were not sufficiently analyzed. |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 20 | In light of this, and since there appears to be a lack of adequate range of alternatives of management options or mitigation for environmental impacts, we support Alternative B (Environmental Preferred) prescriptions within the SRMAs with specific comments as detailed below. | This is an opinion that does not require a response. |
| Western Watersheds Project | 1025 | 21 | Within the recreation section, the maintenance and/or construction of new recreation facilities is not always warranted or justified to "support or enhance recreation opportunities" where existing facilities have not been properly analyzed or developed in the past (eg public health and safety with respect to flood zones, fire hazards, or environmental damage including disturbance to wildlife species. | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.   Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the  RMP.  This would include recreation facilities for SRMAs and Focus Areas.  All existing facilities currently on the ground have been properly analyzed through the NEPA process. |
| Western Watersheds Project | 1025 | 22 | The proposed Tavel Plan should recommend signing travel routes as open instead of closed, therefore removal of signs would not be as costly or result in additional labor, compliance and enforcement problems. | See response to comment 206-5, 120-96, and 479-8. |
| Western Watersheds Project | 1025 | 23 | Motorized vehicle use as proposed within the White Sand Dune area and within 10-mile Wash does not adaquately protect the unique riparian, springs, wildlife and cultural values as initially identified within their respective ACEC proposals. Prescriptions necessary for the Protection of environmental resources within the proposed 10-mile wash ACEC should not differ between Alt B and Alt C with respect to motorized routes within the stream corridor, when special management is identified to avoid damage of identified resources. Furthermore, include with the impact analysis for special designations related to 10-mile Wash ACEC benefits to riparian/wetland resources by prohibiting motorized vehicles downstream of Dripping | See response to comments 479-6 and 124-81. |

| | | | | |
|---|---|---|---|---|
| | | | Stream to the Green River. | |
| Western Watersheds Project | 1025 | 24 | Designations of identified motorized vehicle routes within the riparian/wetland streams of Kane Creek, Upper Courthouse Wash Focus Area and Labyrinth Focus Area, including proposed competitive motorized events, do not adaquately protect the stream ecologies and riparian dependent wildlife.  The proposed travel routes, as well as records of non-compliance existing throughout these critical ecosystems indicate resource damage is currently occurring at alarming rates. | Non-compliance and enforcement actions are issues addressed through policy and adminstrative actions as stated on pg. 1-11 of the DRMP/EIS.

In designating routes for travel, riparian issues were carefully considered.  Of the 2,506 miles of existing routes that are eliminated in the Travel Plan accompanying Alt. C, many were removed because of riparian conflicts.  Where the purpose and need for the route outweighed the riparian conflict, the route was designated in Alt. C such as Kane Creek.  Indiscriminate cross country travel in riparian areas has been almost entirely eliminated in Alt C by limiting travel to designated routes.

Competitive motorized events are directed to the Dee Pass motorized trail focus area in Alt C.  The DRMP/EIS states on pg. 2-25: "Competitive routes within this area would be based on site specific NEPA analysis. |
| Western Watersheds Project | 1025 | 25 | How is the current capacity of authorized livestock grazing determined in the RA to avoid immediate ecological damage? How is the suitability to graze by livestock in areas such as steep slopes, sensitive soils, riparian areas, and areas with high invasive vegetation determined where even the local soil surveys published by the Natural Resource Conservation Service (NRCS) recommend them as unsuitable, limited to suitability, or suitable only for wildlife purposes? | The affects of livestock grazing on resource values such as steep slopes, sensitive soils, riparian areas, and areas with high invasive vegetation do not  require a land use planning decision.
These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.

See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 26 | The data cited was summarized in 1985, which occurs within the highest precipitation periods recorded on the RA. Ecological conditiions have changed greatly since the 1985 estimates cited in Table 3.10. BLM Manual H-1601-1 (BLM 2005a) states that vegetation management decisions, including grazing, must be based on desired future conditions (DFC), usually expressed as ecological or management status of vegetation (species composition, habitat diversity, age | The resources of concern identified by the commentor related to livestock grazing do not require a land use planning decision.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.

See response to comment 1025-4 and 9-3. |

| | | | | |
|---|---|---|---|---|
| | | | and size classes of species) and desired soil qualities (conditions of soil cover, erosion, compaction, loss of soil productivity). DFCs and management objectives are not analyzed and documented by allotment to justify current grazing authorizations. | |
| Western Watersheds Project | 1025 | 27 | Rest-rotation grazing systems and/or season-of-use restrictions should be identified specifically by individual allotment to reduce ecological and user conflicts associated with current grazing authorizations. Table 3.11 indicates insufficient grazing systems are currently in place with 52 allotments being grazed season-long; and only 21 allotments containing deferred rotation grazing; and 1 allotment containing a rest-rotation grazing system. | Rest-rotation grazing systems and season of use restrictions related to livestock grazing do not require a land use planning decision.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.  See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 28 | If livestock grazing is not removed within these allotments, as proposed in some alternatives, then appropriate grazing systems and/or mitigation should be specifically identified for each and justified based on the science. A number of other allotments within the Moab RA appear to also have been recommended for rotation grazing systems within the 1985 RMP which are not currently implemented. Additional allotments have been identified to be conflicting with other resource values within respective analysis. | The BLM is reviewing each allotment and making adjustments based on Standards for Rangeland Health and Guidelines for Grazing Management.  See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 29 | Long-term adjustments to livestock use (term permits adjustments) require the evaluation of monitoring data including climate, actual grazing use, current or historic impacts, utilization mapping, forage capacity determinations and long-term trend data, as well as utilization levels, all of which have been apparently absent within the Moab RA during recent years. | Adjustments to livestock use is being undertaken on a site specific allotment basis using monitoring, actual grazing use, climatic data, and trend data.  This is accomplished through the Standards for Rangeland Health and Guidelines for Grazing Management.  See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 30 | The DEIS/RMP identifies a spread of alternatives to implement range improvement projects in response to meeting Rangeland Health Standards. While these various alternatives may help prioritize implementation of recommendations resulting from Rangeland Health Standard evaluations, regulations require that | The BLM is aware of the regulations to  mitigate ecological damage resulting from Rangeland Health Standard evaluations within 2 years.  The BLM will comply with these regulations. |

| | | | | |
|---|---|---|---|---|
| | | | rangeland improvements to mitigate ecological damage must be implemented within 2 years of the evaluation regardless of the equal benefits to livestock and wildlife, or livestock solely. This is not an appropriate land use planning proposal. | |
| Western Watersheds Project | 1025 | 31 | Alternatives identified within the soils/watershed and livestock grazing sections should be adjusted to apply use restrictions such as closure, season-of-use and rest-rotation grazing systems consistently on all high to moderately saline soils to reduce non-point surce contributions within the Colorado River basin, not just saline soils within mancos areas. Such restrictions should specify individual allotments and particular seasonal or management adjustments or closures to protect sensitive soils. | Use restrictions such as closure, season-of-use and rest-rotation grazing systems related to livestock grazing do not require a land use planning decision.  The resource considerations are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 32 | There is no adequate spread of alternatives identified or maps provided for maintenance of existing or newly planned vegetative treatments, even though objectives and conflicts have altered since their original implementation.  Such actions should undergo NEPA analysis and public review periods prior to implementation within all alternatives to ensure environmental and wildlife protection. | All new vegetative treatments would require site specific NEPA analysis, including public review periods. The DRMP/EIS gives a broad goal for these treatments, but does not define their specific locations.<br><br>Existing vegetative treatments have all undergone the NEPA process at the time of their authorization. Maintenance of these treatments would only occur without new NEPA documentation if there have been no changes in condition.  This means that most vegetative treatment maintenance projects would require new NEPA analysis. |
| Western Watersheds Project | 1025 | 33 | Consideration of habitat banking for compenstaion of wildlife habitat loss should be considered only when it involves parcels which enhance wildlife or ecological resources. | The section referred to is under Chapter 2 of the DRMP/EIS for wildlife and the habitat banking referes to wildlife. |
| Western Watersheds Project | 1025 | 34 | California condor have been documented in the Moab RA as far north as Flaming Gorge, as well as proposed reintroductions of grey wolves, both of which are not analyzed within the Draft RMP/EIS with respect to habitat requirements and impacts from other authorized uses. | Both of these species were released on an experimental basis.  The U.S. Fish and Wildlife Service have not identified habitat requirements within the Moab Field Office. |

| Western Watersheds Project | 1025 | 35 | Air quality impacts from permitted motorized vehicles and recreation events such as occurring during Jeep Safari and 24 Hours of Moab events are not adequately analyzed within the Draft RMP/EIS. | Data is not available to analyze the air quality impacts of motorized vehicles during recreation events. |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 36 | The degree of impacts associated with mineral and oil/gas extraction and geophysical exploration with respect to cumulative motorized vehicle routes, pads, and pipelines is of concern within the RA with no specific thresholds provided to reduce protect cumulative environmental impacts. | The BLM can not discern what the commentor is stating. The commentor does not provide any specific information about where the analysis is deficient. The BLM does not set thresholds for motorized vehicle use and oil and gas development. |
| Western Watersheds Project | 1025 | 37 | The DRMP/EIS assumes no impact from recreation or the travel plan to livestock grazing despite the degree of loss of habitat, spread of invasive weeds, reduce ecological conditions, and competition from large numbers of recreation users, events, authorized roads, and motorcycle route. | The impacts of travel management decisions on livestock grazing are detailed in the DRMP/EIS on pgs. 4,-73, 4-76, 4-79, and 4-80. The BLM has not identified general use as an issue where recreation is a conflict with livestock grazing. For the most part, the grazing seasons and the recreation seasons to not coincide. |
| Western Watersheds Project | 1025 | 38 | Impacts to livestock grazing from watershed actions, need to quantify temporary or permanent decreases in acres or aums in each alternative. | There would be no temporary or permanent decrease in AUMs for livestock based on any watershed actions proposed in the alternatives for the DRMP/EIS. |
| Western Watersheds Project | 1025 | 39 | Significant discrepancies exist within the riparian sections and other sections referencing riparian resources within the DRMP/EIS. Large differences exist between the number of riparian acres cited within the Moab RA in the affected environment, which references the 2003 BLM riparian GIS databases as containing 32,750 acres by ecological condition and those cited in the impact analysis which relies on Gap Analysis to determine Moab RA contains 13,450 acres of riparian resources. The DRMP/EIS quantification and analysis is severly flawed and unreliable throughout the document with these discrepancies, as well as others referenced below. Additionally, discrepancies and confusion exists on the locations and numbers of acres of riparian areas removed from livestock grazing within all alternatives throughout the document. Examples follow:<br>-Within the riparian impact analysis, whether riparian | The discrepancy in riparian data identified by the commentor has been corrected in the PRMP/FEIS. The riparian analysis in Chapter 4 of the PRMP/FEIS has been changed accordingly.<br><br>The BLM is not required to exclude all riparian areas from livestock grazing. Riparian areas are evaluated on an allotment specific basis during the Permit Renewal process using Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>The commentor has expressed a preference for the riparian actions and ACEC designations proposed in Alt B of the DRMP/EIS. The BLM has chosen Alt C as the preferred alternative.<br><br>As part of the Standards and Guidelines process for the Potash allotment, a cattle guard has been placed on the |

BLM_0011989

| | | | acres comprise either 32,750 acres or 13,450 acres, exclusion of livestock rgazing from only 17% of riparian areas, or even anything less than all of riparian acres within the district under the Alternative B Environmentally Preferred or Alt C BLM Preferred alternative is unacceptable, especially when approximately 43% of riparian areas are Functioning-at-Risk or in unsatisfactory condition and riparian areas comprise less than 1-2% of Moab RA public lands. Beneficial impacts to riparian can be realized from selection of 12 proposed special ACEC designations within Alternative B Environmental Preferred alternative. Alternative C BLM Preferred alternatives should recommend selection of more ACEC designations that benefit or protect riparian/wetland. Especially when the proposed SRMAs do not adaquately protect sensitive riparian resources which support approximately 80% of wildlife species. | Potash road between the Potash plant and the boat ramp. This action has excluded grazing from the Potash road (Highway 279) including the access to Day Canyon.  This has excluded Day Canyon from grazing. The text in the PRMP/FEIS has been changed to reflect that Day Canyon has been excluded from grazing.

Specific riparian wetland resources are evaluated on a site specific allotment basis during the Permit Renewal process using Standards for Rangeland Health and Guidlelines for Grazing Management.

The commentor's request for the names of specific streams and acres affected by each alternative is not necessary to analyze impacts and the land use planning level.  The goal of the impact analysis is to compare the alternatives. |
| | | | -Alt B Environmentally Preferred alternative of soil/water impacts analysis cites livestock grazing in 4,422 acres of riparian resources and along 58 miles of perennial stream would be excluded. Alternative C BLM Preferred would restrict grazing in 1,169 acres of riparian resources improving riparian along 28 miles of perennial stream. | For travel management, the number of miles excluded in order to benefit riparian resources has been added to Appendix G of the PRMP/FEIS.. |
| | | | -Alt C BLM Preferred alternative within the wildlife impacts section cites grazing would be restricted in 1,169 acres of riparian habitat in five allotments. Restrictions would include the development of AMPs. In addition, 77 acres in Day Canyon would be unavailable for grazing. Where in contrast within the riparian impacts section 4.3.11.3.3 Alternative C, the riparian areas unavailable for grazing are cited "as the same areas as under Alternative B, with the exception of Day Canyon, Kane Springs, Lower Gray Canyon of the Green River, and Hatch Wash, which would remain available for grazing." Furthermore in the riparian | |

resources alternative table on page 2-31, riparian areas would only be "prioritized for evaluation within specified allotments", with Day Canyon included in both Alt B Environmentally Preferred and Alt C BLM Preferred alternatives. Rangeland Health Standards require the removal of livestock grazing impacts from sensitive riparian/wetland resources whether through season-of-use adjustments, AMP development or fencing for mitigation when issues of Properly Functioning condition are raised as specifically identified for riparian allotments including Day Canyon. Therefore, we support removal of livestock grazing from those allotments identified within Alternative B Environmentally Preferred within the riparian alternative table; those identified with conflicts within Riparian affected environment section; those identified within section 4.3.6.3.3 impacts of riparian actions on livestock grazing management; and Table 4.30 within the riparian impact analysis section although there remain discrepancies between some references.
-Within the soils/watershed impact analysis, similar beneficial impacts from cultural resource proposals to 42 miles of perennial stream within Alternative B and C of soils and water section although there remain discrepencies between some references.
-Within the soils/watershed impact analysis, similar beneficial impacts from cultural resource proposals to 42 miles of perennial stream within Alternaive B and C of soils and water section would be received to riparian and wildlife resources.
-Within impact analysis to livestock grazing from riparian mgmt, all alternatives should cite the specific allotments and numbers of acres affected by alternative not simply that 8 or 6 sites would be excluded from livestock grazing.
-Impacts to riparian/wetland resources from desigated routes and single-track motorcycle routes need to be

| | | | specifically quantified and analyzed for public review especially since this was a scoping issue initially raised by the public.<br>-Within the livestock grazing impact analysis, the number of acres cited available to livestock grazing from selection of riparian actions in Alternative B would be a reduction of 4,422 acres and 203 AUMs as compared to Alternative A. | |
|---|---|---|---|---|
| Moab Friends-for Wheelin' | 1027 | 1 | There are sections of several permitted Easter Jeep Safari trails that are left off the Travel Plan Maps. We understand that Ber Knight has met with the MFO regarding these omissions, and was told that they woould be corrected, but we mention them here as a reminder of their importance to us.<br>  * Copper Ridge Trail:  The connection betweeen southern and northern Little Valley Roads at Klondike Bluffs Road intersection is missing.  Another segment of the route, one that is used to bypass the difficult pipelinge near US 191 at UTM 4282150N 0614340E. Next there has been some discussion among CR trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character. These changes would require two road segments to be left in Alternative C that are eliminated from Alternative A.  The first starts at UTM 4286060N 0615910E in the Sovereign area, proceeds roughly ESE, and then turns NE to connect with the pipeline road about 4286190N 0617590E.  This would allow using a segment of road that passed dinosaur tracks of the way to the usual lunch spot.  The second road segment is a loop that starts from the Little Valley Road at approximately 4290630N 0614020E; it startsin a SW direction, climbs the hill top, then heads NW along the ridgeline before dropping into a wash and bearing NE to reconnect back with Little Valley Road at 4291230N 0612940E.  This loop provides some elevation gain and therefore produces nice veiws into Arches NP. | See response to comment 206-11. |

| | | | | |
|---|---|---|---|---|
| | | | * Strike Ravine Trail:  Two sections are missing.  The N-S road crossing the private property that Red Rock 4 Wheelers had to defend its right to use in court is not shown, approximate UTM4253670N 0638440E on the southern end; a portion of the "Big Ugly" hill is not shown UTM 4254480N 0638550E.<br> * 3D Trail:  A section of road is missing from about UTM 4285900N 609900E north then west to UTM 4286400N 609300E.<br> * Dolores Triangle Trail:  An E-W shortcut near Steamboat Mesa, at about UTM 4295500N 668000E, is eliminated, and it is quite useful.<br> * Flat Iron Mesa Trail:  Four portions of this trail are not included in Alternative C.  First, from UTM 4246450N 636300E jiggling NW to the pipeline road.  Second, from UTM 4245600N 634700E going SW to Plan trail.  Third, from UTM 4246200N 633400Egoing SW to meet the SJ County B road.  Also at approximately UTM 4246440N 634910E the roads do not appear to connect, when in fact they do, and this connection is used on the Flat Iron safari trip.  Last the loop around "Hammerhead Rock" from about UTM 4242400N 633400E southerly and then east to the plan route.  Another note for this trail, the last bit of the permitted route to the county B road has been fenced across with no gate, and a longer existing road is now used to reach the county road.  It would be helpful to update this on the official map. | |
| Moab Friends-for Wheelin' | 1027 | 2 | There are two road segments in existing WSA's that we believe could be reopened without impacting the suitability of the area for preservation.  In one instance Search and Rescue efforts would be enhanced by this action.  These routes are:<br> * Behind the Rocks WSA:  Short segment to "EggRanch Fin", a nice viewpoint.<br> * Negro Bill Canyon WSA:  The road west from Coffee Pot Rock. | See response to comment 206-20. |

| Moab Friends-for Wheelin' | 1027 | 3 | Some routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C and D, do not appear on Alternative C. Three examples of this are listed below. We feel this issue should be addressed and corrections made for the entire map before the plan is finalized.<br>  * Dry Mesa spurs to two overlooks, and the extension of the main road on eastern end.<br>   * Tenmile area has a road to and overlook missing.<br>   * Rainbow Roacks area has two overlook roads missing. | See response to comment 206-21. |
|---|---|---|---|---|
| Moab Friends-for Wheelin' | 1027 | 4 | "Coyote Canyon": We fully support the designation of the Coyote Canyon trail. The extreme rock crawling trail is just to the west of Area BFE and Kiley Miller's private property. It is a user-created trail (in an area currently designated as "open"), and is not in the BLM road inventory and Travel Plan. Extreme trails are important, as they fill a need for a growing segment of 4WD enthusiasts, and there is a shortage of extreme trails in the Moab area. In addition, extreme trails such as Coyote Canyon can help take pressure off of other difficult trails, such as Moab Rim and Pritchett Canyon. | This route is not part of the San Juan County route inventory, nor was it proposed by any member of the public during scoping. As a result, it was not evaluated in the DRMP/EIS. This route can be considered for identification on a site-specific basis in the future. See also response to comment 206-4. |
| Moab Friends-for Wheelin' | 1027 | 5 | (Note: This letter contains comments that are the same as letter I-200, comment numbers 10, 11, 12, and 14.) | See response to comments 200-10, 200-11, 200-12 and 200-14. |
| Moab Friends-for Wheelin' | 1027 | 6 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | See response to comments 122-15, 122-30 and 206-4. |
| Moab Friends-for Wheelin' | 1027 | 7 | SRMAs and their "focus areas" should avoid excluding other uses categorically. The Preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones." Also, visitors to specific focus areas must be made aware that other uses are still allowed in said areas, in order to avoid unwarranted conflict between varied users within the focus area. This is especially important where heavy multiple use is present on trails | The DRMP/EIS specifically states on page 4-192 that focus areas will continue to be available for recreation uses by others than whose needs are specifically addressed by these focus areas. Management plans will be developed for each SRMA and its attendant focus areas. These plans are an implementation level decision, but could include language regarding visitor education of the type the commentor suggests. Visitor education does not require a land use plan decision. |

| | | | or roads within designated focus areas. | |
|---|---|---|---|---|
| Moab Friends-for Wheelin' | 1027 | 8 | We support the proposal made by Ride with Respect to provide a Rockcrawling Focus Area and a Motorcycle Trails Riding Focus Area in the Black Ridge area east of Area BFE, as well as nearby equestrian and mountain bike focus areas.  Rockcrawling and trails focus areas would fufill a need that is neglected under the Draft Plan, and would help reduce conflict on other challenging trails, such as Pritchett Canyon and Moab Rim.  These proposed focus areas would compliment Area BFE, by providing more opportunities and thus more incentive to visit.  We support the idea of designated trails in a rockcrawling focus area, as long as new trails could be legally created through cooperation between BLM and local 4-wheel drive clubs.  (While the route inventory provided by Ride with Respect shows numerous roads and trails, the vast majority are not suitable foe true rockcrawling. However, there are definete possibilities for creating challenging routes.) | See responses to comments 206-3 and 206-4. |
| Moab Friends-for Wheelin' | 1027 | 9 | The Utah Rims SRMA is necessary to properly manage this popular area.  It should have a motorized and mountain bike focus, and include the ability to desifnate or construct routes should they be needed in the future. In addition, additional camping areas should be provided. | The BLM agrees with the commentor's comment on this SRMA, and has included this SRMA in Alternatives B and C. See also response to comment 206-4. |
| Moab Friends-for Wheelin' | 1027 | 10 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond.  Increased visitation there warrants the more active management of a SRMA.  This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 206-3. |
| Moab Friends-for Wheelin' | 1027 | 11 | The Dee Pass SRMA proposes to designate most of the motorcycle single-track in the area.  However, ATV trails still need to be included, especially between White Wash and Red Wash. | The BLM has clarified its discussion in Chapter 4 and related maps to indicate which trails are also available to ATV use. |

| Moab Friends-for Wheelin' | 1027 | 12 | (Note:  This letter has a map attached.) | NRR |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 1 | There is nothing radically wrong with the existing condition except that it does not meet all of the needs of motorized recreationists, does not provide equal opportunity, and does not adequately address the growing need of motorized recreationists. The evaluation and proposal must adequately address these issues and the predisposition to motorized closures must be avoided. | The DRMP/EIS identifies 6,199 miles of inventoried routes in Alt A; 2,871 miles of inventoried routes are excluded from any of the action alternatives because there was no purpose and need for these routes.  Alt C designates 3,693 miles of full-sized vehicle routes and 282 miles of motorized single track.  Alt D includes 3,855 miles of full-sized vehicle routes and 340 miles of motorized single track.  Therefore, Alt D provides more motorized opportunities than does Alt C.

The commentor's implication that all the action alternatives represent a loss in motorized recreation opportunities (when compared with the No Action alternative) is incorrect.  Although 2,871 miles of inventoried routes were eliminated between the No Action and the action alternatives, these routes were determined to have no purpose and need primarily because they were redundant and received virtually no use.  The comment assumes that the motorized recreation opportunities in the action alternatives are inadequate to meet current or anticipated future demand.   The BLM in Chapter 4 discloes that all the action alternatives reduce motorized recreation opportunities.

NEPA and CEQ require that BLM provide a reasonable range of alternatives in the DRMP/EIS, and the BLM asserts that it has done so.  As described in Appendix G, the BLM's travel plan formulation attempts to balance transportation needs (including motorized recreation) with other resource uses and protections.  The BLM must manage for multiple uses, of which motorized recreation is only one. |
| Capital Trail Vehicle Association | 1031 | 2 | A motorized travel plan is a plan that specifically designates roads, trails and areas for motorized use, designates which vehicles will be allowed on which | The Travel Plan accompanying Alt. C in the DRMP/EIS designates routes for motorized use, as required by law and policy. The majority of these routes accommodate |

| | | | | |
|---|---|---|---|---|
| | | | routes and if seasonal restrictions apply. A comprehensive trail designation plan does the same thing except it includes all trail users, including mountain bike, equestrian and hiking. This is a very important distinction because the anti-access groups will attempt to convince the planning team to develop a "comprehensive" travel plan by using the existing inventory of motorized routes. They do this by identify existing motorized trails that are good for mountain bikes, equestrians, and for bird watching... or whatever. The current approach is inequitable because it takes the current motorized route inventory and tries to make it the route inventory for all users. It leaves out possibilities for constructing or otherwise developing non-motorized trails and ignores existing non-motorized trails that exist in both the planning area and adjacent lands. Now, that doesn't mean the agency can't take into consideration the effect each alterative will have on non-motorized visitors. It can- and it should be part of the NEPA analysis. But that is totally different from specifically providing a non-motorized trail system via the existing inventory of motorized routes. We support the creation, designation and management of non-motorized trails, but not at the expense of motorized visitors. We request that the agency not use the existing motorized trail inventory for designating non-motorized trails. Instead, if there is a need for non-motorized trails, then the agency should consider options that do not reduce the existing opportunity for motorized users. | any type of motorized vehicles, although some of the routes are designated specifically for dirt bike or ATV/dirt bike use only. The DRMP/EIS also designates routes for mountain bike use; in addition, mountain bikes may use all routes designated for motorized travel.

Although some trails are specifically designated for hikers and equestrians, these users are not limited to a designated route system. Therefore, the number of routes designated for non-motorized use is not as extensive as that designated for motorized use and mountain bike use, as these uses are limited to designated routes by law and policy. The majority of the non-motorized routes designated in the DRMP/EIS, (e.g., Fisher Towers, Porcupine Rim Singletrack, Hidden Valley, and Corona Arch) are not and have never been motorized vehicle routes.

New trails for non-motorized users can be developed after the completion of the PRMP/FEIS. Although these trails may utilize routes that were not designated for motorized vehicle use, non-motorized users may also suggest entirely new routes. All such proposals would be analyzed using site-specific NEPA analysis.

For information regarding the addition of new motorized routes to the Travel Plan (after completion of the RMP), see response to comments 122-15 and 122-30. |
| Capital Trail Vehicle Association | 1031 | 3 | The project has a critical flaw which is the lack of a true "pro-recreation" alternative that adequately address motorized recreation. All of the alternatives developed for consideration represent the current opportunity. Conversely, virtually every project has developed a "preservation" alterative, where a maximum amount of closures are considered. The increasing demand for OHV recreation opportunities on public lands is | The Moab BLM is very aware of the need to provide for motorized recreation opportunities in the planning area. The BLM acknowledges that there are fewer miles of route in any of the action alternatives than in the No Action alternative. However, the reduction in route miles was largely accomplished by not designating seldom-- or never- used old minerals extraction routes, seismic lines, and pack trails (which never were used for 4WD use, but |

extensively documented. Therefore, it is incumbent upon the project team to formulate at least one alternative that maximizes motorized recreation, or at least does not reduce motorized recreational opportunities in the planning area. Therefore, we request that the project team formulate a wide range of alternatives including at least one Alternative that maximizes motorized recreational opportunity in the project area and addresses the following:

**The project team must formulate a least one alternative that emphasizes OHV use in Roaded Natural and Semi-Primitive Motorized opportunity settings for recreation.

**The pro-recreation alternative should strive to provide for the current and future demand for OHV recreational routes.

**Alternatives should include areas where OHV trails can be constructed and maintained when demand increases.

**Where appropriate, the agency should use this process to analyze the impacts of any future route construction and include those in the decision.

**Direction for the required process to construct new routes should be incorporated into each alternative.

**At least one alternative should maximize the ability to construct new sustainable trails to meet the current and future need.

**The project team should develop management alternatives that allow for proactive OHV management.

**All alternatives should include specific provisions to mark, map, and maintain designated roads trails and areas in cooperation with OHV users.

