| Preservation | | | labeling them "existing" routes. (FOOTNOTE: BLM currently interprets the Section 106 regulations to require a Class III inventory prior to the designation of new routes as well as prior to the designation of certain existing routes for continued use. IM No. 2007-030. Thus, to the extent BLM does not perform Class III inventories of "new" routes because it labels them "existing," it would contravene this interpretation.) Under the preferred alternative, BLM would not perform Class III inventories prior to designating an "existing" OHV route for continued use. Draft RMP at 2-7. This management prescription comes from a BLM Instruction Memorandum (1M) issued in December 2006, which generally requires Class III inventories for the designation of "new" routes but not for the designation of continued use on "existing" routes. IM No. 2007-030. However, neither the DRMP nor the IM define the term "existing route." Thus, an "existing" route may mean a route previously .designated for OHV use by BLM. See Draft RMP at App. G-4 (identifying areas limited to "designated" and "existing" routes under the current RMP). But it may also reasonably be interpreted to mean a route that is physically present on the ground. Both interpretations would frustrate Section 106 compliance. The former because a route previously designated through the land use planning process does not necessarily mean that a Section 106 review occurred in association with the designation. In fact, the Draft RMP is silent as to whether BLM complied with Section 106 for existing route designations in the Moab Field Office. See Draft RMP at 3-83 (discussing route designations under current RMP). The latter interpretation would also prevent BLM from fulfilling the requirements of the Section 106 process because each route proposed for designation under the preferred alternative currently exists on the ground. See Draft RMP at App. G-5. Thus, the "existing" route exception would effectively swallow | not designated in the Travel Plan accompanying this RMP". |

BLM_0012103

| | | | the whole, and could entirely exempt all routes within the Moab Field Office from the requirements of Section 106, including those routes created by users through time and without regard for their direct and indirect effects on cultural resources. See, e.g., id at 3-79 (describing a "network" of user-created routes in the White Wash Dunes area). For the foregoing reasons, BLM must define the term "existing" route to mean only those routes previously designated through the land use planning process and for which BLM completed the Section 106 process. | |
| National Trust for Historic Preservation | 489 | 3 | We recommend that BLM develop a comprehensive strategy for complying with Section 106 prior to designating OHV routes, provide the public with an opportunity to review and comment on the strategy, and consider the following recommendations during the development of this strategy. These recommendations are not intended to represent an exhaustive list of what we believe Section 106 requires for this undertaking. Rather, we provide them here to highlight specific aspects of the Section 106 process that we feel are particularly important in this context: 1. Consult with Indian tribes. BLM must consult with Indian tribes that attach religious or cultural significance to historic properties in areas potentially affected by the proposed OHV designations. Additionally, BLM should revise the Travel Plan to reflect the findings of the ethnographic study referenced in the Draft RMP. Draft RMP at 3-16. 2. Define the areas of potential effect for the proposed routes broadly and in such away that fully captures--their indirect and cumulative effects on cultural resources. 3. Identify cultural resources within the areas of potential effect in accordance with IM 2007-030. As discussed above, BLM should only exempt routes that have previously undergone Section 106 review from the IM's requirement for a Class III inventory. | The BLM will adhere to its Section 106 responsibilities as directed by the NHPA regulations and BLM IM-2007-030 (Clarification of Cultural Resource Considerations for Off-Highway Vehicle Designation and Travel Management). As described in BLM IM-2007-030, cultural resource inventory requirements, priorities and strategies will vary depending on the effect and nature of the proposed OHV activity and the expected density and nature of historic properties based on existing inventory information.

A. Class III inventory is not required prior to designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open. B. Where there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with section 106, focused on areas where adverse effects are likely to occur, is required prior to designation. C. Proposed designations of new routes or new areas as open to OHV use will require Class III inventory of the APE and compliance with section 106 prior to |

BLM_0012104

4. Evaluate the direct, indirect, and cumulative adverse effects of the proposed routes. The Section 106 regulations require BLM to identify and resolve the direct, indirect, and cumulative adverse effects of the proposed OHV designations on cultural resources. 36 C.F.R. § 800.5(a)(1). As part of this analysis, BLM must consider the possibility that OHV route designations will provide greater access to cultural sites and thus increase the likelihood of vandalism, looting, and the inadvertent destruction of cultural sites. See Jerry D. Spangler et al., Chasing Ghosts: An Analysis of Vandalism and Site Degradation in Range Creek Canyon, Utah 21 (2006) (finding a dramatically higher frequency of vandalized cultural sites within 200 meters of a section of the Range Creek Canyon road open to motorized use).

5. Develop a programmatic agreement in consultation with the Advisory Council on Historic Preservation, Indian tribes, Utah State Historic Preservation Office, and other interested parties. The Section 106 regulations allow federal agencies to develop a programmatic agreement (PA) "to govern the....resolution of adverse effects from certain complex project situations or multiple undertakings" in consultation with the Advisory Council. 36 C.F.R. § 800.14(b). The designation of OHV routes in the Moab Field Office clearly meets both of these criteria. A PA would allow BLM, in consultation with the Advisory Council, Utah SHPO, and other interested parties, to develop alternative methods for complying with the Section 106 requirements prior to implementing the OHV routes. .

designation. Class III inventory of the APE and compliance with section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.

D. Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may be appropriate for larger planning areas for which limited information is currently available.

The BLM has consulted with Native American tribes concerning all decisions in the PRMP/FEIS, including the Travel Plan accompanying this RMP.

The BLM has consulted with the Utah SHPO regarding all decisions in the PRMP/FEIS, including the Travel Plan accompanying this RMP.

The Area of Potential Effect for any project is determined in consultation with the appropriate SHPO/THPO in accordance with 36 CFR 800.4(a)(1).  This will occur upon initiation of the Section 106 consultation process for this RMP.

Each route designated in the Travel Plan was examined individually by a professional BLM archaeologist (see Appendix G for a description of the Travel Plan process). Those routes that posed cultural conflicts that outweighed the purpose and need for the route were not designated.  The archaeologist looked at each of 33,000 road segments in the Moab planning area.

The Draft RMP/EIS acknowledges that the illegal activities, such as vandalism and looting, may be impacted by changes in access, as is specifically identified in section 4.3.5. The Draft RMP/EIS does not include a detailed analysis of illegal activities. Enforcing

BLM_0012105

| | | | | |
|---|---|---|---|---|
| | | | | the RMP decisions is an implementation-level action. Concerning the impacts from OHV leaving routes that are identified in an alternative, the Draft RMP/EIS analyzes the effects of the proposed actions, which does not include public land users driving off identified routes in areas that where OHV use is limited to identified routes.<br><br>Programmatic agreements are administrative actions and do not require a planning decision. |
| | 492 | 1 | The law encourages the BLM to be proactive in the protection of cultural resources. The National Historic Preservation Act directs the BLM to do inventories, actively manage and nominate sites for historic registration. Overall, this Management Plan is not proactive. It does not carry out the spirit of Preservation Act, Section 110. Instead of using field inventories, you are basing decisions on archeological density averages. You are relying on Section 106 of the Preservation Act almost entirely.<br><br>Even Alternative B fails to offer cultural resource protection, but it is the best in the plan. I urge you to select B and do the intensive field inventory work necessary to make the decisions you have prematurely made in other alternatives. | National Register nomination is done on a site-specific basis and does not require a land use plan decision. The prioritization of National Register nominations has been removed from the PRMP/DEIS.  A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available.  All cultural resources are protected by law, regulation and policy.  The commentor's preference for Alt. B is noted. |
| | 492 | 2 | We believe that the BLM has done a poor job of cultural resource management associated with this RMP. We are especially concerned with the use of computer modeling to determine cultural resource locations.<br><br>"A limited percentage of lands within the MPA have been physically inspected for the presence of cultural resources, and such an effort is cost-prohibitive as part of preparing the RMP. Therefore, the relative site density potential for areas within the MFO was estimated using environmental factors known to influence site location | In accordance with the BLM Land Use Planning Handbook (1601.1), a Class I cultural survey was conducted.  the cultural model was developed by a BLM professional archeologist. The model identified high, medium, and low site densities and this information was used to quantify the impacts. The model was tested by intersecting 4,259 known cultural sites with the probability coverage in GIS. The DRMP/EIS states on pg. 4-30 "while the site density prediction model used in this analysis is by no means a perfect predictor of site density it is sufficiently accurate (73% success rate) to |

BLM_0012106

| | | | | |
|---|---|---|---|---|
| | | | and type. All areas of the MFO were then ranked as having high, medium, or low potential for containing cultural sites." (Page 3-19)<br><br>This problematic approach does not acknowledge that people and their archaeological footprint are not entirely predictable. We recognize that complete surveys have not been done. However, there has been extensive documentation of cultural resources. "The MPA has approximately 5,200 inventoried cultural sites." (Page 4-253) It is not clear to us that these actual site locations have been given consideration in the RMP.<br><br>The RMP is bereft of information regarding the amount of protection that will be provided to cultural resources. Pages 2-2 through 2-6 provide helpful information regarding the coverage of Off-Highway Vehicle designations, Special Recreation Management Areas, Oil and Gas Leasing and Development, River Classifications, Wildlife, and Wilderness under the various proposed alternatives. No information is provided for cultural resources. There is no way to determine what percentage of the modeled high, medium, or low site probability acreage (Table 3-7, Page 3-19) is covered by an ACEC or special management consideration. Nor is there any way to determine how many of the 5,200 inventoried cultural sites are protected.<br><br>We strongly encourage the BLM to do a better job of managing and protecting cultural resources in the development of future regional management plans. | be utilized as a tool for analyzing potential relative involvement of cultural resource sites in management decisions.  A full cultural inventory is not required for a land use plan. Washington Office Instruction Memorandum 2007-030 states that a Class III inventory is not required for the designation of existing routes. Furthermore, FLPMA states that in the development and revision of land use plans the BLM should rely on the inventory of the public lands, their resources, and other values, to the extent such information is available. The BLM will continue to enhance the inventory and density techniques for high cultural value areas identified in the final plan.<br><br>The number of identified cultural sites has been corrected on p. 4-253.  There are approximately 4,200 cultural sites in the Moab planning area.  All cultural sites are protected by law.  An ACEC designation is not required to protect cultural sites.  Three areas are proposed for ACEC designation in the preferred alternative for the relevant and important value of cultural resources:  Behind the Rocks (5,201 acres), Mill Creek Canyon (3,721 acres) and Ten Mile Wash (4,980 acres). All three of these proposed ACECs have a concentration of cultural resources. |
| | 492 | 3 | Development – We are concerned with development near rock art sites. Allowing camping, roads, oil and gas, and mining near rock art sites is a concern to us. It is clear to us that the greater the number of people that have access to a site, the higher the probability that the site will be vandalized. Unless sites are actively | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Cultural Class III inventories would be required for all new roads and trails. |

BLM_0012107

| | | | | |
|---|---|---|---|---|
| | | | managed and hardened for visitation we suggest that development be kept away from most rock art sites. | Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. All land disturbing activities within Traditional Cultural Properties would be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions would be modified to avoid the area or site, avoid time of use by native American groups, or would be eliminated altogether.   Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. |
| | 492 | 12 | Hellroaring Canyon – An unauthorized off-road vehicle road has been created to the Barrier Canyon Style pictograph site in this canyon. We recommend that this road be closed to protect the rock art site. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. The vehicle route in the main part of Hell Roaring Canyon was bladed during the uranium mining era of the 1950's.  This constructed route has been designated in the preferred alternative.  The user-made spur route from that route to the actual rock art site is not designated. |
| | 492 | 14 | Levi Well – We are concerned about a road segment which bisects an area with a high archeological site density. It is south of Levi Well located in the south half of section 25 Township 23S, Range 18E. In addition to a very extensive lithic scatter, there are rock art panels and dinosaur bone area. Recently a Site Steward encountered remains of a new campfire and camping activity on the site. The area needs to be managed to protect site integrity. | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See also response to comment 415-13. |
| | 492 | 15 | Rock Art Nomination Districts – URARA is committed to the documentation and preservation of Utah rock art sites. The Moab district contains one of the highest | Under all Action Alternatives, the cultural resource management priority for Mill Creek Canyon would be scientific research. Both the north and south forks of Mill |

BLM_0012108

| | | | | |
|---|---|---|---|---|
| | | | densities of rock art in the state. We are willing to donate our time and resources to assisting the BLM in creating the Rock Art Districts described on Page 2-8 under Alternative B. Mill Creek Canyon needs to be added to this list. | Creek would be prioritized for Class II and II surveys and would be targeted for scientific restoration of damaged cultural resources. BLM believes that these measures are more appropriate to document and preserve this site than development of the site for public visitation and interpretation. On pg. 1-11 of the DRMP/EIS, volunteer coordination is identified as an issue addressed through policy or administrative action and does not require a land use planning decision.<br>The decision to prioritize sites for National Register Nomination has been removed.  National Register nomination is not a planning decision.  See response to comment 1-26. |
| The Hopi Tribe | 868 | 1 | Regarding B, C, and D, we do not support the 2/3 of sites allocated for scientific use, and less than 1/3 for conservation for further use. Avoidance of Hopi sacred sites and traditional use areas is the only real means of preventing impairment of these resources. | The BLM concurs with the Hopi Tribe that archaeological resources cannot be allocated to various uses prior to the study of these resources.  The decision allocating archaeological resources has been removed from the PRMP/FEIS. |
| | 945 | 2 | all critical wildlife habitat (including ACEC's in Alternative B) and archaeological sites outside the lands with wilderness potential should be given the protection they need to preserve them. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.   An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives.  A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" |

BLM_0012109

| | | | | means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations. The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and recreation and development on our public lands The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of recreation and development. |
| | 957 | 3 | The Draft Plan proposes to undertake cultural resource inventory and assessments for areas subject to development. This is a great idea since so little inventory data is on hand to inform management decisions. Unfortunately, the preferred alternative includes only about 60% of the total acreage potentially in play for assessment. It is unclear why the most conservative-oriented alternative would propose more inventory and assessment be preformend in the face of markedly less potential development threat. The amount of cultural resources inventory and assessment must be commensurate with the threat and I urge the BLM to be certain the final plan will allow for such activities to be preformed at the scale necessary to ensure archaeological assets are safeguarded. | The commentor is assumed to be referring to the spread, by alternatives, of cultural field inventory. A larger acreage is prioritized for cultural field inventory in the conservation alternative because the BLM is proposing a pro-active, conservation oriented alternative. Alternative D emphasizes commodity production. While the laws protecting cultural resources must be followed in implementing all actions, Alternative D is less concerned with a pro-active conservation approach. Cultural resource inventories will be undertaken in response to the development proposal. Thus, the prioritization of cultural field inventories fits the theme of each of the action alternatives. |
| | 988 | 1 | My comment is about an area south and east of Levi Well, located in the S ½ of Section 25 T23S R18E. This has a high density of Cultural Resources, including rock shelters/residential sites, and numerous rock art panels, | Each of the 33,000 routes was evaluated for its possible impacts to cultural resource, using Class I inventory methods. Many routes were deleted from Travel Plan alternatives due to conflicts with cultural resources. |

105

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | including one site that is very unusual and unique in this management area. Most of the shelter sites have suffered pothunting activities. Although there is still extensive lithic scatter, it is disappearing rapidly. A 4 wheel drive/ATV road passes through the center of the area – in some places within feet of sites. Recent camping activity has been discovered. | Under Management Common to All Action Alternatives (page 2-7), camping would be prohibited and posted within or on archaeological and historic sites eligible for listed on the NRHP. Archaeological damage violates Federal law. Violations of law are beyond the scope of the land use plan under consideration. See also response to comment 415-13. |

## Cumulative Impacts

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 61 | Re: Climate change<br>The other big-enormous, really, consideration which lies outside the RMP/EIS planning process is the undeniable reality of global warming. By all reliable measures, the pace is quickening. Planning for the condition of our environment 15 or 20 years down the road must take into account the certainty of drought, scarcity of resources, and changes in energy production and consumption, as well as related and resultant changes in political environment. | See response to comment 124-115. |
| | 326 | 2 | Alternatives A and D are absolutely outrageous, if we take into consideration all the body of scientific research and evidence (remember those pictures of dust storms, and the cheat grass fires in the news?) indicating that such type of management would produce irreversible damage to the land with severe consequences for all living beings (including those who enjoy riding their OHV cross country!)<br><br>The preferred alternative, C, is a little bit less outrageous, but also unacceptable because it proposes to convert a vast area (almost 2000 acres) in potential hazard for the rest of the land (again remember the pictures of dust storms, and the cheat grass fires in the | Alternative C proposes to manage 1,866 acres in and around the White Wash Sand Dunes as open to cross country travel by OHVs.  Alternative C limits travel to designated routes in the remainder of the planning area. Chapter 4 of the DRMP/EIS acknowledges that Alt B, with 0 acres open to cross country travel, results in fewer impacts to soils than does Alt C.  The area around White Wash Sand Dunes is primarily sand dunes, and cheat grass is not an issue. |

BLM_0012111

| | | | news?). | |
| --- | --- | --- | --- | --- |
| | 658 | 1 | The cumulative impact analysis for the RMP is inadequate. The analysis of cumulative impacts does not support the conclusions reached and does not provide sufficient information to evaluate the impact. For instance, the first resource category listed in section 4.3.24.1 is air quality. The analysis of cumulative impacts on air quality for all alternatives is only two paragraphs in length, containing a mere 264 words. The document states, "Long term cumulative impacts from the activities proposed for all resource decisions on air quality are projected to be minimal to negligible under all alternatives," but provides very little data to support this conclusion. The only supporting statement for this conclusion is a single sentence that states, "Detrimental effects from oil and gas development are expected to be small as emissions and fugitive dust control would be a required part of the permitting process." Well, how small is small and how does this relate to other impacts from other past, present, and reasonably foreseeable future projects? Without providing more specificity on the impacts of this project and the impacts of other related projects, including those of other RMPs the BLM has under consideration, there is no way to determine the magnitude or significance of the cumulative impact or the degree to which this RMP contributes to these impacts. This comment is not limited to just air quality but to all resources addressed in the cumulative impacts section. | See response to comment 124-7.<br><br>The BLM has added the following reasonably foreseeable non-BLM actions to the cumulative impact analysis: minerals extraction on private and SITLA lands; on going residential growth and business development throughout the planning area; and expansion of U.S. Highway 191. OK |

## Designated Wilderness

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
| --- | --- | --- | --- | --- |
| | 303 | 2 | I believe that it is illegal to try to create a de-facto Wilderness by some of the management policies you | See response to comments 120-8, 121-10, 121-58, and 121-61. |

107

BLM_0012112

| | | | | |
|---|---|---|---|---|
| | | | propose to use: Only congress, not he BLM, can make Wilderness or National Parks. Yet the overly restrictive use of management tools such as primitive recreation zones, ACECs, and "areas with wilderness character" have the practical on-the-ground effect of making de-facto Wilderness in some areas, or expanding the territory of Arches and Canyonlands National Parks. | |
| | 336 | 2 | All areas identified in America's Redrock Wilderness proposal should be identified as wilderness in this plan and managed to conserve these values while the issue is being decided in court and congress. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 409 | | Moab RMP needs to rely on the inventory of the wilderness character lands to revise their management plan, as required by law. This means that wilderness character lands found in the inventories need to be managed to protect their values. The Interior Department's settlement with the State of Utah in 2003 established that the BLM does not have the authority to establish Wilderness Study Areas. But the Interior's BLM Instruction Memorandum 2003-274 and 275 clarified the procedure in Consideration of Wilderness Characteristics in Land Use Plans. The Memorandums said that the settlement did not diminish the BLM's authority to inventory public land resources and to consider them during land use planning. According to FLPMA, section 201, the Secretary is required to maintain on a continuing basis an inventory of all public lands and their resource and other values (including but not limited to, outdoor recreation and scenic values) giving priority to areas of critical environmental concern. In addition, FLMPA section 202 c-3 and c-4 respectively, say that the Secretary is also required to give priority to the designation and protection of areas of critical environmental concern and rely, to the extent it is available, on the inventory of the public lands, their resources, and other values when developing and revision of land use plans. | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012113

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | All the lands inventoried as wilderness contained in HR 1796 and S639, America's Red Rock Wilderness Act, including all the lands listed in table 15B-1 in the DRMP EIS and found to have wilderness character in the BLM's 1999 inventory should be off limits to ORV routes,  ROW, mineral exploitation and other activities that will irreparably damage their wilderness character. There is no doubt that activities proposed in Alternative C will irreparably damage these lands and this is documented in the BLM's EIS (chapter 4). It is the BLM's fiduciary responsibility to the national interest, as is evidenced by the choice of Alternative C as their preferred alternative, is more seriously in question than prior to the release of this document. | |
| | 417 | 5 | Lands with Wilderness Character: There is no justification for this process, once the 603 process was completed the agency was supposed to be done with this. The 603 process determined that 3.2 million acres were suitable for congressional consideration; the BLM should not be reviewing this yet again. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 825 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto Wilderness management are unlawful. | See response to comments 120-8, 121-10, 121-58, and 121-61. |

## Fire

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 22 | 4.3.11.1 Impacts of Fire Management Decisions on Riparian Resources. Page 4-241, 4th Paragraph, 4.3.11.1:  Non-fire fuel treatments are not the only issue to consider. Impacts of fire management decisions within the greater watershed could have serious environmental | Fire treatments are implementation actions in which environemtnal impacts would be analyzed on a cases by case, site specific basis following completion of the land use plan.  This environmental documentation would consider ptoential environmental impacts to soil, water, |

BLM_0012114

| | | | | |
|---|---|---|---|---|
| | | | consequences in downstream riparian areas.  Fire fuel treatments upstream and adjacent to riparian resources have a great potential to increase soil erosion and introduce exotic weeds into the riparian areas.  Runoff from these upstream activities could also seriously impact water quality, increasing salinity, selenium, and many other chemicals in unnatural quantities. The direct, indirect, and cumulative impacts of these activities have not been, and must be analyzed in detail in this Moab RMP/DEIS. | air, and potential for exotic species invasion. |
| ECOS Consulting | 9 | 38 | 4.3.13.1 Impacts of Fire management Page 4-279, 5th Paragraph, 4.3.13.1: This plan should discuss in greater detail the procedures used in fuel-reduction projects. Specifically, will machines be used? If so, what will be done to minimize the destruction of biological soil crusts (BSC's), and what is the projected amount of disturbance to soils?  In many cases, the destruction BSCs during these fuels reduction project areas can exceed 60-80% of the soil surface. Once destroyed, BSCs take many, many years to recover, depending on site characteristics and micro-environment. The benificial effects of emergency stabilization projects will oftentimes only last a year or at best a couple of years, and the advantages of many of these projects are often canceled by the amount of biological soil crusts disturbance that occurs during placement.<br><br>The BLM must state specifically what procedures it will follow in order to protect soil and vegetation resources during these fuel reduction projects. Otherwise, there is no ways that the potential damage can be assessed. Are there results of monitoring past fuel reduction projects that the BLM can summarize in this document, so that we can make informed decisions and recommendations? How many fuel reduction projects have been done in the past in the Moab Planning Area? How much soil surface was disturbed? How effective were these projects? What | Fuel reduction projects are implementation actions in which environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan.  This anlysis would consider potential environmental impacts to air, water, and soil.<br><br>See response to comment 124-7. |

110

| | | | | |
|---|---|---|---|---|
| | | | are the indirect and cumulative effects of those activities? | |
| ECOS Consulting | 9 | 39 | Page 4-279, 6th Paragraph, 4.3.13.1:  Are catastrophic fires a real and common threat to habitat of the Moab Planning Area?  How many have there been in the past 10 years? 50 years?  Has there been any research on the actual cause of these lands becoming more susceptible to catastrophic fire?  Isn't it possible that catastrophic fires can be a result of mismanagement and allowed destructive uses of the land?  There is no data in the DRMP that suggests that fuel reduction projects are really necessary. The associated activities can cause more problems because of widespread soil disturbance impacts.  Is BLM using fuel reduction projects as a way to allow firewood gathering, or to clear an area for increased grazing potential?  Has Moab BLM conducted any assessments of these "catastrophic" fires looking at the amount of actual damage that has occurred?  Were the soils burned into sterility?  Were the crusts completely destroyed?  What recovered, and what was the recovery rate?  These are all questions that need to be addressed in order to make informed decisions about managing fuel reduction activities for the next 10-20 years. | On pg. 4-279 of the DRMP/EIS, for all alternatives, states that estimated fuel reduction treatments of 5,000 to 10,000 acres per year would be targeted.  Furthermore, because specific areas are  not designated for treatment each year, the specific soils affected are uknown;  therefore, a qualitative assessment of short and long term impacts follows in the text.  The text further states that individual fire management projects will be analyzed at the implementation level with site specific NEPA documentation under all alternatives. |
| ECOS Consulting | 9 | 59 | Page 4-444, 2nd paragraph, 4.3.19.2: The last sentence states that trampling would have short-term negative effect. This is not true! Any trampling and destruction of biological soil crusts, which the BLM classifies as "Sensitive Soils", in any of the habitats in the Moab Planning Area can have serious long-term effects due to high soil erosion and vegetation loss, and the slow natural restoration rates of these soil and vegetation types. Avoiding trampling and other surface destruction activities must be first and foremost in the planning of fire management activities. | The section referred to by the commentor in the DRMP/EIS (pg. 4-444) involves impacts of fire management decisions on wildlife and fisheries.  Therefore, this section has nothing to do with soil impacts.  The trampling referred to involves trampling of vegetation and human cause wildlife disturbance.  According to US Department of Interior Technical Reference 1730-2 on Biological Crusts, Ecology, and Management when biological crusts are completely removed, recovery can be excessively slow.  In contrast biological crusts crushed in place with vehicles, foot traffic, and horses recover much faster especially on fine |

111

BLM_0012116

| | | | | textured soils. |
|---|---|---|---|---|
| ECOS Consulting | 9 | 60 | Page 4-444, Section 4.3.19.2.1: In what specific areas does the BLM plan to manage with prescribed fires? There are no maps or other resources in this Moab RMP or in the Utah Land Use Plan that show where, and what habitat will be treated.  It is difficult to make an assessment of this activity without specific plans, or at least a summary of the plans. Is there a high probability of catastrophic fire in many areas within the Moab Planning Area? What habitats would be susceptible? How much acreage is involved? It seems that most of the Moab Planning Area consists of desert scrub which is not susceptible to fire, unless the cheat grass is unusually thick. Pinyon-juniper is susceptible in many areas in the West but in the Moab Planning Area it is usually not thick enough in most areas to be a catastrophic fire risk. Sagebrush is probably the most fire susceptible habitat but only incorporates less than 8% of the Moab Planning Area. | See response to comment 9-39. |
| | 326 | 1 | Alternatives A and D are absolutely outrageous, if we take into consideration all the body of scientific research and evidence (remember those pictures of dust storms, and the cheat grass fires in the news?) indicating that such type of management would produce irreversible damage to the land with severe consequences for all living beings (including those who enjoy riding their OHV cross country!)

The preferred alternative, C, is a little bit less outrageous, but also unacceptable because it proposes to convert a vast area (almost 2000 acres) in potential hazard for the rest of the land (again remember the pictures of dust storms, and the cheat grass fires in the news?). | The commentor's thoughts regarding management under Alternatives A, C, and D are noted. |
| Town of Castle Valley | 981 | 1 | With regard to fire management, we fail to see anywhere in Section 4.3.3 on Fire Management a discussion of the issue of fire management on a designated sole source | Specifics as to fire management within the Castle Valley area are not a land use planning decision.  Such specifics would be handled at the site specific fire project |

BLM_0012117

| | | | | |
|---|---|---|---|---|
| | | | aquifer. We expect that any such activities need to be discussed and coordinated with our Town, and, as is stated in your draft, would need to undergo an EPA environmental review for compliance with the goals of the regulation, since they fall into the category of a federal project. | level. |
| | 1030 | 2 | P. 1-10 Issue #9. A fire management plan would be developed to address high risk areas, fire prevention, prescribed burns, rehabilitation and restoration, hazardous fuels reduction, and the protection of life and property.<br><br>Note: this text differs from other issues statements because the above sentence indicates future planning. Does that carry throughout the document? And are all issues evaluated in light of future planning that will tier to the RMP/EIS? I'm sure they are, but only says so overtly for one issue is at least a yellow flag. I would revise or delete the above sentence and make the statement about the need for and commitment to future fire management planning later (probably in the affected environment for this issue). Look at Issue 10 as a template if you decide to reword #9. This comment may be meaningless as it relates to completed analysis/might not be worth the time to address because of that. | The text in question has been revised. The revised text states: Fire management planning is necessary to address these and other wildfire related issues. |
| | 1030 | 8 | P 2-76. Fire mgmt comparison across alts seems incomplete – wouldn't there be greater improvements to riparian under some alternatives vs. alt A? | The impacts of fire management decisions on riparian resources are the same across all alternatives because all fire management decisions are common to all alternatives; they do not vary by alternative. See pages 2-8 through 2-10 in the DRMP/DEIS. |

## Forestry and Woodlands

| Organization | Record ID & Comment Number | Comment Text | Response to Comment |
|---|---|---|---|
| The Nature | 204 | 28 | Woodlands (Pg 2-55—2-56) Though not specifically | Cross country motorized travel off designated routes is |

BLM_0012118

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Conservancy | | | mentioned in this section of the DRMP, we assume that cross-country motorized travel off of designated routes would be prohibited for purposes of retrieving and transporting harvested woodland products. | prohibited in the entire field office except for 2,000 acres near the White Wash Sand Dunes.  There is no purpose which negates this rule.  Neither wood cutting, antler collection, access to dispersed camping or any other purpose is a legal reason to engage in cross country travel in an area where travel is limited to designated routes. |
| The Nature Conservancy | 204 | 29 | Woodlands (Pg 2-55—2-56) As a more technical note, the language used in each of the four Alternatives on DRMP Page 2-56 appears to be confusing. Each one is a single run-on sentence that seems to combine the concepts of provide and prohibit. Although one can figure out which acreage value applies to which concept, it would be best for the Final RMP to use language such as separate sentences so that the distinction between "provide" and "prohibit" is clear and unambiguous. | The language on page 2-56 has been corrected to be more direct. |

## Grazing

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 3 | The alternatives in the Moab RMP show very little difference in range regarding how much actual grazing wil be permitted. The present Alternative range of allowing livestock grazing on 91.5% (Alternative A) to 97% (Alternative D) is unacceptable. | The land use planning decision for livestock grazing involves identifying the areas that are available or not available for grazing.  There is a narrow range in the alternatives for livestock grazing because the entire area is considered chiefly valuable for livestock grazing.  Therefore, only areas with known major resource conflicts were considered for not grazing during the life of the land use plan.  All other resource concerns involving livestock grazing are evaluated on a site specific allotment basis during permit renewal utilizing the Standards for Rangeland Health and Guidelines for Grazing Management.  See also Chapter 2, which details the grazing alternatives considered but dismissed from further analysis. |

114

The MFO is actively monitoring allotments and assessing if the RHS are being met. Allotments found not to be meeting are evaluated and changes made to the grazing permit that will move the allotment or watershed towards meeting Standards. This is an implementation phase of the current RMP and will continue in this RMP as proposed.

It is BLM policy to monitor existing livestock use levels, forage utilization, and the trend of resource condition and make necessary adjustments on an allotment or watershed basis.  These actions are activity-based actions and are part of the implementation of an RMP to assure that Rangeland Health Standards are met, as well the other objectives of the RMP.  Regulations at 43 CFR 4130.3 require that the terms and conditions under which livestock are authorized "ensure conformance with the provisions of subpart 4180," the Standards for Rangeland Health and further 43 CFR 4130.3-1 require that "livestock grazing use shall not exceed the livestock carrying capacity of the allotment".

It would be inappropriate and unfeasible to estimate variable levels of livestock and wildlife use and determine what specific changes to livestock and wildlife numbers and management are appropriate at the RMP planning level.  Such changes would not be supportable and need to be made by considering the monitoring data on a site-specific basis.  The BLM policy directs that monitoring and inventory data be evaluated on a periodic basis and that change to livestock numbers and management be made through a proposed decision under 43 CFR 4160. These implementation level decisions will be in conformance with the Goals and Objectives of the applicable RMP, and must protect and enhance the conditions and uses of the BLM lands.

BLM_0012120

| | | | | The state of Utah monitors water quality and coordinates and cooperates with BLM to conduct water quality testing. When Standard #4 (water quality) is not meet and livestock management is found to be a significant contributing factor changes will be made to the affected grazing permits to make progress towards meeting this Standard. At this time no water quality testing has failed to meet Standard."<br><br>See allotments map 2-4. |
|---|---|---|---|---|
| ECOS Consulting | 9 | 9 | Inadequate Analysis of Short- and Long-Term Effects of Livestock Grazing.  The BLM has failed to consider adequately the extensive adverse long-term and historic direct and, indirect, and cumulative impacts of livestock grazing.  The extremely high historical stocking rates and overgrazing, and livestock preferences for certain more palatable plants, has lead to significant alterations in the species composition of vegetation types across the Southwest (Leopold 1924; Cottam and Steward 1940; Cooper 1960, Buffington and Herbel 1965; Humphrey 1987; Grover and Musick 1990, Archer 1994, Fleischner 1994; Pieper 1994; Mac et al. 1998).  Livestock also altered vegetation composition by serving as the vehicle for the spread of weedy and exotic plant species (Mac et al. 1998, Warshall 1995).  Livestock use of riparian zones has had particularly significant negative ecological impacts (General Accounting Office 1988; Szaro 1989; Bahre and Shelton 1993; Fleischner 1994, Mac et al. 1998).<br><br>In this Draft Moab RMP/EIS, the BLM proposes to exclude livestock from only 48,220 acres for the benefit of wildlife?  This is woefully inadequate because it represents only 2.6% of the 1,800,000 acres of the Moab Planning Area.  In other words, livestock grazing will be allowed on more than 97% of | See response to comment 9-3.<br><br>Alt C of the DRMP/EIS proposes to close 114,234 acres to grazing. |

116

the Moab Planning Area, even though most of the soils and vegetation types are extremely susceptible to damage form livestock.  The BLM is ignoring the serious short- and long-term adverse impacts from livestock grazing in desert environments that have been documented in so many published papers, see above list.  Livestock grazing has one of the most widespread and greatest negative impacts on the ecosystem than any other land use.  Overgrazing is widely considered a major trigger of soils erosion, flooding, and arroyo cutting in the Southwest (Wooton 1908; Leopold 1924, Cooperrider and Hendricks 1937; Cottam and Stewart 1940; Smith 1953; Cook and Reeves 1976; Bahre and Bradbury 1978; Branson 1985; Bahre 1991, Mac et al. 1998).

How can allowing livestock grazing on over 97% of the Moab Planning Area be considered "multiple use" when this activity adversely affects all habitats and all other activities? How can allowing livestock grazing on over 97% of the Moab Planning Area enable the BLM to achieve "sustained yield" when this activity is known to have serious adverse impacts on biological soil crusts and vegetation? Along with OHV use, this is one of the primary issues that the BLM must begin to manage properly, if its management is to have any effect on providing a healthy ecosystem for future generations.

The range of alternatives for livestock grazing is not adequate and must be expanded to include alternatives that allow little (15-25%) or no grazing (0%) or some grazing (50%), or a lot of grazing (90%). As currently planned, with most of the area with in the Moab Planning Area open to the widespread soil and vegetation adverse impacts of livestock grazing, on over 90% of the 1,800,000 acres, it appears that the

BLM_0012122

| | | | | |
|---|---|---|---|---|
| | | | mandates of "multiple use" and "sustained yield" are in jeopardy.  This is a certainly is not "ecosystem management" for the good of the American people.<br><br>It is well documented in the scientific literature that the adverse impacts of livestock grazing have greatly altered the upland and riparian areas within the Southwestern U. S. for many, many, years (Fleischner 1994, Mac et al. 1998).  So much so, that historic floodplains and riparian habitat have been transformed into uplands, many streams have become entrenched due to erosion an arroyo cutting, and native vegetation communities have been reduced to a fragment of what they once were.  The disappearance of native vegetation an mature biological soil crusts in many areas is a direct effect of grazing.  Livestock grazing remains a key process affecting Southwestern ecosystems, and eliminating livestock entirely may be the only way to allow some systems to recover (Mac et al. 1998)  These adverse impacts have serious direct, indirect , and cumulative negative effects on soils, vegetation , water quality and quantity, wildlife populations viability, reproduction, and habitat suitability.   The extent and duration of theses impacts must not be ignored by the BLM in this document that plans for the next 10-20 years.  "The mission of the BLM is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations" (BLM 2001).  This mission is in jeopardy if livestock grazing is allowed to continue on over 90% of the Moab Planning Area, and if correcting these long-term and adverse impacts is not a top BLM priority. | |
| ECOS Consulting | 9 | 26 | Page 4-242, Table 4.71: Percentages are wrong. Actually they are: 32.9% (Alternative B), 8.7% (Alternative C), or 7.4% (Alternative A), or 3.7% (Alternative D). | The BLM agrees that the percentages on Table 4.71 and in the text are wrong and that the percentages provided by the commentor are correct.  The corrections to the table and text have been made in the PRMP/FEIS. |

BLM_0012123

| ECOS Consulting | 9 | 27 | Page 4-242, 4th Paragraph, 4.3.11.3.2: Is "River" an actual grazing allotment? If so, where is it? | Yes.  This allotment is located near the Colorado River along Highway 128 at milepost 15. |
|---|---|---|---|---|
| ECOS Consulting | 9 | 43 | Page 4-282, 2nd Paragraph, 4.3.13.4: As stated in this paragraph, livestock have many many indirect adverse effects on water quality.  However, not stated are the direct adverse effects on water quality and stream morphology.  These must be considered in this analysis. Direct adverse effects include the introduction of waste material directly into a stream, increasing fecal coliform counts and total phosphorus; trampling within the streambed and the loss of stream roughness due to the destruction of point bars, stream bed materials, and stream banks; and the increase in salinity, dissolved solids and total suspended solids due to directly trampling and destruction of vegetation and soils on the streambed and stream banks. | All resource concerns involving livestock grazing are evaluated on a site specific allotment basis during permit renewal utilizing the Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 9-3. |
| ECOS Consulting | 9 | 44 | Healthy Rangelands, Standard #1 states that " Upland soils exhibit permeability and infiltration rates that sustain or improve site productivity, considering the soil type, climate, and landform". Can the BLM show where the monitoring for this standard has taken place? What are the procedures and methods, and how is this monitoring documented? What are the results for the different allotments? Is there any independent analysis or review of this information? I know of numerous allotments in the Moab RMP Planning Area where the field conditions are below the BLM standards. If I don't hve access to the BLM's own monitoring information, how can citizens analyze whether the BLM is doing its job or not? Or how can we trust that the BLM will do its job for the next 10-20 years of the life of this RMP? Without the propper documentation, and an open system of citizen review, the BLM cannot be trusted to make the best decisions, especially considering its past performance and the conditions in the field. There is no mention of a citizen review process in this RMP. It is recommended that | See response to comment 9-43.  An administrative process for interested parties to participate in grazing decisions has been established.  This process is followed for all permit renewals and other actions taken on grazing allotments as part of the implementation of this plan. This planning process also includes public participations as provided for in Handbook 1610 and has been followed throughout the development of the RMP.<br><br>See response to comment 9-3. |

119

| | | | the BLM develop for this RMP a process whereby citizens can participate in and review grazing allotment management and monitoring programs. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 45 | Page 4-282, 4th paragraph 4.3.13.2: Table 4.80 shows the acers of sensitive soils affected by each Alternative. It appears there is little difference between any of the Alternatives. What differences that do exist, are negligible. Is this anyway to manage this most destructive activity on land? Livestock grazing adversly effects just about every part of the ecosystem, its negative impacts are well documented, especially the destruction of soils and vegetation, and the contamination of water. This Moab RMP is a planning document of the next 10-20 years, and the BLM is skimming over the most ecological destructive activity, grazing, as if it could and should just manage itself. Estimated acres of disturbed land is not an analysis and is not adequate. NEPA requires that the BLM perform an analysis of the short-term, long-term, direct, indirect, and cumulative impacts, and that conclusions be based on these analyses.<br><br>It is recommended that before this RMP is finalized, the BLM make a serious analysis of the effects of grazing on arid lands such as these in the Moab RMP Planning Area, and document their findings so that the public can see exactly what the costs of this activity are on our public lands. Has the BLM documented any studies or monitoring on specific areas within the Moab Planning Area? Are there any results? This information is necessary because it can seriously effect whether or not our public lands are in a functioning condition now and for the next 10-20 years. With this information,and the results of monitoring that the BLM has been doing for the past 40-60 years here in the Moab Planning Area, we, the public, can comment properly on the effectiveness, or lack therof, of grazing management | Table 4.80 refers only to the allotments that are available or not available to livestock grazing for the alternatives in the DRMP/EIS. On allotments that will be available for grazing after completion of the land use plan, site specific analysis will continue to be done during the permit renewal process using the Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 9-3.<br><br>The information requested by the commentor is available to the public by request and can be utilized by the public during the permit renewal process. |

BLM_0012125

| | | | | |
|---|---|---|---|---|
| | | | by the BLM. | |
| ECOS Consulting | 9 | 46 | Page 4-282, 6th paragraph, 4.3.13.4: The statement that "the earlier in the year the grazing season ends, the fewer impacts to soils and water resources" is misleading.  It implies that very little will be impacted if the BLM requires livestock to be removed before the onset of spring. When in fact, there are many negative impacts to upland and riparian soils, vegetation, and waters that take place regardless of the season, and sometimes they are even more severe. This is so because during late fall and winter the livestock need to move around more to find food and there is less protection of soils due to seasonal vegetation loss and over grazing. These impacts include: Wtaer contamination from livestock wastes; biological soil crust destruction from trampling, stream bank destruction and damage from the increased search for food during these low productivity periods; and many other serious impacts.<br><br>It is recommended that the BLM discontinue using the early season discontinuance of livestock grazing as an example of good management, when in fact, the practice merely inflicts more damage to other areas. Instead of seasonal movements,  it is recommended that the BLM do an analysis of direct, indirect, and cumulative impacts from livestock in the Moab Planning Area, and keep animals out of areas with medium to high impacts. This will require a sophisticated monitoring program that is well funded and is able to make meaningful decisions based on field conditions and trends. These studies need to involve the public and outside monitors for the results to be credible and trustworthy. | The assessment of impacts to soils and water from livestock grazing found on pg. 4-282 of the DRMP/EIS is a general statement of these impacts.  Resource concerns involving season of use are analyzed during the permit renewal process using the Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>Standards assessment and monitoring of rangeland conditions is an implementation phase of this plan and is currently an ongoing process." |
| ECOS Consulting | 9 | 64 | Page 4-448, 2nd Paragraph, 4.3.19.5.1: The BLM's Standards and Guidelines for Rangeland Health were issued about 10 years ago, 1995 or so.  Since the BLM | See response to comment 9-53. |

121

BLM_0012126

| | | | has had at least 10 years to follow and implement these guidelines, what have been the products?  Are there any peer reviewed studies and reports showing watersheds are in, or making significant progress toward, properly functioning ecological condition, including the upland, riparian-wetland, and aquatic components?  Do soil and plant conditions support infiltration, soil moisture shortage, and the release of their water that are in balance with climate and landform and maintain or improve water quality, water quantity, and tinning and duration of flow?  If so, we would like to see the data, analyses, and the location where this monitoring and analyses have occurred.<br><br>Is the past any indication of future management? What is the intensity and extent of wildlife habitat that is negatively impacted by livestock grazing? These questions must be addressed before this Moab RMP is released. | |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 5 | State policy discourages permanent closure of grazing allotments for improving watershed health, wildlife habitat, and the economic benefits of livestock production.  The state strongly suggests that BLM support flexibility within the management provisions for livestock grazing time (duration) and timing (season of use) in the final plan. | Allotments proposed for closure on page 2-12 are not permanent and the decision to close these allotments or areas may be revisited in the development of subsequent RMPs or the revision of this one. However, certain allotments may not be available for grazing over the life of the plan.  The allotments considered, as not available are spread by alternative.  Subsequent revisions of the land use plan may consider opening these areas to livestock grazing.<br><br>The vast majority (over 95%) of the Moab Planning Area is available for livestock grazing.  For those limited number of allotments shown on page 2-12 of the DRMP/EIS, the BLM is proposing that other uses of the BLM land are the highest and best use of these areas. Both FLPMA and BLM's Land Use Planning Handbook authorizes BLM to close specific areas to livestock grazing to place an emphasis on these areas for other |

BLM_0012127

| | | | | | |
|---|---|---|---|---|---|
| | | | | | purposes or values, such as wildlife use, watershed protection, and recreation.  As indicated by the variable uses of the BLM lands, as shown in the proposed action, it is BLM's intention to emphasize "multiple use" of the public lands within the planning area.<br><br>As stated in the DRMP/EIS (pg. 2-12), for those areas open to livestock grazing, grazing would be managed on an allotment basis according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health (see Appendix Q), including duration and adjustment in season of use.  This will provide the manager flexibility to adjust the permitted numbers of livestock, and the season and duration of use on specific allotments after the careful evaluation of monitoring and inventory data in full compliance with appropriate rules and regulations and BLM policy. |
| State of Utah - Public Lands Policy Coordination | 120 | 6 | The State supports the conversion of livestock AUMs to wildlife AUMs for the Diamond, Cottonwood, Bogart, and Pear Park allotments. | | The BLM has recognized (Alts A, B, & C) the wildlife value of the Cottonwood, Diamond, and Bogart allotments as acknowledged in the 1994 Memorandum of Agreement among the BLM, UDWR, and the Nature Conservancy.  The Pear Park allotment, which is unavailable in Alts A & B, has been made part of the PRMP/FEIS. |
| San Juan County | 121 | 5 | San Juan County supports livestock grazing in a prescriptive manner to accelerate progress toward improved rangeland health and reduction of catastrophic fire.  The BLM should reassess timing and season of use for grazing. | | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or not available for livestock grazing.  This is the only planning decision within the RMP.  Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| San Juan County | 121 | 6 | San Juan County feels that social/economic analysis for livestock grazing is inadequate, as many allotments have been reduced or closed. The county urges BLM to look at grazing on a watershed basis vs. an allotment basis so that livestock operations would have opportunities to be more profitable but also to benefit wildlife and other resources. | | Only one livestock allotment is proposed under any alternative for non-availability in San Juan County (Mill Creek: 3,921 acres).  Of those proposed for non-availability (including those in Grand County) under Alt C, only Mill Creek is available for grazing now.  Most of the other allotments have been unavailable for grazing since 1994, and some since the 1985 Grand RMP.  The |

BLM_0012128

| | | | | socioeconmic impacts of lost grazing opportunities is analyzed on pg. 4-258.<br><br>Decisions concerning numbers of livestock and seasons of use are made on a allotment basis using Standards for Rangeland Health and Guidelines for Grazing Management  during the permit renewal process. |
|---|---|---|---|---|
| San Juan County | 121 | 13 | San Juan County is opposed to relinquishment of preference or retirement of grazing rights in favor of conservation (p. 2-12).  BLM should clarify goals in encouraging relinquishment and what would happen to voluntarily relinquished AUMs if BLM proposes to retire AUMs.  What mechanism would be used to retire grazing rights? | The BLM does not encourage or discourage relinquishment of grazing preference.  The BLM policy concerning the voluntary relinquishment of grazing preference is included on pg. 2-12 of the DRMP/EIS.  As stated in this policy, relinquished permits and the associated preference would remain available for application by qualified applicants after the BLM considers if such action would meet rangeland health standards and is compatible with achieving land use plan goals and objectives.  Upon voluntary relinquishment, the BLM may determine through site specific evaluation and associated NEPA analysis that the public lands involved are better used for other purposes… any decision issued concerning discontinuous of livestock grazing is not permanaent and may be reconsidered and changed through future land use plan amendments. |
| San Juan County | 121 | 14 | Alternatives B and C should not favor a single use regarding vegetation treatments, but should benefit multiple use objectives (p. 2-14). | In the Draft RMP/EIS (pg. 2-14), Alt D specifically favors livestock grazing in conducting vegetation treatments.  Alt C specifies vegetation treatments that would benefit multiple use obectives including livestock grazing and wildlife as well as watershed health.  Alt B specifies vegetation treatments to benefit wildlife, watershed, soils, and riparian health.   Multiple use is defined by FLPMA as 1) the use of some land for less than all of the resources, and 2) a combination of balanced and diversed resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources. |
| San Juan County | 121 | 30 | "Competition between deer and livestock" (pg. 3-38) is used inappropriately because both livestock and deer should be managed under an allocation system for | This statement is only intended to clarify the uses occurring on the Between the Creeks allotment. |

BLM_0012129

| | | | both. | |
|---|---|---|---|---|
| San Juan County | 121 | 31 | With over 300,000 vehicles per year, are there conflicts between people and habitat for desert bighorn, bald eagle, SWWF, T and E fish, peregrine falcon and other sensitive raptors; since the RMP states that there are conflicts between people and livestock on the Professor Valley, River and Ida Gulch allotments (pg-3-39). | The conflicts between the vehicles and the livestock are in the form of vehicle collisions with cattle. Utah State Highway 128 does not cross desert bighorn habitat, and there have been no collisions between vehicles and the other species listed. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 56 | Consideration has to be given to changing livestock grazing activity throughout the area. Currently, much of the MPA is in need of changes in grazing practices. Some areas should have livestock grazing entirely removed and other areas need to have the grazing program modified. Through these efforts habitat conditions would improve in many areas and wildlife would benefit. It could be argued that changes in grazing practices with the resultant improved habitat would benefit wildlife and offset many impacts attributed to OHV activity. | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS. These site specific decisions are not land use planning decisions.<br><br>Closures to livestock use have been considered during plan development to reduce conflicts with other uses. In most cases BLM believes that multiple use is most appropriate and conflicts between uses can be mitigated to an acceptable level while meeting Utah's Rangeland Health Standards. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 78 | Of greater significance to habitat condition in the area [Thompson Trail] is livestock grazing. Observations made while flying the area made it evident that cattle grazing is having a significant impact on habitat conditions. Cattle are concentrating around water sources and along riparian bottoms. This is resulting in poor habitat conditions in these areas. Grazing can eventually reduce habitat quality species associated with riparian, desert shrub, and sagebrush habitats. If livestock grazing were eliminated or grazing practices modified to improve habitat conditions there would be an expected increase in both density and diversity of wildlife. This would more than compensate for the small amount of habitat disturbance associated with single-track trail. | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS. These site specific decisions are not land use planning decisions. |
| Colorado Off-Highway | 123 | 79 | Changing grazing practices [near Thompson Trail] or eliminating grazing would result in improved habitat | See response to comment 123-78. |

125

| | | | | |
|---|---|---|---|---|
| Vehicle Coalition (COHVCO) | | | conditions for prairie dogs and subsequently species such as raptors. This could be especially true in the case of burrowing owls that are known to focus on prairie dog towns for nesting and brood rearing. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 80 | In addition to improving vegetation and habitat conditions [near Thompson Trail] through changes in grazing practices soil compaction and salinity would be reduced.  Soil compaction results in more rapid runoff when there are events and less moisture is retained in the soil to support vegetation.  It has also been found the livestock grazing results in increased salinity. Increasing the salinity in already saline soils especially in arid areas with relatively infertile soils can result in inhibited plant diversity and density.  Which, when runoff occurs, potentially moves down drainage to the Colorado River. | See response to comment 123-78. |
| Van Loan Ranches | 195 | 1 | Our main concerns include the possible loss of our grazing allotments in Utah, one managed by Colorado (error in labeling and road closure) and one managed by Utah (Non-WSA w/ Wilderness Characteristics), and the proposed road closures in Utah (Designated Routes), some of which will close our historic and only access across public land to our Colorado deeded land and Colorado/Utah BLM summer range. The proposed road closures will eliminate our historic access to our Utah BLM and State winter range. | Two routes that start in the State section (T. 21 S, R 26 E, Section 32) on the Colorado State line, cross Utah BLM land, and enter the state of Colorado have been added to the preferred alternative.<br><br>Policy for voluntary relinquishments is given on page 2-12 of the RMP. |
| Van Loan Ranches | 195 | 2 | Livestock Grazing. There are two different Utah grazing allotments named Spring Creek in the Dolores Triangle. One is the Spring Creek-Colorado allotment, #16115, managed by Colorado BLM as part of our Colorado allotment because it is not accessible from Utah. The other allotment is Spring Creek-Utah, which has been unavailable for livestock grazing for a number of years. These are two separate, non-contiguous allotments. The Spring Creek-Colorado allotment has been available for livestock grazing since the Taylor Grazing Act was enacted and has | The confusion regarding the two Spring Creek allotments has been corrected in the PRMP/FEIS.  The map has been corrected. |

126

| | | | | |
|---|---|---|---|---|
| | | | been managed by the BLM as part of our Colorado allotment since 1992. However, on map #2-4-A and map #2-4-B and in the narrative on page 2-13 the Spring Creek-Colorado allotment is incorrectly labeled as being unavailable for livestock and the Spring Creek-Utah allotment is not mentioned in the narrative or shown on the map. The Spring Creek-Colorado allotment would be made available for grazing under Alternatives C and D; however, this is also incorrect since it is already an active allotment. Please correct the status of the Spring Creek-Colorado allotment, located in Utah at the Colorado/Utah State Line, to an active allotment managed by Colorado BLM as part of our Spring Creek-Colorado allotment. Mr. David Williams, BLM Moab office, is familiar with the correct status of these two separate allotments. | |
| Van Loan Ranches | 195 | 3 | Non-WSA Lands with Wilderness Characteristics, Alternative B.  Our winter permit is the Big Triangle allotment, #05872, located in the Dolores Triangle. We acquired this permit in 1951. This allotment is designated as having Wilderness Characteristics in Alternative B. We disagree with this assessment due to the number of roads and uses within this allotment. The BLM 1999 Utah Wilderness Inventory did not include this allotment. On page 8 of the September 2001 Renewal of Term Grazing Permit for Big Triangle Allotment it is stated, "At this time, no new significantly different information has been submitted that would compel BLM to reconsider the wilderness character of these lands or to believe that there is a reasonable probability that the area in question may have wilderness characteristics." The Wilderness Characteristics Review submitted by SUWA dated December 30, 2003, had "No" checked after the question "Was new information submitted by a member of the public for this area?" | The PRMP/FEIS restricts all vehicles to designated routes over the majority of the field office area.  This is true regardless of the land's status as wilderness characteristics.  That is, cross country travel is not allowed.  If the permittee has a specific need to access a specific site by motorized vehicle, motorized access can be granted to the permittee.  Horse use remains unrestricted. . |

BLM_0012132

| | | | | |
|---|---|---|---|---|
| | | | Should it be decided in the final Moab RMP to manage the Big Triangle allotment for wilderness characteristics, we request the use of motorized vehicles, including ATVs, by us and future permittees be grandfathered in for the movement and gathering of livestock, improvement work and allotment monitoring, which sometimes requires ATV off road use. | |
| Van Loan Ranches | 195 | 4 | Designated Routes-Spring Creek Canyon-Colorado access (Dolores Triangle). The Spring Creek Canyon-Colorado access road enters Colorado and then meanders back and forth across the state line as one travels up the south fork of the canyon to the Colorado BLM lands located on the western end of Pinion Mesa. This road is proposed to be changed to non-motorized in Alternative A and closed on Alternatives B, C and D. This is the only route across public lands we have available to access our upper private deeded land and Colorado BLM. This is the only route open to the public to access thousands of acres on top of the western portion of Pinion Mesa which includes the popular areas known as the "Hogback" and "The Big Lake." We need this road to stay open so we can stay in business. | Two routes that start in the State section (T. 21 S, R 26 E, Section 32) on the Colorado State line, cross Utah BLM land, and enter the state of Colorado have been added to the preferred alternative. |
| The Nature Conservancy | 204 | 16 | We recommend that rangeland assessments be done per Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000 or latest version) in order to know when those Standards are (and are not) being met. These items should all be carried forward into the Final RMP. The same should be done for the policy and procedures that are stated regarding Relinquishment of Preference. | The guidelines referred to by the commentor are used in the permit renewal process as part of Standards for Rangeland Health and Guidelines for Grazing Management.  This is part of the Standrads and Guidelines Process and does not need to be included in the RMP. |
| The Nature Conservancy | 204 | 21 | We notice that the next-to-last item under Management Common to All Action Alternatives refers to grazing not being authorized on portions of Beaver Creek – which we support, but which appears to be inconsistent with the treatment of Beaver Creek in Alternatives C and D on Page 2-13. Further, this list | The reference to Beaver Creek and Bogart being unavailable for grazing in Riparian: Management Common to All Action Alternatives is incorrect and this error has been corrected.) |

BLM_0012133

| | | | | |
|---|---|---|---|---|
| | | | contains reference to "Bogart," and in this context it is not clear if it refers to grazing not being authorized on the entire Bogart Allotment (which we support), or just along portions of streams within that allotment. | |
| The Nature Conservancy | 204 | 22 | We support the provision for evaluating non-functioning and functioning-at-risk riparian areas under Alternatives B and C. However, the distinction between the two Alternatives in terms of exclusion (in B) versus restriction (in C) seems artificial and too rigid. Instead, each prescription – exclusion or restriction – should be applied where appropriate according to riparian resource conditions and management opportunities, and not according to a blanket, across-the-board approach as implied in the DRMP. [This same comment applies to the treatment of grazing in riparian areas under Alternatives B and C at the bottom of DRMP Page 2-13.] | Evaluating at-risk streams is an administrative procedure and does not require a land use planning decision. Assessing riparian functioning condition is an on-going process.  The BLM utilizes the Utah Riparian Policy  (IM 2005-91), which seeks to "establish an aggressive riparian area management program that will identify, maintain, restore and/or improve riparian values to achieve a healthy and productive ecologocal condition for maximum long-term benefits."<br><br>Grazing in riparian areas is addressed on a case-by-case basis at the time of the grazing permit renewal .  Site specific analysis of riparian areas is part of the Standards for Rangeland Health and Guidelines for Grazing Management process. |
| Sierra Club Utah Chapter | 205 | 12 | Grazing will need to be managed in a much more ecologically sound manner in light of climate change that detrimental effects of less resilient landscape. *See attached photographs of White Wash, indicating erosion from grazing.* Jerry Holecheck and others noted, "The authors' research and experience across a variety of landscapes, ranches, and countries shows a 25% harvest coefficient is the surest way to avoid chronic forage deficits and land degradation." (Galt, Dee, Francisco Molinar, Joe Navarro, Jamus Joseph, and Jerry Holecheck, Grazing capacity and stocking rate. Rangelands, Dec. 2000, 7-11. This is a reference the BLM range conservation staff should already have on hand. If not we will track down a copy for you. The current utilization in the area of the photographs is probably 100% since there were no desirable forage plants visible. There is little chance that land degradation will not continue to occur. | See responses to comments 124-115, 205-14, 9-3 and 205-13. |

BLM_0012134

| Sierra Club Utah Chapter | 205 | 15 | Consider two sources re: effects of grazing:<br><br>1 – (Crider, F.J. 1955. Root-growth stoppage resulting from defoliation of grass. Washington, DC: USDA Forest Service, Tech. Bull. No. 1102.) We are supplying a copy of this seminal research on an accompanying CD. Crider's research is important because it indicates that grazing pressure will tend to favor fast-growing annuals (such as cheat grass) over perennial native grasses. Continued pressure from grazing will continue to result in diminished populations of perennial native grasses.<br><br>2 – When this is considered in the light of research conducted at the Idaho National Laboratory grazing becomes the single most effective mechanism to increase cheat grass. Below is a summary of the findings of Anderson and Inouye (Anderson, Jay, and Richard Inouye. 2001.  Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years.  Ecological Monographs 71(4):531-556.) We are supplying a copy of this research on an accompanying CD. Note pages 545-553, which show importance of native species, species richness, and which conclude increases in species diversity are due to drought recovery 1950-1975, not due to use of grazing. This study does not support opinion that removal of grazing would decrease species diversity. (Laycock 1994 Study). | The land use planning decision regarding grazing is only whether or not a particular allotment is available or unavailable for grazing during a particular planning cycle. All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q).<br><br>See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 16 | In Sec. 3.7.1.2 Riparian areas, 45% of riparian areas are functioning at risk or not functioning. Standards and Guidelines for Rangeland Health have been in effect since 1996. It is unconscionable that any riparian area not in functioning condition should remain available for grazing in a decision to be made more than ten years later. | As individual allotments are reevaluated using the Standards for Rangeland Health and Guidelines for Grazing Management, decisions about specific riparian areas will be made.  See response to comment 9-3. |
| Sierra Club | 205 | 17 | In Sec. 4.3.6 Livestock Grazing, Among other things | Decisions about actual range conditions and season of |

BLM_0012135

| | | | | |
|---|---|---|---|---|
| Utah Chapter | | | this section states: " In the short term, actual forage use in the decision area may increase due to improving range condition and range recovery from recent drought. Over the long-term, forage demand may continue at historic levels." This is a strange statement since NOAA still lists the entire region as being in moderate drought or abnormally dry. The MFO area is not recovering from recent drought. The seasonal outlook also predicts drought will persist or increase in the area. | use are made on an allotment basis using Standards for Rangeland Health and Guidelines for Grazing Management.  See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 18 | Sec. 4.3.6.1 Impacts Common to All Alternatives Much of this section is typical of the all sections on analyzing the impacts of grazing and the response of the BLM to problems with grazing as they arise. There are consistently vague remedies to problems that are put off into the future. This is exemplified by statements like these:<br>•Grazing practices would be modified if a grazing allotment fails to meet any of the BLM's UtahStandards for Rangeland Health…<br>•      Data collected from rangeland monitoring studies would assist the Field Manager…<br>•      Under all alternatives, certain allotments could undergo season-of-use changes to facilitate grazing management…<br>No clear direction is given for resolving problems. Everything is put off to future decisions. The DRMP lacks direction or substance for grazing management. There are many activities that "could" change grazing management but no direction is given for when, how, or what changes will be made. | See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 19 | Table 4.32 lists five riparian areas that would be unavailable for grazing under Alternative C. Are these all of the 45% of riparian areas that are not meeting Rangeland Standards and Guidelines? Where are those areas analyzed in the DRMP? How is the MFO going to deal with these poorly functioning riparian | These are not the 45% of riparian areas that are not in Proper Functioning Condition.  It should be remembered that lack of Proper Functioning Condition can be due to reasons other than grazing.<br><br>All riparian areas will be considered during the permit |

BLM_0012136

| | | | | |
|---|---|---|---|---|
| | | | areas? | renewal process, at which time Standards for Rangeland Health and Guidelines for Grazing Management are applied.  See response to comment 9-3. |
| Sierra Club Utah Chapter | 205 | 20 | One of the stranger statements in the DRMP comes under the analysis of Alternative C. In subsection 4.3.4.7 the DRMP states, "Change in livestock class from sheep to cattle, fencing, seeding and rest/rotation to improve habitat would be encouraged." Is the BLM planning to "encourage" itself to make changes? The BLM has the authority to make many changes including most of these. Can the best it do is "encourage" itself to make changes? This seems indicative of the tenor of all the cursory analysis of problems. No decisions are made, all changes are put off to the future, and the BLM will encourage itself to change management. This is beyond belief. | The actions referred to by the commentor are those that would be considered during the permit renewal process, using Standards for Rangeland Health and Guidelines for Grazing Management.  By placing these actions in the DRMP/EIS, the BLM commits to consider them during that process. |
| Sierra Club Utah Chapter | 205 | 22 | The entire section on grazing needs to be given some actual management direction. It should not depend so heavily on the 1985 RMP or the 1991 BLM Vegetation Treat FEIS. These are both old and no longer relevant to current conditions or knowledge about grazing and the impacts of grazing. In particular they cannot help the BLM plan for the cumulative effects of grazing on a landscape impacted by climate change or help the BLM determine the adverse effects of grazing as climate change occurs. | See response to comment 9-3.  The Vegetation Treatment EIS has been updated since the DRMP/EIS was released to the public.  The new document, "Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in Seventeen Western States" (2007)  has been utilized in the PRMP/FEIS. |
| Sierra Club Utah Chapter | 205 | 23 | Also look at the recent 27 photographs on the Little Grand Allotment. Do the photographs reflect proper grazing management? Is the forage utilization appropriate according to the standards? If not how would the DRMP guide the correction of the problems? *see attached CD* | The land use planning document makes decisions only on whether or not an allotment is available or unavailable for grazing.   See response to comment 9-3.  Each allotment would be analyzed on a site specific basis at the renewal stage using Standards for Rangeland Health and Guidelines for Grazing Management. |
| Sierra Club Utah Chapter | 205 | 24 | The Moab Field Office should initiate a round of forage capacity analyses including clipping studies, reviewing trend data to see if plant cover, variety, and biomass have changed over the years. We would recommend the MFO recover the SVIM studies conducted by the | See response to comment 9-3.  The type of studies referred to by the commentor are done at the permit renewal stage. |

BLM_0012137

| | | | | |
|---|---|---|---|---|
| | | | BLM back in the 1970s as a baseline for comparisons. (We would be glad to provide the information if you no longer have it.) Reference areas should be created as noted above. The current areas and proposed areas for removal of livestock will not completely meet the need. They may be adequate as references for some areas but not all. And many have other human impacts that would make their value for evaluating grazing minimal.<br>Areas removed from grazing should have a monitoring system created so that what little information that can be gleaned from these areas can be used for comparison purposed with similar areas that continue to be grazed. | |
| Utah Farm Bureau Federation | 219 | 1 | In the Taylor Grazing act, Congress gave the agency at the local, state and national levels, the obligation and responsibilibty to protect and safeguard livestock grazing rights. Any decisions by the agency that would impact the economic contribution, jobs, culture, and historic use must be consistent with congressional mandates. | FLPMA provides for BLM's land use planning process and the allocation of resources. The BLM has followed the dictates of the Taylor Grazing Act.  No specifics are provided of violations of this act. |
| Ruby Ranch | 264 | 4 | Please consider making sure there are at least several strategic locations on each BLM grazing permit where there is no OHV use allowed. This would allow cattle that are being harassed to have some areas they could go to escape. | All OHV use outside the Dunes themselves have been limited to designated routes.  This would provide cattle with escape from motorized uses. |
| | 335 | 1 | The BLM is always insisting that everything is based on these range assessments, however, you are proposing to continue to keep Bogart, Cottonwood, and Diamond Allotments closed in your RMP. We are not aware that the BLM has ever completed a range assessment on those allotments to decide if they should or should not be closed. This contradicts everything that we have been told by your office. The Moab BLM should take a hard look at whether or not these allotments can sustain grazing use. The BLM should work with permittees that would want to graze | The decision to reallocate 100% of the forage previously reserved for livestock grazing was not based on specific range assessments for the allotments mentioned by the commentor. The forage on these allotments were reallocated to wildlife to enhance, protect and improve wildlife habitat, riparian vegetation and watershed values.<br><br>In 1990, the Nature Conservancy purchased large private land holdings (Cunningham and Graham Ranches) and acquire the associated BLM grazing permit.   Since that time, the ranches have been turned over to the Utah |

133

| | | | | |
|---|---|---|---|---|
| | | | those areas to develop both a short term and long term plans. Closing these areas without study data and without field visits from concerned permittees is wrong and should not be supported. We were never notified of any such visits to the area or heard of the BLM doing any studies to support their stand that those allotments should be closed. If your staff has visited the area and collected information recently for the RMP we would like to request copies of it. | Division of Wildlife Resources. The State of Utah supports the continuation of the reallocation of forage in the Cottonwood, Diamond and Bogart allotments to wildlife. See response to the State of Utah's comment, 120-6. |
| | 335 | 2 | If the BLM really wants to solve some grazing issues they would look at some of the poor desert allotments near the Colorado River way, and allotments that keep burning every year like San Arroyo and Harley Dome. | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or nonavailable for livestock grazing. This is the only planning decision within the RMP. Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| | 335 | 3 | We would like to see the BLM take an active approach to grazing management in the Bookcliffs. | The BLM Land Use Planning Handbook (H-1601-1) requires the BLM to identify lands available or nonavailable for livestock grazing. This is the only planning decision within the RMP. Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| | 414 | 1 | See Taylor Grazing Act: Title 43 Chapter 8A Sub Chapter I 315D: AUMs are for domestic livestock, not deer, bison, elk, and all other wildlife. stock, not deer, bison, elk, and all other wildlife. | While the Taylor Grazing Act provides for livestock use of BLM lands in terms of AUMs, the BLM also has other requirements, including providing habitat for wildlife. Vegetation can be allocated to livestock and wildlife. Section 102 of FLPMA requires that the "BLM provide food and habitat for fish and wildlife and domestic animals." As used in this RMP, AUMs are used to reflect the forage and habitat requirements of livestock and wildlife using BLM lands. It is a reflection of the numbers of animals and the length of time they are on specific areas resulting in the need for a particular level of AUMs for their use. |
| | 416 | 1 | Permitting livestock to graze along the highway [Highway 128] poses a danger to our family, and to | The BLM recognizes that ther are safety issues regarding cattle along Highway 128. In addition, the BLM |

134

BLM_0012139

| | | | | |
|---|---|---|---|---|
| | | | may of our friends and neighbors who also drive the River Road. And, as mentioned in the draft RMP, tens of thousands of vehicles travel that road. Some are tourists passing through the area, some are guests at the two guest restorts on the highway, and many are Moab residents who travel the scenic route on their way to and from Grand Junction, CO.  Other vehicles that drive on the road include trucks taking supplies to the aforementioned guest resorts, tour buses, and rafting companies with busloads of customers (trailers in tow, heavily loaded with rafts) driving to the Colorado River put-ins at Westwater, Hittle Bottom and Onion Creek.<br><br>Allowing grazing along any highway is dangerous of both the cattle and the people traveling on the highway.  It is especially hazardous on a narrow, windy, hilly, road with little to no shoulder, such as Hwy 128. | recognizes that visual resources need to be protected along this National Scenic Highway.  For this reason, the BLM proposes in Alt C (preferred alternative) of the DRMP/EIS to remove 1,467 acres from livestock grazing in the Professor Valley, Ida Gulch, and River Allotments. This would be accomplished by building a fence set back up to 2,000 feet from Highway 128. |
| | 416 | 2 | Suggestions regarding Alternative C:<br><br>Build a livestock fence only on the southeast side of the highway, and do not permit grazing between the highway and the river.<br><br>Build the fence only 1,900 feet from the highway on the southeast side instead of 2,000 feet, in order to compensate the permitee for lost grazing between the highway and the river.<br><br>The red line on the attached map shows approximately where the fence would go if built 2,000 feet from the highway on the northwest side.<br><br>The areas outlined in green on the map are the areas that would be available if a fence were built between the highway and the river, a very few acres in five | The text in Chapter 2 of the PRMP/FEIS for Alt C has been changed to read:  "A fence would be constructed along the southeast side of Highway 128 (set back to protect the scenic resources of the National Scenic Highway)". |

BLM_0012140

| | | | widely dispersed areas.<br><br>Advantages:<br><br>Only one fence would have to be constructed. Livestock would not be permitted in the campground areas and raft put-ins at Onion Creek. The campground and put-ins at Hittle Bottom are already fenced.<br><br>Since the grazing between the river and the highway would be fragmented into such small areas, it would appear to be more convenient for the permitee to have an equal amount of grazing added to the northeast side than to attempt to utilize the small parcels of the northwest side of the highway. | |
| | 421 | 1 | I am in favor of alternative C that includes a fence for highway safety, except that the recommended fence set back of 2000 is drastically too restrictive and would result in almost total loss of the grazing resource. A 2000 foot set back would take away practically all of the north side of the highway which is the best ½ of the allotment. In addition the south side of the highway is better grazing closer to the highway and the resource gets poorer as you head toward the south cliffs. The 2000 foot set back effectively eliminates a good 75% of the resource for grazing. | The BLM proposes to build a fence set back up to 2,000 feet from Highway 128 in order to address safety issues regarding cattle along Highway 128 and to protect visual resources along the National Scenic Highway. See Response to comment 416-1 |
| | 424 | 4 | See Table 4.74 Livestock Grazing Acres Available per Alternative.Please explain how BLM can have fewer acres per AUM in the conservation alternative B, than in the commodity alternative D. Does this table have the numbers backward, or are there erroneous calculations in the RMP? | The figures in Table 4.74 are correct: Under Alternative B, 1,668,731 acres are available for grazing, 153,797 acres would not be available for grazing, and 106,437 AUMs would be available. Under Alternative D, those figures are 1,770,314, 52,214, and 108,876, respectively. Thus Alternative D has more acres and AUMs available for grazing, and fewer acres unavailable than Alterative B. The relationship between acres available and AUMs, to which the commentor referred, is fewer under Alternative B is because Alternative has designated almost 200% |

BLM_0012141

| | | | | acres more as being unavailable for grazing than Alternative D. This is consistent with the designation of Alternative B being the conservation alternative and Alternative D the commodity alternative. |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 17 | The EPA recommends the grazing decisions proposed in Alt B to reduce soil compaction and erosion. These actions would protect and restore to PFC up to 4,442 acres of riparian/wetlands along 58 miles of perennial streams. | These grazing actions are site specific and can be implemented under the Standards for Rangeland Health and Guidelines for Livestock Grazing Management under all alternatives in the DRMP/EIS. |
| U.S. Fish and Wildlife Service | 586 | 6 | page 2-12, table 2-1 It is unclear why Alternative C (Preferred) would make available for grazing 12,673 more acres than Alternative A (No Action). We recognize that this may be to allow for greater flexibility in grazing management, such as rest rotation techniques, which can benefit range and habitat. This is unclear, however, and we recommend that the purpose of increasing grazing acreage NOT be to increase AUMs within the MPA. | Pear Park and Ida Gulch have been added to the list of allotments that are unavailable for grazing in the preferred alternative. Pear Park was unavailable for grazing in the 1985 Grand RMP (for wildlife forage). Ida Gulch is in habitat for Jones cycladenia. Other allotments that are unavailable in Alt A but available in Alt C would be subject to range studies prior to determining suitable grazing allocations. If there were suitable permittees interested in applying for these permits, an Environmental Assessment would be conducted. One consideration that may be identified would involve nearby permittees utilizing these newly available allotments without an increases in total AUMs. Additionally, all newly available allotments would require Section 7 consultation which will insure that the concerns and recommendations of the USFWS are considered. |
| | 832 | 1 | How can the BLM even consider reauthorizing grazing on some of those allotments when sportsmen and the DWR spent millions of dollars to provide for forage for wildlife-the rancherswho left were fairly compensated. Are there any provisions in the RMP to allocate additional forage for wildlife if a grazing permitee wants to allocate the forage for wildlife, or two, if forage is created via rangeland improvements and thus there is more forage available for lifestock and wildlife. | Grazing practices are adjusted on an allotment basis using the Standards for Rangeland Health and the Guidelines for Grazing Management (see Appendix Q of the DRMP/EIS. Site specific decisions are not land use planning decisions |
| | 944 | 5 | Grazing is ill suited to our lands, Cattle tear up the plants and soils almost as musch as vehicles. Appreciating wilderness… does not include cresting a | Decisions concerning timing and season of use are made on an allotment basis using the Standards for Rangeland Health and Guidelines for Grazing Management. See |

BLM_0012142

| | | | | |
|---|---|---|---|---|
| | | | hilll only to see..a herd of cattle. | Response to Comment 9-3. |
| | 951 | 2 | Where is the analysis of the drought conditions of the land and its effects on grazing? | All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q). On pg. 2-50 of the DRMP/EIS, criteria for restricting activities, including grazing, during drought are given in management common to all action alternatives. |
| | 951 | 3 | Where is the analysis as to whether cattle grazing is financially still feasible? What other sustainable options are available which support long term health of the land? Where is the long term plan for phasing out allotments that are not economically sustainable? Where are the allotments that will be phased out to allow for increased rangeland diversity of plants? Is there a balanced approach to plant diversity and use of the land? | The land use planning decision regarding grazing is only whether or not a particular allotment is available or unavailable for grazing during a particular planning cycle. All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q). A socioeconomic analysis of the feasibility of cattle grazing is not part of land use planning decision and is beyond the scope of the RMP |
| | 985 | 1 | I would like you to consider reducing the available grazing permits in the Valley to the side of Highway 128 opposite the river. | All specific decisions on grazing are made at the allotment level, using the Standards for Rangeland Health and Guidelines for Grazing Management (see Appendix Q). See response to comment 9-3 and 120-5 |
| | 1007 | 1 | I would support Alternative C "Preferred" except for a 2000 foot setback from the road. That is overly restrictive. 2000 feet is over a third of a mile and result in a terrific loss of resource. Even though plan C does not call of a reduction in AUMs, a 2000 foot setback would quickly result in lost AUMs or even total grazing cancellation as the area lost for grazing would be most of the good grazing land. A 2000 foot setback doesn't make any sense.<br><br>If the 2000 foot was a typo mistake and it was supposed to be a 200 foot setback, I would endorse alternative C. | The BLM proposes to build a fence set back up to 2,000 feet from Highway 128 in order to address safety issues regarding cattle along Highway 128 and to protect visual resources along the National Scenic Highway. See Reponse to comment 416-1. |
| Western Watersheds Project | 1025 | 1 | We note that, in particular, livestock grazing is not analyzed in a range of alterantives (DEIS/RMP Chapter 2) which include No Grazing, Significantly | The No Grazing Alternative proposed by the commentor is an alternative considered but eliminated from analysis on pg. 2-107 of the DRMP/EIS.  This referenced section |

BLM_0012143

| | | | | |
|---|---|---|---|---|
| | | | Reduced Grazing, and No Action.  This failure must be corrected to meet the intent of NEPA and in order to provide a comparison of the impacts of livestock on riparian and upland areas, water quality, soils and wildlife under proposed stocking rates as compared to conditions in the absence of livestock.  Otherwise, no true evaluation of the impacts of livestock grazing can be claimed. | also covers the other concerns raised by the commentor.  See response to comment 9-3. |
| Western Watersheds Project | 1025 | 2 | An update of the AUM forage consumption value to reflect current livestock weights was completed in 2007. This analysis is also attached as Appendix 2. It shows that the forage values BLM uses underestimate forage consumption by livestock such that taking into account the most current information on livestock weights would automatically reduce current permitted nubmers by 1/3. | Forage allocations do not require land use planning decision but are specified on a site specific allotment basis.  The BLM Moab Field Office is currently evaluating each allotments using the Standards for Rangeland Health and Guidelines for Grazing Management for BLM in Utah and making adjustments in numbers and season of use, as necessary, based on these guidelines.  See Appendix Q of the DRMP/EIS.  See response to  comment 9-3. |
| Western Watersheds Project | 1025 | 6 | The Moab FO should conduct a capability analysis to determine the areas that might be available for livestock grazing, excluding steep slopes >30%, low forage production <200 lbs/areas, ecosystems converted by wildfire or invasive weeds, and the ability of sensitive soils to respond following impacts (arid elevations, reclamation, soil chemistry, drought). Then, in consideration of wildlife competition and recreation impacts, determine those lands that will be made available (suitable) for livestock grazing. Areas that should not be considered suitable include riparian areas, wilderness areas, wilderness study areas, ACECs, sensitive soils, crucial wildlife areas, and public campgrounds and other administrative sites. Once this is done, BLM should then apply the current forage capacity and livestock consumption rates to determine the appropriate stocking rates and incorporate management as described in Appendix 1. This analysis, which will result in significant reduced | See response to comment 1025-4. |

BLM_0012144

| | | | grazing, should determine the levels and management of livestock for analysis for comparison with a NO Grazing Alternative and the Status Quo, or No Action Alternative. | |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 9 | The DEIS/RMP does not present an allotment by allotment summary of current monitoring information that describes the trend or condition as compared to the 1985 RMP. Claims of streams and riparian areas in PFC ignore that PFC is a minimal classification that does not address the wildlife habitat attributes of these most important areas, water quality or instream habitat for fish. In addition, springs, seeps and wetlands condition and trend are not described. Where is the analysis of utilization and annual stocking rates? | Monitoring of riparian areas and streams for properly functioning condition does not require a land use planning decision for livestock grazing.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.

See response to comments 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 10 | The DEIS/RMP does not analyze or propose science based utilization standards for upland and riparian areas, stream bank stability standards or other critical livestock management mechanisms.  It does not analyze different grazing systems and their requirements for rest to protect plants during critical growth periods. These are fundamental decisions that must be made at the planning level or BLM cannot claim it is managing in a sustainable manner that does not impair productivity as mandated by FLPMA. Neither does the absence of specific monitoring. | Utilization and stream bank stability do not require a land use planning decision for livestock grazing.  These resource considerations are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.

See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 25 | How is the current capacity of authorized livestock grazing determined in the RA to aviod immediate ecological damage? How is the suitability to graze by livestock in areas such as steep slopes, sensitive soils, riparian areas, and areas with high invasive vegetation determined where even the local soil surveys published by the Natural Resource Conservation Service (NRCS) recommend them as unsuitable, limited to suitability, or suitable only for wildlife purposes? | The affects of livestock grazing on resource values such as steep slopes, sensitive soils, riparian areas, and areas with high invasive vegetation do not  require a land use planning decision.
These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.

See response to comment 1025-4 and 9-3. |
| Western Watersheds | 1025 | 26 | The data cited was summarized in 1985, which occurs within the highest precipitation periods recorded on the | The resources of concern identified by the commentor related to livestock grazing do not require a land use |

140

BLM_0012145

| | | | | |
|---|---|---|---|---|
| Project | | | RA. Ecological conditiions have changed greatly since the 1985 estimates cited in Table 3.10. BLM Manual H-1601-1 (BLM 2005a) states that vegetation management decisions, including grazing, must be based on desired future conditions (DFC), usually expressed as ecological or management status of vegetation (species composition, habitat diversity, age and size classes of species) and desired soil qualities (conditions of soil cover, erosion, compaction, loss of soil productivity). DFCs and management objectives are not analyzed and documented by allotment to justify current grazing authorizations. | planning decision.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 27 | Rest-rotation grazing systems and/or season-of-use restrictions should be identified specifically by individual allotment to reduce ecological and user conflicts associated with current grazing authorizations. Table 3.11 indicates insufficient grazing systems are currently in place with 52 allotments being grazed season-long; and only 21 allotments containing deferred rotation grazing; and 1 allotment containing a rest-rotation grazing system. | Rest-rotation grazing systems and season of use restrictions related to livestock grazing do not require a land use planning decision.  These resource values are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 28 | If livestock grazing is not removed within these allotments, as proposed in some alternatives, then appropriate grazing systems and/or mitigation should be specifically identified for each and justified based on the science. A number of other allotments within the Moab RA appear to also have been recommended for rotation grazing systems within the 1985 RMP which are not currently implemented. Additional allotments have been identified to be conflicting with other resource values within respective analysis. | The BLM is reviewing each allotment and making adjustments based on Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 29 | Long-term adjustments to livestock use (term permits adjustments) require the evaluation of monitoring data including climate, actual grazing use, current or historic impacts, utilization mapping, forage capacity determinations and long-term trend data, as well as utilization levels, all of which have been apparently | Adjustments to livestock use is being undertaken on a site specific allotment basis using monitoring, actual grazing use, climatic data, and trend data.  This is accomplished through the Standards for Rangeland Health and Guidelines for Grazing Management. |

141

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | absent within the Moab RA during recent years. | See response to comment 1025-4 and 9-3. |
| Western Watersheds Project | 1025 | 37 | The DRMP/EIS assumes no impact from recreation or the travel plan to livestock grazing despite the degree of loss of habitat, spread of invasive weeds, reduce ecological conditions, and competition from large numbers of recreation users, events, authorized roads, and motorcycle route. | The impacts of travel management decisions on livestock grazing are detailed in the DRMP/EIS on pgs. 4,-73, 4-76, 4-79, and 4-80. The BLM has not identified general use as an issue where recreation is a conflict with livestock grazing. For the most part, the grazing seasons and the recreation seasons to not coincide. |
| Western Watersheds Project | 1025 | 38 | Impacts to livestock grazing from watershed actions, need to quantify temporary or permanent decreases in acres or aums in each alternative. | There would be no temporary or permanent decrease in AUMs for livestock based on any watershed actions proposed in the alternatives for the DRMP/EIS. |
| | | | am opposed to the four proposals that will do away with cattle grazing in the Millcreek allotment. I purchased this allotment for $18,000 from Carol Meador. I asked the BLM if there would be problems – no one told me about the proposed changes or that there might be problems. Grazing permits should be kept in the Millcreek area. | The BLM analyzed the natural and cultural resources that are present in the 3,921 acre Mill Creek allotment and decided that this allotment would be made unavailable for grazing in the three action alternatives of the RMP. The Mill Creek allotment is in an area of very high cultural occurrence. It has high recreation conflicts and is within the municipal watershed of Moab and Spanish Valley. |

## Hazardous Materials

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 21 | Page 4-241,3rd Paragraph, 4.3.11: "AML" is not defined and is not listed in the "Acronyms and Glossary" section. It is highly probable that the protection of sites from "hazardous materials spills and spill site cleanup" will involve some amount of soil disturbance and drainage re-direction and/or storage. Such activities could seriously effect riparian soil, vegetation, and water quality resources and negatively impact these resources for many years. Of course, these activities will be designated to avoid riparian impacts, but extreme care must be exercized in the design and short and long-term maintenance of these facilities. If | The acronym AML is defined on pg. 2-10 of the DRMP/EIS as Abandoned Mine Lands. This acronym will be added to the glossary. AML projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land use plan. |

BLM_0012147

| | | | | |
|---|---|---|---|---|
| | | | anything goes wrong, such as a breach created by a flood, vandalism, or damage from off-road-vehicle activities, than the resualtant spill could have serious effects on the riparian resources of the surrounding area and downstream. These potential impacts must be considered in this RMP. | |
| ECOS Consulting | 9 | 40 | 4.3.13.2 Impacts of Health And Safety page 4-280, 2nd Paragraph, 4.3.13.2: Whereever Abandoned Mine Lands (AMLs) are rehabilitated, the amount of soild disturbance is usually enormous. What precautions will the BLM demand in order to keep surface disturbance to a minium? Is there a protocol that the BLM follows? If so, a summary of these must be included in this plan?<br><br>Although these toxic materials must be removed, but there are always ways to do it that will cause minimal impact. Does the BLMhave plans for the least destructive ways to rehabilitate these AML sites. Does the BLM insist on using these? The long-term benefits of removing hazardous material are obvious, but are they blinding us to the pitfals of the short- and long-term impacts to the vegetation and soils, such as loss of biological soil crusts destruction and soil compaction, without propper planning of minimal impact methods? | AML projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan. |
| ECOS Consulting | 9 | 48 | Page 4-286, 6th Paragraph, 4.3.13.5: An additional impact that must be considered is the possibility of a chemical spill at well and mine sites. Does the BLM have any information about the frequency and extent of these types of accidents occurring? If so, this should be included in this plan so that averages can be used and potential cumulative impacts determined. | The Council on Environment Quality regulations do not require an environmental document to analyze a worst case scenario. |
| ECOS Consulting | 9 | 62 | Page 4-445, Section 4.3.19.3: How will AML sites be reclaimed to minimize surface disturbance for the benefit of wildlife and water quality?  What safeguards or protocols will the BLM be following in order to minimize impacts? Will there be follow-up monitoring and restoration efforts?  How many AML sites are there | See response to comment 9-40. |

143

BLM_0012148

|  |  | and how large are they?  Are the prioritized according to need of restoration?  Are they privatize according to the sensitivity of their location and direct, indirect, and cumulative adverse impacts on aquatic and terrestrial wildlife and habitat?  What percentage of the different habitats of the Moab Planning Area will these projects impact?  What are the direct, indirect, and cumulative effects of these activities on bats and other species?  These questions need to be addressed before effective future management can be planned. |  |

## Lands and Realty

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 13 | All "right-of-ways" and "easements" must be limited to no more than 100 meters in width.  The width and extent of "Righ-of-Ways" and "Easments" planned in alternatives A, C, and D are too large to maintain functional ecosystems, viable unfragmented wildlife populations, natural vegetation communities, intact soil structure, and prevent widespread wind (dust) and soil erosion.  As planned these "adverse impacts of land and realty decisions" have a high probability of causing serious adverse impacts on wildlife habitat quality and connectivity. The BLM must analyze the extensive short- and long-term direct, indirect, and cumulative impacts of these decisions in more detail. | The commentor refers to rights-of-ways and easements being limited to no more  than 100 meters.  There is nothing in the alternatives of the DRMP/EIS limiting the width of right-of-ways.  The width right-of-ways is determined on a site specific basis.  The width of proposed utility corridors is specified by alternative in the DRMP/EIS.  A half mile width proposed for Alt C represents the area in which utilities would be placed.  This does not mean that surface disturbance would occur throughout the corridor.  Designation of a utility corridor is intended to reduce the impacts to resources by concentrating these necessary infrastructure needs. |
| ECOS Consulting | 9 | 23 | 4.3.11.2 Impacts of Lands and Realty Decisions on Riparian Resources. Page 4-241, 5th paragraph, 4.3.11.2:  The statement that riparian areas are protected from impacts of lands and realty decisions because surface disturbance is not allowed within 100meters of riparian areas is misleading and false presumption. Riparian areas are intimately connected to adjacent areas through a complex network of small and | See response to comment 9-2.  Realty decisions are implementation actions in which environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan.  This environmental impacts would consider potential environmental impacts to riparian areas. |

144

| | | | | |
|---|---|---|---|---|
| | | | large drainage patterns that far exceed 100 meters.  Any disturbance within this network has a distinct and real possibility of impacting nearby riparian areas.  Impacts include soil erosion and arroyo development, the introduction of exotic weed species, drainage into the system of pollutants and contaminants effecting water quality, and the disturbance of wildlife.  Riparian areas are the primary habitat, providing food, water, and shelter for most wildlife in the desert, and they are primary wildlife corridors, alliwoing access to movement and protection from preditors.  One hundred meters is simply not enough of a buffer to mitigate wildlife disturbances and other impacts from BLM lands and realty activities. This buffer should be expanded to at least 1500 meters. | |
| ECOS Consulting | 9 | 41 | 4.3.13.3 Impacts of Lands and Reality page 4-280, 3rd paragraph, 4.3.13.3: The BLM states that no particular data on soil crusts exists. This is an avoidance of the issue.  In the Moab Planning Area, wherever there is soil, there are likely soil crusts, subtract the exposed rock of an area and that is how much soil crust exists. Generally, if there are no soil crusts in an area without rocks, then the area has been highly impacted by some previous disturbance. Thus this discussion could be transformed from qualitative to quantitative with little effort.<br><br>We would like to see this discusion changed from qualitative to quantitative, so that we can make adjustments based on numbers not guesses. The DRMP must include an analysis of indirect and cumulative impacts of these activities. | See response to comment 9-12. |
| ECOS Consulting | 9 | 42 | Page 4-280, Alternatives: These sections are confusing. There are no reasons given for expanding the Utility Corridors, yet these areas get larger and larger with each consecutive Alternative. The BLM must explain in more detail the reasons for this enormous expansion | See response to comment 9-13.<br><br>The increase in acreage between the no action and action alternatives of the DRMP/EIS is due to the conjoining of two existing utility corridors south of Moab |

BLM_0012150

| | | | | |
|---|---|---|---|---|
| | | | from Alternative A through D.  These corridors must be kept to an absolute minimum in order to keep serious direct and indirect soil and vegetation impacts low, and to avoid fragmenting the landscape.  Why does the corridor expand from 32,502 acres in Alternative A to 65,865 acres in Alternative B. In Alternative C, it is more than 5 times that of Alternative A. What is going on here?  What new utilities are planned for the next 20-30 years in the Moab RMP Planning Area?  As the utility corridors expand with each Alternative there will be a corresponding increase in negative impacts to soil and vegetation resources in particular, and probably to water resources also. What are the purpose and need of the wide corridors as planned for Alternatives A, C and D? Please provide more detailed information on this so that we can analyze the impacts. | along Highway 191. |
| ECOS Consulting | 9 | 63 | Page 4-445, section 4.3.19.4.1: This is not an analysis of impacts. How many ROW's easements, permits, utility/transportation systems, acquisitions, disposal and withdrawals are anticipated in the next 10-20 years? Without this estimate, an analysis of environmental impacts is impossible. Wilderness Study Areas make up a small percentage of the Moab Planning Area, making most of the rest of the 1,800,000 acres open to these types of impacts. If the authorization of ROW's would have potential direct, indirect, cumulative short- and long-term adverse impacts on wildlife, then there should be an in depth analysis of these impacts on wildlife and estimate of locations and extent of these impacts and what wildlife would be most impacted. As this Moab RMP is written, it is impossible to make even and educated guess, or to attempt to evaluate impacts. The BLM must provide this information, even if it is an estimate, for proper impact analysis. | See response to comment 9-23. |
| PacficCorp | 12 | 1 | The BLM has indicated that Alternative C is preferred which identfies 806,994 acres available for oil and gas | Designation of utility corridors is intended  to facilitate and channel major utilities that pass through the Moab |

146

| | | | | |
|---|---|---|---|---|
| | | | leases and development but no new utility corridor or provisions for the required infrastructure. | Field Office area.  These corridors are for major transmission lines, not individual distribution lines. Management actions in  the DRMP/EIS address individual rights-of-way for arterial distribution lines and facility-specific tap lines.  Until production is established on oil and gas leases, the location of power needs will not be known.  Authorization of new electrical distribution lines would continue to be handled on a case by case basis, as is provided for in the DRMP/EIS. |
| PacficCorp | 12 | 2 | PacifiCorp does not support the BLM's propposal in the RMP to eliminate the existing utility corridor from Cisco to US Highway 191. | Under Alternatives C and D, the Interstate Highway 70 utility corridor has been widened to include all major existing utilities.  The wider corridor merges two corridors designated in the 1985 Grand RMP.  Currently, there are no rights-of-way for electrical lines within the corridor south of I-70.

This language has been corrected  to state that "the existing utility corridor from Cisco to Highway 191 north of Arches National Park would be merged with the I-70 corridor under all action alternatives"  (pg. 4-65 of the DRMP/EIS).  In addition, the statement on page 2-11 of the DRMP/EIS that the "utility corridor from Cisco to Highway 191 north of Arches has been eliminated"  has been deleted from the text of the PRMP/FEIS. |
| PacficCorp | 12 | 3 | The RMP also contains many surface occupancy, visual or other resource constraints that could preclude new rights-of-way, development of renewable energy resources or construction of facilities required to service the growing development and surrounding areas. | Under all alternatives in the DRMP/EIS, the closure to rights-of-way of approximately 350,000 acres for Wilderness Study Areas (WSA) and Wilderness is not discretionary, and is beyond the scope of this plan. WSAs and designated wilderness are exclusion areas by Federal regulation.  This represents 19% of the planning area under all alternatives.

In the DRMP/DEIS, the remainder of the planning areas is managed as follows: All areas managed as closed are exclusion areas for rights-of-way.  All areas managed as no surface occupancy are avoidance areas for rights-of-way. By combining no surface occupancy acreage and |

147

| | | | | discretionary closed acreage by alternative, the following percentages of the Moab planning area are not available for rights of way: Alt B = 44%, Alt C = 15%; Alt D = 4%. It should be noted that the avoidance areas allow some flexibility in the development of rights-of-way.<br><br>Conversely, under Alternatives B, C and D, 56% , 85%, and 96% of the Moab planning area (exclusive of WSAs and wilderness) would be open to rights-of-way with only minor restrictions, respectively.  These minor restrictions include timing limitation and controlled surface use stipulations.<br><br>See Appendix C of the DRMP/DEIS for details regarding avoidance and exclusion areas.<br><br>The BLM concludes that it has offered a reasonable range of alternatives for the development of rights-of-way. |
| PacficCorp | 12 | 4 | A map submitted to the Department of Energy as part of the West-Wide Energy Corridor Programmatic identified current and proposed high-voltage transmission line locations within the study area. | The map in the West Wide Energy Corridor Programmatic EIS (Map #66-212)  identifies one corridor in the Moab planning area.  The identified corridor in the West Wide Energy corridor Programmatic EIS is identical to the U.S. 191 corridor which is included in all alternatives of the DRMP/EIS. |
| PacficCorp | 12 | 5 | The BLM should expand its description on oil and gas development to include related electrical infrastructure and state that analysis and approvals of proposed development will include associated utlity facilities. | In the Moab planning area, electricity has not been essential for development of oil and gas resources.  Where distribution lines are already present, oil and gas companies may select electricity to run pumps and cathodic protection sites.<br><br>A Reasonably Foreseeable Development (RFD) scenario for oil and gas was prepared for the Moab Field Office as part of the DRMP/EIS.  The RFD projected the amount of oil and gas development that would occur in the planning area over the next 15 years.  Tthis projection includes infrastructure to support oil and gas, |

148

| | | | | which consists of roads, pipelines, and electrical infrastructure. |
|---|---|---|---|---|
| PacficCorp | 12 | 6 | Pacificorp supports any effort to promote the development of all renewable electrical generation methods, especially wind development.  Pacificorp asks that the BLM evaluate future proposals based on the current technology, scientific studies, and potenial resource impacts. | Under all action alternatives of the DRMP/EIS, wind and solar development can be considered wherever rights-of-way can be authorized.  Avoidance and exclusion areas for rights-of-way are specified in Appendix C of the DRMP/EIS. |
| PacficCorp | 12 | 9 | The DRMP/EIS states on pg. 4-365…."the existing utility corridor that runs from Cisco to US 191 would be eliminated which would help mitigate for the adverse effects of utility corridors on special status species.  The BLM has not described in the EIS how the existing Cisco to US 191 utility corridor adversely affects special status species and why it needs to be eliminated. | See response to  comment 12-2 above.  This corridor has not been eliminated, but has been widened to include this portion. |
| PacficCorp | 12 | 10 | PacificCorp asserts that the predation issue in unfounded and that these buffer restrictions are exessive and an unnecessary measure to protect the greater sage-grouse and prairie dogs. | For greater sage grouse, the management prescriptions apply to sage grouse strutting grounds, nesting, and brood-rearing habitat and active leks.  For prairie dogs, the prescriptions refer to a 660 foot buffer around occupied colonies.  The BLM has worked with the Utah Division of Wildlife Resources and the U.S. Fish and Wildlife Service to formulate prescriptions that would protect these animals so that they would not be listed as Endangered Species.<br><br>It should be noted that the Moab planning area currently contains no active leks for either greater or Gunnison sage grouse. The buffer around leks is 0.6 miles.  The prairie dog buffer is 660 feet. |
| PacficCorp | 12 | 11 | Chapter 3, Section 19, pg. 167 of the DRMP/DEIS states that visual resource inventory classes were considered in the EIS prepared for the RMP but the RMP did not recognize visual resources as a program requiring specific management action.  Is the Cisco to U.S. 191 corridor being eliminated because of visual concerns? | No corridor is proposed for elimination for either visual or sensitive species reasons.  See response to comment 12-2.<br><br>Chapter 3.19, pg. 167 of the DRMP/EIS refers to the formulation of visual resource management for the 1985 Grand RMP.  In that effort, visual resource inventory classes were prepared for the Environmental Impact |

BLM_0012154

| | | | | Statement , but visual resources were not placed in a management class as part of that 1985 RMP. |
|---|---|---|---|---|
| PacficCorp | 12 | 12 | PacificCorp recommends that the EIS and final RMP include siting criteria for facilities on existing and future communication sites. | Future communication sites may be located anywhere outside an exclusion area, although efforts would be undertaken to locate outside avoidance areas.  Future communication sites would be addressed during the site-specific NEPA analysis undertaken for the future facility. |
| PacficCorp | 12 | 13 | Pacific Corp supports the less restrictive and wider utility corridor in Alternative D and requests that the BLM incorporate the utility corridors in Alternative D into the Preferred Alternative. | The commentor's preference that the utility corridors be incorporated as described in Alterantive D is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives. |
| State of Utah - Public Lands Policy Coordination | 120 | 11 | The need for BLM to give priority to state-federal land exhanges has been recognized.  The disposal land list is inadequate and lands should be added to this list including 1) all lands proposed for BLM disposal in the pending Utah Recreation Land Exchange Act; 2) the block of BLM lands west of the Canyonlands airport that are currently subject to Potash preference right leases, and 3) all lands in Lisbon Valley. | The Federal Land Policy and Management Act (FLPMA) Section 203 requires the BLM to use the land use planning process to identify lands for disposal through sales.  Indentifying lands for Section 203 sale requires the BLM to meet certain criteria set out specifically in the Statute.<br><br>FLPMA allows the BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally.  The DRMP/EIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition.  The DRMP/EIS does not contain a schedule or prioritize these lands, but the BLM understands that State in-lieu and other exchanges are a high priority for the State and for the BLM. |
| State of Utah - Public Lands Policy Coordination | 120 | 22 | It is unclear how State comments will be sought for new rights-of-way for pipelines or service-access roads. | Where applicable, coordination with other Federal, State, and local entities will be sought as mandated under FLPMA, NEPA, and individual program requirements.  All current NEPA documents prepared by the Utah BLM are posted on the Environmental Notification Bulletin Board via the BLM internet site.  Access to this database |

BLM_0012155

| | | | | is available to the State and the public. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 65 | State Parks currently has an R&PP lease for land along the east side of Dead Horse Point State Park that is within both the Colorado River SRMA and the Highway 279 Corridor/Shafer Basin/Long Canyon ACEC.  The State would like to request an exception for the land currently under R&PP lease that would eventually allow this land to be patented to the Division. | The R&PP lease is a valid existing right and therefore the State of Utah has the right to go to patent upon completion of its plan of development. |
| State of Utah - Public Lands Policy Coordination | 120 | 97 | SITLA requests a detailed reference under Issue 8 of the Issues Identified for Consideration in the Moab RMP concerning inheld state lands within speical areas such as WSAs, ACECs, and lands managaged for wilderness characteristics. | See response to comments 120-101, 103, and 106.  It is not necessary to have this specific language stated in the description of the issue. |
| State of Utah - Public Lands Policy Coordination | 120 | 99 | Paragraph 3.6.2.1 - Land Tenure Adjustments (Pg. 3-28).  This paragraph should specifically reference the need for Federal acquisition of State school trust lands that are captured by Federal reservations and withdrawals such as wilderness study areas be a priority , in accordance with applicable BLM policy guidance.  In addition State selection should be mentioned as an equally preferred method of land disposition as land exchanges. | See response to comments 120-106 and 120-11.<br><br>The FLPMA Section 203 requires the BLM to use the land use planning process to identify lands for disposal through sales.  Identifying lands for Section 203 sale requires BLM to meet certain criteria set out specifically in the statute.<br><br>The FLPMA authorizes BLM to identify lands that would be available for exchange (both disposal and acquisition) more generally.  The Moab DRMP/DEIS has identified lands generally available for exchange, including identifying State lands that are currently available for acquisition.  The DRMP/DEIS does not contain a schedule or prioritize these lands, but BLM understands that State in-lieu and other exchanges are a high priority for the State and for BLM. |
| State of Utah - Public Lands Policy Coordination | 120 | 100 | Section 3.6.2.1.2-Exchanges and Acquisitions (pg. 3-29).  The State encourages the BLM to add a new paragraph after the first paragraph, as follows:  Facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exchange is considered an important public objective, and will be given priority. | See response to comments 120-106 and 120-11. |

BLM_0012156

| | | | | |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 102 | BLM's last analytical assumption, that reasonable access to state lands , across BLM lands, would be provided under all alternatives, needs to be specifically repeated in Table 2.1 under the heading "Management Common to All Alternatives" with a notation that access to state strust lands will be granted even if an area is otherwise an avoidance or exclusion area for ROWs. | See response to comment 120-10. |
| State of Utah - Public Lands Policy Coordination | 120 | 104 | Section 4.3.5-Lands and Realty (pgs. 4-63/69). The second paragraph of section 4.3.5.1 (Impacts Common to All Alternatives) incorrectly states that 354,015 acres within WSAs and the Black Ridge Wilderness Area are closed to surface disturbing activities and thus excluded to new ROWs. | Narrative has been added to the text on these pages to clarify that the BLM has an obligation to grant reasonable access to inheld State lands in WSAs subject to Utah v. Andrus and the Interim Management Policy. There are no State lands within the Black Ridge Wilderness Area. |
| State of Utah - Public Lands Policy Coordination | 120 | 106 | Appendix A.1.1. Land Tenure Adjustment Criteria. Add a new numbered paragraph stating that facilitating acquisition of state trust lands inholdings in wilderness study areas and other sensitive areas through land exhange is considered an important public objective, and will be given priority in accordance with existing BLM policy direction. | Current BLM Utah State Policy is to give priority to State of Utah exchanges and such exchanges do not require a land use planning decision. |
| State of Utah - Public Lands Policy Coordination | 120 | 107 | Delete numbered paragraph 9 in A.1.1. It is inconsistent with county plans and may hinder necessary exchanges to acquire state inholdings. | This paragraph refers to retaining 1,806,413 acres in public ownership including all lands in WSAs, ACECs, SRMAs, and other designated areas.  This paragraph has been restated as follows:  "Retain all public lands within WSAs, ACECs, SRMAs, and other designated areas". |
| State of Utah - Public Lands Policy Coordination | 120 | 108 | Please consider adding a new section, A.1.5, State Selections, which should read as follows:  "State selections under the Utah Enabling Act and other applicable law will also be given priorty pursuant to BLM Manual 2621.06A-C.  All lands not encumbered by a withdrawal or other special designation will be available for state selection." | See the response to comment 120-106. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 99 | The BLM has not developed an alternative that anticipates the Utah Recreational Land Exchange Act with its mineral restirctions. | On pg. 2-11 of the DRMP/EIS states that lands and or interest in lands (such as mineral and conservation easements) acquired through future land tenure adjustments would take on the management of the |

BLM_0012157

| | | | | surrounding area. Should the act be passed by Congress these acquired sections would be managed according to the will of Congress and in accordance with the management of the surrounding areas. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 23 | Alternative C would place 370,250 acres in ROW exclusion area, which again would further limit development and most likely make additional lands inaccessible. These further restrictions are not adequately analyzed in terms of EPCA, NEP, and Executive Order No. 13212, nor in terms of the impact on the economy. | See response to comment 203-22.

The WSAs were established prior to the existence of the EPCA, NEP, EO No. 13212. |
| Independent Petroleum Assoc. of Mountain States | 203 | 24 | The BLM has not adequately explained or justified the ROW avoidance and exclusion areas. Oil and gas operators' ability to develop those leases could be significantly impacted if the BLM inappropriately limits access to leases. The BLM must be willing to work with oil and gas lessees and operators to design access routes to proposed oil and gas development projects. If reasonable access is denied, operators cannot develop their leases and significant resources will be lost, in turn, hurting the local economy and federal treasury. While the issuance of the oil and gas leases does not guarantee access to the leasehold, a federal lessee is entitled to use such part of the surface as may be necessary to produce the leased substance. 43 CFR § 3101.1-2 (2006). | See response to comment 214-12. |
| Independent Petroleum Assoc. of Mountain States | 203 | 25 | The socioeconomic analysis is fundamentally flawed in terms of depth and underlying assumptions. As stated in section 4.3.12, page 4-252, socioeconomic impacts are only considered significant if one or more of the following occurs and is attributable to the implementation of alternatives: 1) Substantial gains or losses in population/employment; 2) Substantial alterations in lifestyle or quality of life; 3) Disproportionately adverse changes that affect minority or low-income populations. IPAMS believes a major impact that should be considered is a decrease in the energy resources | The BLM expects that energy resource contributions in the Moab Field Office (MFO) will be very small relative to national production or even State production. According to a very recent study done under the auspices of the State of Utah (in cooperation with IPAMS), oil and gas production in Grand County accounts for an extremely small share of the Grand County economy, and virtually no jobs to residents of the County. References to this study and its conclusions have been added to Chapter 4 of the DRMP/DEIS. Moreover, The BLM does not expect to see significant energy development (such as |

153

| | | | | |
|---|---|---|---|---|
| | | | available to the community, state, and nation. Restricting development of vital energy resources is a significant socioeconomic impact at the same scale as those listed above. The analysis does not give adequate weight to the importance of energy supplies at all levels of the economy.  Energy development can also positively impact all three of the above impacts, by providing economic growth that positively impacts population, employment, quality of life, and economic opportunities for minorities and low-income individuals. | that experienced in Uintah Basin or parts of Wyoming) in the planning area over the life of the plan as described in chapter 4. Therefore, BLM does not expect large (similar to the other areas noted above) socioeconomic benefits or costs from these activities to national, state, or local communities.<br><br>The DRMP/DEIS Environmental Justice analysis in section 3.6.3 follows Executive Order 12898. This analysis determined there are no environmental justice populations in the socioeconomic study area. In addition, oil and gas development in the DRMP/DEIS study area is not large enough relative to total national and global oil and gas development to impact pump prices. Therefore, low-income communities would not be disproportionally impacted from oil and gas development restrictions by the DRMP/DEIS. Thus, actions required to identify and mitigate impacts to such populations are not required. |
| Glen Canyon Group | 209 | 16 | RE: Impact of Lands and Realty Management Decisions – Section 4.3.8.2.3, Pages 4-113 to 4-117, Table 4.48, Pages 4-114 and 4-115<br>    We noticed in the Executive Summary that "rights of way" covered more than these utility corridors, per the sentence. "Other land uses within the planning area include rights-of-way (ROWs) for roads, pipelines, powerlines, and communication sites, film permits, and livestock grazing." (page ES-7) The Glossary similarly includes roads in the definition of ROWs. The Final RMP/EIS should convey the more restrictive definition from the Lands and Realty sections. | Title V of FLPMA provides authority for issuance of rights-of-way for various uses over, upon, under, and through the public lands, including roads, pipelines, powerlines, and communication sites.  The definition is beyond the scope of the plan. |
| Questar Exploration and Production Company | 210 | 3 | Right-of-way Exclusion and Avoidance Areas Analysis: The DRMP/EIS Preferred Alternative (Alternative C) designates 370,250 acres as right-of-way (ROW) exclusion and avoidance areas. This restriction of surface access will negatively impact the ability of oil and gas operators to access mineral leases and transport their product to market which, in turn, negatively impacts | See response to comments 214-12, 214-13, and 214-14. |

BLM_0012159

| | | | | |
|---|---|---|---|---|
| | | | the local, state, and national economies. The additional restrictions contemplated in the DRMP/EIS are not adequately analyzed in terms of EPA 2005, EPCA 2000, NEP, and Executive Order 13212 and are unnecessarily applied to energy development.<br>The Moab Field Office is primarily comprised of federal land. Management decisions made on those federal lands will not only affect energy development but will also directly impact the ability of state and private landowners to develop their land. The DRMP/EIS should fully analyze and disclose the impacts to state and private landowners if access is denied to their properties due to right-of-way exclusion and avoidance restrictions. Recommendation: Thoroughly analyze and disclose the impacts of the ROW exclusion and avoidance areas on access to valid existing legal rights and state and private lands. Ensure that the RMP provides necessary access. | |
| Bill Barrett Corporation | 214 | 7 | FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an area of 5,000 acres or more to mineral development.  Among the other requirements imposed on the Department of the Inteiror is the requirement for the Secretary of the Inteiror, as compared to the Director of the BLM or a State Director, to make all withdrawals of federal lands. | There are no withdrawals proposed  under any of the alternatives in the DRMP/EIS.  Withdrawals only apply to the general land laws which includes the Mining Law of 1872, as amended.  The action alternatives do propose removing areas from mineral leasing which is discretionary and does not require a withdrawal. |
| Bill Barrett Corporation | 214 | 12 | The BLM indicates that huge right-of-way (ROW) exclusion and avoidance areas will be created under all of the alternatives.  Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided BBC with sufficient information to analyze how such restrictions may impact its ooperations.  BLM must provide this informtion in the Final EIS for the Moab RMP revision.  The BLM has also not adequately explained or justified the ROW avoidance and exclusion areas. | On pg. 2-11 of the DRMP/EIS it states that right-of-way avoidance and exclusion areas would be consistent with the stipulations identified in Appendix C for oil and gas leasing and other surface disturbing activities.  The justification for the stipulations imposed are provided in Appendix C.  The oil and gas leasing stipulations are shown on Maps 2-5-A, 2-5-B, 2-5-C, and 2-5-D. |
| EnCana Oil and Gas (USA) Inc. | 215 | 18 | The BLM has not adequately explained or justified the right of way ("ROW") exclusion area throughout the Moab Planning Area.  EnCana owns numerous oil and gas leases in the planning area and its ability to develop | See response to  comment 214-12 and 214-13. |

155

| | | | | |
|---|---|---|---|---|
| | | | those leases would be significantly impacted if the BLM inappropriately limits EnCana's ability to access its leases. EnCana is concerned that the proposed restriction and avoidance of future ROWs under all alternatives may prevent it from delivering produced natural gas via pipeline to a distribution system in place. Preferred Alternative C exclusion and avoidance areas comprise over 20% of the planning area (a total of 370,250 acres would be ROW exclusion areas and an additional 217,480 acres where surface disturbance activities are limited would be avoidance areas for new ROWs) (See p 4-67) The DRMP does not have any maps that show all areas where ROWs would be excluded and/or avoided. Consequently, EnCana cannot evaluate possible impacts from proposed ROW monument to its operations. It is also not clear if the creation of the ROW exclusion and avoidance areas was done talking into consideration valid and existing lease rights. While the issuance of the oil and gas leases does not guarantee access to the leasehold, a federal lessee is entitles to use such part of the surface as may be necessary to produce the leases substance. 43 C.F.R. 3101.1-2 (2006) | |
| Fidelity Exploration and Production Co. | 221 | 25 | The DRMP reads: "A total of 370,250 acres would be ROW exclusion areas under Alternative C. An Additional 217,480 acres where surface disturbance activities are limited are avoidance areas for new ROWs" (p.4-67) The proposed restrictions/exclusions of future ROWs under all action alternatives may prevent Fidelity from delivering produced natural gas via pipeline to a distribution system already in place. Moreover, in areas such as Big Flat where oil is the primary produced hydrocarbon, there is no distribution system for associated natural gas. Fidelity may be forced to examine other means of disposal/use for the natural gas if ROWs were not available. Preclusion of the issuance of ROWs may result in a loss of federal or state | See response to comments 203-22, 203-24, and 214-12. |

BLM_0012161

| | | | | |
|---|---|---|---|---|
| | | | revenues, or a total los of the productive value of the resource.  Preferred Alternative C represents exclusion/restriction areas that comprise over 20% of the planning area.  Fidelity has not been provide sufficient information in the text in the form of maps that would allow it to evaluate possible impacts from proposed ROW management to its operations.  The DRMP lacks maps that show all areas where ROWs would be excluded and/or avoided.  To ascertain the effects of the implementation of the differing management strategies under each alternative, Fidelity must search through several maps describing proposed ACECs, non-Wilderness Study Area (WSA) lands with wilderness characteristics, wildlife habitat, high recreation use areas, scenic driving corridors, etc.  Fidelity cannot evaluate the possible impacts to its current and future operations without the inclusion of maps that clearly illustrate the ROW exclusion areas | |
| Green River Ranches | 448 | 1 | Our comments are directed to Appendix D, Lands Identified for Disposal in Revised Moab RMP, specifically lands in the Green River area.<br><br>The lands currently identified for disposal in the draft RMP in the Green River area would be of benefit to the Green River community, as well as improving the manageability for the BLM. We believe there are additional lands in that area that could be considered for disposal which would also benefit the community and help the BLM in its mission to manage the public lands.<br><br>FLPMA states that the BLM may sell public lands that meet one or more of three criteria as defined in the Act. The lands on the attached list would fall under criteria (2) and (3) in FLPMA. Criteria (2) states, Disposal of such tract shall service important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved and | Section 102(a) of FLPMA states, "The Congress declares that it is the policy of the United States that – (1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest."<br><br>In the draft RMP, BLM identified approximately 9,500 acres of public lands in the Green River area that are isolated tracts (surrounded by private and State Lands) and would meet the criteria for community expansion of the City of Green River.<br><br>Green River Ranches, LLC has suggested for disposal approximately 32 sections of additional public land that are not isolated tracts and are not difficult or uneconomic for BLM to manage as part of the public lands.  It would not be in the national interest for BLM to dispose of these additional lands and they will not be added to the |

BLM_0012162

| | | | prudently or feasibly on lands other than public lands and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in federal ownership. Criteria (3) states, Such tract, because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands and is not suitable for management by another Federal department or agency. Some of the lands on the list are isolated from any large blocks of public land would appear to be difficult and uneconomic to manage by the BLM. The other tracts, even though not isolated, would appear to be good disposal lands because they are adjacent to other private and state lands and could be developed in order to expand the community of Green River.<br><br>In looking through the RMP it appears there are no overriding reasons to keep these lands in public ownership. We could find no reference to recreation or other values that would preclude their disposal. The configuration of the selected lands on the attached list would in our minds make a more manageable boundary for the BLM and private landowners. The selected lands would be critical to development of agriculture in order to perfect water rights allocated from the Green River. The use of allocated water for agricultural purposes could not occur except on the identified public lands. The proposed boundary, for the most part, closely conforms to the topographic changes in the public land to the north and east of the private lands in the area. The flats could be developed and the steeper, rougher country would remain in public ownership. [See attached list of lands for disposal.] | lands identified for disposal in the RMP. |
|---|---|---|---|---|
| U.S. Fish and Wildlife Service | 586 | 5 | page 2-11, table 2.1 We recommend that BLM identify and incorporate the FWS Interim Guidelines for Wind Power (2003) in the "Management Common to All Action | The text on pg. 2-11 of the DRMP/EIS has been changed to read "Authorization of any ROW for wind or solar energy development would incorporate best |

BLM_0012163

| | | | | |
|---|---|---|---|---|
| | | | Alternatives" for the Lands and Realty section. Implementation of these recommendations will help to minimize impacts from wind power development projects to wildlife, particularly birds and bats, and their habitat. | management practices (including the United States Fish and Wildlife Service's "Guidelines for Wind Power"…" |
| Union Telephone Company | 751 | 1 | In the Final EIS and revised RMP, The BLM should continue to leave most of the Moab Resource Area open for wireless communications infrastructure. Specifically, the BLM should adopt Alternative A or Alternative D because they would allow the siting of wireless communications infrastructure on a large percentage of BLM-administered land, while adopting fewer restrictions on the types o f uses and facilities. | Any application filed for establishment of a new communication site wiould be evaluated on a case-by-case basis. Generally, communication sites require locations with a high elevation for site distance, adequate access, and a power source. Where the resources identified for protection is not already present, these needs must be considered as part of the project that is analyzed through the NEPA process. The resources identified for protection in Alternatives B and C may be a factor in decisions affecting new communication sites regardless of which plan alternative is selected. |
| | 1030 | 10 | P 3-29, section 3.6.2.1.3. It would be reasonable (and consistent with 3.6.2.1.1, 3.6.2.1.2 and subsequent sections) to list R&PP actions within the MPA if any have occurred since the 1985 RMP—or state that none have occurred. | The only R&PP actions within the MPA since 1985 have been an R&PP lease to Dead Horse Point State Park (165 acres), and an R&PP patent to Grand County for the Klondike landfill (80 acres). This information is found in the Analysis of Management Situation, pg. 6-6, which is available on the RMP website. |
| Utah State Office of Education | 1036 | 1 | It is an incorrect analytical assumption by the BLM that "Non-BLM lands would not be directly impacted by RMP decisions since BLM does not make land decisions on BLM lands." [4.1.2 Analytical Assumptions, page 4-3.] Trust lands being managed in the most prudent and profitable manner is a very significant issue for Utah's public schools. None of the alternatives provide any analysis of the loss of revenue to the in-held school lands from formally or effectively eliminating development on lands surrounding the BLM property. | Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly. For specifics regarding the impacts on mineral revenue see comment 120-101. The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3). A sentence will be added to Chapter 2, Lands and Realty,: Non-BLM lands could be indirectly impacted by RMP decisions both positively and negatively. The analysis in Chapter 4 of the PRMP/FEIS has been modified accordingly. For specifics regarding the impacts on mineral revenue see comment 120-101.The BLM does provide for reasonable access to all SITLA lands under all alternatives (pg. 4-3). Information will be added to Chapter 2, Lands and Realty, Management Common to all action alternatives, that |

BLM_0012164

| | | | | states that reasonable access to State land would be provided including across BLM lands within avoidance and exclusion areas for rights-of-way as specified by the Cotter decision (Utah v. Andrus, 10/1/79). In addition, the Moab DRMP/DEIS travel management plan recognizes the requirement to provide access to SITLA lands per the Cotter decision. Also, please see the revised analysis under Socio-Economics in Chapter 4 of the PRMP/FEIS. |
|---|---|---|---|---|
| Utah State Office of Education | 1036 | 4 | Paragraph 1.3.2.2 – Issues Identified for Consideration - Issue 8 (page 1-10). This discussion should contain detailed reference to the issue of in-held state lands in special designations, particularly WSAs, ACECs, and areas to be managed for "wilderness characteristics," and the need to give priority to resolution of the in-held school land issue. | See response to comments 120-101, 120-103, and 120-106. It is not necessary to have this specific language stated in the description of the issue. |
| Utah State Office of Education | 1036 | 5 | Table 2-1 Description of Alternatives – Lands and Realty. It should be noted for all alternatives that, pursuant to the decision of the United States District Court for the District of Utah in Utah vs. Andrus, BLM is obligated to grant reasonable access to the State of Utah and its leases to school trust lands notwithstanding any special designation or avoidance/exclusion area for rights-of-way on intervening BLM lands. 486 F. Supp. 995 (D. Utah 1979). In furtherance of this obligation, no existing roads providing access to trust lands should be closed without the consent of SITLA. | The travel plan provides restrictions to the public for recreational purposes, but does not restrict uses permitted or authorized by the BLM. State inholdings may or may not currently have access, depending upon whether or not exisitng vehicle routes lead to them. Under different alternative scenarios, existing routes may be proposed to closure. BLM policy, as required by the Cotter decision (State of Utah v. Andrus, 10/1/79), is that "the state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common school..." This decision confined the issue of access to situations directly involving economic revenues generated for the school trust. The recreation restrictions do not prohibit the State from reasonable access to its lands for economic purposes through separate permit authorization as specified by the Cotter decision. Routes to State sections may not have been identified for recreation purposes due to resource conflicts or actual route conditions. |

160

## Energy and Minerals, General

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 49 | Page 4-287, 2nd Paragraph, 4.3.13.5: Is the BLM considering the price of uranium and the high likelihood of increased exploration and mining of this mineral? There have already been huge increases in interest in opening an re-opening uranium claims throughout the four-corners region. The BLM should be anticipating this and include other areas besides the Book Cliffs andGreater Cisco RFD areas in the analysis. If areas, such as Hatch Point, Eastern Paradox, Lisbon Valley, Roan Cliffs, and Salt Wash are not included, then the BLM and the public will be in the dark when these activities increase again.  It is recommended the BLM focus on all of these important areas of the Moab RMP Planning Area in the analysis of the Alternatives. Otherwise, the analysis is woefully inadequate. | The potential uranium development for the Moab planning area is discussed on pg. 4-6 of the DRMP/EIS. This information is based on the Mineral Potential Report prepared for the Moab planning area. |
| ECOS Consulting | 9 | 65 | Page 4-445, 3rd paragraph, 4.3.19.6: That is correct, the amount of land open to oil and gas and other mineral uses is not indicative of the number of acres that would be directly disturbed.  When considering the indirect and cumulative impacts, the area impacted often becomes far greater.  These impacts must be considered in detail in this Moab RMP/EIS.  Has there been an analysis of the indirect and cumulative impacts on wildlife of roads that are created to access these sites?  There is much in the scientific literature on this subject. Have there been studies in the Moab area on the indirect and cumulative impacts of downstream water resources affected by runoff of toxic materials from spills and tailings, or from soil erosion?  How about downstream contamination of soils? How about wind erosion and the destruction of biological soil crusts on | Section 4.3.19.6 of the DRMP/EIS is found on pg. 4-453.

The BLM statement on pg. 4-453 that states that the amount of land open to oil and gas and other mineral resources is not indicative of the number of acres that would be directly disturbed.  The analysis assumptions on pg. 4-3 and 4-4 specifies the number of wells projected over a 15 year period based on the restrictions applied to the diiferent alternatives.  It further assumes there would be 15 acres of surface disturbance per well. The number of wells are projected across the areas available for oil and gas leaing and the exact locations can not be identified specifically.  Consequently, the amount of estimated surface disturbance is only a small amount of the total acreage available. |

BLM_0012166

| | | | | |
|---|---|---|---|---|
| | | | adjacent lands due to being smothered by wind-blown sand and dust? If the small direct impacts could be contained, then these activities would be much more manageable. It is the indirect and cumulative impacts on the project area and adjacent lands that need to be analyzed and are most detrimental to wildlife and many other resources. | Proposed oil and gas development projects are implementation actions in which the potential environmental impacts would be analyzed on a case by case, site specific basis following completion of the land use plan. The environmental documentation would include an assessment of direct, indirect, and cumulative analysis.<br><br>See response to comment 124-7. |
| ECOS Consulting | 9 | 66 | Page 4-454, 1st paragraph, 4.3.19.6: Do the numbers representing surface areas disturbed in the tables in Appendix S include disturbance from routes used to access these areas? If not, these must be included, and there must be and estimate of the amount of area impacted by indirect and cumulative impacts. | Appendix S of the DRMP/EIS includes the acreage of disturbance from projected oil and gas disturbance by wildlife habitat. The acreage of disturbance is based on 15 acres per well. Based on the Reasonably Foreseeable Development scenario for oil and gas in the Moab Field Office, the 15 acres of distubance includes the disturbance for well pad, access route, pipelines, and infrastructure. This language has been included in the anlalysis assumptions for oil and gas development in the PRMP/FEIS. |
| ECOS Consulting | 9 | 77 | What are the projected number of oil and gas projects for the next 10-20 years? Where will they be located? How much potential riparian habitat will be affected? These questions must be addressed in detail for an effective cumulative analysis of impacts. | The number of wells projected for the alternatives in the DRMP/EIS is based on the Reaonable Foreseeable Development scenario for oil and gas in the Moab Field Office. On pg. 4-4 of the DRMP/EIS, the number of wells is prorated based on restrictions included in the different alternatives. The numbers are projected across broad areas available for development under the different alternatives and the exact locations can not be specified. Riparian areas are excluded from development under all alternatives. |
| Independent Petroleum Assoc. of Mountain States | 203 | 18 | The BLM fails to acknowledge in the DRMP/EIS that the impacts from oil and gas are temporary, the footprint is small, and that reclamation is successful to the point that areas with previous oil and gas activity are now being proposed for wilderness protections. The fact that the impact is temporary – on average 20-30 years, the lifespan of a typical well – means that the activity does not irreparably harm the land and therefore does not | The impacts from oil and gas development are analyzed in Chapter 4 of the DRMP/EIS. |

162

BLM_0012167

| | | | | |
|---|---|---|---|---|
| | | | require vast acreage to be put off limits. Rather, exploration and production activities are compatible with protecting the land, and locking away vast energy resources is not necessary. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 3 | In addition, the BLM assumption that complex subsurface geologic conditions could result in only 50% of the wells being successful producers likely underestimates the actual number of productive future wells by 50%.  EnCana has experienced a 90% success rate in its Lisbon Valley over the last four years. | The success rate in the BLM assumption is based on the entire Moab planning area and not just on drilling in Lisbon Valley. |
| EnCana Oil and Gas (USA) Inc. | 215 | 4 | The assumptions in the RFD underlying projects of geophysical activity are also inaccurate.  An assumption of four linear miles of source line for each square mile of 3D seismic activity cannot be uniformly applied.  The BLM must make it clear that this number is not a limitation | See response to comment 124-28. |
| EnCana Oil and Gas (USA) Inc. | 215 | 12 | The characterization of geophysical activity in the DRMP as a surface disturbing activity is inaccurate (see p 4-8).  The BLM should also acknowledge its recent decision to include geophysical exploration, when no temporary or new road construction is proposed, in the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement.  See DOI Manual, Chapter 11.9.B(6), (516 DM 11.9.B9b)), 72 Fed.Reg. 45504, 45539 (August 14, 2007). The BLM recognized the limited and temporary impacts associated with such activities.  The assumption that impacts resulting from geophysical exploration surveys would require 10 years for surface reclamation is also in error and contradicts the premise of the categorical exclusion that such surveys are, in fact, a casual use operation whose impacts are sufficiently insignificant that they may be approved without an analysis by an environmental assessment or environmental impact statement if no new road construction is involved.  In fact, geophysical | See response to comment 214-6.<br><br>For the purpose of analysis in Chapter 4 of the DRMP/EIS, it is assumed that cross country travel for geophysical operations result in surface disturbace that require about 10 years to fully reclaim.  These assumptions are based on BLM experience in the area. |

BLM_0012168

| | | | survey operations to reflect the concept of "usage," where no grading and/or blading of the surface are required.  The inaccurate characterization of geophysical survey activities should be corrected throughout the DRMP, including pages 4-16, 4-83, and all other references to "seismic disturbance." | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 17 | The DRMP reads: "For geophysical exploration the assumptions are that reclamation of disturbance would be successful within a scope of 10 years depending on reclamation times related to soils, vegetation, and rainfall…" (p.4-8).  The Federal Register notice dated August 18, 2007, allows the approval of geophysical exploration surveys with a categorical exclusion. The assumption that impacts resulting from geophysical exploration surveys would require 10 years for surface reclamation is in error and contradicts the premise of the categorical exclusion that such surveys are, in fact, a casual use operation whose impacts are sufficiently insignificant that they may b approved without an analysis by an environmental assessment or environmental impact statement if no new road construction is involved.  In fact, geophysical survey operations primarily require use of the surface, not disturbance of the surface.  The BLM should alter its language in addressing impacts that may result from geophysical survey operations to reflect the concept of "usage," where no grading and/o blading of the surface are required.  The inaccurate characterization of geophysical survey activities should be corrected throughout the DRMP, including pages 4-16, 4-83, and all other references to "seismic disturbance." | See response to comment 214-6. |
| Green River City | 263 | 1 | Request that BLM ensure there are no conflicts between developable mineral deposits and areas being proposed (or currently managed) as having strict restrictions on surface disturbance. The Energy Policy Act of 2005 and other legislation sought to identify and mitigate circumstances that limit domestic energy | In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied to protect important natural resources. See response to comments 203-46 and 210-2.

See response to comment 121-15 regarding other |

BLM_0012169

| | | | production that is important to our nation's energy independence. | restrictions. |
|---|---|---|---|---|
| Lisbon Valley Mining Co | 286 | 7 | The Draft RMP tends to project "adverse impacts" to mineral development, including "unquantifiable risk" to cultural resources. It fails to balance this with the favorable impacts. Aside from economic benefits to both private and public sectors, mineral development expends greater resources to study the affected environment. Modern mineral development provides a vast amlount of environmental information. This leads to a better understanding of a particular area/discipline, and provides the framework for land use management. Not all impacts from mineral development are adverse. BLM has worked closely with LVMC to mitigate environmenal impacts in Lisbon Valley. Specific favorable impacts include detailed hydrologic studies, geochemical studies, and comprehensive cultural studies. Hydrologic work has served to characterize groundwater occurrence, quality and movement in an area previously devoid of comprehensive technical information. Geochemical studies address soil conditions and potential amendments necessary to reclaim rangeland to higher standards. Wildlife mitigation includes rangeland rehabilitation, surface water harvesting and spring rehabilitation plans with specific objectives to offset the impacts of ongoing drought. Cultural work includes detailed inventories of cultural resources, and comprehensive synthesis of Prehistoric Archaeology. These collaborative efforts are clearly favorable impacts of mineral development. | The land use plan analyzes activities on a broad, landscape level. The actions mentioned by the commentor have been developed on a site specific, project level. The BLM does not deny the contribution of such mitigating actions by mineral development companies. |
| Lisbon Valley Mining Co | 286 | 8 | The seperation of mineral impacts with other geologically related resources (i.e., paleontological resources) is erroneous, as they are related. Pitting one discipline against another is wrong in this instance. As stated earlier, the ability to gather information as part of a proposed development project affords the best ability to obtain data for management decisions. | The RMP analyzes the impacts of decisions concerning one discipline with the effects upon another discipline. There is no attempt to "pit" disciplines against one another. The site-specific instances mentioned by the commentor are mitigations developed at the project level. They are not analyzed in the RMP process. |

165

| Lisbon Valley Mining Co | 286 | 9 | The evaluation and designation of ACEC's is a one-sided look at impacts. In the Draft RMP, the BLM has looked at development impacts on ACEC's. In the case of mineral and other resource development, ACEC's could adversely impact potential resource development adjacent to ACEC's. As such, it appears the BLM would intend to place greater restrictions on the proposed development. | The preferred alternative manages 63,000 acres in five ACECs. There are restrictions placed on leasable and saleable minerals (but not locatable minerals) in these areas. The effects of restrictions on minerals in these 63,000 acres are disclosed in Chapter 4 of the DRMP/EIS. |
|---|---|---|---|---|
| | 317 | 1 | Does the DRMP use outdated USGS data to determine the potential for energy extraction? Did the BLM in any way understate the oil, gas, and uranium potential in our region? | The Mineral Potential Report (2005) provides an assessment of all the mineral resources within the MPA. It provides a description of the geology and the mineral resources, a summary of exploration and development, a classification of the occurrence and development potential of each resource, and a projection of future development. The occurrence potential of each mineral resource is classified using the ratings system provided in BLM Manual 3031. See response to comments 121-67 and 124-95 regarding the Mineral Potential Report for the Moab Field Office.<br><br>The Reasonable Foreseeable Development scenario is an analytical model, which estimates oil and gas activity that could potentially occur. The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.<br><br>The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities. Rather, it is a scenario or projection of actual |

BLM_0012171

| | | | | and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing. Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly. These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operations are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy. If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement.<br><br>See response to comment 214-1 regarding the RFD for oil and gas.<br><br>The Mineral Potential Report provides a projection of development for all other minerals in the Moab planning area. This report is available on the Moab RMP website. The information contained in the Mineral Potential Report is summarized in Chapters 3 and 4 of the DRMP/EIS. |
| | 317 | 2 | Also, does the DRMP restrict too many areas from both natural resource extraction and other uses? Does it in any way violate the spirit of federal directives that encourage domestic energy production? | In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied to protect important natural resources. See response to comments 203-46 and 210-2.<br><br>See response to comment 121-15 regarding other restrictions. |

BLM_0012172

| Intrepid Potash | 435 | 1 | In the Moab DRMP/EIS, the BLM has failed to adequately consider reasonable access to federal and private mineral resources and to consider the effects its proposed management strategy will have on current and future mineral exploration and development activities, and on the rural economy. Artificially limiting mineral development in the Moab Planning Area will deny the local economy of substantial economic benefits. | Access to federal minerals has been considered throughout the RMP process. The impacts of restrictions on mineral activity to mineral production are outlined in Chapter 4 of the DRMP/EIS in Section 4.3.7. The economic benefits of mineral development are analyzed in Chapter 4 of the DRMP/EIS and are detailed in Section 4.3.12.2.7. The contribution of mineral development in the economy of the Moab Planning area has been studied by the University of Utah. The BLM has also incorporated data from its study, "The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry: Phase III - Grand County." This recent study (January, 2008), commissioned by the State of Utah, confirms the relatively minor contribution that minerals development makes to the planning area's economy. |
|---|---|---|---|---|
| Intrepid Potash | 435 | 3 | The designation of areas within the Cane Creek Known Potash Leasing Area ("KPLA") as Closed or Open Subject to No Surface Occupancy in the DRMP/EIS will unnecessarily limit the development of potash resources within the Cane Creek KPLA and within the Moab Planning Area as a whole.<br><br>According to the DRMP/EIS, the analysis of "Open Subject to No Surface Occupancy" stipulations "assumes that development and production of the underlying mineral resources are administratively available by directional drilling from outside the area." Although some mineral resources may be efficiently extracted with directional drilling, directional drilling may not always be possible or feasible. Some "Open Subject to No Surface Occupancy" designation within the Cane Creek KPLA could effectively close the designated areas to potash exploration and development.<br><br>Cane Creek KPLA is the most significant of the three existing KPLAs in the Moab Planning Area, and the site | Valid existing rights are not affected by the current planning effort. See response to comment 214-4.<br><br>New leases would be subject to the restrictions imposed in the PRMP/FEIS. The Cane Creek Known Potash Leasing Area is partially open to leasing with no surface occupancy. It is true that the mineral resources in these areas would only be available by directional drilling. The areas in the KPLA that are closed are within the Behind the Rocks WSA and have been closed since that WSA was established.<br><br>The determination has been made in the DRMP/EIS that the other values in the area outweigh the value of the mineral resource. |

168

| | | | | |
|---|---|---|---|---|
| | | | of the only commercial production of potash in the Moab Planning Area. Notwithstanding the fact that it is the largest KPLA, Cane Creek KPLA covers a very small percentage of the Moab Planning Area. Closing portions of the Cane Creek KPLA to the development of potash resources through the imposition of either "Closed or "Open Subject to No Surface Occupancy" restrictions would provide little over all benefit to the Moab Planning Area, while effectively stifling the only viable commercial potash production within the Moab Planning Area. Regarding the Cane Creek KPLA, the agency should implement the Oil and Gas Leasing Stipulations set forth in Alternatives A or D. | |
| Intrepid Potash | 435 | 4 | The DRMP/EIS contemplates the establishment of several Areas of Critical Environmental Concern "ACEC" which encompass portions of the Cane Creek KPLA. Only a very small portion of the MPA contains workable potash deposits, the most significant of which are located in the Cane Creek KPLA. Restrictions on potash mining attendant to the establishment of ACECs could significantly limit the exploration for and development of potash resources within the Cane Creek KPLA. The agency should designate any ACECs in or near the Cane Creek KPLA in a manner that does not substantially interfere with the extraction of potash. | The Shafer Basin/Highway 279/Long Canyon ACEC partially overlays the Cane Creek KPLA. This ACEC is established to protect the scenic values of the area, including the views from Dead Horse Point State Park, as well as wildlife values. Restrictions on potash mining were considered in the designation of this ACEC; the relevant and important values of the ACEC were deemed to be more important than the potash deposits. |
| Intrepid Potash | 435 | 5 | Under Alternatives B and C of the DRMP/EIS, portions of the Cane Creek KPLA are designated as VRM I and II. As noted in the DRMP/EIS, "designation of an area as VRM Class I essentially closes the area to mineral resource activity" and "meeting VRM Class II objectives imposes additional costs on mineral resource developers." Exploration for and development of potash deposits are valid and important uses of the area within the Cane Creek KPLA. The Visual Resource management designations proposed in Alternatives B and C will significantly limit the development of the largest and most viable KPLA in the MPA. | See response to comment 214-4 for the issue of valid existing rights. Any rights currently held in the KPLA would not be affected by the PRMP/FEIS.\n\nVRM restrictions in the area of the Cane Creek KPLA were imposed to protect the scenic values of the area. The visual resources of the area are of importance nationally and internationally, and VRM restriction have been imposed in this RMP to protect those important values. |

169

| Public Lands Advocacy | 491 | 1 | BLM's Instruction Memorandum 92-67 clarifies how valid existing rights are to be honored.  It is legally required that valid Existing Rights be honored.  Therefore, not only must their acknowledgement be incorporated into the section that outlines Management Common to All Alternatives, but also throughout the entire EIS and the resulting resource management plan.  Of additional concern is that BLM has failed to analyze the impacts each alternative will have on existing leases and lessees, particularly given that many of the leases are isolated in remote areas and that under Alternatives B, C, and D, BLM has proposed sizeable withdrawals and no surface occupancy designations.  Nowhere has BLM disclosed the impacts these restrictions will have on existing leases and future development of energy resources on these leases.  We recommend that the final EIS fully address this omission. | See response to comment 214-4. |
| Western Watersheds Project | 1025 | 36 | The degree of impacts associated with mineral and oil/gas extraction and geophysical exploration with respect to cumulative motorized vehicle routes, pads, and pipelines is of concern within the RA with no specific thresholds provided to reduce protect cumulative environmental impacts. | The BLM can not discern what the commentor is stating.  The commentor does not provide any specific information about where the analysis is deficient.  The BLM does not set thresholds for motorized vehicle  use and oil and gas development. |

## Energy and Minerals, Leasable

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Arches National Park | 8 | 2 | The oil and gas leasing maps for Alternatives B, C, and D (Maps 2-5-B, C, and D) show some land as open to leasing in Arches NP (No Surface Occupancy), along the southwest boundary of the park adjoining highway 191. We believe this is an error and should be deleted. | The oil and gas leasing maps are in error in showing a portion of the park open to leasing with no surface occupancy.  These maps have been corrected in the PRMP/FEIS. |
| Samson | 201 | 10 | The BLM partially recognizes that existing oil and gas | See response to comment 214-14. |

170

| | | | leases within the Moab RA must be honored. See DRMP/EIS, pg. 2-15. However, the BLM must indicate more clearly that the revised RMP cannot modify or alter existing lease rights by developing a Goal specifically addressing existing lease rights. The BLM more accurately recognized the nature of existing lease rights in the Draft EIS for the Pinedale Resource area in Wyoming in 2007. "Surface use and timing restrictions resulting from this RMP cannot be applied to existing leases." See Pinedale RMP Draft EIS (2007), pg. 2-8. The Draft RMP for the Pinedale Resource Area also recognized that surface use restrictions, timing limitation stipulations, and NSO stipulations, as well as the creation of areas unavailable for leasing restrictions cannot be retroactively applied to valid existing oil and gas leases. "Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations (e.g., Application for Permit to Drill [APD])." See Pinedale RMP Draft EIS, pg. 4-46. The BLM cannot adjust a lessee's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). In order for the public to be fully informed, the Moab RMP should contain similar statements and guarantees. | |
| Cabot Oil and Gas Corporation | 202 | 11 | The BLM insufficiently recognizes that existing oil and gas leases within the Moab RA must be honored. The revised RMP for the Moab RA cannot modify or alter existing lease rights. The BLM should include more accurate and unequivocal statements regarding | See response to comment 214-14. |

BLM_0012176

| | | | | |
|---|---|---|---|---|
| | | | existing lease rights in the Moab RMP. For example, the BLM stated in the Draft EIS for the Pinedale RMP released earlier in 2007 that, "Surface use and timing restrictions resulting from this RMP cannot be applied to existing leases." See Pinedale RMP Draft EIS (2007), pg. 2-8. The Draft RMP for the Pinedale Resource Area also recognized that surface use restrictions, timing limitation stipulations, and NSO stipulations, as well as the creation of areas unavailable for leasing restrictions cannot be retroactively applied to valid existing oil and gas leases. "Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations (e.g., Application for Permit to Drill [APD])." See Pinedale RMP Draft EIS, pg. 4-46. The BLM does not have the authority to modify a lessee's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). | |
| Independent Petroleum Assoc. of Mountain States | 203 | 1 | The impacts attributed to oil and gas development are overstated, and the BLM fails to provide a reasoned, scientific basis for many of the proposed decisions and stipulations that unduly restrict energy development. The DRMP/EIS conflicts with statutory and executive policies which pronounce and facilitate oil and gas development, including the adoption of lease mitigation measures in the planning process that are scientifically justifiable and the least restrictive necessary. Without sufficient explanation of the rationale for the stringent stipulations, and compliance with governing energy policies, the DRMP/EIS does not allow for | The assumptions utilized to analyze the impacts of oil and gas development are provided in Chapter 4 of the DRMP/EIS.  The commentor does not provide any specific information on how the impacts are overstated or are in error.  The stipulations proposed for oil and gas leasing were developed as mitigation to protect specific resource values from oil and gas development.  The preferred alternative (Alt C) imposed the least restrictive stipulation necessary to protect the resource of concern while still allowing oil and gas development.  The justifications for the stipulations proposed for oil and gas leasing are summarized in Appendix C of the |

172

| | | | | |
|---|---|---|---|---|
| | | | meaningful analysis and informed decision-making required by NEPA, 40 CFR § 1502.9. Therefore, as described, the Preferred Alternative is arbitrary and capricious. | DRMP/EIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 4 | FLPMA defines a withdrawal as "withholding an area of Federal land from settllement, sale, location, or entry, under some or all of the general land laws…". By a 2006 Directive, the BLM cannot effect a de facto closure of thousands of acres of public lands to oil and gas leasing without following FLPMA's Secton 204 withdrawal procedures. | There are no withdrawals proposed  under any of the alternatives in the DRMP/EIS.  Withdrawals only apply to the general land laws which includes the Mining Law of 1872, as amended.  The action alternatives do propose removing areas from mineral leasing which is discretionary and does not require a withdrawal.<br><br>The BLM is not aware of the Directive the commentor is referring to.  FLPMA requires the Secretary of the Interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size.  If the BLM decides to eliminate a principal use on over 100,000 acres on a tract of land, then we will approach Congress. |
| Independent Petroleum Assoc. of Mountain States | 203 | 47 | IPAMS does not believe that the DRMP/EIS achieves the right balance of resource protection and energy development. The Moab Field Office has undervalued the oil and gas resource potential in the MPA, and feels free to place major restrictions on development of that resource. The DRMP/EIS places many layers of restriction on oil and gas development, while at the same time down playing the extent of those restrictions. The final RMP/EIS should be revised to reduce the restrictions, and the BLM should not incorporate additional aspects of Alternative B in the Record of Decision. The BLM should be following the dictates of the EPCA to reduce restrictions and encourage development of energy resources, not increase restrictions.<br>The Moab DRMP/EIS has failed to adequately consider reasonable access to federal and private | The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of FLPMA.  The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development.<br><br>In accordance with the Energy Policy Conservation Act, the least restrictive stipulations were applied in the preferred alternative to protect important natural resources. See response to comments 203-46 and 210-2. |

BLM_0012178

| | | | | |
|---|---|---|---|---|
| | | | minerals and to consider the effects it proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy.<br>Many of the new restrictions specified in the DRMP/EIS are unnecessary since oil and gas producers currently comply with existing laws protecting water, air, cultural, and other resources. Please select Alternative A or D in the final RMP, and not Alternative B, which would severely restrict the economic growth of Grand and San Juan counties. Please ensure that the restrictive aspects of Alterative B are not added to the alternative that is ultimately selected. | |
| Bill Barrett Corporation | 214 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particulary for development within Lisbon Valley, Eastern Paradox, and Greater Cisco Areas.  The BLM's RFD Scenario is based soley on past permitting, not potential development based exclusively on geologic factors as required by BLM Washington Office Instruction Memorandum 2004-089. | The Reasonably Foreseeable Development scenario was prepared  in August 2005 and was revised in September of 2006.  The revision in 2006 was prompted by a considerable increase in oil and gas prices and on the ground activity.  Up to the present time (2008) oil and gas prices have continued to climb and activity has continued to increase.  However, the numbers projected in the revised RFD are still within the range of surface disturbance and the impacts analyzed in the DRMP/EIS. If the trend continues the RFD may have to  be revised.<br><br>The RFD was prepared in accordance with BLM Washington Office IM 2004-89.  It is based on geoologic factors, past permitting, and many discussion with oil company personnel (geologists, engineers, and mangers).<br><br>See response to comment 214-28. |
| Bill Barrett Corporation | 214 | 9 | The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure stipulations imposed are only as restrictive as necessary. | The analysis in Chapter 4 of the DRMP/EIS considers the impacts of restrictive stipulations on oil and gas development.  The preferred alternative (Alt C) imposed the least restrictive stipulations necessary to protect the resources of concern while still allowing oil and gas |

BLM_0012179

| | | | | development. |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 13 | The BLM has not adequately analyzed the impacts ROW avoidance and exclusion areas will have upon exinting oil and gas leases.  The BLM must ensure that access is allowed to both existing and newly issued oil and gas leased in the Moab RA. | Refer to response to comment 214-4.

Oil and gas leases issued after completion of the land use plan will be subject to the terms and conditions of the plan.

The impacts of proposed right-of-way exclusion and avoidance areas is analyzed on pg. 4-64 through pg. 4-68 of  the DRMP/EIS. |
| Bill Barrett Corporation | 214 | 14 | Surface use restrictions, including timing limitation stipulations (TLS), NSO stipulations, and controlled surface use (CSU) stipulations, as well as unavailable for leasing designations, cannot be retroactively applied to valid, existing oil and gas leases or to valid, existing use authorizations.  The BLM cannot adjust a lessee's valid and existing rights. | Refer to response to comment 214-4. |
| Bill Barrett Corporation | 214 | 15 | The BLM should acknowledge the BLM's recent decision to include geophysical exploration, when no temporary or new road construction is proposed, to the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement. | Refer to response to comment 124-6. |
| Bill Barrett Corporation | 214 | 16 | The BLM has not analyzed or disclosed the potential impacts the restrictions on future leasing may have upon operations on existing leases.  It is not enough for the BLM to simply assert that existing lease rights will be protected, the BLM must analyze how existing lease rights will be impacted by future limitations on leasing and development and what protection it will afford to said existing leases in the above described scenario. | The analysis in Chapter 4 of the DRMP/EIS identifies the impacts to oil and gas development from furture leasing stipulations.  Although  stipulations  imposed on future leasing could impact existing leases, this type of analysis would require site specific information which can not be analyzed on a land use planning level. The commentor has not provided any information regarding the potential impacts to existing leases. |
| Bill Barrett Corporation | 214 | 23 | The BLM does not have the authority to require offsite mitigation.  Further, offsite mitigation is not appropriate for most oil  and gas projects.  The BLM's Instruction Memorandum also instructed the BLM not to impose | See response to comment 120-33 regarding BLM policy on off-site mitigation.  The commentor provides no information regarding where off-site mitigation is a management action in any of the alternatives in the |

BLM_0012180

| | | | | |
|---|---|---|---|---|
| | | | specific ratios for mitigation measures, a provision of the Insturction Memorandum the BLM has ignored in the Moab DRMP/EIS. | DRMP/EIS. |
| Bill Barrett Corporation | 214 | 26 | The Moab DRMP/EIS does not properly assess the affects restrictive land management decisions will have on the local economy, and the opportunities denied by severely restricting access to energy resources through a whole range of overlapping restrictions including wilderness-like designation of land, NSO, CSU, VRM, timing limitations, and others. | The impacts of imposing restrictions on oil and gas leasing are analyzed in Chapter 4 of the DRMP/EIS. The commentor provides no specific information on where the analysis is insufficient or improper. |
| Bill Barrett Corporation | 214 | 27 | On page 3-113 of the Moab DRMP/EIS, the analysis of the contribution of mineral resources, which as mentioned above does not provide an overall economic contribution of oil and gas, notes that production peaked in 1994 and has declined since. However, the data stops at 2000, just about the time that oil and gas commodity prices started to rise and, coupled with advances in the technology to recover unconventional resources, production throughout Utah and the Intermountain West started to soar. | Chapter 3 of the PRMP/FEIS has been updated to reflect the current trend in oil and gas production. |
| Bill Barrett Corporation | 214 | 28 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continuing increase in oil and gas prices, then the analysis will have to be updated again." This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development in the Moab RA. In the event oil and gas development exceeds the level predicted in the Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development. The BLM will not be required to revise its resource management plan. | The language referred to on pg. 4-3 does not refer to any limitation on oil and gas development. The RFD is merely an analytical tool to assess the impacts of proposed BLM decisions regarding oil and gas leasing. A land use plan amendment would not be required.<br><br>The BLM has revised the RFD scenario based upon public comment. The RFD scenario is an analytical model, which estimates oil and gas activity that could potentially occur. The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and |

BLM_0012181

| | | | | |
|---|---|---|---|---|
| | | | | transportation.<br><br>The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement. |
| Bill Barrett Corporation | 214 | 29 | In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. | The RFD scenario is an analytical model, which estimates oil and gas activity that could potentially occur. The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation. |

BLM_0012182

| | | | | |
|---|---|---|---|---|
| | | | | The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement. |
| | 409 | | The DRMP fails to consider the fact that many of the lands with wilderness characteristics are already leased. These include: Arches Adjacent, Dead Horse Cliffs, Dome Plateau, Floy Canyon, Flume Canyon, Goldbar, Shafer Canyon, Hunter Canyon, Coal Canyon, Goldbar, Hatch Wash, Labyrinth Canyon, and Hunter Canyon. The DRMP needs to determine how they will manage these lands to retain their wilderness characteristics with their current leases. This is not addressed in the plan. | See response to comment 121-67 regarding mineral policy.  The valid existing leases on the lands with wilderness characteristics are disclosed on pg. 4-118 and 4-119.  Arches Adjacent contains 56 leased acres (<1%); Dead Horse Cliffs contains 237 leased acres (30%); Dome Plateau contains 2,364 leased acres (17%); Floy Canyon contains 8,859 leased acres (86%), Flume Canyon contains 1,356 leased acres (38%), Goldbar contains 1,125 leased acres (17%); Shafer Canyon contains 179 leased acres (9%), Hunter Canyon contains 251 leased acres (5%), Coal Canyon contains 13,312 leased acres (62%, Hatch Wash contains 3,006 leased acres (27%) and, Labyrinth Canyon contains |

BLM_0012183

| | | | | |
|---|---|---|---|---|
| | | | | 3,658 leased acres (14%).  Valid existing rights are guaranteed regardless of decisions in the Land Use Plan.  Should these leases be developed, wilderness characteristics would not be retained in that portion of the unit.<br><br>None of the listed units is proposed for management to protect its wilderness characteristics in the preferred alternative. |
| US Geological Survey | 410 | 1 | Section 3.8.1.2.1, Resource Overview, page 3-49<br><br>The USGS has updated its assessment of coalbed methane resources of the Nation and results are reported in the following documents. For the Uinta-Piceance Province, the most recent (2002) USGS estimate of technically recoverable coalbed methane is 2.3 trillion cubic feet of gas (TCFG).<br><br>Assessment of Undiscovered Oil and Gas Resources of the Unita-Piceance Province of Colorado and Utah, 2002, USGS Fact Sheet FS-026-02, http://pubs.usgs.gov/fs/fs-0026-02-fe-0026-26.pdf<br><br>National Oil and Gas Assessment, 2007 Update (PDF map showing mean coalbed methane resources for Uintah Piceance and other provinces) http://certmapper.cr.usgs.gov/data/noga00/natl/graphic/2007/mean_gas_CBM_07.pdf | Our assessment is specific to coalbed  methane contained in the Sego coal field.  The Uintah-Piceance province lies to the north and east of the Moab field office. |
| Dolar Energy | 423 | 1 | The Reasonable Foreseeable Development (RFD) scenario for oil and natural gas development within the planning area is inadequate. The Alternative C (which is the preferred alternative) projects 435 wells in the next 15 years. I believe this to be far below the levels that should be anticipated. | See response to comment 214-1. |
| Dolar Energy | 423 | 2 | With respect to oil and gas resources, BLM Manual 1624, Planning for Fluid Minerals, specifically directs | See response to comment 214-9. |

179

BLM_0012384

| | | | | |
|---|---|---|---|---|
| | | | BLM not only to identify which areas would be subject to different categories of restrictions as included in the DRMP/EIS, but also to show that the least restrictive lease stipulation that would offer adequate protection of a resource has been selected. BLM failed to provide this critically important analysis in the planning document. This omission is of critical concern because it demonstrates that BLM has not carefully considered the effect of restrictive lease stipulations or permit conditions of approval (COA) on current and project future oil and gas activities in the area. Given the fact that the plan will be used to make future decisions on activities, this lack of analysis is a fatal flaw. | |
| Dolar Energy | 423 | 4 | In the Moab DRMP/EIS, the BLM has failed to adequately consider reasonable access to federal and private minerals and to consider the effects its proposed management strategy will have on current and future oil and gas exploration and development activities, and on the rural economy. A recent study by the University of Utah's Bureau of Economic and Business Research found that the oil and gas industry provides for jobs that receive wages 86% higher than the average wage for recreation jobs. Artificially limiting energy development in the Moab Planning Area will deny the local economy of similar benefits. The Moab BLM also must take into consideration the loss of income the state of Utah is denied from rental payments, royalties, and taxes that industry and business provide, that are lost when lands are locked away. | See response to comment 203-25. |
| Dolar Energy | 423 | 5 | I would also suggest the BLM sell No Surface Occupancy leases rather than lock up areas with no leasing opportunities. Future technology may allow the ability to reach minerals to develop them without disturbing the surface. | The preferred alternative uses the "no surface occupancy" restriction (rather than closed) wherever possible to protect resources.  The only discretionary areas that are closed to leasing in the Preferred alternative (25,306 acres) are those that are further than one mile from lands on which occupancy can occur.  The DRMP/EIS specifically states (on pg. 2-15) that "should |

BLM_0012185

| | | | | technology change, a Plan Amendment would be initiated to place these 25,306 acres under an NSO stipulation for oil and gas leasing.". |
|---|---|---|---|---|
| | 663 | 1 | Coalbed Methane – Development Potential Map 3-3<br><br>This is ridiculous. Where would the water come from that is needed to extract the coalbed methane? The already over-used Colorado river? The 1922 Colorado Compact is already divvied up the river and then some to the 7 western states. They will not give up any water rights for extraction so that means it will have to come from somewhere else. Plus, what about the pollution factor? CBM extraction is a notoriously dirty operation. Can the BLM guarantee that there will be no pollution to the ground water and tributaries to the Colorado River? I don't think so. | On pg. 4-6 of the DRMP/EIS, it is stated that coalbed methane development is expected to occur in the northeast corner of the Moab planning area, where there is high development potential.  Future coalbed methane exploration over the next 15 years is expected to entail testing at 3 5 spot well clusters, or 15 new wells, with a cumulative surface disturbance of 225 acres.  Until a specific proposal is provided, the water needs of such a project cannot be analyzed. |

## Energy and Minerals, Locatable

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Arches National Park | 8 | 3 | Map 2-6 shows a Known Potash Leasing Area adjacent to the southwest corner of Arches NP, and possibly jutting slightly across the boundary into the park. We assume that this designation is not the same as an actual lease, which is shown in a different color on the map. If this KPLA does indeed cross into the park, and it is possible to remove the designation inside the park boundary, we would request that this change be made. | The Known Potash Leasing Area is a classification that delineates where there are known potash resources that can be economically recovered.  However, area included in the National Park is closed to leasing and will never be developed.   This classification was made prior to the establishment of the Park and can not be easily modified. |
| State of Utah - Public Lands Policy Coordination | 120 | 41 | The discussion of locatable minerals notes that the anticipated effect of uranium development would be the same under all alternatives because the acres open to extraction would be the same across all alternatives (see pg. 4-259). | On pg. 4-106 to 4-108, it is acknowledged that special stipulations (timing and visual restrictions) impose additional constraints and costs to locatable mineral operations.  The actual costs depend on many factors and can not be quantified on a landscape level document. |

BLM_0012186

| Glen Canyon Group | 209 | 22 | 4.3.8.2.5.5 Locatable Minerals (Uranium and Vanadium) Page 4-131<br>Comment: Map 3-6 displays the presence of uranium/vanadium deposits with development potential. Few permitted mines are shown on the map (mostly in San Juan County), but apparently there are many "prospects" for mines. Although eight of the lands in question are located within areas of moderate potential, there are existing claims in only two of them – Beaver Creek and Goldbar. But there are existing claims in an additional four areas  - Floy Canyon, Dome Plateau, Hatch/Lockhart/Hart and Hatch Wash. The Map should display the locations of existing claims. | Uranium and vanadium are classified as locatable minerals. A land use plan cannot withdraw lands from locatable minerals operations.  This decision requires the action of the Secretary of the Interior. |
| Glen Canyon Group | 209 | 23 | 4.3.8.2.5.5 Locatable Minerals (Uranium and Vanadium) Page 4-131<br>Under all alternatives, such mines (uranium/vanadium) should not be permitted in Non-WSA Lands with Wilderness Characteristics as they are not permitted in Wilderness Areas. | The BLM cannot withdraw from mining any area unless formally approved by the Secretary of the Interior.  To even recommend withdrawal from all area with wilderness characteristics across all alternatives would essentially carry the major management decisions of Alternative B across all alternatives.  This would overly reduce the range of options for analysis across the action alternatives.<br><br>Also see response to comment 209-3. |

## Energy and Minerals, Oil & Gas

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 1 | The BLM should consider the potentially large economic effects the oil and gas industry might have on Grand and San Juan Counties as shown in the Economic and Business Research Study (Phase I) for oil and gas in the Uintah Basin. | The BLM acknowledges the oil and gas study referenced for the Uintah Basin.  However, the applicability to Moab is limited.  The Moab Field Office prepared a Reasonably Foreseeable Development (RFD) scenario for oil and gas development over the next 15 years.  The development predicted in the RFD was utilized to generate the economic impacts in the Draft RMP/EIS as detailed on pg. 4-259 through 4-264. |

BLM_0012187

| State of Utah - Public Lands Policy Coordination | 120 | 40 | The summary of impacts section should be expanded to discuss constraints upon mineral development when all requirements proposed under each alternative are considered concurrently. This should include the acreage available under each alternative, but the viability of development in light of restrictive but not prohibitive requirements such as Class II Visaul Quality. | The summary of impacts section is a summary and does not provide a detailed discussion. The acreage provided under each alternative is provided in the summary. A discussion of the impacts to minerals from visual resource restrictions is provided on pg. 4-107. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 98 | Section 1.3.3-Development of Planning Criteria (pg. 1-13). The BLM states that the RMP will "apply only to public lands and, where appropriate, split estate lands where the subsurace mineral estate is managed by the BLM". The BLM should reconsider whether it can impose its standard on split estate lands where it does not own the surface as mentioned in the Planning Criteria on pg. 1-13. | Information regarding leasing and development on split estate lands is found at the following Washington Office website: www.blm.gov/bmp/Split_Estate.htm.<br><br>Instruction Memorandum No. 2003-202 outlines the policy, procedures and conditions for approving oil and gas operations on split-estate lands. In particular, the BLM will not consider and Application for Permit to Drill or a Sundry Notice administratively or technically complete until the Federal lessee or its operator certifies that an agreement with the surface owner exists, or until the lessee or its operator complies with Onshore Oil and Gas Order No. 1. Compliance with Onshore Oil and Gas Order No. 1 requires the Federal mineral lessee or its operator to enter into good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the disturbed areas, or payment in lieu thereof, to compensate the surface owner for loss of crops and damages to tangible improvements, if any. In addition, the BLM will invite the surface owner to participate in the onsite inspection and will take into consideration the needs of the surface owner when reviewing the Application for Permit to Drill. The BLM will offer the surface owner the same level of surface protection BLM provides on Federal surface (Instruction Memorandum No. 89-201). |
| State of Utah - Public Lands Policy | 120 | 101 | Paragraph 4.1.2 - Analytical Assumptions (pg. 4-2/3). The BLM's second to last analytical assumtion, that non-BLM lands would be minimally directly impacted by RMP | The BLM acknowledges that the closure of adjoining public lands to oil and gas leasing may have a potentially negative impact on SITLA's mineral revenue. The |

BLM_0012188

| Coordination | | | decisions, since BLM does not make land decisions on non-BLM lands, is incorrect with respect to state trust lands. The largest source of revenue for the Utah school trust is from oil and gas bonuses and royalties. In much of Utah, in order to establish an economic oil and gas resource play, the exploration company needs a large areal footprint. It is likely that multiple sections would have to be leased and developed in order to develop the necessary reserves to make the play economic. BLM decisions from mineral lands from leasing in WSAs, areas with wilderness characteristics, ACECs, and other areas directly affect the economic viability of state trust lands inholdings. | assumption on pg. 4-3 has been changed to reflect this fact. In Alternative C, the closure of the 354,015 acres managed as WSA or Wilderness Areas is nondiscretionary and beyond the scope of this plan.<br><br>In Alternatives A, C, and D there are no SITLA lands affected by discretionary closure. Chapter 4 of the PRMP/FEIS has been revised to reflect the impacts in Alternative B on SITLA inholdings of the discretionary closures of 266,485 acres of public land. It should be noted that under any Alternative, the proposed ACECs are not managed as closed to mineral leasing. Areas with wilderness characteristics are recommended as closed under Alternative B and No Surface Occupancy in Alternative C. |
| State of Utah - Public Lands Policy Coordination | 120 | 103 | Section 4.1.3.1/Table 4.2-Oil and Gas. The BLM withdrawals and special designations directly affect development of oil and gas on SITLA lands. The BLM should assume that, in addition to the loss of oil and gas wells on BLM lands, there would be an additional loss of wells on SITLA lands in proportion to the amount of SITLA land within the proposed special designations under each alternative. | As explained in comment 120-101, the only discretionary oil and gas closures imposed by this plan that negatively impact SITLA inholdings are in Alt B where 266,485 acres are closed to protect wilderness characteristics. An estimate of oil and gas wells foregone on SITLA lands as a result of the BLM closure has been added to the text on pg. 4-94. |
| San Juan County | 121 | 15 | BLM should give due consideration to the most efficient program for the development of oil and gas resources in favor of exclusionary management for other uses. BLM is using exclusionary management for non-WSA lands with wilderness characteristics, ACECs and wildlife areas. | Alt B of the Draft RMP/EIS favors the protection of resources over the extraction of mineral development. Alt D favors mineral development over protection of resources. Alt C is designed to be a balance between mineral development and protection of resources. There are no "exclusionary areas" proposed in the Draft RMP/EIS for Alt C within San Juan County for oil and gas. There are no ACECs or non-WSA lands with wilderness characteristics proposed for Alt C within San Juan County. Only timing restrictions for wildlife are proposed in Alt C within San Juan County. |
| Southern Utah Wilderness Alliance | 124 | 95 | The BLM fails to consider known oil and gas locations in evaluating its oil and gas leasing stipulation alternatives and predicting oil and gas development. One | The geology of the Moab Field Office is described in the Mineral Potential Report for the Moab DRMP/EIS. As delineated by the oil and gas resource evaluation under |

BLM_0012189

| (SUWA) | | | shortcoming common to every alternative analyzed in the Moab Draft RMP is that the BLM has not endeavored to match predicted oil and gas development figures with the actual known geologic reserves of oil and gas. Instead, the BLM simply predicts future well numbers based on the total acreage available for leasing in each RFD area.  If the BLM were to analyze reasonably foreseeable development by acknowledging differentiating productive, known oil and gas fields from unproductive or unknown areas then it is likely that there may be little difference in the reasonably foreseeable prediction of well numbers in Alternative B.  There is little or no basis for BLM's prediction that the various alternatives with fewer leasing stipulations will result in significantly larger amounts of wells over the course of fifteen years.  The BLM must evaluate how the proposed leasing stipulations will actually impact access to the known oil and gas fields and reserves of the MPA.

The BLM completely ignores no surface occupancy leases in this analysis, a critical failure as these leases may still allow for substantial access and development, possibly eliminating differences among alternatives. | the EPCA, the northern part of the Moab Field Office includes the southwestern portion of the Uinta Basin whereas the southern two-thirds includes the Fold and Fault Belt of the Paradox Basin.  These areas have very different geology although both are defined as having high occurrence potential for oil and gas.  Therefore, the entire area of the Moab Field Office has a high occurrence potential for oil and gas.

It is erroneous to assume that the known oil and gas fields shown on Map 3-1 of the DRMP/DEIS are synonymous with oil and gas reserves.  The fields shown represent areas where there has been historical and ongoing oil and gas production.  However, there is high potential for additional oil and gas development outside of the known fields across the entire Moab Field Office.  Based on the geology and the knowledge gained from the known oil and gas fields, the Moab Field Office was divided into 7 development areas.  New development within these areas is projected based on historical drilling, BLM experience, and communication with oil and gas operators.  New development is expressed in the number of wells likely to be drilled in the area over the next 15 years.  This development can occur anywhere within the development area and is not limited to oil and gas fields.

Refer to the Reasonably Foreseeable Development scenario for oil and gas available on the Moab RMP website.

The baseline projection of wells by development area is based on no restrictions.  Stipulations on oil and gas leasing were developed by alternative to protect other resource values.  The resultant restrictions result in a proportionate reduction in the number of wells throughout a given development area.  This is the basis |

185

| | | | | for the variability in the number of wells across alternatives.<br><br>The analysis in Chapter 4 (pg. **4**-84) of the DRMP/DEIS is based on acres of surface disturbance associated with oil and gas development.  Since No Surface Occupancy areas would be precluded from occupancy of the surface for operations, no surface disturbance would occur in those areas.  Therefore, the BLM fully considered No Surface Occupancy leases and their impacts in the analysis provided in the DRMP/EIS. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 96 | The BLM should consider an alternative that removes the NSO stipulations in the productive portions of the Greater Cisco RFD.  The BLM must justify why the remaining stipulations in Alternative B would actually diminish oil and gas development. | The BLM has provided a reasonable range of alternatives for the oil and gas leasing stipulations.  Any proposed management action analyzed within the range of alternatives can be selected in the Record of Decision for the RMP.  The BLM does not see the need for creating a new alternative that combines elements of two existing alternatives.  There are a multitude of possible combinations that could be formulated into new alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 97 | The following areas do not contribute to oil and gas production based on the known oil and gas fields and should be protected under all alternative:  Labyrinth Canyon, the area south of the Colorado River and north of the La Sals, portions of Hatch Canyon and Harts Point, the areas with wilderness characteristics in the Bookcliffs, and the Arths Pasture, Big Flat, and Tenmile area. | See response to comment 124-95. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 98 | The BLM must consider a no leasing alternative.  The current draft of the RMP fails to consider such an alternative.  Federal courts have made clear that a no leasing alternative should be a vital component in ensuring that agencies have all possible approaches before them (See, e.g., Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 [9th Cir. 1988]. | The BLM's consideration of the no leasing alternative has been added to Chapter 2 of the PRMP/FEIS under the section on Alternatives Considered but Eliminated from Analysis. |
| Southern Utah Wilderness | 124 | 100 | The BLM must take a hard look at the enviromental and recreational benefits of alternative B versus the potential | Alt B emphasizes the protection/preservation of natural resources.  The impacts upon natural resources from the |

BLM_0012191

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | foregone oil and gas. | various mineral alternatives are fully described in Chapter 4.  For example, the analysis of leasable minerals on wildlife on pg. 4-458 states that Alt B would have considerably more impacts to deer and elk than any other alternative.  As another example, the analysis of mineral development on soils and water resources on pg. 4-290 states that based on the acreages detailed in Table 4.81 and 4.82 Alt B would have the least adverse impacts to soil and water resources due to mineral resource development decisions.  For a final example, the analysis of minerals on recreation on pg. 4-202 states that Alt B would have fewer impacts because fewer acres within the Moab planning area would be potentially impacted by minerals exploration and development.   More examples are available in Chapter 4.  Nonetheless, the BLM contends that a hard look was taken. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 101 | BLM cannot dismiss consideration of directional drilling from existing wells.  BLM must analyze directional drilling and require all operators to include a directional drilling alternative on a site specific basis.  NEPA requires the BLM to consider the least environmentally damaging alternative.  The Draft RMP should require all oil and gas projects to include a directional drilling alternative. | On a land use planning level across a large area it is not reasonable to consider an alternative that limits oil and gas development to directional drilling from existing well sites.  The entire Moab planning area has a high occurrence and development potential for oil and gas.  Based on current technology the DRMP/EIS assumes a directional drilling reach of 1 mile.  Therefore, vast areas of the planning area with oil and gas resources would not be accessible and therefore would be closed to oil and gas leasing.  The commentor provides no rationale regarding the resource conflicts that would warrant this restriction.<br><br>Directional drilling is not conducive to all geologic and mineral environments.  It is an option available at the site specific level and would be analyzed at the permit stage for drilling. |
| Southern Utah Wilderness Alliance | 124 | 205 | Recreation generates more money than oil and gas.  Therefore, all lands within Labyrinth Canyon should closed or no surface occupancy for oil and gas.  The | In Chapter 4 of the DRMP/EIS, the BLM acknowledges the economic values of recreation in the Moab planning area.  In Alt C, the BLM institutes no surface occupancy |

BLM_0012192

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | Green River corridor found by the BLM to possess wilderness characteristics should be closed to oil and gas.  Lands contained in the Red Rock Wilderness Act should be no surface occupancy. | along the entire Green River corridor, including Labyrinth Canyon.<br><br>The BLM has no obligation to close to oil and gas to all lands that are within a bill introduced in Congres, the Red Rock Wilderness Act.  Should congress direct the BLM to close all lands to oil and gas leasing, the BLM will comply with the law. |
| Samson | 201 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particularly for development in the Lisbon Valley, Eastern Paradox, and Greater Cisco Areas and does not consider an alternative to no surface occupancy in environmentally sensitive areas. See Moab DRMP/EIS, map 3-16. The BLM determined that the vast majority of the Moab RA has high potential for oil and gas. See DRMP/EIS, Map 3-2, Mineral Potential Report, pgs. 51-52, Maps 6a, 6b, 6c, and 6d. Nonetheless, the BLM's RFD Scenario appears to be based on past permitting rather than potential development given the geologic conditions as required by BLM Washington Office Instruction Memorandum 2004-089<br>(Jan. 16, 2004). See also BLM Land Use Planning Handbook H-1624-1 Planning for Fluid Minerals (Chapter III, B.)(Release 1-1583, 5/7/06), as modified. The Preferred Alternative, Alternative C, only projects 432 wells in the next 15 years. See Moab DRMP/EIS, pg. 4-91. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. Recent APD filings suggest the fifteen-year RFD should be far higher than the level anticipated by BLM. | See response to comment 214-1 and 214-28. |
| Samson | 201 | 5 | Section 1.4.5 -Energy Policy and Conservation Act (EPCA)<br><br>The BLM indicates in Section 1.4.5 of the Moab | See response to comment 214-9 |

BLM_0012193

| | | | | |
|---|---|---|---|---|
| | | | DRMP/EIS that the agency integrated the general principles from the EPCA Study into the RMP revision. See Moab DRMP/EIS, pg. 1-15. The BLM should also carefully review the results and analysis contained in the Scientific Inventory of Onshore Federal Land's Oil and Gas Resources and the Extent and Nature of Restrictions or Impediments to Their Development (2006) (EPCA II) prepared in compliance with § 604 of the Energy Act of 2000, Pub. L. No. 106-469, and § 364 of the Energy Policy Act of 2005, Pub. L. No. 109-58. The EPCA II study demonstrates the significant negative impacts that stipulations have upon oil and gas leasing and development. The EPCA II study demonstrates that approximately 38.5% of federal lands containing natural gas resources within the Paradox/San Juan Basin are available with Standard Lease Terms and that over 50% of the federal lands are encumbered with restrictions to development. Se EPCA II, pg. 96. However, approximately 49% of the federal lands within the Paradox/San Juan Basin are unavailable for leasing. Id. at 89, 96. That means that 23% (96 MMbbls) of the federal oil and 7% (2.0 TCF) of federal natural gas would be unrecoverable. Id. at 89. The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure that stipulations imposed are only as restrictive as necessary. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3), 119 Stat. 594, 723 (2005). | |
| Samson | 201 | 6 | Section 1.4.7 -Memorandum of Understanding with Forest Service

The BLM incorrectly references a 1991 Memorandum of Understanding between the BLM and the United States Department of Agriculture, Forest Service (Forest Service) establishing joint BLM and Forest Service procedures for managing oil and gas leasing and | See response to comment 202-7. |

BLM_0012194

operational activities in the Moab DRMP/EIS. See Moab DRMP/EIS, pg. 1-16. Section 363 of the Energy Policy Act of 2005 directed the BLM and Forest Service to develop a new Memorandum of Understanding regarding oil and gas leasing and operational activities on lands administered by the BLM and Forest Service. Energy Policy Act of 2005, Pub. L. No. 109-58, § 363, 119 Stat. 594, 722-23 (2005). Congress specifically directed the BLM and Forest Service to develop administrative procedures and timeline to ensure the timely processing of oil and gas lease applications, surface use plans of operations, and applications for permits to drill. Id. The Energy Policy Act of 2005 further required the BLM and Forest Service to ensure that lease stipulations are applied consistently, coordinated between the agencies, and only as restrictive as necessary to protect the resource for which the stipulations are applied. Id. (emphasis added). The BLM and the Forest Service issued the Memorandum of Understanding required by Section 363 of the Energy Policy Act in April of 2006. See BLM MOU WO300-2006-07. The new Memorandum of Understanding clearly and unequivocally "supersedes the BLM and Forest Service Interagency Agreements on leasing and operations dated November 1991." Id. The BLM must correct this inference in the Final EIS for the Moab RMP and ensure that the Moab Field Office reviews and complies with the 2006 Memorandum of Understanding when developing and adopting the Moab RMP, and when permitting or approving future oil and gas leasing or development operations within the Moab RA. The 1991 memorandum has no legal impact or effect at this time.

In particular, the BLM must ensure that the stipulations attached to any future leases are the least restrictive necessary to protect the particular resource values in question. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3)(C), 119 Stat. 594, 722-23 (2005);

BLM_0012195

| | | | BLM MOU WO300-2006-07, pg. 2 of 16. | |
|---|---|---|---|---|
| Samson | 201 | 11 | In the event the BLM designates the Mill Creek Canyon ACEC, the BLM must ensure that operations on adjoining state lands are not impacted. Although it appears BLM intends to either close the Mill Creek Canyon area to oil and gas leasing or impose stringent NSO stipulations, see Moab DRMP/EIS, pg. 2-36, maps 2-14-6, 2-5-6, the BLM must not allow its decisions to inhibit development on nearby State of Utah lands by denying ROWS or other means. The BLM should not close the Mill Creek Canyon area to all oil and gas leasing as it proposes under Alternative B because some development of federal minerals may be possible from adjoining state lands. The BLM must not select Alternative B and close the Mill Creek Canyon area to all oil and gas leasing. | See response to comment 120-10.<br><br>The BLM does not propose to chose Alt B, which closes Mill Creek Canyon to oil and gas leasing. |
| Samson | 201 | 15 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations when -oil and gas development is a mandated and appropriate use of the public lands. See, e.g., 30 U.S.C. § 226; 43 U.S.C. § 1702(1). Congress has directed public lands to be leased for oil and gas development, the BLM cannot require operators to "fully mitigate" the potential where impacts of an activity that Congress has approved and encouraged. The management action should be eliminated. | See response to comment 214-24. |
| Cabot Oil and Gas Corporation | 202 | 1 | The Reasonable Foreseeable Development (RFD) Scenario for oil and natural gas development within the planning area is unreasonably low, particularly for development in the Lisbon Valley, Eastern Paradox, and Greater Cisco Areas. The BLM determined that the vast majority of the Moab RA has high potential for oil and gas. See DRMP/EIS, Map 3-2, Mineral Potential Report, pgs. 51-52, Maps 6a, 6b, 6c, and 6d. Nonetheless, the BLM's RFD Scenario appears to be based solely on past permitting rather than potential development given the geologic conditions as required by BLM Washington | See response to comment 214-1 and 214-28. |

BLM_0012196

| | | | | |
|---|---|---|---|---|
| | | | Office Instruction Memorandum 2004-089 (Jan. 16, 2004). See also BLM Land Use Planning Handbook H-1624-1 Planning for Fluid Minerals (Chapter III, B.)(Release 1-1583, 5/7/06), as modified. The Preferred Alternative, Alternative C, only projects 432 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. Recent APD filings demonstrate the RFD scenario for the Moab RA should be at least 975, based on 2006 data of 65 APDs. | |
| Cabot Oil and Gas Corporation | 202 | 6 | Section 1.4.5 -Energy Policy and Conservation Act (EPCA)<br><br>The BLM indicates in Section 1.4.5 of the Moab DRMP/EIS that the agency integrated the general principles from the EPCA Study into the RMP revision. See Moab DRMP/EIS, pg. 1-15. The BLM should also carefully review the results and analysis contained in the Scientific Inventory of Onshore Federal Land's Oil and Gas Resources and the Extent and Nature of Restrictions or Impediments to Their Development (2006) (EPCA II) prepared in compliance with § 604 of the Energy Act of 2000, Pub. L. No. 106-469, and § 364 of the Energy Policy Act of 2005, Pub. L. No. 109-58. The EPCA II study demonstrates the significant negative impacts that stipulations have upon oil and gas leasing and development. The EPCA II study demonstrates that approximately 38.5% of federal lands containing natural gas resources within the Paradox/San Juan Basin are available with Standard Lease Terms and that over 50% of the federal lands are encumbered with restrictions to development. Se EPCA II, pg. 96. However, approximately 49% of the federal lands within the Paradox/San Juan Basin are unavailable for leasing. Id. at 89, 96. That means that 23% (96 MMbbls) of the federal oil and 7% (2.0 TCF) of federal natural gas us | See response to comment 214-9. |

BLM_0012197

| | | | | |
|---|---|---|---|---|
| | | | unrecoverable. Id. at 89. The BLM should carefully consider the impacts more restrictive stipulations will have upon oil and gas development in the Moab RA and, as required by the Energy Policy Act of 2005, ensure that stipulations imposed are only as restrictive as necessary. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3), 119 Stat. 594, 723 (2005). | |
| Cabot Oil and Gas Corporation | 202 | 7 | Section 1.4.7 -Memorandum of Understanding with Forest Service<br><br>The BLM improperly references a 1991 Memorandum of Understanding between the BLM and the United States Department of Agriculture, Forest Service (Forest Service) establishing joint BLM and Forest Service procedures for managing oil and gas leasing and operational activities in the Moab DRMP/EIS. See Moab DRMP/EIS, pg. 1-16. Section 363 of the Energy Policy Act of 2005 directed the BLM and Forest Service to develop a new Memorandum of Understanding regarding oil and gas leasing and operational activities on lands administered by the BLM and Forest Service. Energy Policy Act of 2005, Pub. L. No. 109-58, § 363, 119 Stat. 594, 722-23 (2005). Congress specifically directed the BLM and Forest Service to develop administrative procedures and timeline to ensure the timely processing of oil and gas lease applications, surface use plans of operations, and applications for permits to drill. Id. The Energy Policy Act of 2005 further required the BLM and Forest Service to ensure that lease stipulations are applied consistently, coordinated between the agencies, and only as restrictive as necessary to protect the resource for which the stipulations are applied. Id. (emphasis added). When developing the Moab RMP the BLM must ensure that any and all stipulations developed for future leasing with the Moab RA are the least restrictive possible.<br>The BLM and the Forest Service issued the | The reference to the Memorandum of Understanding between the BLM and the Forest Service regarding oil and gas leasing has been changed in the PRMP/FEIS from 1991 to 2006. |

193

| | | | | |
|---|---|---|---|---|
| | | | Memorandum of Understanding required by Section 363 of the Energy Policy Act in April of 2006. See BLM MOU WO300-2006-07. The new Memorandum of Understanding clearly and unequivocally "supersedes the BLM and Forest Service Interagency Agreements on leasing and operations dated November 1991." Id. The BLM must correct this inference in the Final EIS for the Moab RMP and ensure that the Moab Field Office reviews and complies with the 2006 Memorandum of Understanding when developing and adopting the Moab RMP, and when permitting or approving future oil and gas leasing or development operations within the Moab RA. The 1991 memorandum has no legal impact or effect at this time.<br><br>In particular, the BLM must ensure that the stipulations attached to any future leases are the least restrictive necessary to protect the particular resource values in question. See Energy Policy Act of 2005, Pub. L. No. 109-58, § 363(b)(3)(C), 119 Stat. 594, 722-23 (2005); BLM MOU WO300-2006-07, pg. 2 of 16. | |
| Cabot Oil and Gas Corporation | 202 | 12 | In the event the BLM designates the Mill Creek Canyon ACEC, the BLM must ensure that operations on adjoining state lands are not impacted. Although it appears BLM intends to either close the Mill Creek Canyon area to oil and gas leasing or impose stringent NSO stipulations, see Moab DRMP/EIS, pg. 2-36, maps 2-14-6, 2-5-6, the BLM must not allow its decisions to inhibit development on nearby State of Utah lands by denying ROWS or other means. The BLM should not close the Mill Creek Canyon area to all oil and gas leasing as it proposes under Alternative B because some development of federal minerals may be possible from adjoining state lands. The BLM must not select Alternative B and close the Mill Creek Canyon area to all oil and gas leasing. | See response to comment 120-10. |
| Cabot Oil and Gas | 202 | 16 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations | See response to comment 214-24. |

194

| Corporation | | | when oil and gas development is a mandated and appropriate use of the public lands. See, e.g., 30 U.S.C. § 226; 43 U.S.C. § 1702(1). The management action should be eliminated or, at the very least, redrafted as follows: "Reasonably mitigate unavoidable habitat losses for special status species when such losses are anticipated to have a direct, measurable impact on sensitive species." | |
| Independent Petroleum Assoc. of Mountain States | 203 | 19 | Appendix C in the DRMP/EIS provides a table of surface stipulations applicable to all surface-disturbing activities. The overlapping surface stipulations are extremely restrictive and would result in severe and unacceptable adverse impacts on the ability of oil and gas industry to fulfill its lease obligations within the Moab Field Office planning area. | See response to comment 203-17. |
| Independent Petroleum Assoc. of Mountain States | 203 | 20 | The BLM assumes for purposes of its analysis of the impacts of NSO stipulations that the current extent of directional drilling technology is 1 mile, page 4-84. Directional drilling cannot generally exceed 1200 feet except under very limited circumstances. The BLM cannot assume directional drilling will be feasible over the distances proposed, particularly without specific analysis of the geologic formations involved. Directional drilling is both expensive and technologically challenging and the BLM cannot assume it can be reliable used in every situation. If the BLM is justifying its management decisions based on 1 mile of directional drilling, that analysis needs to be revised. | On pg. 4-84 of the DRMP/EIS it states that the extent of current directional drilling technology in the region is approximately one mile.  This estimate was based on actual drilling proposals submitted to the BLM. |
| Independent Petroleum Assoc. of Mountain States | 203 | 21 | Visual Resource Management Restrictions: It is not clear from the document if the designation of large portions of the planning areas as VRM Class II is included in the acres of mineral estate that are considered as subject to major constraints, despite the fact that Class II restrictions would constitute a major impediment on development. Since oil and gas development is temporary disturbance to the surface with temporary visual impacts, as most wells are abandoned after 20 or | In Appendix C of the DRMP/EIS, a controlled surface use (CSU) leasing stipulation is applied to areas with proposed VRM II management.  A CSU stipulation is considered a minor constraint because it still allows for oil and gas development. |

BLM_0012200

| | | | | |
|---|---|---|---|---|
| | | | 30 years, the VRM provisions do not provide a reasonable balance between protecting vistas and developing energy resources needed by the nation. Full field development would be virtually impossible under the Class II designation. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 39 | Table 4.3 Summary of Total Predicted Surface Disturbance for Mineral Development Activities in section 4.1.3.10, page 4-7 is based on the erroneous 15-acre-per-well disturbance, as well as the assumption that 1,500 acres would be reclaimed over the fifteen year life of the plan, and only wells drilled in the first five years would be successfully reclaimed within the life of the plan.  This assumption is pessimistic, and does not take into account the interim reclamation and different vegetation types. Operators throughout the West routinely reclaim land right up to the well head once a well head is drilled, so that a very small amount remains disturbed per well. The chart should be redone using a 50% interim reclamation assumption per well and a five acre disturbance per well. | See response to comment 203-38.

The estimate for the time need to reclaim disturbed areas is based on BLM experience in this area. |
| Independent Petroleum Assoc. of Mountain States | 203 | 40 | In addition, the potential habitat for Gunnison Sage Grouse, timing limitations would apply from March 20th to May 15th each year.  In the potential habitat for Greater Sage Grouse, timing limitations would apply from March 1st to May 15th each year.  However, the DRMP/EIS should instead specify a buffer around the actual nesting habitat, as is common practice throughout the Intermountain West, rather than a blanket restriction for the entire potential habitat. The highest concentration of nesting is within two miles of a lek. Therefore, the final RMP/EIS should only limit activity within a two mile buffer around the leks in the 175,727 acres of habitat for Gunnison and the 3,068 acres for Greater Sage Grouse, rather than a blanket timing restriction in areas that may or may not have sage grouse.  According to a study by R.C. Kaiser, (2006, Recruitment by greater sage-grouse in association with natural gas development in Western | The Gunnison sage grouse is a sensitive status species. Although some experts, such as Connolly, suggest a buffer of 2 miles, the BLM has established a minimum buffer of 0.5 miles as necessary to protect this species. The restriction imposed in the DRMP/EIS is to be enlisted in sage grouse habitat only if safe grouse occupancy is determined.  Currently, the Moab BLM has no active Gunnison sage grouse leks. |

BLM_0012201

| | | | Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. | |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 41 | Table C.1, in the stipulation descriptions, for example for sage grouse habitat on page C-22, an exception may be granted "…if the operator submits a plan which demonstrates that impacts from the action would not result in any net loss of habitat." This should explicitly allow for the use of off-site mitigation in the operator's plan to demonstrate no net loss of habitat. | If an operator choses to offer off-site mitigation, the BLM can accept this offer. Off-site mitigation can be considered on a site-specific basis, and it is not a land use planning decision. |
| Independent Petroleum Assoc. of Mountain States | 203 | 42 | On pages 2-46 the BLM describes various management actions and mitigation requirements for relating to greater sage-grouse habitats. The BLM's proposed management for greater sage-grouse is unduly restrictive, particularly under Alternative B. The BLM cannot impose conditions of approval or other limitations which are inconsistent with the lease rights granted.  In particular, the BLM's proposal to prohibit all permanent above ground facilities within two miles of an active lek is unnecessarily restrictive when anti-perch devise can be installed as necessary to protect areas with leks. | The BLM proposes to choose Alt C, not B.  All valid existing rights granted prior to the issuance of the ROD would be recognized under the lease conditions that were granted at the time of the lease. |
| Independent Petroleum Assoc. of Mountain States | 203 | 43 | Prairie Dog Habitat: IPAMS prefers the management measures in Alternative A, but if restrictions for prairie dogs are instituted, the BLM should choose the proposal in Alternatives C and D for CSU stipulations within 660 feet of active prairie dog colonies, rather than the blanket application of NSO and CSU within all potential habitat specified in Alternative B. | The BLM proposes to choose Alt. C, which proposes a buffer of 660 feet around active prairie dog colonies. |
| Independent Petroleum Assoc. of Mountain States | 203 | 44 | On page 2-7 of the DRMP/EIS the BLM states the following management action would be common to all alternatives: "Manage all BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air | See response to comment 214-10. |

BLM_0012202

| | | | | |
|---|---|---|---|---|
| | | | shed of the National Parks (e.g., Arches and Canyonlands National Parks)." The BLM must significantly revise this proposed management action because it violates the Clean Air Act (CAA) and potentially unreasonably limits the BLM's ability to effectively manage the public lands. The BLM does not have any direct authority over air quality or air emissions under the Clean Air Act (CAA). 42 USC §§ 7401 et seq. Under the express terms of the CAA, the EPA has the authority to regulate air emissions. In Utah, the EPA has delegated its authority to the State of Utah, Department of Environmental Quality (UDEQ). The Secretary of the Interior, through the Interior Board of Land Appeals (IBLA) has recognized that the state department of environmental quality, not the BLM has authority over air emissions. Wyoming Outdoor Council, et al., IBLA No. 2006-155, Order at *12 (June 28, 2006). The BLM does not have authority to regulate emissions in Utah. The BLM must eliminate or revise the proposed management action. | |
| Questar Exploration and Production Company | 210 | 7 | The DRMP/EIS should clearly state that Best Management Practices can only be required or applied when both economic and technical feasibility criteria are met. The DRMP/EIS should also acknowledge that many operators work with the BLM in the permitting and planning process to develop new BMPs or modify existing BMPs to make them meet the feasibility criteria. Recommendation: Clarify that BMPs are only required when they are both technically and economically feasible. | See response to comment 215-1. |
| Questar Exploration and Production Company | 210 | 8 | Reasonably Foreseeable Development. The Reasonably Foreseeable Development (RFD) analysis severely underestimates the potential oil and gas development within the planning area. The Preferred Alternative projects 432 wells in the next 15 years despite the fact that 2006 APD activity alone suggests a figure nearly double that. Instruction Memorandum 2004-089 requires | See response to comments 203-15 and 214-1. |

BLM_0012203

| | | | | |
|---|---|---|---|---|
| | | | that BLM use the best available information that data at the time of the RFD study.<br>The BLM does not disclose the methodology or information that was used in developing the RFD, nor whether input from the oil and gas industry was solicited, but it appears that recent data may contradict some of the assumptions that went into it. Recent advances in technology, including 3-D seismic surveys, coupled with higher commodity prices would indicate a higher RFD would be more accurate.<br>Recommendation: The predicted magnitude of the energy resource and the resulting number of wells that could be drilled should be reevaluated based on the best available information and data, taking into account new technology and increased gas prices. Information should be solicited from the oil and gas industry to aid in the evaluation. | |
| Questar Exploration and Production Company | 210 | 12 | The DRMP/EIS uses a grossly overstated average of 15 acres per well surface disturbance associated with oil and gas exploration. Using a normal well pad size of 3 acres, this would mean that the road and pipeline associated with teach well would disturb 12 acres, or approximately 2.5 miles for a 40' easement. This is unrealistic. A more realistic figure of 5 to 7 total acres disturbance would be consistent with other recently published BLM RMPs. An average of 7 acres, allowing 4 acres for the road and pipeline (approximately ½ mile) should be used for the DRMP/EIS. It also important to note that the pipeline disturbance is minimal and temporary. After pipeline construction, the easement would revert to the standard 24' roadway resulting in an immediate reclamation of approximately one acre.<br>The DRMP/EIS also assumes only 1500 acres would be reclaimed over the 15-year life of the RMP and only wells drilled in the first five years would be successfully reclaimed within the life of the plan. This assumption is pessimistic and does not take into account most | See response to comment 203-28. |

BLM_0012204

| | | | operators' standard practice of reclaiming a well location back to producing size immediately upon putting the well on production.<br>Recommendation: Use a 5 to 7 acre average per well location for surface disturbance and a 50% interim reclamation assumption per well. Adjust Table 4.3, Summary of Total Predicted Surface Disturbance for Mineral Development Activities on page 4-7 to reflect this. | |
| Questar Exploration and Production Company | 210 | 13 | Greater and Gunnison Sage-grouse. The conditional surface use (CSU) and no surface occupancy (NSO) buffer expansion to a 0.5 mile radius surrounding Greater Sage-grouse leks and a 0.6 mile radius surrounding Gunnison Sage-grouse for nesting and brood rearing is excessively restrictive and contradicts existing, well established protocol found in recent BLM RMP and EIS decisions and the science upon which those decisions are based (Wallestad and Pyrah 1974, Braun et al. 1977).<br>In areas where relatively higher levels of development occur, monitoring efforts indicate increasing or stable sage-grouse populations. For example, within Questar's Pinedale Anticline Project Area in Southwestern Wyoming, which has seen considerable oil and gas development since 2000, spring 2006 male grouse numbers on the 31 agency-monitored leks were the highest on record since accelerated development began in 2000 (1,559 birds in spring 2000 versus 1,873 birds in spring 2006); relatively consistent monitoring protocol were applied in all years. A 0.25-mile active lek No Surface Occupancy (NSO) buffer and a 2.0-mile CSU seasonal avoidance area are generally applied on the Pinedale Anticline. Furthermore, only 8 of the 31 leks are considered to have declining trends while 7 leks appear to be increasing in abundance (2006 Wildlife Studies, Pinedale Anticline Project by TRC Mariah Associates, Inc. 2007). According to a study by R.C. Kaiser, (2006, | See response to comments 203-40, 203-41 and 203-42. |

BLM_0012205

| | | | | |
|---|---|---|---|---|
| | | | Recruitment by Greater Sage-grouse in Association with Natural Gas Development in Western Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. Recommendation: Remove the expansion of CSU/NSO buffers and continue to use the proven adequate nesting and breeding buffer of 0.25 miles. | |
| Questar Exploration and Production Company | 210 | 14 | The DRMP/EIS introduces further restrictions on oil and gas with large portions of the planning area being designated as VRM Class II. The Preferred Alternative designates 365,567 acres as Class II. It is not clear from the document if the Class II restrictions overlap other restrictions; however, because oil and gas development is a temporary disturbance to the surface with temporary visual impacts, the VRM restrictions do not represent a reasonable balance between protecting vistas and developing energy resources needed by the nation. | See response to comment 203-21. |
| EnCana Oil and Gas (USA) Inc. | 215 | 2 | The BLM's Reasonably Foreseeable Development ("RFD") Scenario for the Moab Planning Area is inaccurate and would limit the opportunities to explore for new resources. Rather than Relying on outdated USGS data, the RFD Scenario should be based on the current levels of 3-D seismic activity and of the application for permits to drill in the area. The BLM should also include additional information explaining the purpose of the RFD Scenario and its role in the planning process. First, the BLM must update the RFD Scenario in light of the increase in drilling activity since it was developed. For example, Preferred Alternative C projects 435 wells in the next 15 years. Based solely on the 65 APDs approved in 206, the 15-year projection should be at least 975 wells. The Moab FO issued an updated RFD Scenario in August 2005 as part of the RMP revision currently underway. The 2005 RFD Scenario projected that 75 wells would be drilled in Lisbon Valley area over | See response to comment 214-1 and 214-28. |

BLM_0012206

| | | | | |
|---|---|---|---|---|
| | | | the next 15 years, 56 which would be drilled on BLM lands (see DRMP p.4-84). This equates to less than four wells per year.  In 2007 EnCana alone drilled seven wells in Lisbon Valley area, and EnCana anticipated drilling nine to twelve wells in 2008.  The Moab DRMP recognizes that the number of wells drilled has increased significantly due to higher energy prices and projects that twice as many wells will be drilled in 2007 as compared to 2007 (see DRMP p.3-44), yet the Moab DRMP does not take the increased level of activity into account.  The BLM's RFD Scenario should be updated to reflect continued growth. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 5 | The BLM should adequately identify the purposes of the RFD, which is not a limitation on development.  EnCana appreciated the BLM's recognition that "the total number of wells cited in the RFD report does not represent upper limits on the number of wells that could be drilled in the Moab Planning Area during the life of the plan." (DRMP page 4-4) However, the statement on page 4-3, "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again," incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development.  The BLM should include additional, specific information the Final EIS, the Record of Decision, and the actual Resource Management Plan for the Moab Planning Area confirming the fact that the RFD Scenario is not a planning decision of limitation on the level of development authorized within the Moab Planning Area.  The RFD is defined by the BLM as a "basline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004).  The RFD is neither a Planning | See response to comment 214-28. |

BLM_0012207

Decision nor the "No Action Alternative" in the NEPA document. "In the NEPA document, the RFD is based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control the type and level of oil and gas activity.  The RFD also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004).

On Several occasions the Interior Board of Land Appeals has confirmed that the RFD Scenario is not a limitation on development.  In these decisions, the IBLA has made it clear that the RFD Scenario is not a planning decision, nor is it a limit on future development.  Wyoming Outdoor Council, 164 IBLA 84, 89 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point past which future exploration and development is prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Wyoming Outdoor Council, et al.  IBLA No. 2006-155 at *26 (June 28, 2006) (holding that the Pinedale RMP does not restrict the number of wells that can be drilled within the Pinedale Resource Area); Biodiversity Conservation Alliance, et al.  IBLA No. 2004-316 at *7 (Oct. 6 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area.") As indicated by the number of decisions cited about, the purpose of the RFD Scenario continues to be a source of

203

| | | | confusion and litigation.  In order to reduce such confusion and litigation, the BLM should include language in the Moab DRMP itself describing the purpose of the RFD Scenario, and the fact that the RFD in the Moab DRMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. | |
|---|---|---|---|---|
| EnCana Oil and Gas (USA) Inc. | 215 | 10 | As development operations are proposed in the future, the  BLM cannot attempt to impose new stipulations or conditions of approval (COA) on existing leases that are inconsistent with their valid existing contractual rights. Once the BLM has issued a federal oil and gas lease without a no surface occupancy stipulation (NSO), and in the absence of a nondiscretionary statutory prohibition against development, the BLM cannot completely deny development on the leasehold, nor impose mitigation measures inconsistent with the BLM's authority under 43 C.F.R. 3101.1-2.  Only Congress has the right to completely prohibit development once a lease has been issued. On Page 4-8 of the DRMP, the following statement appears:  "Due to these existing leases, it is possible that wells could be drilled in areas that are proposed in this plan to be managed as closed or NSO for oil and gas leasing." In the Final EIS, the BLM should expand this statement to discuss the fact that oil and gas lease is a contract between the federal government and the lessee, and that the lessee has certain rights thereunder.  See Mobil Oil Exploration & Production Southeast, Inc V. United States, 530 U.S. 604, 620 (2000). The Moab RMP, when revised, cannot defeat or materially restrain valid and existing rights to exploit its leases through COAs or other means.  See, eg., 43 C.F.R. 1610.5-3. | See response to comment 214-4. |
| EnCana Oil and Gas (USA) Inc. | 215 | 14 | The reference to "proposed wells" is inaccurate.  The DRMP analysis should refer to the number of wells projected by the RFD Scenario | The number of wells by alternative utilized in the air quality analysis in Chapter 4 of the DRMP/EIS.  In the PRMP/FEIS the wording has been changed from proposed wells to projected wells. |

BLM_0012209

| EnCana Oil and Gas (USA) Inc. | 215 | 17 | Table 4.10 on page 4-27 estimates the number of compressors at each RFD Scenario area at 0.063 compressor per well within a minimum of 2 compressors per RFS area. Compressors are located in areas where natural gas is produced into pipelines. The broad assumption allotting compressors to all RFD Scenario areas is likely inaccurate for RFD Scenario areas where the predominant mineral produced is liquid hydrocarbons and/or where no pipelines exist for gas transport out of the area. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 20 | The first sentence of this Section (p. 4-93) should be modified to say that no additional BLM lands would be closed to salable and leaseable mineral resource development. Table 4.38 on page 4-85, shows that there are already 392,205 acres (2.1%) of closed BLM lands. This is an inaccurate sentence and needs to be modified to correctly identify that there are closed areas under Alternative A | The wording in this section has been changed to "Under Alternative A, no acres of lands with wilderness characteristics are to be managed to protect these characteristics, resulting in no additional closures of BLM lands to salable and leasable mineral resource development." |
| Fidelity Exploration and Production Co. | 221 | 1 | The BLM's analysis does not provide Fidelity with a sufficient understanding of how its existing lease rights or potential future operations may be impacted by the adoption of the revised RMP. The BLM must present detailed information and analysis in the revised RMP in a coherent and focused format in order to comply with its procedural obligations under the NEPA | See response to comment 214-4. |
| Fidelity Exploration and Production Co. | 221 | 4 | Prior to implementing oil and gas stipulations, BLM should conduct a complete cost/benefit analysis of individual stipulations, conduct a thorough data review on the proposed stipulations, and adopt a monitoring program to tract the effectiveness of and continuing need for the stipulations | The BLM analyzed the socioeconomic impacts of the different alternatives on oil and gas leasing and development. This information is presented on pg. 4-259 through 4-265 of the DRMP/EIS. It is neither feasible nor practical to conduct cost/benefit analysis on individual stipulations at the land use planning level. The leasing stipulations applied in the Preferred Alternative of the DRMP/EIS are the least restrictive necessary to protect the resource value of concern. Exceptions, modifications, and waivers can be applied to stipulations based on certain condition (see Appendix C). The BLM conducts monitoring during implementation of site |

BLM_0012210

| | | | | specific actions. |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 5 | There should be recognition and disclosure in the DRMP that changes in oil and gas technology will create the benefit of allowing development and operations to take place with less disturbance and impact that might have been the case historically.  Some examples include horizontal dripping reducing well numbers, electronic flow measurement reducing trips to the well, coiled tubing operations reduction completion time, etc. | The BLM is aware that changes in industry technology occur and the adjustments to stipulations will take place accordingly.  It is not necessary to make a statement as proposed by the commentor in the DRMP/EIS. |
| Fidelity Exploration and Production Co. | 221 | 7 | As development operations are proposed in the future, the BLM cannot attempt to impose new stipulations or COAs on Fidelity's existing leases that are inconsistent with its valid existing contractual rights.  In addition to proposed closures or NSO stipulations, the BLM should also note that constraints associated with the management of other resources would not necessarily apply to exploration or development activities on leases that pre-date the DRMP.  The DRMP cannot deny Fidelity's valid and existing rights to exploit its leases through COAs or other means. | Valid existing rights are considered Administrative Actions by the BLM and do not require a specific planning decision to implement.  As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights.  The BLM will work with and subject to the agreement of holders of valid existing rights to modify proposed actions or activities to reduce the effect of the actions or activities on resource values and uses.  These modifications may be necessary to maintain the choice of alternatives being considered during land use plan development and implementation, and may include appropriate stipulations, relocations, redesigns, or delay of proposed actions. |
| Fidelity Exploration and Production Co. | 221 | 8 | The Reasonable Foreseeable Development (RFD) section, which protects the amount of oil and natural gas development within the planning area is inadequate and would limit the opportunities to explore fore new resources. Preferred Alternative C projects 435 wells in the next 15 years.  Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of application for permit to drill (APD) activity.  Just based on 2006 APD data of 65 APDs, the 15 year projection should be at least 975 wells.  BLM should also solicit information about the potential for oil and gas development from the | See response to comment 203-15. |

BLM_0012211

| | | | operators within the DRMP area to assist in the preparation of a realistic, potential reasonable foreseeable development. | |
| --- | --- | --- | --- | --- |
| Fidelity Exploration and Production Co. | 221 | 9 | The RFDS for Big Flat-Hatch Point area is too low.  BLM states: "The RFD is a hypothetical scenario which allows the discussion to focus the analysis of potential impacts" (p.4-83) Fidelity strongly urges the BLM to consider revising its RFDS in active cooperation with the oil and gas operators that hold leases in the Moab planning area to increase the projected well count.<br><br>The Moab Field Office issues RFDS as part of the RMP revision currently underway.  The RFDS projected that 60 wells would be drilled in the Big Flat-Hatch Point area over the next 15 years, 50 of which would be drilled on BLM lands (p.4-84)  This rate of activity equates to approximately four wells per year.  During 2007, Fidelity drilled two federal wells in the big Flat area and plans to drill one additional Federal well and possibly two State wells in 2008.  Fidelity anticipates additional activity in the Hatch Point area in the future. Fidelity is concerned that the level of oil and gas development in the Big Flat-Hatch Point area has been greatly underestimated by the RFDS, and that the level of impacts to other resources that may result within as few as seven years may exceed the level of impacts analyzed in the DRMP.<br><br>The DRMP was developed without use of the most recent data and/or with input from oil and gas lease holders.  The use of 1995 data drawn from the USGS National Assessment of United States Oil and gas Resources to provide the basis for oil and gas activity for the Paradox Basin (p.3-43) has resulted in a substantial underestimation of oil and gas exploration/development in this area.  Recent and proposed activity levels in the Big Flat-Hatch Point area, planned infill operation, or possible development  of unconventional wells using | See response to comment 203-15. |

BLM_0012212

| | | | | |
|---|---|---|---|---|
| | | | new technology were not considered in the description of the existing environment in the DRMP. Thus, the analysis of future impacts that may result from oil and gas activity is critically flawed | |
| Fidelity Exploration and Production Co. | 221 | 10 | RFD guidance issued on January 23, 2004, states that an RFDS is not a planning decision, partially because it is speculative to project oil and gas activity fat into the future. In 2004, the BLM issued an Instruction Memorandum (IM 2004-089) to provide clarification of the use of RFDS in planning. The IM states, and the DRMP should reflect, that exceeding the number of projected wells may not result in exceeding the predicted level of associated environmental effects. Further, it states that mitigation of environmental effects through successful reclamation can percent the level of impacts from substantially exceeding the analyzed impacts. The DRMP states that about 10 years may be required for reclamation to be successful (p.4-7) Fidelity disagrees with a blanket 10-year reclamation period. BLM has not provided any data substantiating this conclusion. While 10 years for successful reclamation may be appropriate for some areas of the Moab planning area, two to three years would be sufficient in other areas (e.g. grassy regions.) | See response to comment 214-28. |
| Fidelity Exploration and Production Co. | 221 | 12 | Map 2-5-B<br><br>Fidelity does not understand with certainty what resource protective measures would be taken under alternative B that would preclude surface occupancy along the Highway 313 corridor, bit it surmises that it relates to visual resource protection. The NSO constraint must be explained for this alternative because VRM II (Visual Resource Management) assignment would not preclude occupancy.<br><br>Fidelity is actively seeking options for beneficial use of natural gas that may be produced in association with oil | The text on pg. 2-52 of the DRMP/EIS states under Alt B "scenic driving corridors would be designated as VRM Class II within a specified viewshed not to exceed 1 mile from centerline. Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface distrubing activities (see Appendix C) within 1 mile of scenic corridors." In addition this restriction is explained in Appendix C on pg. C-9.<br><br>Gold Bar is managed for wilderness characteristics only in Alt B. |

BLM_0012213

| | | | | |
|---|---|---|---|---|
| | | | on Big Flat.  To that end, Fidelity objects to any management of the Gold Bar area with wilderness characteristics that would disallow issuance of a right-of-way (ROW) that may be required to permit the installation of a natural gas pipeline | |
| Fidelity Exploration and Production Co. | 221 | 15 | The DRMP states: "…if projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again" (p. 4-3). The BLM should clarify the consequences of an RFDS that does not adequately project the number of wells that may be drilled within a 15-year time frame.  Does the BLM mean that the final RMP would require amendment?  If so, the BLM should re-examine the projections of future well development now that the DRMP would sufficiently address potential impacts from oil and gas development over 15 future years | See response to comment 214-28. |
| Fidelity Exploration and Production Co. | 221 | 16 | The DRMP states: "Only wells drilled during the first 5 years would be successfully reclaimed over the next 15 years…" (p.4-7). Reclamation following the removal of mature sagebrush and piñon-junipers may require several years before the species composition and succession stage is similar to surrounding areas. Fidelity is aware that sagebrush and piñon-juniper communities are slow growing and may take as long as 25 years for sagebrush and up to 75 years for the piñon-juniper communities to reach maturity. Disturbance to grasslands without the presence piñon-juniper or sagebrush would facilitate reclamation much more quickly, perhaps in as little as five years with the addition of amendments or reclamation procedures that facilitate accelerate vegetative growth.  Such practices are amount the best management practices that may be used by Fidelity on a site-specific basis and should be recognized by BLM in the DRMP. | Based on BLM experience in the area, it can take up to 10 years to fully reestablish vegetative communities. Depending on the vegetation disturbed it could take much less time.  BLM objectives are to establish vegatative diversity and not a monoculture of grass. |
| Fidelity Exploration | 221 | 18 | The DMRP fails to note that the use of alternative drilling technologies, particularly directional/horizontal drilling, | The analysis in Chapter 4 of the DRMP/EIS could not consider all the potential alternatives for drilling that |

209

BLM_0012214

| | | | | |
|---|---|---|---|---|
| and Production Co. | | | typically greatly increases the time required to drill and results in increased emissions from drilling rigs | could result in different drilling times and air emissions. On a land use planning level, the analysis must be made on some general assumptions. |
| Fidelity Exploration and Production Co. | 221 | 22 | Table 1.10 in the DRMP estimates the number of compressors at each RFDS area at 0.063 compressor per well with a minimum of two compressors per RFS area (p.4-27)  Compressors are located in areas where natural gas is produced into pipelines.  The broad assumption allotting compressors to all RFDS areas may be inaccurate for RFDS areas where the predominate mineral produced is liquid hydrocarbons and/or where no pipelines exist for gas transport out of the area.  For example, the Big Flat area currently has no pipelines with which to transport natural gas.  Compressors would not be installed in this area unless a pipeline was constructed. | See response to 215-17. |
| Fidelity Exploration and Production Co. | 221 | 23 | Table 4.10 of the DRMP assumes that NSO areas are not open for development (p.4-27).  This assumption is used inconsistently throughout the DRMP. On page 4-84, the text reads: "Because the resource underlying SNO-stipulated surfaces are more difficult and costly to extract, developers are less likely to opt to develop...."  Fidelity contends that in those areas where geological/reservoir conditions would facilitate production from a horizontal/directional well bore and when economic conditions, including well costs, are favorable, horizontal/directional will be used and would likely be considered for NSO areas.  Consideration of horizontal/directional drilling is site specific; to assume, however, that the minerals beneath all NSO areas will not be developed likely underestimates the surface disturbance resulting from oil and gas activity over the next 15 years as well as the resultant production | On pg. 4-27 of the DRMP/EIS it states "for the purpose of analyzing impacts of mineral decisions on the total number of oil and gas wells, BLM lands designated as no surface occupancy were not considered for development.  This is an analysis assumption regarding the impact of restrictions on the number of wells.  The BLM contends that the other analysis assumption the commentor refers to involving the greater difficulty and cost of drilling areas designated as no surface occupancy is accurate and is not inconsistent with the first assumption. |
| Fidelity Exploration and Production Co. | 221 | 24 | The DRMP reads: "The potential risks associates with oil and gas development include geologic hazards...include seismic activity..." (p.4-61) "Seismic activity" should be replaced with "geophysical survey activity." | The statement referred to by the commentor is accurate and refers to the possiblility of seimic activity in the form of small earthquakes. |

BLM_0012215

| Fidelity Exploration and Production Co. | 221 | 26 | The DRMP reads: "29,678 acres on split-seate lands, of which 9,617 acres (or 0.5% of all Federally leased lands) would be subject to NSO or closed to leasing" (p.4-87) Fidelity fails to understand how BLM can impose on NSO condition to the surface of a land which it does not own/administer.  The minerals may be closed to leasing because on split-estate lands, the management of the mineral resource lies within federal authority. BLM cannot, however, impose conditions on the sue of a surface that is not federal outside of the National Historical Preservation Act and Endangered Species Act | See response to comment 120-98. |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 27 | Under Alternative B, DRMP read: "An estimate of wells foregone is…8 wells in the Big Flat-Hatch Point RFD area…"  (p4-94)  The area within this RFD where wells would be foregone cannot be determined with certainly from Map 2-24-B: however, to the extent that this area where wells would be foregone overlaps Fidelity's existing leases, the BLM estimate is likely in error. Fidelity will operate pursuant to its valid existing rights | See response to comment 124-4. |
| Lisbon Valley Mining Co | 286 | 1 | The draft RMP documents coordination with adjoining RMP's including Vernal, Grand Junction, Uncompahgre, Dolores, and Price Fos (BLM 1985b, 1985c,1985d, 1987, 1989a, 1993a). These documents were developed in the 1980's and early 1990's. It is difficult to tell whether these reviews included newer mineral development and recent commodity price increases. | The Mineral Potential Report and the Reasonably Foreseeable Development Scenario were prepared for the current planning effort.  These two reports were done in conjunction with the Utah Geological Survey, and are dated 2005. |
| Lisbon Valley Mining Co | 286 | 3 | How has Critical Issue #2. (What areas will be available for mineral development, and what restrictions should be imposed?)  Related to mineral development in the draft RMP been evaluated? | The Utah Geological Survey assisted in the preparation of the Mineral Potential Report and the Reasonably Foreseeable Development Scenario.  These reports were prepared in 2005 for the Moab RMP revision effort. Both of these reports are available on the Moab RMP Internet site.  Hard copies of these reports are also available on request. |
| Lisbon Valley Mining Co | 286 | 5 | The Minerals Section of Chapter 3 covers 22 pages of data on the minerals in the Moab FO Area. This section appears comprehensive and well documented. The mineral potential is clearly significant when compared to | The Minerals Section of Chapter 3 represents a summary of the information found in the background documents concerning minerals -- the Mineral Potential Report and the Reasonably Foreseeable Development |

211

| | | | other resource descriptions, yet other disciplines appear to receive a higher ranking of importance with management. | Scenario.  The "minerals discipline" has received much attention in this RMP. |
|---|---|---|---|---|
| Lisbon Valley Mining Co | 286 | 6 | In the assumption used for mineral development (Section 4.1.3) there is discussion of the fact that the Oil and Gas section needed to be revised due to escalating prices due to demand. However, there is no similar consideration for minerals. If you look at the prices and projections for the demand of copper, uranium, gold, aggregate, and other minerals, the demand world wide is expected to increase and warrents greater expansion consideration than what was presented in the Draft RMP. If you look at copper alone, the permitting of Lisbon Valley was done when copper prices were around $0.70/pound. Current prices are more than 4 times greater than in 1996. The BLM should provide the back-up for their projections (especially prices and projected acreage). These estimates should be a function of geology, reported reserves, and prices. | The BLM is aware of the fact that minerals prices have risen over the past year.  However, the commensurate contribution of hard rock minerals to the economic analysis in the RMP remains stable.  Furthermore, copper, uranium and gold are all locatable minerals.  The RMP makes no decisions regarding locatable minerals. |
| Theodore Roosevelt Conservation Partnership | 288 | 1 | Need for Upfront Comprehensive Planning Prior to Leasing: The Moab DEIS generally ignores timely scientific studies and does not provide adequate assurances for mule deer, desert bighorn sheep, Rocky Mountain bighorn sheep, pronghorn, elk, sage grouse, and Colorado cutthroat trout. The Moab DEIS fails to adequately address oil and gas development and how it can be conducted in a way that does not unnecessarily impact fish and wildlife in their habitat.<br><br>I am concerned that the DEIS would enable energy leasing in crucial wildlife habitats without the necessary upfront conservation planning. All areas of crucial fish and wildlife habitats available for oil and gas leasing and without NSO stipulations should have upfront planning prior to the leasing stage to ensure that energy development will be conducted responsibly. While timing stipulations are important, they do not address how an | The DRMP/EIS provides a range of alternatives that allows the BLM to develop management prescriptions to protect wildlife resources as energy development occurs.<br><br>The action of leasing itself does not provide the site specific details necessary for extensive analyses of oil and gas development.  Upon actual development of leasing tracts, environment analyses will be conducted to determine what the specific conflicts, impacts and mitigation will be.  Cumulative impacts will also be determined and mitigation measures developed.  Public lands are managed under a multiple use mandate.  All resources are considered, including wildlife. The BLM has a obligation to ensure that wildlife is protected. Stipulations that have been developed in the preferred alternative will be attached to leases so that the leasee is aware of potential restrictions that may be applied when development occurs.  If new information is presented at |

BLM_0012217

| | | | | |
|---|---|---|---|---|
| | | | area will be developed in order to minimize impacts to wildlife.<br><br>Once a lease is sold, a contractual obligation to develop the energy resources is created and the BLM forfeits most of its right to plan energy developments. The impacts of development on big game and fisheries populations should be weighed in advance so that fish and wildlife losses can be prevented or minimized. While timing stipulations are important, they do not address how an area will be developed in order to minimize impacts on wildlife. Upfront planning prior to leasing is a necessary component of responsible energy development. Below are some elements to upfront planning that should be seriously considered by the Moab FO for incorporation in the FEIS alternatives. | the time of development, the analysis will also include this new informatio |
| Theodore Roosevelt Conservation Partnership | 288 | 2 | Geographically Phased Development: The Moab FO should consider geographically-phased energy development prior to leasing stage to responsibly balance the needs of fish and wildlife with natural gas excavation. Large geographic areas to be offered for oil and gas leasing first should be subdivided into smaller parcels to be leased. Those parcels should be developed fully and completely restored (with respect to fish and wildlife habitat) one at a time before subsequent parcels are developed. That way, wildlife displaced from the developed parcel can migrate to equal value habitat on adjacent lands. When the wildlife habitat on the developed parcel is restored, displaced wildlife can return, and the next parcel can be made available for development. In this way, smaller parcels are developed and restored over a longer period of time, not in the current mode of field development that is too fast. Species of interest to hunters that could be especially helped by geographically phasing are mule deer, pronghorn, elk, bighorn sheep, and sage grouse. | The action proposed by the commentor is not within the scope of the DRMP/EIS.  At the oil field development stage, there may be an opportunity to utilize the concept of geographically phased development.   Prior to the development phase,  there is no 'purpose and need ' for the level of analysis suggested by the commentor. |

BLM_0012218

| | | | | |
|---|---|---|---|---|
| | | | For geographically phasing to be effective in reducing adverse impacts on wildlife populations, the species-specific life stage habitat requirements must be known for the impact area so that all life-stage requirements are provided for; even in the face of parcel subdivision and development. Baseline conditions and future objectives should also be known before development proceeds. Corridors providing wildlife with access to seasonally-required habitat must remain intact and functional at a level acceptable to sustain populations. The area to be developed should be determined for each geographic area based on species present and an assessment of overall habitat conditions in a larger, surrounding area including what is needed to sustain the populations through the development period. | |
| | 291 | 3 | Hatch Canyon: A tributary of Kane Springs Canyon, Hatch Canyon is remote, but close to Highway 191 and Needles/Anticline Overlooks Road. It should be protected from ORVs and oil/gas leasing. | Under Alternative C of the DRMP/EIS, Hatch Wash is proposed as a backpacking focus area, and no new motorized routes could be proposed for this area. There are no routes within the wash.  There is a controlled surface use stipulation on all riparian and floodplain areas for oil and gas leasing. |
| | 291 | 7 | We urge the BLM to establish wider buffer zones around park [Canyonlands and Arches] boundaries and along SR 313. | The BLM has worked with the National Park Service to establish controlled surface use stipulations to protect the major viewsheds of the parks.  In addition, a controlled surface use stipulation has been placed along the entire length of Utah Highway 313 to protect the visual resources along this State Scenic Byway. These protections are found in Alt C of the DRMP/EIS. |
| | 291 | 9 | The tract around the Deadhorse Point road should receive protection. The ACEC proposed in map 2-14-B ("Highway 279 Corridor/Shafer Basin/Long Canyon"), with a ban on oil/gas leasing and ORVs. | The ACEC mentioned by the commentor is proposed in the preferred alternative.  Oil and gas leasing would be managed with a no surface occupancy stipulation, and motorized vehicles would be restricted to designated routes.<br><br>In addition, Highway 313, the entry road to Dead Horse Point, is protected with a controlled surface use stipulation to protect the scenic values of this State |

BLM_0012219

| | | | | scenic byway. |
|---|---|---|---|---|
| | 297 | 1 | Because the US has a national policy of encouraging the development of its native resources, the BLM is required to remove impediments to domestic oil and gas development. | See response to comments 203-46 and 210-2. |
| | 298 | 1 | The acreage available to oil and gas leasing has been reduced from just over 1 million acres to a little over 400,000 acres - a 60% reduction. The DRMP identifies 14 Areas of Critical Environmental Concern. 12 of these contain current leases (which of course will remain valid until they expire).\n\nThese recommendations do not seem to follow the directive that the BLM encourage as much development as possible on federal lands. | The acreage open for oil and gas leasing in the preferred alternative is 1,451,124 acres, of which 217,480 acres are open to oil and gas leasing subject to a no surface occupancy stipulation.  About 806,994 acres are open to oil and gas leasing subject to controlled surface use and timing limitation stipulations.  About 353,000 acres are within Wilderness Study Areas and are closed to oil and gas leasing by policy.  About 25,306 acres are closed to oil and gas leasing because it is not reasonable to apply an NSO stipulation.\n\nAlthough 14 Areas of Critical Environmental Concern are proposed in Alt B, 5 of them, totaling 63,000 acres, are carried forward to Alt C, the preferred alternative.\n\nThe BLM has proposed the least restrictive stipulations necessary to protect the resource values identified for these areas. See response to comments 203-46, 210-2 and 214-9.\n\nSee response to comment 124-96 and 121-15 regarding oil and gas development potential in the MPA. |
| | 299 | 1 | I am writing to compel you to follow the Energy Policy Act and remove as many roadblocks to energy development on BLM land as you can. The RMP, as written, contains too many limitations on energy development. | See response to comments 214-9, 210-2 and 203-46. |
| Delta Petroleum Corporation | 306 | 1 | Alternatives B and C in their present forms, fail to satisfy direction, mandates, and principles articulated in the Energy Act of 2000, the Energy Policy Act of 2005 and Executive Orders 12898 and 13211. Alternatives B and C do not adequately represent a balance between | See response to comment 210-2. |

215

BLM_0012220

| | | | | |
|---|---|---|---|---|
| | | | conservation, resource development and other multiple uses and would severely impact and limit growth of the economy within this region. If implemented, Alternative B and C would also significantly restrict oil and natural gas development throughout the planning area due to overly burdensome and unnecessary land use restrictions. | |
| Delta Petroleum Corporation | 306 | 10 | The DEIS uses an estimate of 15 acres per well for impact analysis. However, in other recent RMP's a 5 acre estimate is used. The basis for using a figure 3 times larger than used in other RMP's has not been provided. The impact analysis should reflect a 5 acre impact as used elsewhere by the BLM or a justification should be provided in the DEIS for the need of a policy change for this MRA. | See response to comment 203-38. |
| Delta Petroleum Corporation | 306 | 11 | There is ongoing reclamation of impacts from exploration and development. This is often required within site specific lease stipulations and should be recognized in the DEIS. | On pg. 4-83 of the DRMP/EIS it states that revegetation will be successful within a scope of 10 years (for oil and gas development). |
| Delta Petroleum Corporation | 306 | 12 | The Energy Policy Act of 2005 and Executive Orders 12898 and 13211, asked that the BLM identify and remove roadblocks to energy development on federal lands. | See response to comment 210-2. |
| Slate River Resources | 312 | 1 | We believe the lands in Townships 16 South, Ranges 24 and 25 east should not be designated as lands with wilderness characteristics, but should be left in multi-use designation. I have enclosed a plat that shows the number of existing wells in the area of Sections 2-4 and 6-T16S-R25E and Sections 9 and 10-T16S-R24E. *See attached map. | These lands (in the Hell's Hole area) are not designated as lands with wilderness characteristics in the preferred alterantive. |
| | 321 | 2 | I encourage you to be sure that you adequately considered the Energy Policy Conservation Act and Executive Order 13211, which requires you to remove as many impediments to oil and gas exploration as possible. The RMP in its current form includes too many restrictions on energy development. In fact, it closes more areas than leaving things as is. The RMP claims to balance these items. | See response to comments 203-46 and 210-2. |

BLM_0012221

| | 329 | 2 | The BLM plan promotes large-scale oil and gas development in sensitive areas. | The BLM strongly disagrees with the commentor's assertion that it is promoting large scale oil and gas development in sensitive areas.<br><br>The BLM has excluded oil and gas development in the preferred alternative of the DRMP/EIS in many sensitive areas.   These areas are identified in Appendix C of the DRMP/EIS and on Map 2-5-C. |
| Environment Preservation Foundation | 478 | 2 | To address the limited direct surface impact only, the BLM turns to standard Timing Limitations as a mitigation measure (see Section 3.8.1).  In addition, the BLM suggests the possibility of vegetation manipulation, and/or restoration of surface impacts by re-vegetation over the lifetime of a given project such as mineral development, but that does not address adequately the loss of habitat from other activities that have indefinite lifetimes such as public hiking/OHV trails, roads, grazing and the like.  Nor does Timing Limitations or restoration of surface impacts over several years life of a project such as oil or gas development address the much larger impact resulting from avoidance behavior that increases habitat loss. | See response to comment 124-7. |
| Environment Preservation Foundation | 478 | 6 | While the Draft notes the need to protect surface watersheds and water resources in general, there is no consideration of a significant planning issue that can result from mineral extraction such as oil and gas-produced water.  Produced water is more often than not of significantly reduced quality and often contains hazardous pollutants that are detrimental to all forms of life, especially wildlife.<br>        Typically the treatment of produced water is accomplished by evaporation, treated on or off-site with filtering, or subjected to deep-well injection. All three methods have advantages and disadvantages. Impounding for evaporation or filtering can result in difficulties keeping wildlife at bay.  Trucking or piping the water to off-site facilities can be expensive; impacts | Produced water from oil and gas development was not raised as an issue during the scoping period for the land use planning process.<br><br>See response to comment 124-7. |

BLM_0012222

| | | | other habitat, can result in air quality issues, and travel safety hazards to wildlife.  Deep well injection is expensive. It could result in additional impacts to air quality from high-pressure compression needs and possibly migrate into higher quality aquifers. Contamination of better quality aquifers would be nearly impossible to correct and could have negative, long-term impacts on surface waters and all biological species. The BLM needs to significantly upgrade their efforts on planning for and mitigating impacts from all activities that could have long-term detrimental effects on the water resources (ground and subsurface) within the planning area. | |
| | 490 | 5 | The Reasonable Foreseeable Development (RFD) scenario for oil and natural gas development within the planning area is inadequate. The Preferred Alternative projects 435 wells in the next 15 years. Rather than relying on outdated USGS data, the RFD should be based on 3-D seismic activity in the area and the current level of APD activity. APD activity alone suggests the fifteen-year RFD should be 975, based on 2006 data of 65 APDs.<br><br>With respect to oil and gas resources, BLM Manual 1624, Planning for Fluid Minerals, specifically directs BLM not only to identify which areas would be subject to different categories of restrictions as included in the DRMP/EIS, but also to show that the least restrictive lease stipulation that would offer adequate protection of a resources has been selected. BLM failed to provide this critically important analysis in the planning document. This omission is of critical concern because it demonstrates that BLM has not carefully considered the effect of restrictive lease stipulations or permit conditions of approval (COA) on current and projected future oil and gas activities in the area. Given the fact that the plan will be used to make future decisions on activities, this lack | See response to comments 214-1 and 124-95 regarding the RFD and MPR.<br><br>The RFD scenario is an analytical model, which estimates oil and gas activity that could potentially occur. The RFD scenario is a reasonable technical and scientific approximation of anticipated oil and gas activity based on the best available information, including the potential for oil and gas resource occurrence, past and present oil and gas activity in conjunction with other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.<br><br>The RFD is purely an estimate; it is not a decision document nor does it establish a limiting threshold for future Federal leasing, exploration, or development activities.  Rather, it is a scenario or projection of actual and hypothetical oil and gas activities based on the specific circumstances or constraints associated with each alternative and corresponding mitigation measures. This hypothetical framework focuses the impact analysis associated with oil and gas leasing.  Because the calculations are based on variables or factors that are |

BLM_0012223

| | | | | |
|---|---|---|---|---|
| | | | of analysis is a fatal flaw. | difficult to accurately determine, the projection of oil and gas wells can vary greatly.  These variables or factors include the price of oil and gas, the success or failure of exploration in unproven areas, and the willingness of investors to invest their money in risky exploration for oil and gas in unproven areas.<br><br>As project-specific drilling operation are being considered, the BLM performs a land use plan conformance review and determination of NEPA adequacy.  If conditions change, the BLM may need to reconsider the land use plan decision and perform further NEPA analysis in either an environmental assessment or an environmental impacts statement |
| Public Lands Advocacy | 491 | 3 | We object to the fact that the analyses and discussions contained in this Draft RMP do not take into account routinely applied mitigation measures.  The manner in which environmental consequences is presented is tantamount to a worst case scenario. Section 1502 of the Council on Environmental Quality Regulations on the National Environmental Policy Act directs that mitigation measures be identified in the EIS which may be employed to reduce or entirely avoid impacts to other resource values.  While this direction has apparently been construed to mean that only lease stipulations and other mitigation measures need be identified somewhere in the document, it is necessary to address all mitigation measures utilized during oil and gas exploration and development activities by incorporating them into the environmental consequences analysis. The Draft RMP does not address any type of mitigation until after it has described the worst case scenario.  This does nothing more than fuel the flames of opposition to oil and gas activities.  It is crucial for mitigation measures to be acknowledged in the effects analysis to show that oil and gas activities are mitigated and are actually compatible with other resources uses, including those in sensitive | The analysis assumptions for oil and gas development on pg. 4-4 of the DRMP/EIS is based on surface disturbance associated with projected well numbers.  This level of impact analysis is appropriate for land use planning.  This is not a worst case scenario but provides a comparison of the impacts across the alternatives.  This comparison of impacts for the alternatives is provided on Table 4.2.  More detailed analysis of impacts and mitigation are considered for site specific proposals after completion of the land use plan. |

BLM_0012224

| | | | | |
|---|---|---|---|---|
| | | | areas. Therefore, it is crucial for this chapter be revised to incorporate mitigation measures in the cumulative effects and environmental consequences analyses. | |
| Public Lands Advocacy | 491 | 4 | CXs are an important tool used in BLM's administration of the federal oil and gas program. They are designed to facilitate the permit approval process by lessening needless paperwork and timeframes associated with these approvals. We recommend that the Final EIS fully examine and disclose the conditions under which they will be used.<br><br>Additionally, the DEIS fails to acknowledge that BLM has adopted a CX for geophysical exploration which eliminates the need for an environmental assessment or environmental impact statement when no roads are involved. This new CX must be incorporated into the record of decision for the Moab RMP. | See response to comment 214-5. |
| Public Lands Advocacy | 491 | 5 | Offsite Mitigation – Under management Common to All Alternatives in Chapter 2, BLM indicates it will seek to "Fully mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio."<br><br>Comment and Recommendation: While we recognize that many companies have offered to perform off-site mitigation, several concerns must be raised. According to Instruction Memorandum 2005-69, compensation or off-site mitigation must be entirely voluntary on the part of the applicant. While BLM may identify offsite mitigation opportunities, it stated they will not be carried forward unless volunteered by the applicant. We oppose any program that would impose off-site or compensation mitigation as a BLM requirement. | Chapter 2 of the PRMP/FEIS has been changed.  The statement has been changed to "Mitigate all unavoidable habitat losses for special status species at a minimum 1:1 ratio, where required by policy or law".<br><br>That the BLM would recommend a reclamation ratio of 1:1.  The word fully has been removed. |
| Public Lands Advocacy | 491 | 8 | PLA is concerned that the Reasonable Foreseeable Development Scenario does not take into account all relevant factors.  While historical uses are indeed part of the mix of factors that should be considered, it is also important to consider the most up-to-date geological | See response to comment 203-15.<br><br>The EPCA Report was utilized in developing the Mineral Report and the Reasonably Foreseeable Development Report. |

BLM_0012225

| | | | | |
|---|---|---|---|---|
| | | | information for the area and the technological advances made by the industry.  The EPCA II Report found that the Paradox/San Juan Basin has high value for energy resources in that it contains 464 MMbbls of oil and 38,119 BCF of natural gas.  As a result, in addition to past permitted activities,  BLM must also factor in future interest in development in the area based upon this potential and taking into account improved drilling and reclamation practices. In our assessment, even if BLM were to base its projections strictly on recently permitted activities, a minimum projection should be at least 975 wells. Clearly it is necessary for BLM to reevaluate its assumptions by utilizing the most up-to-date information to ensure the efficacy of the plan is not diminished by out-dated information. | |
| Public Lands Advocacy | 491 | 10 | Avoidance / Exclusion Areas for Rights-of-Way – The DEIS indicates "Right-of-way (ROW) avoidance and exclusion areas would be consistent with the stipulations identified in Appendix C for oil and gas leasing and other surface disturbing activities. These stipulations have been developed to protect important resources values." Right-of-way exclusion and avoidance areas have been created under each of the management alternatives.

Comment and Recommendation: While the DEIS appears to indicate these exclusion and avoidance areas coincide with lands subject to NSO or no leasing, no specific analysis or justification is provided.  In addition to providing maps for each alternative that illustrate where these areas are located, detailed discussion that provides a rationale by alternative for these decisions is required.  Without such information, it is impossible to analyze the impacts these exclusions will have on energy and mineral activities as well as other multiple use activities. It would appear these decisions have been made in a vacuum without consideration of other land uses, including future oil and gas exploration and | See response to comments 214-12 and 203-22. |

BLM_0012226

| | | | | |
|---|---|---|---|---|
| | | | development activities. Neither does BLM appear to have considered the effects these de facto withdrawals will have upon valid existing rights of lessees who require adequate access for pipelines, flow-lines, and other transportation needs.  This is a fundamental flaw in the analysis that must be remedied. | |
| Public Lands Advocacy | 491 | 11 | Old Spanish Trail – Chapter 2 of the DEIS identifies various management options for the Old Spanish Trail including preparation of the "forthcoming Old Spanish Trail Comprehensive Management Plan."<br><br>Comment and Recommendation: BLM has failed to provide a map depicting the actual location of the Old Spanish Trail making it impossible to determine effects on multiple use activities.  Moreover, no analysis is provided that addresses the impacts the various management options will have on oil and gas activities in the area.  We recommend that a map and comprehensive analysis be included in the FEIS. | See response to comment 214-22. |
| Outward Bound Wilderness | 630 | 7 | Hatch Point: The Hatch Point Area has been a place where our courserse have traveled though Hatch Canyon and its tributaries, then up across Hatch Point, then finding their way down into Lockhart Basin. This area has a real remote feel to our students and offers us a chance to travel through canyons from the La Sal Mountains to the Colorado River as part of an extended backpacking experience. The idea that there may be an energy development out in that area is in direct conflict with our students looking to have an extended backcountry expedition where they are away from the development of modern man. We would request that the BLM has no surface occupancy in this area for oil and gas development and takes into account the visual impact of any oil and gas leases in the area. In addition, the opening of any new roads in the area would also be in conflict of the use that we have in the area. | The visual resources of Hatch Point are considered in the imposition of controlled surface use restrictions on oil and gas development. |
| | 636 | 6 | Reviewing the BLM public information pages versus the | In Chapter 4 of the DRMP/EIS, the BLM acknowledges |

BLM_0012227

| | | | | |
|---|---|---|---|---|
| | | | draft EIS, I notice a serious conflict in relative priorities of recreation versus Oil and Gas in Alternative C. The BLM webspage reports "over two million visitors per year" and recreation being "62% of the Grand County economy." On the other hand, existing oil and gas is 43 and 270 wells, and since many of these are small producers the economic contribution is small. Yet many of the areas prized for their recreation values such as Labyrinth Canyon, Fisher Towers, and Match Point are proposed for energy leasing. I urge the BLM to amend the DEIS to 1) Close to leasing areas with high recreational use or high wildlife value, 2) Require more restrictive stipulations on adjacent areas where development will impact the high recreational use areas.

Important and necessary restrictions include "no surface occupancy," seasonal restrictions to protect wildlife (an especially important issue in the Book Cliffs), and ripping and restoring roads after exploratory drilling and seismic surveys. The restrictions mapped in Alternative B are a much better reflection of recreational values. | the economic values of recreation in the Moab planning area.

In Alt C of the DRMP/EIS, the highest value recreation areas within Labyrinth Canyon, such as the Green River and its major tributaries, are protected from oil and gas disturbance by the application of a no surface occupancy stipulation.  Fisher Towers is proposed to be managed as either closed to oil and gas leasing, or with a no surface occupancy stipulation.  Hatch Point is proposed to be managed with a controlled surface use stipulation for oil and gas leasing to protect its important visual resources.  Other high value recreation areas are similarly restricted from oil and gas leasing and all other surface disturbing activities.  These areas include , but are not limited to,,the entire Green, Colorado and Dolores River corridors, Sand Flats SRMA, Goldbar Hiking Focus Area,  and Beaver Creek.  A no surface occupancy stipulation is sufficient to protect the recreation values in these and other areas, since surface occupancy is precluded.
Important wildlife values are protected in Alt C. by timing limitation stipulations and controlled surface use stipulations.  Desert bighorn sheep habitat is protected with a no surface occupancy stipulation. |
| | 636 | 7 | I support the NSO and Special Stipulations designations shown in Alternative B for the Westwater area and would urge that these restrictions be expanded. An energy development corridor following the railroad tracks and existing D roads south of I-70 would suffice for reasonable exploration access and would protect the dark skies, solitude and viewsheds in this remote area. | Westwater WSA is closed to oil and gas leasing under all alternatives.  Alt C of the DRMP/EIS, manages the rest of the Westwater area much the same as Alt. B. |
| | 673 | 1 | Fisher Towers area. Your preferred alternative would allow oil and gas development on the mesa north of the towers, and to the west of the towers. It also proposes ORV routes on the mesa north of the towers. I have hiked and climbed in this area many times and greatly | The commentor's preference for Alt B is noted.  The scenic values of the Fisher Towers area are protected in Alt C by the imposition of a closed category and no surface occupancy stipulation in the entire Richardson Amphitheater. |

BLM_0012228

| | | | | |
|---|---|---|---|---|
| | | | enjoy the solitude and views which can be experienced from the mesa top. I feel that ORV routes on the mesa would ruin the wilderness values critical to my recreational experience in this area. Furthermore, I believe that oil and gas development on these visually spectacular lands would leave lasting scars and permanently degrade the wilderness values of nearby areas. Please reconsider your preferred alternative so that it will not impact the non-motorized recreational user so negatively and will protect existing wilderness values. | The BLM has chosen not to manage the Top of the World mesa to protect its wilderness characteristics. |
| | 956 | 1 | The BLM is allowing the use of helicopters to stake mining claims which destroy the silence we hikers regard as essential to our experience. | This is not an RMP comment.  The BLM does not have authority over air space. |
| Howard County Bird Club | 972 | 3 | The __ft EIS (map 3-2) indicates that most lands in the planning area have "high potential" for oil and gas development. Members of the Howard County Bird Club have seen oil/gas drilling just north of Canyonlands National Park, off State Highway 313, as well as in major gas fields north of Cisco and nearby in Colorado. It would be a mistake to promote drilling in valuable wildlife areas, in proposed wilderness, or near the national parks. The final plan  should clearly define the areas to be protected for these values, so development can be steered into less critical areas. In the Moab plan, there need not be a conflict, because "high potential" extends throughout the planning area. | Map 2-5-C of the DRMP/EIS shows the areas that are to be protected from oil and gas development in Alt. C. The no surface occupancy restriction would not allow surface disturbance in areas to the east of Canyonlands National Park, along the Colorado, Dolores and Green Rivers (which are very important wildlife habitat), in desert bighorn sheep migration corridors and lambing habitat, and other areas.  Furthermore, additional wildlife restrictions are proposed for Alt. C.  There are many acres subject to timing limitations to protect wildlife. |
| | 976 | 4 | The plan needs a better balance between conservation and mining impacts A report from the Environmental Working Group U.S. Mining Database. Http://www.ewg.org/sites/mining_google/US/analysis.php says that between January 2003 to July 2007, 864 mining claims were staked on BLM lands within 5 miles of Arches National Park, and 233 new claims were staked on BLM lands within 5 miles of Canyonlands National Park. At the October 3rd public meeting at the Salt Lake Public Library a BLM representative said that because BLM has no control over legitimate mining | The location of mining claims does not correlate with production and development.  Many mining claims are located for speculation purposes and no development occurs.  The development that BLM projects for locatable minerals in the Moab planning area is provided in the Mineral Potential Report and is summarized in Chapters 3 and 4 of the DRMP/EIS.  Unless withdrawn, BLM lands are available for mining claim location. Iin Appendix C, on pg. C-1 and C-2, it states: "where necessary in the future, areas identified as no surface occupancy could be recommended for withdrawal from |

224

BLM_0012229

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | claims the potential impacts of this boom in mining claims didn't need to be considered in trying to create balance. While it may be true that BLM has no control to prevent legitimate mining claims it is also clear that these mining claims are essentially a time-bomb that may (or may not) explode into a mining boom at any time bringing with it a population boom, road construction, surface disturbances, and increased motorized travel in the backcountry. It is clear that the minimal protections which Alternative C offers to existing natural areas would become entirely inadequate if a mining boom actually does develop to the current potential. | operations conducted under the mining laws if unacceptable resource impacts are occurring."<br><br>The preferred alternative in the DRMP/EIS proposes to continue the Three Rivers Withdrawal (see Map 2-1). |
| Utah State Office of Education | 1036 | 3 | Cutting off access devalues in-held school land, especially in Desolation Canyon area. For the BLM not to develop oil and gas in its sections also makes it impractical for development to occur on ours, which amounts to an unconstitutional taking. This is true where there are known resources, and may become true for areas in which no drilling has occurred. If the BLM decides that large areas of its land are off limits for drilling, that can effectively prevent feasible drilling on our in-held sections, amounting to a taking of the mineral value of our subsurface resources. The BLM should consider whether it will allow directional drilling from leases on school sections to access oil and gas lands on BLM property, with no surface occupancy of the BLM property. | The BLM acknowledges that the closure of adjoining public lands to oil and gas leasing may have a potentially negative impact on SITLA's mineral revenue. The assumption on pg. 4-3 has been changed to reflect this fact. In Alternative C, the closure of the 354,015 acres managed as WSA or Wilderness Areas is nondiscretionary and beyond the scope of this plan. In Alternatives A, C, and D there are no SITLA lands affected by discretionary closure. Chapter 4 of the PRMP/FEIS has been revised to reflect the impacts in Alternative B on SITLA inholdings of the discretionary closures of 266,485 acres of public land. It should be noted that under any Alternative, the proposed ACECs are not managed as closed to mineral leasing. Areas with wilderness characteristics are recommended as closed under Alternative B and No Surface Occupancy in Alternative C. |

## Other

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Van Loan Ranches | 195 | 5 | Attachments: 3 files with referenced maps-Spring Creek Access Road; Big Triangle | See response to 218-1. |

BLM_0012230

| | | | Access Road; Big Triangle + Spring Creek Access Roads Arial Map. | |
|---|---|---|---|---|
| Moab Trails Alliance | 196 | 5 | Typos: p. 4-464 second paragraph line 4 "carefully" should be careful. | The grammatical correction has been made in the PRMP/FEIS. |
| Moab Trails Alliance | 196 | 6 | Typos: p. I-8 Under Relevance Criteria, seventh line, "…threatened plants do not occur…" Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been deleted. |
| Samson | 201 | 9 | Unfortunately, the BLM has not mapped or identified the exclusion or avoidance areas under the various alternatives. Based on the acreage calculations, it appears that the ROW exclusion designation applies to lands closed to oil and gas leasing and that the ROW avoidance designation applies to lands with a no surface occupancy stipulation. See Moab DRMP/EIS pgs. 2-11 and 2-15. Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided Operators with sufficient information to analyze how such restrictions may impact its operations. BLM must provide this information in the Final EIS for the Moab RMP revision. | See response to comment 214-12. |
| Samson | 201 | 14 | Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trial so that the public and oil and gas operators such as Operators understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources. | See response to comment 214-22. |
| Cabot Oil and Gas Corporation | 202 | 10 | The BLM is proposing huge right-of-way (ROW) exclusion and avoidance areas to be created under all of the alternatives. See Moab DRMP/EIS, pg. 2-11. The BLM has, however, not mapped or identified the exclsion or avoidance areas under the various alternatives. Given the acreage calculations, it appears that the right-of-way exclusion designation applies to | See response to 214-12. |

BLM_0012231

| | | | lands closed to oil and gas leasing and that the avoidance designation applies to lands with a no surface occupancy stipulation. See Moab DRMP/EIS pgs. 2-11 and 2-15. Because the proposed avoidance and exclusion areas are not mapped, the BLM has not provided Cabot with sufficient information to analyze how such restrictions may impact its operations. | |
|---|---|---|---|---|
| Cabot Oil and Gas Corporation | 202 | 15 | Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trial so that the public and oil and gas operators such as Cabot understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources.Special Designation - National Historic Trail - Old Spanish Trail<br>The BLM describes proposed management actions for the Old Spanish Trial on page 2-39 of the Moab DRMP/EIS. The BLM should include a map showing the location of the Old Spanish Trial so that the public and oil and gas operators such as Cabot understand how the trail designation may impact future uses of the public lands, including the development of oil and gas resources. | See response to  comment 214-22. |
| Glen Canyon Group | 209 | 1 | The Draft is comprehensive but extremely complicated and not well cross-referenced. | See response to comment 123-14. |
| Glen Canyon Group | 209 | 55 | Re: Glossary Pages X-29 thru' X-42<br>The Glossary is not comprehensive. For example, "way" is defined, but "route" are not. "Mechanized" and "non-mechanized travel" are not defined at all. Attachment A of Appendix G includes additional terms which should be justified with Glossary definitions and/or referenced in the Glossary. It is possible that there are definitions in other appendices or the text of the document itself which, if added to the Glossary, | The BLM has added the referenced words (route, mechanized and non-mechanized) to the glossary.  The BLM would need more specifics to address the other glossary changes which the commentor recommends. |

BLM_0012232

| | | | | |
|---|---|---|---|---|
| | | | would make it more user friendly. | |
| Glen Canyon Group | 209 | 56 | Re: INDEX Pages X-43 thru' X-46 We cannot discern the criteria used by BLM to decide on which terms to index and which to ignore. The various species of fish and wildlife are indexed. The names of creeks and canyons: of potential ACEC's, SRMA's, and WSA's: and of state/federal agencies are indexed. Non-WSA Lands with Wilderness Characteristics are not. All told, it is of limited helpfulness. | The index is not intended to be complete, but rather helpful to the reader. |
| EnCana Oil and Gas (USA) Inc. | 215 | 19 | There is a typographical error on page 4-68 in the last line of the second full paragraph.  The line should read, "Alternative D, and would have corresponding impacts on the construction of future ROWs" | This is a typographical error, and it has been fixed. |
| International Mountain Bicycling Association | 217 | 2 | IMBA objects to the term "mechanized" when describing bicycles because this definition is unclear. Some pages in the draft RMP correctly categorize mountain biking as non-motorized, while other create this third category of recreation.  By doing so, travel management is needlessly complicated and the agency unfairly and incorrectly implies the impacts of mountain biking are similar to motorized travel and more than other non-motorized uses | Mountain bikes are restricted to designated routes within the DRMP/EIS.  The BLM uses the term "mechanized" to distinguish those routes that are open to mountain bike use, but not to motorized use.  This term is used in the National Mountain Bike Strategy. |
| Grand County Backcountry Council | 289 | 13 | BLM currently does not have the staff or resources to enforce any regulations outlined in the RMP. If the resource area is to be effectively managed, there needs to be a greater on-the-ground presence. | Enforcement is not a planning issue.  The BLM assumes that it will be given the staff needed to enforce its regulations. |
| | 828 | 1 | I spent over 3/4 of an hour putting in comments on your web comment form for the Moab RMP, click the submit button, and get an "address cannot be found" error, or something like that. Of course, when I hit the back button, everything is gone. | We apologize for the inconvenience. |
| Moab Trails Alliance | 964 | 11 | Typos: p. 4-464 second paragraph line 4 "carefully" should be careful | This typographical error has been corrected. |
| | 1030 | 7 | P 2-63, Health and Safety. This seems like a narrow definition of health and safety, what about | Occupational exposure is not a land use planning issue; it is governed by the Occupational Health and Safety |

228

BLM_0012233

| | | | | |
|---|---|---|---|---|
| | | | occupational exposures, etc? | Administration. |

## Paleontology

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 49 | Chapter 4.9 discusses the impacts to paleontological resources, and expresses a concern that the more OHV use in sensitive paleontological areas, the greater the risk these areas are for unauthorized fossil collection and vandalism. The DEIS, however, lacks the nexus between OHV use and an increase in vandalism or unauthorized collection of paleontological resources. Additionally, although it is difficult to determine the extent to which existing routes in paleontologically-sensitive areas will be eliminated, again, existing routes will have not been shown with any data in the DEIS to pose an unreasonable risk to those resources. | Information has been added to Chapter 3 of the PRMP/FEIS that paleontological resources are being, or have been, negatively impacted by the presence of humans engaging in looting or vandalism. Basically that increased access results in increased inadvertent impacts, looting, and vandalism. References will be cited. |
| | 1026 | 10 | PDF pg 80 pg 1-9 Section 1.3.2.2 Issue 7: How do you know there are Paleontological locations if they "have yet to be recorded"? | There are known sites for which the details have yet to be catalogued for reference (i.e., recorded). For example, page 3-67 of the DRMP/ DEIS notes that in the Utah Geological Survey fossil database of 246 fossil locations in the MPA, details are lacking in 177 known localities. The probability of paleontological resources is based on the geologic formation that is exposed at the surface. |

## Process and Procedures

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | 2 | 1 | I am concerned that the public is not being given enough time to comment on the Draft RMPs that will be coming out over the next several months, beginning in August with the Moab plan. I am writing to ask that you | See response to comment 124-1 |

| | | | | |
|---|---|---|---|---|
| | | | extend the public comment period from 90 days to at least 180, to give people a legitimate chance to review the recommendations and make substantive comments.<br><br>This is especially true for those without access to a computer or high speed internet, as it is my understanding tha the public is expected to view the document online. This seems like an unnecessary impediment to many members of the public who may wish to submit comments. The BLM should make paper copies of the document available to members of the public who wish to have one. The public should not be forced to pay exorbitant fees to have a copy of the plan printed. | |
| Colorado 500 | 6 | 21 | ...the published Final Scoping Summary has aroused suspicion. ...in approximately 750 to 1,000 comments in support of "OHV," the word motorcycle appears just once and "motorcycles" only twice, although "dirt bikes" and "motorbikes" slipped through someone's word search.  Yet off-road motorcyclists never refer to themselves as OHV or ORV users, and never refer to their trails as "OHV trails."  They refer to their trails as "singletrack."<br>For example, the Bookcliff Rattlers Motorcycle Club does not call itself the Bookcliff Rattlers OHV Club. This is a universal trend; a Google search of "OHV" clubs will turn up none who use that acronym in their club name.<br>And we noticed something odd in the comments as published in the BLM AMS "Summary of Public Comment Final." Relying on BLM interpretation, as we do not have access to original material, we note here for the record, the following:<br>"OHV" appears 257 times and "ORV" appears 25 times. "Dirt bike" never appears.  "Dirt bike" appears once. "Motorcycle" appears once in the name of the club, and "motorcycles" appears twice. | The BLM received scoping comments from the Bookcliff Rattlers Motorcycle Club.  Many of their inventoried routes were verified by BLM and are included in the Travel Plan.<br><br>The BLM summarized the scoping comments that it received from the public.  All these comments are publicly available and the commentor is welcome to look at them at any time.<br><br>The BLM has included singletrack routes in the Travel Plan accompanying the DRMP/EIS.  The BLM called for these routes to be submitted to the agency during the scoping process.  The BLM verified each of the submitted routes on the ground and analyzed each for resource conflicts. The BLM has designated 282 miles of motorcycle route in the preferred alternative of the DRMP/EIS.<br><br>The BLM considered all scoping comments received from the public.  These comments are publicly available for inspection.  It should be noted that a Scoping Meeting for the Moab RMP was held in Grand Junction, Colorado on |

BLM_0012235

| | | | And for some strange reason, there is not one occurrence of the word "singletrack" in the scoping record, either, and "single track" appears only once, in spite of the fact that for both motorcyclists and mountain biers, singletrack is the most prized type of trail. Because this makes us suspicious that the scoping comments may have been "interpreted" we will briefly examine the published scoping comments that mention "Trails, OHV, and Recreation."  We present this as additional evidence that both motorized users and nonmotorized users do recognize a specific type of one-track trail that is used only by motorcyclists.<br>This is the record that staff will present to the Deciding Officer in the FEIS.  Thus, for staff to truncate the results in such a way that an entire type of very popular and economically positive recreation (which has thousands of clubs, organized events, and is recognized worldwide), is concealed, is a serious issue for the public. | October 14, 2005.  Fourteen people were in attendance, including members of the Book Cliff Rattlers Motorcycle Club. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 12 | The BLM should commit to utilizing the State's expedited energy permitting process. | Federal laws, rules, regulations, and policies govern the procedures for processing all Federal  projects. |
| San Juan County | 121 | 1 | The BLM 's interpretation of the Multiple Use mandate where all uses occur someplace but not togetether is flawed. Landscapes can be managed so that a broad spectrum of resource uses can create social, economic and ecological wealth simultaneously.  Multiple use management results in benefits to various resources. For example, grazing can be a tool to benefit wildlife and their habitats. | In developing land use plans, the BLM is mandated by FLPMA to observe the principles of multiple use and sustained yield.  FLPMA defines multiple use as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people…..the use of some land for less than all of the resources, a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources….with consideration given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output". |

231

| | | | | The final land use plan for the Moab Field Office will define multiple use for this area. |
|---|---|---|---|---|
| San Juan County | 121 | 2 | More emphasis should be placed on monitoring the plan decisions both to measure the results of the plan and to insure that actions are taken to incorporate any changes needed. Watershed function, livestock use, recreation, OHV use and wildlife populations are uses that should be monitored more closely. The plan should have greater flexibility to adapt to changing conditions. | The Federal regulations at 43 CFR 1610.4-9 require that land use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved.  The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the ROD. |
| San Juan County | 121 | 3 | San Juan County asks for more cooperation and collaboration with local, state, and federal agencies (as well as interest groups) in actions and decisions within the Field Office.  Misunderstandings could then be worked out in advance -- in the field rather than the courtroom.  Within the framework of this RMP, the BLM should provide more opportunities to facilitate cooperative relationships and foster better collaboration efforts. | The State of Utah, Grand County, and San Juan County are cooperating agencies involved in the preparation of the RMP.  The BLM has involved the cooperating agencies in all aspects of the land use planning process including participation in the interdisciplinary team meetings.<br>Cooperation and collaboration will continue on site specific projects after the RMP is completed and this does not require a plan decision to accomplish. |
| San Juan County | 121 | 9 | San Juan County is opposed to "layering" or the establishment of ACECs or SRMAs over WSAs or Wild and Scenic Rivers. | "Layering" is planning.  Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands.  Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives.  Under the multiple use concept, the BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands.  The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering".  The BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area.  Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation.  Whether or not a particular form of |

BLM_0012237

management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations, and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans. BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (See, Appendix C, Planning Handbook "H-1601-1"). Specific decisions must be included in each of the alternatives analyzed during development of the land use plan. As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.

For example, the BLM has separate policies and guidelines as well as criteria for establishing Areas of Critcal Environmental Concern (ACECs) as when the Wilderness Study Areas (WSAs) were established. These differing criteria make it possible that the same lands will qualify for both an ACEC and a WSA but for different reasons. The BLM is required to consider these

BLM_0012238

| | | | | different policies. |
|---|---|---|---|---|
| | | | | The values protected by WSA management prescription do not necessarily protect those values found relevant and important in ACEC evaluation, and vice versa.  The relevant and important values of ACECs within or adjacent to WSAs were noted in the ACEC evaluation (Appendix I).  The ACECs are evaluated and ranked based on the presence or absence of the stated relevant and important values.  None of these values include wilderness characteristics.  Additionally, the management prescriptions for the ACEC are limited in scope to protect the relevant and important values and the BLM maintains that the size of the ACEC areas is appropriate to the relevant and important values identified.

SRMAs are not restrictive of resource uses but rather are utilized to control  recreation use.  The South Moab SRMA does overlay the Mill Creek and the Behind the Rocks ACECs, but the management proposed in each is for differing purposes.

Please see Response 120-64 |
| San Juan County | 121 | 57 | BLM has not coordinated with local Native American governments regarding wilderness planning, as is required in Section 202 of FLPMA.  Anything less than the opportunity for full participation will be considered a violation of law subject to legal action. | During the development of the DRMP, the BLM invited the affected tribal governments to fully participate in the RMP process, to consult on any aspect of the RMP's management prescriptions or actions, and to provide comments or issues of tribal concern.  As outlined in Chapter 5 of the Moab DRMP/EIS, the BLM held several meetings with tribal governments concerning the development of the RMP, including holding additional meeting after the DRMP/EIS alternatives were prepared, as requested by the tribal governments.  All consulted tribes were provided copies of the alternatives and draft documents. |

234

BLM_0012239

| | | | | For example, the BLM held several meetings with the Navajo Nation.  The BLM met with the Navajo Utah Commission on February 11, 2004, and with the Navajo Nation Historic Preservation Office on December 9, 2003, and on November 13, 2006.  The BLM also met with the Southern Ute Tribe on March 30, 2004, and on October 11, 2006; meetings with the Ute Mountain Ute Tribe were held on August 26, 2004, and on February 9, 2007.  A summary of tribal consultation, including all meetings with tribal governments and issues raised is contained in Chapter 5 of the DRMP/EIS.  A complete record of the consultations is available in the Administrative Record for the DRMP/EIS. |
|---|---|---|---|---|
| San Juan County | 121 | 60 | BLM must have public hearings, adequate notice and opportunity to comment upon, and participate in the formulation of plans and programs.  There have only been two meetings to give the public an opportunity for clarification, and it was unclear whether the meetings held were "open houses" or "public hearings". | Public participation opportunities are detailed in Chapter 5 of the DRMP/EIS.  To satisfy the public participation requirements of FLPMA, the BLM initiated the public scoping process on June 4, 2003 and the scoping period extended until January 31, 2004.  Six open houses and a comment cruiser were utilized to gather public input as well as a website with provisions for emailing comments and an invitation to provide written comments via letters.  A mailing list has been established of interested parties and a planning website has been maintained throughout the process.  The public was invited to review and comment on the DRMP/EIS from August 27, 2007 to November 30, 2007.  Four open houses were held to solicit comments from the public on the DRMP/EIS.  The public was notified about the open houses through newspaper advertisements and articles, radio announcements, the RMP website, and postcards mailed to everyone on the mailing list.  The open house format was utilized because it is more conducive to full public participation. |
| San Juan County | 121 | 70 | FLPMA requires a consistency review with local plans.  The San Juan County Comprehensive Plan must be considered.  Any diversions from the objectives of this | The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, |

235

BLM_0012240

| | | | | |
|---|---|---|---|---|
| | | | plan by BLM must be accompanied by an explanation of why the BLM could not lawfully conform to the county plan. | Federal law.  However, the BLM is bound by Federal law. The FLPMA requires that the development of an RMP for public lands must be coordinated and consistent with County plans, to the maximum extent possible by law, and inconsistencies between Federal and non-Federal government plans be resolve to the extent practical (FLPMA, Title II Sec. 202 (c)(9)).  As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled.

Thus, while County and Federal planning processes, under FLPMA, are required to be as integrated and consistent as practical, the Federal agency planning process is not bound by or subject to County plans, planning processes, or planning stipulations.  The BLM will identify these conflicts in the PRMP/FEIS, so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.  A consistency review of the PRMP with the State and County Master Plans is included in Chapter 5.

No lands are considered for wilderness designation in the DRMP/EIS.  Also, no non-WSA areas with wilderness characteristics are proposed for management in Alt C. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 5 | The DEIS is far from a model of clarity in distinguishing between program-level and project-level decision-making and management prescriptions.  We urge BLM to clarify this distinction, and to specifically identify program-level management guidance from project-level management prescriptions for all management decisions, especially travel management. | The BLM followed the Land Use Planning Handbook (H-1601-1) to develop program level management guidance. In 2004, the Washington Office (WO) clarified the guidance in the handbook by issuing  WO Instruction Memorandum 2004-005, which states specifiically, "Selection of a network of roads and trails should be performed for all limited areas in each RMP.  This requires establishment of a process that includes selecting specific roads and trails within the limited area or subarea and specifying limitations placed on use." |

BLM_0012241

| | | | | The management decisions in Chapter 2 of the PRMP/FEIS will clearly show which decisions are planning decisions and which decisions are implementation (project-level) decisions. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 6 | The current procedural model presents challenges, if not insurmountable hurdles, to the proper execution of these varied planning elements. The agency and public are unable to fully, if at all, utilize appropriate "tiering" in the planning process. The programmatic RMP and the site-specific Travel Plan are both "moving pieces" of the same puzzle and there is no refinement (in the Travel Plan) that can occur through the subsequent reflection on the RMP. Similarly lost are any benefits that might attend "amendment" of a programmatic RMP through a subsequent and more focused Travel Planning process that is procedurally distinct from RMP generation.<br><br>The Moab planning team should consider the prospect of severing travel planning from the RMP process. | Washington Office Instruction Memorandum 2004-005, states specifically, "Selection of a network of roads and trails should be performed for all limited areas in each RMP.  This requires establishment of a process that includes selecting specific roads and trails within the limited area or subarea and specifying limitations placed on use."  Utah State Office Instruction Memorandum 2004-008 instructs Field Offices to undertake travel planning in conjunction with the RMP planning in Utah.  Utah State Office Instruction Memorandum 2004-061 further directs how to undertake travel planning within the RMP efforts in the state.<br><br>The Moab Field Office followed the instructions of the State Office and Washington Office in designating routes within the RMP process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 14 | The alternatives are not presented in a fashion that allows sufficient public involvement and participation.  The DEIS fails to accurately describe the defferences in the various alternatives. | The BLM has followed the land use planning process and has involved the public throughout.  The public participation process is outlined in Chapter 5 of the DRMP/DEIS.  The public was afforded many opportunities for involvement.  The BLM acknowledges that the planning process is complex requiring participants to look in many locations within the document to get the answers to questions they may have.  This is why the BLM regulations require a 90-day a public comment period rather than the normal 45-day period for an Environmental Impact Statement.<br><br>A comparison of the alternatives in the DRMP/DEIS is provided in Table 2.2. |
| Southern Utah Wilderness Alliance | 124 | 1 | The public comment period is far too short  to allow for a fully informed response to the draft plan. | The BLM provided the public with 90 days to review and comment on the DRMP/EIS, as required by the BLM land use planning regulations (43 CFR 1610.2(e)).  The |

BLM_0012342

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | | standard comment period for a DEIS is 45 days in accordance with CEQ regulations at 40 CFR 1506.10(c). Per CEQ regulations, the BLM planning and NEPA processes are integrated.  Therefore, the BLM provides a 90-day comment period doubling the amount of time for the public to review and comment on the DRMP/DEIS. The BLM made the DRMP/DEIS available, free of charge to the public, in a variety of media, including paper, CD, and online.  In addition, the BLM staff has offered to meet individually with groups or individuals to explain the DRMP/DEIS and help focus review and comment efforts. Finally, the BLM held four open houses around the State to facilitate review of the Moab DRMP/DEIS.  online.<br><br>In addition, the Moab Field Office posted the draft alternatives on the Moab RMP website for almost a year prior to the issuance of the Draft RMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 2 | The National Visitor Use Monitoring Survey (NVUM) conducted in 2006 was not made available to the public and certain data within that document is not adequately incorporated into the Draft RMP/EIS. | The NVUM report was in draft form at the time of the publication of the Draft RMP/EIS (and certain parts of the analysis have not been done yet).  The BLM provided the commentor with a draft version of NVUM despite its non-final form.  The commentor erroneously concludes that BLM failed to use NVUM data properly, and "provided more public lands for ORV use".  In fact, all action alternatives reduce OHV opportunities in the MPA by reducing open acreage significantly, and by significantly reducing miles of routes designated for travel.<br><br>The commentor selectively cites NVUM findings specific to its argument, while ignoring NVUM conclusions which may run counter to its argument.  For example, over half of the respondents indicated some form of motorized activity as one in which they participated in during their BLM visit.<br><br>The USFS (FS) conducted a pilot study of the potential applicability of NVUM to the BLM in FY 2007, using three |

238

BLM_0012243

| | | | | |
|---|---|---|---|---|
| | | | | BLM offices as the pilot.  The BLM was initially hesitant to release the results of the studies, but did so because of public interest.  The BLM hesitation was based on concerns that users of the data might not realize the limitations and caveats inherent in the pilot nature of the study and the preliminary nature of the data. As the NVUM report explicitly states, the three pilot studies are just that-pilot studies.  From the beginning of the process, BLM shared concerns with FS that its model may not be fully applicable to the BLM and its management needs.  The FS agreed with the BLM, but suggested that we start with the FS model (with some modifications), and later evaluate the product generated to see if further modifications were desirable for future BLM studies (or even if such studies are warranted).  For example, the BLM felt from the beginning that certain strata (developed campgrounds, for example) might be oversampled, while other strata (for example, dispersed recreation) might be undersampled.  These concerns have been incorporated into future NVUM planning, based on feedback from the initial pilot studies.  The net result is that the findings of the NVUM studies for the three pilot study sites may not definitively represent actual visitation patterns and uses for the studied offices.<br><br>The preliminary nature of the NVUM data for the BLM pilot sites must be emphasized.  The FS has only recently posted on the NVUM website the adjusted data from FY 2005 studies.  Economic data collected as part of the NVUM process is compiled only every few years, and none is yet available for the 2007 studies. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 3 | The FOIA submitted by SUWA on August 23, 2007 requesting RMP background documents was not responded to during the public comment period even though the deadline for the provision of those documents has expired. | The FOIA process and the land use planning process are different and separate.  However, the FOIA procedures were followed by the BLM in responding to the commentor's FOIA request of 8/23/07 and the information requested was provided on December 12, 2007.  There are remedies through the FOIA process should the |

BLM_0012244

| | | | | |
|---|---|---|---|---|
| | | | | commentor seek to pursue them.  Much of the information in the FOIA request has been made available to the commentor over a period of time. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 5 | FLMPA requires that BLM give priority to designation and protection of areas of critical environmental concern (ACEC).  Protection of existing ACECs and due consideration of proposed ACECs must be a priority in the RMP process.  The designation of only 63,252 acres of ACECs in the planning area of some 609,687 acres found eligible falls far short of FLMPA's mandate that BLM give "priority" to this resource. SUWA recommends that the BLM follow the mandate of FLPMA and give priority to the designations of ACECs and not treat ACEC designation as merely another constituent management option in a matrix of options. | The BLM gave full consideration to designating and perservering ACEC during this land use planning process. The BLM evaluated 35 ACEC nominations and found 14 to meet the criteria for designation as an ACEC.  All 14 ACECs are proposed for designation in Alternative B, 5 ACECs are proposed for designation in Alternative C, and 0 ACECs are proposed for designation in Alternative D. These alternatives analyze and disclose the impacts of the proposed ACEC management prescriptions and protections.

The relevant and important values identified in the ACEC process are proposed for ACEC designation in one or more alternatives and in many cases where ACECs are not proposed for designation, these values are provided protective measures by other management actions.  The management of ACECs is considered within the entire spectrum of BLM's multiple-use mandate. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 6 | Certain elements of the RMP, most strikingly the travel plan, fail the test of the unnecessary or undue degradation (UUD) standard of FLPMA.  By several measures, the proposed travel plan will harm natural resources by increasing cumulative dust and decreasing air quality, unnecessarily fragmenting wildlife habitat, causing unnecessary damage to riparian areas, floodplains and cultural resources, and reduction of naturalness in areas with identified wilderness characteristics. | The BLM analyzed the impacts of travel management as outlined and described in Chapter 4 of the DRMP/EIS. Congress recognized that, through the multiple-use mandate, that there would be conflicting uses and impacts on the public land.  Also, as a matter of clarification, the UUD is a management standard that the BLM applies to third party public land users. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 26 | "Based on consultation with Native Americans, the BLM would consider sites areas, issues, and objects important to their cultural and religious heritage."  1-13. There doesn't appear to be anything in Chapter 4 that reflects the BLM's considerations of these issues and what it did to accommodate Native American interests. | A summary of tribal consultation, including all meetings with tribal governments and specific issues raised by each tribe is contained on pgs. 5-4 through 5-11 in Chapter 5 of the Moab DRMP/EIS.  A complete record of the consultations is available in the Administrative Record for the DRMP/EIS.  The concerns raised by the tribal |

BLM_0012245

| | | | | |
|---|---|---|---|---|
| | | | | governments were addressed in one or more alternatives, where applicable.  For example, the woodlands decisions allow the sustainable harvest (including cutting of green willows and cottonwoods) for Native American traditional ceremonial use. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 142 | The National Park Service should have been a cooperating agency.  The exclusion of the NPS from cooperating agency status has limited the input from this most qualifed agency on the import of effects on Arches National Park and Canyonlands National Park. | Cooperating agency status was extended to Federal, State, and local agencies, including the National Park Service.  In addition to the cooperating agencies, the BLM Moab Field Office held meetings with and sought the input of other agencies that have land management jurisdiction within or adjacent to the planning area.  In particular, the BLM conducted many coordination meetings with the National Park Service during the development of the DRMP/EIS in order to solicit its concerns.  Although not a formal cooperating agency, members of the National Park Service staff worked closely with the BLM to resolve issues and address concern, when possible. |
| Samson | 201 | 3 | In order to avoid potential litigation from those opposed to the use of categorical exclusions, and in order to comply with Congress' unequivocal directive, the BLM must incorporate the Energy Policy Act of 2005 categorical exclusions into the Moab RMP and develop an overall management goal encouraging their use. | See response to comment 214-5. |
| Samson | 201 | 4 | 43 U.S.C. ' 1702(j) (2006). If Alternative B is selected, the BLM would make a total of 71,444 acres unavailable to oil and gas leasing and, under Alternative C a total of 370,250 acres unavailable for oil and gas leasing. Even under the "development alternative" 350,219 acres would be closed to oil and gas leasing. Because withholding such large areas of land from oil and gas leasing constitutes a withdrawal, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA. 43 U.S.C. § 1714 (2006).<br>FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an | See response to comment 214-7. |

BLM_0012246

area of 5,000 acres or more to mineral development. Id. Among the other requirements imposed on the Department of the Interior is the requirement for the Secretary of the Interior, as compared to the Director of the BLM or a State Director, to make all withdrawals of federal lands. 43 U.S.C. § 1714(a) (2006). Only the Secretary-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-is authorized to make withdrawals under FLPMA. The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal. 43 U.S.C. § 1714(b)(l) and (h) (2006). Finally, the Secretary is required to notify both houses of Congress of the proposed withdrawal. See 43 C.F.R. § 1610.6 (2006). The notice must include information: (1) regarding the proposed use of the land; (2) an inventory and evaluation of the current natural resource uses and value of the land and adjacent public and private land which-may be affected; (3) an identification of present users and how they will be affected; (4) an analysis of the manner in which the existing and potential uses are incompatible with or in conflict with the proposed uses; (5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed uses; (6) a statement as to whether suitable alternative sites are available; (7) a statement of the consultation which has been or will be had with other federal, regional, state, and local government bodies; (8) a statement regarding the potential effects of the withdrawal on the state, local, and regional economy; (9) a statement of the length of time needed for the withdrawal; (10) the time and place of the hearings regarding the withdrawal; (11) the place where the records of the withdrawal can be examined; and (12) a report prepared by a qualified mining engineer, engineering geologist, or geologist, which

BLM_0012247

| | | | | |
|---|---|---|---|---|
| | | | shall include information on mineral deposits, mineral production, existing mining claims, and an evaluation of future mineral potential. 43 U.S.C. § 1714(c)(2) (2006). To date, the BLM and Department of the Interior have not complied with these requirements.<br>Additionally, FLPMA requires the Secretary of the interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size. 43 U.S.C. § 1712(e). Oil and gas development is defined as a principal or major use of the public lands. 43 C.F.R. § 1702(1). The BLM would close well over 300,000 acres to oil and gas leasing under Alternatives B, C, and D, yet BLM has not complied with the clear requirements of FLPMA. BLM must notify Congress of its intent to close significant areas to future oil and gas development prior to finalizing the Moab RMP. | |
| Samson | 201 | 19 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again." See Moab DRMP/EIS pg. 4-3. This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development in the Moab RA. Such a position has been rejected by the BLM nationally, and by the Secretary of the Interior through the IBLA. The RFD Scenario is a tool for NEPA compliance, not a decision in the resource management plan. In the event oil and gas development exceeds the level predicted in the<br>Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development through project | See response to comment 214-28. |

BLM_0012248

level analysis; the BLM will not be required to revise its resource management plan.

The BLM should clearly state in the Final EIS, the Record of Decision, and the actual RMP for the Moab RA confirming the nature of the RFD Scenario and the fact that the RFD Scenario is not a planning decision or limitation on the level of development that can be authorized within the Moab RA. The RFD Scenario is defined by the BLM as a "baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is neither a Planning Decision nor the "No Action Alternative" in the NEPA document. "In the NEPA document, the RFD based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD Scenario also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004). The RFD should be based solely or primarily on permitting. The BLM should revise its RFD Scenario given

the high potential for oil and gas development in the planning area.

The IBLA has made clear in six separate decisions that the RFD Scenario is not a planning decision, nor is it a limit on future development. National Wildlife Fed'n, 170

BLM_0012249

| | | | | |
|---|---|---|---|---|
| | | | IBLA 240, 249 (2006) (holding with respect to the Great Divide RMP that the RFD Scenario is not a limitation on development); Wyoming Outdoor Council, et al., 164 IBLA 84, 99 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point past which further exploration and development is prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Theodore Roosevelt Conservation Partnership, et al., IBLA DocIret No. 2007-208, Order at *22 (September 5, 2007); Wyoming Outdoor Council, et al., IBLA Docket No. 2006-155, Order at *26 - 27 (June 28, 2006) (determining RFD Scenario for Pinedale RMP is not a limitation on future development); Biodiversity Conservation Alliance, et al., IBLA No. 2004-316, Order at *7 (Oct. 6, 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding with respect to the Great Divide RMP that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area."). As indicated by the number of decisions cited above, the purpose of the RFD Scenario continues to be a source of confusion, and litigation, for some groups and individuals. In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. Additionally, the BLM must delete or significantly revise the potentially confusing and incorrect language on page 4-3 of the Moab DRMP/EIS. | |
| Cabot Oil and Gas Corporation | 202 | 3 | The BLM promulgated policies regarding the contractual rights granted in an oil and gas lease. First, the BLM's Planning Manual specifically mandates the protection of existing lease rights. "All decisions made in land use plans, and subsequent implementation decisions, will be subject to valid existing rights. This | See response to comment 214-4. |

BLM_0012250

| | | | | |
|---|---|---|---|---|
| | | | includes, but is not limited to, valid existing rights associated with oil and gas leases…" See BLM Manual 1601 – Land Use Planning, 1601.06.G (Rel. 1-166 11/22/00). BLM Instruction Memorandum 92-67 similarly states that "[t]he lease contract conveys certain rights which must be honored through its term, regardless of the age of the lease, a change in surface management conditions, or the availability of new data or information. The contract was validly entered based upon the environmental standards and information current at the time of the lease issuance." As noted in the BLM's Instruction Memorandum, which is binding upon the agency, the lease constitutes a contract between the federal government and the lessee which cannot be unilaterally altered or modified by the BLM. | |
| Cabot Oil and Gas Corporation | 202 | 4 | In order to avoid potential litigation from groups opposed to natural resources development on federal lands, and in order to comply with Congress' unequivocal directive, the BLM must incorporate the Energy Policy Act of 2005 categorical exclusions into the Moab RMP and develop an overall management goal encouraging their use. | See response to comments 214-5 and 214-9. |
| Cabot Oil and Gas Corporation | 202 | 5 | 43 U.S.C. ' 1702(j) (2006). If Alternative B is selected, the BLM would make a total of 71,444 acres unavailable to oil and gas leasing and, under Alternative C a total of 370,250 acres unavailable for oil and gas leasing. Even under the "development alternative" 350,219 acres would be closed to oil and gas leasing. Because producing oil and gas leasing on such large areas constitutes a withdrawal under FLPMA, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA. 43 U.S.C. § 1714 (2006). FLPMA requires the Secretary of the Interior to comply with certain procedural mandates prior to closing an area of 5,000 acres or more to mineral development. Id. For example only the Secretary of the Interior, as | See response to comment 214-7. |

BLM_0012251

compared to the Director of the BLM or a State Director, has the authority to make withdrawals of federal lands. 43 U.S.C. § 1714(a) (2006). The Secretary-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-is authorized to make withdrawals under FLPMA. The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal. 43 U.S.C. § 1714(b)(l) and (h) (2006). Finally, the Secretary is required to notify both houses of Congress of the proposed withdrawal. See 43 C.F.R. § 1610.6 (2006). The notice must include information: (1) regarding the proposed use of the land; (2) an inventory and evaluation of the current natural resource uses and value of the land and adjacent public and private land which-may be affected; (3) an identification of present users and how they will be affected; (4) an analysis of the manner in which the existing and potential uses are incompatible with or in conflict with the proposed uses; (5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed uses; (6) a statement as to whether suitable alternative sites are available; (7) a statement of the consultation which has been or will be had with other federal, regional, state, and local government bodies; (8) a statement regarding the potential effects of the withdrawal on the state, local, and regional economy; (9) a statement of the length of time needed for the withdrawal; (10) the time and place of the hearings regarding the withdrawal; (11) the place where the records of the withdrawal can be examined; and (12) a report prepared by a qualified mining engineer, engineering geologist, or geologist, which shall include information on mineral deposits, mineral production, existing mining claims, and an evaluation of future mineral potential. 43 U.S.C. § 1714(c)(2) (2006). To date, the BLM and Department of the Interior has

BLM_0012252

| | | | | |
|---|---|---|---|---|
| | | | not complied with these requirements. Additionally, FLPMA requires the Secretary of the interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size. 43 U.S.C. § 1712(e). Oil and gas development is defined as a principal or major use of the public lands. 43 C.F.R. § 1702(1). The BLM would close well over 300,000 acres to oil and gas leasing under Alternatives B, C, and D, yet BLM has not complied with the clear requirements of FLPMA. BLM must notify Congress of its intent to close significant areas to future oil and gas development prior to finalizing the Moab RMP. | |
| Cabot Oil and Gas Corporation | 202 | 19 | The BLM incorrectly describes the purpose and role of the RFD Scenario on page 4-3 of the Moab DRMP/EIS. The BLM suggests that "if the projections used in this impact analysis are significantly exceeded at some time in the future due to a continual increase in oil and gas prices, then the analysis will have to be updated again." See Moab DRMP/EIS pg. 4-3. This language incorrectly suggests that the RFD Scenario is a limitation on future oil and gas development in the Moab RA. Such a position has been rejected by the BLM nationally, and by the Secretary of the Interior through the IBLA. The RFD Scenario is a tool for NEPA compliance, not a decision in the resource management plan. In the event oil and gas development exceeds the level predicted in the Moab DRMP/EIS, the BLM will have the opportunity to prepare appropriate additional NEPA analysis analyzing the impacts of increased development. The BLM will not be required to revise its resource management plan simply because additional development is authorized; project level NEPA analysis will provide the necessary analysis of potential impacts from increased oil and gas | See response to comment 214-1, |

BLM_0012253

development.

The BLM should include specific information in the Final EIS, the Record of Decision, and the actual RMP for the Moab RA confirming the nature of the RFD Scenario and the fact that the RFD Scenario is not a planning decision or limitation on the level of development that can be authorized within the Moab RA. The RFD Scenario is defined by the BLM as a "baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is neither a Planning Decision nor the "No Action Alternative" in the NEPA document. "In the NEPA document, the RFD based on scenarios adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures." BLM Instruction Memorandum 2004-089, Attachment 1-1 (January 16, 2004). The RFD is based on review of geologic factors that control potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD Scenario also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. BLM Instruction Memorandum 2004-089, Attachment 1-3 (January 16, 2004).

The IBLA has made clear in six separate decisions that the RFD Scenario is not a planning decision, nor is it a limit on future development. National Wildlife Fed'n, 170 IBLA 240, 249 (2006) (holding with respect to the Great Divide RMP that the RFD Scenario is not a limitation on development); Wyoming Outdoor Council, et al., 164 IBLA 84, 99 (2004) (holding with respect to the Pinedale RMP that the RFD Scenario does not establish "a point

BLM_0012254

| | | | | |
|---|---|---|---|---|
| | | | past which further exploration and development is prohibited"); Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003) (holding that the Book Cliffs RMP did not establish a well limit); Theodore Roosevelt Conservation Partnership, et al., IBLA Doclret No. 2007-208, Order at *22 (September 5, 2007); Wyoming Outdoor Council, et al., IBLA Docket No. 2006-155, Order at *26 - 27 (June 28, 2006) (determining RFD Scenario for Pinedale RMP is not a limitation on future development); Biodiversity Conservation Alliance, et al., IBLA No. 2004-316, Order at *7 (Oct. 6, 2004) (citing Southern Utah Wilderness Alliance, 159 IBLA at 234) (holding with respect to the Great Divide RMP that the "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area."). As indicated by the number of decisions cited above, the purpose of the RFD Scenario continues to be a source of confusion, and litigation, for some groups and individuals. In order to prevent future litigation and appeals, the BLM must include language in the Moab RMP itself describing the purpose of the RFD Scenario, and the fact that the RFD Scenario is not a planning decision or limitation on future development. Additionally, the BLM must delete or significantly revise the potentially confusing and incorrect language on page 4-3 of the Moab DRMP/EIS. | |
| Glen Canyon Group | 209 | 2 | Since eight months were allowed for the scoping process, it is still hoped that a similar amount of time will be allotted for this review and comment period. In the event that – as we've requested, an extension is granted, we will amend, extend and resubmit our Comments. | The BLM has provided the public with 90 days in which to review and comment on the DRMP/DEIS.  The standard comment period for an EIS is 45 days in accordance with the Federal Council on Environmental Quality regulations.  Thus, double the amount of time has been provided to comment on the DRMP/DEIS. BLM has made the DRMP/EIS available, free of charge, in a variety of mediums, including paper, CD, and online.  In addition, BLM staff has offered to meet individually with groups or individuals to explain the Draft RMP/EIS and help focus review and comment efforts.  Finally, BLM held four open |

250

| | | | | houses around the State to facilitate review of the Moab DRMP/DEIS. |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 1 | Questar has become increasingly concerned recently with attempts made via the NEPA process to impose new restrictions on existing legal rights, e.g., leases, rights-of-way, previous Records of Decision, etc. Questar regards this as a serious legal issue and is pleased to note that the Moab DRMP/EIS recognizes that valid existing rights are not subject to new Special Designations, Areas of Critical Environmental Concern (ACECs), wilderness characteristics, wild and scenic rivers, etc. Recommendation: FEIS should continue recognition of valid existing rights. | Valid existing rights are considered Administrative Actions by the BLM and do not require a specific planning decision to implement.  As noted in Chapter 1 under Planning Criteria and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), all decisions made in land use plans and subsequent implementation decision are subject to valid existing rights.  The BLM will work with and subject to the agreement of holders of valid existing rights to modify proposed actions or activities to reduce the effect of the actions or activities on resource values and uses.  These modifications may be necessary to maintain the choice of alternatives being considered during land use plan development and implementation, and may include appropriate stipulations, relocations, redesigns, or delay of proposed actions. |
| Questar Exploration and Production Company | 210 | 2 | The DRMP/EIS contains many restrictions on oil and gas development. Questar finds the following restrictions in the Preferred Alternative to be excessive and in conflict with the Energy Policy Conservation Act of 2000 and Executive Order 13211 which will require identification of and efforts to eliminate impediments to natural gas and oil development:<br>-Lands open to oil and gas leasing under standards stipulations – 59% decrease<br>-Lands with Controlled Surface Use (CSU) and timing limitations – 107% increase<br>-Lands designated No Surface Occupancy (NSO) – 459% increase<br>-NSO imposed on private surface overlying federal minerals<br>The overlapping surface stipulations identified in Appendix C will result in severe and unacceptable adverse impacts on the ability of the oil and gas industry to develop the mineral resource within the Moab Field Office planning area. | In accordance with the Energy Conservation Policy Act, the restrictions on oil and gas leasing developed in the DRMP/EIS for the preferred alternative (Alt C) are the least restrictive stipulations necessary to protect the resources under consideration.  The RFD indicates that the restrictions in Alt C results in reducing the number of wells from 451 in Alt A to 432 to in Alt C.  This is a reduction of 19 wells representing a 4% reduction in development between the two alternatives. See Table 4.2 of the DRMP/EIS (on pg. 4-5) for a summary of wells foregone due to restrictions on oil and gas leasing by alternative.  Nineteen wells (out of a total of 451) does not represent an unreasonable restriction on oil and gas operations.<br><br>The impacts of each of the restrictions on oil and gas development are detailed in Chapter 4 of the DRMP/EIS. |

BLM_0012256

| | | | | |
|---|---|---|---|---|
| | | | Recommendation: BLM must ensure that its decisions comply with the Energy Policy Act (EPA 2005), (Energy Policy and Conservation Act (EPCA 2000), the National Energy Policy (NEP), and Executive Order 13212, (66 Fed Reg 28357 May 18, 2001) and reduce rather than increase impediments to federal oil and gas leasing. Under FLPMA, BLM is required to manage public lands under the principles of multiple use and sustained yield to meet the needs of present and future generations. 43 USC § 1701 (a)(7), (8) & (12); 43 USC § 1732(a) & (b); 43 CFR § 1610.5-3. FLPMA identifies "mineral exploration and production" as one of the "principle or major uses" of public lands. See 43 USC § 1702(1). The removal of expansive acreage from leasing and development in the DRMP/EIS does not comply with BLM objectives. | |
| Bill Barrett Corporation | 214 | 3 | The BLM's Land Use Planning Handbook specifies that RMPs are not normally used to make site-specific implementation decisions.  The BLM must ensure that it leaves itself sufficient flexibility to manage the public lands in light of ever-changing resource demands, uses, and technologies.  By developing overly restrictive management practices, such as specific reclamation of mitigation ratio's, the BLM is limiting its ability to manage the public lands in light of new information.  The management objectives, goals, and actions established in the revised Moab RMP must be sufficiently flexible to manage the Moab RA for at least the next decade. | If conditions change radically the BLM can prepare a land use plan amemdment.  The BLM Land Use Planning Handbook (H-1601-1) on pg. 45 states that plan amedments can be promted to  1) respond to new, intensified, or changed uses on public land; and 2) consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions. |
| Bill Barrett Corporation | 214 | 4 | The BLM cannot attempt to impose stipulations or conditions of approval (COAs) on BBC's existing leases that are inconsistent with its valid existing rights. | The DRMP/EIS as stated on pg. 1-13 and as outlined in the BLM's Land Use Planning Manual (Section 1601.06G), the planning process would recognize the existence of valid existing rights.

Subject to valid existing rights, the BLM will work with a lease holder to modify proposed actions or activities to reduce the effect of the actions or activities on resource |

BLM_0012257

| | | | | values and uses and also to protect threatened/endangered species and cultural resources. Additional modifications may be necessary to prevent undue and unnecessary degradation of public lands. |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 5 | In developing the Moab RMP, the BLM must provide for and allow itself sufficient flexibility to utilize the categorical exclusions developed by Congress to streamline oil and gas permitting on federal lands. | The application of categorical exclusions for oil and gas operations is determined for site specific proposals. This process does not require a land use planning decision. |
| Bill Barrett Corporation | 214 | 6 | When finalizing the Moab RMP, the BLM should also acknowledge the BLM's recent decision to include geophysical exploration, when no temporary or new road construction is proposed, to the Department of the Interior's list of activities that do not require the preparation of an environmental assessment or environmental impact statement. | The NEPA documentation required for geophysical operations is determined on a site specific basis and does not require a land use planning decision. |
| Bill Barrett Corporation | 214 | 8 | FLPMA requires the Secretary of the Interior to comply with specified procedural requirements before making a management decision that totally eliminates a principal or major use of the public lands for a period of two or more years on a tract of land more than 100,000 acres in size. | If the BLM decides to eliminate a principal use on over 100,000 acres on a tract of land, then we will approach Congress. |
| EnCana Oil and Gas (USA) Inc. | 215 | 1 | The Moab DRMP appears to make several management decisions that are most appropriately left to site-specific authorizations. For example, the BLM appears to impose best Management Practices regardless of their applicability or feasibility. The text on page C-3 states, "The following appropriate environmental Best Management Practices ("BMP") will be applied on individual Applications for Permit to Drill and associated right-of-way in the Moab Field Office." [emphasis added]  EnCana strongly supports use of environmental Best Management Practices for all ail and gas operations ands strives to incorporate all practical BMPs on EnCana operations where applicable and appropriate based on site-specific considerations and reasons. | The procedures referred to are based on Washington Office Instruction Memorandum 2007-021 as well as the Gold Book.  They will be applied as appropriate. |

253

BLM_0012258

BMPs should more consistently relate to the letter of IM No. 2007-021 and Surface Operating Standards and Guidelines for Oil and Gas  Development (Gold Book), 2006 or the policy basis.  IM No. 2007-021 states:

Field Offices must be cautious to avoid the "one size fits all" approach to the application of BMPs. Environmental BMPs, by their very nature, are dynamic, innovations and must be flexible enough to respond to new data, field research, technological advances, and market conditions.  Following implementation, Field Offices should monitor, evaluate, and modify BMPs as necessary for use in future permit approvals.

Some of the listed BMPs are not appropriate and/or are impossible to comply with in all cases.  For example, compare the statement in the Sixth bullet, "all flower lines will be buried in or immediately adjacent to the access roads" [emphasis added] to the statement in the Gold Book, "Flowline routes should take advantage of road corridors wherever possible to minimize surface disturbance and provide better leak detection and access for installation and repair operations.  Consider maintenance needs and safety when burying power and pipelines in or immediately adjacent to the road" [emphasis added].  Notwithstanding those different approaches, currently recommendation from the BLM to minimize surface disturbance on and across solid or rocky surfaces.

As a second example, compare the statement in the Eleventh Bullet, "Nose reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment" [emphasis added] to the statement in the Gold boo, "Noise that has the potential to disturb wildlife, livestock and private surface owners or neighbors should be controlled to reduce sound levels" [emphasis added].  Such a blanket requirement over the entire planning area is not justifiable where oil and gas operations and compressors are in very remote

BLM_0012259

| | | | | |
|---|---|---|---|---|
| | | | areas or areas near mining activity, and have no impact on wildlife, livestock and nearby surface owners. | |
| EnCana Oil and Gas (USA) Inc. | 215 | 9 | 43 U.S.C 1702(j) (2006). Because the decision to make an area unavailable for leasing constitutes a withdrawal, the Department of the Interior will be required to comply with the procedural provisions of Section 204 FLPMA. 43 U.S.C 1714 (2006).  Among other things, only the Secretary of the Interior-or a designee in the Secretary's office appointed by the President and confirmed by the Senate-has the authority to make withdrawals of federal lands.  43 U.S.C 1714(a) (2006). The Secretary is also required to provide notice of the proposed withdrawal in the Federal Register and conduct hearings regarding the withdrawal.  43 U.S.C 1714(b) (1) and (h).  Finally, the Secretary is required to notify both houses of Congress of specific information relating to the proposed withdrawal.  See 43 C.F.R. 1610.6; 43 U.S.C. 1714 (c ) (2) The Moab DRMP does not contain adequate justification for declining to reissue expired leases under these standards.  The DRMP notes that withdrawals "are used to preserve sensitive environmental values, protect major Federal investments in facilities or other improvements, support national security, and/or provided for public health and safety." (See DRMP page 3-31) But no such analysis is provided.  Before the BLM takes such steps, it "must ensure that withdrawals are supported by a definite show of need and must recommend revocation of withdrawals that lack sufficient justification." 43 C.F.R. 231.1-2. | See response  to comment 214-7. |
| EnCana Oil and Gas (USA) Inc. | 215 | 13 | The assumptions made by the BLM are inconsistent in some places within the DRMP.  Assumptions made to assess impacts should be uniform and consistent throughout the analyses for all resources.  See 43 C.F.R. 1610.3-2. The assumption used for the analysis of air quality impacts is that "all proposed wells would go into | On pg.  4-16 it states that conservative assumptions were used to better ensure that the findings do not underestimate future impacts.  For example, it was assumed that all proposed wells would go into production within 15 years, and then operate at full production levels with no "'dry hoes or "shut- ins," while in reality a small percentage of dry holes and shut-ins would be expected |

BLM_0012260

| | | | | |
|---|---|---|---|---|
| | | | production within 15 years and then operate at full production levels with no 'dry holes' or 'shut ins'." (see p.4-16)  This assumption is contradicted by the assumption for reclamation described in section 4.1.3.10 on p. 4-7 (and also on p. 4-83): "The assumptions for reclamation for oil and gas are that 50% of the wells drilled would be productive and 50% would be abandoned and reclaimed and revegetation would be successful." (See comment on page 3, infra, regarding EnCana's success rate.) Nevertheless, without consistent and defensible assumptions, impacts to resources from each of the alternatives cannot be compared.  For example, Table 4.3, which displays predicted surface and disturbance, does not appear to consider the 50% plugging and abandonment rate assumption.  It is difficult to determine where the assumption was considered and where it was not. | to occur.  This is a full production scenario to determine if air quality standards would be exceeded over the life of the plan.  The assumption on surface disturbance associated with wells drilled is more realistic.  Although the two assumptions are different they serve different anaytical purposes. |
| EnCana Oil and Gas (USA) Inc. | 215 | 22 | It appears that EnCana is concerned about the level of personnel and staffing at the Moab Field Office.  Operators already experience significant permit delays, and it is not clear to us how the BLM will manage and implement even the Preferred Alternative C absent an increase in personnel | The DRMP/EIS asserts that adequate personnel and staffing will be provided to implement the preferred alternative.  This is stated on pg. 4-3 of the DRMP/EIS: "BLM would have the funding and work force to implement the selected alternative." |
| Delta Petroleum Corporation | 220 | 2 | It appears that the BLM policies for establishing an ACEC and demonstrating that existing laws and regulations are inadequate to protect these special areas has not been followed.  The information used by the BLM to reach a decision that up to 14 ACECs are needed within the MRA has not been included in the DEIS as required by NEPA<br><br>The inclusion of existing leases within these areas would suggest that management by stipulation is the appropriate way to consider oil and gas development within these areas.  Lease stipulations should be developed that are specific to the purpose of the ACEC and the protections warranted by omission from other laws and regulations.  Such analysis of risk versus | The preferred alternative manages five ACECs, totalling 63,000 acres.  Valid existing rights within these areas are recognized and would be honored.<br><br>See also response to comments 203-2, 203-9, 203-10, 203-10, 203-11, 203-12, 203-13 and 203-14.<br><br>None of the ACECs mentioned as having conflicts with utility corridors are proposed for management under the preferred alternative. |

256

| | | | | |
|---|---|---|---|---|
| | | | multiple uses is not present in the DEIS so there is no way to evaluate how the BLM can reach the land restrictions proposed for the ACES's.  In addition, there are a number of existing laws, regulations and policies to protect the water, air, cultural and other resources identified in the ACECs.  In what appears to be a failure to meet regulatory requirements, the RMP contains little in the way of explaining to the public how the BLM reached the designations and proposed land restrictions.<br><br>Several of the proposed ACEC's overlie existing utility corridors within the MRA.  The existing and future use of these utility corridors needs to be recognized and protected within any new designation of an ACEC.  This is particularly true for the proposed Upper Courthouse, Wilson Arch, Cisco White Tailed Prairie Dog Complex, and Colorado River Corridor ACECs | |
| Fidelity Exploration and Production Co. | 221 | 6 | Several of the Areas of Critical Environmental Concern (ACECs) do not contain adequate justification for closing those lands to development.  Twelve of the 14 ACECs listed in the DRMP have existing leases.  While the leases would remain valid until they expire, the potential exists to limit future development in prospective areas because of ACEC designations.  This is not necessary as there are existing laws, stipulations, and policies to protect resources identified in many of the ACECs.<br><br>-NEPA and BLM policy require that the BLM make available for public comment the information upon which the decisions to designate ACECs were reached, including the underlying analysis for the proposed and existing ACECs (Isle Royale, 154 F Supp. 2d at 1127; Trout Unlimited, 509 F.2d at 1284; BLM ACEC Manual 1613.06-4.) The DRMP, however, does little to disclose to the public how and on what information the proposed | See response to comments 214-4, 203-8, 203-9, 203-10, 203-11, 203-12, 203-13 and 203-14.<br><br>It should be noted that only 5 of the 14 ACEC proposals are designated in the preferred alternative.  The total acreage of those designated in the preferred alternative is 63,000 acres. |

BLM_0012262

| | | | ACEC determinations were reached.<br><br>-New ACECs can be nominated by a variety of sources, and indeed, the ACECs considered in DRMP were nominated by various organizations.  There is a lack of disclosure about these submissions, however, as well as the materials serving as the basis of analysis by the BLM interdisciplinary team and how these procedures complied with existing BLM policy.  THE DRMP fails to explain why other management prescriptions or designation in place are inadequate and necessitate the proposed ACEC designations.<br><br>-Regardless of how the ACECs were determined, the examination requires much more than merely examining the importance and relevance criteria.  Disclosing this information allows the public to ascertain the quality of information used by BLM, of the source of information, and the availability of the information for public review.<br><br>-The DRMP fails to demonstrate that the proposed ACEC decisions meet the regulatory criteria of importance and relevance (43 VFR 1610-7-2) Secondly many of the identified resource values already receive adequate protection through other management prescriptions:<br><br>  -ACECs may be designated "where special management attention is required...to protect and prevent irreparable damage" (43 USC 1702(a). )<br><br>  -ACECs are unnecessary when other designations are adequate to protect a resource or value (BLM Manual 1613.51-53.) | |
| Fidelity Exploration | 221 | 11 | The BLM does not clearly associate possible resource management decision in the text with the maps | No specific comments are provided which can be evaluated. |

BLM_0012263

| | | | | |
|---|---|---|---|---|
| and Production Co. | | | | |
| Fidelity Exploration and Production Co. | 221 | 19 | Assumptions made to assess impacts should be uniform and consistent throughout the analyses for all resources.  The DRMP does not make clear if this assumption was sued throughout the remainder of the document for the analyses of impacts to resources other than air quality.  Another assumption states: "The assumptions for reclamation for oil and gas are that 50% of the wells drilled would be productive and 50% would be abandoned and reclaimed and revegetation would be successful" (p.4-7. p. 4-83).  Without consistency, impacts to resources from each of the alternative cannot be compared.  For example, Table 4.3 displays predicted surface disturbance without considering the 50% P&A assumption. | See response to comment 215-13. |
| | 262 | 3 | Please extend the comment period, so we have time to comment. | See response to comment 124-1. |
| San Juan Public Entry and Access Rights | 267 | 3 | We must admit we did not read your document verbatim, but we could find no reference to The American Disability Act of 1990, the Discrimination Act of 1991, or even the Age Discrimination Act of 1967. You are not providing for the elderly or the disabled in your plan. The only thing we are aware of that you do is provide disabled access to your outhouses. Some where in this plan you should be doing something special for the disabled and elderly. By shutting down certain areas to motorized use you are discriminating against the elderly and disabled. We realize it is impossible to provide access to every spot but if roads or trails exist, leave them so those who can't enjoy the values by hiking, can still see them by motorized access. We therefore recommend all existing roads be left available for the elderly and handicap to use by motorized methods. | The BLM worked with Grand and San Juan counties to provide a transportation plan that meets the access needs of recreationists.  The plan designates over 3,000 miles of road for travel. |
| Red River Canoe | 283 | 1 | The 90-day comment period was entirely too brief to allow the average public time to peruse the draft RMP. | See response to comment 124-1. |

BLM_0012264

| Company | | | | |
|---|---|---|---|---|
| | 284 | | The BLM is making it as onerous as possible for the public to participate in this and other land use plans. The BLM should to extend the public comment deadlines by at least another 180 days to allow for meaningful comment for each of the upcoming land use plans. It is a reasonable extension to provide the public a real chance to comment on the future of over 11 million acres of public land. | See response to comment 124-1 |
| | 285 | 1 | I am asking for an extension of the comment period. 90 days is simply not enough time to sift through this thick and confusing document to determine its effects on the land. | See response to comment 124-1 |
| Lisbon Valley Mining Co | 286 | 2 | Scoping appears top emphasize environmental protection over the intended multiple use concepts mandated by FLPMA. Example- BLM asks for "nominations for Areas of Critical Environmental Concern (ACEC's) and nominations for rivers for potential inclusion in the National Wild and Senic Rivers System. No where in the process is there similar opportunity to nominate or designate mineral areas or mining districts." One example is the overlapping development potential for lacatable minerals (copper, uranium, and limestone) and oil & gas in Lisbon Valley. | The Mineral Potential Report (2005) prepared for the Moab RMP details the mineral potential of the planning area. This report was done in conjunction with the Utah Geological Survey. |
| Lisbon Valley Mining Co | 286 | 4 | The RMP references three EIS's within the Moab Field Office Area that were developed as part of planned economic development. This tends to skew results, management and recommendations towards the preservation of environmental and wilderness characteristics. | Socioeconomic Baseline Report for Grand County and a Socioeocnomic Baseline Report for San Juan County were prepared specifically for the current planning effort. These reports were prepared in 2004; they are available on the Moab RMP Internet site, as well as by request. |
| International Adventure Tours | 287 | 3 | We would like to see BLM seek answers through a more active effort to involve these resources [various interest groups] rather than closing use due to BLM's inability to provide the needed resources to keep the land open and appropriately managed. | Involving interest groups and volunteers does not require a planning decision. BLM is required to keep lands open to cross country travel only when there are no resources at risk. Vegetation, cultural resources, wildlife habitat and other natural resources are generally at risk when cross country travel is allowed. |

260

| Theodore Roosevelt Conservation Partnership | 288 | 5 | Multiple Use Management: The BLM should detail in the Moab RMP how public lands proposed for leasing and development within the Moab resource area will be managed for a balance of uses, as required by FLPMA. FLPMA sets for a multiple use mandate [The Organic Act for the BLM] that federal agencies must not ignore. With regards to energy development in the Moab FO, this means that the BLM must consider effects on outdoor recreation and the conservation of fish and wildlife species and habitat, notably mule deer, elk, desert and Rocky Mountain bighorn sheep, pronghorn, Colorado Cutthroat Trout, and sage-grouse in determining appropriate natural gas extraction management.<br><br>All alternatives should retain sufficient management discretion for BLM to permit development of the gas resource without improperly committing itself to wholesale conversion of the area from lands containing wildlife habitat, rangeland, watershed, and energy resources, into a single-use industrialized zone effectively committed to natural gas extraction to the exclusion of most other uses. Given the lack of upfront planning within the DEIS, it is concerning to us that the draft RMP is on track to such single-use zones. | The DRMP/EIS proposes many broad management prescriptions to protect wildlife and their habitats. The specific issues raised by the commentor will be taken into consideration at the lease development stage. Planning is a tiered process, with the RMP setting the broad general guidelines.  Site specific NEPA analyses develop the mitigations that are to be imposed upon the specific project. |
| Grand County Backcountry Council | 289 | 14 | Although it is a moot point now, the 90-day comment period was entirely too brief to allow the average public time to peruse the draft RMP. Furthermore, the comment period occurred largely during local business owners' busy fall season, leaving outfitters, restaurateurs, and other affected parties with little time to devote to the document. | See response to comment 124-1. |
| | 303 | 1 | Keep me as an active participant in this process and on your active mailing list/notification list. | NRR |
| | 303 | 4 | The BLM is mandated to promote multiple-use, so the designation of "exclusive use zones" to decrease minimal or non-existent conflict is functionally against | Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best |

BLM_0012266

| | | | BLM management guidelines. | meet the present and future needs of all the American people. |
|---|---|---|---|---|
| Delta Petroleum Corporation | 306 | 2 | The BLM is mandated under FLPMA to encourage multiple uses of federal land. The multiple uses are not mutually exclusive and can co-exist in a number of ways. With appropriate planning, mitigation, and management of impacts, the BLM can allow these uses to occur in ways that conserve and protect the environment for the enjoyment, use, and benefit of all and future generations. | See response to comment 121-1. |
| | 309 | 6 | You have not chosen to review the Redrock Heritage Plan for Sustainable Economies and Ecosystems. I think that the Redrock Heritage Plan does meet the purpose and need and respectfully ask you to consider and evaluate this proposal as a reasonable and viable alternative. Proposed areas of road closure do meet the purpose and need to protect riparian/soil/watershed resources from ground disturbing activities that may have unavoidable (4-495/496), irreversible/irretrievable (4-499), and cumulative (4-506/5-8) impacts. | See response to comment 124-9. |
| | 309 | 8 | I ask you to work in conjunction with other BLM jurisdictions that cover the Green River to attain a unified plan for the Green River watershed. It does not meet resource protection goals when there are separate jurisdictions to manage this very important area. | See response to comment 120-88 |
| | 314 | 2 | Federal Law requires the BLM to do as much as possible to encourage smart, clean, safe energy development on Federal Lands. | See response to comment 124-115. |
| | 315 | 1 | My main concern is that your agency complies with ALL federal laws that try to make sure that energy exploration and development can continue in our area. Federal Energy Policy Acts have directed public land managers to do what they can to encourage domestic energy production on federal lands. The current RMP does not go far enough in this regard. In fact, I believe it closes too many areas to production. For instance, | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that |

BLM_0012267

| | | | | |
|---|---|---|---|---|
| | | | buffers for endangered species are included that are greater than standard practices (grouse). | best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well as conserving and protecting other resource values for current and future generations.<br><br>The DRMP/DEIS contains alternatives which strike an appropriate balance between environmental protection and development of the mineral resources on our public lands consistent with the requirements of the Mining and Mineral law and FLPMA. The PRMP/FEIS will offer BLM management the flexibility to protect resource values and uses while allowing for acceptable levels of mineral development. |
| | 323 | 1 | I understand that public review deadlines for several other lengthy DRMP and DEIS documents impacting southern Utah are also upcoming in the next few months. While BLM encourages specific comments, preparation of specific comments would require more | See response to comment 124-1 |

263

BLM_0012268

| | | | | |
|---|---|---|---|---|
| | | | time for public review. Therefore, I would like to comment that extended public review period for these many documents would generate more useful comments for the BLM to consider. | |
| | 324 | 1 | 90 days is not enough time to comment on these complex proposals. The time limit must be extended and more public input sought. | See response to comment 124-1 |
| | 334 | 7 | The BLM is ignoring FLPMA in not managing these lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values: that, where appropriate, will preserve and protect certain public lands in their natural condition." | See response to comment 122-9 |
| | 336 | 1 | I hope that you will consider extending the deadling for comments on this plan and the others that are on the street for comment or coming. That way, I can provide more specific comments. | See response to comment 124-1 |
| | 337 | 4 | I am disappointed in how the agency handled the "Public Participation" as required by FLPMA. First, by having RMP's for five other areas in Eastern Utah in some form of public comment right now, you are creating confusion and frustration for the public and stakeholders, thereby probably detracting from the quality of public comment that you will receive. Even worse, you have taken seven years to write this version and now you give the public 90 days. For a plan that covers 1.8 million acres, with a time of over twenty years, this is hardly adequate to gather a wide and deep pulse for how your public would like to see their lands managed. | See response to comment 124-1 |
| | 338 | 5 | The BLM needs to sitck with it's congressional mandate to manage these lands according to the multiple use/ sustained yield paradigm described by law. Allowing OHV enthusiasts, mountain bikers, hikers, equestrians, and energy developers to share these public lands and use them wisely. | Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people. |

264

BLM_0012269

| | 341 | 4 | Please rethink your plans and allow for more public input. | See response to comment 124-1 |
|---|---|---|---|---|
| | 343 | 1 | Given the lack of visibility I was not aware of your efforts to create a Moab DRMP or the deadline for comments on november 30. I read the paper and watch the news. I have seen nothing to indicate what you guys are up to. Is it a secret? | See response to comment 124-1 |
| | 343 | 2 | Poor public notification and short comment period | See response to comment 124-1 |
| | 347 | 1 | Please reconsider your deadline for public comment. The DRMP is a very large, poorly researched document and I feel that those of us with an interest in it have not had sufficient time to give it a thorough review in the time allotted before the public comment period ends. It seems that every special interest group out there is scrambling to get whatever information they can out on the internet for their members to make comment according to. Even they (the special interest groups) aren't completely certain about all the consequences of the different proposed alternatives. Without more time for the public to review the DRMP, I worry about hasty commentary without sufficient thought and review put into it. Also, I worry about the litigation that will surely come about as the BLM attempts to implement the Final RMP due to the short timeline of public involvement and the confusing and conflicting maps. | See response to comment 124-1 |
| | 409 | | The DRMP is unbalanced in favor of ORV users. The BLM DRMP plan for recreation is substantially unbalanced. It is unreasonably weighted in representation of ORV users and does not adequately address other recreational users such as hikers, bikers, and campers. In addition, the plan does not address the fact that the majority of the public is in favor of limiting ORV routes.<br><br>In the scoping summary section 2.1, the BLM lists major challenges facing the planning team. Creating public interest in attending the scoping meetings and reaching | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |

BLM_0012270

those who use the public lands was identified. To combat these problems BLM says that is created a public participation plan to ensure all voices are heard, rather than a dominant fee and contained tactics to draw dialogue from stakeholders representing a cross-section of viewpoints rather than from polarized views. Although BLM recognizes these important elements it fails to carry through with implementing them in the plan. This is evidenced by unilateral reliance on the counties road map to develop the travel plan.

The travel plan involves numerous stake holders and they all need representation.

The Moab BLM responsible for developing the DRMP has admitted that the ORV special interest groups are loud and fanatic. The Moab BLM consulted closely with the county in development of their road plan. In fact the road plan in their preferred alternative is almost identical to the counties plan. According to several people I know in Moab, when the BLM was consulting with the county they spent a substantial portion of time working with a county representative named Jerry McNeely (whom I do now know). Although this can not be substantiated in this document, Moab residents have told me that Jerry McNeely is sympathetic to ORV special interests and that Jerry McNeely did not consider other interests, such as hikers, campers, and mountain bikers when recommending travel routes to the BLM for the DRMP.

When looking through the scoping document it can be seen that the majority of comments were about ORVs and it appears from the document that the majority of comments were in favor of restricting ORV use. Yet when developing the DRMP the entire travel route was prepared with unreasonable reliance of parties with a

266

BLM_0012271

| | | | | |
|---|---|---|---|---|
| | | special interest in ORV trails. | |
| | 409 | Need to consider existing funding and staff for plan management. Several issues were raised through public scoping and described in the Scoping Summary. In the summary is a list of issues beyond the scope of the plan. On that list is "availability of funding and personnel for managing problems." Availability (of more $) is different than EXISTING funding and personnel. And this issue of whether the BLM can manage this plan with the current budget and staff that now exists is a huge part of the success or demise of this plan or any plan. This issue IS a basic tenet of managing all programs in both public and private sectors on a worldwide basis. Therefore, I feel this plan needs to be revised to consider this basic tenet of management. In view of the criticism BLM has gotten for not being able to properly manage the lands with current status, I find it ridiculous to NOT consider it. | See response to comment 124-20 |
| | 409 | Scoping inadequate and does not lead to balanced plan. Federal law dictates that you need to determine who the public is when planning land use. The methods you used to ensure a cross section of representation was not robust enough. For example: a survey would be expected as a legitimate method to define the public "market mix" (a very common definition and practice widely available in worldwide marketing arenas to narrow down the characteristics of a big group).

Your reach was relatively small in the numbers of comments you received in comparison to the annual visitiation per year (1 million visitors with only approximately 6500 comments). This makes me suspect ineffective PR. I realize you sent out the press releases and PSAs etc. But were they effective and did they reach all interested public? For example. Although you had a meeting in Grand Junction, I do not see that you sent press releases or PSAs to other Colorado | The BLM initiated the scoping process with the publication of the June 2003 NOI in the Federal Register. The scoping period lasted from June 4, 2003 to January 31, 2004.  A mailing list for public scoping was developed. A website on the Moab RMP/EIS was continuously maintained throughout the planning process.  Six open houses were held during the scoping period, and several planning bulletins were issued.  The public was informed of the planning process through the media.  The BLM attempted to include the public during the scoping process. |

BLM_0012272

| | | | | |
|---|---|---|---|---|
| | | | media, yet Colorado users are significant. Federal law specifically mentions that in land use revision plans adjacent states should be included. The number of visitors from Denver, Apsen, Durango, and other Colorado towns is significant. Wider representation from Colorado should have been included in the scoping.<br><br>BLM had surveys available to them that would have helped them define "whothe public is" and did not use them. The National Visitor Use Monitoring Study conducted by MFO in 2006. Another survey was published in the Moab Times March, 2005.<br><br>The Scoping document in the table of contents is not complete.<br><br>I would specifically like to know how you address group comments as a percentage of the whole. I did not see this addressed in the scoping document.<br><br>Comments should be categorized in a more meaningful way. For example, on pg. 115, you list 110 letters from Moab open house that want the BLM to close mineral development on land with wilderness values and only 9 letters that want exploitation. I would like to see all comments expressed as a percentage of the whole.<br><br>I would specifically like to know what percentage of the comments were in favor of preserving wilderness characteristics on wilderness character lands. | |
| | 412 | 1 | The time frame for comments on such an important document being so short and our lives being so full and demanding, I would request that you grant an extension period for more comments to be submitted. | See response to comment 124-1 |
| Rising Sun 4x4 Club | 413 | 2 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with | The BLM manages for multiple uses, including all types of recreation, Areas of Critical Environmental Concern and non-WSA lands with wilderness characteristics.  See |

BLM_0012273

| | | | | |
|---|---|---|---|---|
| | | | wilderness character" to create a de-facto Wilderness management are unlawful. Managing increasing acreage of BLM land as 'wilderness-like' not only is a violation of the BLM's mandate, but marginalizes legitimate motorized users into a smaller 'piece of the pie' with increasing per-mile impact. Ironically, this degrades the remaining OHV areas even more. | response to 121-10 and 120-8 for a discussion of wilderness characteristics.  The BLM has provided many opportunities for motorized users within Alt. C of the DRPM/EIS. |
| | 424 | 5 | What authority does BLM have under Federal Law to ignore the majority of the land users (hiking, horse, sightseeing in highway vehicles) in favor of a minority who drive off-road vehicles. What authority does BLM have under Federal Law to give locals much more say in the roads than the rest of the US citizens who equally pay taxes and should have an equal say in land management. What authority does BLM have to only take input on road decisions from the county whose representative openly consulted with 4x4 drivers while never consulting or asking for input from the quiet users, who are the majority of users in the MFO? | See response to comment 124-9 |
| | 425 | 1 | The BLM's present statewide effort, covering the long term management and destiny of over 11 million acres of land, requires more time for study and detailed, informed comment. Indeed, representatives of widely differing and divergent interests have united in requesting an extension which was unjustifiably denied by the agency. | See response to comment 124-1 |
| | 425 | 3 | The travel plan component, in blatant disregard of the agency's own findings regarding lands determined to have wilderness character, and additionally in disregard of lands proposed for wilderness designation in the America's Red Rock Wilderness Act, designates thousands of miles of roads for ORV and motorized access. | See response to comment 124-54 |
| | 425 | 5 | Public opinion overwhelmingly supports non-motorized uses over ORV and mining/drilling access. Land use decisions must be science-based, pursuant to FLPMA and other standards, as opposed to commodity- | See response to comment 122-9 |

BLM_0012274

| | | | based… | |
| | 429 | 1 | Our first comment is the extensive amount of proposed changes that BLM is requesting comment on. We find this to be much too complicated for easy comment. We sincerely believe you are doing an injustice to the public comment period by including such a vast amount of data that needs independent documentation for comment. It would literally take pages and days of work to comment on our concerns on this vast proposal. | See response to comment 124-1 |
| | 438 | 2 | The Comment period for two decades of management for the RMP for such a vast area appears to be a rush to judgment. I recommend that the RMP be withdrawn as it currently stands, to give more time for serious deliberation by the BLM as well as unstampeded public comment. | See response to comment 124-1 |
| NOLS/ Outdoor Industry Association | 487 | 1 | NOLS is compelled to participate in many of them [FO plans], including the Price Supplemental Environmental Impact Statement (EIS) due on December 13, the Vernal Supplemental EIS due on January 3, the Richfield Draft EIS due on January 23, and the Monticello Draft EIS due on February 8. Having so many comment periods open within the same limited time frame will have a negative effect on the quality of comments returned. | See response to comment 124-1. |
| Public Lands Advocacy | 491 | 2 | BLM has ignored the direction contained in Instruction Memorandum (IM) 2003-137, Integration of the Energy Policy and Conservation Act (EPCA) Inventory Results into the Land Use Planning Process, to balance environmentally responsible energy development with sensitive resources.  According to this IM, the MFO is also required to review all current oil and gas lease stipulations to make sure their intent is clearly stated and that stipulations utilized are the least restrictive necessary to accomplish the desired protection. Moreover, the IM directs that stipulations not necessary to accomplish the desired resource protection be modified or dropped using the planning process. | See response to comment 214-9. |

BLM_0012275

| | | | | |
|---|---|---|---|---|
| | | | Nowhere in the DEIS has BLM demonstrated that it met the requirements of EPCA in the Moab land use planning process, i.e., ensuring that access and availability of the public land for energy resources are not unduly restricted.<br><br>In addition, BLM has ignored the findings of EPCA phase II. This report supersedes Phase I of the inventory. It evaluates the Paradox/San Juan Basins and analyzes the additional impact of drilling permit conditions of approval, as required by Section 364 of the Energy Policy Act of 2005. The EPCA II report found this area has more land subject to no leasing than all other EPCA study areas, 57%, more than 10 million acres. Added to that is the 1.6 million acres subject to no surface occupancy stipulations. Specifically, 66% of the Paradox/San Juan Basin is already unavailable for leasing or development. It is of grave concern that 20 percent of all existing federal natural gas reserves and 48 percent of the proven federal oil reserves are off limits to exploration and development. The fact that the DEIS proposed in Alternative C to set aside even more lands is contrary to the direction contained in EPCA II and the National Energy Policy as established in EO no. 13211. We urge BLM to reconsider its selection of Alternative C as the preferred management alternative. | |
| Public Lands Advocacy | 491 | 6 | Comment and Recommendation: The removal of these lands from availability for leasing constitutes a withdrawal. In accordance with FMPLA, only the Secretary of the Interior is authorized to make a withdrawal of lands as described above. The Secretary is also required to provide notice of a proposed withdrawal in the Federal Register, to conduct public hearings on the proposal and to notify Congress of the proposal. Clearly, such a "withdrawal" cannot be made through the resource management planning process. | See response to comment 214-7. |

BLM_0012276

| | | | Therefore, it is necessary for the MFO to either revise its Draft RMP or follow the procedures for withdrawal outlined in FLPMA. | |
|---|---|---|---|---|
| Public Lands Advocacy | 491 | 7 | Comment and Recommendation: The restrictive management proposed in both Alternatives B and C, however, fail to comply with the FLPMA, which required public lands to be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 USC 21a). In addition, the Mining and Minerals Policy Act directs the federal government to "foster and encourage private enterprise" to develop minerals "to help assure satisfaction of industrial, security, and environmental needs." Clearly BLM has ignored these directives just as it has ignored the EPCA Phase II Study, not to mention the energy policy outlined in EO no. 13211. Because this EO directly affects BLM energy decisions and policies in Utah, a discussion of this EO is warranted in conjunction with the Preferred Alternative's effects on energy exploration, development, and production.<br><br>In addition, the excessively restrictive nature of the Preferred Alternative, as well as alternatives B and D, does not allow BLM the management flexibility needed to wisely manage the federal oil and gas program. Therefore, it is essential for BLM to revise its approach by adopting Alternative D which more closely comports with the agency's multiple use mission, complies with current energy status and policies, and recognizes BLM's authority to manage oil and gas development without restoring to broadly applied restrictions designed to thwart reasonable recovery of energy resources. It is illogical to assume that when technological improvements are made, the agency can | See response to comment 210-2. |

BLM_0012277

| | | | | |
|---|---|---|---|---|
| | | | conduct new environmental analyses.  Such an approach is needlessly costly and time consuming and will most likely be done at industry's expense. | |
| | 651 | 1 | You have created new ways to close areas with litigation in the future. Areas of Critical Environmental Concern and Lands with Wilderness Character are a tactic from the "wilderness area study" playbook. The WSA's lingered for years without any action and became de facto wilderness. The more of these categories you create, the more you please the anti-access groups. You only respond to special interest group lawyers, leaving the public to fend for themselves. 'Public lands' seems to be an historical reference with no equivalent in current times. From all alternatives, please drop all references to ACECs, LWCs WSAs, and whatever special categories that you will be using to limit public access. We could appreciate your managing the lands for today's public and for multiple users' per Congressional directives to BLM. It is not obvious from this that will be happening. | See response to comment 121-58 |
| | 656 | 1 | Please add me and my comments to the scoping process. | NRR |
| | 662 | | I am concerned on the timing of your comment period. I do not understand why you are only giving us one month to comment, plus the fact that you have placed that month at one of the most hectic times of the year suspicious of your commitment to public input. | See response to comment 124-1 |
| | 670 | 1 | One of my main concerns is the short time frame for public comment. Ninety days is a totally insufficient amount of time to try and read, digest, and comprehend the scope of the plan which took years to put together. Something of this magnitude needs the ample time it deserves for the public, whom you are serving and who are interested in how the land is used and maintained, to be able to participate in this crucial step. The public comment period is woefully inadequate, unfair and limiting. You claim to look for a balanced approach to | See response to comment 124-1 |

273

BLM_0012278

| | | | | |
|---|---|---|---|---|
| | | | conflict resolution but you cant expect that when you don't allow for the opportunity for a fair and balanced input. A land use plan that has been in effect since 1985 is getting only 90 days for a comment period. That is truly unbalanced. | |
| | 677 | 1 | The current timeframe for responding to your plan is very limited, given the nature of the material, the scope of the uses proposed, and the length of time the resulting plan would be in effect (a long time). In order to read, much less formulate responses to, your Mgmt plan , I request that you extend the comment period for another 3-6 months. | See response to comment 124-1 |
| Moab Solutions | 830 | 1 | I'd like to add my voice to the others calling for the BLM to extend the comment period on the new plan. I liked the way the Tribune put it in last Wednesday's paper. | See response to comment 124-1. |
| Great Old Broads for Wilderness | 941 | 1 | First, I wish to state my dismay that Utah State BLM Director Selma Sierra has refused to extend the comment period for any of the RMPs. This is hardly a way to foster public participation in the planning process! | See response to comment 124-1 |
| | 947 | 4 | I wish I had more time to offer comments in greater debth and detail, but the BLM has seemingly done it's best to limit the time and quality of comments by puttingn no less than six major RMPs on the table at once--again (like this plan) doing a great disservice the very people who own, use, and enjoy these public lands. | See response to comment 124-1 |
| | 950 | 1 | I think the comment period should be opened up again. Ninety days was not adequate time in which to review the huge volume of material covering this historic decision concerning this special Redrock country. | See response to comment 124-1 |
| Californians For Western Wilderness | 952 | 1 | It is a travesty that the BLM is releasing six RMP for the state within a short period of time, expecting the public to be able to comment on them in any meningful way, and only giving 90-day periods for each, with the comments periods all overlapping. This violates the spirit of the National Environmental Policy Act (NEPA). | See response to comment 124-1. |

BLM_0012279

| | | | The scoping period for the Plan was something like 8 months. A similar time frame should have been established to comment on the _____ we urge you in strongest terms to re-open or extend the comment period now. Otherwise BLM's actions come across as being crass political ploy, despite State Director Sierra's comments to the Salt Lake Tribune to the contrary. | |
|---|---|---|---|---|
| Moab Trails Alliance | 964 | 1 | To understand and comment on this draft is a daunting task for anyone other than those intimately involved in the process. I would recommend in the future, that a trusted representative from each of the user groups be hired to review and prepare a position paper that others in that user group could use in formulating their own responses. | Comment noted. |
| | 975 | 1 | Suffcient time has not been allowed for comments. The plans took many years to prepare and are quite detailed. As the BLM is to manage these lands in public interest, more time should be allowed for the public to comment. Because of the limited time allowed for comment, it appears as if the intent is to remove public input on public lands, rather than solicit it. | See response to comment 124-1 |
| | 976 | 1 | BLM should extend the comment period in proportion to the task of trying to evaluate thousands of pages of data and maps in a few months. | See response to comment 124-1 |
| | 1026 | 2 | PDF pg. 57 Letter to the Reader: Makes reference to the decision maker but I can't find out who the decision maker is and what weight will be placed on the input based on what criteria. | The decision maker is the Utah State Director of the BLM. This is the signatory of the "Dear Reader" letter.  That individual is the decision maker. |
| | 1026 | 5 | PDF pg. 75 pg 1-5 Example of double speak with legal terms: Read the first sentence last paragraph, and tell me what it actually means. I have no idea what is said there. | This sentence means that each of the four alternatives were developed to emphasize certain uses or values.  For example, Alt B emphasizes the protection of natural resources, while Alt. D emphasizes the production of commodities.  Alt. C provides a balance between protection and production. |
| | 1026 | 12 | PDF pg 95 Chapter 2.1 table is unreadable. The PDF format is so small that when you blow it up to read the words you are unable to get the full context of where | The 11x 17 page size was necessary to show the alternatives side by side so that direct comparison could be made. |

275

BLM_0012280

| | | | | |
|---|---|---|---|---|
| | | | they apply to the other blocks. This is a classic example trying to read the fine print of a contract. | |
| | 1026 | 27 | The Final RMP should mandate that adaptive management practices be used across the Field Office | Adaptive management merely means using site specific factors to guide future decisions. |
| | 1026 | 45 | The document shows a clear bias against the OHV user group PDF pg. 285 pg. 3-87 3.11.2.7.1 Off-Highway Vehicle (OHV). | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| | 1029 | 1 | The Draft Moab RMP has serious flaws. It gives far too much weight to exploitive and environmentally destructive activities. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management |

BLM_0012281

| | | | | prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|
| | 1029 | 3 | The changes that have occurred between earlier BLM draft plans and the current plan are a betrayal of the broad goals of the BLM and its responsibility to be a steward of the lands for all Americans, for a wide variety of uses, balanced across all regions - not just large extractive industries whose political contributions bias local, state, and federal processes. | The specific changes referred to by the commentor are so vague that a response is not possible. |
| | 1029 | 4 | The limited time available for responses to such large changes are also symptomatic of a process that is being distorted for narrow goals by self-interest groups. | See response to comment 124-1. |
| | 1030 | 3 | P 1-16, section 1.4.8. It seems reasonable to mention the relationship of the MPA to Grand RMP here, unless it was already covered in the description of the planning area (i.e., is there a discussion of the relationship of "old" to "current" terminology for the areas of administrative responsibility – Moab FO vs. Grand RA | The relationship of the current RMP revision to the Grand RMP is explained on the first page of Chapter 1. |

BLM_0012282

| | | | for example.) | |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 14 | The number of NEPA actions at any moment that we would have to evaluate and comment on in order to be involved would total 150 to 180. Recently the route designation process has added considerably to the effort required. It it simply impossible for the public to comment on every road, trail, and NEPA document.<br><br>The 300 page draft environmental document is just too much for the general public to understand and participate in. The size of the environmental document is being used as a mechanism to overwhelm the public and allow the agency to effectively ignore the needs of the public for motorized access and motorized recreation. | The Moab RMP/EIS represents one NEPA action.  See response to comment 124-1 for a similar request for more time to comment.<br><br>The BLM acknowledges that planning is a complex process.  See response to comment 123-14.<br><br>The size of the document is not meant to overwhelm the public, but rather to fully disclose the impacts of each resource on every other resource.  The BLM manages twenty programs, including Recreation, Travel, Paleontology, Air Quality, Lands and Realty, Minerals, Grazing, Cultural Resources, Wildlife, Special Status Species, Special Designations, Watersheds and Soils, Riparian Resources, etc.  To disclose the impacts of each program on every other program necessarily involves much analysis.<br><br>The needs of the public for motorized access and motorized recreation is but one use of the public lands that is managed by the BLM. |
| Colorado 500 | 1032 | 16 | Adaptive Management:  This phrase appears frequently throughout the document.  BLM plans to use "adaptive management" techniquest to correct problems or make changes during the life of this plan.  However, for the travel management proposals, there do not appear to be any standards for determining when management adjustments may be needed.  Please add to the FEIS reasonable, predictable, and feasible standards and triggers to guide future changes that may be needed.<br><br>We realize that in the context of an RMP these standards will be general, and not site-specific.  But there are any number of benchmarks and/or markers that can be set in the RMP to guide site-specific situations. | |

BLM_0012283

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | In other words, we want this RMP to provide a level of predicatability for the business-oriented and the recreating public.<br>The problem with setting those standards now, after the close of comment, is that we will have no public review of the standards.  Therefore, we request that BLM prepare those standards and offer a separate review period in order to provide for that legal necessity. | |
| | 1 | 1 | I am concerned that the public is not being given enough time to comment on the Draft RMPs that will be coming out over the  next several months, beginning in August with the Moab plan. I am writing to ask that you extend the public comment period from 90 days to at least 180, to give people a legitimate chance to refiew the recommendations and make substantive comments. | The BLM provided the public with 90 days to review and comment on the DRMP/DEIS, as required by the BLM land use planning regulations (43 CFR 1610.2(e)).  The standard comment period for a DEIS is 45 days in accordance with CEQ regulations at 40 CFR 1506.10(c). Per CEQ regulations, the BLM planning and NEPA processes are integrated.  Therefore, the BLM provides a 90-day comment period doubling the amount of time for the public to review and comment on the DRMP/DEIS. The BLM made the DRMP/DEIS available, free of charge to the public, in a variety of mediums, including paper, CD, and online.  In addition, the BLM staff has offered to meet individually with groups or individuals to explain the DRMP/DEIS and help focus review and comment efforts. Finally, the BLM held four open houses around the State to facilitate review of the Moab DRMP/DEIS. |

## Recreation

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Colorado 500 | 6 | 3 | I would like the BLM to change the language in the Alternatives and in the Introduction so that BLM's intentions for the Bookcliffs ERMA are fully disclosed.<br><br>From page 1-11 "Introduction" please note that MFO has no wilderness areas of its own; 5,200 acres of the Black Ridge Canyon Wilderness Area lies in the MFO | Under Alt B of the DRMP/EIS, the Bookcliffs are to be managed as a SRMA emphasizing hunting, hiking, and backpacking.  In Alts A, C, and D the Bookcliffs are to be managed as the Moab ERMA.  ERMA management is defined on pg. 2-29.<br><br>On pg. 2-43 of the DRMP/EIS it is stated "Manage the |

but is managed by the Grand Junction Field Office.

Now Please refer to page 2-30, Alternative C, "Manage the Bookcliffs area (335,457 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It would be managed for low frequency of visitor interaction by not establishing new motorized or mechanized recreation routes, no commercial motorized permits would be issued, and competitive events would not be allowed.

Now Please note what BLM has omitted from the analysis:
Although described in glowing ecological terms in Chapter 3, the Bookcliffs are in fact an extremely hostile environment. It is not conducive to pleasurable hiking, backpacking, or equestrian use, because there is no permanent water and it is lethally dry for human habitation (from page 3-2:  The average annual precipitation of the northern section of the MPA is 9.2 inches). BLM accurately describes that there is very little human access. Why?  Because not only is it not unusually scenic, it's not a comfortable place for "traditional pedestrian and equestrian recreation activities. That is why there are few roads, no popular hiking trails and no developed recreational areas.  And with no roads, how can anybody go big game hunting?  Horses need established routes exactly as vehicles do.

Summertime temperatures often exceed 100 degrees with extremely low humidity.... There is no contiguous or even sparse vegetative canopy to provide relief from the relentless heat. Winters are harsh with night-time temperatures dropping well below freezing for sustained lengths of time.  The wildlife is hardy and hostile and presents well-documented dangers to humans and domestic stock.

Black Ridge Wilderness Area (5,200 acres) part of the McInnis Canyon National Conservation Area…"  The Moab and Grand Junction Field Offices have an agreement on the management of the Wilderness Area.

That portion of the Bookcliffs that is within WSAs is managed under the Interim Management Policy for Lands Under Wilderness Review.  In Alt C of the DRMP/EIS no lands are proposed for management to protect non-WSA lands with wilderness characteristics.

Hiking, backpacking, and primitive hunting are human activities which occur with some regularity in the Bookcliffs.

All motorized travel would be managed in accordance with the Travel Plan accompanying Alt C of the PRMP/FEIS.  This plan provides designated travel routes in the Bookcliffs. Motorized travel would be restricted to these routes.

The BLM contends that the affected environment in Chapter 3 of the DRMP/EIS adequately describes in the environment for the Bookcliffs area.

BLM_0012285

| | | | It appears as though the BLM is doing what is called in the trade "manufacturing Wilderness." This is a covert effort to circumvent both FLPMA, which strictly limited the BLM's authority to set aside lands, and more recent judicial proceedings, which affirmed FLPMA and further limited BLM authority to "set aside" lands.<br><br>The closures proposed in this RMP correspond exactly with the polygons of the WSA's in the Bookcliffs, plus enough proximate acreage added by BLM and called "areas with wilderness characteristics outside of the WSA's" to create a large block of land in which human activity is illegal. | |
|---|---|---|---|---|
| Colorado 500 | 6 | 4 | Referring to Chapter III, on page 3-72, MFO states "at least" 1.6 million people visit the MPA per year. That is, one million six hundred thousand people visit because of various and different intrinsic values present in the MPA. On page 3-109 the figure "2 million" visitors is cited. For the purpose of our analysis, we use the 1.6 million numbers. This could be confirmed by presenting the numbers that were collected at the 16 traffic counters that were named in the Analysis of the Management Situation, also called the AMS (a separate document from the DEIS, required by the BLM 1600 planning regulations but in this case was not published as part of the DEIS)> However, BLM has elected to leave out of the DEIS all information about the presence of these traffic counters. BLM relies exclusively upon staff estimates and various regional tourism data. In order that our results be exactly comparable, we will base our analysis on the same material.<br>On page 3-82, table 3.19 sorts recreation activities according to use levels.<br>Since we are allocating land use, we would logically look at the high-use column to see | The BLM acknowledges that it does not know the activity that each and every visitor comes to Moab to enjoy. Furthermore, the Moab Field Office does not know the exact numbers of visitors that come to the planning area. The text in Chapter 3 of the DRMP/EIS states that the field office has "at least" 1.6 million visitors; it is also stated that the actual number may be up to 2 million visitors.<br><br>There are 16 traffic counters in the Moab Field Office. If the commentor wishes to know the locations of these counters, he may call and ask for the locations of these counters. To further understand visitor numbers, the Moab BLM participated in the National Visitation Use Monitoring Study in 2006 (these data are still being analyzed).<br><br>The purpose of Table 3.18 (reference is in error) was to give a general idea of the types of activities that are engaged in by visitors. With so many activities in the Moab planning area, 11% participation can represent a high use activity. |

BLM_0012286

How our limited agency resources would be best utilized.

"River Activities" is found in the high-use column. Here the recreation use numbers on four segments of river in the MPA are provided. Although the DEIS does not say so, we will assume this represents annual river use. The total appears to be 92,000 boaters. The word "boater" clearly indicates individuals, not groups. More than four river segments are described in Chapter 3 but the overlap of use between segments is not reported. Thus, it is reasonable to calculate that the total could be 184,000 boaters.

If the reader does the arithmetic using the numbers provided in the DEIS, boaters constitute 11.5% of one million six hundred thousand visitors.

Because Table 3.19 sets forth three undefined categories: "high, medium, and low," placing the 11.5% in the "high use" column clearly indicates this high use relative to the uses names in the "medium" and "low" columns.

Accepted. However, bear in mind the perception shift when the phrase "high-use" replaces "eleven percent." Flowing from that, bear in mind the degree to which that shift may affect development of all the proposed actions.

To further define the activity proportions provided in table 3.19, hiking is also listed as a "high use" activity. Yet how to calculate the actual number of hikers visiting the BLM lands in the MPA? The usual Agency method is to count vehicles at trailheads, and to count visitor contacts, but the known results of this method always produces an undercount. The only government agency attempts to quantify the accuracy of this method revealed that personal contacts with visitors, even when it is the only job assigned to a park ranger, will touch just 10% of the total visitors (Applegate & Hamilton; USDA Forest Service Mendocino N.F. 1993

BLM_0012287

| | | | | |
|---|---|---|---|---|
| | | | Annual Report to the State OHMVR Division). For the purpose of the recreational land use allocation on two million acres of public land, we prefer calculations that might provide a stronger basis for decisions affecting more than one million people. | |
| Colorado 500 | 6 | 5 | The Moab BLM lands are not one contiguous maze of beautiful canyons and wind-sculpted cliffs. Mostly it is thousands of miles of dirt roads, vast, featureless and sparsely vegetated acreage (just one example to provide proper evidence for our point here: DEIS page 1-162 states, "desert shrub" covers 41% of the BLM lands in the MPA; that is greasewood, shadescale, saltbrush, blackbrush; these species survive in alkaline and salty soils…and they are not scenic. That is to say, people coming from Oregon or Kansas or Washington D.C. do not come to see the greasewood). Hostile desert temperatures (see page 3.1.2 Climate, from Western Regional Climate Center 2004 Temperatures and precipitation for meteorological stations in Eastern Utah), no shade, no permanent water, and no reliable maps. With description in mind, it must be admitted that most of the BLM lands in the MPA are not an attractive hiking destination.<br><br>Hiking as an activity, does not commonly occur throughout the BLM lands in the MPA. To develop a successful recreation program for pedestrian activities such as hiking, it must be kept in mind that the vast majority of hikers arriving in a desert environment want a marked trail that is short and predictable, and that as a rule, a recreation hikers do not hike alone in unmarked territory, and even more reliably, hikers want a scenic or remarkable destination for their hike.<br><br>Furthermore, if 1.6 million people were hiking elsewhere off of the popular hiking trails, we would find user-made hiking trails on every acre of the Field | Hiking is a very common recreation activity in the Moab Field Office. The preliminary National Visitation Use Monitoring (NVUM) study data indicate that hiking is the single most commonly engaged in activity in the Moab planning area. (The NVUM study was done in the Moab Field Office using the U.S. Forest Service data-gathering system. It involved actual random interviews with visitors).<br><br>There are many popular hiking trails in the Moab planning area on BLM lands, including Corona Arch, Negro Bill, Fisher Towers, Amphitheater Loop, Hidden Valley, and others. The trail register data for the Negro Bill Trail alone shows that over 25,000 people per year hike the trail. The BLM stands by its assertion that hiking is a popular recreation activity in the Moab planning area. |

BLM_0012288

Office, because user-made trails are a manifestation of demand. We do not find any new user made hiking trails because the best places to have hiking trails in the MFO are already occupied by hiking trails. What we do find is vast starches of lands under the MFO jurisdiction with no footprints on them whatsoever. Literally tens of thousands of acres and the only tracks are roads, used exclusively by motorcycle, ATV, and 4 wheel drive motor vehicles. No footprints. None.

If the reviewers of this document disagree, we want you to provide factual evidence that this description is not true.

So. Because we know that the hiking trails on BLM could not possible be occupied at the rate of 50,000 people per mile, stretch that out over a season. Let's say that BLM hiking trails receive use on the order of 50,000 people per mile per season, and a season is seven months of the year as noted on page 3-72 in the DEIS. That gets the on-the-ground population of hikers down to 1,786 per weekend, at the occupancy rate of 89 people per mile. The trails would be occupied at a rate of one hiker every 60 feet. That is still only 3.125% of the total visitor-ship to the MPA.

Imagine only taking a hike and meeting someone every 60 feet. Does this amount of hiking actually occur? It can be safely assumed that it does not, because CEQ regulations require that wherever it is available, document and factual information be used to develop the "Affected Environment" chapter, and BLM 1600 Planning regulations require documented, factual information be used to develop the "Analysis of the Management Situation (AMS). It is unlikely in the extreme that MFO staff would conceal those kinds of numbers.

So, we can use the old fashioned person-contact-&vehicle-count method that we know always results in

284

BLM_0012289

| | | | an undercount, or we can estimate according to the maximum carrying capacity of the present hiking trails, but either method, the actual number of people who hike in the MPA very likely amounts to about 5% of the 1.6 million visitors per year. | |
|---|---|---|---|---|
| Colorado 500 | 6 | 6 | Camping is also found in the "high use" column, so let's do the numbers for developed camping opportunities. Conspicuous by its absence in the DEIS, are the actual number of fee-paying campers at the 22 fee campgrounds. This is a significant omission. Without any hard numbers, the reader must extrapolate using the information that is provided: According to the MFO recreation website, there are 450 campsites (including the fee sites), with a vehicle limit of 2 per site, and using the most generous standard visitor-use multiplier of 3.5 people per vehicle this adds up to 3,185 people per weekend if every site is at the legal occupancy limit, Multiple that by 28 (weekends in the seven-month season see page 3-72), and we have 89,180 people stashed in the campgrounds each year. Add another 40,000 people for the people who are there during the week or who don't pay their fees or who pack too many people into their campsite, that gives us 129,000 people camping in developed sites. That's another 8% of the MFO annual visitor-use of 1.6 million.

If we assume that the hikers and the people in the developed campgrounds and the boaters are discrete groups to be counted separately, all of the above named activities together amount to only 22.6% of the 1.6 million people that visit Moab BLM land each year.*

** (Find another way to calculate it. Or, please provide hard numbers of actually counted people to support the statement in Table 3.18. If there are no hard numbers please add this statement to the "Affected | The purpose of Table 3.18 in the DRMP/EIS on pg. 3-80 is to show the range of activities that visitors are engaged in within the Moab Field Office.   A general range of use levels was provided based on available data including actual observations from BLM staff.

The BLM does not accept the calculations that the commentor has performed.  The note at the Table 3.18 clearly states that this list was provided by BLM staff. There is no claim that these estimates are based on actual visitor accounts.  See also response to comment 122-3.

The numbers of paying campers visiting the Moab Field Office is publicly available information.

There is no attempt in the DRMP/EIS to not provide for lower use activities.  For instance, two Focus Areas are provided for Basejumpers in Alt C which are a very low use group. |

BLM_0012290

| | | | Environment:" NO ACTUAL VISITOR NUMBERS ARE AVAILABLE TO SUPPORT THE INFORMATION IN TABLE 3.18. | |
|---|---|---|---|---|
| Colorado 500 | 6 | 7 | In the calculations above, the three activities [boating, hiking, camping] described are afforded the benefit of being counted as three discrete groups, entitled to their own numbers. It is more likely that there is a tremendous overlap, given that most of the developed camping areas are near rivers and notable natural features.<br><br>Recall if you will, these activities are analyzed because they are listed in the "high use" column of Table 3.18 on page 3-80.<br><br>If hiking, at 3.1 % and boating, at 11.5%, and camping, at 8% of the total are considered "high-uses," then the number of people participating in the activities in the "low-use" category must be minuscule. The entire list in the low-use category could not make up the difference.<br><br>With no actual numbers to work with, the reader might guess that each of those eight activities in the low-use column might constitute 2% each of the totals, combining to claim 16% of the 1.6 million people, or another 25,600 people. Remember, BLM placed the activities in the "low-use" category. They must, by implication, constitute smaller percentages than anything else in the other two columns.<br><br>In other words, the three "high-use" activities (hiking, boating, and camping) are placed into the same high-use category as something else---and that "something else" accounts for 80% of the activities that people come to Moab BLM to pursue.<br><br>Looking for more clues about what people do on Moab | The National Visitor Use Monitoring Study (NVUM) was completed by the Forest Service in 2006. The data gathered from visitors during that year using random sampling has not been fully analyzed. Table 4.67 provided some very preliminary data from the NVUM study. These preliminary visitor activity data were provided in Chapter 4 of the DRMP/EIS for analysis and because the Moab Field Office have fielded many questions regarding visitor activities. There is a wealth of other data in the study which will be available to the public at the time of its publication. When complete the NVUM study will be available for the Moab BLM on the US Forest Service website. In the interim, a draft copy of the study is available by contacting the Moab Field Office. See also response to comments 122-2 and 124-2.<br><br>The NVUM data provided in Table 4.67 do not support the claims made by the commentor.<br><br>NVUM data were gathered only on visitors to BLM lands. Visitors were asked where they had recreated. Only those visitors who had recreated on BLM lands were interviewed. National Park, State Park or Forest Service visitors were not interviewed for the NVUM Study and data from these visitors are not included.<br><br>The BLM has no evidence that interest in hiking, camping or boating is waning. The preliminary NVUM data support these conclusions. |

BLM_0012291

BLM lands, we find on page 4-192 of the DEIS Table 4.67 "Recreational Activity Participation." The table is described in Chapter 4 as follows:

"The National Visitor Use Monitoring Study, completed in the MPA in 2006, provides reliable data on user group participation. Visitors were asked what their "main activity" was while visiting Moab, and what activities they were participating in during their visit. The numbers in Table 4.67 show what activities visitors engage in as a percentage of use."

This table is reporting on the "MPA" or, the Moab Planning Area. What is the MPA? According to Map 1-1, "Planning Area," and on page 1-2 to quote: "The MPA encompasses Arches National Park, Dead Horse Point State Park, the La Sal Mountains of the Manti-La Sal National Forest, and the Uintah/Ouray Indian Reservation."

No source for this study is provided and it is not readily available to reviewers of the Moab DEIS. If this survey was professional done, the resulting data would far exceed the scant information provided by Table 4-67, thus what is provided in the table is clearly compressed and arranged by MFO staff, The absence of any information about where this survey was physically conducted is conspicuous and by itself, invalidates the words "reliable data" in the context of BLM managed lands.

The phrase "while visiting Moab" can mean only one thing; the respondent is in or very near to the town of Moab. Why? Because any organization trying to acquire sufficient numerical data to do a "study" of human activity patterns is going to go to where the highest densities of humans are.  The proximity and

BLM_0012292

paved-road access of Arches National Park for exclusively nonmotorized and scenic driving on improved roads will unequivocally skew the numbers toward nonmotorized activities such as "hiking, backpacking, relaxing, viewing, camping and scenic driving" (on improved roads).  Furthermore, Moab itself is not a popular starting point for backpacking, so it is even more critical that we know where this survey was taken and where the "backpacking" numbers fit in, as we already know that the vast majority of the BLM lands under examination in this RMP are not suitable for backpacking or equestrian activities.  The reader is left to wonder if this "study" is appropriate to BLM managed lands at all, because it is hard to find a connection between the 1.6 million BLM visitors and the respondents to this survey.  We need the EIS writers to help us here, yet they conspicuously do not.  Do all 1.6 million BLM lands visitors pass through the town of Moab?  Surely MFO staff does not think any reviewer of this document will believe this.  We request that this study be presented in full in the appendix, including the source and the methodology.  The reason is, in its current presentation, this study odes not appear to provide accurate information for planning decisions on BLM managed lands.  If MFO staff has selected data that is inappropriate to BLM managed lands, a long term mis-allocation of resources will result.  If the presentation of the entire study reveals that it is not appropriate to this DEIS, we request that the study be removed from the document and its conclusion must not be used in this analysis.  So how do we figure out what people are doing when they visit BLM lands in Moab?  The DEIS writers do supply us with solid numbers for the tourism-related tax trends. Table 3.35 on page 3-19 reveals that the total Gross Retail Sales in Grand County (not just the town of Moab) have continued to climb between 1997 and

| | | | | |
|---|---|---|---|---|
| | | | 2003.  So, people are visiting.  Continuing on page 3-109 the DEIS writers state: "Visitation to the Grand County area, outside of BLM lands, follows the traveler-spending trend, as it increased throughout the 1990s and has leveled off in the new century.  The following table shows visitation numbers for several locations in Grand County that can be used as indicators for visitation to the area."  This is a rather astonishing misstatement, because the table that follows on page 3-110, Table 3.36, "Visitation Trends," does not support the writers' statement that visitation has followed visitor spending trend.  Comparing the figures in Tables 3.35 and 3.36 reveals that while visitor spending has climbed slightly, visitation to the parks (Arches, Dead Horse, and Canyonlands) has dropped, and dropped rather precipitously in the "new century."  Please correct this false statement.  And we are still asking the question, what are those 1.2 million "other" visitors to Moab BLM doing?  They are clearly losing interest in passive activities like "scenic driving" and in the hiking opportunities and developed camping opportunities offered int eh parks shown in Table 3.36.  Yet plenty of non-residents are still spending money in Grand County. | |
| Colorado 500 | 6 | 8 | Now please refer to 3.11.1.2.1 The Colorado Riverway.  QUOTE: "The Colorado Riverway includes the public lands managed by the BLM in the following areas:  Along the Colorado River and Utah Highway 128 from Dewey Bridge to U.S. 191, including Negro Bill Canyon Trailhead, Onion Creek, Castleton Tower (Castle Rock) and Fisher Towers.  Utah Highway 128 is a State Scenic Byway, and is also a portion of the Prehistoric Highway National Scenic Byway.  Along the Colorado River and Utah Highway 279 from Moab Valley to Canyonlands National Park, including Wall Street, Poison Spider Trailhead and Shafer Basin.  Utah Highway 279 is a State Scenic Byway.  Along | Fee recreation programs are not a planning issue, but are rather regulated by the Federal Land Recreation Enhancement Act. The camping and boating programs management by the Moab BLM are self-funded. Campers at developed campgrounds pay fees which are used to maintain the campgrounds.  Boaters pay for the operation of the boating program.  The activities referred to by the commentor receive less of the "attention" because they do not generate fees for the maintenance of these activities.

Throughout the DRMP/EIS, motorcycling, four wheel driving and dispersed camping are provided for.  Alt C of |

BLM_0012294

| | | | | |
|---|---|---|---|---|
| | | | Kane Creek Road from Moab Valley to the block of state land south of Hunter Canyon, including Amasa Back totals 76,503.35 acres.  A very small portion of this area (Dewey Bridge to Castle Creek) is within the Colorado River SRMA, with the great majority of the Riverway lying within the Grand ERMA.  The Riverway is the most popular destination of MPA visitors, with recent visitation estimated at approximately 1.04 million people.  Visitors engage in camping, hiking, four-wheel driving, scenic auto touring, mountain biking, bouldering, BASE (Building, Antennae, Span, Earth) jumping, rock art viewing, dinosaur track viewing, rock climbing, and rafting and boating within the Colorado Riverway."  ...while we do not dispute BLM's statement that this is a very popular area, we do think that by working backward from the estimate to the carrying capacity of the geographical area, 1.04 million people cannot possibly want to return for an enjoyable relief from the confines of urban life, because it would be like going to New York City without the buildings.  ...by withholding the actual counter numbers, and providing only "estimates," BLM has created an un-credible scenario.  It is not our intent to declare that 1.6 million do not visit.  It is our intent to use the information provided by BLM in this analysis to demonstrate that because the heavily used areas require so much detailed and expensive Agency attention (campgrounds, restrooms, boat launches, permit systems), BLM has failed to account for an entire demography which requires almost no attention: Long-distance off-road driving, using motorcycles and 4WD vehicles, and dispersed camping in self-contained travel trailers and motor homes. | the DRMP/EIS provides 280 miles of motorcycle route, and over 3,000 miles of four wheel drive routes.  The Moab planning area has over 1.6 million acres that are available for dispersed camping.  A great deal of "attention" has been paid to these recreation users in the DRMP/EIS. |
| Colorado 500 | 6 | 9 | Why do we say this is (visiting Co. River SRMA) is what the other 1 million people are doing?  To answer this question, we do have hard numbers, supplied by the writers of this DEIS.  On page 3-84, we learn that | OHV registrations have increased in both Utah and Colorado since 1998.  This is acknowledged in Chapter 3 of the DRMP/EIS.  Percentage increases do not always mean greater raw numbers than for other types of users, |

BLM_0012295

Utah OHV registration has jumped 207% statewide, and 305% in Grand County during the same time frame the above non-motorized and "passive" visitation has dropped.  (Table 3.36)  Conspicuous by it  absence in the DEIS is any mention of the increase of OHV registration in Colorado (recall page 3-84 of the DEIS:  "It is important to note that the majority of OHV and dirt bike users on the Moab BLM lands are residents of Colorado").   Because the Moab DEIS has omitted any information about Colorado OHV visitors, we will use The NSRE 2000-2003 Colorado Outdoor Recreation Study (SCORP) for hard numbers about Colorado trends.  On page 37, Table 7, they found a 37.28% increase in "land resource-based activities." Table 8 shows a 37.44% increase in trail/street/road activities and in the same chart, "outdoor adventure" saw a 31.41% increase.  According to this study, between 1995 and 2003 the number of people participating in the activity called "primitive camping" increased by only 6% while Colorado OHV registrations increased by 223%.  We think the DEIS writers provide us with a highly suitable description of the phenomena that is occurring, on page 10-25 of the AMS: QUOTE:  "It may be surprising to some that the Moab FO area receives more visitors than the surrounding national parks (see Table10-5).  However, many of the activities that visitors come to the Moab area to enjoy can only be done on public lands.  For instance, OHV activity, mountain biking, rock hounding and other such activities are available on BLM land, and not on national park lands.  In addition, once visitors come to the area to visit a national park, they find that there is a much larger land area available for recreation outside those national parks."  The sheer remoteness of what these folks discover poses a different problem for BLM planners:  how do you count those people?  The answer is, the Moab Field Office

however.  In addition, there ris anecdotal evidence that registrants in Utah have increased since 1998 due to more compliance with registration laws. The BLM does not accept the commentor's statement that "passive" visitation has dropped.  At the same time, the BLM acknowledges that registrations have increased.

Alt C. of the DRMP/EIS provides recreation opportunities (in 30 Focus Areas) for all types of recreation activities, both motorized and non-motorized.

The Moab Field Office has or has had traffic counters throughout the planning area, including in popular OHV areas such as the road to White Wash, Ten Mile, the Kane Creek Road and Cameo Cliffs OHV SRMA.  The National Visitor Use Monitoring Study sampled visitors throughout the field office area, including motor home users engaged in dispersed camping.

BLM_0012296

| | | | | |
|---|---|---|---|---|
| | | | apparently does not. The MFO has no traffic counters on the roads that access the start points for these sorts of trips, or, if they do, they have omitted them from this analysis. MFO has no counters on the popular motorcycle trails. MFO has no counters on the prime long-distance routes that people come from all over the world to ride. And MFO has never surveyed any visitors in their self-contained motor homes in the remotest parts of the Moab Field Office. | |
| Colorado 500 | 6 | 10 | To summarize: Between 1997 and 2006, 1. Visitation to Arches N.P. (non-motorized) has dropped 11.5% (DEIS Table 3.36) 2. Visitation to Dead Horse S.P. (non-motorized) has dropped 20% (DEIS Table 3.36). Visitation to Canyonlands NP (non-motorized) has dropped 13.5% (DEIS Table 3.36) . Interest in primitive camping in Colorado increased by only 6% (Colorado SCORP 2003) 5. OHV registrations in Utah have increased by 205% (DEIS Table 3.21) 6. OHV registrations in Colorado increased by 223% *Colorado SCORP 2003) 7. Interest in "outdoor adventure" increased by 31.4% Colorado SCORP 2003) 8. Interest in "trail/street/road" activities increased by 37.44% (Colorado SCORP 2003) 9. Moab BLM lands provide the essence of trail-dependent outdoor adventure by virtue of the vast unmapped road system and hostile desert environment (DEIS Page ES-7) 10. Tourism-dependent revenue in Grand County has remained steady (DESI Table 3.35); 11. MFO has no visitor numbers for BLM lands outside the developed activity areas 12. The source citation for Table 3-18 page 3-80, "Activity by Use Level" states that these proportions are purely anecdotal, and note derived from any factual source such as traffic counters or surveys. 13. BLM's visitation estimates for the "most popular" BLM sites are so far beyond those sites' carrying capacity that the estimates are not credible. These thirteen items together reveal the flaw in the | The Moab BLM did not have accurate numbers on the activities engaged in by visitors when the planning process started. That is the reason why activity use levels in Table 3.18 are classified as "High", "Medium and "Low". If exact use numbers were known, exact use numbers would have been provided in the table. See also response to comment 122-3.

Since the inception of the planning process, the Moab BLM office was a pilot office for the implementation of the National Visitor Use Monitoring study that is standard operating procedure in Forest Service areas. Preliminary data were available at the time of the DRMP/EIS. Since the largest unknown recreation factor was activity use levels, the preliminary data were supplied from the NVUM study in Table 4.67 regarding the percentage of BLM visitors engaging in various activities on Moab BLM lands. BLM lands in the planning area were surveyed, including the backcountry and dispersed areas mentioned by the commentor. The data in Table 4.67 represents the best information that the BLM has regarding the activities that its visitors engage in during their stays in the Moab area.

The DRMP/EIS provides for the needs of motorized users, as is evidenced in the 3,693 miles of four wheel drive routes and the 282 miles of motorcycle routes. Visitor numbers were not an indicator of how much attention should be paid to the activities of various |

BLM_0012297

| | | | analysis: When the factual information is placed alongside the voids in information, without hundreds of pages between them, we find some very strong clues. There are 1.2 million visitors to Moab BLM lands who are not camping, hiking or boating. These "new century" recreationists appear to want to participate more actively in their public land experience, and off highway vehicles are clearly one of the primary instruments of this demographic and cultural shift. II. What to do about it. What are we asking for, now that sufficient doubt has been cast upon the visitor activity numbers as presented in the Draft EIS? We will only ask for things that are possible for the BLM to accomplish within the scope of this analysis, in order to produce a timely and defendable Record of Decision. The details and citations supporting the following six requests begin on page 13. I. Recall from the above analysis of hikers and hiking trails that user-made trails are a manifestation of demand. Cutting the available mileage in half for any user group will resolve none of the problems set forth in the Purpose and Need statement. Therefore, we want to have all existing road and trail mileage designated by this decision. We will provide peer-reviewed research to assist BLM in justifying this change. Incorporated into this change we fully expect the BLM to conduct site specific analyses (during the decision steps that follow the Record of Decision) of any routes or areas that BLM considers resource problems. If time permits, there may be some areas that this EIS will analyze in sufficient detail to enable a change in designation with this Decision. II. We want all of the motorcycle single-track maps submitted by the public during this comment period to be placed into the designated trail inventory, including but not limited to the routes submitted by the Colorado 500 in separate comments. III. We especially want the BLM to abandon the major | visitors. If that were the case, BASEjumping (with its low visitor use numbers) would not be provided for at all.<br><br>All of the motorcycle trails that were submitted by the public during the scoping period and were verified on the ground by BLM staff were considered for designation in the alternatives for the Travel Plan. As described in Appendix G of the DRMP/EIS, the purpose and need for each route was weighed against possible resource conflicts. See response to comments 124-71, 122-15 and 122-30 for a description of the Travel Plan process and on how to add new routes after the Travel Plan process is complete. See the response to comment 208-2 for an explanation of why all inventoried routes are not found in Alt. C.<br><br>There are 282 miles of motorcycle routes designated in Alt C.<br><br>A planning bulletin was issued during the scoping period of the land use planning process to interested parties that specifically asked the public to submit all route data in a timely manner. All data submitted by the public was considered during alternative formulation. See Appendix G for an explanation of the travel planning process and for a list of those who submitted route data. No trails were "withdrawn" from consideration. All motorcycle trails were not designated in Alt C because some of them posed unacceptable resource conflicts. For instance, the motorcycle route along the Hidden Canyon Rim had unresolvable conflicts with cultural resources. This route was not designated for use by either motorcycles or by bicycles. The motorcycle routes on the top of Duma Point were inventoried and verified by BLM staff. They were not designated because of conflicts with bighorn sheep escape terrain. |

BLM_0012298

| | | | | |
|---|---|---|---|---|
| | | | change of course that omitting 271 miles of "motorcycle trail" represents.  This mileage was named in the AMS as "motorcycle trail," and "Motorcycle trails" were discussed during the time the "scope" of this analysis was being determined.  We consider this omission a questionable change of course because the mileage was withdrawn after the public could no longer provide input, and after the time that is customarily available for dialogue between the affected public and the BLM ("scoping").  This withdrawal was apparently initiated by staff with no explanation or legal authority for doing so.  IV. We want the BLM to abandon certain management concepts that this Draft EIS newly introduces to public lands recreation management, as described in Appendix F and called "Activity-Outcome-Benefit" charts, upon which many of the land allocations have been created.  These concepts fall outside the authorities as set forth in FLPMA and BLM 1600 Handbook, and they are confusing to the public.  In a separate comment we will provide an explanation for this request that will sufficiently justify dropping those concepts without changing any of the major outcomes desired by BLM in this EIS.  V.  We want the BLM to revise the discussions in Chapter 3 that relentlessly repeats that people using motor vehicles are the cause of 80% of this "problem" that BLM calls "user conflict," because the fact is, at least 80% of the visitors are using motor vehicles as the primary instrument of their visit.  VI. We want the BLM to review the references used in support of the Analysis, and remove all inappropriate, obsolete, or mis-used research.  We will be happy to provide current research to guide staff as they strive to avoid decreasing MFO's present road and trail carrying capacity. | The management concepts described by SRMA in Appendix F are required by BLM policy.  The Land Use Planning handbook (H-1601-1) requires the BLM to identify, for each SRMA, the recreation opportunities, outcomes and benefits.  The manual further requires the setting character to be delineated.  The commentor is correct that this is <br><br> new; the previous planning manual did not require these items to be identified.  However, the planning manual that was issued on March 11, 2005 (Appendix C, pg. 15) requires the identification of these concepts. <br><br> The BLM has received reports of user conflict from visitors.  BLM staff have experienced user conflict in the field.  The BLM does not lay blame for these conflicts with any one group.  The issue of user conflict was raised by the public during scoping, and the BLM is required to address user conflict as an issue in the development of alternatives.  The list of instances of user conflict in Chapter 3 was provided to address user conflict as a part of the affected environment. <br><br> The BLM is not aware of any inappropriate research in the DRMP/EIS.  There is no attempt on the part of the BLM to deliberately decrease the Moab Field Office's road carrying capacity.  The BLM worked closely with its county cooperators (Grand and San Juan counties) to provide a transportation system that accounted for the recreation uses of roads by the public.  For instance, all Jeep Safari routes are in Alt C, as are almost all routes used regularly by recreationists.  The BLM consulted guidebooks and commercially available maps to ensure that these routes were included, for the most part, in the Travel Plan accompanying Alt. C.  See also response to comments 1031-5 and 1031-6. |
| Colorado 500 | 6 | 15 | We take serious issue with this newly evolved "mission" called "MFO's benefits-based recreation | See response to comment 124-104.  BLM policy requires field offices to consider the benefits that accrue to visitors |

BLM_0012299

| | | | | |
|---|---|---|---|---|
| | | | management goals and objectives… for the proposed SRMAs." (page 4-190).  1.  Benefits-based recreation management does not flow from the Purpose and Need.  2.  Benefits-based recreation management does not flow from the NOI.  3.  Benefits-based recreation management does not flow from the Scoping.  4.  Benefits-based recreation management adds a burden of analysis to this RMP that lies outside the professional expertise of BLM specialists.  5. Benefits-based recreation management lies outside the authority of BLM.  There is nothing in FLPMA or NEPA that requires BLM to sort visitors according to "user groups" and then expend government resources upon assuring their satisfaction.  6.  In the context of applying the concept to the MFO for the purposes of making land use allocation decisions, the ID Team ahs not used any factual evidence. Professional judgment is professional because it uses a mix of an individual's professional training, peer-reviewed research, factual information from the area under study (monitoring, for example, or the Administrative Record), and their person's experience.  This person's "Professional judgment" is also expected to be a) confined to that person's area of professional expertise and b) reasonably consistent with the research and factual information available in this person's area of expertise. If we do not hold government specialists to these standards, there is nothing to prevent them from simply making up management plans based on their own personal favorite activities.  The narrative on page 4-190 is very sophisticated, but it looks like it was written to do exactly that.  Remedy that would resolve this comment:  We want BLM to abandon the entire "benefits-based" management concept. | from its decisions and actions.  Benefits based recreation management does not lie outside the authority of the BLM.  The BLM has incorporated benefits based management throughout its recreation program. "Recreation and Visitor Services (BLM): A Unified Strategy to Implement BLM's Priorities for Recreation and Visitor Services" guides BLM national policy.<br><br>Washington Office Instruction Memorandum IM 2006-060, "Incorporating Benefits Based Management Within Recreation and Visitor Services Programs" directs BLM field offices to utilize benefits based recreation management in planning for recreation use on BLM lands. The purpose of this IM is given: "Purpose: This IM affirms the Bureau of Land Management's (BLM) program direction approved by the Executive Leadership Team (ELT) to adopt an expanded conceptual framework for planning and managing recreation on public lands. Strategies and policy for planning and managing recreation-tourism use is described in two key documents: "The BLM's Priorities for Recreation and Visitor Services" (see WO IB No. 2004-072) and in Sections II.C and II.D of Appendix C to the Land Use Planning (LUP) Handbook (H-1601-1, Release 1-1693, dated March 11, 2005).  The BLM's recreation constituents and gateway communities have affirmed these changes are appropriate direction for the future management of recreation and visitor services at both the 2004 BLM National Recreation and 2005 Western States Tourism Policy Council forums."<br><br>The Moab Field Office has been directed by BLM policy to use benefits based management. |
| Colorado 500 | 6 | 16 | Please refer to page 4-292, 4.3.13.7 paragraph 2. Quote:  "Where proposed under the alternatives, control of human waste through installation of vault | The BLM has no authority to favor one type of camping over another.  BLM staff recognize that motorhomes and travel trailers have sanitation facilities. |

BLM_0012300

| | | | | |
|---|---|---|---|---|
| | | | toilets in high-use recreation areas generally would benefit water quality by reducing E. coli contamination and nutrient-loading of surface waters.  Designation of camping areas generally would limit the surface disturbance that results from dispersed camping and unofficial fire pits and, thus, would limit adverse impacts to soils." End Quote.  In another comment we requested that you revise the Affected Environment --- (specifically, 3.11.2.72.2 "INADEQUATE FACILITIES/PUBLIC HEALTH AND SAFETY  The availability of facilities is directly related to public health.  Inadequate numbers of organized campgrounds and restroom facilities contribute to unhealthy levels of human waste in some areas, posing a health risk to visitors.")  ---and the Proposed Actions, to encourage the use of self contained motor homes and travel trailers for the specific purpose of addressing these problems in undeveloped camping areas.  ...we make the following requests for revisions to the FEIS and the Proposed Actions:  1.  In the analysis and in all the Proposed Actions, we want you to emphasize the sanitation advantage of self-contained travel trailers' and motor homes.  2.  In the analysis, we want you to emphasize the fact that people who camp using self-contained travel trailers and motor homes do not "need" campfires, and considering their extra carrying capacity, these people are far less likely to build "unofficial firepots:" because they can bring their own firepans and firewood if BLM so requires.   4.  We want this analysis to acknowledge and take into consideration that reduced access will discourage these vehicles. | Motorhomes and travel trailers generally use routes that are maintained.  All B roads, which receive regular maintenance, are designated in all of the action alternatives.  These B roads lead to a myriad of dispersed camping opportunities for motorhome and travel trailer users.

The great majority of routes that are not designated in the Travel Plan accompanying the PRMP/FEIS are routes that in such poor condition that they receive very little use (thus having no purpose and need).  Neither travel trailers nor motorhomes are able to negotiate these routes, so dispersed camping opportunities have not been removed.

The routes designated in the Travel Plan offer ample opportunities for dispersed camping. |
| Colorado 500 | 6 | 17 | Please refer to Appendix F.2 Special Recreation Management Areas beginning on Page F-3.  In these Tables, MFO staff attempts to compare the experience associated each activity, in order to determine a "targeted outcome" whose "benefits" will help | See response to comments 123-4 and 124-104 for a discussion of Appendix F.

The list of preparers includes those with advanced degrees in socioeconomics. |

BLM_0012301

determine the management and resource allocations for each activity. First of all, BLM has failed to establish a coherent relationship between the need to sort people this way and RMP planning.
Even worse than irrelevance, however, is that in the list of preparers for this DEIS, no professional sociologist is listed.  In the literature cited there is no peer-reviewed, broad-based sociological works that might give these tales at least an air of professionalism.  Neither in the Appendix to this document or in the Analysis of the Management Situation are there any peer-reviewed site-specific surveys of all types of visitors to the BLM lands in MFO jurisdiction.
And finally, BLM has provided no evidence -- not even evidence collected by amateurs -- that these "benefits" are not completely interchangeable between activities.  Indeed, entering the arena of the psychological and personal values of the individuals who recreate on BLM lands places a significant burden upon this analysis, by widening the scope of its inquiry into an area that lies far outside the mission and expertise of the agency.
If the agency should pursue this aspect of the inquiry, we want the following changes made:
a) Cite the law, regulation, or Executive Order authorizing the agency to promulgate new regulations that segregate recreational visitors according to the local Moab FO staff perceptions of the value of each type of visitors' personal experience
b) Provide empirical and physical evidence, in the form of a peer-reviewed field and sociological research including user surveys with peer-reviewed question formulation and accurate sample sizes for every type of public land visitor, to confirm that these emotional differences actually exist and are in fact significant enough to expend government resources on allocating

See response to comment 6-15 for a discussion of the BLM's benefits based management recreation and visitor services policies.

User conflict was an issue raised repeatedly by the public during scoping, and the BLM is required to address issues raised by the public.  See also response to comment 6-12.

The BLM's Land Use Planning Handbook (H-1601-1) requires that "discrete Recreation Management Zones" (which are called Focus Areas in the Moab DRMP/EIS) must be delineated in each SRMA.  In addition, Recreation Management Zones are extensively defined in the land use planning document.  "To address these four variables within each RMZ, make the following land-use allocation decisions: 1) identify the corresponding recreation niche to be served; 2) write explicit recreation management objectives for the specific recreation opportunities to be produced and the outcomes to be attained (activities, experiences and benefits); 3) prescribe recreation setting character conditions required to produce recreation opportunities and facilitate the attainment of both recreation experiences and beneficial outcomes, as targeted above and 4) briefly describe an activity planning framework that addresses recreation management, marketing, monitoring and administrative support actions (e.g. visitor services, permits and fees, recreation concessions and appropriate use restrictions), necessary to achieve explicitly-stated recreation management objectives and setting prescriptions." (pg. 15-16 of Appendix C of the BLM Land Use Planning Manual (H-1601-1).

User conflict is not merely an issue with non-motorized recreationists.  There are documented user conflicts

297

BLM_0012302

| | | | | |
|---|---|---|---|---|
| | | | land and resources based on these differences. A popular dodge for this requirement is to interview only the visitors that staff wants to interview, or only the visitors that are easy to find. We expressly demand the BLM refrain from doing this<br>c) Provide an analysis of the social benefits (accruing to all BLM recreationists, and to the taxpaying public) of imposing criminal penalties from crossing the regulatory boundaries that will be established to support these alleged differences<br>d) Provide sufficient justification thereby, for agency law enforcement resources to be expended on physically sorting public land visitors with the intention of applying criminal penalties to violations of these standards, in the present and the indefinite future as this document proposes<br>e) Provide a description of how the government will measure the success of this strategy.<br>Alternatively, We want the BLM to abandon the concept of using individual recreationists' "values/benefits/outcomes/experience" as the basis for any management plan or any regulations or any on-the-ground boundaries. | among motorized recreationists as well.<br><br>Enforcement actions are not a planning decision. It is assumed that the commentor is referring to Focus Areas. Focus Areas do not constitute exclusive use. The focus is to manage these areas for the identified recreation use. Other users are not excluded, but their uses would not be provided for. |
| Colorado 500 | 6 | 22 | We are particularly concerned about Moab BLM's motorized recreation strategy, because there is not a single OHV management information source in the DEIS list of citations.<br>In light of the mandate that the BLM use the "best available information" for its analysis this is a serious omission. It clearly appears as though MFO staff is not measuring their assumptions, strategies and predicted environmental consequences according to currently accepted resource management standards and research.<br>BLM has split the list of references from the body of the text, so the utility of every site is impaired, and we don't have the time to identify how many are actually | The Travel Plan process is described in full in Appendix G of the DRMP/EIS. The BLM worked with county cooperators to designate routes in all three action alternatives. Designation or non-designation was based not on literature, but on on-the-ground resource conflicts that may or may not have been present along the route. For instance, the Hidden Canyon Rim was not designated for motorcycles or bicycles because of the prevalence of cultural resources. The Travel Plan was developed on a site specific basis, with each of 33,000 road segments examined individually.<br><br>Professional recreation management literature concerns the management of the routes, once designated. The |

BLM_0012303

needed to support this document.  The following samples are intended as evidence to support our requests.
Examples of relevant research that is omitted (PLEASE SEE LETTER):
Examples of apparently irrelevant citations (PLEASE SEE LETTER):
We request seven changes:
1.  We want professional recreation management literature included and utilized in the guidance of the travel plan development and the designation of recreational routes.
2.  We want the citations to be joined with the relevant text, in order that the discussions and analysis in the DEIS be supported and guided by the existing research and guidelines and to enable the public to check them.
3.  We want motorized recreation management to be guided by the current nationally recognized OHV professions, using standard OHV management strategies.
4.  More specifically, we want the MFO to use standard recreation management protocols to formulate the Travel plan and Alternatives, and we want the Environmental Consequences re-analyzed where the proposed actions in the DEIS conflict with that literature that has been developed by nationally recognized experts in OHV management.
5. In the absence of supporting literature and in the absence of the actual presence of impacts to any wildlife species, we want all restrictions on OHV (based on that species) removed from consideration.  We want confirmation of the actual presence of the species, and not the "potential" for the species, to guide the designation of all OHV trails.
6.  We want the obvious fact that the presence of any species cannot possibly precede the presence of

criteria for designation or non-designation are not found in literature, but rather in the on-the-ground conditions of each of the routes.

Citations are commonly listed at the end of EIS.  The references in the text refer to documents listed under "References".

The BLM utilized the BLM National OHV Strategy throughout the document. The BLM considered all verified routes proposed by the public during scoping.  These routes were analyzed on a route by route basis.  There is no literature that relates to each of these routes.  The Travel Plan was not formulated as an academic exercise, but rather on a site-specific basis.

There were very few routes not designated due to the presence of wildlife.  Those few that were not designated were because of the presence of bighorn sheep.  The Moab BLM has extensive radio collar studies of the bighorn herds in the planning area.  These data are available upon request.

Although motorized recreation has occurred throughout the planning area for the past 30 years, the Moab DRMP/EIS anticipates increased motorized use.  Travel planning considers this possible increased use.

The river recreationists utilizing the Moab planning area are currently under strict restrictions.  These restrictions are carried forward in the DRMP/EIS.  Westwater river users are restricted to 75 private users per day and 75 commercial users per day, There are no more than 5 private launches and 4 commercial launches per day.  There is also a yearly limit on the numbers of boaters.  Campsites are strictly regulated and are assigned at the put-in.  The Moab BLM river program's requirements limit

BLM_0012304

| | | | | |
|---|---|---|---|---|
| | | | motorized recreation prominently acknowledged (unless the species of concern as a life span of more than 30 years).<br>7. We want the potential for all river recreation impacts on the natural resource analyzed, and restrictions proposed as needed to protect riparian resources. | riparian impacts. These impacts are disclosed on p. 4-245 – 246 in the DRMP/EIS.<br><br>See response to comment 6-12. |
| Colorado 500 | 6 | 24 | Please refer to 3.11.2.5 User Conflict Displacement Quotation: "Another source of tension is among various recreation user groups. When recreational use reaches a certain threshold, user groups start to resent the multi-use nature of public lands. For example, ...Poison Spider Trail - conflict between OHVs and mountain bikers"] end of quote<br>Please provide a peer-reviewed analysis which support the implication of "OHV" as the origin of 100% (one hundred percent) of the conflict cited above. If there is none, please add in a prominent position in the discussion on page 3-86 the following statement: "MFO has no data or peer-reviewed analysis supporting any of the above statements."<br>The MFO staff analysis is omitting from his investigation the defining study in this field, "Conflicts on Multiple-Use Trails." (Moore 1995). It comprises a thorough synthesis of the literature in the sociological field that examines the exact type of conflicts the MFO staff is concerned about. In order to address the core issue that is identified as the source of almost every problem cited in 3.11.2.6, 3.11.2.7.1, the solution is to offer more opportunity, not less. If is the frequency of the encounters, not the type, that elicit the greatest number of dis-satisfied visitor responses. Adding well-designed trail mileage will attack the problem at its source.<br>If the MFO staff chooses to ignore the standard and most accessible research in the field, please provide the analysis and peer-reviewed literature that staff is | The mountain bike community has been vocal during scoping that it is being displaced by increases in motorized use along shared trails. This is evident in scoping comments as well as in comments on the DRMP/EIS. Thus, the issue raised during scoping of "user conflict" was not as a basis of research, but rather a specific issue raised by users of the Moab public lands.<br><br>The articles by R.L. Moore on user conflicts concern crowding on urban, paved bike paths. Moore does not dismiss user conflict, but rather offers urban planners management suggestions to alleviate user conflict.<br><br>The BLM has provided 30 Focus Areas and 10 SRMAs to provide recreation opportunities. The BLM has increased recreation opportunities. If the commentor is referring to the roads designated in Alt C, he can be assured that the great majority of recreationally utilized routes have been included in Alt C.<br><br>Law enforcement is not a planning issue.<br><br>See response to comment 6-12. |

BLM_0012305

| | | | | |
|---|---|---|---|---|
| | | | relying upon that shows that reducing recreation opportunities will resolve the above cited problems. If there is none, please add the following in the Executive Summary and in the Environmental Consequences assumptions: "There is no peer-reviewed research that sets forth the recreation management concept that a reduction of opportunity will resolve the user conflicts cited in this analysis." Please cite the legal authority that mandates imposing criminal penalties upon any lawful activity in the total absence of any sociological, physical, or scientific evidence that such criminalization is a worthwhile and constructive management strategy. If there is none, please add to the Executive Summary and in the Alternatives the following true statement: BLM does not have any evidence to support the concept that criminalizing a lawful activity is a worthwhile and constructive management strategy. | |
| Arches National Park | 8 | 4 | The plan states (page 2-48) "Any routes that are not baseline would be signed "closed" on the ground. " Since this suggest that anything not signed "closed" would be considered open, which could be an incentive for removal of "closed" signs, we would prefer a policy of signing roads as open and if not signed, roads are closed. | The BLM will use a combination of "closed" and "open" signing, along with a required Travel Plan map, to inform the public of which routes are designated for travel. |
| State of Utah - Public Lands Policy Coordination | 120 | 17 | The use of vehicles along the course of the Green River impacts natural resources and other recreational users of the corridor far beyond the traveled path due to noise. | The BLM assessed the impacts on natural resources and recreation conflict between motorized access and river based recreation. The BLM determined that the purpose and need associated with the route outweighed the specified conflict. |
| State of Utah - Public Lands Policy Coordination | 120 | 66 | The State seeks information on developing and approving Recreation Area Management Plans (RAMP) and River Management Plans. | After completion of the RMP, those SRMAs that do not currently have RAMPs will be subject to the development of a site specific RAMP, subject to NEPA. The process is identifcal for River Management Plans. |
| State of Utah - Public Lands Policy | 120 | 67 | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, | The BLM acknowledges that there are entire SRMAs that are focused on a particular type of recreation. The decision on pg. 2-18 has been changed to reflect this; |

BLM_0012306

| | | | | |
|---|---|---|---|---|
| Coordination | | | backcountry touring on designated roads.  This statement appears to indicate that those portions of SRMAs that are not subject to a mor specific focus area will be managed to emphasize motorize recreation.  This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring.  Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for motorized backcountry touring. | "where a specific type of SRMA or focus area is not identified, the focus of that area is motorized backcountry touring on designated routes".  Focus areas particularly for backcountry motorized touring would be managed more intensively than the default management.  For example, focus areas for motorized backcountry touring could be considered for new route creation. |
| State of Utah - Public Lands Policy Coordination | 120 | 68 | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19).  Please explain what a "destination SRMA" is and how such areas would be managed. | Destination SRMAs are those where the majority of visitation is from without the local area.  A destination SRMA definition has been added to pg. 2-18. |
| State of Utah - Public Lands Policy Coordination | 120 | 70 | Clarify launch limits in Westwater Canyon. | Table 4.69 (on pag. 4-207) states that the daily launch limit for Westwater Canyon is 75 people. This has been changed to state "75 people for the commercial sector and 75 people for the private sector".  This equals the 150 person launch limit shown on the BLM website. |
| San Juan County | 121 | 19 | Will future "recreation area management plans" and "river management plans" be subject to NEPA.  What is the process for developing and approving these plans? | After completion of the RMP process, those SRMAs that do not currently have RAMPs will need to develop a site specific RAMP, subject to full compliance with the NEPA. The process is identical for River Management Plans. |
| San Juan County | 121 | 20 | The Draft RMP/EIS states that where a specific focus area is not identified with a Special Recreation Management Area, the focus of that area is motorized, backcountry touring on designated roads.  This statement appears to indicate that those portions of SRMAs that are not subject to a more specific focus area will be managed to emphasize motorize recreation.  This appears inconsistent with designating SRMAs to emphasize non-motorized recreation and mountain bike backcountry touring.  Please also explain haw management of focus areas specifically designated for "motorized backcountry touring" would differ from the default management of SRMA for | See response to comment 120-67. |

BLM_0012307

| | | | motorized backcountry touring. | |
|---|---|---|---|---|
| San Juan County | 121 | 21 | The Draft RMP/EIS makes repeated reference to "destination SRMAs" (pg. 2-19).  Please explain what a "destination SRMA" is and how such areas would be managed. | See response to comment 120-68. |
| Ride with Respect | 122 | 2 | Section 4.3.10 (page 4-192) mentions the National Visitor Use Monitoring Study for the Moab planning area asked visitors what their "main activity" while visiting Moab.  This paragraph should make explicit that this study was not exclusive to BLM land, and probably includes substantial visitation to national parks and other areas. Beyond Table 4.67 (pg. 4-193), the entire study should be reproduced in the RMP, because of its significance for management and potential for misinterpretation. | The National Visitor Use Monitoring (NVUM) Study was conducted in the Moab Field Office in 2006 as a BLM pilot study by the U.S. National Forest Service.  The study was, in actuality, exclusive to BLM visitation.<br><br>See also response to Comment 124-2.<br><br>The study is in draft form and for this reason it has not been included in the DRMP/EIS in its entirety.  A draft of the study is currently available from the Moab Field Office.  When the study is made final, it will be available from the Moab Field Office and will be posted on the U.S. Forest Service website. |
| Ride with Respect | 122 | 9 | Without providing alternatives, the supply for one or both uses will shrink, which leads to crowding.  Crowding only intensifies use conflicts (Moore 1994).  So the final RMP should also insert the following paragraph:  "Where use conflict occurs, the BLM will take steps to mitigate the conflict and, if necessary, provide alternative opportunities for one or both uses." | The BLM attempts to provide recreation opportunities for many and diverse types of recreation.  However, the Moab planning area has finite recreation resources and for the BLM to commit to providing alternative opportunities for all types of potential recreation uses is not realistic.  Therefore a balanced multiple use approach, as required by FLMPA, is used to provide recreation opportunities. |
| Ride with Respect | 122 | 22 | Alternative C would require Special Recreation Permits for groups with "25 vehicles."  The document ought to explicitly exclude counting more than one vehicle per person, since he/she can only use one vehicle at a time.  For example, without such a stipulation, the 25-vehicle rule would require a permit for a group of 9 friends who convene in Moab, each with a pickup truck carrying a motorcycle and bicycle. | The 25 vehicle rule is intended to mean the primary vehicle driven by the participant.  The phrase "one driver/vehicle" has been added to the Special Recreation Permit decisions in the PRMP/FEIS for clarification. |
| Ride with Respect | 122 | 34 | North of Highway 313, the singletrack which drops off Hidden Canyon Rims is a key link for motorcyclists and | The singletrack along Hidden Canyon Rims was inventoried, verified, and considered for designation in the |

BLM_0012308

| | | | | |
|---|---|---|---|---|
| | | | bicyclists, alike.  Bartlett Slickrock should remain open to motorcycling, since all of Tusher Slickrock will already be reserved for exclusively for bicycling.  The Mill Canyon - Sevenmile Rim mountain bike area should be rotated to become Mill Canyon - Tusher Rims.  Tusher has better bicycling potential than Sevenmile due to less sand, more slickrock, and fewer roads. Then Sevenmile - Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground.  Upper Sevenmile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | Travel Plan.  Due to resource conflicts (cultural), the route was not included in the Travel Plan accompanying the DRMP/EIS under any action alternatives.<br><br>The Bartlett Slickrock is proposed as a freeride mountain bike area under Alt. C.  Motorized use would be excluded to reduce conflicts with non-motorized users.  This proposal recognizes that over 90% of the use is by bicycles.<br><br>The uses referred to by the commentor in the Mill Canyon area can occur consistent with the Travel Plan regardless of the boundaries of the mountain bike Focus Area.  The boundary of the Focus Area was delineated to reflect the heavier mountain bike use in the eastern portion of the area.<br><br>Equestrian use is Sevenmile Canyon occurs almost totally within the canyon.  There is no need to include terrain above the canyon on the rim in order to accommodate this use. |
| Ride with Respect | 122 | 38 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus.  Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge.  Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | The recreation use in Yellow Cat is not at a high enough level to warrant a Special Recreation Management Area designation.  The route in Owl Canyon was determined to lack purpose and need as an alternate route is available.  Owl Canyon was identified with riparian values and was not identified with motorized travel.<br><br>A Focus Area for hiking around Arches National Park is not warranted because it currently receives very low use.  However, hiking can occur in this area regardless of its designation as a Focus Area. |
| Ride with Respect | 122 | 39 | Utah Rims SRMA ought to extend further southwest to the Cisco Road.  From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork | The core values of the Utah Rims Special Recreation Management Area are found within the boundary delineated under Alts B and C of the DRMP/EIS.  With |

304

BLM_0012309

| | | | | |
|---|---|---|---|---|
| | | | for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Mel's Loop and associated singletracks. From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat. A non-mechanized focus area could be expanded from the Westwater WSA further southwest all the way to private property. The entire spur road to Big Hole could be closed to enhance primitive characteristics. None the less, the Westwater Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | exception of the lands within the Westwater Wilderness Study Area, lands within the Moab ERMA, south and west of the proposed Utah Rims SRMA, are available for mechanized use consistent with the Travel Management Plan. |
| Ride with Respect | 122 | 44 | Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area. The ATV trail immediately north of the OHV staging area should be designated for <50-inch vehicles, along with a couple miles of non-road trail above Hook & Ladder Gulch. While RwR generally agrees with mixes uses in a given SRMA, we believe that non-motorized opportunities should be developed in the adjacent Canyon Rims rather than Cameo Cliffs. Unnecessarily steering non-motorized use toward an established motorized trail system might create conflicts. Moreover, Canyon Rims has spectacular scenery, including some of the same geologic formations of Cameo Cliffs. The setting prescriptions and road plan for Canyon Rims are better-suited for hiking and equestrian trails. If Cameo Cliffs contains an Old Spanish Trail site of particular interest, then it should be developed for interpretation and fairly accessible by full-size vehicles. | When the Cameo Cliffs SRMA was created, the areas to the east were specifically excluded due to mining hazards. Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area.<br><br>The Old Spanish Trail is recognized in the DRMP/EIS and various sites along it may be proposed for interpretation. |

BLM_0012310

| Ride with Respect | 122 | 48 | Designating campsites should be done with public participation.  The travel plan should be adjusted to access campsites. | Public participation has been provided throughout the land use planning process.  One of the express purposes of leaving a route open for travel was its access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site specific NEPA analysis.<br><br>See also response to comment 123-8. |
|---|---|---|---|---|
| Ride with Respect | 122 | 49 | The Moab Extensive Recreation Management Area should provide roads, singletrack trails and dry washes to connect SRMAs and towns.  The ERMA targets "backcountry driving" and "primitive hiking" as outcomes.  We recommend targeting the ERMA for "an array of recreational opportunities. | The Extensive Recreation Management Area (ERMA) does provide a network of roads as well as some singletrack trails.  For information on dry washes, see response to comment 122-14.<br><br>The Moab Extensive Recreation Management Area (ERMA) identified in all alternatives of the DRMP/EIS recognizes several activities and specific targeted outcomes (see pg. F-9 and pg. 2-29).  The listed outcomes do not preclude non-listed activities as long as they are consistent with the Travel Plan.  The management guidelines for an ERMA are found on pg. C-16 of the Land Use Planning Handbook (H-1601-1) and states that actions in an ERMA are custodial only. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 4 | The BLM's Planning Handbook requires Field Offices to identify goal, settings, and targeted outcomes.  The DEIS does this in Appendix F for SRMAs.  In addition, the RMP outlines common management objectives for SRMAs in Chapter 2.  The DEIS also outlines a general recreation policy in Appendix E.  The Travel Plan is the final overlay.<br><br>The Final Plan must address whether Recreation Settings will or will not "actually determine, what kinds of recreational opportunities are produced."  Regarding the example above it is suggested that the BLM specifically state what the Recreational Settings are meant to be (e.g. "standards" or "guidelines") and to disclose how the Recreational Settings may or may | Management actions that apply to all Special Recreation Management Areas (SRMAs) are found on pg. 2-18.  Specific management actions for each SRMA are listed on pg. 2-18 through pg. 2-29.  Appendix F provides more specifics on goals, settings, and targeted outcomes for each SRMA.  Appendix E provides general recreation rules for the Field Office.  The management actions proposed in these sections are complementary and in no case does one management action contradict the other.<br><br>The recreation settings in Appendix F are descriptive and describe the physical, social, and administrative environment.  Definitions of these terms are provided on pg. F-1. |

BLM_0012311

| | | | | |
|---|---|---|---|---|
| | | | not affect future management decisions, allowable uses, including and especially travel management. | The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/EIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and non-WSA lands with wilderness jurisdictions. A sentence has been added to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states "routes identified in the Travel Plan would be available regardless of other proposed management actions'.

A detailed discussion of Recreation Settings and the benefits that may acrue to that setting is found on pg. 4-190 through pg. 4-193 of the DRMP/EIS.   Recreation Settings for each Special Recreation Management Area (SRMA) are found in Appendix F.

This Appendix it states that "for each SRMA the management goal is to provide for a variety of visitor benefits. In addition on pg. 4-192 it states that "Focus Areas' are Recreation Management Areas that promote specific recreational opportunities and activities while continuing to allow other recreational uses".

On pg. 2-18, Focus Areas are defined as "emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan".

See also response to comment 208-13. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 9 | The agency should consider a policy that considers 1) interim camping rules that do not eliminate existing campsites; and 2) a process by which existing campsites are analyzed and determined to a) not cause considerable adverse effects; and b) managed in a way as to minimize impacts to natural resources. | The BLM is unaware of any popular existing campsites that have been eliminated under the alternatives of the DRMP/EIS. Those specific campsites identified by the commentor at White Wash have been restored in the preferred alternative (Alt C). A process in which to evaluate existing campsites for adverse effects or to minimize impacts to natural resources is not a land use |

BLM_0012312

| | | | | |
|---|---|---|---|---|
| | | | | planning level decision.  This process will be addressed during development implementation plans for the Special Recreation Management Areas. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 13 | In the face of growing demand through varied modalities for access to public lands, BLM must carefully consider how to make satisfying and diverse opportunities for visitation available, rather than excessively constructing more and different uses in a manner that will exceed the impacts of an even unmanaged status quo.  It is not only legally required but logical to consider whether available "best science" truly supports possible management prescriptions. | In DRMP/EIS, the BLM has considered diverse opportunities for recreation and the potential conflicts with resources.  The BLM has provided a wide variety of recreation opportunites for both motorized and nonmotorized uses.  It is not possible for the BLM to envision all the possible recreation activities that may be developed in the future.  The commentor has not provided any information about how the BLM failed to consider "best science". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 20 | Fourth Related Issue:  How should recreational uses be managed to limit conflicts among recreational users? The alternatives appear to answer this by creating restrictive zones.  We are disappointed BLM didn't include an Alternative that took USA-ALL's scoping suggestion to aggressively mitigate social conflict with education. | On pg. 1-11 of the DRMP/EIS, education is identified as an issue addressed through policy or administrative action and does not require a land use planning decision. On pg. 2-17 of the document, the BLM acknowledges the need to provide visitor information and outreach as part implementation of the RMP.  Also, as part of implementation a map will be provided to the public delineating where different recreation uses are emphasized. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 21 | Fifth Related Issue:  How should camping, human waste, fires, and wood collection be managed? Here all of the Alternatives fail miserably. There is no range of alternatives for vehicle based camping, only very slight variation among the various Travel Plan Alternatives.  There is very little reference to impacts to the various resources when OHV and camping activities are restricted. | See response to comment 123-8. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 22 | Sixth Related Issue:  Where should Special Recreation Management Areas (SRMAs) be designated? As we mentioned above, Alternatives B and D's SRMA are so unworkable they do not present a reasonable range of Alternatives.  Besides, again, this is not a very well crafted planning issue.  SRMAs themselves do not fit into the definition of Planning issue (a matter of controversy or dispute over resources management | The BLM Handbook (H-1601-1) at C-15 specifies that the primary land use planning decision for recreation is the identification of Special Recreation Management Areas. |

BLM_0012313

| | | | activities or land use that is well defined or topically discrete and entails alternatives among which to choose or decide. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 23 | Seventh Related Issue: How should conflicts with other, non-recreational uses be reduced? One option we would like to see in the Final Plan is a situation where the permitting process for oil and gas exploration/develop could benefit recreation by using the extensive environmental review to "clear" recreational routes or other infrastructure. | The permitting process for oil and gas operations is an implementation decision and involves site specific analysis of proposals on a case by case basis. The BLM can not require an oil and gas operator to conduct clearances on non-related actions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 24 | Eighth Related Issue:  What management actions should be implemented to mitigate damage caused by recreational uses, including vehicles, on other resources and sensitive areas, especially riparian areas? Although we appreciate the direction to mitigate impacts to routes that are causing impacts (Appendix G), the most common management action BLM proposes is closure.  As noted above, this is not a "range" of management options. Such an approach squanders a huge opportunity to leverage volunteer and OHV grant programs to assist in management or mitigate challenges, such as combining tamarisk infestation, or other such work.  OHV groups can raise funds, just like hunting groups do, for wildlife guzzlers and other wildlife mitigations. | On pg. 1-11 of the DRMP/EIS, volunteer coordination is identified as an issue addressed through policy or administrative action and does not require a land use planning decision. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 25 | Ninth Related Issue:  How should recreation in the MPA be managed to ensure public health and safety? It is generally accepted that information is the primary tool to use in public health and safety.  We are disappointed to see BLM adopt a 'minimum management necessary' concept, especially for recreational uses.  We understand that we don't want a "carsonite forest" out there, but at least one Alternative should have had a more robust directive to provide information to recreationists. | Education and information are identified on pg. 1-11 of the DRMP/EIS as issues addressed through policy or administrative action and do not require a land use planning decision.  The analyses on pg. 4-3 of the DRMP/EIS assumes that there will be funding for implementation of the travel plan which will include public education, enforcement/prosecution, vandalism, and volunteer coordination. |
| Colorado Off- | 123 | 26 | Tenth Related Issue:  Where and under what | The Federal regulations at 43 CFR 2932.11 allow the |

BLM_0012314

| | | | | |
|---|---|---|---|---|
| Highway Vehicle Coalition (COHVCO) | | | circumstances should permitted recreation uses be available? PLEASE keep the group size limit at 50! The DEIS fails to provide sufficient need for the proposed change in Alternative C. We are at a loss to understand the agency's rationale for this proposal. We strongly urge the BLM to, as much as possible, streamline the manner in which recreational "club rides" can be permitted. These clubs should be viewed as a resource. Especially in key motorized focus areas, we recommend the Final Plan include language that directs the manager to encourage cooperative efforts with OHV groups | BLM to require special recreation permits (SRPs) for organized group activities when there are resource concerns, potential user conflicts, or public health and safety issues. The group size numbers vary by alternative based on the emphasis of the alternative and provide a reasonable range of choice. These numbers are based on professional judgment and extensive monitoring of motorized use in the planning area. The lower the threshold for when a SRP is required the greater the opportunity for increased contact and educational outreach with groups. More frequent contact would allow for more sustainable recreation use. The BLM recognizes the benefits of working with clubs and user groups and will seek to streamline permitting wherever possible. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 27 | Divide Labyrinth Rims into two SRMA's: Gemini Bridges SRMA and Labyrinth Rims SRMA. The rationale for this is based on a subtle difference in landscape and more significant difference in use pattern. | The BLM recognizes that Labyrinth Rims/Gemini Bridges Special Recreation Management Area is a large area with diverse use and terrain. These factors will be considered during the development of the implementation plan for the SRMA. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 28 | Utah Rims SRMA. Manage Utah SRMA for a variety of visitor benefits, provide opportunites for a) quality scenic trail-based motorcycling and mountain biking experiences; b) quality camping experiences; c) quality horseback riding experiences on existing routes. Please seriously consider Ride with Respect's proposal on Utah Rims. | See response to comment 122-39. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 30 | BRC supports RwR's proposals: Additional "Yellow Cat" SRMA. RwR proposes Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches National Park, | See response to comment 122-38. |

310

BLM_0012315

| | | | wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple overlooks of Lost Spring Cnayon and Dome Plateau are needed, but they should remain open all the way to the rim.<br>A Yellow Cat SRMA seems one of those 'no brain'ers' and we are at a loss to understand why it wasn't in the alternative that was supposed to (but did not) emphasize motorized recreation. Clif's idea is a well conceived and well balanced proposal. It deserves serious consideration. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 31 | BRC supports RwR's proposals: New "Black Ridge" SRMA's. RwR proposes the Black Ridge area presents many potential recreation opportunities nearby Moab.  The South Spanish Valley Mountain Bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and provides enough room for a full-day's ride.  Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas.  Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exists in Pole Canyon from the powerlines to Area BFE.  In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines.  This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area.  The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shutting.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | See response to comments 123-13 and 122-43. |

BLM_0012316

| | | | BRC strongly encourages the BLM to consider this proposal. All too often, the agency is in the position of responding, usually too late with too few resources, to emerging uses. This proposal is an opportunity to provide for existing uses and growth in popularity, in a controlled and environmentally sound manner.  The BLM should not pass this opportunity up.  Please refer to RwR's formal written comment for more info. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 32 | BRC supports RwR's proposals: This is a shocker.  BRC actually supports the general concept of RwR's proposed expanded backpacking focus area in Hatch Wash.  Hatch Wash backpacking focus area could be expanded for better backpacking.  Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash.  However, only five are necessary to view most stretches of the canyon.  We support the additional backpacking focus area, but disagree only slightly with Clif's determination only 5 overlook spur roads are necessary.  During peak visitation season, 5 may not be enough. In fact, we are almost positive 5 are too few, but are unsure how many are actually used during peak seasons.  BRC suggests close consultation with San Juan County and recommends the BLM defer to their assessment of how many of these overlooks are needed. | See response to comment 122-45. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 33 | BRC supports RwR's proposals: Expanded Cameo Cliffs SRMA.  RwR proposes Cameo Cliffs SRMA should also be expanded for better OHV riding.  The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity.  Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area.  This proposal seems only prudent, and we agree with Clif's assessment that the area is a bit short on quantity of opportunity.  Half day ride, maximum. | See response to comment 122-44. |
| Colorado Off- | 123 | 35 | The second difference between BlueRibbon and RwR | The BLM Manual at 8342.1 identifies protection |

312

BLM_0012317

| | | | | |
|---|---|---|---|---|
| Highway Vehicle Coalition (COHVCO) | | | is White Wash Sand Dunes.  The rationale for our proposal here is that it will be relatively easy to implement because it mirrors, or more accurately, freezes, the existing use and the boundaries are on easily recognized roads.  It also incorporates the interim management philosophy by providing direction (objectives) to implement a RAMP. | requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area proposed by the commentor poses conflicts with many of these resources.  The boundary of the open area at White Wash has been expanded to the west to accommodate dispersed camping.  The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 37 | BRC supports RwR's proposals: The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that surrounds by steering motorcyclists toward a legal alternative.<br>Based on knowledge of this area, the Copper Ridge Motorcycle Loop serves a critical "connector loop" that brings riders north enough to either connect with the Thompson Trail or loop back around to the staging areas. We strongly suggest consideration of this route. | Refer to response to comment 122-36. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 39 | BRC supports RwR's proposals: Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar | See response to comment 122-31. |

BLM_0012318

| | | | | |
|---|---|---|---|---|
| | | | to bicycle trails in Fruita, a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 45 | The Moab BLM ERMA has decidedly non-motorized focus, with Targeted Outcomes being Backcountry driving and primitive hiking, backpacking and equestrian use. But the MSA clearly shows the proposed ERMAs to house a myriad of activities, including OHV trail riding, hunting and mountain biking. We recommend the BLM revise its management guidelines to provide for settings that are compatible with all existing uses. | The Moab Extensive Recreation Management Area (ERMA) identified in all alternatives of the DRMP/EIS recognizes several activities and specific targeted outcomes (see pg. F-9 and pg. 2-29). This list does not preclude non-listed activities as long as they are consistent with the Travel Plan. The management guidelines for an ERMA are found on pg. C-16 of the Land Use Planning Handbook (H-1601-1) and states that actions in an ERMA are custodial only. The setting referred to by the commentor is a statement of fact and not a desired condition. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 50 | Much of the discussion of the Alternatives relating to the impact of OHV decisions on recreation (and specifically camping) discusses a perceived threat to soil and vegetation resources due to OHV use. The DEIS lacks a meaningful analysis of the existing conditions and appears to favor closure over mitigation. The result is a significant loss of recreational opportunities, including a significant loss of camping opportunities. This, in an area which the DEIS recognizes is very important for camping activities. As in other discussions of resource damage due to OHV use, such damage is simply and summarily presumed in the discussion of the camping resource. It is neither quantified or otherwise demonstrated in a useful manner. The resultant decision lacks evidence of the requisite "hard look" present in defensible NEPA documents. Moreover, the effects of the significant loss of OHV opportunities on other resources has not been analyzed, which they must pursuant to NEPA. | On pg. 4-235 of the DRMP/EIS the impacts of reducing recreation travel opportunities on motorized users are discussed. On pg. 4-267, the effects of restricting dispersed camping are discussed. See response to comment 123-8. |
| Southern Utah Wilderness Alliance | 124 | 35 | At 2-17 under management common to all the language is vague and difficult to apply: "where unacceptable damage is anticipated or observed, BLM | The language on pg. 2-17 is under Recreation Management. This language refers to all recreation activities including but not limited to just travel. |

BLM_0012319

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | would seek to limit or control activities by managing the nature and extent of the ativity or by providing site improvements that make the activity more sustainable…Such management would seek to reduce or eliminate the adverse impact while maintaining the economic benefits associated with a wide range of recreation uses."  Why not just adopt the language of the federal regulations which requires closure where adverse effects occur?  The BLM doesn't know what the "economic benefits" of the range of recreational uses are, which deprives this standard of any real meaning. | The purpose of the language, under actions common to all action alterntives, is to provide future flexibility under the plan for protection of natural and cultural resources from recreation activities, while maintaining the benefits of such activities to the community.<br><br>The language referred to in the comment on closures is found under the Federal regulations at 43 CFR 8341.2 on Off-Road Vehicles.  These regulations are  referred to on pg. 2-48 of the DRMP/EIS under Travel Management.<br><br>The economic benefits of recreation are analyzed in Chapter 4 on pgs. 4-266 through 4-272. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 36 | The plan admits that most recreation use occurs on 53% of the MPA, mostly close to Moab.  4-200.  So the closures and relatively fewer trail designations around I-70 don't really do much to address the core ORV impacts; and those areas close to I-70 are open to leasing anyway, right? | The 53% of the MPA is proposed for management as SRMAs under one or more of the alternatives.  It is erroneous to state that these are mostly close to Moab.  For example, the Book Cliffs SRMA (348,140 acres) is located far to the north of Moab and I-70.  The impacts of OHV use are primarily addressed by limiting OHVs to designated routes under all action alternatives.  Permitted actions under oil and gas leases are mitigated through surface use restrictions and OHV use is often non-permitted. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 102 | The total acreage of SRMAs in the planning area, by alternative differs in two Tables.  Table 2.1 does not match the acreage in Table 4.69. Table 4.21 does not match the acreage in Table 2.1. | The acreage in the tables has been corrected in the PRMP/FEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 103 | The Draft RMP states on page 3-74 that "the areas with the greatest numbers of visitors and those that are in the greatest need of special management are currently within the Grand ERMA."  BLM must choose the greatest expansion of SRMA acreage as provided in Alternative B in order to ensure that the MPA is directing its resources to these areas in need of special management. | The acreage of SRMAs in the No Action alternative totals 141,252.  In each of the action alternatives, this acreage is increased (Alt. B = 976,173 acres;  Alt. C = 658,642 acres: Alt. D = 277,471 acres).  The areas that receive the greatest visitation and are in greatest need of special management (Colorado Riverway, Sand Flats and Labyrinth Rims/Gemini Bridges) are all analyzed in both Alts B and C.  The greatest difference acreage between Alts B and C is the inclusion of the Bookcliffs SRMA in Alt |

315

| | | | | |
|---|---|---|---|---|
| | | | | B.  The Bookcliffs is not an area with a great number of visitors nor does it require special management and is not an area referred to in Chapter 3 of the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 104 | In Appendix F of the Draft RMP, SRMAs are assigned standards as to the physical, social, and administrative setting of each SRMA.  There is no explanation for these standards.  The Moab RMP should use the Recreation Opportunity Spectrum (ROS). | The BLM followed the Land Use Planning Handbook (H 1601-1) for Special Recreation Management Areas (SRMAs) at Appendix C.  For each SRMA, the Handbook directs the following: 1) to identify a set of recreation opportunities, 2) to facilitate the attainment of different experience and benefit outcomes, and 3) to identify disctinctive recreation setting characteristics.  The Moab Field Office utilized the traditional physical, social, and administrative settings from the Recreation Opportunity Spectrum (ROS).  This process is summarized in Appendix F of the DRMP/EIS.  Appendix F provides the goals, settings, outcomes, and management prescriptions for each SRMA.  The format for considering ROS settings is currently taught in BLM's  Recreation Planning Course at the National Training Center; Effective Engagement in the BLM Land Use Planning Process (NTC Course 8300-11).  This approach is utilized extensively in other recent RMPs with the BLM.  Washington Office Instruction Memorandum 2006-060 requires the BLM to utilize benefits based planning in land use plans.  As part of this effort the BLM undertook to adapt the traditional Forest Service ROS to a more flexible framework.  Benefits management requires BLM to prescribe the specific character setting of an area.  The BLM decided to change ROS names to those more understandable to the public.  These names are those used in the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 105 | The Bookcliffs Special Recreation Management Area (SRMA) which is in Alternative B would protect recreational values and should be included in the Final RMP. | The commentor's preference that the Bookcliffs SRMA be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives. |

BLM_0012321

| | | | | The primitive recreational opportunities in the Bookcliffs are largely protected by the management under Interim Management Policy for Lands Under Wilderness Review. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 106 | The Canyon Rims Special Recreation Management Areas (SRMA) should be expanded to include the Hatch Wash Focus Area. | The Hatch Wash Focus Area is included in the Canyon Rims SRMA as described in the preferred alternative. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 107 | The Colorado Riverway Special Recreation Management Area should be delinated with the extra acreage as outlined in Alternative B.

SUWA objects to the establishment of any facilities or the improvements associated with the proposed BASEjumping focus area in Kane Creek, as the lands have been identified as possessing wilderness characteristics. | The commentor's preference that the Colorado Riverway SRMA be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives.

The BLM's preferred alternative manages the most highly visited portion of the area as an SRMA.

Any developed facilities associated with the proposed Basejumping focus area in Kane Creek would be along the maintained road.  The jumping platform, while in an area identified with wilderness characteristics, would see only non-motorized activitiy.  Furthermore, this area is not managed to protect wilderness characteristics in the preferred alternative.  Non-motorized activities are allowed even within wilderness study areas as specified in the Interim Management Policy for Lands Under Wilderness Review. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 108 | SUWA cautions BLM to not designate the Labyrinth SRMA because it is biased toward motorized recreation and development.  SUWA recommends the establishment of White Wash as a Hiking Area (as in Alt. B).  SUWA would like to see the western half of Labyrinth managed as a primitive and undeveloped SRMA.  SUWA recommends the Tenmile Hiking Focus Area as in Alt. B.  SUWA takes strong exception to the establishment of a motorized focus area at Dee Pass | The commentor's comment regarding the Labyrinth SRMA is an unfounded assertion.  Under all action alternatives the BLM does not identify for motorized use a large  number of vehicle routes within the area.  Furthermore, all action alternatives place the area in question to a limited to designated routes category thereby reducing mortorized recreation opportunities from the no action alternative (Alt A).  Much of the Labyrinth SRMA lies within a SUWA wilderness proposal.  The BLM |

317

| | | | | |
|---|---|---|---|---|
| | | | as this area is proposed for wilderness in America's Redrock Wilderness Act. | is not obligated to create roadless area in response to external preferences.<br><br>The commentor's preference that White Wash and Ten Mile be managed as proposed in Alt. B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives.<br><br>The Dee Pass area is located within SUWA's Duma Point wilderness proposal.  The BLM's Wilderness Characteristics Review (WCR) determined that this area lacked naturalness due to a profusion of constructed routes and other impacts.<br><br>The commentor's responses to the BLM WCR findings in the DRMP/EIS did not include an objection to the BLM's findings of no wilderness characteristics for the Duma Point Unit. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 109 | SUWA recommends that the Slickrock Trail be closed to motorized use as is proposed in Alt. B.<br><br>BLM should designate all the Special Recreation Management Areas (SRMAs) as described in Alt. B. | The commentor's preference that the Slickrock Trail and all SRMAs be managed as proposed in Alt B is noted.  The State Director will make a decision based on consideration of public comments, analysis of the impacts, resolution of the issues, purpose and need for the plan, and the planning criteria.  The BLM can choose management actions from within the range of alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 110 | BLM must take a hard look at the issuance of special recreation permits (SRPs) on public lands. The Draft RMP does not explore direct, indirect  or cumulative impacts of events and uses associated with SRPs even though they can have significant impacts. | The Moab DRMP/EIS analyzed a range of alternatives, which varied the number of vehicles associated with organized recreational groups from 15 vehicles for Alternative B to 50 vehicles for Alternative D.  Chapter 4 of the DRMP/EIS on pg. 4-227 states that SRPs allow the BLM to impose protective stipulations on users, thereby protecting the resources present and reducing user conflicts.  As the permits issued are increased, resource protection would also be enhanced.  As stated on pg. 4- |

318

BLM_0012323

| | | | | |
|---|---|---|---|---|
| | | | | 228 increasing the number of SRP with specific stipulations to protect and preserve cultural and natural resources would result in more protection and a less likelihood of impact.<br><br>Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.  The issuance of a SRP is a site-specific implementation level authorization, which requires full compliance with NEPA, including analyzing the direct, indirect and cumulative impacts associated with each proposal. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 111 | The Moab Draft varies the number of vehicles that would require an organized group to obtain a Special Recreation Permit (SRP) by alternative.  This is not the kind of range that NEPA contemplates.  It is unreasonable for the only choice among alternatives to be whether 15, 25, or 50 vehicles as the threshold. | See response to comment 124-110.<br>SRPs provide protective stipulations for public land users.  These stipulations do not apply to the general public.  Therefore, increasing the number of SRPs would be more beneficial in terms of reducing user conflict and protecting resources because there would be more protection and preservation related stipulations on cultural and natural resources.<br><br>The BLM asserts that DRMP/EIS provides a reasonable and adequate range of alternatives on group size for SRPs. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 112 | The BLM must take a hard look at factors that should be considered for future Special Recreation Permits (SRPs).  These factors are:<br><br>1) Duration of permit - SRPs should be temporary and short term.<br>2) Number of vehicles permitted - BLM should revise its limits on the number of vehicles by type of vehicle.<br>3) Types of vehicles - BLM does not define what constitutes a vehicle.<br>4) Number of persons permitted - A threshold should be set for the number of people.<br>5) Location of SRPs - the Draft RMP should identify | The Federal regulations at 43 CFR 2930 and the BLM Handbook (H-2930-1) govern the issuance of SRPs.<br><br>Permit durations are managed according to BLM Handbook H-2930-1, and are tailored to the specific proposed use.<br><br>The BLM has a range of threshholds for vehicles, by alternatives (see response to comment 124-110).  These threshholds are intended as general guidance.  The BLM Handbook, H-2930-1, allows management discretion based on individual circumstances.  SRPs are analyzed on a site-specific basis. |

BLM_0012324

| | | | | |
|---|---|---|---|---|
| | | | areas where SRPs would not be allowed which should include wilderness, wilderness study areas, non-WSA lands with wilderness characteristics, and lands being evaluated or managed for primitiveness.<br>6) Number of permits per year - there should be a cap on the number of SRPs within a specific area. | The BLM utilized the definition of off-road vehicles as defined by the Federal regulations at 43 CFR 8340.<br><br>The BLM did not set a threshold of people because the impact of numbers of people varies by the type of proposed activity.  These impacts will be analyzed at the site specific level when an SRP is applied for.<br><br>The effects of SRPs on various categories of land management are analyzed at the site specific level.  It should be noted that the Wilderness Act of 1964 allows for commercial services in wilderness areas.  Non-motorized recreation activities, whether commercial or non-commercial, are allowed in wilderness study areas in accordance with the Interim Management Policy for Lands Under Wilderness Review.<br><br>Limiting the total number of SRPs would reduce management flexibility to accommodate requested uses, and reduce the ability to control impacts from recreational activities.  Refer to response to comment 124-111. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 204 | The BLM should designate Labyrinth Canyon as a primitive, undeveloped SRMA.  Continue the interagency river management system and reduce route density. | In Alt C of the DRMP/EIS, Labyrinth Canyon is part of the Labyrinth Rims/Gemini Bridges Special Recreation Management Area (SRMA) which is a destination SRMA.  However, the portion of the Green River from Placer Bottom to Mineral Bottom is managed as non-mechanized Focus Area (7,709 acres).  The interagency river management system is an issue addressed through policy or adminstrative action and therefore does not require a land use planning decision (see pg. 1-11 of the DRMP/EIS.  For discussion of route density see response to comment 124-62 through 124-66. |
| Canyonlands Field Institute | 199 | 1 | Dolores River Canyons SRMA - Support Alternative C with exceptions:  In the boating management section, we request a CHANGE in party number to match the other sections of river managed by BLM in SE Utah i.e. | The BLM agrees with the commentor that it is important to have consistent river rules.  The BLM also agrees that school groups have special needs because the guide-passenger ratio must often be increased.  The text has |

BLM_0012325

| | | | | |
|---|---|---|---|---|
| | | | change the party size to be 25 PLUS guides. In order to serve school groups, the 25 maximum passengers is necessary in most cases. In addition, make this number consistent with other stretches will make it easier on the public and our office staff in comparing trip options. | been changed to read "25 people, excluding guides." |
| | 200 | 2 | SRMAs. I do not have any major objections to the establishment of the additional SRMAs as proposed. However, some boundary adjustments to allow for better, more understandable enforcement are needed for the White Wash Dune Area. I think the proposed South Moab SMRA should be expanded in size to include Black Ridge. I have seen the Ride with Respect group's proposal for additional focus areas in the enlarged version of this SMRA and it appears to contain excellent ideas. My only reservation is that the corrections to the Strike Ravine Safari Trail I mentioned in my Appendix A need to be incorporated into this proposal. | See responses to comments 206-2 , 206-9 and 206-10. |
| The Nature Conservancy | 204 | 17 | In providing for parking and managing the King's Bench route as a hiking route (page 2-20), we urge that only the minium be done to satisfy access and resource-protection issues. We do not want to see this area publicized as an entry point that draws large numbers of people into the Behind the Rocks fins, which support several Sensitive Plants (chiefly Lomatium latilobum) and pockets of relict vegetation and soil crusts. | Although this is a site-specific action, there is no intention to make the King's Bench route into a major entry point for Behind the Rocks. |
| The Nature Conservancy | 204 | 18 | Reference is made on Page 2-21 to allowing motorized travel use on (among other routes) "the motorized access route to the viewpoint of Ida Gulch (the saddle between Adobe Mesa and Castle Rock)." This appears to be confusing, because (to our knowledge) the saddle between Adobe Mesa and Castle Rock does not look down northward into Ida Gulch, but into an unnamed side drainage of Professor Creek. Motorized access into this saddle from the south (Castle Valley | The commentor is correct that the route looks downward into Professor Valley and not into Ida Gulch.  The wording has been corrected.

The route that ascends the ridge and looks down into Ida Gulch is and will remain non-motorized only. |

321

| | | | | |
|---|---|---|---|---|
| | | | side) via a single designated route is fine. The view down into Ida Gulch is obtained from the saddle between Castle Rock and Parriott Mesa – a saddle to which motorized travel must NOT be allowed from either direction, i.e. the foot path up from the Castle Valley side, or the road into Ida Gulch from Highway 128. | |
| The Nature Conservancy | 204 | 19 | With regard to camping locations and/or restrictions in Labyrinth Rim/Gemini Bridges proposed SRMA listed under Alternatives B and C (page 2-23), we do not recommend one or the other specific set up stipulations. Rather, we more generally raise a concern that while camping in the designated locations may be acceptable per se, adverse impacts are likely to occur in areas surrounding the camping location(s) by some number of irresponsible OHV riders who are camped there. This is a large potential concern for the State Station milkvetch (Astragalus sabulosus var. vehiculus), the only known location for which is in the area north and northeast of Courthouse rock. Any campgrounds of designated campsites established in this area must be well managed and monitored for impacts to surrounding lands. | Providing designated campgrounds and campsites in the Upper Courthouse area is a management action precisely to protect the resources at risk mentioned by the commentor.  There would be a site-specific NEPA document prepared concerning any camping facilities in the area.  At the time of the preparation of this EA, fencing or other actions could be proposed as mitigation.<br><br>All travel in this area would be limited to designated routes.  All off-road travel would be illegal and citable. |
| The Nature Conservancy | 204 | 20 | Alternative C provides for a Tusher Slickrock Mountain Biking Focus Area and a Barlett Slickrock Freeride Focus Area. These are both within the range of known occurrences of the Sensitive Trotter's oreoxis (Oreoxis trotteri). At present we do not have sufficient information to assess the potential for adverse impacts to this plant from these Focus Area proposals, but suggest that inventories be done prior to ratifying these Focus Areas in the Final RMP. | The freeriding opportunities are mapped so as to be on rock only.  The BLM has observational data that mountain bike use will not harm the population of Trotter's oreoxsis. The primary population of Trotter's oreoxsis is on the mesa between Mill and Courtouse washes.  This mesa is off limits to all wheeled vehicles, and is to be managed as no surface occupancy for all surface disturbing activities.<br><br>The BLM invites the commentor to work toward providing protective measures for the Trotter's oreoxis that may occur near the freeride focus areas.  Protective measures such as signing and fencing could be imposed if such actions are necessary to protect this rare plant. |
| The Nature | 204 | 26 | Travel Management (Pg 2-28—2-50) The large issue | The Moab Field Office will use a combination of signing |

BLM_0012327

| | | | | |
|---|---|---|---|---|
| Conservancy | | | within this point is the distinction and choice between a "closed unless signed as open" and "open unless signed as closed" policy to route identification. Each policy has its pros and cons, though in general we believe that "closed unless signed as open" has greater merit (and fewer signs or posts overall). However, the proposed management, which calls for signing any/all non-baseline routes (whatever they are) as "Closed," appears to indicate an "Open unless signed as closed" approach. Does this statement effectively apply a comprehensive policy of "open unless signed as closed" regarding route identification across the entire MPA? If so, that fact should perhaps be made more clear in the Final RMP. If not, then we advocate that the MFO choose one approach (we prefer "closed unless signed as open") and include it up-front in the Travel Management section of the Final RMP. | procedures to ensure on the ground compliance with the Travel Plan.  Many very obscure old routes may need no particular signing at all.  Open travel routes will be marked on the ground.  The ultimate arbiter of a legal route will be the Travel Plan map that will be made available to the public upon the signing of the ROD. |
| Red Rock 4-Wheelers, Inc. | 206 | 2 | Some boundary adjustments to allow for a better recreational experience and more understandable enforcement are needed for the White Wash Sand Dunes Open OHV Focus Area, a part of the Labyrinth Rims/Gemini Bridges SRMA. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS.  See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| Red Rock 4-Wheelers, Inc. | 206 | 3 | The Club urges the BLM to consider establishing another SRMA in the Yellow Cat area north and east of Arches NP as this is an area of growing interest and spectacular beauty along the park fringes. | See response to comment 122-38. |
| Red Rock 4-Wheelers, Inc. | 206 | 4 | All SRMAs should have language included to provide a mechanism for future new routes and route connections as conditions warrant or recreational needs change.  This would add additional flexibility to the management of these areas. | The DRMP/EIS specifically allows for the addition of routes to the Travel Plan.  The document states on p. 2-48 that the Travel Plan "may be modified through subsequent implementation planning and project planning on a case-by-case basis". |
| Red Rock 4-Wheelers, Inc. | 206 | 5 | We recommend careful wording in the naming and signage for SRMAs, particularly the Focus Areas. Users need to know when other types of use are | A land use planning decision is not necessary for the BLM to undertake actions regarding signage and education. This is specifically addressed in Chapter 1 of the |

BLM_0012328

| | | | | |
|---|---|---|---|---|
| | | | allowed in an area, even though an area is primarily focused for recreational enhancement of one group. An example would be the Copper Ridge unit.  A 4x4 road will exist in the area, yet the main focus is mountain bikes.  The Sovereign area (non BLM) is an example of an area being designed for single track use, motorized and mechanized, however, mechanized riders have been encountered that expect exclusive use when on the trails. The Club believes careful wording and trailhead signage can reduce this problem, as well as working with local businesses to stress the importance of providing this same information to their customers. | DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Red Rock 4-Wheelers, Inc. | 206 | 7 | Special Recreation Permit (SRP) policy should remain at the 50 vehicle level to require a permit.  The 25 vehicle requirement proposal under Alternative C is too low. | See response to comment 123-26. |
| Red Rock 4-Wheelers, Inc. | 206 | 8 | Another problem area is the individual SRP policy proposed for the White Wash Sand Dunes Area focus area.  This would appear to be inconsistent with the Federal Land Recreation Enhancement Act (FLREA), wherein the public is supposed to be involved in the decision making process for charging fees.  It would appear the best choice would be to omit this from the RMP and deal with the fee system through the existing Resource Advisory Council. | See response to comment 123-10. |
| San Juan Trail Riders | 207 | 2 | The plan should more explicitly state that conflict is exacerbated by overcrowding. Additionally, the plan should better address the scope of conflicts. They occur at society, group, and individual levels. They occur between management, user groups, and within user groups. Although conflicts generally begin asymmetrically, the direction is not always consistent. Finally, the plan should acknowledge that conflicts become symmetrical when management actions unduly restrict the more dominant uses. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users.  The general nature of societal conflicts is not a land use planning issue. |
| San Juan Trail | 207 | 7 | Designating campsites should be done with public | See response to comment 122-48. |

BLM_0012329

| | | | | |
|---|---|---|---|---|
| Riders | | | participation. Camping should not be confined to one mass site for any given. Most public-land users prefer dispersed camping. The Ruby Ranch Road and Utah Rims should each provide a dozen sites. | |
| San Juan Trail Riders | 207 | 12 | (Please refer to maps provided by Ride with Respect, nonprofit) We generally support establishment of Labyrinth Rims SRMA in Alternative C. However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the power lines. The White Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D ( northward to Ruby Ranch Road and southward toward Red Wash Road), fee programs should be determined with public involvement through a Resource Advisory Council. Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Ten Mile Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Ten Mile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel. | See response to comment 122-32. |
| Bookcliff Rattlers Motorcycle Club | 208 | 5 | The BLM should remove the section requiring the Special Recreation Permit idea, and instead insert guidance to pursue funding sources, including but not limited to potential free programs at the White Wash Sand Dunes.  Implementation of this proposal will be difficult and perhaps unworkable. | See response to comment 123-10. |
| Bookcliff Rattlers Motorcycle Club | 208 | 6 | The BLM should not establish designated camping areas except in highly-developed areas.  The BLM has failed to designate spurs to campsites along the Ruby Ranch road near White Wash, leaving nowhere for users to camp.  This plan cannot be successfully implemented, and clearly demonstrates the flow in | A specific purpose and need of route designation in the alternatives for the Travel Plan was recreation opportunities and experiences which includes dispersed camping (see pg. G-12 of the DRMP/EIS).  The open area to the west side of the White Wash Sand Dunes has been enlarged to accommodate the camping that occurs |

BLM_0012330

| | | | | |
|---|---|---|---|---|
| | | | attempting to limit vehicle camping to designated sites only.<br><br>In addition, the DEIS does not sufficiently analyze the impacts to dispersed camping, nor does it provide a wide range of Alternatives to address dispersed camping.<br><br>BRMC Recommendation:  Vehicle use be allowed 300 feet off designated roads for dispersed camping and vehicle use should be allowed on spurs that lead to an existing campsite. | to the south of the oil well.<br><br>The commentor's suggestion of a 300 foot wide area along designated motorized travel routes would effectively greatly increase the acreage open to cross-country travel, which is inherently incompatible with the intention of moving to a system of designated routes.  The 300 foot area would result in unacceptable impacts to a number of natural and cultural resources.<br><br>See also responses to comments 120-83 and 120-86. |
| Bookcliff Rattlers Motorcycle Club | 208 | 7 | The DEIS should establish additional areas for competitive use.  Additional competitive routes should be established to create user variety and provide rest and rotation for other resources.  The permitting process and associated fees should be minimized. | In Alt C and Alt D of the DRMP/EIS, the Dee Pass Motorized Trail Focus Area (within the Labyrinth SRMA) has been identified as the area for competitive motorized events.  On pg. 2-25 it states: "competitive routes within this area would be identified based on site-specific NEPA analysis."<br><br>The BLM will continue to follow the NEPA process and its Special Recreation Permit (SRP) policies and fee structures for all events which fall under its jurisdiction. |
| Bookcliff Rattlers Motorcycle Club | 208 | 13 | BRMC requests that BLM consider an additional SRMA – "Wild Cow Wash" – in the Final Plan.  We believe that there is a need to plan for a motorized singletrack trail system surrounding Wild Cow Wash beneath the Bookcliffs.  This SRMA should extend north into the Bookcliffs proper. | The recreation use in the eastern Bookcliffs (referred to by commentor as Wild Cow Wash) is not at a high enough level to warrant a Special Recreation Management Area designation.<br><br>The commentor has not provided any site specific information on proposed additional single track routes to be added to the Travel Plan.<br><br>The BLM identified through scoping a large number of recreation issues.  Based on these issues, the BLM developed a variety of Special Recreation Management Areas (SRMAs), as well as a variety of focus areas.  These SRMAs and focus areas are designed to address a |

BLM_0012331

| | | | | |
|---|---|---|---|---|
| | | | | number of recreation needs, and the process is described in Chapter 4, page 192, of the DRMP/EIS.  The BLM believes that it has incorporated an adequate range of recreation opportunities in its action alternatives.<br><br>During the scoping period for the land use planning process, the BLM did not receive any comments identifying a need for the SRMA suggested by the commentor nor for the accompanying motorized trail system.<br><br>See response to comment 208-8. |
| Bookcliff Rattlers Motorcycle Club | 208 | 14 | The SRMAs that have a motorized focus should say they have a motorized focus. The only references to OHV use for the Labyrinth Rims SRMA is; "quality on-route mountain biking and backcountry driving experiences on established routes throughout the SRMA."  We understand this accurately describes some of this SRMA, but there is nothing in this management goal about trail based OHV use, or open riding on dunes, which are the predominant activities in much of the SRMA.<br><br>BRMC Recommendation: The Utah Rims, Labyrinth Rims and Cameo Cliffs all have an OHV focus. Trail based OHV recreation should be emphasized in all of the guidance, especially the management goals.  In motorized SRMA's, provisions for constructing new trails should be incorporated into the RMP. | The commentor is confusing the Labyrinth Canyons Special Recreation management Area (SRMA) with the large number of Focus Areas within this larger SRMA.  It is incorrect to say that the entire SRMA has a "motorized focus".  There are three areas within this SRMA that have the type of OHV-oriented focus that the commentor desires -- the White Wash Sand Dunes Managed Open Area (Alts C and D of DRMP/EIS), the Dee Pass Motorized Trail Focus Area (Alts. C and D) and the Gemini Bridges Motorized Touring Area (Alt. C).  The commentor's assertion that trail-based OHV use and open riding on dunes are the predominant activity in much of the SRMA is an inaccurate representation of how the SRMA would be managed under any of the action alternatives.  Additionally, it is not correct to label the Utah Rims as an OHV SRMA, as the DRMP/EIS specifically describes the management objectives for that particular SRMA as providing OHV, mechanized and hiking opportunities.  The Cameo Cliffs SRMA is described in the DRMP/EIS as providing a motorized/designated trail system.<br><br>As far as creating new routes are concerned, see response to comment 208-8. |
| Bookcliff | 208 | 15 | BRMC supports the adoption of this recommendation | See response to comment 122-39 regarding Utah Rims |

BLM_0012332

| Rattlers Motorcycle Club | | | from RWR with modifications.  Utah Rims SRMA ought to extend further southwest to the Cisco Road.  From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Mel's Loop and associated singletracks.  From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat.  A non-mechanized focus area could be developed in the Westwater WSA but leaving the spur road to Big Hole open to motorized users.  The Westwater Canyon overlook road should not be closed. Mechanized visitors should be allowed at least these two viewpoints of the place that their activities are prohibited from. | SRMA.

Concerning the creation of new routes, see response to comment 208-8.

The routes the commentor does not want closed are left open to motorized use in Alternative D. |
| Bookcliff Rattlers Motorcycle Club | 208 | 16 | BRMC supports the adoption of this recommendation from RWR with modifications.  Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation.  Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus.  Few adjustments are needed to the travel plan, except around Owl Canyon where Road access should be preserved.  A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge.  Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | See response to comment 122-38 regarding Yellow Cat, Yellow Jacket, and Dome Plateau.

Several of the routes of concern to the commentor are designated for motorized use in one or more of the action alternatives for the Travel Plan in the DRMP/EIS. |
| Bookcliff Rattlers Motorcycle Club | 208 | 17 | BRMC supports the adoption of this recommendation from RWR with modifications.  The Black Ridge area presents many potential recreation opportunities nearby Moab.  The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and | See responses to comments 122-43 and 208-8 the proposed Black Ridge Special Recreation Management Area and the addition of routes. |

BLM_0012333

| | | | | |
|---|---|---|---|---|
| | | | provides enough room for a full-day's ride.  Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas.  Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exits in Pole Canyon from the power lines to Area BFE.  In the same vein, a rock crawling area could be established on Black Ridge east of the power lines.  This area is littered with old mine roads, and is currently open to cross-country travel.  The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of the power line, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area.  The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 18 | BRMC supports the adoption of this recommendation from RWR with modifications.  Cameo Cliffs SRMA should also be expanded for better OHV riding.  The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area. | See response to comment 122-44. |
| Bookcliff Rattlers Motorcycle Club | 208 | 21 | BRMC supports the adoption of this recommendation from RWR with modifications.  The non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails.  This northwest corner of the Book Cliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development.  Similar to bike trails in Fruita a Tusher Canyon trail system would boost the economy | See responses to comments 122-31 concerning the area northeast of Green River and 208-8 concerning the addition of new routes. |

BLM_0012334

| | | | | |
|---|---|---|---|---|
| | | | of Green River, and dedicate quality trails for mountain biking. | |
| Glen Canyon Group | 209 | 25 | Re: 4.3.8.2.8 Recreation Decisions – SRMAs, Pages 4-134 to 4-138; also, Volume I, Chapter Two, Table 2.1 Pages 2-2-18 to 2-29.<br><br>The overall management plan described on page 2-18 and corresponding maps 2-8-B and 2-8-C seem well thought out but much too general. Since all 21 non-WSAs Lands with Wilderness Characteristics and portions of seven others are subsumed within SMRAs , it is imperative that their management needs be specifically and separately addressed. | The purpose of SRMA management is to control and provide for recreation use.  The management of non-WSA lands with wilderness characteristics is to protect natural values and to provide opportunities for solitude and primitive recreation.  Many of the 21 wilderness characteristics areas do lie within the boundaries of SRMAs.  Many of these wilderness characteristics areas are proposed to be utilized for hiking and other non-motorized opportunities.  See the discussion of Focus Areas for the recreation management proposed for these areas. |
| Glen Canyon Group | 209 | 26 | Re: 4.3.8.2.8 Recreation Decisions – SRMAs, Pages 4-134 to 4-138; also, Volume I, Chapter Two, Table 2.1 Pages 2-2-18 to 2-29….as stated in line 29 of page 2-18 "where a specific RMZ (or Focus Area) is not identified within an SRMA, the focus of that area is motorized, backcountry touring on designated roads." Why not make it non-motorized? We are greatly concerned that hiding most of the Non-WSA Lands with Wilderness Characteristics within Special Recreational Management Areas will essentially result in their annihilation. | See response to comment 209-12. |
| Glen Canyon Group | 209 | 27 | Re: The Bookcliffs SRMA,<br>There's an inconsistency in the RMP/EIS making the Bookcliffs SRMA a non-mechanized focus on page 2-18 (Alternative B) and non-motorized per page 4-135? | This is an error in Chapter 4 and has been changed to read "non-mechanized in both chapters. |
| Glen Canyon Group | 209 | 28 | Re: The Bookcliffs SRMA,<br>       We see no reason for Alternative C to designate the Bookcliffs an Extension Recreation Management Area (ERMA) rather than a SRMA since – according to Chapter four, specific management would be the same, and since BLM would avoid having to amend the Plan at a later date to accomplish this change. (page 4-136 and 4-137) | The commentor's desire to have the Bookcliffs designated a non-mechanized SRMA in Alt. C is noted. |

BLM_0012335

| Glen Canyon Group | 209 | 29 | Re: Canyon Rims SRMA, Focus Area: Scenic Driving Corridors on page 2-19: Defining widths of corridors from the centerline – rather ¼, ½, or 1 mile is arbitrary. These corridors should be based on the unique values in each area, including terrain, visibility, and line of sight of scenic vistas. | A distance was provided as a guideline for VRM II management in the preferred alternative.  Controlled surface use would be applied for the widths discussed in each alternative. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 30 | Re: Colorado Rivers SRMA: Alternative C should be expanded to include the entire Top of the World area and….should protect all 12,510 acres of Negro Bill Canyon as a day-use only area set aside for a hiking and ecological study focus. (Alternative C protects only 8,684 acres – page 2-21.) For boating management in the Colorado River, Two Rivers and Dolores River SRMAs, Alternative C should be the same as Alternative B in stating that no restrictions on private use would be established unless unacceptable resource impacts occur. | The commentor gives no reason why this SRMA should be expanded in Alt C.

Also see response to comment 209-3.

There is no reason given to restrict Negro Bill Canyon to day use only in Alt C.

A sentence has been added to alternatives C and D for these SRMAs stating that no restrictions on private use would be established unless unacceptable resource impacts occur. |
| Glen Canyon Group | 209 | 31 | Re: Labyrinth Rims/Gemini Bridges SRMA: Defining widths of scenic driving corridors from the centerlines – rather ¼, ½, or 1 mile is arbitrary. These corridors should be based on the unique values in each area, including terrain, visibility, and line of sight of scenic vistas. | See response to comment 209-29. |
| Blueribbon Coalition, Inc. | 211 | 67 | I also oppose the fee system in C and D alternatives. If existing funding will not cover needs, then any fee system should be managed by all affected, including the public using those areas. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 68 | I oppose the fee system proposed in Alternatives C and D. Fee systems are unpopular with public land users. | See response to 123-10. |
| Blueribbon Coalition, Inc. | 211 | 69 | Requiring fences around cottonwood trees is impractical and not a good idea. | See responses to 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 72 | I oppose this camping policy as contained in Appendix E. Further – I support keeping existing campsites open unless closure is accomplished via lawful public planning process. | See response to comment 123-8 and 120-86. |

BLM_0012336

| Blueribbon Coalition, Inc. | 211 | 73 | Limiting camping to one small designated area in the RMP is not wise not needed. | Camping is not limited to one small area in any of the alternatives to the DRMP/EIS. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 82 | ...in White Wash fencing the Cottonwoods doesn't make any sense to much of an expense to all of us. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 83 | I oppose the camping policy because there are no lists of how many camp sites there are going to be for motorized usage, you cannot park in the road and block it. I believe that we need all campsites left open that exist and are legal campsites. | See response to comment s123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 85 | The fee system proposed in Alternative C and D are not only unnecessary but in opposition to federal regulations concerning public use fees. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 86 | The notion of fencing trees and water sources is both impractical and unnecessary . | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 89 | The existing campsites should remain open and available unless closure is through lawful planning process. | See response to comment 123-8. |
| Blueribbon Coalition, Inc. | 211 | 91 | As for the White Wash Sand Dunes I believe that fencing the cottonwoods and water sources is impractical. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 92 | Alternatives C and D open areas should be expanded with no fees imposed for usage. | See response to comments 123-10 and 123-35. |
| Blueribbon Coalition, Inc. | 211 | 6 | Camping is a big issue. You show a lack of areas to camp for motorized, but plenty for non-motorized. Is this intentional or an oversight? Where are we supposed to camp? In the middle of roads? | Access to dispersed campsites was considered as a purpose and need for keeping spur routes open.  Cross country travel to access campsites is not allowed in areas limited to designated (or existing) routes.  Parking in association with dispersed camping may occur on designated routes, or alongside the designated route in previously disturbed areas.  See also responses to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 12 | My first comment regarding your RMP concerns fees. I am definitely opposed to fees. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 13 | The White Wash Sand Dunes management does not seem workable. How can it be practicable to fence each cottonwood tree? It would make more sense to put up signage so that users know to stay away from | See response to comments 208-3 and 479-6. |

332

BLM_0012337

| | | | certain areas. | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 14 | I oppose the BLM fee system in Alternative C and D. Public land should be free for all. Putting fences around trees is impractical. | See response to comments 123-10, 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 17 | One of our favorite riding areas is the White Wash Sand Dunes are near Green River. We understand that there is currently a review being done and policy being set for the White Wash area. We are concerned about the proposed fees that maybe charged for the area. We feel that the regulations of the law should be followed involving public input, also, any fees if charged should be used to improve the area and not taken out and used some where else. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 21 | We are opposed to the fee system proposed in Alternative C and D. Fees are always unpopular. The White Wash Sand Dune management plan is unacceptable and unworkable. Special permits are unlawful. Any fee system should require involvement of affected user groups. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 22 | The proposed fencing around cottonwood trees and water courses is not feasible. The young cottonwoods/water sources vary with the precipitation in the area – in wet years, fencing will be dangerous and impossible to maintain. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 25 | Campground/campsites are being closed by the BLM. Designated campsites and more of them will control and encourage proper usage of BLM sites. | See response to comments 123-8 and 120-86 for a dicsussion of dispersed camping. |
| Blueribbon Coalition, Inc. | 211 | 29 | I am totally opposed to the fee system that is being proposed for the White Wash Sand Dunes without input from the public. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 30 | As for camping with trailers, you have not allowed enough area for Holiday camping and not camping 5 feet from their neighbors. You have more camp areas for tent campers. | See response to comments 120-83, 123-8 and 120-86. The BLM is unaware that there is a bias toward tent campers in the DRMP/EIS. |
| Blueribbon Coalition, Inc. | 211 | 31 | I also disagree with the fee areas there. I am not sure this fee system is explained fully in the proposal. Is the | See response to comment 123-10. |

333

BLM_0012338

| | | | fee system proposed for the need to limit use? Or is there a need for funding for the proposed fencing project? | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 32 | Fencing the trees off is not a practical or feasible solution to the problem. If the wet areas and trees are fenced off there will be an ugly maze of dangerous fences in the area. To protect young trees, if that is the purpose, other options should be considered. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 33 | The camping policy outlined in Appendix E is vague....Closing off camping areas may not be a good idea because it will push people to areas that have never been camped in before. | No areas are closed to camping by action of the DRMP/EIS.  In certain areas, camping is limited to designated sites.  See response to comments 123-8 and 120-86 for a discussion of dispersed camping. |
| Blueribbon Coalition, Inc. | 211 | 36 | I strongly oppose the fee system for White Wash Sand Dunes area. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 37 | Building fences around the cottonwood trees and seasonal streams is not workable, not accepted, and not necessary. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 38 | I would really be opposed to a fee to be able to ride in this [White Wash Sand Dunes] area. One of my concerns here is that many times the fees collected are not used to benefit the users. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 43 | The proposed fee area for White Wash should be rejected outright. Paying for the privilege to use public lands that exist because of public funding is absurd. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 44 | Finally, the idea of vehicle camping only in designated campsites makes no sense for BLM managed lands. While it may be appropriate for national parks and monuments, on BLM land it is an unacceptable reduction in the freedom to use the land that is supposedly there to be protected for the public, not from the public. | The great majority of the Moab planning area is available for dispersed camping under all alternatives.  Travel associated with dispersed camping must be on designated routes;  many spur routes have been left available precisely for this purpose.  See also response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 46 | I do not support the proposed fee system referenced in Alternatives C and D. It does not support the law congress passed regarding fees on public lands. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 47 | Fencing off trees and "water sources" is impractical and unnecessary. Use signs/directional arrows in | See response to comments 208-3 and 479-6. |

BLM_0012339

| | | | | |
|---|---|---|---|---|
| | | | sensitive areas, (that require no activity) to direct travel where it is sustainable terrain. | |
| Blueribbon Coalition, Inc. | 211 | 48 | I am concerned about designated camping areas – to be decided in the future. This DEIS designation will directly affect that process. It is already required to have a "toilet" when camping. This is a very used area – around the Dunes and areas slated for closure will greatly affect where camping will be permitted. | The BLM must address sanitation issues where they arise.  In the White Wash area, the sanitation issues were brought to the agency's attention by the Grand County Sanitarian.  However, sanitation issue is a matter of implementation and does not require a land use planning decision.  See also response to comments 120-86 and 123-8. |
| Blueribbon Coalition, Inc. | 211 | 51 | I go camping to get away from it all. I oppose the camping policy that is outlined in Appendix E. They should be left open and the public must be involved. You are pushing us to camp on sensitive areas that you are trying to protect if you close the camping off. | See response to comments 211-33, 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 53 | Camping restrictions concern me as well. I am concerned with the closure of popular camping areas, such as the "Top of the Hill" if these areas are closed where, and when we camp. I am concerned that we will be left with nowhere to camp. | See response to comments 123-8 and 120-86.  If "Top of the Hill" refers to the White Wash area, the open area around White Wash has been expanded in the preferred alternative to include this popular camping area (see response to comment 120-83). |
| Blueribbon Coalition, Inc. | 211 | 54 | I also oppose the camping policy as outlined in Appendix E. I support a policy where existing campsites are open unless determined closure was necessary via lawful public planning process. | See response to comments 120-86 and 123-8. |
| Blueribbon Coalition, Inc. | 211 | 59 | The fencing of trees in the sand dunes is a huge waste of resources. It would be better just to mark the routes in washes to avoid the denser tree areas. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 61 | I oppose the fee system. Any fee system that must be instituted needs to involve the affected user group. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 62 | Fences around trees and water areas is unnecessary. | See response to comments 208-3 and 479-6. |
| Blueribbon Coalition, Inc. | 211 | 64 | I feel the camping policy as outlined in Appendix E does not tell us how many dispersed campsites would be closed and why they necessarily should be. There isn't enough areas now for the camping for motorized camping. | See response to comment 123-8 and 120-86. |
| Blueribbon | 211 | 95 | How do you justify fencing the cottonwood trees and | See response to comments 208-3 and 479-6. According |

BLM_0012340

| | | | | |
|---|---|---|---|---|
| Coalition, Inc. | | | keep ranch cows from the shade. Sometimes we like to have lunch in the shade. | to the BLM's range conservationist, cattle do not go onto the dunes as there is very little feed. |
| Blueribbon Coalition, Inc. | 211 | 97 | The multiple small campsites and pullout areas along roads provide dispersed camping and keeping as many open as possible is important to me. | An express purpose and need to retaining routes in the Travel Plan was "Recreational opportunities and experiences", which included dispersed camping.  Spur routes were retained that accessed dispersed sites.  See response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 98 | Appendix E: because there is nothing that tells how many or what campsites will be closed and it says nothing about public involvement. This needs to be changed. | See response to comments 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 99 | We strongly oppose the fee system. There is no way that the fees would be enough to even administer the program without being prohibitively high, and this country is PUBLIC LAND. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 100 | We have camped with our 5th wheel in the same area for twenty years. When we go back the next year we can't see any damage from where we were the year before. | See response to comments 120-83, 123-8 and 120-86. |
| Blueribbon Coalition, Inc. | 211 | 102 | …be sure that 80% of your fees collected in the charging areas should be used for upgrading travel trails, roads, camping areas, and toilet facilities. | See response to comment 123-8.  The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |
| | 216 | 2 | The plan should more explicitly state that conflict is exacerbated by crowding.  Additionally, the plan should better address the scope of conflicts.  They occur at society, group, and individual levels.  They occur between management, user groups, and within user groups.  Although conflicts generally begin asymmetrically, the direction is not always consistent.  Finally, the plan should acknowledge that conflicts become symmetrical when management actions unduly restrict the more dominate uses. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. The general nature of societal conflicts is not a land use planning issue. |
| | 216 | 6 | Designating campsites should be done with public participation.  Camping should not be confined to one mass site for any given.  Most public-land users prefer dispersed camping.  The Ruby Ranch Road and Utah | Public participation has been solicited throughout the land use planning process.  Camping is not limited to one mass site in any of the alternatives to the DRMP/EIS. See response to comments 123-8 regarding dispersed and |

BLM_0012341

| | | | | |
|---|---|---|---|---|
| | | | Rims should provide a dozen sites | designated camping. Dispersed camping is allowed on over 95% of the Moab planning area. |
| | 216 | 7 | In areas where camping is not restricted to designated sites, the travel plan should be adjusted to access campsites | See response to comments 120-86 regarding access to dispersed campsites.  One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| | 216 | 8 | The Moab Extensive Recreation Management Area should provide primitive roads, singletrack trails, and dry washes to connect SRMAs and towns.  Such routes offer opportunities for long-distance tours, which are increasingly popular amount motorized and mechanized enthusiasts.  Additionally, such links boost rural economies and disperse use, thereby alleviating conflicts | See response to comment 122-49 and 123-45 regarding the ERMA.The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 216 | 12 | I generally support establishment of Labyrinth Rims SRMA in Alternative C.  However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the powerlines.  The White Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D (northward to Ruby Ranch Road and southward toward Red Wash road).  Fee programs should be determined with public involvement through a Resource Advisory Council.  Approximately twenty-five miles of the surrounding OHB trails are popular among ATV riders, and should be designated as such.  The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts.  The Tenmile Point area from Dripping spring to Levi Well has relatively few routes and could be designated for non-mechanized focus.  Tenmile Wash should be designated without speed limits, since speed has little influence on biopysical impacts of travel. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS.  See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. Commenter's suggestions regarding additional trail designations are noted. The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| | 216 | 19 | The Dolores Triangle includes a few remote areas | See response to comment 122-40 regarding routes in the |

BLM_0012342

| | | | | |
|---|---|---|---|---|
| | | | where primitive character should be preserved.  By closing two less-valuable spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems.  Also, a road on the southeast ridge of the South Beaver Mesa lies outside of this focus area, and should remain open | Dolores Triangle. |
| | 216 | 24 | Cameo Cliffs SRMA should also be expanded for better OHV riding.  The current boundary offers a meager half-day for the skilled rider.  Extending the SRMA east to Big Indian Valley could still avoid mining activity.  Shifting the boundary north o the Browns Hole Road could still skirt the nearby residential area | When the Cameo Cliffs SRMA was created, the areas to the east were specifically excluded due to mining hazards. Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area. |
| Ruby Ranch | 264 | 7 | On pages 2-37 of the RMP it talks about how permits for motorized recreational use may be required if monitoring indicates long-term damage.  Overwhelming long-term damage by OHV use has already been documented in the EIS for the Ruby Ranch Allotment.  Permits should definitely be required for motorized use in high impact areas, especially riparian zones. | The statement referred to by the commentor applies to Ten Mile Wash.  Within Ten Mile Wash, motorized travel is limited to the marked, designated route.  The statement on pg. 2-37 of the DRMP/EIS means that if there were continued use off the Ten Mile route, permits for this one route could then be required. |
| San Juan Public Entry and Access Rights | 267 | 1 | The Cameo Cliff area should be designated as a focus area for ATV use. | Cameo Cliffs is to be managed to provide "sustainable opportunities for road-related motorized recreation on a marked route system"  (DRMP/EIS, pg. 2-18). These opportunities include ATV use. |
| | 268 | 1 | Our concern is that we have not seen any estimates of how many campsites are available currently, compared to how many will be available should Alternative C be implemented. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage |

338

| | | | | to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions |
|---|---|---|---|---|
| | 269 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 269 | 4 | We look at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions.  The commentor has not provided any information regarding specific campsite locations of concern. |
| | 269 | 5 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| | 269 | 6 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| | 271 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 271 | 5 | Access to dispersed camping areas: Technically anyone driving off a designated route to access a dispersed camping area would be in violation of the proposed travel plan. Where this type of camping is permitted it may not be feasible to carry all the necessary camping gear to a camp spot. The plan should address this issue so that legitimate camp spots can be accessed on a legal route. The Fishlake National Forest has implemented a program to address this subject, which as been successful. | See response to comments 120-86 regarding access to dispersed campsites.  One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| | 271 | 11 | It is very important that the Final RMP mandate full | Public participation has been solicited throughout the land |

BLM_0012344

| | | | | |
|---|---|---|---|---|
| | | | public involvement in any establishment and management of "restricted camping areas" or "controlled camping areas." We have looked at your maps and can't tell if the campsites we use are going to be open or closed. | use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 271 | 12 | Yellowcat/The Poison Strip/Dome Plateau is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network county and of mine roads that already exist. | See response to Comment 122-38 |
| | 271 | 16 | Page G-29, Implementation Process: This section should stress the need for maps and signing. It takes both. Most users cannot use maps as a navigational tool, especially broad scale maps without sufficient detail to allow accurate location of designated routes. All designated routes should have a number or some other identifying symbol or name that corresponds to the number, name or symbol on the map. These same identifiers should correspond to what is shown on route signage. With good signs and good maps, it is reasonable to expect users to stay on the designated routes. Until these aids are in place, law enforcement personnel and users will be equally frustrated. | Map and signage decisions are all administrative actions and do not require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
| | 273 | 1 | We oppose any fee systems and the closing of Gemini Bridges. | See response to comment 123-10 regarding fee systems. Commentor's opposition to closing Gemini Bridges noted. |
| | 275 | | URSMA should include Mel's Loop and the surrounding southwest area. | See response to comment 122-39. |
| | 276 | | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |

340

BLM_0012345

| | 276 | | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the network of mining roads that already exist. | See response to Comment 122-38 |
| | 276 | | Requiring fences around the cottonwood trees and water sources is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 277 | 2 | The fencing proposal for the cottonwood trees and water sources are a waste of time and effort and are completely impractical. | See response to comments 208-3 and 479-6. |
| | 278 | 2 | We can't tell by your maps if the campsites we use are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 278 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| | 278 | 5 | Yellowcat is very popular for four wheeling and ATV riding. Designating a SRMA there would utilize the network of roads that already exist. | See response to Comment 122-38 |
| | 279 | 3 | I can't tell by your maps if the campsites we use are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon |

BLM_0012346

| | | | | |
|---|---|---|---|---|
| | | | | site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 282 | 2 | Fencing around the cottonwoods and water is impractical; the draft plan should be abandoned. | See response to comments 208-3 and 479-6. |
| | 282 | 3 | I am opposed to the fee system in alternatives C and D the final RMP should not require fees. | See response to comment 123-10. |
| | 282 | 4 | The Utah Rims SRMA is a popular area to locals and tourists and should be extended to the southwest. | See response to comment 122-39. |
| | 282 | 5 | Yellowcat area is and has been a place that is and has been used by everyone for years. Designating a SRMA there would utilize the old mining roads. | See response to Comment 122-38 |
| International Adventure Tours | 287 | 1 | Installing fences around the cottonwood trees and "water sources" at the White Wash Sand Dunes is impractical and not necessary and will only add unnecessary costs. It has been our experience that the public at large are interested in being responsible users. Therefore, making it an educational matter seems more relevant – install a marker/sign indicating the value of protecting the trees and water sources would be as effective both in purpose and cost. | See response to comments 208-3 and 479-6. |
| Theodore Roosevelt Conservation Partnership | 288 | 8 | Given the long-term nature of energy development, the BLM should include a plan in the FEIS for compensating hunters for the loss of big game that might occur as a result of energy development. The Moab FO must identify the hunting values of the areas being considered for energy development and then determine how subsequent development will impact the uses sportsmen make of our federal public lands during oil and/or gas exploration and development of these lands. Because energy development might keep our members from being able to hunt for the rest of their lives in areas of the Moab FO, it needs to be determined what the Moab FO will do to provide our members and UT sportsmen with alternative locations where they can continue hunting during the appropriate lease-area determination process. | Compensating hunters for the loss of big game due to energy development is not within the scope of the RMP.<br><br>Upon site specific analysis for specific oil and gas project proposals, hunting values will be considered if impacted. Mitigation may be developed at the project development stage. Most public lands are open to hunting; therefore providing alternative locations on public lands is not applicable mitigation. |

BLM_0012347

| Grand County Backcountry Council | 289 | 1 | Two summers ago BLM instigated a study of the kinds of recreational use that occurs around Moab. This study, a part of the National Visitor Use Monitoring Program (NVUM), found that while 49.3 percent of visitors engaged in hiking as a part of their Moab experience, and 17.9 percent engaged in cycling activities, only 7.7 percent reported driving a 4WD vehicle and 3.8 percent rode dirt bikes or ATVs. Despite this data, BLM is designating 2,642 miles of motorized routes in its preferred alternative, an approach that is detrimental to quiet users (i.e. the majority of recreationalists). These NVUM results appear to make the RMP's recreation planning priorities null and void. | See response to comments 124-2, 124-133 and 124-134. |
| Grand County Backcountry Council | 289 | 2 | The results of the NVUM survey have not been released to the public by BLM, and they won't be until after the RMP's public comment period is over with. Why is BLM withholding information that would help the public make more knowledgeable comments on the RMP? The public deserves to a clear picture of actual on-the-ground use, and BLM needs to use those stats- even if they're unrefined – in its planning process. Otherwise, this recreation planning is invalid. | See response to comment 124-2. |
|  | 290 | 5 | Building fences around cottonwood trees and water sources is unnecessary and impractical. | See response to comments 208-3 and 479-6. |
|  | 293 | 2 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
|  | 294 | 1 | I can't tell from your maps if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section |

343

| | | | | E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
|---|---|---|---|---|
| | 294 | 4 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| | 295 | 2 | I looked at your maps and cannot tell if my favorite camping spots are open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 295 | 3 | Requiring fences around the cottonwood trees and "water sources" is impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 295 | 4 | We feel the Utah Rims SRMA is necessary to properly manage this popular recreation area. It must have motorized and mountain bike focus and include a process whereby new routes can be designated or constructed as is deemed necessary. It also needs to be extended to include the Mel's Loop area and beyond. | See response to comment 122-39. The DRMP/EIS specifically allows for routeThe DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). s to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| Sportsmen for Fish and Wildlife | 296 | 2 | There needs to be an adequate mechanism in place for future hunting guides and outfitters to be able to obtain the appropriate permits from the BLM to be able to guide hunters on lands within the RMP. | Hunting permits are granted through the Special Recreation Permit process out;lined in Chapter 2.  These permits continue to be issued in accordance with Handbook 2901-1. |
| Sportsmen for Fish and Wildlife | 296 | 3 | Since the BLM planning process started, and draft alternatives identified, President Bush issued an Executive Order on August 16, 2007, directing federal agencies to: | Nothing in the DRMP/EIS is inconsistent with this Executive Order. |

BLM_0012349

| | | | a)     evaluate the effect of agency actions on trends on hunting…And implement actions that expand and enhance hunting opportunities for the public<br>b)     consider the economic and recreational values of hunting in agency actions<br>c)     manage wildlife and wildlife habitat on public lands in a manner that expands and enhances hunting opportunities<br>d)     work with the states to manage and conserve game species and their habitats in a manner that respects private property rights and state management authority<br>e)     establish short and long term goals to foster healthy and productive populations of game species and appropriate opportunities to hunt those species | |
|---|---|---|---|---|
| American Motorcyclist Association | 302 | 3 | Fees at White Wash Sand Dunes: The AMA strongly opposes the proposed fee system at White Wash Sand Dunes in Alt C and D. We question the need to implement a fee system at White Wash and believe a fee system will be difficult to implement because of the distance from the Moab Field Office and the ease of access to Dunes and nearby trails. That is in fact one of the most common reasons fee systems fail, and it was one of the main reasons Congress passed the Federal Land Recreation Enhancement Act (FLREA). | See response to comment 123-10. |
| American Motorcyclist Association | 302 | 5 | The DEIS does not sufficiently analyze the impacts to dispersed camping, nor does it provide a wide range of Alternatives to address dispersed camping. If BLM is taking site specific actions such as closing campsites, the public deserves the opportunity to comment and suggest alternatives to these closures. | See responses to comments 123-8 and 123-9.. |
| American Motorcyclist Association | 302 | 9 | AMA also requests that BLM consider an additional SRMA in the Final Plan. We believe that there is a need to plan for a motorized single-track system surrounding Wild Cow Wash beneath the Bookcliffs. This area is entirely within a gas field, which stretches from Hay Canyon to the state line, which should | Wild Cow Wash was not brought up during the scoping period as an SRMA.  The area was not placed into SRMA status in any alternative in the DRMP/EIS.<br><br>See response to comment 208-13 regarding SRMA designation of Wild Cow Wash. |

BLM_0012350

| | | | | |
|---|---|---|---|---|
| | | | significantly reduce the environmental analysis required to establish a SRMA there. If the BLM lacks resources to formally establish the SRMA in the RMP process, we request that it be referenced as a potential SRMA and include guidance to coordinate with other stakeholders in an effort to conduct the process necessary to get it done. | |
| | 303 | 3 | There must be full public involvement in any establishment and management of "restricted camping areas" or "controlled camping areas." | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. See response to comments 123-8 regarding dispersed and designated camping. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2. |
| | 303 | 7 | Special Recreation Management Areas as addressed in the draft RMP need to be expanded by the addition of language that would permit additional roads to be added, or connections between roads to be constructed in the future. This will give the Moab BLM the needed flexibility to respond to changing user needs or as a way of mitigation in case future difficulties develop over time. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| | 303 | 9 | -development of a Utah Rims SRMA | Commentor's statement is noted. |
| | 307 | 2 | Emphasis should be placed on motorized vs. non-motorized, rather than mechanized vs. non-mechanized when planning for recreational land use. Bicycles are human-powered, lightweight craft and should not be categorized with OHVs. This is consistent with your BLM National Mountain Biking Strategic Action Plan. Please remove bicycling from any definitions of OHVs and other all-encompassing variations of 'wheeled vehicle' classifications and remove any references to bicycles as mechanized vehicles. At times it is right to group bicucles and motorcycles together, but separate from other | The BLM recognizes that bicycles are not motorized vehicles. The Moab RMP is consistent with the BLM National Mountain Biking Strategic Action Plan. However, bicycles are mechanized conveyances. As such, they are not allowed in areas that are managed for hiking only (such as Wilderness Study Areas). Bicycles are allowed on all routes in the Travel Plan. In addition, the Travel Plan designates some routes and areas for mountain bike use only; this designation excludes motorized vehicles. |

BLM_0012351

| | | | | |
|---|---|---|---|---|
| | | | motorized vehicles when addressing specific single-track and slick rock areas. | |
| | 310 | 6 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We strongly oppose this provision of the Draft Plan. | See response to comments 208-3 and 479-6. |
| | 310 | 9 | I oppose the fee system contemplated in Alternatives C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The final RMP should not require a fee system. However, if funding for infrastructure needs cannot be met with existing funding and grant programs, then a fee system should be implemented only with the full involvement of the Recreational Fee Advisory Council. Because the open area boundary will not easily be identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely difficult to enforce. We suggest that the BLM consider other funding mechanisms to pay for the needed management infrastructure. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| | 310 | 12 | Moab BLM is closing a huge number of dispersed campsites, as outline in Appendix E. The Final EIS should disclose how many campsites would be closed under each alternative. Policy should support that existing campsites are open, unless determined closure was necessary via lawful public planning process. The Final RMP should mandate full public involvement in any establishment and Management of "restricted camping areas" or "controlled camping areas." BLM maps should easily show if campsites will be closed, and show if road is designated right up to campsite. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. . The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Dispersed campsites would be signed; however, maps and signage are not land use planning decision. |
| | 310 | 13 | The Travel Plan and the Administrative Setting must be consistent in all SRMAs. | The routes identified in the Travel Plan are available under all other management scenarios proposed in the alternatives of the DRMP/EIS such as ACECs, Wild and Scenic Rivers, SRMAs, Focus Areas, and non-WSA lands with wilderness jurisdictions. A sentence has been added |

347

| | | | | to the PRMP/FEIS under Travel Management (Management Common to All Action Alternatives) for clarity that states "routes identified in the Travel Plan would be available regardless of other proposed management actions'. The administrative setting described for each SRMA in Appendix F is a general setting for the entire SRMA. When Recreation Activity Management Plans are prepared for each SRMA, specific settings will be identified for each portion of the SRMA. |
|---|---|---|---|---|
| | 310 | 14 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| | 310 | 15 | SRMAs and their "focus areas" should avoid excluding other uses categorically. The Preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones." | See response to comment 413-9. |
| | 310 | 16 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future. In addition, limiting camping to one small designated area, in the RMP, is not wise. The RMP should provide general direction and not limit camping in such a way.<br><br>The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrants the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See response to comment 122-39 regarding the proposed boundary. |
| | 310 | 17 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |

BLM_0012353

| | 327 | 2 | The camping policy as stated in Appendix E. I support a policy where existing campsites are open, unless closure was determined via a lawful public planning process. It is important for the final RMP to mandate having full public involvement in any establishment and management of designated camping areas. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions |
| --- | --- | --- | --- | --- |
| | 328 | 3 | Proper signage and education should be tried prior to fencing around trees and water holes. | See responses to comments 208-3 and 479-6 regarding fencing. Education and Signage are all administrative actions and do not require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
| | 328 | 4 | The proposed "Individual Recreation Permit" If the current needs cannot be met with the normal funding/grand programs, only then should a fee system be utilized. | See response to comment 123-10. |
| | 328 | 5 | The camping policy suggested in Appendix E – the existing campsites should remain open until solid proof shows that different management should be used, and then with public input on new proposals. | Public participation has been solicited throughout the land use planning process. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
| | 328 | 6 | There should be increased focus for motorized and mountain bike use in the Utah Rims SRMA, including the ability to construct new routes in the future, and the area should extend southwest to also encompass Mel's Loop. | See response to Comment 122-39. The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |

349

BLM_0012354

| | 328 | 7 | The Yellowcat area is should also be in a SRMA, using the existing networks of roads, etc. | See response to Comment 122-38 |
|---|---|---|---|---|
| | 330 | 2 | Increase the number of people needed for group special permits. My friends, family and I can easily be a group of 24 people. Make use get a permit and special insurance for a weekend trip to Moab is silly. | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112, and 124-110 regarding clarification of SRP policies and SRP group numbers. |
| | 333 | 3 | On other specifics I support the organization, Ride with Respect's RMP comments:<br>-increase in ERMAs and SRMAs<br>-some important links in the travel plan are missing and some roads could be closed<br>-trails were not properly inventoried for bicycles, motorcycles and ATVs<br>-White Wash should be open to cross country travel | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 338 | 2 | Having designated camping spots is unecessary. People camp or park in the places they have been doing it in for years. The lay of the land already limits how many can park there. Most of the vehicles that camp there are self-contained RVs. So I stronly oppose the camping policy in as outlined in Appendix E of your current draft plan. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| | 339 | 2 | Fencing off areas around resources will not add to the aesthetics, public education for all would be a better alternative | See response to comments 208-3 and 479-6. |
| | 339 | 3 | The fee system as proposed does not seem to make much sense, I am willing to support funding for infrastructure if existing funding is inadequate but please do not impose "individual Special Recreation Permit" programs. Everyone should pay the same no matter what mode of transportation. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| | 339 | 4 | The Utah Rims SRMA would help manage this popular area. | Commentor's statement is noted. |
| | 340 | 2 | Fencing off areas around resources will not add to the aesthetics, public education for all would be a better alternative | See response to comments 208-3 and 479-6. |
| | 340 | 3 | The fee system as proposed does not seem to make | See response to comment 123-10 regarding the |

BLM_0012355

| | | | | |
|---|---|---|---|---|
| | | | much sense, I am willing to support funding for infrastructure if existing funding is inadequate but please do not impose "individual Special Recreation Permit" programs. Everyone should pay the same no matter what mode of transportation. | possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRPs policies. |
| | 340 | 4 | The Utah Rims SRMA would help manage this popular area. | Commentor's statement is noted. |
| | 341 | 1 | As for fencing cottonwood trees in White Wash, this seems utterly unecessary and costly. | See response to comments 208-3 and 479-6. |
| | 344 | 2 | I looked at your maps and cannot tell if the campsites we used are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| Public Lands Equal Access Allaince | 346 | 7 | We have looked at your maps and can't tell if the campsites we use are going to be open or closed. | No new campsites have been closed in the DRMP/EIS. The open area near the White Wash Sand Dunes has been expanded to accommodate the camping that occurs to the east of the Ruby Ranch Road (see response to comment 120-83).<br><br>The commentor provides no specifics about campsites that he uses. |
| | 347 | 13 | It is not clear how many existing campsites would be inaccessible under the policy. The FEIS should clearly state how many campsites would be closed under each alternative. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |

351

BLM_0012356

| | | | | Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
|---|---|---|---|---|
| | 347 | 14 | More clarification is needed as to what is considered obtrusive damage. The stipulation of "trampled vegetation" seems vague to me. It could be interpreted too broadly, resulting in unintended restrictions. | The commentor refers to the discussion of dispersed camping in Appendix E, Section E.1.2. The determination of obtrusive damage must be made on a site-specific basis; the examples given in the appendix are intended to show what type of damage might lead to a future action. Professional judgment would guide this decision in the future, along with a site specific study of damage. |
| | 347 | 15 | The restriction that disbursed campers must stay on designated routes is confusing. Does it mean that a campsite that is 50 yards off a designated route cannot be accessed by motor vehicles? | Yes. See response to Comment 120-86 regarding access to dispersed campsites. See responses to comments 120-86 regarding access to dispersed campsites. One of the express purposes for leaving a route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| | 401 | 2 | I believe Canyon Rims should be managed as a quiet recreation area. | Commentors desire noted. |
| | 405 | 1 | The current proposal is unworkable because it puts too much strain on the resources in a limited area with a very confusing boundary guideline. I am specifically talking about the camping area to the West of the Dunes. | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| | 405 | 2 | Implementing a "Fee System" with the introduction of the "Individual Special Recreation Permit" is unlawful, illegal, and counterproductive to the National OHV Recreation Fee Act set forth by Congress. The Moab BLM office is not above the mandates outlined by Congress. There are funding and grant programs that are REQUIRED to be exhausted first and then the public is again REQUIRED to be involved in the process. | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| | 405 | 3 | The camping policy outlined in Appendix E is irresponsible as well. If an area is to be closed this | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by |

BLM_0012357

| | | | | |
|---|---|---|---|---|
| | | | MUST involve a lawful public planning process. Inclusively, if you look at your maps it is impossible to toll if the campsites we use are going to be open or closed. | action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| New Mexico OHV Alliance | 411 | 1 | Existing campsites should remain open unless closure was determined necessary through individual assessment and a lawful public planning process. The Final RMP must include full public involvement in any decisions to create "restricted camping areas" or "controlled camping areas." | See response to comment 123-8. |
| New Mexico OHV Alliance | 411 | 4 | Fee System: Any fee area proposal must now be reviewed under the Recreation Enhancement Act (REA). Imposition of fees on unimproved areas, without the specific improvements listed in the REA is not allowed under the new act. | See response to comment 123-10.  Wording has been added to clarify that fees would be instituted consistent with the Federal Recreation Land Enhancement Act (FLREA). |
| Rising Sun 4x4 Club | 413 | 3 | Please do NOT put the Rabbit Valley/Westwater area under custodial management with a hiking and equestrian emphasis. | The Rabbit Valley area is part of the Utah Rims SRMA, which is designated in Alt C for motorized and mechanized trail use.<br><br>The Westwater area (outside the Wilderness Study Area) is within the Moab Extensive Recreation Management Area (ERMA).  It is not managed for a hiking and equestrian emphasis.  All recreation activities can occur in the ERMA consistent with the Travel Plan. |
| Rising Sun 4x4 Club | 413 | 6 | Any fee system should require the full involvement of the Recreation Fee Advisory Council, BLM's Resource Advisory Council, and the affected user group. | See response to comment 123-10. |
| Rising Sun 4x4 Club | 413 | 9 | How should recreational uses be managed to limit conflicts among recreational users? BLM's draft plan | Focus Areas are not intended to be for the exclusive use of any one group of recreationists.  The BLM's Land Use |

BLM_0012358

| | | | | |
|---|---|---|---|---|
| | | | indicates that your answer is to create "exclusive use zones." This is not the only answer to user conflict, and is, in fact, unworkable. Currently there is a large amount of Wilderness land appropriate for 'quiet use' advocates, but creating "exclusive use" zones in areas currently open for OHV use will concentrate increasing use on a smaller footprint, increasing impact. | Planning Handbook (H-1601-1) directs the BLM to designates Recreation Management Zones (which are called focus areas in the Moab DRMP/EIS). These areas are defined on pg. 2-18 in the DRMP/EIS as those that "emphasize particular types of redreation activities while still allowing for other uses in accordanced with the Travel Plan. Focus areas are established as a mechanism for enhancing specific recreation opportunities through facilities and education." |
| Rising Sun 4x4 Club | 413 | 11 | Also at issue is the lack of information about campsite closures; the analysis does not tell us how many campsites would be closed under each alternative. This makes it very difficult to gauge the impact of the alternatives on dispersed camping. For instance, it appears that the Appendix E rule change would effectively eliminate all camping in the Bartlett Wash area, at least in the interim until and if it is developed. We support a policy where existing campsites are open unless determined closure was necessary via lawful public planning process including specific impact analysis. This should include full public involvement with adequate information specific to each area. | See responses to comments 120-86 and 123-8. Bartlett Wash is available for dispersed camping presently, although campers are restricted to designated sites and are required to carry out solid human waste. Camping at Bartlett Wash remains as is under the DRMP/EIS; should a developed campground be proposed at Bartlett Wash, site specific NEPA analysis would be undertaken. Full public involvement would be part of the NEPA analysis. |
| Rising Sun 4x4 Club | 413 | 12 | We do believe that all SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| Rising Sun 4x4 Club | 413 | 13 | Please clarify, up front, via signage or other on-the-ground means, that SRMA may emphasize a particular use without excluding other uses. | Signing on the ground is not a land use planning decision. See Chapter 1 of the DRMP/EIS on page 1-11, which clarifies which actions are administrative ones. |
| | 417 | 3 | A general policy of closing dispersed campsites without first determining a reason for it with the proper analysis is wrong. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |

BLM_0012359

| | 418 | 3 | Implementation of any fee system MUST include the uses affected as well as the Recreational Fee Advisory Group. | See response to comment 123-10. |
|---|---|---|---|---|
| | 419 | 2 | The Final RMP must mandate full public involvement in the establishment and management of "restricted camping areas" or "controlled camping areas." BLM's maps are unclear as to whether or not the camp sites the public uses are going to be open or closed. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 419 | 3 | Yellowcat should be a SRMA. | See response to Comment 122-38 |
| | 422 | 5 | The White Wash Sand Dunes management plan is totally unacceptable and unworkable. The draft plan bans nearly all camping until the agency gets around to constructing a developed campground. Further, the agency would also implement a "fee system using individual Special Recreation Permits" although I do not find a timetable or fee structure included. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. |
| | 422 | 7 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. Further, please define the term 'water source' would this include ephemeral springs? What period? Would the fences be required on the off chance water could be sourced there or only during actual flow? | See response to comments 208-3 and 479-6. |
| | 422 | 8 | The open area should be bounded by easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. Because the open area boundary, as | See response to Comment 123-35. The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding. |

355

BLM_0012360

| | | | | |
|---|---|---|---|---|
| | | | proposed will not be easily identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely difficult to enforce. | Enforcement actions are administrative and do not require land use planning decisions. |
| | 422 | 9 | A fee system should be implemented only with the full involvement of the Recreational Fee Advisory Council and affected user group. | See response to comment 123-10. |
| | 428 | 5 | Create a Yellowcat area SRMA | See response to Comment 122-38 |
| | 431 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 431 | 4 | I support a policy where existing campsites are open unless closure was determined necessary via lawful public planning process. It is very important that the final RMP mandate full public involvement in any establishment and management of "restricted camping areas" or controlled camping areas. | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| | 431 | 5 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 431 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| | 431 | 7 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| | 432 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |

BLM_0012361

| | 432 | 4 | I support a policy where existing campsites are open unless closure was determined necessary via lawful public planning process. It is very important that the final RMP mandate full public involvement in any establishment and management of "restricted camping areas" or controlled camping areas. | Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| --- | --- | --- | --- | --- |
| | 432 | 5 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 432 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| | 432 | 7 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| | 433 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comments 208-3 and 479-6. |
| | 433 | 4 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided |

357

| | | | | |
|---|---|---|---|---|
| | | | | any information regarding specific campsite locations of concern. |
| | 433 | 5 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39. |
| | 433 | 6 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Moab Area Climbers Association | 434 | 3 | The MACA would like to see the DRMP formally acknowledge that climbing is a legitimate use of the public lands around Moab. | The DRMP/EIS mentions climbing several times throughout the document.(e.g., p. 3-80). In addition, Focus Areas are proposed specifically for climbing activities. Climbing is acknowledged as a legitimate use of public lands. |
| Moab Area Climbers Association | 434 | 4 | We also feel that certain areas in Kane Creek and on Potash Road are popular enough that toilet facilities are warranted. We would be able to work with the BLM, as the Access Fund and Friends of Indian Creek have done in the past, to help aid the building of these much-needed facilities. | Installing toilet facilities is not a land use planning decision. |
| | 441 | 4 | The camping policy, Appendix E, lacks specifics as to where and what kind of camping is allowed in each area. Maps of camping should be detailed for the public information, with the camping opportunities clearly defined. Can you provide public readable camping maps? | Appendix E outlines areas of controlled and dispersed camping. See responses to comments 123-8 and 120-86 regarding designated and dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number depends upon site specific conditions. Dispersed campsites would be signed; however, maps and signage are not land use planning decisions. |
| | 442 | 3 | The camping policy in Appendix E is no good. The suggested policy will put everyone in tight spots, which will create impact problems. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| | 446 | 1 | One of our favorite areas for dispersed camping has been closed to that activity (the Blue Hills Road, Bartlett Wash area). Please don't close any more | Blue Hills and Bartlett Wash areas are available for dispersed camping presently, although campers are restricted to designated sites and are required to carry out |

358

BLM_0012363

| | | | | |
|---|---|---|---|---|
| | | | areas off to dispersed camping. I fully support that the final management plan must mandate full public involvement in any established and management of "restricted camping areas" or "controlled camping areas." | solid human waste. Camping at Bartlett Wash remains as is under the DRMP/EIS; should a developed campground be proposed at Bartlett Wash, site specific NEPA analysis would be undertaken. Full public involvement would be part of the NEPA analysis. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| | 447 | 2 | Mitigating potential problems with fencing is impractical and does not conform to the environment. | See response to comments 208-3 and 479-6. |
| | 447 | 3 | Yellowcat and the Utah Rims should have a SRMA designation: Yellowcat to utilize the maze of existing mining roads, and Utah Rims should, as a minimum, extend to include Mel's Loop. | See response to Comment 122-38 regarding Yellow Cat, and 122-39 regarding Utah Rim SRMA. |
| | 457 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. We strongly oppose this provision of the draft plan. | See response to comments 208-3 and 479-6. |
| | 457 | 4 | We oppose the fee system contemplated in Alternatives C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The Final RMP should not require a fee system; however, we are willing to support funding for infrastructure if needs cannot be met with existing funding and grant programs, but not with an "individual Special Recreation Permit" program. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |
| | 457 | 5 | Additionally, it is impossible to tell from examination of your maps whether the campsites we use are to be closed or are to remain open. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of |

BLM_0012364

| | | | | concern. |
|---|---|---|---|---|
| | 467 | 2 | Your open area at White Wash in Alt C and D must be expanded.The current proposal is unworkable because it closes the killer hill climg and camping area to the west of the Dunes.<br>Such as small area, confines a huge amount of vehicles use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | See response to comment 123-35 regarding expansion of White Wash. |
| | 467 | 3 | Requiring fences around the cottonwood trees and water sources, is both impractical and unnecessary. We strongly oppose this provision of the draft plan. | See response to comments 208-3 and 479-6. |
| | 467 | 4 | We oppose the fee system contemplated in Alts C and D. Fee systems are inherently controversial and often unpopular with the recreating public. The final RMP should not require a fee system. However, I am willing to support funding for infrastructure if needs cannot be met with existing funding and grant programs, but not with an "individual special recreation permit" program. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112, and 124-110 regarding clarification of SRP policies. |
| | 467 | 5 | We oppose camping policy as outlined in App E. I support a policy where existing campsites are open unless closures was determined to be necessary via a lawful public planning process. The Final RMP must mandate full public involvement in any establishment and management of "restricted camping areas" or 'controlled camping areas" | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. . |
| | 467 | 6 | I looked at your maps and can't tell if the campsites we use are going to be open or closed. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon |

360

| | | | | site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern |
|---|---|---|---|---|
| | 467 | 7 | Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future. The Utah Rims SRMA should extend further southwest to concompass Mel's Loop and beyond. | See response to comment 122-39. |
| | 467 | 8 | Yellowcat is increasingly popular for 4 wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| | 471 | 2 | Proposal to allow vehicle camping only in designated campsites in all areas of the FO is overly restrictive and should be abandoned. By closing carious areas to camping have found other new areas to camp, resulting in more disturbed areas. Some of the areas BLM has designated as Open to Camping are next to railroad tracks and in close proximity to highly traveled roads. Not very desirable locations. I am strongly opposed to the camping policy outlined in App E. | See response to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding vehicular access to dispersed camping sites. One of the express purposes of leaving a route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| BLM - Grand Junction Field Office | 473 | 1 | McInnnis Canyon NCA supports the need for an adequate takeout for users of the Ruby -Horsethief section of the river. Any permit system that would affect these users will need to be developed cooperatively with the NCA and incorporate resources and public use concerns for this entire section of the river, including the portion in Colorado. Follow-up discussions needed with the NCA staff. | The Moab BLM welcomes the opportunity to work with McInnis Canyon NCA regarding takeouts for Ruby users. |
| BLM - Grand Junction Field Office | 473 | 8 | Alt. C for the Dolores River SRMA on the Dolores River , from the CO border to Bridge Canyon specifies a permit requirement for both private and commercial use and it limits commercial outfitters to 14. The GJFO has outfitters using the Dolores River, some shared with the MFO, that will be required to take out at the state line if they are not one of the 14 outfitters. Private boaters using the Dolores River in CO are not currently | Permits are required of all users on the dolores River in Utah. This is not a new planning decision -- it has been the case since the 1970's. The Moab BLM urges the Grand Junction office to consider a permit process for its portion of the Dolores river.<br><br>Commercial boating permits on the Dolores River are on an allocated system. |

BLM_0012366

| | | | required to have a permit and would also have to take out at the state line. This may significantly affect recreation opportunities available on the Dolores river for private boaters, given the limited and unpredictable flows of the river, it seems unnecessary to restrict use. How would private permits be administered? And, why only permit half of MFO's portion of the Dolores? In any case, this issue could influence management options fro the Gateway SRMA and would be a good topic of discussion between the MFO and GJFO. | |
|---|---|---|---|---|
| Environmental Protection Agency | 479 | 8 | The EPA supports the designation of the 10 proposed SRMAs in the preferred alternative and recommends the management prescriptions proposed for them. The EPA recognizes that the BLM has limited law enforcement capability and recommends that the BLM leverage its existing law enforcement resources. Specifically, we recommend that BLM maintain a credible field presence for promoting and monitoring recreation user compliance by hiring seasonal field technicians to educate the public, construct signage, fencing and other barriers, to remediate any new impacts and to report violations to BLM enforcement officers for ticketing. | Enforcement, field presence, monitoring, compliance, education, and signage are all administrative actions and do not require land use planning decisions.  These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
| Coconino Trail Riders | 488 | 5 | The White Wash Dunes Fee Area is ill-advised and unworkable. From an Agency perspective, it would appear to be exceedingly difficult to administer and enforce. From an user perspective, it appears arbitrary and capricious with regards to limits and usefulness. It is also difficult to comply: where can a user conveniently purchase permits? While the CTR is not necessarily opposed to the fee concept, users need to be intimately involved in creation of thee areas, with appropriate oversight of how collected monies are spent. Funds need to be allocated to work on the ground, and not siphoned off for administrative and overhead fees, or be transferred to other districts. | See response to comment 123-10. |
| Coconino Trail | 488 | 6 | Dispersed camping is important to CTR members. It is | See responses to comments 120-86 and 123-8. |

BLM_0012367

| Riders | | | an important part of the off-road recreational experience. With this in mind, it appears that dispersed camping is to be essentially eliminated, although the camping proposals relative to the various Alternates are unclear. The final plan must mandate full public involvement in the establishment of restricted or controlled camping areas. | |
|---|---|---|---|---|
| | 620 | 1 | All trails in the Moab area should be left open. It is not right that while you do these reports you only show the bad. You purposely leave out all the beauty you will be closing off to majority of people that visit this area. In the name of save it for the next generation? | Comment noted. The BLM attempts to provide recreation opportunities for many and diverse types of recreation. However, the Moab planning area has finite recreation resources and for the BLM to commit to providing alternative opportunities for all types of potential recreation uses is not realistic.  Therefore a balanced multiple use approach, as required by FLMPA, is used to provide recreation opportunities. |
| | 632 | 1 | We've noticed some fantastic kiosks and information areas in many places in the Moab area. It would be fantastic if more of these could be created and maintained. I think that education is the solution to our "user conflict" in the area, rather than segregating the different types of users. Through I have not experienced much difficulty with user conflicts, I can see how it would happen if people were caught by surprise. If everyone knew what to expect and how to behave on each individual trail, there would be no surprises or conflicts. The continued and increased use of informational kiosks at trailheads would be very welcome and useful. | See response to 413-9 regarding focus areas. Education and signage are all administrative actions and do not require land use planning decisions. These suggestions will be considered during implementation of the Travel Plan after the land use plan is completed. |
| | 635 | 1 | In Chapter 2, Table 2.1 page 2-25 – I disagree with Alt C statement: "close the spur route to Gemini. Bridges to facilitate public use and help restore damaged lands along the spur route. Construct a parking area near the bridges."<br><br>Closing route to access areas doesn't facilitate "public use." Area should be open and read "Spur to Gemini Bridges will remain open. If unacceptable damage to | Comment noted. |

BLM_0012368

| | | | | |
|---|---|---|---|---|
| | | | natural or cultural resources be recreational use is anticipated or observed, BLM would seek to limit or control activities by managing the nature and extent of the activity or providing site improvements." | |
| | 644 | 1 | Dispersed camping is critical to a pleasant public lands visit. When we visit a National Park, we expect to be shoe-horned into designated, sterile campgrounds. A significant reason for visiting USFS and BLM lands is to enjoy camping experience. In my area, whenever dispersed camping has been banned the result has been illegal camping that is extremely destructive. If your wish is to protect the public lands you have to give users alternatives other than stay home, camp in the equivalent of a Walmart parking lot, or break the law. Your plan never mentions how many campsites may be available or how they will be determined. The public should have a say—aren't these supposed to be PUBLIC lands? | Public participation has been solicited throughout the land use planning process. See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding vehicular access to dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| | 660 | 1 | I have relatives who live near the White Wash Sand Dunes area and we all like to spend time together there on scenic trails when we visit. I understand from them that your agency is in the process of implementing a fee system, using Individual Special Recreation Permits, to help fund the cost of managing the area. I believe that this proposed fee system skirts the intent of the Federal Land Recreation Enhancement Act handed down by Congress in that it does not involve the public when charging fees for recreation and doesn't ensure that the funds benefit the area where they are paid.

I am opposed to an individual special recreation permit for this area and other areas that the BLM manages for the reasons I have stated and believe that without full public involvement in the recreational fee process the BLM is countermanding the voice of the people and Congress as dictated by the FLREA. Furthermore, it is | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes and the Federal Lands Recreation Enhancement Act. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |

BLM_0012369

| | | | | |
|---|---|---|---|---|
| | | | my opinion that the BLM should manage all other funding sources, including RTP, OHV and other grand programs until they are expended before any fee program is established in any BLM managed area. | |
| | 668 | 1 | I feel that the final RMP should not lock public lands away from the public, nor should access be fee based. Fee based systems are discriminate against those with limited resources and generate an animosity between the user and those who administer the fees. It also requires a police like enforcement  program that would require financial resources to carry out. | See response to comment 123-10 regarding possibility of a fee system for use of the open area in White Wash Sand Dunes. Enforcement actions are administrative and do not require land use planning decisions. |
| | 675 | 1 | Fences around cottonwood trees: This is completely unnecessary and takes away from a lot of the area's natural magic. The best thing that can be done for the cottonwood's is to remove the invasive tamarisk. Fences solve nothing for the long term health of the Cottonwoods. | See response to comments 208-3 and 479-6. |
| | 679 | 3 | I don't see a need to decrease the number of participants allowed in a non-permitted group, unless this is either an attempt to generate additional revenue, or to punish large families and recreation groups. | See response to Comment 124-110 and 124-110. |
| | 680 | 4 | Special Permits. As part of the Toyota Land Cruiser Association, I enjoy the Cruise Moab events in the spring. I believe that limiting the number of vehicles in a group to 24 may be a burden on some clubs and groups that want to run a trail together. Please consider a more reasonable number--say 35 to 40. | See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRPs policies and SRP group numbers. The BLM recognizes the benefits of working with clubs and user groups and will seek to streamline permitting wherever possible. |
| | 680 | 5 | White Wash Sand Dunes - Please expand the open travel area beyond what is contemplated in Alt C. Please do away with the proposed fee system. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes |
| | 680 | 6 | The campsite restrictions for vehicle camping on public lands should not be included in the plan. This is over | See response to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area.  See |

BLM_0012370

| | | | | response to comment 120-86 regarding vehicular access to dispersed camping sites. |
|---|---|---|---|---|
| | 683 | 1 | Your open area at White Wash must be expanded. The current proposal is unworkable because it closes killer hill climb and the areas west of the dunes. Requiring fences and boulders around cottonwood trees and water sources is impractical and ridiculous. We strongly oppose any fee system. We pay enough in registration for motorcycles and ATVs. However, I am willing to support funding if the needs of outdoor enthusiasts are met. | See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See response to comment 208-3 and 479-6 regarding fencing. See response to comment 123-10 regarding the possibiity of a fee system for use of the open area. |
| | 684 | 4 | I feel that the requirement for Special Recreation Permits should be required for groups of 35 vehicles and over, and that Alt C should be amended as such, rather than the 24 vehicle limit. | See response to comment 124-122. |
| | 684 | 5 | The Camping Policy in Appendix E should disclose how many campsites would be closed under each alternative, it should also state that existing campsites should remain open unless a closure is necessitated via a lawful public process, and the Final RMP should mandate public involvement to establish and manage "restricted camping areas" and or "controlled camping areas." | Public participation has been solicited throughout the land use planning processNo areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| | 694 | 2 | The camping policy, Appendix E, lacks specific as to where and what kind of camping is allowed in each area. Maps of camping should be detailed for public information, with the camping opportunities clearly defined. Can you provide readable camping maps? | Appendix E outlines areas of controlled and dispersed camping, See responses to comments 123-8 and 120-86 regarding designated and dispersed camping sites. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number depends upon site specific conditions. Dispersed campsites would be signed; |

366

BLM_0012371

| | | | | however, maps and signage are not land use planning decisions. |
|---|---|---|---|---|
| | 823 | 2 | I think the BLM is making a mountain out of a molehill regarding "user conflict." I have been bicycling and hiking there for many many years, and I have had no issues with motorized users. Likewise, in my motorized recreation there, I have had no issues with non-motorized users. In my opinion and experience, the "user conflict" issue is one that has been manufactures as an excuse to further restrict motorized recreation. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. User conflict was an issue raised by the public during the scoping period for the DRMP/EIS. The general nature of societal conflicts is not a land use planning issue Education and signage are all administrative actions and do not require land use planning decisions. |
| | 833 | 1 | Moab BLM has always provided a huge number of dispersed campsites. Dispersion allows both users' solitude and also minimizes over-use pressures. Please include more dispersed campsites (or maintain existing counts) in final Alternatives. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. |
| | 833 | 2 | I also firmly believe that "user conflicts" are more of a perceived than actual problem. I am a mountain biker, hiker, and OHV owner. Trails that are enticing to bikes are not to OHVs, and only somewhat to hikers. Trails that offer challenges and scenic vistas to OHV operators are typically not challenging (or too steep/rough in some spots) for bikes, and uninteresting and wide to hikers. Trails that are already open to hiking are not applicable to OHV use. Potential user conflicts at trail interfaces are easily alleviated with user training and good etiquette. | The BLM's responsibility is to address recreation conflicts that occur on BLM lands, and to allocate among varying types of recreation users. User conflict was an issue raised by the public during the scoping period for the DRMP/EIS. The general nature of societal conflicts is not a land use planning issue Education and signage are all administrative actions and do not require land use planning decisions. |
| Sage Riders Motorcycle Club | 870 | 3 | The Final EIS should disclose how many campsites would be closed under each alternative. | See response to comments 120-86 and 123-8. |
| Sage Riders Motorcycle Club | 870 | 7 | The Sage Riders is requesting that the Travel Plan and the Administrating Setting must be consistent in all SRMAs! All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. SRMAs and their "focus areas" should avoid excluding other uses categorically. The Preferred Alternitave clearly shows Moab BLM | Focus Areas are not intended as exclusive use zones. For the addition of new routes, see response to comments 122-15 and 122-30. |

BLM_0012372

| | | | | |
|---|---|---|---|---|
| | | | recognizes the importance of providing some motorized routes in non-motorized zones. | |
| Sage Riders Motorcycle Club | 870 | 8 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 122-39. |
| | 929 | 2 | In regards to camping you do not tell us the details as to how many areas will be closed or where folks will be able to camp. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| | 929 | 3 | The four options need to be reworked and expanded upon with details and the addition of single track trails for mt. biking and motorcycles that have been left out of your planning. | The BLM specifically asked for route information during the scoping period for the RMP.  All routes submitted by the public at that time were considered for inclusion in the Travel Plan.  See Appendix G for a description of the Travel Planning process.  For the addition of new routes to the travel plan, see response to comments 122-15 and 122-30.  The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 930 | 2 | The Green River non-motorized canoe corridor. People travel from all over the USA and the world for multi-day paddle trips down the Green. Its one of the few places in Grand County where multi-day, non-mechanized travel can be engaged in. What a way to impact sombody's immersion in natural sound with the loud, multi-mile shredding, ehco- amplified buzz of an ATV posse. | The BLM assessed the impacts on natural resources and recreation conflict between motorized access and river based recreation. The BLM determined that the purpose and need associated with the route outweighed the specified conflict. |

BLM_0012373

| 931 | 1 | With the focus areas being talked about in the proposal, I feel that a designated "4x4" area would be appropriate. Giving the 4x4 community an area that was designated to rockcrawling and 4-wheeling specifically would not only give those of us who enjoy this type of recreation an area to do so like hikers already have in most of the open areas in Utah, but also give an opportunity to educate about land use and ways in which 4x4 and OHV users can contribute to keeping our public lands open to everyone. | Four wheel drive opportunities are specifically provided for in the Gemini Bridges Motorized Focus Area.  In addition, four wheel drive opportunities are available on any of the over 2,500 miles of "D" road designated in the Travel Plan accompanying the DRMP/EIS.  Many of these routes (such as Pritchett Canyon and Behind the Rocks) offer challenge to very extreme four wheel drive vehicles. No rockcrawling area is specifically designated in the DRMP/EIS, apart from Potato Salad Hill.  However, rockcrawling opportunities are available on nearby private lands.  Education is valuable, but it is an administrative action and does not require a land use planning decision. |
| 931 | 2 | The White Wash Sand Dunes is also an area that I have enjoyed for many years, both as a campsite and just to drive around on in the afternoon. I do not have anything against paying a fee to use an area or camp there, If my fees keep the land open, then I will pay the fees, but the proposed action seems that the area will be closed, and then in the future there is a possibility of re-opening the area after a campgound is built, if the campgoround is ever built. This is unacceptable . The White Wash Sand Dunes is one of the few areas where open recreation will not harm any vegetation. This area needs to remain open, even if a campground is eventually built. | See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| 933 | 1 | If camping is only dispersed, and we are not allowed to go off of established trails, does that mean we have to camp (or park RV's) in the middle of the road? Or will the "trails" be wide enough to park on the edges, like a highway? | See response to comments 123-8 regarding dispersed and designated camping. See response to comment 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a route open for travel was to provide access to a campsite.  If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. |
| 933 | 2 | Surly you are joking about fencing off the trees and water sources! What a ridiculous waste of money, not to mention the destruction to the area involved in building the fences. How will the wildlife get to the | See response to comments 208-3 and 479-6. |

369

BLM_0012374

| | | | | |
|---|---|---|---|---|
| | | | water or the trees? | |
| | 934 | 4 | White Wash Sand Dunes: a- the boundaries for the area need to be easily identified by visitors. Roads and natural boundaries need to be selected, otherwise there will be an ongoing problem with visitors straying out of the openarea. We oppose arbitrary boundaries unworkable. | See response to Comment 123-35. The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding. |
| | 934 | 5 | b- The area needs to be larger than proposed. This is a popular area and will continue to receive heavy use. Forcing more visitors in to a smaller area will create continuing management problems. If the area is as small as proposed usage will spill over into adjacent areas, especially into areas which have traditionally been used, such as the hill-climb to the northwest. These traditionally used areas need to be included. We oppose these smaller open area proposals. | The commentor is referring to the White Wash Area. See response to comment 123-35 relating to enlarging White Wash Sand Dunes open area in Alt C of the Travel Plan for the DRMP/EIS. See also response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| | 934 | 6 | c- It is a waste of time and money to fence the cottonwood trees and water sources in an open area. We oppose this unnecessary use of BLM time and money. | See response to comments 208-3 and 479-6. |
| | 934 | 7 | d- Camping should continue at White Sands as currently allowed until the BLM constructs a permanent, developed campground. It is unreasonable to ban or restrict camping for the length of time it will take the BLM to complete any project. We oppose any camping ban or restriction before a developed campground is providid for visitors. | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. |
| | 934 | 8 | e- We oppose any fee system for White Sands which is developed or implemented without detailed input and agreement from the visitors who will be affected. | See response to comment 123-10. |
| | 934 | 9 | It is not clear that user conflicts are such a major problem that "exclusive use zones" need to be established. We oppose excluding certain groups fromusing particular areas. This approach unfairly penalizes motorized recreation. Non-motorized remains free to use all public land. Motorized | See response to comment 413-9 regarding focus areas and 123-10 regarding fees. |

BLM_0012375

| | | | | |
|---|---|---|---|---|
| | | | recreation becomes even more limited than it already is. A satisfactory motorized experience means participants cover many more miles in a day than non-motorized, so the creation of more areas where motorized is excluded unfairly reduces the opportunities for this legitimate recreation. | |
| | 934 | 10 | "Exclusive use zones" do not necessarily mean a better experience for non-motorized. With out access to the interior of these areas, non-motorized use will be limited to the fringes where participants can park their vehicles. Having roads open to vehicles through all areas means that all types of recreation will have access to more public land. Non-motorized can park and hike, ride horses, or mountain bike starting anywhere along the roads. We oppose limiting access, which would occur with "exclusive use zones" | See response to comment 413-9. |
| | 934 | 14 | Dispersed campsites should not be closed unless a resource problem is fully documented and reviewed by the open public planning process. The number of campsites which would be closed under each alternitave should be disclosed in the RMP. We oppose closing any dispersed campsites without public review. | Public participation has been solicited throughout the land use planning process. No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| | 936 | 1 | "Special Recreation Management Areas" should stress accommodation of as much recreation as shows up, with the aim of mitigating impact, not diminishing user satisfaction. Expansion of active management in many areas, such as the Utah Rims, Yellowcat, Mill Canyon, Sevenmile Rim, South Spanish Valley, White Wash, Black Ridge, Rabbit Valley, and Westwater is appropriate and needed. | The BLM has proposed ten SRMAs in the preferred alternative.  Mill Canyon, Sevenmile Rim, South Spanish Valley, Utah Rims, White Wash, Black Ridge, Rabbit Valley and Westwater are all within SRMAs (Mill Canyon, Sevenmile Rim and White Wash are within the Labyrinth Rims/Gemini Bridges SRMA, South Spanish Valley and portions of Black Ridge are in the South Moab SRMA, Utah Rims and Rabbit Valley are in the Utah Rims SRMA, and Westwater is in the Two Rivers SRMA.  The |

BLM_0012376

| | | | | |
|---|---|---|---|---|
| | | | | commentor should remember that recreation is but one of the multiple uses for which BLM manages its lands.<br>See response to Comment 122-38 regarding Yellowcat.<br>See response to comment 122-39 regarding Utah Rims<br>See response to Comment 123-35 regarding the boundary of White Wash.<br>See response to comment 122-43 regarding the Black Ridge area. |
| | 942 | 3 | I believe the plan is to disallow any camping that is not a developed campsite is neither adequate or appropriate to meet the needs of the visitors to this area. Many visitors to Moab enjoy dispersed camping, and we enjoy being able to get some space from our fellow man. Also, designating campsites should be done with public participation. | See responses to comments 123-8. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding access to dispersed campsites. Public participation has been solicited throughout the land use planning process. |
| | 943 | 1 | In my experience on these trails, the individual user groups maintain a courteous and respectful co-existence. It seems to me that the conflicts are not with the individual users, but with some of the more extreme organizations that claim to represent the users. I strongly discourage the 'exclusive use zones' proposed for existing trails. This will be difficult to manage especially for less frequent visitors to the area and cause confusion when focus areas are overlapped or contain multi-use trails. | See response to comment 413-9. |
| | 943 | 2 | I note that there is a camping policy proposed in Appendix E. I am concerned with closing a high number of vehicle accessible campsites. This puts a financial bind on many  who visit the area. | See response to comments 123-8 regarding dispersed and designated camping. There is no regional prohibition against vehicle based camping; although vehicle based camping is restricted to designated sites in heavily used areas around Moab (about 5% of the area), due to public health and sanitation concerns. See comment 120-86 regarding vehicular access to dispersed camping sites. |
| | 946 | 2 | The "individual Special Recreation Permit" program does not seem reasonable, and since it would be accessable from all directions, difficult to enforce. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. See response to comment 123-26, as well as comments 122-22, 124-11, 124-112 , and 124-110 regarding clarification of SRP policies. |

BLM_0012377

| | | | | Enforcement actions are administrative and do not require land use planning decisions. |
|---|---|---|---|---|
| | 951 | 7 | What are the strategies for visitor outreach? What has been done? What are the projections for the 20 years? | Education/public outreach are all administrative actions and not land use planning decisions. The BLM projects that recreation use in the Moab planning area will increase slightly, but not at the rates of increase in the 1990s. |
| | 953 | 3 | The proposed action of limiting vehicle camping to "designated campsites" is unheard of on such large portions of public land. I strongly oppose the camping restrictions as outlined in Appendix E. while many campsites appear to remain open, the detail level of the available maps limits our ability to determine if all of the most favored campsites will be open. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. The commentor has not provided any information regarding specific campsite locations of concern. |
| | 954 | 3 | The proposed camping regulations and fee system for the White Wash area are completely off base. These are public lands served by country roads. There are no services such as water or electricity offered. The camping is on sandy rocky barren areas. We do not want to be crowded into restricted areas. If funding is needed there is existing funding and grant programs that can be utalized. There are many areas that can be used for dispersed camping. The money needed to enforce and monitor such a program if available would be better spent addressing issues such as parking, signing and trail maintaince. | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. See comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes. |
| | 954 | 4 | In reviewing Appendix E of the plan regarding camping in designated camp sites only I find that wholly unacceptable. There are so many areas that I have camped where you only need to pull off the road a short distance and have a wonderful camping | See response to comments 123-8 regarding dispersed and designated camping. Dispersed camping is allowed on over 95% of the Moab planning area. See response to comment 120-86 regarding access to dispersed campsites. One of the express purposes of leaving a |

BLM_0012378

| | | | | |
|---|---|---|---|---|
| | | | experience that I shudder to think of losing the ability to do that. Again we are talking about an area that is likely san and rock that is constantly being scoured by the elements such that traces of your camp will soon be obliterated. Also there are new and old mine sites and gas and oil drilling rigs nearby in most areas. These areas are not a National Park! Dispersed camping must be allowed. Any closures of camping areas should be done with the full involvement of the general public so that the public is allowed to comment specifically on each location. | route open for travel was to provide access to a campsite. If roads to specific dispersed campsites have been omitted in the Travel Plan, they may be added at a future date through site-specific NEPA analysis. Public participation has been solicited throughout the land use planning process; however the process in which BLM evaluates existing conditions for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. |
| | 954 | 5 | Special Recreation Management Areas are useful tools for managing areas of special interest or high recreational use. They need to be dynamic rather than static so that as demands change the trail systems can be expanded or changed to accommodate increased public usage. These areas will by nature have a particular focus but must not let that focus exclude usage by other user groups. | See response to comment 413-9. |
| | 954 | 6 | The Utah Pims SRMA is important to manage a high use area with a primary focus on motorized and mechanized recreation. Given the high levels of usage the abiltiy to expand and modified trail networks is important. Also the area should be expanded to the southwest to include the popular Mel's Loop area which provides a changelling long distance single track motorcycle trail. | See response to comment 122-39. |
| | 954 | 7 | I would like to suggest the Yellow Cat area east and north of Arches NP to be considered as potential SRMA. The area is seeing increased use and as it has a dense network of old mining roads it would be an ideal area for a trail network. | See response to Comment 122-38 |
| | 955 | 1 | Among the mountain bike user group I have noticed a steady increase in the appreciation and demand for single track trails with all levels of difficulty. I request the BLM continue to provide and develop additional opportunities for these kinds of quality experiences. In | The BLM asked for specific route submissions from mountain bikers and motorcyclists during the scoping period for the Draft RMP/EIS. The BLM received specific route submissions during that time. Each of these submissions was verified, and considered during the |

BLM_0012379

| | | | | |
|---|---|---|---|---|
| | | | Grand County there exists a special relationship and understanding between the mountain biking and motorcycling user groups; all enjoy and prefer to ride on single-track trails! By providing diverse recreational opportunities with sufficient quantity and quality, like those proposed by Ride with Respect, the BLM can succeed in protecting natural resource values while providing increased recreational opportunities which will reflect positively on the social economy by attracting more recreationists and visitors to Grand County. | planning process (see Appendix G for a description of the Travel Plan). Those single track routes that are in the Travel Plan are a result of this process.<br><br>The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 955 | 5 | The BLM should prioritize the development of new specific bicycle, motorcycle, and ATV trails, with preference to special recreation management areas (SRMAS), and especially to the appropriate focus areas. Trail expansion should avoid pitting recreationalists against one another on a rigid system of roads. To proactively manage recreation, SMRAs should be designated in anticipation of increasing visitation, not in reaction to it. SRMA boundaries and focus areas should be large enough to "grow into" as trends emerge. Focus areas should provide for a wide range of specialized sports. | See response to comment 413-9 regarding focus areas. BLM lands are managed for multiple use under FLPMA; mechanized recreation is but one of these uses.  The BLM has placed 10 SRMAs in the preferred alternative. These SRMAs are designed to meet the future needs of recreationists.  See also response to comment 122-14. |
| | 955 | 7 | The Moab Extensive Recreation Management Area (ERMA) should provide primitive roads, singletrack trails, and dry washes to connect SRMAs and towns. Such routes offer opportunities for long-distance tours, which are increasing in popularity among motorized and mechanized enthusiasts, and promise to boost rural economies and disperse use, thereby alleviating conflicts. | See response to comment 122-49 and 123-45 regarding the ERMA. The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 955 | 17 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl | See response to Comment 122-38 |

375

| | | | | |
|---|---|---|---|---|
| | | | Canyon where road access should be preserved. A non-mechanized focus area should buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple of overlooks of Lost Spring Canyon and Dome Plateau are needed, but thety should remain open all the way to the rim. | |
| | 955 | 18 | Utah Rims SRMA ought to extend further southwest to Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the ground work for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help reserve Guy's Trail and associated singletracks. From Westwater road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of hay flat. a non-mechanized focus area could be expanded from the Westwater WSA further southwest all the water to private property. The entire spur road to Big Hole could be closed to enhance primitive characteristics. None the less, the Westwater Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | See response to comment 122-39. |
| | 955 | 19 | The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing the less-valuable tours, Big Triangle substantially expands the Westwater roadless area to the north. Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well. From Steamboat Mesa to South Bever Mesa, another focus area should be designated for primitive recreation. Half of the Dolores River overlooks could be reserved as cherry stems. Also, a road on the southeast ridge of South Bever Mesa lies outside of this focus area, and should remain open. | See response to comment 122-40 regarding routes in the Dolores Triangle. |

BLM_0012381

| | 955 | 23 | Hatch Wash backpacking focus area could be expanded for better backpacking. Alternative C proposes to designate roughly 20 spur roads to the rim of hatch wash. However, only five are necessary to view most stretches of the canyon. | See response to comment 122-45 regarding additional routes. |
|---|---|---|---|---|
| | 955 | 24 | Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole oasis could still skirt the nearby residential area. | When the Cameo Cliffs SRMA was created, the areas to the east were specifically excluded due to mining hazards. Although travel on routes outside the SRMA is available consistent with the Travel Plan, the designation of the area as an SRMA would encourage the public to this hazardous area. |
| | 958 | 1 | The final EIS should disclose how many camp sites would be closed under each alternative. With self-contained campers or Toy Haulers, there are not the sanitation issues that might exist with tent campers. We self-contained campers would support a policy where existing camping sites are open, unless determined closure is deemed necessary through lawful, public planning process. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsite closures depends upon site specific conditions. |
| | 958 | 2 | The White Wash area has many camping sites, which are used every week by different groups, which do not apprear on your maps. The Final RMP should mandate full public involvement for any establishment and management of "restricted camping areas" or "controlled camping areas" | See response to comment 120-83 concerning enlarging the White Wash area to accommodate dispersed camping. Public participation has been solicited throughout the land use planning process; however, the process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision |
| | 958 | 3 | When addressing "User conflicts" the final RMP should not have "exclusive use zones". Any percieved or potential "oser conflict" could result in prohibiting one or more user groups, again causeing that excluded user group to be compressed into a smaller avaliable space, thus increasing the potential for higher impact. | See response to comment 413-9. |
| | 958 | 4 | The Utah Rim SRMA is needed to properly manage this popular area. There should be two-track, single- | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the |

BLM_0012382

| | | | | |
|---|---|---|---|---|
| | | | track (motorized and mountain bikes)_focus, and feature the ability to designate or construct additional routes as they become needed in the future. Limiting camping to one small designated area in the RMP would be foolish. The RMP should provide general guidelines and not limit camping in such a way. The SRMA must utalize the dense network of mining road that already exist throughout the Moab area. The Utah Rims SRMA should extend further South and West to encompass Mel's Loop and beyond. Increased visits by our citizens currently warrant a more active management of the SMRA. A larger area could provide sufficient room for a full-day motorcycle rides and the creation of a new area for mountain bike focus. | DRMP/EIS). See response to comment 122-39 regarding the proposed boundary. |
| | 961 | 1 | Fee systems are very controversial and unpopular with the recreating public. The accepted version of the RMP should not include or require a fee system. Not only are these system not viewed well by the general public, but they are discriminatory against Americans with lower incomes. Individuals with considerable financial means barely notice the impact, while those with less struggle can't afford to use the land thay already should have option upon. | See response to comment 123-10. |
| | 961 | 2 | It is acceptable to add recreation areas to what has been available in the past that include primary focus opportunities for recreating groups; it is unconstitutional to arrange the plan that excludes specific groups from the right to use public lands | See response to comment 413-9 regarding focus areas. Focus Areas are not intended to be for the exclusive use of any one group of recreationists. |
| Moab Area Climbers Association | 962 | 3 | Climbing venues such as Potash Road, The River Road, Longs Canyon, Castle Valley, The Fisher Towers, and Tusher Canyon are coveted destinations for climbers from all over the world. The MACA would like to see the D.R.M.P. formally aknowledge that climbing is a legitimate use of public lands around Moab. We also feel that certain areas in Kane Creek and on Potash Road are popular enough that toilet facilities are warrented. We would be able to work with | The BLM has recognized the importance of climbing as a recreation activity in the DRMP/EIS.  Wall Street (along the Potash Road) is recommended for management as a climbing focus area.<br><br>The placement of toilet facilities does not require a land use planning decision. |

BLM_0012383

| | | | | |
|---|---|---|---|---|
| | | | the BLM, as The Access Fund and Friends of Indian Creek have done in the past, to help aid the building of these much- needed facilities. | |
| | 968 | 2 | All SRMAs with the motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 968 | 3 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future.<br><br>The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comment 120-30. |
| | 968 | 4 | BLM should consider a SRMA in the Yellowcat area. Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there could utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| | 977 | 1 | User fees- The group that decides how the funding should be spent is not spelled out. I do not want to risk paying a fee that might be used to limit access to public lands. The affected user groups, the Recreational Fee Advisory Council, and the BLM Resource Advisory Council absolutely need to be the main contributers to such funding decisions and this fact needs to be spelled out. | See response to comment 123-10 regarding the possibility of a fee system for use of the open area in White Wash Sand Dunes and the Federal Lands Recreation Enhancement Act. The fees collected in the Moab Field Office are used for operations of this type, in accordance with FLREA. |
| | 977 | 2 | I disagree with constructing fences or anyther structure on migrating sand dunes. I say this with emphasis as a Geologist. The whole point of migrating sand dunes is that they MIGRATE and whatever plants take hold or not have to adapt to the CHANGING conditions. The fence idea appears to be an attempt to | See response to comments 208-3 and 479-6. |

379

BLM_0012384

| | | | | |
|---|---|---|---|---|
| | | | stabilize migrating sand dunes for no logical purpose. | |
| | 978 | 2 | There should be a provision in the plan for future growth and expansion of these [SRMA] areas as the need arises. | The addition of acreage to an SRMA would require a plan amendment.  However, the DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See also response to comments 122-15 and 122-30 concerning adding routes to the Travel Plan. |
| | 997 | 1 | The BLM should consider a SRMA in the Yellowcat area. Many ATV riders like the Yellowcat area. Designating a SRMA there could utilize the dense network of mine roads that already exist. | See response to Comment 122-38 |
| Moab Friends-for-Wheelin' | 1002 | 2 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | For the addition of new routes at the conclusion of the DRMP/EIS, see response to comments 122-15 and 122-30. |
| Western Watersheds Project | 1025 | 18 | Overall, recreation proposals in the DRMP/EIS are very confusing and hard to evaluate due to the extent of management layering of Special Management Designations (SRMAs) and Focus Areas, relative to other Special Management Designations (ACEC, WSAs, WSRs). | See response to comment 121-9 and 123-14. |
| Western Watersheds Project | 1025 | 21 | Within the recreation section, the maintenance and/or construction of new recreation facilities is not always warranted or justified to "support or enhance recreation opportunities" where existing facilities have not been properly analyzed or developed in the past (eg public health and safety with respect to flood zones, fire hazards, or environmental damage including disturbance to wildlife species. | Land use planning is a tiered process ranging from broad general allocations and management prescriptions to subsequent site-specific authorizations.    Land use planning decisions do not require site specific analyses. Detailed impact analysis will be conducted for site-specific authorizations during implementation of the decisions in the  RMP.  This would include recreation facilities for SRMAs and Focus Areas.  All existing facilities currently on the ground have been properly analyzed through the NEPA process. |
| | 1026 | 15 | In this section you state: "A survey conducted by the institute of Outdoor Recreation and Tourism (IORT 2002)" Why were only Mountain Bikers surveyed? It "appears" that the survey was conducted in the Slick Rock area and focused on the use of the Slick Rock | Slickrock Trail was chosen because it was one of the first trail designated primarily for mountain bike use and is one of the most popular mountain bike trails in the world, and due to its popularity it as has a variety management issues including crowding, vegetation trampling, soil |

BLM_0012385

| | | | area. This is a partial survey of users and limited to a specific area. | compaction and erosion, safety, litter, and vandalism. Mountain bikers were chosen by the Institute of Outdoor Recreation and Tourism as the sample survey group because the authors wished to gather information regarding perceptions regarding management of mountain biking. The BLM cannot dictate to Utah State University (home of the IORT) where to or on whom to conduct its research studies. The DRMP/EIS acknowledges on page 3-79 that the survey is not indicative of the entire mountain biking community.<br><br>The study can be found in its entirety at http://extension.usu.edu/files/publications/publication/NR_RF_012.pdf |
|---|---|---|---|---|
| | 1026 | 21 | Again having no idea how you came up with the number of respondents. What is the basis for this table. It is not explained in this chapter | For a discussion of Table 3.18, see response to comment 124-15. |
| | 1026 | 26 | Because the open area boundary will not be easily identifiable on the ground, and also because of easy access to the proposed "fee area" from all directions, it will make this proposal extremely difficult to enforce. We suggest the BLM consider other funding mechanisms to pay for needed management infrastructure. | The commentor is referring to the White Wash open area. See response to Comment 123-35. The BLM asserts that the boundaries of the open area in Alt C (preferred alternative) can be adequately delineated for public understanding.<br><br>Enforcement actions are administrative and do not require land use planning decisions. |
| | 1026 | 31 | The final EIS should disclose how many campsites would be closed under each Alternative. | No areas are closed to camping by action of the DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus the number of campsites closures depends upon site specific conditions. |
| | 1026 | 32 | I am not sure based on the maps provided which | No areas are closed to camping by action of the |

BLM_0012386

| | | | | |
|---|---|---|---|---|
| | | | campsites will actually be closed. | DRMP/EIS. In certain areas, camping is limited to designated sites. See response to comments 123-8 and 120-86 for a discussion of dispersed camping. The process in which BLM evaluates existing campsites for adverse effects or to minimize impacts to natural resources is not a land use planning level decision. Under all alternatives, BLM may restrict camping when damage to an area becomes obtrusive (See Appendix E, Section E.1.2); thus number of campsites closures depends upon site specific conditions. |
| | 1026 | 33 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 1026 | 34 | SRMAs and their "focus areas" should avoid excluding other uses categorically. The preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones" | See response to comment 413-9. |
| | 1026 | 35 | The Utah Rims SRMA is necessary to properly manage this popular area. It should have a motorized and mountain bike focus, and include the ability to designate or construct routes should they be needed in the future. In addition, limiting camping to one small designated area, in the RMP, is not wise. The RMP should provide general direction and not limit camping in such a way. | The DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). See response to comment 122-39 regarding the proposed boundary |
| | 1026 | 36 | The Utah Rims SRMA should extend further southwest to southwest to encompass Mel's Loop and beyond. Increased visitation there warrents the more active management of a SRMA. This larger area would also provide enough room for a full-days motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 122-39. |
| | 1026 | 37 | Some of the "motorcycle trails" are very popular with ATV users. The final travel plan should designate a mix of single track and ATV trails. | The BLM has worked with the user groups to delineate those motorcycle routes that are appropriate for ATVs. The PRMP/FEIS shows those routes that are for both ATVs and motorcycles.  In addition, the DRMP/EIS |

BLM_0012387

| | | | | specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
|---|---|---|---|---|
| | 1026 | 38 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. We strongly suggest looking closely at the proposal developed by Ride with Respect. | The BLM has worked with the user groups to delineate those motorcycle routes that are appropriate for ATVs. The PRMP/FEIS shows those routes that are for both ATVs and motorcycles.  In addition, the DRMP/EIS specifically allows for routes to be added to the Travel Plan at later dates (see pg. 2-48 of the DRMP/EIS). |
| | 1026 | 43 | When addressing "user conflict" the Final RMP should avoid "exclusive use zones" where, based on preceived or potential "user conflict," one or more "conflicting uses" is categorically prohibited. Most of the non-motorized focus areas have been designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will perceive these focus areas as establishing blanket restrictions on motorized use. | See response to comment 413-9. |
| Moab Friends-for Wheelin' | 1027 | 6 | All SRMAs with a motorized focus should include direction regarding when and how additional or expanded routes/areas would be provided should there be a need. | See response to comments 122-15, 122-30 and 206-4. |
| Moab Friends-for Wheelin' | 1027 | 7 | SRMAs and their "focus areas" should avoid excluding other uses categorically.  The Preferred Alternative clearly shows Moab BLM recognizes the importance of providing some motorized routes in non-motorized "zones."  Also, visitors to specific focus areas must be made aware that other uses are still allowed in said areas, in order to avoid unwarranted conflict between varied users within the focus area.  This is especially important where heavy multiple use is present on trails or roads within designated focus areas. | The DRMP/EIS specifically states on page 4-192 that focus areas will continue to be available for recreation uses by others than whose needs are specifically addressed by these focus areas.  Management plans will be developed for each SRMA and its attendant focus areas.  These plans are an implementation level decision, but could include language regarding visitor education of the type the commentor suggests.  Visitor education does not require a land use plan decision. |
| Moab Friends-for Wheelin' | 1027 | 8 | We support the proposal made by Ride with Respect to provide a Rockcrawling Focus Area and a Motorcycle Trails Riding Focus Area in the Black Ridge area east of Area BFE, as well as nearby equestrian and mountain bike focus areas. Rockcrawling and trails focus areas would fulill a need | See responses to comments 206-3 and 206-4. |

BLM_0012388

| | | | | |
|---|---|---|---|---|
| | | | that is neglected under the Draft Plan, and would help reduce conflict on other challenging trails, such as Pritchett Canyon and Moab Rim.  These proposed focus areas would compliment Area BFE, by providing more opportunities and thus more incentive to visit. We support the idea of designated trails in a rockcrawling focus area, as long as new trails could be legally created through cooperation between BLM and local 4-wheel drive clubs.  (While the route inventory provided by Ride with Respect shows numerous roads and trails, the vast majority are not suitable foe true rockcrawling.  However, there are definete possibilities for creating challenging routes.) | |
| Moab Friends-for Wheelin' | 1027 | 9 | The Utah Rims SRMA is necessary to properly manage this popular area.  It should have a motorized and mountain bike focus, and include the ability to desifnate or construct routes should they be needed in the future.  In addition, additional camping areas should be provided. | The BLM agrees with the commentor's comment on this SRMA, and has included this SRMA in Alternatives B and C. See also response to comment 206-4. |
| Moab Friends-for Wheelin' | 1027 | 10 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond.  Increased visitation there warrants the more active management of a SRMA.  This larger area would also provide enough room for a full-day's motorcycle ride, and the establishment of a mountain bike focus area. | See response to comment 206-3. |
| Moab Friends-for Wheelin' | 1027 | 11 | The Dee Pass SRMA proposes to designate most of the motorcycle single-track in the area.  However, ATV trails still need to be included, especially between White Wash and Red Wash. | The BLM has clarified its discussion in Chapter 4 and related maps to indicate which trails are also available to ATV use. |
| Capital Trail Vehicle Association | 1031 | 18 | The document and decision must clearly disclose on maps and tables and summaries all existing areas, and existing roads and trails that would be closed to motorized access and motorized recreationists. Summaries should include overall closures percentages. Otherwise public disclosure has not been adequately provided and the public will not be informed and the public including motorized | The routes that are not to be designated in any of the action alternatives are shown on Map 2-11-A.  This map shows all existing routes in the No Action alternative. The exact number of miles of route to be designated in each of the alternatives is clearly shown under each alternative on pg. 2-48 of the DRMP/EIS.  Although the BLM has not calculated percentages, the public is free to |

BLM_0012389

| | | | recreationist will not be able to adequately participate and comment. | do so.  Tables of designated routes are also shown in Appendix G, by county and by alternative. |
|---|---|---|---|---|
| Colorado 500 | 1032 | 1 | I would like the BLM to change the language in the Alternatives and in the Introduction so that BLM's intentions for the Bookcliffs ERMA are fully disclosed.<br><br>Please refer to Map 2-10-C Off-Highway Vehicle categories Alternative C.<br>Now refer to Map 2-24-B Areas with Wilderness Characteristics Alternative B<br>Now refer to Map 2-11-C Designated Routes Alternative C<br>Now refer to Map 2-16 Wilderness and Wilderness Study Areas<br>Now refer to Map 2-29-C Areas not available for Woodland harvest Alternative C<br>Now refer to Map 2-2-C Utility Corridors Alternative C<br>Now refer to Map 2-4-C Areas not Available for Livestock Grazing<br>Now refer to Map 2-14-C Areas of Critical Environmental Concern Alternative C<br>Now refer to Map 3-16 RFD Areas<br>Now refer to Map 2-5-C Oil and Gas Leasing Stipulations<br><br>From page 1-11 "Introduction" please note that MFO has no wilderness ares of its own; 5,200 acres of the Black Ridge Canyon Wilderness Area lies in the MFO but is managed by the Grand Junction Field Office.<br><br>Now Please refer to page 2-30, Alternative C, "Manage the Bookcliffs area (335,457 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It would be managed for low frequency of visitor interaction by not establishing new motorized or mechanized recreation routes, no commercial motorized permits would be | |

BLM_0012390

issued, and competitive events would not be allows.

Now Please note what BLM has omitted from the analysis:
Although described in glowing ecological terms in Chapter 3, the Bookcliffs are in fact an extremely hostile environment. it is not conducive to pleasurable hiking, backpacking, or equestrian use, because there is no permanent water and it is lethally dry for human habitation (from page 3-2: The average annual precipitation of the northern section of the MPA is 9.2 inches). BLM accurately describes that there is very little human access. Why? Because not only is it not unusually scenic, it's not a comfortable place for "traditional pedestrian and equestrian recreation activities. That is why there are few roads, no popular hiking trails and no developed recreational areas. And with no roads, how can anybody go big game hunting? Horses need established routes exactly as vehicles do.

Summertime temperatures often exceed 100 degrees with extremely low humidity.... There is no contiguous or even sparse vegetative canopy to provide relief from the relentless heat. Winters are harsh with night-time temperatures dropping well below freezing for sustained lengths of time. The wildlife is hardy and hostile and presents well-documented dangers to humans and domestic stock.

It appears as though the BLM is doing what is called in the trade "manufacturing Wilderness." This is a covert effort to circumvent both FLPMA, which strictly limited the BLM's authority to set aside lands, and more recent judicial proceedings, which affirmed FLPMA and further limited BLM authority to "set aside" lands. The closures proposed in this RMP correspond exactly with the polygons of the WSA's in the Bookcliffs, plus

BLM_0012391

| | | | | |
|---|---|---|---|---|
| | | | enough proximate acreage added by BLM and called "areas with wilderness characteristics outside of the WSA's" to create a large block of land in which human activity is illegal. | |
| Colorado 500 | 1032 | 2 | Referring to Chapter III, on page 3-72, MFO states "at least" 1.6 million people visit the MPA per year. That is, one million six hundred thousand people visit because of various and different intrinsic values present in the MPA. On page 3-109 the figure "2 million" visitors is cited. For the purpose of our analysis, we use the 1.6 million numbers.<br><br>This could be confirmed by presenting the numbers that were collected at the 16 traffic counters that were named in the Analysis of the Management Situation, also called the AMS (a separate document from the DEIS, required by the BLM 1600 planning regulations but in this case was not published as part of the DEIS)> However, BLM has elected to leave out of the DEIS all information about the presence of these traffic counters. BLM relies exclusively upon staff estimates and various regional tourism data. In order that our results be exactly comparable, we will base our analysis on the same material.<br><br>On page 3-82, table 3.19 sorts recreation activities according to use levels.<br><br>Since we are allocating land use, we would logically look at the high-use column to see<br><br>How our limited agency resources would be best utilized.<br><br>"River Activities" is found in the high-use column. Here the recreation use numbers on four segments of river in the MPA are provided. Although the DEIS does not say so, we will assume this represents annual river use. The total appears to be 92,000 boaters. The word "boater" clearly indicates individuals, not groups. More than four river segments are described in Chapter 3 but the over lap of use between segments is not | |

BLM_0012392

| | | | |
|---|---|---|---|
| | | | reports. Thus, it is reasonable to calculate that the total could be 184,000 boaters.<br>If the reader does the arithmetic using the numbers provided in the DEIS, boaters constitute 11.5% of one million six hundred thousand visitors.<br>Because Table 3.19 sets forth three undefined categories: "high, medium, and low," placing the 11.5% in the "high use" column clearly indicates this high use relative to the uses names in the "medium" and "low" columns.<br>Accepted. However, bear in mind the perception shift when the phrase "high-use" replaces "eleven percent." Flowing from that, bear in mind the degree to which that shift may affect development of all the proposed actions.<br>To further define the activity proportions provided in table 3.19, hiking is also listed as a "high use" activity. Yet how to calculate the actual number of hikers visiting the BLM lands in the MPA? The usual Agency method is to count vehicles at trailheads, and to count visitor contacts, but the known results of this method always produces an undercount. The only government agency attempts to quantify the accuracy of this method revealed that personal contacts with visitors, even when it is the only job assigned to a park ranger, will touch just 10% of the total visitors (Applegate & Hamilton; USDA Forest Service Mendocino N.F. 1993 Annual Report to the State OHMVR Division).<br>For the purpose of the recreational land use allocation on two million acres of public land, we prefer calculations that might provide a stronger basis for decisions affecting more than one million people. | |
| Colorado 500 | 1032 | 3 | The Moab BLM lands are not one contiguous maze of beautiful canyons and wind-sculpted cliffs. Mostly it is thousands of miles of dirt roads, vast, featureless and sparsely vegetated acreage (just one example to provide proper evidence for our point here: DEIS page | |

BLM_0012393

1-162 states, "desert shrub" covers 41% of the BLM lands in the MPA; that is greasewood, shadescale, saltbrush, blackbrush; these species survive in alkaline and salty soils…and they are not scenic. That is to say, people coming from Oregon or Kansas or Washington D.C. do not come to see the greasewood). Hostile desert temperatures (see page 3.1.2 Climate, from Western Regional Climate Center 2004 Temperatures and precipitation for meteorological stations in Eastern Utah), no shade, no permanent water, and no reliable maps. With description in mind, it must be admitted that most of the BLM lands in the MPA are not an attractive hiking destination.

Hiking as an activity, does not commonly occur throughout the BLM lands in the MPA. To develop a successful recreation program for pedestrian activities such as hiking, it must be kept in mind that the vast majority of hikers arriving in a desert environment want a marked trail that is short and predictable, and that as a rule, a recreation hikers do not hike alone in unmarked territory, and even more reliably, hikers want a scenic or remarkable destination for their hike.

Furthermore, if 1.6 million people were hiking elsewhere off of the popular hiking trails, we would find user-made hiking trails on every acre of the Field Office, because user-made trails are a manifestation of demand. We do not find any new user made hiking trails because the best places to have hiking trails in the MFO are already occupied by hiking trails. What we do find is vast starches of lands under the MFO jurisdiction with no footprints on them whatsoever. Literally tens of thousands of acres and the only tracks are roads, used exclusively by motorcycle, ATV, and 4 wheel drive motor vehicles. No footprints. None.

If the reviewers of this document disagree, we want you to provide factual evidence that this description is

BLM_0012394

| | | | | |
|---|---|---|---|---|
| | | | not true.<br>So. Because we know that the hiking trails on BLM could not possible be occupied at the rate of 50,000 people per mile, stretch that out over a season. Let's say that BLM hiking trails receive use on the order of 50,000 people per mile per season, and a season is seven months of the year as noted on page 3-72 in the DEIS. That gets the on-the-ground population of hikers down to 1,786 per weekend, at the occupancy rate of 89 people per mile. The trails would be occupied at a rate of one hiker every 60 feet. That is still only 3.125% of the total visitor-ship to the MPA.<br>Imagine only taking a hike and meeting someone every 60 feet. Does this amount of hiking actually occur? It can be safely assumed that it does not, because CEQ regulations require that wherever it is available, document and factual information be used to develop the "Affected Environment" chapter, and BLM 1600 Planning regulations require documented, factual information be used to develop the "Analysis of the Management Situation (AMS). It is unlikely in the extreme that MFO staff would conceal those kinds of numbers.<br><br>So, we can use the old fashioned person-contact-&vehicle-count method that we know always results in an undercount, or we can estimate according to the maximum carrying capacity of the present hiking trails, but either method, the actual number of people who hike in the MPA very likely amounts to about 5% of the 1.6 million visitors per year. | |
| Colorado 500 | 1032 | 4 | Camping is also found in the "high use" column, so let's do the numbers for developed camping opportunites. Conspicuous by its absence in the DEIS, are the actual number of fee-paying campers at eh 22 fee campground. This is a significant omission. Without any hard numbers, the reader must | |

BLM_0012395

| | | | | |
|---|---|---|---|---|
| | | | extrapolate using the information that is provided: According to the MFO recreation website, there are 450 campsites (including the fee sites), with a vehicle limit of 2 per site, and using the most generous standard visitor-use multiplier of 3.5 people per vehicle this adds up to 3,185 people per weekend if every site is at the legal occupancy limit, Multiple that by 28 (weekends in the seven-month season see page 3-72), and we have 89,180 people stashed in the campgrounds each year. Add another 40,000 people for the people who are there during the week or who don't pay their fees or who pack too many people into their campsite, that gives us 129,000 people camping in developed sites. That's another 8% of the MFO annual visitor-use of 1.6 million.<br><br>If we assume that the hikers and the people in the developed campgrounds and the boaters are discrete groups to be counted separately, all of the above named activities together amount to only 22.6% of the 1.6 million people that visit Moab BLM land each year.*<br><br>** (Find another way to calculate it. Or, please provide hard numbers of actually counted people to support the statement in Table 3.18. If there are no hard numbers please add this statement to the "Affected Environment:" NO ACTUAL VISITOR NUMBERS ARE AVAILABLE TO SUPPORT THE INFORMATION IN TABLE 3.18. | |
| Colorado 500 | 1032 | 5 | In the calculations above, the three activities [boating, hiking, camping] described are afforded the benefit of being counted as three discrete groups, entitled to their own numbers. It is more likely that there is a tremendous overlap, given that most of the developed camping areas are near rivers and notable natural features.<br>Recall if you will, these activities are analyzed because | |

BLM_0012396

they are listed in the "high use" column of Table 3.18 on page 3-80.

If hiking, at 3.1 % and boating, at 11.5%, and camping, at 8% of the total are considered "high-uses," then the number of people participating in the activities in the "low-use" category must be minuscule. The entire list in the low-use category could not make up the difference.

With no actual numbers to work with, the reader might guess that each of those eight activities in the low-use column might constitute 2% each of the totals, combining to claim 16% of the 1.6 million people, or another 25,600 people. Remember, BLM placed the activities in the "low-use" category. They must, by implication, constitute smaller percentages than anything else in the other two columns.

In other words, the three "high-use" activities (hiking, boating, and camping) are placed into the same high-use category as something else---and that "something else" accounts for 80% of the activities that people come to Moab BLM to pursue.

Looking for more clues about what people do on Moab BLM lands, we find on page 4-192 of the DEIS Table 4.67 "Recreational Activity Participation." The table is described in Chapter 4 as follows:

"The National Visitor Use Monitoring Study, completed in the MPA in 2006, provides reliable data on user group participation. Visitors were asked what their "main activity" was while visiting Moab, and what activities they were participating in during their visit. The numbers in Table 4.67 show what activities visitors engage in as a percentage of use."

BLM_0012397

This table is reporting on the "MPA" or, the Moab Planning Area. What is the MPA? According to Map 1-1, "Planning Area," and on page 1-2 to quote: "The MPA encompasses Arches National Park, Dead Horse Point State Park, the La Sal Mountains of the Manti-La Sal National Forest, and the Uintah/Ouray Indian Reservation."

No source for this study is provided and it is not readily available to reviewers of the Moab DEIS. If this survey was professional done, the resulting data would far exceed the scant information provided by Table 4-67, thus what is provided in the table is clearly compressed and arranged by MFO staff, The absence of any information about where this survey was physically conducted is conspicuous and by itself, invalidates the words "reliable data" in the context of BLM managed lands.

The phrase "while visiting Moab" can mean only one thing; the respondent is in or vey near to the town of Moab. Why? Because any organization trying to acquire sufficient numerical data to do a "study" of human activity patterns is going to go to where the highest densities of humans are.  The proximity and paved-road access of Arches National Park for exclusively nonmotorized andscenic driving on improved roads will unequivocally skew the numbers toward nonmotorized activities such as "hiking, backpacking, relaxing, viewing, camping and scenic driving" (on improved roads).  Furthermore, Moab itself is not a popular starting point for backpacking, so it is even more critical that we know where this survey was taken and where the "backpacking" numbers fit in, as we already know that the vast majority of the BLM lands under exaination in this RMP are not suitable for

393

BLM_0012398

backpacking or equestrian activities.  The reader is left to wonder if this "study" is appropriate to BLM managed lands at all, because it is hard to find a connection between the 1.6 million BLM visitors and the respondents to this survey.  We need the EIS wrtiters to help us here, yet they conspicuously do not.  Do all 1.6 million BLM lands visotrs pass through the town of Moab?  Surely MFO staff does not think any reviewer of this document will believe this.  We request that this study be presented in full in the appendix, including the source and the methodology.  The reason is, in its current presentation, this study odes not appear to provide accurate information for planning decisions on BLM managed lands.  If MFO staff has selected data that is inappropriate to BLM managed lands, a lont term mis-allocation of resources will result.  If the presentation of the entire study reveals that it is not appropriate to this DEIS, we request that the study be removed from the document and its conclusion must not be used in this analysis.  So how do we figure out what people are doing when they visit BLM lands in Moab?  The DEIS writers do supply us with solid numbers for the tourism-related tax trends.  Talbe 3.35 on page 3-19 reveals that the total Gross Retail Sales in Grand County (not just the town of Moab) have continued to climb between 1997 and 2003.  So, people are visiting.  Continuing on page 3-109 the DEIS writers state:  "Visitation to the Grand County area, outside of BLM lands, follows the traveler-spending trend, as it increased throughout the 1990s and has leveled off in the new century.  The following table shows visitation numbers for several locations in Grand County that can be used as indicators for visitation to the area."  This is a rather astonishing misstatement, because the table that follows on page 3-110, Table 3.36, "Visitation Trends," does not support the writers' statement that visitation

BLM_0012399

| | | | | |
|---|---|---|---|---|
| | | | has followed visitor spending trend.  Comparing the figures in Tables 3.35 and 3.36 reveals that while visitor spending has climbed slightly, visitation to the parks (Arches, Dead Horse, and Canyonlands) has dropped, and dropped rather precipitously in the "new century."  Please correct this false statement.  And we are still asking the question, what are those 1.2 million "other" visitors to Moab BLM doing?  They are clearly losing interest in passive activities like "scenic driving" and in the hiking opportunities and developed camping opportunities offered int eh parks shown in Table 3.36.  Yet plenty of non-residents are still spending money in Grand County. | |
| Colorado 500 | 1032 | 6 | Now please refer to 3.11.1.2.1 The Colorado Riverway.  QUOTE: "The Colorado Riverway includes the public lands managed by the BLM in the following areas:  Along the Colorado River and Utah Highway 128 from Dewey Bridge to U.S. 191, including Negro Bill Canyon Trailhead, Onion Creek, Castleton Tower (Castle Rock) and Fisher Towers.  Utah Hightway 128 is a State Scenic Byway, and is also a portion of the Prehistoric Highway National Scenic Byway.  Along the Colorado River and Utah Highway 279 from Moab Valley to Canyonlands National Park, including Wall Street, Poison Spider Trailhead and Shafer Basin.  Utah Highway 279 is a State Scenic Byway.  Along Kane Creek Road from Moab Valley to the block of state land south of Hunter Canyon, including Amasa Back totals 76,503.35 acres.  A very small portion of this area (Dewey Bridge to Castle Creek) is within the Colorado River SRMA, with the great majority of the Riverway lying within the Grand ERMA.  The Riverway is the most popular destination of MPA visitors, with recent visitation estimated at approximately 1.04 million people.  Visitors engage in camping, hiking, four-wheel driving, scenic auto touring, mountain biking, bouldering, BASE (Building, Antennae, Span, | |

BLM_0012400

| | | | | |
|---|---|---|---|---|
| | | | Earth) jumping, rock art viewing, dinosaur track viewing, rock climbing, and rafting and boating within the Colorado Riverway." ...while we do not dispute BLM's staement that this is a very popular area, we do think that by working backward from the estimate to the carrying capacity of the geographical area, 1.04 million people cannot possibly want to return for an enjoyable relief from the confines of urban life, because it would be like going to New York City without the buildings. ...by withholding the actual counter numbers, and providing only "estimates," BLM has created an un-credible scenario. It is not our intent to declare that 1.6 million do not visit. It is our intent to use the information provided by BLM in this analysis to demonstrate that because the heavily used areas require so much detailed and expensive Agency attention (campgrounds, restrooms, boat launches, permit systems), BLM has failed to account for an entire demography which requires almost no attention: Long-distance off-road driving, using motorcylces and 4WD vehicles, and dispersed camping in self-contained travel trailers and motor homes. | |
| Colorado 500 | 1032 | 7 | Why do we say this is (visiting Co. River SRMA) is what the other 1 million people are doing? To answer this question, we do have hard numbers, supplied by the writers of this DEIS. On page 3-84, we learn that Utah OHV registration have jumped 207% statewide, and 305% in Grand County during the same time frame the above non-motorized and "passive" visitation has dropped. (Talbe 3.36) Conspicuous by it absence in the DEIS is any mention of the increase of OHV registration in Colorado (recall page 3-84 of the DEIS: "It is important to note that the majority of OHV and dirt bike users on the Moab BLM lands are residents of Colorado"). Because the Moab DEIS has omitted any information about Colorado OHV visitors, we will use The NSRE 2000-2003 Colorado Outdoor | |

BLM_0012401

| | | | | |
|---|---|---|---|---|
| | | | Recreation Study (SCORP) for hard numbers about Colorado trends.  On page 37, Table 7, they found a 37.28% increase in "land resource-based activities."  Table 8 shows a 37.44% increase in trail/street/road activities and in the same chart, "outdoor adventure" saw a 31.41% increase.  According to this study, between 1995 and 2003 the number of people participating in the activity called "primitive camping" increased by only 6% while Colorado OHV registrations increased by 223%.  We think the DEIS writers provide us with a highly suitable description of the phenomena that is occuring, on page 10-25 of the AMS: QUOTE:  "It may be surprising to some that the Moab FO area receives more vistors than the surrounding national parks (see Table10-5).  However, many of the activities that visitors come to the Moab area to enjoy can only be done on public lands  For instance, OHV activity, mountain biking, rockhounding and other such activities are available on BLM land, and not on national park lands.  In addition, once visitors come to the area to visit a national park, they find that there is a much larger land area available for recreation outside those national parks."  The sheer remoteness of what thses folks discover poses a different problem for BLM planners:  how do you count those people?  The answer is, the Moab Field Office apparently does not.  The MFO has no traffic counters on the roads that access the start ponts for these sorts of trips, or, if they do, they have omitted them from this analysis.  MFO has no counters on the popular motorcyle trails.  MFO has no counters on the prime long-distance routes that people come from all over the world to ride.  And MFO has never surveyed any visitors in their self-contained motor homes in the remotest parts of the Moab Field Office. | |
| Colorado 500 | 1032 | 8 | To summarize:  Between 1997 and 2006, 1.  Visitation to Arches N.P. (non-motorized) has dropped 11.5% | |

BLM_0012402

(DEIS Table 3.36)  2.  Visitation to Dead Horse S.P. (non-motorized) has dropped 20% (DEIS Table 3.36)  3.  Visitation to Canyonlands NP (non-motoized) has dropped 13.5% (DEIS Table 3.36)  4.  Interest in pimitive camping in Colorado increased by only 6% (Colorado SCORP 2003)  5.  OHV registrations inUtah have increased by 205% (DEIS Table 3.21)  6.  OHV registrations in Colorado increased by 223% *Colorado SCORP 2003)  7.  Interest in "outdoor adventure" increased by 31.4% Colorado SCORP 2003)  8. Interest in "trail/street/road" activities increased by 37.44% (Colorado SCORP 2003)  9.  Moab BLM lands provide the essence of trail-dependent outdoor adventure by virtue of the vast unmpapped road system and hostile desert environment (DEIS Page ES-7)  10.  Tourism-dependent revenue in Grand County has remained steady (DESI Table 3.35);  11. MFO has no visitor numbers for BLM lands outside the developed activity areas  12.  The source citation for Table 3-18 page 3-80, "Activity by Use Level" states that these proportions are purely anecdotal, and note derived from any factual source such as traffic counters or sureys.  13.  BLM's visitation estimates for the "most popular" BLM sites are so far beyond those sites' carrying capacity that the estimates are not credible.  These thirteen items together reveal the flaw in the analysis:  When the factual information is placed alongside the voids in information, without hundreds of pages between them, we find some very strong clues. There are 1.2 million visitors to Moab BLM lands who are not camping, hiking or boating.  These "new century" recreationists appear to want to particiapte more actively in their public land experience, and off highway vehicles are clearly one of the primary instruments of this demographic and cultural shift.  II. What to do about it.  What are we asking for, now that sufficient doubt has been cast upon the visitor activity

BLM_0012403

numbers as presented in the Draft EIS?  We will only ask for things that are possible for the BLM to accomplish within the scope of this analysis, in order to produce a timely and defendable Record of Decision. The details and citations supporting the following six requests begin on page 13.  I.  Recall from the above analysis of hikers and hiking trails that user-made trails are a manifestion of demand.  Cutting the available mileage in half for any user group will resolve non of the problems set forth in the Purpose and Need statement.  Therefore, we want to have all existing road and trail mileage designated by this decision.  We will provide peer-reviewed research to assist BLM in justifying this change.  Incorporated into this change we fully expect the BLM to conduct site specific analyses (during the decision steps that follow the Record of Decision) of any routes or areas that BLM considers resource problems.  If time permits, there may be some areas that this EIS will analyze in sufficient detail to enable a change in designation with this Decision.  II.  We want all of the motorcylce singletrack maps submitted by the public during this comment period to be placed into the designated trail inventory, including but not limited to the routes submitted by the Colorado 500 in separate comments. III.  We especially want the BLM to abandon the major change of course that omitting 271 miles of "motorcycle trail" represents.  This mileage was named in the AMS as "motocycle trail," and "Motorcycle trails" were discussed during the time the "scope" of this analysis was being determined.  We consider this omission a questionable change of course because the mileage was withdrawn after the public could no longer provide input, and after the time that is customarily available for dialogue between the affected public and the BLM ("scoping").  This withdrawal was apparently initiated by staff with no explanation or legal

BLM_0012404

| | | | | |
|---|---|---|---|---|
| | | | authority for doing so.  IV.  We want the BLM to abandon certain management concepts that this Draft EIS newly introduces to public lands recreation management, as described in Appendix F and called "Activity-Outcome-Benefit" charts, upon which many of the land allocations have been created.  These concepts fall outside the authorities as set forth in FLPMA and BLM 1600 Handbook, and they are confusing to the public.  In a separate comment we will provide an explanation for this request that will sufficiently justify dropping those concepts without changing any of the major outcomes desired by BLM in this EIS.  V.  We want the BLM to revise the discussions in Chapter 3 that relentlessly repeats that people using motor vehicles are the cause of 80% of this "problem" that BLM calls "user conflict," because the fact is, at least 80% of the visitors are using motor vehicles as the primary instrument of their visit.  VI. We want the BLM to review the references used in support of the Analysis, and remove all inappropriate, obsolete, or mis-used research.  We will be happy to provide current research to guide staff as they strive to avoid decreasing MFO's present road and trail carrying capacity. | |
| Colorado 500 | 1032 | 13 | Please refer to page 4-292, 4.3.13.7 paragraph 2. Quote:  "Where proposed under the alternatives, control of human waste through installation of valut toilets in high-use recreation areas generally would benefit water quality by reducing E. coli containmination and nutrient-loading of surface waters.  Designation of camping areas generally would limit the surface disturbance that results from dispersed camping and unofficial fire pits and, thus, would limit adverse impacts to soils."  End Quote.  In another comment we requested that you revise the Affected Environment --- (specifically, 3.11.2.72.2 "INADEQUATE FACILITIES/PUBLIC HEALTH AND SAFETY  The | |

BLM_0012405

| | | | | |
|---|---|---|---|---|
| | | | availabiltiy of facilities is directly related to public health.  Inadequate numbers of organized campgrounds and restroom facilities contribute to unhealthy levels of human waste in some areas, posing a health risk to visitors.")  ---and the Proposed Actions, to encourage the use of self contained motor homes and travel trailers for the specific purpose of addressing these problems in undeveloped camping areas.  ...we make the following requests for revisions to the FEIS and the Proposed Actions:  1.  In the analysis and in all the Prooosed Actions, we want you to emphasize the santiation advantage of self-contained travel tailers and motor homes.  2.  In the analysis, we want you to emphasize the fact that people who camp using self-contained travel trailers and motor homes do not "need" campfires, and considering their extra carrying capacity, these people are far less likely to build "unofficial firepits:" because they can bring their own firepans and firewood if BLM so requires.   4.  We want this analysis to acknowledge and take into consideration that reduced access will discourage these vehicles. | |
| Colorado 500 | 1032 | 14 | We take serious issue with this newly evolved "mission" called "MFO's benefits-based recreation management goals and objectives... for the prooosed SRMAs."  (page 4-190).  1.  Benefits-based recreation management does not flow from the Purpose and Need.  2.  Benefits-based recreation management does not flow from the NOI.  3.  Benefits-based recreation management does not flow from the Scoping.  4.  Benefits-based recreation management adds a burden of analysis to this RMP that lies outside the professional expertise of BLM specialists.  5. Benefits-based recreation management lies outside the authority of BLM.  There is nothing in FLPMA or NEPA that requires BLM to sort visitors according to "user groups" and then expend government resources | |

BLM_0012406

| | | | | |
|---|---|---|---|---|
| | | | upon assuring their satisfaction. 6. In the context of applying the concept to the MFO for the purposes of making land use allocation decisions, the ID Team ahs not used any factual evidence. Professional judgment is professional because it uses a mix of an individual's professonal training, peer-reviewed research, factual information from the area under study (monitoring, for example, or the Administrative Record), and ther person's experience. This person's "Professional judgemetn" is also expected to be a) confined to that person's area of prfessional expertise and b) reasonably consistent with the reseach and factual information available inthis person's area of expertise. If we do not hold government specialists to these standards, there is nothing to prevent them from simply making up management plans based on their own personal favorite activities. The narrative on page 4-190 is very sophisticated, but it looks like it was written to do exactly that. Remedy that would resolve this comment: We want BLM to abandon the entire "beneftis-based" management concept. | |
| Colorado 500 | 1032 | 15 | Please refer to Appendix F.2 Special Recreation Management Areas beginning on Page F-3. In these Tables, MFO staff attempts to compare the experience associated each activity, in order to determine a "targeted outcome" whose "benefits" will help determine the management and resource allocations for each activity. First of all, BLM has failed to easatblish a coheerent relationship between the need to sort people this way and RMP planning. Even worse than irrelevance, however, is that in the list of preparers for this DEIS, no professional socialogist is listed. In the literature cited there is no peer-reviewed, broad-based sociological works that might give these tales at least an air of professionalism. Neither in the Appendix to this document or in the Analysis of the Management | |

BLM_0012407

Situation are there any peer-reviewed site-specific sureveys of all types of visitors to the BLM lands in MFO juridsdiction.

And finally, BLM has provided no evidence -- not even evidence collected by amateurs -- that these "benefits" are not completely interchangeable between activities. Indeed, entering the areana of the psychological and personal values of the individuals who recreate on BLM lands places a signifiant burden upon this analsyis, by widening the scope of its inquiry into an area that lies far outside the mission and expertise of the agency.

If the agency should pursue this aspect of the inquiry, we want the following changes made:

a) Cite the law, regulation, or Executive Order authorizing the agency to promulgate new regulations that segregate recreational visitors according to the local Moab FO staff perceptions of the alue of each type of visitors' personal experience

b) Provide empirical and physical evidence, in the form of a peer-reviewed field and sociological research including user surveys with peer-reviewed question formulation and accurate sample sizes for every type of public land visitor, to confirm that these emotional differences actually exist and are in fact significant enough to expend government resources on allocating land and resourcs based on these differences.  A popular dodge for this requirement is to interview only the visitors that staff wants to interview, or only the visitors that are easy to find.  We expressly demand the BLM refrain from doing this

c) Provide an analysis of the social benefits (accruing to all BLM recreationists, and to the taxpaying public) of imposing criminal penalties form crossing the regulartory boundaries that will be established to support these alleged differences

d) Provide sufficient justification thereby, for agency

403

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | law enforcement resources to be expended on physically sorting public land visitors with the intention of applying criminal penalties to violations of these standards, in the present and the indefinite future as this document proposes<br>e) Provide a description of how the government will measure the success of this strategy.<br>Alternatively, We want the BLM to abandon the concept of using individual recreationists' "values/benefits/outcomes/experience" as the basis for any management plan or any regulations or any on-the-ground boundaries. | |
| | 3 | 4 | We oppose the camping policy as outlined in Appendix E. I support a policy where existing campsites are open unless closure was determined necessary via lawful public planning process. It is very important that the Final RMP require full public involvement in any establishment and management of "restricted camping areas" or "controlled camping areas". | See response to comments 120-86 and 123-8. |
| | 58 | 1 | I am opposed to the camping policy outlined in Appendix "E" and the concept of "vehicle camping only in designated campsites." Tent camping in dispersed campground can be a very low-impact form of camping and should not be completely prohibited. Existing dispersed campsites should be open for use unless closure is determined necessary by a lawful planning process. The final plan should mandate full public involvement in the establishment of any restricted or controlled camping areas. | See response to comments 120-86 and 123-8. |

## Riparian

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 2 | #2-page 5. When there is nearby surface disturbance, the proposed BLM buffer of "100 meters" is inadequate | The 100 meter buffer is based on Utah State Office Instruction Memorandum UT 2005-091 regarding Utah |

BLM_0012409

| | | | | |
|---|---|---|---|---|
| | | | in this dry desert environment, because of the ease of the spread of soil distrubance and erosion, vegetation loss, and soil and water contamination that can spread into the floodplain and riparian habitat. These direct, indirect, and cumulative impacts can be effectively reduced by increasing the buffer to 1500 meters. | Riparian Management Policy. |
| ECOS Consulting | 9 | 5 | The DRMP should also address future relocation and closure due to deteriorating riparian conditions and deteriorating route conditions due to continuous wear and tear and storm events. | On pg. 2-48 of  the DRMP/EIS it states that "Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse affects, the authorized officer shall close or restrict such areas". |
| ECOS Consulting | 9 | 6 | Riparian Section 9.3.3 on Page G-24 of the Moab RMP states that there are OHV routes in a total of 118.9 miles of riparian area, and 230.2 miles within floodplain areas, but there are no maps or lists of which riparian or floodplain areas. Have the conditions in these riparian areas been monitored? If so, by whom, and are there any reports with analyses, conclusions, and recommendations? Have there been any analyses of direct, aindirect, and cumulative effects for specific areas? If so, is there a report? Has there been any monitoring of the number of vehciles that use the different riparina and floodplain routes? These are all questions that should be answered before 10-20 years of management planning is finalized, as it will be in this Moab RMP | The riparian conflict is identified on a route by route basis for about 33,000 routes in the attribute table for the GIS database.  This data are part of the administrative record and are available to the public upon request.

A monitoring plan will be developed upon completion of the Resource Management Plan where riparian routes will be taken into consideration.

See response to comment 124-33. |
| ECOS Consulting | 9 | 7 | The environmental damage from OHV use is well documented in the literature (Andrews 1990, Brown 1994, Dittmer and Johnson 1975, Forman and Hersperger 1996, Forman and Alexander 1998, Gelbard 1999, Harris and Gallagher 1989, Harris and Scheck 1991, Iverson et al. 1981, Langton 1989, Miller et al 1996, Montgomery 1994, Oxley et al. 1974, Schmidt 1989).  Negative direct and indirect ecological effects of OHV use in and near riparian areas include: 1) increased soil erosion and compactions; 2) increased water velocity; 3) plant community destruction; 4) loss of terrestrial and aquatic insect communities; 5) soil, water | See response to comment 124-7.

The BLM utilized the best riparian data available  in development of the DRMP/EIS..

The BLM acknowledges that routes in riparian areas can have adverse impacts.  However, the majority of the impacts occur when the route was constructed.  The designated routes consist of previsouly created routes. According to Utah State Office Instruction Memorandum 2005-91 related to Utah Riparian Management Policy, no new surface disturbing activities will be allowed within 100 |

BLM_0012410

| | | | | |
|---|---|---|---|---|
| | | | and air pollution; 6) sound pollution; 7) exotic plant invasion; 8) loss of fish and wildlife habitat; 9) reduction of fish and wildlife populations; 10) Stream bank destruction.<br><br>These direct and indirect effects all add up to serious adverse cumulative effects over time.  Cumulative effects include the near and total loss of wildlife habitat and wildlife species; the destruction of vegetation; sediment buildup due to increased flow velocity, which gets worse over time as more and more vegetation is lost; and arroyo cutting and the lowering of the water table, which robs the adjacent flood plains habitat of moisture transforming it into upland habitat.<br><br>Does BLM have baseline data for riparian area vegetation? Has the BLM analyzed any of its riparian areas for former extent of riparian vegetation compared to today?  Does the BLM have any idea what the potential future conditions and extent of riparian habitat could be in any of its perennial or ephemeral streams? If so, BLM must include this information in the Drat Moab RMP/EIS so that the public can make an informed assessment.  It is highly recommended that the BLM perform these types of analysis before committing to 10-20 more years of management without adequate background baseline, trend, and potential habitat extent information. | meters of riparian areas unless it can be shown there are no practical alternatives.  Thus, new route construction in riparian areas would very seldom occur.<br><br>See response to comment 9-5. |
| ECOS Consulting | 9 | 24 | Page 4-241, 6th paragraph, 4.3.11.2:  Due to the extreme ecological importance of riparian areas exceptions should be granted in only the most dire and emergency situations.  When an exception is granted, the receiving party should be given mitigation orders that not only completely restore the disturbed area but also include extended projects that enhance the immediate area.  An example would be controlling any exotic weeds in the area and reseeding with native vegetation. These | The Utah State Office Instruction Memorandum 2005-091 regarding Utah Riparian Management Policy defines the exceptions for the requirement that no new surface disturbing activities will be allowed within 100 meters of riparian areas.  This exception language was included in the DRMP/EIS. |

BLM_0012411

| | | | | |
|---|---|---|---|---|
| | | | mitigation projects should be designated to have adequate follow-up procedures to ensure that restoration objectives have been achieved.  This would satisfy BLMRiparian Guideline #3 (Mangement practices maintain or promote suficient residual vegetation to maintain, improve, or restore riparian-wetland functions of energy dissipation, sediment capture, groundwater recharge and stream bank stability.), and BLM Riparian Guideline #9 (Native species are emphasized in the support of ecological function.).  It would also satisfy the BLM Riparian Standard for Native Species: Healthy, productive and diverse populations of native species exist and are maintained.  These standards have been established in the 43 Code of Federal Regulations 4180.2. Has the BLM developed mitigation plans that have been independantly reviewed and accepted by the general public?  If so, what specific measures is the BLM requiring? | |
| ECOS Consulting | 9 | 25 | Page 4-242, 2 Paragraph, 4.3.11.3: Given the known and well documented adverse impacts of grazing, and the impairment this activity thrusts upon riparian ecosystems, the BLM should take a serious ecological approach to managing grazing more intensely and with effective rules and regulations that protect riparian resources.  Riparian areas are the most productive and ecologically important habitat type in the desert Southwest. Its is estimated that between 75-85% off all biological productivity occurs in riparian areas. According to the BLM's own numbers, riparian habitat makes up a scarce 0.75% of the total area of land that will be managed by the Moab RMP (13,450 acres out of a total of 1,800,000 acres). The Moab RMP is proposing management for about the next 10-20 years and probably even longer, thus BLM should take a proactive and critical stance on the effects of grazing on riparian resources. In the best scenario (Alternative B) the BLM proposes to protect only 34% of existing riparian area or | Riparian areas are evaluated on an allotment specific basis during the Permit Renewal process using Standards for Rangeland Health and Guidelines for Grazing Management. |

BLM_0012412

only 4,422 acres out of a total of 13,450 acres of riparian area. This represents less than 0.25% of the total area managed by the Moab RMP/EIS.  This is clearly inadequate. Alternative C also falls far short of adequately protecting riparian resources because it protects even less total area.  This alternative proposes the protection of only 1,169 acres out of a total of 13,450, which represents less than 0.06% of the ntotal land in the Moab Planning area, and less than 9% of riparian habitat in the Moab Planning Area.  The Moab DRMP's range of alternatives with respect to grazing is unreasonably narrow and inadequate.

Protecting only 32.9% (Alternative B), or 8.7% (Alternative C), or 7.4% (Alternative A), or 3.7% (Alternative D) of the most important habitat in the Moab Planning Area from the known impacts of livestock grazing, especially when riparian habitat constitutes less than 1% of the total landscape, is clearly not acceptable. Especially considering that this plan will be in effect for the next 10-20 years. It is recommended that management is based on the BLM's own riparian standards and guidelines.  In order to achieve these guidelines the BLM must inventory all its riparian resources, prioritize these riparian areas according to severity of impacts, rate these riparian area according to BLM proper functioning condition methodologies (USDI 1993), and institute effective restoration plans of these valuable resources. Due to BLM's poor history of protecting riparian resources, this work must be done in cooperation with other agencies, and private groups and consultants in order to ensure unbiased results. Adoption of these recommendations would satisfy the BLM's Riparian Standard fo Riparian/ Wetlands: Riparian-wetland areas are in properly functioning condition. These standards have been established in the 43 Code of Federal Regulations 4180.2.

BLM_0012413

| ECOS Consulting | 9 | 28 | Page 4-243, 3rd paragraph, 4.3.11.4:Although surface disturbing activities will be prohibited within 100 meters of the riparian area, what is to prevent any downstream flow from this disturbance from entering the riparian habitat?  Mineral resource ground disturbing activities dredge up much material from underground that, if allowed to spread into the riparian area, can be toxic to vegetation, soil, and water quality. There is also the high probability of the introduction of noxious weeds from surface disturbing activities so close to the riparian area. This has the potential to impact large areas downstream of the disturbed sites.  Vehicles and ground disturbance are the primary causes that allow the establishment of noxious weeds.  One hundred meters is not far enough from riparian areas to allow mining activities and avoid impacts.  This should be increased to 1500 meters from riparian areas in order to ensure adequate protection. This would ensure the effectiveness of BLM Guideline # 6 (Management practices maintain or promote the physical and biological conditions necessary to sustain native populations and communities), and BLM Guideline # 13 (Facilities are located away from riparian-wetland areas wherever they conflict with achieving or maintaining riparian-wetland functions.). These recommendations would also allow the BLM to achieve their own Riparian Standards for Soils (Upland soils exhibit infltration and permeability rates that are appropriate to soil type, climate and land form.) and Native Species (Healthy, productive and diverse populations of native species exist and are maintained). These standards have been established in the 43 Code of Federal Regulations 4180.2. | The Utah State Office Instruction Memorandum 2005-091 regarding Utah Riparian Management Policy specifies a 100 meter buffer for riparian resources. Proposals for mineral development are implementation actions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land use plan. |
| ECOS Consulting | 9 | 29 | Page 4-243, 3rd paragraph, 4.3.11.4: Due to high disturbance and serious impacts, it is highly recommended that any mineral development within riparian areas should not be allowed. Exceptions should be issued only in emergency situations. Riparian areas | See response to comment 9-24. |

BLM_0012414

| | | | | |
|---|---|---|---|---|
| | | | are too rare (less than 1% of total Moab Planning Area), ecologically sensitive, and ecologically important, that mineral development activities within floodplains and riparian areas should be avoided at all costs. As mentioned above, ground disturbing activities should be kept at a minium of 1500 meters away from riparian areas and floodplains. Ths distance would serve to protect the soils, riparian/wetland functioning, stream functio, and the native species sections of the BLM's Riparian Standards and Guidelines as defined in the 43 Code of Federal Regulations 4180.2. | |
| ECOS Consulting | 9 | 32 | 4.3.11.7 Impacts of Riparian Management Decisions on Riparian Resources. Page 4-246, 5th Paragraph, 4.3.11.7.1: The BLM has had standards for Rangeland Health for almost 10 years now but there is very little evidence on BLM lands in the Moab area that riparian areas are in better condition due to BLM's stated management standards. Standard 2 states that "riparian and wetland areas must be in properly functioning condition (PFC)", yet there are many riparian areas within the Moab Planning Area that are clearly not in PFC. The DRMP fails to include BLM's monitoring reports and results that determine the condition of the riparian areas.  Does Moab BLM have any monitoring reports and results for each of the riparian areas it manages?  Who is doing the monitoring?  Is it a team of specialists, as specified by BLM PFC protocol, or is it just the range technician who preformes much of this work? Are there any outside reviews of these determinations?  Have there been any reports that analyze results and show the trends?  How often has any one area been assessed?  An area must be assessed more than one time for monitoring to occur and trends determined. | See response to comment 9-6 and 124-33. |
| ECOS Consulting | 9 | 72 | The primary legislation for the management of BLM lands is by the Federal Land Policy and Management Act (FLPMA, 43 U.S.C. §§ 1701-1785). FLPMA | The BLM adheres to all laws, regulations, policies, and Executive Orders pertaining to riparian areas.  There is nothing in these rules that require the BLM to entirely |

410

BLM_0012415

| | | | prescribes sustained-yield management principles (43 U.S.C. § 1702 (c)), which apply to an open-ended list of "renewable and nonrenewable resources," including fish and wildlife, recreation, timber, range, wilderness, mineral, watershed, and natural, scenic, scientific, and historical values.  Riparian areas are one of the few habitats where most of these values are found together. The act further directs BLM, in managing the public lands, "to take any action necessary to prevent unnecessary and undue degradation of the land" [43 USC §1732(b), FLPMA §302(b)].  This can easily be accomplished by closing riparian areas to resource destroying activities such as livestock grazing, OHV use, and mining activities.

"Riparian/wetland habitats are fragile resources and are often among the first landscape features to reflect impacts from management activities. These habitats are used as indicators of overall land health and watershed condition. Some of the functions of a healthy riparian system include: filtering and purifying water as it moves through the riparian zone, reducing sediment loads and enhancing soil stability, reducing destructive energies associated with flood events, providing physical and thermal micro-climates in contrast to surrounding uplands, and contributing to ground water recharge and base flow" (BLM Riparian Area Management Policy, 1987).

In addition to those laws embedded in the very foundation of BLM as a public land management agency (Taylor Grazing Act, 1934, Federal Land Policy and Management Act 1976, and Public Rangelands Improvement Act, 1978), the premiere authority which provides for the most protection of riparian/wetland and associated resources is the Clean Water Act of 1977. In response to the Clean Water Act, two central Executive | close all riparian areas to resource uses. |
|---|---|---|---|---|

411

BLM_0012416

Orders (Wetland and Floodplain) were signed under Presidential authority to protect riparian/wetland and associated floodplain and wildlife values. Relevant regulations, policy, and guidance relative to management of riparian/wetland resources include:
*Executive Order (EO) 11988 (May 24, 1977), the Floodplain EO
*EO 11990 (May 24, 1977), the Wetlands EO
*EO 12088 (October 24, 1978), the Local Water Quality EO
*EO 12962 (1995), Fisheries and Aquatic Ecosystems EO
*EO 13186 (2001), EO in support of the Migratory Bird Treaty Act of 1918
*Fundamentals of Rangeland Reform (1995), under 43 CFR 4180- Fundamentals of Rangeland Health and Guidelines for Grazing Administration (Standards and Guidelines)
*National Riparian Area Management Policy (NRAMP, 1987) Establishes standards and technical methods for riparian area assessment and inventory.
*National Cooperative Riparian Restoration Program (1996) Cooperative program between the BLM, USDA Forest Service, and NRCS" (BLM 2005).

Considering the abundance of policy, guidance, and regulation concerning the importance of maintaining healthy riparian habitat; and since it is estimated that only about 10% of the original extent of riparian area remains in the southwest; and since riparian areas cover only 1-2% of the Southwest landscape, and less than 1% of the Moab Planning Area; and since riparian areas are among the most productive and ecologically important habitats in the Western United States; the BLM must manage what little remains for the maximum good of the American public.  FLPMA prescribes sustained yield management principle, that the BLM is required to

BLM_0012417

| | | | | |
|---|---|---|---|---|
| | | | adhere to these principles, especially i regards to riparian area management.  To that end, it would be advantageous for the BLM to focus particular attention on preserving and restoring all the riparian areas within the Moab Planning Area.

If the riparian areas remain functioning and healthy, then adjoining uplands will likely follow. Thus, the BLM must manage the small percentage of riparian habitat that is in the Moab RMP project area, 0.75% of the total area, for the maximum benefit if renewable resources, and for the ecological benefit of surrounding areas.  Renewable resources that the BLM should focus on with riparian areas include fish and wildlife, vegetation, watersheds, water quality, water quantity, and natural, scenic, and wilderness resources, as well as non-motorize recreation, scientific, and historical values.  These uses provide a wide variety of experience and opportunities for the widest diversity of public users, and contribute to persevering the proper ecological functioning of these rare riparian areas.  Riparian areas have an extraordinary positive influence in adjacent uplands and thus, if in proper functioning conditions, will provide numerous additional benefits for all habitats. | |
| Samson | 201 | 12 | On page 2-30 of the Moab DRMP/EIS, the BLM states that surface-disturbing activities would be precluded within 100-year floodplains, 100m of riparian areas, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | See response to comment 214-20. Appendix H, Guidance for Pipeline Crossings, is included in the DRMP/EIS so that proper pipeline placement and crossing can occur. |
| Cabot Oil and Gas | 202 | 13 | On page 2-30 of the Moab DRMP/EIS, the BLM states that surface-disturbing activities would be precluded | See response to comment 214-20. |

413

| | | | | |
|---|---|---|---|---|
| Corporation | | | within 100-year floodplains, 100m of riparian areas, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | |
| Bill Barrett Corporation | 214 | 20 | The BLM states that surface disturbing activities would be precluded within 100-year floodplains, 110  m of riparian areas, public water reserves, and within 100 m of springs.  As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area. | In Appendix C (page C-5) of the DRMP/EIS it states that an exception to these restrictions can be granted if 1) there are not practical alternatives or, 2) all long term impacts can be fully mitigated, or, 3) the activitiy will benefit and enhance the resource values.  Appendix H provides the guidance for pipelines crossing stream crossings. |
| Ruby Ranch | 264 | 6 | White Wash and Salt Wash are definitely riparian zones. They are acknowledged as such in the EIS for the Ruby Ranch Allotment. However, it seems that this fact is minimized in the Moab RMP. In section 4.3.11.2, page 4-241, it states that "stipulations require that no surface disturbing activities within 100 meters of riparian areas". In many other areas of the Moab RMP, it highlights and emphasizes the fact that the riparian areas within the Moab RMP area are both rare, unique and should be protected.  They are in fact critical zones for watersheds, veg and wildlife, but  in the past 20 years, White Wash has been horribly desecrated and Salt Wash is showing significant damage form OHVs. | The BLM acknowledges that motorized travel in washes can impact riparian values.  By limiting travel to designated routes, many washes will be spared motorized travel.  There are some washes, however, that would be designated for motorized travel in the Travel Plan. |
| Environmental Protection Agency | 479 | 16 | Consistent with EPA's regulatory responsibilities under the Clean Water Act, we consider the protection of the 13,450 acres of riparian/wetlands within the MPA a high priority.  Table 3.22 of the DRMP/EIS indicates that only 57% of these areas are in proper functioning condition (PFC).  The EPA believes that the 100 meter riparian buffer zone, while affording some degree of protection, is not sufficient.  The EPA believes that the ¼ mile buffer | The 100 meter buffer zone for riparian areas is based on BLM policy found in Utah State Office Instruction Memorandum 2005-091.  The EPA provides no rational as to why they believe a for why a 1/4 mile buffer is necessary.  All of the stream segments suggested by the commentor for suitability as Wild and Scenic River status are included in Alt B.  In Alt C, these river segments are recommended for management as no surface occupancy |

BLM_0012419

| | | | | |
|---|---|---|---|---|
| | | | zone created when a river is found suitable for Wild and Scenic River status should be considered for all wetlands 1) not in PFC, 2) vulnerable to impacts from oil and gas production, recreation and grazing, and 3) along stream segments with steeper slopes.  The EPA supports all the stream segments found suitable for Wild and Scenic River Status in Alt C.  The EPA believes that the following additional eligible segments be found suitable for Wild and Scenic River designation in the preferred alternative:  Onion Creek, Mill Creek, Thompson Wash, Negro Bill Canyon, Beaver Creek, Professor Creek, Rattlesnake Canyon, Thompson Canyon and all segments of the Green River. | or closed to protect other resource values.  This proposed management would protect the riparian areas along these stream segments.<br><br><br>Following procedures, it is a suitability decision for the BLM to make.  It is a management decision. Every one of these NSO or closed. |
| Pack Creek Water Company | 904 | 1 | The riparian area, between the Pack Creek community and down stream to the Pack Creek Bridge and Adjoining areas, needs special care by the BLM and protection from erosion and pollution due to grazing. | The riparian area around Pack Creek is to be managed as no surface occupancy in the preferred alternative.<br><br>Grazing in the Pack Creek area must be addressed during the permit renewal process. |
| Pack Creek Water Company | 904 | 2 | We request the BLM addresses and stabilize this riparian area and streambed as soon as possible. Please advise us of BLM plans to deal with this stretch of Pack Creek and any other plans to address erosion issues in the seriously damaged Pack Creek watershed. Furthermore, we ask that the BLM inform and advise the Pack Creek Water Company on all watershed matters, actions, and proposed future actions that affect it and the Pack Creek Community. It is important to us that we be considered a joint stakeholder in all matters that affect us. | Grazing in this allotment will be addressed during the permit renewal process.  The Pack Creek Water Company should ask to be an interested public for this process. |
| Howard County Bird Club | 972 | 4 | The watercourses and the riparian habitat along them are crucial for wildlife in this arid region, both resident species and those migrating through the Colorado Plateau region. BLM identified this as one of the 10 issues to be addressed in the Moab RMP (page 1-9). A total of 32,800 acres is identified by BLM as riparian habitat. Some 26,000 acres of this is within grazing allotments, and 34 percent of those lands were found to | The BLM recognizes the importance of riparian areas for wildlife.  Grazing in riparian areas is addressed not at the land use planning level, but rather when the grazing permit is renewed.  Standards for Rangeland Health and Guidelines for Grazing Management are utilized to protect riparian areas on a case-by case allotment basis.<br><br>In designating routes for travel, riparian issues were |

BLM_0012420

| | | | | |
|---|---|---|---|---|
| | | | be "functioning-at risk," 11 percent as "not functioning" (page 3-35). We commend BLM for recognizing this problem. We ask the bureau to close jeopardized riparian habitat to grazing as proposed in Alternative B. We urge further closures to ORV traffic and mineral leasing to protect riparian habitat in areas. | carefully considered.  Of the 2,506 miles of existing route that are eliminated in the Travel Plan accompanying Alt. C, many were removed because of riparian conflicts. Where the purpose and need for the route outweighed the riparian conflict, the route was designated in Alt. C. Indiscriminate cross country travel in riparian areas has been almost entirely eliminated in Alt C, as has indiscriminate OHV riding in dry washes (which are used by wildlife as travel corridors). |
| | | | | All surface disturbing activities within floodplains and riparian areas are prohibited in all action alternatives. See Appendix C of the DRMP/EIS, pg. C-5, which states: "Allow no surface disturbing activities within 100 year floodplains or within 100 meters of riparian areas.  Also, no surface disturbing a ctivities within public water reserves or within 100 meters of springs." |
| Western Watersheds Project | 102 5 | 39 | Significant discrepancies exist within the riparian sections and other sections referencing riparian resources within the DRMP/EIS. Large differences exist between the number of riparian acres cited within the Moab RA in the affected environment, which references the 2003 BLM riparian GIS databases as containing 32,750 acres by ecological condition and those cited in the impact analysis which relies on Gap Analysis to determine Moab RA contains 13,450 acres of riparian resources.  The DRMP/EIS quantification and analysis is severly flawed and unreliable throughout the document with these discrepencies, as well as others referenced below. Additionally, discrepancies and confusion exists on the locations and numbers of acres of riparian areas removed from livestock grazing within all alternatives throughout the document. Examples follow: -Within the riparian impact analysis, whether riparian acres comprise either 32,750 acres or 13,450 acres, exclusion of livestock rgazing from only 17% of riparian areas, or even anything less than all of riparian acres | The discrepancy in riparian data identified by the commentor has been corrected in the PRMP/FEIS.  The riparian analysis in Chapter 4 of the PRMP/FEIS has been changed accordingly. The BLM is not required to exclude all riparian areas from livestock grazing.  Riparian areas are evaluated on an allotment specific basis during the Permit Renewal process using Standards for Rangeland Health and Guidlelines for Grazing Management. The commentor has expressed a preference for the riparian actions and ACEC designations proposed in Alt B of the DRMP/EIS.  The BLM has chosen Alt C as the preferred alternative. As part of the Standards and Guidelines process for the Potash allotment, a cattle guard has been placed on the Potash road between the Potash plant and the boat ramp. This action has excluded grazing from the Potash road |

BLM_0012421

| | | | within the district under the Alternative B Environmentally Preferred or Alt C BLM Preferred alternative is unacceptable, especially when approximately 43% of riparian areas are Functioning-at-Risk or in unsatisfactory condition and riparian areas comprise less than 1-2% of Moab RA public lands. Beneficial impacts to riparian can be realized from selection of 12 proposed special ACEC designations within Alternative B Environmental Preferred alternative. Alternative C BLM Preferred alternatives should recommend selection of more ACEC designations that benefit or protect riparian/wetland. Especially when the proposed SRMAs do not adequately protect sensitive riparian resources which support approximately 80% of wildlife species.<br><br>-Alt B Environmentally Preferred alternative of soil/water impacts analysis cites livestock grazing in 4,422 acres of riparian resources and along 58 miles of perennial stream would be excluded. Alternative C BLM Preferred would restrict grazing in 1,169 acres of riparian resources improving riparian along 28 miles of perennial stream.<br><br>-Alt C BLM Preferred alternative within the wildlife impacts section cites grazing would be restricted in 1,169 acres of riparian habitat in five allotments. Restrictions would include the development of AMPs. In addition, 77 acres in Day Canyon would be unavailable for grazing. Where in contrast within the riparian impacts section 4.3.11.3.3 Alternative C, the riparian areas unavailable for grazing are cited "as the same areas as under Alternative B, with the exception of Day Canyon, Kane Springs, Lower Gray Canyon of the Green River, and Hatch Wash, which would remain available for grazing." Furthermore in the riparian resources alternative table on page 2-31, riparian areas would only be "prioritized for evaluation within specified allotments", with Day Canyon included in both Alt B Environmentally Preferred and Alt C BLM Preferred alternatives. | (Highway 279) including the access to Day Canyon. This has excluded Day Canyon from grazing. The text in the PRMP/FEIS has been changed to reflect that Day Canyon has been excluded from grazing.<br><br>Specific riparian wetland resources are evaluated on a site specific allotment basis during the Permit Renewal process using Standards for Rangeland Health and Guidelines for Grazing Management.<br><br>The commentor's request for the names of specific streams and acres affected by each alternative is not necessary to analyze impacts and the land use planning level. The goal of the impact analysis is to compare the alternatives.<br><br>For travel management, the number of miles excluded in order to benefit riparian resources has been added to Appendix G of the PRMP/FEIS.. |
|---|---|---|---|---|

BLM_0012422

Rangeland Health Standards require the removal of livestock grazing impacts from sensitive riparian/wetland resources whether through season-of-use adjustments, AMP development or fencing for mitigation when issues of Properly Functioning condition are raised as specifically identified for riparian allotments including Day Canyon. Therefore, we support removal of livestock grazing from those allotments identified within Alternative B Environmentally Preferred within the riparian alternative table; those identified with conflicts within Riparian affected environment section; those identified within section 4.3.6.3.3 impacts of riparian actions on livestock grazing management; and Table 4.30 within the riparian impact analysis section although there remain discrepancies between some references.

-Within the soils/watershed impact analysis, similar beneficial impacts from cultural resource proposals to 42 miles of perennial stream within Alternative B and C of soils and water section although there remain discrepencies between some references.

-Within the soils/watershed impact analysis, similar beneficial impacts from cultural resource proposals to 42 miles of perennial stream within Alternaive B and C of soils and water section would be received to riparian and wildlife resources.

-Within impact analysis to livestock grazing from riparian mgmt, all alternatives should cite the specific allotments and numbers of acres affected by alternative not simply that 8 or 6 sites would be excluded from livestock grazing.

-Impacts to riparian/wetland resources from desiganted routes and single-track motorcycle routes need to be specifically quantified and analyzed for public review especially since this was a scoping issue initially raised by the public.

-Within the livestock grazing impact analysis, the number of acres cited available to livestock grazing from

BLM_0012423

| | | | selection of riparian actions in Alternative B would be a reduction of 4,422 acres and 203 AUMs as compared to Alternative A. | |
|---|---|---|---|---|

## Scope

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 10 | The BLM is Not Using "Ecosystem Management" Principles.<br>The BLM must use the principles of "ecosystem management" in order to conserve its lands for future generations. "In the Management of the Nation's public lands there is a shift form the traditional "multiple use" management model to a large scale "Ecosystem Management" paradigm in the BLM and other Federal management agencies" (Keith 1994). Since 1993, the BLM has committed to a new approach that implements a scientifically sound, ecosystem based strategy for managing lands. This is called "ecosystem management" which can be defined simply as keeping natural environments healthy, diverse and productive so people can benefit from them year after year. The ecosystem management approach means identifying limits to the use and development of the land's recourses and managing within those limits in order to ensure the long-term health , biodiversity, and productivity of the environment. For many areas, is also means trying to restore damaged land to healthy conditions. In adopting "ecosystem management" the BLM recognizes that natural systems must be sustained in order to meet the social and economic needs of future generations. After examining the BLM's Draft Moab RMP/EIS, we are startled to find very little mention of "ecosystem management", especially when considering the wildlife and fisheries sections. | The BLM does not have any rules or policies regarding Ecosystem Management in the land use planning process. |

419

BLM_0012424

| | | | According to this plan, management of the Moab Planning Area is to proceed pretty much as it has in the past 50-100 years, reactive and with very little room for actual "ecosystem management". The BLM's own publication "Ecosystem Management in the BLM: from Concept to Commitment. (USDI BLM 1994)", describes the principals and philosophical framework for ecosystem approaches.<br><br>Has the BLM defined limits to the use and development of the lands resources in habitats within the Moab Planning Area? Has the BLM formulated a strategy for managing within those limits? Is the BLM using any of the nine principals referenced above? No information of this sort can be found in the Draft Moab RMP/EIS. How does "ecosystem management" fit into planning the next 10-20 years in the Moab Planning Area? | |
| ECOS Consulting | 9 | 79 | Protection of vegetation, Biological crusts, and Water must be the Highest Priority.<br>Considering the extreme ecological importance of biological crusts, vegetation, and water in the arid environment of the Moab RMP Planning Area, we recommended that BLM's land management plans be centered around the maximum protection of these resouces.  The biological soil crusts and vegetation are what hold the ecosystem together, and the water is what drives all biological production processes.<br>The primary legislation for the management of BLM lands is by the Federal Land Policy and Management Act (FLPMA, 43 U.S.C. §§ 1701-1785). FLPMA prescribes sustained-yield management principles, which apply to an open-ended list of "renewable and nonrenewable resources," including fish and wildlife, recreation, timber, range, wilderness, mineral, watershed, and natural, scenic, scientific, and historical values. The act further directs BLM, in managing the public lands, to take any action necessary to prevent | The BLM adheres to all laws, regulations, policies, and Executive Orders pertaining to vegetation, biological crusts, and water resources.  There is nothing in these rules that require the BLM to provide maximum protection of these resources.<br><br>The commentor has not provided any specific information on where the BLM has failed to follow the rules regarding vegetation, biological crusts, and water  in the land use planning process. |

BLM_0012425

| | | | | |
|---|---|---|---|---|
| | | | unnecessary and undue degradation of the lands. (43 USC §1732(b)). The DRMP should be guided by these mandates, because if a significant loss of either the biological soil crusts or the water resources should occur, then we would lose the capacity of the land to support all natural processes. We recommend that no activity or combination of activities be allowed that contribute to the destruction of either the soils or water resources over more than 10% of the total area of these resources within the Moab RMP Planning Area. | |
| ECOS Consulting | 9 | 80 | Provide a Wider range of Alternatives regarding Livestock grazing, Travel Management, and Mineral development activities. It is imperative that the BLM develop meaningful alternative for the Moab DRMP so that, in the spirit of FLPMA, analysis and decisions can be made that are based on true alternates for multiple use and sustained yield, and the recovery and protection of the long-term health of the land can proceed into the future. BLM's mandate under the Federal Land Policy and Management Act of 1976 (FLPMA) is to manage the public lands for multiple use, while protecting the long-term health of the land. It appears that in developing the Moab RMP for the Moab Planning Area, the BLM is supporting livestock grazing, OHV recreation, and mineral development activities so blindly, that it is neither managing these lands for multiple use, nor is it protecting the land's long-term health, because it refuses to consider the well-documented and real devastating direct, indirect, and cumulative impacts of livestock grazing, OHV use, and mineral development on the soil, vegetation, and water resources. The National Environmental Policy Act (NEPA) of 1969 specifically provides instruction to the BLM and other Federal agencies for developing a range of reasonable alternatives in environmental impact statements. NEPA | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.). While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. Public participation was essential in this process and full consideration was given to all potential alternatives identified. The BLM in developing the PRMP/FEIS can choose management from within the range of alternatives presented in the DRMP/EIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple use mandate. See response to comment 124-7. |

BLM_0012426

| | | | | |
|---|---|---|---|---|
| | | | assures that the BLM (and other federal agencies) will consider the impact of an action on the human environment before decisions are made and the action is taken. The NEPA process is intended to help public officials make better decisions based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the human environment. In this Moab DRMP, by not including a reasonable range of alternatives, and not dealing directly with the impacts of livestock grazing, OHV routes, and mineral development, the BLM is skirting the NEPA requirements that compel the agencies to concentrate on the significant issues that will seriously effect the protection, restoration, and enhancement of the human environment. Only by considering a full range of alternatives and the full direct, indirect, and cumulative impacts of these activities can the BLM make sound management decisions.<br>The DRMP fails to acknowledge and assess the enormous adverse direct, indirect, and cumulative impacts of livestock grazing and OHV routes on the soils, vegetarian, stream banks and channels, and the riparian areas. The BLM must include an in-depth analysis of the historic ecological damage and how it has affected conditions in the field today, and develop preferred future conditions based on the actual potential of these lands. We say the "actual" potential because for too long the BLM has based conditions on how they have been over the past 100 years, which is probably very different from the potential natural conditions, due primarily to the short- and long-term adverse effects of intensive livestock grazing. | |
| Ride with Respect | 122 | 1 | The DRMP format frequently addresses the same points in different sections. Although our page references are not exhaustive, we request that changes be made consistent throughout the document. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS.  The Federal Land Policy and Management Act requires the BLM to manage public lands based on |

422

BLM_0012427

| | | | | |
|---|---|---|---|---|
| | | | The DRMP format frequently addresses the same points in different sections.  Although our page references are not exhaustive, we request that changes be made consistent throughout the document.

Ride with Respect believes that the solution to managing motorized vehicle access is to provide diverse recreational opportunities with sufficient quantity and quality.  The Draft plan could go further to this end. | the principles of multiple use and sustained yield.  Motorized recreation is but one element of multiple use. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 4 | The Moab Draft RMP fails to acknowledge public will regarding land management preferences.   During the scoping period the majority of the public favored a pro-conservation and non-motorized position by a majority of 10:1. | The issues raised during the scoping period were incorporated into the Moab Draft RMP/EIS.  The scoping comments identified by the commenter are specified as Issues 1 & 10.  Issue 1 states:  How can increased recreation use, especially motorized vehicle access, be managed, while protecting natural resource values?  Issue 10 states:  How should non-WSA lands with wilderness characteristics be managed?  A range of management actions was developed to address the issues identified by the public.  All the action alternatives significantly reduce areas open to cross country use and significantly reduce the number and mileage of routes open to motorized travel.  It should be noted that even the BLM's Alt D (the least restrictive alternative to motorized travel) proposes fewer routes than the travel plan submitted by the commentor during the scoping period. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 38 | The BLM avoids dealing with a range of important issues by declaring some beyond the scope of this plan.  The issues of public education, enforcement/prosecution, vandalism, and volunteer coordination are not addressed but are critical to adequately analyzing the feasibility of implementing travel planning decisions and ORV route designations. | The items listed are admistrative actions and do not require land use planning decisions.  The analyses assumes that there will be funding for implementation of the travel plan which will include public education, enforcement/prosecution, vadalism, and volunteer coordination. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 130 | The BLM has an inherent responsibility to provide "public goods" in sufficient quantities to meet the demands of all U.S. citizens.  These goods include opportunities for solitude, outdoor recreation, clean air, | the commentor may be correct if they are referring to the BLM on a national level, as opposed to the individual Field Office level.  The BLM recognized its responsibility to provide such public goods, and believes it does so |

BLM_0012428

| | | | clean water, the preservation of wilderness, and other undeveloped areas. | through its management actions. The BLM is not required in each field office to provide an adequate supply of these goods to meet the demands of all U.S. citizens, a clearly impossible task even if one were able to quantify such a demand. The BLM is required to provide for a multitude of uses, not all of which need be satisfied by every field office.

The BLM believes that its action alternatives do provide the public goods SUWA demands, but probably not in the quantities it desires. For example, the Moab BLM manages approximately 350,000 acres of Wilderness Study Areas, a necessary ingredient of which is opportunity for solitude. The BLM provides within the alternatives a wide range of outdoor recreation activities, and recognizes recreation as the driving force of the planning area's economy. The BLM is required by law to adhere to the standards governing clean air and water, and will continue to follow such laws. The BLM has no statutory authority to "preserve wilderness" beyond those lands designated as such by law. The BLM will continue to manage WSAs under current policy to not impair their wilderness character, an action beyond the scope of the DRMP/EIS. Finally, the BLM has the option to manage non-WSA lands with wilderness characteristics, but not an obligation to do so. As described in Chapter 4, the BLM proposes varying amounts of acreage in Alternatives B and C for management to protect their wilderness characteristics. Whether that acreage is "enough" is a matter of preference, not law or policy.

The public goods to which SUWA refers are provided in abundance within and in near proximity to the Moab planning area (MPA). In addition to the BLM management actions outlined above, other agencies and BLM field offices provide such opportunities. For example, Arches National Park, with over 75,000 acres of |

424

BLM_0012429

| | | | | |
|---|---|---|---|---|
| | | | | administratively endorsed wilderness, is 4 miles from Moab.  The Manti-LaSal National Forest lies within 25 miles of Moab.  Canyonlands National Park, with over 330,000 acres of administratively endorsed wilderness, lies about 25 miles driving distance from Moab.  Adjoining Utah BLM field offices (Monticello, Price) contain 948,000 acres of WSAs all within a 1-2 hour drive from Moab. |
| | 200 | 3 | I think that identification of Non-WSA lands with Wilderness Characteristics was outside the scope of analysis for an RMP. The time has long since passed that for WSA analysis, a point recent decisions in lawsuits concerning this matter reinforce. These areas should not have been isolated for special management, and therefore 0 acres should be selected under this heading, just like in Alternative A. | See response to comment 206-6. |
| Sierra Club Utah Chapter | 205 | 10 | The Moab Field Office should be considering actions to take in the face of climate change. While the MFO should do its part to reduce impacts to global climate change that is not the focus the BLM take in its resource management plan. The MFO manages approximately1,859,000 acres. Climate change will affect these acres. The BLM must plan to keep the lands healthy and resilient in the face of climate change. | See response to comment 124-115. |
| Sierra Club Utah Chapter | 205 | 14 | Large reference areas of 100 to 1000 acres should be created to assess the effects of grazing and motorized recreation on the productivity of the land. The reference areas should be large enough to allow a wide range of plants to grow in the absence of human disturbances. Only this will give the BLM a means to measure the result of management. The reference areas should be those least impacted by human or human related activities and preferably to have had no impacts for 10 years. If such areas cannot be found then specific sites should be identified and set aside as future reference areas. Grazing utilization should be closely monitored. Cattle should be removed when utilization exceeds | Monitoring of grazing activities are discussed on pages 4-70 and 4-82 of the DRMP/DEIS.  Monitoring of motorized activities are discussed on pages 4-231 and 4-235 of the DRMP/DEIS. Monitoring specifics are implementation issues, and outside the scope of the planning process.  The specific suggestions of the commentor are not supported by any accompanying documentation to suggest that this monitoring regime is the appropriate one for the BLM to follow.  The BLM relies on Standards and Guidelines for Rangeland Health to monitor the impacts of grazing on a variety of resources, and will continue to do so under the new plan.  See response to comments 9-3 |

425

BLM_0012430

| | | | | |
|---|---|---|---|---|
| | | | 25%.<br>The BLM should be investigating climate change and its relationship to management needs. The Forest Service has several projects. Once can be found at http://www.fs.fed.us/psw/cirmount/. An equivalent program is essential particularly in the largely arid environments managed by the BLM in the intermountain west. | and 209-49. |
| Sierra Club Utah Chapter | 205 | 25 | The Redrock Heritage Plan should have been taken seriously and incorporated into the DEIS. The BLM should have worked with the proponents rather than reject the plan outright. | Many of the commentor's earlier remarks criticize the BLM for failing to take into account the numerous alleged negative environmental impacts from the BLM's travel plan.  In this comment, however, the commentor criticizes the BLM for not incorporating the Redrock Heritage Plan into the DRMP/EIS.  It is worth noting that this plan has more miles of motorized routes than any of the BLM's action alternatives, and would presumably create even greater negative environmental impacts of the type feared by the commentor. |
| San Juan Trail Riders | 207 | 3 | We are pleased to read Table 2.1 Recreation (page 2-17), which plans to provide visitor information and outreach programs that foster a land ethic. For planning, We suggest highlighting one more critical item. Noise is the most common complaint against Off Highway Vehicles. Thus for all vehicles across the entire field office we recommend implementing and enforcing a 96-decibel limit based on the "20-inch" test (SAE J1287). | See response to comment 122-7. |
| Glen Canyon Group | 209 | 3 | Given impacts of Alternative C, Alternative B should be the preferred alternative. The Executive Summary concludes that Alternative C was chosen as the preferred alternative based on: 1) Balance of use and protection of resources, and 2) Extent of the environmental impact. (Page ES-8) In our view, BLM's "preferred alternative" is not balanced and in fact abnegates their responsibility to protect the resources entrusted to their care in favor of satisfying the demands of off-roaders and oil/gas interests. As for | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction.  These alternatives provide a broad range of management actions to address the issues raised during scoping.  The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative.  The BLM, |

BLM_0012431

| | | | | |
|---|---|---|---|---|
| | | | "extent" of impact, the Draft RMP/EIS demonstrates that the Conservation Alternative (B) would produce less total impact on the environment and definitely fewer adverse impacts than C. | however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate.<br><br>See also response to comment 121-1. |
| Glen Canyon Group | 209 | 4 | Labeled as the major issue identified during the scoping process was "Issue 1. – Recreation Use and OHVs – How can increased recreation use, especially motorized vehicle use, be managed while protecting natural resource values?" The RMP/EIS does not address both parts of the question. It is not balanced. A balanced plan would look to the future with protection as the primary aim, would listen to all legitimate voices, and would actually manage – not just recognize, the use, overuse, and abuse of natural resource values. A balanced plan that would be easier to decide and easier to defend, would be one that does the right thing – it upholds and holds fast to the paramount goal: Quality Environment. | This is not a comment that the BLM can respond to, but a statement of opinion.  Also see response to comment 209-3. |
| | 277 | 1 | The RMP DEIS should have a recreation-emphasis alternative and the travel plan should have a pro-access guidance as well. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| International Adventure Tours | 287 | 4 | There has to be other answers or solutions that do not exclude the greater majority of the users that the proposed alternatives do. We ask that you reconsider alternatives outside of the ones proposed that will allow broader multiple user access. | There are over 3,000 miles of route open to travel in the preferred alternative.  Almost all lands within the Moab Field Office are readily accessible by motorized travel. The commentor offers no specifics as to the "broader multiple use" being referred to. |
| Delta Petroleum Corporation | 306 | 4 | The BLM should not consider the description provided for in alternatives B and C since they do not accurately portray what is included in each alternative. Under NEPA a no action alternative is included to establish a basis for evaluating impacts from changes to the existing management plan. | The commentor has not provided any information on how the descriptions of the alternatives are not an accurate portrayal. |

BLM_0012432

| Delta Petroleum Corporation | 306 | 5 | We do not believe that the full economic impact of Alternative C was adequately considered, particularly with respect to both resource development and motorized recreation. | The commentor has not provided any infomration regarding the inadequacy of the economic impacts discussed in Chapter 4 of the DRMP/EIS. |
|---|---|---|---|---|
| Delta Petroleum Corporation | 306 | 6 | The economic analysis presented in the DEIS is based on old and outdated information with respect to oil and gas development. It relies on data from 2003 and older. The economic picture, development activities and approaches to resource extraction have undergone a major shift in the last 7 years based on several factors including demand for energy resources, federal policy and legislation and rises in energy costs. It is critical that the DEIS depend on the best and most recent data available. The analysis on oil and gas resources does not rely on available recent data, but primarily on information prior to 2004 which does not reflect changes in the economy, need to increase domestic supplies of energy, impacts of high energy costs on communities and federal resource priorities from the Energy Policy Act of 2005. That information is readily available from both State and Federal sources, including some information in 2007, yet none of this recent information has been included in the DEIS. This is a major flaw under NEPA, since readily available information should be used for decision-making. This affects economic impacts and projections within all of the alternatives. Since this information is readily available, the BLM should amend the DEIS to reflect that information. A decision that affects land uses for the next 15-20 years should not be based on faulty assumptions and old information. | See response to comment 220-1.  Additional data has been added to Chapter 4 of the PRMP/FEIS pertaining to oil and gas employment, potential impacts to State revenues from oil and gas restrictions, information on property taxes and information on severance taxes.<br><br><br>On pgs. 4-259 through 4-265 |
|  | 310 | 1 | There is not a true range of management options in the Alternatives.<br><br>It needs to be made clearer that comments are needed on Alternatives for the RMP and Alternatives for the Travel Plan. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management |

BLM_0012433

| | | | | prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|
| | 310 | 3 | None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates unworkable and impractical management of camping and motorized travel.<br><br>Alternative D fails to provide a true motorized focus. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 310 | 4 | Many of the restrictions in all of the Action Alternatives are simply not justified, and that the FEIS should clearly draw a connection between the facts on the ground and the decision made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. |

429

BLM_0012434

| | | | | An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| | 316 | 1 | From what I have seen, the "multiple-use" directive is not receiving adequate attention in the Moab RMP. My request to you is to include in the RMP considerations of multiple use of the land and also of detailed statistics and projections on the effects of foreseeable resource development on the economy and businesses of Green River, Utah. Failure to make these findings could be considered failures in your process under NEPA. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.<br><br>An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis.<br><br>The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including energy and mineral development, as well |

430

BLM_0012435

| | | | | |
|---|---|---|---|---|
| | | | | as conserving and protecting other resource values for current and future generations. |
| | 345 | 1 | I believe that none of the 4 alternatives are adequate to meet the needs of most visitors to Moab and futher reasonable alternatives proposed by interested parties such as Ride with Respect are required to be studied prior to issuing a decision. At the least, a supplemental study of these alternatives should be conducted. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 347 | 16 | I feel that many of the restrictions in all of the Action Alternative are unclear as to purpose. I feel that the FEIS needs to draw a clear connection between facts on the ground and any decision made. Also, I feel the DEIS does not clearly describe the difference between the Recreation Management Plan and the Travel Plan. The FEIS should clarify the difference. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| Utah Rock Art Research Association | 415 | 2 | The RMP is bereft of information regarding the amount of protection that will be provided to cultural resources. Pages 2-2 through 2-6 provide helpful information regarding the coverage of Off-Highway Vehicle designations, Special Recreation Management Areas, Oil and Gas Leasing and Development, River Classifications, Wildlife, and Wilderness under the various proposed alternatives. No information is provided for cultural resources. There is no way to determine what percentage of the modeled high, medium, or low site probability acreage (table 3-7, page | All cultural sites are protected by law, and will continue to be protected regardless of decisions made in this RMP effort.

Three ACECs, Ten Mile, Behind the Rocks and Mill Creek, were designated in the preferred alternative to provide additional protection for cultural resources. |

BLM_0012436

| | | | | |
|---|---|---|---|---|
| | | | 3-19) is covered by an ACEC or special management consideration. Nor is there anyway to determine how many of the 5,200 inventoried cultural sites are protected. | |
| Utah Rock Art Research Association | 415 | 9 | We do not see any proposed protection under ACEC for the BLM land along the south side of the Colorado River downstream from Moab and up Kane Creek. This area is dense with rock art and other archeological sites of national register quality. It is being documented as part of the proposed Wall Street rock art district. This area receives high visitation, is experiencing non-approved off-road vehicle use, and needs appropriate protection and interpretation at highly visible rock art sites. We believe this area from the Moonflower Site up canyon for approximately 6.5 miles needs to be protected under an archeologically focused ACEC.<br><br>Page 2-8 proposes scientific restoration of archeological sites from Highway 191 to Kane Creek canyon. We see no reason to stop at Kane Creek Canyon and suggest that this restoration continue within our proposed area. | The Kane Creek Road is in the Behind the Rocks ACEC, which is proposed for the protection of cultural resources.<br><br>Travel is limited to designated routes in the DRMP/EIS, although it should be noted that this has been the case in this area since 1992. |
| Utah Rock Art Research Association | 415 | 10 | Seven Mile Canyon is an area with many national register quality rock art sites spanning thousands of years. The Inestine Man site is one of the finest examples of Barrier Canyon Style and world famous. This extraordinary site needs to be part of a thoughtful management plan.<br><br>The campground located at the mouth of the canyon and the road through the canyon recently washed out. We recommend that this road and campground should not be reestablished. We also recommend that this area be included in an archeologically focused ACEC. | Seven Mile Canyon, although not proposed as an ACEC, is specially mentioned in the DRMP/EIS. It is prioritized for Class II and Class III surveys in Alt. C.<br><br>The camping sites at the mouth of the canyon have been decommissioned. It is now illegal to camp in the mouth of Seven Mile Canyon. This has been imposed to protect cultural resources. |
| Utah Rock Art Research Association | 415 | 14 | Rock Art Nomination Districts, Mill Creek Canyon needs to be added to this list. | The Mill Creek Rock Art is sacred to many Native American tribes. These tribes do not wish this rock art to be publicized by nomination to a Rock Art district. |

432

BLM_0012437

| | 422 | 2 | None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates the unworkable and impractical management of camping and motorized travel. In addition, in all of the Alternatives, management for the White Wash Sand Dunes is fatally flawed and must be reconsidered. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
|---|---|---|---|---|
| | 422 | 3 | Alternative D fails to provide a true motorized focus. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 422 | 4 | I am concerned that many of the restrictions in all of the Action Alternatives are simply not justified. The FEIS MUST clearly draw a logical and easily understood connection between the facts on the ground and the decisions made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.

The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS |

433

| | | | | | provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|---|
| | 425 | 2 | The Plan and preferred alternative contemplate significant changes in management that, far from providing a "balanced approach," are tremendously weighted towards industrial/commodity development and motorized recreation access, all of which will have a significant if not devastating impact upon the health of the lands in issue, and upon wilderness values previously identified by the BLM. | | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| | 427 | 1 | Some of your formulated alternatives fail to provide motorized access. Please provide alternative that permits and maximizes all recreational uses in Alt D including motorized and non-motorized trails. | | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 428 | 1 | BLM has forumalted three alternatives to create the appearance of fairness. Each seems to have a poison pill in it to force the acceptance of the "preferred alternative." Alternative D, the "pro-motorized" alternative is less friendly to the motorized recreationalists than the "preferred alternative." | | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| | 429 | 2 | It certainly appears to be a shotgun approach instead of | | The DRMP/EIS provides 4 alternatives that consist of no |

BLM_0012439

| | | | | |
|---|---|---|---|---|
| | | | addressing specific management problems. Your public presentations clearly leave only Alternative A (do nothing) or C (as BLM sees it) as reasonable alternatives. Neither is satisfactory as a whole. | action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| | 636 | 1 | Both alternative B and C are major improvements over the current situation, Alternative A. As a general comment, I consider Alternative B to be the most appropriate of the listed alternatives and am disappointed that the BLM did not consider a true "maximum resource protection alternative" that would have been more restrictive than B. NEPA requires consideration of a full spectrum of alternatives. | See response to comment 124-9 |
| | 658 | 2 | The RMP failed to consider any of the many connected actions they may result with implementation of the alternatives. Consider air quality again as just one example. The RMP addresses the direct and indirect impacts on air quality from different management decisions such as mineral development but didn't identify any connected actions that would not occur if it were not for these management decisions. For instance, there may be significantly regional air quality impacts resulting from coal fire power plant emissions that would not have occurred if it were not for the management decisions made in this RMP. | Cumulative impacts are addressed in Chapter 4 of the DRMP/EIS. |
| | 658 | 3 | Your website provides the following direction for submitting comments, "Comments may identify new impacts, recommend reasonable alternatives, or disagree with the determination of significance." | A systematic interdisciplinary approach was used to provide accurate, objective and scientifically sound environmental analysis on the environmental consequences associated with the management actions |

BLM_0012440

| | | | | |
|---|---|---|---|---|
| | | | Unfortunately, the RMP completely fails to address the significance of any of the alternatives. The RMP identifies direct and indirect impacts but not the significance of those impacts. Without knowing the significance of the impacts of their actions, how can BLM decision makers expect to make an informed decision as to which alternative to implement and how can the BLM expect the public to provide meaningful comment on the alternatives without this information. | or prescriptions under each alternative. [Note: A statement on travel planning's analysis specific to Moab is needed] The analysis discloses the direct, indirect and cumulative affects on the public lands resources and uses sufficient for the decision maker to make a reasoned choice among alternatives. |
| | 829 | 2 | In addition, would you please provide me with an explanation of why exactly you are not choosing the environmentally preferred alternative in this sensitive area? | The DRMP/EIS provides 4 alternatives that consist of no action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| | 934 | 1 | We have tried to read and study the Moab RMP and have found it to be so long and involved that the general public cannot be expected to understand and be able to preform an informed public review on all the various areas about which they are concerned. It is our belief that this project should be seperated in to two or three areas for study. We oppose the document as written. | See response to comment 123-14. |
| | 934 | 2 | It is not clear in the document that the BLM is addressing not only their RMP, but a travel management plan as well. These two different plans should be presented seperately. We oppose the way the document is written | See response to comment 124-71 |
| | 937 | 1 | The draft so-call Management Plan is a sham as no | The DRMP/EIS provides 4 alternatives that consist of no |

BLM_0012441

| | | | | |
|---|---|---|---|---|
| | | | attempt is made to balance between preservation, recreation, and dubious energy development. It is skewed entirely to business special interests at the expence of the American public - vacationers, campers, hunters, birders and everyone else who may choose to just drive through this incredible land. And another special interest is the ORV business which hopes to profit from new open terrain. The BLM plan makes 80% of the area open to oil and gas leasing and opens 81% of the area for Off Road Vehicle (ORV) use. | action, emphasis of protection and preservation of natural resources, balance between commodity production and protection of natural resources, and emphasis of commodity production and extraction. These alternatives provide a broad range of management actions to address the issues raised during scoping. The BLM acknowledges throughout the DRMP/EIS that Alternative B produces fewer adverse environmental impacts -- that is the expressed intention of that alternative. The BLM, however, is not required to choose the alternative which produces the least environmental impact, but must balance competing resources within its sustained yield, multiple use mandate. |
| | 937 | 3 | Adopt the needed protections by adhering to the Redrocks Herritage Plan put forth by the Southern Utah Wilderness Alliance as a balanced alternitave to the present BLM suggestion. The Redrocks Herritage Plan reconciles competing interests without precluding any. It would protect fragile wilderness lands and other sensitive areas from oil/gas leasing and development, and from excessive Off Road Vehicle use. It offers a reasonable transportation plan that lessens the impact of ORVs on the land while providing opportunities for primitive and non-motorized recreation. | See response to comment 124-9. |
| | 940 | 1 | SUWA's arguments are invalid. They are unhappy with the noises put off by off-road vehicles. How can you look at closing lands and not enforce muffler restrictions? | See response to 122-7. |
| | 942 | 1 | I'd like to address a few concerns I have with the alternatives currently on the table. First, I believe that none of the 4 alternatives are adequate to meet the needs of most visitors to Moab and further reasonable alternatives proposed by interested parties such as Ride With Respect are required to be studied prior to issuing a decision. At least, a supplemental study of these alternatives should be conducted. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 944 | 1 | The 2004 scoping period for drafting the RMP received | The BLM used the scoping process to explore and |

437

| | | | | |
|---|---|---|---|---|
| | | | 6,244 comments reflecting a pro-conservation position, and only 25 a pro-off-road-vehicle position. Why do all of the draft alternatives include thousands of miles of off-road -vehicle use? | objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| | 947 | 1 | What is the justification for this plan? The vast majority of local residents AND visitors don't want the Moab area to be destroyed, yet this proposal not only allows for such destruction, it facilitates irreversible damage. | The BLM's Alt C provides protections to important resources within the planning area. |
| | 951 | 4 | Where are the sections that show how you are monitoring the success of the plan and that show us the success of the last plan? | See response to comment 121-2.

 The 1985 Grand RMP has a monitoring report that is updated to track the implementation of plan decisions. |
| Californians For Western Wilderness | 952 | 2 | Plan C is supposedly the most balanced plan, according to the executive summary. Balanced  with regard to what? Most scoping comments came from people who favored quiet recreational uses: hiking, rafting & canoeing, photography, rock are viewing, rock climbing. That is the makeup of the majority of visitors to the Moab area. Yet the plan gives weight far out of proportion to their number to the interests of off-highway vehicle users and energy companies. If BLM had consulted its own surveys of users it would have seen how the numbers came out. Quiet recreationalists make up the huge majority of users in the Moab area. There cannot be any simultaneous use of an area by quiet recreationalists and OHV users. The OHV users will win out every time, since people who go to enjoy nature's quiet and wildlife will not go to areas where | The DRMP/EIS presents four alternatives which seek to balance competing resources and uses. Alt C  balances the needs of motorized and non-motorized users by providing Focus Areas for the needs of both groups.  The Travel Plan accompanying the RMP removes 2,500 miles of existing routes from designation, and reduces by 600,000 acres the lands open to cross country motorized travel.

For discussion of the noise of OHV's, see response to comment 122-7. |

438

BLM_0012443

| | | | | |
|---|---|---|---|---|
| | | | OHV use allowed. The noise is incredibly disturbing. | |
| | 954 | 2 | Regarding the three alternatives proposed for travel management by BLM there appears to be very little to distinguish them apart. None of them are acceptable to me in terms of motorized recreation. The increased motorized use of the area by the citizenry is a strong indicator that what the public wants are more places to ride, not less! In the twenty years I have been riding these areas I have seen little change in the land which is for the most part rock and sand. The area is totally formed and shaped by erosion. How can some tracks in the sand make any difference at all? Frequently after a rain or wind event you really have to search to determine where the trail is. Please remember that as a public agency you need to seriously weigh the needs of all the people who want to use the land, not just those who would reserve it for the uses they see fit. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 965 | 1 | The final RMP should mandate that adaptive management practices be used across the Field Office. The final RMP should direct that mitigation efforts will be exhausted prior to closure. The Final Rmps should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. When using adaptive management principles, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Adaptive management merely means using site specific factors to guide future decisions. |
| National Parks Conservation Association | 970 | 3 | All Alternatives of the RMP has oil and gas leases immediately adjacent to the boundaries of Arches NP. This is extremely concerning given the enormous potential impacts on viewsheds and resources within the Park and the impact on visitor experience. Some examples include the areas outside of Delicate Arch on Dome Plateau and the leases on Yellowcat Flat that would impact the campground, some of the most popular trails in the Park such as Devils Garden and | Alt C of the DRMP/EIS creates an area of controlled surface use for oil and gas leasing around Arches National Park.  This stipulation requires oil and gas facilities to not be visible from the National Park. This is stated on pg. 2-51 of the DRMP/EIS: "Public lands within the viewshed of Arches National Park would be designated as VRM Class II."  VRM Class II requires controlled surface use stipulations for oil and gas. |

BLM_0012444

| | | | | |
|---|---|---|---|---|
| | | | many of the most popular Arches including Double O, Private Arch, Wall Arch, and Navajo. We request that BLM include an alternative that creates a buffer zone in the sensitive area adjacent to national parks. | Valid existing rights are not affected by the current planning effort. |
| | 971 | 1 | Additionally was shocked at the comment in the Special Designations section that pinpointed specific damage to the [White Wash] area as "especially OHV users using the cottonwood trees as slalom poles". Maybe it's been observed, but that does not mean it is the norm. Biased, catch-all statements such as that really made me question the integrity of the document as a whole. The BLM needs to be sure that there exists a factual justification for making any of the decisions and proposals existing in any of the plans. | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| | 971 | 2 | I am also concerned with how the proposal may be addressing closure of trails and areas for OHV use-basically closingbefore testing all alternatives. The Final RMP should mandate that adaptive management practices be used across the Field Office concerning closures. All mitigation efforts should be attempted before closure including working with the affected public to ensure all efforts have been exhausted. When possible, attempts should be made to balance closures with designations of new areas that are similar and more sustainable. | Adaptive management merely means using site specific factors to guide future decisions. |
| Howard County Bird Club | 972 | 8 | The Colorado River is a second major axis of wildlife habitat. Members of our club visited the river segment between Dewey Bridge and Moab, driving on Highway 128, the senic route from interstate 70 to Moab. It is a stunning introduction to the red rock topography of the Moab district. The Colorado River corridor will need secure protection in the years ahead, because it is threatened by oil and gas development and ORV trails.

BLM has recognized wildlife values here for desert bighorn lambing/rutting habitat (map 2-26-B) and has proposed a small ACEC of 50,000 acres. We urge the | The Colorado River corridor is proposed to be managed as no surface occupancy for oil and gas leasing, and as no surface disturbance for all other activities.  In addition, the entire Colorado River is recommended for designation as a Wild and Scenic River.  Much of the area mentioned by the commentor would be managed to protect its wilderness characteristics.

All vehicular travel in the areas mentioned by the commentor is limited to designated routes.  In much of the area, a no surface disturbing stipulation is imposed in Alt C, and no new routes would be allowed. |

BLM_0012445

| | | | | |
|---|---|---|---|---|
| | | | use of ACEC, ORV closures, and Wild Scenic River status to protect more of the corridor, including Fisher Towers, Fisher Mesa, Dome Plateau, Mat Martin Point, the Dolores River Canyon and its tributaries Beaver Creek and Thompson Canyon. The senic panoramas of these areas are enjoyed by visitors in Arches National Park, as well as those driving on Highway 128. Any damage to this landscape would be a blow to tourism in the Moab area. | |
| | 976 | 2 | The plan is so heavily slanted towards commodities development and motorized recreation that it completely fails to meet the goal of balance. When I do a thought experiment and imagine what the Moab area is going to look like once Alternative C is "built out" I see a landscape that is no longer "natural" in any real sense, but largely devoted to motorized recreation, with roads built through areas that used to have natural character. Alternative C does far too little to protect the natural character of the land in the face of population growth and potential commodities development boom, and wrongly assumes that a compromise should be made by sacrificing areas that currently have wilderness characteristics. | See response to comment 124-9 |
| | 978 | 1 | I did my best to look through allof the alternatives presented and can't find many differences between them. The two things they all appear to have in common is that they do not aknowledge the need for and historic use of the area via motorized means and that they drastically reduce the open areas. The lack of recognition for motorized uses is totally unacceptable. There needs to be an alternative that maximizes all recreational uses, including motorized and non-motorized trails. | The BLM has provided a wide range of diverse recreational opportunities within the alternatives of the DRMP/EIS. The Federal Land Policy and Management Act requires the BLM to manage public lands based on the principles of multiple use and sustained yield. Motorized recreation is but one element of multiple use. |
| | 991 | 2 | The so-called "range of alternatives" in this DEIS does not meet the requirements of NEPA. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal |

BLM_0012446

| | | | | and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/DEIS and create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple-use mandate. |
|---|---|---|---|---|
| | 993 | 1 | We request that you remove the "as amended" part of Alternative A. We also request that all parts of the RMP that deal with any changed to Alternative A be removed as well.<br><br>The reason this should be removed is by the nature of Alternative A being a 'no action' alternative. By amending the alternative you are in effect providing a change. Here are some examples of where you are stating change in Alternative A. This being a 1500 page document I am not able to state all the places in time to make the close of the comment period.<br><br>Example 1 – In section 2.1.1.7 the last sentence reads "In Alternatives A and D, management of other resources values and uses would take precedent over the protection of wilderness characteristics." This is suggesting that there are areas of wilderness characteristics in Alternative A. Please remove Alternative A from this sentence.<br><br>Example 2. In Table 2.1 Moab RMP Description of Alternatives there are definitions listed for Alternative A as follows; | The No Action alternative (Alt A) is required by CEQ regulations.  The No Action alternative provides a basis of comparison for the action alternatives.<br><br>"As amended" means that the plan amendments to the 1985 Grand RMP are included as part of the Grand RMP. |

BLM_0012447

| | | | Alternative A (No Action) – All utility corridors would be 1 mile wide, except the existing Moab Canyon utility corridor, which is constrained by the topography of Moab Canyon. This physical corridor is only ¼ mile wide at its narrowest point.<br>Alternative A (No Action) – About 354,015 acres would be exclusion areas for ROWs.<br>About 48,245 acres would be avoidance areas for ROWs.<br>Alternative A (No Action) – The list of parcels identified for disposal totals 12,415 acres.<br><br>There are just two examples of 'amendments' (change) to Alternative A. Please remove all of them. | |
| | 995 | 3 | Based on the EIS, it is very difficult to asses the overall impact of each alternative, beyond some broad-brush qualitative comparisons. The EIS breaks up the discussion of impacts into what amounts to a huge matrix, with an analysis of how decisions made under each resource category would affect all other resource categories. This is fine as far as it goes, but there needs to be a "summing up" of the overall impacts on particular resources. The EIS needs to give a clear idea of what will happen to soils, riparian areas, etc. in toto under each alternative. Specifics are needed, not generalities.<br><br>Ordinarily this could be done under the analysis of cumulative impacts, which is an extremely important part of any EIS. But the cumulative analysis in this EIS is rather cursory and does not provide the in-depth comparison of alternatives that is needed. There needs to be more than a simple qualitative comparison, as in saying that Alternative C would be worse than B but better than D. How many acres can we expect to see stripped of their protective biotic crusts under each alternative? How many miles of stream bottoms and | See response to comment 123-14 regarding complexity of the DRMP/DEIS. See also response to comment 124-7 about direct, indirect and cumulative impacts. The DRMP/EIS gives estimates of acres of surface disturbance expected under each alternative.<br><br>Noise is not within the jurisdiction of the BLM. |

BLM_0012448

| | | | | |
|---|---|---|---|---|
| | | | riparian areas would be damaged? How much land would be subject to noisy intrusions from vehicles? Only if the EIS provides such information is it possible to truly evaluate and compare the alternatives. | |
| | 996 | 1 | Generally I see some flaws in both choice of language and nature of the material. For both the DRMP and the DEIS the lack of clarity between descriptive language intended to be "general guidance" and that intended to be "decision implementing" is quite troubling. When prepared, the Final EIS should make these distinctions much clearer. In addition, the preparation of the FEIS should very clearly state connections between the current facts on the ground and the decisions to be made. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.

An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the planning area, analyzed the current management situation, desired conditions, the uses and activities to create a framework to resolve the issues raised through the development of the alternatives. A balanced approach consistent with FLPMA's principles of "multiple use" was a key component of the analysis. |
| Western Watersheds Project | 1025 | 7 | Despite an improper capability and suitability analysis, the DEIS/RMP failed to quantify and analyze the impacts of livestock grazing with riparian/wetland areas which are critical and sensitive ecosystems within the western landscape. | See response to comment 1025-4. |
| Western Watersheds Project | 1025 | 11 | The Moab FO should at a minimum, analyze alternatives including No Action (status quo), No ATVs, Dirt Bikes, or Snowmobiles, or the new experimental playtoys,  Personal Aerial Vehicles, and the level of use allowed in the current set of alternatives.  Some of the science regarding this issue is presented in the following paragraphs. | There is no snowmobile use on BLM lands within the Moab planning area.  An alternative which proposes to make the entire planning area unavailable to ATVs and dirt bikes does not meet the purpose and need for this document.  NEPA requires that agencies develop appropriate alternatives to recommended portions of actions which involves unresolved conflicts.  No issues or conflicts have been identified during this planning effort which requires the complete elimination of dirt bikes and ATVs within the planning area for their resolution.  An |

BLM_0012449

| | | | | |
|---|---|---|---|---|
| | | | | alternative which proposes to make the entire planning area unavailable to dirt bikes and ATVs would be inconsistent with the National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands. |
| Western Watersheds Project | 1025 | 12 | DEIS/RMP must provide evidence that any proposed mitigation and enforcement efforts will be effective for those alternatives that allow any level of use by these machines. | On pg. 4-3 of the DRMP/EIS the assumption is made that "BLM will have the funding and workforce to implement the selected alternative". |
| Western Watersheds Project | 1025 | 16 | Stipulations added to mitigate various management actions proposed within the DRMP/EIS are inconsistently applied throughout the proposed alternatives. The same types and degrees of stipulations designed to mitigate mineral and oil/gas extraction and development impacts should be applied to reduce all surface distrubing impacts including livestock grazing, and motorized and non-motorized recreation.  Various types of stipulations recommended include seasonal timing limitations; controlled surface use limitations on slope >30%; spatial buffers for sensitive wildlife habitats; restrictions on uses within sensitive soils and municipal watersheds.  Each of these stipulations should be consistently identified and applied in common to all proposed alternatives and to all management actions and authorizations in all applicable locations, including authorization of livestock grazing; development of grazing systems/amps; motorized vehicle routes; mechanized vehicle routes; commercial recreation permitting; recreation events; filming permits; special management designations including ACECs, and SRMAs; right of ways, road and facilities maintenance and construction; vegetation treatments; as well as oil/gas and mineral extraction. | Stipulations developed for oil and gas leasing are applied to all surface disturbing activities.  These activities are defined in Appendix C of the DRMP/EIS on pg. C-1: "Surface disturbing activities are those that normally result in more than negligible disturbance to public lands and accelerate the natural erosive process".   Many examples of surface disturbing activities are provided but the following are not considered surface disturbing: livestock grazing, cross-country hiking, minimum impact filming, and vehicular travel on designated routes.  Many of the activites mentioned by the commentor have not been defined as surface disturbing in the DRMP/EIS.  New motorized routes, high impact film permits, and vegetation treatments are considered surface disturbing and would managed consistent with the oil and gas leasing stipulations. |
| Western Watersheds Project | 1025 | 17 | Many prescriptions within the DRMP/EIS are directed only toward "surface disturbing" activities, intended to exclude activities such as livestock grazing, cross-country hiking, minimum impact filming, and vehicular travel on designated routes. However within Moab RA, | See response to comment 1025-16. |

BLM_0012450

| | | | the extent of impacts associated with livestock grazing, hiking by vast numbers of recreationists, filming and the degree of motorized travel on designated routes certainly meet the referenced definition in Appendix C, which states "surface disturbing activities are those that normally result in more than negligible disturbance to public and that accelerate the natural erosive process. | |
|---|---|---|---|---|
| Western Watersheds Project | 1025 | 19 | However, the impacts from motorized vehicle use along authorized routes are not sufficiently nor scientifically quantified and analyzed, especially with over 300% increases in OHV registration within Grand County alone since 1998 (Table 3.21). | Although the percentage increase is large the actual numbers of registered non-street legal vehicles in Grand County rose from 238 in 1998 to 726 in 2002.  The impacts of vehicle use along designated routes is discussed throughout Chapter 4 of the DRMP/EIS as well as in Appendix G.  The commentor provides no specific information about how the impacts were not sufficiently analyzed. |
| Western Watersheds Project | 1025 | 20 | In light of this, and since there appears to be a lack of adequate range of alternatives of management options or mitigation for environmental impacts, we support Alternative B (Environmental Preferred) prescriptions within the SRMAs with specific comments as detailed below. | This is an opinion that does not require a response. |
| Western Watersheds Project | 1025 | 30 | The DEIS/RMP identifies a spread of alternatives to implement range improvement projects in response to meeting Rangeland Health Standards. While these various alternatives may help prioritize implementation of recommendations resulting from Rangeland Health Standard evaluations, regulations require that rangeland improvements to mitigate ecological damage must be implemented within 2 years of the evaluation regardless of the equal benefits to livestock and wildlife, or livestock solely. This is not an appropriate land use planning proposal. | The BLM is aware of the regulations to  mitigate ecological damage resulting from Rangeland Health Standard evaluations within 2 years.  The BLM will comply with these regulations. |
| Western Watersheds Project | 1025 | 32 | There is no adequate spread of alternatives identified or maps provided for maintenance of existing or newly planned vegetative treatments, even though objectives and conflicts have altered since their original implementation.  Such actions should undergo NEPA | All new vegetative treatments would require site specific NEPA analysis, including public review periods. The DRMP/EIS gives a broad goal for these treatments, but does not define their specific locations. |

BLM_0012340

| | | | analysis and public review periods prior to implementation within all alternatives to ensure environmental and wildlife protection. | Existing vegetative treatments have all undergone the NEPA process at the time of their authorization. Maintenance of these treatments would only occur without new NEPA documentation if there have been no changes in condition.  This means that most vegetative treatment maintenance projects would require new NEPA analysis. |
| | 1026 | 1 | I am very angry about 3 specific things associated with this document. 1. The document itself, it's size (954 pages) and lack of usability. 2. The accusation that OHV users are vandals and theif's. PDF pg 3-87 3.11.2.7.1 Off-Highway Vehicle (OHV). 3. Lack of documentation to support your theory that the OHV community is a Medium user in the Moab area and has minimal economic impact. | This is not a comment that the BLM can respond to, but a statement of opinion. |
| Colorado 500 | 1032 | 9 | Soils:  ... Adding the 271 miles of motorcycle trails and rounding off, we can say that roads and trails disturb a maximum of 4% of the land base.  The most recent cited workin a USFS document was prepared by D.B. Coe and published in 2006.  Coe's objective was to determine the production and delivery of sediment to forest streams via the road system, but in the course of his field work he observed, measured, and recorded another phenomena.  Quoting from Page 21 of the D.B. Coe 2006 paper: "The native surface road segmetns that had been recently graded produced about twice as much sidmetn per unit erositvity as the ungraded segments (p=0.02) (Figure 2.8).  A pairwise comparison indicated that there was no evidence of a decline in sdiemtn production rates between the first and second years after grading (p=0.86).  Page 26 & 27, Coe 2006: "The datea from four recently-graded road segments show that sediment production rates per unit precipitation were much higher in the early portion of the wet season (Figure 2.11).  The high initial sediment pulse can be attributed to the rapid removal of the thick, fine dust layer that had formed on the road surface as a | |

447

| | | | | |
|---|---|---|---|---|
| | | | result of [heavy vehicle traffic]. The subsequent decline in sediment production per unit rainfall suggests that the recently-graded roads rapidly become supply limited as the road surface becomes armored and more resistant to sediment detachment and transport processes." And a review of USDA General Technical Report 193 (2004) confirms Coe's work: ungraded native surface roads consistently produced lower sediment loads than graded roads in every year that was studied. In Coe's work and in the USFS Technical Report, the results suggested that partially overgrown routes, and routes with irregular surfaces such as rocks, ledges, and roots, and lighter traffic loads, produced far less soil loss from the road surface. This research clearly indicates that reducing the mileage available for vehicle access by @50% (as all action alternatives propose) will result in soil losses that are worse, and not just a little worse. Over time, the losses wil be worse by several orders of magnitude. Assuming that all traffic will be restricted to designated roads and trails regardless of the alternative used in the ROD< the proposed action in any alternative except A will result in more erosion, more road damage, and increased demands for maintenance. Increased maintenance, as the 2006 Coe study has revealed, will exacerbate the losses. In other workds, concentrating traffic on few routes is a significant concern in the consideration of cumulative impacts. | |
| Colorado 500 | 1032 | 12 | I would like you to correct a mistake in the Travel Plan. The mistake has its origin in the absence of an OHV Specialist on staff. Evidence that this lack of skills on staff has produced a serious omission in the Travel Plan is revealed by the following examples. 1) Ch.10 P.32: [.. Making management of this activity (OHV) more difficult...]. The fact is, recreation managers who are experienced in motor recreation will unequivocally disagree. Motorized users are actually the easiest to | |

BLM_0012453

manage.  However, if the recreations manager has no understanding of what the motor visitors seek, it will appear that motor recreation is harder to manage.   2) Discussions like this are not even in the analysis: 'Providing sufficient quality route opportunities gives the land manager enormous control, by proficing, removing, or moving, desireable access.  There are many nuances to "desirable:" destination, the difficulty level, the touring aspect of driving for pelasure, the sense of "going somewehre," and always important to every Moab visitor, the sightseeing.  3)  Appendix F, page F-3 through page F-17, Tables of Activity/Experience/Benefits.  These tables reveal a profound lack understanding of all motor recreation.  4) The absence (on the maps) of recreational mileage that the public has shown to MFO staff.  …the MFO staff has disregarded the BLM Washington Office Technical Reference 9113-1, "Planning and Conducting Route Inventories."  If MFO had an OHV specialist on staff this would be excusable.  We request that in the Travel Plan, five categories of routes for RMP level management be established, and general criteria (width, surface, level of improvement) be prepared for each, as follows:  1.  Commercial Routes ( O&G); 2. 2WD Routes; 3.  4WD Routes; 4. ATV Routes; and 5. Motorcycle Singletrack Routes.  This will qualify as a minor variation of the preferred alternative, and because it is well within the spectrum of Alternatives it is entitled to consideration under the authority of CEQ 1503.4, as explained in the 40 Questions 29b, "How must an agency respond to a comment on a draft EIS that raises a new alternative not previously considered which is a minor variation of one of the alternatives discusses in the draft EIS, but this fatiation was not given any consideration by the agency.  The answer is, in such a case, the agency should develop and evaluate the new alternative, if it is reasonable, in the

BLM_0012454

final EIS.  If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed."  In fact, a new alternative is not needed; rather, a simple modification of Alternatice C will satisfy the issue.  This will entail only two changes to the Travel Plan:  1) GIS data revisions so that all the routes in the database are included on the maps pending site-specific analysis, and each route is attributed with the siple criteria noted above.  2) Short descriptions of each type of route will be adeed to the Travel Plan narrative and to the Route Selection Criteria.  Including these descriptions will make it clear that the stipulations for each type of route will be very, very different than those for O&G roads.  This will facilitate the post-ROD decision steps required for implementation.  In the event that staff refuses to consider this minor variation, and wishes to leave the route selection crtiteria as it is presently written, please add the following true statement at the beginning of Page G-11, immediately prior to the discussion of route selection criteria:  "Full Disclosure:  Table 5 on page G-8 shows that the Moab ID Team lacks the skills to find existing motorcycle/ATV routes; and, the team's capacity to evaluate the purpose and need for recreational motorcycle, ATV, or 4-wheel-drive routes is severely constrained and impaired by the absence of a motorized recreation specialist, or any Team member who can offer serious discussion of the purpose and need for any given route or of the appropriate stipulations for each type of route.

450

BLM_0012455

| Socioeconomics | | | |
|---|---|---|---|
| **Organization** | **Record ID & Comment Number** | | **Comment Text** |
| State of Utah - Public Lands Policy Coordination | 120 | 39 | The economic impacts summary table 2-2 (pg. 2-78) for minerals is incomplete. It only mentions lease rental royalty payments for oil and gas. Severance tax and property tax should be addressed as economic benefits. The same table discusses the economic impacts of recreation through sales tax and employment (2,000 jobs), but fails to indicate whether or not those are low or high paying, seasonal or permanent jobs. |
| State of Utah - Public Lands Policy Coordination | 120 | 42 | None of the alternatives adequately analyze the loss of revenue from formally or effectively from eliminating mineral development in many of the lands subject to Special Designations and restrictive viewshed. |
| State of Utah - Public Lands Policy Coordination | 120 | 105 | Section 4.3.12-Socioeconomic Resource (pgs 4-252/277). BLM decisions to withdraw mineral lands from leasing (WSAs, etc.) directly affect the economic viablility of state trust lands inholdings. This should be acknowledged appropriately in the discussion of socioeconomic impacts. In particular, the BLM should assume that in addition to the decline in the number of wells drilled on BLM lands, there will be a proportionate decrease in the number of wells drilled on trust lands if Alternative B is adopted. |
| State of Utah - Public Lands Policy Coordination | 120 | 116 | A statewide social survey was conducted by Utah State University in 2007. The State provides the key survey results for Grand County (146 responses) and for San Juan County (124 responses). |

| **Response to Comment** |
|---|
| The economic benefits of severance taxes to the State of Utah as a whole are referenced on pg. 4-262. Information on the economic benefits of severance tax have been added to table 2-2. Property taxes levied on natural resources can be broken by commodity and county and this has been added to table 2-2 (pg. 279). The economic benefits of property taxes (ad valorem) are also discussed on pg. 4-262. Information on wage distribution for recreation jobs has been added to Chapter 3 (pg. 3-104). |
| On pg. 4-264 the royalty revenues generated under each alternative are provided for oil and gas. The Moab Field Office has only one producing locatable mineral mine (Lisbon copper mine) and revenues (severance and property taxes) from this do not vary across alternatives. |
| See comments 120-101 & 120-103 for an explanation of closed acreage by alternative. In Alt B, the loss of revenue from SITLA wells foregone has been calculated and added to the analysis on page 4-264. |
| The commentor provides an additional source of data not considered in the Draft RMP/EIS, due to the unavailability at the date of publication. The commentor has identified this data as preliminary and no conclusions are provided. This is a study done by Utah State University for the State of Utah (USU). The USU study surveyed residents of all Utah counties on an equal (equal sample size per county) |

BLM_0012456

| | | | | basis.  The commentor has not provided BLM with the raw data, but has compiled summary statistics by county. The survey is described as a social survey, and it "attempts to assess the ways in which Utah residents use and value public land resources, and their views about public land management".  Because it is a survey of a sample of the population, the results are not directly comparable to most of the state government agency-generated data used in the Draft RMP/EIS.  Portions of the study do not distinguish among types of public lands; in the study, this label includes all state and Federal lands, and not just BLM lands.  This makes some of the results more difficult to use in BLM planning and analysis since both counties in the MPA contain significant amounts of state, NPS and USFS lands.  Nonetheless, the study provides interesting results not available elsewhere, and the summaries for Grand and San Juan counties incorporated in Attachment B may be useful in future implementation actions.  None of the results provided affect either the formulation of alternatives in Chapter 2, nor the analysis of impacts in Chapter 4. Where appropriate, pertinent results are incorporated in Chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 12 | San Juan County commends the BLM for the effort that has been expended to better understand and portray socioeconomic impacts in this DRMP.  This has been a weakness in previous plans.  San Juan County encourages BLM to use studies done by Utah's universities to enhance this information such as the social survey undertaken by USU and the economic studies done by the U of U. Every NEPA action in the RMP should include a discussion on socioeconomic conditions and fully disclose all impacts. | The BLM has reviewed the Utah State University survey of rural counties conducted by the State of Utah.  The BLM has received preliminary data from this study received after completion of the Draft RMPM/EIS.  The BLM has incorporated findings in the PRMP/FEIS as appropriate.

The BLM has incorporated findings from recent research completed by the University of Utah's Bureau of Economic and Business Research into the PRMP/FEIS.

On a broad land use planning level, the BLM has disclosed the socioeconomic impacts from various resource actions as discussed in Chapter 4 of the |

452

BLM_0012457

| | | | | |
|---|---|---|---|---|
| | | | | DRMP/EIS. It is not practical to separate out the socioeconomic impacts of the many resource decisions specified in the plan. |
| San Juan County | 121 | 16 | The socio-economic analysis for oil and gas is inadequate. A study in Unitah County found that oil and gas account for 60% of total wages, with the average wage of an oil worker at $84,795. | On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. |
| San Juan County | 121 | 17 | Please explain how the extremely restrictive Alt. B would have only slightly lower economic benefits. Many of the new restrictions on oil and gas proposed in this RMP are not warranted. BLM should make reasonable adjustments in the preferred alternative. | The fiscal impacts have been described in Table 2.2 on pg. 2-78 (DRMP/EIS) in terms of royalty revenue. This table shows that royalty revenues will be reduced by 50% in Alt B. In addition property tax revenue, and severance tax data have been added to the table for the PRMP/FEIS and likewise show a 50% reduction in revenues in Alt B as compared to Alt C. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 117 | BLM's analysis is remiss in its assessment of impacts from oil and gas and off-road motorized recreation "with 80% of the planning area open to both uses". Such uses "will have lasting, even permanent, impacts on the lands in the Moab Planning Area". | SUWA's comment is too general, and it relies on a false premise that BLM's alternatives "open" 80% of the planning area to oil and gas leasing and OHV use. In fact, as the DEIS describes in detail, all action alternatives identify for non-motorized use more than 2500 miles of currently inventoried motorized routes. All action alternatives reduce open OHV acreage to zero or close to zero. Rather than "opening" large areas of the MPA to OHV use, the action alternatives greatly reduce such areas, which in turn should reduce (not increase) the impacts SUWA asserts will occur. The reduction in impacts to a large number of resources which would result from adoption of any of BLM's travel plan action alternatives are described in detail in Chapter 4 of the DEIS.<br><br>SUWA's comment that BLM fails to analyze the costs associated with of oil and gas leasing is unfounded. Chapter 4 uses the best available data to assess these impacts, and the associated cost (and benefits) of the various leasing action alternatives. Characterizing the MPA as being 80% "open" to oil and gas leasing blurs the real distinctions of the various leasing categories labeled |

BLM_0012458

| | | | | as "open', which range from relatively unrestricted to no surface occupancy.

SUWA provides no evidence to support their statement that the (misdescribed) BLM proposals for oil and gas and OHV management will have the lasting and permanent impacts |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 118 | The analysis of social and economic impacts is entirely speculative. | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used the best available data to assess impacts; in many cases, no data was available. In a landscape level plan such as the RMP, qualitative discussions are often all that are necessary (or even possible). |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 119 | BLM must collect and analyze actual data on the economic impacts of the alternatives. BLM should use a specific data source suggested by SUWA. | SUWA's comment is too general. SUWA offers no specifics as to what "actual" data BLM failed to use, nor does SUWA provide any detail as to where BLM erred in its analysis.

SUWA suggests that BLM should rely on the data sources and methodologies outlined in Socio-Economic Framework for Public Land Management Planning, published by the Wilderness Society. Most of the data sources described in this publication were used by BLM, especially in Chapter 3. The Economic Profile System (EPS), developed by the Sonoran Institute for the BLM, aggregates many of the federal data sources in The Wilderness Society's publication. Similarly, BLM incorporated the same Utah state government data sources as are included in The Society's document. Similarly, BLM used (preliminary) recreation data provided by the Forest service's NVUM data for the Moab Field Office.

SUWA incorporates several of the recommended analyses of the Society's document; these will be addressed in the responses to comments which follow. |

454

BLM_0012459

| | | | | The Wilderness Society is an advocacy group, and their recommendations are understandably focused towards their specific goals and objectives.  BLM, on the other hand, must take a broader view under its multiple-use, sustained yield mandate. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 120 | BLM must include a fiscal analysis of alternative implementation and mitigation costs.  The assumption that BLM would have the funding and workforce to implement the selected alternative is dubious.  For example, an alternative resulting in resource damage will require more money to mitigate this resource damage than a less damaging alternative.  It makes no sense for taxpayers to subsidize a more damaging and costly alternative when a less damaging, less costly alternative is available. | Chapter 4, page 3 states that BLM would have the funding and work force to implement the selected alternative.  Implicit in this assumption is that BLM will seek and obtain funding for implementation and mitigation.  BLM goes on to state:  All decisions, projects, activities, and mitigation for the alternatives would be completed as described in Chapter 2 and Appendix C (Surface Stipulations Applicable to all Surface Disturbing Activities).There is no requirement in NEPA to do the detailed analysis SUWA request; this is an implementation issued outside the scope of the current planning effort. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 121 | BLM should choose  a less costly alternative in order to save taxpayer money and mitigate resource damage.  It makes no sense for taxpayers to subsidize a more damaging and costly alternative when a less damaging, less costly alternative is available. | SUWA's comment that BLM's as yet unchosen alternative will be more costly than the (unspecified) alternative SUWA prefers is unsupported, SUWA provided no evidence that  BLM's proposed alternative (whichever one that is) would be more costly to implement than SUWA's (unspecified) alternative.  Furthermore, the comment that BLM's alternative would cause more resource damage is also unsupported. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 122 | In order to fully comply with NEPA, BLM must include the costs of implementing each alternative, the costs of mitigation plans within each alternative, the expected budget level and the probability of fully implementing the plan's mitigation measures.  SUWA bases this demand on CEQ memorandum on NEPA requirements cited in NEPA Compliance Manual, 2nd Edition, 1994. | See response to comment 124-120.\n\nAs evidenced by SUWA's citation presented in their comment, BLM is required in the EIS and ROD to indicate the "likelihood that such measures will be adopted or enforced by the responsible agencies."  BLM will fulfill this requirement in the appropriate documents.  SUWA's contention that this requirement means that BLM must calculate fully and compare the costs of each alternative is in error. |

BLM_0012460

|  |  |  |  | The CEQ Guidelines for Implementation of the Procedural Provisions of the NEPA does not require preparation of a cost-benefit analysis for all EISs.  The regulations state that "If (emphasis added) a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences (40 CFR 1502.23 Cost-benefit analysis).

The Federal Land Policy and Management Act (FLPMA) requires that BLM manage the public lands for Multiple Use.  Section 103 (c) of FLPMA defines Multiple Use as follows: "The term 'multiple use' means . . . Harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." Additionally, given that the implementation schedule for the RMP will vary in the future based on national priorities, available workforce, and funding, etc., there is no way to meaningfully evaluate costs and benefits of the alternatives.  Therefore, a cost-benefit analysis is not central to the planning effort and is not required for consideration of multiple-use planning alternatives.

After selection of an alternative to establish multiple use, costs and benefits of management actions may be considered, depending on priorities and funding.  The BLM's National Planning Handbook (H1601-1) notes that even during implementation of land use plans "there is no requirement to develop a cost/benefit analysis, but management actions that have a high likelihood of improving resource conditions for relatively small expenditures of time and money should receive relatively |

456

BLM_0012461

| | | | | higher priority (BM H-1601, IV. E. Developing Strategies to Facilitate Implementation of Land Use Plans). |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 124 | In order to accurately assess the potential impacts of the alternatives, the BLM must treat any additional oil and gas leasing as an industry gain, and compare all leasing alternatives to currently leased lands.  The currently leased land should be regarded as the status quo, not any additional leasing that may take place under any of the alternatives.  Comparisons of all the alternatives should be made against this status quo. | The  DRMP in Chapter 4, page 82 states:  "In accordance with BLM policy and its recognition of the National Energy Policy and Conservation Act of 2000 (EPCA), as discussed in Chapters 2 and 3, mineral resource development would be allowed throughout the Moab planning area subject to standard lease terms unless precluded by other program prescriptions, as specified in this Draft RMP."  The commentor's proposal is basically to start from a "no lease" alternative, which BLM is not required to do.

The No Action alternative (pg. 2-2 of the DRMP/EIS) "represents the continuation of existing managament under the current Grand Resource Area RMP(1985a), as amended".   This plan provides allocations for oil and gas leasing.  The current land use plan specifies the number of acres available for leasing with various restrictions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 125 | BLM's socioeconomic analyses focus almost exclusively on the potential benefits of increased oil and gas drilling and off-road motorized recreation, without corresponding analysis of the costs associated with these activities.  These costs include social impacts on local communities for example police and hospital services. | SUWA's premise in this comment is that the DRMP's "increase' the potential for leasing and for OHV recreation.  (This alleged increase is presumably in comparison to SUWA's leasing and travel plan alternatives provided during scoping and not to any of the action alternatives in the DRMP).  As described in detail throughout the DRMP. BLM's action alternatives place additional restrictions on leasing relative to the No Action alternative.  Similarly, all action alternatives identify for non-motorized use more than 2500 miles of vehicle routes currently available for motorized use.  Additionally, BLM reduces the amount of acreage "open" to unrestricted OHV use to zero or close to zero in all action alternatives.  These actions would reduce the litany of alleged costs that SUWA enumerates in its comment. These reductions are in response to the potential resource conflicts identified in Chapter 4. |

BLM_0012462

| | | | | BLM summarizes the (minor) costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. SUWA's reference to the impacts such activities have had in other parts of the West is unlikely to apply to the MPA. The RFD predicts relatively few wells will be drilled, would employ relatively few people and produce negligible adverse social impacts.  SUWA seems to be confusing the MPA with the large-scale development that has occurred in certain areas.  BLM's analysis is based on the RFD; SUWA has provided no evidence that the RFD is incorrect.  A recently completed study by the University of Utah concludes that less than 1 percent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 3. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 126 | The BLM must make a full assessment of the social and economic costs that will accrue as a result of implementing the oil and gas drilling (sic) in the alternatives as described in "The Economic and Social Impacts of Oil and Gas Development". | See response to comment 124-125.<br><br>SUWA seems to confuse the MPA oil and gas scenario with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development.  As described in Chapter 4, BLM does not expect to see significant oil and gas development in the MPA over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities. BLM's analysis is based on the RFD; if SUWA needs to provide evidence to support their contention.<br><br>The document cited by SUWA is not a peer-reviewed manuscript, but an advocacy position published by the Wilderness Society.  BLM has reviewed the publication, and has determined that there is no information which would altered the approach taken in the impact analyses of Chapter 4 in the DRMP.  Many of the issues raised in the paper have been addressed in responses to other comments in this section.  BLM believes that it is SUWA's |

BLM_0012463

| | | | | responsibility to indicate which specifics in the attached document are relevant to BLM's planning efforts, and where failure to follow the document's recommendations have resulted in error by the BLM.<br><br>It should be noted that much of what the document discusses refers to very large scale oil and gas development, a scenario which the MPA RFD considers unlikely. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 127 | New businesses will be harmed or deterred from locating in the Moab planning area "by the potential single-use industrialization of vast public lands" under the preferred alternative in the Draft RMP EIS. | SUWA's characterization of the BLM's preferred alternative as "single-use industrialization" is unfounded. (Its phrase suggests that SUWA's own travel plan, which identified more miles of motorized routes than any BLM action alternative, must be "super-industrialized"). BLM agrees that communities in the West rely less on natural resource extraction and more on non-commodity resources such as scenery and recreation opportunities. In its discussion of the impacts of minerals on socioeconomics, BLM emphasizes that the predicted activities would be relatively minor, and not likely to have significant impacts on local communities. In its discussion on the impacts of travel and recreation decisions on socioeconomics, Chapter 4, pp. 266-272, BLM outlines many of the potential benefits (and costs) to both local communities and visitors of the various action alternatives.<br><br>BLM recognizes in Chapter 3, pp. 104-107, the importance of what the Sonoran Institute calls "The New West", with its lower reliance on natural resource extraction. Throughout the DRMP, BLM recognizes the value of recreation and tourism to the local economy. BLM recognizes throughout its action alternatives the desirability of making decisions that will not adversely impact these all-important sectors of the MPA economy. SUWA implies that BLM's preferred alternative will negatively affect the local economy, but offers no |

BLM_0012464

| | | | | evidence to support that claim.   It is worth noting that in another section of SUWA's comments to the DRMP/DEIS, it asks the BLM to close all wilderness quality lands to commercial activities.  This would include those guides and outfitters in the Moab planning area whose business relies to some extent on these areas.  Many of these individuals are the very entrepreneurs for whose economic well-being SUWA expresses concern.

It is worth noting the growth the MPA economy has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market.  This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative, with its less restrictive leasing and OHV management).  There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these industries.

For the reasons outlined in Chapter 4, p.271, BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA economy in the context of OHV management.  BLM does recognize the potential for additional resource damage, as well as potential harm to the MPA economy from Alternative D's greater emphasis on motorized recreation.  This is discussed explicitly in Chapter 4, p. 272. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 128 | The BLM must make a thorough examination of the full socioeconomic impacts likely to occur if the management alternatives are implemented.  These impacts include impacts on the surrounding communities, including the costs of providing additional services, the long-term costs of the likely environmental damage, and the impacts on other sectors of the economy. | See response to comments 124-117, and 124-125 through 124-127. BLM has analyzed the socioeconomic impacts of its alternatives in Chapter 4.  SUWA asserts that surrounding communities will have additional costs of providing services, but provides no evidence to support this claim.  SUWA asserts that long-term environmental damage from BLM actions are "likely", but provide no specifics in this comment, let alone evidence.  The socioeconomic section of Chapter 4 does analyze the |

BLM_0012465

| | | | | |
|---|---|---|---|---|
| | | | | impacts of BLM actions on the "other "(undefined by SUWA) sectors of the economy; that is the purpose of that section. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 129 | The Draft EIS does not account for the non-market values associated with undeveloped wild lands. | The non-market values to which the commentor refers are not available to the BLM.  The studies of which the BLM is aware are based on designated wilderness, the results of which may or may not be generalized to other "wild lands".  Even if the studies are generalizable to Wilderness Study Areas (WSAs), the impacts are irrelevant, since WSA management is outside the scope of the current planning effort.  The BLM is unaware of any evidence  that such studies are generalizable to non-WSA lands with wilderness characteristics<br><br>FLPMA Section 202, (c) (4)states:<br>"In the development and revision of land use plans, the Secretary shall…rely, to the extent it is available, on the inventory of the public lands, their resources, and other values."<br><br>The BLM does recognize the potential importance of non-market values relative to managing for wilderness characteristics.  The lack of available data makes quantification outside the scope of the DRMP/EIS.  These values are discussed qualitatively in Chapter 4, pg. 265. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 131 | The BLM must measure and account for changes in non-market values associated with the levels of oil and gas drilling in this RMP.  To do otherwise omits a very important socioeconomic impact that is the direct result of management actions.  The BLM must assess the non-market impacts on the owners of the lands in the Moab Planning Area-all Americans.  This must include the passive use values of wilderness characteristics. | See response to comment 124-129.  .  The BLM does not dispute the value of non-market data.  SUWA's premise is that, were such non-market data available, it would show a "very important" socio-economic impact that is the direct result of management actions.  As stated fully in the BLM's response to comment 124-126, all the action alternatives place additional restrictions on oil and gas leasing in the Moab planning area (MPA) relative to the no action alternative.  Furthermore, the projected level of oil and gas activities in the MPA is very low, with consequently low expected socio-economic impacts. |

BLM_0012466

| | | | | SUWA's demand that the BLM assess the non-market impacts of planning decisions on "all Americans" is impossible to quantify.<br><br>The "passive use" value to which SUWA refers is another name for the non-market values discussed in the BLM's response to comment 124-129. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 132 | The significance criteria are incomplete because they only consider employment and population. A complete analysis should include all sources of income (including non-labor income) and the impacts of alternatives on these components of income. This is because of the importance of such income to retirees who are likely to leave the area as public lands become "severely degraded by motorized recreation and oil and gas (sic)." This in turn will reduce non-labor income from these departing retirees. | SUWA's premise is that the action alternatives will produce degradation to public lands to such an extent as to dissuade individuals (specifically retirees) from relocating to, or staying in, the Moab planning area (MPA). SUWA's claim that the BLM's action alternatives will result in such degradation is unsupported by any specific information. See responses to comments 124-125 through 124-127.<br><br>SUWA's claim that retirees are likely to relocate from the MPA is unsupported by any data or evidence. The BLM agrees that retirees are likely to be attracted to areas with natural amenities, but maintains that its planning decisions will not reduce such amenities, but should actually preserve and enhance them. Chapter 3, pgs. 103-104, discusses the importance of non-labor income and its potential association with natural amenities. See also response to comment 124-130.<br><br>The BLM is unaware of any methodology which reliably projects non-labor income and its components in a specific area over a 20 year period, let alone any method which could predict changes in these components likely to result from the BLM's action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 133 | The BLM must conduct an analysis of socio-economic impacts on incomes of businesses relying on the presence of protected public lands. It is "almost certain" that the reduction in acreage of lands being managed to protect wilderness characteristics from Alternative B to Alternative C "will result in vastly different social and | Chapter 4, pg. 4-265, discusses the likely impacts on the local economy of the various alternatives for managing non-WSA lands with wilderness characteristics. The BLM is unaware of any methodology which would identify those specific businesses relying on "protected public lands". The BLM is unaware of how any of its action |

462

| | | | | |
|---|---|---|---|---|
| | | | economic conditions in the planning area". | alternatives would negatively affect such businesses, and the commentor provides no evidence to the contrary.  In fact, the commentor has asked the BLM to close these lands to commercial use (see response to comment 124-112), which would presumably negatively impact those businesses (such as guides and outfitters) whose incomes are most closely.  The commentor does not provide any evidence to support its assertion that a reduction in the acreage managed for wilderness characteristics would result in "vastly different social and economic conditions".

The commentor repeats in this comment several misstatements from earlier comments.  The commentor asserts that Alternative C reduces from 15.2 % to 2.6 % the amount of lands in the Moab planning area (MPA) managed to maintain wilderness characteristics", and this is the reduction which will produce the negative impacts to those businesses relying on "protected public lands". The commentor's calculations ignore the primary component of "protected public lands" within the MPA, which is the approximately 350,000 acres of WSAs. Including this acreage in the category of protected public lands is a more meaningful measure of the actual acreage meeting this description.

Similarly, the commentor once again refers to the "80 %" of BLM lands available for motorized recreation in Alternatives B and C.  In fact, as repeated elsewhere in BLM's responses to this commentor's comments, all of BLM's action alternatives reduce the miles of routes available for motorized recreation by more than 2500 miles, and reduce the amount of acreage open to cross-country OHV use to zero or close to zero. |
| Southern Utah Wilderness Alliance | 124 | 134 | Section 4.3.12.2.10 fails to acknowledge that the vast majority of recreation visits to public lands are non-motorized and makes broad assumptions about the | SUWA provides no evidence to support its claim that 'the vast majority" of recreation visits to the Moab planning area (MPA) are non-motorized.  The only local data |

BLM_0012468

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | positive impacts of motorized versus non-motorized recreation.  There are several instances where contributions to the local economy are implied to be attributable to motorized recreation. | SUWA cites come from the 2007 National Visitation Use Monitoring (NVUM) study done for the Moab Field Office. All other data sources cited are either from areas outside the MPA, or aggregated to the extent that generalizing to the MPA is not possible. The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA; see response to comment 124-2.  It is not surprising, for example, that the top listed main activity was "Hiking / Walking/Trail run".  The design of the NVUM study resulted in 23 % of completed interviews occurring in Wilderness Study Areas, with the great majority of these interviews occurring specifically on the Negro Bill Canyon trail.<br><br>Even if one assumes that the NVUM data are definitive, it is incorrect to assert that the data indicate the "vast majority" are non-motorized recreationists.  For example, although the top two main activities are non-motorized, this does not mean that these respondents participated only in those activities while in the MPA.   This is recognized in the NVUM study:<br><br>"Because most BLM visitors participate in several recreation activities during each visit, participation rates usually exceed main activity rates.  After identifying their main recreational activity, visitors were asked how many hours they spent participating in that main activity during this BLM visit. Table 16 only gives the hours spent when the activity was identified as the MAIN activity.  Visitors who participated in this activity but not as a main activity might spend more or less time doing that activity (NVUM, p. 12)."<br><br>The "several instances" in the DRMP/EIS cited by SUWA which "imply" that contributions to the local economy are attributable to motorized recreation consist of a single quote from Chapter 4.  That quote (pg. 4-269) is very |

464

BLM_0012469

| | | | | |
|---|---|---|---|---|
| | | | | hedged, using terms such as "could be" and "it is possible". Nowhere does the BLM say (or imply) that all (or even most) of the recreation impacts on the local economy are attributable to motorized recreationists. Rather, the BLM acknowledges that the different action alternatives tend to favor one type of recreationists over another. Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. SUWA provides no evidence that any of the action alternatives will produce the negative impacts. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 135 | The analysis fails to break down spending between motorized and non-motorized recreationists. The BLM's own data indicate that the "overwhelming" number of visitors to the Moab area do not participate in motorized recreation. | See response to comment 124-134. the comentor mischaracterizes the National Visitation Use Monitoring (NVUM) data, which does not support the assertion of the "overwhelming" number of non-motorized visitors. The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. See response to comment 124-134. The commentor also seems to assume that the BLM has data indicating what each group (assuming that they are discrete entities) contributes to the local economy.<br><br>The BLM has no data to separate out motorized versus non-motorized recreation spending, even assuming that the two groups are completely distinguishable. The commentor provides no evidence that the existence of such data would change any of the BLM's conclusions in Chapter 4. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 136 | The preponderance of evidence is that most visitors are engaging in non-motorized recreation, making it likely that most visitor spending is due to the non-motorized recreation opportunities in the MPA. It is likely that, as the landscape becomes overrun by off-road vehicles, these users are likely to choose other destinations. | SUWA's comment consists of a series of unfounded claims, each one of which depends on the validity of the immediately preceding assertion. The BLM does not dispute the likelihood that most visitors are engaging in non-motorized recreation, at least as part of their recreation activities in the Moab planning area (MPA). |

BLM_0012470

| | | | This impact must be analyzed as part of the Final RMP EIS. | Except for the preliminary and non-generalizable National Visitation Use Monitoring (NVUM) data, the BLM has no means to be certain about this.   The BLM has no data to support SUWA's next assertion that most visitor spending is due to non-motorized recreation.  The BLM disputes SUWA's final assertion that the "overrunning" of the landscape by OHV users (presumably an impact of the BLM's action alternatives), will lead to a loss of visitation and visitor spending.<br><br>Under the current management plan (the no action alternative) in the DEIS/RMP the MPA has seen an explosive growth in its tourist and recreation-driven economy.  Visitation and spending to date does not seem to have been deterred by the "overrunning" of the landscape that one might expect to be occurring (given SUWA's predictions) under current management.   As has been repeatedly stated in these responses, all BLM action alternatives in the DRMP/EIS close more than 2500 miles of currently available routes to motorized recreation.  All BLM action alternatives reduce to zero or close to zero the amount of acreage open to OHV cross-country travel.  It is an extraordinary leap of logic to suggest that the great reduction in OHV opportunities incorporated in the action alternatives will contribute to degradation of the landscape and a loss of visitors and visitor spending.  The BLM believes that its recreation and travel management alternatives will increase and enhance opportunities and benefits for non-motorized recreationists.  The action alternatives dedicate more than 2500 miles of current vehicle routes to non-motorized use.  The action alternatives designate varying miles of new mountain bike routes.  The action alternatives close almost all of the MPA to cross-country OHV use, and eliminate altogether the category of "limited to existing roads and trails".  Alternatives B and C create several hiking and mountain biking focus areas, and identify |

466

BLM_0012471

| | | | | primitive hiking and backpacking SRMAs.  Alternatives B and C close all inventoried ways within Wilderness Study Areas to motorized travel.  The BLM under its multiple use mandate has considered the needs of a wide variety of recreationists in the DRMP/EIS alternative formulation. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 137 | Making 80 % of the Moab Field Office open to off-road vehicles is inappropriate given the small number of participants, the important values which will be lost to all Americans, and the potential high cost that will be imposed on Utah and the rest of the region from higher levels of off-road motorized recreation in the Moab planning area (MPA).  Off-road motorized recreation has well-documented costs which have been "completely ignored" in the DEIS.  These include (with literature citations) increased soils compaction and erosion and disrupted hydrological function, air pollution, impacts on vegetation, impacts on wildlife, foregone passive use benefits, foregone wilderness/roadless recreation benefits, personal injury and safety, law enforcement costs, and costs to taxpayers. | SUWA's operating premise that the DRMP/EIS action alternatives "make 80 per cent of the Moab Field Office open to off-road vehicles", and that these alternatives will produce higher levels of off-road motorized recreation is false.  See response to comments 124-133 and 124-135.  As stated repeatedly in the BLM's responses to SUWA's comments, the DRMP/EIS action alternatives close more than 2500 miles of routes available to motorized use and reduce to zero or near zero the amount of acreage "open" to OHV use (Alt C leaves open 1,833 acres open to cross country travel).  These facts differ from the 80 % figure SUWA repeatedly uses.

SUWA's list of the costs associated with OHV use might be applicable to some other, unspecified BLM planning area, but they are not applicable to the Moab DRMP/EIS.  As noted above, BLM's action alternatives greatly reduce the miles of routes and open areas available to motorized recreation.  In fact, even the least restrictive alternative (D) identifies for motorized use fewer miles of routes than SUWA's own travel plan submitted to the BLM during scoping.  Apparently, SUWA seems to ignore any OHV "costs" of travel on routes outside the lands it proposes for wilderness management.

As described in detail in Chapter 4, the BLM addressed the impacts from travel management to a wide variety of resources under its management.  SUWA provides no specifics as to where the BLM erred in its analysis, either for specific routes or specific resources.  The impacts on resources analyzed in Chapter 4 of the DRMP/EIS included many of the resources enumerated by SUWA, |

BLM_0012472

including soils, air quality, hydrology, riparian, vegetation, wildlife, and wilderness characteristics.  The BLM has never suggested that any of its management decisions are without impacts, including OHV and travel management decisions.  The BLM believes that its action alternatives, which greatly reduce both miles of motorized routes and open areas, should have a positive impact on the resources cited.  The BLM's responsibility is to disclose and analyze the effects of those decisions;  the BLM has fulfilled this responsibility in the analysis disclosed in Chapter 4.

Several of the costs and impacts enumerated by SUWA have been addressed in other responses to comments.  The responses to comments 124-129 and 129-130 address the issue of passive use benefits.   The responses to comments 124-133 and 124-134 address the issue of wilderness/roadless recreation benefits.  The responses to comments 124-120, 124-122 and 124-128 address the issue of economic costs to BLM and to local communities.  As regards SUWA's comment that BLM has ignored the risks to personal safety from OHV use, the BLM notes that it is beyond the scope of the plan to guarantee that individuals will follow commonly recognized OHV safety measures, as well as follow existing OHV laws and policies relating to safe operation.  See also Chapter 1, pg. 11-13, for a discussion of issues beyond the scope of the current planning effort.

The literature SUWA cites refers primarily to the impacts of cross-country travel, not to the impacts of restricting travel to designated routes as proposed in the DRMP/EIS.  Several of the studies were done in ecological and/or geological settings not necessarily relevant to the Moab planning area.  As stated above, the BLM has never implied that OHV use is without costs or impacts most of which result  from unrestricted cross-country travel.

BLM_0012473

| Independent Petroleum Assoc. of Mountain States | 203 | 26 | Despite the positive impacts from economic growth and opportunity from oil and gas development, the DRMP/EIS does not contain a comprehensive analysis of the restrictive management decisions and how they can constrain the current and future development. The socioeconomic analysis admits to this failure in section 4.3.12.1.3, where it is stated that "…it is not likely that BLM-related management decisions (apart from recreation decisions that could increase revenues to recreation-based businesses) would result in significant changes to current population trends." The BLM imposes several layers of severe restrictions on oil and gas development in the DRMP/EIS, and then claims that its decision only affects recreation revenues! This illustrates the fundamentally flawed nature of the analysis. | See response to comment 203-25.<br><br>As far as the commentor's concern with multiple management layers and restrictions, "layering" is a planning tool.  Under FLPMA's multiple-use mandate, the BLM manages many different resource values and uses on public lands.  Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives.  Under the multiple-use concept, the BLM does not necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands.  The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering".  The BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area.  Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation.  Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner.<br><br>Not all uses and values can be provided for on every acre.  That is why land use plans are developed through a public and interdisciplinary process.  The interdisciplinary process helps ensure that all resource values and uses are considered to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan.  Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.<br><br>The FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)).  As a |

469

| | | | | multiple-use agency, the BLM is required to implement laws, regulations and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans.  The BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (See, Appendix C, Land Use Planning Handbook "H-1601-1").  Specific decisions must be included in each of the alternatives analyzed during development of the land use plan.  As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.<br>For example, the BLM has separate policies and guidelines, as well as criteria, for establishing ACECs and when the WSAs were established.  These differing criteria make it possible that the same lands will qualify as both an ACEC and a WSA but for different reasons.  The BLM is required to consider these different policies.<br><br>See also response to comment 203-16. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 27 | The full positive economic impact of mineral development in the planning area was not adequately analyzed, nor did the document analyze the negative impact associated with the severe restrictions called for in the proposed Preferred Alternative C. In fact, in Table 2.2, page 2-78 – 2-79, it is stated that under Alternative B, the long-term economic benefits from oil and gas would be slightly less than current circumstances or if Alternatives C or D were adopted. It defies logic how the extremely restrictive Alternative B would have only slightly lower economic benefits from oil and gas when it would place so many restrictions on development. Clearly, that analysis lacks depth.<br>It also defies logic that Alternative B, with 43% less acreage available for oil and gas leasing, would result in | See responses to comment 203-25 and 203-26.<br><br>The BLM is unable to determine how the commentor arrived at the conclusion that Alternative B has 43 per cent less acreage available for oil and gas leasing.  In fact, Alternative B closes to oil and gas leasing an additional 318,000 acres compared to Alternative A, a reduction of 21.7 per cent.  Furthermore, the BLM's preferred alternative (Alternative C) closes to leasing an additional 17,000 acres relative to Alternative A, a reduction of 4.8 per cent.  This is explicitly described in Table 4.38 of the DRMP/DEIS. |

470

| | | | | |
|---|---|---|---|---|
| | | | such a small negative economic impact. IMPAMS believes the economic analysis fails to account for the lost opportunities due to proposed management decisions, and seriously underestimates the negative impact of Alternative B and other restrictions proposed in the DRMP/EIS. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 28 | Each alternative contained in the DRMP/EIS includes some lands closed to energy resource development. Such closures are based on the BLM's assessment of resource values on those lands, but closure also has implications in terms of national energy consumption and commodity prices, foregone employment opportunities, tax revenues and support for state and local economies. Although BLM must necessarily base land use decisions on consideration of all resource values, social and economic impacts of closure decisions should be estimated to fulfill the agency's mandate under FLPMA, and to comply with guidelines contained in the BLM's Land Use Planning Handbook (H-1601-H) and Instruction Memorandum No. 2002-167. | See response to comment 203-25.\n\nThe BLM has expanded its discussion of fiscal impacts to state and local governments in Chapter 4 of the DRMP/DEIS. |
| Independent Petroleum Assoc. of Mountain States | 203 | 29 | BLM also fails to disclose how the restrictions may combine to increase the consumer cost of gas which may be disproportionately borne by low-income populations. Executive Order 12898, Federal Actions to Address Environmental Justice in Minority and Low-Income Populations, 59 Fed Reg 7629 (1994). | The DRMP/DEIS Environmental Justice analysis in section 3.13.3 follows Executive Order 12898. This analysis determined there are no environmental justice populations in the socioeconomic study area. In addition, oil and gas development in the DRMP/DEIS study area is not large enough relative to total national and global oil and gas development to impact pump prices. Therefore, low-income communities would not be disproportionately impacted from oil and gas development restrictions by the DRMP/DEIS. Thus, actions required to identify and mitigate impacts to such populations are not required. |
| Independent Petroleum Assoc. of Mountain States | 203 | 30 | In Section 3.13.1.6.2, the BLM acknowledges that the unemployment level in Grand County is nearly twice the state average and San Juan County has the highest unemployment in the state at 11%. Despite this recognition, many of the prescriptions in the DRMP/EIS | See responses to comments 203-25 and 203-26. |

BLM_0012476

| | | | | |
|---|---|---|---|---|
| | | | would limit economic activity by restricting access to oil and gas development. The DRMP/EIS does not properly assess the effects restrictive land management decisions will have on the local economy, and the opportunities denied by severely restricting access to energy resources through a whole range of overlapping restrictions including wilderness-like designation of land, NSO, CSU, VRM, timing limitations, and others. Rather than providing the opportunity for developing energy resources, which would create jobs and diversify the economy away from low-paid, seasonal tourism and recreation jobs, the BLM is proposing land management measures that would restrict the rural economy. | |
| Independent Petroleum Assoc. of Mountain States | 203 | 31 | Further, on page 4-261, it is stated that "it is not likely that the employment derived from the drilling and completion of wells in the area would positively impact poverty or unemployment rates in Grand and San Juan counties." This statement fails to take into account the indirect employment that derives from oil and gas development. In areas throughout Utah and the Intermountain West, areas experiencing oil and gas development generate thousands of jobs in local communities, besides the direct drilling and completion crews. These crews consume services in the local economy, but more importantly, local jobs are created by service and supply companies in areas where drilling occurs, many more than the direct drilling jobs created. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain States | 203 | 32 | A recent study by the University of Utah's Bureau of Economic and Business Research, which is attached in IPAMS Appendix D, found that the oil and gas industry in Uintah and Duchesne counties accounts for 49.5% of employment and 60% of total wages. The average wage for exploration and production jobs is $84,795, about 86% higher than the average wage for recreation jobs. These numbers include direct employment numbers of 19.9% of employment and 34.8% of total wages. This shows that the 19.9% of direct employment | See response to comment 203-25. |

BLM_0012477

| | | | | |
|---|---|---|---|---|
| | | | is multiplied throughout the economy and results in 49.5% of employment, with a similar multiplier effect for wages from 34.8% to 60%. There is no reason to assume, as in the DRMP/EIS, that the same type of multiplier effect would not be seen in Grand and San Juan Counties. The University is working on an additional phase of the study throughout the state. IPAMS recommends that the results of further phases of that study, The Structure and Economic Impact of Utah's Oil and Gas Industry, for Grand and San Juan counties, which will be out in early 2008, be included in the socio-economic analysis in the final RMP/EIS. *See attachment D* | |
| Independent Petroleum Assoc. of Mountain States | 203 | 33 | Section 3.13.1.6.3 points out that per capita personal income has fallen in Grand and San Juan counties in comparison to the rest of the state as mineral activity declined in the area.  With the rise in the economic and technical feasibility of developing unconventional resources like those found in the MPA and across the West, Grand and San Juan counties again stand to benefit from oil and gas development. However, the management proposals contained in the DRMP/EIS would constrain that growth and create missed opportunities for the citizens of Grand and San Juan counties.<br>Section 3.13.1.6.5 goes on further to state that "Resident spending of non-local income (dividends, interest, rent) accounted for about 16% of all jobs in the four counties studied. This type of income is closely linked to the type of wealthy households that tend to retire in amenity rich, resort type communities. Again, Grand County may be moving in this direction.<br>I think citizens of Grand County, especially those who have been in the area for many generations, would be appalled to learn that the vision of the BLM has for their county is one of protected lands so that outsiders can come and retire there, living off their retirement and | See response to comments 203-25 and 203-26.<br><br>The commentor seems to assume that amenity-rich communities must choose between retirees and local residents.  As discussed in Chapter 3 of the DRMP/DEIS, retirees (as well as second home owners) can make significant contributions to the incomes of local residents. One of the fastest growing segments of the Grand County economy, for example has been construction, much of which is caused by new home construction.  Similarly, the tourism industry is the major component of the Grand County economy, providing employment opportunities for long-term and newly arrived residents alike.  The commentor is in error in the assumption that the BLM's vision "is one of protected lands so that outsiders can come and retire there, living off their retirement and investment income".  The DRMP/DEIS contains no such statement or implication.<br><br>The commentor assumes that, were it not for BLM decisions, there would be a large increase in minerals-related employment in the planning area.  In fact, the commentor's own organization's assisted study underscores the very low presence of this industry in the |

BLM_0012478

| | | | | |
|---|---|---|---|---|
| | | | investment income. IPAMS speculates that the local community would like good opportunities in their communities, so that their children do not have to go off to Salt Lake City or Denver to make money. The citizens of Grand and San Juan counties have the opportunity to benefit from reasonable development of their oil and gas resources so that they can build up their investment portfolios, rather than being relegated to low-paying tourism jobs and service jobs for wealthy retirees. That is the economic vision that IPAMS believes the BLM should support in the DRMP/EIS, not the one of keeping the locals in low-paying service jobs for wealthy outsiders. | local economy. |
| Independent Petroleum Assoc. of Mountain States | 203 | 34 | Section 3.13.1.6.7 states that the tourist contribution to the Grand County economy continues to remain around $100 million per year.  There should be a similar statement of the contribution of the oil and gas industry to the economy, and the projected contribution for each of the Alternatives. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain States | 203 | 35 | Despite the deference given to the tourism sector of the economy in the DRMP/EIS, the analysis goes on to project that tourism-related revenues appear to have leveled off and are not expected to make gains in the future. A more balanced DRMP/EIS would enable the local economy  to continue to enjoy the steady benefits of the tourism economy while achieving growth through responsible energy development that is not artificially restricted as proposed in the DRMP/EIS. | See response to comment 203-25. |
| Independent Petroleum Assoc. of Mountain States | 203 | 36 | On page 3-113, the analysis of the contribution of mineral resources, which as mentioned above does not provide an overall economic contribution of oil and gas, notes that production peaked in 1994 and has declined since. However, since the data stops at 2000, just about the time that oil and gas commodity prices started to rise, and coupled with advances in the technology to recover unconventional resources, production throughout Utah and the Intermountain west started to | The BLM has incorporated updated production data in Chapter 3 of the DRMP/DEIS.  State of Utah (Utah Division of Oil, Gas and Mining) data shows a continuing decline in production in Grand County through 2007.  The BLM acknowledges that production could increase in the future, and has incorporated its predictions of future well activity in its RFD. |

474

BLM_0012479

| | | | | |
|---|---|---|---|---|
| | | | soar. In fact, production throughout the Rockies has increased by 69% since 1996, as shown in the graph below. Development of unconventional resources in the MPA is on the cusp of similar growth. Therefore the analysis is outdated and does not realistically assess the economic contributions of the industry. *see graph in letter* | |
| Independent Petroleum Assoc. of Mountain States | 203 | 37 | The Sonoran Institute, the Wilderness Society, and other groups devoted to wilderness designation and opposed to oil and gas development have released studies over the years minimizing the economic importance of the industry and claiming that protected public lands actually result in a greater economic benefit than mineral extraction. Despite the obvious bias of these studies being done by groups that are advocating for more wilderness, these studies are fundamentally flawed in several respects. (We acknowledge that IPAMS could be accused of bias in the opposite direction, were we to issue our own studies. That is why we instead use studies and data from unbiased, third-party organizations such as the University of Utah and the Colorado School of Mines.) We urge the BLM not to be confused by these subjective studies and fall into the trap of minimizing an important industry for rural economies in the MPA, Utah and throughout the Intermountain West. A further problem with studies such as the Wilderness Society study is that they are based on old data which excludes the benefits experienced in the Intermountain West form the phenomenal growth of the industry from 2000 to present. In fact, a Wilderness Society report is one of the references for the DRMP/EIS. IPAMS urges the BLM to reconsider any analysis based on the Wilderness Society report, given the biased, unscientific nature of their work. | See response to comment 203-25.  The BLM has not "incorporated" studies by the Wilderness Society, but has referenced them in guarded terms.  The BLM has also incorporated studies done by the University of Utah for the State of Utah; these studies, it should be noted, were done with IPAM's support and assistance. |
| Independent Petroleum | 203 | 38 | Surface disturbance from oil and gas exploration and production activities is calculated at 15 acres per well in | The analysis assumption utilized in Chapter 4 of the DRMP/EIS pertaining to surface disturbance for oil and |

BLM_0012480

| | | | | |
|---|---|---|---|---|
| Assoc. of Mountain States | | | the MPA.  This is out of line with the usual calculation of surface disturbance used by the BLM throughout the Intermountain West. Usually the BLM calculates surface disturbance as five acres per well.  While it could be argued that disturbance would be greater in the MPA because of the remote locations and thus more miles of roads are necessary, this argument does not stand up because many locations throughout the West are just as remote. Surface disturbance throughout the DRMP/EIS should be recalculated using the standard 5 acres per well. | gas development is 15 acres per well.  This estimate  is based on the BLM's experience.  The remoteness of the area requires more miles of roads and utilities. |
| Glen Canyon Group | 209 | 57 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507 The population data, along with other demographic and housing data in Chapter Three are taken from the 2000 Census, as analyzed by the Sonoran Institute. Had BLM consulted the Utah Governor's Office of Planning and Budget, they could have considered, as well, reliable estimates for year 2005 and projections to 2015 and 2025 for Grand and San Juan Counties. The Governor's Office also makes estimates and projections for employment figures. | The BLM is aware of these other data sources, but incorporating them in the document would make no difference in the impact analysis. This is because growth projections for both Grand and San Juan Counties are well below the projections for Utah as a whole.  For example, the growth rate in Grand County is projected at below one percent annually (0.85%) from 2000 through 2025, which is less than half the projected rate for the state of Utah.  In terms of population density, Grand and San Juan counties would still have very low population densities by both state and national standards. |
| Glen Canyon Group | 209 | 58 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507 …the population increases of concern are not of the resident populations of these two counties, but the fast growing Wasatch Front of Utah and all parts of Colorado. According to the National Visitor Use Monitoring study conducted by the MFO in fiscal year 2006, these are the sources of most travelers to the Moab District. The single zip code with the greatest number of visitors, 82, was 84532 which is Grand County. There were an additional 117 from other parts of Utah principally the Wasatch Front. But even more than Utahns were Colorado visitors – there were 210 of them. They come for fun and recreation, for refuge and relaxation, for peace and quiet. Some observers | The BLM does not dispute the potential growth rates for the Wasatch Front or Colorado Front Range areas.  The BLM does not disupte that these areas will continue to provide visitors to the Moab area.  The commentor provides no evidence to support the assertion that displacement of OHV users from Colorado to the Moab area has occurred due to tighter restrictions on OHV use in Colorado.  Even if this were the case, the action alternatives in the DRMP/DEIS greatly reduce the acreage open to OHV travel, as well as the miles of routes identified for motorized use. To the extent that Colorado visitors come to the Moab area for the types of quiet recreation the commentor describes, the action alternatives should provide more of |

BLM_0012481

| | | | | |
|---|---|---|---|---|
| | | | contend that displacement would occur if there were tighter restrictions on OHV travel in the MFO. We would argue that such displacement has already taken place, but in reverse – I.e., tighter restrictions in Colorado have led to their visiting Utah for cross country and other off-highway activities. | these opportunities. |
| Glen Canyon Group | 209 | 59 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507<br>Chapter four shows relatively few if any differences among alternatives in Socioeconomic impacts, whether beneficial, adverse, or unspecified. No differences were projected in Environmental justice, PILT payments, Population, Fire management, Health and safety management, Lands and realty, Locatable minerals, Salable minerals, Paleontological resource decisions, Riparian decisions, Soil/Watershed, Wilderness Study Areas and Wilderness areas, Special status species, Vegetation decisions, and Woodland decisions. | The commentor reiterates the BLM's findings and does not suggest any errors in data or analysis.  The BLM concurs. |
| Glen Canyon Group | 209 | 60 | Re: Socioeconomic Resources Pages 3-95 thru 3-118, 4-252 thru 4-277, 4-49 and 4-507<br>We were struck by the conclusion in this section comparing Alternatives B and C that "adverse social and economical impacts as a result of decreases in OHV use are not likely regardless of alternative selected." This contrasts with the section on Recreation and Travel, in which they postulated that such a decrease under Alternative B would reduce tax revenues to local governments. This comes with the caveat, however, that it is impossible quantify the proportions of recreational expenditures which are attributed to resident consumers versus non-recreational consumers. (page 4-269)<br><br>There also socio-cultural and technological trends which impact planning and which BLM did not consider such as inter-peer texting, promotion of more "fun" and capable motor vehicles, or, conversely, a greater | The BLM's discussion to which the commentor refers is heavily qualified, due to the lack of available data on which to project economic impacts from changes from recreation patterns under the various action alternatives. On pg. 4-269 of DRMP/EIS, the BLM argues that should OHV use decline in the planning area, it is possible that there could be a decline in local revenues.  The BLM does not state that such a decline is likely, which is consistent with the statement quoted by the commentor.<br><br>The BLM agrees with the commentor that there are likely to be a large number of socio-cultural and technological developments which the plan does not (and cannot) consider.  Many of these are so speculative as to make their inclusion and subsequent impact analysis equally speculative.  A recent (February, 2008) publication of the National Academy of Sciences, for example, showed a very large decline in the pursuit of certain outdoor recreational activities, and postulates that a cause may be |

BLM_0012482