**All alternatives should include direction to engage in cooperative management with OHV groups and individuals.

were rather artifacts of the U.S.G.S mapping system). The needs of motorized users were maintained throughout the Travel Planning process. Any routes that were in guidebooks, were utilized by special recreation permittees (such as the Jeep Safari) and/or were regularly used by motorized recreationists were assumed to have a purpose and need. Very few of these routes were not designated in the Travel Plan accompanying the DRMP/EIS. For instance, every mile of the 633 mile Jeep Safari route system is designated in Alt. C.

The primary purpose and need for the great majority of the total system of routes designated in Alt C was, in fact, motorized recreation. The great majority of these routes has no other purpose or need except for motorized recreationists to tour the backcountry. Alt D designates the maximum miles of routes for motorized recreation.

In addition, the Moab RMP planning team considered the needs of singletrack dirt bike users. A dirt bike route system has been designated as part of Alts. C and D in the Travel Plan. The dirt bike route system developed as part of the DRMP/EIS is extensive. It has no use other than motorized recreation.

Both Alts C and Alt D emphasize motorized recreation, although Alt. D emphasizes it slightly more. Focus Areas and Special Recreation Management Areas (SRMA) have been formulated and proposed solely for motorized recreationists in both Alts C and D. For instance, the Dee Pass Motorized Trail Focus Area, the Cameo Cliffs (ATV) Special Recreation Area, the Utah Rims (dirt bike emphasis) SRMA, and the Gemini Bridges Motorized Backcountry Touring Area are all proposed in Alt. C.

Both the preferred and the commodity alternatives (C and D) provide for current and future OHV recreation. The

BLM_0011998

| | | | | motorized focus areas and motorized SRMAs are areas where OHV routes can be constructed and maintained if demand increases.  New routes can be added to the Travel Plan on a site-specific basis using the NEPA process.  This is specifically provided for in the Travel Plan decisions.  See response to comments 122-15 and 122-30 for more information on adding new routes.<br><br>The Travel Plan (Appendix G) details the basic outline of an implementation plan, including the provision to mark, map and maintain routes. Cooperation with user groups is an administrative action and does not require a land use planning decision.  See chapter 1 (p. 1-11) of the DRMP/EIS for a statement regarding volunteer coordination. |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 4 | One of the specific requirements under NEPA is that an agency must consider the effects of the proposed action in the context of all relevant circumstances, such that where "several actions have a cumulative... environmental effect, this consequence must be considered in an EIS." Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990)) A cumulative effect is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonable foreseeable future actions." 18 40 C.F.R. § 1508.7. The cumulative effect of all motorized closures has been significant and is growing greater every day yet they have not been adequately addressed. Ignoring cumulative effect allows the agency to continue to close motorized routes unchecked because the facts are not on the table. CEQ guidance on cumulative effects was developed to prevent just this sort of blatant misuse of NEPA. | The effects of the cumulative impacts of restricting travel are disclosed in the DRMP/EIS.  This disclosure is stated on pg. 4-510 of the DRMP/EIS:  "Cumulative impacts to transportation and access would occur primarily from actions that facilitate, restrict or preclude motorized access.  Management actions that restrict OHV use would limit the degree of travel opportunities and the ability to access certain portions of the planning area."  The title of this section is "Cumulative Impacts: Travel Management."<br><br>The BLM contends that it has disclosed the cumulative impacts to travel management from the management actions proposed in the DRMP/EIS. |
| Capital Trail Vehicle | 1031 | 5 | The site specific analysis of each road or trail to be closed must address or identify where the public would | The routes not designated in the Travel Plan accompanying the DRMP/EIS are, for the most part, |

| Association | | | go to replace the motorized resource proposed for closure. In other words, the analysis must adequately evaluate the site specific value of a road or trail proposed for closure to motorized recreationists. It must also quantify the significant negative cumulative impact experienced when motorized recreationists could not find a trail or road with a similar experience in the area. The quality of our experience has been significantly reduced. It must also quantify the significant cumulative impact that the closure of a system of road and trails would have collectively when enough routes are closed to eliminate a good motorized day outing. An incomplete analysis is not acceptable under NEPA requirements. | routes that have never been used by motorized recreationists. Many of them are old seismic lines, pack trails never open to motorized use and unused mining routes. No purpose or need can be discerned by the travel planning team (which included representatives from both Grand and San Juan counties) for the majority of the routes not designated in the Travel Plan. See response to comment 124-71, as well as Appendix G, for an explanation of the Travel Planning process.<br><br>The impacts of route closures to motorized recreation opportunities are disclosed in Chapter 4 of the DRMP/EIS on pg. 4-408 through pg. 4-411. The BLM contends that the quality of motorized recreation experiences has not been reduced.<br><br>See also response to comment 208-2. |
| Capital Trail Vehicle Association | 1031 | 6 | The action must develop a preferred alternative that mitigates the significant impacts on the public from the loss of motorized access and motorized recreational opportunities from the proposed action and the combined cumulative effect of all other actions in the State. | The majority of the routes not designated in the Travel Plan accompanying the Moab RMP (Alt C) are, for the most part, routes that have never been utilized by recreational motorized users. Grand and San Juan counties were part of the Travel Planning team; the representatives of these counties ascertained that motorized access was being preserved in the development of the Travel Plan.<br><br>The major routes used by recreationists have been designated, including all Jeep Safari routes, routes highlighted in guidebooks and on commercially-available maps, routes utilized by guided driving outfitters, over 250 miles of motorcycle route route and other heavily used motorized routes. There is no significant impact on motorized users as a result of the actions taken in the Travel Plan. Those impacts on motorized users that are present are disclosed in Chapter 4 under direct, indirect and cumulative impacts. |
| Capital Trail | 1031 | 7 | Note that some new construction may be required to | The Travel Management section specifically allows for the |

| Vehicle Association | | | accomplish a reasonable system of loops. Therefore, new construction must be included in the scope of the project. | addition of new routes after the Travel Plan is completed. See response to comments 122-15 and 122-30 for a description of this process. |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 8 | The existing level of motorized access and recreation must not be dismissed without adequate consideration because it is only associated with the No Action Alternative. The existing level of motorized access and recreation is reasonable alternative and alternative other than No Action must be built around it. This reasonable alternative should also include mitigation to protect the natural environment and compensate motorized recreationists for the significant cumulative effect of past losses, and enhancement to adequately address the growing need for motorized access and recreation | Recreational opportunities and motorized access have not been significantly decreased between the No Action alternative and Alt. C (the preferred). The major routes used by recreationists have been designated, including all Jeep Safari routes, routes highlighted in guidebooks and on commercially-available maps, routes utilized by guided driving outfitters, over 250 miles of motorcycle route and other heavily used motorized routes.  There is no significant impact on motorized users as a result of the actions taken in the Travel Plan.  See also response to comment 208-2. |
| Capital Trail Vehicle Association | 1031 | 9 | A sense of magnitude must be used when making decisions about road closures based on indicators such as sediment production. For example, a route should not be closed because it is estimated to produce 10 cubic yards less sediment. The sediment yield must be compared to naturally occurring conditions which includes fires. Recent fires in the Sequoia National Forest discharged thousands of cubic yards of sediment to area streams which is more than all of the motorized routes in the project areas for the next 100 years. | Each of 33,000 route segments was individually assessed in the Travel Plan formulation.  Purpose and need for the route was weighed against resource conflicts that may have occurred with the route.  Appendix G details the Travel Plan process.  Resource conflicts included riparian, cultural, wildlife, recreation, soils and wilderness. A balance was struck between the purpose and need and the conflict.  Routes with conflicts were designated when the purpose and need outweighed the resource conflict. Thus, an indicator alone was not sufficient to not designate a road.  See also response to 124-71. |
| Capital Trail Vehicle Association | 1031 | 10 | Lack of Reasonable Alternatives  * The fact that comments are needed on Alternatives for the RMP and the Alternatives for the Travel Plan is not made clear in the document.  * The difference between an RMP (general guidance) and the Travel Plan (implementation decisions) is not clearly described in the DEIS. The FEIS should clearly | The Travel Plan is part of the RMP; maps were included of the proposed designated routes so that specific comments could be made on the Travel Plan.  The alternative number of miles of route were listed under Travel Management decisions (pg. 2-48 of the DRMP/EIS), and the map accompanying those decisions was referenced.  Implementation decisions have been clearly delineated in |

| | | | | |
|---|---|---|---|---|
| | | | articulate the difference.<br><br>\* None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates unworkable and impractical management of camping and motorized travel. In addition, in all of the Alternatives, management for the White Wash Sand Dunes is fatally flawed and must be reconsidered (see comment below).<br><br>\*Alternative D fails to provide a true motorized focus. | the PRMP/FEIS.  The Travel Plan is an implementation decision.  The BLM designates areas as "open", "closed" or "limited to designated routes".  The Travel Plan delineates which routes have been designated within that latter category.  BLM national and Utah policy requires field offices to disclose the routes to be designated, if possible, during the RMP process.  See also response to comments 123-1 and 123-5.<br><br>The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>For management of White Wash Sand Dunes, see response to comments 120-83, 123-35 and 123-10.<br><br>The land use plan allocates resources among uses.  Motorized recreation is but one use of public lands.  Alt. D is the alternative that is most weighed towards the needs of motorized recreationists.  Alt D puts less emphasis on protection of resources, and more emphasis on uses of the public lands.<br><br>The commentor's disapproval of any of the four alternatives is noted. |
| Capital Trail Vehicle Association | 1031 | 11 | BLM's open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very | See response to comments 120-83, and 123-35. |

| | | | | |
|---|---|---|---|---|
| | | | small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | |
| Capital Trail Vehicle Association | 1031 | 12 | Similar Stats needed for the Moab RMP and DEIS.<br><br>Commentor presents stats for a Forest Service area that reports total number of forest/motorized visitors versus the total number of wilderness visits. Uses this as an argument for more mutiple use and motorized access because the total number of forest visitors/motorized users is much higher (64%) than wilderness users. (36%). Statistics are from the Social Assessment of the Beaverhead-Deerlodge National Forest, a national survey on Recreation titled Outdoor Recreation Participation, and the Southern Research Station's report Off-Highway Vehicle Recreation in the US. | This comment does not apply to the Moab DRMP/EIS. The Moab BLM does not have comparable statistics to those quoted from the "Social Assessment of the Beaverhead-Deerlodge National Forest". |
| Capital Trail Vehicle Association | 1031 | 13 | Note: Simililar Statistics Needed for the Moab DRMP and DEIS. Provided as an example.<br><br>Commentor provides FS stats on high rate of wilderness designation (24%) while no more than 2.55 % of visitors are wilderness visitors. Reiterates points above in comment #12. | This comment does not apply to the Moab DRMP/EIS. The Moab BLM does not have comparable statistics to those quoted from the "Social Assessment of the Beaverhead-Deerlodge National Forest". |
| Capital Trail Vehicle Association | 1031 | 14 | The number of NEPA actions at any moment that we would have to evaluate and comment on in order to be involved would total 150 to 180. Recently the route designation process has added considerably to the effort required. It it simply impossible for the public to comment on every road, trail, and NEPA document.<br><br>The 300 page draft environmental document is just too much for the general public to understand and participate in. The size of the environmental document is being used as a mechanism to overwhelm the public and allow the agency to effectively ignore the needs of the public for motorized access and motorized recreation. | The Moab RMP/EIS represents one NEPA action.  See response to comment 124-1 for a similar request for more time to comment.<br><br>The BLM acknowledges that planning is a complex process.  See response to comment 123-14.<br><br>The size of the document is not meant to overwhelm the public, but rather to fully disclose the impacts of each resource on every other resource.  The BLM manages twenty programs, including Recreation, Travel, Paleontology, Air Quality, Lands and Realty, Minerals, Grazing, Cultural Resources, Wildlife, Special Status Species, Special Designations, Watersheds and Soils, |

| | | | | |
|---|---|---|---|---|
| | | | | Riparian Resources, etc.  To disclose the impacts of each program on every other program necessarily involves much analysis.<br><br>The needs of the public for motorized access and motorized recreation is but one use of the public lands that is managed by the BLM. |
| Capital Trail Vehicle Association | 1031 | 15 | All planning projects should disclose the added benefit to non-motorized recreational resources resulting from the closure of roads by adding the miles of closed roads to the miles of existing non-motorized trails. Additionally, we request that the cumulative negative impact on motorized recreationists resulting from this lack of adequate accounting be evaluated and adequately mitigated | The non-designated routes are discussed under Travel Management (pg. 2-48 of the DRMP/EIS) as being available for non-motorized users to develop into non-motorized trails.  However, these routes would need to be analyzed using a NEPA process for bicycles. (Horses and hikers are not restricted to designated trails, and so they could go on these non-designated routes immediately).<br><br>The cumulative impacts to motorized users of non-designation of routes is discussed under Cumulative Impacts in Chapter 4 (pg. 4-510 of the DRMP/EIS). |
| Capital Trail Vehicle Association | 1031 | 16 | The different management plans being developed by the BLM and Forest Service are using generated, estimated and inadequate data to forward an agenda of eliminating access and motorized recreation from public lands. Economic models such as Implan should not be used when the input data is estimated and not factual or actual. Adequate effort must be exercised by the agencies to gather true and the ground data from businesses and individuals that use our public lands. | The Moab BLM, during the scoping period for the RMP, asked the public to submit route and trail inventory for possible consideration to the Travel Plan.  This process is outlined in Appendix G of the DRMP/EIS.  Motorized users were invited to submit data to the planning process. These data were then verified by the BLM staff on the ground.<br><br>There is no economic statement in the Moab DRMP/EIS regarding the topic suggested by the commentor.   Implan (an economic modeling system) was not used in the preparation of the Moab DRMP/EIS. |
| Capital Trail Vehicle Association | 1031 | 17 | Existing single-track trails or potential single-track trails were not adequately identified and included in the project. There are many single-track "cow" trails that motorcylce trail riders could use in the project area. | Cow trails are not, in and of themselves, motorcycle routes.<br><br>The BLM invited the public to submit singletrack routes during the scoping process (see Appendix G for a description).  All singletrack routes that were submitted by the public underwent a verification process.  BLM staff |

| | | | | visited the proposed route. Those that had established "on the ground" were verified as being existing routes. All of these existing routes were analyzed in the Travel Plan process. Their purpose and need was assumed to be recreational fun, and their designation was weighed against resource conflicts. Some, such as the route above Duma Point and the Hidden Canyon Rim had resource conflicts severe enough to outweigh their purpose and need. (The conflict at Duma Point was bighorn sheep, and the conflict at Hidden Canyon Rim was an abundance of cultural sites) The BLM stands by its efforts to designate a single track motorcycle route system. |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 18 | The document and decision must clearly disclose on maps and tables and summaries all existing areas, and existing roads and trails that would be closed to motorized access and motorized recreationists. Summaries should include overall closures percentages. Otherwise public disclosure has not been adequately provided and the public will not be informed and the public including motorized recreationist will not be able to adequately participate and comment. | The routes that are not to be designated in any of the action alternatives are shown on Map 2-11-A. This map shows all existing routes in the No Action alternative.<br><br>The exact number of miles of route to be designated in each of the alternatives is clearly shown under each alternative on pg. 2-48 of the DRMP/EIS. Although the BLM has not calculated percentages, the public is free to do so. Tables of designated routes are also shown in Appendix G, by county and by alternative. |
| Capital Trail Vehicle Association | 1031 | 19 | We request that the analysis include an adequate benefit-cost analysis of non-motorized versus motorrzed trail use. This analysis should include the annual cost of the non-motorized trails per the actual and documented number of non-motorized trail user The economic analysis should also compare the annual benefit-cost per non-motorized user versus the annual benefit-cost per motorized user if the trails and funding were used as multiple-use/motorized trails. | The BLM has no data which could be used to undertake the analysis suggested by the commentor. The BLM's anecdotal assertion is that cost of route maintenance does not differ appreciably by motorized or non-motorized use. There are many more miles of motorized route (3700 miles of motorized route versus approximately 50 miles of hiking, 50 miles of equestrian and 25 miles of bike-only routes). The BLM spends more time and effort maintaining motorized routes, although the cost per mile is not known.<br><br>The issue that the commentor discusses is not a land use planning issue. |

BLM_0012005

# Comments of the Draft EIS by Resource Type

## *Table of Contents*

Adequacy and Analysis ................................................................................................................ 3
Areas of Critical Environmental Concern ................................................................................... 25
Air Quality .................................................................................................................................. 56
Consultation and Coordination ................................................................................................... 72
Cultural ....................................................................................................................................... 75
Cumulative Impacts .................................................................................................................... 106
Designated Wilderness ............................................................................................................... 107
Fire .............................................................................................................................................. 109
Forestry and Woodlands ............................................................................................................. 113
Grazing ........................................................................................................................................ 114
Hazardous Materials ................................................................................................................... 142
Lands and Realty ......................................................................................................................... 144
Energy and Minerals, General .................................................................................................... 161
Energy and Minerals, Leasable .................................................................................................. 170
Energy and Minerals, Locatable ................................................................................................. 181
Energy and Minerals, Oil & Gas ................................................................................................ 182
Other ........................................................................................................................................... 225
Paleontology ............................................................................................................................... 229
Process and Procedures ............................................................................................................... 229
Recreation ................................................................................................................................... 279
Riparian ....................................................................................................................................... 404
Scope ........................................................................................................................................... 419
Socioeconomics .......................................................................................................................... 451

BLM_0012006

Soils...........................................................................................................................497
Special Status Species..............................................................................................512
Travel Management, Trail-specific...............................................................................542
Travel, General........................................................................................................702
Vegetation...............................................................................................................834
Visual Resource Management ....................................................................................836
Water......................................................................................................................840
Wilderness Characteristics........................................................................................850
Wildlife...................................................................................................................913
Wilderness Study Areas............................................................................................945
Wild and Scenic Rivers.............................................................................................959

BLM_0012007

## Adequacy and Analysis

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 1 | The Moab RMP/EIS doesn't to adequately address indirect impacts and their cumulative effects.  BLM's conclusions regarding potential impacts were presented without supporting scientific analysis or rationale, and as such, appear arbitrary and unfounded.  Solely listing acreage directly impacted by various uses is not adequate for proper environmental impact analysis. | See response to comment 124-7. |
| ECOS Consulting | 9 | 53 | Page 4-297, 6th paragraph, 4.3.13.9.2: The BLM's on Rangeland Health Standards and Guidelines state:"...the BLM's 200 million+ acres of rangeland have long been valued for livestock grazing and mining, but rangelands now are also prized for their recreation opportunities, wildlife habitats, watershed, cultural values, and scenery". These guidelines also state: "...It is time for a change, and BLM is changing to meet the challenge. BLM is now giving management priority to maintaining functioning ecosystems.  This simply means that the needs of the land and its living and nonliving components (soil, air, water, flora, and fauna) are to be considered first.  Only when ecosystems are functioning properly can consumptive, economic, political, and spiritual needs of man be attained in a sustainable way".<br><br>These are very clear guidelines from the BLM's own handbook. They recognize the importance of ecosystems integrity in order to provide balanced uses of the land.  They recognize that there are many more uses of the land that are not as destructive as most of the traditional mining, mineral exploration, and grazing | The BLM utilizes the Standards for Rangeland Health and Guidelines for Grazing Management during the permit renewal process for livestock grazing.  The permit renewal process does not involve a land use planning decision. |

3

BLM_0012008

uses, and in order to manage for the other uses, these traditional, but outdated uses must be managed intensively, or eliminated, if found to impact ecosystem integrity.

It is recommended that the BLM follow its own directive as evidence in the BLM Standards and Guidelines for Rangeland Health, and manage for the "fundamentals of rangeland health". These include:

(a) Watersheds are in, or making significant progress toward, properly functioning physical conditions, including their upland, riparian-wetland, and aquatic components; soil and plant conditions support infiltration, soil moisture storage, and the release of water that are in balance with climate and landform and maintain or improve water quality, water quantity, and timing and duration of flow.

(b) Ecological processes, including the hydrologic cycle, nutrient cycle, and energy flow, are maintained, or there is significant progress toward their attainment, in order to support healthy biotic populations and communities.

© Water quality complies with State water quality standards and achieves, or is making significant progress toward achieving established BLM management objectives such as meeting wildlife needs.

(d) Habitats are, or are making significant progress toward being, restored or maintained for Federal threatened and endangered species, Federal Proposed, Category 1 and 2 Federal candidate and other special status species.

In regards to (a) above, can the Moab BLM Office show significant progress toward properly functioning upland,

4

BLM_0012009

riparian areas, and aquatic components? Is there documentation of this by independent monitors? Independence is vital because of the history of mismanagement and abuse by the BLM and its known support of that abuse. Is there procedure to insure the continuing health of uplands? Has there been any monitoring of aquatic components, including aquatic macro invertebrates? In upland and riparian areas do soil and vegetation conditions support infiltration? How do we know this? Is there documentation? Is there a report that shows trends since this BLM Standards and Guidelines for Healthy Rangelands was released? If not, is there any data and are there plans to write any reports? Is there a mechanism in place, besides the Freedom of Information Act, so that the public can examine data and results from BLM monitoring? What is the decision process for how to improve rangelands in the Moab Field Office?

In regards to (b) above, has there been significant progress toward the maintenance of the hydrologic cycle, nutrient cycle, and energy flow in uplands and riparian areas? If so, is there a report on this? How were decisions made? Was it just an opinion, or were decisions made based on data and analyses? Please provide a summary of the results of these reports in this Moab RMP so that the public can make reasonable judgments and comments. Are the biotic populations and communities healthy? Has there been any monitoring of any biotic populations in uplands or riparian systems in the Moab Planning Area? Are there any reports on this? How can we, the public, know if the biotic populations are thriving or being extinguished?

In regards to © above, is water quality complying with state standards? If not, what parameters are not meeting state standards? Or is the BLM waiting for

BLM_0012010

| | | | certain water bodies to be listed on the Clean Water Act 303 (d) list before any corrective action is considered? Waters on the 303 (d) list are highly impacted, is the BLM waiting for them to be so degraded before trying to fix the cause? What significant progress is being made toward water quality and wildlife habitat within the Moab Planning Area? Please provide information on this so that we can make informed decisions.<br><br>In regard to (d) above, is there significant progress for the restoration and maintenance of habitats for species on the Federal Threatened and Endangered list in the Moab Planning Area? What efforts have been made in behalf of Threatened and Endangered wildlife habitat? Had habitat been mapped in the Moab Planning Area? Has potential habitat that is now non-functional condition been mapped? Have any areas been prioritized for the restoration and maintain of Threatened and Endangered wildlife habitat? Has there been significant progress since these standards and guidelines were adopted by the BLM in the mid-1990's?<br><br>In this Moab RMP the BLM claims to be following its own rangeland health standards and guidelines but offers absolutely nothing to show that this is the case. There is a dire need for analyses of trends and results in order to determine if management is effective, and in order to plan successful future management. | |
| State of Utah - Public Lands Policy Coordination | 120 | 10 | The State strongly disagrees with the BLM's analytical assumption at page 4-3 of the Draft RMP/EIS that non-BLM lands would suffer minimally direct impacts from RMP decisions. SITLA lands may have reduced revenue potential or management objectives that differ from the BLM. The BLM planning decisions on rights-of-way, withdrawals from mineral leasing, special designations, and other determinations impact state trust lands. | Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly. For specifics regarding the impacts on mineral revenue see comment 120-101.<br><br>The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3). A sentence will be added to Chapter 2, Lands and Realty |

6

| | | | | |
|---|---|---|---|---|
| | | | | :  Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively.  The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly.

For specifics regarding the impacts on mineral revenue see comment 120-101.

The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3).  Information will be added to Chapter 2, Lands and Realty, Management Common to all action alternatives, that states that reasonable access to State land would be provided including across BLM lands within avoidance and exclusion areas for rights-of-way as specified by the Cotter decision (Utah v. Andrus, 10/1/79).  In addition, the Moab DRMP/DEIS travel management plan recognizes the requirement to provide access to SITLA lands per the Cotter decision.  Also, please see the revised analysis under Socio-Economics in Chapter 4 of the PRMP/FEIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 77 | The cumulative effects analysis would be enhanced by developing a map depicting the cumulative effect of all use restrictions imposed under each alternative.  Such a map could resemble maps 4-1 through 44 in the Kanab Field Office Draft RMP/EIS. | The maps referred to for the Kanab Draft RMP/EIS depict oil and gas restrictions by alternative.  The same maps are contained in the Moab Draft RMP/EIS and are referred as Maps 2-5A-D.  The oil and gas restrictions shown on these maps apply to all surface disturbing activities (see Appendix C).  These maps have been referred to in the cumulative impact section for minerals (pg. 4-504) and other applicable resources. |
| State of Utah - Public Lands Policy Coordination | 120 | 78 | The BLM should clearly identify all reasonably foreseeable non-BLM actions within the planning area.  As written, it is unclear what -- if any -- non-BLM actions were considered. | The BLM has added the following reasonably foreseeable non-BLM actions to the cumulative impact analysis: minerals extraction on private and SITLA lands; on going residential growth and business development throughout the planning area; and expansion of U.S. Highway 191. |
| State of Utah - Public Lands Policy Coordination | 120 | 79 | Please clarify the identification of alternatives.  For example, pgs 2-2 through 2-5 identify Alternative A as the No Action Alternative, Alternative B as the Preferred Alternative, Alternative C as the Alternative | Our review of these sections shows that the terminology for the alternatives is consistent  and is summarized as follows:
Alternative A is No Action.  Alternative B emphasizes |

BLM_0012012

| | | | emphasizing Resource Protection and Alternative D as the Alternative emphasizing Development.  Page 4-1 identifies Alternative B as the Alternative emphasizing Resource Protection, Alternative C as the Preferred Alternative, and Alternative D as the Alternative emphasizing Development. | protection/preservation of natural resources.  Alternative C is the Preferred Alternative, as it provides for a balanced approach of protection/preservation of natural resources while providing for commodity production.  Alternative D emphasizes commodity production. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 80 | Pages 2-2 through 2-5 indicates that under Alternative C, 31 percent of the MPA would be closed to oil and gas development and only five percent of the MPA would be open under standard lese terms and conditions.  In comparison, Alternative B would close only 14 percent of the MPA and leave 48 percent of the planning area open under standard terms and conditions.  However, Table 4-3 indicates that despite the less stringent stipulations applied under Alternative B, 2,652 fewer oil and gas wells are anticipated compared to the more restrictive Alternative C.  Please clarify this discrepancy. | The only reference to oil and gas restrictions is Summary Table C which shows 370,250 acres closed to oil and gas development in Alt C.  This amounts to 20 percent of the BLM lands within the planning area.  It should be noted that 19% of the BLM lands within the planning area are closed to oil and gas leasing by BLM policy.  Also, as shown on this table, 427,273 acres are open with standard lease terms and conditions for Alt C.  This amounts to 23% of the BLM lands within the planning area.  On the same table, Alt B closes 36% of the BLM lands and leaves 14% of the BLM lands open with standard terms and conditions.<br><br>Table 4.3 shows the total predicted surface disturbance for mineral development in acres by alternative.  The more restrictive Alt B results in 3,321 fewer acres (not wells) of surface disturbance than Alt C for oil and gas development. |
| San Juan County | 121 | 11 | In the analysis of the impacts for the Draft RMP/EIS, almost all the impacts are attributable to OHV use, oil and gas use, and, to some extent, grazing.  The underlying theme is that these 3 things are the cause of all negative impacts and if they are eliminated or controlled then everything else is take care of.  The BLM should consider cheat grass and juniper encroachment, invasive weed problems, and catastrophic fires.  The BLM should utilize livestock to control invasive plants. | In the Draft RMP/EIS surface disturbing activities are considered potential negative impacts to natural and cultural resources.  On page C-1, surface disturbing activities are defined.  Surface disturbing activities include, among many other things, oil and gas development and cross country OHV use.  Neither grazing nor vehicle travel on vehicular routes are defined as surface disturbing activities.<br><br>On pg. 2-50 in decisions common to all action alternatives, the BLM specifies controlling and reducing invasive and noxious weed species.  Vegetation treatments areas for pinyon-juniper area are identified on |

8

BLM_0012013

| | | | | pg. 2-14.<br><br>On an allotment basis, Standards for Rangeland Health and Guidelines for Grazing Management could be utilized to control invasive species. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 7 | In the context of this RMP, the decisions made with regard to travel planning must more fully analyze all effects of travel planning and other planning so that all cumulative and site specific environmental and social impacts are adequately analyzed. | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.  The direct, indirect, and cumulative impact analyses were analyzed in Chapter 4 of the DRMP/EIS.  A site specific analysis is not possible at the land use planning level.  Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the RMP. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 8 | The range of alternatives does not provide protection of natural and cultural resources is a fatal flaw to this plan. | The DEIS/RMP provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction.  These alternatives provide a broad range of management actions to address the issues raised during scoping. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 9 | The Draft RMP did not consider a more environmentally protective alternative consistent with FLPMA's requirement that BLM "minimize adverse impacts on natural, environmental, scientific, cultural, and other resources" and omitted the Redrock Heritage Proposal. | In the Moab DRMP/EIS, Alternative B emphasizes the protection and preservation of natural resources and minimizes human activities, over commodity production and extraction and motorized recreation access.  Alternative B best protects and preserves historic, cultural and natural resources fulfilling both the requirements of FPLMA and NEPA.  The BLM did give full consideration to the Redrock Heritage Proposal, in particular the concept that a desirable BLM Travel Plan contains an equitable allocation between non-motorized and motorized recreation.  Although for the reasons outlined in the DRMP/EIS on pg. 2-107 the Redrock Heritage Proposal was eliminated from detailed analysis, components of the proposal were carried forward for consideration and analysis in all the action alternatives. |
| Southern Utah | 124 | 11 | Accurate, scientific analysis is wholly lacking with | :A systematic interdisciplinary approach was used to |

9

BLM_0012014

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | regard to travel planning, as well as many other aspects of the Moab Draft RMP. | provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative. The best available data were used for travel planning analysis, including wildlife data from the Utah Division of Wildlife Resources and U.S. Fish and Wildlife Service.  The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.<br><br>The DRMP/EIS used a systematic interdisciplinary approach fully considering physical, biological, economic, and social aspects of management actions for the range of alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 12 | The existence of the National Visitor Use Monitoring survey, giving the BLM significant baseline data from which to draft alternatives, calls into question the validity of the baseline analysis and shows that the BLM ignored significant and new information regarding the affected environment. | See response to comment 124-2. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 13 | The dismissal of the Redrock Heritage Proposal is a clear indication of the BLM's refusal to entertain a responsible "opposing view" in the planning process. | See response to comment 124-9. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 14 | One of the most obvious and consequential flaws in the document is its failure to assess the ongoing impact of existing ORV use in the MFO.  For example on pg. 4-442 the BLM asserts that travel on designated routes would have negligible impacts on vegetation because past use has already occurred. | The impacts of travel on natural resources are analyzed in Chapter 4 of the DRMP/DEIS, including the No Action alternative.<br><br>The Travel Section in Chapter 3 of the DRMP/EIS presents the baseline (current situation) for analysis in Chapter 4.  It discusses the ongoing and baseline issues surrounding cross-country travel that is currently permitted by the existing land use plan for the Field Office.  The planning area was inventoried as having 6,199 miles of non-paved routes.  This number represents the baseline for analysis, however, it is also recognized |

BLM_0012015

| | | | | that cross-country travel is currently allowed in many other areas within the Field Office. The impacts associated with cross-country OHV use are described in Chapter 4 under the No Action Alternative. The action alternatives limit travel to designated routes. The routes that are already in use are considered part of the baseline, and therefore, it is not reasonable to consider the impacts to vegetation from these already disturbed linear surfaces. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 15 | What is the basis for Table 3.18? Could it be that ORV use is actually a "low" level use given that only 6% of visitors engage in it? | The information provided in Table 3.18 is based on professional judgment and observation of visitor use in the planning area. It should be noted that jeeping, ATVing, and dirt biking are separated in Table 3.18 but all of these activities are considered as OHV use.<br><br>See also response to comment 124-2. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 16 | Existing conditions should include the presence of non-native species like cheatgrass. Numerous studies are readily available on this subject and should have been described by the BLM or used as the basis for a description of the manner in which roads and ORVs spread weeds and contribute to wildfire. | Table 3.50 lists noxious and invasive species of Grand County and cheatgrass is listed in this table. Complete inventories of noxious weeds are not available across the planning area. Within the action alternatives travel is limited to designated routes and open cross country travel is essentially eliminated. Therefore, the potential for the spread of noxious weeds by OHV use is substantially reduced (pg. 4-428). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 17 | Existing conditions should include the extent of soil erosion caused by ORVs and other uses. For example, a study entitled "Desert Biological Soil Crusts" indicates these crusts can be easily pulverized. | The DRMP/EIS on pg. 3-120 acknowledges the existence of biological soil crust in the planning area. A complete inventory of the biological crusts across the planning area is not available from any source. The impacts of cross country OHV use on soils and biological crusts are discussed on pg. G-24. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 18 | Existing conditions should include an explanation of how ORV use spreads non-natives which outcompete native plants and how ORVs crush native vegetation. | See response to comment 124-16.<br><br>The DRMP/EIS on pg. 4-428 assesses the impacts of OHVs crushing vegetation. |
| Southern Utah Wilderness Alliance | 124 | 19 | Existing conditions should include the impact of ORVs and other uses on riparian areas. | On pg. 4-244, the impacts of travel on riparian resources are discussed by alternative. In all action alternatives, motorized travel in riparian areas is reduced. Further |

BLM_0012016

| (SUWA) | | | | details concerning the impacts of motorized travel on riparian resources are discussed on pg. G-24. |
| --- | --- | --- | --- | --- |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 20 | Existing conditions should include the relative demand for various recreation opportunities.  The BLM made a false assumption about the demand for motorized recreation. | See response to comment 124-15. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 21 | The BLM's failure to analyze and present information about impacts of existing ORV use violates its NEPA duties.  BLM falsely assumes that designating routes causes no new damage.  This designation does cause damage by facilitating back country use where enforcement and monitoring are challenging. | The BLM can not analyze the impacts of illegal activities.  It is assumed that the public will adhere to the Travel Plan accompanying the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 22 | ORV impacts to vegetation are largely ignored.  For example, Chapter 4's discussion of this appears to be limited to two paragraphs, none of which is quantitative and none of which assess the probability of ORV's introducing and facilitating the spread of non-native species. | NEPA analysis for a landscape level document such as a land use plan analysis is done at a qualitative level and site specific quantitative analysis is not possible or practical.  Chapter 4 analysis acknowledges that cross county OHV use can spread noxious weeds and can crush vegetation.  This qualitative level of analysis is sufficient. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 23 | Chapter 4's discussion of soils at 4-279 and 280 provides that "no particular data on the distribution of biological soil crusts are available…"  This lack of information is particularly troublesome because these soils are so important to the health of the desert ecosystem in the MFO. | See response to comment 124-17. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 29 | The EIS does not meet NEPA's requirements to analyze cumulative impacts and connected actions.  The EIS for the plan revisions generally provides little or no discussion of cumulative impacts or the effects of connected activities on various resources. | The cumulative impacts of plan alternatives are analyzed in Chapter 4 of the DRMP/EIS.  This analyses does not require speculation about the impacts from possible future activities.  The BLM asserts that  the analyses of cumulative impacts satisfies the requirements of NEPA. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 30 | The plan provides for high levels of both grazing and ORV use in canyon bottoms where riparian areas and cultural sites are also prevalent.  The BLM should identify the areas in which ORV use is  permitted and discuss the combined effects of grazing and ORVs on these riparian areas. | See response to comment 124-28. |

BLM_0012017

| Southern Utah Wilderness Alliance (SUWA) | 124 | 40 | The Draft RMP should have analyzed and alternative with fewer ORV routes.  It fails to include an alternative that would preclude ORV use in WSAs, proposed wilderness areas, non-WSA lands with wilderness characteristics, and other sensitive areas.  There are only 512 miles of difference between the travel plan mileage in Alt B and Alt D.  Thus the Draft RMP viloates NEPA's requirement that the agency provide a reasonable range of alternatives for the public to consider, and for the agency to analyze in order to make a fully informed decision. | Alt B precludes OHV use in WSAs and Wilderness Areas. In the 266,485 acres of non-WSA lands with wilderness characteristics proposed for management in Alt B, there are 117 miles of route designated.  Although the range of alternatives for miles of road differs by 512 miles between B and D, the difference between A and B is 2,871 miles of road. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 42 | NEPA requires that BLM not limit its review to the 4 proposed alternatives.  For example, BLM could decide to protect additional lands with demonstrated wilderness character or designate additional river segments as suitable for protection under the Wild and Scenic Rivers Act. | NEPA requires a reasonable range of alternatives in an Environmental Impact Statement.  The BLM contends that the 4 alternatives in the DRMP/EIS meet the requirement for a reasonable range.  Alt B includes management prescriptions for all lands identified with wilderness characteristics and management prescriptions for all river segments found eligible as Wild and Scenic Rivers. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 44 | The BLM unjustifiably rejected the Red Rock Heritage Proposal.  The BLM has dismissed the Red Rock Heritiage Proposal entirely not even incorporating any of the excellent recommendations into the conservation alternative. | Refer to response to comment 124-9. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 123 | The total planning acreage varies by alternative, which indicates the possibility that other data might be inaccurate or inconsistent. | SUWA admits that these variances are "not large", yet imply" systematic inaccuracy" in the acreage reported by alternative.  SUWA provides no evidence to support their inference of systematic inaccuracy, nor do they define what constitutes such inaccuracy.  The BLM states in Chapter 4, p.3:"Acreages were calculated using GIS technology; there may be slight variations in total acres between disciplines. These variations are negligible and will not affect analysis. |
| Sierra Club Utah Chapter | 205 | 11 | Dust arriving in Colorado from Utah is altering snow pack in the Rocky Mountains. This in turn will influence the amount of water in the Colorado River and the availability of water to millions of people. | See responses to comments 124-115 and 205-13. |

13

| | | | | |
|---|---|---|---|---|
| | 310 | 2 | The difference between an RMP (general guidance) and the Travel Plan (implementation decision) is not clearly described in the DEIS. The FEIS should clearly articulate the difference. | The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/DEIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and Non-WSA lands with wilderness jurisdictions.  A sentence was added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states, "routes identified in the Travel Plan would be available regardless of other proposed management actions".  The Travel Plan process is described in Appendix G of the DRMP/EIS.. |
| Western Wildlife Conservancy | 311 | 1 | The Moab RMP, especially under the "preferred" alternative, gives far too much weight to mineral exploration and motorized recreation at the expense of intrinsic values and the experiences of quiet recreationists. | See response to 124-9. |
| | 325 | 1 | I feel that the draft Moab RMP unfairly favors consumptive resource use like off road vehicle access to wilderness-quality lands, as well as unrestrained oil and gas leasing.

The current draft of the Moab RMP is just another step in [the land's] degradation. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |

BLM_0012019

| | | | | |
|---|---|---|---|---|
| | | | | The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of Off land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.<br><br>The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development.<br><br>Alt C of the DRMP/EIS provides balanced management for the resources in the Moab planning area. Over 2,500 miles of existing route are not designated in Alt C;  oil and gas leasing is subjected to both major and minor stipulations. |
| | 329 | 1 | The BLM's proposed plan is badly over-weighted in favor of Off Road Vehicle Use. | See response to 124-9. |
| | 337 | 1 | I clearly see the holes in the Moab Resource Management Plan and the lack of a balanced-approach when it comes to managing these magnificent public lands. | The commentor has not provided any specific information regarding a lack of a balanced approach to which to respond.<br>Alt C provides a balance between resource protection and commodity production. |
| | 409 | | The DRMP does not adequately address the important recreation issue of NOISE. Noise pollution eliminates my recreation experience entirely. How are you going to | See response to comment 122-7. |

BLM_0012020

| | | | | |
|---|---|---|---|---|
| | | reduce noise pollution? An issue that was not adequately addressed but yet is of huge importance in the recreation arena is noise. This issue must be addressed because there is been a huge, huge influx of new ORVs using the DRMP lands in comparison to a decade ago, there are thousands of miles of proposed OHV routes in the DRMP, and there is a predicted increase in the population and OHV users in the coming decades. I can no longer go to many areas I used to enjoy because of the noise and fumes of ORVs. This includes but is not limited to: Gemini Bridges, Moab Rim, Upper Courthouse Wash area, Klondike Bluffs, and Porcupine Rim.<br><br>Table 4.3.8.2.13.1 on page 146 of chapter 4 shows how ORV management would be applied in each alternative, in acres, as open or limited to lands inventoried to as having wilderness character. In this same chapter, the EIS admonishes that under ALL alternatives Noise of vehicles using routes proposed would reduce opportunity of visitors to find solitude in wilderness character lands, especially in proximity to the routes. Motorized routes would conflict with primitive and unconfined recreation opportunities found in wilderness character lands. | |
| | 409 | DRMP proposed management of SRMAs (2-18, 2-8-B, 2-8-C) are too general and leaves wilderness character lands open to irreparable damage that will compromise its wilderness character. The DRMP needs to address how it will specifically handle each section of land that had been inventoried to have wilderness character. The current DRMP is inadequate in this area because lands that have been inventoried as having wilderness characteristics have been chopped up into different management categories and not considered in their entirety. | The impacts to all of 266,485 acres of non-WSA lands that were found to have wilderness characteristics are disclosed in Chapter 4 of the DRMP/EIS. Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations. The land use plan provides allocations for each acre of land in the planning area. As stated in Chapter 4 of the DRMP/EIS, over 40% of the lands with wilderness characteristics are managed as no surface occupancy, whether or not they are specifically managed to protect wilderness characteristics. |

BLM_0012021

| | | | | After completion of the RMP process, those SRMAs that do not currently have RAMPs will need to develop a site specific RAMP, subject to full compliance with the NEPA.<br><br>See also response to comment 121-9 regarding the layering of designations and response to comment 124-53 regarding management of Non-WSA lands. |
|---|---|---|---|---|
| | 409 | | The DRMP does not adequately consider the total impact to the land from the combined destructive activities that it will permit (in particular: ORV routes, roads, and oil and gas leasing) and fails to determine the impact that the proposed travel plan will have on the land over the course of 10-20 years. | A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative. The best available data were used for travel planning analysis, including wildlife data from the Utah Division of Wildlife Resources and U.S. Fish and Wildlife Service. The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.<br><br>Alt C of the DRMP/EIS limits all OHV travel to designated routes, with the exception of 1,866 acres near the White Wash Sand Dunes.  The analysis in Chapter 4 discloses the benefits to resources from this proposed action.  In addition, Alt C does not designate over 2,500 miles of route.  This action benefits both natural and cultural resources.  Chapter 4 also analyzes the impacts from oil and gas development to natural resources.  Cultural resources are protected by law. |
| | 422 | 1 | Increase opportunities in order to decrease impacts on a particular area. | This is not an answerable comment.  Please check it out as to whether or not it is complete. |
| | 441 | 1 | To change the present land uses appears to be an attempt to add more de-facto park type area without any documented need. The DRMP indicates that there are changes that need to be addressed, but the needs are not specified. What are the changes that require this action? | Purpose and Need are outlined in Chapter 1, page 1-1 to 1-2.  The BLM conducted a scoping period prior to the development of alternatives.  The scoping process invites the public to raise issues that should be addressed in the plan.  The public addressed such changes, such as the growing numbers of recreation users, the need for a travel plan and other changes since the 1985 RMP.  Chapter 3 |

17

| | | | | contains information regarding the affected environment, including how the resource or resource use has change over time. An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| | 447 | 4 | One area not addressed is the ability to manage the Public Lands in the Moab area. I suggest evaluation of the ratio of clerical staff vs. "in the field" staff. There is clearly a significant imbalance. | Staffing allocations are not a land use planning issue. The analyses on pg. 4-3 of the DRMP/DEIS assumes that there will be funding and work force to implement the selected alternative. |
| | 646 | 1 | I demand (emphasis added) that every acre of the public land that you were mistakenly given control of that is part of the area covered by the America's Red Rock Wilderness Act to be put off-limits to any and all development activities in your final RMP> This is an official public request for a new alternative to be analyzed. If you know anything about the federal rules on planning you will know what this means. I do not expect you to analyze this alternative and then illegally chuck it into an "analyzed, but not given an opportunity to be selected" bin. Implementing a version of Alt B as close as you can come to the most obvious alternative…which would have been the first alternative to come to mind for any thinking human that was not bought-and-paid for by corporate America. So start with B and change it! If you will read your Purpose and Need again, you will select it! | The BLM has no obligation to close to oil and gas to all lands that are within a bill introduced in Congress, the Red Rock Wilderness Act. Should Congress direct the BLM to close all lands to oil and gas leasing, the BLM will comply with the law. The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM examined about 558,956 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics.  The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B.  The remaining 292,322 acres of the Red Rock proposal did not have wilderness characteristics based on the inventory maintenance |

BLM_0012023

conducted by the BLM between 1996 and 2007.

The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.

The BLM determined that a single alternative analyzing the protection of all Non-WSA lands with wilderness characteristics would best provide a reasoned choice among the alternatives.  Although the other alternatives do not provide specific management prescriptions to protect Non-WSA, these alternatives analyze and disclose the impacts of the proposed resource management prescriptions, uses and actions on the Non-WSA lands with wilderness characteristics.  This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands.  If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable.

The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/DEIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's

BLM_0012024

| | | | | |
|---|---|---|---|---|
| | | | | multiple-use mandate. |
| | 930 | 1 | Areas that are greater than one, two, or three miles away from a road are increasingly rare-- this unfortunately makes it more and more difficult to find silence from humans and our machines out on the land. I will remind land managers that the sound envelop/impact for one Off Road Vehicle is significantly larger than the visual impact. | See response to comment 122-7. The commenter is also reminded that the topography of the Moab Field Office means that the one-, two- or three-miles buffer from a road is less important than it may be in a landscape that does not have the topographical variety of the Moab Field Office planning area. |
| | 934 | 3 | The document fails to provide factual evidence to support many of the restrictions placed in all the Alternatives. The document must not make restrictive decisions which are not based on conditions which are confirmed and presented to the public in this document. We oppose making decisions which lack firm facts for their necessity. | Chapter 3 contains information regarding the affected environment, including how the resource or resource use has change over time. A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative.  The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives.

The commentor has not provided specific examples of a decision that seems restriction given the conditions presented in the document. |
| Great Old Broads for Wilderness | 941 | 4 | At the same time, BLM has done no site-specific studies to determine the impact of these routes on Native American Cultural sites or other natural resources like riparian areas and wildlife habitat. Science to back up the ORV route designations does not exist in this document. These resources belong to all Americans, and deserve far more scrutiny before being permanently impacted by energy development and motorized traffic. | The impacts of travel on natural resources are analyzed in Chapter 4 of the DRMP/DEIS, including the No Action alternative. Additional information on the impacts of travel on resources has been added to Chapter 4 of the DRMP/EIS and to Appendix G (Travel). Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations. DRMP/EIS. Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the RMP. |
| | 944 | 3 | Federal law requires the BLM to give PRIORITY to the protection of lands with senic, cultural, or ecological | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to |

20

| | | | | |
|---|---|---|---|---|
| | | | importance, which most of the Moab area qualifies for. The BLM needs to do site-specific studies to determine the impact of ORV routes on cultural and natural resources | subsequent site-specific authorizations. Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the RMP.<br>See response to comment 124-68 regarding ACEC designations.  In addition, all cultural resources are protected by the full force of the law. |
| | 944 | 4 | as for oil and gas exploration, all of my above comments apply. Money-spending tourists are not here to see oil wells, trucks, and helicopters. Most comments received during the 2004 scoping period were not in favor of drilling. Exploration means, once again, lack of solitude for humans, and noise and roads that disrupt the soil, plants and animals, and cultural sites. Utah posseses such a meager percentage of the worlds energy reserves, why destroy our rural areas? | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well |

21

| | | | | as conserving and protecting other resource values for current and future generations.

The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development.

The Moab Field Office interdisciplinary team carefully considered the recreation resources of the Moab planning area in applying oil and gas lease stipulations in Alt C. Important scenic and recreation areas are managed as closed to leasing, or as open to leasing with a no surface occupancy stipulation.  These areas include the lands along the Colorado, Green and Dolores Rivers, the areas around Fisher Towers and Mary Jane Canyon, and in areas along Highway 313.  In addition, a controlled surface use stipulation to protect visual resources has been applied to other important recreation areas.

All cultural sites are protected by law. The BLM worked with the Utah Division of Wildlife Resources, as well as the U.S. Fish and Wildlife Service, to provide protective stipulations for wildlife.  Timing limitation stipulations have been applied to lands with sensitive soils in Alt C. |
| | 951 | 1 | Where is the historic information which shows us how the land has changed over time, giving the BLM the reasons to make changes? | Chapter 3 contains information regarding the affected environment, including how the resource or resource use has changed over time. A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions or prescriptions under each alternative.  The analysis discloses the direct, indirect and |

BLM_0012027

| | | | | |
|---|---|---|---|---|
| | | | | cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives. |
| | 951 | 5 | Where are the sections that address NOISE POLLUTION in the plan? One of the unique great gifts of the area is its quiet and it is not even addressed! | See response to comment 122-7. |
| National Parks Conservation Association | 970 | 2 | BLM assumes they will have the funding and the workforce to implement the selected alternative. The area of focus is huge-1.8 million acres. The proposed increase in oil and gas development and impacts on resources from recreation uses including off road vehicles is so substantial, that we don't believe that the agency has sufficient financial and human resources to implement the preferred alternative. Additionally, BLM assumes that non-BLM lands would be minimally directly impacted by RMP decisions simply because BLM does not make land decisions on non-BLM lands. This is circular and erroneous. Decisions made by adjacent land managers such as BLM have a huge potential to impact non-BLM lands, in particular the national parks in the region. Many uses permitted on BLM lands are not compatible with the mission and protection of the national parks such as Arches and Canyonlands. Air pollution, visibility, soundscapes, nightskies, and wildlife corridors are all impacts that do not respect boundaries. | BLM lands are managed under FLPMA, which directs the agency to manage the public lands for multiple use. See response to comment 121-1 for a definition of the multiple use.<br><br>The BLM has developed stipulations to protect the values of the surrounding national parks. For example, a controlled surface use stipulation has been imposed on oil and gas development surrounding Arches National Park. This controlled surface use stipulation states that oil and gas development cannot be within the viewshed of key observation points within Arches National Park.<br><br>The BLM assumes that it has the resources to effect the RMP. On pg. 1-13 of the DRMP/EIS, it states that BLM would hjave the funding and personnel for managing programs. |
| National Parks Conservation Association | 970 | 9 | The primary purpose of NEPA is for Federal Agencies to identify the effects of their actions on the environment and the significance of those effects (CEQ 1502.16). It was the intent of Congress, with the passage of NEPA that Federal agencies would make informed decisions regarding the consequences of their actions and also to inform and involve the public in this process. Congress intended for better decisions to be made as a result of this information and with the involvement of the public affected. | The BLM complies with NEPA and CEQ. A Resource Management Plan is a land use plan. An environmental impact statement accompanies the RMP because significant impacts can result from the decisions in the RMP. The significant impacts are disclosed in the EIS accompanying the RMP. Chapter 2 summarizes the impacts of each alternative and compares them. |

23

BLM_0012028

| | | | The Moab RMP completely fails in this regard because the significance of the environmental impacts of the Proposed Action and all alternatives are not identified for any of the resource categories. Therefore, it would be impossible for the BLM to make a fully informed decision as to the consequences of their actions or for the public to meaningfully evaluate and comment on the alternatives without knowing the significance of the anticipated effects of the alternatives. The BLM not only failed to follow the implementing regulations of NEPA but failed to meet the most basic underpinnings of law. We are requesting that the draft RMP be revised to include an analysis of the significance of environmental effects and to reissue the draft for review and comment. | |
|---|---|---|---|---|
| | 1030 | 1 | Page 1-2, last paragraph. Due to ease of access and through formal agreement with the Moab FO, the BLM Vernal FO presently manages a small amount of public land (33,331 acres) at the top of the Book Cliffs along the northern portion of the MPA. Management decisions for these 33,331 acres are contained in the Vernal RMP and are not re-evaluated in this EIS.<br><br>Note: the language at the bottom of page 1-11 re: Black Ridge Canyons has good wording for this as another option for rewriting. I believe the above sentence appears in the Executive Summary as well and it should be revised. | The commenter is is referring to 2 different areas. The text on page 1-11 refers to the Black Ridge Canyons wilderness area, which is managed by the Grand Junction FO.  The area referred to on page 2-1 is the in the northern Bookcliffs and is managed, by agreement, by the Vernal FO. |
| | 1030 | 4 | P 2-1, Section 2.1, last paragraph This paragraph talks a lot about decisions – I noticed this wording earlier in the document as well. "Proposed management actions" or "actions" seems like a better choice of words in light of the fact that the RMP/EIS is not a decision document. This would be a search/replace chore, because I notice "proposed decisions again in 2.1.1.3 and elsewhere. | Commentors suggestion is noted. The correct terminology has been used in the PRMP/FEIS. |
| | 1030 | 11 | P 4-1, last paragraph. For the analysis, BLM staff used existing data, science, current methodologies, professional judgments, and projected actions and | Comment noted, thank you. |

BLM_0012029

| | | | levels of use. The analysis takes into account the stipulations described in chapter 2 and describes how each alternative would change the conditions described in chapter 3. | |
|---|---|---|---|---|

## Areas of Critical Environmental Concern

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | 5 | 1 | I feel that the Area of Critical Environmental Concern (ACEC) designations in Alternative "B" are completely inappropriate. | The BLM has followed the dictates of Manual 1613 concerning ACEC consideration.  The commentor's opinion is noted. |
| State of Utah - Public Lands Policy Coordination | 120 | 64 | The State is opposed to the establishment of ACECs overlapping Wilderness Study Areas (WSAs).  The State also does not favor creation of ACECs that exceed the scope of the resources they are designed to protect. | The BLM has separate policies and guidelines, as well as criteria, for establishing ACECs and WSAs.  These differing criteria make it possible that the same lands will qualify as both an ACEC and a WSA but for different reasons.  The BLM is required to consider these different policies.<br><br>The values protected by WSA management prescriptions do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa.  The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC Evaluation (Appendix I).  The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values.  None of these values includes wilderness characteristics.  Additionally, the management prescriptions for the ACECs is limited in scope to protect the relevant and important values, and the BLM maintains that the size of the ACEC areas is appropriate for protection of the relevant and important values identified. |
| State of Utah - Public Lands Policy Coordination | 120 | 69 | The Cottonwood-Diamond Watershed Potential ACEC notes that the proposed designation would remain in force, "until the watershed is restored to a healthy and functioning condition".  Please clarify what management | The Draft RMP/EIS states on pg. 4-320 that the ACEC would be designated until "the watershed is restored to a healthy functioning condition".  The text has been changed to state that the ACEC would be designated until |

25

BLM_0012030

| | | | conditions would apply once the desired future condition is attained and the mechanism used to change prescriptions. | a determination is made by an interdisciplinary team that the Cottonwood and Diamond Watersheds are in propoperly functioning condition (PFC). |
|---|---|---|---|---|
| San Juan County | 121 | 22 | The Mill Creek Canyon Potential ACEC.  San Juan County is opposed to protecting wilderness characteristics and layering.  Alt. D best describes this unit. | Alt C proposes no management to protect wilderness or wilderness characteristics within the Mill Creek Potential ACEC.  Of the 3,721 acres in this ACEC in Alt C, 1,474 acres are within San Juan County.<br><br>Alt. B contains 295 acres of non-WSA lands with wilderness characteristics within San Juan County.  Of these acres, all are within the Mill Creek Potential ACEC as outlined in Alt. B. |
| San Juan County | 121 | 24 | Wilson Arch Potential ACEC.  This should be dropped in all alternatives because of surrounding private land.  The area should be VRM Class III in all alternatives.  The arch should be protected with a hiking trail up to it. | The Wilson Arch Potential ACEC is proposed only in Alt. B.  The potential ACEC meets the relevance criteria and must be included in 1 alternative.  The area is managed as VRM II in Alt C, providing protection to the arch, and managed as VRM III in Alt. D, providing virtually no protection to the arch. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 68 | The BLM has not recognized the statuatory mandate under FLPMA to give preference to ACEC designation.  The agency must prioritize the designation of ACECs over other possible resource uses.  For example, BLM cannot reject designation of an area as an ACEC because it is attempting to balance development and conservation in Alternative C. | The FLPMA states that in developing land use plans the BLM shall give priority to the designation and protection of ACECs.  The BLM gave full consideration to the designation and preservation of ACECs during this land use planning process.  Nominations for ACECs from the public were specifically solicited during the scoping period.  A total of 37 ACEC nominations were received and the relevance and importance of each were determined.  Fourteen of the ACEC nominations were found to meet both the criteria of relevance and importance and all these were included for special management as proposed ACECs in Alternative B.<br><br>The BLM Manual 1613.23 states that "After completing the analysis of the effects of each alternative, the manager selects the preferred plan alternative which best meets the planning criteria and the guidance applicable to the area.  The preferred alternative reflects the BLM's proposals for designation and management of ACECs." |

BLM_0012031

The BLM has full discretion in the selection of ACECs for the various alternatives.  In the selection of the preferred alternative, a comparison of estimated effects and trade-offs associated with the alternative leads to development and selection of the preferred alternative.

Should BLM choose not designate potential ACECs, BLM Manual 1613 .33E provides direction in this process.  Rational for not proposing designation of a potential ACEC in the preferred alternative must be provided, that is, the reasons for the decision not to provide special management attention must be clearly set forth.  Such reasoning may include:

1. Special management attention is not required to protect the potential ACEC because standard or routine management prescriptions are sufficient to protect the Relevance and Importance Values from risks or threats of damage/degradation.

2. The area is being proposed for designation under another statutory authority such as wilderness and would require no further management attention.

3. The manager has concluded that no special management attention is justified either because of exposure to risks of damage to threats to safety is greater if the area is designated or there are no reasonable special management actions which can be taken to protect the resource from irreparable damage or to restore it to a viable condition.

BLM ACEC guidance (Areas of Critical Environmental Concern; Policy and Procedures Guidelines, 45 FR 57318, 57319 (Aug. 27, 1980)) allows a manager to exercise discretion not to protect a potential ACEC through ACEC designation, but that decision has to be

BLM_0012032

| | | | | documented through the planning process. If the manager decides to provide the necessary protection through another form of special management, the documentation will include specifics of the special management proposed. Rationale for all ACEC decisions will be provided in the Record of Decision and supported by analysis in the EIS. If the decision is to allocate the resources with relevant and important values, in whole or in part, to another use which would in result in damage or loss to such resource, the authorized officer must first find that there is an overriding public need for such other use; that the public benefits of such other use outweigh the public benefits of use appropriate with ACEC designation, and that such other use will best meet the present and future needs of the American people. In addition, any allocations to such other use will include all feasible planning and management to prevent, minimize, mitigate or restore any consequent damage to the resource, and these requirements will be specified in the documentation. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 69 | If a recommended area is not to be designated as an ACEC, the analysis supporting the conclusion must be incorporated into the plan and associated environmental document. | The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analysis that forms the basis of the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 70 | The BLM has improperly ignored or discounted the threats to special places (ACECs) from oil and gas development and ORV use and has failed to designate or incorporate sufficient protection for proposed ACECs. | The BLM followed the ACEC designation process outlined in BLM Manual 1613 and analyzed the implications of designating or not designating areas as ACEC. In particular, in Chapter 4 of the DRMP/DEIS analyzes the impacts of ongoing and future uses on the relevance and importance values associated with potential ACECs under all alternatives.<br><br>In addition, see response to comments 124-68 and 124-69. |
| Southern Utah Wilderness | 124 | 71 | The BLM has specifically failed to designate ACECs to protect lands with wilderness characteristics. SUWA | Pursuant to BLM Manual 1613, "An ACEC designation will not be used as a substitute for wilderness suitability |

BLM_0012033

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | believes that BLM's abandonment of its authority to designate any additional wilderness study areas (WSAs) is invalid and will ultimately be overturned in pending litigation and therefore does not prevent the BLM from designating new WSAs. | recommendations". The BLM does not have the authority to designate new WSAs under the land use planning process.<br><br>Under the provisions of FLPMA, the BLM has authority to designate ACECs where special management attention is required to protect and prevent irreparable damage to important cultural, historic, scenic values, fish and wildlife resources, other natural systems or processes, or to protect life and safety from natural hazards. However to be considered as a potential ACEC, an area must meet the criteria or relevance and importance, which does not include wilderness characteristics (ACEC Manual at 1613.1).<br><br>See also response to comment 121-10. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 72 | The BLM must designate all WSAs as ACECs to protect them should they be released from Congress. | Refer to response to comment 124-39. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 73 | Behind the Rocks - The ACEC in Alternative C should include the area overlapping the WSA as proposed in Alternative B. | BLM Manual 1613 gives rationale for not designating potential ACECs. This rationale includes that the area is being proposed for designation under another statutory authority.<br><br>See response to comment 124-39 and 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 74 | Bookcliffs ACEC - The ACEC proposed in Alternative B must be carried forward to Alternative C based on the priority mandate in FLPMA. | See response to comment 124-68. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 75 | Cottonwood-Diamond Watershed ACEC - This ACEC should overlay the Bookcliffs ACEC so when the fire damage heals the land will be managed consistently with the wildife ACEC (Bookcliffs). | The Cottonwood-Diamond Watershed potential ACEC was proposed for the relevant and important values of natural hazards. The natural hazard resulted from fire damage. Wildlife was not one of the relevant and important values identified for this area. In addition this area is managed as a wilderness study area. Therefore, it is proposed for designation under another statutory |

29

BLM_0012034

| | | | | authority which provides protection to the relevant and important values. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 76 | Dolores/Big Triangle - These two ACEC nominations should be combined to cross the threshold of importance for a wildlife corridor. | The BLM stands by its findings concerning the Dolores and Big Triangle ACEC nominations.  Even if these areas were to be combined the wildlife habitat is not unique, rare, sensitive, or fragile.  The habitat referred to was found to meet relevance but not importance because it is duplicated.<br><br>See Appendix I, pgs 7 & 13 of the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 77 | Gemini Poison Spider - This nomination meets the importance criteria for scenery.   The vast expanse of Navajo sandstone fins and slickrock is equally important as a scenic resource as the Behind the Rocks ACEC or Mill Creek Canyon ACEC.  This ACEC also gives protection to wilderness characteristics. | This area was found to meet the relevance criteria for ACEC consideration.  However, the area did not meet the importance criteria for ACEC consideration because the scenery was found to be of no more than local significance as similar scenery is found throughout the Colorado Plateau.<br><br>See Appendix I, pg. 13. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 78 | Hatch Wash - This canyon is geologically unique and important, where Wingate walls typically soar over vast expanses.  The BLM should designate this as an ACEC. | Geology is not one of the relevant and important values for ACEC consideration.<br>Hatch Wash did not meet the importance criteria for scenery because the scenery was of no more than local significance.<br><br>See Appendix I, pg. 13. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 79 | Labyrinth Canyon ACEC - This ACEC should be included in the preferred alternative.  It contains wilderness characteristics lands and is threatened by oil and gas development. | Refer to response to comment 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 80 | Mill Creek ACEC - The ACEC in Alternative C should include the area overlapping the WSA as proposed in Alternative B. | BLM Manual 1613 gives rationale for not designating potential ACECs.  This rationale includes that the area is being  proposed for designation under another statutory authority.<br><br>See response to comment 124-39 and 124-69. |
| Southern Utah Wilderness | 124 | 81 | Tenmile ACEC - The potential ACEC must be managed to protect the critical riparian and cultural resources. | The management of the ACEC for the protection of the riparian and cultural resources is compatible with |

BLM_0012035

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | Motorized travel is incompatible with this delicate riparian this delicate riparian environment rich in cultural resources. | motorized travel on the designated route.  The route has been marked on the ground so travel along the existing route is adhered to and the potential for impacts to cultural and riparian resources has been minimized. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 82 | Upper Courthouse ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | Refer to response to comment 124-69. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 83 | Westwater ACEC - This ACEC should be expanded to include the entire wilderness study area and added to the preferred alternative.  This would provide protection should Congress release this area from WSA status. | See response to comments  124-39 &124-71.  The relevant and important values for the potential ACEC include fish and scenery.  These values are found only along the Westwater Canyon corridor and only this corridor was included in the potential ACEC.  The following sentence has been added to the PRMP/FEIS explaining why Westwater potential ACEC is not in the preferred alternative:  "The area is proposed for designation under another statutory authority (wilderness study area) and requires no further management." |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 84 | White Wash ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | The following sentence has been added to the PRMP/FEIS explaining why the White Wash potential ACEC is not in the preferred alternative:  "The manager has concluded that the threats from damage/degradation to the relevant and important values of natural systems can be protected through restrictions imposed in a Special Recreation Management Area (SRMA)."  As stated on pg. 2-39 of the DRMP/EIS, this SRMA would manage the open OHV area with restrictions to protect the dune field Cottonwood trees and White Wash water sources. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 85 | Wilson Arch ACEC - The BLM identifies the relevance and importance in Appendix I.  Therefore, they should give priority to its designation pursuant to FLPMA. | The following sentence has been added to the PRMP/FEIS explaining why the Wilson Arch potential ACEC is not in the preferred alternative:  "The manager has concluded that the VRM II designation for this area is sufficient to protect the relevant and important values of scenery." |

BLM_0012036

| Southern Utah Wilderness Alliance (SUWA) | 124 | 86 | Upper Labyrinth ACEC nomination - SUWA nominates the area south of the town of Green River and north of the Ruby Ranch.  The nominated ACEC that the Price BLM has on the west side of the Green River.

This ACEC meets that relevant criteria due for scenic, historical, fish, and natural processes associated with the river and its surrounding landscape; historic values ranging from Crystal Geyser to the Powell expedition; and fish and wildlife habitat.  The scenery and landscape of this are is outstanding and offers visitors and outstanding experience either by hiking or by canoeing.

The nomination meets the importance criteria for scenery and for historical values.  In addition, the Green River is habitat to Threatened and Endangered fish and Labyrinth Canyon is an internationally acclaimed canoe trip through BLM lands.  This area faces heightened threats from oil and gas development , with the state of Utah leasing portions of the riverbed. | The BLM considered this ACEC nomination which was submitted during the comment period for the DRMP/EIS.  The values mentioned by the commentor in the Upper Labyrinth area are scenic, historical, fish, and natural processes.  The BLM convened an interdisciplinary team to consider this nomination.  The team found the historical, fish, and natural processes to be relevant.  Scenery was not found to be relevant.  While the canoe trip along the Green River is a highly sought after recreational experience, this portion of the Green River is only a portal to the scenery in the lower part of the canyon below Ruby Ranch.

The relevant values of historical, fish, and natural processes were not found to be important.  While John Wesley Powell did float this portion of the river, there were no significant events occurred in this portion from a historical perspective.  The threatened and endangered fish that may inhabit this portion of the river are found throughout the Colorado and Green River system.  This particular reach of the river provides no special habitat for these fish.
The natural processes along this portion of the Green River are neither fragile, sensitive, rare, irreplaceable, exemplary, or unique.

Because the nomination does not meet the importance criteria, it will not be carried forward as a potential ACEC in the PRMP/FEIS.

The analysis supporting this conclusion has been incorporated into Appendix I of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 87 | Highway 313 ACEC nomination - SUWA nominates the Highway 313 corridor as an ACEC.  This ACEC would protect scenic values and cultural resources (Sevenmile Canyon) along Highway 313 from Highway 191 to Dead Horse Point State Park and spur of this highway leading | The BLM considered this ACEC nomination which was submitted during the comment period for the DRMP/EIS.  The values mentioned by the commentor in the Highway 313 area are scenic and cultural resources.  The BLM convened an interdisciplinary team to consider this |

BLM_0012037

| | | | | |
|---|---|---|---|---|
| | | | to the Island in the Sky district of Canyonlands National Park. This ACEC meets relevant criteria due to this route being already designated as a Scenic Byway, and is the highly scenic gateway to two destination parks. Countless visitors experience this area as part of a larger southern Utah driving and windshield tour to enjoy the exceptional scenery of the landscape.<br><br>The importance criteria are met by the exceptional scenery as well as by the designation of Highway 313 as a Scenic Byway. Travelers from all over the world use this route to access adjoining BLM lands and both Canyonlands National Park and Dead Horse State Park. The ACEC is found to have more than local significance. These values and quality of the Scenic Byway and ACEC are threatened and currently being degraded by visible oil and gas development. | nomination. The team found the scenic and cultural resoures to be relevant.<br><br>The relevant values of scenic and cultural resources were not found to be important. While the scenery in the area is attractive it is of no more than local significance. Visitors enjoy the scenery along Highway 313 but their primary destination is the scenery of Dead Horse Point State Park and Canyonlands National Park. The cultural values, primarily rock art, in Sevenmile Canyon are found throughout the Moab Field Office and the Colorado Plateau. These values are of no more than local significance.<br><br>Because the nomination does not meet the importance criteria, it will not be carried forward as a potential ACEC in the PRMP/FEIS.<br><br>The analysis supporting this conclusion has been incorporated into Appendix I of the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 206 | The BLM must give priority to the designation of Labyrinth ACEC to protect natural resources (riparian, cultural, historical, wilderness characteristics, wildlife and sensitive soils). The relevant and important values are the same as listed in Comment 86. | See response to comment 124-86. |
| Independent Petroleum Assoc. of Mountain States | 203 | 8 | No legal or regulatory mandate exists for prohibiting multiple use activities in Areas of Critical Environmental Concern (ACEC), Special Recreation Management Areas (SRMA), and Wild and Scenic Rivers areas (WSRs). The BLM has apparently arbitrarily restricted other multiple use activities in the ACEC and WSR areas (Chapter 2 – Alternatives B,C, and D). The DRMP/EIS (Chapter 2) should state that companies are allowed to request BLM review and approval of other multiple use actives are often compatible with the uses designated for ACECs and WSRs. BLM should not unnecessarily restrict access or activities in these areas | Refer to response to comment 203-2. |

33

BLM_0012038

| | | | if the other proposed activities are compatible with the designated uses for the area, especially if a company proposes mitigation measures. | |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 9 | Several of the ACECs do not contain adequate justification for closing those lands to development. Twelve of the fourteen ACECs listed in the RMP have existing leases.  While the leases would remain valid until they expire, the potential exists to limit future development in prospective areas because of the ACEC designations, when there are existing laws, stipulations, and policies to protect resources identified in many of the ACECs. | Appendix I of the DRMP/EIS details the relevant and important values identified for the potential ACECs included in the alternatives.  These values provide the justification for restricting uses.  As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights. |
| Independent Petroleum Assoc. of Mountain States | 203 | 10 | We object to the proposal to designate the following areas as ACECs because the BLM has failed to identify a prevailing need to protect significant values associated with these areas: Behind the Rocks 17,836 acres (5,201 acres in Alt C) Bookcliffs – 304,252 acres Cisco White-Tailed Prairie Dog Complex – 117,481 or 125,620 *difference between page 2-33 and I-9 Colorado River Corridor – 50,483 Labyrinth Canyon – 8,528 Upper Courthouse – 11,529 Westwater Canyon – 5,069 White Wash – 2,988 Wilson Arch – 3,700 Despite BLM's proposal to designate these areas as ACECs, the BLM has not made the case that ACEC designation is necessary to protect the values identified in Appendix I. No justification related to fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened resources have been identified. It seems that the BLM's intent is to arbitrarily create ACEC designations without meeting its own significance criteria in an attempt to placate special interest groups. | The BLM determined that the potential ACECs identified in the DRMP/EIS have relevant and important values which provides the need for protection.  Where potential ACECs are designated special management attention would be directed at the relevant and important values. |

34

BLM_0012039

| Independent Petroleum Assoc. of Mountain States | 203 | 11 | NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs. Isle Royale, 154 F. Supp. 2d at 1127; Trout Unlimited, 509 F2d at 1284; BLM ACEC Manual 1613.06 - .4.  The DRMP/EIS does little to disclose to the public how and on what information the proposed ACEC determinations were reached. | In June of 2003 the BLM requested nominations for Areas of Critical Environmental Concern (ACECs).  The public was informed through newspaper articles and a planning bulletin.  The BLM's findings regarding relevance and importance evaluations were posted on the BLM RMP websites in February 2006.  A planning bulletin was released notifying the public of these postings for both the Moab and Monticello Field Offices.  The BLM specifically notified nominators of potential ACECs which were found not to meet the relevance and importance criteria.

The BLM Handbook (1613) regarding Areas of Critical Environmental Concern. |
| Independent Petroleum Assoc. of Mountain States | 203 | 12 | New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP/EIS were nominated by various organizations. However, there is a lack of disclosure about these submissions, the materials serving as the basis of analysis by the BLM interdisciplinary team, and how these procedures complied with existing BLM policy. Disclosing this information allows the public to ascertain the quality of information used by BLM, the location of the source of information, and the availability of the information for public review. The DRMP/EIS fails to explain why other management prescriptions or designations in place are inadequate and necessitate the proposed ACEC designations. | See response to comment 203-11.

The BLM adhered to the ACEC policy found in Manual 1613. |
| Independent Petroleum Assoc. of | 203 | 13 | The DRMP/EIS fails to demonstrate that the proposed ACEC decisions meet the regulatory criteria of importance and relevance. 43 CFR § 1610-7-2. | A rationale for designating or not designating ACECs in the Preferred Alternative of the DRMP/EIS is found in the Administrative Record referred to as the ACEC Final |

BLM_0012040

| | | | | |
|---|---|---|---|---|
| Mountain States | | | Secondly, many of the identified resource values already receive adequate protection through other management prescriptions. 43 USC § 1702 (a) (ACECs may be designated "where special management attention is required…to prevent irreparable damage"); BLM Manual 1613.51-53 (ACECs unnecessary when other designations are adequate to protect a resource or value.) | Report.  The List of Threats and the Rationale for Designating or Not Designating ACECs in the Proposed Alternative is available to the public upon request. Relevant text has been added to Appendix I of the PRMP/FEIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 14 | Many of the proposed ACECs in Alternative B contain portions of existing WSAs. WSA designation already provides a higher level of protection than ACEC designation, making ACEC designation unnecessary in such cases. IPAMS supports the elimination of overlapping ACEC and WSA designations in Alternative C. According to FLPMA, the BLM should be applying the least restrictive management technique to protect a resource, and many of the proposed ACECs fail in that regard. | WSAs and ACECs are established through different processes and criteria. Therefore it is possible to have overlap of the two designations.  In Alt B there is some overlap of ACECs and WSAs; however, in Alt C this overlap was eliminated because it was determined that the WSA designation provides sufficient protection for the relevant and important values of the ACECs.  The management actions for the ACECs is considered the least restrictive to protect the relevant and important values identified.<br><br>Where areas were found to meet the relevance and importance criteria for an ACEC |
| Independent Petroleum Assoc. of Mountain States | 203 | 15 | The Reasonable Foreseeable Development (RFD) scenario, which projects the amount of oil and natural gas development within the planning area, is inadequate. The Preferred Alternative projects 435 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. APD activity alone suggests the fifteen year RFD should be 975, based on 2006 data of 65 APDs. Well projections must be adjusted in an EIS under each alternative to reflect administrative designations, management practices, and mitigation measures. IM 2004-089, Attachment 1-1 (2004). BLM does not disclose the methodology it used in projecting oil and gas well activity by alternative. | The Reasonably Foreseeable Development scenario  was prepared  in August 2005 and was revised in September of 2006.  The revision in 2006 was prompted by a considerable increase in oil and gas prices and on the ground activity.  Up to the present time (2008) oil and gas prices have continued to climb and activity has continued to increase.  However, the numbers projected in the revised RFD are still within the range of surface disturbance and the impacts analyzed in the DRMP/EIS. If the trend continues the RFD may have to  be revised.<br><br>The RFD was prepared in accordance with BLM Washington Office IM 2004-89.  It is based on geoologic factors, past permitting, and many discussion with oil company personnel (geologists, engineers, and |

BLM_0012041

| | | | | |
|---|---|---|---|---|
| | | | | mangers).<br><br>The methodology used in projecting wells by alternative is explained on pg. 4-83 of the DRMP/EIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 16 | The Energy Policy Conservation Act of 2000 and executive order 13211 place emphasis on identifying and eliminating impediments to natural gas and oil development. The Preferred Alternative would have a long-term adverse impact on mineral resource development in the planning area by placing additional restrictions on oil and gas development. Even the supposedly most extractive Alternative D would place many additional restrictions on oil and gas development.. | The analysis in Chapter 4 of the DRMP/EIS considers the impacts of restrictive stipulations on oil and gas development. The preferred alternative (Alt C) imposed the least restrictive stipulation necessary to protect the resources of concern while still allowing oil and gas development.<br><br>The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The |

BLM_0012042

| | | | | FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.<br><br>The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development. |
| Independent Petroleum Assoc. of Mountain States | 203 | 17 | IPAMS appreciates that the BLM acknowledges the meaning of valid existing rights when it states that existing leases will be managed under the stipulations applied at issuance of the lease. Exploration or development activities on leases that pre-date the revised RMP should not be constrained by management decisions made by the revised RMP. | Existing leases are valid existing rights and are not affected by management decisions in the new Resource Management Plan. |
| The Nature Conservancy | 204 | 10 | We would prefer to see this area (Colorado River Corridor Potential ACEC) – or at least our (TNC-proposed) smaller "Professor Valley" subset of it – formally designated as an ACEC in the Final RMP for two primary reasons:<br>1)       The biotic resources that are not only relevant and important, but highly worthy of special management attention. Two such examples include an abundance of the Listed-Threatened Jones cycladenia (Cycladenia humilis var. jonesii), and presence of the entire world-wide distribution of the Sensitive Shultz stickleaf (Mentzelia shultziorum), in a very popular area that supports a great deal of recreational use.<br>2)       The Nature Conservancy considers the Colorado River Corridor to be a very high priority for conservation, and accordingly we have a relatively long | The BLM is well aware of the biotic resources of Professor Valley.  An ACEC was analyzed in Alt B of the DRMP/EIS.  The ACEC designation was not carried forward to the preferred alternative because it was felt that other management actions imposed in Alt C for the area were sufficient to protect the biotic resources.  The following paragraph has been added to Appendix I of the PRMP/FEIS detailing the rationale for not designating the Colorado River Corridor Potential ACEC in Alt C:<br><br>The Colorado River Corridor was not proposed in the preferred alternative because routine management prescriptions are sufficient to protect the resources or values from risks or threats of damage/degradation.  The Colorado River Corridor will be managed as the Colorado Riverway SRMA, and management prescriptions will be |

38

| | | | | |
|---|---|---|---|---|
| | | | history (15+ years) of putting substantial resources into this area. These mostly involve acquisitions of title or conservation easements on multiple tracts of private lands in the corridor, such as the Mayberry Orchard and Matheson Wetlands Preserves. Given this demonstrated private-sector commitment to conservation on our part, we recommend a complementary effort be made by BLM to give formal recognition to the biotic values of the public lands in this area, or at least the Professor Valley portion of it, by virtue of the ACEC title. At an absolute minimum, the Final RMP must contain management prescriptions for resources and uses that protect and enhance the biotic values of the Colorado River Corridor area. It is more important to have the needed management without a title, than to have a title without the needed management. So while we would strongly prefer ACEC designation of this area, we would not actively oppose its failure to be so designated – provided that the management of the area is adequate. | utilized to protect the scenic, fish and wildlife and natural systems: rare plants resources:  Stipulations will be placed on oil, gas and mineral development to protect the above values.  These stipulations include no surface occupancy and closed for oil and gas activities and all other surface disturbing uses. Motorized activity will be allowed only on designated routes. The Endangered Species Act will be employed to protect the endangered fish. Visual Resource Management will include Class I and II VRM within the area to protect the unique scenic values. Recreation activities such as camping will be limited to campgrounds in order to avoid unacceptable impacts to the resources. The management of uses in the Colorado River Corridor is very restrictive and has been deemed sufficient to protect the relevant and important values of the ACEC. The imposition of a no surface occupancy (or closed) restriction on oil and gas leasing and all other surface disturbing activities is protective of all biotic resources. |
| The Nature Conservancy | 204 | 12 | If the ACEC boundary of Alternative C is brought forward into the Final RMP, then another concern could arise in the future: If the day ever comes when the interim status of WSAs is resolved by Congress (as designated wilderness or not), and if the Behind the Rocks WSA does not become wilderness, then we recommend that these 12,635 "released" acres receive the same ACEC title and management as the 5,201 acres would under this new RMP. We don't know if this can be stipulated as a potential future condition in this pending RMP, or if a Plan Amendment would be required at the time that this situation came to pass. | Should WSAs be released by Congress, the RMP stipulates that a plan amendment be done for those WSAs that are released.  This is stated on pg. 2-43 of the DRMP/EIS.  At the time that the Behind the Rocks WSA acres might be "released", a proposal for extending the ACEC could be suggested as a part of the plan amendment addressing that release. |
| The Nature Conservancy | 204 | 13 | Upper Courthouse: we would prefer to see this area formally designated as an ACEC according to its treatment in Alternative B- or at least the smaller subset of this area as presented in our original proposal (ca. | The biotic values of the Upper Courthouse area are protected by BLM Policy 6840 - Special Status Species Management.  The BLM recognizes the biotic values in this area.  Portions of the area are to be managed as No |

BLM_0012044

| | | | | |
|---|---|---|---|---|
| | | | 7,600 acres). At an absolute minimum, the Final RMP must contain management prescriptions for resources/uses that protect and enhance the biotic values of the Upper Courthouse area. So while we would strongly prefer ACEC designation of this area, we would not actively oppose its failure to be so designated – provided that the management of the area is adequate. The items under Alternative C seem less than adequate because they focus provisions for the two Sensitive plants, particularly the State Station milkvetch which occurs on the flats below the mesas, right in the midst of a zone of very heavy motorized-vehicle camping use. Further, as best as we can interpret Map 2-5-C, the zone of No Surface Occupancy stipulation for oil and gas leasing (and preclusion of other surface-disturbing activities) under alternative C does not extend quite far enough to the north and northeast to cover all the known clusters of the Stage Station milkvetch. Therefore, if ACEC designation is not done in the Final RMP, we recommend carrying forward all of the Special Management items that now appear under Alternative B – including a northward extension of the NSO stipulation area – into the Final. | Surface Occupancy.  In all areas, state sensitive plants would be protected under Policy 6840.  All BLM approved actions would be required to avoid state sensitive plants. Recreation impacts in the area are addressed in the DRMP/EIS.  All travel is to be limited to designated routes.  The area is subject to camping restrictions, and a future campground is recommended to concentrate campers in one area.  When campsites in the area are designated, all sensitive plants would be avoided. |
| The Nature Conservancy | 204 | 14 | As a final comment on this subject, all of the ACECs designated in the MPA through the Final RMP should have subsequent management plans prepared and implemented for them. Such management plans would: 1) gather in one document all of the RMP-level management actions or prescriptions that apply to each ACEC; and 2) identify more-detailed and/or proactive finer-scale actions needed in each ACEC, as tiered to the RMP. | The BLM has the discretion to undertake an ACEC management plan for each ACEC designated in the PRMP/EIS.  This is clearly stated in the ACEC Manual (1613.62). |
| The Nature Conservancy | 204 | 15 | All three Action Alternatives identify the same set of public-land parcels as suitable for disposal (Map 2-3 and Appendix D). We recommend that one particular parcel be removed from this list, either in whole or at least the parts of it that support an important biological | Parcel R-11 has been removed from the list of lands available for disposal under all alternatives. |

BLM_0012045

| | | | | |
|---|---|---|---|---|
| | | | resources. The parcel in question is R-11, consisting of S½ NE ¼ and SE ¼ of Section 19; Section 20 (all) and Sec 21 (all) of T27S R23E (SLM). This parcel contains a major population center of the rare Isely's milkvetch (Astragalus iselyi), a plant that is not on the current (August 2002) BLM Sensitive Plant list for Utah, but which has been proposed for addition to a revised Sensitive list that has not yet been finalized and approved. [See paragraph at the bottom of page 2 of this letter for additional information on this species.] Disposal of this parcel would remove from BLM control a significant portion of this plant's total numbers, given that its entire world-wide distribution lies within the MPA. The transfer of this parcel into either private or SITLA ownership (it is adjacent to a sizable SITLA block) would great increase the likelihood of development that would be detrimental to this occurrence of Astragalus iselyi. Such a situation could lead to the need for more stringent protective status or listing for this plant. The best way to avoid this undesirable scenario is to remove parcel R-11 from the suitable-for disposal category – a course that we strongly urge the BLM to adopt in the Final RMP. | |
| Questar Exploration and Production Company | 210 | 4 | Areas of Critical Environmental Concern. New ACECs are proposed under each of the alternatives; however, it is unclear how the BLM determined that the proposed ACECs met the "importance and relevance" criteria. The BLM has not demonstrated that existing management practices and designation do not adequately protect the resource values of concern and that an ACEC is necessary. BLM provides no justification for fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, or threatened criteria have been met. The information and data used by the BLM to make these determinations should be fully disclosed to the public as required by NEPA and BLM policy. | Alt C proposes to manage 5 areas totalling 63,000 acres as ACECs.  Information has been added to Appendix I which details the threats to the ACECs and the rationale for designating or not designating them.  See also response to comments 203-8, 203-9 and 203-10. |

BLM_0012046

| | | | Recommendation: FEIS should disclose the information upon which the proposed ACECs were determined to meet the "importance and relevance" criteria. Eliminate the following proposed ACECs from further consideration based on failure to demonstrate that additional protections are necessary and/or that they meet the importance and relevance criteria:<br>Behind the Rocks<br>Bookcliffs<br>Cisco White-tailed Prairie Dog Complex<br>Colorado River Corridor<br>Labyrinth Canyon<br>Upper Courthouse<br>Westwater Canyon<br>White Wash<br>Wilson Arch | |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 5 | Twelve of the 14 ACECs that are being considered for designation have existing oil and gas leases within them. Though these leases will remain valid until expiration, the ACEC designation limits the potential for future development within these prospective areas. The DRMP/EIS should note that many of the resource values that are meant to be protected by the proposed ACECs are already protected through management prescriptions that are applied to the leases and/or APDs. ACEC designation is unnecessary when other designations are adequate to protect a resource or value. FLPMA states that the least restrictive management technique to protect a resource should be applied. Since many of the resources identified in the proposed ACECs are already protected by current management practices or existing designations, the new ACEC designations would disregard FLPMA. | See response to comments 203-8, 203-9 and 203-10, 203-11, 203-12, 203-13 and 203-14.  For a discussion of valid existing rights, see response to comment 214-14.<br><br>Alt. C designates 5 of the proposed ACECs, totalling 63,000 acres. |
| EnCana Oil and Gas (USA) Inc. | 215 | 8 | EnCana believes that several of the ACECs do not contain adequate justification for closing those lands to development.  Twelve of the 14 ACECs listed in the DRMP have existing leases.  While the leases would | See response to comment 203-9. |

42

BLM_0012047

| | | remain valid until they expire, the potential exists to limit future development in prospective areas because of ACEC designations.  This is unjustifiable where there are existing laws, stipulations, and policies to protect sensitive areas identified in many of the ACECs while still developing the energy resource.<br><br>NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs.  Isle Royale, 154 F. supp. 2d at 1127; Trout Unlimited, 509F.2d at 1284; BLM ACEC Manual 1613.06-.4. The DRMP does little to disclose to the public how and on what information the proposed ACEC determinations were reached.<br><br>New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP were nominated by various organizations.  However, there is a lack of disclosure about these submissions, the materials serving as the basis of analysis by the BLM interdisciplinary team, and how these procedures compiled with existing bLM policy.  The DRMP fails to explain why other management prescriptions or designations in place are inadequate and necessitate the proposed ACEC designations in lieu of less restrictive alternatives.<br><br>Regardless of how the ACECs were determined, the examination requires much more than merely examining the importance and the relevance criteria.  Disclosing this information allows the public to ascertain the quality of information used by BLM, the location of the source of information and the availability of the information for public review. | |
| | 284 | Federal law requires the BLM to give priority to the protection of lands which qualify as "Areas of Critical Environmental Concern" (ACEC) because of scenic, cultural, or ecological importance. However, the BLM | See response to comment 124-68 regarding ACEC designations. |

BLM_0012048

| | | | | |
|---|---|---|---|---|
| | | | plan would fail to protect 90% of the 613,077 acres which qualify for ACEC designation. | |
| Delta Petroleum Corporation | 306 | 7 | Alternative C contains five Areas of Critical Environmental Concern (ACEC) that do not seem to have adequate justification for closure to development. Twelve of the fourteen ACECs already have existing leases. While the ACEC has been identified the information used to determine the need for the ACEC and the area to include in it has not been provided and is required by NEPA. | See response to comment 203-9 and 203-10. |
| Delta Petroleum Corporation | 306 | 8 | Analysis of risk versus multiple use is not present in the DEIS, so there is no way to evaluate how the BLM can reach the land restrictions proposed for the ACEC's. In addition, there are a number of existing laws, regulations and policies to protect the water, air, cultural, and other resources identified in the ACECs. In what appears to be a failure to meet regulatory requirements, the RMP contains little in the way of explaining to the public how the BLM reached the designations and proposed land restrictions. | See response to comment 203-13. |
| Delta Petroleum Corporation | 306 | 9 | Several of the proposed ACECs overlie existing utility corridors within the MRA. The existing and future use of these utility corridors needs to be recognized and protected within any new designation of an ACEC. This is particularly true for the proposed Upper Courthouse, Wilson Arch, Cisco White Tailed Prairie Dog Complex, and Colorado River Corridor ACECs. | None of the ACECs identified by the commentor are within the Proposed Alternative.  There is not a conflict with the utility corridor identified for the Proposed Alternative in the PRMP/FEIS. |
| | 310 | 23 | The Moab BLM has included the White Wash Sand Dunes as a proposed Area of Critical Environmental Concern (ACEC) in Alternative B. This in turn; "gives SUWA whatever they want, despite the existing, traditional uses that have existed for decades" alternative. The White Wash ACEC is especially inappropriate. | Alternatives A, C (the preferred Alternative) and D do not designate White Wash as an ACEC. Refer to response to comment 124-69. |
| | 337 | 2 | It appears that much (almost 90%) of the lands with scenic, cultural, or ecological importance and qualify for "Areas of Critical Environmental Concern" will not | See response to comment 124-68 regarding ACEC designations. |

44

| | | | receive that protection. Yet, it is federal law that those lands be given PRIORITY consideration. | |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 9 | The EPA supports the Areas of Critical Environmental Concern (ACEC) proposed in Alt. C. | Comment noted. |
| Environmental Protection Agency | 479 | 10 | The EPA also supports the designation of the following ACEC proposed in Alt B. White Wash Sand Dunes: The EPA supports leaving 1,833 acres of the dunes open to cross country travel, but including the remaining management prescriptions from the ACEC proposed in Alt B. These prescriptions are necessary to protect the valuable resources in the dunes. The BLM should be prepared to close this remaining area of "open" OHV travel if the prescriptions are not successful in restoring and protecting the health of the ecological and cultural resources. | See response to comment 479-6. |
| Environmental Protection Agency | 479 | 11 | The EPA also supports the designation of the following ACEC proposed in Alt B. Labyrinth Canyon: The EPA supports designating this viewshed as VRM I, closing or stipulation no surface occupancy for oil and gas development, and prohibiting new road construction. These management actions would protect visual resources and prevent water quality impacts to the Green River and to its endangered fish species. | In the preferred alternative, this portion of Labyrinth Canyon is managed as no surface occupancy for oil and gas development. It is designated as VRM II. Surface disturbing activities are prohibited (see Appendix C of the DRMP/EIS), which would include new road construction. The BLM contends that the management actions provided in the preferred alternative are sufficient to protect visual resources and to prevent water quality impacts to the Green River and to its endangered fish species. Therefore, the management actions proposed in Alt C (Preferred Alternative) are sufficient to protect the relevant and important values in the area and an ACEC designation is not required. |
| Environmental Protection Agency | 479 | 12 | The EPA also supports the designation of the following ACEC proposed in Alt B. Upper Courthouse: This ACEC contains two rare plants on the state sensitive list, irreplaceable historic resources, relict plant communities, cryptobiotic soils crusts, and significant paleontological deposits of dinosaur bones similar in quality to those found in Dinosaur National Park. The EPA believes that ACEC | In the preferred alternative, the area containing relict plant communities is managed as no surface occupancy. The majority of the remainder of the Upper Courthouse area is also managed as no surface occupancy to protect bighorn sheep crucial habitat. The rare plants, historical resources and paleontological values are protected by law. Therefore, the management actions proposed in Alt C (Preferred Alternative) are sufficient to protect the |

BLM_0012050

| | | | | |
|---|---|---|---|---|
| | | | designation is necessary to fully protect these unique and valuable resources. | relevant and important values in the area and an ACEC designation is not required. |
| Environmental Protection Agency | 479 | 13 | The EPA also supports the designation of the following ACEC proposed in Alt B.<br>Colorado River Corridor:  This ACEC contains rare and irreplaceable wildlife habitat (for mule deer, desert bighorn, endangered fish, yellow-breasted chats, Lewis woodpeckers, river otter, spotted bat and big free-tailed bat).  It is home to rare and endangered plants including Jones cycladenia, Dolores rushpink, cave primrose, alcove bog orchid, alcove rock daisy, endemic alcove columbine and Shultz stickleaf.  It has unique visual resources.  The EPA believes that the Area should be designated as VRM I and closed or NSO for oil and gas development. | In the preferred alternative (Alt C), the Colorado River Corridor is managed as no surface occupancy or as closed for oil and gas leasing.  Surface disturbing activities are prohibited in areas delineated as no surface occupancy (see Appendix C of the DRMP/EIS).  In this alternative the area is designated as   VRM II.  Therefore, the BLM contends that the management actions proposed in Alt C  are sufficient to protect visual resources and to prevent harm to wildlife and plant habitat along the Colorado River. |
| Environmental Protection Agency | 479 | 14 | The EPA also supports the designation of the following ACEC proposed in Alt B.<br>Canyon Rims:  The scenic views are some of the most spectacular in the western United States and are highly visible to the recreating public.  The EPA believes that the area should be designated VRM II, should be NSO for oil and gas development and that no new routes be allowed. | In the preferred alternative (Alt C), this portion of the Canyon Rims is managed as controlled surface use for oil and gas leasing, as it is designated as VRM II.  Surface disturbing activities must meet the constraints of VRM II management (see Appendix C of the DRMP/EIS).  The BLM contends that the prescriptions provided in Alt C are sufficient to protect visual resources along the rims of the Canyon Rims area. |
| Center for Native Ecosystems | 485 | 1 | The BLM must disclose why ACEC designation is not necessary for the Cisco Complex under some of the proposed alternatives.<br><br> Only alternative B, which is not the preferred alternative, would designate the Cisco White-tailed prairie dog complex ACEC.<br><br>Even when potential ACECs are not recommended for designation in the preferred plan alternative, the rationale for doing so must be included:<br><br>The rationale for ACEC designations in the preferred alternative must be discussed. The rationale for not | General information has been added to Appendix I which explains the rationale for designating or not designating ACECs under the preferred alternative.<br><br>The Cisco Complex ACEC is not designated an ACEC in Alt C because, under Alt C, there are management prescriptions that will protect the relevant and important values of the area;  therefore, ACEC designation is not required.<br><br>The BLM will manage habitats within the proposed ACEC boundaries in coordination with UDWR and according to management guidance recommended in any state recommended management plans. |

BLM_0012051

| | | | | |
|---|---|---|---|---|
| | | | proposing designation of a potential ACEC in the preferred alternative must also be provided. In other words, if the proposed plan does not call for special management attention of a potential ACEC in the preferred alternative (and therefore, it is not proposed for designation), the reasons for the decision not to provide special management attention must be clearly set forth. BLM Manual 1613.33.E<br><br>We were not able to locate such a discussion in the DEIS.<br><br>The BLM has determined that "the habitat within this area is essential for maintaining this species" (I-10, 3-126), so it is difficult to understand why the agency would not designate this area as an ACEC. FLPMA requires that the BLM give priority to the designation and protection of ACECs, so this is a responsibility that the agency should take seriously | • Alternative C makes specific provision for avoiding active colonies that can be implemented on new and existing leases.<br>By surveying areas planned for surface disturbing activities and by avoiding disturbance and destruction of active colonies, ensuring grazing practices that promote seed production and restricting travel to designated roads, the integrity of the relevant and important values of the occupied prairie dog habitats within the proposed ACEC would be preserved.  Much of the 177,481 acres of this area is currently not occupied, thus large tracts of land are available for population expansions.  Although there may be alteration to some of these unoccupied habitats, the management prescriptions will ensure that once these habitats become occupied, management prescriptions will also protect newly occupied areas in the future.<br><br>Although the prescriptions listed above are standard operating procedures, by presenting them in the proposed management prescriptions under Alternative C, the BLM has the ability to implement buffers on all leases. Currently prairie dog numbers are low, but if numbers approach those of earlier decades, it may become impossible to develop a lease and adhere to these stipulations.  For that reason, exception language was developed to ensure there would not be a taking on a lease holding.   Although the buffers are not those recommended by CNE, the BLM worked closely with USFWS and UDWR to develop management prescriptions that satisfy both of these agencies. |
| Center for Native Ecosystems | 485 | 2 | Half of the Cisco complex is already leased for oil and gas drilling – the BLM must adopt strict protections on the remaining acreage.<br><br>Table 4.87 indicates that half of the area within the Cisco White-tailed Prairie Dog ACEC has already been | As mentioned in comment 485-1, Alternative C makes specific provision for avoiding active colonies that can be implemented on new leases.  Because the buffer is within the parameters of Standard Operating Procedures, the stipulation can be applied to existing leases as well.  The Controlled Surface Use stipulation proposed in Alternative |

BLM_0012052

| | | | | |
|---|---|---|---|---|
| | | | leased for oil and gas drilling. The BLM must act now to conserve the remainder of this area. One of the factors for listing a species under the Endangered Species Act is inadequate regulatory mechanisms. Since valid, existing rights have been granted for half of the Cisco Complex already, the BLM will be hard pressed to demonstrate that it is able to provide adequate management for this species even if it adopts stringent protections via this RMP. Instead, the BLM proposes to apply only a CSY with considerable leeway for exceptions and modifications to the remainder of the habitat that the agency still fully controls. As Table 4.117 indicates, under the preferred alternative 100% of the white-tailed prairie dog habitat in the Moab Field Office would be open to oil and gas leasing. This is unacceptable. | C is essentially No Surface Occupancy within 660 feet of an active town.  The BLM, in coordinating with USFWS and UDWR determined that the prescription developed in Alternative C will adequately protect active colony integrity.   Due to the nature of prairie dog population growth and declines, it was not practical to identify all active colonies and place a No Surface Occupancy stipulation in these specific areas.  The BLM, in conjunction with USFWS and UDWR, developed a flexible stipulation that will allow for adaptive management. |
| | 492 | 4 | Behind the Rocks – We strongly advocate an ACEC oriented to archeological protection designation for the entire 17,836 acres included in this area because of the high archeological site density in the area and the potential for inclusion on the National Register of Historic Places as an Archaeological District. Rock art in this area is extensive, from multiple cultures over thousands of years, and is acknowledges as being of national significance.

We believe all roads should be closed beyond the existing spur road to "Old Folks Home." Additional protection as described in alternative B (page 2-33) is appropriate. | The commentor's preference for the Behind the Rocks ACEC designation as outlined in Alternative B is noted.  The difference between the area of the ACEC in Alt B and Alt C is that Alt C removes the acreage within the WSA.  The Behind the Rocks WSA is managed according to the Interim Management Policy for Lands Under Wilderness Review.

The road beyond the "Old Folks Home" is closed to motorized vehicles in Alt C of the DRMP/EIS.

Refer to response to comment 124-69. |
| | 492 | 5 | Bookcliffs – From a cultural resource point of view, we believe that there is a middle ground between alternatives B and C that is appropriate. Alternative C does not establish an ACEC in the Bookcliffs. Alternative B would manage 304,252 acres. Cultural resources are primarily located along the Green River, the base of the Book Cliffs, and in major drainages from | The commentor's preference that an ACEC be established to  protect archeological resources for the Green River corridor, East Canyon, Middle Canyon, Hay Canyon, Spring Canyon, Crescent Junction, Sego Canyon, Thompson Canyon, Coal Canyon, and Tusher Canyon is noted.  All archeological sites are protected by law whether or not they are included in an ACEC. |

BLM_0012053

| | | | | |
|---|---|---|---|---|
| | | | the highlands of the Bookcliffs. We advocate the establishment of an ACEC oriented to archeological protection in these more restricted areas of Alternative B. Specifically, the entire Green River corridor, East Canyon, Middle Canyon, Hay Canyon, Spring Canyon, Crescent Junction, Sego Canyon, Thompson Canyon, Coal Canyon, and Tusher Canyon. The current maps appear not to include the rock art at Crescent Junction. These are significant sites and should be included. | See response to comment 124-68 and 124-69. |
| | 492 | 6 | Highway 279 / Shafer Basin / Long Canyon – We find Alternative C to be an acceptable alternative from a cultural resource viewpoint except that the map appears to exclude "Wall Street" rock art district from the ACEC. We believe that it is important for the entire river corridor including "Wall Street" to be protected in an archeologically focused ACEC. For the past two years URARA (Utah Rock Art Research Association) has been working in cooperation with the MFO archaeologist for the BLM to document the sites along "Wall Street" with the objective of nominating it to the National Register. We would like to see this project continue when a new archeologist is named for the district. The "Wall Street" area receives high visitation and should be managed to minimize visitor impact and to provide interpretation and education. | The Wall Street rock art district is contained within the ACEC boundary in Alt C (the boundary does not differ between Alts B and C for the Highway 279/Shafer Basin/Long Canyon ACEC.<br><br>National Register nominations can be done at any time; they are not a land use planning issue. |
| | 492 | 7 | Canyon Rims – The BLM recommendations for the Canyon Rims potential ACEC says that the area qualifies for an ACEC but Alternative C does not include this area as an ACEC. Which is a bit confusing. It is difficult to determine the boundaries of this district from the maps provided. However, we are concerned that it includes Lockhart Basin which has documented archaic archeological sites. Alternative B provides no cultural resources protection. We would like to see cultural protection in the Lockhart Basin portion of this district. | The commentor's preference that the Canyon Rims potential ACEC be included in Alternative C is noted. In the preferred alternative (Alt C), this portion of the Canyon Rims is managed as controlled surface use for oil and gas leasing, as it is designated as VRM II. Surface disturbing activities must meet the constraints of VRM II management (see Appendix C of the DRMP/EIS). The BLM contends that the prescriptions provided in Alt C are sufficient to protect visual resources along the rims of the Canyon Rims area.<br><br>Refer to response to comment 124-69. |

BLM_0012054

| | | | | Lockhart Basin is entirely within the Monticello BLM planning area. |
|---|---|---|---|---|
| | 492 | 8 | Mill Creek may be the richest source of archeological information within the Moab district. To quote the proposed management plan document "Cultural resources are extensive and span the entire prehistoric context" (page 3-130) and "Mill Creek Canyon's cultural resources have also been identified as being of exceptional importance to Native Americans" (page 3-131). Rock art panels are extensive and meet National Register qualifications. Potential for research questions may be addressed in Mill Creek Canyon because many of the sites have greater depth and integrity than those in other areas.<br><br>The supplied maps are insufficient to indicate whether the culturally rich uplands are included. It is imperative that these lands be protected within an archaeologically focused ACEC.<br><br>We are concerned about a proposed residential development on SITLA land immediately adjacent to this area. We believe that strong cultural resource protection needs to be in place prior to the completion of this development. | Mill Creek Canyon Potential ACEC is designated as an ACEC in Alternative B and C.<br>Under both alternatives, the area would be prioritized for Class II inventory and would protect native American traditional cultural places.  Alt C does manage the Mill Creek uplands as part of the Mill Creek Canyon ACEC. The Mill Creek Canyon ACEC in Alt C differs from  Alt B only in that the WSA acreage is removed from the ACEC in Alt. B.<br><br>Under All Action alternatives, Mill Creek Canyon would have a cultural resource priority of scientific of prehistoric sites and cultural landscapes and would be managed in accordance with the Mill Creek Management Plan (2001).<br><br>Refer to response to comment 124-69.<br><br>Actions on SITLA lands are not within the authority of the BLM. |
| | 492 | 9 | Upper Courthouse – We recommend Alternative B for this proposed ACEC. Upper Courthouse with its riparian areas has a high density of archaeological sites. Known sites exist near Hidden Valley, Brink Spring, Bartlett Wash, and unnamed drainages to the north. The Courthouse Rock area has already experienced vandalism to rock art panels (The Buffalo Blue was rubbed out several years ago) and recreational use in this area continues to be high and is increasing in intensity each year. We believe active protection of archeological sites needs to extend beyond grazing to | The commentor's preference that the Upper Courthouse potential ACEC be designated as proposed in Alt B is noted.<br><br>Refer to response to comment 124-69.<br><br>The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria. The BLM can choose management actions from within the range of alternatives. |

BLM_0012055

| | | | also include visitation. | |
|---|---|---|---|---|
| | | | | All cultural sites, including those in the Upper Courthouse area, are fully protected by the law.  The Upper Courthouse area is part of the Labyrinth Rims/Gemini Bridges SRMA.  This enables the BLM to manage recreationists in a more intense manner.  This area is one in which camping must occur at designated sites. |
| | 492 | 10 | Kane Creek Canyon – We do not see any proposed protection under ACEC for the BLM land along the south side of the Colorado River downstream from Moab and up Kane Creek. This area is dense with rock art and other archeological sites of national register quality. It is being documented as part of the proposed Wall Street rock art district. This area receives high visitation, is experiencing non-approved off-road vehicle use, and need appropriate protection and interpretation at highly visible rock art sites. We believe this area from the Moonflower Site up canyon for approximately 6.5 miles needs to be protected under an archeologically focused ACEC.<br><br>Page 2-8 proposes scientific restoration of archeological sites from Highway 191 to Kane Creek Canyon. We see no reason to stop at Kane Creek Canyon and suggest that this restoration continue within our proposed area. | Kane Creek Canyon is included in the Behind the Rocks ACEC, which is included in the preferred alternative. Archeology is a relevant and important value of the Behind the Rocks ACEC.   In addition, the area referred to by the commentor is managed as part of the Colorado Riverway SRMA.  This designation gives the BLM the ability to manage recreationists.  In addition, all cultural sites, including rock art, are fully protected by law. |
| | 492 | 11 | Seven Mile Canyon – Seven Mile Canyon is an area with many national register quality rock art sites. The campground is located at the mouth of the canyon and the road through the canyon recently washed out. We recommend that this road and campground should not be re-established. We also recommend that this area be included in an archeologically focused ACEC. | The commentor's preference that Seven Mile Canyon be established in an archeologically focused ACEC is noted.<br><br>The camping area at the mouth of Seven Mile Canyon has been closed since 2006.  As part of an SRMA, this area can be managed for camping management.  The BLM intends to keep the Seven Mile Canyon area closed to camping.<br><br>The road in Seven Mile Canyon is designated in Alt. C; however, it has been truncated closer to Highway 313. |

BLM_0012056

| | | | | Refer to response to comment 124-69. |
|---|---|---|---|---|
| | 492 | 13 | Klondike Bluffs – It is not clear from the maps if there is any special protection for the rock art sites located at Klondike Bluffs outside of Arches National Park. We recommend an archeologically focused ACEC for this region if it is not protected. | The commentor's preference that the Klondike Bluffs be designated as an ACEC is noted.  This area was not proposed during scoping to be considered as an ACEC by either the public nor by BLM staff.  All archaeological sites are protected by law, including all rock art sites.  Refer to response to comment 124-69 regarding ACEC designation. |
| U.S. Fish and Wildlfie Service | 586 | 10 | page 3-125, section 3.15.1.1.2.2 (bookcliffs wildlife area ) Is the clay reed mustard within the Moab Planning Area? | The USFWS is correct.  This is an error.  The clay reed mustard is not within the planning area;   it is only within Uintah county. |
| U.S. Fish and Wildlfie Service | 586 | 11 | page 3-125, section 3.15.1.1.2.2. (bookcliffs wildlife area ) typo-Jones cycladenia, with a small c. | The Jones cycladenia is not found in the Bookcliffs area. The text has been corrected. |
| U.S. Fish and Wildlfie Service | 586 | 12 | page 3-127, section 3.15.1.2.5 (colorado River corridor ACEC) 4th paragraph mentions "two state sensitive rare plants" but the State of Utah has no sensitive plant list.  Are these listed on the UNPS rare plant guide or NatureServe? | The sentence has been changed to "Two BLM sensitive plants, alcove rock daisy ( perityle specuicola)and alcove bog orchid (habenaria zothecina) occur in Negro Bill Canyon." |
| U.S. Fish and Wildlfie Service | 586 | 13 | page 3-127, section 3.15.1.2.5 (colorado River corridor ACEC) 4th paragraph  "Alcove rock daisy (listed)": listed by whom, and what is the latin name? | See response to comment 586-12. |
| U.S. Fish and Wildlfie Service | 586 | 14 | page 3-128, section 3.15.1.2.5 The Colorado River Corridor ACEC "...contains about one quarter of all threatened Jones cycladenia plants."  Does this mean within the MPA or across the range of the species? What is the source of this information (citation)? | The sentence has been changed to read: "The potential ACEC also contains threatened Jones cycladenia plants." |
| | 634 | 1 | Federal law requires the BLM to give priority to the protection of lands which qualify as Areas of Critical Environmental Concern because of scenic, cultural, or ecological importance. However, the Moab BLM plan would fail to protect 90 percent of the 613,077 acres which qualify for ACEC designation. Please revise the | See response to comment 124-68 regarding ACEC designations. |

BLM_0012057

| | | | | |
|---|---|---|---|---|
| | | | RMP to reduce the destructive and redundant web of ORV routes. The Moab area, as with the rest of the state, should provide opportunities for traditional non-motorized use and provide ecological havens for the long-term health of the land, the wildlife, the water, and other natural and cultural resources. | |
| | 823 | 3 | Designation of the White Wash area as an ACEC in Alt B. This is an area of longstanding sustainable motorized use over many decades, and there is no basis for the caving in to the desires of extremists in designating the area as an ACEC. | Alternatives A, C (the preferred Alternative) and D do not designate White Wash as an ACEC. Refer to response to comment 124-69. |
| | 939 | 1 | First, I'd like to mention the Areas of Critical Environmental Concern (ACECs). There is an incredibly huge difference between Alt. B and C with regards to ACECs. Fourteen of them are brought forward in B, encompassing 613,000 acres. Alt. C only brings forward 5 ACECs with _3,000 acres. There is no balance in Alt. C. It does not adequately preserve critical areas. It does not recognize the need for maintaining diverse and wild lands for their senic beauty, solitude, and the preservation of species. I am particularly concerned about the vulnerability of the Book Cliffs region, with it's abundance of natural beauty and cultural/ wildlife resources. The 5 ACEC's proposed in Alt. C are completely inadequate and unacceptable. | See response to comment 124-68, 124-69,  and 124-5 regarding ACEC designations |
| | 948 | 1 | Federal Law requires the BLM to give priority to the protection of lands which qualify as "Areas of Critical Environmental Concern" because of senic, cultural or ecological importance. However, the Moab BLM plan would fail to protect 90% of the 613,077 acres which qualify for ACEC designation. Please revise the RMP to reduce the destructive and redundant web or ORV routes. The Moab area, as with the rest of the state, should provide opportunities for traditional non-motorized use and provide ecological havens for the long-term health of the land, the wildlife, water and other natural and cultural resources. | See response to comment 124-68 regarding ACEC designations. |

BLM_0012058

| | 963 | 1 | Labyrinth Canyon- the Green River flows through Labyrinth into Canyonlands National Park, a river segment that has long been enjoyed by the public on float trips. The area has valuable habitat for desert bighorn sheep and pronghorn antelope. It should be protected by barring ORVs and oil/gas leasing from the canyon and its rims and approaches, including Ten Mile Canyon, Ten Mile Point, White Wash, Hell Roaring Canyon, Mineral Point, Horsetheif Point, Deadman Point, and Springs Canyon Point. An "Area of Critical Environmental Concern" (ACEC) should be designated to protect this entire area. | Although Labyrinth Canyon is not proposed as an ACEC in Alt C, many management decisions protect the values brought up by the commentor.  Desert bighorn sheep habitat and migration corridors are protected by the imposition of a no surface occupancy (NSO) stipulation for oil and gas leasing and all other surface disturbing activities.  The Green River, Ten Mile Canyon, Hell Roaring Canyon, Mineral Canyon and Spring Canyon are managed with an NSO stipulation.  Areas near the rim of the Green River (such as Deadman Point, Horsethief Point, Mineral Point and Spring Canyon Point) are also managed with a no surface occupancy stipulation for oil and gas leasing and all other surface disturbing activities.<br><br>All motorized travel in the Labyrinth area is limited to designated routes.  The Travel Plan for Alt C designates some, but not all, existing routes. |
| | 963 | 3 | Colorado River Corridor- Fisher Towers and Mesa, Dome Plateau, the Dolores River and its tributaries should be part of protected ACEC barring ORVs and mineral leasing. Visitors to Moab are enjoying this area by float trips, horse riding, hiking, and siteseeing along Highway 128 on the way to Moab. It is also central in the panoramas people enjoy from popular viewpoints in Arches National Park. ORV traffic and oil/gas drilling would mar these grand views. | In the preferred alternative (Alt C), the Colorado River Corridor, including Highway 128, is managed as no surface occupancy or as closed for oil and gas leasing. Surface disturbing activities are prohibited in areas delineated as no surface occupancy (see Appendix C of the DRMP/EIS). In this alternative the area is designated as VRM II. Therefore, the BLM contends that the management actions proposed in Alt C are sufficient to protect visual resources and to prevent harm to wildlife and plant habitat along the Colorado River. |
| Howard County Bird Club | 972 | 6 | The Labyrinth Canyon segment includes habitat for desert bighorn sheep (lambing and rutting habitat), pronghorn antelope, and burrowing owl (maps 2-26, 2-25, 2-24 respectively). It is also a highly valued route for visitors enjoying a quiet float trip. The intrusion of ORVs and oil/gas activities should not be allowed here. We urge BLM to establish the Labyrinth ACEC, expanding it eastward to cover the desert bighorn lambing and migration areas and merging it with the proposed Tenmile and White Wash ACECs. Mesas and | Oil and gas leasing and all other surface disturbing activities are prohibited in Alt. C along the Green River and up into its major tributaries (Ten Mile, Spring, Hell Roaring and Mineral Canyons).  These prohibitions are imposed to protect the important wildlife habitat that is within these canyons and along the Green River.<br><br>The entire Greeen River, with the exception of the area between Swasey's Rapid and the San Rafael River, is recommended for Wild and Scenic River designation in |

54

| | | | tributaries associated with Labyrinth should be included in the ACEC to protect riparian and upland habitats, including Hell Roaring Canyon, Mineral Point, Horsetheif Point, Deadman Point, Spring Canyon Point, and Tenmile Point. The Green sould be recommended for Wild and Senic River status. | the preferred alternative.<br><br>All OHV use along the Green River is limited to designated routes.  All these routes were constructed and have been in use for many years. |
|---|---|---|---|---|
| Howard County Bird Club | 972 | 7 | We commend BLM for ACEC proposal for White Wash sand dunes. We urge you to expand it to cover the entire dunes, cottonwood groves, water sources, and adjoining riparian habitat and desert bighorn sheep habitat. | The ACEC proposal for White Wash Sand Dunes is proposed only in Alt. B.<br><br>In Alt C, measures are proposed to protect the cottonwood groves and water sources.  The Duma Point area (where the bighorn habitat is) is proposed to be managed as no surface occupancy for oil and gas and all other surface disturbing activities. The White Wash area in Alt C includes approximately 2,000 acres of open area. The entire area surrounding the dunes would be managed as limited to designated routes in Alt C. |
| Howard County Bird Club | 972 | 9 | Our members visited the Canyon Rims Recreation area and Hatch Point. This is an excellent area for visitors seeking an easily accesible view of the Needles section of Canyonlands National Park and a grand panorama of canyon country. Go___ roads lead from State Highway 191 to Needles Overlook and three other viewing sites along the western rim of Hatch Point. The land between the road and the cliffs is highly valuable for quiet visitor use, where people can watch wildlife and enjoy the great canyon vistas. It is now being degraded by ORV traffic; our members saw tracks of ORVs far from the road. The final plan should close it to ORVs.<br><br>BLM has recognized habitat here for Sage-grouse (map 2-20), Burrowing Owl (map 2-22), Pronghorn kidding habitat (map 2-25), and desert bighorn sheep lambing/rutting habitat (map 2-26-B). We favor the proposed Canyon Rims ACEC, but it only protects the cliffs. We urge the BLM to use ACEC protection, with a closure to ORVs, for the area between the cliffs and | The Canyons Rims Recreation Area is prposed to be managed as an SRMA in Alt. C.  In addition, all travel would be limited to designated routes.  Illegal activity off the designated route system is not a planning issue.  The BLM assumes adherence to laws, regulations and policies.<br><br>The Canyon Rims area is recognized as a special visual resource.  It has a controlled surface use restriction on oil and gas leasing in Alt. C that protects its visual resources from oil and gas development.<br><br>See response to comment 1025-11 for the issue of forbidding OHVs across the planning area. |

BLM_0012060

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | Overlooks Road plus lands on the east side of the road including all the pronghorn kidding habitat (map 2-25) | |
| Howard County Bird Club | 972 | 10 | Members of our club have stayed in Moab as a base for their exploration of the region. With the concentration of visitor services here and growth in population, it is essential to protect the valuable areas of wildlife habitat close to town before more damage is done by ORVs and mineral development. BLM has recognized desert bighhorn lambing/rutting habitat in the Shafer Basin (map 2-26-B) and proposed ACEC. We favor that proposal, plus Behind the Rocks and Mill Creek Canyon ACECs (map 2-14-B) and protection of Goldbar Rim. These areas are essential wild lands for visitors to Moab. | Alt C of the DRMP/EIS proposes to designate the Mill Creek and Behind the Rocks ACECs.  The Goldbar Hiking Focus Area is also managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities.  This stipulation will provide protection for wildlife habitat.

All vehicular travel within the Moab planning area (except for 2,000 acres in the White Wash Sand Dunes) would be limited to designated routes.  The BLM assumes that all visitors would adhere to the Travel Plan. |

## Air Quality

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Arches National Park | 8 | 1 | In Section 3.2, Table 3.2 of the draft RMP/EIS, there are only ozone concentrations for La Plata County and Mesa Verde National Park in Colorado included, though ozone has been monitored at Canyonlands National Park for a number of years and is considerably nearer the area of interest. Those data shouuld be included in the EIS, as well. NPS data shows a deteriorating trend for ozone, which may reflect more current data than that used for the RMP. Data for 2005 are available at www2.nature.nps.gov/air/monitoring/ads/ADSReport.cfm. | This data has been added to applicable table in Chapter 3 of the PRMP/FEIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 13 | The State encourages the BLM to impose air emission standards as lease conditions and conditions of approval for Applications for Permit to Drill. | The BLM does not have the responsibility to set air emission standards.  That responsibility lies with EPA and the State of Utah.  The BLM can only approve actions that meet the National Ambient Air Quality Standards as set by EPA or the State.  Site specific mitigation or conditions of approval may be applied at the APD or implementation |

BLM_0012061

| | | | | phase but not during land use planning and leasing. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 14 | Future air quality analysis should include modeling with the following factors: 1) oil and gas proponents should assume that leasing and exploration will result in full field development, 2) air quality analyses should be cumulative and include not only planned development but existing omission sources, 3) air quality analyses should be based on anticipated worst-case meteorological conditions for each dispersion scenario, 4) air quality analyses should address compliance/attainment with all applicable air quality-related requirements and standards, and 5) air quality analysis should specifically address impacts to sensitive visual resources and other air quality-related values. | The BLM may consider the commenter's recommendation for future air quality modeling and analyses. |
| State of Utah - Public Lands Policy Coordination | 120 | 43 | The air quality analysis assumed all new compressors would operate at a NOx emission rate of 0.7 g/hp-hr (pg. 4-17). How will the BLM ensure this projection for newly permitted compressors. | This figure (0.7 g/hp-hr) was used as an analysis assumption and is based on the best available control technology. Air quality impacts will be analyzed for specific proposed oil and gas development on a case by case basis during the NEPA process. Air quality emission restrictions can be imposed at that time. |
| State of Utah - Public Lands Policy Coordination | 120 | 44 | The air quality analysis assumed well spacing of 40 acres and 40 kilometers. Please confirm this analysis spacing. | The analysis assumption was based on 40 acre well spacing as stated on pg. 4-20. This spacing was utilized because it represents a conservative estimate for the oil and gas operations conducted within the Moab Field Office. The spacing varies by area. |
| State of Utah - Public Lands Policy Coordination | 120 | 45 | Assumptions regarding the number of compressors and dehydrators listed on page 4-20 are inconsistent with those shown in Table 4.7. If the numbers in Table 4.7 are correct and the analysis was based on the numbers discussed in the text, the analysis could significantly understate air quality impacts. | The BLM recognizes this discrepancy and has made appropriate changes to both the table and the text (pg. 4-20) in the Proposed RMP/Final EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 115 | The Draft RMP fails to analyze the impacts of climate change to MFO resources. Soil disturbing activities such as recreation, grazing, and energy exploitation reduce or remove the natural components that stabilize desert soil, increasing soil loss through wind and water | A growing body of scientific evidence supports the concern that global climate change will result from the continued build-up of greenhouse gases in the atmosphere. While uncertainties remain, particularly in the area of exact timing, magnitude and regional impacts |

BLM_0012062

| | | | | |
|---|---|---|---|---|
| | | | erosion.  The BLM should design alternatives that minimize soil disturbance.  BLM should designate an alternative with far fewer than the 2600 miles of back country ORV routes that alternative C contains.  The cumulative effects of various uses like ORV recreation and grazing should be considered in the context of climate change.  The BLM is urged to develop and adopt an alternative that minimizes the extent of soil disturbance and reduces the Field Office's vulnerability to the effects of climate change. | of such changes, the vast majority of scientific evidence supports the view that continued increases in greenhouse gas emissions will lead to climate change.  This information was added to Chapter 3 of the PRMP/FEIS.<br><br>The EPA has not developed regulatory protocol or emission standards regarding global climate change.  When these protocols and standards are available, the BLM will analyze potential effects to global warming in the NEPA documentation prepared for site-specific projects.  All information to this effect was added to the PRMP/FEIS. |
| Samson | 201 | 7 | On page 2-7 of the Moab DRMP/EIS the BLM proposes the following management action common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks." See Moab DRMP/EIS, pg. 2-7. The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and confuses the BLM's authority over air quality and air emissions.<br>The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act. 42 U.S.C. §§ 7401 et seq. Under the express terns of the CAA, the Environmental Protection Agency (EPA) has the authority to regulate air emissions. In Utah, the EPA has its authority to the State of Utah, Department of Environmental Quality (UDEQ). The BLM has not, and under the CAA cannot, be delegated such authority. ….The BLM must eliminate or revise the proposed management action. | See response to comment 214-10. |
| Samson | 201 | 8 | The BLM's authority to manage potential visibility | See response to comments 214-10 and 214-11. |

58

| | | impacts is similarly limited by existing federal law. Under the CAA, a federal land manager such as the BLM only has the authority to evaluate and consider whether a "proposed major emitting facility will have an adverse impact" on visibility within designated Class I areas. 42 U.S.C. § 7475(d)(2)(B) (2006). Even then, the final decision whether to approve the siting of the facility rests with the state and EPA, not the federal land manager. With respect to oil and gas development, BLM's role is even more limited because oil and gas operations do not meet the definition of a major emitting facility. Further, under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407(a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410(a)(2)(J). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no such jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Accordingly, the BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts. With these limitations in mind, the BLM must revise its air quality management goal on page 2-7 of the Moab DRMP/EIS. The BLM cannot attempt to impose air emission regulations through its normal management responsibilities. Further, even assuming the BLM had the authority to regulate air quality or emissions, the management goal is poorly worded and could lead to increased litigation. Opponents to natural gas development would likely suggest the above proposed management action prevents the BLM from authorizing actions that may increase emissions within the planning | |

59

| | | | | |
|---|---|---|---|---|
| | | | area. Opponents to natural gas development have used similar language in the existing RMPs in the States of Utah and Wyoming to suggest not only that BLM has authority over air quality, but that the BLM cannot authorize actions which may impact air quality. The BLM must revise its air quality goal to state that BLM's only management goal, objective, or action will be to ensure the BLM does not interfere with the UDEQ's permitting authority. In the event the BLM unwisely retains the potentially illegal objective contained in the Moab DRMP/EIS, the BLM must include clear language in the RMP disavowing any attempt by BLM to regulate air emissions or air quality in the planning area. | |
| Cabot Oil and Gas Corporation | 202 | 8 | On page 2-7 of the Moab DRMP/EIS the BLM proposes the following management action common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks." See Moab DRMP/EIS, pg. 2-7. The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and potentially unreasonably limits the BLM's ability to effectively manage public lands. The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act. 42 U.S.C. §§ 7401 et seq. Under the clear provisions of the CAA, the EPA and delegated states, such as Utah, have the authority to regulate air emissions. The Secretary of the Interior, through the Interior Board of Land Appeals (IBLA) has recognized that in states such as Wyoming and Utah, the Department of Environmental Quality, not the BLM, has the authority over air emissions. | See response to comment 214-10.<br><br>The BLM recognizes that it does not have the responsibility to set air emission standards. That responsibility lies with EPA and the State of Utah. The BLM's can approve actions that meet the National Ambient Air Quality Standards as set by EPA or the State. |

BLM_0012065

| Cabot Oil and Gas Corporation | 202 | 9 | The BLM similarly lacks authority over potential visibility impacts. Under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407 (a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410 (a)(2)(J). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Under CAA, a federal land manager's authority is strictly limited to considering whether a "proposed major emitting facility will have an adverse impact" on visibility within designated Class I areas. 42 U.S.C. § 7475(d)(2)(B) (2006). Oil and gas operations do not meet the definition of a major emitting facility and, thus, federal land managers have even less authority. The BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts. Even then, the final decision whether to approve the siting of the facility rests with the state and EPA, not the federal land manager. With respect to oil and gas development, BLM's role is even more limited because oil and gas operations do not meet the definition of a major emitting facility. Further, under the CAA, the regulation of potential impacts to visibility and authority over air quality in general, rests with the UDEQ. 42 U.S.C. § 7407(a) (2006). The goal of preventing impairment of visibility in Class I areas will be achieved through the regional haze state implementation plans (SIPs) that are being developed. 42 U.S.C. § 7410(a)(2)(J). Although federal land managers with jurisdiction over Class I areas may participate in the development of regional haze SIPs, the BLM has no | See response to comment 214-10. |

BLM_0012066

| | | | | |
|---|---|---|---|---|
| | | | such jurisdiction in Utah. 42 U.S.C. § 7491 (2006). Accordingly, the BLM has no authority over air quality and cannot impose emissions restrictions, either directly or indirectly, on natural gas operations in Utah, particularly if the overall goal is to reduce potential visibility impacts. The BLM cannot attempt to impose air emission regulations through its normal management responsibilities and must revise the objective on page 207 of the Moab DRMP/EIS. Even assuming the BLM had the authority to regulate air quality or emissions, the management goal is unclear and could lead to additional challenges or litigation. Opponents to natural gas development on public lands could, and likely would suggest the above goals prevent the BLM from authorizing actions that may lead to increase emissions within the planning area. Opponents to natural gas development have used similarly phrased language in the existing RMPs in the States of Utah and Wyoming to suggest not only that BLM has authority over air quality, but that the BLM cannot authorize actions which may impact air quality. The BLM must revise its air quality goals to more accurately reflect its lack of authority over air quality. In the event the BLM unwisely retains the potentially illegal objective contained in the Moab DRMP/EIS, the BLM must include clear language in the RMP disavowing any attempt by BLM to regulate air emissions or air quality in the planning area. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 45 | In section 3.2.2, Status of Emissions page 3-8, it states that the emissions sources with in the MPA consist mostly of oil and gas development facilities. However, as in many areas, mobile sources contribute significantly to any air pollution. Given the large amount of vehicular traffic for tourism and OHV recreation, mobile sources are likely a large contributor of emissions in the MPA, and should be included in the analysis. In fact, the source attribution work done by the | Data regarding non-point source emissions (including OHVs) are listed on pg. 3-9 under "Additional Sources of Emissions".  Section 3.2.2 lists point emission sources. |

BLM_0012067

| | | | Colorado Department of Public Health and Environment (CDPHE) for the Denver ozone area showed a low contribution from oil and gas and the New Mexico Environment Department's work around ozone in the Farmington, NM area also showed contribution from oil and gas sources. In both cases, the largest source was boundary conditions transporting into the region. | |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 46 | IPAMS does not believe that the DRMP/EIS achieves the right balance of resource protection and energy development. The Moab Field Office has undervalued the oil and gas resource potential in the MPA, and feels free to place major restrictions on development of that resource. The DRMP/EIS places many layers of restriction on oil and gas development, while at the same time down playing the extent of those restrictions. The final RMP/EIS should be revised to reduce the restrictions, and the BLM should not incorporate additional aspects of Alternative B in the Record of Decision. The BLM should be following the dictates of the EPCA to reduce restrictions and encourage development of energy resources, not increase restrictions.<br><br>The Moab DRMP/EIS has failed to adequately consider reasonable access to federal and private minerals and to consider the effects it proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy.<br><br>Many of the new restrictions specified in the DRMP/EIS are unnecessary since oil and gas producers currently comply with existing laws protecting water, air, cultural, and other resources.<br><br>Please select Alternative A or D in the final RMP, and not Alternative B, which would severely restrict the economic growth of Grand and San Juan counties. Please ensure that the restrictive aspects of Alterative B are not added to the alternative that is ultimately | The BLM has identifed Alt C as the preferred alternative, which  the BLM contends reaches a balance between resource protection and resource production.<br><br>The BLM has proposed restrictions in Alt. C to protect resource values.   These restrictions represent the minimal necessary to protect these values.  For example, the visual restrictions imposed surrounding Arches National Park are controlled surface use.  Controlled surface use is the least restrictive to protect the viewshed from Arches while still allowing for oil and gas development.  The land around Arches National Park could have been restricted with a no surface occupancy stiipulation, but this stipulation was not deemed to be the least restrictive stipulation. |

63

BLM_0012068

| | | | selected. | |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 10 | The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act.. The BLM does not have authority to regulate emissions in Utah.  The BLM must eliminate or revise the proposed management action. | We agree that the BLM does not have direct authority over air quality or emissions under the Clean Air Act.  The State of Utah has primacy for compliance with the CAA.  Permitted activities must meet air quality standards set by the State or the Environmental Protection Agency.  The BLM and its permittees are subject to compliance with air quality standards. The goal stated for Air Quality in the DRMP/EIS (pg. 2-7) states "Maintain existing air quality and air quality related values by ensuring that all authorized uses on public lands comply with and support Federal, State, and local laws and regulations for protecting air quality". This statement does not imply that the BLM has the authority to regulate emissions or air quality.  However, the BLM must ensure that all permitted activities on public lands are in compliance with air quality standards.  Under Management Common to All for Air Quality in the DRMP/EIS pg. 2-7 it states "Manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards. |
| Bill Barrett Corporation | 214 | 11 | In anticipating potential air quality impacts the BLM also misunderstands the nature of oil and gas emissions.  Emissions from oil and gas operations are not simply a matter of the number of wells in a particular area.  The BLM should not attempt to impose restrictions on air quality through the RMP process.  The BLM must revise its air quality goal to state that BLM's only management goal, objective, or action will be to ensure that the UDEQ is invited to participate in the NEPA process as part of the State of Utah's cooperating agency status. | Our estimate of air quality impacts was based on the best available information and basic analysis assumptions.  The commentor provides no specific information on how the analysis was in error.  Refer to response to comment 214-10. |
| EnCana Oil and Gas (USA) Inc. | 215 | 6 | The 1-hour ozone standard of 0.12 ppm shown in Table 3.2 was revoked by the EPA in June 2005.  The table should be corrected. The ozone concentration for Mesa Verde National Park | The BLM will comply with whatever air quality standard is in place at the time of permitting actions. |

64

BLM_0012069

| | | | | |
|---|---|---|---|---|
| | | | of 0.078 ppm shown in Table 3.2 does not agree with the concentration of 0.070 shown in the table on the National Park service website (http://www2.nature.nps.gov/air/monitoring/exceed.cfm). The source of the data in Table 3.2 is not clear.  It is important to note, however, that the comparison to the ozone NAAQS is the 4th highest daily maximum 8-hour average, averaged over three years.  For Mesa Verde National Park, using the three-year average of 2001, 2002, and 2003, the average for compliance comparison is 0.067 ppb.  In addition, due to rounding, an exceedance of the standard is not binding until a three year average is 0.085 ppb or higher.<br>The statement in the first paragraph on page 3-9, "The UDEQ indicated that ozone concentrations in Class I areas of the western states have shown significant increases in the past decade and are approaching the NAAQS level" is not supported by the table from the National Park Service.  Only in Rocky Mountain National park did ozone levels peak in 2002 and 2003; the levels have since dropped | |
| EnCana Oil and Gas (USA) Inc. | 215 | 15 | The assumption on page 4-18 that a control efficiency of 37% would be obtained by watering of all exposed disturbance areas is inconsistent with the assumption on page 4-16 that 50% control of particulate emissions would be obtained by watering.  The DRM should be corrected to consistently reflect the assumptions actually used in the quantification of impacts | The PRMP/FEIS has been corrected in Chapter 4 on air quality to reflect consistent assumptions. |
| EnCana Oil and Gas (USA) Inc. | 215 | 16 | The assumption on page 4-17 that flaring emissions are primarily NOx and CO is incorrect.  Flares are used to dispose of unrecoverable gas emerging concurrently with the crude oil.  During flaring, gaseous methane reacts with atmospheric oxygen to form primarily carbon dioxide and water.  Other minor emissions from flaring include unburned hydrocarbons, CO, and other partially burned and altered hydrocarbons.  Acetylene (non-HAP) is typically formed as a stable intermediate | This assumption was based on the Vernal Air Quality modeling. See Trinity and Nicholls 2006 for justification of assumptions. |

65

BLM_0012070

| | | | | |
|---|---|---|---|---|
| | | | product; however, acetylene formed in combustion reactions may react further to form polycyclic hydrocarbons (HAP).  Flaring operations usually achieve at least 98 percent combustion, such that hydrocarbon and CO emissions amount to less than two percent of the hydrocarbons in the gas stream (U.S. Environmental Protection Agency (EPA). 2005. AP 42, Fifth Edition Compilation of Air pollutant Emission Factors, Volume 1: Stationary Point and Area Sources). | |
| Fidelity Exploration and Production Co. | 221 | 17 | The DRMP reads" "Flaring emissions applicable to this analysis were assumed to be primarily NOx and CO" (p.4-17).  This assumption is incorrect.  Flares are used to dispose of unrecoverable gas emerging concurrently with the crude oil.  During flaring, gaseous methane reacts with atmospheric oxygen to form primarily carbon dioxide and water.  Other, minor emissions from flaring include unburned hydrocarbons, CO, and other partially burned and altered hydrocarbons (HAP).  Flaring operations usually achieve at least 98 percent combustion, such that hydrocarbons and CO emissions amount to less than two percent of the hydrocarbons in the gas stream (U.S. Environmental Protection Agency (EPA). 2005. AP 42, Fifth Edition Compilation of Air Pollutant Emission Factors, Volume 1: Stationary Point and Area Sources) | This assumption was based on the Vernal Air Quality modeling. See Trinity and Nicholls 2006 for justification of assumptions. |
| Fidelity Exploration and Production Co. | 221 | 21 | The DRMP reads: "It was assumed that watering of all exposed disturbance areas…would occur as appropriate…a conservative control efficiency of 37%...was assumed…" (p.4-18).  This statement is contradicted in the DRMP:  "It was also assumed that…50% control of particulate emissions would be obtained by watering" (p.4-16) The DRMP should be corrected to consistently reflect the assumptions actually used in the quantification of impacts | Analysis assumptions relating to control efficiencies have been made consistent within the document and with modeling done for the Vernal FO. The assumptions include a 25% efficiency for watering and a 75% efficiency for graveling of roads. It is assumed that 10% of roads would be watered and 40% of roads would be graveled. |
| | 470 | 1 | We are in crisis mode with the overuse  of C02 and shortage of fuel causing intense pollution. At present clear days are rare, usually only after snow or rain. The | See responses to G-479-21 and G 479-3 regarding emissions from OHV use and global warming issues, respectively. |

BLM_0012071

| | | | | |
|---|---|---|---|---|
| | | | air quickly becomes polluted again. We don't know yet the extent of the damage Done by OHVs and pollution. | |
| Environment Preservation Foundation | 478 | 4 | There is some information on projected emissions from a variety of equipment used in a variety of ways in the Draft in Section 3.2.  What the section does not address is the fact that most of the sources of hazardous emissions are small individual sites like compressors at well sites.  Under existing law, emission control equipment at these locations can be shut down and not monitored if the source falls under certain thresholds of emissions. | See response to comment 214-10. |
| Environment Preservation Foundation | 478 | 5 | Given the projections for continued growth in the mineral extraction activities within the Moab District, it is safe to assume that single sources of undesirable emissions will increase significantly. The Draft fails to consider the cumulative impact from these sources from what is really a single source or project (oil and gas extraction). The BLM needs to take a broader view of the cumulative impact from these sources and insist upon the use of newer technologies that are now coming available to reduce or eliminate these hazardous air pollutants. | See response to comment 214-10 and 214-11. |
| Environmental Protection Agency | 479 | 1 | The BLM (in Table 4-8 of the DRMP/EIS) indicates that projected concentrations (of air pollutants) would be below National Ambient Air Quality Standards for criteria pollutants and hydrogen sulfide, but does not show the concentrations.  The DRMP/EIS does not describe the methods used to calculate the projected concentrations.  EPA recommends that the BLM disclose this information in the Final RMP/EIS. | The methods used to calculate the projected concentrations of pollutants and hydrogen sulfide are included in the PRMP/FEIS. |
| Environmental Protection Agency | 479 | 2 | The air quality analysis omits potential impacts to ozone, visibility or deposition.  The planning area encompasses class I National Park Service airsheds. Ozone is of particular concern because of the potential emissions of volatile organic compounds and oxides of nitrogen from oil and gas development. | Analyses of impacts on ozone, visibility, and deposition are included in Chapter 4 of the PRMP/FEIS. |

67

BLM_0012072

| Environmental Protection Agency | 479 | 3 | The Final RMP/EIS should include information on the effects of oil and gas development on climate change (from CO2 emission).  EPA recommends that the BLM encourage oil and gas lessees to participate in EPA's Natural Gas STAR program. | A growing body of scientific evidence supports the concern that global climate change will result from the continued build-up of greenhouse gases in the atmosphere.  While uncertainties remain, particularly in the area of exact timing, magnitude and regional impacts of such changes, the vast majority of scientific evidence supports the view that continued increases in greenhouse gas emissions will lead to climate change.  This statement has been added to Chapter 3 of the PRMP/FEIS.<br><br>The Environmental Protection Agency (EPA) has not developed regulatory protocol or emission standards regarding global climate change.  When these protocols and standards are available, the BLM will analyze potential effects to global warming in the NEPA documentation prepared for site-specific projects.  A statement to this effect has been added to Chapter 4 of the PRMP/FEIS. |
| Environmental Protection Agency | 479 | 4 | Because a semi-quantitative approach to air quality analysis was taken in the Moab RMP, it is not possible to determine potential impacts to air quality from specific oil and gas development (see Section 4.3.1.3 of the DRMP/EIS).  Nevertheless, it is important to assign responsibility for project-specific air quality analyses for the future.  EPA recommends that the Final RMP/EIS contain this wording from the Rawlins BLM DRMP/EIS, which also used a comparative, emissions-based approach:  "As project-specific developments are proposed, quantitative air quality analysis would be conducted for project-specific assessments performed pursuant to NEPA." | A statement has been added to Chapter 2 of the PRMP/EIS, under Management Common to All, which states the following:  "As appropriate, quantitative analysis of potential air quality impacts would be conducted for project specific developments. |
| Environmental Protection Agency | 479 | 19 | On pg. 4-17 of the DRMP/EIS, the BLM discusses rates of emissions from compressor engines in grams per horsepower-hour.  Table 4.6 shows emission rates in grams per second, but the text does not explain whether BLM made this calculation in order to estimate impacts using the semi-quantitative method or for some | The text and tables in Chapter 4 of the PRMP/EIS have been modified to provide an explanation regarding the units of analyses. |

BLM_0012073

| | | | other reason. An explanation is needed in the Final RMP/EIS as to why different units appear in this section, or convert emission rates to the same units. | |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 20 | In the Final RMP/EIS, the BLM should address the potential for wind events and the contribution of erosion-prone soils to them. The Final RMP/EIS should also address the BLM's plans to mitigate the impact of wind events. | The potential for wind events is addressed on pg. 3-4 and pg. 3-9 of the DRMP/EIS. Management actions proposed under the preferred alternative that would reduce wind blown dust include 1) eliminating cross country travel by limiting OHV use to identified routes and 2) timing restrictions on surface disturbing activities in sensitive soils. |
| Environmental Protection Agency | 479 | 21 | The BLM should provide more specific information on the role of increased OHV use in potential air quality impacts and whether/how the BLM's decision to move to a designated recreational trail system may affect this. The BLM should present details of its estimates of increases in OHV use (e.g. in vehicle-miles traveled or similar measure). | On pg. 4-26 of the DRMP/EIS it identifies a moderate benefit to air quality by restrictions to cross country travel. The effects of OHV use on air quality is discussed on pg. 3-9 of the DRMP/EIS. On pg. 3-157 the increase in OHV use is recognized. Specific quantifiable details on the impacts of OHV use are not available. Land use planning level decisions involve broad resource allocations and qualitative analysis is often all that is available. Further site specific analysis on the impacts to the resources specified by the commentor will be conducted on the project level. |
| | 826 | 1 | In the time available for review of the document, I did not find a discussion of air or water pollution in the alternative discussion. I submit that these will be a problem that should be addressed in considering more intense alternatives, such as C and D. | Analyses of impacts on air quality and water resources are included in Chapter 4 of the PRMP/FEIS. A statement has been added to Chapter 2 of the PRMP/EIS, under Management Common to All, which states the following: "As appropriate, quantitative analysis of potential air quality impacts would be conducted for project specific developments. |
| National Parks Conservation Association | 970 | 1 | BLM's air quality analysis is flawed because they have utilized old data in the visibility analysis for Class I areas. The visibility trend is from 1988 to 1997. However, according to the National Park's Service's 2005 GPRA report, the air quality for Arches and Canyonlands is deteriorating. BLM erroneously states that Table 3.2 contains "the most recent available data for each pollutant." More recent adapt from 2005 and | Table 3.2 has been updated with 2007 air quality data. |

BLM_0012074

| | | | | |
|---|---|---|---|---|
| | | | 2006 is available. This analysis is further severely flawed because BLM has failed to incorporate the air quality data from Canyonlands monitoring station in Table 3.2, Ambient Air Quality Data for the MPA and has not utilized this data in its analysis. | |
| National Parks Conservation Association | 970 | 4 | BLM fails to address potential impacts from ozone due to oil and gas development. According to the National Parks Service, "Tropospheric (ground-level) ozone concentrations were monitored in the park from 1987-1992, and are currently monitored in Canyonlands NP, 1992-present. An analysis of the data indicates that ozone concentrations have significantly increased in the park. The observed concentrations in Canyonlands NP fall within a range that may produce visible effects or growth effects on sensitive plant species under certain conditions. It is likely that ozone concentrations in Arches NP are similar." NPS goes on to state "Several plant species that occur in Arches NP are known to be sensitive to ozone (e.g., Rhus trilobata)." Studies already conducted in other Utah national parks including Bryce, Zion and Cedar Breaks have demonstrated symptoms of "ozone injury" on plant species.<br><br>BLM has relied on out-dated air quality trend data in determining their preferred alternative will have no impacts on the air quality in the affected Class I airsheds. The BLM is obligated to re-analyze their finding based on the most current air trend data, which is already showing a decline in air quality.<br>In Chapter 4.3.1 BLM states incorrectly "Background CO, Nox, and SO2 concentration information was not available within the MPA." They have again ignored air data from Canyonlands monitoring station and should be required to re-asses the air quality data utilizing the most comprehensive data. | Predicting ozone associated with oil and gas development requires air dispersion modeling, which was not used in this analysis. Estimated emissions of NOx and VOCs are included in the analysis, both of which are precursors to ozone formation. Increases in VOCs and NOx are estimated to be 7% and 4% respectively under the PRMP. |
| National Parks | 970 | 5 | Projected emissions rates for gas compressors (Table | Chapter 2 of the DRMP/EIS on pg. 2-7 states that the |

BLM_0012075

| Conservation Association | | | 4.6) were based on best available technology limits. However, nothing in the plan requires the application of BACT.  BLM needs to have permit conditions consistent with their analytical data. | best air quality technology, as per guidance from the Utah Division of air quality would be applied to actions on public lands as needed to meet air quality standards.  It goes on to state "Manage all BLM and all BLM authorized activities to maintain air quality within the thresholds managed by the State of Utah ambient air quality standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD), and protect the Class I airshed of the National Parks (e.g. Arches and Canyonlands). |
| National Parks Conservation Association | 970 | 8 | 4.3.24 of the draft RMP is purported to address cumulative impacts of the environmental consequences of the alternatives. In listing the "activities contributing to cumulative impacts to air quality" BLM fails to list the air pollution impacts from oil and gas including ozone, SO2, NOX.  Instead, BLM only mentions surface-disturbing activities from oil and gas. Additionally, BLM inadequately addresses the impact from other oil and gas development and potential increases in activity from surrounding BLM areas, most of which are also releasing DRMPs. | Analysis of oil and gas impacts includes calculation of emissions associated with compressors, glycol dehydrators, flaring, and surface disturbance. The sections have been updated with the new analysis. |
| Western Watersheds Project | 1025 | 5 | The effects of surface disturance by livestock on soils, biological crusts and plant communities as they interact with wind must be analyzed in an appropriate model that takes into account ground cover, shrub and forest cover, erosion factor, wind patterns and speed to determine the impacts on ambient air quality and human health in nearby communities, National Parks and the region from particulate pollution. This analysis must incude consideration of all other surface disturbing activities such as recreatonal vehicles, normal traffic, oil, gas and mineral exploration, development and production activities. In addition, the relase of greenhouse gases (CO2 and CH4) and other organic or inorganic pollutants must be calculated and modeled to determine the impacts on air quality and human health | See response to comment 1025-4. |

71

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | in nearby communities, National Parks and the region from particulate pollution. This analysis must include consideration of all other surface disturbing activities such as recreational vehicles, normal traffic, oil gas and mineral exploration, development and production activities. In addition, the release of greenhouse gasess (C02 and CH4) and other organic or inorganic pollutants must be calculated and modeled to dermine the impacts on air quality (DEIS/RMP 4.3.1 and 4.3.4), climate change and global warming, wildlife (DEIS/RMP 4.3.15, 4.3.19) and human health (DEIS/RMP 4.3.4) in a like manner. Form example the report recently released by the United Nationas, Livestock's Long Shadow, shows that the greenhouse gas emissions from livestock are greater than that from transportation. | |
| Western Watersheds Project | 1025 | 35 | Air quality impacts from permitted motorized vehicles and recreation events such as occurring during Jeep Safari and 24 Hours of Moab events are not adequately analyzed within the Draft RMP/EIS. | Data is not available to analyze the air quality impacts of motorized vehicles during recreation events. |
| | 1030 | 12 | P 4-10, section 4.3. Existing conditions are described in chapter 3. I can only assume that existing conditions are described for more than air quality…If this statement truly is specific to AQ, it should be moved to 4.3.1. | The statement the reader refers to will be moved from Section 4.3, to Section 4.3.1 Air Quality. |

## Consultation and Coordination

| Organization | Record ID & Comment Number | Comment Text | Response to Comment |
|---|---|---|---|
| | 308   1 | I will be joining Councilman McNeely at future RMP meetings and request that my name be added to the notice list for meetings on the RMP that involve Grand County as a cooperating agency. | Commenter's request has been noted. |
| Ute Mountain Ute Tribe | 430   1 | Upon review of your draft it seems some of the Utah Mountain Ute Tribe's important cultural issues have not been addressed. | On page 2-56 of the DRMP/EIS, under management common to all alternatives, it states: "Permit sustainable harvest (including cutting of green willows and |

72

BLM_0012077

| | | | The women of White Mesa Ute Community, located south of Blanding, Utah, have traditionally made baskets from squawbush. One of the most critical areas where they gather this plant is off Highway 128, adjacent to the Arches National Park boundary and the river. These baskets play an important role in the culture and traditions of the White Mesa Community. The Tribe would therefore formally request that gathering of squawbush be allowed to continue in this area, and that it be made clear that the proposed restrictions in this area do not apply to gathering of plans for both medicinal and traditional practices such as basket making.<br><br>Allowing these traditional gathering practices to continue would result in minor environmental impacts, while simultaneously allowing the White Mesa community to practice and preserve their cultural heritage.<br><br>When spring comes the Cultural Resource staff from the tribe and the tribal elders have agreed to meet with any of the Moab BLM staff to show them culturally significant gathering areas. If there is further information the Tribe can provide, or to arrange a meeting with the staff and elders, please contact Cultural Resources Coordinator, Terry Knight at (970) 759-6790 or Lynn Hartman at (970) 564-5600. | cottonwoods) for Native American traditional ceremonial use".  Squawbush has been added to this list of plants to specifically accommodate the Utah Mountain Ute Tribe's request. |
| National Parks Conservation Association | 970 | 10 | In Chapter 5, BLM states who they are required by Federal law to consult with during an EIS process. BLM has erred in excluding the National Park Service as a cooperating agency. They have ignored the directive outline in the Jan 30, 2002 Memorandum from James Connaughton, Council on Environmental Quality (CEQ) Chair, which states that "The purpose of this Memorandum is to ensure that all Federal agencies are actively considering designation of Federal and non-federal cooperating agencies in the preparation of | See response to comment 124-142. |

BLM_0012078

analyses and documentation required by the National Environmental Policy Act (NEPA), and to ensure that Federal agencies actively participate as cooperating agencies in other agency's NEPA processes. The CEQ regulations addressing cooperating agencies status (40 CFR § 1501.6 & 1508.5) implement the NEPA mandate that Federal agencies responsible for preparing NEPA analyses and documentation do so "in cooperation with State and local governments" and other agencies with jurisdiction by law or special expertise. (42 USC § 4331 (a), 4332(2)). Despite previous memoranda and guidance from CEQ, some agencies remain reluctant to engage other Federal and non-federal agencies as a cooperating agency. In addition, some Federal agencies remain reluctant to assume the role of a cooperating agency, resulting in an inconsistent implementation of NEPA. Studies regarding the efficiency, effectiveness, and value of NEPA analyses conclude that stakeholder involvement is important in ensuring decisionmakers have the environmental information necessary to make informed and timely decisions efficiently."

Cooperating agencies are required to be involved in: identification of issues (43 CFR § 1610.4-1); development of planning criteria (43 CFR § 1610.4-2); inventory data and information collection (43 CFR § 1610.4-3); analysis of the management situation (43 CFR § 1610.4-4); formulation of alternatives (43 CFR § 1610.4-5); estimating effects of alternatives (43 CFR § 1610.4-6); selection of preferred alternative (43 CFR § 1610.4-7); and selection of resource management plan (43 CFR § 1610.4-7). See also, BLM's "A Desk Guide to Cooperating Agency Relationships."

The exclusion of the NPS from cooperating agency status has limited the input from this most qualified agency on the import of effects on Arches National Park

74

BLM_0012079

| | | | | |
|---|---|---|---|---|
| | | | and Canyonlands NP and on the preferred approach to managing these effects.<br><br>BLM must invite the National Parks System to act as a cooperating agency for the remainder of the RMP revision, including assessment of comments and recommendations for revising the Preferred Alternative. In addition, the NPS should be given the opportunity to review the information previously provided to the other cooperating agencies, and then provide input on the analysis of effects and management recommendations pertaining to Arches National Park and Canyonlands National Park. | |
| | 1030 | 13 | P 5-4, section 5.2.1.1 Tribal Concerns, Comments, and Recommendations<br>Below is a summary of the tribal consultation and coordination meetings held during the RMP planning process. Only comments concerning actions in the Moab FO are included below. The second sentence is unclear because it implies that consultation was undertaken for more than the Moab FO. Maybe this is the intended message: Although the planning area encompasses Arches National Park, Dead Horse Point State Park, and the La Sal Mountains of the Manti-La Sal National Forest, consultation and comments are limited to actions proposed in the Moab FO. | Consultation was initially undertaken jointly for the Moab and Monticello FOs. After the initial consultations, the Moab and Monticello Field Offices undertook separate consultation process.  Chapter 5 of the DRMP/EIS covers only the consultation efforts made by the Moab Field Office.  Comments relating to the Monticello planning effort are not included in Section 5.2.1.1 of the Moab DRMP/DEIS; the consultations concerning the Monticello plan are contained in the Monticello DRMP/EIS.<br><br>The commentor is correct in assuming that tribal consultation efforts only included Moab BLM planning decisions. Other federal agencies engage in their own tribal consultation efforts. |

## Cultural

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Colorado Plateau Archaeological | 1 | 1 | An examination by CPAA of the Moab Field Office Draft EIS has identified deficiencies as they relate to cultural resources, both in terms of general theoretical | In preparing the PRMP/DEIS, the BLM used the best available information to form the basis for the cultural resources analysis.  This baseline data is a result of |

75

BLM_0012080

| | | | | |
|---|---|---|---|---|
| Alliance | | | assumptions applied throughout the document, as well as specific strategies identified for addressing cultural resource concerns. One such fundamental concern is the absence of a meaningful and representative statistical sample of inventoried lands within the Moab Field Office whereby the density, diversity and distribution of cultural resources could be adequately considered during the planning process. | Section 106 and 110 inventories of the area and represents the volume of information available.  Any potential surface disturbing activities based on future proposals will require compliance with Section 106 and site-specific NEPA documentation.   Since the Section 106 and 110 inventories that have been done make up all of the cultural resource information that presently exists in the Moab Field Office, this information  forms the basis for the DRMP/EIS discussion.  Any surface disturbing activities based on future proposals would require compliance with Section 106 and site specific NEPA documentation. |
| Colorado Plateau Archaeological Alliance | 1 | 2 | Of the alternatives presented in the Draft EIS, Alternative B offers the best management approach to facilitate the long-term preservation and protection of cultural resources. It is also acknowledged that Alternatives C (preferred) and D are both improvements over the current management approach to lands within the resource area (e.g., no action Alternative A). It is also emphasized that the management alternatives articulated in all three action alternatives may be inadequate to meet the BLM's obligations under federal laws and regulations regarding protection of cultural resources. | Regardless of the planning decisions chosen in the PRMP/FEIS, the BLM will adhere to all laws, regulations and policies concerning cultural resources. The RMP does not supercede laws, regulations or policies.  The commentor's preference for Alt. B is noted. |
| Colorado Plateau Archaeological Alliance | 1 | 3 | The failure of the agency to adequately consider the direct, indirect, and cumulative effect of various activities on the integrity of historic properties, for example the absence of Section 106 compliance prior to the official designation of OHV routes; (2) The failure of the plan to consider Class III inventories of areas adjacent to proposed OHV routes but clearly within the area of potential effect and (3) The failure of the agency to more aggressively embrace its Section 110 responsibilities to edtentify, evaluate and nominate properties under its management jurisdiction ot the National Register of Historic Places. | The BLM analyzed cumulative impacts in Chapter 4 and presented a reasonable estimate of what may happen to cultural resources as a result of trends in management direction, oil and gas development, increased recreational use of public lands and the protection or lack thereof afforded by the various alternatives.  While these impacts are impossible to quantify, the Draft RMP/EIS presents what the BLM considers to be a realistic and qualitative forecast of the general types of impacts that may be expected from various uses.  This forecast is comparative; for example, these kinds of impacts would increase or decrease more under alternative X than they would under alternative Y.  The |

BLM_0012081

|  |  |  |  | analysis is based in large part on existing legislation, regulation and policy that require inventory and mitigation on all federal undertakings.<br><br>The DRMP/EIS acknowledges that the illegal activities, such as vandalism and looting, may be impacted by changes in access, as is specifically identified in section 4.3.2.  In particular, Chapter 4 notes that increased access to cultural sites could increase contact by visitors who could intentionally damage sites by collecting surface artifacts, vandalizing, illegally digging, or otherwise excavating the sites.  The DRMP/DEIS does analyze under the various alternatives the illegal activities in association with the level of access as restricted by the alternatives and does not imply that illegal activities are restricted solely to the areas adjacent to the OHV routes.<br><br>The BLM will comply with its Section 106 responsibilities as directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information.<br><br>A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open.<br>B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be |
|--|--|--|--|--|

BLM_0012082

adversely affected, Class III inventory and compliance with Section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.

C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the Area of Potential Effect and compliance with Section 106 prior to designation.  Class III inventory of the APE and compliance with Section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.

D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available.

See the Appendix for SHPO concurrence with Section 106 consultation.

The White Wash open area has already been surveyed for cultural resources.

The Area of Potential Effect for any project is determined in consultation with the appropriate SHPO/THPO in accordance with 36 CFR 800.4(a)(1).  This will occur upon initiation of the Section 106 consultation process for this RMP.

The BLM integrates the protection of resource values such as cultural resources with its responsibilities for land use planning and resource management under FLPMA to ensure that the affects of any activity or undertaking is taken into account.  In addition, National Programmatic Agreement, which regulates BLM's compliance with National Historic Preservation Act, serves as the procedural basis for BLM managers to

BLM_0012083

| | | | | meet their responsibilities under Section 106, and 110. |
|---|---|---|---|---|
| | | | | Until 1980, Section 106 of the NHPA required agencies to consider the effects of their undertakings only on properties listed on the National Register of Historic Places. However in 1980, Section 106 was amended to require agencies to consider an undertaking's effects on properties included in or eligible for inclusion in the National Register. Since that time the BLM, through its land use planning process, outlines specific management prescriptions and mitigation measures to protect sites both listed and eligible for the National Register. Any potential surface disturbing activities based on future proposals will require compliance with Section 106 and site-specific NEPA documentation. |
| Colorado Plateau Archaeological Alliance | 1 | 4 | CPAA strongly disagrees that Class III inventories should not be required prior to official designations that allow continued use of existing routes. | The BLM will adhere to its Section 106 responsibilities as directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information. A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open. B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with section 106, focused on areas where adverse effects are likely to occur, is required prior to |

BLM_0012084

| | | | | designation.<br>C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the APE and compliance with section 106 prior to designation.  Class III inventory of the APE and compliance with section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.<br>D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available.<br><br>See the PRMP/FEIS for SHPO concurrence with Section 106 consultation.<br><br>The open OHV area in the White Wash Sand Dunes area has undergone an on-the-ground Class II cultural inventory. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 5 | The Draft EIS should clearly articulate the agency's intent ot avoid or minimize all impacts, including indirect and cumulative impacts, that may alter, directly or indirectly, the character of historic properites, inclduing TCPs, "in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association" (36C CFR 800.5 (a)(1). | The DRMP/EIS on pg. 2-7 states that damage to TCP's would be avoided.  The BLM will follow all laws, regulations and policies regarding TCPs.<br><br>The BLM analyzed cumulative impacts in Chapter 4 and presented a reasonable estimate of the incremental impact to cultural resources as a result of trends in management direction, oil and gas development, increased recreational use of public lands and the protection or lack thereof afforded by the various alternatives.  While these impacts are impossible to quantify, the DRMP/DEIS presents what the BLM considers to be a realistic and qualitative forecast of the general types of impacts that may be expected from various uses.  This forecast is comparative; for example, these kinds of impacts would increase or decrease more under alternative B than they would under alternative D. |

BLM_0012085

| | | | | The analysis is based in large part on existing legislation, regulation and policy that require inventory and mitigation on all federal undertakings. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 6 | CPAA recommends that the term "visitation" be clearly defined to include all uses of public lands that are shown to endanger the integrity of sties esligible for lsiting on the National Register (e.g.,industrial, vehicular, recreational. | Visitation means the use of public lands by recreationists, whether on foot, on horseback, or in a vehicle.  Industrial uses of the public lands are not considered visitation. |
| Colorado Plateau Archaeological Alliance | 1 | 7 | Camping should be prohibited at sites eligible for listing on the National Register. CPAA recommends that this prohibition be extended to include a ban on camping "on or Near" elibgible sites. | On pg. 2-7 of the DRMP/EIS, a management decision common to all action alternatives states: "Camping would be prohibited and posted within or on archeological and historic sites eligible for listing on the National Register of Historic Places."  "Near" is far too vague a term to include the PRMP/EIS.  When posting this decision, the BLM extends the camping ban to a reasonable and enforceable distance, as it has at Sego Canyon Rock Art Site. |
| Colorado Plateau Archaeological Alliance | 1 | 8 | "Class III inventories of Areas of Potential Effect (APE) will be conducted in connection with new OHV routes prior to such designations". CPAA agrees but also recommends tha this language be modified to reflect the agency's intent to consider the cumulative impacts from designating thousands of miles of official routes. Concerns related to nature and scope of such Class III inventories are addressed below. | The BLM has considered the cumulative impacts of its decisions in Chapter 4 of the DRMP/EIS. |
| Colorado Plateau Archaeological Alliance | 1 | 9 | "The BLM will cooperate with counties to ensure road and trail construction and maintenance minimized impacts to cultural resources. CPAA recommends this language be modified to reflect a preferred strategy of avoidance of impacts to cultural properties, with a secondary strategy of minimizing impacts when avoidance is not possible. | The word "avoid" has been added to the sentence. |
| Colorado Plateau Archaeological Alliance | 1 | 10 | CPAA agrees that the site density model may be a valuable tool in identifying some areas with higher potential for cultural resources.  CPAA also agrees that it is difficult to plan for and manage cultural resources that remain largely unknown and undocumented.  However, | See response to comments 124-25 and 415-1. |

BLM_0012086

| | | | CPAA believes that model is fundamentally flawed as a primary planning tool in that the data used to create the model are derived from previous archeological inventories that do not comprise a meaningful and statistically valid sample.  These investigations were driven by the location of extraction projects and other site-specific uses of federal lands that did not result in the investigation of all the environmental and ecological ranges where cultural resources are likely to occur. Hence, the predictive model used by BLM staff to identify probability zones for cultural resources is actually a reflection of the amount of Section 106 compliance in a particular area and may not reflect actual site densities. A review of archeological site data on file with the Antiquities Section of the Utah Division of State History reveals astonishingly few archeological block surveys within the MFO that would contribute to an understanding of potential site densities or to the distribution of archeological sites across an entire landscape. | |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 11 | Although the identification of areas such as Tenmile Wash, Mill Creek, and Dolores Triangle as priorities for such surveys are laudable and should be encouraged, this approach fails to address broader perspectives of prehistoric land-use patterns across entire landscapes, including areas of low probability. | Ten Mile Wash and Mill Creek were identified as priority areas for surveys because of there known potential for occurrence of cultural resources.  The Dolores Triangle was prioritized due to lack of cultural information in this area.  The prioritization of areas does not mean that other areas won't be surveyed. |
| Colorado Plateau Archaeological Alliance | 1 | 12 | Hence, management considerations articulated in the various action alternatives are predicted on site quantity rather than actual site significance.  This approach fails to recognize that sites of tremendous scientific and cultural significance may be located in areas deemed to have a low probability for archeological sites, and that the rarity of such site may actually accentuate the importance of those sites within the context of broader cultural landscapes. | The cultural model developed in the DRMP/EIS was for analysis purposes only.  It will not be utilized to determine actual site significance.<br><br>On pg. 4-30 it states that model was developed as a means of estimating general site densities.  Impacts of the alternative  management actions were then assessed "with regard to how much of the action is likely to result in surface disturbing activities within the high or medium density zones.  This method enables a quantifiable assessment of probable relative affects of |

BLM_0012087

| | | | | planning action alternatives. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 13 | It is therefore recommended the probability model developed by BLM planners be augmented to include addition variables that would precipitate greater understanding of the potential impacts to significant cultural resources from the various action alternatives. These variables should include, at a minimum, site types and National Register eligibility.  These data are readily available on the Intermountain Antiquities Computer System database (IMACS) and could be incorporated into the probability model with minimal effort.  Such data would better facilitate management decisions related to significant sites or clusters of significant sites in low probability areas. | See response to comments 1-12,  124-25, and 415-1. |
| Colorado Plateau Archaeological Alliance | 1 | 14 | Any assumption that site avoidance results in no adverse effects, or insignificant effects, is inherently flawed and is at odds with 36 CFR 800.  Avoidance of cultural sites evident on the ground surface may avoid direct damage to the surface evidence.  However, there is a potential for damage to archeological sites not clearly evident on the site surface, as well as adverse effects to sites outside the area of direct impact.  Particularly relevant is 36 CFR 800.5(1) that states "an adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association.  Consideration shall be give to all qualifying characteristics of a historic property…" (emphasis added; See also 65 Fed. Reg. 77698, 77720 (Dec. 12, 2000) discussing indirect effects). | The BLM agrees with the commentor that site avoidance does not always mean that there are no adverse affects. |
| Colorado Plateau Archaeological Alliance | 1 | 15 | It is therefore recommended that the EIS clearly acknowledge the indirect adverse effects of undertakings on historic properties, and it should include a clear strategy with measurable benchmarks to avoid, minimize or mitigate those indirect effects through the Section 106 | The BLM acknowledges that there may be potential adverse effects from the proposed management actions in the alternatives of the PRMP/FEIS on cultural resources.  Avoiding, miniimizing, or mitigating indirect effects to cultural resources through the Section 106 |

BLM_0012088

| | | | review process. | process is a legal requirement and is reiterated on pg. 2-7 of the DRMP/EIS. |
|---|---|---|---|---|
| Colorado Plateau Archaeological Alliance | 1 | 16 | The Draft EIS should reflect the intent of the BLM to adequately consider all indirect impacts of undertakings on National Register-eligible properties that may be a consequence of the undertaking but not directly related to it.  Such intent is not now articulated in Draft EIS. | See response to comment 1-15. |
| Colorado Plateau Archaeological Alliance | 1 | 17 | CPAA concurs with that assessment, but also recommends that the Draft EIS be modified to acknowledge that recreation on such a massive scale could result in cumulative effects to site setting and integrity, even if the historic properties themselves are not directly impacted by vandalism and/or looting (see 36 CFR 800.5(a)(2)(v)). | While Special Recrreation Management Areas (SRMAs) are proposed for designation in the alternatives of the DRMP/EIS, the numbers of people visiting the Moab area can not be controlled by the land use plan.  SRMAs allow the BLM to impose special rules on visitor use thereby reducing potential impacts to cultural resources.  In the cumulative impact ssection on pg. 4-502 of the DRMP/EIS the BLM acknowledges the continually increasing  visitation and its affects on cultural resources.  However, it goes on to say that "recreational activity in and around the Moab planning area would continue to increase regardless of which alternative the BLM selects for its RMP. |
| Colorado Plateau Archaeological Alliance | 1 | 18 | The designation of thousands of miles of OHV routes within the MFO has significant potential to create cumulative  adverse effects that are not anticipated by the draft EIS. | The Travel Section in Chapter 3 of the DRMP/EIS presents the baseline (current situation) for analysis in Chapter 4.  It discusses the ongoing and baseline issues surrounding cross-country travel that is currently permitted by the existing land use plan for the Field Office.  The planning area was inventoried as having 6,199 miles of non-paved routes.  This number represents the baseline for analysis, however, it is also recognized that cross-country travel is currently allowed in many other areas within the Field Office.  The impacts associated with cross-country OHV use are described in Chapter 4 under the No Action Alternative.  The action alternatives limit travel to designated routes.  The routes that are already in use are considered part of the baseline, and therefore, it is not reasonable to consider the impacts to vegetation from these already disturbed linear surfaces. |

BLM_0012089

| Colorado Plateau Archaeological Alliance | 1 | 19 | The fundamental component of the Draft EIS Travel Plan is the BLM's intent to establish thousands of miles of designated trails suitable for OHV travel, and the stated management strategy that Section 106 compliance (e.g., Class III inventories) will not be required prior to designation of routes currently in use.  As such, the Travel Plan is fundamentally flawed on two important points: (1) The failure of the BLM to conduct adequate analysis in the past related to OHV impacts along routes currently being used by motorized vehicles was and still remains an abrogation of agency's Section 106 responsibilities, and the failure of the agency to recognize or correct this deficiency in the new Travel Plan appears to validate and perpetuate the agency's failure to comply with Section 106 requirements in the past; and (2) The failure to require Class III inventories along routes prior to designation suggests the agency official has already made a determination, as per 36 CFR 800.3(a), that travel route designations in such instances are not an undertaking as defined in 36 CFR 800.16(y). | See response to comment 124-43. |
| Colorado Plateau Archaeological Alliance | 1 | 20 | On this point, the Draft EIS reflects remarkable inconsistencies.  The BLM clearly recognizes OHV travel is an activity requiring Section 106 review in that Class III surveys would be required for all "new" OHV routes.  But no such requirements are articulated for routes currently in use, even though Section 106 compliance should have occurred in the past related to these activities. | See BLM Instruction Memorandum No. 2007-030 for Travel Management considerations and Cultural Resources. |
| Colorado Plateau Archaeological Alliance | 1 | 21 | As stated throughout the Draft EIS, the BLM clearly recognizes that OHVs have significant potential to cause future adverse effects to historic properties, and that these adverse effects are already accelerating due to growing OHV travel along and adjacent to routes already in use.  But no convincing rationale is offered as to why Section 106 compliance will be required in the future, but pre-existing uses are exempt from compliance. | See response to comments 1-3 and 489-3. |
| Colorado | 1 | 22 | CPAA has been unable to identify any public outreach | On pg. 1-11 of the DRMP/EIS it states that education is |

BLM_0012090

| | | | | |
|---|---|---|---|---|
| Plateau Archaeological Alliance | | | effort by the BLM in Utah to educate OHV users as to the fragile and irreplaceable nature of cultural resources, to promulgate proper etiquette among OHV users who visit these resources or to enlist the vigilance of the OHV community in reporting vandalism and looting. | an issue addressed through policy or administrative action. |
| Colorado Plateau Archaeological Alliance | 1 | 23 | However, the more designation of official OHV routes is meaningless without a BLM commitment of necessary resources to enforce such travel restrictions.  The MFO has not demonstrated such a commitment in the past, as evidenced by the willful and repeated violation of travel restrictions in Tenmile Canyon and the tepid BLM enforcement response to widespread violation (Spangler and Boomgarden 2007) | On pg. 1-11 of the DRMP/EIS it states that enforcement is an issue addressed through policy or administrative action.  See also response to comment 124-38. |
| Colorado Plateau Archaeological Alliance | 1 | 24 | Given that caveat, it is imperative that Section 106 compliance be initiated as a component regardless of which alternative is chosen.  In short, the BLM cannot manage for and properly protect resources that the agency does not know are there. | See response to comment 1-20. |
| Colorado Plateau Archaeological Alliance | 1 | 25 | As discussed in Section 3.3.2.3, formal listing of sites on the National Register occurs for a small portion of the total sites in any given county or state (DEIS 3-14). | This is not a comment. |
| Colorado Plateau Archaeological Alliance | 1 | 26 | The tiered approach reflected in the three action alternatives (more under Alternative B, less under Alternative C and even less under Alternative D) is problematic and would appear to reflect a common misperception that National Register designations are accompanied by greater levels of protection for listed resources. | All cultural resources are protected by law regardless if they are listed on the National Register or not.  The priority for nominating cultural sites to the National Register has been removed. |
| Colorado Plateau Archaeological Alliance | 1 | 27 | CPAA recommends that the BLM consider two addition areas for listing on the National Register.  As discussed above, the Tenmile Canyon drainage features a potential for 310 to 385 sites within a narrow, spatially defined canyon corridor from Dripping Springs to the canyon confluence with the Green River. | According to the BLM's  land use planning handbook (1601-1), nominating cultural resource sites to the National Register of Historic Places is not a land use planning decision. |
| Colorado Plateau | 1 | 28 | Another area worthy of consideration within the Draft EIS is an expansion of the current boundaries of the | See response to comment 1-27. |

BLM_0012091

| | | | | |
|---|---|---|---|---|
| Archaeological Alliance | | | Desolation Canyon National Historic Landmark along the Green River corridor in lower Desolation and Gray Canyons. | |
| Colorado Plateau Archaeological Alliance | 1 | 29 | CPAA recommends the Moab Field Office Draft EIS reflect support for expanding NHL boundaries to include all of Desolation and Gray Canyons give (1) The BLM management of the river corridor is identical for NHL properties along the river, (2) the non-NHL properties are all federally or tribally owned, (3) the historic properties within the NHL are identical to sites outside the NHL that have been deemed eligible for listing, (4) most BLM lands adjoining the river are wilderness study areas afforded significant environmental protections, and (5) there is widespread public support for maintaining the remarkable environmental and cultural values found in Desolation and Gray Canyons. | Expanding the NHL boundaries does not require a land use planning decision. |
| Colorado Plateau Archaeological Alliance | 1 | 30 | As expressed above, CPAA is fundamentally concerned that BLM decision making has been predicated on insufficient data related to the nature, diversity and distribution of archeological resources within the planning area, and the Draft EIS articulates dew proactive measures whereby these data gaps will be ameliorated.  Quite simply, the BLM cannot manage resources it does not know exist, and management decisions  made without baseline data will inevitably result in adverse and unanticipated consequences to the integrity of historic properties.  This is particularly relevant to the Draft EIS Travel Plan where thousands of miles of OHV routes would be designated without any attempt to determine the nature, diversity, and distribution of cultural resources that have already been adversely effected along those routes, or that could be adversely effected in the future. | See response to comment 489-3.  Furthermore, FLPMA states that in the development of land use plans the BLM will rely, to the extent it is available, on the inventory of public lands, their resources, and other values |
| State of Utah - Public Lands Policy Coordination | 120 | 46 | The State recommends the BLM undertake a final check to ensure that other potential areas of high cultural resource densities or values are examined for potential conflicts.  The MFO should use techniques such as GIS, | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted.  For site specific actions the BLM conducts a Class III cultural survey as appropriate. |

87

| | | | existing site databases. | |
|---|---|---|---|---|
| | | | | On pg. 4-30 a model of cultural resource site density is described that was used to predict potential impacts to cultural resources.  This model identified high, medium, and low site densities and this information was used to quantify the impacts.  The model was tested by intersecting 4,259 known cultural sites  with the probability coverage in GIS. |
| State of Utah - Public Lands Policy Coordination | 120 | 47 | The State suggests that the BLM develop a specific ongoing program to identify and target identification efforts under Section 110 of the National Historic Preservation Act. | These type of actions are administrative and  do not require land use planning decisions to accomplish. However, on pg. 2-8, cultural resource inventory areas under Section 110 are prioritized. |
| State of Utah - Public Lands Policy Coordination | 120 | 48 | The State suggests enhancing and strengthening the density analyses utilized in the Draft RMP/EIS.  These techniques could be significantly enhanced and strengthened in implementation of the Final Plan for high cultural resource value areas which include Sego Rock Art, Wall Street/Colorado River Rock Art, Behind the Rocks, Tenmile Wash, Mill Creek Canyon/South and North Forks of Mill Creek, the Wall Street portion of the Highway 279/Shafer Basin/Long Canyon proposed ACEC, Westwater Canyon, Kane Springs Canyon, Sevenmile Canyon, Bartlett/Hidden Canyon, Hell Roaring Uplands, and the Dolores River Canyon. | The BLM will continue to enhance the inventory and density techniques for high cultural value areas identified in the final plan.  Each of the cultural high value areas mentioned by the commentor has been included in the Proposed Plan for inventory in the Final EIS including Sevenmile Canyon (refer to pg. 2-8). |
| State of Utah - Public Lands Policy Coordination | 120 | 49 | The State requests that a cultural resource management plan be developed for Special Recreation Management Areas. | In Management Common to All Action Alternatives for Cultural Resources (pg. 2-7), several specific areas are mentioned for cultural resource management priority; Ten Mile Wash, Mill Creek Canyon, Behind the Rocks, and Wall Street.  These 4 areas coincide with high visitation areas managed as SRMAs.  The text has been changed to state that Cultural Resource Management Plans will be a component of the implementation plans for the SRMAs that include the 4 cultural areas. |
| State of Utah - Public Lands Policy Coordination | 120 | 50 | The State suggests that BLM specify in the RMP the subsequent development of specific cultural resource management plans, especially in areas with potential resource conflicts between cultural and recreation/travel. | See response to comment 120-49.  In addition, potential heritage tourism development would be a component of the aforementioned Cultural Resource Management Plans (pg. 2-7). |

BLM_0012093

| | | | | |
|---|---|---|---|---|
| | | | These plans could provide for potential heritage tourism development where warranted. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 48 | Alternatives A, B, and C each close significant miles of existing OHV routes in medium and high cultural site-density areas. These closures are justified on the grounds that they will produce "long term beneficial impacts from reduced opportunities for inadvertent impacts, looting, and vandalism." Draft EIS, Sec. 4.3.2. There is no data in the EIS that cultural resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. BRC believes the closure approach in medium and high site-density areas cuts too broadly for the problem. The identified risk is "inadvertent impacts." "Inadvertent impacts" is undefined and is not discussed in the EIS. Inadvertent impacts are therefore an unfounded assumption which cannot be attributable to OHV or mechanized use. BRC believes a plan of mitigation, rather than prohibition, is possible and beneficial. This particularly so because numerous recreators use OHVs to access important historical sites. | The medium and high cultural site density areas referred to by the commentor relate to the model of cultural resource site densities. This model included on pg. 4-30 of the DRMP/EIS was developed to analyze potential impacts to cultural resources from various land use actions. For Travel Plan development documented cultural sites were utilized to determine whether or not a route had a cultural conflict. The miles of closed route listed in the Chapter 4.3.2 include the 2500 miles of routes not identified because they had no purpose and need. Many of these miles or routes are in high and medium site density areas and these closures would benefit cultural resources. Specific route closures for protection of cultural resources are related to known sites. The term "inadvertent" and according to the dictionary means "unintentional". Therefore, inadvertent impacts result from actions of people or uses that accidentally cause damage to cultural resources.<br><br>Access to a large number of cultural sites is provided across all the alternatives for the Travel Plan of the DRMP/EIS.<br><br>Information has been added to Chapter 3 of the PRMP/FEIS that cultural resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. Basically that increased access results in increased inadvertent impacts, looting, and vandalism. References will be cited. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 25 | The analysis of the impacts of ORV use and roads on cultural sites omits information that supports the use of methodology BLM employed to estimate impacts. For example, the cultural modeling used by BLM is inadequate. There is no information about whether there | The cultural model was developed by a BLM professional archeologist. The DRMP/EIS states on pg. 4-30 "while the site density prediction model used in this analysis is by no means a perfect predictor of site density it is sufficiently accurate (73% success rate) to |

BLM_0012094

| | | | | |
|---|---|---|---|---|
| | | | is any legal effect of the high, medium, low classifications or whether they are generally accepted by professionals in the field. The BLM is urged to conduct a full inventory of cultural sites and comply with NHPA. | be utilized as a tool for analyzing potential relative involvement of cultural resource sites in management decisions.<br><br>A full cultural inventory is not required for a land use plan.  Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes.<br><br>Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. |
| Glen Canyon Group | 209 | 37 | Re: Highway 279/Shafer Basin/Long Canyon Potential ACEC<br>In addition to managing rock art for public use with interpretation, the BLM should acknowledge the national significance of the Wall Street Rock Art Site by preparing a National Register Nomination. | There is no requirement to carry forward all of the potential ACECs into the preferred alternative.  The BLM's ACEC Manual (1613) requires that all potential ACECs be carried forward as recommended for designation into at least one alternative in the DRMP/DEIS.  Alternative B analyzed the designation of all potential ACECs.  The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS.<br><br>See also response to comment 124-5. |
| Glen Canyon Group | 209 | 38 | The BLM should acknowledge the national significance of the Wall Street Rock Art Site and rock art sites within Mill Creek Canyon by preparing National Register Nominations. | In keeping with the National Programmatic Agreement and individual state BLM/SHPO protocol agreements, the BLM invites SHPO, public, governmental and Native American participation in all planning efforts.  According to the BLM's planning handbook (BLM-H-1601-1), nominating cultural sites to the National Register of Historic Places is not a land use planning decision and is therefore outside the scope of this EIS. |
| | 262 | 2 | Also important is the proximity of some of the proposed routes to Archaeological areas/sites. How has the RMP | Travel Plan formulation is described in Appendix G. In accordance with the BLM Land Use Planning Handbook |

BLM_0012095

| | | | | |
|---|---|---|---|---|
| | | | assessed and accounted for these areas? The plan has dramatically failed to be both thorough as well as legal. Is it not imperative to incorporate existing laws into this plan like NEPA, as well as the Antiquities Act? | (1601.1), a Class I cultural survey was conducted.  Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. Under Management Common to All Action Alternatives (page 2-7), Cultural Class III inventories would be required for all new roads and trails. All land disturbing activities within Traditional Cultural Properties would be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the area or site, avoid time of use by Native American Groups, or would be eliminated altogether. See also response to the submission by the Colorado Plateau Archaeological Alliance. |
| Western Wildlife Conservancy | 311 | 4 | WWC finds the method employed by the Moab BLM for identifying possible archaeological sites-namely a computer program-to be a poor person's substitute for the real thing, which in this case would be on-the-ground surveys. Not only will a computer program inevitably fail to include some archeological resources, it cannot rank sites by importance or vulnerability. Any potential additions to the motorized trail system in the District should be held in abeyance until such surveys are completed. | The cultural model referred to in the DRMP/EIS was not a method of identifying sites, but rather a methodology for identifying those portions of the planning area where there was high, medium or low site densities.  This allowed analysis of the potential impacts to cultural resources within the planning area. <br><br> Travel Plan formulation is described in Appendix G. Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods.  Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. |
| Western Wildlife | 311 | 5 | Mill Creek Canyon: Both forks of Mill Creek Canyon are rich with archaeological sites and should be given | The North Fork of Mill Creek Canyon is largely within the Mill Creek WSA.  This designation means that the North |

BLM_0012096

| | | | | |
|---|---|---|---|---|
| Conservancy | | | maximum protection. | Fork of Mill Creek is managed according to the Interim Management Policy for Lands Under Wilderness Review.<br><br>The remainder of the North Fork of Mill Creek, and the South Fork of Mill Creek, are within the Mill Creek ACEC, which is designated in the preferred alternative. The area is to be managed as No Surface occupancy for oil and gas drilling and all other surface disturbing activities, providing protection for Mill Creek.  In addition, all archaeological sites are fully protected by law. |
| Western Wildlife Conservancy | 311 | 6 | Behind the Rocks: We strongly advocate that this area be given continued protection as a wilderness study area. The entire 17,836 acres contain high archeological site density and have potential for inclusion on the National Register of Historic Places as an Archaeological District. Rock art in this area is extensive, spanning multiple cultures over thousands of years, and is acknowledged as being of national significance.<br><br>We believe all the roads should be closed beyond the existing spur road to "Olk Folks Home." Additional protection as described in Alternative B (page 2-33) is appropriate. | Behind the Rocks continues as a WSA regardless of any planning decision.  In addition, 5,000 acres beyond the 12,000 acre WSA are designated an ACEC to protect relevant and important values, of which cultural resources are one.  The entire area is managed as no surface occupancy for oil and gas drilling in Alt C.<br><br>The Behind the Rocks area has very few routes designated within it in Alt C.  The route to which the commentor refers has been removed from designation in Alt. C. |
| Western Wildlife Conservancy | 311 | 7 | Upper Courthouse: We recommend Alternative B for this proposed ACEC. Upper Courthouse, with its riparian areas has a high density of archaeological sites. Known sites exist near Hidden Valley, Brink Spring, Bartlett Wash, and unnamed drainages to the north. The Courthouse Rock area has already experienced vandalism to rock art panels (The Blue Buffalo was rubbed out several years ago) and recreational use in this area continues to be high and is increasing in intensity each year. We believe the active protection of archaeological sites needs to extend beyond grazing to also include visitation. | There is no requirement to carry forward all of the potential ACECs into the preferred alternative.  The BLM's ACEC Manual (1613) requires that all potential ACECs be carried forward as recommended for designation into the DRMP/EIS.  Alternative B analyzed the designation of all potential ACECs.  The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the PRMP/FEIS. |

BLM_0012097

| | | | | |
|---|---|---|---|---|
| | | | | See also response to comments124-68 and 124-82.<br><br>Archaeological damage violates Federal law.  Violations of law are beyond the scope of the land use plan under consideration. |
| | 334 | 5 | The BLM has not done adequate cultural surveys in the river corridor or the side canyons and rim, to determine if the travel plan will damage resources. The National Park Service has been doing surveys in Canyonlands National Park, just downstream, and is locating multiple sites and many artifacts. | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted. Travel Plan formulation is described in Appendix G. Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources.<br>A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. The BLM will continue to enhance the inventory for high cultural value areas identified in the final plan. See also response to the submission by the Colorado Plateau Archaeological Alliance. |
| | 336 | 3 | My other large concern is regarding the archeological, historic, and Native American resources in the field office area. The protections specified in the draft RMP seem woefully inadequate to locate and protect these national treasures. | The commentors concerns about the proposed protections for cultural resources are not sufficiently articulated to allow a more detailed response. In addition, all cultural resources are protected by law. |
| Utah Rock Art Research Association | 415 | 1 | We believe that the BLM has done a poor job of cultural resource management associated with this RMP. We are especially concerned with the use of computer modeling to determine cultural resource locations. A limited percentage of lands within the MPA have been physically inspected for the presence of cultural resources, and such an effort is cost prohibitive as part | The commentor misunderstands the use of the computer modeling of cultural resources.  The model (described on pg. 4-30 of the DRMP/EIS) was developed by a professional BLM archaeologist, and used only to "analyze  potential relative involvement of cultural resource sites in management decisions."  It is not used to predict site numbers involved in decisions, nor is it a |

BLM_0012098

| | | | | |
|---|---|---|---|---|
| | | | of preparing the RMP. Therefore, the relative site density potential for areas within the MFO was estimated using environmental factors known to influence site location and type. All areas of the MFO were then ranked as having either high, medium, or low potential for containing cultural sites. (page 3-19) This problematic approach does not acknowledge that people and their archaeological footprint are not entirely predictable. Nor does it consider the significance of sites, only density. We recognize that complete surveys have not been done. However, there has been extensive documentation of cultural resources. "The MPA has approximately 5,200 inventoried cultural sites." (Page 4-253) It is not clear to us that these documented site locations have been given consideration in the RMP. We do not support a decision-making process which is not based on actual rock art and archeological site inventories. | replacement for full inventory for sites prior to surface disturbance. In other words, the model was used to make comparison among the alternatives as to which alternative would be most beneficial or potentially adverse to cultural resources.<br><br>The model was constructed by using the 5,200 known sites in the Moab planning area, and by constructing polygons of "high", "medium" or "low" potential for cultural resources. These areas were then compared by alternative to see which alternative affected high and medium areas more intensively.<br><br>Site specific decisions in the DRMP/EIS (for instance, route designation) were made using the actual cultural resource inventories that have been performed in the Moab planning area. As stated in the DRMP/EIS, all future surface disturbing activities will be required to have an archaeological clearance.<br><br>See also response to comment 124-25. |
| Utah Rock Art Research Association | 415 | 3 | Maps need to be larger with better defined borders and known archeological sites need to be considered in the management plan. | Known archeological sites were considered in the DRMP/EIS. However, these sites were not placed on a map for public viewing in order to protect the integrity of the site.<br><br>The maps in the text of the DRMP/EIS are also available on the internet. In their electronic format, it is possible to enlarge and zoom in on each of the maps on the DRMP/EIS. |
| Utah Rock Art Research Association | 415 | 5 | The current maps appear not to include the rock art at Crescent Junction. These are significant sites and should be included. | The maps in the DRMP/EIS do not include rock art sites. The BLM is aware of the rock art at Crescent Junction.<br><br>No disturbance of cultural sites is allowed under any alternative. All surface disturbing activities would be required to have a cultural clearance. It is required to avoid or fully mitigate cultural sites. |

BLM_0012099

| | | | | |
|---|---|---|---|---|
| Utah Rock Art Research Association | 415 | 6 | It is difficult to determine the boundaries of this district [Canyon Rims] from the maps provided. | The maps can be enlarged in their electronic format. The boundary of Canyon Rims SRMA is along the cliff above Lockhart Basin to the west, along the rim above Kane Creek to the north, along U.S. Highway 191 to the east, and  along the grazing allotment boundary  and the rim of Harts Draw to the south. |
| Utah Rock Art Research Association | 415 | 7 | Mill Creek Canyon: The supplied maps are insufficient to indicate whether the culturally rich uplands are included. | The Mill Creek Canyon ACEC includes much of the culturally rich uplands.  This ACEC has been established to protect the cultural resources found in this area.  The maps can be enlarged in their electronic format. |
| Utah Rock Art Research Association | 415 | 8 | Upper Courthouse: We believe the active protection of archaeological sites needs to extend beyond grazing to also include visitation. | The BLM protects all cultural sites.  This is required by law.  In the Upper Courthouse area, cultural resources have been fenced to protect them from OHV users. Dispersed campsites have not been designated because they are on cultural sites.  The imposition of SRMA management, as is provided for in Alt C, will allow the BLM to impose other restrictions on visitors for the protection of cultural resources. |
| Utah Rock Art Research Association | 415 | 12 | Klondike Bluffs. It is not clear from the maps if there is any special protection for the rock art sites located at Klondike Bluffs outside of Arches National Park. We recommend an archeological focused ACEC for this region if it is not protected. | All rock art sites in the Moab planning area were not proposed as cultural ACECs.  All rock art is protected by law.  The Klondike Bluffs area is proposed to be managed as part of the Lavyrinth Rims/Gemini Bridges SRMA, which will allow the BLM to manage recreation users more directly. |
| | 474 | 4 | Allowing OHV routes within areas of wilderness character would put irreplaceable cultural resources at risk of destruction and looting. The clear mandate to the agency is to protect and preserve these resources for future generations. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration.  The rationale for designation of individual ACECs carried forward into the PRMP/FEIS will be provided in the Record of Decision (ROD). The analyses that will provide the rationale for the final decision to designate or not designate an ACEC can be found in Chapter 4 of the |

BLM_0012100

| | | | | PRMP/FEIS. See also response to comments 124-68 and 124-82. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. |
|---|---|---|---|---|
| | 474 | 5 | The draft plan proposed to take cultural resource inventory and assessments for areas subject to development-great idea, since so little inventory data is on hand to inform decisions. Unfortunately the preferred alternative includes only 60% of the total acreage potentially in play for assessment. It is unclear why the most conservation-oriented alternative would propose more inventory and assessment be performed in the face of markedly less potential development threat. The amount of cultural resources inventory and assessment must be commensurate with the threat and I urge BLM to be certain the final plan will allow for such activities to be performed at the scale necessary to ensure archaeological assets are safeguarded. | The commentor is assumed to be referring to the spread, by alternatives, of cultural field inventory.  A larger acreage is prioritized for cultural field inventory in the conservation alternative because the BLM is proposing a pro-active, conservation oriented alternative.  Alternative D emphasizes commodity production. While the laws protecting cultural resources must be followed in implementing all actions, Alternative D is less concerned with a pro-active conservation approach.  Cultural resource inventories will be undertaken in response to the development proposal. Thus, the prioritization of cultural field inventories fits the theme of each of the action alternatives. |
| | 477 | 1 | When excavating a site, archaeologists leave a large portion of the site unexcavated, saving it for a future time when techniques improve and more data can be gathered. The BLM is charged with protecting these archaeological sites for perpetuity. The archaeological sites including Carrier Canyon rock art sites in Upper Courthouse Wash, Canyon Rims, and Westwater Canyon are well known and priceless. With easy access, the sites will be disturbed and in some cases, destroyed. It is imperative for the BLM not to let any more motorized roads into areas that are known to be rich inn archaeological sites. Correlation between public access and graffiti is well known and has been documented. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See response to comment 1-3. |
| | 477 | 2 | The areas between Hey Joe Canyon, and Bowknot Bend via Spring Canyon and Hell Roaring Canyon and Mineral Canyon in the Green River coridor, Tenmile Canyon, Hell Roaring Canyon, Horsethief Point, Deadman Point, Tenmile Point, Hatch Point, Beaver Creek area, or Goldbar Rim need to remain roadless until detailed | See response to comment 124-48.  The BLM is not required to create roadless areas where none exist.  See also response to comment 1-3 concerning the designation of routes. |

BLM_0012101

| | | | | |
|---|---|---|---|---|
| | | | surveys can be done. The BLM needs to do those surveys carefully and thoroughly before designating and allowing new roads in those areas. | |
| National Trust for Historic Preservation | 489 | 1 | The Draft RMP fails to explain how BLM intends to evaluate 2,642 miles of OHV routes in accordance with the Section 106 process. Section 106 requires BLM to comply with several discrete requirements before approving a final action. See 16 U.S.C. § 470f; 36 C.F.R. §800.1(c). However, the Draft RMP provides virtually no explanation of when and how BLM will comply with each of these requirements before implementing the route designations proposed in the travel plan. For example, although BLM may "adjust" the proposed OHV route designations "through a collaborative process with local government," Draft RMP at 2-48, the Draft RMP does not discuss how and to what extent BLM will consult with Indian tribes prior to finalizing the route designations. See 16 U.S.C. § 470a(6)(b) (requiring tribal consultation). (FOOTNOTE: BLM did meet with twelve tribal organizations during the scoping process for the Draft RMP. Draft RMP at 5-3. Additionally, BLM held meetings with five more tribal organizations to discuss the Draft RMP alternatives. Id. However, the Draft RMP does not disclose whether BLM consulted with these or additional tribal organizations regarding the travel plan and, specifically, the proposed route designations.) Nor does the Draft RMP address how BLM will identify and address the indirect effects of designating OHV routes on cultural resources, including the effects of vandalism caused by the proximity of designated routes to cultural sites. See id. § 800.5(a)(1) (requiring an evaluation of indirect effects. As discussed above, these Section 106 requirements will require a significant commitment from BLM and thus warrant greater consideration in the Moab RMP. | Washington Office Instruction Memorandum 2007-30, "Clarification of Cultural Resource Considerations for Off-Highway (OHV) Designation and Travel Management", details how the BLM complies with Section 106 of the National Historic Preservation Act for designation and management of areas, roads and trails. This IM states that proposed designations that will not change or will reduce OHV use are unlikely to adversely affect historic properties and will require less intensive identification efforts.  The Moab RMP proposes to close over 2,500 miles of existing route.  This constitutes a reduction of OHV use and thus enhances historic properties.

The BLM has consulted with Native American tribes throughout the planning process.  See Chapter 5 for a detailing of these consultation efforts.  The Travel Plan was included as part of this consultation.

Archeological vandalism is illegal. The RMP does not analyze illegal activity. |
| National Trust for Historic | 489 | 2 | The Draft RMP may exempt hundreds, if not thousands, of route miles from the requirements of Section 106 by | A sentence has been added on pg. 2-7 of the DRMP/EIS defining "new route":  New routes are defined as those |

BLM_0012102